IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
     In re                              :    Chapter 11
                                            :
DELPHI CORPORATION, et al.,                 :    Case No. 05-44481 (RDD)
                                            :
                Debtors.   :    (Jointly Administered)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AFFIDAVIT OF SERVICE

     I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants, LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

     On April 13, 2007, I caused to be served the document listed below (i) upon the parties listed on Exhibit A hereto via overnight delivery, (ii) upon the parties listed on Exhibit B hereto via electronic notification and (iii) upon the parties listed on Exhibit C hereto via postage pre-paid U.S. mail:

1) Debtors' Objection to Motion by Furukawa Electric North America APD and Furukawa Electric Co., Ltd., For (A) Abstention Pursuant to 28 U.S.C. Section 1334(c) (B) Relief From Automatic Stay Pursuant to 11 U.S.C. 362(d) and (C) An Order Limiting the Scope of the Third Omnibus Claim Objection Hearing (Docket No. 7678) [a copy of which is attached hereto as Exhibit D]

2) Debtors' Objection to Motion by Wachovia Bank, National Association, for Relief from Automatic Stay to Proceed With Litigation Against Larry Graves, a Delphi Employee, in the Circuit Court of the Second Judicial District of Hinds County Mississippi (Docket No. 7680) [a copy of which is attached hereto as Exhibit E]

On April 16, 2007, I caused to be served the documents listed below upon the party listed on Exhibit F hereto via overnight delivery:

3) Debtors' Objection to Motion by Wachovia Bank, National Association, for Relief from Automatic Stay to Proceed With Litigation Against Larry Graves, a Delphi Employee, in the Circuit Court of the Second Judicial District of Hinds County Mississippi (Docket No. 7680) [a copy of which is attached hereto as Exhibit E]

Dated: April 16, 2007

_____*/s/ Evan Gershbein*_____
Evan Gershbein

Subscribed and sworn to (or affirmed) before me on this 16th day of April, 2007, by Evan Gershbein, personally known to me or proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: _____*/s/ Shannon J. Spencer*_____

Commission Expires: _____*6/20/10*_____

# EXHIBIT A

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2491 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Counsel to Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel to Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com sliviri@ffhsj.com | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel to Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 152 West 57th Street | 35th Floor | New York | NY | 10019 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Internal Revenue Service | Attn: Insolvency Department | 477 Michigan Ave | Mail Stop 15 | Detroit | MI | 48226 | 313-628-3648 | 313-628-3602 | | Michigan IRS |
| Internal Revenue Service | Attn: Insolvency Department, Maria Valerio | 290 Broadway | 5th Floor | New York | NY | 10007 | 212-436-1038 | 212-436-1931 | mariaivalerio@irs.gov | IRS |
| IUE-CWA | Conference Board Chairman | 2360 W. Dorothy Lane | Suite 201 | Dayton | OH | 45439 | 937-294-7813 | 937-294-9164 | | Creditor Committee Member |
| Jefferies & Company, Inc. | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Maritza Ramos | 270 Park Avenue 15th Fl | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | maritza.ramos@chase.com | Prepetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Thomas F. Maher, Richard Duker, Gianni Russello | 270 Park Avenue | | New York | NY | 10017 | 212-270-0426 | 212-270-0430 | thomas.f.maher@chase.com richard.duker@jpmorgan.com gianni.russello@jpmorgan.com | Postpetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | Sheryl Betance | 2335 Alaska Ave | | El Segundo | CA | 90245 | 310-823-9000 | 310-823-9133 | sbetance@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Law Debenture Trust of New York | Daniel R. Fisher | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 3

4/16/2007 11:05 AM
Master Service List Overnight Mail

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Law Debenture Trust of New York | Patrick J. Healy | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |
| McDermott Will & Emery LLP | David D. Cleary | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | dcleary@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Jason J. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | jdejonker@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Mohsin N. Khambati | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | mkhambati@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Peter A. Clark | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | pclark@mwe.com | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | 213-629-5063 | gbray@milbank.com tkreller@milbank.com jtill@milbank.com | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | ServeAG@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | garrick.sandra@pbgc.gov efile@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel to the Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | 2122185500 | 2122185526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel to Wamco, Inc. |

In re Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 3

4/16/2007 11:05 AM
Master Service List Overnight Mail

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Tyco Electronics Corporation | MaryAnn Brereton, Assistant General Counsel | 60 Columbia Road | | Morristown | NJ | 7960 | 973-656-8365 | 973-656-8805 | | Creditor Committee Member |
| United States Trustee | Alicia M. Leonhard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | 212-510-0500 | 212-668-2255 does not take service via fax | | Counsel to United States Trustee |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel to the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Harvey R. Miller | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8500 | 212-310-8077 | harvey.miller@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

4/16/2007 11:05 AM
Master Service List Overnight Mail

# EXHIBIT B

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2491 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Counsel to Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel to Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com sliviri@ffhsj.com | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel to Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 152 West 57th Street | 35th Floor | New York | NY | 10019 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Jefferies & Company, Inc. | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Maritza Ramos | 270 Park Avenue 15th Fl | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | maritza.ramos@chase.com | Prepetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Thomas F. Maher, Richard Duker, Gianni Russello | 270 Park Avenue | | New York | NY | 10017 | 212-270-0426 | 212-270-0430 | thomas.f.maher@chase.com richard.duker@chase.com gianni.russello@jpmorgan.com | Postpetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | Sheryl Betance | 2335 Alaska Ave | | El Segundo | CA | 90245 | 310-823-9000 | 310-823-9133 | sbetance@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Law Debenture Trust of New York | Daniel R. Fisher | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| Law Debenture Trust of New York | Patrick J. Healy | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |
| McDermott Will & Emery LLP | David D. Cleary | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | dcleary@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Jason J. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | jdejonker@mwe.com | Counsel to Recticel North America, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 3

4/16/2007 11:04 AM
Master Service List Email

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| McDermott Will & Emery LLP | Peter A. Clark | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | pclark@mwe.com | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | 213-629-5063 | gbray@milbank.com tkreller@milbank.com jtill@milbank.com | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | ServeAG@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | efile@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel to the Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | 2122185500 | 2122185526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel to Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel to the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Harvey R. Miller | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8500 | 212-310-8077 | harvey.miller@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 3

4/16/2007 11:04 AM
Master Service List Email

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

4/16/2007 11:04 AM
Master Service List Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Airgas, Inc. | David Boyle | 259 Radnor-Chester Road, Suite 100 | P.O. Box 6675 | Radnor | PA | 19087-8675 | | 610-230-3064 | 310-687-1052 | david.boyle@airgas.com | Counsel to Airgas, Inc. |
| Ajamie LLP | Thomas A. Ajamie | 711 Louisiana | Suite 2150 | Houston | TX | 77002 | | 713-860-1600 | 713-860-1699 | tajamie@ajamie.com | Counsel to SANLUIS Rassini International, Inc.; Rassini, S.A. de C.V. |
| Akin Gump Strauss Hauer & Feld, LLP | Peter J. Gurfein | 2029 Centure Park East | Suite 2400 | Los Angeles | CA | 90067 | | 310-552-6696 | 310-229-1001 | pgurfein@akingump.com | Counsel to Wamco, Inc. |
| Allen Matkins Leck Gamble & Mallory LLP | Michael S. Greger | 1900 Main Street | Fifth Floor | Irvine | CA | 92614-7321 | | 949-553-1313 | 949-553-8354 | mgreger@allenmatkins.com | Counsel to Kilroy Realty, L.P. |
| Alston & Bird, LLP | Craig E. Freeman | 90 Park Avenue | | New York | NY | 10016 | | 212-210-9400 | 212-922-3891 | craig.freeman@alston.com | Counsel to Cadence Innovation, LLC |
| Alston & Bird, LLP | Dennis J. Connolly; David A. Wender | 1201 West Peachtree Street | | Atlanta | GA | 30309 | | 404-881-7269 | 404-253-8554 | dconnolly@alston.com dwender@alston.com | Counsel to Cadence Innovation, LLC |
| Ambrake Corporation | Brandon J. Kessinger | 300 Ring Road | | Elizabethtown | KY | 42701 | | 270-234-5428 | 270-737-3044 | bkessinger@akebono-usa.com | Representative for Ambrake Corporation |
| American Axle & Manufacturing, Inc. | Steven R. Keyes | One Dauch Drive, Mail Code 6E-2-42 | | Detroit | MI | 48243 | | 313-758-4868 | | steven.keyes@aam.com | Representative for American Axle & Manufacturing, Inc. |
| Andrews Kurth LLP | Gogi Malik | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | gogimalik@andrewskurth.com | Counsel to ITW Mortgage Investments IV, Inc. |
| Andrews Kurth LLP | Monica S. Blacker | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | mblacker@andrewskurth.com | Counsel to ITW Mortgage Investments IV, Inc. |
| Angelo, Gordon & Co. | Leigh Walzer | 245 Park Avenue | 26th Floor | New York | NY | 10167 | | 212-692-8251 | 212-867-6395 | lwalzer@angelogordon.com | |
| Anglin, Flewelling, Rasmussen, Campbell & Trytten, LLP | Mark T. Flewelling | 199 South Los Robles Avenue | Suite 600 | Pasadena | CA | 91101-2459 | | 626-535-1900 | 626-577-7764 | mtf@afrct.com | Counsel to Stanley Electric Sales of America, Inc. |
| Arent Fox PLLC | Mitchell D. Cohen | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Cohen.Mitchell@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arent Fox PLLC | Robert M. Hirsh | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Hirsh.Robert@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arnall Golden Gregory LLP | Darryl S. Laddin | 171 17th Street NW | Suite 2100 | Atlanta | GA | 30363-1031 | | 404-873-8120 | 404-873-8121 | dladdin@agg.com | Counsel to Daishinku (America) Corp. d/b/a KDS America ("Daishinku"), SBC Telecommunications, Inc. (SBC) |
| Arnold & Porter LLP | Joel M. Gross | 555 Twelfth Street, N.W. | | Washington | D.C. | 20004-1206 | | 202-942-5000 | 202-942-5999 | joel_gross@aporter.com | Counsel to CSX Transportation, Inc. |
| ATS Automation Tooling Systems Inc. | Carl Galloway | 250 Royal Oak Road | | Cambridge | Ontario | N3H 4R6 | Canada | 519-653-4483 | 519-650-6520 | cgalloway@atsautomation.com | Company |
| Barack, Ferrazzano, Kirschbaum Perlman, & Nagelberg LLP | Kimberly J. Robinson | 333 West Wacker Drive | Suite 2700 | Chicago | IL | 60606 | | 312-629-5170 | 312-984-3150 | kim.robinson@bfkpn.com | Counsel to Motion Industries, Inc. |
| Barack, Ferrazzano, Kirschbaum Perlman, & Nagelberg LLP | William J. Barrett | 333 West Wacker Drive | Suite 2700 | Chicago | IL | 60606 | | 312-629-5170 | 312-984-3150 | william.barrett@bfkpn.com | Counsel to Motion Industries, Inc. |
| Barnes & Thornburg LLP | Alan K. Mills | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | alan.mills@btlaw.com | Counsel to Mays Chemical Company |
| Barnes & Thornburg LLP | John T. Gregg | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3930 | 626-742-3999 | john.gregg@btlaw.com | Counsel to Priority Health; Clarion Corporation of America |
| Barnes & Thornburg LLP | Mark R. Owens | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | mark.owens@btlaw.com | Counsel to Clarion Corporation of America |
| Barnes & Thornburg LLP | Michael K. McCrory | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | michael.mccrory@btlaw.com | Counsel to Gibbs Die Casting Corporation; Clarion Corporation of America |
| Barnes & Thornburg LLP | Patrick E. Mears | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3936 | 616-742-3999 | pmears@btlaw.com | Counsel to Armada Rubber Manufacturing Company, Bank of America Leasing & Leasing & Capital, LLC, & AutoCam Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 20

4/16/2007 11:06 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Barnes & Thornburg LLP | Wendy D. Brewer | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | wendy.brewer@btlaw.com | Counsel to Gibbs Die Casting Corporation |
| Bartlett Hackett Feinberg P.C. | Frank F. McGinn | 155 Federal Street | 9th Floor | Boston | MA | 02110 | | 617-422-0200 | 617-422-0383 | ffm@bostonbusinesslaw.com | Counsel to Iron Mountain Information Management, Inc. |
| Beeman Law Office | Thomas M Beeman | 33 West 10th Street | Suite 200 | Anderson | IN | 46016 | | 765-640-1330 | 765-640-1332 | tom@beemanlawoffice.com | Counsel to Madison County (Indiana) Treasurer |
| Bernstein Litowitz Berger & Grossman | Hannah E. Greenwald | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1411 | 2125541444 | hannah@blbglaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Bernstein Litowitz Berger & Grossman | John P. Coffey | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1409 | 2125541444 | sean@blbglaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Bernstein Litowitz Berger & Grossman | Wallace A. Showman | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1429 | 212-554-1444 | wallace@blbglaw.com | Counsel to SANLUIS Rassini International, Inc.; Rassini, S.A. de C.V. |
| Berry Moorman P.C. | James P. Murphy | 535 Griswold | Suite 1900 | Detroit | MI | 48226 | | 313-496-1200 | 313-496-1300 | murph@berrymoorman.com | Counsel to Kamax L.P.; Optrex America, Inc. |
| Bialson, Bergen & Schwab | Kenneth T. Law, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | klaw@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc.. |
| Bialson, Bergen & Schwab | Lawrence M. Schwab, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | lschwab@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc.; Solectron Corporation; Solectron De Mexico SA de CV; Solectron Invotronics; Coherent, Inc.; Veritas Software Corporation |
| Bialson, Bergen & Schwab | Patrick M. Costello, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | pcostello@bbslaw.com | Solectron Corporation; Solectron de Mexico SA de CV; Solectron Invotronics and Coherent, Inc. |
| Bialson, Bergen & Schwab | Thomas M. Gaa | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | tgaa@bbslaw.com | Counsel to  Veritas Software Corporation |
| Bingham McHale LLP | John E Taylor Michael J Alerding Whitney L Mosby | 10 West Market Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-635-8900 | 317-236-9907 | jtaylor@binghammchale.com malerding@binghammchale.com wmosby@binghammchale.com | Counsel to Universal Tool & Engineering co., Inc. and M.G. Corporation |
| Blank Rome LLP | Bonnie Glantz Fatell | Chase Manhattan Centre | 1201 Market Street, Suite 800 | Wilmington | DE | 19801 | | 302-425-6423 | 302-428-5110 | fatell@blankrome.com | Counsel to Special Devices, Inc. |
| Blank Rome LLP | Marc E. Richards | The Chrysler Building | 405 Lexington Avenue | New York | NY | 10174 | | 212-885-5000 | 212-885-5002 | mrichards@blankrome.com | Counsel to DENSO International America, Inc. |
| Bodman LLP | Ralph E. McDowell | 100 Renaissance Center | 34th Floor | Detroit | MI | 48243 | | 313-393-7592 | 313-393-7579 | rmcdowell@bodmanllp.com | Counsel to Freudenberg-NOK; General Partnership; Freudenberg-NOK, Inc.; Flextech, Inc.; Vibracoustic de Mexico, S.A. de C.V.; Lear Corporation; American Axle & Manufacturing, Inc. |
| Bond, Schoeneck & King, PLLC | Camille W. Hill | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | chill@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 20

4/16/2007 11:06 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Bond, Schoeneck & King, PLLC | Charles J. Sullivan | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | csullivan@bsk.com | Counsel to Diemolding Corporation |
| Bond, Schoeneck & King, PLLC | Stephen A. Donato | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | sdonato@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp; Diemolding Corporation |
| Bose McKinney & Evans LLP | Jeannette Eisan Hinshaw | 135 N. Pennslyvania Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-684-5296 | 317-684-5173 | jhinshaw@boselaw.com | Counsel to Decatur Plastics Products, Inc. and Eikenberry & Associates, Inc.; Lorentson Manufacturing, Company, Inc.; Lorentson Tooling, Inc.; L & S Tools, Inc.; Hewitt Tool & Die, Inc. |
| Boult, Cummings, Conners & Berry, PLC | Austin L. McMullen | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | amcmullen@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Boult, Cummings, Conners & Berry, PLC | Roger G. Jones | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | rjones@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Brembo S.p.A. | Massimiliano Cini | Administration Department via Brembo 25 | 24035 Curno BG | Bergamo | | | Italy | 00039-035-605 529 | 0039-035-605-671 | massimiliano_cini@brembo.it | Creditor |
| Brown & Connery, LLP | Donald K. Ludman | 6 North Broad Street | | Woodbury | NJ | 08096 | | 856-812-8900 | 856-853-9933 | dludman@brownconnery.com | Counsel to SAP America, Inc. |
| Buchalter Nemer, A Profesional Corporation | Shawn M. Christianson | 333 Market Street | 25th Floor | San Francisco | CA | 94105-2126 | | 415-227-0900 | 415-227-0770 | schristianson@buchalter.com | Counsel to Oracle USA, Inc.; Oracle Credit Corporation |
| Burr & Forman LLP | Michael Leo Hall | 420 North Twentieth Street | Suite 3100 | Birmingham | AL | 35203 | | (205) 458-5367 | (205) 244-5651 | mhall@burr.com | Counsel to Mercedes-Benz U.S. International, Inc |
| Cahill Gordon & Reindel LLP | Jonathan Greenberg | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 732-205-6777 | jonathan.greenberg@engelhard.com | Counsel to Engelhard Corporation |
| Cahill Gordon & Reindel LLP | Robert Usadi | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 212-269-5420 | rusadi@cahill.com | Counsel to Engelhard Corporation |
| Calinoff & Katz, LLp | Dorothy H. Marinis-Riggio | 140 East 45th Street | 17th Floor | New York | NY | 10017 | | 212-826-8800 | 212-644-5123 | driggio@candklaw.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Carson Fischer, P.L.C. | Robert A. Weisberg | 300 East Maple Road | Third Floor | Birmingham | MI | 48009-6317 | | 248-644-4840 | 248-644-1832 | rweisberg@carsonfischer.com | Counsel to Cascade Die Casting Group, Inc. |
| Carter Ledyard & Milburn LLP | Aaron R. Cahn | 2 Wall Street | | New York | NY | 10005 | | 212-732-3200 | 212-732-3232 | cahn@clm.com | Counsel to STMicroelectronics, Inc. |
| Chadbourne & Parke LLP | Douglas Deutsch, Esq. | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-408-5100 | 212-541-5369 | ddeutsch@chadbourne.com | Counsel to EagleRock Capital Management, LLC |
| Clark Hill PLC | Joel D. Applebaum | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | japplebaum@clarkhill.com | Counsel to BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLC | Shannon Deeby | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | sdeeby@clarkhill.com | Counsel to BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLLC | Robert D. Gordon | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8572 | 313-965-8252 | rgordon@clarkhill.com | Counsel to ATS Automation Tooling Systems Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 20

4/16/2007 11:06 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cleary Gottlieb Steen & Hamilton LLP | Deborah M. Buell | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel to Arneses Electricos Automotrices, S.A.de C.V.; Cordaflex, S.A. de C.V. |
| Cleary, Gottlieb, Steen & Hamilton LLP | James L. Bromley | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel to Bear, Stearns, Co. Inc.; Citigroup, Inc.; Credit Suisse First Boston; Deutsche Bank Securities, Inc.; Goldman Sachs Group, Inc.; JP Morgan Chase & Co.; Lehman Brothers, Inc.; Merrill Lynch & Co.; Morgan Stanley & Co., Inc.; UBS Securities, LLC |
| Cohen & Grigsby, P.C. | Thomas D. Maxson | 11 Stanwix Street | 15th Floor | Pittsburgh | PA | 15222-1319 | | 412-297-4706 | 412-209-1837 | tmaxson@cohenlaw.com | Counsel to Nova Chemicals, Inc. |
| Cohen, Weiss & Simon LLP | Joseph J. Vitale Babette Ceccotti | 330 West 42nd Street | | New York | NY | 10036 | | 212-356-0238 | 646-473-8238 | jvitale@cwsny.com bceccotti@cwsny.com | Counsel to International Union, United Automobile, Areospace and Agriculture Implement Works of America (UAW) |
| Cohn Birnbaum & Shea P.C. | Scott D. Rosen, Esq. | 100 Pearl Street, 12th Floor | | Hartford | CT | 06103 | | 860-493-2200 | 860-727-0361 | srosen@cb-shea.com | Counsel to Floyd Manufacturing Co., Inc. |
| Conlin, McKenney & Philbrick, P.C. | Bruce N. Elliott | 350 South Main Street | Suite 400 | Ann Arbor | MI | 48104 | | 734-971-9000 | 734-971-9001 | Elliott@cmplaw.com | Counsel to Brazeway, Inc. |
| Connolly Bove Lodge & Hutz LLP | Jeffrey C. Wisler, Esq. | 1007 N. Orange Street | P.O. Box 2207 | Wilmington | DE | 19899 | | 302-658-9141 | 302-658-0380 | jwisler@cblh.com | Counsel to ORIX Warren, LLC |
| Contrarian Capital Management, L.L.C. | Mark Lee, Janice Stanton, Bill Raine, Seth Lax | 411 West Putnam Avenue | Suite 225 | Greenwich | CT | 06830 | | 203-862-8200 (230) 862-8231 | 203-629-1977 (203) 629-1977 | mlee@contrariancapital.com jstanton@contrariancapital.com wraine@contrariancapital.com solax@contrariancapital.com | Counsel to Contrarian Capital Management, L.L.C. |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Ronald S. Pretekin | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | Pretekin@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Sylvie J. Derrien | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | derrien@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| Cornell University | Nancy H. Pagliaro | Office of University Counsel | 300 CCC Building, Garden Avenue | Ithaca | NY | 14853-2601 | | 607-255-5124 | 607-254-3566 | nhp4@cornell.edu | Paralegal/Counsel to Cornell University |
| Covington & Burling | Susan Power Johnston | 1330 Avenue of the Americas | | New York | NY | 10019 | | 212-841-1005 | 646-441-9005 | sjohnston@cov.com | Special Counsel to the Debtor |
| Cox, Hodgman & Giarmarco, P.C. | Sean M. Walsh, Esq. | Tenth Floor Columbia Center | 101 W. Big Beaver Road | Troy | MI | 48084-5280 | | 248-457-7000 | 248-457-7001 | swalsh@chglaw.com | Counsel to Nisshinbo Automotive Corporation |
| Curtin & Heefner, LLP | Daniel P. Mazo | 250 N. Pennslyvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | dpm@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| Curtin & Heefner, LLP | Robert Szwajkos | 250 N. Pennslyvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | rsz@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| DaimlerChrysler Corporation | Kim Kolb | CIMS 485-13-32 | 1000 Chrysler Drive | Auburn Hills | MI | 48326-2766 | | 248-576-5741 | | krk4@daimlerchrysler.com | Counsel to DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChlryser Canada, Inc. |
| Damon & Morey LLP | William F. Savino | 1000 Cathedral Place | 298 Main Street | Buffalo | NY | 14202-4096 | | 716-856-5500 | 716-856-5510 | wsavino@damonmorey.com | Counsel to Relco, Inc.; The Durham Companies, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 4 of 20

4/16/2007 11:06 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Day Pitney LLP | Richard M. Meth | P.O. Box 1945 | | Morristown | NJ | 07962-1945 | | 973-966-6300 | 973-966-1015 | rmeth@daypitney.com | Counsel to Marshall E. Campbell Company |
| Day Pitney LLP | Ronald S. Beacher Conrad K. Chiu | 7 Times Square | | New York | NY | 10036 | | 212-297-5800 | 212-916-2940 | rbeacher@daypitney.com cchiu@daypitney.com | Counsel to IBJTC Business Credit Corporation, as successor to IBJ Whitehall Business Credit Corporation |
| Denso International America, Inc. | Carol Sowa | 24777 Denso Drive | | Southfield | MI | 48086 | | 248-372-8531 | 248-350-7772 | carol_sowa@denso-diam.com | Counsel to Denso International America, Inc. |
| Deputy Attorney General | Amina Maddox | R.J. Hughes Justice Complex | P.O. Box 106 | Trenton | NJ | 08625 | | 609-984-0183 | 609-292-6266 | amina.maddox@dol.lps.state.nj.us | Deputy Attorney General - State of New Jersey |
| DiConza Law, P.C. | Gerard DiConza, Esq. | 630 Third Avenue, 7th Floor | | New York | NY | 10017 | | 212-682-4940 | 212-682-4942 | gdiconza@dlawpc.com | Counsel to Tyz-All Plastics, Inc.; Furukawa Electric North America APD; and Co-Counsel to Tower Automotive, Inc. |
| Dinsmore & Shohl LLP | John Persiani | 1900 Chemed Center | 255 East Fifth Street | Cincinnati | OH | 45202 | | 513-977-8200 | 513-977-8141 | john.persiani@dinslaw.com | Counsel to The Procter & Gamble Company |
| DLA Piper Rudnick Gray Cary US LLP | Richard M. Kremen Maria Ellena Chavez-Ruark | The Marbury Building | 6225 Smith Avenue | Baltimore | Maryland | 21209-3600 | | 410-580-3000 | 410-580-3001 | richard.kremen@dlapiper.com | Counsel to Constellation NewEnergy, Inc. & Constellation NewEnergy - Gas Division, LLC |
| Dreier LLP | Maura I. Russell Wendy G. Marcari | 499 Park Ave | 14th Fl | New York | NY | 10022 | | 212-328-6100 | 212-652-3863 | jguerrier@dreierllp.com | Counsel to SPCP Group LLC |
| Drinker Biddle & Reath LLP | Andrew C. Kassner | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | andrew.kassner@dbr.com | Counsel to Penske Truck Leasing Co., L.P. |
| Drinker Biddle & Reath LLP | David B. Aaronson | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | david.aaronson@dbr.com | Counsel to Penske Truck Leasing Co., L.P. and Quaker Chemical Corporation |
| Duane Morris LLP | Joseph H. Lemkin | 744 Broad Street | Suite 1200 | Newark | NJ | 07102 | | 973-424-2000 | 973-424-2001 | jhlemkin@duanemorris.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC; and Hosiden America Corporation |
| Duane Morris LLP | Margery N. Reed, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | dmdelphi@duanemorris.com | Counsel to ACE American Insurance Company |
| Duane Morris LLP | Wendy M. Simkulak, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | wmsimkulak@duanemorris.com | Counsel to ACE American Insurance Company |
| Eckert Seamans Cherin & Mellott LLC | Michael G. Busenkell | 300 Delaware Avenue | Suite 1360 | Wilmington | DE | 19801 | | 302-425-0430 | 302-425-0432 | mbusenkell@eckertseamans.com | Counsel to Chicago Miniature Optoelectronic Technologies, Inc. |
| Electronic Data Systems Corporation | Ayala Hassell | 5400 Legacy Dr. | Mail Stop H3-3A-05 | Plano | TX | 75024 | | 212-715-9100 | 212-715-8000 | ayala.hassell@eds.com | Representattive for Electronic Data Systems Corporation |
| Entergy Services, Inc. | Alan H. Katz | 639 Loyola Ave 26th Fl | | New Orleans | LA | 70113 | | | | akatz@entergy.com | Assistant General Counsel to Entergy Services, Inc |
| Erman, Teicher, Miller, Zucker & Freedman, P.C. | David H. Freedman | 400 Galleria Officentre | Ste. 444 | Southfield | MI | 48034 | | 248-827-4100 | 248-827-4106 | dfreedman@ermanteicher.com | Counsel to Doshi Prettl International, LLC |
| Ettelman & Hochheiser, P.C. | Gary Ettelman | c/o Premium Cadillac | 77 Main Street | New Rochelle | NY | 10801 | | 516-227-6300 | 516-227-6307 | gettelman@e-hlaw.com | Counsel to Jon Ballin |
| Fagel Haber LLC | Gary E. Green | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | | 312-346-7500 | 312-580-2201 | ggreen@fagelhaber.com | Counsel to Aluminum International, Inc. |
| Fagel Haber LLC | Lauren Newman | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | | 312-346-7500 | 312-580-2201 | lnewman@fagelhaber.com | Counsel to Aluminum International, Inc. |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Filardi Law Offices LLC | Charles J. Filardi, Jr., Esq. | 65 Trumbull Street | Second Floor | New Haven | CT | 06510 | | 203-562-8588 | 866-890-3061 | charles@filardi-law.com | Counsel to Federal Express Corporation |
| Finkel Goldstein Rosenbloom & Nash LLP | Ted J. Donovan | 26 Broadway | Suite 711 | New York | NY | 10004 | | 212-344-2929 | 212-422-6836 | tdonovan@finkgold.com | Counsel to Pillarhouse (U.S.A.) Inc. |
| Foley & Lardner LLP | David G Dragich | 500 Woodward Ave Suite 2700 | | Detroit | MI | 48226-3489 | | 313-234-7100 | 313-234-2800 | ddragich@foley.com | Counsel to Internet Corporation |
| Foley & Lardner LLP | Jill L. Murch | 321 North Clark Street | Suite 2800 | Chicago | IL | 60610-4764 | | 312-832-4500 | 312-832-4700 | jmurch@foley.com | Counsel to Kuss Corporation |
| Foley & Lardner LLP | John A. Simon | One Detroit Center | 500 Woodward Ave Suite 2700 | Detroit | MI | 48226-3489 | | 313-234-7100 | 313-234-2800 | jsimon@foley.com | Counsel to Ernst & Young LLP |
| Foley & Lardner LLP | Michael P. Richman | 90 Park Avenue | 37th Floor | New York | NY | 10016-1314 | | 212-682-7474 | 212-687-2329 | mrichman@foley.com | Counsel to Ernst & Young LLP |
| Fox Rothschild LLP | Fred Stevens | 13 East 37th Street | Suite 800 | New York | NY | 10016 | | 212-682-7575 | 212-682-4218 | fstevens@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Fox Rothschild LLP | Michael J. Viscount, Jr. | 1301 Atlantic Avenue | Suite 400 | Atlantic City | NJ | 08401-7212 | | 609-348-4515 | 609-348-6834 | mviscount@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Frederick T. Rikkers | | 419 Venture Court | P.O. Box 930555 | Verona | WI | 53593 | | 608-848-6350 | 608-848-6357 | ftrikkers@rikkerslaw.com | Counsel to Southwest Metal Finishing, Inc. |
| Fulbright & Jaworski LLP | David A Rosenzweig | 666 Fifth Avenue | | New York | NY | 10103-3198 | | 212-318-3000 | 212-318-3400 | drosenzweig@fulbright.com | Counsel to Southwest Research Institute |
| Fulbright & Jaworski LLP | Michael M Parker | 300 Convent St Ste 2200 | | San Antonio | TX | 78205 | | 210-224-5575 | 210-270-7205 | mparker@fulbright.com | Counsel to Southwest Research Institute |
| Gibbons P.C. | David N. Crapo | One Gateway Center | | Newark | NJ | 07102-5310 | | 973-596-4523 | 973-639-6244 | dcrapo@gibbonslaw.com | Counsel to Epcos, Inc. |
| Goldberg, Stinnett, Meyers & Davis | Merle C. Meyers | 44 Montgomery Street | Suite 2900 | San Francisco | CA | 94104 | | 415-362-5045 | 415-362-2392 | mmeyers@gsmdlaw.com | Counsel to Alps Automotive, Inc. |
| Goodwin Proctor LLP | Allan S. Brilliant | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | abrilliant@goodwinproctor.com | Counsel to UGS Corp. |
| Goodwin Proctor LLP | Craig P. Druehl | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | cdruehl@goodwinproctor.com | Counsel to UGS Corp. |
| Gorlick, Kravitz & Listhaus, P.C. | Barbara S. Mehlsack | 17 State Street | 4th Floor | New York | NY | 10004 | | 212-269-2500 | 212-269-2540 | bmehlsack@gkllaw.com | Counsel to International Brotherood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Goulston & Storrs, P.C. | Peter D. Bilowz | 400 Atlantic Avenue | | Boston | MA | 02110-333 | | 617-482-1776 | 617-574-4112 | pbilowz@goulstonstorrs.com | Counsel to Thermotech Company |
| Grant & Eisenhofer P.A. | Jay W. Eisenhofer | 45 Rockefeller Center | 650 Fifth Avenue | New York | NY | 10111 | | 212-755-6501 | 212-755-6503 | jeisenhofer@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Grant & Eisenhofer P.A. | Sharan Nirmul | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | | 302-622-7000 | 302-622-7100 | snirmul@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 6 of 20

4/16/2007 11:06 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gratz, Miller & Brueggeman, S.C. | Matthew R. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | mrr@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Gratz, Miller & Brueggeman, S.C. | Timothy C. Hall | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | tch@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Graydon Head & Ritchey LLP | J. Michael Debbler, Susan M. Argo | 1900 Fifth Third Center | 511 Walnut Street | Cincinnati | OH | 45202 | | 513-621-6464 | 513-651-3836 | mdebbeler@graydon.com | Counsel to Grote Industries; Batesville Tool & Die; PIA Group; Reliable Castings |
| Greenberg Traurig, LLP | Maria J. DiConza | MetLife Bldg | 200 Park Avenue | New York | NY | 10166 | | 212-801-9200 | 212-801-6400 | diconzam@gtlaw.com | Counsel to Samtech Corporation |
| Greenberg Traurig, LLP | Shari L. Heyen | 1000 Louisiana | Suite 1800 | Houston | TX | 77002 | | 713-374-3500 | 713-374-3505 | heyens@gtlaw.com | Counsel to Samtech Corporation |
| Greensfelder, Hemker & Gale, P.C. | Cherie Macdonald J. Patrick Bradley | 10 S. Broadway | Suite 200 | St. Louis | MO | 63102 | | 314-241-9090 | 314-241-8624 | ckm@greensfelder.com jpb@greensfelder.com | Counsel to ARC Automotive, Inc. |
| Guaranty Bank | Herb Reiner | 8333 Douglas Avenue | | Dallas | TX | 75225 | | 214-360-2702 | 214-360-1940 | herb.reiner@guarantygroup.com | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Company |
| Halperin Battaglia Raicht, LLP | Alan D. Halperin Christopher J.Battaglia Julie D. Dyas | 555 Madison Avenue | 9th Floor | New York | NY | 10022 | | 212-765-9100 | 212-765-0964 | cbattaglia@halperinlaw.net ahalperin@halperinlaw.net jdyas@halperinlaw.net | Counsel to Pacific Gas Turbine Center, LLC and Chromalloy Gas Turbine Corporation; ARC Automotive, Inc |
| Hancock & Estabrook LLP | R John Clark Esq | 1500 Tower I | PO Box 4976 | Syracuse | NY | 13221-4976 | | 315-471-3151 | 315-471-3167 | rjclark@hancocklaw.com | Counsel to Alliance Precision Plastics Corporation |
| Harris D. Leinwand | Harris D. Leinwand | 350 Fifth Avenue | Suite 2418 | New York | NY | 10118 | | 212-725-7338 | 212-244-6219 | hleinwand@aol.com | Counsel to Baker Hughes Incorporated; Baker Petrolite Corporation |
| Haynes and Boone, LLP | Judith Elkin | 153 East 53rd Street | Suite 4900 | New York | NY | 10022 | | 212-659-7300 | 212-918-8989 | judith.elkin@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Haynes and Boone, LLP | Lenard M. Parkins Kenric D. Kattner | 1 Houston Center | 1221 McKinney, Suite 2100 | Houston | TX | 77010 | | 713-547-2000 | 713-547-2600 | lenard.parkins@haynesboone.com kenric.kattner@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Heller Ehrman LLP | Timothy Mehok | Times Square Tower | Seven Times Square | New York | NY | 10036 | | 212-832-8300 | 212-763-7600 | timothy.mehok@hellerehrman.com | Counsel to @Road, Inc. |
| Herrick, Feinstein LLP | Paul Rubin | 2 Park Avenue | | New York | NY | 10016 | | 212-592-1448 | 212-545-3360 | prubin@herrick.com | Counsel to Canon U.S.A., Inc. and Schmidt Technology GmbH |
| Hewlett-Packard Company | Anne Marie Kennelly | 3000 Hanover St., M/S 1050 | | Palo Alto | CA | 94304 | | 650-857-6902 | 650-852-8617 | anne.kennelly@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Kenneth F. Higman | 2125 E. Katella Avenue | Suite 400 | Anaheim | CA | 92806 | | 714-940-7120 | 740-940-7539 | ken.higman@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Sharon Petrosino | 420 Mountain Avenue | | Murray Hill | NJ | 07974 | | 908-898-4760 | 908-898-4133 | sharon.petrosino@hp.com | Counsel to Hewlett-Packard Financial Services Company |
| Hiscock & Barclay, LLP | J. Eric Charlton | 300 South Salina Street | PO Box 4878 | Syracuse | NY | 13221-4878 | | 315-425-2716 | 315-425-8576 | echarlton@hiscockbarclay.com | Counsel to GW Plastics, Inc. |
| Hodgson Russ LLP | Julia S. Kreher | One M&T Plaza | Suite 2000 | Buffalo | NY | 14203 | | 716-848-1330 | 716-819-4645 | jkreher@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hodgson Russ LLP | Stephen H. Gross, Esq. | 230 Park Avenue | 17th Floor | New York | NY | 10169 | | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hogan & Hartson L.L.P. | Audrey Moog | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | 202-637-5910 | amoog@hhlaw.com | Counsel to Umicore Autocat Canada Corp. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 7 of 20

4/16/2007 11:06 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hogan & Hartson L.L.P. | Edward C. Dolan | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | 202-637-5910 | ecdolan@hhlaw.com | Counsel to Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Scott A. Golden | 875 Third Avenue | | New York | NY | 10022 | | 212-918-3000 | 212-918-3100 | sagolden@hhlaw.com | Counsel to XM Satellite Radio Inc. |
| Holme Roberts & Owen, LLP | Elizabeth K. Flaagan | 1700 Lincoln | Suite 4100 | Denver | CO | 80203 | | 303-861-7000 | 303-866-0200 | elizabeth.flaagan@hro.com | Counsel to CoorsTek, Inc.; Corus, L.P. |
| Honigman, Miller, Schwartz and Cohn, LLP | Donald T. Baty, Jr. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7314 | 313-465-7315 | dbaty@honigman.com | Counsel to Fujitsu Ten Corporation of America |
| Honigman, Miller, Schwartz and Cohn, LLP | E. Todd Sable | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7548 | 313-465-7549 | tsable@honigman.com | Counsel to Valeo Climate Control Corp.; Valeo Electrical Systems, Inc. - Motors and Actuators Division;Valeo Electrical Systems, Inc. - Wipers Division; Valeo Switches & Detection System, Inc. |
| Howard & Howard Attorneys PC | Lisa S Gretchko | 39400 Woodward Ave | Ste 101 | Bloomfield Hills | MI | 48304-5151 | | 248-723-0396 | 248-645-1568 | lgretchko@howardandhoward.com | Intellectual Property Counsel for Delphi Corporation, et al. |
| Hunter & Schank Co. LPA | John J. Hunter | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | | 419-255-4300 | 419-255-9121 | jrhunter@hunterschank.com | Counsel to ZF Group North America Operations, Inc. |
| Hunter & Schank Co. LPA | Thomas J. Schank | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | | 419-255-4300 | 419-255-9121 | tomschank@hunterschank.com | Counsel to ZF Group North America Operations, Inc. |
| Hunton & Wiliams LLP | Michael P. Massad, Jr. | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | mmassad@hunton.com | Counsel to RF Monolithics, Inc. |
| Hunton & Wiliams LLP | Steven T. Holmes | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | sholmes@hunton.com | Counsel to RF Monolithics, Inc. |
| Hurwitz & Fine P.C. | Ann E. Evanko | 1300 Liberty Building | | Buffalo | NY | 14202 | | 716-849-8900 | 716-855-0874 | aee@hurwitzfine.com | Counsel to Jiffy-Tite Co., Inc. |
| Ice Miller | Ben T. Caughey | One American Square | Box 82001 | Indianapolis | IN | 46282-0200 | | 317-236-2100 | 317-236-2219 | Ben.Caughey@icemiller.com | Counsel to Sumco, Inc. |
| Infineon Technologies North America Corporation | Greg Bibbes | 1730 North First Street | M/S 11305 | San Jose | CA | 95112 | | 408-501-6442 | 408-501-2488 | greg.bibbes@infineon.com | General Counsel & Vice President for Infineon Technologies North America Corporation |
| Infineon Technologies North America Corporation | Jeff Gillespie | 2529 Commerce Drive | Suite H | Kokomo | IN | 46902 | | 765-454-2146 | 765-456-3836 | jeffery.gillispie@infineon.com | Global Account Manager for Infineon Technologies North America |
| InPlay Technologies Inc | Heather Beshears | 234 South Extension Road | | Mesa | AZ | 85201 | | | | heather@inplaytechnologies.com | Creditor |
| Intermet Corporation | Alan Miller | 301 Commerce Street | Ste 2901 | Fort Worth | TX | 76102 | | | | amiller@intermet.com | Creditor |
| International Union of Operating Engineers | Richard Griffin | 1125-17th Avenue, N.W. | | Washington | DC | 20036 | | 202-429-9100 | 202-778-2641 | rgriffin@iuoe.org | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Jaffe, Raitt, Heuer & Weiss, P.C. | Paige E. Barr | 27777 Franklin Road | Suite 2500 | Southfield | MI | 48034 | | 248-351-3000 | 248-351-3082 | pbarr@jaffelaw.com | Counsel to Trutron Corporation |
| James R Scheuerle | Parmenter O'Toole | 601 Terrace Street | PO Box 786 | Muskegon | MI | 49443-0786 | | 231-722-1621 | 231-728-2206 | JRS@Parmenterlaw.com | Counsel to Port City Die Cast and Port City Group Inc |
| Jenner & Block LLP | Ronald R. Peterson | One IBM Plaza | | Chicago | IL | 60611 | | 312-222-9350 | 312-840-7381 | rpeterson@jenner.com | Counsel to SPX Corporation (Contech Division), Alcan Rolled Products-Ravenswood, LLC and Tenneco Inc. |
| Jones Day | Scott J. Friedman | 222 East 41st Street | | New York | NY | 10017 | | 212-326-3939 | 212-755-7306 | sjfriedman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Katten Muchin Rosenman LLP | John P. Sieger, Esq. | 525 West Monroe Street | | Chicago | IL | 60661 | | 312-902-5200 | 312-577-4733 | john.sieger@kattenlaw.com | Counsel to TDK Corporation America and MEMC Electronic Materials, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 8 of 20

4/16/2007 11:06 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Kaye Scholer LLP | Richard G Smolev | 425 Park Avenue | | New York | NY | 10022-3598 | | 212-236-8000 | 212-836-8689 | rsmolev@kayescholer.com | Counsel to InPlay Technologies Inc |
| Kegler, Brown, Hill & Ritter Co., LPA | Kenneth R. Cookson | 65 East State Street | Suite 1800 | Columbus | OH | 43215 | | 614-426-5400 | 614-464-2634 | kcookson@keglerbrown.com | Counsel to Solution Recovery Services |
| Keller Rohrback L.L.P. | Lynn Lincoln Sarko Cari Campen Laufenberg Erin M. Rily | 1201 Third Avenue | Suite 3200 | Seattle | WA | 98101 | | 206-623-1900 | 206-623-3384 | lsarko@kellerrohrback.com claufenberg@kellerrohrback.com eriley@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Keller Rohrback P.L.C. | Gary A. Gotto | National Bank Plaza | 3101 North Central Avenue, Suite 900 | Phoenix | AZ | 85012 | | 602-248-0088 | 602-248-2822 | ggotto@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Kelley Drye & Warren, LLP | Mark I. Bane | 101 Park Avenue | | New York | NY | 10178 | | 212-808-7800 | 212-808-7897 | mbane@kelleydrye.com | Counsel to the Pension Benefit Guaranty Corporation |
| Kelley Drye & Warren, LLP | Mark. R. Somerstein | 101 Park Avenue | | New York | NY | 10178 | | 212-808-7800 | 212-808-7897 | msomerstein@kelleydrye.com | Counsel to the Pension Benefit Guaranty Corporation |
| Kennedy, Jennick & Murray | Larry Magarik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | lmagarik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Susan M. Jennik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | sjennik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Thomas Kennedy | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | tkennedy@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| King & Spalding, LLP | H. Slayton Dabney, Jr. Bill Dimos | 1185 Avenue of the Americas | | New York | NY | 10036 | | 212-556-2100 | 212-556-2222 | sdabney@kslaw.com bdimos@kslaw.com | Counsel to KPMG LLP |
| Kirkpatrick & Lockhart Nicholson Graham LLP | Edward M. Fox | 599 Lexington Avenue | | New York | NY | 10022 | | 212-536-4812 | 212-536-3901 | efox@klng.com | Counsel to Wilmington Trust Company, as Indenture trustee |
| Klett Rooney Lieber & Schorling | Eric L. Schnabel DeWitt Brown | The Brandywine Building | 1000 West Street, Suite 1410 | Wilmington | DE | 19801 | | (302) 552-4200 | | schnabel@klettrooney.com dbrown@klettrooney.com | Counsel to Entergy |
| Krugliak, Wilkins, Griffiths & Dougherty CO., L.P.A. | Sam O. Simmerman | 4775 Munson Street N.W. | P.O. Box 36963 | Canton | OH | 44735-6963 | | 330-497-0700 | 330-497-4020 | sosimmerman@kwgd.com | Counsel to for Millwood, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 9 of 20

4/16/2007 11:06 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Kutak Rock LLP | Jay Selanders | 1010 Grand Blvd Ste 500 | | Kansas City | MO | 64106 | | 816-502-4617 | 816-960-0041 | jay.selanders@kutakrock.com | Counsel to DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrysler Canada, Inc. |
| Kutchin & Rufo, P.C. | Edward D. Kutchin | 155 Federal Street | 17th Floor | Boston | MA | 02110-1727 | | 617-542-3000 | 617-542-3001 | ekutchin@kutchinrufo.com | Counsel to Parlex Corporation |
| Kutchin & Rufo, P.C. | Kerry R. Northrup | 155 Federal Street | 17th Floor | Boston | MA | 02110-1727 | | 617-542-3000 | 617-542-3001 | knorthup@kutchinrufo.com | Counsel to Parlex Corporation |
| Lambert, Leser, Isackson, Cook & Guinta, P.C. | Susan M. Cook | 309 Davidson Building | PO Box 835 | Bay City | MI | 48707-0835 | | 989-893-3518 | | smcook@lambertleser.com | Counsel to Linamar Corporation |
| Latham & Watkins | Erika Ruiz | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | erika.ruiz@lw.com | UCC Professional |
| Latham & Watkins | Henry P. Baer, Jr. | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | henry.baer@lw.com | UCC Professional |
| Latham & Watkins | John W. Weiss | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | john.weiss@lw.com | UCC Professional |
| Latham & Watkins | Mark A. Broude | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1384 | 212-751-4864 | mark.broude@lw.com | UCC Professional |
| Latham & Watkins | Michael J. Riela | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | michael.riela@lw.com | UCC Professional |
| Latham & Watkins | Mitchell A. Seider | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | mitchell.seider@lw.com | UCC Professional |
| Law Offices of Michael O'Hayer | Michael O'Hayer Esq | 22 N Walnut Street | | West Chester | PA | 19380 | | 610-738-1230 | 610-738-1217 | mkohayer@aol.com | Counsel to A-1 Specialized Services and Supplies Inc |
| Lewis and Roca LLP | Rob Charles, Esq. | One South Church Street | Suite 700 | Tucson | AZ | 85701 | | 520-629-4427 | 520-879-4705 | rcharles@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Lewis and Roca LLP | Susan M. Freeman, Esq. | 40 North Central Avenue | Suite 1900 | Phoenix | AZ | 85004-4429 | | 602-262-5756 | 602-734-3824 | sfreeman@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Linear Technology Corporation | John England, Esq. | General Counsel for Linear Technology Corporation | 1630 McCarthy Blvd. | Milpitas | CA | 95035-7417 | | 408-432-1900 | 408-434-0507 | jengland@linear.com | Counsel to Linear Technology Corporation |
| Linebarger Goggan Blair & Sampson, LLP | Diane W. Sanders | 1949 South IH 35 (78741) | P.O. Box 17428 | Austin | TX | 78760-7428 | | 512-447-6675 | 512-443-5114 | austin.bankruptcy@publicans.com | Counsel to Cameron County, Brownsville ISD |
| Linebarger Goggan Blair & Sampson, LLP | Elizabeth Weller | 2323 Bryan Street | Suite 1600 | Dallas | TX | 75201 | | 214-880-0089 | 4692215002 | dallas.bankruptcy@publicans.com | Counsel to Dallas County and Tarrant County |
| Linebarger Goggan Blair & Sampson, LLP | John P. Dillman | P.O. Box 3064 | | Houston | TX | 77253-3064 | | 713-844-3478 | 713-844-3503 | houston_bankruptcy@publicans.com | Counsel in Charge for Taxing Authorities: Cypress-Fairbanks Independent School District, City of Houston, Harris County |
| Loeb & Loeb LLP | P. Gregory Schwed | 345 Park Avenue | | New York | NY | 10154-0037 | | 212-407-4000 | | gschwed@loeb.com | Counsel to Creditor The Interpublic Group of Companies, Inc. and Proposed Auditor Deloitte & Touche, LLP |
| Loeb & Loeb LLP | William M. Hawkins | 345 Park Avenue | | New York | NY | 10154 | | 212-407-4000 | 212-407-4990 | whawkins@loeb.com | Counsel to Industrial Ceramics Inc. |
| Lord, Bissel & Brook | Timothy S. McFadden | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-0370 | 312-896-6394 | tmcfadden@lordbissell.com | Counsel to Methode Electronics, Inc. |
| Lord, Bissel & Brook | Timothy W. Brink | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-1832 | 312-443-896-6432 | tbrink@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. |
| Lord, Bissel & Brook LLP | Kevin J. Walsh | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | | 212-947-8304 | 212-947-1202 | kwalsh@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| Lowenstein Sandler PC | Bruce S. Nathan | 1251 Avenue of the Americas | | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | bnathan@lowenstein.com | Counsel to Daewoo International (America) Corp. |
| Lowenstein Sandler PC | Ira M. Levee | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | ilevee@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 10 of 20

4/16/2007 11:06 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Lowenstein Sandler PC | Kenneth A. Rosen | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | krosen@lowenstein.com | Counsel to Cerberus Capital Management, L.P. |
| Lowenstein Sandler PC | Michael S. Etikin | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | metkin@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Lowenstein Sandler PC | Scott Cargill | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | scargill@lowenstein.com | Counsel to Cerberus Capital Management, L.P.; AT&T Corporation |
| Lowenstein Sandler PC | Vincent A. D'Agostino | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | vdagostino@lowenstein.com | Counsel to AT&T Corporation |
| Lyden, Liebenthal & Chappell, Ltd. | Erik G. Chappell | 5565 Airport Highway | Suite 101 | Toledo | OH | 43615 | | 419-867-8900 | 419-867-8909 | egc@lydenlaw.com | Counsel to Metro Fibres, Inc. |
| MacDonald, Illig, Jones & Britton LLP | Richard J. Parks | 100 State Street | Suite 700 | Erie | PA | 16507-1459 | | 814-870-7754 | 814-454-4647 | rparks@mijb.com | Counsel to Ideal Tool Company, Inc. |
| Madison Capital Management | Joe Landen | 6143 South Willow Drive | Suite 200 | Greenwood Village | CO | 80111 | | 303-957-4254 | 303-957-2098 | jlanden@madisoncap.com | Representative for Madison Capital Management |
| Margulies & Levinson, LLP | Jeffrey M. Levinson, Esq. Leah N. Caplan, Esq. | 30100 Chagrin Boulevard | Suite 250 | Pepper Pike | OH | 44124 | | 216-514-4935 | 216-514-4936 | jml@ml-legal.com lmc@ml-legal.com | Counsel to Venture Plastics |
| Mastromarco & Jahn, P.C. | Victor J. Mastromarco, Jr. | 1024 North Michigan Avenue | P.O. Box 3197 | Saginaw | MI | 48605-3197 | | 989-752-1414 | | vmastromar@aol.com | Counsel to H.E. Services Company and Robert Backie and Counsel to Cindy Palmer, Personal Representative for the Estate of Michael Palmer |
| Masuda Funai Eifert & Mitchell, Ltd. | Gary D. Santella | 203 North LaSalle Street | Suite 2500 | Chicago | IL | 60601-1262 | | 312-245-7500 | 312-245-7467 | gsantella@masudafunai.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC and Hosiden America Corporation |
| Mayer, Brown, Rowe & Maw LLP | Jeffrey G. Tougas | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | jgtougas@mayerbrownrowe.com | Counsel to Bank of America, N.A. |
| Mayer, Brown, Rowe & Maw LLP | Raniero D'Aversa, Jr. | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | rdaversa@mayerbrown.com | Counsel to Bank of America, N.A. |
| McCarter & English, LLP | David J. Adler, Jr. Esq. | 245 Park Avenue, 27th Floor | | New York | NY | 10167 | | 212-609-6800 | 212-609-6921 | dadler@mccarter.com | Counsel to Ward Products, LLC |
| McCarter & English, LLP | Eduardo J. Glas, Esq. | Four Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4096 | | 913-622-4444 | 973-624-7070 | eglas@mccarter.com | Counsel to General Products Delaware Corporation |
| McCarthy Tetrault LLP | John J. Salmas Lorne P. Salzman | 66 Wellington Street West | Suite 4700 | Toronto | Ontario | M5K 1E6 | | 416-362-1812 | 416-868-0673 | jsalmas@mccarthy.ca lsalzman@mccarthy.ca | Counsel to Themselves (McCarthy Tetrault) |
| McDermott Will & Emery LLP | James M. Sullivan | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5477 | 212-547-5444 | jmsullivan@mwe.com | Counsel to Linear Technology Corporation, National Semiconductor Corporation; Timken Corporation |
| McDermott Will & Emery LLP | Stephen B. Selbst | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5400 | 212-547-5444 | sselbst@mwe.com | Counsel to National Semiconductor Corporation |
| McDonald Hopkins Co., LPA | Jean R. Robertson, Esq. | 600 Superior Avenue, East | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | jrobertson@mcdonaldhopkins.com | Counsel to Brush Engineered materials |
| McDonald Hopkins Co., LPA | Scott N. Opincar, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sopincar@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 11 of 20

4/16/2007 11:06 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| McDonald Hopkins Co., LPA | Shawn M. Riley, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sriley@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McElroy, Deutsch, Mulvaney & Carpenter, LLP | Jeffrey Bernstein, Esq. | Three Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4079 | | 973-622-7711 | 973-622-5314 | jbernstein@mdmc-law.com | Counsel to New Jersey Self-Insurers Guaranty Association |
| McGuireWoods LLP | Elizabeth L. Gunn | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | | 804-775-1178 | 804-698-2186 | egunn@mcguirewoods.com | Counsel to Siemens Logistics Assembly Systems, Inc. |
| Meyer, Suozzi, English & Klein, P.C. | Hanan Kolko | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | hkolko@msek.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Meyer, Suozzi, English & Klein, P.C. | Lowell Peterson, Esq. | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | lpeterson@msek.com | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Meyers, Rodbell & Rosenbaum, P.A. | M. Evan Meyers | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | emeyers@mrrlaw.net | Counsel to Prince George County, Maryland |
| Meyers, Rodbell & Rosenbaum, P.A. | Robert H. Rosenbaum | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | rrosenbaum@mrrlaw.net | Counsel to Prince George County, Maryland |
| Michael Cox | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | miag@michigan.gov | Attorney General for State of Michigan, Department of Treasury |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Dennis J. Raterink | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | raterinkd@michigan.gov | Assistant Attorney General for Worker's Compensation Agency |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Michael Cox | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | miag@michigan.gov | Attorney General for Worker's Compensation Agency |
| Miles & Stockbridge, P.C. | Kerry Hopkins | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | 410-385-3700 | khopkins@milesstockbridge.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miles & Stockbridge, P.C. | Thomas D. Renda | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | 410-385-3700 | trenda@milesstockbridge.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miller Johnson | Thomas P. Sarb | 250 Monroe Avenue, N.W. | Suite 800, PO Box 306 | Grand Rapids | MI | 49501-0306 | | 616-831-1748 | 616-988-1748 | sarbt@millerjohnson.com | |
| | Robert D. Wolford | | | | | | | 616-831-1726 | 616-988-1726 | wolfordr@millerjohnson.com | Counsel to Pridgeon & Clay, Inc. |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Miller, Canfield, Paddock and Stone, P.L.C. | Jonathan S. Green | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8452 | 313-496-7997 | greenj@millercanfield.com | Counsel to Wells Operating Partnership, LP |
| Miller, Canfield, Paddock and Stone, P.L.C. | Timothy A. Fusco | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8435 | 313-496-8453 | fusco@millercanfield.com | Counsel to Niles USA Inc.; Techcentral, LLC; The Bartech Group, Inc.; Fischer Automotive Systems |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Paul J. Ricotta | One Financial Center | | Boston | MA | 02111 | | 617-542-6000 | 617-542-2241 | pjricotta@mintz.com | Counsel to Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Stephanie K. Hoos | The Chrysler Center | 666 Third Avenue | New York | NY | 10017 | | 212-935-3000 | 212-983-3115 | skhoos@mintz.com | Counsel of Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Molex Connector Corp | Jeff Ott | 2222 Wellington Ct. | | Lisle | IL | 60532 | | 630-527-4254 | 630-512-8610 | Jeff.Ott@molex.com | Counsel to Molex Connector Corp |
| Morgan, Lewis & Bockius LLP | Andrew D. Gottfried | 101 Park Avenue | | New York | NY | 10178-0060 | | 212-309-6000 | 212-309-6001 | agottfried@morganlewis.com | Counsel to ITT Industries, Inc.; Hitachi Chemical (Singapore), Ltd. |
| Morgan, Lewis & Bockius LLP | Menachem O. Zelmanovitz | 101 Park Avenue | | New York | NY | 10178 | | 212-309-6000 | 212-309-6001 | mzelmanovitz@morganlewis.com | Counsel to Hitachi Chemical (Singapore) Pte, Ltd. |
| Morgan, Lewis & Bockius LLP | Richard W. Esterkin, Esq. | 300 South Grand Avenue | | Los Angeles | CA | 90017 | | 213-612-1163 | 213-612-2501 | resterkin@morganlewis.com | Counsel to Sumitomo Corporation |
| Moritt Hock Hamroff & Horowitz LLP | Leslie Ann Berkoff | 400 Garden City Plaza | | Garden City | NY | 11530 | | 516-873-2000 | | lberkoff@morritthock.com | Counsel to Standard Microsystems Corporation and its direct and indirect subsidiares Oasis SiliconSystems AG and SMSC NA Automotive, LLC (successor-in-interst to Oasis Silicon Systems, Inc.) |
| Morrison Cohen LLP | Michael R. Dal Lago | 909 Third Avenue | | New York | NY | 10022 | | 212-735-8757 | 917-522-3157 | mdallago@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Munsch Hardt Kopf & Harr, P.C. | Raymond J. Urbanik, Esq., Joseph J. Wielebinski, Esq. and Davor Rukavina, Esq. | 3800 Lincoln Plaza | 500 North Akard Street | Dallas | RX | 75201-6659 | | 214-855-7590 214-855-7561 214-855-7587 | 214-855-7584 | rurbanik@munsch.com jwielebinski@munsch.com drukavina@munsch.com | Counsel to Texas Instruments Incorporated |
| Nantz, Litowich, Smith, Girard & Hamilton, P.C. | Sandra S. Hamilton | 2025 East Beltline, S.E. | Suite 600 | Grand Rapids | MI | 49546 | | 616-977-0077 | 616-977-0529 | sandy@nlsg.com | Counsel to Lankfer Diversified Industries, Inc. |
| Nathan, Neuman & Nathan, P.C. | Kenneth A. Nathan | 29100 Northwestern Highway | Suite 260 | Southfield | MI | 48034 | | 248-351-0099 | 248-351-0487 | Knathan@nathanneuman.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| National City Commercial Capital | Lisa M. Moore | 995 Dalton Avenue | | Cincinnati | OH | 45203 | | 513-455-2390 | 866-298-4481 | lisa.moore2@nationalcity.com | Vice President and Senior Counsel to National City Commercial Capital |
| Nelson Mullins Riley & Scarborough | George B. Cauthen | 1320 Main Street, 17th Floor | PO Box 11070 | Columbia | SC | 29201 | | 803-7255-9425 | 803-256-7500 | george.cauthen@nelsonmullins.com | Counsel to Datwyler Rubber & Plastics, Inc.; Datwyler, Inc.; Datwyler i/o devices (Americas), Inc.; Rothrist Tube (USA), Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 13 of 20

4/16/2007 11:06 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Nix, Patterson & Roach, L.L.P. | Bradley E. Beckworth | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | bbeckworth@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Nix, Patterson & Roach, L.L.P. | Jeffrey J. Angelovich | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | jangelovich@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Nix, Patterson & Roach, L.L.P. | Susan Whatley | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | susanwhatley@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| North Point | David G. Heiman | 901 Lakeside Avenue | | Cleveland | OH | 44114 | | 216-586-3939 | 216-579-0212 | dgheiman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Office of the Chapter 13 Trustee | Camille Hope | P.O. Box 954 | | Macon | GA | 31202 | | 478-742-8706 | 478-746-4488 | cahope@chapter13macon.com | Office of the Chapter 13 Trustee |
| Office of the Texas Attorney General | Jay W. Hurst | P.O. Box 12548 | | Austin | TX | 78711-2548 | | 512-475-4861 | 512-482-8341 | jay.hurst@oag.state.tx.us | Counsel to The Texas Comptroller of Public Accounts |
| Orbotech, Inc. | Michael M. Zizza, Legal Manager | 44 Manning Road | | Billerica | MA | 01821 | | 978-901-5025 | 978-667-9969 | michaelz@orbotech.com | Company |
| Orrick, Herrington & Sutcliffe LLP | Alyssa Englund, Esq. | 666 Fifth Avenue | | New York | NY | 10103 | | 212-506-5187 | 212-506-5151 | aenglund@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Frederick D. Holden, Jr., Esq. | 405 Howard Street | | San Francisco | CA | 94105 | | 415-773-5700 | 415-773-5759 | fholden@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Jonathan P. Guy | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | jguy@orrick.com | Counsel to Westwood Associates, Inc. |
| Orrick, Herrington & Sutcliffe LLP | Matthew W. Cheney | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | mcheney@orrick.com | Counsel to Westwood Associates, Inc. |
| Orrick, Herrington & Sutcliffe LLP | Richard H. Wyron | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | rwyron@orrick.com | Counsel to Westwood Associates, Inc. |
| Pachulski Stang Ziehl Young Jones & Weintraub LLP | Michael R. Seidl | 919 N. Market Street, 17th Floor | P.O. Box 8705 | Wilmington | DE | 19899-8705 | | 302-652-4100 | 302- 652-4400 | mseidl@pszyjw.com | Counsel for Essex Group, Inc. |
| Pachulski Stang Ziehl Young Jones & Weintraub LLP | William P. Weintraub | 780 Third Avenue, 36th Floor | | New York | NY | 10017-2024 | | 212-561-7700 | 212-561-7777 | wweintraub@pszyjw.com | Counsel for Essex Group, Inc. |
| Paul, Weiss, Rifkind, Wharton & Garrison | Andrew N. Rosenberg Justin C. Brass | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | arosenberg@paulweiss.com jbrass@paulweiss.com | Counsel to Merrill Lynch, Pierce, Fenner & Smith, Incorporated |
| Paul, Weiss, Rifkind, Wharton & Garrison | Douglas R. Davis | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | ddavis@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Elizabeth R. McColm | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | emccolm@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Stephen J. Shimshak | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3133 | 212-373-2136 | sshimshak@paulweiss.com | Counsel to Ambrake Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 14 of 20

4/16/2007 11:06 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Peggy Housner | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | housnerp@michigan.gov | Assistant Attorney General for State of Michigan, Department of Treasury |
| Pepe & Hazard LLP | Kristin B. Mayhew | 30 Jelliff Lane | | Southport | CT | 06890-1436 | | 203-319-4022 | 203-259-0251 | kmayhew@pepehazard.com | Counsel for Illinois Tool Works Inc., Illinois Tool Works for Hobart Brothers Co., Hobart Brothers Company, ITW Food Equipment Group LLC and Tri-Mark, Inc. |
| Pepper, Hamilton LLP | Anne Marie Aaronson | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | aaronsona@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pepper, Hamilton LLP | Francis J. Lawall | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | lawallf@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pepper, Hamilton LLP | Henry Jaffe | 1313 Market Street | PO Box 1709 | Wilmington | DE | 19899-1709 | | 302-777-6500 | 302-421-8390 | jaffeh@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pepper, Hamilton LLP | Linda J. Casey | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | caseyl@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pierce Atwood LLP | Jacob A. Manheimer | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | jmanheimer@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p.A. |
| Pierce Atwood LLP | Keith J. Cunningham | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | kcunningham@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p.A. |
| Pillsbury Winthrop Shaw Pittman LLP | Karen B. Dine | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | karen.dine@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Margot P. Erlich | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | margot.erlich@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Mark D. Houle | 650 Town Center Drive | 7th Floor | Costa Mesa | CA | 92626-7122 | | 714-436-6800 | 714-436-2800 | mark.houle@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Richard L. Epling | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | richard.epling@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Robin L. Spear | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | robin.spear@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Porzio, Bromberg & Newman, P.C. | Brett S. Moore, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | bsmoore@pbnlaw.com | |
| Porzio, Bromberg & Newman, P.C. | John S. Mairo, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | jsmairo@pbnlaw.com | Counsel to Neuman Aluminum Automotive, Inc. and Neuman Aluminum Impact Extrusion, Inc. |
| Previant, Goldberg, Uelman, Gratz, Miller & Brueggeman, S.C. | Jill M. Hartley and Marianne G. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | jh@previant.com mgr@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| QAD, Inc. | Jason Pickering, Esq. | 10,000 Midlantic Drive | | Mt. Laurel | NJ | 08054 | | 856-840-2489 | 856-840-2740 | jkp@qad.com | Counsel to QAD, Inc. |
| Quadrangle Debt Recovery Advisors LLC | Andrew Herenstein | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1742 | 866-741-2505 | andrew.herenstein@quadranglegroup.com | Counsel to Quadrangle Debt Recovery Advisors LLC |
| Quadrangle Group LLC | Patrick Bartels | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1748 | 866-552-2052 | patrick.bartels@quadranglegroup.com | Counsel to Quadrangle Group LLC |
| Quarles & Brady Streich Lang LLP | John A. Harris | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | jharris@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Quarles & Brady Streich Lang LLP | Kasey C. Nye | One South Church Street | | Tucson | AZ | 85701 | | 520-770-8717 | 520-770-2203 | knye@quarles.com | Counsel to Offshore International, Inc.; Maquilas Teta Kawi, S.A. de C.V.; On Semiconductor Corporation |
| Quarles & Brady Streich Lang LLP | Scott R. Goldberg | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | sgoldber@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Reed Smith | Elena Lazarou | 599 Lexington Avenue | 29th Street | New York | NY | 10022 | | 212-521-5400 | 212-521-5450 | elazarou@reedsmith.com | Counsel to General Electric Capital Corporation, Stategic Asset Finance. |
| Reed Smith | Richard P. Norton | One Riverfront Plaza | 1st Floor | Newark | NJ | 07102 | | 973-621-3200 | 973-621-3199 | rnorton@reedsmith.com | Counsel to Jason Incorporated, Sackner Products Division |
| Riddell Williams P.S. | Joseph E. Shickich, Jr. | 1001 4th Ave. | Suite 4500 | Seattle | WA | 98154-1195 | | 206-624-3600 | 206-389-1708 | jshickich@riddellwilliams.com | Counsel to Microsoft Corporation; Microsoft Licensing, GP |
| Rieck and Crotty PC | Jerome F Crotty | 55 West Monroe Street | Suite 3390 | Chicago | IL | 60603 | | 312-726-4646 | 312-726-0647 | jcrotty@rieckcrotty.com | Counsel to Mary P. O'Neill and Liam P. O'Neill |
| Riemer & Braunstein LLP | Mark S. Scott | Three Center Plaza | | Boston | MA | 02108 | | 617-523-9000 | 617-880-3456 | mscott@riemerlaw.com | Counsel to ICX Corporation |
| Riverside Claims LLC | Holly Rogers | 2109 Broadway | Suite 206 | New York | NY | 10023 | | 212-501-0990 | 212-501-7088 | holly@regencap.com | Riverside Claims LLC |
| Robinson, McFadden & Moore, P.C. | Annemarie B. Mathews | P.O. Box 944 | | Columbia | SC | 29202 | | 803-779-8900 | 803-771-9411 | amathews@robinsonlaw.com | Counsel to Blue Cross Blue Shield of South Carolina |
| Ropes & Gray LLP | Gregory O. Kaden | One International Place | | Boston | MA | 02110-2624 | | 617-951-7000 | 617-951-7050 | gregory.kaden@ropesgray.com | Attorneys for D-J, Inc. |
| Ropes & Gray LLP | Marc E. Hirschfield | 45 Rockefeller Plaza | | New York | NY | 10111-0087 | | 212-841-5700 | 212-841-5725 | marc.hirschfield@ropesgray.com | Attorneys for D-J, Inc. |
| Rosen Slome Marder LLP | Thomas R. Slome | 333 Earle Ovington Boulevard | Suite 901 | Uniondale | NY | 11533 | | 516-227-1600 | | tslome@rsmllp.com | Counsel to JAE Electronics, Inc. |
| Russell Reynolds Associates, Inc. | Charles E. Boulbol, P.C. | 26 Broadway, 17th Floor | | New York | NY | 10004 | | 212-825-9457 | 212-825-9414 | rttrack@msn.com | Counsel to Russell Reynolds Associates, Inc. |
| Sachnoff & Weaver, Ltd | Charles S. Schulman | 10 South Wacker Drive | 40th Floor | Chicago | IL | 60606 | | 312-207-1000 | 312-207-6400 | agelman@sachnoff.com | Counsel to Infineon Technologies North America Corporation |
| Satterlee Stephens Burke & Burke LLP | Christopher R. Belmonte | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | cbelmonte@ssbb.com | Counsel to Moody's Investors Service |
| Satterlee Stephens Burke & Burke LLP | Pamela A. Bosswick | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | pbosswick@ssbb.com | Counsel to Moody's Investors Service |
| Schafer and Weiner PLLC | Daniel Weiner | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | dweiner@schaferandweiner.com | Counsel to Dott Industries, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 16 of 20

4/16/2007 11:06 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Schafer and Weiner PLLC | Howard Borin | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | hborin@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Max Newman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | mnewman@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Ryan Heilman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | rheilman@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schiff Hardin LLP | Eugene J. Geekie, Jr. | 7500 Sears Tower | | Chicago | IL | 60606 | | 312-258-5635 | 312-258-5600 | egeekie@schiffhardin.com | Counsel to  Means Industries |
| Schiffrin & Barroway, LLP | Michael Yarnoff | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7056 | 610-667-7706 | myarnoff@sbclasslaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Schiffrin & Barroway, LLP | Sean M. Handler | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7706 | 610-667-7056 | shandler@sbclasslaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Schulte Roth & Sabel LLP | James T. Bentley | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2273 | 212-593-5955 | james.bentley@srz.com | Counsel to Panasonic Autommotive Systems Company of America |
| Schulte Roth & Sabel LLP | Michael L. Cook | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | michael.cook@srz.com | Counsel to Panasonic Automotive Systems Company of America; D.C. Capital Partners, L.P. |
| Schulte Roth & Zabel LLP | Carol Weiner Levy | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | carol.weiner.levy@srz.com | Counsel to D.C. Capital Partners, L.P. |
| Seyfarth Shaw LLP | Paul M. Baisier, Esq. | 1545 Peachtree Street, N.E. | Suite 700 | Atlanta | GA | 30309-2401 | | 404-885-1500 | 404-892-7056 | pbaisier@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | Robert W. Dremluk, Esq. | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | | 212-218-5500 | 212-218-5526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | William J. Hanlon | World Trade Center East | Two Seaport Lane, Suite 300 | Boston | MA | 02210 | | 617-946-4800 | 617-946-4801 | whanlon@seyfarth.com | Counsel to  le Belier/LBQ Foundry S.A. de C.V. |
| Sheehan Phinney Bass + Green Professional Association | Bruce A. Harwood | 1000 Elm Street | P.O. Box 3701 | Manchester | NH | 03105-3701 | | 603-627-8139 | 603-627-8121 | bharwood@sheehan.com | Counsel to Source Electronics, Inc. |
| Sheldon S. Toll PLLC | Sheldon S. Toll | 2000 Town Center | Suite 2550 | Southfield | MI | 48075 | | 248-358-2460 | 248-358-2740 | lawtoll@comcast.net | Counsel to Milwaukee Investment Company |
| Sheppard Mullin Richter & Hampton LLP | Eric Waters | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | 212-332-3888 | ewaters@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Malani J. Sternstein | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | 212-332-3888 | msternstein@sheppardmullin.com | Counsel to International Rectifier Corp. and Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theodore A. Cohen | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | 213-620-1398 | tcohen@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theresa Wardle | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | 213-620-1398 | twardle@sheppardmullin.com | Counsel to International Rectifier Corp. |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 5353 Essen Lane | Suite 650 | Baton Rouge | LA | 70809 | | 225-757-2185 | 225-757-7674 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 909 Poydras Street | 28th Floor | New Orleans | LA | 70112-1033 | | 504-299-2100 | 504-299-2300 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Sills, Cummis Epstein & Gross, P.C. | Andrew H. Sherman | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | asherman@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 17 of 20

4/16/2007 11:06 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Sills, Cummis Epstein & Gross, P.C. | Jack M. Zackin | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | jzackin@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |
| Silver Point Capital, L.P. | Chaim J. Fortgang | Two Greenwich Plaza | 1st Floor | Greenwich | CT | 06830 | | 203-542-4216 | 203-542-4100 | cfortgang@silverpointcapital.com | Counsel to Silver Point Capital, L.P. |
| Smith, Gambrell & Russell, LLP | Barbara Ellis-Monro | 1230 Peachtree Street, N.E. | Suite 3100 | Atlanta | GA | 30309 | | 404-815-3500 | 404-815-3500 | bellis-monro@sgrlaw.com | Counsel to Southwire Company |
| Smith, Katzenstein & Furlow LLP | Kathleen M. Miller | 800 Delaware Avenue, 7th Floor | P.O. Box 410 | Wilmington | DE | 19899 | | 302-652-8400 | 3026528405 | kmiller@skfdelaware.com | Counsel to Airgas, Inc. |
| Sonnenschein Nath & Rosenthal LLP | D. Farrington Yates | 1221 Avenue of the Americas | 24th Floor | New York | NY | 10020 | | 212-768-6700 | 212-768-6800 | fyates@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc. |
| Sonnenschein Nath & Rosenthal LLP | Robert E. Richards | 8000 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | 312-876-7934 | rrichards@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc. |
| Sony Electronics Inc. | Lloyd B. Sarakin - Chief Counsel, Finance and Credit | 1 Sony Drive | MD #1 E-4 | Park Ridge | NJ | 07656 | | 201-930-7483 | | lloyd.sarakin@am.sony.com | Counsel to Sony Electronics, Inc. |
| Sotiroff & Abramczyk, P.C. | Robert M. Goldi | 30400 Telegraph Road | Suite 444 | Bingham Farms | MI | 48025 | | 248-642-6000 | 248-642-9001 | rgoldi@sotablaw.com | Counsel to Michigan Heritage Bank; MHB Leasing, Inc. |
| Squire, Sanders & Dempsey L.L.P. | Eric Marcks | One Maritime Plaza | Suite 300 | San Francisco | CA | 94111-3492 | | | 415-393-9887 | emarcks@ssd.com | Counsel to Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| Squire, Sanders & Dempsey L.L.P. | Penn Ayers Butler | 600 Hansen Way | | Palo Alto | CA | 94304 | | 650-856-6500 | 650-843-8777 | pabutler@ssd.com | Counsel to Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| State of California Office of the Attorney General | Sarah E. Morrison | Deputy Attorney General | 300 South Spring Street Ste 1702 | Los Angeles | CA | 90013 | | 213-897-2640 | 213-897-2802 | sarah.morrison@doj.ca.gov | Attorneys for the State of California Department of Toxic Substances Control |
| State of Michigan Department of Labor & Economic Growth, Unemployment Insurance Agency | Roland Hwang Assistant Attorney General | 3030 W. Grand Boulevard | Suite 9-600 | Detroit | MI | 48202 | | 313-456-2210 | 313-456-2201 | hwangr@michigan.gov | Assistant Attorney General for State of Michigan, Unemployment Tax Office of the Department of Labor & Economic Growth, Unemployment Insurance Agency |
| Steel Technologies, Inc. | John M. Baumann | 15415 Shelbyville Road | | Louisville | KY | 40245 | | 502-245-0322 | 502-245-0542 | jmbaumann@steeltechnologies.com | Counsel to Steel Technologies, Inc. |
| Stein, Rudser, Cohen & Magid LLP | Robert F. Kidd | 825 Washington Street | Suite 200 | Oakland | CA | 94607 | | 510-287-2365 | 510-987-8333 | rkidd@srcm-law.com | Counsel to Excel Global Logistics, Inc. |
| Steinberg Shapiro & Clark | Mark H. Shapiro | 24901 Northwestern Highway | Suite 611 | Southfield | MI | 48075 | | 248-352-4700 | 248-352-4488 | shapiro@steinbergshapiro.com | Counsel to Bing Metals Group, Inc.; Gentral Transport International, Inc.; Crown Enerprises, Inc.; Economy Transport, Inc.; Logistics Insight Corp (LINC); Universal Am-Can, Ltd.; Universal Truckload Services, Inc. |
| Sterns & Weinroth, P.C. | Jeffrey S. Posta Michael A Spero Simon Kimmelman Valerie A Hamilton | 50 West State Street, Suite 1400 | PO Box 1298 | Trenton | NJ | 08607-1298 | | 609-392-2100 | 609-392-7956 | jposta@sternslaw.com jspecf@sternslaw.com | Counsel to Doosan Infracore America Corp. |
| Stevens & Lee, P.C. | Chester B. Salomon, Esq. Constantine D. Pourakis, Esq. | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | | 212-319-8500 | 212-319-8505 | cs@stevenslee.com cp@stevenslee.com | Counsel to Tonolli Canada Ltd.; VJ Technologies, Inc. and V.J. ElectroniX, Inc. |
| Stinson Morrison Hecker LLP | Mark A. Shaiken | 1201 Walnut Street | | Kansas City | MO | 64106 | | 816-842-8600 | 816-691-3495 | mshaiken@stinsonmoheck.com | Counsel to Thyssenkrupp Waupaca, Inc. and Thyssenkrupp Stahl Company |
| Stites & Harbison PLLC | Madison L.Cashman | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | robert.goodrich@stites.com | Counsel to Setech, Inc. |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Stites & Harbison PLLC | Robert C. Goodrich, Jr. | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | madison.cashman@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison, PLLC | W. Robinson Beard, Esq. | 400 West Market Street | | Louisville | KY | 40202 | | 502-681-0448 | 502-779-8274 | wbeard@stites.com | Counsel to WAKO Electronics (USA), Inc. and Ambrake Corporation |
| Stroock & Stroock & Lavan, LLP | Kristopher M. Hansen | 180 Maiden Lane | | New York | NY | 10038 | | 212-806-5400 | 212-806-6006 | khansen@stroock.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| Swidler Berlin LLP | Robert N. Steinwurtzel | The Washington Harbour | 3000 K Street, N.W. Suite 300 | Washington | DC | 20007 | | 202-424-7500 | 202-424-7645 | rnsteinwurtzel@swidlaw.com | Attorneys for Sanders Lead Co., Inc. |
| Taft, Stettinius & Hollister LLP | Richard L. Ferrell | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202-3957 | | 513-381-2838 | | ferrell@taftlaw.com | Counsel to Wren Industries, Inc. |
| Taft, Stettinius & Hollister LLP | W Timothy Miller Esq | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202 | | 513-381-2838 | 513-381-0205 | miller@taftlaw.com | Counsel to Select Industries Corporation and Gobar Systems, Inc. |
| Tennessee Department of Revenue | Marvin E. Clements, Jr. | c/o TN Attorney General's Office, Bankruptcy Division | PO Box 20207 | Nashville | TN | 37202-0207 | | 615-532-2504 | 615-741-3334 | marvin.clements@state.tn.us | Tennesse Department of Revenue |
| Terra Law LLP | David B. Draper | 60 S. Market Street | Suite 200 | San Jose | CA | 95113 | | 408-299-1200 | 408-998-4895 | ddraper@terra-law.com | Counsel to Maxim Integrated Products, Inc. |
| Thacher Proffitt & Wood LLP | Jonathan D. Forstot | Two World Financial Center | | New York | NY | 10281 | | 212-912-7679 | 212-912-7751 | jforstot@tpw.com | Counsel to TT Electronics, Plc |
| Thacher Proffitt & Wood LLP | Louis A. Curcio | Two World Financial Center | | New York | NY | 10281 | | 212-912-7607 | 212-912-7751 | lcurcio@tpw.com | Counsel to TT Electronics, Plc |
| The Furukawa Electric Co., Ltd. | Mr. Tetsuhiro Niizeki | 6-1 Marunouchi | 2-Chrome, Chiyoda-ku | Tokyo | Japan | 100-8322 | | | 81-3-3286-3919 | niizeki.tetsuhiro@furukawa.co.jp | Legal Department of The Furukawa Electric Co., Ltd. |
| The Timpken Corporation BIC - 08 | Robert Morris | 1835 Dueber Ave. SW | PO Box 6927 | Canton | OH | 44706-0927 | | 330-438-3000 | 1-330-471-4388 | robert.morris@timken.com | Representative for Timken Corporation |
| Thelen Reid Brown Raysman & Steiner LLP | David A. Lowenthal | 875 Third Avenue | | New York | NY | 10022 | | 212-603-2000 | 212-603-2001 | dlowenthal@thelenreid.com | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Corporation and Oki Semiconductor Company |
| Thompson & Knight | Rhett G. Cambell | 333 Clay Street | Suite 3300 | Houston | TX | 77002 | | 713-654-1871 | 713-654-1871 | rhett.campbell@tklaw.com | Counsel to STMicroelectronics, Inc. |
| Thompson & Knight LLP | Ira L. Herman | 919 Third Avenue | 39th Floor | New York | NY | 10022-3915 | | 212-751-3045 | 214-999-9139 | ira.herman@tklaw.com | Counsel to Victory Packaging |
| Thompson & Knight LLP | John S. Brannon | 1700 Pacific Avenue | Suite 3300 | Dallas | TX | 75201-4693 | | 214-969-1505 | 214-969-1609 | john.brannon@tklaw.com | Counsel to Victory Packaging |
| Thurman & Phillips, P.C. | Ed Phillips, Jr. | 8000 IH 10 West | Suite 1000 | San Antonio | TX | 78230 | | 210-341-2020 | 210-344-6460 | ephillips@thurman-phillips.com | Counsel to Royberg, Inc. d/b/a Precision Mold & Tool and d/b/a Precision Mold and Tool Group |
| Todd & Levi, LLP | Jill Levi, Esq. | 444 Madison Avenue | Suite 1202 | New York | NY | 10022 | | 212-308-7400 | jlevi@toddlevi.com | Counsel to Bank of Lincolnwood |
| Tyler, Cooper & Alcorn, LLP | W. Joe Wilson | City Place | 35th Floor | Hartford | CT | 06103-3488 | | 860-725-6200 | 860-278-3802 | jwilson@tylercooper.com | Counsel to Barnes Group, Inc. |
| Underberg & Kessler, LLP | Helen Zamboni | 300 Bausch & Lomb Place | | Rochester | NY | 14604 | | 585-258-2800 | 585-258-2821 | hzamboni@underbergkessler.com | Counsel to McAlpin Industries, Inc. |
| Union Pacific Railroad Company | Mary Ann Kilgore | 1400 Douglas Street | MC 1580 | Omaha | NE | 68179 | | 402-544-4195 | 402-501-0127 | mkilgore@UP.com | Counsel to Union Pacific Railroad Company |
| Varnum, Riddering, Schmidt & Howlett LLP | Michael S. McElwee | Bridgewater Place | P.O. Box 352 | Grand Rapids | MI | 49501-0352 | | 616-336-6827 | 616-336-7000 | msmcelwee@varnumlaw.com | Counsel to Furukawa Electric North America APD and Co-Counsel to Tower Automotive, Inc. |
| Vorys, Sater, Seymour and Pease LLP | Robert J. Sidman, Esq. | 52 East Gay Street | P.O. Box 1008 | Columbus | OH | 43216-1008 | | 614-464-6422 | 614-719-8676 | rjsidman@vssp.com | |
| Vorys, Sater, Seymour and Pease LLP | Tiffany Strelow Cobb | 52 East Gay Street | | Columbus | OH | 43215 | | 614-464-8322 | 614-719-4663 | tscobb@vssp.com | Counsel to America Online, Inc. and its Subsidiaries and Affiliates |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 19 of 20

4/16/2007 11:06 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Wachtell, Lipton, Rosen & Katz | Emil A. Kleinhaus | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | EAKleinhaus@wlrk.com | Counsel to Capital Research and Management Company |
| Wachtell, Lipton, Rosen & Katz | Richard G. Mason | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | RGMason@wlrk.com | Counsel to Capital Research and Management Company |
| Waller Lansden Dortch & Davis, PLLC | David E. Lemke, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | david.lemke@wallerlaw.com | Counsel to Nissan North America, Inc. |
| Waller Lansden Dortch & Davis, PLLC | Robert J. Welhoelter, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | robert.welhoelter@wallerlaw.com | Counsel to Nissan North America, Inc. |
| Warner Norcross & Judd LLP | Gordon J. Toering | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2185 | 616-222-2185 | gtoering@wnj.com | Counsel to Robert Bosch Corporation |
| Warner Norcross & Judd LLP | Michael G. Cruse | 2000 Town Center | Suite 2700 | Southfield | MI | 48075 | | 248-784-5131 | 248-603-9631 | mcruse@wnj.com | Counsel to Compuware Corporation |
| Warner Norcross & Judd LLP | Stephen B. Grow | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2158 | | growsb@wnj.com | Counsel to Behr Industries Corp. |
| Warner Stevens, L.L.P. | Michael D. Warner | 301 Commerce Street | Suite 1700 | Fort Worth | TX | 76102 | | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Counsel to Electronic Data Systems Corp. and EDS Information Services, L.L.C. |
| Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP | Lei Lei Wang Ekvall | 650 Town Center Drive | Suite 950 | Costa Mesa | CA | 92626 | | 714-966-1000 | 714-966-1002 | lekvall@wgllp.com | Counsel to Toshiba America Electronic Components, Inc. |
| Weinstein, Eisen & Weiss LLP | Aram Ordubegian | 1925 Century Park East | #1150 | Los Angeles | CA | 90067 | | 310-203-9393 | 310-203-8110 | aordubegian@weineisen.com | Counsel to Orbotech, Inc. |
| Weltman, Weinberg & Reis Co., L.P.A. | Geoffrey J. Peters | 175 South Third Street | Suite 900 | Columbus | OH | 43215 | | 614-857-4326 | 614-222-2193 | gpeters@weltman.com | Counsel to Seven Seventeen Credit Union |
| White & Case LLP | Glenn Kurtz<br>Gerard Uzzi<br>Douglas Baumstein | 1155 Avenue of the Americas | | New York | NY | 10036-2787 | | 212-819-8200 | | gkurtz@ny.whitecase.com<br>guzzi@whitecase.com<br>dbaumstein@ny.whitecase.com | Counsel to Appaloosa Management, LP |
| White & Case LLP | Thomas Lauria<br>Frank Eaton | Wachovia Financial Center | 200 South Biscayne Blvd., Suite 4900 | Miami | FL | 33131 | | 305-371-2700 | 305-358-5744 | tlauria@whitecase.com<br>featon@miami.whitecase.com | Counsel to Appaloosa Management, LP |
| Whyte, Hirschboeck Dudek S.C. | Bruce G. Arnold | 555 East Wells Street | Suite 1900 | Milwaukee | WI | 53202-4894 | | 414-273-2100 | 414-223-5000 | barnold@whdlaw.com | Counsel to Schunk Graphite Technology |
| Winstead Sechrest & Minick P.C. | Berry D. Spears | 401 Congress Avenue | Suite 2100 | Austin | TX | 78701 | | 512-370-2800 | 512-370-2850 | bspears@winstead.com | Counsel to National Instruments Corporation |
| Winstead Sechrest & Minick P.C. | R. Michael Farquhar | 5400 Renaissance Tower | 1201 Elm Street | Dallas | TX | 75270 | | 214-745-5400 | 214-745-5390 | mfarquhar@winstead.com | Counsel to National Instruments Corporation |
| Winthrop Couchot Professional Corporation | Marc. J. Winthrop | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | mwinthrop@winthropcouchot.com | Counsel to Metal Surfaces, Inc. |
| Winthrop Couchot Professional Corporation | Sean A. O'Keefe | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | sokeefe@winthropcouchot.com | Counsel to Metal Surfaces, Inc. |
| Womble Carlyle Sandridge & Rice, PLLC | Lillian H. Pinto | 300 North Greene Street | Suite 1900 | Greensboro | NC | 27402 | | 336-574-8058 | 336-574-4528 | lpinto@wcsr.com | Counsel to Armacell |
| Zeichner Ellman & Krause LLP | Peter Janovsky | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | pjanovsky@zeklaw.com | Counsel to Toyota Tsusho America, Inc. and Karl Kufner, KG aka Karl Kuefner, KG |
| Zeichner Ellman & Krause LLP | Stuart Krause | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | skrause@zeklaw.com | Counsel to Toyota Tsusho America, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 20 of 20

4/16/2007 11:06 AM
Email

# EXHIBIT C

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| Akebono Corporation (North America) | Alan Swiech | 34385 Twelve Mile Road | | Farminton Hills | MI | 48331 | 248-489-7406 | Vice President of Administration for Akebono Corporation |
| APS Clearing, Inc. | Andy Leinhoff | 1301 S. Capital of Texas Highway | Suite B-220 | Austin | TX | 78746 | 512-314-4416 | Counsel to APS Clearing, Inc. |
| APS Clearing, Inc. | Matthew Hamilton | 1301 S. Capital of Texas Highway | Suite B-220 | Austin | TX | 78746 | 512-314-4416 | Counsel to APS Clearing, Inc. |
| Cage Williams & Abelman, P.C. | Steven E. Abelman | 1433 Seventeenth Street | | Denver | CO | 80202 | 303-295-0202 | Counsel to United Power, Inc. |
| Colbert & Winstead, P.C. | Amy Wood Malone | 1812 Broadway | | Nashville | TN | 37203 | 615-321-0555 | Counsel to Averitt Express, Inc. |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Steven M. Wachstein | 33 West First Street | Suite 600 | Dayton | OH | 45402 | 937-223-8177 | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Company |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | Andrew M. Thau | 101 Park Avenue | | New York | NY | 10178-0061 | 212-696-8898 | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | David S. Karp | 101 Park Avenue | | New York | NY | 10178-0061 | 212-696-6065 | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co. |
| Dykema Gossett PLLC | Gregory J. Jordan | 10 Wacker | Suite 2300 | Chicago | IL | 60606 | 312-627-2171 | Counsel to Tremont City Barrel Fill PRP Group |
| Genovese Joblove & Battista, P.A. | Craig P. Rieders, Esq. | 100 S.E. 2nd Street | Suite 4400 | Miami | FL | 33131 | 305-349-2300 | Counsel to Ryder Integrated Logistics, Inc. |
| Grant & Eisenhofer P.A. | Geoffrey C. Jarvis | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | 302-622-7000 | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Heller Ehrman LLP | Carren Shulman | Times Square Tower | Seven Times Square | New York | NY | 10036 | 212-832-8300 | Counsel to @Road, Inc. |
| Jason, Inc. | Beth Klimczak, General Counsel | 411 E. Wisconsin Ave | Suite 2120 | Milwaukee | WI | 53202 | | General Counsel to Jason Incorporated |
| Johnston, Harris Gerde & Komarek, P.A. | Jerry W. Gerde, Esq. | 239 E. 4th St. | | Panama City | FL | 32401 | 850-763-8421 | Counsel to Peggy C. Brannon, Bay County Tax Collector |
| Kirkland & Ellis LLP | Geoffrey A. Richards | 200 East Randolph Drive | | Chicago | IL | 60601 | 312-861-2000 | Counsel to Lunt Mannufacturing Company |
| Lord, Bissel & Brook LLP | Rocco N. Covino | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | 212-812-8340 | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| Miami-Dade County Tax Collector | Metro-Dade Paralegal Unit | 140 West Flagler Street | Suite 1403 | Miami | FL | 33130 | 305-375-5314 | Paralegal Collection Specialist for Miami-Dade County |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 2

4/16/2007 11:06 AM
US Mail

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| Norris, McLaughlin & Marcus | Elizabeth L. Abdelmasieh, Esq | 721 Route 202-206 | P.O. Box 1018 | Somerville | NJ | 08876 | 908-722-0700 | Counsel to Rotor Clip Company, Inc. |
| North Point | Michelle M. Harner | 901 Lakeside Avenue | | Cleveland | OH | 44114 | 216-586-3939 | Counsel to WL. Ross & Co., LLC |
| O'Rourke Katten & Moody | Michael C. Moody | 161 N. Clark Street | Suite 2230 | Chicago | IL | 60601 | 312-849-2020 | Counsel to Ameritech Credit Corporation d/b/a SBC Capital Services |
| Paul, Weiss, Rifkind, Wharton & Garrison | Curtis J. Weidler | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | 212-373-3157 | Counsel to Ambrake Corporation; Akebono Corporation |
| Professional Technologies Services | John V. Gorman | P.O. Box #304 | | Frankenmuth | MI | 48734 | 989-385-3230 | Corporate Secretary for Professional Technologies Services |
| Republic Engineered Products, Inc. | Joseph Lapinsky | 3770 Embassy Parkway | | Akron | OH | 44333 | 330-670-3004 | Counsel to Republic Engineered Products, Inc. |
| Ropers, Majeski, Kohn & Bentley | Christopher Norgaard | 515 South Flower Street | Suite 1100 | Los Angeles | CA | 90071 | 213-312-2000 | Counsel to Brembo S.p.A; Bibielle S.p.A.; AP Racing |
| Sachnoff & Weaver, Ltd | Charles S. Schulman | 10 South Wacker Drive | 40th Floor | Chicago | IL | 60606 | 312-207-1000 | Counsel to Infineon Technologies North America Corporation |
| Schiff Hardin LLP | William I. Kohn | 6600 Sears Tower | | Chicago | IL | 60066 | 312-258-5500 | Counsel to  Means Industries |
| Shipman & Goodwin LLP | Jennifer L. Adamy | One Constitution Plaza | | Hartford | CT | 06103-1919 | 860-251-5811 | Counsel to Fortune Plastics Company of Illinois, Inc.; Universal Metal Hose Co., |
| Stroock & Stroock & Lavan, LLP | Joseph G. Minias | 180 Maiden Lane | | New York | NY | 10038 | 212-806-5400 | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. a |
| Togut, Segal & Segal LLP | Albert Togut, Esq. | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | Conflicts counsel to Debtors |
| United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO | David Jury, Esq. | Five Gateway Center | Suite 807 | Pittsburgh | PA | 15222 | 412-562-2549 | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| WL Ross & Co., LLC | Stephen Toy | 600 Lexington Avenue | 19th Floor | New York | NY | 10022 | 212-826-1100 | Counsel to WL. Ross & Co., LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 2

4/16/2007 11:06 AM
US Mail

# EXHIBIT D

TOGUT, SEGAL & SEGAL LLP
Co-Counsel for Delphi Corporation, *et al.*,
Debtors and Debtors in Possession
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Neil Berger (NB-3599)
Sean McGrath (SM-4676)

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT         **HEARING DATE: April 20, 2007**
SOUTHERN DISTRICT OF NEW YORK                     **AT:  10:00 a.m.**
-------------------------------------------------------------x
                                                  :
In re:                                            :
                                                  :        Chapter 11
DELPHI CORPORATION, *et al.*,                     :        Case No. 05-44481 [RDD]
                                                  :
                         Debtors.                 :        Jointly Administered
                                                  :
-------------------------------------------------------------x

## DEBTORS' OBJECTION TO MOTION BY FURUKAWA ELECTRIC NORTH AMERICA APD AND FURUKAWA ELECTRIC CO., LTD., FOR (A) ABSTENTION PURSUANT TO 28 U.S.C. § 1334(c);  (B) RELIEF FROM AUTOMATIC STAY PURSUANT TO 11 U.S.C. 362(d);  AND (C) AN ORDER LIMITING THE SCOPE OF THE THIRD OMNIBUS CLAIM OBJECTION HEARING

**TO THE HONORABLE ROBERT D. DRAIN,**
**UNITED STATES BANKRUPTCY JUDGE:**

Delphi Corporation ("Delphi") and certain of its subsidiaries and

affiliates, debtors and debtors in possession (collectively, the "Debtors") in the above-

captioned cases (the "Cases"), by their undersigned counsel, as and for their objection to

the motion dated March 23, 2007 (the "Motion") of Furukawa Electric North America

APD ("Furukawa North America") and Furukawa Electric Co., Ltd. (jointly,

"Furukawa" or the "Claimant") for an Order for (a) abstention pursuant to 28 U.S.C.

1334(c);  (b) relief from the automatic stay pursuant to 362(d) of title 11 of the United

States Code (the "Bankruptcy Code");  and (c) for an order limiting the scope of the

claim objection hearing scheduled for May 10, 2007, respectfully state:

## PRELIMINARY STATEMENT

1.      The Motion should be denied in all respects because Furukawa has

not shown adequate cause for the relief that it seeks.

2.      Furukawa submitted to the jurisdiction of this Court when it filed

its proof of claim and the Debtors have objected to Furukawa's Proof of Claim.  The

parties' dispute is a claim objection which is proceeding in this Court and which is a

"core proceeding" pursuant to 28 U.S.C. § 157.

3.      "Abstention is only mandated with respect to non-core matters.

Therefore where a matter constitutes a core proceeding, the mandatory abstention

provisions of section 1334(C)(2) are inapplicable."  Luan Investment S.E. v. Franklin 145

Corp. (In re Petrie Retail, Inc.), 304 F.3d 223, 232 (2d Cir. 2002).

4.      Furukawa has failed to satisfy its burden to establish either

mandatory or discretionary abstention.  It has also failed to satisfy its burden to

establish cause to modify the automatic stay.

5.      Consequently, the Furukawa claim objection is properly litigated in

this Court and not in the State Court (defined below).  See Langenkamp v. Culp, 498

U.S. 42, 44 (1990) ("by filing a claim against a bankruptcy estate the creditor triggers the

process of 'allowance and disallowance of claims,' thereby subjecting himself to the

bankruptcy court's equitable power").

## Current Business Operations of the Debtors

6.     As of December 31, 2005, Delphi and its subsidiaries and affiliates (collectively, the "Company") had global 2005 net sales of approximately $26.9 billion and global assets of approximately $17.0 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

7.     The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

8.     Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of

---

[1]     The aggregated financial data used in this objection generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

### Events Leading To The Chapter 11 Filing

9.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.

10.      The Debtors believe that the Company's financial performance has deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

11.      In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for

---

[2]      Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

## The Debtors' Transformation Plan

12.     On March 31, 2006, the Company outlined five key tenets of its transformation plan.  First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.  Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise a workable solution to their current pension situation.

13.     On December 18, 2006, the Debtors marked another milestone in their chapter 11 cases with the announcement of two significant agreements.  The first of these was an equity purchase and commitment agreement (the "Equity Purchase and Commitment Agreement") with affiliates of Appaloosa Management L.P., Cerberus Capital Management, L.P., and Harbinger Capital Partners Master Fund I, Ltd., as well as Merrill Lynch & Co. and UBS Securities LLC (collectively, the "Plan Investors").  Under the Equity Purchase and  Commitment Agreement, the Plan Investors have agreed to invest up to $3.4 billion in preferred and common equity in the reorganized Delphi to support the Debtors' transformation plan.  The Equity Purchase and Commitment Agreement is subject to the completion of due diligence, satisfaction or waiver of numerous other conditions (including Delphi's achievement of consensual

agreements with its principal U.S. labor unions and GM), and the non-exercise by either

Delphi or the Plan Investors of certain termination rights.  The second agreement was a

plan framework support agreement (the "Plan Framework Support Agreement") with

the Plan Investors and GM.  The Plan Framework Support Agreement outlines certain

proposed terms of the Debtors' anticipated plan of reorganization, including the

distributions to be made to creditors and shareholders, the treatment of GM's claims,

the resolution of certain pension funding issues, and the corporate governance of the

reorganized Debtors.  The terms of the Plan Framework Support Agreement are

expressly conditioned on the Debtors' reaching consensual agreements with their U.S.

labor unions and GM.

       14.    On January 12, 2007, this Court authorized the Debtors to execute,

deliver, and implement the Equity Purchase and Commitment Agreement and the Plan

Framework Support Agreement (Docket No. 6589).  On February 28, 2007, Delphi

entered into an amendment to the Equity Purchase and Commitment Agreement with

the Plan Investors to extend the date by which the Company, the Cerberus Capital

Management, L.P. affiliate, or the Appaloosa Management L.P. affiliate have the right to

terminate the agreement on account of not yet having completed tentative labor

agreements with Delphi's principal U.S. labor unions and a consensual settlement of

legacy issues with GM.  The amendment extended the termination right pursuant to a

14-day notice mechanism.  The amendment also extended the deadline to make certain

regulatory filings under the federal antitrust laws in connection with the Equity

Purchase and Commitment Agreement and the Plan Framework Support Agreement.

       15.    Although much remains to be accomplished in the Debtors'

reorganization cases, the Debtors and their stakeholders are together navigating a

course that should lead to a consensual resolution with their U.S. labor unions and GM

while providing an acceptable financial recovery framework for the Debtors'
stakeholders.  Upon the conclusion of the reorganization process, the Debtors expect to
emerge as a stronger, more financially sound business with viable U.S. operations that
are well-positioned to advance global enterprise objectives.  In the meantime, Delphi
will marshal all of its resources to continue to deliver high-quality products to its
customers globally.  Additionally, the Company will preserve and continue the strategic
growth of its non-U.S. operations and maintain its prominence as the world's premier
auto supplier.

## BACKGROUND

A.    **The Parties' Disputed Claims**

16.    Pursuant to:  (a) a Long Term Contract dated September 7, 2000
between Furukawa Electric Co., Ltd. and Delphi Automotive Systems, LLC ("DAS
LLC") (the "Long Term Contract") and (b) a purchase order number SAG90I4710 issued
September 12, 2001 by DAS LLC to Furukawa North America (the "Purchase Order,"
together with the Long Term Contract, the "Agreements"), Furukawa agreed to sell
DAS LLC approximately 100% of DAS LLC's requirements for torque and position
sensors (the "Sensors").  Copies of the Agreements are annexed to Exhibit 2 of the
Motion.

17.    The Sensors that were manufactured and sold by Furukawa, were
shipped to DAS LLC's manufacturing facility in Saginaw, Michigan, and were
assembled by DAS LLC into Power Steering Assist Mechanisms that were then
assembled into steering columns.  The steering columns manufactured by DAS LLC
were sold to General Motors Corporation ("GM") for assembly into GM vehicles.

18.    Furukawa offered a design for the Sensors that would meet the
manufacturing and electrical steering use requirements of DAS LLC in its manufacture

7

of steering columns for sale to GM. DAS LLC's specific requirements were communicated to Furukawa to accomplish this purpose. A pre-production part of the Sensors was provided by Furukawa to DAS LLC, and was subjected to the tests and evaluations required for production approval. DAS LLC ordered the Sensors from Furukawa on the well-founded belief that Furukawa would ship Sensors having the same design, integrity, metallurgical quality, and electrical quality as the approved parts.

19.      Subsequent to providing Delphi with the pre-production part, which was approved by the Debtors, and validated by GM and the Debtors, Furukawa twice requested that material revisions be made to the Sensors' specification, and DAS LLC twice refused such requests for sound metallurgical and engineering reasons. Furukawa, without the knowledge and consent of DAS LLC, and with intentional disregard of DAS LLC's instructions, changed certain material used as plating in the Sensors. Furukawa's material and unauthorized change in the plating of the Sensors resulted in the failure of the Sensors, which led to failures in the steering columns sold by DAS LLC to GM. GM issued a recall as a result of the failure of the Sensor, and, in turn, deducted approximately $24 million from payments to DAS LLC -- amounts representing GM's losses that were caused by Furukawa's unauthorized changes to the Sensors.

20.      In addition, Furukawa knew of, or should have known of, DAS LLC's expectation that the Sensors meet certain design requirements. Thus, in addition to the express warranties provided by the terms of the Agreements, Furukawa's material alterations of the Sensors breached certain implied warranties created by law.

21.      As a result of its breach of both express and implied warranties, Furukawa breached the terms of the Agreements. When the parties could not resolve

8

the issues through negotiation, DAS LLC filed a complaint against Furukawa (the "State

Court Complaint") in the Circuit Court for the County of Saginaw Michigan (the "State

Court") on October 14, 2004 (the "State Court Action").

22.    Significantly, Furukawa never asserted a counterclaim in the State

Court Action.  Instead, it asserted its Proof of Claim in this Court.

23.    There has been no deposition discovery in the State Court Action, a

mediation mandated by Michigan law has not yet been scheduled and no trial date has

been set.[3]

**B.    The Proof of Claim**

24.    On October 8, 2005, the Debtors commenced these Cases.

25.    Furukawa filed proof of claim number 12347 (the "Proof of Claim")

against DAS LLC on or about July 28, 2006.  The Proof of Claim asserts an unsecured

nonpriority claim in the amount of $2,589,684.56 for alleged breach of contract damages

(the "Furukawa Claim").  The Furukawa Claim includes alleged damages for legal fees,

"inventory," "investment," and other miscellaneous charges.  See attachments to the

Proof of Claim which is annexed to the Motion as Exhibit 3.

26.    The Debtors objected to the Furukawa Claim pursuant to the

Debtors' (I) Third Omnibus Objection (Substantive) Pursuant to 11 U.S.C. § 502(b) and

Fed. R. Bankr. P. 3007 To Certain (A) Claims With Insufficient Documentation, (B)

Claims Unsubstantiated By Debtors' Books And Records, and (C) Claims Subject To

Modification and (II) Motion to Estimate Contingent And Unliquidated Claims

Pursuant To 11 U.S.C. § 502(c) (Docket No. 5452) (the "Third Omnibus Claims

Objection"), which was filed on October 31, 2006.

---

[3] The time within which the Debtors may remove the State Court Action has been extended by this Court.

27.     Furukawa responded and objected to the Debtors' Third Omnibus
Claims Objection (Docket No. 5788) (the "Response") on November 22, 2006.

28.     The Debtors' objections to the Furukawa Claim requires
consideration and adjudication of the Debtors' affirmative claims against Furukawa,
absent which, adjudication of the claim objection will result in an incomplete resolution.

## ARGUMENT

### A.     The Motion for Mandatory Abstention Should Be Denied

29.     Furukawa submitted to the jurisdiction of this Court when it filed
its proof of claim.  The Debtors have objected to Furukawa's Proof of Claim and
Furukawa responded and joined issue with the Debtors' objection.

30.     This dispute involves a claim objection which is a "core
proceeding" pursuant to 28 U.S.C. § 157.

31.     "Abstention is only mandated with respect to non-core matters.
Therefore where a matter constitutes a core proceeding, the mandatory abstention
provisions of section 1334(c)(2) are inapplicable."   Luan Investment S.E. v. Franklin 145
Corp. (In re Petrie Retail, Inc.), 304 F.3d 223, 232 (2d Cir. 2002)

32.     Furukawa explicitly concedes this point when it states that
mandatory abstention is required only when the matter at issue is a non-core
proceeding.  Motion at 10.

33.     Accordingly, the Furukawa claim objection is properly litigated in
this Court and not in the State Court Action.  See Langenkamp v. Culp, 498 U.S. 42, 44
(1990) ("by filing a claim against a bankruptcy estate the creditor triggers the process of
'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy
court's equitable power ").

34.    Based upon the foregoing, its request for mandatory abstention must be denied.

**B.  The Motion for Discretionary Abstention Should Be Denied**

35.    Furukawa alternatively seeks relief under the doctrine of discretionary abstention pursuant to 28 U.S.C §1334(c)(1).  However, as demonstrated below, Furukawa has failed to establish any of the exceptional circumstances required for permissive abstention.

This Court recently held:

> In determining whether to exercise permissive abstention under section 1334 (c), courts have considered one or more (not necessarily all) of twelve factors (1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention;  (2) the extent to which state law issues predominate over bankruptcy issues;  (3) the difficulty or unsettled nature of the applicable state law;  (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court;  (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334;  (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case;  (7) the substance rather than the form of an asserted 'core' proceeding;  (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;  (9) the burden of the bankruptcy court's docket;  (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;  (11) the existence of a right to a jury trial;  (12) the presence in the proceeding of nondebtor parties."

In re:  Calpine Corp.  2007 WL 39124 at *3 (S.D.N.Y. Jan. 3, 2007).  After reviewing these factors, the Court held that "abstention is appropriate only in certain narrowly tailored exceptional circumstances" (citing Colorado River Water Conservation vs. U.S., 424 U.S. 800, 817-18 (1946) and that "[f]ederal courts have a 'virtually unflagging obligation' to exercise the jurisdiction given them."  2007 WL 39124 at *3 (citing In re Joint Eastern and Southern District Asbestos Litigation 78 F.3d 764, 775 (2d. Cir. 1996);  accord Luan

Investment S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.), 2001 WL 826122

(S.D.N.Y. July 19, 2001), aff'd, 304 F.3d 223, 232 (2d Cir. 2002).

36.     Here the relevant factors identified in Calpine militate against

discretionary abstention.  With respect to the efficient administration of justice,

Furukawa filed the proof of claim in this Court based on the same contract out of which

the State Court Action arose.  The parties are all before this Court[4] and the issues of

liability, damages and recovery regarding the Debtors' Agreements with Furukawa

may and should all be adjudicated in this Court, as opposed to the piecemeal

adjudication that Furukawa advocates.

37.     While the parties' dispute may implicate some state law issues, this

claim dispute can be resolved by applying Michigan law.  See Luan Investment S.E.,

2001 WL 826122 at *8, aff'd, 304 F.3d 223 (2d. Cir. 2002) ("Principles of comity were

satisfied because the bankruptcy court applied the law of the Commonwealth of Puerto

Rico in interpreting the Lease.").  This Court has previously adjudicated liability claim

disputes that were governed by Michigan state law.  See Order Disallowing Claim of

Laborsource 2000 Inc., dated March 8, 2007 [Docket No. 7173].

38.     Moreover, while Furukawa baldly describes the matter as

"complex", Motion at 12, it points to no specific difficult or unsettled issue of state law

that would govern the parties' dispute, and it showed its faith in this Court's ability to

interpret whatever state law issues might be implicated by filing its Proof of Claim in

this Court.  Accordingly, a consideration of those factors militates against abstention.

---

[4] Indeed, Furukawa has previously been before this Court, having sought relief from the automatic stay
to effect a setoff against a pre-petition overpayment it received.  [Docket No. 1537].  That request was
denied.  [Docket No. 2652].

39.     The Debtors and Furukawa are "diverse" within the meaning of 28 U.S.C. § 1332, consequently, an independent basis for jurisdiction exists for this contested matter in this Court.  This factor favors rejection of discretionary abstention.

40.     Resolution of Furukawa's proof of claim and Delphi's related claim against it could provide approximately $24 million to the for the benefit of the Debtors and their stakeholders.  Clearly, this dispute is closely related to the main bankruptcy case and involves a "core proceeding" in substance as well as name.

41.     Severing these matters is the least feasible option.  The State Court Action is not ready for trial and abstention at this point might mean a delay of years in the State Court before a judgment could benefit the Debtors' estates and their stakeholders.  This matter will not unduly strain the Court's docket because, following resolution of the Motion, the dispute between the parties can be resolved within the already well-defined terms of the claims objections procedures that were established by the Court's December 6, 2006 Order (the "Claims Procedures Order").  [Docket No. 6089].  This Court has already ruled on numerous claim objections in these cases.

42.     Furukawa has presented no allegation or evidence that forum shopping has occurred.  Indeed, Furukawa never asserted a counterclaim in the State Court Action.  Instead, it asserted its Proof of Claim in this Court.

43.     For all of these reasons, Furukawa's request for discretionary abstention should be denied.

## C.     The Motion for Relief from the Automatic Stay Should Be Denied

44.     Furukawa also contends that it should be granted relief from the automatic stay to pursue the State Court Action.  This request must also be rejected because Furukawa has failed to satisfy its burden to establish cause to modify the stay.

45.     The automatic stay imposed by section 362 of the Bankruptcy Code is one of the most fundamental and significant protections that the Bankruptcy Code affords a debtor.  Midatlantic Nat'l Bank v. N.J. Dep't of Envt'l. Prot., 474 U.S. 494, 503 (1986);  see also In re Drexel Burnham Lambert Group Inc., 113 B.R. 830, 837 (Bankr. S.D.N.Y. 1990) ("[A]utomatic stay is key to the collective and preservative nature of a Bankruptcy proceeding.").  The automatic stay is designed to, among other purposes, give the debtor a "breathing spell" after the commencement of a chapter 11 case and shield the debtor from creditor harassment and a multitude of litigation in a variety of forums at a time when the debtor's personnel should be focusing on restructuring.  See Taylor v. Slick, 178 F.3d 698, 702 (3d Cir. 1999), cert. denied, 528 U.S. 1079 (2000);  In re Enron Corp., 300 B.R. 201, 211 (Bankr. S.D.N.Y. 2003).

46.     The automatic stay broadly extends to all matters that may have an effect on a debtor's estate, enabling bankruptcy courts to ensure that a debtor has the opportunity to rehabilitate and reorganize its operations.  See Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.), 801 F.2d 60, 62-64 (2d Cir. 1986);  see also Fidelity Mortgage Investors v. Camelia Builders, Inc., 550 F.2d 47, 53 (2d Cir. 1976), cert. denied, 429 U.S. 1093 (1977) ("Such jurisdiction is necessary 'to exclude any interference by the acts of others or by proceedings in other courts where such activities or proceedings tend to hinder the process of reorganization.'") (citation omitted);  AP Indus. Inc. v. SN Phelps & Co. (In re AP Indus. Inc. v. SN Phelps & Co. (In re AP Indus., Inc.) 117 B.R. 789, 798 (Bankr. S.D.N.Y. 1990) ("The automatic stay prevents creditors from reaching the assets of the debtor's estate piecemeal and preserves the debtor's estate so that all creditors and their claims can be assembled in the bankruptcy court for a single organized proceeding.").

47.     Section 362(d)(1) of the Bankruptcy Code provides that the Court

may grant relief from the automatic stay "for cause."  In Sonnax Indus. v. Tri

Component Prods. Corp. (In re Sonnax Indus.), 907 F.2d 1280, 1285 (2d Cir. 1990), the

Court of Appeals explained the burden-shifting regime on a motion to modify the

automatic stay:

> The burden of proof on a motion to lift or modify the automatic
> stay is a shifting one.  Section 362(d)(1) requires an initial showing
> of cause by the movant, while Section 362(g) places the burden of
> proof on the debtor for all issues other than "the debtor's equity in
> property," 11 U.S.C. § 362(g)(1).  See 2 Collier on Bankruptcy ¶
> 362.10, at 362-76.  If the movant fails to make an initial showing of
> cause, however, the court should deny relief without requiring any
> showing from the debtor that it is entitled to continued protection.

48.     "If the movants fail to make an initial showing of cause . . .  the

court should deny relief without requiring any showing from the debtor that it is

entitled to continued protection."  Id.;  see also In re Metro Transp. Co., 82 B.R. 351, 353

(Bankr. E.D. Pa. 1988) (unsecured creditors face difficult task of producing evidence to

establish balance of hardships tips in their favor to obtain stay relief).  Moreover, during

the period when debtors still retain the exclusive right to formulate a plan of

reorganization, "an unsecured, unliquidated claim holder should not be permitted to

pursue litigation against the debtor in another court unless extraordinary circumstances

are shown."  See In re Pioneer Commercial Funding Corp., 114 B.R. 45, 48 (Bankr.

S.D.N.Y. 1990).

49.     As demonstrated herein, Furukawa has failed to establish any

cause, let alone extraordinary cause, sufficient to obtain relief from the automatic stay to

proceed with the State Court Action.  The failure of Furukawa to satisfy its burden to

show cause is sufficient grounds to deny its Motion.

50.     Even if Furukawa had provided some evidence to satisfy its burden to establish cause – which it has not – this Court may exercise its discretion to determine whether a modification of the automatic stay would be appropriate under the circumstances.  In re Sonnax Indus., 907 F.2d at 1288.  Courts have traditionally used multifactor tests to determine whether cause exists to modify or lift the automatic stay. The Second Circuit has used a twelve-factor test articulated in the Sonnax decision.  In re Sonnax sets forth the following list of twelve factors that should be considered when deciding whether the stay should be modified to allow litigation against a debtor to continue in another forum:

> (1) whether relief would result in a partial or complete resolution of the issues;  (2) lack of any connection with or interference with the bankruptcy case;  (3) whether the other proceeding involves the debtor as a fiduciary;  (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it;  (6) whether the action primarily involves third parties;  (7) whether litigation in another forum would prejudice the interests of other creditors;  (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;  (10) the interests of judicial economy and the expeditious and economical resolution of litigation;  (11) whether the parties are ready for trial in the other proceeding;  and (12) impact of the stay on the parties and the balance of harms.

Id. at 1286.  See also In re Curtis, 40 B.R. 795, 799–800 (Bankr. D. Utah 1984).  All twelve factors will not be relevant in every case, Mazzeo v. Lenhart (In re Mazzeo), 167 F.3d 139, 143 (2d Cir. 1999), nor must the Court afford equal weight to each of the twelve factors.  See Burger Boys, Inc. v. S. St. Seaport Ltd. P'ship (In re Burger Boys, Inc.), 183 B.R. 682, 688 (Bankr. S.D.N.Y. 1994).

51.     The factors relevant to the Motion are:  (i) whether relief would result in a partial or complete resolution of the issues;  (ii) lack of any connection with

or interference with the bankruptcy case; (iii) whether the action primarily involves third parties; (iv) whether litigation in another forum would prejudice the interests of other creditors; (v) the interests of judicial economy and the expeditious and economical resolution of litigation; (vi) whether the parties are ready for trial in the other proceeding; and (vii) the impact of the stay on the parties and the balance of harms. As demonstrated below, Furukawa has not, and indeed cannot, carry the burden of establishing that sufficient cause exists to modify the automatic stay. Accordingly, the Motion should be denied.

1.      Relief from Stay Would (i) Result in an Incomplete
        Resolution of the Issues; (ii) Interfere With the Bankruptcy Case;
        and (iii) Not Serve the Interests of Judicial Economy

        52.     As described above, the State Court Action and the Furukawa Claim Objection in this Court are inextricably intertwined because they are based on identical facts, circumstances and injuries. Furukawa's pursuit of the State Court Action would interfere with these Cases because the Debtors would need to focus their resources of time, people and money to oversee the State Court Action while pursuing their objection to the Furukawa Claim in this Court, all at a time when they need to devote their resources to maintain enterprise value and advance their reorganization efforts. The relief sought by Furukawa would not only result in an incomplete or inconsistent resolution of the issues but would also be contrary to the interests of judicial and case administration economy.

2.      The Conflict Involves the Same Parties, the State Court
        Action Is Not Ready For Trial, and Pursuit of the State
        Court Lawsuit Would Prejudice the Rights of Other Creditors

        53.     The Debtors' objection to Furukawa's Proof of Claim in this Court and the State Court Action involve the identical parties.

17

54.    In addition, the State Court Action has not meaningfully progressed.  In fact, the case is in such a preliminary phase that there has yet to be any deposition discovery and neither a state mandated mediation nor a trial date has been scheduled.  The total amount at issue, approximately $24 million, is significant to these estates.  Modifying the automatic stay to allow Furukawa to proceed against the Debtors in the State Court Action would require the Debtors and their counsel to invest in time-consuming and costly litigation to the detriment of other efforts that are more central to the Debtors' efforts to reorganize.

55.    The case of <u>Bohack Corp. v. Borden, Inc.</u>( <u>In re Bohack Corp.</u>), 599 F.2d 1160, 1168 (2d Cir. 1979), cited by Furukawa as support for the proposition that relief from the automatic stay should be granted, is inapposite on the facts and the law. Contrary to Furukawa's assertion, the antitrust complaint filed by the debtor in <u>Bohack</u> was filed two years *after* the debtor sought bankruptcy relief.  When the creditor subsequently made a counterclaim in the antitrust litigation, the Court, citing equity, ruled it would be unfair to preclude it from doing so.  Here, by contrast, Furukawa submitted to and invoked this Court's jurisdiction by filing its Proof of Claim -- having never asserted that claim in the State Court Action.  Furukawa thereafter joined issue in the Debtors' objection to Furukawa's Proof of Claim in this Court.[5]  Equity requires that Furukawa be held to its choice of forum and litigate here.

3.    The Balance Of The Harms Weighs In Favor Of
      <u>Denying Furukama Relief from the Stay</u>

56.    In stark contrast to the substantial prejudice that the Debtors would suffer, Furukawa cannot show that it would be prejudiced if the Motion were denied.

---

[5] In compliance with this Court's Claims Procedures Order, Furukawa and the Debtors participated at a meet and confer session and are scheduled to meet again.

Furukawa will participate in the Debtors' cases in the same way that all other creditors will participate in complex chapter 11 cases, and this Court has limited the delay associated with claim adjudication by implementing the procedures contained in the Claims Procedures Order.  See In re Comdisco, 271 B.R. 273 at 277-80 (Bankr. N.D. Ill. 2002) (finding that "the automatic stay almost always delays litigants … [t]hat, after all, is its purpose, and the reason they call it a 'stay'").

57.     Finally, Furukawa submitted to the jurisdiction of this Court when it filed its proof of claim.  The Debtors have objected to Furukawa's Proof of Claim.  The allowance or disallowance of a claim is a core proceeding and the Furukawa claim objection is properly litigated in this Court and not in the State Court Action.  See Langenkamp v. Culp, 498 U.S. 42, 44 (1990) ("by filing a claim against a bankruptcy estate the creditor triggers the process of 'allowance and disallowance of claims, thereby subjecting himself to the bankruptcy court's equitable power").

D.     **This Matter Should Be Fully Resolved at a Claims Hearing**

58.     Furukawa's request that the claims hearing for the Debtors' claim objection hearing be "limited" must also be rejected.  This dispute is a breach of contract matter and can be resolved within the parameters of the Orders of this Court. Furukawa and the Debtors each assert claims for damages in connection with the Agreements.  This Court cannot adjudicate one claim without considering the other, and this Court is well equipped to adjudicate all of the parties' claims.  Furukawa will not suffer any hardship as a result of this Court's resolving the parties' claims.  The interests of judicial economy strongly favor such a resolution and granting Furukawa's requests could lead to inconsistent adjudications.

## CONCLUSION

59.    Based on the foregoing, Furukawa has failed to establish any basis for abstention or relief from the automatic stay, and its Motion should be denied in its entirety.

## NOTICE

60.    Notice of this Objection has been provided in accordance with the Order under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing (i) Omnibus Hearing Dates, (ii) Certain Notice, Case Management, and Administrative Procedures, and (iii) Scheduling an Initial Case Conference in Accordance with Local Bankr. R. 1007-2(e), which was entered by this Court on December 7, 2006 (Docket No. 6089).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## MEMORANDUM OF LAW

61.    Because the legal points and authorities upon which this Objection relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

**WHEREFORE**, the Debtors respectfully request that the Court enter an

Order denying the Motion, together with such other and further relief as may be just

and proper.

Dated:   New York, New York
         April 13, 2007

DELPHI CORPORATION, *et al.*
By their attorneys,
TOGUT, SEGAL & SEGAL LLP
By:


/s/ Neil Berger
ALBERT TOGUT (AT-9759)
NEIL BERGER (NB-3599)
Members of the Firm
One Penn Plaza
New York, New York 10119
(212) 594-5000

TOGUT, SEGAL & SEGAL LLP
Co-Counsel for Delphi Corporation, *et al.*,
Debtors and Debtors in Possession
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Neil Berger (NB-3599)
Sean P. McGrath (SM-4676)

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT          **HEARING DATE: April 20, 2007**
SOUTHERN DISTRICT OF NEW YORK                      **AT:  10:00 a.m.**
-------------------------------------------------------------x
                                              :
In re:                                        :
                                              :        Chapter 11
DELPHI CORPORATION, *et al.*,                 :        Case No. 05-44481 [RDD]
                                              :
                    Debtors.                  :        Jointly Administered
                                              :
-------------------------------------------------------------x

### DECLARATION OF JOSEPH E. PAPELIAN IN SUPPORT OF DEBTORS' OBJECTION TO MOTION BY FURUKAWA ELECTRIC NORTH AMERICA APD AND FURUKAWA ELECTRIC CO., LTD., FOR (A) ABSTENTION PURSUANT TO 28 U.S.C. § 1334 (c);  (B) RELIEF FROM AUTOMATIC STAY PURSUANT TO 11 U.S.C. 362(d);  AND (C) AN ORDER LIMITING THE SCOPE OF THE THIRD OMNIBUS CLAIM OBJECTION HEARING

JOSEPH E. PAPELIAN, hereby declares pursuant to section 1746 of title 28 of the
United States Code:

       1.     I am Deputy General Counsel – Litigation of Delphi Corporation

and certain of its affiliates, as debtors and debtors in possession in the above-captioned

cases (collectively the "Debtors").

       2.     I am authorized to submit this Declaration on behalf of the Debtors.

3.      Except as otherwise set forth herein, all statements in this Declaration are based on my personal knowledge, my familiarity with the Debtors' books and records, my review of relevant documents, discussion with Delphi's outside counsel in the Delphi Automotive Systems, LLC v. Furukawa Electric North America APD, et. al. case, and my negotiations with counsel for Furukawa.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

4.      I submit this Declaration in support of the Debtors' objection (the "Objection") to the motion (the "Motion") by Furukawa Electric North America APD ("Furukawa North America") and Furukawa Electric Co., Ltd. for an Order for (a) abstention pursuant to 28 U.S.C.  1334(c);  (b) relief from the automatic stay pursuant to 362(d) of title 11 of the United States Code (the "Bankruptcy Code"); and (c) for an order limiting the scope of the claim objection hearing scheduled for May 10, 2007,

5.      I have read the Motion and the Objection and am fully familiar with the facts, circumstances and status of the State Court Action.

6.      To the best of my information, knowledge and belief, each of the factual statements contained in the Debtors' Objection are true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  April 13, 2007

                                    /s/ Joseph E. Papelian
                                    Joseph E. Papelian

2

# EXHIBIT E

TOGUT, SEGAL & SEGAL LLP
Co-Counsel for Delphi Corporation, *et al.*,
Debtors and Debtors in Possession
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Neil Berger (NB-3599)
Lara Sheikh (LS-0879)

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

| UNITED STATES BANKRUPTCY COURT | | HEARING DATE: April 20, 2007 |
| SOUTHERN DISTRICT OF NEW YORK | | AT:  10:00 a.m. |

-------------------------------------------------------------x
                                                          :
In re:                                                    :
                                                          :         Chapter 11
DELPHI CORPORATION, *et al.*,                             :         Case No. 05-44481 [RDD]
                                                          :
                    Debtors.                              :         Jointly Administered
                                                          :
-------------------------------------------------------------x

**DEBTORS' OBJECTION TO MOTION BY WACHOVIA
BANK, NATIONAL ASSOCIATION, FOR RELIEF FROM
AUTOMATIC STAY TO PROCEED WITH LITIGATION AGAINST
LARRY GRAVES, A DELPHI EMPLOYEE, IN THE CIRCUIT COURT
OF THE SECOND JUDICIAL DISTRICT OF HINDS COUNTY MISSISSIPPI**

**TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:**

Delphi Corporation ("Delphi") and certain of its subsidiaries and

affiliates, debtors and debtors in possession (collectively, the "Debtors") in the above-

captioned cases (the "Cases"), by their undersigned counsel, as and for their objection to

the Motion (the "Motion") by Wachovia Bank, National Association, as successor by

merger to SouthTrust Bank, ("Wachovia" or "SouthTrust") for an Order for relief from

the automatic stay to proceed with a Mississippi state court lawsuit (the "State Court

Action") against Larry Graves ("Mr. Graves"), one of the Debtors' current managers, respectfully state:

## PRELIMINARY STATEMENT

1.     Mr. Graves is a current management employee of the Debtors to whom the Debtors have indemnity obligations.  Those indemnity obligations arise from the Debtors' By-Laws and pursuant to an Order of this Court.  The Debtors are bound to advance Mr. Graves' costs and expenses incurred and to indemnify him in accordance with the Debtors' Bylaws in the State Court Action, which Wachovia commenced against the Debtors prior to the Filing Date (defined below)[1].

2.     Wachovia asserts a claim of more than $6.8 million against Delphi. Now that its direct claims against Delphi are stayed, Wachovia seeks to collect upon its claims by pursuing litigation against Mr. Graves in the Mississippi State Court Action with full knowledge of the Debtors' indemnification obligations.

3.     Wachovia improperly seeks relief from the automatic stay to pursue Mr. Graves even though the Mississippi State Court has held that:  (i) claims which Wachovia sought to assert against other Delphi employees, including Mr. Graves' superior, based upon conduct and allegations that are precisely the same as those asserted against Graves, are "based solely on alleged acts they performed in their representative capacity and in the course and scope of their employment with Delphi . . . " and "do not indicates [sic] any basis for liability . . ."; and (ii)  the

---

[1]     Wachovia added Mr. Graves as a defendant in the Mississippi State Court Action before the Filing Date (defined below).

automatic stay pursuant by Title 11 U.S.C. (the "Bankruptcy Code") section 362 bars

Wachovia's efforts to assert its claim against the other Delphi Employees.[2]

4.      On August 13, 2006, the Mississippi State Court entered an order

advising that if the continuation of any litigation against Mr. Graves was also found to

be a violation of the automatic stay, it would entertain Mr. Graves' request for payment

of reasonable fees and expenses.  Wachovia filed its Motion in this Court three days

before those sanctions were to be considered by the Mississippi State Court.

5.      It is abundantly clear that having been told by the Mississippi State

Court that its claims against Delphi employees violate the automatic stay in the

Debtors' cases, Wachovia's present Motion is an impermissible request that this Court

exercise appellate review of the Mississippi State Court ruling.

6.      The facts, which are uncontested by Wachovia, demonstrate an

identity of interest between Mr. Graves and the Debtors, such that "unusual

circumstances" warrant extending the automatic stay to stay the Mississippi State Court

Action against Mr. Graves.  Wachovia has failed to demonstrate any cause to justify

modification of the automatic stay, and no basis exists for this Court to exercise its

discretion to permit the State Court Action to continue against one of the Debtors'

current employees on account of duties that he took within the course and scope of his

employment.  Consequently, the Motion should be denied.

## THE DEBTORS' BANKRUPTCY CASES

7.      On October 8 and 14, 2005, Delphi and certain of its U.S.

subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief

---

[2]      The Mississippi State Court denied Wachovia's second request to amend its Complaint in the
Mississippi State Court Action to sue additional Delphi employees, including Mr. Graves'
superiors. See Exhibit "5," ¶ 2.

3

under Chapter 11 of Title 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered Orders directing the joint administration of the Debtors' Chapter 11 cases.

8.    On October 13, 2005, this Court entered an Order which, among other things, authorized the Debtors to continue maintenance with their Human Capital Benefits Programs [the "Human Capital Order," Docket No. 198].  Those Human Capital Benefits Programs include, among other things, the Debtors' obligation to advance fees and expenses for the benefit of employees for costs and liability that they incur in connection with their actions relating to their employment with the Debtors.  See Exhibit "1."

9.    On October 17, 2005, the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors.  No trustee or examiner has been appointed in the Debtors' cases.  On April 28, 2006 the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee").

10.    This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334.

## Current Business Operations of the Debtors

11.    As of December 31, 2005, Delphi and its subsidiaries and affiliates (collectively, the "Company") had global 2005 net sales of approximately $26.9 billion and global assets of approximately $17.0 billion.[3]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of

4

assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their

business operations without supervision from the Bankruptcy Court.

   12. The Company is a leading global technology innovator with

significant engineering resources and technical competencies in a variety of disciplines,

and is one of the largest global suppliers of vehicle electronics, transportation

components, integrated systems and modules, and other electronic technology.  The

Company supplies products to nearly every major global automotive original

equipment manufacturer.

   13. Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM

conducted the Company's business through various divisions and subsidiaries.

Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries

were transferred to the Company in accordance with the terms of a Master Separation

Agreement between Delphi and GM.  In connection with these transactions, Delphi

accelerated its evolution from a North American-based, captive automotive supplier to

a global supplier of components, integrated systems, and modules for a wide range of

customers and applications.  Although GM is still the Company's single largest

customer, today more than half of Delphi's revenue is generated from non-GM sources.

## Events Leading To The Chapter 11 Filing

   14. In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter,

however, with the exception of 2002, the Company has suffered losses.  In calendar year

2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in

---

[3] The aggregated financial data used in this objection generally consists of consolidated

*(footnote continued on the following page)*

net sales.[4]  Reflective of a continued downturn in the marketplace, in 2005 Delphi

incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.

15.    The Debtors believe that the Company's financial performance has

deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and

operational restrictions driven by collectively bargained agreements, including

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all

of which have the effect of creating largely fixed labor costs, (b) a competitive U.S.

vehicle production environment for domestic OEMs resulting in the reduced number of

motor vehicles that GM produces annually in the United States and related pricing

pressures, and (c) increasing commodity prices.

16.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities,

product portfolio, operational issues, and forward-looking revenue requirements.

Because discussions with its major unions and GM had not progressed sufficiently by

the end of the third quarter of 2005, the Company commenced these chapter 11 cases for

its U.S. businesses to complete the Debtors' transformation plan and preserve value for

its stakeholders.

### The Debtors' Transformation Plan

17.    On March 31, 2006, the Company outlined five key tenets of its

transformation plan.  First, Delphi must modify its labor agreements to create a

competitive arena in which to conduct business.  Second, the Debtors must conclude

their negotiations with GM to finalize GM's financial support for the Debtors' legacy

---

information from Delphi and its worldwide subsidiaries and affiliates.

[4]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the
recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The
Company's net operating loss in calendar year 2004 was $482 million.

and labor costs and to ascertain GM's business commitment to the Company.  Third, the

Debtors must streamline their product portfolio to capitalize on their world-class

technology and market strengths and make the necessary manufacturing alignment

with their new focus.  Fourth, the Debtors must transform their salaried workforce to

ensure that the Company's organizational and cost structure is competitive and aligned

with its product portfolio and manufacturing footprint.  Finally, the  Debtors must

devise a workable solution to their current pension situation.

     18.    On December 18, 2006, the Debtors marked another milestone in

their chapter 11 cases with the announcement of two significant agreements.  The first

of these was an equity purchase and commitment agreement (the "Equity Purchase and

Commitment Agreement") with affiliates of Appaloosa Management L.P., Cerberus

Capital Management, L.P., and Harbinger Capital Partners Master Fund I, Ltd., as well

as Merrill Lynch & Co. and UBS Securities LLC (collectively, the "Plan Investors").

Under the Equity Purchase and  Commitment Agreement, the Plan Investors have

agreed to invest up to $3.4 billion in preferred and common equity in the reorganized

Delphi to support the Debtors' transformation plan.  The Equity Purchase and

Commitment Agreement is subject to the completion of due diligence, satisfaction or

waiver of numerous other conditions (including Delphi's achievement of consensual

agreements with its principal U.S. labor unions and GM), and the non-exercise by either

Delphi or the Plan Investors of certain termination rights.  The second agreement was a

plan framework support agreement (the "Plan Framework Support Agreement") with

the Plan Investors and GM.  The Plan Framework Support Agreement outlines certain

proposed terms of  the Debtors' anticipated plan of reorganization, including the

distributions to be made to creditors and shareholders, the treatment of GM's claims,

the resolution of certain pension funding issues, and the corporate governance of the

reorganized Debtors.  The terms of the Plan Framework  Support Agreement are expressly conditioned on the Debtors' reaching consensual agreements with their U.S. labor unions and GM.

19.     On January 12, 2007, this Court authorized the Debtors to execute, deliver, and implement the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement (Docket No. 6589).  On February 28, 2007, Delphi entered into an amendment to the Equity Purchase and Commitment Agreement with the Plan Investors to extend the date by which the Company, the Cerberus Capital Management, L.P. affiliate, or the  Appaloosa Management L.P. affiliate have the right to terminate the agreement on account of not yet having completed tentative labor agreements with Delphi's principal U.S. labor unions and a consensual settlement of legacy issues with GM.  The amendment extended the termination right  pursuant to a 14-day notice mechanism.  The amendment also extended the deadline to make certain regulatory filings under the federal antitrust laws in connection with the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement.

20.     Although much remains to be accomplished in the Debtors' reorganization cases, the Debtors and their stakeholders are together navigating a course that should lead to a consensual resolution with their U.S. labor unions and GM while providing an acceptable financial recovery framework for the Debtors' stakeholders.  Upon the conclusion of the  reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic

growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Wachovia's Claim and State Court Action

21.     Lextron Corporation ("Lextron") was a manufacturer of automotive and telecommunications parts in Jackson, Mississippi.  The Debtors purchased finished automotive parts from Lextron.  The Debtors provided equipment to Lextron to make the automotive parts, and was a major supplier of raw materials to Lextron.  Many of the parts made by Lextron for Delphi were original parts for new vehicles.  Lextron was Delphi's sole supplier of many of those original parts, and those original parts were part of Delphi's "just in time" inventory system.  Lextron supplied parts to the Debtors pursuant to a requirements contract.  See Exhibit "2."

22.     Discovery in the Mississippi State Court Action has disclosed that in 2002, SouthTrust, now Wachovia, provided real estate loans, an operating line of credit and other loans to Lextron.  By mid-2002, Lextron's total debt to SouthTrust had reached approximately $6.2 million.  In the first half of 2002, SouthTrust increased Lextron's line of credit from $2.5 million to $3.2 million.  Inventory and receivables secured the line of credit.

23.     In late 2002, SouthTrust sent an independent collateral auditor to inspect Lextron.  The collateral auditor reported to SouthTrust that Lextron's financial records were in poor condition, that employee trust funds had been diverted,[5] that Lextron was slow paying its vendors, and that its inventory and receivable records were unreliable.  The collateral auditor concluded that SouthTrust lacked adequate collateral

---

[5]     The Internal Revenue Service has asserted tax liens against Lextron's assets, including the Lextron POC (defined below) against the Debtors.

to secure its claims against Lextron. Lextron's loans were then transferred to SouthTrust's Special Assets Division, with the account to be administered by Andy Raine, a SouthTrust vice president.

24. By late 2002, SouthTrust declared Lextron's loans in default, and directed Lextron to hire Alvarez & Marsal ("A&M"), a consultant for financially distressed companies. In late December, A&M prepared a five-week cash flow projection that revealed significant negative cash flow at Lextron. A&M also prepared a liquidation analysis that projected a low, medium and high recovery if Lextron was liquidated. Under all of those scenarios, A&M projected that SouthTrust was in a loss position.

25. SouthTrust and Lextron entered into a Forbearance Agreement with an effective date of December 31, 2002. In the Forbearance Agreement, SouthTrust took assignment of Lextron's claims against its outside CPA firm (which produced audited financial statements). Subsequently, in its own lawsuit against the CPA firm, SouthTrust described Lextron as a "financial house of cards."

26. Although SouthTrust knew that Lextron was not viable, in December 2002, SouthTrust asked the Debtors to provide it with a written representation that the Debtors would continue to use Lextron as a supplier. On January 9, 2003, the Debtors sent a letter (the "January 9 Letter") to SouthTrust, signed by Mr. Graves[6] in his capacity as representative of the Debtors, in which the Debtors stated that their "focus [was] to maintain Lextron as a supplier." Significantly, the letter

---

[6]     Mr. Graves did not participate in the communications between SouthTrust and the Debtors which culminated in the January 9 Letter. Discovery in Wachovia's action against the Debtors confirms that Mr. Graves signed the January 9 Letter only because the employees who did participate in those communications were unavailable on January 9.

also retained the Debtors' right of setoff, i.e., the use of bookkeeping contra entries to
net out payments.  The letter was emailed to Mr. Raine on January 9, 2003.

27.     In January 2003, SouthTrust increased Lextron's line of credit by
$800,000.  Wachovia now asserts that SouthTrust relied upon the January 9 Letter when
it increased Lextron's line of credit even though:  (a) Lextron supplied parts to the
Debtors pursuant to a requirements contract pursuant to which monthly shipments and
billings were subject to fluctuation;  and (b) A&M told Lextron's officers in a January 3,
2003 email, *before* Delphi's letter was sent to Wachovia and before Wachovia's
conversations with the Debtors' representatives concluded, that SouthTrust was
committed to increase the line of credit by $800,000.  Moreover, Delphi's letter was sent
after Wachovia had seen A&M's five-week cash flow projection which showed a
substantial shortfall.  SouthTrust's loan record approving the increase in Lextron's line
of credit bears a typed date of January 8, 2003 – one day before the January 9 Letter to
SouthTrust.  The loan record further reflects that the purpose of the loan was to stop a
free fall liquidation, and made no mention of the January 9 Letter.  See Exhibit "3"
annexed hereto.

28.     Reports issued by each A&M and the Debtors' professionals
separately concluded that Lextron could not continue as a viable business enterprise
and a supplier to the Debtors.  The Debtors terminated Lextron as a supplier during
February 2003 after Lextron failed to present a credible plan to assure the Debtors that
Lextron had the ability to continue as a going concern.

**Mississippi State Court Action**

29.     On April 3, 2003, SouthTrust commenced the Mississippi State
Court Action against the Debtors and Lextron.  SouthTrust asserted that the Debtors
made material misrepresentations that induced SouthTrust to increase its line of credit

11

to Lextron, and that the Debtors were responsible for the repayment of that $800,000 line of credit.  Lextron cross-claimed against the Debtors and asserted similar facts against the Debtors, and also sought consequential and incidental damages.[7]

30.    Wachovia asserted that the Debtors are liable to Wachovia: $966,750.68 in compensatory damages, representing the increased line of credit to Lextron, plus interest, costs and expenses;  $856,120.84, representing attorneys' fees and expenses;  and $4,833,753.40, representing punitive damages.  Wachovia has filed duplicative Proofs of Claim Nos. 14912 and 14913 in the Debtors' case.  See Exhibit "4" annexed hereto (together, the "Wachovia POC").

31.    Lextron filed its own petition for relief under Chapter 11 of the Bankruptcy Code in the United State Bankruptcy Court for the Southern District of Mississippi in February 2004.  Lextron was unable to reorganize and, upon a motion by the United States Trustee, Lextron's bankruptcy case was dismissed.

32.    At a hearing during September 2005, prior to the Filing Date, SouthTrust sought leave to file an amended complaint to add Mr. Graves as a defendant in the Mississippi State Court Action and it was orally granted permission to do so.  Consistent with their By-Laws, the Debtors have agreed to advance fees and expenses to Mr. Graves in the Mississippi State Court Action.

33.    Later in September 2005, Wachovia filed a motion for authority to file a second amended complaint (the "Second Amended Complaint") to add certain other Delphi employees as defendants, including Mr. Graves' superior at the time, Sidney Johnson (the "Other Delphi Employees").  Wachovia asserted that the Other

---

[7]    Lextron's cross-claims against the Debtors were dismissed.  Lextron asserted similar claims in a response to the Debtors' separate replevin action that they had to commence against Lextron to recover possession of the Debtors' tooling.

Delphi Employees participated in the preparation of the January 9 Letter and, based upon allegations precisely the same as those asserted by Wachovia against Graves, Wachovia asserted that the Other Delphi Employees were liable to Wachovia, even though their actions were within the scope of their employment with the Debtors.

34.    On April 11, 2006, the Mississippi State Court entered an order (the "April 11 Order") and denied Wachovia's motion for leave to file the Second Amended Complaint against the Other Delphi Employees, and held that:

> "SouthTrust seeks individual liability against the [Other] Delphi Employees based solely on alleged acts they performed in their representative capacity and in the course and scope of their employment with Delphi.  No allegations in the proposed Second Amended Complaint indicates [sic] any basis for liability against the [Other] Delphi Employees in their individual capacity. . . .  SouthTrust's claims against Delphi are subject to the automatic stay afforded Delphi as a result of its Chapter 11 bankruptcy filing on October 8, 2005. The bankruptcy automatic stay afforded Delphi also applies to the Delphi Employees."

April 11 Order, ¶¶ 1-2, annexed hereto as Exhibit "5."

35.    Wachovia's allegations of liability against the Other Delphi Employees, which were rejected by the Mississippi State Court, are identical to the allegations against Mr. Graves in the First Amended Complaint.  See Second Amended Complaint ¶¶ 7-9, and First Amendment Complaint ¶¶ 3-5, each annexed hereto as Exhibit "6."

36.    On August 23, 2006, the Mississippi Court entered an order (the "August 23  Order," a copy of which is annexed hereto as Exhibit "7") which decreed that in the event the Mississippi State Court was asked to determine and concluded that any litigation against Mr. Graves is stayed – as are the claims against the Other Delphi Employees – it would consider a motion by Mr. Graves to assess expenses

against Wachovia, including attorneys' fees incurred by Mr. Graves to defend in the Mississippi State Court Action.

37.     On September 25, 2006, Mr. Graves filed a motion to dismiss the First Amended Complaint and he sought costs against Wachovia.  Mr. Graves' motion was scheduled to be heard by the Mississippi State Court on December 1, 2006. Apparently, Wachovia concluded that the Mississippi State Court would follow its prior ruling and hold that Wachovia's claims against Mr. Graves – which are the same as the proposed causes of action against the Other Delphi Employees –  are stayed and award costs to Mr. Graves.  Wachovia filed its present Motion in this Court on November 28, 2006 – three days before the Mississippi State Court was scheduled to consider Mr. Graves' motion for dismissal and sanctions.  Wachovia then asked the Mississippi State Court to refrain from ruling on Mr. Graves' motion until this Court rules on the Motion.

38.     Lextron has filed duplicative Proofs of Claim Nos. 10385460 and 10385461 in the Debtors' cases seeking payment of $800,000, plus incidental and punitive actual consensual damages . . . ."  See Exhibit "8" annexed hereto (together, the "Lextron POC").

39.     Pursuant to an Agreement to Release Account Proceeds and Collateral Assignment of Claims between SouthTrust and Lextron dated March 14, 2003, Lextron collaterally assigned to SouthTrust all of Lextron's claims against the Debtors, and gave Wachovia "the right to release, waive, compromise or settle any of the [Lextron] Claims" against the Debtors.  See Exhibit "9."

40.     The Debtors advised Wachovia that they object to the Wachovia and Lextron POC's.  The Debtors and Wachovia agreed to mediate the Debtors' claim objections.  The parties' mediation began on March 16, 2007 in Jackson, Mississippi and

14

continued until the negotiations reached an impasse.  The Debtors' formal objections to

Wachovia's and Lextron's POCs will be adjudicated in this Court pursuant to this

Court's December 6, 2006 Order (the "Claim Procedure Order") which, among other

things, approved procedures governing objections to claims [Docket No. 6089].[8]

**Delphi's Obligations**

      41.    Article V of the Amended and Restated By-Laws of Delphi

Corporation (the "By-Laws") provides for the indemnification of managerial employees

of the Debtors, such as Mr. Graves.  A copy of the By-Laws is annexed hereto as Exhibit

"10."  Section 5.1 of the By-Laws provides, in relevant part, that Delphi shall indemnify

any person who was or is made a party to any action, suit or proceeding by reason of

the fact that such person is or was a managerial employee of Delphi against expenses

(including attorneys' fees and disbursements), costs, judgments, fines, penalties and

amounts paid in settlement actually and reasonably incurred by such person in

connection with such action.  Delphi is also obligated under its By-Laws to advance Mr.

Graves' expenses pursuant to section 5.5 of the By-Laws.

      42.    The Human Capital Order authorized the Debtors to honor their

obligations to Mr. Graves.

      43.    A verified copy of the By-Laws were provided to Wachovia in the

Mississippi State Court Action.

---

[8]    Disallowance of the Wachovia POC and the Lextron POC will render moot Wachovia's claims
against Mr. Graves in the Mississippi State Court Action.

## ARGUMENT

**I.    The Automatic Stay Should Bar the Continuation of the Mississippi State Court Action Against Mr. Graves[9]**

44.    Pursuant to sections 105(a) and 362(a) of the Bankruptcy Code, a Bankruptcy Court may properly conclude that proceedings against non-debtor co-defendants are stayed in the presence of "unusual circumstances," such as where there is such an identity between the debtor and the third party defendant, that the debtor may be said to be the real party defendant and that the judgment against the third party defendant will in effect be a judgment or finding against the debtor.  A.H. Robins Co. v. Piccinin, 788 F.2d 994, 999, cert. denied, 479 U.S. 876 (4th Cir. 1986); In re Lomas Financial Corp. v. Northern Trust Company, 117 B.R. 64, 68 (S.D.N.Y. 1990).  Polytop Corp. v. Globe Plastics, Inc., 31 B.R. 226 (D.R.I. 1983) (concluding that state court action against employee of debtor violated the automatic stay).  "An illustration of such a situation would be a suit against a third party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case."  A.H. Robins, 788 F.2d at 999; In re Lomas, 117 B.R. at 68.

---

[9]    The extension of the automatic stay to Mr. Graves does not require the commencement of an adversary proceeding because both parties have briefed the issue of the applicability of the automatic stay to Mr. Graves in the Mississippi State Court Action, and the failure to proceed by adversary proceeding will not prejudice either party.  See In re Zale Corporation, 62 F.3d 746,763-64 (5th Cir.1995)(requirements of adversary proceeding may be waived where each party is aware of all the issues and has had a chance to address them)(citing In re Haber Oil Co., 12 F.3d 426, 440 (5th Cir. 1994)); In re Copper Kind Inn, 918 F.2d 1404, 1407 (9th Cir. 1990)(same); In re E-Z Serve Convenience Stores, Inc., 318 B.R. 631, 636 (Bankr. M.D.N.C. 2004)(the lack of adversary proceeding is "harmless error" if the failure to provide an adversary proceeding "does not result in demonstrable prejudice")(citing In re Lewis, 142 B.R. 952, 955 (Bankr. D. Colo. 1992)); In re Wlodarski, 115 B.R. 53, 56 (Bankr. S.D.N.Y. 1990)(although action should have been brought as an adversary proceeding, the failure of the opposing party to object to the form of the proceeding, and the interests of an expeditious resolution to the case, allowed the court to resolve the matter).

45.    A debtor corporation's financial responsibility for claims against its principals creates an identity of interest sufficient to justify extension of the automatic stay.  In re North Star Contracting Corp., 125 B.R. 368, 370 (S.D.N.Y. 1991);  In re Lomas, 117 B.R. at 68.  See also, Queenie Ltd. v. Nygard Int'l, 321 F.3d 282, 287 (2d Cir. 2003) (recognizing that it is appropriate to apply the stay to a non-debtor where the adjudication of a lawsuit will have an immediate adverse economic impact on the debtor's estate).

46.    Courts also extend the automatic stay to non-debtors when an adverse judgment in that litigation will collaterally estop the debtor in subsequent litigation.  In re Calpine Corp., 354 B.R. 45, 47 (Bankr. S.D.N.Y. 2006) (citing cases).  Polytop, supra 31 B.R. at 229 ("the allegations against Globe necessarily concern actions by Lindley in his capacity as an employee of Polytop").

47.    In this case, Delphi's By-Law's expressly provide for the indemnification of managerial employees, such as Mr. Graves.  By its Human Capital Order, this Court authorized Delphi to honor its indemnity obligations to its managerial employees, and the Debtors have agreed to advance the costs and expenses that Mr. Graves has been incurring to defend himself in the Mississippi State Court Action.  This alone creates a basis to conclude that the automatic stay prevents the continuation of Wachovia's claims against Mr. Graves.  A.H. Robins, supra.

48.    The Mississippi State Court has already ruled that Wachovia's allegations in the proposed Second Amended Complaint against the Other Delphi Employees, including Mr. Graves' superiors who prepared the January 9 Letter, do not provide any basis to hold those employees liable in their individual capacities because their alleged actions in connection with the January 9 Letter were all taken in the scope and capacity as representatives of the Debtors.  See Exhibit "5," ¶ 2.  The allegations

17

against Mr. Graves are identical to Wachovia's allegations against the Other Delphi Employees.  As a result, Wachovia's allegations against Mr. Graves fail to provide a basis for any individual liability.  Indeed, Wachovia's allegations seek to impose liability for actions taken by Mr. Graves in his capacity as an employee of the Debtors.  Consequently, any findings or judgment in an action against Mr. Graves would be findings and a judgment against the Debtors.

49.    Furthermore, Wachovia's claims against Mr. Graves are based upon the identical facts that give rise to the Wachovia Claim against the Debtors and are inextricably tied to the Wachovia POC.  Wachovia filed the Wachovia POC in this Court and submitted itself to this Court's jurisdiction.  The Debtors' objection to the Wachovia POC has been asserted and gone to mediation as contemplated by the Claims Procedure Order.  If the mediation fails, the allowance of the Wachovia POC will be adjudicated by this Court as a "core" proceeding pursuant to the Claims Procedures Order.  28 U.S.C. § 157(b)(2)(B).

50.    If the State Court Lawsuit is permitted to proceed against Mr. Graves, issues regarding the Debtors' liability, their defenses and any damages that may be fixed, will be determined in the Debtors' absence, thereby exposing the Debtors to a significant risk of inconsistent rulings, collateral estoppel, *stare decisis* and evidentiary prejudice.  This result also supports a continuation of the complete stay of the Mississippi State Court Lawsuit.  See In re Calpine Corp., 354 B.R. at 47.

51.    All of these facts satisfy the "unusual circumstances" standard set forth in A.H. Robins and adopted by Courts in this Circuit.  A judgment against Mr. Graves will in effect be a judgment against Delphi as a result of its immediate adverse economic impact to the Debtors' estates and its potential collateral estoppel effect.  The

stay articulated by the Mississippi State Court is sound and should apply to Mr. Graves
– and the Debtors' interests pursuant to Bankruptcy Code sections 105(a) and 362(a).

## II.    Wachovia Has Failed to Establish Cause to Modify the Automatic Stay

52.    The automatic stay imposed by section 362 of the Bankruptcy Code
is one of the most fundamental and significant protections that the Bankruptcy Code
affords a debtor.  Midlantic Nat'l Bank v. N.J. Dep't of Envt'l. Prot., 474 U.S. 494, 503
(1986); see also In re Drexel Burnham Lambert Group, Inc., 113 B.R. 830, 837 (Bankr.
S.D.N.Y. 1990) ("[A]utomatic stay is key to the collective and preservative nature of a
bankruptcy proceeding.").  The automatic stay is designed to, among other purposes,
give the debtor a "breathing spell" after the commencement of a chapter 11 case and
shield the debtor from creditor harassment and a multitude of litigation in a variety of
forums at a time when the debtor's personnel should be focusing on restructuring.  See
Taylor v. Slick, 178 F.3d 698, 702 (3d Cir. 1999), cert. denied, 528 U.S. 1079 (2000); In re
Enron Corp., 300 B.R. 201 (Bankr. S.D.N.Y. 2003).

53.    The automatic stay broadly extends to all matters that may have an
effect on a debtor's estate, enabling bankruptcy courts to ensure that the debtor has the
opportunity to rehabilitate and reorganize its operations.  See Manville Corp. v. Equity
Sec. Holders Comm. (In re Johns-Manville Corp.), 801 F.2d 60, 62–64 (2d Cir. 1986); see
also Fid. Mortgage Investors v. Camelia Builders, Inc., 550 F.2d 47, 53 (2d Cir. 1976)
("Such jurisdiction is necessary 'to exclude any interference by the acts of others or by
proceedings in other courts where such activities or proceedings tend to hinder the
process of reorganization.'") (citation omitted); AP Indus. Inc. v. SN Phelps & Co. (In re
AP Indus., Inc.), 117 B.R. 789, 798 (Bankr. S.D.N.Y. 1990) ("The automatic stay prevents
creditors from reaching the assets of the debtor's estate piecemeal and preserves the

19

debtor's estate so that all creditors and their claims can be assembled in the bankruptcy court for a single organized proceeding.").

54.    The Second Circuit has described the automatic stay as a "crucial provision of bankruptcy law" intended to "prevent[ ] disparate actions against debtors . . . [and] ensur[e] that no creditor receives more than an equitable share of the bankrupt's estate." Lincoln Savings Bank, FSB v. Suffolk County Treasurer (In re Parr Meadows Racing Assoc., Inc., 880 F.2d 1540, 1545 (2d Cir. 1989) (internal citations omitted).

55.    Section 362(d)(1) of the Bankruptcy Code provides that the Court may grant relief from the automatic stay "for cause." The Bankruptcy Code does not define the term "cause" and the determination of whether sufficient cause exists to modify the stay is determined on a case by case analysis. See In re Balco Equities Ltd., Inc., 312 B.R. 734, 748-49 (Bankr. S.D.N.Y. 2004). While the debtors still retain the exclusive right to formulate a plan of reorganization, "an unsecured, unliquidated claim holder should not be permitted to pursue litigation against the debtor in another court unless extraordinary circumstances are shown." See In re Pioneer Commercial Funding Corp., 114 B.R. 45, 48 (Bankr. S.D.N.Y. 1990).

56.    As more fully described below, Wachovia has failed to show any cause, let alone extraordinary cause, sufficient to obtain relief from the automatic stay to proceed with its litigation against Mr. Graves, which is, in essence, a prosecution of its allegations of actions taken by the Debtors. The failure of Wachovia to satisfy its burden to show cause is sufficient grounds to deny its Motion.

57.    Even if Wachovia had provided evidence to show cause, the determination to modify the automatic stay is committed to the sound discretion of the Court. In re Sonnax Indus., 907 F.2d 1280, 1288 (2d Cir. 1990). Courts have traditionally

20

used multifactor tests to determine whether cause exists to modify or lift the automatic

stay.  In re Sonnax sets forth the following list of twelve factors that should be

considered when deciding whether the stay should be lifted to allow litigation against a

debtor to continue in another forum:

> (1) whether relief would result in a partial or complete resolution of the  issues;
> (2) lack of any connection with or interference with the bankruptcy  case; (3)
> whether the other proceeding involves the debtor as a fiduciary;  (4) whether a
> specialized tribunal with the necessary expertise has been  established to hear the
> cause of action; (5) whether the debtor's insurer has  assumed full responsibility
> for defending it; (6) whether the action  primarily involves third parties; (7)
> whether litigation in another forum  would prejudice the interests of other
> creditors; (8) whether the judgment  claim arising from the other action is subject
> to equitable subordination;  (9) whether movant's success in the other proceeding
> would result in a  judicial lien avoidable by the debtor; (10) the interests of
> judicial economy  and the expeditious and economical resolution of litigation;
> (11) whether  the parties are ready for trial in the other proceeding; and (12)
> impact of  the stay on the parties and the balance of harms.

Id. at 1286.  See also In re Curtis, 40 B.R. 795, 799–800 (Bankr. D. Utah 1984).  All twelve

factors will not be relevant in every case, Mazzeo v. Lenhart (In re Mazzeo), 167  F.3d

139, 143 (2d Cir. 1999), nor must the Court afford equal weight to each of the  twelve

factors.  See Burger Boys, Inc. v. S. St. Seaport Ltd. P'ship (In re Burger Boys, Inc.), 183

B.R. 682, 688 (S.D.N.Y. 1994).

   58. Consideration of the Sonnax factors relevant here:  (i) whether relief

would result in a partial or complete resolution of the issues; (ii) lack of any connection

with or interference with the bankruptcy case; (iii) whether litigation in another forum

would prejudice the interests of other creditors; (iv) the interests of judicial economy

and the expeditious and economical resolution of litigation; (v) whether the parties are

ready for trial in the other proceeding; and (vi) the impact of the stay on the parties and

the balance of harms, all dictate denial of the Motion.  As demonstrated below,

Wachovia has not, and cannot, carry its burden of establishing that cause exists to modify the automatic stay.

A.    Relief from Stay Would (i) Result in an Incomplete
       Resolution of the Issues; (ii) Interfere With the
       Bankruptcy Case; and (iii) Not Serve the Interests of
       Judicial Economy

       59.    As described above, the Mississippi State Court Action, the Lextron

Claim and the Wachovia Claim are inextricably intertwined because they are based on

identical facts and circumstances and they allege similar damages.  Wachovia's pursuit

of the Mississippi State Court Action against Mr. Graves in the Mississippi State Court

will interfere with these Cases because the Debtors would be required to devote time

and resources to oversee and participate in the State Court Action while at the same

pursue their objections to the Wachovia and Lextron POC's in this Court.

       60.    Moreover, permitting claimants such as Wachovia to pursue

collection of their claims against the Debtors by asserting claims against the Debtors'

employees in foreign forums would present distracting and unreasonable burdens that

would impair the Debtors' reorganization efforts at a time when maintaining enterprise

value is paramount.  Relief from the automatic stay could not only result in an

incomplete or inconsistent resolution of the issues, but it would be contrary to the

interests of judicial economy.  Wachovia's litigation tactics should not be condoned.

B.    The Debtors And Their Creditors Will Be Prejudiced
       Because There Is No Insurance To Cover The Costs And
       Potential Liability of Mr. Graves

       61.    The Debtors do not have insurance to cover the costs and liability

associated with the Mississippi State Court Action against Mr. Graves.  All of the costs

associated with defending the action and any liability that may ultimately arise on

account of Wachovia's claims against Mr. Graves would be borne directly by the

Debtors to the detriment of their stakeholders.  As a result, the Debtors and their estates would be prejudiced if the automatic stay was modified to permit the State Court Action to proceed.

C.      The Mississippi State Court Action As Against Mr.
        Graves is Not Prepared For Trial and Pursuit of the
        State Court Lawsuit Would Prejudice the Rights of
        Other Creditors

        62.      The State Court Action against Mr. Graves is in its infancy.  The amended Complaint against Mr. Graves was filed in December 2005, shortly after the Debtors' Filing Date.  This factor mitigates in favor of denial of the Motion.  See In re Comdisco, 271 B.R. 273, 277–80 (Bankr. N.D. Ill. 2002) (denying motion to lift stay regarding securities class action in its early stages).  In fact, no scheduling order has been entered regarding the claims against Mr. Graves.

        63.      The assertion of claims of more than $7 million is significant to these estates.  Modifying the automatic stay to allow Wachovia to proceed against the Mr. Graves in the Mississippi State Court Action would require the Debtors and their counsel to invest in time and resources to costly litigation to the detriment of other efforts that are more central to the Debtors' efforts to reorganize.

        64.      Finally, Wachovia has not articulated any credible reason why the continuation of the stay of the Mississippi State Court Action would cause Wachovia harm.

        65.      Consequently, the 'balance of harms' dictate denial of the Motion.

## CONCLUSION

        66.      Based upon the foregoing, "unusual circumstances" exist to conclude that the automatic stay applies to the claims against Mr. Graves in the

23

Mississippi State Court Action.  Wachovia has failed to establish any basis for relief from the automatic stay, and its Motion should be denied in its entirety.

## Notice

67.    Notice of this Objection has been provided in accordance with the Order under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing (i) Omnibus Hearing Dates, (ii) Certain Notice, Case Management, and Administrative Procedures, and (iii) Scheduling an Initial Case Conference in Accordance with Local Bankr. R. 1007-2(e), which was entered by this Court on October 14, 2005 (Docket No. 245).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum of Law

68.    Because the legal points and authorities upon which this Objection relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

*(Concluded on Following Page)*

24

      **WHEREFORE**, the Debtors respectfully request that the Court enter an

Order denying the Motion, together with such other and further relief as may be just

and proper.

Dated:  New York, New York
        April 13, 2007

                                      DELPHI CORPORATION, *et al.*
                                        By their attorneys,
                                        TOGUT, SEGAL & SEGAL LLP
                                        By:


                                        /s/ Neil Berger
                                        ALBERT TOGUT (AT-9759)
                                        NEIL BERGER (NB-3599)
                                        Members of the Firm
                                          One Penn Plaza
                                        New York, New York 10119
                                        (212) 594-5000

TOGUT, SEGAL & SEGAL LLP
Co-Counsel for Delphi Corporation, *et al.*,
Debtors and Debtors in Possession
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Neil Berger (NB-3599)
Lara Sheikh (LS-0879)

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT          **HEARING DATE: April 20, 2007**
SOUTHERN DISTRICT OF NEW YORK                      **AT:  10:00 a.m.**
------------------------------------------------------------x
                                            :
In re:                                      :
                                            :       Chapter 11
DELPHI CORPORATION, *et al.*,               :       Case No. 05-44481 [RDD]
                                            :
                    Debtors.                :       Jointly Administered
                                            :
------------------------------------------------------------x

### DECLARATION OF JOSEPH E. PAPELIAN IN SUPPORT OF DEBTORS' OBJECTION TO MOTION BY WACHOVIA BANK, NATIONAL ASSOCIATION, FOR RELIEF FROM AUTOMATIC STAY TO PROCEED WITH LITIGATION AGAINST LARRY GRAVES, A DELPHI EMPLOYEE, IN THE CIRCUIT COURT OF THE SECOND JUDICIAL DISTRICT OF HINDS COUNTY MISSISSIPPI

JOSEPH E. PAPELIAN, hereby declares pursuant to section 1746 of title 28 of the United States Code:

       1.      I am Deputy General Counsel – Litigation of Delphi Corporation

and certain of its affiliates, as debtors and debtors in possession in the above-captioned

cases (collectively the "Debtors").

       2.      I am authorized to submit this Declaration on behalf of the Debtors.

       3.      Except as otherwise set forth herein, all statements in this

Declaration are based on my personal knowledge, my familiarity with the Debtors'

books and records, my review of relevant documents, and discussion with Delphi's

outside counsel in the SouthTrust vs. Delphi et. al. case.  If I were called upon to testify,

I could and would testify competently to the facts set forth herein.

4.    I submit this Declaration in support of the Debtors' objection (the

"Objection") to the motion (the "Motion") by Wachovia Bank, National Association, as

successor by merger to South Trust Bank, ("Wachovia" or "South Trust") for an Order

for relief from the automatic stay to proceed with a Mississippi state court lawsuit (the

"State Court Action") against Larry Graves ("Mr. Graves"), one of the Debtors' current

employees.

5.    I have read the Motion and the Objection and am fully familiar

with the facts, circumstances and status of the State Court Action.

6.    To the best of my information, knowledge and belief, each of the

factual statements contained in the Debtors' Objection are true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  April 11, 2007

/s/ Joseph E. Papelian
Joseph E. Papelian

2

# EXHIBIT "1"

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                  :
        In re                                     :
                                                  :    Chapter 11
DELPHI CORPORATION, et al.,                       :
                                                  :    Case No.  05 – 44481(RDD)
                        Debtors.                  :
                                                  :    (Jointly Administered)
                                                  :
------------------------------------------------------------x

ORDER UNDER 11 U.S.C. §§ 105(a), 363, 507, 1107, AND 1108
(I) AUTHORIZING DEBTORS TO PAY PREPETITION WAGES AND SALARIES
TO EMPLOYEES AND INDEPENDENT CONTRACTORS; (II) AUTHORIZING DEBTORS
TO PAY PREPETITION BENEFITS AND CONTINUE MAINTENANCE
OF HUMAN CAPITAL BENEFIT PROGRAMS IN THE ORDINARY COURSE;
AND (III) DIRECTING BANKS TO HONOR PREPETITION CHECKS FOR
PAYMENT OF PREPETITION HUMAN CAPITAL OBLIGATIONS

("HUMAN CAPITAL OBLIGATIONS ORDER")

Upon the motion dated October 8, 2005 (the "Motion"),[1] wherein Delphi

Corporation ("Delphi") and certain of its domestic subsidiaries and affiliates (the "Affiliate

Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the

"Debtors"), moved for entry of an order, under sections 105(a), 363, 507(a)(3), 507(a)(4), 541,

1107, and 1108 of the Bankruptcy Code, (i) authorizing, but not directing, the Debtors to pay all

human capital obligations of the Debtors, including prepetition claims of the Debtors' domestic

active and inactive employees, any independent contractors, including those provided by

employee supplier agreements, who currently are under formal or informal contracts,

(collectively, and solely for the purposes of this Motion, the "Employees"), and those prepetition

---

[1]    Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the
       Motion.


0544481051013000000000029

claims on account of benefits to be provided to any of the Debtors' retirees and their surviving

spouses (collectively, the "Retirees"), (ii) authorizing, but not directing, the Debtors to pay

prepetition benefits and continue the Debtors' various human capital benefit plans and programs

(collectively, the "Prepetition Human Capital Obligations"), and (iii) directing all banks to honor

prepetition checks for payment of Prepetition Human Capital Obligations and prohibiting banks

from placing any holds on, or attempting to reverse, any automatic transfers to Employees'

accounts for Prepetition Human Capital Obligations; and upon the Affidavit Of Robert S. Miller,

Jr. In Support Of Chapter 11 Petitions and First Day Orders; and upon the record of the hearing

held on the Motion; and the Court having determined that the relief requested in the Motion is in

the best interests of the Debtors, their estates, their creditors, and other parties-in-interest; and it

appearing that proper and adequate notice of the Motion has been given and that no other or

further notice is necessary; and after due deliberation thereon, and good and sufficient cause

appearing therefor, it is hereby

ORDERED, ADJUDGED, AND DECREED THAT:

1.    The Motion is GRANTED.

2.    The Debtors are authorized, but not directed, to pay or otherwise honor the

Prepetition Human Capital Obligations, as described in the Motion, including, but not limited to,

Employees' prepetition and postpetition wages and salaries, including any commissions and

bonuses for which the Employees are eligible; outstanding fees to members of the Debtors'

Board of Directors; vacation, sick leave, personal leave, expense reimbursements, and severance;

health, insurance, retirement, and other employee benefit programs; defined contribution, defined

benefit, tax-qualified, and non-tax-qualified retirement plans; workers' compensation programs;

and other benefits to, or for the benefit of, the Employees, and to continue each of the foregoing

2

Employee programs in the ordinary course of business; provided, however, that such payment, continuance of such Employee program, other honoring of such Prepetition Human Capital Obligations, or entry of this Order shall not make such obligations administrative expenses of the estates entitled to priority status under sections 503 and 507 of the Bankruptcy Code.

3.     With respect to former officers and directors, the authority granted hereunder on account of Prepetition Human Capital Obligations is limited to advancement of litigation expenses, as subject to an aggregate cap of $5 million, health benefits, basic life insurance benefits, long-term disability benefits, and benefits provided under the Delphi Supplemental Executive Retirement Program, as limited to no more than $5,000 per month per eligible officer or director.

4.     The Debtors shall pay no Performance Achievement Plan Awards under the Debtors 2003-2005 Long-Term Incentive Plan prior to November 30, 2005.

5.     The financial institutions upon which any checks are drawn in payment of the Prepetition Human Capital Obligations, either before, on, or after the date on which the Debtors filed these chapter 11 cases, are hereby authorized and directed to honor, upon presentation, any such checks.

6.     Such financial institutions are authorized and directed to rely upon the representations of the Debtors as to which checks are in payment of the Prepetition Human Capital Obligations.

7.     The Debtors may pay all federal, state, local, and foreign income withholding, payroll, employment, unemployment, social security, and similar taxes (including, but not limited to, taxes relating to the Federal Insurance Contributions Act ("FICA")), whether withheld from Employees' wages or paid directly by the Debtors to governmental authorities, as

3

well as other Employee withholdings including, but not limited to, pension plan contributions, union dues, charitable contributions, and garnishment contributions, if any.

      8.    The Debtors are authorized, but not directed, to pay any and all costs incident to maintaining or paying third parties to maintain and provide record-keeping relating to the various Employee benefit programs and any trusts related thereto that may be outstanding as of the Petition Date in the ordinary course of business.

      9.    Any party receiving payment from the Debtors is authorized and directed to rely upon the representations of the Debtors as to which payments are authorized by this Order.

      10.    Neither the provisions of this Order, nor any payments made by the Debtors pursuant to the Motion or this Order, shall be deemed to change the classification of any claim or to in any way change the rights or create new rights of any Employee or other person, including, without limitation, the creation of any right to payment entitled to administrative expense priority pursuant to sections 503 and 507 of the Bankruptcy Code.

      11.    Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary, the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

      12.    The entry of this Order is final; provided, however, that (a) within ten business days after the official committee of unsecured creditors (the "Creditors' Committee") has been formed and retained counsel, the Creditors' Committee may object to the prospective application of this Order from and after the date of such objection, and (b) within ten business days of the date of entry hereof, the agent for the Debtors' prepetition banks (the "Agent") may

object to the prospective application of this Order from and after the date of such objection;

provided further, that if such objection is timely made by the Creditors' Committee or the Agent,

such objection shall be heard at the next regularly-scheduled omnibus hearing in these cases, and

(c) pending such hearing, this Order shall remain in full force and effect.

13.    The Court shall retain jurisdiction to hear and determine all matters arising

from the implementation of this Order.

14.    The requirement under Local Rule 9013-1(b) for the service and filing of a

separate memorandum of law is deemed satisfied by the Motion.

Dated:        New York, New York
              October 13, 2005

                                                  /s/ ROBERT D. DRAIN
                                                  UNITED STATES BANKRUPTCY JUDGE

5

# EXHIBIT "2"

# DELPHI

DELPHI CORPORATION
LONG TERM CONTRACT

**EXHIBIT**
G

## 1.    Purchase of Product

**Lextron Automotive Technologies Corporation** ("Seller") agrees to sell, and **Delphi Corporation LLC acting through its Safety & Interior Systems Division** ("Buyer") agrees to purchase, approximately <u>one hundred</u> percent (<u>100%</u>) of Buyer's production and service requirements for the following products (each referred to as a "Product" and collectively referred to as the "Products"):

| Part Number | Description | Per Unit Price | Annual Tool Capacity |
|---|---|---|---|
| 16643688 | 2004 Cami YT1 Door Hardware Module Wire Harness (Front) | $█████ | ████████ |
| 16643690 | 2004 Cami YT1 Door Hardware Module Wire Harness (Front) | $█████ | ████████ |

## 2.    Term

With respect to each Product, the term of this Contract is from **Model Year 2004** through **Model Year 2005.**

## 3.    Prices

The per unit price of each Product for **Model Year 2004 is F.O.B. Buyer's Plant, Freight Collect (2000 IncoTerms).** Pricing for each subsequent **Model Year** is subject to the following minimum annual percentage reductions from the prior **Model Year's** pricing:

**Part Number 16643688**

| | | |
|---|---|---|
| Model Year 2005 | Three percent ( 3%) | Piece Price ████ ea. |
| Model Year 2006 | Three percent ( 3%) | Piece Price ████ ea. |
| Model Year 2007 | Three percent ( 3%) | Piece Price ████ ea. |
| Model Year 2008 | Three percent ( 3%) | Piece Price ████ ea. |

**Part Number 16643690**

| | | |
|---|---|---|
| Model Year 2005 | Three percent ( 3%) | Piece Price ████ ea. |
| Model Year 2006 | Three percent ( 3%) | Piece Price ████ ea. |
| Model Year 2007 | Three percent ( 3%) | Piece Price ████ ea. |
| Model Year 2008 | Three percent ( 3%) | Piece Price ████ ea. |

Buyer and Seller will use their best efforts to implement cost savings and productivity improvements in order to reduce Seller's costs of supplying each Product. Buyer and Seller agree that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to fifty percent (50%) of any net cost savings achieved by Seller with respect to such Product (i.e., savings after recovery by Seller of a pro rata portion, based on the remaining term of this Contract, of the reasonable and documented costs to achieve such cost savings), provided, however, that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any savings resulting from reduction on the content of the such Product.

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Seller's labor, materials, overhead and other costs. In the event that Buyer agrees to any price increases (or a decrease of any scheduled price reductions) with respect to any Product, then, notwithstanding anything to the contrary set forth in this Contract, the pricing of each Products will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any subsequent net cost savings achieved by Seller with respect to such Product until aggregate price reductions on account of Seller's cost savings equal any price increases previously agreed to by Buyer.

4.    **Right to Purchase from Others**

During the entire term of this Contract, Seller will assure that each Product remains competitive in terms of technology, design, service and quality with any similar product available to Buyer. Following **Model Year 2004** Seller will also assure that each Product remains competitive in terms of price with any similar product available to Buyer. If, in the reasonable opinion of Buyer, a Product does not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which a similar product is more competitive. If, within ninety (90) days, Seller does not agree to immediately sell any Product with comparable technology, design, quality, or, if applicable, price, Buyer may elect to purchase any similar products available to Buyer without any liability to Seller under this Contract.

5.    **Purchase Orders**

All Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders (including related delivery releases and shipping instructions) issued by Buyer from time to time during the term of this Contract. Buyer's General Terms and Conditions, a copy of which is attached, are hereby incorporated into this Contract by reference, provided, however, that Buyer's right to "terminate for convenience" under the General Terms and Conditions will be inapplicable to this Contract until the end Model Year 2004. Any amendment to, or revision of, such General

Terms and Conditions shall also become a part of this Contract, provided that (i) Buyer provides Seller with a copy of such revised Terms and Conditions and (ii) Seller does not object to such revised Terms and Conditions in writing within thirty (30) days after receipt. The Terms and Conditions (together with any revision made a part of this Contract) shall be construed, to the extent possible, as consistent with the terms and conditions set forth in this Contract and as cumulative, provided, however, that if such construction is unreasonable, the terms and conditions set forth in this Contract shall control.

EXECUTED by Buyer and Seller as of this 5ᵗʰ day of SEPTEMBER, 2002.

Buyer:

Seller:

Delphi Corporation LLC
acting through its Safety & Interior
Systems Division

Lextron Automotive
Technologies Corporation

By: _____

By: _____

Name: ___Michelle E. Joseph___

Name: ___Ray C. Irby___

Title: ___Senior Electrical Buyer___

Title: ___Chief Operating Officer___

# DELPHI AUTOMOTIVE SYSTEMS

## GENERAL TERMS AND CONDITIONS

*Delphi Automotive Systems seeks to exceed its customers' expectations. Delphi's suppliers are integral to achieving this objective, and Delphi hopes that its suppliers will recognize Delphi as their preferred customer. Delphi will establish high performance expectations for itself and its suppliers, measure performance and reward superior performance.*

## 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

## 2. SHIPPING AND BILLING

2.1  <u>Shipping.</u>  Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and/or release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs. Seller will include on bills of lading or other shipping receipts the correct classification identification of the goods shipped as Buyer or the carrier requires. The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

2.2  <u>Billing.</u>  Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer. If the payment due date is not otherwise specified in this Contract, the payment due date will be the due date established by the Multilateral Netting System (MNS-2) used by Buyer, which provides, on average, that payment will be due on the second day of the second month following the date Buyer receives the goods or services. Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

2.3  <u>Delivery Schedules.</u>  Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract. Time is of the essence with respect to all delivery schedules Buyer establishes. Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules. Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules. If Buyer determines that the requirements of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other modification of this Contract.

Revised June 24, 1999

2.4  Premium Shipments.  If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules using the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods using a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible. Seller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to fail to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

## 3. SPECIFICATION, DESIGN AND SCOPE CHANGES

Buyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract, including work related to inspection, testing or quality control.  While Buyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such changes.  Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including Buyer's payment of reasonable costs of modifications to Seller's Equipment and Facilities (as defined in Article 16) necessary to implement such changes.  In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's cost of production and the time to implement such changes.  In the event of any disagreement arising out of such changes, Buyer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue performing under this Contract, including prompt implementation of changes required by Buyer, while Buyer and Seller resolve any disagreement arising out of such changes.

## 4. QUALITY AND INSPECTION

Seller will participate in Buyer's supplier quality and development program(s) and comply with all quality requirements and procedures Buyer specifies from time to time.  Seller will permit Buyer and its representatives and consultants to (i) inspect Seller's books and records in order to monitor Seller's compliance with this Contract and Seller's financial condition and (ii) enter Seller's facilities at reasonable times to inspect such facilities and any goods, materials and property that relate to this Contract.  No such inspection by Buyer will constitute acceptance by Buyer of any work-in-process or finished goods.

## 5. NON-CONFORMING GOODS

Buyer is not required to perform incoming inspections of any goods, and Seller waives any right to require Buyer to conduct any such inspections.  Seller will not substitute any goods for the goods covered by this Contract unless Buyer consents in writing.  If Buyer rejects any goods as non-conforming, Buyer may, at its option, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods, (b) require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or remedies.  If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of non-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or such shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the non-conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to arrange for the shipment of any non-conforming goods back to Seller at Seller's expense.  Seller will bear all risk of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by Buyer to return, store or dispose any non-conforming goods.  Buyer's payment for any non-conforming goods will not constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or relieve Seller of responsibility for the non-conforming goods.

-2-

Revised June 24, 1999

## 6. FORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for so long as such event or occurrence continues, provided, however, that the affected party gives written notice of such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by the quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities and at times Buyer requests and at the prices set forth in this Contract. If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without liability. Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any such disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such disruption commences.

## 7. WARRANTY

7.1 <u>General</u>. Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services covered by this Contract will (a) conform to all applicable specifications, drawings, samples, descriptions, brochures and manuals furnished by Seller or Buyer, (b) will be merchantable, (c) of good material and workmanship, (d) free from defect, and (e) are fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

7.2 <u>Date and Time Processing</u>. Seller warrants and guarantees to Buyer and its customers that any products (including computer hardware, software, firmware, machinery and equipment) covered by this Contract must at all times accurately process, handle, calculate, compare and sequence date and time data from, into, within and between the 20th and 21st centuries, including leap year calculations.

7.3 <u>Warranty Period</u>. The period for each of the foregoing warranties will be that provided by applicable law, except that if Buyer ever provides a longer warranty to its customers, such longer warranty period will apply to the goods covered by this Contract.

## 8. INGREDIENTS AND HAZARDOUS MATERIALS

If Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all ingredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to the ingredients. Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers sufficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures and precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable

- 3 -

Revised June 24, 1999

legal requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing.

## 9. INSOLVENCY OF SELLER

Buyer may immediately terminate this Contract without liability to Seller in any of the following or any similar events: (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract. Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract, without liability to Seller at any time after execution if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract; or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing. Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under this Contract which are useable and in a merchantable condition. The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by Buyer and not previously paid for, plus (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less (c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent. In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which Seller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required to pay for any goods or materials that are in Seller's standard stock or that are readily marketable. Payments made under this Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination. Within sixty (60) days after the effective date of termination, Seller will submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit an audit by Buyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 12. TECHNICAL INFORMATION

12.1   Exchange of Information.   Buyer and Seller will cooperate to create, maintain, update, and share technical information about the goods, products, machinery, materials, formulations and their manufacture, use, application and control in compliance with Buyer's drafting and math data standards. Such technical information will not be subject to any use or disclosure restrictions. Accordingly, Seller agrees not to assert any claims against Buyer, its customers or their respective suppliers with respect to any technical information that Seller discloses in connection with this Contract.

12.2   Waiver of Claims.   Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, Buyer's customers or their respective suppliers with respect to any technical information that Seller shall have disclosed or may hereafter disclose in connection with the goods or services covered by this Contract.

-4-

Revised June 24, 1999

12.3  <u>Repair and Rebuild</u>.  Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and their subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment of any royalty or other compensation to Seller.

12.4  <u>Computer Programs and Written Works</u>.  All works of authorship, including without limitation, software, computer programs, and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing this Contract (separately or as part of any goods and components) are "works made for hire" and the sole property of Buyer.  To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller agrees to assign and assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship.

## 13.  INDEMNIFICATION

13.1  <u>Infringement</u>.  Seller will defend, hold harmless and indemnify Buyer and its customers, and their respective successors and assigns, against any claims of infringement (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses (including, without limitation, attorney and other professional fees and disbursements) relating to the goods or services covered by this Contract, including any claims in circumstances where Seller has provided only part of the goods or services.  Seller waives any claim against Buyer that any such infringement arose out of compliance with Buyer's specifications.

13.2  <u>Activities on Buyer's Premises</u>.  Seller will defend, hold harmless, and indemnify Buyer from and against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other professional fees and disbursements) arising from or in connection with the performance of any service or work by Seller or its employees, agents, representatives and subcontractors on Buyer's or Buyer's customer's premises or the use of the property of Buyer or any customer of Buyer, except to the extent such liability arises out of the negligence or willful misconduct of Buyer or Buyer's customer.

13.3  <u>Product Liability</u> .  Seller will defend, hold harmless, and indemnify Buyer from and against any liability and expenses (including, without limitation, attorney and other professional fees and disbursements) arising from or in connection with any third party claims or demands to recover for personal injury or death, property damage or economic loss caused by any of the goods or services supplied by Seller (regardless of whether such claim or demand arises under tort, negligence, contract, warranty, strict liability or other legal theories), except to the extent such injury, damage or loss results from Buyer's specifications as to design or materials or from alteration or improper repair, maintenance or installation by any party other than Seller.

## 14.  COMPLIANCE WITH LAWS

Seller, and any goods or services supplied by Seller, will comply with all applicable laws, rules, regulations, orders, conventions, ordinances and standards of the country(ies) of origin and destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety.  Neither Seller nor any of its subcontractors will utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or services under this Contract.  Upon Buyer's request, Seller will certify in writing its compliance with the foregoing.  Seller will defend, hold harmless and indemnify Buyer from and against any liability, claims, demands, damages or expenses (including reasonable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with this Article.

## 15.  INSURANCE

Revised June 24, 1999

Seller will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers reasonably acceptable to Buyer.    With respect to any such insurance coverage, Seller will furnish to Buyer either a certificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies of all insurance policies within ten (10) days after Buyer requests.  The certificate must provide that Buyer will receive thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's obligations or liabilities under this Contract.

## 16.  SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required for the production of the products covered by this Contract ("Seller's Equipment").  Seller will insure Seller's Equipment with fire and extended coverage insurance for its full replacement value.  Seller grants Buyer an irrevocable option to take possession of, and title to, all or part of Seller's Equipment that is specially designed or outfitted for the production of the goods covered by this Contract upon payment to Seller of the net book value of such Seller's Equipment less any amounts that Buyer has previously paid to Seller for the cost of such Seller's Equipment.  This option will not apply to the extent that Seller's Equipment is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.  Buyer's right to exercise this option is not conditioned on Seller's breach or Buyer's termination of this Contract or upon payment of any other amounts due under this Contract.

## 17.  BUYER'S PROPERTY

17.1  Bailment of Property.  All supplies, materials, tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items Buyer furnishes, either directly or indirectly, to Seller, or for which Buyer gives consideration to Seller in whole or in part ("Buyer's Property"), will be and remain the property of Buyer and be held by Seller on a bailment basis. To the extent that this Contract provides that Buyer will reimburse Seller for any specific items of Buyer's Property (such as tooling), Seller will purchase and pay for such Buyer's Property as agent of Buyer.  To the extent that this Contract provides that Seller will obtain any specific items of Buyer's Property (such as tooling) without separate or additional payment or reimbursement by Seller, Seller acknowledges and agrees that Buyer's issuance of this Contract is good and sufficient consideration for such Buyer's Property and that title to such Buyer's Property shall vest immediately in Buyer and be held by Seller pursuant to this Article.  Seller shall assign to Buyer any contract rights or claims in which Seller has an interest with respect to Buyer's Property.  Seller shall also execute (i) any bills of sale or other documents of conveyance Buyer requests to evidence the transfer to Buyer of title to any Buyer's Property, related contract rights and claims and (ii) any financing statements or other documents Buyer requests to evidence Buyer's ownership of Buyer's Property.  Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property.  Seller will not sell, lend, rent, encumber, pledge, lease, transfer or otherwise dispose of Buyer's Property.  Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property.  When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property for work performed on such property or otherwise.  Goods manufactured based on Buyer's drawings and/or specifications may not be used for Seller's own use or sold to third parties without Buyer's express written authorization.

17.2  Seller's Duties with Respect to Buyer's Property.  While Buyer's Property is in Seller's possession and until Seller delivers Buyer's Property back to Buyer, Seller bears the risk of loss and damage to Buyer's Property.  Seller will be responsible for the cost of repairing or replacing Buyer's Property if it is damaged or destroyed regardless of cause or fault.  Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from Seller's premises without Buyer's written approval, and (g) use Buyer's Property in compliance with Buyer's or the manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations.  Buyer

- 6 -

will have the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with respect thereto.

17.3  Return of Buyer's Property.  Seller agrees that Buyer has the right, at any time and from time to time, with or without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property. Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the right to enter Seller's premises and take possession of any and all of Buyer's Property.  Upon Buyer's request and in accordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by Seller, either (i) Ex Works (Incoterms 1990) at Seller's plant properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates, in which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates. If Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or without legal process, and take immediate possession of Buyer's Property.

17.4  Disclaimer of Warranties.  Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's Property nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's benefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF BUYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE.  Buyer will not be liable to Seller for any loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including, without limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of service or for any loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory damages, profits or any other indirect, special or consequential damages.

17.5  Development, Engineering And Consulting Services.  Engineering, consulting or development services ("Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of authorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole property of Buyer. Seller agrees to assign all right, title and interest in and to IP that results from Development Services ("Developed IP") to Buyer.  Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every reasonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional documents reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse Seller for reasonable costs incurred by Seller in providing such assistance.

## 18. SERVICE AND REPLACEMENT PARTS

During the term of this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and replacement parts requirements to Buyer's customers at the then current production price(s) under this Contract. If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module at price(s) that will not, in the aggregate, exceed the price of the system or module less assembly costs. If this Contract is in effect at the end of the vehicle production program into which the goods covered by the Contract are incorporated, Seller will also sell goods to Buyer to fulfill Buyer's and its customers' service and replacement parts requirements during the fifteen (15) year period following the end of such vehicle production program (the "Post-Production Period"), and this Contract will automatically remain in effect during the entire Post-Production Period. During the first three (3) years of the Post-Production Period, the price(s) for such goods will be the production price(s) which were in effect at the commencement of the Post-Production Period. For the remainder of the Post-Production Period, the price(s) for such service goods will be as reasonably agreed to by the parties. If requested by Buyer, Seller will also make service literature and other materials available at no additional charge to support Buyer's service activities.

## 19. REMEDIES

Revised June 24, 1999

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity.

## 20. CUSTOMS AND EXPORT CONTROLS

Credits or benefits resulting or arising from this Contract, including trade credits, export credits or the refund of duties, taxes or fees, belong to Buyer. . Seller will provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive these benefits or credits, and to fulfill any customs related obligations, origin marking or labeling requirements and local content origin requirements. Seller will obtain all export licenses or authorizations necessary for the export of the goods unless otherwise indicated in this Contract, in which event Seller will provide all information as may be necessary to enable Buyer to obtain such licensees or authorization(s). Seller will make all arrangements that are necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

## 21. SETOFF AND RECOVERY

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or Buyer's affiliates, Buyer may (i) setoff such obligations against any sums owing to Seller or Seller's affiliates and/or (ii) recoup such obligations from any amounts paid to Seller or Seller's affiliates by Buyer or Buyer's affiliates.

## 22. NO ADVERTISING

Seller will not, in any manner, advertise or publish that Seller has contracted to furnish Buyer the goods or services covered by this Contract or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials unless Buyer consents in writing.

## 23. NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any provision of this Contract will not affect the right to require such performance at any later time, nor will the waiver by either party of a breach of any provision of this Contract constitute a waiver of any succeeding breach of the same or any other provision. No course of dealing or course of performance may be used to evidence a waiver or limitation of Seller's obligations under this Contract.

## 24. ASSIGNMENT

Buyer may assign its rights and obligations under this Contract without Seller's prior written consent. Seller may not assign or delegate its rights or obligations under this Contract without Buyer's prior written consent.

## 25. RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties. Nothing in this Contract makes either party the agent or legal representative of the other for any purpose whatsoever, nor grants either party any authority to assume or create any obligation on behalf of or in the name of the other party.

## 26. GOVERNING LAW AND JURISDICTION

This Contract is to be construed according to the laws of the country (and state or province, if applicable) from which this Contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law.

- 8 -

Revised June 24, 1999

Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in the court(s) having jurisdiction over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures. Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this Contract is issued.

## 27. SEVERABILITY

If any provision of this Contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Contract will remain in full force and effect.

## 28. RIGHT TO AUDIT AND INSPECT

Buyer, at its expense, has the right to audit and review all relevant books, records, payroll data, receipts and other documents, including Seller's administrative and accounting policies, guidelines, practices and procedures, in order to substantiate any charges and other matters under this Contract. Seller will maintain and preserve all such documents for a period of four (4) years following final payment under this Contract. In addition, Buyer has the right to inspect all inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges, and other items related to Seller's performance of this Contract. Seller will provide Buyer with reasonable access to its facilities and otherwise cooperate and facilitate any such audits or inspections by Buyer.

## 29. ENTIRE AGREEMENT

This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written contract amendment issued by Buyer. Notwithstanding anything to the contrary contained herein, Buyer explicitly reserves, and this Contract will not constitute a waiver or release of, any rights and claims against Seller arising out of, or relating to, any fraud or duress in connection with the formation of this Contract or any breach or anticipatory breach of any previously existing contract between Buyer and Seller (whether or not such previously existing contract related to the same or similar goods or subject matter as this Contract). All payments by Buyer to Seller under this Contract are without prejudice to Buyer's claims, rights, or remedies.

- 9 -

Delphi has redacted the Lextron requirement contract to the extent that it includes
competitive edge pricing information.

# EXHIBIT "3"

# Interim Action Credit Offering Report

| | | | | | SIC Code: 3679 | | | Date: 1/08/03 |
|---|---|---|---|---|---|---|---|---|
| Borrower(s): | Lextron Corporation and Lextron Automotive, LLC. (Subsidiary) | | | | Tax ID#: | | | Dept: Corp. Special Assets |
| Address: | 249 Mitchell Avenue | | | | | 64-0803735 | | Officer: Andy Raine |
| City, State: | Jackson, MS | | Zip: 39213 | | CL Account #: | | | Assign Unit: 1530 |
| Principals: | Charles Doty (100% owner) | | | | | 0015169856 | | Ind Vul Code: 3 |
| | | | | | Current Loan | | | Phone #: 5688 |
| Nature of Business: Manufacture/Assembly of electr. | | Obligor Type: 102 | | | Rating: | 9 | | Fax #: 4852 |
| components used in automotive and telcom industries | | | | | | | | |

## Commitments & Outstanding ($ In Thousands)

| | | FDIC | | | Commitments | | | Outstandings | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Facility | Rating | Collateral | Fed Class | Bank | Others | Total | Bank | Others | Total |
| Commitments under Consideration: | | | | | | | | | |
| Revolving Line of Credit (working capital) | 9 | 780 | 599 | $4,000.0 | | $4,000.0 | $3,200.0 | | $3,200.0 |
| Term Loan (building) | 9 | 134 | 599 | $913.6 | | $913.6 | $913.6 | | $913.6 |
| Term Loan (equipment) | 9 | 550 | 599 | $194.6 | | $194.6 | $194.6 | | $194.6 |
| Term Loan (residential R/E) | 9 | 120 | 599 | $115.4 | | $115.4 | $115.4 | | $115.4 |
| Previously Approved Commitments: | | | | | | | | | |
| IRB Backup Letter of Credit | 9 | 134 | 599 | $1,931.8 | | $1,931.8 | $1,931.8 | | $1,931.8 |
| All other Commitments | | | | | | | | | |
| Related Debt: | | | | | | | | | |
| Grand Totals | | | | $7,155.4 | $0.0 | $7,155.4 | $6,355.4 | $0.0 | $6,355.4 |

## Commitment Expiration Dates

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Acceptance: (1) | Line: 06/30/03 | | Acceptance: (2) | Line: | Acceptance: (3) | Line: | |

## Reason for Request & Recommendation

**Purpose:** 2) Recommend approval of an $800m increase to the Company's Line of Credit that will stop a free-fall liquidation and allow the Company adequate time to stabilize the business with the assistance of a qualified turnaround consultant (Alvarez and Marsal). In addition, approval is requested to defer two months worth of principal payments on the Term Loans for 60 days.

**Comments:** Alavarez and Marsal has performed a liquidation analysis and the results show a large shortfall in the Bank's collateral coverage. YTD Interim statements for 6/30/02 show the Company reporting a Net Loss of ($974m) from Revenues of $7.7mm. (Please see attached liquidation analysis and cash flow budget prepared by Alvarez and Marsal.)

**Collateral:** $3.2MM Line of Credit is secured by banket lien on all of Borrowers' accounts, contract rights, chattel, inventory and general intangibles. Based on a 1/07/03 Borrower's report, the Company reported total borrowing availability of $1.7mm. Lextron Automotive, LLC has been added as a joint and several borrower. The LLC is a wholly owned subsidary of Lextron Corp. and is the owner of a portion of the collateral.

**Other:** Based on the necessity to avoid a free-fall liquidation and to provide the Company adequate time to stabilize the business with proper assistance from Alvarez and Marsal, approval of the Line increase and principal deferral is recommended as presented.

Are all taxes, regardless of type, current for both Obl and Gurantors? No_____

## APPROVAL

| | | | Other Action: |
|---|---|---|---|
| Recommended By: Andy Raine | Officer # A60 | | |
| Approving Authority | Req'd | Date | Approved / Declined |
| Officer | X | 01/10/03 | |
| Senior Loan Committee | X | 01/10/03 | |

Revised 10/

INFORMATExt2008_v04

PLAINTIFF'S
EXHIBIT
17

CONF...

ST/Lextron (Delphi)
005744

# EXHIBIT "4"

FORM B10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor<br>**Delphi Automotive Systems, LLC** | Case Number:<br>**05-44640 (RDD)** |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request"
for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

RECEIVED
AUG 1 1 2006
KURTZMAN CARSON

| Name of Creditor (The person or other entity to whom the debtor owes money or property)<br>**Wachovia Bank, N.A., successor by merger to SouthTrust Bank** | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | ☒ Date Stamped Copy Returned |
|---|---|---|

| Name and addresses where notices should be sent<br>**Christopher D. Carson**<br>Burr & Forman LLP<br>420 N 20th Street, Suite 3100<br>Birmingham, Alabama 35203<br>Telephone No. (205)251-3000 | ☒ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | ☐ No self addressed stamped envelope<br>☐ No copy to return<br><br>THIS SPACE IS FOR COURT USE ONLY |
|---|---|---|

| Last four digits of account or other number by which creditor identifies debtor: | Check here ☐ replaces<br>If this claim ☐ amends | a previously filed claim, dated:_____ |
|---|---|---|

**1. Basis for claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☒ Other: Pre-petition tort, contract, and equitable claims

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (Fill out below)
  Last four digits of your SS # _____
  Unpaid compensation for services performed
  from _____ to _____
  (date)          (date)

**2. Date debt was incurred:**

**3. If court judgment, date obtained:**

**4.    Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed.
See reverse side for important explanations.

**Unsecured Nonpriority Claim $6,656,624.92 (plus accruing interest and attorneys' fees)**

☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority.

Amount entitled to priority: $_____

Specify the priority of the claim:
- ☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B)
- ☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier 11 U.S.C. § 507(a)(4).
- ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

**Secured Claim**

☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate  ☐ Motor Vehicle ☐ Other:

Value of Collateral:      $_____

Amount of arrearage claim and other charges at time case filed included in secured claim, if any:  $_____

- ☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
- ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(__).

*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

| **5. Total Amount of Claim at Time Case Filed:** | $6,656,624.92 | $ | $ | $6,656,624.92 |
|---|---|---|---|---|
| | (unsecured) | (secured) | (priority) | (total) |

☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

THIS SPACE IS FOR COURT USE ONLY
RECEIVED
JUL 3 1 2006
CLAIMS PROCESSING CENTER

**7. Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

| Date<br>July 27, 2006 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br><br>[signature]<br>Christopher D. Carson, Attorney for Wachovia Bank, N.A., successor by merger to SouthTrust Bank |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years or both. 18 U.S.C. §§ 152 and 3571.

1486103 v2

BURR & FORMAN LLP
420 North 20th Street
Suite 3100
Birmingham, Alabama 35203
(205) 251-3000
Christopher D. Carson
Jason D. Woodard
Jennifer A. Harris

Attorneys for Creditor
Wachovia Bank, National Association,
successor by merger to SouthTrust Bank

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtor. | : | |

------------------------------------------------

## STATEMENT IN SUPPORT OF PROOF OF CLAIM OF WACHOVIA BANK

COMES NOW Wachovia Bank, National Association, successor by merger to SouthTrust Bank ("Wachovia"), and, pursuant to 11 U.S.C. §§ 501 and 502, files this Statement in Support of its Proof of Claim, which reflects a claim in the amount of $6,656,624.92 as of the petition date, plus accruing interest, costs, and attorneys fees. In support of its claim, Wachovia states the following:

1.    Wachovia holds pre-petition claims against Delphi Corporation, Delphi Automotive Systems USA, LLC, Delphi Automotive Systems, LLC, Delphi Packard, Delphi Packard Electric Systems, Delphi Energy & Chassis Systems, and Delphi Safety and Interior Systems (collectively, "Delphi"), for misrepresentation, suppression, conspiracy, breach of

1486184

contract, interference with business relationship, breach of duty of good faith and fair dealing, negligence, and promissory estoppel.

2.     On March 3, 2003, Wachovia filed suit against Delphi in the Circuit Court for the Second Judicial District of Hinds County Mississippi (the "Mississippi State Court"), commencing litigation on its pre-petition claims and seeking compensatory damages, attorneys' fees and costs, and punitive damages.

3.     Litigation of Wachovia's pre-petition claims against Delphi in the Mississippi State Court is currently stayed by virtue of Delphi's bankruptcy.   A true and correct copy of Wachovia's complaint, which sets forth the basis of its claims against Delphi, is attached hereto as Exhibit 1.

4.     Wachovia's claim against the estate of the above-captioned Debtor as of the petition date includes $966,750.68 in compensatory damages, $856,120.84 in attorneys' fees and expenses, and $4,833,753.40 in punitive damages.

Dated this the 28th day of July, 2006

_____
Christopher D. Carson
Jason D. Woodard
Jennifer A. Harris

OF COUNSEL:
BURR & FORMAN LLP
3100 Wachovia Tower
420 North 20th Street
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

1486184                                         2

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the Proof of Claim of Wachovia Bank, National Association, successor by merger to SouthTrust Bank, and the Statement in Support of the Proof of Claim of Wachovia Bank and its accompanying Exhibit have been served on the following counsel for the Debtor, via first class United States mail, postage prepaid, on this the 28th day of July 2006:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Kayalyn A. Marafioti
Thomas J. Matz
FourtTimes Square
New York, New York 10036

OF COUNSEL

1486184                                    3

Apr-14-03 03:43P                                                                    P.02

# IN THE CIRCUIT COURT FOR THE SECOND JUDICIAL DISTRICT
# OF HINDS COUNTY, MISSISSIPPI

SOUTHTRUST BANK, a corporation          )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )
                                        )
LEXTRON CORPORATION, a                  )
corporation; CHARLES DOTY, an           )
individual; LEXTRON AUTOMOTIVE,         )
LLC, a limited liability company;       )
DELPHI CORPORATION, a                   )
corporation; DELPHI AUTOMOTIVE          )
SYSTEMS USA, LLC, a limited             )        CIVIL ACTION NO. 2003-14
liability company; DELPHI               )
AUTOMOTIVE SYSTEMS, LLC, a              )
limited liability company; DELPHI       )
PACKARD, DELPHI PACKARD                 )
ELECTRIC SYSTEMS, DELPHI                )
ENERGY & CHASSIS SYSTEMS, and           )
DELPHI SAFETY AND INTERIOR              )
SYSTEMS, divisions, subsidiaries or     )
affiliates of defendant, Delphi         )
Corporation.                            )
                                        )
            Defendants.                 )

**FILED**

APR 1 4 2003

BARBARA DUNN, CIRCUIT CLERK
BY_____D.C.

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES Now plaintiff, SouthTrust Bank, and for its Complaint against defendants Charles Doty, Lextron Corporation, Lextron Automotive, LLC, Delphi Corporation, Delphi Automotive Systems USA, LLC, Delphi Automotive Systems, LLC, Delphi Packard, Delphi Packard Electric Systems, Delphi Energy & Chassis Systems, and Delphi Safety and Interior Systems (collectively, the "Defendants"), states the following:

1034962 v3

```
EXHIBIT
    A
```

Apr-14-03 03:43P                                    LANGSTON-SWEET-F                              ☐ 03

                                                                                                P.03

## I. PARTIES

1.    Plaintiff, SouthTrust Bank, is an Alabama banking corporation, doing business in Hinds County, Mississippi ("SouthTrust").

2.    Defendant Lextron Corporation ("Lextron Corp.") is a Mississippi corporation with its principal place of business located in the City of Jackson, Hinds County, Mississippi. Lextron Corp. is named as a defendant in this action by virtue of the unpaid Loans (herein after defined) owing to SouthTrust.

3.    Defendant Charles Doty ("Doty") is an individual resident citizen of Hinds County, Mississippi. Doty is named as a defendant in this action by virtue of his personal guarantee of the Loans.

4.    Defendant Lextron Automotive, LLC ("Lextron Automotive," and together with Lextron Corp., "Lextron") is a Mississippi limited liability company with its principal place of business located in the City of Jackson, Hinds County, Mississippi. Lextron Automotive is named as a defendant in this action by virtue of its guarantee of the Loans.

5.    Defendant Delphi Corporation ("Delphi Corp.") is a Delaware corporation doing business in Mississippi.

6.    Defendant Delphi Automotive Systems USA, LLC ("Delphi Auto USA") is a Michigan limited liability company doing business in Mississippi.

7.    Defendant Delphi Automotive, LLC ("Delphi Automotive") is a Delaware limited liability doing business in Mississippi.

8.    Defendants Delphi Packard, Delphi Packard Electric Systems, Delphi Energy & Chassis Systems, and Delphi Safety and Interior Systems are divisions,

10N4862 v3                            2

subsidiaries or affiliates of Delphi Corp., Delphi Auto USA and/or Delphi Automotive, and are doing business in Mississippi (collectively, and together with Delphi Corp., Delphi Auto USA and Delphi Automotive, the "Delphi Defendants").

9.    The Delphi Defendants are named as defendants in this action by virtue of covenants, assurances, commitments, fraud, negligence, breaches of covenants of good faith and fair dealing, and misrepresentations made to SouthTrust regarding the Delphi Defendants' business relationship with Lextron.

## II. FACTS

10.    From time to time, SouthTrust made loans (the "Loans") to Lextron to fund its business operations, including its manufacturing and assembly business with the Delphi Defendants.  The Loans are evidenced by various promissory notes and credit agreements (the "Loan Documents").  [Copies of the Loan Documents, the Collateral Documents (hereinafter defined) and the Guaranties (hereinafter defined) are so voluminous that it is not practical to attach copies to this Complaint.  Such copies will be made available to the Court, the jury and the Defendants].

11.    The Loans are secured by various mortgages, security agreements and other collateral documents made by Lextron in favor of SouthTrust (the "Collateral Documents").

12.    Doty and Lextron Automotive unconditionally guaranteed the Loans as evidenced by various guaranties executed in favor of SouthTrust (the "Guaranties" and together with the Loan Documents and the Collateral Documents, the "Credit Documents").

13.    Defaults occurred under the Credit Documents, and all applicable cure periods have expired.  Lextron and Doty failed to cure such defaults.  The total amount

1044962 v3                                  3

of the Loans, including all principal, interest and agreed charges, are now due and payable by Lextron and Doty.

14. Since 1997 Lextron has been a manufacturer, assembler and supplier of certain automobile parts for one or more of the Delphi Defendants.

15. The Delphi Defendants shipped raw materials to Lextron, creating an account payable ("Accounts Payable") owing by Lextron to the Delphi Defendants.

16. Lextron manufactured finished products from the raw materials and shipped the finished products back to the Delphi Defendants thereby creating accounts receivable owing by the Delphi Defendants ("Accounts Receivable").

17. The Accounts Receivable were to exceed the Accounts Payable, and the Delphi Defendants would pay the excess to Lextron; such excess represented Lextron's gross profits from this arrangement. The Accounts Receivable were pledged to SouthTrust as security for the Loans pursuant to the terms of the Collateral Documents.

18. The Delphi Defendants frequently turned to Lextron to perform work that was to be completed by other suppliers who could not meet the Delphi Defendants' production demands.

19. The business relationship between Lextron and the Delphi Defendants grew to the point that by August 2001 Lextron completed construction of a 59,000 square foot, state-of-the-art warehouse/office facility in Jackson, Mississippi to ensure that Lextron could meet the production demands of the Delphi Defendants.

20. Lextron received over 90% of its revenue from the work it performed for the Delphi Defendants, and the Delphi Defendants were aware of this fact.

1084942 v3

4

21.    Apparently due to rapid growth in business, in November 2002, Lextron began experiencing financial difficulties and defaults occurred under the Credit Documents. Andy Raine, a Vice-President of SouthTrust ("Raine"), met with Lextron and Doty to discuss a strategy for Lextron to work through its financial difficulties and repay the Loans to SouthTrust.

22.    Due to the defaults, SouthTrust entered into a Forbearance Agreement dated  December 31, 2002 with Lextron and Doty, whereby it was agreed that SouthTrust would forbear for a period of time from exercising its remedies to collect the Loans and otherwise forbear from enforcing the Credit Documents. It was anticipated that during this period of forbearance, Lextron would work through its financial problems.

23.    Approximately one week later, in early January of 2003, Mr. Raine received a telephone call from Sidney Johnson ("Johnson"), Director of Purchasing for Delphi Automotive. Mr. Johnson asked SouthTrust to lend Lextron additional money so Lextron could pay its payroll due to employees.

24.    Mr. Raine told Mr. Johnson that SouthTrust would not loan Lextron additional money without assurances from the Delphi Defendants that they would not terminate their business relationship with Lextron, and that Lextron would have enough work from the Delphi Defendants to continue in business. Mr. Johnson gave Mr. Raine those assurances, but these promises were not true.

25.    After Mr. Johnson's phone conversation with Mr. Raine, Greg Naylor ("Naylor") and Martha "Marty" Everett ("Everett") from the Delphi Defendants, on

separate occasions, discussed with Mr. Raine Lextron's financial status and Lextron's relationship with the Delphi Defendants.

26.    In those conversations, Mr. Naylor and Ms. Everett specifically stated that the Delphi Defendants would continue their business relationship with Lextron and specifically requested that SouthTrust lend additional sums of money to Lextron and to forbear taking any collection action against Lextron.

27.    In these conversations, Mr. Raine requested that the Delphi Defendants provide written confirmation of their commitment to Lextron, and on or about January 9, 2003, Larry W. Graves, North American Purchasing Director Delphi Packard Electric Systems, ("Graves") sent a memorandum to Mr. Raine via e-mail (the "Delphi Memo") with copies going to Mr. Johnson, Mr. Naylor and Ms. Everett.

28.    The Delphi Memo made reference to the conversations between representatives of SouthTrust and the Delphi Defendants, and went on to say that "I am writing you [SouthTrust] this memo to re-iterate Delphi Packard's (Delphi-P) focus to maintain Lextron corporation as a supplier. We have the resources to assist Lextron, including a reduction in our payment terms to Net 15, during its cash flow shortfall." The Delphi Memo specifically asked that "because of Delphi-P's support and interest in Lextron, Delphi-P is requesting SouthTrust Bank to continue its support of Lextron."

29.    In reliance on the assurances made in the phone conversations with Mr. Johnson, Mr. Naylor, Ms. Everett and Mr. Graves, and in reliance of the representations made in the Delphi Memo, SouthTrust loaned Lextron an additional $800,000.

30.   At all times during their communications with SouthTrust, the Delphi Defendants were fully aware of Lextron's financial difficulties.

31.   Even though the Delphi Defendants had given the foregoing assurances to SouthTrust, SouthTrust learned on February 25, 2003 that the Delphi Defendants intended to terminate their business relationship with Lextron effective February 28, 2003.

32.   Representatives of Lextron, its financial consultant and SouthTrust phoned the Delphi Defendants several times to discuss the termination of Lextron as a supplier; however no one from any of the Delphi Defendants ever attempted to explain their decision to abruptly terminate Lextron.

33.   Moreover, on February 28, 2003, SouthTrust sent a letter to Delphi Corp. (the "February 28 Letter") expressing its concerns regarding the Delphi Defendants' unilateral decision to terminate the Lextron relationship, and the increase in the Loans in reliance upon the assurances given by the Delphi Defendants.

34.   No one from the Delphi Defendants responded to the February 28 Letter.

35.   Because the Delphi Defendants abruptly terminated their business relationship with Lextron, Lextron was forced to lay-off approximately 150 employees and cease all but a minor part of its manufacturing operations.

36.   After the Delphi Defendants terminated their business relationship with Lextron, SouthTrust learned that the Delphi Defendants were moving the manufacturing work previously performed by Lextron "in-house," presumably to their Delphi Hinds County, Mississippi facility.

1084262 v5

7

04/14/05  16:56  FAX 2056717030          LANGSTON-SWEET-F                      Ø09

Apr-14-03 03:44P                                                               P.09

37.    The Delphi Defendants have not attempted to hire any of the 150 employees laid-off by Lextron.

## COUNT I
## NON-PAYMENT OF LOANS

38.    SouthTrust hereby adopts and incorporates the allegations set forth in the paragraphs 1 through 37.

39.    Lextron Corp., Lextron Automotive and Doty are obligated to repay the Loans to SouthTrust pursuant to the terms of the Credit Documents.

40.    Lextron Corp., Lextron Automotive and Doty breached their obligations owing to SouthTrust by failing to pay the principal of, interest on and agreed charged due on the Loans.

WHEREFORE, PREMISES CONSIDERED, SouthTrust demands judgment against Lextron Corp., Lextron Automotive, and Doty, jointly and severally, for compensatory damages in an amount equal to the total principal, interest and agreed charges (including attorney's fees and other expenses of collection) due on the Loans and otherwise owing under the Credit Documents, and such other and further relief as this Court deems appropriate.

## COUNT II - MISREPRESENTATION

41.    SouthTrust hereby adopts and incorporates the allegations set forth in the paragraphs 1 through 40 above.

42.    The Delphi Defendants intentionally, willfully, negligently, wantonly or recklessly misrepresented to SouthTrust that they would continue their manufacturing relationship with Lextron and continue to give business to Lextron (the "Delphi

1084262 v5                                    8

Representations") for the purpose of inducing SouthTrust to continue its banking relationship with Lextron and to induce SouthTrust to make additional loan advances to Lextron.

43.   The Delphi Representations were false.

44.   Delphi made the Delphi Representations to SouthTrust knowing the Delphi Representations were false or with ignorance of their truth.

45.   Delphi intended that SouthTrust would act upon the Delphi Representations in a manner reasonably contemplated.

46.   SouthTrust did not know the Delphi Representations were false.

47.   SouthTrust relied on the Delphi Representations.

48.   SouthTrust had the right to rely on the Delphi Representations.

49.   SouthTrust was injured as a consequence of the Delphi Representations being false.

WHEREFORE, PREMISES CONSIDERED, SouthTrust demands judgment as follows:

A.   Against the Delphi Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, plus accruing charges and attorneys fees, costs of this action, and such other and further relief as this Court deems appropriate.

B.   Against the Delphi Defendants, jointly and severally, for punitive damages in an amount to be determined at trial.

## COUNT III - SUPPRESSION

50.   SouthTrust hereby adopts and incorporates the allegations set forth in the paragraphs 1 through 49 above.

1084962 v5                                    9

51.    The Delphi Defendants had a duty to disclose existing material facts to SouthTrust regarding their relationship with Lextron.

52.    The Delphi Defendants suppressed those material facts from SouthTrust to induce SouthTrust to continue its banking relationship with Lextron and make additional loan advances to Lextron.

53.    SouthTrust was injured and suffered actual damages as a result of the Delphi Defendants' suppression of the material facts.

WHEREFORE, PREMISES CONSIDERED, SouthTrust demands judgment as follows:

A.    Against the Delphi Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, plus accruing charges and attorneys fees, costs of this action, and such other and further relief as this Court deems appropriate.

B.    Against the Delphi Defendants, jointly and severally, for punitive damages in an amount to be determined at trial.

## COUNT IV – CONSPIRACY

54.    SouthTrust hereby adopts and incorporates the allegations set forth in the paragraphs 1 through 53 above.

55.    The Delphi Defendants conspired to defraud SouthTrust.

56.    The Delphi Defendants' committed overt acts of fraud by sending correspondence and having phone conferences with SouthTrust in furtherance of the conspiracy.

57.    SouthTrust suffered damages as a result of the fraud and conspiracy.

WHEREFORE, PREMISES CONSIDERED, SouthTrust demands judgment as follows:

A.    Against the Delphi Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, plus accruing charges and attorneys fees, costs of this action, and such other and further relief as this Court deems appropriate.

B.    Against the Delphi Defendants, jointly and severally, for punitive damages in an amount to be determined at trial.

### COUNT V - BREACH OF COVENANTS

58.    SouthTrust hereby adopts and incorporates the allegations set forth in the paragraphs 1 through 57 above.

59.    The Delphi Representations constituted covenants by the Delphi Defendants that they would continue to give manufacturing, assembly and supply business to Lextron thereby giving Lextron the wherewith all to stay in business and repay the Loans to SouthTrust.

60.    In consideration of the covenants made by the Delphi Defendants, and at the request of the Delphi Defendants, SouthTrust made additional advances to Lextron on the Loans.

61.    The Delphi Defendants breached their covenants made to SouthTrust when they terminated their business relationship with Lextron.

62.    SouthTrust suffered damages as a direct consequence of such breach by the Delphi Defendants.

WHEREFORE, PREMISES CONSIDERED, SouthTrust demands judgment against the Delphi Defendants, jointly and severally, for compensatory damages in an amount to be

determined at trial, plus accruing charges and attorneys fees, costs of this action, and

such other and further relief as this Court deems appropriate.

### COUNT VI – INTERFERENCE WITH BUSINESS RELATIONSHIP

63.    SouthTrust hereby adopts and incorporates the allegations set forth in the

paragraphs 1 through 62 above.

64.    SouthTrust and Lextron had a contractual business and banking

relationship.

65.    The Delphi Defendants knew of this relationship between SouthTrust and

Lextron.

66.    The Delphi Defendants intentionally interfered with such business and

banking relationship.

67.    The Delphi Defendants' interference with such business and banking

relationship was intentional and willful.

68.    The Delphi Defendants' interference with such business and banking

relationship was not justified.

69.    The Delphi Defendants' actions were calculated to cause damage to

SouthTrust.

70.    The Delphi Defendants' actions were done with the unlawful purpose of

causing damage and loss, without right or justifiable cause.

71.    SouthTrust has suffered damages as a result of the Delphi Defendants'

interference.

WHEREFORE, PREMISES CONSIDERED, SouthTrust demands judgment as follows:

76.    SouthTrust hereby adopts and incorporates the allegations set forth in the paragraphs 1 through 75 above.

77.    The Delphi Defendants owed a duty to SouthTrust.

78.    The Delphi Defendants breached that duty when they terminated their business relationship with Lextron.

79.    SouthTrust was injured, and the Delphi Defendants' breach of duty was the proximate and cause-in-fact of SouthTrust's injury.

80.    SouthTrust suffered actual loss and damage resulting to the interests of the Delphi Defendants.

WHEREFORE, PREMISES CONSIDERED, SouthTrust demands judgment as follows:

A.    Against the Delphi Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, plus accruing charges and attorneys fees, costs of this action, and such other and further relief as this Court deems appropriate.

B.    Against the Delphi Defendants, jointly and severally, for punitive damages in an amount to be determined at trial.

### COUNT XI — PROMISSORY ESTOPPEL

81.    SouthTrust hereby adopts and incorporates the allegations set forth in the paragraphs 1 through 80 above.

82.    The Delphi Defendants promised SouthTrust that the Delphi Defendants would not terminate their business relationship with Lextron and that Lextron would have enough work from the Delphi Defendants to continue in business.

04/14/03  18:56  FAX 2068717030          LANGSTON-SWEET-F                              ☑16

Apr-14-03 03:46P                                                                        P.16

83.    The Delphi Defendants reasonably expected such promises to induce SouthTrust to act by lending additional money to Lextron.

84.    The expected action or forbearance by SouthTrust was of a definite and substantial character.

85.    The promises did, in fact, induce SouthTrust into lending additional money to Lextron.

WHEREFORE, PREMISES CONSIDERED, SouthTrust demands judgment as follows:

A.    Against the Delphi Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, plus accruing charges and attorneys fees, costs of this action, and such other and further relief as this Court deems appropriate.

B.    Against the Delphi Defendants, jointly and severally, for punitive damages in an amount to be determined at trial.

SOUTHTRUST DEMANDS A TRIAL BY STRUCK JURY ON ALL COUNTS OF THIS COMPLAINT

Dennis C. Sweet, III (MB #: 8105)
Richard A. Freese (MB # 99885)
Attorneys for Plaintiff, SouthTrust Bank

OF COUNSEL:

LANGSTON SWEET & FREESE, P.C.
201 North President Street
Jackson Mississippi 39201
(601) 969-1356
(601) 968-3866 Fax

1084N2 v1                           15

**OF COUNSEL:**

LANGSTON SWEET & FREESE, P.C.
2900 Highway 280
Suite 240
Birmingham, AL  35223
(205) 871-4144
(205) 871-4104

**OF COUNSEL:**

Robert H. Walker, Esquire
BURR & FORMAN LLP
210 East Capitol Street – Suite 700
Jackson, MS  39201
(601) 355-3434
(601) 355-5150 Fax

**OF COUNSEL:**

D. Christopher Carson, Esquire
Christina A. Graham, Esquire
BURR & FORMAN LLP
3100 SouthTrust Tower
420 North 20th Street
Birmingham, AL  35203
(205) 251-3000
(205) 358-5100 Fax

**DEFENDANTS ADDRESSES:**

Charles Doty
249 Mitchell Avenue
Jackson, Mississippi 39213

Lextron Corporation
249 Mitchell Avenue
Jackson, Mississippi 39213

Lextron Automotive, LLC
249 Mitchell Avenue
Jackson, Mississippi 39213

Delphi Corporation

1044062 v3                                16

5725 Delphi Drive
Troy, Michigan 48098-2815


Delphi Automotive Systems USA, LLC
6546 Mercantile Way
Lansing, Michigan 48911


Delphi Automotive Systems, LLC
7525 Delphi Drive
Troy, Michigan  48098


Delphi Packard
408 Dana Street
Warren, Ohio 44486


Delphi Packard Electric Systems
408 Dana Street
Warren; Ohio 44486


Delphi Energy & Chassis Systems
5725 Delphi Drive, Building D
Troy, Michigan 48098


Delphi Safety & Interior Systems
1401 Crooks Road
M/C: 480-009-130
Troy, Michigan 48084

FORM B10 (Official Form 10) (10/05)

**UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK**

COPY
PROOF OF CLAIM
RECEIVED
AUG 1 1 2006
KURTZMAN CARSON

| Name of Debtor | Case Number: |
|---|---|
| **Delphi Corporation** | **05-44481 (RDD)** |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property):
**Wachovia Bank, N.A., successor by merger to SouthTrust Bank**

Name and addresses where notices should be sent
**Christopher D. Carson**
Burr & Forman LLP
420 N 20th Street, Suite 3100
Birmingham, Alabama 35203
Telephone No. (205)251-3000

Last four digits of account or other number by which creditor identifies debtor:

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☒ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

☒ Date Stamped Copy Returned
☐ No self addressed stamped envel
☐ No copy to return

THIS SPACE IS FOR COURT USE ONLY.

Check here ☐ replaces
☐ amends    a previously filed claim, dated: _____
If this claim

**1. Basis for claim**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other: Pre-petition tort, contract, and equitable claims

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (Fill out below)
Last four digits of your SS # _____
Unpaid compensation for services performed
from _____ to _____
(date)                    (date)

**2. Date debt was incurred:**

**3. If court judgment, date obtained:**

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed. See reverse side for important explanations.

**Unsecured Nonpriority Claim $6,656,624.92 (plus accruing interest and attorneys' fees)**

☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**
☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority.
Amount entitled to priority: $_____
Specify the priority of the claim:
☐ Domestic support obligations under 11 U.S.C. § 507(a)(I)(A) or (a)(I)(B)
☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

**Secured Claim**
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate ☐ Motor Vehicle ☐ Other: _____
Value of Collateral: $_____
Amount of arrearage claim and other charges at time case filed included in secured claim, if any: $_____

☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(__).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**5. Total Amount of Claim at Time Case Filed:** $6,656,624.92 $_____ $_____ $6,656,624.92
(unsecured)          (secured)          (priority)          (Total)

☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

**7. Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

RECEIVED
JUL 3 1 2006
CLAIMS PROCESSING CENTER
USBC, SDNY

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
|---|---|
| July 27, 2006 | Christopher D. Carson, Attorney for Wachovia Bank, N.A., successor by merger to SouthTrust Bank |

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

1486108

BURR & FORMAN LLP
420 North 20th Street
Suite 3100
Birmingham, Alabama 35203
(205) 251-3000
Christopher D. Carson
Jason D. Woodard
Jennifer A. Harris

Attorneys for Creditor
Wachovia Bank, National Association,
successor by merger to SouthTrust Bank

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------

| | : | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI AUTOMOTIVE | : | |
| SYSTEMS, LLC | : | Case No. 05-44640 (RDD) |
| | : | |
| Debtor. | : | |

------------------------------------------------

## STATEMENT IN SUPPORT OF PROOF OF CLAIM OF WACHOVIA BANK

COMES NOW Wachovia Bank, National Association, successor by merger to SouthTrust Bank ("Wachovia"), and, pursuant to 11 U.S.C. §§ 501 and 502, files this Statement in Support of its Proof of Claim, which reflects a claim in the amount of $$6,656,624.92 as of the petition date, plus accruing interest, costs, and attorneys fees. In support of its claim, Wachovia states the following:

1.     Wachovia holds pre-petition claims against Delphi Corporation, Delphi Automotive Systems USA, LLC, Delphi Automotive Systems, LLC, Delphi Packard, Delphi Packard Electric Systems, Delphi Energy & Chassis Systems, and Delphi Safety and Interior Systems (collectively, "Delphi"), for misrepresentation, suppression, conspiracy, breach of

1486184 v2

contract, interference with business relationship, breach of duty of good faith and fair dealing, negligence, and promissory estoppel.

2.     On March 3, 2003, Wachovia filed suit against Delphi in the Circuit Court for the Second Judicial District of Hinds County Mississippi (the "Mississippi State Court"), commencing litigation on its pre-petition claims and seeking compensatory damages, attorneys' fees and costs, and punitive damages.

3.     Litigation of Wachovia's pre-petition claims against Delphi in the Mississippi State Court is currently stayed by virtue of Delphi's bankruptcy.   A true and correct copy of Wachovia's complaint, which sets forth the basis of its claims against Delphi, is attached hereto as Exhibit 1.

4.     Wachovia's claim against the estate of the above-captioned Debtor as of the petition date includes $966,750.68 in compensatory damages, $856,120.84 in attorneys' fees and expenses, and $4,833,753.40 in punitive damages.

Dated this the 28th day of July, 2006

_____
Christopher D. Carson
Jason D. Woodard
Jennifer A. Harris

OF COUNSEL:
**BURR & FORMAN LLP**
3100 Wachovia Tower
420 North 20th Street
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the Proof of Claim of Wachovia Bank, National Association, successor by merger to SouthTrust Bank, and the Statement in Support of the Proof of Claim of Wachovia Bank and its accompanying Exhibit have been served on the following counsel for the Debtor, via first class United States mail, postage prepaid, on this the 28th day of July 2006:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Kayalyn A. Marafioti
Thomas J. Matz
FourtTimes Square
New York, New York 10036

OF COUNSEL

04/14/03  18:56  FAX 2058717030          LANGSTON-SWEET-F                                    02    3

Apr-14-03  03:43P                                                                            P.02

# IN THE CIRCUIT COURT FOR THE SECOND JUDICIAL DISTRICT
## OF HINDS COUNTY, MISSISSIPPI

SOUTHTRUST BANK, a corporation    )

       Plaintiff,    )

v.    )

LEXTRON CORPORATION, a    )
corporation; CHARLES DOTY, an    )
Individual; LEXTRON AUTOMOTIVE,    )
LLC, a limited liability company;    )
DELPHI CORPORATION, a    )
corporation; DELPHI AUTOMOTIVE    )
SYSTEMS USA, LLC, a limited    )
liability company; DELPHI    )
AUTOMOTIVE SYSTEMS, LLC, a    )
limited liability company; DELPHI    )
PACKARD,  DELPHI PACKARD    )
ELECTRIC SYSTEMS, DELPHI    )
ENERGY & CHASSIS SYSTEMS, and    )
DELPHI SAFETY AND INTERIOR    )
SYSTEMS, divisions, subsidiaries or    )
affiliates of defendant, Delphi    )
Corporation,    )

      Defendants.    )

**FILED**

APR 1 4 2003

BARBARA DUNN, CIRCUIT CLERK
BY_____D.C.

CIVIL ACTION NO. *2003 - 14*

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES Now plaintiff, SouthTrust Bank, and for its Complaint against defendants Charles Doty, Lextron Corporation, Lextron Automotive, LLC, Delphi Corporation, Delphi Automotive Systems USA, LLC, Delphi Automotive Systems, LLC, Delphi Packard, Delphi Packard Electric Systems, Delphi Energy & Chassis Systems, and Delphi Safety and Interior Systems (collectively, the "Defendants"), states the following:

1084062 v5

EXHIBIT

A

## I. PARTIES

1.    Plaintiff, SouthTrust Bank, is an Alabama banking corporation, doing business in Hinds County, Mississippi ("SouthTrust").

2.    Defendant Lextron Corporation ("Lextron Corp.") is a Mississippi corporation with its principal place of business located in the City of Jackson, Hinds County, Mississippi. Lextron Corp. is named as a defendant in this action by virtue of the unpaid Loans (herein after defined) owing to SouthTrust.

3.    Defendant Charles Doty ("Doty") is an individual resident citizen of Hinds County, Mississippi. Doty is named as a defendant in this action by virtue of his personal guarantee of the Loans.

4.    Defendant Lextron Automotive, LLC ("Lextron Automotive," and together with Lextron Corp., "Lextron") is a Mississippi limited liability company with its principal place of business located in the City of Jackson, Hinds County, Mississippi. Lextron Automotive is named as a defendant in this action by virtue of its guarantee of the Loans.

5.    Defendant Delphi Corporation ("Delphi Corp.") is a Delaware corporation doing business in Mississippi.

6.    Defendant Delphi Automotive Systems USA, LLC ("Delphi Auto USA") is a Michigan limited liability company doing business in Mississippi.

7.    Defendant Delphi Automotive, LLC ("Delphi Automotive") is a Delaware limited liability doing business in Mississippi.

8.    Defendants Delphi Packard, Delphi Packard Electric Systems, Delphi Energy & Chassis Systems, and Delphi Safety and Interior Systems are divisions,

04/14/03  18:58  FAX 2058712030                   LANGSTON-SWEET-P                          @04

Apr-14-03 03:43P                                                                             P.04

subsidiaries or affiliates of Delphi Corp., Delphi Auto USA and/or Delphi Automotive, and are doing business in Mississippi (collectively, and together with Delphi Corp., Delphi Auto USA and Delphi Automotive, the "Delphi Defendants").

9.    The Delphi Defendants are named as defendants in this action by virtue of covenants, assurances, commitments, fraud, negligence, breaches of covenants of good faith and fair dealing, and misrepresentations made to SouthTrust regarding the Delphi Defendants' business relationship with Lextron.

## II. FACTS

10.    From time to time, SouthTrust made loans (the "Loans") to Lextron to fund its business operations, including its manufacturing and assembly business with the Delphi Defendants. The Loans are evidenced by various promissory notes and credit agreements (the "Loan Documents"). [Copies of the Loan Documents, the Collateral Documents (hereinafter defined) and the Guaranties (hereinafter defined) are so voluminous that it is not practical to attach copies to this Complaint. Such copies will be made available to the Court, the jury and the Defendants].

11.    The Loans are secured by various mortgages, security agreements and other collateral documents made by Lextron in favor of SouthTrust (the "Collateral Documents").

12.    Doty and Lextron Automotive unconditionally guaranteed the Loans as evidenced by various guaranties executed in favor of SouthTrust (the "Guaranties" and together with the Loan Documents and the Collateral Documents, the "Credit Documents").

13.    Defaults occurred under the Credit Documents, and all applicable cure periods have expired. Lextron and Doty failed to cure such defaults. The total amount

1044942 v.1                                   3

of the Loans, including all principal, interest and agreed charges, are now due and payable by Lextron and Doty.

14.    Since 1997 Lextron has been a manufacturer, assembler and supplier of certain automobile parts for one or more of the Delphi Defendants.

15.    The Delphi Defendants shipped raw materials to Lextron, creating an account payable ("Accounts Payable") owing by Lextron to the Delphi Defendants.

16.    Lextron manufactured finished products from the raw materials and shipped the finished products back to the Delphi Defendants thereby creating accounts receivable owing by the Delphi Defendants ("Accounts Receivable").

17.    The Accounts Receivable were to exceed the Accounts Payable, and the Delphi Defendants would pay the excess to Lextron; such excess represented Lextron's gross profits from this arrangement.   The Accounts Receivable were pledged to SouthTrust as security for the Loans pursuant to the terms of the Collateral Documents.

18.    The Delphi Defendants frequently turned to Lextron to perform  work that was to be completed by other suppliers who could not meet the Delphi Defendants' production demands.

19.    The business relationship between Lextron and the Delphi Defendants grew to the point that by August 2001 Lextron completed construction of a 59,000 square foot, state-of-the-art warehouse/office facility in Jackson, Mississippi to ensure that Lextron could meet the production demands of the Delphi Defendants.

20.    Lextron received over 90% of its revenue from the work it performed for the Delphi Defendants, and the Delphi Defendants were aware of this fact.

:

21.     Apparently due to rapid growth in business, in November 2002, Lextron began experiencing financial difficulties and defaults occurred under the Credit Documents. Andy Raine, a Vice-President of SouthTrust ("Raine"), met with Lextron and Doty to discuss a strategy for Lextron to work through its financial difficulties and repay the Loans to SouthTrust.

22.     Due to the defaults, SouthTrust entered into a Forbearance Agreement dated   December 31, 2002 with Lextron and Doty, whereby it was agreed that SouthTrust would forbear for a period of time from exercising its remedies to collect the Loans and otherwise forbear from enforcing the Credit Documents. It was anticipated that during this period of forbearance, Lextron would work through its financial problems.

23.     Approximately one week later, in early January of 2003, Mr. Raine received a telephone call from Sidney Johnson ("Johnson"), Director of Purchasing for Delphi Automotive. Mr. Johnson asked SouthTrust to lend Lextron additional money so Lextron could pay its payroll due to employees.

24.     Mr. Raine told Mr. Johnson that SouthTrust would not loan Lextron additional money without assurances from the Delphi Defendants that they would not terminate their business relationship with Lextron, and that Lextron would have enough work from the Delphi Defendants to continue in business. Mr. Johnson gave Mr. Raine those assurances, but these promises were not true.

25.     After Mr. Johnson's phone conversation with Mr. Raine, Greg Naylor ("Naylor") and Martha "Marty" Everett ("Everett") from the Delphi Defendants, on

:

separate occasions, discussed with Mr. Raine Lextron's financial status and Lextron's relationship with the Delphi Defendants.

26.   In those conversations, Mr. Naylor and Ms. Everett specifically stated that the Delphi Defendants would continue their business relationship with Lextron and specifically requested that SouthTrust lend additional sums of money to Lextron and to forbear taking any collection action against Lextron.

27.   In these conversations, Mr. Raine requested that the Delphi Defendants provide written confirmation of their commitment to Lextron, and on or about January 9, 2003, Larry W. Graves, North American Purchasing Director Delphi Packard Electric Systems, ("Graves") sent a memorandum to Mr. Raine via e-mail (the "Delphi Memo") with copies going to Mr. Johnson, Mr. Naylor and Ms. Everett.

28.   The Delphi Memo made reference to the conversations between representatives of SouthTrust and the Delphi Defendants, and went on to say that "I am writing you [SouthTrust] this memo to re-iterate Delphi Packard's (Delphi-P) focus to maintain Lextron corporation as a supplier.  We have the resources to assist Lextron, including a reduction in our payment terms to Net 15, during its cash flow shortfall."  The Delphi Memo specifically asked that "because of Delphi-P's support and interest in Lextron, Delphi-P is requesting SouthTrust Bank to continue its support of Lextron."

29.   In reliance on the assurances made in the phone conversations with Mr. Johnson, Mr. Naylor, Ms. Everett and Mr. Graves, and in reliance of the representations made in the Delphi Memo, SouthTrust loaned Lextron an additional $800,000.

30.    At all times during their communications with SouthTrust, the Delphi Defendants were fully aware of Lextron's financial difficulties.

31.    Even though the Delphi Defendants had given the foregoing assurances to SouthTrust, SouthTrust learned on February 25, 2003 that the Delphi Defendants intended to terminate their business relationship with Lextron effective February 28, 2003.

32.    Representatives of Lextron, its financial consultant and SouthTrust phoned the Delphi Defendants several times to discuss the termination of Lextron as a supplier; however no one from any of the Delphi Defendants ever attempted to explain their decision to abruptly terminate Lextron.

33.    Moreover, on February 28, 2003, SouthTrust sent a letter to Delphi Corp. (the "February 28 Letter") expressing its concerns regarding the Delphi Defendants' unilateral decision to terminate the Lextron relationship, and the increase in the Loans in reliance upon the assurances given by the Delphi Defendants.

34.    No one from the Delphi Defendants responded to the February 28 Letter.

35.    Because the Delphi Defendants abruptly terminated their business relationship with Lextron, Lextron was forced to lay-off approximately 150 employees and cease all but a minor part of its manufacturing operations.

36.    After the Delphi Defendants terminated their business relationship with Lextron, SouthTrust learned that the Delphi Defendants were moving the manufacturing work previously performed by Lextron "in-house," presumably to their Delphi Hinds County, Mississippi facility.

⋮

37.   The Delphi Defendants have not attempted to hire any of the 150 employees laid-off by Lextron.

## COUNT I

### NON-PAYMENT OF LOANS

38.   SouthTrust hereby adopts and incorporates the allegations set forth in the paragraphs 1 through 37.

39.   Lextron Corp., Lextron Automotive and Doty are obligated to repay the Loans to SouthTrust pursuant to the terms of the Credit Documents.

40.   Lextron Corp., Lextron Automotive and Doty breached their obligations owing to SouthTrust by failing to pay the principal of, interest on and agreed charged due on the Loans.

WHEREFORE, PREMISES CONSIDERED, SouthTrust demands judgment against Lextron Corp., Lextron Automotive, and Doty, jointly and severally, for compensatory damages in an amount equal to the total principal, interest and agreed charges (including attorney's fees and other expenses of collection) due on the Loans and otherwise owing under the Credit Documents, and such other and further relief as this Court deems appropriate.

## COUNT II - MISREPRESENTATION

41.   SouthTrust hereby adopts and incorporates the allegations set forth in the paragraphs 1 through 40 above.

42.   The Delphi Defendants intentionally, willfully, negligently, wantonly or recklessly misrepresented to SouthTrust that they would continue their manufacturing relationship with Lextron and continue to give business to Lextron (the "Delphi

Representations") for the purpose of inducing SouthTrust to continue its banking relationship with Lextron and to induce SouthTrust to make additional loan advances to Lextron.

43.   The Delphi Representations were false.

44.   Delphi made the Delphi Representations to SouthTrust knowing the Delphi Representations were false or with ignorance of their truth.

45.   Delphi intended that SouthTrust would act upon the Delphi Representations in a manner reasonably contemplated.

46.   SouthTrust did not know the Delphi Representations were false.

47.   SouthTrust relied on the Delphi Representations.

48.   SouthTrust had the right to rely on the Delphi Representations.

49.   SouthTrust was injured as a consequence of the Delphi Representations being false.

WHEREFORE, PREMISES CONSIDERED, SouthTrust demands judgment as follows:

A.   Against the Delphi Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, plus accruing charges and attorneys fees, costs of this action, and such other and further relief as this Court deems appropriate.

B.   Against the Delphi Defendants, jointly and severally, for punitive damages in an amount to be determined at trial.

## COUNT III - SUPPRESSION

50.   SouthTrust hereby adopts and incorporates the allegations set forth in the paragraphs 1 through 49 above.

51.    The Delphi Defendants had a duty to disclose existing material facts to SouthTrust regarding their relationship with Lextron.

52.    The Delphi Defendants suppressed those material facts from SouthTrust to induce SouthTrust to continue its banking relationship with Lextron and make additional loan advances to Lextron.

53.    SouthTrust was injured and suffered actual damages as a result of the Delphi Defendants' suppression of the material facts.

WHEREFORE, PREMISES CONSIDERED, SouthTrust demands judgment as follows:

A.    Against the Delphi Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, plus accruing charges and attorneys fees, costs of this action, and such other and further relief as this Court deems appropriate.

B.    Against the Delphi Defendants, jointly and severally, for punitive damages in an amount to be determined at trial.

## COUNT IV – CONSPIRACY

54.    SouthTrust hereby adopts and incorporates the allegations set forth in the paragraphs 1 through 53 above.

55.    The Delphi Defendants conspired to defraud SouthTrust.

56.    The Delphi Defendants' committed overt acts of fraud by sending correspondence and having phone conferences with SouthTrust in furtherance of the conspiracy.

57.    SouthTrust suffered damages as a result of the fraud and conspiracy.

WHEREFORE, PREMISES CONSIDERED, SouthTrust demands judgment as follows:

A.    Against the Delphi Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, plus accruing charges and attorneys fees, costs of this action, and such other and further relief as this Court deems appropriate.

B.    Against the Delphi Defendants, jointly and severally, for punitive damages in an amount to be determined at trial.

## COUNT V - BREACH OF COVENANTS

58.    SouthTrust hereby adopts and incorporates the allegations set forth in the paragraphs 1 through 57 above.

59.    The Delphi Representations constituted covenants by the Delphi Defendants that they would continue to give manufacturing, assembly and supply business to Lextron thereby giving Lextron the wherewith all to stay in business and repay the Loans to SouthTrust.

60.    In consideration of the covenants made by the Delphi Defendants, and at the request of the Delphi Defendants, SouthTrust made additional advances to Lextron on the Loans.

61.    The Delphi Defendants breached their covenants made to SouthTrust when they terminated their business relationship with Lextron.

62.    SouthTrust suffered damages as a direct consequence of such breach by the Delphi Defendants.

WHEREFORE, PREMISES CONSIDERED, SouthTrust demands judgment against the Delphi Defendants, jointly and severally, for compensatory damages in an amount to be

determined at trial, plus accruing charges and attorneys fees, costs of this action, and such other and further relief as this Court deems appropriate.

### COUNT VI – INTERFERENCE WITH BUSINESS RELATIONSHIP

63.    SouthTrust hereby adopts and incorporates the allegations set forth in the paragraphs 1 through 62 above.

64.    SouthTrust and Lextron had a contractual business and banking relationship.

65.    The Delphi Defendants knew of this relationship between SouthTrust and Lextron.

66.    The Delphi Defendants intentionally interfered with such business and banking relationship.

67.    The Delphi Defendants' interference with such business and banking relationship was intentional and willful.

68.    The Delphi Defendants' interference with such business and banking relationship was not justified.

69.    The Delphi Defendants' actions were calculated to cause damage to SouthTrust.

70.    The Delphi Defendants' actions were done with the unlawful purpose of causing damage and loss, without right or justifiable cause.

71.    SouthTrust has suffered damages as a result of the Delphi Defendants' interference.

WHEREFORE, PREMISES CONSIDERED, SouthTrust demands judgment as follows:

1084962 v5                          12

A.    Against the Delphi Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, plus accruing charges and attorneys fees, costs of this action, and such other and further relief as this Court deems appropriate.

B.    Against the Delphi Defendants, jointly and severally, for punitive damages in an amount to be determined at trial.

### COUNT VII – BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

72.    SouthTrust hereby adopts and incorporates the allegations set forth in the paragraphs 1 through 71 above.

73.    The Delphi Defendants owed a duty of good faith and fair dealing to SouthTrust.

74.    The Delphi Defendants breached that duty of good faith and fair dealing when they terminated their business relationship with Lextron.

75.    SouthTrust suffered damages that were caused by the Delphi Defendants' breach of good faith and fair dealing.

WHEREFORE, PREMISES CONSIDERED, SouthTrust demands judgment as follows:

A.    Against the Delphi Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, plus accruing charges and attorneys fees, costs of this action, and such other and further relief as this Court deems appropriate.

B.    Against the Delphi Defendants, jointly and severally, for punitive damages in an amount to be determined at trial.

### COUNT VIII – NEGLIGENCE

1084962 v3                            13

76.    SouthTrust hereby adopts and incorporates the allegations set forth in the paragraphs 1 through 75 above.

77.    The Delphi Defendants owed a duty to SouthTrust.

78.    The Delphi Defendants breached that duty when they terminated their business relationship with Lextron.

79.    SouthTrust was injured, and the Delphi Defendants' breach of duty was the proximate and cause-in-fact of SouthTrust's injury.

80.    SouthTrust suffered actual loss and damage resulting to the interests of the Delphi Defendants.

WHEREFORE, PREMISES CONSIDERED, SouthTrust demands judgment as follows:

A.    Against the Delphi Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, plus accruing charges and attorneys fees, costs of this action, and such other and further relief as this Court deems appropriate.

B.    Against the Delphi Defendants, jointly and severally, for punitive damages in an amount to be determined at trial.

## COUNT XI – PROMISSORY ESTOPPEL

81.    SouthTrust hereby adopts and incorporates the allegations set forth in the paragraphs 1 through 80 above.

82.    The Delphi Defendants promised SouthTrust that the Delphi Defendants would not terminate their business relationship with Lextron and that Lextron would have enough work from the Delphi Defendants to continue in business.

1084062 v3                                    14

83.    The Delphi Defendants reasonably expected such promises to induce SouthTrust to act by lending additional money to Lextron.

84.    The expected action or forbearance by SouthTrust was of a definite and substantial character.

85.    The promises did, in fact, induce SouthTrust into lending additional money to Lextron.

WHEREFORE, PREMISES CONSIDERED, SouthTrust demands judgment as follows:

A.    Against the Delphi Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, plus accruing charges and attorneys fees, costs of this action, and such other and further relief as this Court deems appropriate.

B.    Against the Delphi Defendants, jointly and severally, for punitive damages in an amount to be determined at trial.

SOUTHTRUST DEMANDS A TRIAL BY STRUCK JURY ON ALL COUNTS OF THIS COMPLAINT

_____
Dennis C. Sweet, III (MB #: 8105)
Richard A. Freese (MB # 99885)
Attorneys for Plaintiff, SouthTrust Bank

OF COUNSEL:

LANGSTON SWEET & FREESE, P.C.
201 North President Street
Jackson Mississippi 39201
(601) 969-1356
(601) 968-3866 Fax

04/14/03  18:56  FAX 2058717030          LANGSTON-SWEET-F                          ☒17

Apr-14-03 03:46P                                                              P.17

OF COUNSEL:

LANGSTON SWEET & FREESE, P.C.
2900 Highway 280
Suite 240
Birmingham, AL  35223
(205) 871-4144
(205) 871-4104

OF COUNSEL:

Robert H. Walker, Esquire
BURR & FORMAN LLP
210 East Capitol Street – Suite 700
Jackson, MS  39201
(601) 355-3434
(601) 355-5150 Fax

OF COUNSEL:

D. Christopher Carson, Esquire
Christina A. Graham, Esquire
BURR & FORMAN LLP
3100 SouthTrust Tower
420 North 20th Street
Birmingham, AL  35203
(205) 251-3000
(205) 358-5100 Fax


**DEFENDANTS ADDRESSES:**

Charles Doty
249 Mitchell Avenue
Jackson, Mississippi 39213


Lextron Corporation
249 Mitchell Avenue
Jackson, Mississippi 39213


Lextron Automotive, LLC
249 Mitchell Avenue
Jackson, Mississippi 39213


Delphi Corporation

1084962 v5                              16

5725 Delphi Drive
Troy, Michigan 48098-2815


Delphi Automotive Systems USA, LLC
6540 Mercantile Way
Lansing, Michigan 48911


Delphi Automotive Systems, LLC
7525 Delphi Drive
Troy, Michigan  48098


Delphi Packard
408 Dana Street
Warren, Ohio 44486


Delphi Packard Electric Systems
408 Dana Street
Warren, Ohio 44486


Delphi Energy & Chassis Systems
5725 Delphi Drive, Building D
Troy, Michigan 48098


Delphi Safety & Interior Systems
1401 Crooks Road
M/C: 480-009-130
Troy, Michigan 48084

# EXHIBIT "5"

**FILED**

APR 1 1 2006

BARBARA DUNN, CIRCUIT CLERK

BY S. Williams D.C

IN THE CIRCUIT COURT OF THE SECOND JUDICIAL DISTRICT
OF HINDS COUNTY, MISSISSIPPI

SOUTHTRUST BANK, a corporation                                    **PLAINTIFF**

V.                                                    CIVIL ACTION NO. 2003-14

LEXTRON CORPORATION, a corporation, et al.                       **DEFENDANTS**

## ORDER DENYING SOUTHTRUST BANK'S MOTION
## FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

THIS MATTER is before the Court on the motion of SouthTrust Bank ("SouthTrust"),
seeking leave to file a Second Amended Complaint for the purpose of adding as party defendants
certain employees of Delphi Corporation; Delphi Automotive Systems USA, LLC; and Delphi
Automotive Systems, LLC, together with its divisions, Delphi Packard, Delphi Packard Electric
Systems, Delphi Energy & Chassis Systems, and Delphi Safety and Interior Systems
(collectively, "Delphi")—specifically, Jonathan R. Stegner, R. David Nelson, Martha Everett,
Sidney Johnson and Greg Naylor (collectively, "the Delphi Employees"). Having considered the
written submissions of the parties, the arguments of counsel at hearing, and applicable law, the
Court finds as follows:

1.    SouthTrust seeks individual liability against the Delphi Employees based solely
on alleged acts they performed in their representative capacity and in the course and scope of
their employment with Delphi. No allegations in the proposed Second Amended Complaint
indicates any basis for liability against the Delphi Employees in their individual capacity.

2.    SouthTrust's claims against Delphi are subject to the automatic stay afforded
Delphi as a result of its Chapter 11 bankruptcy filing on October 8, 2005. The bankruptcy
automatic stay afforded Delphi also applies to the Delphi Employees.

3.    SouthTrust's request for leave to file a Second Amended Complaint at this stage
of the litigation is too late and is, therefore, untimely. Such request, if granted, would be
prejudicial. *Harris v. Mississippi State University*, 873 So.2d 970 (Miss. 2004).

4.    Based on the findings above, SouthTrust's request for leave to file a Second Amended Complaint should be denied.

IT IS, THEREFORE, HEREBY ORDERED that SouthTrust Bank's Motion for Leave to File Second Amended Complaint is denied.

SO ORDERED, this _____ day of _____, 2006.

_____
CIRCUIT COURT JUDGE

Presented by:

_____
Frank W. Trapp (MSB #8261)
Phelps Dunbar LLP
111 East Capitol Street, Suite 600
Jackson, Mississippi 39201
(601) 352-2300

**ATTEST A TRUE COPY**

APR 1 1 2006

BARBARA DUNN, CIRCUIT CLERK

BY _S. Williams_ D.C.

JO.99326392.1

# EXHIBIT "6"

IN THE CIRCUIT COURT FOR THE SECOND JUDICIAL DISTRICT OF
HINDS COUNTY, MISSISSIPPI

| | |
|---|---|
| SOUTHTRUST BANK, a banking corporation, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| LEXTRON CORPORATION, a corporation; | ) |
| CHARLES DOTY, an individual; LEXTRON | ) |
| AUTOMOTIVE, LLC, a limited liability | ) |
| company; DELPHI CORPORATION, a | ) |
| corporation; DELPHI AUTOMOTIVE | ) |
| SYSTEMS USA, LLC, a limited liability | ) CIVIL ACTION NO. 2003-14 |
| company; DELPHI AUTOMOTIVE SYSTEMS, | ) |
| LLC; a limited liability company; DELPHI | ) |
| PACKARD, DELPHI PACKARD ELECTRIC | ) |
| SYSTEMS, DELPHI ENERGY & CHASSIS | ) |
| SYSTEMS, DELPHI SAFETY AND INTERIOR | ) |
| SYSTEMS, divisions, subsidiaries or affiliates of | ) |
| defendant, Delphi Corporation, and LARRY | ) |
| GRAVES, an individual | ) |
| | ) |
| Defendants. | ) |

**FILED**

DEC 0 1 2005

BARBARA DUNN, CIRCUIT CLERK
BY _____ D.C

## FIRST AMENDED COMPLAINT

COMES NOW the plaintiff SouthTrust Bank ("SouthTrust"), by and through its undersigned counsel, and hereby amends its Complaint against defendants Charles Doty ("Doty"), Lextron Corporation ("Lextron"), Lextron Automotive, LLC ("Lextron Automotive," and together with Lextron and Doty, the "Lextron Defendants"), and Delphi Corporation, Delphi Automotive Systems USA, LLC, Delphi Automotive Systems, LLC, Delphi Packard, Delphi Packard Electric Systems, Delphi Energy & Chassis Systems, and Delphi Safety and Interior Systems to add Larry W. Graves (collectively, the "Delphi Defendants") as a defendant.

1.        Upon information and belief, Larry W. Graves is an individual citizen of the State of Texas.

2.   SouthTrust adopts, references and incorporates all allegations set forth in its original Complaint as if fully set forth herein.

3.   Mr. Graves, a director of Delphi, personally participated in and was responsible for the negligent, reckless, wanton or intentional tortious conduct and breaches set forth in the original complaint including the counts set forth in the Complaint for misrepresentation, suppression, conspiracy, breach of covenants, interference with business relationship, breach of duty of good faith and fair dealing, negligence and promissory estoppel.

4.   In inducing SouthTrust to forbear from exercising its rights against the Lextron Defendants and to loan more money to Lextron, the Delphi Defendants (through Mr. Graves) gave both oral and written assurances to SouthTrust that the Delphi Defendants would continue to do business with Lextron. Before, during and after the time the Delphi Defendants gave these assurances to SouthTrust, the Delphi Defendants had invoked processes to terminate Lextron as a supplier.

5.   Despite the oral and written assurances given to SouthTrust, the Delphi Defendants terminated Lextron as a supplier in late February 2003.

**WHEREFORE, PREMISES CONSIDERED,** SouthTrust demands judgment against the Delphi Defendants for the following:

(i)   a money judgment for compensatory damages and punitive damages in an amount to be determined at trial; and

(ii)   such other and further relief as this Court deems appropriate.

SouthTrust Demands a Trial by Struck Jury on All Counts of the Complaint and
this First Amended Complaint.

_____

James F. Robinson
D. Christopher Carson
Jason D. Woodard
BURR & FORMAN LLP
3100 SouthTrust Tower
420 North 20th Street
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

and

Dennis C. Sweet, III (Miss. Bar No. 8105)
Richard Freese (Miss. Bar No. 9885)
SWEET & FREESE, PLLC
201 North President Street
Jackson Mississippi 39201
Telephone: 601-969-1356
Facsimile: 601-968-3866

Attorneys for Plaintiff SouthTrust Bank, N.A.

OF COUNSEL:
BURR & FORMAN LLP
3100 SouthTrust Tower
420 North 20th Street
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

Defendant's Address:
Larry W. Graves
c/o Frank Trapp
Phelps Dunbar, LLP
111 East Capitol Street, Suite 600
P. O. Box 23066
Jackson, Mississippi 39225-3066

3

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on the following by directing same to their office addresses through first-class, United States mail, postage prepaid, on this the 1 day of _VRC_ , 2005:

Frank Trapp
Debra Brown
Phelps Dunbar, LLP
111 East Capitol Street, Suite 600 (39201-2122)
P.O. Box 23066
Jackson, Mississippi 39225-3066

Joseph E. Papelian
Delphi Legal Staff
5725 Delphi Drive
Troy, MI 48098-2815
Telephone: 248-813-2535

Sheila M. Bossier, Esq.
Attorney for Lextron Corporation
Bossier Kitchens, PLLC
1520 N. State Street
Jackson, Mississippi 39202
email: sbossier@bkpllc.com
Facsimile: 301-352-5452

Mikel J. Bowers
Attorney for Lextron Corporation
Capshaw Goss Bowers LLP
3031 Allen Street, Suite 200
Dallas, Texas 75204
email: mike@cgb-law.com
Facsimile: 214-761-6611

OF COUNSEL

4

IN THE CIRCUIT COURT FOR THE SECOND JUDICIAL DISTRICT OF
HINDS COUNTY, MISSISSIPPI

| | |
|---|---|
| SOUTHTRUST BANK, a banking corporation, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| LEXTRON CORPORATION, a corporation; ) | |
| CHARLES DOTY, an individual; LEXTRON ) | |
| AUTOMOTIVE, LLC, a limited liability ) | |
| company; DELPHI CORPORATION, a ) | |
| corporation; DELPHI AUTOMOTIVE ) | |
| SYSTEMS USA, LLC, a limited liability ) | |
| company; DELPHI AUTOMOTIVE SYSTEMS, ) | CIVIL ACTION NO. 2003-14 |
| LLC; a limited liability company; DELPHI ) | |
| PACKARD, DELPHI PACKARD ELECTRIC ) | |
| SYSTEMS, DELPHI ENERGY & CHASSIS ) | |
| SYSTEMS, DELPHI SAFETY AND INTERIOR ) | |
| SYSTEMS, divisions, subsidiaries or affiliates of ) | |
| defendant, Delphi Corporation, LARRY ) | |
| GRAVES, an individual, JON STEGNER, an ) | |
| individual, R. DAVID NELSON, an individual, ) | |
| MARTHA EVERETT, an individual, SIDNEY ) | |
| JOHNSON, an individual, and GREG NAYLOR, ) | |
| an individual, ) | |
| ) | |
| Defendants. ) | |

## SECOND AMENDED COMPLAINT

COMES NOW the plaintiff SouthTrust Bank ("SouthTrust"), by and through its

undersigned counsel, and hereby amends its Complaint against defendants Charles Doty

("Doty"), Lextron Corporation ("Lextron"), Lextron Automotive, LLC ("Lextron Automotive,"

and together with Lextron and Doty, the "Lextron Defendants"), and Delphi Corporation, Delphi

Automotive Systems USA, LLC, Delphi Automotive Systems, LLC, Delphi Packard, Delphi

Packard Electric Systems, Delphi Energy & Chassis Systems, Delphi Safety and Interior Systems



EXHIBIT
"A"

and Larry W. Graves to add Jonathon R. Stegner, R. David Nelson, Martha (Marti) Everett, Sidney Johnson and Greg Naylor (collectively, the "Delphi Defendants") as defendants.

1.      Upon information and belief, Jonathon R. Stegner is a citizen of the State of Michigan.

2.      Upon information and belief, R. David Nelson is a citizen of the State of Michigan.

3.      Upon information and belief, Martha (Marti) Everett is a citizen of the State of Michigan.

4.      Upon information and belief, Sidney Johnson is a citizen of the State of Ohio.

5.      Upon information and belief, Greg Naylor is a citizen of the State of Ohio.

6.      SouthTrust adopts, references and incorporates all allegations set forth in its original Complaint and its First Amended Complaint as if fully set forth herein.

7.      Messrs. Stegner, Nelson, Johnson and Naylor, and Ms. Everett, personally participated in and were responsible for the negligent, reckless, wanton or intentional tortious conduct and breaches set forth in the original Complaint and the First Amended Complaint including the counts set forth for misrepresentation, suppression, conspiracy, breach of covenants, interference with business relationship, breach of duty of good faith and fair dealing, negligence and promissory estoppel.

8.      In inducing SouthTrust to forbear from exercising its rights against the Lextron Defendants and to loan more money to Lextron, the Delphi Defendants gave both oral and written assurances to SouthTrust that the Delphi Defendants would continue to do business with Lextron. Before, during and after the time the Delphi Defendants gave these assurances to SouthTrust, the Delphi Defendants had invoked processes to terminate Lextron as a supplier.

9.     Despite the oral and written assurances given to SouthTrust, the Delphi Defendants terminated Lextron as a supplier in late February 2003.

**WHEREFORE, PREMISES CONSIDERED**, SouthTrust demands judgment against the Delphi Defendants for the following:

(i)     a money judgment for compensatory damages and punitive damages in an amount to be determined at trial; and

(ii)     such other and further relief as this Court deems appropriate.

**SOUTHTRUST DEMANDS A TRIAL BY STRUCK JURY ON ALL COUNTS OF THE COMPLAINT, THE FIRST AMENDED COMPLAINT AND THIS SECOND AMENDED COMPLAINT.**

**Respectfully Submitted** this the ___23rd___ day of September, 2005.

Dennis C. Sweet, III (MS Bar # 8105)
Richard Freese (MS Bar # 9885)
Warren L. Martin, Jr. (MS Bar # 101528)
SWEET & FREESE, PLLC
201 North President Street
Jackson Mississippi 39201
Telephone: 601-969-1356
Facsimile: 601-968-3866

and

Eric F. Hatten
James J. Robinson
D. Christopher Carson
Jason D. Woodard
BURR & FORMAN LLP
3100 SouthTrust Tower
420 North 20th Street
Birmingham, Alabama 35203

1396503

3

Telephone: (205) 251-3000
Facsimile: (205) 458-5100

ATTORNEYS FOR PLAINTIFF SOUTHTRUST
BANK

OF COUNSEL:
Dennis C. Sweet, III (MS Bar # 8105)
Richard A. Freese (MS Bar # 9885)
SWEET & FREESE, PLLC
200 S. Lamar Street Suite 200
Post Office Box 1178
Jackson, Mississippi 39201
Telephone: 601-965-8700
Fax: 601-965-8719

**Defendant's Addresses:**
Jon Stegner
4835 Eagle Springs Court
Independence, Michigan 48348

R. David Nelson
6430 Elmoor Drive
Troy, Michigan 48098

Martha Everett
1412 Ridgelawn Avenue
Flint, Michigan 48503-2755

Sidney Johnson
Delphi Corporation
408 Dana Street
Warren, Ohio 44488

Greg Naylor
10156 Lumin Lane
Twinsburg, Ohio 44087-1474

1396503

4

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on the following by directing

same to their office addresses through first-class, United States mail, postage prepaid, on this the

23rd day of September_____, 2005:

Frank Trapp
Debra Brown
Phelps Dunbar, LLP
111 East Capitol Street, Suite 600 (39201-2122)
P.O. Box 23066
Jackson, Mississippi 39225-3066

Joseph E. Papelian
Delphi Legal Staff
5725 Delphi Drive
Troy, MI 48098-2815
Telephone: 248-813-2535

Sheila M. Bossier, Esq.
Attorney for Lextron Corporation
Bossier Kitchens, PLLC
1520 N. State Street
Jackson, Mississippi 39202
email: sbossier@bkpllc.com
Facsimile: 301-352-5452

Mikel J. Bowers
Attorney for Lextron Corporation
Capshaw Goss Bowers LLP
3031 Allen Street, Suite 200
Dallas, Texas 75204
email: mike@cgb-law.com
Facsimile: 214-761-6611

Warren L. Martin, Jr.

# EXHIBIT "7"

IN THE CIRCUIT COURT OF THE SECOND JUDICIAL DISTRICT OF **FILED**
HINDS COUNTY, MISSISSIPPI

**AUG 23 2006**

SOUTHTRUST BANK                          PLAINTIFF   BARBARA DUNN, CIRCUIT CLER

VS.                                      NO. 252-03-14 CIV   BY _S. Williams_   D

LEXTRON CORP., ET AL                     DEFENDANTS

<u>ORDER</u>

THIS CAUSE this day came on for consideration on the motion filed by

defendant Delphi to strike the plaintiff's first amended complaint, and the Court, having

considered said motion, plaintiff's response thereto, as well as the authorities of law

submitted by the parties, and being otherwise fully advised in the premises, finds as

follows:

1.  Plaintiff brought on for hearing, at a September 16, 2005 status conference in this

    cause, a motion seeking leave of Court to file a first amended complaint, adding

    one Larry Graves as an individual defendant. After hearing arguments on said

    issue and also concerning a trial setting and entry of a scheduling order, the Court

    ruled, in pertinent part, "...with this many lawyers and with yet another party

    being about to be included by the Court's granting the motion filed by the plaintiff

    to file an amended complaint, and that motion, by the way, is granted..." (See

    Transcript of Proceedings, p. 13).

2.  No order, however, effectuating that ruling was ever submitted by the plaintiff for

    entry by the Court and spread upon its minutes.

3.  As a court of record, this Court may only speak through its minutes. *Oliver v.*

    *Miles*, 110 So. 666 (Miss. 1927). Consequently, the Court's oral ruling of

    September 16, 2005, has to date been of no force and effect.



4. The Court, however, has ruled that plaintiff may file the amended complaint, and it would not be in the best interests of justice and judicial economy to strike the said amended complaint, require plaintiff to re-file the motion, set it for another hearing, and reach the same result.

5. One of the grounds upon which Delphi opposed plaintiff's motion to file an amended complaint, adding Graves as a defendant, is because Graves is alleged to be an officer of Delphi and that the stay entered in Delphi's bankruptcy proceedings likewise bar further proceedings against its officers who are sued individually.

IT IS, THEREFORE, ORDERED AND ADJUDGED that plaintiff's motion seeking leave to file a first amended complaint be, and the same is hereby, sustained, as pronounced by the Court in its oral ruling of record on September 16, 2005, and the first amended complaint filed thereafter shall not be stricken, but shall be effective only from and after this date; and

IT IS FURTHER ORDERED AND ADJUDGED that any and all dispositive issues concerning the aforesaid Larry Graves, will be addressed by the Court, once Mr. Graves is made a defendant in this action, by virtue of the said first amended complaint, and upon any dispositive motion being filed on his behalf; and

IT IS FURTHER ORDERED AND ADJUDGED that in the event the Court subsequently determines that any litigation in this cause against Graves, individually, is barred by the stay in Delphi's bankruptcy proceedings, the Court will consider, upon motion by Graves, assessing plaintiff the reasonable expenses, including attorney's fees,

2

incurred by him in defending the action brought by plaintiff's amended complaint.

SO ORDERED AND ADJUDGED, this the 23rd day of August, 2006.

CIRCUIT JUDGE

# EXHIBIT "8"

☒ Date Stamped Copy Returned
☐ No self addressed stamped envelope
☐ No copy to return

# 9522

FORM B10 (Official Form 10) (04/04)

| UNITED STATES BANKRUPTCY COURT SOUTHERN   DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>Delphi Automotive System, LLC | Case Number<br>05-44640 | MASTER CODE:<br>10385461 |
|---|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property):

**Lextron Corporation**

Name and address where notices should be sent:

Craig M. Geno, Esq.
Melanie Vardaman, Esq.
Harris & Geno, PLLC
PO Box 3380, Ridgeland, MS 39158-3380
Telephone number: 601-427-0048

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☒ Check box if the address differs from the address on the envelope sent to you by the court.

Claim #09522
USBC SDNY
Delphi Corporation, et al.
05-44481 (RDD)

**Received**
JUL 1 8 2006
Kurtzman Carson
THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies debtor:

Check here ☐ replaces ☐ amends   a previously filed claim, dated: _____

**1. Basis for Claim**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other   Contract Dispute

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)
Last four digits of SS #: _____
Unpaid compensation for services performed
from _____ to _____
        (date)        (date)

| 2. Date debt was incurred:<br>October 2002 | 3. If court judgment, date obtained:<br>N/A |
|---|---|

**4.** Total Amount of Claim at Time Case Filed: $800,000.00, plus incidental and punitive actual, compensatory damages (damages to be determined)   (secured)   (unsecured)   (priority)   (Total)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate   ☐ Motor Vehicle
☐ Other _____

Value of Collateral:   $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

**6. Unsecured Nonpriority Claim** $800,000.00
☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority   $_____
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,925),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units-11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**8.  Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9.  Supporting Documents:**  *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10.  Date-Stamped Copy:**  To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim

THIS SPACE IS FOR COURT USE ONLY

RECEIVED
2006
CLAIMS PROCESSING CENTER
USBC, SDNY

| Date<br>7/13/06 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>Melanie T. Vardaman, Esq.   Melanie T. Vardaman   Attorney for Lextron Corporation |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

0544640060714000000000001

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
FILED
SEP - 7 2004
J. T. NOBLIN, CLERK
BY_____ DEPUTY

DELPHI AUTOMOTIVE SYSTEMS, LLC,

    Plaintiff

v.                         CIVIL ACTION NO. 3:03CV335WS

LEXTRON CORPORATION,

    Defendant

RECEIVED
APR 0 8 2006
BY:

### ANSWER AND COUNTERCLAIM OF LEXTRON CORPORATION

    Lextron Corporation ("Lextron") files this Answer and Counterclaim in response to the

Complaint filed by Delphi Automotive Systems, LLC ("Plaintiff") as follows:

### AFFIRMATIVE DEFENSES

### Affirmative Defense No. 1

    This action is or should be stayed by operation of 11 U.S.C. § 362, due to Lextron's

Chapter 11 bankruptcy filing in the United States Bankruptcy Court for the Southern District of

Mississippi ("the Bankruptcy Court") on February 12, 2004.  Delphi has never sought relief from

the automatic stay; nor has it ever been a party to any motion seeking relief from the automatic

stay; nor has this action ever been the subject of an order granting any form of relief from the

automatic stay.  Lextron is reserved of its right to seek relief from the Bankruptcy Court to

impose the stay as to this proceeding, and to seek any damages that may be warranted under the

circumstances.

### Affirmative Defense No. 2

Plaintiff's request for relief is barred or diminished by operation of one or more of the following doctrines: waiver, estoppel, ratification, and/or laches.

### Affirmative Defense No. 3

Plaintiff's request for relief is barred by principles of equity, including but not limited to, unclean hands and unjust enrichment.

### Affirmative Defense No. 4

Plaintiff's request for relief is barred or diminished as a result of its failure to abide by the covenant of good faith and fair dealing inherent in every contract to be performed in Mississippi.

### Affirmative Defense No. 5

Plaintiff's putative claims should be barred or diminished due to its failure to mitigate.

### Affirmative Defense No. 6

Plaintiff's putative claims are subject to setoff and/or recoupment, which are specifically reserved and asserted.

### Affirmative Defense No. 7

Plaintiff's putative claims are subject to treatment in a plan of reorganization to be confirmed by the Bankruptcy Court in Lextron's Chapter 11 case, and the terms of such plan will control and supersede any judgment that might be obtained by Plaintiff, without regard to any judgment obtained by Lextron in it counterclaim.

### Affirmative Defense No. 8

Plaintiff has failed to join a necessary or indispensable party, or necessary or indispensable parties, or a party or parties needed for just adjudication, and should be required to join such party or parties pursuant to Rules 17 and 19 of the Federal Rules of Civil Procedure.

1558851.1/08173.15318

2

### Affirmative Defense No. 9

Plaintiff's claim for replevin of bailed property is moot, as is its request for damages for wrongful detention, due to Lextron's agreement to relinquish the equipment made the subject of the replevin count, and the Agreed Order Granting Motion for Writ of Replevin ("the Replevin Order") entered by this Court on March 5, 2003. Lextron is reserved of its right to seek damages from Plaintiff for wrongful removal of equipment belonging to Lextron.

### Affirmative Defense No. 10

Plaintiff cannot recover on its putative claims because it is not the real party in interest for purposes of this action, and/or because it lacks standing to pursue putative causes of action belonging to other legally distinct entities. In addition, any attempt by Plaintiff to assign its putative claims to other entities, or to add other entities as Plaintiffs at this stage of the litigation is barred by operation of 11 U.S.C. § 362.

### Affirmative Defense No. 11

Plaintiff's contract claims are barred by one or more of the following: lack of mutuality of obligation; lack of consideration; failure of consideration; duress; impossibility; and failure of conditions precedent and/or conditions subsequent.

### ANSWERS TO NUMBERED PARAGRAPHS OF COMPLAINT

And now, addressing Plaintiff's Complaint, paragraph by numbered paragraph, Lextron answers as follows:

1.     Lextron is without knowledge or information sufficient to form a belief as to the truth of paragraph 1.

2.     Admitted.

3.     Denied.

4.      Admitted as to venue, without admitting jurisdiction.  Denied as to allegations regarding Delphi's replevin claim, due to entry of the Replevin Order.

5.      Admitted.

6.      Admitted that Plaintiff and Lextron entered into various Contracts, and admitted that the Contracts speak for themselves.  Denied as to any contrary interpretation.  Further admitted that Lextron entered into contracts with other legally distinct Delphi entities.  All other allegations not admitted herein are denied.

7.      Admitted that Lextron performed work for Delphi Packard Electric Systems Division pursuant to the General Terms and Conditions, which speak for themselves.  Denied as to any contrary interpretation or legal effect.

8.      Admitted that Lextron performed work for Delphi Safety & Interior Division pursuant to the General Terms and Conditions, as amended from time to time, which speak for themselves.  Denied as to any contrary interpretation or legal effect.

9.      Admitted.

10.      Admitted that the Contracts speak for themselves.  Denied as to any contrary interpretation or legal effect.

11.      Admitted that the contractual language speaks for itself.  Denied as to any contrary interpretations or legal effect.

12.      Admitted that the contractual language speaks for itself.  Denied as to any contrary interpretations or legal effect.

13.      Admitted that Plaintiff transmitted letters terminating the relationship between Plaintiff and Lextron, without admitting to the validity or legal effect of the letters, and admitted

that copies are attached to the Complaint. Admitted that the letters speak for themselves, and denied as to any contrary interpretation or legal effect.

14.      Admitted that Charles Doty ("Mr. Doty") and Sidney Johnson ("Mr. Johnson") engaged in a telephone conversation on February 28, 2003. Admitted that Mr. Doty conditionally agreed to give Delphi access to the Lextron premises, subject to certain terms and conditions to be met by Delphi, and subject to further consideration of the rights and obligations of the parties. All other allegations not admitted herein are denied.

15.      Admitted that Mr. Doty conditionally agreed to give Delphi access to the Lextron premises, subject to certain terms and conditions to be met by Delphi, and subject to further consideration of the rights and obligations of the parties. All other allegations not admitted herein are denied.

16.      Denied that Lextron owed a balance to Plaintiff, denied that Lextron had failed to meet its contract obligations to Plaintiff in January, 2003, and denied that Lextron was in breach of its contract with Plaintiff. Admitted that Plaintiff extended certain accommodations to Lextron as an inducement for Lextron to continue working for Plaintiff. Admitted that Lextron was out of formula on a loan from SouthTrust, and admitted that the loan documents speak for themselves. Denied as to any contrary interpretation. Admitted that Lextron was in arrears with respect to certain payroll taxes assessed for 2002, but denied as to the amount asserted by Delphi. Denied that Lextron failed to maintain adequate accounting controls. All other allegations not admitted herein are denied.

17.      Denied to Delphi's claim as to the purpose of the document attached as Exhibit 3A to the Complaint. Denied that Plaintiff had no obligation to pay Lextron in connection with

terminating the contract.  Otherwise, admitted, subject to resolution of the replevin counts, as contained in the Replevin Order.

18.    The allegations of paragraph 18 are moot based on the Replevin Order, and therefore denied.

19.    Denied.

20.    Admitted that Plaintiff incorporates all prior allegations of the Complaint. Lextron incorporates all prior enumerated answers.  Denied as to content and legal effect.

21.    The allegations of paragraph 21 are moot based on the Replevin Order, and therefore denied.

22.    The allegations of paragraph 22 are moot based on the Replevin Order, and therefore denied.

23.    The allegations of paragraph 23 are moot based on the Replevin Order, and therefore denied.

24.    Admitted that Plaintiff incorporates all prior allegations of the Complaint. Lextron incorporates all prior enumerated answers.  Denied as to content and legal effect.

25.    The allegations of paragraph 25 are moot based on the Replevin Order, and therefore denied.

26.    The allegations of paragraph 26 are moot based on the Replevin Order, and therefore denied.

27.    Admitted that Plaintiff incorporates all prior allegations of the Complaint. Lextron incorporates all prior enumerated answers.  Denied as to content and legal effect.

28.    Admitted that the Court has the power to issue a declaratory judgment.  Denied as to any contrary interpretation.

29.     Admitted that Plaintiff is requesting a declaratory judgment. Denied that it is entitled to the judgment requested.

30.     Admitted that Plaintiff incorporates all prior allegations of the Complaint. Lextron incorporates all prior enumerated answers. Denied as to content and legal effect.

31.     Denied.

32.     Denied.

33.     Denied. Lextron further denies that Delphi is entitled to any of the relief in the unnumbered *ad damnum* paragraph beginning "WHEREFORE. . . ." All other allegations of the Complaint not specifically admitted herein are denied.

WHEREFORE, PREMISES CONSIDERED, Lextron Corporation requests that a judgment of dismissal be entered in its favor as to all counts of Plaintiff's Complaint not previously adjudicated. Lextron requests all other relief appropriate in the premises.

## COUNTERCLAIM

Lextron files this Counterclaim pursuant to F.R.C.P. 13, as follows:

### I. Parties

1.     Counterclaimant Lextron Corporation ("Lextron") is a Mississippi Corporation with its principal place of business located in the City of Jackson, Hinds County, Mississippi.

2.     Counterdefendant Delphi Automotive Systems, LLC ("Delphi") is a Delaware limited liability company doing business in the state of Mississippi.

### II. Facts

3.     At the inception of their joint venture, Delphi advised Lextron ("Lextron") and certain of its affiliates that it wanted to work with Lextron to manufacture significant amounts of auto components for use by Delphi. Delphi advised Lextron and Doty that the volume of business Delphi would make available to Lextron as part of the joint venture was such that

1558851.1\08173.15318                                            7

Lextron would have to significantly expand its physical plant. Delphi further promised Lextron

and Doty that it would use its "best efforts" to cause the venture to be a success, as Delphi

represented to Lextron that it would cause Lextron's cost of producing products for Delphi to be

as low as possible and its production facilities to be as efficient as possible.

    4.      In reliance on Delphi's representations and promises, Lextron acquired at

considerable expense a manufacturing facility, and after consultation, inspection and direction by

Delphi, renovated that facility at even greater expense so as to accommodate Delphi's

manufacturing requirements, all in compliance with Delphi's demand that the facility be

dedicated to manufacturing for Delphi alone (hereinafter sometimes "the Delphi dedicated

facility").

    5.      Delphi, at all times relevant herein, represented to Lextron and Doty that Delphi

would provide necessary economic and technical support, guidance and assistance to Lextron,

and, through their combined efforts, Lextron would be a major Delphi supply partner.

    6.      Subsequently, Delphi failed to, and intentionally refused to increase the volume

of Delphi manufacturing business as promised, failed to grant modest and reasonable price

increases despite repeated requests from Lextron, and otherwise failed to use its "best efforts" to

cause the joint venture to be a success. In fact, Delphi refused to implement Lextron requested

cost reductions and production efficiencies. As a consequence of Delphi's acts, omissions

and misrepresentations, by late 2002, Lextron had serious financial difficulties.

    7.      Despite Lextron's financial difficulties, Delphi continued to assure Lextron that it

was and would continue to work in Lextron's best interest to cause Lextron to be profitable,

specifically and expressly agreeing by written Contract to use its, Delphi's, "best efforts" to

cause Lextron's costs to be as low as possible and its production facilities and efficiencies to

be as high as possible *(see* Contracts dated October 31, 2002, October 8, 2002 and September 5, 2002 attached hereto as Exhibits A, B and C).

8.     Shortly thereafter, Delphi reassured Lextron's lender, Southtrust Bank, and Doty, that Delphi had an interest in the Lextron venture and was committed to support of it. Delphi reaffirmed its commitment to support Lextron in a letter to Southtrust Bank dated January 9, 2003, a copy of which is attached as Exhibit D. In reliance on Delphi's promises as aforesaid, Lextron committed to incur additional indebtedness from Southtrust Bank in the amount of $800,000.00, and Charles Doty was induced, in reliance on Delphi's promises, to execute a personal guaranty of that debt.

9.     Lextron had earlier incurred substantial indebtedness from Southtrust Bank (guaranteed by Lextron CEO Charles Doty) in reliance on Delphi's promises to support and grow Lextron economically and technologically.

10.     In late February 2003, shortly after Delphi's written assurances of its commitment to the Lextron venture's success (by assuring Lextron that whatever means were necessary to reduce Lextron's costs and increase its efficiencies would be undertaken by Delphi), and just after Delphi confirmed its interest in and obligation to support Lextron, Delphi abruptly and unilaterally breached its agreements and duties by reneging on its commitment to the Lextron venture and by terminating all Contracts between Delphi and Lextron then in existence, including three (3) new contracts (hereinafter referred to as the "Three New Contracts") which had recently (within the last few months) been awarded.

11.     Delphi represented to Doty and Lextron that the basis for termination of its commitments was a provision in a document entitled "General Terms and Conditions" which reads as follows:

Buyer [Delphi] may immediately terminate this contract
without liability to Seller [Lextron] in any of the following or
any similar events:... (f) any accommodation by Buyer, financial
or otherwise, not contemplated by this contract, that are
necessary for Seller to meet its obligations under this contract
[emphasis added].

*See* Letter dated February 27, 2003, from Delphi to Lextron attached as Exhibit E.

12.     Delphi's termination of the joint venture and of the three then existing

production agreements was knowingly without any lawful basis since, among other things, (a)

the provision referenced above on which the termination was purportedly based has no

application to Delphi's commitment to the success of the Lextron joint venture, and (b) with

respect to the "Three New Contracts" in particular, because they specifically require Delphi

to assist and work with Lextron by using its "best efforts." Because the accommodation provision

in subsection (f) of the General Terms and Conditions document has no application, it

therefore could not be relied upon as a basis for termination.

13.     Delphi schemed throughout the Lextron venture to make Lextron dependent on it

under the guise that Delphi would use its massive know-how and resources to insure the success

of Lextron's Delphi manufacturing business. Yet, Delphi actually acted to drive Lextron into

debt and then unilaterally and wrongfully terminated their relationship and its obligations to

support Lextron. Among the wrongful conduct in which Delphi engaged, in addition to the

aforedescribed, was Delphi's refusal to honor its commitment which it stated repeatedly, to

significantly increase Lextron's volume of business so as to utilize all, or substantially all,

of the Delphi dedicated facility; Delphi's refusal to adjust Lextron's pricing model so as to

enable Lextron to make a profit from the joint venture; Delphi's refusal to pay Lextron for

commodities at the same higher price paid by Delphi to Lextron's competitors within the

State of Mississippi; Delphi's refusal to allow Lextron to reduce its costs, including

10

lead wire cost; Delphi's misrepresentation of its intent with regard to the retention of

consultants who were represented to be working for the benefit of Lextron while, in reality,

they were used by Delphi to obtain information regarding Lextron and its prospective non-

Delphi related business ventures and to otherwise sabotage the Lextron-Delphi joint

venture; and Delphi's assurances to Lextron and Doty that in the event Lextron incurred

indebtedness in pursuit of the Delphi venture, Delphi would support Lextron

economically and technologically to ensure its success. As a part of Lextron's effort to

restructure its business, Delphi urged, through BBK, Ltd., that Lextron shut down all non-

Delphi business activity.

14.    As set forth more fully below, the foregoing acts, omissions and

misrepresentations were intentional and reckless and have severely damaged Lextron and Doty.

## COUNT ONE

### BREACH OF JOINT VENTURE AGREEMENT

15.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual

allegations.

16.    Delphi's acts, omissions and misrepresentations as set forth herein constitute a

breach of the Delphi agreements to act jointly with Lextron (and Charles Doty) to create a

profitable Delphi dedicated manufacturing facility.

17.    Lextron is therefore entitled to damages as a consequence of the aforesaid acts,

omissions and misrepresentations as more fully set forth below.

## COUNT TWO

### BREACH OF CONTRACTS

18.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual

allegations.

19.    Such acts, omissions and misrepresentations constitute a breach of the Lextron-Delphi contracts, including the "Three New Contracts."

20.    Defendant Lextron is entitled to damages as a consequence of the aforesaid contractual breaches as more fully set forth below.

21.    In addition, Lextron is entitled to contractual and damages from Delphi as a result of improperly applied credits, and the failure of Delphi to either pay Lextron or credit it for products assembled and shipped to Delphi.

22.    Specifically, and in contrast to Delphi's claim that Lextron owes certain sums for allegedly breaching the supply contract, Delphi in fact owes Lextron the net amount of $461,197.16 for products assembled and shipped to Delphi, and for which Delphi never paid or properly credited Lextron.

## COUNT THREE

### INTENTIONAL MISREPRESENTATION

23.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

24.    Such misrepresentations were intentional and were relied upon by Lextron in acquiring and renovating a dedicated Delphi facility; incurring substantial indebtedness (including the $800,000.00 Southtrust indebtedness noted in Paragraph No. 8 of this Counterclaim); expending funds to travel to Michigan to meet with Delphi when Delphi had already decided to break its contract with Lextron; making significant investments in capital equipment which had functional and economic usefulness only in the production of Delphi products; devoting scarce and valuable resources to working with Delphi's consultants and agents; and diverting Lextron's attention from other business opportunities.

25.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT FOUR

### NEGLIGENT MISREPRESENTATION

26.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

27.    Such misrepresentations were relied by Lextron in acquiring and renovating the Delphi dedicated facility; incurring indebtedness (including the additional $800,000.00 Southtrust indebtedness noted in Paragraph No. 8 of this Counterclaim); expending funds to travel to Michigan to meet with Delphi when Delphi had already decided to break its contract with Lextron; making significant investments in capital equipment which had functional and economic usefulness only in the production of Delphi products; devoting scarce and valuable resources to working with Delphi's consultants and agents; and diverting Lextron's and Doty's attention from other business opportunities.

28.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT FIVE

### TORTIOUS INTERFERENCE WITH CONTRACT

29.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

30.    Delphi's conduct in unilaterally, intentionally, wrongfully and recklessly terminating the joint venture and aforementioned contracts and in breaching those agreements tortiously interfered with (and was intended to interfere with) Lextron's contracts with Southtrust Bank, other creditors, and with other existing and potential business pursuits.

31.   Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT SIX

### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

32.   Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

33.   Such acts, omissions and misrepresentations, as set forth herein were willful, malicious and undertaken in bad faith, and thus constituted a breach of the duty of good faith and fair dealing implied in all contracts.

34.   Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT SEVEN

### UNFAIR TRADE PRACTICES

35.   Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

36.   The foregoing acts, omissions and misrepresentations constitute unfair trade practices, including, but not limited to, Delphi's practice of paying more for commodities purchased from Lextron competitors than for those same products purchased from Lextron, in violation of Miss. Code Ann. 75-21-3, and other applicable state statutes.

37.   Defendant Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT EIGHT

### INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

38.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

39.    Such acts, omissions and misrepresentations interfered with Lextron's prospective business relations with other parties. Delphi intentionally committed such acts, including the wrongful termination of the joint venture and the aforementioned contracts to cause Lextron to be unable to consummate such other prospective business.

40.    Defendants are entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT NINE

### BREACH OF FIDUCIARY DUTY

41.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

42.    As a consequence of the long-standing course of dealing, representations and promises of Delphi and the joint venture arrangement of the parties, Delphi owed Lextron a fiduciary duty, which Delphi breached by the foregoing acts, omissions and misrepresentations.

43.    The foregoing breach of fiduciary duties entitles Defendants to damages as set forth below.

## COUNT TEN

### FRAUD

44.    Lextron and Doty incorporate herein, as if fully set forth, all of the foregoing factual allegations.

45.    Delphi knowingly made the foregoing representations and promises with the knowledge that they were false or with reckless disregard for their truth and intending for and inducing Lextron to rely thereon all to Lextron's extreme detriment. Under the circumstances of the parties' unique, fiduciary, and special relationship, Lextron at all times pertinent hereto, was entitled to rely on the Delphi representations.

46.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT ELEVEN

### SUPPRESSION OF MATERIAL FACTS

47.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

48.    Delphi suppressed its true intentions while misrepresenting to Lextron its interest in and support of Lextron, all to the extreme detriment of Lextron.

49.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT TWELVE

### CONVERSION

50.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

51.    Despite specific concerns raised by Lextron with respect to the property by Delphi in its count for replevin, and despite assurances by Delphi that it would remove only equipment owned by it, on March 10, 2003, Delphi removed items of equipment belonging to Lextron, and in which Delphi had no interest.

16

52.    The equipment wrongfully converted by Delphi is listed as follows:

| | |
|---|---|
| Front Door Harness: | Serial # 16643688 |
| Front Door Harness: | Serial # 16643690 |
| Backdoor Harness: | Serial # 1544-7743 |
| Backdoor Harness: | Serial # 1544-7744 |
| Steering Column Harness: | Serial # 16870022 |

53.    Delphi's removal of these items of equipment was in direct violation of the Agreed Order entered into by and between Delphi and Lextron, and filed of record in this Court, which authorized Delphi to remove only those items of equipment belonging to it.

54.    Delphi's removal and continued detention of these items was deliberate and intentional, and was performed in furtherance of its calculated business decision to ruin Lextron.

55.    In the alternative, Delphi's removal and continued detention of these items was the product of gross negligence, mismanagement, and lack of oversight as to amount to an intentional tort.

56.    Delphi is therefore liable to Lextron for actual, compensatory, incidental, and punitive damages as a result of its willful or grossly negligent acts of conversion of Lextron's property, all in violation of an Order of this Court.

WHEREFORE, PREMISES CONSIDERED, Lextron Corporation demands judgment against Delphi Automotive Systems, LLC, including all of its divisions and affiliates named or referred to in the Complaint filed by Delphi herein, or who may otherwise be liable to Lextron, for all actual, compensatory, incidental, and punitive damages in an amount to be determined by the jury at trial, plus all accruing pre- and post-judgment interest and costs of this action, and such other and further relief as the jury and Court deem appropriate.

Dated, this the ⟨7th⟩ day of September, 2004.

LEXTRON CORPORATION

By: _____
        Chad J. Hammons

Alveno N. Castilla, Esq. (MS Bar 5924)
Chad J. Hammons, Esq. (MS Bar #10419)
Watkins Ludlam Winter & Stennis, P.A.
633 North State Street (39202)
Post Office Box 427
Jackson, MS 39205-0427

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has this

day been placed in the United States Mail, postage prepaid, to the following:

Debra Brown, Esq.
Frank Trapp, Esq.
Phelps Dunbar
P. O. Box 23066
Jackson, MS 39225-3066

This ⟨7th⟩ day of September, 2004.

_____
Chad J. Hammons

# EXHIBIT "A"

# DELPHI



RECEIVED
NOV 1 2002
BY:

**DELPHI CORPORATION**
**LONG TERM CONTRACT**

### 1.    Purchase of Product

Lextron Automotive ("Seller") agrees to sell, and **Delphi Corporation LLC acting through its Safety & Interior Systems Division** ("Buyer") agrees to purchase, approximately **One Hundred percent (100%)** of Buyer's production and service requirements for the following products (each referred to as a "Product" and collectively referred to as the "Products"):

| Part Number | Description | Per Unit Price | Annual Tool Capacity |
|---|---|---|---|
| GX203842 <br> 15447743 | 2004 DCX HB RRAB Leadwire Asm (LH) | $▇▇▇ USD | ▇▇▇ annually (based on maximum of 235 working days and 100 hours per week) |
| GX203843 <br> 15447744 | 2004 DCX HB RRAB Leadwire Asm (RH) | $▇▇▇ USD | ▇▇▇ annually (based on maximum of 235 working days and 100 hours per week) |

### 2.    Term

With respect to each Product, the term of this Contract is from Calendar Year 2003 through Calendar Year 2006.

### 3.    Prices

The per unit price of each Product for Calendar Year 2003 is F.O.B. Seller's Plant, Freight Collect (2000 IncoTerms). Pricing for each subsequent Calendar Year is subject to the following minimum annual percentage reductions from the prior Calendar Year's pricing:

| Part Number | % Red. | Calendar Year 2004 Pricing | % Red. | Calendar Year 2005 Pricing | % Red. | Calendar Year 2006 Pricing |
|---|---|---|---|---|---|---|
| GX203842 | 5% | ▇▇▇ | 5% | ▇▇▇ | 5% | ▇▇▇ |
| GX203843 | 5% | ▇▇▇ | 5% | ▇▇▇ | 5% | ▇▇▇ |

15447743
15447744

M£S
10/21/02

Buyer and Seller will use their best efforts to implement cost savings and productivity improvements in order to reduce Seller's costs of supplying each Product. Buyer and Seller agree that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to ~~fifty percent (50%)~~ of any net cost savings achieved by Seller with respect to such Product (i.e., savings after recovery by Seller of a pro rata portion, based on the remaining term of this Contract, of the reasonable and documented costs to achieve such cost savings), provided, however, that the pricing of each Product will be reduced (in addition to any scheduled price

reductions) by an amount equal to one hundred percent (100%) of any savings resulting from reduction on the content of the such Product.

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Seller's labor, materials, overhead and other costs. In the event that Buyer agrees to any price increases (or a decrease of any scheduled price reductions) with respect to any Product, then, notwithstanding anything to the contrary set forth in this Contract, the pricing of each Products will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any subsequent net cost savings achieved by Seller with respect to such Product until aggregate price reductions on account of Seller's cost savings equal any price increases previously agreed to by Buyer.

4.    Right to Purchase from Others

During the entire term of this Contract, Seller will assure that each Product remains competitive in terms of technology, design, service and quality with any similar product available to Buyer. Following Calendar Year 2003 Seller will also assure that each Product remains competitive in terms of price with any similar product available to Buyer. If, in the reasonable opinion of Buyer, a Product does not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which a similar product is more competitive. If, within ninety (90) days, Seller does not agree to immediately sell any Product with comparable technology, design, quality, or, if applicable, price, Buyer may elect to purchase any similar products available to Buyer without any liability to Seller under this Contract.

5.    Purchase Orders

All Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders (including related delivery releases and shipping instructions) issued by Buyer from time to time during the term of this Contract. Buyer's General Terms and Conditions, a copy of which is attached, are hereby incorporated into this Contract by reference, provided, however, that Buyer's right to "terminate for convenience" under the General Terms and Conditions will be inapplicable to this Contract until the end Calendar Year 2003. Any amendment to, or revision of, such General Terms and Conditions shall also become a part of this Contract, provided that (i) Buyer provides Seller with a copy of such revised Terms and Conditions and (ii) Seller does not object to such revised Terms and Conditions in writing within thirty (30) days after receipt. The Terms and Conditions (together with any revision made a part of this Contract) shall be construed, to the extent possible, as consistent with the terms and conditions set forth in this Contract and as cumulative, provided, however, that if such construction is unreasonable, the terms and conditions set forth in this Contract shall control.

EXECUTED by Buyer and Seller as of this _31ST_ day of _OctobER_, 2002.

Buyer:                                    Seller:

Delphi Corporation LLC                    Lextron Automotive
acting through its Safety & Interior
Systems Division

By: _____            By: _____
Name: Michelle E. Joseph                  Name: Ray C. Irby
Title: Senior Electrical Buyer            Title: Chief Operating Officer

DELPHI AUTOMOTIVE SYSTEMS

GENERAL TERMS AND CONDITIONS

*Delphi Automotive Systems seeks to exceed its customers' expectations. Delphi's suppliers are integral to achieving this objective, and Delphi hopes that its suppliers will recognize Delphi as their preferred customer. Delphi will establish high performance expectations for itself and its suppliers, measure performance    and    reward    superior    performance.*

## 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

## 2. SHIPPING AND BILLING

2.1  Shipping.  Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and/or release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs.  Seller will include on bills of lading or other shipping receipts the correct classification identification of the goods shipped as Buyer or the carrier requires.  The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

2.2  Billing.  Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer. If the payment due date is not otherwise specified in this Contract, the payment due date will be the due date established by the Multilateral Netting System (MNS-2) used by Buyer, which provides, on average, that payment will be due on the second day of the second month following the date Buyer receives the goods or services. Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

2.3  Delivery Schedules.  Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract.  Time is of the essence with respect to all delivery schedules Buyer establishes.  Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules.  Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules.  If Buyer determines b  the requirements of Buyer's customers or market, economic or other conditions require changes in it...ery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other modification of this Contract.

- 1 -

Revised June 24, 1999

.. ..emium Shipments. If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules
sing the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods
sing a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible.
eller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to
il to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

## . SPECIFICATION, DESIGN AND SCOPE CHANGES

uyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of
ny services or work covered by this Contract, including work related to inspection, testing or quality control. While
uyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such
anges. Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes,
cluding Buyer's payment of reasonable costs of modifications to Seller's Equipment and Facilities (as defined in Article
) necessary to implement such changes. In order to assist in the determination of any equitable adjustment in price or
livery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's .
st of production and the time to implement such changes. In the event of any disagreement arising out of such changes,
yer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue
rforming under this Contract, including prompt implementation of changes required by Buyer, while Buyer and Seller
olve any disagreement arising out of such changes.

## QUALITY AND INSPECTION

ler will participate in Buyer's supplier quality and development program(s) and comply with all quality requirements
l procedures Buyer specifies from time to time. Seller will permit Buyer and its representatives and consultants to (i)
· : Seller's books and records in order to monitor Seller's compliance with this Contract and Seller's financial
c...on and (ii) enter Seller's facilities at reasonable times to inspect such facilities and any goods, materials and
perty that relate to this Contract. No such inspection by Buyer will constitute acceptance by Buyer of any work-in-
:ess or finished goods.

## NON-CONFORMING GOODS

er is not required to perform incoming inspections of any goods, and Seller waives any right to require
er to conduct any such inspections. Seller will not substitute any goods for the goods covered by this
tract unless Buyer consents in writing. If Buyer rejects any goods as non-conforming, Buyer may, at its
on, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods,
require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or
edies. If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of
-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or
shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the
conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to
nge for the shipment of any non-conforming goods back to Seller at Seller's expense. Seller will bear all
of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by
r to return, store or dispose any non-conforming goods. Buyer's payment for any non-conforming goods
ot constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or
/e Seller of responsibility for the non-conforming goods.

-2-

Revised June 24, 1999

ORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for so long as such event or occurrence continues, provided, however, that the affected party gives written notice of such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by the quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities and at times Buyer requests and at the prices set forth in this Contract. If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without liability. Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any such disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such disruption commences.

WARRANTY

1 General. Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services ...ed by this Contract will (a) conform to all applicable specifications, drawings, samples, descriptions, brochures and manuals furnished by Seller or Buyer, (b) will be merchantable, (c) of good material and workmanship, (d) free from efect, and (e) are fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer. If requested y Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

2 Date and Time Processing. Seller warrants and guarantees to Buyer and its customers that any products (including computer hardware, software, firmware, machinery and equipment) covered by this Contract must at all times accurately process, handle, calculate, compare and sequence date and time data from, into, within and between the 20th and 21st centuries, including leap year calculations.

3 Warranty Period. The period for each of the foregoing warranties will be that provided by applicable law, except that Buyer ever provides a longer warranty to its customers, such longer warranty period will apply to the goods covered by is Contract.

INGREDIENTS AND HAZARDOUS MATERIALS

Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all ingredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to ingredients. Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers sufficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures and precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable

- 3 -

Revised June 24, 1999

le · requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, tr.. portation, processing, use or disposal of the goods, containers and packing.

## 9. INSOLVENCY OF SELLER /

Buyer may immediately terminate this Contract without liability to Seller in any of the following or any similar events: (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract. Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract, without liability to Seller at any time after execution if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract; or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

n addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing. Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under hi  ntract which are useable and in a merchantable condition. The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by buyer and not previously paid for, plus (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent. In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which eller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required pay for any goods or materials that are in Seller's standard stock or that are readily marketable. Payments made under his Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or lease schedules outstanding at the date of termination. Within sixty (60) days after the effective date of termination, eller will submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit an audit by uyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 2. TECHNICAL INFORMATION

2.1  Exchange of Information.  Buyer and Seller will cooperate to create, maintain, update, and share technical formation about the goods, products, machinery, materials, formulations and their manufacture, use, application and ontrol in compliance with Buyer's drafting and math data standards. Such technical information will not be subject to y use or disclosure restrictions. Accordingly, Seller agrees not to assert any claims against Buyer, its customers or their spective suppliers with respect to any technical information that Seller discloses in connection with this Contract.

2.2  Waiver of Claims.  Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, ry  · customers or their respective suppliers with respect to any technical information that Seller shall have disclosed n... hereafter disclose in connection with the goods or services covered by this Contract.

- 4 -

Revised June 24, 1999

1.   Repair and Rebuild.  Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and their subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment of any royalty or other compensation to Seller.

12.4  Computer Programs and Written Works.  All works of authorship, including without limitation, software, computer programs, and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing this Contract (separately or as part of any goods and components) are "works made for hire" and the sole property of Buyer.  To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller agrees to assign and assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship.

## 3.  INDEMNIFICATION

3.1  Infringement.  Seller will defend, hold harmless and indemnify Buyer and its customers, and their respective successors and assigns, against any claims of infringement (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses including, without limitation, attorney and other professional fees and disbursements) relating to the goods or services covered by this Contract, including any claims in circumstances where Seller has provided only part of the goods or services.   Seller waives any claim against Buyer that any such infringement arose out of compliance with Buyer's specifications.

3.2  Activities on Buyer's Premises.  Seller will defend, hold harmless, and indemnify Buyer from and against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other professional fees and disbursements) arising from or in connection with the performance of any service or work by Seller its employees, agents, representatives and subcontractors on Buyer's or Buyer's customer's premises or the use of the property of Buyer or any customer of Buyer, except to the extent such liability arises out of the negligence or willful misconduct of Buyer or Buyer's customer.

3.3  Product Liability .  Seller will defend, hold harmless, and indemnify Buyer from and against any liability and expenses (including, without limitation, attorney and other professional fees and disbursements) arising from or in connection with any third party claims or demands to recover for personal injury or death, property damage or economic loss caused by any of the goods or services supplied by Seller (regardless of whether such claim or demand arises under tort, negligence, contract, warranty, strict liability or other legal theories), except to the extent such injury, damage or loss results from Buyer's specifications as to design or materials or from alteration or improper repair, maintenance or installation by any party other than Seller.

## COMPLIANCE WITH LAWS

Seller, and any goods or services supplied by Seller, will comply with all applicable laws, rules, regulations, orders, conventions, ordinances and standards of the country(ies) of origin and destination or that relate to the manufacture, handling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Neither Seller nor any of its subcontractors will utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or services under this Contract.  Upon Buyer's request, Seller will certify in writing its compliance with the foregoing.  Seller will defend, hold harmless and indemnify Buyer from and against any liability, claims, demands, damages or expenses (including reasonable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with this Article.

1   INSURANCE

-5-

Revised June 24, 1999

r will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers reasonably acceptable to Buyer. With respect to any such insurance coverage, Seller will furnish to Buyer either a certificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies of all insurance policies within ten (10) days after Buyer requests. The certificate must provide that Buyer will receive thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's obligations or liabilities under this Contract.

## 16. SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required for the production of the products covered by this Contract ("Seller's Equipment"). Seller will insure Seller's Equipment with fire and extended coverage insurance for its full replacement value. Seller grants Buyer an irrevocable option to take possession of, and title to, all or part of Seller's Equipment that is specially designed or outfitted for the production of the goods covered by this Contract upon payment to Seller of the net book value of such Seller's Equipment less any amounts that Buyer has previously paid to Seller for the cost of such Seller's Equipment. This option will not apply to the extent that Seller's Equipment is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others. Buyer's right to exercise this option is not conditioned on Seller's breach or Buyer's termination of this Contract or upon payment of any other amounts due under this Contract.

## 17. BUYER'S PROPERTY

17.1  Bailment of Property. All supplies, materials, tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items Buyer furnishes, either directly or indirectly, to Seller, or for which Buyer gives consideration to Seller in whole or in part ("Buyer's Property"), will be and remain the property of Buyer and be held by Seller on a bailment basis. To the extent that this Contract provides that Buyer will reimburse Seller for any specific items of Buyer's Property (such as tooling), Seller will purchase and pay for such Buyer's Property as agent of Buyer. To the extent that this Contract provides that Seller will obtain any specific items of Buyer's Property (such as tooling) without separate or additional payment or reimbursement by Seller, Seller acknowledges and agrees that Buyer's issuance of this Contract is good and sufficient consideration for such Buyer's Property and that title to such Buyer's Property shall vest immediately in Buyer and be held by Seller pursuant to this Article. Seller shall assign to Buyer any contract rights or claims in which Seller has an interest with respect to Buyer's Property. Seller shall also execute (i) any bills of sale or other documents of conveyance Buyer requests to evidence the transfer to Buyer of title to any Buyer's Property, related contract rights and claims and (ii) any financing statements or other documents Buyer requests to evidence Buyer's ownership of Buyer's Property. Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property. Seller will not sell, lend, rent, encumber, pledge, lease, transfer or otherwise dispose of Buyer's Property. Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property. When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property or work performed on such property or otherwise. Goods manufactured based on Buyer's drawings and/or specifications may not be used for Seller's own use or sold to third parties without Buyer's express written authorization.

7.2  Seller's Duties with Respect to Buyer's Property. While Buyer's Property is in Seller's possession and until Seller delivers Buyer's Property back to Buyer, Seller bears the risk of loss and damage to Buyer's Property. Seller will be responsible for the cost of repairing or replacing Buyer's Property if it is damaged or destroyed regardless of cause or fault. Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from its premises without Buyer's written approval, and (g) use Buyer's Property in compliance with Buyer's or the manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations. Buyer

-6-

Revised June 24, 1999

v... ave the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with
e..,..ct thereto.

7.3  Return of Buyer's Property. / Seller agrees that Buyer has the right, at any time and from time to time, with or
without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property.
Vithout further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the
ight to enter Seller's premises and take possession of any and all of Buyer's Property. Upon Buyer's request and in
ccordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by
;eller, either (i) Ex Works (Incoterms 1990) at Seller's plant properly packed and marked in accordance with the
equirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates,
1 which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates.
f Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an
nmediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or
ithout legal process, and take immediate possession of Buyer's Property.

7.4  Disclaimer of Warranties.  Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's
roperty nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's
enefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT
!ADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS
R IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF
UYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. Buyer will not be liable to Seller for
y loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including,
ithout limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of
rvice or for any loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory
mages, profits or any other indirect, special or consequential damages.

.5  Development, Engineering And Consulting Services.  Engineering, consulting or development services
Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of
thorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole
operty of Buyer. Seller agrees to assign all right, title and interest in and to IP that results from Development Services
Developed IP") to Buyer.  Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every
sonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional
uments reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse
ler for reasonable costs incurred by Seller in providing such assistance.

SERVICE AND REPLACEMENT PARTS

ring the term of this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and
lacement parts requirements to Buyer's customers at the then current production price(s) under this
ntract. If the goods are systems or modules, Seller will sell the components or parts that comprise the
tem or module at price(s) that will not, in the aggregate, exceed the price of the system or module less
embly costs. If this Contract is in effect at the end of the vehicle production program into which the goods
ered by the Contract are incorporated, Seller will also sell goods to Buyer to fulfill Buyer's and its
tomers' service and replacement parts requirements during the fifteen (15) year period following the end of
h vehicle production program (the "Post-Production Period"), and this Contract will automatically remain in
ct during the entire Post-Production Period. During the first three (3) years of the Post-Production Period,
price(s) for such goods will be the production price(s) which were in effect at the commencement of the
t-Production Period. For the remainder of the Post-Production Period, the price(s) for such service goods
be as reasonably agreed to by the parties. If requested by Buyer, Seller will also make service literature
i other materials available at no additional charge to support Buyer's service activities.

...~MEDIES

- 7 -

Revised June 24, 1999

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity.

## 20. CUSTOMS AND EXPORT CONTROLS

Credits or benefits resulting or arising from this Contract, including trade credits, export credits or the refund of duties, taxes or fees, belong to Buyer. Seller will provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive these benefits or credits, and to fulfill any customs related obligations, origin marking or labeling requirements and local content origin requirements. Seller will obtain all export licenses or authorizations necessary for the export of the goods unless otherwise indicated in this Contract, in which event Seller will provide all information as may be necessary to enable Buyer to obtain such licenses or authorization(s). Seller will make all arrangements that are necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

## 21. SETOFF AND RECOVERY

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or Buyer's affiliates, Buyer may (i) setoff such obligations against any sums owing to Seller or Seller's affiliates and/or (ii) recoup such obligations from any amounts paid to Seller or Seller's affiliates by Buyer or Buyer's affiliates.

## 22. NO ADVERTISING

Seller will not, in any manner, advertise or publish that Seller has contracted to furnish Buyer the goods or services ___ered by this Contract or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials ___ess Buyer consents in writing.

## 23. NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any provision of this Contract will not affect the right to require such performance at any later time, nor will the waiver by either party of a breach of any provision of this Contract constitute a waiver of any succeeding breach of the same or any other provision. No course of dealing or course of performance may be used to evidence a waiver or limitation of Seller's obligations under this Contract.

## 24. ASSIGNMENT

Buyer may assign its rights and obligations under this Contract without Seller's prior written consent. Seller may not assign or delegate its rights or obligations under this Contract without Buyer's prior written consent.

## 25. RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties. Nothing in this Contract makes either party the agent or legal representative of the other for any purpose whatsoever, nor grants either party any authority to assume or create any obligation on behalf of or in the name of the other party.

## 26. GOVERNING LAW AND JURISDICTION

___ 's Contract is to be construed according to the laws of the country (and state or province, if applicable) from which this ___ntract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law.

- 8 -

Revised June 24, 1999

Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in the court(s) having jurisdiction over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures. Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this Contract is issued.

## 27. SEVERABILITY

If any provision of this Contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Contract will remain in full force and effect.

## 28. RIGHT TO AUDIT AND INSPECT

Buyer, at its expense, has the right to audit and review all relevant books, records, payroll data, receipts and other documents, including Seller's administrative and accounting policies, guidelines, practices and procedures, in order to substantiate any charges and other matters under this Contract. Seller will maintain and preserve all such documents for a period of four (4) years following final payment under this Contract. In addition, Buyer has the right to inspect all inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges, and other items related to Seller's performance of this Contract. Seller will provide Buyer with reasonable access to its facilities and otherwise cooperate and facilitate any such audits or inspections by Buyer.

## 29. ENTIRE AGREEMENT

This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written contract amendment issued by Buyer. Notwithstanding anything to the contrary contained herein, Buyer explicitly reserves, and this Contract will not constitute a waiver or release of, any rights and claims against Seller arising out of, or relating to, any fraud or duress in connection with the formation of this Contract or any breach or anticipatory breach of any previously existing contract between Buyer and Seller (whether or not such previously existing contract related to the same or similar goods or subject matter as this Contract). All payments by Buyer to Seller under this Contract are without prejudice to Buyer's claims, rights, or remedies.

# EXHIBIT "B"

**DELPHI**



RECEIVED
OCT 9 2002
BY:_____

DELPHI CORPORATION
LONG TERM CONTRACT

**FILE**

1.   **Purchase of Product**

Lextron Corporation ("Seller") agrees to sell, and Delphi Corporation LLC acting through its Safety & Interior Systems Division ("Buyer") agrees to purchase, approximately One Hundred percent (100%) of Buyer's production and service requirements for the following products (each referred to as a "Product" and collectively referred to as the "Products"):

| Part Number | Description | Per Unit Price | Annual Tool Capacity |
|---|---|---|---|
| 16870022 | 2003 ½ GMT 315 Steering Wheel Wire Harness | $▇▇ | ▇▇▇ (based on a maximum of 235 working days and 100 hours per week) |

2.   **Term**

With respect to each Product, the term of this Contract is from Calendar Year 2003 through Calendar Year 2007.

3.   **Prices**

The per unit price of each Product for Calendar Year 2003 is F.O.B. Seller's Plant, Freight Collect (2000 IncoTerms).   Pricing for each subsequent Calendar Year. is subject to the following minimum annual percentage reductions from the prior Calendar Year's pricing:

| | | |
|---|---|---|
| Calendar Year 2004 | ▇▇% or Piece Price $▇▇ | ea. |
| Calendar Year 2005 | ▇▇% or Piece Price $▇▇ | ea. |
| Calendar Year 2006 | ▇▇% or Piece Price $▇▇ | ea. |
| Calendar Year 2007 | ▇▇% or Piece Price $▇▇ | ea. |

Buyer and Seller will use their best efforts to implement cost savings and productivity improvements in order to reduce Seller's costs of supplying each Product.   Buyer and Seller agree that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to fifty percent (50%) of any net cost savings achieved by Seller with respect

to such Product (i.e., savings after recovery by Seller of a pro rata portion, based on the remaining term of this Contract, of the reasonable and documented costs to achieve such cost savings), provided, however, that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any savings resulting from reduction on the content of the such Product.

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Seller's labor, materials, overhead and other costs. In the event that Buyer agrees to any price increases (or a decrease of any scheduled price reductions) with respect to any Product, then, notwithstanding anything to the contrary set forth in this Contract, the pricing of each Products will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any subsequent net cost savings achieved by Seller with respect to such Product until aggregate price reductions on account of Seller's cost savings equal any price increases previously agreed to by Buyer.

4.   **Right to Purchase from Others**

During the entire term of this Contract, Seller will assure that each Product remains competitive in terms of technology, design, service and quality with any similar product available to Buyer. Following Calendar Year 2003 Seller will also assure that each Product remains competitive in terms of price with any similar product available to Buyer. If, in the reasonable opinion of Buyer, a Product does not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which a similar product is more competitive. If, within ninety (90) days, Seller does not agree to immediately sell any Product with comparable technology, design, quality, or, if applicable, price, Buyer may elect to purchase any similar products available to Buyer without any liability to Seller under this Contract.

5.   **Purchase Orders**

All Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders (including related delivery releases and shipping instructions) issued by Buyer from time to time during the term of this Contract. Buyer's General Terms and Conditions, a copy of which is attached, are hereby incorporated into this Contract by reference, provided, however, that Buyer's right to "terminate for convenience" under the General Terms and Conditions will be inapplicable to this Contract until the end Calendar Year 2003. Any amendment to, or revision of, such General Terms and Conditions shall also become a part of this Contract, provided that (i) Buyer provides Seller with a copy of such revised Terms and Conditions and (ii) Seller does not object to such revised Terms and Conditions in writing within thirty (30) days after receipt. The Terms and Conditions (together with any revision made a part of this Contract) shall be

construed, to the extent possible, as consistent with the terms and conditions set forth in this Contract and as cumulative, provided, however, that if such construction is unreasonable, the terms and conditions set forth in this Contract shall control.

EXECUTED by Buyer and Seller as of this 8TH day of October, 2002.

Buyer:                                    Seller:

Delphi Corporation LLC                    Lextron Corporation
acting through its Safety & Interior
Systems Division

By: _____            By: _____
Name: Michelle E. Joseph                  Name: Ray C. Irby
Title: Senior Electrical Buyer            Title: Chief Operating Officer

Page 2 of 2

# EXHIBIT "C"

# DELPHI

### DELPHI CORPORATION
### LONG TERM CONTRACT

### 1.    Purchase of Product

Lextron Automotive Technologies Corporation ("Seller") agrees to sell, and Delphi Corporation LLC acting through its Safety & Interior Systems Division ("Buyer") agrees to purchase, approximately one hundred percent (100%) of Buyer's production and service requirements for the following products (each referred to as a "Product" and collectively referred to as the "Products"):

| Part Number | Description | Per Unit Price | Annual Tool Capacity |
|---|---|---|---|
| 16643688 | 2004 Cami YT1 Door Hardware Module Wire Harness (Front) | $█████ | ███,███/yr |
| 16643690 | 2004 Cami YT1 Door Hardware Module Wire Harness (Front) | $█████ | ███,███/yr |

### 2.    Term

With respect to each Product, the term of this Contract is from **Model Year 2004** through **Model Year 2005.**

### 3.    Prices

The per unit price of each Product for **Model Year 2004 is F.O.B. Buyer's Plant, Freight Collect (2000 IncoTerms).** Pricing for each subsequent **Model Year** is subject to the following minimum annual percentage reductions from the prior Model Year's pricing:

**Part Number 16643688**
| | | |
|---|---|---|
| Model Year 2005 | Three percent ( 3%) | Piece Price $████ ea. |
| Model Year 2006 | Three percent ( 3%) | Piece Price $████ ea. |
| Model Year 2007 | Three percent ( 3%) | Piece Price $████ ea. |
| Model Year 2008 | Three percent ( 3%) | Piece Price $████ ea. |

**Part Number 16643690**
| | | |
|---|---|---|
| Model Year 2005 | Three percent ( 3%) | Piece Price $████ ea. |
| Model Year 2006 | Three percent ( 3%) | Piece Price $████ ea. |
| Model Year 2007 | Three percent ( 3%) | Piece Price $████ ea. |
| Model Year 2008 | Three percent ( 3%) | Piece Price $████ ea. |

Buyer and Seller will use their best efforts to implement cost savings and productivity improvements in order to reduce Seller's costs of supplying each Product. Buyer and Seller agree that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to **fifty percent (50%)** of any net cost savings achieved by Seller with respect to such Product (i.e., savings after recovery by Seller of a pro rata portion, based on the remaining term of this Contract, of the reasonable and documented costs to achieve such cost savings), provided, however, that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any savings resulting from reduction on the content of the such Product.

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Seller's labor, materials, overhead and other costs. In the event that Buyer agrees to any price increases (or a decrease of any scheduled price reductions) with respect to any Product, then, notwithstanding anything to the contrary set forth in this Contract, the pricing of each Products will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any subsequent net cost savings achieved by Seller with respect to such Product until aggregate price reductions on account of Seller's cost savings equal any price increases previously agreed to by Buyer.

4.    <u>Right to Purchase from Others</u>

During the entire term of this Contract, Seller will assure that each Product remains competitive in terms of technology, design, service and quality with any similar product available to Buyer. Following Model Year 2004 Seller will also assure that each Product remains competitive in terms of price with any similar product available to Buyer. If, in the reasonable opinion of Buyer, a Product does not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which a similar product is more competitive. If, within ninety (90) days, Seller does not agree to immediately sell any Product with comparable technology, design, quality, or, if applicable, price, Buyer may elect to purchase any similar products available to Buyer without any liability to Seller under this Contract.

5.    <u>Purchase Orders</u>

All Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders (including related delivery releases and shipping instructions) issued by Buyer from time to time during the term of this Contract. Buyer's General Terms and Conditions, a copy of which is attached, are hereby incorporated into this Contract by reference, provided, however, that Buyer's right to "terminate for convenience" under the General Terms and Conditions will be inapplicable to this Contract until the end Model Year 2004. Any amendment to, or revision of, such General

Terms and Conditions shall also become a part of this Contract, provided that (i) Buyer provides Seller with a copy of such revised Terms and Conditions and (ii) Seller does not object to such revised Terms and Conditions in writing within thirty (30) days after receipt. The Terms and Conditions (together with any revision made a part of this Contract) shall be construed, to the extent possible, as consistent with the terms and conditions set forth in this Contract and as cumulative, provided, however, that if such construction is unreasonable, the terms and conditions set forth in this Contract shall control.

EXECUTED by Buyer and Seller as of this __5TH__ day of __SEPTEMBER__, 2002.

Buyer:                                          Seller:

**Delphi Corporation LLC**              **Lextron Automotive**
**acting through its Safety & Interior**  **Technologies Corporation**
**Systems Division**

By: _____     By: _____
Name:  __Michelle E. Joseph__       Name:  __Ray C. Irby__
Title:  __Senior Electrical Buyer__   Title:  __Chief Operating Officer__

# DELPHI AUTOMOTIVE SYSTEMS

## GENERAL TERMS AND CONDITIONS

*Delphi Automotive Systems seeks to exceed its customers' expectations. Delphi's suppliers are integral to achieving this objective, and Delphi hopes that its suppliers will recognize Delphi as their preferred customer. Delphi will establish high performance expectations for itself and its suppliers, measure performance and reward superior performance.*

## 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

## 2. SHIPPING AND BILLING

1. Shipping. Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and/or release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs. Seller will include on bills of lading or other shipping receipts the correct classification and identification of the goods shipped as Buyer or the carrier requires. The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

2. Billing. Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer. If the payment date is not otherwise specified in this Contract, the payment due date will be the due date established by the Multilateral Netting System (MNS-2) used by Buyer, which provides, on average, that payment will be due on the second day of the second month following the date Buyer receives the goods or services. Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

Delivery Schedules. Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract. Time is of the essence with respect to all delivery schedules Buyer establishes. Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules. Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules. If Buyer determines the requirements of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other modification of this Contract.

-1-

Revised June 24, 1999

‐   Premium Shipments.  If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules using the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods using a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible. Seller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to fail to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

## 3. SPECIFICATION, DESIGN AND SCOPE CHANGES

Buyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract, including work related to inspection, testing, or quality control.  While Buyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such changes.  Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including Buyer's payment of reasonable costs of modifications to Seller's Equipment and Facilities (as defined in Article 16) necessary to implement such changes.  In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's cost of production and the time to implement such changes.  In the event of any disagreement arising out of such changes, Buyer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue performing under this Contract, including prompt implementation of changes required by Buyer, while Buyer and Seller resolve any disagreement arising out of such changes.

## ‐ QUALITY AND INSPECTION

Seller will participate in Buyer's supplier quality and development program(s) and comply with all quality requirements and procedures Buyer specifies from time to time.  Seller will permit Buyer and its representatives and consultants to (i) inspect Seller's books and records in order to monitor Seller's compliance with this Contract and Seller's financial position and (ii) enter Seller's facilities at reasonable times to inspect such facilities and any goods, materials and property that relate to this Contract.  No such inspection by Buyer will constitute acceptance by Buyer of any work-in-process or finished goods.

## NON-CONFORMING GOODS

Buyer is not required to perform incoming inspections of any goods, and Seller waives any right to require Buyer to conduct any such inspections.  Seller will not substitute any goods for the goods covered by this Contract unless Buyer consents in writing.  If Buyer rejects any goods as non-conforming, Buyer may, at its option, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods, (b) require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or remedies.  If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of non-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or such shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the non-conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to arrange for the shipment of any non-conforming goods back to Seller at Seller's expense.  Seller will bear all risk of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by Buyer to return, store or dispose any non-conforming goods.  Buyer's payment for any non-conforming goods will not constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or relieve Seller of responsibility for the non-conforming goods.

-2-

Revised June 24, 1999

## FORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for so long as such event or occurrence continues, provided, however, that the affected party gives written notice of such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by the quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities and at times Buyer requests and at the prices set forth in this Contract. If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without liability. Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any such disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such disruption commences.

## WARRANTY

.1 General. Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services covered by this Contract will (a) conform to all applicable specifications, drawings, samples, descriptions, brochures and manuals furnished by Seller or Buyer, (b) will be merchantable, (c) of good material and workmanship, (d) free from defect, and (e) are fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

.2 Date and Time Processing. Seller warrants and guarantees to Buyer and its customers that any products (including computer hardware, software, firmware, machinery and equipment) covered by this Contract must at all times accurately process, handle, calculate, compare and sequence date and time data from, into, within and between the 20th and 21st centuries, including leap year calculations.

.3 Warranty Period. The period for each of the foregoing warranties will be that provided by applicable law, except that if Buyer ever provides a longer warranty to its customers, such longer warranty period will apply to the goods covered by this Contract.

## INGREDIENTS AND HAZARDOUS MATERIALS

If Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all ingredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to ingredients. Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers sufficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures and precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable

-3-

Revised June 24, 1999

legal requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, ;portation, processing, use or disposal of the goods, containers and packing.

## 9. INSOLVENCY OF SELLER

Buyer may immediately terminate this Contract without liability to Seller in any of the following or any similar events: (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract. Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract, without liability to Seller at any time after execution if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract; or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

n addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing. Upon such termination, Buyer may, at its option, urchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under his Contract which are useable and in a merchantable condition. The purchase price for such finished goods, raw u    als and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory rhich is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or :rvices that have been completed in accordance with this Contract as of termination date and delivered and accepted by uyer and not previously paid for, plus (b) the actual costs of work-in-process and raw materials incurred by Seller in nnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly llocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less ) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's ritten consent. In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which :ller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required pay for any goods or materials that are in Seller's standard stock or that are readily marketable. Payments made under is Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or lease schedules outstanding at the date of termination. Within sixty (60) days after the effective date of termination, ller will submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit an audit by yer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## . TECHNICAL INFORMATION

.1   Exchange of Information.  Buyer and Seller will cooperate to create, maintain, update, and share technical 'ormation about the goods, products, machinery, materials, formulations and their manufacture, use, application and ntrol in compliance with Buyer's drafting and math data standards.  Such technical information will not be subject to y use or disclosure restrictions. Accordingly, Seller agrees not to assert any claims against Buyer, its customers or their pective suppliers with respect to any technical information that Seller discloses in connection with this Contract.

.2   Waiver of Claims.  Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, yer's customers or their respective suppliers with respect to any technical information that Seller shall have disclosed a    iereafter disclose in connection with the goods or services covered by this Contract.

-4-

Revised June 24, 1999

3  Repair and Rebuild.  Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and their subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment of any royalty or other compensation to Seller.

12.4  Computer Programs and Written Works.  All works of authorship, including without limitation, software, computer programs, and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing this Contract (separately or as part of any goods and components) are "works made for hire" and the sole property of Buyer.  To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller agrees to assign and assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship.

## 13.  INDEMNIFICATION

13.1  Infringement.  Seller will defend, hold harmless and indemnify Buyer and its customers, and their respective successors and assigns, against any claims of infringement (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses (including, without limitation, attorney and other professional fees and disbursements) relating to the goods or services covered by this Contract, including any claims in circumstances where Seller has provided only part of the goods or services.    Seller waives any claim against Buyer that any such infringement arose out of compliance with Buyer's specifications.

13.2  Activities on Buyer's Premises.  Seller will defend, hold harmless, and indemnify Buyer from and against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other professional fees and disbursements) arising from or in connection with the performance of any service or work by Seller or employees, agents, representatives and subcontractors on Buyer's or Buyer's customer's premises or the use of the property of Buyer or any customer of Buyer, except to the extent such liability arises out of the negligence or willful misconduct of Buyer or Buyer's customer.

3.3  Product Liability .  Seller will defend, hold harmless, and indemnify Buyer from and against any liability and expenses (including, without limitation, attorney and other professional fees and disbursements) arising from or in connection with any third party claims or demands to recover for personal injury or death, property damage or economic loss caused by any of the goods or services supplied by Seller (regardless of whether such claim or demand arises under contract, negligence, contract, warranty, strict liability or other legal theories), except to the extent such injury, damage or loss results from Buyer's specifications as to design or materials or from alteration or improper repair, maintenance or installation by any party other than Seller.

## 1.  COMPLIANCE WITH LAWS

Seller, and any goods or services supplied by Seller, will comply with all applicable laws, rules, regulations, orders, conventions, ordinances and standards of the country(ies) of origin and destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety.  Neither Seller nor any of its subcontractors will utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or services under this contract.  Upon Buyer's request, Seller will certify in writing its compliance with the foregoing.  Seller will defend, hold harmless and indemnify Buyer from and against any liability, claims, demands, damages or expenses (including reasonable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with this Article.

1.  INSURANCE

- 5 -

Revised June 24, 1999

Seller will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers
reasonably acceptable to Buyer.    With respect to any such insurance coverage, Seller will furnish to Buyer either a
certificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies
of all insurance policies within ten (10) days after Buyer requests.  The certificate must provide that Buyer will receive
thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage.
The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's
obligations or liabilities under this Contract.

## 16. SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and
equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required
for the production of the products covered by this Contract ("Seller's Equipment").  Seller will insure Seller's Equipment
with fire and extended coverage insurance for its full replacement value.  Seller grants Buyer an irrevocable option to take
possession of, and title to, all or part of Seller's Equipment that is specially designed or outfitted for the production of the
goods covered by this Contract upon payment to Seller of the net book value of such Seller's Equipment less any amounts
that Buyer has previously paid to Seller for the cost of such Seller's Equipment.  This option will not apply to the extent
that Seller's Equipment is used to produce goods that are the standard stock of Seller or if a substantial quantity of like
goods are being sold by Seller to others.  Buyer's right to exercise this option is not conditioned on Seller's breach or
Buyer's termination of this Contract or upon payment of any other amounts due under this Contract.

## 17. BUYER'S PROPERTY

17.1  Bailment of Property.  All supplies, materials, tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment and
other items Buyer furnishes, either directly or indirectly, to Seller, or for which Buyer gives consideration to Seller in
whole or in part ("Buyer's Property"), will be and remain the property of Buyer and be held by Seller on a bailment basis.
T     : extent that this Contract provides that Buyer will reimburse Seller for any specific items of Buyer's Property (such
as tooling), Seller will purchase and pay for such Buyer's Property as agent of Buyer.  To the extent that this Contract
provides that Seller will obtain any specific items of Buyer's Property (such as tooling) without separate or additional
payment or reimbursement by Seller, Seller acknowledges and agrees that Buyer's issuance of this Contract is good and
sufficient consideration for such Buyer's Property and that title to such Buyer's Property shall vest immediately in Buyer
and be held by Seller pursuant to this Article.  Seller shall assign to Buyer any contract rights or claims in which Seller
has an interest with respect to Buyer's Property.  Seller shall also execute (i) any bills of sale or other documents of
conveyance Buyer requests to evidence the transfer to Buyer of title to any Buyer's Property, related contract rights and
claims and (ii) any financing statements or other documents Buyer requests to evidence Buyer's ownership of Buyer's
Property.  Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer
immediately upon attachment to or incorporation into Buyer's Property.  Seller will not sell, lend, rent, encumber, pledge,
lease, transfer or otherwise dispose of Buyer's Property.  Furthermore, Seller will not assert, or permit any person
claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property.  When
permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property
or work performed on such property or otherwise.  Goods manufactured based on Buyer's drawings and/or specifications
may not be used for Seller's own use or sold to third parties without Buyer's express written authorization.

17.2  Seller's Duties with Respect to Buyer's Property.  While Buyer's Property is in Seller's possession and until Seller
delivers Buyer's Property back to Buyer, Seller bears the risk of loss and damage to Buyer's Property.  Seller will be
responsible for the cost of repairing or replacing Buyer's Property if it is damaged or destroyed regardless of cause or
fault.  Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's
own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be
personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not
commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from
Seller's premises without Buyer's written approval, and (g) use Buyer's Property in compliance with Buyer's or the
manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations.  Buyer

- 6 -

Revised June 24, 1999

will have the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with ...ect thereto.

**17.3** Return of Buyer's Property. Seller agrees that Buyer has the right, at any time and from time to time, with or without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property. Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the right to enter Seller's premises and take possession of any and all of Buyer's Property. Upon Buyer's request and in accordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by Seller, either (i) Ex Works (Incoterms 1990) at Seller's plant properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates, in which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates. If Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or without legal process, and take immediate possession of Buyer's Property.

**17.4** Disclaimer of Warranties. Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's Property nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's benefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF BUYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. Buyer will not be liable to Seller for any loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including, without limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of service or for any loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory damages, profits or any other indirect, special or consequential damages.

**17.** Development, Engineering And Consulting Services. Engineering, consulting or development services ("Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of authorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole property of Buyer. Seller agrees to assign all right, title and interest in and to IP that results from Development Services "Developed IP") to Buyer. Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every reasonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional locuments reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse Seller for reasonable costs incurred by Seller in providing such assistance.

## 8. SERVICE AND REPLACEMENT PARTS

During the term of this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and replacement parts requirements to Buyer's customers at the then current production price(s) under this Contract. If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module at price(s) that will not, in the aggregate, exceed the price of the system or module less assembly costs. If this Contract is in effect at the end of the vehicle production program into which the goods covered by the Contract are incorporated, Seller will also sell goods to Buyer to fulfill Buyer's and its customers' service and replacement parts requirements during the fifteen (15) year period following the end of such vehicle production program (the "Post-Production Period"), and this Contract will automatically remain in effect during the entire Post-Production Period. During the first three (3) years of the Post-Production Period, the price(s) for such goods will be the production price(s) which were in effect at the commencement of the post-Production Period. For the remainder of the Post-Production Period, the price(s) for such service goods will be as reasonably agreed to by the parties. If requested by Buyer, Seller will also make service literature and other materials available at no additional charge to support Buyer's service activities.

**9.** REMEDIES

-7-

Revised June 24, 1999

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity.

## 20. CUSTOMS AND EXPORT CONTROLS

Credits or benefits resulting or arising from this Contract, including trade credits, export credits or the refund of duties, taxes or fees, belong to Buyer. - Seller will provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive these benefits or credits, and to fulfill any customs related obligations, origin marking or labeling requirements and local content origin requirements. Seller will obtain all export licenses or authorizations necessary for the export of the goods unless otherwise indicated in this Contract, in which event Seller will provide all information as may be necessary to enable Buyer to obtain such licensees or authorization(s). Seller will make all arrangements that are necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

## 21. SETOFF AND RECOVERY

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or Buyer's affiliates, Buyer may (i) setoff such obligations against any sums owing to Seller or Seller's affiliates and/or (ii) recoup such obligations from any amounts paid to Seller or Seller's affiliates by Buyer or Buyer's affiliates.

## 22. NO ADVERTISING

Seller will not, in any manner, advertise or publish that Seller has contracted to furnish Buyer the goods or services covered by this Contract or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials unless Buyer consents in writing.

## 23. NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any provision of this Contract will not affect the right to require such performance at any later time, nor will the waiver by either party of a breach of any provision of this Contract constitute a waiver of any succeeding breach of the same or any other provision. No course of dealing or course of performance may be used to evidence a waiver or limitation of Seller's obligations under this Contract.

## 24. ASSIGNMENT

Buyer may assign its rights and obligations under this Contract without Seller's prior written consent.  Seller may not assign or delegate its rights or obligations under this Contract without Buyer's prior written consent.

## 25. RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties.  Nothing in this Contract makes either party the agent or legal representative of the other for any purpose whatsoever, nor grants either party any authority to assume or create any obligation on behalf of or in the name of the other party.

## 26. GOVERNING LAW AND JURISDICTION

This Contract is to be construed according to the laws of the country (and state or province, if applicable) from which this Contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law.

- 8 -

Revised June 24, 1999

Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over or or, at Buyer's option, in the court(s) having jurisdiction over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures. Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this Contract is issued.

## 27. SEVERABILITY

If any provision of this Contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Contract will remain in full force and effect.

## 28. RIGHT TO AUDIT AND INSPECT

Buyer, at its expense, has the right to audit and review all relevant books, records, payroll data, receipts and other documents, including Seller's administrative and accounting policies, guidelines, practices and procedures, in order to substantiate any charges and other matters under this Contract. Seller will maintain and preserve all such documents for a period of four (4) years following final payment under this Contract. In addition, Buyer has the right to inspect all inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges, and other items related to Seller's performance of this Contract. Seller will provide Buyer with reasonable access to its facilities and otherwise cooperate and facilitate any such audits or inspections by Buyer.

## 29. ENTIRE AGREEMENT

This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written contract amendment issued by Buyer. Notwithstanding anything to the contrary contained herein, Buyer explicitly reserves, and this Contract will not constitute a waiver or release of, any rights and claims against Seller arising out of, or relating to, any fraud or duress in connection with the formation of this Contract or any breach or anticipatory breach of any previously existing contract between Buyer and Seller (whether or not such previously existing contract related to the same or similar goods or subject matter as this Contract). All payments by Buyer to Seller under this Contract are without prejudice to Buyer's claims, rights, or remedies.

-9-

# EXHIBIT "D"

# DELPHI

memo

Date:     February 26, 2003   *JAN 9*

To:       Andy Raines            SouthTrust Bank

From:     Larry Graves

Subject:  Delphi-P Support of Lextron

c:        Sidney Johnson
          Greg Naylor
          Martha Everett

As a follow up your conversation with Greg Naylor and Martha Everett, I am writing you this memo to re-iterate Delphi Packard's (Delphi-P) focus to maintain Lextron Corporation as a supplier. We have resources to assist Lextron, including a reduction in our payment terms to Net 15, during its cash flow shortfall.

Delphi-P is currently extending the equivalent of MNS2 credit terms (very favorable credit terms) for the material that Lextron purchases from Delphi-P. We take our payment via a contra rather than receiving a check from Lextron. Lextron and your bank have asked Delphi-P to stop the contra method and change to accepting check payments from Lextron. Delphi-P will continue to send invoices and will allow Lextron to reconcile the contra amount prior to the contra being taken. Delphi-P understands that need for accurate fiscal review and accountability at Lextron, and will support their desire to achieve that relative to this business situation. Delphi-P is not considering limiting its right to set offs.

Additionally, because of Delphi-P's support and interest in Lextron, Delphi-P is requesting SouthTrust Bank to continue its support of Lextron. If you have any questions please contact Greg Naylor or me.

Regards,

Larry W. Graves
North America Purchasing Director
Delphi Packard Electric Systems

# EXHIBIT "E"

# DELPHI

February 27, 2003

Mr. Charles Doty
President and CEO
Lextron Corporation
P.O. Box 23971
Jackson, Mississippi 39225-3971

Dear Mr. Doty,

As you are aware, Delphi Automotive Systems LLC, by and through its Delphi Safety & Interior Systems Division, ("Delphi") has issued three (3) Long Term Contracts (the "Contracts") to Lextron Corporation ("Lextron") for the manufacture and supply of a variety of wire harness and other component assemblies for use in the automotive industry (the "Products").

Each of those Contracts incorporates Delphi's General Terms and Conditions and provides that those General Terms and Conditions are cumulative with the terms and conditions contained in the Contracts.  Section 9 of Delphi's General Terms and Conditions states as follows:

> Buyer may immediately terminate this Contract without liability to Seller in any of the following or any similar events ... (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract.

As you know, in recent months, Lextron has required a number of financial and contract accommodations from Delphi in order to continue operations.  Regrettably, the necessity of accommodations from Delphi forces us to terminate the Contracts and exit Lextron.  This is a difficult but necessary decision to ensure the continued and uninterrupted supply of Products. As I am sure you appreciate, the consequences of not delivering the Products to our customers are enormous and a situation we must avoid.

Sincerely,

DELPHI AUTOMOTIVE SYSTEMS LLC
Delphi Safety & Interior Systems Division

Ann Macrino
Electrical Commodity Manager, Delphi Safety & Interiors

cc:   Karen Craft, Delphi Legal Staff
      Joseph Papelian, Delphi Legal Staff
      Martha Everett, Delphi Supplier Risk Management
      Michelle E. Joseph, Buyer, Delphi Safety & Interiors
      Karen McClain, Purchasing Director, Delphi Safety & Interiors
      Albeno Castilla, Counsel to Lextron Corporation

World Headquarters and Customer Center

# 9524

FORM B10 (Official Form 10) (04/04)

| UNITED STATES BANKRUPTCY COURT __SOUTHERN__ DISTRICT OF __NEW YORK__ | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>**Delphi Corporation** | Case Number<br>**05-44481** | Master Code:<br>**10385460** |
|---|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property):

**Lextron Corporation**

Name and address where notices should be sent:
**Craig M. Geno, Esq.**
**Melanie T. Vardaman, Esq.**
**Harris & Geno, PLLC**
**PO Box 3380, Ridgeland, MS  39158-33**
Telephone number: **601-427-0048**

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☒ Check box if the address differs from the address on the envelope sent to you by the court.

Claim #09524
USBC SDNY
Delphi Corporation, et al.
05-44481 (RDD)

**Received**
**JUL 18 2006**
THIS SPACE IS FOR COURT USE ONLY
Kurtzman Carson

Account or other number by which creditor identifies debtor:

Check here ☐ replaces  ☐ amends    a previously filed claim, dated:_____
if this claim

**1. Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☒ Other    **Contract Dispute**

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (fill out below)
  Last four digits of SS #: _____
  Unpaid compensation for services performed
  from _____ to _____
  (date)      (date)

| **2. Date debt was incurred:**<br>**October 2002** | **3. If court judgment, date obtained:**<br>**N/A** |
|---|---|

**4. Total Amount of Claim at Time Case Filed:** $ **800,000.00 actual, compensatory damages plus incidental and punitive damages be determined.**    (unsecured)    (secured)    (priority)    (Total)

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate    ☐ Motor Vehicle
☐ Other _____

Value of Collateral: $ _____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $ _____

**6. Unsecured Nonpriority Claim** $ **800,000.00**

☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim

Amount entitled to priority $ _____
Specify the priority of the claim:
- ☐ Wages, salaries, or commissions (up to $4,925),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
- ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
- ☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
- ☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties owed to governmental units-11 U.S.C. § 507(a)(8).
- ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim

THIS SPACE IS FOR COURT USE ONLY

RECEIVED
JUL 1 8 2006
CLAIMS PROCESSING CENTER
USBC, SDNY

| Date<br>**7/13/06** | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): *Melanie T. Vardaman*<br>*Melanie T. Vardaman, Esq.  attorney for Lextron Corporation* |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment



0544481060714000000000025

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D
SEP - 7 2004
J. T. NOBLIN, CLERK
BY_____ DEPUTY

DELPHI AUTOMOTIVE SYSTEMS, LLC,

       Plaintiff

v.

                              CIVIL ACTION NO. 3:03CV335WS

LEXTRON CORPORATION,

       Defendant

RECEIVED
APR 0 8 2006
BY:_____

## ANSWER AND COUNTERCLAIM OF LEXTRON CORPORATION

Lextron Corporation ("Lextron") files this Answer and Counterclaim in response to the

Complaint filed by Delphi Automotive Systems, LLC ("Plaintiff") as follows:

### AFFIRMATIVE DEFENSES

### Affirmative Defense No. 1

This action is or should be stayed by operation of 11 U.S.C. § 362, due to Lextron's

Chapter 11 bankruptcy filing in the United States Bankruptcy Court for the Southern District of

Mississippi ("the Bankruptcy Court") on February 12, 2004.  Delphi has never sought relief from

the automatic stay; nor has it ever been a party to any motion seeking relief from the automatic

stay; nor has this action ever been the subject of an order granting any form of relief from the

automatic stay.  Lextron is reserved of its right to seek relief from the Bankruptcy Court to

impose the stay as to this proceeding, and to seek any damages that may be warranted under the

circumstances.

1558851.1/08173.15316

### Affirmative Defense No. 2

Plaintiff's request for relief is barred or diminished by operation of one or more of the following doctrines: waiver, estoppel, ratification, and/or laches.

### Affirmative Defense No. 3

Plaintiff's request for relief is barred by principles of equity, including but not limited to, unclean hands and unjust enrichment.

### Affirmative Defense No. 4

Plaintiff's request for relief is barred or diminished as a result of its failure to abide by the covenant of good faith and fair dealing inherent in every contract to be performed in Mississippi.

### Affirmative Defense No. 5

Plaintiff's putative claims should be barred or diminished due to its failure to mitigate.

### Affirmative Defense No. 6

Plaintiff's putative claims are subject to setoff and/or recoupment, which are specifically reserved and asserted.

### Affirmative Defense No. 7

Plaintiff's putative claims are subject to treatment in a plan of reorganization to be confirmed by the Bankruptcy Court in Lextron's Chapter 11 case, and the terms of such plan will control and supersede any judgment that might be obtained by Plaintiff, without regard to any judgment obtained by Lextron in it counterclaim.

### Affirmative Defense No. 8

Plaintiff has failed to join a necessary or indispensable party, or necessary or indispensable parties, or a party or parties needed for just adjudication, and should be required to join such party or parties pursuant to Rules 17 and 19 of the Federal Rules of Civil Procedure.

### Affirmative Defense No. 9

Plaintiff's claim for replevin of bailed property is moot, as is its request for damages for wrongful detention, due to Lextron's agreement to relinquish the equipment made the subject of the replevin count, and the Agreed Order Granting Motion for Writ of Replevin ("the Replevin Order") entered by this Court on March 5, 2003.  Lextron is reserved of its right to seek damages from Plaintiff for wrongful removal of equipment belonging to Lextron.

### Affirmative Defense No. 10

Plaintiff cannot recover on its putative claims because it is not the real party in interest for purposes of this action, and/or because it lacks standing to pursue putative causes of action belonging to other legally distinct entities.  In addition, any attempt by Plaintiff to assign its putative claims to other entities, or to add other entities as Plaintiffs at this stage of the litigation is barred by operation of 11 U.S.C. § 362.

### Affirmative Defense No. 11

Plaintiff's contract claims are barred by one or more of the following: lack of mutuality of obligation; lack of consideration; failure of consideration; duress; impossibility; and failure of conditions precedent and/or conditions subsequent.

## ANSWERS TO NUMBERED PARAGRAPHS OF COMPLAINT

And now, addressing Plaintiff's Complaint, paragraph by numbered paragraph, Lextron answers as follows:

1.    Lextron is without knowledge or information sufficient to form a belief as to the truth of paragraph 1.

2.    Admitted.

3.    Denied.

4.      Admitted as to venue, without admitting jurisdiction.  Denied as to allegations
regarding Delphi's replevin claim, due to entry of the Replevin Order.

5.      Admitted.

6.      Admitted that Plaintiff and Lextron entered into various Contracts, and admitted
that the Contracts speak for themselves.  Denied as to any contrary interpretation.  Further
admitted that Lextron entered into contracts with other legally distinct Delphi entities.  All other
allegations not admitted herein are denied.

7.      Admitted that Lextron performed work for Delphi Packard Electric Systems
Division pursuant to the General Terms and Conditions, which speak for themselves.  Denied as
to any contrary interpretation or legal effect.

8.      Admitted that Lextron performed work for Delphi Safety & Interior Division
pursuant to the General Terms and Conditions, as amended from time to time, which speak for
themselves.  Denied as to any contrary interpretation or legal effect.

9.      Admitted.

10.      Admitted that the Contracts speak for themselves.  Denied as to any contrary
interpretation or legal effect.

11.      Admitted that the contractual language speaks for itself.  Denied as to any
contrary interpretations or legal effect.

12.      Admitted that the contractual language speaks for itself.  Denied as to any
contrary interpretations or legal effect.

13.      Admitted that Plaintiff transmitted letters terminating the relationship between
Plaintiff and Lextron, without admitting to the validity or legal effect of the letters, and admitted

that copies are attached to the Complaint. Admitted that the letters speak for themselves, and denied as to any contrary interpretation or legal effect.

14.   Admitted that Charles Doty ("Mr. Doty") and Sidney Johnson ("Mr. Johnson") engaged in a telephone conversation on February 28, 2003. Admitted that Mr. Doty conditionally agreed to give Delphi access to the Lextron premises, subject to certain terms and conditions to be met by Delphi, and subject to further consideration of the rights and obligations of the parties. All other allegations not admitted herein are denied.

15.   Admitted that Mr. Doty conditionally agreed to give Delphi access to the Lextron premises, subject to certain terms and conditions to be met by Delphi, and subject to further consideration of the rights and obligations of the parties. All other allegations not admitted herein are denied.

16.   Denied that Lextron owed a balance to Plaintiff, denied that Lextron had failed to meet its contract obligations to Plaintiff in January, 2003, and denied that Lextron was in breach of its contract with Plaintiff. Admitted that Plaintiff extended certain accommodations to Lextron as an inducement for Lextron to continue working for Plaintiff. Admitted that Lextron was out of formula on a loan from SouthTrust, and admitted that the loan documents speak for themselves. Denied as to any contrary interpretation. Admitted that Lextron was in arrears with respect to certain payroll taxes assessed for 2002, but denied as to the amount asserted by Delphi. Denied that Lextron failed to maintain adequate accounting controls. All other allegations not admitted herein are denied.

17.   Denied to Delphi's claim as to the purpose of the document attached as Exhibit 3A to the Complaint. Denied that Plaintiff had no obligation to pay Lextron in connection with

terminating the contract. Otherwise, admitted, subject to resolution of the replevin counts, as contained in the Replevin Order.

18.   The allegations of paragraph 18 are moot based on the Replevin Order, and therefore denied.

19.   Denied.

20.   Admitted that Plaintiff incorporates all prior allegations of the Complaint. Lextron incorporates all prior enumerated answers. Denied as to content and legal effect.

21.   The allegations of paragraph 21 are moot based on the Replevin Order, and therefore denied.

22.   The allegations of paragraph 22 are moot based on the Replevin Order, and therefore denied.

23.   The allegations of paragraph 23 are moot based on the Replevin Order, and therefore denied.

24.   Admitted that Plaintiff incorporates all prior allegations of the Complaint. Lextron incorporates all prior enumerated answers. Denied as to content and legal effect.

25.   The allegations of paragraph 25 are moot based on the Replevin Order, and therefore denied.

26.   The allegations of paragraph 26 are moot based on the Replevin Order, and therefore denied.

27.   Admitted that Plaintiff incorporates all prior allegations of the Complaint. Lextron incorporates all prior enumerated answers. Denied as to content and legal effect.

28.   Admitted that the Court has the power to issue a declaratory judgment. Denied as to any contrary interpretation.

29.    Admitted that Plaintiff is requesting a declaratory judgment.  Denied that it is entitled to the judgment requested.

30.    Admitted that Plaintiff incorporates all prior allegations of the Complaint.  Lextron incorporates all prior enumerated answers.  Denied as to content and legal effect.

31.    Denied.

32.    Denied.

33.    Denied.  Lextron further denies that Delphi is entitled to any of the relief in the unnumbered *ad damnum* paragraph beginning "WHEREFORE. . . ."  All other allegations of the Complaint not specifically admitted herein are denied.

WHEREFORE, PREMISES CONSIDERED, Lextron Corporation requests that a judgment of dismissal be entered in its favor as to all counts of Plaintiff's Complaint not previously adjudicated.  Lextron requests all other relief appropriate in the premises.

## COUNTERCLAIM

Lextron files this Counterclaim pursuant to F.R.C.P. 13, as follows:

### I. Parties

1.    Counterclaimant Lextron Corporation ("Lextron") is a Mississippi Corporation with its principal place of business located in the City of Jackson, Hinds County, Mississippi.

2.    Counterdefendant Delphi Automotive Systems, LLC ("Delphi") is a Delaware limited liability company doing business in the state of Mississippi.

### II. Facts

3.    At the inception of their joint venture, Delphi advised Lextron ("Lextron") and certain of its affiliates that it wanted to work with Lextron to manufacture significant amounts of auto components for use by Delphi. Delphi advised Lextron and Doty that the volume of business Delphi would make available to Lextron as part of the joint venture was such that

Lextron would have to significantly expand its physical plant. Delphi further promised Lextron

and Doty that it would use its "best efforts" to cause the venture to be a success, as Delphi

represented to Lextron that it would cause Lextron's cost of producing products for Delphi to be

as low as possible and its production facilities to be as efficient as possible.

4.    In reliance on Delphi's representations and promises, Lextron acquired at

considerable expense a manufacturing facility, and after consultation, inspection and direction by

Delphi, renovated that facility at even greater expense so as to accommodate Delphi's

manufacturing requirements, all in compliance with Delphi's demand that the facility be

dedicated to manufacturing for Delphi alone (hereinafter sometimes "the Delphi dedicated

facility").

5.    Delphi, at all times relevant herein, represented to Lextron and Doty that Delphi

would provide necessary economic and technical support, guidance and assistance to Lextron,

and, through their combined efforts, Lextron would be a major Delphi supply partner.

6.    Subsequently, Delphi failed to, and intentionally refused to increase the volume

of Delphi manufacturing business as promised, failed to grant modest and reasonable price

increases despite repeated requests from Lextron, and otherwise failed to use its "best efforts" to

cause the joint venture to be a success. In fact, Delphi refused to implement Lextron requested

cost reductions and production efficiencies. As a consequence of Delphi's acts, omissions

and misrepresentations, by late 2002, Lextron had serious financial difficulties.

7.    Despite Lextron's financial difficulties, Delphi continued to assure Lextron that it

was and would continue to work in Lextron's best interest to cause Lextron to be profitable,

specifically and expressly agreeing by written Contract to use its, Delphi's, "best efforts" to

cause Lextron's costs to be as low as possible and its production facilities and efficiencies to

be as high as possible *(see* Contracts dated October 31, 2002, October 8, 2002 and September 5, 2002 attached hereto as Exhibits A, B and C).

8.     Shortly thereafter, Delphi reassured Lextron's lender, Southtrust Bank, and Doty, that Delphi had an interest in the Lextron venture and was committed to support of it. Delphi reaffirmed its commitment to support Lextron in a letter to Southtrust Bank dated January 9, 2003, a copy of which is attached as Exhibit D. In reliance on Delphi's promises as aforesaid, Lextron committed to incur additional indebtedness from Southtrust Bank in the amount of $800,000.00, and Charles Doty was induced, in reliance on Delphi's promises, to execute a personal guaranty of that debt.

9.     Lextron had earlier incurred substantial indebtedness from Southtrust Bank (guaranteed by Lextron CEO Charles Doty) in reliance on Delphi's promises to support and grow Lextron economically and technologically.

10.     In late February 2003, shortly after Delphi's written assurances of its commitment to the Lextron venture's success (by assuring Lextron that whatever means were necessary to reduce Lextron's costs and increase its efficiencies would be undertaken by Delphi), and just after Delphi confirmed its interest in and obligation to support Lextron, Delphi abruptly and unilaterally breached its agreements and duties by reneging on its commitment to the Lextron venture and by terminating all Contracts between Delphi and Lextron then in existence, including three (3) new contracts (hereinafter referred to as the "Three New Contracts") which had recently (within the last few months) been awarded.

11.     Delphi represented to Doty and Lextron that the basis for termination of its commitments was a provision in a document entitled "General Terms and Conditions" which reads as follows:

Buyer [Delphi] may immediately terminate this contract
without liability to Seller [Lextron] in any of the following or
any similar events:... (f) any accommodation by Buyer, financial
or otherwise, not contemplated by this contract, that are
necessary for Seller to meet its obligations under this contract
[emphasis added].

*See* Letter dated February 27, 2003, from Delphi to Lextron attached as Exhibit E.

12.    Delphi's termination of the joint venture and of the three then existing

production agreements was knowingly without any lawful basis since, among other things, (a)

the provision referenced above on which the termination was purportedly based has no

application to Delphi's commitment to the success of the Lextron joint venture, and (b) with

respect to the "Three New Contracts" in particular, because they specifically require Delphi

to assist and work with Lextron by using its "best efforts." Because the accommodation provision

in subsection (f) of the General Terms and Conditions document has no application, it

therefore could not be relied upon as a basis for termination.

13.    Delphi schemed throughout the Lextron venture to make Lextron dependent on it

under the guise that Delphi would use its massive know-how and resources to insure the success

of Lextron's Delphi manufacturing business. Yet, Delphi actually acted to drive Lextron into

debt and then unilaterally and wrongfully terminated their relationship and its obligations to

support Lextron. Among the wrongful conduct in which Delphi engaged, in addition to the

aforedescribed, was Delphi's refusal to honor its commitment which it stated repeatedly, to

significantly increase Lextron's volume of business so as to utilize all, or substantially all,

of the Delphi dedicated facility; Delphi's refusal to adjust Lextron's pricing model so as to

enable Lextron to make a profit from the joint venture; Delphi's refusal to pay Lextron for

commodities at the same higher price paid by Delphi to Lextron's competitors within the

State of Mississippi; Delphi's refusal to allow Lextron to reduce its costs, including

10

lead wire cost; Delphi's misrepresentation of its intent with regard to the retention of

consultants who were represented to be working for the benefit of Lextron while, in reality,

they were used by Delphi to obtain information regarding Lextron and its prospective non-

Delphi related business ventures and to otherwise sabotage the Lextron-Delphi joint

venture; and Delphi's assurances to Lextron and Doty that in the event Lextron incurred

indebtedness in pursuit of the Delphi venture, Delphi would support Lextron

economically and technologically to ensure its success. As a part of Lextron's effort to

restructure its business, Delphi urged, through BBK, Ltd., that Lextron shut down all non-

Delphi business activity.

14.    As set forth more fully below, the foregoing acts, omissions and

misrepresentations were intentional and reckless and have severely damaged Lextron and Doty.

## COUNT ONE

### BREACH OF JOINT VENTURE AGREEMENT

15.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual

allegations.

16.    Delphi's acts, omissions and misrepresentations as set forth herein constitute a

breach of the Delphi agreements to act jointly with Lextron (and Charles Doty) to create a

profitable Delphi dedicated manufacturing facility.

17.    Lextron is therefore entitled to damages as a consequence of the aforesaid acts,

omissions and misrepresentations as more fully set forth below.

## COUNT TWO

### BREACH OF CONTRACTS

18.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual

allegations.

19.    Such acts, omissions and misrepresentations constitute a breach of the Lextron-Delphi contracts, including the "Three New Contracts."

20.    Defendant Lextron is entitled to damages as a consequence of the aforesaid contractual breaches as more fully set forth below.

21.    In addition, Lextron is entitled to contractual and damages from Delphi as a result of improperly applied credits, and the failure of Delphi to either pay Lextron or credit it for products assembled and shipped to Delphi.

22.    Specifically, and in contrast to Delphi's claim that Lextron owes certain sums for allegedly breaching the supply contract, Delphi in fact owes Lextron the net amount of $461,197.16 for products assembled and shipped to Delphi, and for which Delphi never paid or properly credited Lextron.

### COUNT THREE

### INTENTIONAL MISREPRESENTATION

23.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

24.    Such misrepresentations were intentional and were relied upon by Lextron in acquiring and renovating a dedicated Delphi facility; incurring substantial indebtedness (including the $800,000.00 Southtrust indebtedness noted in Paragraph No. 8 of this Counterclaim); expending funds to travel to Michigan to meet with Delphi when Delphi had already decided to break its contract with Lextron; making significant investments in capital equipment which had functional and economic usefulness only in the production of Delphi products; devoting scarce and valuable resources to working with Delphi's consultants and agents; and diverting Lextron's attention from other business opportunities.

25.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT FOUR

### NEGLIGENT MISREPRESENTATION

26.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

27.    Such misrepresentations were relied by Lextron in acquiring and renovating the Delphi dedicated facility; incurring indebtedness (including the additional $800,000.00 Southtrust indebtedness noted in Paragraph No. 8 of this Counterclaim); expending funds to travel to Michigan to meet with Delphi when Delphi had already decided to break its contract with Lextron; making significant investments in capital equipment which had functional and economic usefulness only in the production of Delphi products; devoting scarce and valuable resources to working with Delphi's consultants and agents; and diverting Lextron's and Doty's attention from other business opportunities.

28.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT FIVE

### TORTIOUS INTERFERENCE WITH CONTRACT

29.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

30.    Delphi's conduct in unilaterally, intentionally, wrongfully and recklessly terminating the joint venture and aforementioned contracts and in breaching those agreements tortiously interfered with (and was intended to interfere with) Lextron's contracts with Southtrust Bank, other creditors, and with other existing and potential business pursuits.

1559851.1/08173.15318

13

31.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT SIX

### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

32.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

33.    Such acts, omissions and misrepresentations, as set forth herein were willful, malicious and undertaken in bad faith, and thus constituted a breach of the duty of good faith and fair dealing implied in all contracts.

34.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT SEVEN

### UNFAIR TRADE PRACTICES

35.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

36.    The foregoing acts, omissions and misrepresentations constitute unfair trade practices, including, but not limited to, Delphi's practice of paying more for commodities purchased from Lextron competitors than for those same products purchased from Lextron, in violation of Miss. Code Ann. 75-21-3, and other applicable state statutes.

37.    Defendant Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT EIGHT

### INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

38.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

39.    Such acts, omissions and misrepresentations interfered with Lextron's prospective business relations with other parties. Delphi intentionally committed such acts, including the wrongful termination of the joint venture and the aforementioned contracts to cause Lextron to be unable to consummate such other prospective business.

40.    Defendants are entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

### COUNT NINE

### BREACH OF FIDUCIARY DUTY

41.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

42.    As a consequence of the long-standing course of dealing, representations and promises of Delphi and the joint venture arrangement of the parties, Delphi owed Lextron a fiduciary duty, which Delphi breached by the foregoing acts, omissions and misrepresentations.

43.    The foregoing breach of fiduciary duties entitles Defendants to damages as set forth below.

### COUNT TEN

### FRAUD

44.    Lextron and Doty incorporate herein, as if fully set forth, all of the foregoing factual allegations.

45.    Delphi knowingly made the foregoing representations and promises with the knowledge that they were false or with reckless disregard for their truth and intending for and inducing Lextron to rely thereon all to Lextron's extreme detriment. Under the circumstances of the parties' unique, fiduciary, and special relationship, Lextron at all times pertinent hereto, was entitled to rely on the Delphi representations.

46.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT ELEVEN

### SUPPRESSION OF MATERIAL FACTS

47.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

48.    Delphi suppressed its true intentions while misrepresenting to Lextron its interest in and support of Lextron, all to the extreme detriment of Lextron.

49.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT TWELVE

### CONVERSION

50.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

51.    Despite specific concerns raised by Lextron with respect to the property by Delphi in its count for replevin, and despite assurances by Delphi that it would remove only equipment owned by it, on March 10, 2003, Delphi removed items of equipment belonging to Lextron, and in which Delphi had no interest.

1558651.008173.15318

16

52. The equipment wrongfully converted by Delphi is listed as follows:

| | |
|---|---|
| Front Door Harness: | Serial # 16643688 |
| Front Door Harness: | Serial # 16643690 |
| Backdoor Harness: | Serial # 1544-7743 |
| Backdoor Harness: | Serial # 1544-7744 |
| Steering Column Harness: | Serial # 16870022 |

53. Delphi's removal of these items of equipment was in direct violation of the Agreed Order entered into by and between Delphi and Lextron, and filed of record in this Court, which authorized Delphi to remove only those items of equipment belonging to it.

54. Delphi's removal and continued detention of these items was deliberate and intentional, and was performed in furtherance of its calculated business decision to ruin Lextron.

55. In the alternative, Delphi's removal and continued detention of these items was the product of gross negligence, mismanagement, and lack of oversight as to amount to an intentional tort.

56. Delphi is therefore liable to Lextron for actual, compensatory, incidental, and punitive damages as a result of its willful or grossly negligent acts of conversion of Lextron's property, all in violation of an Order of this Court.

WHEREFORE, PREMISES CONSIDERED, Lextron Corporation demands judgment against Delphi Automotive Systems, LLC, including all of its divisions and affiliates named or referred to in the Complaint filed by Delphi herein, or who may otherwise be liable to Lextron, for all actual, compensatory, incidental, and punitive damages in an amount to be determined by the jury at trial, plus all accruing pre- and post-judgment interest and costs of this action, and such other and further relief as the jury and Court deem appropriate.

Dated, this the 7th day of September, 2004.

LEXTRON CORPORATION

By: _____
Chad J. Hammons

Alveno N. Castilla, Esq. (MS Bar 5924)
Chad J. Hammons, Esq. (MS Bar #10419)
Watkins Ludlam Winter & Stennis, P.A.
633 North State Street (39202)
Post Office Box 427
Jackson, MS 39205-0427

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has this

day been placed in the United States Mail, postage prepaid, to the following:

Debra Brown, Esq.
Frank Trapp, Esq.
Phelps Dunbar
P. O. Box 23066
Jackson, MS 39225-3066

This 7th day of September, 2004.

_____
Chad J. Hammons

155825l.1/06173.15318

# EXHIBIT "A"

# DELPHI



RECEIVED
NOV 1 2002
BY:

**DELPHI CORPORATION**
**LONG TERM CONTRACT**

### 1.  Purchase of Product

Lextron Automotive ("Seller") agrees to sell, and Delphi Corporation
LLC acting through its Safety & Interior Systems Division ("Buyer")
agrees to purchase, approximately One Hundred percent (100%) of
Buyer's production and service requirements for the following products
(each referred to as a "Product" and collectively referred to as the
"Products"):

| Part Number | Description | Per Unit Price | Annual Tool Capacity |
|---|---|---|---|
| GX203842 *15447743* | 2004 DCX HB RRAB Leadwire Asm (LH) | $████ USD | ████ annually (based on maximum of 235 working days and 100 hours per week) |
| GX203843 *15447744* | 2004 DCX HB RRAB Leadwire Asm (RH) | $████ USD | ████ annually (based on maximum of 235 working days and 100 hours per week) |

### 2.  Term

With respect to each Product, the term of this Contract is from Calendar
Year 2003 through Calendar Year 2006.

### 3.  Prices

The per unit price of each Product for Calendar Year 2003 is F.O.B. Seller's
Plant, Freight Collect (2000 IncoTerms).  Pricing for each subsequent
Calendar Year is subject to the following minimum annual percentage
reductions from the prior Calendar Year's pricing:

| Part Number | % Red. | Calendar Year 2004 Pricing | % Red. | Calendar Year 2005 Pricing | % Red. | Calendar Year 2006 Pricing |
|---|---|---|---|---|---|---|
| GX203842 | 5% | $█████ | 5% | $█████ | 5% | $█████ |
| GX203843 | 5% | $█████ | 5% | $█████ | 5% | $█████ |

*15447743*
*15447744*

*ME8 (10/24/02)*

Buyer and Seller will use their best efforts to implement cost savings and
productivity improvements in order to reduce Seller's costs of supplying each
Product.  Buyer and Seller agree that the pricing of each Product will be
reduced (in addition to any scheduled price reductions) by an amount equal
to fifty percent (50%) of any net cost savings achieved by Seller with respect
to such Product (i.e., savings after recovery by Seller of a pro rata portion,
based on the remaining term of this Contract, of the reasonable and
documented costs to achieve such cost savings), provided, however, that the
pricing of each Product will be reduced (in addition to any scheduled price

reductions) by an amount equal to one hundred percent (100%) of any savings resulting from reduction on the content of the such Product.

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Seller's labor, materials, overhead and other costs. In the event that Buyer agrees to any price increases (or a decrease of any scheduled price reductions) with respect to any Product, then, notwithstanding anything to the contrary set forth in this Contract, the pricing of each Products will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any subsequent net cost savings achieved by Seller with respect to such Product until aggregate price reductions on account of Seller's cost savings equal any price increases previously agreed to by Buyer.

### 4.    Right to Purchase from Others

During the entire term of this Contract, Seller will assure that each Product remains competitive in terms of technology, design, service and quality with any similar product available to Buyer. Following Calendar Year 2003 Seller will also assure that each Product remains competitive in terms of price with any similar product available to Buyer. If, in the reasonable opinion of Buyer, a Product does not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which a similar product is more competitive. If, within ninety (90) days, Seller does not agree to immediately sell any Product with comparable technology, design, quality, or, if applicable, price, Buyer may elect to purchase any similar products available to Buyer without any liability to Seller under this Contract.

### 5.    Purchase Orders

All Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders (including related delivery releases and shipping instructions) issued by Buyer from time to time during the term of this Contract. Buyer's General Terms and Conditions, a copy of which is attached, are hereby incorporated into this Contract by reference, provided, however, that Buyer's right to "terminate for convenience" under the General Terms and Conditions will be inapplicable to this Contract until the end Calendar Year 2003. Any amendment to, or revision of, such General Terms and Conditions shall also become a part of this Contract, provided that (i) Buyer provides Seller with a copy of such revised Terms and Conditions and (ii) Seller does not object to such revised Terms and Conditions in writing within thirty (30) days after receipt. The Terms and Conditions (together with any revision made a part of this Contract) shall be construed, to the extent possible, as consistent with the terms and conditions set forth in this Contract and as cumulative, provided, however, that if such construction is unreasonable, the terms and conditions set forth in this Contract shall control.

EXECUTED by Buyer and Seller as of this ___31ST___ day of __OCTOBER__, 2002.

Buyer:                                    Seller:

**Delphi Corporation LLC**                **Lextron Automotive**
**acting through its Safety & Interior**
**Systems Division**

By: _____             By: _____
Name:  Michelle E. Joseph               Name:  Ray C. Irby
Title:   Senior Electrical Buyer        Title:   Chief Operating Officer

Page 3 of 3

# DELPHI AUTOMOTIVE SYSTEMS

## GENERAL TERMS AND CONDITIONS

*Delphi Automotive Systems seeks to exceed its customers' expectations. Delphi's suppliers are integral to achieving this objective, and Delphi hopes that its suppliers will recognize Delphi as their preferred customer. Delphi will establish high performance expectations for itself and its suppliers, measure performance and reward superior performance.*

## 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

## 2 SHIPPING AND BILLING

2.1 Shipping. Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and/or release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs. Seller will include on bills of lading or other shipping receipts the correct classification identification of the goods shipped as Buyer or the carrier requires. The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

2.2 Billing. Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer. If the payment due date is not otherwise specified in this Contract, the payment due date will be the due date established by the Multilateral Netting System (MNS-2) used by Buyer, which provides, on average, that payment will be due on the second day of the second month following the date Buyer receives the goods or services. Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

2.3 Delivery Schedules. Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract. Time is of the essence with respect to all delivery schedules Buyer establishes. Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules. Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules. If Buyer determines th the requirements of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other modification of this Contract.

-1-

Revised June 24, 1999

2. Premium Shipments. If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules using the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods using a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible. Seller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to fail to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

## SPECIFICATION, DESIGN AND SCOPE CHANGES

Buyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract, including work related to inspection, testing or quality control. While Buyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such changes. Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including Buyer's payment of reasonable costs of modifications to Seller's Equipment and Facilities (as defined in Article 5) necessary to implement such changes. In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's cost of production and the time to implement such changes. In the event of any disagreement arising out of such changes, Buyer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue performing under this Contract, including prompt implementation of changes required by Buyer, while Buyer and Seller resolve any disagreement arising out of such changes.

## QUALITY AND INSPECTION

Seller will participate in Buyer's supplier quality and development program(s) and comply with all quality requirements and procedures Buyer specifies from time to time. Seller will permit Buyer and its representatives and consultants to (i) review Seller's books and records in order to monitor Seller's compliance with this Contract and Seller's financial condition and (ii) enter Seller's facilities at reasonable times to inspect such facilities and any goods, materials and property that relate to this Contract. No such inspection by Buyer will constitute acceptance by Buyer of any work-in-process or finished goods.

## NON-CONFORMING GOODS

Buyer is not required to perform incoming inspections of any goods, and Seller waives any right to require Buyer to conduct any such inspections. Seller will not substitute any goods for the goods covered by this Contract unless Buyer consents in writing. If Buyer rejects any goods as non-conforming, Buyer may, at its option, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods, (b) require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or remedies. If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of non-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or a shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the non-conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to arrange for the shipment of any non-conforming goods back to Seller at Seller's expense. Seller will bear all risk of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by Buyer to return, store or dispose any non-conforming goods. Buyer's payment for any non-conforming goods will not constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or relieve Seller of responsibility for the non-conforming goods.

-2-

Revised June 24, 1999

**ORCE MAJEURE**

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for so long as such event or occurrence continues, provided, however, that the affected party gives written notice of such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by the quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities and at times Buyer requests and at the prices set forth in this Contract. If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without liability. Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any such disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such disruption commences.

**I. WARRANTY**

.1   General. Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services covered by this Contract will (a) conform to all applicable specifications, drawings, samples, descriptions, brochures and manuals furnished by Seller or Buyer, (b) will be merchantable, (c) of good material and workmanship, (d) free from defect, and (e) are fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

.2   Date and Time Processing. Seller warrants and guarantees to Buyer and its customers that any products (including computer hardware, software, firmware, machinery and equipment) covered by this Contract must at all times accurately process, handle, calculate, compare and sequence date and time data from, into, within and between the 20th and 21st centuries, including leap year calculations.

.3   Warranty Period. The period for each of the foregoing warranties will be that provided by applicable law, except that if Buyer ever provides a longer warranty to its customers, such longer warranty period will apply to the goods covered by this Contract.

**INGREDIENTS AND HAZARDOUS MATERIALS**

If Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all ingredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to the ingredients. Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers sufficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures and precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable

- 3 -

Revised June 24, 1999

le ˙ requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, tr... portation, processing, use or disposal of the goods, containers and packing.

## 9. INSOLVENCY OF SELLER /

Buyer may immediately terminate this Contract without liability to Seller in any of the following or any similar events: (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract. Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract, without liability to Seller at any time after execution if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract; or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing. Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under thi contract which are useable and in a merchantable condition. The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by buyer and not previously paid for, plus (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent. In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which eller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required o pay for any goods or materials that are in Seller's standard stock or that are readily marketable. Payments made under this Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination. Within sixty (60) days after the effective date of termination, eller will submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit an audit by uyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 2. TECHNICAL INFORMATION

**2.1  Exchange of Information.** Buyer and Seller will cooperate to create, maintain, update, and share technical formation about the goods, products, machinery, materials, formulations and their manufacture, use, application and ntrol in compliance with Buyer's drafting and math data standards. Such technical information will not be subject to ry use or disclosure restrictions. Accordingly, Seller agrees not to assert any claims against Buyer, its customers or their spective suppliers with respect to any technical information that Seller discloses in connection with this Contract.

**2.2  Waiver of Claims.** Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, y ˙ customers or their respective suppliers with respect to any technical information that Seller shall have disclosed n... hereafter disclose in connection with the goods or services covered by this Contract.

- 4 -

Revised June 24, 1999

1.   Repair and Rebuild.  Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and their subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment of any royalty or other compensation to Seller.

12.4  Computer Programs and Written Works.  All works of authorship, including without limitation, software, computer programs, and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing this Contract (separately or as part of any goods and components) are "works made for hire" and the sole property of Buyer.  To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller agrees to assign and assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship.

## 3.  INDEMNIFICATION

3.1  Infringement.  Seller will defend, hold harmless and indemnify Buyer and its customers, and their respective successors and assigns, against any claims of infringement (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses including, without limitation, attorney and other professional fees and disbursements) relating to the goods or services covered by this Contract, including any claims in circumstances where Seller has provided only part of the goods or services.   Seller waives any claim against Buyer that any such infringement arose out of compliance with Buyer's specifications.

3.2  Activities on Buyer's Premises.  Seller will defend, hold harmless, and indemnify Buyer from and against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other professional fees and disbursements) arising from or in connection with the performance of any service or work by Seller its employees, agents, representatives and subcontractors on Buyer's or Buyer's customer's premises or the use of the property of Buyer or any customer of Buyer, except to the extent such liability arises out of the negligence or willful misconduct of Buyer or Buyer's customer.

.3  Product Liability .  Seller will defend, hold harmless, and indemnify Buyer from and against any liability and expenses (including, without limitation, attorney and other professional fees and disbursements) arising from or in connection with any third party claims or demands to recover for personal injury or death, property damage or economic is caused by any of the goods or services supplied by Seller (regardless of whether such claim or demand arises under t, negligence, contract, warranty, strict liability or other legal theories), except to the extent such injury, damage or loss ults from Buyer's specifications as to design or materials or from alteration or improper repair, maintenance or installation any party other than Seller.

## COMPLIANCE WITH LAWS

ler, and any goods or services supplied by Seller, will comply with all applicable laws, rules, regulations, orders, ventions, ordinances and standards of the country(ies) of origin and destination or that relate to the manufacture, eling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor ction, discrimination, occupational health/safety and motor vehicle safety. Neither Seller nor any of its subcontractors l utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or services under this tract.  Upon Buyer's request, Seller will certify in writing its compliance with the foregoing. Seller will defend, hold nless and indemnify Buyer from and against any liability, claims, demands, damages or expenses (including onable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with Article.

1   JRANCE

- 5 -

Revised June 24, 1999

r will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers reasonably acceptable to Buyer. With respect to any such insurance coverage, Seller will furnish to Buyer either a certificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies of all insurance policies within ten/(10) days after Buyer requests. The certificate must provide that Buyer will receive thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's obligations or liabilities under this Contract.

## 16. SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required for the production of the products covered by this Contract ("Seller's Equipment"). Seller will insure Seller's Equipment with fire and extended coverage insurance for its full replacement value. Seller grants Buyer an irrevocable option to take possession of, and title to, all or part of Seller's Equipment that is specially designed or outfitted for the production of the goods covered by this Contract upon payment to Seller of the net book value of such Seller's Equipment less any amounts that Buyer has previously paid to Seller for the cost of such Seller's Equipment. This option will not apply to the extent that Seller's Equipment is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others. Buyer's right to exercise this option is not conditioned on Seller's breach or Buyer's termination of this Contract or upon payment of any other amounts due under this Contract.

## 17. BUYER'S PROPERTY

17.1 Bailment of Property. All supplies, materials, tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment and oth— items Buyer furnishes, either directly or indirectly, to Seller, or for which Buyer gives consideration to Seller in w  or in part ("Buyer's Property"), will be and remain the property of Buyer and be held by Seller on a bailment basis. To the extent that this Contract provides that Buyer will reimburse Seller for any specific items of Buyer's Property (such as tooling), Seller will purchase and pay for such Buyer's Property as agent of Buyer. To the extent that this Contract provides that Seller will obtain any specific items of Buyer's Property (such as tooling) without separate or additional payment or reimbursement by Seller, Seller acknowledges and agrees that Buyer's issuance of this Contract is good and sufficient consideration for such Buyer's Property and that title to such Buyer's Property shall vest immediately in Buyer and be held by Seller pursuant to this Article. Seller shall assign to Buyer any contract rights or claims in which Seller has an interest with respect to Buyer's Property. Seller shall also execute (i) any bills of sale or other documents of conveyance Buyer requests to evidence the transfer to Buyer of title to any Buyer's Property, related contract rights and claims and (ii) any financing statements or other documents Buyer requests to evidence Buyer's ownership of Buyer's Property. Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property. Seller will not sell, lend, rent, encumber, pledge, lease, transfer or otherwise dispose of Buyer's Property. Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property. When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property for work performed on such property or otherwise. Goods manufactured based on Buyer's drawings and/or specifications may not be used for Seller's own use or sold to third parties without Buyer's express written authorization.

17.2 Seller's Duties with Respect to Buyer's Property. While Buyer's Property is in Seller's possession and until Seller delivers Buyer's Property back to Buyer, Seller bears the risk of loss and damage to Buyer's Property. Seller will be responsible for the cost of repairing or replacing Buyer's Property if it is damaged or destroyed regardless of cause or fault. Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from   s premises without Buyer's written approval, and (g) use Buyer's Property in compliance with Buyer's or the manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations. Buyer

- 6 -

Revised June 24, 1999

w  ave the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with
re_,.ct thereto.

17.3  Return of Buyer's Property./ Seller agrees that Buyer has the right, at any time and from time to time, with or
without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property.
Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the
:ight to enter Seller's premises and take possession of any and all of Buyer's Property. Upon Buyer's request and in
iccordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by
Seller, either (i) Ex Works (Incoterms 1990) at Seller's plant properly packed and marked in accordance with the
equirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates,
n which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates.
f Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an
immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or
vithout legal process, and take immediate possession of Buyer's Property.

7.4  Disclaimer of Warranties.  Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's
roperty nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's
enefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT
IADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS
R IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF
UYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. Buyer will not be liable to Seller for
ry loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including,
ithout limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of
rvice or for any loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory
images, profits or any other indirect, special or consequential damages.

'.5  Development, Engineering And Consulting Services.  Engineering, consulting or development services
Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of
:thorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole
operty of Buyer. Seller agrees to assign all right, title and interest in and to IP that results from Development Services
Developed IP") to Buyer.  Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every
sonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional
cuments reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse
ller for reasonable costs incurred by Seller in providing such assistance.

. SERVICE AND REPLACEMENT PARTS

iring the term of this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and
placement parts requirements to Buyer's customers at the then current production price(s) under this
ntract. If the goods are systems or modules, Seller will sell the components or parts that comprise the
stem or module at price(s) that will not, in the aggregate, exceed the price of the system or module less
sembly costs. If this Contract is in effect at the end of the vehicle production program into which the goods
vered by the Contract are incorporated, Seller will also sell goods to Buyer to fulfill Buyer's and its
stomers' service and replacement parts requirements during the fifteen (15) year period following the end of
:h vehicle production program (the "Post-Production Period"), and this Contract will automatically remain in
ect during the entire Post-Production Period. During the first three (3) years of the Post-Production Period,
 price(s) for such goods will be the production price(s) which were in effect at the commencement of the
st-Production Period. For the remainder of the Post-Production Period, the price(s) for such service goods
' be as reasonably agreed to by the parties. If requested by Buyer, Seller will also make service literature
j other materials available at no additional charge to support Buyer's service activities.

..._MEDIES

-7-

Revised June 24, 1999

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity.

## 20. CUSTOMS AND EXPORT CONTROLS

Credits or benefits resulting or arising from this Contract, including trade credits, export credits or the refund of duties, taxes or fees, belong to Buyer. Seller will provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive these benefits or credits, and to fulfill any customs related obligations, origin marking or labeling requirements and local content origin requirements. Seller will obtain all export licenses or authorizations necessary for the export of the goods unless otherwise indicated in this Contract, in which event Seller will provide all information as may be necessary to enable Buyer to obtain such licensees or authorization(s). Seller will make all arrangements that are necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

## 21. SETOFF AND RECOVERY

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or Buyer's affiliates, Buyer may (i) setoff such obligations against any sums owing to Seller or Seller's affiliates and/or (ii) recoup such obligations from any amounts paid to Seller or Seller's affiliates by Buyer or Buyer's affiliates.

## 22. NO ADVERTISING

Seller will not, in any manner, advertise or publish that Seller has contracted to furnish Buyer the goods or services ...red by this Contract or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials ....ess Buyer consents in writing.

## 23. NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any provision of this Contract will not affect the right to require such performance at any later time, nor will the waiver by either party of a breach of any provision of this Contract constitute a waiver of any succeeding breach of the same or any other provision. No course of dealing or course of performance may be used to evidence a waiver or limitation of Seller's obligations under this Contract.

## 24. ASSIGNMENT

Buyer may assign its rights and obligations under this Contract without Seller's prior written consent. Seller may not assign or delegate its rights or obligations under this Contract without Buyer's prior written consent.

## 25. RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties. Nothing in this Contract makes either party the agent or legal representative of the other for any purpose whatsoever, nor grants either party any authority to assume or create any obligation on behalf of or in the name of the other party.

## 26. GOVERNING LAW AND JURISDICTION

...is Contract is to be construed according to the laws of the country (and state or province, if applicable) from which this ...ntract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law.

~ 8 ~

Revised June 24, 1999

action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in the court(s) having jurisdiction over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures. Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this Contract is issued.

## 27. SEVERABILITY

If any provision of this Contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Contract will remain in full force and effect.

## 28. RIGHT TO AUDIT AND INSPECT

Buyer, at its expense, has the right to audit and review all relevant books, records, payroll data, receipts and other documents, including Seller's administrative and accounting policies, guidelines, practices and procedures, in order to substantiate any charges and other matters under this Contract. Seller will maintain and preserve all such documents for a period of four (4) years following final payment under this Contract. In addition, Buyer has the right to inspect all inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges, and other items related to Seller's performance of this Contract. Seller will provide Buyer with reasonable access to its facilities and otherwise cooperate and facilitate any such audits or inspections by Buyer.

## 29. ENTIRE AGREEMENT

This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written contract amendment issued by Buyer. Notwithstanding anything to the contrary contained herein, Buyer explicitly reserves, and this Contract will not constitute a waiver or release of, any rights and claims against Seller arising out of, or relating to, any fraud or duress in connection with the formation of this Contract or any breach or anticipatory breach of any previously existing contract between Buyer and Seller (whether or not such previously existing contract related to the same or similar goods or subject matter as this Contract). All payments by Buyer to Seller under this Contract are without prejudice to Buyer's claims, rights, or remedies.

-9-

# EXHIBIT "B"

# DELPHI



RECEIVED
OCT 9 2002
BY:

**DELPHI CORPORATION
LONG TERM CONTRACT**

# FILE

## 1.    Purchase of Product

Lextron Corporation ("Seller") agrees to sell, and Delphi Corporation LLC acting through its Safety & Interior Systems Division ("Buyer") agrees to purchase, approximately One Hundred percent (100%) of Buyer's production and service requirements for the following products (each referred to as a "Product" and collectively referred to as the "Products"):

| Part Number | Description | Per Unit Price | Annual Tool Capacity |
|---|---|---|---|
| 16870022 | 2003 ½ GMT 315 Steering Wheel Wire Harness | $████ | ████(based on a maximum of 235 working days and 100 hours per week) |

## 2.    Term

With respect to each Product, the term of this Contract is from Calendar Year 2003 through Calendar Year 2007.

## 3.    Prices

The per unit price of each Product for Calendar Year 2003 is F.O.B. Seller's Plant, Freight Collect (2000 IncoTerms). Pricing for each subsequent Calendar Year is subject to the following minimum annual percentage reductions from the prior Calendar Year's pricing:

| Calendar Year 2004 | ██% or Piece Price $████ ea. |
|---|---|
| Calendar Year 2005 | 3.5% or Piece Price $████ ea. |
| Calendar Year 2006 | ██% or Piece Price $████ ea. |
| Calendar Year 2007 | ██% or Piece Price $1.24 ea. |

Buyer and Seller will use their best efforts to implement cost savings and productivity improvements in order to reduce Seller's costs of supplying each Product. Buyer and Seller agree that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to fifty percent (50%) of any net cost savings achieved by Seller with respect

to such Product (i.e., savings after recovery by Seller of a pro rata portion, based on the remaining term of this Contract, of the reasonable and documented costs to achieve such cost savings), provided, however, that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any savings resulting from reduction on the content of the such Product.

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Seller's labor, materials, overhead and other costs. In the event that Buyer agrees to any price increases (or a decrease of any scheduled price reductions) with respect to any Product, then, notwithstanding anything to the contrary set forth in this Contract, the pricing of each Products will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any subsequent net cost savings achieved by Seller with respect to such Product until aggregate price reductions on account of Seller's cost savings equal any price increases previously agreed to by Buyer.

4.    **Right to Purchase from Others**

During the entire term of this Contract, Seller will assure that each Product remains competitive in terms of technology, design, service and quality with any similar product available to Buyer. Following Calendar Year 2003 Seller will also assure that each Product remains competitive in terms of price with any similar product available to Buyer. If, in the reasonable opinion of Buyer, a Product does not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which a similar product is more competitive. If, within ninety (90) days, Seller does not agree to immediately sell any Product with comparable technology, design, quality, or, if applicable, price, Buyer may elect to purchase any similar products available to Buyer without any liability to Seller under this Contract.

5.    **Purchase Orders**

All Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders (including related delivery releases and shipping instructions) issued by Buyer from time to time during the term of this Contract. Buyer's General Terms and Conditions, a copy of which is attached, are hereby incorporated into this Contract by reference, provided, however, that Buyer's right to "terminate for convenience" under the General Terms and Conditions will be inapplicable to this Contract until the end Calendar Year 2003. Any amendment to, or revision of, such General Terms and Conditions shall also become a part of this Contract, provided that (i) Buyer provides Seller with a copy of such revised Terms and Conditions and (ii) Seller does not object to such revised Terms and Conditions in writing within thirty (30) days after receipt. The Terms and Conditions (together with any revision made a part of this Contract) shall be

construed, to the extent possible, as consistent with the terms and conditions set forth in this Contract and as cumulative, provided, however, that if such construction is unreasonable, the terms and conditions set forth in this Contract shall control.

EXECUTED by Buyer and Seller as of this ___8TH___ day of ___October___, 2002.

Buyer:                                    Seller:

Delphi Corporation LLC                    Lextron Corporation
acting through its Safety & Interior
Systems Division

By: _____              By: _____
Name:   Michelle E. Joseph                Name:   Ray C. Irby
Title:  Senior Electrical Buyer           Title:  Chief Operating Officer

# EXHIBIT "C"

# DELPHI

### DELPHI CORPORATION
### LONG TERM CONTRACT

### 1.   Purchase of Product

Lextron Automotive Technologies Corporation ("Seller") agrees to sell, and **Delphi Corporation LLC** acting through its Safety & Interior Systems Division ("Buyer") agrees to purchase, approximately <u>one hundred</u> percent (<u>100%</u>) of Buyer's production and service requirements for the following products (each referred to as a "Product" and collectively referred to as the "Products"):

| Part Number | Description | Per Unit Price | Annual Tool Capacity |
|---|---|---|---|
| 16643688 | 2004 Cami YT1 Door Hardware Module Wire Harness (Front) | $████ | ███,███/yr |
| 16643690 | 2004 Cami YT1 Door Hardware Module Wire Harness (Front) | $████ | ███,███/yr |

### 2.   Term

With respect to each Product, the term of this Contract is from **Model Year 2004** through **Model Year 2005**.

### 3.   Prices

The per unit price of each Product for **Model Year 2004** is F.O.B. Buyer's Plant, Freight Collect (2000 IncoTerms). Pricing for each subsequent Model Year is subject to the following minimum annual percentage reductions from the prior Model Year's pricing:

**Part Number 16643688**

| | | |
|---|---|---|
| Model Year 2005 | Three percent (█%) | Piece Price $████ ea. |
| Model Year 2006 | Three percent (█%) | Piece Price $████ ea. |
| Model Year 2007 | Three percent (█%) | Piece Price $████ ea. |
| Model Year 2008 | Three percent (█%) | Piece Price $████ ea. |

**Part Number 16643690**

| | | |
|---|---|---|
| Model Year 2005 | Three percent (█%) | Piece Price $████ ea. |
| Model Year 2006 | Three percent (█%) | Piece Price $████ ea. |
| Model Year 2007 | Three percent (█%) | Piece Price $████ ea. |
| Model Year 2008 | Three percent (█%) | Piece Price $████ ea. |

Buyer and Seller will use their best efforts to implement cost savings and productivity improvements in order to reduce Seller's costs of supplying each Product. Buyer and Seller agree that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to fifty percent (50%) of any net cost savings achieved by Seller with respect to such Product (i.e., savings after recovery by Seller of a pro rata portion, based on the remaining term of this Contract, of the reasonable and documented costs to achieve such cost savings), provided, however, that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any savings resulting from reduction on the content of the such Product.

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Seller's labor, materials, overhead and other costs. In the event that Buyer agrees to any price increases (or a decrease of any scheduled price reductions) with respect to any Product, then, notwithstanding anything to the contrary set forth in this Contract, the pricing of each Products will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any subsequent net cost savings achieved by Seller with respect to such Product until aggregate price reductions on account of Seller's cost savings equal any price increases previously agreed to by Buyer.

4.   **Right to Purchase from Others**

During the entire term of this Contract, Seller will assure that each Product remains competitive in terms of technology, design, service and quality with any similar product available to Buyer. Following Model Year 2004 Seller will also assure that each Product remains competitive in terms of price with any similar product available to Buyer. If, in the reasonable opinion of Buyer, a Product does not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which a similar product is more competitive. If, within ninety (90) days, Seller does not agree to immediately sell any Product with comparable technology, design, quality, or, if applicable, price, Buyer may elect to purchase any similar products available to Buyer without any liability to Seller under this Contract.

5.   **Purchase Orders**

All Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders (including related delivery releases and shipping instructions) issued by Buyer from time to time during the term of this Contract. Buyer's General Terms and Conditions, a copy of which is attached, are hereby incorporated into this Contract by reference, provided, however, that Buyer's right to "terminate for convenience" under the General Terms and Conditions will be inapplicable to this Contract until the end Model Year 2004. Any amendment to, or revision of, such General

Terms and Conditions shall also become a part of this Contract, provided that (i) Buyer provides Seller with a copy of such revised Terms and Conditions and (ii) Seller does not object to such revised Terms and Conditions in writing within thirty (30) days after receipt. The Terms and Conditions (together with any revision made a part of this Contract) shall be construed, to the extent possible, as consistent with the terms and conditions set forth in this Contract and as cumulative, provided, however, that if such construction is unreasonable, the terms and conditions set forth in this Contract shall control.

EXECUTED by Buyer and Seller as of this 5th day of September, 2002.

Buyer:                                      Seller:

Delphi Corporation LLC                      Lextron Automotive
acting through its Safety & Interior        Technologies Corporation
Systems Division

By: _____                       By: _____
Name: Michelle E. Joseph                    Name: Ray C. Irby
Title: Senior Electrical Buyer              Title: Chief Operating Officer

# DELPHI AUTOMOTIVE SYSTEMS

## GENERAL TERMS AND CONDITIONS

*Delphi Automotive Systems seeks to exceed its customers' expectations. Delphi's suppliers are integral to achieving this objective, and Delphi hopes that its suppliers will recognize Delphi as their preferred customer. Delphi will establish high performance expectations for itself and its suppliers, measure performance and reward superior performance.*

## 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

## . SHIPPING AND BILLING

.1  Shipping.  Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and/or release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs. Seller will include on bills of lading or other shipping receipts the correct classification identification of the goods shipped as Buyer or the carrier requires. The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

. Billing.  Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer. If the payment due date is not otherwise specified in this Contract, the payment due date will be the due date established by the Multilateral Netting System (MNS-2) used by Buyer, which provides, on average, that payment will be due on the second day of the second month following the date Buyer receives the goods or services. Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

. Delivery Schedules.  Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract. Time is of the essence with respect to all delivery schedules Buyer establishes. Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules. Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules. If Buyer determines that the requirements of Buyer's customers or market, economic or other conditions require changes in schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other modification of this Contract.

- 1 -

Revised June 24, 1999

Premium Shipments. If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules using the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods using a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible. Seller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to fail to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

## 3. SPECIFICATION, DESIGN AND SCOPE CHANGES

Buyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract, including work related to inspection, testing or quality control. While Buyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such changes. Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including Buyer's payment of reasonable costs of modifications to Seller's Equipment and Facilities (as defined in Article 16) necessary to implement such changes. In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's cost of production and the time to implement such changes. In the event of any disagreement arising out of such changes, Buyer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue performing under this Contract, including prompt implementation of changes required by Buyer, while Buyer and Seller resolve any disagreement arising out of such changes.

## 4. QUALITY AND INSPECTION

Seller will participate in Buyer's supplier quality and development program(s) and comply with all quality requirements and procedures Buyer specifies from time to time. Seller will permit Buyer and its representatives and consultants to (i) inspect Seller's books and records in order to monitor Seller's compliance with this Contract and Seller's financial position and (ii) enter Seller's facilities at reasonable times to inspect such facilities and any goods, materials and property that relate to this Contract. No such inspection by Buyer will constitute acceptance by Buyer of any work-in-process or finished goods.

## 5. NON-CONFORMING GOODS

Buyer is not required to perform incoming inspections of any goods, and Seller waives any right to require Buyer to conduct any such inspections. Seller will not substitute any goods for the goods covered by this Contract unless Buyer consents in writing. If Buyer rejects any goods as non-conforming, Buyer may, at its option, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods, (b) require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or remedies. If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of non-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or such shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the non-conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to arrange for the shipment of any non-conforming goods back to Seller at Seller's expense. Seller will bear all risk of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by Buyer to return, store or dispose any non-conforming goods. Buyer's payment for any non-conforming goods will not constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or relieve Seller of responsibility for the non-conforming goods.

- 2 -

Revised June 24, 1999

## FORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for so long as such event or occurrence continues, provided, however, that the affected party gives written notice of such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by the quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities and at times Buyer requests and at the prices set forth in this Contract. If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without liability. Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any such disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such disruption commences.

## WARRANTY

.1   General.  Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services o    d by this Contract will (a) conform to all applicable specifications, drawings, samples, descriptions, brochures and  anuals furnished by Seller or Buyer, (b) will be merchantable, (c) of good material and workmanship, (d) free from  efect, and (e) are fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer.  If requested  y Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for onconforming goods.

.2   Date and Time Processing.  Seller warrants and guarantees to Buyer and its customers that any products (including  omputer hardware, software, firmware, machinery and equipment) covered by this Contract must at all times accurately  rocess, handle, calculate, compare and sequence date and time data from, into, within and between the 20th and 21st  enturies, including leap year calculations.

3   Warranty Period.  The period for each of the foregoing warranties will be that provided by applicable law, except that  Buyer ever provides a longer warranty to its customers, such longer warranty period will apply to the goods covered by  is Contract.

## INGREDIENTS AND HAZARDOUS MATERIALS

Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all  gredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to  : ingredients.  Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers  fficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous  aterial that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures  d precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable

- 3 -

Revised June 24, 1999

legal requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing.

## 9. INSOLVENCY OF SELLER

Buyer may immediately terminate this Contract without liability to Seller in any of the following or any similar events: (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract. Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract, without liability to Seller at any time after execution if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract; or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing. Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under his Contract which are useable and in a merchantable condition. The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by Buyer and not previously paid for, plus (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent. In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which eller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required to pay for any goods or materials that are in Seller's standard stock or that are readily marketable. Payments made under his Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination. Within sixty (60) days after the effective date of termination, eller will submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit an audit by Buyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 2. TECHNICAL INFORMATION

1.1 Exchange of Information. Buyer and Seller will cooperate to create, maintain, update, and share technical information about the goods, products, machinery, materials, formulations and their manufacture, use, application and control in compliance with Buyer's drafting and math data standards. Such technical information will not be subject to any use or disclosure restrictions. Accordingly, Seller agrees not to assert any claims against Buyer, its customers or their respective suppliers with respect to any technical information that Seller discloses in connection with this Contract.

.2 Waiver of Claims. Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, Buyer's customers or their respective suppliers with respect to any technical information that Seller shall have disclosed or may hereafter disclose in connection with the goods or services covered by this Contract.

- 4 -

Revised June 24, 1999

**3** <u>Repair and Rebuild</u>.  Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment of any royalty or other compensation to Seller.

12.4 <u>Computer Programs and Written Works</u>.  All works of authorship, including without limitation, software, computer programs, and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing this Contract (separately or as part of any goods and components) are "works made for hire" and the sole property of Buyer.  To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller agrees to assign and assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship.

## 13. INDEMNIFICATION

13.1 <u>Infringement</u>.  Seller will defend, hold harmless and indemnify Buyer and its customers, and their respective successors and assigns, against any claims of infringement (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses (including, without limitation, attorney and other professional fees and disbursements) relating to the goods or services covered by this Contract, including any claims in circumstances where Seller has provided only part of the goods or services.  Seller waives any claim against Buyer that any such infringement arose out of compliance with Buyer's specifications.

13.2 <u>Activities on Buyer's Premises</u>.  Seller will defend, hold harmless, and indemnify Buyer from and against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other professional fees and disbursements) arising from or in connection with the performance of any service or work by Seller or employees, agents, representatives and subcontractors on Buyer's or Buyer's customer's premises or the use of the property of Buyer or any customer of Buyer, except to the extent such liability arises out of the negligence or willful misconduct of Buyer or Buyer's customer.

13.3 <u>Product Liability</u>.  Seller will defend, hold harmless, and indemnify Buyer from and against any liability and expenses (including, without limitation, attorney and other professional fees and disbursements) arising from or in connection with any third party claims or demands to recover for personal injury or death, property damage or economic loss caused by any of the goods or services supplied by Seller (regardless of whether such claim or demand arises under tort, negligence, contract, warranty, strict liability or other legal theories), except to the extent such injury, damage or loss results from Buyer's specifications as to design or materials or from alteration or improper repair, maintenance or installation by any party other than Seller.

## 4. COMPLIANCE WITH LAWS

Seller, and any goods or services supplied by Seller, will comply with all applicable laws, rules, regulations, orders, conventions, ordinances and standards of the country(ies) of origin and destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety.  Neither Seller nor any of its subcontractors will utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or services under this Contract.  Upon Buyer's request, Seller will certify in writing its compliance with the foregoing.  Seller will defend, hold harmless and indemnify Buyer from and against any liability, claims, demands, damages or expenses (including reasonable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with this Article.

## 5. INSURANCE

-5-

Revised June 24, 1999

Seller will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers sonably acceptable to Buyer.  With respect to any such insurance coverage, Seller will furnish to Buyer either a ...dificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies of all insurance policies within ten (10) days after Buyer requests.  The certificate must provide that Buyer will receive thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's obligations or liabilities under this Contract.

## 16. SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required for the production of the products covered by this Contract ("Seller's Equipment").  Seller will insure Seller's Equipment with fire and extended coverage insurance for its full replacement value.  Seller grants Buyer an irrevocable option to take possession of, and title to, all or part of Seller's Equipment that is specially designed or outfitted for the production of the goods covered by this Contract upon payment to Seller of the net book value of such Seller's Equipment less any amounts that Buyer has previously paid to Seller for the cost of such Seller's Equipment.  This option will not apply to the extent that Seller's Equipment is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.  Buyer's right to exercise this option is not conditioned on Seller's breach or Buyer's termination of this Contract or upon payment of any other amounts due under this Contract.

## 17. BUYER'S PROPERTY

17.1 Bailment of Property.  All supplies, materials, tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items Buyer furnishes, either directly or indirectly, to Seller, or for which Buyer gives consideration to Seller in whole or in part ("Buyer's Property"), will be and remain the property of Buyer and be held by Seller on a bailment basis. T      extent that this Contract provides that Buyer will reimburse Seller for any specific items of Buyer's Property (such as wholing), Seller will purchase and pay for such Buyer's Property as agent of Buyer.  To the extent that this Contract provides that Seller will obtain any specific items of Buyer's Property (such as tooling) without separate or additional payment or reimbursement by Seller, Seller acknowledges and agrees that Buyer's issuance of this Contract is good and sufficient consideration for such Buyer's Property and that title to such Buyer's Property shall vest immediately in Buyer and be held by Seller pursuant to this Article.  Seller shall assign to Buyer any contract rights or claims in which Seller has an interest with respect to Buyer's Property.  Seller shall also execute (i) any bills of sale or other documents of conveyance Buyer requests to evidence the transfer to Buyer of title to any Buyer's Property, related contract rights and claims and (ii) any financing statements or other documents Buyer requests to evidence Buyer's ownership of Buyer's Property.  Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property.  Seller will not sell, lend, rent, encumber, pledge, ease, transfer or otherwise dispose of Buyer's Property.  Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property.  When ermitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property or work performed on such property or otherwise.  Goods manufactured based on Buyer's drawings and/or specifications may not be used for Seller's own use or sold to third parties without Buyer's express written authorization.

7.2 Seller's Duties with Respect to Buyer's Property.  While Buyer's Property is in Seller's possession and until Seller elivers Buyer's Property back to Buyer, Seller bears the risk of loss and damage to Buyer's Property.  Seller will be sponsible for the cost of repairing or replacing Buyer's Property if it is damaged or destroyed regardless of cause or ult.  Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's wn expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be rsonal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not ommingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from iller's premises without Buyer's written approval, and (g) use Buyer's Property in compliance with Buyer's or the a:     cturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations.  Buyer

- 6 -

Revised June 24, 1999

will have the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with ect thereto.

17.3  Return of Buyer's Property.  Seller agrees that Buyer has the right, at any time and from time to time, with or without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property. Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the right to enter Seller's premises and take possession of any and all of Buyer's Property. Upon Buyer's request and in accordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by Seller, either (i) Ex Works (Incoterms 1990) at Seller's plant properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates, in which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates. If Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or without legal process, and take immediate possession of Buyer's Property.

17.4  Disclaimer of Warranties.  Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's Property nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's benefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF BUYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. Buyer will not be liable to Seller for any loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including, without limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of service or for any loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory damages, profits or any other indirect, special or consequential damages.

17.   Development, Engineering And Consulting Services.  Engineering, consulting or development services ("Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of authorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole property of Buyer. Seller agrees to assign all right, title and interest in and to IP that results from Development Services ("Developed IP") to Buyer. Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every reasonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional documents reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse Seller for reasonable costs incurred by Seller in providing such assistance.

18. SERVICE AND REPLACEMENT PARTS

During the term of this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and replacement parts requirements to Buyer's customers at the then current production price(s) under this Contract. If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module at price(s) that will not, in the aggregate, exceed the price of the system or module less assembly costs. If this Contract is in effect at the end of the vehicle production program into which the goods covered by the Contract are incorporated, Seller will also sell goods to Buyer to fulfill Buyer's and its customers' service and replacement parts requirements during the fifteen (15) year period following the end of such vehicle production program (the "Post-Production Period"), and this Contract will automatically remain in effect during the entire Post-Production Period. During the first three (3) years of the Post-Production Period, the price(s) for such goods will be the production price(s) which were in effect at the commencement of the Post-Production Period. For the remainder of the Post-Production Period, the price(s) for such service goods will be as reasonably agreed to by the parties. If requested by Buyer, Seller will also make service literature and other materials available at no additional charge to support Buyer's service activities.

9.   REMEDIES

-7-

Revised June 24, 1999

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity.

## 20. CUSTOMS AND EXPORT CONTROLS

Credits or benefits resulting or arising from this Contract, including trade credits, export credits or the refund of duties, taxes or fees, belong to Buyer. Seller will provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive these benefits or credits, and to fulfill any customs related obligations, origin marking or labeling requirements and local content origin requirements. Seller will obtain all export licenses or authorizations necessary for the export of the goods unless otherwise indicated in this Contract, in which event Seller will provide all information as may be necessary to enable Buyer to obtain such licenses or authorization(s). Seller will make all arrangements that are necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

## 21. SETOFF AND RECOVERY

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or Buyer's affiliates, Buyer may (i) setoff such obligations against any sums owing to Seller or Seller's affiliates and/or (ii) recoup such obligations from any amounts paid to Seller or Seller's affiliates by Buyer or Buyer's affiliates.

## 22. NO ADVERTISING

Seller will not, in any manner, advertise or publish that Seller has contracted to furnish Buyer the goods or services covered by this Contract or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials unless Buyer consents in writing.

## 23. NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any provision of this Contract will not affect the right to require such performance at any later time, nor will the waiver by either party of a breach of any provision of this Contract constitute a waiver of any succeeding breach of the same or any other provision. No course of dealing or course of performance may be used to evidence a waiver or limitation of Seller's obligations under this Contract.

## 24. ASSIGNMENT

Buyer may assign its rights and obligations under this Contract without Seller's prior written consent. Seller may not assign or delegate its rights or obligations under this Contract without Buyer's prior written consent.

## 25. RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties. Nothing in this Contract makes either party the agent or legal representative of the other for any purpose whatsoever, nor grants either party any authority to assume or create any obligation on behalf of or in the name of the other party.

## 26. GOVERNING LAW AND JURISDICTION

This Contract is to be construed according to the laws of the country (and state or province, if applicable) from which this Contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law.

- 8 -

Revised June 24, 1999

Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over
er or, at Buyer's option, in the court(s) having jurisdiction over Buyer's location, in which event Seller consents to
jurisdiction and service of process in accordance with applicable procedures. Any actions or proceedings by Seller against
Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this
Contract is issued.

## 27. SEVERABILITY

If any provision of this Contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or
other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary
to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Contract will remain
in full force and effect.

## 28. RIGHT TO AUDIT AND INSPECT

Buyer, at its expense, has the right to audit and review all relevant books, records, payroll data, receipts and other
documents, including Seller's administrative and accounting policies, guidelines, practices and procedures, in order to
substantiate any charges and other matters under this Contract. Seller will maintain and preserve all such documents for a
period of four (4) years following final payment under this Contract. In addition, Buyer has the right to inspect all
inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges, and other items related to
Seller's performance of this Contract. Seller will provide Buyer with reasonable access to its facilities and otherwise
cooperate and facilitate any such audits or inspections by Buyer.

## 29. ENTIRE AGREEMENT

This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this
C   ict, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract
and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written
contract amendment issued by Buyer. Notwithstanding anything to the contrary contained herein, Buyer explicitly
reserves, and this Contract will not constitute a waiver or release of, any rights and claims against Seller arising out of, or
relating to, any fraud or duress in connection with the formation of this Contract or any breach or anticipatory breach of
any previously existing contract between Buyer and Seller (whether or not such previously existing contract related to the
same or similar goods or subject matter as this Contract). All payments by Buyer to Seller under this Contract are without
prejudice to Buyer's claims, rights, or remedies.

-9-

# EXHIBIT "D"

# DELPHI

memo

Date: ~~February 26,~~ 2003   *JAN 9*

To:     Andy Raines            SouthTrust Bank

From:   Larry Graves

Subject: Delphi-P Support of Lextron

c:      Sidney Johnson
        Greg Naylor
        Martha Everett

As a follow up your conversation with Greg Naylor and Martha Everett, I am writing you this memo to re-iterate Delphi Packard's (Delphi-P) focus to maintain Lextron Corporation as a supplier. We have resources to assist Lextron, including a reduction in our payment terms to Net 15, during its cash flow shortfall.

Delphi-P is currently extending the equivalent of MNS2 credit terms (very favorable credit terms) for the material that Lextron purchases from Delphi-P. We take our payment via a contra rather than receiving a check from Lextron. Lextron and your bank have asked Delphi-P to stop the contra method and change to accepting check payments from Lextron. Delphi-P will continue to send invoices and will allow Lextron to reconcile the contra amount prior to the contra being taken. Delphi-P understands that need for accurate fiscal review and accountability at Lextron, and will support their desire to achieve that relative to this business situation. Delphi-P is not considering limiting its right to set offs.

Additionally, because of Delphi-P's support and interest in Lextron, Delphi-P is requesting SouthTrust Bank to continue its support of Lextron. If you have any questions please contact Greg Naylor or me.

Regards,

Larry W. Graves
North America Purchasing Director
Delphi Packard Electric Systems

# EXHIBIT "E"

# DELPHI

February 27, 2003

Mr. Charles Doty
President and CEO
Lextron Corporation
P.O. Box 23971
Jackson, Mississippi 39225-3971

Dear Mr. Doty,

As you are aware, Delphi Automotive Systems LLC, by and through its Delphi Safety & Interior Systems Division, ("Delphi") has issued three (3) Long Term Contracts (the "Contracts") to Lextron Corporation ("Lextron") for the manufacture and supply of a variety of wire harness and other component assemblies for use in the automotive industry (the "Products").

Each of those Contracts incorporates Delphi's General Terms and Conditions and provides that those General Terms and Conditions are cumulative with the terms and conditions contained in the Contracts.  Section 9 of Delphi's General Terms and Conditions states as follows:

> Buyer may immediately terminate this Contract without liability to Seller in any of the following or any similar events ... (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract.

As you know, in recent months, Lextron has required a number of financial and contract accommodations from Delphi in order to continue operations.  Regrettably, the necessity of accommodations from Delphi forces us to terminate the Contracts and exit Lextron.  This is a difficult but necessary decision to ensure the continued and uninterrupted supply of Products. As I am sure you appreciate, the consequences of not delivering the Products to our customers are enormous and a situation we must avoid.

Sincerely,

DELPHI AUTOMOTIVE SYSTEMS LLC
Delphi Safety & Interior Systems Division

Ann Macrino
Electrical Commodity Manager, Delphi Safety & Interiors

cc:   Karen Craft, Delphi Legal Staff
      Joseph Papelian, Delphi Legal Staff
      Martha Everett, Delphi Supplier Risk Management
      Michelle E. Joseph, Buyer, Delphi Safety & Interiors
      Karen McClain, Purchasing Director, Delphi Safety & Interiors
      Albeno Castilla, Counsel to Lextron Corporation

World Headquarters and Customer Center

Delphi has redacted certain exhibits to the Lextron proofs of claim to the extent that they
include competitive edge pricing information.

# EXHIBIT "9"

<u>AGREEMENT TO RELEASE ACCOUNT PROCEEDS
AND COLLATERAL ASSIGNMENT OF CLAIMS</u>

THIS AGREEMENT TO RELEASE ACCOUNT PROCEEDS AND COLLATERAL ASSIGNMENT OF CLAIMS (this "Assignment"), made as of the *16th* day of March 2003, by and among SOUTHTRUST BANK, an Alabama banking corporation (the "Lender"), and LEXTRON CORPORATION, a Mississippi corporation (the "Borrower"), LEXTRON AUTOMOTIVE, LLC, a Mississippi limited liability company ("Automotive"), and CHARLES DOTY, an individual ("Doty" and together with Automotive, the "Guarantors") (Borrower and Guarantors are collectively referred to herein as the "Obligors").

R E C I T A L S:

WHEREAS, one or more of the Obligors hold certain claims and causes of action against Delphi Automotive Systems, LLC, a Delaware limited liability company ("DAS"), and certain of its affiliates and divisions, including Delphi Packard Electric Systems Division, Delphi Safety & Interior Division, Delphi Corporation, Delphi Packard and/or BBK, Ltd. (together with DAS, the "Delphi Entities"), and such claims and causes of action include, but are not limited to, claims against the Delphi Entities arising out of tort and/or breach of contract due to the wrongful termination and breach by one or more of the Delphi Entities of automotive parts assembly and supply contracts, and purchase orders, between one or more of the Delphi Entities as Buyer, and the Borrower or Automotive as Seller, some or all of such contracts and purchase orders being performed pursuant to certain <u>GENERAL TERMS AND CONDITIONS</u> Revised June 24, 1999 prepared by DAS, and due to other actionable behavior of certain of the Delphi Entities (collectively, the "Delphi Claims");

WHEREAS, the Delphi Claims include, but are not limited to all counterclaims that are now or are hereafter asserted against any of the Delphi Entities by any of the Obligors, in Civil Action 3:03CV335WS in the U.S. District Court for the Southern District of Mississippi, Jackson Division;

WHEREAS, one or more of the Obligors hold certain claims and causes of action against Banks Finley and White & Co., certified public accounts, and its partners, shareholders, members, principals, agents and employees, (collectively, the "BFW Entities"), and such claims and causes of action include, but are not limited to claims against the BFW Entities arising out of tort and/or breach of contract due to the negligence, wantonness, intentional misconduct and/or breach of contract by the BFW Entities in performing certain financial auditing and accounting services, and tax preparation and reporting services for the Borrower during and for fiscal years 1999 through 2003 and all interim periods during such fiscal years (collectively, the "BFW Claims" and together with the Delphi Claims, the "Claims");

WHEREAS, pursuant to various promissory notes, loan agreements, agreements pertaining to letters of credit, and other credit documents (collectively, the "Loan Documents"), the Borrower is indebted to the Lender for various loans and other credit facilities (the "Loan Obligations");

1078601 v4

**EXHIBIT**

tabbies®  ___S___

ST/Lextron (Delphi)
000422

WHEREAS, included among the credit facilities that were available under the Loan Documents was a revolving line of credit loan (the "Line of Credit") advanced from time to time by Lender to Borrower based upon the amount and eligibility of Borrower's accounts receivable pledged to Lender;

WHEREAS, the Loan Obligations are secured by various collateral documents, including, without limitation, security agreements and deeds of trusts encumbering the Borrower's equipment, accounts, inventory, general intangibles, real property and other assets (collectively, the "Collateral Documents" and together with the Loan Documents, the "Credit Documents");

WHEREAS, as further security for the Loans Obligations, the Guarantors have unconditionally guaranteed the Loan Obligation as evidenced by their unconditional guaranties of payment (the "Guaranties") executed in favor of Lender;

WHEREAS, the parties hereto entered into an Amended Forbearance Agreement dated January 15, 2003 (the "Forbearance Agreement") in which the parties agreed, *inter alia*, that the Lender would forebear from exercising certain remedies under the Credit Documents that were otherwise available due to the occurrence and continuance of various Existing Defaults described and defined in the Forbearance Agreement;

WHEREAS, additional events of default not covered by the Forbearance Agreement occurred and the Lender's obligation to continue to forbear under the Forbearance Agreement was properly terminated, Lender stopped making advances on the Line of Credit, and all payments from account debtors on Borrower's accounts receivable pledged to Lender (the "Pledged Accounts") are now being collected by Lender and applied to pay the Loan Obligations;

WHEREAS, Obligors have prepared a weekly cash-needs budget (the "Budget") that the Obligors have represented to Lender sets forth the Borrower's requirements for cash on a weekly basis (the "Budged Cash Requirements") for Borrower's operations during the period (the "Budget Period") covered by the Budget (a copy of the Budget prepared by the Obligors and submitted to Lender is attached hereto and made a part hereof as Exhibit A);

WHEREAS, Obligors have requested that on a weekly basis during the Budget Period, Lender release to Borrower amounts equal to the Budged Cash Requirements from the collections received from March 14th 2003 to June 1, 2003 by Lender on Pledged Accounts paid by non-automotive industry account debtors (the "Pledged Non-Auto Accounts");

WHEREAS, to induce Lender to grant their request, the Obligors have agreed to further secure the Loan Obligations by collaterally assigning the Claims to Lender; and

WHEREAS, Lender has agreed to grant the request of the Obligors, but only on the terms and conditions herein set forth.

1078601 v4

2

ST/Lextron (Delphi)
000423

## AGREEMENT

**NOW, THEREFORE,** in consideration of in the foregoing recitals and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and as security for the Loan Obligations and payment and performance of Borrower's obligations under the Credit Documents, the parties agree as follows:

1.    **RELEASE OF BUDGETED CASH REQUIREMENTS.** Subject to the terms and conditions hereof, from time to time on a weekly basis during the Budget Period, provided there are available collections received from March 1[th] 2003 to June 1, 2003 of good funds from Pledged Non-Auto Accounts, Lender shall transfer to Borrower's checking account maintained with Lender, sums equal to the Budgeted Cash Requirements shown on the Budget for the applicable calendar week. Anything to the contrary notwithstanding, all Borrower's accounts (including, without limitation, Pledged Non-Auto Accounts) arising before, during and after the Budget Period shall continue to be collateral for and secure the Loan Obligations.

2.    **BORROWER'S BI-WEEKLY REPORTS.** On the first business day of every other calendar week during the weekly Budget Period, Borrower shall furnish to Lender such reports and certifications (the "Bi-Weekly Reports") as may be required by Lender to confirm that Borrower's expenses, production, newly generated accounts, and other operational and financial items for the previous two weeks were within the Budget. At the end of the Budget Period, or if at any time during the Budget Period a Bi-Weekly Reports reveals or Lender otherwise determines, that Borrower has not met the requirements of the Budget (a "Budget Default"), then at Lender's election, and without notice, Lender may stop transferring funds into Borrower's checking account as otherwise provided in paragraph 1 of this Assignment, and, notwithstanding any subsequent cure of the Budget Default, Lender shall have no further obligation to make any such transfers. Likewise, Lender shall not be required to make any such transfers after the occurrence of any Assignment Default described and defined in paragraph 13 hereof.

3.    **SECURITY INTEREST IN CLAIMS.** Obligors grant to Lender, and its successors and assigns, a collateral assignment of and a continuing security interest in the Collateral (as defined below) as security for the payment and performance of the Obligations (as defined below); provided, however, that such collateral assignment and security interest shall be limited to and the Collateral shall be applied only to the extent of the Obligations.

4.    **OBLIGATIONS SECURED.** The Collateral shall secure the payment and performance of the Loan Obligations and all of Obligors' present and future, joint and/or several, direct and indirect, absolute and contingent, express and implied, loans, guarantees, reimbursement obligations, indebtedness, warranties, representations, obligations, liabilities and covenants now or hereafter at any time owing to Lender, (including costs of collection, legal expenses and attorneys' fees, incurred by Lender in connection with its efforts to collect any of the foregoing or realize upon or protect any collateral, including, collateral covered by the Collateral Documents and this Assignment) (collectively, the "Obligations").

5.    **COLLATERAL COVERED BY ASSIGNMENT.** The "Collateral" covered by this Assignment shall consist of all of the following-described actions, claims, counterclaims,

1078601 v4

3

ST/Lextron (Delphi)
000424

causes of action, awards, judgments, settlements, collections, rights and remedies, whether now existing or hereafter arising, and whether held jointly or severally by one or more of the Obligors (collectively the "Collateral"):

(a)     All of Obligors' rights in and to the Claims;

(b)     all actual, compensatory, special, liquidated and punitive damages and awards to any of the Obligors resulting from any verdict, decision, finding or order by a jury, court or arbitrator based in whole or part on one or more of the Claims and all judgments entered in connection with any Claims;

(c)     any and all prejudgment and post-judgment interest on the awards described in clause (b) above;

(d)     any and all payments and proceeds from any settlement of one or more of the Claims, regardless of whether such settlement proceeds are characterized as actual, compensatory, special, liquidated or punitive damages, interest on such damages, or otherwise;

(e)     the right to release, waive, compromise or settle any of the Claims;

(f)     products and proceeds of the foregoing; and

(g)     the right to prosecute and settle the Claims in the name of the Obligors or, at Lender's election, in Lender's name; provided, however, the Claims shall be prosecuted and pursued by the Obligors in their names unless and until Lender in good faith determines, after notice thereof to Obligors, that Obligors are not prosecuting and pursuing the Claims against all parties liable thereon with reasonable speed, effort and dispatch, and after making such good faith determination and giving notice to Obligors, Lender may elect to prosecute and/or settle any or all of the Claims either in Obligors' name or in Lender's name; provided further, however, that in any event, before settling, releasing or waiving any Claims, the Obligors shall first obtain Lender's written approval thereof, except any settlement that will result in the Obligations being paid in full shall require at least ten (10) business days' notice thereof to Lender, but shall not require the prior approval of Lender. (Although Lender agrees that Obligors shall prosecute and pursue the Claims in Obligors' name, the Lender unconditionally retains its right to have all sums realized from the Claims paid to Lender for application on the Obligations as herein provided).

    6.    REPRESENTATIONS, WARRANTIES, AND COVENANTS.   Obligors represent, warrant and covenant to Lender that:

(a)     Obligors are and shall remain the sole owner of the Collateral;

(b)     Obligors will derive substantial benefit by entering into this Assignment;

1078601 v4

4

ST/Lextron (Delphi)
000425

(c)     Borrower's and Automotive's chief executive office, chief place of business, and office where its business records relating to the Collateral are located in the City of Jackson, Hinds County, Mississippi; and Doty resides in the City of Jackson, Hinds County, Mississippi; and Obligors shall immediately advise Lender in writing of any change in or addition to the foregoing addresses;

(d)     Borrower and Automotive shall not become a party to any restructuring of their form of business or changing of their state of formation, or participate in any consolidation, merger, liquidation or dissolution without Lender's prior written consent;

(e)     Borrower and Automotive shall notify Lender of the nature of any intended change of either of their names, or the use of any trade name, and the effective date of such change;

(f)     The Obligors shall not further assign or encumber the Collateral, and the Collateral is and shall at all times remain free of all tax and other liens, security interests, encumbrances and claims of any kind except for those belonging to Lender;

(g)     Obligors shall defend the Collateral against all claims and demands of all persons at any time claiming any interest therein;

(h)     Obligors have the right, power and authority to enter into and perform their obligations under this Assignment and the Credit Documents to which Obligors are a party and the undersigned officers of Borrower and Automotive are duly authorized to execute this Assignment on behalf of Borrower and Automotive. Obligors' execution and performance of this Assignment do not and shall not conflict with the provisions of any statute, regulation, ordinance, rule of law, contract or other agreement which may now or hereafter be binding on Obligors;

(i)     This Assignment and the obligations described in this Assignment are executed and incurred for commercial and not consumer purposes;

(j)     Obligors covenant to diligently prosecute and pursue the Claims to final judgment or satisfactory settlement in such a manner as to maximize the monetary value of any judgment or settlement resulting therefrom. It is understood and agreed, however, that this covenant is based and conditioned upon Obligors having adequate financial resources or being able to reach reasonable contingent fee arrangements to enable them to prosecute and pursue the Claims in the manner stated.

(k)     This Assignment, the Credit Documents and the Guaranties evidence legally binding obligations of the Obligors who are parties thereto, and this Assignment, the Credit Documents and the Guaranties are in full force and effect, and are not subject to any claims, counterclaims, set offs, rights of recoupement or other reductions or credits.

7.     PRIOR ASSIGNMENT OF BFW CLAIMS.   Obligors have previously assigned the BFW Claims to Lender pursuant to the Forbearance Agreement (the "Prior BFW Assignment"). The Prior BFW Assignment shall remain in full force and effect from the date of execution of the Forbearance Agreement, and the Prior BFW Assignment shall be deemed

1073601 ,4                                              5

ST/Lextron (Delphi)
000426

modified hereby only to the extent this Assignment grants further rights and remedies to Lender with respect to the BFW Claims. The parties hereto acknowledge that the forbearance provided by the Forbearance Agreement has been terminated for good cause, and nothing herein shall be construed to reinstate such forbearance.

8.    FINANCING STATEMENTS AND OTHER DOCUMENTS. Obligors shall at any time and from time to time take all actions and execute all documents required by Lender to attach, perfect and maintain Lender's security interest in the Collateral and establish and maintain Lender's right to receive the payment of the proceeds of the Collateral including, but not limited to, executing any financing statements, continuation statements, notices of security interest, control agreements and/or other documents required by the Uniform Commercial Code and other applicable law. Obligors shall pay the costs of filing such documents in all offices wherever filing or recording is deemed by Lender to be necessary or desirable. Lender shall be entitled to perfect its security interest in the Collateral by filing carbon, photographic or other reproductions of the aforementioned documents with any authority required by the Uniform Commercial Code or other applicable law. Obligors authorizes Lender to execute and file, without Obligors' signatures, any financing statements, as well as extensions, renewals and amendments of financing statements in such form as Lender may require to perfect and maintain perfection of any security interest granted in this Assignment.

9.    INQUIRIES AND NOTIFICATION TO THIRD PARTIES. Obligors hereby authorize Lender to contact any third party and make any inquiry pertaining to Obligors' financial condition or the Collateral. In addition, Lender is authorized to provide oral or written notice of its security interest in the Collateral to any third party and instruct such third party to make payment on the Claims directly to Lender. Specifically, (i) Lender shall be entitled to give notice to the court in which any of the Claims is being litigated, the attorneys representing Obligors and the attorneys representing parties against whom the Claims are asserted, of Lender's interest in the Claims as set forth herein, and that any distribution of Collateral to which Obligors would otherwise be entitled but for this Assignment shall, to the extent of any principal and/or interest then outstanding under the Obligations, be paid to Lender and (ii) Obligors hereby instruct such court and attorneys to pay over such Collateral to Lender to the extent of any principal and/or interest then outstanding under the Obligations. Said court and attorneys shall be entitled to rely upon any instructions given by Lender in respect to the assignment of the Claims pursuant to this Assignment and Lender's written statement of principal and interest outstanding under the Obligations, and such statement shall be conclusive notwithstanding any instructions to the contrary from Obligors. As set forth below in paragraph 16, this Assignment and, specifically, the notification and instruction provisions of this paragraph can only be modified in a writing signed by the Lender.

10.    POWER OF ATTORNEY. Obligors hereby appoint Lender as attorney-in-fact to perform any action or execute any document required to be taken or executed by Obligors under this Assignment, including, but not limited to the execution of any financing statement deemed by Lender to be necessary to perfect or continue the perfection of Lender's security interest evidenced hereby with or without any Obligor's signature. Lender's performance of such action or execution of such documents shall not relieve Obligors from any obligations they have under this Assignment or any of the Credit Documents. The powers of attorney described in this paragraph are coupled with an interest and are irrevocable.

1078601 v4                                      6

ST/Lextron (Delphi)
000427

11.   INDEMNIFICATION.   Lender shall not assume or be responsible for the performance of any of Obligors' obligations with respect to the Collateral under any circumstances. Obligors shall immediately provide Lender with written notice of and indemnify and hold Lender and its shareholders, directors, officers, attorneys, employees and agents harmless from all claims, damages, liabilities (including attorney's fees and legal expenses), causes of action, actions, suits and other legal proceedings (cumulatively "Indemnified Claims") pertaining to its business operations or the Collateral including, but not limited to, those arising from Obligors' obligations with respect to the Collateral or any counterclaims made against Obligors in the Indemnified Claims.   Obligors expressly acknowledge and agree that Lender shall not be assigned any of Obligors' obligations and/or liabilities associated with the Indemnified Claims, including but not limited to any liability associated or resulting from any counterclaim, third party claim or other claims against Obligors. Obligors, upon the request of Lender, shall hire legal counsel to defend Lender from such Indemnified Claims, and pay the attorney's fees, legal expenses and other costs to the extent permitted by applicable law, incurred in connection therewith. Upon Obligors' failure to provide such legal counsel, Lender shall be entitled to employ its own legal counsel to defend such Indemnified Claims at Obligors' cost.

12.   INSPECTION OF COLLATERAL AND BOOKS AND RECORDS.   Obligors shall allow Lender or its agents to examine, inspect and make abstracts and copies of the pleadings filed in the Claims and any discovery (including, but not limited to, writings of any kind, including the originals and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, and whether printed, recorded, created or reproduced by any mechanical means or process, or written or produced by hand) produced or received in the Claims and Obligors' books and records pertaining to the Collateral during normal business hours.  Obligors shall provide any assistance required by Lender for these purposes and hereby instructs its attorney of record in the Claims to make such items available to the extent such items are in such attorney's office.

13.   ASSIGNMENT DEFAULTS.   (a) Upon any breach of the obligations, covenants, agreements or warranties by the Obligors in this Assignment, (b) if there is any material misrepresentation by the Obligors hereunder, (c) upon any of the Obligors becoming a debtor under a case commenced under any chapter of the U.S. Bankruptcy Code (11 U.S.C. § 101 et seq), (d) upon an involuntary case being commenced against any of the Obligors pursuant to Section 303 of the U.S. Bankruptcy Code (whether or not relief is ultimately ordered in such case) (any of the events described in clauses (a), (b) (c) and (d) of this paragraph are referred to herein as an "Assignment Default"), or (e) upon the occurrence of any Budget Default, then, whether or not any such Assignment Default or Budget Default is subsequently incurred, in addition to all other rights and remedies available to the Lender under this Assignment, the Credit Documents and the Guaranties, without demand or notice, Borrower shall have no further right to receive, and Lender shall have no further obligation to transfer any funds collected from Non-Auto Accounts as provided in paragraph 1 of this Assignment. Anything herein or otherwise to the contrary notwithstanding, Lender has not waived or released any default or event of default otherwise outstanding under any of the Credit Documents or Guaranties, and Lender has not granted forbearance with respect thereto (any prior forbearance having been terminated for good cause).  Lender has reserved all its rights and remedies under the Credit Documents and the Guaranties, and the same remain in full force and effect and legally binding on the Obligors in all respect.

1078601 v4

7

ST/Lextron (Delphi)
000428

14.   **APPLICATION OF PAYMENT.**   All payments made in respect to the Collateral shall be applied against the amounts paid by Lender (including attorney's fees and legal expenses) in connection with the exercise of its rights or remedies described in this Assignment and any interest thereon, and then to the payment of the remaining Obligations in whatever order Lender chooses.

15.   **REIMBURSEMENT OF AMOUNTS EXPENDED BY LENDER.**   Obligors shall reimburse Lender for all amounts (including attorney's fees and legal expenses) expended by Lender in the performance of any action required to be taken by Obligors or the exercise of any right or remedy belonging to Lender under this Assignment, together with interest thereon at the highest rate allowed by law from the date of payment until the date of reimbursement. These sums shall be included in the definition of Obligations, shall be secured by this Assignment and the Collateral Documents, and shall be payable upon demand.

16.   **MODIFICATION AND WAIVER.**   The modification or waiver of any of Obligations or Lender's rights under this Assignment must be contained in a writing signed by Lender. A written waiver on one occasion shall not constitute a waiver on any other occasion. Obligors' obligations under this Assignment shall not be affected if Lender amends, compromises, exchanges, fails to exercise, impairs or releases any of the Claims or Collateral.

17.   **SUCCESSORS AND ASSIGNS.**   This Assignment shall be binding upon and inure to the benefit of Obligors and Lender and their respective successors, assigns, trustees, receivers, administrators, personal representatives, legatees, and devisees.

18.   **NOTICES.**   Any notice or other communication to be provided under this Assignment shall be in writing and sent by hand delivery, First Class U.S. Mail or recognized overnight courier service (e.g. Federal Express) to the parties at the addresses described below or such other address as the parties may designate in writing from time to time.

If to one or more of the Obligors:

Lextron Corporation
249 Mitchell Ave.
Jackson, MS 39213
Attention:  Mr. Charles Doty

If to the Lender:

SouthTrust Bank
Corporate Special Assets
420 North 20th Street
Suite 3300
Birmingham, Alabama 35203

19.   **SEVERABILITY.**   If any provision of this Assignment violates the law or is unenforceable, the rest of the Agreement shall remain valid.

ST/Lextron (Delphi)
000429

20.   APPLICABLE LAW; JURISDICTION.   The validity, interpretation, enforcement and effect of this Assignment shall be governed by, and construed according to the laws of, the State of Alabama. By execution and delivery of this Assignment, Obligors expressly and irrevocably assent and submit to the personal jurisdiction of the state and federal courts presiding in and over Jefferson County, Alabama, in any legal action or proceeding arising under, out of, or in any manner relating to this Assignment or the Obligation, the Credit Agreements and/or the Guaranties, and acknowledge that the negotiation, execution and delivery of this Assignment constitute sufficient contacts with the State of Alabama for purposes of independently conferring such jurisdiction. The Obligors further agree that the exclusive venue of any such legal action or proceeding arising out of or in any manner relating to this Assignment, the Obligations, the Credit Agreements and/or the Guaranties, shall be in the state and/or federal courts presiding in and over Jefferson County, Alabama, unless the Lender shall, at its sole option, elect to bring or permit the maintenance of any such action in another venue, and the Obligors hereby waive any and all rights under any state or federal law to object to such venue on grounds of *forum non conveniens* or otherwise.

21.   WAIVER OF JURY TRIAL. THE OBLIGORS AND LENDER, HEREBY MUTUALLY WAIVE ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY PERTAINING OR RELATING TO THIS ASSIGNMENT, THE OBLIGATIONS, THE CREDIT DOCUMENTS, THE GUARANTIES, OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION WITH THE OBLIGATIONS, OR (B) IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS ASSIGNMENT, THE OBLIGATIONS, THE CREDIT DOCUMENTS, THE GUARANTIES OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR IN CONNECTION WITH THE TRANSACTIONS RELATED THERETO OR CONTEMPLATED THEREBY OR THE EXERCISE OF EITHER PARTY'S RIGHTS AND REMEDIES THEREUNDER, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. THE OBLIGORS AND LENDER AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED AGREEMENT BETWEEN THE PARTIES IRREVOCABLY TO WAIVE TRIAL BY JURY, AND THAT ANY DISPUTE OR CONTROVERSY WHATSOEVER BETWEEN THEM SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

22.   COLLECTION COSTS. If Lender hires an attorney to assist in collecting any amount due or enforcing any right or remedy under this Assignment, Obligors agree to pay Lender's reasonable attorneys' fees and collection costs.

23.   MISCELLANEOUS. This Assignment is executed for commercial purposes. Obligors shall supply information regarding the Collateral in the form and manner as requested by Lender from time to time. All information furnished by Obligors to Lender shall be true,

ST/Lextron (Delphi)
000430

accurate and complete in all respects.  Obligors and Lender agree that time is of the essence. Obligors waive presentment, demand for payment, notice of dishonor and protest except as required by law. This Assignment shall remain in full force and effect until Lender provides Obligors with written notice of termination. This Assignment and any related documents represent the complete and integrated understanding between Obligors and Lender pertaining to the terms and conditions of those documents.

24.    **EFFECT OF ASSIGNMENT.**  Obligors acknowledge and agree that (i) this Assignment is not intended to be, and shall not be deemed or construed to be, a novation, payment, settlement, satisfaction, or release, in whole or in part, of any of the Obligations, as evidenced by the Credit Documents and Guaranties; (ii) this Assignment is not intended to be, and shall not be deemed or construed to be, a modification, amendment, settlement, release or waiver of any rights Lender may have against Obligors with respect to the Obligations, the Credit Documents and Guaranties; and (iii) except as otherwise expressly provided in this Assignment, Lender reserves all available rights and remedies, at law, in equity, and under the Credit Documents and Guaranties in connection with any default or event of default, whether now existing or hereafter occurring, under the Credit Documents or Guaranties.  No action of Lender hereunder or pursuant to the Credit Documents, the Guaranties or otherwise shall act to release Obligors from their Obligations to Lender, and all of said Obligations are hereby ratified and affirmed the same as if repeated on this date.

IN WITNESS WHEREOF, Borrower, Automotive and Lender have caused this Assignment to be properly executed and delivered by their duly authorized representatives, and the Doty has hereunto set his hand and seal, all as of the day and year first above written.

OBLIGORS:

WITNESS:

_____        _____
                                        CHARLES J. DOTY

ATTEST:                                 LEXTRON CORPORATION

_____        By: _____
                                        Its: President / C.E.O.

ATTEST:                                 LEXTRON AUTOMOTIVE, LLC

_____        By: _____
                                        Its: President / C.E.O.

1078601 v4                              10

ST/Lextron (Delphi)
000431

LENDER:

SOUTHTRUST BANK

ATTEST:

By: _____
Its: _____

11

ST/Lextron (Delphi)
000432

# EXHIBIT "10"

Exhibit 99 (c)

AMENDED AND RESTATED BYLAWS

OF

DELPHI CORPORATION

(Incorporated under the Laws of the State of Delaware)

As Amended Through October 8, 2005

 

TABLE OF CONTENTS

Page

ARTICLE I

Offices And Records; Certain Definitions ···················································································1

Section 1.1  Delaware Office ·····················································································1
Section 1.2  Other Offices ·························································································1
Section 1.3  Books and Records ··············································································1
Section 1.4  Certain Definitions ···············································································1

ARTICLE II

Action By Stockholders··············································································································2

Section 2.1  Annual Meetings···················································································2
Section 2.2  Special Meetings ··················································································2
Section 2.3  Place of Meetings ·················································································2
Section 2.4  Notice of Meetings; Postponement or Cancellation ·······················2
Section 2.5  Quorum and Adjournment ····································································3
Section 2.6  Proxies·································································································3
Section 2.7  Notice of Stockholder Nominations and Other Proposed Stockholder Action. ··· 3
Section 2.8  Procedure for Election of Directors and Other Stockholder Votes···· 7
Section 2.9  Vote Required for Stockholder Action ··················································7
Section 2.10  No Stockholder Action by Written Consent ········································7

ARTICLE III

Board of Directors·····················································································································8

Section 3.1  General Powers·····················································································8
Section 3.2  Number and Tenures of Directors ························································8
Section 3.3  Regular Meetings ··················································································8
Section 3.4  Special Meetings ··················································································8
Section 3.5  Notice of Meetings ················································································9
Section 3.6  Action by Written Consent In Lieu of a Meeting ···································9
Section 3.7  Telephonic Participation in Meetings ···················································9

ii

 

Section 3.8  Quorum; Vote Required for Action ···································································· 9

Section 3.9  Vacancies ··············································································································· 10

Section 3.10  Board Approval Policies ··················································································· 10

Section 3.11  Committees of the Board of Directors ······················································· 11

Section 3.12  Removal ················································································································· 14

Section 3.13  Minutes of the Board and Certain Other Records ···································· 14


ARTICLE IV

Officers ············································································································································· 14


Section 4.1  Officers ···················································································································· 14

Section 4.2  Election and Term of Office ·············································································· 15

Section 4.3  Chairman of the Board; Chief Executive Officer; Vice Chairmen of the Board ·········· 15

Section 4.4  President ·················································································································· 15

Section 4.5  Vice Presidents ······································································································ 16

Section 4.6  Treasurer; Assistant Treasurers ······································································ 16

Section 4.7  General Counsel; Assistant General Counsel ············································· 16

Section 4.8  Secretary; Assistant Secretaries ····································································· 17

Section 4.9  Agents; Employees ······························································································ 17

Section 4.10  Removal ················································································································· 17

Section 4.11  Vacancies ·············································································································· 17


ARTICLE V

Indemnification of Directors, Officers, Executives, Managerial Employees, Employees and Agents ······· 18


Section 5.1  Indemnification Respecting Third Party Claims ·········································· 18

Section 5.2  Indemnification Respecting Derivative Claims ············································ 19

Section 5.3  Determination of Entitlement to Indemnification ········································ 20

Section 5.4  Right to Indemnification In Certain Circumstances ··································· 20

Section 5.5  Advances of Expenses ························································································ 21

Section 5.6  Indemnification Not Exclusive ·········································································· 21

Section 5.7  Corporate Obligations; Reliance ······································································ 22

Section 5.8  Accrual of Claims; Successors ········································································· 22

Section 5.9  Insurance ················································································································· 22

Section 5.10  Definitions of Certain Terms ··········································································· 22

iii

## ARTICLE VI

Stock Certificates and Transfers ·············································································· 23

Section 6.1  Stock Certificates and Transfers ············································· 23
Section 6.2  Lost, Stolen or Destroyed Certificates ································· 24

## ARTICLE VII

Contracts, Proxies, Etc. ······························································································ 24

Section 7.1  Contracts ··················································································· 24
Section 7.2  Proxies ······················································································· 24

## ARTICLE VIII

Miscellaneous Provisions ··························································································· 25

Section 8.1  Fiscal Year ················································································· 25
Section 8.2  Dividends ·················································································· 25
Section 8.3  Seal ···························································································· 25
Section 8.4  Waiver of Notice ······································································· 25
Section 8.5  Annual Audit ·············································································· 25
Section 8.6  Resignations ·············································································· 25

## ARTICLE IX

Amendments ················································································································ 26

ARTICLE I

Offices And Records; Certain Definitions

Section 1.1 Delaware Office. The principal office of the Corporation in the State of Delaware shall be located in the City of Wilmington, County of New Castle, and the name and address of its registered agent is The Corporation Trust Company, 1209 Orange Street in the City of Wilmington, County of New Castle.

Section 1.2 Other Offices. The Corporation may have such other offices, either within or without the State of Delaware, as the business of the Corporation may from time to time require and as may be authorized by the Board of Directors or the officers.

Section 1.3 Books and Records. The books and records of the Corporation may be kept outside the State of Delaware at such place or places as may from time to time be designated by the Board of Directors or officers.

Section 1.4 Certain Definitions. Except where otherwise explicitly provided, all references herein to the "CERTIFICATE OF INCORPORATION" shall mean the certificate of incorporation of the Corporation as from time to time amended or restated and in effect (including any certificates of designations (a "PREFERRED STOCK DESIGNATION") filed under section 151(g) (or any successor provision) of the General Corporation Law of the State of Delaware, as amended and in effect from time to time (the "DGCL")), starting with the Amended and Restated Certificate of Incorporation dated January 26, 1999 in effect on the date these Bylaws become effective. In the event of any amendment of these Bylaws that does not involve a complete restatement thereof, any reference herein to "THE BYLAWS" or "THESE BYLAWS" or "HEREIN", or "HEREOF" or a like reference shall refer to these Bylaws as so amended.

1



ARTICLE II

ACTION BY STOCKHOLDERS

Section 2.1 Annual Meetings. The Annual Meeting of Stockholders of the Corporation for the election of directors and to act on such other matters as may properly be brought before the meeting shall be held on such date and at such time as may be fixed by resolution of the Board of Directors, except as may otherwise be provided by law.

Section 2.2 Special Meetings. Except as otherwise required by law and subject to the rights of the holders of any class or series of stock having a preference over the common stock as to dividends or distributions upon liquidation, special meetings of stockholders of the Corporation of any class or series for any purpose or purposes may be called only by the Board of Directors pursuant to a resolution stating the purpose or purposes thereof approved by a majority of the total number of directors which the Corporation would have if there were no vacancies on the Board of Directors (the "WHOLE BOARD"). No business other than that stated in the notice shall be transacted at any special meeting.

Section 2.3 Place of Meetings. The Board of Directors shall designate the place of meeting for any annual meeting or for any special meeting of the stockholders. If no designation is so made, the place of meeting shall be the principal office of the Corporation.

Section 2.4 Notice of Meetings; Postponement or Cancellation. Written notice of a meeting of stockholders, stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be given, either personally or by mail, by the Corporation not less than 10 calendar days nor more than 60 calendar days before the date of the meeting to each stockholder of record entitled to vote at such meeting. If mailed, such notice shall be deemed to be given when deposited in the United States mail with postage thereon prepaid, addressed to the stockholder at such person's address as it appears on the stock transfer books of the Corporation. Such further notice shall be given as may be required by law. Only such business shall be conducted at a special meeting of stockholders of which notice shall have been given in accordance herewith. Any proper matter for stockholder action may be brought before an Annual Meeting of Stockholders, provided that notice of any such matter to be brought before the meeting by any stockholder shall have been given to the Corporation as provided by Section 2.7 of these Bylaws. Meetings may be held without notice if all stockholders entitled to vote are present, or if notice is waived in accordance with Section 8.4 of these Bylaws by those not present or not provided notice. Any previously scheduled meeting of the stockholders may be postponed or cancelled, and any special meeting of the stockholders called by the

2

Board of Directors may be postponed or cancelled, by resolution of the Board of Directors upon public notice given prior to the date previously scheduled for such meeting of stockholders.

Section 2.5 Quorum and Adjournment. Except as otherwise provided by law or by the Certificate of Incorporation, the holders of a majority of the voting power of all outstanding shares of the Corporation entitled to vote generally in the election of directors ("VOTING STOCK"), represented in person or by proxy, shall constitute a quorum at a meeting of stockholders, except that, when specified business is to be voted on by one or more classes or series of stock voting as a class, unless otherwise provided by law or the Certificate of Incorporation, the holders of a majority of the voting power on such matter of the shares of all such classes or series shall constitute a quorum for the transaction of such business. Any meeting may be adjourned from time to time, whether or not there is a quorum, either (i) in the discretion of the Chairman of the meeting where necessary for the proper and orderly conduct of the meeting (including, without limitation, where necessary to tabulate any vote the tabulation of which is necessary for the continued conduct of the meeting) or (ii) by vote of the holders of a majority of the voting power of the shares of stock present at the meeting. Other than an announcement at the meeting of the time and place of the adjourned meeting, no notice of the time and place of adjourned meetings need be given except as required by law. The stockholders present at a duly called meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum, provided that the vote required for the taking of any particular stockholder action shall nonetheless continue to be required for such action.

Section 2.6 Proxies. At all meetings of stockholders, a stockholder may vote by proxy in writing (or in such other form as permitted by the DGCL) executed by the stockholder or by the stockholder's duly authorized attorney-in-fact.

Section 2.7 Notice of Stockholder Nominations and Other Proposed Stockholder Action.

(a)    Annual Meetings of Stockholders.

(1)    Nominations of persons for election as directors and the proposal of matters to be considered and voted on by the stockholders at an Annual Meeting of Stockholders made be made only (i) by or at the direction of the Board of Directors, or (ii) by any stockholder of the Corporation who was a stockholder of record at the time of giving the notice required by this Section and who shall be entitled to vote at the meeting (or a duly authorized proxy therefor) and who complies with the notice procedures set forth in this Section.

3

(2)    For nominations or other proposals to be properly brought before an Annual Meeting of Stockholders by a stockholder pursuant to paragraph (a)(1) of this Section, the stockholder must have given timely notice thereof (including the information required hereby) in writing to the Secretary of the Corporation and any such proposal must otherwise be a proper matter for stockholder action. To be timely, a stockholder's notice shall be delivered to the Secretary at the principal executive offices of the Corporation not later than the close of business on the 90th calendar day nor earlier than the close of business on the 120th calendar day prior to the first anniversary of the preceding year's annual meeting; provided, however, that in the event that the date of the annual meeting is more than 30 calendar days before or more than 60 calendar days after such anniversary date, notice by the stockholder to be timely must be so delivered not earlier than the close of business on the 120th calendar day prior to such annual meeting and not later than the close of business on the later of the 90th calendar day prior to such annual meeting or the 10th calendar day following the calendar day on which public announcement of the date of such meeting is first made by the Corporation. In no event shall the public announcement of an adjournment of an annual meeting commence a new time period for the giving of a stockholder's notice of a nomination or proposed action as described above. Such stockholder's notice shall set forth: (a) as to each person whom the stockholder proposes to nominate for election or reelection as a director, all information relating to such person that is required to be disclosed in solicitations of proxies for election of directors in an election contest, or is otherwise required, in each case pursuant to Regulation 14A under the Securities Exchange Act of 1934, as amended (the "EXCHANGE ACT"), and Rule 14a-11 thereunder (or any successor provision of law), including such person's written consent to being named as a nominee and to serving as a director if elected; (b) as to any other business that the stockholder proposes to bring before the meeting, a brief description of the business desired to be brought before the meeting, the reasons for conducting such business at the meeting and any material interest in such business of such stockholder and of any of such stockholder's affiliates (as defined below) and of any person who is the beneficial owner (as defined below), if any, of such stock; and (c) as to the stockholder giving the notice and each beneficial owner, if any, of such stock, the name and address of such stockholder, as they appear on the Corporation's stock ownership records, and the name and address of each beneficial owner of such stock and the class and number of shares of capital stock the Corporation which are owned of record or beneficially by each such person.

(3)    Notwithstanding anything in the second sentence of paragraph (a)(2) of this Section to the contrary, in the event that the number of directors to be elected to the Board of Directors of the Corporation at an annual meeting of stockholders is increased and there is no public announcement by the Corporation specifying the increased size of the Board of Directors

4

 

at least 100 calendar days prior to the first anniversary of the preceding year's annual meeting, a stockholder's notice required by this Section shall also be considered timely, but only with respect to nominees for any new positions created by such increase, if it shall be delivered to the Secretary of the Corporation at the principal executive offices of the Corporation not later than the close of business on the 10th calendar day following the day on which such public announcement is first made by the Corporation.

(b)     Special Meetings of Stockholders. Only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the Corporation's notice of meeting under Section 2.4 of these Bylaws. Nominations of persons for election to the Board of Directors at a special meeting of stockholders at which directors are to be elected pursuant to the Corporation's notice of meeting may be made only (i) by or at the direction of the Board of Directors or (ii) provided that the Board of Directors has determined that directors shall be elected at such meeting, by any stockholder of the Corporation who is a stockholder of record at the time of giving the notice required by this Section and who shall be entitled to vote at the meeting (or a duly authorized proxy therefor) and who complies with the notice procedures set forth in this Section. In the event the Corporation calls a special meeting of stockholders for the purpose of electing one or more directors to the Board of Directors, for nominations to be properly brought before the special meeting by a stockholder pursuant to this paragraph, the stockholder must give notice thereof containing the information required in the case of a nomination to be made by a stockholder at an annual meeting of stockholders by paragraph (a)(2) of this Section to the Secretary of the Corporation at the principal executive offices of the Corporation not earlier than the close of business on the 120th calendar day prior to such special meeting and not later than the close of business on the later of the 90th calendar day prior to such special meeting or the 10th calendar day following the day on which public announcement is first made of the date of the special meeting and of the nominees proposed by the Board of Directors to be elected at such meeting. In no event shall the public announcement of an adjournment of a special meeting commence a new time period for the giving of a stockholder's notice of a nomination as described above.

5

(c)  General.

(1)    Only such persons who are nominated in accordance with the procedures set forth in this Section shall be eligible to serve as directors and only such business shall be conducted at a meeting of stockholders as shall have been brought before the meeting in accordance with the procedures set forth in this Section. Except as otherwise provided by law, the Certificate of Incorporation or these Bylaws, the Chairman of the meeting shall have the power and duty to determine whether a nomination or any business proposed to be brought before the meeting was made or proposed, as the case may be, in accordance with the procedures set forth in this Section and, if any proposed nomination or business is not in compliance with this Section, to declare that such defective proposal or nomination shall be disregarded.

(2)    For purposes of this Section, "AFFILIATE" in respect of a person shall mean another person who controls, is controlled by or is under common control with such person and the term "BENEFICIALLY OWNS" (and variations thereof) shall have the same meaning as when used in Section 13(d) of the Exchange Act and Regulation 13D-G thereunder (or any successor provision of law). For purposes of this Section, "PUBLIC ANNOUNCEMENT" shall mean disclosure in a press release reported by the Dow Jones News Service, Associated Press or comparable national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Section 13, 14 or 15(d) of the Exchange Act.

(3)    Notwithstanding the foregoing provisions of this Section, (i) a stockholder shall also be required to comply with all applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth in this Section and nothing contained herein shall constitute a waiver by the Corporation or any stockholder of compliance therewith and (ii) nothing in this Section shall be deemed to affect any rights (A) of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act (or any successor provision of law) or (B) of the holders of any series of preferred stock to elect directors in accordance with the provision of an applicable Preferred Stock Designation.

(4)    Notwithstanding the foregoing provisions of this Section, any common stockholder who, together with its affiliates, owns shares of common stock entitled to exercise a majority of the voting power which all outstanding shares of Voting Stock are entitled to exercise in the election of directors may nominate one or more individuals for election as directors by giving to the Secretary of the Corporation in writing notice only of the name and business or

6

residence address of its nominee or nominees, including each such individual's written consent to being named as a nominee and to serving as a director if elected, not later than five days before the day on which the meeting for the election of directors is scheduled to be held.

Section 2.8 Procedure for Election of Directors and Other Stockholder Votes. Election of directors at all meetings of the stockholders at which directors are to be elected shall be by ballot only if required by the Chairman of the meeting. The Board of Directors by resolution shall appoint, or shall authorize an officer of the Corporation to appoint, one or more inspectors of election with respect to all votes at any annual or special meeting of stockholders, which inspector or inspectors may include individuals who serve the Corporation in other capacities, including, without limitation, as officers, employees, agents or representatives. One or more persons may be designated as alternate inspector(s) to replace any inspector who fails to act. If no inspector or alternate has been appointed to act or is able to act at a meeting of stockholders, the Chairman of the meeting shall appoint one or more inspectors to act at the meeting. Each inspector, before discharging such person's duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of such person's ability. The inspector(s) shall collect any ballots and tabulate all votes and make a report thereon and shall have the other duties prescribed by law. The Chairman of the meeting shall fix and announce at the meeting the time of the opening and the closing of the polls for each matter upon which the stockholders will vote at the meeting, provided, however, that procedural matters may be voted on by voice vote or other means, without a tabulation of votes.

Section 2.9 Vote Required for Stockholder Action. Subject to the rights(if any) of the holders of any series of preferred stock to elect directors from time to time as provided by the Certificate of Incorporation, a plurality of the votes cast in favor of a nominee at the meeting shall be required for, and sufficient to, elect a director. Except as otherwise provided by law, the Certificate of Incorporation or these Bylaws (including with respect to removal of directors), in all matters other than the election or removal of directors, the affirmative vote of a majority of the voting power of the shares present in person or represented by proxy at a meeting and entitled to vote on a matter presented to the meeting and voting in favor of or against the matter presented shall be required for, and sufficient to constitute, the act of the stockholders on such matter.

Section 2.10 No Stockholder Action by Written Consent. Except as otherwise provided pursuant to provisions of the Certificate of Incorporation fixing the powers, privileges or rights of any series of preferred stock in respect of action by written consent of the holders of such series of preferred stock, any action required or permitted to be taken by the stockholders of the Corporation must be effected at a duly called annual or special meeting of such holders and may not be effected by any consent in writing by such holders.

7

ARTICLE III

BOARD OF DIRECTORS

Section 3.1 General Powers. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. In addition to the powers and authorities by these Bylaws expressly conferred upon them, the Board of Directors may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation or by these Bylaws required to be exercised or done by the stockholders.

Section 3.2 Number and Tenures of Directors. Except as otherwise fixed by or pursuant to provisions of the Certificate of Incorporation relating to the rights of the holders of any class of preferred stock or series thereof with respect to the election of additional directors under specified circumstances, the number of the directors of the Corporation shall be fixed from time to time exclusively pursuant to a resolution adopted by a majority of the Whole Board (but shall not be less than three); provided, however, that no reduction in the number of directors shall reduce the term of office of any director then in office. The directors, other than those who may be elected by the holders of any class of preferred stock or any series thereof, shall be classified by the Board of Directors with respect to the time for which they severally hold office, into three classes, as nearly equal in number as possible, one class to be originally elected for a term expiring at the annual meeting of stockholders to be held in 2000, another class to be originally elected for a term expiring at the annual meeting of stockholders to be held in 2001, and another class to be originally elected for a term expiring at the annual meeting of stockholders to be held in 2002, with a director of each class to hold office until his or her successor is duly elected and qualified (such classification to be effective upon the date shares of common stock of the Corporation are first publicly held). At each succeeding annual meeting of stockholders, directors elected to succeed those directors whose terms then expire shall be elected for a term of office to expire at the third succeeding annual meeting of stockholders after their election (and until such person's successor shall have been duly elected and qualified).

Section 3.3 Regular Meetings. The Board of Directors may, by resolution, provide the time and place for the holding of regular meetings without other notice than such resolution.

Section 3.4 Special Meetings. Special meetings of the Board of Directors may be called by the Chairman of the Board, any Vice Chairman of the Board (if any), the President or any three directors then in office. The person or persons authorized to call a special meeting of the Board of Directors may fix the

8

place, date and time of the meeting. Upon request by the person or persons authorized to call a special meeting, the Secretary shall give any requisite notice for the meeting.

Section 3.5 Notice of Meetings. Notice of any special meeting of directors shall be given to each director in a writing addressed to such person's business address or principal residence (as the Secretary has most recently been advised of) and sent by hand delivery, first-class or overnight mail or courier service, telegram or facsimile transmission, or given to the director orally. If mailed by first-class mail, such notice shall be deemed adequately delivered when deposited in the United States mails so addressed, with postage thereon prepaid, at least 5 calendar days before such meeting. If by telegram, overnight mail or courier service, such notice shall be deemed adequately delivered when the telegram is delivered to the telegraph company or the notice is delivered to the overnight mail or courier service company at least 24 hours before such meeting. If by facsimile transmission, such notice shall be deemed adequately delivered when the notice is transmitted at least 12 hours before such meeting. If given orally (by telephone or in person) or by hand delivery, the notice shall be given at least 12 hours prior to the time set for the meeting. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified in the notice of such meeting. A meeting may be held at any time without notice if all the directors then in office are present or if all directors then in office waive in writing notice of the meeting either before or after such meeting.

Section 3.6 Action by Written Consent In Lieu of a Meeting. Any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board or committee.

Section 3.7 Telephonic Participation in Meetings. Members of the Board of Directors or any committee thereof may participate in a meeting of the Board of Directors or such committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at such meeting; provided, however, that provision of such means for telephonic participation shall be in the discretion of the Board of Directors.

Section 3.8 Quorum; Vote Required for Action. Subject to Section 3.9 of these Bylaws, a quorum for the transaction of business by the Board of Directors at a meeting thereof shall be a majority of the Whole Board, but, if at any meeting of the Board of Directors there shall be less than a quorum present, a majority of the directors present may adjourn the meeting from time to time without notice to all the directors not present of the time and place of the adjourned meeting; provided, however, that no adjourned meeting shall continue past the date for which the next notice of meeting is given or the next

9

regular meeting is scheduled. Except as otherwise provided in the Certificate of Incorporation or these Bylaws (including, without limitation, Section 3.10 of these Bylaws), the affirmative vote of the majority of the directors present at a meeting at which a quorum is present when the meeting is convened shall be the act of the Board of Directors. The directors present at a duly convened meeting may continue to transact business until adjournment, notwithstanding the withdrawal from the meeting of enough directors to leave less than a quorum, provided that the votes required for the taking of any particular action shall nonetheless continue to be required for such action to be taken.

Section 3.9 Vacancies. Except as otherwise provided for or fixed by or pursuant to provisions of the Certificate of Incorporation relating to the rights of the holders of any class or preferred stock or series thereof with respect to the election of additional directors under specified circumstances, newly created directorships resulting from any increase in the number of directors and any vacancies on the Board of Directors resulting for any reason shall be filled by the affirmative vote of a majority of the remaining directors then in office, even though less than a quorum of the Board of Directors. Any director elected in accordance with the preceding sentence shall hold office for the remainder of the full term of the class of directors in which the new directorship was created or the vacancy occurred and until such director's successor shall have been duly elected and qualified. No decrease in the number of directors constituting the Board of Directors shall shorten the term of any incumbent director.

Section 3.10 Board Approval Policies. The Board of Directors by resolution adopted by the affirmative vote of a majority of the Whole Board shall establish such policies for the Corporation with respect to the categories of matters which shall require the approval of the Board of Directors or a committee thereof prior to the Corporation taking action to put such a matter into effect, as the Board of Directors shall from time to time consider appropriate for the exercise of effective oversight of the Corporation's business and affairs by the Board of Directors. Any such resolution or resolutions may provide that the approval by the Board of Directors required for a particular category of matter shall require the affirmative vote of a number of directors greater than that which would otherwise be required by Section 3.8 of these Bylaws (but not greater than 80% of the Whole Board) and any such greater vote requirement established by such resolution requiring the affirmative vote of a number of directors greater than that which would otherwise be required by Section 3.8 of these Bylaws shall have the same force and effect as if set forth in these Bylaws; provided, however, that such resolution shall have been adopted by the like affirmative vote of the Board of Directors as that required by such resolution for such approval of the Board of Directors; and provided further that any such resolution that has been adopted by the Board of Directors may be rescinded or amended only by the affirmative vote of a majority of the Whole Board.

Section 3.11 Committees of the Board of Directors.

(a)    Designation of Committees. The Board of Directors may by resolution designate one or more committees in addition to the standing committees of the Board of Directors hereinafter provided for, consisting of one or more directors of the Corporation, which, to the extent authorized in any resolution of the Board of Directors or these Bylaws and permissible under the laws of the State of Delaware and the Certificate of Incorporation, shall have and may exercise any or all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation. The Board of Directors by resolution shall have power at any time to fill vacancies in, to change the membership of or to dissolve any such committee. Any committee of the Board of Directors may authorize the seal of the Corporation to be affixed to any papers which may require it pertaining to matters within the committee's authority.

(b)    Alternate Members of Committee. The Board of Directors may designate one or more directors as alternate members of any committee (by the same vote required to elect a regular member of the committee), who may replace any absent or disqualified member at any meeting of the committee. The presence of such an alternate at a meeting of the committee shall count towards the quorum for such meeting and the vote or consent of such an alternate shall have the same force and effect as that of a regular member of the committee.

(c)    Committee Procedures; Quorum; Vote Required For Action. A majority of any committee may determine its procedures for conduct of business and fix the time and place of its meetings, unless the Board of Directors shall by resolution otherwise provide. Notice of such meetings shall be given to each member of the committee in the same manner as provided for meetings of the Board of Directors by Section 3.5 of these Bylaws. Each committee shall keep written minutes of its proceedings and shall report such proceedings to the Board of Directors when required. Except as otherwise provided by resolution of the Board of Directors, a quorum for the transaction of business by a committee at a meeting thereof shall be a majority of the members and the affirmative vote of a majority of the members present at a meeting at which a quorum is present shall be the act of the committee.

(d)    Committees of the Corporation. Nothing herein shall be deemed to prevent the Board of Directors from appointing one or more committees consisting in whole or in part of one or more officers, employees or persons who are not directors of the Corporation to conduct any part of the business or affairs of the Corporation; provided, however, that no such committee shall have or may exercise any authority of the Board of Directors.

11



(e)   Standing Committees. The following committees shall be standing committees of the Board of Directors: the Executive Committee, the Audit Committee, the Compensation and Executive Development Committee, and the Corporate Governance and Public Issues Committee. The members and chairmen of each standing committee of the Board of Directors shall be elected annually by the Board of Directors at its first meeting after each Annual Meeting of Stockholders or at any other time as the Board of Directors shall determine, but each such committee shall have at least three members. No officer or employee of the Corporation or any subsidiary of the Corporation shall be a member of the Audit Committee or the Corporate Governance and Public Issues Committee. No officer or employee of the Corporation or any subsidiary of the Corporation shall be a member of the Compensation and Executive Development Committee.

(f)   Executive Committee. The Executive Committee shall have and may exercise, between meetings of the Board of Directors, all of the powers and authority which the Board of Directors may exercise in the direction and management of the business and affairs of the Corporation, except as prohibited by the DGCL or the Certificate of Incorporation and except to the extent another committee shall have been accorded authority over the matter. The executive committee shall also have responsibility, and may exercise such powers and authority as may be necessary, to oversee the management of the investment funds of the Corporation and its subsidiaries and to serve as named fiduciary of all benefit plans of the Corporation and its subsidiaries covered by the Employee Retirement Income Security Act of 1974, as from time to time amended ("ERISA"), except to the extent that a different person, committee or entity is so designated by the documents governing such plans as approved by the Executive Committee or the Board of Directors.

(g)   Audit Committee. The Audit Committee shall have responsibility, and may exercise such powers and authority as may be necessary, to select, and to establish the scope of, and oversee the annual audit to be conducted by, the independent auditors for the Corporation and its consolidated subsidiaries, such selection for the ensuing calendar year to be made annually in advance of the annual meeting of stockholders. Such selection may be submitted to the stockholders for ratification or rejection at such meeting. The Audit Committee shall have such other responsibilities, and such powers and authority, as are normally incident to the functions of an audit committee or as may be determined by the Board of Directors. The members of the Audit Committee shall not be eligible to participate in any incentive compensation plan for employees of the Corporation or any of its subsidiaries.

(h) Compensation and Executive Development Committee.

(1)   The Compensation and Executive Development Committee shall determine the compensation of: (a) employees of the Corporation who are directors of the Corporation and (b)

12

after receiving and considering the recommendation of the Chief Executive Officer and the President of the Corporation, all officers of the Corporation or any other employee of the Corporation or any of its direct or indirect subsidiaries who occupy such other positions as may be designated by the committee from time to time.

(2) Where any employee benefit or incentive compensation plan affects employees of the Corporation or its subsidiaries whose compensation is to be determined or is subject to review by the Compensation and Executive Development Committee, such plan shall first be submitted to the committee for its review. Any such plan or amendment or modification shall be made effective with respect to such employees only if and to the extent approved by the committee. The committee also shall have and may exercise the powers and authority granted to it by any incentive compensation plan for employees of the Corporation or any of its subsidiaries.

(3) The Compensation and Executive Development Committee shall have such powers and authority as necessary to carry out the foregoing responsibilities and shall have such other responsibilities, and such other powers and authority, as may be determined by the Board of Directors.

(i) Corporate Governance and Public Issues Committee.

(1) The Corporate Governance and Public Issues Committee shall be responsible for matters relating to the governance of the Corporation, except as otherwise explicitly allocated by these Bylaws to the Executive Committee (with respect to investment funds), the Audit Committee or the Compensation and Executive Development Committee. The committee also shall, upon its own initiative or otherwise, inquire as it considers appropriate into all phases of the Corporation's business activities that relate to matters of public policy. The committee may make recommendations to the Board of Directors to assist it in the formulation and adoption of basic policies calculated to promote the best interests of the Corporation and the communities in which it operates.

(2) The Corporate Governance and Public Issues Committee shall also be responsible for matters relating to service on the Board of Directors, subject to any policies adopted by the Board of Directors. The committee from time to time shall conduct studies of the size and composition of the Board of Directors. Prior to each annual meeting of stockholders, the committee shall recommend to the Board of Directors the individuals to constitute the nominees of the Board of Directors, for whose election the Board of Directors will solicit proxies. The committee shall review the qualifications of individuals for consideration as director candidates

13

 

and shall recommend to the Board of Directors, for its consideration, the names of individuals for election by the Board of Directors. In addition, the committee shall from time to time conduct studies and make recommendations to the Board of Directors regarding compensation of directors.

(3) The Corporate Governance and Public Issues Committee shall have such powers and authority as necessary to carry out the foregoing responsibilities and shall have such other responsibilities, and such other powers and authority, as may be determined by the Board of Directors.

Section 3.12 Removal. Subject to the rights of any class of preferred stock or series thereof to elect and remove additional directors under specified circumstances any director may be removed from office only for cause by the affirmative vote of the holders of at least a majority of the voting power of all Voting Stock then outstanding, voting together as a single class.

Section 3.13 Minutes of the Board and Certain Other Records. The Board of Directors shall cause to be kept a record containing the minutes of the proceedings of the meetings of the Board and its committees, and of any actions thereof not taken at a meeting, and of the meetings of the stockholders and of any actions thereof not taken at a meeting, and appropriate stock transfer books and registers and such other books of records and accounts as may be necessary for the proper conduct of the business of the Corporation.

ARTICLE IV

OFFICERS

Section 4.1 Officers. The Board of Directors shall elect, as officers of the Corporation, a Chairman of the Board of Directors, a President, a Treasurer, a General Counsel, a Secretary, and such other officers (including, without limitation, one or more Vice Chairmen, a Controller, and such Vice Presidents, Senior Vice Presidents and Executive Vice Presidents) as the Board of Directors from time to time shall determine to be appropriate for the conduct of the Governance and affairs of the Corporation. The Chairman of the Board shall be chosen from among the directors. All officers elected by the Board of Directors shall each have such powers and duties as are provided by these Bylaws and determined by the Board of Directors or a committee thereof and, subject thereto, as customarily pertain to their respective offices. The Board or any committee thereof may from time to time also elect, or the Chairman of the Board, as chief executive officer of the Corporation, or the President may appoint, such subordinate officers (including one or more Assistant Vice Presidents, Assistant General Counsel, Assistant

14

 

Controllers, Assistant Secretaries and Assistant Treasurers), as the Board or such officer shall determine to be appropriate for the conduct of the business and affairs of the Corporation, provided that the Board of Directors shall be notified of the appointment by the Chairman of the Board or President of any such subordinate officer. Such subordinate officers shall have such duties and shall hold their offices for such terms as shall be prescribed by the Board or a committee thereof or, if appointed thereby, by the Chairman of the Board or President, as the case may be. Two or more offices may be held by one individual. The Board of Directors shall designate, from among the officers, a chief financial officer and a chief accounting officer.

Section 4.2 Election and Term of Office. The elected officers of the Corporation shall be elected annually by the Board of Directors at the regular meeting of the Board of Directors held after the annual meeting of the stockholders. If the election of officers shall not be held at such meeting, such election shall be held as soon thereafter as convenient. Each officer shall hold office until such person's successor shall have been duly elected and shall have qualified or until such person's death or incapacity or until he shall resign or be removed pursuant to Section 4.10 of these Bylaws.

Section 4.3 Chairman of the Board; Chief Executive Officer; Vice Chairmen of the Board. The Chairman of the Board shall (if present) preside at all meetings of the stockholders and of the Board of Directors. The Chairman of the Board shall be the chief executive officer of the Corporation. As the Corporation's chief executive, the Chairman of the Board shall be responsible for the general supervision of the management and the policies and affairs of the Corporation and shall perform the duties, and have the powers and authority, customarily incidental to such office and all such other duties, powers and authority as are determined by the Board of Directors. As chief executive of the Corporation, he or she shall be responsible to keep the Board of Directors reasonably informed about the business and affairs of the Corporation, and shall see that all orders and resolutions of the Board of Directors and of any committee thereof are carried into effect. The Chairman of the Board may also serve as President, if so elected by the Board. The directors also may elect one or more Vice-Chairmen to act in the place of the Chairman upon his or her absence or inability to act and to have such other responsibilities, and powers and authority, as may be determined by the Board of Directors.

Section 4.4 President. The President shall act in a general executive capacity and shall assist the Chairman of the Board in the general supervision of the management and the policies and affairs of the Corporation and shall supervise the day-to-day operations of the Corporation. The President, if he or she is also a director, shall, in the absence of or because of the inability to act of the Chairman of the Board, perform all duties of the Chairman of the Board and preside at all meetings of stockholders and of the Board of Directors.



Section 4.5 Vice Presidents. The Board of Directors may elect such Executive Vice Presidents, Senior Vice Presidents and Vice Presidents, with such powers, authority and duties, as the Board of Directors shall determine to be appropriate for the conduct of the business and affairs of the Corporation. The Vice Presidents shall have such power and duties and shall be subject to such directions, as may be provided from time to time by the Board of Directors, any committee thereof, the Chairman of the Board or the President. Assistant Vice Presidents shall have such of the powers, authority and duties of the Vice Presidents they assist as may be assigned by the Board of Directors, a committee thereof, the Chairman of the Board as chief executive officer, the President or such Vice President and during the absence or the disability of such Vice President, may exercise such of his or her powers and authority and perform such of his or her duties as may be appropriate to the conduct of the business and affairs of the Corporation.

Section 4.6 Treasurer; Assistant Treasurers. The Treasurer shall exercise general supervision over the receipt, custody and disbursement of the funds, including cash-equivalent securities, of the Corporation. The Treasurer shall cause the funds of the Corporation to be deposited in such banks, other depository institutions and brokerage firms as may be authorized by the Board of Directors or designated in such manner as may be provided by resolution of the Board of Directors. The Treasurer shall have such further powers and duties, and shall be subject to such directions, as may be provided from time to time by the Board of Directors, any committee thereof, the Chairman of the Board or the President. Assistant Treasurers shall have such of the powers, authority and duties of the Treasurer as may be assigned by the Board of Directors, a committee thereof, the Chairman of the Board as chief executive officer, the President or the Treasurer and, during the absence or the disability of the Treasurer, may exercise such of his or her powers and authority and perform such of his or her duties as may be appropriate for the conduct of the business and affairs of the Corporation.

Section 4.7 General Counsel; Assistant General Counsel. The General Counsel shall be the chief legal officer of the Corporation, shall exercise general supervision of the Corporation's legal affairs and may represent, or designate counsel to represent, the Corporation before any court, regulatory or investigative body or arbitral or other tribunal. The General Counsel shall have such other powers and duties, and shall be subject to such directions, as may be provided from time to time by the Board of Directors, any committee thereof, the Chairman of the Board or the President. Assistant General Counsels shall have such of the powers, authority and duties of the General Counsel as may be assigned by the Board of Directors, a committee thereof, the Chairman of the Board as chief executive officer, the President or the General Counsel and, during the absence or disability of the General Counsel, may exercise such of his or her powers and authority and perform such of his or her duties as may be appropriate for the conduct of the business and affairs of the Corporation.



Section 4.8 Secretary; Assistant Secretaries. The Secretary shall keep or cause to be kept minutes of all meetings of the Board, the committees of the Board and the stockholders; shall see that all notices of meetings thereof or actions taken thereby are duly given in accordance with the provisions of these Bylaws and as required by law; shall be custodian of the seal of the Corporation and may cause it to be affixed to all stock certificates of the Corporation (unless the seal of the Corporation on such certificates shall be a facsimile, as hereinafter provided) and to all other documents to be executed on behalf of the Corporation under its seal; shall certify or attest to actions of the Board of Directors, the committees thereof, or the stockholders or officers of the Corporation and shall see that all such certificates and other documents required by law to be kept and filed are properly kept and filed; and, in general, shall perform all the duties customarily incident to the office of secretary of a Corporation. The Secretary shall have such other powers and duties, and shall be subject to such directions, as may be provided from time to time by the Board, a committee thereof the Chairman of the Board as chief executive officer, the President or, as to legal matters, the General Counsel. Assistant Secretaries shall have such of the powers, authority and the duties of the Secretary as may be assigned by the Board of Directors, a committee thereof, the Chairman of the Board as chief executive officer, the President or the Secretary and during the absence or disability of the Secretary, may exercise such of his or her powers and authority and perform such of his or her duties as may be appropriate for the conduct of the business and affairs of the Corporation.

Section 4.9 Agents; Employees. The Board of Directors, a committee thereof and each officer of the Corporation may appoint such employees or other agents to perform any of its responsibilities and to exercise any of its powers as may be permitted by law.

Section 4.10 Removal. Any officer elected, or agent appointed, by the Board of Directors or a committee thereof and any subordinate officer or employee or agent appointed by the Board of Directors, a committee thereof, the Chairman of the Board as chief executive officer or the President may be removed by the Board of Directors, a committee or the officer who appointed such subordinate officer, employee or agent whenever, in the judgment thereof, the best interests of the Corporation would be served thereby. No officer shall have any rights against the Corporation for compensation by virtue of such election beyond the date of the election of such person's successor, such person's death, such person's resignation or such person's removal, whichever event shall first occur, except as otherwise provided in an employment or other contract or under an employee benefit plan.

Section 4.11 Vacancies. A newly created office and any vacancy in any elected office arising for any reason may be filled by the Board of Directors or a committee thereof. Any vacancy in a subordinate office appointed by the Chairman of the Board or the President arising for any reason may be filled by the Chairman of the Board or the President.

17

ARTICLE V

INDEMNIFICATION OF DIRECTORS, OFFICERS, EXECUTIVES,
MANAGERIAL EMPLOYEES, EMPLOYEES AND AGENTS

Section 5.1  Indemnification Respecting Third Party Claims.

(a)  Indemnification of Directors, Officers, Executives and Managerial Employees. The
Corporation, to the fullest extent permitted and in the manner required, by the laws of the State of
Delaware as in effect from time to time shall indemnify in accordance with the following provisions of this
Article any person who was or is made a party to or is threatened to be made a party to any threatened,
pending or completed action, suit or proceeding (including any appeal thereof), whether civil, criminal,
administrative, regulatory or investigative in nature (other than an action by or in the right of the
Corporation), by reason of the fact that such person is or was a director, officer, executive or managerial
employee of the Corporation, or, such person is or was serving at the request of, or to represent the
interests of, the Corporation as a director, officer, partner, member, trustee, fiduciary, executive,
managerial employee, employee or agent (a "SUBSIDIARY OFFICER") of another corporation,
partnership, joint venture, limited liability company, trust, employee benefit plan or other enterprise
including any charitable or not-for-profit public service organization or trade association (an "AFFILIATED
ENTITY"), against expenses (including attorneys' fees and disbursements), costs, judgments, fines,
penalties and amounts paid in settlement actually and reasonably incurred by such person in connection
with such action, suit or proceeding if such person acted in good faith and in a manner such person
reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to
any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful;
provided, however, that (i) the Corporation shall not be obligated to indemnify a director, officer, executive
or managerial employee of the Corporation or a Subsidiary Officer of any Affiliated Entity against
expenses incurred in connection with an action, suit, proceeding or investigation to which such person is
threatened to be made a party but does not become a party unless such expenses were incurred with the
approval of the Board of Directors, a committee thereof or the Chairman, a Vice Chairman or the
President of the Corporation and (ii) the Corporation shall not be obligated to indemnify against any
amount paid in settlement unless the Corporation has consented to such settlement. The termination of
any action, suit or proceeding by judgment, order, settlement or conviction or upon a plea of nolo
contendere or its equivalent shall not, of itself, create a presumption that the person did not act in good
faith and in a manner which such person reasonably believed to be in or not opposed to the best interests
of the Corporation, and, with respect to any criminal action or proceeding, that such person had
reasonable cause to believe that his or her conduct was unlawful. Notwithstanding anything to the

contrary in the foregoing provisions of this paragraph, a person shall not be entitled, as a matter of right, to indemnification pursuant to this paragraph against costs or expenses incurred in connection with any action, suit or proceeding commenced by such person against the Corporation or any Affiliated Entity or any person who is or was a director, officer, partner, member, fiduciary, executive, managerial employee, employee or agent of the Corporation or a Subsidiary Officer of any Affiliated Entity in their capacity as such, but such indemnification may be provided by the Corporation in a specific case as permitted by Section 5.6 of these Bylaws.

(b)    Indemnification of Employees and Agents. The Corporation may indemnify any employee or agent of the Corporation in the manner and to the same or a lesser extent that it shall indemnify any director, officer, executive or managerial employee under paragraph (a) above in this Section.

Section 5.2 Indemnification Respecting Derivative Claims.

(a)    The Corporation, to the fullest extent permitted and in the manner required, by the laws of the State of Delaware as in effect from time to time shall indemnify, in accordance with the following provisions of this Article, any person who was or is made a party to or is threatened to be made a party to any threatened, pending or completed action or suit (including any appeal thereof) brought by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that such person is or was a director, officer, executive or managerial employee of the Corporation, or is or was serving at the request of, or to represent the interests of, the Corporation as a Subsidiary Officer of an Affiliated Entity against expenses (including attorneys' fees and disbursements) and costs actually and reasonably incurred by such person in connection with such action or suit if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless, and only to the extent that, the Court of Chancery of the State of Delaware or the court in which such judgment was rendered shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses and costs as the Court of Chancery of the State of Delaware or such other court shall deem proper; provided, however, that the Corporation shall not be obligated to indemnify a director, officer, executive or managerial employee of the Corporation or a Subsidiary Officer of any Affiliated Entity against expenses incurred in connection with an action or suit to which such person is threatened to be made a party but does not become a party unless such expenses were incurred with the approval of the Board of Directors, a committee thereof, or the Chairman, a Vice Chairman or the President of the Corporation. Notwithstanding anything to the contrary in the foregoing provisions of this paragraph, a person shall not be entitled, as a matter of right, to indemnification pursuant to this paragraph against costs and expenses

19

 

incurred in connection with any action or suit in the right of the Corporation commenced by such Person, but such indemnification may be provided by the Corporation in any specific case as permitted by Section 5.6 of these Bylaws.

(b)    Indemnification of Employees and Agents. The Corporation may indemnify any employee or agent of the Corporation in the manner and to the same or a lesser extent that it shall indemnify any director, officer, executive or managerial employee under paragraph (a) above in this Section.

Section 5.3 Determination of Entitlement to Indemnification. Any indemnification to be provided under any of paragraphs of Section 5.1 or 5.2 of these Bylaws (unless ordered by a court of competent jurisdiction) shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification is proper under the circumstances because such person has met the applicable standard of conduct set forth in such paragraph. Such determination shall be made (i) by the Board of Directors by a majority vote of a quorum consisting of directors who were not parties to the action, suit or proceeding in respect of which indemnification is sought or by majority vote of the members of a committee of the Board of Directors composed of at least three members each of whom is not a party to such action, suit or proceeding, or (ii) if such a quorum is not obtainable and/or such a committee is not established or obtainable, or, even if obtainable, if a quorum of disinterested directors so directs, by independent legal counsel in a written opinion, or (iii) by the stockholders entitled to vote thereon. In the event a request for indemnification is made by any person referred to in paragraph (a) of Section 5.1 or 5.2 of these Bylaws, the Corporation shall use its best efforts to cause such determination to be made not later than 90 days after such request is made.

Section 5.4  Right to Indemnification in Certain Circumstances.

(a)    Indemnification Upon Successful Defense. Notwithstanding the other provisions of this Article, to the extent that a director, officer, executive, managerial employee, employee or agent of the Corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in any of paragraphs (a) or (b) of Section 5.1 or 5.2 of these Bylaws, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees and disbursements) and costs actually and reasonably incurred by such person in connection therewith.

(b)    Indemnification for Service As a Witness. To the extent any person who is or was a director, officer, executive or managerial employee of the Corporation has served or prepared to serve as a witness in any action, suit or proceeding (whether civil, criminal, administrative, regulatory or investigative in nature), including any investigation by any legislative body or any regulatory or self-

regulatory body by which the Corporation's business is regulated, by reason of his or her services as a director, officer, executive or managerial employee of the Corporation or his or her service as a Subsidiary Officer of an Affiliated Entity but excluding service as a witness in an action or suit commenced by such person, the Corporation shall indemnify such person against out-of-pocket costs and expenses (including attorneys' fees and disbursements) actually and reasonably incurred by such person in connection therewith and shall use its best efforts to provide such indemnity within 45 days after receipt by the Corporation from such person of a statement requesting such indemnification, averring such service and reasonably evidencing such expenses and costs; it being understood, however, that the Corporation shall have no obligation under this Article to compensate such person for such person's time or efforts so expended. The Corporation may indemnify any employee or agent of the Corporation to the same or a lesser extent as it may indemnify any director, officer, executive or managerial employee of the Corporation pursuant to the foregoing sentence of this paragraph.

Section 5.5 Advances of Expenses.

(a)    Advances to Directors, Officers, Executives and Managerial Employees. Expenses and costs, incurred by any person referred to in paragraph (a) of Section 5.1 or 5.2 of these Bylaws in defending a civil, criminal, administrative, regulatory or investigative action, suit or proceeding shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking in writing by or on behalf of such person to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified in respect of such costs and expenses by the Corporation as authorized by this Article.

(b)    Advances to Employees and Agents. Expenses and costs incurred by any person referred to in paragraph (b) of Section 5.1 or 5.2 of these Bylaws in defending a civil, criminal, administrative, regulatory or investigative action, suit or proceeding may be paid by the Corporation in advance of the final disposition of such action, suit or proceeding as authorized by the Board of Directors, a committee thereof or an officer of the Corporation authorized to so act by the Board of Directors upon receipt of an undertaking in writing by or on behalf of such person to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the Corporation in respect of such costs and expenses as authorized by this Article.

Section 5.6 Indemnification Not Exclusive. The provision of indemnification to or the advancement of expenses and costs to any person under this Article, or the entitlement of any person to indemnification or advancement of expenses and costs under this Article, shall not limit or restrict in any way the power of the Corporation to indemnify or advance expenses and costs to such person in any other way permitted by law or be deemed exclusive of, or invalidate, any right to which any person

seeking indemnification or advancement of expenses and costs may be entitled under any law, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in such person's capacity as an officer, director, executive, managerial employee, employee or agent of the Corporation and as to action in any other capacity.

Section 5.7 Corporate Obligations; Reliance. The provisions of this Article shall be deemed to create a binding obligation on the part of the Corporation to the persons who from time to time are elected officers or directors of the Corporation, and such persons in acting in their capacities as officers, directors, executives or managerial employees of the Corporation or Subsidiary Officers of any Affiliated Entity shall be entitled to rely on such provisions of this Article, without giving notice thereof to the Corporation.

Section 5.8 Accrual of Claims; Successors. The indemnification provided or permitted under the foregoing provisions of this Article shall or may, as the case may be, apply in respect of any expense, cost, judgment, fine, penalty or amount paid in settlement, whether or not the claim or cause of action in respect thereof accrued or arose before or after the effective date of such provisions of this Article. The right of any person who is or was a director, officer, executive, managerial employee, employee or agent of the Corporation or a Subsidiary Officer of an Affiliated Entity to indemnification or advancement of expenses as provided under the foregoing provisions of this Article shall continue after he or she shall have ceased to be a director, officer, executive, managerial employee, employee or agent or Subsidiary Officer of an Affiliated Entity and shall inure to the benefit of the heirs, distributees, executors, administrators and other legal representatives of such person.

Section 5.9 Insurance. The Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, executive, managerial employee, employee or agent of the Corporation, or is or was serving at the request of, or to represent the interests of, the Corporation as a Subsidiary Officer of any Affiliated Entity, against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under the provisions of this Article or applicable law.

Section 5.10 Definitions of Certain Terms. For purposes of this Article, (i) references to "the Corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed into the Corporation in a consolidation or merger if such corporation would have been permitted (if its corporate existence had continued) under applicable law to indemnify its directors, officers, executives, managerial employees, employees or agents, so that any person who is or was a director, officer, executive, managerial employee, employee or agent of such constituent corporation, or is or was serving at the request, or to represent the interests of, such

22



constituent corporation as a director, officer, executive, managerial employee, employee or agent of any Affiliated Entity shall stand in the same position under the provisions of this Article with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued; (ii) references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; (iii) references to "serving at the request of the Corporation" shall include any service as a director, officer, partner, member, trustee, fiduciary, executive, managerial employee, employee or agent of the Corporation or any Affiliated Entity which service imposes duties on, or involves services by, such director, officer, partner, member, trustee, fiduciary, executive, managerial employee, employee or agent with respect to an employee benefit plan, its participants, or beneficiaries; and (iv) a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interest of the Corporation" as referred to in this Article.

## ARTICLE VI

## STOCK CERTIFICATES AND TRANSFERS

Section 6.1 Stock Certificates and Transfers. The interest of each stockholder of the Corporation shall be evidenced by certificates for shares of stock in such form as the Board of Directors or appropriate officers of the Corporation may from time to time prescribe in accordance with the DGCL, the Certificate of Incorporation and these Bylaws, provided that the Board of Directors may provide by resolution that some or all of any or all classes or series of stock of the Corporation shall be uncertificated. Any such resolution, however, shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation. Notwithstanding the adoption of a resolution by the Board of Directors providing that shares of any class or series of stock of the Corporation shall be uncertificated, every holder of uncertificated shares shall be entitled to receive from the Corporation a certificate representing the number of shares registered in such holder's name. The shares of the stock of the Corporation shall be transferred on the books of the Corporation by the holder thereof in person or by such person's attorney, upon surrender for cancellation of certificates for at least the same number of shares, with an assignment and power of transfer endorsed thereon or attached thereto, duly executed, with such proof of the authenticity of such signature as the Corporation or its agents may reasonably require. The certificates of stock shall be signed, countersigned and registered in such manner as required by the DGCL and as the Board of Directors may by resolution prescribe.



Section 6.2 Lost, Stolen or Destroyed Certificates. No certificate for shares of stock in the Corporation shall be issued in place of any certificate alleged to have been lost, destroyed or stolen, except on production of such evidence of such loss, destruction or theft and on delivery to the Corporation of a bond of indemnity in such amount (if any), upon such terms and secured by such surety, as the Board of Directors or an appropriate officer may in its, his or her discretion require.

ARTICLE VII

CONTRACTS, PROXIES, ETC.

Section 7.1 Contracts. Except as otherwise explicitly prohibited or required by law, the Certificate of Incorporation or these Bylaws, any contract or other instrument may be executed and delivered in the name and on the behalf of the Corporation, and under its corporate seal, by such officer or officers, or such employee or employees or other agent or agents, of the Corporation as by or pursuant to these Bylaws may be authorized to act on the subject matter thereof, (and within any such limits as may have been established by the Board of Directors) without further specific direction thereunto from the Board of Directors.

Section 7.2 Proxies. Unless otherwise provided by resolution adopted by the Board of Directors, the Chairman of the Board as chief executive officer, the President or any Vice President may from time to time act or appoint an attorney or attorneys or agent or agents of the Corporation to act, in the name and on behalf of the Corporation, to cast any votes which the Corporation may be entitled to cast as the holder of stock or other securities in any other corporation or other company, at meetings of the holders of the stock or other securities of such other company, or to consent in writing, in the name of the Corporation as such holder, to any action by such other company or to waiver of any notice, or to exercise or waive any right appurtenant to such stock or other securities and may instruct the person or persons so appointed as to the manner of casting such votes or giving such consent or waiver or exercising or waiving any such right, and may execute or cause to be executed, in the name and on behalf of the Corporation and under its corporate seal or otherwise, all such written proxies or other instruments as he may deem appropriate for the conduct of the business and affairs of the Corporation.

## ARTICLE VIII

## MISCELLANEOUS PROVISIONS

Section 8.1 Fiscal Year. The fiscal year of the Corporation shall begin on the first day of January and end on the last day of December of each year.

Section 8.2 Dividends. The Board of Directors may from time to time declare, and the Corporation may pay, dividends on its outstanding shares in the manner and upon the terms and conditions provided by law and the Certificate of Incorporation.

Section 8.3 Seal. The corporate seal shall have inscribed thereon the words Corporate Seal, the year of incorporation and the word Delaware.

Section 8.4 Waiver of Notice. Whenever any notice is required to be given to any stockholder or director of the Corporation under the provisions of the DGCL, the Certificate of Incorporation or these Bylaws, a waiver thereof in writing, signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. Neither the business to be transacted at, nor the purpose of, any annual or special meeting of the stockholders or the Board of Directors or committee thereof need be specified in any waiver of notice of such meeting.

Section 8.5 Annual Audit. The accounts, books and records of the Corporation and its consolidated subsidiaries shall be audited upon the conclusion of each fiscal year by a firm of independent certified public accountants selected by the Audit Committee of the Board of Directors, and it shall be the duty of the Board of Directors to cause such audit to be done annually.

Section 8.6 Resignations. Any director or any officer, whether elected or appointed, may resign at any time by giving written notice of such resignation to the Chairman of the Board, the President, or the Secretary, and such resignation shall be deemed to be effective as of the close of business on the date said notice is received by the Chairman of the Board, the President, or the Secretary, or at such later time as is specified therein. No acceptance or other formal action shall be required of the Board of Directors, the stockholders or any officers to make any such resignation effective.

## ARTICLE IX

## AMENDMENTS

These Bylaws may be altered or repealed and new Bylaws may be adopted (i) at any annual or special meeting of stockholders by the affirmative vote of the holders of a majority of the voting power of the stock issued and outstanding and entitled to vote thereon; provided, however, that any proposed alteration or repeal of, or the adoption of any Bylaw inconsistent with, any of Section 2.2, 2.7 or 2.10 of Article II or Section 3.1, 3.2, or 3.12 of Article III or Section 8.6 of Article VIII or this Article IX of these Bylaws by the stockholders shall require the affirmative vote of the holders of at least 80% of the voting power of all Voting Stock then outstanding, voting together as a single class; and provided, further, that, in the case of any such stockholder action at a special meeting of stockholders, notice of the proposed alteration, repeal or adoption of the new Bylaw or Bylaws must be contained in the notice of such special meeting, or (ii) by the affirmative vote of a majority of the Whole Board; provided, however, that, before the Trigger Date, the affirmative vote of 80% of the Whole Board shall be required to alter or repeal any provision of these Bylaws or to adopt any new Bylaw.

# EXHIBIT F

Delphi Corporation
Special Party

| COMPANY | CONTACT | ADDRESS1 | CITY | STATE | ZIP |
|---------|---------|----------|------|-------|-----|
| Burr & Forman LLP | Attn D Christopher Carson | 3100 Southtrust Tower | Birmingham | AL | 35203 |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

4/16/2007 11:07 AM
Wachovia Special Party