1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION ET AL,


        Debtor.


- - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                March 21, 2007

                10:29 AM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1   HEARING re Third Omnibus Objection to Claims with hearing to be

2   held on 11/30/2006 at 10:00 AM at Courtroom 610 (RDD)

3   Objections due by 11/24/2006, filed by John Wm. Butler Jr. on

4   behalf of Delphi Corporation.

5

6   HEARING re Notice of Hearing Notice Of Claims Objection Hearing

7   With Respect To Debtors' Objection To Proof Of Claim No. 7090

8   filed by John Wm. Butler Jr. on behalf of Delphi Corporation.

9

10  HEARING re Notice of Adjournment of Hearing Notice of

11  Adjournment of Claims Objection Hearing with Respect to

12  Debtors' Objection to Proof of Claim No. 9956 (Joseph Reno)

13  filed by John Wm. Butler Jr. on behalf of Delphi Corporation.

14

15  HEARING re Notice of Proposed Order (HEARING DATE: 3/21/2007 at

16  10:00 AM) Notice of Presentment of Joint Stipulation and Agreed

17  Order Disallowing and Expunging Claim Numbers 2299 and 2300

18  Filed By Constellation NewEnergy - Gas Division, LLC and

19  Constellation NewEnergy, Inc. filed by Neil Matthew Berger on

20  behalf of Delphi Corporation.

21

22  HEARING re Notice of Presentment Notice Of Presentment Of Joint

23  Stipulation And Agreed Order Compromising And Allowing Proof Of

24  Claim Number 503 (Karl Kuefner KG) filed by John Wm. Butler Jr.

25  on behalf of Delphi Corporation.

3

1   HEARING re Notice of Presentment Notice Of Presentment Of Joint

2   Stipulation And Agreed Order Compromising And Allowing Proof Of

3   Claim Number 447 (Moraine Maintenance Company, Inc.) filed by

4   John Wm. Butler Jr. on behalf of Delphi Corporation.

5

6   HEARING re Notice of Presentment Notice Of Presentment Of Joint

7   Stipulation And Agreed Order Compromising And Allowing Proof Of

8   Claim Number 10275 (McDermott, Will & Emery) filed by John Wm.

9   Butler Jr. on behalf of Delphi Corporation.

10

11  HEARING re Notice of Presentment Notice Of Presentment Of Joint

12  Stipulation And Agreed Order Disallowing And Expunging Claim

13  Number 5506 (G.P. Reeves, Inc.) filed by John Wm. Butler Jr. on

14  behalf of Delphi Corporation.

15

16  HEARING re Notice of Presentment Notice Of Presentment Of Joint

17  Stipulation And Agreed Order Disallowing And Expunging Claim

18  Numbers 1214 And 3092 (Commissioner Of Revenue For The

19  Commonwealth Of Massachusetts filed by John Wm. Butler Jr. on

20  behalf of Delphi Corporation.

21

22

23

24

25  Transcribed by:  Pnina Eiberg

4

1

2    A P P E A R A N C E S :

3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

4        Attorneys for Debtor

5        333 West Wacker Drive

6        Chicago, IL 60606

7

8    BY:   JOHN K. LYONS, ESQ.

9        ALBERT L. HOGAN, III, ESQ.

10

11   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

12       Attorneys for Debtor

13       Four Times Square

14       New York, NY 10036

15

16   BY:   KAYALYN A. MARAFIOTI, ESQ.

17       THOMAS J. MATZ, ESQ.

18

19

20   LAW OFFICES OF BRAD A. CHALKER, LLC

21       Attorneys for Claimant Joseph Reno

22       848-C East Franklin Street

23       Dayton, OH 45475

24

25   BY:   BRAD A. CHALKER, ESQ.

5

1   TOGUT, SEGAL & SEGAL, LLP

2        One Penn Plaza

3        New York, NY 10119

4

5   BY:   TALLY M. WIENER, ESQ.

6

7   LATHAM & WATKINS, LLP

8        Attorneys for Committee

9        885 Third Avenue

10       New York, NY 10022

11

12  BY:   JUDE GORMAN, ESQ.

13

14  MCDERMOTT, WILL & EMERY

15       340 Madison Avenue

16       New York, NY 10017

17

18  BY:   ABIGAIL M. BEAL, ESQ.

19

20

21

22

23

24

25

6

1        **P R O C E E D I N G S**

2              THE COURT:  Please be seated.  Delphi Corporation.

3     I'm sorry we're late.  Our -- our scheduled ECRO reporter was

4     sick and we've been trying to make arrangements to have someone

5     all -- the whole day.  Why don't you go ahead?

6              MR. LYONS:  Good morning, Your Honor.  John Lyons on

7     behalf of Delphi Corporation and its affiliates.  I have here

8     with me in court Mr. Dean Unruh, Delphi Claims Administrator,

9     Karen Kraft who is managing restructuring counsel.  Also, Mr.

10    Tom Matz, Joe Warden and Lisa Diaz the Delphi claims team.  And

11    then handling the Reno matter that would be contested today is

12    my partner Al Hogan, Chris Conners and also Mr. Skip Koontz at

13    the Dinsmore and Shohl law firm.

14              THE COURT:  Okay.

15              MR. LYONS:  Your Honor, with your permission I could

16    proceed to the agenda.

17              THE COURT:  Why don't you do that?

18              MR. LYONS:  But first, Your Honor, I wanted to hand

19    up the chart that we do every other omnibus hearing to show the

20    progress in the claims administration.

21              THE COURT:  Okay.

22              MR. LYONS:  And Your Honor, the chart shows that

23    we've reached the midpoint in adjudicating or resolving over

24    half the total claims filed in the case.  There's about 16,000

25    claims and -- so we've -- I think this chart will show, Your

7

1    Honor, the progress we have been making.  And also, it's

2    noteworthy that a very significant portion of the remaining

3    fifty percent are actually claims that will be dealt with under

4    a plan of reorganization under the current framework agreement.

5    So we've actually -- are far -- dealt with, you know, much more

6    than fifty percent, in our view, of claims that will actually

7    have to be handled through this process.

8             THE COURT:  Okay.

9             MR. LYONS:  Okay, Your Honor, turning to the agenda.

10   Your Honor, I'd like to go rather quickly through some of the

11   matters that are being continued.  Item number 1, the claim

12   objection relating to Autoliv, the parties have agreed to

13   adjourn that to a future hearing date.  No date is set.

14             Item number 2, the claim objection regarding the

15   claim of Ms. Eva Orlik.  That has been continued to April 13th.

16             And then finally, item number 3 on the agenda, the

17   claim -- the objection to the claim of H.B. Performance

18   Systems, Inc.  Your Honor, that has been continued to May 10th.

19   And actually, Your Honor, the parties have agreed to both

20   adjudicate the claim filed against the Delphi estate along with

21   the claim that Delphi has against H.B. Performance Systems.  So

22   Your Honor will actually have the opportunity to adjudicate a

23   claim that Delphi has against this creditor by consent of the

24   parties.

25             THE COURT:  Okay.

8

1          MR. LYONS:  Okay.  Now, with respect to agenda item

2     number 4, there are a number of claims that were objected to in

3     our third omnibus objection for which we have signed

4     settlements.  And we will hand the Court a disk of all these

5     signed stipulations after the conclusion of this hearing.

6          We have Moraine Maintenance, item number 4.  That has

7     settled for 22,000 dollars and change.

8          Item number 5, Bank of Lincolnwood.  That about

9     has -- that claim has been settled for 667,000 dollars out of

10    an initial assertion of a claim of over 1.2 million dollars.

11         And again, all these settlements are done pursuant to

12    our authority granted under the settlement procedures order.

13         THE COURT:  Okay.

14         MR. LYONS:  Again, item number 6, Your Honor, the

15    claim objection to the claim of McDermott, Will and Emory.

16    That claim has been settled for 16,422 dollars and eighty

17    cents.

18         Claim number 7 is -- or I'm sorry, item number 7 on

19    the agenda is the claim objection relating to Gulf Coast Bank

20    and Trust.  That claim has been settled in the amount of

21    200,000 dollars from an initial asserted claim of 347,043

22    dollars and twenty-three cents.  We're awaiting one more

23    signature on that, Your Honor, so that may actually await

24    tomorrow or the next day to submit to -- to Your Honor.

25         Item number 8 is the claim objection regarding the

9

1    claim of Karl Kuefner.  That claim has been settled for 611,381

2    dollars and fifty cents.  In addition, Mr. Kuefner is going to

3    reserve his rights to assert a priority reclamation claim for

4    16,927 dollars and sixty-six cents in the event that

5    reclamation claims are afforded such a priority by Your Honor,

6    which no determination has been made as of yet.

7            Item number 9 in the agenda is the claim objection to

8    the claim of the Massachusetts Department of Revenue.  The

9    state of Massachusetts has agreed to withdraw that claim.

10   They've -- they've concurred with our books and records that

11   nothing is owed.

12           THE COURT:  Okay.

13           MR. LYONS:  Item number 10, Your Honor, these

14   relate -- these claims relate to the fourth omnibus claims

15   objection, the claim objection regarding the claim of DBM

16   Technologies.  The parties have reached an agreement and have

17   resolved the setoff issue with DBM Technologies.  We are still

18   waiting for signatures which we should get later this

19   afternoon.  So hopefully we'll be able to submit that either

20   this afternoon or tomorrow.

21           THE COURT:  All right.

22           MR. LYONS:  Item number 11 on the agenda, this

23   relates to the six omnibus claims objection.  The claim

24   objection regarding the claim of Constellation NewEnergy.  We

25   have, with the concurrence of Constellation, agreed that two of

10

1    the claims are duplicative and will be expunged and that -- and

2    that the other two claims will survive.  However, we will still

3    reserve the rights to object on other grounds.

4              THE COURT:  Okay.

5              MR. LYONS:  And one more, Your Honor, item number 12,

6    the claim objection regarding the claim of G.P. Reeves, Inc.,

7    the claimant initially asserted claim for -- for 2,296 dollars

8    but -- but the parties agreed to disallow and expunged the

9    claim.

10             THE COURT: Okay.

11             MR. LYONS:  Okay, Your Honor, we have a few more

12   stipulations that are carried over from February 14th and March

13   1st.  In particular, Nissan Technical Center, Donna Wilson,

14   Edith James, Freddie Johnson, Karen Sevens and Harold Woodson.

15   We're in the process of just finalizing the settlement

16   documentation and getting the signatures.  So once we've

17   finalized those we will submit them to Your Honor at the next

18   hearing.

19             THE COURT:  Okay.

20             MR. LYONS:  All right.  With that, Your Honor, I'd

21   like to turn the podium over to my partner Al Hogan, who will

22   be conducting the claim objection regarding the claim of Mr.

23   Joseph Reno.

24             MR. HOGAN:  Good morning, Judge, Al Hogan from

25   Skadden, Arps, Slate, Meagher and Flom for the debtors.  Judge,

1  we're here on -- with respect to the claims objection hearing

2  for claim number 9956, claimant Joseph Reno.  As the Court is

3  aware, last week we discussed, in a chamber's conference, the

4  concept that today's hearing would be limited to the liability

5  aspects of Mr. Reno's claim and that's the way we'll be

6  proceeding today.

7          From an evidentiary perspective, Judge, I know we

8  submitted the -- the joint exhibit binder to chambers last

9  evening.  And again, as we discussed in the chamber's

10 conference the parties agreed to relax, somewhat, the

11 provisions under the claims procedures order in that there are

12 additional deposition transcripts and other documents that were

13 included in here that may have fallen outside the procedures

14 orders.  But by agreement of the parties, the declarations of

15 the claimant, Mr. Reno, Ms. Patrick and Mr. Brown, who are the

16 debtor's witnesses and the Exhibits 4 through 27 will be

17 admitted for purposes of the hearing.

18         I just want to be clear that with respect to the --

19 the last exhibit, that's tab 28 that is the debtor's

20 demonstrative exhibit.  That's not an agreed exhibit.  I'm sure

21 Mr. Chalker will, in fact, disagree with several of the entries

22 there.  So that's a demonstrative not -- not really offered for

23 evidentiary purposes.

24         THE COURT:  So -- let me make sure I understand.  All

25 exhibits except 28 are deemed admitted?

12

1          MR. HOGAN:  That's correct.  That was the agreement

2     of the parties.

3          THE COURT:  And 28 is the demonstrative so it will

4     just be used for that purpose.

5          MR. HOGAN:  That's correct.  It's just for purposes

6     of discussion with the Court.

7          THE COURT:  Okay.  Is that right, sir?

8          MR. CHALKER:  Yes, sir.  Brad Chalker for Joe Reno

9     and that is correct.

10         THE COURT:  Okay.

11         MR. HOGAN:  Judge, with that preliminary out of the

12    way with respect to the evidence we can -- we can proceed with

13    respect to the hearing.  In terms of order of presentations,

14    the debtor's objection to the claim -- the underlying claim is

15    based on Mr. Reno's litigation so therefore he's got the burden

16    of proof.

17         With respect to opening statements from the debtors,

18    I'll say briefly, I know your court.  Your Honor's read -- read

19    our submissions.  The evidence that we'll explore today will

20    demonstrate that Mr. Reno was terminated by Ms. Beth Patrick,

21    ultimately, at Delphi for engaging in conduct that violated

22    Delphi's policies and attempting to cover up that contact.

23         THE COURT:  Okay.

24         MR. HOGAN:  That's all I will say for now.

25         THE COURT:  I do have one question for you.

13

1        MR. HOGAN:  Certainly.

2        THE COURT:  The original response to the brief argued

3   collateral estoppel based on the OSHA review.  The amended one

4   didn't raise that point and I'm just -- are you still asserting

5   collateral estoppel or not?

6        MR. HOGAN:  Judge, we're not.

7        THE COURT:  Okay.

8        MR. HOGAN:  We're not.

9        THE COURT:  All right.  All right so --

10       MR. HOGAN:  We think that's persuasive and we

11   certainly want to talk about that but as a legal matter we're

12   not going to argue that the Court need not consider the

13   merits --

14       THE COURT:  All right.

15       MR. HOGAN:  -- on a collateral estoppel basis.

16       THE COURT:  Okay.  All right.

17       MR. HOGAN:  Mr. Chalker may want to make some opening

18   remarks.  I will say that I've read carefully Mr. Reno's

19   declaration.  And based on that declaration the debtors aren't

20   going to have any cross examination of Mr. Reno.  And so Mr.

21   Chalker may want to proceed with opening remarks.  Or he may

22   want to go straight to the witnesses offered by the debtors.

23       THE COURT:  All right.  Well I -- I generally don't

24   encourage opening remarks.  I've read your papers and they're

25   clear.

14

1          MR. CHALKER:  That's fine, Your Honor.  Brad Chalker.

2     I did have a question procedurally, how much time each side is

3     going to get to hear today?

4          THE COURT:  Assuming we have a replacement for this

5     person who's kindly filled in, and she has to leave about

6     12:30, and I'm sure we will, I'm free all day.  I mean, I'm not

7     encouraging you to use up the whole day but --

8          MR. CHALKER:  I understand, Your Honor.

9          THE COURT: -- but if you have to, I'm free.

10          MR. CHALKER:  I understand.  Thank you.

11          THE COURT:  Okay.

12          MR. HOGAN:  So Judge, in terms of proceeding, if --

13     in terms of the evidence that's submitted, again, we have read

14     Mr. Reno's declaration.  We have no questions for him at this

15     time.  I'm not sure if the Court does.

16          THE COURT:  No, I've read his declaration also.

17          MR. HOGAN:  Okay.

18          THE COURT:  And I don't.

19          MR. HOGAN:  Then, with the Court's permission we can

20     proceed to present the witnesses from the debtors, if that's

21     acceptable to the Court?

22          THE COURT:  Okay.  That's fine.

23          MR. HOGAN:  Judge, our -- the first witness that

24     we'll present from the debtors is Ms. Elizabeth Patrick.  Her

25     declaration is contained at Tab 2 in the joint exhibit binder.

15

1    She is here in the court today prepared to answer Mr. Chalker's

2    questions or the Court's questions.

3              THE COURT:  Okay.  Do you want to cross examine her?

4              MR. CHALKER:  No, Your Honor, I don't.

5              THE COURT:  Okay.  All right.  Well, again, I've read

6    your declaration, ma'am.  And I -- I -- I don't need to ask you

7    any further questions either.

8              MR. HOGAN:  Judge, then the second witness that we've

9    offered for purposes of this hearing is Michael Brown.  Michael

10   Brown's declaration -- amended declaration is contained at tab

11   3 of the joint exhibit binder.  He is, as well, here in court

12   today prepared to answer Mr. Chalker's questions or the Court's

13   questions.

14             THE COURT:  Okay.  Do you want to cross examine Mr.

15   Brown?

16             MR. CHALKER:  Your Honor, Brad Chalker.  With respect

17   to Mr. Brown, we presented his statement as Exhibit -- joint

18   Exhibit 5 -- strike that -- joint Exhibit 6.  And also excerpts

19   from his prior deposition, sworn testimony as joint Exhibit 21.

20             THE COURT:  Right.

21             MR. CHALKER:  And during my presentation I will make

22   comments on those.

23             THE COURT:  Okay.

24             MR. CHALKER:  But that's sufficient.  We don't need

25   to take his live cross-examination and testimony here today.

16

1         THE COURT:  Okay.  Let me -- I think I know, but just

2  for clarity's sake, which side has marked the deposition

3  transcripts with the blue highlighter and which side with the

4  yellow?

5         MR. HOGAN:  The claimant's designations are with the

6  blue and the debtors' are with the yellow.

7         THE COURT:  Okay.  All right.  Very well.  Okay.  So

8  there -- and again, I've read the declaration as well as the --

9  the excerpts and the witness statement.  And I think, also,

10  some e-mails that Mr. Brown sent.  So I don't -- I don't think

11  I need -- well, I know I don't need --

12         MR. HOGAN:  Okay.

13         THE COURT: -- any questions from him either.

14         MR. HOGAN:  Well Judge, in -- I will tell you, I

15  would have not guessed that we would close the evidentiary

16  record in seven minutes on this hearing.  But without any

17  further questions of Mr. Brown, I believe we have.

18         THE COURT:  Okay.  All right.

19         MR. HOGAN:  Again --

20         THE COURT:  That's fine.

21         MR. HOGAN:  The claimant, I believe, has the

22  underlying burden of proof, in terms of closing remarks.  I'd

23  cede the podium to Mr. Chalker.

24         THE COURT:  Okay.  That's fine.

25         MR. CHALKER:  Brad Chalker on behalf of the claimant

17

1    Joseph Reno.  May it please the Court, this is a wrongful

2    discharge claim with multiple causes of action and they're both

3    federal and Ohio State law.  Those causes of action are set

4    forth in joint Exhibit 4, which is the amended complaint which

5    was filed in Federal District Court in Dayton, Ohio.  That case

6    was stayed on the eve of a two-week jury trial by the filing of

7    this bankruptcy proceeding.  And, therefore, we are now here in

8    this courtroom to present those same causes of action.

9           As I'm sure the Court is aware there are -- well,

10   step back.  The prime reason we are here is because of the

11   whistle blower cause of action which is contained in joint

12   Exhibit 4.  It's not the only reason but it is the major point

13   of dispute.  I think that is fair to say.  And as a result I

14   think I should address that with most of my remarks here this

15   morning.

16          As the Court is aware, there are three generally

17   accepted elements with respect to a whistle blower claim.  A

18   protected activity, an adverse employment action and a causal

19   connection between the protected activity and the adverse

20   employment action.  In the instant case, back in February of

21   2004, my client, Joe Reno, was in charge of an environmental

22   and safety emergency which was ongoing at the Delphi plant

23   located in Kettering, Ohio which is near Dayton.

24          What was happening at that time was, there was a leak

25   discovered in a 75,000 gallon chromium waste water treatment

1   tank containing hazardous, cancer-causing chromium waste.

2   While engaged in addressing that environmental emergency a

3   dispute arose, between Joe Reno and his supervisor at Delphi,

4   as to the extent and cost of repairs to the leaking hazardous

5   waste tank as well as to a companion tank, which is identical

6   in its structure and capacity.

7          On the morning of February 20, 2004, Joe Reno and his

8   superior, Mark Gooding, argued about that -- the repairs to

9   this -- the repairs that were needed for this environmental

10  emergency.  And that same day, that same afternoon, that same

11  supervisor, Mark Gooding, called Joe Reno into his office and

12  suspended him from his employment at Delphi.  Thereafter, on

13  March 2, 2004, Joe Reno wrote a whistle blower letter, a copy

14  of which is attached as joint Exhibit 7 in this proceeding.

15  And finally, on March 17, 2004, Delphi terminated Joe Reno's

16  employment after more than twentyyears of service to the

17  company.

18          Applying those basic facts to the prima facie case

19  for a whistle blower case there is no dispute, at least in my

20  mind, as to the protected activity nor as to the adverse

21  employment actions which were taken.  The real question becomes

22  whether there was a causal connection between the protected

23  activity and the adverse employment action.

24          THE COURT:  Before you get to that, and I know that's

25  critical, what is your response to Delphi's argument that under

19

1    the Ohio statute, which the Ohio courts appear to interpret

2    narrowly as far as the procedural requirements are concerned,

3    Mr. Reno didn't go through the procedural hoops with his

4    reporting and letter?

5              MR. CHALKER:  Well, I disagree as to their

6    interpretation of Ohio law.  And I have included, at page 6 and

7    7 of my trial brief, a copy of the Sixth Circuit case, John

8    Jermer v. Siemens.  I did that, specifically, to address   why

9    --

10             THE COURT:  But isn't that -- I mean, I -- I'm just

11   trying to focus on the whistle blower point.  Wasn't that Sixth

12   Circuit case really a common law -- I mean, you've also raised

13   a common law whistle blower type of claim.

14             MR. CHALKER:  Exactly, Your Honor.  There are two

15   counts, both under the statute, the Ohio Revised Code Statute

16   upon whistle blowing, and then the public policy.

17             THE COURT:  Right.  And I understand the public

18   policy argument.  And that's why I think causation is

19   ultimately important.  But as far as the statute is concerned

20   Delphi says that Mr. Reno didn't go through the hoops that the

21   statute requires.

22             MR. CHALKER:  Well, I disagree, Your Honor.  And the

23   reasons are stated in -- in the amended complaint as well as in

24   the -- in trial brief.  I don't think a whistle blower is

25   expected to cite chapter and verse to the exact regulations

20

1    which are being violated in the whistle blower's opinion at

2    that time.   I'm sure there's no case law that says you have to

3    do that.   You just have to have sufficient specificity to bring

4    to the attention of the employer what the violation is.   And --

5    and Joe Reno's three-page whistle blower does that.   It is

6    attached as Exhibit 7 to Exhibit 7.

7                THE COURT:   What about the issue that the in-house

8    lawyer that he sent the letter to wasn't the person that he had

9    been communicating with about the tank?

10               MR. CHALKER:   Well, as long as he brings it to the

11   attention of the corporation, his employer, and he certainly

12   did that by bringing it to the attention of Mr. Walle, who was

13   at the corporate headquarters and who was in charge of

14   environmental law matters.   He obviously put the corporation on

15   notice.

16               THE COURT:   No, again -- but I'm -- I'm just

17   distinguishing the Ohio statute from -- from the common law

18   rule.   I mean, it seems to me that the Ohio statute has this

19   requirement that you send the letter, or the "written report"

20   is how they phrase it, to the -- to the person that -- that

21   you'd previously been talking with about the problem.

22               MR. CHALKER:   I don't believe that -- that is

23   accurate, Your Honor.   The statute itself is --

24               THE COURT:   Well, it says the employee orally -- this

25   is RC 4113.52.

21

```
 1              MR. CHALKER:  Right.

 2              THE COURT:  It says the employee should orally notify

 3    his or her supervisor or other responsible officer of the

 4    employer of the violation.  And (b) subsequently file with that

 5    person a written report --

 6              MR. CHALKER:  Right.

 7              THE COURT:  -- that provides sufficient detail,

 8    etcetera.

 9              MR. CHALKER:  Or other responsible person.  And

10    that's what he did in this case.

11              THE COURT:  Well -- I'm sorry.  That's in  "(a)",

12    right?  But they -- it sets forth this -- this requirement that

13    you file the report with the person that -- that you -- it says

14    with that person, which refers to the people in "(a)".  And he

15    -- I don't think he -- I think he testified that he hadn't

16    spoken with --

17              MR. CHALKER:  Mr. Gooding?

18              THE COURT:  No, no, with the person he sent the

19    letter to before.

20              MR. CHALKER:  Well, that's -- that's true, Your

21    Honor.  He had not.

22              THE COURT:  Okay.

23              MR. CHALKER:  But under any analysis, I think that

24    even if the opposing counsel's analysis of -- of 4113.52 and

25    requirements thereof is correct.  Quite frankly I don't think
```

22

1    that matters because he's met his public policy burden with

2    respect to the next count in the amended complaint.

3            THE COURT:  I guess the other -- the other issue I

4    have is, I believe the debtor makes the point that they did

5    promptly hire consultants, as well as do their own effort, to

6    correct or deal with the -- with the tank problem.

7            MR. CHALKER:  What -- what they did, Your Honor, is

8    predetermine how they were going to test the tank.  And that is

9    evidenced by Exhibit number 11.  And -- and the date on that is

10   February 19th.  And they predetermined that they were only

11   going to test the inside of this leaking, hazardous waste tank

12   three feet from the -- from the ground.  And these tanks are

13   approximately twenty feet tall.

14           THE COURT:  But -- but didn't they hire these

15   consultants?

16           MR. CHALKER:  They did and the consultants came back

17   and said in Exhibit -- and these consultants are actually

18   testing -- American Testing Services, Limited.  And they came

19   back with their report, dated February 20th, which is

20   identified as Exhibit 13, and said that this tank does present

21   a significant hazard.  That is, a failure and it is rejected

22   and it does not comply with the code section cited in there.

23   But the point being --

24           THE COURT:  But after doing that, didn't they then

25   address the -- I mean, it seemed to be that -- to me, that they

23

1    addressed the problem by getting verification that what Mr.

2    Reno said had some basis to it.  They had -- they had someone

3    else check and then they went and hired someone to fix it,

4    didn't they?

5         MR. CHALKER:  Well, number one, they -- they decided

6    ahead of time not to inspect the entire leaking tank without

7    knowing where the leak was coming from.  Number two, they then

8    had evidence in their hand via the American Testing Services

9    report, identified as Exhibit 13, that the tank was presenting

10   significant safety hazard.  And then number three, they wrote

11   this letter back to Mr. Reno on March 4th from Mr. Walle saying

12   that none of those things, in fact, saying that we're still

13   looking into the matter as of March 4th and that's simply not

14   true.  That letter, instead of complying with Ohio whistle

15   blower --

16        THE COURT:  Well, I'm sorry.  The -- what exhibit is

17   that?

18        MR. CHALKER:  It's number 15, Your Honor.  It's

19   Wally's response to Mr. Reno's whistle blower letter.  And what

20   the statute says is that you can do two things in response to a

21   whistle blower letter.  One is, you can -- first is, you can

22   acknowledge that the problem exists and you're dealing with it.

23   And second is, say no, we've investigated, there is no such

24   problem.  This letter, dated March 4th, does neither.

25        THE COURT:  Well it -- it says -- the statute says

24

1   you're supposed to make a reasonable good-faith effort to

2   correct the violation or correct it.

3          MR. CHALKER:  Your Honor, they didn't even test for

4   all the violations.  They only tested three feet up.

5          THE COURT:  Okay.

6          MR. CHALKER:  Back to the prima facie case, you need

7   the -- the adverse action, the protected activity and the

8   causal connection.  I'll skip over the first two because

9   they're obvious and jump right into causal connection.  It's

10  Mr. Reno's position that causal connection is provided by the

11  temporal proximity between the adverse action and the

12  protective activity.  Namely same-day proximity with respect to

13  his suspension on February 20th of 2004 and then close

14  proximity between his whistle blower letter of March 2nd and

15  his termination later in March, on March 17th of 2004.  So it's

16  our position that Mr. Reno has presented a prima facie whistle

17  blower case with these facts.

18          And the real question then becomes whether the Delphi

19  Corporation has presented a subsequent -- has presented a non-

20  discriminatory reason for Mr. Reno's termination, which has

21  nothing to do with his protected activity.  The burden, in

22  other words, shifts to Delphi to prove that legitimate non-

23  discriminatory reason.  The reason they point to in this case

24  as reflected in their statements -- in their written statements

25  -- is the completion of a third party investigation into a

1    dumpster on the part of -- a dumpster rented by my client Joe

2    Reno.  Their theory is that somehow Joe Reno intended to have

3    that dumpster paid for by Delphi.  That, undisputedly, never

4    happened.  But they did retain a third party investigator, a

5    man by the name of Michael Brown, who's in the courtroom here

6    today. He is and was as far -- was and is, as far as I know, an

7    employee of Securitas, Inc., which is a stand-alone third party

8    company.  It is my mission here today to demonstrate that this

9    completion -- that the completion of the third party

10   investigation by Investigator Brown is and was a pretext for

11   the wrongful termination of Joe Reno's employment.

12            To this end, I would refer the Court to Exhibit 5.

13   Well, first to Exhibit 4 -- well -- strike that.  Exhibit 5,

14   sorry.  Exhibit 5 which is the position paper letter prepared

15   by Delphi in response to the OSHA investigation that took place

16   with respect to Mr. Reno's termination of employment.

17   Specifically, I would point out to the Court page 7 of that

18   Exhibit 5, four bullets down where Delphi proffers its

19   nondiscriminatory reason for terminating Mr. Reno's employment

20   on July -- on March 17, 2004.  And I quote, "complainant's

21   suspension was essentially converted into a termination when

22   Brown completed his investigation."  So they are tying --

23   Delphi tied, during an official government investigation, they

24   tied the trigger event with respect to Mr. Reno's termination

25   of employment, to the completion of their third party

26

1    Investigator Brown's investigation.  That simply is not true.

2            If you look at Exhibit 6, which is Investigator

3    Brown's statement, page 2, you will see that he contacted Beth

4    Sacks and Mary Ann Pulvinan, corporate headquarters on February

5    20th of 2004 and informed them that his investigation was not

6    complete.  Later on in his statement he makes the point that he

7    had no meetings or contacts with corporate individuals to

8    discuss his investigation since February 20th up to and through

9    the termination of Mr. Reno's employment on March 17th of 2004.

10           So that period of time, March 20th when Mr. Reno was

11   suspended, after having an argument in the morning with his

12   supervisor, and later that same day being --

13           THE COURT:  You mean February 20th.

14           MR. CHALKER:  February 20th of 2004, I'm sorry Your

15   Honor.  When that same day there were multiple important

16   events.  One was the morning argument about dealing with the

17   environmental emergency, the afternoon suspension by the same

18   supervisor.  And then on that same day the investigator, with

19   respect to the dumpster investigation, was informing Delphi

20   headquarters, I have not completed my investigation with

21   respect to the dumpster.

22           Days go by, a period of time between February 20th

23   and March 17th of 2004 --

24           THE COURT:  Can I -- can I stop you, though?

25           MR. CHALKER:  Yes, sir.

27

1          THE COURT:  On -- if you look at Exhibit 12 --

2          MR. CHALKEER:  Yes, sir.

3          THE COURT: -- which is Mr. Brown's e-mail --

4          MR. CHALKER:  Right.

5          THE COURT:  -- to various Delphi people which is, I

6    guess it's a February 20th 11:42 e-mail.  If you look at his --

7    the last paragraph he says, "if everyone agrees we could do one

8    of two things.  Delphi could suspend Joe pending further

9    investigation [which is what it ended up doing or do so after a

10   second interview].  It should be clear to everyone that Joe has

11   violated several rules."  And then he goes on to say, "I had

12   hoped to conclude this investigation by this time, however due

13   to the additional information and need for further interviews

14   it will not be done today."  And then he talks about his

15   vacation.  And the last sentence says, "I would like to be" --

16   he leaves out the word be.  "I would like to [be] a part of the

17   pending action but if necessary Mark Gooding and Debbie Field

18   know what I know and could go forward without my presence."

19   And so, I guess, I want you to comment on whether -- whether

20   the investigation was really necessary as far as if Delphi

21   considered he had broken the rules, to fire him -- to -- to --

22   either to suspend or to terminate.

23          MR. CHALKER:  Your Honor, as of February 20, 2004,

24   Investigator Brown had an incomplete investigation.  He had an

25   incompetent investigation and he had, thereafter, an illegal

28

 1    investigation.  There was nothing -- nothing that he had come

 2    up with that justified the termination, suspension or any

 3    adverse employment action against Joe Reno at that point in

 4    time.

 5         Now, the reason --

 6         THE COURT:  Well, I guess that's kind of mixing a

 7    couple concepts.  I mean, if it was -- if he's incompetent, it

 8    doesn't matter whether he finishes or not.  But if it's -- I'm

 9    still going on the issue of "incomplete."

10         MR. CHALKER:  Well, he says right in here -- the

11    further action, above where you mentioned.

12         THE COURT:  Yeah.

13         MR. CHALKER:  The further action required.

14         THE COURT:  Right.

15         MR. CHALKER:  Interviews with David Atchison, Lowe,

16    Ruble, secondary with Joe Reno.  He did not complete his own

17    plan of action on March 17th he still had yet to do an

18    interview with David Atchison.  He still had to do a second

19    review -- interview with Joe Reno.  Those -- to this day, Your

20    Honor, that investigation plan is not complete.

21         THE COURT:  Okay.  Is it -- is there anything in

22    the -- in the record -- I didn't see it, but maybe -- maybe I'm

23    missing it, where Mr. Brown says what it is he would want to

24    talk with Mr. Reno about in the second investigation?

25         MR. CHALKER:  Well, I would hope that he would

29

1   present him with a summary --

2         THE COURT:  No, I -- I --

3         MR. CHALKER:  -- of his investigation.

4         TH ECOURT:  That wasn't my question.  I mean, we can

5   all speculate what he might want to ask him about.  And there

6   are all sorts of different things.

7         MR. CHALKER:  Well, the Fair Credit Reporting Act

8   would require the summary of his report be given to the

9   employee who is the subject of the adverse action.  So the law

10  requires or required that he be -- you know, that he either --

11  that Delphi either -- you know.  And the obvious thing is have

12  Brown present the report, but that's not necessarily the way it

13  had to be but the obvious -- in order to comply with federal

14  law, Fair Credit Reporting Act, he should have supplied Mr.

15  Reno with a summary of his findings and allowed Mr. Reno to

16  rebut them, if he could.

17        THE COURT:  Okay.  But as far as my question was

18  concerned, are you aware of any statement that he said what it

19  was that he wanted to talk with him about?

20        MR. CHALKER:  I am not.

21        THE COURT:  And as far as talking with Mr. Atchison?

22        MR. CHALKER:  Mr. Atchison was a key individual.  His

23  affidavit is in the record.

24        THE COURT:  Right.  I mean, again, we can speculate

25  because I obviously, at one point at least, Calton said --

30

1    Calton said that he didn't think that Mr. Atchison was present.

2    So we had speculated that that's what Mr. Brown would want to

3    talk to him about but, again, does the record say anything as

4    to what Mr. Brown wanted to talk to him about?

5            MR. CHALKER:  Well, Mr. Atchison was identified as a

6    defense witness by Mr. Reno on -- at his first interview.  So

7    anybody -- any competent investigator of employee misconduct,

8    and definitely during the course of an employee misconduct

9    investigation, must go talk to those folks who are identified

10   as exculpatory as defense witnesses.  So for that --

11           THE COURT:  Okay.  But there's no -- there's nothing

12   that says why he wanted it.  I mean I understand there's -- the

13   second issue when we can speculate what someone would ask.  And

14   I understand your point that someone might, more than would

15   they should ask those types of questions.  But I'm just trying

16   to figure out if there's anything in the record as to what he

17   would want to say in those -- in those two interviews -- in

18   those two things.

19           MR. CHALKER:  All I can say is that its difficult to

20   ascertain from the interim reports of Investigator Brown where

21   he was going, why he was going there and why he didn't complete

22   his investigation.

23           THE COURT:  If -- if you look at the first full

24   paragraph on that last page of that e-mail, he says "Troy still

25   states that he drove Joe out of gate four in an Onyx truck

1    daily and took Joe around to Joe's personal vehicle.  Troy also

2    states that he -- that he nor any other of the treatment plant

3    workers see or talk to Joe in the afternoon.  Troy states he

4    does not know where Joe is or what he's doing.  When asked

5    about any gratuities given to Joe or anyone else at Delphi,

6    Troy stated that he buys chicken every Wednesday for the

7    treatment plant employees, which amounts to approximately forty

8    to thirty dollars. Joe is present for those lunches.  He states

9    that no other money, gifts or services are or have been paid."

10           There's nothing in the record about him wanting to

11   talk to Mr. Reno about those sorts of things either?

12           MR. CHALKER:  No, sir.

13           THE COURT:  Okay.  All right.  Okay.

14           MR. CHALKER:  Back to the issue of temporal

15   proximity, which I would submit to the Court is -- is a key in

16   this case.  When we have, by virtue of Exhibit 5, Delphi being

17   on record as to what they submit was the triggering event for

18   Joseph Reno's termination on March 17th.  They claim, they

19   state, they represent, they material represent that it was --

20   that the conclusion -- completion, use their word -- completion

21   of third party Brown's investigation.  That's not true because

22   Brown never completed his investigation as is evidenced by his

23   statement, Exhibit 6.  And further evidenced by his sworn

24   testimony in his deposition, and that's Exhibit 21 pages 40 and

25   41.  And I'm going to read this because it is so important:

32

1          "Question:  Between February 20th and March 17th did

2     you, Investigator Brown, tell anybody that you had completed

3     your investigation of Mr. Reno?  Answer:  No.  Question:  And

4     the reason you hadn't completed it is because you hadn't done

5     the second Joe Reno interview and you hadn't done the Dave

6     Atchison interview before Mr. Reno was terminated on March

7     17th, correct?  "Answer:" by Mr. Brown, "that's correct.

8          So, unquestionably the investigator Brown is

9     contradicting the very reason given by Delphi as to what

10    triggered Mr. Reno's termination of employment on March 17th.

11         THE COURT:  Could we -- I'm -- I'm sorry, because

12    you're relying heavily on this submission to OSHA, Exhibit 5.

13         MR. CHALKER: Right.

14         THE COURT:  I want to -- I want you to point me to

15    the specific language about completion of the investigation.

16         MR. CHALKER:  Sure.  And we're talking about Exhibit

17    6, Your Honor, second page.

18         THE COURT:  It's -- it's five isn't it?

19         MR. CHALKER:  Oh, Exhibit 5 being the Delphi letter

20    to OSHA?

21         THE COURT:  Yeah, I'm sorry, I --

22         MR. CHALKER:  It's on page 7 of Exhibit 5.  If you

23    look at the top where it says, there is no evidence of a causal

24    connection heading, the first bullet, Your Honor.

25         THE COURT:  Yeah.

1    MR. CHALKER:  And then go down to the other 1, 2, 3,

2    4, 5 bullets below that.  And it's the fourth bullet down where

3    Delphi makes the key representation in this entire exhibit that

4    it was -- it was Mr. -- that -- and they say, and I'll quote it

5    again, "complainant's suspension was essentially converted into

6    a termination when Brown completed his investigation," and

7    that's not true.

8    I do want to discuss the joint exhibits in brief

9    detail.  But I do want to address one point now, if I could.

10   In its declarations and pleadings filed with this Court, and in

11   the most recent filing its timeline it submitted today, Delphi

12   keeps claiming that it was Elizabeth Patrick who made the

13   decision to terminate Joe Reno's employment.  That's not

14   accurate.  According to Glenn Howarth's sworn deposition

15   testimony at Exhibit 24, Mr. Howarth made the ultimate decision

16   to terminate Joe Reno's employment.  He says that -- lines 22,

17   23 and 24 --

18   THE COURT:  I'm sorry.  What -- what exhibit?

19   MR. CHALKER:  This is Exhibit 24, which is the

20   excerpts from the sworn deposition testimony of Glenn Howarth.

21   THE COURT:  I think 24 is Calton's deposition.

22   Twenty -- twenty-five is Howarth.  At least in my book twenty-

23   five is Howarth.

24   MR. CHALKER:  All right.  Your Honor, let me -- let

25   me address that.  There's confusion on the numbers.  I have in

34

1    front of me a joint exhibit listing, which was provided to my

2    by opposing counsel, where they have designated Glenn Howarth

3    as twenty-four.  I guess they changed the numbers.

4            THE COURT:  Anyway, I have it.  I mean, I just wanted

5    the record to be clear.

6            MR. CHALKER:  Okay.

7            THE COURT:  But he says here, I think it was -- we

8    had -- we had a meeting to discuss the situation and Beth

9    Patrick and myself made the ultimate decision.

10           MR. CHALKER:  Right.  It -- the point being that Beth

11   Patrick, alone, did not make this decision in a vacuum by

12   herself.  And it's more important to note that what Glenn

13   Howarth, who participated in this ultimate decision, who made

14   the ultimate decision if you will, he admits later on that he

15   was well aware of the whistle blower problem complaint raised

16   by Joe Reno at the time.  So any -- any suggestion that Beth

17   Patrick made this in a vacuum without knowledge -- made the

18   ultimate decision to terminate Joe Reno's employment, with no

19   knowledge of the whistle blower complaint is simply false.  And

20   furthermore, the -- the participation of Mary Ann Pulvinan, on

21   March 17, 2004, is significant.  Because if you look back at

22   what the Investigator Brown said in his OSHA statement, Exhibit

23   6, he says that on February 20th I contacted Beth Sacks and

24   Mary Ann Pulvinan at corporate headquarters to inform them that

25   my investigation was not complete.

1          So in the meeting in Troy, Michigan there was a

2     triumvirate who had made the ultimate decision to terminate Joe

3     Reno's employment.  Included in that triumvirate was Mary Ann

4     Pulvinan with express knowledge that the Investigator Brown's

5     dumpster investigation was not complete.  Glenn Howarth, with

6     full knowledge of the ongoing dispute between Delphi and Joe

7     Reno, with respect to the protected activity and the leave with

8     pay --

9               THE COURT:  I'm sorry.  I -- how does Pulvinan enter

10    into the decision to fire?

11              MR. CHALKER:  She's present.  As Howarth says in his

12    deposition testimony, "from what I recall, it was Beth Patrick

13    and myself and, I believe, Mary Ann Pulvinan" -

14              THE COURT:  But that did what?

15              MR. CHALKER:  That decided, ultimately, to terminate

16    Mr. Joe Reno's employment.

17              THE COURT:  And where -- I'm sorry, can you point me

18    to that in his deposition?

19              MR. CHALKER:  Yes, it's in Howarth's deposition,

20    which is the first page of Exhibit 25, I believe, and it's at

21    lines 16 and 17 of Howarth's deposition.

22              THE COURT:  I'm sorry.  You have to bear with me a

23    little bit.  What page of his deposition?

24              MR. CHALKER:  Page 34.

25              THE COURT:  Okay.

36

1              MR. CHALKER:  Okay.  So I just wanted to rebut any

2    suggestion that the decision to -- to -- to terminate Joe

3    Reno's employment was made by some Delphi employee in a vacuum

4    without knowledge of his whistle blower complaint and/or

5    without knowledge of the incomplete status of the dumpster

6    investigation because Mr. Howarth has said to the contrary.

7              I'd like to, just take a quick look at Exhibit 4.  I

8    think I better get my listing here and make sure I have my

9    numbers correct.  Exhibit 4, Your Honor, is that amended

10   complaint and it does set forth the causes of action both in

11   the federal court action which is stayed at this time in Ohio,

12   and in this court.  I won't bore the Court with reviewing them

13   but I would note, as the Court has, that there is a public

14   policy whistle blower a

15   count contained in these actions which does not require

16   specificity or reference to any particular law being violated.

17   I'd also note that there is an ERISA claim, and that's count

18   two and that's pages 6 and 7 of joint Exhibit 4.  And I wanted

19   to point that out to the Court because that's a stand-alone

20   theory of liability as to Delphi.  What happened there, Your

21   Honor, was that Delphi refused, on multiple occasions, after

22   Mr. Reno's termination of employment on March 17th of 2004, to

23   pay out his vested pension fund.  And in fact the payout did

24   not take place until approximately two years later and only

25   upon my filing an amended complaint in the Federal District

1    Court amending the complaint to add this ERISA violation did

2    Delphi then payout the funds which they should have paid out

3    before that time.

4              THE COURT:  So and -- I'm sorry, the -- given that

5    they were paid out, the claim is for --

6              MR. CHALKER:  Well, it's for -- well, not to pay for

7    damages but there was a diminution in value.

8              THE COURT:  That -- that's what the claim is for it's

9    the diminution of value between the date that they should have

10   been paid out and the date that they were paid out?

11             MR. CHALKER:  Correct.

12             THE COURT:  Okay.

13             MR. CHALKER:  It should not have taken two years and

14   the filing of an amended complaint to force a payout of a

15   vested pension.

16             THE COURT:  Okay.

17             MR. CHALKER:  The other causes of action are as

18   written.  COBRA violation, ERISA, whistle blower, public

19   policy, wage payment, defamation and the Fair Credit Reporting

20   Act violations, which I've previously mentioned.

21             We've talked about Exhibit 5 and Exhibit 6, Exhibit 7

22   is the whistle blower letter.  Exhibit 8 and 9 are pieces of

23   evidence, written statements, signed statements which exculpate

24   Mr. Reno from any wrongdoing -- from misdoing.  With respect to

25   the dumpster investigation, I'd note, for the record, Your

38

1    Honor, that Investigator Brown never obtained a single signed

2    statement, sworn or otherwise, to the contrary.  He never -- in

3    fact, he based his entire opinion upon the third oral statement

4    of Troy Calton as his interim report makes clear.  And

5    thereafter -- thereafter could not ever get Calton to put that

6    in writing.  When I asked him about that, and it's in

7    deposition testimony here in his exhibit, Investigator Brown,

8    amazingly said that that meant no red flag.  As far as he was

9    concerned the oral statement of Calton was -- was perfectly

10   fine even though he had given prior inconsistent oral

11   statements and even though he refused to put any incriminating

12   statements in writing.

13            THE COURT:  Didn't Calton say that -- and this was

14   after he'd talked with Onyx's lawyer--

15            MR. CHALKER:  Yes.

16            THE COURT:  -- that he --

17            MR. CHALKER:  Well, he talked with the Onyx owners.

18            THE COURT:  -- Onyx owners.

19            MR. CHALKER:  In -- in a group interview.

20            THE COURT:  No, no, no.  Didn't -- didn't Calton say

21   that he'd provide a written statement if he -- if Onyx and he

22   got a release?

23            MR. CHALKER:  that's what Investigator Brown states

24   in his double hearsay statement.  But we don't really know, as

25   we sit here today and stand here today, we don't really know

39

1    what Calton said during any of those oral interviews because

2    Investigator Brown has no record, no statement, nothing to

3    show.  All we have is what Investigator Brown says Calton said,

4    which is, of course, double hearsay.

5              THE COURT:  Did he -- did Calton, in his deposition?

6              MR. CHALKER:  In his deposition he did not

7    incriminate Mr. Reno.  He said, and it's in the joint exhibits,

8    he said that there was no conspiracy.  That Joe Reno never

9    intimated, asked or otherwise requested or suggested that --

10   that the dumpster that Mr. Reno had ordered for his personal

11   use be paid for by Delphi.

12             THE COURT:  Did -- he said that he assumed that would

13   be the case though, right?

14             MR. CHALKER:  I'm sorry?

15             THE COURT:  He said he assumed that would be the case

16   though, right?

17             MR. CHALKER:  He did say he assumed that was the case

18   but he had no basis for that assumption.  And furthermore, I'd

19   refer you to the Exhibit 10, which is the OSHA statement of

20   Joanne Rowe.

21             THE COURT:  Uh-huh.

22             MR. CHALKER:  Now, the significance of this OSHA

23   statement is -- is tri-fold, really.  Number one, it

24   demonstrates that there was really no reason to even have a

25   dumpster investigation.  Because everything that the dumpster

40

1    investigation was supposed to determine was already known to

2    Delphi.  Joanne Rowe has it in this statement.  She said,

3    before the dumpster investigation ever began, I told Gooding or

4    I told Delphi where I learned that this -- this box came from

5    Joe Reno's property.  And furthermore, importantly, it's in

6    here that Troy Calton took steps, he took active measures to

7    prevent this box -- the paperwork for this box being mixed in

8    and somehow being paid for by Delphi.  So there was no

9    conspiracy.

10          So, there was no conspiracy.  There was no mystery.

11   There were no unknown facts that required a dumpster

12   investigation other than the personal animus of Mr. Gooding.

13          THE COURT:  But -- but wasn't -- but didn't the

14   dumpster investigation, and I appreciate the term makes it

15   sound like the Caine Mutiny and the Ice Cream Incident.  But

16   doesn't the dumpster investigation pre-date --

17          MR. CHALKER:  It does.

18          THE COURT:  -- the -- the tank?

19          MR. CHALKER:  It does predate it.

20          THE COURT:  So, I mean, if -- if Gooding didn't

21   like -- if the reason that that investigation started was

22   because Gooding didn't like Mr. Reno, it wasn't because of the

23   tank, it was for some other reason.

24          MR. CHALKER:  No, it was personal animus.

25          THE COURT:  But -- but -- then how can this be

41

1   retaliation for the tank?

2           MR. CHALKER:  It's not.  It's the -- the dumpster

3   investigation is not retaliation in any way, shape or form for

4   the protected activity.  It is and was a pretext for

5   termination of Joe Reno's employment because that investigation

6   was incomplete.  It was--

7           THE COURT:  But why would they go through all of

8   that?  I mean, they hire an investigator --

9           MR. CHALKER:  Right.

10          THE COURT:  -- they interview employees.  It

11  obviously creates a big, you know, mishigas or fasceria or

12  whatever ethnic term you want to use at -- at, you know, at the

13  Troy plant.  Why would they bother to do that just to create a

14  pretext for something that's going to happen in the future that

15  they don't know about?  I mean it --

16          MR. CHALKER:  At the time that -- that Gooding

17  initiated the dumpster investigation, the problems that were

18  about to happen with the leaking hazardous chrome tank were

19  unknown to all parties, I freely admit that.  This dumpster

20  investigation was initiated for no good purpose, other than the

21  personal animus by Supervisor Gooding.  And I cite this Joanne

22  Rowe statement as proof of that because there was nothing to

23  investigate.  All the fact, all the material facts with respect

24  to the dumpster investigation were already known to -- to

25  Delphi and it's -- that's evidenced by this statement.

42

1        THE COURT:  Well, I'm going to bring in another

2   allusion then.  Unfortunately, sometimes stupid investigations

3   lead to legitimate conclusions, as poor Mr. Libby just learned.

4   I mean, Delphi's argument is that during the investigation,

5   unfortunately for Mr. Reno, he, you know -- he lied and he did

6   other things that weren't appropriate.

7        MR. CHALKER:  Well, I suggest that if you scratch the

8   surface and get below the "he lied," what did he lie about?

9   There's no evidence that he lied.  There is absolutely no

10  evidence.  The only thing that -- that --

11       THE COURT:  Well, he said -- he -- Calton said under

12  oath that they went together to drop the dumpster off at the

13  plant.  And Reno said just the opposite.  And he also said

14  that --

15       MR. CHALKER:  That's true, Your Honor.  But it is a

16  non-significant fact.  And also, I think Calton was confused by

17  that.  It makes no sense why Joe Reno would ride in a dumpster

18  truck from his residence, miles away, and then be dropped off

19  at -- at the plant.  How was he supposed to get home?  It just

20  makes no sense.

21       THE COURT:  Well, maybe with his friend Troy?

22       MR. CHALKER:  Calton was confused on that point, Your

23  Honor.

24       THE COURT:  Okay.

25       MR. CHALKER:  But the -- the point of Exhibit 10 is

43

1    that there was no substance to the dumpster investigation and

2    it would have died a natural death but for the intervening,

3    superseding protected activity that commenced on February 20th

4    and then finalized on March 17th.

5             We've talked about Exhibit 11 being evidence that --

6    of this protected activity.  And there is a plethora of

7    evidence to support the arguments that were ongoing between

8    Gooding and Reno with respect to how to comply with the

9    environmental laws arising out of repairing the tank.  Not only

10   do we have Joe Reno's own declaration, we have his whistle

11   blower letter, Exhibit 7.  We have the testimony of Terry

12   Brown, a contractor, which is joint Exhibit 22, wherein he

13   describes the arguments that he overheard or knew of between

14   Gooding and Reno on or about February 20th.  And then we have

15   the Troy Calton deposition, page 88, lines 8 and 10 where he

16   also describes his knowledge of this ongoing dispute Reno and

17   Delphi with respect to how to address the ongoing environmental

18   hazard.

19             THE COURT:  He said the source of that was -- was

20   Reno, right?

21             MR. CHALKER:  Are we talking about Calton, Your

22   Honor?

23             THE COURT:  Yeah.

24             MR. CHALKER:  That's --

25             THE COURT:  I mean, I don't know how much to accord

44

1   to that anyway, but --

2          MR. CHALKER:  That's 24.

3          THE COURT:  -- since it was clearly from someone other

4   than -- he -- I don't think he says he was present when they

5   were having their argument.

6          MR. CHALKER:  I don't recall, Your Honor.  I'll look

7   it up real quick.  "Question:  He and they -- he wanted to fix

8   it and they didn't.  Answer:  Joe Reno wanted to do -- fix the

9   whole tank and Mark Gooding wanted to fix just part of it.

10  Question:  When did that come -- when did you come to know

11  this? During that process of doing that job while Joe was still

12  there? Uh-huh.  Yes.  Yes, I'm sorry."

13         THE COURT:  Yeah.  As I -- I remembered it wasn't

14  that clear how he knew.  Anyway, I don't -- it's not -- let me

15  ask you a different question though.  If -- given -- given

16  today's world and given the fact that Mr. Reno, in his letter

17  to -- is it Walee or Wala -- or I don't know you pronounce --

18         MR. CHALKER:  It's Walle.

19         THE COURT:  Walle.  Very clearly linked his -- his

20  problems with the suspension to the -- his report about the

21  tank.  Doesn't -- doesn't that very fact make any employer

22  think twice about firing someone who you would normally fire.

23  I mean, isn't -- isn't Delphi's action --

24         MR. CHALERK:  Arrogant?

25         THE COURT:  Well, no, no.  I was going to say, well,

45

1    I guess that's the only response is that it's arrogant.  But it

2    would seem to me that --

3              MR. CHALKER:  It would seem that -- that a careful

4    employer would have thought twice about going forward with the

5    termination under these circumstances, and would have allowed

6    the dumpster investigation to go to its conclusion if that

7    indeed was not a pretext.  That did not happen here.  We had a

8    triumvirate decision made in Troy, Michigan on March 17th to

9    terminate Joe Reno's employment.  And even if it was a mixed

10   motive situation, Your Honor -- even if it was a mixed motive

11   where some of the motive is attributable to the dumpster and

12   some of it is attributable to the hate and discontent due to

13   his whistle blower letter, the Price Waterhouse line of cases

14   490 US 228, the 1989 Supreme Court case would indicate that if

15   it's a situation of mixed motives, Mr. Reno still prevails.

16             THE COURT:  Well, but -- we're -- let me get to

17   the -- doesn't the -- doesn't the Sixth Circuit say "more

18   likely" to have been motivated by an illegal motive in Manzer,

19   in interpreting this -- the Ohio law?

20             MR. CHALKER:  The Sixth Circuit -- I don't have Sixth

21   Circuit case in front of me.  But I will tell you that the

22   second circuit --

23             THE COURT:  But they -- Second Circuit wasn't

24   interpreting the Ohio common law rule or the Ohio statute,

25   right?

46

1          MR. CHALKER:  No, sir.  But we're talking about a

2   mixed motive case by the U.S. Supreme Court here.  And I think

3   that's pretty good precedent for the proposition that if there

4   were, and I'm not saying there were, but argue in though if

5   there were mixed motives going on here in that office in Troy,

6   Michigan on March 17th that Mr. Reno still prevails, assuming

7   one of the mixed motives had to do with his whistle blower

8   letter and the hate -- the discontent that that obviously

9   created.

10          THE COURT:  Can I go -- go back to something on

11   motive, though?  And maybe I -- I just misunderstand this

12   point.  As far as what actually happened at the plant, they

13   actually brought in third parties, didn't they?  I mean, it

14   wasn't like they were protecting Gooding.  They brought in the

15   third parties to check the tank and by the -- by the third week

16   of March had done the repairs on it.

17          MR. CHALKER:  Well --

18          THE COURT:  I mean, usually the whistle blowers"

19   claims are -- well, I guess they come in two -- two stripes.

20   But -- but the -- the clearest stripe is where the people in

21   the company, generally, are hiding something.  And that doesn't

22   appear to be the case here.

23          MR. CHALKER:  Well, they were hiding something, Your

24   Honor.  They were hiding the fact that they were unwilling to

25   test the tank more than three feet from the base.

47

1          THE COURT:  But they -- but they brought in these

2     people who rejected the tank the next day.

3          MR. CHALKER:  Anyway.  But -- but who knows what

4     problems were in that tank above the three foot level.

5     Understand what Mr. Reno was arguing for was to go inside that

6     tank, grind it down to bare metal.  Do a testing on the entire

7     tank.  And not just that tank.  He wanted to do it on the

8     companion tank which was of the same age and condition so that

9     there would be no -- to prevent any leaks of cancer-causing

10    agents into the environment.  So, Delphi did not -- through

11    Gooding, did not want to go through that expense so they

12    decided, we're going to take an ostrich in the sand approach

13    here.  We're only going to test this tank so we don't find any

14    problems beyond three feet from the -- from the ground level.

15    You know, that's egregious, Your Honor.  And it was something

16    that -- that was causing tremendous argument -- arguments to

17    not -- not limit the testing and the repairs of the tanks.

18    That was the position that was well known and argued by Joe

19    Reno on or about February 20th when he was suspended from his

20    employment.

21          THE COURT:  Okay.

22          MR. CHALKER:  Your Honor, I'm going to give you, now,

23    the Joe Reno case in a nutshell.  I'm getting tired of talking

24    here, all right?  Between February 20th of 2004 and March 17th

25    of 2004 absolutely nothing occurred in the dumpster

48

1        investigation with the temporal proximity to explain Joe Reno's

2        discharge on March 17th of 2004.  What did happen during this

3        period -- this crucial period of time, February 20th to March

4        17th of 2004, was Joe Reno's March 2, 2004 whistle blower

5        letter.  That was followed in close temporal proximity by

6        Delphi's discharge of Joe Reno after more than twenty-two years

7        of employment.  Because whistle blower cases are decided on

8        temporal proximity, I'm asking, respectfully, that this Court

9        render a judgment in favor or my client Joseph Reno.

10               Thank you, Your Honor.

11               THE COURT:  Let me just look at one thing.  I -- I'm

12       sorry.  I did have one other question for you.  And that's not

13       to take anything away from your summation.  That was -- that

14       was fine.  But I was just going back to the work that Delphi

15       did.  There is this -- in addition to Exhibit 13, which was the

16       American Services Testing, which was on the 20th, there's a

17       report here from Hubble Rock and Clark, which is Exhibit 19.

18       It's dated March 26th but I think that it goes through the

19       whole chronology here.  And their -- their inspector, Mr. Cote

20       visited this site on March 6th and it seems -- and my -- well,

21       were there any limitations placed on HRC's analysis here?  I

22       mean, were they told just to look at the, you know, the --

23               MR. CHALKER:  Three feet up.

24               THE COURT:  -- three feet up or were they authorized

25       and directed to do whatever was -- you know, recommend to do

49

```
 1   whatever was appropriate?

 2             MR. CHALKER:  That's not something that was put into

 3   evidence in the Federal District Court case, so I'm not

 4   really -- really not aware of what HRC was, what their mission

 5   was.  I will say that this HRC report is -- it -- it -- it

 6   indicates that there was a minor problem going on.  And that's

 7   simply not true.  It was a major problem which resulted in

 8   fifteen -- at least there was at least one fifteen inch crack

 9   and that it was -- it was not as insignificant an environmental

10   emergency as the Hubble Rock reports leads us to believe.  But

11   as far as what they were directed to do, that was not -- never

12   placed into evidence.

13             THE COURT:  Okay.  All right.  Thank you.

14             MR. HOGAN:  Again, this is Al Hogan from Skadden Arps

15   for the debtors.  Judge, this is obviously not a pleasant case,

16   in the sense that a long-time Delphi employee was terminated.

17   But on the merits, in terms of what the plaintiff has to prove

18   here, it actually is a -- a fairly straightforward case.  Joe

19   Reno's employment with Delphi was not terminated because he was

20   a whistle blower.  If -- to the extent there is any connection

21   between those two it's -- it's exactly reversed.  In the sense

22   that Mr. Reno was attempting to become a whistle blower because

23   he knew his employment with Delphi was about to be terminated.

24   But, the important point is the former.  His employment wasn't

25   terminated because he was a whistle blower or because he
```

50

1    claimed to disagree with how Delphi was fixing the leaking

2    waste water tank in its Dayton, Ohio facility.  Mr. Reno was

3    terminated because Beth Patrick, a director in the Human

4    Resources Department of Troy, Ohio, reasonably determined that

5    Mr. Reno had engaged in misconduct that violated Delphi's

6    employment policies.  The evidence that has -- has been

7    admitted overwhelmingly shows that that was Ms. Patrick's

8    decision and that was the basis for that -- for that decision.

9            Mr. Chalker talked in terms of who participated --

10           THE COURT:  Could it -- before you go on, there -- I

11   mean, it is -- the evidence does -- I think it's -- maybe --

12   maybe you don't dispute this, she was also aware of the whistle

13   blower letter.

14           MR. HOGAN:  She certainly was.  At the time -- two

15   points in time, Judge.  Ms. Patrick made the decision to

16   suspend Mr. Reno on February 20th with no awareness of the

17   leaking tank issue.

18           THE COURT:  Right.  But -- but I think what -- what

19   the claimant is saying is that normally that suspension would

20   have been, sort of, a slap on the wrist and he would again go

21   back to work.  Or, at least they'd complete the investigation

22   and then do something.  And instead the -- what she learned

23   subsequently -- led to the termination.

24           MR. HOGAN:  Right.  And -- and the chronology is, is

25   that Ms. Patrick explains in her declaration that she made that

51

1    suspension decision without any knowledge.  She was informed of

2    the whistle blower letter prior to the termination decision and

3    really acted in spite of that as opposed to because of that

4    on -- on March 17th.  Ms. Patrick also does state very clearly,

5    and so does Mr. Brown in his amended declaration, that there

6    was communication of some additional investigation to the folks

7    at corporate.  Ms. Patrick says she looked at some updated

8    results of Mr. Brown's investigation and so, it's also not in

9    dispute, Judge.  We don't contend that Mr. Brown believes his

10   investigation was completed, that's true.  He -- he still did

11   want to do some interviews.  But the question is, from Ms.

12   Patrick's perspective, did she have enough evidence based on

13   what the investigation had uncovered to -- to make her

14   termination decision and -- and she did.  And her declaration

15   is -- is unambiguous.  No one at Delphi ever suggested or

16   hinted to her that Mr. Reno was being terminated or should be

17   terminated because of anything having to do with -- with the

18   environmental issue.  Her decision was based solely on a clear

19   violation of -- of Delphi policies.

20           There's -- there's really no doubt, based on the

21   evidence that her -- her conclusion with respect to what the

22   underlying dumpster investigation had revealed was -- was a

23   reasonable one.  And the evidence shows, pretty clearly, that

24   Mr. Reno was engaged in misconduct.

25           There's the debate about whether or not Mr. Calton's

1    first story or second story was -- was accurate.  But Judge, if

2    we look at just the undisputed facts in the 2003 and 2004 time

3    frame, it's clear that Ms. Patrick could -- could have stepped

4    back and looked at all of this and concluded Mr. Reno had

5    violated the policies.  First, it's undisputed that Delphi had

6    a clearly stated policy against conflict of interest and

7    really, sort of a zero tolerance policy, in terms of

8    solicitation of favors from vendors.  That's spelled out in Tab

9    17 of the exhibit book.  That is Delphi's Foundation of

10   Excellence Policy.  The first page of this exhibit, by the way,

11   is Mr. Reno's acknowledgment that he received this policy in

12   2001.  And if you -- if you flip through the policy there is

13   clear disclosure of -- of Delphi's stance with respect to

14   conflicts of interest.  And these policies are made on common

15   sense as well.  They talk about how, in the Foundations of

16   Excellence, that a conflict can arise or even the appearance of

17   benefits from people with whom Delphi does business.  There's

18   also -- and that's on page 6, 7 and 8 of the policy.  There --

19   there is also, on page 13 of the policy, there's something that

20   talks about soliciting gifts or favors.  And really that

21   policy, it is a zero tolerance policy.  It states that the size

22   of the gift or the favor is immaterial.  Delphi employees

23   simply cannot solicit favors from people that do business with

24   Delphi.  And all conduct in this regard that creates even the

25   appearance of impropriety must be avoided.  So, those are

53

1    Delphi's policies.  They have those policies because Delphi's a

2    huge corporation and their business relationships are

3    innumerable.  And obviously, with suppliers and both with

4    vendors this is Delphi's policy and it was clearly articulated

5    and was in place in 2003.  Mr. Reno knew about it.

6          Undisputed fact, sometime in 2003 Mr. Reno decided

7    that he needed a dumpster delivered to his personal residence

8    so he could get rid of some yard debris.  Undisputed that he

9    approached Troy Calton who was an Onyx -- the main Onyx contact

10   for Delphi's Kettering facility, and who really reported to Mr.

11   Reno in the context of the Delphi business relationship.

12         It is disputed about what was said in that meeting.

13   Mr. Reno claimed that he said he would pay for it in full.  Mr.

14   Calton, you know, now says that that's really not what the

15   arrangement was.  But Judge, what is undisputed is that in this

16   transaction Mr. Reno handed a hundred dollars in cash to Mr.

17   Calton.  He got no receipt at the time.  There was no purchase

18   order.  There was no work order.  There was no documentation

19   of -- of any kind.  It's also undisputed that Mr. Reno did not

20   seek out any superior to clear this in advance or even advise

21   them that he was going to engage in this transaction with a

22   Delphi vendor.  Instead what Mr. Reno claims is that he

23   deliberately conducted this all cash-no document transaction in

24   front of witnesses who also just happen to be his subordinate

25   employees at Delphi.  And so, even if you accept that version

54

1    of events, that's misconduct -- that's clearly misconduct under

2    Delphi's policy.  But the incredibility of Mr. Reno's version

3    only gets greater when these events start to come to light.  As

4    the record shows, in late January Delphi learned about the

5    dumpster on its property that was -- was -- was suspicious.

6    Very quickly Mr. Reno learned that Delphi was investigating

7    this.  And although he claims that this was a big

8    misunderstanding, rather than raise his hand and go to any

9    supervisor, anyone in HI to try and clear this up, he

10   immediately begins creating back-dated receipts for the payment

11   of this dumpster and soliciting three employees to provide

12   witness statements.  Notably, one of those employees said I'm

13   not going to do it.  And two of the subordinate employees did

14   provide witness statements in terms of a conversation that

15   supposedly happened four months later.

16          Once Mr. Reno collected this information he did

17   nothing with it.  Knowing that his dumpster was on Delphi

18   property, knowing that Delphi was looking into it, he waited

19   for approximately two weeks until Mr. Brown reached out to him

20   to conduct the investigation.  Now, Judge, it could be, I

21   suppose in some world, that all of these undisputed facts are

22   the result of just a very -- a string of very bad decisions by

23   Mr. Reno, innocently taken.  But that's not at likely.

24          Beth Patrick looking at this set of circumstances in

25   2004 concluded that it wasn't likely.  Concluded that there was

55

1    a clear violation of this policy and that Mr. Reno had, worse

2    yet, attempted to obfuscate the facts once Delphi tried to

3    understand what had happened.  And of course, Judge, if you add

4    to that what Mr. Calton then said, again when he was presented

5    with the -- the reality that his way to avoid consequences was

6    to tell the truth, Mr. Calton then further says that the

7    dumpster had been placed back on Delphi property by both

8    himself and Mr. Reno.  It had been sitting there for months and

9    that he intended -- he assumed that Delphi would be billed for

10   that.  If you -- if you give that any weight, and I think

11   certainly everyone was entitled to at the time, the underlying

12   misconduct case is -- is clear.  It's unfortunate but it

13   warranted a termination and that's what -- what ultimately

14   happened.

15         Mr. Reno suggests that the causal effect here is that

16   he was terminated not because of this dumpster investigation,

17   but because of the concerns he raised over the waste water

18   tank.  And again, Ms. Patrick is very clear on that.  In her

19   declaration, paragraph 11, she said that nobody at Delphi,

20   either subordinate to, equal to or superior to her hinted at or

21   even suggested that Mr. Reno be terminated because of his

22   complaint about the water tank.

23         Now, in the face of this direct testimony what --

24   what evidence there is is, there is no direct evidence of any

25   causal link that Delphi sought to terminate Mr. Reno because of

56

1   his complaints with respect to this environmental matter.   In

2   this case that's -- it's noteworthy in any case but it's

3   noteworthy in this -- in the context of this claims hearing

4   because we've -- we've expanded the record.   There was

5   substantial discovery that happened in this case in the Federal

6   District Court.   Depositions, documents, all sorts of things

7   took place and there is no direct evidence where anyone

8   provided any -- any evidence that said we want to fire Joe Reno

9   because he's causing us problems on the environmental side.   It

10  just doesn't exist.

11          So, the only -- the only evidence, and Mr. Chalker

12  talked about it extensively, is the temporal overlap.   The fact

13  that on February 20th, the same day that Ms. Patrick

14  independently decided to suspend him, there was an incident

15  going on with the -- with the waste water tank.   The overlap is

16  on the calendar.   But if you look at the timeline, I think Your

17  Honor referred to it just a little bit ago, the timeline

18  actually shows why the -- the pretext story doesn't hold up.

19  The dumpster matter or the dumpster investigation began long

20  before anyone raised any concerns about this waste water tank.

21  Almost six weeks before -- I'm sorry, almost four weeks before

22  the leak was discovered and four weeks before Mr. Reno was --

23  was suspended.

24          Mike Brown, who was conducting Delphi's investigation

25  said that he didn't learn about the leak until after Mr. Reno

57

1    had been terminated.  And so, once again, there's -- there's

2    all kinds of evidence.  The evidence overwhelmingly points to

3    the fact that the dumpster investigation was proceeding.  It

4    had been launched.  The findings were coming out the way they

5    were coming out and the -- the environmental issue arose as a

6    coincidence during this same time frame.

7           Judge, you pointed to some documents.  I don't think

8    the Court needs to wade into the field of metallurgical

9    engineering to understand what happened here.  But there's --

10   there's no doubt that the substance that was at issue was

11   something that had to be treated carefully.  Mr. Chalker points

12   to the -- the report from the ATS Company.  And that company

13   did come out, right around February 20th, investigated the

14   tank.  But the -- the other reports that Your Honor referred

15   to, at Tab 19 and then there's another one at Tab 21, that's

16   from the Montgomery Department of Sanitary Engineering.  What

17   happened there was that after these events occurred and after

18   Mr. Reno voiced his complaints in his whistle blower letter,

19   Delphi had these folks out.  They redrained the tank and both

20   the independent consulting agency and the Department of

21   Sanitary Engineering concluded that Delphi was proceeding

22   reasonably.

23          Putting aside the debate about how to best fix a

24   tank, I think the more interesting matter is the time frame in

25   which Mr. Reno actually disclosed the tank issue.  He says that

58

1    he first learned about this on February 13, 2004.  There's at

2    least some evidence that this problem may have been known

3    before that.  Terry Brown who is a Crown Solutions employee,

4    that's at Tab 23 of his deposition.  He testified that Crown

5    actually knew something was going on with this tank for months

6    prior.  And that although he couldn't remember it, it was their

7    typical practice to report this to Mr. Reno.  Mr. Reno was

8    their only point of contact.  But putting that aside, it's

9    undisputed that on February 13th the tank incident becomes --

10   becomes a bigger incident and Mr. Reno takes the actions that

11   he takes.  But for the next five days he doesn't report the

12   leak to anyone at Delphi.  It's not until February 18th that

13   Mr. Reno reports the tank incident to anyone at Delphi.

14          In between that time period, Mr. Reno was interviewed

15   by Mr. Brown.  And in between that period of time Mr. Brown was

16   also scheduling the second interview with -- with Troy Calton.

17   So Judge, I think it's a reasonable inference that the dispute

18   that was happening in this late February time period was -- was

19   influenced, from Mr. Reno's perspective, by what was -- what

20   was going on with respect to the dumpster investigation.  But

21   again, the important point is that as of February 20th the

22   suspension decision was made by Ms. Patrick without any

23   knowledge of what was going on with respect to the tank.

24          Mr. Brown actually did do some other investigations

25   after he came back from his vacation which was -- happened on

59

1    February 20th.  He talked to Mr. Ruble, who was an employee who

2    said Mr. Reno asked me for a statement and I wouldn't provide

3    it.  Mr. Ruble also talked about how he had done some personal

4    work with Mr. Reno in the past.  He talked to another

5    contractor who said that he didn't know about it but by the way

6    I also did some work with Mr. Reno in the past.  I did some

7    favors for him.  So, by the time the termination decision

8    happens, that update is provided and Ms. Patrick determines

9    that the investigation appears to be conclusive about the

10   misconduct.  We're not learning anything and so she proceeded.

11          After -- after Mr. Reno was terminated he filed the

12   complaint with OSHA.  OSHA conducted an investigation and OSHA

13   determined that Mr. Reno wasn't terminated because he was a

14   whistle blower but instead, because he engaged in misconduct

15   regarding the dumpster incident.  That OSHA finding is

16   contained at Tab 20 of the evidence binder.

17          Judge, what OSHA saw and what Ms. Patrick saw at the

18   time is evident from the evidence.  And that is that Mr. Reno

19   engaged in misconduct and that was the reason for his

20   termination.  Judge, I won't repeat the legal arguments we've

21   made concerning the various whistle blower causes of action but

22   based on this evidence, Mr. Reno cannot maintain a claim under

23   either the Ohio statute or the Ohio public policy with respect

24   to his discharge.

25          Quick discussion on the Fair Credit Reporting Act

60

1    claim, that claim is frankly a throw away.  The damages are

2    limited to a thousand dollars.  But that claim focuses on

3    consumer reports from a consumer reporting agency.  And

4    there's -- if you read the statute I would submit that it just

5    doesn't apply to a case like this where you have, basically, a

6    full-time contractor who does investigations and is not doing

7    anything that looks like a consumer report.  He's investigating

8    specific incidents.  I don't think that statute applies.

9            THE COURT:  Well, I didn't -- is there anything in

10   the record as to whether Brown's firm does reporting on

11   consumers on a regular basis?

12           MR. HOGAN:  There is -- Judge, I'm not aware of

13   anything that's in the record.  I know that Mr. Brown does not.

14           THE COURT:  But that -- but that -- but that's not in

15   the record, right?  I didn't see him say anything about that in

16   the record.

17           MR. HOGAN:  No, no.

18           THE COURT:  Okay.

19           MR. HOGAN:  I didn't see anything in the record about

20   what his firm may -- actually,

21           THE COURT:  You can -- you can -- I'm going to give

22   you some time to respond so if there's something that --

23           MR. CHALKER:  Thank you, Your Honor.  I plan to

24   respond.

25           THE COURT:  -- Mr. Hogan missed, you can tell me.

61

1              MR. CHALKER:  Thank you.

2              THE COURT:  Okay.

3              MR. HOGAN:  I do know, and again this is in the

4    record, I do know Securitas is a very large firm.  It's a

5    global security firm.  So I don't know.  They may do all sorts

6    of things.

7              THE COURT:  Okay.

8              MR. HOGAN:  But I know that Mr. Brown does not.  So

9    we maintain that that -- that statute simply doesn't apply.

10   Judge, the defamation claim goes away because I don't think

11   this was -- I don't think there's any defamatory statements

12   made here.  And Delphi didn't -- certainly didn't report this

13   to any perspective employers.  The defamation claim really

14   falls with the whistle blower claim.

15             The last thing is the ERISA claim.  Mr. Reno, in his

16   deposition said he had been paid for his vested pension

17   benefits.  The only evidence that we have right now is Mr.

18   Reno's declaration where he alleges an ERISA damage of 6,000

19   dollars.  I don't know where that calculation comes from.  I

20   don't know what it is.  I don't know how to support it so I

21   don't know how to respond to it.  But I know there was a delay

22   from the time that Mr. Reno was terminated to when he was paid.

23   That's -- so that's the only thing that's in the record right

24   now, Judge.  I would suggest that -- that he -- the claimant

25   hasn't met his burden to establish what the basis for that

62

1   6,000 dollar claim is.

2           THE COURT:  Well, but the damages aren't for today

3   anyway, right?

4           MR. HOGAN:  He hasn't, but even if there's a delay,

5   I'm not sure -- on this one, Judge, we maybe overlooked a

6   problem.  And that is, it sounds like his claim, and the

7   damages that flow from it, are one and the same.  If there's a

8   time value of money aspect to this claim, we either paid him

9   the right amount or we didn't.  And I simply -- I simply think

10  that -- that's not articulated in his -- anywhere in Mr. Reno's

11  claim.

12          THE COURT:  Okay.

13          MR. HOGAN:  At a minimum, I think we should -- we

14  should consider looking at that one as a one-off basis.

15          THE COURT:  Well, it seems to me if there's a damages

16  claim, it will be based upon whether he was harmed based upon

17  the payment that was made to him.  And if the payment that was

18  made to him included an accrual calculation for the interest

19  that he should have gotten, then he wouldn't be harmed.  But if

20  it didn't, then he was harmed.

21          MR. HOGAN:  I agree completely, Judge.  And I guess

22  what I'd say is, I don't think it's -- I don't think we can

23  make a liability finding on that today.  I know we talked about

24  the concept --

25          THE COURT:  I don't -- I don't think so either.

63

1            MR. HOGAN:  At a subsequent damages hearing --

2            THE COURT:  Okay.

3            MR. HOGAN:  I think we can address that as part of

4    dealing with that -- that potential hearing.

5            THE COURT:  Okay.

6            MR. HOGAN:  Judge, if you -- if you don't have any

7    other questions, I think that concludes my remarks.

8            THE COURT:  The Foundations of Excellence Policy --

9            MR. HOGAN:  Yes, sir.

10           THE COURT:  It -- it -- as I read it, I mean it's

11   a -- it's a very good upstanding statement of corporate

12   principles, and I understand the reasons for them.  It doesn't

13   say that there's a zero -- does it -- I don't think it says

14   there's zero tolerance here, does it?

15           MR. HOGAN:  With respect to the solicitation of gifts

16   or favors there's --

17           THE COURT:  Oh, there's a -- there's a magnitude

18   element too.

19           MR. HOGAN:  Yes.

20           THE COURT:  But it doesn't say you will be fired if

21   you --

22           MR. HOGAN:  No, it doesn't -- it does not list -- I

23   don't believe it lists consequences in here of violating any of

24   these policies.  I believe that's right.

25           THE COURT:  Okay.

64

```
 1          MR. HOGAN:  Those decisions are handled by the human

 2   resources professionals.

 3          THE COURT:  All right.  Okay.  Do you have any brief

 4   response?

 5          MR. CHALKER:  Very brief.

 6          THE COURT:  All right.

 7          MR. CHALKER:  Thank you, Judge, Brad Chalker once

 8   again for claimant Joseph Reno.  Contrary to what opposing

 9   counsel just said, the dispositive question here is not whether

10   there was enough evidence in the subjective mind of Beth

11   Patrick on March 17th of 2004.  If that were true, then Delphi

12   lied to OSHA as to the triggering reason for its termination

13   on -- of Mr. Reno's employment because, as we know from beating

14   that to death, they told OSHA it was the completion of

15   Investigator Brown's dumpster investigation that was the

16   triggering event.  Of course we further know --

17          THE COURT:  I guess I -- maybe I'm missing something

18   there but if -- if there is enough -- if he gave her enough to

19   make a decision, and I conclude that that decision was not

20   pretextual --

21          MR. CHALKER:  right.

22          TH COURT:  Does it really matter that it wasn't

23   complete?

24          MR. CHALKER:  It does matter, Your Honor.  It matters

25   a lot as to what was the precipitating cause.  Because temporal
```

65

1    proximity is everything in these whistle blower cases.  Was

2    it -- the temporal proximity, why did they pick March 17th to

3    terminate his employment?  Was it really because Beth Patrick

4    in her subjective mind felt she had sufficient evidence, based

5    on the incompetent investigation of Investigator Brown?  I

6    submit not.  And we have evidence to the contrary because they

7    told OSHA.  You know, that's -- that is a misrepresentation

8    during the course of a government investigation.  It got Martha

9    Stewart in trouble.  It got Scooter Libby in trouble and it got

10   Delphi in trouble in this -- in this situation.  You don't make

11   those kinds of misrepresentations on a key important point.

12   They were -- they had to come up with a reason why they picked

13   March 17th because nothing happened in the dumpster

14   investigation.  Again, contrary to what opposing counsel just

15   said, there may have been some local activity but what Brown

16   said in his sworn statement is, I didn't communicate any of

17   that activity to corporate headquarters where they were making

18   the ultimate decision. I didn't communicate any activity.  I

19   made no contacts, whatsoever, to corporate folks after February

20   20th and before March 17TH.

21           THE COURT:  But he did -- he did communicate some

22   more information, right?  I mean, Mr. Hogan alluded to some

23   other information about third parties doing work for Mr. Reno

24           MR. CHALKER:  He said -- he said to the contrary,

25   during the course of his -- in the written OSHA statement that

66

1   he made and in his deposition testimony he said, I communicated

2   nothing to the decision makers.

3            THE COURT:  Well, not to the decision makers but

4   they -- but to somebody.  And --

5            MR. CHALKER:  Well, he may have done that on a local

6   level but --

7            THE COURT:  -- and they -- and they could have

8   communicated that to the decision makers.

9            MR. CHALKER:  Well, he certainly didn't communicate

10  that he completed his investigation.  And that is not splitting

11  hairs.  That is the temporal proximity reason given in the

12  course of an official government investigation as to why.

13           THE COURT:  The why -- I guess -- I understand -- I

14  understand the point about the -- the temporal overlap with

15  February 20th.  And the debtors have their response to that.

16  But why is -- why is March 17th so important?  I don't

17  understand how that date is -- it's important because he was

18  fired then, but I don't understand how that coincides with

19  anything else.

20           MR. CHALKER:  Well, it coincides because there was no

21  material event occurring in the dumpster investigation between

22  February 20th and March 17th.  On the other hand there was a

23  material event in the whistle blower case in that -- that the

24  whistle blower letter that he wrote on March 2nd was received

25  on March 3rd based upon the response date of Walle's letter of

1    March 4th.

2              THE COURT:  Okay.  All right.

3              MR. CHALKER:  So during that period of time the only

4    material event that happened was the whistle blower letter and

5    it obviously ticked people off.

6              Further, in response --

7              THE COURT:  Except he -- he was already suspended.

8              MR. CHALKER:  With pay, with benefits pending the

9    completion of an investigation that was never completed.

10             THE COURT:  Okay.

11             MR. CHALKER:  There was some suggestion here as to

12   the billing for the -- for the dumpster.  I want to clear that

13   up.  These dumpsters -- there's a -- there's a two-step

14   process.  You put down a deposit, Mr. Reno did that.  It's not

15   been contested.  There's no evidence to the contrary.  He paid

16   a hundred dollars for -- to have the dumpster delivered to his

17   home.  Then there's a tipping fee, because you don't know what

18   the ultimate cost of it is until they weigh it and tip it and

19   look at -- see what's inside of it.  So, when it was tipped Mr.

20   Reno did pay that fee and the affidavit of Atchison, which is

21   Exhibit 14, evidences that he told -- in front of Atchison he

22   told Calton I will pay the tipping fee once you tip it.  The

23   tipping fee was paid as is evidenced by -- by Mr. Reno.  So

24   Delphi was never out any money and Mr. -- and there's evidence

25   in the record that -- that Mr. Reno intended for Delphi never

68

1   to be out any money as a result of his use of this dumpster.

2   And that's an important point.

3           During the course of the dumpster investigation,

4   Investigator Brown never came up with one -- not one written,

5   signed statement, not one affidavit, not one unsworn statement

6   to support his ridiculous conclusions that Mr. Reno committed

7   any misconduct during the course of this dumpster debacle.

8           And it's not temporal overlap.  I pointed out

9   temporal proximity between the event of the whistle blower

10  letter and the adverse employment action.  It's not overlap,

11  it's a proximity.

12          And third, I guess there was an admission here that

13  there was a Fair Credit Reporting Act violation, but it's only

14  worth a thousand dollars so --

15          THE COURT:  No, no.  I think he -- he said that -- I

16  think he said that it may not be worth the time spent arguing

17  on it but it's -- it's -- they're not liable either.

18          MR. CHALKER:  It -- it's worth it from my standpoint

19  because it demonstrates the illegal nature of the investigation

20  by a third party.  And it doesn't have to be a third party that

21  is engaged in consumer reporting.  It's a third party

22  investigator, period.  And that's what took place here.  So

23  Delphi was bound, did violate the Fair Credit Reporting Act.

24          That's all I have, thank you.

25          THE COURT:  Well, a detective agency doesn't count,

69

1    necessarily, under the -- as a -- a covered party under the

2    Fair Credit Reporting Act.  They have to be a certain type

3    of --

4            MR. CHALKER:  No, no, Your Honor.  I believe that's

5    incorrect.  If -- if an employer contacts a third party to

6    conduct an investigation, whether it's credit history, whether

7    it's an internal misconduct investigation, there are

8    consequences -- legal consequences that flow from that.  Now,

9    if it's an internal -- internal investigation of misconduct, as

10   this was, there are lesser requirements than if it is a

11   consumer credit report, which then results.  But it's --

12   there's still consequences under the Fair Credit Reporting Act.

13   As long as you go outside your company, as Delphi did and hire

14   a third party to do the investigation.

15           THE COURT:  Well --

16           MR. CHALKER:  I cite the Fair Credit Reporting Act in

17   my trial brief, page 4.

18           THE COURT:  Yeah.

19           MR. CHALKER:  Section 603(x) provides special

20   procedures for investigations of suspected misconduct.

21           THE COURT:  But I'm looking at the definition of

22   consumer reporting agency.  There's a 2002 case by District

23   Judge Jones from the Southern District.  She finds someone who

24   was commissioned to do a report was not a consumer reporting

25   agency.

70

1           MR. CHALKER:  But there are additional burdens on a

2     consumer reporting agency.  When a third party entity is

3     retained to do a misconduct investigation, there are lesser

4     requirements, those being, essentially, you've got to give a

5     summary of your report to the subject of your investigation.

6               That's all I have, Your Honor.

7           THE COURT:  I'm -- I'm sorry, you've got to show that

8     to me.  I -- I didn't get that out of your brief.  Where is

9     that?

10          MR. CHALKER:  It's page 4.  Fair Credit Reporting

11    Act, special procedures for employee investigations.  Section

12    6.03(x).  They're not treated as consumer reports, I grant you

13    that.

14          THE COURT:  Well, what -- what -- what -- 15 USC,

15    what section?

16          MR. CHALKER:  1681.  I don't have the actual language

17    in front of me but --

18          THE COURT:  Isn't this an exception that you're

19    referring to that says that this isn't covered by the Act.

20          MR. CHALKER:  It's not covered by the Act so long

21    as -- so long as -- it says, these investigations are not

22    treated as consumer reports so long as the employer or its

23    agent complies with the procedures set forth in section

24    603(x)."

25              THE COURT:  Right.  But that doesn't change the

71

1    underlying definition of a consumer report or -- or a consumer

2    reporting agency, right?  It doesn't -- there's not a separate

3    definition of that.  There's only one definition of that term,

4    right, in the FCRA?

5              MR. CHALKER:  I -- I have to look at it more closely,

6    Your Honor.

7              THE COURT:  Okay.  All right.  But this -- this

8    section, you're -- this section you're referring to is in 1681,

9    right?

10             MR. CHALKER:  I believe so.  Yes, sir.

11             THE COURT:  And it's the one that exempts certain

12   types of -- and you're saying they're not within the exemption.

13   I understand you -- I understand that point that they're not --

14   you're saying they're not within the exemption.

15             MR. CHALKER:  Right.

16             THE COURT:  But I don't think that section states

17   that the definition of a consumer report is anything other than

18   how its defined elsewhere in the code, right?

19             MR. CHALKER:  Right.  There -- there was a

20   controversy which was resolved, I believe, by -- by this

21   exception if you will.  And it's my position, and I have no

22   reason to believe otherwise, that Investigator Brown, by virtue

23   of being an employee of a third party investigation company,

24   Securitas, Inc., which is admitted to be a huge private

25   detective agency if you will, by virtue of calling him in to do

72

1    an employee, he still had limited duties under the Fair Credit

2    Reporting Act those being -- to provide a summary of his report

3    to the object of the adverse employee action.

4              THE COURT:  Okay.  All right.

5              MR. HOGAN:  Judge, other than if you have any

6    questions on the 1681, I don't have anything further.

7              THE COURT:  Well, I mean, I think -- are you at least

8    going to tell me what I thought I just said which is that --

9              MR. HOGAN:  Real quickly, Judge 1681 is --

10             THE COURT:  -- that this provision doesn't change the

11   definition of consumer reporting.

12             MR. HOGAN:  It doesn't change, first of all, the

13   provision exception was effective March 31, 2004, after this --

14   very close but after the report.  It's an exception and it

15   says, but for this subsection, the communication would be --

16   would be a consumer report.  It uses the same term and then it

17   goes through the exceptions.

18             THE COURT:  And that consumer report is someone -- is

19   a report issued by a consumer reporting --

20             MR. HOGAN:  Consumer reporting agency.

21             THE COURT:  -- agency.

22             MR. HOGAN:  Okay?  Thank you.

23             THE COURT:  All right.  Okay.  I'm going to take a

24   break till 12:30 and then come back.

25        (Recess from 12:17 till 12:30 PM)

73

1          THE COURT:  Please be seated.  Okay.  We're back on

2     the record in Delphi Corporation and in particular I'm going to

3     give a bench ruling on the debtors' objection to the proof of

4     claim filed by Mr. Joseph Reno.  As I generally do with fairly

5     lengthy bench decisions, I'll give it orally because I think

6     it's important for the parties to know the result right away,

7     but I will review the transcript.  And I'll review it not only

8     for accuracy but also reserve the right to edit it if what came

9     out of my mouth, remarkably, didn't make sense and to correct

10    it, and that will be my final ruling.  But I will not change

11    the gist of my ruling.

12          The claim by Mr. Reno sets forth a number of theories

13    of recovery, but I should note first that today's hearing, by

14    agreement of the parties, was limited to the merits of those

15    theories, with the parties reserving to a subsequent hearing,

16    if necessary, a determination of damages in connection with any

17    claims that I find to be meritorious.

18          The theories all stem from the same common facts,

19    except the last one, which is a claim under ERISA for damages

20    resulting from delayed payment of pension benefits.  The

21    claimant also makes a claim under COBRA, and obviously that

22    claim itself does not derive from the facts that I'm going to

23    go  through in a moment, but the debtors' defense does.

24    Essentially, as both parties have stated, those facts pertain

25    to Mr. Reno's termination as an employee of Delphi in March of

74

1    2004.  Mr. Reno contends that that termination was a wrongful

2    discharge in retaliation for his view expressed to his

3    supervisor, and ultimately to an in-house lawyer at Delphi,

4    that Delphi needed to take certain steps to correct a condition

5    in a waste water container tank, and that might exist in

6    another waste water container, and that, consequently, he has a

7    wrongful discharge claim and/or a claim under Ohio's

8    whistleblower statute because he was terminated in light of

9    Delphi's receipt of the letter informing Delphi of the waste

10   water container issue.

11          He also contends that Delphi did not comply with the

12   Fair Credit Reporting Act in the conduct of, and the provision

13   of information in connection with, Delphi's investigation of

14   him.  This is not only a claim but is also offered as evidence

15   to show the real motivation rather than the pretextual basis,

16   for Delphi's termination of Mr. Reno.

17          Delphi, on the other hand, contends that Mr. Reno was

18   fired not because of his environmental warning or the point of

19   view that he raised with his supervisor, and ultimately with

20   in-house legal staff, but rather because of information that

21   Delphi learned pertaining to Mr. Reno's conduct on the job and

22   in connection with an investigation of that conduct.

23   Consequently, Delphi argues that his termination was not

24   wrongful, but proper, and certainly was not retaliatory.  It

25   contends that because Mr. Reno was properly terminated for such

75

1    reasons, it did not have a responsibility, under COBRA, to him

2    and that it also is not liable for the remaining cause of

3    action, which I have not yet described, which is a defamation

4    claim.

5            Finally, Delphi contends that the investigation that

6    it commissioned and the use of that investigation were not

7    covered within the ambit of the Fair Credit Reporting Act and,

8    consequently, that there was nothing improper or actionable in

9    connection with the investigation, and, further, that no

10   inference can be drawn from any alleged impropriety under the

11   Fair Credit Reporting Act as to Delphi's motivation in

12   terminating Mr. Reno's employment.

13           As with most claims of this nature, the parties have

14   very different views as to the underlying facts.  They have

15   presented those facts in a written record before the Court in a

16   joint exhibit binder that includes witness declarations, as

17   well as the prior testimony of witnesses, and letters and e-

18   mails, which I've reviewed.

19           In light of the differences in the underlying

20   testimony and the nature of the claims here, it's important to

21   delineate the burden of proof, which I think the parties

22   generally agree upon.  As the claimant, Mr. Reno, has the

23   ultimate burden of proof.  However his claim, in large measure,

24   comes down to an assertion that the reason proffered for his

25   termination by Delphi was and is merely a pretext.  Under those

76

1    circumstances the courts have developed a burden-shifting

2    regime which provides that, under the proper circumstances, by

3    showing a prima facie case of retaliation the claimant may

4    shift the burden to the defendant to articulate a legitimate

5    non-retaliatory reason for its employment decision.  That is,

6    the employer meets that burden by showing an alternative reason

7    than the discriminatory one stated by the claimant, which the

8    claimant then may show was only a pretext.

9          In my view -- although, and I'll get to this in a

10   moment, at oral argument claimant may have been setting forth a

11   somewhat different burden-shifting argument -- once the

12   employer has come forward with a non-discriminatory reason for

13   firing the claimant, the claimant again has the ultimate burden

14   of proof.  The area of potential doubt is whether he meets that

15   burden by showing that it is more likely the case that the

16   claimant was fired for the discriminatory reason, or

17   alternatively, that he need show only that the non-

18   discriminatory reason articulated was not the only basis for

19   the termination, but, rather, there was a mixed motive,

20   including an improper one.  In the "pretext" cases, I believe

21   that the burden is on the claimant to show that it is more

22   likely that he or she was terminated for a discriminatory or an

23   improper reason or a retaliatory reason.  See Manzer v. Diamond

24   Shamrock Chemicals, 29 F.3d 1078 (6th Cir. 1994).  In a prior

25   Title VII context, the latter view, however, was adopted by a

77

1    plurality opinion of the Supreme Court in Price Waterhouse v.

2    Hopkins, 490 U.S. 228 (1989), although, again, that was in a

3    Title VII context, not focusing on the pretextual argument that

4    the claimant is making here.

5          In any event, I find that Delphi's articulated reason

6    was not a mere pretext and that Mr. Reno has not proven an

7    improper or retaliatory reason for Delphi's firing him.

8          Let me proceed through the factual record and address

9    first the wrongful discharge claims, since I believe that

10   consideration of the other claims, with the exception of the

11   ERISA claim, all flow from that analysis.

12         First, it should be noted that Mr. Reno asserts

13   claims under both Ohio's whistleblower statute and then,

14   second, or alternatively, under Ohio common law that his

15   termination violated Ohio public policy as arising from his

16   having rasied a legitimate workplace concern regulated by

17   federal and state environmental laws dealing with hazardous

18   wastes.

19         The Ohio whistleblower statute should be addressed

20   first, because, at least based on my reading of it, as well as

21   the cases interpreting it, it contains procedural requirements

22   that obviously do not exist under the Ohio common law wrongful

23   termination cases, and I find that Mr. Reno did not comply with

24   those procedural requirements, and, under the case law

25   interpreting Ohio Rev. Code Ann. § 4113.52(A)(1)(a), he would,

78

1    therefore, not have a claim.  The statute requires that an

2    employee (a) orally notify his or her supervisor, or other

3    responsible officer of the employer, of the alleged violation,

4    and (b) subsequently file with that person a written report

5    that provides sufficient detail to identify and describe the

6    violation.  And then it provides for a mechanism, if those

7    requirements have been satisfied, for the employer to correct

8    the violation or make a reasonable and good faith effort to

9    correct it within twenty-four hours after the oral notification

10   or the receipt of the written report, whichever is earlier.

11   And then it provides an opportunity for the employee to seek

12   appropriate redress.

13          The debtors contend that Mr. Reno did not comply with

14   this provision in two respects.  One I don't accept.  Although

15   it's somewhat of a close call, I believe he did set forth in

16   sufficient detail the environmental concerns or hazardous

17   substance concerns that he claims, legitimately, existed with

18   respect to the container tanks.  However, procedurally he did

19   not provide oral notification of those conditions to the person

20   to whom he then sent the written report.  That is, he informed

21   Mr. Gooding, his supervisor, orally of the conditions and

22   subsequently mailed his letter to Mr. Walle, the in-house

23   counsel at Delphi.

24          Given the timing constraints and specific language of

25   this statute, that means that he has not complied with it and

79

1    he doesn't have a cause of action under it.  See Haney v.

2    Chrysler Corp., 699 N.E.2d 121, 122 (Ohio Ct. App. 1997).

3            There are other potential defenses to this cause of

4    action, but I believe that they are best dealt with in the

5    context of the other wrongful discharge claim raised by Mr.

6    Reno, which is that he was suspended or terminated contrary to

7    Ohio public policy.  That public policy claim doctrine was

8    adopted by the Ohio Supreme Court in Greeley v. Miami Valley

9    Maintenance Contractors, Inc., 551 N.E.2d 981 (Ohio 1989).

10   It's an exception to Ohio's general at-will employment

11   standard, which permits an employer to terminate an employee at

12   will for any cause at any time whatsoever.

13           In order to have a claim for discharge in violation

14   of public policy under Ohio law, the claimant must show (1) the

15   existence of a clear public policy (that is, the "clarity"

16   element);  (2) dismissal under the circumstances would

17   jeopardize that policy (the "jeopardy" element); (3) dismissal

18   related to a public policy (the "causation" element); and (4)

19   lack of an overriding business justification for the employer's

20   action.  The debtors do not dispute the "clarity" or "jeopardy"

21   elements laid out in the Ohio cases, including Painter v.

22   Graley, 639 N.E.2d 51 (Ohio 1994) and Urban vs. Osborne Mfg.,

23   Inc., 847 N.E.2d 1272 (Ohio Ct. App. 2006).  They do, however,

24   dispute causation, arguing strenuously that Mr. Reno was not

25   dismissed because of his championing the public policy of the

80

1   State of Ohio and the United States to have an environmentally

2   clean and safe workplace, but, rather, for a wholly separate

3   reason.

4          They also contend, relatedly, that the overriding

5   business justification for his termination was, again, that his

6   personal conduct was in violation of Delphi's policies, as

7   opposed to his disagreement with Mr. Gooding over the proper

8   maintenance and protection of the container tanks and the

9   surrounding environment or his making that concern known to Mr.

10  Walle in his letter.

11         I've been through the factual record, and, as is

12  often the case with claims of this kind, there is no smoking

13  gun and the claimant relies upon the Court's drawing inferences

14  from circumstantial evidence.  On its face, that circumstantial

15  evidence, to my mind, does set forth a prima facie case, in

16  that on the very day that Mr. Reno had his dispute with Mr.

17  Gooding about the container tanks he was put on administrative

18  suspension, albeit with full pay and benefits.

19         Moreover, he was terminated just short of a month

20  thereafter, after he had notified Mr. Walle on March 2, 2004 of

21  his concern about the container tank's condition as well as his

22  concern about being put on suspension.  Between February 20th,

23  when he was suspended, and the date of his termination, that

24  letter on its face is one of only two significant factual

25  developments.  The other is some additional investigatory work

81

1    done by the third party investigator, Mr. Brown, that the

2    debtors had hired to investigate a situation that I will talk

3    about in a moment.  But those facts alone, in my mind, raise

4    enough of a concern to shift the burden to Delphi.

5              I find, however, based on my review of the factual

6    record, including not only the declarations of Ms. Patrick and

7    Mr. Brown but also the depositions and prior testimony and

8    witness statements, that Delphi has met its burden to show that

9    it was not motivated by the hazardous waste or environmental

10   issues that Mr. Reno raised with his supervisor and then

11   disclosed to Mr. Walle, or by Mr. Reno's having raised those

12   issues.  And, having shifted the burden back to Mr. Reno, I do

13   not believe that Mr. Reno has overcome the evidence that

14   supports my conclusion that Delphi terminated him for separate

15   reasons that were legitimate and unrelated to retaliation over

16   Mr. Reno's having aired his views as to the container tanks.

17             Specifically, it became known to Delphi that a

18   dumpster owned by one of its contractors had been placed on the

19   Dayton property, or the Dayton site, containing garbage and

20   debris that was not Delphi's.  In and of itself that was a

21   fairly innocuous event; however, it was of enough concern,

22   apparently, to cause Mr. Reno's boss, Mr. Gooding, to arrange

23   for a third party investigator, Mr. Brown, to determine the

24   circumstances under which the dumpster came to the site.  The

25   reason for that concern appears to be that it was very quickly

82

1    assumed, and assumed correctly, that the debris in the dumpster

2    originated with Mr. Reno.  Delphi has a clear policy against

3    conflicts of interest and, separately and distinctly,

4    soliciting gifts or favors from suppliers or vendors or

5    customers.  And there was an appearance that that may have

6    occurred here.  All of this occurred well before the date that

7    Mr. Reno says he first learned of the waste water treatment

8    container issue, which he says was February 13, 2004.

9            The investigation started two weeks before then.  And

10   the investigator interviewed Mr. Reno on February 16th, as well

11   as other parties involved.  As a result of that investigation

12   process Mr. Brown concluded that Mr. Reno had obtained a favor

13   from Troy Calton, an employee of a company called Onyx that

14   works directly for, as a contractor, Mr. Reno, to remove

15   material from his yard and/or house.  Brown also learned that

16   this arrangement may well have been a secret one, and that it

17   was, at least, not cleared in advance with Mr. Reno's

18   superiors, and, perhaps as importantly, that in the process of

19   the investigation Mr. Reno was not forthcoming as to the facts

20   of the relationship and had sought out from his subordinates

21   witness statements in connection with the relationship, which

22   he held in reserve.  All of this led Mr. Brown and also

23   Delphi's personnel officers to conclude that Mr. Reno had

24   violated both Delphi's no-favors policy and the conflict of

25   interest policy, as well as potentially put undue pressure on

83

```
1    subordinates and perhaps asked them to remember facts that they

2    could not remember or that were not, in fact, the truth.

3          The record, I should be clear, is not one where I can

4    ultimately decide whether Mr. Brown's conclusions were right or

5    wrong.  But, beyond that, the claimant contends that they were

6    so clearly incorrect that Delphi could not credibly be said to

7    have relied on them as a basis for his termination, which is a

8    proper inquiry for me to make.

9          I'll note first in considering the conclusions that

10   Mr. Brown made that I do credit his conclusions with regard to

11   the underlying arrangements between Calton and Mr. Reno.  Mr.

12   Calton changed his story in a second interview with Mr. Brown,

13   in a way that I believe indicated that the second version is

14   the correct version.  It is, moreover, one that Mr. Calton's

15   subsequent deposition in key respects corroborates, namely that

16   the dumpster was filled and taken under an arrangement with Mr.

17   Reno, with Mr. Reno's knowledge and, in fact, at least as

18   Calton stated in his deposition, Calton's implied assumption

19   that ultimately the cost would be run through Delphi's

20   accounting system.  To my mind, having reviewed Delphi's

21   Foundation of Excellence Policy, at Exhibit 17, whether

22   ultimately Mr. Reno felt he was going to pay, in full, for this

23   dumpster arrangement is less important than the fact that he

24   engaged in it at all with Mr. Calton without disclosing it to

25   his supervisors.
```

84

1          I also believe that Mr. Reno's not being forthcoming

2      about the facts of this relationship was fairly well

3      established through Mr. Brown's investigation.  And that, in

4      turn, lays some doubt on the witness statements that Mr. Reno

5      got out of his subordinates, particularly in light of the facts

6      that one of them did not provide a witness statement although

7      Mr. Reno asked him to do so -- that individual being the one

8      who was apparently no longer working for Delphi -- as well as

9      Mr. Calton's testimony that neither of the individuals who did

10     provide statements was present when he had the discussion with

11     Mr. Reno about the dumpster.

12          Ms. Patrick states in her affidavit, and I believe

13     that the record corroborates this, that Mr. Reno was put on

14     suspension before she, or anyone making that decision,

15     understood his contention about the container tanks, and that

16     it was a coincidence that Gooding gave him this news on the

17     very day that they had their argument about the tanks.

18          That moves the analysis, therefore, to the subsequent

19     period.  And I think that this is where Mr. Reno and his

20     counsel properly turned their attention.  Their argument is

21     that, in essence, the work that Brown did and that led Delphi

22     to suspend Mr. Reno was not sufficient to lead to his

23     termination and could not be viewed to be sufficient to lead to

24     his termination, but, rather, that it was the subsequent

25     development of Reno's sending his letter to Mr. Walle, and his

85

1   insistence on a different approach to the container tank

2   problem than Mr. Gooding wanted to take, that led to the

3   termination.

4           There is no direct evidence of this in the record.

5   The claimant relies, therefore, on two things.  First, he

6   contends that the "dumpster incident," as the parties have

7   referred to it, is simply too insignificant to lead to his

8   termination.  (And I should note that he has spent his career

9   at Delphi).

10          Second, he contends that Mr. Brown's investigation,

11  by Mr. Brown's own admission, was not complete at the time that

12  Mr. Reno was terminated in March of 2004.  Why not wait, Mr.

13  Reno contends, until the investigation was complete -- for the

14  record to be done --before making that decision? And the answer

15  to that question, he says, is that it was simply a facade or a

16  pretense -- or a pretext -- for the decision.

17          I've carefully considered those two points and I'll

18  deal with them in order.  It seems to me that it is regrettable

19  that an individual would be fired over something as foolish and

20  petty as this dumpster incident.  However, Mr. Reno is a person

21  charged with important duties that involve integrity,

22  credibility and adherence to proper procedures.  And I

23  understand why Delphi could legitimately conclude that not only

24  the relationship with the contractor but also the way that it

25  appears Mr. Reno reacted to the investigation in terms of

86

1    arguably not telling the truth and arguably inducing

2    subordinates to take positions on his behalf, arguably

3    improperly, all support important and legitimate concerns as to

4    his credibility, reliability and adherence Delphi's policies.

5         I have the impression, which I believe is

6    corroborated to some extent by some updating of the initial

7    investigation by Mr. Brown, that Delphi was concerned that this

8    was not an isolated matter but that Mr. Reno had involved other

9    people, both employees and contractors, in doing favors for

10   him: for example, the statement by Mr. Ruble that he helped

11   with an aquarium business owned by Mr. Reno's wife, even though

12   Mr. Ruble testified that he did that work for Mr. Reno and his

13   wife after hours.

14        So, it does not appear to me that the dumpster

15   incident is, in fact, comparable to Captain Queeg's ice cream

16   incident in the Caine Mutiny but, rather, it had substance to

17   it, particularly given Mr. Reno's position of responsibility.

18        As far as the issue of what I should take away from

19   Mr. Brown's acknowledgement that his investigation was

20   incomplete, I have also considered that point, and I believe

21   that in the absence of anything in the record to show how much

22   more Mr. Brown felt he needed to make it complete, and in what

23   sense he felt it was incomplete, I turn to the e-mail from him

24   to Delphi on the day that Mr. Reno was suspended, in which

25   Brown said that "it should be clear to everyone that Joe has

87

1    violated several rules" -- Joe meaning Mr. Reno.  Brown said

2    that in the same paragraph in which he acknowledged that he

3    would like to do more work on the investigation.  I don't

4    believe therefore that, based on this record, the fact that Mr.

5    Brown believed the investigation was incomplete is something

6    that, in and of itself, shows that Delphi was using his work as

7    a pretext, given what had already been disclosed.

8            Mr. Reno contends that I should look askance on

9    Brown's investigation also because it was incompetent and

10   illegal.  And I've considered that argument as well.  As far as

11   the incompetency point, I'll note that Brown had been an

12   investigator for six years, and I do not see in his

13   investigation or in the subsequent testimony or record any

14   attempt to do anything other than a good job.  He does not

15   appear to me to have been negligent, or, alternatively,

16   motivated to reach a certain result.  And I do not believe that

17   the law requires him to conduct an investigation beyond what he

18   did.

19           The contention of illegality dovetails back to Mr.

20   Reno's claim that the investigation and the debtors' failure to

21   provide a copy of it to Mr. Reno violated the Fair Credit

22   Reporting Act.  There may be instances where the failure to

23   comply with a law such as the Fair Credit Reporting Act may

24   lead a court to draw an inference that something very serious

25   was motivating a party to act contrary to law, an ulterior

88

1    purpose.  For example, here it is argued, at least between the

2    lines, why would the debtor violate the FCRA but for the fact

3    that it wanted to cover up that it was engaging in the whole

4    exercise as a facade to hide a retaliatory purpose?  I,

5    however, do not accept that argument here.  I will determine

6    shortly whether the FCRA was violated or not.  But I think, at

7    a minimum, it is clear that it was not clearly violated.  That

8    is, someone in Ms. Patrick's position or Mr. Gooding's

9    position, or other people involved in this process, would not

10   have known with any degree of clarity that what they were doing

11   was in violation of the FCRA -- which undercuts the whole

12   inferential argument about an improper motivation.

13          Mr. Reno's contention that the FCRA applies here is a

14   plain meaning argument that has been criticized by a number of

15   courts, particularly in respect of the version of the statute

16   that would be applicable here, which is that in addition to

17   applying to the provision of reports with regard to a

18   consumer's creditworthiness, credit standing and credit

19   capacity, the statute provides that it applies to such reports

20   going to a consumer's character, general reputation, personal

21   characteristics or mode of living with regard to employment

22   purposes.

23          I agree with Johnson v. Federal Express Corp., 147

24   F.Supp. 2d. 1268 (M.D. Ala. 2001), Hartman v. Lyle Park Dist.,

25   158 F.Supp. 2d 869 (N.D. Ill. 2001) and Rugg v. Hanac, Inc.,

89

1    2002 U.S. Dist. LEXIS 18101 (S.D.N.Y. 2001), as to their

2    skepticism that the FCRA applies to this type of investigatory

3    report dealing with a consumer's particular workplace conduct

4    (that is, in contrast to reports going to decisions to hire or

5    to fire based on general non-workplace conduct, such as set

6    forth in Comeaux v. Brown & Williamson Tobacco Co., 915 F.2d

7    1264 (9th Cir. 1990) and Hodge v. Texaco, Inc., 975 F.2d 1093

8    (5th Cir. 1992)).

9            In addition, I believe that the record, as it is,

10   does not enable me to find that Mr. Brown's company, Securitas,

11   which is not described other than as simply being a large

12   investigatory company, would be a "credit reporting agency,"

13   which is necessary to fit his investigation within the FCRA's

14   definition of an "investigative consumer report" which, in

15   turn, triggers the applicability of the statute under 15 U.S.C.

16   § 1681a(f).  That term is defined as "any person which, for

17   monetary fees, dues or on a cooperative non-profit basis,

18   regularly engages in whole or in part in the practice of

19   assembling or evaluating consumer credit information or other

20   information on consumers for the purpose of furnishing consumer

21   reports to third parties, and which uses any means or facility

22   of interstate commerce for the purpose of preparing or

23   furnishing consumer reports."  See again Rugg v. Hanac, Inc.,

24   2002 U.S. Dist. LEXIS 18101 (S.D.N.Y. 2002).

25           So, not only on the merits, but also, as importantly

90

1     -- since, as was pointed out in oral argument, even if Mr. Reno

2     were to prevail on the merits of the FCRA claim he would get a

3     very small amount of money -- in connection with evaluating

4     whether Delphi was engaging in a pretext when it said that it

5     relied upon Mr. Brown's investigation, I conclude that the FCRA

6     has no bearing.

7          Therefore, in considering the circumstantial evidence

8     in the record before me, where Delphi has come forward with a

9     non-retaliatory or a non-discriminatory reason for firing Mr.

10    Reno that I find credible, I do not believe that Mr. Reno has

11    carried his burden of proof to show that this was not the only

12    reason for his termination, or that, to the contrary, it was

13    more likely that he was terminated in retaliation for having

14    taken his views on the container tank issue over Mr. Gooding's

15    head.  The proof offered by Mr. Reno is too slim and his

16    assertions of a bad motive too strongly contradicted by the

17    record.

18         I'll note further, although ultimately this is a

19    lesser reason for my holding, that Delphi in response to Mr.

20    Reno's letter, at least shortly after the letter was received,

21    commissioned a third-party environmental consultant to look at

22    the tanks.  That was done on March 6th, and that consultant's

23    report appears in the record at Exhibit 19.  So there does

24    appear to be a prompt response by Delphi, and certainly no

25    attempt to keep Mr. Reno's complaint under wraps, but, to the

91

1    contrary, to open it up to a third party.  And I think the

2    report not only has to speak for itself, because there's been

3    no further testimony about its bona fides, but I think it does

4    speak for itself as a legitimate third party corroboration of

5    the bona fides of Delphi's actions.  Moreover, Delphi later

6    that summer, in May, apparently involved the local authorities

7    in looking at the tanks, who also were satisfied.

8           So while I acknowledge that the sunshine aspect of

9    what Delphi did doesn't necessarily obviate Mr. Reno's claim,

10   because, after all, one could still infer, if the

11   circumstantial evidence was sufficient, that Delphi terminated

12   him because Delphi was mad that he raised the environmental

13   concerns in the first place, it does further support Delphi's

14   contention that as far as that aspect of his performance was

15   concerned, as opposed to his dealings with Mr. Calton and

16   subordinates, they considered Mr. Reno's advice and took it

17   seriously.

18          Based on those findings, the defamation claim, I

19   believe, will not lie under Ohio law.  To state a claim under

20   Ohio law for defamation, the plaintiff must show that there was

21   a false statement defamatory to the plaintiff, published to a

22   third party by a defendant who was, at least, negligent, that

23   was damaging to the plaintiff's reputation.  A plaintiff must

24   prove a defendant's negligence by clear and convincing

25   evidence, but need only prove the other elements by a

92

1    preponderance of the evidence.  In a defamation action,

2    therefore, falsity is an essential element.  Furthermore, in

3    defending against a defamation action, it is sufficient for the

4    defendant to show that the imputation is substantially true, or

5    as it is often put, to justify the gist, the sting or the

6    substantial truth of the defamation.  See Parry v. Mohawk

7    Motors of Mich., 236 F.3d 299, 312 (6th Cir. 2001) (citations

8    omitted).  Here, the alleged defamation was the statement that

9    Mr. Reno was being terminated because of the dumpster incident

10   and his conduct in connection with the investigation thereof.

11   And for the reasons I've stated, there was, under the Ohio law,

12   no basis for a defamation claim based on that statement.

13        The COBRA claim is, for me, somewhat more difficult

14   to decide, given the posture of this action.  The statute

15   provides, in 29 U.S.C. § 1163(2) that continuing coverage is

16   not required to be provided to an employee after termination

17   for "gross misconduct."  That term is not defined.  The courts

18   have grappled with the definition in various ways.  One, at

19   least, has said that "gross misconduct" constitutes a deviation

20   from the employer's business ethics policy for, among other

21   reasons, failing to disclose a financial interest in a

22   supplier, accepting favors and gifts from a vendor and claiming

23   reimbursement from the company for non-official travel.  See

24   Karby v. Standard Prods. Co., Civ. A. No. 3:90-2918-17, 1992 WL

25   333931 (D.S.C. 1992).  A case out of Texas has defined the term

93

1  to mean a substantial deviation from the high standards and

2  obligations of a managerial employee that would indicate that

3  such an employee cannot be entrusted with his management duties

4  without danger to the employer.  See Avina v. Texas Pig Stands,

5  Inc., 1991 U.S. Dist. LEXIS 13957 (W.D. Tex. 1991).

6          As I said, I have not determined here, because I

7  cannot on this record, whether Mr. Brown was right or not.  I

8  have determined that there was enough of a basis in his

9  investigation for a proper termination of Mr. Reno.  But I do

10  not know from his investigation whether he had established

11  "gross misconduct."  And I don't believe the debtors have

12  established it here, either, as a matter of fact, for purposes

13  of this statute.  They have, again, established that they had a

14  valid basis for terminating Mr. Reno, based on the

15  investigation.  They did not have to conduct a trial.  But I

16  think that proving gross misconduct, as opposed to proving that

17  they had enough basis to terminate him, requires more in the

18  factual record.  And so I believe that they have not met what I

19  think is their burden here to show gross misconduct.

20  Therefore, I believe that Mr. Reno's COBRA claim is

21  established.

22          Finally, as to the ERISA claim, I think it was made

23  clear at oral argument that this claim really devolves into a

24  damages issue.  I did not see any opposition on the merits as

25  to, for example, an alleged defense that it was proper to delay

94

1    distribution of Mr. Reno's pension money.  And so the issue as

2    to whether that distribution included an element of interest

3    and/or if it didn't, what the proper damages would be for Mr.

4    Reno's not having received it from the date -- which has also

5    not been established -- that the pension money should have been

6    distributed and the date it was, which has been established,

7    should await further trial if the parties choose to do so,

8    although my hope is, given the amount claimed, that there can

9    be a resolution of that matter.

10           All right.  As I said, I'm going to go over the

11   transcript, because obviously this has gone on, probably far

12   too long for all of you, and I want to make sure it's accurate

13   and properly reflects my thinking on the issues.  But again,

14   the conclusions won't change.  So, Mr. Hogan, you should submit

15   an order, consistent with my ruling, which disallows all of the

16   claims except for the COBRA and ERISA claims, reserves the

17   ERISA issue for further trial on damages calculation and allows

18   the COBRA claim.

19           MR. HOGAN:  We'll do so, Judge.

20           THE COURT:  Okay.  Thank you.  Oh, you don't have to

21   settle the order but I -- I -- circulate it -- I'm sure -- but

22   I'll say it anyway, you'll provide it to counsel for Mr. Reno

23   so that he can make sure that it says what I just said.

24           MR. HOGAN:  We will, Judge.

25           THE COURT:  Okay.  Thank you.

95

1        (Proceedings concluded at 1:58 PM)

2

3

4

5

6

7

8

9

10

11

12                        I N D E X

13

14                        RULINGS

15                              Page      Line

16   Denial of all claims      72        25

17   except for COBRA and

18   ERISA

19

20

21

22

23

24

25

96

1

2

3

4

5

6

7

8

9

10

11

12                    C E R T I F I C A T I O N

13

14      I, Pnina Eilberg, court approved transcriber, certify that the

15      foregoing is a correct transcript from the official electronic

16      sound recording of the proceedings in the above-entitled

17      matter, except where, as indicated, the Court has modified its

18      bench ruling.

19

20      _____ March 27, 2007

21      Signature of Transcriber              Date

22

23      Pnina Eilberg

24      typed or printed name

25

**A**

**ABIGAIL** 5:18
**able** 9:19
**above-entitled** 96:16
**absence** 86:21
**absolutely** 42:9 47:25
**accept** 53:25 78:14 88:5
**acceptable** 14:21
**accepted** 17:17
**accepting** 92:22
**accord** 43:25
**accounting** 83:20
**accrual** 62:18
**accuracy** 73:8
**accurate** 20:23 33:14 52:1 94:12
**acknowledge** 23:22 91:8
**acknowledged** 87:2
**acknowledgement** 86:19
**acknowledgment** 52:11
**act** 29:7,14 37:20 59:25 68:13,23 69:2,12,16 70:11 70:19,20 72:2 74:12 75:7,11 87:22,23,25
**acted** 51:3
**action** 17:2,3,8,11 17:18,20 18:23 24:7,11 27:17 28:3 28:11,13,17 29:9 36:10,11 37:17 44:23 59:21 68:10 72:3 75:3 79:1,4 79:20 92:1,3,14
**actionable** 75:8
**actions** 18:21 36:15 58:10 91:5
**active** 40:6
**activity** 17:18,19

18:20,23 24:7,12 24:21 35:7 41:4 43:3,6 65:15,17,18
**actual** 70:16
**add** 37:1 55:3
**addition** 9:2 48:15 88:16 89:9
**additional** 11:12 27:13 51:6 70:1 80:25
**address** 17:14 19:8 22:25 33:9,25 43:17 63:3 77:8
**addressed** 23:1 77:19
**addressing** 18:2
**adherence** 85:22 86:4
**adjourn** 7:13
**Adjournment** 2:10 2:11
**adjudicate** 7:20,22
**adjudicating** 6:23
**administration** 6:20
**administrative** 80:17
**Administrator** 6:8
**admission** 68:12 85:11
**admit** 41:19
**admits** 34:14
**admitted** 11:17,25 50:7 71:24
**adopted** 76:25 79:8
**advance** 53:20 82:17
**adverse** 17:18,19 18:20,23 24:7,11 28:3 29:9 68:10 72:3
**advice** 91:16
**advise** 53:20
**affidavit** 29:23 67:20 68:5 84:12
**affiliates** 6:7
**afforded** 9:5
**afternoon** 9:19,20

18:10 26:17 31:3
**age** 47:8
**agency** 57:20 60:3 68:25 69:22,25 70:2 71:2,25 72:20 72:21 89:12
**agenda** 6:16 7:9,16 8:1,19 9:7,22
**agent** 70:23
**agents** 47:10
**ago** 56:17
**agree** 62:21 75:22 88:23
**agreed** 2:16,23 3:2,7 3:12,17 7:12,19 9:9,25 10:8 11:10 11:20
**agreement** 7:4 9:16 11:14 12:1 73:14
**agrees** 27:7
**ahead** 6:5 23:6
**aired** 81:16
**Al** 1:8 6:12 10:21,24 49:14
**Ala** 88:24
**albeit** 80:18
**ALBERT** 4:9
**alleged** 75:10 78:3 92:8 93:25
**alleges** 61:18
**allowed** 29:15 45:5
**Allowing** 2:23 3:2,7
**allows** 94:17
**alluded** 65:22
**allusion** 42:2
**alternative** 76:6
**alternatively** 76:17 77:14 87:15
**amazingly** 38:8
**ambit** 75:7
**amended** 13:3 15:10 17:4 19:23 22:2 36:9,25 37:14 51:5
**amending** 37:1
**American** 22:18 23:8 48:16

**amount** 8:20 62:9 90:3 94:8
**amounts** 31:7
**analysis** 21:23,24 48:21 77:11 84:18
**and/or** 36:4 74:7 82:15 94:3
**animus** 40:12,24 41:21
**Ann** 26:4 34:20,24 35:3,13 77:25
**answer** 15:1,12 32:3 32:7 44:8 85:14
**anybody** 30:7 32:2
**anyway** 34:4 44:1,14 47:3 62:3 94:22
**App** 79:2,23
**apparently** 81:22 84:8 91:6
**appear** 19:1 46:22 86:14 87:15 90:24
**appearance** 52:16 52:25 82:5
**appears** 59:9 81:25 85:25 90:23
**applicability** 89:15
**applicable** 88:16
**applies** 60:8 88:13 88:19 89:2
**apply** 60:5 61:9
**applying** 18:18 88:17
**appreciate** 40:14
**approach** 47:12 85:1
**approached** 53:9
**appropriate** 42:6 49:1 78:12
**approved** 96:14
**approximately** 22:13 31:7 36:24 54:19
**April** 7:15
**aquarium** 86:11
**area** 76:14
**arguably** 86:1,1,2

**argue** 13:12 46:4
**argued** 13:2 18:8
 47:18 88:1
**argues** 74:23
**arguing** 47:5 68:16
 79:24
**argument** 18:25
 19:18 26:11,16
 42:4 44:5 47:16
 76:10,11 77:3
 84:17,20 87:10
 88:5,12,14 90:1
 93:23
**arguments** 43:7,13
 47:16 59:20
**arising** 43:9 77:15
**arose** 18:3 57:5
**Arps** 4:3,11 10:25
 49:14
**arrange** 81:22
**arrangement** 53:15
 82:16 83:16,23
**arrangements** 6:4
 83:11
**arrogant** 44:24 45:1
**articulate** 76:4
**articulated** 53:4
 62:10 76:18 77:5
**ascertain** 30:20
**aside** 57:23 58:8
**askance** 87:8
**asked** 31:4 38:6 39:9
 59:2 83:1 84:7
**asking** 48:8
**aspect** 62:8 91:8,14
**aspects** 11:5
**assembling** 89:19
**assert** 9:3
**asserted** 8:21 10:7
**asserting** 13:4
**assertion** 8:10 75:24
**assertions** 90:16
**asserts** 77:12
**assumed** 39:12,15
 39:17 55:9 82:1,1
**assuming** 14:4 46:6

**assumption** 39:18
 83:18
**Atchison** 28:15,18
 29:21,22 30:1,5
 32:6 67:20,21
**ATS** 57:12
**attached** 18:14 20:6
**attempt** 87:14 90:25
**attempted** 55:2
**attempting** 12:22
 49:22
**attention** 20:4,11,12
 84:20
**Attorneys** 4:4,12,21
 5:8
**attributable** 45:11
 45:12
**at-will** 79:10
**authorities** 91:6
**authority** 8:12
**authorized** 48:24
**Autoliv** 7:12
**Avenue** 5:9,15
**Avina** 93:4
**avoid** 55:5
**avoided** 52:25
**await** 8:23 94:7
**awaiting** 8:22
**aware** 11:3 17:9,16
 29:18 34:15 49:4
 50:12 60:12
**awareness** 50:16

**B**

**b** 1:21 21:4 78:4
**back** 17:10,20 22:16
 22:19 23:11 24:6
 31:14 34:21 46:10
 48:14 50:21 52:4
 55:7 58:25 72:24
 73:1 81:12 87:19
**back-dated** 54:10
**bad** 54:22 90:16
**Bank** 8:8,19
**bankruptcy** 1:2,14
 1:23 17:7

**bare** 47:6
**base** 46:25
**based** 12:15 13:3,19
 38:3 51:12,18,20
 59:22 62:16,16
 65:4 66:25 77:20
 81:5 87:4 89:5
 91:18 92:12 93:14
**basic** 18:18
**basically** 60:5
**basis** 13:15 23:2
 39:18 50:8 60:11
 61:25 62:14 74:15
 76:18 83:7 89:17
 92:12 93:8,14,17
**BEAL** 5:18
**bear** 35:22
**bearing** 90:6
**beating** 64:13
**began** 40:3 56:19
**begins** 54:10
**behalf** 2:4,8,13,20
 2:25 3:4,9,14,20
 6:7 16:25 86:2
**believe** 16:17,21
 20:22 22:4 35:13
 35:20 49:10 63:23
 63:24 69:4 71:10
 71:20,22 76:20
 77:9 78:15 79:4
 81:13 83:13 84:1
 84:12 86:5,20 87:4
 87:16 89:9 90:10
 91:19 93:11,18,20
**believed** 87:5
**believes** 51:9
**bench** 73:3,5 96:18
**benefits** 52:17 61:17
 67:8 73:20 80:18
**Berger** 2:19
**best** 57:23 79:4
**Beth** 12:20 26:3 34:8
 34:10,16,23 35:12
 50:3 54:24 64:10
 65:3
**better** 36:8

**beyond** 47:14 83:5
 87:17
**big** 41:11 54:7
**bigger** 58:10
**billed** 55:9
**billing** 67:12
**binder** 11:8 14:25
 15:11 59:16 75:16
**bit** 35:23 56:17
**blower** 17:11,17
 18:13,19 19:11,13
 19:24 20:5 23:15
 23:19,21 24:14,17
 34:15,19 36:4,14
 37:18,22 43:11
 45:13 46:7 48:4,7
 49:20,22,25 50:13
 51:2 57:18 59:14
 59:21 61:14 65:1
 66:23,24 67:4 68:9
**blowers** 46:18
**blower's** 20:1
**blowing** 19:16
**blue** 16:3,6
**bona** 91:3,5
**book** 33:22 52:9
**books** 9:10
**bore** 36:12
**boss** 81:22
**bother** 41:13
**bound** 68:23
**Bowling** 1:15
**box** 40:4,7,7
**Brad** 4:20,25 12:8
 14:1 15:16 16:25
 64:7
**break** 72:24
**brief** 13:2 19:7,24
 33:8 64:3,5 69:17
 70:8
**briefly** 12:18
**bring** 20:3 42:1
**bringing** 20:12
**brings** 20:10
**broken** 27:21
**brought** 46:13,14

47:1
**Brown** 11:15 15:9
15:15,17 16:10,17
25:5,10,22 27:24
28:23 29:12 30:2,4
30:20 31:22 32:2,7
32:8 33:6 34:22
38:1,7,23 39:2,3
43:12 51:5,9 54:19
56:24 58:3,15,15
58:24 60:13 61:8
65:5,15 68:4 71:22
81:1,7,23 82:12,15
82:22 83:10,12
84:21 86:7,22,25
87:1,5,11 89:6
93:7
**Brown's** 15:10 26:1
26:3 27:3 31:21
35:4 51:8 60:10
64:15 83:4 84:3
85:10,11 86:19
87:9 89:10 90:5
**bullet** 32:24 33:2
**bullets** 25:18 33:2
**burden** 12:15 16:22
22:1 24:21 61:25
75:21,23 76:4,6,13
76:15,21 81:4,8,12
90:11 93:19
**burdens** 70:1
**burden-shifting**
76:1,11
**business** 52:17,23
53:2,11 79:19 80:5
86:11 92:20
**Butler** 2:3,8,13,24
3:4,9,13,19
**buys** 31:6

---

**C**

**C** 4:2 6:1 96:12,12
**Caine** 40:15 86:16
**calculation** 61:19
62:18 94:17
**calendar** 56:16

**call** 78:15
**called** 18:11 82:13
**calling** 71:25
**Calton** 29:25 30:1
38:4,5,9,13,20
39:1,3,5 40:6
42:11,16,22 43:15
43:21 53:9,14,17
55:4,6 58:16 67:22
82:13 83:11,12,18
83:24 91:15
**Calton's** 33:21
51:25 83:14,18
84:9
**cancer-causing** 18:1
47:9
**capacity** 18:6 88:19
**Captain** 86:15
**career** 85:8
**careful** 45:3
**carefully** 13:18
57:11 85:17
**carried** 10:12 90:11
**case** 1:4 6:24 17:5
17:20 18:18,19
19:12 20:2 21:10
24:6,17,23 31:16
39:13,15,17 45:14
45:21 46:2,22
47:23 49:3,15,18
55:12 56:2,2,5
60:5 66:23 69:22
76:3,15 77:24
80:12,15 92:25
**cases** 45:13 48:7
65:1 76:20 77:21
77:23 79:21
**case,John** 19:7
**cash** 53:16
**cash-no** 53:23
**causal** 17:18 18:22
24:8,9,10 32:23
55:15,25
**causation** 19:18
79:18,24
**cause** 17:11 64:25

75:2 79:1,3,12
81:22
**causes** 17:2,3,8
36:10 37:17 59:21
**causing** 47:16 56:9
**cede** 16:23
**Center** 10:13
**cents** 8:17,22 9:2,4
**certain** 69:2 71:11
74:4 87:16
**certainly** 13:1,11
20:11 50:14 55:11
61:12 66:9 74:24
90:24
**certify** 96:14
**CHALERK** 44:24
**CHALKEER** 27:2
**Chalker** 4:20,25
11:21 12:8,8 13:17
13:21 14:1,1,8,10
15:4,16,16,21,24
16:23,25,25 19:5
19:14,22 20:10,22
21:1,6,9,17,20,23
22:7,16 23:5,18
24:3,6 26:14,25
27:4,23 28:10,13
28:15,25 29:3,7,20
29:22 30:5,19
31:12,14 32:13,16
32:19,22 33:1,19
33:24 34:6,10
35:11,15,19,24
36:1 37:6,11,13,17
38:15,17,19,23
39:6,14,17,22
40:17,19,24 41:2,9
41:16 42:7,15,22
42:25 43:21,24
44:2,6,18 45:3,20
46:1,17,23 47:3,22
48:23 49:2 50:9
56:11 57:11 60:23
61:1 64:5,7,7,21
64:24 65:24 66:5,9
66:20 67:3,8,11

68:18 69:4,16,19
70:1,10,16,20 71:5
71:10,15,19
**Chalker's** 15:1,12
**chambers** 11:8
**chamber's** 11:3,9
**championing** 79:25
**change** 8:7 70:25
72:10,12 73:10
94:14
**changed** 34:3 83:12
**chapter** 19:25
**character** 88:20
**characteristics**
88:21
**charge** 17:21 20:13
**charged** 85:21
**chart** 6:19,22,25
**check** 23:3 46:15
**Chemicals** 76:24
**Chicago** 4:6
**chicken** 31:6
**choose** 94:7
**Chris** 6:12
**chrome** 41:18
**chromium** 17:25
18:1
**chronology** 48:19
50:24
**Chrysler** 79:2
**Cir** 76:24 89:7,8
92:7
**circuit** 19:7,12
45:17,20,21,22,23
**circulate** 94:21
**circumstances** 45:5
54:24 76:1,2 79:16
81:24
**circumstantial**
80:14,14 90:7
91:11
**citations** 92:7
**cite** 19:25 41:21
69:16
**cited** 22:22
**Civ** 92:24

**claim** 2:7,12,17,24
3:3,8,12,17 7:11
7:14,15,17,17,20
7:21,23 8:9,10,15
8:15,16,18,19,20
8:21,25 9:1,1,3,7,8
9:9,15,15,23,24
10:6,6,7,9,22,22
11:2,5 12:14,14
17:2,17 19:13
31:18 36:17 37:5,8
59:22 60:1,1,2
61:10,13,14,15
62:1,6,8,11,16
73:4,12,19,21,22
74:7,7,14 75:4,23
77:11 78:1 79:5,7
79:13 87:20 90:2
91:9,18,19 92:12
92:13 93:20,22,23
94:18
**claimant** 4:21 10:7
11:2,15 16:21,25
50:19 61:24 64:8
73:21 75:22 76:3,7
76:8,10,13,13,16
76:21 77:4 79:14
80:13 83:5 85:5
**claimant's** 16:5
**claimed** 50:1 53:13
94:8
**claiming** 33:12
92:22
**claims** 2:1,6,11 6:8
6:10,20,24,25 7:3
7:6 8:2 9:5,14,14
9:23 10:1,2 11:1
11:11 46:19 53:22
54:7 56:3 73:17
75:13,20 77:9,10
77:13 78:17 80:12
94:16,16 95:16
**clarity** 79:15,20
88:10
**clarity's** 16:2
**Clark** 48:17

**clean** 80:2
**clear** 11:18 13:25
27:10 34:5 38:4
44:14 51:18 52:3
52:13 53:20 54:9
55:1,12,18 67:12
79:15 82:2 83:3
86:25 88:7 91:24
93:23
**cleared** 82:17
**clearest** 46:20
**clearly** 44:3,19 51:4
51:23 52:6 53:4
54:1 83:6 88:7
**client** 17:21 25:1
48:9
**close** 16:15 24:13
48:5 72:14 78:15
**closely** 71:5
**closing** 16:22
**Coast** 8:19
**COBRA** 37:18
73:21 75:1 92:13
93:20 94:16,18
95:17
**code** 19:15 22:22
71:18 77:25
**coincidence** 57:6
84:16
**coincides** 66:18,20
**collateral** 13:3,5,15
**collected** 54:16
**come** 28:1 44:10,10
46:19 54:3 57:13
65:12 72:24 76:12
90:8
**Comeaux** 89:6
**comes** 61:19 75:24
**coming** 23:7 57:4,5
**commenced** 43:3
**comment** 27:19
**comments** 15:22
**commerce** 89:22
**commissioned** 69:24
75:6 90:21
**Commissioner** 3:18

**committed** 68:6
**Committee** 5:8
**common** 19:12,13
20:17 45:24 52:14
73:18 77:14,22
**Commonwealth**
3:19
**communicate** 65:16
65:18,21 66:9
**communicated** 66:1
66:8
**communicating**
20:9
**communication**
51:6 72:15
**companion** 18:5
47:8
**company** 3:3 18:17
25:8 46:21 57:12
57:12 69:13 71:23
82:13 89:10,12
92:23
**comparable** 86:15
**competent** 30:7
**complainant's** 25:20
33:5
**complaint** 17:4
19:23 22:2 34:15
34:19 36:4,10,25
37:1,14 55:22
59:12 90:25
**complaints** 56:1
57:18
**complete** 26:6 28:16
28:20 30:21 34:25
35:5 50:21 64:23
85:11,13 86:22
**completed** 25:22
26:20 31:22 32:2,4
33:6 51:10 66:10
67:9
**completely** 62:21
**completion** 24:25
25:9,9,25 31:20,20
32:15 64:14 67:9
**complied** 78:25

**complies** 70:23
**comply** 22:22 29:13
43:8 74:11 77:23
78:13 87:23
**complying** 23:14
**Compromising** 2:23
3:2,7
**concept** 11:4 62:24
**concepts** 28:7
**concern** 77:16 80:9
80:21,22 81:4,21
81:25
**concerned** 19:2,19
29:18 38:9 86:7
91:15
**concerning** 59:21
**concerns** 55:17
56:20 78:16,17
86:3 91:13
**conclude** 27:12
64:19 82:23 85:23
90:5
**concluded** 52:4
54:25,25 57:21
82:12 95:1
**concludes** 63:7
**conclusion** 8:5 31:20
45:6 51:21 81:14
**conclusions** 42:3
68:6 83:4,9,10
94:14
**conclusive** 59:9
**concurred** 9:10
**concurrence** 9:25
**condition** 47:8 74:4
80:21
**conditions** 78:19,21
**conduct** 12:21 52:24
54:20 69:6 74:12
74:21,22 80:6
87:17 89:3,5 92:10
93:15
**conducted** 53:23
59:12
**conducting** 10:22
56:24

conference 11:3,10
conflict 52:6,16
  82:24
conflicts 52:14 82:3
confused 42:16,22
confusion 33:25
connection 17:19
  18:22 24:8,9,10
  32:24 49:20 73:16
  74:13,22 75:9
  82:21 90:3 92:10
Conners 6:12
consent 7:23
consequences 55:5
  63:23 69:8,8,12
consequently 74:6
  74:23 75:8
consider 13:12
  62:14
consideration 77:10
considered 27:21
  85:17 86:20 87:10
  91:16
considering 83:9
  90:7
consistent 94:15
conspiracy 39:8
  40:9,10
Constellation 2:18
  2:19 9:24,25
constitutes 92:19
constraints 78:24
consultant 90:21
consultants 22:5,15
  22:16,17
consultant's 90:22
consulting 57:20
consumer 60:3,3,7
  68:21 69:11,22,24
  70:2,12,22 71:1,1
  71:17 72:11,16,18
  72:19,20 89:14,19
  89:20,23
consumers 60:11
  89:20
consumer's 88:18

88:20 89:3
contact 12:22 53:9
  58:8
contacted 26:3
  34:23
contacts 26:7 65:19
  69:5
contained 14:25
  15:10 17:11 36:15
  59:16
container 74:5,6,10
  78:18 80:8,17,21
  81:16 82:8 84:15
  85:1 90:14
containing 18:1
  81:19
contains 77:21
contend 51:9 78:13
  80:4
contends 74:1,11,17
  74:25 75:5 83:5
  85:6,10,13 87:8
contention 84:15
  87:19 88:13 91:14
contested 6:11 67:15
context 53:11 56:3
  76:25 77:3 79:5
continued 7:11,15
  7:18
continuing 92:15
contractor 43:12
  59:5 60:6 82:14
  85:24
contractors 79:9
  81:18 86:9
contradicted 90:16
contradicting 32:9
contrary 36:6 38:2
  64:8 65:6,14,24
  67:15 79:6 87:25
  90:12 91:1
contrast 89:4
controversy 71:20
conversation 54:14
converted 25:21
  33:5

convincing 91:24
cooperative 89:17
copy 18:13 19:7
  87:21
Corp 79:2 88:23
corporate 20:13
  26:4,7 34:24 51:7
  63:11 65:17,19
corporation 1:8 2:4
  2:8,13,20,25 3:4,9
  3:14,20 6:2,7
  20:11,14 24:19
  53:2 73:2
correct 12:1,5,9
  21:25 22:6 24:2,2
  32:7,7 36:9 37:11
  73:9 74:4 78:7,9
  83:14 96:15
correctly 82:1
corroborated 86:6
corroborates 83:15
  84:13
corroboration 91:4
cost 18:4 67:18
  83:19
Cote 48:19
counsel 6:9 34:2
  64:9 65:14 78:23
  84:20 94:22
counsel's 21:24
count 22:2 36:15,17
  68:25
counts 19:15
couple 28:7
course 30:8 39:4
  55:3 64:16 65:8,25
  66:12 68:3,7
court 1:2,14 6:2,8,14
  6:17,21 7:8,25 8:4
  8:13 9:12,21 10:4
  10:10,19 11:2,24
  12:3,6,7,10,18,23
  12:25 13:2,7,9,12
  13:14,16,23 14:4,9
  14:11,15,16,18,21
  14:22 15:1,3,5,11

15:14,20,23 16:1,7
  16:13,18,20,24
  17:1,5,9,16 18:24
  19:10,17 20:7,16
  20:24 21:2,7,11,18
  21:22 22:3,14,24
  23:16,25 24:5
  25:12,17 26:13,24
  27:1,3,5 28:6,12
  28:14,21 29:2,17
  29:21,24 30:11,23
  31:13,15 32:11,14
  32:18,21,25 33:10
  33:18,21 34:4,7
  35:9,14,17,22,25
  36:11,12,12,13,19
  37:1,4,8,12,16
  38:13,16,18,20
  39:5,12,15,21
  40:13,18,20,25
  41:7,10 42:1,11,21
  42:24 43:19,23,25
  44:3,13,19,25
  45:14,16,23 46:2
  46:10,18 47:1,21
  48:8,11,24 49:3,13
  50:10,18 56:6 57:8
  60:9,14,18,21,25
  61:2,7 62:2,12,15
  62:25 63:2,5,8,10
  63:17,20,25 64:3,6
  64:17,22 65:21
  66:3,7,13 67:2,7
  67:10 68:15,25
  69:15,18,21 70:7
  70:14,18,25 71:7
  71:11,16 72:4,7,10
  72:18,21,23 73:1
  75:15 77:1 79:8
  87:24 94:20,25
  96:14,17
courtroom 2:2 17:8
  25:5
courts 19:1 76:1
  88:15 92:17
Court's 14:19 15:2

15:12 80:13
**cover** 12:22 88:3
**coverage** 92:15
**covered** 69:1 70:19
    70:20 75:7
**crack** 49:8
**cream** 40:15 86:15
**create** 41:13
**created** 46:9
**creates** 41:11 52:24
**creating** 54:10
**credibility** 85:22
    86:4
**credible** 90:10
**credibly** 83:6
**credit** 29:7,14 37:19
    59:25 68:13,23
    69:2,6,11,12,16
    70:10 72:1 74:12
    75:7,11 83:10
    87:21,23 88:18,18
    89:12,19
**creditor** 7:23
**creditworthiness**
    88:18
**critical** 18:25
**criticized** 88:14
**cross** 13:20 15:3,14
**cross-examination**
    15:25
**Crown** 58:3,4
**crucial** 48:3
**Ct** 79:2,23
**current** 7:4
**customers** 82:5

---

**D**

**D** 1:22 6:1 95:12
**daily** 31:1
**damage** 61:18
**damages** 37:7 60:1
    62:2,7,15 63:1
    73:16,19 93:24
    94:3,17
**damaging** 91:23
**danger** 93:4

**date** 2:15 7:13,13
    22:9 37:9,10 66:17
    66:25 80:23 82:6
    94:4,6 96:21
**dated** 22:19 23:24
    48:18
**Dave** 32:5
**David** 28:15,18
**day** 6:5 8:24 14:6,7
    18:10 26:12,15,18
    28:19 47:2 56:13
    80:16 84:17 86:24
**days** 26:22 58:11
**Dayton** 4:23 17:5,23
    50:2 81:19,19
**DBM** 9:15,17
**deal** 22:6 85:18
**dealing** 23:22 26:16
    63:4 77:17 89:3
**dealings** 91:15
**dealt** 7:3,5 79:4
**Dean** 6:8
**death** 43:2 64:14
**debacle** 68:7
**debate** 51:25 57:23
**Debbie** 27:17
**debris** 53:8 81:20
    82:1
**debtor** 1:10 4:4,12
    22:4 88:2
**debtors** 2:7,12 10:25
    12:17 13:19,22
    14:20,24 16:6
    49:15 66:15 73:3
    73:23 78:13 79:20
    81:2 87:20 93:11
**debtor's** 11:16,19
    12:14
**decide** 83:4 92:14
**decided** 23:5 35:15
    47:12 48:7 53:6
    56:14
**decision** 33:13,15
    34:9,11,13,14,18
    35:2,10 36:2 45:8
    50:8,8,15 51:1,2

51:14,18 58:22
    59:7 64:19,19
    65:18 66:2,3,8
    76:5 84:14 85:14
    85:16
**decisions** 54:22 64:1
    73:5 89:4
**declaration** 13:19
    13:19 14:14,16,25
    15:6,10,10 16:8
    43:10 50:25 51:5
    51:14 55:19 61:18
**declarations** 11:14
    33:10 75:16 81:6
**deemed** 11:25
**defamation** 37:19
    61:10,13 75:3
    91:18,20 92:1,3,6
    92:8,12
**defamatory** 61:11
    91:21
**defendant** 76:4
    91:22 92:4
**defendant's** 91:24
**defending** 92:3
**defense** 30:6,10
    73:23 93:25
**defenses** 79:3
**defined** 71:18 89:16
    92:17,25
**definitely** 30:8
**definition** 69:21
    71:1,3,3,17 72:11
    89:14 92:18
**degree** 88:10
**delay** 61:21 62:4
    93:25
**delayed** 73:20
**deliberately** 53:23
**delineate** 75:21
**delivered** 53:7 67:16
**Delphi** 1:8 2:4,8,13
    2:20,25 3:4,9,14
    3:20 6:2,7,8,10
    7:20,21,23 12:21
    17:22 18:3,12,15

19:20 24:18,22
    25:3,15,18,23
    26:19 27:5,8,20
    29:11 31:5,16 32:9
    32:19 33:3,11 35:6
    36:3,20,21 37:2
    39:11 40:2,4,8
    41:25 43:17 47:10
    48:14 49:16,19,23
    50:1 51:15,19 52:5
    52:17,22,24 53:11
    53:22,25 54:4,6,17
    54:18 55:2,7,9,19
    55:25 57:19,21
    58:12,13 61:12
    64:11 65:10 67:24
    67:25 68:23 69:13
    73:2,25 74:3,4,9
    74:11,17,21,23
    75:5,25 78:23 81:4
    81:8,14,17 82:2
    83:6 84:8,21 85:9
    85:23 86:7,24 87:6
    90:4,8,19,24 91:5
    91:9,11,12
**Delphi's** 12:22 18:25
    42:4 44:23 48:6
    50:5 52:9,13 53:1
    53:1,4,10 54:2
    56:24 74:9,13,16
    75:11 77:5,7 80:6
    81:20 82:23,24
    83:19,20 86:4 91:5
    91:13
**demonstrate** 12:20
    25:8
**demonstrates** 39:24
    68:19
**demonstrative**
    11:20,22 12:3
**Denial** 95:16
**Department** 9:8
    50:4 57:16,20
**deposit** 67:14
**deposition** 11:12
    15:19 16:2 31:24

33:14,20,21 35:12
35:18,19,21,23
38:7 39:5,6 43:15
58:4 61:16 66:1
83:15,18
**depositions** 56:6
81:7
**derive** 73:22
**describe** 78:5
**described** 75:3
89:11
**describes** 43:13,16
**designated** 34:2
**designations** 16:5
**detail** 21:7 33:9 78:5
78:16
**detective** 68:25
71:25
**determination** 9:6
73:16
**determine** 40:1
81:23 88:5
**determined** 50:4
59:13 93:6,8
**determines** 59:8
**developed** 76:1
**development** 84:25
**developments** 80:25
**deviation** 92:19 93:1
**devolves** 93:23
**Diamond** 76:23
**Diaz** 6:10
**died** 43:2
**differences** 75:19
**different** 29:6 44:15
75:14 76:11 85:1
**difficult** 30:19 92:13
**diminution** 37:7,9
**Dinsmore** 6:13
**direct** 55:23,24 56:7
85:4
**directed** 48:25 49:11
**directly** 82:14
**director** 50:3
**disagree** 11:21 19:5
19:22 50:1

**disagreement** 80:7
**disallow** 10:8
**Disallowing** 2:17
3:12,17
**disallows** 94:15
**discharge** 17:2 48:2
48:6 59:24 74:2,7
77:9 79:5,13
**disclose** 92:21
**disclosed** 57:25
81:11 87:7
**disclosing** 83:24
**disclosure** 52:13
**discontent** 45:12
46:8
**discovered** 17:25
56:22
**discovery** 56:5
**discriminatory**
24:20,23 76:7,16
76:18,22
**discuss** 26:8 33:8
34:8
**discussed** 11:3,9
**discussion** 12:6
59:25 84:10
**disk** 8:4
**dismissal** 79:16,17
**dismissed** 79:25
**dispositive** 64:9
**dispute** 17:13 18:3
18:19 35:6 43:16
50:12 51:9 58:17
79:20,24 80:16
**disputed** 53:12
**Dist** 88:24 89:1,24
93:5
**distinctly** 82:3
**distinguishing** 20:17
**distributed** 94:6
**distribution** 94:1,2
**District** 1:3 17:5
36:25 49:3 56:6
69:22,23
**Division** 2:18
**doctrine** 79:7

**document** 53:23
**documentation**
10:16 53:18
**documents** 11:12
56:6 57:7
**doing** 22:24 27:9
31:4 44:11 60:6
65:23 86:9 88:10
**dollar** 62:1
**dollars** 8:7,9,10,16
8:21,22 9:2,4 10:7
31:8 53:16 60:2
61:19 67:16 68:14
**Donna** 10:13
**double** 38:24 39:4
**doubt** 51:20 57:10
76:14 84:4
**dovetails** 87:19
**DRAIN** 1:22
**draw** 87:24
**drawing** 80:13
**drawn** 75:10
**Drive** 4:5
**drop** 42:12
**dropped** 42:18
**drove** 30:25
**due** 2:3 27:12 45:12
**dues** 89:17
**dumpster** 25:1,1,3
26:19,21 35:5 36:5
37:25 39:10,25,25
40:3,11,14,16 41:2
41:17,19,24 42:12
42:17 43:1 45:6,11
47:25 51:22 53:7
54:5,11,17 55:7,16
56:19,19 57:3
58:20 59:15 64:15
65:13 66:21 67:12
67:16 68:1,3,7
81:18,24 82:1
83:16,23 84:11
85:6,20 86:14 92:9
**dumpsters** 67:13
**duplicative** 10:1
**duties** 72:1 85:21

93:3
**D.S.C** 92:25

**E**

**e** 1:21,21 4:2,2 6:1,1
75:17 95:12 96:12
**earlier** 78:10
**East** 4:22
**ECOURT** 29:4
**ECRO** 6:3
**edit** 73:8
**Edith** 10:14
**effect** 55:15
**effective** 72:13
**effort** 22:5 24:1 78:8
**egregious** 47:15
**Eiberg** 3:25
**eighty** 8:16
**Eilberg** 96:14,23
**either** 9:19 15:7
16:13 27:22 29:10
29:11 31:11 55:20
59:23 62:8,25
68:17 93:12
**electronic** 96:15
**element** 63:18 79:16
79:17,18 92:2 94:2
**elements** 17:17
79:21 91:25
**Elizabeth** 14:24
33:12
**emergency** 17:22
18:2,10 26:17
49:10
**Emery** 3:8 5:14
**Emory** 8:15
**employee** 20:24 21:2
25:7 29:9 30:7,8
36:3 49:16 58:3
59:1 70:11 71:23
72:1,3 73:25 78:2
78:11 79:11 82:13
92:16 93:2,3
**employees** 31:7
41:10 52:22 53:25
54:11,12,13 86:9

**employer** 20:4,11 21:4 44:21 45:4 69:5 70:22 76:6,12 78:3,7 79:11 93:4
**employers** 61:13
**employer's** 79:19 92:20
**employment** 17:18 17:20 18:12,16,21 18:23 25:11,16,19 25:25 26:9 28:3 32:10 33:13,16 34:18 35:3,16 36:3 36:22 41:5 45:9 47:20 48:7 49:19 49:23,24 50:6 64:13 65:3 68:10 75:12 76:5 79:10 88:21
**enable** 89:10
**encourage** 13:24
**encouraging** 14:7
**ended** 27:9
**engage** 53:21
**engaged** 18:2 50:5 51:24 59:14,19 68:21 83:24
**engages** 89:18
**engaging** 12:21 88:3 90:4
**engineering** 57:9,16 57:21
**enter** 35:9
**entire** 23:6 33:3 38:3 47:6
**entitled** 55:11
**entity** 70:2
**entries** 11:21
**entrusted** 93:3
**environment** 47:10 80:9
**environmental** 17:21 18:2,9 20:14 26:17 43:9,17 49:9 51:18 56:1,9 57:5 74:18 77:17 78:16

81:9 90:21 91:12
**environmentally** 80:1
**equal** 55:20
**ERISA** 36:17 37:1 37:18 61:15,18 73:19 77:11 93:22 94:16,17 95:18
**ESQ** 4:8,9,16,17,25 5:5,12,18
**essence** 84:21
**essential** 92:2
**essentially** 25:21 33:5 70:4 73:24
**establish** 61:25
**established** 84:3 93:10,12,13,21 94:5,6
**estate** 7:20
**estoppel** 13:3,5,15
**ET** 1:8
**etcetera** 21:8
**ethics** 92:20
**ethnic** 41:12
**Eva** 7:15
**evaluating** 89:19 90:3
**eve** 17:6
**evening** 11:9
**event** 9:4 25:24 31:17 64:16 66:21 66:23 67:4 68:9 77:5 81:21
**events** 26:16 54:1,3 57:17
**evidence** 12:12,19 14:13 23:8 32:23 37:23 42:9,10 43:5 43:7 49:3,12 50:6 50:11 51:12,21,23 55:24,24 56:7,8,11 57:2,2 58:2 59:16 59:18,22 61:17 64:10 65:4,6 67:15 67:24 74:14 80:14 80:15 81:13 85:4

90:7 91:11,25 92:1
**evidenced** 22:9 31:22,23 41:25 67:23
**evidences** 67:21
**evident** 59:18
**evidentiary** 11:7,23 16:15
**exact** 19:25
**exactly** 19:14 49:21
**examination** 13:20
**examine** 15:3,14
**example** 86:10 88:1 93:25
**Excellence** 52:10,16 63:8 83:21
**exception** 70:18 71:21 72:13,14 77:10 79:10
**exceptions** 72:17
**excerpts** 15:18 16:9 33:20
**exculpate** 37:23
**exculpatory** 30:10
**exemption** 71:12,14
**exempts** 71:11
**exercise** 88:4
**exhibit** 11:8,19,20 11:20 14:25 15:11 15:17,18,18,19 17:4,12 18:14 20:6 20:6 22:9,17,20 23:9,16 25:12,13 25:13,14,18 26:2 27:1 31:16,23,24 32:12,16,19,22 33:3,15,18,19 34:1 34:22 35:20 36:7,9 36:18 37:21,21,21 37:22 38:7 39:19 42:25 43:5,11,12 48:15,17 52:9,10 67:21 75:16 83:21 90:23
**exhibits** 11:16,25 33:8 39:7

**exist** 56:10 74:5 77:22
**existed** 78:17
**existence** 79:15
**exists** 23:22
**expanded** 56:4
**expected** 19:25
**expense** 47:11
**explain** 48:1
**explains** 50:25
**explore** 12:19
**express** 35:4 88:23
**expressed** 74:2
**expunged** 10:1,8
**Expunging** 2:17 3:12,17
**extensively** 56:12
**extent** 18:4 49:20 86:6
**e-mail** 27:3,6 30:24 86:23
**e-mails** 16:10

___

**F**

**F** 1:21 96:12
**facade** 85:15 88:4
**face** 55:23 80:14,24
**facie** 18:18 24:6,16 76:3 80:15
**facility** 50:2 53:10 89:21
**fact** 11:21 23:12 36:23 38:3 41:23 42:16 44:16,21 46:24 53:6 56:12 57:3 83:2,17,23 86:15 87:4 88:2 93:12
**facts** 18:18 24:17 40:11 41:23 52:2 54:21 55:2 73:18 73:22,24 75:14,15 81:3 82:19 83:1 84:2,5
**factual** 77:8 80:11 80:24 81:5 93:18

**failing** 92:21
**failure** 22:21 87:20
 87:22
**fair** 17:13 29:7,14
 37:19 59:25 68:13
 68:23 69:2,12,16
 70:10 72:1 74:12
 75:7,11 87:21,23
**fairly** 49:18 73:4
 81:21 84:2
**faith** 78:8
**fallen** 11:13
**falls** 61:14
**false** 34:19 91:21
**falsity** 92:2
**far** 7:5 19:2,19 25:6
 25:6 27:20 29:17
 29:21 38:8 46:12
 49:11 86:18 87:10
 91:14 94:11
**fasceria** 41:11
**favor** 48:9 52:22
 82:12
**favors** 52:8,20,23
 59:7 63:16 82:4
 86:9 92:22
**FCRA** 71:4 88:2,6
 88:11,13 89:2 90:2
 90:5
**FCRA's** 89:13
**February** 10:12
 17:20 18:7 22:10
 22:19 24:13 26:4,8
 26:13,14,22 27:6
 27:23 32:1 34:23
 43:3,14 47:19,24
 48:3 50:16 56:13
 57:13 58:1,9,12,18
 58:21 59:1 65:19
 66:15,22 80:22
 82:8,10
**federal** 17:3,5 29:13
 36:11,25 49:3 56:5
 77:17 88:23
**fee** 67:17,20,22,23
**fees** 89:17

**feet** 22:12,13 24:4
 46:25 47:14 48:23
 48:24
**felt** 65:4 83:22 86:22
 86:23
**fides** 91:3,5
**field** 27:17 57:8
**fifteen** 49:8,8
**fifty** 7:3,6 9:2
**figure** 30:16
**file** 21:4,13 78:4
**filed** 2:3,8,13,18,19
 2:24 3:3,8,13,19
 6:24 7:20 17:5
 33:10 59:11 73:4
**filing** 17:6 33:11
 36:25 37:14
**filled** 14:5 83:16
**final** 73:10
**finalized** 10:17 43:4
**finalizing** 10:15
**finally** 7:16 18:15
 75:5 93:22
**financial** 92:21
**find** 47:13 73:17
 77:5,23 81:5 89:10
 90:10
**finding** 59:15 62:23
**findings** 29:15 57:4
 91:18
**finds** 69:23
**fine** 14:1,22 16:20
 16:24 38:10 48:14
**finishes** 28:8
**fire** 27:21 35:10
 44:22 56:8 89:5
**fired** 63:20 66:18
 74:18 76:16 85:19
**firing** 44:22 76:13
 77:7 90:9
**firm** 6:13 60:10,20
 61:4,5
**first** 6:18 14:23
 23:21 24:8 25:13
 30:6,23 32:24
 35:20 52:1,5,10

58:1 72:12 73:13
 77:9,12,20 82:7
 83:9 85:5 91:13
**fit** 89:13
**five** 32:18 33:23
 58:11
**fix** 23:3 44:7,8,9
 57:23
**fixing** 50:1
**flag** 38:8
**flip** 52:12
**Flom** 4:3,11 10:25
**flow** 62:7 69:8 77:11
**focus** 19:11
**focuses** 60:2
**focusing** 77:3
**folks** 30:9 51:6
 57:19 65:19
**followed** 48:5
**foolish** 85:19
**foot** 47:4
**force** 37:14
**foregoing** 96:15
**form** 41:3
**former** 49:24
**forth** 17:4 21:12
 36:10 70:23 73:12
 76:10 78:15 80:15
 89:6
**forthcoming** 82:19
 84:1
**forty** 31:7
**forward** 27:18 45:4
 76:12 90:8
**Foundation** 52:9
 83:21
**Foundations** 52:15
 63:8
**four** 4:13 25:18
 30:25 54:15 56:21
 56:22
**fourth** 9:14 33:2
**frame** 52:3 57:6,24
**framework** 7:4
**Franklin** 4:22
**frankly** 21:25 60:1

**Freddie** 10:14
**free** 14:6,9
**freely** 41:19
**friend** 42:21
**front** 34:1 45:21
 53:24 67:21 70:17
**full** 30:23 35:6 53:13
 80:18 83:22
**full-time** 60:6
**fund** 36:23
**funds** 37:2
**furnishing** 89:20,23
**further** 15:7 16:17
 27:8,13 28:11,13
 31:23 55:6 64:16
 67:6 72:6 75:9
 90:18 91:3,13 94:7
 94:17
**furthermore** 34:20
 39:18 40:5 92:2
**future** 7:13 41:14
**F.Supp** 88:24,25
**F.2d** 89:6,7
**F.3d** 76:24 92:7

**G**

**G** 6:1
**gallon** 17:25
**garbage** 81:19
**Gas** 2:18
**gate** 30:25
**general** 79:10 88:20
 89:5
**generally** 13:23
 17:16 46:21 73:4
 75:22
**getting** 10:16 23:1
 47:23
**gift** 52:22
**gifts** 31:9 52:20
 63:15 82:4 92:22
**gist** 73:11 92:5
**give** 47:22 55:10
 60:21 70:4 73:3,5
**given** 29:8 31:5 32:9
 37:4 38:10 44:15

44:15,16 66:11
78:24 86:17 87:7
92:14 94:8
**Glenn** 33:14,20 34:2
34:12 35:5
**global** 61:5
**go** 6:5 7:10 13:22
19:3,20 26:22
27:18 30:9 33:1
41:7 45:6 46:10,10
47:5,11 50:10,20
54:8 69:13 73:23
94:10
**goes** 27:11 48:18
61:10 72:17
**going** 9:2 13:12,20
14:3 22:8,11 28:9
30:21,21 31:25
41:14 42:1 44:25
45:4 46:5 47:12,13
47:22 48:14 49:6
53:21 54:13 56:15
58:5,20,23 60:21
72:8,23 73:2,22
83:22 88:20 89:4
94:10
**good** 6:6 10:24
41:20 46:3 63:11
78:8 87:14
**Gooding** 18:8,11
21:17 27:17 40:3
40:12,20,22 41:16
41:21 43:8,14 44:9
46:14 47:11 78:21
80:7,17 81:22
84:16 85:2
**Gooding's** 88:8
90:14
**good-faith** 24:1
**GORMAN** 5:12
**gotten** 62:19
**government** 25:23
65:8 66:12
**Graley** 79:22
**grant** 70:12
**granted** 8:12

**grappled** 92:18
**gratuities** 31:5
**greater** 54:3
**Greeley** 79:8
**Green** 1:15
**grind** 47:6
**gross** 92:17,19 93:11
93:16,19
**ground** 22:12 47:14
**grounds** 10:3
**group** 38:19
**guess** 22:3 27:6,19
28:6 34:3 45:1
46:19 62:21 64:17
66:13 68:12
**guessed** 16:15
**Gulf** 8:19
**gun** 80:13
**G.P** 3:13 10:6

---

**H**

**hairs** 66:11
**half** 6:24
**Hanac** 88:25 89:23
**hand** 6:18 8:4 23:8
54:8 66:22 74:17
**handed** 53:16
**handled** 7:7 64:1
**handling** 6:11
**Haney** 79:1
**happen** 41:14,18
45:7 48:2 53:24
**happened** 25:4
36:20 46:12 54:15
55:3,14 56:5 57:9
57:17 58:25 65:13
67:4
**happening** 17:24
58:18
**happens** 59:8
**harmed** 62:16,19,20
**Harold** 10:14
**Hartman** 88:24
**hate** 45:12 46:8
**hazard** 22:21 23:10
43:18

**hazardous** 18:1,4
22:11 41:18 77:17
78:16 81:9
**head** 90:15
**heading** 32:24
**headquarters** 20:13
26:4,20 34:24
65:17
**hear** 14:3
**hearing** 2:1,1,6,6,6
2:10,10,11,15,15
2:22 3:1,6,11,16
6:19 7:13 8:5
10:18 11:1,4,17
12:13 15:9 16:16
56:3 63:1,4 73:13
73:15
**hearsay** 38:24 39:4
**heavily** 32:12
**held** 2:2 82:22
**helped** 86:10
**HI** 54:9
**hide** 88:4
**hiding** 46:21,23,24
**high** 93:1
**highlighter** 16:3
**hinted** 51:16 55:20
**hire** 22:5,14 41:8
69:13 89:4
**hired** 23:3 81:2
**history** 69:6
**Hodge** 89:7
**Hogan** 4:9 6:12
10:21,24,24 12:1,5
12:11,24 13:1,6,8
13:10,15,17 14:12
14:17,19,23 15:8
16:5,12,14,19,21
49:14,14 50:14,24
60:12,17,19,25
61:3,8 62:4,13,21
63:1,3,6,9,15,19
63:22 64:1 65:22
72:5,9,12,20,22
94:14,19,24
**hold** 56:18

**holding** 90:19
**home** 42:19 67:17
**HON** 1:22
**Honor** 6:6,15,18,22
7:1,9,10,18,19,22
8:14,23,24 9:5,13
10:5,11,17,20 14:1
14:8 15:4,16 19:14
19:22 20:23 21:21
22:7 23:18 24:3
26:15 27:23 28:20
32:17,24 33:24
36:9,21 38:1 42:15
42:23 43:22 44:6
45:10 46:24 47:15
47:22 48:10 56:17
57:14 60:23 64:24
69:4 70:6 71:6
**Honor's** 12:18
**hoops** 19:3,20
**hope** 23:25 94:8
**hoped** 27:12
**hopefully** 9:19
**Hopkins** 77:2
**hours** 78:9 86:13
**house** 82:15
**Howarth** 33:15,20
33:22,23 34:2,13
35:5,11 36:6
**Howarth's** 33:14
35:19,21
**HRC** 49:4,5
**HRC's** 48:21
**Hubble** 48:17 49:10
**huge** 53:2 71:24
**human** 50:3 64:1
**hundred** 53:16
67:16
**H.B** 7:17,21

---

**I**

**ice** 40:15 86:15
**identical** 18:5
**identified** 22:20
23:9 30:5,9
**identify** 78:5

**III** 4:9
**IL** 4:6
**Ill** 88:25
**illegal** 27:25 45:18
  68:19 87:10
**illegality** 87:19
**immaterial** 52:22
**immediately** 54:10
**implied** 83:18
**important** 19:19
  26:15 31:25 34:12
  49:24 58:21 65:11
  66:16,17 68:2 73:6
  75:20 83:23 85:21
  86:3
**importantly** 40:5
  82:18 89:25
**impression** 86:5
**improper** 75:8
  76:20,23 77:7
  88:12
**improperly** 86:3
**impropriety** 52:25
  75:10
**imputation** 92:4
**inch** 49:8
**incident** 40:15 56:14
  58:9,10,13 59:15
  85:6,20 86:15,16
  92:9
**incidents** 60:8
**included** 11:13 19:6
  35:3 62:18 94:2
**includes** 75:16
**including** 76:20
  79:21 81:6
**incompetency** 87:11
**incompetent** 27:25
  28:7 65:5 87:9
**incomplete** 27:24
  28:9 36:5 41:6
  86:20,23 87:5
**inconsistent** 38:10
**incorrect** 69:5 83:6
**incredibility** 54:2
**incriminate** 39:7

**incriminating** 38:11
**independent** 57:20
**independently** 56:14
**indicate** 45:14 93:2
**indicated** 83:13
  96:17
**indicates** 49:6
**individual** 29:22
  84:7 85:19
**individuals** 26:7
  84:9
**inducing** 86:1
**infer** 91:10
**inference** 58:17
  75:10 87:24
**inferences** 80:13
**inferential** 88:12
**influenced** 58:19
**inform** 34:24
**information** 27:13
  54:16 65:22,23
  74:13,20 89:19,20
**informed** 26:5 51:1
  78:20
**informing** 26:19
  74:9
**initial** 8:10,21 86:6
**initially** 10:7
**initiated** 41:17,20
**innocently** 54:23
**innocuous** 81:21
**innumerable** 53:3
**inquiry** 83:8
**inside** 22:11 47:5
  67:19
**insignificant** 49:9
  85:7
**insistence** 85:1
**inspect** 23:6
**inspector** 48:19
**instances** 87:22
**instant** 17:20
**integrity** 85:21
**intended** 25:2 55:9
  67:25
**interest** 52:6,14

62:18 82:3,25
  92:21 94:2
**interesting** 57:24
**interim** 30:20 38:4
**internal** 69:7,9,9
**interpret** 19:1
**interpretation** 19:6
**interpreting** 45:19
  45:24 77:21,25
**interstate** 89:22
**intervening** 43:2
**interview** 27:10
  28:18,19 30:6 32:5
  32:6 38:19 41:10
  58:16 83:12
**interviewed** 58:14
  82:10
**interviews** 27:13
  28:15 30:17 39:1
  51:11
**intimated** 39:9
**investigate** 41:23
  81:2
**investigated** 23:23
  57:13
**investigating** 54:6
  60:7
**investigation** 24:25
  25:10,15,22,23
  26:1,5,8,19,20
  27:9,12,20,24,25
  28:1,20,24 29:3
  30:9,22 31:21,22
  32:3,15 33:6 34:25
  35:5 36:6 37:25
  39:25 40:1,3,12,14
  40:16,21 41:3,5,17
  41:20,24 42:4 43:1
  45:6 48:1 50:21
  51:6,8,10,13,22
  54:20 55:16 56:19
  56:24 57:3 58:20
  59:9,12 64:15 65:5
  65:8,14 66:10,12
  66:21 67:9 68:3,19
  69:6,7,9,14 70:3,5

71:23 74:13,22
  75:5,6,9 82:9,11
  82:19 84:3 85:10
  85:13,25 86:7,19
  87:3,5,9,13,17,20
  89:13 90:5 92:10
  93:9,10,15
**investigations** 42:2
  58:24 60:6 69:20
  70:11,21
**investigative** 89:14
**investigator** 25:4,10
  26:1,2,18 27:24
  30:7,20 32:2,8
  34:22 35:4 38:1,7
  38:23 39:2,3 41:8
  64:15 65:5 68:4,22
  71:22 81:1,23
  82:10 87:12
**investigatory** 80:25
  89:2,12
**involve** 85:21
**involved** 82:11 86:8
  88:9 91:6
**in-house** 20:7 74:3
  74:20 78:22
**isolated** 86:8
**issue** 9:17 20:7 22:3
  28:9 30:13 31:14
  50:17 51:18 57:5
  57:10,25 74:10
  82:8 86:18 90:14
  93:24 94:1,17
**issued** 72:19
**issues** 81:10,12
  94:13
**item** 7:11,14,16 8:1
  8:6,8,14,18,25 9:7
  9:13,22 10:5

---

**J**
**J** 4:17
**James** 10:14
**January** 54:4
**jeopardize** 79:17
**jeopardy** 79:17,20

**Jermer** 19:8
**Joanne** 39:20 40:2
  41:21
**job** 44:11 74:21
  87:14
**Joe** 6:10 12:8 17:21
  18:3,7,11,13,15
  20:5 25:1,2,11
  27:8,10 28:3,16,19
  30:25 31:1,3,4,5,8
  32:5 33:13,16
  34:16,18 35:2,6,16
  36:2 39:8 40:5
  41:5 42:17 43:10
  44:8,11 45:9 47:18
  47:23 48:1,4,6
  49:18 56:8 86:25
  87:1
**Joe's** 31:1
**John** 2:3,8,13,24 3:4
  3:8,13,19 4:8 6:6
**Johnson** 10:14
  88:23
**joint** 2:16,22 3:1,6
  3:11,16 11:8 14:25
  15:11,17,18,19
  17:4,11 18:14 33:8
  34:1 36:18 39:7
  43:12 75:16
**Jones** 69:23
**Joseph** 2:12 4:21
  10:23 11:2 17:1
  31:18 48:9 64:8
  73:4
**Jr** 2:3,8,13,24 3:4,9
  3:13,19
**JUDE** 5:12
**Judge** 1:23 10:24,25
  11:7 12:11 13:6
  14:12,23 15:8
  16:14 49:15 50:15
  51:9 52:1 53:15
  54:20 55:3 57:7
  58:17 59:17,20
  60:12 61:10,24
  62:5,21 63:6 64:7

69:23 72:5,9 94:19
  94:24
**judgment** 48:9
**July** 25:20
**jump** 24:9
**jury** 17:6
**justification** 79:19
  80:5
**justified** 28:2
**justify** 92:5

## K

**K** 4:8
**Karby** 92:24
**Karen** 6:9 10:14
**Karl** 2:24 9:1
**KAYALYN** 4:16
**keep** 90:25
**keeps** 33:12
**Kettering** 17:23
  53:10
**key** 29:22 31:15
  33:3 65:11 83:15
**KG** 2:24
**kind** 28:6 53:19
  80:12
**kindly** 14:5
**kinds** 57:2 65:11
**knew** 43:13 44:14
  49:23 53:5 58:5
**know** 7:5 11:7 12:18
  16:1,11 18:24 25:6
  27:18,18 29:10,11
  31:4 38:24,25
  41:11,12,15 42:5
  43:25 44:10,17
  47:15 48:22,25
  53:14 59:5 60:13
  61:3,4,5,8,19,20
  61:20,21,21 62:23
  64:13,16 65:7
  67:17 73:6 93:10
**knowing** 23:7 54:17
  54:18
**knowledge** 34:17,19
  35:4,6 36:4,5

43:16 51:1 58:23
  83:17
**known** 40:1 41:24
  47:18 58:2 80:9
  81:17 88:10
**knows** 47:3
**Koontz** 6:12
**Kraft** 6:9
**Kuefner** 2:24 9:1,2

## L

**L** 4:9
**lack** 79:19
**laid** 79:21
**language** 32:15
  70:16 78:24
**large** 61:4 75:23
  89:11
**late** 6:3 54:4 58:18
**LATHAM** 5:7
**launched** 57:4
**law** 4:20 6:13 17:3
  19:6,12,13 20:2,14
  20:17 29:9,14
  36:16 45:19,24
  77:14,22,24 79:14
  87:17,23,25 91:19
  91:20 92:11
**laws** 43:9 77:17
**lawyer** 20:8 38:14
  74:3
**lays** 84:4
**lead** 42:3 84:22,23
  85:7 87:24
**leads** 49:10
**leak** 17:24 23:7
  56:22,25 58:12
**leaking** 18:4 22:11
  23:6 41:18 50:1,17
**leaks** 47:9
**learn** 56:25
**learned** 40:4 42:3
  50:22 54:4,6 58:1
  74:21 82:7,15
**learning** 59:10
**leave** 14:5 35:7

**leaves** 27:16
**led** 50:23 82:22
  84:21 85:2
**legal** 13:11 59:20
  69:8 74:20
**legitimate** 24:22
  42:3 76:4 77:16
  81:15 86:3 91:4
**legitimately** 78:17
  85:23
**lengthy** 73:5
**lesser** 69:10 70:3
  90:19
**letter** 18:13 19:4
  20:8,19 21:19
  23:11,14,19,21,24
  24:14 25:14 32:19
  37:22 43:11 44:16
  45:13 46:8 48:5
  50:13 51:2 57:18
  66:24,25 67:4
  68:10 74:9 78:22
  80:10,24 84:25
  90:20,20
**letters** 75:17
**level** 47:4,14 66:6
**LEXIS** 89:1,24 93:5
**liability** 11:4 36:20
  62:23
**liable** 68:17 75:2
**Libby** 42:3 65:9
**lie** 42:8 91:19
**lied** 42:5,8,9 64:12
**light** 54:3 74:8 75:19
  84:5
**limit** 47:17
**limitations** 48:21
**limited** 11:4 22:18
  60:2 72:1 73:14
**Lincolnwood** 8:8
**line** 45:13 95:15
**lines** 33:16 35:21
  43:15 88:2
**link** 55:25
**linked** 44:19
**Lisa** 6:10

list 63:22
listing 34:1 36:8
lists 63:23
litigation 12:15
little 35:23 56:17
live 15:25
living 88:21
LLC 2:18 4:20
LLP 4:3,11 5:1,7
local 65:15 66:5
    91:6
located 17:23
long 20:10 56:19
    69:13 70:20,21,22
    94:12
longer 84:8
long-time 49:16
look 26:2 27:1,6
    30:23 32:23 34:21
    36:7 44:6 48:11,22
    52:2 56:16 67:19
    71:5 87:8 90:21
looked 51:7 52:4
looking 23:13 54:18
    54:24 62:14 69:21
    91:7
looks 60:7
lot 64:25
Lowe 28:15
lunches 31:8
Lyle 88:24
Lyons 4:8 6:6,6,15
    6:18,22 7:9 8:1,14
    9:13,22 10:5,11,20

M

M 5:5,18
mad 91:12
Madison 5:15
magnitude 63:17
mailed 78:22
mails 75:18
main 53:9
maintain 59:22 61:9
maintenance 3:3 8:6
    79:9 80:8

major 17:12 49:7
makers 66:2,3,8
making 7:1 65:17
    77:4 80:9 84:14
    85:14
man 25:5
management 93:3
managerial 93:2
managing 6:9
Manzer 45:18 76:23
MARAFIOTI 4:16
March 1:18 10:12
    18:13,15 23:11,13
    23:24 24:14,15,15
    25:20 26:9,10,23
    28:17 31:18 32:1,6
    32:10 34:21 36:22
    43:4 45:8 46:6,16
    47:24 48:2,3,4,18
    48:20 51:4 64:11
    65:2,13,20 66:16
    66:22,24,25 67:1
    72:13 73:25 80:20
    85:12 90:22 96:20
Mark 18:8,11 27:17
    44:9
marked 16:2
Martha 65:8
Mary 26:4 34:20,24
    35:3,13
Massachusetts 3:19
    9:8,9
material 31:19
    41:23 66:21,23
    67:4 82:15
matter 1:6 6:11
    13:11 23:13 28:8
    56:1,19 57:24
    64:22,24 86:8
    93:12 94:9 96:17
matters 7:11 20:14
    22:1 64:24
Matthew 2:19
Matz 4:17 6:10
ma'am 15:6
McDermott 3:8 5:14

8:15
Meagher 4:3,11
    10:25
mean 14:6 19:10,12
    20:18 22:25 26:13
    28:7 29:4,24 30:12
    34:4 40:20 41:8,15
    42:4 43:25 44:23
    46:13,18 48:22
    50:1 63:10 65:22
    72:7 93:1
meaning 87:1 88:14
means 78:25 89:21
meant 38:8
measure 75:23
measures 40:6
mechanism 78:6
meeting 34:8 35:1
    53:12
meetings 26:7
meets 76:6,14
mentioned 28:11
    37:20
mere 77:6
merely 75:25
meritorious 73:17
merits 13:13 49:17
    73:14 89:25 90:2
    93:24
met 22:1 61:25 81:8
    93:18
metal 47:6
metallurgical 57:8
Mfg 79:22
Miami 79:8
Mich 92:7
Michael 15:9,9 25:5
Michigan 35:1 45:8
    46:6
midpoint 6:23
Mike 56:24
miles 42:18
million 8:10
mind 18:20 64:10
    65:4 80:15 81:3
    83:20

minimum 62:13
    88:7
minor 49:6
minutes 16:16
misconduct 30:7,8
    50:5 51:24 54:1,1
    55:12 59:10,14,19
    68:7 69:7,9,20
    70:3 92:17,19
    93:11,16,19
misdoing 37:24
mishigas 41:11
misrepresentation
    65:7
misrepresentations
    65:11
missed 60:25
missing 28:23 64:17
mission 25:8 49:4
misunderstand
    46:11
misunderstanding
    54:8
mixed 40:7 45:9,10
    45:15 46:2,5,7
    76:19
mixing 28:6
mode 88:21
modified 96:17
Mohawk 92:6
moment 73:23 76:10
    81:3
monetary 89:17
money 31:9 62:8
    67:24 68:1 90:3
    94:1,5
Montgomery 57:16
month 80:19
months 54:15 55:8
    58:5
Moraine 3:3 8:6
morning 6:6 10:24
    17:15 18:7 26:11
    26:16
motivated 45:18
    81:9 87:16

**motivating** 87:25
**motivation** 74:15
75:11 88:12
**motive** 45:10,10,11
45:18 46:2,11
76:19 90:16
**motives** 45:15 46:5
46:7
**Motors** 92:7
**mouth** 73:9
**moves** 84:18
**multiple** 17:2 26:15
36:21
**Mutiny** 40:15 86:16
**mystery** 40:10
**M.D** 88:24

**N**

**N** 4:2 6:1 95:12
96:12
**name** 25:5 96:24
**narrowly** 19:2
**natural** 43:2
**nature** 68:19 75:13
75:20
**near** 17:23
**necessarily** 29:12
69:1 91:9
**necessary** 27:17,20
73:16 89:13
**need** 13:12 15:6,24
16:11,11 24:6
27:13 76:17 91:25
**needed** 18:9 53:7
74:4 86:22
**needs** 57:8
**negligence** 91:24
**negligent** 87:15
91:22
**Neil** 2:19
**neither** 23:24 84:9
**never** 25:3 31:22
38:1,2 39:8 49:11
67:9,24,25 68:4
**New** 1:3,16,16 4:14
5:3,10,16

**NewEnergy** 2:18,19
9:24
**news** 84:16
**Nissan** 10:13
**non** 24:19,22 76:17
**nondiscriminatory**
25:19
**non-discriminatory**
76:12 90:9
**non-official** 92:23
**non-profit** 89:17
**non-retaliatory** 76:5
90:9
**non-significant**
42:16
**non-workplace** 89:5
**normally** 44:22
50:19
**Notably** 54:12
**note** 34:12 36:13,17
37:25 73:13 83:9
85:8 87:11 90:18
**noted** 77:12
**noteworthy** 7:2 56:2
56:3
**notice** 2:6,6,10,10,15
2:16,22,22 3:1,1,6
3:6,11,11,16,16
20:15
**notification** 78:9,19
**notified** 80:20
**notify** 21:2 78:2
**no-favors** 82:24
**number** 2:24 3:3,8
3:13 7:11,14,16
8:2,2,6,8,14,18,18
8:25 9:7,13,22
10:5 11:2 22:9
23:5,7,10,18 39:23
73:12 88:14
**numbers** 2:17 3:18
33:25 34:3 36:9
**nutshell** 47:23
**NY** 4:14 5:3,10,16
**N.D** 88:25
**N.E.2d** 79:2,9,22,23

**O**

**O** 1:21 6:1 96:12
**oath** 42:12
**obfuscate** 55:2
**object** 10:3 72:3
**objected** 8:2
**objection** 2:1,6,7,11
2:12 7:12,14,17
8:3,15,19,25 9:7
9:15,15,23,24 10:6
10:22 11:1 12:14
73:3
**Objections** 2:3
**obligations** 93:2
**obtained** 38:1 82:12
**obviate** 91:9
**obvious** 24:9 29:11
29:13
**obviously** 20:14
29:25 41:11 46:8
49:15 53:3 67:5
73:21 77:22 94:11
**occasions** 36:21
**occurred** 47:25
57:17 82:6,6
**occurring** 66:21
**offered** 11:22 13:22
15:9 74:14 90:15
**office** 18:11 46:5
**officer** 21:3 78:3
**officers** 82:23
**OFFICES** 4:20
**official** 25:23 66:12
96:15
**Oh** 4:23 32:19 63:17
94:20
**Ohio** 17:3,5,23 19:1
19:1,6,15 20:17,18
23:14 36:11 45:19
45:24,24 50:2,4
59:23,23 77:14,15
77:19,22,25 79:2,7
79:8,9,14,21,22,23
80:1 91:19,20
92:11
**Ohio's** 74:7 77:13

79:10
**Okay** 6:14,21 7:8,9
7:25 8:1,13 9:12
10:4,10,11,19 12:7
12:10,23 13:7,16
14:11,17,22 15:3,5
15:14,23 16:1,7,7
16:12,18,24 21:22
24:5 28:21 29:17
30:11 31:13,13
34:6 35:25 36:1
37:12,16 42:24
47:21 49:13 60:18
61:2,7 62:12 63:2
63:5,25 64:3 67:2
67:10 71:7 72:4,22
72:23 73:1 94:20
94:25
**omitted** 92:8
**omnibus** 2:1 6:19
8:3 9:14,23
**once** 10:16 54:16
55:2 57:1 64:7
67:22 76:11
**one-off** 62:14
**ongoing** 17:22 35:6
43:7,16,17
**Onyx** 30:25 38:17
38:18,21 53:9,9
82:13
**Onyx's** 38:14
**open** 91:1
**opening** 12:17 13:17
13:21,24
**opinion** 20:1 38:3
77:1
**opportunity** 7:22
78:11
**opposed** 51:3 80:7
91:15 93:16
**opposing** 21:24 34:2
64:8 65:14
**opposite** 42:13
**opposition** 93:24
**oral** 38:3,9,10 39:1
76:10 78:9,19 90:1

93:23
orally 20:24 21:2
    73:5 78:2,21
order 2:15,17,23 3:2
    3:7,12,17 8:12
    11:11 12:13 29:13
    53:18,18 79:13
    85:18 94:15,21
ordered 39:10
orders 11:14
original 13:2
originated 82:2
Orlik 7:15
Osborne 79:22
OSHA 13:3 25:15
    32:12,20 34:22
    39:19,22 59:12,12
    59:12,15,17 64:12
    64:14 65:7,25
ostrich 47:12
outside 11:13 69:13
overcome 81:13
overheard 43:13
overlap 56:12,15
    66:14 68:8,10
overlooked 62:5
overriding 79:19
    80:4
overwhelmingly
    50:7 57:2
owed 9:11
owned 81:18 86:11
owners 38:17,18

**P**
P 4:2,2 6:1
page 19:6 25:17 26:3
    30:24 32:17,22
    35:20,23,24 43:15
    52:10,18,19 69:17
    70:10 95:15
pages 31:24 36:18
paid 25:3 31:9 37:2
    37:5,10,10 39:11
    40:8 61:16,22 62:8
    67:15,23

Painter 79:21
paper 25:14
papers 13:24
paperwork 40:7
paragraph 27:7
    30:24 55:19 87:2
Park 88:24
Parry 92:6
part 25:1 27:16 44:9
    63:3 89:18
participated 34:13
    50:9
participation 34:20
particular 10:13
    36:16 73:2 89:3
particularly 84:5
    86:17 88:15
parties 7:12,19,24
    9:16 10:8 11:10,14
    12:2 41:19 46:13
    46:15 65:23 73:6
    73:14,15,24 75:13
    75:21 82:11 85:6
    89:21 94:7
partner 6:12 10:21
party 24:25 25:4,7,9
    25:25 31:21 68:20
    68:20,21 69:1,5,14
    70:2 71:23 81:1,23
    87:25 91:1,4,22
Patrick 11:15 12:20
    14:24 33:12 34:9
    34:11,17 35:12
    50:3,15,25 51:4,7
    52:3 54:24 55:18
    56:13 58:22 59:8
    59:17 64:11 65:3
    81:6 84:12
Patrick's 50:7 51:12
    88:8
pay 35:8 36:23 37:6
    53:13 67:8,20,22
    80:18 83:22
payment 37:19
    54:10 62:17,17
    73:20

payout 36:23 37:2
    37:14
pending 27:8,17
    67:8
Penn 5:2
pension 36:23 37:15
    61:16 73:20 94:1,5
people 21:14 27:5
    46:20 47:2 52:17
    52:23 67:5 86:9
    88:9
percent 7:3,6
perfectly 38:9
performance 7:17
    7:21 91:14
period 26:10,22 48:3
    48:3 58:14,15,18
    67:3 68:22 84:19
permission 6:15
    14:19
permits 79:11
person 14:5 20:8,20
    21:5,9,13,14,18
    78:4,19 85:20
    89:16
personal 31:1 39:10
    40:12,24 41:21
    53:7 59:3 80:6
    88:20
personnel 82:23
perspective 11:7
    51:12 58:19 61:13
persuasive 13:10
pertain 73:24
pertaining 74:21
petty 85:20
phrase 20:20
pick 65:2
picked 65:12
pieces 37:22
Pig 93:4
place 25:15 36:24
    53:5 56:7 68:22
    91:13
placed 48:21 49:12
    55:7 81:18

plain 88:14
plaintiff 49:17 91:20
    91:21,23
plaintiff's 91:23
plan 7:4 28:17,20
    60:23
plant 17:22 31:2,7
    41:13 42:13,19
    46:12
Plaza 5:2
pleadings 33:10
pleasant 49:15
please 6:2 17:1 73:1
plethora 43:6
plurality 77:1
PM 72:25 95:1
Pnina 3:25 96:14,23
podium 10:21 16:23
point 13:4 17:12
    19:11 22:4,23
    24:23 25:17 26:6
    28:3 29:25 30:14
    32:14 33:9 34:10
    35:17 36:19 42:22
    42:25 46:12 49:24
    58:8,21 65:11
    66:14 68:2 71:13
    74:18 86:20 87:11
pointed 57:7 68:8
    90:1
points 50:15 57:2,11
    85:17
policies 12:22 50:6
    51:19 52:5,14 53:1
    53:1 63:24 80:6
    86:4
policy 19:16,18 22:1
    36:14 37:19 52:6,7
    52:10,11,12,18,19
    52:21,21 53:4 54:2
    55:1 59:23 63:8
    77:15 79:7,7,14,15
    79:17,18,25 82:2
    82:24,25 83:21
    92:20
poor 42:3

**portion** 7:2
**position** 24:10,16
  25:14 47:18 71:21
  86:17 88:8,9
**positions** 86:2
**posture** 92:14
**potential** 63:4 76:14
  79:3
**potentially** 82:25
**practice** 58:7 89:18
**precedent** 46:3
**precipitating** 64:25
**predate** 40:19
**predetermine** 22:8
**predetermined**
  22:10
**preliminary** 12:11
**prepared** 15:1,12
  25:14
**preparing** 89:22
**preponderance** 92:1
**presence** 27:18
**present** 14:20,24
  17:8 22:20 29:1,12
  30:1 31:8 35:11
  44:4 84:10
**presentation** 15:21
**presentations** 12:13
**presented** 15:17
  24:16,19,19 55:4
  75:15
**presenting** 23:9
**Presentment** 2:16
  2:22,22 3:1,1,6,6
  3:11,11,16,16
**pressure** 82:25
**pretense** 85:16
**pretext** 25:10 41:4
  41:14 45:7 56:18
  75:25 76:8,20 77:6
  85:16 87:7 90:4
**pretextual** 64:20
  74:15 77:3
**pretty** 46:3 51:23
**prevail** 90:2
**prevails** 45:15 46:6

**prevent** 40:7 47:9
**previously** 20:21
  37:20
**pre-date** 40:16
**Price** 45:13 77:1
**prima** 18:18 24:6,16
  76:3 80:15
**prime** 17:10
**principles** 63:12
**printed** 96:24
**prior** 15:19 38:10
  51:2 58:6 75:17
  76:24 81:7
**priority** 9:3,5
**private** 71:24
**probably** 94:11
**problem** 20:21 22:6
  23:1,22,24 34:15
  49:6,7 58:2 62:6
  85:2
**problems** 41:17
  44:20 47:4,14 56:9
**procedural** 19:2,3
  77:21,24
**procedurally** 14:2
  78:18
**procedures** 8:12
  11:11,13 69:20
  70:11,23 85:22
**proceed** 6:16 12:12
  13:21 14:20 77:8
**proceeded** 59:10
**proceeding** 11:6
  14:12 17:7 18:14
  57:3,21
**proceedings** 95:1
  96:16
**process** 7:7 10:15
  44:11 67:14 82:12
  82:18 88:9
**Prods** 92:24
**professionals** 64:2
**proffered** 75:24
**proffers** 25:18
**progress** 6:20 7:1
**prompt** 90:24

**promptly** 22:5
**pronounce** 44:17
**proof** 2:7,12,23 3:2
  3:7 12:16 16:22
  41:22 73:3 75:21
  75:23 76:14 90:11
  90:15
**proper** 74:24 76:2
  80:7 83:8 85:22
  93:9,25 94:3
**properly** 74:25
  84:20 94:13
**property** 40:5 54:5
  54:18 55:7 81:19
**Proposed** 2:15
**proposition** 46:3
**protected** 17:18,19
  18:20,22 24:7,21
  35:7 41:4 43:3,6
**protecting** 46:14
**protection** 80:8
**protective** 24:12
**prove** 24:22 49:17
  91:24,25
**proven** 77:6
**provide** 38:21 54:11
  54:14 59:2 72:2
  78:19 84:6,10
  87:21 94:22
**provided** 24:10 34:1
  56:8 59:8 92:16
**provides** 21:7 69:19
  76:2 78:5,6,11
  88:19 92:15
**proving** 93:16,16
**provision** 72:10,13
  74:12 78:14 88:17
**provisions** 11:11
**proximity** 24:11,12
  24:14 31:15 48:1,5
  48:8 65:1,2 66:11
  68:9,11
**public** 19:16,17 22:1
  36:13 37:18 59:23
  77:15 79:7,7,14,15
  79:18,25

**published** 91:21
**Pulvinan** 26:4 34:20
  34:24 35:4,9,13
**purchase** 53:17
**purpose** 12:4 41:20
  88:1,4 89:20,22
**purposes** 11:17,23
  12:5 15:9 88:22
  93:12
**pursuant** 8:11
**put** 20:14 38:5,11
  49:2 67:14 80:17
  80:22 82:25 84:13
  92:5
**putting** 57:23 58:8

---

**Q**

**Queeg's** 86:15
**question** 12:25 14:2
  18:21 24:18 29:4
  29:17 32:1,3 44:7
  44:10,15 48:12
  51:11 64:9 85:15
**questions** 14:14 15:2
  15:2,7,12,13 16:13
  16:17 30:15 63:7
  72:6
**quick** 36:7 44:7
  59:25
**quickly** 7:10 54:6
  72:9 81:25
**Quite** 21:25
**quote** 25:20 33:4

---

**R**

**R** 1:21 4:2 6:1 96:12
**raise** 13:4 54:8 81:3
**raised** 19:12 34:15
  55:17 56:20 74:19
  79:5 81:10,11
  91:12
**rasied** 77:16
**RC** 20:25
**RDD** 2:2
**reach** 87:16
**reached** 6:23 9:16
  54:19

reacted 85:25
read 12:18,18 13:18
  13:24 14:13,16
  15:5 16:8 31:25
  60:4 63:10
reading 77:20
real 18:21 24:18
  44:7 72:9 74:15
reality 55:5
really 11:22 19:12
  27:20 38:24,25
  39:23,24 49:4,4
  51:3,20 52:7,20
  53:10,14 61:13
  64:22 65:3 93:23
reason 17:10,12
  24:20,23,23 25:19
  28:5 32:4,9 39:24
  40:21,23 59:19
  64:12 65:12 66:11
  71:22 75:24 76:5,6
  76:12,16,18,23,23
  77:5,7 80:3 81:25
  90:9,12,19
reasonable 24:1
  51:23 58:17 78:8
reasonably 50:4
  57:22
reasons 19:23 63:12
  75:1 81:15 92:11
  92:21
rebut 29:16 36:1
recall 35:12 44:6
receipt 53:17 74:9
  78:10
receipts 54:10
received 52:11
  66:24 90:20 94:4
Recess 72:25
reclamation 9:3,5
recommend 48:25
record 16:16 28:22
  29:23 30:3,16
  31:10,17 34:5
  37:25 39:2 54:4
  56:4 60:10,13,15

60:16,19 61:4,23
  67:25 73:2 75:15
  77:8 80:11 81:6
  83:3 84:13 85:4,14
  86:21 87:4,13 89:9
  90:8,17,23 93:7,18
recording 96:16
records 9:10
recovery 73:13
red 38:8
redrained 57:19
redress 78:12
Reeves 3:13 10:6
refer 25:12 39:19
reference 36:16
referred 56:17
  57:14 85:7
referring 70:19 71:8
refers 21:14
reflected 24:24
reflects 94:13
refused 36:21 38:11
regard 52:24 83:10
  88:17,21
regarding 7:14 8:25
  9:15,24 10:6,22
  59:15
regime 76:2
regrettable 85:18
regular 60:11
regularly 89:18
regulated 77:16
regulations 19:25
reimbursement
  92:23
rejected 22:21 47:2
relate 9:14,14
related 79:18
relatedly 80:4
relates 9:23
relating 7:12 8:19
relationship 53:11
  82:20,21 84:2
  85:24
relationships 53:2
relax 11:10

release 38:22
reliability 86:4
relied 83:7 90:5
relies 80:13 85:5
relying 32:12
remaining 7:2 75:2
remarkably 73:9
remarks 13:18,21
  13:24 16:22 17:14
  63:7
remember 58:6 83:1
  83:2
remembered 44:13
remove 82:14
render 48:9
Reno 2:12 4:21 6:11
  10:23 11:2,15 12:8
  12:20 13:20 17:1
  17:21 18:3,7,11,13
  19:3,20 23:2,11
  24:16 25:2,2 26:10
  28:3,16,19,24
  29:15,15 30:6
  31:11 32:3,5,6
  34:16 35:7 37:24
  39:7,8,10 40:22
  42:5,13,17 43:8,14
  43:16,20 44:8,16
  45:15 46:6 47:5,19
  47:23 48:6,9 49:22
  50:2,5,16 51:16,24
  52:4 53:5,6,11,13
  53:16,19,22 54:6
  54:16,23 55:1,8,15
  55:21,25 56:8,22
  56:25 57:18,25
  58:7,7,10,13,14
  59:2,4,6,11,13,18
  59:22 61:15,22
  64:8 65:23 67:14
  67:20,23,25 68:6
  73:4,12 74:1,16,17
  74:25 75:22 77:6
  77:12,23 78:13
  79:6,24 80:16
  81:10,12,13 82:2,7

82:10,12,14,19,23
  83:11,17,22 84:4,7
  84:11,13,19,22
  85:12,13,20,25
  86:8,12,24 87:1,8
  87:21 90:1,10,10
  90:15 92:9 93:9,14
  94:22
Reno's 11:5 12:15
  13:18 14:14 18:15
  20:5 23:19 24:10
  24:20 25:11,16,19
  25:24 26:9 31:18
  32:10 33:13,16
  34:18 35:3,16 36:3
  36:22 40:5 41:5
  43:10 45:9 48:1,4
  49:19 52:11 54:2
  58:19 61:18 62:10
  64:13 73:25 74:21
  75:12 81:11,16,22
  82:17 83:17 84:1
  84:25 86:11,17
  87:20 88:13 90:20
  90:25 91:9,16
  93:20 94:1,4
rented 25:1
reorganization 7:4
repairing 43:9
repairs 18:4,8,9
  46:16 47:17
repeat 59:20
replacement 14:4
report 20:19 21:5,13
  22:19 23:9 29:8,12
  38:4 44:20 48:17
  49:5 57:12 58:7,11
  60:7 61:12 69:11
  69:24 70:5 71:1,17
  72:2,14,16,18,19
  78:4,10,20 89:3,14
  90:23 91:2
reported 53:10
reporter 6:3
reporting 19:4 29:7
  29:14 37:19 59:25

60:3,10 68:13,21
68:23 69:2,12,16
69:22,24 70:2,10
71:2 72:2,11,19,20
74:12 75:7,11
87:22,23 89:12
**reports** 30:20 49:10
57:14 58:13 60:3
70:12,22 88:17,19
89:4,21,23
**represent** 31:19,19
**representation** 33:3
**reputation** 88:20
91:23
**requested** 39:9
**require** 29:8 36:15
**required** 28:13
29:10 40:11 92:16
**requirement** 20:19
21:12
**requirements** 19:2
21:25 69:10 70:4
77:21,24 78:7
**requires** 19:21
29:10 78:1 87:17
93:17
**reserve** 9:3 10:3
73:8 82:22
**reserves** 94:16
**reserving** 73:15
**residence** 42:18 53:7
**resolution** 94:9
**resolved** 9:17 71:20
**resolving** 6:23
**resources** 50:4 64:2
**respect** 2:7,11 8:1
11:1,18 12:12,13
12:17 15:16 17:17
22:2 24:12 25:16
25:24 26:19,21
35:7 37:24 41:23
43:8,17 51:21
52:13 56:1 58:20
58:23 59:23 63:15
78:18 88:15
**respectfully** 48:8

**respects** 78:14 83:15
**respond** 60:22,24
61:21
**response** 13:2 18:25
23:19,20 25:15
45:1 64:4 66:15,25
67:6 90:19,24
**responsibility** 75:1
86:17
**responsible** 21:3,9
78:3
**restructuring** 6:9
**result** 17:13 54:22
68:1 73:6 82:11
87:16
**resulted** 49:7
**resulting** 73:20
**results** 51:8 69:11
**retain** 25:4
**retained** 70:3
**retaliation** 41:1,3
74:2 76:3 81:15
90:13
**retaliatory** 74:24
76:23 77:7 88:4
**Rev** 77:25
**revealed** 51:22
**Revenue** 3:18 9:8
**reversed** 49:21
**review** 13:3 28:19
73:7,7 81:5
**reviewed** 75:18
83:20
**reviewing** 36:12
**Revised** 19:15
**rid** 53:8
**ride** 42:17
**ridiculous** 68:6
**right** 9:21 10:20
12:7 13:9,9,14,16
13:23 15:5,20 16:7
16:18 19:17 21:1,6
21:12 24:9 27:4
28:10,14 29:24
31:13 32:13 33:24
34:10 39:13,16

41:9 43:20 45:25
47:24 49:13 50:18
50:24 57:13 60:15
61:17,23 62:3,9
63:24 64:3,6,21
65:22 67:2 70:25
71:2,4,7,9,15,18
71:19 72:4,23 73:6
73:8 83:4 93:7
94:10
**rights** 9:3 10:3
**ROBERT** 1:22
**Rock** 48:17 49:10
**Rowe** 39:20 40:2
41:22
**Ruble** 28:16 59:1,3
86:10,12
**Rugg** 88:25 89:23
**rule** 20:18 45:24
**rules** 27:11,21 87:1
**ruling** 73:3,10,11
94:15 96:18
**RULINGS** 95:14
**run** 83:19

## S

**S** 4:2 6:1
**Sacks** 26:4 34:23
**safe** 80:2
**safety** 17:22 23:10
**sake** 16:2
**same-day** 24:12
**sand** 47:12
**Sanitary** 57:16,21
**satisfied** 78:7 91:7
**saw** 59:17,17
**saying** 23:11,12 46:4
50:19 71:12,14
**says** 19:20 20:2,24
21:2,13 23:20,25
23:25 27:7,15
28:10,23 30:12,24
32:23 33:16 34:7
34:23 35:11 39:3
44:4 51:7 53:14
55:6 57:25 63:13

70:19,21 72:15
82:7,8 85:15 94:23
**scheduled** 6:3
**scheduling** 58:16
**Scooter** 65:9
**scratch** 42:7
**seated** 6:2 73:1
**second** 15:8 23:23
27:10 28:18,24
30:13 32:5,17
45:22,23 52:1
58:16 77:14 83:12
83:13 85:10
**secondary** 28:16
**secret** 82:16
**section** 22:22 69:19
70:11,15,23 71:8,8
71:16
**Securitas** 25:7 61:4
71:24 89:10
**security** 61:5
**see** 26:3 28:22 31:3
60:15,19 67:19
76:23 79:1 87:12
89:23 92:6,23 93:4
93:24
**seek** 53:20 78:11
**SEGAL** 5:1,1
**send** 20:19
**sending** 84:25
**sense** 42:17,20 49:16
49:21 52:15 73:9
86:23
**sent** 16:10 20:8
21:18 78:20
**sentence** 27:15
**separate** 71:2 80:2
81:14
**separately** 82:3
**serious** 87:24
**seriously** 91:17
**service** 18:16
**services** 22:18 23:8
31:9 48:16
**set** 7:13 17:3 36:10
54:24 70:23 78:15

80:15 89:5
**setoff** 9:17
**sets** 21:12 73:12
**setting** 76:10
**settle** 94:21
**settled** 8:7,9,16,20
9:1
**settlement** 8:12
10:15
**settlements** 8:4,11
**seven** 16:16
**Sevens** 10:14
**Shamrock** 76:24
**shape** 41:3
**shift** 76:4 81:4
**shifted** 81:12
**shifts** 24:22
**Shohl** 6:13
**short** 80:19
**shortly** 88:6 90:20
**show** 6:19,25 39:3
70:7 74:15 76:8,17
76:21 79:14 81:8
86:21 90:11 91:20
92:4 93:19
**showing** 76:3,6,15
**shows** 6:22 50:7
51:23 54:4 56:18
87:6
**sick** 6:4
**side** 14:2 16:2,3 56:9
**Siemens** 19:8
**signature** 8:23 96:21
**signatures** 9:18
10:16
**signed** 8:3,5 37:23
38:1 68:5
**significance** 39:22
**significant** 7:2 22:21
23:10 34:21 80:24
**simply** 23:13 26:1
34:19 49:7 52:23
61:9 62:9,9 85:7
85:15 89:11
**single** 38:1
**sir** 12:7,8 26:25 27:2

31:12 46:1 63:9
71:10
**sit** 38:25
**site** 48:20 81:19,24
**sitting** 55:8
**situation** 34:8 45:10
45:15 65:10 81:2
**six** 9:23 56:21 87:12
**Sixth** 19:7,11 45:17
45:20,20
**sixty-six** 9:4
**size** 52:21
**Skadden** 4:3,11
10:25 49:14
**skepticism** 89:2
**skip** 6:12 24:8
**slap** 50:20
**Slate** 4:3,11 10:25
**slim** 90:15
**small** 90:3
**smoking** 80:12
**solely** 51:18
**solicit** 52:23
**solicitation** 52:8
63:15
**soliciting** 52:20
54:11 82:4
**Solutions** 58:3
**somebody** 66:4
**somewhat** 11:10
76:11 78:15 92:13
**sorry** 6:3 8:18 21:11
23:16 25:14 26:14
32:11,21 33:18
35:9,17,22 37:4
39:14 44:12 48:12
56:21 70:7
**sort** 50:20 52:7
**sorts** 29:6 31:11
56:6 61:5
**sought** 55:25 82:20
**sound** 40:15 96:16
**sounds** 62:6
**source** 43:19
**Southern** 1:3 69:23
**speak** 91:2,4

**special** 69:19 70:11
**specific** 32:15 60:8
78:24
**specifically** 19:8
25:17 81:17
**specificity** 20:3
36:16
**speculate** 29:5,24
30:13
**speculated** 30:2
**spelled** 52:8
**spent** 68:16 85:8
**spite** 51:3
**splitting** 66:10
**spoken** 21:16
**Square** 4:13
**staff** 74:20
**stance** 52:13
**stand** 38:25
**standard** 79:11
92:24
**standards** 93:1
**standing** 88:18
**standpoint** 68:18
**Stands** 93:4
**stand-alone** 25:7
36:19
**start** 54:3
**started** 40:21 82:9
**state** 9:9 17:3 31:19
51:4 77:17 80:1
91:19
**stated** 19:23 31:6
52:6 73:24 76:7
83:18 92:11
**statement** 15:17
16:9 26:3,6 29:18
31:23 34:22 38:2,3
38:9,21,24 39:2,19
39:23 40:2 41:22
41:25 59:2 63:11
65:16,25 68:5,5
84:6 86:10 91:21
92:8,12
**statements** 12:17
24:24,24 37:23,23

38:11,12 54:12,14
61:11 81:8 82:21
84:4,10
**states** 1:2,14 30:25
31:2,3,8 38:23
52:21 71:16 80:1
84:12
**status** 36:5
**statute** 19:1,15,15
19:19,21 20:17,18
20:23 23:20,25
45:24 59:23 60:4,8
61:9 74:8 77:13,19
78:1,25 88:15,19
89:15 92:14 93:13
**stayed** 17:6 36:11
**stem** 73:18
**step** 17:10
**stepped** 52:3
**steps** 40:6 74:4
**Stewart** 65:9
**sting** 92:5
**Stipulation** 2:16,23
3:2,7,12,17
**stipulations** 8:5
10:12
**stop** 26:24
**story** 52:1,1 56:18
83:12
**straight** 13:22
**straightforward**
49:18
**Street** 4:22
**strenuously** 79:24
**strike** 15:18 25:13
**string** 54:22
**stripe** 46:20
**stripes** 46:19
**strongly** 90:16
**structure** 18:6
**stupid** 42:2
**subject** 29:9 70:5
**subjective** 64:10
65:4
**submission** 32:12
**submissions** 12:19

**submit** 8:24 9:19 10:17 31:15,17 60:4 65:6 94:14
**submitted** 11:8 14:13 33:11
**subordinate** 53:24 54:13 55:20
**subordinates** 82:20 83:1 84:5 86:2 91:16
**subsection** 72:15
**subsequent** 24:19 63:1 73:15 83:15 84:18,24 87:13
**subsequently** 21:4 50:23 78:4,22
**substance** 43:1 57:10 78:17 86:16
**substantial** 56:5 92:6 93:1
**substantially** 92:4
**sufficient** 15:24 20:3 21:7 65:4 78:5,16 84:22,23 91:11 92:3
**suggest** 42:7 61:24
**suggested** 39:9 51:15 55:21
**suggestion** 34:16 36:2 67:11
**suggests** 55:15
**summary** 29:1,8,15 70:5 72:2
**summation** 48:13
**summer** 91:6
**sunshine** 91:8
**superior** 18:8 53:20 55:20
**superiors** 82:18
**superseding** 43:3
**supervisor** 18:3,11 21:3 26:12,18 41:21 54:9 74:3,19 78:2,21 81:10
**supervisors** 83:25
**supplied** 29:14

**supplier** 92:22
**suppliers** 53:3 82:4
**support** 43:7 61:20 68:6 86:3 91:13
**supports** 81:14
**suppose** 54:21
**supposed** 24:1 40:1 42:19
**supposedly** 54:15
**Supreme** 45:14 46:2 77:1 79:8
**sure** 11:20,24 14:6 14:15 17:9 20:2 32:16 36:8 62:5 94:12,21,23
**surface** 42:8
**surrounding** 80:9
**survive** 10:2
**suspected** 69:20
**suspend** 27:8,22 50:16 56:14 84:22
**suspended** 18:12 26:11 47:19 56:23 67:7 79:6 80:23 86:24
**suspension** 24:13 25:21 26:17 28:2 33:5 44:20 50:19 51:1 58:22 80:18 80:22 84:14
**suspicious** 54:5
**sworn** 15:19 31:23 33:14,20 38:2 65:16
**system** 83:20
**Systems** 7:18,21
**S.D.N.Y** 89:1,24

---

**T**

**T** 96:12,12
**tab** 11:19 14:25 15:10 52:8 57:15 57:15 58:4 59:16
**take** 15:25 36:7,24 47:12 48:13 72:23 74:4 85:2 86:2,18

**taken** 18:21 37:13 54:23 83:16 90:14
**takes** 58:10,11
**talk** 13:11 28:24 29:19 30:3,4,9 31:3,11 52:15 81:2
**talked** 37:21 38:14 38:17 43:5 50:9 56:12 59:1,3,4 62:23
**talking** 20:21 29:21 32:16 43:21 46:1 47:23
**talks** 27:14 52:20
**tall** 22:13
**TALLY** 5:5
**tank** 18:1,5,5 20:9 22:6,8,11,20 23:6 23:9 40:18,23 41:1 41:18 43:9 44:9,21 46:15,25 47:2,4,6 47:7,7,8,13 50:2 50:17 55:18,22 56:15,20 57:14,19 57:24,25 58:5,9,13 58:23 74:5 85:1 90:14
**tanks** 22:12 47:17 78:18 80:8,17 81:16 84:15,17 90:22 91:7
**tank's** 80:21
**team** 6:10
**Technical** 10:13
**Technologies** 9:16 9:17
**tell** 16:14 32:2 45:21 55:6 60:25 72:8
**telling** 86:1
**temporal** 24:11 31:14 48:1,5,8 56:12 64:25 65:2 66:11,14 68:8,9
**term** 40:14 41:12 71:3 72:16 89:16 92:17,25

**terminate** 27:22 33:13,16 34:18 35:2,15 36:2 45:9 55:25 65:3 79:11 93:17
**terminated** 12:20 18:15 32:6 49:16 49:19,23,25 50:3 51:16,17 55:16,21 57:1 59:11,13 61:22 74:8,25 76:22 79:6 80:19 81:14 85:12 90:13 91:11 92:9
**terminating** 25:19 75:12 93:14
**termination** 24:15 24:20 25:11,16,21 25:24 26:9 28:2 31:18 32:10 33:6 36:22 41:5 45:5 50:23 51:2,14 55:13 59:7,20 64:12 73:25 74:1 74:16,23 75:25 76:19 77:15,23 80:5,23 83:7 84:23 84:24 85:3,8 90:12 92:16 93:9
**terms** 12:13 14:12 14:13 16:22 49:17 50:9 52:7 54:14 85:25
**Terry** 43:11 58:3
**test** 22:8,11 24:3 46:25 47:13
**tested** 24:4
**testified** 21:15 58:4 86:12
**testimony** 15:19,25 31:24 33:15,20 35:12 38:7 43:11 55:23 66:1 75:17 75:20 81:7 84:9 87:13 91:3
**testing** 22:18,18

23:8 47:6,17 48:16
**Tex** 93:5
**Texaco** 89:7
**Texas** 92:25 93:4
**TH** 29:4 64:22
**thank** 14:10 48:10
  49:13 60:23 61:1
  64:7 68:24 72:22
  94:20,25
**theories** 73:12,15,18
**theory** 25:2 36:20
**thereof** 21:25 92:10
**they'd** 50:21
**thing** 29:11 42:10
  48:11 61:15,23
**things** 23:12,20 27:8
  29:6 30:18 31:11
  42:6 56:6 61:6
  85:5
**think** 6:25 13:10
  16:1,9,10 17:13,14
  19:18,24 21:15,15
  21:23,25 30:1
  33:21 34:7 36:8
  42:16 44:4,22 46:2
  48:18 50:11,18
  55:10 56:16 57:7
  57:24 58:17 60:8
  61:10,11 62:9,13
  62:22,22,25 63:3,7
  63:13 68:15,16
  71:16 72:7 73:5
  75:21 84:19 88:6
  91:1,3 93:16,19,22
**thinking** 94:13
**third** 2:1 5:9 8:3
  24:25 25:4,7,9,25
  31:21 38:3 46:13
  46:15,15 65:23
  68:12,20,20,21
  69:5,14 70:2 71:23
  81:1,23 89:21 91:1
  91:4,22
**third-party** 90:21
**thirty** 31:8
**THOMAS** 4:17

**thought** 45:4 72:8
**thousand** 60:2 68:14
**three** 17:16 22:12
  23:10 24:4 46:25
  47:4,14 48:23,24
  54:11
**three-page** 20:5
**throw** 60:1
**ticked** 67:5
**tied** 25:23,24
**till** 72:24,25
**time** 14:2,15 17:24
  20:2 23:6 26:10,22
  27:12 28:4 34:16
  36:11 37:3 41:16
  48:3 50:14,15 52:2
  53:17 55:11 57:6
  57:24 58:14,15,18
  59:7,18 60:22
  61:22 62:8 67:3
  68:16 79:12 85:11
**timeline** 33:11 56:16
  56:17
**Times** 4:13
**timing** 78:24
**tip** 67:18,22
**tipped** 67:19
**tipping** 67:17,22,23
**tired** 47:23
**Title** 76:25 77:3
**Tobacco** 89:6
**today** 6:11 11:6
  12:19 14:3 15:1,12
  15:25 25:6,8 27:14
  33:11 38:25,25
  62:2,23
**today's** 11:4 44:16
  73:13
**TOGUT** 5:1
**told** 40:3,4 48:22
  64:14 65:7 67:21
  67:22
**tolerance** 52:7,21
  63:14
**Tom** 6:10
**tomorrow** 8:24 9:20

**top** 32:23
**total** 6:24
**transaction** 53:16
  53:21,23
**Transcribed** 3:25
**transcriber** 96:14
  96:21
**transcript** 73:7
  94:11 96:15
**transcripts** 11:12
  16:3
**travel** 92:23
**treated** 57:11 70:12
  70:22
**treatment** 17:25
  31:2,7 82:7
**tremendous** 47:16
**trial** 17:6 19:7,24
  69:17 93:15 94:7
  94:17
**tried** 55:2
**trigger** 25:24
**triggered** 32:10
**triggering** 31:17
  64:12,16
**triggers** 89:15
**triumvirate** 35:2,3
  45:8
**tri-fold** 39:23
**trouble** 65:9,9,10
**Troy** 30:24 31:1,3,6
  35:1 38:4 40:6
  41:13 42:21 43:15
  45:8 46:5 50:4
  53:9 58:16 82:13
**truck** 30:25 42:18
**true** 21:20 23:14
  26:1 31:21 33:7
  42:15 49:7 51:10
  64:11 92:4
**Trust** 8:20
**truth** 55:6 83:2 86:1
  92:6
**try** 54:9
**trying** 6:4 19:11
  30:15

**turn** 10:21 84:4
  86:23 89:15
**turned** 84:20
**turning** 7:9
**twenty** 22:13 33:22
  33:22
**twentyyears** 18:16
**twenty-five** 33:22
**twenty-four** 34:3
  78:9
**twenty-three** 8:22
**twenty-two** 48:6
**twice** 44:22 45:4
**two** 9:25 10:2 19:14
  23:7,20 24:8 27:8
  30:17,18 36:18,24
  37:13 46:19,19
  49:21 50:14 54:13
  54:19 78:14 80:24
  82:9 85:5,17
**two-step** 67:13
**two-week** 17:6
**tying** 25:22
**type** 19:13 69:2 89:2
**typed** 96:24
**types** 30:15 71:12
**typical** 58:7

------

**U**

**Uh-huh** 39:21 44:12
**ulterior** 87:25
**ultimate** 33:15 34:9
  34:13,14,18 35:2
  65:18 67:18 75:23
  76:13
**ultimately** 12:21
  19:19 35:15 55:13
  74:3,19 83:4,19,22
  90:18
**unambiguous** 51:15
**uncovered** 51:13
**undercuts** 88:11
**underlying** 12:14
  16:22 51:22 55:11
  71:1 75:14,19
  83:11

**understand** 11:24
  14:8,10 19:17
  30:12,14 47:5 55:3
  57:9 63:12 66:13
  66:14,17,18 71:13
  71:13 85:23
**understood** 84:15
**undisputed** 52:2,5
  53:6,8,15,19 54:21
  58:9
**undisputedly** 25:3
**undue** 82:25
**unfortunate** 55:12
**unfortunately** 42:2
  42:5
**United** 1:2,14 80:1
**unknown** 40:11
  41:19
**unquestionably** 32:8
**unrelated** 81:15
**Unruh** 6:8
**unsworn** 68:5
**unwilling** 46:24
**update** 59:8
**updated** 51:7
**updating** 86:6
**upstanding** 63:11
**Urban** 79:22
**USC** 70:14
**use** 14:7 31:20 39:11
  41:12 68:1 75:6
**uses** 72:16 89:21
**usually** 46:18
**U.S** 1:23 46:2 77:2
  89:1,24 93:5
**U.S.C** 89:15 92:15

———————
**V**
**v** 19:8 76:23 77:1
  79:1,8,21 88:23,24
  88:25 89:6,7,23
  92:6,24 93:4
**vacation** 27:15
  58:25
**vacuum** 34:11,17
  36:3

**valid** 93:14
**Valley** 79:8
**value** 37:7,9 62:8
**various** 27:5 59:21
  92:18
**vehicle** 31:1
**vendor** 53:22 92:22
**vendors** 52:8 53:4
  82:4
**verification** 23:1
**verse** 19:25
**version** 53:25 54:2
  83:13,14 88:15
**vested** 36:23 37:15
  61:16
**view** 7:6 74:2,19
  76:9,25
**viewed** 84:23
**views** 75:14 81:16
  90:14
**VII** 76:25 77:3
**violate** 68:23 88:2
**violated** 12:21 20:1
  27:11 36:16 50:5
  52:5 77:15 82:24
  87:1,21 88:6,7
**violating** 63:23
**violation** 20:4 21:4
  24:2 37:1,18 51:19
  55:1 68:13 78:3,6
  78:8 79:13 80:6
  88:11
**violations** 24:4
  37:20
**virtue** 31:16 71:22
  71:25
**visited** 48:20
**voiced** 57:18
**vs** 79:22

———————
**W**
**Wacker** 4:5
**wade** 57:8
**wage** 37:19
**wait** 85:12
**waited** 54:18

**waiting** 9:18
**Wala** 44:17
**Walee** 44:17
**Walle** 20:12 23:11
  44:18,19 78:22
  80:10,20 81:11
  84:25
**Walle's** 66:25
**Wally's** 23:19
**want** 11:18 13:11,17
  13:21,22 15:3,14
  27:19 28:23 29:5
  30:2,17 32:14,14
  33:8,9 41:12 47:11
  51:11 56:8 67:12
  94:12
**wanted** 6:18 29:19
  30:4,12 34:4 36:1
  36:18 44:7,8,9
  47:7 85:2 88:3
**wanting** 31:10
**Warden** 6:10
**warning** 74:18
**warranted** 55:13
**wasn't** 19:11 20:8
  29:4 40:13,22
  44:13 45:23 46:14
  49:24 54:25 59:13
  64:22
**waste** 17:25 18:1,5
  22:11 50:2 55:17
  56:15,20 74:5,6,9
  81:9 82:7
**wastes** 77:18
**water** 17:25 50:2
  55:17,22 56:15,20
  74:5,6,10 82:7
**Waterhouse** 45:13
  77:1
**WATKINS** 5:7
**way** 11:5 12:12
  29:12 41:3 52:10
  55:5 57:4 59:5
  83:13 85:24
**ways** 92:18
**Wednesday** 31:6

**week** 11:3 46:15
**weeks** 54:19 56:21
  56:21,22 82:9
**weigh** 67:18
**weight** 55:10
**went** 23:3 42:12
**weren't** 42:6
**West** 4:5
**we'll** 9:19 11:5 12:19
  14:24 94:19
**we're** 6:3 8:22 10:15
  11:1 13:6,8,11
  23:12 32:16 45:16
  46:1 47:12,13
  59:10 73:1
**we've** 6:4,23,25 7:5
  10:16 15:8 23:23
  37:21 43:5 56:4,4
  59:20
**whatsoever** 65:19
  79:12
**whichever** 78:10
**whistle** 17:11,17
  18:13,19 19:11,13
  19:16,24 20:1,5
  23:14,19,21 24:14
  24:16 34:15,19
  36:4,14 37:18,22
  43:10 45:13 46:7
  46:18 48:4,7 49:20
  49:22,25 50:12
  51:2 57:18 59:14
  59:21 61:14 65:1
  66:23,24 67:4 68:9
**whistleblower** 74:8
  77:13,19
**wholly** 80:2
**WIENER** 5:5
**wife** 86:11,13
**Williamson** 89:6
**Wilson** 10:13
**withdraw** 9:9
**witness** 14:23 15:8
  16:9 30:6 54:12,14
  75:16 81:8 82:21
  84:4,6

**witnesses** 11:16
  13:22 14:20 30:10
  53:24 75:17
**WL** 92:24
**Wm** 2:3,8,13,24 3:4
  3:8,13,19
**Woodson** 10:14
**word** 27:16 31:20
**words** 24:22
**work** 48:14 50:21
  53:18 59:4,6 65:23
  80:25 84:21 86:12
  87:3,6
**workers** 31:3
**working** 84:8
**workplace** 77:16
  80:2 89:3
**works** 82:14
**world** 44:16 54:21
**worse** 55:1
**worth** 68:14,16,18
**wouldn't** 59:2 62:19
**wraps** 90:25
**wrist** 50:20
**writing** 38:6,12
**written** 20:19 21:5
  24:24 37:18,23
  38:21 65:25 68:4
  75:15 78:4,10,20
**wrong** 83:5
**wrongdoing** 37:24
**wrongful** 17:1 25:11
  74:1,7,24 77:9,22
  79:5
**wrote** 18:13 23:10
  66:24
**W.D** 93:5

---

**X**

**x** 1:5,12 95:12

---

**Y**

**yard** 53:8 82:15
**Yeah** 28:12 32:21,25
  43:23 44:13 69:18
**years** 36:24 37:13
  48:6 87:12

**yellow** 16:4,6
**York** 1:3,16,16 4:14
  5:3,10,16

---

**Z**

**zero** 52:7,21 63:13
  63:14

---

**0**

**05-44481** 1:4

---

**1**

**1** 7:11 33:1 79:14
**1st** 10:13
**1.2** 8:10
**1:58** 95:1
**10** 9:13 39:19 42:25
  43:15
**10th** 7:18
**10:00** 2:2,16
**10:29** 1:19
**10017** 5:16
**10022** 5:10
**10036** 4:14
**10119** 5:3
**10275** 3:8
**1078** 76:24
**1093** 89:7
**11** 9:22 22:9 43:5
  55:19
**11/24/2006** 2:3
**11/30/2006** 2:2
**11:42** 27:6
**1163(2)** 92:15
**12** 10:5 27:1
**12:17** 72:25
**12:30** 14:6 72:24,25
**121** 79:2
**1214** 3:18
**122** 79:2
**1264** 89:7
**1268** 88:24
**1272** 79:23
**13** 22:20 23:9 48:15
  52:19 58:1 82:8
**13th** 7:15 58:9
**13957** 93:5

**14** 67:21
**14th** 10:12
**147** 88:23
**15** 23:18 70:14 89:15
**158** 88:25
**16** 35:21
**16th** 82:10
**16,000** 6:24
**16,422** 8:16
**16,927** 9:4
**1681** 70:16 71:8 72:6
  72:9
**1681a(f)** 89:16
**17** 18:15 25:20 34:21
  35:21 52:9 83:21
**17th** 24:15 26:9,23
  28:17 31:18 32:1,7
  32:10 36:22 43:4
  45:8 46:6 47:24
  48:2,4 51:4 64:11
  65:2,13,20 66:16
  66:22
**18th** 58:12
**18101** 89:1,24
**19** 48:17 57:15 90:23
**19th** 22:10
**1989** 45:14 77:2 79:9
**1990** 89:7
**1991** 93:5,5
**1992** 89:8 92:24,25
**1994** 76:24 79:22
**1997** 79:2

---

**2**

**2** 7:14 14:25 18:13
  26:3 33:1 48:4
  79:16 80:20
**2d** 88:24,25
**2nd** 24:14 66:24
**2,296** 10:7
**20** 18:7 27:23 59:16
**20th** 22:19 24:13
  26:5,8,10,13,14,22
  27:6 32:1 34:23
  43:3,14 47:19,24
  48:3,16 50:16

**56**:13 57:13 58:21
  59:1 65:20 66:15
  66:22 80:22
**200,000** 8:21
**2001** 52:12 88:24,25
  89:1 92:7
**2002** 69:22 89:1,24
  89:24
**2003** 52:2 53:5,6
**2004** 17:21 18:7,13
  18:15 24:13,15
  25:20 26:5,9,14,23
  27:23 34:21 36:22
  47:24,25 48:2,4,4
  52:2 54:25 58:1
  64:11 72:13 74:1
  80:20 82:8 85:12
**2006** 79:23
**2007** 1:18 96:20
**21** 1:18 15:19 31:24
  57:15
**22** 33:16 43:12
**22,000** 8:7
**228** 45:14 77:2
**2299** 2:17
**23** 33:17 58:4
**2300** 2:17
**236** 92:7
**24** 33:15,17,19,21
  44:2
**25** 35:20 95:16
**26th** 48:18
**27** 11:16 96:20
**28** 11:19,25 12:3
**29** 76:24 92:15
**299** 92:7

---

**3**

**3** 7:16 15:11 33:1
  79:17
**3rd** 66:25
**3/21/2007** 2:15
**3:90-2918**-17 92:24
**3092** 3:18
**31** 72:13
**312** 92:7

**333** 4:5
**333931** 92:25
**34** 35:24
**340** 5:15
**347,043** 8:21

### 4

**4** 8:2,6 11:16 17:4,12
25:13 33:2 36:7,9
36:18 69:17 70:10
79:18
**4th** 23:11,13,24 67:1
**40** 31:24
**41** 31:25
**4113.52** 20:25 21:24
**4113.52(A)(1)(a)**
77:25
**447** 3:3
**45475** 4:23
**490** 45:14 77:2

### 5

**5** 8:8 15:18 25:12,13
25:14,18 31:16
32:12,19,22 33:2
37:21
**5th** 89:8
**503** 2:24
**51** 79:22
**5506** 3:13
**551** 79:9

### 6

**6** 8:14 15:18 19:6
26:2 31:23 32:17
34:23 36:18 37:21
52:18
**6th** 48:20 76:24
90:22 92:7
**6,000** 61:18 62:1
**6.03(x)** 70:12
**603(x)** 69:19 70:24
**60606** 4:6
**610** 2:2
**611,381** 9:1
**639** 79:22
**667,000** 8:9

**699** 79:2

### 7

**7** 8:18,18 18:14 19:7
20:6,6 25:17 32:22
36:18 37:21 43:11
52:18
**7090** 2:7
**72** 95:16
**75,000** 17:25

### 8

**8** 8:25 37:22 43:15
52:18
**847** 79:23
**848-C** 4:22
**869** 88:25
**88** 43:15
**885** 5:9

### 9

**9** 9:7 37:22
**9th** 89:7
**915** 89:6
**975** 89:7
**981** 79:9
**9956** 2:12 11:2