IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                :
    In re               :    Chapter 11
                :
DELPHI CORPORATION, et al.,    :    Case No. 05-44481 (RDD)
                :
          Debtors.    :    (Jointly Administered)
                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### AFFIDAVIT OF SERVICE

I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants, LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

On April 16, 2007, I caused to be served the document listed below upon the parties listed on Exhibit A hereto via overnight delivery:

> Debtors' Omnibus Supplemental Reply With Respect to Proofs of Claim Numbers 837, 838 and 14762 (H.E. Services Company, Robert Backie & Richard Janes) ("Supplemental Reply - H.E. Services, et al") (Docket No. 7710) [a copy of which is attached hereto as Exhibit B]

Dated: April 18, 2007

                                       */s/ Evan Gershbein*
                                       Evan Gershbein

Subscribed and sworn to (or affirmed) before me on this 18th day of April, 2007, by Evan Gershbein, personally known to me or proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature:    */s/ Vanessa R. Quiñones*

Commission Expires:    *3/20/11*

# EXHIBIT A

Delphi Corporation
Objection/Response Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2491 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com sliviri@ffhsj.com | Counsel to Equity Security Holders Committee |
| H E Services Comp Robert Backie | Victor Mastromarco Jr | The Mastromarco Firm | 1024 N Michigan Ave PO Box 3197 | Saginaw | MI | 48605 | | | | Counsel to HE Services and Robert Backie |
| JPMorgan Chase Bank, N.A. | Thomas F. Maher, Richard Duker, Gianni Russello | 270 Park Avenue | | New York | NY | 10017 | 212-270-0426 | 212-270-0430 | thomas.f.maher@chase.com richard.duker@jpmorgan.com gianni.russello@jpmorgan.com | Postpetition Administrative Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Richard Janes | Michael R Wernette | Schafer And Weiner Pllc | 40950 Woodward Ave Ste 100 | Bloomfield Hills | MI | 48304 | | | | Counsel to Richard Janes |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

4/17/2007 2:43 PM
HE Services Reply Service List

# EXHIBIT B

**Hearing Date and Time: June 22, 2007 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
Albert L. Hogan III (AH 8807)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                            :
    In re                        :     Chapter 11
                            :
DELPHI CORPORATION, et al.,    :     Case No. 05-44481 (RDD)
                            :
                            :     (Jointly Administered)
            Debtors.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

DEBTORS' OMNIBUS SUPPLEMENTAL REPLY WITH RESPECT TO
PROOFS OF CLAIM NUMBERS 837, 838 & 14762
(H.E. SERVICES COMPANY, ROBERT BACKIE & RICHARD JANES.)

("SUPPLEMENTAL REPLY – H.E. SERVICES, ET AL")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit their Supplemental Reply With Respect To Proofs Of Claim Nos. 837, 838, and 14762 (H.E. Services Company, Robert Backie, and Richard Janes) (this "Supplemental Reply"), and respectfully represent as follows:

<u>Introduction</u>

1.    H.E. Services Company ("HES"), a long-time former supplier of goods and services to Delphi Automotive Systems, LLC ("DAS LLC") and its predecessor the GM Corporation ("GM")[1] since the 1990s, made a number of business decisions that were not as lucrative as HES hoped and that eventually led to HES's demise in 2004. Instead of accepting that its decisions to invest in new facilities or new equipment did not yield desirable results, HES seeks to recoup the money it invested over the years (as well as any lost profits and other damages) by alleging that various individuals from DAS LLC – most of whom are unnamed in HES's papers – *guaranteed* HES a stream of future purchase orders if it made the investments. However, HES, as a long-time and sophisticated supplier of DAS LLC, knew full well that DAS LLC (i) does not promise future business outside its request for quotation (or "RFQ") process, (ii) highlights that its projections are not guaranteed, and (iii) does not guarantee the success of supplier investments in new facilities or equipment. Simply put, HES took a number of business risks that did not pan out; it was not guaranteed an endless stream of business regardless of whether, as happened here, the cost and quality of HES's goods and services made it noncompetitive.

---

[1]    Prior to Delphi's January 1, 1999 divestiture from GM, HES supplied parts and services to GM.  For convenience "DAS LLC" is used throughout this Reply regardless of the time frame at issue.

2

2.      HES's underlying complaint articulates three discrete investments that HES allegedly made based on some apparently verbal agreement or guarantee of future business from DAS LLC: (i) construction of a facility in El Paso, Texas to service DAS LLC's technology center in Juarez, Mexico (the "Juarez Relationship"); (ii) establishment of a manufacturing facility in Flint, Michigan to service DAS LLC's Saginaw Steering Division's needs (the "Flint Relationship"); and (iii) the purchase of an EX-CELL-O grinding machine to manufacture prototype parts for DAS LLC's Saginaw Steering Division (the "EX-CELL-O Relationship") (collectively, the "Relationships"). Based on these statements, HES has asserted a variety of claims, including fraud, misrepresentation, promissory estoppel, and breach of contact – all allegedly done because HES is a minority-owned firm. These claims must fail, however, because in fact DAS LLC never promised future business on the condition that HES make these investments; DAS LLC represented then to suppliers, as it continues to represent to suppliers today, that purchase orders are issued as a result of its RFQ process and the supplier with the most competitive quote, in terms of price and quality, will be awarded the business. HES made its investments so that it could *compete* for DAS LLC's business – not be guaranteed such business *ad infinitum*.

3.      The claims asserted by HES's shareholders – Robert Backie and Richard Janes – also fail for independent reasons. [2] As shareholders, Backie and Janes have no standing to raise claims belonging to HES. Moreover, Janes was not a party to the underlying lawsuit filed in 2005 and has not alleged any discrimination against him individually.

---

[2]      Backie and Janes are former HES officers and shareholders. Backie was the majority shareholder.

3

4.      The claims also fail for a variety of other reasons, including Claimants' failure to: (i) file claims by the deadline set forth in the applicable statute of limitations; (ii) set forth any specific facts indicating discrimination; (iii) set forth facts that support its fraud and misrepresentation claims; (iv) set forth facts of a clear and definite promise upon which HES reasonably relied; and (v) explain how alleged oral agreements or promises would be enforceable in light of DAS LLC's standard terms and conditions that contain an integration clause and written amendment requirement. Accordingly, the claims asserted by HES, Backie, and Janes should be disallowed and expunged in their entirety.

<u>Background</u>

5.      HES's relationship with DAS LLC, and its predecessor GM, began in the mid-1990s and lasted until spring 2004 when HES permanently went out of business. Since the inception of the relationship, DAS LLC purchased automotive components that HES engineered pursuant to various purchase orders, each incorporating DAS LLC's General Terms and Conditions.  Additionally, DAS LLC hired HES to perform inspection and assembly services, also pursuant to purchase orders incorporating the same General Terms and Conditions.

6.      Experienced and sophisticated DAS LLC suppliers, including HES, understand that DAS LLC issues written RFQs to multiple potential suppliers in connection with all products or services DAS LLC desires to purchase.  (<u>See</u> Declaration Of John Taylor In Support Of Debtors' Supplemental Reply (the "Taylor Decl.") ¶ 7, a true and correct copy of which is attached hereto as <u>Exhibit 1</u>; Declaration Of Stephen Dawe In Support Of Debtors' Supplemental Reply (the "Dawe Decl.") ¶ 7, a true and correct copy of which is attached hereto

4

as <u>Exhibit 2</u>.)[3]  Once an RFQ is issued, suppliers have the opportunity to bid on the prospective

business; after a series of negotiations (the "RFQ Process"), DAS LLC chooses the most

competitive supplier, both in terms of value and quality, to fulfill its needs.  (<u>See</u> <u>id.</u>)  Suppliers

never receive business – or the promise of business – from DAS LLC without first going through

the RFQ Process.  (<u>See</u> Dawe Decl. ¶ 7.)

       7.     Through its policies, DAS LLC encourages business with minority

suppliers.  (Taylor Decl. ¶ 4.)  Primarily, DAS LLC helps minority suppliers gain access to

business opportunities with DAS LLC, <u>i.e.</u>, access to the RFQ Process.  (<u>Id.</u> ¶ 6.)  Once a

minority supplier is issued an RFQ, there is no guarantee that such supplier ultimately will win

the business.  (<u>Id.</u>)  During the RFQ Process, minority suppliers' bids are considered without

regard to their minority status.  (<u>Id.</u> ¶¶ 6-7)  If, at the end of the RFQ Process, two or more

suppliers are *equally* competitive in terms of value and quality, then DAS LLC will normally

choose to give the business to the minority supplier.[4]  (<u>Id.</u> ¶¶ 6-7.)  DAS LLC conveyed its

policy to Mr. Backie on numerous occasions.

       8.     Over the years, while HES remained operational, it received numerous

RFQs from DAS LLC.  In all cases, DAS LLC's decisions not to award business to HES after the

RFQ Process were based solely on HES's relative lack of competitiveness in terms of value or

quality.  DAS LLC's decisions to terminate contracts with HES, from time to time, were

---

[3]    The Debtors have redacted certain confidential pricing information from certain declaration exhibits pursuant to paragraph 9(f)(ii) of the Claim Objection Procedures Order, and agree to make such information available to Claimants' counsel upon request.

[4]    Exceptions may be made in certain cases where, for example, the Buyer overseeing the RFQ process has an excellent and long-standing relationship with the non-minority supplier.

similarly premised on HES's relative lack of competitiveness.  They were never based on the fact

that HES was a minority-owned firm or that Backie was a minority.  (See, e.g., Dawe Decl. ¶ 8.)

A.    HES's Decision To Open Up A Facility In El Paso, Texas To Service DAS
      LLC's Tech Center Located in Juarez, Mexico

9.    In the 1995-1996 timeframe, six divisions of DAS LLC – itself then a

division of GM – established a "Tech Center" in Juarez, Mexico.  The Tech Center produces,

among other things, automotive prototype parts and automotive assemblies for DAS LLC's

customers.  Because DAS LLC lacked a local supplier base in Juarez, it approached many of its

current suppliers and notified them of the business opportunities available in Juarez.

10.    In particular, DAS LLC notified suppliers, including HES, of its plans for

the Tech Center and the type of work the Tech Center would require.  DAS LLC encouraged its

suppliers to grow with DAS LLC, but cautioned that suppliers should not expand to Juarez

without developing other business opportunities in the area.  DAS LLC provided no promise or

guarantee of business to HES or any other prospective supplier; indeed, all prospective suppliers,

including HES, were well-aware of DAS LLC's standard RFQ Process.

11.    DAS LLC's Juarez Tech Center issued multiple RFQs to HES's El Paso

facility during its operation.  Moreover, once DAS LLC's Saginaw Steering Division learned that

Mr. Backie intended to close HES El Paso, even DAS LLC's Saginaw facility issued RFQs to

HES El Paso.  (Declaration Of Bruce Waslusky In Support Of Debtors' Supplemental Reply (the

"Waslusky Decl.") ¶ 5, a true and correct copy of which is attached hereto as Exhibit 3.)  HES's

failure to obtain business from these RFQs was due solely to HES's relative lack of

competitiveness in terms of value or quality.  (Id.)  DAS LLC's decisions not to award business

to HES El Paso were not premised on race.

6

12.     DAS LLC made no promise to HES that it would secure any – much less exclusive – business with DAS LLC's Tech Center; indeed, the only valid evidence of DAS LLC's promise to do business with HES in any respect is a properly issued purchase order. Setting this fact aside, it was inherently unreasonable for HES to rely on the prospect of future business where DAS LLC's RFQ Process was common knowledge.

B.     HES's Decision To Open Up A Facility In Flint, Michigan

13.     DAS LLC made no promise of future business to HES in connection with the Flint Relationship.  In particular, DAS LLC did not require or "entice" HES to establish its Flint Manufacturing division.  (See Dawe Decl. ¶ 4.)  Nor did DAS LLC promise future business to HES's Flint Manufacturing and Universal Manufacturing[5] divisions.  (See id. ¶ 7.)  All business offered to the HES Flint Manufacturing and Universal Manufacturing divisions was subject to DAS LLC's standard RFQ Process.  (Id.)

14.     DAS LLC awarded certain business to HES's Flint Manufacturing and Universal Manufacturing divisions after HES submitted the most competitive bids in response to RFQs.  (Id.)  Subsequently, DAS LLC issued purchase orders to HES, each of which incorporated DAS LLC's standard Terms and Conditions.  (Id.)

15.     In or around early 2002, DAS LLC began learning of serious quality issues with respect to products produced at HES's Flint and Saginaw facilities.  (Id. ¶¶ 9-14.)  Indeed, in response to customer complaints, DAS LLC audited Universal Manufacturing on or about March 22 and March 26, 2002.  (Id. ¶ 11.)  The DAS LLC auditor, Sybil Chernek, documented the major quality control issues at HES's Universal Manufacturing division,

---

[5]     Universal Manufacturing was the name of HES's Saginaw facility.  (Dawe Decl. ¶ 5.)

7

including the "absence or total breakdown of [quality systems]," which resulted HES's Universal

Manufacturing division being placed on "major nonconformity status."  (Id.)

16.     Around that same time that the quality of HES's products began

deteriorating, HES proposed that DAS LLC pay increased prices for the parts HES manufactured

and assembled because HES was not turning a profit on the business.  (Id. ¶ 15.)  DAS LLC first

refused the requested increases in February of 2002.  (Id.)  Nevertheless, HES persisted in

requesting price increases, going so far as refusing to correct its quality problems before being

awarded a price increase.  (Id. ¶ 16.)  HES's persistent requests for price increases culminated in

meetings between HES and DAS LLC personnel on or about October 8, 2002 and December 4,

2002.  (Id. ¶¶ 17-18.)  During the meetings, HES indicated that it would not honor its contractual

obligations at the previously agreed upon prices.  (Id.)  DAS LLC reiterated that it would not

agree to the increased prices.  (Id.)  As a result, HES and DAS LLC mutually agreed that DAS

LLC would begin resourcing the HES business to more competitive suppliers.[6]  (Id. ¶ 18.)

Accordingly, on December 6, 2002, DAS LLC provided notice of its decision to terminate its

contracts with HES's Flint Manufacturing and Universal Manufacturing divisions for

convenience pursuant to DAS LLC's General Terms & Conditions.  (Id. ¶ 19.)

17.     DAS LLC's decision to terminate contracts with HES's Flint

Manufacturing and Universal Manufacturing divisions was based solely on the value and quality

of products HES provided, not on race.  Indeed, DAS LLC continued to contract with other

divisions of HES until HES went out of business in the spring of 2004.  (See id. ¶ 21.)

---

[6]     Delphi eventually did resource this business to three suppliers, including one minority-owed supplier.  These
suppliers offered prices lower than HES's prices.  (Dawe Decl. ¶ 20.)

8

18.    DAS LLC's terminations of its contracts with HES's Flint Manufacturing and Universal Manufacturing divisions were proper under the terms of the relevant purchase orders.  DAS LLC fully performed under the purchase orders prior to the terminations and therefore did not breach any contractual obligation to HES.  Moreover, during the performance of the contracts, HES expressly assumed the risk of variations in DAS LLC's requirements.  As such, HES cannot complain that DAS LLC ultimately ordered fewer parts than anticipated.

C.    HES's Purchase Of An EX-CELL-O Machine

19.    In approximately mid-1999, DAS LLC issued RFQ number S30000009 to HES, among other suppliers, to solicit production of prototype C/V joint components, specifically inner and outer races.  (Waslusky Decl. ¶ 7.)  Production of the prototype inner and outer races required that the supplier purchase an EX-CELL-O Model XG-690 grinding machine to facilitate DAS LLC's requirements.  (Id.)   After the RFQ Process, DAS LLC awarded HES's Ancon division the business because it offered DAS LLC the most competitive per part prices.[7] (Id. ¶ 8.)

20.    Upon being awarded the business, HES was responsible for contracting with EX-CELL-O GmbH for the purchase of the EX-CELL-O machine.  (Id. ¶ 9.)  Moreover, HES was responsible for providing all maintenance and repair to the EX-CELL-O machine.  (Id.) HES acknowledged these responsibilities in its various quotes on the EX-CELL-O business. (Id.)  Moreover, DAS LLC consistently conveyed to HES personnel that DAS LLC did not

---

[7]    The per part price HES quoted Delphi was based both the cost of necessary materials and the cost of the EX-CELL-O machine.  (Waslusky Decl. ¶ 8.)

9

intend to become involved with the purchase of the EX-CELL-O machine or any related

commercial issues between HES and EX-CELL-O GmbH.  (Id. ¶ 10.)

      21.    DAS LLC desired the incorporation of Fanuc controls into the EX-CELL-

O machine; because Fanuc controls are the industry standard in the United States, DAS LLC

routinely requires the use of Fanuc controls to meet its requirements.[8]  (Id. ¶ 11.)  HES was

aware of the requirement that the EX-CELL-O machine incorporate Fanuc controls prior to

bidding on and being awarded the EX-CELL-O business.  (Id.)

      22.    On or about October 29, 1999, DAS LLC issued a blanket requirements

contract in the form of a purchase request ("MBO S3B00028") to HES in connection with the

EX-CELL-O Relationship.  (Id. ¶ 12.)  MBO S3B00028 specified that although DAS LLC

projected that it would require 7,000 parts annually in connection with the EX-CELL-O

Relationship, the actual volume may vary according to DAS LLC's requirements.  (Id.)  MBO

S3B00028 also acknowledged that the per part price "will go up or down based on actual[]

volume."  (Id.)

      23.    In approximately late 2001, HES requested, and DAS LLC agreed to

make, a consistent monthly payment to HES to help offset the cost of the EX-CELL-O machine

– irrespective of the number of parts ordered. (Id. ¶ 14.)  This was in lieu of a volume driven

variable monthly payment to HES based on the number of parts ordered, as was originally

anticipated.  (Id.)  If DAS LLC required parts in any given month it would pay an additional

amount above and beyond the guaranteed payment.  (Id.)  To effect the revised terms of the EX-

CELL-O Relationship, on April 30, 2002, DAS LLC issued purchase order number S3S18278 to

---

[8]    By contrast, Siemens controls are the industry standard in Europe and are thus generally incompatible with
Delphi's American operations.  (Waslusky Decl. ¶ 11.)

HES.  (Id. ¶ 15.)  This purchase order was governed by DAS LLC's General Terms and

Conditions.  (Id.)  Purchase order S3S18278 authorized DAS LLC to disburse to HES a monthly

payment of $22,926.00 toward HES's costs associated with acquiring the EX-CELL-O machine

(which were originally included in the quoted per part price).  (Id.)  These payments were

scheduled to continue for 36 months; however, DAS LLC made only twenty of the scheduled

payments because HES permanently closed its business prior to invoicing DAS LLC for the

remaining payments.  (Id.)

     24.     Simultaneous to the issuance of purchase order S3S18278 on April 30,

2002, DAS LLC also re-issued the blanket requirements contract associated with the EX-CELL-

O Relationship under a new purchase request ("MBO S3B00059").  (Id. ¶ 16.)  This re-issued

purchase request reflected lowered per part prices because DAS LLC was separately making

monthly payments to HES under purchase order S3S18278.  (Id.)  All purchase orders issued

under MBO S3B00059 explicitly incorporated and were made subject to DAS LLC's General

Terms and Conditions.

     25.     Problems arose between EX-CELL-O GmbH and HES that resulted in

delayed delivery of the EX-CELL-O machine.[9]  (Id. ¶ 13.)  Following the late delivery of the

EX-CELL-O machine, problems persisted that prevented HES from efficiently meeting DAS

LLC's requirements.  (Id. ¶ 17.)  For instance, HES experienced problems with the programming

of the machine, which it struggled with for many months.  (Id. ¶ 18.)  Additionally, the

---

[9]    Indeed, contrary to Mr. Backie's representation that the EX-CELL-O machine was delivered on September 15,
2000 (Backie Aff. ¶ 56), the EX-CELL-O machine was not actually delivered to HES until December 15, 2001.
(Waslusky Decl. ¶ 13.)

permanent tooling for the machine presented continuous problems where HES was unable to alter the EX-CELL-O machine efficiently to meet DAS LLC's requirements.  (Id.)

26.    As a result of these problems, HES sometimes failed to meet DAS LLC's requirements.  (Id. ¶ 21.)  On such occasions, where the alternative was defaulting on obligations to customers, DAS LLC resourced production of some inner and outer race prototypes to Ranger Tool & Die ("Ranger") at a substantially higher cost to DAS LLC.  (Id. ¶¶ 21-22.)  DAS LLC's determination to resource certain business to Ranger was not based on race.

27.    Despite Ranger's involvement, DAS LLC remained committed to the EX-CELL-O Relationship and continued to make monthly payments to HES under purchase order S3S18278 until the time that HES permanently closed its business.  (Id. ¶ 22.)  As such, DAS LLC fully performed on the contracts related to the EX-CELL-O Relationship and did not breach any obligations to HES.  Moreover, HES assumed the risk in good faith variations in DAS LLC's requirements.  See supra ¶ 22.  As such it was inherently unreasonable for HES to rely on DAS LLC's requirements forecasts, especially where the original blanket purchase order (MBO00028) explicitly stated that such forecasts were subject to change.

D.    HES's Alleged Unpaid Invoices

28.    HES attached over 700 pages of allegedly unpaid invoices to its Supplemental Response.  (See Supp. Resp. Exs. 2, 3, 4.)  Although Debtors' investigation into these invoices is on-going, Debtors have identified certain invoices that have been previously paid.  (Declaration Of William Locricchio In Support Of Debtors' Supplemental Reply (the "Locricchio Decl.") ¶ 8, a true and correct copy of which is attached hereto as Exhibit 4.)  Additionally, Debtors have identified inconsistencies and duplicate invoices, which cast doubt on

12

HES's claims.  (Id. ¶¶ 4-7.)  Thus far, Debtors have not identified any invoices that it was

required to pay, yet failed to do so. [10]  (Id. ¶ 9.)

Argument

29.     As an initial matter, the claims asserted by HES, Backie, and Janes fail

because of several legal defects. With respect to the claims in general, HES's shareholders

cannot, as they attempt to do here, prosecute claims owned by HES; accordingly, their claims fail

for, among other reasons, lack of standing. Moreover, many of the claims (as they relate to

various investments) fail because they were filed after the applicable statutes of limitation had

run.

30.     Their claims also fail as a matter of law because the facts, as articulated in

the HES's Supplemental Response and Backie's Affidavit, do not establish their claims. The

claim under 42 U.S.C. § 1981 fails because no facts suggest that DAS LLC intended to

discriminate on the basis of race. The fraud and misrepresentation claims fail because HES's

allegations amount to nothing more than a promise to purchase a certain amount of goods or

services from HES in the future, and a breach of a future promise is not actionable under a fraud

or misrepresentation theory. The bad-faith promise claim fails because no facts suggest a

fraudulent intent contemporaneous with the alleged promise. Indeed, in most cases, HES does

not even identify the individual who allegedly made the false promise. The promissory estoppel

claim fails because HES does not allege either a clear and definite promise or reasonable

reliance. And the breach of contract claim fails to the extent that HES relies on alleged oral

---

[10]     Debtors are continuing to reconcile the over-700 pages of invoices and other documentation submitted by HES
with its Supplemental Response and determine whether any of HES's claims for nonpayment falls outside the
applicable statute of limitation period or is barred by the claim bar date.

13

promises because each relationship was governed by a purchase order, which contained an integration clause and written amendment requirement.

      31.    The claims fail on the merits as well. As the facts above demonstrate, HES simply made a number of investments that were not as profitable as HES had hoped. DAS LLC did not guarantee future business in the event that HES made such investments or otherwise deceive HES. Rather, DAS LLC communicated that such investment simply permitted HES to compete for the business – not be guaranteed it regardless of whether HES remained competitive.

### A.    <u>Backie and Janes Lack Standing to Bring the Claims of HES.</u>

      32.    As an initial matter, all of the claims in the Amended Complaint belong solely to HES. Backie and Janes lack standing to assert HES's claims in their individual capacities as former officers or shareholders of the company. <u>See</u> <u>Belle Isle Grill Corp. v. Detroit</u>, 666 N.W.2d 271, 474 (Mich. Ct. App. 2003). The Amended Complaint alleges economic losses sustained by HES in connection with HES's Relationships with DAS LLC. (<u>See</u> Am. Cmplt. ¶¶ 93, 100, 111, 120, 128, 135, 147, 158.) Any loss that Backie and Janes sustained in connection with these Relationships are derivative to the losses of HES. Because Backie and Janes lack fail to state any actionable individual injuries, the Court must disallow all Counts as to Backie and Janes.

B.    All Claims Based On the Juarez Relationship and the Section 1981 Claim With
Respect to the Other Relationships Are Barred By The Statute of Limitations.

33.    HES and Backie filed their original complaint in the underlying case on

February 16, 2005.[11]    The statute of limitations is four years for the following claims: the claim

under 42 U.S.C. § 1981 and the breach of contract claim arising under the Uniform Commercial

Code ("UCC").  See 28 U.S.C. § 1658(a) (Section 1981 claim); MCLA § 440.2725(1) (UCC

claim). The statute of limitations is six years for claims of misrepresentation, fraud, common law

breach of contract, and promissory estoppel.  See MCLA § 600.5813 (all personal actions,

including fraud and misrepresentation); Kawsny v. Driessen, 202 N.W.2d 443, 446 (Mich. Ct.

App. 1972) (fraud claim); MCLA § 600.5807(8) (common law breach of contract claim);

Huhtala v. Travelers Ins. Co., 257 N.W.2d 640, 643 (Mich. 1977) (promissory estoppel claim).

34.    Many of Claimants' claims are barred by the statute of limitations. For

example, with respect to the Juarez Relationship, all of the claims are barred because no facts

suggest that any cause of action based on that Relationship accrued after February 15, 1999 (six

years before the lawsuit was filed) and certainly not after February 15, 2001 (four years before

the lawsuit was filed). Moreover, the Section 1981 claim must fail as it relates to the other

Relationships as well (i.e., the Flint and EX-CELL-O Relationships) because no facts suggest

that a discriminatory act occurred after February 15, 2001.  Discovery may reveal that other

claims of HES are similarly barred.

---

[11]    Janes was not a party to the underlying lawsuit and has not separately sued Delphi based on the conduct alleged
in the Amended Complaint.

15

C.    Claimants Fail to State a Claim Under 42 U.S.C. § 1981.

35.    Even assuming Claimants' Section 1981 claim is not barred by the statute

of limitations – which the Debtors dispute – Claimants still fail to state a claim of discrimination

under 42 U.S.C. § 1981.  To establish a claim under Section 1981 a plaintiff must allege and

ultimately prove, among other things, intent to discriminate on the basis of race by the defendant.

See Burton v. Plastics Research Corp., 134 F. Supp.2d 881, 885-86 (E.D. Mich. 2001). Here,

Claimants fail to allege, and cannot prove, any facts suggesting an intent on the part of DAS

LLC to discriminate against Claimants *on the basis of race*.  To the contrary, Claimants

explicitly state that DAS LLC's alleged conduct was motivated by its desire to drive down the

prices offered by HES's competitors – not to drive HES out of business because it was a

minority-owned business.  (See Am. Cmplt. ¶¶ 18-19.)  Indeed, Claimants' minority status is

merely incidental to the scheme they allege.  Because Claimants fail to state a claim under

Section 1981, their Section 1981 claim must be disallowed and expunged in its entirety.

D.    Claimants Fail to State Claims for Misrepresentation or Fraud.

36.    Claimants fail to state claims for which relief may be granted with respect

to the fraud and misrepresentation claims (the "Fraud Claims," which are Counts II through IV of

the Amended Complaint).  Misrepresentation and fraud claims must be predicated on a false

statement of past or existing fact.  E.g., Hi-Way Motor Co. v. Int'l Harvester Co., 247 N.W.2d

813, 816 (Mich. 1976).  "Future promises are contractual and do not constitute fraud." Id.

37.    Here, in connection with each Relationship, Claimants allege that DAS

LLC misrepresented its "present need for services and parts."  (E.g., Am. Cmplt. ¶ 37; see also

id. ¶¶ 29, 48, 51, 54, 61, 65, 82.)  These allegations amount to nothing more than breach of

16

contract claims.  In other words, Claimants complain that DAS LLC allegedly breached

"promises" to purchase a certain amount of products or services from HES.  Thus, the Fraud

Claims fail and must be disallowed and expunged in their entirety.[12]

        E.        Claimants Fail to State a Claim for Bad-Faith Promise.

        38.        Claimants fail to state a claim for fraud based on a bad-faith promise.  The

so-called "bad-faith" exception to the general rule that promises are not actionable as torts

applies when "a promise [is] made in bad faith without the intention of performance."  Hi-Way

Motor Co., 247 N.W.2d at 816.  For a claim to fall within this exception, the Claimant must

allege facts sufficient to show fraudulent intent "'at the very time of making the representations,

or almost immediately thereafter.'"  Id. at 817 (citing Danto v. Charles C. Robbins, Inc., 230

N.W. 188, 190 (Mich. 1930).  In their general allegations, Claimants identify three purported

"bad-faith" promises.  (Am. Cmplt. ¶¶ 29-31 (alleging, in connection with the Juarez

Relationship, that DAS LLC promised that HES would be "given the exclusive contract to serve"

DAS LLC's needs), ¶ 48 (alleging, in connection with the Flint Relationship, that DAS LLC

promised future business to HES), ¶ 82 (alleging, in connection with the EX-CELL-O

Relationship, that DAS LLC promised to purchase parts from HES).)  However, Claimants

articulate no facts showing a contemporaneous fraudulent intent on the part of DAS LLC.

Accordingly, the claim for fraud based on a bad-faith promise fails and must be disallowed and

expunged in its entirety.

---

[12]   Moreover, Claimants' failure to comply with Fed. R. Civ. P. 9(b) provides an independent basis for disallowing
and expunging these claims.

F.    Claimants Fail to State a Claim for Promissory Estoppel.

39.    The Claimants' promissory estoppel claim fails for multiple reasons. As an initial matter, the Claimants allege, and DAS LLC agrees, that contracts govern each of the Relationships.  Michigan law provides that "[w]here the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel . . . ." Terry Barr Sales Agency, Inc. v. All-Lock Co., 96 F.3d 174, 181 (6th Cir. 1996).  Thus, an action for promissory estoppel cannot lie.

40.    Moreover, Claimants do not allege, and certainly cannot prove, reasonable reliance on the purported promises.  First, Claimants' reliance on oral statements outside the four corners of the written contracts is unreasonable because DAS LLC's terms and conditions contained an integration clause.  Second, Claimants reliance on DAS LLC's alleged and indefinite statements – rather than the actual promises embodied in the agreements – is inherently unreasonable.  As a long-time and sophisticated DAS LLC supplier, HES's reliance on volume projections or notification of business opportunities – rather than purchase orders – was unreasonable.

G.    Claimants' Breach of Contract Claims Fail Under the Parole Evidence Rule.

41.    To support their breach of contract allegations, Claimants rely on evidence of apparently oral promises extrinsic to the written contracts between the parties.  The evidence will show that each of the Relationships was governed by written purchase orders issued by DAS LLC and accepted by HES.  Moreover, each purchase order expressly incorporates DAS LLC's General Terms & Conditions, which includes an integration clause and a written amendment requirement. (See e.g., Dawe Decl. Ex. A, Terms & Conditions ¶¶ 1, 29.) Thus, Claimants'

18

breach of contract claims, which are apparently based on either pre- or post-contract formation oral promises, must fail and be disallowed and expunged in their entirety.

      H.    <u>Claimants' Claims Also Fail On The Merits</u>.

      42.    Each of Claimants' claims fail on the merits as well. To the extent that Claimants properly state claims for relief, DAS LLC denies Claimants' allegations in their entirety. The evidence will show that in connection with each Relationship, DAS LLC's conduct is not actionable; rather, Claimants essentially ask this Court to hold DAS LLC responsible for Claimants' poor business management and resulting financial losses. Because Claimants have not – and cannot – meet their burden of proving each of the essential elements of the eight causes of action, Claimants' Proofs of Claims should be disallowed and expunged in their entirety.

<u>Identification of Witnesses</u>

      43.    The parties have mutually agreed that more than the two witnesses allotted under the claim hearing procedures order are needed to fairly adjudicate the claims. In addition to the witnesses whose declarations are attached as exhibits to the Supplemental Reply, the Debtors also may seek to depose or submit declarations from witnesses outside Debtors' control, including former Delphi employees Jerry Haller, Enrique Chavez, and Gregg Novac. Moreover, the Debtors are unaware of any fraud, misrepresentation, false promise, and the like made to HES, and HES has failed to identify specific individuals making such statements. HES also has failed to attach copies of agreements or purchase orders that form the basis of its claims. Accordingly, the Debtors reserve their right to name, as witnesses, additional individuals including those alleged to have made statements forming the basis of HES's claims or who were otherwise involved in the Relationships.

19

<u>Conclusion</u>

44.    For the reasons stated above, the Proof of Claims asserted by HES,

Backie, and Janes should be disallowed and expunged in their entirety.

WHEREFORE the Debtors respectfully request the Court enter an order (i) sustaining the

Third Omnibus Claims Objection as to the Proof of Claim, (ii) disallowing and expunging the

Proof of Claim, and (iii) granting such further and other relief the Court deems just and proper.

Dated: New York, New York
       April 16, 2007

SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP

By:  /s/ Albert L. Hogan III
      John Wm. Butler, Jr.  (JB 4711)
      Albert L. Hogan III  (AH 8807)
      John K. Lyons (JL 4951)
      Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

        – and –

SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP

By:  /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti (KM 9632)
      Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, <u>et al.</u>,
 Debtors and Debtors-in-Possession

20

EXHIBIT 1

**Hearing Date:  June 22, 2007**
**Hearing Time:  10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

 - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
              :
  In re         :  Chapter 11
              :
DELPHI CORPORATION, et al.,  :  Case No. 05-44481 (RDD)
              :
              :  (Jointly Administered)
     Debtors.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF JOHN TAYLOR IN SUPPORT OF DEBTORS' SUPPLEMENTAL REPLY WITH RESPECT TO PROOFS OF CLAIM NUMBERS 837, 838 & 14762 (H.E. SERVICES COMPANY, ROBERT BACKIE & RICHARD JANES)

("TAYLOR DECLARATION – H.E. SERVICES COMPANY, ET AL.")

I, John Taylor, declare as follows:

1.      Delphi Corporation and certain of its subsidiaries and affiliates are debtors and debtors-in-possession in these chapter 11 cases.  I submit this declaration in support of the Debtors' Supplemental Reply With Respect To Proofs Of Claim 837, 838 & 14762  (H.E. Services Company, Robert Backie and Richard Janes) (the "Supplemental Reply").  Capitalized terms not otherwise defined in this declaration have the meanings ascribed to them in the Supplemental Reply and the Statement of Disputed Issues.

2.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion, and my experience with and knowledge of Delphi Automotive Systems LLC's ("DAS LLC") relationship with H.E. Services Company ("H.E. Services").  If I were called upon to testify, I could and would testify to the facts set forth herein.

3.      I began working for GM / DAS LLC in 1978 and have worked for DAS LLC in various capacities over the years.  From 1994 to 1998, I was a purchasing manager for General Motors in Buena, Indonesia.  From 1999 to approximately February 2001, I was a purchasing manager focusing on purchasing for DAS LLC's Machinery and Equipment and Indirect business. From February 2001 to the present, I have been manager of DAS LLC's Supplier Diversity Development program.

4.      DAS LLC has an internal policy of supporting minority suppliers. If a supplier wishes to be considered as a minority-owned supplier they must have proof of Certification by the National Minority Supplier Development Council or one of it's 39 regional councils. If the supplier is not so certified, DAS LLC refers that supplier to the appropriate Minority Supplier Development Council and that supplier may become certified as a minority-

2

owned company with that entity. The minority-owned supplier is required to provide such things

as a birth certificate of the majority shareholder, as well as proof of minority financial ownership

and management involvement in order to establish minority status. Minority-owned suppliers

must provide this certification to DAS LLC on an annual basis.

5.       In my current position, my role is to support DAS LLC's diversity supplier

program. In that role, I encourage dialogue about any problems that minority-owned suppliers

believe they are experiencing. With respect to H.E. Services, I recall having periodic calls with

H.E. Services' management roughly once a month since at least 2001. I do not recall H.E.

Services' management raising any concerns related to diversity during these calls, until late-2003

to 2004 when the DAS LLC and H.E. Services' relationship was ending. Specifically, in or

around late-2003 to 2004, I attended one or more meetings between representatives from DAS

LLC and H.E. Services.  H.E. Services' president, Robert Backie, requested such meetings

because he believed that DAS LLC representatives were not giving him a "fair shake." My

understanding is that Stephen Dawe, a DAS LLC purchasing manager, looked into Mr. Backie's

concerns and determined that H.E. Services was not being treated unfairly. I also recall attending

one or more meetings in late-2004 to early-2005.  During those meetings, H.E. Services

representatives complained that they lost their start-up investment in connection with the Juarez

Tech Center and that DAS LLC's Saginaw Division treated H.E. Services unfairly with respect to

its Flint facility. This was the first time that I heard H.E. Services' management voice these

specific concerns.  Additionally, during the meetings, we resolved open issues related to

improperly documented purchase orders and helped H.E. Services secure payment on those

purchase orders.

6. One of the major benefits enjoyed by minority-owned suppliers is additional access to DAS LLC buyers. Specifically, once or twice a year DAS LLC hosts an event and invites both minority-owned suppliers and DAS LLC buyers. This event is designed to provide minority-owned suppliers with additional opportunities to meet DAS LLC buyers and cultivate business relationships with them.

7. Nevertheless, minority status does not give the minority-owned supplier any "special treatment" or privileges in the bidding process. In virtually all cases, it is DAS LLC's standard practice to issue requests for quotation ("RFQ") to multiple qualified suppliers prior to selecting a supplier to meet DAS LLC's requirements. Minority-owned suppliers are permitted to bid if they are qualified to bid. There are programs, such as mentoring, to help minority suppliers with these qualifications. After DAS LLC receives quotations from multiple suppliers, DAS LLC awards the business to the most competitive supplier, both in terms of quality and value, without regard to minority status. If two or more suppliers are equally competitive, DAS LLC often will award business to a minority-owned supplier to further its goals of supporting minority-owned suppliers.

8. Although DAS LLC has a policy of supporting minority-owned suppliers, it does not have a policy of promising them business simply by virtue of their minority status. I am unaware of any instance where DAS LLC used H.E. Services' minority status to H.E. Services' or Mr. Backie's detriment. Nor am I aware of any other act of discrimination on the part of DAS LLC against H.E. Services. To my knowledge, DAS LLC supported H.E. Services as a minority-owned business, but such support did not involve any promises of future business.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct.

4

Executed on April 16, 2007 in Troy, Michigan


_____ /s/ John Taylor _____

John Taylor

EXHIBIT 2

Hearing Date:  June 22, 2007
Hearing Time:  10:00 a.m. (Prevailing Eastern Time)

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                              :
        In re                                 :    Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :    Case No. 05-44481 (RDD)
                                              :
                                              :    (Jointly Administered)
        Debtors.                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

DECLARATION OF STEPHEN DAWE IN SUPPORT OF DEBTORS' SUPPLEMENTAL
REPLY WITH RESPECT TO PROOFS OF CLAIM NUMBERS 837, 838 & 14762
(H.E. SERVICES COMPANY, ROBERT BACKIE & RICHARD JANES)

("DAWE DECLARATION – H.E. SERVICES COMPANY, ET AL.")

Stephen Dawe declares as follows:

1.       Delphi Corporation and certain of its subsidiaries and affiliates are debtors and debtors-in-possession in these chapter 11 cases.  I submit this declaration in support of the Debtors' Supplemental Reply With Respect To Proofs Of Claim 837, 838 & 14762  (H.E. Services Company, Robert Backie and Richard Janes) (the "Supplemental Reply").  Capitalized terms not otherwise defined in this declaration have the meanings ascribed to them in the Supplemental Reply and the Statement of Disputed Issues.

2.       Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion, and my experience with and knowledge of Delphi Automotive Systems LLC's ("DAS LLC") relationship with H.E. Services Company  ("H.E. Services").  If I were called upon to testify, I could and would testify to the facts set forth herein.

3.       I have worked for DAS LLC, or its predecessor the GM Corporation ("GM"), in various capacities since 1973.  From 1997 to 2000, I served as the Metallic Purchasing Manager for the DAS LLC Saginaw Steering Systems division.  In that capacity I oversaw Buyers who purchased products from H.E. Services.  From 2000 through 2002, I served as the Purchasing Manager – Contract Manufacturing for the DAS LLC Saginaw Steering Systems division.  In that capacity I oversaw both Buyers who purchased products from H.E. Services and Supplier Quality Engineers who evaluated the quality of H.E. Services' products. From 2002 to the present, I have continued to serve as a Purchasing Manager for DAS LLC; in 2002 I was the Business Line Purchasing Manager for Halfshafts, from 2003 through 2005 I was the Purchasing Manager for Indirect & M&E, and since 2006 I have been the Purchasing Manager – Machinery & Equipment.

2

4.      I am unaware of DAS LLC ever asking H.E. Services or any employee of H.E. Services to establish a plant in the Flint Michigan area.

5.      In or around 2000, after H.E. Service's Flint plant was operational, I became involved with the Flint Relationship.  With respect to the Flint Relationship, when I became the Purchasing Manager – Contract Manufacturing I assumed responsibility for overseeing both the quality and cost of products purchased from various suppliers, including the products purchased from H.E. Services' Flint Manufacturing division ("Flint Manufacturing").  I was similarly responsible for overseeing both the quality and cost of products purchased from H.E. Services' Saginaw plant, which was known as the Universal Manufacturing division ("Universal Manufacturing").

6.      Prior to my involvement with the Flint Relationship, DAS LLC issued purchase orders to H.E. Services for the manufacture of machine shift tubes, press pins, and side covers at its Flint Facility.  Also prior to my involvement, in approximately 1999 and 2000, DAS LLC awarded business to Universal Manufacturing for the assembly of lower column brackets, pump housings tie rods, flanges and lock modules.

7.      Each of the purchase orders issued to H.E. Services' Flint Manufacturing and Universal Manufacturing divisions expressly incorporated DAS LLC's General Terms and Conditions.  (Ex. A (DAS LLC Terms & Conditions).)  Moreover, each purchase order was issued only after H.E. Services bid in response to a DAS LLC Request for Quotation ("RFQ").  DAS LLC's standard and well-established practice is to issue RFQs to multiple prospective suppliers who then have the opportunity to bid on the available work.  Both the value and the quality of suppliers' products are considered when awarding business to the most competitive

3

supplier.  DAS LLC does not give prospective suppliers "high probability ratings"—or any
probability ratings—related to their chance of securing future business.

8.    Indeed, over the course of the Flint Relationship, DAS LLC issued RFQs
to H.E. Services for the production or assembly of many products.  In cases where H.E. Services
failed to win the bid it was due solely to H.E. Services' relative lack of competitiveness.  (See,
e.g., Ex. B (linear shift assemblies sourcing and recommendation summary demonstrating that
H.E. Services bid was slightly higher than the current supplier's); Ex. C (shift bracket assembly
sourcing and recommendation summary demonstrating that H.E. Services bid was $10.22 per
part higher than the winning supplier); Ex. D ("tele motor and pot" assembly sourcing and
recommendation summary demonstrating that H.E. Services bid was $5.34 per part higher than
the winning supplier); Ex. E (motor bracket assembly sourcing and recommendation summary
demonstrating that H.E. Services bid was $6.68 per part higher than the winning supplier); see
also Ex. F (9/4/01 letter from Robert Backie indicating that H.E. Services was "advised that [it
would] not be awarded a P.O. for the machining of shift bowls" and that H.E. Services received
RFQs for trunnion, spacer and bearing holder and prototype operations)[1].)  Decisions not to
award business to H.E. Services were not premised on H.E. Services' minority status.

9.    Many quality problems arose with respect to products produced at both the
Flint Manufacturing and Universal Manufacturing plants during the 2001-2003 timeframe.

10.    For example,  beginning in the summer of 2001 and continuing through
early 2002, DAS LLC's customers issued Problem Reports and Resolutions ("PRR") to Universal
Manufacturing, complaining of quality issues related to Universal Manufacturing's products.

---

[1]    Although Mr. Backie's September 4, 2001 letter indicates that H.E. Services had "shown a loss for fifteen
straight months" (Ex. F), a November 28, 2001 letter from H.E. Services' Joe Stearns states that H.E. Services
recorded a profit in October 2001 after instituting improvements and cost-cutting measures (Ex. G).

4

11.    In response to these PRRs, I asked a Supplier Quality Engineer reporting
to me, Sybil Chernek, to audit Universal Manufacturing's facility and report back to me on the
results.  Ms. Chernek completed audits of Universal Manufacturing on March 22, 2002 and
March 26, 2002.  (See Exs. H (audits).)  During these audits, Ms. Chernek reviewed Universal
Manufacturing's production of lock modules and flanges, respectively.  (See id.)  As a result of
the audits, DAS LLC placed Universal Manufacturing on "major nonconformity status" resulting
from the "absence or total breakdown of [quality systems]" at Universal Manufacturing.  (See Ex.
H at 23.)  Further, it was determined that Universal Manufacturing's systems were unable to meet
DAS LLC's customer requirements.  (See id.)  All products produced at Universal Manufacturing
were thereby placed in Level II Containment[2] until the end of May 2002, or later depending on
subsequent findings.  (Id. at 8.)  Robert Backie was notified of this decision in a letter dated
March 31, 2002.  (Ex. I.)

12.    Problems continued to surface at the Universal Manufacturing plant and,
in August of 2002, I was notified that a sticky residue was found on the pump housings
manufactured there.  (Ex. J.)  I also was informed that a visit to the plant revealed that "adequate
maintenance of the washer was neither being performed nor documented."  (Id.)

13.    Similarly, in approximately the summer of 2002, I learned of quality
issues with respect to side covers produced by Flint Manufacturing.  Specifically, H.E. Services
consistently machined the side cover castings supplied to it by a third company, Madison-Kipp,

---

[2]    When products are placed in Level II Containment, the supplier bears the cost of hiring a third company to
inspect and sort all products prior to their use.  This differs from Level I Containment where the supplier may
inspect and sort their own products.

5

incorrectly.[3]  (Ex. K.)  As a result, the product was routinely returned to Madison-Kipp, at

substantial cost to Madison-Kipp, for reworking.  (Id.)  In August 2002, Madison-Kipp proposed

to DAS LLC that it machine the castings, rather than send the castings to H.E. Services.  (Id.)

Madison-Kipp offered Delphi a price of $2.1560 per side cover, resulting in a $0.371 savings per

side cover.  (See id.)    DAS LLC approached H.E. Services regarding both the quality and price

issues with respect to this product and gave H.E. Services several opportunities to make their

product more competitive and retain the business.  (See id.)

14.    Ultimately, on April 24, 2003, DAS LLC notified Robert Backie that H.E.

Services was on the "Delphi Saginaw Steering Systems Top Problem Supplier List" as a result of

H.E. Services' serious quality issues.  (Ex. L.)

15.    In approximately February 2002, as the quality of H.E. Services' products

began to deteriorate, H.E. Services proposed various price increases to DAS LLC for certain

parts produced at its Flint Manufacturing and Saginaw Manufacturing divisions.  H.E. Services

represented that these price increases were necessary to ensure their profitability where several

of DAS LLC's projected volumes had not been met.  However, DAS LLC never guaranteed

specific volumes for the products at issue.  The contractual relationships associated with these

products were requirements contracts whereby DAS LLC agreed to purchase its requirements

from H.E. Services.  That requirements will change and sometimes be less than anticipated is

well-known to sophisticated suppliers such as H.E. Services.  Because DAS LLC continued to

---

[3]    These problems were unrelated to the equipment DAS LLC supplied to Flint Manufacturing.  On occasions
where I learned of problems related to any equipment on consignment to H.E. Services, I immediately remedied
the problem.  For example, in approximately 2001, I became aware of problems at Flint Manufacturing related
to tooling equipment that DAS LLC had outsourced to H.E. Services.  Specifically, I learned that the pin presses
DAS LLC had supplied H.E. Services were in need of repair.  In response, I immediately hired a repairman to
fix the pin presses.  After the repairs, the DAS LLC Supplier Quality Engineer who reported to me informed me
that the problem was resolved.

purchase its requirements under these contracts, DAS LLC determined that the proposed price increases were not warranted. Therefore, DAS LLC rejected H.E. Services' unilateral attempt to alter the pricing terms of its contracts. (See Ex. M (Price Increase Follow-Up indicating that the request was refused on 2/25/2002).)

16.    H.E. Services continued to pressure DAS LLC for price increases (and, conversely, the quality of its products continued to decrease, see supra ¶¶ 10-15).  On or around April 9, 2002, DAS LLC personnel, including myself and Sybil Chernek, among others, and H.E. Services personnel, including Mr. Backie, met.  Although the meeting was called to address the break down of quality systems at H.E. Services, Mr. Backie stated that he was uninterested in addressing the quality issues unless he was awarded price increases.  (Ex. N (4/9/02 meeting notes).)[4]  Mr. Backie further stated that "there would not be a quality system without a price increase."  (Id. at 2.)  Mr. Backie also indicated that he did not want DAS LLC's "piddley" assembly jobs; he wanted lucrative hi-tech jobs.  (Id.)  Moreover, Mr. Backie threatened to breach his contracts with DAS LLC unless he was awarded a price increase.  (Id.)

17.    On or around October 8, 2002, in response to H.E. Services' persistent requests for price increases, DAS LLC and H.E Services personnel met again.  (See Ex. O.) During the meeting, H.E. Services stated that it refused to continue to produce the products at the agreed upon rates.  (See id.)  I again told H.E. Services that DAS LLC refused to accept the price increases.  (See id.)  As a result, I advised H.E. Services that DAS LLC intended to resource the

---

[4]    Sybil Chernek took notes during the meeting and they accurately reflect my memory of what occurred during the meeting.

H.E. Services business to more competitive suppliers, exercising DAS LLC's right under the purchase orders to terminate for convenience.[5]    (See id.)

18.    In a subsequent meeting that occurred on or about December 4, 2002, DAS LLC and H.E. Services mutually agreed that all of the H.E. Services business would be resourced to more competitive suppliers because DAS LLC was unwilling to accept the proposed price increases.  (See Ex. P (12/6/2002 Letter).)

19.    Due to H.E. Services' pervading quality issues and continual requests for price increases, on or about December 6, 2002, DAS LLC notified H.E. Services in writing that because H.E. Services refused to honor its contract prices, DAS LLC intended to terminate its contracts with H.E. Services and resource the business to more competitive suppliers.[6]    (Id.)    At that time, DAS LLC agreed to extend its current purchase orders with H.E. Services through and including March 31, 2003, giving DAS LLC several months to pursue resourcing the business. (Id.)  DAS LLC further extended certain of these purchase orders as it continued to pursue resourcing the business.  (See Ex. Q (6/3/2004 Letter).)

20.    Following the submission of RFQs to potential suppliers, DAS LLC eventually resourced the H.E. Services business to several new suppliers, including Prince Manufacturing ("Prince"), Contech Metal Forge ("Contech"), and Mariah Industries ("Mariah"). (See, e.g., Ex. R (April 2, 2003 memorandum indicating that Prince's pricing resulted in a 17%

---

[5]    Although H.E. Services expressed a willingness to continue to perform under the few contracts it viewed as lucrative, DAS LLC determined to terminate all of its contracts with H.E. Services pursuant to DAS LLC's general Terms & Conditions.  (See Exs. O, P.)  Given H.E. Services' on-going quality issues and refusal to honor certain of its contractual obligations to DAS LLC, DAS LLC decided that it was prudent to resource all business away from H.E. Services' Flint Manufacturing and Universal Manufacturing divisions.

[6]    DAS LLC's Terms & Conditions, applicable to all purchase ordered issued in connection with the Flint Relationship, enabled DAS LLC to terminate its contracts with H.E. Services as DAS LLC's convenience upon written notification.  (See Ex. A at § 11.)

8

savings to DAS LLC); Ex. S (recommendation summary indicating that DAS LLC would benefit

from "significant logistics savings" by resourcing business away from H.E. Services to Contech,

a division of SPX Corporation).)   Mariah is a minority-owed company.  (Ex. T (indicating that

the majority of the Universal Manufacturing business was resourced to another minority business

enterprise ("MBE") named Mariah Industries).)

21.     Due to the lack of quality records at H.E. Services' Flint Manufacturing

and Universal Manufacturing divisions, we hired H.E. Services' Universal Inspection division

("Universal Inspection") to inspect and sort products produced by Prince and Mariah during the

early production phase.  Despite problems with H.E. Services' Flint Manufacturing and Universal

Manufacturing divisions, DAS LLC continued to have a good working relationship with

Universal Inspection.  (See id. ("It is our understanding that the Universal Inspection and Ancon

facilities were profitable and we are disappointed that they are being closed.  It was our intention

to continue the business relationship with these divisions.").)

22.     After DAS LLC resourced its business away from H.E. Services Flint

Manufacturing and Universal Manufacturing divisions, DAS LLC reclaimed possession of

certain machinery and equipment that was on consignment to H.E. Services.  I was informed that

when DAS LLC collected this equipment it had been intentionally damaged.  For instance, wires

were severed inside the panel boxes of various pieces of equipment.  (Ex. U.)  DAS LLC bore

the cost of repairing this damage.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct.

Executed on April 16, 2007 in Saginaw, Michigan.


_____Stephen Dawe_____

Stephen Dawe

EXHIBIT A

Revised June 24, 1999

## DELPHI AUTOMOTIVE SYSTEMS

## GENERAL TERMS AND CONDITIONS

*Delphi Automotive Systems seeks to exceed its customers' expectations. Delphi's suppliers are integral to achieving this objective, and Delphi hopes that its suppliers will recognize Delphi as their preferred customer. Delphi will establish high performance expectations for itself and its suppliers, measure performance and reward superior performance.*

## 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

## 2. SHIPPING AND BILLING

2.1 Shipping. Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and/or release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs. Seller will include on bills of lading or other shipping receipts the correct classification identification of the goods shipped as Buyer or the carrier requires. The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

2.2 Billing. Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer. If the payment due date is not otherwise specified in this Contract, the payment due date will be the due date established by the Multilateral Netting System (MNS-2) used by Buyer, which provides, on average, that payment will be due on the second day of the second month following the date Buyer receives the goods or services. Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

2.3 Delivery Schedules. Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract. Time is of

Revised June 24, 1999

the essence with respect to all delivery schedules Buyer establishes. Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules. Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules. If Buyer determines that the requirements of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other modification of this Contract.

2.4   Premium Shipments.   If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules using the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods using a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible. Seller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to fail to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

## 3. SPECIFICATION, DESIGN AND SCOPE CHANGES

Buyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract, including work related to inspection, testing or quality control. While Buyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such changes. Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including Buyer's payment of reasonable costs of modifications to Seller's Equipment and Facilities (as defined in Article 16) necessary to implement such changes. In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's cost of production and the time to implement such changes. In the event of any disagreement arising out of such changes, Buyer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue performing under this Contract, including prompt implementation of changes required by Buyer, while Buyer and Seller resolve any disagreement arising out of such changes.

## 4. QUALITY AND INSPECTION

Seller will participate in Buyer's supplier quality and development program(s) and comply with all quality requirements and procedures Buyer specifies from time to time. Seller will permit Buyer and its representatives and consultants to (i) inspect Seller's books and records in order to monitor Seller's compliance with this Contract and Seller's financial condition and (ii) enter Seller's facilities at reasonable times to inspect such facilities and any goods, materials and property that relate to this Contract. No such inspection by Buyer will constitute acceptance by Buyer of any work-in-process or finished goods.

## 5. NON-CONFORMING GOODS

Buyer is not required to perform incoming inspections of any goods, and Seller waives any right to require Buyer to conduct any such inspections. Seller will not substitute any goods for the goods covered by this Contract unless Buyer consents in writing. If Buyer rejects any goods as non-conforming, Buyer may, at its option, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods, (b) require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or remedies. If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of non-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or such shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the non-conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to

Revised June 24, 1999

arrange for the shipment of any non-conforming goods back to Seller at Seller's expense.  Seller will bear all risk of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by Buyer to return, store or dispose any non-conforming goods.  Buyer's payment for any non-conforming goods will not constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or relieve Seller of responsibility for the non-conforming goods.

## 6. FORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for so long as such event or occurrence continues, provided, however, that the affected party gives written notice of such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter).  Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures.  During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by the quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities and at times Buyer requests and at the prices set forth in this Contract.  If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without liability.  Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any such disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such disruption commences.

## 7. WARRANTY

7.1 <u>General</u>.  Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services covered by this Contract will (a) conform to all applicable specifications, drawings, samples, descriptions, brochures and manuals furnished by Seller or Buyer, (b) will be merchantable, (c) of good material and workmanship, (d) free from defect, and (e) are fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer.  If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

7.2 <u>Date and Time Processing</u>.  Seller warrants and guarantees to Buyer and its customers that any products (including computer hardware, software, firmware, machinery and equipment) covered by this Contract must at all times accurately process, handle, calculate, compare and sequence date and time data from, into, within and between the 20th and 21st centuries, including leap year calculations.

7.3 <u>Warranty Period</u>.  The period for each of the foregoing warranties will be that provided by applicable law, except that if Buyer ever provides a longer warranty to its customers, such longer warranty period will apply to the goods covered by this Contract.

Revised June 24, 1999

## 8. INGREDIENTS AND HAZARDOUS MATERIALS

If Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all ingredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to the ingredients. Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers sufficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures and precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable legal requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing.

## 9. INSOLVENCY OF SELLER

Buyer may immediately terminate this Contract without liability to Seller in any of the following or any similar events:  (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract.  Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract, without liability to Seller at any time after execution if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract; or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing.  Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under this Contract which are useable and in a merchantable condition.  The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by Buyer and not previously paid for, plus (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less (c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent.  In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which Seller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required to pay for any goods or materials that are in Seller's standard stock or that are readily marketable.  Payments made under this Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination.  Within sixty (60) days after the effective date of termination, Seller will submit a comprehensive

Revised June 24, 1999

termination claim to Buyer, with sufficient supporting data to permit an audit by Buyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 12. TECHNICAL INFORMATION

12.1   Exchange of Information.   Buyer and Seller will cooperate to create, maintain, update, and share technical information about the goods, products, machinery, materials, formulations and their manufacture, use, application and control in compliance with Buyer's drafting and math data standards.   Such technical information will not be subject to any use or disclosure restrictions.   Accordingly, Seller agrees not to assert any claims against Buyer, its customers or their respective suppliers with respect to any technical information that Seller discloses in connection with this Contract.

12.2   Waiver of Claims.   Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, Buyer's customers or their respective suppliers with respect to any technical information that Seller shall have disclosed or may hereafter disclose in connection with the goods or services covered by this Contract.

12.3   Repair and Rebuild.   Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and their subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment of any royalty or other compensation to Seller.

12.4   Computer Programs and Written Works.   All works of authorship, including without limitation, software, computer programs, and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing this Contract (separately or as part of any goods and components) are "works made for hire" and the sole property of Buyer.   To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller agrees to assign and assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship.

## 13. INDEMNIFICATION

13.1   Infringement.   Seller will defend, hold harmless and indemnify Buyer and its customers, and their respective successors and assigns, against any claims of infringement (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses (including, without limitation, attorney and other professional fees and disbursements) relating to the goods or services covered by this Contract, including any claims in circumstances where Seller has provided only part of the goods or services.     Seller waives any claim against Buyer that any such infringement arose out of compliance with Buyer's specifications.

13.2   Activities on Buyer's Premises.   Seller will defend, hold harmless, and indemnify Buyer from and against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other professional fees and disbursements) arising from or in connection with the performance of any service or work by Seller or its employees, agents, representatives and subcontractors on Buyer's or Buyer's customer's premises or the use of the property of Buyer or any customer of Buyer, except to the extent such liability arises out of the negligence or willful misconduct of Buyer or Buyer's customer.

13.3   Product Liability .   Seller will defend, hold harmless, and indemnify Buyer from and against any liability and expenses (including, without limitation, attorney and other professional fees and disbursements) arising from or in connection with any third party claims or demands to recover for personal injury or death, property damage or economic loss caused by any of the goods or services supplied by Seller (regardless of whether

Revised June 24, 1999

such claim or demand arises under tort, negligence, contract, warranty, strict liability or other legal theories), except to the extent such injury, damage or loss results from Buyer's specifications as to design or materials or from alteration or improper repair, maintenance or installation by any party other than Seller.

## 14. COMPLIANCE WITH LAWS

Seller, and any goods or services supplied by Seller, will comply with all applicable laws, rules, regulations, orders, conventions, ordinances and standards of the country(ies) of origin and destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Neither Seller nor any of its subcontractors will utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or services under this Contract. Upon Buyer's request, Seller will certify in writing its compliance with the foregoing. Seller will defend, hold harmless and indemnify Buyer from and against any liability, claims, demands, damages or expenses (including reasonable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with this Article.

## 15. INSURANCE

Seller will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers reasonably acceptable to Buyer. With respect to any such insurance coverage, Seller will furnish to Buyer either a certificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies of all insurance policies within ten (10) days after Buyer requests. The certificate must provide that Buyer will receive thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's obligations or liabilities under this Contract.

## 16. SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required for the production of the products covered by this Contract ("Seller's Equipment"). Seller will insure Seller's Equipment with fire and extended coverage insurance for its full replacement value. Seller grants Buyer an irrevocable option to take possession of, and title to, all or part of Seller's Equipment that is specially designed or outfitted for the production of the goods covered by this Contract upon payment to Seller of the net book value of such Seller's Equipment less any amounts that Buyer has previously paid to Seller for the cost of such Seller's Equipment. This option will not apply to the extent that Seller's Equipment is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others. Buyer's right to exercise this option is not conditioned on Seller's breach or Buyer's termination of this Contract or upon payment of any other amounts due under this Contract.

## 17. BUYER'S PROPERTY

17.1  Bailment of Property.  All supplies, materials, tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items Buyer furnishes, either directly or indirectly, to Seller, or for which Buyer gives consideration to Seller in whole or in part ("Buyer's Property"), will be and remain the property of Buyer and be held by Seller on a bailment basis. To the extent that this Contract provides that Buyer will reimburse Seller for any specific items of Buyer's Property (such as tooling), Seller will purchase and pay for such Buyer's Property as agent of Buyer. To the extent that this Contract provides that Seller will obtain any specific items of Buyer's Property (such as tooling) without separate or additional payment or reimbursement by Seller,

Revised June 24, 1999

Seller acknowledges and agrees that Buyer's issuance of this Contract is good and sufficient consideration for such Buyer's Property and that title to such Buyer's Property shall vest immediately in Buyer and be held by Seller pursuant to this Article. Seller shall assign to Buyer any contract rights or claims in which Seller has an interest with respect to Buyer's Property. Seller shall also execute (i) any bills of sale or other documents of conveyance Buyer requests to evidence the transfer to Buyer of title to any Buyer's Property, related contract rights and claims and (ii) any financing statements or other documents Buyer requests to evidence Buyer's ownership of Buyer's Property. Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property. Seller will not sell, lend, rent, encumber, pledge, lease, transfer or otherwise dispose of Buyer's Property. Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property. When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property for work performed on such property or otherwise. Goods manufactured based on Buyer's drawings and/or specifications may not be used for Seller's own use or sold to third parties without Buyer's express written authorization.

17.2 <u>Seller's Duties with Respect to Buyer's Property</u>. While Buyer's Property is in Seller's possession and until Seller delivers Buyer's Property back to Buyer, Seller bears the risk of loss and damage to Buyer's Property. Seller will be responsible for the cost of repairing or replacing Buyer's Property if it is damaged or destroyed regardless of cause or fault. Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from Seller's premises without Buyer's written approval, and (g) use Buyer's Property in compliance with Buyer's or the manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations. Buyer will have the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with respect thereto.

17.3 <u>Return of Buyer's Property</u>. Seller agrees that Buyer has the right, at any time and from time to time, with or without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property. Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the right to enter Seller's premises and take possession of any and all of Buyer's Property. Upon Buyer's request and in accordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by Seller, either (i) Ex Works (Incoterms 1990) at Seller's plant properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates, in which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates. If Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or without legal process, and take immediate possession of Buyer's Property.

17.4 <u>Disclaimer of Warranties</u>. Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's Property nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's benefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF BUYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. Buyer will not be liable to Seller for any loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including, without limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of service or for any

loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory damages, profits or any other indirect, special or consequential damages.

17.5 Development, Engineering And Consulting Services. Engineering, consulting or development services ("Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of authorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole property of Buyer. Seller agrees to assign all right, title and interest in and to IP that results from Development Services ("Developed IP") to Buyer. Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every reasonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional documents reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse Seller for reasonable costs incurred by Seller in providing such assistance.

## 18. SERVICE AND REPLACEMENT PARTS

During the term of  this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and replacement parts requirements to Buyer's customers at the then current production price(s) under this Contract.  If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module at price(s) that will not, in the aggregate, exceed the price of the system or module less assembly costs. If this Contract is in effect at the end of the vehicle production program into which the goods covered by the Contract are incorporated, Seller will also sell goods to Buyer to fulfill Buyer's and its customers' service and replacement parts requirements during the fifteen (15) year period following the end of such vehicle production program (the "Post-Production Period"), and this Contract will automatically remain in effect during the entire Post-Production Period.  During the first three (3) years of the Post-Production Period, the price(s) for such goods will be the production price(s) which were in effect at the commencement of the Post-Production Period.  For the remainder of the Post-Production Period, the price(s) for such service goods will be as reasonably agreed to by the parties.  If requested by Buyer, Seller will also make service literature and other materials available at no additional charge to support Buyer's service activities.

## 19. REMEDIES

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity.

## 20. CUSTOMS AND EXPORT CONTROLS

Credits or benefits resulting or arising from this Contract, including trade credits, export credits or the refund of duties, taxes or fees, belong to Buyer.  Seller will provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive these benefits or credits, and to fulfill any customs related obligations, origin marking or labeling requirements and local content origin requirements.  Seller will obtain all export licenses or authorizations necessary for the export of the goods unless otherwise indicated in this Contract, in which event Seller will provide all information as may be necessary to enable Buyer to obtain such licensees or authorization(s).  Seller will make all arrangements that are necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

## 21. SETOFF AND RECOVERY

Revised June 24, 1999

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or Buyer's affiliates, Buyer may (i) setoff such obligations against any sums owing to Seller or Seller's affiliates and/or (ii) recoup such obligations from any amounts paid to Seller or Seller's affiliates by Buyer or Buyer's affiliates.

## 22. NO ADVERTISING

Seller will not, in any manner, advertise or publish that Seller has contracted to furnish Buyer the goods or services covered by this Contract or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials unless Buyer consents in writing.

## 23. NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any provision of this Contract will not affect the right to require such performance at any later time, nor will the waiver by either party of a breach of any provision of this Contract constitute a waiver of any succeeding breach of the same or any other provision. No course of dealing or course of performance may be used to evidence a waiver or limitation of Seller's obligations under this Contract.

## 24. ASSIGNMENT

Buyer may assign its rights and obligations under this Contract without Seller's prior written consent. Seller may not assign or delegate its rights or obligations under this Contract without Buyer's prior written consent.

## 25. RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties. Nothing in this Contract makes either party the agent or legal representative of the other for any purpose whatsoever, nor grants either party any authority to assume or create any obligation on behalf of or in the name of the other party.

## 26. GOVERNING LAW AND JURISDICTION

This Contract is to be construed according to the laws of the country (and state or province, if applicable) from which this Contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law. Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in the court(s) having jurisdiction over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures. Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this Contract is issued.

## 27. SEVERABILITY

If any provision of this Contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Contract will remain in full force and effect.

## 28. RIGHT TO AUDIT AND INSPECT

Revised June 24, 1999

Buyer, at its expense, has the right to audit and review all relevant books, records, payroll data, receipts and other documents, including Seller's administrative and accounting policies, guidelines, practices and procedures, in order to substantiate any charges and other matters under this Contract. Seller will maintain and preserve all such documents for a period of four (4) years following final payment under this Contract. In addition, Buyer has the right to inspect all inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges, and other items related to Seller's performance of this Contract. Seller will provide Buyer with reasonable access to its facilities and otherwise cooperate and facilitate any such audits or inspections by Buyer.

## 29. ENTIRE AGREEMENT

This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written contract amendment issued by Buyer. Notwithstanding anything to the contrary contained herein, Buyer explicitly reserves, and this Contract will not constitute a waiver or release of, any rights and claims against Seller arising out of, or relating to, any fraud or duress in connection with the formation of this Contract or any breach or anticipatory breach of any previously existing contract between Buyer and Seller (whether or not such previously existing contract related to the same or similar goods or subject matter as this Contract). All payments by Buyer to Seller under this Contract are without prejudice to Buyer's claims, rights, or remedies.

# EXHIBIT B

3-13-02

# Buyer:  Jodi Wood (36)
# GS #11072

## P/N  Various Linear Shift Assemblies

### PROGRAM INFORMATION

Model Year/Car Body:  2002 GMT 800 & various other applications
Cost Book:  Current Prices    $0 (Tooling)
APV/TPV:  $4,824,724
PPAP:  NA
SOP:  01JA02

### PRODUCT BACKGROUND

Negotiations with current supplier did not result in initial savings, last
right of refusal was given and supplier answered the targets.

Business Team requires that the source be local.

Selected supplier would eventually purchase all components currently
consigned and Delphi will purchase final assembly only.

### STRATEGY

Keep business local and provide same quality and technical expertise.

Link and Leverage future business with Euclid for additional savings

### RECOMMENDATION

Supplier:  Euclid Industries @ 27.1 – 3 – 3 - 3

Current/primary supplier of Linear Shift assemblies to Delphi

jw①

# RECOMMENDATION SUMMARY

**Reporting Date:** 13-Mar-2002 12:26:44

**Buyer Name:** WOOD, JODI

**Activity/RFQ Project ID:** 11072

**Activity Type:** GLOBAL SOURCING

**Total NPV:** 10,117,453

**Currency:** USD

| Year | Comparison APV (first 12 months only) | Recommended APV (first 12 months only) | Quality (past sourcing parts only) | Tooling (cost of tool change) (parts only) | Savings % (past 2 yrs) (savings %) |
|------|------|------|------|------|------|
| 2002 | REDACTED | REDACTED | REDACTED | | |
| 2003 | | | REDACTED | | |
| 2004 | | | REDACTED | | |
| 2005 | | | REDACTED | | |
| Totals | REDACTED | REDACTED | REDACTED | REDACTED | |

| Recommended Supplier Name | DUNS Number | PPM | Location | Registration | Number of Die/Tool/Fixture |
|------|------|------|------|------|------|
| EUCLID INDUSTRIES INC 051506467 | 21 | N/A | DSSS | QS 9000 07-Jan-2003 | 12 |

26051958MA999, 26057528MA999, 26063900MA020,
26064241MA999, 26075696MA999, 26077203MA999, –
26078761MA999, 26089071MA999, 26089928MA999,

Recommended Contract Type:

**Buyer** _(signature)_

**Divisional Supplier Quality** _(signature)_

**Divisional Purchasing Director** _(signature)_ – 3/13/02

**Divisional/Production Control** _(signature)_

**Regional Purchasing Director** _(signature)_

**Divisional Engineer** Michael DG _(signature)_

**DGP Commodity Director** Pat Murtagh

**Commodity Team Leader/Manager** Christina Ciardonne

→ CONDITIONAL
UPON TIMING PLAN
TO HAVE EUCLID OBTAIN COMPONENTS THEMSELVES

—— DELPHI CONFIDENTIAL ——

# SOURCE COMPARISON DETAIL

**Buyer Name:** WOOD, JODI

**Activity/RFQ Project ID:** 11072

**Reporting Date:** 13-Mar-2002 12:23:14

All prices are expressed in the Receiving Country Currency

| SUPPLIER NAME DUNS Number | Sell Quote Entity / Name / Currency / Term | Landed Price | Offsetting Original Life of Program Landing Value | NPV | Period 1 Savings |
|---|---|---|---|---|---|
| SKILLED MANUFACTURING INC 122000912 / Round 3 | US | REDACTED | 0.00.0 | | |
| HE SERVICES CO 081546288 / Round 4 | US USD | REDACTED | REDACTED | | REDACTED |
| EUCLID INDUSTRIES INC 051306467 / Round 4 | US USD | REDACTED | REDACTED | | REDACTED |
| MEANS INDUSTRIES INC 057693145 / Round 4 | US USD | REDACTED | REDACTED | REDACTED | REDACTED |

——— **DELPHI CONFIDENTIAL** ———

# SOURCE COMPARISON DETAIL

**Reporting Date:** 13-Mar-2002 12:23:14

**Buyer Name:** WOOD, JODI

**Activity/RFQ Project ID:** 11072

All prices are expressed in the Receiving Country Currency

## PART:

| Part Number/<br>Description | | | | | | | | | | | | Estimated<br>SOP Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 26051958MA599<br>SHIFT ASM, LINEAR | | | | REDACTED | | | | | | | | Container<br>Package Type -<br>Comments |

## CURRENT SUPPLIERS/COSTBOOK:

| Supplier Name/<br>DUNS Number/Last<br>Redirect quoting<br>supplier's Only | Supplier<br>Country | Redirect<br>NCC<br>Curr | | | | | | | | | NPV | Period 1<br>Savings |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 05150646 7<br>EUCLID INDUSTRIES INC | | | | REDACTED | | | | | | | | |

## QUOTING SUPPLIERS:

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ANDROID INDUSTRIES-<br>WHITMORE LK<br>196776627 / Round 1 | US | | | | | 0.00.0 | | | | | | |
| MADISON-KIPP CORP<br>006071716 / Round 2 | US | | | | | 0.00.0 | | | | | | |
| PRINCE MANUFACTURING<br>CORP OXFORD<br>879345916 / Round 1 | US | | | | | 0.00.0 | | | | | | |
| REA INTERNATIONAL INC<br>256854258 / Round 1 | CA | | | | | 0.00.0 | | | | | | |

——— **DELPHI CONFIDENTIAL** ———

Page 1 of 24

# EXHIBIT C

# GLOBAL SOURCING AND ADVANCED PURCHASING
## ROUNDS OF NEGOTIATION

REQUEST NUMBER: _____

BUYER NAME: DALE E. KOWALESKI

PART NUMBER: 26100244

PART NAME: Shift Bracket Assembly

DECISION DATE: _____

| SUPPLIER | 1ST ROUND PRICE/TOOLS | 2ND ROUND PRICE/TOOLS | 3RD ROUND PRICE/TOOLS | 4TH ROUND PRICE/TOOLS | 5TH ROUND PRICE/TOOLS | 6TH ROUND PRICE/TOOLS |
|---|---|---|---|---|---|---|
| H. E. SERVICES | REDACTED | | | | | |
| MANCELONA MFG | | REDACTED | | | | |
| TIERCON INDUSTRIES | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

CURRENT PRICE: _____

FINAL TARGET PRICE: _____

9/4/2002

REV: 10/19/00

S:PURCHGSCFORMS/26100244

# RECOMMENDATION SUMMARY

**Reporting Date:**    04-Oct-2002  14:50:37

**Buyer Name:** KOWALESKI, DALE

**Activity/RFQ Project ID:** 59725

**Activity Type:** ADVANCE PURCHASING

**Total Cost (NPV):** 90,416

**Currency:** USD

| Year | Comparison APV | Recommended APV | Calendar Year Savings (Parts only) | Tooling Cost < or = Costbook | Savings % (Parts only) |
|------|----------------|-----------------|-----------------------------------|------------------------------|------------------------|
| 2002 |                |                 |                                   |                              |                        |
| 2003 | REDACTED       | REDACTED        | REDACTED                          | REDACTED                     |                        |
| 2004 |                |                 |                                   |                              |                        |
| 2005 |                |                 |                                   |                              |                        |
| 2006 |                |                 |                                   |                              |                        |
| Totals |              |                 |                                   |                              |                        |

| Recommended Supplier Name/ DUNS Number | PPM | Top Problem Supplier | QS9000 Status/ Date | # Parts Recomm- ended | Part Numbers |
|----------------------------------------|-----|----------------------|---------------------|-----------------------|--------------|
| MANCELONA MANUFACTURING INC 937511681  | 122 | NO                   | QS9000 13-Nov-2003  | 1                     | 26100244     |

| Recommended Contract Types | Regions | Divisions |
|----------------------------|---------|-----------|
| Long Term                  | N       | DSSS      |

**Buyer**

**Divisional Supplier Quality**

**Divisional Purchasing Director**

**Divisional Production Control**  11/7/02

**Regional Purchasing Director**

**Divisional Engineer**  2S002

**DGP Commodity Director**

**Commodity Team Leader/Manager**

------- DELPHI CONFIDENTIAL -------

# EXHIBIT D

# GLOBAL SOURCING AND ADVANCED PURCHASING
## ROUNDS OF NEGOTIATION

**REQUEST NUMBER:** _____

**BUYER NAME:** DALE E. KOWALESKI

**PART NUMBER:** 26100242

**PART NAME:** Tele Motor & Pot Assembly

**DECISION DATE:** _____

| SUPPLIER | 1ST ROUND PRICE/TOOLS | 2ND ROUND PRICE/TOOLS | 3RD ROUND PRICE/TOOLS | 4TH ROUND PRICE/TOOLS | 5TH ROUND PRICE/TOOLS | 6TH ROUND PRICE/TOOLS |
|---|---|---|---|---|---|---|
| H. E. SERVICES | | | | | | |
| MANCELONA MFG | REDACTED | | | | | |
| TIERCON INDUSTRIES | | REDACTED | | | | |
| | | | | | | |

**CURRENT PRICE:** _____

**FINAL TARGET PRICE:** _____

9/4/2002

REV: 10/18/00

S:\PURCHGS\GSO\FORMS\26100242

# RECOMMENDATION SUMMARY

Reporting Date:    03-Oct-2002  15:33:24

Buyer Name: KOWALESKI, DALE

Activity/RFQ Project ID: 59562

Activity Type: ADVANCE PURCHASING

Total Cost (NPV): 89,431

Currency: USD

| Year | Comparison APV | Recommended APV | Calendar Year Savings (Parts only) | Tooling Cost < or = Costbook | Savings % (Parts only) |
|------|----------------|-----------------|-----------------------------------|------------------------------|------------------------|
| 2002 | REDACTED | REDACTED | REDACTED | | REDACTED |
| 2003 | | | | | |
| 2004 | | | | | |
| 2005 | | | | | |
| 2006 | | | | | |
| Totals | | | | | |

| Recommended Supplier Name/ DUNS Number | PPM | Top Problem Supplier | QS9000 Status/ Date | # Parts Recomm-ended | Part Numbers |
|------|-----|------|------|------|------|
| MANCELONA MANUFACTURING INC 937511681 | 122 | NO | QS9000 13-Nov-2003 | 1 | 26100242 |

| Recommended Contract Types | Regions | Divisions |
|------|------|------|
| | N | DSSS |

_____ Buyer

_____ Divisional Supplier Quality

_____ Divisional Purchasing Director
Mel C. Bryant
11/7/02

_____ Divisional Production Control

_____ Regional Purchasing Director

_____ Divisional Engineer
2SC02

_____ DGP Commodity Director

_____ Commodity Team Leader/Manager

-------- DELPHI CONFIDENTIAL --------

Page 1 of 1

EXHIBIT E

# GLOBAL SOURCING AND ADVANCED PURCHASING
## ROUNDS OF NEGOTIATION

REQUEST NUMBER: _____

BUYER NAME: DALE E. KOWALESKI

PART NUMBER: 26100243

PART NAME: Motor Bracket Assembly

DECISION DATE: _____

| SUPPLIER | 1ST ROUND PRICE/TOOLS | 2ND ROUND PRICE/TOOLS | 3RD ROUND PRICE/TOOLS | 4TH ROUND PRICE/TOOLS | 5TH ROUND PRICE/TOOLS | 6TH ROUND PRICE/TOOLS |
|---|---|---|---|---|---|---|
| H. E. SERVICES | | | | | | |
| MANCELONA MFG | REDACTED | REDACTED | | | | |
| TIERCON INDUSTRIES | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

CURRENT PRICE: _____

FINAL TARGET PRICE: _____

9/4/2002

REV: 10/19/00

S:\PURCHGSC\FORMS\26100243

# RECOMMENDATION SUMMARY

**Buyer Name:** KOWALESKI, DALE

**Activity/RFQ Project ID:** 59681

**Activity Type:** ADVANCE PURCHASING

**Total Cost (NPV):** 85,515

**Currency:** USD

| Year | Comparison APV | Recommended APV | Calendar Year Savings (Parts only) | Tooling Cost < or = Costbook | Savings % (Parts only) |
|------|----------------|-----------------|-------------------------------------|------------------------------|------------------------|
| 2002 | REDACTED | REDACTED | | | |
| 2003 | | | | | |
| 2004 | | | | | |
| 2005 | | | REDACTED | | |
| 2006 | | | | | REDACTED |
| Totals | | | | | |

| Recommended Supplier Name/ DUNS Number | PPM | Top Problem Supplier | QS9000 Status/ Date | # Parts Recomm-ended | Part Numbers |
|----------------------------------------|-----|----------------------|---------------------|----------------------|--------------|
| MANCELONA MANUFACTURING INC 937511681 | 122 | NO | QS9000 13-Nov-2003 | 1 | 26102 43 |

| Recommended Contract Types | Regions | Divisions |
|----------------------------|---------|-----------|
| Long Term | N | DSSS |

Buyer _____

Divisional Supplier Quality _____

Divisional Purchasing Director _____

Divisional Production Control  11/1/02 _____

Regional Purchasing Director _____

Divisional Engineer  250002 _____

DGP Commodity Director _____

Commodity Team Leader/Manager _____

DELPHI CONFIDENTIAL

Page 1 of 1

EXHIBIT F

**HES**  ENGINEERING / TESTING
        MANUFACTURING

H E. SERVICES • 5117 S. DORT HWY • FLINT, MI 48507 • (810) 743-4900 • FAX (810) 743-8400

September 4, 2001

Delphi Saginaw Steering Systems
3900 Holland Rd.
Saginaw, MI 48601
Attention: Mr. Duane Bolinger
           Director of Purchasing

Dear Duane,

As of the present date, H.E. Services continues to support Delphi in their technical support requirements to assist in their operational objectives. As a supplier to Delphi for fifteen years and one of the largest minority owned business enterprises in the Delphi supplier base, we are thankful for the many opportunities we have been provided.

As you are well aware, we have gone through tremendous changes to address Delphi's need to improve profitability. H.E. Services has been forced to close operations, sell off equipment, reduce staff and implement an extreme austerity plan that is in its eighth phase totaling annualized cost cutting to exceed $3,360,000.

In addition to the above, ownership has infused an additional amount exceeding $1,000,000 to help ensure near-term continuation of our operations. Even with the above extreme changes, we have shown a loss for fifteen straight months totaling $1,681,901.

Our intent was, and still is, to execute a recovery action plan that provides you, our primary customer, with "Win-Win" opportunities. This plan was presented and initiated with positive verbal conversation with you and your staff, but with little results to date.

The following is a brief status of these "Win-Win" opportunities:

**Side Covers**
We have quoted competitively (we are told) on the 670 Left Hand Side Covers to allow for a 'win-win' opportunity". H.E. Services has machined, to date, an average of about 40% of the quoted volume of 1,400 parts per day and there is a need for approximately 1,800 per day. Awarding the additional quantities to H.E. Services will help us recover our losses we have taken on this program. Delphi wins because H.E. Services is the best supplier of Side Covers with a perfect record on both delivery and quality at a competitive price.

-2-

### Level II Containment and Sorting

We are an outstanding source for sorting and level II containment with superior qualifications to provide your organization with the level of quality assurance that Delphi should demand. We have recently provided Steve Dawe with an outline of our qualifications (copy attached) to compare to any other source and had suggested that the standards for qualification to engage in this business be comparable to ours. H.E. Services, as history suggests, has always reacted in record time to making available the necessary resources required to perform the job, including securing buildings for additional floor-space as required.

### Shift Bowls

We have recently been advised that we will not be awarded a P.O. for the machining of shift bowls.

### Trunnion, Spacer, and Bearing Holder

We have resubmitted a quote on the GMX270 Trunnion, Spacer, and Bearing Holder and have received a technical review package in preparation for a technical review meeting to be held on September 6, 2001.

### Prototype Operations

We have received an RFQ, which will allow us to submit our ideas for improving the effectiveness and efficiency of this important activity. We are looking forward to discussing this proposal with your people.

### Cost Bridging

Finally, the opportunity to allow us to cost bridge per the Delphi mentorship program for minority owned business enterprises would provide a win-win opportunity with respect to maintaining your low cost objectives. Our Ancon Prototype and Machine (Vendor no. 608814059) and Universal Tool and EDM (Vendor no. 00-703-4445) are fully QS9000 certified with the outstanding track record of delivery, quality and the highest technology in machine tool provisions. The 'Bridge Solution' is attached per the MBE mentorship program at Delphi.

It is my hope that all of these mutual beneficial opportunities can be initiated to allow us to maintain our excellent relationship and continued business viability. Please contact me upon your availability to further discuss the contents of this letter.

Sincerely yours,

Robert L. Backie – CEO

Cc: Mr. Ray Campbell

# EXHIBIT G

**HES** ENGINEERING / TESTING
MANUFACTURING

H.E. SERVICES • 225 E. MORLEY DR. • SAGINAW, MI 48601 • (989) 753-9015 • FAX (989) 753-7703

November 28, 2001

Mr. Steve Dawe, Purchasing Dept.
Delphi Automotive
3900 Holland Rd.
Saginaw, Michigan 48601

Dear Steve,

In the past few months, we have continued to institute cost reduction measures in the form of reduced direct and indirect labor, material cost reductions, and improvements in efficiency. The results of these efforts are starting to pay off and we recorded a profit in the month of October. We have additional improvement measures in the planning stages and we fully expect this cost reduction trend to continue.

During this past year we have increased our customer base and have taken on new business in various sectors of our company. This diversification has strengthened our company and will continue to pay off as we go forward.

Our outlook for the short and long term is positive. However, until the general economy picks up we will not realize the profit levels that we had previously projected. Our employee moral is high and we are all feeling positive that we will continue to maintain our business position in the automotive business community and continue our companies growth pattern of the past 15 years.

The linear shift program is a perfect fit for our Flint facility and will have a very positive impact in spreading the fixed cost thus allowing this facility to make a major contribution to the company's bottom line. We are requesting that you award this business to H.E. Services and allow us to utilize the manufacturing floor space that we had reserved for our manufacturing expansion plans with your company.

I have attached a copy of a letter dated Oct. 24th, which addresses the TechCenteral/ H.E. Services relationship. As you can see in the letter, these are two separate companies.

If you have need of additional information please feel free to contact me.

Regards,

Joseph A. Stearns
VP Engineering and Manufacturing

Attachment:

EXHIBIT H

# DELPHI
## Automotive Systems

### PRODUCTION PROCESS REVIEW

Appendix 39

Supplier: _Universal Tool (HE)_      Part Number(s): _26056263, 26093782_
                                      _26088811, 26075081 - Lock modules_
SQE: _Sybil Chernek_                  Date: _March 22, 02_

**\*\* USE OPEN ISSUES LIST TO DOCUMENT ACTION ITEMS \*\***

---

## Process Observations

Y __✓__ N ____   1. Is the product being manufactured at the production site using the production tooling, gaging, process, materials, operators, environment, and process settings?
Comments:_____

Y __✓__ N ____   2. Are good housekeeping practices being followed? Is the work place properly configured? (adequate lighting, space, etc.)? Comments: _Lighting not good on factory floor_____

---

## Quality Documents

Y ____ N __✓__   3. Does the actual process flow agree with the process flow diagram? Comments:_____

Y ____ N __✓__   4. Are operator instructions/visual controls available and adhered to at each work station? _Not posted W/I refresher not posted_
_WFF need - updated_ Comments: _Operator Instructions were posted but not however_
_Reject Mat'l added_ _Parts list / B/P's and Visual aids are needed for operator_
_Clear Containers_ _in order for operators to be assured they are building correct_
_+ tagging added_ _Part No's. II u_

5. Are work instructions available for the following:
*(For additional detail, see optional 'Work Instruction' section)*

Y ____ N/A ____   • Start/Stop: (Explains how to start up run and shutdown equipment safely)
Y __✓__ N ____   • Run: (Standardized method of performing work)
Y ____ N/A ____   • Setup/Changeover: (Requirements for set-up, changeover and start/end of shift)
Y ____ N/A ____   • Control & Gaging: (Control checks for 'important' product and process characteristics)

Comments: _A) no gaging req'd - no machines, no_
_change over as in machines._
_B) Operators did not know how to tell if correct part_
_#'s were being built - mgt to post B/P's & Build sheets + visual_
_aids_
_All operators were signed off on Job Instructions_

Y ✓ N ___    6. Is the production process control plan (or equivalent) easily accessible to operators?
Comments: _but operators don't know where they are_

Y ✓ N ___    7. Does production process control plan relate to the process flow diagram and PFMEA? (i.e. Is the process control plan numerically sequenced to the process flow diagram and PFMEA?)
Comments: _Control Plan needs updating on some of the Verbage_

Y ✓ N ___    8. Does the production process control plan agree with the actual process? (i.e. Is the control plan being followed?) Comments: _ex some cases the control plan is better than the work content than the work instructions_

Y ✓ N ___    9. Do production part checks and statistical monitoring take place and properly recorded as outlined on the process control plan? Comments: _There is no SPC requirements in this process_

Y ___ N/A    10. Is process capability data maintained and regularly updated as required for KPC's?
Comments: _Not a requirement_

- Is it readily available? _N/A / N/R_
- How current is it? _N/A / N/R_
- Is the process in control (Ppk ≥ 1.67 Short Term, Cpk ≥ 1.33 Long Term)? _N/A / N/R_

Y ___ N/A    11. Does the statistical data make sense (Reasonable control limits, normal variation, common cause vs. special cause)? Comments: _N/A / N/R_

Y ___ N/A    12. Are measurement devices properly calibrated? Comments: _N/A / N/R_

Y ✓ N ___    13. Is the process control plan sufficient to effectively meet the design record requirements? (KPC's, customer interface dimensions) Comments: _____

Y ___ N ___    14. Are High RPN potential failure modes, as identified in the PFMEA, addressed through error-proofing equipment or documented in the control plan? Comments: _not addressed by error proofing — but addressed thru proven Double_

Y ✓ N ___    15. Is there proper lot traceability/identification of all material? (in-process and final labeling, packaging, shipping) Comments: _____

Y ✓ N ___    16. Can the parts run since the last good check be traced to the producing shift and operation to prevent reoccurrence? Comments: _____

_Needs to switch to 7 step_

_CFO Mark → Joel called respraepaef to discuss the problem @ 1:05 P.M._

## Gage Control/Error Proofing

Y ___ N /A   17. Does a calibration control system for manual gages exist?  Comments: _____
_____

Y ___ N /A   18. For automatic inspection stations, does a verification / calibration plan exist?  Comments: __
_____

Y ___ N /A   19. Is there evidence of compliance?  Comments: _____
_____

Y ___ N /A   20. Are gages labeled with calibration status?  Comments: _____
_____

Y ___ N /A   21. Are the required gages available at the point of use?  Comments: _____
_____

Y ___ N /A   22. Are they easy to use repetitively?  Comments: _____
_____

Y ___ N /A   23. Do gages have adequate repeatability and discrimination (Gage R & R)?  Comments: _____
_____

Y ___ N /A   24. Are variable gages used where necessary (i.e. KPC's) for tracking common cause variation?
Are attribute gages used where appropriate (i.e. 100% containment of special cause variation)?
Comments: _____
_____

Y ✓ N ___   25. Is error-proofing employed and implemented according to the PFMEA and process control
plan?  Comments: *Error Proofed fixture's*
_____

Y ✓ N ___   26. Does the machine logic prevent non-conforming parts from reaching subsequent operations (is
it effective)?  Comments: *no machines / however error*
*Proofed fixtures are in place*

Y ~~✓~~ N ✓   27. Are error proofing devices checked periodically for proper function?  Comments:
*recommendation - fixture lay out should*

Y ___ N ___   28. Are Error Proof verification masters included?  Comments: _____
*be performed @a frequency of E/6Mo*

Y ___ N ✓   29. Are the error proofing devices re-verified following P.M., etc. and is the frequency of error
proof verification identified in the work instruction?  Comments: *Needs to be write*
*P.M. W/Instruction and enstie*

## Handling of Reject/Suspect Material

Y ✓ N ___ 30. Does the process control plan contain a reaction plan for nonconformances?   Comments: ___
_See last section of C/P_

Y ✓ N ___ 31. Does the reaction plan have containment and corrective actions?   Comments: ___
_Corrective actions must be addressed thru 5 phase, PRR's, 7-step Corrective Action_

Y ✓ N ___ 32. When a part out of spec/control limits is identified as a result of the Control Plan, Pre-Control or SPC, is this condition properly managed within the organization (Action Plans, Assigned Responsibility, Progress Monitoring, and Containment)?
_need QSP 127_
★ Comments: _Ref. Procedure # QSP 127_

Y ✓ N ___ 33. Do problems, including out of spec./control limits, quickly get communicated to people that can help?  Comments: _Ref. 5 phase In Book_

Y ___ N/A 34. Does information, including out of spec./out of control conditions, get passed across shifts?
Comments: _Only runs (1) One Shift_

Y ✓ N ___ 35. Does the support system respond to the operator? Comment: ___
_Ref 5 phase_

Y ✓ N ___ 36. Are controls in place to isolate incoming material until it has been approved?
Comments: ___

— Y ✓ N ___ 37. Are all non-conforming products (in-process and finished) properly quarantined and/or scrapped? Comments: _non-Conforming is prompt returned to Supplier - Not held over 24 hrs. Employee Couldn't find the remaining records - No Scrap d..._
_Record retention problem —_

Y ___ N ___ 38. Is the suspect / scrap data recorded?   Comments: ___
_Jan 5, 02 WAS Last date Shown on Rejects Rec'd - Ref QF 224_

Y ___ N ✓ 39. Is there evidence that the data is used?  Comments: _Purchased or SAG MAKE parts returned._

Y ✓ N ___ 40. Is it likely that a suspect / scrap part will be reintroduced into the normal process flow?
Comments: _No records found to indicate it couldn't - Documentation retention Problem - Also Lack of records - No organization ..._

Y ✓ N ___ 41. Are suspect / scrap containers available at each operation?   Comments: ___
_However parts were still Setting around out Side Cont..._

Y ___ N ✓ 42. Is the use of these containers defined in the operator work instructions? Comments: ___
_New Work Instructions Written In Jan of 02 defining the Containers but the plant never reviewed/signed or Posted these instructions they were still Setting in the Book._

Y ___ N ✓    43. Are the containers properly sized and identified for visual control (color coded, etc.)?
Comments: _Only (1) one Color Red Container_

Y ___ N ✓    44. Does the supplier proactively revert to their Early Production Containment Plan should problems arise? Comments:
_No Documented Evidence_

*Docum. Controls this class desire*
*has many issue's = Lack of Con*

---

## Work Instructions (Optional Detail)

### 45. Work Instruction - Start/Stop
**(Explains how to start-up, run, and shutdown equipment safely)**
- If Start/Stop procedure is not followed correctly, is there a negative impact on product quality?
- Do they exist?
- Do they have the correct content?
- Does it tell how to do a 'cold' start-up?
- Does it tell how to shut equipment down?

*N/A - No MACHINE*

### 46. Work Instruction - Run
**(Standardized method of performing work)**
- Do they exist? *yes but not current*
- Are they posted in front of the operator? *NO - Central Location*
- For automatic stations, are they posted appropriately? *N/A*
- Do they have correct content? *NO*
- Are they short, simple, and easily understandable? *To short/need update*
*Ref. Quality #4 & 8*

### 47. Work Instruction - Setup/Changeover
**(Requirements for set-up, changeover, and start/end of shift)**
- Do they exist?
- Are they readily available?
- Does everyone who needs then know where to find them?
- Do they have the correct content?
- Are they short, simple, and easily understandable?
- Is it identified who is authorized to do what?
- Is setup inspection/verification method identified?
- Is proper disposal of set-up parts defined?
- Do instructions insure correct feeder parts are being assembled?

*N/A*

### 48. Work Instruction - Control & Gaging
**(Control checks for 'important' product and process characteristics)**
- Does it exist for both product and process?
- Is it posted in front of the operator?
- For automatic stations, is it posted appropriately?
- Are all required checks included?
- Are frequencies appropriate for process capability levels?
- Are they short, simple, and easily understandable?
- Are responsibilities for checks clearly defined?
- For automatic stations, do they tell operator/jobsetter what to do with part(s) in station when auto sequence is interrupted and how to restart?
- Is proper disposal of suspect/scrap parts defined for attended and unattended stations?

*N/A*

- Are Error Proof verification checks included? *NO*

---

## Training (Optional)

49. Is a training plan written and training materials available?  Comments: _____
*Training Materials limited to Work Instructions*
_____

50. Are operators, jobsetters, etc. familiar with the training plan?  Comments: _____
*Ask the operators about HE's Training Plan - he said there is pretty much not one -*

51. Is the training formalized?  Comments: _____
*NO*

52. Does the training have suitable content?  Comments: _____
*NO  Only short Work Instructions + a few visual aid*

53. Does the plan address transfers, absences, etc.?  Comments: *yes Ref Procedure*
*# QSP-135 - 4.15 & 4.16*

54. Does the plan address the need for additional training due to product / process
   changes or improvements?  Comments: _____ *NO* _____
_____

55. Does the plan recognize the need for retraining if a trained operator has not run a job
   in a long time?  Comments: _____
   *NO*

---

## Additional Comments/Recommendations

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Overall Subjective Ranking:  ☒ Red    ☐ Yellow    ☐ Green

Follow-Up Date: _____ *TBD* _____   ☐ None Required

### PRODUCTION PROCESS REVIEW

# RESULTS SUMMARY

**SUPPLIER:** _HE Services Sal._

**DATE OF PROCESS REVIEW:** _22 MR 02_

**S.Q.E.:** _Sybil Chernek_     **OTHERS:** _____

**STATUS (Circle one)\*:**   (RED)     YELLOW     ▮▮▮

**PROCESS RESULTS:**
When checking Dock Audit records duplicate Copies were
found when questioning person responsable for Dock Audit
She stated She was sick alot in Jan. and She admitted
to fudging the Doc. Audit records

**ENGINEERING ISSUES:**
N/A

**SYSTEMIC CONCERNS:**
Ref. Attachment 1 and 2 Attached to
26056263

Note: All products produced @ HE
Saginaw - has been placed in
CS2 until End of May or later
depending on findings
            Sybil
            22 MR 02

# DELPHI
## Automotive Systems

**PRODUCTION PROCESS REVIEW**

Appendix 39

---

**Supplier:** _HE SERVICES (SAG.)_   **Part Number(s):** _1818568 (FLANGE)_

**SQE:** _SYBIL CHERNEK_   **Date:** _3/26/02_

---

**\*\* USE OPEN ISSUES LIST TO DOCUMENT ACTION ITEMS \*\***

## Process Observations

Y___ N_✓_ 1. Is the product being manufactured at the production site using the production tooling, gaging, process, materials, operators, environment, and process settings?
Comments: _CAN NOT ANSWER this - NO FLOW, PFMEA, CONTROL PLAN ON HAND_

Y___ N_✓_ 2. Are good housekeeping practices being followed? Is the work place properly configured? (adequate lighting, space, etc.)? Comments: _HS KEEPING OK CURRENTLY! LIGHTING POOR_

## Quality Documents

Y___ N_✓_ 3. Does the actual process flow agree with the process flow diagram? Comments:_____
_NO FLOW DEVELOPED_

Y___ N_✓_ 4. Are operator instructions/visual controls available and adhered to at each work station?
Comments: _NO OPERATOR INSTRUCTIONS @ OPERATION OPERATOR STATED SHE HAD NOT SEEN ANY IN MONTHS_

5. Are work instructions available for the following:
*(For additional detail, see optional 'Work Instruction' section)*
- Y___ N_✓_   • Start/Stop: (Explains how to start up run and shutdown equipment safely)
- Y___ N_✓_   • Run: (Standardized method of performing work)
- Y___ N_✓_   • Setup/Changeover:  (Requirements for set-up, changeover and start/end of shift)
- Y___ N_✓_   • Control & Gaging: (Control checks for 'important' product and process characteristics)

Comments: _NOTHING ON HAND to REVIEW_

Y \_\_\_ N ✓   6. Is the production process control plan (or equivalent) easily accessible to operators?
   Comments: *Not Developed*

Y \_\_\_ N ✓   7. Does production process control plan relate to the process flow diagram and PFMEA? (i.e. Is
   the process control plan numerically sequenced to the process flow diagram and PFMEA?)
   Comments: *Not Developed*

Y \_\_\_ N ✓   8. Does the production process control plan agree with the actual process? (i.e. Is the control plan
   being followed?) Comments: *Not Developed*

Y \_\_\_ N ✓   9. Do production part checks and statistical monitoring take place and properly recorded as
   outlined on the process control plan? Comments: *Operator using*
   *wrong chart to record on for 2-3 days &*
   *not properly using calipers - never zero's out!*

Y \_\_\_ N/A   10. Is process capability data maintained and regularly updated as required for KPC's?
   Comments: *No KPC'D.*

   - Is it readily available? *N/A*
   - How current is it? *N/A*
   - Is the process in control (Ppk ≥ 1.67 Short Term, Cpk ≥ 1.33 Long Term)? *N/A*

Y \_\_\_ N/A   11. Does the statistical data make sense (Reasonable control limits, normal variation, common
   cause vs. special cause)? Comments: *N/A*

Y ✓ N \_\_\_   12. Are measurement devices properly calibrated? Comments: *Caliper & 1 Gage*
   *used was Calibrated*

Y \_\_\_ N ✓   13. Is the process control plan sufficient to effectively meet the design record requirements?
   (KPC's, customer interface dimensions) Comments: *Control Plan*
   *Not Developed - Could not be found*

Y \_\_\_ N ✓   14. Are High RPN potential failure modes, as identified in the PFMEA, addressed through error-
   proofing equipment or documented in the control plan? Comments: *No PFMEA*
   *found*

Y ✓ N \_\_\_   15. Is there proper lot traceability/identification of all material? (in-process and final labeling,
   packaging, shipping) Comments: *Note! Parts Being Manu-*
   *factured to ship (1150 pcs) No! PPAP Approval!*
   *they are now on hold Ref Tag II'o. 1363165 & 136 3196*

Y ✓ N \_\_\_   16. Can the parts run since the last good check be traced to the producing shift and operation to
   prevent reoccurrence? Comments:

## Gage Control/Error Proofing

Y ✓ N ___    17. Does a calibration control system for manual gages exist?  Comments:_____
_____

Y ___ N/A    18. For automatic inspection stations, does a verification / calibration plan exist?  Comments: __
_____

Y ___ N/A    19. Is there evidence of compliance?  Comments: _____
_____

Y ✓ N ___    20. Are gages labeled with calibration status?  Comments: _____
_____

Y ✓ N ___    21. Are the required gages available at the point of use?  Comments: _____
_____

Y ✓ N ___    22. Are they easy to use repetitively?  Comments: _____
_____

Y ___ N ✓    23. Do gages have adequate repeatability and discrimination (Gage R & R)?  Comments: _____
No GAGE R+R'D FOUND _____

Y ___ N/A    24. Are variable gages used where necessary (i.e. KPC's) for tracking common cause variation?
Are attribute gages used where appropriate (i.e. 100% containment of special cause variation)?
Comments: _____

Y ___ N ✓    25. Is error-proofing employed and implemented according to the PFMEA and process control
plan?  Comments: ___ No PFMEA FOUND , No Control
Plan Found _____

Y ___ N/A    26. Does the machine logic prevent non-conforming parts from reaching subsequent operations (is
it effective)?  Comments: _____

Y ___ N/A    27. Are error proofing devices checked periodically for proper function?  Comments: N/A
_____

Y ___ N/A    28. Are Error Proof verification masters included?  Comments: ___ N/A _____
_____

Y ___ N/A    29. Are the error proofing devices re-verified following P.M., etc. and is the frequency of error
proof verification identified in the work instruction?  Comments:_____ N/A
_____

## Handling of Reject/Suspect Material

Y ___ N ✓ 30. Does the process control plan contain a reaction plan for nonconformances? Comments:___
*No Control PLAN Found*
_____

Y ___ N ✓ 31. Does the reaction plan have containment and corrective actions? Comments:_____
*No Control Plan Found*

Y ___ N ✓ 32. When a part out of spec/control limits is identified as a result of the Control Plan, Pre-Control or SPC, is this condition properly managed within the organization (Action Plans, Assigned Responsibility, Progress Monitoring, and Containment)?
Comments: *CAN't Comment No! Documents to Review*

Y ___ N ✓ 33. Do problems, including out of spec./control limits, quickly get communicated to people that can help? Comments: *No Documented RecoRDs to Review — Can't Comment*

Y ___ N ✓ 34. Does information, including out of spec./out of control conditions, get passed across shifts?
Comments: *Can't Comment — No Records to Review!*

Y ___ N ✓ 35. Does the support system respond to the operator? Comment: *No Comment What Support System!??*

Y ✓ N 36. Are controls in place to isolate incoming material until it has been approved?
Comments: *Some what!! NEEDs improvement*
_____

Y ___ N ✓ 37. Are all non-conforming products (in-process and finished) properly quarantined and/or scrapped? Comments: *Just put in place a Quarantine Area.*

Y ___ N ✓ 38. Is the suspect / scrap data recorded? Comments: *Not! Always — Scrap Data Could Not Be Found, Reject log for Incoming Mat'l only Recorded Some times — last Date Recorded 5Jan*

Y ___ N ✓ 39. Is there evidence that the data is used? Comments: _____

Y ✓ N 40. Is it likely that a suspect / scrap part will be reintroduced into the normal process flow?
Comments: *Tagging & Record Keeping less than Desirable*

Y ___ N ✓ 41. Are suspect / scrap containers available at each operation? Comments: _____

Y ___ N ✓ 42. Is the use of these containers defined in the operator work instructions? Comments: _____
*No Operator Instruction on Job!*

Y ___ N ✓   43. Are the containers properly sized and identified for visual control (color coded, etc.)?
Comments: _____

Y ___ N ✓   44. Does the supplier proactively revert to their Early Production Containment Plan should
problems arise? Comments: No Control Plan Found

Note: All these questions receive a "No" Answer since No Work Instruction was on Job.

---

## Work Instructions (Optional Detail)

**45. Work Instruction - Start/Stop**
**(Explains how to start-up, run, and shutdown equipment safely)**
- If Start/Stop procedure is not followed correctly, is there a negative impact on product quality?
- Do they exist?
- Do they have the correct content?
- Does it tell how to do a 'cold' start-up?
- Does it tell how to shut equipment down?

**46. Work Instruction - Run**
**(Standardized method of performing work)**
- Do they exist?
- Are they posted in front of the operator?
- For automatic stations, are they posted appropriately?
- Do they have correct content?
- Are they short, simple, and easily understandable?

**47. Work Instruction - Setup/Changeover**
**(Requirements for set-up, changeover, and start/end of shift)**
- Do they exist?
- Are they readily available?
- Does everyone who needs then know where to find them?
- Do they have the correct content?
- Are they short, simple, and easily understandable?
- Is it identified who is authorized to do what?
- Is setup inspection/verification method identified?
- Is proper disposal of set-up parts defined?
- Do instructions insure correct feeder parts are being assembled?

**48. Work Instruction - Control & Gaging**
**(Control checks for 'important' product and process characteristics)**
- Does it exist for both product and process?
- Is it posted in front of the operator?
- For automatic stations, is it posted appropriately?
- Are all required checks included?
- Are frequencies appropriate for process capability levels?
- Are they short, simple, and easily understandable?
- Are responsibilities for checks clearly defined?
- For automatic stations, do they tell operator/jobsetter what to do with part(s) in station when auto sequence is interrupted and how to restart?
- Is proper disposal of suspect/scrap parts defined for attended and unattended stations?
- Are Error Proof verification checks included?

---

## Training (Optional)

49. Is a training plan written and training materials available?  Comments: _____

TRAINING PLAN WRITTEN - Not WELL USED per operators ON floor + My Questions to Operators

50. Are operators, jobsetters, etc. familiar with the training plan?  Comments: _____

Most Stated No or Not Sure

51. Is the training formalized?  Comments: _No_

52. Does the training have suitable content?  Comments: _NO_

53. Does the plan address transfers, absences, etc.?  Comments: _YES_

54. Does the plan address the need for additional training due to product / process changes or improvements?  Comments: _NO_

55. Does the plan recognize the need for retraining if a trained operator has not run a job in a long time?  Comments: _NO_

---

## Additional Comments/Recommendations

Overall Subjective Ranking:   ☒ Red   ☐ Yellow   ☐ Green

Follow-Up Date: _TBD-_   ☐ None Required

# *PRODUCTION PROCESS REVIEW*

## RESULTS SUMMARY

**SUPPLIER:** HE Services (Sag.)

**DATE OF PROCESS REVIEW:** 3/26/02

**S.Q.E.:** Sybil Chernek          **OTHERS:** _____

**STATUS (Circle one)*:**    [RED]        [YELLOW]        [■■■■■■]

**PROCESS RESULTS:**

A)    NONE - ReJected - No Documents to use
AS A Standard to Verify Process

_____
_____
_____
_____
_____

**ENGINEERING ISSUES:**

B)    THE SAME AS Item "A"

_____
_____
_____
_____
_____

**SYSTEMIC CONCERNS:**

C)    THERE IS Not A System @ HE Service
WAShington RD. "SEE Attachment", This HAS A ON
GOING Problem For OVER 1½ Yrs. AND NO Improvements
to date. Please See Attachment #1 - For HE Sag.
Status AS of Mr. 26, 02

This location Currently in CS2 as of failure On
3/22/02 Audit.

Sybil Chernek
Delphi AQE/SQE
26MR.02
989-284-1385

# *PRODUCTION PROCESS REVIEW*

## <u>Suggested</u> guidelines for Red, Yellow, & Green rankings

 **(Institute Controlled Shipping)**

- KPC's, CQC's, or other <u>not</u> being monitored for statistical control.
- Substantial number of nonconformances to the process review which are deterrents to an effective quality system.
- Any non-compliance to the following questions that would probably result in a non-conformance being shipped to Delphi or Delphi's customers. (Questions 1,8,10,18,19,26,31,36,40 are major quality process requirements)
- Any noncompliance subject to the judgement and experience of the S.Q.E., which would result in a major failure of the quality system and/or non-conforming product being shipped to Delphi or Delphi's customers.

 **(Corrective action plans required within 30 days)**

- KPC's, CQC's, or other monitored but no reaction to out of control conditions or, control limits not established for KPC characteristics.
- Work instructions are not linked to the control plan. Items on the control plan should have specific links to specific instructions of the controlling characteristics.
- A number of nonconformances to the process review that are not likely to result in Delphi or one of its' customers receiving nonconforming product, but improvements within the quality system are recognized.

**(Process in control, action plans as required)**

- KPC's are being effectively monitored and controlled.
- Minor noncompliance in part of the suppliers quality system.
- Confidence by the S.Q.E. that the supplier will not ship known nonconformances to Delphi or its' customer.

# PRODUCTION PROCESS REVIEW

## Suggested guidelines for Red, Yellow, & Green rankings

 **(Institute Controlled Shipping)**

- KPC's, CQC's, or other **not** being monitored for statistical control. *N/A*
- Substantial number of nonconformances to the process review which are deterrents to an effective quality system.
- Any non-compliance to the following questions that would probably result in a non-conformance being shipped to Delphi or Delphi's customers. (Questions 1,8,10,18,19,26,31,36,40 are major quality process requirements)
- Any noncompliance subject to the judgement and experience of the S.Q.E., which would result in a major failure of the quality system and/or non-conforming product being shipped to Delphi or Delphi's customers.

*Dock Audit Reject Log*

**YELLOW**     **(Corrective action plans required within 30 days)**

- KPC's, CQC's, or other monitored but no reaction to out of control conditions or, control limits not established for KPC characteristics. *N/A*
- Work instructions are not linked to the control plan. Items on the control plan should have specific links to specific instructions of the controlling characteristics.
- A number of nonconformances to the process review that are not likely to result in Delphi or one of its' customers receiving nonconforming product, but improvements within the quality system are recognized. 

**(Process in control, action plans as required)**

- KPC's are being effectively monitored and controlled. *N/A*
- Minor noncompliance in part of the suppliers quality system.
- Confidence by the S.Q.E. that the supplier will not ship known nonconformances to Delphi or its' customer.

*Attachment #1*

**Phase III - Analysis and Report** A review of the findings of the first two phases is used to determine supplier conformance to *QS-9000*.

## Audit Summary Alternatives

The auditor/customer will determine which of two alternatives will be used to summarize audit findings:

- Recommended/not recommended
- Variable score

Each of the elements may be classified in one of two ways, depending on the customer's requirements:

- As a "conforms" or "minor/major nonconformance" status for that element.
- As a 0 to 10 point rating for the element, see Evaluation Process for Using a Variables Score Method.

## Definitions

**A MAJOR NONCONFORMITY** is either:

- The absence or total breakdown of a system to meet a *QS-9000* requirement. A number of minor nonconformities against one requirement which when combined can represent a total breakdown of the system and thus be considered a major nonconformity.

- Any noncompliance that would result in the probable shipment of a nonconforming product. A condition that may result in the failure or materially reduce the usability of the products or services for their intended purpose

- A noncompliance that judgment and experience indicate is likely either to result in the failure of the quality system or to materially reduce its ability to assure controlled processes and products.

**A MINOR NONCONFORMITY** is a QS-9000 noncompliance that judgment and experience indicate is not likely to :

- result in the failure of the quality system, or
- reduce its ability to assure controlled processes, or
- result in the probable shipment of nonconforming product.

2

Attach Report #2

Audit Summary for                    3/26/02

3/26/02 - Flange Asm.

1) - No Work Instructions pasted @ job, operator stated she does not know where they are she hasn't had any since last Summer.

2) Operator not trained and/or signed off on work instructions

3) No gage instructions - Operator did not use Calipers properly - she did not "Zero" Out before use, then when I explained she needed to Zero Out she did "Once" and then made 6 to 7 checks before I explained again you must "Zero" Out each time.

4) Operator using wrong inspection Chart for 7818568 Flange she was using Chart for 7815986 she had been using this Chart for 2 to 3 days, since she started the build.

5) Chart needs up dating if the added readings are to be recorded. (SEE ABOVE)

6) Could not find a Flow, PMEA and Control Plan for this part number

7) "No" PPAP Approval was found for this part no. and it "Was not" covered on any of the Warrents. The parts have been put on Hold Until all documents are complete & I approve them! SHIPPING WITHOUT PPAP.

8) Charts in use On Factory floor not being Completed as req'd these were failed Submitted for filing with Only Part No, date and Signed.

9) Hanges & Lock Modules in CS1 the required Paper work not submitted to the SOE since day I I have ask for this Several times. (ALMOST 1 YEAR)

10) Hanges stored in A regular Card Board Box under ASM. table rejected tag On them but Also displayed A "OK" Certified tag. (improper Container & tags Only 1 tag to Container)

11) Work/ASM Carts are Very! Very! "dirty" Bottom of Cart has unidentified parts On it.

12) Procedures Given to Me On Friday Mar. 22. 02 Audit did not and does not Match the Master Book in the Document Central Center. the Procedures found in the Doc Center are the Ones that has been cited by Delphi as insufficent @ the Beginning of 2001 the Ones that was given to me On the 22 MR 02 was the Current up dated Ones. that Was Completed in the time frame of my June, July by Paris Rogers these were retained in A green folder On Top of the file Cabinet Out Side Tom Nienks Office Also Several Procedures was failed in the Computer @ Tom's Plant that don't Match Master Book.



13) The Master Procedure Book did not have a table of Contents you Could not tell what was suppose to be there, Or what was or has been deleted And When.

14) Internal Audits for 2001 Could not be found in the Doc. Center

15) QS9000 Audits for 2001 And 02 Could not be found in Doc Center

16) The INTERNAL Audit Schedule was not On hand for Review the Corp. Quality Manger Stated it was On his Computer @ the Flint Office and was locked in his Computer by a Code. the Audit Schedule Should/Shall be on hand and posted for Review On site @ All times.

15) Charts/Forms that are to be Contralled are not there, Several Versions On the floor @ Anytime and these don't match the Master book.

16) 75% Of the Master forms/charts in the Book are not used @ least Can not be found Filed in the Document Control Center - these Must be used to Full Fil QS9000 Requirements Since the Procedures in many Cases are Vague or non existent.

17) The records, Books ect. that are to be Contained in the Document Contralle

Center needs Attention ASAP. The entire DoC Center is in a State of ~~disarray~~ disarray.

18) No records Could be found stating who the Certified internal Auditors were

19) Tom's Plant don't really know where Quality records/Procedures are kept Or What status Quality items are in.

20) Please Read Attachment 1 After reviewing this report and you will understand why you are in a "MAJOR NONCONFORMITY" STATUS AS THE ABSENCE OF OR TOTAL BREAKDOWN of A System to MEET A QS9000/Customer REQUIREMENT.

21) ON 8-24-01 HE WAS REQUESTED TO UPDATE PFMEA, CONTROL PLANS, PROCESS FLOW & WORK INSTRUCTIONS AS A RESULT OF A QUALITY SPILL AT FORD. AS OF TODAY THIS UPDATE IS FAR FROM BEING COMPLETED. NO WORK INSTRUCTIONS ARE ON THE JOB.

Thank You,

Sylvil Chernek

Delph AQE/SQE

Phone 989-757 3325

OR Cell 989-284-1935

# EXHIBIT I

**DELPHI**

Automotive Systems

Mr. Robert Backie                                      31 MR 02
H E Services
5117 S. Dort Hwy.
Flint, MI 48507

Subject:            **CONTROLLED SHIPPING NOTIFICATION - LEVEL 2**

Dear Mr Backie:

      It has come to our attention that the quality of your products shipped to our facility are falling substantially short of our specifications. We have determined that you have lost control of your process and we believe you currently lack the capability to isolate our plants from further discrepancies. We have, therefore, decided to implement Level 2 Controlled Shipping which requires you to bear the expense of a third party inspection company for containment and reinspection of your products until you re-establish suitable process control and quality systems..

The following part number(s), produced by your facility (Mfg. DUNS # 007034445) are unacceptable for use at Delphi Saginaw Steering Systems Plants 3, 6 , 7 & 33 at their current quality level:

| **Part Number** | **Part Name** | **Problem** |
|---|---|---|
| All Part Numbers Manufactured at this facility | Assemblies | Total breakdown of quality systems |

      The third party's responsibilities will be to inspect your production parts and provide data for you to utilize in your root cause analysis. The inspection has two purposes:

- First, it will isolate our plants from nonconforming material.
- Second, it will provide your operating people with the actual discrepant parts and shorten the feedback loop to enhance corrective action efforts.

A meeting will be held at your Flint facility on 4/3/02 at 3 p.m. to outline containment requirements and documentation required. At that time exit criteria will be established.

You are instructed to notify your QS9000 registrar that you have been placed in Level 2 Controlled Shipping and provide evidence at the meeting on 4/3/02.

      Thank you for your immediate attention to this matter. If you have further questions about this procedure, please contact me at (989) 757-2959 or fax at (989) 757- 1048.

Sincerely,

Diane Fries
Director of Supplier Quality

c.c.     Bill Vance          John Riester          Mark Johnston          Dale Kowaleski
         Steve Dawe          Bill Bringer          Mike Howerton          Brian Darling

Appendix 45.doc                                      6/26/00

## CONTROLLED SHIPPING CONFIRMATION REPLY

**TO:**      Sybil Chernek
Delphi Saginaw Steering Systems
3900 Holland Rd.
Saginaw, MI 48601

**FROM:**    H E Services
SUPPLIER DUNS NUMBER  007034445
5117 S. Dort Hwy.
Flint, MI 48507

We acknowledge receipt of your letter dated, _____ advising us that our above facility has been placed in:  (check those that apply)

           ☒   Controlled Shipping Level 1
           ☒   Controlled Shipping Level 2

☐   We understand the containment process requirements.
☐   We do not fully understand the containment process requirements.   Please
contact:_____ (Name of contact)
        _____ (Telephone number)

Following is a description of how conforming parts and shipments will be identified to indicate that they have been qualified as conforming to requirements.

_____
_____
_____
_____
_____
_____

The containment activity will be performed at the following location:

_____
_____

The person responsible for the containment activity:
Name   _____
Phone  _____

_____     Date: _____
(Signature of person responsible for containment)

heacknowltr                          12/1/99

EXHIBIT J



                                                                    memo

Date:     06AU02

To:       S. Chernek          D. Timma              T. Mienke
c.c.      D. C. Cook          S. Caird

From:     G. Gerrish   T. Maurer

Subject:  Residue on 26045841 Pump Housing - Visit to HE Services to Review Cleaning
          Process

A visit was made to HE Services to try to determine the cause of a "sticky" residue on
pump housing that are sent to Prince for assembly. During review of the washer and
conversation with Tom Mienk, the Plant Manager, the following observations were
made:

1. <u>In general, adequate maintenance of this washer was neither being performed
   nor documented.</u> The maintenance procedure and data sheets need to be
   revised to reflect the corrective actions and to comply to basic quality record
   requirements per QS-9000.
2. The washer appeared to need cleaning, based on condition of the wash and
   rinse tanks, as well as the presence of a sticky residue on various components
   of the track and vent. Also, according to Tom Mienk, the last time the washer
   was drained, cleaned, and recharged was last September.
3. Records of wash and rinse tank concentrations were incomplete:
   - Checks were not recorded every day
   - No checks were recorded since 19JL02
   - All checks in the wash tank were recorded at 3% and all rinse tank
     concentrations were recorded at 2.5%, with no readings recorded of the
     concentration before additions (assuming the recorded readings were
     taken after additions)
   - There were no specifications identified on the data sheets.
4. There is no record of when additions were made, or how much cleaner was
   added.
5. There were no weekly temperature checks recorded.

Based on these observations and further discussion, the following action items will be
taken by Tom Mienk:
1. The washer will be drained, cleaned, and refilled at a minimum of quarterly
   intervals, beginning with today.
2. Washer concentration checks will be recorded before and after additions (when
   necessary) daily. If the washer is not running, N/R will be noted on that date.
   Amount and date of additions will be noted on the sheets. Copies of these
   sheets will be obtained by S. Chernek for the next two weeks for review by the
   Delphi Metallurgy Department.
3. The weekly temperature checks will be performed and recorded.

In addition to the preceding corrective actions, samples of the wash and rinse tanks
were taken to determine the concentration in the washer during this problem period.
Delphi Metallurgy will evaluate these samples.

EXHIBIT K

Steve,

Just a quick summary supporting the move of the LH Side Cover (26063061) from H.E.
Services to Madison-Kipp.

As you can see from the letter addressed to me, from Sharon Mobry of Madison-Kipp
dated Aug. 13, 2002, quality was a huge issue. Madison-Kipp supplied the casting to
H.E. Services who was to machine it and press in a bushing and ship to Delphi. The
second paragraph of the letter explains that Madison-Kipp wanted to take on the
machining as well, due to H.E. Services lack of ability to machine the part correctly
resulting in product being returned to Madison-Kipp. This obviously was costly to
Madison-Kipp.

The second issue was price. Madison-Kipp produced the casting for a cost of  **REDACTED**
H.E. Services machined that casting and pressed the bushing in for $.827 ea. Making the
total cost of the Side Cover $2.527.

I had approached H.E. Services both on quality and the cost penalty. H.E. Services had
many opportunities to reduce cost and improve quality, to make the product more
competitive and retain the business. They were unable to accomplish this therefore, the
business was moved to Madison-Kipp.

                                                                Steve Burk

**Burk, Steve**

| | |
|---|---|
| **From:** | Mobry Sharon [smobry@madison-kipp.com] |
| **Sent:** | Tuesday, August 13, 2002 3:30 PM |
| **To:** | Burk, Steve |
| **Cc:** | Johnson Robert; McNulty Craig; Jerry Lawicki; Sholl Gary; Wojdak Joe |
| **Subject:** | Cost Reduction for part 26063061 |

Steve,

Confirming your phone conversation with Jerry Lawicki on Monday, August 12, 2002, Madison-Kipp Corporation is prepared to offer Delphi Saginaw a price on part 26063061, LH Side Cover of          **REDACTED**          RH Side Cover to cover the cost of the tooling change to reverse threads on the LH Side Cover.

Madison-Kipp Corporation can no longer accept the exorbitant cost of taking product back that HE Services can't machine correctly.  Their CNC machining centers do not perform all the operations required to machine all features as is done by the MKC dedicated machining center.  The unwillingness of HE and Delphi to address this problem over the past year has been unsatisfactory, and MKC will no longer accept parts back and perform the remaining operations.  All this time MKC has absorbed transportation costs back to MKC and performed the rework at no cost to Delphi.  MKC management specifically requests you award this business to MKC effective September 1, 2002.

MKC offers the above price for 100% of the business, currently estimated at 183,000 pieces per year.  MKC has the capacity, prior operations instructions, prior quality instructions, and can take over the business upon approval. If you have any questions, please call me or contact Jerry upon his return from vacation on August 19th.

Regards.
Sharon Mobry
Madison-Kipp Corporation
Phone:  608-242-5272
Fax:      608-242-5284
Email: smobry@madison-kipp.com <mailto:smobry@madison-kipp.com>

1

EXHIBIT L



Delphi Saginaw Steering Systems
3900 Holland Road
Saginaw, Michigan 48601

April 24, 2003

Robert Backie
HE Services
5117 S. Dort Hwy.
Flint, MI 48507

Dear Mr. Backie:

Reference: Mfg. DUNS: 007034445

This letter is to notify you that HE Services appears on the Delphi Saginaw Steering Systems Top Problem Supplier List for the month of March. HE Services must focus immediate attention to containing and irreversibly correcting the source of the quality issues. The inclusion of HE Services on this list is the direct result of parts not banded properly for shipment, causing 3 trays to be scrapped out, also, mistagged part.

Information concerning the suppliers appearing on this list is communicated across Delphi Corporation and receives high-level visibility and reviews. Removal from this list will occur only as the result of sustained quality improvement. Failure to resolve the quality issues within a timely manner will affect future sourcing decisions and current Delphi Corporation business with HE Services.

If additional help is required from Delphi Saginaw Steering Systems, please contact your Delphi Saginaw Steering Systems Supplier Quality Engineer, Sybil Chernek at 989-757-3325. Please acknowledge in writing the receipt of this letter and the actions HE Services will be taking to address the quality issues described above. Your prompt attention to the quality issues is appreciated. If you have any questions, please call me at 989-757-4904.

Sincerely,

Leisha McKay

Leisha McKay
Supplier Quality Manager
Delphi Saginaw Steering Systems

cc: Diane Fries, Beverly Gaskin, JP Sexton, Sybil Chernek, Jeff Uhl

# EXHIBIT M



## DELPHI
### Automotive Systems

| | Price Increase Follow-Up |
|---|---|

| | Division | Old $ | New $ | $ Inc. | % Inc. |
|---|---|---|---|---|---|
| Supplier: H.E. Services | DE&C | | | $0 | 0.00% |
| Mfg. Location: Saginaw, MI | DDELCO | | | $0 | 0.00% |
| Parent Corporation: H.E. Services | DHTS | | | $0 | 0.00% |
| Contact: David Stearns | DILS | | | $0 | 0.00% |
| Title: Account Manager | DPES | | | $0 | 0.00% |
| Telephone: (989)753-9015 | DSSS | $509,172 | $664,693 | $155,521 | 30.54% |
| Fax: (989)753-7703 | | | | $0 | 0.00% |
| Contract Expiration: 12/31/2002 | | | | $0 | 0.00% |
| Notification Date: 2/25/2002 | | | | $0 | 0.00% |
| Buyer: Dale E. Kowaleski | | | | $0 | 0.00% |
| Commodity Manager: Steve Dawe | | | | $0 | 0.00% |
| Commodity Director: Pat Murtagh | **Total:** | $509,172 | $664,693 | $155,521 | 30.54% |
| Commodity Team: Assemblies | | | | | |

**Supplier Cost Savings History:**

| Year | % |
|---|---|
| | |
| | |

**Cost Breakdown**

| % Mat'l | % Labor |
|---|---|
| | |

Chemical ☐    Electrical ☐    Metallic ☑

Description: _____

| Action | | Date | Comments |
|---|---|---|---|
| Refuse Request | | 2/25/2002 | |
| Obtain Documentation | | | |
| G/S | | | |
| Move Business | | | |
| A/P Leverage | | | |
| Short Term Strategy | Lean | | |
| | Resale | | |
| | Mat'l Chg. | | |
| Reviews | Pur. Dir. | | |
| | Com. Dir. | | |
| | VP | | |
| DGP Staff | | | |
| Final Disposition | | | |

**Notes:**
1. Final documentation should be an approved action plan. (Supplier negotiation or Global sourcing)

EXHIBIT N

PREPARED BY: 54Bil
DATE: 4/9/02

NE Service Mtg -          10:30 A.M.

Topic: Moving of all jobs from NE Services, Washington Rd Saginaw Mich due to total break down of Quality System

- Mr. Backie Stated while in the Main Lobby awaiting for Some one to pick him and his other personnel that if the Scheluded mtg was about Quality he was not going to Attend, I told him I did not know what all the mtg was about.

Start of Mtg.
Mr. Backie stated he was not interested in talking about Quality unless he was awarded a pc. price increase

Mr. Backie Stated he Quoted 9/10 jobs this past year and Only got 3/4 out of those.

Mr. Backie stated he just gave $279,000.00 rebates and his bank doesn't like what its Seeing.

PREPARED BY SYBIL
DATE 4/9/02

In regards to the Moving of the
equipment from HE Washington. Jag
Kie (Mr. Backie) was not interested
unless he get's a Pc price increas
And Delphi would pay for all equip-
ment moves.

Mr. Backie Stated Againg he had
been kicking around the Quality
Issue's and there would not be a
Quality System w/out a price increas
he Stated he goes to the mtg's in
Detroit & Troy and he knows whats
going on and that Delphi's
pricing is not Correct and that
he really doesn't want our
"Piddley" asm jobs. He wants Hi-
Tech jobs and that he just got
2 "Big" jobs from Chrysler that
he Can Make money On.

Mr. Backie Stated Again. he will
decide When the Price increase
is offered if he keeps the jobs
are not.

Mr. Backie Stated he will go
And talk to Bill Loyd and

PREPARED BY Sybil
DATE 4/9/62

J.T. Battenberg that he Sits
On Boards With Our "Hi-up's
And Again he knows what is
going On.

Mr. Backie expressed in ditail
Loud & Clear how unhappy he is
And has been With Delphi and
that Again his bank don't like
What they See.

he departed Awaiting a
Answer from Delphi.

Sybil Chernik
Delphi AOE/SPE

54Bil

4/9/02

Backie HE Mtg.

Mtg - Troy - he know whats going on.

9/10 Jobs = Only Have 3/4 Jobs. Out of those

$279 000.00 - rebates to Tech Central -

① Move Equip - who pays?
② do all drop lines
Piddley ③ Kicking around Quality =
Got 2 New Jobs w/ Chrysler -
he goes to Mtg in Det. & listen

Say. is Your Pc. Price Correct -??

Proper Pricing
What Price
will decide if they Keep it.
Don't Want to do ASM. per Backie

$18,000 °° Putting error proofing =
Bill Loyd - Battenberg will
go talk to them.
Dier Rd, Fenton =

not suppose to go Out on Bid

EXHIBIT O

# H.E. SERVICES COMPANY

**225 E. Morley Drive - Saginaw · MI · 48601 · (517) 753-9015 - fax (517) 753-7703**

October 9, 2002

Steve Dawe
Purchasing Department
Delphi – Saginaw Steering Systems
3900 Holland Road
Saginaw, Michigan 48601

Re:    **Purchase Orders Renewal/Cancellation Intent**

Mr. Dawe,

This letter is documentation and follow-up regarding a meeting held at your location on October 8, 2002. I presented you with information on H.E. Services historical actual volumes compared to quoted volumes supplied by Delphi Saginaw Steering Systems Purchasing. I had also discussed break-even analysis and how volume impacts profit and loss. H.E. Services is operating at a significant loss on programs where actual volumes are only 0% - 40% of quoted volumes.

| Program | Quoted Volume – YTD | 2002 Actual Volume – YTD | % of Quoted Volume |
|---|---|---|---|
| Outer Tie Rods | 18000 | 0 | 0% |
| Bearing Holder | 135,450 | 31,500 | 23.3% |
| Flange Coupling | 46,080 | 13,700 | 29.7% |
| Support Housing | 53,100 | 16,980 | 32.0% |
| Jack Screw | 45,900 | 19,308 | 32.7% |
| Dia Size Pumps | 315,000 | 117,629 | 37.3% |

H.E. Services had submitted price increases on these programs back on February 25, 2002 as a result of the non-materialized volumes. All of the programs where price increases were submitted have contracts that expire on 12/31/02. I stated in that meeting that our company would not renew these contracts under the given pricing structure. You stated that you would not grant the price increases due to budgetary concerns. It was decided by you to resource the business covering these programs. Furthermore, you decided that you would resource all of the business that you hold contracts with at the Universal Manufacturing Division of H.E. Services. Some of these programs have multi-year contracts. H.E. Services is not in agreement with cancellation on any program that has a multi-year, agreed upon, contract. H.E. Services does not want to be punished for making a sound business decision for cutting severe losses.

I am requesting that you identify which jobs and/or purchase orders you are considering or planning to cancel or not renew with H.E. Services. In addition, I need a detailed timeline and plan for each program. Please respond as soon as possible. H.E. Services has been a dedicated minority service supplier to your organization for over sixteen years and has provided top quality manufacturing services while never missing a delivery. H.E. Services understands Delphi's commitment to assist and foster minority supplier business development and growth.

Sincerely,

David Stearns
V.P. – Manufacturing

Cc: Robert Backie, Duane Bolinger

SteveDawe100902.doc

EXHIBIT P



Delphi Saginaw Steering Systems
3900 Holland Road
Saginaw, Michigan  48601
December 6, 2002


H.E. Services
Attn:  Mr. David Stearns
225 E. Morley Drive
Saginaw, MI  48601


Dave:

As a follow-up to the meeting that Steve Dawe and I had with you and Tom Mienk on Wednesday, December 4th, I wanted to reiterate Delphi's intent to extend our current purchase orders with H.E. Services up through and including March 31, 2003.  Based on a discussion that took place in a previous meeting, it was mutually agreed upon that the business be resourced since H.E. Services could no longer produce these parts at the current contract price and Delphi Saginaw could not accept the price increase that was being proposed.  Note that we are aggressively pursuing this resourcing in compliance with our conversation and, therefore, the contract extension will be submitted at the current contract price foregoing any additional premium costs that were proposed for this period of time.

Best Regards,


Dale E. Kowaleski
Senior Buyer-Assemblies
Delphi Saginaw Steering Systems

EXHIBIT Q



Delphi Saginaw Steering Systems
3900 Holland Road
Saginaw, Michigan  48601

June 4, 2003

H.E. Services Company
Attn: Patrick Harmon
5117 S. Dort Highway
Flint, MI  48507

Pat:

As we continue to move forward in the process of resourcing the business that Delphi Saginaw currently
has with H.E. Services (both in Saginaw and Flint), we need to insure that previous commitments made by
Delphi Saginaw to our customers remain intact.  From a delivery standpoint, much emphasis has been
placed on the bank build and availability of parts as we go through the validation process.  These efforts to
build this bank cannot be compromised.  The bank-build quantities that we've established through the
issuance of spot-buy P.O. #9FI4771 must be fulfilled by June 27, 2003.

With respect to quality, an obligation remains for H.E. Services to meet the standards outlined by Delphi
Saginaw for all parts in the system for which they have had manufacturing responsibility.  This
responsibility for quality and liability of all said parts will extend until all of these parts have been
exhausted through the Delphi Saginaw system.  In order to distinguish between suppliers, these parts
processed by the new supplier will be marked for identification.

Thank you for your continued cooperation and support as we work toward completion of this project.  If
you have any questions pertaining to this correspondence, please contact me immediately.

Best Regards,

Dale E. Kowaleski
Senior Buyer-Assemblies and
Remanufactured Components
(989)757-6009ph
(989)757-5983fx

CC: Garrett Backie
     Diane Fries
     Leisha McKay
     Terry Wirsing
     Steve Dawe
     Sybil Chernek

EXHIBIT R



Delphi Saginaw Steering Systems
3900 Holland Road
Saginaw, Michigan  48601

April 2, 2003

To:  J.P. Sexton, Terry Wirsing

From:  Dale E. Kowaleski

RE:  Lock Module Resourcing Summary/Overview of Prince Mfg (Delphi Saginaw Plant 33)

HE Services (HES) originally came to Delphi in March 2002 proposing a price increase that amounted to
$155,000.  This increase affected six of the eleven 'product families' that they assembled for Delphi.  The
price increase was fought off by Delphi until October 2002 when a meeting between both parties resulted in
a mutual agreement whereby stating that neither party could continue on under the current business
agreement.  Delphi advised HES that they would begin to resource the business immediately.  HES
expressed their willingness to retain the 'families' that were viewed as financial winners.  Delphi stated it
was all or nothing and we continued on with our resourcing exercise.

 The Assembly Commodity Team (ACT) provided a bid list of four suppliers to Saginaw.  All four of these
suppliers held minority status.  Prior to the initial technical review, one of the four suppliers dropped out.
Of the remaining three, only Mariah demonstrated a legitimate effort in working toward meeting our targets
throughout multiple rounds of negotiations and provided out year price reductions as well.  Even though
their efforts identified them as the best of the suppliers from the ACT bid list,  Mariah's pricing was still in
excess of 30% higher than the prices we are currently paying through HES.  At this point no one from the
original bid list was competitive.

Prince Mfg (Plant 33) is a dedicated Delphi Saginaw facility located in Oxford, MI.  In the 1st Quarter of
2001, they were chosen to take over the assembly of all TC Pumps (both Service and Production)
manufactured by Delphi Saginaw.  This line was transferred from Delphi Plant 21 in Alabama to Prince
Mfg beginning in May 2001.  As a dedicated facility, they have access to all Delphi IS&S and PC&L
systems and are responsible for their own quality to other Delphi plants and/or customers.

A group from Saginaw Purchasing visited Prince Mfg's plant on Wednesday, February 5th to review the
process improvements they had made to their facility as well as to Delphi-owned equipment.  In attendance
were Steve Dawe, JP Sexton, Duane Bolinger and Dale Kowaleski.  Due to the success that was
demonstrated by Prince, along with the significant gains that were made in transforming a losing TC Pump
program into a winner, a decision was made at this meeting to identify new business opportunities for
Prince Mfg.  It was agreed that we would benchmark them on all remaining assemblies being resourced
from HE Services.  From the standpoint of economics, we felt we could leverage any open payment issues
with the prospect of potential new business on the horizon.  Upon receiving their responses back after
multiple rounds of activity, we were pleasantly surprised to find Prince Mfg to be most competitive coming
in with prices that represented a savings to those which we were currently on contract with HES.  Prince's
pricing resulted in a savings of approximately 17%.

Prince Mfg's capabilities include column and pump assembly, painting operations, column sequencing as
well as pump housing machining.  The majority of the work that they currently perform for Saginaw relates
to the machining and assembly of TC Pumps.  Long-range considerations include the transfer of assembly
for S4 and P&N Pumps from Delphi Saginaw Plant 3 .

Our timeline for moving entirely out of HES is May 1, 2003. While this date has moved several times, the supplier has been very clear that this timing is now firm. We have prioritized the order in which we're moving the families of parts to Mariah. In order to build an adequate bank of parts prior to the moves, HES has indicated that they would need to utilize the manpower currently associated with lock module assembly. Due to the tight timing we're faced with, we will need to free up this manpower by finalizing the lock module resourcing allowing the build-ahead of other assemblies to occur.

EXHIBIT S

# RECOMMENDATION SUMMARY

Reporting Date:    15-May-2003   15:39:04

**Buyer Name:** ROUECIL, KARRIE
**Activity/RFQ Project ID:** 70846
**Activity Type:** GLOBAL SOURCING
**Total Cost (NPV):** 1,805,087
**Currency:** USD

| Year | Comparison APV | Recommended APV | Calendar Year Savings (Parts only) | Tooling Cost < or = Costbook | Savings % (Parts only) | Part Numbers |
|------|----------------|-----------------|------------------------------------|------------------------------|-------------------------|--------------|
| 2003 | | | | | | |
| 2004 | REDACTED | | | REDACTED | REDACTED | |
| 2005 | | | REDACTED | | | |
| 2006 | | | | | | |
| 2007 | | REDACTED | | | | |
| Totals | | | | | | |

| Recommended Supplier Name/ DUNS Number | PPM | Top Problem Supplier | QS9000 Status/ Date | # Parts Recomm- ended | Part Numbers |
|-----------------------------------------|-----|----------------------|---------------------|-----------------------|--------------|
| SPX CORP 053669594 | 79 | NO | QS9000 12-Sep-2005 | 2 | 26063655, 26103560 |

| Recommended Contract Types | Regions | Divisions |
|-----------------------------|---------|-----------|
| Long Term | N | DSSS |

Buyer _KSlough_ 5/20/03

Divisional Supplier Quality _Sybil Chojnacki_

Divisional Purchasing Director _6/2/03_

Divisional Production Control _5-20-03_

Regional Purchasing Director

Divisional Engineer _M. Domenett_   ECR REWARD 5/30/03

DGP Commodity Director

Commodity Team Leader/Manager

If a field is blank, the calculated value may be too large to display.  Contact your Divisional/Regional DGSS Primary Support for further information.

\*\*\*\*\*\*\*\*\*   DELPHI CONFIDENTIAL   \*\*\*\*\*\*\*\*

Page 1 of 1

# BACKGROUND SHEET

**Reporting Date:** 22-May-2003 07:02:05

| | |
|---|---|
| **Buyer Name:** | ROUECH, KARRIE |
| **Activity/RFQ Project ID:** | 70846 |

| | | | |
|---|---|---|---|
| **Activity Type:** | GLOBAL SOURCING | **Planned Approval Date:** | May-2003 |
| **Activity Description:** | SUPPORT, STRG COL IISG | **Buyer Phone:** | 989-757-3180 |
| **Savings Category:** | DGP | **Regions:** | N |
| **Commodity:** | METALLIC | **Divisions:** | DSSS |
| **Commodity Team:** | CASTINGS | | |
| **Commodity Subgroup:** | HIGH PRESSURE ALUMINUM | | |
| **Material Group:** | HIGH PRESSURE ALUMINUM | **Total Activity APV (USD):** | $560,124 |

## SUMMARY

| | |
|---|---|
| **Current Situation:** | SUPPORT PINS ARE ASSEMBLED TO THE HOUSING AT IIE SERVICES.  DELPHI IS SEEKING TO EXIT ALL BUSINESS FROM IIE, AS THEY IIAVE REQUESTED A PRICE INCREASE. |
| **Customers:** | GM |
| **Product Lines:** | COLUMNS |
| **Activity Comments:** | CONTECII HAS OFFERED ADDITIONAL DAILY CAPACITY ON THE TWO-PIECE HOUSING OF 1,000 PARTS PER DAY IN EXCHANGE FOR THE AWARD OF THE PIN PRESS OPERATION. |
| **Activity Target %:** | 3 |
| **Quality & Engineering Functional Requirements:** | RISK ASSESSMENT & TECH REVIEWS |
| **Receiving Countries:** | US | **Estimated SOP Date:** | Jul-2003 |

## PURCHASING STRATEGY

SELECTED CONTECII FOR PRICE, SIIORTENED VALUE STREAM. AVOIDED $400,000 INVESTMENT WHILE GAINING NEEDED MACIIINING CAPACITY. SIGNIFICANT LOGISTICS SAVING VS. CURRENT SITUATION OR OTIIER BIDDERS.

--------- DELPHI CONFIDENTIAL ---------

## Pin Press Savings

**Piece Price Savings:**

|          | HE Price | Contech Price | Savings Per Piece | Volumes | Savings per year |
|----------|----------|---------------|-------------------|---------|------------------|
| 26063655 |          |               |                   |         |                  |
| 26103560 |          | **REDACTED**  |                   |         |                  |

Total

**Logistics Savings:**

Logistics savings on 3,100,000 parts per year are approximately $.0952 per support and $.0034 per set of two pins. This figures out to be approximately **$305,600 savings per year**.

**Inventory Savings:**

According to Curt Dalton, the expediter at plant 6, Delphi held a two day inventory of supports at HE Services. The savings from eliminating this inventory is approximately **$96,000**.

EXHIBIT T

The attached describes recent activity between HE Services and Delphi Saginaw Steering Systems. I will cover the points by HE locations in Saginaw, Mi.

### TechCentral:
- Saginaw Steering spends approximately $20,000,000 with them annually
- Bob Backie sold this business in March 2004 to Troy Design

### Universal Inspection:
- This location provides gage calibration services and sorting services
- Saginaw Steering Prototype operations purchased $528,000 in services from this location in the last year
- Universal was awarded a sorting contract on October 27, 2003 that is worth $400,000 on an annual basis
- We also do random sorting activities with an approximate value of $50,000
- Lee Lambert, who was the Manager of this facility under HE Services, has attempted to purchase the inspection services business.
- Our prototype operations will issue a purchase order to the new company for calibration after the sale is complete.

### HE Services – Morley St.:
- Saginaw Steering has been doing validation testing at this site for 8 years
- The testing is done with Saginaw owned equipment and we pay monthly fees of approximately $150,000 which include facilities, technicians and utilities
- A decision was made in June, 2003 to insource this testing and HE Services was unofficially notified of this decision in September, 2003 (see attached engineering note on timing)
- The bundled service for personnel was to be maintained with HE Services until they announced closing of the business. This bundled service will go to Troy Design which purchased the contract employee business from HE

### Ancon:
- Saginaw Steering Prototype operations purchased $1,268,000 in machined product from this location in the last year
- The prototype operations had an excellent relationship with Ancon. In many cases, Ancon approached us advising that they were short of work or could use additional opportunities. In every case, we have bent over backwards to accommodate them. Our Purchasing Manager directed, in some cases, that the buyer advise them of the market pricing so if they wished to match it, they would get the orders. Our buyers would also work with their management in reviewing their price performance "after the fact" so they could get a feel for where they had to be to get future work.

**It is our understanding that the Universal Inspection and Ancon facilities were profitable and we are disappointed that they are being closed. It was our intention to continue the business relationship with these divisions.**

Previously we also did business with another operation, Universal Manufacturing, which is now closed. We resourced the majority of this business to another MBE named Mariah Industries on July 1, 2003. The resourcing occurred due to quality issues and a requested price increase.

# EXHIBIT U

# DELPHI
## Automotive Systems

Tuesday, July 15, 2003

| | | | |
|---|---|---|---|
| To: | PAT HARMON | From: | Dale E. Kowaleski, Senior Buyer – Misc Assemblies/Remanufactured Components |
| Company: | H E SERVICES | Email: | dale.e.kowaleski@delphi.com |
| Phone: | (810)743-4900 | Phone: | (989) 757-6009 |
| Fax: | (810)743-8400 and (989)755-0337 | Fax: | (989) 757-5983 |
| Subject: | Resourcing Issues | | |

☐ Urgent    ☐ Review    ☒ Reply

Number of Pages
(including Cover Sheet): 1

Pat:

As a follow-up to the discussion we had yesterday, here are the gage numbers (w/specifications) that are missing from the Inner Tie Rod line:

| | |
|---|---|
| 246976 | 203.0mm |
| 246976 | 429.5mm (+/- 1.0mm) |
| 246976 | 263.0mm (+/- 2.0mm) |
| 246976 | 33.7mm (+/- 3.0mm) |
| | |
| 809014 | M18x1.5mm (6H thread) minor diameter of 16.89mm/16.38mm |
| 809014 | 33.0mm/36.0mm |
| | |
| 980527 | 3.5mm (+/- 0.5mm) |
| | |
| 980529 | 30.5mm (+/- 5mm) |

In addition to these missing gages, several other issues remain as a result of this business moving from Universal Mfg:

* Battery on bearing press in GMX Room became dislodged causing the program to be lost.
* Wires were cut IN panel boxes for equipment in GMX Room and Diamondsizer.
* Several wires in panel boxes for equipment in GMX Room were crossed.

Pat, we need you to look into these occurrences and respond back as soon as possible. As always, thanks for the support you've offered to us during this period of transition.

Best Regards,

Saginaw Steering Systems   World Headquarters   3900 Holland Road   Saginaw, MI  48601-9494   USA

EXHIBIT 3

**Hearing Date: June 22, 2007**
**Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

　　　- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
　　Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   -   x
　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　In re　　　　　　　　　　　　　　　　　:　　Chapter 11
　　　　　　　　　　　　　　　　　　　　　　　　:
DELPHI CORPORATION, et al.,　　　　　　　　　:　　Case No. 05-44481 (RDD)
　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　:　　(Jointly Administered)
　　　　　　　　Debtors.　　　　　　　　　　　　:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF BRUCE WASLUSKY IN SUPPORT OF DEBTORS' SUPPLEMENTAL
REPLY WITH RESPECT TO PROOFS OF CLAIM NUMBERS 837, 838 & 14762
(H.E. SERVICES COMPANY, ROBERT BACKIE & RICHARD JANES)

("WASLUSKY DECLARATION – H.E. SERVICES COMPANY, ET AL.")

Bruce Waslusky declares as follows:

1.      Delphi Corporation and certain of its subsidiaries and affiliates are debtors and debtors-in-possession in these chapter 11 cases.  I submit this declaration in support of the Debtors' Supplemental Reply With Respect To Proofs Of Claim 837, 838 & 14762  (H.E. Services Company, Robert Backie and Richard Janes) (the "Supplemental Reply").  Capitalized terms not otherwise defined in this declaration have the meanings ascribed to them in the Supplemental Reply and the Statement of Disputed Issues.

2.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion, and my experience with and knowledge of Delphi Automotive Systems LLC's ("DAS LLC") relationship with H.E. Services Company  ("H.E. Services").  If I were called upon to testify, I could and would testify to the facts set forth herein.

3.      I began working for DAS LLC in 1971 and I have worked in various capacities over the years, including Line Supervisor, Production Control Logistics, Purchasing, Value Analysis, and Buyer.  I currently work as a Prototype Purchasing Manager for DAS LLC's Saginaw Steering Division.  I have held this position since 1996.  In my current position I am responsible for overseeing Buyers, meeting the requirements of Delphi's Saginaw prototype center, and providing plant support.

4.      I worked with H.E. Services to meet various prototype requirements of DAS LLC from approximately 1996 until H.E. Services closed in approximately the spring of 2004.

2

5.      In approximately the summer of 2000, Robert Backie advised me that H.E. Services intended to close its facility in El Paso, Texas due to lack of business.  When I became aware of Mr. Backie's intentions, I began sending Requests for Quotation ("RFQ") to H.E. Services' El Paso facility for work related to the requirements of DAS LLC's Saginaw prototype center.  Although I was under no obligation to send these RFQs to H.E. Services, I did so because DAS LLC and H.E. Services shared a good working relationship.  Over the course of several months, I sent approximately twenty RFQs to H.E. Services' El Paso facility, however, it did not win any of the requested business due to lack of competitive pricing.  During my conversation with Robert Backie he did not suggest that his decision to close the El Paso facility was related to discrimination or broken promises on the part of DAS LLC.

6.      After H.E. Services' El Paso facility closed, I learned from Darrin Krogman, H.E. Services' Ancon division manager, that the equipment from the El Paso facility was moved to the Ancon division facility.  It is my understanding that later, in approximately 2004, this equipment was sold for top dollar at a liquidation auction in connection with H.E. Services' dissolution.

7.      I was involved in the EX-CELL-O Relationship.  In approximately June 1999, DAS LLC issued RFQ number S30000009 to ten suppliers potentially interested in and capable of producing prototype C/V joint components, specifically inner and outer races.[1]  (Ex. A at 4, 5 (Sourcing Committee Bidders' List and Request for Sourcing).)  Production of the

---

[1]   Automobiles transfer power from the transmission to the wheels through drive-axel assemblies.  C/V ("Constant Velocity") joint components, located on the ends of the axle, allow a wheel's rotating shaft to transmit power through a variable angle, at a constant speed, without an appreciable increase in friction or play.   Inner and outer races make up a portion of the C/V joint.

3

prototype inner and outer races required that the supplier purchase an EX-CELL-O Model XG-690 grinding machine to facilitate DAS LLC's requirements.  (Id. at 5, 6.)

8.     Of the ten suppliers that DAS LLC solicited, five responded by bidding on the business.  (Id. at 3, 4.)  After three rounds of negotiations with the potential suppliers, H.E. Services' Ancon division was awarded the contract because it offered DAS LLC the most competitive price.  (Id. at 1-3.)  The per part price H.E. Services quoted Delphi was based both the cost of necessary materials and the cost of the EX-CELL-O machine.  (See Exs. B, C, D (Quotes).)

9.     Upon being awarded the business, as part of its agreement with DAS LLC, H.E. Services was responsible for contracting with EX-CELL-O GmbH and purchasing an EX-CELL-O machine.  Moreover, H.E. Services was responsible for providing all maintenance and repair to the EX-CELL-O machine.  H.E. Services acknowledged these responsibilities in its various quotes on the EX-CELL-O business.  (See Ex. B (July 20, 1999 Quote ("Ancon to provide all maintenance and repair to the Excello Machine")); Ex. C (Sept. 22, 1999 Quote (same)); Ex. D (October 12, 1999 Quote (same)); see also Ex. E at 3 (Aug. 20, 1999 Proposal ("[S]upplier to purchase an Excello Machining Center")).)

10.     Moreover, I consistently conveyed to H.E. Services personnel, including Joseph Stearns, H.E. Services Vice President of Engineering and Manufacturing, that DAS LLC did not intend to become involved in purchase of the EX-CELL-O machine or any commercial issues between H.E. Services and EX-CELL-O GmbH arising out of that purchase.  (See Ex. F (Jan. 31, 2001 memorandum from B. Waslusky to D. Bolinger).)  DAS LLC's sole concern with respect to the EX-CELL-O machine was that the machine was capable of meeting the prototype requirements of DAS LLC and its customers.  (See id.)

4

11.     DAS LLC specified in its RFQ that the EX-CELL-O machine incorporate Fanuc controls.  Because Fanuc controls are the industry standard in the United States, DAS LLC routinely requires the use of Fanuc controls to meet its requirements.  By contrast, Siemens controls are the industry standard in Europe and are thus generally incompatible with DAS LLC's American operations.  H.E. Services was aware of the requirement that the EX-CELL-O machine incorporate Fanuc controls prior to bidding on and being awarded the EX-CELL-O business.  Nevertheless, the differences between the two controllers were tested by EX-CELL-O GmbH and EX-CELL-O GmbH assured both DAS LLC and H.E. Services that the Fanuc and Siemens controllers were equivalent.  (See Exs. G, H (Feb. 28, 2001 and Mar. 5, 2001 EX-CELL-O conference call minutes).)

12.     On or about October 29, 1999, DAS LLC issued a blanket requirements contract in the form of a purchase request ("MBO S3B00028") to H.E. Services in connection with the EX-CELL-O Relationship.  (Ex. I.)  MBO S3B00028 specified that although DAS LLC projected that it would require 7,000 parts annually in connection with the EX-CELL-O Relationship, the actual volume may vary according to DAS LLC's requirements.  (Id.)  MBO S3B00028 also acknowledged that the per part price "will go up or down based on actual[] volume."  (Id.)  I did not promise or represent to H.E. Services that DAS LLC would purchase any specified number of parts on an annual basis.  Moreover, projected volumes are not firm; experienced suppliers such as H.E. Services know that DAS LLC's requirements may change.

13.     Although H.E. Services immediately contracted with EX-CELL-O GmbH for the purchase of an EX-CELL-O machine that would meet DAS LLC's requirements in connection with MBO S3B00028, problems arose that prevented H.E. Services from timely beginning work under the requirements contract.  Specifically, although the EX-CELL-O GmbH

5

originally scheduled the machine to be delivered to H.E. Services on or about September 15,

2000 (Ex. F at 2), the machine did not actually arrive at H.E. Services' Ancon division facility

until December 13, 2001.  (Ex. J (Dec. 13, 2001 EX-CELL-O meeting minutes).)  The fourteen

month delivery delay was caused, at least in part, by EX-CELL-O GmbH because EX-CELL-O

GmbH experienced difficulty manufacturing a machine capable of meeting DAS LLC's

requirements.  (See Ex. F at 2; Ex. K  (letters from H.E. Services to EX-CELL-O GmbH).)  H.E.

Services, not DAS LLC, retained responsibility for ensuring the capability of the EX-CELL-O

machine, including conducting run-offs that would ensure that the machine would efficiently

produce parts to DAS LLC's specifications.  (See, e.g., Ex. K.)

14.    As previously noted, the per part price that H.E. Services anticipated to

charge DAS LLC for parts produced using the EX-CELL-O machine incorporated H.E. Services'

cost of acquiring the machine.   Due in large part to H.E. Services' delayed receipt of the EX-

CELL-O machine, and resulting delays in orders and payments from DAS LLC, H.E. Services

requested, and DAS LLC agreed, to make monthly payments to H.E. Services to help offset the

cost of the machine – irrespective of the number of parts ordered – rather than make a volume

driven variable monthly payment to H.E. Services as was originally anticipated.  (Ex. L at 1

(Nov. 13, 2001 letter from J. Stearns to B. Waslusky).)  This arrangement was beneficial to H.E.

Services because it enabled H.E. Services to receive a guaranteed payment from DAS LLC each

month regardless of how many parts DAS LLC required, effectively insulating H.E. Services

from wide swings in DAS LLC's month-to-month requirements.  If DAS LLC required parts in

any given month it would pay an additional amount above and beyond the guaranteed payment.

15.    To effect the revised terms of the EX-CELL-O Relationship, on April 30,

2002, DAS LLC issued purchase order number S3S18278 to H.E. Services. (Ex. M.)  This

6

purchase order was governed by DAS LLC's General Terms and Conditions.  (Id. at 5.) Purchase

order S3S18278 authorized DAS LLC to disburse to H.E. Services a monthly payment of

$22,926.00 to help offset H.E. Services' costs associated with its purchase of the EX-CELL-O

machine (which were originally included in the quoted per part price).  (Id.)  These payments

were originally scheduled to continue for 36 months.  (Id.)  However, DAS LLC made only

twenty of the scheduled payments because H.E. Services closed its business and never invoiced

DAS LLC for the remaining payments.  DAS LLC subsequently closed purchase order

S3S18278 in May of 2005; at that time purchase order S3S18278 was altered to reflect that DAS

LLC made only twenty payments under it.  (See Ex. N (purchase order alteration).)

16.     Simultaneous to the issuance of purchase order S3S18278 on April 30,

2002, DAS LLC also re-issued the blanket requirements contract associated with the EX-CELL-

O Relationship under a new purchase request ("MBO S3B00059").  (Ex. O)  This re-issued

purchase request was revised based on H.E. Services' revised quote of June 19, 2001 as well as

purchase order S3S18278.  (Id.)  In essence, the per-part price payable to H.E. Services under

MBO S3B00059 was lowered to reflect the fact that DAS LLC was separately making monthly

payments to H.E. Services under purchase order S3S18278.  All purchase orders issued under

MBO S3B00059 explicitly incorporated and were made subject to DAS LLC's General Terms &

Conditions.  (See Ex. P (PO S3S26246); see also Ex. Q (Terms & Conditions).)

17.     Following the late delivery of the EX-CELL-O machine, problems

persisted that prevented H.E. Services from efficiently meeting DAS LLC's requirements.  For

instance, immediately following the delivery the machine, H.E. Services learned for the first time

that the machine ran on a central coolant system.  This indicated to me that H.E. Services'

personnel failed to achieve familiarity with the machine despite their contractual obligation to do

7

so.  Nevertheless, DAS LLC purchased a central coolant system for H.E. Services' use at a cost

of approximately $6,000.

18.     H.E. Services also experienced problems with the programming of the

machine, which it struggled with for many months.  Additionally, the permanent tooling for the

machine presented continuous problems where H.E. Services was unable to alter the EX-CELL-

O machine efficiently to meet DAS LLC's requirements.  Because alterations and improvements

to prototype parts are the norm, it was essential that H.E. Services be able to effect these

alterations to the machine in an efficient manner in order to meet DAS LLC's requirements.

19.     As reflected in correspondence I received, these problems were

exacerbated because EX-CELL-O GmbH refused to honor its warranty with respect to the

machine.  This was due to the fact that H.E. Services refused to pay EX-CELL-O GmbH for the

full amount invoiced for the machine.  (See Ex. R (letters from EX-CELL-O GmbH to H.E.

Services).)  The long delivery delay had strained the relationship between H.E. Services and EX-

CELL-O GmbH and in response, as a self-help remedy, H.E. Services underpaid EX-CELL-O

GmbH for the machine.[2]  (See id.)  EX-CELL-O GmbH did not agree with H.E. Services actions

and, accordingly, refused to honor its warranty with respect to the machine.  Thus, when

problems such as those related to programming and permanent tooling arose, EX-CELL-O

---

[2]     On January 23, 2001, H.E. Services first requested that EX-CELL-O GmbH reimburse H.E. Services for
$207,820.00 in "losses" allegedly incurred in connection with the late delivery of the EX-CELL-O machine.
(See Ex. F at 2.)  On or about April 26, 2002, H.E. Services provided Delphi with detail of the EX-CELL-O
machine costs in connection with Delphi's agreement to issue a monthly payment toward the machine.  (Ex. S
(April 26, 2002 Analysis).)  At least some of the "losses" H.E. Services asked EX-CELL-O GmbH to pay were
included in the "costs" Delphi agreed pay, including travel and bank costs.  (Compare Ex. F with Ex. S.)  Delphi
disputed some of the costs H.E. Services claimed, including travel costs that EX-CELL-O GmbH paid (see, e.g.,
Ex. T) and other costs that H.E. Services either agreed to pay for or incurred through its own fault.  (See Exs. U,
V.)  Nevertheless, Delphi agreed to waive its dispute as to these additional costs so long as H.E. Services
negotiated a reduction in the purchase price with EX-CELL-O GmbH.  (See Ex. V.)

8

GmbH was unavailable to assist due solely to H.E. Services' dispute with EX-CELL-O GmbH.

Although DAS LLC was copied on correspondence between H.E. Services and EX-CELL-O

GmbH relevant to these issues, DAS LLC was not directly involved in the contractual

relationship between the two companies.  It remained H.E. Services' responsibility to DAS LLC

to insure that the machine could meet DAS LLC's requirements.

      20.     On or about March 11, 2003, I held a meeting with H.E. Services' Robert

Backie and David Stearns.  Among other things, I advised Messrs. Backie and Stearns that:  (1)

H.E. Services was "suffering from internal paralysis," which was effecting their performance in

connection with the EX-CELL-O Relationship; (2) H.E. Services was experiencing inefficiencies

with respect to tooling; (3) the EX-CELL-O Relationship lacked programming and engineering

support from H.E. Services; (4) parts were being wasted in connection with setting up and

running the EX-CELL-O machine; and (5) communication between DAS LLC and H.E. Services

had deteriorated.  (Ex. W (Email).)  No significant progress was made on these items in the

weeks following the meeting.  (Id.)  Additionally, H.E. Services failed to meet delivery deadlines

during that time frame.  (Id.)

      21.     As a result of these problems, and in order to meet DAS LLC's customers'

requirements, DAS LLC resourced production of some inner and outer race prototypes to Ranger

Tool & Die ("Ranger").  DAS LLC only resourced business to Ranger on the occasions where

H.E. Services failed to meet DAS LLC's requirements and DAS LLC's only alternative would

have been to default on obligations to its customers.

      22.     Ranger produced inner and outer races for DAS LLC prior to H.E.

Services and was capable of producing the prototypes in question.  However, Ranger charged

substantially higher prices than H.E. Services.  Despite Ranger's involvement, DAS LLC

9

remained committed to the EX-CELL-O Relationship with H.E. Services and desired that the

EX-CELL-O machine become capable of meeting DAS LLC's requirements.  This is evidenced

by the fact that DAS LLC continued to make monthly payments to H.E. Services under purchase

order S3S18278 until the time that H.E. Services permanently closed its business in the spring of

2004.

      23.     I did not contact EX-CELL-O GmbH or otherwise encourage EX-CELL-

O GmbH to sue H.E. Services or repossess the EX-CELL-O machine.  My only direct contact

with EX-CELL-O GmbH occurred on two occasions during the summer of 2004 after H.E.

Services had closed.  On the first occasion, I contacted EX-CELL-O GmbH after being notified

by Lee Lampert, a former H.E. Services' employee, that a person was on H.E. Services' property

inspecting the EX-CELL-O machine.  Out of concern, I called EX-CELL-O GmbH to inquire

whether they had sent a representative to inspect the machine; I was assured that they had done

so.  On the second occasion, I was contacted by an EX-CELL-O GmbH salesperson who

inquired whether DAS LLC had interest in purchasing the EX-CELL-O machine.  I explored this

possibility with my colleagues, Mark Martin and David McGregor, but ultimately DAS LLC

determined not to purchase the EX-CELL-O machine at that time.

      24.     I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the

foregoing statements are true and correct.

Executed on April 16, 2007 in Saginaw, Michigan

                              _____Bruce Waslusky_____

                                  Bruce Waslusky

# EXHIBIT A

DELPHI CONFIDENTIAL

# DELPHI SOURCE RECOMMENDATION FORM
## INDIRECT/MACHINERY and EQUIPMENT

| | | M & E | |
|---|---|---|---|
| DPR # C9600068 | | INDIRECT | X |

DIVISION/LOCATION: Delphi Steering Systems/Prototype Headquarters    MEETING DATE: 10/18/99-Monday

DESCRIPTION: INNER & OUTER RACE PROTOYPE BLANKET (BUILD TO PRINT)

CREATIVITY TEAM NAME:

PROGRAM: Halfshaft/various

MODEL YEAR:                                                         LINKED / LEVERAGED: _____ (DPR #)

APP. REQUEST #: 0                                                   DELIVERY DATE: 01-Oct-00

COSTBOOK $: $2,968,369

TARGET PRICE(S): $2,551,500                                         A/R $    $0

BUYER: Allen Fisher                                                 PHONE: 8-357-3072

FINANCIAL:                                                          PHONE: 0

| SUPPLIER | LOCATION | | QUOTED PRICE $ | NEGOTIATED PRICE $ | BUYER SAVINGS $ | REDUCTION AGAINST AR/CB $ % |
|---|---|---|---|---|---|---|
| ANCON PROTOTYPE | SAGINAW, MI. | | REDACTED | REDACTED | REDACTED | REDACTED |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | 0 | | | |

COMMENTS: 3 year contract effective 10/01/2000/ Supplier req'd to purchase machine from Excello
Ancon's price reduction for 2nd & 3rd year. 3%, 3%

| | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|
| STATE COSTBOOK BY YEAR: | | $164,909 | $989,456 | $989,456 | $824,547 |
| SAVINGS AGAINST AR/CB: | $17,001 | $102,003 | $102,003 | $85,003 |

APPROVAL SIGNATURES:

| COMMODITY MANAGER | BUYER | REQUISITIONER | DIVISIONAL MANAGER |
|---|---|---|---|
| | | | |

| DIVISIONAL/REGIONAL DIRECTOR | COMMODITY DIRECTOR | VICE PRESIDENT |
|---|---|---|
| | | |

Rev 5/3/99

DELPHI CONFIDENTIAL

# DELPHI SOURCE RECOMMENDATION FORM
## INDIRECT/MACHINERY and EQUIPMENT

| | | M & E | INDIRECT |
|---|---|---|---|
| | | | X |

DPR # C9600068

**DIVISION/LOCATION:** Delphi Steering Systems/Prototype Headquarters

MEETING DATE: 10/18/99-Monday

**DESCRIPTION:** INNER & OUTER RACE PROTOYPE BLANKET (BUILD TO PRINT)

**CREATIVITY TEAM NAME:**

**PROGRAM:** Halfshaft/various

**MODEL YEAR:**

LINKED / LEVERAGED: _____ (DPR #)

**APP. REQUEST #:** 0

**COSTBOOK $:** $2,968,369

**TARGET PRICE(S):** $2,551,500

DELIVERY DATE: 01-Oct-00

**BUYER:** Allen Fisher

A/R $         $0

**FINANCIAL:** 0

PHONE: 8-357-3072

PHONE: 0

| MS (*) | SUPPLIER | LOCATION | | QUOTED PRICE $ | NEGOTIATED PRICE $ | BUYER SAVINGS $ | REDUCTION AGAINST AR/CB $ | % |
|---|---|---|---|---|---|---|---|---|
| | ANCON PROTOTYPE | SAGINAW, MI. | | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**COMMENTS: 3 year contract effective 10/01/2000! Supplier req'd to purchase machine from Excello**

**Ancon's price reduction for 2nd & 3rd year. 3%, 3%**

**APPROVAL SIGNATURES:**

| | | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|
| STATE COSTBOOK BY YEAR: | | | $164,909 | $989,456 | $989,456 | $824,547 |
| SAVINGS AGAINST AR/CB: | | | $17,001 | $102,003 | $102,003 | $85,003 |

| COMMODITY MANAGER | BUYER | REQUISITIONER |
|---|---|---|
| | | COMMODITY DIRECTOR |
| DIVISIONAL/REGIONAL DIRECTOR | DIVISIONAL MANAGER | VICE PRESIDENT |

Rev 5/3/99

DELPHI CONFIDENTIAL

# DELPHI SOURCING COMMITTEE
## ROUNDS OF NEGOTIATIONS

**DPR #:** C9600068

**Costbook:** $2,968,369

**Description:** INNER & OUTER RACE PROTOYPE BLANKET (BUILD TO PRINT)

| M S Supplier Name | Original Quote | Round #1 | Round #2 | Round #3 | Round #4 | Round #5 | Round #6 |
|---|---|---|---|---|---|---|---|
| ANCON PROTOTYPE | | | | | | | |
| MERRILL TOOL | | | | | | | |
| COLD FORM TECHNOLOGY | | | | | | | |
| PANDA PRECISION | | | | | | | |
| DYNAMIC PROTOTYPE OPERATION | | | | | | | |
| | | | REDACTED | | | | |
| Targets: | | REDACTED | REDACTED | REDACTED | | | |

Rev 5/3/99

DELPHI CONFIDENTIAL

# DELPHI SOURCING COMMITTEE
## BIDDERS LIST

**Description:**

INNER & OUTER RACE PROTOYPE BLANKET (BUILD TO PRINT)

**DPR #** C9600068

**Meeting Date** 10/18/99-Monday

| M S | Supplier | Country/ State | Quoted | Declined | No Response | Comments |
|---|---|---|---|---|---|---|
| | CENTRAL TOOL ROOM | USA/MICHIGAN | | x | | |
| | ANCON PROTOTYPE | USA/MICHIGAN | x | | | |
| | BELL ENGINEERING | USA/MICHIGAN | | x | | |
| | RANGER TOOL & DIE | USA/MICHIGAN | | x | | |
| | MISTEQUAY GROUP, LTD. | USA/MICHIGAN | | x | | |
| | MERRILL TOOL | USA/MICHIGAN | x | | | |
| | COLD FORM TECHNOLOGY | USA/MICHIGAN | x | | | |
| | PANDA PRECISION | USA/MICHIGAN | x | | | |
| | PARAVIS INDUSTRIES INC. | USA/MICHIGAN | | | x | |
| | DYNAMIC PROTOTYPE OPERATION | USA/MICHIGAN | x | | | |
| | | | | | | |

Rev 5/3/99

DELPHI CONFIDENTIAL

# DELPHI MACHINERY & EQUIPMENT/CONSTRUCTION/INDIRECT
# REQUEST FOR SOURCING

Delphi Purchasing Request # **C9600068**

## TO BE COMPLETED BY ENGR/REQUESTER

TO: _____

TEL: _____    FAX: _____

| | |
|---|---|
| Project Name: | INNER & OUTER RACE PROTOTYPE BLANKET (BUILD TO PRINT) |
| Costbook($): | $2,968,369    Capital or Expense:  E |
| Appropriation Request # | Req. # |
| Appropriation Request Provision ($): | |
| Delivery Date: | Spec Avail. Date: |
| Bids Out Date: 22-Jun-99 | Bids Due Date: 20-Jul-99 |
| Division/Location: | Delphi Steering Systems/Prototype Headquarters |
| Platform/Program: | Halfshaft/various |
| Engineer/Requisitioner: | Mark Martin |
| Phone: 8-357-4614 | Fax: 8-357-3866 |
| Financial Contact: | |
| Phone: | Fax: |

## TO BE COMPLETED BY PURCHASING:

TO:    **Dick Ballou**

TEL:  **8-276-4935**    FAX: **8-276-4941**

Date:  14-Jun-99

Buyer Name:  Allen Fisher

Phone 8-357-3072    FAX: 8-357-9075

Planned Award Date:  18-Oct-99

Sourcing Strategy:  BEST/LOW BID

Comments:

To provide the prototype center with a Blanket Order for three

years renewable at end of term for inner & outer races.  This contract inludes the aggreement that the supplier will purchase an Excello Model XG-690 to facilitate our requirements.

## PROJECT/EQUIPMENT/MATERIAL DESCRIPTION

Supplier will have a three year contract to supply the prototype center with Inner & Outer races.  Supplier must purchase an Excello Machine with a cost of $622,000.  Delphi Saginaw shall purchase and provide all non-perishable tooling, estimated cost to Saginaw is $300,000.  The purpose for this project is to help the Prototype center cut the lead time out of the inner & outer race machining process.

## RECOMMENDED SOURCES

| MS | COMPANY | MFG. LOCATION | DUNS NO. |
|---|---|---|---|
| | CENTRAL TOOL ROOM | DELPHI SAGINAW STEERING/PLANT 03 | 059158456 |
| | ANCON PROTOTYPE | 1755 WICCO RD.,  SAGINAW, MI  48601 | 608814059 |
| | BELL ENGINEERING | 735 S. OUTER DR., SAGINAW, MI 48601 | 006523450 |
| | RANGER TOOL & DIE | 317 SOUTH WESTERVELT, SAGINAW, MI 48604 | 5514740 |
| | MISTEQUAY GROUP, LTD. | 1212 N. NIAGARA STREET,  SAGINAW, MI 48605 | 825362650 |
| | MERRILL TOOL | 20720 GRATIOT RD., MERRILL, MI 48637 | 926404120 |
| | COLD FORM TECHNOLOGY | 6556 ARROW DR., STERLING HEIGHTS, MI 48314 | 800130551 |
| | PANDA PRECISION | 28046 OAKLAND OAKS CT., WIXOM, MI  48393 | 803855196 |
| | PARAVIS INDUSTRIES INC. | 1597  ATLANTIC BLVD., AUBURN HILLS,  MI.  48326 | 098013725 |
| | DYNAMIC PROTOTYPE OPERATION | 2193 EXECUTIVE HILLS BLVD., AUBURN HILLS, MI.  48326 | 835469321 |

Rev 5/3/99

DELPHI CONFIDENTIAL

## INTRODUCTION - "HISTORY/OVERVIEW"

**ACTION PLAN/DPR #:**   C9600068

**P/N or DESCRIPTION:**   INNER & OUTER RACE PROTOTYPE BLANKET (BUILD TO PRINT)

**INTRODUCTION/HISTORY:**

To provide the prototype center with a Blanket Order for three years for inner

& outer races.  This contract includes the aggreement that the supplier will purchase an Excello Model XG-690

machine to facilitate our requirements.       This contract is open for use to the Delphi Paris and Mexico

Tech. Centre locations.

**STRATEGIES:**

Best/Low Bid

05/03/1999

# EXHIBIT B

# ANCON

## PROTOTYPE / MACHINE

(A Division of H.E. Services)

1755 Wicco Rd. • Saginaw, Michigan 48601 • (517) 755-0328 • FAX (517) 755-0330

**TO:**   Al Fisher

**FROM:**   Darrin Krogman  D.K.

**DATE:**   July 20, 1999

**RE:**   Delphi's RFQ. No. S30000009, Inner & Outer Race

We are pleased to submit the following quote:

Monthly Equipment/Maintenance Cost/Training for an Ex-Cell-O XG-690 Milling &
Grinding Machine:   $16,607.00 for a period of 3 years.

- Price based on $450,000.00 Purchase of Excello Model XG-690.
- Three year contract doing minimum of 3454 pcs. Inner Races and 3569 pcs. Outer Races per year.
- Ancon to provide all maintenance and repair to the Excello Machine.
- Three Ancon employees to be trained at the Excello Plant in Germany.
- All equipment and estimated 1000 sq. ft. to be dedicated solely to Delphi. Includes storage space for raw material and blanks.
- Delphi to provide all steel, blanks, heat treating, broaching, and cold forming of splines and threads for races.
- All tooling and special equipment necessary to produce inner and outer races to be provided by Delphi.

### Outer Races

| | | | |
|---|---|---|---|
| SX046486 | Race, C/G Joint Outer | $220 | Solid |
| SX040689 | Race, C/G Joint Outer | $243 | Solid |
| SX034440 | Race, D/O Joint Outer | $166 | Blank |
| 26076827 | Race, C/G Joint Outer | $195 | Blank |
| SX046443 | Race, C/G Joint Outer | $220 | Solid |
| 26080617 | Race, C/V Joint Outer | $245 | Solid |
| 26080615 | Race, C/V Joint Outer | $245 | Solid |
| SX046875 | Race, Male D/O Joint Outer | $216 | Solid |
| SX043369 | Race, Female D/O Joint Outer (Delphi to Broach) | $221 | Solid |
| 4500112 | Outer Race | $228 | Forging |

### Inner Races

| | | | |
|---|---|---|---|
| 4500115 | Race, C/V Joint Inner | $150 | Forging |
| SX044901 | Race, D/O Joint Inner | $159 | Solid |
| SX042709 | Race, C/V Joint Inner | $130 | Solid |
| SX046447 | Race, C/V Joint Inner | $120 | Solid |
| SX046490 | Race, C/V Joint Inner | $120 | Solid |
| SX042709 | Race, C/V Joint Inner | $137 | Solid |
| 26058593 | Race, C/V Joint Inner | $137 | Solid |



- All races will be 100% inspected on a Zeiss Prismo Vast (CMM) A2LA Certified Facility.
- QS-9000 Certified/Air Conditioned Plant.
- Minority Owned Business Enterprise (MBE) and is a recognized Delphi Equal Partner.

If you have any questions on this quote, feel free to contact me.  Thank you for the opportunity to provide this quote.

EXHIBIT C



## PROTOTYPE / MACHINE

(A Division of H.E. Services)

1755 Wicco Rd. • Saginaw, Michigan 48601 • (517) 755-0328 • FAX (517) 755-0330

**TO:**      Al Fisher

**FROM:**    Darrin Krogman

**DATE:**    September 22, 1999

**RE:**      Delphi's RFQ. No. S30000009, Inner & Outer Race

We are pleased to submit the following quote:

### Inner and Outer Races made from bar stock:

| Part Cost | Excello Machine Cost | Total Cost |
|-----------|----------------------|------------|
| $95.40    | $29.50               | $124.90    |

### Inner and Outer Races made from provided blanks:

| Part Cost | Excello Machine Cost | Total Cost |
|-----------|----------------------|------------|
| $77.40    | $29.50               | $106.90    |

- Price based on $520,000 Purchase of Excello Model XG-690.
- Three year contract doing minimum of 3454 pcs. Inner Races and 3569 pcs. Outer Races per year.
- Ancon to provide all maintenance and repair to the Excello Machine.
- Three H.E. Services employees to be trained at the Excello Plant in Germany.
- All equipment and estimated 1000 sq. ft. to be dedicated solely to Delphi. Includes storage space for raw material and blanks.
- Delphi to provide all steel, blanks, heat treating, broaching, and cold forming of splines and threads for races.
- All tooling and special equipment necessary to produce inner and outer races to be provided by Delphi.
- Additional requirements subject to price adjustment if necessary.
- Races will be inspected on a Zeiss Prismo Vast (CMM) at our A2LA Certified Facility.
- QS-9000 Certified/Air Conditioned Plant.
- Minority Owned Business Enterprise (MBE) and is a recognized Delphi Equal Partner.
- We will be able to do hard milling upon receipt of tooling cost along with set-up and run times.
- Engineering development time will be quoted at $80 per hour.

EXHIBIT D



# PROTOTYPE / MACHINE

(A Division of H.E. Services)

1755 Wicco Rd. • Saginaw, Michigan 48601 • (517) 755-0328 • FAX (517) 755-0330

**TO:** Al Fisher

**FROM:** Darrin Krogman

**DATE:** October 12, 1999    *mBo S3B000 28*

**RE:** Delphi's RFQ. No. S30000009, Inner & Outer Race

We are pleased to submit the following quote:

**Inner and Outer Races made from bar stock:**

| Part Cost | Excello Machine Cost | Total Cost |
|-----------|----------------------|------------|
| $95.40 | $35.30 | $130.70 |

**Inner and Outer Races made from provided blanks:**

| Part Cost | Excello Machine Cost | Total Cost |
|-----------|----------------------|------------|
| $77.40 | $35.30 | $112.70 |

- Price based on $622,000 Purchase of Excello Model XG-690.
- Three year contract doing minimum of 3454 pcs. Inner Races and 3569 pcs. Outer Races per year.
- Ancon to provide all maintenance and repair to the Excello Machine.
- Three H.E. Services employees to be trained at the Excello Plant in Germany.
- All equipment and estimated 1000 sq. ft. to be dedicated solely to Delphi.  Includes storage space for raw material and blanks.
- Delphi to provide all steel, blanks, heat treating, broaching, and cold forming of splines and threads for races.
- All tooling and special equipment necessary to produce inner and outer races to be provided by Delphi.
- Additional requirements subject to price adjustment if necessary.
- Races will be inspected on a Zeiss Prismo Vast (CMM) at our A2LA Certified Facility.
- QS-9000 Certified/Air Conditioned Plant.
- Minority Owned Business Enterprise (MBE) and is a recognized Delphi Equal Partner.
- We will be able to do hard milling upon receipt of tooling cost along with set-up and run times.
- Engineering development time will be quoted at $65 per hour, time and a half on Saturdays, and double time on Sundays.
- Price reduction after the first year for the next 2 years will be 3%, 3%.

EXHIBIT E

# ANCON
# PROTOTYPE/MACHINE

## PROPOSAL TO
## MANUFACTURE

## INNER AND OUTER RACES
## USING THE XG690 EX-CELL-O
## MACHINING CENTER

"Servicing Your Prototype Machining Needs"

# CONTENTS

Assessment of Needs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1
Available Facilities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1
Ancon Prototype Machine . . . . . . . . . . . . . . . . . . . . . . . . . .    2
Universal Tool . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2
Universal Inspection  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2
Training  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2
Proposed Plan  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2
Summary  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3
Ancon QS 9000 Certificate  . . . . . . . . . . . . . . . . . . . . . . . .    4
Universal Tool QS 9000 Certificate . . . . . . . . . . . . . . . . . .    5
Universal Inspection A2LA Certificate  . . . . . . . . . . . . . . .    6
Ancon Equipment List . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7
Universal Tool Equipment List . . . . . . . . . . . . . . . . . . . . . .    8
Universal Inspection Equipment List . . . . . . . . . . . . . . . . .    9
Universal Tool Plant Layout  . . . . . . . . . . . . . . . . . . . . . . .    10
Universal Inspection Plant Layout . . . . . . . . . . . . . . . . . . .    11



# PROTOTYPE / MACHINE ———————

(A Division of H.E. Services)

1755 Wicco Rd. • Saginaw, Michigan 48601 • (517) 755-0328 • FAX (517) 755-0330

**TO:**     Al Fisher
            Bill Lemmer
            Jim Sundeck

**DATE:**   8-20-99

**RE:**     Proposed plan to manufacture prototype C/V Joints using the
            Excello XG 690 Machining Center.

Ancon Prototype & Machine would like to thank the Delphi Prototype Purchasing
Department for the opportunity to quote on this program. We feel that we have a plan
that will work well for your requirements.

## Assessment of Needs

- To find a dedicated supplier to purchase an Excello Machining Center for the
  manufacture of prototype C/V Joint components for Delphi.
- Improving quality of C/V Joint components.
- Improving delivery of C/V Joint components.
- A Zeiss Prismo Vast CMM must be located near the Excello Machining Center.
- Three operators should be trained on the proper use of the equipment.
- Close proximity to Delphi Engineering is an important factor.
- C/V Joint components can be manufactured for Delphi Saginaw only and not for
  Delphi competitors.
- The operation shall have the ability to be blocked off from sight within the suppliers
  operation.
- No competitors or their suppliers shall be allowed to view this operation.
- The supplier shall maintain final responsibility for GP-11 inspection.

## Available Facilities

Based on the needs listed above, we have set forth the following plan which will utilize
Ancon Prototype, Universal Tool, and Universal Inspection. These three facilities are
divisions of H.E. Services. Each division has an excellent track record in both quality
and delivery. Ancon and Universal Tool have been awarded QS 9000 Certification.
Universal Inspection is an A2LA accredited laboratory. Certificates showing these
achievements are included with this proposal. Each of these three divisions are within a

1

five minute drive from Delphi Engineering and Prototype allowing for excellent customer/supplier relations. The following is a brief description of each location:

## Ancon Prototype & Machine
Ancon has been making quality prototype components for Delphi Saginaw for over 18 years. Ancon's highly skilled machinists and programmers utilize the latest technology in CNC machining and programming. An equipment list is included which shows the wide variety of equipment available including a Zeiss CMM to verify the quality of prototype parts. Ancon is the leader in quality and delivery for prototypes.

## Universal Tool
Universal Tool is a facility specializing in fixture and detail work. Universal Tool is an extension of Ancon with its excellent track record of quality and on time delivery. Their equipment list will show a variety of machines, most of which are manual. Universal Tool has a 1000 square foot section in the back of the building which will make a perfect site for the Excello Machining Center. There is a sliding door that allows that area to be segregated from the rest of the facility.

## Universal Inspection
Universal Inspection is a state-of-the art inspection laboratory. Their equipment list includes a Zeiss Prismo Vast CMM which is needed for the proper inspection of Inner and Outer Races. Universal Inspection is located next door to Universal Tool which addresses the need of having the Excello Machine in close proximity to the Zeiss Prismo Vast CMM. Universal Tool's highly skilled programmers and operators have experience in the programming and inspection of Inner and Outer Races for Delphi Engineering.

## Training
Ancon and Universal Tool have the most highly skilled Tool Makers and machinists in the area. We will have three of our top journeyman toolmakers trained in the operation and set-up of the Excello Machining Center.

## Proposed Plan
1. Incoming material will be received at Ancon according to QS 9000 procedures.
2. Parts will be machined at Ancon on all operations required previous to the Excello operations and verified for accuracy on the Zeiss CMM.
3. Parts requiring spline rolling will be sent to Cold Forming Tech or another Delphi approved source. Ancon will inspect outsourced machining.
4. Parts will be sent to Universal Tool for ball groove machining on the Excello Machine prior to heat treat.
5. Inspection will be done in process on the Prismo Vast CMM at Universal Inspection to be sure the parts will have the proper amount of material left for finish machining after heat treat and verification of previous operations.
6. Parts will be sent to Delphi for heat treat or another Delphi approved source. Heat Treat certification will be verified.
7. Parts will be O.D. or I.D. ground if necessary at Ancon or Universal Tool. Parts will be checked for accuracy on the Zeiss CMM.

2

8.  Ball Grooves will be finish machined at Universal Tool on the Excello Machine and inspection will be done in process at Universal Inspection on the Zeiss Prismo Vast CMM, according to Delphi requirements.

9.  All inspection data will be gathered and GP-11 paperwork will be finalized after thorough review to be sure all dimensions meet print specifications.

10. Warrant and all necessary documentation will be organized and completed prior final shipment.

11. Parts will be packaged and shipped according to Delphi requirements.

## Summary

Ancon/H.E. Services has the resources necessary to meet and exceed the requirements of this program. Our commitment to customer satisfaction is second to none. We understand the importance of this program and the impact it will have on the half shaft business for Delphi. We have an excellent quality system in place at all three proposed locations and all are within minutes of Delphi Engineering and Prototype. Our Universal Inspection facility has a Zeiss Prismo Vast CMM which is a requirement for this program. The Excello Machining Center will have its own dedicated area that can be closed off from the rest of Universal Tool simply by pulling a sliding door shut. This area is also large enough to add three more Excello Machines if future business demands more volume. Please review the Quality Certificates, plant layouts, and equipment lists included in this proposal. We will work to the best of our ability to meet any target prices that are put forward that will allow us to be awarded this business. Thank you for your consideration.

Sincerely,

Darrin Krogman

Darrin Krogman
Operations Manager

3

# REGISTRATION

Perry Johnson Registrars, Inc., has assessed the Quality System of:

**Ancon Prototype and Machine**
*Division of H.E. Services*
*1755 Wicco Road*
*Saginaw, MI 48601*

(hereinafter called the Supplier) and hereby declares that Supplier is in compliance with:

***ISO 9002:1994 and QS-9000:1995***

This Registration is in respect to the following scope of supply:

*Prototype precision machining, edm, molds, small stampings and small production manufacturing*

*(Supplier has been audited in accordance with the requirements of the QS-9000, Appendix B "Code of Practice")*

Such products shall be manufactured by the Supplier at, or such processes or services shall be offered at or from, only the address given above. This Registration is granted subject to the system rules governing the Registration referred to above, and the Supplier hereby covenants with the Assessment body duly to observe and comply with the said rules.

For PJR

PERRY JOHNSON REGISTRARS, INC.
26555 Evergreen, Suite 1340
Southfield, MI 48076
(248) 358-3388

**Issue date:**    May 22, 1998

**Expiration Date:**    May 21, 2001





PERRY JOHNSON
REGISTRARS, INC.

**Cert. No.**    98-177

Accredited by the
RvA Dutch Council
for Accreditation

ACCREDITED

ANSI • RAB    QMS

4



# PERRY JOHNSON REGISTRARS, INC.

*Certificate of Registration*

*Perry Johnson Registrars, Inc., Has assessed the Quality System of:*

## Universal Tool & Manufacturing
### 3860 East Washington
### Saginaw, MI 48601

*(Hereinafter called the Organization and hereby declares that Organization is in conformance with:*

### ISO 9002:1994 and QS-9000:1995

*This Registration is in respect to the following scope of supply:*

## Production, Manufacturing, Assembly, Prototype, Fixtures and Tooling Activities Serving the Automotive Industry Including Aftermarket and Service Parts
**(Supplier has been audited in accordance with the requirements of the QS-9000, Appendix B "Code of Practice")**

*Such products shall be manufactured by the Organization at, or such processes or services shall be offered at or from, only the address given above. This Registration is granted subject to the system rules governing the Registration referred to above, and the Organization hereby covenants with the Assessment body duty to observe and comply with the said rules.*

For PJR:

Terry Boboige, President

Perry Johnson Registrars, Inc. (PJR)
26555 Evergreen, Suite 1340
Southfield, Michigan 48076
(248) 358-3388





Accredited by the
RvA, Dutch Council
for Accreditation



PERRY JOHNSON
REGISTRARS, INC.

*The validity of this certificate is mandated through ongoing surveillance.*

| Issue Date: | Expiration Date: | Certificate No.: |
|---|---|---|
| February 18, 1999 | February 17, 2002 | 99-039 |



**THE AMERICAN
ASSOCIATION
FOR LABORATORY
ACCREDITATION**

# ACCREDITED LABORATORY

A2LA has accredited

# UNIVERSAL INSPECTION
**Saginaw, MI**

for technical competence in the field of

## Calibration

The accreditation covers the specific calibrations listed on the agreed scope of accreditation.  This laboratory meets the requirements of ISO/IEC Guide 25-1990 "General Requirements for the Competence of Calibration and Testing Laboratories" (equivalent to relevant requirements of the ISO 9000 series of standards), ANSI/NCSL Z540-1-1994, and any additional program requirements in the identified field of calibration.

Presented this 19th day of March, 1999.

President
For the Accreditation Council
Certificate Number 1332.01
Valid to 05/31/2001

For the calibrations to which this accreditation applies, please refer to the laboratory's Calibration Scope of Accreditation

6



## PROTOTYPE / MACHINE

(A Division of H.E. Services)

1755 Wicco Rd. • Saginaw, Michigan 48601 • (517) 755-0328 • FAX (517) 755-0330

### EQUIPMENT LIST

| | |
|---|---|
| 1 | CNC MILL, HAAS VF-1 W/20 HEAD TOOL CHANGER (16" X 20" TRAVEL) |
| 1 | CNC MILL, HAAS VF-3 W/20 HEAD TOOL CHANGER (40" X 20" TRAVEL) |
| 1 | CNC MILL, HAAS VF-4 W/20 HEAD TOOL CHANGER (50" X 20" TRAVEL) |
| 3 | CNC MILL, MAZAK VTC-16B W/24 HEAD TOOL CHANGER (44" X 16" TRAVEL) |
| 3 | CNC MILLS, SUPERMAX YCM 40 |
| 1 | CNC MILL, MAZAK 20/40B W/ 30 HEAD TOOL CHANGER (36" X 24" TRAVEL) |
| 12 | BRIDGEPORT MILLS, ALL FITTED WITH X & Y READOUTS |
| 5 | PROTO-TRAK BRIDGEPORT RETRO FITS WITH CNC X & Y AXIS |
| 1 | CNC WIRE EDM, JAPAK LDM 20A |
| 1 | CNC WIRE EDM, FANUC ROBOCUT |
| 1 | KING SPARK EDM PLUNGE WITH 2 AXIS CNC ORBITAL HEAD |
| 4 | CNC LATHE, MAZAK 15 N WITH 8 TOOL TURRET HEAD |
| 2 | MASTERCAM CNC PROGRAMMING STATIONS, LEVEL 3 |
| 1 | MASTERCAM CNC PROGRAMMING STATION, LEVEL 2 |
| 1 | MASTERCAM CNC WIRE EDM PROGRAMMING STATION |
| 2 | LATHES, CLAUSING COLCHESTER (1) 17" & (1) 15" |
| 4 | PRESSES, (2) 150 TON DAKE, (2) 75 TON DAKE |
| 3 | PRESSES, 25 TON K.R. WILSON |
| 3 | HYDRAULIC, AUTOMATIC PRESSES |
| 1 | GRINDER, 6" I.D./O.D., MYFORD |
| 1 | SURFACE GRINDER, 6" X 18", HARIG |
| 1 | SURFACE GRINDER, 24" X 36", KINKINDA |
| 1 | SURFACE GRINDER, 6" X 18", KENT |
| 1 | BRIDGEPORT #30 2 HEAD, TRACER DUPLICATOR |
| 2 | HORIZONTAL BANDSAW |
| 3 | VERTICAL BANDSAW |
| 1 | POWER SHEAR, 10 GAGE (.135), NATIONAL |
| 1 | CMM ZEISS (36 X 48) ZEISS ECLIPSE DCC CMM W/ZEISS ST PROBE HEAD |
| 1 | DELTRONIC OPTICAL COMPARATOR |
| 1 | BROWN & SHARP MICRO-HITE HEIGHT GAGE |
| 1 | MITUTOYO SURFACE TESTER |
| 1 | SATO HARNESS TESTER |
| 1 | O.B.I., 35 TON, BUSS PRESS |
| 2 | VIBRATORY TUMBLER, 40 GALLON & 30 GALLON, GIANT MFG. |
| 1 | HYDRAULIC IRONWORKER, JAWS 4, EDWARDS |
| 1 | DRY BLAST, 36" X 24", TRINCO |
| 1 | POWER HONE, MODEL J, SUPERIOR HONE |
| 1 | VACUUM PUMP W/ CHAMBER, 1/2 H.P., GAST INC. |
| 1 | DIASCO CYLINDER LINE BENDER |

7

QF-42
REV. 005
5-1-99



Division of H.E. Services

3860 E. Washington Road, Saginaw, Michigan 48601

BUS. (517) 753-6221   FAX (517) 753-6472

## MACHINE TOOL INVENTORY

| | |
|---|---|
| 2 | PROTOTRACK CNC VERTICAL MILLS |
| 9 | VERTICAL MILLS, ALL FITTED WITH DRO ON X & Y AXIS |
| 1 | CNC MILLS, SUPERMAX YCM 40/ WITH ANILAM CONTROL |
| 2 | LATHE, JET WITH SONY DRO ON X & Y AXIS, 14" SWING X 40" BED |
| 1 | ID/OD GRINDER, CINCINNATI, 14" SWING X 36" BED |
| 1 | SURFACE GRINDER, ABRASIVE MACHINE TOOL, 6" X 16" |
| 1 | HYDRAULIC PRESS, 50 TON |
| 1 | KR WILSON 25 TON PRESS |
| 1 | O.B.I, 35 TON PRESS, NIAGARA M-35 |
| 1 | O.B.I, 32 TON PRESS, U.S. INDUSTRIES |
| 1 | SHEAR, PEXTO (FOOT) 52" X 16 GAGE |
| 1 | CUT-OFF SAW, EMERSON 7" WET CUTTING, HORIZONTAL BANDSAW |
| 1 | BANDSAW, DAKE/JOHNSON VERTIACAL, VARIABLE SPPED W/WELDER |
| 1 | 12 SPEED DRILL PRESS |
| 1 | WIRE WELDER, LINCOLN IDEAL ARC SP 150 |
| 1 | TIG WELDER, MILLER SYNCROWAVE 250 |
| 1 | SAND BLASTER, TRINCO |
| 1 | SPOT WELDER, MILLER |
| 1 | AIR COMPRESSOR, DAYTON #52592, 5HP |

QF-90
REV. 004
6/9/99

# UNIVERSAL INSPECTION
### Division Of H.E. Services
### A2LA ACCREDITED LABORATORY ISO/IEC-GUIDE 25

Universal Inspection Division specializes in providing total coverage for all our customers' inspection needs. This third party inspection facility is equipped with the very latest and highest quality measurement equipment as well as highly qualified personnel to provide "world class service". Services such as Zeiss CMM inspection, gage calibration and certification, gage R & R studies, general part inspection, layout work, production sorting and rework including level II containment services, hardness and surface finish inspection, and optical comparison studies are available. Our temperature and humidity monitored laboratory enables us to measure to an accuracy range of .000005 of an inch (.000127mm).

The latest addition to our inspection facility is a state-of-the-art <u>Zeiss Prismo Vast CMM machine.</u> This machine is recognized as the current world standard and provides continuous probe contact scanning ability with reverse engineering capabilities. This ultra-precise system will bring any company to that "next level" of inspection accuracy.

Also, we can support your company in providing commodity calibration management and sample approval inspection data including PPAP and GP-11 requirements thus meeting all QS-9000 standards.




## <u>List of measuring instruments and capabilities:</u>

◆ Zeiss Prismo Vast CMM X-900mm, Y-1500mm, Z-650mm (Accuracy +/- .0017mm)
◆ Zeiss Eclipse CMM X-715mm, Y-1016mm, Z-510mm (Accuracy +/- .0025mm)
◆ Zeiss Eclipse CMM X-711mm, Y-1016mm, Z-600mm (Accuracy +/- .002mm)
◆ Mitutoyo M-801 Mu Checker (Accuracy +/- .000127mm)
◆ Mitutoyo Ceramic Master Gage Block Set (Accuracy +/- 5 micro inches)
◆ (2) Brown & Sharp Micro Height Gages (Accuracy +/- .005mm)
◆ Starrett/Sigma Optical Comparator (Accuracy +/- .005mm)
◆ Deltronic Controlled Optical Comparator (Accuracy +/- .005mm)
◆ Mitutoyo Surf Tester-Print Out Readings (Ra, Rq, Rz, Rmax, Rp, Rt, Pc, Tp)
◆ Taylor Hobson Surtronic 3+ Surface Measurement Tester (all surface texture parameters)
◆ Mitutoyo Digital Hardness Tester (full range of hardness checking on carbide, ceramic, steel, non-ferrous metal, plastic, grinding stones)
◆ Sato Hardness Tester (Rockwell Hardness HrA, HrB, HrC)
◆ (7) Grade AA Granite Surface Plates

July 12,1999

 **UNIVERSAL INSPECTION DIVISION**
3870 E. WASHINGTON, SAGINAW, MI 48601 • TELEPHONE (517) 758-0950 • FAX (517) 758-0954 • http://www.heservices.com
CONTACT PERSON: LEE LAMBERT



10

H.E. SERVICES
TECH CENTER

SAGINAW, MI
48601

H.E. QUALITY
ENGINEERING LAB

S. REZMER | NO SCALE | 05MR98

UNIVERSAL INSPECTION

N
W    E
S

UNIVERSAL INSPECTION
3970 E. WASHINGTON
SAGINAW, MI 48601

SHIPPING & RECEIVING DOCK

HANDICAPPED PARKING

CUSTOMER PARKING

CUSTOMER PARKING

BATHROOM

BATHROOM

RECEPTIONIST OFFICE

DOCUMENT CONTROL CENTER

SINK AREA

MANAGER OFFICE

STORAGE CABINETS

LAYOUT PLATE

ZEISS CMM

LAYOUT PLATE

MITUTOYO CMM

CONFERENCE ROOM

OPTICAL COMPARATOR

HARDNESS TESTER

SURFACE TESTER

CONTROL PART TEMPATURE TABLE

REJECT AREA

SORT TABLES

INCOMING PARTS

CONTAINMENT AREA

SORT TABLES

HOLD AREA

SHIPPING PARTS

LUNCH ROOM

OVERHEAD DOOR

SHIPPING & RECEIVING DOCK

AIR COMPRESSOR

BREEZE WAY

11

EXHIBIT F

Date:  31JAN01

Subject:   Ancon's order to purchase an Excello machine to manufacture
            all prototype inner and outer races for halfshafts.

To:        Duane Bollinger

From:      Bruce Waslusky


Attached is a copy of a letter to Excello from Joe Stearns at Ancon (HE
Services).

He seemed very concerned that you have a copy of this although I fail to
see the significance.  I promised I would forward a copy and it is attached.

Ancon's purchase of this equipment is between them and Excello and
other than our obvious concerns that the equipment be capable, the
commercial issues between the two companies is really none of our affair.
That attitude is what has been conveyed to Joe and Ancon.

**HES**

ENGINEERING / TESTING

MANUFACTURING

H.E. SERVICES • 225 E. MORLEY DR. • SAGINAW, MI 48601 • (517) 753-9015 • FAX (517) 753-7703

January 23, 2001

Mr. U. Stuhlmuller, Sales Manager
Ex-Cell-O Corporation
Werkzeugmaschinen
Sondermaschinen

Dear Mr. Stuhlmuller,

As you are well aware, Ex-Cell-O grinding machine XG 690 (ref. P.O. 53510057) was quoted to be delivered to H.E. Services, in Saginaw, Michigan by Sept. 15, 2000.

As of this date, this machine is still at your factory and, in fact, is not capable of producing a part to specification. It is imperative that you make the necessary corrections to this machine as soon as possible so that it will function properly. If this requires the use of a different controller, then you must propose this as a solution immediately.

H.E. Services has incurred substantial costs as a direct result of your failure to deliver the machine on schedule. To date, the four-month delay has created the following losses, in US funds, to H.E. Services:

- Lost business---------------------------------------------------------$80,010
- Trips to Germany for training and machine runoff (wasted trips)-------$18,500
- Financial commitments to bank---------------------------------------- $66,110
- Employee labor costs-------------------------------------------------$43,200

Losses to date:   $207,820

Obviously, continued delays in delivering this machine, to specification, will increase the losses incurred to H.E. Services. The losses shall be deducted from the purchase price as follow:   $621,696- $207,820 = $413,876

Also, it will be your responsibility to train our personnel in the proper operation and programming of this machine once it arrives in Saginaw, Michigan. As you know, a significant amount of time has passed and the actual training received by our people while in Germany was very minimal as the machine would not function at that time.

Please respond in writing as to the plan for Ex-Cell-O to address the above issues and the timing for approval run-off, shipping and receipt at our plant in Saginaw, Michigan.

Sincerely,

Joseph A. Stearns
VP engineering and Manufacturing

Cc: Robert Backie, CEO
Timothy Fortier, President

# EXHIBIT G

Wednesday, February 28, 2001

## MINUTES OF CONFERENCE CALL WITH EXCELLO

**PRESENT AT THE CALL MEETING:**
Tom Arnold, Mark Martin
Lee Lambert, Barry Torrey
G. Kieffer, Excello, Germany)

1- Fanuc has added acceleration/de-acceleration interpolation to the controller, making it equal to the Seimens controller. This will be proven in grinding 23 size inboards this week. Summarizing inspection data will be Friday or Monday (Feb 5). The purpose of the next call will be to decide which controller will be on the machine.

2- Tom expressed concern about running out of expensive prototype parts in processing verification runs. Excello was asked to determine the inventory of 23 size inboards and call Loren with the number.

3- Lee expressed a concern about the time delay while doing R & D on the controller. He requested a timeline from Excello for shipping machine.

4- Lee will get a call from Kieffer of Excello, Friday, March 2 if the have grinding results are available.

5- Tom reminded Excello there has already been a 15 week delay and Delphi has had to process many parts alternative and expensive ways.

**NEXT PHONE MEETING; MONDAY, MARCH 5, AT 9:00**

*Loren Kramer*

Loren Kramer
Supplier Development

CC
Jerry Eaton, Bill Lemmer, David McGregor, Bruce Waslusky, Joe Stearns – Ancon

# EXHIBIT H

March 5, 2001

## MINUTES OF CONFERENCE CALL WITH EXCELLO

**PRESENT AT THE CALL MEETING:**
Tom Arnold, Mark Martin, Joe Zielinski, Dino Tsoukleris
Lee Lambert, Barry Torrey
G. Kieffer, Excello, Germany)

1- Excello is convinced the Fanuc controller is equivalent to the Seimens controller but still did
not offer a timeline as was requested for this special meeting. They faxed inspection detail
for 1 inner race, 23 size, that has 4 micron surface finish results.

2- Excello has 17 inner races left of 23 size and want to have Lee Lambert in Germany to
provide quick decisions of parts coming of the machine before they run any more. They
offered to pay for flight and motel to facilitate this activity.

3- Excello Manager (name unknown ) reports activity on machine now is to optimize machine
to controller, an activity that should have happened 3 months ago and that would also need to
happen if the Seimens controller is substituted. This will take 2-4 weeks.

4- (Manager) Excello has never been asked to grind the form the Delphi design requires. They
may need to have some compromising design decisions during the optimization.

5- It was agreed to reconvene tomorrow with travel decisions.


**NEXT PHONE MEETING; TUESDAY, MARCH 6, AT 9:00**


Loren Kramer
Supplier Development

CC
Jerry Eaton, Bill Lemmer, David McGregor, Bruce Waslusky, Joe Stearns – Ancon

EXHIBIT I

NOV 03 '99 12:55

PAGE.03

# DELPHI AUTOMOTIVE SYSTEMS
## Purchase Request

Shaded areas are required fields

|  | SB PO / REL No. | S3B | Req. No. |
|--|--|--|--|
|  | MBO / BL PO No. | | PR233556 |
|  | PO# / Alt. | | |

**Supplier** ANCON TOOL & DIE INC

| Duns No. 60B814059 | Date 10/29/1999 | APA Rec'd | Require 10/01/2000 |
|--|--|--|--|

**Address** 1755 WICCO RD

| | Fax No. | Ship To PO 3PI | | Promise |
|--|--|--|--|--|

SAGINAW                    MI        48601

| | | Rec.Notly  Jay Mikolaizik | Effective 10/01/2000 |
|--|--|--|--|

**Contact:** BARRY          Phone No. (517) 755-0328

| | | Phone (517) 757-4841  Mall/Plt | Fax | Expires 10/01/2003 |

**Tax Code:** 4A          Number: K9SE00411

| | | Deliver To |

WO Type: OTHER

| Qty | U/M | Est Cost | Actual Cost | GC 2 | GL 4 | Dept 5 | Sub Acct 5 | Corp 3 | Loc 3 | Prod 4 | 99 | 14 | 1 | Item ID/Description |
|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|
| 0 | EA | | $0.00 | | | | | | | | | | | NPN - 000     INNER RACE, OUTER RACE |

|  |  | Where Used / Remarks     EXCELLO MACHINE |
|--|--|--|
| **Total Est. Cost** | | * Complete GP-11 Submission REQUIRED |
| **Total Actual Cost** | $0.00 | ANCON IS BLANKET HOLDER FOR EXCELLO MACHINE |

Must Be Complete: Is a Substitute Material or Supplier Acceptable

Yes ☐      No ☑  Must Provide Justification

Invoice / Packing Slip

Service Approved / Completed

APA Rec'd Services

ANCON AGREES NOT TO USE EXCELLO MACHINE OR TOOLING FOR ANY OF DELPHI'S COMPETITORS. SUPPLIER WILL HAVE A SECURED AREA FOR EXCELLO MACHINE AND FOR MACHINE. ANCON WILL BE EVALUATED EVERY 1/4 ON VOLUME STARTING 3 MONTHS AFTER MACHINE IS PLACE AT UNIVERSAL TOOL AND RUN OFF IS SUCCESSFUL. PAYMENT FOR MACHINE IS INCLUDED IN PART PC PRICE. PRICE BASED ON A QUANTITY OF 7,000 PCS ANNUALLY. THIS PRICE WILL GO UP OR DOWN BASED ON ACTUAL VOLUME EVER 1/4 TO INSURE PAYMENT OF MACHINE. REFER TO ANCON'S QUOTE DATED 10/12/1999. APPROVED AT SOURCING ON 10/18/1999. SOURCING DECISION ATTACHED

| Originator | Phone | Haz'd Mat'l Appr. | | Acct. Appr. | | Clauses | | |
|--|--|--|--|--|--|--|--|--|
| SINIFF, DAVID | (517)757-3543 | | | | | Buyer | Shipper | |
| | 03-99-01 | | | | | Purchasing Manager | FOB  Shipping Point | |
| | | Date | Approval | Date | Approval | Date | Pay Terms  NET 25th | Date |

Refer to Signature Page included

**ORIGINAL - DELPHI**

DAS 2207 0199

Req. No. 00028 / 001/007

ENTERED NOV 0 3 1999

Kaup 11-3-99

Date 11/3/99

NOV 03 '99 13:57                                                                      PAGE.01

DELPHI CONFIDENTIAL

# DELPHI SOURCE RECOMMENDATION FORM
## INDIRECT/MACHINERY and EQUIPMENT

**DPR # C9600068**

| | M & E | |
|---|---|---|
| MEETING DATE: 10/18/99-Monday | INDIRECT | X |

**DIVISION/LOCATION:** Delphi Steering Systems/Prototype Headquarters

**DESCRIPTION:** INNER & OUTER RACE PROTOYPE BLANKET (BUILD TO PRINT)

**CREATIVITY TEAM NAME:**

**PROGRAM:** Halifax/various

**MODEL YEAR:**

LINKED / LEVERAGED:

DELIVERY DATE: 01-Oct-00

**APP. REQUEST #:** 0

**COSTBOOK $:** $2,968,369

**TARGET PRICE(S):** $2,551,500                        A/R $          $0

**BUYER:** Allen Fisher

**FINANCIAL:** 0                    PHONE: 8-357-3072

PHONE: 0

(DPR ) 3

| MS (*) | SUPPLIER | LOCATION | QUOTED PRICE $ | NEGOTIATED PRICE $ | BUYER SAVINGS $ | REDUCTION AGAINST AR/CB $ | % |
|---|---|---|---|---|---|---|---|
| | ANCON PROTOTYPE | SAGINAW, MI. | $3,144,255 | $2,662,359 | $481,896 | $306,010 | 10.31% |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**COMMENTS:** 3 year contract effective 10/01/2000/ Supplier req'd to purchase machine from Excello

Ancon's price reduction for 2nd & 3rd year. 3%, 3%

| | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|
| STATE COSTBOOK BY YEAR: | | $164,909 | $989,456 | | $824,547 |
| SAVINGS AGAINST AR/CB: | | $17,001 | $102,003 | $102,003 | $85,003 |

**APPROVAL SIGNATURES:**

| BUYER | REQUISITIONER | DIVISIONAL MANAGER |
|---|---|---|
| *(signature)* 10/18/99 | *(signature)* David B. Smith 10/18/99 | *(signature)* |

| COMMODITY MANAGER | DIVISIONAL/REGIONAL DIRECTOR | COMMODITY DIRECTOR | VICE PRESIDENT |
|---|---|---|---|
| *(signature)* 10/18/99 | | | |

ENTERED NOV 0 3 1999

Rev 5/3/99

11/03/99 14:33  FAX                        +++ DEMBT31                        @01

NOV 03 '99 13:58

PAGE.02

Dick Ross

DELPHI CONFIDENTIAL

# DELPHI SOURCE RECOMMENDATION FORM
## INDIRECT/MACHINERY and EQUIPMENT

DPR # C9600068

MEETING DATE: 10/18/99-Monday

| | M & E |
| --- | --- |
| INDIRECT | x |

**DIVISION/LOCATION:** Delphi Steering Systems/Prototype Headquarters

**CREATIVITY TEAM NAME:**

**DESCRIPTION:** INNER & OUTER RACE PROTOTYPE BLANKET (BUILD TO PRINT)

**PROGRAM:** Halfshaft/various

**MODEL YEAR:**

LINKED / LEVERAGED: _____

(DPR #)

DELIVERY DATE: 01-Oct-00

**APP. REQUEST #:** 0

**COSTBOOK $:** $2,968,369

**TARGET PRICE(S):** $2,551,500

**BUYER:** Allen Fisher

**FINANCIAL:** 0

A/R $    $0

PHONE: 8-357-3072

PHONE: 0

| MS (*) | SUPPLIER | LOCATION | QUOTED PRICE $ | NEGOTIATED PRICE $ | BUYER SAVINGS $ | REDUCTION AGAINST AR/CB | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | ANCON PROTOTYPE | SAGINAW, MI. | $3,144,255 | $2,662,359 | $481,896 | $306,010 | 10.31% |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**COMMENTS:** 3 year contract effective 10/01/2000 Supplier req'd to purchase machine from Excello

Ancon's price reduction for 2nd & 3rd year. 3%, 3%

**APPROVAL SIGNATURES:**

| | | 1999 | 2000 | 2001 | 2002 | 2003 |
| --- | --- | --- | --- | --- | --- | --- |
| STATE COSTBOOK BY YEAR: | | | $164,909 | $989,456 | $989,456 | $824,547 |
| SAVINGS AGAINST AR/CB: | | | $17,001 | $102,003 | $102,003 | $85,003 |

| COMMODITY MANAGER | BUYER | REQUISITIONER | COMMODITY DIRECTOR | DIVISIONAL MANAGER |
| --- | --- | --- | --- | --- |
| DIVISIONAL/REGIONAL DIRECTOR | | Oct 18 99 | | VICE PRESIDENT |

Rev 5Q/99

# DELPHI AUTOMOTIVE SYSTEMS

## Purchase Request

Bold areas are required fields

SB PO / REL No. S3B00028/003

Page ___ of ___

Req. No. 346553 / 233556

| Service | |
| --- | --- |
| Cap/Const. | |
| MBO / BL PO No. | |
| Other. | PO#/Alt. |

Supplier: ANION

Duns No. 6088/4059

| | | |
| --- | --- | --- |
| Fax No. | Date 5/6/02 | APA Rec'd — Required |
| Rec./Notify | Ship to Dock | Promised |
| | | Effective |

Address

Phone  Mail/Plt.  Fax  Expires

Contact: Barry

Phone No.

Deliver To

Tax Code: 4A  WO Type  Number

| Qty | U/M | Est. Cost | Actual Cost | GC 2 | GL 4 | Dept 5 | Sub Acct. 5 | Corp. 3 | Loc. 3 | Prod. 4 | Item ID / Description |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | | | | | |
| | | | (ALL) | | | | | | | | CANCEL BLANKET PO. |
| | | | | | | | | | | | IT HAS BEEN REISSUED AS |
| | | | | | | | | | | | S3B00059/001 |

Where Used / Remarks: EXCELLO

Total  Est.  Cost

Must be Complete: Is a Substitute Material or Supplier Acceptable

Yes ___  No ___  Must Provide Justification

Quote No.

| Clauses | |
| --- | --- |

ENTERED MAY 0 3 2002

Invoice / Packing Ship

Service Approved / Completed

APA Rec'd Services

| Originator | Phone | Haz'd Mat'l Appr. | Acct. Appr. | Date | Approval | Buyer | Date | Shipper | FOB | Pay Terms | Date |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Jill Sanborn | 7-3404 | | m'Kaulani | | | Purchasing Manager | Date | | | Approval | Date |

Buyer: Sanborn 5/6/02  S16

REQUISITIONER COPY

EXHIBIT J



December 13, 2001

## MINUTES 0F MEETING ON EX-CELL-O

**PRESENT AT THE MEETING:**
**Delphi:** Tom Arnold, Mark Martin, Brian Kohler, Jim Lu, Steve Thomas, Todd Norris
**H.E.S.:** Joe Stearns, Lee Lambert, Phil Howey

1-  The Ex-Cell-O machine arrived at H.E.S. this a.m.
2-  To take advantage of the technical personnel from Ex-Cell-O in January-February, this
    meeting was to determine what jobs are to be processed first.
    The 33 tooth, FTH design is first. Inspection data for this is already loaded in the Ziess. The
    need for collets and chucks will be determined and also if there is an existing blank for the
    outer race.
    The 2nd and 3rd jobs are to be; 14 size NBC and 28 tooth FTH. Again, the need for collets and
    chucks, and availability of blanks will be determined. John Gauruder will be required to load
    inspection programs on the Ziess.

### NEXT PHONE MEETING; THURSDAY, DECEMBER 20 @ 9:30

*Loren Kramer*
Loren Kramer
Supplier Development

CC
Jerry Eaton, Bill Lemmer, David McGregor, Bill Skvarla, Bruce Waslusky

EXHIBIT K

**HES** ENGINEERING / TESTING
MANUFACTURING

H.E. SERVICES • 225 E. MORLEY DR. • SAGINAW, MI 48601 • (517) 753-9015 • FAX (517) 753-7703

*Bruce,*
*• FOR YOUR INFORMATION.*
*• PLS DO NOT DIST. THIS LETTER*
*• MACHINE CYCLE TIMES*
*WERE GIVEN BY EX-CELL-O*
*TO DELPHI AND THEN BY*
*DELPHI TO ANCON TO*
*DEVELOP OUR FINAL*
*PART COSTS TO YOU.*
*SLOWER CYCLE TIMES*
*WILL AFFECT FINAL*
*COST OF PARTS*
*WE PRODUCE.*
*TIME WIL*
*TELL!*
*REGARDS*
*JOE*

March 14, 2001

Mr. Gerhard Eberle, CEO
Ex-Cell-O Corporation
Werkzeugmachinen
Sondermaschinen

Dear Mr. Eberle,

As I am sure you are aware, Ex-Cell-O Corporation still has not delivered the grinding machine XG 690 (P.O. 53510037) to H. E. Services in Saginaw, Michigan. The original promised delivery date was Sept. 15, 2000.

Your Company also has not responded in writing to our letter on this subject dated January 23, 2001. This letter requested your plan in writing to address the remaining issues and a new time-line schedule. Once again I am requesting a response from you in writing by no later than March 27, 2001.

I wish to clarify one issue. Machine cycle times were furnished by Ex-Cell-O as part of quotation No. 310.096.4.012 (copy attached). These cycle times were used in good faith to establish finished part cost figures. Therefore, cycle time verification must be included as part of the final run-off approval process.

What is your current position on the controller and what is your level of confidence that it will produce a "to specification" part every time?

I must reiterate that all of the requirements for machine performance, operator training, and machine run-off still apply and must carefully be reviewed prior to a time-line being finalized. We wait your response.

Sincerely,

*Joseph A. S. Stearns*

Joseph A. Stearns
VP Engineering and Manufacturing

Attachment:

Cc. Uli Stuhlmuller, Ex-Cell-O
    Robert Backie, CEO
    Timothy Fortier, President

10-AUG-1999  15:48        EX-CELL-O VERKAUF                    +49 7161 805347   S.03

| Delphi Automotive Systems | | | | | EX-CELL-O | | |
| Cycle Times Grinding | | | | | Quotation No. 310.096.4.012 | | |
| Workpart # | Type | Gauge Ball Dia | PCD | Trod Ø | Feed rate [mm/s] | Feed stroke | Cycle time (incl. machining load/unload) |
|---|---|---|---|---|---|---|---|
| ZG0B0615 | Outer Bell RF | 14,600 | 48,407 | 14,60 | 9,0 | 31 | 39 |
| ZG0B0617 | Outer Bell RF | 15,875 | 54,280 | 15,875 | 8,7 | 34 | 41 |
| 4500112 | Outer Bell RF | 17,462 | 60,212 | 17,462 | 8,0 | 37 | 45 |
| SX03440 | Outer Bell DO | 19,844 | 57,114 | 19,844 | 7,7 | 77 | 78 |
| SX046875 | Outer Bell DO | 20,638 | 61,538 | 20,638 | 7,0 | 88 | 93 |
| SX043360 | Outer Bell DO | 20,638 | 61,538 | 20,638 | 7,0 | 88 | 93 |
| 26076827 | Outer Bell VL | 17,462 | 53,000 | 17,462 | 8,0 | 44 | 52 |
| SX046443 | Disc VL | 17,462 | 53,012 | 17,462 | 8,0 | 45 | 53 |
| SX016486 | Disc VL | 20,638 | 60,103 | 20,638 | 7,0 | 47 | 60 |
| SX040689 | Outer Bell VL | 22,225 | 64,105 | 22,225 | 5,7 | 38 | 59 |
| 4500115 | Inner Race RF | 17,462 | 95,692 | 17,462 | 8,0 | 57 | 61 |
| SX044901 | Inner Race DO | 20,638 | 62,830 | 20,638 | 7,0 | 39 | 51 |
| 26058993 | Inner Race VL | 17,462 | 53,013 | 17,462 | 8,0 | 39 | 47 |
| SX046447 | Inner Race VL | 17,462 | 53,011 | 17,462 | 8,0 | 36 | 45 |
| SX046490 | Inner Race VL | 20,638 | 60,103 | 20,638 | 7,0 | 42 | 54 |
| SX042709 | Inner Race VL | 22,225 | 64,095 | 22,225 | 5,7 | 46 | 66 |

Page: 5 of 5
Date: 03.08.1999
Drawn: O.Schmitt

10-AUG-1999  15:48    EX-CELL-O VERKAUF    +49 7161 605347    S.02

## Delphi Automotive Systems
### Cycle Times Soft milling

## EX-CELL-O
### Quotation No. 310.096.4.012

| Workpart # | Type | Gauge Ball Dia | PCD | Tool∅ 1 | Feed rate [mm/s] | Feed stroke 1 | Cycle time (incl. machining load/unload) | Tool∅ 2 | Feed rate [mm/s] | Feed stroke 2 | Cycle time (incl. machining load/unload) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 26080615 | Outer Bell RF | 14.600 | 48.407 | 21.0 | 12 | 46 | 43 | 14.3 | 17.8 | 34 | 32 |
| 26080617 | Outer Bell RF | 15.875 | 54.280 | 23.0 | 11 | 49 | 46 | 15.5 | 16.4 | 37 | 33 |
| 4500112 | Outer Bell RF | 17.462 | 60.212 | 25.0 | 10 | 48 | 49 | 17.2 | 14.8 | 40 | 36 |
| SX034040 | Outer Bell DO | 19.844 | 57.114 | 25.0 | 10 | 80 | 67 | 19.6 | 13.0 | 80 | 57 |
| SX046875 | Outer Bell DO | 20.638 | 61.538 | 25.0 | 10 | 91 | 74 | 20.3 | 12.5 | 91 | 64 |
| SX043069 | Outer Bell DO | 20.638 | 61.538 | 25.0 | 10 | 91 | 74 | 20.3 | 12.5 | 91 | 64 |
| 26076827 | Outer Bell VL | 17.462 | 53.000 | 17.2 | 15 | 47 | 66 | | | | |
| SX006443 | Disc VL | 17.462 | 53.012 | 17.2 | 15 | 48 | 67 | | | | |
| SX064B6 | Disc VL | 20.638 | 60.103 | 20.3 | 13 | 50 | 76 | | | | |
| SX006689 | Outer Bell VL | 22.225 | 64.105 | 21.9 | 12 | 41 | 71 | | | | |
| dS00115 | Inner Race RF | 17.462 | 55.692 | 25.0 | 10 | 60 | 55 | 17.2 | 14.8 | 60 | 44 |
| 26054991 | Inner Race DO | 20.638 | 62.830 | 25.0 | 10 | 42 | 45 | 20.3 | 12.5 | 42 | 40 |
| 26058593 | Inner Race VL | 17.462 | 53.013 | 17.2 | 15 | 42 | 54 | | | | |
| SX046447 | Inner Race VL | 17.462 | 63.011 | 17.2 | 15 | 39 | 52 | | | | |
| SX046490 | Inner Race VL | 20.638 | 60.103 | 20.3 | 13 | 45 | 63 | | | | |
| SX042709 | Inner Race VL | 22.225 | 64.095 | 21.9 | 12 | 49 | 71 | | | | |

Page: 4 of 5
Date: 03.08.1999
Drawn: O.Schmitt

Remark: For RF- and DO-parts (2) separate set-ups are necessary (rough and finish milling)!

EXHIBIT L

**-HES** **ENGINEERING / TESTING**
**MANUFACTURING**

H.E. SERVICES • 225 E. MORLEY DR. • SAGINAW, MI 48601 • (989) 753-9015 • FAX (989) 753-7703

November13, 2001

Delphi Steering Systems
3900 Holland Road
Saginaw, Michigan 48601
Attn: Bruce Waslusky

Subject: Ex-Cell-O Grinding machine

Dear Bruce,

On July 25,2001 there was a meeting at the Prototype Center to discuss the Ex-Cell-O
program and in particular the payment schedule for the machine.

In that meeting, you made the decision to make a consistent monthly payment instead of
the volume driven variable monthly payment schedule as stated in the P. O. We were in
agreement with this decision. You were provided a loan payment schedule by Tim Fortier
in a letter dated July 31,2001. I have updated this through Nov 2001 and a copy is
attached for your use. The monthly payment amount would now be $20,235.65 for 36
months. The Machine is scheduled to arrive the second week of December of this year
and we would really appreciate it if you could start the first payment in that month.

The part cost was revised and provided to you in a letter from Barry Torrey dated June
19, 2001 and a copy is attached for your reference. This latest pricing should be reflected
in the re-issued P.O. as well as all other conditions of the quote as stated in this letter.

If you have any questions or need additional information please feel free to contact me.

Regards,

Joseph A. Stearns
VP Engineering and Manufacturing

Attachments:

Cc. Robert Backie
    Tim Fortier

**HES** ENGINEERING / TESTING
MANUFACTURING

H E. SERVICES • 5117 S. DORT HWY • FLINT, MI 48507 • (810) 743-4900 • FAX (810) 743-8400

July 31, 2001

Delphi – Saginaw
3900 Holland Road
Saginaw, MI 48601-9494
Attn: Bruce Waslusky

Dear Bruce:

The monthly payment schedule for the Exello is as follows:

| Description | Original Monthly Cost | Interest Income | Present Monthly Cost |
|---|---|---|---|
| Three year term | $20,592.00 | $301.00 | $20,291.00 |

356.35    # 20,235.65    11-13-01

Based on effective start date of October 1, 2001.

The costs include projected costs for payments of principle, interest and associated machine developmental costs minus interest costs while funding was maintained in a liquid account. If you require additional information, you may contact Joe Stearns (989) 753-9015 or me at the above number.

Sincerely Yours,

Timothy E. Fortier
President

Attachment

## H.E. Services

### Purchase / Debt -- Excello Machine

#### Summary of Net Debt Payments

| | |
|---|---|
| Total Principal Payments | $622,000.00 |
| Total Interest Expense | $87,598.33 |
| Total Debt Payments | $709,598.33 |
| Less:  Interest Income | (12,828.75) |
| Net Debt Service | $696,769.58 |
| Monthly Payments over 36 Months | $19,354.71 |

#### Summary of Debt Terms

| | |
|---|---|
| Closing Date | 11/13/2000 |
| Initial Loan Balance | $622,000.00 |
| Number of Payments | 36 |
| Ending Loan Balance | $0.00 |
| Interest Expense Rate | 9.75% |
| Interest Income Rate | 2.70% |

### H.E. Services

### Purchase / Debt -- Excello Machine

**Summary of Total Debt Payment & Interest Earned**

| Payment Number | Payment Dates | Beginning Loan Balance | Principal | Interest Expense | Ending Loan Balance | Total Payment | Estimated Interest Earned on Saving Balance |
|---|---|---|---|---|---|---|---|
| 1 | 01/01/2001 | $622,000.00 | $17,277.78 | $5,053.75 | $604,722.22 | $22,331.53 | $1,360.63 |
| 2 | 02/01/2001 | 604,722.22 | 17,277.78 | 4,585.81 | 587,444.44 | 21,863.59 | 1,321.75 |
| 3 | 03/01/2001 | 587,444.44 | 17,277.78 | 4,454.79 | 570,166.67 | 21,732.56 | 1,282.88 |
| 4 | 04/01/2001 | 570,166.67 | 17,277.78 | 4,323.76 | 552,888.89 | 21,601.54 | 1,244.00 |
| 5 | 05/01/2001 | 552,888.89 | 17,277.78 | 4,192.74 | 535,611.11 | 21,470.52 | 1,205.13 |
| 6 | 06/01/2001 | 535,611.11 | 17,277.78 | 4,061.72 | 518,333.33 | 21,339.50 | 1,166.25 |
| 7 | 07/01/2001 | 518,333.33 | 17,277.78 | ~3,930.69 | 501,055.56 | 21,208.47 | 1,127.38 |
| 8 | 08/01/2001 | 501,055.56 | 17,277.78 | 3,799.67 | 483,777.78 | 21,077.45 | 1,088.50 |
| 9 | 09/01/2001 | 483,777.78 | 17,277.78 | 3,668.65 | 466,500.00 | 20,946.43 | 1,049.63 |
| 10 | 10/01/2001 | 466,500.00 | 17,277.78 | 3,537.63 | 449,222.22 | 20,815.40 | 1,010.75 |
| 11 | 11/01/2001 | 449,222.22 | 17,277.78 | 3,406.60 | 431,944.44 | 20,684.38 | 971.88 |
| 12 | 12/01/2001 | 431,944.44 | 17,277.78 | 3,275.58 | 414,666.67 | 20,553.36 | |
| 13 | 01/01/2002 | 414,666.67 | 17,277.78 | 3,144.56 | 397,388.89 | 20,422.33 | |
| 14 | 02/01/2002 | 397,388.89 | 17,277.78 | 3,013.53 | 380,111.11 | 20,291.31 | |
| 15 | 03/01/2002 | 380,111.11 | 17,277.78 | 2,882.51 | 362,833.33 | 20,160.29 | |
| 16 | 04/01/2002 | 362,833.33 | 17,277.78 | 2,751.49 | 345,555.56 | 20,029.26 | |
| 17 | 05/01/2002 | 345,555.56 | 17,277.78 | 2,620.46 | 328,277.78 | 19,898.24 | |
| 18 | 06/01/2002 | 328,277.78 | 17,277.78 | 2,489.44 | 311,000.00 | 19,767.22 | |
| 19 | 07/01/2002 | 311,000.00 | 17,277.78 | 2,358.42 | 293,722.22 | 19,636.19 | |
| 20 | 08/01/2002 | 293,722.22 | 17,277.78 | 2,227.39 | 276,444.44 | 19,505.17 | |
| 21 | 09/01/2002 | 276,444.44 | 17,277.78 | 2,096.37 | 259,166.67 | 19,374.15 | |
| 22 | 10/01/2002 | 259,166.67 | 17,277.78 | 1,965.35 | 241,888.89 | 19,243.13 | |
| 23 | 11/01/2002 | 241,888.89 | 17,277.78 | 1,834.32 | 224,611.11 | 19,112.10 | |
| 24 | 12/01/2002 | 224,611.11 | 17,277.78 | 1,703.30 | 207,333.33 | 18,981.08 | |
| 25 | 01/01/2003 | 207,333.33 | 17,277.78 | 1,572.28 | 190,055.56 | 18,850.06 | |
| 26 | 02/01/2003 | 190,055.56 | 17,277.78 | 1,441.25 | 172,777.78 | 18,719.03 | |
| 27 | 03/01/2003 | 172,777.78 | 17,277.78 | 1,310.23 | 155,500.00 | 18,588.01 | |
| 28 | 04/01/2003 | 155,500.00 | 17,277.78 | 1,179.21 | 138,222.22 | 18,456.99 | |
| 29 | 05/01/2003 | 138,222.22 | 17,277.78 | 1,048.19 | 120,944.44 | 18,325.96 | |
| 30 | 06/01/2003 | 120,944.44 | 17,277.78 | 917.16 | 103,666.67 | 18,194.94 | |
| 31 | 07/01/2003 | 103,666.67 | 17,277.78 | 786.14 | 86,388.89 | 18,063.92 | |
| 32 | 08/01/2003 | 86,388.89 | 17,277.78 | 655.12 | 69,111.11 | 17,932.89 | |
| 33 | 09/01/2003 | 69,111.11 | 17,277.78 | 524.09 | 51,833.33 | 17,801.87 | |
| 34 | 10/01/2003 | 51,833.33 | 17,277.78 | 393.07 | 34,555.56 | 17,670.85 | |
| 35 | 11/01/2003 | 34,555.56 | 17,277.78 | 262.05 | 17,277.78 | 17,539.82 | |
| 36 | 12/01/2003 | 17,277.78 | 17,277.78 | 131.02 | 0.00 | 17,408.80 | |
| Total Payments & Interest Income | | | $622,000.00 | $87,598.33 | | $709,598.33 | $12,828.75 |



→ PROTOTYPE / MACHINE ——————    (A Division of H.E. Services)

1755 Wicco Rd. • Saginaw, Michigan 48601 • (517) 755-0328 • FAX (517) 755-0330

**TO:**      Bruce Waslusky
**FROM:**    Barry Torrey
**DATE:**    June 19, 2001
**RE:**      Delphi's RFQ. No. S30000009, Inner & Outer Race (RE-QUOTE)

We are pleased to submit the following re-quote. Upon further evaluation over the last six months of dealing with ExCello and the trip that was made to Excello, we are submitting this re-quotation. Once the machine is on our floor and in operation, we will strive to reduce the costs through improved cycle times and efficiency.

### Inner and Outer Races made from bar stock:

| Part Cost | Excello Machine Cost | Total Cost |
|-----------|----------------------|------------|
| $119.25   | $35.30               | $154.55    |

### Inner and Outer Races made from provided blanks:

| Part Cost | Excello Machine Cost | Total Cost |
|-----------|----------------------|------------|
| $96.75    | $35.30               | $132.05    |

- Price based on $622,000 Purchase of Excello Model XG-690.
- Three year contract doing minimum of 3454 pcs. Inner Races and 3569 pcs. Outer Races per year.
- Ancon to provide all maintenance and repair to the Excello Machine.
- Three H.E. Services employees to be trained by Excello.
- All equipment and estimated 1000 sq. ft. to be dedicated solely to Delphi. Includes storage space for raw material and blanks.
- Delphi to provide all steel, blanks, heat treating, broaching, and cold forming of splines and threads for races.
- All tooling and special equipment necessary to produce inner and outer races to be provided by Delphi.
- Ancon to provide fixturing and tooling with prints for new design changes at additional cost to Delphi.
- Additional requirements subject to price adjustment if necessary.
- Races will be inspected on a Zeiss Prismo Vast (CMM) at our A2LA Certified Facility.
- QS-9000 Certified/Air Conditioned Plant.
- Minority Owned Business Enterprise (MBE) and is a recognized Delphi Equal Partner.
- We will be able to do hard milling upon receipt of tooling cost along with set-up and run times.
- Engineering development time will be quoted at $65 per hour, time and a half on Saturdays, and double time on Sundays.
- Price reduction after the first year for the next 2 years will be 3%, 3%.
- The Excello Machine will be dedicated to Delphi for an 8 year period.

EXHIBIT M

# DELPHI
## Automotive Systems

**PURCHASE ORDER:** S3S18278

PAGE 1

This Number Must Appear on All Invoices, Packing Slips, Packages and Bills of Lading.
(2) copies of your packing slip must accompany each shipment.
Item Identification Number(s) must be shown on Packing Slips and Invoice Attn. Accounts Payable
Do not Declare Valuation of Express Shipments or Insure Parcel Post.

| | |
|---|---|
| **ORDER DATE** | 04/30/02 |
| **ALTERATION ISSUE DATE** | |
| **ALTERATION EFFECTIVE DATE** | |

**SHIP VIA** SEE BELOW

**PHONE:** 989-757-3404

| | | |
|---|---|---|
| J | S18 | SANBORN |
| | | **Buyer** |

**PURCHASING AGENT**

---

TO:
VENDOR NUMBER 60-881-4059
H E SERVICES, CO
ANCON PROTOTYPE MACHINE
1755 WICCO RD
SAGINAW MI
48601
US

SHIP TO:
DELPHI SAGINAW STEERING SYS.
(3PI) PROTOTYPE OPERATIONS
2975 NODULAR DR
SAGINAW MI
48601
US

INVOICE TO:
DELPHI AUTOMOTIVE SYSTEMS
PROTOTYPE OPERATIONS
3900 HOLLAND RD.
DEPT. 14
SAGINAW MI
48601
US

DELPHI SAGINAW STEERING SYSTEM
3900 HOLLAND RD.
SAGINAW MI
48601
US

The information contained in this order including the reverse side hereof and all documents referred to herein and made a part hereof by such reference, is the entire and final agreement between the parties. This order, including the terms and conditions on the face and reverse side hereof, contains the complete and final agreement between Buyer and Seller and no other agreement in any way modifying any of said terms and conditions will be binding upon the Buyer unless made in writing and signed by Buyer's authorized representative.
Attached Hereto Apply.

**PAYMENT TERMS** NET
2ND DAY OF 2ND MONTH

**F.O.B.** SHIPPING POINT

DESTINATION UNLESS OTHERWISE INDICATED

| ITEM SEQUENCE | QUANTITY ORDERED | ITEM IDENTIFICATION NO. | NOUN NAME | DESCRIPTION | RFQ NUMBER | DATE REQUIRED | TAX CODE/ % | BASE UNIT PRICE | PRICE/MULTIPLE MEASURE | UNIT O MEASURE |
|---|---|---|---|---|---|---|---|---|---|---|
| 000001 | 36 | PR359602 001 | | THIS ORDER IS LISTED IN THE FOLLOWING CURRENCY USD DOLLAR (UNITED STATES) | | | | | | |
| | | | | EXCELLO CONTRACT, REF QUOTE DATE 6/19/01 FOR MANUFACTURE OF INNER/OUTER RACES TO BE RECEIVED AS 1 LOT EACH MONTH STARTING APRIL 2002. WHO ORDERED: L.KRAMER/7-9801 | 7-9801 | 04/30/02 A 04/30/02 | 0.00% | 22926.0000 | | LOT |
| | | | | ***********SHIPPING AND ROUTING INSTRUCTIONS*********** NUMBER AS WELL AS THE PURCHASE ORDER NUMBER. INSTRUCTS YOU TO DO SO. YOU WILL NEED YOUR INVOICE CONTACT THE BUYER UNLESS SUPPLIER RELATIONS IN- CONTACT SUPPLIER RELATIONS AT (248) 874-4636. DO NOT FOR INVOICING PROBLEMS UNDER THIS PURCHASE ORDER (DC) | | | | | | |
| | | | | INDIVIDUAL PACKAGES SHOULD WEIGH NO MORE THAN 40# OR SHIPMENT SHOULD BE CALLED IN TO UPS NOT COLLECT INDIVIDUAL PACKAGES SHOULD BE CALLED IN TO UPS NOT COLLECT LESS THAN 150#--UPS CONSIGNEE BILLING IS HOW THE | | | | | | |
| | | | | LESS. IF PRACTICAL, PLANT NUMBER MUST BE ON LABEL. FOR ITEMS COLLECTIVELY WEIGHING 150#-12,000# BELOW | | | | | | |
| | | | | IF SHIPPING FROM---USE THESE CARRIERS: | | | | | | |
| | | | | MI,IN,IL,WI,OH ON, (ONTARIO) | ALVAN MOTOR FRT U.S.F.HOLLAND | | | | | |

ORIGINAL

CONTINUE PAGE 2

SMP/01 11/98

# DELPHI
Automotive Systems

## PURCHASE ORDER: S3S18278

PAGE 2

This Number Must Appear On All Invoices, Packing Slips, Packages and Bills of Lading.
(2) copies of your packing slip must accompany each shipment. Item Identification Number(s) must be shown on Packing Slips and Invoices. Attn: Accounts Payable
Do not Declare Valuation of Express Shipments or Insure Parcel Post.

| ORDER DATE | PHONE: 989-757-3404 |
|---|---|
| 04/30/02 | J SANBORN |
| ALTERATION ISSUE DATE | S18 Buyer |
| ALTERATION EFFECTIVE DATE | PURCHASING AGENT |

VENDOR NUMBER 60-881-4059

TO:
ANCON PROTOTYPE MACHINE
1755 WICCO RD
SAGINAW MI 48601
US

SHIP TO: DELPHI SAGINAW STEERING SYS.
(3PI) PROTOTYPE OPERATIONS
2975 NODULAR DR
SAGINAW MI
48601
US

INVOICE TO: DELPHI AUTOMOTIVE SYSTEMS
DELPHI SAGINAW STEERING SYSTEM
3900 HOLLAND RD.
DEPT. 14
SAGINAW MI
48601
US

This order is to be entered and must accepted acceptance should be executed on acknowledgement copy which should be returned to Buyer...

F.O.B. DESTINATION UNLESS OTHERWISE INDICATED
SHIPPING POINT

| ITEM SEQUENCE | NET QUANTITY ORDERED | ITEM IDENTIFICATION NO. | NOUN NAME DESCRIPTION | RFQ NUMBER | DATE REQUIRED | TAX CODE/ % | BASE UNIT PRICE | PRICE MULTIPLE/MEASURE |
|---|---|---|---|---|---|---|---|---|
| 000522 | | | ALL OTHER STATES | ROADWAY EXPRESS | | SEE BELOW | | |

PAYMENT TERMS
NET 2ND DAY OF 2ND MONTH

USER MELISSA L KALEYTA

OVER 12,000 #
TION DEPARTMENT FOR CARRIER DESIGNATION
(517) 757-3509 OR (517) 757-3510
LEAD TIME, WHETHER INITIATED BY SUPPLIER OR SAGINAW
MUST NOT BE MADE WITHOUT PRIOR APPROVAL BY SAGINAW
PURCHASING VIA A PURCHASE ORDER ALTERATION.
ANY CHANGES IN DELIVERY DATE FOR ANY REASON
WHATSOEVER WILL BE REPORTED PROMPTLY, IN WRITING, TO
THE BUYER WITH DETAILED EXPLANATION.
THIS PURCHASE ORDER IS AN INVOICELESS PURCHASE
ORDER. YOUR COMPANY IS NO LONGER REQUIRED TO SEND
INVOICES TO RECEIVE PAYMENT (DO NOT SEND INVOICES).
DELPHI-S WILL GENERATE PAYMENTS TO YOUR COMPANY BASED
UPON RECEIPT OF MATERIAL AT OUR CURRENT PRICE AND PAY-
MENT TERMS TO ENSURE PROMPT PAYMENT YOU WILL NEED TO
ADHERE TO THE FOLLOWING GUIDELINES:
1. ADVISE THE BUYER OF ANY DISCREPANCIES ON THE PURC
HASE ORDER PRIOR TO SHIPMENT. CONVEY THIS INFORMATION
VIA BOTH PHONE AND FAX/LETTER. REFER TO BOTH THE PUR-
CHASE ORDER NUMBER AND THE ITEM NUMBER AND PUT ON
THE FAX OR LETTER.
2. THE DELPHI PART/ITEM NUMBER, THE PURCHASE ORDER
NUMBER MUST BE INCLUDED ON ALL PACKING SLIPS SENT IN
WITH SHIPMENTS. COPIES SHOULD ALSO BE MAILED TO THE

CALL DELPHI SAGINAW TRANSPORTA-

CONTINUE PAGE 3

ORIGINAL

# DELPHI
Automotive Systems

DELPHI SAGINAW STEERING SYSTEM

**PURCHASE ORDER:** S3S18278

PAGE 3

VENDOR NUMBER 60-881-4059

TO:
H E SERVICES CO
ANCON PROTOTYPE MACHINE
1755 WICCO RD
SAGINAW MI
48601
US

SHIP TO: (3PI) PROTOTYPE OPERATIONS
2975 NODULAR DR
SAGINAW MI
48601
US

INVOICE TO:
DELPHI AUTOMOTIVE SYSTEMS
PROTOTYPE OPERATIONS
3900 HOLLAND RD.
DEPT. 14
SAGINAW MI
48601
US

This Number Must Appear On All Invoices, Packing Slips,
Packages and Bills of Lading.
(2) copies of your packing slip must accompany each shipment.
Item Identification Number(s) must be shown on Packing Slips and
Invoices.
Invoice Attn: Accounts Payable
Do not Declare Valuation of Express Shipments or Insure Parcel
Post.

ORDER DATE: 04/30/02
ALTERATION ISSUE DATE:
ALTERATION EFFECTIVE DATE:

SHIP VIA: SEE BELOW

PHONE: 989-757-3404
J SANBORN    Buyer
S18

| PAYMENT TERMS | | |
|---|---|---|
| NET 2ND DAY OF 2ND MONTH | | |

| ITEM SEQUENCE | QUANTITY ORDERED | ITEM IDENTIFICATION NO. | NOUN NAME DESCRIPTION | RFQ NUMBER | DATE REQUIRED | TAX CODE/ % | BASE UNIT PRICE | PRICE/MULTIPLE MEASUR | UNIT OF MEASUR |
|---|---|---|---|---|---|---|---|---|---|
| 000522 | | | "WHO ORDERED" PERSON AND THE "DELIVER TO" PERSON | | | | | | |

F.O.B.: SHIPPING POINT
DESTINATION UNLESS OTHERWISE INDICATED

"WHO ORDERED" PERSON AND THE "DELIVER TO" PERSON
REFERENCED ON THE ORDER, IF PAYMENT DID NOT OCCUR 2ND
DAY 2ND MONTH AFTER RECEIPT OF GOODS.
3. THE UNIT OF MEASURE ON THE PACKING SLIP MUST BE
THE SAME AS THE PURCHASE ORDER UNIT OF MEASURE.
4. DO NOT SEND AN INVOICE. PAYMENT WILL BE BASED
RECEIPT RECORDS.
5. WAIT FOR PAYMENTS TO BE MADE THE 2ND DAY OF THE
2ND MONTH AFTER RECEIPT BEFORE BEING CONCERNED.
6. IF PAYMENT HAS NOT OCCURRED BY THE 2ND DAY 2ND
MONTH AND IN THE CASE OF SERVICES TYPE ORDERS CALL
THE PERSON DESIGNATED AS "WHO ORDERED" OR THE
"DELIVER TO" PERSON TO CONFIRM IF A RECEIPT HAS BEEN
ELECTRONICALLY ENTERED AUTHORIZING THE PAYMENT CYCLE
TO BEGIN.
7. IF IT CAN BE CONFIRMED THAT A RECEIPT HAS BEEN
ENTERED YOU CAN CALL "EAG DISBURSEMENTS" TO CHECK ON
THE STATUS OF THE PAYMENT. YOU WILL NEED YOUR
COMPANY'S (9) DIGIT DUN AND BRADSTREET ACCOUNT NO.
******************** EAG DISBURSEMENTS PHONE (248) 874-4636
*************** IF IT BECOMES NECESSARY TO "BILL TO EAG DISBURSEMENT
ANALYSIS: P.O. BOX 1550, FLINT, MI. 48501-1550.
PLEASE DO NOT BILL SALES TAX AS WE HAVE OUR OWN
DIRECT PAY PERMITS. ALABAMA PERMIT NO. 224.

USER MELISSA L KALEYTA

ORIGINAL                    CONTINUE PAGE    4

PURCHASING AGENT

# DELPHI
## Automotive Systems

# PURCHASE
## ORDER: S3S18278

PAGE 4

This Number Must Appear On All Invoices, Packing Slips, Packages and Bills of Lading.
(2) copies of your packing slip must accompany each shipment. Item Identification Number(s) must be shown on Packing Slips and Invoices.
Invoice Attn: Accounts Payable
Do not Declare Valuation of Express Shipments or Insure Parcel Post.

| ORDER DATE | ALTERATION ISSUE DATE | ALTERATION EFFECTIVE DATE |
| --- | --- | --- |
| 04/30/02 | | |

PHONE: 989-757-3404
J. SANBORN   S18
Buyer

DELPHI SAGINAW STEERING SYSTEM
3900 HOLLAND RD.
SAGINAW MI
48601

VENDOR NUMBER 60-881-4059
TO:
H E SERVICES/CO
ANCON PROTOTYPE MACHINE
1755 WICCO RD
SAGINAW MI
48601

US

SHIP TO: DELPHI SAGINAW STEERING SYS. (3PI) PROTOTYPE OPERATIONS
2975 NODULAR DR
SAGINAW MI
48601

US

INVOICE TO: DELPHI AUTOMOTIVE SYSTEMS
PROTOTYPE OPERATIONS
3900 HOLLAND RD.
DEPT. 14
SAGINAW MI
48601

US

This order is placed subject to the terms and conditions and acknowledgement copy which should be returned to Buyer. [faint legal text] ... Additional Terms and Conditions Attached Hereto Apply.

| PAYMENT TERMS | | F.O.B. | DESTINATION UNLESS OTHERWISE INDICATED | RFQ NO. | DATE REQUIRED | TAX CODE/ % | SHIP VIA | PURCHASING AGENT |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| NET 2ND DAY OF 2ND MONTH | | SHIPPING POINT | | DP00036 | | | SEE BELOW | |

| ITEM SEQUENCE | QUANTITY ORDERED | ITEM IDENTIFICATION NO. | NOUN NAME | DESCRIPTION | BASE UNIT PRICE | PRICE/MULTIPLE | UNIT OF MEASUR |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 0000522 | USER MELISSA L KALEYTA | | MICHIGAN PAY PERMIT ME3800440, NY. | | | | |

ITEMS PRODUCED ON THIS ORDER SHALL BE COMPLIANT TO THE GUIDELINES OF THE GENERAL MOTORS PROCEDURE GP-11 "FOR SUPPLIERS OF MATERIAL FOR PRE-PROTOTYPE & PROTOTYPE GP-11". SUBMISSION LEVEL "B" IS REQUIRED WITH COMPLETE DOCUMENTATION. MATERIAL CERTIFICATION, GP-11 SUBMISSION REQUIREMENTS ARE AT LEVEL "B" AND MUST ACCOMPANY THE SHIPMENT WITH TEST DATA SHOWING COMPLIANCE. DELPHI SAGINAW REQUIRES SERIALIZATION USING OF THE JULIAN DATE (I.E. 0145-001), NOT THE "S-001" METHOD DESCRIBED WITHIN THE PROCEDURE. COMPLETE CHARACTERISTIC INSPECTION OF ALL PRINT DIMENSIONS SHALL BE CONDUCTED ON 3 PIECES (1 PIECE ON PLASTIC INJECTED, RUBBER, CASTINGS & STAMPINGS). ALL KEY PRODUCT CHARACTERISTICS (KPC'S AND STARRED* DIMENSIONS) MUST BE MEASURED ON ALL PARTS. INSPECTION RESULTS WILL BE RECORDED. OUT OF TOLERANCE SPECIFICATION DIMENSIONS MUST BE CIRCLED. THE PROCURING DELPHI ENGINEER MUST SIGN OFF ON THE WARRANT TO ACCEPT ANY DEVIATION(S) PRIOR TO SHIPMENT. SHIPMENT WILL NOT BE ACCEPTED INTO THE SYSTEM FOR MANDATORY FOR THIS ORDER / RELEASE FOR FURTHER INFORMATION CONTACT GREG ROVOLL AT (517) 757-3095.

ORIGINAL                                                                 CONTINUE PAGE 5

# DELPHI
Automotive Systems

## PURCHASE ORDER:

S3S18278

PAGE 5

DELPHI SAGINAW STEERING SYS.

This Number Must Appear On All Invoices, Packing Slips, Packages and Bills of Lading. (2) copies of your packing slip must accompany each shipment. Item Identification Number(s) must be shown on Packing Slips and Invoice Attn: Accounts Payable. Do not Declare Valuation of Express Shipments or Insure Parcel Post.

PHONE: 989-757-3404

ORDER DATE: 04/30/02

J SANBORN
S18
Buyer

| ALTERATION ISSUE DATE | | SHIP VIA |
| --- | --- | --- |
| ALTERATION EFFECTIVE DATE | | SEE BELOW |

PURCHASING AGENT

TO:

VENDOR NUMBER 60-881-4059

H E SERVICES, CO
ANCON PROTOTYPE MACHINE
1755 WICCO RD
SAGINAW MI
48601
US

SHIP TO:

DELPHI SAGINAW STEERING SYSTEM
3900 HOLLAND RD.
SAGINAW MI
48601

SHIP TO: (3P1) PROTOTYPE OPERATIONS
2975 NODULAR DR
SAGINAW MI
48601
US

INVOICE TO:

DELPHI AUTOMOTIVE SYSTEMS
PROTOTYPE OPERATIONS
3900 HOLLAND RD.
DEPT. 14
SAGINAW MI
48601
US

| ITEM SEQUENCE | QUANTITY ORDERED | ITEM IDENTIFICATION NO. | NOUN NAME | DESCRIPTION | DATE REQUIRED | TAX CODE | % | BASE UNIT PRICE | UNIT OF MULTIPLE MEASURE |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |

PAYMENT TERMS: NET 2ND DAY OF 2ND MONTH

F.O.B.: SHIPPING POINT

DESTINATION UNLESS OTHERWISE INDICATED

TAX CODE: SEE BELOW

A0000522    USER MELISSA L KALEYTA

PAYMENT UNTIL REQUIREMENTS ARE MET. NON-COMPLIANCE MAY RESULT IN THE ISSUANCE OF A PROBLEM REPORT AND RESOLUTION (PR & R) UTILIZING THE GLOBAL QUALITY TRACKING SYSTEM (GQTS) PER GP-5. COMPLETE DETAILS ARE AVAILABLE WITHIN THE GP-11 REFERENCE MANUAL. FOR INFORMATION CONCERNING SUBMISSION REQUIREMENTS OR A COPY OF THE MANUAL, CONTACT GREG ROVOLL AT SAGINAW DELPHI PROTOTYPE OPERATIONS 517-757-3095.

TERMS AND CONDITIONS JANUARY 2001, APPLY OF WHICH SUPPLIER HAS RECEIVED A COPY.

ORIGINAL

LAST PAGE

SMDL03 .11/98

# DELPHI AUTOMOTIVE SYSTEMS
## Purchase Request

*Bold areas are required fields*

| Service | | | SB PO / REL No. | 355 10278 | Page ___ of ___ |
| Cap/Const. | | | MBO / BL PO No. | | Req. No. 359602 |
| Other | | | PO# / Alt. | | |

**Supplier:** AULON

**Address:** ___

**Contact:** ___

**Duns No.** 6028 140 52

**Fax No.** ___

**Phone No.** ___

**Number** ___

| Date 4-30-02 | APA Rec'd | Required |
| Ship to Dock | | Promised |
| Rec/Notify | | Effective |
| Phone | Mail/Plt. | Fax | Expires |

**Deliver To** ___

| Tax Code ✓ | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Qty** | **U/M** | **Est. Cost** | **Actual Cost** | **WO Type** | **GC 2** | **GL 4 5** | **Dept 5** | **Sub Acct. 5** | **Corp. 3** | **Loc. 3** | **Prod. 4** |
| 36 | LOTS | $823,536.00 | $22,926 | | K8601247 (P) | | | | | | |

**Item ID / Description**

EXCELLO CONTRACT, REF. QUOTE
DATED 6-19-01 FOR MANUFACTURE
OF INNER/OUTER RACES.
TO BE REC'D AS 1 LOT EACH
MONTH STARTING APRIL 2002.

EXPEDITED MAR 3 0 2002

**Total Est. Cost** $823,536.00

| No ____ Must Provide Justification | Yes ____ |
| Must be Complete: Is a Substitute Material or Supplier Acceptable | |

**Invoice / Packing Slip** ___
**Service Approved / Completed** ___
**APA Rec'd Services** ___

**Originator** Loren Karner

**Phone** 7-9801

**Haz'd Mat'l Appr.** ___

**Where Used / Remarks** EXCELLO MACHINES

**Quote No.** ___

**Acct. Appr.** 4.3 Dept ___ **Approval** Mel Jay
MKalinski) MelJay 4/30/02

**Clauses** ___

| Shipper | |
| FOB | |
| Pay Terms | |
| Approval | Date |

**Purchasing Manager** ___ **Date** 4/30/02 Sig

**Buyer** ___ **Date**

DAS 2207 0999

**APA/BUYER**

EXHIBIT N

# DELPHI

## PURCHASE ORDER: S3S18278 001

PAGE 1

PHONE: 989-757-3404
S18   J MIKOLEIZIK   Buyer

### ALTERATION ###

| ORDER DATE | ALTERATION ISSUE DATE |
|---|---|
| 04/30/02 | 05/24/05 |
| ALTERATION EFFECTIVE DATE | |
| 05/24/05 | |

### ### ALTERATION ###

This Number Must Appear On All Invoices, Packages and Bills of Lading.
(2) copies of your packing slip must accompany each shipment. Item Identification Number(s) must be shown on Packing Slips and Invoices.
Invoice Attn: Accounts Payable
Do not Declare Valuation of Express Shipments or Insure Parcel Post.

DELPHI SAGINAW STEERING SYSTEM
3900 HOLLAND RD.
SAGINAW MI
48601

VENDOR NUMBER 60-881-4059

TO:
H E SERVICES CO
ANCON PROTOTYPE MACHINE
1755 WICCO RD
SAGINAW MI
48601

US

SHIP TO:
(3P1) PROTOTYPE OPERATIONS
DELPHI SAGINAW STEERING SYS.
2975 NODULAR DR
SAGINAW MI
48601
US

INVOICE TO:
DELPHI AUTOMOTIVE SYSTEMS
PROTOTYPE OPERATIONS
3900 HOLLAND RD.
DEPT. 14
SAGINAW MI
48601
US

This order is not binding until accepted. Acceptance should be executed on acknowledgement copy which should be returned to Buyer...

| PAYMENT TERMS | | F.O.B. | DESTINATION UNLESS OTHERWISE INDICATED | SHIP VIA |
|---|---|---|---|---|
| NET 2ND DAY OF 2ND MONTH | | SHIPPING POINT | | SEE BELOW |

| ITEM SEQUENCE | QUANTITY ORDERED | ITEM IDENTIFICATION NO. | NOUN NAME DESCRIPTION | MFG NUMBER | DATE REQUIRED | TAX CODE/ % | BASE UNIT PRICE | PRICE MULTIPLE/MEASURE | UNIT OF MEASURE |
|---|---|---|---|---|---|---|---|---|---|
| 0001 | 20 | PR359602 001 | ### SPOT BUY S3S18278 HAS BEEN ALTERED AS FOLLOWS ### | | 04/30/02  A | 0.00% | 22926.0000 | | LOT |

THIS ORDER IS LISTED IN THE FOLLOWING CURRENCY
USD DOLLAR (UNITED STATES)

*** DO NOT MAIL TO VENDOR ***
ALT QTY TO CLOSE P.O. FOR OLIMPIC TO SAP CONVERSION

### THIS ITEM HAS BEEN CHANGED ###

EXCELLO CONTRACT, REF QUOTE DATE 6/19/01 FOR
MANUFACTURE OF INNER/OUTER RACES
TO BE RECEIVED AS 1 LOT EACH MONTH STARTING
APRIL 2002.
WHO ORDERED: L.KRAMER/7-9801

001412   USER MELISSA L KALEYTA

PURCHASING AGENT

ORIGINAL

LAST PAGE

EXHIBIT O

# DELPHI AUTOMOTIVE SYSTEMS
## Purchase Request

Shaded areas are required fields

| SB PO / REL No. | | | |
|---|---|---|---|
| MBO / BL PO No. | S3B | 00059 | Req. No. |
| PO# / Alt. | | | PR366155 |

**Supplier** ANCON TOOL & DIE INC

Duns No. 608814059

**Date** 04/30/2002   APA Rec'd

**Address** 1755 WICCO RD

Fax No. (989) 755-0330

Ship To PO   3PI

| Require | |
| APA Rec'd | |
| Promise | |

SAGINAW    MI    48601

Rec./Notify  Kristine DuCharme

**Effectiv** 5/1/02

**Conta** BARRY TORREY

Phone No.

Phone (989) 757-1282  Mail/Pl  Fax

**Expires** 5/1/05

**Tax Code** HM    WO type: SE    Number

Deliver To    99    14    1

| Qty | U/M | Est Cost | Actual Cost | GC. 2 4 | Gl. 4 5 | Dept 6 | Sub Acct 3 5 | Cap 3 | Loc. 4 | Prod | Item ID/Description |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | PC | $ 0.00 | | ( USA - United State ) | | WO K9SE01217 | | 100 % P | | | NPN - 000 | INNER/OUTER RACE OFF EXCELLO MACHINE. RACES MADE FROM BAR STOCK COST $119.25, RACES MADE FROM SUPPLIED BLANKS COST $96.75. |

REJSSUE OF MBO S380028. ANCON AGREES NOT TO USE EXCELLO MACHINE OR TOOLING FOR ANY OF DELPHI'S COMPETITORS. SUPPLIER WILL HAVE A SECURED AREA FOR EXCELLO MACHINE AND PARTS. REFER TO QUOTE INFORMATION ATTACHED TO ORIGINAL MBO. PRICE IS BASED ON QUOTE DATED 6/19/01. REF PO33S118278 FOR EXCELLO MACHINE.

Total Actual Cost: $ 0.00    ( USA - United State )

| Total Est. Cost | |
|---|---|

Where Used / Remarks    NEW DEVELOPMENT

**\* Complete GP-11 Submission REQUIRED to accompany shipment**

ENTERED MAY 0 1 2002

Must Be Complete: Is a Substitute Material or Supplier Acceptable

Yes ☐    No ☑   Must Provide Justification

MBO - EXCELLO

Invoice / Packing Slip

Quote No.

Service Approved / Completed

APA Rec'd Services

| Clauses | |

| Originator MARTIN, MARK | Phone (989) 757-4614 | Hazr'd Matl Appr. | Acct. Appr. 5.102 Date | Approved | Date Buyer Purchasing Manage | Date |
| 0399 | | | | | | Shipper |
| | | | | | | FOB   Shipping Point |
| | | | | | | Pay Terms  NET 25th |
| | | | | Date | Approval | Date |

ORIGINAL - DELPHI

DAS 2207 01 99



*APr 10,'02*
*cc D. STearns.*

## PROTOTYPE / MACHINE

(A Division of H.E. Services)

1755 Wicco Rd. • Saginaw, Michigan 48601 • (517) 755-0328 • FAX (517) 755-0330

**TO:** Bruce Waslusky
**FROM:** Barry Torrey
**DATE:** June 19, 2001
**RE:** Delphi's RFQ. No. S30000009, Inner & Outer Race (**RE-QUOTE**)

We are pleased to submit the following re-quote. Upon further evaluation over the last six months of dealing with ExCello and the trip that was made to Excello, we are submitting this re-quotation. Once the machine is on our floor and in operation, we will strive to reduce the costs through improved cycle times and efficiency.

### Inner and Outer Races made from bar stock:

| Part Cost | Excello Machine Cost | Total Cost |
|-----------|---------------------|------------|
| $119.25 | $35.30 | $154.55 |

### Inner and Outer Races made from provided blanks:

| Part Cost | Excello Machine Cost | Total Cost |
|-----------|---------------------|------------|
| $96.75 | $35.30 | $132.05 |

- Price based on $622,000 Purchase of Excello Model XG-690.
- Three year contract doing minimum of 3454 pcs. Inner Races and 3569 pcs. Outer Races per year.
- Ancon to provide all maintenance and repair to the Excello Machine.
- Three H.E. Services employees to be trained by Excello.
- All equipment and estimated 1000 sq. ft. to be dedicated solely to Delphi. Includes storage space for raw material and blanks.
- Delphi to provide all steel, blanks, heat treating, broaching, and cold forming of splines and threads for races.
- All tooling and special equipment necessary to produce inner and outer races to be provided by Delphi.
- Ancon to provide fixturing and tooling with prints for new design changes at additional cost to Delphi.
- Additional requirements subject to price adjustment if necessary.
- Races will be inspected on a Zeiss Prismo Vast (CMM) at our A2LA Certified Facility.
- QS-9000 Certified/Air Conditioned Plant.
- Minority Owned Business Enterprise (MBE) and is a recognized Delphi Equal Partner.
- We will be able to do hard milling upon receipt of tooling cost along with set-up and run times.
- Engineering development time will be quoted at $65 per hour, time and a half on Saturdays, and double time on Sundays.
- Price reduction after the first year for the next 2 years will be 3%, 3%.
- The Excello Machine will be dedicated to Delphi for an 8 year period.

EXHIBIT P

# DELPHI AUTOMOTIVE SYSTEMS
## Purchase Request
Shaded areas are required fields

Req. No.    PR397766

| SB PO / REL No. | MBO / BL PO No. | PO#/ Alt. |
|---|---|---|

| Supplier: ANCON TOOL & DIE INC | Duns No. 608814059 | Date 02/05/2004 | APA Rec'd |
| | | Ship To PO    3Pt | Require 02/20/2004 |
| Address 1755 WICCO RD | Fax No. (989) 755-0330 | Rec./Notify Kristine DuCharme | Promise |
| | | Phone (989) 757-1262 Mail/Plt    Fax | Effective |
| SAGINAW    MI    48601 | | Deliver To    99    14    1 | Expires |
| Contact: JOEL KARWAT (QUOTES) | Phone No. (989) 755-0328 | | |

| Tax Code: | WO Type: | Number: | | |

| Qty | U/M | Est. Cost | Actual Cost | GC 2 | GL 4 | Dept 5 | Sub Acct 5 | Com 3 | Loc 3 | Prod 4 | Item ID/Description |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 16 | PC | $ 96.75 | | | ( USA - United State ) | | WO K9SE01726 | 50 % P | | 28111331 - 02B | OUTER RACE 33 TOOTH |
| | | | | | | | WO K9SE01871 | 50 % E | | | |

**PRODUCTION BLANK (GRIND SPHERE & BALL GROOVES)**

| 1 | LT | $ 350.00 | | | ( USA - United State ) | | WO K9SE01726 | 50 % P | | SETUP - 02B | SET-UP CHARGE |
| | | | | | | | WO K9SE01871 | 50 % E | | | |

| 16 | PC | $ 96.75 | | | ( USA - United State ) | | WO K9SE01726 | 50 % P | | 28111380 - 000 | INNER RACE 33 TOOTH |
| | | | | | | | WO K9SE01871 | 50 % E | | | |

**PRODUCTION BLANK (GRIND SPHERE & BALL GROOVES)**

| 1 | LT | $ 350.00 | | | ( USA - United State ) | | WO K9SE01726 | 50 % P | | SETUP - 000 | SETUP CHARGE |
| | | | | | | | WO K9SE01871 | 50 % E | | | **ENTERED FEB 0 6 2004** |

**Total Actual Cost   $ 3,796.00   ( USA - United State )**

| Total Est. Cost | Inspection Requirement:  Full GP-11 | Clauses | |
| | Technical Specification:  Single Supplier - Complete Blueprint | Buyer | Date |
| Must Be Complete: Is a Substitute Material or Supplier Acceptable | Tech Plan Details: | Purchasing Manager | Date |
| Yes ☐  No ☑    Must Provide Justification | Holder of Blanket Order | Shipper | Pay Terms  MNS-2 |
| Program:  Next Generation Corolla | | FOB    Destination | |
| Service Approved / Completed | Quote No. | | |
| APA Rec'd Services | | | |

| Originator HAIN, TIM | Phone (989) 757-0794 | Haz'd Mat'l Appr. | Acct. Appr. | Date, Approval  2-5-04 | Date    Approval | Date |
| 99161 | | | | | | |

ORIGINAL - DELPHI

DAS 2207 0199

# ANCON PROTOTYPE/MACHINE

(A Division of H.E. Services)

1755 Wicco Road * Saginaw, MI 48601 * Phone: (989) 755-0328 * Fax: (989) 755-0330

| | |
|---|---|
| **TO:** Delphi Prototype Center | **DATE: 2/5/2004** |
| | **QUOTE #: 6417** |
| | **VALID FOR 30 Days** |
| **ATTN:** Purchasing | |
| **CC:** Kris Ducharme | |
| **Fax:** (989) 757-5287 | |

We are pleased to submit the following quote:

| Item # | Qty. | Part # | Detail # | RFQ # | Part Name | Price Each | Delivery |
|--------|------|--------|----------|-------|-----------|------------|----------|
| 1 | 16 | 26111381-02B | N/A | STR | Outer Race | $96.75 | 2/20/2004 |
| 2 | 1 | 26111381-02B | N/A | STR | Outer Race – Setup Charge | $350.00 | 2/20/2004 |
| 3 | 16 | 26111380-000 | N/A | STR | Inner Race | $96.75 | 2/20/2004 |
| 4 | 1 | 26111380-000 | N/A | STR | Inner Race – Setup Charge | $350.00 | 2/20/2004 |

Note:

Thank you for the opportunity to provide this quote.

Sincerely,



Joel Karwat
Operation Manager

QF-64
REV. 001
2/22/01

# PURCHASE ORDER: S3S26246

PAGE 2

DELPHI SAGINAW STEERING SYSTEM

VENDOR NUMBER 60-881-4059
H.E. SERVICES CO
ANCON PROTOTYPE MACHINE
1755 WICCO RD
SAGINAW MI
48601
US

SHIP TO:
DELPHI SAGINAW STEERING SYS.
(3P) PROTOTYPE OPERATIONS
2975 NODULAR DR
SAGINAW MI
48601
US

INVOICE TO:
DELPHI AUTOMOTIVE SYSTEMS
PROTOTYPE OPERATIONS
DEPT. 14
3900 HOLLAND RD.
SAGINAW MI
48601
US

3900 HOLLAND RD.
SAGINAW MI
48601
US

This Number Must Appear On All Invoices, Packing Slips,
Packages and Bills of Lading.
(2) copies of your packing slip must accompany each shipment.
Item Identification Number(s) must be shown on Packing Slips &
Invoices.
Invoice Attn: Accounts Payable
Do not Declare Valuation of Express Shipments or Insure Parcel
Post.

ORDER DATE: 02/06/04
ALTERATION ISSUE DATE:
ALTERATION EFFECTIVE DATE:

SHIP VIA: SEE BELOW

J. SANBORN S18
Buyer

989-757-340
PURCHASING AGENT

PAYMENT TERMS
NET  2ND DAY OF 2ND MONTH

F.O.B.
DESTINATION UNLESS OTHERWISE INDICATED
SHIPPING POINT

| ITEM SEQUENCE | QUANTITY ORDERED | ITEM IDENTIFICATION NO. | NOUN NAME DESCRIPTION | RFQ NUMBER | DATE REQUIRED | TAX CODE/ % | BASE UNIT PRICE | PRICE UNIT/MULTIPLE MEA. |
|---|---|---|---|---|---|---|---|---|
| | | | THIS ORDER IS LISTED IN THE FOLLOWING CURRENCY: USD DOLLAR (UNITED STATES) | | | | | |
| | | | THIS IS A MATERIAL REQUEST AGAINST MBO S3B00059 | | | | | |
| | | | **THIS IS A CONFIRMING ORDER DO NOT DUPLICATE** CONFIRMED WITH: JOEL KARWAT | | | | | |
| | | | COMPLETE GP-11 SUBMISSION REQUIRED TO ACCOMPANY SHIPMENT | | | | | |
| 00001 | 16 | PR397766 001 | 26111381-02B OUTER RACE 33 TOOTH PRODUCTION BLANK (GRIND SPHERE & BALL GROOVES) WHO ORDERED: K.DUCHARME/757-1262 | | 02/20/04  A | 0.00% | 96.7500 | EA |
| 00002 | 1 | PR397766 002 | SETUP-02B SET-UP CHARGE WHO ORDERED: K.DUCHARME/757-1262 | | 02/20/04  A | 0.00% | 350.0000 | LT |
| 00003 | 16 | PR397766 003 | 26111380-000 INNER RACE 33 TOOTH PRODUCTION BLANK (GRIND SPHERE & BALL GROOVES) WHO ORDERED: K.DUCHARME/757-1262 | | 02/20/04  A | 0.00% | 96.7500 | PC |

A000855   USER BRUCE WASLUSKY

ORIGINAL

CONTINUE PAGE  2

SMD003 01/16/2003



# PURCHASE ORDER: S3260246

PAGE 3

This Number Must Appear On All Invoices, Packing Slips, Packages and Bills of Lading.
(2) copies of your packing slip must accompany each shipment.
Item Identification Number(s) must be shown on Packing Slips Invoices.
Invoice Attn: Accounts Payable
Do not Declare Valuation of Express Shipments or Insure Parcel Post.

| ORDER DATE | ALTERATION ISSUE DATE | J SANBORN | 989-757-340 |
|---|---|---|---|
| 02/06/04 | 02/06/04 | S18 | Buyer |
| | ALTERATION EFFECTIVE DATE | | PURCHASING AGENT |

SHIP TO: (3P1 PROTYPE OPERATIONS
2975 NODULAR DR
SAGINAW MI
48601                                US

DELPHI SAGINAW STEERING SYSTEM

VENDOR NUMBER 60-881-4059
H E SERVICES CO
ANCON PROTOTYPE MACHINE
1755 WICCO RD
SAGINAW MI
48601

DELPHI SAGINAW STEERING SYSTEM
3900 HOLLAND RD.
SAGINAW MI
48601                                US

TO:

INVOICE TO: DELPHI AUTOMOTIVE SYSTEMS
PROTOTYPE OPERATIONS
3900 HOLLAND RD.
DEPT. 14
SAGINAW MI
48601                                US

| PAYMENT TERMS | F.O.B. | SHIP VIA |
|---|---|---|
| NET: 2ND DAY OF 2ND MONTH | DESTINATION UNLESS OTHERWISE INDICATED SHIPPING POINT | SEE BELOW |

| ITEM SEQUENCE | QUANTITY ORDERED | ITEM IDENTIFICATION NO. | NOUN NAME | DESCRIPTION | RFQ NUMBER | DATE REQUIRED | TAX CODE/ % | BASE UNIT PRICE | PRICE UN MULTIPLE NE. |
|---|---|---|---|---|---|---|---|---|---|
| 00004 | 1 | PR397766 004 | SET-UP-000 | SET-UP CHARGE WHO ORDERED: K.DUCHARME/757-1262 | | 02/20/04 | A 0.00% | 350.0000 | L1 |

*************SHIPPING AND ROUTING INSTRUCTIONS************
LESS THAN 150#--UPS CONSIGNEE BILLING IS HOW THE
SHIPMENT SHOULD BE CALLED IN TO UPS NOT COLLECT
INDIVIDUAL PACKAGES SHOULD WEIGH NO MORE THAN 40# OR
LESS IF PRACTICAL; PLANT NUMBER MUST BE ON LABEL;
FOR ITEMS COLLECTIVELY WEIGHING 150# -12,000# BELOW

IF SHIPPING FROM---USE THESE CARRIERS:

MI,IN,IL,WI,OH                      ALVAN MOTOR FRT
ON, (ONTARIO)                       U.S.F.HOLLAND
ALL OTHER STATES                    CENTRAL TRANSPORT

OVER 12,000 #-- CALL DELPHI SAGINAW TRANSPORTA-
TION DEPARTMENT FOR CARRIER DESIGNATION
(989)757-3509 OR (989)757-3510
LEAD TIME, WHETHER INITIATED BY SUPPLIER OR SAGINAW
MUST NOT BE MADE WITHOUT PRIOR APPROVAL BY SAGINAW
PURCHASING VIA A PURCHASE ORDER ALTERATION.
ANY CHANGES IN DELIVERY DATE FOR ANY REASON
WHATSOEVER WILL BE REPORTED PROMPTLY, IN WRITING, TO
THE BUYER WITH DETAILED EXPLANATION.

A000855   USER BRUCE WASLUSKY

ORIGINAL                                                    CONTINUE PAGE   3

SMD03 01/15/2003



# PURCHASE ORDER: S33S26246

**DELPHI SAGINAW STEERING SYS.**

PAGE

**SHIP TO:** (3P1) PROTOTYPE OPERATIONS
2975 NODULAR DR
SAGINAW MI
48601
US

**INVOICE TO:** DELPHI AUTOMOTIVE SYSTEMS
PROTOTYPE OPERATIONS
3900 HOLLAND RD.
DEPT. 14
SAGINAW MI
48601
US

This Number Must Appear On All Invoices, Packing Slips,
Packages and Bills of Lading.
(2) copies of your packing slip must accompany each shipment.
Item Identification Number(s) must be shown on Packing Slips &
Invoice. Attn. Accounts Payable
Invoices.
Do not Declare Valuation of Express Shipments or Insure Parce
Post.

| ORDER DATE | ALTERATION ISSUE DATE | ALTERATION EFFECTIVE DATE |
|---|---|---|
| 02/06/04 | J | S18 |

989-757-340-
**SANBORN**
Buyer

PURCHASING AGENT

**DELPHI SAGINAW STEERING SYSTEM**
3900 HOLLAND RD.
SAGINAW MI
48601

**TO:** ANCON PROTOTYPE MACHINE
1755 WICCO RD
SAGINAW MI
48601

VENDOR NUMBER 60-881-4059
H E SERVICES CO

| PAYMENT TERMS | | |
|---|---|---|
| NET 2ND DAY OF 2ND MONTH | | |

| ITEM SEQUENCE | QUANTITY ORDERED | ITEM IDENTIFICATION NO. | NOUN NAME | DESCRIPTION | RFQ NUMBER | DATE REQUIRED | TAX CODE/ % | SHIP VIA | BASE UNIT PRICE | PRICE UM MULTIPLE/ME/ |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | SEE BELOW | | |

F.O.B. SHIPPING POINT
DESTINATION UNLESS OTHERWISE INDICATED

THIS PURCHASE ORDER IS AN INVOICELESS PURCHASE
ORDER. YOUR COMPANY IS NO LONGER REQUIRED TO SEND
INVOICES TO RECEIVE PAYMENT (DO NOT SEND INVOICES).
DELPHI'S WILL GENERATE PAYMENT TO YOUR COMPANY BASED
UPON RECEIPT OF MATERIAL AT OUR CURRENT PRICE AND PAY
MENT TERMS, TO ENSURE PROMPT PAYMENT YOU WILL NEED TO
ADHERE TO THE FOLLOWING GUIDELINES:
1. ADVISE THE BUYER OF ANY DISCREPANCIES ON THE PURC
HASE ORDER PRIOR TO SHIPMENT. CONVEY THIS INFORMATION
VIA BOTH PHONE AND FAX/LETTER. REFER TO BOTH THE PUR-
CHASE ORDER NUMBER AND THE ITEM NUMBER AND PUT ON
THE FAX OR LETTER.
2. THE DELPHI PART/ITEM NUMBER, THE PURCHASE ORDER
NUMBER MUST BE INCLUDED ON ALL PACKING SLIPS SENT IN
WITH SHIPMENTS. IF PAYMENT DID NOT OCCUR 2ND DAY 2ND
2ND MONTH AFTER RECEIPT OF GOODS, COPIES SHOULD BE
MAILED TO THE "WHO ORDERED" PERSON AND THE "DELIVER
TO" PERSON REFERENCED ON THE ORDER.
3. THE UNIT OF MEASURE ON THE PACKING SLIP MUST BE
THE SAME AS THE PURCHASE ORDER UNIT OF MEASURE.
4. DO NOT SEND AN INVOICE. PAYMENT WILL BE BASED ON
RECEIPT RECORDS.
5. WAIT FOR PAYMENTS TO BE MADE THE 2ND DAY OF THE
2ND MONTH AFTER RECEIPT BEFORE BEING CONCERNED. IF
6. IF PAYMENT HAS NOT OCCURRED BY THE 2ND DAY, 2ND
MONTH AND IN THE CASE OF SERVICES TYPE ORDERS CALL

A000855   USER BRUCE WASLUSKY   ORIGINAL   CONTINUE PAGE   4

SMO.03 01/15/2003



# PURCHASE ORDER: S3S26246

PAGE 2

**SHIP TO:** (3PI) PROTOTYPE OPERATIONS
2975 NODULAR DR
SAGINAW MI
48601
US

DELPHI SAGINAW STEERING SYSTEM
3900 HOLLAND RD.
SAGINAW MI
48601

VENDOR NUMBER 60-881-4059
H E SERVICES CO
ANCON PROTOTYPE MACHINE
1755 WICCO RD
SAGINAW MI
48601
US

**INVOICE TO:** DELPHI AUTOMOTIVE SYSTEMS
PROTOTYPE OPERATIONS
3900 HOLLAND RD.
DEPT. 14
SAGINAW MI
48601
US

This Number Must Appear On All Invoices, Packing Slips,
Packages and Bills of Lading.
(2) copies of your packing slip must accompany each shipment.
Item Identification Number(s) must be shown on Packing Slips
Invoice, Attn. Accounts Payable
Do not Declare Valuation of Express Shipments or Insure Parcel
Post.

| ORDER DATE | ALTERATION ISSUE DATE | | | | |
|---|---|---|---|---|---|
| 02/06/04 | | J SANBORN | | | |
| | | Buyer | | | |
| SHIP VIA | ALTERATION EFFECTIVE DATE | 989-757-340 | | | |
| SEE BELOW | | PURCHASING AGENT | | | |

| PAYMENT TERMS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| NET 2ND DAY OF 2ND MONTH | | | | | | | | |

| ITEM SEQUENCE | QUANTITY ORDERED | ITEM IDENTIFICATION NO. | NOUN NAME | DESCRIPTION | RFQ NUMBER | DATE REQUIRED | TAX CODE/ % | BASE UNIT PRICE | PRICE MULTIPLE |
|---|---|---|---|---|---|---|---|---|---|

THE PERSON DESIGNATED AS "WHO ORDERED" OR THE
"DELIVER TO" PERSON TO CONFIRM IF A RECEIPT HAS BEEN
ELECTRONICALLY ENTERED AUTHORIZING THE PAYMENT CYCLE
TO BEGIN.
7.   IF IT CAN BE CONFIRMED THAT A RECEIPT HAS BEEN
ENTERED YOU CAN CALL "EAG DISBURSEMENTS" TO CHECK ON
THE STATUS OF THE PAYMENT. YOU WILL NEED YOUR
COMPANY'S (9) DIGIT DUN AND BRADSTREET ACCOUNT NO.
***********************************************
EAG DISBURSEMENTS  PHONE (248) 874-4636
***********************************************
IF IT BECOMES NECESSARY TO "BILL TO EAG DISBURSEMENT
ANALYSIS: P.O. BOX 1550, FLINT, MI. 48501-1550.
PLEASE DO NOT BILL SALES TAX AS WE HAVE OUR OWN
DIRECT PAY PERMITS. ALABAMA PERMIT NO. 224.
MICHIGAN PAY PERMIT ME3B00440 NY. DP00036
ITEMS PRODUCED ON THIS ORDER TO BE IN COMPLIANCE
WITH DELPHI PROTOTYPE MATERIAL PROCEDURE - GP-11.
GP-11 SUBMISSION REQUIREMENTS ARE AT LEVEL "B" AND
MANDATORY FOR THIS ORDER / RELEASE. FOR FURTHER
INFORMATION CONTACT TROY ROHN AT (989) 757-3095.

ITEMS PRODUCED ON THIS ORDER SHALL BE COMPLIANT TO
THE GUIDELINES OF THE GENERAL MOTORS PROCEDURE GP-11
"FOR SUPPLIERS OF MATERIAL FOR PRE-PROTOTYPE &
PROTOTYPE GP-11". HOWEVER, DELPHI SAGINAW STEERING

A000855    USER BRUCE WASLUSKY

ORIGINAL                                    CONTINUE PAGE    5

SM0L03 01/15/2003



# PURCHASE ORDER

PAGE

ORDER: S3S26246

This Number Must Appear On All Invoices, Packing Slips, Packages and Bills of Lading. (2) copies of your packing slip must accompany each shipment. Item Identification Number(s) must be shown on Packing Slips & Invoices. Invoice Attn: Accounts Payable. Do not Declare Valuation of Express Shipments or Insure Parcel Post.

ORDER DATE: 02/06/04

ALTERATION ISSUE DATE

ALTERATION EFFECTIVE DATE

SHIP VIA: SEE BELOW

989-757-340
J   SANBORN   Buyer
S18

PURCHASING AGENT

VENDOR NUMBER 60-881-4059
H E SERVICES CO
ANCON PROTOTYPE MACHINE
1755 WICCO RD
SAGINAW MI
48601

TO:

DELPHI SAGINAW STEERING SYSTEM
3900 HOLLAND RD.
SAGINAW MI
48601

SHIP TO: (3PI) PROTOTYPE OPERATIONS
2975 NODULAR DR
SAGINAW MI
48601
US

INVOICE TO: DELPHI SAGINAW STEERING SYS.
3900 HOLLAND RD.
PROTOTYPE OPERATIONS
SAGINAW MI
48601
US

DELPHI AUTOMOTIVE SYSTEMS
3900 HOLLAND RD.
DEPT. 14
SAGINAW MI
48601
US

| PAYMENT TERMS | F.O.B. | TAX CODE/ % |
| --- | --- | --- |
| NET   2ND DAY OF 2ND MONTH | DESTINATION UNLESS OTHERWISE INDICATED | |

SHIPPING POINT

| ITEM SEQUENCE | QUANTITY ORDERED | ITEM IDENTIFICATION NO. | NOUN NAME / DESCRIPTION | RFQ NUMBER | DATE REQUIRED | BASE UNIT PRICE | PRICE UNIT MULTIPLE MEA |
| --- | --- | --- | --- | --- | --- | --- | --- |

HAS SOME CUSTOMER SPECIFIC REQUIREMENTS THAT DIFFER
FROM THE GM PROCEDURE. THE DELPHI SAGINAW STEERING
CUSTOMER SPECIFIC REQUIREMENTS ARE: SUBMISSION LEVEL
"B" IS REQUIRED (WARRANT ROADMAPPED PRINT MATERIAL
CERTIFICATION, INSPECTION SUMMARY, AND PART MATERIAL/
REV LEVEL AND JULIAN DATE SERIALIZATION).
- MATERIAL CERTIFICATION(S) TO ACCOMPANY THE
  SHIPMENT WITH TEST DATA SHOWING COMPLIANCE.
- EACH PART REQUIRES THE PART NUMBER, REVISION
  LEVEL AND SERIALIZATION USING THE JULIAN DATE
  (I.E. 1145-001), NOT THE "S-001" METHOD
  DESCRIBED WITHIN THE GM PROCEDURE.
- NUMBER ALL DIMENSIONS ON THE PRINT, INCLUDING
  NOTES TO CORRELATE WITH THE DIMENSIONAL SUMMARY
  INSPECTION SHEET. THE INSPECTION SHALL BE
  CONDUCTED ON A 3 PIECE RANDOM SAMPLE FOR EACH
  SHIPMENT. FOR PLASTIC INJECTED RUBBER
  INJECTED AND CASTINGS, A COMPLETE INSPECTION
  IS REQUIRED ON 1 PIECE FROM EACH CAVITY OR DIE
  FROM THE SAME RUN.
- IF THE PRINT REFERENCES A SPECIFICATION, A COPY
  OF THAT SPECIFICATION MUST BE INCLUDED WITH THE
  SUBMISSION.
- COMMON REQUIREMENTS ARE:
- ALL KEY PRODUCT CHARACTERISTICS (KPC'S AND
  STARRED* DIMENSIONS) MUST BE MEASURED ON ALL

CONTINUE PAGE   6

A000855   USER BRUCE WASLUSKY

ORIGINAL

SMCK03 01/15/2003

# PURCHASE ORDER: S3S26246

PAGE 7

ORDER DATE 02/06/04   J   S18   989-757-3404

ALTERATION EFFECTIVE DATE   SANBORN   Buyer

PURCHASING AGENT

This Number Must Appear On All Invoices, Packages and Bills of Lading.
(2) copies of your packing slip must accompany each shipment. Item Identification Number(s) must be shown on Packing Slips and Invoices. Attn: Accounts Payable
Do not Declare Valuation of Express Shipments or Insure Parcel Post.

SHIP VIA
SEE BELOW

DELPHI SAGINAW STEERING SYS.

SHIP TO: (3P1) PROTOTYPE OPERATIONS
2975 NODULAR DR
SAGINAW MI
48601
US

DELPHI SAGINAW STEERING SYSTEM
3900 HOLLAND RD.
SAGINAW MI
48601

VENDOR NUMBER 60-881-4059
H E SERVICES CO
1755 WICCO RD
SAGINAW MI
48601
US

TO: ANCON PROTOTYPE MACHINE

INVOICE TO:
DELPHI AUTOMOTIVE SYSTEMS
PROTOTYPE OPERATIONS
3900 HOLLAND RD.
DEPT. 14
SAGINAW MI
48601
US

PAYMENT TERMS
NET  1st  2ND DAY OF 2ND MONTH

F.O.B.
SHIPPING POINT

DESTINATION UNLESS OTHERWISE INDICATED

| ITEM SEQUENCE | QUANTITY ORDERED | ITEM IDENTIFICATION NO. | NOUN NAME | DESCRIPTION | RFQ NUMBER | DATE REQUIRED | TAX CODE/ % | BASE UNIT PRICE | PRICE UNIT/MULTIPLE MEAS. |
|---|---|---|---|---|---|---|---|---|---|
| A000855 | USER BRUCE WASLUSKY | | | | | | | | |

PARTS. INSPECTION RESULTS MUST BE RECORDED.
OUT OF TOLERANCE SPECIFICATION DIMENSION(S)
MUST BE CIRCLED. THE SUPPLIER MUST COMPLETE
THE CORRECTIVE ACTION ON THE BACK OF THE
WARRANT AND FAX IT TO THE APPROPRIATE DELPHI
ENGINEER FOR REVIEW. IF ACCEPTABLE, THE
PROCURING DELPHI ENGINEER MUST SIGN OFF ON THE
BACK OF THE WARRANT TO ACCEPT THE DEVIATION(S)
PRIOR TO SUBMITTING THE PARTS FOR SHIPMENT.
DELPHI SAGINAW STEERING REQUIREMENTS ARE SUMMARIZED
IN A DOCUMENT TITLED "GP-11 MADE SIMPLE". THIS
DOCUMENT MAY BE OBTAINED BY CONTACTING THE NUMBER
BELOW. IF SUBMITTING A PPAP SUBMISSION IN PLACE OF
A GP-11 SUBMISSION, THE PPAP MUST INCLUDE AN APPROVED
WARRANT SIGNED BY THE CUSTOMER. YOU CANNOT SUBMIT A
PPAP SUBMISSION THAT IS "PENDING APPROVAL. IN PLACE
OF GP-11.
PRODUCTION SUPPLIER MUST BE REGISTERED
WITH COVISINT. ANY NON-COMPLIANCE TO THE
REQUIREMENTS MAY RESULT IN THE ISSUANCE OF A
PROBLEM REPORT AND RESOLUTION (PR & R). WHEN GP-11
LEVEL OF CERTIFICATION IS INDICATED, THE SUPPLIER
MUST REVIEW THE STATUS OF GP-11 DOCUMENTATION WITH
THE PROTOTYPE EXPEDITOR AND OBTAIN A RELEASE BEFORE
MATERIAL IS SHIPPED. IF MATERIAL IS SHIPPED WITHOUT
PROTOTYPE APPROVAL, THE SUPPLIER ACCEPTS
RESPONSIBILITY FOR ALL TRANSPORTATION AND

CONTINUE PAGE

ORIGINAL

SMDC03 01/15/2003

DELPHI

# PURCHASE ORDER: S3S26246

PAGE

This Number Must Appear On All Invoices, Packing Slips, Packages and Bills of Lading.
(2) copies of your packing slip must accompany each shipment.
Item Identification Number(s) must be shown on Packing Slips and Invoices.
Invoice Attn: Accounts Payable
Do not Declare Valuation of Express Shipments or Insure Parcel Post.

| ORDER DATE | | | |
|---|---|---|---|
| 02/06/04 | J | S18 | |
| ALTERATION ISSUE DATE | SANBORN | | Buyer |
| ALTERATION EFFECTIVE DATE | | | |

SHIP VIA: SEE BELOW

PURCHASING AGENT: 989-757-3404

**SHIP TO:**
(3P) PROTOTYPE OPERATIONS
2975 NODULAR DR
SAGINAW MI
48601    US

**INVOICE TO:**
DELPHI AUTOMOTIVE SYSTEMS
PROTOTYPE OPERATIONS
3900 HOLLAND RD.
DEPT   14
SAGINAW MI
48601    US

DELPHI SAGINAW STEERING SYSTEM
3900 HOLLAND RD.
SAGINAW MI
48601    US

**VENDOR NUMBER 60-881-4059**
H E SERVICES CO
ANCON PROTOTYPE MACHINE
1755 WICCO RD
SAGINAW MI
48601

**TO:**

DELPHI SAGINAW STEERING SYS.
(3P) PROTOTYPE OPERATIONS

This order and Buyer's other terms and conditions
referred to herein and, if applicable, as to which
this Purchase Order is issued, shall constitute the complete
agreement between the parties and shall supersede all
prior agreements. Buyer's acceptance is expressly
limited to the terms and conditions hereof. Any additional
or different terms proposed by Seller are rejected unless
expressly assented to in writing.
Attached Hereto Are Contract Standard Terms and Conditions
which by Reference Number for Shown Hereon, additional Terms and Conditions
Attached Hereto Apply.

**PAYMENT TERMS**
NET :    2ND DAY OF 2ND MONTH

| ITEM QUANTITY ORDERED | ITEM IDENTIFICATION NO. | NOUN NAME | DESCRIPTION | RFQ NUMBER | DATE REQUIRED | TAX CODE/ % | BASE UNIT PRICE | PRICE UNIT/MULTIPLE MEAS |
|---|---|---|---|---|---|---|---|---|
| | | | F.O.B. SHIPPING POINT | | DESTINATION UNLESS OTHERWISE INDICATED | | | |

INSPECTION EXPENSES REQUIRED TO MEET THE ORIGINAL
REQUIREMENT OF THE PURCHASE ORDER. IF THE ORDER
IS FOR TOOLING, THE GP-11 REQUIREMENTS ARE NOT
NECESSARY. IF YOU WOULD LIKE INFORMATION
CONCERNING THE GP-11 REQUIREMENTS, CONTACT
TROY ROHN AT DELPHI SAGINAW STEERING PROTOTYPE
OPERATIONS AT 989-757-3095.

TERMS AND CONDITIONS PRINTED ON THE REVERSE
SIDE OF THE PURCHASE ORDER AND THE REFERENCE TO
TERMS AND CONDITIONS DATED JANUARY, 2001 ARE NOT
VALID. DELPHI'S TERMS AND CONDITIONS CAN BE
FOUND ON THE WEB SITE LISTED BELOW. SELLER
ACKNOWLEDGES AND AGREES THAT BUYER'S GENERAL
TERMS AND CONDITIONS ARE INCORPORATED IN, AND
A PART OF, THIS CONTRACT AND EACH PURCHASE ORDER,
RELEASE, REQUISITION, WORK ORDER, SHIPPING
INSTRUCTION SPECIFICATION AND OTHER DOCUMENTS
ISSUED BY BUYER OR ACCEPTED IN WRITING BY BUYER,
WHETHER EXPRESSED IN WRITTEN FORM OR BY ELECTRONIC
DATA INTERCHANGE, RELATING TO THE GOODS AND/OR
SERVICES TO BE PROVIDED BY SELLER PURSUANT TO
THIS CONTRACT (SUCH DOCUMENTS ARE COLLECTIVELY
REFERRED TO AS THIS "CONTRACT"), A COPY OF
BUYER'S GENERAL TERMS AND CONDITIONS IS AVAILABLE
UPON WRITTEN REQUEST TO BUYER OR VIA THE INTERNET

CONTINUE PAGE   8

A000855    USER BRUCE WASLUSKY

ORIGINAL

SN0E03 01/19/2003



# PURCHASE ORDER.

S3S26246

PAGE

DELPHI SAGINAW STEERING SYSTEM
3900 HOLLAND RD.
SAGINAW MI 48601
US

VENDOR NUMBER 60-881-4059
H E SERVICES CO
ANCON PROTOTYPE MACHINE
1755 WICCO RD
SAGINAW MI 48601

SHIP TO: (3P1) PROTOTYPE OPERATIONS
2975 NODULAR DR
SAGINAW MI
48601
US

INVOICE TO:
DELPHI AUTOMOTIVE SYSTEMS
PROTOTYPE OPERATIONS
3900 HOLLAND RD.
DEPT. 14
SAGINAW MI
48601
US

This Number Must Appear On All Invoices, Packing Slips, Packages and Bills of Lading.
(2 copies of your packing slip must accompany each shipment
Item Identification Number(s) must be shown on Packing Slips
Invoice Attn: Accounts Payable
Do not Declare Valuation of Express Shipments or Insure Parcel Post.

ORDER DATE: 02/06/04
ALTERATION ISSUE DATE:
ALTERATION EFFECTIVE DATE:

SHIP VIA: SEE BELOW

989-757-34(
J SANBORN  Buyer
S18

PURCHASING AGENT:

| PAYMENT TERMS | ITEM SEQUENCE | QUANTITY ORDERED | ITEM IDENTIFICATION NO. | RQUM NAME | DESCRIPTION | F.O.B. | PFQ NUMBER | DATE REQUIRED | TAX CODE/% | BASE UNIT PRICE | PRICE MULTIPLE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NET 2ND DAY OF 2ND MONTH | A000855 | | USER BRUCE WASLUSKY | | | DESTINATION UNLESS OTHERWISE INDICATED SHIPPING POINT | | | | | |

AT DELPHI'S WEBSITE, DELPHI.COM (BY CLICKING ON "SUPPLIERS" IN THE HEADER AND THEN "SUPPLIER COMMUNITY PORTAL", THEN CLICK ON "SUPPLIER STANDARDS" THEN "ATTACHMENTS, FORMS, AND ADDITIONAL INFORMATION" AND THEN "DGP SUPPLIER GUIDELINES ATTACHMENT C GENERAL TERMS AND CONDITIONS"). SELLER ACKNOWLEDGES AND AGREES THAT IT HAS READ AND UNDERSTANDS BUYER'S GENERAL TERMS AND CONDITIONS. IF SELLER ACCEPTS THIS CONTRACT IN WRITING OR COMMENCES ANY OF THE WORK OR SERVICES WHICH ARE THE SUBJECT OF THIS CONTRACT, SELLER WILL BE DEEMED TO HAVE ACCEPTED THIS CONTRACT AND BUYER'S GENERAL TERMS AND CONDITIONS IN THEIR ENTIRETY WITHOUT MODIFICATION. ANY ADDITIONS TO, CHANGES IN, MODIFICATIONS OF, OR REVISIONS OF THIS CONTRACT (INCLUDING BUYER'S GENERAL TERMS AND CONDITIONS) WHICH SELLER PROPOSES WILL BE DEEMED TO BE REJECTED BY BUYER EXCEPT TO THE EXTENT THAT BUYER EXPRESSLY AGREES TO ACCEPT ANY SUCH PROPOSALS IN WRITING.

*TOOLS - PROPERTY OF & RIGHT TO AUDIT*
ANY TOOLS MANUFACTURED/PROCURED SPECIFICALLY FOR THE PROCESSING OF THE PART(S) ON THIS PURCHASE ORDER ARE PROPERTY OF DELPHI AND MUST BE PROPERLY IDENTIFIED AS SUCH. ALL PURCHASE ORDERS FOR PROTOTYPE TOOLING REQUIRE THAT BLUEPRINTS OF SAID TOOLING BE SUBMITTED

ORIGINAL

CONTINUE PAGE  9

SMD.03 01/15/2001



# PURCHASE ORDER: 53526246

PAGE

DELPHI SAGINAW STEERING SYS.
(3PI) PROTOTYPE OPERATIONS
2975 NODULAR DR
SAGINAW MI
48601

US

**SHIP TO:**

DELPHI AUTOMOTIVE SYSTEMS
PROTOTYPE OPERATIONS
SAGINAW MI
48601

US

**INVOICE TO:**

DELPHI SAGINAW STEERING SYS.
3900 HOLLAND RD.
DEPT. 14
SAGINAW MI
48601

US

This Number Must Appear On All Invoices, Packing Slips, Packages and Bills of Lading.
(1) copies of your packing slip must accompany each shipment
Item Identification Number(s) must be shown on Packing Slips
Invoice Attn: Accounts Payable
Do not Declare Valuation of Express Shipments or Insure Parc
Post.

| ORDER DATE | SHIP VIA |
|---|---|
| 02/06/04 | SEE BELOW |

| | ALTERATION ISSUE DATE |
|---|---|
| J | 518 |

| PURCHASING AGENT | |
|---|---|
| J SANBORN | 989-757-34( |
| Buyer | |

| ALTERATION EFFECTIVE DATE | BASE UNIT PRICE |
|---|---|

DELPHI SAGINAW STEERING SYSTEM
3900 HOLLAND RD.
SAGINAW MI
48601

**TO:**

VENDOR NUMBER 60-881-4059
H E SERVICES CO
ANCON PROTOTYPE MACHINE
1755 WICCO RD
SAGINAW MI
48601

US

| PAYMENT TERMS | | | | |
|---|---|---|---|---|
| NET 2ND DAY OF 2ND MONTH | | | | |

| ITEM SEQUENCE | QUANTITY ORDERED | ITEM IDENTIFICATION NO. | NOUN NAME | DESCRIPTION |
|---|---|---|---|---|
| A000855 | | USER BRUCE WASLUSKY | | TO THE BUYER IMMEDIATELY AFTER THE TOOLING IS COMPLETED (WHEN REQUESTED BY THE BUYER). TOOLS ARE TO BE HELD AT SELLER'S PLANT AND ARE NOT TO BE MOVED OR USED FOR ANY OTHER PURPOSE WITHOUT THE SPECIFIC AUTHORIZATION OF THE BUYER. "SELLER HEREBY AGREES TO RETAIN THE TOOLS DESCRIBED ABOVE FOR A PERIOD OF FIVE (5) YEARS THEREAFTER TO RETURN, TRANSFER TO ANOTHER LOCATION, OR TO REMIT THE PROCEEDS OF THE SALE FOR SCRAP TO THE DIRECTOR OF PURCHASING AS SO INSTRUCTED BY THE BUYER." IN ORDER TO FACILITATE PROMPT PAYMENT, PLEASE INCLUDE SET-UP AND/OR TOOLING CHARGES ON YOUR PACKING SLIP WITH THEIR APPROPRIATE SEQUENCE/ITEM NUMBER WHEN MAKING THE FIRST SHIPMENT OF THE PARTS. DELPHI BUYER RESERVES THE RIGHT TO AUDIT ALL PERTINENT DOCUMENTS RELATING TO THE GOODS OR SERVICES COVERED BY THIS PURCHASE ORDER AND IF REQUESTED BY THE BUYER, SELLER SHALL PROVIDE SUCH DOCUMENTATION PROMPTLY. BUYER SHALL REIMBURSE SELLER THE LESSER OF (I) THE AMOUNT SPECIFIED IN THIS CONTRACT OR (II) SELLER'S ACTUAL COST FOR PURCHASED MATERIALS AND SERVICES COVERED BY THIS PURCHASE ORDER AND IF REQUESTED BY THE BUYER, SELLER SHALL PROVIDE SUCH DOCUMENTATION PROMPTLY. TOOLING BREAKDOWN: WHEN QUOTING TOOLS, GAGES OR FIXTURES PLEASE PROVIDE A COMPLETE BREAKDOWN OF TOOLS WITH ITEMIZED COSTS. REQUIREMENTS FOR THE BREAKDOWN ARE AS |

F.O.B.  DESTINATION UNLESS OTHERWISE INDICATED

SHIPPING POINT

RFQ NUMBER    DATE REQUIRED    TAX CODE/ %

CONTINUE PAGE    10

ORIGINAL

SND620 01/15/2003



# PURCHASE ORDER: S3S26246

PAGE

DELPHI SAGINAW STEERING SYS.
3900 HOLLAND RD., PROTOTYPE OPERATIONS
2975 NODULAR DR
SAGINAW MI
48601
US

VENDOR NUMBER 60-881-4059

TO:
H E SERVICES CO
ANCON PROTOTYPE MACHINE
1755 WICCO RD
SAGINAW MI
48601

INVOICE TO:
DELPHI AUTOMOTIVE SYSTEMS
PROTOTYPE OPERATIONS
3900 HOLLAND RD.
DEPT. 14
SAGINAW MI
48601
US

This Number Must Appear On All Invoices, Packing Slips,
Packages and Bills of Lading.
(2 copies of your packing slip must accompany each shipment
Item Identification Number(s) must be shown on Packing Slip
Invoice.
Invoice Attn: Accounts Payable
Do not Declare Valuation of Express Shipments or Insure Parc
Post.

| PAYMENT TERMS | F.O.B. | ORDER DATE | SHIP VIA |
|---|---|---|---|
| NET 2nd DAY OF 2nd MONTH | SHIPPING POINT | 02/06/04 | SEE BELOW |

| | | DESTINATION UNLESS OTHERWISE INDICATED | ALTERATION ISSUE DATE | J SANBORN 989-757-341 S18 |

PURCHASING AGENT

| ITEM SEQUENCE | QUANTITY ORDERED | ITEM IDENTIFICATION NO. | NOUN NAME | DESCRIPTION | RFQ NUMBER | DATE REQUIRED | TAX CODE/ % | BASE UNIT PRICE | PRICE U MULTIPLE ea |
|---|---|---|---|---|---|---|---|---|---|
| A000855 | USER BRUCE WASLUSKY | | | FOLLOWS: (1) ANY DESIGN/DEVELOPMENT COST MUST BE ITEMIZED SEPARATE FROM TOOL COSTS. (2) ANY PROTOTYPE TOOLS, GAGES OR FIXTURES THAT CAN BE USED IN PRODUCTION LATER MUST BE IDENTIFIED AS PRODUCTION INTENT TOOLS. THESE TOOLS WILL BE PAID BY PRODUCTION AFTER PPAP. (3) QUOTES WITHOUT PROPER DOCUMENTATION ARE SUBJECT TO NON-ACCEPTANCE. (4) PLEASE PROVIDE A COPY OF THE PROPOSED TOOLING SOURCES' QUOTE(S) WITH YOUR QUOTE. ANY DEVIATION FROM THE ABOVE REQUIREMENTS WILL ULTIMATELY DELAY ISSUANCE OF A PURCHASE ORDER.<br><br>TERMS AND CONDITIONS JANUARY 2001, APPLY OF WHICH SUPPLIER HAS RECEIVED A COPY. | | | | | |

ORIGINAL                    LAST PAGE                    SMDO3 01/16/2003

EXHIBIT Q

Revised June 24, 1999

# DELPHI AUTOMOTIVE SYSTEMS

## GENERAL TERMS AND CONDITIONS

> *Delphi Automotive Systems seeks to exceed its customers' expectations. Delphi's suppliers are integral to achieving this objective, and Delphi hopes that its suppliers will recognize Delphi as their preferred customer. Delphi will establish high performance expectations for itself and its suppliers, measure performance and reward superior performance.*

## 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

## 2. SHIPPING AND BILLING

2.1 Shipping. Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and/or release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs. Seller will include on bills of lading or other shipping receipts the correct classification identification of the goods shipped as Buyer or the carrier requires. The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

2.2 Billing. Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer. If the payment due date is not otherwise specified in this Contract, the payment due date will be the due date established by the Multilateral Netting System (MNS-2) used by Buyer, which provides, on average, that payment will be due on the second day of the second month following the date Buyer receives the goods or services. Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

2.3 Delivery Schedules. Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract. Time is of

the essence with respect to all delivery schedules Buyer establishes. Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules. Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules. If Buyer determines that the requirements of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other modification of this Contract.

2.4   Premium Shipments.   If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules using the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods using a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible. Seller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to fail to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

## 3. SPECIFICATION, DESIGN AND SCOPE CHANGES

Buyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract, including work related to inspection, testing or quality control. While Buyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such changes. Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including Buyer's payment of reasonable costs of modifications to Seller's Equipment and Facilities (as defined in Article 16) necessary to implement such changes. In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's cost of production and the time to implement such changes. In the event of any disagreement arising out of such changes, Buyer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue performing under this Contract, including prompt implementation of changes required by Buyer, while Buyer and Seller resolve any disagreement arising out of such changes.

## 4. QUALITY AND INSPECTION

Seller will participate in Buyer's supplier quality and development program(s) and comply with all quality requirements and procedures Buyer specifies from time to time. Seller will permit Buyer and its representatives and consultants to (i) inspect Seller's books and records in order to monitor Seller's compliance with this Contract and Seller's financial condition and (ii) enter Seller's facilities at reasonable times to inspect such facilities and any goods, materials and property that relate to this Contract. No such inspection by Buyer will constitute acceptance by Buyer of any work-in-process or finished goods.

## 5. NON-CONFORMING GOODS

Buyer is not required to perform incoming inspections of any goods, and Seller waives any right to require Buyer to conduct any such inspections. Seller will not substitute any goods for the goods covered by this Contract unless Buyer consents in writing. If Buyer rejects any goods as non-conforming, Buyer may, at its option, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods, (b) require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or remedies. If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of non-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or such shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the non-conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to

Revised June 24, 1999

arrange for the shipment of any non-conforming goods back to Seller at Seller's expense. Seller will bear all risk of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by Buyer to return, store or dispose any non-conforming goods. Buyer's payment for any non-conforming goods will not constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or relieve Seller of responsibility for the non-conforming goods.

## 6. FORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for so long as such event or occurrence continues, provided, however, that the affected party gives written notice of such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by the quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities and at times Buyer requests and at the prices set forth in this Contract. If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without liability. Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any such disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such disruption commences.

## 7. WARRANTY

7.1 General. Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services covered by this Contract will (a) conform to all applicable specifications, drawings, samples, descriptions, brochures and manuals furnished by Seller or Buyer, (b) will be merchantable, (c) of good material and workmanship, (d) free from defect, and (e) are fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

7.2 Date and Time Processing. Seller warrants and guarantees to Buyer and its customers that any products (including computer hardware, software, firmware, machinery and equipment) covered by this Contract must at all times accurately process, handle, calculate, compare and sequence date and time data from, into, within and between the 20th and 21st centuries, including leap year calculations.

7.3 Warranty Period. The period for each of the foregoing warranties will be that provided by applicable law, except that if Buyer ever provides a longer warranty to its customers, such longer warranty period will apply to the goods covered by this Contract.

## 8. INGREDIENTS AND HAZARDOUS MATERIALS

If Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all ingredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to the ingredients. Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers sufficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures and precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable legal requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing.

## 9. INSOLVENCY OF SELLER

Buyer may immediately terminate this Contract without liability to Seller in any of the following or any similar events:  (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract.  Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract, without liability to Seller at any time after execution if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract; or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing.  Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under this Contract which are useable and in a merchantable condition.  The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by Buyer and not previously paid for, plus (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less (c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent.  In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which Seller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required to pay for any goods or materials that are in Seller's standard stock or that are readily marketable. Payments made under this Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination.  Within sixty (60) days after the effective date of termination, Seller will submit a comprehensive

Revised June 24, 1999

termination claim to Buyer, with sufficient supporting data to permit an audit by Buyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 12. TECHNICAL INFORMATION

12.1   Exchange of Information.   Buyer and Seller will cooperate to create, maintain, update, and share technical information about the goods, products, machinery, materials, formulations and their manufacture, use, application and control in compliance with Buyer's drafting and math data standards.  Such technical information will not be subject to any use or disclosure restrictions.  Accordingly, Seller agrees not to assert any claims against Buyer, its customers or their respective suppliers with respect to any technical information that Seller discloses in connection with this Contract.

12.2   Waiver of Claims.   Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, Buyer's customers or their respective suppliers with respect to any technical information that Seller shall have disclosed or may hereafter disclose in connection with the goods or services covered by this Contract.

12.3   Repair and Rebuild.   Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and their subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment of any royalty or other compensation to Seller.

12.4   Computer Programs and Written Works.   All works of authorship, including without limitation, software, computer programs, and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing this Contract (separately or as part of any goods and components) are "works made for hire" and the sole property of Buyer.  To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller agrees to assign and assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship.

## 13. INDEMNIFICATION

13.1   Infringement.   Seller will defend, hold harmless and indemnify Buyer and its customers, and their respective successors and assigns, against any claims of infringement (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses (including, without limitation, attorney and other professional fees and disbursements) relating to the goods or services covered by this Contract, including any claims in circumstances where Seller has provided only part of the goods or services.     Seller waives any claim against Buyer that any such infringement arose out of compliance with Buyer's specifications.

13.2   Activities on Buyer's Premises.   Seller will defend, hold harmless, and indemnify Buyer from and against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other professional fees and disbursements) arising from or in connection with the performance of any service or work by Seller or its employees, agents, representatives and subcontractors on Buyer's or Buyer's customer's premises or the use of the property of Buyer or any customer of Buyer, except to the extent such liability arises out of the negligence or willful misconduct of Buyer or Buyer's customer.

13.3   Product Liability .   Seller will defend, hold harmless, and indemnify Buyer from and against any liability and expenses (including, without limitation, attorney and other professional fees and disbursements) arising from or in connection with any third party claims or demands to recover for personal injury or death, property damage or economic loss caused by any of the goods or services supplied by Seller (regardless of whether

Revised June 24, 1999

such claim or demand arises under tort, negligence, contract, warranty, strict liability or other legal theories), except to the extent such injury, damage or loss results from Buyer's specifications as to design or materials or from alteration or improper repair, maintenance or installation by any party other than Seller.

## 14. COMPLIANCE WITH LAWS

Seller, and any goods or services supplied by Seller, will comply with all applicable laws, rules, regulations, orders, conventions, ordinances and standards of the country(ies) of origin and destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Neither Seller nor any of its subcontractors will utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or services under this Contract. Upon Buyer's request, Seller will certify in writing its compliance with the foregoing. Seller will defend, hold harmless and indemnify Buyer from and against any liability, claims, demands, damages or expenses (including reasonable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with this Article.

## 15. INSURANCE

Seller will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers reasonably acceptable to Buyer. With respect to any such insurance coverage, Seller will furnish to Buyer either a certificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies of all insurance policies within ten (10) days after Buyer requests. The certificate must provide that Buyer will receive thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's obligations or liabilities under this Contract.

## 16. SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required for the production of the products covered by this Contract ("Seller's Equipment"). Seller will insure Seller's Equipment with fire and extended coverage insurance for its full replacement value. Seller grants Buyer an irrevocable option to take possession of, and title to, all or part of Seller's Equipment that is specially designed or outfitted for the production of the goods covered by this Contract upon payment to Seller of the net book value of such Seller's Equipment less any amounts that Buyer has previously paid to Seller for the cost of such Seller's Equipment. This option will not apply to the extent that Seller's Equipment is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others. Buyer's right to exercise this option is not conditioned on Seller's breach or Buyer's termination of this Contract or upon payment of any other amounts due under this Contract.

## 17. BUYER'S PROPERTY

17.1 Bailment of Property. All supplies, materials, tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items Buyer furnishes, either directly or indirectly, to Seller, or for which Buyer gives consideration to Seller in whole or in part ("Buyer's Property"), will be and remain the property of Buyer and be held by Seller on a bailment basis. To the extent that this Contract provides that Buyer will reimburse Seller for any specific items of Buyer's Property (such as tooling), Seller will purchase and pay for such Buyer's Property as agent of Buyer. To the extent that this Contract provides that Seller will obtain any specific items of Buyer's Property (such as tooling) without separate or additional payment or reimbursement by Seller,

**Revised June 24, 1999**

Seller acknowledges and agrees that Buyer's issuance of this Contract is good and sufficient consideration for such Buyer's Property and that title to such Buyer's Property shall vest immediately in Buyer and be held by Seller pursuant to this Article. Seller shall assign to Buyer any contract rights or claims in which Seller has an interest with respect to Buyer's Property. Seller shall also execute (i) any bills of sale or other documents of conveyance Buyer requests to evidence the transfer to Buyer of title to any Buyer's Property, related contract rights and claims and (ii) any financing statements or other documents Buyer requests to evidence Buyer's ownership of Buyer's Property.  Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property. Seller will not sell, lend, rent, encumber, pledge, lease, transfer or otherwise dispose of Buyer's Property. Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property.  When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property for work performed on such property or otherwise. Goods manufactured based on Buyer's drawings and/or specifications may not be used for Seller's own use or sold to third parties without Buyer's express written authorization.

17.2  <u>Seller's Duties with Respect to Buyer's Property</u>.  While Buyer's Property is in Seller's possession and until Seller delivers Buyer's Property back to Buyer, Seller bears the risk of loss and damage to Buyer's Property.  Seller will be responsible for the cost of repairing or replacing Buyer's Property if it is damaged or destroyed regardless of cause or fault.  Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from Seller's premises without Buyer's written approval, and (g) use Buyer's Property in compliance with Buyer's or the manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations.  Buyer will have the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with respect thereto.

17.3  <u>Return of Buyer's Property</u>.  Seller agrees that Buyer has the right, at any time and from time to time, with or without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property. Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the right to enter Seller's premises and take possession of any and all of Buyer's Property.  Upon Buyer's request and in accordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by Seller, either (i) Ex Works (Incoterms 1990) at Seller's plant properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates, in which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates.  If Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or without legal process, and take immediate possession of Buyer's Property.

17.4  <u>Disclaimer of Warranties</u>.  Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's Property nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's benefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF BUYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE.  Buyer will not be liable to Seller for any loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including, without limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of service or for any

**Revised June 24, 1999**

loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory damages, profits or any other indirect, special or consequential damages.

17.5  Development, Engineering And Consulting Services.  Engineering, consulting or development services ("Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of authorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole property of Buyer.  Seller agrees to assign all right, title and interest in and to IP that results from Development Services ("Developed IP") to Buyer.  Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every reasonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional documents reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse Seller for reasonable costs incurred by Seller in providing such assistance.

## 18. SERVICE AND REPLACEMENT PARTS

During the term of  this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and replacement parts requirements to Buyer's customers at the then current production price(s) under this Contract.  If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module at price(s) that will not, in the aggregate, exceed the price of the system or module less assembly costs.  If this Contract is in effect at the end of the vehicle production program into which the goods covered by the Contract are incorporated, Seller will also sell goods to Buyer to fulfill Buyer's and its customers' service and replacement parts requirements during the fifteen (15) year period following the end of such vehicle production program (the "Post-Production Period"), and this Contract will automatically remain in effect during the entire Post-Production Period.  During the first three (3) years of the Post-Production Period, the price(s) for such goods will be the production price(s) which were in effect at the commencement of the Post-Production Period.  For the remainder of the Post-Production Period, the price(s) for such service goods will be as reasonably agreed to by the parties.  If requested by Buyer, Seller will also make service literature and other materials available at no additional charge to support Buyer's service activities.

## 19. REMEDIES

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity.

## 20. CUSTOMS AND EXPORT CONTROLS

Credits or benefits resulting or arising from this Contract, including trade credits, export credits or the refund of duties, taxes or fees, belong to Buyer.  Seller will provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive these benefits or credits, and to fulfill any customs related obligations, origin marking or labeling requirements and local content origin requirements.  Seller will obtain all export licenses or authorizations necessary for the export of the goods unless otherwise indicated in this Contract, in which event Seller will provide all information as may be necessary to enable Buyer to obtain such licensees or authorization(s).  Seller will make all arrangements that are necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

## 21. SETOFF AND RECOVERY

Revised June 24, 1999

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or Buyer's affiliates, Buyer may (i) setoff such obligations against any sums owing to Seller or Seller's affiliates and/or (ii) recoup such obligations from any amounts paid to Seller or Seller's affiliates by Buyer or Buyer's affiliates.

## 22. NO ADVERTISING

Seller will not, in any manner, advertise or publish that Seller has contracted to furnish Buyer the goods or services covered by this Contract or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials unless Buyer consents in writing.

## 23. NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any provision of this Contract will not affect the right to require such performance at any later time, nor will the waiver by either party of a breach of any provision of this Contract constitute a waiver of any succeeding breach of the same or any other provision.  No course of dealing or course of performance may be used to evidence a waiver or limitation of Seller's obligations under this Contract.

## 24. ASSIGNMENT

Buyer may assign its rights and obligations under this Contract without Seller's prior written consent.  Seller may not assign or delegate its rights or obligations under this Contract without Buyer's prior written consent.

## 25. RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties.  Nothing in this Contract makes either party the agent or legal representative of the other for any purpose whatsoever, nor grants either party any authority to assume or create any obligation on behalf of or in the name of the other party.

## 26. GOVERNING LAW AND JURISDICTION

This Contract is to be construed according to the laws of the country (and state or province, if applicable) from which this Contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law.  Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in the court(s) having jurisdiction over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures.  Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this Contract is issued.

## 27. SEVERABILITY

If any provision of this Contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Contract will remain in full force and effect.

## 28. RIGHT TO AUDIT AND INSPECT

Revised June 24, 1999

Buyer, at its expense, has the right to audit and review all relevant books, records, payroll data, receipts and other documents, including Seller's administrative and accounting policies, guidelines, practices and procedures, in order to substantiate any charges and other matters under this Contract. Seller will maintain and preserve all such documents for a period of four (4) years following final payment under this Contract. In addition, Buyer has the right to inspect all inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges, and other items related to Seller's performance of this Contract. Seller will provide Buyer with reasonable access to its facilities and otherwise cooperate and facilitate any such audits or inspections by Buyer.

## 29. ENTIRE AGREEMENT

This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written contract amendment issued by Buyer. Notwithstanding anything to the contrary contained herein, Buyer explicitly reserves, and this Contract will not constitute a waiver or release of, any rights and claims against Seller arising out of, or relating to, any fraud or duress in connection with the formation of this Contract or any breach or anticipatory breach of any previously existing contract between Buyer and Seller (whether or not such previously existing contract related to the same or similar goods or subject matter as this Contract). All payments by Buyer to Seller under this Contract are without prejudice to Buyer's claims, rights, or remedies.

EXHIBIT R

| | | | |
|---|---|---|---|
| **Telefax Nr.**<br>Telefax No. | 001 810 743 8400 | | **EX·CELL·O** |

| | |
|---|---|
| **An Firma**<br>To company | H.E.Services<br>Flint, MI 48507 |

**EX-CELL-O GmbH**
Werkzeugmaschinen
Sondermaschinen

| | |
|---|---|
| **Zu Händen**<br>Attn. | Mr. Richard E. Everden<br>Corporate Controller |

Salacher Straße 93
D-73054 Eislingen/Fils

Postfach 1161
D-73048 Eislingen/Fils

Telefon (07161) 805-0
Telefax (07161) 805-223

## Telefax

| **Seitenanzahl**<br>No. of pages | 7 | **Von**<br>From | V-I/G. Kieffer | **Durchwahl**<br>Direct call | 299 |
|---|---|---|---|---|---|

| **Datum**<br>Date | Aug. 12, 2002 |
|---|---|

**e-mail**
Verkauf-Innendienst@ex-cell-o.de

| **Betreff**<br>Subject | Your order no. 21249 of Dec. 14, 1999<br>Grinding Machine XG 690<br>Our comm.-no. 401 125 |
|---|---|

Dear Mr. Everden,

we refer to your letter of July 19, 2002.

According to the attached letter dd. Oct. 25, 2001 signed by Mr. Joseph A. Stearns (Vice President Engineering and Manufacturing) and our response of Oct. 26, 2001 we have a very clear agreement that the second payment rate of 20 % i.e. US $ 123.628,-- is due 120 days after the shipping date and the safe arrival of machine in Saginaw, Mi. and payable without any deductions. We assume that the agreement is still valid.

The machine arrived at your plant on Dec. 13, 2001, which means that the 120 days were over on April 13, 2002. Since then we have been waiting for the payment and have a daily loss of interest. Therefore we kindly ask you once again to arrange the payment now until latest August 23, 2002.

We agree that the reasons for the delay are very complex. There was a lot of development work we had to do together with your people and also the FANUC Control which we had to use on your special request was one of the reasons for the delay.
Please do bear in mind that considerable costs had been caused to our company by paying the flight tickets for two of your engineers as well as providing you with a service engineer for a period of 8 weeks (our letter from July, 27, 2001). Further money had been spend on the development work referred to above. Therefore as already mentioned in our letter from March 16, 2001 we disagree with paying the costs you mentioned again in your letter from July 19, 2002.

**EX-CELL-O GmbH**
Werkzeugmaschinen
Sondermaschinen

Blatt 2

In as far as the last payment rate of 10 % is concerned it is agreed upon that these are due after final acceptance under the terms and conditions of the original P.O.

As far as we are informed by your operators and engineers the machine is working now to your full satisfaction and for you as a prototype manufacturer the machine perfectly suits your specific needs.

For this reason the last payment rate will be due and must be paid, too. However, we are ready to agree to a deduction of the drawing conversation costs as follows:

Final Payment rate:                                               US $ 61.814,--
Less your invoice no. 10000028684-HES  dd.  3/21/02       US $ 15.750,--

Due for payment by the 23 rd. of Aug., 2002                  US $ 46.064,--.

Apart from the fact that we already paid US $ 5.000,-- in November 2001 we would like to point out that there are some drawings incl. in the total figure, that are not as complex as that they would justify the rate of US $ 125,-- each. Moreover we can not agree to pay the invoice of US $ 4.250,--. As this amount is to our favour (as mentioned in the P.S of our telefax from Dec. 12., 2001)  and we did not know about the agreement between you and Delphi stated in the memo Dec. 13, 2001 (and now see it for the first time), we disagree with this agreement that we clearly did not take part in. Regarding your invoice no. 10000029060-HES dd. 3/29/02 in the amount of US $ 5.375,-- please provide us with a list showing which drawing numbers you have converted. After reception of the list we will check it and if it is correct you can deduct it also from the final payment rate in accordance with the agreement
of Dec. 3., 2001.

In order to assure ongoing understanding between our two companies and avoid the entrance of third parties we suggest this mutual and fair agreement that we think is acceptable for both sides.

We would appreciate to receive your positive reply and remain

Sincerely,
EX-CELL-O GmbH

i. V.                          i. V.
U. Stuhlmüller              G. Kieffer

**EX-CELL-O GmbH**
Werkzeugmaschinen
Sondermaschinen

Blatt 3

Encl.

| | | |
|---|---|---|
| **Telefax Nr.** / Telefax No. | 001 810 743 8400 | **EX·CELL·O** |
| **An Firma** / To company | H.E.Services<br>Flint, MI 48507 | **EX-CELL-O GmbH**<br>Werkzeugmaschinen<br>Sondermaschinen |
| **Zu Händen** / Attn. | Mr. Richard E. Everden<br>Corporate Controller | Salacher Straße 93<br>D-73054 Eislingen/Fils<br><br>Postfach 1161<br>D-73048 Eislingen/Fils<br><br>Telefon (07161) 805-0<br>Telefax (07161) 805-223 |

## Telefax

| | | | | | |
|---|---|---|---|---|---|
| **Seitenanzahl** / No. of pages | 1 | **Von** / From | V-I/G. Kieffer | **Durchwahl** / Direct call | 299 |
| **Datum** / Date | Sept. 16, 2002 | | | **e-mail** | Verkauf-Innendienst@ex-cell-o.de |
| **Betreff** / Subject | Your order no. 21249 of Dec. 14, 1999<br>Grinding Machine XG 690<br>Our comm.-no. 401 125 | | | | |

Dear Mr. Everden,

we refer to your letter of Sept. 06, 2002 and Sept. 10, 2002.

Once again we like to point out that we have done in the past everything to satisfy your company. This will probably confirmed from all the engineering people (Ancon, Universal Inspection, H.E.S.) worked together with us on this project since more than two years.

We also have spent a lot of money in this project and have made an enormously lost in this business.

Therefore we are sorry to inform you that we are not able to agree to your proposal to pay the outstanding amount in monthly rates of US $ 10.000,00.

We like to draw your attention again to our Telefax dd. Aug. 12, 2002. Immediately after receipt of the US $ 123.628,-- which are confirmed by Mr. Joseph A. Stearns and your approval that the final payment rate of US $ 61.814,00 less your invoice no-10000028684-HES dd 3/21/02 of US $ 15.750,00  =  US $ 46.064,00 will be paid until the End of September 2002 we will continue with assistance in the well reliable manner as done up to now.

We look forward to your early reply and final acceptance of the before mentioned.

Best regards,
EX-CELL-O GmbH

i. V. .
U. Stuhlmüller

i. V.
G. Kieffer

Bei schlechtem oder unvollständigem Empfang, bitten wir um Ihren Rückruf.
In case of bad or incomplete transmission please phone us.

**EX-CELL-O GmbH**
Werkzeugmaschinen
Sondermaschinen

Blatt 2

Encl.

| **Telefax Nr.**<br>Telefax No. | 001 810 743 8400 | **EX·CELL·O** |
| **An Firma**<br>To company | H. E. Services<br>Flint, Mi 48507 / USA | **EX-CELL-O GmbH**<br>Werkzeugmaschinen<br>Sondermaschinen |
| **Zu Händen**<br>Attn. | Mr. Mark G. Lesperance<br>COO & CFO | Salacher Straße 93<br>D-73054 Eislingen/Fils |

EX-CELL-O GmbH
Werkzeugmaschinen
Sondermaschinen

Salacher Straße 93
D-73054 Eislingen/Fils

Postfach 1161
D-73048 Eislingen/Fils

Telefon (07161) 805-0
Telefax (07161) 805-223

## Telefax

| **Seitenanzahl** No. of pages | 3 | **Von** From | V-I/ki | **Durchwahl** 299 Direct call |
| **Datum** Date | Jan. 02, 2003 | | | **e-mail** Verkauf-Innendienst@ex-cell-o.de |
| **Betreff** Subject | Your order no. 21249 dd. 12/14/99 (1) EX-CELL-O Grinding Machine XG 690 Our comm.-no. 401 125 | | | |

Dear Mr. Lesperance,

We refer to your Telefax dated December 11, 2002.

Once again we like to draw your attention to the agreement of Oct. 25, 2001 (copy attached) we have made with your former Vice President Engineering and Manufacturing,
Mr. Joseph A. Stearns. In this agreement it is very clearly mentioned that the second payment rate of 20 % i.e. US $ 123.628,-- is due 120 days after the shipping date and the safe arrival of machine in Saginaw, Mi. and payable without any deductions.

Based on this agreement we have shipped the machine, we have made the training of your people and supported your personal a very long time. So far we have fulfilled our duties completely but H.E.S did not release the second payment rate as agreed.

As far as we are informed by your operators and engineers the machine was working to your full satisfaction and perfectly suits your specific needs. Moreover we have always given a prompt reply in case of any questions concerning the machine and the relationship with your engineering department has always been a very positive and constructive one. As the problem with the spindle came up in mid-October 2002 we have pointed out that we will provide you with service support immediately if H.E.S. has fulfilled their payment obligation. Therefore it is not correct to say that EX-CELL-O was unwilling to make the necessary repairs or did not provide you with any help. We are sure that this 4 month, or longer delay in getting

**EX-CELL-O GmbH**
Werkzeugmaschinen
Sondermaschinen

sheet 2

the machine repaired is not the way it should be and it should never happen in the future. We believe that a good relationship is the best economical way to save a lot of time and costs if any machine problems or the possibilities of grinding new workparts can be discussed between your and our engineering department .Therefore we kindly ask you once again to fulfil your part of the agreement and arrange the payment of the US $ 123.628,-- until the end of this month.

In view of a further good relationship we like to thank you in advance for your positive reply.

Best regards,
EX-CELL-O GmbH

i.V                      i. V.
U. Stuhlmüller           G. Kieffer

Encl.

EXHIBIT S



H.E. Services
Revised – April 26, 2002

Aggregate Cash Receipts
Excello Machine

REVISED -- 4/26/2002

H.E. Services

Excello Machine Costs

| | Installation & Development Expenses | Ref. No. | Principal | Interest | Less Interest Income | Total | Aggregate |
|---|---|---|---|---|---|---|---|
| Installation Costs | | | | | | | |
| Electrical Hookup | $14,697.58 | 1 | | $1,689.61 | | $16,388.19 | |
| Machine Chiller Installation (Chiller Purchased by Delphi) | 3,829.14 | 2 | | 440.35 | | 4,271.49 | |
| Cutting Oil | 2,717.41 | 3 | | 312.39 | | 3,032.80 | |
| Diamond Dressing Disk | 4,436.21 | 4 | | 509.98 | | 4,950.19 | |
| Hand Tools | 1,000.00 | | | 114.96 | | 1,114.96 | |
| Other Miscellaneous Installation Costs | 1,500.00 | | | 172.44 | | 1,672.44 | |
| Total Installation Costs | $28,180.34 | | | $3,239.73 | | $31,430.07 | |
| Development Costs | | | | | | | |
| Design, Installation, Part Testing and Other Expenses | $61,823.71 | 5 | | $7,107.18 | | $68,935.89 | |
| Development Supplies | 14,648.89 | | | 1,684.02 | | 16,332.91 | |
| Travel Expenses | 17,198.72 | | | 1,977.14 | | 19,175.86 | |
| Total Development Costs | 93,671.32 | | | $10,768.34 | | $104,444.66 | |
| Total Installation & Development Costs | $121,851.66 | | | $14,008.07 | | $135,874.73 | |
| Loan Payment (70%) | | | $432,698.00 | $55,268.15 | ($7,621.03) | $480,345.12 | |
| Installation & Development Expenses plus Loan Payment (70%) | $121,851.66 | | $432,698.00 | $69,276.22 | ($7,621.03) | $616,219.85 | $616,219.85 |
| Loan Payment (20%) | | | 123,628.00 | 15,790.90 | 0.00 | 139,418.90 | 755,638.75 |
| Loan Payment (10%) | | | 61,814.00 | 7,895.45 | 0.00 | 69,709.45 | 825,348.20 |
| | $121,851.66 | | $618,140.00 | $92,962.57 | ($7,621.03) | $825,348.20 | |
| Monthly Payment (36 Months) | | | | | | $22,926.34 | |

excello machine analysis for delphi.xls/Costs

EXHIBIT T

April 25, 2001

# MINUTES OF CONFERENCE CALL WITH EXCELLO

**PRESENT AT THE CALL MEETING:**
**Delphi:** Tom Arnold, Mark Martin
**H.E. Services:** Joe Stearns, Lee Lambert
G. Kieffer, Excello Germany)

1- A couple questions remain from a meeting/conference call with Excello, yesterday; How much time is required to program the machine for a "new" size race? Are the parts usable and acceptable, coming off the Excello now?

2- Excello wants to pay for the transportation for 2 people from Saginaw to visit Excello in Germany for the period May 14 – June 9.

3- Finish grinding of 10 outers, 23 size were sent and are now held in US Customs. These will provide some verification of machine capability to perform repeatability.

4- Cross grooves, SX042709 & SX040689 will be processed next, to be finished by May 11. Cross Grooves will be machined later than previously reported.


**NEXT PHONE MEETING; WEDNESDAY, MAY 2, AT 9:00**


*Loren Kramer*
Loren Kramer
Supplier Development

CC
Jerry Eaton, Bill Lemmer, David McGregor, Bruce Waslusky,

EXHIBIT U

**Kramer, Loren D**

| | |
|---|---|
| **From:** | Martin, Mark |
| **Sent:** | Tuesday, April 30, 2002 12:47 PM |
| **To:** | Waslusky, Bruce |
| **Cc:** | McGregor, Dave ; Kramer, Loren D |
| **Subject:** | H.E. Services Excello Startup Costs |

Bruce,

I reviewed the letter from H.E. concerning their costs to receive and runoff the Excello machine. I have the following comments.

- The electrical hookup costs seem to be high. There was a misunderstanding on the electrical requirements for the machine and H.E. upgraded way beyond the requirements of the machine. The final configuration of the machine may not of required an upgrade at all.
- The dressing wheel was used up during Excello's development effort and the two runoffs. (Germany and Saginaw). I believe Excello should supply a new wheel at no cost to H.E.
- I don't know what the $1000 hand tools are as well as the miscellaneous costs.
- I don't know what $14,648.89 of development supplies is for.
- I believe Excello paid for the travel expenses or at least a part of them.
- The labor hours seem to be the hours the people spent in training. It was agreed between Excello and H.E. that the training would be conducted during the runoff of the machine. H.E. signed up on the original agreement to train three people. Speaking of which, it appears that Phil and Roger are the only two people who spent much time getting the training.
- There were separate purchase orders paid to H.E. for the parts needed for the runoffs. These prices should include the normal inspection time, the time for the movement of the parts and the associated paperwork. We also paid for additional tooling on a separate purchase order for the additional 33 tooth part used for runoff.
- The prices charged for the Zeiss inspection is the same rate we pay for inspection of parts when we send to Universal.

If have any questions please let me know.

Thanks,

Mark

1

EXHIBIT V

# DELPHI
## Automotive Systems

Date: 30APR02

H.E. Services
5117 S. Dort Hwy.
Flint, MI  48507
Attn. Mr. Mark Lesperance

Mark,

Thank you for your prompt response to my request for detail for the charges
reviewed  in our last meeting.

I called you today and outlined what our expectations are for this issue.  To
re-cap our conversation:  1.  Our expectation is that H.E. Services shall negotiate
a substantially lower price that what was quoted for the machine from EXCELLO
due late delivery, blueprint errors etc.  2.  This reduced price shall be applied to
the total cost of the machine to Delphi and will be reflected in the monthly fee.  3.
That this shall be accomplished within the next 120 days (drop dead date is
31JULY02.  Today we issued new purchase orders for 36 months @
$22,926/month and entered a receiver for 1 lot for the machine payment and
another MBO order for the manufacture of inner and outer races from solid and
from blanks.

If we cannot accomplish items 1 – 3 above within the time frame specified then
we would want to take exception to several of the line items you have presented.
(see attachment)  To review, there was misunderstanding on what the electrical
requirements were for the machine and the upgrade that was made exceeded
what the machine needs are and yet Delphi is expected to pay for this error.  The
dresser listed was used for both German and U.S. machine run-offs.  Excello
paid for some of the travel costs.  Development supplies are an issue.  Training
hours and labor hours listed range from $10.10/hr. to $50.03/hr. and we are
unsure if profit is included in the billing from one of your other divisions.
Universal inspection charges are in question as well as normal inspection for the
runoff parts since we paid for those parts separately and assume that normal

inspection would be in the piece price.

In review, we are willing to waive all the above if H.E. can substantially reduce the purchase price from EXCELLO. If not, then we would like the opportunity to challenge those charges that you have presented.

Sincerely,

Bruce Waslusky-Prototype Purchasing Manger
Delphi Saginaw Steering Systems Prototype

Cc: Bob Backie          Dave McGregor     Loren Kramer
    Dave Stearns        Mark Martin
    Garrette Backie     Jill Sanborn

EXHIBIT W

**Kramer, Loren D**

| | |
|---|---|
| **From:** | Waslusky, Bruce |
| **Sent:** | Thursday, March 27, 2003 9:37 AM |
| **To:** | Martin, Mark ; Sanborn, Jill K; Kramer, Loren D |
| **Subject:** | FW: Follow-Up to March 11th. Meeting with Bob Backie & Dave Stearns |

FYI

-----Original Message-----

| | |
|---|---|
| **From:** | Waslusky, Bruce |
| **Sent:** | Wednesday, March 26, 2003 3:30 PM |
| **To:** | McGregor, Dave |
| **Cc:** | 'robertb@heservices.com'; 'rknizaky@heservices.com'; 'markl@heservices.com'; 'daves@heservices.com' |
| **Subject:** | FW: Follow-Up to March 11th. Meeting with Bob Backie & Dave Stearns |

After over two weeks since our meeting with Backie/Stearns, there appears to be no significant progress in improving any of the issues we reviewed in the meeting. In addition, H.E. is now late on delivery of the first order that was given them in a series of four to determine how effective they will be in handling our future requirements. This is very disappointing. Please advise on what our next step should be. Thanks, Bruce.

-----Original Message-----

| | |
|---|---|
| **From:** | Martin, Mark |
| **Sent:** | Wednesday, March 26, 2003 10:48 AM |
| **To:** | Waslusky, Bruce |
| **Subject:** | RE: Follow-Up to March 11th. Meeting with Bob Backie & Dave Stearns |

Bruce,

Here is a rough draft of my response. Please let me know if I missed anything or if you want something changed. Thanks

There has been very little information given to me regarding these issues. I'll go through each one and give you an update based on what information I have. Dave Stearns has focused his entire time on breaking down the maching code. I left voice mails for him to call me but he never returned them. When I finally talked to him he told me he has not been checking his voice mail during this time.

1. There is still difficulty in this area. Zack is trying to coordinate between the three but it doesn't appear to be much better.

2. The only thing I know is that Jill negotiated some new pricing on both the design and build cost. There has been nothing done to try to improve this process.

3. Dave Stearns said that Zack at Ancon is the single point of contact. He has been working on the day to day projects and quotes but says he has no information beyond that. He submitted an invoice for payment on the Excello machine on Tuesday. I told him we couldn't pay it until we settle on a total amount. His response was he was just doing what he was told. It doesn't sound like he is assuming responsibility for the whole program rather just his part.

4. After our meeting with Mr. Backie, Dave Stearns, Lee Lambert, and myself met to develop a strategy to get this program going. Dave said he was going to transfer an engineer from Flint to be responsible for the Excello and have Phil train three new operators. He would then transition Phil back to Ancon. Dave did bring in the engineer to work on the machine code with him, but told me yesterday that as soon as they get a good part off the machine he would be going back to Flint. He also told me that Phil was going to stay on and would not be going back to Ancon. As far as I know there has been no additional training done either. So it appears the bottom line is that nothing has changed. They think they are close to figuring out the programming issue but to this date they have not made a good part yet.

5. As of my conversation with Dave on Monday there will be no onsite engineering support, only on call. I have heard nothing about the outside engineer they told us they hired. I don't think he has been involved since they brought the person in from Flint. I don't know for sure.

6. I have heard nothing concerning grinder burn checks.

7. They have been working on this program since mid February and I have no idea on how many parts they have burned up. On the new orders we have issued we ordered 20 pieces and told them we needed to net 15.

8. I have received minimum communication from Zack and none from Dave except last Tuesday when I tracked him down.

9. They are behind on the delivery schedule they sent us and we gave out at both our meetings with H.E. management. The inner races are due 3/19/03. I received no update until I asked and then Zack sent me one on 3/20/03 that said nothing except they were waiting on an inspection program. If you just looked at that letter you would think I was holding up the whole show. The truth of the matter is that the machine is nowhere ready to run these parts. I have had Coordinate Measurement working higher priorities until Ancon was ready to grind these parts. They have had the program to check the ball groove path since last Monday and will have the contact angle program today. I called Zack Monday and asked him for a more accurate update in writing. He promised me he would have it to me yesterday but I have not seen anything yet.

10. We have issued the second purchase order and those parts are due to us on April 21, 2003. The third RFQ is ready for pickup today and we will be issuing the last order either the end of this week or the beginning of next.

-----Original Message-----
From:      Waslusky, Bruce
Sent:      Tuesday, March 25, 2003 10:36 AM
To:        Martin, Mark
Subject:   Follow-Up to March 11th. Meeting with Bob Backie & Dave Stearns

Please advise me as to the status of those talking points that we reviewed with Robert Backie and Dave Stearns on March 11th. If there is any changes, either positive of negative pertaining to our situation concerning each of these issues please attach that update so I can inform the larger group as to our progress or lack of:

1. Advised H.E. that they are suffering from internal paralysis in that they (Ancon/H.E./Universal/H.E. Eng.) do not support    each other and that lack of support is effecting the Excello performance.

2. Timing for tooling is always an issue. Takes longer to just get a quote on tools than we have to provide parts to the customer. Need flexible tooling that can be used for multiple size ranges so we don't have to re-invent the wheel every time we    have a requirement.

3. Need a single point contact for this project. Every issue seems to have a different contact or responsible person.

4. There is a lack of programing support for Excello. H.E. agreed to provide an Engineer/Operator? Status?

5. There is a lack of engineering support internal to H.E. to support the Excello project.

6. There is no gaging at the Excello to check blanks provided by Ancon.

7. We waste way too many parts on set-up to run the Excello.

8. Communication between our companies has deterioriated. Weekly meetings cancelled because of no progress. No plan to        improve communications?

9. H.E. has a current requirement that a promise was given for delivery. That date has came and went, have no update as to        whether they performed or not.

10. A series of orders were to be issued at a regular interval that would represent normal requirements and lead times. Have        these orders been issued? Have we passed any of the due dates? What's our status?

EXHIBIT 4

**Hearing Date:  June 22, 2007**
**Hearing Time:  10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                                          :
         In re                                            :     Chapter 11
                                                          :
DELPHI CORPORATION, et al.,                               :     Case No. 05-44481 (RDD)
                                                          :
                                                          :     (Jointly Administered)
               Debtors.                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF WILLIAM LOCRICCHIO IN SUPPORT OF
DEBTORS' SUPPLEMENTAL REPLY WITH RESPECT TO
PROOFS OF CLAIM NUMBERS 837, 838 & 14762
(H.E. SERVICES COMPANY, ROBERT BACKIE & RICHARD JANES)

("LOCRICCHIO DECLARATION – H.E. SERVICES COMPANY, ET AL.")

William Locricchio declares as follows:

1.       Delphi Corporation and certain of its subsidiaries and affiliates are debtors and debtors-in-possession in these chapter 11 cases.  I submit this declaration in support of the Debtors' Supplemental Reply With Respect To Proofs Of Claim 837, 838 & 14762  (H.E. Services Company, Robert Backie and Richard Janes) (the "Supplemental Reply").  Capitalized terms not otherwise defined in this declaration have the meanings ascribed to them in the Supplemental Reply and the Statement of Disputed Issues.

2.       Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion, and my experience with and knowledge of Delphi Automotive Systems LLC's ("DAS LLC") relationship with H.E. Services Company  ("H.E. Services").  If I were called upon to testify, I could and would testify to the facts set forth herein.

3.       I am employed by Callaway Partners.  I work on a contract basis for DAS LLC as a Proof of Claim Analyst.  I have worked on DAS LLC matters since August 2006.   I am responsible for, among other thing, investigating H.E. Services' claim that DAS LLC failed to pay H.E. Services for $979,239.02 worth of invoices (the "Unpaid Invoices Claim").  My investigation into the Unpaid Invoices Claim is currently on-going.  Subject to my further investigation, and subject to discovery in this matter, I have drawn the following initial conclusions relevant to the Unpaid Invoices Claim:

4.       I began with a review of the exhibits supporting H.E. Services' Unpaid Invoices Claim, which were attached to its Proof of Claim and its Supplemental Response.  During this initial review, I discovered that in its Supplemental Response H.E. Services failed to account for $5,304.18 of credit memos (i.e., DAS LLC debits) showing credits H.E. Services

2

provided to DAS LLC. These credit memos were reflected in the exhibits to H.E. Services'

Proof of Claim. I also discovered that H.E. Services double counted 19 invoices, totaling

$50,145.92, because these invoices were included twice among H.E. Services' exhibits.

5.     Specifically, as part of its Unpaid Invoices Claim, H.E. Services claims

DAS LLC failed to pay its Universal Inspection Division $247,746.58. In support of this claim,

H.E. Services cites Exhibit 2 to its Supplemental Response. My initial review of Exhibit 2

uncovered seven invoices (numbers 166, 193, 197, 260, 273, 288, 291, and 299), which were

included twice in the exhibit.

6.     H.E. Services also claims DAS LLC failed to pay its Ancon

Prototype/Machine division $133,291,20. In support of this claim, H.E. Services cites Exhibit 3

to its Supplemental Response. During my initial review of Exhibit 3, I uncovered four invoices

(numbers 7110000068, 7110000149, 7110000166, and 195) that were either included twice in

that exhibit or were already included in Exhibit 2.

7.     H.E. Services also claims DAS LLC failed to pay H.E. Services

Engineering $598,201.44. In support of this claim, H.E. Services cites Exhibit 4 to its

Supplemental Response. During my initial review of Exhibit 4, I discovered eight invoices

(numbers 144, 201, 213, 217, 132-133-134, 132-133-134-133a, and 149/15/164) that were either

included twice in that exhibit or were already included in Exhibit 3.

8.     After reducing H.E. Services' original claim by $55,450.10 to account for

the credit memos and duplicate invoices (making the revised claim amount $923,788.92), I

began to reconcile the Unpaid Invoices Claim to determine what invoices have already been paid.

Although my review is on-going, so far I have discovered $506,904.66 worth of invoices

included in the Unpaid Invoices Claim, which DAS LLC previously paid to H.E. Services. In

3

some cases, DAS LLC paid the precise amount invoiced by H.E. Services.  (See, e.g., Ex. A

(demonstrating that DAS LLC paid the precise amounts invoiced with respect to H.E. Services'

invoice numbers 130, 139  and 180).)  In other cases, DAS LLC paid more than the amount

invoiced by H.E. Services.  (See, e.g., Ex. B (demonstrating that DAS LLC paid more than the

amounts invoiced with respect to H.E. Services invoice numbers 153 and 176).)

        9.     Currently, $416,884.26 of H.E. Services' Unpaid Invoices Claim remains

unresolved, however, my investigation into this portion of the claim is on-going.  I have

requested the retrieval of archived data, which will enable me to accurately reconcile the

remaining amount.   Thus far, I have not discovered any invoices from H.E. Services that DAS

LLC failed to pay in full.

        10.    I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the

foregoing statements are true and correct.

Executed on April 16, 2007 in Troy, Michigan


                      William Locricchio

                      William Locricchio

EXHIBIT A



## E-DACOR DOCUMENT SEARCH RESULTS
### Search Results For Duns Number: RD 175211044

| View Detail/ Image | Process # | Plant Code | Doc Type | Document # | Document Date | Total Amount | Currency Code | Bill of Lading | Purchase Order # | Status | Due Date/ Payment Date | Payment # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 9000029365544 | K9 | 02 | 051740680001 | 02/19/2004 | $9,336.00 | USD | 130 | S2S46221 | PAID | 02/24/2005 | 000637778 |

help | site map | user guide | feedback

All content and information on this site copyright General Motors 2000. All rights reserved.

Bill Locricchio



**E-DACOR SEARCH RESULTS-Part Level Detail**
**Search Results For Document Number: 9000029365544**

| Part Number/ Charge Type | Part Description | Quantity | Unit of Measure | Extension | Currency | Part PO |
|---|---|---|---|---|---|---|
| PR395300001 | LEAD ENGINEER @ 45/HR. SR.DESIGNER III @ 38/HR. | 9336.000 | DOLS | $9336.00 | USD | S2S46221 |

help | site map | user guide | feedback

All content and information on this site copyright General Motors 2000. All rights reserved.

Bill Locricchio

Engineering/Testing
**H E Services**
**225 E. Morley Drive**
**Saginaw, MI  48601**
**USA**

Voice:  (989)753-9015

Fax:     (989)753-7703

**Invoice**

Invoice Number:
130

Invoice Date:
Feb 19, 2004

Page:
1

Sold To:
Delphi Saginaw Steering Systems
(3SI) SERVICE ORDERS
3900 HOLLAND AVENUE
SAGINAW, MI  48601
US

Ship to:
Delphi Saginaw Steering Systems
(3SI) SERVICE ORDERS-E. SAVAGE
3900 HOLLAND AVENUE
SAGINAW, MI  48601
US

| Customer ID | Customer PO | Payment Terms |
|---|---|---|
| Delphi | S2S46221 | Net 30 Days |
|  |  |  |
|  |  |  |

| Quantity | Description | Unit Price | Extension | Job ID |
|---|---|---|---|---|
| 9,336.00 | PR395300 001 | 1.00 | 9,336.00 | 9017050100 |
|  | LEAD ENGINEER |  |  |  |
|  | SR. DESIGNER III |  |  |  |
|  | AUTOCAD |  |  |  |
|  | UNIGRAPHICS |  |  |  |
|  | LOW COST COLUMN DEVELOPMENT REF HES #70501 |  |  |  |

Check/Credit Memo No:

Total Invoice Amount          9,336.00

**Remit Payment to:**
**H. E. SERVICES**
**c/o COMERICA**
**DEPARTMENT #274201**
**P.O. BOX 67000**
**DETROIT, MI  48267-2742**

Authorized By: _____

Date: _____

# DELPHI

## PURCHASE ORDER: S2S46221

PAGE

This Number Must Appear On All Invoices, Packing Slips, Packages and Bills of Lading.
(2) copies of your packing slip must accompany each shipment.
Item Identification Number(s) must be shown on Packing Slips and Invoices.
Invoice Attn: Accounts Payable
Do not Declare Valuation of Express Shipments or Insure Parcel Post.

| ORDER DATE | 12/22/03 | 989-757-404 |
| --- | --- | --- |
| ALTERATION ISSUE DATE | | S RUDZINSKI   Buyer |
| ALTERATION EFFECTIVE DATE | | S 12 |
| SHIP VIA | | BASE UNIT PRICE |

PURCHASING AGENT

PRICE MULTIPLE PER

SHIP TO: DELPHI SAGINAW STEERING SYS.
(3SI) SERVICE ORDERS
3900 HOLLAND RD
SAGINAW MI
48601
US

INVOICE TO: DELPHI
SEE INVOICE
INSTRUCTIONS  00
00000
US

DELPHI SAGINAW STEERING SYSTEM
3900 HOLLAND RD.
SAGINAW MI
48601
US

TO:
VENDOR NUMBER 14-423-0695
THE SERVICES CO
ANCON TOOL DIV
5117 S DORT HWY
FLINT MI
48507

F.O.B.   SHIPPING POINT

DESTINATION UNLESS OTHERWISE INDICATED
SEE BELOW

| PAYMENT TERMS | | | | | |
| --- | --- | --- | --- | --- | --- |
| NET   2ND DAY OF 2ND MONTH | | | | | |

| ITEM SEQUENCE | QUANTITY ORDERED | ITEM IDENTIFICATION NO. | NOUN NAME | DESCRIPTION | RFQ NUMBER | DATE REQUIRED | TAX CODE/ % | BASE UNIT PRICE | PRICE MULTIPLE PER |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 00001 | 9500 | PR395300 001 | | THIS ORDER IS LISTED IN THE FOLLOWING CURRENCY USD DOLLAR (UNITED STATES) | | | 0.00% | 1.0000 | |

THIS IS A MATERIAL REQUEST AGAINST MBO S2B00034

LEAD ENGINEER @ 45/HR, SR.DESIGNER III @ 38/HR,    01/30/04 G
AUTOCAD @ 5/HR, UNIGRAPHICS @ 14/HR - LOW COST
COLUMN DEVELOPMENT REF HES #70501
WHO ORDERED: E.SAVAGE/757-3230

ALL INVOICES MUST BE SENT TO: E.SAVAGE/757-3230
AT DELPHI SAGINAW TO INSURE                   (ZH)
PAYMENT. FAILURE TO DO SO MAY RESULT
IN NON-PAYMENT OF INVOICES. PURCHASE ORDER
NUMBER AND APPROPRIATE ITEM IDENTIFICATION
NUMBERS MUST APPEAR ON ALL INVOICES. (IN)
*RIGHT TO AUDIT*
BY ACCEPTANCE OF THIS PURCHASE ORDER THE SELLER OF
GOODS AND/OR SERVICES GRANTS BUYER THE RIGHT TO AUDIT
ALL CHARGES AND AGREES THAT ALL RECORDS SUPPORTING
CHARGES (INCLUDING THOSE OF SUBSIDIARIES AND AFFIL-
IATES TO WHOM WORK HAS BEEN CONTRACTED) WILL BE
AVAILABLE FOR AUDIT BY DELPHI AUTOMOTIVE FOR
A PERIOD OF ONE (1) YEAR BEYOND FINAL PAYMENT.
*************************SALES TAX CODES******************(TX)

#70501

A000843  ___R STEPHEN PARKS

ORIGINAL



## E-DACOR DOCUMENT SEARCH RESULTS
### Search Results For Duns Number: RD 175211044

| View Detail/ Image | Process # | Plant Code | Doc Type | Document # | Document Date | Total Amount | Currency Code | Bill of Lading | Purchase Order # | Status | Due Date/ Payment Date | Payment # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 9000030202186 | K9 | 02 | 051781610001 | 02/29/2004 | $9,976.00 | USD | 139 | S2S45771 | PAID | 05/04/2005 | 000650560 |

help | site map | user guide | feedback

All content and information on this site copyright General Motors 2000. All rights reserved.

Bill Locricchio



### E-DACOR SEARCH RESULTS-Part Level Detail
### Search Results For Document Number: 9000030202186

| Part Number/ Charge Type | Part Description | Quantity | Unit of Measure | Extension | Currency | Part PO |
|---|---|---|---|---|---|---|
| PR395288001 | SR. DESIGN III - 232 HOURS REF HES #901-718 | 8816.000 | DOLS | $8816.00 | USD | S2S45771 |
| PR395288002 | AUTOCAD - 232 HOURS | 1160.000 | DOLS | $1160.00 | USD | S2S45771 |

help | site map | user guide | feedback

All content and information on this site copyright General Motors 2000. All rights reserved.

Bill Locricchio

## Engineering/Testing
## H E Services
## 225 E. Morley Drive
## Saginaw, MI 48601
## USA

# Invoice

Voice: (989)753-9015

Fax: (989)753-7703

Invoice Number:
139

Invoice Date:
Feb 29, 2004

Page:
1

Sold To:
Delphi Saginaw Steering Systems
(3SI) SERVICE ORDERS
3900 HOLLAND AVENUE
SAGINAW, MI  48601
US

Ship to:
Delphi Saginaw Steering Systems
(3SI) SERVICE ORDERS - BENNETT
3900 HOLLAND AVENUE
SAGINAW, MI  48601
US

| Customer ID | Customer PO | Payment Terms |
|---|---|---|
| Delphi | | Net 30 Days |
| | | |

| Quantity | Description | Unit Price | Extension | Job ID |
|---|---|---|---|---|
| 8,816.00 | PR395288 001 | 1.00 | 8,816.00 | 9017180000 |
| | SR. DESIGN III | | | |
| 1,160.00 | PR395288 002 | 1.00 | 1,160.00 | 9017180000 |
| | AUTOCAD | | | |
| | REF HES #901-718 | | | |
| | PORTABLE SERVO CART | | | |

Check/Credit Memo No:

Total Invoice Amount          9,976.00

Remit Payment to:
H. E. SERVICES
c/o COMERICA
DEPARTMENT #274201
P.O. BOX 67000
DETROIT, MI  48267-2742

Authorized By: _____

Date: _____

# DELPHI

**DELPHI SAGINAW STEERING SYSTEM**
3900 HOLLAND RD.
SAGINAW MI
48601
US

TO:

VENDOR NUMBER 14-423-0695
THE SERVICES CO
ANCON TOOL DIV
5117 S DORT HWY
FLINT MI
48507

**SHIP TO:** DELPHI SAGINAW STEERING SYS.
(3SI) SERVICE ORDERS
3900 HOLLAND RD
SAGINAW MI
48601
US

**INVOICE TO:** DELPHI
SEE INVOICE
INSTRUCTIONS 00
00000
US

## PURCHASE ORDER: S2S45771

PAGE

This Number Must Appear On All Invoices, Packing Slips, Packages and Bills of Lading.
(2) copies of your packing slip must accompany each shipment Item Identification Number(s) must be shown on Packing Slips Invoices.
Invoice Attn: Accounts Payable
Do not Declare Valuation of Express Shipments or Insure Parcel Post.

| ORDER DATE | 989-757-40- |
|---|---|
| 11/25/03 | S RUDZINSKI |
| ALTERATION ISSUE DATE | Buyer |
| | S12 |
| ALTERATION EFFECTIVE DATE | |

PURCHASING AGENT

| PAYMENT TERMS | | SHIP VIA |
|---|---|---|
| NET 2ND DAY OF 2ND MONTH | | SEE BELOW |

| F.O.B. DESTINATION UNLESS OTHERWISE INDICATED |
|---|
| SHIPPING POINT |

| ITEM SEQUENCE | QUANTITY ORDERED | ITEM IDENTIFICATION NO. | NOUN NAME | DESCRIPTION | RFQ NUMBER | DATE REQUIRED | TAX CODE/ % | BASE UNIT PRICE | PRICE MULTIPLE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | THIS ORDER IS LISTED IN THE FOLLOWING CURRENCY USD DOLLAR (UNITED STATES) | | | | | |
| | | | | THIS IS A MATERIAL REQUEST AGAINST MBO S2800034 | | | | | |
| 00001 | 8816 | PR395288 001 | | ¢SR, DESIGN III - 232 HOURS REF HES #901-718 WHO ORDERED: T.BENNETT/757-4708 | | 12/22/03 G | 0.00% | 1.0000 | |
| 00002 | 1160 | PR395288 002 | | AUTOCAD - 232 HOURS WHO ORDERED: T.BENNETT/757-4708 | | 12/22/03 G | 0.00% | 1.0000 | |
| | | | | ALL INVOICES MUST BE SENT TO: T.BENNETT/757-4708 AT DELPHI SAGINAW TO INSURE PAYMENT. FAILURE TO DO SO MAY RESULT IN NON-PAYMENT OF INVOICES. PURCHASE ORDER NUMBER AND APPROPRIATE ITEM IDENTIFICATION NUMBERS MUST APPEAR ON ALL INVOICES. (IN) *RIGHT TO AUDIT* (ZH) BY ACCEPTANCE OF THIS PURCHASE ORDER THE SELLER OF GOODS AND/OR SERVICES GRANTS BUYER THE RIGHT TO AUDIT ALL CHARGES AND AGREES THAT ALL RECORDS SUPPORTING CHARGES (INCLUDING THOSE OF SUBSIDIARIES AND AFFIL-IATES TO WHOM WORK HAS BEEN CONTRACTED) WILL BE AVAILABLE FOR AUDIT BY DELPHI AUTOMOTIVE FOR | | | | | |

CONTINUE PAGE

.R STEPHEN PARKS                    ORIGINAL

A3000826



## E-DACOR DOCUMENT SEARCH RESULTS
### Search Results For Duns Number: RD 175211044

| View Detail/ Image | Process # | Plant Code | Doc Type | Document # | Document Date | Total Amount | Currency Code | Bill of Lading | Purchase Order # | Status | Due Date/ Payment Date | Payment # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 9000029273253 | K9 | 02 | 051735790001 | 04/04/2004 | $9,589.00 | USD | 180 | S2S47555 | PAID | 02/15/2005 | 000637141 |

help | site map | user guide | feedback

All content and information on this site copyright General Motors 2000. All rights reserved.

Bill Locricchio



## E-DACOR SEARCH RESULTS-Part Level Detail
### Search Results For Document Number: 9000029273253



| Part Number/ Charge Type | Part Description | Quantity | Unit of Measure | Extension | Currency | Part PO |
|---|---|---|---|---|---|---|
| PR376536001 | SR. DESIGN III - 223 HOURS - CMS GMT-610 & | 8474.000 | DOLS | $8474.00 | USD | S2S47555 |
| PR376536002 | AUTOCAD - 223 HOURS | 1115.000 | DOLS | $1115.00 | USD | S2S47555 |

help | site map | user guide | feedback

All content and information on this site copyright General Motors 2000. All rights reserved.

Bill Locricchio

**Engineering/Testing**
**H E Services**
**225 E. Morley Drive**
**Saginaw, MI  48601**
**USA**

Voice:  (989)753-9015

Fax:    (989)753-7703

# Invoice

Invoice Number:
180

Invoice Date:
Apr 4, 2004

Page:
1

Sold To:
Delphi Saginaw Steering Systems
(3SI) SERVICE ORDERS
3900 HOLLAND AVENUE
SAGINAW, MI  48601
US

Ship to:
Delphi Saginaw Steering Systems
(3SI) SERVICE ORDERS-BENNETT
3900 HOLLAND AVENUE
SAGINAW, MI  48601
US

| Customer ID | Customer PO | Payment Terms |
|---|---|---|
| Delphi | S2S47555 | Net 30 Days |
| | | |

| Quantity | Description | Unit Price | Extension | Job ID |
|---|---|---|---|---|
| 8,474.00 | PR376536 001 | 1.00 | 8,474.00 | 9016730000,La |
| | SP. DESIGN III | | | |
| 1,115.00 | PR376536 002 | 1.00 | 1,115.00 | 9016730000,La |
| | AUTOCAD | | | |
| | CMS GMT-610 & GMT-345 CABLE DESIGN REF. | | | |
| | HES #673 | | | |

Check/Credit Memo No:

Total Invoice Amount          9,589.00

Remit Payment to:
H. E. SERVICES
c/o COMERICA
DEPARTMENT #274201
P.O. BOX 67000
DETROIT, MI  48267-2742

Authorized By: _____

Date: _____

DELPHII

DELPHI SAGINAW STEERING SYSTEM   US
3900 HOLLAND RD.
SAGINAW MI
48601

1445  1595

VENDOR NUMBER 14-423-0695
TO:  THE SERVICES CO
ANCON TOOL DIV
5117 S DORT HWY
FLINT MI
48507

SHIP TO: DELPHI SAGINAW STEERING SYS.
(3SI) SERVICE ORDERS
3900 HOLLAND RD
SAGINAW MI
48601                          US

INVOICE TO: Delphi
SEE INVOICE
INSTRUCTIONS 00
00000                          US

## PURCHASE ORDER: S2S47555

PAGE

This Number Must Appear On All Invoices, Packing Slips,
Packages and Bills of Lading.
(2) copies of your packing slip must accompany each shipment
Item Identification Number(s) must be shown on Packing Slips
Invoices.
Invoice Attn: Accounts Payable
Do not Declare Valuation of Express Shipments or Insure Parc
Post.

PHONE: 989-757-40ᵤ
S. RUDZINSKI                Buyer
S12                  PURCHASING AGENT

| ORDER DATE | ALTERATION ISSUE DATE |
|---|---|
| 03/17/04 | |

ALTERATION EFFECTIVE DATE

SHIP VIA    SEE BELOW

F.O.B.    DESTINATION UNLESS OTHERWISE INDICATED
SHIPPING POINT

PAYMENT TERMS
NET    2ND DAY OF 2ND MONTH

| ITEM SEQUENCE | QUANTITY ORDERED | ITEM IDENTIFICATION NO. | NOUN NAME | DESCRIPTION | RFQ NUMBER | DATE REQUIRED | TAX CODE/ % | BASE UNIT PRICE | PRICE MULTIPLE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | THIS ORDER IS LISTED IN THE FOLLOWING CURRENCY USD DOLLAR (UNITED STATES) | | | | | |
| | | | | REFERENCE S2B00034 | | | | | |
| 00001 | 8474 | PR376536 001 | | SR. DESIGN III - 223 HOURS - CMS GMT-610 & GMT-345 CABLE DESIGN REF. HES #673 WHO ORDERED: T. BENNETT/7-4708 | | 03/31/04 | G  0.00% | 1.0000 | |
| 00002 | 1115 | PR376536 002 | | AUTOCAD - 223 HOURS WHO ORDERED: T. BENNETT/7-4708 | | 03/31/04 | G  0.00% | 1.0000 | |
| | | | | ALL INVOICES MUST BE SENT TO: TIM BENNETT/757-4708 AT DELPHI SAGINAW TO INSURE PAYMENT. FAILURE TO DO SO MAY RESULT IN NON-PAYMENT OF INVOICES. PURCHASE ORDER NUMBER AND APPROPRIATE ITEM IDENTIFICATION NUMBERS MUST APPEAR ON ALL INVOICES. (IN) (ZH) *RIGHT TO AUDIT* BY ACCEPTANCE OF THIS PURCHASE ORDER THE SELLER OF GOODS AND/OR SERVICES GRANTS BUYER THE RIGHT TO AUDIT ALL CHARGES AND AGREES THAT ALL RECORDS SUPPORTING CHARGES (INCLUDING THOSE OF SUBSIDIARIES AND AFFIL- IATES TO WHOM WORK HAS BEEN CONTRACTED) WILL BE | | | | | |

CONTINUE PAGE    2

A000897  USER JACQUELINE LEWIS                ORIGINAL

EXHIBIT B



## E-DACOR DOCUMENT SEARCH RESULTS
### Search Results For Duns Number: RD 175211044



| View Detail/ Image | Process # | Plant Code | Doc Type | Document # | Document Date | Total Amount | Currency Code | Bill of Lading | Purchase Order # | Status | Due Date/ Payment Date | Payment # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ⬤ | 9000025508551 | K9 | 02 | 041514120001 | 02/09/2004 | $1,260.00 | USD | 153 | S2S45116 | PAID | 04/01/2004 | 000588269 |
| ⬤ | 9000028382611 | K9 | 02 | 041677280001 | 02/29/2004 | $9,823.00 | USD | 153 | S2S46548 | PAID | 11/18/2004 | 000623469 |

help | site map | user guide | feedback

All content and information on this site copyright General Motors 2000. All rights reserved.

Bill Locricchio



## E-DACOR SEARCH RESULTS-Part Level Detail
### Search Results For Document Number: 9000025508551



| Part Number/<br>Charge Type | Part Description | Quantity | Unit of<br>Measure | Extension | Currency | Part PO |
|---|---|---|---|---|---|---|
| PR393213001 | LEAD DESIGNER - SPLINE HELIX ENDING ROLLING HEAD | 1260.000 | DOLS | $1260.00 | USD | S2S45116 |

help | site map | user guide | feedback

All content and information on this site copyright General Motors 2000. All rights reserved.

Bill Locricchio



**E-DACOR SEARCH RESULTS-Part Level Detail**
**Search Results For Document Number: 9000028382611**

| Part Number/ Charge Type | Part Description | Quantity | Unit of Measure | Extension | Currency | Part PO |
|---|---|---|---|---|---|---|
| PR399158001 | COMPLETE LIST OF STACKS FOR THE QUADRASTEER ACTUAT | 9823.000 | DOLS | $9823.00 | USD | S2S46548 |

help | site map | user guide | feedback

All content and information on this site copyright General Motors 2000. All rights reserved

Bill Locricchio

**Engineering/Testing**
**H E Services**
**225 E. Morley Drive**
**Saginaw, MI  48601**
**USA**

Voice:  (989)753-9015

Fax:  (989)753-7703

# Invoice

Invoice Number:
153

Invoice Date:
Feb 29, 2004

Page:
1

Sold To:
Delphi Saginaw Steering Systems
(3SI) SERVICE ORDERS
3900 HOLLAND AVENUE
SAGINAW, MI  48601
US

Ship to:
Delphi Saginaw Steering Systems
(3SI) SERVICE ORDERS MCNALLEY
3900 HOLLAND AVENUE
SAGINAW, MI  48601
US

| Customer ID | Customer PO | Payment Terms |
|---|---|---|
| Delphi | S2846549 | Net 30 Days |

| Quantity | Description | Unit Price | Extension | Job ID |
|---|---|---|---|---|
| 9,823.00 | PR399158 001 COMPLETE LIST OF STACKS FOR THE QUADRASTEER ACTUATOR ASSY FOR NISSAN WZW SUV APPLICATION.  STACKS TO BE SIMILAR IN FORMAT TO GMT 800 AND GMT 900 STACKS PREVIOUSLY COMPLETED BY HES. | 1.00 | 9,823.00 | 9017650000,Le |

Check/Credit Memo No:

Total Invoice Amount          9,823.00

Remit Payment to:
H. E. SERVICES
c/o COMERICA
DEPARTMENT #274201
P.O. BOX 67000
DETROIT, MI  48267-2742

Authorized By: _____

Date: _____

# DELPHI

**PURCHASE ORDER:** S2S46548    PAGE

1910

DELPHI SAGINAW STEERING SYSTEM
3900 HOLLAND RD.
SAGINAW MI
48601
US

SHIP TO: DELPHI SAGINAW STEERING SYS.
(3SI) SERVICE ORDERS
3900 HOLLAND RD
SAGINAW MI
48601
US

INVOICE TO: DELPHI
SEE INVOICE
INSTRUCTIONS 00
00000
US

This Number Must Appear On All Invoices, Packing Slips,
Packages and Bills of Lading.
(2) copies of your packing slip must accompany each shipment.
Item Identification Number(s) must be shown on Packing Slips and
Invoices.
Invoice Attn. Accounts Payable
Do not Declare Valuation of Express Shipments or Insure Parcel
Post.

| ORDER DATE | 989-757-4041 |
|---|---|
| 01/26/04 | S RUDZINSKI    Buyer |
| ALTERATION ISSUE DATE | S12 |
| | PURCHASING AGENT |

ALTERATION EFFECTIVE DATE

SHIP VIA    SEE BELOW

VENDOR NUMBER 14-423-0695
HE SERVICES CO
ANCON TOOL DIV
5117 S DORT HWY
FLINT MI
48507

F.O.B.    DESTINATION UNLESS OTHERWISE INDICATED
SHIPPING POINT

| PAYMENT TERMS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| NET 2ND DAY OF 2ND MONTH | | | | | | | | |

| ITEM SEQUENCE | QUANTITY ORDERED | ITEM IDENTIFICATION NO. | NOUN NAME | DESCRIPTION | RFQ NUMBER | DATE REQUIRED | TAX CODE/ % | BASE UNIT PRICE | PRICE UP MULTIPLE ME |
|---|---|---|---|---|---|---|---|---|---|
| | | | | THIS ORDER IS LISTED IN THE FOLLOWING CURRENCY USD DOLLAR (UNITED STATES) | | | | | |
| | | | | THIS IS A MATERIAL REQUEST AGAINST MBO S2B00034 | | | | | |
| 00001 | 10000 | PR399158 001 | | COMPLETE LIST OF STACKS FOR THE QUADRASTEER ASSY FOR NISSAN WZW SUV APPLICATION. STACKS TO BE SIMILAR IN FORMAT TO GMT 800 AND GMT 900 STACKS PREVIOUSLY COMPLETED BY HES. WHO ORDERED: B.MCNALLEY/757-3665 | | 03/01/04 G 0.00% | | 1.0000 | |
| | | | | ALL INVOICES MUST BE SENT TO: B.MCNALLEY/757-3665 AT DELPHI SAGINAW TO INSURE PAYMENT. FAILURE TO DO SO MAY RESULT IN NON-PAYMENT OF INVOICES. PURCHASE ORDER NUMBER AND APPROPRIATE ITEM IDENTIFICATION NUMBERS MUST APPEAR ON ALL INVOICES. (IN) (ZH) *RIGHT TO AUDIT* BY ACCEPTANCE OF THIS PURCHASE ORDER THE SELLER OF GOODS AND/OR SERVICES GRANTS BUYER THE RIGHT TO AUDIT ALL CHARGES AND AGREES THAT ALL RECORDS SUPPORTING CHARGES (INCLUDING THOSE OF SUBSIDIARIES AND AFFIL- IATES TO WHOM WORK HAS BEEN CONTRACTED) WILL BE AVAILABLE FOR AUDIT BY DELPHI AUTOMOTIVE FOR A PERIOD OF ONE (1) YEAR BEYOND FINAL PAYMENT. | | | | | |

CONTINUE PAGE

STEPHEN PARKS

ORIGINAL

A0000860



**E-DACOR DOCUMENT SEARCH RESULTS**
**Search Results For Duns Number: RD 175211044**

| View Detail/ Image | Process # | Plant Code | Doc Type | Document # | Document Date | Total Amount | Currency Code | Bill of Lading | Purchase Order # | Status | Due Date/ Payment Date | Payment # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 9000025855341 | K9 | 02 | 041532040001 | 02/06/2004 | $1,142.00 | USD | 176 | S2S47208 | PAID | 04/01/2004 | 000588269 |
| | 9000027816193 | K9 | 02 | 041645210001 | 04/15/2004 | $136,542.74 | USD | 176 | S2S28280 | PAID | 10/01/2004 | 000616401 |

help | site map | user guide | feedback

All content and information on this site copyright General Motors 2000. All rights reserved

Bill Locricchio



### E-DACOR SEARCH RESULTS-Part Level Detail
### Search Results For Document Number: 9000027816193

| Part Number/ Charge Type | Part Description | Quantity | Unit of Measure | Extension | Currency | Part PO |
|---|---|---|---|---|---|---|
| PR333446001 | SERVICES FOR "CENTRAL LAB SERVICES" | 66625.090 | DOLS | $66625.09 | USD | S2S28280 |
| PR333446002 | SERVICES FOR "COLUMN" PRODUCT GROUP | 1568.090 | DOLS | $1568.09 | USD | S2S28280 |
| PR333446003 | SERVICES FOR "GEAR" PRODUCT GROUP | 4744.860 | DOLS | $4744.86 | USD | S2S28280 |
| PR333446004 | SERVICES FOR "HALFSHAFT" PRODUCT GROUP | 11352.660 | DOLS | $11352.66 | USD | S2S28280 |
| PR333446005 | SERVICES FOR "PUMP & HOSE" PRODUCT GROUP | 10272.110 | DOLS | $10272.11 | USD | S2S28280 |
| PR333446006 | SERVICES FOR "EPS" PRODUCT GROUP | 37900.100 | DOLS | $37900.10 | USD | S2S28280 |
| PR333446007 | SERIVES FOR "Q-STEER" PRODUCT GROUP | 4079.830 | DOLS | $4079.83 | USD | S2S28280 |

*PAID $000 MORE*

help | site map | user guide | feedback

All content and information on this site copyright General Motors 2000. All rights reserved.

Bill Locricchio



## E-DACOR SEARCH RESULTS-Part Level Detail
### Search Results For Document Number: 9000025855341

| Part Number/ Charge Type | Part Description | Quantity | Unit of Measure | Extension | Currency | Part PO |
|---|---|---|---|---|---|---|
| PR301097001 | ZEISS PRISMO CMM INSPECTION STRAIGHT TIME | 320.000 | DOLS | $320.00 | USD | S2S47208 |
| PR301097002 | ZEISS ECLIPSE CMM INSPECTION STRAIGHT TIME | 714.000 | DOLS | $714.00 | USD | S2S47208 |
| PR301097003 | GENERAL INSPECTION STRAIGHT TIME (REF. 3 PCS. | 108.000 | DOLS | $108.00 | USD | S2S47208 |

help | site map | user guide | feedback

All content and information on this site is property of General Motors 2000. All rights reserved.

Bill Locricchio

CUSTOMER:   DELPHI SAGINAW STEERING SYSTEMS        INVOICE:        176
            DEVELOPMENT LAB DEPT 26
            3900 HOLLAND RD
            SAGINAW, MI  48601
                                                   HES CONTACT:    AMY PUMPERA

ATTN.:      STAN KIELAR                             DATE:          15-Apr-04

                                                    PO#            S2S28280



| ITEM CODE | DESCRIPTION | AMOUNT |
|---|---|---|
| PR333446-001 | CENTRAL LAB SERVICES | $66,625.09 |
| PR333446-002 | COLUMN GROUP | $1,568.09 |
| PR333446-003 | GEAR GROUP | $4,744.86 |
| PR333446-004 | HOSE & PUMPS GROUP | $11,352.66 |
| PR333446-005 | HALF-SHAFT GROUP | $10,272.11 |
| PR333446-006 | EPS GROUP | $34,900.10 |
| PR333446-007 | Q-STEER | $4,079.83 |
| | TOTAL INVOICE AMOUNT | $133,542.74 |

## MONTHLY BILLING FOR SERVICES AT OFF-SITE TEST FACILITY FOR MARCH 2004

| Employee | | ST | OT | DT | Central 1505 | Column 1506 | Gear 1507 | Pumps 1508 | Half-Shafts 1509 | EPS 1510 | Quad Steer 1511 | Column Testing 1512 | EPS 1514 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| G. Turk | Lead Sup. | 192.0 | | | $7,077.12 | | | | | | | | | $7,077.12 |
| W. Nordbeck | Tech I | 200.0 | | | $3,906.00 | | | | | | | | | $3,906.00 |
| H. Pike | Tech II | 189.0 | | | $4,692.87 | | | | | | | | | $4,692.87 |
| C. Elond | Tech I | 200.0 | | | $3,906.00 | | | | | | | | | $3,906.00 |
| J. Bolduc | Tech I | 210.0 | 36.0 | | | | | | | $4,989.95 | | | | $4,989.95 |
| D. Jelly | Tech I | | | | $1,933.47 | | | | | | | | | $1,933.47 |
| L. Berdysz | Tech III | 160.0 | | | $4,064.00 | $672.00 | | | | $186.23 | | | | $4,922.23 |
| D. Dunlap | Tech III | | | | | | $4,672.90 | | | | | | | $4,672.90 |
| M. O'Brien | Tech III | 199.0 | | | | | | $5,601.85 | | | | | | $5,601.85 |
| K. Schnaidis | Tech II | 200.0 | | | | | | $5,630.00 | | | | | | $5,630.00 |
| B. Gromaski | Tech I | 192.0 | | | | | | | | | $4,079.83 | | | $4,079.83 |
| T. Matzke | Tech I | 192.0 | 13.0 | | $4,102.92 | $613.08 | | | | | | | | $3,636.63 |
| J. Vanhorn | Tech II | 192.0 | 3.5 | | $5,236.55 | $211.05 | | | | | | | | $4,716.00 |
| Hemgesberg | Tech III | | | | | | | | $3,966.00 | | | | | $5,666.20 |
| D. Derop | Tech I | 200.0 | | | $3,916.76 | | | | | | | | | $3,906.00 |
| C. Kisser | Tech II | 183.0 | 13.5 | | | | | | $30.15 | $3,838.63 | | | | $3,916.76 |
| B. Ballard | Tech I | 192.0 | | | $3,749.76 | | | | | $90.45 | | | | $3,749.76 |
| D. Royes | Tech I | 200.0 | 4.0 | | $4,007.56 | | | | | | | | | $4,007.56 |
| R. York | | 191.0 | 20.0 | | $4,238.03 | | | | | | | | | $4,238.03 |
| C. Zube | | 132.0 | 4.0 | | $2,679.52 | | | | | | | | | $2,679.52 |
| SUB-TOTAL-LABOR | | | | | $53,610.56 | $1,496.13 | $4,672.90 | $11,231.85 | $3,936.15 | $9,105.26 | $4,079.83 | | | $86,132.67 |
| Shuttle Moving | | | | | $850.00 | | | | | | | | | $850.00 |
| Floor Space | | | | | $816.00 | | | | | $18,809.00 | | | | $25,969.00 |
| Utilities | | | | | $10,807.91 | | | | $6,204.00 | $2,240.26 | | | | $13,138.17 |
| Depot. Supplies | | | | | $499.07 | $71.96 | $71.96 | $71.96 | $71.96 | $4,745.58 | | | | $5,532.49 |
| Credit Memo's | | | | | | | | | | | | | | |
| Engineering Work | | | | | | | | | | | | | | |
| SUB-TOTAL | | | | | $66,625.09 | $1,668.09 | $4,744.86 | $11,352.86 | $10,272.11 | $34,900.10 | $4,079.83 | | | $133,542.73 |
| GRAND TOTAL | $133,542.73 | | | | $133,542.73 | | | | | | | | | |

DIV 73 LABOR-MATERIAL TRACKING LOG - MAR 2004

Page 1