**Hearing Date And Time: May 31, 2007 at 10:00 a.m.**
**Objection Deadline: May 24, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| In re | : Chapter 11 |
| DELPHI CORPORATION, et al., | : Case No. 05-44481 (RDD) |
|  | : (Jointly Administered) |
| Debtors. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. § 363(b) AND FED. R.
BANKR. P. 6004 AUTHORIZING DEBTORS TO ENTER INTO
<u>NETWORK SUPPORT SERVICES AGREEMENT</u>

("NETWORK SUPPORT SERVICES MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order pursuant to 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 authorizing, but not directing, the Debtors to enter into various information technology ("IT") agreements related to global network support services, and respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  The Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are section 363(b) of the Bankruptcy Code and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.[2]

6.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and

---

[1] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[2] On March 20 2007, Delphi Automotive Systems Espana S.L., whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed its "Concurso" application for a Spanish insolvency proceeding.  The application was approved by the Spanish court on April 13, 2007.  The Concurso proceeding does not affect other Delphi legal entities in Spain or elsewhere and is an isolated event that is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

3

modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.  Events Leading To The Chapter 11 Filing

8. In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006, the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

9. The Debtors believe that the Company's financial performance has deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

---

[3] Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

4

portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.      The Debtors' Transformation Plan

11.     On March 31, 2006, the Company outlined five key tenets of its transformation plan. First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business. Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company. Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus. Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.[4] Finally, the Debtors must devise a workable solution to their current pension situation.

12.     On December 18, 2006, the Debtors marked another milestone in their chapter 11 cases with the announcement of two significant agreements. The first of these was an equity purchase and commitment agreement (the "Equity Purchase and Commitment Agreement") with affiliates of Appaloosa Management L.P., Cerberus Capital Management, L.P., and Harbinger Capital Partners Master Fund I, Ltd., as well as Merrill Lynch & Co. and

---

[4] As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages. The Company's revised operating structure consists of its four core business segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture. The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.

5

UBS Securities LLC (collectively, the "Plan Investors").  Under the Equity Purchase and Commitment Agreement, the Plan Investors have agreed to invest up to $3.4 billion in preferred and common equity in the reorganized Delphi to support the Debtors' transformation plan.  The Equity Purchase and Commitment Agreement is subject to the completion of due diligence, satisfaction or waiver of numerous other conditions (including Delphi's goal of achieving consensual agreements with its principal U.S. labor unions and GM), and the non-exercise by either Delphi or the Plan Investors of certain termination rights.  The second agreement was a plan framework support agreement (the "Plan Framework Support Agreement") with the Plan Investors and GM.  The Plan Framework Support Agreement outlines certain proposed terms of the Debtors' anticipated plan of reorganization, including the distributions to be made to creditors and shareholders, the treatment of GM's claims, the resolution of certain pension funding issues, and the corporate governance of the reorganized Debtors.  The terms of the Plan Framework Support Agreement are expressly conditioned on the Debtors' reaching consensual agreements with their U.S. labor unions and GM.

    13.  On January 12, 2007, this Court authorized the Debtors to execute, deliver, and implement the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement (Docket No. 6589).  On February 28, 2007, Delphi entered into an amendment to the Equity Purchase and Commitment Agreement with the Plan Investors to extend the date by which the Company, the Cerberus Capital Management, L.P. affiliate, or the Appaloosa Management L.P. affiliate have the right to terminate the agreement on account of not yet having completed tentative labor agreements with Delphi's principal U.S. labor unions and a consensual settlement of legacy issues with GM.  The amendment extended the termination right pursuant to a 14-day notice mechanism.  The amendment also extended the deadline to make

6

certain regulatory filings under the federal antitrust laws in connection with the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement.

14.     On April 19, 2007, Delphi announced that the Debtors anticipated negotiating changes to the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement. The Debtors do not believe that these developments will preclude the Debtors from filing a joint plan of reorganization and related documents with the Court prior to the current expiration of the exclusivity period on July 31, 2007 or emerging from chapter 11 reorganization this year. The Debtors also confirmed that none of the parties entitled to give notice of termination of the framework agreements had done so as of the date of this filing and that these agreements remain effective as previously filed until modified or terminated.

15.     Although much remains to be accomplished in the Debtors' reorganization cases, the Debtors and their stakeholders are together navigating a course that should lead to a consensual resolution with their U.S. labor unions and GM while providing an acceptable financial recovery framework for the Debtors' stakeholders. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

16.     By this Motion, the Debtors seek entry of an order under section 363(b) of the Bankruptcy Code and Bankruptcy Rule 6004 authorizing, but not directing, the Debtors to enter into and perform under an amendment to the March 9, 2007 Master Services Agreement

with Computer Sciences Corporation ("CSC"), which provides for certain global network support services, including wide area network, local area network, voice services, and mobility services support (the "Network Support Services Agreement").[5]

## Basis For Relief

17.    The Debtors' decision to enter into the Network Support Services Agreement is another step in the implementation of their transformation plan.  As previously indicated to this Court, under the Debtors' transformation plan, the Debtors intend to transform their salaried workforce to ensure a competitive structure aligned with their product portfolio and manufacturing footprint, which would in turn lower the Debtors' selling, general, and administrative ("SG&A") expenses.  To achieve this goal, the Debtors have designed and are implementing a shared service delivery model that will contribute to the reduction of their global SG&A expense by $450 million annually.  One aspect of this effort is Delphi's accelerated consolidation and outsourcing of IT functions and its transition to common processes and systems.  Benchmarking analysis conducted with independent consultants examining the detailed cost of IT services of Delphi and its key IT competitors led to the conclusion that Delphi's 2005 IT operating budget of $588 million could be reduced by $256 million (included in the $450 million objective) through three transformation actions:  outsourcing IT services, reducing the number and type of unique, non-common systems and moving such systems to common operating platforms, and running a streamlined IT shared service organization.

18.    Outsourcing of IT services, which is expected to result in a portion of the $256 million in savings, is to be completed in three phases.  The Debtors' shared service model

---

[5]    Pursuant to the Application Maintenance Order (defined below), the Debtors received authority from this Court to enter into and perform under the March 9, 2007 Master Service Agreement by and between Delphi and CSC (the "CSC MSA").

calls for the outsourcing of the following IT services: (a) global infrastructure services, including desktops, service desk, and mainframe and server systems hosting, (b) application maintenance and support, and (c) network support services such as data networks and voice services. On October 19, 2006, this Court entered an order authorizing the Debtors to enter into and perform under the first phase of their planned IT outsourcing (Docket No. 5378) and on April 23, 2007, this Court entered an order authorizing the Debtors to enter into and perform under the second phase of their planned IT outsourcing (Docket No. 7774). The Debtors have commenced performance under both Phase I and Phase II of the IT outsourcing plan. This Motion addresses the outsourcing of global network support services, which is the third and final phase of the IT outsourcing plan.

19. Prior to the implementation of their IT transformation plan, the Debtors purchased IT services from more than 100 regional-based suppliers. The completion of all three outsourcing phases should enable rationalization of the supplier-provider base to fewer than ten direct suppliers. Because many of the Debtors' major existing IT contracts are due to expire by the end of 2007, it is appropriate for the Debtors to take this initiative now. Alternatively, the Debtors could begin negotiations to extend their existing agreements. Doing so, however, would not only hinder the Debtors' long-term efforts to transition to a more efficient delivery model through outsourcing, but could also restrict the Debtors in completing other transformation objectives due to ongoing minimum revenue commitments in existing contracts.

20. Outsourcing IT services to a few strategic suppliers will enable the Debtors to significantly reduce the number of internal employees providing such services. The third phase of this project, outsourcing of global network support services, will result in significant operating savings beyond current operating costs. After one-time transition costs of

9

approximately $16 million, the Debtors expect net operating savings to approximate $71 million over the five-year term of the Network Support Services Agreement.

21. As part of the competitive bidding process for the outsourcing of global network support services, the Debtors used external industry experts in global outsourcing and contract negotiations to objectively and competitively select service providers that have proven technical capability and global breadth. As with the previous phases of their IT outsourcing process, the Debtors followed a structured bidding process methodology to ensure that an objective and comprehensive assessment was conducted according to established standards. The Debtors established a selection steering committee (the "Selection Steering Committee") to assess the market for qualified service providers. The Selection Steering Committee identified six target service providers. Subsequently, the Selection Steering Committee conducted a formal review of each service provider's standard market offering, and ultimately the Debtors sought requests for proposals from three service providers. The Debtors provided a detailed service requirement document to the three service providers and also conducted due diligence on the global service delivery capabilities of such providers. Two of the service providers submitted formal proposals to the Debtors. Based on the submitted proposals, the Debtors selected CSC to take to final contract. Subsequently, the parties negotiated a master service agreement, statement of work, service levels, pricing, and related supporting schedules.

22. Based on arms-length negotiations between the Debtors and CSC, the Debtors recommended to Delphi's Board of Directors (the "Board"), and subsequently received approval from the Board, to award the project to CSC. By moving to a model that provides for the outsourcing of data networks and voice services to a single outside vendor, the Debtors believe that they will (a) be able to develop a stronger relationship with that service provider and

(b) reduce their costs through common processes, common systems, and economies of scale. The key terms of the proposal are described below.

The Network Support Services Agreement

          23.     The Debtors have entered into the Network Support Services Agreement with CSC, the effectiveness of which is conditioned on this Court's approval. The Debtors are filing the Network Support Services Agreement under seal as Exhibit A attached hereto.[6] The Network Support Services Agreement is being filed under seal because it contains competitively sensitive business information which, if publicly disclosed, would release proprietary and confidential information and could detrimentally affect the Debtors' (and CSC's) ability to negotiate the terms of future agreements with other parties. Generally, the Network Support Services Agreement is a global services contract under which Delphi will contract for global network support services on behalf of itself and each of its subsidiaries and affiliates for a five-year term.[7] The cost of the contract is between $325 and $400 million over the five-year term. Monthly operating expenses and one-time transition costs will be charged directly or allocated to the Delphi affiliates which use the services, with approximately 45% of operating and transition costs being borne by the Debtors and the remaining costs by non-Debtor affiliates of Delphi.[8]

---

[6]    The Debtors filed the Network Services Agreement under seal in accordance with the Order Under 11 U.S.C. § 107(b) And Fed. R. Bankr. P. 9018 Authorizing Debtors To File the Network Services Agreement Under Seal (Docket No. ___). The Debtors previously filed the CSC MSA under seal in accordance with the March 28, 2007 Order Under 11 U.S.C. § 107(b) And Fed. R. Bankr. P. 9018 Authorizing Debtors To File Application Maintenance And Support Agreements Under Seal (Docket No. 7453).

[7]    In the event of any inconsistency between the Motion and the Network Services Agreement, the Network Services Agreement governs.

[8]    As previously disclosed in other filings before this Court, the Intercompany Agreement, dated May 17, 1999, is an intercompany cash pooling agreement permitting Delphi and its subsidiaries to engage in intercompany transactions, track intercompany transfers of funds, and obtain reimbursement for services provided to each other. The Intercompany Agreement covers the flow of expenses and liabilities arising from the CSC Agreement.

24. The scope of services to be provided under the Network Support Services Agreement includes transition services both at the inception of the Network Support Services Agreement and at the termination of the Network Support Services Agreement to ensure a smooth transition from existing service providers to CSC and also to ensure that there is no disruption to Delphi's business at the end of the term. The agreement includes a provision for moving Delphi to the next level of technology innovation, the convergence of data and voice services into a single platform, and enables innovative pricing that shifts the risk of transformation to CSC. As explained in more detail below, this provision will be particularly helpful when Delphi seeks to sell or wind-down non-core product lines and manufacturing sites as part of its transformation plan. The Network Support Services Agreement also includes a benchmarking clause to ensure that the agreement continues to be competitive as to service, price, and technology over its term.

25. <u>Termination Rights</u>. Delphi may terminate the Network Support Services Agreement (a) for cause, (b) for convenience, (c) upon change in control of CSC or Delphi, or (d) for insolvency of CSC. No termination charges apply in the case of a termination for cause or upon insolvency of the applicable service provider. The amounts of any termination charges under a termination for convenience or upon change in control are calculated in accordance with the schedule attached to the terminated agreement and reflect CSC's investment to provide the services. There are no termination charges payable after four years under the Network Support Services Agreement.

26. CSC has certain termination rights under the Network Support Services Agreement. If CSC becomes entitled to terminate its agreement, it must nonetheless provide

termination assistance services as long as Delphi pays for such services (at previously negotiated prices) in advance.

27.  <u>Divestitures</u>.  As part of its transformation plan, Delphi identified non-core product lines and manufacturing sites that do not fit into its future strategic framework and that Delphi is seeking to sell or wind-down.  Delphi also continually evaluates its product portfolio and could retain or exit certain businesses depending on market forces or cost structure changes. Delphi intends to sell or wind-down non-core product lines and manufacturing sites during the term of the Network Support Services Agreement.  Thus, Delphi required that the Network Support Services Agreement provide Delphi flexibility with respect to the effect that a divestiture would have upon Delphi's rights and obligations under the agreement.  The following table summarizes Delphi's options under the Network Support Services Agreement subsequent to a divestiture:

|  | **Partial Termination For Convenience** | **Reduced Service Consumption (Reduced Resource Credit Mechanism)** | **Requirement Of Divested Entity To Enter Into Separate Agreement With Service Provider By Separating Master Services Agreement** |
|---|---|---|---|
| **Termination Charges** | • Termination charges would apply | • No termination charges apply | • No termination charges apply |
| **Rights** | • Right to hire people, buy equipment, and assign contracts | • No right to hire people, buy assets, or assign contracts | • No need to hire people, buy assets, or transfer contracts |
| **Base Charges** | • Apportioned to scale for remaining services | • Charges for network support services are adjusted for changes in volume as a percentage of the resource unit cost and based on variance above or below applicable resource baseline | • Apportioned, based on services to be provided to divested entity<br>• Per unit pricing based on aggregate of services |
| **Other** | • Most likely incur separate project costs for services related to due diligence | • "Extraordinary Events" clause (which may result in more favorable pricing for Delphi) may be invoked if reduction is significant | • Base charges may be increased to reflect higher fixed costs (service provider would be required to prove that separating caused higher fixed costs)<br>• May incur separate project costs for services related to due diligence |

13

28.     <u>Treatment Of Prepetition Agreements And Claims Of CSC</u>.  Prior to the commencement of the Debtors' reorganization cases, although CSC and Delphi were parties to two agreements, the services provided under those agreements were not within the scope of the Network Support Services Agreement.  Therefore, the Network Support Services Agreement does not include a release in respect of any claims under those prepetition agreements.

29.     <u>Services To Affiliates</u>.  As was the case with its involvement in the second phase of the IT outsourcing process, CSC has entered or will enter into companion agreements with certain of Delphi's affiliates (the "Companion Agreements") to provide such affiliates with the services contemplated under the Network Support Services Agreement.  Pursuant to the Companion Agreements and the Network Support Services Agreement, Delphi's affiliates will be directly invoiced for the services they receive from CSC or a CSC affiliate under the Network Support Services Agreement and will be obligated to pay those invoices.  To induce CSC's performance to Delphi's affiliates, Delphi has agreed to be secondarily liable for certain charges billed directly to Delphi's non-Debtor affiliates.  In addition, Delphi also will be fully responsible and liable with respect to itself and its non-Debtor affiliates for certain other obligations under the Network Support Services Agreement.  Contemporaneously with entering into the Companion Agreements, Delphi has entered into indemnity agreements with its foreign, non-Debtor affiliates receiving services performed by CSC, both under the CSC MSA, which already has been approved by the Court, and the Network Support Services Agreement.  Under these indemnity agreements, in consideration for Delphi's directing CSC to provide the services contemplated under the Network Support Services Agreement to the foreign affiliates, the foreign affiliates will indemnify Delphi for any payments made by Delphi on their behalf under the Network Support Services Agreement.  In the event that Delphi is required to make payment

under the Network Support Services Agreement on behalf of an affiliate Debtor, Delphi hereby requests that it be granted an allowed claim under section 503 of the Bankruptcy Code against the affiliate Debtor in the amount of such payment.

30.     The Debtors and CSC have bargained in good faith to arrive at the terms and conditions of the Network Support Services Agreement.  Moreover, CSC has significant and proven experience with delivering the services as described herein.  Thus, the Debtors submit that CSC has the expertise, skills, and tools to help Delphi efficiently transform its data networks and voice services.

31.     In the exercise of their business judgment, the Debtors believe that the savings and organizational efficiency that could be achieved through implementation of the Network Support Services Agreement will maximize the recovery for all stakeholders and that therefore the proposed agreement with CSC is in the best interests of the Debtors' estates.

Applicable Authority

32.     Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it.  See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).

33.     The Second Circuit has held that, although the Bankruptcy Court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate." In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993). The Court's consideration of a debtor's section 363(b) motion is a summary proceeding, intended merely as a means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial with disputed issues." Orion Pictures, 4 F.3d at 1098-99.

34. Once the debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992). Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." Id. To satisfy its burden, it is not enough for an objector simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections." Lionel, 722 F.2d at 1071.

35. As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

36. The Debtors submit that entering into Network Support Services Agreement in accordance with the terms described above reflects a sound use of the Debtors' business judgment. By entering into the Network Support Services Agreement, the Debtors estimate total net operating savings as compared to current spending for global network support services of approximately $71 million over the five-year term of the agreements. The fact that

16

the Network Support Services Agreement would allow for significant changes in the Debtors' organizational size and scope commensurate with business portfolio divestitures, wind-downs, or acquisitions without triggering a repricing of the Agreement constitutes a significant benefit to Delphi. Also, by reducing the number of service providers, the Debtors should reduce their IT costs through common processes, common systems, and economies of scale.

## Notice Of Motion

37.     Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, and Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice, Case Management, and Administrative Procedures, entered October 26, 2006 (Docket No. 5418).

## Memorandum Of Law

38.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) authorizing, but not directing, the Debtors to enter into and perform under the Network Support Services Agreement with CSC and (b) granting the Debtors such other and further relief as is just.

Dated:  New York, New York
        May 11, 2007

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:  /s/ John Wm. Butler, Jr.
     John Wm. Butler, Jr. (JB 4711)
     John K. Lyons (JL 4951)
     Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

           - and -

By:  /s/ Kayalyn A. Marafioti
     Kayalyn A. Marafioti (KM 9632)
     Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

**Exhibit A**
**Network Support Services Agreement**

(Filed Under Sea