**Hearing Date And Time: May 31, 2007 at 10:00 a.m.**
**Objection Deadline: May 24, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                :
   In re            :  Chapter 11
                :
DELPHI CORPORATION, et al.,    :  Case No. 05-44481 (RDD)
                :
                :  (Jointly Administered)
    Debtors.         :

MOTION PURSUANT TO 11 U.S.C. § 105(a) FOR SUPPLEMENTAL ORDER UNDER 11
U.S.C. §§ 363, 502, AND 503 AND FED. R. BANKR. P. 9019(b) CLARIFYING DEBTORS'
AUTHORITY TO COMPROMISE OR SETTLE CERTAIN CLASSES OF CONTROVERSY AND
ALLOW CLAIMS AGAINST SPECIFIC ESTATES WITHOUT FURTHER COURT APPROVAL

("MOTION FOR SUPPLEMENTAL SETTLEMENT PROCEDURES")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for a supplemental order clarifying the Order Under 11 U.S.C. §§ 363, 502, And 503 And Fed. R. Bankr. P. 9019(b) Authorizing Debtors To Compromise Or Settle Certain Classes Of Controversy And Allow Claims Without Further Court Approval (Docket No. 4414) (the "Settlement Procedures Order") to expressly provide that the Debtors have the authority, under the Settlement Procedures (defined below), to allow claims (i) against specific Debtor entities and their estates and (ii) with a priority or status different from that which was asserted by claimants in their proofs of claim. In support of this Motion, the Debtors respectfully represent as follows:

## Background

A.  The Chapter 11 Filings

    1.  On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. The Court has ordered joint administration of these cases.

    2.  No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

    3.  This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

    4.  The statutory predicate for the relief requested herein is section 105(a) of the Bankruptcy Code.

B.  Current Business Operations Of The Debtors

    5.  Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.[2]

    6.  The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

    7.  Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

---

[1] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[2] On March 20 2007, Delphi Automotive Systems Espana S.L., whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding.  The application was approved by the Spanish court on April 13, 2007.  The Concurso proceeding does not affect other Delphi legal entities in Spain or elsewhere and is an isolated event that is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.     Events Leading To The Chapter 11 Filing

8.     In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006, the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

9.     The Debtors believe that the Company's financial performance has deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating

---

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

4

largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

10. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.   The Debtors' Transformation Plan

11. On March 31, 2006, the Company outlined five key tenets of its transformation plan. First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business. Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company. Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus. Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.[4] Finally, the Debtors must devise a workable solution to their current pension situation.

---

[4] As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages. The Company's revised operating structure consists of its four core business segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture. The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.

5

12. On December 18, 2006, the Debtors marked another milestone in their chapter 11 cases with the announcement of two significant agreements. The first of these was an equity purchase and commitment agreement (the "Equity Purchase and Commitment Agreement") with affiliates of Appaloosa Management L.P., Cerberus Capital Management, L.P., and Harbinger Capital Partners Master Fund I, Ltd., as well as Merrill Lynch & Co. and UBS Securities LLC (collectively, the "Plan Investors"). Under the Equity Purchase and Commitment Agreement, the Plan Investors have agreed to invest up to $3.4 billion in preferred and common equity in the reorganized Delphi to support the Debtors' transformation plan. The Equity Purchase and Commitment Agreement is subject to the completion of due diligence, satisfaction or waiver of numerous other conditions (including Delphi's goal of achieving consensual agreements with its principal U.S. labor unions and GM), and the non-exercise by either Delphi or the Plan Investors of certain termination rights. The second agreement was a plan framework support agreement (the "Plan Framework Support Agreement") with the Plan Investors and GM. The Plan Framework Support Agreement outlines certain proposed terms of the Debtors' anticipated plan of reorganization, including the distributions to be made to creditors and shareholders, the treatment of GM's claims, the resolution of certain pension funding issues, and the corporate governance of the reorganized Debtors. The terms of the Plan Framework Support Agreement are expressly conditioned on the Debtors' reaching consensual agreements with their U.S. labor unions and GM.

13. On January 12, 2007, this Court authorized the Debtors to execute, deliver, and implement the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement (Docket No. 6589). On February 28, 2007, Delphi entered into an amendment to the Equity Purchase and Commitment Agreement with the Plan Investors to

extend the date by which the Company, the Cerberus Capital Management, L.P. affiliate, or the Appaloosa Management L.P. affiliate have the right to terminate the agreement on account of not yet having completed tentative labor agreements with Delphi's principal U.S. labor unions and a consensual settlement of legacy issues with GM.  The amendment extended the termination right pursuant to a 14-day notice mechanism.  The amendment also extended the deadline to make certain regulatory filings under the federal antitrust laws in connection with the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement.

        14.     On April 19, 2007, Delphi announced that the Debtors anticipated negotiating changes to the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement.  The Debtors do not believe that these developments will preclude the Debtors from filing a joint plan of reorganization and related documents with the Court prior to the current expiration of the exclusivity period on July 31, 2007 or emerging from chapter 11 reorganization this year.  The Debtors also confirmed that none of the parties entitled to give notice of termination of the framework agreements has done so as of the date of this filing and that these agreements remain effective as previously filed until modified or terminated.

        15.     Although much remains to be accomplished in the Debtors' reorganization cases, the Debtors and their stakeholders are together navigating a course that should lead to a consensual resolution with their U.S. labor unions and GM while providing an acceptable financial recovery framework for the Debtors' stakeholders.  Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and

continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

### Relief Requested

16.    By this Motion, out of an abundance of caution and pursuant to the guidance of this Court, the Debtors seek a supplemental order (the "Supplemental Settlement Procedures Order") clarifying that the Debtors, when settling claims pursuant to the Settlement Procedures Order, have the authority to allow claims (i) against specific Debtor entities and their estates and (ii) with a priority or status different from that which was asserted by claimants in their proofs of claim.  Further, the Debtors request that the Supplemental Settlement Procedures Order relate back to the date of entry of the Settlement Procedures Order.  The relief sought herein is consistent with the intended scope of the Settlement Procedures Order.

### Basis For Relief

17.    Given the large number of claims and other matters the Debtors anticipated resolving during the course of these cases, and the high costs associated with an individualized approach to obtaining court approval of each of those settlements, the Debtors, pursuant to the Motion For Order Under 11 U.S.C. §§ 363, 502, And 503 And Fed. R. Bankr. P. 9019(b) Authorizing Debtors To Compromise Or Settle Certain Classes Of Controversy And Allow Claims Without Further Court Approval (Docket No. 4037) (the "Settlement Procedures Motion") dated June 6, 2006, sought this Court's approval of certain guidelines and notice procedures (the "Settlement Procedures") that would enable the Debtors to settle disputes in commercial transactions and other circumstances outside the ordinary course of the Debtors' business and to allow certain prepetition and postpetition claims without further court approval.

18.    By order entered on June 29, 2006, the Court approved the Settlement Procedures with certain modifications.  Although the Settlement Procedures Order authorizes the

8

Debtors to allow certain claims without further court approval, it is silent in two respects relevant to the allowance of such claims. First, the Settlement Procedures Order does not expressly authorize the Debtors to allow – nor does it expressly prohibit the Debtors from allowing – claims against specific Debtor entities and their estates. Second, the Settlement Procedures Order does not expressly authorize the Debtors to allow – nor does it expressly prohibit the Debtors from allowing – claims to be characterized as having a priority or status different from that which was asserted by claimants in their proofs of claim.

19. Because the Debtors believe that such authority is inherent in the relief granted by the Settlement Procedures Order,[5] the Debtors, as part of their claims reconciliation process, have utilized the Settlement Procedures to enter into agreements with claimants that (i) allow, in whole or in part, prepetition claims against the estates of specific Debtor entities (e.g., Delphi Automotive Systems LLC) rather than against "the Debtors" as a whole and/or (ii) characterize claims with a priority or status (e.g., secured, unsecured, or priority) different from that which was asserted by the claimants. Because the Debtors' estates have not been substantively consolidated at this time, and because the Debtors often dispute the specific estate against which certain claims were asserted, the Debtors believe that specifying the estate against which each prepetition claim will be allowed is a necessary part of settling prepetition claims. Likewise, because the characterization of a prepetition claim is a key component to any settlement of that claim, and because the Debtors often dispute the claim classification asserted by claimants, the Debtors believe that the ability to allow a claim with a priority or status different from that which was asserted by claimants is also necessary.

---

[5] The Settlement Procedures Order appears to contemplate settlements by specific Debtor entities. Indeed, paragraph 4(b)(vi) of that order limits the instances in which the Ad Hoc Trade Committee (as defined in the Settlement Procedures Motion) is entitled to receive notice to only those settlements involving "claims proposed to be settled by Delphi Corporation." See Settlement Procedures Order ¶ 4(b)(vi).

9

20.     Therefore, although the Debtors believe that the ability to settle claims as described above is inherent in the relief granted by the Settlement Procedures Order, the Debtors seek to confirm that the Settlement Procedures Order expressly authorizes such action.

### Applicable Authority

21.     Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order . . . that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." Section 105(a) forms "'the basis for a broad exercise of power in the administration of a bankruptcy case.'" In re Elmendorf, 345 B.R. 486, 503 (Bankr. S.D.N.Y. 2006) (quoting In re Flores, 291 B.R. 44, 54 (Bankr. S.D.N.Y. 2003) (internal quotation omitted)).

22.     The Supplemental Settlement Procedures Order, confirming that the Debtors may, under the Settlement Procedures, allow claims against the estates of specific Debtor entities and with a priority or status different from that which was asserted by claimants, is both necessary and appropriate to the administration of the Debtors' reorganization cases.

23.     As the Court has implicitly acknowledged by approving the Settlement Procedures, such procedures are appropriate in light of the size and complexity of, and the number of disputes that arise in, the Debtors' chapter 11 cases. If, however, claimants do not know the estate against which their claims will be allowed and the Debtors do not have the ability to settle claims against a specific estate, the likelihood of settlements under the Settlement Procedures and the benefits and effectiveness of the procedures for the Debtors' estates, creditors, and other stakeholders will be diminished. Further, given that allocating claims to specific estates is a prerequisite, absent substantive consolidation, to distribution of those claims under a plan of reorganization, the Debtors question whether they have the ability to consummate a final resolution of any claims without the ability to allow claims against specific

estates. If the Debtors are not able to finally resolve claims, then final resolution will require formal adjudication by this Court for each claim, the very thing the Settlement Procedures were designed to avoid. Therefore, the Debtors assert that the Supplemental Settlement Procedures Order is necessary and appropriate under section 105(a) of the Bankruptcy Code.

24. In addition, the Debtors assert that the Supplemental Settlement Procedures Order should be effective, <u>nunc</u> <u>pro</u> <u>tunc</u>, as of June 29, 2006, which is the date the Court entered the Settlement Procedures Order. As noted above, since the entry of the Settlement Procedures Order, the Debtors have settled a number of controversies and claims under the Settlement Procedures, many of which have included the allowance of claims against specific Debtor entities and/or with a priority or status different from that which was asserted by the claimants. To protect the soundness of these consummated settlements, the Supplemental Settlement Procedures Order should apply retroactively to such settlements. Without this relief, it could appear that the Debtors applied two sets of claims settlement procedures. This perceived lack of uniformity might force the Debtors to reopen previously consummated settlements entered into prior to the Supplemental Settlement Procedures Order if parties to such previous settlements feel that they have been prejudiced and wish to verify that such previous settlements are in fact subject to the Supplemental Settlement Procedures Order. Thus, for the sake of uniformity in the Settlement Procedures, and to avoid the possibility of having to revisit claims that have already been settled, the Debtors assert that the Supplemental Settlement Procedures Order should be applied retroactively to the date of the entry of the Settlement Procedures Order.

25. Accordingly, to maximize the benefits of the Settlement Procedures, including efficiency and value in the Debtors' settlement of disputes, the Settlement Procedures Order should be supplemented to clarify that the Debtors are authorized to allow claims covered

by the Settlement Procedures against specific Debtor entities and their estates and with a priority or status different from that which was asserted by claimants.

## Notice Of Motion

26. Notice of this Motion has been provided in accordance with the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on October 26, 2006 (Docket No. 5418). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

27. Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (i) supplementing the Settlement Procedures Order to clarify that the Debtors are authorized, under the Settlement Procedures, to settle claims (a) against the estates of specific Debtor entities and (b) with a priority or status different from that which was asserted by claimants, and (ii) granting the Debtors such other and further relief as is just.

Dated:   New York, New York
         May 11, 2007

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:   /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr. (JB 4711)
      John K. Lyons (JL 4951)
      Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:   /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti (KM 9632)
      Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

13