**Hearing Date And Time: May 31, 2007 at 10:00 a.m.**
                    **Objection Deadline: May 24, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

      - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | : | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION UNDER 11 U.S.C. § 363 AND FED. R. BANKR. P. 9019
FOR ORDER AUTHORIZING DELPHI CORPORATION TO (A) PERFORM UNDER
PENSION FUNDING WAIVERS ISSUED BY UNITED STATES INTERNAL REVENUE
SERVICE AND (B) PROVIDE LETTERS OF CREDIT TO PENSION BENEFIT <u>GUARANTY
CORPORATION THEREUNDER</u>

("IRS PENSION FUNDING WAIVER MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") under 11 U.S.C. § 363 and Fed. R. Bankr. P. 9019 for an Order Authorizing Delphi to (a) perform under pension funding waivers (the "Waivers") issued by the United States Internal Revenue Service (the "IRS") and (b) provide letters of credit to the Pension Benefit Guaranty Corporation (the "PBGC") in connection with the Waivers. In support of this Motion, the Debtors respectfully represent as follows:

Background

A.  The Chapter 11 Filings

1.  On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. The Court has ordered joint administration of these cases.

2.  No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

3.  This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.       The statutory predicates for the relief requested herein are section 363 of the Bankruptcy Code and rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.       Delphi and its subsidiaries and affiliates (collectively, the "Company"), as of December 31, 2006, had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.[2]

6.       The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.       Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in

---

[1] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[2] On March 20 2007, Delphi Automotive Systems Espana S.L., whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed its "Concurso" application for a Spanish insolvency proceeding.  The application was approved by the Spanish court on April 13, 2007.  The Concurso proceeding does not affect other Delphi legal entities in Spain or elsewhere and is an isolated event that is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

8.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006, the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

9.    The Debtors believe that the Company's financial performance has deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic

---

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

4

OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

10. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.  The Debtors' Transformation Plan

11. On March 31, 2006, the Company outlined five key tenets of its transformation plan. First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business. Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company. Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus. Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.[4] Finally, the Debtors must devise a workable solution to their current pension situation.

---

[4] As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages. The Company's revised operating structure consists of its four core business segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture. The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.

5

12.     On December 18, 2006, the Debtors marked another milestone in their chapter 11 cases with the announcement of two significant agreements. The first of these was an equity purchase and commitment agreement (the "Equity Purchase and Commitment Agreement") with affiliates of Appaloosa Management L.P., Cerberus Capital Management, L.P., and Harbinger Capital Partners Master Fund I, Ltd., as well as Merrill Lynch & Co. and UBS Securities LLC (collectively, the "Plan Investors"). Under the Equity Purchase and Commitment Agreement, the Plan Investors have agreed to invest up to $3.4 billion in preferred and common equity in the reorganized Delphi to support the Debtors' transformation plan. The Equity Purchase and Commitment Agreement is subject to the completion of due diligence, satisfaction or waiver of numerous other conditions (including Delphi's goal of achieving consensual agreements with its principal U.S. labor unions and GM), and the non-exercise by either Delphi or the Plan Investors of certain termination rights. The second agreement was a plan framework support agreement (the "Plan Framework Support Agreement") with the Plan Investors and GM. The Plan Framework Support Agreement outlines certain proposed terms of the Debtors' anticipated plan of reorganization, including the distributions to be made to creditors and shareholders, the treatment of GM's claims, the resolution of certain pension funding issues, and the corporate governance of the reorganized Debtors. The terms of the Plan Framework Support Agreement are expressly conditioned on the Debtors reaching consensual agreements with their U.S. labor unions and GM.

13.     On January 12, 2007, this Court authorized the Debtors to execute, deliver, and implement the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement (Docket No. 6589). On February 28, 2007, Delphi entered into an amendment to the Equity Purchase and Commitment Agreement with the Plan Investors to

6

extend the date by which the Company, the Cerberus Capital Management, L.P. affiliate, or the Appaloosa Management L.P. affiliate have the right to terminate the agreement on account of not yet having completed tentative labor agreements with Delphi's principal U.S. labor unions and a consensual settlement of legacy issues with GM.  The amendment extended the termination right pursuant to a 14-day notice mechanism.  The amendment also extended the deadline to make certain regulatory filings under the federal antitrust laws in connection with the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement.

        14.      On April 19, 2007, Delphi announced that the Debtors anticipated negotiating changes to the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement.  The Debtors do not believe that these developments will preclude the Debtors from filing a joint plan of reorganization and related documents with the Court prior to the current expiration of the exclusivity period on July 31, 2007 or emerging from chapter 11 reorganization this year.  The Debtors also confirmed that none of the parties entitled to give notice of termination of the framework agreements has done so as of the date of this filing and that these agreements remain effective as previously filed until modified or terminated.

        15.      Although much remains to be accomplished in the Debtors' reorganization cases, the Debtors and their stakeholders are together navigating a course that should lead to a consensual resolution with their U.S. labor unions and GM while providing an acceptable financial recovery framework for the Debtors' stakeholders.  Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and

continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

16.  By this Motion, the Debtors seek an order under section 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019 authorizing Delphi to (a) perform under the Waivers issued by the IRS and (b) provide letters of credit to the PBGC thereunder.

## Basis For Relief

17.  The Debtors seek authority for Delphi to perform under the Waivers, which consist of an hourly pension plan waiver and a salaried pension plan waiver.[5] The primary purpose of the hourly plan Waiver is to facilitate the Debtors' effort to effect a transfer of certain hourly pension plan obligations to GM under section 414(l) of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1-9833 (the "IRC"), as set forth in the Plan Framework Support Agreement. This transfer is an essential aspect of the Debtors' efforts to successfully reorganize with the full and voluntary participation of its labor unions and other core constituencies.

18.  To make the transfer economically feasible for the Debtors, the Debtors must secure a short extension of the statutory June 15, 2007 funding deadline for the plan year ended September 30, 2006. Securing an extension also will prevent the assessment of significant excise tax penalties with respect to both plans that the IRS would likely impose were the Debtors to miss the statutory deadline. Although the Debtors believe that such penalties are unenforceable under applicable bankruptcy law, implementation of the Waivers would avoid a

---

[5]  Copies of the hourly pension plan funding waiver and salaried pension plan funding waiver are attached hereto as Exhibits A and B, respectively. The Waivers are in the form of private letter rulings from the IRS.

8

protracted dispute with the IRS over the issue as well as any questions about how a $1.4 billion excise tax assessment would be reflected in the Debtors' financial statements.

19. As a result, the Debtors seek authority for Delphi to perform under the Waivers, in return for which the IRS would waive the minimum funding requirements for the plan year ended September 30, 2006 until the Debtors emerge from chapter 11 and bring their funding obligations up to date. The costs of performing under the Waivers are substantially less than the benefit to be gained from effecting the section 414(l) transaction and the resolution of the IRS penalty issues, and performance under the Waivers is accordingly in the best interests of the Debtors and their estates.

20. Most importantly, the resolution of this pension funding issue effected by the Waivers is consistent with the Debtors' goals in their restructuring. As set forth above, resolution of the Debtors' current pension situation is one of the primary tenets of their transformation plan. The successful conclusion of this pension matter is essential to the Debtors' timely emergence from chapter 11.

A.   The Debtors' Pension Obligations

21. Delphi maintains two separate pension plans for its employees, one for salaried workers and one for hourly workers (the "Plans"). The Debtors' funding obligations under the Plans are governed by the IRC and the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461 ("ERISA"). Under the IRC and ERISA, the Debtors are required to meet certain minimum funding standards for their pension plans.

22. The Plan Framework Support Agreement provides for funding of the Plans accomplished in part by a transfer of certain pension obligations from Delphi's hourly plan to a GM pension plan under section 414(l) of the IRC. Under IRC and ERISA funding standards, a

9

section 414(l) transfer implemented during a plan year is not fully reflected on the Plan's books in the same way that a cash contribution would be recognized. As a result, even if pension liabilities under the hourly plan were transferred during the year to GM, the Debtors would be required to make cash contributions to the hourly plan as though a significant portion of the transferred liabilities remained in the plan. Absent the hourly plan funding Waiver, these redundant cash contributions would result in projected overfunding of the hourly pension plan. The hourly plan funding Waiver avoids this economically inefficient outcome by deferring the date on which funding contributions are due to the hourly plan from June 15, 2007 to the date the Debtors emerge from chapter 11.

23.     The Waivers also would avoid a likely dispute with the IRS regarding the enforceability of potential excise tax penalty assessments that could top $1 billion.

24.     Since the Debtors sought reorganization relief under chapter 11 of the Bankruptcy Code they have been making "normal cost" contributions to the Plans, or contributions that reflect the amounts related to service provided by plan participants post-filing.[6] These "normal cost" contributions are less than the minimum funding requirements established by the IRC and ERISA. As a result, if additional amounts are not contributed within eight and one-half months after the end of the plan year for which the contributions are due, an accumulated funding deficiency will arise. Section 4971(a) of the IRC imposes a 10% excise tax penalty on the amount of any funding deficiency. Under section 4971(b) of the IRC, an additional excise tax penalty of 100% may be assessed by the IRS if the funding deficiency is not timely corrected.

---

[6] See Treas. Reg. 1.404(a)-6 for further discussion of the definition of "normal cost." 26 C.F.R. § 1.404(a)-6 (2007).

25. The IRS asserted that the Plans had a funding deficiency of $173 million for the plan year ended September 30, 2005, resulting in an excise tax assessed by the IRS of $17.3 million.[7] For the plan year ended September 30, 2006, the Debtors anticipate that if the Plans are not funded in accordance with ERISA and IRC minimum requirements by June 15, 2007, and the Waivers are not implemented, the IRS would assert that there is a funding deficiency of at least $1.25 billion in the Plans for the plan year ended September 30, 2006, which could result in an additional 10% excise tax assessment of at least $125 million. In addition, the IRS may attempt to assess additional 100% excise tax penalties of $173 million on the uncorrected deficiency from the plan year ended September 30, 2005, and $1.25 billion if the deficiency from the plan year ended September 30, 2006 is not timely corrected. Accordingly, the total potential excise tax that the IRS might assert in respect of the Plans after June 15, 2007 could be more than $1.4 billion.

26. Although the Debtors dispute the IRS's assertion that these excise tax penalties might properly be levied, the IRS would be expected to vigorously pursue its claims. The Waivers would preempt any such dispute with the IRS over the penalties by (a) extending the June 15, 2007 funding deadline for the plan year ended September 30, 2006, thereby avoiding any accumulated funding deficiency for that year,[8] and (b) settling the IRS's excise tax claims for the plan year ended September 30, 2005, in exchange for the Debtors' commitment to make an accelerated contribution of $10 million to the hourly plan upon the Debtors' emergence

---

[7] Delphi has not paid this assessed excise tax penalty.

[8] As set forth above, the Debtors intend to fully satisfy any minimum funding requirements with respect to the Plans upon their emergence from chapter 11. The Debtors made this intention clear in the Plan Framework Support Agreement which they entered into on December 18, 2006 with the Plan Investors.

11

from chapter 11. The contribution would be deductible by Delphi as credited towards any required contributions for the plan year ending September 30, 2007.

B.      Terms Of The Waivers

27.     After months of protracted negotiations, on March 21, 2007, the Debtors met with the IRS and the PBGC to finalize the conditions under which the Debtors could obtain the Waivers. IRC section 412 provides that the IRS, after consultation with the PBGC, may require that security be given to the PBGC in favor of a pension plan as a condition of granting a funding waiver. As a matter of IRS and PBGC administrative practice, no waiver of any significant size is granted absent such security. In light of the magnitude of the Waivers in this instance – reportedly the largest funding waivers ever granted by the IRS – the agencies informed the Debtors that security satisfactory to the PBGC was a minimum prerequisite for the Waivers.

28.     On May 1, 2007, the IRS agreed to grant the Waivers subject to conditions contained in the waiver ruling letters. The terms of the Waivers provide in part that (a) Delphi must file a chapter 11 plan by July 31, 2007 and (b) Delphi must satisfy any minimum funding requirements by the effective date of a plan of reorganization, which must be not later than November 15, 2007.[9] In addition, as security for the Debtors' obligations as set forth in the Waivers, Delphi must provide the PBGC with letters of credit in the amount of $100 million on account of its hourly pension plan and $50 million on account of its salaried pension plan by no

---

[9] The Waiver for the hourly plan also anticipates that the plan of reorganization will include the section 414(l) transfer outlined in the Plan Framework Support Agreement. Under section 414(l) of the IRC, obligations in a pension plan can be transferred to another pension plan without negative tax implications if certain conditions are met. The Plan Framework Support Agreement contemplates that Delphi will make a section 414(l) transfer to a GM pension plan of approximately $1.5 billion of hourly pension plan liabilities.

12

later than June 15, 2007.[10]  If Delphi does not meet its obligations under the Waivers, the PBGC would be entitled to apply the proceeds of the letters of credit for the benefit of the respective Plans.  The proceeds would be treated as deductible employer contributions made by Delphi to the Plans in satisfaction of a portion of Delphi's funding obligations to the Plans.  Delphi intends to honor its pension obligations and thus does not anticipate that the letters of credit will ever be drawn down by the PBGC.  Once Delphi emerges from chapter 11 and satisfies its obligations under the Waivers, the letters of credit will expire.

29.  The Debtors' DIP financing Credit Agreement provides for a fixed fronting fee of 1/4% and an annual fee of 2.5% of the outstanding exposure under a letter of credit.[11]  Even if the Debtors were not to emerge from chapter 11 until November 15, 2007 (the outside date for such event in the Waivers), the total fees Delphi would incur in respect of the issuance of the letters of credit would be $1,754,125.00.  In addition to the fees incurred with respect to the letters of credit, under the hourly plan Waiver, Delphi must reimburse the PBGC for outside consultant costs incurred in reviewing the Debtors' funding waiver request, in an amount not to exceed $4 million.[12]

30.  The Debtors' total cost for entering into the Waivers is therefore approximately $5,754,125.00.  This amount is minimal when compared to the result of the transfer of pension liabilities to GM and the avoidance of a protracted dispute (and negative publicity) regarding a potential excise tax penalty of more than $1.4 billion.  More generally,

---

[10] Issuance of the letters of credit is within the Debtors' letter of credit capacity of $325 million under their DIP financing, and providing this security to the PBGC is consistent with Delphi's financial plan going forward.

[11] Credit Agreement ¶ 2.23.  The Credit Agreement was attached to the DIP Refinancing Motion (Docket No. 6180), filed on December 18, 2006, which was approved by this Court's order of January 5, 2007 (Docket No. 6461).

[12] We understand from the PBGC that they expect the reimbursable fees will be well below the $4 million cap.

obtaining the Waivers will allow the Debtors to implement a consensual resolution of its pension obligations with the IRS and the PBGC. This resolution will further help the Debtors to effect the pension agreement negotiated with GM and its employees and embodied in the Plan Framework Support Agreement, a key component of the Debtors' successful emergence from chapter 11. For these reasons, the Debtors assert that the Agreement is in the best interests of the Debtors' estates and will maximize value for all creditors as described above.

## Applicable Authority

A.   <u>The Debtors Have Soundly Exercised Their Business Judgment</u>

       31.   Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it. <u>See</u> <u>In re Lionel Corp.</u>, 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); <u>In re Delaware Hudson Ry. Co.</u>, 124 B.R. 169, 179 (Bankr. D. Del. 1991).

       32.   The Second Circuit has held that, although the Bankruptcy Court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate." <u>In re Orion Pictures Corp.</u>, 4 F.3d 1095, 1098-99 (2d Cir. 1993). The Court's consideration of a debtor's section 363(b) motion is a summary proceeding, intended merely as a means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial with disputed issues." <u>Orion Pictures</u>, 4 F.3d at 1098-99.

14

33.     Once the debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." Id.   To satisfy its burden, it is not enough for an objector simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections." Lionel, 722 F.2d at 1071.

34.     As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

35.     As set forth above, Delphi has sound business justification for performing under the Waivers at this time.  The Waivers will make it feasible to implement the 414(l) transfer of the hourly plan described above and will prevent assessment of potential excise taxes of approximately $1.4 billion with respect to the Plans.  Against these savings, Delphi will only be required to incur costs of approximately $5,754,125.00.  Moreover, this agreement will facilitate a consensual resolution of the Debtors' pension obligations that will allow them to successfully exit chapter 11.  Finally, terms of the Waivers were negotiated with the IRS and the PBGC at arms length and in good faith.

B.  The Court Should Approve The Settlement Set Forth In The Agreement

36. Bankruptcy Rule 9019 provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Bankruptcy Rule 9019(a). Settlements and compromises are "a normal part of the process of reorganization," Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 308 U.S. 106, 130 (1939)); see also In re Adelphia Comm'ns Corp., 327 B.R. 143, 159 (decision to accept or reject a settlement lies within sound discretion of bankruptcy court), adhered to on reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

37. Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate when the compromise is fair and equitable and is in the best interests of a debtor's estate. See, e.g., TMT Trailer Ferry, 390 U.S. at 424; Adelphia Comm'ns, 327 B.R. at 159 ("The settlement need not be the best that the debtor could have obtained. Rather, the settlement must fall 'within the reasonable range of litigation possibilities.'") (citations omitted) (quoting In re Penn Centr. Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979); Nellis v. Shugrue, 165 B.R. 115, 121 (S.D.N.Y. 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it."). In general, compromises in the bankruptcy context should be approved unless they "'fall below the lowest point in the range of reasonableness.'" Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (citation omitted).

38. The Supreme Court in TMT Trailer Ferry set forth the following factors that courts should consider in determining whether a proposed settlement or compromise is in the best interests of a debtor's estate: (a) the probability of the debtor's success in the litigation, (b)

16

the difficulties associated with collection, (c) the complexity of the litigation, and the attendant expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors. TMT Trailer Ferry, 390 U.S. at 424-25; see also Nellis, 165 B.R. at 122; Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002).

39. Courts in this district have further elaborated on these factors to consider: (a) the balance between the likelihood of plaintiff's or defendants' success should the case go to trial vis-à-vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures, (b) the prospect of complex and protracted litigation if the settlement is not approved, (c) the proportion of the class members who do not object or who affirmatively support the proposed settlement, (d) the competency and experience of counsel who support the settlement, (e) the relative benefits to be received by individuals or groups within the class, (f) the nature and breadth of releases to be obtained by the directors and officers as a result of the settlement, and (g) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion. Adelphia Comm'ns, 327 B.R. at 159-60; accord In re Texaco Inc., 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

40. The bankruptcy court need not determine that all of the foregoing criteria favor approval of a compromise, and the proposed compromise need not be the best agreement that the debtor could have achieved under the circumstances. See Adelphia Comm'ns, 327 B.R. at 159-60; see also Penn Centr., 596 F.2d at 1114. Instead, the court's proper "role is to determine whether the settlement as a whole is fair and equitable," In re Lee Way Holding Co., 120 B.R. 881, 890 (Bankr. S.D. Ohio 1990), and falls "'within the reasonable range of litigation possibilities.'" In re Telesphere Comm'ns, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994) (citation omitted). To that end, courts should not substitute their own judgment for that of the

debtor, but rather should "'canvass the issues'" to affirm that the proposed settlement falls above "'the lowest point in the range of reasonableness.'" Adelphia Comm'ns, 327 B.R. at 159 (quoting W.T. Grant Co., 699 F.2d at 608); accord Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd sub nom. Sobchack v. Am. Nat'l Bank & Trust Co., 17 F.3d 600 (2d Cir. 1994).

41.     Delphi's performance under the Waivers should be approved under Bankruptcy Rule 9019(a) because the settlement terms contained therein are fair and equitable, fall well within the range of reasonableness, and are in the best interests of the Debtors and their estates.  Most significantly, the Waivers will allow the Debtors to obtain full value for the approximately $1.5 billion anticipated section 414(l) liability transfer from the hourly plan to a GM pension plan and will resolve potential excise taxes of approximately $1.4 billion while incurring only $5,754,125.00 in costs.  This settlement will also assist the Debtors in their goals outlined in the Plan Framework Support Agreement.  This resolution is a key component of the Debtors' transformation plan and their successful emergence from chapter 11.  For these reasons, the Debtors assert that performance under the terms of the Waivers is in the best interests of the Debtors' estates and will maximize value for all creditors as described above.

Notice Of Motion

42.     Notice of this Motion has been provided in accordance with the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on October 26, 2006 (Docket No. 5418).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

18

Memorandum Of Law

43. Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) authorizing, but not directing, Delphi to (i) perform under the Waivers issued by the IRS (ii) provide letters of credit to the PBGC in connection with the Waivers, and (b) granting them such other and further relief as is just.

Dated:  New York, New York

May 11, 2007

      SKADDEN, ARPS, SLATE, MEAGHER
        & FLOM LLP

By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession