Hearing Date and Time:  5/31/07 at 10:00 a.m.

VARNUM, RIDDERING, SCHMIDT
 & HOWLETT LLP
Michael S. McElwee (P36088)
333 Bridge Street, N.W., Ste. 1700
Grand Rapids, MI 49504
Telephone:  (616) 336-6827

DiCONZA LAW, P.C.
Gerard DiConza (GD 0890)
630 Third Avenue
New York, New York 10017
Telephone:  (212) 682-4940

*Co-counsel for Furukawa Electric North America APD*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
                                                            :
In re:                                                      :    Chapter 11
                                                            :
DELPHI CORPORATION, *et al.*,                               :    Case No. 05-44481 (RDD)
                                                            :
                     Debtors.                               :    (Jointly Administered)
                                                            :
-----------------------------------------------------------x

**FURUKAWA'S REPLY TO DEBTORS' OBJECTION TO MOTION BY FURUKAWA
ELECTRIC NORTH AMERICA APD AND FURUKAWA ELECTRIC CO., LTD. FOR
(A) ABSTENTION PURSUANT TO  28 U.S.C. § 1334(C); (B) RELIEF FROM
AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(D); AND (C) AN ORDER
<u>LIMITING THE SCOPE OF THE THIRD OMNIBUS CLAIM OBJECTION HEARING</u>**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

      Furukawa Electric North America APD and Furukawa Electric Co., Ltd.

("Furukawa"), by their undersigned counsel, respectfully submit this reply ("Reply") to the April

13, 2007 objection ("Objection") filed by Delphi Corporation and certain of its subsidiaries and

affiliates as debtors and debtors-in-possession (collectively, the "Debtors" or "Delphi") to

Furukawa's Motion dated March 23, 2007 for (a) Abstention Pursuant to 28 U.S.C. § 1334(c); (b) Relief for the Automatic Stay Pursuant to 11 U.S.C. § 362(d); and (c) an Order Limiting the Scope of the Third Omnibus Claim Objection Hearing (the "Motion"):

## PRELIMINARY STATEMENT

1.    Delphi's Objection misstates the law and, worse, badly miss-describes the merits of the case Delphi filed against Furukawa in State Court.[1]

2.    Contrary to Delphi's arguments, the Court has broad discretion to abstain from state court cases involving purely state law claims, discretion typically exercised in cases exactly like this one, *i.e.*, cases filed prior to bankruptcy that involve no bankruptcy or other federal law issues.

3.    For these and the other reasons described in this Reply, Delphi's Objection should be rejected and the Motion should be granted.

## BACKGROUND

**A.    Furukawa Did Not Sell Non-Conforming Goods to Delphi.**

4.    Although its relevance to the Motion is not clear, Delphi asserted in the "BACKGROUND" section of its Objection a very simple liability theory, namely that Delphi specified a part without Teflon, Furukawa secretly put Teflon in the part after being told not to by Delphi, and the part eventually failed on account of the Teflon.

5.    Delphi's characterization of the facts and theory of liability is a gross miss-description of the State Court Action and the operative facts in it.

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

2

*(1)     <u>Delphi did not specify a Teflon-free part</u>.*

6.      There is no specification in any contract document between Delphi and Furukawa for a Teflon-free part.  The contract documents do not in any way prohibit the use of Teflon.  Delphi's suggestion to the contrary is completely false.

7.      To be sure, the contracts between the parties have specifications in them, but they specify "performance," not "materials."  That is, the contracts require Furukawa to produce steering sensors for Delphi that meet certain performance parameters specified by Delphi.  The contract documents do not, however, limit the materials available to Furukawa to accomplish these performance requirements, and Furukawa would not have signed the documents if they did.

8.      The performance requirements at issue relate to noise, and more specifically to two kinds of noise:  audible noise and electric noise.

9.      The steering sensor manufactured by Furukawa is installed on the passenger side of the vehicle firewall, and can thus be heard by the vehicle driver.  Delphi therefore specified a maximum audible noise threshold, because audible noise is annoying and is associated subjectively with poor quality.

10.     Delphi also specified a maximum electric noise threshold, because electric noise (called "static" by non-engineers) is an indication of a poor or weak electrical connection.  When too much electric noise occurs in the sensor, power steering function is interrupted, and a message is sent to the driver of the vehicle to "check power steering."  To avoid this, electric noise had to be kept low.

11.     In other words, Furukawa had to design a power steering sensor that was "quiet" both audibly and electrically.

3

### *(2)    Delphi tested and approved the sensors containing Teflon.*

12.    The power steering sensors initially manufactured by Furukawa for Delphi were produced without Teflon.  Samples of these products were shipped by Furukawa to Delphi for pre-production approval process ("PPAP").  During the initial phases of PPAP, these parts PASSED the electric noise specification (*i.e.*, they were sufficiently "quiet" electrically), but FAILED the audible noise specification (*i.e.*, they were too noisy audibly).

13.    The challenge for Furukawa was therefore to produce a steering sensor that was equally quiet electrically, but quieter audibly.  After considerable work, Furukawa's engineers determined that the best solution was to introduce Teflon into the substrate of the steering sensor slip ring.  This change was tested extensively by Furukawa, and was determined to produce a slip ring that was not only quieter audibly, but also quieter electrically.

14.    Based on these test results, which Furukawa shared with Delphi, Furukawa proposed the Teflon solution to Delphi.  Delphi eventually embraced this proposal as a "very major step forward."  The correspondence sent by Delphi to Furukawa on this subject is so emphatically positive, and so different from the characterization of it in Delphi's Objection, that it bears quoting in full:

> Gentlemen:
>
> GREAT NEWS!!!!!
>
> After much work and convincing, Delphi management has approved us to go into production with the Low Friction Plating Process provided all your testing, Delphi testing, and customer testing pass successfully. This is a very major step forward! There were many discussions that took place amongst Delphi management and the customer to finally get to this point.

4

> I can't thank you enough for your hard work and the information that made this possible.  The only problem now is to time this change (provided all testing passes) along with all other changes (upper rotor tab, clamp ring, and floating pin design) so we can implement them all at the same time.  I had to explain this in great detail to our management but they now all support it!  However, this does turn up the pressure to complete all these other activities as well.
>
> My management is convinced that we have a good test plan at FEC, Delphi, and on customer's vehicles at Milford in order to validate this change.  Delphi is currently in the process of doing bottoming testing on the low friction parts you provided me, customer vehicles are currently being changed over to the low friction sensors you provided me, and FEC will be starting their testing on April 1.  This is all taking place simultaneously and with a pretty significant cost to everybody, but I (and management) am confident your sensor will be much more robust in the end.
>
> Even Ted Seeger said he was impressed with the engineering that went into this change.  You should be very proud of yourselves – this is the type of engineering my management is looking for when they decide who to award new business opportunities to.
>
> Great job everybody –
>
> Mr. Kirk
>
> Kirk Halstead
> Delphi - Saginow Steering Systems

A copy of the above-referenced email correspondence is annexed hereto as Exhibit 1.

   15.  After the initial PPAP testing, Furukawa sent power steering sensors with low friction plating (*i.e.*, with Teflon) to Delphi and Delphi's customer, General Motors, for completion of the testing process.  At the conclusion of PPAP, Delphi determined that the audible noise was now within contract specifications, and also that the electric noise, which was previously within specification, was now even lower (and thus well within contract specifications).

5

16. The parts with Teflon slip rings were therefore approved by Delphi for final production. This final approval is contained in a "Part Submission Warrant" dated February 27, 2003, a copy of which is attached hereto as Exhibit 2. Furukawa did not -- repeat, did not -- deliver nonconforming goods to Delphi, a fact Delphi itself verified.

17. Delphi's allegation that the steering sensors PPAP'd and approved for final production did not contain Teflon, or that the parts that were approved are different than the parts that were sold to the public, is completely untrue.

18. Delphi is correct that, at some time during the PPAP process, its "upper management" changed its mind and "told" Furukawa not to use low friction plating (*i.e.*, not to use Teflon). Nothing in the contract documents, however, permitted Delphi to exclude materials needed by Furukawa to meet Delphi's performance specs. Delphi's attempt to prohibit the use of Teflon was, then, a breach of the contracts between the parties not by Furukawa, but by Delphi.

19. Thus, two of the three essential ingredients in Delphi's liability theory – that Furukawa did not disclose the presence of Teflon in the steering sensors and that Delphi did not PPAP and approve steering sensors with Teflon in the substrate – are untrue. For the reasons indicated below, the third ingredient in Delphi's theory – that the Teflon substrate caused the failures in the field – is also untrue.

**B.    The Sensors Failed Because Delphi Installed Them
Incorrectly, Not Because of the Teflon in the Slip Rings.**

20. When Delphi received the steering sensors from Furukawa, it did not have its installation processes in control and, as a consequence, the steering sensors were not "seated" correctly. That is, rather than



being seated firmly at 90 degrees around the steering shaft, the sensors were tilted slightly, generally in the range of 1.3 degrees. *See* "Root Cause Investigation by Furukawa/Wobbling of the Sensor in EPS Column" attached hereto as Exhibit 3. *See also* Fig. 1 above.

21. With the steering sensor mounted this way, when the steering wheel was articulated, the surfaces inside the steering sensor were splayed, causing the brushes to lose firm contact with the opposing surface, which in turn caused a spike in electrical noise, and a loss of power steering function. *See* Fig. 2 below.

22. If the driver of the vehicle straightened out the vehicle's wheels, the brushes would again come into firm contact with the opposite surface, and when the car was switched off and back on again, the computer would re-set and power steering function would be restored. This shows (1) that the loss of power steering function was temporary (*i.e.*, it depended on whether torque was exerted on the power steering column), and (2) that the cause of the failure could not possibly be the Teflon substrate.

**Fig. 2**

23. Companies like Delphi typically produce engineering reports that detail failure modes both before and during the final manufacturing process. These reports are referred to as DFMEA and PFMEA reports. Given the obvious relevance of these reports to the causation issues in this case, Furukawa requested them during discovery in the State Court Action. They were requested over a year ago. Delphi has consistently refused to produce them claiming, not that the reports are privileged or not subject to discovery, but only that its engineers are "not comfortable" allowing Furukawa to read them. *See* Email correspondence from Delphi annexed hereto as Exhibit 4.

24.  Paragraphs 4 through 23 above are supported by the Affidavits of David Noble and Masahiro Hasegawa, attached hereto as Exhibits 5 and 6, respectively.

## ARGUMENT

### I.  Cases Involving Purely State Law Claims Are Not Core Proceedings.

25.  Delphi argued that the filing of a proof of claim by Furukawa transformed the State Court Action into a "core" proceeding that may be finally adjudicated by this Court. Delphi's argument is contrary to the Supreme Court's decision in *Northern Pipeline Construction Company v. Marathon Pipeline Company,* 458 U.S. 50 (1982) where the Court held that to permit the bankruptcy court to adjudicate the debtor's suit based on pre-petition state law claims for breach of contract violated Article III of the Constitution.

26.  Absent consent of the parties, a bankruptcy court's power to hear and determine cases is limited to "all cases under Title 11 and all core proceedings arising under Title 11, or arising in a case under Title 11." 28 U.S.C. § 157(b)(1). The bankruptcy court has no power (absent consent) to hear and determine purely state law breach of contract claims, which do not "arise under" Title 11 and thus are non-core by definition. *In re Wood,* 825 F.2d 90, 97 (5th Cir. 1987) (a proceeding does not "arise under" Title 11 if it does not invoke a substantive right created by federal bankruptcy law); *In re Satelco, Inc.,* 58 B.R. 781 (Bankr. N.D. Tex. 1986) (action to recover pre-petition accounts receivable or similar money damages under state law is not a core proceeding "arising under" Title 11).

27.  Core proceedings are defined as including but not limited to certain categories of cases enumerated in 28 U.S.C. § 157(b)(2). The categories enumerated in subsection (b)(2), however, must be read in light of the definition of a core proceeding in 28 U.S.C. § 157(b)(1), which was designed by Congress to reflect the holding in *Marathon Oil*.

Since the claims in the State Court Action between Delphi and Furukawa do not arise under Title 11, they are not "core" claims within the meaning of 28 U.S.C. § 157(b)(1), and thus cannot be core proceedings under subsection (b)(2). *Stoe v. Flaherty,* 436 F.3d 209, 216-18 (3d Cir. 2006).

28.     For this reason, *Collier on Bankruptcy* has observed that the reported cases are in error to the extent they assert core jurisdiction over purely state law counterclaims asserted by a debtor in connection with an objection to a creditor's claim. 1 *Collier on Bankruptcy,* ¶ 3.02[3][d][i] ("Footnote 31 in the plurality opinion in *Marathon* suggests that there are constitutional doubts as to whether the filing of a proof of claim can have such an effect [*i.e.,* subjecting the counterclaim claimant to core treatment]").

29.     Since the State Court Action (a) was commenced in the State Court, (b) is based on state law claims, (c) is, at most, "related to" the Debtors' cases, and (d) could not have been commenced in federal court, mandatory abstention pursuant to 28 U.S.C. § 1334(c)(2) is required.

## II.    Abstention Under 28 U.S.C. § 1334(c) Is Not the "Narrowly Tailored" Remedy Described By Delphi in its Objection.

30.     Under 28 U.S.C. § 1334(c)(1), bankruptcy courts have the discretion, in the interest of justice, or in the interest of comity with state courts or respect for state law, to abstain from any "arising under" or "related to" case, even if the case is a core proceeding. *Republic Reader's Service, Inc, v. Magazine Service Bureau, Inc.*, 81 B.R. 422, 426 (Bankr. S.D. Tex. 1987) (permissive abstention applies to both core and non-core proceedings).

31.     The court's exercise of discretion under 28 U.S.C. § 1334(c)(1) is not subject to appellate review. *See* 28 U.S.C. § 1334(d) ("Any decision to abstain or not abstain made under subsection (c) . . . is not reviewable on appeal. . . .").[2]

---

[2]     The only exception is a decision **not** to abstain when abstention is mandatory under the statute,

9

32. Even assuming, arguendo, that the State Court Action is a "core" matter, a decision to abstain under 28 U.S.C. § 1334(c) is not, as Delphi suggested, an abdication of the court's "virtually unflagging obligation" to decide cases within its jurisdiction.[3]

33. The "virtual unflagging obligation" language cited by Delphi[4] arises not from bankruptcy cases controlled by 28 U.S.C. § 1334(c), but from non-bankruptcy cases involving the common law abstention doctrine. *See Colorado River Water Conservation v. U.S.,* 424 U.S. 800 (1976); *In Re Joint Eastern & Southern Dist. Asbestos Litigation,* 78 F.3d 764, 774-77 (2d Cir. 1996).

34. For this and other reasons, the cases have consistently held that *Colorado River* and its progeny do not apply to statutory abstention under 28 U.S.C. § 1334(c). *See, e.g.*, *Bricker v. Martin,* 348 B.R. 28, 32-33 (W.D. Pa. 2006) ("*Colorado River* concerns the general doctrine of abstention. The grounds for abstention in bankruptcy cases have been codified and [bankruptcy courts] are not strictly bound by these precedents.") (citing, *South Winds Associates, Ltd. v. Reedy,* 115 B.R. 857, 861 n.5 (Bankr. W.D. Pa. 1990)).

35. The Fifth Circuit concluded that a court's discretion to abstain under the statute is broad, not narrow:

> The [statute] grants the district court *broad power* to abstain whenever appropriate in the interest of justice, or in the interest of comity with the State courts or respect for State law. The abstention provisions of the [statute] demonstrate the intent of

---

which is subject to full appellate review. *Id.*

[3] Abstention does not even arise as an issue unless the court's jurisdiction is established in the first instance. *S.G. Phillips Constructors, Inc. v. City of Burlington, Vermont (In re S.G. Phillips Constructors, Inc.),* 45 F.3d 702, 708 (2d Cir. 1995) ("It bears noting at the outset that the abstention provisions implicate the question of whether the bankruptcy court should exercise jurisdiction, not whether the court has jurisdiction in the first instance.").

[4] See Objection at ¶ 35 (citing *In re Calpine,* 2007 WL 39124 (Bankr. S.D.N.Y. Jan. 3, 2007) (J. Lifland)).

10

> Congress that concerns of comity and judicial convenience should be met, not by rigid limitations on the jurisdiction of federal courts, but by the discretionary exercise of abstention when appropriate in a particular case. . . .

*Wood v. Wood,* 825 F.2d 90, 93 (5th Cir. 1987) (emphasis in original).

36.  Delphi's argument to the contrary imposes limitations on the Court's discretion that are completely foreign to the statute, and should therefore be rejected.

### III.  The Parties in this Case Are Not Diverse, and as a Result, There is No Independent Basis for Federal Jurisdiction.

37.  One of the twelve factors that governs permissive abstention is whether there is a basis for federal jurisdictional other than 28 U.S.C. § 1334.  *See Citicorp Savs v. Chapman* (*In re Chapman*), 132 B.R. 153, 157 (Bankr. N.D. Ill. 1991).

38.  Delphi suggested in its Objection that the parties are diverse and that, as a result, there is an independent basis for federal jurisdiction here.  *See* Delphi Objection ¶ 39. This suggestion, unsupported by any citation to the law or to the operative facts, is incorrect.

39.  For purposes of diversity jurisdiction, a corporation is a citizen of both its place of incorporation and its principal place of business.  28 U.S.C. § 1332(c)(1).

40.  Delphi is a Delaware corporation with its principal place of business in Troy, Michigan.  *See* Delphi's Complaint against Furukawa attached as Exhibit 2 to the Motion. Furukawa North America APD, Inc. is also a Delaware corporation, with its principal place of business in Plymouth, Michigan (about 20 miles from Delphi's headquarters).  *See* Affidavit of David Noble, attached hereto as Exhibit 5.  The parties are therefore not diverse, either with respect to the place of incorporation, or with respect to the principal place of business.

11

41.     Absent complete diversity between each plaintiff and each defendant, diversity jurisdiction cannot lie under 28 U.S.C. § 1332. *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.,* 373 F.3d 296, 302 (2d Cir. 2004).

42.     There is also no federal question jurisdiction under 28 U.S.C. § 1331, as Delphi's Complaint commencing the State Court Action asserts only state law claims. *See* Complaint annexed as Exhibit 2 to the Motion.

43.     There is therefore no independent basis for federal jurisdiction here, which weighs strongly in favor of abstention.

### IV.  The Predominance of State Law Claims Weighs In Favor of Abstention, Even if The Law Is Not Complex Or Unsettled.

44.     Two of the other twelve factors governing permissive abstention are (1) whether state law predominates in the case and (2) whether that law is unsettled or complex. *Chapman*, 132 B.R. at 157.

45.     Delphi suggests in its Objection that these factors do not warrant abstention here because, while state law predominates the State Court Action, that law is not unsettled. Objection at ¶¶ 37-38.

46.     Where, however, state law predominates, it need not also be unsettled for a bankruptcy court to abstain. *See Republic Reader's Service, Inc, v. Magazine Service Bureau, Inc.*, 81 B.R. 422, 426 (Bankr. S.D. Tex. 1987) ("Where a cause of action for monetary damages based primarily on state law can be litigated in state court without substantial delay and disruption to the orderly administration of the estate, the best forum for resolution of that action is state court, irrespective of whether the legal issues present unsettled questions of state law." ).

47.     The predominance of state law issues thus weighs in favor of abstention, even if that law is not unsettled.

**V.      Furukawa's Right to a Jury Trial Weighs Strongly In Favor of Abstention.**

48.     In the State Court Action, a trial by jury was demanded.  *See* Complaint annexed as Exhibit 2 to the Motion.

49.     Possibly the strongest of the twelve permissive abstention factors is whether a trial by jury has been demanded in the state court proceeding. *Bricker v. Martin,* 348 B.R. 28, 37 (W.D. Pa. 2006) ("As one cogent opinion noted, the right to trial by jury is so significant as to be almost dispositive of the question of whether to abstain.").

50.     The jury demand in the State Court Action thus not only weighs in favor of abstention, it virtually requires it.

**VI.     Michigan Is a Far More Convenient Forum.**

51.     Two of the other twelve factors for permissive abstention are (1) the effect on the efficient administration of justice and (2) the presence of a related state court proceeding. Both of these factors weigh in favor of abstention, notwithstanding Delphi's suggestion that Furukawa's Motion would result in "piecemeal" litigation.  *See* Objection ¶ 36.

52.     The parties, all of the party witnesses, all of the documents, all of the physical evidence, and all of the attorneys in the pending state-court case, are located in and around Detroit, Michigan or in Japan; none of the parties, none of the party witnesses, none of the documents, and none of the physical evidence, are located in New York.

53.     Moving this case to New York would therefore accomplish little more than creating a duplicate proceeding in a much less convenient, and much more remote, forum. This could only increase the time and expense of the parties and slow the resolution of the State Court Action.  The better and more efficient resolution is to allow the claims to be resolved in Michigan, where they are currently pending, and where both parties have their operations and

13

personnel. This will not result in piecemeal litigation at all. Quite the opposite, it will assure a resolution of all claims in a single, competent, and more convenient forum.

54. The suggestion in Delphi's Objection that leaving the case in State Court might lead to "years of delay" is completely speculative and unfounded. It also appears to hinge on Delphi's suggestion that its $25 million in claims can and should be resolved in a one-hour mini-trial. This suggestion offends basic notions of fair play and due process.

## VII. This Case Cannot Be Adjudicated Within the Confines of the Claim Procedures Order Without Violating Furukawa's Due Process Rights.

55. Delphi's stated objective for opposing the Motion -- a "no muss, no fuss" trial that results in a $25 million award to Delphi after a one-hour hearing -- while certainly efficient and advantageous to Delphi, cannot be accomplished without violating Furukawa's procedural and substantive rights.

56. Where an objection to a claim is joined with a demand for affirmative relief of the kind specified in Bankruptcy Rule 7001, the matter becomes an adversary proceeding, triggering the 7000 series rules. Bankruptcy Rule 3007 ("If any objection to a claim is joined with a demand for relief of the kind specified in Rule 7001, it becomes an adversary proceeding"); Bankruptcy Rule 7001 ("An adversary proceeding is governed by the Rules of this Part VII"); *In re Zodiac Enterprises, Inc.,* 84 B.R. 874 (Bankr. S.D. Fla. 1988).

57. The addition of an affirmative counter-claim for money damages thus creates a "full blown lawsuit." *See In re Adelphia Communications Corp.,* 285 B.R. 848, 855 (Bankr. S.D.N.Y. 2002). The creation of a "full blown lawsuit" triggers the full menu of rights under the Constitution and the Rules:

> The concept of due process is no less applicable in bankruptcy proceedings. It is incorporated into the bankruptcy code by the procedural requirements of Part VII of the Federal Rules of

14

> Bankruptcy Procedure. Rule 7001 requires an action to recover property to be brought as an adversary proceeding. The bankruptcy rules governing adversary proceedings were intended to provide essentially the same procedural and due process protections as the Federal Rules of Civil Procedure.

*Smith v. Wheeler Tech., Inc. (In re Wheeler Tech., Inc.),* 139 B.R. 235, 240 (9th Cir. B.A.P. 1992).

58. The Claim Procedures Order entered by this Court on December 6, 2006 ("Claim Procedure Order"), which limits the party's to one hour of trial time each, prevents the taking of live testimony from party witnesses and significantly restricts the scope of discovery otherwise available under Federal Rules of Civil Procedure made applicable by the 7000 series Bankruptcy Rules. Moreover, the Claims Procedure Order was not designed for, and cannot be appropriately applied to, adversary proceedings involving multi-million dollar claims by the Debtors.

59. Applying the Claim Procedures Order to such claims would deprive Furukawa of its rights under the 7000 series Bankruptcy Rules and its due process rights under the U.S. Constitution.

**[concluded on the following page]**

## **CONCLUSION**

60. For all of the reasons set forth above, Furukawa respectfully requests that its Motion be granted.

Respectfully submitted,

Dated: May 17, 2007  　　　　　　　　　VARNUM RIDDERING SCHMIDT & HOWLETT, LLP
　　　　Grand Rapids, MI

By:  　/s/ Michael S. McElwee　
　　　Michael S. McElwee (P36088)
　　　Bridgewater Place
　　　P.O. Box 352
　　　Grand Rapids, MI  49501
　　　(616) 336-6491
　　　msmcelwee@varnumlaw.com

　　　　　　　　　　　　　　and

Dated: May 17, 2007  　　　　　　　　　DICONZA LAW, P.C.
　　　　New York, New York

By:  　/s/ Gerard DiConza　
　　　Gerard DiConza (GD 0890)
　　　630 Third Avenue, 7th Floor
　　　New York, NY 10017
　　　(212) 682-4940
　　　gdiconza@dlawpc.com

*Co-Counsel for Furukawa Electric North America APD and Furukawa Electric Co., Ltd.*