# EXHIBIT D

Page 1

```
 1   IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
             SECOND JUDICIAL DISTRICT
 2
 3
     SOUTHTRUST BANK, a corporation
 4       Plaintiff,
 5   VERSUS          CIVIL ACTION NO. CV03-14
 6
     LEXTRON CORPORATION, et al.,
 7       Defendants.
 8
                    VOLUME I
 9       VIDEOTAPED DEPOSITION OF LARRY W. GRAVES
10       Taken at the offices of Brunini, Grantham,
         Growers & Hewes, PLLC, located at 1400
11       Trustmark Building, 248 East Capital Street,
         Jackson, Mississippi, on Wednesday,
12       September 24, 2003, beginning at 9:00 a.m.
13
14   REPORTED BY:
15       LAURA CROSS
         State-Wide Reporters
16       4400 Old Canton Road
         Suite 201 (39211)
17       Post Office Box 14113
         Jackson, Mississippi 39236
18       Telephone: (601) 366-9676
         Fax: (601) 366-9756
19
         Coast Address:
20
         764 Water Street (39530)
21       Post Office Box 389
         Biloxi, Mississippi 39533
22       Telephone: (228) 432-0770
         Fax: (228) 432-0690
23       msreporters@aol.com
24
25
```

Page 2

```
 1   APPEARANCES:
 2       BROOKS EASON, ESQUIRE
         Brunini, Grantham, Grower & Hewes
 3       1400 Trustmark Building
         248 East Capitol Street
 4       Jackson, Mississippi 39201
         Telephone: (601) 948-3101
 5       Fax: (601) 960-6902
             ATTORNEY FOR DELPHI
 6
         JOSEPH E. PAPELIAN, ESQUIRE
 7       5725 Delphi Drive
         Troy, Michigan 48098-2815
 8       Telephone: (248) 813-2535
         Fax: (248) 813-3251
 9           ATTORNEY FOR DELPHI
10       RICHARD FREESE, ESQUIRE
         DENNIS SWEET, ESQUIRE
11       Langston, Sweet & Freese, P.A.
         2900 Highway 280, Suite 240
12       Morgan Keegan Center
         Birmingham, Alabama 35223
13       Telephone: (205) 8710-4144
         Fax: (205) 871-4104
14           ATTORNEY FOR SOUTHTRUST BANK
             AND ANDY RAINE
15
         CHRIS CARSON, ESQUIRE
16       CHRISTINA A. GRAHAM, ESQUIRE
         Burr & Forman, LLP
17       3100 Southtrust Tower
         420 North 20th Street
18       Birmingham, Alabama 35203
         Telephone: (205) 458-5426
19       Fax: (205) 458-5100
             ATTORNEY FOR SOUTHTRUST BANK
20           AND ANDY RAINE
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES: (Continued)
 2       HAL DOCKINS, ESQUIRE
         ELLIE TURNAGE, ESQUIRE
 3       EARLE BANKS, ESQUIRE
         GAYLA CARPENTER, ESQUIRE
 4       Dockins, Turnage & Banks
         840 East River Place
 5       Suite 500
         Jackson, Mississippi 39202
 6       Telephone: (601) 969-2221
         Fax: (601) 969-2741
 7           ATTORNEY FOR CHARLES DOTY AND LEXTRON
             COMPANIES
 8
         JENNY VIRDEN, ESQUIRE
 9       Chapman, Lewis & Swan
         961 Madison Avenue, Suite 1A
10       Madison, Mississippi 39110
         Telephone: (601) 605-9081
11       Fax: (601) 605-9765
             ATTORNEY FOR CROSS PLAINTIFF, LEXTRON
12           AND CHARLES DOTY
13
14
     LEGAL VIDEO TECHNICIAN:
15
         TONY SCOTT
16
17
     ALSO PRESENT:
18
         CHARLES DOTY
19
20
21
22
23
24
25
```

Page 4

```
 1          T-A-B-L-E O-F C-O-N-T-E-N-T-S
 2   Examination By:              Page
 3       Mr. Freese                  7
 4       Ms. Virden                228
 5   Stipulation                    6
 6   Exhibits:
 7       Exhibit 1, E-mail cc'd to
         Larry Graves from Greg
 8       Naylor dated 9/19/02,
         and e-mail to Gabriel
 9       Llausas; Martha Everett and
         Greg Naylor from Christine
10       Justice dated 9/23/02        84
11       Exhibit 2, E-mail to Martha
         Everett from Greg Naylor
12       and cc'd to Larry Graves
         dated 1/8/03, rough draft
13       Letter to Andy Raine from
         Greg Naylor                 107
14
         Exhibit 3, Memo to Larry
15       Graves from Martha Everett
         concerning letter to Andy
16       Raine from Greg Naylor      134
17       Exhibit 4, E-mail from Larry
         Graves to Andy Raine dated
18       9/9/03                      155
19       Exhibit 5, Ethical principles
         of Delphi written by
20       Mr. Battenberg              183
21       Exhibit 6, E-mail to
         Mr. Wheelock from Greg
22       Naylor dated 12/6/02, memo to
         Christine Justice, Greg
23       Naylor dated 12/5/02, memo
         to Christine Justice from
24       Marty Weigel dated 12/5/02  194
25
```

STATE-WIDE REPORTERS (228) 432-0770

Page 65

1 number.
2    Q.   How many people do you think -- Give me
3 your best judgement. I understand you may not can
4 give the exact number. How many people in your
5 best judgement were on this conference call on
6 January 7th?
7    A.   Best judgement, about six or seven.
8    Q.   And involving how many different
9 departments or divisions or whatever you want to
10 call it?
11    A.   Purchasing, production control and
12 logistics. That might have been it probably on
13 January 7th.
14    Q.   All right. And was Mr. Johnson on this
15 phone call?
16    A.   No.
17    Q.   But you talked to him that day?
18    A.   I don't know specifically that I talked
19 to him on that day.
20    Q.   I asked you who was the most senior
21 person involved on January 7th, and you told me
22 Sid Johnson was; is that correct?
23    A.   Yes.
24    Q.   How did Mr. Johnson get involved in
25 this issue if he was not on that conference call?

Page 66

1    A.   He's located in Warren, Ohio.
2    Q.   Okay.
3    A.   And people that would have been on the
4 call are located in Warren, Ohio.
5    Q.   Well, remember I want to stick with
6 facts. Okay?
7    A.   Sure.
8    Q.   Do you know or do you not know how
9 Mr. Johnson was informed of this serious supplier
10 issue?
11    A.   Specifically, no on January 7th.
12    Q.   But you were certain that somehow it
13 was communicated to him?
14    A.   I don't know for sure.
15    Q.   So when you told me that earlier,
16 you're not sure. You were speculating that
17 Mr. Johnson was involved?
18    A.   Yes.
19    Q.   The most senior person that you know
20 was involved was you?
21 MR. EASON:
22       On the 7th?
23 Mr FREESE:
24    Q.   On the 7th.
25    A.   On the 7th. As far as I know.

Page 67

1    Q.   And are you giving marching orders to
2 everybody, or is somebody just telling you, Larry,
3 this is that we're planning on doing? Who's
4 directing this meeting?
5    A.   It would have been -- It would have
6 been called by production control and logistics.
7    Q.   Okay.
8    A.   And during the call we would have asked
9 questions.
10    Q.   And I apologize. My notes don't
11 reflect that I got an answer. Is there some
12 record that will show me the duration and the time
13 of this conference call?
14    A.   Not that I'm aware of.
15    Q.   Is it your best guess this is an
16 internal communication telephone system as opposed
17 to using an outside long distance carrier?
18    A.   Don't know for sure. I would have
19 guessed that there would have been a telephone
20 conference.
21    Q.   All right. An outside carrier?
22    A.   An 888 number.
23    Q.   In other words, someone is --
24    A.   Possibly.
25    Q.   -- billing Delphi for this time?

Page 68

1    A.   If that telephone conference would have
2 been used. Yes.
3    Q.   There will be a record of that?
4    A.   If there was. Yes.
5    Q.   Let's assume for a second -- I'm not
6 saying it was -- who is custodian of that record?
7 How can I find that record?
8    A.   Possibly, through the finance group.
9    Q.   All right. Where are they located?
10    A.   Warren, Ohio.
11    Q.   And if someone asked your lawyers for
12 it, what document do I need to ask your lawyers to
13 give me that will give me that information? Just
14 your long distance bills? Is that good enough?
15    A.   If it's on there, yes.
16    Q.   And this involved Juarez, Mexico, and
17 Warren, Ohio, correct?
18    A.   Yes.
19    Q.   Anyone else? Any other city involved?
20    A.   Not that I'm aware of on the 7th.
21 There may have been more than one call during the
22 day. But the initial one would have been on the
23 7th.
24    Q.   Do you recall or do you not recall more
25 than one conference call that day?

Page 69

1    A.   I don't recall more than one.
2    Q.   All right. Do you keep a Daytimer?
3    A.   No.
4    Q.   So you don't keep track of what
5    meetings or telephone conferences you have?
6    A.   No.
7    Q.   You have no personal notes of anything?
8    A.   No.
9    Q.   All right. Do you know whether or not
10   anyone on that conference call kept notes of that
11   teleconference?
12   A.   No, I don't.
13   Q.   All right. And there were in your
14   judgement six people there. And sitting here
15   today -- And I understand we've got a lot of
16   paperwork -- But sitting here today, you are not
17   aware of a single scrap of paper that the
18   potentially seven people on this conference call
19   wrote or made to record the content of this
20   conference call?
21   A.   I'm not aware of it.
22   Q.   Now, you said one other thing you did
23   or would have likely done, is start a contingency
24   plan that day.
25   A.   Yes.

Page 70

1    Q.   What does that mean?
2    A.   A contingency plan would be involved.
3    The number of part numbers that we're dealing with
4    the company. What the volumes would be in terms
5    of daily deliveries or weekly deliveries? Who
6    owns the tooling if there's tooling involved? How
7    much inventory do we have? Those would be typical
8    questions.
9    Q.   All right. Now, why would you want to
10   know who owns the tooling?
11   A.   In a contingency plan, you would need
12   to know who owns the tooling that if a supplier is
13   unable to deliver, is there any other tooling
14   available. Is it something that our own company
15   or another company could make the product.
16   Q.   All right. I understand that, and I
17   may have asked a poor question and I apologize.
18   A.   Uh-huh.
19   Q.   I know you may want to know where your
20   capacity is to make a product, correct?
21   A.   Yes.
22   Q.   What difference would it make on
23   January 7th who owned Lextron's tooling?
24   A.   In a contingency plan, you would put
25   together short-term, long-term contingencies

Page 71

1    depending on the information you find out. And
2    if -- if you own the tooling, you would need to
3    know that.
4    Q.   Why?
5    A.   If you would have to create new
6    tooling, then it would require more certification
7    versus if you were -- you had the tooling, then
8    you wouldn't have to certify.
9    Q.   Well, in other words, let's get
10   specific.
11   A.   Uh-huh.
12   Q.   If Delphi owned the tooling, you
13   couldn't go on that supplier's premises and take
14   it, correct?
15   A.   I don't believe so.
16   Q.   But if Delphi owned the tooling and
17   they were not supplying your suppliers, then in
18   that case you would want to know if you owned it
19   so you could go and get it and take it off the
20   premises, correct?
21   MR. EASON:
22        Let me object to the form. You
23   mentioned Delphi in both of those questions.
24   MR. FREESE:
25        I'm sorry. Let me reask the question.

Page 72

1    Q.   If Lextron owned the equipment, you
2    would want to know that because you can't go and
3    take it if Lextron owns it.
4    A.   We would just need to know in terms of
5    P-PAP, which is part approval process. You would
6    need to know the whole value stream.
7    Q.   I understand. There may be a lot of
8    reasons. But one of the reasons why you want to
9    know who owns the tooling is to know whether or
10   not Delphi has a right to go and get the tooling
11   and use it yourself if a supplier is not doing
12   their job.
13   A.   That would be one reason.
14   Q.   Yeah. Because you don't want to go out
15   and buy or make new toolings if you already own
16   some at one of your supplier's location.
17   A.   You may -- In a contingency plan
18   depending on the timing, you may need to create
19   duplicate tooling.
20   Q.   I understand. But what I'm asking you
21   is: One of the reasons you want to know if you
22   own the tooling is if you want to go get it and
23   use it yourself.
24   A.   That would be one reason.
25   Q.   All right. And you know in fact, do

Page 73

1  you not, sir, that Delphi did come and take
2  tooling materials from Lextron's operation?
3     A.  It's my understanding, yes.
4     Q.  And you did it after you terminated
5  them as a supplier, correct?
6     A.  After we -- I think after we notified
7  them. Yes.
8     Q.  After you notified them that they were
9  terminated, you came and got stuff that you
10 believed was yours?
11    A.  Yes.
12    Q.  All right. How often does Delphi go
13 and obtain or retake or repossess equipment that
14 it owns from a supplier and is still using that
15 supplier?
16    A.  Still using that supplier?
17    Q.  Yes.
18    A.  Not very often.
19    Q.  The usual situation -- If you're going
20 to get the equipment, it's because they're no
21 longer a supplier. You own it, and you want it
22 back?
23    A.  There would be cases that we may move
24 business from another supplier to another on a
25 particular part because they either have had

Page 74

1  quality problems or they're not competitive.
2     Q.  In this case, though, Lextron was
3  terminated. You went and got the tooling that you
4  believe you owned?
5     A.  Yes.
6     Q.  And in order to know whether or not you
7  had the right to go get it, you had to determine
8  whether or not you owned it.
9     A.  Yes.
10    Q.  And on January 7th that was one of the
11 instructions you gave to the division. Go figure
12 out who owns all that stuff down at Doty's plant
13 there in Mississippi.
14    A.  We would -- I said in a contingency
15 plan we would ask a number of questions. I don't
16 know if on January 7th we would have asked that
17 particular question.
18    Q.  But you said that was a normal thing
19 that you would normally do in a contingency plan.
20    A.  That would be one thing.
21    Q.  All right. And you also said one of
22 the things you'd want to find out is how much
23 product you had in inventory, correct?
24    A.  Yes.
25    Q.  Why would you want to know that?

Page 75

1     A.  We want to know how close we are in
2  terms of meeting our requirement deliveries to a
3  customer.
4     Q.  And that's something that you would
5  normally do when you establish a contingency plan,
6  correct?
7     A.  Yes.
8     Q.  And to the best of your recollection,
9  you would have done that on January 7th, correct?
10    A.  Probably, would have started that, yes.
11    Q.  All right. And I gather that it's just
12 common sense the more inventory you've got, the
13 more likelihood that you're not going to default
14 on or miss a deadline to your customer, correct?
15    A.  More than likely, yes.
16    Q.  So more inventory is good, less
17 inventory, bad?
18    A.  In terms of delivery problems with a
19 supplier?
20    Q.  Yes.
21    A.  Yes.
22    Q.  And that's another thing you probably
23 tried to identify on January 7th, 2003, correct?
24    A.  The company, yes, would have determined
25 that, yes.

Page 76

1     Q.  Let me back up.
2     A.  Uh-huh.
3     Q.  Do you give these contingency plans a
4  name?
5     A.  No.
6     Q.  Do your contingency plans have team
7  members?
8     A.  Generally, it would include production
9  control and logistics and purchasing initially.
10 If we had to, we may need to get our sales team to
11 let them know of a potential problem. Possibly,
12 our operations would need to get involved. Maybe
13 engineering. And possibly, even finance.
14    Q.  Did your company establish a Lextron
15 contingency plan team?
16    A.  On January 7th?
17    Q.  I'm not asking you a date right now.
18 Did Delphi establish a Lextron contingency plan
19 team?
20    A.  Yes.
21    Q.  All right. When was it done?
22    A.  As I said, we would have started the
23 initial questions on the 7th. I believe there was
24 a formal team that would have met daily late in
25 January.

05-44481-rdd    Doc 8025-4    Filed 05/24/07    Entered 05/24/07 12:43:23    Exhibit D
Graves Depo Excerpt    Pg 6 of 10

Page 77

1  Q. All right. You said informal team.
2  Well, was the informal Lextron team meeting before
3  late in January?
4  MR. EASON:
5      Object to the form.
6  MR. FREESE:
7      You may answer.
8  MR. EASON:
9      You assume that there was in informal
10  team.
11  MR. FREESE:
12      Well, he used the word formal so I'm
13  assuming that if there was a formal team, there
14  had to be an informal team beforehand.
15  THE WITNESS:
16  A. There were calls subsequent to January
17  7th that would discuss the topic of the Lextron
18  situation.
19  Q. Well, that's what I'm getting at, sir.
20  Whether or not it was a formal team or -- Starting
21  January 7th the message was out to all the
22  important people that had to be involved in the
23  loop to start gathering this information to assess
24  the Lextron situation.
25  A. Yes.

Page 78

1  Q. And that group of people ultimately
2  became as you described it a formal team, correct?
3  A. Yes.
4  Q. But for all intents and purposes, they
5  had their marching orders on January 7th?
6  A. There were people in various functions
7  that were to go out and find information.
8  Q. As part of this what ultimately became
9  the Lextron team.
10  A. That eventually evolved into a -- yes.
11  Q. Now, how does one get invited to join
12  the team?
13  A. Which team?
14  Q. The Lextron team.
15  A. Like which team are you talking about?
16  Q. The Lextron team.
17  A. The one that was the formal team that
18  was meeting on contingency?
19  Q. Yes.
20  A. It would depend on the functions that
21  were needed to be a part of that group.
22  Q. I understand you involved the people.
23  How did they get communicated to them --
24  Mr. Naylor, it's your lucky day. You're on the
25  Lextron team. How does that get communicated to

Page 79

1  your employees that you are now on a team whose
2  mission is to gather data solely about Lextron?
3  A. It would be determined which functions
4  were needed to be on the team, and then somebody
5  from that function would be the focal point for
6  that.
7  Q. I -- Go ahead. I'm sorry. I didn't
8  mean to interrupt you.
9  A. That's it.
10  Q. How is that communicated to that
11  person?
12  A. One-on-one contact or a phone call.
13  Q. No e-mails, no written -- guys, the
14  team is gathering, and you've been invited to
15  join?
16  A. Might be. It's possible it could be
17  that way.
18  Q. Have you ever seen a document anywhere
19  that identified who was needed for this team and
20  that they were being inducted into it?
21  A. I don't recall a specific document.
22  Q. What happened between --
23  THE WITNESS:
24      Do you mind if we take a break? I need
25  to use the men's room if your don't mind.

Page 80

1      (Off the record.)
2      (A recess was taken.)
3  Mr. FREESE:
4  Q. Mr. Graves, before the break you told
5  me that you recall one telephone conversation with
6  Mr. Doty; is that correct?
7  A. Yes.
8  Q. And when did that telephone
9  conversation occur?
10  A. Sometime around the 7th or 8th of
11  January.
12  Q. And what did you tell Mr. Doty at that
13  time?
14  A. I wanted to get his concurrence that he
15  was putting his efforts into making sure that
16  people were working as necessary to maintain
17  deliveries to us.
18  Q. All right. And what did he tell you?
19  A. He said that he was going to apply
20  resources that he needed to try and get back on
21  schedule with us.
22  Q. Did you believe him?
23  A. Yes.
24  Q. And did he get back on schedule?
25  A. We still had delivery problems with

20 (Pages 77 to 80)
STATE-WIDE REPORTERS (228) 432-0770

Page 93

1  "that they are at risk based upon our verbal
2  direction to encourage them to ship"?
3  A. That's the first I've seen that.
4  Q. All right. And is that consistent with
5  the way your company does business?
6  MR. EASON:
7      Object to the form. Is what
8  consistent?
9  MR. FREESE:
10 Q. Driving somebody into bankruptcy?
11 A. Delphi driving somebody into
12 bankruptcy?
13 Q. Yes. Is Delphi driving somebody into
14 bankruptcy consistent with the way y'all do
15 business?
16 A. No.
17 Q. You see here Mr. Wheelock is telling
18 Mr. Naylor that if we keep insisting that Weigel
19 ship product, we're going to drive him into
20 bankruptcy. You see him telling Mr. Naylor that,
21 do you not?
22 A. I see what's written here.
23 Q. And I just described, have I not, what
24 is written there?
25 A. I don't know the specifics specifically

Page 94

1  behind this.
2  Q. I'm not asking you that, sir. I want
3  you to simply answer my question. Is Mr. Wheelock
4  telling your subordinate, Mr. Naylor, that if we
5  keep insisting that Weigel deliver product, we're
6  going to drive them into bankruptcy?
7  A. "We can not afford to drive Weigel into
8  bankruptcy and they are at risk based on our
9  verbal direction to them encouraging them to
10 ship." I specifically don't know what he's
11 meaning on this.
12 MR. EASON:
13     Well, let me object to the question to
14 the extent you are mischaracterizing the document.
15 The document speaks for itself, and it doesn't say
16 what you've said.
17 MR. FREESE:
18     I object to you're saying I'm
19 mischaracterizing anything.
20 Q. Does the document not say, Mr. Graves,
21 that if we keep insisting on Weigel shipping
22 without getting paid, we are going to drive them
23 into bankruptcy and we cannot afford to do this?
24 A. All right. I don't know even the
25 specifics even before that.

Page 95

1  Q. I'm not asking you that, sir. I'm
2  asking what was being said in that e-mail.
3  A. It was just saying that there must be a
4  problem with Weigel. They must not be getting
5  paid.
6  Q. Sir, that's not my question. Do you or
7  do you not agree with me that Mr. Wheelock for
8  whatever reason -- I'm not saying he's right or
9  wrong -- But Mr. Wheelock is telling Mr. Naylor
10 that our insistence on Weigel continuing to
11 deliver product is going to drive them to
12 bankruptcy, and we cannot afford to do that. Is
13 that not what Mr. Wheelock is telling Mr. Naylor?
14 MR. EASON:
15     Excuse me. Object to the
16 mischaracterization of the document.
17 MR. FREESE:
18 Q. You may answer.
19 A. I don't know if that's what he's
20 specifically saying on that and that's what he
21 means.
22 Q. Well, you can read. He says we cannot
23 afford to drive Weigel into bankruptcy. He says
24 that.
25 A. Uh-huh.

Page 96

1  Q. Yes?
2  A. Yes.
3  Q. And you understand "we" as referring to
4  Delphi, correct?
5  A. That's the assumption there.
6  Q. And "they" -- That's Weigel -- are at
7  risk based on our -- Delphi -- verbal direction to
8  them encouraging them to ship.
9  A. That's what that says.
10 Q. So any common usage of the English
11 language tells us that if Delphi continues to
12 insist on Weigel shipping to Lextron, it's going
13 to drive them into bankruptcy.
14 MR. EASON:
15     I object to the mischaracterization of
16 the document. The document says they are at risk.
17 MR. FREESE:
18 Q. You can answer the question.
19 A. An honest concern.
20 Q. Now, sir, when is the first time that
21 you ever spoke with anyone at Southtrust Bank if
22 ever?
23 A. It would have been on January 9th.
24 Q. And what happened on January 9th?
25 A. In speaking with somebody at

24 (Pages 93 to 96)

STATE-WIDE REPORTERS (228) 432-0770

Page 97

1  Southtrust?
2  Q. Yes, sir.
3  A. Confirmation with Andy Raine that he
4  received an e-mail.
5  Q. Did you call him?
6  A. Yes.
7  Q. And how did you come to know Mr. Raine?
8  A. I was requested by Sid Johnson that a
9  letter needed to be sent to Andy Raine at
10 Southtrust on the 9th, and that Martha Everett was
11 going to provide me with that letter, and it just
12 needed to go out under my signature.
13 Q. Why was that?
14 A. Why was what?
15 Q. Why did the letter need to go out under
16 your signature?
17 A. Sid felt that it needed to be by a
18 director. And he was actually traveling at the
19 time and couldn't do it himself, and so he
20 directed me to do that.
21 Q. Are you a director?
22 A. Yes, I am.
23 Q. Now, the job of director, that's not
24 like a director on the board of directors; it's a
25 title for the --

Page 98

1  A. Just a title.
2  Q. And Mr. Johnson is one also?
3  A. Correct.
4  Q. Did you know who Southtrust was or what
5  Southtrust was or what they had to do with this
6  whole Lextron situation?
7  A. I had known that they were a bank that
8  had provided financial funding to Lextron.
9  Q. Did you know anything more than they
10 were a bank and they provided financing to
11 Lextron?
12 A. At that time that was about it.
13 Q. All right. So on January 9th when you
14 sent an e-mail to Mr. Raine -- and this is
15 important, sir --
16 A. Uh-huh.
17 Q. -- so I want to make sure I get this
18 straight. On January 9th, 2003, when you sent
19 this e-mail to Mr. Raine, the sum and substance of
20 the entire facts you knew about Southtrust is that
21 is was a bank and that it loaned money to Lextron?
22 A. Uh-huh.
23 Q. Is that correct?
24 A. Yeah.
25 Q. You knew nothing more about --

Page 99

1  A. And I believe that they were looking to
2  see if they were going to put more money into the
3  operation.
4  Q. Now who told you that?
5  A. It would have been Sid or Greg or
6  Martha, one of the three. I'm not really sure.
7  Q. All right. And did you know that
8  before the letter was sent?
9  A. Yes.
10 Q. And one of those three told you that
11 Southtrust was looking to see if they were going
12 to put more money into Lextron's operation?
13 A. Yes.
14 Q. Anything else?
15 A. And that they had instructed another
16 company, I think, by the name of Alverez and
17 something or other to take a look at the financial
18 situation of Lextron.
19 Q. How did you find that out?
20 A. Again, either through Greg or Martha.
21 Q. Was this in writing, or was it verbal?
22 A. I believe it was verbal.
23 Q. Did you have any knowledge what the
24 status of the loans from Southtrust Bank to
25 Lextron were?

Page 100

1  A. On the 9th?
2  Q. Yes.
3  A. Not specifically, no.
4  Q. Were you aware that Delphi was
5  encouraging Southtrust Bank to forebear taking any
6  action on the note it had with Lextron?
7  A. No.
8  Q. You didn't know that?
9  A. No.
10 Q. Were you aware that Delphi was
11 encouraging Southtrust to loan new money to
12 Lextron?
13 A. I knew Delphi was encouraging
14 Southtrust to remain with Lextron as Delphi was.
15 Q. All right. I'm going to get to that.
16 A. Okay.
17 Q. But specifically, did you realize on
18 January 9th and before that Delphi was encouraging
19 SouthTrust Bank to loan more money to Lextron?
20 A. I knew that they were looking to loan
21 more money and that SouthTrust was looking for a
22 letter from Delphi.
23 Q. All right. You're not answering my
24 question.
25 A. I'm sorry.

Page 101

1   Q.  I apologize for not asking it well.
2   Were you aware that on January 9th and before
3   Delphi was actively encouraging SouthTrust to go
4   and give more money to Lextron?
5   A.  Not before the 9th I was not aware of
6   anything.
7   Q.  All right. When you saw the letter
8   that was crafted for you, you realized it then did
9   you not?
10  A.  Yes. Yes.
11  Q.  Specifically, Delphi was asking
12  SouthTrust to give $800,000 in new money to
13  Lextron; am I correct?
14  A.  I think that's the amount that they
15  were looking to.
16  Q.  When you --
17      You want to change your tape. Let's go
18  off the record.
19      (Off the record.)
20  MR. FREESE:
21  Q.  Mr. Graves, before the break we were
22  talking about your phone call to Mr. Raine --
23  A.  Yes.
24  Q.  -- where you confirmed that he received
25  your e-mail; is that correct?

Page 102

1   A.  That's right.
2   Q.  And what else was said other than to
3   Mr. Raine confirming your e-mail?
4   A.  That there was an issue in the
5   financial transactions between us and them about
6   something on the order of $120,000 issue of
7   obsolete inventory or something like that, and
8   that there was a concern of whether they were
9   actually going to receive the full amount or some
10  portion of that. And so during the call we -- I
11  told him, I said we can't confirm that that
12  $120,000 is what the final agreeable amount would
13  be.
14  Q.  Let me see if I understand this. When
15  you spoke with Mr. Raine, you confirmed he got
16  your e-mail.
17  A.  Right.
18  Q.  And then Mr. Raine brought up issue of
19  this obsolete inventory?
20  A.  No. I don't think he brought it up. I
21  brought it up because it was part of the financial
22  assessment that they were expecting or Lextron was
23  expecting to get the full $120,000 by the end of
24  the month. And that at this point, we couldn't
25  confirm yes or no -- all, any, or part of that.

Page 103

1   Q.  And what was Mr. Raine's response to
2   that?
3   A.  He didn't seem to say one way or
4   another.
5   Q.  But this $120,000 was you were telling
6   Mr. Raine that there is $120,000 issue out there
7   on obsolete inventory. Lextron may be entitled to
8   all of it, some of it, or none of it.
9   A.  We hadn't made that determination, yes.
10  Q.  And did y'all discuss anything else?
11  A.  Other than -- Another issue that I
12  understand that was a concern was how Delphi does
13  the contras which is like the end of the month,
14  the balancing of what they owe us and we owe them.
15  And that, you know, we were, you know, going to
16  continue the way that we did, but as in the letter
17  says that Lextron, you know, has the right to look
18  at the data before the end of the month, the
19  contra transaction.
20  Q.  That was discussed in this phone
21  conversation?
22  A.  In small part, yes.
23  Q.  And I'm sorry, what specifically was
24  said about the -- did you have to explain to
25  Mr. Raine the contra, or did he seem to understand

Page 104

1   it?
2   A.  No. No. He seemed to understand it.
3   I mean, he -- You know, I asked him about the
4   letter. Did it meet his expectations, and he said
5   yes.
6   Q.  That was your question?
7   A.  Yeah.
8   Q.  I interrupted you. I'm sorry. Let me
9   get a straight answer. You said Mr. Raine, have
10  you received my e-mail? He said yes, Mr. Graves,
11  I received your e-mail.
12  A.  Yes.
13  Q.  And you said, Mr. Raine, does it meet
14  your expectations, and he said, yes, Mr. Graves,
15  it does.
16  A.  Yes.
17  Q.  How long was that conversation?
18  A.  Just a matter of a couple minutes.
19  Q.  Did you tell Mr. Raine that someone had
20  ghostwritten that e-mail for you?
21  A.  No.
22  Q.  Did you tell him that many people had
23  input in the writing of that memo?
24  A.  No.
25  Q.  Which is a fact, was it not?

26 (Pages 101 to 104)

Page 105

1    A.   Yeah. Yes.
2    Q.   All right. How many people had their
3    hands in that e-mail that purported to be from you
4    to Mr. Raine?
5    MR. EASON:
6         Object to the form.
7    MR. FREESE:
8         I'm sorry. What's your objection?
9    MR. EASON:
10        Well, it was from him to Mr. Raine.
11   MR. FREESE:
12        Well, it was purported to be from him
13   to Mr. Raine as author of the document.
14   MR. EASON:
15        That's right. You say purported to be.
16   I'm objecting to the mischaracterization.
17   MR. FREESE:
18        It's a perfectly fact --
19   MR. EASON:
20        It in fact was from him to Mr. Raine.
21   MR. FREESE:
22        He didn't author it.
23   Q.   Let's go back to my question,
24   Mr. Graves. How many people had their hands in
25   writing that e-mail to Mr. Raine?

Page 106

1    A.   That had input --
2    Q.   Yes, sir.
3    A.   -- prior to it? My understanding Greg
4    Naylor, Martha Everett, Sid Johnson. As far as I
5    know, that's about it.
6    Q.   How did Sid Johnson have input into it?
7    A.   He was traveling, and it's my
8    understanding that he was the one who gave
9    instructions that it needed to go out and that I
10   needed to send it.
11   Q.   Okay. I remembered you say he was
12   traveling so did someone e-mail a copy of this for
13   his approval before you sent it to Mr. Raine?
14   A.   I don't know.
15   Q.   Do you know today whether or not
16   Mr. Johnson approved that letter?
17   A.   He approved the letter going out, yes.
18   Q.   How do you know that?
19   A.   Because after the letter, he had said
20   that he knew that it went out.
21   Q.   Did you have anything to do with any of
22   the content of that e-mail?
23   A.   Yes.
24   Q.   And I'm going to ask you about that.
25   Who was the author of the first draft of the

Page 107

1    e-mail?
2    A.   The first draft that came to me said it
3    was from Greg Naylor.
4         (Exhibit 2 was marked.)
5    MR. FREESE:
6    Q.   I'm going to show you what I've marked
7    as Exhibit 2. I think I may have an extra copy
8    here somewhere. Maybe I don't.
9         All right. Mr. Graves, you see Exhibit
10   2 is a two-page document, correct?
11   A.   Uh-huh.
12   Q.   Is that a "yes"?
13   A.   Yes.
14   Q.   And the first page is an e-mail
15   entitled Memo Template for Lextron. Do you see
16   that?
17   A.   Yes.
18   Q.   All right. And this is from Mr. Naylor
19   to Ms. Everett, correct?
20   A.   Yes.
21   Q.   And copies yourself and Mr. Johnson?
22   A.   Yes.
23   Q.   This is at 3:14 p.m. on January 8th,
24   2003.
25   A.   Yes.

Page 108

1    Q.   And Mr. Naylor tells "M" who I assume
2    is Martha or Marti.
3    A.   Yes.
4    Q.   "M, below is a draft of my 'generic'
5    letter I was going to send to Andy Raine at
6    SouthTrust Bank prior to your recommendation to
7    hold off sending it. I still believe we need to
8    communicate to the bank... We can put our heads
9    together tomorrow to figure out our approach.
10   Also, feel free to modify the letter as you see."
11   Did I correctly read what Mr. Naylor's note was to
12   Ms. Everett?
13   A.   Yes.
14   Q.   All right. She's a risk manager; is
15   that right?
16   A.   Yes.
17   Q.   What does that mean? What does a risk
18   manager do?
19   A.   She works for headquarters' staff and
20   works issues regarding suppliers that could be in
21   trouble.
22   Q.   Is one of her jobs to make sure that
23   Delphi minimizes the risk to itself?
24   A.   Her objective is to make sure that we
25   have suppliers that can deliver components.