# EXHIBIT E

Page 1

```
 1   IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
            SECOND JUDICIAL DISTRICT
 2
 3
     SOUTHTRUST BANK, a corporation
 4       Plaintiff,
 5   VERSUS        CIVIL ACTION NO. CV03-14
 6
     LEXTRON CORPORATION, et al.,
 7       Defendants.
 8
              VOLUME I
 9     VIDEOTAPED DEPOSITION OF GREG NAYLOR
10   Taken at the offices of Brunini, Grantham,
        Growers & Hewes, PLLC, located at 1400
11   Trustmark Building, 248 East Capital Street,
        Jackson, Mississippi, on Thursday, September
12   25, 2003, beginning at 2:43 p.m.
13
14   REPORTED BY:
15      LAURA CROSS
        State-Wide Reporters
16      4400 Old Canton Road
        Suite 201 (39211)
17      Post Office Box 14113
        Jackson, Mississippi 39236
18      Telephone: (601) 366-9676
        Fax: (601) 366-9756
19
        Coast Address:
20
        764 Water Street (39530)
21      Post Office Box 389
        Biloxi, Mississippi 39533
22      Telephone: (228) 432-0770
        Fax: (228) 432-0690
23      msreporters@aol.com
24
25
```

Page 2

```
 1  APPEARANCES:
 2    BROOKS EASON, ESQUIRE
      Brunini, Grantham, Grower & Hewes
 3    1400 Trustmark Building
      248 East Capitol Street
 4    Jackson, Mississippi 39201
      Telephone: (601) 948-3101
 5    Fax: (601) 960-6902
        ATTORNEY FOR DELPHI
 6
      RICHARD FREESE, ESQUIRE
 7    Langston, Sweet & Freese, P.A.
      2900 Highway 280, Suite 240
 8    Morgan Keegan Center
      Birmingham, Alabama 35223
 9    Telephone: (205) 8710-4144
      Fax: (205) 871-4104
10      ATTORNEY FOR SOUTHTRUST BANK
        AND ANDY RAINE
11
      CHRIS CARSON, ESQUIRE
12    CHRISTINA A. GRAHAM, ESQUIRE
      Burr & Forman, LLP
13    3100 Southtrust Tower
      420 North 20th Street
14    Birmingham, Alabama 35203
      Telephone: (205) 458-5426
15    Fax: (205) 458-5100
        ATTORNEY FOR SOUTHTRUST BANK
16      AND ANDY RAINE
17    HAL DOCKINS, ESQUIRE
      ELLIE TURNAGE, ESQUIRE
18    EARLE BANKS, ESQUIRE
      Dockins, Turnage & Banks
19    840 East River Place
      Suite 500
20    Jackson, Mississippi 39202
      Telephone: (601) 969-2221
21    Fax: (601) 969-2741
        ATTORNEY FOR CHARLES DOTY AND LEXTRON
22      COMPANIES
23
24
25
```

Page 3

```
 1  APPEARANCES: (Continued)
 2    JENNY VIRDEN, ESQUIRE
      Chapman, Lewis & Swan
 3    961 Madison Avenue, Suite 1A
      Madison, Mississippi 39110
 4    Telephone: (601) 605-9081
      Fax: (601) 605-9765
 5      ATTORNEY FOR CROSS PLAINTIFF, LEXTRON
        AND CHARLES DOTY
 6
 7
    LEGAL VIDEO TECHNICIAN:
 8
      TONY SCOTT
 9
10
    ALSO PRESENT:
11
      CHARLES DOTY
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1        T-A-B-L-E O-F C-O-N-T-E-N-T-S
 2  Examination By:             Page
 3    Mr. Freese                  7
 4  Stipulation                   6
 5  Certificate of Court Reporter      148
 6  Witness Signature Sheet            149
```

1 (Pages 1 to 4)

**STATE-WIDE REPORTERS (228) 432-0770**

Page 89

1  January -- as I've told you before -- the
2  beginning of February that there was not a viable
3  business per BB&K's assessment, there were
4  decisions that were made. And I was aware that
5  having looked at this that S&I was being removed
6  from Lextron.
7    Q.  Five minutes ago you swore that was not
8  true.
9    A.  I was -- I was confused on the dates.
10   Q.  All right. Now, you know that on
11 February 12th you received an e-mail saying S&I
12 was being removed entirely from Lextron, correct?
13   A.  That's correct.
14   Q.  And in fact the new source had already
15 been chosen, correct?
16   A.  Correct.
17   Q.  And two of the new sources were your
18 own Packard division, correct?
19   A.  That's correct. I thought you were
20 referring to January 12th originally.
21   Q.  And in bold print it says "Please do
22 not communicate to Lextron regarding these
23 activities." Do you see that?
24   A.  Yeah, I can.
25   Q.  And as a loyal soldier, you followed

Page 90

1  that instruction and concealed that information
2  from Mr. Doty, didn't you?
3    A.  That's correct.
4    Q.  Now, you testified a few minutes ago
5  that there was no contingency plan even put in
6  place until the 15th or the 18th of January, 2003,
7  by Ms. Everett; is that correct?
8    A.  That's correct.
9    Q.  Do you want to change that testimony,
10 sir?
11   A.  No. Not at this point.
12   Q.  All right. Do you want me to show you
13 the document and then give you the chance?
14   A.  Sure.
15   Q.  Let me show you Exhibit 8.
16      This is an e-mail that you're the
17 author of; is it not, sir?
18   A.  That's correct.
19   Q.  And would you tell the jury what the
20 date of this e-mail is, sir?
21   A.  December 19th, 2002, 3:01 p.m.
22   Q.  A full month before you say a
23 contingency group was even established at Delphi,
24 correct?
25   A.  A formal contingency plan, that's

Page 91

1  correct.
2    Q.  Formal. Nobody said anything about
3  formal, sir. You said the group was not started
4  until the 15th or the 18th of January, did you
5  not?
6    A.  That's correct.
7    Q.  All right. Now, would you please read
8  to the jury the last sentence of your e-mail to
9  Mr. Johnson.
10   A.  "Currently, the buyers are generating
11 contingency plans for 'just in case.'"
12   Q.  And just in case is in quotation marks,
13 correct?
14   A.  That's correct. "I will update you
15 immediately following the holidays."
16   Q.  Do you want to change your testimony
17 now?
18   A.  Again, I was under the impression that
19 you were asking for a formal team when originally
20 asked.
21   Q.  The words formal never crossed my lips,
22 sir.
23   A.  Or a team. All I asked here was the
24 buyers to have a backup plan.
25   Q.  All right. So now you know -- Now that

Page 92

1  we've erased the confusion of formality -- that
2  contingency plans to replace this man's and his
3  company as a supplier were being prepared at least
4  as early as December 19th, 2002, am I correct?
5    A.  Yes.
6    Q.  And what did you mean by "just in
7  case"?
8    A.  Well, because this was -- This was an
9  evolving circumstance. This started out in the
10 August/September time frame, and as we got more
11 information the more we had to secure our
12 contingency plan. So as we got more information
13 that there wasn't a viable business, the more so
14 we had to secure our contingency plan.
15   Q.  All right. Is "just in case" just in
16 case we have to terminate him as a supplier?
17   A.  Just in case he's not able to remain a
18 viable supplier.
19   Q.  Right.
20   A.  That's right.
21   Q.  So what you meant is just in case we
22 have to exit him, the buyers are generating
23 contingency plans?
24   A.  That's correct.
25   Q.  And you were doing this at least as

23 (Pages 89 to 92)

Page 93

1 early as December 19th, 2002?
2    A.   That's correct.
3    Q.   And probably earlier.
4    A.   With the information that we had, that
5 they were having financial troubles, that was our
6 protocol.
7    Q.   So you, Greg Naylor, were cognoscente
8 in appreciating the fact that it was important to
9 get a contingency plan in place just in case we
10 had to terminate him. You knew this back in
11 December of 2002?
12    A.   That's correct.
13    Q.   All right. And did you communicate
14 this fact that there were these contingency plans
15 being developed by the buyers to Mr. Graves?
16    A.   I mean, he's on the distribution here.
17    Q.   So we can conclude that if you
18 distribute it to him, he should have known that
19 the contingency plan was being developed, correct?
20    A.   Thereabouts. This was close to the
21 holidays. I'm assuming he was still at work.
22    Q.   And he said he saw this memo.
23    A.   Uh-huh.
24    Q.   And am I correct that this contingency
25 plan that you're referring to here in Exhibit 8 is

Page 94

1 the same one that carried through to January and
2 February and so forth?
3 MR. EASON:
4    Before he answer the question, let me
5 object to your characterization of the prior
6 witnesses testimony. I believe he said he was
7 already on vacation and didn't see that until he
8 got back.
9 MR. FREESE:
10   Thank you, Brooks. I appreciate that.
11 Mr. Graves was on your e-mail, was he not?
12    A.   That's correct.
13    Q.   This was a huge issue as you described,
14 correct?
15    A.   That's correct.
16    Q.   One can fairly assume that whether or
17 not he was on vacation or not, you were keeping
18 him apprised along the way of these contingency
19 plans just in case?
20    A.   That's correct.
21    Q.   So if he denied knowing anything about
22 this just in case contingency plan, you would take
23 issue with that, would you not?
24    A.   Would I take issue to it?
25    Q.   Yes, sir. And I'm not saying what he

Page 95

1 did or didn't say, but if he testified that he had
2 no idea there was any contingency plans going on
3 in December of 2002, you would disagree with that
4 characterization.
5    A.   Well, I'm saying he should have been
6 aware. Again, this was around vacation time. I
7 don't know if he read the e-mail or not or -- I
8 mean, he's a director of a global company. He
9 gets hundreds of e-mails. I don't know if he read
10 it or when he read it.
11    Q.   Well, let me ask you this: Were you
12 planning on exiting any other suppliers at this
13 time?
14    A.   From our divisional standpoint?
15    Q.   Yes, sir.
16    A.   I don't know.
17    Q.   You can't think of one?
18    A.   I don't know.
19    Q.   All right. And the reason I'm asking
20 the question is I know you like to say it's a big
21 company, he's got lot of e-mails and lots of
22 responsibilities, but this was not some
23 back-burner issue, was it sir?
24    A.   No.
25    Q.   So if Mr. Graves is doing his job and

Page 96

1 being honest about it, he knew what was going on
2 with these contingency plans?
3    A.   That's correct. Part of him being on
4 the distribution.
5    Q.   Now, let me show you Exhibit 20. I'm
6 going to give you a chance to look at that, sir.
7 Tell me when you're done reading, sir.
8    A.   I'm done.
9    Q.   Okay. Can I have it back?
10    A.   Uh-huh.
11    Q.   This is an e-mail once again that you
12 were the author of, correct?
13    A.   That's correct.
14    Q.   December 6th, 2002, correct?
15    A.   That's correct.
16    Q.   And we're now almost two weeks
17 backwards from the December 19th meeting, right?
18    A.   Uh-huh.
19    Q.   Yes?
20    A.   That's correct.
21    Q.   All right. And I assume that
22 Mr. Graves hadn't gone on vacation by December
23 6th, had he?
24    A.   I don't know.
25    Q.   You sent him a copy of this e-mail,

24 (Pages 93 to 96)

Page 97

1  too, did you not?
2  A.  That's correct.
3  Q.  And you say here -- And you're writing
4  to Graves and Precopi, Matthews, and Christian --
5  "I need for you guys to initiate a payment terms
6  waiver for Lextron because they are financially
7  troubled." You were trying help him out; is that
8  right?
9  A.  Uh-huh.
10  Q.  Is that correct?
11  A.  That's correct.
12  Q.  But you conclude the e-mail with "Our
13  contingency plan may be necessary depending on the
14  outcome of the meeting." And the meeting you're
15  referring to was Mr. Doty and Sid Johnson were
16  gong to get together, were they not?
17  A.  That's correct.
18  Q.  All right. So now we're back as early
19  as December 6th. Greg Naylor and everyone working
20  with you -- You're already referring to our
21  contingency plan. It ain't, we need to go develop
22  one. You were calling it our contingency plan,
23  correct?
24  A.  That's correct.
25  Q.  So you already had one in place by

Page 98

1  December 6th, 2002?
2  A.  Well, it was a request for these guys
3  to continue looking for alternative sources.
4  Nothing was finalized even from a contingency plan
5  standpoint at that point in time.
6  Q.  You would agree with me, sir, that the
7  or phraseology, if you will, that you use here is
8  an existing fact. "Our contingency plan may be
9  necessary depending on the outcome of the
10  meeting." Correct?
11  A.  That's correct.
12  Q.  And the contingency that you're
13  referring to is terminating Lextron as a supplier
14  unless Sid Johnson decides to give them some more
15  favorable financial terms.
16  A.  I mean, that was one possibility.
17  Q.  Well, it's the only two possibilities
18  that you and Mr. Wheelock were discussing at that
19  time, was it not?
20  A.  Well, I thought we were also talking at
21  that time about advanced payments and things like
22  that outside the payments.
23  Q.  Well, that's a change in terms; is it
24  not?
25  A.  It's almost really a loan.

Page 99

1  Q.  But it's some kind of financial
2  accommodation to Lextron to --
3  A.  If you want to look at it in that
4  light. That's correct.
5  Q.  And in fact, the reason you know that
6  is because an hour earlier on that day you wrote
7  to Mr. Wheelock and told him that Sid and Mr. Doty
8  were meeting the following week, correct?
9  A.  I don't have -- I don't recall the time
10  from that one.
11  Q.  Well, it's 11:01 or something. Isn't
12  it?
13  A.  Uh-huh.
14  Q.  And this one is 12:10, same day.
15  A.  Okay. That's correct.
16  Q.  And so the only two things that at that
17  time that you were considering for Lextron was
18  either Sid is going to change the terms or exit
19  Lextron.
20  A.  No.
21  Q.  That is all your e-mail says, is it
22  not?
23  A.  That's all that says, but that's not
24  all I was considering.
25  Q.  Well, all you were telling Mr. Wheelock

Page 100

1  is Sid's going to meet with Lextron next week and
2  assess -- Sid's going to assess Lextron and
3  determine Delphi's position . . . whether to exit
4  or change terms. I'll let you know the result."
5  That's what you told him.
6  A.  It's a quickie e-mail.
7  Q.  Well, a quickie e-mail that had the
8  future of this company in its hands, correct?
9  A.  Not at that point.
10  Q.  Well, you're saying we can either
11  change terms, or we're going to exit the supplier.
12  A.  I mean, there was no decision made
13  there.
14  Q.  Sir, you're telling Mr. Wheelock Sid's
15  going to meet with him and he's either going to
16  change the terms or we're going to exit the
17  supplier. You told him that, didn't you?
18  A.  I didn't say it was either/or.
19  Q.  Do you see any --
20  A.  Can I review it again?
21  Q.  Yes, sir, you absolutely can. Tell me
22  if you find any more than two alternatives in that
23  e-mail.
24  A.  I only see two alternatives. That's
25  correct.

25 (Pages 97 to 100)

Page 105

1  A. No.
2  Q. And you don't know who paid for Alvarez
3  & Marsal, do you?
4  A. No, I don't.
5  Q. You have no belief the bank paid for
6  them?
7  A. I didn't know who paid for them.
8  Q. Well, he was paying for them. Mr. Doty
9  was.
10 MR. EASON:
11     Object to the testimony.
12 MR. FREESE:
13     It was just for edification purposes.
14 Q. All right. Now, I guess it's fair to
15 say, sir, that by early December you were
16 concerned enough about the financial viability of
17 this company that you already had buyers forming
18 contingency plans and by the middle of December
19 predicting that you may need to execute those exit
20 plans sooner than you thought.
21 A. As better information became available.
22 That's correct.
23 Q. But you certainly knew that much in
24 middle December of 2002?
25 A. That's correct.

Page 106

1  Q. Now, when is the first time that you
2  spoke to anyone at SouthTrust Bank?
3  A. That gets a little leery. It was
4  either December or January time frame. I don't
5  recall.
6  Q. Is 8 in front of you, sir?
7  A. Yes.
8  Q. All right. Let's look at the top of
9  that exhibit. This is December 19th, 2002,
10 correct?
11 A. Uh-huh.
12 Q. This is from you. "I talked with
13 Lextron today regarding their cash flow. At this
14 point in time they are pursuing capital from
15 SouthTrust Bank which they believe will take 60-90
16 days to complete." You say SouthTrust has
17 stipulated that outside consultants Alvarez &
18 Marsal conducted an independent review of
19 Lextron's cash flow requirements. And you've
20 already told me you don't know who hired who them,
21 do you?
22 A. That's correct.
23 Q. "The review will be complete during
24 shut down." All right. So as of middle December
25 you knew who SouthTrust was and what Mr. Doty was

Page 107

1  doing with them?
2  A. That's correct.
3  Q. All right. And then tell me about the
4  first conversation that you had with Mr. Raine.
5  A. I don't actually recall when my first
6  conversation was with Mr. Raine. There was a
7  conversation, I know, after the first of the year
8  in 2003 where Sid had asked me to call Andy Raine
9  regarding a letter.
10 Q. All right. And what did Mr. Johnson
11 tell you the reason was that you were supposed to
12 call Mr. Raine?
13 A. He basically just told me that Andy
14 Raine wanted a letter identifying what we were
15 doing.
16     (Off the record.)
17 MR. FREESE:
18 Q. Mr. Naylor, we're back now. And to
19 refresh you, my question was: When was the first
20 time you spoke with Mr. Raine. You were telling
21 me Sid Johnson had asked you to call him.
22 A. Uh-huh.
23 Q. Is that "yes"?
24 A. That's correct.
25 Q. All right. And what I'd like to know

Page 108

1  is what Mr. Johnson -- as specifically as you
2  can -- told you about SouthTrust and what your
3  marching orders were in dealing with SouthTrust.
4  A. Well, it was a short conversation. He
5  had just asked me to send him a letter letting
6  them know what we were doing.
7  Q. All right. And that was it?
8  A. Pretty much.
9  Q. What you were doing was building
10 contingency plans to exit Lextron, was it not?
11 A. We were identifying alternative
12 sources.
13 Q. Okay. That's what you were doing,
14 correct?
15 A. That's correct.
16 Q. Did you share that little fact with
17 Mr. Raine when you called him?
18 A. No.
19 Q. So you really didn't follow
20 Mr. Johnson's instructions very well, did you?
21 Because he called you and told you to call
22 Mr. Raine and tell him what Delphi was doing. And
23 the thing that you were most doing was
24 establishing a contingency plan to exit Lextron.
25 And that didn't get communicated to Mr. Raine, did

27 (Pages 105 to 108)

STATE-WIDE REPORTERS (228) 432-0770

Page 109

1  it?
2  MR. EASON:
3      Object to the form of the question.
4      A.   That did not get communicated.
5  MR. FREESE:
6      Q.   What did Mr. Johnson ask you to
7  communicate to Mr. Raine that you were doing at
8  that time?
9      A.   He basically asked me really to contact
10 Andy. And he was a little unclear as to really
11 what Andy was looking for. And that's when I
12 actually called Andy and had a general
13 conversation with Andy.
14     Q.   But you can't remember specifically
15 what it is he wanted you to tell Mr. Raine that
16 you were "doing"?
17     A.   No, I can't.
18     Q.   So you called Mr. Raine. And you're
19 not exactly sure of the day?
20     A.   No.
21     Q.   Do you know the month?
22     A.   I think it was January.
23     Q.   I think it was, too. And tell me what
24 you recall you saying and what Mr. Raine said in
25 that telephone conversation.

Page 110

1      A.   It was a conversation. I called Andy
2  and let him know who I was and that Sid had
3  requested for me to touch base with him and to
4  follow up on a -- I guess, a previous conversation
5  that they had had. And basically had asked Andy
6  what did he want from me.
7      Q.   Okay. And what did he tell you?
8      A.   He requested -- From what I recall, he
9  had requested a letter for Delphi to stay or to
10 keep their business at Lextron for six months.
11     Q.   All right. What else?
12     A.   That's really all I recall.
13     Q.   And what did you tell him when he asked
14 you that?
15     A.   I told him I couldn't -- I really told
16 him that we really didn't have any intentions on
17 moving the business, but I didn't know if I could
18 get him the letter. And I would check with him
19 and get back with him soon.
20     Q.   All right. So you said Mr. Raine asked
21 you to promise that Delphi would at least give
22 Lextron business for six months so they could get
23 over this financial hump, correct?
24     A.   I didn't know what it was for. I
25 didn't know that it was to bridge their gap or

Page 111

1  anything.
2      Q.   Really? What did you think they wanted
3  an assurance for at least six months?
4      A.   Well, to make certain that they would
5  try to remain viable. I don't know why six months
6  because everything I had seen, you know, from
7  Lextron showed that they couldn't make it even
8  after six months.
9      Q.   And you knew that before you called
10 Mr. Raine?
11     A.   I knew that I had some information, I
12 believe, from Marvel Turner prior to them putting
13 together any additional plans.
14     Q.   But what I'm getting at is, you said
15 you thought it was odd that Mr. Raine was asking
16 for a six-month assurance when you already
17 believed based on what you knew even then that
18 they wouldn't be viable even after six months,
19 correct?
20     A.   Well, everything was odd to me. I
21 mean, I traditionally don't have a bank calling
22 me.
23     Q.   Well, the bank didn't call you. You
24 called them.
25     A.   Or I don't have request -- I

Page 112

1  traditionally don't have request to call a bank
2  from a purchasing standpoint.
3      Q.   Well, in this case you called the bank;
4  the bank didn't call you.
5      A.   Well, it was a follow-up to a call that
6  they had made to Sid from my understanding.
7      Q.   All right. And before you made this
8  call to the bank, you had already gathered
9  information that six months would not be a
10 sufficient amount of time for Lextron to remain
11 viable?
12     A.   I had tentative --
13 MR. EASON:
14     Object to the form of the question.
15 MR. FREESE:
16     Q.   Well, that's what you said, isn't it,
17 sir?
18     A.   I had tentative information from
19 Mr. Doty's CFO that showed a cash flow that showed
20 that there was a deteriorating cash flow situation
21 through six months.
22     Q.   What else did Mr. Raine ask for other
23 than for Delphi to assure him that they would stay
24 with Lextron for at least six months?
25     A.   Ask that question again.

Page 113

1  Q. It was probably a bad question. It's
2  late in the day. Was there anything else
3  Mr. Raine asked of you in that telephone
4  conversation?
5  A. I don't recall.
6  Q. All right. Was there anything that
7  Mr. Raine asked of you other than a letter
8  assuring SouthTrust that Delphi would stick with
9  Lextron for at least six months?
10 A. I don't recall.
11 Q. You do recall telling him that Delphi
12 at that time had no intention of exiting Lextron;
13 is that correct?
14 A. Yes.
15 Q. But in fact, as we've shown from all
16 these e-mails, you were actively pursuing an exit
17 strategy --
18 A. I was pursuing a contingency plan.
19 Q. Well, you say that, but what you said
20 in your December e-mail was that we have to
21 execute our plan earlier than we think or thought.
22 A. Yeah. A contingency. It's still a
23 contingency.
24 Q. And you knew that in December?
25 A. I knew we had -- we had contingency

Page 114

1  plans developing.
2  Q. And you did not share that with
3  Mr. Raine when you spoke with him, did you?
4  A. That is correct.
5  Q. For the very same reason that you
6  didn't want to share it with Mr. Doty. And that
7  is if SouthTrust did not give their financial
8  backing to Lextron, not only would they not make
9  it six months, they wouldn't make it six weeks
10 would they?
11 A. Andy never asked for that question.
12 Q. I didn't ask you if he asked you for
13 it. Listen to my question.
14 A. My purpose of the call back to Andy was
15 to determine what he wanted from me, and I was
16 asking Andy what are you looking for from me. I
17 did not offer up that information if that's what
18 you're asking.
19 Q. That is what I'm asking.
20 A. Okay.
21 Q. Even though you had it?
22 A. Even though I had it.
23 Q. Now, if you were being forthright and
24 fair to SouthTrust, you would have offered up that
25 information, would you not?

Page 115

1  A. Not necessarily.
2  Q. Well, tell me why -- when you say not
3  necessarily -- When would it be forthright and
4  when would it not be forthright to share that
5  information with Mr. Raine?
6  A. Well, SouthTrust was not a supplier to
7  Delphi. I had --
8  Q. So to heck with them?
9  A. Not to heck with them. I had no
10 compelling reason to share that information with
11 Mr. Doty's banker prior to sharing any information
12 with Mr. Doty.
13 Q. Fair enough. Well then, sir, if you
14 had no compelling reason not to share that
15 information with the bank who's keeping Mr. Doty's
16 business afloat, why not tell him?
17 MR. EASON:
18    He said he had no compelling reason to
19 share it with them.
20 MR. FREESE:
21 Q. Well, sir, you understood, did you not,
22 and let's draw on your MBA and your CPA for a
23 moment here.
24 A. Uh-huh.
25 Q. You know the reason why Mr. Raine

Page 116

1  wanted the assurance that Delphi was not going to
2  cut and run and leave Lextron hanging, don't you?
3  You know that's what the bank wanted to know.
4  A. That's correct.
5  Q. Because you, your company, was asking
6  SouthTrust to forebear on a note that they had
7  with Lextron, were you not?
8  A. At that time I did not know we were
9  asking for that.
10 Q. You didn't know that?
11 A. No.
12 Q. Did you know that you were asking
13 SouthTrust to extend and additional $800,000 in
14 credit to Mr. Doty?
15 A. I did not know Delphi was asking for
16 that much --
17 Q. Did you know that --
18 A. -- or that dollar amount.
19 Q. All right. Did you later become aware
20 of that?
21 A. It was really all news to me when I
22 found out about the forbearance agreement. I
23 actually had to ask what does it mean?
24 Q. When did you find out about it?
25 A. I don't recall. It's in my notes.

Page 117

1  It's probably like the 14th or the 15th.
2      Q.   Right. Let's get back to all that
3  financial education of yours now. You know this
4  is important information to the bank -- how
5  committed Delphi is to Lextron. Because if
6  Delphi, the 85 percent supplier of business to
7  Lextron, is not going to stay with them, then
8  SouthTrust is not going to extend additional money
9  and is not going to forebear any more on its note.
10 You know that, do you not?
11     A.   Most of it.
12     Q.   All right. And you knew it when you
13 talked to Mr. Raine, didn't you?
14     A.   That's correct.
15     Q.   All right. Have you told me everything
16 that you recall you saying and everything
17 Mr. Raine said to you in the telephone
18 conversation?
19     A.   Yes.
20     Q.   And did you tell Mr. Raine I'll see
21 what kind of letter I can get to you?
22     A.   That's correct.
23     Q.   Now let me show you Exhibit 2 and ask
24 if that's the letter that you prepared after your
25 conversation with Mr. Raine?

Page 118

1      A.   That's correct.
2      Q.   Now, how soon after your conversation
3  with Mr. Raine did you prepare Exhibit 2?
4      A.   I think a day or so after.
5      Q.   And were you in Ohio at the time that
6  you prepared this letter?
7      A.   Yes.
8      Q.   And were you being honest in this draft
9  of the letter that you prepared?
10     A.   Yes.
11     Q.   You were trying to uphold the ethical
12 principles of your company, correct?
13     A.   Yes.
14     Q.   Did this letter accurately describe
15 what you and Mr. Raine talked about in the
16 telephone conversation?
17 MR. EASON:
18       Why don't you let him see it?
19 MR. FREESE:
20       Sure. I'm sorry.
21     Q.   The question, sir, is: Does the letter
22 accurately describe the content and the request
23 Mr. Raine made of you in that telephone
24 conversation?
25     A.   Yes.

Page 119

1      Q.   You write "As a follow-up to our
2  conversation this morning." So it appears you
3  wrote the letter the same day, frankly, does it
4  not?
5      A.   I'd have to take a look at it again on
6  the date. That's correct.
7      Q.   So the very same day you talked to
8  Mr. Raine -- You have a computer at your desk?
9      A.   Yes.
10     Q.   You sit down and peck out this letter
11 to Mr. Raine, correct?
12     A.   That's correct.
13     Q.   All right. And you say in here "I am
14 writing you this memo to re-iterate Delphi's focus
15 to maintain and grow Lextron Corporation as a
16 valued supplier." Do you see that?
17     A.   Yes.
18     Q.   Was that a true statement when you made
19 it?
20     A.   Yes. Again, we were continuing to move
21 business into Lextron.
22     Q.   Business that you can't remember
23 exactly what it was.
24     A.   That's correct.
25     Q.   So you told Mr. Raine in the telephone

Page 120

1  conversation that Delphi's focus was to maintain
2  and grow Lextron as a valued supplier.
3      A.   That's correct.
4      Q.   And you also told Mr. Raine that
5  "Resources are being committed by Delphi to assist
6  Lextron (including a reduction in our payment
7  terms to Net 15) during it's cash flow shortfall."
8      A.   That's correct.
9      Q.   And you also told Mr. Raine "In turn,
10 Delphi has no intentions of exiting Lextron."
11 Correct?
12     A.   What I was saying was we were taking
13 the necessary steps to continue our relationship.
14     Q.   And you were saying you have no
15 intentions of exiting Lextron, correct?
16     A.   And at that point in time, we had no
17 intentions of exiting Lextron.
18     Q.   Even though three weeks earlier you
19 were advising your buyers that you might have to
20 expedite your termination of Lextron, were you
21 not?
22     A.   That's correct.
23     Q.   Do you think that may be a false
24 representation that you made to Mr. Raine that you
25 had no intention of exiting Lextron.

Page 121

1   A.  It was not a false representation.
2   Q.  Do you believe it was a misleading
3   representation that you made?
4   A.  No. No, I do not.
5   Q.  Do you believe it was deceitful in any
6   way?
7   A.  No, I do not.
8   Q.  Was the intent of you telling Mr. Raine
9   that you had no intention of exiting Lextron was
10  to give them a sense of trust and that you were
11  going to hang in and support Lextron just like
12  Delphi was asking SouthTrust to do. Was that what
13  you were doing when you told Mr. Raine that?
14  A.  No.
15  Q.  Why were you telling Mr. Raine that you
16  had no intention of exiting Lextron?
17  A.  Because basically, it was really
18  because Andy had asked for the letter.
19  Q.  And he said, Mr. Naylor, I'd like a
20  letter assuring me that you have no intention of
21  exiting Lextron, correct?
22  A.  That's correct.
23  Q.  And you sat down --
24  A.  For six months.
25  Q.  Well, I don't see six months in here

Page 122

1   anywhere. Did you see six months in here?
2   A.  Well, I was following up that that's
3   what he had asked for.
4   Q.  But in your letter right after your
5   phone conversation you made no mention of the six
6   months, do you?
7   A.  That's correct.
8   Q.  And this letter was drafted the same
9   day as that conversation?
10  A.  Possibly.
11  Q.  Well, it says it was. "As a follow-up
12  to our conversation this morning." Correct?
13  A.  Well, a lot of times I'll draft memos
14  on paper and then just when I actually type the
15  memo I'll just write it like that. When I
16  actually typed it, it could have been a different
17  day.
18  Q.  Would you type a memo two or three days
19  later saying following our conversation this
20  morning if you talked to him two or three days
21  ago?
22  A.  Possibly. I was very busy at that
23  time. Possibly.
24  Q.  Well, sir, you said the conversation
25  occurred on January 8th, did it not?

Page 123

1   A.  I don't recall when the conversation
2   occurred. I just said at the beginning of
3   January.
4   Q.  But in any event Mr. Raine asked for
5   your assurance, and you gave him your verbal
6   assurance that at that time Delphi had no
7   intention of exiting Lextron?
8   A.  That's correct.
9   Q.  And then you went -- And consistent
10  with your oral statement to him, you typed it into
11  this memo.
12  A.  That's correct.
13  Q.  All right. And then you said
14  "Additionally, because of Delphi's support and
15  interest in Lextron, Delphi is requesting
16  SouthTrust to continue its support of Lextron."
17  Do you see that?
18  A.  That's correct.
19  Q.  Now, there you're speaking on behalf of
20  Delphi, correct?
21  A.  That's correct.
22  Q.  And you're asking SouthTrust to support
23  Lextron, are you not?
24  A.  Yes.
25  Q.  And the reason you say that you are

Page 124

1   asking SouthTrust to support Lextron is because
2   Delphi is going to support Lextron?
3   A.  I'm not sure that's a fair statement.
4   Q.  Well, then look at it again, sir, and
5   tell me if that's not a fair statement.
6   A.  What's your question again?
7   Q.  Look at the last paragraph that you
8   wrote.
9   A.  What's the question again?
10  Q.  The question is: You were asking
11  SouthTrust to support Lextron, and the basis upon
12  which you were asking SouthTrust to support
13  Lextron was because Delphi was going to support
14  Lextron?
15  A.  It was not a because.
16  Q.  Well, read the sentence to the jury
17  then, sir.
18  A.  "Additionally, because of Delphi's
19  support and interest in Lextron, Delphi is
20  requesting SouthTrust Bank to continue its support
21  of Lextron."
22  Q.  All right. It said because of our
23  support of Lextron, we're asking you to support
24  Lextron.
25  A.  Okay.

31 (Pages 121 to 124)

Page 125

1  Q.  You agree with that?
2  A.  That's correct.
3  Q.  Those are your words?
4  A.  Uh-huh.
5  Q.  Yes?
6  A.  That's correct.
7  Q.  Back up for a second. You knew how
8  important this letter was to SouthTrust making a
9  fair and informed decision about lending money to
10 Lextron, didn't you?
11 A.  No. I didn't know that that letter was
12 going to result in additional money or any
13 additional money being lent.
14 Q.  Well, what did you think continued
15 support meant?
16 A.  From my standpoint, it was almost like
17 hey, don't foreclose on this situation.
18 Q.  Well, you said you didn't have any idea
19 about that.
20 A.  Well, that's the thought process that I
21 had when I wrote that.
22 Q.  Well, wait a minute. If you had a
23 thought process, you had to be thinking something
24 I assume.
25 A.  Uh-huh.

Page 126

1  Q.  What kind of support did you think
2  SouthTrust Bank could give to Lextron?
3  A.  Just not calling their existing loan
4  that I thought Charles was in arrears on.
5  Q.  Well, if you were talking with
6  Mr. Doty, you knew he was seeking additional
7  money, did you not?
8  A.  That's correct.
9  Q.  He told you that.
10 A.  That's correct.
11 Q.  And you knew he was seeking the money
12 from SouthTrust?
13 A.  No. He had multiple sources he was
14 seeking money from. He was looking for an equity
15 partner is what he told us.
16 Q.  Who did Mr. Doty tell you that he was
17 seeking loans from other than SouthTrust?
18 A.  He told me an equity partner. He
19 didn't give a name.
20 Q.  Well, a bank is not an equity -- I
21 mean --
22 A.  That's what I'm saying. The bank was
23 not the only party here.
24 Q.  I understand, sir. But there was no
25 other bank that Doty told you he was seeking funds

Page 127

1  from other than SouthTrust, correct?
2  A.  Mr. Doty told me that he was seeking
3  funds from an equity partner.
4  Q.  All right. You're not listening to my
5  question. Equity is not debt, is it, sir?
6  A.  That's correct.
7  Q.  That's the first day of accounting; is
8  it not?
9  A.  That's correct.
10 Q.  Okay. Listen to my question. Mr. Doty
11 told you that he was seeking loans, debt from
12 nobody other than SouthTrust Bank?
13 A.  I didn't know that at the time?
14 Q.  He didn't tell you that?
15 A.  I didn't know that SouthTrust was the
16 only.
17 Q.  Well, how many phone calls did Sid
18 Johnson ask you to make to any other banks?
19 A.  He didn't ask me to make any to any
20 other banks.
21 Q.  One bank?
22 A.  One bank.
23 Q.  So a fair conclusion is that if
24 Mr. Doty's seeking additional money, it's going to
25 be from the bank that's calling Sid Johnson,

Page 128

1  correct?
2  A.  Correct.
3  Q.  All right. What you meant by
4  SouthTrust's support was you wanted -- that is
5  Delphi -- was asking for SouthTrust's continued
6  financial support to Lextron, correct?
7  A.  That's correct.
8  Q.  And you would agree with me as you
9  stated earlier that if SouthTrust knew all the
10 facts and decided if Delphi is going to cut and
11 run on Lextron, we're not going to continue to
12 financially support that company like Delphi was
13 asking. And that had potentially catastrophic
14 effects on Delphi, did it not?
15 A.  That's correct.
16 Q.  And you knew that when you talked to
17 Mr. Raine, didn't you?
18 A.  That's correct.
19 Q.  And that's why you felt comfortable
20 saying we have no intentio of leaving the man;
21 we're going to support him, and we would like you
22 to support him.
23 A.  That's correct.
24 Q.  You then e-mailed this letter to Marti
25 Everett.

32 (Pages 125 to 128)

**STATE-WIDE REPORTERS (228) 432-0770**

Page 129

1  A.  Okay.
2  Q.  She's become known as the clairvoyant,
3  which I'll explain to you later on. Okay?
4  A.  Uh-huh.
5  Q.  Do you know the woman?
6  A.  Yes.
7  MR. EASON:
8      Object to the speech. I move to
9  strike it.
10 MR. FREESE:
11 Q.  Now, why did you send this letter to
12 Ms. Everett?
13 A.  Because I had a lot of reluctance on
14 making any type of commitment on Delphi's behalf.
15 Q.  Even though your boss told you to call
16 Andy?
17 A.  That's correct.
18 Q.  Did he tell you whether or not you
19 could send the bank a letter?
20 A.  He told me to send them a letter as to
21 what we were doing, and that was it.
22 Q.  And in fact you e-mailed to Mr. Johnson
23 the very letter that you typed right after your
24 conversation with Mr. Raine, didn't you?
25 A.  That's correct.

Page 130

1  Q.  Did Mr. Johnson call you and say, Greg,
2  we ain't sending that letter to Andy Raine at the
3  bank?
4  A.  No.
5  Q.  Did he even call you and say there was
6  anything in your letter that gave him any
7  heartburn or any concern whatsoever?
8  A.  Not that I recall.
9  Q.  And you also sent it to Larry Graves,
10 did you not?
11 A.  That's correct.
12 Q.  Did Larry call you and say, you know,
13 Greg, we better not be saying this to SouthTrust
14 Bank because we've got all of those people milling
15 around out there, you know, doing these
16 contingency plans. Did he express any reservation
17 to you about sending that letter to SouthTrust
18 Bank?
19 MR. EASON:
20     Object to the form of the question.
21 A.  I'm not sure if Larry really had the
22 opportunity based on timing. When it was sent to
23 Larry, I was on a plane and traveling thereafter.
24 Q.  It was sent by your secretary or
25 something?

Page 131

1  A.  No. I had sent it -- I think when I
2  sent it to Larry, I think, it was late in the day.
3  And he had told me 5:00 that evening to go to
4  Lextron. And we hadn't talked about that letter
5  at all.
6  Q.  But you sent it to Marti, Sid, and
7  Larry at the same time?
8  A.  That's correct.
9  Q.  Now, after you sent it to Marti, did
10 she call you back?
11 A.  When I had sent it, I don't think we
12 had an opportunity to talk until after I had
13 arrived in Mississippi.
14 Q.  Did you talk to her when you arrived?
15 A.  Shortly thereafter.
16 Q.  All right. And let me back up for a
17 second. What was your reservation about sending a
18 letter that might be committing Delphi to
19 something?
20 A.  You know, it was a reservation that I
21 just didn't have -- 1) I didn't want to have
22 authority -- I didn't think I had authority and 2)
23 what it can be misconstrued as in terms of
24 commitment.
25 Q.  You recognized even as you were typing

Page 132

1  that letter that it might be viewed differently by
2  SouthTrust than maybe you intended it?
3  A.  That's correct.
4  Q.  That SouthTrust might actually have
5  relied on that letter consistent with your oral
6  representations to the bank, correct?
7  A.  That's correct.
8  Q.  And you didn't want that to happen, did
9  you?
10 A.  That's correct.
11 Q.  Sir, why would you tell a man something
12 at a bank and then put it in writing and then feel
13 reluctant to put in writing when you've already
14 told the man that?
15 A.  Because writing is different that
16 verbal. I've always viewed writing as different
17 than verbal.
18 Q.  Are you supposed to be more honest in
19 writing than you are when you're verbal?
20 A.  Well, writing is kind of like in blood
21 so to speak.
22 Q.  Well, aren't you suppose to be honest
23 all the time?
24 A.  I am honest all the time.
25 Q.  And so when you wrote that memo, you

33 (Pages 129 to 132)

Page 133

1  were being as close in that conversation with
2  Mr. Raine as you could have, correct?
3     A.  That's correct.
4     Q.  And it gave you a little pause or
5  concern what you were about to send to Mr. Raine,
6  didn't it?
7     A.  That's correct.
8     Q.  Because you were concerned that it
9  might not really be that accurate or honest of
10 statement, correct?
11    A.  As well as was I following procedure
12 from a Delphi standpoint.
13    Q.  Well, Mr. Johnson -- two levels above
14 you -- had given you the authority to write the
15 letter, hadn't he?
16    A.  Not that letter.
17    Q.  A letter?
18    A.  A letter.
19    Q.  Now, let me ask you something,
20 Mr. Naylor.  When you had this epiphany after
21 writing this letter that you felt uncomfortable
22 with, did you have any cause to think, you know
23 what, maybe I ought to call Mr. Raine back because
24 I've not put down on paper -- which you said is
25 more like in blood -- what we've talked about, and

Page 134

1  I just ain't feeling real comfortable about what I
2  put down on paper.  Did you ever think about doing
3  that?
4     A.  I may have.
5     Q.  But you didn't act on it, did you?
6     A.  I don't recall.
7     Q.  You didn't call him back and tell him,
8  Andy, by the way, all that stuff I told you, it's
9  not true, don't rely on it.  You didn't do that,
10 did you?
11    A.  No.
12    Q.  So Mr. Raine was left with the
13 impression that he was dealing A) with an honest
14 person, correct?
15    A.  That's correct.
16    Q.  And that he could rely on the truth of
17 what this honest person was telling him about the
18 intentions of Delphi, correct?
19    A.  That's correct.
20    Q.  And you wanted Mr. Raine to rely on
21 what you were saying, did you not?
22    A.  Yes.
23    Q.  You wanted him to believe you on behalf
24 of Delphi, did you not?
25    A.  That's correct.

Page 135

1     Q.  Now, Marti got a hold of your letter,
2  didn't she?
3     A.  Yeah.  It was sent to Marti.
4     Q.  She e-mails you back at 5:00 p.m. on
5  the next day, correct?
6     A.  I guess.
7     Q.  Well let me show you Exhibit 3.
8     A.  Okay.  Am I on the distribution here?
9     Q.  Are you not?
10    A.  No.
11    Q.  So you've written the letter.  She's
12 now taking your letter -- Okay.  Well, that's a
13 good point, Mr. Naylor.  I'm sorry I missed that.
14 She takes your letter, and she doesn't even bother
15 to send it back to you; is that correct?
16    A.  I'm not sure.
17    Q.  Well, it shows -- at least it shows
18 here -- that she didn't even send this letter back
19 to you, did she?
20    A.  My letter?  I don't know if that's my
21 version there.
22    Q.  Well, that's what we're about to talk
23 about.
24    A.  Okay.
25    Q.  And these documents are Bates stamped

Page 136

1  together.  I believe that this e-mail cover
2  sheet -- this letter behind it is the attachment
3  to this e-mail cover sheet.  You don't have any
4  reason to dispute that, do you?
5     A.  No.
6     Q.  Now, Ms. Everett takes your letter, and
7  she sends it Chip High, correct?  It says Lloyd
8  here.  That's Chip.
9     A.  I can read that.  Uh-huh.
10    Q.  He's the finance guy that wanted to cut
11 Lextron off back in August or September, correct?
12    A.  That's correct.
13    Q.  She sends it to Larry Graves who's busy
14 as you say with other things at the time?
15    A.  That's correct.
16    Q.  And doesn't even bother sending you a
17 copy of it, correct?
18    A.  A copy of --
19    Q.  Of now a second draft of the letter
20 that's proposed to go to SouthTrust?
21    A.  Okay.
22    Q.  Did you agree with that?  She does not?
23    A.  I think I've seen the second draft.
24    Q.  Take a moment and look at Exhibit 3,
25 sir, which is Ms. Everett's version of your

Page 137

1  letter.
2     A.  Ms. Everett's version?
3     Q.  Well, I'm assuming it's hers because
4  she's the person the letter's coming from that
5  she's sending to Chip High and to Mr. Graves.
6     A.  Well, this has my name that it's coming
7  from me.
8     Q.  I understand.
9     A.  But I didn't draft this.
10    Q.  I understand that, sir. That's what
11 we're about to talk about.
12    A.  Okay.
13    Q.  Ms. Everett gets your letter -- She
14 leaves your name on there, does she not?
15    A.  That's what it appears to have
16 happened.
17    Q.  Where is she?
18    A.  I don't know.
19    Q.  I mean, physically, where's her office?
20    A.  In Troy, Michigan.
21    Q.  What is that, a couple hundred miles
22 from your office in Cleveland?
23    A.  Thereabouts.
24    Q.  So you're having this conversation with
25 Andy Raine, she's a couple hundred miles away in

Page 138

1  Michigan. She's not on the conversation with
2  Mr. Raine, is she?
3     A.  I'm not sure.
4     Q.  When you talked to Mr. Raine, it was
5  just you and Mr. Raine, wasn't it?
6     A.  Oh, was she in that conversation?
7     Q.  Yes, sir.
8     A.  No. She was not in that conversation.
9     Q.  All right. And you're writing this
10 letter to Mr. Raine to memorialize the discussion
11 you two had?
12    A.  That's correct. From my standpoint.
13    Q.  So Ms. Everett, who's not a party to
14 this conversation, starts putting her handiwork
15 together in this letter. Okay? Is that correct?
16    A.  That's correct.
17    Q.  Now, she says "As a follow-up to our
18 conversation this morning" as though this is Greg
19 Naylor writing the letter still, correct?
20    A.  Presumably.
21    Q.  You didn't write this version of the
22 letter, did you?
23    A.  No, I did not.
24    Q.  All right. She says, "I am writing you
25 this memo to re-iterate Delphi's focus to maintain

Page 139

1  Lextron Corporation as a valued supplier." Do you
2  see that?
3     A.  Yes.
4     Q.  She's taken out the word grow now,
5  hasn't she? From your version of the letter.
6     A.  That's correct.
7     Q.  Now, you're telling Andy in writing,
8  you know, we want it to grow. And in fact you
9  told me, we thought we still were growing them,
10 right?
11    A.  That's correct.
12    Q.  But for some reason Ms. Everett thinks
13 we better take out the word "grow," so we're going
14 to focus on maintaining Lextron Corporation,
15 correct?
16    A.  That word grow is --
17    Q.  Deleted?
18    A.  Uh-huh.
19    Q.  Yes?
20    A.  Yes.
21    Q.  All right. Without your permission?
22    A.  Without my knowledge.
23    Q.  Without your knowledge even though you
24 told Mr. Raine that, correct?
25    A.  Well, I had actually requested Marti to

Page 140

1  feel free to modify the letter as she sees fit.
2  So tentatively she did have my --
3     Q.  Did she have the editorial license to
4  modify it so it wasn't accurate anymore, sir?
5     A.  Well, I hadn't had a chance to review
6  it to see that it was not accurate.
7     Q.  She didn't give you the chance, did
8  she, because she didn't send it to you?
9     A.  No, she did not.
10    Q.  So how is she going to know whether or
11 not her version of your conversation with
12 Mr. Raine is accurate or not if A) she's not in on
13 the conversation and B) she doesn't send you a
14 copy of her version of the letter?
15    A.  I don't know.
16    Q.  There ain't no way in the world she can
17 do, is there?
18    A.  No.
19    Q.  She then goes on to say "in turn Delphi
20 has no current intentions of exiting Lextron."
21 Now was that in your first letter?
22    A.  "In turn, Delphi has no current
23 intentions of exiting Lextron" is in my current
24 letter.
25    Q.  She's modified your letter again,

Page 141

1  hasn't she? She's changed "no intention of
2  exiting Lextron" to "no current intention of
3  exiting Lextron"?
4      A.   That's correct.
5      Q.   She's added a word, and that word gives
6  you or gives somebody a little more wiggle room,
7  doesn't it? Saying having no intention versus
8  having no current intention has a different
9  meaning, does it not?
10     A.   That's correct.
11     Q.   Because if you have no current
12 intention, that intention can change the next day,
13 couldn't it?
14     A.   Depending on your definition of
15 current.
16     Q.   That was not in your contemporaneous
17 version of the letter, was it?
18     A.   The word? No, "current" was not in
19 mine.
20     Q.   Your version was much stronger, was it
21 not? We have no intentions of exiting Lextron.
22     A.   Depends on your interpretation.
23     Q.   Well, you would agree with me that a
24 receiver -- If you have the choice of being given
25 assurance of what the future holds, you'd rather

Page 142

1  get the version that says "no intention" versus
2  "no current intention," would you not?
3      A.   That's correct.
4      Q.   Now, she does leave in your request to
5  support Lextron because Delphi is supporting
6  Lextron, correct?
7      A.   That's correct.
8      Q.   She gets into some discussion in the
9  middle of Paragraph 2 -- Well, let me ask you
10 this: Is Ms. Everett's Paragraph 2, her draft, is
11 that all new to your letter?
12     A.   Let me take a look here for a second.
13 For the most part, yes.
14     Q.   Well, it's entirely new, is it not?
15     A.   That's correct.
16     Q.   You think she's taking too much license
17 here writing to Andy Raine about a conversation
18 she wasn't in -- that Martha Everett wasn't in --
19 and putting all this stuff in this letter?
20     A.   Well, she was just editing at that
21 point in time.
22     Q.   Well, let me tell you: None of this
23 that was added to your letter was discussed by you
24 and Mr. Raine, was it?
25     A.   That's correct.

Page 143

1      Q.   So she just added something that had
2  never even occurred, didn't she?
3      A.   That's correct.
4      Q.   Now, when's the first time you saw her
5  version of the letter?
6      A.   It was probably mid to late January at
7  the earliest.
8      Q.   So well after it was sent. Hers was
9  not sent, but well after the letter was sent.
10     A.   That's correct.
11     Q.   All right. And am I correct, sir, that
12 you never got to give your input on Ms. Everett's
13 letter?
14     A.   That's correct.
15     Q.   All right. Did you ever even see it
16 again before it was sent to Mr. Raine?
17     A.   I don't ever recall ever seeing Marti's
18 editing ever. I mean, I saw my version, and I saw
19 the version that was actually submitted or
20 e-mailed.
21     Q.   How long after the version that was
22 sent to SouthTrust was it before you saw that
23 version?
24     A.   Saw the version --
25     Q.   The altered version.

Page 144

1      A.   Like I say, I don't recall. It was
2  probably late January, mid January, late January
3  maybe.
4      Q.   Well after it was sent?
5      A.   That's correct.
6      Q.   So am I correct, sir, that the sole
7  person from Delphi who was in the conversation
8  never even saw the final letter that was sent to
9  SouthTrust?
10     A.   Well, I'm assuming also that Sid and
11 Andy may have talked about this, and I'm not
12 certain if he saw it.
13     Q.   If Andy saw what, the ultimate letter?
14     A.   Well, I'm assuming that Andy Raine and
15 Sid Johnson had talked about this letter.
16     Q.   The ultimate one?
17     A.   The ultimate one.
18     Q.   Well, in fact, it's addressed to him,
19 is it not?
20     A.   To who?
21     Q.   Mr. Raine.
22     A.   That's correct.
23     Q.   Now, I want to show you Exhibit 4,
24 which is the ultimate letter that was sent to
25 Mr. Raine.

36 (Pages 141 to 144)

Page 145

1  MR. EASON:
2       We're at a quarter till 6:00.
3  MR. FREESE:
4       After this letter I'm done, and we're
5  done for the day.
6  MR. EASON:
7       Thanks. I'm for that.
8  MR. FREESE:
9       Q. Have you had a chance to look at this,
10  sir?
11      A. Uh-huh. That's correct.
12      Q. It's dated February 6th, 2003, but
13  that's because the way the printer works. You
14  understand this is the version that was sent
15  January 9th?
16      A. It's dated February 6th.
17      Q. Well, if you look at the final version,
18  it says February 6th, 2003.
19  MR. EASON:
20      Just so the record's clear about this,
21  evidently the computer program generates that
22  letter whenever it's printed as opposed to the
23  date it was actually sent. And we will stipulate
24  that the letter was sent on January 9th, 2003.
25  MR. FREESE:

Page 146

1       Q. Right. I just didn't want you to get
2  confused by the date, sir.
3       A. Okay.
4       Q. So now Exhibit 4, which is the memo
5  that Mr. Raine ultimately received, looks almost
6  nothing like your original letter, does it?
7       A. I think it has the same meaning in
8  general.
9       Q. Exhibit 4 has the same meaning as
10  Exhibit 2, the one you drafted?
11      A. That's correct.
12      Q. Now you are no longer the author of the
13  letter. Mr. Graves has succeeded you as the
14  author of the letter; is that correct?
15      A. That's correct.
16      Q. Mr. Graves didn't have any conversation
17  with Mr. Raine, did he?
18      A. That's correct.
19      Q. And it says as a follow-up to your
20  conversation with Greg Naylor and Martha
21  Everett -- Did Mr. Graves think that Martha
22  Everett was on the phone with you and Mr. Raine
23  when y'all talked?
24      A. I'm not sure if he thought she was on
25  the phone or if they had a separate conversation.

Page 147

1       Q. Well, it says your conversation in
2  singular.
3       A. Right.
4       Q. But you know that Martha Everett was
5  not on the conversation you had with Mr. Raine,
6  right?
7       A. That's correct.
8       Q. And you were never given a chance to
9  edit or look at this letter before it was sent to
10  SouthTrust; is that correct?
11      A. That's correct.
12          (Off the record.)
13          (Deposition concluded at 5:44 p.m.)

Page 148

1           CERTIFICATE OF COURT REPORTER
2       I, LAURA CROSS, Court Reporter and Notary
3  Public, in and for the County of Rankin, State of
4  Mississippi, hereby certify that the foregoing
5  pages contain a true and correct transcript of the
6  testimony of the witness, as taken by me at the
7  time and place heretofore stated, and later
8  reduced to typewritten form by computer-aided
9  transcription under my supervision, to the best of
10 my skill and ability.
11      I further certify that I placed the witness
12 under oath to truthfully answer all questions in
13 this matter under the authority vested in me by
14 the State of Mississippi.
15      I further certify that I am not in the employ
16 of, or related to, any counsel or party in this
17 matter, and have no interest, monetary or
18 otherwise, in the final outcome of the
19 proceedings.
20      Witness my signature and seal, this the
21 day of              , 2003.
22
23
24            Laura Cross
              My Commission Expires February 3, 2007
25

37 (Pages 145 to 148)

STATE-WIDE REPORTERS (228) 432-0770