Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                 :

In re                         :     Chapter 11
                                   :

DELPHI CORPORATION, et al.,    :     Case No. 05-44481 (RDD)
                                   :

                   Debtors.   :     (Jointly Administered)
                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - -  x

SUPPLEMENTAL APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a),
328(a), AND 1107(b) AND FED. R. BANKR. P. 2014 AUTHORIZING
EMPLOYMENT AND RETENTION OF ERNST & YOUNG LLP
AS INDEPENDENT AUDITORS AND ACCOUNTING ADVISORS TO
DEBTORS, EFFECTIVE NUNC PRO TUNC TO MARCH 1, 2007

("ERNST & YOUNG SUPPLEMENTAL RETENTION APPLICATION")

        Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this supplemental application (the "Supplemental Application") for an order under

11 U.S.C. §§ 327(a), 328(a), and 1107(b) and Fed. R. Bankr. P. 2014 authorizing the

employment and retention of Ernst & Young LLP ("E&Y") as independent auditors and

accounting advisors to the Debtors, effective nunc pro tunc to March 1, 2007.  In support of this

Supplemental Application, the Debtors submit the Supplemental Affidavit Of Kevin F. Asher,

sworn to May 30, 2007 (the "Asher Supplemental Affidavit").  In further support of this

Supplemental Application, the Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

      1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  The Court has ordered joint administration of these cases.

      2.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

      3.    This Court has jurisdiction over this application pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

      4.    The statutory predicates for the relief requested herein are sections 327(a), 328(a), and 1107(b) of the Bankruptcy Code and rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.    <u>Current Business Operations Of The Debtors</u>

      5.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

---

[1]    The aggregated financial data used in this Supplemental Application generally consists of consolidated information from Delphi and its worldwide subsidiaries as disclosed in the Company's Form 10-K filed on February 27, 2007.

company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.[2]

6.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

---

[2]    On March 20 2007, Delphi Automotive Systems Espana S.L., whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding. The application was approved by the Spanish court on April 13, 2007. The Concurso proceeding does not affect other Delphi legal entities in Spain or elsewhere and is an isolated event that is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

C.     Events Leading To The Chapter 11 Filing

8.     In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006, the Debtors incurred

a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee

special attrition programs.

9.     The Debtors believe that the Company's financial performance has

deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

restrictions driven by collectively bargained agreements, including restrictions preventing the

Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating

largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic

OEMs resulting in the reduced number of motor vehicles that GM produces annually in the

United States and related pricing pressures, and (iii) increasing commodity prices.

10.     In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major unions and GM had not progressed sufficiently by the end of the third quarter of

---

[3]     Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating
loss in calendar year 2004 was $482 million.

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the

Debtors' transformation plan and preserve value for its stakeholders.

D.      The Debtors' Transformation Plan

11.      On March 31, 2006, the Company outlined five key tenets of its

transformation plan.  First, Delphi must modify its labor agreements to create a competitive

arena in which to conduct business.  Second, the Debtors must conclude their negotiations with

GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain

GM's business commitment to the Company.  Third, the Debtors must streamline their product

portfolio to capitalize on their world-class technology and market strengths and make the

necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform

their salaried workforce to ensure that the Company's organizational and cost structure is

competitive and aligned with its product portfolio and manufacturing footprint.[4]  Finally, the

Debtors must devise a workable solution to their current pension situation.

12.      On December 18, 2006, the Debtors marked another milestone in their

chapter 11 cases with the announcement of two significant agreements.  The first of these was an

equity purchase and commitment agreement (the "Equity Purchase and Commitment

Agreement") with affiliates of Appaloosa Management L.P., Cerberus Capital Management,

L.P., and Harbinger Capital Partners Master Fund I, Ltd., as well as Merrill Lynch & Co. and

UBS Securities LLC (collectively, the "Plan Investors").  Under the Equity Purchase and

Commitment Agreement, the Plan Investors have agreed to invest up to $3.4 billion in preferred

---

[4]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product
portfolio on core technologies for which the Company believes it has significant competitive and technological
advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics
and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also
has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the
Company's transformation plan.

and common equity in the reorganized Delphi to support the Debtors' transformation plan.  The

Equity Purchase and Commitment Agreement is subject to the completion of due diligence,

satisfaction or waiver of numerous other conditions (including Delphi's goal of achieving

consensual agreements with its principal U.S. labor unions and GM), and the non-exercise by

either Delphi or the Plan Investors of certain termination rights.  The second agreement was a

plan framework support agreement (the "Plan Framework Support Agreement") with the Plan

Investors and GM.  The Plan Framework Support Agreement outlines certain proposed terms of

the Debtors' anticipated plan of reorganization, including the distributions to be made to creditors

and shareholders, the treatment of GM's claims, the resolution of certain pension funding issues,

and the corporate governance of the reorganized Debtors.  The terms of the Plan Framework

Support Agreement are expressly conditioned on the Debtors' reaching consensual agreements

with their U.S. labor unions and GM.

        13.     On January 12, 2007, this Court authorized the Debtors to execute,

deliver, and implement the Equity Purchase and Commitment Agreement and the Plan

Framework Support Agreement (Docket No. 6589).  On February 28, 2007, Delphi entered into

an amendment to the Equity Purchase and Commitment Agreement with the Plan Investors to

extend the date by which the Company, the Cerberus Capital Management, L.P. affiliate, or the

Appaloosa Management L.P. affiliate have the right to terminate the agreement on account of not

yet having completed tentative labor agreements with Delphi's principal U.S. labor unions and a

consensual settlement of legacy issues with GM.  The amendment extended the termination right

pursuant to a 14-day notice mechanism.  The amendment also extended the deadline to make

certain regulatory filings under the federal antitrust laws in connection with the Equity Purchase

and Commitment Agreement and the Plan Framework Support Agreement.

14.    On April 19, 2007, Delphi announced that the Debtors anticipated
negotiating changes to the Equity Purchase and Commitment Agreement and the Plan
Framework Support Agreement.  The Debtors do not believe that these developments will
preclude the Debtors from filing a joint plan of reorganization and related documents with the
Court prior to the current expiration of the exclusivity period on July 31, 2007 or emerging from
chapter 11 reorganization this year.  The Debtors also confirmed that none of the parties entitled
to give notice of termination of the framework agreements has done so as of the date of this
filing and that these agreements remain effective as previously filed until modified or terminated.

15.    Although much remains to be accomplished in the Debtors' reorganization
cases, the Debtors and their stakeholders are together navigating a course that should lead to a
consensual resolution with their U.S. labor unions and GM while providing an acceptable
financial recovery framework for the Debtors' stakeholders.  Upon the conclusion of the
reorganization process, the Debtors expect to emerge as a stronger, more financially sound
business with viable U.S. operations that are well-positioned to advance global enterprise
objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-
quality products to its customers globally.  Additionally, the Company will preserve and
continue the strategic growth of its non-U.S. operations and maintain its prominence as the
world's premier auto supplier.

<u>Prior Applications</u>

16.    On November 28, 2005, the Debtors filed an Application For Order Under
11 U.S.C. §§ 327(a), 328(a), and 1107(b) Authorizing Employment And Retention Of Ernst &
Young LLP As Sarbanes-Oxley, Valuation, And Tax Services Providers to Debtors, Effective
<u>Nunc</u> <u>Pro</u> <u>Tunc</u> To October 8, 2005 (the "Initial Application").  The Initial Application sought

this Court's authorization of the Debtors' employment of E&Y in accordance with the terms of four engagement letters (the "Prior Engagement Letters").  The Initial Application was supported by the Affidavit of Randall J. Miller, sworn to November 28, 2005 (the "Miller Affidavit").  On January 5, 2006 this Court entered an order approving the Initial Application (Docket No. 1743).

17.    E&Y completed all of the services under the Prior Engagement Letters on or before December 16, 2005.  On December 29, 2005, E&Y provided to the Debtors formal notice of termination of the Prior Engagement Letters.

18.    On March 17, 2006, the Debtors filed an Application For Order Under 11 U.S.C. §§ 327(a), 328(a), And 1107(b) Authorizing Employment And Retention Of Ernst & Young LLP As Independent Auditors, Accountants, And Tax Advisors to Debtors, Effective Nunc Pro Tunc To January 1, 2006 (the "2006 Audit Application").  The 2006 Audit Application authorized E&Y to perform: (i) independent auditing and accounting services in accordance with the "audit engagement letter" attached to the 2006 Audit Application as Exhibit 1 and (ii) tax advisory services in accordance with the "master tax advisory agreement" attached to the 2006 Audit Application as Exhibit 2.  The 2006 Audit Application was supported by the Declaration of Kevin F. Asher, executed on March 17, 2006 (the "First Asher Declaration," and collectively with the Miller Affidavit and the Asher Supplemental Affidavit, the "Affidavits and Declaration").  On April 5, 2006 this Court entered an order approving the 2006 Audit Application (Docket No. 3121).

19.    Pursuant to the order approving the 2006 Audit Application, E&Y has performed an audit of the Debtors' financial statements and their internal control over financial reporting for the year ending December 31, 2006.

<u>Relief Requested</u>

20.    By this Supplemental Application, the Debtors request authorization to
employ and retain E&Y as their independent auditors to perform an audit of the Debtors'
financial statements and their internal control over financial reporting for the year ending
December 31, 2007 and to provide accounting advisory services, consistent with the rules and
regulations of the Securities and Exchange Commission and the Public Company Accounting
Oversight Board (the "Applicable Rules and Regulations"), effective <u>nunc pro tunc</u> to March 1,
2007.  Specifically, the Debtors respectfully request entry of an order under sections 327(a),
328(a), and 1107(b) of the Bankruptcy Code and Bankruptcy Rule 2014 authorizing E&Y to
perform independent auditing and accounting advisory services in accordance with the terms set
forth in the letter agreement attached hereto as <u>Exhibit 1</u> (the "Engagement Letter"), which the
Debtors submit for approval.[5]  The Debtors agree that, upon approval, the Engagement Letter
shall apply to services provided by E&Y as of March 1, 2007.

<u>Scope Of Services</u>

21.    As set forth in further detail in the Engagement Letter and in the Asher
Supplemental Affidavit, subject to approval of this Court, E&Y has agreed to provide the
following services:

A.    <u>Audit Services</u>:

   (i)    Perform an audit (the "Integrated Audit") of the Company's consolidated financial
statements and its internal control over financial reporting, including auditing and
reporting on the consolidated financial statements of the Debtors for the year
ending December 31, 2007;

---

[5]    Any description of the terms and conditions of E&Y's employment under the Engagement Letter contained
herein, including without limitation any description of the scope of services to be provided, fees to be charge, or
any other matter, is subject to the actual terms of the Engagement Letter which is sought to be approved by this
Supplemental Application.

(ii)     Perform an audit (the "Audit of Internal Control") and report on management's assessment of the effectiveness of internal control over financial reporting and on the effectiveness of internal control over financial reporting as of December 31, 2007; and

(iii)    Review the Company's unaudited interim financial information before the Company files its 2007 Form 10-Q's (collectively with the Integrated Audit and the Audit of Internal Control, the "Audit Services").

B.     <u>Accounting Advisory Services</u>:

(i)     As and when requested by the Debtors from time to time, provide accounting and auditing advisory and research services in connection with various accounting matters, including consultations required for significant proposed or executed transactions; implementation of new accounting standards; continuing education support; assistance with and review of registration statements, comfort letters, and consents; information technology internal controls; services related to mergers, acquisitions, and divestitures; and fresh start accounting including related audit procedures, which such services may include carve-out audits of one or more business units and which may, with Delphi's consent, be provided by another member of the global E&Y network or any of their respective affiliates (collectively, the "EYG Entities" and any one of them, an "EYG Entity"). Additionally, as and when requested by the Debtors, E&Y may (or with the Debtors' consent, another EYG Entity may) perform additional audit procedures with respect to any financial statements of a consolidated or non-consolidated affiliate of Delphi which are required to be filed with Delphi's annual report on Form 10-K pursuant to Article 3-09 or other Articles of Regulation S-X of the Securities and Exchange Act of 1934, as amended, or otherwise. E&Y may also provide services to audit the accounts, disclosures, and transactions associated with the Debtors' operating under chapter 11 of the Bankruptcy Code. All of the services described in this paragraph are hereinafter referred to as "Additional Accounting Advisory Services" (and together with the Audit Services, the "Services").

C.     <u>Audit Committee Pre-Approval And Maintenance Of Independence</u>:

22.    All services to be provided by E&Y to the Company, including those specifically contemplated by the Engagement Letter, must be pre-approved by Delphi's audit committee (the "Audit Committee") pursuant to the Audit Committee's pre-approval process, policies, and procedures, including specific pre-approval of internal control-related services. No services may be provided which adversely impact E&Y's ability  to satisfy the independence

standards of the Applicable Rules and Regulations.  E&Y is required to communicate annually

with the Audit Committee on independence matters as required by such independence standards.

D.      Subcontracting

23.    E&Y will provide the Services to Delphi and its U.S. subsidiaries and

affiliates which are Debtors in these chapter 11 cases.

24.    Certain EYG Entities other than E&Y will provide services to certain of

Delphi's foreign subsidiaries and affiliates which are not Debtors in these chapter 11 cases (the

"Foreign Non-Debtors").  Such services may include, without limitation, statutory audit services,

tax services or accounting advisory services, which will be provided under engagement letters

separate and distinct from the Engagement Letter.  Because the Foreign Non-Debtors are not

debtors or debtors-in-possession in U.S. chapter 11 proceedings, neither E&Y nor the respective

EYGL Member Firms will seek Court approval for these engagements.

25.    Pursuant to the Engagement Letter, E&Y may subcontract a portion of its

responsibilities under the Engagement Letter to any of the EYG Entities without the Debtors'

prior written approval; provided, however, that E&Y shall be and shall remain fully and solely

responsible for all of the liabilities and obligations of E&Y under the Engagement Letter,

whether or not performed, in whole or part, by E&Y, any other EYG Entity, or any subcontractor

or personnel of any EYG Entity.  The Debtors will have no recourse, and will bring no claim,

against any EYG Entity other than E&Y, or against any subcontractors, members, shareholder,

directors, officers, managers, partners, agents, representatives, or employees of any EYG Entity

(or any of their respective successors or permitted assigns) or any of their respective assets, with

respect to the Services or otherwise under the Engagement Letter.

11

26.    If E&Y subcontracts to an EYG Entity, E&Y will supplement the Asher Supplemental Affidavit to set forth the nature of the services to be provided under the subcontracting arrangement.

27.    The services to be provided by E&Y to the Debtors will not be unnecessarily duplicative of those provided by any other of the Debtors' professionals, and E&Y will coordinate any services performed at the Debtors' request with the Debtors' other professionals, including financial advisors and counsel, as appropriate, to avoid duplication of effort, consistent with the auditor independence requirements of the Applicable Rules and Regulations.

28.    Subject to this Court's approval of this Supplemental Application, E&Y is willing to serve as the Debtors' independent auditors and accounting advisors  and to perform the Services on the terms set forth in the Engagement Letter.

<u>Qualifications Of Professionals</u>

29.    The Debtors are familiar with the professional standing and reputation of E&Y.  The Debtors understand that E&Y is well-experienced in providing independent auditors and accountants in restructurings and reorganizations, and that E&Y is well-respected for services it has rendered in large, complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

30.    As set forth in the Asher Supplemental Affidavit, E&Y's depth and breadth of experience with Tier 1 automotive suppliers offers numerous benefits to the Debtors.

31.    In addition, as stated in the Asher Supplemental Affidavit, E&Y is very familiar with the Debtors' accounting, financial control and reporting, and other financial

processes.  The Debtors believe this familiarity will benefit them substantially with respect to E&Y's Services under the Engagement Letter.

32.    The services of E&Y are deemed necessary to enable the Debtors to maximize the value of their estates and to reorganize successfully.  The Debtors submit that E&Y is well-qualified and able to represent the Debtors in a cost-effective, efficient, and timely manner.

<u>Disinterestedness Of Professionals</u>

33.    The Affidavits and Declaration contain information available to date on E&Y's connections with other parties-in-interest, as required by Bankruptcy Rule 2014(a). Based on the information in the Affidavits and Declaration, which are incorporated herein by reference, the Debtors submit that E&Y and the professionals in the firm are "disinterested persons," as that term is used in section 101(14) of the Bankruptcy Code, and are otherwise eligible to be retained under section 327(a) of the Bankruptcy Code.

34.    E&Y's engagement period for the Services began on March 1, 2007.  Both E&Y and the Debtors have performed comprehensive independence reviews prior to the commencement of the Audit Services.  E&Y's independence review was consistent with the Applicable Rules and Regulations, including Independence Standard Board No. 1.

<u>Professional Compensation</u>

35.    Subject to this Court's approval and pursuant to the terms and conditions of the Engagement Letter, the Debtors have agreed to E&Y's professional compensation as follows:

A.    <u>Audit Services</u>

     36.    E&Y's estimated domestic fees for the Audit Services (the "Domestic Fixed Fee") will be $7,200,000, plus expenses.  Expenses include reasonable and customary out-of-pocket expenses such as travel, meals, accommodations, and other expenses specifically related to E&Y's engagement.  The Debtors and E&Y have agreed that E&Y may submit invoices for the Audit Services in accordance with the following schedule, as to which the Debtors request approval:

| <u>Date</u> | <u>Amount</u>[6] |
|---|---|
| March 2007 | $3,000,000 |
| July 2007 | $3,000,000 |
| December 2007[7] | $1,200,000 |

     37.    The Domestic Fixed Fee is based upon, among other things, E&Y's preliminary review of the Debtors' records and the representations the Debtors' personnel have made to E&Y, the Debtors' documentation of internal control over financial reporting, the procedures the Debtors' perform to support management's assessment of the effectiveness of internal control over financial reporting, and the results of E&Y's audit procedures.  The Domestic Fixed Fee is additionally based upon the Debtors' personnel providing a reasonable level of assistance during the Integrated Audit.  Should E&Y's assumptions with respect to these

---

[6]    This amount does not reflect expenses.

[7]    The executed engagement letter contains a typographical error that lists the due date for this payment as December 2008.

matters be incorrect or should it require additional commitments by E&Y beyond those upon

which the Domestic Fixed Fee is based, E&Y will bill for this time at the rates and in the manner

set forth below with respect to the Additional Accounting Advisory Services.

B.    <u>Additional Accounting Advisory Services</u>.

      38.    Fees for the Additional Accounting Advisory Services will be based on

E&Y's hourly rates for such services, plus reasonable expenses.  Expenses include reasonable

and customary out-of-pocket expenses such as travel, meals, accommodations, and other

expenses specifically related to E&Y's engagement.  E&Y's current hourly rates for the

Additional Accounting Advisory Services are as follows:

| Level | Hourly Rate |
|---|---|
| Partner | $550-800 |
| Senior Manager | $425-675 |
| Manager | $330-515 |
| Senior | $250-415 |
| Staff | $135-220 |
| Client Service Associate | $75-140 |

      39.    E&Y intends to invoice the Debtors on a monthly basis for the Additional

Accounting Advisory Services.

      40.    E&Y's hourly rates are revised periodically in the ordinary course of E&Y's

business.  E&Y's hourly rates for the Additional Accounting Advisory Services will be adjusted

on January 1st annually, beginning January 1, 2008.  E&Y will advise the Debtors, the Office of

the United States Trustee, the Creditors' Committee, and any other party as directed by this Court

of its new rates once they are established if a rate change is effective during the course of this engagement.

41.    E&Y will request reimbursement of fees for any time E&Y may spend, subject to prior approval by the Debtors, which approval will not be unreasonably withheld, in considering or responding to discovery requests or participating as a witness in any legal regulatory, or other proceeding before this Court or the United States District Court for the Southern District of New York (the "District Court") and any relevant administrative orders as a result of E&Y's performance of the Services, including any time or reasonable expenses of outside counsel retained by E&Y in respect of any of the foregoing.[8]

42.    E&Y will apply to this Court for compensation and reimbursement of expenses in accordance with section 330(a) of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), the U.S. Trustee Guidelines, and any other applicable orders of this Court.  E&Y acknowledges that all compensation will be subject to this Court's review and approval after notice and a hearing.

43.    The Debtors believe that E&Y's fees are fair and reasonable in light of industry practice, market rates both inside and outside of chapter 11 cases, E&Y's experience in reorganizations, and E&Y's importance to these cases.

---

[8]    E&Y acknowledges that in the event it seeks reimbursement for outside counsel pursuant to this paragraph, such attorney's time records and invoices have to be included in E&Y's own fee applications.  Additionally, such attorney's time records and invoices will be subject to the Office of the United States Trustee's guidelines for compensation and reimbursement of expenses (the " U.S. Trustee Guidelines ") and approval of this Court under the standards of sections 330 and 331 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy section 330(a)(3)(C) of the Bankruptcy Code.

<u>Dispute Resolution</u>

44.    Pursuant to the Engagement Letter, the Debtors and E&Y have agreed that any controversy or claim with respect to, in connection with, arising out of, or in any way related to the Engagement Letter or the services provided thereunder (including any such matter involving a parent, subsidiary, affiliate, successor-in-interest, or agent of the Debtors or E&Y) will be brought in this Court, or in the District Court if such District Court withdraws the reference, and the Debtors and E&Y, and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole and exclusive forum (unless such court does not have jurisdiction and venue of such claims or controversies) for the resolution of such claims, causes of action, or lawsuits.  The Debtors and E&Y, and any and all successors and assigns thereof, have also agreed to waive trial by jury in any controversy or claim.  If this Court, or the District Court upon withdrawal of the reference, does not have or retain jurisdiction over the foregoing claims or controversies, the Debtors and E&Y, and any and all successors and assigns thereof, have agreed to submit first to non-binding mediation and, if mediation is not successful, then to binding arbitration in Detroit, Michigan, in accordance with the dispute resolution procedures set forth in <u>Exhibit C</u> to the Engagement Letter.

45.    The Engagement Letter provides further that notwithstanding the dispute resolution procedures described above, the Debtors or E&Y may seek injunctive relief to enforce its rights with respect to the use or protection of (i) its confidential or proprietary information or material, (ii) its names, trademarks, service marks, or logos, and (iii) the enforcement of the notice provisions set forth in the Engagement Letter.

17

<u>Termination</u>

46.    Under the Engagement Letter the Debtors or E&Y may terminate the

engagements thereunder at any time, <u>provided</u>, <u>however</u>, that the terminating party will notify the

other and will provide this Court, the Office of the United States Trustee, the Creditors'

Committee, the Fee Review Committee, and any other party as directed by this Court  with three

business days' notice of termination.  In any event E&Y's engagement will terminate upon the

earlier of (i) the completion of the services to be rendered by E&Y under the Engagement Letter

or (ii) the effective date of the Debtors' confirmed plan of reorganization, or liquidation of the

Debtors' assets under chapter 11 or 7 of the Bankruptcy Code, or otherwise.

47.    The  provisions of the Engagement Letter relating to fees and expenses and

alternative dispute resolution will remain operative and in full force and effect regardless of any

termination or expiration of such engagement and will survive completion of the Debtors'

bankruptcy.

<u>Conclusion</u>

48.    For the foregoing reasons, the Debtors submit that the relief requested

herein is in the best interests of the Debtors and their estates and creditors and should be

approved.

<u>Notice</u>

49.    Notice of this Supplemental Application has been provided in accordance

with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P.

2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus Hearing Dates And Certain Notice,

Case Management, And Administrative Procedures, entered by this Court on March 20, 2006

(Docket No. 2883) and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1)

And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus

Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered

by this Court on October 26, 2006 (Docket No. 5418).  In light of the nature of the relief

requested, the Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

     50.    Because the legal points and authorities upon which this Supplemental

Application relies are incorporated herein, the Debtors respectfully request that the requirement

of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be

deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing the Debtors to employ and retain E&Y as independent auditors and accounting advisors pursuant to the terms and conditions set forth in the Engagement Letter, effective <u>nunc pro tunc</u> to March 1, 2007 and (b) granting the Debtors such other and further relief as is just.

Dated:        New York, New York
              May 30, 2007


                                        DELPHI CORPORATION, on behalf of itself and
                                        certain of its subsidiaries and affiliates, as Debtors
                                        and Debtors-in-Possession

                                        By:    <u>/s/ John D. Sheehan</u>
                                               Name: John D. Sheehan
                                               Title: Vice President and Chief Restructuring
                                                   Officer

**<u>Exhibit 1</u>**
**(Engagement Letter)**



■ **Ernst & Young LLP**                          ■ Phone: (313) 628-7100
Global Automotive Center
Suite 1000
??? Woodward Avenue
Detroit, Michigan 48226

March 19, 2007

Mr. Robert H. Brust, Chairman
The Audit Committee of Delphi Corporation
5725 Delphi Drive
Troy, MI 48098

Mr. Robert J. Dellinger, Executive Vice President, Chief Financial Officer
Delphi Corporation
5725 Delphi Drive
Troy, MI 48098

Dear Messrs. Brust and Dellinger:

This letter agreement (the "Agreement") sets forth the terms and conditions of the engagement of
Ernst & Young LLP ("Ernst & Young" or "E&Y") by Delphi Corporation and its affiliates (the
"Company," "Delphi" or "Debtor") to perform audit services and, on request of the Company, to
provide related accounting advisory and research services subsequent to the Company's filing of
a Chapter 11 petition in the United States Bankruptcy Court for the Southern District of New
York (the "Bankruptcy Court").

We have agreed to provide such services, contingent upon the Bankruptcy Court approving our
retention in accordance with the terms and conditions which are set forth in this Agreement.

1.   This will confirm the engagement of Ernst & Young by Delphi Corporation as approved by
     the Audit Committee to perform an audit of the Company's financial statements and its
     internal control over financial reporting (referred to hereinafter as the "integrated audit").
     As part of the integrated audit, we will audit and report on the consolidated financial
     statements of the Company for the year ended December 31, 2007 (the "audit of the
     financial statements"). We also will audit and report on management's assessment of the
     effectiveness of the Company's internal control over financial reporting and on the
     effectiveness of internal control over financial reporting as of December 31, 2007 (the
     "audit of internal control"). In addition, we will review the Company's unaudited interim
     financial information before the Company files its Form 10-Q. All of the services described
     in this paragraph may hereafter be referred to as either "Audit Service" or "Audit Services."

2.   In addition, as and when requested by the Company from time to time during the term
     hereof, we will  provide accounting advisory and research services in connection with
     various accounting matters, including consultations required for significant proposed or
     executed transactions; implementation of new accounting standards; continuing education
     support; assistance with and review of registration statements, comfort letters and consents;
     information technology internal controls; and services related to mergers, acquisitions,
     and divestitures, fresh start accounting including related audit procedures, which such

04/27/2007  08:46    248-813-4499                    DWHQ  D  3RD  FLR                    PAGE  02
05-44481-rdd   Doc 8098-1   Filed 05/30/07   Entered 05/30/07 12:58:50
Supplemental Application    Pg 23 of 41

2

services may include carve-out audits of one or more business units and which may, with Delphi's consent, be provided by another member of the global E&Y network or any of their respective affiliates (collectively, the 'EYG Entities" and any one of them, an "EYG Entity"). Additionally, as and when requested by the Company, we may (or with Delphi's consent another EYG Entity may) perform additional audit procedures with respect to any financial statements of a consolidated or non-consolidated affiliate of Delphi which are required to be filed with Delphi's annual report on Form 10-K pursuant to Article 3-09 of Regulation S-X of the Securities and Exchange Act of 1934, as amended, or otherwise. We will also provide services to audit the accounts, transactions and disclosures associated with the Company operating under Chapter 11 of the Bankruptcy Code. All of the services described in this paragraph may hereafter be referred to as "Additional Accounting Advisory Services.

## Integrated Audit Responsibilities and Limitations

3. The objective of our audit of the financial statements is to express an opinion on whether the consolidated financial statements are presented fairly, in all material respects, in conformity with U.S. generally accepted accounting principles. The objectives of our audit of internal control are to express an opinion on (1) whether management's assessment of the effectiveness of internal control over financial reporting is fairly stated, in all material respects, based on suitable control criteria, and (2) the effectiveness of internal control over financial reporting. Should conditions not now anticipated preclude us from completing either our audit of the financial statements or our audit of internal control and issuing our reports thereon, we will advise the Audit Committee and management promptly and take such action as we deem appropriate.

4. We will conduct our integrated audit in accordance with the standards of the Public Company Accounting Oversight Board ("the PCAOB"). Those standards require that we obtain reasonable, rather than absolute, assurance that the consolidated financial statements are free of material misstatement, whether caused by error or fraud, and that the Company maintained, in all material respects, effective internal control over financial reporting as of the date specified in management's assessment. As the Company is aware, there are inherent limitations in the audit process, including, for example, selective testing and the possibility that collusion or forgery may preclude the detection of material error, fraud, and illegal acts. Accordingly, there is some risk that a material misstatement of the financial statements or a material weakness in internal control over financial reporting would remain undetected. Also, an audit of the financial statements is not designed to detect error or fraud that is immaterial to the consolidated financial statements. Similarly, an audit of internal control is not designed to detect deficiencies in internal control over financial reporting that, individually or in combination, are less severe than a material weakness.

5. We will consider the Company's internal control over financial reporting in determining the nature, timing, and extent of our audit procedures for the purpose of expressing our opinion

04/27/2007   08:46    248-813-4499                    DWHQ D 3RD FLR                        PAGE  03
05-44481-rdd   Doc 8098-1   Filed 05/30/07   Entered 05/30/07 12:58:50
Supplemental Application    Pg 24 of 41

3

on: (1) the consolidated financial statements; (2) management's assessment of the effectiveness of internal control over financial reporting, and; (3) the effectiveness of internal control over financial reporting. Our report on item (2) above relates to whether management's assessment process, including documentation, provides a reasonable basis for its assessment. Our report on item (3) above relates to the effectiveness of the entity's internal control taken as a whole, and not to the effectiveness of each individual internal control component.

6.   In accordance with the standards of the PCAOB, we will communicate certain matters related to the conduct and results of the audit to the Audit Committee. Such matters include, when applicable, disagreements with management, whether or not resolved; serious difficulties encountered in performing the audit; our level of responsibility under PCAOB auditing standards for the financial statements, for internal control, and for other information in documents containing the audited financial statements; unrecorded audit differences that were determined by management to be immaterial, both individually and in the aggregate, to the financial statements as a whole; changes in the Company's significant accounting policies and methods for accounting for significant unusual transactions or for controversial or emerging areas; our judgments about the quality of the Company's accounting principles; our basis for conclusions as to sensitive accounting estimates; management's consultations, if any, with other accountants; and major issues discussed with management prior to our retention.

7.   In accordance with the rules of the Securities and Exchange Commission (SEC) implementing the requirements of Section 204 of the Sarbanes-Oxley Act of 2002, we will communicate to the Audit Committee all critical accounting policies and practices used by the Company, and all alternative treatments within generally accepted accounting principles for policies and practices related to material items that have been discussed with management, including ramifications of the use of such alternative disclosures and treatments along with the treatment preferred by us. We also will advise the Audit Committee of other material written communications between management and us.

8.   We will obtain pre-approval to be confirmed in writing from the Audit Committee for any services we are to provide to the Company pursuant to the Audit Committee's pre-approval process, policies, and procedures, including specific pre-approval of internal control-related services. We also will communicate annually with the Audit Committee on independence matters as required by the independence standards of the PCAOB. We will promptly inform the Chair of the Audit Committee and management if the Audit Services are selected for inspection by the PCAOB and also will promptly communicate any information of which we become aware as a result of such inspection that has a material effect on the financial statements previously reported on by us or that could result in a significant modification to an audit report previously issued by us. Upon your request, we will provide the Audit Committee and the Company with a copy of any publicly available inspection reports on

4

E&Y issued by the PCAOB, but we will not provide any confidential inspection reports issued by the PCAOB to E&Y, the confidentiality of which is provided for in the Sarbanes-Oxley Act of 2002 and the PCAOB's inspection rules.

9.  If we determine that there is evidence that fraud or possible illegal acts may have occurred, we will promptly bring such matters to the attention of an appropriate level of management. If we become aware of fraud involving senior management or fraud (whether by senior management or other employees) that causes a material misstatement of the consolidated financial statements, we will promptly report this matter directly to the Audit Committee. We will determine that the Audit Committee is adequately informed of illegal acts that come to our attention unless they are clearly inconsequential. In addition, we will promptly inform the Audit Committee and appropriate members of management of significant audit adjustments noted during our audit procedures and confirm such representations in writing to the Chair of the Audit Committee and General Counsel within five business days.

10. We will communicate in writing to management and the Audit Committee all significant deficiencies and material weaknesses in internal control over financial reporting that we identify during the course of our integrated audit. The identification of a material weakness that remains uncorrected as of the date of management's assessment will cause us to express an adverse opinion on the effectiveness of the Company's internal control over financial reporting. We also will communicate to management in writing all internal control deficiencies (that is, those deficiencies in internal control over financial reporting that are of a lesser magnitude than significant deficiencies) identified during the integrated audit and not previously communicated by us or by others. We also will communicate to the Board of Directors the existence of any significant deficiency or material weakness as a result of ineffective oversight by the Audit Committee of the Company's external financial reporting and internal control over financial reporting.

## Reviews of Unaudited Interim Financial Information

11. Our review of the Company's unaudited interim financial information will be performed in accordance with relevant PCAOB auditing standards.

12. A review of interim financial information consists principally of performing analytical procedures and making inquiries of management responsible for financial and accounting matters. It involves a review of the condensed financial information included in the filing on Form 10-Q and does not include any earlier earnings releases or other such communications. A review is substantially less in scope than an audit conducted in accordance with the standards of the PCAOB, the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we will not express an opinion on the interim financial information.

5

13. A review includes obtaining sufficient knowledge of the entity's business and its internal control as it relates to the preparation of both annual and interim financial information to: identify the types of potential material misstatements in the interim financial information and consider the likelihood of their occurrence; and select the inquiries and analytical procedures that will provide us with a basis for communicating whether we are aware of any material modifications that should be made to the interim financial information for it to conform with U.S. generally accepted accounting principles.

14. A review is not designed to provide assurance on internal control or to identify significant deficiencies. However, we will communicate to the Audit Committee any significant deficiencies noted during our review procedures.

15. If, during our review procedures, we determine that there is evidence that fraud or possible illegal acts may have occurred, we will promptly bring such matters to the attention of the appropriate level of management. If we become aware of fraud involving senior management or fraud (whether caused by senior management or other employees) that causes a material misstatement of the interim financial information, we will promptly report this matter directly to the Audit Committee. We will determine that the Audit Committee is adequately informed of illegal acts that come to our attention unless they are clearly inconsequential. We also will inform the Audit Committee and appropriate members of management of significant unrecorded differences noted during our review procedures.

**Management's Responsibilities and Representations**

16. The consolidated financial statements, unaudited interim financial information, and management's assessment of the effectiveness of internal control over financial reporting are the responsibility of the Company's management. Management is responsible for establishing and maintaining effective internal control over financial reporting, for properly recording transactions in the accounting records, for safeguarding assets, and for the overall fair presentation of the consolidated financial statements and unaudited interim financial information. Management of the Company also is responsible for the identification of, and for the Company's compliance with, laws and regulations applicable to its activities.

17. Management of the Company is responsible for adjusting the consolidated financial statements and unaudited interim financial information to correct material misstatements and for affirming to us in its representation letter that the effects of any unrecorded differences accumulated by us during the applicable Audit Service and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the consolidated financial statements and unaudited interim financial information taken as a whole.

04/27/2007  08:46  248-813-4499                    DWHQ D 3RD FLR                    PAGE  06
05-44481-rdd   Doc 8098-1   Filed 05/30/07   Entered 05/30/07 12:58:50
Supplemental Application    Pg 27 of 41

6

18. Management of the Company is responsible for apprising us of all allegations involving financial improprieties received by management or the Audit Committee (regardless of the source or form and including, without limitation, allegations by "whistle-blowers"), and for providing us full access to these allegations and any internal investigations of them, on a timely basis. Allegations of financial improprieties include allegations of manipulation of financial results by management or employees, misappropriation of assets by management or employees, intentional circumvention of internal controls, inappropriate influence on related party transactions by related parties, intentionally misleading E&Y, or other allegations of illegal acts or fraud that could result in a misstatement of the financial statements or otherwise affect the financial reporting of the Company. If the Company limits the information otherwise available to us under this paragraph (based on the Company's claims of attorney/client privilege, work product doctrine, or otherwise), the Company will immediately inform us of the fact that certain information is being withheld from us. Any such withholding of information could be considered a restriction on the scope of our Audit Services and may prevent us from opining on the Company's financial statements or internal control over financial reporting; alter the form of report we may issue on such financial statements or internal control over financial reporting; prevent us from consenting to the inclusion of previously issued auditor's reports in future Company filings; or otherwise affect our ability to continue as the Company's independent registered public accounting firm. The Company and we will disclose any such withholding of information to the Audit Committee.

19. Management of the Company is responsible for evaluating the effectiveness of the Company's internal control over financial reporting using suitable control criteria and for supporting its assessment with sufficient evidence, including documentation. Management also is responsible for presenting a written assessment of the effectiveness of the Company's internal control over financial reporting as of the end of the Company's most recent fiscal year. In connection with its assessment of internal control over financial reporting, management will affirm to us in its representation letter that it has: (1) disclosed to us all significant deficiencies in the design or operation of internal control over financial reporting, and (2) identified those that it believes to be material weaknesses.

20. As required by PCAOB auditing standards, we will make specific inquiries of management about the representations contained in the consolidated financial statements and unaudited interim financial information and management's assessment of the effectiveness of internal control over financial reporting. Those standards also require that, at the conclusion of the applicable Audit Service, we obtain representation letters from certain members of management about these matters. The responses to those inquiries, the written representations, and the results of our procedures comprise the evidential matter we will rely upon in completing the applicable Audit Service. Management is responsible for providing us with all financial records and related information and making available to us all internal control documentation and records necessary to complete our Audit Services on

7

a timely basis. Management's failure to do so may cause us to delay our report, as applicable, modify our procedures, or even terminate our engagement.

21.   Management of the Company agrees to cause all of the Company's foreign subsidiaries and affiliates included in the Company's consolidated financial statements to provide any authorization, to the fullest extent permissible under applicable law, necessary to permit compliance with requests by the SEC or the PCAOB for production of documents or information in a foreign public accounting firm's, associated person's or E&Y's possession, custody or control that was obtained in the conduct of audit services by such firm or person. In addition, the Company hereby waives, to the fullest extent permissible under applicable law, the rights provided under any laws, regulations, professional standards, or other provisions that might restrict the ability of any foreign public accounting firm, any associated person, or E&Y, to comply with requests by the SEC or the PCAOB for production of documents or information in such foreign public accounting firm's, associated person's or E&Y's possession, custody or control that was obtained in the conduct of audit services by such foreign firm or person, and consents, to the fullest extent permissible under applicable law, to action taken in furtherance of the foregoing by any foreign public accounting firm, associated person or E&Y.

The parties hereto recognize that E&Y and/or any foreign public accounting firm and any associated person may obtain documents and copies of documents and other information during the conduct of audit services for the Company and any Company Entity that contain legally privileged, business confidential, trade secret, other confidential, proprietary and competitively sensitive information, or the Company or Company Entity's books and records. In the event that a request, subpoena or order is delivered to E&Y, any foreign public accounting firm or associated person by the SEC, the PCAOB, the United States or any foreign government, a non-government third party seeking access to or copies of documents or any other information of a Company Entity that may be in the possession of E&Y, any foreign public accounting firm or associated person, whether for the purpose of a review by the PCAOB or any other requesting party, or in connection with an informal or formal investigation of a Company Entity, E&Y, to the fullest extent permitted by the applicable regulatory or professional body or under applicable law, shall:

(i)    promptly provide both Delphi's Vice President, General Counsel and its Chief Accounting Officer, Controller with written notice of such request, subpoena or order, together with a copy thereof by facsimile and Federal Express (or similar overnight courier) as follows:

Delphi Vice President,                         Delphi Chief Accounting Officer,
General Counsel                                 Controller
5725 Delphi Drive                               5725 Delphi Drive

04/27/2007   08:46    248-813-4499              DWHQ D 3RD FLR                    PAGE  08
05-44481-rdd   Doc 8098-1   Filed 05/30/07   Entered 05/30/07 12:58:50
Supplemental Application    Pg 29 of 41

8

M/C 483-400-603                          M/C 483-400-626
Troy, MI 48098                           Troy, MI 48098
Facsimile: 248-813-2491                  Facsimile: 248-813-2590

(ii)   promptly, after receiving such request, subpoena or order, and (subject to clause
       (iv) below) prior to responding to any such request, subpoena or order by means
       of the production of any non-public documents in the possession of E&Y or such
       foreign public accounting firm or associated person, either prepared by a
       Company Entity or which were obtained by E&Y or such foreign public
       accounting firm or associated person from any Company Entity (in each case a
       "Delphi Document"), provide the Company the opportunity to read all Delphi
       Documents within the scope of such request;

(iii)  subject to clause (iv) below, prior to responding to any such request, subpoena or
       order by means of the production of any non-public Delphi Documents, (A)
       provide reasonable cooperation to the Company in connection with any efforts the
       Company may wish to make in presenting to the SEC, the PCAOB, any relevant
       court, or other government agency, attorney or other authority, any reasonable
       objection they may have to the granting of access to or production of any such
       documents and information, and (B) provide reasonable cooperation to the
       Company in connection with the Company's efforts to seek any reasonable
       protective order, delay in production (including reasonable efforts by E&Y to
       pursue any extension of time requested by the Company for compliance with any
       government request based on the applicable circumstances) or other reasonable
       agreement requested by them in relation to such documents and information so as
       to permit the Company to avoid any loss of privilege or confidentiality with
       respect to the content of any such documents, and to comply with any
       confidentiality obligations it may have to third parties prior to granting access to
       or delivery of such documents or information, and (C) not produce or grant third
       party access to such documents until the Company, based on applicable
       circumstances, has had an opportunity to seek assurances regarding the
       confidentiality of such information sought by the SEC, the PCAOB, or other
       relevant court, government agency, attorney or other authority; and

(iv)   nothing in this Agreement shall require E&Y or any foreign public accounting
       firm or associated person to violate any legal or regulatory requirement.

22.  Management shall make appropriate inquiry of the Company's officers, directors and
     substantial stockholders to determine whether any business relationships exist between any
     officer, director or substantial stockholder (or any entity for or of which such an officer or
     director acts in a similar capacity) and E&Y or any other EYG Entities, other than one
     pursuant to which EYG Entities perform professional services. For this purpose, a
     "substantial stockholder" is a person or entity (excluding institutional investors, registered

04/27/2007  08:46    248-813-4499              DWHQ D 3RD FLR                      PAGE  09
05-44481-rdd   Doc 8098-1   Filed 05/30/07   Entered 05/30/07 12:58:50
Supplemental Application    Pg 30 of 41

9

investment advisors or investment companies) that are known by the Company to be the beneficial owners of more than five percent of any class of the Company's voting securities. [i.e. subject to the reporting requirements of Section 13 of the Securities Exchange Act of 1934 and the related rules thereunder].

23.   Kevin Asher will be the Coordinating Partner and Steve Sheckell and Jeff Henning will be the Engagement Partners, responsible for the provision of our accounting and auditing services. Mike Hatzfeld, Jamie Simpson, and Aaron Krabill, Senior Managers, will work closely with management in performing all required accounting and audit services.   If one or more of these individuals ceases to provide services pursuant to this agreement, Ernst & Young will so advise the Company and, if that professional is replaced, provide the Company with the name of that professional's replacement. Other staff, not identified herein, may be utilized as required to conduct our work in most efficient manner. Key personnel would be replaced by like skills and competency where appropriate. Delphi has the right to approve the replacement of any key partner or senior manager, not to be unreasonably withheld.

24.   We will perform the Audit Services described herein for each of the Company's subsequent fiscal years based on the terms and conditions set forth in this agreement until either the Audit Committee or E&Y terminates the agreement. Changes in the scope of our Audit Services and estimated fees for such services in subsequent fiscal years will be communicated in supplemental letters.

**Fees and Billings**

**Fees and Billings for Audit Services**

25.   We estimate that our U.S. fee for Audit Services will be approximately $7.2 million, plus expenses. We will submit our invoices following the below schedule, and payment of them will be made in accordance with the Interim Compensation Order (as defined below).

| | |
|---|---|
| March 2007 | $3,000,000 |
| July 2007 | 3,000,000 |
| December 2008 | 1,200,000 |

26.   All payments made pursuant to paragraphs 25, 26, 27, 28 and 29 must be made in conformity with the orders from the Bankruptcy Court including the order under 11 U.S.C Section 331 establishing procedures for interim compensation and reimbursement of expenses of professionals (the "Interim Compensation Order") (Docket No. 869). E&Y will timely file the appropriate interim and final applications for allowance of compensation and reimbursement of expenses pursuant to the Interim Compensation Order. In addition, the Company shall reimburse us for direct expenses incurred in connection with the performance of the Audit Services, subject to the provisions of paragraph 27 and the

04/27/2007 08:46   248-813-4499              DWHQ D 3RD FLR                    PAGE 10
      05-44481-rdd   Doc 8098-1   Filed 05/30/07   Entered 05/30/07 12:58:50
                     Supplemental Application   Pg 31 of 41

                                                                                  10

Interim Compensation Order. Direct expenses include reasonable and customary out-of-pocket expenses such as travel, meals, accommodations and other expenses specifically related to this engagement. E&Y may receive rebates in connection with certain purchases, which are used to reduce overhead charges that E&Y would otherwise pass on to its clients. Our estimated fees and schedule of performance are based upon, among other things, our preliminary review of the Company's records and the representations Company personnel have made to us, the Company's documentation of internal control over financial reporting, the procedures the Company performs to support management's assessment of the effectiveness of internal control over financial reporting, and the results of our audit procedures.   Our fee estimate does not include any fees associated with Additional Accounting Advisory Services. (See paragraphs 27 through 29 below).   Our fee and schedule of performance also are dependent upon the Company's personnel providing a reasonable level of assistance during our integrated audit. Should our assumptions with respect to these matters be incorrect or should the documentation of internal control, results of our procedures, condition of the records, degree of cooperation, extent of procedures performed by the Company to support management's assessment, extent of remediation testing related to ineffective internal controls or other matters beyond our reasonable control require additional commitments by us beyond those upon which our estimated fees are based, we will bill for this time at the rates and in the manner set forth below with respect to the Additional Accounting Advisory Services.

**Fees and Billings for Additional Accounting Advisory Services**

27.  Fees for the Additional Accounting Advisory Services will be billed as follows:

   a. Projects will be billed at hourly rates as scheduled in the attached document in Exhibit A.

   b. The rate in Exhibit A will be adjusted on January 1st, annually, based on our revised standard rates.

   c. We will submit monthly invoices and detailed billing schedules by individual and topic at hourly rates as scheduled in the attached document.

   d. In addition, the Company shall reimburse us for direct expenses incurred in connection with the performance of the Additional Accounting Advisory Services. Direct expenses include reasonable and customary out-of-pocket expenses such as travel, meals, accommodations and other expenses specifically related to this engagement. E&Y may receive rebates in connection with certain purchases, which are used to reduce overhead charges that E&Y would otherwise pass on to its clients.

28.  We will request payment of our fees for Audit Services and Additional Accounting Advisory Services in accordance with local bankruptcy rules for the Southern District of New York, orders from the Bankruptcy Court including the Interim Compensation Order

(Docket No. 869), and any relevant administrative orders. In addition, we will request reimbursement of our actual expenses related to this engagement, as well as fees for any time (including any time or reasonable expenses of outside legal counsel), subject to prior approval by the Company, which approval shall not unreasonably be withheld, we may incur in considering or responding to discovery requests or participating as a witness in any legal regulatory, or other proceeding before the Southern District of New York and any relevant administrative orders as a result of our performance of these services. Delphi's Billing Procedures for outside counsel (Exhibit B) shall control the expenses for which Delphi will be responsible.

29. In the event we are requested or authorized by the Company or are required by government regulation, subpoena, or other legal process to produce our documents or our personnel as witnesses with respect to our engagements for the Company, the Company will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such requests.

**Other Matters**

30. The Company shall not, during the term of the Agreement and for 12 months following its termination for any reason, solicit for employment, or hire, any E&Y personnel involved in the performance of the Audit Services, except as otherwise agreed in writing by E&Y; provided that the Company shall not breach its obligation hereunder by generally advertising available positions or hiring E&Y personnel who either respond to such advertisements or come to the Company on their own initiative without direct or indirect encouragement from the Company.

31. In addition, the Company shall not, without the prior written consent of E&Y, solicit for employment or for a position on its Board of Directors, or hire, any current or former partner or professional employee of E&Y, any affiliate thereof, or any other member of the global Ernst & Young network or any of their respective affiliates, if such partner or professional employee has been involved in the performance of any audit, review, or attest service for or relating to the Company at any time since the date of filing of the Company's most recent periodic annual report with the SEC (or, if the Company has not previously filed such a report, since the beginning of the most recent fiscal year to be covered by the Company's first such report) or in the 12 months preceding that date.

32. By your signature below, you confirm that the Company, through its Board of Directors, has authorized the Audit Committee to enter into this Agreement with us on the Company's behalf and that you have been expressly authorized by the Audit Committee to execute this Agreement on behalf of, and to bind, the Company.

12

33. Any controversy or claim with respect to, in connection with arising out of, or in any way related to this Agreement or the Services provided hereunder (including any such matter involving any parent, subsidiary, affiliate, successor in interest or agent of the Company or of E & Y) shall be brought in the Bankruptcy Court, or the District Court if such District Court withdraws the reference and the parties to this Agreement, and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole exclusive forum (unless such court does not have jurisdiction and venue of such claims or controversies) for the resolution of such claims, causes of action or lawsuits. The parties to this Agreement, and any and all successors and assigns thereof, hereby waive trial by jury, such waiver being informed and freely made. If the Bankruptcy Court, or the District Court upon withdrawal of the reference does not have or retain jurisdiction over the foregoing claims or controversies, the parties to this Agreement and any and all successors and assigns thereof, agree to submit first to non-binding mediation; and, if mediation is not successful, then to binding arbitration in Detroit, Michigan, in accordance with the dispute resolution procedures set forth in Exhibit C to this Agreement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. The foregoing is binding upon the Company, E & Y and any all successors and assigns thereof. Notwithstanding the agreement to such procedures, either party may seek injunctive relief to enforce its rights with respect to the use or protection of (i) its confidential or proprietary information or material, (ii) its names, trademarks, service marks or logos and (iii) the enforcement of the notice provisions set forth in this Agreement.

34. The benefits of this Agreement shall inure to the respective successors and assigns of the parties hereto and the obligations and liabilities assumed in this Agreement by the parties hereto shall be binding upon their respective successors and assigns.

35. As set forth herein, the Company has requested that Ernst & Young provide audit and accounting services, the scope of which is set forth in the Agreement. The Company recognizes and acknowledges that by performing the services set forth in the Agreement, Ernst & Young is not acting in any Company management capacity and that the Company has not asked Ernst & Young to make, nor has Ernst & Young agreed to make, any business decisions on behalf of the Company. All decisions about the business or operations of the Company remain the sole responsibility of the Company's management and its board of directors.

36. If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this Agreement shall remain in effect. This agreement shall be governed by, and construed in accordance with, the laws of the State of Michigan applicable to agreements made and fully to be performed therein by residents thereof.

37. This Agreement may be terminated at any time by the Company or E&Y, but in any event this Agreement will expire upon the earlier of (i) completion of the Services or (ii) the

05-44481-rdd   Doc 8098-1   Filed 05/30/07   Entered 05/30/07 12:58:50
Supplemental Application    Pg 34 of 41

13

effective date of the Company's confirmed plan of reorganization, or liquidation of the Company's assets under Chapter 11 or 7 of Title 11 of the United States Code, or otherwise. If either party terminates this Agreement, in addition to notice to the other party, the terminating party shall provide not less than three (3) days' prior written notice to the Bankruptcy Court, the U.S. Trustee's office, the Creditor's Committee and the Fee Review Committee (if any). The provisions of this Agreement relating to fees and expenses and alternative dispute resolution will remain operative and in full force and effect regardless of any termination or expiration of this Agreement and shall survive completion of the Company's bankruptcy whether through a confirmed plan of reorganization, liquidation of the Company's assets under Chapter 11 or 7 of Title 11 of the United States Code, or otherwise. If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or in part, the remaining portions of this Agreement shall remain in full force and effect. By agreement to the provision of the Services set forth in the Agreement, E&Y is not providing a guarantee to the Company that E & Y's performance of those services pursuant to the terms and conditions set forth in the Agreement will guarantee the Company's successful reorganization under Chapter 11 of Title 11 of the United States Code.

38. E&Y may subcontract a portion of its responsibilities under this Agreement without Company's prior written approval to any of the EYG Entities; provided, however, that E&Y shall be and shall remain fully and solely responsible for all of the liabilities and obligations of E&Y under this Agreement, whether or not performed, in whole or part, by E&Y, any other EYG Entity or any subcontractor or personnel of any EYG Entity. The Company shall have no recourse, and shall bring no claim, against any EYG Entity other than E&Y, or against any subcontractors, members, shareholder, directors, officers, managers, partners, agents, representatives or employees of any EYG Entity (or any of their respective successors or permitted assigns,) or any of their respective assets, with respect to the Services or otherwise under this Agreement.

14

If these arrangements are acceptable, please sign one copy of this agreement and return it to us.

We very much appreciate the opportunity to serve as Delphi Corporation's independent registered public accounting firm and would be pleased to furnish any additional information you may request concerning our responsibilities and functions.

Yours very truly,

*Ernst + Young LLP*

AGREED TO AND ACCEPTED BY:
DELPHI CORPORATION

By:
_____
Mr. Robert H. Brust
Chairman, The Audit Committee of Delphi
Corporation

Date:_____

By:_____
Mr. Robert J. Dellinger
Executive Vice President, Chief Financial
Officer

Date:_____ 4·24·07_____

# Exhibit A

**Review of Fee Arrangements-AABS**
**Delphi Corporation**

| Level | Rate 2007 |
|---|---|
| Client Service Associate | $ 75 - 140 |
| Staff | $ 135 - 220 |
| Senior | $ 250 - 415 |
| Manager | $ 330 - 515 |
| Senior Manager | $ 425 - 675 |
| Partner | $ 550 - 800 |

EXHIBIT B

## <u>INSTRUCTIONS FOR COMPLETING INVOICES</u>

The attached invoice form should be submitted with all original invoices for services rendered in connection with all legal matters involving Delphi Automotive Systems and its U.S. subsidiaries submitted by law firms or consultants and experts providing legal-related services.

Please submit invoices monthly if the "Total Fees & Disbursements" exceed $500.00 per case or matter. Otherwise, submit invoices quarterly or annually.  In the case of a flat fee or other special billing arrangement, submit invoices in accordance with that arrangement.

---

**CERTAIN BASIC INFORMATION IS REQUIRED TO PROCESS AN INVOICE. THE INVOICE CANNOT BE PROCESSED WITHOUT THIS INFORMATION:**

**<u>Case Matter Name</u>:**  If you do not know the case/matter name, please contact the responsible Delphi Attorney or Legal Assistant.

**<u>Case Matter No.</u>:**  If you do not know the case/matter number, please contact the responsible Delphi Attorney or Legal Assistant.  Note that only one case/matter may be billed on an invoice.

**<u>Firm Employer Identification Number</u>:**  Please include your firm's EIN on the invoice.

**<u>Invoice No.</u>:**  Each invoice must be specifically identifiable by means of a unique Invoice Number.  In other words, no two invoices should have the same Invoice Number.  The Invoice Number should consist of no more than ten characters (numeric and/or alpha).  Please do not reuse invoice numbers submitted to Delphi previously.

**<u>Insurance No.</u>:**  Please include any insurance number on the invoice (Sedgwick for those matters covered by Delphi's insurance carrier or ESIS for those matters covered by GM's insurance carrier).

---

**<u>Approval</u>:**  All invoices must be signed on behalf of the firm.

## <u>ANALYSIS OF FEES FOR PERSONS PERFORMING SERVICES DURING THIS BILLING PERIOD</u>

**<u>Last Name, First Initial</u>:**  List only persons who performed services during the billing period covered by the invoice. Partial hours should be stated as a decimal fraction, i.e., 20 minutes = .33.

**<u>This Bill</u>:**  Under the category "This Bill," please do <u>not</u> include any past due amount.  Past due amounts should only be included in the "Cumulative Totals."

**<u>Cumulative Totals</u>:**  Amounts for "This Bill" should be included in "Cumulative Totals."  (The amounts shown under "This Bill" and "Cumulative Totals" should be the same on each line on the first billing for each case/matter using the new invoice format.)

## **GENERALLY**

Delphi **will** reimburse a firm for reasonable and actual out-of-pocket payments made to third-party vendors (i.e., Delphi **will not** pay for markups or surcharges added by the firm) for the following items:

- Air freight/express mail deliveries
- Bond fees and premiums
- Coach-class air fare (lowest available rate/class)
- Computerized Delphi database research
- Computerized legal research (e.g., Lexis, Westlaw)
- Court reporter fees
- Expert witness fees
- Filing fees
- Inside photocopy (up to 10 cents per page)
- Local business transportation (e.g., taxi fares)
- Long distance telephone charges (for voice, fax or data)
- Outside messenger services
- Outside photocopy, binding, and printing services
- Postage
- Travel (airfare, hotel, rental car)

Delphi **will not** pay for:

- Books/subscriptions
- Charges related to overall case management
- Creating, updating or organizing litigation or case files
- Distribution of documents, pleadings, correspondence and materials internally or to client
- Entertainment items (movies, books, alcohol, etc.)
- Fax communications (except long distance telephone charges)
- Hourly fees while traveling
- Inside photocopy (more than 10 cents per page)
- Internal case docketing activities
- Internal firm information technology charges
- LEXIS/NEXIS/Westlaw charges beyond the expenses actually incurred by the firm
- Local meals
- Local personal transportation (taxi/limousine to/from home)
- Local telephone charges
- Membership fees
- Office supplies
- Overtime charges
- Room service or excessive meal expenses
- Secretarial/clerical charges
- Storage charges
- Time spent copying documents or materials
- Transportation expenses or time spent traveling between firm offices
- Word processing

**<u>Exhibit C</u>**

## Dispute Resolution Procedures

The following procedures shall be used to resolve any controversy or claim ("dispute") as provided in this Agreement, other than objections to fee applications relating to the subject retention. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

### *Mediation*

A party shall submit a dispute to mediation by written notice to the other party or parties. The mediator shall be selected by the parties. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR") shall designate a mediator at the request of a party. Any mediator must be acceptable to all parties.

The mediator shall conduct the mediation as he/she determines, with the agreement of the parties. The parties shall discuss their differences in good faith and attempt, with the mediator's assistance, to reach an amicable resolution of the dispute. The mediation shall be treated as a settlement discussion and shall therefore be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. The mediation proceedings shall not be recorded or transcribed.

Each party shall bear its own costs in the mediation. The parties shall share equally the fees and expenses of the mediator.

If the parties have not resolved a dispute within 90 days after written notice beginning mediation (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute shall be settled by arbitration. In addition, if a party initiates litigation, arbitration, or other binding dispute resolution process without initiating mediation, or before the mediation process has terminated, an opposing party may deem the mediation requirement to have been waived and may proceed with arbitration.

### *Arbitration*

The arbitration will be conducted in accordance with the procedures in this document and the CPR Rules for Non-Administered Arbitration ("Rules") as in effect on the date of the Agreement, or such other rules and procedures as the parties may agree. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, to be selected in accordance with the screened selection process provided in the Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may be appointed unless he or she has agreed in writing to these procedures.

The arbitration panel shall have no power to award non-monetary or equitable relief of any sort or to make an award or impose a remedy that (i) is inconsistent with the agreement to which these procedures are attached or any other agreement relevant to the dispute, or (ii) could not be made or imposed by a court deciding the matter in the same jurisdiction.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only in accordance with the Rules or applicable professional standards. Before making any such disclosure, a party shall give written notice to all other parties and shall afford them a reasonable opportunity to protect their interests, except to the extent such disclosure is necessary to comply with applicable law, regulatory requirements or professional standards.

The result of the arbitration shall be binding on the parties, and judgment on the arbitration award may be entered in any court having jurisdiction.