**Bidding Procedures Hearing Date And Time:  June 26, 2007 at 10:00 a.m.**
**Bidding Procedures Objection Deadline:  June 19, 2007 at 4:00 p.m.**
**Sale Hearing Date And Time:  August 16, 2007 at 10:00 a.m.**
**Sale Hearing Objection Deadline:  August 9, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    x
                                                              :
      In re                       :    Chapter 11
                                                              :
DELPHI CORPORATION, et al.,                                   :    Case No. 05-44481 (RDD)
                                                              :
                                                              :    (Jointly Administered)
      Debtors.                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    x

MOTION FOR ORDERS UNDER 11 U.S.C. §§ 363, 365, AND 1146 AND FED. R. BANKR. P. 2002,
6004, 6006, AND 9014 (A) (I) APPROVING BIDDING PROCEDURES, (II) GRANTING CERTAIN BID
PROTECTIONS, (III) APPROVING FORM AND MANNER OF SALE NOTICES, AND (IV) SETTING SALE
HEARING DATE AND (B) AUTHORIZING AND APPROVING (I) SALE OF CERTAIN
OF DEBTORS' ASSETS COMPRISING SUBSTANTIALLY ALL THE ASSETS PRIMARILY USED IN
DEBTORS' CATALYST BUSINESS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES,
(II) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, AND (III) ASSUMPTION OF CERTAIN LIABILITIES

("CATALYST BUSINESS SALE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this motion (the "Motion") for orders under 11 U.S.C. §§ 363, 365, and 1146

and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 (a) (i) approving the bidding procedures set

forth herein and attached hereto as Exhibit A (the "Bidding Procedures"), (ii) granting certain

bid protections, (iii) approving the form and manner of sale notices (the "Notice Procedures"),

and (iv) setting a sale hearing (the "Sale Hearing") and (b) authorizing and approving (i) the

sale (the "Sale") of certain of the Selling Debtor Entities' (defined below) assets (the

"Purchased Assets") comprising substantially all the assets primarily used in the Selling Debtor

Entities' catalyst business to the Purchasers or the Successful Bidder (both as hereinafter

defined) submitting a higher or otherwise better bid, as the case may be, (ii) the assumption

and assignment of certain prepetition executory contracts and unexpired leases (the "Assumed

Contracts") and the assignment of certain postpetition executory contracts and unexpired leases

(the "Post-Petition Contracts," and collectively with the Assumed Contracts, the "Assigned

Contracts") to the Purchasers or the Successful Bidder, as the case may be, and (iii) the

assumption of certain liabilities (the "Assumed Liabilities") by the Purchasers or the Successful

Bidder, as the case may be.  In support of this Motion, the Selling Debtor Entities[1] respectfully

represent as follows:

---

[1]   For the purpose of convenience, references to the "Sellers" herein (including in all exhibits) would mean, as the context requires, (i) the Selling Debtor Entities to the extent such reference implicates assets of the Selling Debtor Entities or (ii) non-Debtor affiliates to the extent such reference implicates assets of the non-Debtor affiliates.  Moreover, for convenience, use of the term "Selling Debtor Entities" would mean, as the context requires, the specific Debtor entity undertaking the transaction(s) referenced to the extent such transaction affects the assets of such entity.

2

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.         On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  The Court has ordered joint administration of these cases.

2.         No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee").

3.         This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.         The statutory predicates for the relief requested herein are sections 363, 365, and 1146 of the Bankruptcy Code and rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.    <u>Current Business Operations Of The Debtors</u>

5.         Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of

3

approximately $15.4 billion.[2]  At the time of its chapter 11 filing, Delphi ranked as the fifth

largest public company business reorganization in terms of revenues and the thirteenth largest

public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are

not chapter 11 debtors and continue their business operations without supervision from the

Bankruptcy Court.[3]

6.        The Company is a leading global technology innovator with

significant engineering resources and technical competencies in a variety of disciplines, and is

one of the largest global suppliers of vehicle electronics, transportation components, integrated

systems and modules, and other electronic technology.  The Company supplies products to

nearly every major global automotive original equipment manufacturer.

7.        Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted

the Company's business through various divisions and subsidiaries.  Effective January 1, 1999,

the assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

---

[2]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27,
2007.

[3]    On March 20 2007, Delphi Automotive Systems Espana S.L., whose sole operation is a non-core automotive
component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding.  The
application was approved by the Spanish court on April 13, 2007.  The Concurso proceeding does not affect
other Delphi legal entities in Spain or elsewhere and is an isolated event that is consistent with Delphi's
transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

8.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[4] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006, the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

9.      The Debtors believe that the Company's financial performance has deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

10.      In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because

---

[4]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

discussions with its major unions and GM had not progressed sufficiently by the end of the

third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses

to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined five key tenets of its

transformation plan.  First, Delphi must modify its labor agreements to create a competitive

arena in which to conduct business.  Second, the Debtors must conclude their negotiations with

GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain

GM's business commitment to the Company.  Third, the Debtors must streamline their product

portfolio to capitalize on their world-class technology and market strengths and make the

necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform

their salaried workforce to ensure that the Company's organizational and cost structure is

competitive and aligned with its product portfolio and manufacturing footprint.[5]  Finally, the

Debtors must devise a workable solution to their current pension situation.

12.    On December 18, 2006, the Debtors marked another milestone in their

chapter 11 cases with the announcement of two significant agreements.  The first of these was

an equity purchase and commitment agreement (the "Equity Purchase and Commitment

Agreement") with affiliates of Appaloosa Management L.P., Cerberus Capital Management,

L.P., and Harbinger Capital Partners Master Fund I, Ltd., as well as Merrill Lynch & Co. and

UBS Securities LLC (collectively, the "Plan Investors").  Under the Equity Purchase and

---

[5]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.

6

Commitment Agreement, the Plan Investors have agreed to invest up to $3.4 billion in preferred and common equity in the reorganized Delphi to support the Debtors' transformation plan. The Equity Purchase and Commitment Agreement is subject to the completion of due diligence, satisfaction or waiver of numerous other conditions (including Delphi's goal of achieving consensual agreements with its principal U.S. labor unions and GM), and the non-exercise by either Delphi or the Plan Investors of certain termination rights. The second agreement was a plan framework support agreement (the "Plan Framework Support Agreement") with the Plan Investors and GM. The Plan Framework Support Agreement outlines certain proposed terms of the Debtors' anticipated plan of reorganization, including the distributions to be made to creditors and shareholders, the treatment of GM's claims, the resolution of certain pension funding issues, and the corporate governance of the reorganized Debtors. The terms of the Plan Framework Support Agreement are expressly conditioned on the Debtors' reaching consensual agreements with their U.S. labor unions and GM.

13.    On January 12, 2007, this Court authorized the Debtors to execute, deliver, and implement the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement (Docket No. 6589). On February 28, 2007, Delphi entered into an amendment to the Equity Purchase and Commitment Agreement with the Plan Investors to extend the date by which the Company, the Cerberus Capital Management, L.P. affiliate, or the Appaloosa Management L.P. affiliate have the right to terminate the agreement on account of not yet having completed tentative labor agreements with Delphi's principal U.S. labor unions and a consensual settlement of legacy issues with GM. The amendment extended the termination right pursuant to a 14-day notice mechanism. The amendment also extended the deadline to make certain regulatory filings under the federal antitrust laws in connection

with the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement.

14.    On April 19, 2007, Delphi announced that the Debtors anticipated negotiating changes to the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement.  The Debtors also confirmed that none of the parties entitled to give notice of termination of the framework agreements has done so as of the date of this filing and that these agreements remain effective as previously filed until modified or terminated.  The Debtors anticipate filing a plan of reorganization and disclosure statement as soon as reasonably practicable following conclusion of a consensual agreement with the Debtors' major stakeholders.

15.    Although much remains to be accomplished in the Debtors' reorganization cases, the Debtors and their stakeholders are together navigating a course that should lead to a consensual resolution with their U.S. labor unions and GM while providing an acceptable financial recovery framework for the Debtors' stakeholders.  Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

16.        By this Motion, Delphi and the selling Debtor entities described in the agreement (the "Selling Debtor Entities")[6] seek approval for the sale of the Catalyst Business (as defined below) to Umicore and certain of its affiliates (the "Purchasers").[7]  To effect the sale, the Selling Debtor Entities seek two types of relief.  First, at the omnibus hearing to be held on June 26, 2007, the Selling Debtor Entities will seek an order substantially in the form attached hereto as Exhibit B (the "Bidding Procedures Order") approving the Bidding Procedures, Notice Procedures, and certain bid protections to be provided to the Purchasers pursuant to the Agreement and as described more fully herein.  Second, subject to the terms of the Bidding Procedures Order, at the omnibus hearing to be held on August 16, 2007, the Selling Debtor Entities will request an order substantially in the form attached hereto as Exhibit C (the "Sale Approval Order") authorizing and approving the Sale to the Purchasers or the Successful Bidder, as the case may be, including, without limitation, the assumption and assignment of the Assumed Contracts to the Purchasers, and the assumption by the Purchasers of the Assumed Liabilities.

## Basis For Relief

17.        The Company has stated that to achieve the necessary cost savings and operational effectiveness envisioned in its transformation plan, it must streamline its product portfolio to capitalize on its world-class technology and market strengths and make the

---

[6]    Under the Agreement, the Selling Debtor Entities are comprised of Delphi, Delphi Automotive Systems (Holding) Inc. ("DASHI"), ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Environmental Catalysts, LLC and Exhaust Systems Corporation.

[7]    This Motion will refer to Umicore, and together with any affiliates it identifies in Schedule 1 of the Agreement, as the "Purchasers" or each individually as a "Purchaser."

necessary manufacturing realignment consistent with its new focus.  As part of the Company's

transformation plan, which was announced on March 31, 2006, the Company identified the

Catalyst Business (as defined below) as a non-core business subject to disposition.

18.    Accordingly, following extensive marketing efforts, on June 5, 2007

Delphi and certain of its affiliates, including the Selling Debtor entities and certain non-Debtor

entities, and Belgium-based Umicore and certain of its affiliates entered into a Master Sale and

Purchase Agreement, a copy of which is attached hereto as <u>Exhibit D</u> (the "Agreement").  The

Agreement contemplates a global divestiture of the Company's original equipment

manufacturer and aftermarket catalyst business (the "Catalyst Business")[8] to the Purchasers for

the Preliminary Purchase Price[9] of approximately $55.6 million, subject to certain adjustments.

The divestiture, as memorialized in the Agreement, contemplates that the majority of the assets

will be sold by non-Debtor affiliates.  The transactions to be undertaken by the non-Debtor

affiliates, although memorialized in the Agreement and the attachments thereto, are generally

not the subject of this Motion because those entities are not under the supervision of the Court.

The discussion in this Motion is generally (but not exclusively) limited to transactions to be

undertaken by the Selling Debtor Entities, which require Court approval.

A.    <u>The Catalyst Business</u>

19.    The Company is a leading global supplier of catalytic solutions for a

broad range of automotive engine and other engine emission applications.  The Catalyst

---

[8]    The catalyst, which includes a ceramic substrate coated with precious metals, is located inside a catalytic
converter.  The catalytic converter facilitates the chemical reactions that change engine exhaust emissions
(primarily hydrocarbons, carbon monoxide, and oxides of nitrogen), collected in the exhaust manifold, into
water vapor, carbon dioxide, and nitrogen.  Catalytic converters make vehicles more environmentally friendly
and help meet tailpipe emissions requirements.

[9]    The preliminary purchase price is subject to the escrow provisions and to adjustments set forth in section 4 of
the Agreement (the "Preliminary Purchase Price").  The final aggregate, adjusted purchase price, as so
determined, is referred to herein as the "Purchase Price".

Business' global presence and process technologies allow it to offer world-class products and solutions that enable automotive original equipment manufacturers ("OEMs") and other customers to meet regulatory exhaust emission requirements efficiently and effectively.  The Catalyst Business employs approximately 745 people worldwide and produces catalysts at operating manufacturing facilities in the following locations: Tulsa, Oklahoma; San Luis Potosi, Mexico; Florange, France; Port Elizabeth, South Africa; Clayton-Melbourne, Australia; and Shanghai, China.[10]  Competitors in this product line, other than the Purchasers, include Johnson Matthey, BASF (Engelhard), Cataler, CSI, and Sud Chemie.

20.      In 1998, Delphi (then a subsidiary of GM) acquired AlliedSignal's ownership interest in ASEC Catalyst, a previously established joint venture between Delphi and AlliedSignal.  The catalysts produced by the Catalyst Business are a key element of a catalytic converter within the exhaust system of an automobile and are typically sold to catalytic converter manufacturers, also known as "canners," at the direction of OEMs.  The products manufactured by the Catalyst Business serve four market segments: (i) gasoline engines, (ii) diesel engines, (iii) aftermarket, and (iv) "non-road" engines.  The customers of the Catalyst Business include BMW, DaimlerChrysler, Fiat, GM, PSA Peugeot Citroën, VW, and a number of aftermarket customers.

B.      Factors Leading To The Sale

21.      Although the Company believes that the Catalyst Business' product line is fundamentally strong, the Catalyst Business does not fit within the Company's anticipated product portfolio under its transformation plan.  In particular, the Company has determined, after an intensive product portfolio review, that the product line is outside the

---

[10]    The Shanghai facility is operated as a joint venture under which Delphi's non-Debtor affiliate, Shanghai Delphi Emissions Control Systems Company, Ltd., owns an 81% controlling interest.

primary focus of the Company's growth and long-term strategic goals.  In addition, the Catalyst

Business has limited synergies with the Company's other business lines, due in part to the

specialty chemical processes required by the Catalyst Business.

       22.      The Company believes, however, that as a standalone business, the

Catalyst Business could become more profitable and competitive.  The Company has therefore

determined that the value of the Catalyst Business would be maximized through its divestiture.

To achieve that goal, while balancing the needs of its customers, the Company is seeking to

transition the Catalyst Business to a prospective buyer.  The Company, including its Selling

Debtor Entities, will carefully manage the transition of the Catalyst Business and the Sale will

be completed in coordination with the Company's customers, employees, unions, and other

stakeholders.

       23.      The Company has actively marketed the Catalyst Business for

approximately two years.  As part of this process, the Company identified potential purchasers

and provided those parties with access to information about the Catalyst Business.  To facilitate

an efficient diligence process, the management of Delphi and the other Sellers[11] (as referred to

in the Agreement) established a virtual data room to permit interested bidders to conduct

diligence, and the Company has updated the data available as the marketing process continued.

       24.      The Sellers evaluated the terms and benefits of the proposals, as well

as the benefits of other alternatives to divesting the Catalyst Business.  In their business

judgment the Sellers concluded that the proposal from the Purchasers, which formed the basis

of the Agreement, offered the most advantageous terms and the greatest economic benefit.

This decision was based in part on the Sellers' ability to maximize the value of the business

---

[11]   An organizational chart showing the organizational structure of the Catalyst Business is attached hereto as
Exhibit F.

line as a going concern and their belief that the Purchasers would continue to provide quality

products to the Company's customers, many of whom buy other products from Delphi.  Indeed,

the Purchasers are a global metals and materials company, are one of the largest global

suppliers of catalyst parts, and are financially healthy as reflected by their EBITDA of €503.4

million in fiscal year 2006.  Moreover, the Purchasers have a strong relationship with almost

all of the global and regional OEMs, which should ease the transition of the Catalyst Business.

C.    The Agreement

        25.     Pursuant to the Agreement, (a) the Selling Debtor Entities will (i) sell

the Purchased Assets owned by the Selling Debtor Entities free and clear of any Interests

and/or Claims,[12] except for Permitted Liens as defined in the Agreement, in consideration for

their allocated share of the Preliminary Purchase Price of $55.6 million, subject to adjustments,

and other consideration, and (ii) assume (if applicable) and assign the Assigned Contracts to

the Purchasers and (b) the Purchasers will assume the Assumed Liabilities.

        26.     The significant terms of the Agreement are as follows:[13]

     (a)    General Terms.  The Purchasers would acquire the Purchased Assets,
which comprise substantially all of the assets primarily used by the Catalyst Business through
an asset sale, which include machinery, working capital, related technology and intellectual
property, and manufacturing facilities in Tulsa, Oklahoma, Florange, France, and Port

---

[12]   "Interests and/or Claims" means any and all liens, claims, interests, and encumbrances of any type whatsoever
(whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or
unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-
contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed,
whether arising prior to or subsequent to the Petition Date, and whether imposed by agreement, understanding,
law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability), including,
but not limited to those (i) that purport to give to any party a right or option to effect any forfeiture,
modification, right of first refusal, or termination of the Selling Debtor Entities' or the Purchaser's interest in the
Purchased Assets, or any similar rights, and (ii) relating to taxes arising under or out of, in connection with, or
in any way relating to the operation of the Catalyst Business prior to the Closing Date, including the transfer of
the Purchased Assets to the Purchasers.

[13]   In the event of any discrepancy between the Agreement and this summary, the provisions of the Agreement are
controlling.  Although the terms and conditions are generally the same for all the Sellers, the summaries in this
Motion refer generally to the Selling Debtor Entities and not the non-Debtor Sellers.

Elizabeth, South Africa.  The Purchasers will also acquire from DASHI all of the shares or other equity of Delphi Catalysts South Africa (Proprietary) Ltd., a South African affiliate of Delphi engaged in the Catalyst Business (the "South Africa Sale Company").

(b)    <u>Bankruptcy Approval</u>.  The Sale is subject to approval by this Court and competitive bidding pursuant to the Bidding Procedures.

(c)    <u>Documentation</u>.  The Sale would be effected pursuant to the Agreement and related documentation.[14]  At the closing,[15] certain of the Sellers and certain of the Purchasers would enter into, among others, the following ancillary agreements (collectively, the "Ancillary Agreements"):[16] (i) an intellectual property license granting the Purchasers certain rights in intellectual property owned by the Sellers with respect to atmospheric catalysts, (ii) an intellectual property license granting certain of the Sellers certain rights in intellectual property to be conveyed to the Purchasers with respect to fuel reformers, (iii) a closing escrow agreement for purchase price adjustments and indemnification claims, (iv) a transition services agreement (Tulsa, Florange, and Port Elizabeth), (v) toll manufacturing agreements (China, Australia, and Mexico), (vi) canning supply agreements (China and Australia), (vii) testing services agreements (Luxembourg and Flint), and (viii) local transfer agreements to be entered into by non-Debtor, non-U.S. affiliates.  The Ancillary Agreements would be delivered to Sellers on terms reasonably satisfactory to Sellers on or before the closing and would be performed in all material respects.

(d)    <u>Purchase Price</u>.  The purchase price to be paid by the Purchasers is $55.6 million, subject to adjustments.

(e)    <u>Deposit Escrow</u>.  Upon execution of the Agreement and the entry of the Bidding Procedures Order, the Purchasers would deposit $1,000,000 into an escrow account as an earnest money deposit (the "Deposit Amount").  Upon closing, the Sellers would be entitled to apply the Deposit Amount to the Purchase Price.  Upon any significant breach by the Purchasers, that the Purchasers shall fail to remedy in accordance with the terms of the Agreement, the Sellers would be entitled to retain the Deposit Amount.  In the event that the Agreement is terminated for a reason other than a significant breach by the Purchasers, the Deposit Amount would be returned to the Purchasers upon the mutual direction of the Sellers and the Purchasers.

(f)    <u>Representations And Warranties</u>.  Pursuant to the Agreement, the Selling Debtor Entities would provide representations and warranties relating to the Sale and the Purchased Assets and the Purchasers would provide representations and warranties generally

---

[14]    Copies of the schedules to the Agreement and the Ancillary Agreements (as defined above) are available upon request to parties-in-interest who execute a confidentiality agreement acceptable to the Debtors and who show that they would be affected by the relief requested in this Motion.

[15]    The Selling Debtor Entities anticipate the sale closing during the third quarter of 2007.

[16]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Agreement.

standard in a transaction of this type.  The representations and warranties of the parties would survive the closing of the Sale and generally expire eighteen months after the date of closing.

(g)    <u>Covenants</u>.  Between the date of signing the Agreement and the closing, the Selling Debtor Entities would be required to, among other things: (i) perform in all material respects all of their obligations under certain capital leases, (ii) keep in full force and effect insurance comparable in amount and scope to coverage maintained, (iii) use commercially reasonable efforts to maintain and preserve relations with customers, suppliers, employees, and others having business relations with the Catalyst Business, (iv) endeavor to maintain the goodwill of the Catalyst Business, and (v) promptly advise the Purchasers of any material and adverse change in the business condition (financial or other) of the Catalyst Business or the Acquired Assets, any event or occurrence that would reasonably be expected to delay the closing or that would likely result in a breach of any representation, warranty, or covenant in the Agreement.  For a period of five years after the closing, the Selling Debtor Entities would be required not to take certain actions which would compete with the Catalyst Business.

(h)    <u>Closing Escrow Account</u>.  Upon closing, the Purchasers would place $7,000,000 of the Purchase Price into an escrow account (the "Closing Escrow Account") to be held for eighteen months in case of reductions to the initial purchase price ($5,000,000) and indemnity claims ($2,000,000) under the Agreement.  The Purchase Price would be adjusted based on changes related to the following items, among others: (i) net working capital, (ii) amounts on hand of owned platinum group metals ("PGMs"), (iv) consigned PGMs, (v) PGM leases or borrowings, if any, (vi) non-U.S. pension and benefit liabilities, and (vii) liabilities related to accrued paid-time-off obligations for employees of the Catalyst Business .

(i)    <u>Indemnity</u>.  Under the Agreement, the non-Debtor Sellers are obligated to indemnify the Purchasers on account of any claims asserted against the Purchasers as a result of, or arising out of, (i) any misrepresentation, breach, default, or failure to perform or satisfy any representation or warranty by such non-Debtor Seller, (ii) those retained liabilities or excluded Assets that are retained by such non-Debtor Seller, and (iii) a breach or default of any agreement or covenant of such non-Debtor Seller that is intended to be performed after the closing date.  Under the Agreement, Delphi and DASHI would indemnify the Purchasers solely with respect to indemnification obligations that are triggered on account of the South Africa Sale Company.  Further, to the extent that any such indemnity is triggered on account of the liability of a non-Debtor Seller, such indemnity obligations would be paid from the proceeds of the Sale allocated to such non-Debtor Seller.

(j)    <u>Closing Conditions</u>. In addition to certain other customary closing conditions relating to bankruptcy court approvals and regulatory matters (including certain competition filings), the obligation of the Purchasers to close the Sale would be subject to the satisfaction of the following conditions: (i) the performance in all respects by the Selling Debtor Entities of their covenants under the Agreement, including payment by the Sellers of all Cure Amounts under Assumed Contracts of the Selling Debtor Entities, (ii) the accuracy of the Selling Debtor Entities' representations and warranties in all material respects, and (iii) retirement of the South Africa Sale Company's debt. (The purchase price allocation to the South Africa Sale Company is $4.9 million, but approximately $14 million would be required to retire intercompany and third-party debt at this entity, subject to working capital adjustments,

15

as required under the Agreement. Because the South Africa Sale Company is a wholly-owned subsidiary of DASHI, the approximate $8.9 million deficiency would be funded by DASHI). The Agreement also requires that the Shelf Tulsa Collective Bargaining Agreement (defined below) become effective as of the closing date and not have been amended, modified, terminated, or waived in any respect without Purchasers' consent.

(k)      Termination. The Agreement could be terminated in the following circumstances by a party which is not in breach of the Agreement: (i) upon mutual written consent of Delphi on behalf of the Sellers and Umicore on behalf of the Purchasers, (ii) by either the Sellers or the Purchasers if consummation of the Sale would violate any final non-appealable order of any regulatory governmental entity, (iii) by either party, if the Sellers consummate an Alternative Transaction (defined below), (iv) by either party, if the Court has not entered a Sale Approval Order that is a final order on or before 120 days after the date of the Agreement, (v) by either party if closing does not occur within 120 days after entry of the Sale Approval Order for any reason other than failure to obtain regulatory approvals, (vi) by either party for any reason if the closing would not have occurred within 240 days after entry of the Sale Approval Order, (vii) by the Purchasers upon a material breach of the Agreement by Sellers or the occurrence of an event that results in a material adverse effect to the Catalyst Business, (viii) by the Purchasers if the transactions contemplated by the Agreement are prohibited by any applicable antitrust authority, or (ix) by the Sellers upon a material breach of the Agreement by Purchasers or if the Sellers accept a qualified bid at the auction other than that of the Purchasers and complete such Alternative Transaction within 30 days of such termination.

(l)      Break-up Fee. Subject to Court approval and certain exceptions, the Sellers would be required to pay a Break-Up Fee to the Purchasers in the amount of $2,000,000 (the "Break-Up Fee"), which is 3.6% of the Preliminary Purchase Price, if the Sellers sell, transfer, lease, or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, or other similar transaction, all or substantially all or a material portion of the Purchased Assets in a transaction or a series of related transactions with one or more parties other than the Purchasers (an "Alternative Transaction"). The Break-Up Fee, however, would not be paid if the Agreement was terminable because (i) the Sale would violate any final non-appealable order of any regulatory governmental entity, (ii) the transactions contemplated by the Agreement are prohibited or restricted by any competent antitrust authority, or (iii) the Purchasers breached the Agreement, and then failed to cure the breach, or the Purchasers breached in any significant respect any representation or warranty under the Agreement, and such breach could not be cured.

(m)      Expense Reimbursement. Subject to Court approval and certain exceptions, the Sellers would be required to reimburse the Purchasers' reasonable, actual out-of-pocket fees and expenses incurred in connection with the transactions contemplated by the Agreement in an amount not to exceed $1,750,000, which is 3.2% of the Preliminary Purchase Price  (the "Expense Reimbursement"), generally upon termination of the Agreement unrelated to an Alternative Transaction, other than in a circumstance (i) in which the Purchasers are in breach of the Agreement for which the Sellers had previously notified the Purchasers or (ii) in the case of regulatory approvals, in which the event giving rise to termination does not relate

16

solely to the status, actions, or conduct of the Sellers.  <u>The Purchasers have agreed that, in the
event that they are entitled to receive both the Break-Up Fee and the Expense Reimbursement
under the Agreement, the Purchasers would only be entitled to receive one of the two and in no
case would be entitled to receive payment of both.</u>

      (n)    <u>Transfer Taxes</u>.  The Selling Debtor Entities and the Purchasers would use
commercially reasonable efforts and cooperate in good faith to exempt the Sale from any sales
taxes, documentary and stamp taxes, transfer, documentary, sales, use, registration, recording,
stamp, use, gross receipts, excise, value-added, and other such taxes and related fees ("Transfer
Taxes") as may be payable in connection with the Sale.  In the event an exemption(s) is
unavailable, the Purchasers would be liable for and pay all Transfer Taxes triggered by the
consummation of the transactions contemplated by the Agreement.

      27.    Ownership interests of intellectual property related to the Catalyst
Business are held by to Delphi Automotive Systems, LLC ("DAS LLC"), Delphi
Technologies, Inc. ("DTI"), and ASEC Manufacturing General Partnership ("ASEC
Manufacturing").  To effect the transfer of the necessary intellectual property to the
Purchasers as required by the Agreement, Delphi would cause DAS LLC and DTI to transfer
their ownership interest in the intellectual property to ASEC Manufacturing (or another
Selling Debtor Entity) or directly to its designee by quit-claim assignment.  In return, ASEC
Manufacturing has agreed to pay DAS LLC and DTI fair value for any such transferred
intellectual property, either through an intercompany note or otherwise.

D.    <u>Allocation Of Purchase Price</u>

      28.    As noted above, most of the Purchased Assets are being sold by
certain non-Debtor affiliates.  The allocation of the Purchase Price among the Selling Debtor
Entities (on an entity by entity basis) and non-Debtor affiliates is set forth in the chart
attached hereto as <u>Exhibit E</u>.

E.    <u>Workforce Provisions</u>

      29.    Pursuant to Agreement, the Purchasers would hire the majority of all
current employees of the global Catalyst Business.  Regarding the employees of the Selling

17

Debtor Entities' operations at Tulsa, Oklahoma specifically, at closing, the Purchasers would extend offers of employment to all approximately 89 hourly employees and the majority of approximately 220 salaried employees employed in the Selling Debtor Entities' Tulsa facility. The hourly workforce at the Tulsa facility dedicated to the Catalyst Business is, with a few exceptions, represented by the International Union of Automobile, Aerospace and Agricultural Implement Workers of America, Local Union No. 286 (the "Local UAW").  The Purchasers have negotiated ratified modifications to the existing collective bargaining agreement at Tulsa, subject to and effective upon closing with Purchasers.

30.    With respect to salaried employees employed at the Tulsa facility who are not employed by the Purchasers upon closing the transaction, the applicable Selling Debtor Entity would pay such severed employees a separation payment that is consistent with existing applicable separation pay programs described in the Human Capital Obligation Motion and authorized by the order entered on October 13, 2005.  Employees of the Selling Debtor Entities who refuse a job offer with the Purchasers would be considered a "quit," depending on applicable policies and laws.

31.    Even prior to the Petition Dates, the Sellers announced the potential sale of the Catalyst Business.  Due to the uncertainty caused by the announcement, management had significant concerns about potential attrition of key employees at the Tulsa facility, which would have adversely impacted the Catalyst Business.  Accordingly, prior to the Petition Dates, the Selling Debtor Entities offered a retention award to each of the most senior Tulsa salaried employees (scientists and managers), none of whom is an executive. Specifically, upon the sale of the Catalyst Business, the Selling Debtor Entities promised to

pay twelve salaried employees a retention award, which in the aggregate totals $244,924.[17]

The Selling Debtor Entities needed to retain these key employees to assist in the continued

operation of the Tulsa facility and thus enhance the saleability of the Catalyst Business.  The

Selling Debtor Entities believe that the benefit of this retention award more than outweighs its

cost and that the program is still needed to maintain continued employment of the employees

through closing.  Should any of the twelve employees resign prior to the closing, such

employee would not be entitled to a retention award.  The Selling Debtor Entities believe the

retention award is in the best interest of the applicable Selling Debtor Entities and their

stakeholders.  Although the Selling Debtor Entities submit that they have first-day authority[18]

to honor this program, out of an abundance of caution, the Selling Debtor Entities seek

authority to honor this retention award program to the extent Court approval is required.

32.    In addition to the retention award program, the Selling Debtor Entities

would retain liabilities related to (i) social security disability or employment taxes for

employees (including retired employees) accrued on or before the closing date, (ii) benefit

plans covering current and former employees of the Selling Debtor Entities' operations which

the Purchasers are not required to assume by operation of law or by virtue of the Purchasers'

acquisition of the Purchased Assets, including any liabilities under the Employee Retirement

Income Security Act of 1974, as amended, (iii) obligations pertaining to paid time off (or PTO)

owed to current employees who are not hired by the Purchasers and to former employees of the

---

[17]    The original agreements, executed between April and August 2005, were extended postpetition.

[18]    See this Court's Order Under 11 U.S.C. §§ 105(a), 363, 507, 1107 And 1108 (i) Authorizing Debtors To Pay
Prepetition Wages And Salaries To Employees And Independent Contractors; (ii) Authorizing Debtors To Pay
Prepetition Benefits And Continue Maintenance Of Human Capital Benefit Programs In The Ordinary Course;
And (iii) Directing Banks To Honor Prepetition Checks For Payment Of Prepetition Human Capital
Obligations, dated October 13, 2005 (Docket No. 198).

Selling Debtor Entities, as applicable, and (iv) any collective bargaining agreements to which a

Seller is a party.

33.    The following is a summary of significant terms of the sale related to

the Selling Debtor Entities' employees:

(a)    The Selling Debtor Entities are retaining the assets and liabilities relating to the U.S. employee benefit plans covering current or former employees of the U.S. operations.  The Sellers currently estimate that the unfunded liability of the Tulsa defined benefit pension plan and other post-employment benefits ("OPEB") for both hourly and salaried employees (assuming July 1, 2007 freeze date) would be approximately $2.7 million and $3.8 million, respectively.  All current employees who become employees of the Purchaser after closing (the "Hired Current Employees") in the U.S. would be fully vested in the Tulsa defined benefit pension plan as of the closing and the Selling Debtor Entities would retain responsibility for funding defined benefit pension plan in accordance with its terms.  The Selling Debtor Entities would be responsible for the continued payment of OPEB to eligible Tulsa retirees.  Hired Current Employees would not be eligible for OPEB from the Selling Debtor Entities or Purchasers following the closing.

(b)    Shelf Tulsa Collective Bargaining Agreement.  Umicore Autocat USA Inc. and the Local UAW entered into an agreement, dated effective as of the closing date and ratified as of May 23, 2007, which would govern hourly employees employed at the Tulsa, Oklahoma facility (the "Shelf Tulsa Collective Bargaining Agreement").

(c)    Purchasers' U.S. Benefit Plans. The Purchasers would offer participation in and eligibility for benefits under the Purchasers' benefit plans to Hired Current Employees no later than two months following the closing date.  The Purchasers would recognize each Hired Current Employee's years of service before the closing date for eligibility and vesting purposes under the Purchasers' benefit plans; provided, however, that such recognition would not cause a duplication of benefits being provided to the Hired Current Employees by the Selling Debtor Entities and the Purchasers.

(d)    Sellers' U.S. Health Plans.  The Selling Debtor Entities would continue to maintain certain health care plans for Hired Current Employees (the "Seller U.S. Health Plans") until the earlier of: (i) the date that is two months after the closing date and (ii) written notification from Purchasers that a Purchaser has established health plans providing coverage for Hired Employees.  During that two-month period, the Selling Debtor Entities would either continue to provide coverage under the Seller U.S. Health Plans or make continuation coverage under COBRA (as defined below) available to the Hired Employees located in the U.S., their "qualified beneficiaries" as defined in the Consolidated Omnibus Budget Reconciliation Act of 1986, as amended ("COBRA"), and the "M&A Qualified beneficiaries" (as such term is defined in Treasury Regulation § 54.4980B-9 Q&A-4(a)).  In accordance with the Transition Services Agreement, the Purchasers would reimburse the Sellers for the Seller's costs in this regard.

20

(e) <u>PTO Obligations</u>.  The Purchasers would assume all liabilities related to or arising from accrued paid-time-off, vacation, holiday, and sick leave obligations (the "PTO Obligations") with respect to the Hired Current Employees, but the Selling Debtor Entities would retain responsibility for PTO obligations owed to each current employee or former employee who is not hired by the Purchasers.  The Sellers and Purchasers have agreed to a purchase price adjustment mechanism with respect to these assumed PTO Obligations by the Purchasers.

(f) <u>Workers' Compensation</u>.  The Selling Debtor Entities would retain responsibility for all workers' compensation benefits related to injuries or illnesses to the extent incurred by Hired Current Employees in the United States prior to the closing date and the Purchasers are responsible for workers' compensation benefits incurred by these employees following the closing date.

F.    <u>Bidding Procedures</u>

34.    The Sale of the Catalyst Business is subject to higher or otherwise better offers pursuant to the Bidding Procedures.  The Selling Debtor Entities believe that the proposed structure of the Bidding Procedures is the one most likely to maximize the realizable value of the Catalyst Business for the benefit of the Sellers, including the Selling Debtor Entities and their estates, their stakeholders, and other interested parties.  Accordingly, the Selling Debtor Entities seek approval of the Bidding Procedures for the sale of the Catalyst Business.

35.    The Bidding Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder(s), and this Court's approval thereof (collectively, the "Bidding Process").

36.     The proposed Bidding Procedures attached hereto as <u>Exhibit A</u>

provide, in relevant part, as follows:[19]

(a)    <u>Participation Requirements</u>:  To ensure that only bidders with financial ability and a serious interest in the purchase of the Purchased Assets participate in the Bidding Process, the Bidding Procedures provide for certain requirements for a potential bidder to become a "Qualified Bidder":  (i) executing a confidentiality agreement substantially in the form attached to the Bidding Procedures, (ii) providing the Sellers with certain financial assurances as to such bidder's ability to close, and (iii) submitting a preliminary proposal reflecting (a) the purchase price range, (b) any Purchased Assets expected to be excluded, (c) the structure and financing of the transaction, (d) any anticipated regulatory approvals, (e) the anticipated time frame and any anticipated impediments to obtaining such approvals, (f) any additional conditions to closing it may wish to impose, and (g) the nature and extent of any due diligence it may wish to conduct and the date by which such due diligence would be completed.

(b)    <u>Due Diligence</u>:  All Qualified Bidders will be afforded an opportunity to participate in the diligence process.  The Sellers would coordinate the diligence process and provide due diligence access and additional information as reasonably requested by any Qualified Bidders.

(c)    <u>Bid Deadline</u>:  All bids must be received not later than 11:00 a.m. (prevailing Eastern time) by July 24, 2007 (the "Bid Deadline").  The Sellers will have a one-time right (but not the obligation) to extend the Bid Deadline up to a maximum of five Business Days.

(d)    <u>Bid Requirements</u>:  All bids must include the following documents: (i) a letter stating that the bidder's offer is irrevocable for the period set forth in the Bidding Procedures, (ii) an executed copy of the Agreement, together with all schedules, marked to show amendments and modifications to the agreement, purchase price, and proposed schedules, (iii) a good faith deposit in an amount equal to 1.75% of such bidder's gross purchase price, and (iv) satisfactory written evidence of a commitment for financing or other ability to consummate the proposed transaction.

(e)    <u>Qualified Bids</u>: To be deemed a "Qualified Bid," a bid must be received by the Bid Deadline and, among other things, must (i) be on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to the Sellers than, those contained in the Agreement, (ii) not be contingent on obtaining financing or the outcome of unperformed due diligence, (iii) have a value greater than the purchase price reflected in the Agreement, plus the amount of the Break-Up Fee, plus $1,000,000, (iv) not be

---

[19]   In the event of any conflict between the Bidding Procedures and this summary, the provisions of the Bidding Procedures control.  Capitalized terms used but not otherwise defined in this summary have the meanings ascribed to them in the Bidding Procedures.

conditioned on bid protections, other than the bidding increments contemplated in the Bidding Procedures, (v) contain acknowledgements and representations that the bidder (a) has had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to making its offer, (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Purchased Assets in making its bid, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the marked agreement, and (vi) include a commitment to consummate the purchase or the Purchased Assets within not more than 15 days after entry of a Court order approving such purchase.  The Sellers retain the sole right to deem a bid a Qualified Bid even if such bid does not conform to one or more of the aforementioned requirements.  Notwithstanding the foregoing, the Purchaser will be deemed a Qualified Bidder, and the Agreement will be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale.  A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction.  Each Qualified Bid other than the Agreement will be referred to as a "Subsequent Bid."

 (f) <u>Conduct Of Auction</u>: If the Sellers receive at least one Qualified Bid in addition to that of the Purchasers, they will conduct an auction (the "Auction") of the Purchased Assets at 10:00 a.m. (prevailing Eastern time) on August 1, 2007, or such later time as the Sellers would notify all Qualified Bidders who have submitted Qualified Bids, in accordance with the procedures outlined in the Bidding Procedures which include: (i) attendance at the Auction will be limited to specified parties as outlined in the Bidding Procedures, (ii) by the close of business on July 27, 2007, each Qualified Bidder with a Qualified Bid will inform the Sellers whether it intends to participate in the Auction and by the close of business on July 28, 2007, the Sellers will provide such bidders with copies of the Qualified Bid which the Sellers then believe is the highest or otherwise best offer for the Purchased Assets, (iii) all Qualified Bidders will be entitled to be present for all Subsequent Bids, and (iv) bidding at the Auction will begin with the highest or otherwise best Qualified Bid, continue in minimum increments of at least $1,000,000, and conclude after each participating bidder has had the opportunity to submit one or more additional Subsequent Bids.

 (g) <u>Selection Of Successful Bid</u>:  As soon as practicable after the conclusion of the Auction, the Sellers, in consultation with their advisors, will review each Qualified Bid and identify the highest or otherwise best offer for the Purchased Assets (the "Successful Bid") and the bidder making such bid (the "Successful Bidder").  The Sellers would sell the Purchased Assets for the highest or otherwise best Qualified Bid to the Successful Bidder upon the approval of such Qualified Bid by this Court after the hearing (the "Sale Hearing").

 (h) <u>Sale Hearing</u>: The Selling Debtor Entities request that the Sale Hearing be scheduled for August 16, 2007 at 10:00 a.m. (prevailing Eastern time) and that the Sale Hearing may be adjourned or rescheduled by the Sellers without notice other than by an announcement of the adjourned date at the Sale Hearing.  If no Qualified Bids other than that

of the Purchasers is received, the Sellers will proceed with the sale of the Purchased Assets to the Purchasers, pursuant to the terms of the Agreement, as may be modified by the Sale Approval Order, following entry of such order. If the Sellers do receive additional Qualified Bids, then at the Sale Hearing, the Selling Debtor Entities may seek approval of the Successful Bid, as well as the second highest or best Qualified Bid (the "Alternate Bid," and such bidder, the "Alternate Bidder"). A bid will not be deemed accepted by the Sellers unless and until approved by this Court. Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for specified reasons, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will effectuate a sale to the Alternate Bidder without further order of this Court.

(i)    Return Of Good Faith Deposits:  Good faith deposits of all Qualified Bidders (except for the Successful Bidder) would be held in an interest-bearing escrow account and all Qualified Bids would remain open until two business days following the closing of the Sale (the "Return Date"). Notwithstanding the foregoing, the good faith deposit submitted by the Successful Bidder, together with interest thereon, would be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, such Successful Bidder would forfeit its good faith deposit, and such good faith deposit would irrevocably become the property of the Sellers in full and final satisfaction of any and all Liabilities of such defaulting Successful Bidder to the Seller with respect to the Sale. On the Return Date, the Sellers would return the good faith deposits of all other Qualified Bidders, together with the accrued interest thereon.

(j)    Reservation Of Rights:  The Sellers, after consultation with the Creditors' Committee:  (i) may determine which Qualified Bid, if any, is the highest or otherwise best offer and (ii) may reject, at any time, any bid (other than the Purchasers' bid) that is:  (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the Sellers, including the Selling Debtor Entities, their estates, and their stakeholders as determined by the Sellers, including the Selling Debtor Entities in their sole discretion.

G.    Bid Protections

37.    At various times over the course of two years, the Purchasers have expended, and likely will continue to expend, considerable time, money, and energy pursuing the purchase of the Catalyst Business. Moreover, the Purchasers have engaged in extended arm's length and good faith negotiations regarding a possible sale. The Purchasers are not "insiders" of any of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code. The Agreement is the culmination of these efforts.

38.    In recognition of this expenditure of time, energy, and resources, the Sellers have agreed to provide certain bid protections to the Purchasers (the "Bid Protections"). Specifically, the Agreement provides for, and the Selling Debtor Entities respectfully request that this Court approve, a Break-Up Fee payable by the Sellers to the Purchasers in the amount of $2,000,000, which is approximately 3.6% of the Preliminary Purchase Price, if the Sellers, with certain exceptions, sell, transfer, lease, or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, or other similar transaction, all or substantially all or a material portion of the Purchased Assets in a transaction or a series of related transactions with one or more parties other than the Purchasers.

39.    In addition, the Selling Debtor Entities respectfully request this Court's approval of the term in the Agreement providing for reimbursement of the Purchasers' reasonable, actual out-of-pocket fees and expenses incurred in connection with the transactions contemplated by the Agreement, in an amount not to exceed $1,750,000, which is 3.2% of the Preliminary Purchase Price under certain circumstances.  Specifically, in the event that the Agreement is terminated (i) by either the Sellers or the Purchasers, if the Court has not entered a Sale Approval Order that is a final order on or before the date that 120 days after the date of the Agreement, (ii) by either the Sellers or the Purchasers, if the closing does not occur within 120 days after entry of the Sale Approval Order for any reason other than failure to obtain certain necessary competition and other third party approvals and consents, (iii) by either the Sellers or the Purchasers, if the closing does not occur within 240 days after entry of the Sale Approval Order for any reason other than in connection with certain regulatory approvals, (iv) by the Purchasers, at any time prior to closing, if a Material Adverse Effect occurs and in the good faith judgment of the Purchasers has not been cured and is not capable of being cured

25

within 45 days of the date of the event giving rise to such Material Adverse Effect, or (v) by

the Purchasers upon certain breaches by the Sellers of their representations, warranties,

covenants, or obligations under the Agreement, then the Sellers would be obligated to pay the

Purchasers an amount equal to the Purchasers' reasonable, actual out-of-pocket fees and

expenses (including reasonable attorneys' fees, expenses of its financial advisors, and expenses

of other consultants) incurred in connection with the transactions contemplated by the

Agreement including, but not limited to, the conduct of pre-contract due diligence and the

negotiation and drafting of the Agreement and the other documents contemplated herein (the

"Expense Reimbursement") up to a maximum of $1,750,000.  The portion of the Bid

Protections to be paid by the Selling Debtor Entities, as provided by the Agreement, would

constitute a superpriority administrative expense claim.

       40.      The Agreement provides that in the event the Agreement is terminated

and the Purchasers become entitled to receive or receive any Expense Reimbursement, the

Purchasers would not be entitled to receive nor would they receive the Break-Up Fee or any

portion thereof, and, conversely, that in the event that the Purchasers become entitled to or do

receive, the Break-Up Fee, they would not be entitled to receive nor would they receive the

Expense Reimbursement or any portion thereof.

       41.      The Selling Debtor Entities recognize that a 3.6% Break-Up Fee and a

3.2% Expense Reimbursement (although mutually exclusive) are both on the higher end of the

range of traditional bid protections approved in asset sales pursuant to section 363 of the

Bankruptcy Code.  However, the Purchasers have been negotiating this acquisition for more

than two years and, to induce the Purchasers to be the stalking horse bidder, a $2,000,000

Break-Up Fee was required.  The Bid Protections were a material inducement for, and a

26

condition of, the Purchasers' entry into the Agreement.  The Sellers believe that the Bid

Protections are fair and reasonable in view of (a) the intensive analysis, due diligence

investigation, and negotiation undertaken by the Purchasers in connection with the Sale and (b)

the fact that the Purchasers' efforts have increased the chances that the Sellers would receive

the highest or otherwise best offer for the Purchased Assets.

42.    In the event that the Purchasers are entitled to, and do, receive the

Deposit Amount, the Break-Up Fee, or Expense Reimbursement, as the case may be, the right

of the Purchasers to receive such amounts would constitute Purchaser's sole remedy for (and

such amounts would constitute liquidated damages in respect of) any breach by any Seller of

any of its representations, warranties, covenants, or agreements set forth in the Agreement.

43.    The Purchasers are unwilling to commit to hold open their offer to

purchase the Purchased Assets under the terms of the Agreement without the approval of the

bidding protections in the Agreement and the Bidding Procedures Order.  Thus, absent entry of

the Bidding Procedures Order and approval of the Bid Protections, the Sellers will lose the

opportunity to obtain what they believe to be the highest and best offer for the Purchased

Assets.

44.    Moreover, payment of the Bid Protections would not diminish the

Selling Debtor Entities' estates.  The Sellers would not expect to pay the Break-Up Fee unless

they do so to accept an alternative Successful Bid, which must exceed the price offered by the

Purchasers by an amount sufficient to pay the applicable Bid Protections.  The Expense

Reimbursement is a necessary cost of obtaining a binding commitment from the Purchasers for

the sale of the Catalyst Business.  The Selling Debtor Entities thus request that this Court

authorize payment of the Bid Protections pursuant to the terms and conditions of the

Agreement.

H.    Assumption And Assignment Of Contracts

45.    The Selling Debtor Entities seek authority under section 365 of the

Bankruptcy Code to assume and assign the Assumed Contracts to the Purchasers or the

Successful Bidder, as the case may be.  The approximate cost to cure the Assumed Contracts is

$5,787,601.  With respect to the Assumed Contracts, on or before July 6, 2007, the Selling

Debtor Entities will file with this Court and serve on each non-Debtor party to an Assumed

Contract a cure notice substantially in the form attached hereto as Exhibit G (the "Cure

Notice").  The Cure Notice would state, with respect to the Assumed Contracts, the cure

amount that the Selling Debtor Entities believe is necessary to assume such contract or lease

pursuant to section 365 of the Bankruptcy Code (the "Cure Amount") and notify each party

that such party's lease or contract will be assumed and assigned to the Purchaser to be

identified at the conclusion of the Auction.  In addition, such Cure Amounts would be listed on

a schedule to the Sale Approval Order.  In connection with the proposed Sale, the Selling

Debtor Entities also seek authority under section 363 of the Bankruptcy Code to assign the

Post-Petition Contracts to the Purchasers or the Successful Bidder, as the case may be.  There

are no past due obligations under the Post-Petition Contracts.

46.    The Debtors propose that any objection to the Cure Amount would be

required to be filed within ten days of the date of the Cure Notice and served as set forth in the

Cure Notice.  Any objection to the Cure Amount would be required to state with specificity

what cure amount the party to the Assumed Contract believes is required, including appropriate

documentation thereof.  If no objection is timely received, the Cure Amount set forth in the

Cure Notice would be controlling notwithstanding anything to the contrary in any Assumed

Contract or other document, and the non-Debtor party to the Assumed Contract would be

forever barred from asserting any other claims against the Selling Debtor Entities, the

Purchaser, or the Successful Bidder (as appropriate) or the property of any of them, as to such

Assumed Contract.

47.       In addition, on or before July 6, 2007, the Selling Debtor Entities

propose to file with this Court and serve on each non-Debtor party to an Assigned Contract a

notice, substantially in the form attached hereto as Exhibit H (the "Purchaser

Assumption/Assignment Notice").  The Purchaser Assumption/Assignment Notice would

identify the Purchaser as the party that will be assigned all of the Selling Debtor Entities' right,

title, and interest in the Assigned Contracts, subject to completion of the bidding process

provided under the Bidding Procedures.[20]  Non-Debtor parties to any Assumed Contract would

be required to file an objection to the assumption and/or assignment of the Assumed Contract

within ten days of service of the Purchaser Assumption/Assignment Notice, and such parties

would be required to state, with specificity, the legal and factual basis of their objection, unless

otherwise ordered by this Court.

48.       One business day following the Bid Deadline, the Selling Debtor

Entities propose to send a notice (the "Qualified Bidder Assumption/Assignment Notice"),

substantially in the form attached hereto as Exhibit I, to each non-Debtor party to an Assigned

Contract identifying any Qualified Bidders as potential parties to which the Assigned Contracts

would be assigned.  Non-Debtor counterparties to any Assumed Contract would be required to

---

[20]    The Selling Debtor Entities would serve the Purchaser Assumption/Assignment Notice and the Qualified Bidder
Assumption/Assignment Notice (as defined below) upon each non-Debtor counterparty to the Post-Petition
Contracts as a means of fulfilling any requirement under the applicable contract to provide notice of
assignment.

file an objection to the assumption and/or assignment of the Assumed Contract within ten days

from the service of the Qualified Bidder Assumption/Assignment Notice, and such parties

would be required to state, with specificity, the legal and factual basis of its objection, unless

otherwise ordered by this Court.

I.    Notice Of Sale Hearing

      49.    Within five days after entry of the Bidding Procedures Order (the

"Mailing Date"), the Selling Debtor Entities (or their agent) propose to serve the Motion, the

Agreement, the proposed Sale Approval Order, the Bidding Procedures, and a copy of the

Bidding Procedures Order by first-class mail, postage prepaid, upon (i) the Office of the United

States Trustee for the Southern District of New York, (ii) counsel for the Purchasers, (iii)

counsel for the Creditors' Committee, (iv) counsel for the Equity Committee, (v) all entities

known to have expressed an interest in a transaction with respect to the Purchased Assets

during the past six months, [21] (vi) all entities known to have asserted any lien, claim, interest,

or encumbrance in or upon the Purchased Assets, (vii) all federal, state, and local regulatory or

taxing authorities or recording offices, including but not limited to environmental regulatory

authorities, which have a reasonably known interest in the relief requested by the Motion, (viii)

all parties to Assigned Contracts, (ix) the United States Attorney's office, (x) the United States

Department of Justice (the "DOJ"), (xi) the Securities and Exchange Commission (the "SEC"),

(xii) the Internal Revenue Service (the "IRS"), (xiii) all entities on the Master Service List (as

defined by the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P.

2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice,

Case Management, And Administrative Procedures (Docket No. 2883) (the "Supplemental

---

[21]    All such entities would be served by electronic mail, in addition to overnight mail, to the extent the Debtors
have electronic mail addresses for such parties.

Case Management Order")), and (xiv) such other entities as are required to be served with notices under the Supplemental Case Management Order.

J.    Publication Notice

50.    The Selling Debtor Entities also propose, pursuant to Fed. R. Bankr. P. 2002(l) and 2002(d), that publication of a notice of the Sale in a form substantially similar to the form annexed hereto as Exhibit J in the Wall Street Journal, the New York Times, the Tulsa World, and the Claremore Progress by the Mailing Date or as soon as practicable thereafter, be deemed proper notice to any other interested parties whose identities are unknown to the Selling Debtor Entities.

## Applicable Authority

A.    Bidding Procedures

51.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it.  See Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 178-179 (D. Del. 1991).

52.    The Second Circuit has held that, although the bankruptcy court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate." Orion Pictures Corp. v. Showtime Network, Inc. (In re Orion Pictures

31

Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's consideration of a debtor's section

363(b) motion is a "summary proceeding," intended merely as a means "to efficiently review

the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy

estate.  It is not the time or place for prolonged discovery or a lengthy trial with disputed

issues."  Id. at 1098-99.

53.     Once the debtor articulates a valid business justification, a

presumption arises that "in making a business decision the directors of a corporation acted on

an informed basis, in good faith and in the honest belief that the action was in the best interests

of the company.'"  Official Comm. of Subordinated Bonderholders v. Integrated Resources,

Inc., (In re Integrated Resources Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter,

"[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of

rebutting the presumption of validity."  Id.  To satisfy its burden, it is not enough for an

objector simply to raise and argue an objection. Rather, an objector "is required to produce

some evidence respecting its objections."  Lionel Corp., 722 F.2d at 1071.

54.     As a rule, the debtor's business judgment "'should be approved by the

court unless it is shown to be so manifestly unreasonable that it could not be based upon sound

business judgment, but only on bad faith, or whim or caprice.'"  In re Aerovox, Inc., 269 B.R.

74, 80 (Bankr. D. Mass. 2001) (citations omitted).

55.     As set forth above, the Sellers have sound business justifications for

pursuing a sale process at this time.  Although the Sellers believe that the Catalyst Business is

fundamentally strong, the Catalyst Business does not fit the Debtors' anticipated product

portfolio under their transformation plan.  Thus, the Selling Debtor Entities have determined

that the Catalyst Business' value will be maximized through its divestiture.  Moreover,

delaying the sale of the Purchased Assets may result in the erosion of the Catalyst Business'

value.  Indeed, net revenues have deteriorated on a year-over-year basis since 2005.

Accordingly, there is a sound business purpose for pursuing the sale process promptly and in

accordance with the Bidding Procedures.

56.    Moreover, a prospective purchaser of assets from a chapter 11 debtor

may be reluctant to make an offer because it knows that even if it reaches agreement with the

debtor, its offer is subject to a higher bid by another party.  Pre-approved bidding procedures

address these concerns by assuring initial bidders that any auction procedure will be

reasonable.  Thus, the Selling Debtor Entities submit that the use of the Bidding Procedures

also reflects sound business judgment.

B.    Approval Of The Bid Protections

57.    Bidding incentives encourage potential bidders to invest the requisite

time, money, and effort to negotiate with a debtor and perform the necessary due diligence

attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of

the chapter 11 process.  See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr.

S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight

to enter the bidding by providing some form of compensation for the risks it is undertaking")

(citation omitted).  Bankruptcy courts often approve bidding incentives under the business

judgment rule.  In re Global Crossing Ltd., 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) ("[N]o

litigant has seriously argued the inapplicability of the business judgment test, and if any such

argument had been made, the Court would be compelled . . . to reject it."); United States

Trustee v. In re Bethlehem Steel Corp. (In re Bethlehem Steel Corp.), No. 02 Civ.

2854(MBM), 2003 WL 21738964, at *8 n.13 (S.D.N.Y. July 28, 2003) (the court should

33

approve agreements providing bidding incentives "unless they are unreasonable or appear more likely to chill the bidding process than to enhance it"). One court, explaining the force of the business judgment rule in this context, stated "the business judgment rule does not become inapplicable simply because a court decides a break-up fee is too large." Integrated Resources, 147 B.R. at 660.

58.     This district has established a three part test for determining when to permit bidding incentives. Id. at 657-58. The three questions for a court to consider when assessing a break-up fee are: "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; and (3) is the amount of the fee unreasonable relative to the proposed purchase price." Id.

59.     Here, the Selling Debtor Entities seek authority to utilize the Bidding Process and Bid Protections in the event that the Purchasers are not ultimately the Successful Bidder or must increase the Purchasers' bid price to become the Successful Bidder. Although the Bid Protections are greater than 3.0%, they are nonetheless fair and reasonable in amount, particularly in view of the efforts previously made and to be made by the Purchasers and the risk to the Purchasers of being used as a stalking horse. Moreover, the maximum payment under the proposed Bid Protections – the $2,000,000 Break-Up Fee (3.6% of the Preliminary Purchase Price) – not only constitutes a fair and reasonable percentage of a proposed purchase price, but is within the range that is customary for similar transactions of this type in the bankruptcy context. See, e.g., In re Allegiance Telecom, Inc., Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. 2004) (allowing 2.8% break-up fee and expense reimbursement provision in asset sale agreement); In re Enron Corp., Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. 2004)

34

(approving 3% break-up fee if debtor closed superior transaction); In re Genuity Inc., Case No.

02-43558 (PCB)(Bankr. S.D.N.Y. 2002) (allowing 4.13% break-up fee if court approved

alternative transaction); In re PSINet, Inc., Case No. 01-13213 (REG) (Bankr. S.D.N.Y. 2001)

(permitting 4.28% break-up fee in the event that seller consummated transaction with

alternative bidder); In re Teligent, Inc., Case No. 01-12974 (SMB) (Bankr. S.D.N.Y. 2001)

(allowing break up fee ranging from 1.3% to 4.25% depending on value of alternative

transaction). In addition, the payment of the Break-Up Fee or the Expense Reimbursement, as

the case may be, is reasonable in light of the significant investment in time and resources that

the Purchasers will have contributed as the stalking horse bidder. Further, the Purchasers

acknowledge and agree that, in the event that a Purchaser terminates the Agreement or a Seller

terminates the Agreement and the Purchasers become entitled to receive or receives any

Expense Reimbursement, the Purchasers will not be entitled to receive nor will they receive the

Break-Up Fee or any portion thereof, and, conversely, that in the event that the Purchasers

become entitled to receive or receives any Break-Up Fee, they will not be entitled to receive

nor will they receive the Expense Reimbursement or any portion thereof.

    60.  The Selling Debtor Entities submit that the Bidding Procedures and the

Bid Protections have encouraged competitive bidding because the Purchasers would not have

entered into the Agreement without such provisions. The Bidding Procedures and the Bid

Protections have thus induced a bid that otherwise would not have been made. Finally, the

mere existence of the Bidding Procedures and Bid Protections permits the Sellers to insist that

competing bids be materially higher or otherwise better than the Agreement, which will

produce a clear benefit to the Selling Debtor Entities, their estates, and their stakeholders.

C.    Sale Of The Purchased Assets Free And
      Clear Of Liens, Claims, Encumbrances, And Interests

61.    Under section 363(f) of the Bankruptcy Code, a debtor-in-possession

may sell property free and clear of any lien, claim, or interest in such property if, among other

things:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such
    interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is sold is great that the
    aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled in a legal or equitable proceeding, to accept a   money
    satisfaction of such interest.

11 U.S.C. § 363(f).

62.    Here, section 363(f) of the Bankruptcy Code permits the Selling

Debtor Entities to sell the Purchased Assets free and clear of all liens, claims, and

encumbrances.[22] Excluding Permitted Liens, each lien, claim, or encumbrance that is not the

result of an assumed liability satisfies at least one of the five conditions of section 363(f), and

the Selling Debtor Entities submit that any such lien, claim, or encumbrance will be adequately

protected by attachment to the net proceeds of the Sale, subject to any claims and defenses the

Selling Debtor Entities may possess with respect thereto.  Accordingly, except for the liens

resulting from the Assumed Liabilities or the Permitted Liens, the Selling Debtor Entities

request that the Purchased Assets be transferred to the Successful Bidder(s) free and clear of all

---

[22]    As a result of intense negotiations, certain liabilities will be assumed by the Purchaser or the Successful Bidder,
        as the case may be.

36

liens, claims, and encumbrances, with such liens, claims, and encumbrances to attach to the

proceeds of the Sale of the Purchased Assets.

D.    The Purchasers Are Good Faith Purchasers Pursuant To
      Section 363(m) Of The Bankruptcy Code And The Transaction
      Contemplated By The Agreement Should Carry The
      Protections Of Section 363(n) Of The Bankruptcy Code

        63.        Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or
> (c) of this section of a sale or lease of property does not affect the validity of a
> sale or lease under such authorization to an entity that purchased or leased such
> property in good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).

        Although the Bankruptcy Code does not define "good faith," the Second

Circuit Court has held that:

> Good faith of a purchaser is shown by the integrity of his conduct during the
> course of the sale proceedings; where there is a lack of such integrity, a good faith
> finding may not be made.  A purchaser's good faith is lost by 'fraud, collusion
> between the purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.'

Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 390 (2d. Cir. 1997) (quoting In

re Rock Industries Machinery Corp., 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting former

Bankruptcy Rule 805, the precursor of section 363(m))); see also Evergreen Int'l Airlines Inc.

v. Pan Am Corp. (In re Pan Am Corp.), 91 Civ. 8319 (LMM), 1992 WL 154200, at *4

(S.D.N.Y. June 18, 1992); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988).

        64.        Section 363(n) of the Bankruptcy Code further provides, in relevant

part, that:

> The trustee may avoid a sale under this section if the sale price was controlled by
> an agreement among potential bidders at such sale, or may recover from a party to

37

such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount.

65.      The Selling Debtor Entities submit, and will present evidence at the Sale Hearing, that as set forth above, the Agreement reflects an intensely negotiated, arm's length transaction.  Indeed, these negotiations have continued, on and off, for approximately two years.

66.      As a result of the foregoing, the Selling Debtor Entities submit that the Purchase Price to be paid by the Purchasers constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and the laws of the United States, and any state, territory, possession, or the District of Columbia.

67.      Throughout the negotiations, the Purchasers have at all times acted in good faith.  Moreover, to the extent that the assets are sold to a Successful Bidder, it will be because of a well planned competitive process and intense negotiations at arm's length to be conducted at the Auction.  The Selling Debtor Entities, therefore, request that this Court make a finding that the Purchasers or the Successful Bidder, as the case may be, have purchased the Purchased Assets and assumed the Assigned Contracts and Assumed Liabilities in good faith within the meaning of section 363(m) of the Bankruptcy Code.  Because a key element of a good faith finding is that the Purchasers' successful bid is not the product of fraud or collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders, the Selling Debtor Entities further request that this Court make a finding that the transactions contemplated by the Agreement are not avoidable under section 363(n) of the Bankruptcy Code.

38

E.    Relief From Transfer Taxes Under Section 1146(c) Of the Bankruptcy Code

68.    Bankruptcy Code section 1146(c) provides that "[t]he issuance,

transfer, or exchange of a security, or the making or delivery of an instrument of transfer under

a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a

stamp tax or similar tax."  11 U.S.C. § 1146(c).  This language has been construed to include

transfers pursuant to a sale outside of, but in furtherance of effectuating a reorganization plan.

See City of New York v. Jacoby-Bender, Inc. (In re Jacoby-Bender, Inc.), 758 F.2d 840, 842

(2d Cir. 1985) (holding that when transfer is necessary to consummation of plan, transfer is

"under a plan" within meaning of section 1146(c)); In re United Press Int'l, Inc., Case No. 91 B

13955 (FGC), 1992 Bankr. LEXIS 842, at *4 (Bankr. S.D.N.Y. May 18, 1992) (holding that

section 1146(c) exemption applied to section 363 sale in instance in which it found "the value

of the Debtor's assets . . . likely to deteriorate [during] time necessary to . . . confirm a plan");

In re Beulah Church of God In Christ Jesus, 316 B.R. 41, 50-51 (stating that determination of

applicability of section 1146(c) exemption depends on whether transfers are in view of, and

integral to, a Chapter 11 plan that is subsequently confirmed); City of New York v. Smoss

Enters. Corp. (In re Smoss Enters. Corp.), 54 B.R. 950, 951 (E.D.N.Y. 1985) (stating that

section 1146(c) was designed to reach transfer of assets, on which "plan hinged and which the

court had to approve prior to the confirmation").

69.    As set forth above, as part of their transformation plan, the Selling

Debtor Entities have identified non-core product lines, including the Catalyst Business, that do

not fit into the company's future strategic framework, and have planned to sell or wind-down

these product lines.  The Debtors anticipate filing a plan of reorganization and disclosure

statement as soon as reasonably practical following conclusion of a consensual agreement with

39

the Debtors' major stakeholders.  Thus, this sale process may continue after a plan has already

been filed, which would squarely satisfy <u>Beaulah Church</u>.  <u>See</u> <u>Beaulah Church</u>, 316 B.R. at 50-

51.

70.    In addition, even if a plan of reorganization is not filed by the Sale

Hearing, this Court's approval of the sale of the Catalyst Business is as an important step

toward the implementation of their transformation plan.  Indeed, the Catalyst Business is one

of six non-core product lines that were included in the Debtors' March 31, 2006 announcement.

In light of the foregoing, the Selling Debtor Entities submit that the Sale should be exempt

under section 1146(c) of the Bankruptcy Code from any stamp, transfer, sales, recording, or

similar taxes.

F.    <u>The Assumption And Assignment Of The Assumed Contracts</u>

71.    Section 365(f)(2) of the Bankruptcy Code provides that:

The trustee may assign an executory contract or unexpired lease of the debtor
only if –

(A)    the trustee assumes such contract or lease in accordance with the
provisions of this section; and

(B)    adequate assurance of future performance by the assignee of such contract
or lease is provided, whether or not there has been a default in such contract or
lease.

11 U.S.C. § 365(f)(2).

72.    Under section 365(a) of the Bankruptcy Code a debtor, "subject to the

court's approval, may assume or reject any executory contract or unexpired lease of the

debtor."  11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the

requirements for assuming an unexpired lease or executory contract of a debtor.  It provides:

(b)(1)   If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of the assumption of such contract or lease, the trustee –

(A)     cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

73.     Courts give the phrase "adequate assurance of future performance" a "practical, pragmatic construction." EBG Midtown South Corp. v. Mcharen/Hart Envtl. Engig Corp. (In re Sanshoe Worldwide Corp.) 139 B.R. 585, 592 (S.D.N.Y. 1992), aff'd, 993 F.2d 300 (2d Cir. 1993); see Sanshoe Worldwide, 139 B.R. at 592 (presence of adequate assurance should be "determined under the facts of each particular case"); see also In re Fifth Ave. Originals, 32 B.R. 648, 652 (Bankr. S.D.N.Y. 1983) (holding that adequate assurance was furnished on two separate grounds).  Courts have consistently held that the phrase does not require total assurances.  See In re Natco Industries, Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) ("[I]t does not mean absolute insurance that the debtor will thrive and make a profit."); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").  In fact, adequate assurance has been provided by demonstrating the Purchasers' financial health and experience in managing the type of enterprise or property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance existed when prospective assignee of lease

41

from debtor had financial resources and had expressed willingness to devote sufficient funding
to business to give it strong likelihood of succeeding).

74.    To the extent that any defaults exist under any prepetition executory
contract or unexpired lease that is to be assumed and assigned in connection with the sale of
the Purchased Assets or any portion thereof, the Selling Debtor Entities will cure any such
default.  As set forth above, the Purchasers are an established manufacturer in the catalyst
industry and they have the financial resources to perform under the Assumed Contracts.
Moreover, if necessary, the Selling Debtor Entities will adduce facts at the Sale Hearing
demonstrating the financial wherewithal of the Purchasers or the Successful Bidder, as the case
may be, their experience in the industry, and their willingness and ability to perform under the
contracts to be assumed and assigned to them.

75.    The Sale Hearing therefore will provide this Court and other parties-
in-interest ample opportunity to evaluate and, if necessary, challenge the ability of the
Purchasers or the Successful Bidder(s) to provide adequate assurance of future performance
under the contracts to be assumed.  This Court therefore should have a sufficient basis to
authorize the Selling Debtor Entities to assume and assign the Assumed Contracts as set forth
in the Agreement.

G.    Retention Bonus

76.    The Selling Debtor Entities have authority to honor the outstanding
obligations under the retention bonus program to employees in Tulsa under section 363(b)(1)
of the Bankruptcy Code.  Authority for a debtor's determination to honor prepetition
obligations may be found in section 363(b)(1) of the Bankruptcy Code, which authorizes a
debtor to use estate funds outside the ordinary course of business. See In re Kmart Corp., 359

42

F.3d 866, 872-73 (7th Cir. 2004); see also In re Ionosphere Clubs, Inc., 98 B.R. 174, 175-176

(Bankr. S.D.N.Y. 1989). Since the In re Kmart decision was announced, several bankruptcy

courts have explicitly authorized debtors to honor prepetition obligations pursuant to section

363(b)(1) of the Bankruptcy Code, in particular, in the context of honoring obligations to

employees. See, e.g., In re FV Steel & Wire Co., Case No. 04-22421, et seq. (Bankr. E.D. Wis.

2004) (accrued employee wages and benefits); In re Jay's Foods, LLC, Case No. 04 B 8681

(Bankr. N.D. Ill. 2004) (accrued employee wages and benefits and accrued obligations to

customers); In re Haynes International, Inc., Case No. 04-05364 (Bankr. S.D. Ind. 2004)

(employees; shippers with goods in their possession; and creditors secured by artisans and

materialmen's liens).  The Selling Debtor Entities needed these employees, none of whom is an

executive, to assist in the continued operation of the Tulsa facility and believed that offering

this program instilled good will and loyalty.  In addition, the Selling Debtor Entities submit

that to retain their employees and, therefore, to avoid jeopardizing the basic operation of the

Catalyst Business, the Selling Debtor Entities would like to pay the amounts due under the

retention bonus program as summarized above.  Although the Selling Debtor Entities submit

that they have first-day authority to honor this program, out of an abundance of caution, the

Selling Debtor Entities seek authority to honor this retention award program to the extent Court

approval is required.

H.    Conclusion

77.    The Selling Debtor Entities submit that the granting of the Bidding

Procedures, Bid Protections, and Notice Procedures, the setting of a Sale Hearing, and the

entry of an order approving the Sale of the Purchased Assets free and clear of liens, claims, and

encumbrances, the assumption and assignment of the Assigned Contracts, and the assumption

of the Assumed Liabilities by the Purchasers or the Successful Bidder (as the case may be) are in the best interests of the Selling Debtor Entities' estates and will maximize value for all stakeholders.

## Notice Of Motion

78.     Notice of this Motion has been provided in accordance with the Supplemental Case Management Order.  Further notice with respect to the Sale will be provided in accordance with the Notice Procedures described herein.  In light of the nature of the relief requested, the Selling Debtor Entities submit that no other or further notice is necessary.

## Memorandum Of Law

79.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Selling Debtor Entities respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Selling Debtor Entities respectfully request that this Court enter an order (a) (i) approving the Bidding Procedures, (ii) granting the Bid Protections, (iii) approving the Notice Procedures, and (iv) setting the Sale Hearing; (b) approving (i) the Sale of the Purchased Assets free and clear of liens, claims, and encumbrances to the Purchasers or to the Successful Bidder, (ii) the assumption and assignment of the Assigned Contracts to the Purchasers or the Successful Bidder, and (iii) the assumption of the Assumed Liabilities by the Purchasers or the Successful Bidder; and (c) granting them such other and further relief as is just.

Dated:     New York, New York
           June 6, 2007

                    SKADDEN, ARPS, SLATE, MEAGHER
                     & FLOM LLP

                    By:    /s/ John Wm. Butler, Jr.
                           John Wm. Butler, Jr. (JB 4711)
                           John K. Lyons (JL 4951)
                           Ron E. Meisler (RM 3026)
                    333 West Wacker Drive, Suite 2100
                    Chicago, Illinois 60606
                    (312) 407-0700

                             - and -

                    By:    /s/ Kayalyn A. Marafioti
                           Kayalyn A. Marafioti (KM 9632)
                           Thomas J. Matz (TM 5986)
                    Four Times Square
                    New York, New York 10036
                    (212) 735-3000

                    Attorneys for Delphi Corporation, et al.,
                     Debtors and Debtors-in-Possession

45