# Exhibit D

**MASTER SALE AND PURCHASE AGREEMENT**

**BETWEEN**

**UMICORE AND THE OTHER AFFILIATED PURCHASERS
TO BE SET FORTH ON SCHEDULE 1**

**AND**

**DELPHI CORPORATION AND THE OTHER AFFILIATED SELLERS TO BE
SET FORTH ON THE SIGNATURE PAGES AND SCHEDULE 1**

**June 5, 2007**

**<u>TABLE OF CONTENTS</u>**

<u>PAGE</u>

1.    CONVEYANCE OF THE ACQUIRED ASSETS AND SALE SECURITIES: ............................ 20
    1.1.    General. ................................................................................................................. 20
        1.1.1.    Transfer of Purchased Assets. ................................................................. 20
        1.1.2.    Identity of Purchasers. ............................................................................ 20
        1.1.3.    Governing Documents. ............................................................................ 20
    1.2.    Sale Securities. ..................................................................................................... 20
    1.3.    Acquired Assets Transactions. ............................................................................. 21
        1.3.1.    Acquired Assets. ..................................................................................... 21
        1.3.2.    Carved-Out Location Assets. .................................................................. 21
    1.4.    Excluded Assets. ................................................................................................... 22
        1.4.1.    Bailed Assets. .......................................................................................... 22
        1.4.2.    Personnel and Medical Records. ............................................................. 22
        1.4.3.    Certain Financial Assets. ........................................................................ 23
        1.4.4.    Certain Financial Contracts. ................................................................... 23
        1.4.5.    Tax Refunds, Etc. .................................................................................... 23
        1.4.6.    Excluded Intellectual Property. ............................................................... 23
        1.4.7.    Excluded Canning Business. .................................................................... 23
        1.4.8.    Assets of the Chinese Joint Venture. ...................................................... 24
        1.4.9.    Assets of the Australian and Mexican Operations. ................................. 24
        1.4.10.  Technical Centers. ................................................................................... 24
        1.4.11.  Sales Offices. .......................................................................................... 24
        1.4.13.  Insurance. ................................................................................................ 24
        1.4.15.  Real Property. .......................................................................................... 24
        1.4.16.  Benefit Plans. .......................................................................................... 24
    1.5.    Post-Closing Asset Deliveries. ............................................................................. 25
    1.6.    Non-Assignable Permits and Contracts: ............................................................... 25
        1.6.1.    Non-Assignability. .................................................................................. 25
        1.6.2.    Efforts to Obtain Consents and Waivers. ................................................ 25
        1.6.3.    If Waivers or Consents Cannot Be Obtained. ......................................... 25
        1.6.4.    Obligation of Purchasers to Perform. ..................................................... 26
    1.7.    Certain Assigned Contracts. ................................................................................. 26

2.    ASSUMPTION OF LIABILITIES REGARDING ACQUIRED ASSETS TRANSACTIONS;
    RETAINED LIABILITIES: ............................................................................................... 26
    2.1.    Assumed Liabilities. ............................................................................................. 26
    2.2.    No Expansion of Third Party Rights. .................................................................... 27
    2.3.    Retained Liabilities. .............................................................................................. 28

3.    ACQUIRED ASSETS - PERSONNEL MATTERS - TRANSFERRED EMPLOYEES: ........... 29
    3.1.    Current Employees. ............................................................................................... 29
    3.2.    Offer of Employment: ........................................................................................... 29
    3.3.    Purchasers' U.S. Benefit Plans. ............................................................................ 30
    3.4.    WARN Act. ........................................................................................................... 31
    3.5.    Sellers' U.S. Pension Plans. .................................................................................. 31

i

3.6.   Non-U.S. Benefit Plans. .................................................................................. 31
3.7.   Continuation of U.S. Health Plans by Sellers after the Closing. ..................... 31
3.8.   U.S. Benefit Plans For Retired Employees. .................................................... 32
3.9.   Collective Bargaining Agreements. ................................................................ 32
3.10. Severance; Stay/Retention Bonuses. .............................................................. 32
3.11. Cooperation. .................................................................................................. 32
3.12. No Third Party Rights. .................................................................................. 32
3.13. PTO Obligations. .......................................................................................... 32
3.14. Workers' Compensation. ............................................................................... 32

4.     PURCHASE PRICE: .................................................................................................. 33
4.1.   Preliminary Purchase Price. ........................................................................... 33
4.2.   Deposit Amount. ........................................................................................... 33
    4.2.1.  Deposit Instructions. .......................................................................... 33
    4.2.2.  Violation of Agreement. ..................................................................... 33
    4.2.3.  Other Reason. ..................................................................................... 33
4.3.   Escrow Amount. ............................................................................................ 33
4.4.   Delivery of Purchase Price. ............................................................................ 34
4.5.   Pre-Closing Review of PGM Inventory Levels. ............................................... 34
4.6.   Adjustments to Purchase Price. ...................................................................... 34
    4.6.1.  Net Working Capital. ......................................................................... 34
    4.6.2.  Adjustments for Changes in Owned PGMs: ....................................... 35
    4.6.3.  Adjustment Related to Unfulfilled Restitution Commitments. ............. 36
    4.6.4.  Adjustments for PGM Leases or Borrowings. ..................................... 36
    4.6.5.  Adjustments for Non-U.S. Pension and Benefit Liabilities. ................. 36
    4.6.6.  Adjustments for Assumed PTO Obligations. ...................................... 36
    4.6.7.  Adjustments for Sale Company. .......................................................... 37
    4.6.8.  Capital Leases. ................................................................................... 37
4.7.   Post-Closing Purchase Price Adjustments. ...................................................... 37
    4.7.1.  General: .............................................................................................. 37
    4.7.2.  Objections by Sellers; Consequence of No Objections. ...................... 38
    4.7.3.  Negotiated Settlement of Objections. ................................................. 38
    4.7.4.  Arbitrated Settlement of Objections. ................................................. 38
    4.7.5.  Payment Mechanics for Post-Closing Purchase Price Adjustments Generally. .. 39
4.8.   Allocation of Purchase Price: ......................................................................... 40

5.     REPRESENTATIONS AND WARRANTIES: .......................................................... 40
5.1.   Warranties of Delphi and each Seller. ............................................................ 40
    5.1.1.  Organization and Good Standing. ....................................................... 40
    5.1.2.  Corporate Power; Due Authorization. ................................................ 40
    5.1.3.  No Violations. .................................................................................... 41
    5.1.4.  Sufficiency of Acquired Assets. .......................................................... 41
    5.1.5.  Personal Property; Condition of Personal Property: ........................... 41
    5.1.6.  Litigation. .......................................................................................... 41
    5.1.7.  Intellectual Property Assets: .............................................................. 42
    5.1.8.  Insurance. .......................................................................................... 43
    5.1.9.  Compliance with Other Instruments and Laws; Permits. .................... 43
    5.1.10. Brokers. ............................................................................................ 43
    5.1.11. Consents and Approvals. .................................................................. 43
    5.1.13. Events Subsequent to January Projections. ....................................... 44
    5.1.14. Contracts: ......................................................................................... 44
    5.1.15. Regulatory Matters. ......................................................................... 45

05-44481-rdd    Doc 8179-4    Filed 06/06/07    Entered 06/06/07 02:36:28    Exhibit D -
Master Sale And Purchase Agreement    Pg 5 of 106

**PAGE**

|         | 5.1.16. | Real Property: | 45 |
|         | 5.1.17. | Tax Matters: | 46 |
|         | 5.1.18. | Capitalization of the Sale Company and Related Matters: | 48 |
|         | 5.1.19. | Employee Issues: | 48 |
|         | 5.1.20. | Environmental Representations and Warranties. | 50 |
|         | 5.1.21. | Product Claims. | 51 |
|         | 5.1.22. | Accounts Receivable. | 51 |
|         | 5.1.23. | Absence of Other Representations or Warranties. | 52 |
| 5.2.    | Warranties of Purchasers. | | 52 |
|         | 5.2.1. | Corporate Data. | 52 |
|         | 5.2.2. | Corporate Power; Due Authorization. | 52 |
|         | 5.2.3. | No Violations. | 52 |
|         | 5.2.4. | Consents and Approvals. | 53 |
|         | 5.2.5. | Litigation. | 53 |
|         | 5.2.6. | Brokers. | 53 |
|         | 5.2.7. | Solvency. | 53 |
|         | 5.2.8. | Availability of Funds. | 53 |
|         | 5.2.9. | Investment Intent: | 53 |
|         | 5.2.10. | Compliance with Law. | 54 |
|         | 5.2.11. | Anti-Money Laundering. | 54 |
|         | 5.2.12. | Adequate Assurance of Future Performance. | 54 |
|         | 5.2.13. | Shelf Tulsa Collective Bargaining Agreement. | 55 |
| 6.      | CONDITIONS TO CLOSING: | | 55 |
| 6.1.    | Conditions to Obligations of Sellers and Purchasers. | | 55 |
|         | 6.1.1. | Sale Approval Order. | 55 |
|         | 6.1.2. | No Law, Judgments, etc. | 55 |
|         | 6.1.3. | Approvals by Antitrust Authorities. | 55 |
|         | 6.1.4. | Other Approvals. | 55 |
| 6.2.    | Conditions to Obligations of Purchasers. | | 55 |
|         | 6.2.1. | Accuracy of Warranties. | 55 |
|         | 6.2.2. | Material Adverse Effect. | 56 |
|         | 6.2.3. | Ancillary Agreements and Performance of Covenants. | 56 |
|         | 6.2.4. | Other Approvals; Cure Amounts. | 56 |
|         | 6.2.5. | CBA. | 56 |
|         | 6.2.6. | Sale Company Debt. | 56 |
|         | 6.2.7. | Florange Pre-emptive Right. | 56 |
|         | 6.2.8. | Closing Deliveries. | 56 |
| 6.3.    | Conditions to Obligations of Sellers. | | 57 |
|         | 6.3.1. | Accuracy of Warranties. | 57 |
|         | 6.3.2. | Ancillary Agreements Performance of Covenants. | 57 |
|         | 6.3.3. | Closing Deliveries. | 57 |
| 7.      | CLOSING: | | 57 |
| 7.1.    | The Closing. | | 57 |
| 7.2.    | Ancillary Agreements. | | 57 |
| 7.3.    | Sellers' Other Deliveries. | | 58 |
| 7.4.    | Purchasers' Deliveries. | | 59 |
| 7.5.    | Post-Closing Deliveries. | | 60 |
| 7.6.    | Sale Company. | | 60 |

05-44481-rdd    Doc 8179-4    Filed 06/06/07    Entered 06/06/07 02:36:28    Exhibit D -
Master Sale And Purchase Agreement    Pg 6 of 106

**PAGE**

8.      CERTAIN ADDITIONAL COVENANTS: ....................................................................... 60
    8.1.      Certain Pre-Closing Matters: ............................................................................ 60
    8.2.      Joinder of Additional Seller Parties. ................................................................ 62
    8.3.      Bankruptcy Actions: ......................................................................................... 62
    8.4.      Registrations, Filings and Consents; Further Actions:..................................... 62
    8.5.      Operation of the Business Pending Closing: ..................................................... 64
    8.6.      Assumed U.S. Contracts; Cure Amounts. .......................................................... 64
    8.7.      Hired Current Employees. ................................................................................. 65
    8.8.      Assumed PTO Obligations. ................................................................................ 65
    8.9.      Guarantee by Umicore. ...................................................................................... 65
    8.10.     Post-Closing Covenants. .................................................................................... 65
        8.10.1.  Seller Post-Closing Covenants: ................................................................ 65
        8.10.2.  Technical Documentation. ....................................................................... 66
        8.10.3.  Books and Records and Litigation Assistance From and After Closing:............ 66
        8.10.4.  Payment and Collections. ........................................................................ 68
        8.10.5.  Intellectual Property Transition Rights. .................................................. 68
        8.10.6.  Change of Name of the Sale Company. .................................................... 68
        8.10.7.  Catalyst Co-Development and Supply. ..................................................... 68
    8.11.     Further Assurances. .......................................................................................... 68
    8.12.     Certain Transactions. ........................................................................................ 68
    8.13.     Communications with Customers and Suppliers. ............................................... 69
    8.14.     Permit Transfers. .............................................................................................. 69
    8.15.     Pre-Closing Transfer of Intellectual Property. .................................................. 69

9.      TERMINATION:............................................................................................................ 69
    9.1.      Termination. ...................................................................................................... 69
    9.2.      Notice of Termination. ....................................................................................... 71
    9.3.      Break-Up Fee; Expense Reimbursement; Return of Deposit: ........................... 71
        9.3.1.   Break-Up Fee. ......................................................................................... 71
        9.3.2.   Expense Reimbursement. ......................................................................... 71
        9.3.3.   Payments. ................................................................................................ 72
        9.3.4.   Limitations. ............................................................................................. 72
        9.3.5.   Return of Deposit. ................................................................................... 72
    9.4.      Procedure and Effect of Termination. ................................................................ 72
    9.5.      Conflicts. ........................................................................................................... 72

10.     OTHER TAX MATTERS: ............................................................................................. 73
    10.1.     General. ............................................................................................................. 73
    10.2.     Sale Company Taxes. ......................................................................................... 73
        10.2.1.  Sellers' Liability. ..................................................................................... 73
        10.2.2.  Purchasers' Liability................................................................................ 73
        10.2.3.  Straddle Period Allocations. ................................................................... 73
        10.2.4.  Tax Sharing Agreements. ........................................................................ 74
        10.2.5.  Refunds and Tax Benefits. ....................................................................... 74
    10.3.     Tax Returns:...................................................................................................... 74
        10.3.1.  Taxable Periods Ending on or Before the Closing Date: ........................... 74
        10.3.2.  Taxable Periods Beginning Before and Ending After the Closing Date (Straddle
                Periods)................................................................................................... 75
    10.4.     Audits and Adjustments. .................................................................................... 75
    10.5.     Sales or Transfer Taxes. .................................................................................... 75
    10.6.     Purchasers Covenants and Indemnity. ............................................................... 76
    10.7.     Sellers Covenants and Indemnity....................................................................... 76

05-44481-rdd    Doc 8179-4    Filed 06/06/07    Entered 06/06/07 02:36:28    Exhibit D -
Master Sale And Purchase Agreement    Pg 7 of 106

**PAGE**

|  |  |  |
|---|---|---|
| 10.8. | Purchase Price Adjustment. | 76 |
| 10.9. | Customs Duties. | 76 |
| 11. | BIDDING PROCEDURES: | 77 |
| 11.1. | Delphi Initial Bankruptcy Actions. | 77 |
| 11.2. | Qualified Bidder. | 77 |
| 11.3. | Due Diligence. | 77 |
| 11.4. | Bid Deadline. | 78 |
| 11.5. | Bid Requirements. | 78 |
| 11.6. | Qualified Bids. | 78 |
| 11.7. | Bid Protection. | 79 |
| 11.8. | Auction Bidding Increments and Bids Remaining Open. | 80 |
| 11.9. | Acceptance of Qualified Bids. | 81 |
| 11.10. | Sale Hearing. | 81 |
| 11.11. | Return of Good Faith Deposit. | 81 |
| 11.12. | Modifications. | 81 |
| 12. | SURVIVAL OF REPRESENTATIONS, WARRANTIES AND COVENANTS; INDEMNIFICATION: | 82 |
| 12.1. | Sellers' Agreement to Indemnify. | 82 |
| 12.2. | Specific Performance. | 82 |
| 12.3. | Purchasers' Agreement to Indemnify. | 82 |
| 12.4. | Third Party Indemnification. | 83 |
| 12.5. | Limitations. | 84 |
| 12.6. | Environmental Matters: | 86 |
| 12.6.2. | Limitations on Liability. | 87 |
| 12.6.3. | Remediation of Environmental Damage: | 87 |
| 13. | MISCELLANEOUS: | 88 |
| 13.1. | Bulk Sales Laws. | 88 |
| 13.2. | Notices. | 88 |
| 13.3. | Assignment. | 89 |
| 13.4. | Entire Agreement. | 89 |
| 13.5. | Waiver. | 89 |
| 13.6. | Severability. | 89 |
| 13.7. | Amendment. | 89 |
| 13.8. | Expenses. | 89 |
| 13.9. | Third Parties. | 90 |
| 13.10. | Headings. | 90 |
| 13.11. | Counterparts. | 90 |
| 13.12. | Governing Law. | 90 |
| 13.13. | Public Announcements. | 90 |
| 13.14. | Venue and Retention of Jurisdiction. | 90 |
| 13.15. | Risk of Loss. | 90 |
| 13.16. | Enforcement of Agreement. | 90 |
| 13.17. | Dispute Resolution. | 90 |
| 13.18. | No Right of Setoff. | 91 |
| 13.19. | Limitation on Damages. | 91 |

## MASTER SALE AND PURCHASE AGREEMENT

**THIS MASTER SALE AND PURCHASE AGREEMENT** dated June **5,** 2007, by and between **UMICORE**, a Belgian corporation ("**Umicore**") on behalf of itself and each of its affiliates to be listed on Schedule 1 hereto (each of Umicore and such affiliates a "**Purchaser**", and collectively "**Purchasers**"), and **DELPHI CORPORATION**, a Delaware corporation ("**Delphi**"), on behalf of itself and each of its affiliates listed as a signatory hereto and on Schedule 1 hereto (each of Delphi and such affiliates a "**Seller**", and collectively "**Sellers**").

### R E C I T A L S :

**WHEREAS,** Sellers are engaged in the Business (as hereinafter defined).

**WHEREAS,** on October 8, 2005 (the "**Petition Date**"), the Filing Affiliates (as hereinafter defined) filed voluntary petitions for relief (the "**Bankruptcy Cases**") under Chapter 11 of Title 11, U.S.C. §§ 101 et seq. (as amended as of the Petition Date) (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

**WHEREAS,** upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 363, 365 and 1146 of the Bankruptcy Code, Sellers wish to sell to Purchasers, all right, title and interest of Sellers in and to the Purchased Assets (as hereinafter defined), and Purchasers wish to make such purchase, subject to Purchasers' assumption of the Assumed Liabilities (as hereinafter defined) and the conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the premises, mutual promises, representations, warranties and covenants contained in this Agreement and other good and valuable consideration, and intending to be legally bound hereby, the Parties agree:

### DEFINITIONS

The following terms, as used in this Agreement, shall have the meanings set forth below whether used in the singular or plural. For purposes of this "Definitions" section only, a "—" followed by a reference to a specific section of this Agreement, shall be understood to reference the section of this Agreement in which such term is defined. Unless otherwise indicated, all figures preceded by "$" refer to U.S. dollars.

"**Accounts Payable**" means all trade accounts payable including all Trade Payables and other obligations to pay suppliers and third parties to the extent arising from the conduct of the Business or relating to the Acquired Assets.

"**Accounts Receivable**" means all trade accounts receivable including all Trade Receivables and other rights to payment from customers and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of Products delivered to customers, all other accounts receivable and the full benefit of all security for such accounts and any claim, remedy or other right related to any of the foregoing.

"**Acquired Assets**" — Section 1.3.

"**Acquired Carved-Out Location Assets**" — Section 1.3.2.2.

1

"**Acquired Carved-Out Manufacturing Location Assets**" — Section 1.3.2.1.

"**Acquired Carved-Out Technical Center Assets**" — Section 1.3.2.2.

"**Administrative Assets**" means books, records and other administrative assets including advertising and promotional materials, catalogues, price lists, correspondence, mailing lists, customer lists, vendor lists, photographs, production data, sales materials and records, purchasing materials and records, personnel records of employees, billing records, accounting records, other financial records, sale order files, tool routings, labor routings, facility blueprints, service blueprints, plant layouts and Technical Documentation.

"**Affiliate**" means with respect to any Party any business or other entity directly or indirectly controlling, controlled by or under common control with such specified entity.  For purposes of this definition, control means ownership of more than fifty percent (50%) of the shares or other equity interest having power to elect directors or persons performing a similar function.

"**Agreement**" means this Master Sale and Purchase Agreement, including its Schedules.

"**Allocation**" — Section 4.8.1.

"**Alternate Bid(s)**" — Section 11.10.

"**Alternate Bidder(s)**" — Section 11.10.

"**Alternative Transaction**" — Section 9.3.1.

"**Ancillary Agreements**" means the Transfer Agreements, the Transition Services Agreement(s), the Toll Manufacturing Agreements, Fuel Reformer Patent License, the Atmospheric Catalyst License, the Testing Services Agreements, the Canning Supply Agreements and other agreements referred to in Section 7.2.

"**Antitrust Authority**" shall mean any national, supranational, or state entity having antitrust or competition jurisdiction with respect to the Sale, including, but not limited to, the Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States, the European Commission, the governments of its member states, or any other jurisdiction pursuant to applicable Antitrust Laws.

"**Antitrust Laws**" shall mean the Sherman Act, as amended, the Clayton Act, as amended, the HSR Act, the Federal Trade Commission Act, as amended, and all other federal, state, and non-U.S. statutes, regulations, or other binding legal requirements including Council Regulation (EC) No. 139/2004, as amended, rules, regulations, orders, and decrees and all other such Laws governing antitrust and competition matters as are applicable to the Business or the Purchased Assets.

"**Arbitrator**" — Section 4.7.4.

"**Asset Purchasers**" means each Purchaser to be set forth on <u>Schedule 1</u> prior to Closing, with respect to the Acquired Assets described on such Schedule.

"**Asset Seller(s)**" means Sellers set forth on <u>Schedule 1</u>, with respect to the Acquired Assets described on such Schedule.

2

"**Assumed Liabilities**" — Section 2.1.

"**Assumed PTO Obligation Calculation Methodology**" means the methodology for calculating the Assumed PTO Obligations at Closing as set forth on <u>Schedule 4.6.6</u> hereto.

"**Assumed PTO Obligations**" — Section 2.1.5.

"**Assumed U.S. Contracts**" means assumed Contracts of the Filing Affiliates as further described in Section 8.6.

"**Atmospheric Catalyst License**" means that certain agreement between the Sellers and the Purchasers pursuant to which one or more Sellers shall license U.S. Patent No. 6,924,249 and European Patent Application No. 03077909.4, Publication No. EP 140 5 670 A1, Date of Publication April 7, 2004 to one or more Purchasers all on the terms and conditions set forth therein.

"**Auction**" — Section 11.8.

"**Auditor of Closing Date Statement**" means Deloitte and Touche; <u>provided</u>, <u>however</u>, that if Deloitte and Touche cannot or will not fill this role, such other recognized auditing firm as the Parties shall mutually agree will.

"**Australia Pro Forma Trade Receivables**" means Accounts Receivable which are owing to the Clayton, Australia operations of the Business by the Clayton, Australia canning operations (as opposed to a financing transaction).

"**Australian and Mexican Operations**" — Section 1.4.9.

"**Bankruptcy Cases**" — the Recitals.

"**Bankruptcy Code**" — the Recitals.

"**Bankruptcy Court**" — the Recitals.

"**Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**Baseline Environmental Conditions**" — Section 12.6.1.C.

"**Benefit Plans**" means any pension, thrift, savings, profit-sharing, retirement, bonus, incentive, health, dental, accident, disability (short or long-term), stock purchase, stock option, stock appreciation, stock bonus, executive or deferred compensation, hospitalization, "parachute," severance, termination indemnity (in respect of non-U.S. jurisdictions) or other termination benefits, whether pension or lump sum payment-based, payable on retirement, death or cessation of service, vacation, service leave, sabbatical or jubilee benefits or leave, sick leave, life insurance (including post-retirement life insurance), food coupon, automotive subsidy or transportation, fringe or other welfare benefits, plans, policies or practices in which (or at which) the current or former employees (individually or as a group or groups) of the Business or their beneficiaries participate or participated (or are entitled), including those listed and briefly described on <u>Schedule 5.1.19.C</u>.

"**Bid Deadline**" — Section 11.4.

"**Bidding Procedures**" — Section 11.1.

"**Bidding Procedures Order**" means the order of the Bankruptcy Court approving the Bidding Procedures and certain provisions of this Agreement including Purchasers' right, under the terms and conditions set forth hereafter, to a Break-Up Fee or Expense Reimbursement.

"**Bidding Process**" — Section 11.1.

"**Break-Up Fee**" — Section 9.3.1.

"**Business**" means the business of Sellers and the Sale Company relating to the design, testing, manufacture, remanufacture, development, marketing, sale, installation and service of Catalytic Materials as currently conducted at production facilities located in Tulsa, Oklahoma; San Luis Potosí, Mexico; Florange, France; Port Elizabeth, South Africa; Clayton-Melbourne, Australia; Shanghai, China (where Sellers own a controlling 81% interest in the Chinese Joint Venture); and Maharashtra, India (where Sellers have entered into the Indian License and Equipment Lease Arrangements); and technical centers located at Flint, Michigan and Bascharage, Luxembourg, as conducted at the date of this Agreement. The Business does not include Sellers' Fuel Reformer activities, including rights to the Fuel Reformer Patents that will be transferred to Purchaser at Closing subject to a license back to Seller in accordance with the terms of the Fuel Reformer Patent License. The Business also includes various overhead-type services performed at the Listed Real Property and Sales Offices exclusively for the Asset Sellers and Sale Company (such as financial accounting, budget preparation and financial forecasting, cost estimating, cost accounting, invoicing and accounts receivable processing and management, accounts payable processing and management, payroll processing, local tax compliance and management, human resources services, indirect material purchasing, logistics, quality control, plant maintenance and security), but shall not include corporate headquarters-type services that are not exclusively provided to the Business (such as treasury, legal, group level tax, corporate public relations, internal audit services and certain group finance and accounting services such as consolidated financial statement preparation).

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which banks in Brussels, Belgium, London, England or New York, New York, are authorized or obligated by law or executive order to close.

"**Canning Supply Agreements**" — Section 7.2.9.

"**Cap Amount**" — Section 12.5.6.

"**Capital Lease**" means any lease by any Person of any property (whether real, personal or mixed) which would, in accordance with GAAP, be required to be accounted for as a capital lease.

"**Carved-Out Locations**" — Section 1.3.2.

"**Carved-Out Locations Acquired Equipment and Machinery**" means production machinery, equipment, tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, related spare parts, model shop equipment, laboratory test fixtures and all other machinery and equipment used in washcoat making or preparation and located at a Carved-Out Manufacturing Location, but with the exception of the most recently acquired gas-fired furnace at the Shanghai, China location, specifically does not include furnaces used in the production process at any Carved-Out Manufacturing Location.

"**Carved-Out Manufacturing Locations**" — Section 1.3.2.

4

"**Catalytic Materials**" shall mean chemical emission control devices in the form of catalysts, catalytic coatings deposited on filter substrates, catalytic formulations, manufacturing methods and substrate coating processes relating to such catalysts, information concerning the functionality of such devices (including relationships, models or data about kinetics, thermodynamics or transport phenomena), in each case for the primary purpose of the catalytic treatment of engine exhaust gas by contact of the engine exhaust gas with catalysts and not for the primary purpose of creating reformate (an H2 and CO mixture) or Fuel Reformers.

"**China Pro Forma Trade Receivables**" means Accounts Receivable which are owing to the Shanghai, China operations of the Business by the Shanghai, China canning operations (as opposed to a financing transaction).

"**Chinese Joint Venture**" means Shanghai Delphi Emission Control Systems Company, Ltd. (China), a legal entity organized under Chinese law, controlling equity interest in which is owned by a Delphi Affiliate.

"**Claims**" mean Losses, Liabilities, claims (as defined in Section 101 of the Bankruptcy Code), damages or expenses (including reasonable legal fees and expenses) whatsoever, whether known or unknown, fixed, liquidated, contingent or otherwise.

"**Claims Incurred**" — Section 3.7.

"**Closing**" — Section 7.1.

"**Closing Date**" means the date of Closing.

"**Closing Date Assumed PTO Obligations Schedule**" — Section 8.8.

"**Closing Date Statement**" — Section 4.7.1.2.

"**Closing Escrow Agreement**" — Section 7.2.11.

"**Closing PGM Inventory**" — Section 4.7.1.1.

"**COBRA**" — Section 3.7.

"**Collective Bargaining Agreements**" — Section 3.9.

"**Committee**" — Section 11.4.

"**Competitive Business**" — Section 8.10.1.A.

"**Consigned PGMs**" means, as of the Closing Date, metals owned by direct or indirect customers of the Business which have been consigned to Sellers.

"**Contract Modification**" — Section 8.1.2.

"**Contracts**" mean purchase orders, sales agreements, service contracts, distribution agreements, sales representative agreements, employment or consulting agreements, leases (including Capital Leases), product warranty or service agreements and other commitments, agreements and undertakings, including

quotations and bids outstanding on the Closing Date including the Indian License and Equipment Lease Arrangements.

"**Copyrights**" mean: (i) copyrights existing anywhere (registered, statutory or otherwise) and registered, renewals, revivals, reissuances, extensions and applications for registration thereof, and all rights therein, provided by international treaties or conventions; (ii) moral rights (including rights of paternity and integrity), and waivers of such rights by others; (iii) database and data protection rights whether or not based on copyright; (iv) maskworks and similar protection, (v) copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; (vi) all rights to file and apply for, prosecute, defend and enforce any of the foregoing; and (vii) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Covered Employees**" — Section 3.7.

"**Cure Amounts**" means all cure amounts payable in order to cure any monetary defaults required to be cured under Section 365(b)(1) of the Bankruptcy Code, or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by Seller and assignment to Purchasers of Assumed U.S. Contracts under the Sale Approval Order.

"**Current Employees**" means: (i) employees of any Asset Seller or Affiliate that perform services primarily related to the Business; (ii) employees of the Sale Company; and (iii) U.S. Corporate Employees.

"**DASHI**" means Delphi Automotive Systems (Holding), Inc., the Seller of the Sale Securities of the Sale Company.

"**DDS France**" means Delphi Diesel Systems France SAS, the Seller of the Acquired Assets in Florange, France.

"**Debt**" means financing-type indebtedness consisting of obligations for borrowed money as evidenced by bonds, debentures, notes, or other similar instruments, and obligations upon which interest charges are customarily paid or discounted (other than ordinary course Trade Payables), and including principal and interest thereon, and all guaranties of such obligations.

"**Deductible Amount**" — Section 12.5.4.

"**Defending Party**" — Section 13.17.

"**Delphi**" — Preamble.

"**Demanding Party**" — Section 13.17.

"**Deposit Amount**" — Section 4.2.

"**Deposit Escrow Agreement**" means the Deposit Escrow Agreement, dated as of the date hereof, executed by and among Purchasers, Sellers and the Escrow Agent concurrently with this Agreement.

"**Disclosure Schedule**" means, collectively, the Schedules to Sellers' Representations and Warranties referenced in Article 5.

"**Environment**" means any and all organisms (including humans), biota, ecosystems, land, natural resources, indoor or outdoor air, soil, soil gas, sediment, water, groundwater and buildings and fixtures.

"**Environmental Claim**" means any claim, cause of action, governmental information request, notice of potential responsibility, investigation or written notice by any Governmental Entity arising under Environmental Law and any notice, claim or cause of action-alleging Liability by any other person or entity under Environmental Law or the common law or other Law, including those arising out of, based on or resulting from: (i) the presence or Release of or exposure to any Hazardous Materials at any location, whether or not owned or operated by a Seller; or (ii) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"**Environmental Compliance Matter**" means a condition, event, activity, practice, action or omission at the Listed Real Property which gives rise to an actual or alleged breach or violation of an Environmental Law, but which excludes Environmental Contamination.

"**Environmental Contamination**" means the presence, in violation of applicable Environmental Laws or that requires reporting or any response action under any Environmental Laws, of a Hazardous Material at, in, under, on or about the Environment at the Listed Real Property or migrating from the Listed Real Property.

"**Environmental Damages**" means Losses arising out of an Environmental Law or relating to a Hazardous Material, but in all cases excluding Losses deemed consequential or loss of profit, and also excluding expenses of investigating information solely for the purposes of making a claim for indemnification under this Agreement.

"**Environmental Laws**" means, in each case as in force and effect on or prior to the date of this Agreement, all federal, state, local and foreign Laws, all applicable supranational laws (including European Union laws and directives, and NAFTA rules), and applicable permits, codes, guidance, directives, decrees and orders, in each case relating to or having the purpose or effect of prevention or remediation of Releases or threatened Releases of Hazardous Materials or the exposure of any person, property, ecosystem or natural resources to Hazardous Materials (but excluding OSHA and similar worker safety Laws applying to employers), and the protection of the ecosystem or the Environment, including the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq.

"**Equityholders' Committee**" — Section 11.4.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" shall mean any trade or business (whether or not incorporated) that is part of the same controlled group, or under common control with, or part of an affiliated service group that includes a Seller, within the meaning of Code Section 414(b), (c), (m), or (o) or ERISA Section 4001(a)(14).

"**Escrow Agent**" means the escrow agent under the Deposit Escrow Agreement and the Closing Escrow Agreement.

"**Escrow Amount**" — Section 4.3.

"**Excess Cash**" means amounts of cash (net of Debt) of the Sale Company for periods prior to the Closing.

"**Excluded Assets**" means assets not included in the Acquired Assets, as set forth in Section 1.4.

"**Excluded Canning Business**" — Section 1.4.7.

"**Excluded Carved-Out Location Assets**" — Section 1.3.2.1.

"**Excluded Carved Out Location Trade Payables**" means with respect to the operations of the Business located in: (i) Shanghai, China (1) Third Party Trade Payables and (2) Trade Payables owed to the Business' Tulsa, Oklahoma operations; (ii) Clayton, Australia and San Luis Potosi, Mexico, Third Party Trade Payables.

"**Excluded Financial Contracts**" — Section 1.4.4.

"**Excluded Intellectual Property**" — Section 1.4.6.

"**Excluded Inventory**" means all work-in-process in China.

"**Excluded Trade Payables**" means all: (i) Excluded Carved Out Location Trade Payables; and (ii) Pro Forma Tulsa Trade Payables.

"**Excluded Trade Receivables**" means all: (i) Overdue Trade Receivables; (ii) Account Receivables generated by the Shanghai, China operations of the Business, including the China Pro Forma Trade Receivables; (iii) Australia Pro Forma Trade Receivables; and (iv) Trade Receivables of the Tulsa, Oklahoma operations of the Business that represent Trade Payables of the Shanghai, China operations of the Business.

"**Existing Tulsa Collective Bargaining Agreement**" means that certain Third Agreement, dated as of July 22, 2006, between ASEC Manufacturing General Partnership and the International Union United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) and its Unit, Local Union No. 286 governing workers at Seller's 1300 Main Parkway, Catoosa, Rogers County, Oklahoma (*e.g.*, Tulsa) facility.

"**Expense Reimbursement**" — Section 9.3.2.

"**Filing Affiliates**" means Delphi, DASHI and the following Affiliates of Delphi, which are included in the Bankruptcy Cases and operate certain portions of the Business or are Asset Sellers:  Delphi Automotive Systems LLC, Exhaust Systems Corporation, Environmental Catalysts, LLC, Delphi Automotive Systems (Holding), Inc., Delphi Technologies, Inc., ASEC Manufacturing General Partnership and ASEC Sales General Partnership.

"**Final Closing Date Statement**" — Sections 4.7.2, 4.7.3 or 4.7.4, as applicable.

"**Final Order**" means an order or judgment: (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending; or (ii) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, the order or judgment has been affirmed by the highest court to which such order or judgment was appealed or certiorari has been denied, or reargument or rehearing shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous

rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not prevent such order or judgment from being considered a Final Order.

"**Foreign Operations**" means the operations of the Business other than by any of the Filing Affiliates.

"**Fuel Reformer**" means a device having the principal function to convert fuels (hydrocarbons, alcohols, other chemical compounds containing chemically bound hydrogen or mixtures thereof) to produce mixtures containing free hydrogen that can be used within such mixtures or, after full or partial separation, for applications using hydrogen (e.g. as a chemical reactant), and containing other chemical compounds (e.g. carbon monoxide). A device having the above-described principal function shall be considered to be a Fuel Reformer notwithstanding the fact that engine exhaust may be introduced thereto as a reactant instead of fuel during some phases of its operating cycle or as a secondary reactant in addition to fuel.

"**Fuel Reformer Patent License**" – Section 7.2.2.

"**Fuel Reformer Patents**" – Section 7.2.1.

"**GAAP**" means United States generally accepted accounting principles as in effect from time to time consistently applied.

"**Good Faith Deposit**" — Section 11.5.3.

"**Governmental Entity**" means any United States federal, state or local or any supranational or non-United States court, tribunal, legislative, executive, governmental, quasi-governmental or regulatory authority, self-regulatory authority, agency, department, commission, instrumentality, governmental authority or regulatory body including all Antitrust Authorities.

"**Governmental Order**" means, with respect to any Person, any judgment, order, writ, injunction, decree, stipulation, agreement, determination or award entered or issued by or with any Governmental Entity and binding on such Person.

"**Governmental Requirements**" — Section 5.1.3.

"**Hazardous Materials**" means all matter or the effect of matter including any substances listed, defined or regulated under an Environmental Law or which has the characteristic of being explosive, radioactive, noxious, infectious, mutagenic, corrosive, carcinogenic, hazardous or toxic to human health, the ecosystem or the Environment.

"**Hired Current Employees**" means those Current Employees hired by Purchasers on or promptly after the Closing Date and those Current Employees who become employees of a Purchaser on the Closing Date by operation of Law or contract as a result of the Sale.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended.

"**Improvements**" — Section 5.1.16.A.

"**Including**" means, whether or not initially capitalized, including, without limitation.

"**Indemnifiable Losses**" — Section 12.1.

"**Indemnified Party**" — Section 12.3.

"**Indemnified Real Property**" — Section 12.6.1.A.

"**Indemnifying Party**" — Section 12.4.

"**Indian License and Equipment Lease Arrangements**" means the arrangement between Sellers and Varroc Exhaust Systems Pvt. Ltd. under which Sellers license technical information, lease equipment and provide advice, assistance and support services to Varroc.

"**Individual Claim Amount**" — Section 12.5.5.

"**Intellectual Property**" means the Patent Rights, Trademark Rights, Copyrights, Software, Trade Secrets, Know-How and registered domain names and IP addresses.

"**Inventory**" means raw materials (including substrates), work-in-process, finished goods and packaging that is usable in the Ordinary Course of Business, owned by Sellers and valued at the lower of cost or market value in accordance with GAAP and past practices of the Business.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**January Projections**" means those certain financial projections of the Business as of January 2007 provided to the Purchasers by the Sellers in March 2007.

"**Know-How**" means proprietary technical and business knowledge and information, including specifications, designs, methodologies, processes and production techniques resulting from research and development, technology, manufacturing and production processes, research and development information, drawings, specifications, designs, plans, proposals, technical data, vendor and marketing and business data and customer and vendor lists and information, whether or not confidential.

"**Laws**" means laws, ordinances, codes, standards, administrative rulings or regulations of any applicable federal, state, local or foreign governmental authority.

"**Liability**" or "**Liabilities**" mean any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on- or off- balance sheet or otherwise, or due or to become due, including those arising under any Law, Claim, Governmental Order, Contract or otherwise.

"**Licensed Intellectual Property**" means Sellers' rights with respect to all Intellectual Property licensed or sublicensed to any Seller or its Affiliates from an affiliated or unaffiliated third party which is Used in Connection with the Business, including the Licensed Intellectual Property listed on Schedule 5.1.7.A.2.

"**Lien**" means any lien, charge, claim, interest, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"**Listed Contracts**" — Section 5.1.14.A.

"**Listed Real Property**" — Section 5.1.16.A.

"**Loss**" or "**Losses**" means any and all claims, losses, Liabilities, sanctions, penalties, damages, costs and expenses; in each case including reasonable, actual, out-of-pocket expenses (including reasonable attorneys' fees).

"**Marked Agreement**" — Section 11.5.2.

"**Material**" or "**material**" shall mean, with respect to the Business, the Acquired Assets or the Sale Company, having, or reasonably likely to have, an impact thereon or a value thereto in excess of $1,000,000.

"**Material Adverse Effect**" shall mean, with respect to the Business, the Acquired Assets or the Sale Company, an adverse change or effect on the assets, properties, operations, Liabilities or financial condition of the Business, any of the Acquired Assets or the Sale Company whether arising out of a single event or circumstance or a series of related events or circumstance and resulting in a monetary Loss (including a (1) loss related to income from operations or (2) in the case of an actual or intended reduction in a commitment by a customer (measured by contribution margin in any twelve month period), an actual or reasonably expected Loss) in excess of U.S. $3,000,000; provided, however, that any change or effect resulting from, relating to or arising directly out of (i) the public announcement of the transactions contemplated by this Agreement or actions required by this Agreement including by reason of the identity of Purchaser or communication by Purchaser of its plans or intentions regarding operation of the Business; (ii) any act or omission of a Seller taken with the prior written consent of the Purchaser; (iii) any action taken by Seller or Purchaser or any of their respective representatives required by the terms of this Agreement or necessary to consummate the transactions contemplated by this Agreement; (iv) conditions affecting the industry and markets in which the Business generally operates, to the extent that such conditions do not disproportionately affect the Business as compared to other participants in the industry and markets in which the Business generally operates; (v) changes in United States generally accepted accounting principles or generally accepted accounting principles of any foreign jurisdiction in which any of the Acquired Assets are located, or (vi) changes in any Law, in each case, shall not be considered to have a Material Adverse Effect.

"**Net Working Capital**" means the total amount of all Inventory (other than Excluded Inventory or Owned PGMs) *plus* all Accounts Receivables of the Business (other than Excluded Trade Receivables) *plus* certain other current assets relating to the Purchased Assets; *minus* the sum of the total amount of all Accounts Payables of the Business (other than Excluded Trade Payables) *plus* the sum of all certain other current liabilities relating to the  Purchased Assets, in each case as set forth in Schedule 4.6.1.

"**Net Working Capital Methodology**" means the methodology to be employed by the Purchasers and the Sellers in calculating the Net Working Capital of the Business set forth on Schedule 4.6.1. Schedule 4.6.1 sets forth a demonstration of the Net Working Capital Methodology. Attached hereto as Schedule 4.6.1 are several spreadsheets setting forth the quantitative expression of the Net Working Capital Methodology.

"**Net Working Capital Target**" means U.S. $57.9 million; provided, however, that if the Closing does not occur prior to September 30, 2007, the Parties shall work together in good faith to update the Net Working Capital Target using the same Net Working Capital Methodology as was employed to set the target as of the date hereof.   For purposes of clarification, and not limitation, the Net Working Capital

Target is independent of, and in addition to, the Owned PGM Target Value without any duplication of the elements thereof.

"**Non-Filing Affiliate**" means the: (i) Sale Company; and (ii) each Seller other than Delphi and the Filing Affiliates.

"**Notice**" — Section 13.17.

"**OEM**" means original equipment manufacturer.

"**OFAC**" — Section 5.2.11.

"**Ordinary Course of Business**" means: (i) with respect to the U.S. Operations of the Filing Affiliates, the ordinary course of business consistent with custom and practice of the Business prior to the Petition Date or to the extent consistent with orders issued in the Bankruptcy Cases thereafter; and (ii) with respect to the Foreign Operations, the ordinary course of business consistent with past custom and practice of the Business.

"**Other Book Assets**" means: all other assets including general intangible assets of the Sellers which are Used in Connection with the Business but which are not otherwise covered by the definitions of the various categories of assets included in the Acquired Assets identified in Section 1.3.1, including: (i) all rights to or in connection with prepaid expenses (other than the prepaid expenses related to the Excluded Canning Business or other Excluded Assets); and (ii) all claims and similar rights (and benefits arising from such claims or rights) owing to any Asset Seller, whether or not yet due and payable, including the benefit of all security therefor and of all guarantees, indemnities and rights (including warranty rights against suppliers) in respect of the same.

"**Overdue Trade Receivable**" means a Trade Receivable that has not been paid by the account debtor at least thirty (30) days after such Trade Receivable was due. The due date of any particular Trade Receivable shall be determined based on the terms which the Business has established with the applicable customer (including Delphi or any of its Affiliates) as the date when the subject invoice is due to be paid by such customer (whether based on an invoice date, delivery date or other date associated with the customer and the relevant Contract or applicable terms and conditions of Sale).

"**Owned Intellectual Property**" means all Intellectual Property in and to which a Seller holds, or has a right to hold, in whole or in part, right, title and interest which is Used in Connection with the Business and the Reformer Patents, including such Intellectual Property listed on Schedules 5.1.7.A.1 and 5.1.7.A.3.

"**Owned PGM Shortfall**" — Section 4.6.2.1.

"**Owned PGM Surplus**" — Section 4.6.2.2.

"**Owned PGM Target Value**" means U.S. $1,200 per troy ounce for platinum, U.S. $350 per troy ounce for palladium and U.S. $5,650 per troy ounce for rhodium, determined in accordance with the methodology set forth in Schedule 4.6.2. The total Owned PGM Target Value is approximately U.S. $30,769,000.

"**Owned PGM Volume Target**" means 5,834 troy ounces for platinum, 22,226 troy ounces for palladium and 2,830 troy ounces for rhodium, determined in accordance with the methodology set forth in Schedule 4.6.2.

"**Owned PGMs**" means PGMs owned by the Sellers.

"**Party**" or "**Parties**" means any Purchaser or Purchasers and/or any Seller or Sellers.

"**Patent Rights**" means: (i) patentable inventions, whether or not reduced to practice, and whether or not yet made the subject of a pending patent application or applications; (ii) designs, ideas and conceptions of patentable subject matter, including any patent disclosures and inventor certificates, whether or not reduced to practice and whether or not yet made the subject of a pending patent application or applications; (iii) national (including the United States) and multinational statutory invention registrations, patents, patent registrations and patent applications (including all provisionals, substitutions, reissues, divisions, continuations, continuation-in-part, extensions and reexaminations) and all rights therein provided by international treaties or conventions, and all patentable improvements to the inventions disclosed in each such registration, patent or application; (iv) copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; (v) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing; (vi) without limiting the foregoing, all patent rights included in the Acquired Assets or underlying the Atmospheric Catalyst License.

"**Permit Transfer Liabilities**" shall mean Losses incurred by Purchasers due to the inability to transfer any Permit required under Environmental Law to Purchasers as of the Closing Date despite Purchasers' reasonable best efforts to transfer such permits in full cooperation with Sellers.

"**Permits**" means permits, concessions, grants, franchises, licenses and other governmental authorizations and approvals issued to any Seller and that are currently used for the purpose of carrying on the Business or that relate to the Acquired Assets.

"**Permitted Encumbrances**" means, with respect to the Real Property: (i) Liens for any current real estate or ad valorem taxes or assessments not yet delinquent or being contested in good faith by appropriate proceedings; (ii) inchoate mechanic's, materialmen's, laborer's and carrier's liens and other similar inchoate liens arising by operation of law or statute in the Ordinary Course of Business for obligations which are not delinquent and which will be paid or discharged in the Ordinary Course of Business; (iii) rights of the public and adjoining property owners in streets and highways abutting and adjacent to the Real Property; (iv) easements, covenants, restrictions and other encumbrances of public record; and (v) such other matters, the existence of which, in the aggregate, would not materially interfere with or materially affect the use of the respective underlying asset to which such encumbrances relate as used on the Closing Date.

"**Permitted Lien**" means: (i) purchase money security interests arising in the Ordinary Course of Business; (ii) security interests relating to progress payments created or arising pursuant to government contracts set forth on <u>Schedule 5.1.5.A</u>; (iii) Liens of any Seller's pre-Petition Date secured lenders and post-Petition Date secured lenders which such lenders have agreed to release in connection with the Sale to the extent such Liens are actually released at Closing.

"**Person**" means an individual, a corporation, a partnership, a limited liability company, an association, a trust or other entity or organization.

"**Personal Property**" means tangible personal property other than Inventory, including production machinery, equipment, tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, related spare parts, business machines, computer hardware and other IT assets other than Intellectual Property, office furniture and fixtures, in-factory vehicles, trucks, model shop equipment,

laboratory test fixtures and other tangible personal property, whether located on the Real Property, at the place of business of a vendor or elsewhere, together with any interest as lessee in any leases with respect to the foregoing.

"**Petition Date**" — the Recitals.

"**PGM**" means platinum group metals, including platinum, palladium and rhodium.

"**PGM Inventory**" means Sellers' PGM inventory.

"**PGM Inventory Methodology**" means the methodology to be employed by the Purchasers and the Sellers for calculating the PGM Inventory and set forth on <u>Schedule 4.7.1.1</u> hereto.

"**PGM Leases or Borrowings**" — Section 4.6.4.

"**PGM Physical Inventory Report**" — Section 4.7.1.1.

"**PGM Pricing Methodology**" means applying the first London fixing for platinum and palladium and the Johnson Mathey 9:00 a.m. base price for rhodium.

"**Post-Closing Environmental Compliance Matter**" means an Environmental Compliance Matter occurring on or after the Closing Date.

"**Post-Closing Environmental Contamination**" means Environmental Contamination occurring on or after the Closing Date.

"**Post-Closing Severance Obligations**" — Section 2.1.10.

"**Post-Petition Contracts**" means the Contracts of the Filing Affiliates entered into on or after the Petition Date relating to the Business in the Ordinary Course of Business or approved by the Bankruptcy Court.

"**Potential Bidder**" — Section 11.2.

"**Pre-Closing Environmental Compliance Matter**" means an Environmental Compliance Matter occurring prior to the Closing Date.

"**Pre-Closing Environmental Contamination**" means Environmental Contamination occurring prior to the Closing Date.

"**Pre-Petition Contracts**" means the Contracts of the Filing Affiliates relating to the Business entered into by such Filing Affiliates before the Petition Date.

"**Preliminary Closing Date Net Working Capital Calculation**" — Section 4.6.1.

"**Preliminary Closing Owned PGMs**" — Section 4.6.2.1.

"**Preliminary Closing PGM Inventory Statement**" — Section 4.5.

"**Preliminary Purchase Price**" — Section 4.1.

14

"**Preliminary Restitution Commitments**" — Section 4.6.3.

"**Products**" means ceramic or metallic monolith substrates coated with catalytically active components, designed, manufactured, marketed, sold, installed or serviced by the Business.

"**Pro Forma Tulsa Trade Payables**" means certain Trade Payables reflected in the accounting books and records of the Business' Tulsa operations that reflects the reconciliation of the actual Trade Payables of the Business' Tulsa location with the Trade Payables that would have been reflected on the Tulsa balance sheet if the Filing Affiliates had not sought bankruptcy protection (e.g., were not subject to the amended payment terms required by suppliers and vendors of the Filing Affiliates).

"**Proposed Hired Current Employees**" — Section 8.7.

"**PTO Obligations**" means all Liabilities related to or arising from accrued paid-time-off, vacation, holiday and sick leave obligations to Current Employees.

"**Purchase Price**" — Section 4.1.

"**Purchased Assets**" means the Acquired Assets and the Sale Securities.

"**Purchased Intellectual Property**" means all Owned Intellectual Property and Licensed Intellectual Property in each instance, other than the Patent Rights subject to the Atmospheric Catalyst License.

"**Purchaser**" and "**Purchasers**" shall have the meanings set forth in the preamble to this Agreement.

"**Purchaser Confidentiality Agreement**" means that certain Confidentiality Agreement dated as of June 21, 2005 between Delphi and Umicore, as amended by that certain letter agreement dated as of February 20, 2007 between Delphi and Umicore and as further amended by that second letter agreement dated as of February 27, 2007 between Delphi and Umicore.

"**Purchaser Indemnified Parties**" — Section 12.1.

"**Qualified Bid**" — Section 11.6.

"**Qualified Bidder**" — Section 11.2.

"**Real Property**" means the real property at the facilities described in Schedule 5.1.16.A and all Improvements located thereon, including all rights to leases of such Real Property.

"**Release**" means any release, spill, emission, discharge, leaking, pumping, injection, deposit, disposal, dispersal, or leaching or migration into the indoor or outdoor environment (including ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the movement of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

"**Remedial Works**" means the works, designs, investigations, Remediation and activities carried out by a Party in relation to Environmental Contamination or Environmental Compliance Matters, but excluding expenses of investigating information solely for the purposes of making a claim for indemnification under this Agreement.

15

"**Remediation**" means any investigation, clean-up, removal action, remedial action, restoration, repair, response action, corrective action, monitoring, sampling and analysis, installation, reclamation, closure, or post-closure in connection with the suspected, threatened or actual Release of Hazardous Materials.

"**Remediation Standards**" means standards which are: (i) the minimum criteria or standards under Environmental Laws, including use of risk assessment methodologies where permitted, in existence as of date of the Remediation; and (ii) applicable to the industrial use and operations at the Listed Real Property as carried out as of the date of the Remediation.

"**Remedy**" — Section 12.6.3.A.

"**Required Bid Documents**" — Section 11.5.

"**Restitution Commitments**" means, as of any date of determination, Sellers' aggregate commitments (measured by weight as opposed to value) to return or make restitution to customers of Consigned PGMs.

"**Retained Liabilities**" — Section 2.3.

"**Retired Employees**" means: (i) former employees of any Asset Seller or Affiliate that performed services primarily related to the Business; (ii) former employees of the Sale Company; and (iii) former U.S. Corporate Employees and their dependents, who as of the Closing Date were either retired and were covered by, or are eligible for or are receiving benefits under any "employee welfare benefit plan" (as that term is defined in ERISA) sponsored by Sellers that provides health, medical, drug, or other form of welfare benefit.

"**Return Date**" — Section 11.11.

"**Sale**" means the sale of the Business in accordance with the Bidding Procedures.

"**Sale Approval Order**" means an order or orders of the Bankruptcy Court issued pursuant to Sections 363 and 365 of the Bankruptcy Code: (i) in form and substance reasonably satisfactory to Purchasers; (ii) authorizing and approving, among other things, the sale, transfer and assignment of the Acquired Assets and Assumed Liabilities and the Sale Securities to the Purchasers in accordance with the terms and conditions of this Agreement, free and clear of all Liens other than Permitted Encumbrances, Permitted Liens and Liens encompassed within Assumed Liabilities assumed by Purchasers pursuant to Section 2.1; (iii) including a specific finding that Purchasers are good faith purchasers of the Acquired Assets and the Sale Company and are entitled to the protections afforded by Section 363(m) of the Bankruptcy Code; and (iv) approving Sellers' assumption and assignment of the Assumed U.S. Contracts to the Purchasers pursuant to Section 365 of the Bankruptcy Code and, subject to and in accordance with Section 8.6, ordering Sellers to pay the Cure Amounts to the other parties to the Assumed U.S. Contracts as a condition to such assignment and assumption.

"**Sale Company**" means Delphi Catalyst South Africa (Proprietary) Ltd., a South African Affiliate of Delphi engaged in the Business, all of the Sale Securities of which are owned by DASHI.

"**Sale Company Current Tax Amount**"  — Section 4.6.7.

"**Sale Company Retained Liability Amount**" — Section 4.6.7.

"**Sale Hearing**" — Section 11.9.

"**Sale Motion**" means one or more motions filed by Sellers with the Bankruptcy Court for approval of the Bidding Procedures Order and the Sale Approval Order.

"**Sale Securities**" means the shares or other equity of the Sale Company listed on Schedule 5.1.18.

"**Sales Offices**" means the Business' sales offices listed on Schedule 1.

"**SDN List**" — Section 5.2.11.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Securities Purchasers**" means the Purchasers to be set forth on Schedule 1 prior to Closing, with respect to the Sale Securities set forth opposite its name.

"**Seller**" and "**Sellers**" — the preamble to this Agreement.

"**Seller U.S. Health Plans**" — Section 3.7.

"**Sellers' Knowledge**" means the actual knowledge after reasonable investigation of the individuals listed on Schedule A in each of their respective functional areas listed on such schedule, without imputation of the knowledge of any other Person.

"**Shelf Tulsa Collective Bargaining Agreement**" means that certain Agreement, dated effective as of the Closing Date and ratified as of May 23, 2007, between Umicore Autocat USA Inc. and the International Union United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) and its Unit, Local Union No. 286 governing workers at Seller's 1300 Main Parkway, Catoosa, Rogers County, Oklahoma  (*e.g.*, Tulsa) facility, as set forth in Schedule 5.2.13.

"**Software**" means computer software and programs, including source code, shareware, firmware, middleware, courseware, open source code, operating systems and specifications, system data, record and table layouts, databases, files documentation, storage media, manuals and other materials related thereto.

"**Special Claim Matters**" — Section 12.5.5.

"**Straddle Period**" — Section 10.2.1.

"**Subsequent Bid**" — Section 11.6.

"**Successful Bid(s)**" — Section 11.8.6.

"**Successful Bidder(s)**" — Section 11.8.6.

"**Tax Return**" means any return, declaration, report, claim for refund or information return, or statement, or any other similar filings, related to Taxes, including any schedule or attachment thereto.

"**Tax(es)**" means any tax or similar governmental charge, impost or levy whatsoever (including income, profits, franchise, transfer, use, gross receipts, value added, employment, excise, ad valorem, property, withholding, payroll, social contribution, customs duty,  trade, license, severance, stamp,

occupation, premium, environmental, capital stock, social security (or similar), unemployment, disability, real property, personal property, sales, registration, alternative or add-on minimum, estimated or windfall profit taxes or transfer fees), together with any related penalties, fines, additions to tax or interest, imposed by the United States or any state, county, local or foreign government or subdivision or agency thereof.

"**Taxable Period**" means any period for which Taxes are owed to a federal, state, local or foreign taxing authority, or for which a Tax Return is required to be filed by any of the Sellers, Sale Company or Purchasers with respect to the Business.

"**Technical Centers**" — Section 1.3.2.

"**Technical Documentation**" means all documented technical information currently in the files of the Business primarily used in the Business and owned by Sellers, in each case pertaining to the design or manufacture of the Products of the Business or the Purchased Intellectual Property.

"**Termination Date**" — Section 9.1.1.D.

"**Testing Services Agreement(s)**" — Section 7.2.8.

"**Third Party Bailed Assets**" — Section 1.4.1.

"**Third Party Indemnification Claim**" — Section 12.4.

"**Third Party Trade Payables**" means Accounts Payable which arise from and relate to the Business and are: (i) between Sellers or the Sales Company, on the one hand, and non-affiliate third parties, on the other hand; or (ii) between the Seller and/or the Sale Company, on the one hand, and another Delphi Affiliate that is not a Seller or the Sale Company, on the other hand and in the case of (ii) reflects a legitimate arm's length trade obligation as opposed to a financing transaction among such parties.

"**Toll Manufacturing Agreement(s)**" — Section 7.2.10.

"**Trade Payables**" means Accounts Payable which arise from and relate to the Business and are: (i) between Sellers or the Sales Company, on the one hand, and non-Affiliate third parties, on the other hand; (ii) between the Seller and/or the Sale Company, on the one hand, and another Seller, Sale Company or other Delphi Affiliate, on the other hand; or (iii) between the portion of any Seller that relates to the Business and any other portion of such Seller (*i.e.*, such as the canning operations of such Seller) and in the case of (ii) or (iii) reflect a legitimate arm's length trade obligation as opposed to a financing transaction among such parties.

"**Trade Receivables**" means Accounts Receivable which arise from and relate to the Business and are: (i) between Sellers or the Sales Company, on the one hand, and non-Affiliate third parties, on the other hand; (ii) between the Seller and/or the Sale Company, on the one hand, and another Seller, Sale Company or other Delphi Affiliate, on the other hand; or (iii) between the portion of any Seller that relates to the Business and any other portion of such Seller (*i.e.*, such as the canning operations of such Seller) and in the case of (ii) or (iii) reflect a legitimate arm's length trade obligation as opposed to a financing transaction among such parties.

"**Trade Secrets**" means: (i) all forms and types financial, business, scientific, technical, economic, manufacturing or engineering information, including patterns, plans, compilations, specifications, test results, tooling, program devices, formulas, designs, prototypes, testing plans, methods, techniques,

processes, procedures, programs, customer and vendor lists, pricing and cost data, whether tangible or intangible, and whether or how stored, compiled or memorialized physically, electronically, graphically, photographically or in writing, if: (a) the owner thereof has taken reasonable measures to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public, and confidential technical and business information (including ideas, formulas, compositions, inventions and conceptions of inventions whether patentable or unpatentable and whether or not reduced to practice); (ii) all copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; (iii) all rights to file and apply for, prosecute, defend and enforce any of the foregoing; and (iv) all rights to sue or recover and retain damages, costs and attorneys' fees for present and past misappropriation of any of the foregoing.

"**Trademark Rights**" means: (i) trademarks, trade names and service marks; (ii) the good will associated with trademarks, trade names and service marks; (iii) registrations and applications for registration of trademarks, trade names and service marks; (iv) copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; and (v) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Transfer Agreement(s)**" — Section 1.1.2.

"**Transfer Documents**" means such bills of sale, assignments and other good and sufficient instruments of transfer conveying and transferring to Purchasers title to the Acquired Assets and the Sale Securities as provided in this Agreement or any Transfer Agreement and as Purchasers may reasonably request, including executed assignments for the Owned Intellectual Property, where applicable.

"**Transfer Taxes**" — Section 10.5.

"**Transition Services Agreement**" means any Transition Services Agreement between Sellers and Purchasers referred to in Section 7.2.6.

"**U.S. Corporate Employees**" means those Current Employees specifically designated as such on Schedule 5.1.19.A.

"**U.S. Operations**" means the operations of the Business by the Filing Affiliates including the manufacturing operations in Tulsa, Oklahoma, the Flint, Michigan, technical center and the sales and other business activities in Troy, Michigan.

"**Umicore**" — Preamble.

"**United States**" or "**U.S.**" means the fifty (50) states and the District of Columbia of the United States of America.

"**USA PATRIOT Act**" — Section 5.2.11.

"**Used in Connection with the Business**" — Section 1.3.1.

"**WARN Act**" means the Workers Adjustment and Retraining Notification Act of 1989, as amended, and the regulations promulgated thereunder.

"**Warranties**" refers to the representations and warranties provided by Sellers to Purchasers, or by Purchasers to Sellers, as the case may be, in each case as referred to in Article 5 of this Agreement or expressly set forth in any Transfer Agreement.

"**Works Council**" means any organization formed by, and comprised of, employees of the Business, any Seller or the Sale Company that represent the interests of, and negotiates on behalf of, such employees with respect to employment and benefit matters.

1.    **CONVEYANCE OF THE ACQUIRED ASSETS AND SALE SECURITIES:**

    **1.1.    General.**  Subject to the terms and conditions of this Agreement, at the Closing, the Sellers described on Schedule 1 shall sell, transfer and assign the Purchased Assets sold by such Seller to the corresponding Purchasers described on Schedule 1 in accordance with this Section 1.1.  The Parties agree that the transfer of the Purchased Assets shall be governed by this Agreement.

    **1.1.1.    Transfer of Purchased Assets.**  Subject to Section 1.1.3 below, at Closing, the transfer of the Purchased Assets may be effected through one or more transfers embodied in and pursuant to the applicable Transfer Agreements as may be necessary or advisable under applicable local Laws.

    **1.1.2.    Identity of Purchasers.**  Attached hereto is a preliminary Schedule 1 reflecting the identity of certain of the Umicore affiliates who are anticipated to be the Purchasers hereunder. Umicore may make changes to the identities of any of such Purchasers (other than Purchasers of Purchased Assets from any of the Filing Affiliates) on or before five (5) days prior to the date of the Auction, provided that it may make changes to the identity of any Purchaser purchasing assets in France at any time on or before ten (10) Business Days prior to the Closing Date or such earlier date as may be reasonably requested by Delphi and agreed by Umicore as may be necessary in connection with the transfer of Contracts relating to the Business in France.  Each such Umicore affiliate shall be a direct or indirect wholly-owned subsidiary of Umicore.  Consistent with Section 7.2, the Parties agree to cooperate to finalize any Transfer Agreements required by or advisable under applicable local Law to transfer the Purchased Assets consistent with the transferors and transferees and Purchased Assets described on Schedule 1 (collectively, such local country, non-U.S. agreements under which the Acquired Assets and Sale Securities may be transferred by the Asset Sellers and Securities Sellers to the Asset Purchasers and Securities Purchasers are referred to herein as the "**Transfer Agreement(s)**").

    **1.1.3.    Governing Documents.**  To the extent that there is an inconsistency between a Transfer Agreement (or its effect) and this Agreement, this Agreement shall control, except to the extent that the intent for a Transfer Agreement to control is expressly stated in such Transfer Agreement.  The Parties agree to cooperate with each other in effecting the multiple transfers required to effect the transactions contemplated by this Agreement, and to enter into any additional Contracts reasonably necessary or advisable under applicable Law to effect and document the desired transfer.

    **1.2.    Sale Securities.**  With respect to the Sale Company, upon the terms and subject to the conditions set forth in this Agreement (subject to Section 1.1.3 above), on the Closing Date, DASHI shall sell, transfer, assign, convey and deliver to the Securities Purchaser the Sale Securities; and Umicore shall cause the Securities Purchaser to purchase, accept and acquire the Sale Securities.

**1.3.    Acquired Assets Transactions.**  Upon the terms and subject to the conditions set forth in this Agreement, as modified or supplemented by any applicable Transfer Agreement (subject to Section 1.1.3 above), at Closing, Delphi shall, and shall cause each of the Asset Sellers to, and each of the Asset Sellers shall, sell, transfer, assign, convey and deliver to the Asset Purchasers, and Purchasers shall, or shall cause each of the Asset Purchasers to purchase, accept and acquire from the Asset Sellers, free and clear of all Liens except: (i) Permitted Encumbrances; (ii) Permitted Liens; and (iii) Liens included in the Assumed Liabilities assumed by Purchasers pursuant to Article 2, all of the assets and properties described in Section 1.3.1 below, subject in each case to Section 1.4 in respect of Excluded Assets (collectively, the "**Acquired Assets**").

**1.3.1.    Acquired Assets.**  The Acquired Assets consist of all of Sellers' right, title and interest in and to the rights and assets Used in Connection with the Business (as defined below) by the Sellers (other than the Excluded Assets) including: Accounts Receivable (other than Excluded Trade Receivables); Other Book Assets; Real Property; Personal Property; Permits; Inventory (wherever located and including all Inventory in transit or on order and not yet delivered, and all rights with respect to the processing and completion of any work-in-process, including the right to collect and receive charges for the Products and services performed by the Asset Sellers or the Sale Company with respect thereto); Contracts (including the Indian License and Equipment Lease Arrangements, and Capital Leases); Administrative Assets; and Purchased Intellectual Property, in each case to the extent Used in Connection with the Business, together with all other property and assets of every kind or nature Used in Connection with the Business (other than the Excluded Assets); provided that: (i) with respect to the Sales Offices, the Acquired Assets shall consist only of the Assets specifically set forth in Schedule 1.3.1; and (ii) with respect to the Carved-Out Locations, the Acquired Assets shall consist only of the assets set forth in Sections 1.3.2 below. The term "**Used in Connection with the Business**" as used herein shall mean all of those assets comprising the foregoing asset categories including any other assets owned, leased, licensed or otherwise held by a Seller or the Sale Company which were acquired for use or held for use by such Seller or Sale Company primarily in connection with the Business as currently conducted and which are necessary for the continued operation of the Business after the Closing in substantially the same manner as before the Closing, and including all current and total assets which would be reflected on the books of account of the Business if such accounts were: (i) presented on a carved-out or stand-alone basis; and (ii) audited by an independent accounting firm as of the Closing Date.  It is specifically understood and agreed that the Purchasers are acquiring, and the Sellers are selling, all of the tangible and intangible assets Used in Connection with the Business by the Asset Sellers or the Sale Company, except to the extent any such assets are included in the definition of the Excluded Assets.

**1.3.2.    Carved-Out Location Assets.**    Notwithstanding Section 1.3.1 above and consistent with the terms of Sections 1.4.8, 1.4.9 and 1.4.10 below relating to certain Excluded Assets, the Sellers are only selling and the Purchasers are only purchasing certain specific assets Used in Connection with the Business in respect of the Sellers' catalyst operations in Clayton-Melbourne, Australia, San Luis Potosí, Mexico and Shanghai, China (the "**Carved-Out Manufacturing Locations**") and catalyst technical and testing centers in Flint, Michigan and Bascharage, Luxembourg (the "**Technical Centers**" and, together with the Carved-Out Manufacturing Locations, collectively the "**Carved-Out Locations**") as set forth below.

**1.3.2.1.**    In respect of the Carved-Out Manufacturing Locations, the applicable Asset Purchasers shall only acquire at the Closing the Accounts Receivables (but excluding any Excluded Trade Receivables), Inventory (other than work-in-process at the Shanghai location), Contracts with customers of the Business, direct material supplier

Contracts of the Shanghai, China operations as required for the performance of its material purchase obligation under the Shanghai Toll Manufacturing Agreement, Administrative Assets used in connection with such Acquired Assets, Purchased Intellectual Property, Carved-Out Locations Acquired Equipment and Machinery (including those items to be selected by Purchaser at a mutually agreed time before Closing from among the Assets set forth on Schedule 1.3.2.1, such list to be completed by Purchaser) and Other Book Assets Used in Connection with the Business at such locations (collectively, the "**Acquired Carved-Out Manufacturing Location Assets**"). For purposes of this Section 1.3.2.1, Contracts shall only *include* any open or pending Contracts with customers and any Capital Leases for Carved-Out Locations Acquired Equipment and Machinery and shall specifically *exclude* any Contracts: (x) with suppliers or vendors of the Business; (y) governing the provision of utilities (*i.e.*, water, electricity, gas) services to any Seller; and (z) for the acquisition or purchase of raw materials by any Seller (other than in respect of the Shanghai, China location as described above). Consistent with the foregoing and Sections 1.4.8 and 1.4.9 below, the Sellers shall retain and the Purchasers shall not acquire all of the other tangible and intangible assets of the Business at the Carved-Out Locations, including any Real Property, Personal Property (other than the Carved-Out Locations Acquired Equipment and Machinery), Permits, and other tangible assets (including production furnaces other than the most recently acquired gas furnace in Shanghai) of the Business at the Carved-Out Locations (collectively, the "**Excluded Carved-Out Location Assets**"). The arrangements pertaining to the fulfillment of such open or pending Contracts and other matters among the relevant Purchasers and Sellers (as well as the Chinese Joint Venture in respect of the Shanghai, China operations) shall be governed by the Toll Manufacturing Agreements and Transition Services Agreement.

1.3.2.2. In respect of the Sellers' Technical Centers, the Sellers are only selling and the applicable Asset Purchasers are only purchasing the Purchased Intellectual Property Used in Connection with the Business at the Technical Centers and certain confidentiality agreements included in the Listed Contracts with respect to the Luxembourg testing center (the "**Acquired Carved-Out Technical Center Assets**" and, together with the Acquired Carved-Out Manufacturing Location Assets, the "**Acquired Carved-Out Location Assets**"). Consistent with the foregoing and Section 1.4.10 below, the Sellers shall retain and the Purchasers shall not acquire any of the Excluded Carved-Out Location Assets located at the Carved-Out Technical Centers. At the Closing, the appropriate Sellers and Asset Purchasers shall enter into Testing Services Agreements with respect to each Technical Center.

1.4. **Excluded Assets**. Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreement, the following properties and assets shall not be included in the Acquired Assets:

1.4.1. **Bailed Assets**. Any machinery, equipment, tools, Inventory (including Consigned PGMs), tooling, dies, molds, patterns, jigs, gauges, production fixtures, special material handling equipment, customer dunnage and containers owned by an OEM or a Tier 1 Supplier thereto or any other third party, including such items referred to in Schedule 1.4.1 ("**Third Party Bailed Assets**"); provided, however, that any Contracts pertaining to such bailment arrangements shall be transferred as part of the Acquired Assets in accordance with Section 1.3.1 and Section 1.3.2 above.

1.4.2. **Personnel and Medical Records**. All work histories, personnel and medical records of employees and former employees of any Seller who worked at any time for any reason at

the Business for whom a record exists at the Business at the time of Closing; provided, however, so far as legally permissible under applicable data protection, privacy or similar Laws, Purchasers will be provided the originals of all personnel and medical records of all Hired Current Employees, after posted written notice or other appropriate notice to such employees if legally required or if Sellers so elect. All such personnel and medical records of such employees shall be books and records governed by Section 8.10.3 of this Agreement. Upon written request of a Seller (or an Affiliate of a Seller), Purchasers shall promptly return any and all of these records to such Seller (or an Affiliate of such Seller as directed) at which time such Seller shall provide Purchasers with copies of the personnel and medical records of such employees. If an employee objects to provision of personnel or medical records to Purchasers, the records will not be provided, except to the extent Sellers determine that provision of the records to Purchasers over the objections by the employee is permitted by the applicable local Law without adverse consequences to Sellers.

**1.4.3.   Certain Financial Assets.** Cash, cash equivalents and bank accounts; provided, however, that to the extent any local or other bank accounts are held by the Sale Company and are necessary for the operation of the Business activities of such entity, Sellers agree to cause the transfers of such accounts with the Sale and Purchasers shall reimburse Sellers to the extent of any cash (net of any overdraft obligations) contained in such operating accounts as of the Closing Date.

**1.4.4.   Certain Financial Contracts.** Contracts or commitments relating to Debt (other than Capital Leases) including Contracts or commitments for the borrowing or lending of money, credit cards, lines of credit or guarantees of indebtedness; letters of credit, performance or payment bonds or guarantees of performance; or contracts or commitments with any investment banker, financial advisor, finder or broker and those contracts specifically listed in Schedule 1.4.4 ("**Excluded Financial Contracts**"); provided, that any Contracts pertaining to PGM Leases or Borrowings Used in Connection with the Business shall be transferred in accordance with Section 1.3.1 and Section 1.3.2 above and subject to the operation of the Purchase Price adjustment provisions of Article 4.

**1.4.5.   Tax Refunds, Etc.** Consistent with Article 10, any refund of Taxes, or claim for refund of Taxes, or deferred Taxes (other than deferred Taxes of the Sale Company) of any kind relating to the Acquired Assets, for any period prior to the Closing Date.

**1.4.6.   Excluded Intellectual Property.** (i) All Intellectual Property owned by Sellers or their Affiliates (except for Software, which to the extent excluded is listed on Schedule 1.4.6), which, in the case of each such item of Intellectual Property, is not Used in Connection with the Business; (ii) that Intellectual Property listed on Schedule 1.4.6; (iii) the underlying Patent Rights of Sellers that are the subject of the Atmospheric Catalyst License; and (iv) also the trademarks and/or names "Delphi" and "Delphi Catalyst" and all other trademarks, service marks and trade names of Sellers or their Affiliates not listed on Schedule 5.1.7.A.1, Schedule 5.1.7.A.2 and Schedule 5.1.7.A.3 (collectively, the "**Excluded Intellectual Property**") subject to the limited rights granted to Purchasers and their Affiliates pursuant to Section 8.10.5; provided, however, that as of the Closing Date, the Sellers agree to grant Purchasers a worldwide, perpetual, assignable (to Affiliates), royalty bearing, non-exclusive license to certain atmospheric catalyst Patent Rights on the terms set forth in the Atmospheric Catalyst License.

**1.4.7.   Excluded Canning Business.** Sellers' catalyst canning operations (i.e., the encapsulation of a coated catalyst within a sheet metal container) (the "**Excluded Canning Business**") and all assets relating thereto.

**1.4.8.   Assets of the Chinese Joint Venture.**   Other than the assets pertaining to the Chinese Joint Venture which are described in Section 1.3.2 above as being part of the Acquired Carved-Out Manufacturing Location Assets, all assets of the Chinese Joint Venture including the Excluded Carved-Out Manufacturing Location Assets pertaining to the Chinese Joint Venture.

**1.4.9.   Assets of the Australian and Mexican Operations.**   Other than the assets pertaining to Sellers' catalyst operations in Clayton, Australia and San Luis Potosí, Mexico (the "**Australian and Mexican Operations**") which are described in Section 1.3.2 above as being part of the Acquired Carved-Out Manufacturing Location Assets, all assets of the Australian and Mexican Operations including the Excluded Carved-Out Manufacturing Location Assets pertaining to the Australian Operations.

**1.4.10.   Technical Centers.**   Other than assets pertaining to Technical Centers described in Section 1.3.2 above as being part of the Acquired Carved-Out Technical Center Assets, all assets of the Technical Centers including the Excluded Carved-Out Technical Center Assets pertaining to the Technical Centers.

**1.4.11.   Sales Offices.**   All assets of the Sales Offices of any kind whatsoever other than those listed on Schedule 1.3.1.

**1.4.12.   Privileged Information and Materials.**   Information and materials protected by the attorney-client privilege (or its equivalent in jurisdictions outside the United States); and the lack of which excluded information and materials are not material to the operation of the Business.

**1.4.13.   Insurance.**   The benefit of any of Sellers' or Sellers' Affiliates' insurance policies relating to the operation of the Business (including any right to proceeds thereunder).

**1.4.14.   Certain Rights.**   All of the rights and claims of the Filing Affiliates available to Filing Affiliates under the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the Bankruptcy Code, and any related claims and actions arising under such sections by operation of law or otherwise, including claims against a certain PGM supplier referred to in Schedule 5.1.14.B. including any and all proceeds of the foregoing.

**1.4.15.   Real Property.**   All real property which is neither Listed Real Property nor any Improvements located thereon.

**1.4.16.   Benefit Plans.**   Any assets held on behalf of a Benefit Plan covering current or former employees of the U.S. Operations and any other Benefit Plan not required to be assumed by Purchasers as set forth in Section 2.1.4.

**1.4.17.   Collective Bargaining Agreements.**   Except as required to be assumed by applicable Laws and consistent with Section 3.9, all Collective Bargaining Agreements (including the Existing Tulsa Collective Bargaining Agreement).

**1.4.18.   Excluded Trade Receivables.** All Excluded Trade Receivables.

**1.4.19.   Certain Contracts.** With respect to any Carved-Out Manufacturing Location, any Contracts governing the provision of utility (e.g., water, electricity, gas) services to any Seller or

Contracts for the acquisition or purchase of any supplies, including raw materials by any Seller (other than Chinese raw material Contracts addressed in Section 1.3.2).

**1.4.20. Other Assets.** (i) All finished goods Inventory and all inventories, products, rights, properties, assets and businesses of the Business which shall have been transferred or disposed of by Sellers prior to Closing not in breach of this Agreement; (ii) any document, information, Permit, Contract, Intellectual Property or other asset the transfer of which is prohibited by any Law or referred to in Schedule 1.4.20; and (iii) all computer hardware, equipment, computer Software and the other assets listed on Schedule 1.4.20; provided, however, that, to the extent that Sellers' foregoing exclusion of computer hardware, equipment and software is anticipated to result in a loss or disruption to the Business of its continuing functionality, the Parties will include the necessary arrangements to avoid such loss or disruption in a Transition Services Agreement, as contemplated by Section 7.2.6.

**1.5. Post-Closing Asset Deliveries.** Should any Seller, in its reasonable discretion, determine after the Closing that books, records or other materials constituting Acquired Assets are still in the possession of such Seller or any of its Affiliates, such Seller shall or shall cause such Affiliates to promptly deliver them to the applicable Purchaser at no cost to such Purchaser. Should Sellers or Purchasers, in their reasonable discretion, determine after the Closing that books, records or other materials constituting Excluded Assets were delivered to Purchasers, Purchasers shall promptly return them to the applicable Seller at no cost to such Seller.

**1.6. Non-Assignable Permits and Contracts:**

**1.6.1. Non-Assignability.** To the extent that any Contract or Permit (except for certain critical Contracts and Permits identified in writing by a Purchaser to a Seller) included in the Acquired Assets is not capable of being assigned to Purchasers at the Closing without the consent or waiver of the issuer thereof or the other party thereto or any third party (including a Governmental Entity) that has not yet been obtained by the Parties, or if such assignment or attempted assignment would constitute a breach thereof, or a violation of any Law, this Agreement shall not constitute an assignment thereof, or an attempted assignment, unless any such consent or waiver is obtained. Schedules 5.1.11 and 5.1.14.A expressly denotes which of the Listed Contracts and Permits are not capable of being assigned to Purchasers at the Closing, but that would otherwise be considered Acquired Assets provided that noting that a consent is required to effect the transfer of Contract or Permit does not, by itself, place such Contract or Permit within this sentence.

**1.6.2. Efforts to Obtain Consents and Waivers.** At Purchaser's request, Sellers shall, at their expense, use commercially reasonable efforts, and Purchasers shall, at their expense, cooperate with Sellers, to obtain the consents and waivers and to resolve the impracticalities of assignment referred to in Section 1.6.1 after the Closing.

**1.6.3. If Waivers or Consents Cannot Be Obtained.** To the extent that the consents and waivers referred to in Section 1.6.1 are not obtained by Sellers, or until the impracticalities of assignment referred to therein are resolved, Sellers' sole responsibility with respect to such matters, notwithstanding Section 1.2, shall be to use, during the twelve (12) month period commencing with the Closing, all commercially reasonable efforts, at no cost to Sellers, to: (i) provide to the applicable Purchaser the benefits of any Permit or Contract, all as referred to in Section 1.6.1, included in the Acquired Assets; (ii) cooperate in any reasonable and lawful arrangement designed to provide such benefits to such Purchaser, without incurring any financial obligation to such

Purchaser; and (iii) enforce for the account of such Purchaser and at the cost of such Purchaser any rights of Sellers arising from the Permits or Contracts included in the Acquired Assets referred to in Section 1.6.1 against such issuer thereof or other party or parties thereto.

      **1.6.4.    Obligation of Purchasers to Perform.**    To the extent that any Purchaser is provided the benefits pursuant to Section 1.6.3 of any Permit or Contract included in the Acquired Assets, such Purchaser shall perform, on behalf of the applicable Seller, for the benefit of the issuer thereof or the other party or parties thereto, the obligations of such Seller thereunder or in connection therewith, and if such Purchaser shall fail to perform to the extent required herein, the applicable Seller, without waiving any rights or remedies that it may have under this Agreement or applicable Laws, may suspend its performance under Section 1.6.3 in respect of the instrument which is the subject of such failure to perform unless and until such situation is remedied; or such Seller may perform at such Purchaser's sole cost and expense, in which case such Purchaser shall reimburse such Seller's costs of such performance immediately upon receipt of an invoice therefor.

      **1.7.    Certain Assigned Contracts.**    With respect to those Contracts for goods or services included in the Acquired Assets and used by both the Business and the other operations of Delphi or its affiliates that are set forth on Schedule 1.7 and will be transferred to Purchasers at Closing, Purchasers shall provide Sellers with the benefits of such Contracts in substantially the manner described in Section 1.6.3 above, and Sellers shall reimburse Purchasers for such benefits in substantially the manner described in Section 1.6.4 above, until the earlier of such time as separate contracts for such goods or services have been agreed between the applicable Seller and the other party to such contracts or the termination of such Contract.

    **2.**    **ASSUMPTION OF LIABILITIES REGARDING ACQUIRED ASSETS TRANSACTIONS; RETAINED LIABILITIES:**

      **2.1.    Assumed Liabilities.**    At and as of the Closing, Umicore shall cause the applicable Asset Purchasers or Securities Purchaser to assume and agree to pay, perform and discharge when due, and shall be liable only with respect to the following obligations, Liabilities and responsibilities relating to the operation of the Business (the "**Assumed Liabilities**"):

      **2.1.1.**    The obligations of Sellers arising subsequent to the Closing under the Contracts, licenses, Permits and leases included in the Acquired Assets and assigned or otherwise transferred to Purchasers pursuant to this Agreement or the Transfer Agreements.

      **2.1.2.**    Accounts Payable (other than Excluded Trade Payables) that have been incurred in the Ordinary Course of Business, including Trade Payables to any Seller or Seller Affiliate that are not Excluded Trade Payables.

      **2.1.3.**    Claims and other obligations relating to Purchasers' ownership, operation or use of the Acquired Assets after the Closing.

      **2.1.4.**    Obligations which Purchasers are required to assume by operation of Law as a result of the Sale or by virtue of Purchasers' acquisition of the Sale Securities, under Benefit Plans covering current or former employees of the Sale Company and the Foreign Operations in Florange, France (i.e., other than the Assumed PTO Obligations described in Section 2.1.5, the Purchasers are assuming no such Liabilities or obligations in respect of Benefit Plans relating to the U.S. Operations or the Foreign Operations outside of the Sale Company and Florange, France), together

with obligations with respect to Purchasers' employment after the Closing of the Hired Current Employees, all as described in Article 3 of this Agreement.

**2.1.5.**    All PTO Obligations with respect to each Hired Current Employee (the "**Assumed PTO Obligations**").

**2.1.6.**    The obligation to pay for assets, goods or services relating to the Business and acquired pursuant to a Contract that is an Acquired Asset pursuant to this Agreement, which are ordered by any Seller on or prior to the Closing in the Ordinary Course of Business and that are received by the relevant Purchaser after Closing.

**2.1.7.**    Liabilities and obligations arising out of, resulting from, or relating to Products manufactured subsequent to the Closing, including all Product warranty, Product returns, Product Liability and Product recall Liability (recognizing that Sellers are assigning to Purchasers their rights against third party manufacturers in respect of Products manufactured subsequent to the Closing in accordance with the provisions of Section 1.3.1); provided, however, that subject to the understanding that such matters are not a Retained Liability, Purchasers' assumption of any such Product-related warranty or Liability shall be limited to the extent that it was warranted directly to a customer of the Business, that such Product met the specific specifications and test conditions mandated by such customer and, on no account shall Purchasers assume or be liable for any Product warranty, Product return, Product Liability or Product recall Liability under any Product warranty extended by a Seller or any other Delphi Affiliate to an OEM, Tier 1 supplier or other customer which covers any performance- or durability-related features of any exhaust systems-level, canning or other non-catalyst products, whether arising before, on or after the Closing Date.

**2.1.8.**    Any and all Environmental Claims or Liabilities as allocated in accordance with the principles set forth in Section 12.6 of this Agreement; provided, however, that Permit Transfer Liabilities are not an Assumed Liability hereunder.

**2.1.9.**    Any and all Claims: (i) arising after the Closing Date under health and safety Laws (such as the Occupational Safety and Health Act) applicable to employers; and (ii) for "toxic tort" for exposure of any person or property to Hazardous Material under a Law or common law to the extent the exposure giving rise to the "toxic tort" Claim occurred after the Closing Date.

**2.1.10.**    Subject to Sellers' retention of Liabilities related to Benefit Plans covering current and former employees of the U.S. Operations and non-U.S. Benefit Plans which Purchasers are not required to assume by operation of Law or by virtue of Purchasers' acquisition of the Sale Securities, all severance obligations owed or owing to any Hired Current Employees or which become due and payable to Hired Current Employees, in each case after the Closing Date, in respect of employment following the Closing Date, which results from any post-Closing transfer, attempted transfer, other condition of, or termination of employment of one or more Hired Current Employees by a Purchaser ("**Post-Closing Severance Obligations**").

**2.2.**    **No Expansion of Third Party Rights.**    The assumption by Purchasers of the Assumed Liabilities shall in no way expand the rights or remedies of any third party against any Purchaser or Seller as compared to the rights and remedies which such third party would have had against the applicable Seller absent the Bankruptcy Cases, had Purchasers not assumed such Assumed Liabilities.  Without limiting the generality of the preceding sentence, the assumption by Purchasers of the Assumed Liabilities shall not

create any third party beneficiary rights other than with respect to the Person that is the obligee of such Assumed Liability.

      **2.3.**   **Retained Liabilities.**   Notwithstanding anything in this Agreement to the contrary, other than the Assumed Liabilities, Purchasers shall not assume or be deemed to have assumed, and shall have no Liability or obligation with respect to, any other Liabilities and obligations of any Seller or the Business and the appropriate Seller shall continue to be responsible for such Liabilities and obligations (collectively, "**Retained Liabilities**").   Without limiting the generality of the foregoing, the Sellers expressly acknowledge and agree that, other than the Assumed Liabilities, the appropriate Seller shall retain, and the Purchasers shall not assume or otherwise be obligated to pay, perform, defend or discharge any: (i) Liabilities (including Liabilities relating to social security (or similar) disability, or unemployment taxes) in respect of employment or services performed by any employee of the Business or any Seller or Affiliate on or prior to the Closing Date, including Retired Employees, other than any Post-Closing Severance Obligations in accordance with Section 2.1.10 or as otherwise set forth in Article 3; (ii) Product warranty, Product return, Product Liability and Product recall Liability claims relating to Products manufactured prior to the Closing Date; (iii) Liabilities in the nature of general and automobile Liability arising prior to Closing; (iv) litigation for which a claim has been made to Sellers on or before the Closing Date or to the extent it relates to an act or omission by any Seller or Affiliate prior to such date; (v) consistent with Article 10, Tax Liabilities for periods or portions of periods ending on or before the Closing Date; (vi) Liability of the Sellers to any person or entity (including Retired Employees) in connection with any Benefit Plan covering current and former employees of the U.S. Operations and non-U.S. Benefit Plans which Purchasers are not required to assume by operation of Law or by virtue of Purchasers' acquisition of the Sale Securities, including any Liability of Delphi or any other Seller under ERISA, whether directly or as an ERISA Affiliate; (vii) to the extent not captured by the preceding clause (vi), Liability for any PTO Obligations pertaining to Current Employees (other then Hired Current Employees) or former employees of the U.S. Operations, or for any severance or stay/retention bonuses which Liabilities are for the account of the Sellers as provided in Section 3.10 below; (viii) Liability of the Sellers to any person or entity (including Retired Employees) in connection with any Benefit Plan covering the current or former employees of the Foreign Operations insofar as the Australian, Chinese, Mexican, Indian, non-U.S. Sales Offices or Luxembourg operations of the Business are concerned; (ix) any and all Environmental Claims or Liabilities as allocated in accordance with the principles set forth in Section 12.6 of this Agreement, and any and all Claims: (a) arising prior the Closing Date under health and safety Laws (such as the Occupational Safety and Health Act) applicable to employers; and (b) for "toxic tort" for exposure of any person or property to Hazardous Materials under a Law or common law to the extent the exposure giving rise to the "toxic tort" Claim occurred prior to the Closing Date; (x) any Liability or obligation of any Seller relating to any default under any of the Contracts included in the Acquired Assets or under any of the Assumed Liabilities, to the extent such default takes place or pertains to acts or omissions of any Seller or Affiliate during the period prior to the Closing Date, including any Cure Amounts related to any Assumed U.S. Contract; (xi) any Liability or obligation of any Seller for administrative fees and expenses, including "allowed administrative expenses" under Section 503(b) of the Bankruptcy Code; (xii) any Liability or obligation of any Seller for transaction fees and expenses and fees and expenses payable to lenders, brokers, financial advisors, legal counsel, accountants and other professionals in connection with this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby; (xiii) any Liabilities owed to a Seller or any of its Affiliates by any Asset Seller or Sales Company which arose before the Closing Date (other than Included Trade Payables); (xiv) all Debt owed by a Seller or a Sale Company or any of their respective Affiliates; and (xv) Excluded Trade Payables; (xvi) all Collective Bargaining Agreements (including the Existing Tulsa Collective Bargaining Agreement) and obligations thereunder except: (A) as required to be assumed by Purchasers by applicable Laws; and (B) to which the Sale Company is a party. Sellers further agree to satisfy and discharge as the same shall become due all obligations and Liabilities of the Sellers (including the Retained Liabilities) not specifically assumed by Purchasers hereunder.

3.    **ACQUIRED ASSETS - PERSONNEL MATTERS - TRANSFERRED EMPLOYEES:**

    **3.1.    Current Employees.** Schedule 5.1.19.A lists all Current Employees. With respect to each Current Employee, Schedule 5.1.19.A lists: (i) each such person's title or job/position; (ii) each such person's job designation (i.e., salaried or hourly); (iii) each such person's location of employment; (iv) each such person's employment status (i.e., actively employed or not actively at work (due to, e.g., illness, short-term disability, sick leave, authorized leave of absence, etc.)); (v) each such person's annual base rate of compensation; and, if applicable, any bonus; (vi) any material, individual specific provisions relating to such person's employment (e.g., non-compete agreement, employment agreements, deferred compensation agreement, golden parachute, etc.) to the extent permitted to be disclosed under applicable Law (including local privacy laws); (vii) with respect to hourly employees, an indication of such employee's union or non-union status, and an identification of any relevant union; (viii) a description of the Benefit Plans in which each such employee participates providing the legal name of such plan, such employee's date of birth and date of hire; and (ix) with respect to those current and deferred beneficiaries of Benefit Plans which will be assumed by Purchasers by operation of law or as a result of acquisition of the Sale Company, a description of the benefit entitlement of each such beneficiary and whether such beneficiary is a current or deferred beneficiary and, if deferred, the date on which such benefit will become due; provided, however, that in respect of the information referred to in clause (vi), if such information is not on Schedule 5.1.19.A, Sellers may provide such information to Purchasers under separate cover. Purchaser will make offers of employment to all active hourly Current Employees of the Tulsa operations. From the date of this Agreement until five (5) days prior to Closing, Purchaser will provide Sellers with monthly updates as to status of Purchaser's discussions with U.S. salaried Current Employees. Not later than thirty-five (35) days prior to the Closing Date, Sellers will provide Purchasers with an updated Schedule 5.1.19.A, marked to show changes from the original list. With respect to those Current Employees of an Asset Seller (other than those who will automatically become Hired Current Employees by operation of Law or contract as a result of the Sale), no later than five (5) days prior to Closing, Purchasers will provide Sellers with a list of Current Employees to whom any Purchaser has made an offer of employment that has been accepted to be effective on the Closing Date. On the Closing Date, Schedule 5.1.19.A will be updated to include only Hired Current Employees.

    **3.2.    Offer of Employment:**

        **3.2.1.** Set forth on Schedule 3.2.1 is the agreement among the Parties with respect to certain matters relating to the Current Employees.

        **3.2.2.** The following provisions of this Section 3.2.2 apply only to Current Employees of Shanghai, China and San Luis Potosi, Mexico locations, since Purchaser has agreed not to contact Seller's Current Employees in Australia with respect to offers of employment. Notwithstanding the foregoing, with respect to employees of the Business located at the Sellers' Shanghai, China or San Luis Potosi, Mexico locations (but not Clayton, Australia), at any time prior to the termination of the applicable Toll Manufacturing Agreement covering such location, Purchasers shall provide Sellers with a list of employees to whom Seller intends to make an offer of employment effective upon the termination of such Toll Manufacturing Agreement (or such sooner date as such Seller and such Purchaser shall agree). During the term of the relevant Toll Manufacturing Agreement, Purchasers and Sellers shall reasonably consult regarding, and Sellers shall provide reasonable access to, employees providing services under the relevant Toll Manufacturing Agreements each for the purpose of allowing Purchasers to evaluate such employees for potential employment with Purchasers. For a period of three (3) months following the Closing, or at any time with respect to the persons named on a list (following their being placed on such list) provided to the Sellers pursuant to the second sentence of this subsection, Sellers shall take no action, or fail to take any

action, intended to cause any such employee to not accept employment with any Purchaser (or its Affiliates) including transferring or reassigning any such employee to, or offering any, alternative positions with the Seller or any of its Affiliates.  In the event the Purchaser offers employment to any such employee and the employee accepts such employment, the applicable Purchaser and Seller shall reasonably cooperate to transfer the employment of such employee(s) to the Purchaser at the end of the relevant Toll Manufacturing Agreement.

  **3.2.3.** Subject to applicable Laws and to the longer period with respect to certain Current Employees as set forth in Section 3.2.2 above, Sellers agree to provide, through the Closing Date, Purchasers with reasonable access to all Current Employees (and related personnel and medical records and facilities), including but not limited to facilitating interviews of, and offers of employment to, such employees.  Sellers will release to, or obtain release of and deliver to Purchasers experience records from Sellers' insurer to allow Purchasers to pursue and seek bids for health and risk benefit plans.

  **3.2.4.** Purchasers will set their own initial terms and conditions of employment for the Hired Current Employees and others it may hire, including work rules, benefits and salary and wage structure, all in accordance and consistent with such Purchaser's own policies and plans and as permitted by applicable Laws.  Other than merit programs and annual wage increases in the Ordinary Course of Business and benefits set forth on Schedule 3.2.4, no Seller has made any announcement in the past twelve (12) months to any Current Employee regarding any continuation, introduction, increase or improvement of any Benefit Plan, and no Seller will make any such announcement prior to Closing without the prior written consent of Purchasers.  Except as explicitly provided in this Agreement or by operation of Law, Purchasers will assume no Liabilities with respect to any Benefit Plan of any Seller.  It is understood and agreed that: (i) Purchasers' intention to extend certain offers of employment as set forth in this Section 3.2 will not constitute a contract (express or implied) on the part of any Purchaser to any post-Closing employment relationship of any fixed term or duration or upon any terms or conditions other than those that a Purchaser may establish pursuant to individual offers of employment; and (ii) any employment offered by any Purchaser is "at will" and may be terminated by Purchaser or by an employee at any time for any reason (subject to any written commitments to the contrary made by a Purchaser or an employee and applicable Laws governing employment).  Nothing in this Agreement will be deemed to prevent or restrict in any way the right of any Purchaser to terminate, reassign, promote or demote any of the Hired Current Employees after the Closing, or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations, salaries, other compensation or terms or conditions of employment of such employees; provided, however, that Purchasers' may be subject to Post-Closing Severance Obligations pursuant to Section 2.1.10 above.  Notwithstanding the foregoing, the Purchasers shall recognize the seniority status (*e.g.,* years of service) of all Hired Current Employees for all purposes of the employment of such Hired Current Employees with such Purchaser; provided, however, that Purchasers shall not be obligated to factor seniority status into any initial hiring decisions.

  **3.3.** **Purchasers' U.S. Benefit Plans.** U.S. Hired Current Employees' and their eligible dependents and beneficiaries participation in and eligibility for benefits under Purchasers' Benefit Plans will commence no later than two (2) months following the Closing Date.  Purchasers will recognize each Hired Current Employees' pre-Closing service with Seller for eligibility and vesting purposes under Purchasers' Benefit Plans; provided, however, that such recognition will not cause a duplication of benefits being provided to the Hired Current Employees by Sellers and Purchasers.

**3.4.    WARN Act.**  In respect of the U.S. Operations, Sellers shall be responsible for and shall pay all Liabilities or obligations arising under the WARN Act, if any, arising out of or resulting from layoffs of Current Employees or any termination of their employment which occurs prior to or on the Closing Date. The applicable Purchasers shall be responsible for and shall pay all Liabilities or obligations arising under the WARN Act, if any, arising out of or resulting from layoffs of Hired Current Employees or any termination of their employment which occurs after the Closing Date.

**3.5.    Sellers' U.S. Pension Plans.**  Consistent with Sections 2.1.4 and 2.3(v), Sellers are retaining and Purchasers are not assuming any assets or Liabilities relating to Benefit Plans covering current or former employees of, or otherwise sponsored by, the U.S. Operations.  Accordingly, all Hired Current Employees in the U.S. who are participants in the Benefit Plans that are pension plans as defined in ERISA Section 3(2) will be fully vested in their accounts under such Benefit Plans as of the Closing Date; provided, however, that the applicable Seller (or the applicable Benefit Plan) will retain sole Liability for the payment of such benefits as and when such Hired Current Employees become eligible for such benefits under such U.S. Benefit Plans, and Purchasers will assume no Liabilities with respect to such U.S. Benefit Plans.

**3.6.    Non-U.S. Benefit Plans.**  Consistent with Section 2.1.4, Sellers are not retaining and Purchasers are assuming Liabilities relating to Benefit Plans covering current or former employees of the Sale Company and the Foreign Operations in Florange, France which Purchasers are required to assume by operation of Law or by virtue of Securities Purchasers' acquisition of the Sale Securities.  Accordingly, all Hired Current Employees who are participants in the non-U.S. Benefit Plans covering current or former employees of the Sale Company or of the Foreign Operations in Florange, France which are so assumed by Purchasers will retain their benefits under such Benefit Plans as of the Closing Date in accordance with applicable Laws, the applicable Purchaser (or the applicable non-U.S. Benefit Plan so assumed by Purchasers) will assume (or retain) sole Liability for further payment of such benefits as when such Hired Current Employees became eligible for such benefits under such non-U.S. Benefit Plans.  Seller shall retain and Purchasers will assume no Liabilities with respect to any other non-U.S. Benefit Plans.  Purchasers' are not assuming any Liabilities or assets with respect to any non-U.S. Benefit Plans that the Purchasers are not required to assume by operation of Law or by virtue of the securities acquisition of the Sale Securities.

**3.7.    Continuation of U.S. Health Plans by Sellers after the Closing.**  Sellers shall maintain, keep in good standing (including make all required regulatory filings), and not terminate each of the Benefits Plans listed on Schedule 5.1.19.C (collectively, the "**Seller U.S. Health Plans**") until the earlier of: (i) the date that is two (2) months after the Closing Date; and (ii) written notification from Purchasers that a Purchaser has established health plans providing coverage for Hired Current Employees.  During such two (2) month period, unless Sellers continue to provide coverage for all Hired Current Employees under the Seller U.S. Health Plans, Sellers shall make available to any such Hired Current Employees as are located in the U.S. continuation coverage under the Consolidated Omnibus Budget Reconciliation Act of 1986, as amended ("**COBRA**"), to such Hired Current Employees (the "**Covered Employees**") (and their "qualified beneficiaries," as such term is defined by COBRA) and to the "M&A qualified beneficiaries" (as such term is defined in Treasury Regulation § 54.4980B-9 Q&A-4(a)), all in accordance with the terms of the Transition Services Agreement.  Except for reimbursing Seller's costs as set forth in the Transition Services Agreement, Purchasers shall not have any obligation to collect or pay to Sellers the COBRA premium payments of the Covered Employees (and their qualified beneficiaries) or the M&A qualified beneficiaries, or to make available COBRA continuation coverage to any covered Employee or M&A qualified beneficiaries or any other current or former employee of Seller.  Purchasers' reimbursement of Sellers for the costs associated with the foregoing shall be reimbursed by such Purchaser(s) in accordance with the terms of the Transition Services Agreement.  Purchasers shall not have any responsibilities, obligations or Liabilities for the Seller U.S. Health Plans or to extend or administer COBRA continuation coverage to Covered Employees or to M&A qualified beneficiaries as a consequence of the sale of Purchased Assets

described herein. Sellers shall retain all responsibility for and shall satisfy all Claims Incurred (as defined below) under the Seller U.S. Health Plans on or prior to Closing Date.  For purposes of this Section 3.7, the term "**Claims Incurred**" means that the medical services giving rise to such medical plan claims have actually been performed.  Sellers will not take any action without the prior written consent of Purchasers that would result in the termination of the Seller U.S. Health Plans or otherwise result in Sellers being unable to provide continuation coverage to the Covered Employees (and their qualified beneficiaries) and the M&A qualified beneficiaries in accordance with this Section 3.7.

**3.8.    U.S. Benefit Plans For Retired Employees.**  Except for benefits to Retired Employees under Benefit Plans required to be assumed by Purchasers by operation of Law or by virtue of Securities Purchaser's acquisition of the Sale Securities, Sellers will retain sole Liability for the continued payment of benefits for Retired Employees, and Purchasers will assume no Liabilities to provide any employee welfare benefits, or pay for any employee welfare benefit plans (or any other Benefit Plans) with respect to such Retired Employees.

**3.9.    Collective Bargaining Agreements.**    Schedule 5.1.19.D lists all material collective bargaining agreements with any labor union, Works Council or other representative of Current Employees (including material local agreements, amendments, supplements, letters and memoranda of understanding of any kind) (collectively, the "**Collective Bargaining Agreements**").  Except as required by applicable Laws, Purchasers are not obligated to assume any Collective Bargaining Agreements under this Agreement (including the Existing Tulsa Collective Bargaining Agreement).  As and to the extent required by law, Purchasers will negotiate in good faith with the counterparties to the Collective Bargaining Agreements with respect to the status of all Hired Current Employees who were employed in accordance with a Collective Bargaining Agreement.

**3.10.  Severance; Stay/Retention Bonuses.**  Except in respect of Post-Closing Severance Obligations, Sellers retain all obligations and Liabilities relating to any claims for severance, termination (actual or constructive), change in control agreements, stay or retention bonuses or other payments or benefits of Current Employees deriving from Purchasers' purchase of the Business or the Purchased Assets. In the event that following the Closing any Seller is required to pay any stay or retention bonuses or make other payments or provide any benefits to any employees at one or more Carved-Out Locations to incentivize such employees to fulfill Seller's obligations under any Ancillary Agreement, such Seller shall bear the entire cost of any such payments, benefits or incentives, except as otherwise expressly agreed by Purchaser in connection with the Toll Manufacturing Agreement for the Shanghai, China Carved-Out Manufacturing Location.

**3.11.  Cooperation.** Sellers and Purchasers will provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this Article 3.

**3.12.  No Third Party Rights.**  No provision of this Agreement confers rights or remedies upon any person, including Current Employees, other than the Parties to this Agreement.

**3.13.  PTO Obligations.**   Subject to the related Purchase Price adjustment mechanism in Section 4.6.6, the Purchasers shall assume, and the Sellers shall have no obligation for, Assumed PTO Obligations with respect to each Hired Current Employee. The Sellers shall retain Liability for PTO Obligations owed to each Current Employee or former employee who is not a Hired Current Employee.

**3.14.   Workers' Compensation.** Seller's will retain responsibility for all Liabilities, for worker's compensation benefits related to injuries or illnesses to the extent incurred by U.S. Hired Current

Employees prior to the Closing Date. Purchaser's will have responsibility for all Liabilities, for worker's compensation benefits related to injuries or illnesses to the extent incurred by U.S. Hired Current Employees following the Closing Date.

**4.      PURCHASE PRICE:**

**4.1.      Preliminary Purchase Price.**  Subject to the terms and conditions of this Agreement, in consideration of the Sale, the aggregate purchase price for the Acquired Assets, Assumed Liabilities and Sale Securities shall be the amount of Fifty-Five Million Six Hundred Thousand U.S. Dollars (U.S. $55,600,000.00) ("**Preliminary Purchase Price**") subject to the escrow provisions set forth below in Sections 4.2 and 4.3 and to the adjustments which may occur by operation of the other provisions of this Section 4 below.  The final aggregate, adjusted purchase price, as so determined, is referred to herein as the "**Purchase Price**".

**4.2.      Deposit Amount.**  Upon execution of this Agreement by the Parties and the issuance  by the Bankruptcy Court of the Bidding Procedures Order, Purchaser will deliver to the Escrow Agent pursuant to the terms of the Deposit Escrow Agreement ONE MILLION U.S. Dollars (U.S $1,000,000) in immediately available funds (such amount, together with the interest accrued thereon prior to the Closing, the "**Deposit Amount**"), to be held by the Escrow Agent in an interest bearing account of the Escrow Agent to serve as an earnest money deposit under this Agreement, and to be released in accordance with the following procedures:

    **4.2.1.      Deposit Instructions.** The Escrow Agent shall deposit the Deposit Amount in an account of the Escrow Agent (and such amount shall be applied towards the payment of the Purchase Price);

    **4.2.2.      Violation of Agreement.**  Upon any breach by a Purchaser of this Agreement which results in termination by Sellers of this Agreement pursuant to Section 9.1.3.B, the Escrow Agent shall deliver the Deposit Amount, in accordance with the terms of the Deposit Escrow Agreement, by wire transfer of immediately available funds, to an account designated by Delphi on behalf of the Sellers in the Deposit Escrow Agreement, to be retained by Sellers; and

    **4.2.3.      Other Reason.**  Upon termination of this Agreement for any other reason, Delphi (on behalf of the Sellers) and Umicore (on behalf of the Purchasers) shall jointly instruct the Escrow Agent to deliver the Deposit Amount, by wire transfer of immediately available funds, to an account designated by Umicore on behalf of the Purchasers in the Deposit Escrow Agreement, to be retained by Purchasers.

**4.3.      Escrow Amount.**  At the Closing, and in accordance with the terms of a mutually acceptable escrow agreement (the "**Closing Escrow Agreement**"), Purchasers shall deliver to the Escrow Agent Seven Million U.S. Dollars (U.S. $7,000,000) of the Purchase Price in immediately available funds (such amount, together with the interest accrued thereon prior to the Closing, the "**Escrow Amount**"), to be held by the Escrow Agent in an interest-bearing account of the Escrow Agent which shall serve as an escrow in case: (i) the Preliminary Purchase Price is reduced pursuant to adjustments following the Closing by the operation of Sections 4.6 and 4.7 below; or (ii) there are indemnification claims pursuant to Article 12 below, and which shall be released in accordance with the terms of the Closing Escrow Agreement, including:

      **A.**      Up to Five Million U.S. Dollars (U.S. $5,000,000) shall be released following the conclusion of the post-Closing Purchase Price adjustment process established by the other provisions of this Article 4 below;

      **B.**      On each of the six (6) and twelve (12) month anniversaries of the Closing, U.S. $750,000, net of any amounts to be held in reserve for pending indemnification claims as to which Sellers have received notice from Purchasers prior to such anniversary date, shall be released to Delphi on behalf of the Non-Filing Affiliates; and

      **C.**      On the eighteen (18) month anniversary of the Closing, all amounts remaining in escrow, net of any amounts held in reserve for pending indemnification Claims as to which Sellers have received notice from Purchasers prior to such anniversary date, shall be released to Delphi on behalf of the Non-Filing Affiliates.

In the event of a conflict between this Section 4.3 and the Closing Escrow Agreement, the terms of the Closing Escrow Agreement shall govern.

      **4.4.**    **Delivery of Purchase Price.**  At Closing, and subject to the other terms and conditions of this Agreement: (i) Purchasers shall pay to Sellers an aggregate amount equal to the Preliminary Purchase Price as adjusted pursuant to Section 4.6 below, *less* the sum of: (a) the Deposit Amount; (b) the Escrow Amount; and (c) the amount of any Preliminary Purchase Price paid by the Purchaser of the Shanghai, China Acquired Assets to the Seller of the Shanghai, China Acquired Assets in local currency; and (ii) the Escrow Agent shall deliver the Deposit Amount, in accordance with the terms of the Deposit Escrow Agreement, by wire transfer in immediately available funds to Delphi on behalf of the Sellers to an account designated by Delphi.

      **4.5.**    **Pre-Closing Review of PGM Inventory Levels.**  Not less than (6) Business Days prior to Closing, Sellers will produce and deliver to Purchasers a written statement, in form and substance reasonably satisfactory to the Purchasers (the "**Preliminary Closing PGM Inventory Statement**") summarizing the volumes by weight of the Owned PGMs (and also showing actual, verifiable cost for such Owned PGMs), Consigned PGMs and Restitution Commitments and PGM Leases and Borrowings, if any, as of end of the month preceding the expected Closing Date as updated to reflect any projections for the period until the anticipated Closing Date.  The Preliminary Closing PGM Inventory Statement shall form the basis for the calculation of the Closing adjustments set forth in Sections 4.6.2 through 4.6.4 below.

      **4.6.**    **Adjustments to Purchase Price.**  The Purchase Price shall be adjusted at Closing as set forth below in this Section 4.6.  The Parties agree that any adjustments to the Purchase Price required pursuant to this Article 4 shall not be double counted in connection with any other adjustment to the Purchase Price under any other provisions of this Agreement.

      **4.6.1.**    **Net Working Capital.**  Not less than six (6) Business Days prior to Closing, Sellers shall deliver to the Purchasers an estimate, calculated in accordance with the Net Working Capital Methodology and otherwise reasonably satisfactory to the Purchasers, of the Business' Net Working Capital as of the Closing (the "**Preliminary Closing Date Net Working Capital Calculation**") together with appropriate supporting documentation (e.g., a schedule of Trade Payables and Trade Receivables, etc.) necessary to support such calculation.  At the Closing, if the Business' Net Working Capital as set forth in the Preliminary Closing Date Net Working Capital Calculation is less than or greater than the Net Working Capital Target by more than U.S. $500,000, then the Purchase Price shall be adjusted (on a dollar-for-dollar basis): (i) upward by the amount that the Business' Net Working Capital (calculated in accordance with the Net Working Capital

Methodology) exceeds the Net Working Capital Target; or (ii) downward by the amount that the
Business' Net Working Capital (calculated in accordance with the Net Working Capital
Methodology) is less than the Net Working Capital Target. For purposes of clarification, and not
limitation, the adjustment based on Net Working Capital set forth in this Section 4.6.1 is in addition
to, without duplication of any of the elements of, the adjustment for changes in Owned PGMs set
forth in Section 4.6.2.

**4.6.2.    Adjustments for Changes in Owned PGMs:**

**4.6.2.1.**    If and to the extent that the volume of Owned PGMs shown on the
Preliminary Closing PGM Inventory Statement (the "**Preliminary Closing Owned
PGMs**") fall short of the volume of the Owned PGM Volume Targets with respect to any
particular PGM (with respect to such PGM, an "**Owned PGM Shortfall**"), the Preliminary
Purchase Price shall be decreased by the dollar amount necessary for Purchasers to acquire
sufficient volumes of such PGM to satisfy such Owned PGM Shortfall at market prices as
of the Closing Date (calculated using the PGM Pricing Methodology as of the Closing
Date).

**4.6.2.2.**    If and to the extent the volume of the Preliminary Closing Owned PGMs
exceeds the Owned PGM Volume Targets with respect to any particular PGM (with
respect to such PGM, an "**Owned PGM Surplus**"), the Purchase Price shall be increased
by the value of the Owned PGM Surplus (calculated using Delphi's actual cost verified by
customer commitments for Owned PGM Surplus).

**4.6.2.3.**    In the event of an Owned PGM Shortfall with respect to one or more
PGMS as well as an Owned PGM Surplus with respect to one or more PGMs, the Purchase
Price shall be adjusted, upward or downward by the net amount of such Owned PGM
Surplus and Owned PGM Shortfall adjustments.

**4.6.2.4.    (a)**    Once the quantitative adjustments have been completed under
Sections 4.6.2.1 through 4.6.2.3 above, then if and to the extent that the actual costs
verified by customer commitments reflected on the Preliminary Closing PGM Inventory
Statement with respect to any particular Owned PGM Target exceeds the PGM Target
Value for such PGM, the Purchase Price shall be increased by the differential.  If, on the
other hand, the actual costs verified by customer commitments reflected in the Preliminary
Closing PGM Inventory Statement in respect of any particular Owned PGM Target is less
than the Owned PGM Target Value for such Owned PGM, the Purchase Price shall be
reduced by the differential.  Adjustments shall be made pursuant to this Section 4.6.2.4 only
to the extent the actual costs verified by customer commitments referenced in the
preceding two sentences can be reconciled to Contracts with customers of the Business.

**(b)**        For any Owned PGM not covered by the proceeding paragraph, then if and
to the extent that the verified actual costs reflected on the Preliminary Closing PGM
Inventory Statement with respect to these Owned PGM exceeds the PGM Target Value for
such Owned PGM, the Purchase Price shall be increased by the differential.  If, on the other
hand, the verified actual costs reflected in the Preliminary Closing PGM Inventory
Statement in respect to these Owned PGM is less than the Owned PGM Target Value for
such Owned PGM, the Purchase Price shall be reduced by the differential.

The Parties agree that any adjustment to the Purchase Price required as a result of a change in volume of the Owned PGMs pursuant to the terms of this Section 4.6.2 shall not be double counted in connection with any adjustment to the Purchase Price under any other provision of this Agreement (e.g., under Section 4.6.1 in connection with Net Working Capital (calculated in accordance with the Net Working Capital Methodology) to the extent of any change in Inventory that resulted from a change in PGM Inventory).

Notwithstanding the foregoing, no adjustment shall be made to the Purchase Price pursuant to this Section 4.6.2 unless the adjustment (upwards or downwards) called for by this Section 4.6.2 is at least U.S. $250,000 (and, if so, any adjustment shall be back to dollar one).

**4.6.3.    Adjustment Related to Unfulfilled Restitution Commitments.**  If and to the extent the calculation of the Business' Consigned PGMs and Restitution Commitments set forth on the Preliminary Closing PGM Inventory Statement (the "**Preliminary Restitution Commitments**") shows that as of the Closing Date there is a negative discrepancy between volumes of Consigned PGMs, on the one hand, and Restitution Commitments of the Business, on the other (e.g., the level of Consigned PGMs of the Business as of the Closing Date are insufficient to satisfy the outstanding Restitution Commitments as of such date), the Purchase Price shall be decreased by the amount necessary for Purchasers to acquire sufficient volumes of PGMs as needed to satisfy such uncovered Restitution Commitments at market prices as of the Closing Date (calculated using the PGM Pricing Methodology as of the Closing Date).

**4.6.4.    Adjustments for PGM Leases or Borrowings.**  If and to the extent that the PGM Leases or Borrowings calculation set forth on the Preliminary Closing PGM Inventory Statement indicates that the Business is subject to any PGM Leases or Borrowings as of the Closing Date, the PGM Leases or Borrowings shall be treated as Debt and the Purchase Price shall be reduced on a dollar-for-dollar basis by the amount of such PGM Leases or Borrowings at the Closing.  For purposes of this Agreement: (i) the term "**PGM Leases or Borrowings**" means the total amount of all PGM Leases or Borrowings where a Seller has acted as lessee or borrower including any termination or similar type fees, costs and expenses, measured in U.S. Dollars (as opposed to weight); and (ii) the monetary amount of any PGM Lease or Borrowing shown on such statement shall be calculated using the PGM Pricing Methodology as of the Closing Date.

**4.6.5.    Adjustments for Non-U.S. Pension and Benefit Liabilities.**  Purchasers acknowledge and agree that, by operation of Law or by virtue of their acquisition of the Sale Securities, the Purchasers are required to assume certain Liabilities under certain non-U.S. Benefit Plans with the provisions of this Agreement (e.g., Sections 2.1.4 and 3.6).  Notwithstanding such assumption of those Liabilities, however, it is agreed that the Purchase Price shall be adjusted downward at the Closing to reflect such assumption of Liabilities in accordance with the provisions of this Section 4.6.5.  However, since the exact amount of such non-U.S. pension and benefit Liabilities has not yet been determined, the mechanism set forth on Schedule 4.6.5 is designed to allow the Parties to reach such an agreement and settle on an appropriate Purchase Price adjustment with respect to such matters.

**4.6.6.    Adjustments for Assumed PTO Obligations.**  No later than six (6) Business Days prior to the anticipated Closing, the Sellers shall deliver a calculation of the Assumed PTO Obligations calculated in accordance with the Assumed PTO Obligation Calculation Methodology set forth in Schedule 4.6.6.  The Purchase Price shall be adjusted downwards by an amount equal to the Assumed PTO Obligations.

36

**4.6.7.    Adjustments for Sale Company.** The Purchase Price shall be adjusted upward or downward, as appropriate, at the Closing by an amount equal to the Sale Company Retained Liability Amount minus the amount of the Sale Company's cash and cash equivalents as of the Closing.  For purposes of clarification, if the foregoing calculation results in a: (i) negative number, then the adjustment will be upwards (e.g., if the Sale Company's cash and cash equivalents exceed the Sale Company Retained Liability Amount); and (ii) positive number, then the adjustment will be downwards (e.g., if the Sale Company Retained Liability Amount exceeds the Sales Company's cash and cash equivalents).  For purposes of this Agreement, the "**Sale Company Retained Liability Amount**" means that amount, which the parties agree in good faith approximates the dollar value of all Liabilities of the Sale Company that would be "Retained Liabilities" under this Agreement if the sale of the Sale Company was structured as an asset sale rather than a sale of the Sale Securities. The parties shall work together to agree upon the Sale Company Retained Liability Amount (including any portion of the Sale Company Retained Liability Amount attributable to Taxes that are accrued on the balance sheet of the Company but not yet due and payable net of any current Value Added Tax assets which amount shall be specified in the agreement between the parties with respect to the Sale Company Retained Liability Amount (the "**Sale Company Current Tax Amount**")) no later than six (6) Business Days prior to the anticipated Closing Date. Notwithstanding the foregoing, in no event shall the Sale Company Retained Liability Amount include any amounts that were the subject of an adjustment pursuant to Section 4.6.5.  In addition, the amount of any deferred tax liabilities included in the Sale Company Retained Liability Amount shall be offset by the amount of any deferred tax assets of the Sale Company.  For purposes of clarification, and not limitation, the Sellers make no representation or warranty regarding the size of the deferred tax asset of the Sale Company as of December 31, 2006.

**4.6.8.    Capital Leases.** The Purchase Price shall be adjusted downward (other than for Capital Leases in which a Seller is the lessor) on a dollar-for-dollar by the total amount of the Liability under any Capital Leases assumed by the Purchasers as of the Closing.

**4.7.    Post-Closing Purchase Price Adjustments.**    The Purchase Price shall be adjusted following the Closing pursuant to, and in accordance with, the procedures set forth in this Section 4.7.

**4.7.1.    General:**

**4.7.1.1.**    Immediately following the Closing, Sellers and Purchasers will cooperate to conduct a joint physical inventory of the PGM Inventory (including substrates) and the volumes by weight of Owned PGMs, Consigned PGMs, Restitution Commitments and PGM Leases or Borrowings (the "**Closing PGM Inventory**") as of the Closing Date. Based on such physical review, the Sellers and Purchasers shall produce a report summarizing the results of such physical PGM Inventory with the details of the volumes by weight of the Owned PGMs, Consigned PGMs and Restitution Commitments and PGM Leases and Borrowings, if any, as of the Closing PGM Inventory date (the "**PGM Physical Inventory Report**").  Such physical inventory shall be conducted, and such PGM Physical Inventory Report shall be prepared, using the same procedures and appropriate methodologies as shown on Schedule 4.7.1.1 (including with respect to the timing set forth therein) provided that the Parties agree Schedule 4.7.1.1 is substantially complete but remains subject to further discussion and mutual refinement by the Parties.  The Sellers and Purchasers shall mutually cooperate pre-Closing to prepare for the immediate post-Closing inventory.  The PGM Physical Inventory Report shall form the basis for the calculation of the post-Closing adjustments 4.7.1.2 below.  For clarity, it is understood that in respect of any physical inventory of the PGM Inventory called for by the terms of this Article 4 it

shall <u>not</u> include a physical inventory of non-PGM Inventory (other than substrates) (e.g., fuel, spare parts, other consumables)

   **4.7.1.2.**  Promptly after the Closing Date (but in any event no later than ninety (90) days after the Closing Date) Purchasers will prepare and deliver to Sellers a draft written statement as of the Closing Date for the Business on a combined, stand-alone basis showing the: (v) levels of Net Working Capital calculated in accordance with the Net Working Capital Methodology; (w) in respect of the PGM Inventory, of Owned PGMs (including Owned PGM Volume Targets and actual costs verified by customer commitments for all Owned PGMs), Consigned PGMs, Restitution Commitments and PGM Leases or Borrowings of the Business as of the Closing Date; (x) the actual Assumed PTO Obligations; (y) the Sale Company Retained Liability Amount as of the Closing Date; and (z) the total amount of the Liabilities assumed by Purchasers under the Capital Leases as of the Closing Date (the "**Closing Date Statement**") and the adjustment, if any, that should be made to the Purchase Price (as adjusted at the Closing) as a result of the Closing Date Statement.  Such statement shall be prepared on a consistent basis with <u>Schedules 4.6.1</u>, <u>4.6.6</u> and <u>4.7.1.1</u>.  The Closing Date Statement shall be audited/reviewed as appropriate by the Auditor of the Closing Date Statement pursuant to a scope of limited audit or review and fee estimate which shall be mutually agreeable to the Parties prior to the commencement of such audit/review.  The Parties shall cooperate in requesting that the Auditor of the Closing Date Statement complete such audit as soon as practicable following receipt of Closing Date Statement with a target completion date of not more than forty-five (45) days thereafter.  The expense of this audit/review shall be shared equally by the Parties.  It is the intent of the Parties under this Section 4.7 that based on the information contained in the Closing Date Statement, the Parties shall derive the final Closing Date figures for Net Working Capital (calculated in accordance with the Net Working Capital Methodology), Assumed PTO Obligations and the volume of Owned PGMs (and the actual costs verified by customer commitments), Consigned PGMs, Restitution Commitments and PGM Leases and Borrowing, which figures and volumes may trigger post-Closing adjustments to the Purchase Price under the terms of Section 4.8 below.  The Purchasers shall grant Sellers and the auditors of the aforementioned items all necessary assistance and access to all relevant documents and Persons in order to audit and review the preparation of the Closing Date Statement.

   **4.7.2.**  <u>**Objections by Sellers; Consequence of No Objections.**</u>  Within fifteen (15) days after receipt of the Closing Date Statement Sellers may notify Purchasers of an objection.  Any objection by Sellers shall only be deemed effective if and to the extent that the objection specifies the item against which the objection is raised.  If Sellers do not object within such fifteen (15) day period, the Closing Date Statement shall be deemed to be final and binding as against the Parties and accordingly shall constitute the "**Final Closing Date Statement**" for purposes of the post-Closing adjustments to be made to the Purchase Price under this Section 4.7.

   **4.7.3.**  <u>**Negotiated Settlement of Objections.**</u>  If Sellers do object, Purchasers and Sellers shall meet or otherwise attempt in good faith to agree on the Closing Date Statement.  If the Parties do so agree, then the Closing Date Statement shall be deemed final and binding on the parties and accordingly shall constitute the "**Final Closing Date Statement**" for purposes of the post-Closing adjustments to be made to the Purchase Price under the terms of this Sections 4.7.

   **4.7.4.**  <u>**Arbitrated Settlement of Objections.**</u>  If Sellers and Purchasers cannot agree on the Closing Date Statement within fifteen (15) days after Sellers have objected against items

therein, the points in dispute shall be referred to an independent auditor to be mutually agreed by the Parties prior to the Closing Date to act as an independent arbitrator (the "**Arbitrator**").  The Arbitrator shall be a nationally or regionally recognized firm that is neither (i) then providing financial audit services to any Purchaser or Seller nor (ii) Deloitte and Touche.  The Arbitrator shall give Sellers and Purchasers adequate opportunity to present their arguments in writing and at a hearing or hearings (as the Arbitrator may decide) to be held in the presence of the Parties and their advisers (such arguments to be presented, and such hearing or hearings to be held, within thirty (30) days of the Arbitrator's appointment).

If and to the extent that the Arbitrator determines that objections by Sellers that could not be resolved by agreement between Purchasers and Sellers are justified, the Arbitrator shall amend the Closing Date Statement to assure that the Closing Date Statement has been prepared in a manner consistent with the provisions of this Article 4; provided, however, that the Arbitrator shall be bound by those items upon which Sellers and Purchasers have agreed, and further provided that with respect to each particular item the Arbitrator shall not exceed the range of dispute between Sellers and Purchasers.  The Arbitrator shall give a written decision addressing all such disputed issues.  The Closing Date Statement reflecting any adjustments made as a result of the Arbitrator's decisions shall be deemed final and binding on the Parties and, accordingly, shall constitute the "**Final Closing Date Statement**" for purposes of the post-Closing adjustments to the Purchase Price to be made under the terms of this Section 4.7.  The Arbitrator shall render its decision no later than sixty (60) days from the date of its appointment.  The costs associated with the Arbitrator shall be shared equally by the Parties.

### 4.7.5.    Payment Mechanics for Post-Closing Purchase Price Adjustments Generally.
Within three (3) Business Days following the date on which the Final Closing Date Statement is settled in accordance with the preceding provisions of this Section 4.7, final adjustments to the Purchase Price (as adjusted at Closing) and any further payments shall be made as follows.

A.    To the extent the aggregate or net amount of any such adjustments increases the Preliminary Purchase Price paid to Sellers at the Closing: (i) the Closing Escrow Agreement shall provide that the Escrow Agent shall release $5,000,000 of the Escrow Amount; plus (ii) Purchasers shall pay any additional amount needed to cover the balance of such increase in Purchase Price; in each case to Delphi on behalf of all the Sellers by wire transfer in immediately available funds (in U.S. Dollars) to the account designated by Delphi.

B.    To the extent any such adjustments decrease the Preliminary Purchase Price paid to Sellers at the Closing, the Closing Escrow Agreement shall provide that the Escrow Agent shall promptly pay up to $5,000,000 of the amount of such decrease to Umicore by wire transfer in immediately available funds to the account designated by Umicore on behalf of the Purchasers; provided, however, that, if the decrease is less than $5,000,000, an amount equal to the difference between $5,000,000 and the amount of such decrease shall be similarly disbursed to an account designated by Delphi on behalf of the Sellers.

C.    To the extent the aggregate amount of any such decrease in the Purchase Price as a result of the adjustments is greater than $5,000,000, Sellers shall promptly pay the amount by which such decrease exceeds $5,000,000 to Purchasers by wire transfer in immediately available funds in U.S. Dollars to the account designated by Umicore on behalf of the Purchasers.

**4.8.    Allocation of Purchase Price:**

**4.8.1.**    The Parties agree to allocate the Purchase Price (as adjusted pursuant to this Article 4) among the Purchased Assets and the agreements provided herein for transfer of the Business to Purchasers, for all purposes (including financial, accounting and tax purposes) (the "**Allocation**") in a manner consistent with the Allocation Schedule attached hereto as Schedule 4.8.1.

**4.8.2.**    Purchasers and Sellers shall each report the federal, state, local and foreign income and other Tax consequences of the purchase and sale contemplated hereby in a manner consistent with the Allocation, and neither will take any position inconsistent with the Allocation unless otherwise required under applicable Law.  Sellers shall provide Purchasers and Purchasers shall provide Sellers with a copy of any information required to be furnished either to the Secretary of the Treasury under Internal Revenue Code Section 1060, including Internal Revenue Service Form 8594 and any attachments or schedules relating thereto, or to any other relevant Tax authority in a non-U.S. jurisdiction.

**4.8.3.**    Any adjustments to the Purchase Price made in accordance with the foregoing provisions of this Section 4 shall be treated for income tax purposes as an adjustment to the Purchase Price and allocated in a mutually acceptable manner.

**5.    REPRESENTATIONS AND WARRANTIES:**

**5.1.    Warranties of Delphi and each Seller.**  (i) Each Seller that is a Non-Filing Affiliate, severally represents with respect solely to such Seller; and (ii) Delphi and each Seller that is a Filing Affiliate, jointly and severally represent with respect to each such Filing Affiliate as well as the Sale Company, to Purchasers as follows:

**5.1.1.    Organization and Good Standing.** Each Seller and the Sale Company is a legal entity duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate or other organizational power and, subject to any required Bankruptcy Court approval, authority to own, lease and operate its properties and assets and to carry on the Business as presently conducted, and is in good standing in all jurisdictions where it owns or leases real property or maintains stocks of business inventories relating to the Business or otherwise conducts the Business, except where the failure so to qualify or to be so licensed would not have a Material Adverse Effect.

**5.1.2.    Corporate Power; Due Authorization.** Subject to Bankruptcy Court approval, each Seller has the corporate or other organizational power and authority to execute and deliver this Agreement and the Ancillary Agreements, including the Transfer Documents, to which such Seller is a party, and to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated herein and therein.  Subject to Bankruptcy Court approval, the execution, delivery and performance of this Agreement and the Ancillary Agreements to which such Seller is a party, including the Transfer Documents by each of the Sellers party thereto and the consummation by each of the Sellers of the contemplated transactions have been duly authorized by all necessary action on the part of each Seller.  Subject to the entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, this Agreement has been duly and validly executed and delivered by or on behalf of each of the Sellers and (assuming this Agreement constitutes a valid and binding obligation of Purchasers) constitutes a legal, valid and binding agreement of Sellers, enforceable against Sellers in accordance with its terms, and the Ancillary

Agreements, including the Transfer Documents will be, when executed and delivered by the applicable Sellers who are parties thereto, the legal, valid and binding obligations of the Sellers parties thereto, enforceable against the Sellers parties thereto in accordance with their respective terms, in each case subject to applicable bankruptcy, reorganization, insolvency, moratorium and other Laws affecting creditors' rights generally from time to time in effect and to general equitable principles.

**5.1.3.    No Violations.** Except as set forth on Schedule 5.1.3, no consent, approval, authorization of, declaration, filing or registration with any Governmental Entity is required to be made or obtained by any of the Sellers in connection with the execution, delivery and performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements, except for:  (i) consents, approvals, authorizations of, declarations or filings with, the Bankruptcy Court; and (ii) the filing of required notifications with Antitrust Authorities under applicable foreign Antitrust Laws and the receipt of any necessary approvals thereunder.   The items referred to in clauses (i) and (ii) of this Section 5.1.3 are hereinafter referred to as the "**Governmental Requirements**."

**5.1.4.    Sufficiency of Acquired Assets.** The Acquired Assets and the assets of the Sale Company comprise all of the assets Used in Connection with the Business, except for the Excluded Assets.

**5.1.5.    Personal Property; Condition of Personal Property:**

**A.    Title to Personal Property**. Except for the Personal Property leases and other Personal Property referred to in Schedule 5.1.5.A, each relevant Asset Seller has good, valid and marketable title to the Personal Property and Inventory included in the Acquired Assets, and the Sale Company has good, valid and marketable title to the Personal Property and Inventory Used in Connection with the Business by the Sale Company, in each case free and clear of any Liens, except Permitted Liens.

**B.    Condition of Personal Property.**  The Personal Property included in the Acquired Assets of each Asset Seller and of the Sale Company are in good condition or repair reasonably suitable and adequate for its present and intended use, reasonable wear and tear and routine maintenance excepted.

**C.    Inventory.**  The Inventory included in the Acquired Assets or of the Sale Company will, as of the Closing, be located at the Listed Real Property, or at such other locations as are identified on Schedule 5.1.5.C and will be fit for the purpose for which it is ordinarily acquired, and, in the case of finished goods Inventory, merchantable in the Ordinary Course of Business in all material respects.

**D.    Machinery, Equipment and Tools.**  Schedule 5.1.5.D sets forth a true and correct list of all machinery, equipment and capitalized tools with an acquisition value greater than U.S. $25,000, which are included in the Acquired Assets or owned by the Sale Company, or located at a Carved-Out Manufacturing Location, and in any case, Used in Connection with the Business.

**5.1.6.    Litigation.** (i) Except for Claims raised in connection with the pendency of the Bankruptcy Cases and any Claims referred to in Schedule 5.1.6, there is no suit, action, proceeding or investigation (whether at law or equity, before or by any Governmental Entity, or before any

41

arbitrator) pending or, to any of the Sellers' Knowledge, threatened against or affecting any Seller or the Sale Company, the outcome of which would have, individually or in the aggregate, a Material Adverse Effect, nor is there any Order outstanding against any Seller or the Sale Company that would have a Material Adverse Effect, nor is there any suit, action, proceeding or investigation pending or, to any Sellers' Knowledge, threatened that challenges or seeks to enjoin, alter or delay the Sale; and (ii) assuming the entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, no Purchaser (or any of its respective Affiliates) shall be subject to Claims, litigation or Liabilities in connection with the consummation of the sale of the Acquired Assets and Sale Securities.  For purposes of clarification, the phrase "consummation of the Sale of the Acquired Asset and Sale Securities" relates to the transactions contemplated by this Agreement and not to the Purchaser's post-closing operation of the Business.

### 5.1.7.    **Intellectual Property Assets:**

A.    Schedule 5.1.7.A.1 sets forth a true and complete list, including a complete identification of each patent, trademark registration, copyright registration and application therefor included in the Owned Intellectual Property.  Schedule 5.1.7.A.2 sets forth a true and complete list of all Licensed Intellectual Property; in each case included in the Acquired Assets or, in respect of the Sale Company, Used in Connection with Business. Schedule 5.1.7.A.3 sets forth a true and complete list, in all material respects, of all Software that is part of the Purchased Intellectual Property included in the Acquired Assets or in respect of the Sale Company, Used in Connection with the Business.  None of such Software contains any open source or copy left code.  The Purchased Intellectual Property constitutes all of the intellectual property Used in Connection with the Business as currently conducted, except for the Excluded Intellectual Property.  As of the date of this Agreement, there are no impediments to the ability of any Seller to maintain in effect or renew their respective rights, in all material respects, in and to the Purchased Intellectual Property.  Sellers have taken commercially reasonable efforts to protect and maintain the confidentiality of the Trade Secrets and Know-How included in the Purchased Intellectual Property.  There are no impediments to the ability of any Seller under applicable Law to grant to Purchasers all material rights to the Purchased Intellectual Property that are contemplated in this Agreement.  Upon consummation of the transactions contemplated by this Agreement, Purchasers shall have the same rights in and to the Purchased Intellectual Property that Sellers had prior to the Closing.

B.    As of the date of this Agreement, Sellers are conducting the Business in a manner that does not, and the Products and services of the Business do not, infringe, misappropriate or violate the Intellectual Property right of another Person, which violation would reasonably be expected to result in a material Claim or loss.

C.    No Seller has granted any material license, sub-license or other permission to use the Owned Intellectual Property or the Licensed Intellectual Property to any third party, except as set forth on Schedule 5.1.7.C.

D.    Except as referred to in Schedule 5.1.7.D, Sellers have no Knowledge of any material Claim pending or threatened by any third party against any Seller or its Affiliates of Intellectual Property infringement or misappropriation resulting from the operation of the Business or the ownership or use by Sellers of the Purchased Intellectual Property during the two (2) years prior to the date on which the Bidding Procedures Order is issued by the Bankruptcy Court.

**E.**    Subject to Section 8.15, all Owned Intellectual Property is owned solely and exclusively by or on behalf of the applicable Asset Seller or the Sale Company, as the case may be, free and clear of any Liens thereon, other than Permitted Liens.

**F.**    Except as set forth in Schedule 5.1.7.F to the Knowledge of the Sellers, no third party is infringing, misappropriating, or violating any of the Purchased Intellectual Property.

**G.**    Neither the execution, delivery, or performance of this Agreement (or any of the Ancillary Agreements) nor the consummation of any of the transactions contemplated by this Agreement (or any of the Ancillary Agreements) will result in, or give any other Person the right or option to cause or declare, an impairment to the Purchased Intellectual Property or cause the release or distribution of any Purchased Intellectual Property to any third party.

**5.1.8.    Insurance.**    Schedule 5.1.8 contains a complete and correct list, in all material respects, of all material policies of insurance covering any of the assets primarily used in or relating to the Business, other than Excluded Assets, and any Seller Benefit Plans related to Current Employees indicating for each policy the carrier, risks insured, the amounts of coverage, deductible, expiration date and any material pending claims thereunder.  All such policies are outstanding and in full force and effect.

**5.1.9.    Compliance with Other Instruments and Laws; Permits.**    Except as provided in Schedule 5.1.9, the Business is in compliance with all Laws applicable to the conduct of the Business and all Permits, except where the failure to be in compliance would not have a Material Adverse Effect.  All Permits that are necessary for the conduct of the Business and the ownership and operation of the Acquired Assets or the assets of the Sale Company have been duly obtained, and, except as indicated on Schedule 5.1.9, are in full force and effect, and there are no proceedings pending or, to Sellers' Knowledge, threatened, which may result in the revocation, cancellation or suspension, or any materially adverse modification, of any such Permit, except in each case as would not, individually or in the aggregate, result in a Material Adverse Effect.  The execution, delivery and performance of, and compliance with, this Agreement and the Ancillary Agreements by Sellers will not result in any such violation or be in conflict with or constitute a default under any Permit.

**5.1.10.    Brokers.**    Sellers have employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which any Purchaser would be liable.

**5.1.11.    Consents and Approvals.**    Subject to entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, assuming that the Governmental Requirements will be satisfied, made or obtained and will remain in full force and effect, and upon receipt of the consents, approvals and authorizations listed in Schedule 5.1.11, neither the execution, delivery or performance of this Agreement and the Ancillary Agreements by the Sellers parties thereto, nor the consummation by any Seller of the Sale, nor compliance by any Seller with any of the provisions hereof and of the Ancillary Agreements, will:  (i) result in any breach of any provisions of the articles of incorporation or bylaws or similar organizational documents of any Seller or the Sale Company; (ii) result in a violation, or breach of, or constitute (with or without due notice or lapse of time) a default (or give rise to any right of termination, cancellation, amendment, vesting, payment, exercise, acceleration, suspension or revocation) under any of the terms, conditions or provisions of

43

any note, bond, mortgage, deed of trust, security interest, indenture, loan or credit agreement, license, permit, contract, lease, agreement, plan or other instrument, commitment or obligation to which any Seller or the Sale Company is a party or by which such entity's properties or assets may be bound or affected; (iii) violate any order, writ, governmental authorization, injunction, decree, statute, rule or regulation applicable to any Seller or the Sale Company or to any properties or assets of any such entity; or (iv) result in the creation or imposition of any Lien other than Permitted Encumbrances on any asset of a Seller or the Sale Company, except in the case of clauses (ii), (iii) and (iv) above, for violations, breaches, defaults, terminations, cancellations, accelerations, creations, impositions, suspensions or revocations that are excused by or unenforceable as a result of the filing of the Bankruptcy Cases or the applicability of any provision of or any applicable law of the Bankruptcy Code.

**5.1.12.  January Projections.**  The January Projections represent the reasonable, good faith estimates of the Seller.  To the Knowledge of the Seller, the January Projections are not materially inaccurate (e.g., meaning inaccurate with respect to projections of contribution margin by a factor greater than Three Million Dollars (U.S. $3,000,000)).  The foregoing is not a guarantee of the January Projections.

**5.1.13.  Events Subsequent to January Projections.**  Except as set forth on Schedule 5.1.13 since the date of the January Projections or in the January Projections: (i) there has not been any event which had or could reasonably be expected to have a Material Adverse Effect; and (ii) the Business has been conducted and carried on only in the Ordinary Course of Business.

**5.1.14.  Contracts:**

**A.**    Schedule 5.1.14.A lists all Contracts included in the Acquired Assets or to which the Sale Company is a party and that are used in or related to the Business, and: (i) which involve payment or performance obligations that individually exceed $250,000; (ii) are material agreements to which Sellers or any of their Affiliates is a party or by which any of them or any of their properties is bound that primarily relate to the Business (including license and distribution agreements and arrangements among any such Sellers, Affiliates and intra-divisional facilities or third parties), other than Accounts Receivable; (iii) are PGM leases to which the Sale Company is a party or to which a Seller is a party and that are used in or related to the Business; and (iv) are joint venture, stockholder and partnership agreements to which the Sale Company is a party or to which a Seller is a party and that are Used in Connection with the Business; and (v) all Capital Leases (all Contracts required to be listed on Schedule 5.1.4.A hereafter referred to as the "**Listed Contracts**"). Sellers have delivered or made available to Purchasers either: (i) true, correct and complete copies in all material respects; or (ii) accurate written descriptions in all material respects, of the Listed Contracts.

**B.**    Each of the Listed Contracts is valid, binding and, subject to payment of all Cure Amounts payable to effectuate, pursuant to the Bankruptcy Code, the assumption and assignment to Purchasers of such Listed Contracts under the Sale Approval Order, if applicable, enforceable against the applicable Seller, to the extent set forth therein, and, to Sellers' Knowledge, the other parties thereto, in accordance with its terms, and is in full force and effect.  Except as set forth on Schedule 5.1.14.B , and other than with respect to monetary defaults by Sellers under Listed Contracts that are curable by payment by Sellers of all Cure Amounts, if applicable, the applicable Seller, and to Sellers' Knowledge each of the other parties thereto, has performed all obligations required to be performed by it to

44

date under, and is not in default in respect of, any of such Listed Contracts, and there is not a default (except with respect to defaults that need not be cured under Section 365 of the Bankruptcy Code for Sellers to assume and assign such Material Contracts to Purchaser, if applicable) thereunder or claim of default and there has not occurred any event which, with the passage of time or the giving of notice or both, would constitute a default thereunder, whether on the part of the applicable Seller or any of its Affiliates, or to Sellers' Knowledge, on the part of any other party thereto; in each case, other than where the failure to perform or such default would not have a material impact in respect of the individual Listed Contract or where such failures to perform or defaults would not, in respect of all of such Listed Contracts, measured in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except as set forth in <u>Schedule 5.1.14.B</u>, and other than with respect to monetary defaults by Sellers under Listed Contracts that are curable by payment by Sellers of all Cure Amounts payable to effectuate, pursuant to the Bankruptcy Code, the assumption and assignment to Purchasers of such Listed Contracts under the Sale Approval Order, if applicable, to Sellers' Knowledge, Sellers have received no claim or notice from any other party to any such Listed Contract that any Delphi Affiliate has breached any obligations to be performed by it thereunder, or is otherwise in default or delinquent in performance thereunder, where the consequence of such breach or default would be reasonably expected to have a Material Adverse Effect.  <u>Schedule 5.1.14.B</u> identifies all Post-Petition Contracts included within the Listed Contracts other than open purchase orders  or other Contracts that do not meet the requirements of Listed Contracts and which were entered into in the Ordinary Course of Business.  Except as set forth on <u>Schedule 5.1.14.B</u>, none of the Post-Petition Contracts included within the Listed Contracts contains any provisions restricting its assumption and assignment to Purchasers pursuant to the terms of this Agreement.

**5.1.15. <u>Regulatory Matters.</u>** Except as set forth in <u>Schedule 5.1.15</u>, or to the extent not material to the operation of the Business or the manufacture or sale of the Product, no Seller is required to file or otherwise provide reports or data, other information or applications with respect to the Products with any federal, state or local governmental authorities with jurisdiction over the manufacture, use or sale of such Products, and no material regulatory approvals are required with respect to the manufacture or sale of such Products.

**5.1.16. <u>Real Property</u>:**

    **A.**     **<u>Generally.</u>**  <u>Schedule 5.1.16.A</u> lists all Real Property included in the Acquired Assets or that is owned, used or occupied by the Sale Company, is Used in Connection with the Business and which will be transferred to or leased by a Purchaser pursuant to this Agreement or any Ancillary Agreements (the "**Listed Real Property**"). Except as set forth on <u>Schedule 5.1.16.A</u>, all buildings, structures and other improvements to the Listed Real Property (the "**Improvements**") are in good condition and repair, adequate to operate such facilities as currently used and in compliance with all applicable Laws.  Except for those matters to be covered by the Transition Services Agreement  in accordance with Section 7.2.6, all utilities and other similar systems serving the Listed Real Property and the Improvements are installed and operating and are sufficient to enable the Listed Real Property and the Improvements to be used and operated in the manner currently being used and operated.  The use of the Listed Real Property used for manufacturing activities as currently used is a permitted use by right in the applicable zoning classification and is not a nonconforming use or a conditioned use, and no variances are needed and none have been granted with respect to such Real Property.  There are

currently in full force and effect duly issued certificates of occupancy permitting the Listed Real Property to be legally used and occupied as the same are currently constituted. The Listed Real Property has rights of access to dedicated public highways. To Sellers' Knowledge, no fact or condition exists that would prohibit or adversely affect the ordinary rights of access to and from the Listed Real Property from and to the existing highways and roads, and there is no pending or, to Sellers' Knowledge, threatened restriction or denial, governmental or otherwise, upon such ingress and egress. No Seller has received notice of: (a) any claim of adverse possession or prescriptive rights involving or affecting any Listed Real Property; (b) any structure located on any Listed Real Property that encroaches on or over the boundaries of neighboring or adjacent properties; or (c) any structure of any other person or entity that encroaches on or over the boundaries of any Listed Real Property. None of the Listed Real Property is located in a flood plain, flood hazard area, wetland or lakeshore erosion area within the meaning of any Law or order.

**B.**    **Marketable Title.** Except as set forth on Schedule 5.1.16.B, the applicable Seller has good and marketable fee title or equivalent title rights in non-U.S. jurisdictions or leasehold title (as applicable) to all of the Listed Real Property free and clear of all Liens except for Permitted Encumbrances. None of the Listed Real Property is subject to any material restrictions with respect to the transferability or divisibility thereof. At the Closing, Sellers will convey to Purchasers good and marketable fee title or leasehold title (or local equivalent, as applicable) to all of the Listed Real Property, free and clear of all Liens other than the Permitted Encumbrances.

**C.**    **No Condemnation, Expropriation or Similar Action.** Neither the whole nor any portion of the Real Property included in the Acquired Assets is subject to any order to be sold and Sellers have received no notice, and have no Knowledge, that any of such Real Property is being condemned, expropriated or otherwise taken by any Governmental Entity with or without payment of compensation therefore and to the Sellers' Knowledge no such condemnation, expropriation or taking has been planned, scheduled or proposed.

**5.1.17.** **Tax Matters:**

**A.**    The Sellers and the Sale Company have: (i) duly and timely filed with the appropriate federal, state, local and foreign authorities or governmental agencies, all Tax Returns required to be filed with respect to the Business and, when filed, each such Tax Return was true, correct and complete; (ii) timely paid all Taxes shown thereon as due and owing; and (iii) timely paid all other Taxes due with respect to the Business except where the failure to pay any such Taxes would not in the aggregate have a Material Adverse Effect on the financial condition of the Business.

**B.**    The Sellers and the Sale Company have withheld all Taxes required to have been withheld in connection with amounts paid or owing to any employee working within the Business and have timely paid all withholding and other employment and payroll Taxes to the appropriate federal, state, local and foreign authorities or governmental agencies, except where the failure to file or to pay such taxes would not in the aggregate have a Material Adverse Effect.

**C.**    Neither any Seller nor the Sale Company is a party to any Tax allocation, Tax sharing agreement or Tax indemnity arrangement, except as provided in this

46

Agreement, under which a Purchaser could be subject to Tax or other Liability after the Closing, and the Sale Company is not liable for the Taxes of any other person or entity.

      **D.**     Except as disclosed in <u>Schedule 5.1.17.D</u>, no claim has ever been made by an authority in a jurisdiction in which the Sale Company does not file Tax Returns that it is or may be subject to taxation by that jurisdiction or authority with respect to, in connection with, associated with or related to, the Sale Company; no agreements or waivers are outstanding extending the statutory period of limitations applicable to any Tax Return of the Sale Company; and the Sale Company has not received any: (i) notice of underpayment of Taxes or other deficiency that has not been paid with respect to, in connection with, associated with or related to, the Sale Company; or (ii) any objection to any Tax Return, with respect to, in connection with, associated with or related to, the Sale Company that would have a Material Adverse Effect on the Business. Except as disclosed in <u>Schedule 5.1.17.D</u>, all deficiencies asserted or assessments made as a result of any examinations with respect to, in connection with, associated with or related to, the Sale Company have been fully paid or are fully reflected as a Liability in the financial statements of the Sale Company or the Sellers.

      **E.**     The Sale Company is not a party to any agreement, contract arrangement or plan that has resulted or would result, separately or in the aggregate, in the payment of any excess parachute payments within the meaning of IRC Code Section 280G.

      **F.**     There are no tax liens imposed upon the Sale Company or any of the Purchased Assets, except in the case of Filing Affiliate Taxes the payment of which may have been prohibited by the Bankruptcy Code.

      **G.**     No transaction contemplated by this Agreement is subject to withholding tax under Section 1445 of the Code. For purposes of disclosure only, to the Sellers' Knowledge <u>Schedule 5.1.17.G</u>, sets forth all sales Taxes, use Taxes, value added Taxes, stamp Taxes, excise Taxes, real estate transfer Taxes, withholding Taxes or other similar Taxes that might be imposed on the transfer of the Purchased Assets pursuant to this Agreement.

      **H.**     None of the Purchased Assets is properly treated as owned by persons other than the relevant Seller for income Tax purposes, and none of the Purchased Assets is "tax-exempt use property" within the meaning of Section 168(h) of the Code.

      **I.**     Neither the Sale Company nor any Seller with respect to the Business has participated in or cooperated with an international boycott within the meaning of Section 999 of the Code, nor have they had operations that are or may be reportable under Section 999 of the Code.

      **J.**     All transactions and dealings between or among the Sale Company and any persons or entities related directly or indirectly to the Sale Company have occurred on arm's-length terms, as if between and among unrelated parties. The Sale Company has complied in all material respects with any and all tax-related requirements that the arm's-length nature of the terms of such transactions and dealings be documented.

      **K.**     Except as attached to <u>Schedule 5.1.17.K</u> regarding the Sale Company, there are no Tax rulings, request for rulings or closing agreements to which any Seller or

the Sale Company is a party which relates or is applicable to the Business, the Acquired Assets or the Sale Company that could affect the Purchasers' Liability for Taxes for any period after the Closing Date. During the period which Sellers owned the Sale Company, no Seller nor the Sale Company has taken any action not in accordance with past practice and not in the Ordinary Course of Business that would have the effect of deferring any Tax Liability for the Sale Company from any Taxable Period ending on or before the Closing Date to any taxable period ending after the Closing Date.

**L.**    The Sale Company has not been either a "distributing corporation" or a "controlled corporation" in a distribution of stock intended to qualify for tax-free treatment under Section 355 of the Code: (i) in the two (2) years prior to the date of this Agreement; or (ii) which otherwise could constitute part of a "plan" or "series of related transactions" (within the meaning of Section 355(e) of the Code) in conjunction with the transactions contemplated by this Agreement.

**M.**    The Sale Company is not a "passive foreign investment company" within the meaning of Section 1297(a) of the Code.

**5.1.18.    Capitalization of the Sale Company and Related Matters:**

**A.**    The Sale Securities are owned by DASHI as set forth on <u>Schedule 5.1.18</u> to this Agreement. The Sale Securities are duly authorized, validly issued, fully paid and non-assessable (in those jurisdictions in which such concepts are applicable) and are not subject to any preemptive rights. There are no voting trust agreements or other contracts, agreements or arrangements, to which DASHI is a party, restricting voting or dividend rights or transferability with respect to the Sale Securities.

**B.**    There is no outstanding security, right, subscription, warrant, option, privilege or other agreement, commitment or contract, preemptive, contractual or otherwise that gives the right to: (i) purchase or otherwise receive or be issued any share capital of the Sale Company or any security of any kind convertible into or exchangeable or exercisable for any share capital of the Sale Company; or (ii) receive or exercise any benefits or rights similar to any rights enjoyed by or accruing to a holder of share capital of the Sale Company, including any rights to participate in the equity or income of the Sale Company, or to participate in or direct the election of any directors of the Sale Company or the manner in which any share capital of the Sale Company are voted.

**C.**    DASHI owns and has good and valid title to the relevant Sale Securities free and clear of all Liens other than Permitted Liens of the type described in clause (iv) of the definition of Permitted Lien.

**5.1.19.    Employee Issues:**

**A.**    **Current Employees.**  <u>Schedule 5.1.19.A</u> contains a true and complete list of all Current Employees, and the information included on such Schedule as required by Section 3.1 above with respect to each such employee is true and complete.

**B.**    **Sellers' Performance.**  Each Seller (as applicable) has performed and discharged, in all material respects, its obligations with respect to all of the Current Employees and U.S. Corporate Employees, including working time, payment of wages and

salaries, employer's contributions to any relevant social security, health, welfare and occupational pension scheme and payment of all other costs and expenses relating to the employment of such employees (any taxation, accrued bonus or other sums payable with respect to employment) or Retired Employees up to and including the Closing Date, except as otherwise set forth on Schedule 5.1.19.B.

C.    **Benefit Plans.**  Schedule 5.1.19.C lists all Benefit Plans in which the Current Employees or Retired Employees participate.  Except as set forth on Schedule 5.1.19.C, none of the Sellers nor the Sale Company maintains or has any obligation to contribute or provide benefits pursuant to an employee benefit plan applicable to any of the Current Employees, other than an obligation to contribute to a government required and/or collectively bargained program in accordance with applicable Laws or a Collective Bargaining Agreement.

(i)    **Delivery of Documents.**  Sellers have given access or delivered to Purchasers true, correct and complete copies of the following information with respect to each of the Benefit Plans: (a) the written plan document, if any, including all amendments thereto; (b) if there is not a written plan document, a written summary of the material terms and conditions of such Benefit Plan; and (c) if the Benefit Plan is funded through insurance or a trust, insurance or any third party funding vehicle, the insurance policy or contract of the trust or other funding agreement and the latest financial statements thereof.  Seller has provided Purchasers with true and correct copies of any announcement to Current Employees regarding changes to any Benefit Plan not reflected in the applicable Benefit Plan documentation.

(ii)    **Compliance.**  Except as may be set forth in Schedule 5.1.19.C(ii): (a) with respect to each such Benefit Plan, all material reports and information relating to the Benefit Plan required to be filed with any Governmental Entity or provided to participants or their beneficiaries have been timely filed or disclosed and, when filed or disclosed, were true, correct and complete in all material respects, and all records related to such Benefit Plan have been accurately maintained in all material respects; (b) each Benefit Plan is and has been operated and maintained in compliance with all applicable Laws and in accordance with the provisions of such plan in all material respects; and (c) to the extent that any Benefit Plan provides for benefits which, under applicable Laws, must be reserved on the balance sheet of a Seller or the Sale Company or for which funds must be set aside or reserved, such reserves or funds for each such Benefit Plan meet the requirements under all applicable Laws or under the generally accepted accounting principles of the relevant jurisdiction.  No Benefit Plan is a multiemployer plan within the meaning of Section 4001(a)(3) of ERISA, nor has any Seller nor the Sale Company, or other element of the Business made, or been obligated to make, contributions to any multiemployer plan, either directly or as an ERISA Affiliate.

(iii)    **No Triggering of Obligations.**  Except for as set forth on Schedule 5.1.19.C(iii), the consummation of the transactions contemplated hereby will not: (a) entitle any current or former employee, director or independent contractor to severance pay, unemployment compensation or any other payment, except as expressly provided in this Agreement; or (b) accelerate the time of

49

payment or vesting or increase the amount of compensation due to any current or former employee, director or independent contractor.

(iv)    **Funding of Benefit Plans.**    Except as set forth in Schedule 5.1.19.C(iv): (a) all contributions required to be made to a Benefit Plan by any plan document, any contractual undertaking or Laws, and all premiums due or payable with respect to any insurance policy funding any Benefit Plan and any required accumulated book reserves (e.g., pension accruals) have been made timely or paid in full; and (b) there exists no "accumulated funding deficiency" as defined in Section 302(a)(2) of ERISA or Section 412 of the Code, whether or not waived, and no "unfunded current liability" as determined under Section 412(l) of the Code exists with respect to any Benefit Plan.  Sellers have provided Purchasers with true and correct copies of the most recent actuarial valuations of any Benefit Plan.

D.    **Collective Bargaining Agreements.**    Schedule 5.1.19.D lists all Collective Bargaining Agreements.  Sellers have given access or delivered to Purchasers true, correct and complete copies of each of the Collective Bargaining Agreements.  Except for the Collective Bargaining Agreements, and except as disclosed on Schedule 5.1.19.D, neither any Seller nor any of its Affiliates has entered into any material written employment or consulting agreements that are obligations of the Business.  Sellers are in compliance in all material respects with each Collective Bargaining Agreement.

E.    **Grievance, Labor Negotiations.**    Except as disclosed on Schedule 5.1.19.E, or as reflected in the Collective Bargaining Agreements, with respect to the Business: (i) there is no labor strike, dispute, slowdown or stoppage relating to any of the employees actually pending or, to Sellers' Knowledge, threatened against or involving any Seller or the Sale Company relating to any of the Current Employees; (ii) neither any Seller nor the Sale Company has in the past three (3) years experienced any work stoppage or other labor difficulty or organizational activity relating to any of the Current Employees; (iii) no material labor grievance relating to any of the Current Employees is pending as of the date of Schedule 5.1.19.E; and (iv) neither any Seller nor any Affiliate has any labor negotiations in process with any labor union works council or other labor organization relating to the Business.  Except as set forth on Schedule 5.1.19.E, there are no pending material claims against any Seller or the Business whether under applicable Laws, employment agreements or otherwise asserted by any present employee or former employee of any other Person as relates to the Business, including claims on account of or for: (w) overtime pay, other than overtime pay for work done during the current payroll period; (x) wages or salary for any period other than the current payroll period; (y) any amount of vacation pay or pay in lieu of vacation or time off; or (z) any violation of any statute, ordinance or regulation relating to minimum wages or maximum hours at work, and, to Sellers' Knowledge, there are no such claims which have not been so asserted.

F.    **Works Councils and Other Staff Representative Bodies.** Sellers have performed and discharged in all material respects its obligations with respect to Works Councils and other staff representatives, staff representative bodies and institutions representing all or part of the Current Employees.

**5.1.20.  Environmental Representations and Warranties.**  Except as otherwise set forth in Schedule 5.1.20, since January 1, 1999:

**A.**    At the time of Closing, the Listed Real Property and operations at such Listed Real Property are in material compliance with all applicable Environmental Laws.

**B.**    No Seller has received notice of, or has knowledge that any Environmental Claim relating to the Business or any Listed Real Property is pending or threatened.

**C.**    There have been no Releases of Hazardous Materials at, on, from or underneath any of the Listed Real Properties that would be reasonably likely to result in material Liability or require Remediation under Environmental Law.

**D.**    No aboveground or underground storage tanks have been located, stored, used, abandoned or disposed of on or under any Listed Real Property.

**E.**    Sellers have delivered or otherwise made available to the Purchasers copies of any Phase I or Phase II environmental assessments and any material reports, Governmental Entities' inspection reports, studies, analyses or test results or material correspondence with Governmental Entities in the possession or control of any Seller pertaining to Hazardous Materials in, at, on, beneath or adjacent to any Listed Real Property, or non-privileged reports regarding the Sellers' compliance with Environmental Laws in connection with the Business.

**F.**    No Listed Real Property, and, to Seller's Knowledge, no property to which Hazardous Materials originating on or from the Listed Real Property or from the Sale Company has been sent for treatment or disposal to a facility that is listed or proposed to be listed on the National Priority List or CERCLIS or on any other similar database or list maintained by a Governmental Entity.

**G.**    (i)  A list of all Permits required under Environmental Law to operate the Business as currently operated at the Listed Real Property is set forth in <u>Schedule 5.1.20</u>. The Sellers are in compliance with all such Permits required to be set forth on <u>Schedule 5.1.20</u>.

(ii)    Except as set forth in <u>Schedule 5.1.20</u>, Sellers have timely filed applications for such Permits at the Listed Real Property required under Environmental Laws.

**5.1.21.  <u>Product Claims.</u>**  In the three (3)-year period prior to the date of this Agreement, no Seller nor the Sale Company has received in connection with any product manufactured, sold or distributed by any of them related to the Business any material claim in writing of personal injury, death or property damage, any material claim for punitive or exemplary damages, any material claim for contribution or indemnification or any material claim for injunctive relief other than claims that were resolved at the business level by credit or replacement of goods or allowance therefor.

**5.1.22.  <u>Accounts Receivable.</u>**  The Accounts Receivable (including all of the Trade Receivables other than the Excluded Trade Receivables) of the Business and of the Sale Company and included in the Purchased Assets represent or will represent valid obligations arising from sales of Products or services performed in the Ordinary Course of Business.  Six (6) Business Days prior to the anticipated Closing Date, Sellers shall deliver to the Purchasers <u>Schedule 5.1.22</u> setting forth an Account Receivables aging report of the Business as of such date.

51

**5.1.23.  Absence of Other Representations or Warranties.**  Except for the Warranties expressly set forth in this Agreement and the Ancillary Agreements, no Seller makes any representations or warranties, express or implied, with respect to the Acquired Assets, the Assumed Liabilities, the sale of the Sale Securities or the Business, and in particular but without limitation Sellers are making no representations with respect to any plan(s) of Purchasers for the future conduct of the Business.  For the avoidance of doubt, no warranty or representation is given on the contents of the documents provided in due diligence, on any other documents or other information not contained in this Agreement or the Ancillary Agreements, or on any projected volumes of the Business (other than the January Projections as expressly set forth herein), all which were produced only for information purposes.

**5.2.  Warranties of Purchasers.**  Purchasers warrant and represent, jointly and severally, to Sellers as follows:

**5.2.1.  Corporate Data.**  Each Purchaser is a legal entity duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, and has all requisite corporate or other organization power and authority to own, lease and operate its properties and assets.  Each Purchaser has the requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted and is duly qualified or licensed to do business and is in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except where the failure to be so qualified or licensed would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on the ability of Purchasers to consummate the transactions contemplated by this Agreement.

**5.2.2.  Corporate Power; Due Authorization.**  Each Purchaser has the requisite corporate or other organizational power and authority to execute and deliver this Agreement and the Ancillary Agreements to which such Purchaser is a party, including the Transfer Documents, and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated herein and therein.  The execution, delivery and performance of this Agreement and the Ancillary Agreements, including the Transfer Documents, have been duly authorized by all necessary action on the part of each Purchaser that is a party thereto.  This Agreement is, and the Ancillary Agreements, including the Transfer Documents, to which a Purchaser is a party, will be, when executed and delivered (assuming this Agreement constitutes a legal, valid and binding obligation of the Sellers), valid and legally binding obligations of such Purchaser, enforceable against such Purchaser in accordance with their respective terms, except as enforcement of such terms may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws or proceedings affecting the enforcement of creditors' rights generally and by the availability of equitable remedies and defenses.

**5.2.3.  No Violations.**  Neither the execution, delivery or performance of this Agreement by Purchasers, nor the consummation by Purchasers of the transactions contemplated herein, nor compliance by Purchasers with any of the provisions hereof, will:  (i) except for the Governmental Requirements, require Purchasers to obtain any consent, approval or action of, or make any filing with or give notice to, any domestic or foreign governmental or regulatory body or any other Person; (ii) conflict with or result in any breach of any provisions of the certificate of incorporation or bylaws of any Purchasers; (iii) result in a violation or breach of, or constitute (with or without due notice or lapse of time) a default (or give rise to any right of termination, cancellation, acceleration, vesting, payment, exercise, suspension or revocation) under any of the terms, conditions or provisions of any note, bond, mortgage, deed of trust, security interest, indenture,

52

license, contract, agreement, plan or other instrument or obligation to which any Purchaser is a party or by which any Purchaser or its properties or assets may be bound or affected; (iv) violate any order, writ, injunction, decree, statute, rule or regulation applicable to any Purchaser or its properties or assets; or (v) result in the creation or imposition of any Lien on any asset of Purchasers.

      **5.2.4.    Consents and Approvals.**  Except for Governmental Requirements, no consent, approval or authorization of, or declaration, filing or registration with, any domestic or foreign government or regulatory authority is required to be made or obtained by Purchasers in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein.

      **5.2.5.    Litigation.**  Except for Claims raised in connection with the pendency of the Bankruptcy Cases, there is no suit, action, proceeding or investigation (whether at law or equity, before or by any Governmental Entity, or before any arbitrator) pending or, to the knowledge of Purchasers, threatened against or affecting Purchasers which could reasonably be expected to result in the issuance of an Order outstanding restraining, enjoining or otherwise prohibiting Purchasers from consummating the transactions contemplated by this Agreement.

      **5.2.6.    Brokers.**  Purchasers have employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which any Seller would be liable.

      **5.2.7.    Solvency.**  Upon the consummation of the transactions contemplated by this Agreement: (i) none of the Purchasers will be insolvent; (ii) none of the Purchasers or other legal entities constituting the Business will be left with unreasonably small capital; (iii) none of the Purchasers or the Business will have incurred debts beyond its ability to pay such debts as they mature; (iv) the capital of the Purchasers and the other legal entities constituting the Business will not be impaired; and (v) immediately following Closing, Purchasers, individually and in the aggregate, will have sufficient capital to continue the Business as a going concern (it being understood that Purchasers will have no obligation to continue all or any portion of the Business as a going concern, subject to Purchasers' obligations to perform covenants and otherwise fulfill its commitments made pursuant to this Agreement).

      **5.2.8.    Availability of Funds.**  Purchasers have the financial ability and will have available, at Closing, sufficient cash in immediately available funds to pay the Preliminary Purchase Price and thereafter to pay the Purchase Price if greater than the Preliminary Purchase Price, and all costs, fees and expenses necessary to consummate the transactions contemplated by this Agreement.  Purchasers expressly acknowledge and agree that its obligation to consummate the transactions contemplated by this Agreement and the Ancillary Agreements is not subject to any condition or contingency with respect to financing.

      **5.2.9.    Investment Intent:**

      **5.2.9.1.**    The applicable Purchaser who is acquiring the Sale Securities is acquiring the Sale Securities for its own account, solely for the purpose of investment and not with a view to, or for sale in connection with, any distribution thereof in violation of the Securities Act or any applicable securities Laws of any other jurisdiction.

**5.2.9.2.**   Umicore is an "accredited investor" as defined in Rule 501(a) promulgated under the Securities Act.

**5.2.9.3.**   Umicore understands that the acquisition of the Sale Securities to be acquired by it pursuant to the terms of this Agreement involves substantial risk.  Umicore and its officers have experience as an investor in securities and equity interests of companies such as the ones being transferred pursuant to this Agreement and acknowledges that it can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that Purchaser is capable of evaluating the merits and risks of its investment in the Sale Securities to be acquired by it pursuant to the transactions contemplated hereby.

**5.2.9.4.**   The applicable Purchaser understands that the Sale Securities to be acquired by it hereunder have not been registered under the Securities Act of 1933, as amended, on the basis that the sale provided for in this Agreement is exempt from the registration provisions thereof, and agrees that such securities may not be transferred unless such transfer is pursuant to an effective registration statement under the Securities Actor under the applicable securities Laws of any other jurisdiction, or, in each case, an applicable exemption therefrom.

**5.2.10.   Compliance with Law.**   Purchasers are in compliance with all Laws applicable to it, except with respect to those violations that could not reasonably be expected to result in the issuance of an Order outstanding restraining, enjoining or otherwise prohibiting any Purchaser from consummating the transactions contemplated by this Agreement.

**5.2.11.   Anti-Money Laundering.**   Each Purchaser is in material compliance with all applicable provisions of: (i) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-57) ("**USA PATRIOT Act**") as amended and all regulations issued pursuant to it; (ii) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibited Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism; (iii) the International Emergency Economic Power Act (50 U.S.C.  1701 et seq.), and any applicable implementing regulations; (iv) the Trading with the Enemy Act ( 50 U.S.C.  50 et seq.), and any applicable implementing regulations; and (v) all applicable legal requirements relating to anti-money laundering, anti-terrorism and economic sanctions in the jurisdictions in which such Purchaser operates or does business.  Neither any Purchaser nor any of their directors, officers or Affiliates is identified on the United States Treasury Department Office of Foreign Asset Control's ("**OFAC**") list of "Specially Designated Nationals and Blocked Persons" (the "**SDN List**") or otherwise the target of an economic sanctions program administered by OFAC, and no Purchaser is affiliated in any way with, or providing financial or material support to, any such persons or entities. Purchasers agree that should they, or any of their  respective directors, officers or affiliates be named at any time prior to the Closing on the SDN List, Purchasers shall inform Sellers in writing immediately.

**5.2.12.   Adequate Assurance of Future Performance.**   Purchaser has provided or will be able to provide, at or prior to the Sale Hearing, adequate assurance of its future performance under each Assumed U.S. Contract to the parties thereto (other than Sellers) in satisfaction of Section 365(f)(2)(B) of the Bankruptcy Code, and no other or further assurance will be necessary thereunder with respect to any Assumed U.S. Contract.

**5.2.13. Shelf Tulsa Collective Bargaining Agreement.** The Shelf Tulsa Collective Bargaining Agreement is attached hereto as Schedule 5.2.13.

## 6.    CONDITIONS TO CLOSING:

**6.1.    Conditions to Obligations of Sellers and Purchasers.** The respective obligations of each Party to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver by both Parties at or prior to the Closing Date of the following conditions precedent:

**6.1.1.    Sale Approval Order.** The Sale Approval Order, in form and substance reasonably satisfactory to Purchasers, shall be entered by the Bankruptcy Court onto the court docket and shall not be subject to a stay or injunction.

**6.1.2.    No Law, Judgments, etc.** Subject to Section 9.1.2 and other than matters within the scope of Section 6.1.3, (a) no Law, injunction, judgment or ruling enacted, promulgated, issued, entered amended or enforced by any Governmental Authority shall be in effect enjoining, restraining, preventing or prohibiting consummation of the transactions or making the consummation of the transactions contemplated by this Agreement illegal;  (b) Sellers shall have completed any required information and consultation process with the Works Councils and (c) Purchasers and Sellers shall each be reasonably satisfied (I) that the sale of the Acquired Assets and Sale Securities will not be rescinded or voided, and (II) that no Purchaser (or any of its respective Affiliates) is reasonably likely to be subject to Claims, litigation or Liabilities in connection with the consummation of the transactions contemplated by this Agreement for which such Purchaser (or its respective Affiliates) has not received adequate indemnification or other reasonable protection.  In the event that the Purchaser is not reasonably satisfied that it (or its Affiliates) has received such adequate indemnification (including with respect to the limits on such coverage and/or the types of damages for which the Purchaser (or its Affiliates) shall be covered) or other reasonable protection, then the parties shall work together in good faith to provide for such indemnification or other reasonable protection as the Purchaser reasonably believes is adequate.

**6.1.3.    Approvals by Antitrust Authorities.** All competition filings, required to be made under any Antitrust Law by the Parties jointly, or individually by either of the Parties or any of their Affiliates, in any jurisdiction in connection with the transactions contemplated by this Agreement shall have been made and the consents, approvals and authorizations shall have been obtained and remain in full force and effect or required waiting periods shall have expired or been terminated.

**6.1.4.    Other Approvals.** Any and all Governmental Entity consents, approvals, authorizations, declarations, filings and registrations required to assign the Purchased Assets to the appropriate Purchasers shall have been duly obtained.

**6.2.    Conditions to Obligations of Purchasers.** The obligation of Purchasers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Purchasers):

**6.2.1.    Accuracy of Warranties.** Except as otherwise permitted by this Agreement or a Transfer Agreement, and after giving effect to the Sale Approval Order, the representations and warranties of Sellers contained in this Agreement (without taking into account any materiality or Material Adverse Effect qualification therein) shall be true and correct as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which shall be true and correct only as of such date or time) except where the failure of such

representations and warranties to be true and correct would not have a Material Adverse Effect. Subject to the preceding sentence, Sellers may update or supplement the Disclosure Schedule prior to Closing by notice to Purchasers, but any such update or supplement shall not be taken into account in determining whether the condition set forth in this Section 6.2.1 has been satisfied. Any claim that Purchasers may have based on matters disclosed by Sellers in such updated or supplemented Disclosure Schedule will be deemed waived by Purchasers if Purchasers nonetheless complete the transactions contemplated herein or in the Transfer Agreements.

**6.2.2.    Material Adverse Effect.**  Since the date of the January Projections and up to and including the Closing, there shall not have been any event, circumstance, change or effect that, individually or in the aggregate, has, had or likely will have a Material Adverse Effect and the Sellers shall have conducted the Business in the Ordinary Course of Business.

**6.2.3.    Ancillary Agreements and Performance of Covenants.**  Each of the Ancillary Agreements to which any Seller is a party shall have been executed and delivered by such Sellers to Purchasers on terms reasonably satisfactory to Purchasers, and all other agreements and transactions contemplated hereby or in any Ancillary Agreement to be performed by any Seller on or before the Closing shall have been performed in all material respects, subject to Purchaser's performance of its obligations under Section 5.2.12.

**6.2.4.    Other Approvals; Cure Amounts.**  The third party and Governmental Entity consents, approvals, authorizations, declarations, filings and registrations required to assign the Purchased Assets to the appropriate Purchasers including those required to be set forth in Schedules 5.1.3, 5.1.11 or 5.1.14.A and that the Purchasers reasonably believe are necessary or otherwise material to the Business shall have been received and all consents, approvals and filings in connection with non-competition related Governmental Requirements shall have been obtained or made in form and substance reasonably satisfactory to the Purchasers and any Cure Amounts required to be paid for effective assignment and assumption of the U.S. Assumed Contracts shall have been paid, otherwise resolved by Sellers with the consent of the other parties to such Assumed U.S. Contracts, or absent such consent, by Final Order of the Bankruptcy Court. As used in this section, "material" shall *not* mean having or reasonably likely to have an impact of more than $1,000,000.

**6.2.5.    CBA.**  That certain Shelf Collective Bargaining Agreement shall be put in full force and effect effective as of the Closing Date and shall not have been amended, modified, terminated or waived in any respect without Purchasers' consent.

**6.2.6.    Sale Company Debt.**  The Sale Company's Debt shall be retired, exhausted or repaid in a mutually agreeable manner.

**6.2.7.    Florange Pre-emptive Right.**  The *declaration d'intention d'aliéner* shall have been properly filed as soon as practicable following the date hereof and, in any event, no later than June 15, 2007, with respect to the Listed Real Property located in Florange, France and such Listed Real Property shall no longer be subject to a pre-emptive or similar right in favor of any French Governmental Entity.

**6.2.8.    Closing Deliveries.**  Purchasers shall have received from Sellers all of the instruments, documents and considerations described in Sections 7.2 and 7.3 other than any of such items not received solely due to Purchasers' failure to perform under Section 5.2.12.

**6.3.    Conditions to Obligations of Sellers.** Except as otherwise permitted by this Agreement or a Transfer Agreement, the obligation of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Sellers):

**6.3.1.    Accuracy of Warranties.**  The representations and warranties of Purchasers contained in this Agreement shall be true and correct in all material respects as of the Closing Date if made on such date (except for representations and warranties that speak as of a specific date or time, which shall be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a material adverse effect on Purchasers' ability to consummate the transactions contemplated by this Agreement.

**6.3.2.    Ancillary Agreements Performance of Covenants.** Each of the Ancillary Agreements to which any Purchaser is a party shall have been executed and delivered by such Purchaser to Sellers on terms reasonably satisfactory to Sellers, and all other agreements and transactions contemplated hereby or in any Ancillary Agreement to be performed by any Purchaser on or before the Closing shall have been performed in all material respects.

**6.3.3.    Closing Deliveries.**  Sellers shall have received from Purchasers all of the instruments, documents and considerations described in Sections 7.2 and 7.4.

**7.    CLOSING:**

**7.1.    The Closing.** Subject to the terms and conditions of this Agreement, the closing (the "**Closing**") of the transactions contemplated hereby shall take place at the offices of Delphi at 10:00 a.m. on the second (2nd) Business Day after the conditions set forth in Article 6 shall have been satisfied or waived (other than conditions which by their nature can be satisfied only at the Closing), or on such other date or at such other time as the Parties may agree.  For tax and accounting purposes, the effective time of the transaction shall be 11:59 p.m. ET on the Closing Date.  The Parties shall use commercially reasonable efforts to schedule the Closing for the last Business Day of the month. The Closing of the Ancillary Agreements shall take place simultaneously with the Closing or on a later date if mutually agreed by the relevant Seller and relevant Purchaser.

**7.2.    Ancillary Agreements.**  The Parties shall execute and deliver to each of the applicable Sellers and Purchasers the following agreements on mutually agreeable terms and other documents necessary to effect the transactions contemplated by this Agreement (the "**Ancillary Agreements**"):

**7.2.1.**    Transfer Agreements and/or assignments necessary for the Sellers to transfer to Purchasers the Purchased Intellectual Property and the Fuel Reformer Patent Rights set forth on Schedule 7.2.1 (the "**Fuel Reformer Patents**"), including any forms required to be filed with any applicable Governmental Entity in respect of Intellectual Property transfers and assignments.

**7.2.2.**    Fuel Reformer Patent License between certain Purchasers and certain Sellers pursuant to which Purchasers shall grant Sellers a non-exclusive, worldwide license, with limited rights to sublicense those certain Fuel Reformer Patents on the terms set forth in Schedule 7.2.2 (the "**Fuel Reformer Patent License**").

**7.2.3.**    To the extent that equity interests of the Sale Company are represented by stock certificates, DASHI shall deliver to the Securities Purchaser original certificates evidencing the Sale Securities (to the extent applicable in the respective jurisdiction), which certificates shall be

57

duly endorsed for transfer or accompanied by duly executed stock transfer powers or other appropriate instruments of assignment and transfer in favor of such Purchasers or their permitted assigns.

**7.2.4.**    Transfer Agreements for Acquired Assets of certain Business locations (including France and China) in each case in form and substance to the reasonable satisfaction of the parties.

**7.2.5.**    Transfer Documents, including for: (i) Listed Real Property (e.g., lease assignments or special warranty deeds in the U.S. or their equivalent in other jurisdictions); (ii) Contracts; (iii) Permits; and (iv) the Acquired Carved-Out Location Assets in each case reasonably satisfactory to the Parties in form and substance.

**7.2.6.**    Transition Services Agreement substantially in the form attached hereto as Schedule 7.2.6 ("**Transition Services Agreement**").

**7.2.7.**    The Atmospheric Catalyst License substantially in the form of Schedule 7.2.7.

**7.2.8.**    Testing Services Agreements covering the provision by the Sellers of long-term testing services to the Purchasers at the Bascharage, Luxembourg site and short-term testing services to the Purchaser at the Flint, Michigan site (each such agreement a "**Testing Services Agreement**", and, collectively, the "**Testing Services Agreements**") containing the terms set forth in the draft agreements attached as Schedule 7.2.8(i) (Luxembourg) and Schedule 7.2.8(ii) (Flint) and such additional terms as the Parties shall agree.

**7.2.9.**    Canning Supply Agreements pursuant to which the Purchasers supply Products to the Sellers' canning operations in: (i) Shanghai, China; and (ii) Clayton, Australia (each a "**Canning Supply Agreement**"), containing the terms set forth in the draft agreements attached as Schedule 7.2.9(i) (Shanghai) and Schedule 7.2.9(ii) (Clayton) and such additional terms as the Parties shall agree.

**7.2.10.**    Toll Manufacturing Agreements covering each of Shanghai, China, Clayton, Australia and San Luis Potosi, Mexico between the Purchasers and Sellers pursuant to which the Sellers shall provide certain manufacturing services at such location, to the Purchasers (each such agreement a "**Toll Manufacturing Agreement**", and, collectively, the "**Toll Manufacturing Agreements**"), containing the terms set forth in the draft agreements attached as Schedule 7.2.10(i) (Shanghai), Schedule 7.2.10(ii) (Clayton) and Schedule 7.2.10(iii) (San Luis Potosi) and such additional terms as the Parties shall agree.

**7.2.11.**    The Closing Escrow Agreement between Sellers, Purchasers and the Escrow Agent, substantially in the form of Schedule 7.2.11.

**7.2.12.**    To the extent Sellers require a separate assumption agreement or other document(s) pursuant to which the relevant Purchasers assume the Assumed Liabilities under Section 7.4.2 below, the form of same shall be reasonably satisfactory to Purchasers and Sellers.

**7.3.**    **Sellers' Other Deliveries.**    At the Closing, in addition to the Ancillary Agreements covered by Section 7.2, Sellers shall deliver to Purchasers the following, in proper form for recording where appropriate, and in each case, in form and substance reasonably satisfactory to the Purchasers:

**7.3.1.**    An officer's certificate, dated as of the Closing Date, executed by Delphi on behalf of all the Sellers, certifying that the conditions specified in Section 6.2 have been fulfilled.

**7.3.2.**    A certificate, dated as of the Closing Date, executed by Delphi on behalf of all the Sellers by a Secretary or an Assistant Secretary, certifying: (i) a true and correct copy of each Seller's Organizational Documents; (ii) a true and correct copy of the resolutions of each Seller's board authorizing the execution, delivery and performance of this Agreement and any Ancillary Agreement to which such Seller is a party and the consummation of the transactions contemplated hereby and thereby; and (iii) incumbency matters.

**7.3.3.**    Certified copies of all orders of the Bankruptcy Court pertaining to the contemplated transactions contemplated by this Agreement and the Ancillary Agreements, including the Bidding Procedures Order and the Sale Approval Order.

**7.3.4.**    Appropriate receipts.

**7.3.5.**    The minute books and other corporate, partnership or limited liability company record books of the Sale Company.

**7.3.6.**    Resignations of all directors (or equivalent) and officers of the Sale Company, except as otherwise requested by Purchasers no less than six (6) Business Days prior to the Closing Date.

**7.3.7.**    Releases from any third party having a Lien on any of the Purchased Assets other than Permitted Liens.

**7.3.8.**    All Technical Documentation in accordance with the provisions of Section 8.6 below.

**7.3.9.**    A certificate of non-foreign status pursuant to Treasury Regulation Section 1.1445-2(b)(2) with respect to each Seller transferring a United States real property interest (within the meaning of Section 897(c) of the Code).

**7.3.10.**    All other documents and papers reasonably requested by Purchasers to effect the transactions contemplated hereby.

**7.4.    Purchasers' Deliveries.**    At the Closing, Purchasers shall deliver to Sellers, in proper form for recording where appropriate, and in each case, in form and substance reasonably satisfactory to the Sellers:

**7.4.1.**    The Purchase Price to be paid at Closing as required by, and in accordance with, Section 4.4.

**7.4.2.**    An appropriate assumption agreement or other document or documents pursuant to which the relevant Purchasers assume the Assumed Liabilities.

**7.4.3.**    An officer's certificate, dated as of the Closing Date, executed by Umicore on behalf of all the Purchasers, certifying that the conditions specified in Section 6.3 have been fulfilled.

**7.4.4.** A certificate, dated as of the Closing Date, executed by Umicore on behalf of all the Purchasers by its Secretary or an Assistant Secretary, certifying: (i) a true and correct copy of Purchasers' Organizational Documents; (ii) a true and correct copy of the resolutions of the Purchasers' board authorizing the execution, delivery and performance of this Agreement by Purchasers and the consummation of the transactions contemplated hereby; and (iii) incumbency matters.

**7.4.5.** All other documents and papers reasonably requested by Sellers to effect the transactions contemplated hereby.

**7.5. Post-Closing Deliveries.** Promptly following the Closing, Seller shall deliver signature cards from all banks or financial institutions with which the Sale Company has any account, designating signatures approved by the Purchasers.

**7.6. Sale Company.** At Closing, the Sellers shall perform the following obligations, in each case, with effect from Closing:

**7.6.1.** Seller shall deliver to Purchaser definitive certificates for the Shares, together with a share transfer form, in a mutually agreeable form, in respect of the shares duly executed by the registered holder in favor of the relevant Purchaser; and

**7.6.2.** Seller shall deliver to Purchaser written resignation(s) of any Seller representatives as directors of the Company (to take effect from the Closing).

**7.6.3.** Seller shall obtain the approval of the directors of the Company which: (i) accepts the resignations of the director(s) whose resignation is required in terms of Section 7.6.2 and duly appoints Purchaser representatives whose names have been provided to Seller at least five (5) Business Days before Closing as additional directors of the Company; (ii) approves the transfers of the shares from Seller to Purchaser (subject to their being duly stamped); and (iii) approves the placing of Purchaser's name on the Company's register of members in accordance with the share transfer form delivered and authorizes the issue of a new share certificate to Purchaser.

# 8. CERTAIN ADDITIONAL COVENANTS:

## 8.1. Certain Pre-Closing Matters:

**8.1.1.** Prior to the Closing, Sellers shall afford the officers, employees, accountants, attorneys and authorized representatives of Purchasers reasonable access at reasonable business hours and upon reasonable prior request to the facilities, properties, books, personnel, and records of the Sellers and the Sale Company in order that Purchasers may have the opportunity to determine the amounts of the Purchase Price adjustments set forth in Article 4 (including a financial audit to determine the Sale Company Retained Liability Amount) and to facilitate Day 1 readiness and integration planning.

**8.1.2.** Prior to the Closing, Sellers shall: (i) furnish Purchasers with such additional material, including financial and operating data and other information relating to the Business, as Purchasers may reasonably request from time to time including access to all Contracts (including Contracts with customers, suppliers and consultants) and any amendments, modifications or waivers with respect thereto (each a, "**Contract Modification**"); and (ii) upon the request of any Purchaser, cooperate with Purchasers (including by waiving any applicable confidentiality

60

restrictions) to arrange meetings between Purchasers and customers or suppliers of any Seller in accordance with the Purchaser Confidentiality Agreement.  Purchasers shall be permitted to disclose the terms of this Agreement to any such customer or supplier, as appropriate, to provide assurances to such customer or supplier with respect to the continued viability of the Business after the Closing.

8.1.3.    Prior to the Closing and as soon as reasonably practicable, the Parties will finalize all steps needed to organize the transactions contemplated by this Agreement and facilitate the drafting and negotiation of all of the Ancillary Agreements which, by the terms of Section 7.2 above, are required to effect the Closing.

8.1.4.    Prior to the Closing, Sellers shall allow the Purchasers and its representatives, in accordance with the terms of an Environmental Right of Access Agreement dated on or about March 30, 2007 between the Parties, access to its facilities, real property, books, records and personnel for purposes of completing the Purchasers' environmental, health and safety review, including, without limitation, such Phase I and Phase II assessments as required by the Purchasers; provided, however, that the results of such Phase I and Phase II assessments will not specifically provide any Purchaser with a right to rescind this Agreement and provided further that the foregoing shall not limit, modify or amend any other provision of this Agreement or any Purchaser's rights with respect thereto.

8.1.5.    Within fifteen (15) Business Days following the last day of each calendar month prior to Closing, the Sellers shall provide in a form reasonably acceptable to the Purchaser: (i) a summary of the Sellers' Net Working Capital (calculated in accordance with the Net Working Capital Methodology) and PGM inventory as of the last Business Day of the preceding calendar month; and (ii) a reasonably detailed summary of the Seller's capital investments during the prior calendar month.

8.1.6.    If, prior to the Closing, the Sellers demonstrate the effectiveness of operational initiatives that have the effect of decreasing the volumes of PGM required to operate in the Ordinary Course of Business, then the Parties shall work together in good faith to determine appropriate adjustments to target levels.  Any resulting change in the Owned PGM Volume Target shall be reflected in an amendment to the Agreement adopted pursuant to Section 13.7.  For information purposes only, Schedule 8.1.6 sets forth further background information on currently contemplated initiatives and possible adjustment methodology to be applied in such situation.

8.1.7.    The Parties will use all commercially reasonable efforts to complete all Ancillary Agreements as soon as practicable.

8.1.8.    The Parties agree that the definition of Net Working Capital includes certain other current assets and other current liabilities of the type that are set forth on the attached Schedule 8.1.8, but that have yet to be finally determined.  All of the assets and liabilities set forth on Schedule 8.1.8 were taken into account in setting the Net Working Capital Target.  The Parties shall work together in good faith as soon as reasonably practicable  to determine which of such assets and liabilities on Schedule 8.1.8 are properly included within the definition of the Net Working Capital and, if appropriate, to adjust the Net Working Capital Target to reflect such discussions.

8.1.9.    The Parties shall work together in good faith to consider any amendments or modifications to this Agreement as are required in connection with Delphi's possible transition of

any portion of the operations of the Business from one existing location to any other existing location of the Business.

**8.2.** **Joinder of Additional Seller Parties.** Notwithstanding anything to the contrary contained herein, no later than five (5) Business Days prior to the Closing, Delphi shall cause each Delphi Affiliate listed in Schedule 1 that is not a signatory hereto as of the date hereof, to execute and deliver to Umicore counterpart signature pages to this Agreement in the form of Schedule 8.2. Upon Umicore's execution and delivery of each counterpart signature page, each such Person shall be considered a "Seller" for all purposes under this Agreement effective as of the date hereof. Notwithstanding the foregoing, in the event that the Parties mutually agree that applicable Law or other considerations require an alternative approach to ensuring that the appropriate Delphi Affiliates are bound to the obligations set forth with respect to such Affiliates hereunder, the Parties shall work together in good faith to adopt an alternative approach to this Section 8.2 including through agreement on the terms of mutually satisfactory local transfer agreements.

**8.3.** **Bankruptcy Actions:**

**8.3.1.** The Bidding Procedures are set forth in Section 11. Promptly after the execution of this Agreement, Delphi shall, and shall cause the other Sellers that are Filing Affiliates to, file a motion or motions (and related notices and proposed orders) with the Bankruptcy Court seeking, and thereafter diligently pursue and defend, approval of the Bidding Procedures Order and the Sale Approval Order. In the event that the Bidding Procedures Order is not entered on or before July 9, 2007 absent any material default by Purchasers hereunder, Purchasers may choose to withdraw this Agreement, and neither party hereto will have any further Liability to the other arising from this Agreement.

**8.3.2.** Delphi shall use commercially reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Bankruptcy Rules, as modified by order, if any, of the Bankruptcy Court, in connection with obtaining approval of the sale of the Purchased Assets under the Agreement, including serving on all required Persons in the Bankruptcy Cases, notice of the Sale Approval Motion, the Sale Hearing (as hereinafter defined) and all applicable objection deadlines in accordance with Rules 2002, 6004, 6006 and 9014 of the Bankruptcy Rules, the Bidding Procedures Order or other orders of the Bankruptcy Court, and any applicable local rules of the Bankruptcy Court.

**8.3.3.** With respect to any and all proceedings before the Bankruptcy Court, Sellers agree: (i) that they will take no action inconsistent with the terms of this Agreement; (ii) that they will take any actions and make any filings with the Bankruptcy Court necessary and prudent to ensure that the indemnification obligations of any Seller under this Agreement are fully funded and are not impacted or mitigated in any respect by the Bankruptcy Court; (iii) that such indemnification obligations survive in full any bankruptcy reorganization of any Seller; and (iv) that any Plan of Reorganization filed with or approved by the Bankruptcy Court with respect to any Seller will contain no provisions inconsistent with such Seller's obligations and duties under this Agreement.

**8.4.** **Registrations, Filings and Consents; Further Actions:**

**8.4.1.** As soon as practicable after the date hereof as requested by a Purchaser, each of the Parties shall: (i) promptly file all notifications, filings and other documents required in connection with all Antitrust Authorities and other regulatory approvals referred to in Sections 6.1.3 and 6.2.4, and to respond as promptly as practicable to any inquiries or requests received from any Antitrust Authority or other Governmental Entity, including for additional information or documentation; (ii)

promptly furnish the other Party with copies of all documents (except documents or portions thereof for which confidential treatment has been requested of or by any Antitrust Authority which may be furnished to the other Party's legal counsel only) and correspondence: (a) prepared by or on behalf of it for submission to any Antitrust Authority or other Governmental Entity; and (b) received by or on behalf of it or its counsel from any Antitrust Authority or other any Governmental Entity, in each case in connection with the transactions contemplated by this Agreement, and limited to, in the case of competitively sensitive information, such Party's outside antitrust counsel who have signed or agreed to abide by that certain Joint Defense Agreement, effective as of December 12, 2006; and (iii) use its commercially reasonable efforts to consult with and keep the other Party informed as to the status of such matters (except that documents or portions thereof dealing with competitively sensitive information such as the price that Purchaser would pay for the Business or that Seller would accept for the Business may be withheld even from the other Party's outside antitrust counsel).  Notwithstanding the foregoing, Purchasers and Sellers agree that neither of them will make any voluntary filing under applicable foreign Antitrust Laws unless advised by legal counsel in such jurisdiction that the failure to make a filing could result in a Material Adverse Effect or otherwise be in violation of applicable Law.  Each Party hereto shall promptly inform the other of any oral communication from any Antitrust Authority or other Governmental Entity regarding any of the transactions contemplated by this Agreement and the Ancillary Agreements. If the Antitrust Authority in any such country: (i) determines that it will impose conditions to its approval of the transactions contemplated by this Agreement or does impose such; or (ii) determines that it will file a suit, action or other proceeding before a court or governmental agency seeking to restrain or prohibit, or to obtain damages or other relief in connection with, the consummation of the transactions contemplated by this Agreement or does file such, either Party shall have the right to terminate the transaction pursuant to Section 9.1.1.B (notwithstanding anything to the contrary in Section 9.1.1.B) if such conditions, suits, actions or other proceedings are not resolved within ninety (90) days from the date of such determination.  Notwithstanding anything in this Agreement to the contrary, in no event shall Purchasers or Sellers be obligated to propose or agree to accept any undertaking or condition, to enter into any consent decree, to make any divestiture, to accept any operational restriction, or take any other action that, in the reasonable judgment of the Purchasers or Sellers, could be expected to: (1) limit the right of the Purchasers or Sellers to own or operate all or any portion of the Purchased Assets or of Purchasers to own or operate any portion of their existing businesses or assets; or (2) require Purchasers or Sellers to license any of the Intellectual Property rights or to modify any existing license or their Intellectual Property rights.  With regard to any Antitrust Authority or Governmental Authority, no Seller shall, without Purchasers' prior written consent (not to be unreasonably withheld) propose, opine on the advisability of or commit to any divestiture transaction, or propose, opine on the advisability of or commit to alter any of their business or commercial practices in any way, or otherwise take or commit to any action that limits Purchasers' freedom of action with respect to, or Purchasers' ability to retain any of, the Purchased Assets or receive the full benefits of this Agreement.

     **8.4.2.**    Within three (3) Business Days after the entry of an unstayed Sale Approval Order upon the terms and subject to the conditions of this Agreement, each of the parties hereto shall use its reasonable best efforts to take, or cause to be taken, all appropriate actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as promptly as practicable including using their reasonable best efforts to cause the satisfaction of all conditions to Closing.  At all times prior to the Closing: (i) Delphi will notify Umicore in writing of any fact, condition, event or occurrence that is reasonably expected to result in the failure of any of the conditions contained in Article 6 to be satisfied, promptly upon becoming aware of the same; and (ii) Umicore will notify Delphi in writing of any fact, condition,

event or occurrence that is reasonably expected to result in the failure of any of the conditions contained in Article 6 to be satisfied, promptly upon becoming aware of the same.

**8.5.**    **Operation of the Business Pending Closing:**

    **8.5.1.**    Except: (i) as otherwise provided herein; (ii) as disclosed in <u>Schedule 8.5</u> of the Disclosure Schedule; (iii) as required by, arising out of, relating to or resulting from the Bankruptcy Cases (including Delphi's Section 1113 and 1114 Motion, consensual resolutions between Delphi and any of its U.S. unions and an approved plan of reorganization); (iv) subject to any changes that may be required under applicable Laws or that may result from the disclosure of this Agreement or the transactions contemplated hereby; (v) in connection with Delphi's possible transition of any portion of the operations of the Business from one existing location to any other existing location of the Business and (vi) as set forth in the following sentence, until the Closing, Sellers will carry on the Business in the Ordinary Course of Business; perform in all material respects all of its obligations under all Listed Contracts and not amend, alter or modify in any material respect that is adverse to the Business any provision of any Listed Contract; keep in full force and effect insurance comparable in amount and scope to coverage maintained by it on the date of this Agreement; use commercially reasonable efforts to maintain and preserve business relations with customers, suppliers, employees and others having business relations with the Business; endeavor to maintain the goodwill of the Business; and promptly advise Purchaser of any material and adverse change in the business condition (financial or other) of the Business or the Acquired Assets, any event or occurrence that would reasonably be expected to restrain, enjoin, substantially delay or otherwise prohibit the Closing under this Agreement, or that would be likely to result in a breach of any representation, warranty or covenant in this Agreement.  Notwithstanding any implication to the contrary, Excess Cash may be distributed by the Sale Company prior to Closing.

    **8.5.2.**    Notwithstanding the foregoing, except as otherwise contemplated by this Agreement, or as described in Section 8.5.1 and <u>Schedule 8.5</u> of the Disclosure Schedule, no Asset Seller or DASHI, as applicable, shall, without the prior written consent of Purchasers, which consent shall not be unreasonably withheld or delayed: (i) waive or modify any rights material to any of the Sellers relating to the Acquired Assets; (ii) enter into any material transaction not contemplated by the January Projections; <u>provided</u>, <u>however</u>, that nothing herein shall require Sellers to inform or seek consent from Purchasers prior to bidding on competitive opportunities before Closing; (iii) knowingly do any act, omit to do any act, or permit any omission to act within its control, that is reasonably expected to cause: (x) a material breach or default in any of the Listed Contracts; (y) any of the Permits to lapse; or (z) for any other reason, a breach of any representation or warranty in this Agreement or a Material Adverse Effect; (iv) except in the Ordinary Course of Business, change or increase the rate of compensation paid by any of the Sellers to any of its Current Employees or agents, except for payments or bonuses that are payable by such Seller before the Closing Date; (v) make any change in the authorized or outstanding capital stock, charter or governing bylaws or regulations of the Sale Company, or merge or consolidate the Sale Company; or (vi) enter into any agreement, authorize, or commit to do any of the foregoing. Notwithstanding the foregoing, in the event the Sellers are legally required to undertake any of the actions listed in this Section 8.5.2 in the course of the Bankruptcy Cases, the Sellers shall provide advance written notice to the Purchasers and such action by Sellers shall not constitute a breach of this Section 8.5.2.

    **8.6.**    **Assumed U.S. Contracts; Cure Amounts.**  Promptly after the Bidding Procedures Order has been issued by the Bankruptcy Court, Sellers shall, pursuant to a motion or other appropriate notice in form and substance reasonably acceptable to Purchasers (which motion may be incorporated into the Sale

Motion), move to assume and assign to Purchasers the Pre-Petition Contracts and other Contracts with a Filing Affiliate that the Purchasers have identified for assumption and assignment to the Purchasers (collectively, the "**Assumed U.S. Contracts**") and shall provide notice thereof in accordance with all applicable Bankruptcy Rules as modified by any orders of the Bankruptcy Court. Sellers shall pay all Cure Amounts required to effect assumption and assignment of the Assumed U.S. Contracts as agreed to by the Sellers and each party to a Assumed U.S. Contract or, absent such agreement, by Final Order of the Bankruptcy Court in the time and manner specified by the Sale Approval Order.

8.7.    **Hired Current Employees.**    No later than thirty (30) days prior to the Closing, Purchasers shall provide the Sellers with a list setting forth each proposed Current Employee to whom the Asset Purchasers intend to offer employment as of the Closing ("**Proposed Hired Current Employees**").

8.8.    **Assumed PTO Obligations.**    Not less then three (3) Business Days prior to the Closing, the Sellers shall provide the Purchasers with a true and complete copy of Schedule 8.8 setting forth the Assumed PTO Obligations for each Hired Current Employee as of the Closing Date (the "**Closing Date Assumed PTO Obligations Schedule**").

8.9.    **Guarantee by Umicore.**    Umicore agrees to unconditionally guarantee all obligations of Purchasers pursuant to the terms of this Agreement, including, without limitation, to pay the Purchase Price and any indemnification obligations of Purchasers. Umicore shall also reimburse Sellers for reasonable fees and expenses (including reasonable fees of counsel) incurred in successfully enforcing the guarantee obligations set forth in this Section 8.9.

8.10.    **Post-Closing Covenants.**    From and after the Closing, each of the Parties will perform its respective covenants and agreements set forth below:

8.10.1.    **Seller Post-Closing Covenants:**

A.    **Non-Competition.**    Sellers have at Closing, established the reputation of the Business. Each Seller undertakes and agrees with Purchasers that for a period of five (5) years after the Closing Date, except with the consent of Purchasers, Sellers shall not, and shall ensure that each Affiliate of Sellers shall not, either on its own account or in conjunction with or on behalf of any person, firm or company whether by sales, marketing or other activities, carry on or be engaged, concerned or interested, directly or indirectly, whether as a shareholder, director, employee, partner, agent or otherwise in carrying on any business which is engaged in the research, design, development, manufacture, remanufacture or sale of Products as conducted by the Business (a "**Competitive Business**"); provided, however, that the restrictions contained in this Section 8.10.1 will not prohibit: (i) the acquisition of a controlling interest or merger with any person, or a division or business unit thereof, which is not primarily engaged in a Competitive Business, acquired by or merged, directly or indirectly, into a Seller or any of its Affiliated companies after the Closing Date, provided that Delphi will use commercially reasonable efforts to divest, as soon as practicable after such acquisition or merger, any portion of the business of such Person that constitutes a Competitive Business if the Competitive Business accounts for the lesser of: (1) $10 million in sales; or (2) ten percent (10%) of the total sales of the person, division or business unit being acquired; (ii) the acquisition by Seller or any of its Affiliated companies, directly or indirectly, of a non-controlling ownership interest in any person or a division or business unit thereof, or any other entity engaged in a Competitive Business, if the Competitive Business accounts for fifteen percent (15%) or less of the sales or ten percent (10%) or less of the value of the acquired

business at the date of such acquisition (whichever is the greater); (iii) the acquisition by a Seller or any of its Affiliated companies, directly or indirectly, of less than five percent (5%) of the publicly traded stock of any person engaged in a Competitive Business; (iv) provision of non-Business-related consulting services to, the license of any technology that a Seller or any Seller Affiliate owns or has the right to sublicense to, or the financing (on its own behalf or on behalf of any other Person) of any Person for the purpose of designing or manufacturing on behalf of a Seller or any Seller Affiliate or selling to a Seller or any Seller Affiliate components and parts for automotive applications which are outside the scope of the Business, the Purchased Intellectual Property or the design, development, manufacture, remanufacture, sale or purchase of Products; (v) Sellers or any of their Affiliates by themselves or with others and, in each case, consistent with the obligation to pay any royalties that may be owed under the provisions of the Fuel Reformer Patent License: (a) designing, developing (including making catalyst prototypes for Fuel Reformers but not themselves manufacturing any Fuel Reformer catalysts for commercial production), testing and/or purchasing Fuel Reformer catalysts; (b) allowing a third party to manufacture Fuel Reformer catalysts; (c) selling Fuel Reformers containing Fuel Reformer catalysts; and (d) technical interchanges with catalyst suppliers consistent with Delphi's Fuel Reformer activities; (vi) activities under the Toll Manufacturing Agreement; (vii) consistent with Sellers' generally applicable troubled supplier practices, direct or indirect activities of a Seller or any Seller Affiliate to advise a troubled supplier of a Seller or its Affiliates; and (viii) any business or activity conducted by any Affiliate, subsidiary or division of a Seller (excluding the Business) as of the Closing Date (each of which shall be deemed not to breach this Section 8.10.1.A), including any activity conducted by the operations referred to as Excluded Canning Business or other Excluded Assets.

      **B.**      While the restrictions contained in this Section 8.10.1 are considered by the parties to be reasonable in all the circumstances for the protection of the interests of Purchasers and/or the Business, it is recognized that restrictions of the nature in question may fail for technical reasons and, accordingly, it is hereby agreed and declared that if any of such restrictions shall be adjudged to be void but would be valid if part of the wording thereof were deleted or the periods thereof reduced or the range of activities or area dealt with thereby reduced in scope, the said restriction shall apply with such modifications as may be necessary to make it valid and effective.

      **8.10.2.** <u>**Technical Documentation.**</u> Sellers shall, or cause their Affiliates to, deliver, or will deliver on or before the Closing, to the relevant member of Purchasers, all Technical Documentation included in the Acquired Assets. For a period of not less than ten (10) years commencing at Closing, Purchasers shall use reasonable efforts to maintain all Technical Documentation applicable to pre-Closing Date product design, test, release and validation it acquires from Sellers in connection with the purchase of the Acquired Assets or the Sale Company under Article 1 of this Agreement at a location at which they shall be reasonably accessible to Sellers upon request. During such ten (10) year period, Purchasers shall not destroy or give up possession of its final copy of such documentation without offering Sellers the opportunity, at Sellers' expense but without any payment to Purchasers, to obtain a copy of such documentation.

      **8.10.3.** <u>**Books and Records and Litigation Assistance From and After Closing:**</u>

      **A.**      Purchasers shall, and shall cause and their Affiliates to, preserve and keep all books, records, computer files, software programs and any data processing files delivered to Purchasers by Sellers pursuant to this Agreement for a period of not less than

five (5) years from the Closing Date, or for any longer period as may be required by any Governmental Entity, ongoing litigation, law, regulation, audit or appeal of Taxes, or Tax examination at Purchasers' sole cost and expense. During such period, Purchasers shall: (i) provide Sellers with such documents and information as necessary, consistent with past practice, to complete the accounting books and records of each facility included within the Business as of the Closing Date; and (ii) make such books and records available to Sellers and their Affiliates as may be reasonably required by Sellers and their Affiliates in connection with any legal proceedings against or governmental investigations of Sellers and their Affiliates or in connection with any Tax examination, audit or appeal of Taxes of Sellers and their Affiliates, the Business or the Acquired Assets. Sellers or their Affiliates shall reimburse Purchasers for the reasonable out-of-pocket expenses incurred in connection with any request by Sellers to make available records pursuant to the foregoing sentence. In the event Purchasers wish to destroy or dispose of such books and records after five (5) years from the Closing Date, it shall first give not less than ninety (90) days' prior written notice to Sellers, and Sellers shall have the right, at its option, upon prior written notice given to Purchasers within sixty (60) days of receipt of Purchasers' notice, to take possession of said records within ninety (90) days after the date of Purchasers' notice to Sellers hereunder.

      **B.**       Purchasers shall, from time to time, at the reasonable request of Sellers, cooperate fully with Sellers in providing Sellers and their Affiliates (as appropriate), to the extent possible through employees formerly employed by Sellers, with technical assistance and information in respect to any claims brought against Sellers and their Affiliates involving the conduct of the Business prior to Closing, including consultation and/or the appearance(s) of such persons on a reasonable basis as expert or fact witnesses in trials or administrative proceedings. Sellers shall reimburse Purchasers and their Affiliates for their reasonable, actual direct out-of-pocket costs (including travel, employee time, hotels, etc.) of providing such services. In particular, Purchasers agree to: (i) retain all documents required to be maintained by federal, state, national or local legislation or regulations and all documents that may be reasonably required to establish due care or to otherwise assist Sellers and their Affiliates in pursuing, contesting or defending such claims; (ii) make available its documents and records in connection with any pursuit, contest or defense, including documents that may be considered to be "confidential" or subject to trade secret protection (except that: (a) no documents or records protected by the attorney client privilege in favor of Purchasers must be made available if making these documents or records available would cause the loss of this privilege (in any case, however, Purchasers must notify Sellers of the existence of such privileged documents); and (b) Sellers agree to keep confidential documents and records that are confidential or are subject to trade secret protection); (iii) promptly respond to discovery requests in connection with such claim, understanding and acknowledging that the requirements of discovery in connection with litigation require timely responses to interrogatories, requests to produce and depositions and also understanding and acknowledging that any delays in connection with responses to discovery may result in sanctions; (iv) make available, as may be reasonably necessary and upon reasonable advance notice and for reasonable periods so as not to interfere materially with Purchasers' business, mutually acceptable engineers, technicians or other knowledgeable individuals to assist Sellers and their Affiliates in connection with such claim, including investigation into claims and occurrences described in this section and preparing for and giving factual and expert testimony at depositions, court proceedings, inquiries, hearings and trial; and (v) make available facilities and exemplar parts for the sole and limited use of assisting Sellers and their Affiliates in the contest or defense.

**8.10.4.  Payment and Collections.**  Sellers shall take such action as may be reasonably necessary to segregate payments made or collections received on behalf of Purchasers after Closing, and Purchasers shall take such action as may be reasonably necessary to segregate payments made or collections received on behalf of Sellers after Closing, in order to ensure that the cost of the related Liability or the benefits of the related assets accrue to the appropriate Party in accordance with the terms of this Agreement.  To the extent that any such collections are received after Closing in the form of checks or other negotiable instruments payable to the other Party, Sellers or Purchasers, as appropriate, shall promptly take all necessary action to endorse such checks or instruments to permit the appropriate Party to collect the proceeds of such checks and instruments. Sellers shall promptly send Purchasers copies of all remittance advices and checks related to payments received by Sellers with respect to such items.  Purchasers shall notify the Business' customers of the change in address of the owner of the Acquired Assets as may be required in order for such customers to properly remit any payments required under any applicable Acquired Asset and Sellers shall cooperate with Purchaser as is reasonably necessary to so notify such customers.

**8.10.5.  Intellectual Property Transition Rights.**  Purchasers will have the right (including the right to authorize relevant Affiliates) to continue to sell or dispose of any existing inventories or service materials of the Business in existence at the Closing and bearing any trademark, service mark, trade name or related corporate name of Delphi or any Affiliate of Delphi for a period of up to three (3) months after the Closing Date; provided that Purchasers and their Affiliates shall clearly indicate on any written materials related to such sale or disposition, including business cards, stationery, purchase orders, invoices and the like, that the Business is owned by Purchasers and their Affiliates and is no longer affiliated with, and Purchasers and their Affiliates do not represent, the Sellers or any Affiliate of Sellers.

**8.10.6.  Change of Name of the Sale Company.**  Purchasers shall cause the applicable Securities Purchaser to change the name of the Sale Company, as necessary, immediately following Closing to a name not containing the word "Delphi", such change to take effect pursuant to the terms of the respective Transfer Agreement governing the sale of the Sale Company.

**8.10.7.  Catalyst Co-Development and Supply.**  Following the Closing, the Parties intend to discuss in good faith possible catalyst co-development and supply arrangements beyond those contemplated in the Ancillary Agreements.

**8.11.  Further Assurances.**  If at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement or any of the Ancillary Agreements, each of the Parties will take such further action (including the execution and delivery of such further instructions and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under this Agreement). Notwithstanding the foregoing, in the event that following the Closing Sellers are required to pay any stay or retention bonuses or make other payments or provide any benefits to any employees at one or more Carved-Out Locations to incentivize such employees to fulfill Sellers' obligations under any Ancillary Agreement, the Seller shall bear the entire cost of any such payments, benefits or incentives.

**8.12.  Certain Transactions.**  Purchasers shall not acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets if the entering into of a definitive agreement relating to or the consummation of such acquisition, merger or consolidation would reasonably be expected to: (i) impose any material delay in the obtaining of, or significantly increase the risk of not obtaining, any

authorizations, consents, orders, declarations or approvals of any Governmental Entity necessary to consummate the transactions contemplated by this Agreement or the Ancillary Agreements or the expiration or termination of any applicable waiting period; (ii) significantly increase the risk of any Governmental Entity entering an order prohibiting the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements; (iii) significantly increase the risk of not being able to remove any such order on appeal or otherwise; or (iv) materially delay or prevent the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements.

      **8.13.**  **Communications with Customers and Suppliers.**  Subject to applicable Law, prior to the Closing, Purchaser shall not, and shall cause its Affiliates and representatives not to, contact, engage in any substantive discussions or otherwise communicate with any of the Business' customers, suppliers and others with whom, to Purchaser's knowledge, the Seller has material commercial dealings regarding the Sale (including post-Closing plans for the Business) without obtaining the prior written consent of Seller (which shall not be unreasonably withheld provided, that, except with respect to General Motors and at all times prior to the entry of the Sale Approval Order, such consent may be conditioned upon Seller having the right to designate a representative who is reasonably acceptable to Umicore to participate in any meetings or discussion with any such customers, suppliers or others who is reasonably acceptable to Umicore). Purchasers shall be permitted to disclose the terms of this Agreement to any such customer or supplier, as appropriate, to provide assurances to such customer or supplier with respect to the continued viability of the Business after the Closing.  Notwithstanding the foregoing (but subject to applicable Law, and Purchaser's obligations under the Purchaser Confidentiality Agreement), nothing contained herein shall prevent Purchaser, its Affiliates or representatives from contacting, engaging in discussions with or otherwise communicating with any Person (including the Business' customers, suppliers and others with whom, to Purchaser's knowledge, the Seller has material commercial dealings) regarding any other matter including: (i) program development, sales or purchases by any Purchaser or any of their respective Affiliates to or from such Persons; or (ii) matters that may be competitive with Seller or its Affiliates.  Without limiting the foregoing, nothing contained in this Agreement shall prevent or limit the ability of each Purchaser and their respective Affiliates) from competing with each Seller and their respective Affiliates with respect to any matter, including the Business.

      **8.14.**  **Permit Transfers.**  Sellers shall assist and cooperate with Purchasers with respect to the transfer of or application for any  environmental Permits listed pursuant to Section 5.1.20.G that require transfer to Purchasers or procurement of new Permits by Purchasers in connection with the transaction contemplated hereby.

      **8.15.**  **Pre-Closing Transfer of Intellectual Property.**  Prior to the Closing Date, Delphi will cause all of the Owned Intellectual Property and Licensed Intellectual Property (if any) of Delphi Automotive Systems LLC and Delphi Technologies, Inc. to be transferred, pursuant to documentation (including any necessary registrations of same that need to be filed with any Governmental Entity) in form and substance reasonably satisfactory to Purchasers, to ASEC Manufacturing  or another ASEC (as defined on Schedule 1) Filing Affiliate, so that the transfer of  the Purchased Intellectual Property to Umicore may be effected as set forth in Schedule 1; provided that such ASEC Filing Affiliate may cause the transfer to be consummated by means of a direct transfer from the record holder of the Purchased Intellectual Property to Umicore, subject to Umicore's consent.

**9.**      **TERMINATION:**

      **9.1.**  **Termination.**  Anything contained herein to the contrary notwithstanding, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing Date:

**9.1.1.**    By either Party:

    **A.**    By mutual written consent of Delphi on behalf of the Sellers and Umicore on behalf of the Purchasers.

    **B.**    Provided the terminating Party is not in default of its obligations under this Agreement, if consummation of the Sale would violate any non-appealable Final Order of any Antitrust Authority or other Governmental Entity, or as such termination is otherwise permitted under Section 8.4.1.

    **C.**    If Sellers consummate an Alternative Transaction.

    **D.**    Provided the terminating Party is not in material breach of its obligations under this Agreement, if the Bankruptcy Court has not entered a Sale Approval Order that is a Final Order on or before the date that is one hundred twenty (120) days after the date of this Agreement (either, a "**Termination Date**").

    **E.**    Provided the terminating Party is not in material breach of its obligations under this Agreement, if the Closing shall not have occurred within one hundred twenty (120) days after entry of the Sale Approval Order for any reason other than failure to meet the conditions set forth in Sections 6.1.3 (Approvals) or 6.2.4 (Other Approvals; Collective Bargaining Agreements; Cure Amounts).

    **F.**    Provided the terminating Party is not in default of its obligations under this Agreement by either Sellers or Purchasers, if the Closing shall not have occurred within two hundred forty (240) days after entry of the Sale Approval Order for any reason.

  **9.1.2.**    By Purchasers (provided that no Purchaser is in material breach of any representation, warranty, covenant or other agreement contained herein):

    **A.**    At any time prior to Closing, if a Material Adverse Effect shall have occurred Purchaser may terminate if, in the good faith judgment of Purchaser, such Material Adverse Effect has not been cured and is not capable of being cured within forty-five (45) days of the date of the event giving rise to such Material Adverse Effect; or

    **B.**    If the Antitrust Authority in any country: (i) determines that it will impose conditions to its approval of the transactions contemplated by this Agreement or does impose such; or (ii) determines that it will file a suit, action or other proceeding before a court or Governmental Entity seeking to restrain or prohibit, or to obtain damages or other relief in connection with, the consummation of the transactions contemplated by this Agreement or does file such, within twenty (20) Business Days after becoming aware of such event so long as such event is continuing at the time of any such termination.

    **C.**    If (i) Sellers shall have breached or failed to perform in any significant respect any of the covenants or obligations applicable to Sellers under this Agreement and such breach or failure to perform cannot be cured within thirty (30) days from notice of such breach or failure to perform; or (ii) Sellers shall have breached in any significant respect any representation or warranty of Sellers contained in this Agreement and such breach cannot be cured within thirty (30) days from notice of such breach.

70

**9.1.3.**   By Sellers:

    **A.**   If Sellers accept a Qualified Bid at the Auction other than that of Purchasers, provided that such termination shall be of no effect if Seller does not: (i) enter into an agreement with respect to such Qualified Bid within two (2) Business Days after termination hereunder; and (ii) subsequently complete the Sale to an Alternative Transaction within thirty (30) calendar days of such termination.

    **B.**   If (provided that no Seller is in material breach of any representation, warranty, covenant or other agreement contained herein): (i) Purchasers shall have breached or failed to perform in any significant respect any of the covenants or obligations applicable to Purchasers under this Agreement and such breach or failure to perform cannot be cured within thirty (30) days from notice of such breach or failure to perform; or (ii) Purchasers shall have breached in any significant respect any representation or warranty of Purchasers contained in this Agreement and such breach cannot be cured within thirty (30) days from notice of such breach.

**9.2.**   **Notice of Termination.**   In the event of any termination pursuant to this Article 9, written notice thereof setting forth the reasons therefor shall promptly be given to the other Party and the transactions contemplated by this Agreement shall be terminated, without further action by any Party.

**9.3.**   **Break-Up Fee; Expense Reimbursement; Return of Deposit:**

**9.3.1.**   **Break-Up Fee.**   In the event that any Seller sells, transfers, leases or otherwise disposes, directly or indirectly, including through an asset sale, stock sale, merger or other similar transaction, all or substantially all or a material portion of the Business or the Acquired Assets in a transaction or a series of related transactions with one or more parties other than Purchaser in accordance with the Bidding Procedures (such event being an "**Alternative Transaction**"), Sellers shall, within two (2) Business Days after the consummation of the Alternative Transaction(s), pay to Umicore on behalf of the Purchasers an amount equal to Two Million U.S. Dollars (U.S. $2,000,000) (the "**Break-Up Fee**"), unless the Agreement is then terminable under Section 9.1.1.B, 9.1.2.B or 9.1.3.B; in which case no Break-Up Fee shall be payable.   Purchasers shall have a superpriority administrative expense claim pursuant to Section 507(b) of the Bankruptcy Code in the amount of the Break-Up Fee or Expense Reimbursement, as the case may be.

**9.3.2.**   **Expense Reimbursement.**   In the event this Agreement is terminated pursuant to Sections, 9.1.1.D, 9.1.1.E, 9.1.1.F, 9.1.2.A or 9.1.2.C or and provided that: (i) no Purchaser is then in material breach of this Agreement for which Sellers had previously notified Purchasers; (ii) in the case of Section 9.1.1.F, this Agreement is not then terminable under Section 9.1.1.B; and (iii) and, in the case of Section 9.1.1.E, the failure or occurrence of the event giving rise to any such termination results solely from the status of Sellers or any action or conduct of a Seller and not from the status of Purchasers or any action or conduct of Purchasers, then Sellers shall be obligated to pay Purchasers an amount equal to Purchasers' reasonable, actual out-of-pocket fees and expenses (including reasonable attorneys' fees, expenses of its financial advisors, and expenses of other consultants) incurred in connection with the transactions contemplated by this Agreement including, but not limited to, the conduct of pre-contract due diligence and the negotiation and drafting of this Agreement and the other documents contemplated herein (the "**Expense Reimbursement**") up to a maximum of One Million Seven Hundred and Fifty Thousand U.S. Dollars (U.S. $1,750,000).   Purchasers shall have a superpriority administrative expense claim pursuant to Section 507(b) of the Bankruptcy Code in the amount of the Break-Up Fee or Expense

Reimbursement, as the case may be. Any Expense Reimbursement payable upon termination of this Agreement shall be immediately earned upon such termination and payable by Sellers to Purchasers promptly upon the delivery of an invoice related to such Expense Reimbursement to Sellers by Purchasers to be delivered to Sellers within thirty (30) days of termination of this Agreement; provided, however, that if Sellers believe, in good faith, that the amount of the Expense Reimbursement sought by Purchasers is not reasonable, then Sellers shall have the right, within thirty (30) days of receipt of Purchasers' invoice, to seek Bankruptcy Court review thereof prior to paying such amount.

**9.3.3.    Payments.** Payments to Purchasers pursuant to this Section 9.3 shall be by wire transfer of immediately available funds in U.S. Dollars, to such account or accounts as Umicore shall designate in writing.

**9.3.4.    Limitations.** Purchasers acknowledge and agree that, in the event that a Purchaser terminates this Agreement or a Seller terminates this Agreement and Purchasers become entitled to receive or receives any Expense Reimbursement, Purchasers shall not be entitled to receive nor shall they receive the Break-Up Fee or any portion thereof, and, conversely, that in the event that Purchasers become entitled to receive or receives any Break-Up Fee, they shall not be entitled to receive nor shall they receive the Expense Reimbursement or any portion thereof.

**9.3.5.    Return of Deposit.** In the event this Agreement is terminated for any reason (including an Alternative Transaction) other than pursuant to 9.1.3.B, Escrow Agent shall, pursuant to the Deposit Escrow Agreement, within two (2) Business Days of such termination, pay to Umicore on behalf of the Purchasers the Deposit Amount.

**9.4.    Procedure and Effect of Termination.** In the event of termination and abandonment of the transactions contemplated hereby pursuant to Section 9.1, written notice thereof shall forthwith be given to the other Parties to this Agreement, and this Agreement shall terminate (subject to the provisions of this Article 9) and the transactions contemplated by this Agreement shall be abandoned, without further action by any of the parties hereto. If this Agreement is terminated as provided herein no Party shall have any Liability or further obligation to any other Party resulting from such termination except for the provisions of: (i) Purchasers' obligations under the Purchaser Confidentiality Agreement; (ii) Article 9 (Termination); (iii) Sections 4.2 (Deposit Amount), 13.2 (Notice), 13.3 (Assignment), 13.4 (Entire Agreement), 13.5 (Waiver), 13.8 (Expenses), 13.12 (Governing Law), 13.13 (Public Announcements), 13.14 (Venue and Retention of Jurisdiction) and 13.17 (Dispute Resolution), all of which shall remain in full force and effect; and (iv) no party waives any claim or right against a breaching party in respect of any of its representations, warranties, covenants or agreements set forth in this Agreement occurring prior to such termination; provided, however, that in the event Purchasers are entitled to and do receive the Deposit Amount, the Break-Up Fee or Expense Reimbursement, as the case may be, the right of Purchasers to receive such amounts shall constitute Purchaser's sole remedy for (and such amounts shall constitute liquidated damages in respect of) any breach by any Seller of any of its representations, warranties, covenants or agreements set forth in this Agreement. In connection with any termination of this Agreement, all filings, applications and other submissions made pursuant to the transactions contemplated by this Agreement shall, to the extent practicable, be withdrawn from the agency or Person to which made.

**9.5.    Conflicts.** To the extent there exists any conflict or ambiguity between Section 9.1.1.D, on the one hand, and Sections 11.10 and 11.11, on the other hand, in respect of Purchasers' right to terminate this Agreement, (a) Section 9.1.1.D shall control with respect to Purchasers' initial bid as represented by this Agreement, and (b) Sections 11.10 and 11.11 shall control with respect to any subsequent bid submitted by the Purchasers in connection with the Auction.

10.    **OTHER TAX MATTERS:**

**10.1.    General.**  Except as provided below with respect to the Sale Company, Sellers will be liable for and pay all Taxes imposed on the Business for all periods or portions of periods before and through the Closing Date (including all capital gain, income or similar Taxes (and specifically not including transfer Taxes) triggered by this Agreement and/or the consummation of the transactions contemplated by this Agreement), and Purchasers will be liable for and pay all transfer Taxes triggered by the consummation of the transactions contemplated by this Agreement and Taxes imposed on the Business for all periods or portions of periods after the Closing Date.  For example, and not by way of limitation, the Purchaser agrees to reimburse the Seller for any tax professionelle, tax fonchière and other taxes that have been paid by the Sellers and relate to any taxable year or period after the Closing Date.

**10.2.  Sale Company Taxes.**  With respect to the Sale Company:

**10.2.1.  Sellers' Liability.**  Sellers will be liable for and pay all Taxes imposed on the Sale Company, or for which the Sale Company may be liable: (i) for any taxable year or period that ends on or before the Closing Date; and (ii) with respect to any period commencing before and ending after the Closing Date (a "**Straddle Period**"), the portion of such Straddle Period ending on and including the Closing Date net of the Sale Company Current Tax Amount (including any capital gain, income or similar tax triggered by this Agreement and/or the consummation of the transactions contemplated by this Agreement, and any obligations to contribute to the payment of a Tax determined on a consolidated, combined or unitary basis with respect to any group of corporations that includes any Seller and any Taxes resulting from the Sale Company ceasing to be a member of such group).  Notwithstanding the foregoing, in the event that the Taxes of the Sale Company for the Straddle Period are less than the Sale Company's Current Tax Amount, the Purchasers shall refund such positive differential to the Sellers subject to offset for any other amount owed by Sellers pursuant to this Article 10.  For avoidance of doubt, Sellers will receive the benefit of the utilization of any tax loss carryover existing at December 31, 2006 during the portion of the Straddle Period ending on and including the Closing Date for purposes of determining the Sale Company Current Tax Amount.  For purposes of clarification and not limitation, Sellers are responsible for all Straddle Period Taxes that exceed the Sale Company Current Tax Amount.

**10.2.2.  Purchasers' Liability.**  Purchasers will be liable for and pay all Taxes imposed on the Sale Company for any taxable year or period that begins after the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period beginning after the Closing Date provided, however, that Purchasers will not be liable for or pay, and will not indemnify Sellers against, any Taxes for which Sellers are liable under this Agreement.

**10.2.3.  Straddle Period Allocations.**  For purposes of this Section 10.2, Taxes for a Straddle Period will be allocated between the portion of the Straddle Period that ends at the end of the Closing Date and the remaining portion of the Straddle Period in the following manner:

**A.**    Any Tax based upon or related to income, revenue, receipts or wage and salary payments will be allocated based on a "closing of the books" as of the end of the Closing Date.

**B.**    Real and personal property Taxes with respect to any assets of the Sale Company will be prorated based on the ratio of the number of days in the portion of the Straddle Period ending on the Closing Date to the total number of days in the Straddle Period.  Sales and use taxes will be deemed to accrue as property is purchased, sold, used,

or transferred.  All other taxes (other than those specified in this Section 10.2.3) will accrue in accordance with local generally accepted accounting principles.

**10.2.4.  Tax Sharing Agreements.**  All tax sharing agreements or similar agreements with respect to or involving the Sale Company will be terminated as of the Closing Date and, after the Closing Date, the Sale Company will not be bound thereby or have any Liability thereunder.

**10.2.5.  Refunds and Tax Benefits.**  Any Tax refunds with respect to the Sale Company that are received by Purchasers or the Sale Company, and any amounts credited against Tax of the Sale Company to which Purchasers or the Sale Company becomes entitled, that relate to Taxable Periods or portions thereof ending on or before the Closing Date will be for the account of Sellers, and Purchasers will pay over to Sellers any such refund or the amount of any such credit (to the extent such refund or credit is within the control of the Purchasers or any Subsidiary) within sixty (60) days after receipt or entitlement thereto.

**10.3.  Tax Returns:**

**10.3.1.  Taxable Periods Ending on or Before the Closing Date:**

**A.**        Sellers will prepare or cause to be prepared and file or cause to be filed all Tax Returns that are required to be filed for the Sale Company for all Taxable Periods ending on or prior to the Closing Date that are required to be filed on or prior to the Closing Date.  All Tax Returns which Sellers are required to file or cause to be filed in accordance with this section will be prepared and filed in a manner consistent with past practice and, on such Tax Returns, no position will be taken, election made or method adopted that is inconsistent with positions taken, elections made or methods used in preparing and filing similar Tax Returns in prior periods.  Without limiting the generality of the foregoing, Sellers will not, in such Tax Returns, adopt a new position, election or method which would have the effect of deferring income to periods for which Purchasers are liable under this Article 10 or accelerating deductions to periods for which Sellers is liable under this Article 10 unless required by applicable Laws without the prior consent of Purchasers, which consent will not be unreasonably withheld.  Sellers will provide to Purchasers copies of income tax returns reasonably in advance of their filing and at least thirty (30) calendar days before such returns are required to be filed.  Purchasers will notify Sellers of any proposed revisions within fifteen (15) calendar days after receipt of such income tax returns from Sellers.  Purchasers and Sellers agree to attempt to resolve in good faith any dispute concerning the reporting of any item on such income tax returns in a timely fashion before filing date.  Nothing in this Agreement will be construed as preventing Sellers or Sale Company from timely filing of any income tax returns.

**B.**        Purchasers will prepare or cause to be prepared and file or cause to be filed all Tax Returns that are required to be filed for the Sale Company for all Taxable Periods ending on or prior to the Closing Date that are required to be filed after the Closing Date.  Without limiting the generality of the foregoing, Purchasers will not, in such Tax Returns, adopt a new position, election or method which would have the detrimental effect in a period for which Sellers are liable under this Article 10, unless required by applicable Laws, without the prior consent of Sellers which consent will not unreasonably be withheld.

**10.3.2.  Taxable Periods Beginning Before and Ending After the Closing Date (Straddle Periods).**  Purchasers will prepare or cause to be prepared and file or cause to be filed any Tax Returns of the Sale Company that are required to be filed for Straddle Periods.  Purchasers will provide to Sellers copies of all such Tax Returns for Straddle Periods (together with a calculation of the allocation pursuant to Section 10.2.3 of the Tax shown on each such Tax Return between the portion of the Straddle Period ending on the Closing Date and the portion of the Straddle Period starting on the day after the Closing Date) at least thirty (30) calendar days before such Tax Returns are required to be filed.  Sellers will notify Purchasers of any proposed revisions to such Tax Returns (or such allocation) within fifteen (15) calendar days after receipt of such Tax Returns from Purchasers.  Purchasers and Sellers agree to attempt to resolve in good faith any dispute concerning the reporting of any item on such Tax Return in a timely fashion before filing date.  Nothing in this Agreement will be construed as preventing Purchasers or the Sale Company from timely filing of any Tax Returns.  Sellers will pay to Purchasers within fifteen (15) calendar days after an agreement is reached on the above-mentioned allocation of Straddle Period taxes (as determined pursuant to Section 10.2.3).

**10.4.  Audits and Adjustments.**  The Purchasers will inform Sellers of any pending or threatened Tax audits or assessments of, or with respect to, Taxes for which Sellers are responsible under this Agreement; provided, however, that the failure of Purchasers to provide timely notice will not affect the obligations of Sellers hereunder except to the extent (if any) that Sellers' ability to contest such Tax assessment has been prejudiced by such failure.  For tax periods ending on and including the Closing Date, Sellers will control the conduct of any such audit or proceeding but will not dispose of any such audit or proceeding in a manner that would result in the Sale Company adopting a position or method or election which could have the effect of deferring income to periods for which Purchasers are liable under this Article 10 or accelerating deductions to period for which Sellers are liable under this Article 10 or could reasonably result in an adverse consequence to Purchasers in respect of a tax period for which Purchasers are liable under this Article 10 without the consent of the Purchasers which shall not be unreasonably withheld.  For tax periods ending on and including the Closing Date, Purchasers and their legal or tax advisor will have the right to attend and participate in all relevant meetings with the authorities and Purchasers will provide all information which sellers may reasonably request in connection therewith.  For the Straddle Period, Purchasers will control the conduct of any such audit or proceeding but will not dispose of any such audit or proceeding in a manner that would result in the Sale Company adopting a position or method or election which could reasonably result in adverse consequences on Taxes for which Sellers are liable during the Straddle Period under this Article 10 or could reasonably result in an adverse consequence to Sellers in respect of a tax period for which Sellers are liable under this Article 10 without the consent of the Sellers which shall not be unreasonably withheld.  For the Straddle Period, Sellers and their legal or tax advisor will have the right to attend and participate in all relevant meetings with the authorities and Purchasers will provide all information which Sellers may reasonably request in connection therewith.  Each party will bear its own expenses in connection with such audits or proceedings.  Sellers will be responsible for the payment of any Tax deficiency resulting from such audit insofar as and to the extent provided herein and in all cases without any offset against any deferred tax assets.

**10.5.  Sales or Transfer Taxes.**  Sellers and Purchasers will use commercially reasonable efforts and cooperate in good faith to exempt (including by the Seller seeking approval of such exception in the Sale Motion) the sale, conveyance, assignments, transfers and deliveries to be made to the Purchasers hereunder from any sales taxes, documentary and stamp taxes, transfer, documentary, sales, use, registration, recording, stamp, use, gross receipts, excise, value-added, and other such taxes (including all applicable real estate transfer taxes, but excluding any taxes based on or attributable to income or gains) and related fees (including notarial fees as well as any penalties, interest and additions to tax) ("**Transfer Taxes**") payable in connection with such sale, conveyance, assignments, transfers and deliveries, to the

extent provided in the Sale Approval Order, in accordance with Section 1146(c) of the Bankruptcy Code. If Bankruptcy Court approval is granted for such exemption, then any instrument transferring the acquired assets to the Purchasers will contain the following endorsement:

> Because this [instrument] has been authorized pursuant to Order of the United States Bankruptcy Court for the Southern District of New York relating to a chapter 11 plan of [Seller], it is exempt from transfer taxes, stamp taxes, or similar taxes pursuant to 11 U.S.C. § 1146(c).

To the extent not exempt under Section 1146 of the Bankruptcy Code and approved in the Sale Approval Order, such Transfer Taxes arising out of or incurred in connection with this Agreement will be borne solely by Purchasers. The party that is legally required to file a Tax Return relating to Transfer Taxes will be responsible for preparing and timely filing such Tax Return. Delphi will prepare the Transfer Tax returns for which Delphi is responsible as soon as is practicable and provide Umicore with a copy to review not less than fifteen (15) days in advance of the deadline for such return. Umicore agrees to provide Delphi with comments in sufficient time to enable Delphi to timely file the return and pay the Transfer Tax and Delphi shall use commercially reasonable efforts to incorporate such comments. Purchaser will also be liable for the Chinese recapture duty and VAT on tangible assets retained by Seller and sold to Purchaser that have not been used more than five (5) years at their current location.

**10.6.  Purchasers Covenants and Indemnity.**  Except as otherwise provided herein, Purchasers agree that they will pay when due all Taxes for which they are responsible pursuant to this Agreement and will indemnify and hold Sellers (or any entity that is controlled directly or indirectly by Sellers) harmless from and against Liability for such Taxes and any Loss related to such Liability. Payment by Purchasers of any amount due to Sellers under this Section 10.6 will be made within thirty calendar days following written notice by Sellers that payment of such amounts to the appropriate taxing authority is due, provided that Sellers will provide to Purchasers reasonable and sufficient documentation establishing the amount of any such Loss.

**10.7.  Sellers Covenants and Indemnity.**  Except as otherwise provided herein, Sellers agree that they will pay when due all Taxes for which any Seller is responsible pursuant to the provisions of this Agreement and will indemnify and hold Purchasers (or the Sale Company or other entity that is controlled directly or indirectly by any Purchaser) harmless from and against Liability for such Taxes and any Loss related to such Liability. Payment by any Seller of any amount due under this Section 10.7 will be made within thirty calendar days following written notice by Purchasers to Sellers that payment of such amounts to the appropriate taxing authority is due, provided that Purchasers will provide to Sellers reasonable and sufficient documentation establishing the amount of any such Loss.

**10.8.  Purchase Price Adjustment.**  Any payments made pursuant to the provisions of this Article 10 will be treated for income tax purposes as an adjustment to the Purchase Price consistent with Section 4.8.3.

**10.9.  Customs Duties.**  The Purchasers expressly agree to reimburse Sellers for all customs-related duties, fees and associated costs incurred by Sellers with respect to the Acquired Assets following the Closing, including all such duties, fees and costs incurred in connection with co-loaded containers that clear customs intentionally or unintentionally under Sellers' importer/exporter identification numbers and bonds/guarantees post-Closing.

11.    **BIDDING PROCEDURES**:

**11.1.    Delphi Initial Bankruptcy Actions.**  This Article 11 sets forth the bidding procedures (the
"**Bidding Procedures**") to be employed with respect to the Agreement and the sale (the "**Sale**") of the
Purchased Assets.  The Sale is subject to competitive bidding as set forth herein and approval by the
Bankruptcy Court in the Sale Approval Order.  The following overbid provisions and related bid
protections are designed to compensate the Purchasers for their efforts and agreements to date and to
facilitate a full and fair process (the "**Bidding Process**") designed to maximize the value of the Purchased
Assets for the benefit of Sellers' and their Affiliates' creditors, shareholders and bankruptcy estate.

**11.2.    Qualified Bidder.**   Unless otherwise ordered by the Bankruptcy Court or as otherwise
determined by Delphi, in order to participate in the Bidding Process, each person (a "**Potential Bidder**"),
other than the Purchaser, must deliver (unless previously delivered) to Sellers no later than 4 P.M. (EST) on
the fifth (5th) Business Day following the entry of the Bidding Procedures Order:

**11.2.1.**  An executed confidentiality agreement substantially similar to the Purchaser
Confidentiality Agreement.

**11.2.2.**  Current audited financial statements of the Potential Bidder, or, if the Potential
Bidder is an entity formed for the purpose of acquiring the Purchased Assets and the Business,
current audited financial statements of the equity holders of the Potential Bidder who shall
guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and
credit-quality support or enhancement acceptable to Sellers and their financial advisors; and

**11.2.3.**  A preliminary (non-binding) proposal regarding: (i) the purchase price range; (ii)
any assets and/or equity interests expected to be excluded; (iii) the structure and financing of the
transaction (including, but not limited to, the sources of financing for the Purchase Price and the
requisite Good Faith Deposit); (iv) any anticipated regulatory approvals required to close the
transaction, the anticipated time frame and any anticipated impediments for obtaining such
approvals; (v) any conditions to closing that it may wish to impose in addition to those set forth in
this Agreement; and (vi) the nature and extent of additional due diligence it may wish to conduct
and the date by which such due diligence will be completed.

A Potential Bidder that delivers the documents described in the previous subparagraphs above and
whose financial information and credit-quality support or enhancement demonstrate the financial capability
of the Potential Bidder to consummate the Sale if selected as a successful bidder, and that the Sellers
determine in their sole discretion is likely (based on availability of financing, experience and other
considerations) to be able to consummate the Sale within the time frame provided by this Agreement shall
be deemed a "**Qualified Bidder**".  Notwithstanding the foregoing, Purchasers shall be deemed a Qualified
Bidder for purposes of the Bidding Process.

**11.3.    Due Diligence.**   Sellers shall afford each Qualified Bidder due diligence access to the
Purchased Assets and the Business.  Due diligence access may include management presentations as may
be scheduled by Sellers, access to data rooms, on site inspections and such other matters which a Qualified
Bidder may request and as to which Sellers, in their sole discretion, may agree to.  Sellers shall designate an
employee or other representative to coordinate all reasonable requests for additional information and due
diligence access from Qualified Bidders.  Any additional due diligence shall not continue after the Bid
Deadline.  Sellers may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders
have simultaneous access to due diligence materials and/or simultaneous attendance at management
presentations or site inspections.  Neither Sellers nor any of its Affiliates (or any of their respective

representatives) shall be obligated to furnish any information relating to Purchased Assets and the Business to any Person other than to Qualified Bidders who make an acceptable preliminary proposal.

**11.4.  Bid Deadline.**  A Qualified Bidder that desires to make a bid shall deliver the Required Bid Documents to:  Delphi Automotive Systems LLC, 5725 Delphi Drive, Troy, Michigan 48098 Attention: Steven P. DeRaedt, Director, Mergers & Acquisitions, with copies to: (i) Sellers' counsel, Skadden, Arps, Slate, Meagher & Flom LLP, at 333 West Wacker Drive, Chicago, Illinois 60601-1285, Attention John K. Lyons and Brian M. Fern; (ii) Sellers' financial advisor, Credit Suisse First Boston, at 11 Madison Avenue, New York, New York 10010-3629, Attention Spyros Svoronos; (iii) counsel to the official committee of unsecured creditors appointed in the Bankruptcy Cases (the "**Committee**"), Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022, Attention: Robert J. Rosenberg; and (iv) counsel for the agent under Delphi's post petition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017, Attention: Donald S. Bernstein and Brian Resnick; so as to be received not later than 11:00 A.M. (EST), on a date to be determined by Delphi that is at least five (5) Business Days before the date of Sale Hearing (the "**Bid Deadline**").  As soon as reasonably practicable following receipt of each Qualified Bid, Sellers will deliver complete copies of all items and information enumerated in the section below entitled "Bid Requirements" to counsel for the Official Committee of Equity Security Holders (the "**Equityholders' Committee**").  At the same time that Sellers notify the Potential Bidder that it is a Qualified Bidder, Sellers shall allow the Qualified Bidder to begin to conduct due diligence with respect to the Purchased Assets and the Business as provided in Section 11.3 above.

**11.5.  Bid Requirements.**  All bids must include the following documents (the "**Required Bid Documents**"):

**11.5.1.**  A letter stating that the bidder's offer is irrevocable until two (2) Business Days after the closing of the Sale of the Purchased Assets.

**11.5.2.**  An executed copy of this Agreement, together with all schedules marked (a "**Marked Agreement**") to show those amendments and modifications to such agreement and schedules that the Qualified Bidder proposes, including this Purchase Price (as defined in this Agreement).

**11.5.3.**  A good faith deposit (the "**Good Faith Deposit**") in the form of a certified bank check from a U.S. bank or by wire transfer (or other form acceptable to Sellers in their sole discretion) payable to the order of Delphi (or such other party as Sellers may determine) in an amount equal to 1.75% of such bidder's gross (pre-adjustment) Purchase Price (rounded to the nearest $100,000).

**11.5.4.**  Written evidence of a commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to Sellers and its advisors.

**11.6.  Qualified Bids.**  A bid will be considered only if the bid:

**11.6.1.**  Is on terms and conditions (other than the amount of the consideration and the particular Liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to Sellers than, those contained in the Agreement.

**11.6.2.**  Is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder.

**11.6.3.** Proposes a transaction that Delphi determines, in the good faith opinion of its senior management, after consultation with its financial advisors, is not materially more burdensome or conditional than the terms of the Agreement and has a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum of the Purchase Price plus the amount of the Break-Up Fee, plus $1,000,000: (i) in the case of the initial Qualified Bid; and (ii) in the case of any subsequent Qualified Bids, over the immediately preceding highest Qualified Bid.

**11.6.4.** Is not conditioned upon any bid protections, such as a break-up fee, termination fee, expense reimbursement or similar type of payment.

**11.6.5.** Contains an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreement.

**11.6.6.** Includes a commitment to consummate the purchase of the Purchased Assets (including the receipt of any required governmental or regulatory approvals) within not more than fifteen (15) days after entry of an order by the Bankruptcy Court approving such purchase, subject to the receipt of any governmental or regulatory approvals which must be obtained within sixty (60) days after entry of such order.

**11.6.7.** Is received by the Bid Deadline; provided, however, that Delphi shall have a one-time right to extend the Bid Deadline up to a maximum of five (5) Business Days, but Delphi is not obligated to do so. If Delphi extends the Bid Deadline, it will promptly inform all of the Qualified Bidders of such extension.

A bid received from a Qualified Bidder will constitute a "**Qualified Bid**" only if it includes all of the Required Bid Documents and meets all of the above requirements; provided, however, Delphi will have the right, in its sole discretion, to entertain bids for the Acquired Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids. Notwithstanding the foregoing, the Purchaser shall be deemed a Qualified Bidder, and the Agreement shall be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale. A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction. Each Qualified Bid other than that of the Purchasers is referred to as a "**Subsequent Bid**".

If Sellers do not receive any Qualified Bids other than the Agreement received from the Purchasers, Sellers will report the same to the Bankruptcy Court and will proceed with the Sale pursuant to the terms of the Agreement.

**11.7.** **Bid Protection.** Recognizing the Purchasers' expenditure of time, energy and resources, Sellers have agreed to provide certain bidding protections to the Purchaser. Specifically, Sellers have determined that the Agreement will further the goals of the Bidding Procedures by setting a floor for which all other Qualified Bids must exceed. As a result, Sellers have agreed that if Umicore and the other Purchasers are not the Successful Bidder, Sellers shall, in certain circumstances, pay to the Purchasers a

Break-Up Fee.  In the event the Agreement is terminated pursuant to certain other provisions thereof, then Sellers shall be obligated to pay only the Purchasers' Expense Reimbursement.  The payment of the Break-Up Fee or the Expense Reimbursement (as applicable) shall be governed by the provisions of this Agreement and the Bidding Procedures Order.

**11.8.**  **Auction Bidding Increments and Bids Remaining Open.**  If Sellers receive one (1) or more Qualified Bids in addition to this Agreement, Sellers will conduct an auction (the "**Auction**") of the Purchased Assets and the Business upon notice to all Qualified Bidders who have submitted Qualified Bids at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 (at Delphi's election) or other place as Delphi shall notify all Qualified Bidders who have submitted Qualified Bids, at a time to be determined by Delphi (but in no event later than the second (2nd) Business Day prior to the Sale Hearing), in accordance with the following procedures:

**11.8.1.**  Only Delphi, Umicore, any representative of the Committee and the Equityholder's Committee, any representative of Delphi's post-petition credit facility (and the legal and financial advisers to each of the foregoing), and any Qualified Bidder who has timely submitted a Qualified Bid shall be entitled to attend the Auction, and only Umicore and Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

**11.8.2.**  At least three (3) Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform Delphi whether it intends to participate in the Auction and at least two (2) Business Day prior to the Auction, Delphi shall provide copies of the Qualified Bid or combination of Qualified Bids which Sellers believe is the highest or otherwise best offer to all Qualified Bidders who have informed Delphi of their intent to participate in the Auction.

**11.8.3.**  All Qualified Bidders who have timely submitted Qualified Bids shall be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction.

**11.8.4.**  Sellers may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith.

**11.8.5.**  Bidding at the Auction shall begin with the highest or otherwise best Qualified Bid or combination of Qualified Bids and continue in minimum increments of at least $1,000,000 higher than the previous bid or bids.  The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit one or more additional Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid or bids.  For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by Purchaser), Sellers shall give effect to any Break-Up Fee or Expense Reimbursement that may be payable to Purchaser under the Agreement as well as any assets and/or equity interests to be retained by any Seller.

**11.8.6.**  At the conclusion of the foregoing steps in the Auction, or as soon thereafter as practicable, Sellers, in consultation with their advisors, shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those

factors affecting the speed and certainty of consummating the sale; and (ii) identify the highest or otherwise best offer(s) for the Purchased Assets and the Business received at the Auction (the "**Successful Bid(s)**" and the bidder(s) making such bid, the "**Successful Bidder(s)**").

**11.9.    Acceptance of Qualified Bids.**  Sellers shall sell the Purchased Assets for the highest or otherwise best Qualified Bid to the Successful Bidder upon the approval of such Qualified Bid by the Bankruptcy Court after a hearing (the "**Sale Hearing**").  If, after an Auction in which the Purchasers: (i) shall have bid an amount in excess of the consideration presently provided for in the Agreement with respect to the transactions contemplated under the Agreement; and (ii) is the Successful Bidder, it shall, at the Closing under the Agreement, pay, in full satisfaction of the Successful Bid, an amount equal to: (a) the amount of the Successful Bid; less (b) the Break-Up Fee.

Sellers' presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute Sellers' acceptance of the bid.  Sellers will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

**11.10.  Sale Hearing.**  The Sale Hearing shall be held before the Honorable Judge Robert Drain on August 16, 2007 at 10:00 a.m. (prevailing Eastern time) in the United States Bankruptcy Court for the Southern District of New York, located in New York, New York, but may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing (subject, however to Section 9.1.1.E. above).  If Delphi does not receive any Qualified Bids (other than the Qualified Bid of the Purchasers), Delphi will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Purchased Assets to the Purchasers following entry of the Sale Order.  If Delphi does receive additional Qualified Bids, then, at the Sale Hearing, Delphi shall seek approval of the Successful Bid(s), and, at Delphi's election, one or more next highest or best Qualified Bid(s) (the "**Alternate Bid(s)**" and such bidder(s), the "**Alternate Bidder(s)**").  Sellers' presentation to the Bankruptcy Court of the Successful Bid(s) and Alternate Bid(s) shall not constitute Sellers' acceptance of either or any such bid(s), which acceptance shall only occur upon approval of such bid(s) by the Bankruptcy Court at the Sale Hearing. Following approval of the sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of:  (i) failure of a condition precedent beyond the control of either Sellers or the Successful Bidder; or (ii) a breach or failure to perform on the part of such Successful Bidder(s), then the Alternate Bid(s) shall be deemed to be the Successful Bid(s) and Sellers shall effectuate a sale to the Alternate Bidder(s) subject to the terms of the Alternate Bid(s) of such alternate Bidder(s) without further order of the Bankruptcy Court.

**11.11.  Return of Good Faith Deposit.**  Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) shall be held in an interest-bearing escrow account and all Qualified Bids shall remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders), until two (2) Business Days following the closing of the Sale (the "**Return Date**").  Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Successful Bidder(s), together with interest thereon, shall be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder(s).  If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, such Successful Bidder will forfeit its Good Faith Deposit, and such Good Faith Deposit shall irrevocably become property of Sellers in full and final satisfaction of any and all Liabilities of defaulting Successful Bidder to Seller with respect to the Sale.  On the Return Date, Sellers shall return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

**11.12.  Modifications.**  Sellers, after consultation with the agents for their secured lenders and the Committee: (i) may determine, which Qualified Bid, if any, is the highest or otherwise best offer; and (ii)

may reject at any time, any bid (other than the Purchasers' bid) that is: (a) inadequate or insufficient; (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of the Sale; or (c) contrary to the best interests of Sellers, their estate and creditors as determined by Sellers in their sole discretion.

## 12.    SURVIVAL OF REPRESENTATIONS, WARRANTIES AND COVENANTS; INDEMNIFICATION:

**12.1.    Sellers' Agreement to Indemnify.**    If the Closing occurs, subject to the terms and limitations of this Article 12, from and after the Closing: (i) each Seller that is a Non-Filing Affiliate, severally, with respect solely to such Seller; and (ii) in the case of the Sale Company only, Delphi and DASHI, jointly and severally, shall indemnify and hold harmless each Purchaser and its Affiliates, directors, members, managers, officers, employees and their respective Affiliates (collectively, the "**Purchaser Indemnified Parties**") from and against all Losses incurred by a Purchaser Indemnified Party (such Losses actually incurred by either a Purchaser Indemnified Party or a Seller Indemnified Party are referred to as "**Indemnifiable Losses**"), as a result of or arising out of: (A) any misrepresentation, breach, default or failure to perform or satisfy by any Non-Filing Affiliate or, with respect to the Sale Company, DASHI under any of the representations and warranties of such Non-Filing Affiliate, DASHI or the Sale Company set forth in this Agreement or in any document, agreement or certificate delivered by any Non-Filing Affiliate, DASHI (with respect to the Sale Company) or the Sale Company to any such Purchaser at Closing; (B) Retained Liabilities or Excluded Assets that are retained by any such Non-Filing Affiliate; or (C) a breach or default of any agreement or covenant of any such Non-Filing Affiliate in this Agreement that, by its terms, is intended to be performed by such Seller after the Closing Date.  Purchasers agree that, except as contemplated by this Article 12, from and after the Closing, the indemnification provided in this Article 12 is the exclusive remedy for a breach by any Seller of any agreement or covenant contained in this Agreement that, by its terms, is intended to be performed by such Non-Filing Affiliate at or after the Closing.

**12.2.    Specific Performance.**    Sellers acknowledge that the Purchased Assets to be sold and delivered to Purchasers pursuant to this Agreement and the covenants and agreements of Sellers contained herein, including with respect to non-competition in Section 8.10.1.A, are unique and that Purchasers have no adequate remedy at law if Sellers shall fail to perform any of their obligations hereunder intended to be performed by any Seller after the Closing, and Sellers therefore confirm and agree that Purchasers' right to specific performance is essential to protect the rights and interests of Purchasers.  Accordingly, in addition to any other remedies which Purchasers may have, Purchasers shall have the right to seek equitable remedies, including specific performance in any of the courts of the United States, any state or other political subdivision thereof or any foreign jurisdiction.

**12.3.    Purchasers' Agreement to Indemnify.**    If the Closing occurs, subject to the terms of this Article 12, from and after the Closing, Purchasers shall indemnify and hold harmless each Seller and its Affiliates, directors, members, managers, officers, employees and their respective Affiliates (together with the Purchaser Indemnified Parties, each an "**Indemnified Party**") from and against all Indemnifiable Losses incurred by Sellers as a result of or arising out of: (i) any misrepresentation, breach, default or failure to perform or satisfy by any Purchaser under any of the representations and warranties set forth in this Agreement or in any document, agreement or certificate delivered by any Purchaser to any such Seller at Closing; (ii) the Assumed Liabilities, the Acquired Assets or the Sale Securities; (iii) a breach of any agreement or covenant of any Purchaser contained herein that, by its terms, is intended to be performed after the Closing Date; or (iv) except as otherwise provided in Section 12.1, the conduct of the Business or the ownership of the Acquired Assets after Closing, other than Liabilities relating to environmental matters, for which Section 12.6 shall provide the exclusive basis for indemnification.  Sellers agree that, except as

82

contemplated by this Article 12, from and after the Closing the indemnification provided in this Article 12 is the exclusive remedy for a breach by any Purchaser of any agreement or covenant contained in this Agreement that, by its terms, is intended to be performed after the Closing, and that there shall be no remedy for breach by any Purchaser of a representation or warranty or any breach of a covenant or agreement that, by its terms, is intended to be performed prior to the Closing.

**12.4.** **Third Party Indemnification.**   The obligations of any Party (such Party, the "**Indemnifying Party**") to indemnify any Indemnified Party under Sections 12.1 or 12.3 with respect to Indemnifiable Losses incurred by the Indemnified Party, resulting from the assertion of Liability by third parties (including Governmental Entities) (a "**Third Party Indemnification Claim**"), shall be subject to the following terms and conditions:

**12.4.1.**  Any Indemnified Party against whom any Third Party Indemnification Claim is asserted shall give the Indemnifying Party written notice of any such Third Party Indemnification Claim promptly after learning of such Third Party Indemnification Claim (with such notice satisfying the requirements of Section 13.2, as the case may be), and the Indemnifying Party may, at its option, undertake the defense thereof by representatives of its own choosing and shall provide written notice of any such undertaking to the Indemnified Party.  Failure to give prompt written notice of an Third Party Indemnification Claim hereunder shall not affect the Indemnifying Party's obligations under this Article 12, except to the extent that the Indemnifying Party is actually prejudiced by such failure to give prompt written notice.  The Indemnified Party shall, and shall cause its employees and representatives to, cooperate with the Indemnifying Party in connection with the settlement or defense of such Third Party Indemnification Claim and shall provide the Indemnifying Party with all available information and documents concerning such Third Party Indemnification Claim.  If the Indemnifying Party, within thirty (30) days after written notice of any such Third Party Indemnification Claim, fails to assume the defense of such Third Party Indemnification Claim, the Indemnified Party against whom such claim has been made shall (upon further written notice to the Indemnifying Party) have the right to undertake the defense, compromise or settlement of such claim on behalf of and for the account and risk, and at the expense, of the Indemnifying Party, subject to the right of the Indemnifying Party to assume the defense of such Third Party Indemnification Claim at any time prior to settlement, compromise or final determination thereof upon written notice to the Indemnified Party. For purposes of clarification, the term "party" as used in the first sentence of this paragraph means, collectively, each of the Purchasers or each of the Non-Filing Affiliates, as the case may be.

**12.4.2.** **Escrow Claim.**   If any claim for indemnification is made by a Purchaser Indemnified Party pursuant to this Article 12 prior to the eighteen (18) month anniversary of the Closing, such a Purchaser Indemnified Party shall first apply to the Escrow Agent for reimbursement of such claim in accordance with the provisions of the Closing Escrow Agreement prior to seeking reimbursement for such claim provided that nothing herein shall change any of Purchaser's obligation to follow the procedures for indemnification hereunder.

**12.4.3.**  Anything in this Section 12.4 to the contrary notwithstanding: (i) the Indemnified Party shall not settle a claim for which it is indemnified without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld, conditioned or delayed; and (ii) the Indemnifying Party shall not enter into any settlement or compromise of any action, suit or proceeding, or consent to the entry of any judgment for relief other than monetary damages to be borne by the Indemnifying Party, without the prior written consent of the Indemnified Party, which consent shall not be unreasonably withheld, conditioned or delayed.

**12.5.  Limitations.**  Each Purchaser's and Seller's right to seek indemnification pursuant to this Section 12 shall be subject to the following limitations.

**12.5.1.**  Except as expressly provided in Section 12.5.2 or 12.5.3, the respective representations and warranties and related indemnities of the Non-Filing Affiliates and, with respect to the Sale Company, DASHI and Delphi set forth in this Agreement, and the post-Closing indemnity obligations of the Non-Filing Affiliates and DASHI and Delphi with respect to the Sale Company for breach of such representations and warranties as set forth in this Article 12, shall survive for a period of eighteen (18) months following the Closing.  Except as expressly set forth in the preceding sentence with respect to DASHI and Delphi, the representations and warranties of the Filing Subsidiaries will not survive Closing.  All other covenants contained in Section 8.10 hereof to be performed after Closing, shall survive the Closing in accordance with their terms until expiration of the applicable statute of limitations unless otherwise set forth herein.

**12.5.2.**  Notwithstanding Section 12.5.1 above, the representations and warranties set forth in (and the post-Closing indemnity obligations as set forth in this Article 12 of Non-Filing Affiliates, and with respect to the Sale Company, DASHI and Delphi or Purchasers, as the case may be, for breach of such representations and warranties): Sections 5.1.2 (Corporate Power; Due Authorization), 5.1.5.A (Title to Personal Property), 5.1.16.B (Marketable Title) and 5.2.2 (Corporate Power; Due Authorization) shall survive the Closing indefinitely.

**12.5.3.**  Notwithstanding Section 12.5.1 above, the representations and warranties set forth in (and the post-Closing indemnity obligations as set forth in this Article 12 of Non-Filing Affiliates and, with respect to the Sale Company, DASHI or Purchasers, as the case may be, for breach of such representations and warranties): (i) Sections 5.1.7 (Intellectual Property Assets), 5.1.15 (Regulatory Matters), 5.1.17 (Tax Matters), 5.1.21 (Product Claims) and 5.2.11 (Anti-Money Laundering) will survive until expiration of the applicable statute of limitations; and (ii) Section 5.1.20 (Environmental Representations and Warranties) will survive for three (3) years after Closing.

**12.5.4.**  In the case of Claims under Sections 12.1(i) or 12.2(i) (representations), an Indemnifying Party will only be responsible for the amount of all Indemnifiable Losses which, in the aggregate exceeds Three Hundred Twenty-Five Thousand Dollars ($325,000.00) ("**Deductible Amount**"), after which point an Indemnifying Party will be obligated to indemnify an Indemnified Party from and against Indemnifiable Losses that are in excess of the Deductible Amount, subject to the Individual Claim Amounts, if applicable; provided, however, any Liability of the: (x) Non-Filing Affiliates under subsections (B) of Section 12.1; or (y) the Purchasers under subsection (ii) of Section 12.3 shall be dollar-for-dollar without regard to the Deductible Amount or the Indemnification Cap. In determining whether or not the threshold for the Deductible Amount has been met, the amount of all Special Claim Matters shall be counted without regard to whether the amount of any particular Special Claim Matter meets or exceeds the Individual Claim Amount. Furthermore, in determining whether the threshold for the Deductible Amount or Indemnification Cap has been met for purposes of this Section 12.5.4 the indemnification obligation of all of the Purchasers and all of the Sellers, respectively, shall be aggregated without regard to the particular Purchaser or Seller against whom indemnification was sought.  For example, if Purchaser A has a claim against Seller 1 for $200,000 and Purchaser B has a claim against Seller 2 for $200,000, the total Indemnifiable Losses would exceed $325,000 and, thus, the Purchasers could seek indemnification hereunder for $75,000.

**12.5.5.** Notwithstanding any provision of Section 12.5.4 to the contrary, in the case of Claims under Section 12.6 (Environmental Matters), or relating to Excluded Liabilities relating solely to Product warranty or Product returns (the "**Special Claim Matters**"), the Purchaser shall not be permitted to make a Claim for indemnification pursuant to this Article 12 unless the individual Claim or series of related Claims relates to an Indemnifiable Loss equal to or greater than Twenty-Five Thousand Dollars ($25,000.00) ("**Individual Claim Amount**"). For purposes of clarification, except as set forth in the preceding sentence, no other type of Claim shall be subject to any minimum amount or size.

**12.5.6.** The aggregate amount of Indemnifiable Losses indemnified by the combined Indemnifying Parties that are Purchasers or Sellers, as the case may be, shall not exceed an amount equal to fifty percent (50%) of the Purchase Price (not taking into account any adjustments thereto), after which point such Indemnifying Party(s) will have no further obligation with respect to Indemnifiable Losses under this Agreement; provided, however, that no individual Indemnifying Party shall be obligated to indemnify any Indemnified Party from and against Indemnifiable Losses in excess of one hundred percent (100%) of the Purchase Price for the Acquired Assets sold by such Indemnifying Party. The term "**Cap Amount**" refers to the maximum amount payable by an Indemnifying Party or all Indemnifying Parties that are Purchasers or Sellers, as the case may be.

**12.5.7.** In the absence of fraud by any Seller, the Purchasers shall not be entitled to rescission.

**12.5.8.** Claims made by one Party against the other Party for failure to pay an amount owed by one Party pursuant to Article 4 shall not be subject to any of the provisions or the limitations set forth in Section 12.5. Notwithstanding the foregoing, no Party to the Agreement shall be entitled to make any claim under this Article 12 to the extent, but only to such extent, that the item for which such claim was made resulted in a Preliminary Purchase Price adjustment pursuant to Sections 4.6 or 4.7 that was paid in full by the other Party.

**12.5.9.** In calculating amounts payable to the Indemnified Party, the amount of any Indemnifiable Losses shall be determined without duplication of any other Indemnifiable Losses for which an Indemnified Party has made a claim for indemnification pursuant to this Agreement.

**12.5.10.** Any written notice delivered by an Indemnified Party to an Indemnifying Party seeking indemnification pursuant to this Agreement with respect to Indemnifiable Losses suffered by the Indemnified Party shall set forth, with as much specificity as is reasonably practicable, the basis of the claim for Indemnifiable Losses, the sections of this Agreement which form the basis for the claim, copies of all material written materials relating to such claim and, to the extent reasonably practicable, a reasonable estimate of the amount of the Indemnifiable Losses that have been or may be sustained by the Indemnified Party.

**12.5.11.** Any indemnity amounts payable by the Indemnifying Party to or on behalf of an Indemnified Party pursuant to this Agreement (including any indemnity payment made under this Article 12) shall be reduced by any Tax benefit arising from the claim, loss or damage for which the indemnity is being paid, including any increase in deductions, credits or losses of such Indemnified Party (or any of its Affiliates) but shall be increased to make such Indemnified Party (and any of its Affiliates) whole for any Tax detriment arising from the indemnification payment itself. In the case of Tax benefits consisting of depreciation, amortization or other similar deductions, the Tax benefit amount will be based on the net present value of such deductions using a discount rate equal to the mid-term applicable federal rate in effect on the day on which the indemnification payments are

due.  Any calculations of the Tax benefit under this Section 12.5.11 shall be determined assuming such Indemnified Party pays Taxes at the highest combined marginal Tax rate for applicable U.S. federal, foreign, state and local Taxes.

12.5.12.   Notwithstanding any other provision of this Agreement, in no event shall any Indemnified Party be entitled to indemnification pursuant to this Agreement to the extent any Indemnified Party's Indemnifiable Losses were attributable to Indemnified Party's own gross negligence or willful misconduct.

12.5.13.   Nothing in this Article 12 shall limit any party in exercising or securing any remedies provided by applicable statutory or common law in connection with this Agreement or in the amount of damages that it can recover from the other in the event that any party successfully proves fraud, intentional misconduct, or fraudulent conduct in connection with this Agreement and/or the Transactions.

**12.6.  Environmental Matters:**

12.6.1.  Indemnification of Seller and Purchaser:

**A.**      Subject to the provisions of this Agreement, and solely with respect to the Listed Real Property included in the Acquired Assets or real property held by the Sale Company ("**Indemnified Real Property**"), the appropriate Seller shall indemnify the appropriate Purchaser solely for Environmental Damages arising from Pre-Closing Environmental Contamination and Pre-Closing Environmental Compliance Matters at the Indemnified Real Property.

**B.**      Subject to the provisions of this Agreement, and solely with respect to the Indemnified Real Property, Purchaser shall indemnify Sellers for  Environmental Damages arising from Post-Closing Environmental Contamination and Post-Closing Environmental Compliance Matters.

**C.**      To the extent feasible, Pre-Closing Environmental Contamination and Pre-Closing Environmental Compliance Matters shall be determined based on the Phase I and Phase II environmental investigations to be conducted prior to Closing by Purchasers at the Indemnified Real Property, and the reports from such investigations shall document pre-Closing baseline conditions ("**Baseline Environmental Conditions**").

**D.**      Subject to the provisions of this Agreement, including, without limitation, the next sentence, for those Environmental Damages arising from circumstances that may be considered both: (i) Pre-Closing Environmental Contamination and Post-Closing Environmental Contamination; or (ii) Pre-Closing Environmental Compliance Matters and Post-Closing Environmental Compliance Matters, such Environmental Damages shall be allocated between the Parties in proportion to the extent that such Environmental Damages arose pre- or post-Closing, and each Party shall indemnify the other for its share as determined by such allocation.

**E.**      Section 12.4 shall apply to any third party environmental claims.

**F.**      Section 13.17 shall apply to any disputes between the parties as to environmental matters.

86

**12.6.2.** **Limitations on Liability.**    Claims relating to environmental matters that are Retained Liabilities are not subject to the limitations of this Article 12 regarding the Deductible Amounts and Cap Amounts.  Claims relating to the environmental matters that are based on a breach of Section 5.1.20 are subject to the limitations of this Article 12 regarding the Deductible Amounts and Cap Amounts.  In addition, neither Party shall be liable under this Agreement for Environmental Damages:

> **A.**    In the case of Environmental Claims arising from Pre-Closing Environmental Compliance Matters or Post-Closing Environmental Compliance Matters (as the case may be), unless written notice of such claim has been served on the non-claiming Party on or before three (3) years following the Closing Date.

> **B.**    In the case of Environmental Claims arising from a Pre-Closing Environmental Contamination or Post-Closing Environmental Contamination (as the case may be), unless written notice of such claim has been served on the non-claiming Party on or before three (3) years following the Closing Date.

> **C.**    Where the indemnified party uses the Indemnified Real Property for a use other than an industrial use substantially similar to such use in effect at the Closing, or seeks to or changes the zoning or land use classification of the Indemnified Real Property to a classification more sensitive than the industrial classification in effect at Closing.

**12.6.3.** **Remediation of Environmental Damage:**

> **A.**    Where an Environmental Damage arises out of Environmental Contamination, the non-claiming Party shall be responsible for Remedial Works or the redressing of an Environmental Compliance Matter ("**Remedy**") to no less but no more than the Remediation Standards allowed by applicable Environmental Laws; such Remedial Works may be determined, in compliance with applicable Environmental Laws using risk assessment and related risk evaluation methods.  Remedial Work shall be conducted using the commercially reasonable methods of investigation, corrective measures, remediation and/or containment (including the use of institutional controls or deed restrictions for use of the property for industrial purposes only).

> **B.**    The non-claiming Party shall, where a Remedy is required pursuant to this Agreement, shall conduct such Remedy in a reasonably expeditious manner.

> **C.**    The conduct of a Remedy shall be as follows:

>> (i)    The non-claiming Party shall prepare appropriate work plans or scopes of work to satisfactorily undertake and complete the Remedy under this Agreement; such Party will provide the other Party with an opportunity to review and comment on such work plans or scopes of work, which comments the non-claiming Party should adopt where such comments do not materially increase any cost or Liability of the Remedy;

>> (ii)    When requested, the claiming Party shall cooperate with the non-claiming Party in any communications with the appropriate Competent Authority;

(iii)    Where a Seller is the non-claiming Party, such Seller will take all reasonable steps to avoid interfering with Purchaser's operation or use of the Indemnified Real Property, and Purchaser will reasonably cooperate with such Seller including providing access to the Indemnified Real Property and the use of utilities in the conduct of the Remedy;

(iv)    Where applicable the non-claiming Party shall provide copies of all relevant correspondence sent to and received from a Competent Authority, and keep the non-claiming Party reasonably apprised of the progress of the conduct of the Remedy;

(v)    The claiming Party shall have the right to observe all Remediation work; and

(vi)    The conduct of the Remedy shall be deemed complete when, as the case may be:

(1)    The non-claiming Party has received approval regarding the Remedy by an applicable Governmental Entity; or

(2)    Subject to Section 12.6.3.A of this Agreement, the remedy meets the Remediation Standards which are allowed by applicable Environmental Laws.

## 13.    **MISCELLANEOUS:**

**13.1.  Bulk Sales Laws.**  Each Seller and Purchaser hereby waive compliance by Sellers with the provisions of the bulk sales Law of any state or foreign jurisdiction.

**13.2.  Notices.**  Except as otherwise provided in Article 11 hereto, all notices, requests, consents or other communications permitted or required under this Agreement shall be in writing and shall be deemed to have been given when personally delivered, or when sent if sent via facsimile (with receipt confirmed), or on the first Business Day after being sent by reputable overnight carrier, or on the third Business Day after being sent by registered or certified first class mail (with receipt confirmed), to the following:

|                |                                                             |
|----------------|-------------------------------------------------------------|
| **If to Sellers:** | **DELPHI CORPORATION**                                   |
|                | 5725 Delphi Drive                                           |
|                | Troy, Michigan 48098                                        |
|                | Attn:  President - Delphi Energy & Chassis Systems          |
|                | Fax No.:  248-813-4301                                      |
|                |                                                             |
| **With a copy to:** | **DELPHI CORPORATION**                                  |
|                | 5725 Delphi Drive                                           |
|                | Troy, Michigan 48098                                        |
|                | Attn:  Deputy General Counsel - Transactional & Restructuring |
|                | Fax No.:  248-813-2491                                      |

|                       |                              |
|-----------------------|------------------------------|
| **If to Purchasers:** | **UMICORE**                  |
|                       | Broekstraat 31 Rue du Marais |
|                       | Brussels B-1000              |
|                       | Belgium                      |
|                       | Attn:  Alain Godefroid       |
|                       | Fax No.:  (IAC) 32-2-227-7913 |
|                       |                              |
| **With a copy to:**   | **GOODWIN | PROCTER LLP**    |
|                       | 901 New York Avenue, N.W.    |
|                       | Washington, DC 20001         |
|                       | Attn:  J. Hovey Kemp         |
|                       | Fax No.:  202-346-4444       |

provided, however, if either Party shall have designated a different addressee by notice, then to the last addressee so designated.

**13.3.   Assignment.**  This Agreement shall be binding and inure to the benefit of the successors and assigns of each of the Parties, but no rights, obligations, duties or Liabilities of either Party may be assigned without the prior written consent of the other, which shall not be unreasonably withheld.

**13.4.   Entire Agreement.**   This Agreement, together with the Ancillary Agreements and the Purchaser Confidentiality Agreement, represents the entire agreement and understanding between the Parties with respect to the transactions contemplated herein.   This Agreement supersedes all prior agreements, understandings, arrangements, covenants, representations or warranties, written or oral, by any officer, employee or representative of either Party dealing with the subject matter hereof.

**13.5.   Waiver.**  Any waiver by any Seller or Purchaser of any breach or of a failure to comply with any provision of this Agreement: (i) shall be valid only if set forth in a written instrument signed by the Party to be bound; and (ii) shall not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any provision of this Agreement.  At any time prior to the Closing Date, the Parties may: (a) extend the time for the performance of any of the obligations or other acts of the other Parties hereto; (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions contained herein.  Except as otherwise expressly provided herein, any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party.

**13.6.   Severability.**   Should any provision, or any portion thereof, of this Agreement for any reason be held invalid or unenforceable, such decision shall not affect the validity or enforceability of any of the other provisions, or portions thereof, of this Agreement, which other provisions, and portions, shall remain in full force and effect, and the application of such invalid or unenforceable provision, or portion thereof, to persons or circumstances other than those as to which it is held invalid or unenforceable shall be valid and be enforced to the fullest extent permitted by Law.

**13.7.   Amendment.**  This Agreement may only be amended only in writing by duly authorized representatives or officers of Delphi and Umicore.

**13.8.   Expenses.**  Except as otherwise expressly provided in Section 9.3 of this Agreement or an Ancillary Agreement, each Party shall be responsible for its own expenses incurred in connection with the

preparation of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby.

13.9.  **Third Parties.**  Nothing contained in this Agreement, express or implied, is intended to or shall be construed to confer upon or give to any person, firm, corporation, association, labor union or trust (other than the Parties, their Affiliates and their respective permitted successors and assigns), any claims, rights or remedies under or by reason of this Agreement.

13.10.  **Headings.**  The headings contained in this Agreement are inserted for convenience only and shall not be deemed to constitute a part of this Agreement.

13.11.  **Counterparts.**  More than one counterpart of this Agreement may be executed by the Parties, and each fully executed counterpart shall be deemed an original.  Signatures may be sent by facsimile or other form of electronic transmission.

13.12.  **Governing Law.**  This Agreement shall be construed and enforced in accordance with the laws of the State of New York and, to the extent applicable the Bankruptcy Code, without giving effect to rules governing the conflict of laws.

13.13.  **Public Announcements.**  Sellers and Purchasers will consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and shall not issue any press release or make any public statement without mutual consent, except as may be required by Law and then only with such prior consultation, or in connection with the Bankruptcy Cases.

13.14.  **Venue and Retention of Jurisdiction.**  All actions brought, arising out of or related to the transactions contemplated in this Agreement shall be brought in the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction to determine any and all such actions.

13.15.  **Risk of Loss.**  Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Acquired Assets or the Business shall be borne exclusively by the Sellers.

13.16.  **Enforcement of Agreement.**  The Parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or were otherwise breached.  It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to all other remedies available at law or in equity.

13.17.  **Dispute Resolution.**  Sellers and Purchasers will, in the first instance, attempt to settle any and all claims or disputes arising in connection with this Agreement or any Transfer Agreement by good faith negotiations by senior management of each party.  If the dispute is not resolved by senior management within thirty (30) days after delivery of a written request for such negotiation by either party to the other, either party may make a written demand (the "**Demanding Party**") for formal dispute resolution (the "**Notice**") and specify therein in reasonable detail the nature of the dispute.  Within fifteen (15) business days after receipt of the Notice, the receiving party (the "**Defending Party**") shall submit to the other a written response.  The Notice and the response shall include: (i) a statement of the respective party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that party and of any other person who will accompany the executive to meetings of the parties. Within fifteen (15) Business Days after such written response, the executives (and others named in the Notice or response) will meet at a mutually acceptable time and place, and thereafter as often as they

reasonably deem necessary, to attempt to resolve the dispute.  All reasonable requests for information made by one party to the other will be honored promptly.  All negotiations pursuant to this Section 13.17 are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.  In any case, the Parties agree not to commence any litigation actions until the expiration of ninety (90) days after the date of the Notice, and all such actions are subject to Section 13.14 above.

**13.18.   No Right of Setoff.**   Neither party hereto nor any Affiliate thereof may deduct from, set off, holdback or otherwise reduce in any manner whatsoever any amount owed to it hereunder or pursuant to any Ancillary Agreement against any amounts owed hereunder or pursuant to any Ancillary Agreement by such Persons to the other party hereto or any of such other party's Affiliates.

**13.19.   Limitation on Damages.**   NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, INCLUDING ARTICLE 12, IN NO EVENT SHALL PURCHASER OR SELLER BE LIABLE FOR, OR BEAR ANY OBLIGATION IN RESPECT OF, ANY PUNITIVE, INCIDENTAL, INDIRECT, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES OF ANY KIND OR CHARACTER OR ANY DAMAGES RELATING TO, OR ARISING OUT OF, DIMINUTION IN VALUE, LOST PROFITS OR CHANGES IN RESTRICTIONS ON BUSINESS PRACTICES.

**[Signature Pages to Follow]**

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their duly authorized officers.

<u>**PURCHASERS:**</u>

**UMICORE** (on behalf of itself and its Affiliates to be signatories hereto)

By:_____
    **Thomas Leysen**
    Chief Executive Officer

By:_____
    **Marc Grynberg**
    Executive Vice President

<u>**SELLERS:**</u>

**DELPHI CORPORATION**

By:_____
    **John P. Arle**
    Vice President and Treasurer

**DELPHI AUTOMOTIVE SYSTEMS
(HOLDING), INC.**

By:_____
    **John P. Arle**
    Chief Financial Officer and Treasurer

**EXHAUST SYSTEMS CORPORATION**

By:_____
    **John P. Arle**
    Assistant Treasurer

**ENVIRONMENTAL CATALYSTS, LLC**

By:_____
    **John P. Arle**
    Assistant Treasurer

**ASEC MANUFACTURING (ASEC)**

By:    **ENVIRONMENTAL CATALYSTS, LLC**

By: _____
    **John P. Arle**
    Assistant Treasurer

By:    **EXHAUST SYSTEMS CORPORATION**

By: _____
    **John P. Arle**
    Assistant Treasurer

**ASEC SALES (ASEC)**

By:    **ENVIRONMENTAL CATALYSTS, LLC**

By: _____
    **John P. Arle**
    Assistant Treasurer

By:    **EXHAUST SYSTEMS CORPORATION**

By: _____
    **John P. Arle**
    Assistant Treasurer

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized officers.

### PURCHASERS:

UMICORE (on behalf of itself and its Affiliates to be signatories hereto)

By:_____
Thomas Leysen
Chief Executive Officer

By:_____
Marc Grynberg
Executive Vice President

### SELLERS:

DELPHI CORPORATION

By:_____
Print Name: John P. Arle
Title:  Vice President and Treasurer

EXHAUST SYSTEMS CORPORATION

By:_____
Print Name:
Title:

DELPHI AUTOMOTIVE SYSTEMS
(HOLDING), INC.

By:_____
Print Name:
Title:

ENVIRONMENTAL CATALYSTS, LLC

By:_____
Print Name:
Title:

92

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized officers.

**PURCHASERS:**

**UMICORE** (on behalf of itself and its Affiliates to be signatories hereto)

By:_____

    **Thomas Leysen**
    Chief Executive Officer

By:_____
    **Marc Grynberg**
    Executive Vice President

**SELLERS:**

**DELPHI CORPORATION**

**DELPHI AUTOMOTIVE SYSTEMS (HOLDING), INC.**

By:_____
Print Name: **John P. Arle**
Title: **Vice President and Treasurer**

By:_____
Print Name:
Title:

**EXHAUST SYSTEMS CORPORATION**

**ENVIRONMENTAL CATALYSTS, LLC**

By:_____
Print Name:
Title:

By:_____
Print Name:
Title:

92

## LIST OF SCHEDULES

| DESIGNATION | DESCRIPTION |
|---|---|
| Schedule A | Sellers' Knowledge |
| Schedule 1 | Detail of Sellers and Purchasers |
| Schedule 1.3.1 | Sales Office Acquired Assets |
| Schedule 1.3.2.1 | Acquired Carved-Out Manufacturing Location Assets |
| Schedule 1.4.1 | Third Party Bailed Assets |
| Schedule 1.4.4 | Excluded Financial Contracts |
| Schedule 1.4.6 | Excluded Intellectual Property |
| Schedule 1.4.20 | Other Excluded Assets |
| Schedule 1.7 | Certain Assigned Contracts |
| Schedule 3.2.1 | Offer of Employment |
| Schedule 3.2.4 | Recent Benefit Announcements |
| Schedule 4.6.1 | Net Working Capital Methodology |
| Schedule 4.6.2 | Adjustments for Changes in Owned PGMs |
| Schedule 4.6.5 | Methodology for Determining Benefits Adjustment |
| Schedule 4.6.6 | Assumed PTO Calculation Methodology |
| Schedule 4.7.1.1 | Closing PGM Inventory Methodology |
| Schedule 4.8.1 | Allocation of Purchase Price |
| Schedule 5.1.3 | No Violations |
| Schedule 5.1.5.A | Title to Personal Property |
| Schedule 5.1.5.C | Other Inventory Locations |
| Schedule 5.1.5.D | Machinery, Equipment and Capitalized Tools (Value Greater than U.S. $25,000) |
| Schedule 5.1.6 | Litigation |
| Schedule 5.1.7.A.1 | Owned Intellectual Property |
| Schedule 5.1.7.A.2 | Licensed Intellectual Property |
| Schedule 5.1.7.A.3 | Software |
| Schedule 5.1.7.C | Rights Granted to Third Parties |
| Schedule 5.1.7.D | Intellectual Property Litigation Claims |
| Schedule 5.1.7.F | Infringement of Purchased Intellectual Property |
| Schedule 5.1.8 | Insurance |
| Schedule 5.1.9 | Compliance and Permit Exceptions |
| Schedule 5.1.11 | Third Party Consents |
| Schedule 5.1.13 | Absence of Certain Changes |
| Schedule 5.1.14.A | Listed Contracts |
| Schedule 5.1.14.B | Listed Contracts - Exceptions |
| Schedule 5.1.15 | Regulatory Matters |
| Schedule 5.1.16.A | Real Property |
| Schedule 5.1.16.B | Title Exceptions to Real Property |
| Schedule 5.1.17.D | Tax Returns |
| Schedule 5.1.17.G | Other Tax |
| Schedule 5.1.17.K | Tax Rulings |
| Schedule 5.1.18 | Sale Securities |
| Schedule 5.1.19.A | Current Employees |
| Schedule 5.1.19.B | Exceptions to Sellers' Performance |
| Schedule 5.1.19.C | Benefit Plans |
| Schedule 5.1.19.C(ii) | Compliance |
| Schedule 5.1.19.C(iii) | Triggering of Obligations |
| Schedule 5.1.19.C(iv) | Funding of Seller Benefit Plans |
| Schedule 5.1.19.D | Collective Bargaining Agreements |

| DESIGNATION | DESCRIPTION |
|---|---|
| Schedule 5.1.19.E | Grievance, Labor Negotiations |
| Schedule 5.1.20 | Environmental |
| Schedule 5.1.22 | Accounts Receivable |
| Schedule 5.2.13 | Shelf Tulsa Collective Bargaining Agreement |
| Schedule 7.2.1 | Fuel Reformer Patents |
| Schedule 7.2.2 | Fuel Reformer Patent License |
| Schedule 7.2.6 | Transition Services Agreement |
| Schedule 7.2.7 | Atmospheric Catalyst License |
| Schedule 7.2.8(i) | Testing Services Agreement – Luxembourg |
| Schedule 7.2.8.(ii) | Testing Services Agreement – Flint |
| Schedule 7.2.9(i) | Canning Supply Agreement Term Sheet – Shanghai |
| Schedule 7.2.9(ii) | Canning Supply Agreement Term Sheet – Clayton |
| Schedule 7.2.10(i) | Toll Manufacturing Agreement Term Sheet – Shanghai |
| Schedule 7.2.10(ii) | Toll Manufacturing Agreement Term Sheet – Clayton |
| Schedule 7.2.10(iii) | Toll Manufacturing Agreement Term Sheet – San Luis Potosi |
| Schedule 7.2.11 | Closing Escrow Agreement |
| Schedule 8.1.6 | Currently Contemplated PGM Initiatives |
| Schedule 8.1.8 | Other Current Assets and Liabilities |
| Schedule 8.2 | Counterpart Signature Page to Master Sale and Purchase Agreement |
| Schedule 8.5 | Operation of the Business Pending Closing |
| Schedule 8.8 | Closing Date Assumed PTO Obligations Schedule |
| Annex I | Sample Calculation of Purchase Price Adjustments |

**SCHEDULE 1**

**DETAILS OF SELLERS AND PURCHASERS**

| Manufacturing Facility | Asset/ Stock | Sale Company | Seller | Purchaser |
|---|---|---|---|---|
| San Luis Potosi, Mexico | Asset | | AS Catalizadores Ambientales, S.A. de C.V. (**ASCA**) | Umicore Autocat USA Inc. (USA) or Unimet S.A. de C.V.(Mexico) |
| Port Elizabeth, South Africa | Stock (100%) | Delphi Catalyst South Africa (Proprietary) Ltd. | Delphi Automotive Systems (Holding), Inc. | Umicore Finance Luxembourg S.A. (Luxembourg) |
| Shanghai, China | Asset | N/A | Shanghai Delphi Emission Control Systems Company, Ltd. (China) | UMS (Shanghai) Ltd (China) or Umicore Autocat China Ltd |
| Florange, France | Asset | N/A | Delphi Diesel Systems France SAS | NewCo SAS (France) |
| Clayton, Australia | Asset | N/A | Delphi Automotive Systems Australia Ltd. | Umicore Autocat USA (USA) or UMS Australia Ltd (Australia) |
| Tulsa, Oklahoma | Asset | N/A | Exhaust Systems Corporation; Environmental Catalysts, LLC; ASEC Man and ASEC Sales (**ASEC**)** | Umicore Autocat USA Inc. (USA)  Umicore[1] |
| Maharashtra, India | Asset | N/A | Delphi Automotive Systems Pvt. Ltd. | To be decided for each agreement what non-Indian Umicore company will take it over |
| | | | | |
| **Technical Centers** | | | | |
| Flint, Michigan | Asset | N/A | ASEC | Umicore Autocat USA Inc. (USA)  Umicore[1] |
| Bascharage, Luxembourg | Asset | N/A | Delphi Automotive Systems Luxembourg S.A. | NewCo S.A. (Luxembourg) |
| | | | | |

---

[1]      All Intellectual Property included in the Acquired Assets shall be acquired by Umicore.

1

| **Manufacturing Facility** | **Asset/ Stock** | **Sale Company** | **Seller** | **Purchaser** |
|---|---|---|---|---|
| **Sales Offices*** | | | | |
| Italy | Asset | N/A | | Local Umicore company |
| Germany | Asset | N/A | | Local Umicore company |
| Japan | Asset | N/A | | Local Umicore company |
| India | Asset | N/A | | Local Umicore company |
| Troy, Michigan | Asset | N/A | | Local Umicore company |

**ASEC Man is 50% owned by Environmental Catalysts, LLC (**EC LLC**) and 50% owned by Exhaust Systems Corporation (**ESC**); ASEC Sales is 50.1% owned by EC LLC and 49.9% owned by ESC.

*** Assets consist of computers and, in some cases, vehicles.  The following employees supporting technical and sales activities are Employees of the Sales Offices: India - 1; Italy – 1; Japan – 2; Troy, MI - 4; and Germany – 1, and would need to be relocated on or before the Closing Date.