**Hearing Date And Time: June 26, 2007 at 10:00 a.m.**
**Objection Deadline: June 19, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                             :
         In re                       :      Chapter 11
                             :
DELPHI CORPORATION, et al.,        :      Case No. 05-44481 (RDD)
                             :
                             :      (Jointly Administered)
           Debtors.             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. § 363(b) AND FED. R.
BANKR. P. 6004 AUTHORIZING DELPHI CORPORATION TO ENTER INTO
AND PERFORM UNDER SANDUSKY FACILITY CAPITAL
PROCUREMENT AGREEMENT WITH GENERAL MOTORS CORPORATION

("SANDUSKY CAPITAL PROCUREMENT MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order pursuant to 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 authorizing, but not directing, Delphi to enter into and perform under an agreement with General Motors Corporation ("GM") to procure certain tooling and equipment for a facility in Sandusky, Ohio (the "Sandusky Facility"), and respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. The Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are section 363(b) of the Bankruptcy Code and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

2

B.    Current Business Operations Of The Debtors

5.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.[2]

6.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers

---

[1]  The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[2]  On March 20 2007, Delphi Automotive Systems Espana S.L., whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding.  The application was approved by the Spanish court on April 13, 2007.  The Concurso proceeding does not affect other Delphi legal entities in Spain or elsewhere and is an isolated event that is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

and applications.  Although GM is still the Company's single largest customer, today more than

half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

8.    In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006, the Debtors incurred

a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee

special attrition programs.

9.    The Debtors believe that the Company's financial performance has

deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

restrictions driven by collectively bargained agreements, including restrictions preventing the

Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating

largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic

OEMs resulting in the reduced number of motor vehicles that GM produces annually in the

United States and related pricing pressures, and (iii) increasing commodity prices.

10.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

---

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating
loss in calendar year 2004 was $482 million.

with its major unions and GM had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the

Debtors' transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined five key tenets of its

transformation plan.  First, Delphi must modify its labor agreements to create a competitive

arena in which to conduct business.  Second, the Debtors must conclude their negotiations with

GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain

GM's business commitment to the Company.  Third, the Debtors must streamline their product

portfolio to capitalize on their world-class technology and market strengths and make the

necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform

their salaried workforce to ensure that the Company's organizational and cost structure is

competitive and aligned with its product portfolio and manufacturing footprint.[4]  Finally, the

Debtors must devise a workable solution to their current pension situation.

12.    On December 18, 2006, the Debtors marked another milestone in their

chapter 11 cases with the announcement of two significant agreements.  The first of these was an

equity purchase and commitment agreement (the "Equity Purchase and Commitment

Agreement") with affiliates of Appaloosa Management L.P., Cerberus Capital Management,

L.P., and Harbinger Capital Partners Master Fund I, Ltd., as well as Merrill Lynch & Co. and

UBS Securities LLC (collectively, the "Plan Investors").  Under the Equity Purchase and

---

[4]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product
portfolio on core technologies for which the Company believes it has significant competitive and technological
advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics
and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also
has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the
Company's transformation plan.

Commitment Agreement, the Plan Investors have agreed to invest up to $3.4 billion in preferred and common equity in the reorganized Delphi to support the Debtors' transformation plan.  The Equity Purchase and Commitment Agreement is subject to the completion of due diligence, satisfaction or waiver of numerous other conditions (including Delphi's goal of achieving consensual agreements with its principal U.S. labor unions and GM), and the non-exercise by either Delphi or the Plan Investors of certain termination rights.  The second agreement was a plan framework support agreement (the "Plan Framework Support Agreement") with the Plan Investors and GM.  The Plan Framework Support Agreement outlines certain proposed terms of the Debtors' anticipated plan of reorganization, including the distributions to be made to creditors and shareholders, the treatment of GM's claims, the resolution of certain pension funding issues, and the corporate governance of the reorganized Debtors.  The terms of the Plan Framework Support Agreement are expressly conditioned on the Debtors' reaching consensual agreements with their U.S. labor unions and GM.

13.    On January 12, 2007, this Court authorized the Debtors to execute, deliver, and implement the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement (Docket No. 6589).  On February 28, 2007, Delphi entered into an amendment to the Equity Purchase and Commitment Agreement with the Plan Investors to extend the date by which the Company, the Cerberus Capital Management, L.P. affiliate, or the Appaloosa Management L.P. affiliate have the right to terminate the agreement on account of not yet having completed tentative labor agreements with Delphi's principal U.S. labor unions and a consensual settlement of legacy issues with GM.  The amendment extended the termination right pursuant to a 14-day notice mechanism.  The amendment also extended the deadline to make

certain regulatory filings under the federal antitrust laws in connection with the Equity Purchase

and Commitment Agreement and the Plan Framework Support Agreement.

14.    On April 19, 2007, Delphi announced that the Debtors anticipated

negotiating changes to the Equity Purchase and Commitment Agreement and the Plan

Framework Support Agreement.  None of the parties entitled to give notice of termination of the

framework agreements has done so and these agreements will remain effective as previously

filed until modified or terminated.  The Debtors anticipate filing a plan of reorganization and

disclosure statement as soon as reasonably practicable following conclusion of a consensual

agreement with the Debtors' major stakeholders.

15.    Although much remains to be accomplished in the Debtors' reorganization

cases, the Debtors and their stakeholders are together navigating a course that should lead to a

consensual resolution with their U.S. labor unions and GM while providing an acceptable

financial recovery framework for the Debtors' stakeholders.  Upon the conclusion of the

reorganization process, the Debtors expect to emerge as a stronger, more financially sound

business with viable U.S. operations that are well-positioned to advance global enterprise

objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-

quality products to its customers globally.  Additionally, the Company will preserve and

continue the strategic growth of its non-U.S. operations and maintain its prominence as the

world's premier auto supplier.

<u>Relief Requested</u>

16.    By this Motion, the Debtors seek entry of an order under section 363(b) of

the Bankruptcy Code and Bankruptcy Rule 6004 authorizing, but not directing, Delphi to enter

into and perform under an agreement with GM (the "Capital Procurement Agreement"), which

provides for the procurement of certain tooling and equipment to support future automotive

bearing production at the Sandusky Facility.

Basis For Relief

17.    Delphi, through its subsidiary, Delphi Automotive Systems LLC, currently

operates the Sandusky Facility, at which Delphi manufactures automotive bearings for sale to

customers, including GM.  Recently, GM awarded the future automotive bearing production for

GM's "Delta II," "Epsilon II," "Theta," and "Zeta" programs (collectively, the "New GM

Programs"), with the expectation that bearings for the New GM Programs would be produced at

the Sandusky Facility.  To support the New GM Programs, however, certain new tooling and

equipment would need to be installed at the Sandusky Facility (the "New Tooling and

Equipment").

18.    As part of the transformation plan, the Debtors identified their wheel

bearings business as a non-core product line that they will seek to sell or wind-down.  As a

result, Delphi advised GM that it would purchase the New Tooling and Equipment and the re-

billable tooling identified in the Capital Procurement Agreement (the "Re-Billable Tooling," and

together with the New Tooling and Equipment, the "Tooling and Equipment") only if GM agreed

to purchase the Tooling and Equipment from Delphi.  In turn, GM agreed to purchase the New

Tooling and Equipment provided that Delphi agrees to be responsible for the repurchase of the

New Tooling and Equipment from GM upon the divestiture of the bearings business as set forth

more fully in the Capital Procurement Agreement.[5]  To facilitate this transaction, GM is in the

process of issuing tooling purchase orders to Delphi for the New GM Programs for the purchase

of Re-Billable Tooling.

---

[5]    GM also has agreed to purchase the Re-Billable Tooling from Delphi without conditioning such purchase on
Delphi's repurchase of same upon the divestiture of the bearings business.

Terms Of The Capital Procurement Agreement

19.    Delphi has entered into the Capital Procurement Agreement with GM, the effectiveness of which is conditioned on this Court's approval.  A copy of the Capital Procurement Agreement is attached hereto as Exhibit A.[6]  The Capital Procurement Agreement sets forth, in pertinent part, the process by which (i) Delphi would procure and purchase the Tooling and Equipment, (ii) GM would reimburse Delphi for the amount spent in purchasing the Tooling and Equipment, and (iii) in connection with the sale of the Sandusky Facility, Delphi would purchase the New Tooling and Equipment from GM so that such assets could be included in any sale.[7]  The Capital Procurement Agreement also describes the parties' changing legal rights related to the Tooling and Equipment from Delphi's initial purchase of such assets through the date of Delphi's sale of the Sandusky Facility (or substantially all of the Sandusky Facility's assets) to a third-party purchaser (the "Sandusky Closing Date").

20.    Delphi's Procurement Of The Tooling And Equipment.  Under the terms of the Capital Procurement Agreement, GM would assist Delphi in developing and executing sourcing decisions for the New Tooling and Equipment.  Delphi estimates that to honor the purchase orders contemplated by the Capital Procurement Agreement, it would purchase Tooling and Equipment in the approximate aggregate amount of $44 million.  In connection with Delphi's purchases, Delphi has agreed that it would provide GM five days' advance notice prior to making a commitment or entering into any agreement for New Tooling and Equipment.  If a certain commitment or agreement would cause Delphi to spend, in the aggregate, more than $44 million under the Capital Procurement Agreement, Delphi would not proceed with such commitment or

---

[6]    Exhibits to the Capital Procurement Agreement were not attached to the Motion, but are available upon request, subject to the requesting party and the Debtors executing a mutually agreeable confidentiality agreement.

[7]    In the event of any inconsistency between the Motion and the Capital Procurement Agreement, the Capital Procurement Agreement governs.

agreement without GM's express written consent.  Upon obtaining GM's consent, Delphi would

be permitted to purchase the New Tooling and Equipment.  GM has the right to direct Delphi to

cease its capital procurement activities relating to the New Tooling and Equipment.  Under the

agreement, GM would not hold Delphi liable for any delay in timing for any of the New GM

Programs as a result of its failure to provide consent on a timely basis or its directing Delphi to

cease such procurement activities.

21.     <u>GM's Reimbursement Of Delphi For Tooling And Equipment</u>.  The

Capital Procurement Agreement provides that at the end of each month, Delphi, when applicable,

may present GM with a bill detailing the amount spent by Delphi in procuring the Tooling and

Equipment during that month.  Within five business days of receiving that bill, GM would be

required to reimburse Delphi for the full amount spent.  Subject to Delphi's rights under the

Capital Procurement Agreement, upon GM's reimbursement, all of Delphi's right, title, and

interest in the Tooling and Equipment corresponding to the reimbursement amount would pass to

GM free and clear of liens and encumbrances.  From and after the passage of title in such assets

from Delphi to GM, Delphi would hold those assets as GM's bailee at will; provided, however,

that GM would not remove the New Tooling and Equipment from Delphi's possession while

Delphi or any of its subsidiaries remain obligated to perform under the GM purchase orders.

Under the Capital Procurement Agreement, Delphi or any of its subsidiaries would use the

Tooling and Equipment solely to manufacture parts for GM and not for any other purpose.  Once

Delphi completes all of its obligations to GM under the purchase orders for the New GM

Programs, GM would have the right to take possession of the Tooling and Equipment for which

it has all right, title, and interest without further notice or court approval.

22.    <u>Delphi's Purchase Of New Tooling And Equipment From GM At Closing
Of Sale Of Sandusky Facility</u>.  The Capital Procurement Agreement also provides that on the

Sandusky Closing Date, GM would sell the New Tooling and Equipment to Delphi at a purchase

price computed under a prescribed formula that in no event would be greater than the aggregate

amount previously reimbursed to Delphi by GM under the monthly bills described above (the

"Purchase Price").[8]  At the closing of the sale of the Sandusky Facility (or substantially all of the

Sandusky Facility's assets), GM would deliver a bill of sale in favor of Delphi, and Delphi would

transfer the Purchase Price to GM.  GM warrants that title in and to the New Tooling and

Equipment would pass to Delphi upon its payment of the Purchase Price to GM free and clear of

liens and encumbrances.  Within seven days after the Closing Date, Delphi and GM would

recalculate the purchase price by applying the formula attached to the agreement.  If this

recalculation were to result in an amount in excess of the Purchase Price, Delphi would pay the

difference to GM, but in no event would Delphi's total purchase price exceed the aggregate

amount previously reimbursed by GM to Delphi under the monthly bills described above.  If this

recalculation were to result in an amount less than the Purchase Price, then GM would refund

any overpayment to Delphi, and GM's repayment obligation would be absolute, unconditional,

and not be subject to any offsets, counterclaims, or defenses.

23.    Delphi and GM have bargained in good faith to arrive at the terms and

conditions of the Capital Procurement Agreement.  Moreover, the Capital Procurement

Agreement provides value to Delphi's estate because it provides a significant amount of new

business for the Sandusky Facility, which without this agreement would not be available.

---

[8]    Under the Capital Procurement Agreement, after GM reimburses Delphi for the Re-Billable Tooling, GM would
have title to such assets.  Unlike the New Tooling and Equipment, GM would not be selling the Re-Billable
Tooling to Delphi.  Thus, the Re-Billable Tooling would be excluded from the Debtors' sale of the Sandusky
Facility.

Indeed, the New GM Programs would increase the amount of bearings projected to be produced at the Sandusky Facility over the next few years by a factor of approximately seven. By entering into the Capital Procurement Agreement, Delphi believes that the value of the Sandusky Facility would be increased, which should result in a more marketable business that yields a higher purchase price from prospective purchasers of the Sandusky Facility.

24.    Delphi believes that its entry into the Capital Procurement Agreement is an ordinary course transaction. Given that the transaction, however, contemplates a capital investment in a non-core product line and involves the Debtors' largest customer, Delphi makes this Motion out of an abundance of caution. In the exercise of its business judgment, Delphi has determined that execution of and performance under the Capital Procurement Agreement will maximize the recovery for all stakeholders. Accordingly, Delphi believes that the Capital Procurement Agreement with GM is in the best interests of its estate and that the relief sought herein should be approved.

<u>Applicable Authority</u>

25.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it. <u>See</u> <u>In re Lionel Corp.</u>, 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); <u>In re Delaware Hudson Ry. Co.</u>, 124 B.R. 169, 179 (Bankr. D. Del. 1991).

26.    The Second Circuit has held that, although the Bankruptcy Court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate."  In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's consideration of a debtor's section 363(b) motion is a summary proceeding, intended merely as a means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate.  It is not the time or place for prolonged discovery or a lengthy trial with disputed issues."  Orion Pictures, 4 F.3d at 1098-99.

27.      Once the debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity."  Id.   To satisfy its burden, it is not enough for an objector simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections." Lionel, 722 F.2d at 1071.

28.      As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'"  In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

29.      Delphi submits that entering into the Capital Procurement Agreement in accordance with the terms described above reflects a sound use of Delphi's business judgment. The Capital Procurement Agreement allows Delphi to receive the benefits of the new business awards related to the New GM Programs without bearing the risk normally associated with

infusing capital into a non-core product line.  Delphi believes that the Capital Procurement

Agreement increases the value of the Sandusky Facility, which the Debtors seek to sell to a third-

party purchaser.  By increasing the value of the Sandusky Facility, the Capital Procurement

Agreement carries the prospect of increasing the recovery for all stakeholders.

<u>Notice Of Motion</u>

30.    Notice of this Motion has been provided in accordance with the

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered March 20, 2006 (Docket No. 2883) and the Amended

Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m),

9006, 9007, and 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case

Management, And Administrative Procedures, entered October 26, 2006 (Docket No. 5418).  In

light of the nature of the relief requested, the Debtors submit that no other or further notice is

necessary.

<u>Memorandum Of Law</u>

31.    Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York be deemed

satisfied.

WHEREFORE Delphi respectfully request that the Court enter an order (a)

authorizing, but not directing, Delphi to enter into and perform under the Capital Procurement

Agreement with GM and (b) granting Delphi such other and further relief as is just.

Dated:        New York, New York
              June 6, 2007
                                    SKADDEN, ARPS, SLATE, MEAGHER
                                    & FLOM LLP


                              By:    /s/ John Wm. Butler, Jr.
                                    John Wm. Butler, Jr. (JB 4711)
                                    John K. Lyons (JL 4951)
                                    Ron E. Meisler (RM 3026)
                                    333 West Wacker Drive, Suite 2100
                                    Chicago, Illinois 60606
                                    (312) 407-0700

                                          - and -


                              By:    /s/ Kayalyn A. Marafioti
                                    Kayalyn A. Marafioti (KM 9632)
                                    Thomas J. Matz (TM 5986)
                                    Four Times Square
                                    New York, New York 10036
                                    (212) 735-3000

                                    Attorneys for Delphi Corporation, et al.,
                                      Debtors and Debtors-in-Possession