**Exhibit A**
**Capital Procurement Agreement**

**EXECUTION COPY**

## CAPITAL PROCUREMENT AGREEMENT

General Motors Corporation ("GM") and Delphi Corporation ("Delphi") enter into this Capital Procurement Agreement (this "Agreement") on June 5 , 2007.

### RECITALS

A.    Delphi Automotive Systems LLC ("DAS LLC"), a subsidiary of Delphi, currently operates a manufacturing facility located at 2509 Hayes Avenue, Sandusky, OH 44870 (the "Sandusky Facility") at which facility Delphi manufactures automotive bearings for sale to GM.

B.    GM has awarded the future automotive bearing production for the GM "Delta II", "Epsilon II", "Theta", and "Zeta" programs (collectively, the "New Programs") for production at the Sandusky Facility. In order to support the New Programs, the new tooling and equipment described on Exhibit A (the "New Tooling & Equipment") must be promptly ordered and installed.

C.    GM has issued or shall issue tooling purchase orders to Delphi for the New Programs for the procurement and purchase of re-billable tooling as described on Exhibit B (the "Re-Billable Tooling"). As a reference point, the expected cost of such Re-Billable Tooling is noted on Exhibit B, however, the amount of the "Monthly Reimbursement" (defined below in Section 2.2) will be the actual amounts paid to procure the New Tooling & Equipment and Re-Billable Tooling.

D.    Delphi has advised GM that Delphi is unwilling to purchase the New Tooling & Equipment and the Re-Billable Tooling unless GM agrees to purchase the same from Delphi.

E.    GM is willing to purchase the New Tooling & Equipment on the terms and conditions set forth in this Agreement only if Delphi agrees to be responsible for the repurchase of the New Tooling & Equipment from GM as set forth in this Agreement. In addition, as more fully set forth below, GM has agreed to allow Delphi to bill GM, and GM has agreed to pay, for the reimbursement of progress payments on the Re-Billable Tooling at the time Delphi makes payments to its vendors and prior to PPAP.

WHEREFORE, based upon the foregoing recitals and for good and valuable consideration, the receipt and adequacy of which is acknowledged, the parties agree as follows:

## TERMS AND CONDITIONS

### 1.0 Effective Date.

This Agreement will become effective upon the entry of a final order by Delphi's bankruptcy court that is not subject to a stay or injunction approving the terms of this Agreement.

### 2.0 Definitions.

2.1. "Procurement Amount" means the aggregate amount actually spent by Delphi from and after January 1, 2007 through the Closing Date (as defined below) for the purchase of New Tooling & Equipment and Re-Billable Tooling. As a point of clarity, payments made to tooling and equipment vendors may include progress payments toward the purchase of such assets as required under the terms of the applicable agreement between Delphi and such vendors and all such payments will be included in the Procurement Amount. In no event will the Procurement Amount include any amounts not relating specifically to investment required for the New Programs.

2.2. "Monthly Reimbursement" means the amount Delphi bills GM at the end of each month for any Procurement Amount paid to New Tooling & Equipment and Re-Billable Tooling vendors during the month in support of acquiring such New Tooling & Equipment and Re-Billable Tooling. For sake of clarity, such amounts will be shown as 2 separate line items in the billing with a sub total amount for New Tooling & Equipment and a sub total amount for Re-Billable Tooling.

2.3. "Closing Date" means the date on which a sale of the Sandusky Facility, whether as a going-concern or as a sale of substantially all of the Sandusky Facility Assets, is completed.

2.4. "Sale Proceeds" means the net amount received from a third party purchaser for the purchase of the Sandusky Facility and the New Tooling & Equipment, whether as a going concern or as a sale of substantially all of the Sandusky Facility Assets, whether in cash, promissory note, assumption of indebtedness or other valuable

2

consideration, less amounts actually paid by Delphi for Court-approved break-up fees or expense reimbursement payments and a Court-approved success fee for Delphi's investment banker.

      2.5.    "Delphi Productive Inventory Amount" has the meaning set forth on Exhibit C.

      **3.0**    **Reimbursement Obligation and Purchase.**

      3.1.    GM will provide purchasing support to Delphi in its procurement of the New Tooling & Equipment by assigning a GM Purchasing and Supply Chain representative (the "GM Contact Person") to assist Delphi in developing and executing sourcing decisions for the New Tooling & Capital Equipment. Attached as Exhibit D is Delphi's projected budget and timeline for spending on New Tooling & Capital Equipment procurement. Before making any commitments or entering into any agreements with New Tooling & Capital Equipment vendors, Delphi will provide 5 days advance notice to the GM Contact Person that Delphi intends to enter into such commitment or agreement. In the event that a given commitment or agreement would cause Delphi to incur liabilities or costs which would cause the aggregate Procurement Amount to exceed $44,000,000, Delphi will not proceed with such commitment or agreement without GM's express written consent. In the event that GM fails or refuses to provide its consent to Delphi proceeding with such commitment or agreement, Delphi will not enter into such commitment or agreement. Any dispute over GM's failure to consent to a given expenditure will be escalated, upon Delphi's request, to Greg Ruselowski and Leigh Dushane, or their successor(s), for further review by GM. To the extent that GM's failure or refusal to provide its consent results in a delay in the program timing for any one or more of the New Programs, GM will not hold Delphi or any of its subsidiaries responsible for such delay.

      3.2.    Within 5 business days after receiving a written Monthly Reimbursement bill from Delphi, GM will pay to Delphi, via wire transfer in immediately available funds, such Monthly Reimbursement amount. The Monthly Reimbursement bill must identify the subject New Tooling & Equipment and/or Re-Billable Tooling, along with copies of (a) the agreement between Delphi and the applicable vendor relating to such assets, and (b) any invoices or receipts (including cost build-up documentation for the applicable assets) relating to Delphi's payment of the Monthly Reimbursement

3

amount(s). No other documentation will be required as a condition to GM's payment of the Monthly Reimbursement Amount. At GM's request, GM will be provided an opportunity to audit Delphi's books and records relating to such Monthly Reimbursement request. Upon GM making such Monthly Reimbursement payment, all of Delphi's right, title and interest in and to the applicable New Tooling & Equipment or Re-Billable Tooling (or part thereof if such asset(s) are not yet completed) will pass to GM free and clear of liens and encumbrances. Delphi will be responsible to ensure that such transfer is free and clear of liens and encumbrances. From and after the passage of title in such assets to GM, Delphi will hold such assets as GM's bailee as set forth in Section 4.0 below. Any amounts paid under this Agreement for Re-Billable Tooling will be applied to the purchase price for the Re-Billable Tooling set forth in the Re-Billable Tooling purchase orders. GM's obligation to pay the Monthly Reimbursement Amounts actually due hereunder shall be absolute and unconditional and shall not be subject to any offsets, counterclaims or defenses of any nature whatsoever.

3.3. GM retains the right, in its sole discretion at any time, to direct Delphi, in writing in accordance with Section 6.0 below (the "Cessation Notice"), to cease Delphi's capital procurement activities relating to the New Tooling & Equipment. In the event that GM provides Delphi with a Cessation Notice, (a) Delphi will cease its capital procurement activities with respect to the New Tooling & Equipment except for activities relating to a final accounting and reconciliation of the Procurement Amount, and (b) GM will remain obligated under Sections 3.1 and 3.2 above for Procurement Amounts incurred by Delphi before the Cessation Notice is received, but not for any amounts incurred relating to the New Tooling & Equipment after the Cessation Notice is received, it being understood and agreed that costs shall be deemed to have been incurred if Delphi is obligated to pay such costs under a contractual commitment made before the Cessation Notice is received. To the extent that the Cessation Notice results in a delay in the program timing for any one or more of the New Programs, GM will not hold Delphi responsible for such delay.

4.0    **Bailment.**

For all assets purchased by GM under Section 3.0 above, the following terms and conditions will apply.

4

4.1.    <u>Bailee at Will.</u>  Delphi will hold the New Tooling & Equipment and Re-Billable Tooling as GM's bailee at will; provided, however, that GM shall not remove the New Tooling & Equipment from Delphi's possession while Delphi or any of its subsidiaries remain obligated to perform under the purchase orders relating to the New Programs.  Delphi will use the New Tooling & Equipment and Re-Billable Tooling solely in the manufacture of component parts for GM and not for any other purpose.

4.2.    <u>Title.</u>  Subject to Delphi's limited right of possession as provided in this Agreement, Delphi shall have no rights in or to the New Tooling & Equipment and Re-Billable Tooling whatsoever and all right, title and interest in and to the New Tooling & Equipment and Re-Billable Tooling shall remain in GM.

4.3.    <u>GM's Right to Possession.</u>  Immediately upon GM's written request (but in no event prior to such time as Delphi has no obligation to provide product under the purchase orders for the New Programs), GM shall have the unfettered right to immediate possession of the New Tooling & Equipment and Re-Billable Tooling, without further notice or a court hearing.  Delphi agrees to fully cooperate with GM in GM's taking possession of the New Tooling & Equipment and Re-Billable Tooling when GM requests that Delphi surrender possession of the New Tooling & Equipment and Re-Billable Tooling, including, but not limited to, facilitating and consenting to GM's immediate access to Delphi's premises.

4.4.    <u>Use and Preservation.</u>  Delphi agrees to maintain the New Tooling & Equipment and Re-Billable Tooling in a careful and proper manner, to comply with all applicable laws and regulations in connection with any use and operation of the New Tooling & Equipment and Re-Billable Tooling, and to maintain the New Tooling & Equipment and Re-Billable Tooling in good condition, normal wear and tear excepted, at Delphi's cost and expense.  Delphi agrees to make no material alterations to the New Tooling & Equipment and Re-Billable Tooling without GM's prior written consent, which shall not be unreasonably withheld.  All additions and improvements to the New Tooling & Equipment and Re-Billable Tooling of any kind shall immediately become property of GM subject to the terms and conditions of this Agreement.

4.5.    <u>Risk of Loss, Insurance</u>.  Delphi hereby assumes all risk of loss and damage to the New Tooling & Equipment and Re-Billable Tooling from any cause whatsoever and Delphi shall maintain adequate insurance policies to cover the

5

replacement value of the New Tooling & Equipment and Re-Billable Tooling with GM named as loss payee to the extent of the replacement value of the New Tooling & Equipment and Re-Billable Tooling. So long as GM requires Delphi or any of its subsidiaries to perform under the purchase orders for the programs for which the New Tooling & Equipment and Re-Billable Tooling is utilized, any proceeds of insurance shall be made available to Delphi by GM for the replacement of the New Tooling & Equipment and Re-Billable Tooling on GM's behalf.

4.6. <u>Location and GM's Right to Inspect.</u> Delphi agrees to not remove the New Tooling & Equipment and Re-Billable Tooling from the Sandusky Facility without GM's prior written consent. At all times during normal business hours, upon reasonable advance notice, GM shall have the right to enter the premises where the New Tooling & Equipment and Re-Billable Tooling is located for purposes of inspecting the New Tooling & Equipment and Re-Billable Tooling.

4.7. **<u>NO WARRANTIES.</u> DELPHI ACKNOWLEDGES THAT GM HAS MADE NO REPRESENTATIONS, WARRANTIES OR COVENANTS, EXPRESS OR IMPLIED, WITH RESPECT TO THE NEW TOOLING & EQUIPMENT AND RE-BILLABLE TOOLING OR THEIR FITNESS FOR A PARTICULAR PURPOSE.** GM shall not be liable to Delphi and Delphi shall defend, indemnify and hold GM harmless from any liability, loss or damage caused directly or indirectly by the New Tooling & Equipment and Re-Billable Tooling or Delphi's use thereof, by any inadequacy thereof or defect therein or by any incident in connection therewith occurring while the New Tooling & Equipment and Re-Billable Tooling is in Delphi's possession.

4.8. <u>Identification.</u> Delphi agrees to cooperate with and assist GM, at GM's cost and expense, to place and maintain conspicuous markings and identifications on the New Tooling & Equipment and Re-Billable Tooling showing that GM holds all right, title and interest in the New Tooling & Equipment and Re-Billable Tooling.

5.0 <u>Delphi Purchase.</u>

5.1. On the Closing Date, GM will sell, and Delphi will purchase, the New Tooling & Equipment. The purchase price for the New Tooling & Equipment will be calculated as of the Closing Date in accordance with Exhibit C.

5.2.    GM and Delphi will cooperate to ensure full reconciliation of any partial month billings/payments and Sales Proceeds to ensure the purchase price can be calculated and any outstanding balances are paid in accordance with this Agreement.  At the Closing, GM will execute and deliver a Bill of Sale in the form of Exhibit E attached hereto in favor of Delphi and Delphi will wire transfer the purchase price to GM calculated based on the Delphi Productive Inventory Amount as of the previous month-end (the "Initial Payment").  Delphi's obligation to pay GM the Initial Payment shall be absolute and unconditional and shall not be subject to any offsets, counterclaims or defenses of any nature whatsoever. Title in and to the New Tooling & Equipment will pass to Delphi upon Delphi's payment of the Initial Payment, and GM will be responsible to ensure that such transfer is free and clear of liens and encumbrances.

5.3.    Within 7 days after the Closing Date, Delphi and GM will re-calculate the purchase price based on Delphi's Productive Inventory Amount as of the Closing Date and to the extent such calculation results in an amount in excess of the Initial Payment, Delphi will pay such overage to GM via wire transfer in immediately available funds within 3 business days thereafter.  Delphi's obligation to repay GM such overage shall be absolute and unconditional and shall not be subject to any offsets, counterclaims or defenses of any nature whatsoever.  To the extent this calculation results in an amount which is lower than the Initial Payment, GM will repay such overpayment to Delphi, via wire transfer in immediately available funds, within 3 business days thereafter. GM's obligation to repay any overpayment to Delphi shall be absolute and unconditional and shall not be subject to any offsets, counterclaims or defenses of any nature whatsoever.

**6.0    Notices.**

All notices, requests, and other communications that are required or may be given under this Agreement must be in writing, and shall be deemed to have been given on the date of delivery, if delivered by hand, telecopy or courier, or three (3) days after mailing, if mailed by certified or registered mail, postage prepaid, return receipt requested, addressed as set forth below (which addresses may be changed, from time to time, by notice given in the manner provided in this Section):

If given to Delphi, sent to:    Delphi Corporation
Director - Mergers & Acquisitions
MC: 483-400-421

7

|  |  |
|---|---|
|  | 5725 Delphi Drive<br>Troy, MI 48098<br>Facsimile: (248) 813-2599<br>Attn: Mr. Stephen Olsen |
| with a copy to: | Delphi Corporation<br>Deputy General Counsel - Transactional & Restructuring<br>5725 Delphi Drive<br>Troy, MI 48098<br>Mail Code 483-400-603<br>Facsimile: (248) 813-2491 |
| If given to GM, sent to: | General Motors Corporation<br>Treasurer's Office<br>767 Fifth Avenue<br>New York, NY 10153<br>Facsimile: (212) 418-3623<br>Attn: Director of Business Development |
| with a copy to: | General Motors Corporation<br>M/C 482-C23-D24<br>300 Renaissance Center<br>P.O. Box 300<br>Detroit, MI 48265-3000<br>Facsimile: (313) 665-4960<br>Attn: Gil A. Kaminski, Esq. |
| and to | Honigman Miller Schwartz and Cohn LLP<br>2290 First National Building<br>660 Woodward Avenue<br>Detroit, Michigan 48226<br>Facsimile: (313) 465-7597<br>Attn: Robert B. Weiss, Esq. |

**7.0  Miscellaneous.**

7.1. <u>Expiration</u>. Notwithstanding any other provision of this Agreement, except as set forth in Section 5.3 of this Agreement, GM's and Delphi's obligations under this Agreement will expire on the Closing Date.

7.2. <u>Authorization</u>. The parties executing this Agreement warrant that they have the corporate power and authority to execute this Agreement and this Agreement has been duly authorized by the parties.

7.3. <u>Waivers and Amendments; Successors and Assigns</u>. No term or provision of this Agreement may be waived, altered, modified, or amended except by a

written instrument, duly executed by the parties hereto. This Agreement and all of the parties' obligations are binding upon their respective successors and assigns, and together with the rights and remedies of the parties under this Agreement, inure to the benefit of the parties and their respective successors and assigns. No party may assign or transfer any right or obligation under this Agreement without the prior written consent of all parties. Delphi shall have the right to cause any of its obligations under this Agreement to be performed by a subsidiary of Delphi, provided that Delphi will remain obligated for the performance of all such obligations.

7.4. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and by each party hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart. For purposes of this Agreement, facsimile signatures shall also constitute originals.

7.5. <u>Entire Agreement; Conflicts; Ambiguous Language</u>. This Agreement, together with any other agreements and schedules referenced to herein or executed in connection with this Agreement, constitutes the entire understanding of the parties in connection with the subject matter hereof. This Agreement is being entered into among competent persons who are experienced in business and represented by counsel, and has been reviewed by the parties and their respective counsel. Therefore, any ambiguous language in this Agreement will not necessarily be construed against any particular party as the drafter of such language.

7.6. <u>Governing Law</u>. This Agreement is made in the State of Michigan and shall be governed by, and construed and enforced in accordance with, the laws of the State of Michigan, without regard to conflicts of law principles.

8.0   <u>CONSULTATION WITH COUNSEL</u>.

THE PARTIES HERETO ACKNOWLEDGE THAT THEY HAVE BEEN GIVEN THE OPPORTUNITY TO CONSULT WITH COUNSEL BEFORE EXECUTING THIS AGREEMENT AND ARE EXECUTING SUCH AGREEMENT WITHOUT DURESS OR COERCION AND WITHOUT RELIANCE ON ANY REPRESENTATIONS, WARRANTIES OR COMMITMENTS OTHER THAN THOSE REPRESENTATIONS, WARRANTIES AND COMMITMENTS SET FORTH IN THIS AGREEMENT.

9.0    <u>WAIVER OF JURY TRIAL</u>.

THE PARTIES HERETO ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT THAT THIS RIGHT MAY BE WAIVED. THE PARTIES EACH HEREBY KNOWINGLY, VOLUNTARILY AND WITHOUT COERCION, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES ARISING OUT OF OR IN RELATION TO THIS AGREEMENT.  NO PARTY SHALL BE DEEMED TO HAVE RELINQUISHED THE BENEFIT OF THIS WAIVER OF JURY TRIAL UNLESS SUCH RELINQUISHMENT IS IN A WRITTEN INSTRUMENT SIGNED BY THE PARTY TO WHOM SUCH RELINQUISHMENT WILL BE CHARGED.

[The remainder of this page left intentionally blank.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

GENERAL MOTORS CORPORATION

By: _____

Its: _____TREASURER_____

DELPHI CORPORATION

By: _____

Its: _____

11

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

GENERAL MOTORS CORPORATION

By: _____

Its: _____

DELPHI CORPORATION

By: _[signature]_____

Its: PRESIDENT - AUTOMOTIVE HOLDINGS

11