**Bidding Procedures Hearing Date And Time: June 26, 2007 at 10:00 a.m.**
**Bidding Procedures Objection Deadline: June 22, 2007 at 4:00 p.m.**
**Sale Hearing Date And Time: July 19, 2007 at 10:00 a.m.**
**Sale Hearing Objection Deadline:  July 12, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                            :
    In re                                :    Chapter 11
                                                            :
DELPHI CORPORATION, et al.,                                 :    Case No. 05-44481 (RDD)
                                                            :
                                                            :    (Jointly Administered)
        Debtors.                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

EXPEDITED MOTION FOR ORDERS UNDER 11 U.S.C. §§ 363 AND 365 AND FED. R. BANKR. P. 2002,
6004, 6006, AND 9014 (A) (I) APPROVING BIDDING PROCEDURES, (II) GRANTING CERTAIN BID
PROTECTIONS, (III) APPROVING FORM AND MANNER OF SALE NOTICES, AND (IV) SETTING SALE
HEARING DATE AND (B) AUTHORIZING AND APPROVING (I) SALE OF DELPHI AUTOMOTIVE
SYSTEMS LLC'S MEXICO BRAKE PLANT ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND
ENCUMBRANCES, (II) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, AND (III) ASSUMPTION OF CERTAIN LIABILITIES

("MEXICO BRAKE PLANT ASSET SALE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for orders under 11 U.S.C. §§ 363 and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 (i) approving the bidding procedures set forth herein and attached hereto as Exhibit A (the "Bidding Procedures"), (ii) granting certain bid protections, (iii) approving the form and manner of sale notices (the "Notice Procedures"), and (iv) setting a sale hearing (the "Sale Hearing") in connection with the sale (the "Sale") of certain assets of Delphi Automotive System LLC ("DAS LLC" or the "Seller") comprising substantially all of DAS LLC's assets used in the brake and chassis modules product lines manufactured in a plant located in Saltillo, Mexico (the "Mexico Brake Plant Business"), including the machinery, equipment, inventories, medical and personnel records, water well rights, and all other assets of DAS LLC to be sold to the Purchasers (as defined below) (the "Acquired Assets") related to the Mexico Brake Plant Business.  The Sale would be effected for $15.0 million and other consideration.  The Acquired Assets are being sold to Robert Bosch LLC ("Bosch") and Frenados Mexicanos S.A. de C.V. (together with Bosch, the "Purchasers") pursuant to that certain Asset Sale And Purchase Agreement, dated June 14, 2007, by and among DAS LLC, Delphi Sistemas de Energia, S.A. de C.V. ("Delphi Mexico" and, collectively with DAS LLC, the "Sellers"),[1] and the Purchasers (the "Agreement")[2] or to the Successful Bidder (as hereinafter defined) submitting a higher or otherwise better bid.  The Acquired Assets being sold by DAS LLC under the Agreement would be conveyed free and clear of liens, claims, and encumbrances.  The Sale would include the

---

[1]    The assets to be sold by Delphi Mexico, a non-Debtor affiliate, are not subject to this Motion.  For the purpose of convenience, references to "the Sellers" herein (including all exhibits) means, as the context requires, (i) DAS LLC to the extent such reference implicates assets of DAS LLC or (ii) Delphi Mexico to the extent such reference implicates assets of Delphi Mexico.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Agreement.

2

assumption and assignment of certain prepetition executory contracts and unexpired leases (the

"Assumed Contracts") and the assignment of certain postpetition executory contracts and

unexpired leases (the "Postpetition Contracts," and together with the Assumed Contracts, the

"Transferred Contracts") to the Purchasers or the Successful Bidder, as the case may be, and the

assumption of certain liabilities (the "Assumed Liabilities") by the Purchasers or the Successful

Bidder, as the case may be.  In support of this Motion, DAS LLC respectfully represents as

follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their

businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections

1107(a) and 1108.  The Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official

committee of equity holders.

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are sections 363

and 365 of the Bankruptcy Code and rules 2002, 6004, 6006, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").

3

B.      Current Business Operations Of The Debtors

5.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[3]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.[4]

6.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and

---

[3]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[4]    On March 20 2007, Delphi Automotive Systems Espana S.L., whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding.  The application was approved by the Spanish court on April 13, 2007.  The Concurso proceeding does not affect other Delphi legal entities in Spain or elsewhere and is an isolated event that is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

8.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[5] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006, the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

9.    The Debtors believe that the Company's financial performance has deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

10.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

---

[5]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

5

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major unions and GM had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the

Debtors' transformation plan and preserve value for its stakeholders.

D.      The Debtors' Transformation Plan

        11.     On March 31, 2006, the Company outlined five key tenets of its

transformation plan.  First, Delphi must modify its labor agreements to create a competitive

arena in which to conduct business.  Second, the Debtors must conclude their negotiations with

GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain

GM's business commitment to the Company.  Third, the Debtors must streamline their product

portfolio to capitalize on their world-class technology and market strengths and make the

necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform

their salaried workforce to ensure that the Company's organizational and cost structure is

competitive and aligned with its product portfolio and manufacturing footprint.[6]  Finally, the

Debtors must devise a workable solution to their current pension situation.

        12.     On December 18, 2006, the Debtors marked another milestone in their

chapter 11 cases with the announcement of two significant agreements.  The first of these was an

equity purchase and commitment agreement (the "Equity Purchase and Commitment

Agreement") with affiliates of Appaloosa Management L.P., Cerberus Capital Management,

L.P., and Harbinger Capital Partners Master Fund I, Ltd., as well as Merrill Lynch & Co. and

---

[6]     As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product
portfolio on core technologies for which the Company believes it has significant competitive and technological
advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics
and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also
has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the
Company's transformation plan.

UBS Securities LLC (collectively, the "Plan Investors"). Under the Equity Purchase and

Commitment Agreement, the Plan Investors have agreed to invest up to $3.4 billion in preferred

and common equity in the reorganized Delphi to support the Debtors' transformation plan. The

Equity Purchase and Commitment Agreement is subject to the completion of due diligence,

satisfaction or waiver of numerous other conditions (including Delphi's goal of achieving

consensual agreements with its principal U.S. labor unions and GM), and the non-exercise by

either Delphi or the Plan Investors of certain termination rights. The second agreement was a

plan framework support agreement (the "Plan Framework Support Agreement") with the Plan

Investors and GM. The Plan Framework Support Agreement outlines certain proposed terms of

the Debtors' anticipated plan of reorganization, including the distributions to be made to creditors

and shareholders, the treatment of GM's claims, the resolution of certain pension funding issues,

and the corporate governance of the reorganized Debtors. The terms of the Plan Framework

Support Agreement are expressly conditioned on the Debtors' reaching consensual agreements

with their U.S. labor unions and GM.

13.    On January 12, 2007, this Court authorized the Debtors to execute,

deliver, and implement the Equity Purchase and Commitment Agreement and the Plan

Framework Support Agreement (Docket No. 6589). On February 28, 2007, Delphi entered into

an amendment to the Equity Purchase and Commitment Agreement with the Plan Investors to

extend the date by which the Company, the Cerberus Capital Management, L.P. affiliate, or the

Appaloosa Management L.P. affiliate have the right to terminate the agreement on account of not

yet having completed tentative labor agreements with Delphi's principal U.S. labor unions and a

consensual settlement of legacy issues with GM. The amendment extended the termination right

pursuant to a 14-day notice mechanism. The amendment also extended the deadline to make

certain regulatory filings under the federal antitrust laws in connection with the Equity Purchase

and Commitment Agreement and the Plan Framework Support Agreement.

14.    On April 19, 2007, Delphi announced that the Debtors anticipated

negotiating changes to the Equity Purchase and Commitment Agreement and the Plan

Framework Support Agreement.  The Debtors anticipate filing a plan of reorganization and

disclosure statement as soon as reasonably practical following conclusion of a consensual

agreement with the Debtors' major stakeholders.  The Debtors also confirmed that none of the

parties entitled to give notice of termination of the framework agreements has done so as of the

date of this filing and that these agreements remain effective as previously filed until modified or

terminated.  The Debtors anticipate filing a plan of reorganization and disclosure statement as

soon as reasonably practicable following conclusion of a consensual agreement with the Debtors'

major stakeholders.

15.    Although much remains to be accomplished in the Debtors' reorganization

cases, the Debtors and their stakeholders are together navigating a course that should lead to a

consensual resolution with their U.S. labor unions and GM while providing an acceptable

financial recovery framework for the Debtors' stakeholders.  Upon the conclusion of the

reorganization process, the Debtors expect to emerge as a stronger, more financially sound

business with viable U.S. operations that are well-positioned to advance global enterprise

objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-

quality products to its customers globally.  Additionally, the Company will preserve and

continue the strategic growth of its non-U.S. operations and maintain its prominence as the

world's premier auto supplier.

8

<u>Relief Requested</u>

16.     On June 14, 2007, the Sellers and the Purchasers entered into the

Agreement which provides for the Sale of the Acquired Assets to the Purchasers, for $15.0

million and other consideration.  The proposed Sale is subject to additional competitive bidding

pursuant to the proposed Bidding Procedures and approval by this Court.  By this Motion, DAS

LLC seeks entry of two orders.  First, at the omnibus hearing to be held on June 26, 2007, DAS

LLC will seek entry of an order substantially in the form attached hereto as <u>Exhibit B</u> (the

"Bidding Procedures Order") approving the Bidding Procedures, Notice Procedures, and certain

bid protections to be provided to the Purchasers pursuant to the Agreement and as described

more fully herein.  Second, subject to the terms of the Bidding Procedures Order, at the omnibus

hearing to be held on July 19, 2007, DAS LLC will seek entry of an order substantially in the

form attached hereto as <u>Exhibit C</u> (the "Sale Approval Order") authorizing and approving the

Sale, the assumption and assignment of the Assumed Contracts, and the assumption by the

Purchasers of the Assumed Liabilities.

17.     As more fully set forth below, after a comprehensive strategic review,

DAS LLC believes that the Sale is its best opportunity under the circumstances to maximize the

underlying core value of the Acquired Assets and, therefore, the sale is in the best interests of its

estate and its stakeholders.

<u>Basis For Relief</u>

A.     <u>The Mexico Brake Plant Business</u>

18.     The Sellers operate a manufacturing plant in Saltillo, Mexico (the "Mexico

Brake Plant"), which supports GM, Bosch, and other customers with a variety of brake products

and chassis modules.  In 2006, the Mexico Brake Plant Business generated approximately $213

million in revenues.  The Mexico Brake Plant Business began in 1999 to supply certain products

for the GMT 800 full sized truck and sport utility vehicles manufactured at the GM vehicle

assembly plant in Silao, Mexico.  The GMT 800 pickup trucks and sport utility vehicles are a

key program for the Mexico Brake Plant Business, accounting for a significant majority of the

Mexico Brake Plant Business' revenues.

19.    In 2005, GM, as part of a "mid-cycle enhancement" (i.e., design refresh)

program for the GMT 800 pickup trucks, designated Robert Bosch Corporation as the Tier I

supplier for the program.  The Sellers, however, continued to support the brakes requirements for

the GM Silao vehicle assembly plant as a "directed buy" supplier to Robert Bosch Corporation.

The Mexico Brake Plant Business also provides brakes and suspension parts to other GM

assembly locations in Mexico and Arlington, Texas and support for other plants engaged in the

supply of brakes to other GM locations.  The Mexico Brake Plant Business continues to supply

excellent quality products to GM, through Robert Bosch Corporation.

B.    Factors Leading To The Sale

20.    On March 31, 2006, the Debtors announced the five key tenets of their

transformation plan, one of which was to streamline their product portfolio by identifying non-

core product lines that do not fit into their future strategic framework.  Indeed, the Debtors

identified the brake business as a non-core product line.  Because the brake business does not fit

within the Debtors' anticipated product portfolio, DAS LLC has determined to divest the Mexico

Brake Plant Business.

21.    Following Delphi's announcement of product lines and plants that would

be either sold or wound-down, GM, the Mexico Brake Plant Business' largest customer, began to

select new sources for the brake parts made by the Mexico Brake Plant Business.  GM ultimately

selected Bosch to supply all of the GMT 900 (full sized pick-ups and SUVs) light duty brake

components made by the Mexico Brake Plant Business.  As a result of GM's resource decision, a significant majority of the Mexico Brake Plant Business' future revenue stream would be eliminated.

22.      The Sellers engaged in discussions with a number of potentially interested parties regarding the sale of the Mexico Brake Plant Business.  In part, due to the long history of supply to GM through Bosch as a Tier I supplier, however, Bosch expressed the most interest in purchasing the Mexico Brake Plant Business and offered the most value for the Acquired Assets.

23.      DAS LLC evaluated selling the Mexico Brake Plant Business pursuant to the terms and conditions of the Agreement (a copy of which is attached hereto as Exhibit D), as well as the benefits of other alternatives.  DAS LLC concluded that the value of the Mexico Brake Plant Business would be maximized for the benefit of all stakeholders through its divestiture – whether to Bosch pursuant to the terms of the Agreement or to another bidder making the highest or otherwise best offer at the auction (the "Successful Bidder"), as the case may be.  Moreover, Bosch's familiarity with the Mexico Brake Plant Business and its relationship with GM will minimize, if not avoid entirely, any possible disruption to both GM and the other customers of the Mexico Brake Plant Business.

C.      The Agreement

24.      Pursuant to the Agreement, (a) the Sellers would sell the Mexico Brake Plant Business to the Purchasers for $15.0 million and other consideration, free and clear of all liens, claims, interests, and encumbrances related to assets being sold by DAS LLC, (b) DAS LLC would assume and assign the Assumed Contracts to the Purchasers, and (c) the Purchasers would assume the Assumed Liabilities.

25.      The significant terms of the Agreement are as follows:[7]

(a)      General Terms.  The Purchasers would acquire the Acquired Assets, which comprise substantially all of the assets exclusively used by the Mexico Brake Plant Business through an asset sale.  Among others, certain bailed assets, financial assets, contracts, tax refunds, privileged information and materials, benefits arising under insurance policies, finished goods related to the Mexico Brake Plant Business, certain electrical materials and equipment, and DAS LLC's rights under chapter 5 of the Bankruptcy Code would be excluded from the Acquired Assets.[8]

(b)      Bankruptcy Approval.  The Sale would be subject to approval by this Court and competitive bidding pursuant to the Bidding Procedures.

(c)      Documentation.  The Sale would be effected pursuant to the Agreement and related documentation.  At the closing, the Sellers and the Purchasers would enter into, among others, the following agreements: (i) an assignment of the Mexico Brake Plant lease to the Purchasers by Delphi Mexico, a non-Debtor affiliate and lessee, or a transfer deed, (ii) a lease agreement, if applicable, (iii) a maintenance agreement for one of the Purchaser's use of Delphi Mexico's substation to deliver electricity, (iv) an assignment and assumption agreement relating to the Transferred Contracts, (v) an indemnity escrow agreement by and among the Sellers, the Purchasers, and an escrow agent for the purposes described below (the "Escrow Agreement"), and (vi) a bill of sale.

(d)      Purchase Price.  The purchase price to be paid by the Purchasers would be $15.0 million.

(e)      Deposit Escrow.  Upon execution of the Agreement, the Purchasers would place $500,000 into an escrow account as a good faith deposit (the "Deposit Amount").  Upon closing, or if the Agreement is terminated prior to closing because of the Purchasers' failure to consummate the Sale, the Sellers would be entitled to keep the Purchasers' Deposit Amount.  The Sellers' retention of the Deposit Amount would constitute the Sellers' sole recourse in connection with such failure of the Purchasers.

(f)      Representations And Warranties.  Pursuant to the Agreement, the Sellers and the Purchasers provided certain representations and warranties relating to the Sale and the

---

[7]    In the event of any discrepancy between the Agreement and this summary of the Agreement, the provisions of the Agreement control.

[8]    Copies of the schedules to the Agreement are available upon request to parties-in-interest who can show that they would be affected by the relief requested by this Motion and who execute a confidentiality agreement acceptable to the Debtors.

Acquired Assets which would survive the closing of the Sale and generally expire on the second anniversary of the date of closing.

(g)    Covenants.  Between the date of signing the Agreement and the closing, and subject to certain exceptions, the Sellers would be required to, among other things: (i) carry on the business in substantially the same manner (except for the treatment of finished products related to the Mexico Brake Plant Business),[9] (ii) perform in all material respects all of their respective obligations under certain contracts and not amend, alter, or modify in any significant respect such contracts in a manner that is adverse to the Mexico Brake Plant Business, (iii) keep in full force and effect insurance comparable in amount and scope to coverage maintained by them on the date of the Agreement, (iv) use commercially reasonable efforts to maintain and preserve relations with customers, suppliers, employees, and others having business relations with the Mexico Brake Plant Business, (v) endeavor to maintain the goodwill of the Mexico Brake Plant Business, and (vi) promptly advise the Purchasers of any material and adverse change in the business condition (financial or other) of the business or the Acquired Assets. Additionally, no Seller would make a capital expenditure in relation to the Mexico Brake Plant Business in excess of $5,000 without prior notification to the Purchasers.

(h)    Indemnification.  The Sellers have agreed to indemnify the Purchasers for damages incurred by the Purchasers as a result of: (i) the retained liabilities and the excluded assets that are retained at closing by the Sellers, (ii) a breach of any representation or warranty of Sellers in the Agreement, (iii) any failure to perform a covenant that the Agreement required be performed by Sellers on or before closing, or (iv) a breach of any agreement or covenant of Seller in the Agreement to be performed after closing.  The Purchasers' sole source from which to satisfy any claim for indemnification would be the general escrow amount ($2,000,000), which would be initially placed into escrow by the Purchasers at closing (the "Escrow Amount"). Under no circumstances would the Sellers be responsible for indemnity in any amounts exceeding the Escrow Amount.  Notwithstanding the foregoing, any claim based on clause (iii) above would have to be made within one hundred eighty (180) days after the closing date. Additionally, on the one year anniversary of the closing date, the escrow agent would release $1,000,000 of the Escrow Amount to the Sellers.  As soon as possible after the second anniversary of the closing, the applicable Escrow Amount, including all cash, interest accrued thereon and other property retained by the escrow agent, would be delivered to the Sellers by the escrow agent, less an amount necessary to satisfy the amount of all then outstanding claims by the Purchasers for damages in accordance with the terms of the escrow agreement.

(i)    Closing Conditions.  In addition to certain other customary closing conditions relating to bankruptcy court approvals and regulatory matters, the obligation of the Purchasers to close the Sale would be subject to the satisfaction of the following conditions: (i) the accuracy of the Sellers' representations and warranties in all material respects, (ii) the

---

[9]    The Purchasers would agree to purchase from DAS LLC after closing all of the finished products on hand at closing related to the Mexico Brake Plant Business under the same terms that existed between the parties prior to the closing.

performance in all respects by the Sellers of their covenants under the Agreements, and (iii) payment of cure amounts with respect to Assumed Contracts.

(j)      Termination.  The Agreement could be terminated in the following circumstances (but not by a party which is in breach of the Agreement): (i) upon mutual written consent of the Sellers and the Purchasers, (ii) by either the Sellers or the Purchasers if consummation of the Sale would violate any final non-appealable order of any regulatory governmental entity other than this Court, (iii) by either the Sellers or the Purchasers if the Sellers consummate an alternative transaction, (iv) by either the Sellers or the Purchasers if the closing has not occurred by September 28, 2007, (v) by either the Sellers or the Purchasers if the Sale Approval Order is not entered by August 27, 2007 or if the Sale Approval Order, as of August 27, 2007, is subject to a stay or injunction, (vi) by the Purchasers within ten business days of becoming aware that a material adverse effect has occurred and is continuing, or (vii) by the Sellers if they accept or are about to accept a qualified bid at the auction other than that of the Purchasers (provided that such termination under (vii) will be of no effect unless the Sellers enter into an agreement with respect to such qualified bid within two business days of termination and subsequently complete the Sale pursuant thereto).

(k)      Break-up Fee.  Subject to Court approval and provided that the terminating party is not in material breach of the Agreement, the Sellers would be required to pay a break-up fee to the Purchasers in the amount of $450,000, which amounts to 3% of the Purchase Price (the "Break-Up Fee"), if (i) (a) either the Sellers or the Purchasers terminated the Agreement for the Sellers to consummate an alternative transaction for the sale of the Mexico Brake Plant Business or (b) the Sellers terminated the Agreement after declaring a Qualified Bid (as defined below) other than the Purchasers' the Successful Bid (as defined below) and (ii) the Sellers consummated such alternative transaction with one or more parties other than the Purchasers.

(l)      Expense Reimbursement.  Subject to Court approval and provided that the Purchasers are not then in breach of the Agreement for which the Sellers had previously notified either Purchaser, the Sellers would be required to reimburse the Purchasers' reasonable, actual out-of-pocket fees and expenses incurred in connection with the transactions contemplated by the Agreement in an amount not to exceed $200,000 (the "Expense Reimbursement") upon: (i) a termination of the Agreement by reason of the failure of the closing to occur by the September 28, 2007 or (ii) a termination of the Agreement by reason of (A) the failure of the Sale Approval Order to be entered on or before August 27, 2007 or (B) the Sale Approval Order, as of August 27, 2007, being subject to a stay or injunction, in any case.

D.      Bidding Procedures

26.      The Sale of the Acquired Assets would be subject to higher or otherwise

better offers pursuant to the Bidding Procedures.  DAS LLC believes that the proposed structure

of the Bidding Procedures is the one most likely to maximize the realizable value of the

14

Acquired Assets for the benefit of DAS LLC's estate and its stakeholders.  Accordingly, DAS

LLC seeks approval of the Bidding Procedures for the Sale of the Acquired Assets.

27.     The Bidding Procedures describe, among other things, the assets available

for sale, the manner in which bidders and bids become "qualified," the coordination of diligence

efforts among bidders, the receipt and negotiation of bids received, the conduct of any

subsequent Auction (as defined below), the ultimate selection of the Successful Bidder(s), and

this Court's approval thereof (collectively, the "Bidding Process").

28.     The proposed Bidding Procedures attached hereto as <u>Exhibit A</u> provide, in

relevant part, as follows:[10]

(a)     <u>Assets To Be Sold</u>:  The assets proposed to be sold are the Acquired
Assets.

(b)     <u>Free Of Any And All Claims And Interests</u>:  Except as set forth in
the Agreement or the purchase agreement of a Successful Bidder, the Acquired Assets being sold
by DAS LLC are to be sold free and clear of all liens, claims, interests, and encumbrances of any
type whatsoever (whether known or unknown, choate or inchoate, filed or unfiled, scheduled or
unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or
disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured,
material or non-material, disputed or undisputed, whether arising prior to or subsequent to
October 8, 2005, and whether imposed by agreement, understanding, law, equity, or otherwise,
including claims otherwise arising under doctrines of successor liability), including but not
limited to those (i) that purport to give to any party a right or option to effect any forfeiture,
modification, right of first refusal, or termination of DAS LLC's or the Purchasers' interest in the
Acquired Assets, or any similar rights, and (ii) relating to taxes arising under or out of, in
connection with, or in any way relating to the operation of the Mexico Brake Plant Business
prior to the transfer of the Acquired Assets to the Purchasers or a Successful Bidder (collectively,
the "Claims and Interests") and the Claims and Interests are to attach to DAS LLC's allocation of
the net proceeds of the sale of such Acquired Assets.

(c)     <u>Participation Requirements</u>:  To ensure that only bidders with a
serious interest in the purchase of the Acquired Assets participate in the Bidding Process, the
Bidding Procedures provide for minimal requirements for a potential bidder to become a
"Qualified Bidder," including the following:  (i) executing a confidentiality agreement in form

---

[10]     In the event of any conflict between the Bidding Procedures and this summary of the Bidding Procedures, the
provisions of the Bidding Procedures control.  Capitalized terms used but not otherwise defined in this summary
have the meanings ascribed to them in the Bidding Procedures.

and substance satisfactory to DAS LLC, (ii) providing DAS LLC with certain financial assurances as to such bidders' ability to close a transaction, and (iii) submitting a preliminary proposal reflecting the purchase price, any Acquired Assets expected to be excluded, the structure and financing of the transaction, any anticipated regulatory approvals, the anticipated time frame and any anticipated impediments to obtaining such approval, any additional conditions to closing the Qualified Bidder may wish to impose, and the nature and extent of any due diligence it may wish to conduct and the date by which such due diligence will be completed.

(d)    Due Diligence:  All Qualified Bidders will be afforded an opportunity to participate in the diligence process.  DAS LLC would coordinate the diligence process and provide due diligence access and additional information as reasonably requested by any Qualified Bidders.

(e)    Bid Deadline:  A bid deadline of 11:00 a.m. (prevailing Eastern time) on July 10, 2007 (the "Bid Deadline") has been established.  As soon as reasonably practicable following receipt of each Qualified Bid, DAS LLC would deliver to the Purchasers and their counsel complete copies of all items and information set forth in section (g) below.

(f)    Bid Requirements:  All bids must include the following documents: (i) a letter stating that the bidder's offer is irrevocable until two business days after the closing of the Sale of the Mexico Brake Plant Business, (ii) an executed copy of the Agreement, together with all schedules, marked to show amendments and modifications to the agreement, including, without limitation, to the purchase price and proposed schedules, (iii) a good faith deposit of $500,000, and (iv) written evidence of a commitment for financing or other ability to consummate the proposed transaction.

(g)    Qualified Bids:  To be deemed a "Qualified Bid," a bid must be received by the Bid Deadline and, among other things, must (i) be on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to and are not materially more burdensome or conditional to DAS LLC than those contained in the Agreement, (ii) not be contingent on obtaining financing or the outcome of unperformed due diligence, (iii) have a value greater than the purchase price reflected in the Agreement, plus the amount of the Break-Up Fee, plus $200,000 initially, then in increments of $100,000, (iv) not be conditioned on bid protections, (v) contain acknowledgements and representations that the bidder: (a) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Acquired Assets in making its bid, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreement, and (vi) include a commitment to consummate the purchase of the Acquired Assets within not more than 15 days after entry of an order from this Court approving such purchase, subject to the receipt of any governmental or regulatory approvals which must be obtained within 20 days after entry of such order.  DAS LLC would retain the sole right to deem a bid a Qualified Bid, if such bid does not conform to one or more of the aforementioned requirements.

Notwithstanding the foregoing, the Purchasers shall be deemed a Qualified Bidder, and the Agreement shall be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction (as defined below), and the Sale. A Qualified Bid would be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction.

(h)    Conduct Of Auction: If DAS LLC receives at least one Qualified Bid in addition to that of the Purchasers, they would conduct an auction (the "Auction") of the Acquired Assets at 10:00 a.m. (prevailing Eastern time) on or before July 17, 2007, or such later time as DAS LLC shall notify all Qualified Bidders who have submitted Qualified Bids, in accordance with the procedures outlined in the Bidding Procedures which include: (i) attendance at the Auction would be limited to specified parties as outlined in the Bidding Procedures, (ii) by the close of business on July 13, 2007, each Qualified Bidder with a Qualified Bid must inform DAS LLC whether it intends to participate in the Auction and by the close of business on July 16, 2007, DAS LLC must provide such bidders with copies of the Qualified Bid which DAS LLC then believes is the highest or otherwise best offer for the Acquired Assets, (iii) all Qualified Bidders would be entitled to be present for all subsequent bids, and (iv) bidding at the Auction would begin with the highest or otherwise best Qualified Bid, continue in minimum increments of at least $100,000, and conclude after each participating bidder has had the opportunity to submit one or more additional subsequent bids.

(i)    Selection Of Successful Bid:  As soon as practicable after the conclusion of the Auction, DAS LLC will review each Qualified Bid and identify the highest or otherwise best offer for the Acquired Assets (the "Successful Bid") and the Successful Bidder. DAS LLC would sell the Acquired Assets to the Successful Bidder pursuant to the terms of the highest or otherwise best Qualified Bid and the transaction would be consummated as soon as reasonably practicable following the approval of such Qualified Bid by this Court.

(j)    Sale Hearing: DAS LLC requests that the Sale Hearing be scheduled for July 19, 2007 at 10:00 a.m. (prevailing Eastern time) and that the Sale Hearing may be adjourned or rescheduled by DAS LLC without notice other than by an announcement of the adjourned date at the Sale Hearing; provided, however, that the parties agreed that the Sale Hearing would not be adjourned or rescheduled to a date later than August 31, 2007.  If no Qualified Bids other than that of the Purchasers are received, DAS LLC would proceed with the sale of the Acquired Assets to the Purchasers following entry of such order.  If DAS LLC does receive additional Qualified Bids, then at the Sale Hearing, DAS LLC would seek approval of the Successful Bid, as well as the second highest or best Qualified Bid (the "Alternate Bid" and such bidder, the "Alternate Bidder").  A bid would not be deemed accepted by DAS LLC unless and until approved by the Court.  Following approval of the sale to the Successful Bidder, if Successful Bidder fails to consummate the sale for specified reasons, then the Alternate Bid would be deemed to be the Successful Bid and DAS LLC would effectuate a sale to the Alternate Bidder without further order of this Court.

(k)    Return Of Good Faith Deposits:  Good faith deposits of all Qualified Bidders (except for the Successful Bidder) would be held in an interest-bearing escrow account and all Qualified Bids would remain open until two business days following the closing of the Sale (the "Return Date").  Notwithstanding the foregoing, the good faith deposits

17

submitted by the Successful Bidder, together with interest thereon, would be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder. If a Successful Bidder fails to consummate an approved sale, DAS LLC would not have any obligation to return such good faith deposit and such deposit would irrevocably become property of DAS LLC. On the Return Date, DAS LLC would return the good faith deposits of all other Qualified Bidders, together with the accrued interest thereon.

        (l)    Reservation Of Rights: DAS LLC, after consultation with the official committee of unsecured creditors (the "Creditors' Committee"): (i) may determine which Qualified Bid, if any, is the highest or otherwise best offer and (ii) may reject, at any time, any bid (other than the Purchasers' bid) that is: (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of DAS LLC, its estate, and its stakeholders as determined by DAS LLC in its sole discretion.

E.    Bid Protections

        29.    The Purchasers have expended, and likely will continue to expend, considerable time, money, and energy pursuing the Sale and have engaged in extended arm's length and good faith negotiations. The Agreement is the culmination of these efforts.

        30.    In recognition of this expenditure of time, energy, and resources, the Sellers agreed to provide certain bid protections to the Purchasers (the "Bid Protections"). Specifically, the Agreement provides for, and DAS LLC respectfully requests that the Bidding Procedures Order approve, the Break-Up Fee payable by DAS LLC to the Purchasers in the amount of $450,000, which comprises 3% of the Purchase Price, if (i) (a) DAS LLC terminates the Agreement to close an alternative transaction or (b) DAS LLC terminates the Agreement after declaring a Qualified Bid other than the Purchasers the Successful Bid and (ii) such alternative transaction is consummated, unless either of the Purchasers is in material breach of the Agreement.

        31.    In addition, DAS LLC respectfully requests this Court's approval of the term in the Agreement providing for reimbursement of the Purchasers' reasonable, actual out-of-pocket fees and expenses incurred in connection with the transactions contemplated by the

Agreement, not to exceed $200,000.  Provided that the Purchasers are not in default of their

obligations under the Agreement, the Expense Reimbursement would be triggered upon (i) a

termination of the Agreement by reason of the failure to close by September 28, 2007, (ii) a

termination of the Agreement by reason of the failure of the Sale Approval Order to be entered

on or before August 27, 2007, or (iii) if the Sale Approval Order, as of the August 27, 2007, is

subject to a stay or injunction.  DAS LLC's obligation to pay each of the Bid Protections, as

provided by the Agreement, would survive termination of the Agreement and, until paid, would

constitute a superpriority administrative expense claim under section 364(c)(1) of the

Bankruptcy Code.[11]

　　　　　32.　　　The Bid Protections were a material inducement for, and a condition of,

the Purchasers' entry into the Agreement.  DAS LLC believes that the Bid Protections are fair

and reasonable in view of (a) the intensive analysis, due diligence investigation, and negotiation

undertaken by the Purchasers in connection with the Sale and (b) the fact that the Purchasers'

efforts will maximize the value of the Acquired Assets for the benefit of all stakeholders whether

as a result of consummating the divestiture of the Mexico Brake Plant Business pursuant to

either the Agreement or the highest or otherwise best offer to be submitted at the Auction.

　　　　　33.　　　The Purchasers are unwilling to keep open their offer to purchase the

Acquired Assets under the terms of the Agreement unless the Bidding Procedures Order

authorizes payment of the Bid Protections.  Thus, absent entry of the Bidding Procedures Order

and approval of the Bid Protections, the Sellers may lose the opportunity to obtain what they

have determined to be the highest and best offer for the Acquired Assets.

---

[11]　　If DAS LLC becomes responsible for the payment of Bid Protections, those costs would be allocated between
　　　DAS LLC and Delphi Mexico through an intercompany agreement.

34.      Moreover, payment of the Break-Up Fee will not diminish DAS LLC's estate.  DAS LLC would not pay the Break-Up Fee unless it does so to accept an alternative Successful Bid, which would result in even greater value to DAS LLC's estate and its stakeholders.  The Expense Reimbursement is a necessary cost of reaching an agreement with the Purchasers for the sale of the Mexico Brake Plant Business.  The Expense Reimbursement could trigger a cost to the estate, but DAS LLC analyzed the cost of the Expense Reimbursement as compared to the benefit of selecting the Purchasers as a stalking horse bidder and determined that the Expense Reimbursement is a beneficial and reasonable bid protection.  DAS LLC thus requests that this Court authorize payment of the Bid Protections pursuant to the terms and conditions of the Agreement.

F.      Assumption And/Or Assignment Of The Transferred Contracts

35.      In connection with the proposed Sale, DAS LLC seeks authority under section 363 of the Bankruptcy Code to assign the Postpetition Contracts to the Purchasers or the Successful Bidder, as the case may be.  There are no past due obligations under the Postpetition Contracts.  In addition, DAS LLC seeks authority under section 365 of the Bankruptcy Code to assume and assign the Assumed Contracts to the Purchasers or the Successful Bidder, as the case may be.  The approximate cost to cure the Assumed Contracts is $213,377.45.  With respect to the Assumed Contracts, on or before July 6, 2007, DAS LLC would file with this Court and serve on each non-Debtor party to an Assumed Contract a cure notice substantially in the form attached hereto as Exhibit E (the "Cure Notice").  The Cure Notice would state, with respect to the Assumed Contracts, the cure amount that DAS LLC believes  is necessary to assume such contract or lease pursuant to section 365 of the Bankruptcy Code (the "Cure Amount") and notify each party that such party's lease or contract would be assumed and assigned to the Purchasers or

20

the Successful Bidder, as the case may be.  In addition, such Cure Amounts would be listed on a
schedule to the Sale Approval Order.

36.    The Debtors propose that any objection to the Cure Amount be filed
within ten days of the date of the Cure Notice (the "Cure Objection Deadline") and served as set
forth in the Sale Notice.  Any objection to the Cure Amount must state with specificity what cure
amount the party to the Assumed Contract believes is required, including appropriate
documentation thereof.  If no objection is timely received, the Debtors propose that the Cure
Amount set forth in the Cure Notice be controlling notwithstanding anything to the contrary in
any Assumed Contract or other document, and that the non-Debtor party to the Assumed
Contract be forever barred from asserting any other claims against DAS LLC, the Purchasers, or
the Successful Bidder (as appropriate) or the property of any of them, as to such Assumed
Contract.

37.    In addition, on or before July 6, 2007, the Debtors propose to file with
this Court and serve on each non-Debtor party to a Transferred Contract a notice, substantially in
the form attached hereto as Exhibit F (the "Purchaser Assumption/Assignment Notice").  The
Purchaser Assumption/Assignment Notice would identify the Purchasers as the parties that
would be assigned all of the DAS LLC's rights, title, and interest in the Transferred Contracts,
subject to completion of the bidding process provided under the Bidding Procedures.[12]  Non-
Debtor parties to any Assumed Contract would be required to file an objection to the assumption
and assignment of the Assumed Contract within ten days from the service of the Purchaser

---

[12]    DAS LLC would serve the Purchaser Assumption/Assignment Notice and the Qualified Bidder
Assumption/Assignment Notice (as defined below) to each non-Debtor party to the Postpetition Contracts, and
otherwise comply with the assignment requirements of those contracts, as a means of fulfilling any requirement
under the applicable contract to provide notice of assignment.

Assumption/Assignment Notice, and such parties would be required to state, with specificity, the legal and factual basis of their objection, unless otherwise ordered by this Court.

38.     The Debtors propose that one business day following the Bid Deadline, DAS LLC send a notice (the "Qualified Bidder Assumption/Assignment Notice"), substantially in the form attached hereto as <u>Exhibit G</u>, to each non-Debtor party to a Transferred Contract identifying any Qualified Bidders as potential parties to which the Transferred Contracts would be assigned.  Non-Debtor parties to any Assumed Contract would be required to file an objection to the assumption and assignment of the Assumed Contract within ten days from the service of the Qualified Bidder Assumption/Assignment Notice, and such parties would be required to state, with specificity, the legal and factual basis of its objection, unless otherwise ordered by this Court.

G.     <u>Notice Of Sale Hearing</u>

39.     Within five days after entry of the Bidding Procedures Order (the "Mailing Date"),  DAS LLC (or its agent) propose to serve the Motion, the Agreement, the proposed Sale Order, the Bidding Procedures, and a copy of the Bidding Procedures Order by first-class mail, postage prepaid, upon (i) the Office of the United States Trustee for the Southern District of New York, (ii) counsel for the Purchasers, (iii) counsel for the Creditors' Committee, (iv) counsel for the official committee of equity security holders appointed in these chapter 11 cases, (v) all entities known to have expressed an interest in a transaction with respect to the Acquired Assets during the past six months, (vi) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon the Acquired Assets, (vii) all federal, state, and local regulatory or taxing authorities or recording offices, including but not limited to environmental regulatory authorities, which have a reasonably known interest in the relief requested by the Motion, (viii)

all parties to Transferred Contracts, (ix) the United States Attorney's office, (x) the United States

Department of Justice, (xi) the Securities and Exchange Commission, (xii) the Internal Revenue

Service, (xiii) all entities on the Master Service List (as defined by the Supplemental Order

Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014

Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And

Administrative Procedures (Docket No. 2883) (the "Supplemental Case Management Order")),

and (xiv) such other entities as are required to be served with notices under the Supplemental

Case Management Order.

40.    DAS LLC also proposes pursuant to Fed. R. Bankr. P. 2002(l) and 2002(d)

to publish of a notice of the Sale in a form substantially similar to the form annexed hereto as

Exhibit H, in The International Edition of the Wall Street Journal, the New York Times, and El

Norte (the most widely-read newspaper in Saltillo, Mexico) by the Mailing Date or as soon as

practicable thereafter, and DAS LLC requests that such publication notice be deemed proper

notice to any other interested parties whose identities are unknown to DAS LLC.

## Applicable Authority

A.    Bidding Procedures

41.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be

authorized if the debtor demonstrates a sound business justification for it.  See Comm. Of Equity

Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business

judgment rule requires finding that good business reason exists to grant debtor's application

under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 178-179 (D.

Del. 1991).

42.     The Second Circuit has held that, although the bankruptcy court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate."  Orion Pictures Corp. v. Showtime Network, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's consideration of a debtor's section 363(b) motion is a "summary proceeding," intended merely as a means "to efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate.  It is not the time or place for prolonged discovery or a lengthy trial with disputed issues."  Id. at 1098-99.

43.     Once the debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc., (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity."  Id.  To satisfy its burden, it is not enough for an objector simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections."  Lionel Corp., 722 F.2d at 1071.

44.     As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'"  In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).  As set forth above, DAS LLC has sound business justifications for pursuing a sale

process at this time.  DAS LLC believes that a sale of the Mexico Brake Plant Business will lead to greater recovery than a wind-down and is therefore the best outcome for its stakeholders. Because delaying the sale of the Acquired Assets could result in the erosion of value, there is a sound business purpose for pursuing the sale process promptly and in accordance with the Bidding Procedures.

45.    Moreover, a prospective purchaser of assets from a chapter 11 debtor may be reluctant to make an offer, because it knows that even if it reaches agreement with the debtor, its offer is subject to a higher bid by another party.  Pre-approved bidding procedures address these concerns by assuring initial bidders that any auction procedure will be reasonable.  Thus, DAS LLC submits that the use of the Bidding Procedures also reflects sound business judgment.

B.    Sale Of The Acquired Assets from DAS LLC Free And
       Clear Of Liens, Claims, Encumbrances, And Interests

46.    Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell property free and clear of any lien, claim, or interest in such property if, among other things:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is sold is great that the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

47.    Here, section 363(f) permits DAS LLC to sell its portion of the Acquired

Assets free and clear of all liens, claims, and encumbrances.[13]  Each lien, claim, or encumbrance

that is not the result of an assumed liability satisfies at least one of the five conditions of 11

U.S.C. § 363(f), and DAS LLC submits that any such lien, claim, or encumbrance would be

adequately protected by attachment to the net proceeds of the Sale, subject to any claims and

defenses DAS LLC may possess with respect thereto.  Accordingly, DAS LLC requests that the

Acquired Assets being sold by DAS LLC be transferred to the Purchasers or the Successful

Bidder(s), as the case may be, free and clear of all liens, claims, and encumbrances, with such

liens, claims, and encumbrances to attach to the proceeds of the Sale of the Acquired Assets.

C.    The Purchasers Are Good Faith Purchasers Pursuant To
       Section 363(m) Of The Bankruptcy Code And The Transaction
       Contemplated By The Agreement Should Carry The
       Protections Of Section 363(n) Of The Bankruptcy Code

48.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does not
> affect the validity of a sale or lease under such authorization to an entity
> that purchased or leased such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such authorization and
> such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Although the Bankruptcy Code does not define "good faith," the Second

Circuit Court of Appeals has held:

> Good faith of a purchasers is shown by the integrity of his conduct during
> the course of the sale proceedings; where there is a lack of such integrity,
> a good faith finding may not be made.  A purchasers' good faith is lost by
> 'fraud, collusion between the purchaser and other bidders or the trustee, or
> an attempt to take grossly unfair advantage of other bidders.'

---

[13]    As a result of the negotiations, certain liabilities will be assumed by the Purchasers or the Successful Bidder, as
the case may be.

26

Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 390 (quoting In re Rock

Industries Machinery Corp., 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting former

Bankruptcy Rule 805, the precursor of section 363(m))); see also Evergreen Int'l Airlines Inc. v.

Pan Am Corp. (In re Pan Am Corp.), 91 Civ. 8319 (LMM), 1992 WL 154200 at *4 (S.D.N.Y.

June 18, 1992); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988).

        49.      Section 363(n) of the Bankruptcy Code further provides, in relevant part,

that:

> The trustee may avoid a sale under this section if the sale price was
> controlled by an agreement among potential bidders at such sale, or may
> recover from a party to such agreement any amount by which the value of
> the property sold exceeds the price at which such sale was consummated,
> and may recover any costs, attorneys' fees, or expenses incurred in
> avoiding such sale or recovering such amount.

        50.      DAS LLC submits, and will present evidence at the Sale Hearing, that the

Agreement reflects an intensely negotiated, arm's-length transaction.  Throughout the

negotiations, the Purchasers have at all times acted in good faith.  DAS LLC, therefore, requests

that this Court make a finding that the Purchasers have purchased the Acquired Assets and

assumed the Assumed Contracts and Assumed Liabilities in good faith within the meaning of

section 363(m) of the Bankruptcy Code.  Further, DAS LLC submits that any asset purchase

agreement reached as a result of the Bidding Procedures necessarily would comprise an arm's-

length, intensely-negotiated transaction entitled to the protections of section 363(m) of the

Bankruptcy Code and DAS LLC will present evidence of the same at the Sale Hearing.  Because

DAS LLC has shown that the Purchasers' successful bid is not the product of fraud or collusion

between the Purchasers and other bidders or the trustee, or an attempt to take grossly unfair

advantage of other bidders, DAS LLC further requests that this Court make a finding that the

transactions contemplated by the Agreement are not avoidable under section 363(n) of the

Bankruptcy Code.  As a result of the foregoing, DAS LLC submits that the Purchase Price to be

paid by the Purchasers constitutes reasonably equivalent value and fair consideration under the

Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer

Act, and under the laws of the United States, and any state, territory, possession, or the District

of Columbia.

D.    The Assumption And Assignment Of The Assumed Contracts

51.    Section 365(f)(2) of the Bankruptcy Code provides that:

[t]he trustee may assign an executory contract or unexpired lease of the
debtor only if –

(A)    the trustee assumes such contract or lease in accordance with the
provisions of this section; and

(B)    adequate assurance of future performance by the assignee of such
contract or lease is provided, whether or not there has been a default in
such contract or lease.

11 U.S.C. § 365(f)(2).

52.    Under section 365(a) of the Bankruptcy Code a debtor, "subject to the

court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements

for assuming an unexpired lease or executory contract of a debtor.  It provides:

(b)(1)  If there has been a default in an executory contract or unexpired lease of
the debtor, the trustee may not assume such contract or lease unless, at the time of the
assumption of such contract or lease, the trustee –

(A)    cures, or provides adequate assurance that the trustee will promptly
cure, such default;

(B)    compensates, or provides adequate assurance that the trustee will
promptly compensate, a party other than the debtor to such contract or
lease, for any actual pecuniary loss to such party resulting from such
default; and

(C)    provides adequate assurance of future performance under such
contract or lease.

11 U.S.C. § 365(b)(1).

53.    Courts give the phrase "adequate assurance of future performance" a
"practical, pragmatic construction."  EBG Midtown South Corp. v. Mcharen/Hart Envtl. Engig
Corp.  (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) aff'd, 993 F.2d 300
(2d. Cir. 1993); See Sanshoe Worldwide, 139 B.R. at 592 (the presence of adequate assurance
should be "determined under the facts of each particular case"); see also In re Fifth Ave.
Originals, 32 B.R. 648, 652 (Bankr. S.D.N.Y. 1983) (holding that adequate assurance was
furnished on two separate grounds).  Courts have consistently held that the phrase does not
require total assurances.  See In re Natco Industries, Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y.
1985) ("[I]t does not mean absolute insurance that the debtor will thrive and make a profit."); In
re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("Although no single
solution will satisfy every case, the required assurance will fall considerably short of an absolute
guarantee of performance.").  In fact, adequate assurance has been provided by demonstrating
the Purchasers' financial health and experience in managing the type of enterprise or property
assigned.  See In re Bygraph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate
assurance of future performance existed when prospective assignee of lease from debtor had
financial resources and had expressed willingness to devote sufficient funding to business in
order to give it strong likelihood of succeeding).

54.    To the extent that any defaults exist under any prepetition executory
contract or unexpired lease that is to be assumed and assigned in connection with the sale of the
Acquired Assets or any portion thereof, DAS LLC would cure any such default prior to such
assumption and assignment.  The Purchasers have the financial resources to perform under the

Assumed Contracts.  Moreover, the Sellers will adduce facts at the Sale Hearing demonstrating

the financial wherewithal of any Successful Bidder, its experience in the industry, and its

willingness and ability to perform under the contracts to be assumed and assigned to it.

55.    The Sale Hearing therefore would provide this Court and other parties-

in-interest ample opportunity to evaluate and, if necessary, challenge the ability of the Successful

Bidder(s) to provide adequate assurance of future performance under the contracts to be

assumed.  This Court therefore should have a sufficient basis to authorize DAS LLC to assume

and assign the Assumed Contracts as set forth in the Agreement.

E.    Approval Of The Bid Protections

56.    Bidding incentives encourage potential bidders to invest the requisite time,

money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to

the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11

process.  See, e.g., In re 995 Fifth Ave. Associates, L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992)

(bidding incentives may "be legitimately necessary to convince a white knight to enter the

bidding by providing some form of compensation for the risks it is undertaking") (citation

omitted).  Bankruptcy courts often approve bidding incentives under the business judgment rule.

In re Global Crossing Ltd., 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) ("[N]o litigant has

seriously argued the inapplicability of the business judgment test, and if any such argument had

been made, the Court would be compelled . . . to reject it."); In re Bethlehem Steel Corp., Case

No. 02 Civ. 2854 (MBM), 2003 WL 21738964 at *8 n.13 (S.D.N.Y. July 28, 2003) (the court

should approve agreements providing bidding incentives "unless they are unreasonable or appear

more likely to chill the bidding process than to enhance it").  One court, explaining the force of

the business judgment rule in this context, stated "the business judgment rule does not become

inapplicable simply because a court decides a break-up fee is too large." <u>In re Integrated Resources</u>, 147 B.R. at 660.

57.     This district has established a three part test for determining when to permit bidding incentives. <u>Id.</u> at 657-58.  The three questions for a court to consider when assessing a break-up fee are: "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; and (3) is the amount of the fee unreasonable relative to the proposed purchase price." <u>Id.</u>

58.     Here, DAS LLC seeks authority to utilize the Bidding Process and Bid Protections in the event that the Purchasers are not ultimately the Successful Bidder or must increase the Purchasers' bid price to become the Successful Bidder.  The Bid Protections are fair and reasonable in amount, particularly in view of the efforts to be made by the Purchasers and the risk to the Purchasers of being used as a stalking horse.  Indeed, the maximum amount of the Break-Up Fee – $450,000 (3% of the Purchase price) – not only constitutes a fair and reasonable percentage of a proposed purchase price, but also is customary for similar transactions of this type in the bankruptcy context and is within the range of breakup fees typically approved by courts in this district.  <u>See, e.g.</u>, <u>In re Allegiance Telecom, Inc.</u>, Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. 2004) (allowing 2.8% break-up fee and expense reimbursement provision in asset sale agreement); <u>In re Enron Corp.</u>, Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. 2004) (approving 3% break-up fee if debtor closed superior transaction); <u>In re Genuity Inc.</u>, Case No. 02-43558 (PCB) (Bankr. S.D.N.Y. 2002) (allowing 4.13% break-up fee if court approved alternative transaction); <u>In re PSINet, Inc.</u>, Case No. 01-13213 (REG) (Bankr. S.D.N.Y. 2001) (permitting 4.28% break-up fee in event that seller consummated transaction with alternative

bidder); In re Teligent, Inc., Case No. 01-12974 (SMB) (Bankr. S.D.N.Y. 2001) (allowing break

up fee ranging from 1.3% to 4.25% depending on value of alternative transaction).  In addition,

the payment of the Break-Up Fee or the Expense Reimbursement under the terms and conditions

of the Agreement are reasonable in light of the significant investment in time and resources that

the Purchasers will have contributed as the stalking horse bidder.

59.    DAS LLC submits that the Bidding Procedures and the Bid Protections

have encouraged competitive bidding because the Purchasers would not have entered into the

Agreement without such provisions.  The Bidding Procedures and the Bid Protections have thus

induced a bid that otherwise would not have been made.  Finally, the mere existence of the

Bidding Procedures and Bid Protections permits DAS LLC to insist that competing bids be

materially higher or otherwise better than the Agreement, which would produce a clear benefit to

DAS LLC, its estate, its stakeholders, and all other parties-in-interest.

F.    Conclusion

60.    DAS LLC submits that the relief requested in this Motion, including the

Bidding Procedures, Bid Protections, Notice Procedures, and the setting of a Sale Hearing are in

the best interests of DAS LLC's estate and would maximize value for all of its stakeholders.

DAS LLC will further show at the Sale Hearing that the entry of an order approving the Sale of

the Acquired Assets of DAS LLC free and clear of liens, claims, and encumbrances, the

assumption and assignment of the Assumed Contracts, and the assumption of the Assumed

Liabilities by the Purchasers or the Successful Bidder (as the case may be), are likewise in the

best interests of DAS LLC's estate and would maximize value for all of its stakeholders.

## Notice Of Motion

61.     Notice of this Motion has been provided in accordance with the

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered March 20, 2006 (Docket No. 2883) (the "Supplemental

Case Management Order") and the Amended Eighth Supplemental Order Under 11 U.S.C. §§

102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus

Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered

October 26, 2006 (Docket No. 5418) (together with the Supplemental Case Management Order,

the "Case Management Orders").  Further notice with respect to the Sale will be provided in

accordance with the Notice Procedures described herein.  In addition, the Debtors have complied

with the Supplemental Case Management Order with respect to the filing of this Motion and the

need for expedited relief.[14]  In light of the nature of the relief requested, the Debtors submit that

no other or further notice is necessary.

## Memorandum Of Law

62.     Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York be deemed

satisfied.

---

[14]     The Debtors have noticed this Motion for the omnibus hearing on June 26, 2007.  In compliance with the terms
of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors'
Committee regarding the relief sought in this Motion as well as the timing of its filing.  The Debtors have been
informed that the Creditors' Committee has consented to this Motion being heard on June 26, 2007.  Because
this Motion is being filed on less than 20 days' notice, parties-in-interest will have until June 22, 2007 to file an
objection to entry of the Bidding Procedures Order.

WHEREFORE DAS LLC respectfully requests that this Court enter an

order (a) (i) approving the Bidding Procedures, (ii) granting the Bid Protections, (iii) approving

the Notice Procedures, and (iv) setting the Sale Hearing; (b) approving (i) the Sale of the

Acquired Assets related to assets being sold by DAS LLC free and clear of liens, claims, and

encumbrances to the Purchasers or to the Successful Bidder, (ii) the assumption and assignment

of the Assumed Contracts to the Purchasers or the Successful Bidder, and (iii) the assumption of

the Assumed Liabilities by the Purchasers or the Successful Bidder; and (c) granting DAS LLC

such other and further relief as is just.

Dated:        New York, New York
              June 15, 2007

                            SKADDEN, ARPS, SLATE, MEAGHER
                             & FLOM LLP

                            By:    /s/ John Wm. Butler, Jr.
                                   John Wm. Butler, Jr. (JB 4711)
                                   John K. Lyons (JL 4951)
                                   Ron E. Meisler (RM 3026)
                            333 West Wacker Drive, Suite 2100
                            Chicago, Illinois 60606
                            (312) 407-0700

                                        - and -

                            By:    /s/ Kayalyn A. Marafioti
                                   Kayalyn A. Marafioti (KM 9632)
                                   Thomas J. Matz (TM 5986)
                            Four Times Square
                            New York, New York 10036
                            (212) 735-3000

                            Attorneys for Delphi Corporation, et al.,
                             Debtors and Debtors-in-Possession