**Hearing Date And Time: June 26, 2007 at 10:00 a.m.**
**Objection Deadline: June 22, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :
    In re                     :    Chapter 11
                              :
DELPHI CORPORATION, et al.,   :    Case No. 05-44481 (RDD)
                              :
                              :    (Jointly Administered)
              Debtors.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. § 1121(d) EXTENDING
DEBTORS' EXCLUSIVE PERIODS WITHIN WHICH TO FILE
AND SOLICIT ACCEPTANCES OF REORGANIZATION PLAN

("FOURTH § 1121(d) EXCLUSIVITY EXTENSION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion"), with the consent of the Official Committee of Unsecured Creditors, the Official Committee of Equity Security Holders, and General Motors Corporation ("GM"), for an order under 11 U.S.C. § 1121(d) further extending the Debtors' exclusive periods within which to file and solicit acceptances of a plan of reorganization, and respectfully represent as follows:

## Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  The Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee," and together with the Creditors' Committee, the "Statutory Committees").

3. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4. The statutory predicate for the relief requested herein is section 1121(d) of the Bankruptcy Code, as amended and in effect on October 8, 2005.

B. Current Business Operations Of The Debtors

5. Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.[2]

6. The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer.

---

[1] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[2] On March 20 2007, Delphi Automotive Systems Espana S.L., whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding. The application was approved by the Spanish court on April 13, 2007. The Concurso proceeding does not affect other Delphi legal entities in Spain or elsewhere and is an isolated event that is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

7. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C. Events Leading To The Chapter 11 Filing

8. In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006, the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

---

[3] Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

4

9. The Debtors believe that the Company's financial performance has deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

10. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D. <u>The Debtors' Transformation Plan</u>

11. On March 31, 2006, the Company outlined five key tenets of its transformation plan. First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business. Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company. Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus. Fourth, the Debtors must transform their salaried workforce to ensure that the Company's

organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.[4]  Finally, the Debtors must devise a workable solution to their current pension situation.

12.     On December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement (the "Equity Purchase and Commitment Agreement") with affiliates of Appaloosa Management L.P. ("Appaloosa"), Cerberus Capital Management, L.P. ("Cerberus"), and Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), as well as Merrill Lynch & Co. ("Merrill") and UBS Securities LLC ("UBS") (collectively, the "Plan Investors"), and a plan framework support agreement (the "Plan Framework Support Agreement") with the Plan Investors and GM.[5]  The Equity Purchase and Commitment Agreement remains subject to the completion of due diligence, satisfaction or waiver of numerous other conditions (including Delphi's goal of achieving consensual agreements with its principal U.S. labor unions and GM), and the non-exercise by either Delphi or the Plan Investors of certain termination rights.  The Plan Framework Support Agreement outlines certain proposed terms of the Debtors' anticipated plan of reorganization, including potential distributions to be made to creditors and shareholders, the treatment of GM's claims, the resolution of certain pension funding issues, and the corporate governance of the reorganized Debtors.  The terms of the Plan Framework

---

[4]  As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.

[5]  The Equity Purchase and Commitment Agreement, the Plan Framework Support Agreement, and various related agreements are referred to herein as the Framework Agreements.

6

Support Agreement are expressly conditioned on the Debtors' reaching consensual agreements with their U.S. labor unions and GM.[6]

13. On April 19, 2007, Delphi confirmed that it anticipated negotiating changes to the Equity Purchase and Commitment Agreement and related Plan Framework Support Agreement. Delphi said that any changes would be made primarily as a result of addressing differences in views regarding the Company's reorganization enterprise value among the Plan Investors, GM, the Statutory Committees, and the Company. Delphi also said that it expected that under amended framework agreements, the Appaloosa and Harbinger affiliates, Merrill Lynch, and UBS would continue to participate as Plan Investors (together with possible additional investors that may include members of the Statutory Committees), and that Cerberus might participate in the Company's exit financing, as part of a competitive process, but not as a Plan Investor. Delphi also confirmed that none of the parties entitled to give notice of termination of the framework agreements had yet done so, that these agreements remain effective as previously filed until modified or terminated, and that Delphi did not intend to comment further regarding its discussions on the framework agreements until those agreements are either modified or terminated.

---

[6] On January 12, 2007, this Court authorized the Debtors to execute, deliver, and implement the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement (Docket No. 6589). On February 29, 2007, Delphi entered into an amendment to the Equity Purchase and Commitment Agreement with the Plan Investors to extend the date by which the Company, the Cerberus affiliate, or the Appaloosa affiliate have the right to terminate the agreement if tentative labor agreements with Delphi's principal U.S. labor unions and a consensual settlement of legacy issues with GM have not been completed. The amendment extended the termination right pursuant to a fourteen-day notice mechanism. The amendment also extended the deadline to make certain regulatory filings under the federal antitrust laws in connection with the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement.

14. The April 19, 2007 press release also said that Delphi did not then expect that the framework developments would preclude the Company from filing its plan of reorganization and related documents with the Bankruptcy Court prior to the current expiration of the Company's exclusivity period on July 31, 2007 or the Company's emergence from Chapter 11 reorganization this year. Although much remains to be accomplished in the Debtors' reorganization cases, the Debtors and their stakeholders are together navigating a course that should lead to a consensual resolution with their U.S. labor unions and GM while providing an acceptable financial recovery framework for the Debtors' stakeholders. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

15. As of the date of this Motion, Delphi continues to engage in productive discussions with its major stakeholders which Delphi believes should lead to the filing of a largely consensual plan of reorganization. Delphi does not presently believe that it would be in the best interests of the Debtors or their stakeholders to further summarize or comment on those discussions in the context of this Motion or otherwise. The Debtors believe that the interests of the Debtors and their stakeholders are best served by facilitating these continuing settlement discussions on settlement paths that reach

conclusion on their own cadence as determined by the parties to the discussions. Although this cadence may permit the Debtors to file their plan of reorganization and related documents with the Bankruptcy Court prior to the current expiration of the Company's exclusivity period on July 31, 2007, the Debtors, after consultation with the Statutory Committees and GM, believe that it would be prudent to obtain further relief from this Court with respect to a continuation of the Debtors' exclusivity periods for the balance of the calendar year. The relief sought by Delphi in this Motion does not represent any change of view from Delphi's expectation expressed in its April 19, 2007 press release that the Debtors expect to emerge from chapter 11 reorganization by the end of this year.

Relief Requested

16. As set forth in the Order Under 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Periods Within Which To File And Solicit Acceptances Of Reorganization Plan (Docket No. 6700) entered by this Court on January 23, 2007, the Debtors have the exclusive right to file one or more reorganization plans through and including July 31, 2007 (the "Plan Proposal Period") and the exclusive right to solicit and obtain acceptances for those plans through and including September 30, 2007 (the "Solicitation Period," and, together with the Plan Proposal Period, the "Exclusive Periods").

17. As stated above, the Debtors believe that a further extension of the Exclusive Periods is necessary and is in the best interests of their estates and their stakeholders. Accordingly by this Motion, the Debtors seek entry of an order further

9

extending (a) the Plan Proposal Period through and including December 31, 2007[7] and (b) the Solicitation Period through and including February 29, 2008,[8] without prejudice to the Debtors' right to seek further extensions of the Exclusive Periods.  Although the Debtors are requesting this five-month extension, the Debtors anticipate filing a plan of reorganization and disclosure statement as soon as reasonably practicable following conclusion of settlement discussions with the Debtors' major stakeholders.

Basis For Relief

18.     The Exclusive Periods are intended to afford chapter 11 debtors a full and fair opportunity to rehabilitate their businesses and to negotiate and propose a reorganization plan without the deterioration and disruption of their businesses that might be caused by the filing of competing reorganization plans by non-debtor parties.  A further extension of the Exclusive Periods is justified by the significant progress the Debtors have made toward reorganization since they last sought an extension of the Exclusive Periods.

19.     The Debtors' good-faith progress toward reorganization and the related unresolved contingencies are not the only factors that support the Debtors' request to extend the Exclusive Periods.  The size and complexity of the Debtors' cases alone justify a further extension of the Exclusive Periods.  Additionally, the Debtors' efforts to negotiate a resolution to the outstanding contingencies in the Framework Agreements

---

[7]   The requested five-month extension is slightly shorter than the approximately six-month extensions sought by the Debtors in their three prior motions.

[8]   These cases are not subject to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) ("BAPCPA"), most provisions of which became effective in cases commenced on or after October 17, 2005.  Thus, these cases are not subject to the 18- and 20-month limitations on plan and solicitation exclusivity found under the current version of 11 U.S.C. § 1121(d)(2).

evidence the fact that the Debtors have not used their exclusivity period to pressure stakeholders to submit to the Debtors' reorganization demands. Instead, the Debtors have actively utilized this period to resolve the remaining issues in good faith with their diverse constituencies. Finally, the Debtors are timely paying their bills, and have the ability to continue doing so.

20. Therefore, the Debtors submit that under these circumstances the Debtors' requested extension of the Plan Proposal Period through December 31, 2007 and the Solicitation Period through February 29, 2008 is justified.

## Applicable Authority

21. Section 1121(d) of the Bankruptcy Code permits the court to extend a debtor's exclusive periods upon a demonstration of cause:

> On request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section.

11 U.S.C. § 1121(d). The court in In re McLean Indus., Inc., 87 B.R. 830 (Bankr. S.D.N.Y. 1987), identified the following factors as relevant to the determination of "cause" to extend a debtor's Exclusive Periods:

(a) the existence of good faith progress toward reorganization;

(b) existence of an unresolved contingency;

(c) the size and complexity of the debtor's case;

(d) a finding that the debtor is not seeking to extend exclusivity to pressure creditors "to accede to [the Debtor's] reorganization demands"; and

    (e)  the fact that the debtor is paying its bills as they come due.

In re McLean Indus., 87 B.R. at 834; accord In re Hoffinger Indus., Inc., 292 B.R. 639, 644 (B.A.P. 8th Cir. 2003) (stating that not all factors "are relevant in every case" and court has discretion to "decide which factors are relevant and give the appropriate weight to each").

    22.  In other cases of similar size and complexity to the Debtors' cases, courts have extended the debtors' exclusivity rights to propose a plan of reorganization for periods similar to those requested by the Debtors.  See, e.g., In re Delaco Co., Case No. 04-10899 (PCB) (Bankr. S.D.N.Y. 2004) (granting total extensions of approximately 16 months); In re Enron Corp., Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. 2001) (extensions of approximately 15 months); In re Bethlehem Steel, Case No. 01-15288 (BRL) (Bankr. S.D.N.Y. 2001) (extensions of more than 17 months); In re Kmart Corp., Case No. 02-02474 (Bankr. N.D. Ill. 2002) (extensions of more than 17 months); In re Kaiser Aluminum Corp., Case No. 02-10429 (Bankr. D. Del. 2002) (extensions of approximately 43 months); In re UAL Corp., Case No. 02-B48141 (Bankr. N.D. Ill. 2002) (extensions of approximately 29 months).  In this case, based upon the preceding factors and in line with other cases of similar size and complexity, sufficient cause exists for a five-month extension of the Exclusive Periods.

A.  The Debtors Have Made Good-Faith Progress Toward Reorganization

    23.  An extension of a debtor's exclusive periods also is justified by a debtor's progress in resolving issues facing its creditors and estates.  In re AMKO Plastics, Inc., 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996).  The Debtors' progress in these cases thus far is significant and compels a further extension of the Exclusive Periods.

(i)     The Framework Agreements

24.     As noted above, the Debtors have continued negotiations with the Plan Investors, potential new investors under the Framework Agreements, and GM. To further the transactions contemplated by the Framework Agreements, on March 7, 2007 Delphi filed with the Securities and Exchange Commission a Form S-1 Registration Statement (not yet effective) for a potential rights offering with respect to up to 56,700,000 shares of common stock of Delphi. The rights offering would be made to raise a portion of the funds necessary to consummate the contemplated plan of reorganization. In addition to the issues addressed in the framework discussions with other constituencies, the Debtors have continued their discussions with their six U.S. labor unions and GM to achieve the goals of their transformation plan and to reach agreements required by the Framework Agreements. Although further negotiations are necessary, the Debtors believe that the successful resolution of these discussions should provide the Debtors with a platform to emerge from chapter 11 during the current calendar year.

(ii)    Claims Reconciliation

25.     A condition precedent to the effectiveness of the potential plan contemplated by the Plan Framework Support Agreement is that the amount of all trade claims and unsecured claims scheduled or asserted in these cases, as allowed or estimated, will total no more than $1.7 billion (excluding, among other things, the Debtors' unsecured senior and subordinated notes). Although creditors have filed more than 16,000 proofs of claim asserting more than $36.0 billion in liquidated amounts plus certain unliquidated amounts, the Debtors have made significant strides in the claims reconciliation process.

As of June 1, 2007, the Debtors have objected to approximately 12,300 claims asserting nearly $9.4 billion (plus additional unliquidated amounts) and this Court has granted relief with respect to approximately $8.7 billion in asserted liquidated claims (plus additional unliquidated claims).

    (iii)    Other Matters

        26.    In addition to the foregoing, since the Debtors last sought an extension of the Exclusivity Periods, the Debtors have also, among other things:

    (a)    entered into a replacement financing facility which has resulted in an estimated financing costs savings of approximately $9 million per month;

    (b)    obtained court approval for the sale of substantially all of the assets of their brake hose business, and sought court approval for the sale of substantially all assets used in their catalyst business and the sale of substantially all assets used in their brake plant business in Saltillo, Mexico.

    (c)    reached agreements to provide limited discovery to the lead plaintiffs in the securities litigation and ERISA litigation and arranged to participate in a mediation of these disputes in July 2007;

    (d)    filed twelve omnibus claims objections;

    (e)    received court approval to enter into an agreement to outsource certain information technology application maintenance and support services, as well as accounts receivable, accounts payable, and other financial-related matters;

    (f)    received court approval to perform under certain pension waivers granted by the Internal Revenue Service; and

    (g)    sought court approval to enter into an agreement with GM, which provides for the procurement of certain tooling and equipment to support automotive bearing production and a specific facility.

27. In summary, the Debtors are making good-faith progress toward their reorganization. Nevertheless the Debtors still have significant tasks to complete before proposing a plan of reorganization.

B. Unresolved Contingencies Still Exist

28. Courts have also cited the need to resolve an important contingency as justification for extending a debtor's exclusivity periods. Under the terms of the Plan Framework Support Agreement, the Debtors must reach agreements with a number of parties and constituencies, including reaching agreements on new or amended collective bargaining agreements with each of their U.S. labor unions and agreements resolving the Debtors' many significant GM-related issues. These issues are significant for both their magnitude and complexity, and amply satisfy the contingency component described in the McLean test.

C. These Cases Are Large And Complex

29. The size and complexity of the Debtors' chapter 11 cases alone constitute sufficient cause to extend the Exclusive Periods. See, e.g., In re Texaco Inc., 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987); In re United Press Int'l, Inc., 60 B.R. 265, 270 (Bankr. D.D.C. 1986) ($40 million company granted extension of exclusive periods based on size and complexity of case; "In many much smaller cases, involving far less complications, two or three years go by before the debtor is in a position to file a plan."). These and other authorities show that in large, complex chapter 11 cases, courts consistently extend the debtor's exclusive periods to afford the debtor time to stabilize its business, analyze reliable information to diagnose problems, and formulate a long-term business plan before commencing the plan of reorganization process.

15

30.     The Debtors' cases are indisputably large and the multi-lateral and multi-dimensional scope of actions that must be taken to address Delphi's restructuring requirements are exceedingly complex.  A review of certain basic statistics noted above in the Motion and in prior motions makes the foregoing conclusion self-evident.  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Thus, by any measure, the Debtors' chapter 11 cases are sufficiently large and complex to warrant an extension of the Exclusive Periods under the foregoing authorities.  Moreover, in addition to the typical issues that can be anticipated to arise in a large chapter 11 case, the Debtors face numerous significant issues that are unique to the automobile industry (an industry which, as a whole, is in distress) affecting the Debtors' ability to formulate and execute a viable business plan.

D.     The Debtors Are Using Exclusivity For A Proper Purpose

31.     Courts have denied extensions of exclusive periods when plan negotiations among parties in interest have broken down and the continuation of exclusivity would merely give the debtor unfair bargaining leverage over the other parties in interest.  See Teachers Ins. & Annuity Ass'n of Am. v. Lake in the Woods (In re Lake in the Woods), 10 B.R. 338, 345 (E.D. Mich. 1981).  Here, the Debtors' request for an extension of the Exclusive Periods is not a negotiation tactic.  To the contrary, a further extension would permit the Debtors to continue to facilitate complex multilateral settlement discussions on multiple discrete settlement paths that should lead to the formulation and confirmation of a viable plan of reorganization during this calendar year.

16

E.  <u>The Debtors Are Paying Their Bills As They Come Due</u>

32. Courts considering an extension of exclusivity may also assess a debtor's liquidity and solvency. <u>See</u> <u>In re Ravenna Indus., Inc.</u>, 20 B.R. 886, 890 (Bankr. N.D. Ohio 1982). The Debtors are paying their bills as they come due. The Debtors' $4.5 billion debtor-in-possession financing facility has decreased the financing expenses by approximately $9 million per month, which increases the Debtors' liquidity and provides additional comfort to creditors and other stakeholders that the Debtors will continue to meet their obligations as they come due.

F.  <u>The Debtors Have Shown Cause To Further Extend The Exclusive Periods</u>

33. As shown above, the Debtors have made significant and productive strides in these chapter 11 cases. Based on this progress and all the other applicable factors, sufficient cause exists to extend the Exclusive Periods without prejudice to the Debtors' rights to seek a further extension. There is no harm in granting the requested extensions now because they will be without prejudice to the right of any party to request a termination of exclusivity for cause at any time under section 1121(d) of the Bankruptcy Code. Accordingly, the Debtors submit that the relief requested herein is in the best interests of the Debtors, their estates, and other parties-in-interest.

<u>Notice</u>

34. Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883)

and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered October 26, 2006 (Docket No. 5418).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

35. Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (i) extending the Debtors' exclusive periods to file and solicit acceptance of a plan of reorganization through and including December 31, 2007 and February 29, 2008, respectively, and (ii) granting the Debtors such other further relief as is just.

Dated:   New York, New York
         June 15, 2007

          SKADDEN, ARPS, SLATE, MEAGHER
           & FLOM LLP

          By:   /s/ John Wm. Butler, Jr.
               John Wm. Butler, Jr. (JB 4711)
               George N. Panagakis (GP 0770)
               Ron E. Meisler (RM 3026)
          333 West Wacker Drive, Suite 2100
          Chicago, Illinois 60606
          (312) 407-0700

          - and –

          By:   /s/ Kayalyn A. Marafioti
               Kayalyn A. Marafioti (KM 9632)
               Thomas J. Matz (TM 5986)
          Four Times Square
          New York, New York 10036
          (212) 735-3000

          Attorneys for Delphi Corporation, et al.,
            Debtors and Debtors-in-Possession