SCHWARTZ LAW FIRM, P.C.
Jay A. Schwartz (P45268).
37887 West Twelve Mile Rd., Suite A
Farmington Hills, MI  48331
(248) 553-9400

Counsel for Nu-Tech Plastics Engineering

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| DELPHI CORPORATION, et al., | Case No. 05-44481 (RDD) |
| Debtors. | (Jointly Administered) |

**CLAIMANT'S SUPPLEMENTAL[1] RESPONSE CLAIM NO. 1279**

**(NU-TECH PLASTICS ENGINEERING, INC.)**

---

[1] Although this pleading is captioned as Nu-Tech's "Supplemental Response" it is actually Nu-Tech's initial response to Debtor's substantive defenses of Nu-Tech's claim. Debtor initially objected to Nu-Tech's claim only on the grounds that it did not appear in Debtor's books and records.  Debtors' Statement of Disputed Issues was to include all documentation supporting disallowance, expungement, reduction or reclassification of the Contested Claim in accordance with the Claim Objection Procedures Order, ¶ 9(d). Debtor did not attach any documentation to its Statement of Disputed Issues.  Debtor thereafter filed an Amended Statement of Disputed Issues but only attached some documents to support some of its purported defenses.  Nu-Tech's "Supplemental Response" was thus hampered by Debtor's belated provision of only a limited set of documents.  Nu-Tech objects to any and all documents or testimony upon which Debtor attempts to rely, or which Debtor presents to this court, that was not presented in accordance with this Court's Claim Objection Procedures Order.

Claimant Nu-Tech Plastics Engineering, Inc. (Nu-Tech) was a supplier to General Motors and Debtor, Delphi Corporation and other manufacturers in Michigan. It was a minority operated business founded in 1995 by John G. Cooper as 49% shareholder and John Mailey, the majority shareholder.[2] Nu-Tech was an injection mold plastics manufacturer which had been accepted into the General Motors/Delphi mentorship program wherein General Motors and Delphi worked closely with its mentees, including Nu-Tech, to assist them in developing viable business plans and obtaining purchase orders both from General Motors/Delphi and others.[3] Nu-Tech's claims against Delphi arise out of the breach of a requirements contract for the purchase of millions of fuel pump reservoirs, General Motors' part number 25160694, used in General Motors pick-up trucks.[4] The breach began in January of 1999 and continued for the life of the purchase order which required Delphi to order from Nu-Tech exclusively all of General Motors' need for a certain part, number 25106094, commonly referred to as part 0694, through December 2000.

After its initial breach of the contract, Delphi caused more economic damage to Nu-Tech, ultimately financially destroying it and causing the sale of most of Nu-Tech's assets in December of 1999, by promising Nu-Tech that it would order another part to replace 0694. That promise induced Nu-tech's reliance in the form of continuing to lease injection molding machines in which the General Motors' tools were placed in order to produce parts and continuing to lease additional buildings and to employ otherwise unnecessary staff in anticipation of the replacement part. Delphi never terminated the

---

[2] Cooper Affidavit
[3] Patrick Affidavit
[4] Exhibit A, Complaint in Genesee County Circuit Court, Cooper Affidavit

purchase order and never notified Nu-Tech that no amendment to the purchase order adding a different part would be forthcoming. Ultimately, as a direct result of Delphi's breach of contract and unfulfilled promises to order new parts from Nu-Tech, Nu-Tech was treated as a "troubled supplier" by Delphi, put into a work-out while being run by Delphi's agent, BBK, LLC, and, finally, forced to sell most of its assets at a fire-sale price to Rapid Product Technologies, LLC on December 1, 1999.

Debtor, in its Amended Statement of Disputed Issues, sets forth only two actual defenses to Nu-Tech's claim; that the suit in the Michigan court is time barred and that the Debtor did not breach the contract when it failed to provide a written termination notice and failed to order any of the parts required under the contract from 1999 forward. Neither defense has merit.

## THE CONTRACT

In 1997, General Motors issued purchase order (PO) 8C934 to Nu-Tech, its mentee.[5] The purchase order was for a number of different parts and was a "factory assist" contract as explicitly stated on each page of the order meaning that Nu-Tech was to supply all parts identified in the PO required by General Motors *other than those parts which General Motors itself produced in house.*[6] On November 5, 1997, General Motors amended the PO to, *inter alia*, add part number 25160694, a fuel pump reservoir.[7] Again, the amended PO contained the "factory assist" language on each page. The Effective Date of Amendment was 11/17/97 (Page 1 of PO) and the expiration date for part 0694

---

[5] Patrick Affidavit, Exhibit 1 to Patrick Affidavit, Cooper Declaration
[6] Patrick Affidavit, Exhibit 1 to Patrick Affidavit, Cooper Declaration
[7] Exhibit 1 to Patrick Affidavit, Patrick Affidavit and Cooper Declaration

was 7/31/98 (Page 10 of PO).[8] In January of 1997, Nu-Tech supplied its production numbers for 1997 and its projections for 1998 production which formed the basis of Nu-Tech's bid for a contract for a number of parts including 0694.[9] The bid was submitted to Delphi on March 5, 1998.[10] The bid included production of over a million pieces per year of part 0694.

With PO 8C934 set to expire on July 31, 1998, General Motors, instead of amending that PO to extend the dates, issued a new purchase order, 9C941 which included part 0694.[11] *PO 9C941 omitted the "factory assist" designation and was, by its express terms, a requirements contract as set forth on each page of the order.* A requirements contract means that the seller is to produce parts necessary to fulfill the buyers requirements for the parts as defined by the contract. The requirements contract, PO 9C941, explicitly states that General Motors was obligated to order **100% of its requirements for part 0694** from Nu-Tech for the effective dates of the PO, *to wit* 8/1/98 (the day after PO 8C934 expired of its own terms) through July 31, 1999.[12] Like all General Motors' purchase orders, the Requirements Contract included GM's General Terms and Conditions in which General Motors required itself to provide written notice to Nu-Tech if the contract was to be terminated for any reason other than Nu-Tech's breach of contract.[13]

Nu-Tech was contractually obligated to be able to produce up to 14,000 parts 0694 *per day* operating for up to 16 hours per day for that part alone as is also set forth on

---

[8] Patrick Affidavit, Cooper Declaration
[9] Cooper Declaration,  and Exhibit 1 thereto
[10] Patrick Affidavit and Exhibit 5 thereto, Cooper Declaration
[11] Patrick Affidavit and Exhibit 2 thereto, Cooper Declaration
[12] Id, See specifically page 9 of PO 9C941
[13] Patrick Affidavit and Exhibit 4 thereto

page 9 of the PO.  In order to permit the production of the part, General Motors gave Nu-Tech GM's own tools to be placed into the two large injection molding machines Nu-Tech leased for the sole purpose of producing part 0694.[14]  Because Nu-Tech was part of the mentorship program, it was never charged for the use of these tools nor was it ever charged for the costs of the raw material (resin) with which to produce the part.[15]

Over the course of 1998, Nu-Tech produced over 750,000 parts 0694 at the contract price of $1.86 per piece operating the 2 injection mold machines for 22 hours per day and 16+ hours per day. [16] The profit margin to Nu-Tech on this part was enormous as was the volume of production.  When General Motors was facing a labor strike in the summer of 1998, it issued additional purchase orders to Nu-Tech. In order to help its mentor, Nu-Tech purchased additional equipment, hired additional staff and worked around the clock to assist General Motors in its time of need. The production of part 0694 was not affected by the strike as is borne out by Nu-Tech's production data.[17] Nu-Tech's performance during the strike was extraordinary enough to warrant thank you letters from both General Motors' Vice President and Group Executive of Worldwide Purchasing and Delphi's Director of Purchasing.[18]  Bolstered by the revenues generated from business from General Motors, the largest piece of which was part 0694, Nu-Tech expanded its operations and increased its other business as a result of its expanded capabilities.[19]

In August 1998 with the spin-off of Delphi imminent, Delphi assumed PO 9C941 from General Motors and issued Line Item Detail to Standard Blanket Order N580000B

---

[14] Patrick Affidavit and Exhibits 9 and 10 thereto, Cooper Declaration.
[15] Cooper Declaration, Patrick Affidavit and Exhibit 6 thereto
[16] Cooper Declaration.
[17] Cooper Declaration.
[18] See Exhibits L and M
[19] Cooper Declaration

for part number 0694 dated 8/17/98 to accomplish the transfer of the PO for that part to Delphi as buyer.[20] The terms and conditions of PO 9C941, including the effective dates, price per piece and production capacity requirements were unchanged and Delphi's line item detail contains no indication that it amended PO 9C941 other than to change the payment terms and the buyer's identity. Nu-Tech continued to mass produce part 0694 and Delphi paid for those parts through the end of 1998.[21]

In the winter of 1998, the labor union gain launched a strike against General Motors and, General Motors again turned to Nu-Tech for help issuing a specific "strike protection" purchase order for a limited number of parts, not including 0694, for a limited period.[22] Nu-Tech again stepped up and was rewarded by General Motors' settling the strike by promising the union to bring the production of part 0694 back in house for 1999.[23] On December 31, 1998, General Motors removed the last tool which permitted Nu-Tech to produce part -0694. *However, not only did Delphi fail to comply with its own General Term and Condition 13 which required it to give **written notice** of termination of a purchase order to Nu-Tech for part 0694, on May 3, 1999, months after the strike was settled, Delphi **__extended__** the contract for that part specifically through December, 2000!*[24]

Despite the recovery of the tooling for part 0694, Delphi continued to promise Nu-Tech either a resumption of the production of that part or a replacement part at

---

[20] Patrick Affidavit and Exhibit 3 thereto, Cooper Declaration

[21] Cooper Declaration and Exhibit 3 thereto

[22] Patrick Affidavit and Exhibit 12 thereto, Cooper Declaration

[23] Exhibit H

[24] Patrick Affidavit and Exhibit 7 thereto, Cooper Declaration. See also Patrick Exhibit 4, General Terms and Conditions. General Motors had also promised to leave the second tool with Nu-Tech until June, 1999, a promise breached on December 31, 1998. Cooper Declaration and Exhibit 2 thereto.

similar volume and pricing to help its mentee.[25]  Knowing that General Motors/Delphi

had a practice of simply amending existing purchase orders to add new parts and relying

on its mentors promises of a replacement part, Nu-Tech, with full knowledge of Delphi,

continued to lease the equipment it would need to produce fuel pump reservoirs and the

employees to actually produce them.[26] Delphi continued to fail to order parts 0694, in a

continuing breach of its purchase order with Nu-Tech yet never provided a written notice

of termination of that purchase order throughout 1999.[27]  Delphi also failed to provide a

replacement part, breaking its promise to Nu-Tech and causing Nu-Tech's financial

ruin.[28]

Delphi placed Nu-Tech in a work-out hiring BBK, LLC to run Nu-Tech from

September 1999 until a buyer could be found for Nu-Tech.[29] Ultimately, Rapid Product

Technologies, Inc. purchased most of Nu-Tech's assets pursuant to an Asset Purchase

Agreement effective December 1, 1999.[30] By that time, Nu-Tech had suffered devastating

losses and a consequent significant reduction in its value.[31]

**NU-TECH'S MICHIGAN LAWSUIT**

Nu-Tech filed suit on December 30, 2002 in the Genesee County Circuit Court

against General Motors and Delphi alleging breach of contract and promissory estoppel.[32]

Delphi filed multiple responsive pleadings the last of which was its Second Amended

---

[25] Cooper Declaration
[26] Cooper Declaration, Exhibit H, Troubled Supplier Memorandum from Delphi dated September, 1999.
[27] Cooper Declaration
[28] Cooper Declaration, Patrick Affidavit, Exhibit H
[29] Cooper Declaration, Exhibit H
[30] Cooper Declaration, Exhibit F, Asset Purchase Agreement.
[31] Cooper Declaration and Exhibit 4 thereto, Leeman Affidavit
[32] See Exhibit A, Complaint.  After Delphi filed its Voluntary Petition, Nu-Tech's claim against General Motors was resolved.

Answer attached hereto as Exhibit B.  In 2005, both defendants filed motions to dismiss

on the basis that Nu-Tech did not own the right to the breach of contract claim (i.e. was

not a real party in interest) at the time suit was filed or thereafter and, therefore, lacked

standing to sue.  After full briefing and oral argument, the transcript of which is attached

hereto, the circuit court ruled that Nu-Tech was a proper plaintiff with standing to sue

General Motors and Delphi for the breach of contract and promissory estoppel.[33]  The

case was ready for trial when Delphi filed its voluntary petition for reorganization relief

in October 2005.

### NU-TECH'S CLAIM  IS NOT TIME BARRED

Debtor's argument that Nu-Tech's breach of contract claim is time barred is

incorrect.  Moreover, the Michigan Court  has already ruled, in a final order on the issue,

that Nu-Tech is and was  the proper party.  Delphi failed to file a timely motion for

reconsideration of the trial court's ruling that Nu-Tech was a proper party in interest with

standing to pursue the claims which Delphi would have had to file by April 14, 2005

pursuant to the Michigan Court Rules, specifically MCR 2.119(F). [34]

There is no legal support whatsoever for Debtor's apparent argument  that, despite

the perpetual pendency of a suit brought by Nu-Tech against Delphi from December

2002 to 2006, the case is barred because, despite the Michigan court's ruling to contrary,

Delphi believes Nu-Tech did not own its cause of action at the time the Michigan law suit

was filed.  Delphi claims, again contrary to the ruling of the trial court, the terms of the

---

[33] See Exhibit C transcript of oral argument of Defendant's Motion for Summary
Disposition dated March 24, 2005 and Exhibit D , April 7, 2005 Order Denying
Defendant's Motion.
[34] Delphi filed an application for leave to appeal the decision to the Michigan Court of
Appeals which was denied on August 5, 2005; See Exhibit E

Asset Purchase Agreement and the unequivocal statements of both parties to the Asset Purchase Agreement, that Nu-Tech did not own the claim from the time of the Asset Purchase Agreement with RPT and the March 8, 2005 when, in response to Delphi's motion to dismiss (filed more than two years after the suit was initiated) RPT and Nu-Tech entered into an Acknowledgment and Assignment of Claims attached hereto as Exhibit G.

Contrary to Debtor's contention, Nu-Tech did **not** sell all of its assets to Rapid Product Technologies in December, 1999 as is clear from a review of the Agreement and its clearly labeled "Excluded Assets" section.[35]    The Agreement itself specifically excludes "sell ***(b) books of account, trade, intercompany and <u>other</u> <u>accounts receivable</u> <u>attributable to services rendered prior to the effective date</u>** …*(d) **those assets not specifically or by inference included in the above paragraphs or the attached exhibits."** It also specifically states that Nu-Tech is entitled to full payment of all receivables existing as of the date of sale even if paid after the effective date of the sale. The Agreement is silent as to causes of action belonging to Nu-Tech.

There is no dispute that the parties to the purchase orders in question were Delphi and Nu-Tech.  Delphi has not argued that, if any breach of contract occurred, it occurred after the Asset Purchase Agreement was executed.   The alleged breaches not only occurred before the sale of assets but were the reason that Nu-Tech was forced to sell most of its assets and, essentially, go out of business.[36]   Moreover, the General Terms and

---

[35] Exhibit F, Asset Purchase Agreement.
[36]  Nu-Tech is still a legal entity; the fact that it is currently not doing business does not implicate its capacity to sue.

Conditions to the purchase order upon which Delphi relies in its Affirmative Defenses[37] *expressly prohibit assignments of the purchase order without Delphi's "prior written consent."*[38]  There is no evidence that Delphi consented to an assignment of the purchase orders prior to December 1, 1999.  The existence of a void assignment of rights does not require dismissal of an action by the assignor.[39]

The Asset Purchase Agreement between Nu-Tech and RPT expressly states that it is **not** a sale of all of Nu-Tech's assets.  There are numerous excluded assets, including accounts receivable.  It is apparent from a reading of the types of assets transferred in comparison with the assets retained that the intent of the parties was to transfer to RPT certain physical assets and contracts from the date of sale forward but to retain for Nu-Tech anything Nu-Tech had coming to it prior to the sale.   The agreement is silent as to whether causes of action are assigned.

Because of silence of the agreement as to causes of action and to prevent any claim of ambiguity in the Agreement, Nu-Tech and RTP executed an Acknowledgment and Assignment dated March 8,  2005.  In it, the only parties to the original agreement, acknowledge that Nu-Tech did **not assign its cause of action against Delphi** to RPT. Additionally, RPT assigned back to Nu-Tech any such cause of action that a court might find to have been inadvertently assigned to RPT. Accordingly, under any circumstances, Nu-Tech is now, indisputably, the owner of such cause of action.

As matters stand, and as they stood at the time of the Michigan court's rulings, Nu-Tech is the sole possessor of the right to sue Delphi for breach of the purchase orders

---

[37] See Exhibit B
[38] See Exhibit 4 to Patrick Affidavit
[39] *Weston* v *Dowty*, 163 Mich App 238, 243 (1987).

in question and was the "real party in interest". The purpose of the real party in interest rule is to protect a defendant from a multiplicity of suits by different parties for the same claim but not to protect defendants from litigation entirely.[40]

Moreover, even if RPT had had a right to any money which Nu-Tech might receive from Delphi, such a beneficial interest would not divest Nu-Tech of its right to pursue the claim. "A real party in interest is one who is vested with the right of action on a given claim, although the beneficial interest may be in another."[41] In this matter, RPT is claiming no interest in the cause of action or its proceeds. The original asset purchase agreement required that, if RPT received payment on any receivable which was attributable to pre-sale transactions or services, RPT was to forward that money to Nu-Tech.[42] In short, the only party arguing that anyone other than Nu-Tech ever was the real party in interest, is Delphi so that it can disregard the properly and timely filed suit by Nu-Tech in a strained and inaccurate interpretation of Michigan's statutes of limitation.

MCL 440.2725 provides a limitation period of 4 years from the breach of a contract for the sale of specialty good within which to bring suit. The limitations period for a claim of promissory estoppel in Michigan is six years.[43] MCL 600.5856 is the tolling provision for statutes for limitations in Michigan. The statute of limitations is tolled during the pendency of an action against the defendant for a particular cause of action. Nu-Tech's suit against Delphi has been pending since December 30, 2002. Accordingly, the limitations period was not running at the time of the March 8, 2005 re-

---

[40] *Kearns* v *Michigan Iron and Coke Company,* 340 Mich 577 at 581 (1954).

[41] *Weston* v *Dowty*, 163 Mich App, 238, 242 (1987).

[42] Section 4.2 of asset purchase agreement.

[43] *Huhtala v. Travelers Ins. Co.* 401 Mich. 118, 133-134, 257 N.W.2d 640, 647 - 648 (Mich. 1977)

assignment and had been tolled since December 30, 2002. Nu-Tech, the proper plaintiff, had a pending suit. It had never been dismissed nor had any other party been the plaintiff. Delphi's reliance on both the "relation back" doctrine and the *Miller v Chapman* case is misplaced. Both serve the purpose of protecting a *defendant* who was not named as a party defendant during the limitations period from being dragged into a stale case under the guise of an *amended* pleading. There has never been an amendment of the complaint in the Michigan case, there was no request for correction of a misnomer, Delphi has been a Defendant since the suit was filed and, in fact, there was no motion to dismiss Nu-Tech's claim on the basis that it was not the real party in interest *until the case had been in court for more than two years and was on the eve of trial.*

Moreover, even if Nu-Tech had not had standing at the time the suit was initially filed, the correction of that condition prior to dismissal of the case bars dismissal on the basis of the initial defect.[44] Nu-Tech filed its claim within the statutory period of MCL 440.2725 for the breach of contract claim and the 6 year limitations period provided for claims of promissory estoppel.

**DEBTOR BREACHED ITS CONTRACT WITH NU-TECH**

Debtor does not dispute, even in its Amended Statement of Disputed Issues, that it did not order any parts 0694 from Nu-Tech after January, 1999. Review of the document *prepared by GM and Delphi* reveals that they are not in fact ambiguous and, accordingly, only the contract documents themselves, not parol evidence as to the parties' intent, is

---

[44] *George Morris Cruises v Irwin Yacht Marine Corporation* 191 Mich App 409 (1992); *Thomas v Costa* 2003 Westlaw 460222 Mich App February 21, 2003 attached hereto as Exhibit I

necessary or properly considered in determining liability.[45]   The relevant purchase order,

9C941, issued June 23, 1998, assumed by Delphi 2 months later and extended by Delphi

in May, 1999, is, by its own express terms, drafted by General Motors and adopted in full

by Delphi,  a requirements contract which is *not* a factory assist contract and which calls

for Nu-Tech to produce 100% of GM/Delphi's requirements for the part in question,

0694.[46] Contrary to Delphi's contention, Nu-Tech's claim for breach of that contract is

fully supported by the contract itself.

Requirements contracts are defined and governed by MCL 440.2306, part of

Michigan's Uniform Commercial Code.  That section defines a "requirements contract,"

the term selected by GM, the drafter of the purchase order, and adopted by Delphi, as one

which "measures the quantity by the…requirements of the buyer" and covers the

"*actual... requirements as may occur in good faith…*"   According to page 9 of the

purchase order, it covered 100% of the buyer's need for that part.   Requirements

contracts are enforceable and are not unduly vague in quantity terms so as to violate the

Statute of Frauds.[47]It also required that Nu-Tech be able to demonstrate that it was able to

produce 14,000 parts per day.  Not only does the written contract itself establish that GM

was to have only Nu-Tech produce *all* of GM's requirements for part 6094 through July

---

[45] Where a contract is unambiguous, the terms speak for themselves and parol evidence as to the parties' intent or meaning is neither admissible nor substantive evidence to contradict the express terms of the documents. *Wilkie v. Auto-Owners Ins. Co.* 469 Mich. 41, 664 N.W.2d 776  (2003); *Orr v. Schmidt, Ellis & Associates, Inc.* 28 Mich.App. 176, 184 N.W.2d 329 (1970).  Moreover, Delphi's own pleadings assert that the contract documents contain and integration clause and form the entire scope of the obligations and rights of the parties.  See Exhibit 2.

[46]  Patrick Affidavit, Exhibits 2, 3 and 7 thereto

[47] *Precision Rubber Products Corp v George McCarthy, Inc.*  872 F2d 187 (6th Cir 1989) and *Metal One America, Inc. v. Center Mfg., Inc.*  2005 WL 1657128 (W.D.Mich. 2005) attached hereto as Exhibit J

31, 1999, John Cooper, one of Nu-Tech's owners, *and the buyer who entered into the contracts for GM and, later, Delphi* have both testified to those facts.[48]  Delphi picked up the PO from GM via its Line Item detail issued August 17, 1998 which is part of Defendants' Exhibit A.  On May 3, 1999, Delphi extended that PO's expiration date from July, 1999 to December 2000. [49]

As part of the purchase orders, GM issued its Terms and Conditions. Section 13 of those terms and conditions, again drafted by General Motors and adopted by Delphi, requires the buyer to give *written notice* to Nu-Tech if the buyer wished to terminate the contract.[50]  Nu-Tech never received any such written notice, nor has Delphi ever asserted that it provided the required notice. [51]  Defendants knew about the termination provision which they drafted.  What's more, on a different purchase order for a different part unrelated to this litigation, they complied with their own requirement. [52]

As set forth above, Michigan's UCC defines requirements contracts.  General Motors and Delphi chose to designate their purchase orders for part 6094 as "requirements contracts".  Nowhere in any of the contract documents drafted by Delphi

---

[48]  Patrick Affidavit, paragraphs 19, and 22; Cooper Affidavit, paragraphs 8, 9, and 12;  It is Nu-Tech's contention that the contract documents are unambiguous and do not require parol evidence.  Accordingly, testimony by representatives of the parties as to their beliefs about the meaning of the documents are inadmissible parol evidence.  Meagher v Wayne State University, 222 Mich App 700, 722 (1997) and UAW-GM Human Resource Center v KSL Recreation Corp, 228 Mich App 486, 492 (1998). However, should this Court determine that the contract terms are ambiguous, and admit parol evidence, Mr. Cooper's Declaration as well as the Affidavit of Trenia Patrick, the actual GM then Delphi Senior Buyer who entered into the orders in question with Nu-Tech both support Nu-Tech's claim that Delphi was contractually obligated to buy all parts 6094 needed by General Motors from Nu-Tech during the term of the purchase order.

[49]  See Line Item Detail issued May 3, 1999 attached as part of Defendants' Exhibit A.

[50]  Patrick Affidavit, Exhibit 4, paragraph 13

[51]  Cooper Declaration

[52]  Exhibit C.

does Delphi reserve the right to purchase parts listed on the PO from suppliers other than

Nu-Tech and nowhere did they reserve the right to order no parts from Nu-Tech or limit

their damages to Nu-Tech in the event that they failed to order their requirements from

Nu-Tech.    The statute expressly imposes a duty of good faith upon both the buyer and

the seller under requirements contracts.   In this case, Delphi certainly did not act in good

faith when it unceremoniously retrieved the tooling, failed to provide written notice of

termination and continually promised to provide replacement work to Nu-Tech as more

fully set forth below.

There are no Michigan cases expressly addressing this section of the UCC or

requirements contracts under MCL 440.2306 and their import.   However, two federal

cases have addressed the code section under Michigan law.  In Tigg Corporation vs Dow

Corning Corporation[53], the court explained that, under MCLA 440.2306, the buyer owes

the seller the duty to, in good faith, buy the buyer's requirements for parts under a

requirements contract.    In Advanced Plastics Corporation vs White Consolidated

Industries, Inc.,[54] the court differentiated between a true requirements contract for 100

percent of the buyer's need for product and a contract wherein the buyer leaves open it

option to either purchase all of its need from the particular seller or to purchase only

some of its needs from that seller.   Certainly, Delphi is a sophisticated buyer. Moreover,

---

[53]  962 F2d 1119 (3d Cir. 1992); See also *Propane Indus. Inc. v General Motors Corporation* 429 F. Supp. 214 (W.D. Mo. 1977); *General Motors Corporation v Paramount Metal Products Co.* 90 F. Supp. 2d 861 (ED Mich 2000); *Precision Rubber Products Corp v George McCarthy, Inc.*  872 F2d 187 (6th Cir 1989) and *Metal One America, Inc. v. Center Mfg., Inc*.  2005 WL 1657128 (W.D.Mich. 2005) attached hereto as Exhibit J
[54] 828 F. Supp 484 (ED Mich 1993)aff'd in unpublished opinion at 47 F3d 1167 (6th Cir. 1995)

14

Delphi was aware of the term "factory assist" as that term was used in the first PO to Nu-Tech and removed from the PO at issue.[55]

Delphi breached PO 9C941 when it stopped purchasing any parts 6094 from Nu-Tech and prevented Nu-Tech from being able to produce the part by removing the tooling provided to Nu-Tech under the GM mentoring agreement. The breach continued each time GM produced part 6094 itself and failed to order the part from Delphi via Nu-Tech.

Interestingly, there has never been a claim that the failure to purchase parts from Nu-Tech was due to a lack of need for the part. It was a part essential to the production of one of GM's hottest vehicles, the Chevy S-10 truck.[56] Instead, Delphi admits that GM continued to use that part but produced all of the parts in house despite the fact the deletion of the term "factory assist" language from the PO 9C491.[57] By doing so, GM and Delphi forfeited the right to simply yank all of the business for part 6094 from Nu-Tech unceremoniously and without complying with the written termination provision of the terms and conditions so that GM could manufacture the parts in house. In other words, it is not that GM's requirements for the part were zero and, therefore, it complied with the contract to purchase all of its non-existent requirements from Nu-Tech. Instead, Delphi simply breached the contract and brought all the production of part 6094 in house.[58]

---

[55] Likewise, Delphi's claim that the order for part 0694 was a strike protection contract or a spot buy contract is belied by the fact that actual spot buy and strike protection contracts as demonstrated by Exhibits 11 and 12 to Patrick Affidavit and Patrick Affidavit as well Cooper Declaration.
[56] Patrick Affidavit, paragraph 10
[57] Exhibit H
[58] Id

Moreover, the breach of the purchase order was clearly not in good faith. Not only did Delphi violate its own terms and condition by failing to give written notice to Nu-Tech in order to terminate the contract, *Delphi extended the contract, of their own volition in May, 1999 after the strike had ended.  The line item which extended the contract date did not add back the term "factory assist"*.   Despite the extension of the contract to December, 2000, Delphi ordered no more parts 6094 from Nu-Tech after the end of 1998.

**NU-TECH'S FINANCIAL CONDITION DETERIORATED SIGNIFICANTLY AS A DIRECT RESULT OF DEBTOR'S BREACH OF CONTRACT AND FAILURE TO FULFILL ITS EXPLICIT PROMISE TO PROVIDE ADDITIONAL ORDERS TO NU-TECH**

Delphi and General Motors admit, in Exhibit H, that the loss of production of part 0694 was the primary cause of the severe deterioration in Nu-Tech's financial viability despite the current position that Nu-Tech's demise was caused by internal "mis-management".  Delphi not only believed that Nu-Tech was a going concern in mid 1998 when the PO in question was issued, but it was fully aware of the fact that Nu-Tech's dire financial straits at the end of 1999 were entirely the fault of Delphi for breaching the contract with Nu-Tech for part 0694.[59]  Delphi's internal memoranda acknowledge that Nu-Tech was suffering gravely due to its "over-expansion" in order to meet Defendants' production needs and that Nu-Tech's "decline [was] largely attributable to Delphi's in-sourcing of part [6094].[60] These same documents establish that Delphi's breach of the contract resulted in a "critical loss of revenue" to Nu-Tech which is further confirmed by the Affidavit of Trenia Patrick.  Delphi should not be permitted to rely on the severe

---

[59] Exhibit H

[60]  Id.

financial losses it wrought as a result of its unconscionable breach of contract and Nu-Tech's reasonable reliance on Delphi's unfulfilled promises of new business as a defense against its own unlawful behavior.

## NU-TECH IS ENTITLED TO DAMAGES UNDER ITS CLAIM OF PROMISSORY ESTOPPEL

Not only did Delphi know that its breach of contract caused tremendous financial losses to Nu-Tech, it induced Nu-Tech to rely on promises of replacement contracts again to Nu-Tech's detriment. Nu-Tech claims that Delphi unequivocally promised Nu-Tech that Delphi would, not might, give Nu-Tech a new contract for another similar part.[61] Delphi's own documents establish that the expected volume for the 6094 part for 1999-2002 would be 4,200,000 parts .[62]

The elements of claim for promissory estoppel are: a promise; that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promise, which in fact produced reliance or forebearance of that nature and circumstances such that the promise must be enforced if injustice is to be avoided.[63]

Here, Defendants made a clear and definite promise that Defendants would give Nu-Tech a contract through 2002 which would require the same production volume as the 6094 contract provided.  Defendants knew or should have known that such a promise would induce Nu-Tech to keep its machinery, tooling and staff in place in order to accommodate the new contract and produce the 4 millions parts Delphi projected that it would need.  In fact, Nu-Tech had even better reason to rely on the promise, that is, GM/Delphi were Nu-Tech's mentors and had promised and engaged in a course of

---

[61] Cooper Declaration
[62]  Exhibit 6 to Patrick Affidavit
[63]  Schmidt vs Bretzlaff 208 Mich App 376, 378-379 (1995).

conduct the goal of which was to keep Nu-Tech profitable and in business. [64] GM/Delphi had established a position of trust with Nu-Tech as result of this special relationship. Nu-Tech, therefore, in reliance on its mentors' promise of replacement part, maintained its full operating capacity at great expense to Nu-Tech. Such reliance included keeping facilities which Nu-Tech had leased, keeping machinery needed to produce the promised parts, keeping employees needed to run the machinery and other expenses.[65] As a matter of justice, Nu-Tech's losses should be laid at the feet of those who caused the unnecessary expense, Delphi. Delphi did not have to promise any new or new contract. It strung Nu-Tech along for months on end and was aware of Nu-Tech's financial condition and its operating capacity. Had Delphi kept its promise, Nu-Tech would have had over $1,700,000 in additional sales in 1999, more than enough to keep them operating and certainly enough to have avoided the fire sale of its assets which Delphi brokered.[66]

In State Bank of Standish vs Curry 442 Mich 76 (1993), the Michigan Supreme Court reversed the grant of summary disposition in favor of the bank which had promised to loan money to the Currys in the future. The court first set forth that the purpose of the doctrine is "to protect the ability of individuals to trust promises in circumstances where trust is essential." It then established the definition of a promise as "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." No actual contract is necessary to a claim of promissory estoppel, according to the Court.

---

[64] Exhibit H, pp. 36-37.
[65] Cooper Declaration
[66] Leeman Affidavit and Exhibits thereto

18

The elements of a promissory estoppel claim under Michigan law are: (1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of promisee, (3) which in fact produced reliance or forbearance of that nature, and (4) in circumstances such that the promise must be enforced if injustice is to be avoided.[67] The promissory estoppel claim, as described by Mr. Cooper, is based on Delphi's promise to provide Nu-Tech with a new contract for a different part to replace part 6094 which contract would be in place for a specific duration, until December 2002, and which would call for the same volume of part production as the old contract for part 6094 which was a discernible volume and had been forecasted by Delphi for the years 1999-2002 respectively. Accordingly, Delphi's promise was clear and definite and contained the terms of duration and quantity. The promise is separate and apart from PO 9C491 though it was borne of Defendants' breach of that PO. Likewise, the promise was clearly for a long term contract requiring the production of millions of parts, and, therefore, was for something completely different from the "spot buy" contract which was actually given to Nu-Tech for a small order of a prototype part.

## **DAMAGES**

Nu-Tech is entitled to damages for the breach of contract in accordance with MCL 440.2708. That section of Michigan's Uniform Commercial Code, governing contracts for the sale of specialty goods specifically calls for the payment of expectation damages and incidental damages caused by the breach less the credit for savings in production

---

[67] *Ardt v Titan Insurance Company* 233 Mich.App. 685, 593 N.W.2d 215 (1999)

costs to the seller.[68] Nu-Tech's expert, Gary Leeman, relying on financial data from Nu-Tech, its accounts, Delphi and BBK, has rendered an opinion setting forth the basis for his damages calculation as well as the amount of damages occasioned by Delphi's breach of contract and breach of promise.[69]  Nu-Tech's loss of income (lost profits) caused by Delphi's breach of contract to order all parts 0694 required by General Motors until December 2000 is $7,638,671.[70] Nu-Tech's lost business value, an element of damage which is recoverable under both causes of action, breach of contract and breach of promise, is $4,981,901.[71]  Finally, Nu-Tech incurred $1,336,558 in excess costs, an element of damage to which Nu-Tech is entitled under either theory.[72]  The total amount of Nu-Tech's damages is $13,957,130.[73]

Respectfully submitted,

SCHWARTZ LAW FIRM, P.C.

By: __/s/_ Jay A. Schwartz_____
    Jay A. Schwartz (P45268)
    Attorney for Claimant Nu-Tech Plastics
      Engineering, Inc.
    37887 West Twelve Mile Road, Suite A
    Farmington Hills, Michigan 48331
Dated:    June 18, 2007    (248) 553-9400
    jschwartz@schwartzlawfirmpc.com

---

[68] See also *Great Northern Packaging v General Tire and Rubber Co* 154 Mich App 777;399 NW 2d 408 (1987)
[69] Leeman Affidavit and Exhibits thereto.  Also note that, despite repeated requests, Delphi failed to produce any actual production data for vehicles using the 0694 part after Delphi's breach of the contract. See Exhibit K.
[70] Leeman Affidavit and Exhibit 12 thereto
[71] The damages calculation does not duplicate the damages because they would be recoverable under two different causes of action.  Rather, the amount claimed is simply the total amount of loss of business value.
[72] Id
[73] Id