Michael A. Isaacs, CSBN 99782
Diana L. Donabedian, CSBN 191384
LUCE, FORWARD,
HAMILTON & SCRIPPS, LLP
121 Spear Street, Suite 200
San Francisco, CA 94105
Telephone: 415.356.4600
Fax: 415.356.3895
E-mail: misaacs@luce.com
E-mail: ddonabedian@luce.com

Attorneys for The Brix Group Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Case No. 05-44481 (RDD) |
| DELPHI CORPORATION, et. al., | Chapter 11 |
| Debtors | (Jointly Administered) |
| | **RESPONSE TO DEBTORS' FIFTEENTH OMNIBUS CLAIMS OBJECTION (SUBSTANTIVE) PURSUANT TO 11 U.S.C. § 502(b) AND FED. R. BANKR. P. 3007 TO CERTAIN (A) INSUFFICIENTLY DOCUMENTED CLAIMS, (B) CLAIMS NOT REFLECTED ON DEBTORS' BOOKS AND RECORDS, (C) UNTIMELY CLAIMS AND UNTIMELY TAX CLAIM, AND (D) CLAIMS SUBJECT TO MODIFICATION, TAX CLAIMS SUBJECT TO MODIFICATION, AND MODIFIED CLAIMS ASSERTING RECLAMATION** |
| | **Claimant: The Brix Group, Inc.**<br>**Claim Numbers 8139 and 8229** |

The Brix Group, Inc. ("Claimant") hereby submits this Response to Fifteenth Omnibus Claims filed by Delphi Corporation and certain of its subsidiaries and affiliates, debtors and debtors-in-possession ("Delphi") in support of Claim Number 8139 in the amount of $44,754 and Claim Number 8229 in the amount of $2,896,591.72.

On June 19, 2006, The Brix Group, Inc. filed claim number 8139 in the amount of $44,754 ("Claim No. 8139). On June 19, 2006, The Brix Group, Inc. filed claim number 8229 in the amount of $2,896,591.72. For the reasons set forth below, Claimant believes Claim No. 8139 and Claim No. 8229 should not be disallowed and expunged and should be allowed in the respective amounts as filed. The relevant documentation, including but not limited to the Representative Agreement(s) and the Distribution Agreement(s) and their corresponding exhibits, as described below, are attached to Claim No. 8139 and Claim No. 8229.

**I.    History and Background of Claim No. 8139 and Claim No. 8229:**

In March 2002 at the Mid American Truck show in Louisville, Kentucky John Trenberth, President of Pana-Pacific, a division of The Brix Group, Inc met Steve Hartwood, division president of Delphi. Mr. Trenberth and Mr. Hartwood had some congenial conversations about their company's experiences supplying the truck channel with products. Pana-Pacific has a very good reputation in the trucking industry as a great supplier of electronics including radios, speakers, antennas, inverters etc. This meeting resulted in a series of follow-up communications between Mr. Trenberth and Mr. Hartwood. These subsequent conversations resulted in an invitation from Delphi for Harry Brix, Chairman, and John Trenberth to travel to Kokomo, Indiana in the summer of 2002 for a meeting with Delphi about the possibility of doing business together.

An initial meeting took place in the summer of 2002 at Delphi's offices in Kokomo Indiana with Harry Brix and John Trenberth of The Brix Group, Inc, Steve Hartwood and Beth Swarting of Delphi and Satchel Gidwani of MobileAria, a wholly owned subsidiary of Delphi, in attendance. A number of business opportunities were discussed and a presentation was given by Delphi and MobileAria personnel about the "Truck PC" project.

///

The Truck PC project was a project Delphi and MobileAria were working on to provide a system to be installed in trucks which would perform a number of functions including monitoring speed, location, fuel consumption, engine performance etc. and relay that information to the truck's operations/dispatch office via wireless communication. At that meeting Harry Brix and John Trenberth of The Brix Group, Inc. were told that the product was complete and ready for market and that in fact 4,400 units of the product had already been sold. Delphi indicated that they were considering providing Pana-Pacific the opportunity to be a supplier of the product to the trucking channel and that if the parties were to come to an agreement they would look to Pana-Pacific to develop and provide the components required for installation in trucks including wire harnesses, modems etc. The Brix Group management specifically asked if the software developed by MobileAria for the Truck PC integrated with existing fleet management systems already being used by fleets to manage their trucks. In response, Delphi and MobileAria officials said that the software integrated with existing systems.

The Distribution Agreement With Delphi

Discussions continued over the next several months between Delphi and The Brix Group, Inc. These discussions contemplated the transfer of business from Delphi to The Brix Group, Inc. Delphi had apparently determined that The Brix Group, Inc could more efficiently manage distribution of their products to the commercial vehicle market than they could. Effective December 19, 2002, the "DISTRIBUTION AGREEMENT" between Delphi Electronics Corporation, a subsidiary of Delphi Corporation and The Brix Group, Inc. was signed. This agreement was for a three year term and granted The Brix Group, Inc exclusivity in the distribution of certain Delphi Electronics Corporation's products in specified markets. It also transferred responsibility for fulfilling Delphi Electronics Corporation's sales contracts (transferred business) which were already in effect as of the effective date. These sales contracts only produced 5% to 7% margins. Additionally, Delphi promised to release for sale new products which would generate approximately $750,000 per month in sales and over $100,000 in gross profit to offset the losses expected from the transferred sales. The DISTRIBUTION

AGREEMENT also included a number of "EXHIBITS" which specified the following:
- Exclusive Products
- Non-exclusive products
- Conditions for maintenance of exclusivity
- Sales Incentives
- Warranty
- Trademark, Logo and service mark guidelines and;
- Cooperative advertising

The Sales Incentive bonus available to Pana-Pacific for 2003 applied only to "New Business" over and above the business transferred to Pana-Pacific (even though this business was transferred at very low margin, below that at which Pana-Pacific can operate its business) plus an incentive on the sale of Truck PC units. This Sales Incentive would be earned by Pana-Pacific if "New Business" sales exceeded $30,000,000 and at least 6,500 TruckPC units were sold in 2003.

The only way Pana-Pacific would be profitable in 2003 operating under the DISTRIBUTION AGREEMENT is if it could earn the "Sales Incentive" which was directly tied to selling 6,500 TruckPCs. However, The Brix Group, had been told the Truck PC was complete, ready for sale and that 4,400 units had already been sold. The Brix Group, Inc. was also told that there was another deal with Freightliner pending and that both of these deals would qualify toward the sales goal of 6,500 for the year. The Sales Incentive for 2003 was $469,000. Margins were supposed to be increased as new products were released for sale based upon representations made by Delphi. However, no new products were released in 2003.

Pana-Pacific began performing under the DISTRIBUTION AGREEMENT in 2003 and performed very well. Almost immediately upon signing the DISTRIBUTION AGREEMENT Pana-Pacific began performing engineering services to support the installation of the TruckPC in various models of trucks and began hiring a sales staff early in 2003 (before any agreement existed to be compensated by MobileAria for telematics sales) dedicated to selling the TruckPC unit to OEMs and fleets. This staff consisted of a manager, well regarded in the trucking industry, and

two account managers. These people were kept on staff through most of 2005 in support of the company's efforts to develop the market for the TruckPC. This sales team developed sales programs, produced sales collateral, made sales presentations and performed demonstrations to truck fleet operators nationwide. Pana-Pacific incurred a total cost of at least $750,000 in direct costs for this sales team and sales program development over the three year period in addition to the engineering costs incurred to develop all of the installation applications and hardware for the TruckPC.

As the Pana-Pacific sales and marketing staff began development of the TruckPC sales program, they discovered that the TruckPC did not perform as Pana-Pacific had been led to believe. Among the things Pana-Pacific learned were:

- There were serious issues with the software. The TruckPC units had to be sent back to Delphi to have updated software loaded into the units on several occasions.
- The software did not interface with existing fleet management systems. Fleets that had invested in Fleet Management systems (almost all large fleets have) realized that the purchase and implementation of the TruckPC would make obsolete the systems they currently had employed, creating a significant barrier to entry.
- No deals were ever forthcoming for the sale of the 4,400 units as promised and no sales were pending at Freightliner.

As contemplated in the DISTRIBUTION AGREEMENT, Delphi did transfer business to Pana-Pacific throughout 2003. Pana-Pacific executed very well delivering approximately $20 million in new business to Delphi but had very little success selling the Truck PC and earned no incentive. However, the new products which were to be released for sale in 2003 were delivered by Delphi months after they had been promised, costing The Brix Group, Inc. approximately $2,500,000 in lost gross sales and over $350,000 in lost gross profit.

/ / /

/ / /

4

The Representative Agreement

Effective October 7, 2003, the "REPRESENTATIVE AGREEMENT" between MobileAria, Inc (a wholly owned subsidiary of Delphi) and The Brix Group, Inc. dba Pana-Pacific was signed. This agreement was for a three year period and specified the terms under which The Brix Group, Inc would market and support MobileAria's services. MobileAria developed the telematics software services to be used in conjunction with the TruckPC. Functionality of the TruckPC was dependent upon the software developed by MobileAria to perform. The representative agreement also included several "EXHIBITS" which specified the following:

- Company Services & Pricing (MobileAria's)
- Commissions, Volume Commitments and Resource Commitments
- Roles and Responsibilities
- House Accounts and Special Accounts

Exhibit C of the REPRESENTATIVE AGREEMENT specified the roles and responsibilities to be discharged by three parties, Delphi, MobileAria and Pana-Pacific. Further, Exhibit F of the REPRESENTATIVE AGREEMENT specifically made reference to a house account; BP and a Special Account; Airgas, Inc. Sales to these House and Special Accounts qualified towards the sales quota but would earn no commissions on "telematics" sales because these accounts had been sold by Delphi and MobileAria.

In September of 2004, a meeting was scheduled by Delphi and MobileAria to discuss the TruckPC project. The meeting was held at MobileAria in Mountain View, California. Beth Swarting, Vice President of Sales & Marketing Delphi and Dan Salmons, Director of North American Sales, Delphi, Sachael Gidwani, President MobileAria, Adam Wegee and Dan Jester of Mobile Aria and Harry Brix, John Trenberth, Derik Toy and Debbie Cameron of The Brix Group, Inc were present. In this meeting Delphi said that they had finally received a commitment from Airgas, Inc. to test the TruckPC in 3,000 trucks and that Pana-Pacific needed to purchase all of the peripherals required to support its installation in these trucks. Pana-Pacific was directed to

5

contract with a company called Velociti to perform the installations. Pana-Pacific was also told that the sales would be paid for by GreatAmerica Leasing Corporation under a lease between Airgas, Inc. and GreatAmerica Leasing Corporation, guaranteed by Delphi.

During the meeting in September 2004, representatives from The Brix Group, Inc. pointed out that there were numerous problems with the TruckPC such as software glitches, lack of interface with fleet management systems and that to date all of the tests performed by numerous fleet operators such as Churchill, Roadway and PIE had failed to produce acceptable results and that the companies testing the product had decided not to implement installation in their fleets. Representatives from the Brix Group also pointed out that no commitment for the sale of 4,400 units had ever been forthcoming as promised. At that point, Mr. Sachael Gidwani, President of MobileAria began waving in the air what he said was a contract for 4,400 units. The Brix Group was never shown that contract.

Beth Swarting told The Brix Group that they needed to purchase all of the peripherals required to complete the installations for Airgas and contract with Velociti to perform the installations. She said that the 3,000 installations must be completed by December 31, 2004 and that if we failed to perform Delphi would question our commitment to the program and that our DISTRIBUTION AGREEMENT with Delphi would be jeopardized.

Based upon the reassurance that all of the problems with the TruckPC had been overcome and the threats made relative to the DISTRIBUTION AGREEMENT, Brix Group management committed to purchase all of the required peripherals and contract with Velociti for the installations. The Brix Group, Inc contracted with Velociti as directed by Delphi and worked diligently with Velociti to insure that coordination of the installations with Airgas, Inc. was performed as well as possible and insured that all of the components required to perform the installations were engineered, developed, produced (including unique mounting and installation components) and that the TruckPC units and peripheral equipment required to perform all of the installations were deliverd to Velociti consistent with the schedule developed to complete the installations be December 31, 2004.

As previously noted, Airgas, Inc was a "Special Account" as specified in the "REPRESENTATIVE AGREEMENT" between MobileAria, Delphi and The Brix Group, Inc. Airgas, Inc was reserved as a "Special Account" because the "sale" to this account was made by MobileAria and Delphi. It was critical for the success of the TruckPC program that the product be tested on a large scale. Airgas, Inc was convinced by Delphi to test the product but because it was a "test" Airgas was unwilling to commit to either; purchase 3,000 TruckPCs or be solely obligated on the lease for 3,000 units. Thus Delphi agreed to give Airgas the right to assign the GreatAmerica lease to Delphi if in fact the test failed to produce the desired results. The lease between Airgas, Inc and GreatAmerica Leasing included the provision that Airgas, Inc could assign the lease to Delphi and Delphi was a signatory to the lease.

On May 10, 2005, GreatAmerica Leasing sent a letter addressed to Mr. Ted R. Schulte, Division President, Airgas, Inc. advising him that based upon material changes in the credit profile of Delphi Corporation ("Delphi") GreatAmerica Leasing would no longer accept Equipment Schedules under the Master Lease for the TruckPC unless the right to assign the lease to Delphi was removed. Airgas, Inc was unwilling to execute a new lease or an amendment to remove the right to assign their obligation under the lease to Delphi because they were not convinced the TruckPC worked.

GreatAmerica Leasing sent John Trenberth, President of Pana-Pacific, a copy of the letter advising Airgas of their decision to discontinue accepting "Equipment Schedules" under the Master Lease unless the assignment provision was removed. Upon receipt Mr. Trenberth called Mr. Dan Salmons, Director, North American Sales, Delphi and informed Mr. Salmons of the letter and its contents. Mr. Salmons offered no guidance or direction. Concurrently there were installations of the TruckPC being performed in numerous locations around the country. These installations were billed to GreatAmerica Leasing on May 31, 2005, and were not paid by GreatAmerica Leasing. The total of the billings unpaid by GreatAmerica Leasing is $180,144.34. In addition, because GreatAmerica refused to pay the invoices The Brix Group, Inc. never billed GreatAmerica for $138,219.23 in installation costs paid to Velociti, the company specified by

Delphi to install the TruckPCs in Airgas trucks, as they would have been rejected by GreatAmerica Leasing. Thus, while The Brix Group has not been paid at least $318,363.57 for TruckPCs installed in Airgas trucks (Delphi's customer), installations performed at the direction of Delphi, The Brix Group has confirmed in conversations with Mr. Randy Carlson, Delphi Proof of Claims that Delphi did make payments to GreatAmerica Leasing when the lease was assigned to Delphi by Airgas.

On October 8, 2005 Delphi Corporation filed for voluntary chapter 11 bankruptcy.

The Brix Group, Inc began hearing rumblings that the test being performed by Airgas, Inc. was not going well. On December 9, 2005, a member of senior management at The Brix Group, Inc. called Mr. Tuffy Baum, National Fleet Manager, Airgas to inquire as to the status of the "test" in process. Mr. Baum informed The Brix Group that Airgas was in the process of removing all of the TruckPCs from their trucks because Airgas had concluded that the test was a failure, the TruckPC did not work. When The Brix Group, Inc. notified Delphi management that Airgas had concluded that the test failed, Delphi said they would take back, under warranty, all of the TruckPC units and give The Brix Group, Inc. full credit for the return of TruckPCs. (Note this was for ALL of the TruckPC units not just those which had been installed in Airgas trucks.) Delphi had obviously concluded the product did not work and agreed to issue warranty credit for all TruckPCs returned to them. These credits were issued.

In December 2005, numerous discussions were held with Delphi management to discuss the ongoing bankruptcy and the issues surrounding the fact that The Brix Group, Inc. had purchased over $2,000,000 in peripheral equipment to support the installation of TruckPCs in Airgas trucks at the direction of Delphi management.

On January 17, 2006 a conference call was held between Beth Swarting, Vice President Sales and Marketing, Delphi, Dan Salmons, Director North American Sales of Delphi and Harry Brix, Chairman, David Tilton, Chief Financial Officer, of The Brix Group to discuss how to deal with ongoing issues related to the TruckPC. Specifically, the issues of the peripheral equipment inventory, which had absolutely no value except as a component of the TruckPC installation,

8

outstanding amounts due from GreatAmerica Leasing and Velociti were discussed. During that conference call Beth Swarting offered The Brix Group, Inc. 40% of the un-recovered cost of the peripheral inventory, payments due from GreatAmerica Leasing, payments made to Velociti and drop shipments made on behalf of Delphi to Volvo.

The Brix Group, Inc continued to have discussions with representatives from Delphi and provided Delphi with copies of invoices, checks and inventory listings to support the amounts claimed in The Brix Group, Inc's bankruptcy claim. All of the information was supplied to Ms. Theresa Wyza, Customer Manager Delphi and to Mr. Randy Carlson, Delphi Proof of Claim Group. Mr. Carlson, in writing, told David Tilton, Chief Financial Officer of The Brix Group, Inc., that "I have all the paperwork I need". In addition, Delphi sent one of their engineers to The Brix Group location in Fresno California to count and verify that all of the peripheral inventory claimed was in fact still in the possession of The Brix Group. The engineer did in fact verify that The Brix Group does have all of the worthless peripheral equipment claimed.

The Brix Group continued to believe that Delphi intended to negotiate the claim in good faith. However, on May 25, 2007 The Brix Group, Inc received in the mail a "NOTICE OF OBJECTION TO CLAIM". Upon receipt of that claim David Tilton, Chief Financial Officer, The Brix Group called Mr. James Bretl, Delphi to discuss the "OBJECTION". Mr. Bretl said during that conversation that he had spoken with Delphi management and that they felt really bad about the situation and that they believed they had significant responsibility for what had happened. However, they had been told by their lawyers they needed to accept or reject the claim in total and that after the formal rejection they could negotiate a resolution with The Brix Group. Mr. Bretl said that they believed they were at least 50% responsible.

/ / /

/ / /

/ / /

/ / /

/ / /

9

**II.    CONCLUSION**

Based upon the foregoing and the supporting documentation attached to Claim No. 8139 and Claim No. 8220, The Brix Group, Inc. believes that: (1) Claim No. 8139 was properly filed in the amount of $44,754 and should not be subject to modification; and (2) Claim No. 8229 was properly filed in the amount of $2,896,591.72 and should not be subject to modification.

DATED: June __, 2007                  Respectfully submitted,
                                      LUCE, FORWARD, HAMILTON & SCRIPPS LLP


                                      By: _____
                                              DIANA L. DONABEDIAN
                                              Attorneys for The Brix Group, Inc.

301008923.3

10