**Hearing Date And Time: July 19, 2007 at 10:00 a.m.**
**Objection Deadline: July 12, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

      -and-

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

      -and-

O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
Tom A. Jerman (TJ 1129)
Jessica Kastin (JK 2288)

Attorneys for Delphi Corporation, et al.,
   Debtor and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698
Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :
      In re                     :         Chapter 11
                              :
DELPHI CORPORATION, et al.,    :         Case No. 05-44481 (RDD)
                              :
                  Debtors. :        (Jointly Administered)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 363, 1113 AND 1114
AND FED. R. BANKR. P. 6004 AND 9019 APPROVING MEMORANDUM OF UNDERSTANDING
AMONG UAW, DELPHI, AND GENERAL MOTORS CORPORATION
INCLUDING MODIFICATION OF UAW COLLECTIVE BARGAINING AGREEMENTS
AND RETIREE WELFARE BENEFITS FOR CERTAIN UAW-REPRESENTED RETIREES

("UAW 1113/1114 SETTLEMENT APPROVAL MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion")[1] for an order approving under 11 U.S.C. §§ 363, 1113 and 1114 of the Bankruptcy Code and Fed. R. Bankr. P. 6004 and 9019, (i) a memorandum of understanding regarding Delphi's restructuring entered into among the United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), Delphi, and General Motors Corporation ("GM") (the "UAW Settlement Agreement" or the "Memorandum of Understanding"),[2] a comprehensive agreement that (a) modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the UAW, and its various locals (the "UAW CBAs"), and (b) provides that GM and Delphi will undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate these modifications, (ii) withdrawal without prejudice of the Debtors' Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing  Modification Of Retiree Welfare Benefits (the "1113/1114 Motion") as it solely pertains to the UAW and UAW-represented retirees and approving the parties' settlement of the 1113/1114 Motion as it pertains to the UAW and UAW-represented retirees, and (iii) modification of retiree welfare benefits for certain UAW-represented retirees of the Debtors.

---

[1]    A copy of the informational notice provided to active Delphi hourly employees and hourly retirees represented by the UAW in connection with the Motion is attached hereto as Exhibit 1.

[2]    A copy of the UAW Settlement Agreement is annexed to the Proposed Order which is attached hereto as Exhibit 2.  Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the UAW Settlement Agreement.

2

Introduction

1.      The UAW, Delphi, and GM have discussed the challenges impacting Delphi and its UAW-represented operations.  As GM's largest supplier and the employer of thousands of UAW-represented employees, indirectly supporting tens of thousands of dependents, retirees, and surviving spouses, these parties have a critical interest in Delphi's successful emergence from bankruptcy with certain UAW-represented operations.  These parties acknowledge that restructuring actions are necessary and commit to take specific actions to protect the needs of these parties and their constituencies, continuing progress already made toward transforming Delphi's labor cost structure and ongoing business operations.

2.      The UAW has already agreed to an attrition program pursuant to which thousands of employees at traditional Big Three wages and benefits took buy outs, flowbacks to GM, or retired, and the UAW waived Delphi obligations to hire thousands of new employees as a result of the departures caused by the attrition program.  The UAW, Delphi, and GM have also agreed to the "Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and GM Consensual Triggering of Benefit Guarantee"[3] facilitating the freeze of Delphi's pension plan and the assumption of billions of dollars of OPEB liabilities by GM, thereby dramatically reducing Delphi's ongoing benefit costs and liabilities.

3.      In addition to the above, to enable continued transformation to more competitive wage and benefit levels, to address capacity, divestiture, work rules, and staffing level issues, and to better position Delphi to retain existing business and attract new business, the UAW, Delphi, and GM have entered into various agreements in the Memorandum of

---

[3]    This agreement is Attachment B to the Memorandum of Understanding.

3

Understanding on a two-party or three-party basis, as applicable, which agreements were ratified by the UAW membership on June 28, 2007.

4.      On March 31, 2006, the Debtors filed the 1113/1114 Motion after they were unable to consummate consensual modifications to the Debtors' collective bargaining agreements and retiree welfare benefits with the UAW and the other unions representing certain of its U.S. employees and retirees (the "Unions")[4] during the first six months of its chapter 11 reorganization cases.  The Debtors continued to negotiate with the Unions even after they filed the 1113/1114 Motion, and represented that they would continue to negotiate with the Unions even if Debtors obtained the order requested in the 1113/1114 Motion.[5]  The parties were unable to reach a consensus before the scheduled commencement of the hearing on the 1113/1114 Motion on May 9, 2006.  This Court conducted hearings on the contested motion on various trial dates in May and June 2006, the record of which constitutes part of the basis for approval of the relief requested in this Motion.  Throughout the 1113/1114 proceedings, however, the Debtors and the Unions continued to seek negotiated alternatives to litigation.

5.      On June 8, 2006, the Debtors and all respondents to the 1113/1114 Motion conducted a "meet and confer" at which the parties agreed to submit a scheduling order to this

---

[4]    These unions include the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America ("IUE-CWA"), the United Steelworkers of America ("USW"), the International Association of Machinists and Aerospace Workers, the International Brotherhood of Electrical Workers, the International Union of Operating Engineers, and their local affiliates.

[5]    The Debtors' proposed modifications to the UAW CBAs upon which their 1113/1114 Motion was based are described in detail in the 1113/1114 Motion and the accompanying Declaration Of Darrell Kidd In Support of the 1113/1114 Motion (Docket No. 3039).  In sum, the Debtors' proposed modifications contemplated two possible scenarios: one in which they received no or inadequate financial support from GM (the "Competitive Benchmark Proposals") and the other in which they received financial support from GM adequate to offer less restrictive or severe modifications to their national and local labor agreements (the "GM Consensual Proposals").  The UAW, as well as the Debtors' other U.S. labor unions, rejected the Competitive Benchmark Proposals and took the position that the Competitive Benchmark and GM Consensual Proposals were unacceptable and did not provide a framework for negotiations.  The Memorandum of Understanding that is the basis of this Motion is essentially a fully negotiated GM Consensual Proposal on terms acceptable to the UAW, Delphi, and GM.

4

Court which provided for a recess of the hearings until August 11, 2006 (Docket No. 4170).

During the next five months, the Debtors' discussions with the Unions, GM, and other

stakeholders continued.  As a consequence of those negotiations, the parties submitted to this

Court further scheduling orders adjourning the 1113/1114 Motion through the balance of 2006

and, on January 31, 2007, this Court suspended further proceedings on the 1113/1114 Motion

(Docket No. 6779).  Further orders continuing the suspension of the 1113/1114 Motion have

been granted by this Court with the intention of allowing the parties additional time to negotiate

consensual modifications to Delphi's labor agreements.

      6.     The UAW Settlement Agreement applies only to the UAW and does not

resolve the 1113/1114 Motion as to the remaining Unions.  As of the date of this Motion,

however, the Debtors are engaged in active bargaining with their second and third largest Unions

and expect to renew formal bargaining with their three remaining Unions prior to the hearing

date on this Motion in an effort to reach consensual agreements with all of the remaining Unions

that could be considered by this Court as early as the August 16, 2007 omnibus hearing.

      7.     The UAW Settlement Agreement, among other subject matters,[6] provides

that:[7]

---

[6]    Delphi and the UAW have also agreed that Delphi will pay as soon as reasonably practicable after the Effective Date approximately (but in no event more than) $993,000 in cash severance and vacation payments to former UAW-represented hourly employees of Manufacturers Products Co. ("MPC"), a former distressed supplier to the Debtors.  The payments relate to an unfunded budget line for severance and vacation payments in connection with an Accommodation Agreement dated January 24, 2006 among Delphi, MPC, and certain third parties pursuant to which parts (including an inventory bank) were produced in February and March 2006. Delphi had previously disputed any contractual or other basis for these claims.  Based on Delphi's participation in the Accommodation Agreement, its pro-rata apportionment of the claims would have been approximately $233,355.  When MPC wound down and distributed the proceeds of its liquidation, Delphi received approximately $209,000 in reimbursement of payments made under the Accommodation Agreement; however, none of the severance or vacation payments to UAW-represented employees contemplated under the Accommodation Agreement were previously paid.  These MPC-related payments are to be in full satisfaction of all claims against the Debtors arising or related to MPC and the Accommodation Agreement and the Debtors will receive full releases therefor, including from each payment recipient.  In addition, all related claims filed in Delphi's chapter 11 cases will be disallowed and expunged, including claim no. 13270.

5

    (A)    Effective upon the later of entry of this Court's approval order in respect of the Motion or the first Monday following receipt of written notice of ratification from the UAW: [8]

- The term of the UAW CBAs are extended until September 14, 2011;

- A site plan is implemented with respect to each of 21 UAW-Delphi plants which includes specific revenue, production, and job commitments from Delphi and/or GM and pursuant to which Delphi will retain ownership and operations in four facilities, seven facilities will be sold or transferred to a third party so that Delphi will have no further operational or employment responsibilities after certain specified sunset dates, and ten facilities will be closed;

- A workforce transition program is implemented for traditional UAW-represented employees that provides eligible employees with transformation plan options including  (1) attrition options similar to the previously-approved UAW attrition programs, (2) flowback rights to eligible Delphi employees as of the Petition Date (as defined below) who do not elect the attrition options, including relocation allowances of up to $67,000 in certain circumstances when plants cease production, (3) provision of lump sum "buy-down" payments totaling $105,000 for traditional production employees who do not elect the attrition option or flowback and continue to work for Delphi under the terms of the 2004 UAW-Delphi Supplemental Agreement applicable to employees hired after 2004, transferring those employees to Supplemental Employee Status as of October 1, 2007, (4) conversion of temporary employees in UAW-Delphi plants to permanent employee status, and (5) severance payments up to

---

[7]    The summary of the UAW Settlement Agreement set forth in this Motion is qualified entirely by and is subject to the actual terms and conditions of the UAW Settlement Agreement filed as an exhibit to the Proposed Order which is attached hereto as Exhibit 2.

[8]    Until the effective date of a plan of reorganization, nothing in the UAW Settlement Agreement will constitute an assumption of any agreement described in the UAW Settlement Agreement, including, without limitation, any collective bargaining agreement between the UAW and Delphi (except as provided for in Section K.3) or any commercial agreement between GM and Delphi, nor will anything in the UAW Settlement Agreement be deemed to create an administrative or priority claim with respect to GM or convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party.  The UAW Settlement Agreement also provides that the UAW, Delphi, and GM agree (and the order approving this Motion must also provide) that the UAW Settlement Agreement is without prejudice to any interested party (including the UAW, Delphi, GM, and the statutory committees) in all other aspects of Delphi's chapter 11 cases and the UAW, Delphi, and GM reserve all rights not expressly waived in the UAW Settlement Agreement.

6

$40,000 to eligible employees who are permanently laid off prior to September 14, 2011;[9]

- Certain terms of the 2004 UAW-Delphi Supplemental Agreement with respect to wages, individual retirement and savings plans, and post-retirement health care accounts are modified;

- Certain terms of the UAW CBAs are modified with respect to provisions covering hiring requirements, existing CHR/Legal Services, holiday schedule, workers' compensation letter, temporary employees, Appendix L, GIS, AOL, and other matters described in Attachment E to the Memorandum of Understanding;

- Local negotiations subject to mutual agreement regarding work rules and other local agreement issues will be conducted on an expedited basis;

- Delphi's commitment in the Supplemental Agreement to the principle of "equivalence of sacrifice" when establishing compensation and benefit levels for salaried employees and management is reaffirmed;

- All employee, retiree, and union asserted and unasserted claims are settled (except for waiver of rights to vested pension benefits, workers compensation benefits, unemployment compensation benefits, and pending ordinary course grievances of employees remaining in the workforce); and

- The UAW will receive an allowed prepetition claim in the amount of $140 million on account of the CHR and Legal Services claims as of April 1, 2007 (to be adjusted by the difference between accruals through October 1, 2007 and expenditures until the effective date of a plan of reorganization) of which $30 million will be paid to the UAW-GM Center for Human Resources and the balance will be paid directly to the DC VEBA established pursuant to a settlement agreement approved by the court in the case of International Union, UAW, et al. v. General Motors Corp., Civil Action No. 05-73991.[10]

---

[9]    GM will receive certain claims in connection with certain of these commitments as specified in Attachment C to the UAW Settlement Agreement.

[10]    The UAW and the Debtors agree that Sections H.3 and J.3 are clarified to provide for the continuance of CHR accruals through October 1, 2007 and that the UAW will receive on the Effective Date an allowed prepetition general unsecured claim against Delphi in the amount of $140 million to be paid pursuant to the plan of reorganization following substantial consummation of a plan of reorganization.  The UAW and the Debtors

7

(B)        Effective upon the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM and substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by this Court which incorporates, approves, and is consistent with all of the terms of the UAW Settlement Agreement and Delphi-GM settlement:

- Delphi's obligation to provide certain retiree welfare benefits is eliminated and GM is obligated to provide certain retiree welfare benefits for certain UAW-represented employees covered as provided in the Benefit Guarantee Term Sheet;

- A transfer of certain pension assets and liabilities from Delphi's pension plans to GM's pension plans is effectuated pursuant to Internal Revenue Code Section 414(l) in exchange for certain consideration to be paid by Delphi to GM;

- Delphi's existing pension plan is frozen in certain respects effective upon emergence from chapter 11 and GM is obligated to pay certain benefits for certain UAW-represented employees covered as provided in the Benefit Guarantee Term Sheet;

- The amount of $450 million is funded by GM, which the UAW has directed to be paid directly to the DC VEBA established pursuant to a settlement agreement approved by the court in the case of International Union, UAW, et al. v. General Motors Corp., Civil Action No. 05-73991;

- The Memorandum of Understanding (including the UAW CBAs) is assumed pursuant to 11 U.S.C. § 365;

- The UAW released parties are exculpated and released in connection with the Memorandum of Understanding and Delphi's chapter 11 cases; and

- Delphi and GM receive releases from the UAW, all employees and former employees of Delphi represented or formerly represented by the UAW, and all persons or entities with claims derived from or related to any relationship with such employees of Delphi arising directly

---

further agree that: (a) Section H.3 is clarified to be subject to and consistent with Section J.3; (b) the first sentence of J.3 is clarified to mean that Delphi will continue to make payments in the ordinary course of business until the effective date of a plan of reorganization; (c) the second sentence of J.3 is clarified to be consistent with this footnote and the Approval Order; and (d) the adjustment calculation referred to in the second sentence of J.3 is clarified to mean adjustment for accruals through October 1, 2007 and adjustment for expenditures by Delphi until the effective date of a plan of reorganization.

8

or indirectly from or in any way related to any obligations under the collective bargaining agreements or the Memorandum of Understanding (except for claims for benefits provided for or explicitly not waived under the Memorandum of Understanding).

8.    The Debtors submit that approval of the UAW Settlement Agreement, which resolves Delphi's 1113/1114 Motion as it pertains to the UAW, is in the best interests of the Debtors and their stakeholders.  The Debtors believe that approval of the UAW Settlement Agreement will facilitate the Debtors' ability to reach consensual resolutions of their labor issues with the remaining Unions and GM and permit the Debtors to continue to implement their transformation plan and to promptly develop, prosecute, confirm, and consummate a plan of reorganization.

Background

A.    The Chapter 11 Filings

9.    On October 8 and 14, 2005 (collectively, the "Petition Date"), the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

10.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

11.     This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

12.     The statutory predicates for the relief requested herein are sections 363, 1113, and 1114 of the Bankruptcy Code and Rule 6004 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.     Business Operations Of The Debtors

13.     Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[11]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from this Court.[12]

14.     The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

---

[11]   The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[12]   On March 20 2007, Delphi Automotive Systems Espana S.L., whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding.  The application was approved by the Spanish court on April 13, 2007.  The Concurso proceeding does not affect other Delphi legal entities in Spain or elsewhere and is an isolated event that is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

15.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

16.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[13] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006, the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to Special Attrition Programs.

17.    The Debtors believe that the Company's financial performance has deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production

---

[13]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

11

environment for domestic automakers resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

18.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

19.    On March 31, 2006, the Company outlined five key tenets of its transformation plan.  First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.  Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.[14]  Finally, the Debtors must devise a workable solution to their current pension situation.

---

[14]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.

12

D.    The Debtors' Prior Special Attrition Programs

20.    On March 22, 2006, Delphi, GM and the UAW entered into a three-party

agreement establishing a special attrition program (the "UAW Special Attrition Program"),

pursuant to which certain eligible Delphi U.S. hourly employees represented by the UAW were

offered normal and early voluntary retirements with a $35,000 lump sum incentive payment paid

by Delphi and reimbursed by GM.  The program also provided a pre-retirement program for

employees with at least 27 and fewer than 30 years of credited service.  In addition, employees

who elected to participate were eligible to retire as employees of Delphi or to flow back to GM

and retire.

21.    On June 5, 2006, Delphi, GM, and the UAW agreed on a supplemental

program (the "UAW Supplemental Attrition Agreement") that expanded the UAW Special

Attrition Program to include a pre-retirement program for employees with 26 years of credited

service and provided buyouts for UAW-represented hourly employees (collectively, the UAW

Special Attrition Program and UAW Supplemental Attrition Agreement are referred to herein as

the "UAW Attrition Programs").  The buyout payments, depending on the amount of seniority or

credited service, ranged from $40,000 to $140,000.  GM has agreed to reimburse Delphi for one-

half of these buyout payments and in exchange will receive an allowed prepetition general

unsecured claim.

22.    On May 8, 2006 (Docket No. 3648) and May 12, 2006 (Docket No. 3754),

this Court entered an order and an amended order, respectively, approving the UAW Special

Attrition Program.  The UAW Supplemental Attrition Agreement and the IUE-CWA Special

Attrition Program were approved by this Court on June 29, 2006, and on July 7, 2006, this Court

entered the order approving the motion (Docket No. 4461).[15]

        23.     Pursuant to the UAW Attrition Programs, approximately 12,400 of

Delphi's UAW-represented employees opted to retire by January 1, 2007 and approximately

1,400 additional UAW-represented Delphi employees elected a buyout.  Furthermore,

approximately 6,200 IUE-CWA-represented Delphi employees, representing approximately 82%

of the eligible IUE-CWA-represented workforce, elected to participate in the IUE-CWA Special

Attrition Program.  The Special Attrition Programs provided nearly two-thirds of Delphi's

existing UAW and IUE-CWA-represented long-term hourly employees (as of September 26,

2006 and August 18, 2006, respectively) with "soft landings" through a combination of

incentivized retirement programs[16] and, as to UAW-represented employees, GM flowback rights.

E.      Settlement Of The 1113/1114 Motion As It Pertains To The UAW Through The UAW
        Settlement Agreement

        24.     On June 22, 2007, the Debtors reached a tentative agreement with GM and

the UAW as set forth in the UAW Settlement Agreement that includes significant and necessary

modifications to the UAW CBAs.  Delphi's UAW-represented employees ratified the UAW

Settlement Agreement on June 28, 2007.  As set forth above, Delphi, GM, and the UAW will

implement certain terms of the UAW Settlement Agreement as of the Effective Date (defined in

the UAW Settlement Agreement as the later of entry of an order by the Court approving the

---

[15]    On June 16, 2006, Delphi, GM, and the IUE-CWA reached agreement on the terms of a special attrition
      program (the "IUE-CWA Special Attrition Program," and together with the UAW Attrition Programs, the
      "Special Attrition Programs") which mirrored in all material respects the UAW Attrition Programs.

[16]    Delphi is negotiating the terms of similar programs with the USW and Delphi's other Unions which, if agreed
      upon as part of a comprehensive settlement, would provide those hourly employees with retirement programs
      and incentives.

UAW Settlement Agreement that is satisfactory to the parties (the "Approval Order"), or the first

Monday following receipt by Delphi of written notice of ratification from the UAW).[17]

25.    The UAW Settlement Agreement settles the 1113/1114 Motion as it

pertains to the UAW, enabling the Debtors to seek authority by this Motion to withdraw, without

prejudice, the 1113/1114 Motion with respect to the UAW.

Relief Requested

26.    By this Motion, the Debtors seek entry of an order, under 11 U.S.C. §§

363, 1113, and 1114 of the Bankruptcy Code and Fed. R. Bankr. P. 6004 and 9019, approving (i)

the UAW Settlement Agreement, (ii) withdrawal without prejudice of the 1113/1114 Motion

solely as it pertains to the UAW and approving the parties' settlement of the 1113/1114 Motion

solely as it pertains to the UAW, and (iii) modification of retiree welfare benefits for certain

UAW-represented retirees of the Debtors.

Basis For Relief

27.    The UAW Settlement Agreement requires a court order approving the

UAW Settlement Agreement, which encompasses a settlement of the 1113/1114 Motion as it

pertains to the UAW.  See UAW Settlement Agreement Section K.  Thus, as noted above and

consistent with the terms and spirit of the UAW Settlement Agreement, this Motion is brought

before this Court under sections 363, 1113, and 1114 of the Bankruptcy Code and Bankruptcy

Rules 6004 and 9019.[18]

---

[17]    As noted above, the effective date of certain provisions of the UAW Settlement Agreement is conditioned upon confirmation of the Debtors' reorganization plan and resolution of certain financial, commercial, and other issues between Delphi and GM.

[18]    The Debtors do not concede through this Motion that the modifications to the UAW CBAs contained in the UAW Settlement Agreement require court approval either because such modifications are outside the ordinary course of business under section 363 or pursuant to sections 1113 or 1114 of the Bankruptcy Code.  Out of an abundance of caution in connection with GM's unique role here and consistent with the terms of the UAW Settlement Agreement, the Debtors are seeking this Court's approval of the UAW Settlement Agreement.  See

15

F.    Approval Of The UAW Settlement Agreement Is Warranted Under Bankruptcy Code Section 363

28.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1).  Whether modifications to a collective bargaining agreement are ordinary course transactions under section 363 of the Bankruptcy Code or whether such modifications are outside the ordinary course requiring approval under the Bankruptcy Code has generally been determined on a case-by-case basis.  See In re North American Royalties, Inc., 267 B.R. 587, 593 (Bankr. E.D. Tenn. 2002) (collecting and comparing relevant authority).

29.    Use of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it.  See Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 178-179 (D. Del. 1991).

30.    The Second Circuit has held that, although the bankruptcy court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming an "arbiter of disputes between creditors and the estate."  Orion Pictures Corp. v. Showtime Network, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's consideration of a debtor's section 363(b) motion is a "summary proceeding," intended merely as a means "to efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate.  It

---

In re The Leslie Fay Cos., 168 B.R. 294, 303 (Bankr. S.D.N.Y. 1994) (debtors can enter into agreement modifying existing collective bargaining agreements postpetition without notice or hearing).

is not the time or place for prolonged discovery or a lengthy trial with disputed issues." Id. at 1098-99.

31.     Once the debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." Id.  To satisfy its burden, it is not enough for an objector simply to raise and argue an objection.  Rather, an objector "is required to produce some evidence respecting its objections." Lionel Corp., 722 F.2d at 1071.

32.     As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

33.     The Debtors have demonstrably sound business reasons for entering into the UAW Settlement Agreement at this time.  The UAW Settlement Agreement, which is the result of careful deliberations and extensive negotiations, includes modifications to the UAW CBAs that equitably address many of the Debtors' substantial financial, transformational, and labor relations roadblocks in a manner that will best serve the economic interests of the Debtors' estates and their stakeholders.

17

34.    First, once implemented, the modifications to the UAW CBAs contemplated by the UAW Settlement Agreement will generate a level of labor cost savings that will significantly improve the Debtors' ability to emerge from chapter 11 successfully.

35.    Second, the UAW Settlement Agreement provides the Debtors with the flexibility necessary to transform their operations to compete as a supplier to nearly every major global automotive original equipment manufacturer while furthering the legitimate interests of Delphi's employees, retirees, and other stakeholders.  As evidenced by the summary provided above, the UAW Settlement Agreement achieves significant cost savings through wage reductions, work rule and operational changes, and buy-out and buy-downs that will enable Delphi to better meet its competitive challenges.  Accordingly, there is a sound business purpose for consummating the transactions contemplated in the UAW Settlement Agreement promptly.

36.    In the exercise of their business judgment, the Debtors believe that the terms of the UAW Settlement Agreement are reasonable based upon the significant benefits that they will receive, as summarized above, as well as the potential harm to the estates if the relief requested herein is not granted.[19]

G.    Approval Of The UAW Settlement Agreement Is Warranted Under
       Bankruptcy Rule 9019

37.    Bankruptcy Rule 9019 provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Bankruptcy Rule 9019(a).  Settlements and compromises are "a normal part of the process of

---

[19]    For certain of the agreements in the UAW Settlement Agreement to be implemented, the Debtors' plan of reorganization must contain provisions consistent with the UAW Settlement Agreement and the confirmation order for such plan will provide for the assumption of the UAW Settlement Agreement and the agreements referenced in Attachment E thereto under section 365 of the Bankruptcy Code.  Indeed, by its terms, the UAW Settlement Agreement itself does not constitute an assumption of the UAW CBAs.  See UAW Settlement Agreement Section K.  It is relevant to note that this undertaking by the Debtors constitutes a condition to the effectiveness of certain provisions rather than a covenant by the Debtors that might impermissibly restrict the plan of reorganization that could be prosecuted by them.

reorganization."  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.

Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 308 U.S. 106,

130 (1939)); In re Adelphia Communications Corp., 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005)

(decision to accept or reject settlement lies within sound discretion of bankruptcy court), adhered

to on reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

38.    In addition, Rule 9019 applies to settlements such as the UAW Settlement

Agreement that modify (i) the terms of a collective bargaining agreement pursuant to 11 U.S.C. §

1113, and (ii) retiree benefits pursuant to 11 U.S.C. § 1114.  See Nellis v. Shugrue, 165 B.R.

115, 116-17, 121(S.D.N.Y. 1994) (applying Bankruptcy Rule 9019 to the approval of a

settlement under 11 U.S.C. § 1113); In re Tower Automotives, 241 F.R.D. 162, 170 (S.D.N.Y.

2006) (applying Bankruptcy Rule 9019 to the approval of settlements and compromises under

11. U.S.C. § 1114); see also In re GF Corp., 120 B.R. 421, 425 (Bankr. D. Ohio 1990) (applying

Bankruptcy Rule 9019 to settlement pursuant to 11 U.S.C. §§ 1113, 1114).[20]

39.    Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate

when the compromise is fair and equitable and is in the best interests of the debtor's estate.  See,

e.g., TMT Trailer Ferry, 390 U.S. at 424; Adelphia, 327 B.R. at 159 ("The settlement need not be

the best that the debtor could have obtained.  Rather, the settlement must fall 'within the

reasonable range of litigation possibilities.'") (citations and internal quotations omitted); Nellis,

165 B.R. at 121 ("The obligation of the bankruptcy court is to determine whether a settlement is

in the best interest of an estate before approving it.")  In general, compromises in the bankruptcy

---

[20]    No retiree committee was formed under section 1114 of the Bankruptcy Code in these cases because under the
Order (I) Appointing Unions As Authorized Representatives For Union Represented Retirees Under 11 U.S.C.
§§ 1114(c) And 1114(d) Or, In The Alternative, (II) Establishing Procedures For Solicitation, Nomination, And
Appointment Of Committee Of Retired Employees granted by this Court on October 13, 2005 (Docket No.
231), the UAW (and the other Unions) elected to serve and have been acting as the authorized representative for
purposes of section 1114 of the Bankruptcy Code throughout these chapter 11 cases of the Delphi retirees who
were previously represented by the Unions as active employees.

context should be approved unless they "'fall below the lowest point in the range of reasonableness.'"  Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (citation omitted).

40.    The Supreme Court in TMT Trailer Ferry set forth the following factors that courts should consider in determining whether a proposed settlement or compromise is in the best interests of a debtor's estate:  (a) the probability of the debtor's success in the litigation, (b) the difficulties associated with collection, (c) the complexity of the litigation, and the attendant expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors. TMT Trailer Ferry, 390 U.S. at 424-25; see also Nellis, 165 B.R. at 122.

41.    Courts in this district have further elaborated on the following relevant factors: (a) the balance between the likelihood of plaintiff's or defendants' success should the case go to trial vis-à-vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures, (b) the prospect of complex and protracted litigation if the settlement is not approved, (c) the competency and experience of counsel who support the settlement, (d) the relative benefits to be received by individuals or groups within the class, and (e) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.  Adelphia, 327 B.R. at 159-60; accord In re Texaco Inc., 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

42.    The bankruptcy court need not determine that all of the foregoing criteria favor approval of a compromise, and the proposed compromise need not be the best agreement that the debtor could have achieved under the circumstances.  See Adelphia, 327 B.R. at 159-60; Nellis, 165 B.R. at 123.  Instead, the court's proper role is to familiarize itself with all the facts necessary for an intelligent and objective opinion, and determine whether the settlement is fair and equitable.  In re Best Products Co., Inc., 168 B.R. 35, 49-51 (Bankr. S.D.N.Y. 1994).  To

that end, courts should not substitute their own judgment for that of the debtor, but rather should "'canvass the issues'" to affirm that the proposed settlement falls above "'the lowest point in the range of reasonableness.'"  Adelphia, 327 B.R. at 159 (quoting W.T. Grant Co., 699 F.2d at 608); accord Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd sub nom. Sobchack v. Am. Nat'l Bank & Trust Co., 17 F.3d 600 (2d Cir. 1994); In re Best Products Co., Inc., 168 B.R. at 49-51.

43.    Given that the UAW Settlement Agreement is a resolution or settlement of the issues raised in the 1113/1114 Motion as it pertains to the UAW, it should be approved under Bankruptcy Rule 9019(a) because its terms are fair and equitable, fall well within the range of reasonableness, and are in the best interests of the Debtors, their estates, their creditors, and their stakeholders.  Most significantly, the UAW Settlement Agreement clarifies and provides certainty regarding the manner in which Delphi's labor, pension, and OPEB issues with the UAW will be resolved.

44.    Moreover, the Court is not required to find that the terms of the settlement are the most favorable that the Debtors could have obtained in order to approve the UAW Settlement Agreement.  In re W.T. Grant Co., 699 F.2d at 608 (noting that court is only required to "see whether the settlement falls below the lowest point in the range of reasonableness") (citation omitted); Nellis, 165 B.R. at 123; In re Best Products Co., Inc., 168 B.R. at 49-51.

45.    And, as recognized by this Court on various occasions, a consensual resolution to the Debtors' need to reduce labor costs is in the best interests of the Debtors' estates. See, e.g., May 12, 2006 Hearing Transcript at pp. 201-02 (noting that the representatives of the Delphi and the Unions, not the Court, are the most important in an 1113/1114 proceeding, and urging parties to reach good faith agreement).  Consensual agreements are recognized generally as a normal part of the reorganization process and as beneficial to the estate in part because of

21

the inevitable reduction in administrative costs and other burdens associated with protracted

litigation.  This is especially the case here, given the thousands of employees and retirees who

would be affected by the non-consensual modifications proposed in the 1113/1114 Motion,

should that motion ultimately be granted by the Court.  See, e.g., TMT Trailer Ferry, Inc., 390

U.S. at 424 ("[c]ompromises are a normal part of the process of reorganization."); Nellis, 165

B.R. at 123 (stating "the general rule that settlements are favored and, in fact, encouraged by the

bankruptcy approval process").

Notice Of Motion

46.    Notice of this Motion has been provided in accordance with the Amended

Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m),

9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case

Management, And Administrative Procedures, entered by this Court on October 26, 2006

(Docket No. 5418), and the Supplemental Order Under 11 U.S.C. Sections 102(1) And 105 And

Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And

Certain Notice, Case Management, And Administrative Procedures (Docket No. 2883).  The

Debtors have also provided the informational notice of this Motion, a copy of which is attached

hereto as Exhibit 1, as a courtesy to all of the UAW-represented employees and UAW-

represented retirees affected by this Motion.  In light of the relief requested, the Debtors submit

that no other or further notice is necessary.

Memorandum Of Law

47.    Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of service and filing of

a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

22

WHEREFORE the Debtors respectfully request that the Court enter an order pursuant to 11 U.S.C. §§ 363, 1113, and 1114 of the Bankruptcy Code and Fed. R. Bankr. P. 6004 and 9019 (i) approving the UAW Settlement Agreement, (ii) authorizing the withdrawal without prejudice of the Debtors' 1113/1114 Motion solely as it pertains to the UAW and approving the parties' settlement of the 1113/1114 Motion solely as it pertains to the UAW, (iii) authorizing the Debtors' modification of retiree welfare benefits for certain UAW-represented retirees of the Debtors, and (iv) granting the Debtors such other and further relief as is just.

Dated:       New York, New York
            June 29, 2007

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:    /s/ John Wm. Butler, Jr.
       John Wm. Butler, Jr. (JB 4711)
       John K. Lyons (JL 4951)
       Ron E. Meisler (RM 3026)
       333 West Wacker Drive, Suite 2100
       Chicago, Illinois 60606
       (312) 407-0700

- and -

By:    /s/ Kayalyn A. Marafioti
       Kayalyn A. Marafioti (KM 9632)
       Thomas J. Matz (TM 5986)
       Four Times Square
       New York, New York 10036
       (212) 735-3000

- and-

O'MELVENY & MYERS LLP

By:    /s/ Tom A. Jerman
       Tom A. Jerman (TJ 1129)
       Jessica Kastin (JK 2288)
       1625 Eye Street, NW
       Washington, DC 20006
       (202) 383-5300

23

Attorneys for Delphi Corporation, <u>et al.</u>,
Debtors and Debtors-in-Possession