**Hearing Date And Time: July 19, 2007 at 10:00 a.m.**
          **Objection Deadline: July 16, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| DELPHI CORPORATION, et al., | Case No. 05-44481 (RDD) |
| | (Jointly Administered) |
| Debtors. | |

EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. §§ 363, 1107, AND 1108
AUTHORIZING DELPHI AUTOMOTIVE SYSTEMS (HOLDING), INC.
TO PROVIDE FUNDS TO DELPHI AUTOMOTIVE SYSTEMS ESPANA S.L.
("DASE FUNDING MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order pursuant to 11 U.S.C. §§ 363, 1107, and 1108 authorizing, but not directing, Delphi Automotive Systems (Holding), Inc. ("DASHI") to provide funds to its wholly-owned subsidiary, Delphi Automotive Systems Espana S.L. ("DASE"), for the purposes set forth herein and respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  The Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the Creditors' Committee, the "Statutory Committees").

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are sections 363, 1107, and 1108 of the Bankruptcy Code.

2

B.   Current Business Operations Of The Debtors

5.   Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6.   The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.   Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's

---

[1]   The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

3

single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.   Events Leading To The Chapter 11 Filing

8.   In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006, the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

9.   The Debtors believe that the Company's financial performance has deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

10.   In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions

---

[2]   Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

4

with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.     The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined five key tenets of its transformation plan.[3] First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.[4] Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain

---

[3] In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement (the "Equity Purchase and Commitment Agreement") with affiliates of Appaloosa Management L.P. ("Appaloosa"), Cerberus Capital Management, L.P. ("Cerberus"), and Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), as well as Merrill Lynch & Co. ("Merrill") and UBS Securities LLC ("UBS") (collectively, the "Plan Investors"), and a plan framework support agreement (the "Plan Framework Support Agreement") with the Plan Investors and GM. On April 19, 2007, Delphi confirmed that it anticipated negotiating changes to the Equity Purchase and Commitment Agreement and related Plan Framework Support Agreement. Delphi said that any changes would be made primarily as a result of addressing differences in views regarding the Company's reorganization enterprise value among the Plan Investors, GM, the Statutory Committees, and the Company. Delphi also said that it expected that under amended framework agreements, the Appaloosa and Harbinger affiliates, Merrill, and UBS would continue to participate as Plan Investors (together with possible additional investors that may include members of the Statutory Committees), and that Cerberus might participate in the Company's exit financing, as part of a competitive process, but not as a Plan Investor. As part of the process of negotiating amended framework agreements, on July 9, 2007, Delphi confirmed that it had formally terminated the Equity Purchase and Commitment Agreement and related Plan Framework Support Agreement but that it expects to enter into new framework agreements with plan investors later this month.

[4] Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM that (a) modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the UAW, and its various locals, (b) provides that GM will undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate these modifications, and (c) modifies retiree welfare benefits for certain UAW-represented retirees of the Debtors. The agreement, which is subject to approval by this Court, should facilitate the Debtors' reaching consensual resolutions of their labor issues with the remaining unions and GM and permit the Debtors to continue to implement their transformation plan and to develop, prosecute, confirm, and consummate a plan of reorganization. Delphi is currently engaged in settlement discussions with its second and third largest U.S. labor unions and is working to conclude discussions with those unions as well as three smaller unions as soon as possible.

GM's business commitment to the Company.[5] Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.[6] Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.[7] Finally, the Debtors must devise a workable solution to their current pension situation.[8]

E.  DASE Spanish Plant Closure

12. As part of the Debtors' global portfolio and manufacturing realignment, in February 2007, DASE, a Spanish, non-Debtor affiliate and wholly-owned subsidiary of DASHI, announced the closure of its non-core automotive component plant at the Puerto Real site in Cadiz, Spain (the "Cadiz Plant"). The Cadiz Plant, which has approximately 1,600 employees, is the primary asset – and liability – of DASE.

---

[5] On July 9, 2007, Delphi confirmed that its discussions with GM on a comprehensive settlement agreement had entered the documentation phase and that it expected that a settlement with GM would be incorporated into the Debtors' plan of reorganization rather than filed with this Court for separate approval.

[6] Indeed, during the 2006 and 2007 calendar years, the Debtors sold substantially all of the assets related to MobileAria, Inc., its chapter 11 affiliate, they obtained court approval for the sale of substantially all of the assets of their brake hose business, and they obtained court approval of bid procedures related to the upcoming sale of substantially all assets used in their catalyst business and their Saltillo, Mexico brake plant business. In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, its steering, interior, and closures businesses. Moreover, the transaction contemplated by this Motion is in furtherance of the manufacturing alignment necessary to effectuate the Debtors' transformation plan.

[7] As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages. The Company's revised operating structure consists of its four core business segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture. The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.

[8] To that end, on May 31, 2007, the Bankruptcy Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 plan year funding waivers, which were approved by the IRS, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees. Should certain events not occur prior to September 30, 2007, the Debtors may need to seek an additional pension waiver or other relief from the IRS.

13. On March 20, 2007, DASE filed a "Concurso" application for a Spanish insolvency proceeding. On April 13, 2007, the Spanish court declared DASE to be in voluntary Concurso and appointed Enrique Bujidos, Adalberto Canadas Castillo, and, thereafter, Fernando Gómez Martín as receivers of DASE (the "DASE Receivers"). The Concurso provides DASE support by managing the process of resolving claims related to the operation of the Cadiz Plant in accordance with applicable Spanish law, with oversight of the Spanish court and the DASE Receivers. The role of the DASE Receivers is to, among other things, (i) address the legal interests of employees, suppliers, and any other parties affected by the closure of the Cadiz Plant, (ii) prepare a report for the Spanish court setting forth the assets and liabilities, including claims, of DASE, (iii) supervise and approve expenditures of funds by DASE during Concurso, and (iv) provide consultation and support for DASE's plan of reorganization in Concurso, including the terms relating to the Separation Plan (as defined below).

14. Under Spanish law, Delphi must provide employees affected by the closure of the Cadiz Plant with a separation allowance. The minimum separation payment under Spanish law is 20 days of salary per year of service, but the Cadiz workers councils, assemblies, and the unions representing the affected employees (the "Cadiz Unions") assert that Spanish automotive industry standard is approximately 45 to 60 days of salary per year of service, which would cost DASE between €115 and €155 million (approximately $156 and $211 million[9]). In late 2005, DASE entered into a labor agreement which provided for 60-day severance packages for some employees and continued jobs for the remaining 1,600 employees through the end of 2010 (the "2005 Industrial Plan"). Were the 2005 Industrial Plan to be enforced, the cost of

---

[9] The currency conversion of 1.3601 dollars/euros used herein is for explanatory purposes only and is based on the key currency cross rates quoted by Reuters at 4:00 p.m. Eastern Daylight Time on July 5, 2007, as published in the Wall Street Journal on July 6, 2007.

7

continuing wages and severance payments would be approximately €374 million (approximately $509 million).

16. In the course of the Concurso process, DASE commenced negotiations on a social plan and a collective lay off procedure (an "ERE") related to the separation allowance with the Cadiz Unions. Absent an agreement by DASE to fund a social plan on behalf of the affected employees and implementation of that plan on or before July 31, 2007, the Spanish court could dismiss the ERE. DASE's receivers have announced that in such a case, the Spanish court might order the implementation of the terms of DASE's 2005 Industrial Plan, which provides each employee with a separation payment of 60 days for each year of service, estimated to be €164 million, plus continuing wages through the end of calendar year 2010.[10] Regardless of the ultimate Court imposed alternative, salaries would accrue for the time period during which the Spanish court is resolving the issue (estimated to be no fewer than four months) at a cost of approximately €5.0 million (approximately $6.8 million) per month.

16. On July 4, 2007, DASE, the DASE Receivers, and the Cadiz workers councils, assemblies and Unions, based on the efforts of the Spanish court, reached a settlement on a social plan funded with €120 million for a separation allowance of approximately 45 days of salary per year of service to each employee (the "Separation Plan"). An English translation of the Separation Plan is attached hereto as Exhibit A. As reported in the media on July 9, 2007, 89.4% of the Cadiz workers approved the Separation Plan. To fund the Separation Plan, DASE requires funds in an amount of €120 million (approximately $163 million) from its sole shareholder, DASHI. In consideration for providing such funds, the DASE Receivers have agreed to acknowledge that, upon (i) approval of the ERE by the Spanish court, (ii) approval of

---

[10] The Debtors reserve their right to challenge any and all such claims should this matter not be resolved consensually as contemplated by this Motion.

8

DASE's plan of reorganization by the requisite number of DASE creditors, (iii) payment of not less than 66 2/3% of creditors' pre-Concurso claims within three years, and (iv) payment of full post-Concurso claims, DASHI, Delphi, all of the other Delphi affiliates, and each of their directors and officers will be released from any liability related to or arising out of DASE and its Concurso application, and the DASE Receivers will be prevented by law from bringing any action against such parties for any reason. Additionally, each Cadiz worker who accepts payment under the Separation Plan is required to confirm that such payment is in full satisfaction of any claims the worker may have against DASE, DASHI, Delphi, or any other Delphi affiliate. Furthermore, DASHI's obligation to provide funds to DASE under the terms of the Separation Plan is subject to the agreement of the DASE Receivers to use their best efforts to support this Motion before this Court.

17. DASE believes that if it does not accept the terms of the Separation Plan, the Spanish court may dismiss the ERE. If the Spanish court dismisses the ERE, DASE, which is an asset of DASHI, would be exposed to claims by the affected employees (individually or collectively) for termination indemnities, or for claims for breach of the 2005 Industrial Plan. Additionally, creditors of DASE may claim that DASE's directors, and DASHI and/or Delphi under a "shadow director" theory, could be exposed to potential actions directly against them for their conduct in creating or aggravating DASE's economic condition. DASE's directors would be eligible for full indemnification from the Company, so the liability of DASE's directors would be expected to be borne by Delphi, DASHI, and other Delphi affiliates.

18. The Separation Plan, the consummation of which provides benefits to DASHI's wholly-owned subsidiary, DASE, also provides benefits directly to Delphi and DASHI. Because the Separation Plan would result in the previously-described release from liability, the

9

DASE Receivers would not be permitted under law to file actions (a) seeking to "pierce the corporate veil" or (b) under a "shadow director" theory and thus seek to recover damages from DASHI, Delphi, and other Debtors and non-Debtor affiliates, for actions related to DASE and its Concurso application. DASE, DASHI, and Delphi believe there is no basis for any such action. Nevertheless, litigating such matters would be expensive, time-consuming, and could possibly disrupt DASHI's operations in Spain and elsewhere, causing, among other things, damage to the Company's world-wide reputation.

19. In addition to the labor-related claims against DASE, there are suppliers and other non-labor creditors who have asserted claims against DASE of approximately €20-25 million. To protect the credit reputation of the Company globally, and particularly in Europe, the Debtors have concluded that it is in their best interest to provide additional funds in an amount not to exceed €10 million (approximately $13.6 million) for the purpose of funding payment of the claims of DASE's suppliers and non-labor creditors. At this time, DASE currently holds approximately €15.9 million in liquid assets. DASE and the DASE Receivers would first use DASE's liquid assets and proceeds from the sale of its non-liquid assets (other than the Cadiz Plant and certain fixed assets necessary to operate the Cadiz Plant, which when no longer necessary for purposes of liquidating assets and/or completing Concurso proceedings will be transferred to the regional government in Andalucia) to pay such claims. DASHI would provide up to €10 million to DASE only if the foregoing assets were insufficient to fully fund payment of the supplier and non-labor claims against DASE.

20. In the exercise of their business judgment, the Debtors submit that the provision of funds by DASHI is in the best interests of the Debtors' estates and their

stakeholders.[11] First, the separation allowance to be paid under the Separation Plan is at the low end of Spanish automotive industry standard. Second, the consummation of the Separation Plan would reduce the risk of costly and contentious litigation. As parent to DASE, DASHI believes that funding the Separation Plan at this time would reduce the costs, risks, and other negative consequences of exposing DASE and DASHI to unnecessary litigation. In addition, to preserve the reputation and credibility of the Company's profitable international operations, the Debtors believe that the provision of funds by DASHI to DASE for purposes of funding payment of the claims of DASE's suppliers and non-labor creditors is in the best interest of their estates and their stakeholders.

## Relief Requested

21. By this Motion, the Debtors seek entry of an order authorizing, but not directing, DASHI to provide up to €130 million (approximately $177 million) to DASE, a foreign non-Debtor affiliate and wholly-owned subsidiary of DASHI. DASHI, a holding company, would receive the funds necessary to make the funding contemplated in this Motion through the repatriation of dividends from cash currently on hand at non-Debtor entities in Asia and Europe. The funds will not come from the Debtors' debtor-in-possession financing facility. DASHI will provide the funds to DASE through an equity contribution or other transaction which the Debtors believe is in the best interests of the estate.

---

[11] The board of directors for both Delphi and DASHI have been apprised of matters related to DASE and the settlement described herein. Because the settlement discussions have been ongoing, the boards of directors for both Delphi and DASHI have not had an opportunity to vote on the authority requested herein prior to the filing of the Motion. A formal vote by each board of directors, currently scheduled to occur on July 16, 2007, will take place prior to the hearing on the Motion.

11

Applicable Authority

22.    Sections 1107(a) and 1108 of the Bankruptcy Code vest debtors-in-possession with authority to continue operating their businesses.  The Debtors, operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners."  In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the duties of a chapter 11 debtor-in-possession is the duty "to protect and preserve the estate, including an operating business's going-concern value."  Id.

23.    Section 1107(a) of the Bankruptcy Code provides that the debtor-in-possession shall have the duties of a trustee in a chapter 11 case with all the rights and powers of a trustee.  11 U.S.C. § 1107.  Section 363(c) of the Bankruptcy Code provides in pertinent part: "[T]he [debtor-in-possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).

24.    The Debtors do not concede through this Motion that the relief requested herein is outside the ordinary course of business.  Instead, the Debtors make this Motion out of an abundance of caution.[12]  Nonetheless, should this Court find that DASHI's decision to provide funds to DASE constitutes a transaction outside of the ordinary course of business, section 363(b)(1) of the Bankruptcy Code requires that "there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."

---

[12]    Indeed, in the fall of 2006, in the ordinary course of its business, DASHI made a substantial contribution to DASE.  DASHI also earlier made an ordinary course commitment to fund the minimum separation payment under Spanish law of 20 days of salary per year of service.  The Debtors have determined to bring a motion in this instance because they are funding more than the Spanish statutory minimum requirement.

12

Institutional Creditors of Continental Airlines, Inc. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.), citing In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); accord Stephens Indus., Inc. v. McClung (In re McClung), 789 F.2d 386, 390 (6th Cir. 1986); Fulton State Bank v. Schipper (In re Schipper), 109 B.R. 832, 836 (Bankr. N.D. Ill. 1989); In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1988).

25. Sound business reasons exist to justify DASHI providing funds to DASE.[13] DASHI is seeking to provide funds to DASE of €120 million to fund the Separation Plan, which would provide employees at the Cadiz Plant with a separation allowance at the low end of the Spanish automotive industry standard and far below the potential liability under the 2005 Industrial Plan.[14] Funding the Separation Plan would result in the release of DASHI, Delphi, Delphi's affiliates, and each of their directors and officers from any and all liability related to or arising out of the termination of the labor agreements. Moreover, DASHI would avoid risky, costly, and time-consuming litigation that the DASE Receivers might file against DASE, DASHI, or any of the other Delphi affiliates if the Separation Plan were not funded. The settlement with the Cadiz Unions also would prevent the DASE Receivers from filing any civil actions directly against the DASE directors (including DASHI or Delphi as potential shadow directors) for termination of the labor agreements. The Debtors also believe that DASHI's

---

[13] In reaching their business judgment, the Debtors considered, among other things, factors evaluated by Second Circuit courts for approval of settlements under Rule 9019(a) of the Bankruptcy Rules including, inter alia, the balance between the likelihood of plaintiff's or defendants' success should the case go to trial vis-à-vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures and the prospect of complex and protracted litigation if the settlement is not approved. In re Adelphia Comm'ns Corp., 327 B.R. 143, 159, adhered to on reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

[14] Notably, this funding is being used in large part to fund severance and attrition costs, not unlike the attrition plans approved by this Court and similar to the agreement outlined in the memorandum of understanding with the UAW and GM that is set for hearing on July 19, 2007. To date, to achieve such consensual resolutions with its hourly workforce, the Company has spent several billion dollars to fund such attrition plans.

funding of the Separation Plan would reduce the risk of DASE's creditors' seeking to assert claims against Delphi's other affiliates in satisfaction of DASE's claims.

        26.    Additionally, the Debtors believe that the provision of funds in an amount not to exceed €10 million for purposes of funding payment of the claims of DASE's suppliers and non-labor creditors is in their best interest to preserve the credit reputation of the Company globally, and particularly in Europe. Accordingly, DASHI would provide the funds through the repatriation of dividends from certain of its foreign, non-Debtor subsidiaries. Moreover, the provision of such funds would assist DASE in achieving a satisfactory creditors agreement in the Concurso, thereby avoiding any potential claims by non-labor creditors and any action for insolvency-related liability by the DASE Receivers.

Expedited Relief Sought

        27.    The Debtors brought the Motion on an expedited basis to ensure that DASE could preserve the current terms of the Separation Plan.[15] If DASHI does not obtain the relief requested herein prior to July 20, 2007, DASE would not be able to obtain approval of the Separation Plan in the Spanish court until at least September 2007, because the Spanish court is in recess for the entire month of August. Such a delay would cost DASE approximately €5.0 million (approximately $6.8 million) per month for accrued wages and social contributions in addition to a potential significant increase in the cost of a revised social plan if terms of 45 days of salary per year of service could not be reached at that time. These additional costs ultimately

---

[15] As required by the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883) and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered October 26, 2006 (Docket No. 5418) (together, the "Case Management Orders"), the Debtors notified the Creditors' Committee of their intention to file this Motion on expedited notice and the Creditors' Committee confirmed that it did not object to the Motion being brought on expedited notice.

could require additional funds from DASE's 100% shareholder, DASHI. For the foregoing reasons, the Debtors believe that the relief requested herein is in the best interests of the estates and should be granted.

## Notice Of Motion

28.     Notice of this Motion has been provided in accordance with the Case Management Orders. In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

29.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) authorizing, but not directing, DASHI to provide funds to DASE for the purposes described herein and (b) granting the Debtors such other and further relief as is just.

Dated:     New York, New York
           July 9, 2007

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:   /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr. (JB 4711)
      John K. Lyons (JL 4951)
      Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:   /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti (KM 9632)
      Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession