Hearing Date and Time: July 19, 2007 at 10:00 a.m.
Response Date and Time: July 12, 2007 at 4:00 p.m.

BENESCH FRIEDLANDER COPLAN
& ARONOFF LLP
Stuart A. Laven, Jr. (SL-9838)
David M. Neumann
2300 BP Tower
200 Public Square
Cleveland, OH 44114-2378
(216) 363-4500

Attorneys for Eaton Corporation

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| IN RE: | Chapter 11 |
| DELPHI CORPORATION, et. al., | Case No. 05-44481 (RDD) |
| Debtors. | (Jointly Administered) |

---

### EATON CORPORATION'S RESPONSE TO DEBTORS' SEVENTEENTH OMNIBUS CLAIMS OBJECTION

| | |
|---|---|
| Claimant: | Eaton Corporation |
| Claim No: | 12158 |
| Date Claim Filed: | July 28, 2006 |
| Asserted Claim Amount: | $2,000,000.00 |
| Basis For Debtor's Objection: | Books and Records Claim |
| Debtor's Proposed Treatment of Claim: | Disallow and Expunge |

For its response ("Response") to the Debtors' Seventeenth Omnibus Claims Objection (the "Objection") to its Claim No. 12158, Eaton Corporation ("Eaton") states as follows:

## BACKGROUND

1. For several years prepetition, Eaton supplied Delphi Corp. and various of its affiliates and divisions (collectively, "Delphi") with components for a number of Delphi's auto parts programs.

2. In or about 2001, representatives of Eaton and Delphi commenced discussions concerning the possibility of Eaton supplying a bi-state solenoid valve component (the "Component") for Delphi's "GMT-800" program.

3. On or about March 1, 2002, Delphi delivered to Eaton a requirements contract (the "Purchase Order")[1] memorializing, in general terms, Delphi's agreement to purchase, and Eaton's agreement to engineer, develop and sell to Delphi, a minimum range of 500,000 to 1.5 million units of the Component per year.

4. Subsequently, the parties had numerous discussions and exchanged various correspondence concerning the engineering, testing and development of the Component.

5. In or about May 2003, Delphi approved the Component for "PPAP"— Production Part Approval Process (*i.e.*, Delphi gave Eaton formal approval to commence final-phase product testing on the Component).

6. In reliance on the Purchase Order and Delphi's various representations and continued directions to Eaton to continue engineering and development of the Component, Eaton expended several million dollars over most of 2002 and 2003 to develop the Component.

---

[1]    A true and accurate copy of the Purchase Order is attached hereto as <u>Exhibit A</u>.

2

7.    However, on or about September 1, 2003, Delphi advised Eaton that Delphi would not honor the Purchase Order. Instead, Delphi advised Eaton that Delphi would commit to purchase only 40,000 units of the Component.

8.    In ensuing correspondence and meetings, Delphi informed Eaton that Delphi had sought out and obtained another supplier of the Component for Delphi's larger volume needs and that Delphi would not purchase the substantially higher volume of the Component as previously agreed in the Purchase Order.

9.    In or about October 2003, in response to Delphi's cancellation of all but a nominal, 40,000-unit portion of the Purchase Order, Eaton refused to accept Delphi's reduced offer and demanded cancellation damages of approximately $6.1 million (which figure represented the sum of Eaton's then estimated out-of-pocket costs for engineering, tooling, and supplier cancellation costs directly related to Eaton's design and engineering of the Component). Eaton had engineered the Component and its assembly process for large-volume mass production; fulfilling the nominal 40,000-unit order would have caused Eaton to suffer enormous losses.

10.    Delphi has acknowledged and admitted on numerous occasions that it entered into a binding agreement to purchase the Component from Eaton at substantial volume (*i.e.*, millions of units). For example, in a letter dated as of December 9, 2003, Delphi admits that "Delphi Energy and Chassis did award Eaton a requirements contract for the Bi-State Solenoid Valve for the model years 2003, 2004, 2005 and 2006."[2]

11.    As a result of Delphi's failure to perform as agreed under the Purchase Order and Eaton's detrimental reliance on Delphi's numerous representations and

---

[2] *See* December 9, 2003 Letter from Carl Snowden, E&C Electrical Commodity Manager, Delphi Global Supply Management, to Scott King, Vice President, Sales and Marketing, Eaton Corp., a true and accurate copy of which is attached hereto as Exhibit B.

3

requests for continued performance under the Purchase Order, Eaton incurred substantial out-of-pocket costs. These out-of-pocket costs are recoverable against Delphi as damages for Delphi's breach of contract (the Purchase Order and subsequent correspondence) or, in the alternative, as damages in quasi-contract resulting from Eaton's good faith and detrimental reliance on Delphi's Purchase Order and subsequent correspondence and instructions. Eaton calculates these damages at $2,000,000 (the "Claim").

12. On July 28, 2006, Eaton timely evidenced Delphi's indebtedness under the Claim by filing Proof of Claim No. 12158 (the "Proof of Claim"), together with a supporting affidavit, a copy of the Purchase Order, and other documentation.

### RESPONSE

13. In the Objection, the Debtors allege that their books and records do not reflect the Claim as an obligation owing Eaton. Eaton disputes the Debtors' allegation, which fails to meet Debtors' burden in challenging Proof of Claim No. 12158, which is prima facie evidence of the Claim pursuant to Bankruptcy Rule 3001(f).

14. The Claim is supported by the Purchase Order (which was attached to the Proof of Claim as filed), an affidavit of an Eaton employee with personal knowledge of Delphi's contract to purchase the Component (also attached to the Proof of Claim as filed), as well as various emails, letters, engineering reports, and other documents, which Eaton will proffer in support of its Claim at or in advance of an evidentiary hearing thereon. Thus, Eaton has sustained and will further sustain its minimal burden under Bankruptcy Code sections 501 and 502 and Bankruptcy Rules 3001 and 3003.

15. A timely and properly filed proof of claim constitutes prima facie evidence of the claim's validity and amount. *See* Fed. R. Bankr. P. 3001(f); *see also McGee v. O'Connor (In re O'Connor)*, 153 F.3d 258, 260-26 1 (5th Cir. 1998); *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 65 (Bankr. D. Del. 2002) ("A claimant filing a proof of claim must allege facts sufficient to support a legal basis for the claim. If the assertions in the filed claim meet this standard of sufficiency, the claim is prima facie valid pursuant to Fed. R. Bankr. P. 3001(f).").

16. A party objecting to a timely and properly filed proof of claim bears the initial burden of presenting "enough evidence to overcome the prima facie effect of the claim." *O'Connor*, 153 F.3d at 261; *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. at 65. The objector must "produce evidence tending to defeat the claim that is of a probative force equal to that of the creditor's proof of claim." *See In re Simmons*, 765 F.2d 547, 552 (5th Cir. 1985); *In re Alleghany Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992) (objector must present evidence that is "equal in force" to the prima facie evidence supporting the claim).

17. By merely stating that the Claim should be disallowed and expunged, the Debtors have not met their burden of presenting "enough evidence" to overcome the presumptive validity of Eaton's Claim. For these reasons, this Court should adjourn the Objection as to the Claim and schedule an evidentiary hearing in accordance with the Court's December 7, 2006 Omnibus Order.

18. Eaton and certain of its affiliates are prosecuting several claims against the Debtors. Respective counsel for Eaton and the Debtors have been in ongoing discussions with respect to the possible agreed treatment/settlement of these claims. Adjourning the

Objection and scheduling an evidentiary hearing on the within Claim will afford Eaton and the Debtors additional time to further their settlement discussions on all of Eaton's claims in this case.

19.    Eaton reserves all other rights and remedies under the Bankruptcy Code and other applicable law.

WHEREFORE, Eaton respectfully requests that the Court adjourn the Objection to the Claim, schedule an evidentiary hearing thereon in accordance with the Court's Omnibus Order, and grant Eaton such other relief as the Court deems just and proper.

Dated: Cleveland, OH
       July 10, 2007

Respectfully submitted,

/s/ Stuart A. Laven, Jr.
Stuart A. Laven, Jr.
BENESCH FRIEDLANDER COPLAN
& ARONOFF LLP
Stuart A. Laven, Jr. (SL-9838)
David M. Neumann
2300 BP Tower
200 Public Square
Cleveland, OH  44114-2378
(216) 363-4500
slaven@bfca.com
dneumann@bfca.com

Attorneys for Eaton Corporation

## Certificate of Service

The forgoing Response of Eaton Corporation was sent to the following on July 10, 2007.

Original in hard copy form by Federal Express to:

Honorable Robert D. Drain
United State Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
One Bowling Green, Room 632
New York, New York 10004


Copy in Paper Form by Federal Express to:

Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive, Suite 2100
Chicago, IL 60606

Attn:  John Wm. Butler, Jr.
       John K. Lyons
       Joseph N. Wharton


Copy in Paper Form by United States Mail to:

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098

Attn: General Counsel

/s/ Stuart A. Laven, Jr.

Doc 1453608 Ver 1

# EXHIBIT A


**DELPHI**
Automotive Systems

Energy & Chassis Systems

Page 1 of 3

Delphi Energy & Chassis Systems
4800 S. Saginaw Street
FLINT MI 48501

**Requirements Contract**

| PO Number | Date Issued: |
|---|---|
| 550004423 | 03/01/2002 |
| Version | |
| 10/09/2001 16:03:20 | |

*Please deliver to:*
See Delivery Schedule

## ORIGINAL
## REQUIREMENT CONTRACT

EATON CORP
ACTUATOR & SENSOR DIV
P.O. Box 5020
ROCHESTER HILLS MI 48307

| Vendor No: | 1005681 |
|---|---|
| DUNS No: | 878124387 |

| Payment Terms: ZMN2 | Currency: USD |
|---|---|
| Settled on 2nd Day, 2nd Month | |

Incoterms: F03 - Ship Pt Frt Coll-Buyer Pays

*See Attached for Delphi Automotive Systems General Terms and Conditions*

Plant

| Item No. | Material No. Description | | | | | |
|---|---|---|---|---|---|---|
| | | | | DELPHI E & C   KETTERING | | |
| 00010 | 22305502 | | | | | |
| | VALVE OUTLINE BI-STATE | | | | | |

Bi-State
OMT500 for 2003 M/Y

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 03/01/2002 | 07/31/2003 | USD | 10,570.00 | 1,000 | PC |
| 08/01/2003 | 07/31/2004 | USD | 10,250.00 | 1,000 | PC |
| 08/01/2004 | 07/31/2005 | USD | 9,950.00 | 1,000 | PC |
| 08/01/2005 | 07/31/2006 | USD | 9,650.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

**Notes:**
This Contract replaces previous contract # N/A.

****************
This contract sets forth the exclusive terms and conditions under which seller shall sell and buyer shall purchase the goods or services described in the line item detail of this contract for the period(s) specified therein. Terms and conditions proposed by seller which are different from or in addition to the provisions of this contract are unacceptable to buyer, are expressly rejected by buyer, and shall not become a part of this contract. Any modification of this contract shall be made only in accordance with the provisions of paragraph 39 of the general terms and conditions.
****************

****************
Seller grants to Buyer access to all pertinent information, including, but not limited to, books, records, payroll data, receipts, correspondence and other documents for the purpose of auditing seller's charges under this contract. Seller will preserve these documents for a period of 1 year after the final payment under this contract. In addition, all work, materials, inventories and other items provided under this contract must be accessible to Buyer, including, but not limited to, parts, tools, fixtures, gauges and models. Seller will segregate its records and otherwise cooperate with Buyer so as to facilitate the audit.
****************

Buyer: Shepherd, B(Sen)

Phone: 937-455-9180

Fax: 937-455-9133

**Buyer's Address:**
DELPHI ENERGY & CHASSIS SYSTEMS
2000 FORRER BLVD.
KETTERING OH 45420

Date and Time Printed:  10/05/2001 16:03:20

# DELPHI

*Automotive Systems*

_____ Energy & Chassis Systems

Page 2 of 3

```
EATON CORP
ACTUATOR & SENSOR DIV
P.O. Box 5020
ROCHESTER HILLS MI 48307
```

**Requirements Contract**

| PO Number | Date Issued |
|---|---|
| 550004423 | 03/01/2002 |

Version
10/09/2001 16:03:20

Item No.   Material No.                                         Plant
           Description

**Notes Continued:**

The term of this contract is for the period(s) of purchase indicated in the line item notes on the face of this contract.

The price(s) for the goods are set forth in the line item notes of this contract. No adjustments will be made for increases in seller's costs, including increases in the costs for labor, material or overhead.

In addition, Buyer and Seller will use their best efforts to implement cost savings and productivity improvements in order to reduce seller's costs, with the understanding that such savings (after financing) will be shared as follows: (i.) savings resulting from reduction in the content of the goods shall be for the benefit of the Buyer; (ii.) If Seller is responsible for the design of the goods, and the price exceeds the price at which Seller was awarded production, all savings shall be for the benefit of Buyer until the price is reduced to the price at the time of award, (iii.) If the price of the product is at or below the price at which Seller was awarded production, 50% of the savings shall be for the benefit of the Buyer and 50% shall be for the benefit of the Seller.

Seller will assure that the goods remain competitive in terms of technology, design and quality with similar goods available to Buyer. However so long as Seller performs its obligation hereunder, sellers price for goods shall not be required to be competitive with prices available to Buyer from others during the first 12 months of the contract. In addition, during this period of pricing, Buyer shall forbear from exercising its rights under paragraph 13 ("termination") of this contract.

If, in the reasonable opinion of the Buyer, the goods do not remain competitive as defined in above, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which other goods are more competitive. If, within (30) days, Seller does not agree to immediately sell the goods with comparable technology, design, quality or, if applicable, at a competitive price, Buyer may terminate this contract and purchase from another supplier without liability to Seller.

Buyer and Seller will cooperate to create, maintain, update, and share technical information about the product and its manufacture, as needed without restriction and in compliance with buyer's drafting and math data standards. In the event Buyer exercises its right to terminate this contract and then makes the goods or purchases the goods from another supplier, Seller agrees not to bring any action or claim against Buyer, its suppliers, dealers, or customers for any reason, including any claim for infringement of patents or other proprietary rights, arising from the manufacture, use and sale of the goods or use of the information furnished by Seller to Buyer. Seller will secure the necessary agreements with its employees and sub-contractors to assure compliance with this provision.

Delphi Automotive Systems requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website, www.delphiauto.com then Suppliers/Project Vega/Supplier Requirements, for additional information.

Seller acknowledges and agrees that Buyer's General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract") A copy of Buyer's General Terms and Conditions is available upon written request to Buyer or via the Internet at Delphi's website, delphiauto.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions in their entirety without modification. Any add

# DELPHI
## Automotive Systems

Energy & Chassis Systems

Page 3 of 3

EATON CORP
ACTUATOR & SENSOR DIV
P.O. Box 5020
ROCHESTER HILLS MI 48307

**Requirements Contract**

| PO Number | Date Issued |
|---|---|
| 550004423 | 03/01/2002 |

Version
19/09/2001 16:03:20

| Item No. | Material No. Description | Plant |
|---|---|---|

**Notes Continued:**
tions in, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.
*************************

Replaced Requirements Contract 550004395

**EXHIBIT B**

# DELPHI

Delphi Global Supply Management

December 9, 2003

Mr. Scott L. King
Vice President, Sales and Marketing
Eaton Corporation
26101 Northwestern Highway
Southfield, MI 48076

Subject: Bi-State Solenoid Valve

Dear Mr. King,

I am responding to Eaton's request for cancellation claims on the current GMT 800 Bi-State Solenoid Valve program.

Eaton and Delphi Energy and Chassis have put an enormous amount of effort into validating the Eaton Valve, during the past few years with the result that Eaton has been unable to provide product that meets the specifications.

I do want to review a few points about this program.

- Delphi Energy and Chassis did award to Eaton a requirements contract for the Bi-State Solenoid Valve for the model years 2003, 2004, 2005 and 2006. This award was contingent upon Eaton's ability to meet all qualification requirements including service, quality, technology, price and timing.

- Eaton committed to a February 2002 PPAP. This commitment was not met due to functionality problems with the Eaton Valve. PPAP approval was indeed given in June 2003, 16 months late. Because of these problems, it was necessary to change our plans and continue production with the current supplier. That supplier also took advantage of your delays to improve their quality and cost, with the results that their Solenoid Valve was of higher quality and lower cost than the Eaton Valve. (This information was given to Eaton as notification of a lack of competitiveness.)

- The current buyer, Brigette Shepherd and myself had a conference call with Eaton's Ann Rundle and Leo Massecar in late July. After Eaton acquired PPAP approval to discuss and review Eaton's competitive position, improvement plan and see what role Eaton could have with Delphi. At this meeting I agreed to direct engineering to validate and tune-in Eaton's product on a small volume Cadillac Platinum program (40,000 units). Engineering agreed and schedules were released to Eaton for production on September 1, 2003.

- In September, Eaton advised Delphi that they would not support the Platinum program because of the low volume and not having schedule releases for the remaining GMT 800

Delphi Energy & Chassis Systems
8820 Delphi Drive, Bldg. D
Troy, MI 48098

volume. This was disappointing and required Delphi Energy and Chassis to validate and tune-in the current suppliers product and request a change from our customer.

During November our customer reported an objectionable audible noise when testing the new Escalate Platinum with Eaton Solenoid Valve during final road testing. This noise problem is not in compliance with our specifications. Eaton was informed and asked for technical support to resolve this issue. Eaton responded that they would not provide any further engineering support for the Bi-State Solenoid until commercial issues were resolved. This led Delphi Energy and Chassis engineering to push even harder to validate and tune-in the current supplier's product into this program.

As of this date, Eaton Corporation does not have a Solenoid Valve that meets the requirements for our Bi-State Damper application.

We nave offered to Eaton the potential to win on a competitive basis the future GMT 900 programs provided they can demonstrate on-time delivery, quality and cost reduction ideas. I sent the estimated volumes, programs, and program life to Sara Hazen via fax on December 5, 2003.

During the Bi-State Solenoid Valve award process the cost concessions and investment monies provided by Eaton was done to secure the program production and displace the current supplier. Having secured this program, Eaton has been unable to deliver its end of the bargain, i.e. a Solenoid Valve that meets the technical specifications. I do not agree that Delphi Energy and Chassis should pay the asked for cancellation charges.

Sincerely,

*Carl Snowden*

Carl Snowden
*E&C Electrical Commodity Manager*
*Delphi Global Supply Management*

Delphi Energy & Chassis Systems
5820 Delphi Drive, Bldg. D
Troy, MI 48098