## DECLARATION OF GARY WHITNEY

I, Gary Whitney, declare:

1.     I am the plaintiff in the lawsuit entitled <u>Gary Whitney v. Delphi Corporation, Delphi Product and Service Solutions, Inc., et. al.</u>, Los Angeles Superior Court Case No. BC 337315 and the claimant in <u>In Re Delphi Corporation</u>, Case No. 05-44481(RDD)(Proof of Claim No. 10157). I have personal knowledge of the facts stated herein and, if sworn as a witness, I could and would testify competently thereto.

2.     I am 60 years old. I was born on April 29, 1947.

3.     I am married and live with my wife Patrice. We have been married for over 27 years.

4.     I have a B.S. degree in Business Administration from the Rochester Institute of Technology.

5.     I have been involved in sales and marketing in the retail electronics field for over thirty years. The following is a very brief summary of my experience:

1

A.    Sylvania Electric Co. - In about 1974, I began working for Sylvania Electric Co. as a Retail Trainer.  In this position, I traveled across the United States providing television and home stereo sales training for Sylvania dealers.  In about 1976, I was promoted by Sylvania to the position of District Sales Manager.  In that position, I was responsible for a large portion of Sylvania's Southern California market where I sold televisions and home stereo equipment to various retail dealers. I acquired some of the retail dealers when I assumed this position and added additional retail dealers during my two years in this position.

B.    GTE Automatic Electric  - In about 1978, I became the Western Regional Sales Manager for GTE Automatic Electric in the 13 Western United States (Alaska, Hawaii, California, Oregon, Washington, Idaho, Nevada, Utah, Arizona, Montana, Wyoming, Colorado, and New Mexico).  In this position, I was responsible for managing the company's manufacturers representatives selling GTE telephones.  I called on all of the major consumer electronic retailers and was influential in establishing business relationships with them.

C.    Sanyo Electronics - In about 1979, I became the National Sales Manager for Sanyo Electronics.  In this position, I was

2

responsible for supervising the company's manufacturers

representatives selling Sanyo televisions, video recorders, and home

and personal stereo equipment.

D.      Toshiba America - In about 1981, I became the General

Manager of the Western Zone of Toshiba America Inc. In this

position, I was responsible for supervising the company's

manufacturers representatives selling the company's consumer

products (televisions, microwaves, car audio equipment, home and

personal stereos) in the 13 Western United States. I was also

responsible for overseeing the company's entire Western Zone

operation. Among other things, this meant that I was responsible for

directing the sales activities of my two Regional Sales Managers and

the company's Managers within the areas of Operations, Accounting,

Credit, Service, Administration, and Warehousing. I held the

responsibility for profit and loss, inventory management, forecasting,

budgeting, expense control, and customer relations. I excelled in this

position and, in about 1987, was promoted by Toshiba America to

the position of Vice-President and General Manager for Toshiba's

Western Zone. With this promotion came the responsibility of

releasing our manufacturers representatives from their contractual

3

relationship with the company and hiring a direct sales force to sell

the company's products (televisions, microwaves, car audio

equipment, and home stereos). I was responsible for acquiring the

proper headcount of experienced salespeople and assigning their

sales territory. I also established a second sales office in the Bay

Area and assigned a Regional Sales Manger to oversee the sales

from that location. While with Toshiba America, my annual sales

went from about $45 million at start date to about $140 million at

end.

E.     Aiwa America, Inc. - In about 1993, I became the Western

Zone Manager for Aiwa America, Inc. In that position, I was

responsible for supervising the company's manufacturers

representatives as well as three direct sales people selling the

company's car audio equipment, home and personal stereo products

in the Western Region. While there, I was able to increase sales by

78%.

F.     Galaxy Brands - In or about 1997, I became the Director of

Sales for Galaxy Brands. In this position, I was responsible for

supervising the company's manufacturers representatives selling the

company's portable sound products (*e.g.*, Walkman type devices,

4

boom boxes, personal CD players, etc...). These products were sourced and imported under the name of "Wilson" as in "Wilson Sporting" goods. While there, I bolstered sales by 70% over a 12-month period and increased the account base by 30%.

G.     Konka USA - In or about 1999, I became the Vice-President of Sales and Marketing for Konka USA. In that position, I was responsible for the national marketing and sales of the company's televisions and DVD players. This included the following job duties and responsibilities: I established and directed the activities of a North American sales team and initiated the company's sales policies, goals, and procedures. I also created and implemented the general policies and employee guidelines and defined specific product sales to relevant industry segments. I profitably achieved a stated goal of 1% market share within the first full year of operations and met or exceeded all immediate and long-range goals.

6.     During my 30 plus years in the retail electronics field, I had extensive experience marketing and selling consumer electronics products to major consumer electronics retail stores like Best Buy and Circuit City. Indeed, I was responsible for marketing and sales to the following major consumer electronics retail stores:

5

A.  Best Buy - (while employed by Konka and Delphi).

B.  Circuit City - (while employed by Konka).

C.  The Good Guys - (whiled employed by Toshiba, Aiwa, Galaxy
Brands, and Delphi).

D.  The Sharper Image - (while employed by Toshiba and Aiwa).

E.  Fred Meyer Dept. Stores - (while employed by Toshiba, Aiwa,
Konka, and Delphi).

F.  Ultimate Electronics - (while employed by Toshiba, Aiwa, Galaxy
Brands, and Delphi).

G.  May Co. Dept. Stores - (while employed by Toshiba, Aiwa, Galaxy
Brands, and Konka).

H.  Federated Dept. Stores - (while employed by Toshiba and Aiwa).

I.  Car Toys - (while employed by Aiwa and Delphi).

J.  LA Tronics - (while employed by Toshiba and Aiwa).

K.  Cowboy Maloney's - (while employed by Aiwa and Konka).

L.  Brandsmart - (while employed by Konka).

M.  HH Gregg - (while employed by Konka and Delphi).

N.  Tweeter - (while employed by Konka).

O.  MusicLand - (while employed by Delphi).

P.  Sam Goody - (while employed by Delphi).

6

Q.    Amazon.com - (whiled employed by Konka and Delphi).

R.    Costco - (while employed by Toshiba).


7.    Based on the work-related friendships and business contacts that I made
during my 30 plus year career, I had the connections and ability to successfully operate in
the retail electronics field. Indeed, as discussed in more detail below, my immediate
supervisor at Delphi during much of my employment at the Company, Bob Kustasz, and
my second level supervisor (that is, Mr. Kustasz's supervisor), Don LaDieu, frequently
praised my performance, told me that I was doing an "outstanding" job, an "excellent"
job, that I played a "major role" in the Company's successful role out of the XM satellite
radio receiver and related accessories, and that I met or exceeded all of the sales goals set
for me by the Company.


8.    In late 2001, the Director of Delphi's Consumer Electronics Division, Don
LaDieu, contacted me and said that he was interested in interviewing me to become
Delphi's Western Regional Sales Manager. Mr. LaDieu knew me because he and I had
previously worked together at several companies (including Toshiba America Inc.,
Sylvania Electric, Aiwa America, Galaxy Brands, and Konka). As a result of our prior
work experience, Mr. LaDieu was extremely knowledgeable about my: (a) experience
working in the major retail electronics field; (b) connections to major electronics retail

7

stores; and (c) ability to successfully operate in the major retail electronics field. Mr.
LaDieu told me that he wanted interview me because of my experience selling and
marketing retail consumer electronics products.

8.      In mid-summer 2002, I interviewed for the position of Delphi's
Western Regional Sales Manager with Mr. LaDieu and John Passante (whom I believe
held the position of Vice-President of Delphi's Human Resources Department. Mr.
LaDieu was in his late 50s and Mr. Passante was in his mid-to-late 50s.

9.      In late 2002, Mr. LaDieu and Robert "Bob" Kustasz, Delphi's
National Sales Manager, hired me to be Delphi's Western Regional Sales Manager. Mr.
Kustasz was in his 50s. As far as I am aware, neither Joe Damato, Mike Roberts, nor
Burt Valanty played any role whatsoever in the decision to hire me. I never met Joe
Damato, Mike Roberts, nor Burt Valanty during the interview process or the hiring
Indeed, neither Joe Damato nor Mike Roberts were even employed by Delphi at the time
that Mr. LaDieu and Mr. Kustasz hired me.

10.     On or about January 6, 2003, I became an employee of Delphi. I was
Delphi's Western Regional Sales Manager responsible for supervising all of the
Company's manufacturers representatives west of the Mississippi. My immediate

8

supervisor was Delphi's National Sales Manager, Bob Kustasz. At that time, Mr. Kustasz
was in his 50s. My second-level supervisor was Mr. LaDieu. At that time, Mr. LaDieu
was in his late 50s.

11.     During the entire time that I was employed by Delphi, Delphi regularly
employed more than 5 employees. Indeed, it employed hundreds, if not thousands, of
employees during the entire time that I was employed by Delphi.

12.     At the time I was hired, Delphi informed me that, pursuant to Company
policy, Delphi rated employee performance on the following scale: Outstanding,
Satisfactory, Diminishing Performance, and Unsatisfactory. During the time that I was
employed by Delphi, no one ever informed me that this policy had been rescinded or
revised in any way. As explained in more detail below, both Mr. LaDieu (my second
level supervisor) and Mr. Kustasz (my immediate supervisor) told me that my
performance was "excellent" and "outstanding." No one ever informed me that my
performance was anything less than "Outstanding." To be clear, no one ever told me that
my performance was "Satisfactory," "Diminishing Performance," or "Unsatisfactory."

13.     At the time that I was hired, Delphi informed me that, pursuant to Company
policy, if my performance ever dipped below "Satisfactory" to "Diminishing

9

Performance," my supervisors would tell me of that fact and develop a plan to assist me
in the improvement of my performance.    During the time that I was employed by Delphi,
no one ever informed me that this policy had been rescinded or revised in any way.    As
explained in more detail below, no one ever informed me that my performance was
"Diminishing Performance" and no one ever developed a plan to assist me in the
improvement of my performance.    Indeed, both Mr. LaDieu (my second level supervisor)
and Mr. Kustasz (my immediate supervisor) told me that my performance was "excellent"
and "outstanding."    Moreover, Mike Roberts, the person who became my immediate
supervisor after the Company fired Mr. Kustasz, told me that I had done everything that
he had asked of me and that all of my dealers really liked me.

14.    At the time that I was hired, Delphi informed me that, pursuant to Company
policy, if my performance ever dipped below Diminishing Performance to Unsatisfactory,
that my supervisors and human resources would inform me of that fact and develop a
Performance Improvement Plan ("PIP") providing me with specific instruction and
expectations with objectives that would be monitored to insure that I knew where I stood
with respect to the expected accomplishments.    At the same time, Delphi also informed
me that, pursuant to Company policy, if, with my supervisor's assistance, I was unable to
meet the expectations set forth in the PIP within a reasonable amount of time (which
Delphi defined as "historically 6 months"), I could be terminated.    During the time that I

10

was employed by Delphi, no one ever informed me that these policies had been rescinded

or revised in any way.  As explained in more detail below, no one ever informed me that

my performance "Unsatisfactory" and no one ever placed me on a PIP.  Indeed, both Mr.

LaDieu (my second level supervisor) and Mr. Kustasz (my immediate supervisor) told me

that my performance was "excellent" and "outstanding." Moreover, Mike Roberts, the

person who became my immediate supervisor after the Company fired Mr. Kustasz, told

me that I had done everything that he had asked of me and that all of my dealers really

liked me.


15.    Attached hereto as Exhibit "A" is a true and correct copy of the Delphi

policies referenced above in paragraphs 12 - 14.


16.    Beginning in the late summer of 2003, Delphi began to get rid of the older

workers in the Consumer Electronics Division and replace them with younger workers.

In the late summer of 2003, Delphi fired Mr. Kustasz (in his mid-50s) and subsequently

replaced him (around December 2003/January 2004) with the significantly younger Mike

Roberts. Mr. Roberts was in his 30s.  At the time Mr. Kustasz's employment was

terminated, he told me that my performance was "excellent" and that I had met or

exceeded every expectation that Delphi had for me.


11

17.    In or about late 2003, Mr. LaDieu became ill, had some type of surgery, and
went on a medical leave of absence until about February/March 2004.  From January
2003, when I began my employment with Delphi, through late 2003 when Mr. LaDieu
went on his medical leave, Mr. Ladieu frequently told me that my performance was
"excellent" and that I met or exceeded my the Company's expectations.  Indeed, Mr.
LaDieu told me he believed that I played a "major part" in the Company's successful roll-
out of its XM Satellite car radio receiver and accessories.  At no time did Mr. LaDieu
criticize my performance.

18.    During the time that Mr. LaDieu was on his medical leave, Delphi replaced
Mr. LaDieu (in his 50s) with Joe Damato.  At that time, Mr. Damato was in his 30s.

19.    When Mr. LaDieu returned from his medical leave in about
February/March 2004, he became the Sub-Director of Delphi's Consumer Electronics
Division.  In this new position, Mr. LaDieu remained one of my supervisors.
Subsequently, in late spring or early summer 2004 (around May/June), Mr. LaDieu had to
have another surgery and go on another medical leave of absence due to complication
from his earlier surgery.

\\\

12

20.     During the approximate three months that Mr. LaDieu worked in 2004 (from approximately February/March through approximately May/June), he again told me that my performance was "excellent" and that he was very happy with my sales. At no time did Mr. LaDieu criticize my performance.

21.     Shortly after replacing Mr. LaDieu, Mr. Damato began altering the personnel in the sales team and brought in Mike Roberts (in his early to mid 30s) to replace Bob Kustasz (in his mid-50s).

22.     During the entire time that Mr. Kustasz was my immediate supervisor, he also told me that my performance was "outstanding", "excellent", and that he was very happy with my sales. At no time did Mr. Kustasz criticize my performance.

23.     After Mr. Damato hired Mr. Roberts, Mr. Roberts hired two new Sales Managers. These new Sales Managers were in their early-to-mid-30s.

24.     In or about April 2004, Mr. Damato and Mr. Roberts held a sales meeting with their new sales team at Delphi's corporate headquarters in Troy, Michigan. The meeting was held over the course of three days. One of those days was my birthday. When Mr. Roberts learned that it was my birthday, he asked: "how old are you?" I told

13

him that I was 57. That night, when the sales team went out to dinner, Mr. Roberts and

some of the other younger employees  made age-based discriminatory remarks about my

age and they commented on the fact that I was "old."   Following dinner, Mr. Roberts

took us (his sales team) to a strip club. I got the distinct impression that, because of my

age, Mr. Roberts felt uncomfortable having me with him and the other younger

employees at the strip club.

25.   During the three day meeting in April and at other times when I

communicated with Mr. Roberts, I got the distinct impression that he was uncomfortable

supervising someone who was older than he was.

26.   On or about June 23, 2004, Mr. Roberts summoned me to a meeting at the

Century Crown Plaza Hotel in Los Angeles, California. Mr. Roberts told me that the

purpose of the meeting was to go over planning for meetings that we would be having

with our customers later in the day. At the meeting, Mr. Roberts told me that he had

some "bad news" – he was firing me. When Mr. Roberts told me that he was firing me, I

was completely shocked. Up to this point in time, neither Mr. Roberts, Mr. Damato, nor

anyone else had ever criticized my performance. In fact, Mr. Roberts' immediate

supervisor, Mr. LaDieu had recently told me that performance was "excellent."

14

27.    In violation of Company policy, prior to firing me, no one had ever placed
me on a PIP or otherwise indicated in any way that I needed to improve my performance.

28.    After he told me that he was firing me, I asked Mr. Roberts why he was
firing me. In response, Mr. Roberts asked me: "do we have to go there?" I nodded in the
affirmative and Mr. Roberts asked me whether I had ever met Burt Valanty (Delphi's
Director of Human Resources). When I said that I had heard of Mr. Valanty but that I
had never met him, an individual walked over and introduced himself to me as "Burt
Valanty."

29.    With Mr. Valanty at the table, I again asked Mr. Roberts what I had done
wrong. Mr. Roberts replied: "Gary, you haven't done anything wrong. In fact, you have
done everything I have asked of you. You haven't done anything wrong, Gary. And I
know that all of your dealers really like you." Incredulous, I said:

> "Is this because I don't fit in with the new team? I know that
> I am a lot older than all of the new team members. This about
> my age, isn't it?"

Neither Mr. Roberts nor Mr. Valanty denied my statement.

\\\

15

30.   Instead of answering my question, Mr. Roberts looked at Mr. Valanty and Mr. Valanty said: "let's just say that you do not have the fit and finish for the new team." I took this to mean I didn't "fit" in a 30-something group and I didn't have the same "finish" as the younger team members because my appearance was old.

31.   Although I had never asserted any type of legal claim against Delphi, Mr. Valanty handed me a Separation Agreement and Release which contained a release of, among other things, my rights under various statutes prohibiting age discrimination including "the age discrimination and employment act." Attached hereto as Exhibit "B" is a true and correct copy of the Separation Agreement and Release.

32.   Delphi replaced me with a younger employee – a man in his 30s.

33.   Following my termination, I spoke with Mr. LaDieu (who, although out of work on a medical leave of absence, was still employed by Delphi) and told him that I had been fired. Mr. LaDieu seemed extremely surprised. He told me that I was an "excellent" performer, that I met or exceeded every sales goal, that he would not have fired me, and that he believed the only reason that I was fired was because of my age and that Mr. Damato and Mr. Roberts simply wanted to work with a younger crew of employees.

16

34.    Following my termination, I also spoke with Mr. Kustasz and told him that I had been fired. Mr. Kustasz reiterated Mr. Ladieu's assessment of my performance (that I was an "excellent" performer and that he would not have fired me) and echoed Mr. LaDieu's belief that the only reason that I was fired was because of my age.

35.    When I realized that I was actually being fired, I initially began feeling angry. I was angry not only because I knew that I was doing an excellent job for Delphi, and because Mr. LaDieu and Mr. Kustasz had repeatedly confirmed that I was doing an "excellent" job, and because no one had ever placed my on a PIP as required by Company policy, and because Mr. Roberts admitted that I had done "everything" that he had asked of me but also because it was clear that I was being fired because of my age.

36.    After my meeting with Mr. Roberts and Mr. Valanty, I also began to feel anxious, apprehensive, and worried because, at the age of 57, I was extremely concerned that I would not be able to obtain another job much less a job that paid as well and had benefits as comprehensive as the job I had with Delphi. I was also extremely worried because I had recently sold my home in Big Bear, California and purchased a larger, more expensive home in Oregon (See Paragraph 43). I was very concerned that without a paycheck, I was not only not going to be able to pay the mortgage on new home but that I would go into debt. Eventually, I was forced to sell my home in Oregon and move to a

17

cheaper city, purchase a cheaper home in Colorado, and live off of the equity from the house I sold.

37.    As a result of my apprehension and anxiety, I began to have trouble falling asleep at night.  I also would regularly wake up around Midnight on many nights and not be able to fall back asleep until around 5:00 a.m.  I began taking Ambien.

38.    Because I wasn't sleeping well at night, I was often tired and irritable during the day.  My irritability from being tired and anger at Delphi spilled over into my marriage causing me to become angry with my wife and have unnecessary and frequent arguments or disagreements with her.  All of this placed a great deal of stress on my marriage.

39.    As a result of my depression/stress, I began seeing a psychiatrist.  The psychiatrist prescribed Lexapro (an anti-depressant).

40.    I continue to have feeling of depression and anxiety from worrying about the future and my ability to support my wife and myself.

Declaration of Gary Whitney

41.     At the time that Delphi fired my, I was earning $80,000.00 annually. In
addition, I had a comprehensive employment benefits package including medical, dental,
life, disability, and vision insurance. I also was able to participate in Delphi's retirement
benefit program.

42.     I have been unable to find comparable employment since I was fired.

43.     In 2003, I told Mr. Kustasz and Mr. LaDieu that I was interested in moving
from Big Bear Lake, California to Grants Pass, Oregon. I asked them if there was any
business reason why I should not move. They both told me that it was okay for my to
move. As a result, I put my home on the market and began looking for a new home in
Grants Pass, Oregon. In early 2004, when Mr. Roberts became my immediate supervisor,
I sent him an e-mail informing him that I was planning to move from Big Bear Lake,
California to Grants Pass, Oregon, that Mr. LaDieu and Mr. Kustasz had previously
approved the move, and I asked him to let me know if there was any reason why he didn't
think that I should move.

44.     I read in a document entitled "Debtor's Statement of Disputed Issues," that
Delphi is now saying that my skills were not suited to the Consumer Electronics
Division's strategic direction of selling products in major consumer electronics retail

stores like Best Buy and Circuit City. This statement is false and doesn't make sense. It is false for at least three reasons. First, the two individuals who supervised me during the vast majority of my employment at Delphi (Mr. Kustasz and Mr. LaDieu) repeatedly told me that my performance was "excellent," that I played a major role in the Company's ability to dramatically exceed our sales goals not only in the Western Region (the region for which I was responsible) but also with regard to the major national accounts, and that I had met or exceeded every goal that I was given. Second, the individual who supervised me after the Company fired Mr. Kustasz (Mr. Roberts) told me that I had done everything that he had asked of me. Third, as discussed above, Delphi had a policy requiring that underperforming employees be notified of their performance problems, placed on a PIP, and given a sufficient amount of time (typically 6 months) to improve. As Delphi never notified me of any performance problems nor placed me on a PIP, it could not have truly believed that I had any performance problems. This statement does not make sense because I was Delphi's *Western* Regional Sales Manager. As such, my job duties and responsibilities simply did not encompass Circuit City which had its corporate headquarters in Richmond, Virginia.

45.    I read in a document entitled "Debtor's Statement of Disputed Issues," that Delphi is now saying that I was not effective in my sales position. This statement is absolutely false. It is false for at least three reasons. First, the two individuals who

20

supervised me during the vast majority of my employment at Delphi (Mr. Kustasz and

Mr. LaDieu) repeatedly told me that my performance was "excellent," that I played a

major role in the Company's ability to dramatically exceed our sales goals not only in the

Western Region (the region for which I was responsible) but also with regard to the major

national accounts, and that I had met or exceeded every goal that I was given. Second,

the individual who supervised me after the Company fired Mr. Kustasz (Mr. Roberts) told

me that I had done everything that he had asked of me. Third, as discussed above, Delphi

had a policy requiring that underperforming employees be notified of their performance

problems, placed on a PIP, and given a sufficient amount of time (typically 6 months) to

improve. As Delphi never notified me that I was not effective in my position nor placed

me on a PIP, it could not have truly believed that I was not effective in my position.


46.     I read in a document entitled "Debtor's Statement of Disputed Issues," that

Delphi is now saying that I did not appear to have the connections and ability to

successfully operate in the major retail electronics field. This statement is absolutely

false. As explained above, I had significant experience working with the major players in

the major retail electronics industry and he had the necessary connections at consumer

electronics retail store such as Best Buy, Circuit City, The Good Guys, Fred Meyer

Department Stores, Ultimate Electronics, and Costco to name a few. In addition,

according not only to me but also to my supervisors, my actual performance at Delphi

21

met or exceeded all expectations set for me by the Company and thereby demonstrated
not only that I had the connections and ability to successfully operate in the major retail
electronics field, but also that I was successfully operating in the major retail electronics
field.  Indeed, the two individuals who supervised me during the vast majority of my
employment at Delphi (Mr. Kustasz and Mr. LaDieu) repeatedly told me that my
performance was "excellent," that I played a major role in the Company's ability to
dramatically exceed our sales goals not only in the Western Region (the region for which
I was responsible) but also with regard to the major national accounts, and that I had met
or exceeded every goal that I was given.  Second, the individual who supervised me after
the Company fired Mr. Kustasz (Mr. Roberts) told me that I had done everything that he
had asked of me.

47.    I read in a document entitled "Debtor's Statement of Disputed Issues," that
Delphi is now saying that I "did not appear to have a level of self-initiative or timeliness
that was required and expected for his position."  This statement is absolutely false. As
indicated above, my supervisors told me that my performance was "excellent" and that I
met or exceeded all of the goals that the Company set for me.

\\\

\\\

\\\

Declaration of Gary Whitney

I declare under penalty of perjury under the laws of the State of California,

the State of Colorado, and the United States that the foregoing is true and correct.

Executed this 16ᵗʰ day of July 2007 at_COLLINS [name of City],

COLORADO [Name of State].

Gary Whitney

# EXHIBIT A

Employment Policies

- Personal Development Plan, PBP, is to be initiated by the supervisor at time of employment.
    - Annual Business Objectives are entered so employee understands the scope of the organization's management directive
    - Major Responsibilities are developed by the supervisor with input from the employee. This section lists what the companies expectation is of the employee work effort and conduct.
    - Performance Objectives are developed with specific expected results. Performance objectives must be Specific, Measurable, Aligned, Realistic, Time-specific, SMART

- Personal Development Plan, PBP, is to have an interim feedback/process/review, usually in the August 31 timeframe.
    - Objectives reviewed for progress
    - Discussion on improvement or accomplishment
    - Supervisor guidance on meeting objectives and performance.

- Personal Development Plan, PBP, Final Review/Comments is communicated prior to the end of the calendar year.
    - Supervisor rates employee on Excellence Competencies with comments on Strengths, Proficient or Developmental Need
    - Supervisor rates on Overall Performance, Outstanding, Satisfactory, Diminishing Performance, Unsatisfactory
    - Supervisor is to develop a plan to assist employee in improvements if rated Diminishing Performance with specific instruction on supervisor expectation and SMART objectives to monitor performance
    - Supervisor in conjunction with Human Resources develops a Performance Improvement Plan, PIP, if employee is rated Unsatisfactory. Specific instruction and expectations with objectives that are SMART are monitored to insure the employee knows where they are in these accomplishments. It is the responsibility of the supervisor to assist the employee develop the attributes and give guidance to the employee to meet the expectations if the employee's competence level can adapt.
    - If the employee, with the supervisor's assistance, cannot meet the expectations agreed upon by Human Resources, the supervisor and the employee within a "reasonable period of time" historically 6 months, the employee can be released.

# EXHIBIT B

## SEPARATION AGREEMENT & RELEASE

Gary Whitney ("Employee") and, Delphi Corporation, and all affiliates, predecessors, and divisions (collectively "Delphi"), in consideration for the payments and mutual covenants below, enter into the following Separation Agreement and Release ("Agreement"):

1. Employee's Last of Work with Delphi will end effective June 23, 2004.

2. Notwithstanding Employee's separation from employment, in consideration for this Agreement, Employee will receive the following additional special negotiated terms and consideration:

   (a) Delphi will pay to Employee Twenty Thousand and one Dollars ($20,001.00), less withholding for any and all applicable federal, state and local taxes within 30 days following expiration of the seven (7) day revocation period described in Paragraph 13 below.

   (b) Employee will have the opportunity to utilize outplacement service provided By Lee, Hecht, Harrison (cost of which, up to $3,900, will be paid directly by the Company).

   (c) Delphi will pay to Employee, in addition to the amount referenced in sub-paragraph (a) above, Two Thousand Dollars ($2,000.00), less withholding for any and all applicable federal, state and local taxes, in transition assistance within 30 days following expiration of the seven (7) day revocation period described in Paragraph 13 below.

3. Employee acknowledges that the consideration referred to in Paragraph 2 is more than Delphi is required to provide under its normal policies, procedures or programs and that Employee would not be eligible for said consideration absent this Agreement. Employee further acknowledges that the additional special consideration Delphi is providing pursuant to Paragraph 2 above is being provided to Employee based upon this Agreement and is not a standard part of any exit incentive program being offered to a group of Delphi employees.

4. Except for the rights and obligations created by this Agreement and for the consideration provided for in this Agreement, Employee, on his behalf and on behalf of his heirs, agents, representatives, successors, or assigns, releases, remises, and forever discharges Delphi, its officers, directors, and employees, from all claims, demands, and causes of action, known or unknown which Employee may have based on his employment with or separation from Delphi. This release specifically includes, without limitation, a release of any rights or claims Employee may have under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"); Title VII of the Civil Rights Act of 1964, which prohibits discrimination in employment based on race, color, national origin, religion, or sex; the Age Discrimination and Employment Act,

which prohibits age discrimination in employment based on age; the Americans with Disabilities Act, which prohibits discrimination in employment based on disability; the Equal Pay Act; state fair employment practices or civil rights laws, and any other federal, state, or local laws, or regulations, or any common law actions relating to employment, or employment discrimination. This release further includes, without limitation, any claims for breach of employment contract, either express or implied, defamation, slander, libel, or wrongful discharge and California Labor Code Section 970. This release covers both claims that Employee knows about and those he does not know about. This Agreement does not waive any claims that arise after the date Employee separates from employment with Delphi. Employee waives all rights under Section 1542 of the California Civil Code which provides that a general release does not extend to claims that the creditor does not know or suspect to exist in his favor at the time of executing the release which if known by him must have materially affected his settlement with debtor.

5. Employee promises never to file a lawsuit against Delphi asserting claims that are released in Paragraph 4.

6. Employee understands and agrees that, by entering into this Agreement and payment of the aforesaid consideration, Delphi, its officers, agents and employees do not admit any unlawful conduct, discrimination, breach of contract, wrongful discharge deceit, fraud, negligence, carelessness or any other liability to Employee.

7. Employee acknowledges that during the course of his employment with Delphi, he had access and was privy to information, documents and/or materials relating to Delphi which are of a confidential and/or proprietary nature and/or which constitute or contain trade secrets or privileged information the disclosure of which will cause irreparable harm to Delphi. Employee hereby warrants and affirms that he has or will have by June 23, 2004 returned to Delphi any and all such documents and/or materials that are in his possession or control. Employee further agrees that he will not discuss or disclose to any person or entity any trade secrets, confidential and/or proprietary information, or privileged matters and will abide by the terms of this Agreement and any prior agreements or acknowledgements made by Employee pertaining to protection of confidential and/or proprietary information related to products, processes, business, work, design, methods, styling, inventions and facilities of Delphi and its customers. Employee further acknowledges that any continuing, post-employment obligations Employee has under the Delphi Intellectual Property Rights Agreement, Customer Information Security and Protection Agreement and any other agreements signed by him as Delphi employee are not waived or otherwise affected by this Agreement.

8. Employee understands and agrees that the existence and terms of this Agreement, together with the negotiations, discussions, and proceedings leading up to this Agreement are confidential and may not be disclosed to any other person or entity, other than to Employee's immediate family members, attorneys and tax consultants. Employee agrees that neither he, his family, his attorneys, consultants or any individual acting on Employee's behalf shall disclose any of these matters to any person or entity, except as expressly required by law.

2

9. This Agreement is the entire and only agreement and understanding between Employee and Delphi regarding Employee's separation from employment with Delphi. Delphi has made no representations or promises to Employee regarding his separation other than those in this Agreement.

10. Employee acknowledges that he has been given a period of twenty-one (21) days to review and consider this Agreement before signing it. Employee understands that he may use as much of the twenty-one (21) day period as he wishes prior to signing. Employee has been advised that he may consult with an attorney before signing this Agreement. Employee understands that whether or not he does so is exclusively his decision.

12. Delphi suggests Employee consult with an attorney before signing this Agreement. Employee understands that whether or not he does so is exclusively his decision.

13. Employee may revoke this Agreement within seven (7) days of signing it. Employee may revoke the Agreement by delivering a written "Notice of Revocation" to Burt Valanty, 1441 West Long Lake Road, Troy, Michigan 48098-5090. For the revocation to be effective, written notice must be received no later than the close of business on the seventh (7th) day after Employee signs this Agreement. If Employee revokes this Agreement, no part will be effective or enforceable and Employee will not receive the consideration provided for in this Agreement.

**EMPLOYEE ACKNOWLEDGES READING THIS AGREEMENT, AND, BY HIS SIGNATURE BELOW, STATES THAT HE UNDERSTANDS ITS TERMS AND VOLUNTARILY AGREES TO SUCH.**

**PLEASE READ THIS AGREEMENT CAREFULLY. IT CONTAINS A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.**

Accepted by Employee:                          Accepted by Delphi:


_____                        _____
Gary Whitney                                   Burt Valanty
                                               Director Human Resources

Dated: _____                         Dated: 06/23/2004

3