**Hearing Date, Time, And Related Schedule: TO BE ESTABLISHED BY COURT**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
     Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |

EXPEDITED MOTION FOR ORDER AUTHORIZING AND APPROVING
DELPHI-APPALOOSA EQUITY PURCHASE AND COMMITMENT AGREEMENT
PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), 503(b), AND 507(a)

("DELPHI-APPALOOSA INVESTMENT AND PLAN FRAMEWORK MOTION")

Delphi Corporation ("Delphi" or the "Company") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (the "Debtors"), submit this expedited motion (the "Motion") for an order authorizing and approving the Delphi-Appaloosa Equity Purchase and Commitment Agreement (as defined below) and certain related agreements pursuant to 11 U.S.C. §§ 105(a), 363(b), 503(b), as described herein, and respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  The Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the Creditors' Committee, the "Statutory Committees").

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are sections 105,

363(b), 503(b), and 507(a) of the Bankruptcy Code and rule 6004 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as

of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately

$15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues and the thirteenth largest public company

business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors and continue their business operations without supervision from the Bankruptcy Court.[2]

6.      The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer ("OEM").

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27,
2007.

[2]    On March 20, 2007, Delphi Automotive Systems Espana S.L., whose sole operation is a non-core automotive
component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding.  The
application was approved by the Spanish court on April 13, 2007.  The Concurso proceeding is consistent with
Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

C.      Events Leading To The Chapter 11 Filing

8.      In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006, the Debtors incurred

a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee

special attrition programs.

9.      The Debtors believe that the Company's financial performance has

deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which

have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production

environment for domestic OEMs resulting in the reduced number of motor vehicles that GM

---

[3]     Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
        valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating
        loss in calendar year 2004 was $482 million.

produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

10.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined five key tenets of its transformation plan.  First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.[4]  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.[5]  Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the

---

[4]    Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM that (a) modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the UAW, and its various locals, (b) provides that GM and Delphi will undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate these modifications, and (c) modifies retiree welfare benefits for certain UAW-represented retirees of the Debtors.  This agreement, which is subject to approval by this Court, should facilitate the Debtors' reaching consensual resolutions of their labor issues with the remaining unions and GM and permit the Debtors to continue to implement their transformation plan and to develop, prosecute, confirm, and consummate a plan of reorganization.  Delphi is currently engaged in settlement discussions with its second and third largest U.S. labor unions and is working to conclude discussions with those unions as well as three smaller unions as soon as practicable.

[5]    On July 9, 2007, Delphi confirmed that its discussions with GM on a comprehensive settlement agreement had entered the documentation phase and that it expected that a settlement with GM would be incorporated into the Debtors' plan of reorganization rather than filed with this Court for separate approval.

necessary manufacturing alignment with their new focus.[6]  Fourth, the Debtors must transform

their salaried workforce to ensure that the Company's organizational and cost structure is

competitive and aligned with its product portfolio and manufacturing footprint.[7]  Finally, the

Debtors must devise a workable solution to their current pension situation.[8]

12.    Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

---

[6]    In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and
"non-core" product lines and plants.  The Debtors have been working to divest non-core assets so as to
maximize the value of the estate for stakeholders.  During the 2006 and 2007 calendar years, for example, the
Debtors sold substantially all of the assets related to MobileAria, Inc., its chapter 11 affiliate, they obtained
court approval for the sale of substantially all of the assets of their brake hose business, and they obtained court
approval of bid procedures related to the upcoming sale of substantially all assets used in their catalyst business
and their Saltillo, Mexico brake plant business.  In addition, as announced publicly, the Debtors anticipate
selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

[7]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product
portfolio on core technologies for which the Company believes it has significant competitive and technological
advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics
and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also
has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the
Company's transformation plan.  The Debtors also made significant progress in ensuring that their
organizational and cost structure is competitive in obtaining the entry of this Court's Order Under 11 U.S.C.
Section 363(b) and Fed. R. Bankr. P. 6004 Authorizing Debtors to Enter into Finance Outsourcing Agreement
on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order").  The Finance Outsourcing Order
authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets,
travel and expense reporting, general ledger, and contract administration processes and significantly reduce
SG&A expenses as part of their transformation plan.

[8]    To that end, on May 31, 2007, the Bankruptcy Court granted the Debtors' motion for authority to perform under
the terms of those certain September 30, 2006 plan year funding waivers, which were approved by the IRS, for
both the Delphi Hourly-Rate Employees Plan (the "Hourly Plan") and the Delphi Retirement Program for
Salaried Employees (the "Salaried Plan" and together with the Hourly Plan, the "Plans").  On July 13, 2007, the
IRS modified the conditional funding waivers granted to Delphi related to the Plans, extending the dates by
which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and
February 28, 2008, respectively.

E.    The Original Equity Purchase And Commitment Agreement

13.    In the summer of 2006, Appaloosa Management L.P. ("Appaloosa") and

Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), as significant stakeholders of the

Debtors, negotiated and entered into non-disclosure agreements with the Debtors pursuant to

which they obtained certain information from and about the Debtors and their businesses and

engaged in discussions regarding various potential reorganization structures and related matters,

including the potential requirement for a substantial equity investment in Delphi to facilitate the

Debtors' restructuring.  Following several months of negotiations among Delphi, GM, the

Statutory Committees, Appaloosa, Harbinger, and other potential investors, on December 18,

2006, the Debtors announced their execution of an equity purchase and commitment agreement

(the "Original EPCA") with affiliates of Appaloosa, Cerberus Capital Management, L.P.

("Cerberus"), and Harbinger, as well as Merrill Lynch & Co. ("Merrill") and UBS Securities

LLC ("UBS") (collectively, the "Original Investors"), and a plan framework support agreement

(the "Original PSA," and together with the Original EPCA, the "Original Framework

Agreements") with the Original Investors and GM.  As previously discussed in the Debtors'

motion for approval of the Original EPCA and the Original PSA,[9] the Original EPCA and

Original PSA were the product of framework discussions that commenced in August 2006 and

culminated in the Debtors' December 18 announcement.  The Original PSA, as well as the

economics and structure of the plan framework itself, were expressly conditioned on reaching

consensual agreements with Delphi's U.S. labor unions and GM.  Both Delphi and the Original

Investors were permitted to terminate the Original EPCA (which would terminate the Original

---

[9]    See Expedited Motion for Order Authorizing and Approving The Equity Purchase and Commitment Agreement
Pursuant to Sections 105(a), 363(b), 503(b), and 507(a) of the Bankruptcy Code and the Plan Framework
Support Agreement Pursuant To Sections 105(a), 363(b), and 1125(e) of the Bankruptcy Code, dated December
18, 2006 (Docket No. 6179) (the "Original Framework Motion").

PSA) if consensual agreements were not reached with labor and GM that were acceptable to each party in their sole discretion.

14.     The Framework Hearing.  Despite the months of framework discussions and negotiations, the Original Framework Motion immediately drew objections from the Debtors' Statutory Committees.  The Debtors also received objections from the Ad Hoc Committee of Delphi Trade Claim Holders, the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America (the "IUE-CWA"), the International Union of Operating Engineers (the "IUOE"), the International Brotherhood of Electrical Workers (the "IBEW"), and the U.S. Trustee.

15.     On December 21, 2006, the Debtors received an unsolicited investment proposal from Highland Capital Management, L.P. ("Highland").  Highland issued a press release stating that it was prepared to offer a competing investment proposal, submitted a letter to the Board outlining the proposal's principal terms, and objected to the Original Framework Motion, attaching its alternative proposal as an exhibit to that objection.[10]  Prior to issuing its press release and letter to the Board, Highland had made no prior contact with the Debtors regarding participation in the Debtors' reorganization.  Nevertheless, Delphi acknowledged publicly on December 21, 2006 that it would carefully analyze and consider Highland's proposal and discuss its merit with the Board.

16.     Simultaneously, the Debtors and their advisors worked to resolve the objections received to the Original Framework Motion.  While attempting to resolve the objections to the Original Framework Motion, the Debtors' discussions and meetings with Highland continued, including attempts to negotiate the terms and conditions of a proposed

---

[10]    Unlike the transaction contemplated by the Original EPCA, the current transaction with Appaloosa as lead investors has the support of both Statutory Committees, as well as GM.

confidentiality agreement.  Subsequently, Highland agreed to provide additional information to the Debtors, including proposed revisions to the existing Original Framework Agreements, Highland's due diligence requests and timetable, and Highland's vision statement regarding execution of the transaction and the value Highland would bring to the Debtors as a plan investor.

17.    In early January 2007, the Board met and continued its evaluation of the Highland proposal while the Debtors solicited input regarding the Highland proposal from their key constituencies, including GM, the Statutory Committees, the labor unions, and other stakeholders.  The Debtors advised Highland that they would proceed with the hearing on the Original Framework Motion on January 11, 2007 because it was in the best interests of the Company and its stakeholders, taken as a whole, to enter into the Original PSA and Original EPCA and endeavor to carry out the terms of those agreements.  The Debtors advised Highland that the Debtors could not then conclude that the Highland proposal, as a matter of fact, would deliver superior value to the Debtors' stakeholders and that there were significant conditionality and execution risks in the Highland proposal.

18.    At the hearing on the Original Framework Motion, four witnesses testified, including the Executive Chairman of the Board, the Debtors' Chief Restructuring Officer, and the Debtors' lead financial advisor.  After closing arguments, on January 12, 2007, this Court rendered an opinion approving the Original Framework Approval Order,[11] which reflected, among other things, that entry into the Original Framework Agreements was a proper exercise of the Debtors' business judgment.  The Court noted that in reviewing the Original

---

[11]    See Order Authorizing and Approving The Equity Purchase and Commitment Agreement Pursuant to Sections 105(a), 363(b), 503(b) and 507(a) of the Bankruptcy Code and the Plan Framework Support Agreement Pursuant to Sections 105(a), 363(b) and 1125(e) of the Bankruptcy Code, dated January 12, 2007 (Docket No. 6589).

Framework Agreements and the Highland proposal Delphi's Board "is not only independent and

without conflict but also one that acted with due care and responsibly and with a welcome degree

of responsiveness to the views of their constituents." (Transcript of January 12, 2007 Hearing at

112: 5, 116: 13-15.) On January 18, 2007, the Original Framework Agreements were fully

executed.

F.    Original EPCA Amendments, Termination, And Other Significant Events

19.    On February 28, 2007, Delphi announced that it had entered into an

amendment to the Original EPCA with the Original Investors. The amendment revised, among

other things, the provision of the Original EPCA granting Delphi and the affiliates of two

Original Investors, Cerberus and Appaloosa, the right to terminate the Original EPCA if Delphi

did not reach tentative labor agreements with its principal labor unions and a consensual

settlement of legacy issues with GM by January 31, 2007. The amendment extended the

termination deadline to a future date to be determined through a notice mechanism, and provided

further that Delphi and the affiliates of Cerberus and Appaloosa would not exercise their section

12(g) termination right before March 15, 2007. The amendment also extended the deadline for

making certain regulatory filings under the federal antitrust laws in connection with the Original

EPCA-related transactions.

20.    In furtherance of the transactions contemplated by the Original EPCA, on

March 7, 2007, Delphi filed with the United States Securities and Exchange Commission a

registration statement on Form S-1 regarding the rights offering for Delphi common stock.

21.    On April 18, 2007, Highland sent a letter to the Board asserting its

continued interest in going forward as a plan investor. After the completion of the hearing on the

Original Framework Agreements, Delphi invited Highland to enter into a non-disclosure and

standstill agreement similar to that executed by the Original Plan Investors and proceed with due

10

diligence on a "dual track" basis with the Original Plan Investors.  Highland declined Delphi's

invitation and initiated no formal communications with the Debtors until sending this letter.

Prior to this time, Highland made no effort to contact any of Delphi's senior officers with whom

Highland had extensive prior communication.  Delphi responded to Highland's letter on the same

day and pointed out the three-month lapse in communications from Highland, as well as

Highland's continuing refusal to enter into a non-disclosure and standstill agreement and

commence due diligence.[12]

        22.      Delphi confirmed on April 19, 2007 that it anticipated negotiating

additional changes to the Original EPCA and amendments to the Original PSA, and that none of

the parties to the Original EPCA or the Original PSA had issued a termination notice.  The

primary reason for the negotiations were the differing views of Delphi, the Original Investors,

GM, and the Statutory Committees in these cases as to the enterprise value of a reorganized

Delphi.  Delphi's expectation at that time was that all of the Original Investors except Cerberus

would continue to participate as plan investors (possibly together with additional new plan

investors), and that Cerberus might participate in Delphi's exit financing.  Delphi met with its

Statutory Committees during this period to review these developments and potential revisions

regarding the treatment of Delphi's stakeholders under a plan of reorganization, including

increasing the equity portion of the recovery available to general unsecured creditors in order,

among other things, to reduce the cash raise required to fund more robust reorganization plan

distributions.

---

[12] Following this correspondence, Highland ultimately entered into a non-disclosure and standstill agreement and a diligence protocol agreement on May 25, 2007, as a co-investor in a transaction led by another potential investor, Pardus Capital Management L.P. ("Pardus").  It was not until June 18, 2007 that Highland executed a non-disclosure and standstill agreement and a diligence protocol agreement to lead its own investment group.

23.    During May and June, 2007 while continuing discussion with the Original

Plan Investors regarding an agreement to modify the Original EPCA, as well as conducting

discussions with alternative plan investors with respect to new equity purchase and commitment

agreements, Delphi was also focused intensely on negotiations with its principal U.S. labor

unions and GM.  During this time period, GM and Delphi agreed on the documentation

architecture for their settlement and restructuring agreements.

24.    On June 22, 2007, Delphi achieved another significant milestone in its

transformation and a major step toward emergence when it reached an agreement with the United

Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM

(the "UAW Settlement Agreement").  The UAW Settlement Agreement is a comprehensive

agreement that modifies, extends, or terminates the provisions of the existing collective

bargaining agreements among Delphi, the UAW, and its various locals; provides that GM and

Delphi will undertake certain financial obligations to Delphi's UAW-represented employees and

retirees to facilitate those modifications; and settles the contested matter regarding the Debtors'

motion under sections 1113 and 1114 of the Bankruptcy Code as it pertains to the UAW.[13]  The

UAW membership ratified the UAW Settlement Agreement on June 28, 2007.  The following

day, the Debtors filed a motion seeking this Court's approval of the UAW Settlement

Agreement.[14]  The motion, which is not contested, will be heard at the omnibus hearing on July

19, 2007.

---

[13]    See Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements
And Under 11 U.S.C. § 1114(g) Authorizing Modification Of Retiree Welfare Benefits ("Section 1113 And
1114 Motion"), dated March 31, 2006 (Docket No. 3035).

[14]    See Motion For Order Under 11 U.S.C. §§ 363, 1113 And 1114 And Fed. R. Bankr. P. 6004 And 9019
Approving Memorandum Of Understanding Among UAW, Delphi, And General Motors Corporation Including
Modification Of UAW Collective Bargaining Agreements And Retiree Welfare Benefits For Certain UAW-

25.    Delphi is currently engaged in active bargaining with its second- and third-largest unions – the International Union of Electronic, Electrical, Salaried, Machine, and Furniture Workers-Communications Workers of America and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC – with respect to consensual agreements resolving the labor issues affecting those unions.  Delphi is working to conclude those discussions, as well as discussions with its three remaining unions, as soon as possible.

26.    Despite many positive developments, over the Independence Day holiday Delphi determined that it would be unable reach agreements with its various constituencies and investors that would allow the Original Framework Agreements to continue or allow the Original Framework Agreements to serve as a basis for the Debtors' plan of reorganization.  On July 7, 2007, pursuant to section 12(g)[15] of the Original EPCA, Delphi sent a termination notice of the Original EPCA to the other parties to the Original EPCA.  As a result of the termination of the EPCA, a Termination Event (as defined in the Original PSA) occurred, and all obligations of the parties to the Original PSA under the Original PSA were immediately terminated and were of no further force and effect.  On July 9, 2007, Delphi publicly disclosed that it had terminated the Original EPCA and the Original PSA, and that it expected to enter into new framework agreements at some point in July 2007.  Delphi also confirmed on that date that its discussions with GM regarding a comprehensive settlement agreement had entered the documentation phase.

Represented Retirees ("UAW 1113/1114 Settlement Approval Motion"), dated June 29, 2007 (Docket No. 8445).

[15]    Section 12(g) of the Original EPCA was modified by an amendment entered into between Delphi and the Original Investors on February 28, 2007.  Under modified section 12(g), certain parties to the Original EPCA could deliver a notice of termination at any time before a specified date (as such term was defined in modified section 12(g)), but not after Delphi had entered into both (i) tentative labor agreements with its unions and (ii) the settlement with GM.

Delphi expects that a settlement with GM will be incorporated in its plan of reorganization, rather than filed with this Court for separate approval.

27.     Simultaneously, while the Debtors were negotiating the potential amendments to the Original EPCA and Original PSA, in late June and early July, the Debtors received an amended draft of the Original EPCA from Appaloosa and a draft of a potential investment agreement from Highland.  The Debtors reviewed and evaluated the draft agreements and provided comments on the draft investment agreements at various times, including to Appaloosa on July 7 and to Highland on July 9.  On July 11, the Debtors met with Appaloosa for more than six hours to further discuss and negotiate Appaloosa's investment agreement.  That same day, the Debtors also met with Highland in the late afternoon for a negotiation session that lasted more than six hours.  Through these meetings and negotiation sessions, the Debtors developed a set of competing investment proposals from Appaloosa and Highland.

28.     Following the meetings on July 11, both Appaloosa and Highland committed to sending the Debtors revised agreements that represented their "best and final" proposals on Friday, July 13.  Appaloosa submitted a revised draft agreement late Friday night, and Highland sent its revised draft agreement on Saturday night, July 14.  The Debtors also actively continued discussions with both Appaloosa and Highland following the meetings on July 11.  While discussions with the potential investors were ongoing, the Debtors also kept their key stakeholders, including GM and the Statutory Committees, up to date on the plan investor developments.

29.     On July 16, 2007, Delphi's Board of Directors met to consider two proposals for a new equity purchase and commitment agreement – one put forward by an investor group led by Appaloosa, and the other proposed by Highland.  At the meeting, the

Board received and reviewed presentations by Delphi's management and legal and financial advisors comparing and contrasting the proposals, and weighed the costs and benefits of proceeding with several courses of action.

30.    The Board met again on the night of July 17 to consider the proposals. The Board formed a special committee and delegated authority on behalf of the Company to the special committee. The special committee acted pursuant to its authority, and following the special committee session on the morning of July 18, Delphi announced[16] that it had accepted a new proposal for an equity purchase and commitment agreement with the affiliates of lead investor Appaloosa Management L.P.; Harbinger Capital Partners Master Fund I, Ltd.; Merrill Lynch, Pierce, Fenner & Smith Inc., UBS Securities LLC; Goldman Sachs & Co.; and Pardus Capital Management L.P. (the "Delphi-Appaloosa EPCA"[17]). The Delphi-Appaloosa EPCA outlines the terms of the investment and the expected treatment of the Debtors' stakeholders in its

---

[16]    A copy of Delphi's press release, issued on July 18, 2007, is attached hereto as <u>Exhibit A</u>.

[17]    As referenced in the Delphi-Appaloosa EPCA and used herein, "Investors" means A-D Acquisition Holdings, LLC (an affiliate of Appaloosa) ("ADAH"), Harbinger Del-Auto Investment Co. Ltd. (an affiliate of Harbinger), Pardus DPH Holding LLC (an affiliate of Pardus), GS, Merrill, and UBS. In connection with the Delphi-Appaloosa EPCA, Appaloosa, Harbinger, and Pardus Special Opportunities Master Fund L.P. (collectively, the "Commitment Parties"), are also executing certain equity commitment letters (the "Commitment Letters," along with the Investment Proposal Letter (the "Proposal Letter") and the Delphi-Appaloosa EPCA, collectively, the "Investment Agreements")) in support of the obligations of their respective affiliate Investors under the Delphi-Appaloosa EPCA. The Commitment Letters, in turn, set forth the terms and conditions upon which the Commitment Parties will provide the funding to the Investors that will be necessary to enable the Investors to make the investment called for under the Delphi-Appaloosa EPCA. The Investors and the Commitment Parties are collectively referred to herein as the "Plan Investors"; when the term "Plan Investors" is used in connection with a specific agreement, the term includes only those Plan Investors as defined in such agreement. The discussion of the Delphi-Appaloosa EPCA contained herein is a summary only. The Delphi-Appaloosa EPCA is a complex and lengthy document, and many of the provisions of the agreement are not highlighted in this summary. In the event of any inconsistency between this summary and the Delphi-Appaloosa EPCA, the terms of the agreement control.

anticipated plan of reorganization and provides a framework for several other aspects of the

Debtors' reorganization.[18]

G.    The Revised Framework Agreements

31.    The negotiations between Appaloosa and the Debtors described above led

to the development of the terms of the Delphi-Appaloosa EPCA described below.  The Debtors

believe that the change in terms of the amended framework documents will materially benefit the

estates and all of the Debtors' stakeholders.  For example, and as discussed in more detail below,

unlike the Original EPCA, the closing conditions in the Delphi-Appaloosa EPCA are not subject

to the completion of due diligence and the Plan Investors no longer have the ability to make

determinations under the agreement in their sole discretion.[19]

(a).    Delphi-Appaloosa Equity Purchase And Commitment Agreement

32.    Plan Investor Investments.  The Delphi-Appaloosa EPCA sets forth the

terms and conditions upon which the Plan Investors would (i) commit to purchase approximately

$175 million of common stock in the reorganized Delphi (the "Direct Subscription Shares") and

$800 million of preferred shares in the reorganized Delphi (the "Preferred Shares") and (ii)

commit to purchasing any unsubscribed shares of common stock in connection with a rights

offering (the "Rights Offering") to existing common stock holders (the "Back Stop

Commitment").[20]

---

[18]    Attached as Exhibit B hereto is a copy of the executed Proposal Letter, dated July 18, 2007, and its attachments,
including the Delphi-Appaloosa EPCA, the Preferred Stock Term Sheet, the Plan Framework and Special
Statutory Committee Provisions, and the Commitment Letters from the Committee Parties that are using special
purpose transaction entities as signatories to the Delphi-Appaloosa EPCA.

[19]    Exhibit C  attached hereto contains a marked version showing changes between the Original EPCA and certain
of its exhibits and the Delphi-Appaloosa EPCA and certain of its exhibits.

[20]    The Original EPCA called for the Original Investors to purchase $220,500,000 of common stock through a
direct purchase, $1.2 billion in preferred stock, and to back stop a $1.984 billion rights offering.

33.    The Rights Offering contemplated by the Delphi-Appaloosa EPCA provides that Delphi would distribute at no charge to each holder of common stock (an "Eligible Holder"), as of a record date to be determined, certain rights (the "Rights") to acquire new common stock in reorganized Delphi.  The Rights would permit Eligible Holders to purchase their pro rata share of 41,026,311 shares[21] of new common stock at a purchase price of $38.39 per share.  Under the Delphi-Appaloosa EPCA, the Rights would be issued to Eligible Holders after the confirmation of Delphi's plan of reorganization and the Rights Offering would remain open for 30 days after the distribution of the Rights.[22]  The Plan Investors would commit to purchase the number of shares that were offered through the Rights Offering to Eligible Holders, but whose rights were not properly exercised (the "Unsubscribed Shares").  In the event that no shareholders were to subscribe to the Rights Offering, the Plan Investors, through the Back Stop Commitment, would purchase all of the Unsubscribed Shares for approximately $1.575 billion. Altogether, through the Back Stop Commitment and the purchase of the Direct Subscription Shares and the Preferred Shares, the Plan Investors could invest up to $2.55 billion in the reorganized Debtors.[23]

---

[21]    References to the number of shares in various sections of this Motion and the Delphi-Appaloosa EPCA are preliminary estimates based on current assumptions regarding, among other items, amounts of unsecured claims and accrued interest, assumed net debt at emergence, and the date of emergence. Changes in these assumptions will impact the actual number of shares issued pursuant to the Delphi-Appaloosa EPCA and described in the Delphi-Appaloosa Agreement, the Preferred Stock Term Sheet, and Plan Framework Provisions.  See, e.g., Delphi-Appaloosa EPCA §§ 1(c), 2(a), 3(d).

[22]    The Original EPCA provided for a rights offering of 56,700,000 shares, with an exercise price of $35 per share. Under the terms of the Original EPCA, the rights offering would have taken place at the same time as solicitation on the Debtors' plan of reorganization.

[23]    Although the investments contemplated by the Delphi-Appaloosa EPCA have been fully committed to by the Plan Investors, Delphi has been advised that the allocation of investment amounts among the Plan Investors  (as described on Schedule 2 to the Delphi-Appaloosa EPCA) has not been finalized.  Such amounts will be finalized before the entry of the order approving this Motion.

34.    <u>Fees And Transaction Expenses</u>.  In connection with the Plan Investors'
commitment to purchase the Preferred Shares, the Debtors would pay the Plan Investors an
aggregate commitment fee of $18 million (the "Preferred Commitment Fee").[24]  In addition, to
compensate the Plan Investors for their undertakings in connection with their purchase of the
Direct Subscription Shares and the Backstop Commitment, the Debtors would pay an aggregate
commitment fee of $39.375 million (the "Standby Commitment Fee" and, together with the
Preferred Commitment Fee, the "Commitment Fees").[25]  The Debtors would also pay an
arrangement fee of $6.375 million to Appaloosa to compensate Appaloosa for arranging the
transactions contemplated in the amended framework agreements (the "Arrangement Fee," and
together with the Commitment Fees, the "Fees").  The total of the Fees payable to the Plan
Investors under the Delphi-Appaloosa EPCA would be $63.75 million.

35.    The Commitment Fees would be paid in stages.  The first payment of the
Commitment Fees, in the amount of $7,525,000, and the Agreement Fee will be paid on the first
business day following the first date that the order approving this Motion is issued by this Court.
The balance of the first 50% of the Commitment Fees, $21,162,500, will be paid on the date that
the disclosure statement is filed.  The balance of the Commitment Fees, $28,687,500, will be
paid on the first business day following the entry of an order by the Bankruptcy Court approving
the Debtors' disclosure statement.

36.    The Debtors will also agree to reimburse or pay the out-of-pocket costs
and expenses reasonably incurred by the Plan Investors to the extent the expenses are incurred on
or before the first to occur of the termination of the Delphi-Appaloosa EPCA and the effective

---

[24]    The preferred commitment fee under the Original EPCA was $21 million.

[25]    The standby commitment fee under the Original EPCA was $55.125 million.

date of Delphi's reorganization plan (the "Transaction Expenses").  If Transaction Expenses are

incurred by (i) ADAH or Harbinger prior to December 1, 2006 (which expenses do not exceed

$5 million and do not include Transaction Expenses incurred by ADAH or affiliates on or prior

to May 17, 2006) and (ii) by ADAH and Harbinger from and after December 1, 2006, by GS

after July 3, 2007, by Pardus after June 18, 2007, or by UBS or Merrill after July 30, 2006, and

the Transaction Expenses are not already paid, the Transaction Expenses would be paid promptly

(within 30 days) upon submission to Delphi of summary statements by each Plan Investor and

without further Bankruptcy Court review or order.

   37.  In addition, under the terms of the Delphi-Appaloosa EPCA (i)

Transaction Expenses incurred by ADAH on or before May 17, 2006 in an amount not to exceed

$5 million would be paid if and when the effective date of any plan of reorganization occurs, and

only if the plan results in a recovery for holders of existing Delphi common stock, (ii)

Transaction Expenses incurred by Pardus on or prior to June 18, 2007 will be paid to the extent

that they comprise the reasonable fees, costs, and expenses of legal counsel to Pardus related to

the negotiation of the Delphi-Appaloosa EPCA, the non-disclosure agreement between Pardus

and Delphi, and the transactions contemplated by the Delphi-Appaloosa EPCA, (iii) Transaction

Expenses incurred by GS on or prior to July 3, 2007 would be paid to the extent that they

comprise the reasonable fees, costs, and expenses of legal counsel to GS related to the

negotiation of the Delphi-Appaloosa EPCA, the non-disclosure agreement between GS and

Delphi related to the transactions contemplated by the Delphi-Appaloosa EPCA, and the

transactions contemplated by the Delphi-Appaloosa EPCA, and (iv) the filing fee, if any,

required to be made by any Investor or its affiliates under the HSR Act or any other competition

laws or regulations would be paid by Delphi.

38.    To the extent permitted under any order authorizing the Company to obtain postpetition financing and/or to utilize cash collateral then or thereafter in effect (each, a "Financing Order"), the Transaction Expenses incurred from and after the date of entry of the Original Framework Approval Order would be protected by and entitled to the benefits of the carve-out for professional fees provided in any such Financing Order.

39.    The Debtors believe that the fee structure described above is appropriate. The Fees represent a 2.5% weighted average for the investments contemplated by the Delphi-Appaloosa EPCA.  In addition, the Plan Investors would receive a guaranteed allocation of the Rights Offering, which would allow the Plan Investors to purchase shares at a discount to the assumed value of $45.00 per share.  The compensation structure was agreed to following substantial arms-length negotiations between the Debtors and the Plan Investors, in a competitive investment environment.

40.    Representations, Warranties, And Covenants.  The Delphi-Appaloosa EPCA, like the Original EPCA, contains extensive representations, warranties, and covenants made by Delphi, and a customary set of more limited representations, warranties, and covenants by the Plan Investors.  Like the Original EPCA, under the terms of the Delphi-Appaloosa EPCA, Delphi would have additional time to deliver a disclosure schedule qualifying the representations and warranties made in the agreement.  Under the terms of the Delphi-Appaloosa EPCA, Delphi would deliver the disclosure letter to the Plan Investors no later than 10 days prior to the filing of Delphi's disclosure statement.  Delphi has covenanted to deliver to the Plan Investors as soon as reasonably practicable a final five-year business plan (which includes a binding GM settlement)..  ADAH would not be required to accept a business plan unless it is reasonably satisfied that the business plan does not amend or deviate from the draft business plan provided by Delphi in such

20

a way as would have a material impact on the Plan Investors' proposed investment in Delphi.

Delphi has also covenanted to use its reasonable best effort to agree on, before the disclosure

statement filing date, a settlement agreement with GM that is consistent with the Delphi-

Appaloosa EPCA, the Debtors' plan of reorganization, and the UAW memorandum of

understanding..

       41.   Conditions.  Unlike the Original EPCA, the Delphi-Appaloosa EPCA is

not subject to the completion of due diligence.  In addition, unlike the Original EPCA, which

included certain conditions to consummation of the investments contemplated by the Original

EPCA based on a sole discretion standard, the Delphi-Appaloosa EPCA contains no conditions

that are subject to a "sole discretion" standard.  For example, in the Original EPCA, each of the

affiliates of Appaloosa and Cerberus investing in Delphi had, during a specified time period, sole

discretion to approve the GM settlement and labor agreements with the UAW, IUE-CWA, and

the USW.  In the Delphi-Appaloosa EPCA, the applicable condition generally provides that

Appaloosa must be reasonably satisfied with the terms of certain specified documents, including

the plan and disclosure statement, confirmation order, business plan, certain constituent

documents, and labor agreements to the extent the terms thereof would have an impact on the

Plan Investors' proposed investment in Delphi.  The condition with respect to the GM Settlement

is based on a standard of the reasonable discretion of Appaloosa, taking into account whether the

GM settlement has a material impact on the Plan Investors' proposed investment in the

Company, and other relevant factors.

       42.   Termination Provisions.  Another significant change between the Original

EPCA and the Delphi-Appaloosa EPCA is the ability of Delphi to cure a deficiency in the

satisfaction of certain conditions.  The Delphi-Appaloosa EPCA provides that termination can

21

occur for a period of 20 days following a cure period after a notice of deficiency is given by

ADAH with respect to failure to satisfy a condition relating to, among others, the plan, disclosure

statement, the confirmation order, the GM settlement, the business plan, or other constituent

documents.  The opportunity for Delphi to cure a failure to satisfy these conditions is of great

benefit to the Debtors and their stakeholders because the conditionality of the consummation of

the Delphi-Appaloosa EPCA could in certain circumstances be reduced.

43.    The Delphi-Appaloosa EPCA provides for other bases for termination,

including by mutual written consent of Delphi and ADAH.  In addition, Appaloosa, upon written

notice to Delphi, could terminate the agreement for certain reasons, including (i) if the order

approving the Motion has not become final order by the later of 10 days of the Bankruptcy

Court's entry of an order approving this Motion or August 16, 2007, (ii) if the effective date of

Delphi's plan of reorganization has not occurred by March 31, 2008, (iii) if the Debtors'

disclosure statement is not filed with the Bankruptcy Court on or before January 31, 2008, (iv) if

the Debtors breach the agreement, which causes a failure of certain conditions that are not cured,

(v) if there was a change of recommendation by the Company or the Company enters into an

alternate transaction agreement, and (vi) if there are modifications to the agreed forms of certain

transaction documents.

44.    Alternate Transaction Fee.  If the Delphi-Appaloosa EPCA is terminated

under certain circumstances, an alternate transaction fee of $82.5 million (the "Alternate

Transaction Fee") would be payable to the Plan Investors.[26]  The events that give rise to the

payment of the Alternate Transaction Fee are:  (i) termination of the Delphi-Appaloosa EPCA as

a result of the Company's entry into an Alternate Transaction (as defined below), (ii) termination

---

[26]    The alternate transaction fee under the Original EPCA was $100 million.

of the Delphi-Appaloosa EPCA due to a change of recommendation by the Company and the Company's entry into or consummation of an Alternate Transaction within a 24-month period following the termination, and (iii) termination of the EPCA by the Plan Investors due to a willful breach by the Company and the Company's entry into or consummation of an Alternate Transaction within a 24-month period following the termination.  For the purposes of the Delphi-Appaloosa EPCA, an Alternate Transaction is defined to include any plan, proposal, offer, or transaction that is inconsistent with the Delphi-Appaloosa EPCA, the preferred stock term sheet attached as an exhibit to the Delphi-Appaloosa EPCA, the Debtors' settlement with GM, or the Debtors' plan of reorganization, other than a liquidation under chapter 7 of the Bankruptcy Code.

45.    <u>Maximum Liability And Indemnification</u>.  The aggregate liability for the Commitment Parties, the Plan Investors, and the Debtors is limited by the terms of the Delphi-Appaloosa EPCA.  The maximum dollar exposure in the aggregate for all of the Commitment Parties and the Investors (or the Debtors) for any reason, including for any willful breach, for any act or omission occurring on or prior to the date the Bankruptcy Court approves the Debtors' disclosure statement would not exceed $100 million.  After the order approving the disclosure statement is entered, the aggregate liability would not exceed $250 million.  Liability for any party prior to filing of the disclosure statement with the Bankruptcy Court attaches only on a several basis.  After the filing of the disclosure statement, liability attaches on a joint and several basis.

46.    The Delphi-Appaloosa EPCA also provides for certain indemnification rights to the Plan Investors, regardless of whether the Rights Offering is consummated or the Delphi-Appaloosa EPCA is terminated or the transactions contemplated by the Delphi-Appaloosa EPCA or the Debtors' plan are consummated.

23

(b).    <u>Corporate Governance</u>

47.    Under the Delphi-Appaloosa EPCA, a five-member committee (the "Search Committee") would be appointed, consisting of the Company's lead director (currently John Opie) as the representative of Delphi, one representative of Appaloosa, one representative of the Creditors' Committee, one representative of the co-lead investors other than UBS, GS, and Merrill (who would be determined by Appaloosa), and one representative of the Equity Committee reasonably acceptable to the other members of the Search Committee.  The Search Committee would select Delphi's post-emergence executive chairman, have veto rights over all directors nominated by the Plan Investors and the Statutory Committees, and appoint directors to all board committees.

48.    Under the terms of the preferred stock term sheet (the "Preferred Stock Term Sheet") attached as an exhibit to the Delphi-Appaloosa EPCA, reorganized Delphi would have a nine-member three-year classified board.  The members of the board would be the CEO, three members nominated by Appaloosa, an Executive Chairman, three members nominated by the Creditors' Committee, and one member nominated by the co-lead investor representative on the Search Committee with the approval of either Delphi or the Creditors' Committee.  The Class I directors would be the CEO, the Executive Chairman, and one member appointed by the Creditors' Committee.  The Class II directors would be the remaining Creditors' Committee appointees and the member appointed by the co-lead investors.  The Appaloosa appointees would constitute the Class III directors.  The Class I directors' terms will expire in 2009, Class II in 2010, and Class III in 2011.  Certain election provisions will be governed by the terms of the Preferred Shares.

49.    The structure of the board proposed under the terms of the Preferred Stock Term Sheet provides that six of the nine board members would be independent of the Plan Investors.  The Preferred Stock Term Sheet also requires that six of the nine board members be independent members as defined by the relevant stock exchange where the common stock of Reorganized Delphi will be traded.

50.    Finally, through the ownership of the Series A-1 Preferred Stock, Appaloosa has certain veto rights regarding extraordinary corporate transactions and acquisitions or investments in excess of $250 million in any twelve-month period.

(c).    Plan Framework And Special Statutory Committee Provisions

51.    Exhibit B to the Delphi-Appaloosa EPCA (the "Plan Framework Provisions") further outlines the Debtors' proposed framework for a plan of reorganization, which includes distributions to be made to creditors and shareholders, the treatment of GM's claims, and the corporate governance of the reorganized Company.  Many of the provisions of the Plan Framework Provisions had been the subject of the Original PSA between Delphi, GM, and the Original Investors.  Delphi previously reported that its discussions with GM on a comprehensive global settlement agreement have entered the documentation phase and that a settlement with GM will be incorporated into the Debtors' plan of reorganization rather than filed with the Bankruptcy Court for separate approval.

52.    The Plan Framework Provisions outlines the following potential recoveries to the Debtors' stakeholders:

- All senior secured debt would be refinanced and paid in full and all allowed administrative and priority claims would be paid in full.

- Trade and Other Unsecured Claims and unsecured funded debt claims shall be placed in a single class.  All such claims that are allowed (including all allowed accrued interest, which for trade claims shall be at a rate to be agreed to or determined by the Bankruptcy Court, it being understood that with respect to

trade claims, the Debtors and Plan Investors will not take the position that there should not be an entitlement to postpetition interest) will be satisfied in full with (a) $3.48 billion of common stock (77.3 million out of a total of 147.6 million shares,[27] at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi and (b) the balance in cash;[28] provided, however, that the common stock and cash to be distributed pursuant to the immediately preceding clause will be reduced proportionately by the amount that allowed Trade and Other Unsecured Claims are less than $1.7 billion, excluding allowed accrued postpetition interest thereon.  A condition to effectiveness of the plan requires that the amount of allowed trade and unsecured claims (other than funded debt claims) not exceed $1.7 billion, excluding all allowed accrued postpetition interest thereon.

•   In exchange for GM's financial contribution to Delphi's transformation plan and in satisfaction of GM's claims against the Debtors, GM will receive $2.70 billion in cash, and an unconditional release of any alleged estate claims against GM.  In addition, as with other customers, certain GM claims would flow-through the chapter 11 cases and be satisfied by the reorganized company in the ordinary course of business.  The plan framework outlined in the Plan Framework Provisions anticipates that GM's financial contribution to the Debtors' transformation plan would be consistent with the items identified in the Original PSA.  While the actual value of the potential GM contribution cannot be determined until the Delphi-GM global settlement and master restructuring agreement are finalized, Delphi is aware that GM has publicly estimated its potential exposure related to the Debtors' chapter 11 filing.

•   All Delphi subordinated debt claims (including all accrued interest thereon) will be allowed and, in resolution of the subordination rights of Delphi senior debt, all cash otherwise distributable to Delphi subordinated debt claims pursuant to section 1.3 of the Plan Framework Provisions will be distributed to Delphi senior debt, and the allowed Delphi subordinated debt claims will be satisfied with $478 million of common stock (10.6 million out of a total of 147.6 million shares, at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi.

•   Any allowed securities claims, including all claims in the MDL litigation pending in the United States District Court for the Eastern District of Michigan, will be satisfied solely from available insurance or as otherwise agreed by Delphi and Appaloosa.

---

[27]  Inclusive of distributions to subordinated debt claims described in section 1.6 of the Plan Framework Provisions.  References to the total number of shares of common stock gives effect to the conversion of the preferred stock issued pursuant to the Delphi-Appaloosa EPCA to common stock.  The actual number of shares of common stock to be issued by Delphi and to be distributed to various classes is subject to final adjustment and reconciliation as well as negotiation of plan distribution mechanics in the plan of reorganization.

[28]  Such amounts to be adjusted by proceeds from the Par Rights Offering to be conducted by Delphi as described in the treatment of the equity securities class.

- The equity securities class in the plan shall receive, in the aggregate, (i) $66 million of common stock (1.5 million out of a total of 147.6 million shares, at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi, (ii) rights to purchase 45.6 million out of a total of 147.6 million shares of common stock (to be reduced by the guaranteed minimum of 10% of the rights for the Plan Investors) in reorganized Delphi for $1.75 billion (exercise price: $38.39/share), (iii) 5-year warrants to purchase for $45/share an additional 5% of the common stock of Delphi, and (iv) the right to purchase on a proportionate basis, approximately $522 million of the common stock that would otherwise be distributable to unsecured claims plus an additional $50 million of the common stock that would otherwise be distributable to Appaloosa (each pursuant to Section 1.3 of the Plan Framework Provisions) for a price of $45/share (the "Par Rights Offering"); provided, that Appaloosa (in its capacity as a stockholder of Delphi) shall agree not to participate in the Par Rights Offering and shall use commercially reasonable efforts to obtain such agreement from the other Plan Investors.[29]

53.     The Plan Framework Provisions reaffirm Delphi's earlier commitment to the preservation of its salaried and hourly defined benefit pension plans and will include an arrangement to fund approximately $3.5 billion of its pension obligations.  As much as $2 billion (and no less than $1.5 billion) of this amount shall be satisfied through GM taking an assignment of Delphi's net pension obligations under applicable federal law.  GM will receive a note in the amount of such assignment on agreed market terms that will be paid in full within ten days following the effective date of the reorganization plan.  Through this funding, Delphi will make up required contributions to the pension plans that were not made in full during the chapter 11 cases.

54.     In addition, as more fully described in section 2.1 of the Plan Framework Provisions, the Creditors' Committee and Equity Committee would receive certain consultation and review rights regarding periodic working drafts of the plan, disclosure statement,

---

[29]  Inclusion in the Debtors' plan of subsections (iii) and (iv) is conditioned upon the Equity Committee supporting entry of the order approving this Motion and there not occurring a "Withdrawal of Support" by the Equity Committee as such term is defined the Special Statutory Committee Provisions of the Plan Framework Provisions.  The rights in the Par Rights Offering are to be equivalent to 15% of the common stock that would otherwise be distributable to all unsecured claims plus an additional $50 million of the common stock that would otherwise be distributable to Appaloosa on mechanics to be agreed.

confirmation order, and other related plan material that will exist so long as the Creditors'

Committee and the Equity Committee support the entry of the order approving the Delphi-

Appaloosa EPCA and the implementation of the Delphi-Appaloosa EPCA and the transactions

contemplated thereby.

Relief Requested

55.    By this Motion, the Debtors seek entry of an order authorizing and

approving the Debtors' entry into the Delphi-Appaloosa EPCA pursuant to sections 105(a),

363(b), 503(b), and 507(a) of the Bankruptcy Code, and waiving the 10-day stay under

Bankruptcy Rule 6004(g).

Applicable Authority

H.    Approval of the Delphi-Appaloosa EPCA

56.    Bankruptcy Code section 363(b)(1) permits a chapter 11 debtor to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  This Court may authorize use of estate property outside the ordinary

course of business if a debtor demonstrates a sound business justification for it.  In re Lionel

Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good

business reason exists to grant debtor's application under section 363(b)); In re Delaware Hudson

Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).  This "business judgment" test is premised on

the debtor's business judgment that the proposed use of property of the estate would be beneficial

to the estate.  Cf. Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),

4 F.3d 1095, 1099 (2d Cir. 1993) (analyzing business judgment standard under section 365).  To

a bankruptcy court, "'business judgment' . . . is just that – a judgment of the sort a businessman

would make."  Id.

28

57.     Once the debtor articulates a valid business justification, the business judgment rule creates "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted). The debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)). "Courts are both to interfere with corporate decisions absent a showing of bad faith, self interest or gross negligence." Integrated Resources, 147 B.R. at 656.

58.     A number of qualitative and quantitative factors were reviewed and evaluated in connection with the Delphi-Appaloosa EPCA. In addition to the value and dollar amounts of the commitments, the Debtors considered, among many other factors, the speed of the consummation of the transaction, execution risks, and corporate governance factors. Among the many factors considered by Delphi in connection with the Delphi-Appaloosa EPCA were that Appaloosa had completed its due diligence subject to closing conditions, Appaloosa had developed a syndicate for its backstop commitment, the Statutory Committees and GM supported the Delphi-Appaloosa EPCA, and under the corporate governance provisions the board of reorganized Delphi would have a nine-member three-year classified board, with two-thirds of the board members independent of Appaloosa. The Debtors, in their sound business judgment, believe that the transactions contemplated by the Delphi-Appaloosa EPCA the other Investment Agreements, will facilitate the Debtors' transformation plan and their prosecution of a plan of reorganization, and is in the best interests of their creditors, shareholders, and other

parties-in-interest.  After considering the above factors, Delphi's management and Board believe

that the Delphi-Appaloosa EPCA presents the best result for Delphi and all of its stakeholders.

59.    Moreover, the Debtors believe that the Fees provided for in the Delphi-

Appaloosa EPCA are reasonable in the context of the Debtors' cases and the transactions

contemplated in the Delphi-Appaloosa framework agreements.  The Fees represent a small

fraction of the investment that the Plan Investors will make to acquire the Preferred Shares, the

Direct Subscription Shares, and the Unsubscribed Shares.  The purchase price for the Preferred

Shares and the Direct Subscription Shares totals nearly $1 billion, with an additional investment

to be made, if necessary, to acquire the Unsubscribed Shares.  In addition, the Debtors believe

that payment and reimbursement of the Transaction Expenses is reasonable under the

circumstances.  Moreover, the Debtors' commitment to pay the Fees and the Transaction

Expenses is an integral part of the transactions contemplated under the amended framework

agreements, and the Plan Investors would not otherwise enter into the agreements without such

commitment.  The payment of the Fees and Transaction Expenses are actual, necessary costs of

preserving the estate and should be entitled to administrative priority status under sections 503(b)

and 507(a).

60.    The Debtors further submit that the agreement to pay the Alternate

Transaction Fee constitutes a material inducement for, and a condition of, the Plan Investors'

entry into the EPCA.  See, e.g., In re Allegiance Telecom, Inc., Case No. 03-13057 (RDD)

(Bankr. S.D.N.Y. 2004) (allowing 2.8% break-up fee and expense reimbursement provision in

asset sale agreement); Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien

Environmental Energy, Inc.), 181 F.3d 527 (3d Cir. 1999) (break-up fees warranted when

necessary to preserve estate value).  Moreover, the Debtors believe that the requested Alternate

30

Transaction Fee is fair and reasonable in view of the Delphi-Appaloosa EPCA, which will allow

the Debtors to continue to develop its plan of reorganization on its previously announced

timetable.  Specifically, the Debtors have determined, with assistance from their investment

bankers and other financial advisors, that the amount of the Alternate Transaction Fee is within a

range of reasonableness given the nature and size of the proposed Rights Offering and the

circumstances under which the Plan Investors have agreed to make their investment.  Finally,

similar fees have been granted in connection with rights offerings of similar magnitude.  See,

e.g., In re Owens Corning, Case No. 00-03837 (Bankr. D. Del. June 29, 2006) (up to $130

million fee in connection with backstop of $2.2 billion rights offering); In re USG Corp., Case

No. 01-2094 (Bankr. D. Del. Feb. 23, 2006) (up to $120 million fee in connection with backstop

of $1.8 billion rights offering).

I.      Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

61.      Under Bankruptcy Rule 6004(g), "An order authorizing the use, sale, or

lease of property other than cash collateral is stayed until the expiration of 10 days after entry of

the order, unless the court orders otherwise."  Courts in this district have waived this stay upon a

showing of business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr.

S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the

order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr.P. 6004(g).");

In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of

"business exigency" for waiver of ten-day stay under Bankruptcy Rule 6004(g)).  In general,

courts will grant waivers when doing so is important to the debtor's financial health.  See In re

Second Grand Traverse School, 100 Fed. Appx. 430, 434-35 (6th Cir. 2004) (affirming decision

waiving 10-day stay because "time was of the essence"); In re Decora Industries, Inc., Case No.

00-4459 (JJF), 2002 WL 32332749, at *9 (D. Del. May 20, 2002) ("[T]he Court understands that an immediate closing is required to remedy Debtors' precarious financial and business position. Accordingly, the Court will waive the Rules 6004(g) and 6006(d), allowing the parties to close.").

62.     As described in this Motion, the Delphi-Appaloosa EPCA is a the product of discussions that originally began in the summer of 2006.  Delphi, the Statutory Committees, the Plan Investors, and GM look forward to formulating and drafting developing a plan and the consummation of Delphi's chapter 11 cases.  The Debtors submit that the waiver of the ten-day stay is appropriate here to allow for the payment of the Commitment Fees, the Arrangement Fee, and the Transaction Expenses, as described in the Delphi-Appaloosa EPCA, will add necessary certainty to the ongoing plan negotiations among the stakeholders, and allow the Debtors and their stakeholders to pursue the consummation of these cases.

63.     Based on the foregoing, the Debtors believe that they have exercised sound business judgment in deciding to execute the Framework Agreements, and this Court should authorize and approve the Debtors' entry into such agreements.

<u>Notice Of Motion</u>

64.     Notice of this Motion will be provided in accordance with this Court's Order To Show Cause Why Motion For Order Authorizing And Approving Delphi-Appaloosa Equity Purchase And Commitment Agreement Pursuant To 11 U.S.C. §§ 105(a), 363(b), 503(b), And 507(a) Should Not Be Granted.[30]  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

---

[30]   The Order To Show Cause will be submitted to the Court on July 19, 2007, and the Debtors will comply with its provisions.

WHEREFORE the Debtors respectfully request that the Court enter an order (i) authorizing and approving the Debtors' entry into the Delphi-Appaloosa EPCA and the payment of all associated fees, expenses, and damage claims, and of all related indemnities as and when provided for therein, pursuant to sections 105(a), 363(b), 503(b), and 507(a) of the Bankruptcy Code and Bankruptcy Rule 6004, and (ii) granting the Debtors such other and further relief as is just.

Dated:     New York, New York
           July 18, 2007

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By:    /s/ John Wm. Butler, Jr.
       John Wm. Butler, Jr. (JB 4711)
       George N. Panagakis (GP 0770)
       Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:    /s/ Kayalyn A. Marafioti
       Kayalyn A. Marafioti (KM 9632)
       Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession