SCHWARTZ LAW FIRM, P.C.
Jay A. Schwartz (P45268)
37887 West Twelve Mile Rd., Suite A
Farmington Hills, MI  48331
(248) 553-9400

Counsel for Nu-Tech Plastics Engineering, Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| DELPHI CORPORATION, et al., | Case No. 05-44481 (RDD) |
| Debtors. | (Jointly Administered) |

**"SUPPLEMENTAL"[1] RESPONSE**

**(CLAIM NO. 1279, NU-TECH PLASTICS ENGINEERING, INC.)**

Nu-Tech Plastics Engineering, Inc. ("Nu-Tech") timely filed its initial Supplemental

Response (Doc. No. 8299) on June 18, 2007.  Thereafter, Debtor reset the deadline on which

both Nu-Tech's Supplemental Response and Debtor's corresponding reply are due, by

adjourning the Claims Objection Hearing until August 30, 2007.  Debtor's Second Notice of

Adjournment of Claims Obj. Hr'g with Respect to Debtors' Obj. to Proof of Claim No. 1279

---

[1] Although this pleading is captioned as Nu-Tech's "Supplemental Response" it is actually Nu-Tech's initial response to Debtor's substantive defenses of Nu-Tech's claim. Debtor initially objected to Nu-Tech's claim only on the grounds that it did not appear in Debtor's books and records. Doc. No. 5452, p. 12 and Ex. C-1. Debtor revealed its substantive defenses to Nu-Tech's claims for the first time 5 months later in Debtors' Statement of Disputed Issues. Doc. No. 7574. Although this statement was to include the "material factual" bases upon which Debtor would rely in prosecuting its Claim Objection and documentation that supports this objection, Debtor did not attach any documentation to its Statement of Disputed Issues; Claim Objection Procedures Order, ¶ 9(d). Eight weeks later, Debtor filed an Amended Statement of Disputed Issues that only attached 5 supporting documents. Doc. No. 8177    Nu-Tech's "Supplemental Response" was thus hampered by Debtor's belated provision of only a limited set of documents. Nu-Tech objects to any and all factual bases and documents or testimony upon which Debtor attempts to rely to prosecute or support its objection that were not presented in accordance with the Claim Objection Procedures Order.

(Doc. No. 8418). Accordingly, Nu-Tech withdraws its previously-filed Supplemental Response and files this Supplemental Response in its stead, without prejudice to Nu-Tech's rights to Amended Supplemental Response as the Claims Objection Procedures Order authorizes.

For its Supplemental Response, Nu-Tech states:

**SYNOPSIS**

The story behind Nu-Tech's claims is simple: GM nurtured Nu-Tech; GM used Nu-Tech; and then GM crushed Nu-Tech to buy labor peace.

GM nurtured Nu-Tech by accepting it into GM's minority contractor mentorship program and, as part of the program, provided Nu-Tech with business and financial guidance, free raw materials and molds (aka "tools") to produce GM parts, and contracts to buy these parts. GM used Nu-Tech by entrusting Nu-Tech with a contract to be GM's only supplier for millions of units of a key part for one of GM's mainstay truck lines, and extending this 1999 contract for another year (through 2000). Then —without warning, notice or compliance with the contract's termination provisions drafted by GM — GM crushed Nu-Tech. To satisfy GM's Unions, in late 1998, GM repossessed its tools so that GM's unions could produce this part in house. GM compounded Nu-Tech's losses by promising Nu-Tech a "replacement" order to produce similar volumes of other parts, forcing Nu-Tech to maintain buildings, equipment and people to meet this promised demand. GM's promised orders never materialized. Nu-Tech was ruined; its remaining assets were sold; its going-concern value gone.

Nu-Tech's damages from GM's conduct exceed $13 million.

To date, GM's defense has relied on legal convolution and factual whitewash. For example, GM has asserted that its contract, on each page of which the words "Requirements Contract" appear, and which does not contain factory assist language and which explicitly calls for Nu-Tech to

2

produce 100% of GM's need for part 0694 doesn't actually mean that Nu-Tech was to produce 100% of GM's need for that part.[2]  And GM has asserted that Nu-Tech's claims are time barred because Nu-Tech sold its claim to the entity that bought Nu-Tech's asserts, even though (1) the state court has already ruled against Delphi in this precise issue(2) the buyer denies this; (3) the asset-purchase agreement does not cover these claims; and (4) this does not effect the fact that Nu-Tech's pursuit of these claims tolled the statute of limitations. The State court has already eliminated Delphi's argument that Nu-Tech did not own its claim against GM/Delphi and, in denying GM/Delphi's motion for summary disposition, came very close to granting a judgment in favor of Nu-Tech.  The Michigan Court of Appeals refused to even hear GM/Delphi's Application for Leave to Appeal. [3]

## FACTS

Nu-Tech was a minority-owned, injection-mold-plastics manufacturer that supplied parts to General Motors (GM) and Debtor Delphi Automotive Systems LLC (Delphi).[4]  GM accepted Nu-Tech into a GM/Delphi mentorship program, through which GM and Delphi provided substantial business, financial and other assistance to Nu-Tech.[5]  This assistance included obtaining purchase orders and developing business plans, providing at little or no charge the tools for Nu-Tech to place in its machines to make the parts and free raw materials.*Id.*

As a result of this assistance, during its first two years in business, Nu-Tech was manufacturing parts and selling them to GM/Delphi.[6]  The key part that Nu-Tech produced and

---

[2] Exhibit C, pp. 51-52
[3] Exhibit C, Transcript of hearing on Motion for Summary Disposition, especially pages 55-57, Exhibit D, Order Denying Defendants' Motion for Summary Disposition and Exhibit E, Denial of Application for Leave to Appeal
[4] Cooper Declaration, p. 2
[5] Patrick Affidavit, pp. 2-3
[6] Cooper Declaration pp. 1-2

sold to Delphi was part number 25160694 (the "Part" or "Part 0694"), which is a fuel pump reservoir for what was then one of GM's hottest-selling trucks, the S-10.[7]    Nu-Tech's production of Part 0694 and other parts was governed by a series of contracts with GM. These contracts show GM's progressively increasing comfort with and reliance on the minority supplier that GM was developing. For convenience, these contracts are summarized in the chart below:

| Date | Purch. Ord. # | Type | Shorthand Name | Period Covered |
|------|---------------|------|----------------|----------------|
| 11/05/97 | 8C934 | Factory Assist | Amended Initial Contract adding part 0694 | 11/17/97-7/31/98[8] |
| 6/23/98 | 9C941 | Requirements | Requirements Contract | 8/01/98-7/31/99 |
| 8/17/98 | N58000B | Requirements | Delphi Assumption of 9C941 | 8/1/98-7/31/99 |
| 05/03/99 | N58000B | Requirements | Extension Requirements Contract | 8/1/99-12/31/2000 |

The details of these various contracts and their relationship to and difference with each other are described below.

**The Contracts**

GM issued the Initial Contract to Nu-Tech when the GM/Delphi/Nu-Tech relationship began.[9] This P.O. was for a number of different parts. Each page of the Initial Contract expressly states that it is a "factory assist" contract, meaning that Nu-Tech was to supply all parts identified in the P.O. *other than those GM itself produced in house.*[10]

---

[7] Patrick Affidavit p. 3
[8] Dates are only the period that the contract covered for the production of Part 0694.
[9] Patrick Affidavit, p. 3, Exhibit 1 to Patrick Affidavit, Cooper Declaration, p. 2
[10] Patrick Affidavit, pp. 2-3 and Exhibit 1 thereto, Cooper Declaration, p. 7

On November 5, 1997, GM amended the Initial Contract to add Part 0694.[11] This Amended Initial Contract again contained the "factory assist" language on each page. The amendment was effective on 11/17/97 and the expiration date for part 0694 was 7/31/98.[12]

As the Amended Contract's July 1998 expiration date approached, Nu-Tech submitted a bid to produce a number of parts for GM/Delphi, including Part 0694.[13] Nu-Tech submitted its bid in the Spring of 1998.[14] Nu-Tech based its bid on Nu-Tech's production numbers for 1997, which Nu-Tech had supplied to Delphi in January 1998, and Nu-Tech's projections for 1998. Nu-Tech's bid anticipated that it would produce millions of Part 0694 per year. Instead of amending the Amended Contract to reflect this production, GM issued a new purchase order — the Requirements Contract (P.O. 9C941) — to Nu-Tech.[15] The Requirements Contract included Part 0694.

Like all GM purchase orders, the Requirements Contract included GM's General Terms and Conditions which, in relevant part, required GM to provide written notice to Nu-Tech if the contract was to be terminated for any reason other than Nu-Tech's breach of contract.[16] Unlike the Initial Contract and the Amended Initial Contract, though, the Requirements Contract was not labeled "factory assist" on each page. Instead, each Page of the Requirements Contracts is labeled as a "Requirements Contract."[17] By law, a requirements contract means that the buyer must buy from the seller, and the seller must produce and sell to the buyer, all of the parts necessary to fulfill the buyer's requirements during the contract term.

---

[11] Exhibit 1 to Patrick Affidavit, Patrick Affidavit, pp. 2-3 and Cooper Declaration, p. 7
[12] Patrick Affidavit, p. 3 and Exhibit 1 thereto at pp. 1 and 10 respectively, Cooper Declaration, p. 7
[13] Cooper Declaration, p. 3, and Exhibit 1 thereto
[14] Patrick Affidavit, p. 3 and Exhibit 5 thereto, Cooper Declaration, p. 2
[15] Patrick Affidavit, p. 4 and Exhibit 2 thereto, Cooper Declaration, p. 3
[16] Patrick Affidavit, pp. 3 and 6 and Exhibit 4 thereto
[17] Exhibit 2 to Patrick Affidavit

The Requirements Contract expressly states that GM must order 100% of its requirements for Part 0694 from Nu-Tech for the Requirement Contract's effective dates, *to wit* August 1, 1998, through July 31, 1999. Under the column "Apprx % of Bus." for Part 0694, GM typed "100%".[18]

Being responsible for producing all of the Part 0694s that GM required had consequences for Nu-Tech. The Requirements Contract required Nu-Tech to be able to produce up to 14,000 parts 0694 *per day*.[19] To assist with production, GM gave Nu-Tech its (GM's) tools for placement into the two large injection molding machines which Nu-Tech had leased for the sole purpose of producing part 0694.[20] Because it was part of the GM/Delphi mentorship program, Nu-Tech was not charged for the use of these tools or for the cost of the raw material (resin) used to produce the part.[21] In 1998, Nu-Tech produced over 750,000 parts 0694 at the contract price of $1.86 per piece, operating the 2 injection mold machines for 22 hours per day and 16+ hours per day.[22] Nu-Tech's profit margin was enormous as was the production volume.

### The Breach

Facing a labor strike in the summer of 1998, GM turned to Nu-Tech for assistance. Additional purchase orders were issued. Nu-Tech bought additional equipment, hired additional staff and worked around the clock to assist GM, its mentor, in GM's time of need. The production of part 0694 was not affected by the strike as is borne out by Nu-Tech's production data.[23] Nu-Tech's performance during the strike was extraordinary enough to warrant thank you letters from both GM's Vice President and Group Executive of Worldwide Purchasing and

---

[18]  Patrick Affidavit p. 5 and Exhibit 2 thereto at page 9
[19]  Patrick Affidavit p. 5
[20]  Patrick Affidavit, p. 6 and Exhibits 9 and 10 thereto, Cooper Declaration, p. 4
[21]  Cooper Declaration, p. 4, Patrick Affidavit, p. 3 and Exhibit 6 thereto
[22]  Cooper Declaration, p. 4
[23]  Cooper Declaration, p. 8

Delphi's Director of Purchasing.[24] Bolstered by the GM revenues, primarily from part 0694, Nu-Tech expanded its operations and increased its other business as a result of its expanded capabilities.[25]

In August 1998, with the spin-off of Delphi imminent, Delphi assumed P.O. 9C941 from GM and issued Line Item Detail to Standard Blanket Order N580000B for part number 0694, dated 8/17/98, to accomplish the transfer of the P.O. for that part to Delphi as buyer.[26] The terms and conditions of P.O. 9C941, including the effective dates, price per piece and production capacity requirements, were unchanged and Delphi's line item detail contains no indication that it amended P.O. 9C941 other than to change the payment terms and the buyer's identity. Nu-Tech continued to mass produce part 0694, and Delphi continued to pay Nu-Tech for those produced parts through the end of 1998.[27]

In the winter of 1998, the labor union again launched a strike, and GM again turned to Nu-Tech for help, issuing to Nu-Tech a specific "strike protection" purchase order for a limited number of parts, not including 0694, for a limited period.[28] Nu-Tech again stepped up and helped GM. But this time, GM's gratitude was short-lived. In settling the strike, GM promised the union that GM would bring production of part 0694 back in house for 1999.[29] On 12/31/98, GM removed from Nu-Tech the last tool needed to produce part 0694. *However, not only did Delphi fail to comply with its own General Term and Condition 13 which required it to give Nu-Tech*

---

[24] Cooper Declaration, p. 8 and Exhibits 5 and 6 thereto
[25] Cooper Declaration, p. 4
[26] Patrick Affidavit, p. 5 and Exhibit 3 thereto, Cooper Declaration, pp. 3-4
[27] Cooper Declaration, pp. 3-4 and Exhibit 3 thereto
[28] Patrick Affidavit, pp. 5-6 and Exhibit 12 thereto, Cooper Declaration, p. 8
[29] Exhibit H

***written notice*** *of its termination of a P.O. 9C941 for part 0694 (if that were its intention), on*

*May 3, 1999, Delphi* **<u>extended</u>** *the contract for that part through December, 2000.*[30]

After removal of the tools for part 0694, Delphi continued to promise Nu-Tech either a

resumption of the production of that part or a replacement part at similar volumes and pricing.[31]

Knowing that GM/Delphi had a practice of simply amending existing purchase orders to add new

parts and relying on its mentors' promises of a replacement part, Nu-Tech, with the full

knowledge of Delphi, continued to lease the equipment needed to produce fuel pump reservoirs

and the employees to actually produce them.[32] Throughout 1999, Delphi failed to order part 0694

from Nu-Tech, in a continuing breach of contract, but still did not provide any written

termination notice.[33]  Delphi also failed to provide the replacement part, breaking its promise to

Nu-Tech and causing Nu-Tech's financial ruin.[34]

Nu-Tech's claims in this proceeding arise out of Delphi's breach of the requirements

contract[35]  Part 0694 was the heart of Nu-Tech's business.  Delphi's breach began in January

1999 and continued through December 2000.

After its initial contract breach, Delphi caused more harm to Nu-Tech, ultimately

destroying it, by promising Nu-Tech that it would order another part at similar volume to replace

0694.[36]  That promise induced Nu-tech's reliance in the form of maintaining bloated overhead

(unnecessary buildings, injection molding machines, staff, etc.) in anticipation of the

---

[30] Patrick Affidavit, pp. 5-6 and Exhibits 4 and 7 thereto, Cooper Declaration, p. 5.   General
Motors had also promised to leave the second tool with Nu-Tech until June, 1999, a promise
breached on December 31, 1998.  Cooper Declaration, p. 5 and Exhibit 2 thereto.
[31] Cooper Declaration, pp. 5-6
[32] Cooper Declaration, pp. 5-6, Exhibit H, Troubled Supplier Memorandum from Delphi dated
September, 1999.
[33] Cooper Declaration, pp. 5-6
[34] Cooper Declaration, pp. 5-6,  Patrick Affidavit, p.7 , Exhibit H
[35] Exhibit A, Complaint in Genesee County Circuit Court
[36] Cooper Declaration, p. 2

replacement part.[37] Delphi never terminated the purchase order (P.O.) for 0694 and never notified Nu-Tech that no amendment to that P.O. adding a different part would be forthcoming.[38] Ultimately, as a direct result of Delphi's breach of contract and unfulfilled promises for a replacement part, in September 1999, Delphi placed Nu-Tech in a work-out, hiring BBK, LLC to run its operations until a buyer could be found.[39] On 12/31/99, RPT purchased most of Nu-Tech's assets.[40] By that time, Nu-Tech had suffered devastating losses and a consequent significant reduction in its value which BBK, in a document submitted to Delphi, attributed primarily to Delphi pulling part 0694 from Nu-Tech to produce in-house in order to appease the labor unions.[41] On December 1, 1999, Nu-Tech was forced to sell most of its assets at a fire-sale to Rapid Product Technologies, LLC (RPT).[42]

In 2002, Nu-Tech sued GM and Delphi in Michigan state court.[43] GM settled with Nu-Tech.[44] Delphi, on the eve of trial, filed its bankruptcy petition thereby staying the state court action. Nu-Tech then filed Claim No. 1279 (Claim) in this proceeding.

Debtor's Amended Statement of Disputed Issues sets forth only two actual defenses to Nu-Tech's Claim: that Delphi did not breach the requirements contract (despite failing to order the parts from Nu-Tech and failing to provide Nu-Tech with the written termination notice

---

[37] Id. at p. 6
[38] Id. at p. 5
[39] Cooper Declaration, pp. 6-7, Exhibit H
[40] Cooper Declaration, Exhibit F, Asset Purchase Agreement.
[41] Exhibit H, Cooper Declaration, pp. 6-7 and Exhibit 4 thereto, Leeman Affidavit
[42] Id. at pp. 6-7 and Exhibit F
[43] Exhibit A
[44] There is a confidentiality provision in the settlement agreement. Nu-tech has requested GM's permission to disclose the agreement to Delphi. GM has agreed provided Nu-Tech and Delphi stipulate that it will be shown in camera or under other circumstances that prevent its public disclosure. Nu-Tech has agreed. Debtor has not.

mandated by P.O. 0694's terms and conditions) and that the suit in the Michigan court is time barred. Neither defense has merit.

# ARGUMENT

1.  Debtor breached a requirements contract with Nu-Tech by failing to order part 0694 from Nu-Tech and failing to provide Nu-Tech with the written termination notice mandated by the General Terms and Conditions of P.O. 9C941.

In Michigan, requirements contracts are defined and governed by Michigan's Uniform Commercial Code. MCL 440.2306 defines a "requirements contract" as one which "measures the quantity by the...requirements of the buyer" and covers the "*actual*... requirements as may occur in good faith..." [45]

Two federal cases have addressed this UCC code section under Michigan law. In *Advanced Plastics Corp.* v. *White Consolidated Industries, Inc.,*[46] the court differentiated between a true requirements contract for 100% of the buyer's need for a product and a contract in which the buyer leaves open its option to purchase only some of its needs from that seller. In *Tigg Corp.* v. *Dow Corning Corp.,*[47] the court explained that, under MCLA 440.2306, the buyer owes the seller the duty to buy, in good faith, **all** of the buyer's requirements for the part.

P.O. 9C941, issued by GM on 6/23/98, assumed by Delphi two months later, and extended by Delphi in May 1999, is, by its express terms, a requirements contract and not a factory assist contract. GM drafted the P.O. and specifically typed the phrase "Requirements

---

[45] *Precision Rubber Products Corp.* v. *George McCarthy, Inc.,* 872 F.2d 187 (6th Cir. 1989) and *Metal One America, Inc.* v. *Center Mfg., Inc.,* 2005 WL 1657128 (W.D.Mich. 2005) attached hereto as Exhibit J

[46] 828 F. Supp. 484 (E.D. Mich 1993) aff'd in unpublished opinion at 47 F.3d 1167 (6th Cir. 1995)

[47] 962 F.2d 1119 (3rd Cir. 1992); See also *Propane Indus., Inc.* v. *General Motors Corp.,* 429 F. Supp. 214 (W.D. Mo. 1977); *General Motors Corp.* v. *Paramount Metal Products Co.,* 90 F. Supp. 2d 861 (E.D. Mich 2000); *Precision Rubber Products Corp.* v. *George McCarthy, Inc.,* 872 F.2d 187 (6th Cir. 1989) and *Metal One America, Inc.* v. *Center Mfg., Inc.,* 2005 WL 1657128 (W.D.Mich. 2005) attached hereto as Exhibit J

Contract" on nearly every page.[48]    Under the column "Apprx % of Bus." for part 0694, GM

typed "100%".[49]   Nu-Tech was contractually required to be able to produce 14,000 parts 0694

per day.  Had GM and Delphi desired P.O. 9C941 to be a "factory assist" contract, they would

have included the same language which had been included in the first purchase order, P.O.

8C934 *to wit* "This revision to add part number 25160694 to Contract.   Plan 02 Factory

Assist".[50]    The removal and absence of the words "Factory Assist" and the inclusion of the

words "Requirements Contract" throughout P.O. 9C941 should be dispositive. The contract

language is clear and unambiguous. Accordingly, only the document itself, not parol evidence as

to what the parties intended when they signed it (as Delphi would like this Court to consider),

may be considered when determining liability.[51] And, in the event that the Court were interested

in parol evidence, John Cooper (one of Nu-Tech's owners) *and the GM/Delphi buyer who*

*entered into this contract* have both testified that P.O. 9C941 was intended as a requirements

contract, obligating Nu-Tech to produce 100% of GM's requirements for part 0694.[52]

Standard terms and conditions accompany GM purchase orders. Section 13 of those

terms and conditions, again drafted by GM and adopted by Delphi, require the buyer to give

---

[48]   Patrick Affidavit, pp. 4-7 and Exhibit 2 thereto at pages 1 through 8

[49]   Patrick Affidavit p. 5 and Exhibit 2 thereto at page 9

[50]  Patrick Affidavit, p. 6 and Exhibit 1 thereto at page 1.  Likewise, Delphi's claim that the order for part 0694 was a strike protection contract or a spot buy contract is belied by the actual spot buy and strike protection contracts Exhibits 11 and 12 to Patrick Affidavit as well Cooper Declaration, p. 3

[51]  Where a contract is unambiguous, the terms speak for themselves and parol evidence as to the parties' intent or meaning is neither admissible nor substantive evidence to contradict the express terms of the documents. *Wilkie* v. *Auto-Owners Ins. Co.*, 469 Mich. 41, 664 N.W.2d 776 (2003); *Orr* v. *Schmidt, Ellis & Associates, Inc.*, 28 Mich.App. 176; 184 N.W.2d 329 (1970). *Meagher* v. *Wayne State University*, 222 Mich.App. 700, 722; 565 N.W.2d 451 (1997) and *UAW-GM Human Resource Center* v. *KSL Recreation Corp.*, 228 Mich. App. 486, 492; 579 N.W.2d 411 (1998). Moreover, Delphi's own pleadings assert that the contract documents contain an integration clause and form the entire scope of the obligations and rights of the parties.  See Exhibit B.

[52]  Patrick Affidavit, pp. 2, 4 and 5; Cooper Declaration, pp. 2-3

*written notice* to Nu-Tech if the buyer wishes to terminate the contract. After written notice of a termination, Nu-Tech would have had certain remedies.[53] Neither GM nor Delphi provided Nu-Tech with written notice that they were terminating the P.O. at issue.[54] GM and Delphi clearly knew of this requirement as they exercised it with Nu-Tech on a different P.O. for a different part unrelated to this litigation. [55]

Delphi breached P.O. 9C941 when it stopped purchasing part 0694 from Nu-Tech and prevented Nu-Tech from being able to produce the part by retrieving the necessary tools. The breach continued each time GM and/or Delphi produced part 0694 in-house and failed to order the part from Nu-Tech.

The statute expressly imposes a duty of good faith upon both the buyer and the seller under requirements contracts. In this case, Delphi certainly did not act in good faith when it retrieved the tooling, failed to provide written notice of termination and continually promised to provide replacement work to Nu-Tech as more fully set forth below. Nu-Tech, however, did exercise good faith by maintaining its capacity to produce 14,000 parts 0694 per day as the contract, which remained in full force and which had been extended to December 2000, required.

Interestingly, there has never been a claim that the failure to purchase part 0694 from Nu-Tech was due to a GM's lack of need for the part. It was, in fact, a part essential to the production of one of GM's hottest vehicles, the Chevy S-10 truck.[56] Delphi admits that GM needed the part but that it manufactured it in house instead of obtaining it from Nu-Tech.[57] In other words, Delphi cannot suggest that GM's requirements for the part were zero. Massive

---

[53] Patrick Affidavit, pp. 2 and 6 and Exhibit 4 thereto at paragraph 13
[54] Cooper Declaration, p. 5
[55] Patrick Affidavit at p. 6 and Exhibit 8 thereto, Cooper Declaration, p.5
[56] Patrick Affidavit, p. 3
[57] Exhibit H

quantities of part 0694 were needed during the term of the Delphi/Nu-Tech contract.  Delphi

breached its contract with Nu-Tech by satisfying that requirement elsewhere.[58]

2.    Nu-Tech is entitled to damages under its promissory estoppel claim.

The elements of a promissory estoppel claim under Michigan law are:  (1) a promise, (2)

that the promisor should reasonably have expected to induce action of a definite and substantial

character on the part of promisee, (3) which in fact produced reliance or forbearance of that

nature, and (4) in circumstances such that the promise must be enforced if injustice is to be

avoided.[59]  In *State Bank of Standish* v. *Curry*,[60] the Michigan Supreme Court reversed the grant of

summary disposition in favor of the bank which had promised to loan money to the defendants in the

future.  The court first set forth that the purpose of the doctrine of promissory estoppel is "to protect

the ability of individuals to trust promises in circumstances where trust is essential." It then

established the definition of a promise as "a manifestation of intention to act or refrain from

acting in a specified way, so made as to justify a promisee in understanding that a commitment

has been made." No actual contract is necessary to a claim of promissory estoppel, according to

the Court.

Nu-Tech's promissory estoppel claim, as described by Mr. Cooper, is based on Delphi's

promise to substitute a different part for part 0694 the need for which would be similar in volume

to part 0694 (a discernible quantity per Delphi's forecast)[61] and which would continue for a

specific duration, until December 2000.  Accordingly, Delphi's promise was clear and definite

and contained the terms of duration and quantity.  Likewise, the promise was clearly for a long

---

[58] Id.
[59] *Ardt* v. *Titan Insurance Co.*, 233 Mich.App. 685; 593 N.W.2d 215 (1999)
[60] 442 Mich. 76; 367 N.W.2d 1 (1993)
[61] Exhibits 5 and 6 to Patrick Affidavit, Cooper Declaration at p. 3 and Exhibit 1 thereto

term contract requiring the production of millions of parts. It was not a "spot buy" contract such as the one actually given to Nu-Tech for a small order of a prototype part.

Not only did Delphi know that pulling part 0694 in house in breach of Nu-Tech's contract caused tremendous financial losses to Nu-Tech, it then made matters worse by inducing Nu-Tech to rely on promises of resumption of production of part 0694 or a replacement part. Delphi unequivocally promised Nu-Tech that Delphi would, not might, order a replacement for part 0694, similar in type and quantity to part 0694 and for the same contract duration, until December, 2000.[62]

Delphi knew that such a promise would and, in fact, did induce Nu-Tech to keep its machinery, tooling and staff in place in order to comply with the expected contract terms and produce the 4 millions parts Delphi projected that it would need. Nu-Tech had very good reason, beyond the simple commercial relationship of buyer/seller, to rely on Delphi's promise; GM/Delphi were Nu-Tech's mentors and had promised and engaged in a course of conduct the goal of which was to keep Nu-Tech profitable and in business. [63] GM/Delphi had established a position of trust with Nu-Tech as result of this special relationship. Moreover, GM and Delphi had previously ordered new parts by simply amending existing P.O.'s to list new parts with all of the other terms remaining constant.

Nu-Tech, in reliance on its mentors' promise of replacement part, maintained its full operating capacity at great expense to Nu-Tech. Such reliance included keeping facilities which Nu-Tech had leased, keeping machinery needed to produce the promised part, keeping

---

[62] Cooper Declaration, pp. 5-6
[63] Exhibit H, Cooper Declaration, pp. 5-6, Patrick Affidavit, p. 2

employees needed to run the machinery and other expenses.[64] As a matter of justice, Nu-Tech's losses should be laid at the feet of the entity which caused the unnecessary expense, Delphi. It strung Nu-Tech along for months on end despite Delphi's knowledge of Nu-Tech's deteriorating financial condition and its obligation to Delphi to maintain high operating capacity in anticipation of the new part. Had Delphi kept its promise, Nu-Tech would have had over $1,700,000 in additional sales in 1999, more than enough to keep it operating and certainly enough to have avoided the fire sale of its assets which Delphi brokered.[65]

3.    <u>Nu-Tech's claims are not time barred.</u>

Delphi argues that Nu-Tech sold its right to sue Delphi to RPT as part of the 12/31/99 Nu-Tech/RPT asset purchase transaction, that Nu-Tech did not reacquire the right to sue Delphi until 3/8/05 (when, in response to Delphi's motion to dismiss, Nu-Tech and RPT entered into an Acknowledgment and Assignment of Claims agreement[66]) and that Nu-Tech suit against Delphi in state court was untimely. This theory fails for any of four reasons: (1) the Michigan state court has already ruled, in a final order, that Nu-Tech is and was the proper party and Debtor is barred from re-litigating that issue under the Rooker-Feldman doctrine;[67] (2) Nu-Tech has been consistently pursuing this claim since 2002 which, under Michigan law, tolls the statute of limitations between the parties meaning that, even if Nu-Tech did not re-acquire the right to sue Delphi until March 2005, the statute of limitations had still not expired; (3) the express terms of the Nu-Tech/RPT asset purchase agreement make clear that Nu-Tech never transferred its right

---

[64] Cooper Declaration at p. 6. Also, as noted above and demonstrated by the attached documents, GM's requirements contracts obligated Nu-Tech to maintain extremely high operating capacities.
[65] Leeman Affidavit and all exhibits thereto
[66] Exhibit G.
[67] *D.C. Court of Appeals* v. *Feldman*, 460 U.S. 462 (1983); *Rooker* v. *Fidelity Trust Co.*, 263 U.S. 413 (1923)

to sue Delphi to RPT; and (4) GM/Delphi's Standard Terms and Conditions prohibited Nu-Tech from assigning the claim to RPT, even if those parties had so desired, without Delphi's written consent, which consent Delphi never provided.

First, as to the Michigan state court proceeding, Nu-Tech sued GM and Delphi in Genesee County Circuit Court, Michigan in 2002 alleging breach of contract and promissory estoppel.[68] In 2005, the Defendants filed a motion to dismiss claiming that Nu-Tech did not own the right to sue (i.e. was not a real party in interest) because it had transferred said right to RPT as part of the 12/31/99 asset purchase agreement. After full briefing and oral argument, the transcript of which is attached hereto, the trial court denied the motion and held that Nu-Tech was a proper plaintiff with standing to sue both parties on both claims.[69] Delphi failed to file a motion for reconsideration of the trial court's ruling, which, to be timely would have to have been filed by April 14, 2005 pursuant to the Michigan Court Rules, specifically MCR 2.119(F).[70] Under the Rooker-Feldman doctrine, Delphi is barred from now re-litigating that issue here.

Second, Nu-Tech's claims against Delphi have been perpetually pending since the lawsuit was filed on December 30, 2002.[71] In Michigan, the statute of limitations for a breach of a contract claim for the sale of specialty goods is four years[72] and the statute of limitations for a promissory estoppel claim is six years.[73] MCL 600.5856 is the tolling provision for statutes of limitations. The limitations period is tolled during the pendency of an action against the

[68] See Exhibit A. Delphi filed multiple responsive pleadings the last of which was its Second Amended Answer attached hereto as Exhibit B.
[69] See Exhibit C, transcript of oral argument of Defendant's Motion for Summary Disposition dated March 24, 2005 and Exhibit D , April 7, 2005 Order Denying Defendant's Motion.
[70] Delphi filed an application for leave to appeal the decision to the Michigan Court of Appeals which was denied on August 5, 2005; See Exhibit E
[71] See Exhibit A
[72] MCL 440.2725
[73] *Huhtala* v. *Travelers Ins. Co.*, 401 Mich. 118, 133-134, 257 N.W.2d 640 (1977)

defendant for a particular cause of action. Nu-Tech's suit against Delphi has been pending since December 30, 2002. Accordingly, the limitations period was not running at the time of the March 8, 2005 re-assignment from RPT to Nu-Tech and has consistently been tolled since December 30, 2002. The case has never been dismissed nor has there ever been any other plaintiff than Nu-Tech.

Delphi's reliance on both the "relation back" doctrine and the *Miller* v. *Chapman* case is misplaced. Both serve the purpose of protecting a *defendant* who was *not named* as a party defendant during the limitations period from being dragged into a stale case under the guise of an *amended* pleading. There has never been an amendment of the complaint in the Michigan case, there was no request for correction of a misnomer, Delphi has been a Defendant since the suit was filed and, in fact, there was no motion to dismiss Nu-Tech's claim on the basis that it was not the real party in interest *until the case had been in court for more than two years and was on the eve of trial.*[74] Accordingly, even if Nu-Tech had not had standing at the time the suit was initially filed, the correction of that condition prior to dismissal of the case bars dismissal on the basis of the initial defect.[75] Nu-Tech filed its claim within the statutory period of MCL 440.2725 for the breach of contract claim and the 6 year limitations period provided for claims of promissory estoppel.

Third, Nu-Tech did *not* sell its right to sue Delphi to as part of the 12/31/99 transaction as evidenced by the clear and unambiguous language of the asset purchase agreement and its clearly labeled "Excluded Assets" section which excludes from the transaction "**(d) those assets not**

---

[74] Debtor does not contest this. Nu-Tech incorporates its prior pleadings wherein it sought remand of this claim to the trial court for adjudication.

[75] *George Morris Cruises* v. *Irwin Yacht Marine Corp.,* 191 Mich. App. 409 (1992); *Thomas* v. *Costa,* 2003 WL 460222 (Mich. App. February 21, 2003) attached hereto as Exhibit I

**specifically or by inference included in the above paragraphs or the attached exhibits."**[76]

None of the paragraphs in the agreement, nor any exhibit thereto identifies Nu-Tech's causes of actions against any third-party as assets being sold to RPT. The agreement is entirely silent as to Nu-Tech's causes of action. Because of this silence, and to prevent any claim of ambiguity in the Agreement, Nu-Tech and RTP executed an Acknowledgment and Assignment dated March 8, 2005. In it, the only parties to the original agreement acknowledged that Nu-Tech did **not assign its cause of action against Delphi** to RPT. Additionally, in the event someone concluded to the contrary, RPT assigned back to Nu-Tech any such cause of action. Accordingly, under the worst case scenario, Nu-Tech became the owner of such cause of action in March 8, 2005 while its claim against Delphi remained pending, and, thus, became (if it had not been since day one of the lawsuit) the real party interest. The purpose of the real party in interest rule is to protect a defendant from a multiplicity of suits by different parties for the same claim but not to protect defendants from litigation entirely.[77]

Fourth, the General Terms and Conditions to P.O. 9C941, upon which Delphi relies in its Affirmative Defenses[78] *expressly prohibit assignments of the purchase order without Delphi's "prior written consent."*[79] Nu-Tech's breach of contract cause of action against Delphi is based on P.O. 9C941. If Nu-Tech wished to assign its breach of contract cause of action to RPT, it would have had to assign the P.O. to RPT and obtain Delphi's written consent to do so. The existence of a void assignment of rights does not require dismissal of an action by the assignor.[80]

4.    Nu-Tech has suffered damages as a proximate result of Delphi's breaches

---

[76] Exhibit F, Asset Purchase Agreement.
[77] *Kearns* v. *Michigan Iron and Coke Co.,* 340 Mich. 577, 581;66 N.W.2d 230 (1954).
[78] See Exhibit B
[79] See Exhibit 4 to Patrick Affidavit
[80] *Weston* v. *Dowty,* 163 Mich. App. 238, 243; 414 N.W.2d 165 (1987).

In Exhibit H, Delphi and GM acknowledged that the loss of production of part 0694 was the primary cause of Nu-Tech's demise. This admission stands in stark contrast to Debtor's current position that Nu-Tech's problems were caused by internal "mis-management". Delphi not only believed that Nu-Tech was a going concern in mid 1998 when the P.O. in question was issued, but it was fully aware of the fact that Nu-Tech's dire financial straits at the end of 1999 were entirely the fault of Delphi for breaching the contract with Nu-Tech for part 0694.[81] Delphi's internal memoranda acknowledge that Nu-Tech was suffering gravely due to its "over-expansion" *in order to meet Defendants' production needs* and that Nu-Tech's "decline [was] largely attributable to Delphi's in-sourcing of part [6094].[82] These same documents establish that Delphi's breach of the contract resulted in a "critical loss of revenue" to Nu-Tech which is further confirmed by the Affidavit of Trenia Patrick. Delphi should not be permitted to rely on the severe financial losses it wrought as a result of its unconscionable breach of contract and Nu-Tech's reasonable reliance on Delphi's unfulfilled promises of new business as a defense against its own unlawful behavior.

Nu-Tech is entitled to damages for the breach of contract in accordance with MCL 440.2708. That section of Michigan's Uniform Commercial Code, governing contracts for the sale of specialty goods, specifically calls for the payment of expectation damages and incidental damages caused by the breach less the credit for savings in production costs to the seller.[83] Nu-Tech's expert, Gary Leeman, relying on financial data from Nu-Tech, its accountants, Delphi and BBK, has rendered an opinion setting forth the basis for his damages calculation as well as

---

[81] Exhibit H
[82] Id.
[83] See also *Great Northern Packaging* v. *General Tire and Rubber Co.,* 154 Mich. App. 777;399 N.W.2d 408 (1987)

19

the amount of damages occasioned by Delphi's breach of contract and breach of promise.[84] Nu-Tech's loss of income (lost profits) caused by Delphi's breach of contract to order all parts 0694 required by General Motors until December 2000 is $7,638,671.[85] Nu-Tech's loss of business value, an element of damage which is recoverable under both the breach of contract and breach of promise claims, is $4,981,901.[86] Finally, Nu-Tech incurred $1,336,558 in excess costs, an element of damage to which Nu-Tech is entitled under either theory.[87] The total amount of Nu-Tech's damages is $13,957,130.[88]

Respectfully submitted,

SCHWARTZ LAW FIRM, P.C.

By: __/s/_ Jay A. Schwartz_____
    Jay A. Schwartz (P45268)
    Attorney for Claimant Nu-Tech Plastics
      Engineering, Inc.
    37887 West Twelve Mile Road, Suite A
    Farmington Hills, Michigan 48331

Dated:  July 19, 2007
    (248) 553-9400
    jschwartz@schwartzlawfirmpc.com

---

[84] Leeman Affidavit and Exhibits thereto.  Also note that, despite repeated requests, Delphi failed to produce any actual production data for vehicles using the 0694 part after Delphi's breach of the contract. See Exhibit K.
[85] Leeman Affidavit and Exhibit 12 thereto
[86] The damages calculation does not duplicate the damages because they would be recoverable under two different causes of action.  Rather, the amount claimed is simply the total amount of loss of business value.
[87] Id.
[88] Id.