05-44481-rdd    Doc 8688-11    Filed 07/19/07    Entered 07/19/07 13:50:16    Exhibit J - Metal One America v Center Manf Opinion    Pg 1 of 15

Case 1:04-cv-00431-GJQ    Document 37    Filed 07/14/2005    Page 1 of 15

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

METAL ONE AMERICA, INC.,
a Delaware corporation

        Plaintiff,

v.                                                                    Case No. 1:04-cv-431

CENTER MANUFACTURING, INC.,                                           HON. GORDON J. QUIST
a Michigan corporation

        Defendant.
_____/

## OPINION

Plaintiff, Metal One America, Inc. ("Metal One"), has sued Defendant, Center Manufacturing, Inc. ("Center"), alleging that Center breached a contract between Metal One and Center by acting in bad faith pursuant to M.C.L.A. § 440.2306(1). Metal One has moved for summary judgment as to liability only. Metal One's motion will be granted.

### I. Facts

**A.     The Business Relationship**

Metal One is a steel trading company which buys or sells steel without taking physical possession of the steel. Center is a producer of complex metal assemblies. One of Center's operations is to buy cold drawn steel bars ("steel bars") and process them into television screen frames. Based upon representations of volume made to it by Sony Corporation ("Sony"), Center established a plant in Corona, California solely to supply 21-inch and 29-inch television frames to Sony. Center started to purchase steel bars from Metal One for the operation of the Corona plant

sometime around January 2002. All of the steel bars from Metal One are specifically for the production of 29-inch frames.

Plymouth Steel Corporation ("Plymouth") was Metal One's supplier of steel bars. Plymouth manufactured steel bars using hot roll bar material according to the specifications required by Metal One. Plymouth delivered steel bars directly to Center.

Corus is a company in England. It supplied Plymouth the hot roll material that Plymouth used to make the steel bars.

The manufacture and delivery of the steel bars take three to four months. Specifically, it takes Plymouth three months to obtain the hot roll bars from Corus. It takes two weeks for Plymouth to process the hot roll bars into steel bars, and another seven to ten days for Plymouth to deliver the steel bars to Center. Both the steel bars produced by Plymouth and the hot roll bars produced by Corus are highly engineered products. Once they are processed, they are only suitable for producing Sony's 29-inch frames. Center was aware of the commercial relationship among Metal One, Plymouth, and Corus. Center was also aware of the high specialization of the steel bars and hot roll bars and the lead time needed to produce and deliver them to Center. (Answer ¶ 11; Nielsen Dep. at 19-20, Pl.'s Br. Supp. Mot. Ex. 2.)

**B.   The Inventory Management**

Both Sony and Center maintained a just-in-time inventory system to minimize overhead. In other words, both Sony and Center kept a minimum of inventory and expected their suppliers to make on time delivery. Sony's volume of production was highly fluctuating. Sony could increase or decrease its orders anytime, and Center had to be flexible in order to respond to Sony's orders. Center described Sony's placement of orders as "a very manual thing." (Nielsen Dep. at 13.) "[The

2

plant in California] operated out there almost like Burger King, you know. They'd [Sony] pull up to the counter and say I'll have X amount of these and they'd give us a forecast that was basically about a month's horizon at a time." (*Id.* at 11.) Because Center also kept a just-in-time inventory, Center required Plymouth to make on time delivery of steel bars so that Center could produce frames to meet Sony's demands.

Because of the fluctuation of Sony's orders, Center was unable to give Metal One an accurate estimate of steel bars that Center would order in the future. Based upon Sony's forecast, Center provided Metal One blanket purchase orders ("blanket orders") which gave Metal One a general idea of the volume of steel bars needed in the next few months. Metal One then notified Plymouth of this forecast so that Plymouth could project the amount of hot roll bars to order from Corus. Center's estimate in its blanket orders fluctuated frequently, depending upon Sony's volume of production. Therefore, Metal One and Plymouth would not ship anything on the blanket orders. Rather, Metal One would ship only when it received a firm release from Center. However, Center often sent Metal One a firm release only a few days or weeks in advance of the required delivery date. Therefore, if Metal One and Plymouth waited for the firm release and then ordered hot roll bars from England, Plymouth would not be able to meet Center's on time delivery requirement. As a result, Plymouth held on behalf of Metal One at least three or four months worth of steel bar and hot roll bar inventory.

The back of Center's blanket order provides that Center may cancel an order by written notice prior to delivery:

> In the event of a cancellation by Purchaser as provided herein, and of the goods which are the subject or [sic] this Order are manufactured especially for Purchaser and are not saleable to others in the ordinary course of the kind of business in which

3

05-44481-rdd    Doc 8688-11    Filed 07/19/07    Entered 07/19/07 13:50:16    Exhibit J -
Metal One America v Center Manf Opinion    Pg 4 of 15
Case 1:04-cv-00431-GJQ    Document 37    Filed 07/14/2005    Page 4 of 15

Seller engages. [sic] Then Purchaser shall reimburse Seller for the cost of direct labor and materials for all completed items and work-in-process (less savage value) and costs of materials procured specifically for this Order and which are not standard items useable in other applications (less savage value). Any claims on account of cancellation must be submitted by Seller within thirty (30) days of the date of the notice of cancellation and must be supported by cost data in such form and detail as may reasonably be required by Purchaser.

. . .

15. **Governing Law.** This Purchase Order shall be governed by and interpreted in accordance with the laws of the State of Michigan.

(Center's Blanket Order ¶¶ 7 & 15, Pl.'s Br. Supp. Mot. Ex. 6.)

In addition, the front of the blanket order provides: "Volumes are estimates only, and do not constitute a firm commitment to total." (*Id.*; Davison Dep. Ex. 3, Pl.'s Br. Supp. Mot. Ex. 1.) The firm release provides: "The steel forecast . . . is based on Sony's current forecast. It is subject to change based on Sony's forecast changes." (3/25/03 Firm Release, Davison Dep. Ex. 12.)

C.  **The Cancellation**

On July 30, 2003, Center released a shipment of 315,000 pounds of steel bars for delivery to it in August, September, and October. Metal One forwarded this information to Plymouth on the same day.

On August 4 or 5, 2003, Don Steffee ("Steffee"), Center's director of purchasing, called Ronald Davison, the sales manager of Metal One, and notified him that Center may close down its plant in Corona. Prior to this call, Metal One had no notice of the impending shutdown. Metal One immediately instructed Plymouth to cancel any order it could from Corus. On August 12, 2003, prior to the delivery of the released steel bars, Metal One received an official notice from Center that it would close down the Corona plant. After August 12, Center did not order any more steel bars from

4

Metal One. As of August 6, Plymouth held in inventory on Metal One's behalf 230,000 pounds of finished steel bars and 670,000 pounds of hot roll bars. Metal One was contractually obligated to pay Plymouth for the value of these bars.

Richard Nielsen, Center's president and CEO, testified that Center shut down the Corona plant in order to curtail financial loss. As stated earlier, Center had opened the Corona plant solely for the purpose of supplying 21-inch and 29-inch frames to Sony. However, because Sony reduced the volume of its orders throughout the years, Center suffered losses at the Corona plant. To make Center's situation worse, in July 2003, Sony announced that it was going to cease the production of 21-inch frames. Upon Sony's announcement, Center decided to shut down the Corona plant because the production of 29-inch frames alone was a "hopeless deal going forward." (Nielsen Dep. at 23.)

> [Sony's announcement] was making the situation that was already untenable, absolutely impossible. Center was losing between a hundred and fifty thousand and two hundred thousand dollars a month on operations out there. So you know, we -- when we knew that it was a hopeless deal going forward, we responded when they gave us the notification that we're going to cease production.

(*Id.* at 22-23.)

However, Sony kept its commitment to Center to carry the production of 29-inch frames "until March 2004 and beyond." (E-mail from Halac to Davison of 10/29/03, Davison Dep. Ex. 16.) Nielsen also testified that Sony did not cancel any of its orders on 29-inch frames:

> Q: . . . As of August of 2003 -- well, let me ask you this. The product that Plymouth and Metal One was supplying and delivering to your California plant, which TV frames was that product intended for?
> A: I believe -- I believe the item that we were dealing with there was for the 29-inch.
> Q: As of August 2003, did SONY inform you that it was canceling its forecast for 29-inch frames?
> A: No, they did not.

5

05-44481-rdd    Doc 8688-11    Filed 07/19/07    Entered 07/19/07 13:50:16    Exhibit J -
Metal One America v Center Manf Opinion    Pg 6 of 15
Case 1:04-cv-00431-GJQ    Document 37    Filed 07/14/2005    Page 6 of 15

. . .

> Q:   At the time -- on the date this letter was sent, August 12th, sir, of 2003, had SONY canceled it's [sic] blanket purchase order with you for 29-inch televisions, television frames?
> A:   No.
> Q:   And once again, the product, if you please, that Plymouth and Metal One were shipping to the -- to Center's California plant were [sic] intended for 29-inch SONY television frames?
> A:   That is correct.

(Nielsen Dep. at 23 & 27-28.)

Center also conceded this fact in its response to Metal One's request for admission:

> 16. Admitted that on August 14, 2003, defendant cancelled all of its orders for specially manufactured steel bars from Metal One even though Sony was willing to continue to purchase finished product from defendant.
>
> **RESPONSE**: Admitted.

(Center's Resp. to Metal One's First Req. for Admis. ¶ 16, Pl.'s Br. Supp. Mot. Ex. 5.)

Davison testified that, had Center kept the Corona plant and continued to supply Sony 29-inch frames, the production "would have cleared out all our inventory with no problem." (Davison Dep. at 66.) Even Center agreed with this:

> Q:   Would it be correct to say that had Center kept the plant in California open it would have been able to continue selling those 29-inch TV frames to SONY in the latter months of 2003?
> A:   Most probably.

(Nielsen Dep. at 29.)

In the instant motion, Metal One requests that the court grant it summary judgment with respect to liability only, leaving for further consideration the amount of damages.

6

05-44481-rdd    Doc 8688-11    Filed 07/19/07    Entered 07/19/07 13:50:16    Exhibit J -
Metal One America v Center Manf Opinion    Pg 7 of 15
Case 1:04-cv-00431-GJQ    Document 37    Filed 07/14/2005    Page 7 of 15

## II. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## III. Discussion

### A.   The Law

Michigan's version of Uniform Commercial Code ("UCC") provides:

> Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

M.C.L.A. § 440.2208(1).

The Michigan Court of Appeals defines a requirements contract as one "'in which the seller promises to supply all the specific goods or services which the buyer may need during a certain period at an agreed price in exchange for the promise of the buyer to obtain his required goods or services exclusively from the seller.'" *Benedict Mfg. Co. v. Aeroquip Corp.*, No. 242563, 2004 WL

7

05-44481-rdd    Doc 8688-11    Filed 07/19/07    Entered 07/19/07 13:50:16    Exhibit J - Metal One America v Center Manf Opinion    Pg 8 of 15

Case 1:04-cv-00431-GJQ    Document 37    Filed 07/14/2005    Page 8 of 15

1532280, at *3 n.5 (Mich. Ct. App. July 8, 2004) (per curiam) (citing *Propane Indus., Inc. v. Gen. Motors Corp.*, 429 F. Supp. 214, 218 (W.D. Mo. 1977)). Subsequently, the Michigan Court of Appeals, citing *General Motors Corp. v. Paramount Metal Products Co.*, 90 F. Supp. 2d 861, 873 (E.D. Mich. 2000), held "that MCL 440.2306 expresses a legislative intent to enforce both exclusive and non-exclusive requirements contracts." *Plastech Engineered Prods. v. Grand Haven Plastics, Inc.*, No. 252532, 2005 WL 736519, at *7 (Mich. Ct. App. Mar. 31, 2005) (per curiam).

The UCC accepts the validity of requirement contracts.

> **Output, requirements.** A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

M.C.L.A. § 440.2306(1).

In addition, in a requirements contract, Michigan law imposes a duty on the parties to act in good faith. Comment 2 of M.C.L.A. § 440.2306 provides:

> Under this Article, a contract for output or requirements is not too indefinite since it is held to mean the actual good faith output or requirements of the particular party. Nor does such a contract lack mutuality of obligation since, under this section, the party who will determine quantity is required to operate his plant or conduct his business in good faith and according to commercial standards of fair dealing in the trade so that his output or requirements will approximate a reasonably foreseeable figure. Reasonable elasticity in the requirements is expressly envisaged by this section and good faith variations from prior requirements are permitted even when the variation may be such as to result in discontinuance. A shut-down by a requirements buyer for lack of orders might be permissible when a shut-down merely to curtail losses would not. The essential test is whether the party is acting in good faith.

M.C.L.A. § 440.2306 cmt. 2.

8

05-44481-rdd    Doc 8688-11    Filed 07/19/07    Entered 07/19/07 13:50:16    Exhibit J -
Metal One America v Center Manf Opinion    Pg 9 of 15
Case 1:04-cv-00431-GJQ    Document 37    Filed 07/14/2005    Page 9 of 15

B.  Analysis

1)  Course of Performance

This court concludes that the pattern in which the parties interacted established a course of performance. The parties had been dealing with each other for over one and a half years. During this time, Center communicated with Metal One frequently to assist it in properly forecasting the amount of steel bars that Center would need. Center periodically sent Metal One blanket orders which projected Center's need for steel bars on a quarterly or monthly basis. Metal One then notified Plymouth of the projection so that Plymouth could estimate the quantity of steel bars it should hold in inventory and the quantity of the hot roll bars to order from Corus. All these communications ensured a smooth and reliable flow of materials so that Plymouth was able to deliver the steel bars on time within days after Center placed a firm release as Center demanded. Center was well aware, and does not deny that it was well aware, that Plymouth had to hold sufficient inventory of steel bars and hot roll bars. The communication and the placement of blanket orders and firm releases demonstrate a course of performance between Center and Metal One, and the court considers such course of performance "highly persuasive evidence of proper contract interpretation . . . ." *Dilusso Bldg. Co., Inc. v. Concord Indus. Group*, No. 233912, 2003 WL 462425, at *2 (Mich. Ct. App. Feb. 21, 2003) (per curiam).

Furthermore, the court concludes that the course of performance has demonstrated that the parties had a requirements contract with respect to the steel bars and hot roll bars held by Plymouth. Metal One promised to supply all the steel bars that Center would need in a certain period. Indeed, in order to keep this promise, Metal One contracted with Plymouth and is obligated to pay Plymouth for any steel bars and hot roll bars that Plymouth held on behalf on Metal One. Similarly, even

9

05-44481-rdd    Doc 8688-11    Filed 07/19/07    Entered 07/19/07 13:50:16    Exhibit J -
Metal One America v Center Manf Opinion    Pg 10 of 15
Case 1:04-cv-00431-GJQ    Document 37    Filed 07/14/2005    Page 10 of 15

though Center never ordered any hot roll bars from Metal One, the hot roll bars were raw materials necessary to produce the steel bars. Therefore, the hot roll bars shipped from Corus were also part of the requirements contract. Moreover, by frequent communication with Metal One and the issuance of blanket orders and firm releases, Center has acknowledged that Metal One was the supplier of steel bars. As a result, the parties had a requirements contract on these steel bars and hot roll bars.

### 2)    The Good Faith Requirement

Michigan law imposes upon the parties to a requirements contract a duty to act in good faith. M.C.L.A. § 440.2306 cmt. 2. "[A] contract for sale may measure the quantity by the output of the seller or the requirements of the buyer, measuring such output or requirements as may occur in good faith." *Plastech*, 2005 WL 736519, at *6.

In *General Motors Corp. v. Paramount Metal Products Co.*, 90 F. Supp. 2d 861 (E.D. Mich. 2000), the plaintiffs, GMC and Woodbridge, contracted with the defendant, Paramount, under various purchase orders for the manufacture of car seat frames. Paramount was GMC's sole supplier for these seat frames. Paramount later encountered financial difficulty and allegedly requested GMC to grant Paramount $10 million in retroactive price increases under the threat of immediately ceasing seat frame production. GMC was forced to give some price adjustments, but later sued Paramount for breach of GMC purchase orders and for economic duress. The court ruled that the purchase orders were enforceable as contracts, though facts remained about whether they were requirements contracts. In addition, the court stated that GMC, as a purchaser, had a duty to act in good faith:

> Construing the pleadings and evidence in a light most favorable to the plaintiffs GMC and Woodbridge, it remains possible for the plaintiffs to develop a record at trial demonstrating that the various purchase orders are in fact enforceable

10

05-44481-rdd    Doc 8688-11    Filed 07/19/07    Entered 07/19/07 13:50:16    Exhibit J -
Metal One America v Center Manf Opinion    Pg 11 of 15
Case 1:04-cv-00431-GJQ    Document 37    Filed 07/14/2005    Page 11 of 15

> requirements contracts. Plaintiffs owed a contractual duty under Michigan's version of the UCC to execute the purchase orders "in good faith and according to commercial standards of fair dealing in the trade". M.C.L. § 440.2306 Comment 2. If, in bad faith or inconsistent with commercial standards of fair dealing, the plaintiffs exercised a unilateral right not to purchase seat frames or to terminate the purchase orders, the plaintiffs would be subject to liability for breach of contract. *Id.* This same reasoning holds true had the plaintiffs acted in bad faith and not issued a release. The purchase orders, governed by the UCC, are not unenforceable for lack of mutuality of performance or obligation. *Id.*; M.C.L. § 440.2306.

*Gen. Motors Corp.*, 90 F. Supp. 2d at 873.

The Michigan Court of Appeals adopted the ruling and reasoning of *General Motors Corp.* in *Plastech*. In *Plastech*, JCI and GHP had an ongoing business relationship where GHP supplied plastic parts to JCI according to JCI's purchase orders. Later, JCI contracted with Plastech and authorized Plastech to manage JCI's current suppliers, and if necessary, to terminate JCI's business relationship with these suppliers in order to let Plastech manufacture the product. Plastech subsequently cancelled all of the purchase orders with GHP. GHP brought a breach of contract suit against Plastech. The lower court ruled that GHP had a meritorious breach of contract claim and thus denied Plastech's motion for summary judgment. On appeal, the Michigan Court of Appeals affirmed the lower court's ruling on the summary judgment motion. The court cited *General Motors Corp.*:

> The court in *Gen Motors Corp*, *supra*, concluded that under Michigan's version of the UCC, pursuant to Comment 2, the plaintiffs owed a contractual duty to execute the purchase order in good faith and according to commercial standards of fair dealing in the trade. *Id.* at 873 . . . .

*Plastech*, 2005 WL 736519, at *7. The court further stated: "If the PO's constituted requirements contracts, then Plastech's unilateral termination of the PO's may constitute a breach of contract . . . ." *Id.*

11

Similarly, in the instant case, Center terminated the contract with Metal One to curtail the loss at the Corona plant. All of the steel bars Metal One provided to Center were for the production of Sony's 29-inch frames. The undisputed evidence shows that Sony would have continued to order 29-inch frames from Center until March 2004 and beyond. "Our commitment to Center would have carried our production until March 2004 and beyond. The decision to close the Center facility was not Sony's it was Center's." (E-mail from Halac to Davison of 10/29/03.) If Center had continued the operation in the Corona plant, Sony's orders would have cleared out all of the inventory held by Plymouth. However, Center chose to shut down the plant because the production of 29-inch frames alone was a "hopeless deal." Comment 2 to M.C.L.A. § 440.2306 specifically disallows a shutdown to curtail financial losses: "A shut-down by a requirements buyer for lack of orders might be permissible when a shut-down merely to curtail losses would not. The essential test is whether the party is acting in good faith." M.C.L.A. § 440.2306 cmt. 2. Because Center shut down the plant to "curtail losses," Center breached the contract in bad faith as a matter of law.

3) **Breach of The Blanket Order**

The court concludes that Center breached Paragraph 7 of the blanket order as a matter of law. Paragraph 7 provides that if Center cancels any order of specifically manufactured goods, Center shall reimburse Metal One for the cost of such goods, direct labor, and materials. However, Center has refused to reimburse Metal One for the cost of the steel bars and hot roll bars held by Plymouth, and thus Center breached the contract as a matter of law.

Center contends that Paragraph 7 provides that Center shall reimburse Metal One for the "goods which are the subject or [sic] this Order" and for the "costs of materials procured specially for this Order." (Center's Blanket Order ¶ 7.) Center emphasizes the words "this Order" and

12

05-44481-rdd   Doc 8688-11   Filed 07/19/07   Entered 07/19/07 13:50:16   Exhibit J -
Metal One America v Center Manf Opinion   Pg 13 of 15
Case 1:04-cv-00401-GJQ   Document 37   Filed 07/14/2005   Page 13 of 15

interprets "this Order" to be the July 30, 2003, order. Center argues that none of the inventory held by Plymouth on August 6, 2003, was specifically procured for the July 30, 2003, release because Center cancelled the release within five days.

Center misses the point. First, this case is not about an individual order (e.g. the July 30, 2003, release). Rather, this case is about a requirements contract in which Metal One promised to supply Center all the steel bars it would need in a certain period (i.e. from January 2002 to August 2003). The inventory that Plymouth held on behalf of Metal One was to ensure that Metal One was able to fulfill its commitment in this requirements contract. Center breached this requirement contract in bad faith by shutting down the plant – not because Sony cancelled the product being supplied by Metal One, but because Center was suffering losses at this plant. Second, assuming *arguendo*, that the inventory Plymouth held on August 6, 2003, was not procured specifically for the July 30, 2003, release, all of the inventory Plymouth held on behalf of Metal One was specially procured to fill Center's orders, a fact of which Center was well aware. Therefore, Center's argument that the inventory was not specifically procured for the July 30, 2003, order is without merit. As a result, Center is liable to Metal One for the steel bars and hot roll bars that Plymouth held on August 6, 2003, because these products were procured to fulfill the requirements contract.

Center further argues that, even assuming the contract is a requirements contract, it never contracted for the excessive inventory held by Plymouth. Center's argument ignores the course of performance requirement in M.C.L.A. § 440.2208(1) and assumes that Metal One can create finished steel bars within days. As discussed above, Center never objected to Plymouth's operation of holding sufficient inventory. Rather, Center communicated with Metal One frequently so that it could properly forecast the inventory that Plymouth should hold. Indeed, Center was aware that such

13

operation was the only way to enable Metal One and Plymouth to deliver finished products on time. Center has reaped all the benefits of the on time delivery, and it can not now turn around and claim these products are excessive inventory.

Center cites Steffee's affidavit, dated May 20, 2005, as evidence that Center's last purchase order to Metal One was dated April 14, 2003. However, Center acknowledges in its brief that its last order was the July 30, 2003, release. Steffee also states:

> 5. Center never required Metal One to maintain any level of inventory.
>
> 6. . . . The manner in which Metal One conducted business and managed its just-in-time program was not the concern of Center Manufacturing, Inc. and Metal One's methods and techniques were not known to Center.

(Steffee Aff. ¶¶ 5 & 6, Def.'s Resp. Br.)

Steffee, in essence, makes the same argument regarding Metal One that Sony makes regarding Center. (E-mail from Halac to Davison of 10/29/03.) In any event, there are two problems with the Steffee Affidavit:

> First, Steffee's affidavit is inconsistent with Center's answer. Center admitted that it was aware of the business relationship among Metal One, Plymouth and Corus for the production of steel bars and the four months lead time to process the materials. *Cf. Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) ("A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony.").

Second, although Center never expressly required Metal One to maintain any inventory, Center was well aware that Metal One and Plymouth could not simply wait for a firm release and then order hot roll bars from Corus. Rather, Center knew that Plymouth

14

held the inventory to ensure on time delivery to Center, and Center never objected. Again, Center has reaped the benefits of on time delivery, and it is unjust for Center to leave Metal One alone to absorb the cost of the inventory.

## IV. Conclusion

The allocation of risk in cases like this involving so-called "just-in-time" inventory management will probably continue to be the subject of continuing negotiation and litigation. In this particular case, for the foregoing reasons, the court will grant Metal One's motion for summary judgment.

An Order consistent with this Opinion will be entered.

Dated: July 14, 2005                                    /s/ Gordon J. Quist
                                                        GORDON J. QUIST
                                                        UNITED STATES DISTRICT JUDGE