SCHWARTZ LAW FIRM, P.C.
Jay A. Schwartz (P45268)
37887 West Twelve Mile Rd., Suite A
Farmington Hills, MI 48331
(248) 553-9400

Counsel for Nu-Tech Plastics Engineering

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>DELPHI CORPORATION, et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 05-44481 (RDD)<br>(Jointly Administered) |

### DECLARATION OF JOHN G. COOPER

Under penalty of perjury, I, John G. Cooper do solemnly swear to the following facts of which I have personal knowledge and to which I will testify if called:

1) I am a resident of the State of Michigan and have been in the business of selling and installing equipment, specifically conveyors, to the automotive industry in Michigan for over 40 years.

2) In 1995, I co-founded Nu-Tech Plastics Engineering Inc. with John Mailey who had extensive experience in the business of plastic injection mold parts manufacturing. I was a 49% shareholder and Mr. Mailey was a 51% shareholder. Nu-Tech began operating in 1996.

3) Mr. Mailey is African-American and, accordingly, Nu-Tech was a minority business which was accepted into General Motors Equal Partner/Mentorship Program.

4) Through the Mentorship Program, Nu-Tech received advice and assistance from General Motors and Delphi to help Nu-Tech establish sales contacts and to develop, implement and continue a viable long term business plan.

5) The Mentorship Program also provided assistance to Nu-Tech in the form of Delphi providing, at Delphi's cost, raw materials for the fabrication of parts ordered from Nu-Tech.

6) In 1997, General Motors first issued purchase order 8C934 which included a number of parts but which was a "factory assist" contract meaning that Nu-Tech would only produce the parts identified on the purchase order which General Motors required but could not produce itself.

7) That purchase order, 8C934, was amended in November, 1997 to add part 25160694 and other changes. A true and accurate copy of the amended 8C934 received by Nu-Tech is attached as Exhibit 1 to the Patrick Affidavit.

8) Nu-Tech was required to participate in a formal bidding process and submitted its latest bid for part number 25160694 to Delphi on March 5, 1998 a true and accurate copy of which is attached to the Patrick Affidavit as exhibit 5 with a per piece price of $1.86 through the year 2002 for over 1.3 million of such parts in 1999 and over 1.1 million parts per year for the years 2000, 2001 and 2002.

9) On June 23, 1998, Nu-Tech negotiated a new purchase order, 9C941, with General Motors which replaced purchase order 8C934 which was set to expire on July 31, 1998. Purchase order 9C941 covered most of the same parts which had previously been the subject of purchase order 9C941. Purchase order 9C941 was **not** a factory assist purchase order as can be seen by the omission of the term "factory assist" which had appeared on purchase order 8C934 and by the references on page 9 of the purchase order indicating that Nu-Tech was to produce 100% of the part from 8/1/98 through 7/31/99.

10) Purchase order 8C934 expired of its own terms on July 31, 1998 and was never extended.

11) Nu-Tech had previously supplied Delphi with the per piece price, actual production numbers for 1997 and estimated production volume of 4,200,000 parts 0694 upon which the bid was based on January 21, 1998. See true and accurate copy of January 21, 1998 letter from Nu-Tech Director of Marketing and Sales, Joe Harris, to Donald Robinson of Delphi attached hereto as Exhibit 1.

12) As a result of that bid, Purchase Order 9C941 for that part, called "Reservoir F/Pump Fuel" was extended, in June, 1998 to end on July 31, 1999 (Exhibit 2 to Patrick Affidavit) and order was assumed by Delphi on August 17, 1998 through Delphi Blanket Order N580000B, Line Item Detail (Exhibit 3 to Patrick Affidavit) and later extended via Delphi Line

  Item Detail dated May 3, 1999 to expire on December, 31, 2000 as demonstrated in Exhibit 7 to the Patrick Affidavit.

13) In order to accommodate the enormous production volume (generating 8 parts every 45 seconds for on two machines, 550 ton Cincinnati Milacron Plastic Injection Molding Machines) leased by Nu-Tech through December 2002 the leases for which are exhibits to Leeman Affidavit one machine running 22 hours per day and the other running 16.56 hours per day just to produce part 0694, Nu-Tech not only leased the two machines to run the tools for the parts but hired additional staff to run the part and leased additional buildings to house the machines and production needs for that part alone at a total cost to Nu-Tech in excess of $1,000,000. See building and equipment leases and payroll documents attached to Leeman Affidavit which are true accurate records of Nu-Tech provided to Leeman by me.

14) Throughout 1998, Nu-Tech produced all of General Motors/Delphi's parts 0694 and retained possession of General Motors' tools at no cost to Nu-Tech other than the cost of routine maintenance of the tools.

15) Throughout the time that Nu-Tech produced part 0694, Nu-Tech was never charged for the raw materials provided by General Motors and Delphi. However, because the purchase orders did not specifically state that Nu-Tech would not be charged for the materials at some point, the financial statements, balance sheets and other financial documents of Nu-

Tech, true and accurate copies of which I provided to Gary Leeman, reflected the potential cost of the materials to Nu-Tech.

16) As of December 15, 1998, Delphi had promised Nu-Tech that at least one of the tools necessary to produce part 0694 would remain at Nu-Tech through at least June of 1999 and Nu-Tech continued to run that tool through December, 1998 producing part 0694. See true and accurate copy of Nu-Tech Staff Meeting Minutes of 12/8/1998 attached hereto as Exhibit 2 and true and accurate copies of 1998 Accounts Payable Payment History Reports to Nu-Tech reflecting payments to Nu-Tech for Delphi purchase order N580000B attached hereto as Exhibit 3.

17) On December 31, 1998, Delphi removed from Nu-Tech, the tool necessary to continue production of part 0694.

18) Delphi never provided any written notice that the purchase order for part 0694 was terminated or going to be terminated as required by the General Terms and Conditions of the purchase order. Delphi had issued written termination notices to Nu-Tech related to other parts such as that marked as Exhibit 8 to the Patrick Affidavit.

19) In fact, Delphi continued to promise Nu-Tech that another part would be substituted for part 0694 at similar prices and volume on the purchase order. Nu-Tech had obtained and tested tooling for a similar part which Delphi had issued spot-buy purchase orders for (part number 25180510) and which Nu-Tech believed would be the replacement Delphi had promised.

20) There was a past practice with General Motors of substituting one part for another by simply amending an existing purchase order, rather than issuing a new purchase order, and Nu-Tech relied on Delphi's promises of a replacement part, the May, 1999 extension of the purchase order for the reservoir part to December, 2000, the process of testing a new tool for production of the other reservoir part (25180510), the mentorship relationship between Nu-Tech and Delphi/General Motors in retaining the machines, staff and facilities it would need to run the promised replacement part all of which resulted in significant cost and losses to Nu-Tech as detailed in Leeman's affidavit and the summary of losses document I prepared based on personal knowledge a true and accurate copy of which is attached hereto as Exhibit 4.

21) Because Nu-Tech was a Delphi mentee, when Nu-Tech was suffering from financial distress due to the breach of the contract which is the basis of this suit, Delphi brought in BBK, LLC to assume the management of Nu-Tech and attempted to find a buyer for Nu-Tech's business.

22) From the last quarter of 1999 to the date of the Asset Purchase Agreement between Nu-Tech and Rapid Product Technologies, Inc., BBK managed Nu-Tech's business and prepared all financial records which records were provided to Gary Leeman at the offices of BBK.

23) As a direct result of the loss of business from Delphi, Nu-Tech's revenues declined sharply thereby significantly reducing the value of the business.

24) As required by the work-out program into which Delphi had placed Nu-Tech, Nu-Tech sold most of its assets to Rapid Product Technologies, Inc. (RPT) in December, 1999. A true and accurate copy of the Asset Purchase agreement between Nu-Tech and RPT is attached to the Supplemental Response as Exhibit F.

25) Nu-Tech did not sell or transfer its potential causes of action against General Motors or Delphi arising from the breach of contract and promissory estoppel which had occurred earlier in 1999 to RPT.

26) When Delphi and General Motors asserted in the Michigan lawsuit that Nu-Tech's causes of action had been sold to RPT, to clarify the actual facts, Nu-Tech and RPT entered into the Acknowledgment and Assignment dated March 8, 2005 a true and accurate copy of which is attached to Nu-Tech's Supplemental Response as Exhibit G.

27) The balance sheets, income statements, leases, tax returns, cost of production spreadsheet, sales spreadsheets, Statement of Revenues, Expenses and Retained Earnings for 1997 and 1998 Financial Statement prepared by Daig & Daig for Nu-Tech, and Closing Statement Regarding Purchase of Assets attached to the Leeman Affidavit which I have reviewed are true and accurate copies of the regularly kept business records of Nu-Tech and which were provided to Leeman either by me or by BBK.

28) During the summer of 1998 and in December, 1998, General Motors issued to Nu-Tech "strike protection" purchase orders requiring Nu-Tech

to produce several parts (not 0694) during a labor strike against General Motors.

29) Nu-Tech purchased additional equipment and hired additional staff to accommodate General Motor's production needs during the strike in the summer of 1998.

30) When the summer, 1998 strike ended, both General Motors and Delphi expressed their gratitude for Nu-Tech's extraordinary contribution to General Motor's needs during the strike. See Exhibits 5 and 6 hereto which are true and accurate copies of letters received by Nu-Tech.

31) During the strikes in 1998 against General Motors, there was no change in the production volumes or General Motors' requirements for part 0694 100% of which was being produced by Nu-Tech before and after the strikes pursuant to P.O. 9C941.

Further Declarant saith not.

_____
John G. Cooper

Subscribed and sworn before me this
18 day of July, 2007.

Margaret A. Kitchen
_____, Notary Public
Wayne County, Michigan
My Commission Expires: 10-08-2011
Acting in Oakland County, Michigan

MARGARET A. KITCHEN
NOTARY PUBLIC, STATE OF MI
COUNTY OF WAYNE
MY COMMISSION EXPIRES Oct 8, 2011
ACTING IN COUNTY OF