## <u>Exhibit D</u>

**Asset Sale And Purchase Agreement**

**Execution Copy**

## ASSET SALE AND PURCHASE AGREEMENT

**THIS ASSET SALE AND PURCHASE AGREEMENT** (this "Agreement") dated June 14, 2007, by and among Delphi Automotive Systems LLC, a Delaware limited liability company ("Delphi"), Delphi Sistemas de Energia, S.A. de C.V., a Mexican corporation with a productive facility in the municipality of Ramos Arizpe, State of Coahuila, Mexico ("DSE"), each a "Seller" and, collectively, the "Sellers", and Delphi Controladora S.A. de C.V., a Mexican corporation, as guarantor of certain obligations,  and Robert Bosch LLC, a Delaware limited liability company ("RBUS") and Frenados Mexicanos S.A. de C.V., a Mexican corporation ("FRMX"), each a "Purchaser" and, collectively, the "Purchasers".

## RECITALS:

**WHEREAS,** Delphi is engaged in the business of designing and selling brake systems and components to Original Equipment Manufacturers, Tier 1 suppliers and the automotive aftermarket; and

**WHEREAS**, DSE is engaged in providing Services (as hereinafter defined) to Delphi in connection with the Business (as hereinafter defined); and

**WHEREAS**, Delphi owns certain machinery and equipment, most of them imported into Mexico on a temporary basis, located in the Premises (as hereafter defined), and used by DSE in providing the Services to Delphi; and

**WHEREAS**, on October 8, 2005, Delphi and certain of its affiliates filed voluntary petitions for relief under Chapter 11 of Title 11, U.S.C. §§101 et seq. (as then amended) (the "Bankruptcy Code") (such petitions for relief hereafter referred to as the "Bankruptcy Cases"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and

**WHEREAS**, upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 363 and 365 of the Bankruptcy Code, Delphi desires to sell to RBUS all right, title and interest of Delphi in and to the Acquired Assets (as hereinafter defined), and RBUS desires to make such purchase, subject to Purchaser's assumption of the Assumed Liabilities and the conditions set forth in this Agreement; and

**WHEREAS**, upon the terms and subject to the conditions set forth in this Agreement,  FRMX desires to offer employment to substantially all of the employees of DSE;

**NOW, THEREFORE**, in consideration of the premises, mutual promises, representations, warranties and covenants contained in this Agreement and other good and valuable consideration, and intending to be legally bound hereby, the Parties agree:

1

## DEFINITIONS

The following terms, as used in this Agreement, shall have the following meanings whether used in the singular or plural (other terms are defined in Sections or Schedules to which they pertain):

"**$**" means United States Dollars, unless other currency is specified.

"**Acquired Assets**" means the assets referred to in Section 1.1.1.

"**Administrative Assets**" means books, records and other administrative assets used in or necessary for continuing to provide the Services, including but not limited to, correspondence, customer lists, vendor lists, production data, sales materials and records, purchasing materials and records, personnel records of employees, billing records, accounting records, other financial records, and sale order files; provided, however that Administrative Assets do not include Technical Documentation.

"**Affiliate**" means with respect to any Party any business or other entity directly or indirectly controlling, controlled by or under common control with such specified entity. For purposes of this definition, control means ownership of more than fifty percent (50%) of the shares or other equity interest having power to elect directors or persons performing a similar function.

"**Agreement**" means this Asset Sale and Purchase Agreement, including its Exhibits and Schedules.

"**Allocation**" means allocation of the Purchase Price, as described in Section 4.2.

"**Alternate Bid(s)**" shall have the meaning set forth in Section 11.11.

"**Alternate Bidder(s)**" shall have the meaning set forth in Section 11.11.

"**Alternative Transaction**" shall have the meaning set forth in Section 9.3.1.

"**Ancillary Agreements**" means the agreements referred to in Section 7.2.

"**Assumed Contracts**" means those Transferred Contracts entered into by Seller before the Petition Date that Delphi, at Purchasers' request,  which such request shall be made to Delphi no later than entry of the Bidding Procedures Order, moves to assume and assign to the Purchaser under section 365 of the Bankruptcy Code.

"**Assumed Liabilities**" means the obligations assumed by Purchaser pursuant to Article 2, but only to the extent that an obligation: (a) arises on or after the Closing; and (b) with respect to obligations arising under Transferred Contracts: (i) does not arise from or relate to any breach by a  Seller of any provision of any of the Transferred Contracts; (ii)

does not arise from or relate to any event, circumstance or condition occurring or existing on or prior to the Closing that, with or without notice or lapse of time, would constitute or result in a breach of any of the Transferred Contracts; and (iii) is ascertainable by reference to the express terms of the Transferred Contracts.

"**Auction**" shall have the meaning set forth in Section 11.9.

"**Bankruptcy Cases**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Code**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Court**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**Bid Deadline**" shall have the meaning set forth in Section 11.4.

"**Bidding Procedures**" means the bidding procedures set forth in Section 11.1.

"**Bidding Procedures Order**" means the order of the Bankruptcy Court approving the Bidding Procedures in form and substance satisfactory to the Purchasers.

"**Bidding Process**" shall have the meaning set forth in Section 11.1.

"**Break-Up Fee**" shall have the meaning set forth in Section 9.3.1.

"**Business**" means the production of Products for the GMT 900 Programs being carried out at the Premises, including, without limitation, the GMT900 Light Duty Brake Corner Program, and other related programs.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which banks in New York, New York are authorized or obligated by law or executive order to close.

"**Claims**" mean losses, liabilities, claims (as defined in Section 101 of the Bankruptcy Code), damages or expenses (including reasonable legal fees and expenses) whatsoever, whether known or unknown, fixed, liquidated, contingent or otherwise.

"**Closing**" shall have the meaning set forth in Section 7.1.

"**Closing Date**" means the date of Closing.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Cases.

"**Contracts**" mean all written or material oral purchase orders, sales agreements,

3

service contracts, employment or consulting agreements, leases (for real property, personal property or otherwise), product warranty or service agreements and other commitments, agreements and undertakings of any nature, but not including quotations and bids of Sellers outstanding on the Closing Date.

"**Cure Amounts**" means all cure amounts payable in order to cure any monetary defaults required to be cured under Section 365(b)(1) of the Bankruptcy Code or otherwise effectuate, pursuant to the Bankruptcy Code, the assumption by Delphi and assignment to RBUS of the Assumed Contracts under the Sale Approval Order.

"**Defending Party**" shall have the meaning set forth in Section 13.18.

"**Demanding Party**" shall have the meaning set forth in Section 13.18.

"**Deposit Amount**" shall have the meaning set forth in Section 4.1.1.

"**Disclosure Schedule**" means, collectively, the Schedules to Sellers' Representations and Warranties contained in Section 5.1.

"**Employees**" shall have the meaning set forth in Section 3.1.

"**Escrow Agent**" means the escrow agent under the Escrow Agreement.

"**Escrow Agreement**" shall have the meaning set forth in Section 4.1.1.

"**Escrow Amount**" shall have the meaning set forth in Section 4.1.2.

"**Excluded Assets**" means assets not included in the Acquired Assets, as set forth in Section 1.1.2.

"**Excluded Contracts**" shall have the meaning set forth in Section 1.1.2.C.

"**Expense Reimbursement**" shall have the meaning set forth in Section 9.3.2.

"**Expiration Date**" shall have the meaning set forth in Section 5.3.

"**Final Order**" means an order or judgment: (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending or (ii) if an appeal, writ of certiorari, re-argument or rehearing has been filed or sought, the order or judgment has been affirmed by the highest court to which such order or judgment was appealed or certiorari has been denied, or re-argument or rehearing shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal or to seek certiorari or further re-argument or rehearing has expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with

respect to such order or judgment shall not prevent such order or judgment from being considered a Final Order.

"**Full Escrow Period"** shall have the meaning set forth in Section 4.1.2.

"**GMT 900 Light Duty Brake Corner Program**" means the GMT 900 Light Duty Brake Corner Program and such other GM Programs for brake-related business with General Motors Corporation in which RBUS currently acts as a Tier 1 supplier and Delphi acts as a Tier 2 supplier to RBUS.

"**Good Faith Deposit**" shall have the meaning set forth in Section 11.6.3.

"**Governmental Entity**" means any United States or Mexican federal, state or local, tribunal, legislative, executive, governmental, quasi-governmental or regulatory authority, self-regulatory authority, agency, department, commission, instrumentality or body having governmental authority with respect to the transactions contemplated hereby, under applicable law.

"**Hazardous Material**" means all matter or the effect of matter (and whether alone or in combination with other matter, and whether solid, liquid, gas or other state) which is a pollutant, contaminant, chemical, material, substance, constituent or waste, including without limitation, petroleum, petroleum-based products, polychlorinated biphenyls, asbestos and asbestos-containing materials, and noxious, radioactive, flammable, corrosive, caustic materials, all of which are governed under a Law, or are hazardous or toxic to biota, the ecosystem, or the environment.

"**Including**" means, whether or not initially capitalized, including without limitation.

"**Indemnification Claim**" shall have the meaning set forth in Section 12.4.

"**Initial Escrow Period**" shall have the meaning set forth in Section 4.1.2.

"**Intellectual Property**" means any and all patent rights, trademark rights, copyrights, software, Technical Documentation, trade secrets and know-how used by the Sellers in providing the Services.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

"**Inventory**" means, raw materials, work-in-process, packaging, stores, stock, and supplies, wherever located, but not Products, related to the Business.

"**Land**" means the land on which the Premises are located and which is leased by Fraccionadora  Industrial Del Norte, S.A. de C.V. from Alambrados y Circuitos Electricos, S.A. de C.V. as described in public deed number 618 dated October 15, 1998, issued by Onésimo Flores Rodríguez, Notary Public No. 9, of Saltillo, Coahuila.

"**Laws**" means laws, ordinances, codes, standards, administrative rulings or regulations of any applicable Governmental Entity.

"**Licensed Intellectual Property**" means the Intellectual Property necessary to fulfill the Transferred Contracts which will be, or has been, licensed to RBUS.

"**Lien**" means any lien, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction or similar statutes as applicable under Mexican law).

"**Listed Contracts**" means the Seller's contracts and commitments listed on Schedule 5.1.14.A.

"**M&E**" shall have the meaning set forth in Section 5.1.5.D.

"**Marked Agreement**" shall have the meaning set forth in Section 11.6.2.

"**Material Adverse Effect**" means any change or event that has a material adverse effect on the  Acquired Assets or properties being purchased pursuant to this Agreement, except any change or event resulting from, relating to or arising out of: (a) any act or omission of a Seller taken with the prior written consent of a Purchaser; (b) any action taken by a Seller or a Purchaser or any of their respective representatives required by the terms of this Agreement; (c) general business or economic conditions; (d) conditions affecting the industry and markets in which the Business generally operates; (e) increases in energy, electricity, natural gas, raw materials or other operating costs; (f) changes resulting from any action required by the Bankruptcy Court; (g) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon such country, any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of any of such

countries; (h) acts of God; (i) changes in United States generally accepted accounting principles or generally accepted accounting principles of any foreign jurisdiction; (j) changes in any Law; (k) any existing event, occurrence or circumstance listed in the Disclosure Schedule as of the date hereof; (l) any adverse change in or effect on the Business,  or an adverse change in or effect on the Services that is entirely cured by Seller  before the earlier of: (1) the Closing Date; and (2) the date on which this Agreement is terminated pursuant to Section 6.3 hereof; or (m) the regulatory status of a Purchaser.

"**Notice**" shall have the meaning set forth in Section 13.18.

"**Ordinary Course of Business**" means, with respect to the Business, the ordinary

course of business consistent with custom and practice of the Business prior to the Petition Date or to the extent consistent with orders issued in the Bankruptcy Cases.

"**Party**" or "**Parties**" means any Purchaser and/or Seller.

"**Permits**" means permits, concessions, grants, franchises, licenses and other governmental authorizations and approvals issued to a Seller and that are currently used exclusively for the purpose of carrying on the Business or that relate exclusively to the Acquired Assets.

"**Person**" means an individual, a corporation, a partnership, a limited liability company, an association, a trust or other entity or organization.

"**Personal Property**" means tangible personal property other than Inventory, including production machinery, equipment, tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, related spare parts, business machines, computer hardware and other IT assets other than Intellectual Property, office furniture and fixtures, in-factory vehicles, trucks, model shop equipment, laboratory test fixtures and other tangible personal property, whether located on the premises of DSE, at the place of business of a vendor or elsewhere.

"**Petition Date**" shall mean October 8, 2005.

"**Post-Petition Contracts**" means the Contracts that Delphi entered into on or after the Petition Date relating to the Business entered into in the Ordinary Course of Business or approved by the Bankruptcy Court.

"**Potential Bidder**" shall have the meaning set forth in Section 11.3.

"**Premises**" means the building  leased by DSE from Fraccionadora Industrial Del Norte, S.A. de C.V. on the Saltillo-Piedras Negras Highway at Km. 8.54, Number 8540, Ramos Arizpe, Coahuila, Mexico, C.P. 25900.

"**Premises Lease**" means the lease for the Premises.

"**Products**" means finished products consisting of master cylinder bodies, brake drums, front corner modules, knuckles and rotors for OEMs, Tier 1 suppliers and the automotive aftermarket.

"**Purchase Price**" means the payment referred to in Section 4.1.

"**Purchaser Damages**" shall have the meaning set forth in Section 12.1.

"**Qualified Bid**" shall have the meaning set forth in Section 11.7.7.

"**Qualified Bidder**" shall have the meaning set forth in Section 11.3.3.

"**Required Bid Documents**" shall have the meaning set forth in Section 11.6.

"**Retained Liabilities**" shall have the meaning set forth in Section 2.3.

"**Sale**" means the sale of the Acquired Assets, the leasehold interest in the Premises and the Land  in accordance with the Bidding Procedures.

"**Sale Approval Order**" means an order or orders of the Bankruptcy Court approving the Sale pursuant to Sections 363 and 365 of the Bankruptcy Code in form and substance reasonably satisfactory to Purchaser, authorizing and approving, among other things, the sale, transfer and assignment of the Acquired Assets and Assumed Liabilities of Delphi to RBUS, in accordance with the terms and conditions of this Agreement, free and clear of all Liens.

"**Sale Hearing**" shall have the meaning set forth in Section 11.10.

"**Sale Approval Motion**" means the motion to obtain the Sale Approval Order.

"**Seller Damages**" shall have the meaning set forth in Section 12.2.

"**Sellers' Knowledge**" or "**Knowledge of Seller(s)**" means the actual knowledge after reasonable investigation of the individuals listed on Schedule A, in each of their respective functional areas without imputation of the knowledge of any other Person.

"**Services**" means the assembly and manufacturing operations that DSE performs for Delphi at the Premises.

"**Software**" means computer software and programs, including, without limitation, source code, shareware, firmware, middleware, courseware, open source code, operating systems and specifications, system data, record and table layouts, databases, files documentation, storage media, manuals and other materials related thereto.

"**Subsequent Bid**" shall have the meaning set forth in Section 11.7.7.

"**Successful Bid(s)**" shall have the meaning set forth in Section 11.9.6.

"**Successful Bidder(s)**" shall have the meaning set forth in Section 11.9.6.

"**Tax Return**" means any return, declaration, report, claim for refund or information return, or statement, or any other similar filings, related to Taxes, including any Schedule or attachment thereto.

"**Tax(es)**" means, without limiting the generality of the following, all taxes, duties, fees, premiums, assessments, imposts, levies and other charges of any kind whatsoever

imposed by any Governmental Entity under applicable Law, together with all interest, penalties, fines, additions to tax or other additional amounts imposed in respect thereof, including those levied on, or measured by, or referred to as income, value added tax, profits, single business, capital, transfer, land transfer, sales, goods and services, harmonized sales, use, value-added, excise, stamp, withholding, business, franchising, property, employer health, payroll, employment, unemployment, social security (or similar) taxes, all surtaxes, all customs duties and import and export taxes, all license, franchise and registration fees; for the avoidance of doubt, the term "taxes" shall include each and all of the concepts referred to in articles 2, 3 and 4 of the Mexican Tax Code ("*Código Fiscal de la Federación*").

"**Technical Documentation**" means all documented technical information currently in the files of the Business primarily used in the Business owned by Delphi, in each case pertaining to the design or manufacture of the Products including the items listed on Schedule 5.1.7.

"**Termination Date**" shall have the meaning set forth in Section 9.1.1.E.

"**Third Party Bailed Assets**" shall have the meaning set forth in Section 1.1.2.A.

"**Third-Party Requirements**" shall have the meaning set forth in Section 5.1.3.

"**Transferred Contracts**" means the Contracts of the Sellers to be assigned to Purchaser at Closing as described in Section 2.1.1.

"**United States**" or "**U.S.**" means the fifty (50) states and the District of Columbia of the United States of America.

"**Warranties**" refers to the representations and warranties provided by either Seller to the Purchasers, or by either Purchaser to a Seller, as the case may be, in each case as referred to in Article 5 of this Agreement.

"**Water Concession**" shall have the meaning set forth in Section 1.l.1.E.

1.      **CONVEYANCE OF THE ACQUIRED ASSETS**:

**1.1. <u>Acquired Assets Transaction</u>**. Upon the terms and subject to the conditions set forth in this Agreement, at Closing Delphi and DSE shall sell, transfer, assign, convey and deliver to RBUS and to FRMX, and RBUS and FRMX (as the case may be) shall purchase, accept and acquire from Delphi or DSE, as the case may be, all of the assets and properties described in Section 1.1.1 below (collectively, the "**Acquired Assets**"), subject in each case to Section 1.1.2, free and clear of all Liens except the DSE liens specified in Section 5.1.15.E below.

**1.1.1. <u>Acquired Assets</u>**.

A.      **<u>Machinery and Equipment.</u>** The Acquired Assets consist of all of Sellers' right, title and interest in and to the machinery and equipment listed on Schedule

1.1.1 hereto, Permits, Inventory, rights under Transferred Contracts (including Delphi's rights against third party manufacturers to the extent any liability is assumed by a Purchaser pursuant to Section 2.1), Intellectual Property and Administrative Assets. The Acquired Assets shall be transferred by Sellers to RBUS in full compliance with any legal and/or administrative provision that may apply in order to, when applicable, preserve the Acquired Assets' temporary importation customs regime. Specifically, Sellers shall transfer temporary imported Acquired Assets through the so called "virtual customs operations" or through any similar or equivalent method that may achieve the same result.

**B.** **Premises.** DSE shall transfer to FRMX at Closing a leasehold interest in the Premises. DSE shall obtain the consent of Fraccionadora Industrial del Norte, S.A. de C.V. (the "Landlord") for the transfer of the leasehold. At Closing, DSE and FRMX will execute an assignment agreement in the form of Exhibit 1.1.1B-1 attached hereto, pursuant to which DSE shall assign to FRMX all of DSE's rights and obligations deriving from that certain Lease Agreement entered into between the Landlord and DSE on November 11, 1998, as amended, and shall deliver to Purchasers the written consent of the Landlord to such assignment and assumption. In the event DSE and the Sellers are successful in negotiating with the Landlord the purchase of the Premises then, at Closing, the Landlord and FRMX shall complete the transfer of the Premises by signing a transfer deed in the form of Exhibit 1.1.B-2 hereto at Closing.

**C.** **Land**. DSE shall cause Alambrados y Circuitos Electricos S.A. de C.V. (the "Owner") to transfer the Land to FRMX by having the Owner sign a transfer deed in the form of Exhibit 1.1.1C at Closing. FRMX shall be solely responsible for paying the applicable acquisition tax, the notarial fees for such transfer and for the physical structures to separate the Land from the contiguous property, such as fences.

**D.** **Personnel and Medical Records**. All work histories, personnel and medical records of Employees and former employees of DSE who worked at any time for any reason at the Premises for whom a record exists at the Premises at the time of Closing; provided, however, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws: FRMX will be provided the originals of all personnel and medical records of Employees of DSE who have accepted employment with FRMX in connection with the sale hereunder, with the prior written consent of such Employee or after posted written notice or other appropriate notice to such Employees if legally required. If an Employee objects to provision of personnel or medical records to Purchaser, the records will not be provided. DSE will be entitled to retain a copy of any originals provided to FRMX, and, in the event of any employment litigation that DSE would be required to defend under this Agreement, and that would require DSE to produce such original documentation, FMRX will cooperate with DSE to provide such original documentation or certified copies, as appropriate.

**E.** **Water Well Rights**. Any and all rights and obligations for the extraction, use, and exploitation of underground national water with an aggregate water demand of 60,000 cubic meters per annum under the Water Concession number 06COA113347/24FMGR04 issued on July 29, 1998 by the National Water Commission

("Comisión Nacional del Agua") (the "Water Concession").

        F.      **Discharge of Water Rights**. Any and all rights and obligations for the discharge of 25,118.30 cubic meters of water per annum under the Discharge of Water Concession number 06COA111504/24IMGE06 issued on March 23, 2006 by the National Water Commission ("Comisión Nacional del Agua").

        G.      **Electricity Rights.**  Subject to Section 5.1.8 below, the right to use electricity from DSE's electric substation until the date that FRMX obtains delivery of electricity from the Mexican Federal Electricity Commission (Comision Federal de Electricidad or "CFE").

        **1.1.2.** **Excluded Assets**. Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreement, the following properties and assets shall not be included in the Acquired Assets:

        A.      **Bailed Assets**. Any machinery, equipment, tools, Inventory, tooling, dies, molds, patterns, jigs, gauges, production fixtures, special material handling equipment, customer dunnage and containers owned by any other third party listed in Schedule 1.1.2.A ("Third Party Bailed Assets").

        B.      **Certain Financial Assets**. Cash, cash equivalents, bank accounts and all accounts receivable.

        C.      **Certain Contracts**. All Contracts of Delphi that are not Transferred Contracts, including Contracts set forth on Schedule 1.1.2.C ("**Excluded Contracts**").

        D.      **Tax Refunds**. Any refund of Taxes paid, or claim for refund of Taxes paid, of any kind relating to the Acquired Assets for any period prior to the Closing Date.

        E.      **Privileged Information and Materials**. Information and materials protected by the attorney-client privilege or that, in the case of environmental-related documents, a Seller considers to be proprietary information, and the lack of which excluded information and materials is not material to the  manufacture of the Products or the provision of the Services.

        F.      **Insurance**. The benefit of any of Sellers' or Sellers' Affiliates' insurance policies relating to the operation of the Business or the provision of the Services (including any right to proceeds thereunder).

        G.      **Certain Rights**. All of the rights and claims of Delphi available to Delphi under the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, and any other applicable provisions of the Bankruptcy Code, and any related claims and actions arising under such sections by operation of law or otherwise, including any and all proceeds of the foregoing.

**H.** **Other Excluded Assets**. All computer hardware, equipment, or other assets listed on Schedule 1.1.2. H.

**I.** **Finished Goods**. All Products manufactured at the Premises prior to Closing.

**J.** **Electricity**. All electrical materials and equipment, including substations and metering equipment, related to the supply of Electricity to FRMX.

**1.1.3. Post-Closing Asset Deliveries**. Should a Seller or a Purchaser, in its reasonable discretion, determine after the Closing that books, records or other similar materials constituting Acquired Assets are still in the possession of such Seller, such Seller shall promptly deliver them to the appropriate Purchaser at no cost to that Purchaser. Should a Seller or a Purchaser, in its reasonable discretion, determine after the Closing that books, records or other materials constituting Excluded Assets were delivered to a Purchaser, such Purchaser shall promptly return them to the appropriate Seller at no cost to such Seller other than reimbursing Purchaser's reasonable out-of-pocket costs, but only if and to the extent such costs exceed, in the aggregate, $5,000.

**1.1.4. Prorations**:

**A.** To the extent that a Seller has made any payment relating to the Products or the Services prior to the Closing Date with respect to any item listed in Subparagraph B below relating to periods on or following the Closing Date, RBUS or FRMX, as the case may be, shall reimburse Seller on a per diem basis; and

**B.** To the extent either Purchaser makes any payment relating to the Business or the Services following the Closing Date with respect to any item listed below relating to periods prior to the Closing Date, the appropriate Seller shall reimburse the appropriate Purchaser on a per diem basis;

**C.** The per diem under the preceding paragraphs A and B shall in each case be only for the following concepts:

(i) Rent for the Premises and copier leases and other pre-paid amounts under Transferred Contracts (such other pre-paids to be mutually agreed by the parties before Closing);

(ii) Personal, real property and other ad valorem Taxes, allocated in accordance with local custom;

(iii) Water, wastewater treatment, sewer charges and other similar types of charges with respect to the Premises;

(iv)    Electric, fuel, gas, telephone and internet services and other utility charges; and

**C.**    **Further Assurance**. The parties will use commercially reasonable efforts to determine the amounts of the above prorations and settle such amounts at Closing. To the extent that, within sixty (60) days after Closing, a Seller, on the one hand, or a Purchaser, on the other hand, receives any bill or other invoice for any of the items listed in this Section 1.1.4 or similar items, relating to both pre-Closing and post-Closing periods, such Seller or Purchaser shall, as soon as practicable but no later than ninety (90) days after Closing, send any such bill or invoice to the other Party. If necessary to avoid incurring interest, penalties and/or late charges, a Purchaser may pay all amounts shown to be due thereon, and may invoice the appropriate Seller for all amounts owed by such Seller thereunder, and in such case such Seller shall reimburse such amounts.

Any payments due under this Section 1.1.4 that have not been settled at Closing shall be made within thirty (30) days after the end of the month in which a bill or invoice is sent to a Party (or Affiliate thereof); provided, however, that the disputed portion of any such item shall be paid within thirty (30) days after the final determination thereof on an item-by-item basis. When a Party makes a payment to a third party which is required to be reimbursed to such Party by the other Party, the reimbursement payment shall be considered the repayment of an advance.

### 1.1.5. Non-Assignable Permits and Contracts:

**A.**    **Non-Assignability**. After giving effect to the Sale Approval Order, to the extent that any Permit included in the Acquired Assets or any Transferred Contract is not capable of being assigned to Purchaser at the Closing without the consent or waiver of the issuer thereof or the other party thereto or any third party (including a Governmental Entity), or if such assignment or attempted assignment would constitute a breach thereof, or a violation of any Law, this Agreement shall not constitute an assignment thereof, or an attempted assignment, until any such consent or waiver is obtained.

**B.**    **Efforts to Obtain Consents and Waivers**. At Purchasers' request, Sellers shall, at  their  expense, use commercially reasonable efforts, and  Purchasers shall, at Purchasers' expense, cooperate with  Sellers, to obtain the consents and waivers and to resolve the impracticalities of assignment referred to in Section 1.1.5.A after the Closing.

**C.**    **Waivers or Consents that Cannot be Obtained.** Schedule 1.1.5.C lists the Permits and Transferred Contracts, if any, that Sellers have been unable to assign to Purchasers by Closing.  Until the impracticalities of assignment referred to therein are resolved, such Seller's sole responsibility with respect to such matters, notwithstanding Section 1. 1, shall be to use, during the one hundred eighty (180) day period commencing with the Closing, all commercially reasonable efforts, at no cost to either Purchaser (other than pursuant to Section 1.1.5.D below), to: (i) cooperate in any reasonable and lawful arrangement designed to provide such benefits to the appropriate Purchaser, without incurring any financial obligation to such Purchaser or to any third party; and (ii) at the

request and direction of a Purchaser, take all reasonable actions to enforce for the account of such Purchaser and at the cost of such Purchaser any rights of the Seller arising from the Permits included in the Acquired Assets or Transferred Contracts referred to in Section 1.1.5.A against such issuer thereof or other party or parties thereto.

  **D.** **Obligation of Purchaser to Perform**. To the extent that a Purchaser is provided the benefits pursuant to Section 1.1.5.C of any Permit included in the Acquired Assets or Transferred Contracts, such Purchaser shall perform, on behalf of the Seller providing such benefits, for the benefit of the issuer thereof or the other party or parties thereto the obligations of the Seller thereunder or in connection therewith and if such Purchaser shall fail to perform to the extent required herein, the Seller, without waiving any rights or remedies that it may have under this Agreement or applicable Laws, may suspend its performance under Section 1.1.5.C in respect of the instrument which is the subject of such failure to perform unless and until such situation is remedied; or, at Purchaser's request, such Seller may perform at such Purchaser's sole reasonable cost and expense, in which case such Purchaser shall reimburse the Seller's reasonable costs of such performance immediately upon receipt of an invoice.

**2.** **ASSUMPTION OF LIABILITIES:**

  **2.1. Assumed Liabilities**. At and as of the Closing, each Purchaser shall assume and agree to pay, perform and discharge when due, and shall be liable with respect to, all obligations, liabilities and responsibilities specifically referred to in this Section 2.1 ("Assumed Liabilities"), other than the Retained Liabilities, as follows:

   **2.1.1.** The obligations of each Seller to be performed under the Contracts listed on Schedule 2.1.1 (the "Transferred Contracts") and the obligations of such Seller to be performed under licenses and Permits included in the Acquired Assets that are assigned or otherwise transferred to a Purchaser pursuant to this Agreement.

   **2.1.2**. The obligation to pay for all the costs and expenses related to the separation between the Land and the contiguous piece of land along the property boundary, including without limitation the placing of appropriate fences, and the cost of all goods and services related to the installation of independent utility and other services to the Premises, including without limitation electricity, telephone, water, internet, sewer and the like.

   **2.1.3.** Liabilities and obligations arising out of, resulting from, or relating to sales pursuant to Transferred Contracts for Products or Services by the Business, including all Product warranty, Product returns, Product liability (other than design defects) and Product recall liability related thereto, but only to the extent such liabilities and obligations result from a Purchaser's performance under a Transferred Contract after the Closing.

  **2.2. No Expansion of Third Party Rights.** The assumption by a Purchaser of any Assumed Liability shall in no way expand the rights or remedies of any third party against a Purchaser or a Seller as compared to the rights and remedies which such third party would have had against such Seller absent the Bankruptcy Cases, had such Purchaser not assumed

such Assumed Liability. Without limiting the generality of the preceding sentence, the assumption by either Purchaser of the Assumed Liabilities shall not create any third-party beneficiary rights other than with respect to the Person that is the obligee of such Assumed Liability.

**2.3. Retained Liabilitie**s. Notwithstanding anything in this Agreement to the contrary, no Purchaser shall assume or be deemed to have assumed, nor shall have any liability or obligation with respect thereto, any other liabilities of Delphi or DSE (collectively, "Retained Liabilities") including without limitation the following: (i) liabilities in respect of employment or services performed on or prior to the Closing; (ii) product liability claims to the extent based on a defective design for Products designed by Seller and sold prior to the Closing Date or manufactured by Sellers (whether sold prior to or after the Closing Date) except as expressly set forth in Section 2.1.3; (iii) existing litigation for which a claim has been made to or threatened in writing against either Seller on or before the Closing Date; (iv) all Tax liabilities of each Seller for all periods prior to Closing (but excluding any Tax liabilities allocated to Purchaser pursuant to Section 10.3 of this Agreement); (v) any liability or obligation of either Seller for administrative fees and expenses, including, without limitation, "allowed administrative expenses" under Section 503(b) of the Bankruptcy Code; (vi) any liability or obligation of either Seller for transaction fees and expenses and fees and expenses payable to lenders, brokers, financial advisors, legal counsel, accountants and other professionals in connection with this Agreement; (vii) all Debt owed by either Seller to any party; (viii) all Claims, except for Assumed Liabilities; ; (ix) Customs duties and ancillary charges for importations made prior to the Closing date; (x) any liability or obligation not expressly assumed pursuant to Section 2.1 hereof;  (xi) any accounts payable on the books of Sellers prior to the Closing; (xii) all liabilities to Employees arising out of their employment by DSE or any affiliate thereof or payment of severance amounts at their termination prior to Closing; and (xiii) all  PBGC-related liabilities  accruing  prior to Closing with respect to Sellers or the Sellers' assets.

**3.     ACQUIRED ASSETS - PERSONNEL MATTERS – TRANSFERRED EMPLOYEES**:

**3.1. DSE Employees**. Listed on Schedule 5.1.16.A are all employees of DSE who perform services exclusively or primarily for the Business (each employee required to be so listed an "Employee" and, collectively, "Employees"). With respect to each such Employee (as limited in definition for purposes of this Article 3 only) included thereon, Schedule 5.1.16.A lists each Employee's: (i) title or job/position; (ii) job designation (i.e., salaried or hourly); (iii) location of employment; and (iv) annual base rate of compensation.

**3.1.1. Pre Closing Severance.**  At the request of Purchasers, DSE has agreed to and will cause all Employees to be terminated pursuant to the Federal Labor Law prior to Closing (but only after determining that RBUS or Purchasers are the Successful Bidders) and shall be responsible for all termination procedures and expenses.   Not later than ten (10) calendar days prior to the Closing Date, FRMX will offer employment to those Employees of DSE whom FRMX wishes to employ.  On the first business day following the Closing Date, FRMX will hire the Employees who accept the offer of Employment extended by

FRMX.

### 3.1.2 Employment Liabilities.

A.  Except as otherwise provided for in this Agreement, Purchasers shall be responsible for, and shall assume and thereafter pay, perform and discharge, any and all employment, compensation and employee benefit liabilities, responsibilities and obligations, including, without limitation, any and all claims under applicable law, including breach of any contract of service or claim for compensation or redress for wrongful or unfair dismissal or discrimination or failure to comply with an order for reinstatement or re-engagement or failure to comply with any provisions of all or any existing laws with respect to the employees, which liabilities, responsibilities and obligations related to the period of employment which began after the Closing Date.

B.     Except as otherwise provided for in this Agreement, Sellers shall be responsible for, and shall assume and thereafter pay, perform and discharge, any and all employment, compensation and employee benefit liabilities, responsibilities and obligations, including, without limitation, any and all claims under applicable law, including breach of any contract of service or claim for compensation or redress for wrongful or unfair dismissal or discrimination or failure to comply with an order for reinstatement or re-engagement or failure to comply with any provisions of all or any existing laws with respect to the Employees, which liabilities, responsibilities and obligations related to the period of employment (or its termination) before the Closing Date.

**3.1.3.** FRMX's offer of employment to substantially all persons identified on Schedule 5.1.16.A, will be on such terms and conditions as FRMX, in its sole discretion, shall determine.

**3.2. <u>Cooperation</u>**. DSE and FRMX will provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this Article 3.

**3.3. <u>No Third Party Rights</u>**. No provision of this Agreement confers rights or remedies upon any person, including Employees, other than the parties to this Agreement.

## 4.     PURCHASE PRICE:

**4.1. <u>Purchase Price; Deposit Amount</u>**. Subject to the terms and conditions of this Agreement, in consideration of the Sale, the aggregate purchase price for the Acquired Assets shall be the amount of: (i) fifteen million Dollars (US$ 15,000,000) (the "Purchase Price").

**4.1.1. Deposit Amount**. Upon execution of this Agreement, RBUS has delivered to the Escrow Agent, pursuant to the terms of the Escrow Agreement attached hereto as Exhibit 4.1.1 (the "Escrow Agreement"), $500,000 in immediately available funds (such amount, together with the interest accrued thereon prior to the Closing, the "Deposit

Amount"), to be held by the Escrow Agent in an interest bearing account reasonably acceptable to Purchaser to serve as an earnest money deposit and also as the Good Faith Deposit defined in Section 11.6.3 below, and to be released in accordance with the following procedures and the Bid Procedures set forth in Section 11 hereof:

      **A.**     **Deposit Instructions**. On the Closing Date, Delphi and RBUS shall jointly instruct the Escrow Agent to deliver the Deposit Amount, by wire transfer of immediately available funds, to an account or accounts designated by Delphi in the Escrow Agreement (and such amount shall be applied towards the payment of the Purchase Price);

      **B.**     **Termination of Agreement**. Upon any failure by RBUS to consummate the transactions contemplated hereby pursuant to this Agreement if and as required by Section 7.1 hereof, the Escrow Agent shall deliver the Deposit Amount, in accordance with the terms of the Escrow Agreement, by wire transfer of immediately available funds, to an account designated by Delphi in the Escrow Agreement, to be retained by Delphi. Any such payment shall constitute Delphi's sole recourse in connection with such failure to consummate the transactions contemplated hereby; and

      **C.**     **Other Reason**. Upon termination of this Agreement for any other reason, or upon the failure by Delphi and DSE to consummate the transactions contemplated hereby pursuant to this Agreement if and as required by Section 7.1 hereof by September 28, 2007, the Escrow Agent to deliver the Deposit Amount, by wire transfer of immediately available funds, to an account designated by RBUS in the Escrow Agreement, to be retained by RBUS.

    **4.1.2. <u>Delivery of Purchase Price</u>**. At Closing, Purchasers shall pay to Sellers an aggregate amount equal to the Purchase Price less the Deposit Amount (apportioned pursuant to the allocation referred to in Section 4.2) and less $2,000,000.00 (two million dollars) (the "Escrow Amount") by wire transfer in U.S. Dollars in immediately available funds to the account of the appropriate Seller, pursuant to this Agreement and a notice delivered by each Seller to Purchasers prior to Closing. At Closing, Purchasers shall pay to JP Morgan Trust Company, National Association as "Escrow Agent" hereunder the Escrow Amount to be held by the Escrow Agent as collateral to secure the rights of the parties under Article 12 hereof. The Escrow Amount shall be held pursuant to the provisions of the Escrow Agreement. The entire Escrow Amount will be held by the Escrow Agent from the Closing Date until the one (1) year anniversary of the Closing Date (the "Initial Escrow Period"), at which time $1,000,000 of the Escrow Amount will be released to the Sellers; provided, however, that in the event a Purchaser has made a claim under Article 12 prior to the end of the Initial Escrow Period, then such Escrow Period shall continue (and the Escrow Agent will continue to hold in escrow that portion of the Escrow Amount which is equal to the amount which is necessary to satisfy such indemnity claim) until such claim is fully and finally resolved. The remainder of the Escrow Amount will be held by the Escrow Agent from the Closing Date until the two (2) year anniversary of the Closing Date (the "Full Escrow Period") provided, however, that in the event a Purchaser has made a claim under Article 12 after the first anniversary of the Closing Date but prior to the end of the Full Escrow Period, then the Full Escrow Period shall continue (and the Escrow Agent will

continue to hold in escrow that portion of the Escrow Amount which is equal to the amount which is necessary to satisfy such indemnity claim) until such claim is fully and finally resolved. The costs and expenses of the Escrow Agent will be paid from and borne solely by the Escrow Amount.

> **4.2.** **Allocation of Purchase Price**. The Parties agree to allocate the Purchase Price among the Acquired Assets, for all purposes (including financial, accounting and tax) (the "Allocation") in a manner consistent with the Allocation Schedule set forth in Schedule 4.2 to be mutually agreed upon by RBUS and Delphi in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended, based on the fair market value of the Acquired Assets. RBUS shall provide to Delphi a draft Allocation within fifteen (15) days following the Closing Date. This Allocation shall become final and binding on the parties, unless Delphi notifies RBUS within fifteen (15) days after receipt of such Allocation of Delphi's disagreement with such Allocation. In the event Delphi timely notifies RBUS of such disagreement, the parties shall resolve such disagreement in the manner described in Section 13.18 of this Agreement. RBUS and Delphi shall each report the federal, state and local income and other Tax consequences of the purchase and sale contemplated hereby in a manner consistent with the Allocation, including, if applicable, the preparation and filing of Forms 8594 under Section 1060 of the Internal Revenue Code (or any successor form or successor provision of any future tax law) with their respective federal income Tax Returns for the taxable year which includes the Closing Date, and neither will take any position inconsistent with the Allocation unless otherwise required under applicable law. Delphi shall provide RBUS and RBUS shall provide Delphi with a copy of any information required to be furnished to the Secretary of the Treasury under Internal Revenue Code Section 1060.

**5.** **REPRESENTATIONS AND WARRANTIES:**

> **5.1.** **Representations and Warranties of Seller**. All information set forth in the Disclosure Schedules with respect to any clause of this Section 5.1 shall be deemed disclosed under and incorporated into any other clause of this Section 5.1 as to which such disclosure would clearly be appropriate based solely on the language in such disclosure and such other clause. Each Seller represents and warrants to the Purchasers as follows:

>> **5.1.1. Organization and Good Standing**. Except as otherwise set forth on Schedule 5.1.1, each Seller is a legal entity duly organized, validly existing and in good standing under the laws of its jurisdiction of formation, and has all requisite corporate or other organizational power and, subject to any required Bankruptcy Court approval, authority to own, lease and operate its properties and assets and to carry on the Business as presently conducted, and is in good standing in all jurisdictions where it owns or leases real property.

>> **5.1.2. Corporate Power; Due Authorization**. DSE has, and Delphi, subject to Bankruptcy Court approval, also has the corporate or other organizational power and authority to execute and deliver this Agreement and the Ancillary Agreements, subject to Bankruptcy Court approval, to which such Seller is a party, and to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated herein and

therein.  The execution, delivery and performance of this Agreement and the Ancillary Agreements by DSE, and subject to Bankruptcy Court approval, the execution, delivery and performance of this Agreement and the Ancillary Agreements by Delphi, and the consummation of the contemplated transactions have been duly authorized by all necessary action on the part of such Seller. Subject to the entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, this Agreement, and the Ancillary Agreements, have been duly and validly executed and delivered by or on behalf of the Sellers and (assuming this Agreement constitutes a valid and binding obligation of Purchasers) constitutes a legal, valid and binding agreement of Sellers, enforceable against each Seller in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and to general equitable principles.

**5.1.3. No Violations**. No consent, approval, authorization of, declaration, filing or registration with any domestic or foreign government or regulatory authority or any other third party is required to be made or obtained by either Seller in connection with the execution, delivery and performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements (including the assignment of all Transferred Contracts), except for: (i) consents, approvals, authorizations of, declarations or filings with, the Bankruptcy Court that have been made or obtained, or will be made or obtained prior to the Closing; and (ii) consents, approvals, authorizations, declarations, filings and registrations set forth on Schedule 5.1.3, the lack of which would not have a Material Adverse Effect. The items referred to in clauses (i) through (ii) of this Section 5.1.3 are hereinafter referred to as the "Third-Party Requirements".

**5.1.4. Sufficiency of Acquired Assets**. The Acquired Assets comprise all of the assets reasonably necessary to continue the supply of  Products  in a manner consistent with DSE's supply of Products the, pursuant to RBUS's and Delphi's Tier 1/Tier 2 arrangement.

**5.1.5. Personal Property; Condition of Personal Property**:

**A.    Title to Personal Property**. Except for the Personal Property leases and other Personal Property referred to in Schedule 5.1.5.A, each of the Sellers has good, valid and marketable title to its respective  Personal Property and Inventory included in the Acquired Assets. Upon entry by the Bankruptcy Court of the Sale Approval Order, Delphi shall transfer the Acquired Assets free and clear of any Lien.

**B.    Condition of Personal Property**. The Personal Property included in the Acquired Assets is in such condition at Closing (considering age, wear and tear, and purpose for which used) as to enable fulfillment of the Transferred Contracts as they are currently being fulfilled without material disruption, but Sellers make no representation or warranty as to the duration of such condition after Closing.

**C.    Inventory**. Except to the extent identified in Schedule 5.1.5.C, the

Inventory included in the Acquired Assets will, as of the Closing, be located at the Premises and such other locations as set forth on Schedule 5.1.5.C, be fit for the purpose for which it is ordinarily acquired.

   **D.**  **Machinery, Equipment and Tools**. Regarding the Acquired Assets, Schedule 5.1.5.D sets forth a list of substantially all machinery, equipment and capitalized tools (collectively, the "M&E") with an acquisition value greater than $5,000 USD, included in the Acquired Assets and primarily used in or related to the Services.  The M&E included in the Acquired Assets is in such condition at Closing (considering age, wear and tear, and purpose for which used) as to enable fulfillment of the Transferred Contracts as they are currently being fulfilled without material disruption, but Sellers make no representation or warranty as to the duration of such condition after Closing.

   **E.**  **Imported Assets**. Except for matters referred to in Schedule 5.1.5.E, all imported assets included in the Acquired Assets (i) have been imported in full compliance with Applicable Laws and regulations and customs documentation requirements and, where applicable, any special customs regime to which the Sellers are subject, including PITEX, Maquila, IMMEX PROSEC or others; (ii) all customs filings, reports and certifications required to be filed have been duly and timely filed; (iii) all custom duties, Taxes and other fees have been duly and timely paid; and (iv) all documents legally required to be maintained with respect thereto, including but not limited to the customs documentation evidencing the correct import as well as the assets legal stay in Mexico, have been and are being maintained by Sellers in the Ordinary Course of Business.

  **5.1.6. Litigation.** Except for the pendency of the Bankruptcy Cases, including all proofs of claim filed by creditors in the Bankruptcy Cases, and any Claims referred to in Schedule 5.1.6, there is no suit, action, proceeding or, to either Seller's Knowledge, investigation (whether at law or equity, before or by any federal, state or foreign commission, court, tribunal, board, agency or instrumentality, or before any arbitrator) pending or, to any Seller's Knowledge, threatened against or affecting either Seller.

  **5.1.7. Intellectual Property .**  The parties agree and acknowledge that Delphi has provided RBUS with all Intellectual Property required to conduct the Business in arrangements that precede this Agreement, in furtherance of RBUS Tier 1 arrangements with General Motors, including the licenses listed on Schedule 5.1.7 which licenses are enforceable in accordance with  their terms.

   A.  Schedule 5.1.7.A. sets forth a true and complete list of the Intellectual Property.  Except as set forth in Schedule 5.1.7.A, there are no impediments to the ability of any Seller under any agreement with a third party or under applicable Law to grant to Purchasers the rights to use the Intellectual Property as contemplated in this Agreement.

   B.  To Sellers' Knowledge, Sellers are conducting the Business in a manner that does not violate the intellectual property right of another Person and no Claim has been made by any third party against any Seller of Intellectual Property infringement or misappropriation in connection with the Intellectual Property resulting from the operation of

the Business, except as set forth in Schedule 5.1.7.B.

**5.1.8. Electricity.** DSE will allow FRMX to use electricity from DSE's substation until the date that FRMX is able to obtain its own electricity from the CFE, provided that such date does not exceed 18 months from the date of Closing.

**5.1.9. <u>Compliance with Other Instruments and Laws; Permits</u>**. Each Seller is in compliance with all Laws applicable to the manufacture of the Products and the provision of the Services and all Permits. All Permits that are necessary for the manufacture of the Products and the ownership and operation of the Acquired Assets have been duly obtained, are in full force and effect, and, to any Seller's Knowledge, are listed on Schedule 5.1.9, and there are no proceedings pending or, to either Seller's Knowledge, threatened, which may result in the revocation, cancellation or suspension, or any materially adverse modification, of any such Permit. The execution, delivery and performance of, and compliance with, this Agreement and the Ancillary Agreements by either Seller will not, with or without the passage of time or the giving of notice, result in any such violation or be in conflict with or constitute a default under any Permit.

**5.1.10. <u>Brokers</u>**. No Seller has employed a finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which a Purchaser would be liable.

**5.1.11. <u>Consents and Approvals</u>**. Assuming that the Third-Party Requirements will be satisfied, made or obtained and will remain in full force and effect, and assuming receipt of the consents, approvals and authorizations listed in Schedule 5.1.11, neither the execution, delivery or performance of this Agreement and the Ancillary Agreements by the Sellers, nor the consummation by the Sellers of the Sale, nor compliance by any Seller with any of the provisions hereof and of the Ancillary Agreements, will, with or without the passage of time or the giving of notice: (i) result in any breach of any provisions of the articles of incorporation or bylaws or similar organizational documents of any Seller; (ii) result in a material violation, or breach of, or constitute (with or without due notice or lapse of time) a default (or give rise to any right of termination, cancellation, amendment, vesting, payment, exercise, acceleration, suspension or revocation) under any of the terms, conditions or provisions of any note, bond, mortgage, deed of trust, security interest, indenture, loan or credit agreement, license, permit, contract, lease, agreement, plan or other instrument, commitment or obligation to which a Seller is a party or by which its properties or assets may be bound or affected; (iii) violate any order, writ, governmental authorization, injunction, decree, statute, rule or regulation applicable to any Seller or to any of its properties or assets; or (iv) result in the creation or imposition of any Lien on any Delphi asset that is part of the Acquired Assets; *provided, however,* that the representations and warranties in clauses (ii) and (iii) above shall not apply to the extent they relate to violations, breaches, defaults, terminations, cancellations, accelerations, creations, impositions, suspensions or revocations that are excused by or unenforceable as a result of the filing of the Bankruptcy Cases or the applicability of any provision of or any applicable law of the Bankruptcy Code.

**5.1.12. Intentionally Omitted.**

**5.1.13. Intentionally Omitted.**

**5.1.14. Contracts**:

     **A.**    Schedule 5.1.14.A lists all Transferred Contracts together with any other agreements included in the Assumed Liabilities related to the manufacture of the Products and the provision of the Services that involve payment or performance obligations that individually exceed $5,000, and such Schedule includes all other Contracts to which either Seller is a party or by which any of its properties are bound or that primarily relate to, are primarily used in, are primarily arising from, or are necessary for the conduct of the manufacture of the Products or the provision of the Services under the Transferred Contracts (collectively, "Listed Contracts"). Each Seller has delivered or made available to the Purchasers true, correct and complete copies of the Listed Contracts, except as set forth on Schedule 5.1.14.A. Schedule 5.1.14.A identifies all Post-Petition Contracts included within the Listed Contracts other than immaterial Post-Petition Contracts and open purchase orders entered into in the Ordinary Course of Business. Except as set forth on Schedule 5.1.14.A, and except for Post-Petition Contracts that are immaterial to the Business, none of the Post-Petition Contracts included within the Listed Contracts contains any provisions restricting its assignment to Purchaser pursuant to the terms of this Agreement.

     **B.**    Each of the Listed Contracts is valid, binding and, subject to payment of all Cure Amounts, if applicable (which Cure Amounts will be paid by Delphi as set forth in the Sale Approval Order), enforceable against the relevant Seller, to the extent set forth therein, and, to Sellers' Knowledge, the other parties thereto, in accordance with its terms, and is in full force and effect. Except as set forth on Schedule 5.1.14.B, and other than with respect to monetary defaults by Delphi under Listed Contracts that are curable by payment of all Cure Amounts, if applicable, Delphi, and to Sellers' Knowledge each of the other parties thereto, has performed all obligations required to be performed by it to date under, and is not in default (except with respect to defaults that need not be cured under Section 365 of the Bankruptcy Code for Delphi to assume and assign such Listed Contracts to a Purchaser, if applicable) in respect of, any of such Listed Contracts, on the part of a Seller, or to Sellers' Knowledge, on the part of any other party thereto. Except as set forth in Schedule 5.1.14.B, and other than with respect to monetary defaults by Delphi under Listed Contracts that are curable by payment of all Cure Amounts, if applicable, Sellers have received no written claim or notice from any other party to any such Listed Contract that such Seller has breached any obligations to be performed by it thereunder, or is otherwise in default or delinquent in performance thereunder (except with respect to defaults, delinquencies or obligations that need not be cured or performed, as appropriate, under Section 365 of the Bankruptcy Code for Delphi to assume and assign such Listed Contracts to Purchaser, if applicable).

**5.1.15. Tax Matters**:

     **A.**    Each Seller has: (i) duly and timely filed with the appropriate federal, state,

local and foreign authorities or governmental agencies, all material Tax Returns required to be filed and such Tax Returns were true, correct and complete; and (ii) and have paid all Taxes shown thereon as due and owing, except where the failure to file such Tax Returns or to pay such Taxes would not result in any liability to either Purchaser or any Lien on the Acquired Assets.

**B.** Except as set forth on Schedule 5.1.15.A, each Seller has properly and timely withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor or other third party (including federal income taxes, sales and use taxes, personal property taxes, Federal Insurance Contribution Act taxes and Federal Unemployment Tax Act taxes) and has properly and timely paid the same to the proper Tax receiving officers or authorized depositories, except in each case where such failure would not result in any liability to either Purchaser or any Lien on the Acquired Assets.

**C.** Delphi is not a party to any Tax allocation, Tax sharing agreement or Tax indemnity arrangement, except as provided in this Agreement, under which Purchaser could be subject to Tax or other liability after the Closing.

**D.** No claim has ever been made by Mexican tax authorities that Delphi is or may be subject to taxation in Mexico; and no claim has ever been made by US tax authorities that DSE is or may be subject to taxation in the United States.

**E.** There are no Tax liens on any of Sellers' assets, except for liens asserted by the PBGC against assets of DSE which, to Sellers' knowledge, are not perfected.

**F.** Except for Transfer Taxes relating to the Sale, since  January 1, 2002, neither Seller has incurred any Taxes other than in the ordinary course of business and each Seller has made adequate provisions on its books of account for all Taxes with respect to the Acquired Assets and the Business for such period, except for Taxes that would not result in any liability to either Purchaser or any Lien on the Acquired Assets.

**G.** Neither Seller has any liability for the Taxes of any Person other than a Seller or any of its subsidiaries (i) under Treasury Regulation 1.1502-6 (or any similar Treasury Regulations), (ii) as a transferee or successor, (iii) by contract, or (iv) otherwise, except in each case where such liability would not result in any liability to either Purchaser or any Lien on the Acquired Assets.

**H.** In the event the Mexican Tax authorities assert that either of the Purchasers is jointly liable with DSE pursuant to paragraph IV of Article 26 of the Mexican Federal Tax Code (Código Fiscal de la Federación) for any taxes not paid by DSE, DSE and Delphi Controladora S.A. de C.V., a Mexican corporation agree, jointly and severally,  to hold the Purchasers safe and harmless from any claim filed against them by the tax authorities and to indemnify the Purchasers for any damages   incurred by  the Purchasers as a result of such tax claims.

**5.1.16. Employee Issues**:

> **A.      Employees**. Schedule 5.1.16.A contains a list of all DSE Employees, and the information thereon is true, complete and correct in all material respects.

> **B.      Seller Performance**. DSE has performed and discharged, or will perform and discharge on or before the Closing Date, its obligations with respect to all of the Employees, up to and including the Closing Date, including working time, payment of wages and salaries, benefits, employer's contributions to any relevant social security, health, welfare and occupational pension scheme, severance or any other payments, and payment of all other costs and expenses relating to their employment (including without limitation any taxation, accrued holiday and vacation pay, accrued bonus or other sums payable with respect to employment) up to and including the Closing Date, except as otherwise set forth on Schedule 5.1.16.B.

**5.1.17. Environmental**.

> **A.      Since January 1, 1999, the operation of the Premises is in material compliance with all applicable environmental laws.

> **B**.      Except as set forth in Schedule 5.1.17, there are no Hazardous Materials present in the surface water, groundwater or soil (either surface or subsurface) at the Premises in excess of the amounts permitted under applicable Laws.

**5.1.18. Absence of Other Representations or Warranties**. Except for the Warranties expressly set forth in this Agreement and the Ancillary Agreements, no Seller makes any representations or warranties, express or implied, with respect to the Acquired Assets, the Assumed Liabilities, and in particular but without limitation, Sellers make no representations with respect to any plan(s) of Purchaser for the future conduct of the Business. For the avoidance of doubt, no warranty or representation is given on the contents of the documents provided in due diligence, on any other documents or other information not contained in this Agreement or the Ancillary Agreements, all of which were produced only for information purposes.

**5.2. Representations and Warranties of Purchasers.** Purchasers warrant and represent to Sellers as follows:

**5.2.1. Corporate Data**. Each Purchaser is a legal entity duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, and has all requisite corporate or other organization power and authority to own, lease and operate its properties and assets.

**5.2.2. Corporate Power; Due Authorization.** Each Purchaser has the corporate or other organizational power and authority to execute and deliver this Agreement and the

Ancillary Agreements and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated herein and therein. The execution, delivery and performance of this Agreement and the Ancillary Agreements have been duly authorized by all necessary action on the part of Purchaser. This Agreement is, and the Ancillary Agreements to which Purchaser is a party will be, when executed and delivered (assuming this Agreement constitutes a legal, valid and binding obligation of the Sellers), valid and legally binding obligations of Purchasers, enforceable against each Purchaser in accordance with their respective terms, except as enforcement of such terms may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws or proceedings affecting the enforcement of creditors' rights generally and by the availability of equitable remedies and defenses.

**5.2.3. No Violations**. Neither the execution, delivery or performance of this Agreement by Purchaser, nor the consummation by either Purchaser of the transactions contemplated herein, nor compliance by a Purchaser with any of the provisions hereof, will: (i) except for the Third-Party Requirements listed on Schedule 5.1.3, require a Purchaser to obtain any consent, approval or action of, or make any filing with or give notice to, any domestic or foreign governmental or regulatory body or any other Person; (ii) conflict with or result in any breach of any provisions of the certificate of incorporation or bylaws of Purchaser; or (iii) violate any order, writ, injunction, decree, statute, rule or regulation applicable to either Purchaser or such Purchaser's properties or assets.

**5.2.4. Litigation**. Except for the pendency of the Bankruptcy Cases, including all proofs of claim filed by creditors in the Bankruptcy Cases, there is no suit, action, proceeding or investigation (whether at law or equity, before or by any federal, state or foreign commission, court, tribunal, board, agency or instrumentality, or before any arbitrator) pending or, to the knowledge of either Purchaser, threatened against or affecting Purchaser which could reasonably be expected to result in the issuance of an Order outstanding restraining, enjoining or otherwise prohibiting Purchaser from consummating the transactions contemplated by this Agreement.

**5.2.5. Brokers**. Neither Purchaser has employed a finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which a Seller would be liable.

**5.2.6. Intentionally Omitted.**

**5.2.7.  Intentionally Omitted.**

**5.2.8. Adequate Assurance of Future Performance**. Purchasers have provided or will be able to provide, at or prior to the Sale Hearing, adequate assurance of their future performance under each Assumed Contract to the parties thereto (other than Sellers) in satisfaction of Section 365(f)(2)(B) of the Bankruptcy Code, and no other or further assurance shall be necessary thereunder with respect to any Assumed Contract.

**5.2.9. Compliance with Law**. Each Purchaser is in compliance with all Laws

applicable to it, except with respect to those violations that could not reasonably be expected to result in the issuance of an order outstanding restraining, enjoining or otherwise prohibiting Purchaser from consummating the transactions contemplated by this Agreement.

**5.2.10. Intentionally Omitted.**

**5.3. Survival of Representations, Warranties and Covenants of the Seller.** The representations and warranties made by the Sellers in Section 5.1 shall survive the Closing and shall expire on the  second anniversary of the Closing Date (the "Expiration Date") except for  the representations and warranties made by Sellers in Section 5.1.5.A, which shall survive indefinitely; provided, however, that if, at any time prior to the Expiration Date, a Purchaser delivers to Sellers a written notice alleging the existence of an inaccuracy in or a breach of any of the representations and warranties made by a Seller and asserting a claim for recovery in accordance with Article 12 based on such alleged inaccuracy or breach, then the claim asserted in such notice shall survive the Expiration Date until such time as such claim is fully and finally resolved. The covenants made by the Sellers shall survive the Closing and shall expire on the Expiration Date.

**5.4. Survival of Representations, Warranties and Covenants of the Purchaser**. The representations and warranties made by the Purchasers in Section 5.2 shall survive the Closing and shall expire on the Expiration Date; provided, however, that if, at any time prior to the Expiration Date, a Seller delivers to a Purchaser a written notice alleging the existence of an inaccuracy in or a breach of any of the representations and warranties made by the Purchaser and asserting a claim for recovery in accordance with Article 12 based on such alleged inaccuracy or breach, then the claim asserted in such notice shall survive the Expiration Date  until such time as such claim is fully and finally resolved. The covenants made by the Purchasers shall survive the Closing and shall expire on the Expiration Date.

**6.      CONDITIONS TO CLOSING**:

**6.1. Conditions to Obligations of Seller and Purchaser**. The respective obligations of each party to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver at or prior to the Closing Date of the following conditions precedent:

**6.1.1. Sale Approval Order**. The Sale Approval Order shall be entered by the Bankruptcy Court and shall not be subject to a stay or injunction.

**6.1.2. No Law, Judgments, etc.** No provisions of any applicable Law and no judgment, injunction (preliminary or permanent), order or decree that prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement shall be in effect (each party taking any and all steps required by Section 8.2 of this Agreement).

**6.2. Conditions to Obligations of Purchasers**. The obligation of Purchasers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which

may be waived in whole or in part by Purchasers):

**6.2.1. Accuracy of Representations and Warranties**. Except as otherwise permitted by this Agreement, and after giving effect to the Sale Approval Order, the representations and warranties of Sellers contained in this Agreement shall be true and correct in all material respects, in each case as of the date hereof and as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which shall be true and correct only as of such date or time) except where the failure of such representation and warranty to be true and correct would not have a Material Adverse Effect. Subject to the preceding sentence, Sellers may update or supplement the Disclosure Schedule prior to Closing by written notice to Purchasers.

**6.2.2. Performance of Covenants**. Each of the Ancillary Agreements to which a Seller is a party shall have been executed and delivered by such Seller to Purchaser, and all other agreements and transactions contemplated hereby or in any Ancillary Agreement to be performed by such Seller on or before the Closing shall have been performed in all material respects.

**6.2.3. Payment of Amounts due under Certain Contracts**. Delphi shall have paid all Cure Amounts with respect to Assumed Contracts as set forth in Section 8.4 hereof. Delphi shall have paid all outstanding amounts that arose post-petition under Transferred Contracts that are Post-Petition Contracts and became due and owing prior to the Closing Date.

**6.2.4. Certification.** Sellers shall furnish to Purchasers a certification in a form acceptable to Purchaser pursuant to Treasury Regulation Section 1.1445-2(b)(2) that Seller is not a foreign person.

**6.2.5. Other Approvals**. The third party consents set forth in Schedule 6.2.5 shall have been received and all consents, approvals and filings in connection with Third-Party Requirements shall have been obtained or made in form and substance reasonably satisfactory to the Purchaser.

**6.2.6 Sump Remediation.**  Sellers shall have completed the "sump remediation" as described in that certain Phase II Environmental Site Assessment dated May, 2007, Ref. No. 049354 delivered by Delphi to RBUS.

**6.2.7 Continued Supply of Products.**  Sellers shall have continued to meet their obligations under their existing supply agreements and to have otherwise continued to conduct the Business substantially as it was conducted prior to the execution of this Agreement.

**6.2.8. Maintenance of Assets**.  Sellers shall maintain the Personal Property included in the Acquired Assets and the  M&E up to the date of  Closing, substantially as it has maintained them while fulfilling its existing supply contracts.

**6.2.9 Confirmation of Electrical Service**.  Purchasers shall have obtained from the CFE written confirmation that it is possible for FRMX to obtain the necessary electricity from CFE to operate the Premises as presently operated by DSE.    **6.2.10  Importation Documents**. Sellers shall have provided to Purchasers, on or before the Closing Date, all the documentation available to or in the possession of Sellers establishing legal importation into, and continued presence in Mexico of all the Acquired Assets.

**6.2.11. Water and Discharge of Water Concessions Obligations**. As of the Closing Date the Sellers are in compliance with all of their obligations under applicable Laws with respect to the Water Concession  and the Water Discharge Concession and the payment of all water fees, and there no procedure shall have been initiated, or threatened to be initiated by the Mexican National Water Commission to revoke the Sellers' Water Concession or the Sellers' Water Discharge Concession.

**6.2.12 Regularization of the legal import and/or stay in Mexico of the Acquired Assets**. In accordance with subsection E of section 5.1.5 above, Sellers shall, before the Closing Date, regularize the legal import and/or stay in Mexico of all assets included in the Acquired Assets whose legal import and/or stay in Mexico cannot be evidenced with the proper customs documentation or with an invoice complying with all mandatory requirements issued by a taxpayer duly registered in the Mexican Federal Taxpayers Registry. The said regularization shall comply with the applicable tax and/or customs provisions and/or regulations. Sellers shall bear any taxes, fines, fees or any amount necessary for duly carrying out the regularization of any Acquired Assets.  Sellers shall provide to Purchasers, on or before the Closing Date, all the documentation evidencing the proper regularization of the legal import and/or stay in the country of the Acquired Assets.

**6.3. Conditions to Obligations of Sellers**. Except as otherwise permitted by this Agreement, the obligation of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Seller):

**6.3.1. Accuracy of Representations and Warranties**. Except as otherwise permitted by this Agreement, and after giving effect to the Sale Approval Order, the representations and warranties of Purchasers contained in this Agreement shall be true and correct in all material respects, in each case as of the Closing Date if made on such date (except for representations and warranties that speak as of a specific date or time, which shall be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a material adverse effect on either Purchaser's ability to consummate the transactions contemplated by this Agreement.

**6.3.2. Performance of Covenants**. Each of the Ancillary Agreements to which a Purchaser is a party shall have been executed and delivered by such Purchaser to Sellers, and all other agreements and transactions contemplated hereby or in any Ancillary Agreement to be performed by a Purchaser on or before the Closing shall have been performed in all material respects.

**6.3.3. Delivery of Purchase Price**. RBUS shall have delivered to Delphi the Purchase Price by wire transfer, in immediately available funds, to such bank account or bank accounts as shall be specified by Delphi to RBUS on the Closing Date.

**7.**    **CLOSING**:

**7.1.**    **The Closing**. Subject to the satisfaction of the conditions set forth in Article 6 of this Agreement, the closing (the "Closing") of the transactions contemplated hereby shall take place at the offices of Robert Bosch LLC, 38000 Hills Tech Drive, Farmington Hills, Michigan 48331 at 10:00 a.m. on the second Business Day after the conditions set forth in Article 6 shall have been satisfied or waived (other than conditions which by their nature can be satisfied only at the Closing) and in any case on a mutually agreeable date no later than September 28 , 2007, or on such other date or at such other time as the Parties may agree. For tax and accounting purposes, the effective time of the transaction shall be 11:59 p.m. EDT on the Closing Date.

**7.2.**    **Ancillary Agreements**. At the Closing, the Parties shall execute and deliver each to the other the following agreements to which they are a party:

**7.2.1.** Assignment of Lease of the Premises or Transfer Deed as set forth in Section 1.1.1B above.

**7.2.2.**   Transfer Deed as set forth in Section 1.1.1.C above.

**7.2.3.** Shared Facilities and Maintenance Agreement in the form attached hereto as Exhibit 7.2.3.

**7.2.4.** Assignment and Assumption Agreement relating to the Transferred Contracts, consistent with the Sale Approval Order substantially in the form attached hereto as Exhibit 7.2.4.

**7.2.5.** Escrow Agreement between Seller, Purchaser and the Escrow Agent substantially in the form attached hereto as Exhibit 4.1.1.

**7.2.6.** Bill of Sale substantially in the form attached hereto as Exhibit 7.2.5.

**7.3.**    **Seller's Deliveries**. At the Closing, Sellers shall deliver to Purchasers the following, in proper form for recording where appropriate:

**7.3.1**. Executed assignments for the Permits and Contracts to be acquired by Purchaser pursuant to Article 1.

**7.3.2**. An officer's certificate, dated as of the Closing Date, executed on behalf of Sellers, certifying that the conditions specified in Section 6.2 have been fulfilled.

**7.3.3.** A certificate, dated as of the Closing Date, executed on behalf of each Seller by a Secretary or an Assistant Secretary, certifying: (i) a true and correct copy of the resolutions of Seller's board authorizing the execution, delivery and performance of this Agreement and any Ancillary Agreement to which such Seller is a party and the consummation of the transactions contemplated hereby and thereby.

**7.3.4**. Copies of all orders of the Bankruptcy Court pertaining to the contemplated transactions contemplated by this Agreement and the Ancillary Agreements, including the Bidding Procedures Order and the Sale Approval Order.

**7.3.5**. Duly executed Bill of Sale transferring the Acquired Assets to Purchaser.

**7.3.6.** Appropriate receipts. When applicable, DSE or any other Seller shall deliver to Purchasers invoices covering all of the Assets that require the delivery of an invoice in accordance with Applicable Law, duly issued in favor of Purchasers. The invoices delivered to Purchasers by DSE shall comply with all the applicable requirements set forth in the Mexican Federal Fiscal Code (Código Fiscal de la Federación). DSE shall deliver to Purchasers true and correct copies of invoices for Acquired Assets that have been definitely imported by DSE, if applicable, each of which shall include the date and number of the custom document (pedimento de importación), the customs office where the goods were imported into Mexico, and the legend "first-hand sale of imported goods" (venta de primera mano de bienes importacion).

**7.3.7.** A public deed signed before a notary public by Centro Técnico Herramental, S.A. de C.V. ("CENTEC") in which CENTEC grants a temporary easement (servidumbre de paso) in terms of article 1642 of the Civil Code for the State of Coahuila on and through the land in which the CENTEC plant is built, giving FRMX access to the Premises. Such easement shall be in effect until the earliest to occur of (a) the date that FRMX builds its own access to the Land or (b) 36 months from the date of the Closing.  The public deed will be in the form of Exhibit "7.3.7".

**7.3.8**. An assignment of water rights agreement in the form of Exhibit 7.3.8 duly executed by DSE before a notary public.

**7.3.9**.  An assignment of rights agreement in the form of Exhibit 7.3.9 duly executed by DSE before a notary public under which DSE transfers all of its rights and obligations under the Discharge of Water Concession.

**7.4.**    **Purchaser's Deliveries**. At the Closing, Purchaser shall deliver to Seller, in proper form for recording where appropriate:

**7.4.1**. The Purchase Price less the Deposit Amount as required by, and in accordance with, Section 4.1.

**7.4.2**. An Assignment and Assumption Agreement pursuant to which the Purchaser assumes the Assumed Liabilities.

**7.4.3**. An officer's certificate, dated as of the Closing Date, executed on behalf of each Purchaser, certifying that the conditions specified in Section 6.3 have been fulfilled.

**7.4.4**. A certificate, dated as of the Closing Date, executed on behalf of each Purchaser by its Secretary or an Assistant Secretary, certifying: (i) a true and correct copy of the resolutions of the Purchaser's board authorizing the execution, delivery and performance of this Agreement by Purchaser and the consummation of the transactions contemplated hereby.

## 8.    **CERTAIN ADDITIONAL COVENANTS**:

### 8.1.    **Bankruptcy Actions**:

**8.1.1**. The Bidding Procedures are set forth in Section 11.1. As further specified below, Delphi shall file a motion or motions (and related notices and proposed orders) with the Bankruptcy Court seeking approval of the Bidding Procedures Order and the Sale Approval Order.

**8.1.2.** Delphi shall use commercially reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Bankruptcy Rules as modified by order, if any, of the Bankruptcy Court, in connection with obtaining approval of the sale of the Acquired Assets under the Agreement, including serving on all required Persons in the Bankruptcy Cases, notice of the Sale Approval Motion, the Sale Hearing (as hereinafter defined) and the objection deadline in accordance with Rules 2002, 6004, 6006 and 9014 of the Bankruptcy Rules, the Bidding Procedures Order or other orders of the Bankruptcy Court, and any applicable local rules of the Bankruptcy Court.

**8.1.3.** Notwithstanding Purchasers' obligations with respect to the Assumed Contracts, if at any time prior to August 31, 2007, Purchasers request that Delphi move to assume and assign to Purchasers one or more prepetition executory contract or unexpired lease related to the Business other than the Assumed Contracts (the "Remaining Contracts"), Delphi will use its reasonable best efforts to assume and assign the Remaining Contracts to Purchasers under Section 365 of the Bankruptcy Code.  Purchasers shall provide, at or prior to the hearing on the motion to assume and assign the Remaining Contracts, adequate assurance of their future performance under each Remaining Contract to the parties thereto (other than Sellers) in satisfaction of Section 365(f)(2)(B) of the Bankrutpcy Code.

**8.2. Registrations, Filings and Consents; Further Actions.** Upon the terms and subject to the conditions of this Agreement, each of the parties hereto shall use commercially reasonable efforts to take, or cause to be taken, all appropriate actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as promptly as practicable including, without limitation, using their reasonable best efforts to cause the satisfaction of all conditions to Closing.

**8.3. Operation of the Business Pending Closing**:

**8.3.1.** Except: (i) as otherwise provided herein; (ii) as required by or resulting from the Bankruptcy Cases or otherwise approved by the Bankruptcy Court; (iii) pursuant to any changes that may be required under applicable Laws; (iv) as set forth in the following sentence, until the Closing, Sellers will (a) carry on the Business in substantially the same manner as heretofore (except for the treatment of Products, which Delphi shall store at a location other than the Premises and shall sell to RBUS as set forth in Section 8.5.6 below); (b) will perform in all material respects all of their respective obligations under all Listed Contracts and not amend, alter or modify in any significant respect that is adverse to the Business any provision of any Listed Contract, unless pursuant to the preceding sentence 8.3.1(iv)(a), and Sellers agree to advise Purchasers of any such amendment, alteration or modification if it is foreseeable that the change will result in an adverse financial impact exceeding $10,000; (c) keep in full force and effect insurance comparable in amount and scope to coverage maintained by it on the date of this Agreement; (d) use commercially reasonable efforts to maintain and preserve relations with customers, suppliers, employees and others having business relations with the Business; (e) endeavor to maintain the goodwill of the Business; and (f) promptly advise Purchasers of any material and adverse change in the business condition (financial or other) of the Business or the Acquired Assets. No Seller shall make a capital expenditure in relation to the Business in excess of $5000 without prior notification to RBUS.

**8.3.2.** Delphi shall promptly notify Purchasers if it becomes aware of the occurrence of any event or circumstance that could reasonably be expected to cause the conditions set forth in Sections 6.1.1, 6.1.2, 6.2.1 or 6.2.5 hereof not to be satisfied including, without limitation, any event or circumstance that, upon the occurrence of such event or circumstance, causes any representation or warranty of the Seller to be untrue in any material (except for any representation or warranty qualified by materiality) respect at the time of the occurrence of such event or condition.

**8.3.3.** RBUS shall promptly notify Sellers if  it becomes aware of the occurrence of any event or circumstance that could reasonably be expected to cause the conditions set forth in Sections 6.1.1, 6.1.2 or 6.3.1 hereof not to be satisfied including, without limitation, any event or circumstance that, upon the occurrence of such event or circumstance, causes any representation or warranty of the Purchasers to be untrue in any material (except for any representation or warranty qualified by materiality) respect at the time of the occurrence of such event or condition.

**8.4. Assumed Contracts; Cure Amounts**. As soon as practicable after the date hereof, Delphi shall, pursuant to a motion reasonable in form and substance (which motion may be incorporated into the Sale Approval Motion), move to assume and assign to Purchasers the Assumed Contracts and shall provide notice thereof in accordance with all applicable Bankruptcy Rules as modified by orders of the Bankruptcy Court. Delphi shall pay Cure Amounts as agreed to by it and each party to an Assumed Contract or, absent such agreement, by order of Court in the time and manner specified by the Sale Approval Order.

Notwithstanding anything in this Agreement to the contrary, at any time prior to the conclusion of the Sale Hearing, RBUS may notify Delphi that it has elected not to take an assignment of one or more Assumed Contracts and Delphi shall have no obligation to assume or make payment of the Cure Amount with respect to any such Assumed Contract. Delphi agrees to make such information available as RBUS reasonably requests in order to make a determination with respect to such Assumed Contracts.

**8.5.** **Post-Closing Covenants**. From and after the Closing, each of the Parties will perform its respective covenants and agreements set forth below:

**8.5.1. Seller Post-Closing Covenants**:

**A**.    **Intentionally omitted.**

**B**.    **Intentionally Omitted**

**C.**    **Electricity**.  Purchasers shall assist and cooperate with DSE on a best efforts basis to put into place alternative electricity metering for FRMX to receive electricity in conformance with applicable law prior to and after Closing, including, without limitation, by making any governmental applications for the submission of such electricity as may necessary or desirable, seeking confirmation by the CFE that the CFE will supply FRMX with sufficient electricity subsequent to Closing sufficient to carry on the Business at the Premises as is presently conducted by DSE, constructing (at Purchasers' expense) the necessary infrastructure to receive the electricity once approved by the CFE, and the like.

**8.5.2. Technical Documentation**. Delphi has delivered, or will deliver on or before the Closing, to the RBUS, a copy of all Intellectual Property to be used in connection with the Transferred Contracts included in the Acquired Assets. For a period of not less than one (1) year commencing at Closing, RBUS and its Affiliates shall use reasonable efforts to maintain all Technical Documentation applicable to product design, test, release, validation and manufacture, including quotations and it acquires from Sellers and their Affiliates in connection with the purchase of the Acquired Assets under Article 1 of this Agreement and its obligations under the Transferred Contracts, at a location at which they shall be reasonably accessible to Delphi and its Affiliates upon reasonable request and with reasonable advance notice. During such one (1) year period, RBUS shall not intentionally destroy or give up possession of its final copy of such documentation without offering Delphi the opportunity, at its expense but without any payment to RBUS, to obtain a copy of such documentation

**8.5.3. Books and Records and Litigation Assistance From and After Closing**:

**A.**    Purchasers and their respective Affiliates shall use reasonable efforts to preserve and keep all books, records, computer files, software programs and any data processing files delivered to Purchasers by Sellers and their respective Affiliates pursuant to the provisions of this Agreement for a period of not less than five (5) years from the Closing

Date, or for any longer period as may be required of the Business by any government agency, law, regulation, audit or appeal of Taxes, or Tax examination at Purchaser's sole cost and expense. If and when Delphi believes that such records are no longer legally required, it will notify RUBS. During such period,  RBUS shall: (i) provide Delphi or its Affiliates with such documents and information as necessary, consistent with past practice, to complete the accounting books and records of the Business as of December 31, 2007; and (ii) make such books and records available to Delphi and its Affiliates as may be reasonably required by Delphi or its Affiliates in connection with any legal proceedings against, or governmental investigations of, Delphi and its Affiliates, or in connection with any Tax examination, audit or appeal of Taxes of Sellers and  their respective Affiliates, the Business or the Acquired Assets during such period. Sellers or their Affiliates shall reimburse Purchasers for the reasonable out-of-pocket expenses incurred in connection with any request by Dephi to make available records pursuant to the foregoing sentence. In the event a Purchaser wishes to destroy or dispose of such books and records after five (5) years from the Closing Date, it shall first give not less than thirty (30) days' prior written notice to Sellers or their Affiliates, and Sellers or their Affiliates shall have the right, at its option, upon prior written notice given to Purchaser within twenty (20) days of receipt of Purchaser's notice, to take possession of said records within thirty (30) days after the date of Purchaser's notice to Sellers hereunder.

**B**.        RBUS, for itself and on behalf of its Affiliates, agrees to: (i) retain all documents required to be maintained by federal, state, national or local legislation or regulations; (ii) make available documents and records delivered to it by Sellers reasonably necessary in connection with any pursuit, contest or defense related to the Business, including documents that may be considered to be "confidential" or subject to trade secret protection (except that: (a) no documents or records protected by the attorney client privilege in favor of Purchaser must be made available if making these documents or records available would cause the loss of this privilege (in any case, however, Purchaser must notify Seller of the existence of such privileged documents); and (b) Seller and its Affiliates will agree to keep confidential and not use for any other purpose documents and records that are confidential or are subject to trade secret protection); (iii) make available, as may be reasonably necessary and upon reasonable advance notice and for reasonable periods so as not to significantly interfere with Purchaser's business, mutually acceptable engineers, technicians or other knowledgeable individuals to assist Seller and its Affiliates in connection with such claim.

**8.5.4. Payment and Collections**. Any proceeds from the sales of Products by Delphi prior to the Closing shall be the property of Delphi even if payment therefor occurs after Closing, and any proceeds from the sale of Products by Sellers after Closing shall belong to Sellers.  Sellers shall take such action as may be reasonably necessary to segregate payments made or collections received on behalf of Purchasers after Closing, and Purchasers shall take such action as may be reasonably necessary to segregate payments made or collections received on behalf of Sellers after Closing, in order to ensure that the cost of the related liability or the benefits of the related assets accrue to the appropriate Party in accordance with the terms of this Agreement. To the extent that any such collections are received after Closing in the form of checks or other negotiable instruments payable to the other Party,

Sellers or Purchasers, as appropriate, shall promptly take all necessary action to endorse such checks or instruments to permit the appropriate Party to collect the proceeds of such checks and instruments. Sellers shall promptly send Purchasers copies of all remittance advices and checks related to payments received by a Seller with respect to such items. Purchasers shall notify the Business' customers of the change in address of the owner of the Acquired Assets as may be required in order for such customers to properly remit any payments required under any applicable Acquired Asset and Sellers shall cooperate with Purchasers as is reasonably necessary to so notify such customers, including providing appropriate contact information for each such customer.

8.5.5.   **Visual Review of DFMEA Materials.**  Following the Closing and for 12 months thereafter, Sellers agree to provide Purchasers with access to DFMEA materials ("DFMEAs") relating to the Business for purposes of visual review and to make knowledgeable engineers available at Delphi's location for discussion regarding the DFMEAs.  Purchasers shall not have the right to copy the DFMEAs, where to copy means copy, scan, photograph, or in any way duplicate the DFMEAs, except that if a design change to the Product becomes necessary, RBUS shall send Delphi written notice of the same, specifying in reasonable detail the changes and reasons therefor, and Delphi will not unreasonably deny RBUS the opportunity to make a copy of the portion of the materials that is relevant for making such change.

8.5.6.   **Purchase of Products.**  Purchasers agree to purchase from Delphi all and not less than all the Products on hand at Closing, such purchases to be completed after Closing under the same purchase terms as existed prior to Closing, provided, however, that Purchasers shall not be obligated to buy Products for the GMT 900 Light Duty Brake Corner Program valued in excess of One Million Dollars ($1,000,000.00). Such purchases shall be carried out on a first-in-first-out basis, provided, however, that, subject to the limitation contained in the preceding sentence, Purchasers will complete the purchase of all Products on hand at Closing on or before FRMX's output begins to include Products.

8.5.7.   **Removal of Non Business Materials.**  Prior to and continuing after the Closing, DSE shall use its best efforts to remove all assets unrelated to the Business and which are not part of this transaction from the Premises.  Removal of such assets shall be complete no later than October 31, 2007.  Sellers will consider any offer from Purchasers for the purchase of any such assets separately from this Agreement.

**8.6. Further Assurances**. If at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instructions and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under this Agreement).

**8.7**.     **Intentionally omitted.**

**8.8.** **Intentionally omitted.**

**8.9.** **Communications with Customers and Suppliers**. Prior to the Closing, neither Purchaser shall, nor shall either Purchaser cause its Affiliates or representatives to, contact, engage in any discussions or otherwise communicate with any of the Sellers' Business customers, suppliers and others with whom it has material commercial dealings, regarding the Business, without obtaining the prior written consent of Delphi (which may be conditioned on Delphi's having the right to participate in any meetings or discussion with any such customers, suppliers or others but which may not otherwise be unreasonably withheld); provided, that RBUS and Delphi shall work together in good faith to arrange for an orderly transition of customer, supplier, and other third party relationships, including, without limitation, at the request of RBUS, meetings and other correspondence with such customers, suppliers, and other third parties to ensure such orderly transition.

**8.10.** **Assignment of Water Rights and of the Discharge of Water Rights**. The Parties hereby agree that the assignment of the water rights under the Water Concession and of the discharge of water rights under the Discharge of Water Concession shall be subject to notification of such assignment to the Public Registry of Water Rights pursuant to the Mexican Law of National Waters and, Sellers hereby agree to use their best efforts to assist Purchasers with the filing of such notices before the Public Registry of Water Rights, at no cost to Sellers and subject to Purchasers' reimbursement of Sellers reasonable out-of-pocket costs.

**9.** **TERMINATION:**

**9.1.** **Termination.** Anything contained herein to the contrary notwithstanding, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing Date:

**9.1.1.** **By Either Party:**

**A.** By mutual written consent of Seller and Purchaser.

**B.** Provided the terminating Party is not in default of its obligations under this Agreement, if consummation of the Sale would violate any non-appealable Final Order of any regulatory Governmental Entity, other than the Bankruptcy Court.

**C.** If Seller consummates an Alternative Transaction.

**D.** Provided the terminating Party is not in default of its obligations under this Agreement, by either Seller or Purchaser if the Closing shall not have occurred by September 28, 2007.

**E.** If the Bankruptcy Court has not entered the Sale Approval Order, on or before August 27, 2007 (the "Termination Date") or such Sale Approval Order is subject to a stay or injunction; provided, however, that the right to terminate this Agreement

pursuant to this Section 9.1.1.E shall not be available to Purchaser if Purchaser shall have failed to perform, or caused any of its respective Affiliates to perform, any of its respective material obligations under this Agreement.

**9.1.2.** **By Purchaser**. By RBUS (provided that it or FRMX are not then in material breach of any representation, warranty, covenant or other agreement contained herein) at any time prior to Closing, if a Material Adverse Effect shall have occurred, so long as (A) RBUS provides Delphi written notice of termination in conformance with Section 9.2 below within ten (10) Business Days after receiving written notice of such event, and (B) and such Material Adverse Effect is continuing at the time of any such termination. Nothing in this Section 9.1.2 or elsewhere in this Agreement shall be construed as obligating RBUS to submit a Subsequent Bid.

In the event of such termination under Section 9.1.2, Purchaser's sole remedy shall be the prompt return of the Deposit Amount, and Seller shall have no other liability to Purchaser whatsoever, whether a Break-Up Fee, Expense Reimbursement or otherwise .

**9.1.3.** **By Seller.** If Delphi declares a Qualified Bid other than that of Purchaser the Successful Bid (as defined in Section 11.9.6), provided that such termination shall be of no effect if  Delphi  does not: (i) enter into an agreement with respect to such Qualified Bid within two (2) Business Days after such declaration; and (ii) subsequently consummates the Sale pursuant to an Alternative Transaction.

**9.2.**    **Notice of Termination**. In the event of any termination pursuant to this Article 9, written notice thereof setting forth the reasons therefor shall promptly be given to the other Party and the transactions contemplated by this Agreement shall be terminated, without further action by any Party.

**9.3. Break-Up Fee; Expense Reimbursement:**

**9.3.1. Break-Up Fee**. In the event that: Delphi terminates the Agreement under Section 9.1.1.C or Section 9.1.3  and sells, transfers, leases or otherwise disposes, directly or indirectly, including through an asset sale, stock sale, merger or other similar transaction, all or substantially all of the Acquired Assets in a transaction or a series of related transactions with one or more parties other than RBUS (such event being an "Alternative Transaction"); Delphi shall, within two (2) Business Days after the consummation of an Alternative Transaction(s), pay to RBUS an amount equal to three percent (3.0%) of the Purchase Price (the "Break-Up Fee"). The claim of RBUS for a Break-up Fee shall be paid to RBUS from the sale proceeds of an Alternative Transaction and, until paid in full, shall constitute a superpriority administrative expense claim under Section 364(c)(1) of the Bankruptcy Code. Notwithstanding the foregoing, RBUS shall not be entitled to a Break-Up Fee if either or both Purchasers are in material breach of this Agreement.

      **9.3.2. <u>Expense Reimbursement</u>**.

In the event this Agreement is terminated pursuant to Sections 9.1.1.D or 9.1.1.E, and as a further condition to the above, provided that the Purchasers are not then in breach of this Agreement for which Sellers had previously notified either Purchaser, and, in the case of Section 9.1.1.D, the failure or occurrence of the event giving rise to any such termination results solely from the status of Seller or any action, inaction or conduct of Seller and not from the status of RBUS or any intentional action, inaction or conduct of RBUSthen Seller shall be obligated to pay RBUS an amount equal to RBUS's reasonable, actual out-of-pocket fees and expenses (including, without limitation, reasonable attorneys' fees, expenses of its financial advisors, and expenses of other consultants) incurred in connection with the transactions contemplated by this Agreement (the "Expense Reimbursement") up to a maximum of $200,000. Any Expense Reimbursement payable upon termination of this Agreement shall be immediately earned upon such termination and payable by Delphi  to RBUS promptly upon the delivery of an invoice related to such Expense Reimbursement to Seller by RBUS to be delivered to Delphi  within ten (10) Business days of termination of this Agreement; provided, however, that if Delphi believes , in good faith, that the amount of the Expense Reimbursement sought by RBUS is not reasonable, then Delphi will have the right to seek Bankruptcy Court review thereof prior to paying such amount. The claim of RBUS for an Expense Reimbursement shall constitute a superpriority administrative expense under Section 364(c)(1) of the Bankruptcy Code.

      **9.3.3.** Payments to RBUS pursuant to this Section 9.3 shall be by wire transfer of immediately available funds in U.S. Dollars, to such account or accounts as RBUS shall designate in writing.

      **9.4. <u>Procedure and Effect of Termination</u>**. In the event of termination and abandonment of the transactions contemplated hereby pursuant to Section 9.1, written notice thereof shall forthwith be given to the other Parties to this Agreement, and this Agreement shall terminate (subject to the provisions of this Article 9) and the transactions contemplated by this Agreement shall be abandoned, without further action by any of the parties hereto. If this Agreement is terminated as provided herein no Party shall have any liability or further obligation to any other Party resulting from such termination except for the provisions of: (i)(a) Purchasers' obligations under that certain confidentiality agreement between the Parties dated October 18, 2006; (b) Article 9 (Termination); and (c) Sections 4.1.1 (Deposit Amount), 13.2 (Notice), 13.3 (Assignment), 13.4 (Entire Agreement), 13.5 (Waiver), 13.8 (Expenses), 13.12 (Governing Law), 13.13 (Public Announcements), 13.15 (Venue and Retention of Jurisdiction) and 13.18 (Dispute Resolution), all of which shall remain in full force and effect for  two years following the date this Agreement is terminated; and (ii) no party waives any claim or right against a breaching party in respect of any of its representations, warranties, covenants or agreements set forth in this Agreement occurring prior to such termination; provided, however, that in the event Purchaser is entitled to receive the Break-Up Fee or Expense Reimbursement, the right of a Purchaser to receive such amounts shall constitute such Purchaser's sole remedy for (and such amount shall constitute liquidated damages in respect of) any breach by a Seller of any of its

representations, warranties, covenants or agreements set forth in this Agreement, and provided, further, that in the event Delphi is entitled to receive the Deposit Amount, Delphi's right to receive such amount shall constitute its sole remedy for (and such amount shall constitute liquidated damages in respect of) any breach by a Purchaser of any of its representations, warranties, covenants or agreements set forth in this Agreement. In connection with any termination of this Agreement, all filings, applications and other submissions made pursuant to the transactions contemplated by this Agreement shall, to the extent practicable, be withdrawn from the agency or Person to which made.

## 10. OTHER TAX MATTERS:

**10.1.** Sellers will be responsible for the preparation and filing of all Tax Returns for the Business for all periods for which Tax Returns are due prior to the Closing, including amended returns, applications for loss carryback refunds and applications for estimated tax refunds. Purchaser shall make available to Sellers (and to Sellers' accountants and attorneys) any and all books and records and other documents and information in its possession or control reasonably requested by Sellers to prepare these Tax Returns. Sellers will make all payments required with respect to any such Tax Return.

**10.2.** Purchasers will be responsible for the preparation and filing of all Tax Returns in connection with the conduct of its business after the Closing for all periods for which Tax Returns are due after the Closing (other than for Taxes with respect to periods for which the consolidated, unitary and Tax Returns of Sellers will include the operations of the Business). RBUS shall be responsible for and shall pay when due all Taxes attributable, levied or imposed upon or incurred in connection with the Acquired Assets and the transactions arising out of or in connection with the Transferred Contracts pertaining to any period ending after the Closing Date.

**10.3.** Sellers and Purchasers will cooperate in connection with: (i) the preparation of filing of any Tax Return, Tax election, Tax consent or certification or any claim for a Tax refund; (ii) any determination of liability for Taxes; and (iii) any audit, examination or other proceeding in respect of Taxes related to the Business or the Acquired Assets. Such cooperation includes a reasonable amount of direct access to accounting, engineering and contracting personnel, subject to availability, which shall not be unreasonably restricted, and advance notice to RBUS's chief financial officer.

**10.4.** Sellers shall not, and shall not cause the Business to make, revoke or amend any tax election, execute any waiver of restrictions or tax assessments or collections or extensions if there will be any impact on Purchaser as a result of doing so.

## 11.    BIDDING PROCEDURES:

**11.1. Delphi Initial Bankruptcy Actions**. This Article 11 sets forth the bidding procedures (the "Bidding Procedures") to be employed with respect to the Agreement and the sale (the "Sale") of the Acquired Assets. The Sale is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court in the Sale Approval Order. The

following overbid provisions and related bid protections are designed to compensate the Purchaser for its efforts and agreements to date and to facilitate a full and fair process (the "Bidding Process") designed to maximize the value of the Acquired Assets for the benefit of Delphi and its Affiliates' creditors, shareholders and bankruptcy estate.

**11.2. Intentionally Omitted**.

**11.3. Qualified Bidder**. Unless otherwise ordered by the Bankruptcy Court, for cause shown, or as otherwise determined by Delphi, in order to participate in the bidding process, each person (a "Potential Bidder"), other than the Purchaser, must deliver (unless previously delivered) to Delphi:

**11.3.1**. An executed confidentiality agreement in form and substance satisfactory to Delphi.

**11.3.2.** Current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Acquired Assets and the Business, current audited financial statements of the equity holders of the Potential Bidder who shall guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement acceptable to Delphi and its financial advisors; and

**11.3.3**. A preliminary (non-binding) written proposal regarding: (i) the purchase price; (ii) any assets and/or equity interests expected to be excluded; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the Purchase Price and the requisite financial assurance); (iv) any anticipated regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) any conditions to closing that it may wish to impose in addition to those set forth in this Agreement; and (vi) the nature and extent of additional due diligence it may wish to conduct and the date by which such due diligence will be completed.

A Potential Bidder that delivers the documents described in the previous subparagraphs above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of the Potential Bidder to consummate the Sale, if selected as a successful bidder, and that Delphi determines in its sole discretion is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale within the time frame provided by this Agreement shall be deemed a "**Qualified Bidder**". As promptly as practicable, after a Potential Bidder delivers all of the materials required above, Delphi shall determine, and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that Delphi notifies the Potential Bidder that it is a Qualified Bidder, Delphi shall allow the Qualified Bidder to begin to conduct due diligence with respect to the Acquired Assets and the Business as provided in Section 11.5 below. Notwithstanding the foregoing, Purchaser shall be deemed a Qualified Bidder for purposes of the Bidding Process.

**11.4. <u>Bid Deadline</u>**. A Qualified Bidder (other than Purchaser) that desires to make a bid shall deliver written copies of its bid to: (i) Delphi Automotive Systems LLC, 5725 Delphi Drive, Troy, Michigan, 48098, Attention: John P. Carney; (ii) Delphi's restructuring counsel, Skadden, Arps, Slate, Meagher & Flom LLP, at 333 West Wacker Drive, Chicago, Illinois 60601-1285, Attention: John K. Lyons and Brian Fern; (iii) Delphi's financial advisor  FTI Consulting, Inc., Three Times Square, New York, New York 10036, Attention: Randall S. Eisenberg;  (iv) Delphi's Deputy General Counsel, Attention Sean Corcoran,at 5725 Delphi Drive, Troy, Michigan, 48098; (v) counsel to the Creditors' Committee, Latham & Watkins LLP, at 885 Third Avenue, New York, New York 10022, Attention: Robert J. Rosenberg and Mark A. Broude; (vi) the Creditors' Committee's financial advisor, Mesirow Financial Consulting LLC, 666 Third Avenue, 21st Floor, New York, New York 10017, Attention: Ben Pickering; and (vii) counsel for the agent under Delphi's post-petition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017, Attention: Donald S. Bernstein and Brian Resnick, so as to be received not later than 11:00 A.M. (New York Time), on  a date to be determined by Delphi that is at least five (5) Business Days before the Sale Hearing (the "Bid Deadline"). As soon as reasonably practicable following receipt of each Qualified Bid, Delphi shall deliver to RBUS and its counsel complete copies of all items and information enumerated in Section 11.6 of this Agreement.

**11.5. <u>Due Diligence</u>**. Delphi shall afford each Qualified Bidder due diligence access to the Acquired Assets and the Business. Due diligence access may include management presentations as may be scheduled by Delphi, access to data rooms, on site inspections and such other matters which a Qualified Bidder may request and as to which Delphi, in its sole discretion, may agree to. Delphi shall designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. Any additional due diligence shall close after the Bid Deadline. Delphi may, in its discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. Neither Delphi nor any of its Affiliates (or any of their respective representatives) shall be obligated to furnish any information relating to Acquired Assets and the Business to any Person other than to Qualified Bidders who make an acceptable preliminary proposal and execute mutually agreeable confidentiality agreements.

**11.6. <u>Bid Requirements</u>**. All bids must include the following documents (the "Required Bid Documents"):

**11.6.1**. A letter stating that the bidder's offer is irrevocable until two (2) Business Days after the closing of the Sale of the Acquired Assets.

**11.6.2.** An executed copy of the Agreement, together with all schedules a ("Marked Agreement") marked to show those amendments and modifications to such agreement and schedules that the Qualified Bidder proposes, including the Purchase Price.

**11.6.3**. A good faith deposit (the "Good Faith Deposit") in the form of a

certified bank check from a U.S. bank or by wire transfer (or other form acceptable to Delphi in its sole discretion) payable to the order of Delphi (or such other party as Delphi may determine) in an amount equal to US$500,000.

**11.6.4**. Written evidence of a commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to Delphi and its advisors.

**11.7. <u>Qualified Bids</u>**. A bid will be considered only if the bid:

**11.7.1**. Is on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to Delphi than, those contained in the Agreement.

**11.7.2**. Is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder.

**11.7.3**. Proposes a transaction that Delphi determines, in its sole discretion, has a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum of the Purchase Price plus the amount of the Break-Up Fee, plus (i) in the case of the initial Qualified Bid, $ 200,000; and (ii) $100,000 in the case of any subsequent Qualified Bids, over the immediately preceding highest Qualified Bid.

**11.7.4**. Is not conditioned upon any bid protections, such as a break-up fee, termination fee, expense reimbursement or similar type of payment.

**11.7.5**. An acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreement.

**11.7.6**. Includes a commitment to consummate the purchase of the Acquired Assets (including the receipt of any required governmental or regulatory approvals) within not more than fifteen (15) days after entry of an order by the Bankruptcy Court approving such purchase, subject to the receipt of any governmental or regulatory approvals which must be obtained within twenty (20) days after entry of such order.

**11.7.7**. Is received by the Bid Deadline.

A bid received from a Qualified Bidder will constitute a "Qualified Bid" only if it includes all of the Required Bid Documents and meets all of the above requirements; provided, however, that Delphi shall have the right, in its sole discretion, to entertain bids for the

Acquired Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids. Notwithstanding the foregoing, the Purchaser shall be deemed a Qualified Bidder, and the Agreement shall be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale. A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction. Each Qualified Bid other than that contained in this Agreement is referred to as a "Subsequent Bid".

If Delphi does not receive any Qualified Bids other than the Agreement received from the Purchaser, Delphi will report the same to the Bankruptcy Court and will proceed with the Sale pursuant to the terms of the Agreement and will report the same to the Bankruptcy Court.

**11.8. Bid Protection**.   Recognizing Purchaser's expenditure of time, energy and resources, Delphi has agreed to provide certain bidding protections to the Purchaser. Specifically, Delphi has determined that the Agreement will further the goals of the Bidding Procedures by setting a floor that all other Potential Bids must exceed.  As a result, Delphi has agreed that it will pay to RBUS  the Break-Up Fee or the Expense Reimbursement, as applicable, pursuant to, and subject to the terms of, Section 9.3 hereof.

**11.9. Auction, Bidding Increments and Bids Remaining Open**. If Delphi receives at least one (1) Qualified Bid in addition to the Agreement, Delphi will conduct an auction (the "Auction") of the Acquired Assets and the Business upon notice to all Qualified Bidders who have submitted Qualified Bids at 10:00 a.m. EST on or before July 17, 2007, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, or 333 West Wacker Drive, Chicago, Illinois 60606 or such later time or other place as Delphi will notify (with RBUS's consent not to be unreasonably withheld) all Qualified Bidders who have submitted Qualified Bids, but in no event later than the second (2nd) Business Day prior to the Sale Hearing, in accordance with the following procedures:

**11.9.1**. Only Delphi, RBUS, any representative of the Committee, any representative of Delphi's post-petition credit facility (and the legal and financial advisers to each of the foregoing), and any Qualified Bidder who has timely submitted a Qualified Bid shall be entitled to attend the Auction, and only RBUS and Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

**11.9.2.** At least two (2) Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform Delphi whether it intends to participate in the Auction and at least one (1) Business Day prior to the Auction, Delphi shall provide copies of the Qualified Bid or combination of Qualified Bids which Delphi believes is the highest or otherwise best offer to all Qualified Bidders who have informed Delphi of their intent to participate in the Auction. Should an Auction take place, Purchaser shall have the right, but not the obligation, to participate in the Auction. Purchaser's election not to participate in an Auction shall in no way impair its entitlement to receive the Break-Up Fee or Expense Reimbursement, as applicable.

**11.9.3**. All bidders shall be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction.

**11.9.4**. Delphi may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith.

**11.9.5**. Bidding at the Auction shall begin with the highest or otherwise best Qualified Bid or combination of Qualified Bids and continue in minimum increments of at least $100,000 higher than the previous bid or bids. The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit an additional Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid or bids. For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), Delphi shall give RBUS a credit in an amount equal to the greater of any Break-Up Fee or Expense Reimbursement, as applicable, that may be payable to RBUS under this Agreement and shall give effect to any assets and/or equity interests to be retained by Delphi.

**11.9.6**. At the conclusion of the Auction, or as soon thereafter as practicable, Delphi, in consultation with its advisors, shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale; and (ii) identify the highest or otherwise best offer(s) for the Acquired Assets and the Business received at the Auction (the "Successful Bid(s)" and the bidder(s) making such bid, the "Successful Bidder(s)").

**11.10**. **Acceptance of Qualified Bids**. Delphi shall sell the Acquired Assets for the highest or otherwise best Qualified Bid upon the approval of such Qualified Bid by the Bankruptcy Court after the hearing (the "Sale Hearing"). If, after an Auction in which the Purchaser: (i) shall have bid an amount in excess of the consideration presently provided for in the Agreement with respect to the transactions contemplated under the Agreement; and (ii) is the Successful Bidder, it shall, at the Closing under the Agreement, pay, in full satisfaction of the Successful Bid, an amount equal to: (a) the amount of the Successful Bid; less (b) the Break-Up Fee.

**11.11**. **Sale Hearing**. The Sale Hearing will be held before the Honorable Robert Drain on July 19, 2007 at 10:00 a.m. (New York City time) at the United States Bankruptcy Court for the Southern District of New York, located in New York, New York, but may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing, provided, however, that the Sale Hearing shall not be adjourned or rescheduled to a date later than August 31, 2007. If Delphi does not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), Delphi will report the same to the

Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Acquired Assets to the Purchaser following entry of the Sale Order. If Delphi does receive additional Qualified Bids, then, at the Sale Hearing, Delphi shall seek approval of the Successful Bid(s), as well as the second highest or best Qualified Bid(s) (the "Alternate Bid(s)" and such bidder(s), the "Alternate Bidder(s)"). Delphi's presentation to the Bankruptcy Court of the Successful Bid(s) and Alternate Bid(s) shall not constitute Delphi's acceptance of either or any such bid(s), which acceptance shall only occur upon approval of such bid(s) by the Bankruptcy Court at the Sale Hearing. Following approval of the sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of: (i) failure of a condition precedent beyond the control of either Delphi or the Successful Bidder; or (ii) a breach or failure to perform on the part of such Successful Bid(s), then the Alternate Bid(s) shall be deemed to be the Successful Bid(s) and Delphi shall effectuate a sale to the Alternate Bidder(s) without further order of the Bankruptcy Court.

**11.12.** **Return of Good Faith Deposit**. Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) shall be held in an interest-bearing escrow account and all Qualified Bids shall remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders), until two (2) Business Days following the closing of the Sale (the "Return Date"). Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Successful Bidder(s), together with interest thereon, shall be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder(s). If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, Delphi will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become property of Delphi. On the Return Date, Delphi shall return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

**11.13.** **Reservation of Rights**. Delphi, after consultation with the Committee: (i) may determine, which Qualified Bid, if any, is the highest or otherwise best offer; and (ii) may reject at any time, any bid (other than the Purchaser's bid) that is: (a) inadequate or insufficient; (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of the Sale; or (c) contrary to the best interests of Delphi, its estate and creditors as determined by Delphi in its sole discretion.

**12.** **INDEMNIFICATION:**

**12.1.** **Seller's Agreement to Indemnify.** If the Closing occurs and a Purchaser makes a written claim for indemnification against Seller in accordance with the procedures set forth in this Article 12 prior to the applicable Expiration Date, then Seller agrees to indemnify and hold harmless the Purchasers subject to the terms of this Article 12, from and after the Closing, from and against all out-of-pocket liabilities, claims, assessments, losses, judgments, settlements, damages, costs and expenses (including, without limitation, reasonable attorneys' and consultants' fees and expenses) (collectively, the "Purchaser Damages") incurred by a Purchaser as a result of or arising out of: (i) those Retained Liabilities and those Excluded Assets that are retained at Closing by Sellers; (ii) a breach of

any representation or warranty in this Agreement; (iii) any failure to perform a covenant that this Agreement required be performed on or before Closing; or (iv) a breach of any agreement or covenant of Seller in this Agreement to be performed after Closing; and the sole source to satisfy any remedy with respect to any claim for indemnification shall be the Escrow Amount, and under no circumstances shall Sellers be responsible for indemnity in any amounts exceeding the Escrow Amount. Notwithstanding the foregoing, any claim based on clause (iii) must be made within one hundred eighty (180) days after the Closing Date. As soon as possible after the applicable Expiration Date, the Escrow Amount, including all cash, interest accrued thereon and other property retained by the Escrow Agent, will be delivered to Sellers by the Escrow Agent, less an amount necessary to satisfy the amount of all then outstanding claims by Purchaser for Purchaser Damages in accordance with the terms of the Escrow Agreement.

**12.2. <u>Purchaser's Agreement to Indemnify</u>**. If the Closing occurs and a Seller makes a written claim for indemnification against a Purchaser in accordance with the procedures set forth in this Article 12, then, from and after the Closing, Purchaser shall indemnify and hold harmless Seller from and against all out-of-pocket liabilities, claims, assessments, losses, judgments, settlements, damages, costs and expenses (including, without limitation, reasonable attorneys' and consultants' fees and expenses) (collectively, the "Seller Damages") incurred by Seller as a result of or arising out of: (i) the Assumed Liabilities; (ii) a breach of any representation or warranty of Purchaser contained herein; (iii) any covenant to be performed on or before Closing; (iv) a breach of any agreement or covenant of Purchaser contained herein to be performed after Closing; or (v) the use, operation or ownership of the Business or any of the Acquired Assets after the Closing unless such matters are of a nature also subject to indemnification pursuant to Section 12.1. The maximum amount of Purchaser's obligations under clauses (i), (ii) and (iii) above shall be $1,000,000.00 . Notwithstanding the foregoing, any claim based on clause (iii) must be made within one hundred eighty (180) days after the Closing Date.

**12.3<u>. Limitations on Agreements to Indemnify</u>**. The obligations of either Party to indemnify the other pursuant to this Article 12 are subject to the following limitations:

**12.3.1**. Each Party agrees that, from and after the Closing, the indemnification provided in this Article 12 is the exclusive remedy for a breach by the other Party of any representation, warranty, agreement or covenant contained in this Agreement, and that there shall be no other remedy for any breach by a party in respect of any claim for monetary damages arising out of or under this Agreement;

**12.3.2**. In calculating amounts payable to an indemnified party, the amount of any indemnified Purchaser Damages or Seller Damages, as the case may be, shall be determined without duplication of any other damages for which a claim has been made or could be made under any other representation, warranty, covenant or agreement included herein;

**12.3.3**. Any written notice delivered by an indemnified party to an indemnifying party seeking indemnification pursuant to this Agreement shall set forth, with

as much specificity as is reasonably practicable, the basis of the claim, the sections of this Agreement which form the basis for the claim, and, to the extent reasonably practicable, a reasonable estimate of the amount of the Purchaser Damages or Seller Damages, as the case may be, that have been or may be sustained by such indemnified party; and

**12.3.4**. Notwithstanding any other provision of this Agreement, in no event shall an indemnified party be entitled to indemnification pursuant to this Agreement to the extent any Purchaser Damages or Seller Damages, as the case may be, were attributable solely to the indemnified party's acts or omissions.

**12.3.5**. No indemnifying party shall be liable to an indemnified party until the amount of all indemnifiable damages of such indemnified party in the aggregate exceeds USD $20,000.00, after which point the indemnifying party will be obligated to the indemnified party for all damages (and not just the amount in excess of such amount) up to but not to exceed the indemnity coverage ceilings established in this Section 12.  To the extent an indemnifying party makes any indemnification payment pursuant this Article 12 for which the indemnified party has a right to recover against a third party (including an insurance company), the indemnifying party shall be subrogated to the right of the indemnified party to seek and obtain recovery from such third party.

**12.3.6**. Subject to the foregoing, Sellers shall not be obligated to provide indemnification with respect to an environmental condition and/or any representation or warranty related to an environmental condition under this Agreement, to the extent that :

**12.3.6.1**. the Premises are, after the Closing Date, put to use under a zoning or land use classification other than industrial use, or where FRMX or FRMX's successor in interest seeks to or changes the zoning or land use classification of the Premises to a classification more sensitive than the industrial classification; or

**12.3.6.2**. the Purchasers did not take reasonable steps to mitigate Seller Damages; or

**12.3.6.3** Where a Purchaser discloses information related to environmental conditions at the Premises to a Governmental Entity or third party based on such Purchaser's reasonable belief that such disclosure is required by applicable law, without, prior to such disclosure, obtaining the prior written consent of the Sellers, such consent of the Sellers not to be unreasonably withheld, except where the information is clearly in the public domain through no fault of the Purchaser.

**12.4. <u>Third Party Indemnification Procedures</u>**. The obligations of any indemnifying party to indemnify any indemnified party under Sections 12.1 or 12.2 with respect to Purchaser Damages or Seller Damages, as the case may be, resulting from the assertion of liability by third parties (including Governmental Entities) (an "Indemnification Claim"), shall be subject to the following terms and conditions:

**12.4.1**. Any party against whom any Indemnification Claim is asserted shall give the party required to provide indemnity hereunder written notice of any such Indemnification Claim promptly after learning of such Indemnification Claim (with such notice satisfying the requirements of Section 12.3.3), and, to the extent such matter involves a third party claim, the indemnifying party may, at its option, undertake the defense thereof by representatives of its own choosing and shall provide written notice of any such undertaking to the indemnified party. The indemnified party's failure to give prompt written notice of an Indemnification Claim hereunder shall not affect the indemnifying party's obligations under this Article 12, except to the extent that the indemnifying party is actually prejudiced by such failure to give prompt written notice. The indemnified party, at the indemnifying party's expense, shall, and shall cause its employees and representatives to, reasonably cooperate with the indemnifying party in connection with the settlement or defense of such Indemnification Claim and shall provide the indemnifying party with all available information and documents concerning such Indemnification Claim. If the indemnifying party, within thirty (30) days after written notice of any such Indemnification Claim, fails to assume the defense of such Indemnification Claim, the indemnified party against whom such claim has been made shall (upon further written notice to the indemnifying party) have the right to undertake the defense, compromise or settlement of such claim on behalf of and for the account and risk, and at the expense, of the indemnifying party.

**12.4.2.** Anything in this Section 12.4 to the contrary notwithstanding: (i) the indemnified party shall not settle a claim for which it is indemnified without the prior written consent of the indemnifying party, which consent shall not be unreasonably withheld, conditioned or delayed; and (ii) the indemnifying party shall not enter into any settlement or compromise of any action, suit or proceeding, or consent to the entry of any judgment for relief other than monetary damages to be borne exclusively by the indemnifying party, without the prior written consent of the indemnified party, which consent shall not be unreasonably withheld, conditioned or delayed.

**13. MISCELLANEOUS**:

**13.1. <u>Bulk Sales Laws</u>**. Sellers and Purchasers hereby waive compliance by Seller with the provisions of the bulk sales Law of any state or foreign jurisdiction.

**13.2. <u>Notices</u>**. All notices, requests, consents or other communications permitted or required under this Agreement shall be in writing and shall be deemed to have been given when personally delivered, or when sent if sent via facsimile (with receipt confirmed), or on the first business day after sent by reputable overnight carrier, or on the third business day after sent by registered or certified first class mail (with receipt confirmed), to the following: If to Seller:
DELPHI Automotive Systems LLC
5725 Delphi Drive
Troy, Michigan 48098
Attn: Assistant General Counsel - Commercial & Transactional
Fax No.: 248-813-2491

48

With a copy to:
AHG – Attn: John P. Carney
5725 Delphi Drive
Troy, Michigan 48098
Fax No.: 248-813-2410

If to Purchaser:
Robert Bosch LLC
38000 Hills Tech Drive
Farmington Hills, Michigan 48331
Attn.: Mr. Devesh Sharma
Fax No.: 248-876-6540

With a copy to:
Robert Bosch LLC
2800 South 25th Avenue
Broadview, Illinois 60155
Attn.:  General Counsel
Fax No.: 708-786-3673

provided, however, if either Party shall have designated a different addressee by notice, then to the last addressee so designated.

**13.3. Assignment**. This Agreement shall be binding and inure to the benefit of the successors and assigns of each of the Parties and their Affiliates, but no rights, obligations, duties or liabilities of either Party may be assigned without the prior written consent of the other, which shall not be unreasonably withheld.

**13.4. Entire Agreement**. This Agreement, together with the Ancillary Agreements, represents the entire agreement and understanding between the Parties with respect to the transactions contemplated herein. This Agreement supersedes all prior agreements, understandings, arrangements, covenants, representations or warranties, written or oral, by any officer, employee or representative of either Party dealing with the subject matter hereof.

**13.5. Waiver.** Any waiver by Seller or Purchaser of any breach or of a failure to comply with any provision of this Agreement: (i) shall be valid only if set forth in a written instrument signed by the Party to be bound; and (ii) shall not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any provision of this Agreement. At any time prior to the Closing Date, the Parties may: (a) extend the time for the performance of any of the obligations or other acts of the other Parties hereto; (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions contained herein. Except as otherwise expressly provided herein, any agreement on the part of a Party to any such extension or waiver shall

be valid only if set forth in an instrument in writing signed on behalf of such Party.

**13.6. <u>Severability</u>**. Should any provision, or any portion thereof, of this Agreement for any reason be held invalid or unenforceable, such decision shall not affect the validity or enforceability of any of the other provisions, or portions thereof, of this Agreement, which other provisions, and portions, shall remain in full force and effect, and the application of such invalid or unenforceable provision, or portion thereof, to persons or circumstances other than those as to which it is held invalid or unenforceable shall be valid and be enforced to the fullest extent permitted by Law.

**13.7. <u>Amendment.</u>** This Agreement may only be amended only in writing by duly authorized representatives or officers of the Parties.

**13.8. <u>Expenses</u>**. Except as otherwise expressly provided in Section 9.3 of this Agreement or an Ancillary Agreement, each Party shall be responsible for its own expenses incurred in connection with the preparation of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby.

**13.9. <u>Third Parties</u>**. Nothing contained in this Agreement, express or implied, is intended to or shall be construed to confer upon or give to any person, firm, corporation, association, labor union or trust (other than the Parties, their Affiliates and their respective permitted successors and assigns), any claims, rights or remedies under or by reason of this Agreement.

**13.10. <u>Headings</u>**. The headings contained in this Agreement are inserted for convenience only and shall not be deemed to constitute a part of this Agreement.

**13.11. <u>Counterparts</u>**. More than one counterpart of this Agreement may be executed by the Parties, and each fully executed counterpart shall be deemed an original.  A facsimile signature shall be deemed an original for purposes of this Agreement, provided, however, that they shall be promptly replaced by signature pages bearing original signatures.

**13.12. <u>Governing Law</u>**. This Agreement shall be construed and enforced in accordance with the laws of the State of  Michigan  and, to the extent applicable the Bankruptcy Code, without giving effect to rules governing the conflict of laws.

**13.13. <u>Public Announcements</u>**. Except for the public filings and notices contemplated in this Agreement, Sellers and Purchasers will consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and shall not issue any press release or make any public statement without mutual consent, except as may be required by Law and then only with such prior consultation.

**13.14. <u>Sales or Transfer Taxes</u>**. All sales taxes, documentary and stamp taxes, transfer taxes, use taxes, gross receipts taxes, excise taxes, value-added gross receipt taxes or

similar charges and all charges for filing and recording documents in connection with the transfer of the Acquired Assets (including intellectual property filing and recording fees) shall be paid by Purchaser.

      **13.15. <u>Venue and Retention of Jurisdiction</u>**. All actions brought, arising out of or related to the transactions contemplated in this Agreement shall be brought in the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction to determine any and all such actions.

      **13.16. <u>Risk of Loss</u>**. Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Acquired Assets or the Business shall be borne exclusively by the Sellers.

      **13.17. <u>Enforcement of Agreement</u>**. The Parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or were otherwise breached. It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to all other remedies available at law or in equity.

      **13.18. <u>Dispute Resolution.</u>** Sellers and Purchasers will, in the first instance, attempt to settle any and all claims or disputes arising in connection with this Agreement or any Ancillary Agreement by good faith negotiations by senior management of each party. If the dispute is not resolved by senior management within thirty (30) days after delivery of a written request for such negotiation by either party to the other, either party may make a written demand (the "Demanding Party") for formal dispute resolution (the "Notice") and specify therein in reasonable detail the nature of the dispute. Within fifteen (15) business days after receipt of the Notice, the receiving party (the "Defending Party") shall submit to the other a written response. The Notice and the response shall include: (i) a statement of the respective party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that party and of any other person who will accompany the executive to meetings of the parties. Within fifteen (15) business days after such written notification, the executives (and others named in the Notice or response) will meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute. All reasonable requests for information made by one party to the other will be honored promptly. All negotiations pursuant to this Section 13.18 are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence. In any case, the Parties agree not to commence any litigation actions until the expiration of ninety (90) days after the date of the Notice, and all such actions are subject to Section 13.15 above.

      **13.19. <u>No Right of Setoff</u>**. Neither party hereto nor any Affiliate thereof may deduct from, set off, holdback or otherwise reduce in any manner whatsoever any amount owed to it hereunder or pursuant to any Ancillary Agreement against any amounts owed hereunder or pursuant to any Ancillary Agreement by such Persons to the other party hereto or any of such other party's Affiliates.

      **13.20.** <u>**Limitation on Damages**</u>. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, INCLUDING ARTICLE 12, IN NO EVENT SHALL PURCHASERS OR SELLERS BE LIABLE FOR, OR BEAR ANY OBLIGATION IN RESPECT OF, ANY PUNITIVE, INCIDENTAL, INDIRECT, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES OF ANY KIND OR CHARACTER OR ANY DAMAGES RELATING TO, OR ARISING OUT OF, DIMINUTION IN VALUE, LOST PROFITS OR CHANGES IN RESTRICTIONS ON BUSINESS PRACTICES.

      **13.21**. <u>**Bankruptcy Court Approval**</u>. Notwithstanding anything to the contrary herein, Delphi's obligations under Section 9.3 are expressly subject to entry of the Bidding Procedures Order. All other obligations of the Sellers hereunder are expressly subject to entry of the Sale Approval Order.

      **IN WITNESS WHEREOF**, each of the parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first above written.

**THIS SPACE INTENTIONALLY LEFT BLANK**

**SELLERS**

**DELPHI  AUTOMOTIVE SYSTEMS LLC**


By:_____
_____
Name:
Title:


**DELPHI SISTEMAS DE ENERGIA, S.A. DE C.V.**


By:_____
_____
Name:
Title:


**DELPHI CONTROLADORA, S.A. DE C.V**., APPEARING AS INDEMNITOR ONLY
FOR PURPOSES OF SECTION 5.1.15.H HEREOF AND NO OTHER PURPOSE


By:_____
_____
Name:
Title:

**Witnesses**


_____        _____

**PURCHASERS**

**ROBERT BOSCH LLC**

By:_____
_____
Name:
Title:

By:_____
_____
Name:
Title:

**FRENADOS MEXICANOS S.A. DE C.V.**

By:_____
_____
Name:
Title:

By:_____
_____
Name:
Title

**Witnesses**

_____                    _____