# **<u>EXHIBIT 1</u>**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION ET AL,


          Debtor.


- - - - - - - - - - - - - - - - - - - - -x


                    United States Bankruptcy Court

                    One Bowling Green

                    New York, New York


                    March 21, 2007

                    10:29 AM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

72

| | |
|---|---|
| 1 | Credit Reporting Act those being -- to provide a summary of his |
| 2 | report to the object of the adverse employee action. |
| 3 | THE COURT:  Okay.  All right. |
| 4 | MR. HOGAN:  Judge, other than if you have any |
| 5 | questions on the 1681, I don't have anything further. |
| 6 | THE COURT:  Well, I mean, I think -- are you at least |
| 7 | going to tell me what I thought I just said which is that -- |
| 8 | MR. HOGAN:  Real quickly, Judge 1681 is -- |
| 9 | THE COURT:  -- that this provision doesn't change the |
| 10 | definition of consumer reporting. |
| 11 | MR. HOGAN:  It doesn't change, first of all, the |
| 12 | provision exception was effective March 31, 2004, after this -- |
| 13 | very close but after the report.  It's an exception and it |
| 14 | says, but for this subsection, the communication would be -- |
| 15 | would be a consumer report.  It uses the same term and then it |
| 16 | goes through the exceptions. |
| 17 | THE COURT:  And that consumer report is someone -- is |
| 18 | a report issued by a consumer reporting -- |
| 19 | MR. HOGAN:  Consumer reporting agency. |
| 20 | THE COURT:  -- agency. |
| 21 | MR. HOGAN:  Okay?  Thank you. |
| 22 | THE COURT:  All right.  Okay.  I'm going to take a |
| 23 | break till 12:30 and then come back. |
| 24 | (Recess from 12:17 till 12:30 PM) |
| 25 | THE COURT:  Please be seated.  Okay.  We're back on |

73

1    the record in Delphi Corporation and in particular I'm going to

2    give a bench ruling on the debtor's objection to the proof of

3    claim filed by Mr. Joseph Reno.  As I general do with fairly

4    lengthy bench decisions, I'll give it because I think it's

5    important for the parties to know the result right away, but I

6    will review the transcript.  And I'll review it not only for

7    accuracy but also reserve the right to edit it if what came out

8    of my mouth, remarkably didn't make sense when it did so and to

9    correct it and that will be my final ruling.  But I -- I will

10   not change the gist of my ruling.

11        The claim by Mr. Reno sets forth a number of theories

12   of recovery and I should note first that today's hearing, by

13   agreement of the parties, was limited to the merits of those

14   theories with the parties reserving to a subsequent hearing, if

15   necessary, a determination of damages in connection with any

16   claims that I found to be meritorious.

17        The theories all stem from the same common facts,

18   except the last one which is a claim under ERISA for damages

19   resulting from a -- a delayed payment of ERISA benefits.  The

20   claimant also makes a claim under COBRA and obviously that

21   claim itself does not derive from the facts that I'm going to

22   go to -- go through in a moment but the debtor's defense does.

23   Essentially, as both parties have stated, those facts pertain

24   to Mr. Reno's termination as an employee of Delphi in March of

25   2004.  Mr. Reno contends that that termination was a wrongful

74

1    discharge and done in retaliation for his view expressed to his

2    supervisor and ultimately to in-house lawyer at Delphi.  That

3    Delphi needed to take certain steps to correct a condition in a

4    waste water container and that might exist in another waste

5    water container.  And that consequently he has a wrongful

6    discharge claim and/or a claim under Ohio's Whistle Blower

7    statute because he was terminated after the letter informing

8    Delphi of the waste water container issue was received.

9         He also contends that Delphi did not comply with the

10    Fair Credit Reporting Act in the conduct and provision of

11    information in connection with Delphi's investigation of him.

12    This is not only a claim but is also offered as evidence to

13    show the motivation or protectoral basis for Delphi's

14    termination of Mr. Reno.

15         Delphi, on the other hand, contends that Mr. Reno was

16    fired, not because of the environmental information and point

17    of view that he raised with his supervisor, and ultimately with

18    in-house legal staff, but rather because of information that

19    Delphi learned pertaining to Mr. Reno's conduct on the job and

20    in connection with an investigation of that conduct.

21    Consequently, Delphi argues that his termination was not

22    wrongful but proper.  And certainly was not retaliatory.  It

23    contends that because Mr. Reno was properly terminated for such

24    reasons, it did not have a responsibility, under COBRA, to him.

25    And that it also is not liable for the remaining cause of

75

1      action, which I have not yet described which is a defamation

2      cause of action.

3              Finally, Delphi contends that the investigation that

4      it commissioned and the provision of -- or the use of that

5      investigation was not covered within the ambit of the Fair

6      Credit Reporting Act and consequently that there was nothing

7      improper in connection with the investigation.  And further,

8      that no inference can be drawn from any alleged impropriety

9      under the Fair Credit Reporting Act as to Delphi's motivation

10     in terminating Mr. Reno's employment.

11             As with any or at least most claims of this nature,

12     the parties have very different views as to the underlying

13     facts.  They have set forth those facts in a written record

14     before the court, in a joint exhibit binder that includes

15     witness declarations as well as prior testimony of witnesses

16     and letters and e-mails, which I've reviewed.  And I think that

17     in light of the difference in the underlying testimony and the

18     nature of the claims here, it's important to delineate the

19     burden of proof, which I think the parties generally agree

20     upon, as the claimant, Mr. Reno, has the ultimate burden of

21     proof here.  However his claim, in large measure, comes down to

22     an assertion that the proffered reason for his termination or

23     the reason proffered for his termination by Delphi was and is

24     merely a pretext.  And under those circumstances the courts

25     have developed a burden shifting regime which shows or -- or

76

1    provides that under the proper circumstances in showing a prima

2    facie case of retaliation the claimant may shift the burden to

3    the defendant to articulate a legitimate non-retaliatory reason

4    for its employment decision.  Depending upon the nature of

5    the -- the pretextual argument that is responded to the

6    employer meets that burden by showing an alternative reason

7    than the discriminatory one stated by the claimant.

8            In my view, although -- and I'll get to this in a

9    moment, at oral argument claimant may be setting a different

10   process for shifting the burden.  Once the employer has come

11   forward with a non-discriminatory reason for firing the

12   claimant -- I'm sorry -- firing the claimant, the plaintiff

13   again has or the claimant again has the ultimate burden.  The

14   area of potential doubt is whether that burden must be one that

15   shows that it is more likely the case that the claimant was

16   fired for the discriminatory reason or that there must be

17   wholly non-discriminatory reason available and provide a basis

18   for the termination.  In the pretext cases, I believe that the

19   burden is on the claimant to show that it is more likely that

20   he or she was terminated for a discriminatory, an improper

21   reason or retaliatory reason, see Manzer vs. Diamond Shamrock

22   Chemicals 29 F.3d 1078, (6th Cir. 1994).  In a title seven

23   context the latter view was adopted by a plurality opinion of

24   the Supreme Court in Price Waterhouse vs. Hopkins 490 US 228,

25   (1989), although, again, that wasn't a title seven context not

1    focusing on the pretextual argument that the claimant is making

2    here.

3            In any event, let me proceed through the factual

4    record and address first the wrongful discharge claims, since I

5    believe that the other claims, with the exception of the ERISA

6    claim, all flow from that analysis.

7            First, it should be noted that Mr. Reno asserts

8    claims under both Ohio's Whistle Blower Statute and then

9    second, or alternatively, under Ohio Common Law, that his

10   termination violated Ohio Public Policy for raising a

11   legitimate workplace concern regulated by federal and state

12   environmental laws dealing with hazardous wastes.

13           The Ohio Whistle Blower Statute should be addressed

14   first.  Because at least based on my reading of it, as well as

15   the cases interpreting it, it contains procedural requirements

16   that obviously do not exist under the Ohio Common Law wrongful

17   termination cases.  And I find that Mr. Reno did not comply

18   with those procedural requirements.  And under the case law

19   interpreting RC 40113.52(a) 1, he would therefore not have a

20   claim under the Whistle Blower Statute.  That statute requires

21   that an employee orally notify his or her supervisor, or other

22   responsible officer of the employer, of the alleged violation.

23   And (b) subsequently file with that person a written report

24   that provides sufficient detail to identify and describe the

25   violation.  And then it provides for a mechanism if those

78

1    requirements have been satisfied, for the employer to correct

2    the violation or make a reasonable and good faith effort to

3    correct it within twenty-four hours after the oral notification

4    or the receipt of the written report, which ever is earlier.

5    And then an opportunity for the employee to seek appropriate

6    redress.

7            The debtors contend that Mr. Reno did not comply with

8    this provision in two respects.  One I don't accept, although

9    it's somewhat of a close call.  But I believe he did provide in

10   sufficient detail the environmental concerns or hazardous

11   substance concerns that he claims, legitimately, existed with

12   respect to the container tanks.  However, procedurally, he had

13   not provided oral notification of those conditions to the

14   person that he sent the written report to.  That is, he

15   informed Mr. Gooding, his supervisor, orally of the conditions

16   and subsequently mailed his letter to Mr. Wally, the in-house

17   counsel at Delphi.

18           Given the timing constraints and specific language of

19   this statute, that means that he's not complied and we don't

20   have a cause of action under it, see Heney vs. Chrysler

21   Corporation, 699 NE 2.d 121 at 122, Ohio Court of Appeals

22   (1997).

23           There are other potential defenses to this cause of

24   action but I believe that they are best dealt with in the

25   context of the other wrongful discharge claim raised by Mr.

79

1    Reno, which is that he was suspended or terminated contrary to

2    Ohio Public Policy.  That policy is a doctrine adopted by the

3    Ohio Supreme Court in Greeley vs. Miami Valley Maintenance

4    Contractors, Inc., 551 NE 2.d 981, Ohio (1989).  It's an

5    exception to Ohio's general at will employment standard which

6    permits an employer to terminate an employee at will for any

7    cause at any time whatsoever.

8            In order to support a claim for discharge in

9    violation of Public Policy, the plaintiff must show (1) the

10   existence of a clear public policy that has the clarity

11   element.  (2) Dismissal under the circumstances would

12   jeopardize that policy, the jeopardy element.  (3) Dismissal

13   related to public policy, the causation element and (4) lack of

14   overriding business justification for the employer's action.

15   The debtors do not dispute the clarity or jeopardy elements

16   laid out in the Ohio cases including Painter vs. Graily, 639 NE

17   2.d 51, Ohio (1994) and Urban vs. Osborne Manufacturing, Inc,

18   847 NE 2.d 1272, Ohio Court of Appeals (2006).  They do,

19   however, dispute causation arguing strenuously that Mr. Reno

20   was not dismissed contrary to the -- or because of his

21   championing the public policy of the State of Ohio and United

22   States to have an environmentally clean and safe workplace but

23   for a wholly separate reason.

24           They also contend, relatingly -- relatedly -- excuse

25   me, that the overriding business justification for his

80

1    termination was, again, because of his personal conduct in

2    violation of Delphi policies as opposed to his disagreement

3    with Mr. Gooding over the proper maintenance and protection of

4    the container tanks and the surrounding environment or his

5    making that concern known to Mr. Wally in his written letter.

6           I've been through the factual record and as is often

7    the case with claims of this kind, there is no smoking gun and

8    the claimant relies upon the Court drawing inferences from

9    circumstantial evidence.  On its face that circumstantial

10   evidence, to my mind, does set forth a prima facie case in that

11   on the very day that Mr. Reno had his dispute with Mr. Gooding

12   about the container tanks he was put on administrative

13   suspension, albeit with full pay and benefits.

14          Moreover, he was terminated just short of a month

15   thereafter.  After he had notified Mr. Wally on, I believe it

16   was May 4th -- May 2nd, but I may be wrong.  Let me check.

17   Yes, May 2, 2004, of his concern about the container as well as

18   his concern about being put on suspension.  Between the 20th,

19   when he was suspended, and the date of his termination that

20   letter on its face is a -- one of only two significant factual

21   developments.  The other is some additional investigatory work

22   done by the third party investigator, Mr. Brown, that the

23   debtors had hired to investigate a situation that I will talk

24   about in a moment.  But those facts alone, in my mind, raise

25   enough of a concern to shift the burden to Delphi.

81

1          I find, however, based on my review of the factual

2     record including, not only the declarations of Ms. Patrick and

3     Mr. Brown but also the depositions and prior testimony and

4     witness statements, that Delphi has met its burden to show that

5     it was not motivated by the hazardous waste or environmental

6     issues that Mr. Reno had raised with his supervisor and then

7     disclosed to Mr. Wally.  And having shifted the burden back to

8     Mr. Reno, I do not believe that Mr. Reno has overcome the

9     evidence that supports my conclusion that Delphi terminated him

10    for separate reasons that were legitimate and unrelated to

11    retaliation because of Mr. Reno's views as to the container

12    tanks.

13          Specifically, it became known to Delphi that a

14    dumpster of one of its contractors had been placed on the Troy

15    property, or the Troy site, containing garbage and debris that

16    was not Delphi's.  In and of itself that was a fairly innocuous

17    event, however, it was of enough concern, apparently, to cause

18    Mr. Reno's boss, Mr. Gooding, to arrange for a third party

19    investigator, Mr. Brown, to determine the circumstances under

20    which the dumpster came to the site.  The reason for that

21    concern appears to be that it was very quickly assumed and

22    assumed correctly, that the debris in the dumpster originated

23    with Mr. Reno.  Delphi has a clear policy against conflicts of

24    interest and separately and distinctly soliciting gifts or

25    favors from suppliers or vendors or customers.  And there was

82

1    an appearance that may have occurred here.  All of this

2    occurred well before the date that Mr. Reno says he first

3    learned of the waste water treatment container issue, which he

4    says was February 13, 2004.

5              The investigation started two weeks before then.  And

6    the investigator interviewed Mr. Reno on February 16th, as well

7    as other parties involved.  As a result of that investigation

8    process Mr. Brown concluded that Mr. Reno had obtained a favor

9    from Troy Calton, an employee of the company called Onyx that

10   works directly for, as a contractor, Mr. Reno to remove

11   material from his yard and/or house.  He also learned that this

12   arrangement may well have been a secret one.  And that it was,

13   at least, not cleared in advance with Mr. Reno's superiors.

14   And perhaps as important, that in the process of his

15   investigation Mr. Reno was not forthcoming as to the facts of

16   the relationship and had sought out from his subordinates

17   witness statements in connection with the relationship, that he

18   held in reserve.  All of this led Mr. Brown and also Delphi's

19   personnel officers to conclude that Mr. Reno had both violated

20   the favor policy and the conflict of interest policy, as well

21   as potentially put undue pressure on subordinates and perhaps

22   asked them to remember facts that they could not remember or

23   that were not, in fact, the truth.

24             The record, I should be clear, is not one where I can

25   ultimately decide whether Mr. Brown's conclusions were right or

83

1    not.  And beyond that the claimant contends that they were so

2    clearly incorrect that Delphi could not credibly be said to

3    have relied on them as a basis for termination, which is a

4    proper inquiry for me to make.

5            I'll note in considering the conclusions that Mr.

6    Brown made, that I do credit his conclusions with regard to the

7    underlying arrangements between Calton and Mr. Reno.  Mr.

8    Calton changed his story in a second interview with Mr. Brown;

9    in a way that I believe indicated that the second version is

10   the correct version.  It is, moreover, one that his -- Mr.

11   Calton's subsequent deposition in key respects corroborates.

12   Namely that the dumpster was filled and taken under an

13   arrangement with Mr. Reno -- with Mr. Reno's knowledge and, in

14   fact, at least under Calton's belief, the implied assumption

15   that ultimately this would be run through Delphi's accounting

16   system.  To my mind, having reviewed Delphi's Foundation of

17   Excellence Policy, at Exhibit 17, whether ultimately Mr. Reno

18   felt he was going to pay for this process or not, in full, is

19   less important than the fact that he engaged in it at all with

20   Mr. Calton without disclosing it to his supervisors.

21           I also believe that the issue about Mr. Reno not

22   being forthcoming about the facts of this relationship is

23   fairly well established through Mr. Brown's investigation.  And

24   that, in turn, lays some doubt on the witness statements that

25   he got out of his subordinates.  Particularly in light of the

84

1    fact that one of them did not provide a witness statement

2    although asked to do so.  That individual apparently no longer

3    working for Delphi and Mr. Calton's testimony that neither of

4    the individuals who did provide statements were present when he

5    had the discussion with Mr. Reno about the dumpster.

6            Ms. Patrick states in her affidavit, and I believe

7    that the record has to corroborate this, that Mr. Reno was put

8    on suspension before she, or anyone making that decision,

9    understood his contention about the container tanks.  And that

10   it was a coincidence that Gooding gave him this news on the

11   very day that they had that argument.

12           That leaves, therefore, the analysis to the

13   subsequent period.  And I think that this is where Mr. Reno and

14   his counsel properly turned their attention.  Their argument is

15   that, in essence, the work that Brown did and the -- and that

16   led Delphi to suspend Mr. Reno was not sufficient to lead to

17   his termination and could not be viewed to be sufficient to

18   lead to his termination.  But rather that it was the subsequent

19   development of his letter to Mr. Wally and his insistence of a

20   different approach to the container tank problem than Mr.

21   Gooding wanted to take that led to the termination.

22           There is no direct evidence of this in the record.

23   The claimant relies, therefore, on two things.  First, his

24   contention that the dumpster incident, as the parties have

25   referred to it, is simply too insignificant to lead to his

85

1    termination.  And I should note that he has spent his carrier

2    at Delphi.

3            The second is that Mr. Brown's investigation, by Mr.

4    Brown's own admission, was not complete at the time that Mr.

5    Reno was terminated in -- in March of 2004.  Why not wait, he

6    contends, until the investigation was complete -- for the

7    record to be done before making that decision and in answering

8    that question he says, because it was simply a facade or a

9    pretense -- or a pretext for a decision.

10           I've carefully considered those two points and I'll

11   deal with them in order.  It seems to me that it is regrettable

12   that an individual would be fired over something as foolish and

13   petty as this dumpster incident.  However, Mr. Reno is a person

14   charged with important duties that involve credibility and

15   adherence to proper procedures.  And I understand why Delphi

16   could legitimately conclude that not only the relationship with

17   the contractor but also the way that it appears the -- Mr. Reno

18   reacted to the investigation in terms of arguably not telling

19   the truth and arguably inducing subordinates to take positions

20   on his behalf, arguably improperly, all go to important issues

21   as to his reliability and Delphi's policies.

22           I have the impression, which I believe is

23   corroborated to some extent by some updating of the initial

24   investigation by Mr. Brown, that Delphi was concerned that this

25   was not an isolated matter but that Mr. Reno had involved other

86

1    people, both employees and contractors, in doing favors for

2    him.  For example, the statement by Mr. Ruble that he helped

3    with an aquarium business of his wife even though Mr. Ruble

4    testified that he did that work for Mr. Reno and his wife after

5    hours.

6         So, it does not appear to me that the dumpster

7    incident is, in fact, comparable to Captain Queeg's Ice Cream

8    and Strawberry incident in the Cayne Mutiny but that had

9    substance to it, particularly given Mr. Reno's position.

10        As far as the issue of what I should take away from

11   Mr. Brown's acknowledgement that his investigation was

12   incomplete, I have also considered that point and I believe

13   that in the absence of anything in the record to show how much

14   more Mr. Brown felt he needed to make it complete, and in what

15   sense he felt it was incomplete, I turn to the e-mail from him

16   to Delphi on the day that Mr. Reno was suspended.  In which he

17   said that it should be clear to everyone that Joe has violated

18   several rules, Joe meaning Mr. Reno.  He said that, in the same

19   paragraph -- in the same section he acknowledged he would like

20   to do more work.  I don't believe that, based on this record,

21   the fact that Mr. Brown believed the investigation was

22   incomplete is something that in and of itself shows that Delphi

23   was using his work as a pretext, given what had already been

24   disclosed.

25        Mr. Reno contends that I should look askance on his

87

1    investigation also because it was incompetent and illegal.  And

2    I've considered that argument as well.  As far as the in

3    competency point, I'll note that he has been an investigator

4    for six years and I do not see, in his investigation or in the

5    subsequent testimony or record, any attempt to do anything

6    other than a -- a good job.  He does not appear to me to be

7    negligent or alternatively motivated to reach a certain result.

8    And I do not believe that the law requires him to conduct an

9    investigation beyond what he did.

10           As far as the illegal contention, that dovetails back

11   to Mr. Reno's claim that the investigation and the debtor's

12   failure to provide a copy of it to Mr. Reno violated the Fair

13   Credit Reporting Act.  There may be instances where the failure

14   to comply with a law, such as the Fair Credit Reporting Act,

15   may lead a Court to draw an inference that something very

16   serious was motivating the debtor to act contrary to law.  And

17   usually that something very serious may be an ulterior purpose.

18   For example, here it is argued, at least between the lines,

19   that why would the debtor violate the FCRA but for the fact

20   that he wanted to cover up that it was doing it -- doing the

21   whole exercise as a facade to hide a retaliatory purpose.  I,

22   however, do not accept that argument here.  I will determine,

23   later in this ruling, whether the FCRA was violated or not.

24   But I think, at a minimum, it is clear that it was not clearly

25   violated.  That is that someone in Ms. Patrick's position or

88

1    Mr. Gooding's position, or other people involved in this

2    process, would not have known, with any degree of clarity that

3    what they were doing was in violation of the FCRA which

4    undercuts the whole motivational or inferential argument about

5    motivation.

6            The argument as to whether the FCRA applies here is a

7    plain meaning argument that has been criticized by a number of

8    courts, particularly in respect of the version of the statute

9    that would be applicable here, which is that in addition to

10   applying to the provision of reports with regard to a

11   consumer's credit worthiness, credit standing and credit

12   capacity, the statute provides that it applies to such reports

13   going to a consumer's character, general reputation, personal

14   characteristics of mode of living with regard to employment

15   purposes.

16           I agree with Johnson vs. Federal Express Corporation,

17   147 F.2d, 1268 MD Alabama (2001), Heartland vs. Lyle Park

18   District, Northern District of Illinois (2001) and Rug vs.

19   Henack, Inc., 2002 U.S. District Lexus 18101 SDNY (2002).  As

20   to their skepticism that the FCRA applies to this type of

21   investigatory report dealing with a consumer's particular

22   workplace conduct that is in contrast to reports going to

23   decisions to hire or to fire based on general non-workplace

24   conduct, such as set forth in Comeaux, C-O-M-E-A-U-X, vs. Brown

25   and Williamson Tobacco Company, 915 F.2d, 1264 9th Cir. (1990)

89

1    and Hodge vs. Texaco, Inc., 975 F.2d 1093, 5th Cir. (1992).

2           In addition, I believe that the record, as it is,

3    does not enable me to find that Mr. Brown's company, which is

4    not described other than simply being a large investigatory

5    company, would be a credit reporting agency which is necessary

6    to fit within the FCRA's definitions of consumer report -- an

7    investigative consumer report which trigger the applicability

8    of the statute under 15 U.S.C. 1681 AF, which is defined as any

9    person which for monetary fees, dues or on a cooperative non-

10   profit basis, regularly engages in whole or in part in the

11   practice of assembling or evaluating consumer credit

12   information or other information on consumers for the purpose

13   of furnishing consumer reports to third parties and which uses

14   any means or facility of interstate commerce for the purpose of

15   preparing or furnishing consumer reports, see again Rug vs.

16   Henack, Inc., 2002 U.S. District Lexus 18101.

17          So, both on the merits, but as importantly since, as

18   was pointed out in oral argument, even if Mr. Reno were to

19   prevail on the merits of the FCRA claim he would get a very

20   small amount of money.  Therefore, not only on the merits, but

21   also in connection with evaluating whether Delphi was engaging

22   in a pretext when it said that it relied upon Mr. Brown's

23   investigation.  I conclude that the FCRA has no -- no bearing.

24          Therefore, in considering the circumstantial evidence

25   in the record before me where Delphi has come forward with a

90

1    non-retaliatory or a non-discriminatory reason for firing Mr.

2    Reno that I find credible, I do not believe that MR. Reno has

3    carried his burden of proof to show that that was not the

4    reason for his termination, but that to the contrary, it was

5    more likely that he was terminated in retaliation or for having

6    taken his views as to the container tank issue over Mr.

7    Gooding's head.

8            I'll note further, although ultimately this is a

9    lesser reason for my holding that Delphi in response to Mr.

10   Reno's letter apparently or at least shortly after the letter

11   was received, commissioned a third-party environmental

12   consultant to look at the tanks and that was done on March 6th.

13   And that consultant's report appears in the record at Exhibit

14   19.  So there does appear to be a prompt response by Delphi,

15   certainly no attempt to keep Mr. Reno's complaint under wraps

16   but to the contrary, to open it up to a third party.  And I

17   think the report not only has to speak for itself, because

18   there's been no further testimony about its bona fides, but I

19   think does speak for itself as a legitimate third party

20   corroboration of Delphi's actions.  It further, later that

21   summer in May, apparently involved the local authorities in

22   looking at the -- at the tanks, who also were satisfied.

23           So while I acknowledge that -- that sunshine aspect

24   of what Delphi did doesn't necessarily obviate Mr. Reno's

25   claim, because after all one could still infer if the

1    circumstantial evidence was sufficient that Delphi terminated

2    him anyway, because they were mad that he raised it in the

3    first place, it does further support Delphi's contention that

4    as far as that aspect of his performance was concerned, as

5    opposed to his dealing with Mr. Calton and subordinates, they

6    considered his advice and took it seriously.

7           The defamation claim, I believe, is based on those

8    findings, one that will not lie under Ohio law.  The stated

9    claim, under Ohio law, for defamation the plaintiff must show

10   that there was a false statement defamatory to the plaintiff

11   publish to a third party by a defendant who was, at least,

12   negligent and damaging to the plaintiff's reputation.  A

13   plaintiff must prove a defendant's negligence by clear and

14   convincing evidence, but need only prove the other elements by

15   a preponderance of the evidence.  In a defamation action,

16   however, falsity is an essential element.  Furthermore, in

17   defending against a defamation action it is sufficient for the

18   defendant to show that the imputation is substantially true or

19   as it is often put, to justify the gist, the sting or the

20   substantial truth of the defamation, see Perry vs. Mohawk

21   Motors of Michigan, 236 F.3d 299 at 312 6th Cir. (2001),

22   citations omitted.  Here the defamation was the statement

23   that -- or the alleged defamation was the statement that Mr.

24   Reno was being terminated because of the dumpster incident and

25   related investigation thereof.  And for the reasons I've

92

1    stated, there was, under the Ohio law, consequently no basis

2    for a defamation claim based on that statement.

3            The COBRA claim is, for me, somewhat more difficult

4    to decide, given the nature of this wrongful action.  The

5    statute provides, in 29 U.S.C., Section 16 -- I'm sorry,

6    1163(2) that continuing coverage is not required to be provided

7    to an employee after termination for a "gross misconduct".

8    That term's not defined.  The courts have grappled with that

9    definition in various ways.  One, at least, has said that gross

10   misconduct constitutes a deviation from the employer's business

11   ethics policy for, among other reasons, failing to disclose a

12   financial interest in a supplier, accepting favors and gifts

13   from a vendor and claiming reimbursement from the company for

14   non-official travel, see Karby vs. Standard Products Company,

15   1992 West Law 333931, District Court, South Carolina (1992).  A

16   case out of Texas has defined the term to mean a substantial

17   deviation from the high standards and obligations of a

18   managerial employee.  That would indicate that such an employee

19   cannot be entrusted with his management duties without danger

20   to the employer, Aveena vs. Texas Pink Stands, Inc., 1991 U.S.

21   District Lexus 13957, Western District Texas (1991).

22           As I said, I have not determined here, because I

23   cannot, on this record whether Mr. Brown was right or not.  I

24   have determined that there was enough basis in his

25   investigation for a proper termination of Mr. Reno.  But I do

93

1    not know from his investigation whether he has established

2    gross misconduct.  And I don't believe the debtors have here

3    either, as a matter of fact, for purposes of this statute.

4    They have, again, established that they had a valid basis for

5    terminating Mr. Reno, based on the investigation.  But I think

6    that proving gross misconduct, as opposed to proving that they

7    had enough basis to terminate him, requires a -- more in the

8    factual record.  So I believe that they have not established

9    what I think is their burden here, to show an established gross

10   misconduct.  So I believe that his claim is established on

11   COBRA.

12            Finally, as to the ERISA claim, I think it was made

13   clear at oral argument, that claim really does devolve into a

14   damages issue.  I did not see any opposition on the merits as

15   to, for example, an alleged defense that it was proper to delay

16   distribution of Mr. Reno's pension money.  And so the issue as

17   to whether that distribution included an element of interest

18   and/or if it didn't, what the proper damages would be for not

19   having received it from the date, which has also not been

20   established, that the pension money should have been

21   distributed and the date it was, which has been established,

22   should all await further trial if the parties choose to do so.

23   Although my hope is, given the amount claimed, that there can

24   be a resolution of that matter.

25            All right.  As I said, I'm going to go over the

94

1    transcript; because obviously this has gone on, probably far

2    too long for all of you, and I want to make sure it's accurate

3    and properly reflects my thinking on this issue.  But again,

4    the conclusions won't change.  So, Mr. Hogan, you should submit

5    an order consistent with my ruling which disallows all of the

6    claims except for the COBRA and ERISA claims.  Reserves the

7    ERISA issue for further trial on damages calculation and allows

8    the COBRA claim.

9            MR. HOGAN:  We'll do so, Judge.

10           THE COURT:  Okay.  Thank you.  Oh, you don't have to

11   settle the order but I -- I -- you'll circuit -- I'm sure but

12   I'll say it anyway, you'll provide it to counsel for Mr. Reno

13   so that he can make sure that it says what I just said.

14           MR. HOGAN:  We will, Judge.

15           THE COURT:  Okay.  Thank you.

16       (Proceedings concluded at 1:58 PM)

17

18

19

20

21

22

23

24

25

95

1

2                                    **I N D E X**

3

4                                   RULINGS

5                              Page      Line

6    **Denial of all claims      72        25**

7    **except for COBRA and**

8    **ERISA**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

96

1

2                      C E R T I F I C A T I O N

3

4      I, Pnina Eilberg, court approved transcriber, certify that the

5      foregoing is a correct transcript from the official electronic

6      sound recording of the proceedings in the above-entitled

7      matter.

8

9      _____ March 27, 2007

10     Signature of Transcriber              Date

11

12     Pnina Eilberg

13     typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25