Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                        :
    In re                              :        Chapter 11
                                        :
DELPHI CORPORATION, et al.,             :        Case No. 05-44481 (RDD)
                                        :
                   Debtors.        :        (Jointly Administered)
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(e) AND 1107(b)
AND FED. R. BANKR. P. 2014 AUTHORIZING EMPLOYMENT AND
RETENTION OF DYKEMA GOSSETT PLLC AS SPECIAL COUNSEL
TO DEBTORS NUNC PRO TUNC TO APRIL 1, 2007

("DYKEMA RETENTION APPLICATION")

      Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this application (the "Application") for an order under 11 U.S.C. §§ 327(e) and 1107(b) and Fed. R. Bankr. P. 2014 authorizing the employment and retention of Dykema Gossett PLLC ("Dykema") as special counsel to the Debtors, nunc pro tunc to April 1, 2007. In support of this Application, the Debtors submit the declaration and disclosure of Ronald L. Rose, executed on July 26, 2007 (the "Rose Declaration"), and respectfully represent as follows:

Background

A.    The Chapter 11 Filings

      1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  The Court has ordered joint administration of these cases.

    2.  No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the official committee of unsecured creditors, the "Statutory Committees").

    3.  This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

    4.  The statutory predicates for the relief requested herein are sections 327(e) and 1107(b) of the Bankruptcy Code and rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.  Current Business Operations Of The Debtors

    5.  Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company

---

[1]   The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

2

business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.[2]

      6.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

      7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

      8.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however,

---

[2] On March 20 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding. The application was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

3

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006, the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

9.      The Debtors believe that the Company's financial performance has deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

10.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

---

[3]     Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

4

D.      The Debtors' Transformation Plan

11.     On March 31, 2006, the Company outlined five key tenets of its transformation plan.[4] First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.[5] Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.[6] Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.[7] Fourth, the Debtors must transform

---

[4]     In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors, and a plan framework support agreement with those investors and GM. On April 19, 2007, Delphi confirmed that it anticipated negotiating changes to the agreements, primarily as a result of addressing differences in views regarding the Company's reorganization enterprise value among the investors, GM, the Statutory Committees, and the Company. On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework support agreement but that it expected to enter into new framework agreements with plan investors presently. Subsequently, on July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as, Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors"). Under the Delphi-Appaloosa EPCA, which is subject to Court approval, the New Plan Investors would invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization.

[5]     Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM that (a) modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the UAW, and its various locals, (b) provides that GM will undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate these modifications, and (c) modifies retiree welfare benefits for certain UAW-represented retirees of the Debtors. This agreement, which was approved by this Court on July 19, 2007, should facilitate the Debtors' reaching consensual resolutions of their labor issues with the remaining unions and GM and permit the Debtors to continue to implement their transformation plan and to develop, prosecute, confirm, and consummate a plan of reorganization. Delphi is currently engaged in settlement discussions with its second and third largest U.S. labor unions and is working to conclude discussions with those unions as well as three smaller unions as soon as practicable.

[6]     On July 9, 2007, Delphi confirmed that its discussions with GM on a comprehensive settlement agreement had entered the documentation phase and that it expected that a settlement with GM would be incorporated into the Debtors' plan of reorganization rather than filed with this Court for separate approval.

[7]     In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants. The Debtors have been working to divest non-core assets so as to

5

their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.[8]  Finally, the Debtors must devise a workable solution to their current pension situation.[9]

12.     Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

---

maximize the value of the estate for stakeholders.  During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., its chapter 11 affiliate, obtained court approval for the sale of substantially all of the assets of their brake hose and Saltillo, Mexico brake plant businesses, and obtained court approval of bid procedures related to the upcoming sale of substantially all assets used in their catalyst business.  In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

[8]     As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.  The Debtors also made significant progress in ensuring that their organizational and cost structure is competitive in obtaining the entry of this Court's Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order").  The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[9]     To that end, on May 31, 2007, the Bankruptcy Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 plan year funding waivers, which were approved by the IRS, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Plans").  On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively.

6

Relief Requested

13. Dykema is currently retained as a professional utilized by the Debtors in the ordinary course of business in accordance with the provisions of the Order Under 11 U.S.C §§ 327, 330, And 331 Authorizing Retention Of Professionals Utilized by Debtors In Ordinary Course of Business, entered by this Court on November 4, 2005 (the "OCP Order") (Docket No. 883). Paragraph 3 of the OCP Order authorized the Debtors to make monthly payments for fees and expenses to each of the professionals utilized by the Debtors in the ordinary course of business (collectively, the "OCPs") in the ordinary course of business and without further court approval, provided, however, that fees paid to an OCP could not exceed either (a) $50,000 per month for each OCP (the "Monthly OCP Threshold") or (b) $500,000 in the aggregate for each OCP over the course of these chapter 11 cases. Under paragraph 4 of the OCP Order, if the fees payable to any OCP exceeded the Monthly OCP Threshold, the Debtors were required to formally retain such OCP. Because Dykema has recently exceeded, and will probably continue to exceed, the Monthly OCP Threshold, it must be formally retained.[10] By this Application, the Debtors respectfully request the entry of an order under sections 327(e) and 1107(b) of the Bankruptcy Code and Bankruptcy Rule 2014 authorizing the employment and retention of Dykema as special counsel to the Debtor regarding intellectual property, environmental, corporate, and litigation matters.

Basis For Relief

14. The Debtors submit that Dykema's proposed retention meets all the prerequisites for retention of special counsel under section 327(e) of the Bankruptcy Code, which

---

[10] Dykema has exceeded the Monthly OCP Threshold for the months of April and May 2007, and therefore seeks to be retained nunc pro tunc to April 1, 2007.

7

permits a debtor-in-possession, with court approval, to employ counsel for a "specified special purpose" if such employment is in the best interest of the Debtors.

### The Debtors' Employment Of Dykema Is In The Best Interests Of The Estates

15.     On November 10, 2005, the Debtors retained Dykema as an OCP pursuant to the OCP Order and the Affidavit Of Legal Ordinary Course Professional, dated November 10, 2005, a copy of which is attached as Exhibit 1 to the Rose Declaration (the "Ordinary Course Affidavit").  Dykema since then has represented the Debtors in relation to various intellectual property matters as well as in a number of other environmental, corporate, and litigation matters.  As a result of its work on additional matters, Dykema has recently exceeded, and will probably continue to exceed, the Monthly OCP Threshold.  Therefore, the Debtors request that Dykema be formally retained as special counsel to the Debtors in these chapter 11 cases as special counsel to the Debtor regarding intellectual property, environmental, corporate, and litigation matters.

16.     The Debtors believe that the continued employment of Dykema will not duplicate the employment of any of the other professionals retained by the Debtors.  The Debtors understand that Dykema will work with the other professionals retained by the Debtors to avoid any such duplication.

### Services To Be Rendered By Dykema

17.     The Debtors wish to retain Dykema to continue to provide the Debtors with ongoing legal advice and services regarding certain of the Debtors' intellectual property, environmental, corporate, and litigation matters, and related issues (the "Services").

18.     Dykema has indicated its desire and willingness to represent the Debtors as set forth herein and to render the necessary professional services as special counsel to the Debtors.

8

Disinterestedness Of Professionals

19.    Section 327(e) does not require that Dykema and its attorneys be "disinterested persons" as defined in section 101(14) of the Bankruptcy Code.  Rather, section 327(e) of the Bankruptcy Code requires that Dykema not represent or hold any interest adverse to the estates or the Debtors with respect to the matters on which Dykema is to be employed.  As discussed above, the employment of Dykema as special counsel to the Debtors is in the best interests of the Debtors.

20.    The Rose Declaration filed in support of this Application contains information available to date on Dykema's connections with other parties-in-interest, as required by Bankruptcy Rule 2014(a).  According to the Rose Declaration, Dykema, its partners, counsel, and associates do not hold or represent any interest adverse to the Debtors, their creditors, any other party-in-interest in these chapter 11 cases, their respective attorneys and investment advisors, the U.S. Trustee, or any person employed therein, with respect to the matters on which Dykema is to be employed.

21.    Dykema has disclosed to the Debtors that Dykema has in the past represented, currently represents, and likely in the future will represent, certain of the Debtors' creditors and other parties-in-interest in matters unrelated to the Debtors or their chapter 11 cases, and in certain matters related to these chapter 11 cases, but unrelated to the matters on which Dykema is to be employed.  Dykema does not believe that the foregoing raises any actual or potential conflict of interest for Dykema relating to the representation of the Debtors as their special counsel in these chapter 11 cases, but such relationships are disclosed out of an abundance of caution.  The Debtors understand that, to vitiate any actual or potential conflicts of interest, Dykema will not assist the Debtors in connection with their analysis, negotiations, and litigation, if any, with parties with whom Dykema has existing client relationships, and that

Skadden, Arps, Slate, Meagher, & Flom LLP ("Skadden") (or other counsel if Skadden has a conflict), instead, will handle any such tasks.

Professional Compensation

22.     Dykema intends to apply to this Court for compensation and reimbursement of expenses in accordance with sections 330(a) and 331 of the Bankruptcy Code, the Bankruptcy Rules, applicable guidelines established by the U.S. Trustee, and orders of this Court.[11]  Dykema acknowledges that all compensation will be subject to this Court's review and approval, after notice and a hearing.

23.     Under the applicable provisions of the Bankruptcy Code, and subject to the approval of this Court, the Debtors propose to pay Dykema its rates as disclosed in the Rose Declaration and in the Ordinary Course Affidavit.  Dykema's hourly rates for the lawyers expected to provide the Services range from $185 to $625, and the rate for paralegals and most other paraprofessionals range from $145 to $235.  Dykema reserves the right to adjust its hourly rates in accordance with the firm's general adjustment to its attorneys and paraprofessional rates as may be made from time to title.

24.     No arrangement is proposed between the Debtors and Dykema for compensation to be paid in these chapter 11 cases other than as set forth above, in the Ordinary Course Affidavit, and in the Rose Declaration.

25.     At the Debtors' request, Dykema has for a period of time predating this Application assisted the Debtors in connection with some of the Services in its capacity as an OCP, but Dykema has exceeded the Monthly OCP Threshold for work performed on and after

---

[11]     If the requested relief is granted and the Debtors are authorized to employ and retain Dykema as special counsel, effective as of April 1, 2007, Dykema will be required to submit fee applications with this Court for only those periods including and filed following April 1, 2007.

10

April 1, 2007, and hence the Debtors request Dykema's retention under this Application to be effective <u>nunc</u> <u>pro</u> <u>tunc</u> to April 1, 2007.

Conclusion

26.    For the foregoing reasons, the Debtors submit that the employment of Dykema as the Debtors' special counsel on the terms set forth herein is in the best interests of the estates.

Memorandum Of Law

27.    Because the legal points and authorities upon which this Application relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (i) authorizing the Debtors to employ and retain Dykema as their special counsel to perform the Services, <u>nunc</u> <u>pro</u> <u>tunc</u> to April 1, 2007 and (ii) granting the Debtors such other and further relief as is just.

Dated:  New York, New York
         July 27, 2007

                                       DELPHI CORPORATION, on behalf of itself and certain of its subsidiaries and affiliates, as Debtors and Debtors-in-Possession

                                       By:    /s/ John D. Sheehan
                                               Name: John D. Sheehan
                                               Title:  Vice President, Chief Restructuring Officer, and Controller