TOGUT, SEGAL & SEGAL LLP,
Conflicts Counsel for
 Debtors and Debtors in Possession
One Penn Plaza, Suite 3335
New York, NY  10119
(212) 594-5000
Albert Togut (AT-9759)
Neil Berger (NB-3599)

HEARING DATE:          October 25, 2007
HEARING TIME:          10 a.m.
OBJECTION DEADLINE:    October 18, 2007

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                        :
In re                                   :          Chapter 11
                                        :
     DELPHI CORPORATION, *et al.*,      :          Case No. 05-44481 (RDD)
                                        :
                          Debtors.      :          (Jointly Administered)
                                        :
------------------------------------------------------------X

### FIFTH APPLICATION OF TOGUT, SEGAL & SEGAL LLP FOR AN ALLOWANCE OF INTERIM COMPENSATION FOR SERVICES RENDERED AS CONFLICTS COUNSEL FOR THE DEBTORS FOR THE PERIOD FEBRUARY 1, 2007 THROUGH MAY 31, 2007 AND FOR REIMBURSEMENT OF EXPENSES

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

            Togut, Segal & Segal LLP ("TS&S" or "Applicant"), as conflicts counsel for

Delphi Corporation ("Delphi") and the other above-captioned debtors and debtors in

possession (collectively, the "Debtors"), respectfully makes this application (the "Fifth

Application") for an allowance of interim compensation for professional services

rendered during the period of February 1, 2007 through and including May 31, 2007

(the "Fifth Interim Period"), and for reimbursement of expenses incurred in connection

with such services.  In support of this Application, TS&S states:

### PRELIMINARY STATEMENT

            During the Fifth Interim Period, TS&S continued to provide legal services

to assist the Debtors including, without limitation, the settlement of setoff claims, which

were asserted by customers and vendors who sought to withhold payment of an

aggregate of $12,009,519. As part of Applicant's efforts to resolve these claims during

the Fifth Interim Period, Applicant helped the Debtors to identify and collect

approximately $814,000 of trade accounts receivable that were being withheld by setoff

claimants above the amount of their allowable setoff claims. Since the Initial Filing Date

(defined below), Applicant has helped the Debtors to collect more than $33 million of

excess trade accounts receivable from setoff claimants and to settle more than $133

million of setoff claims.

 During the Fifth Interim Period, Applicant also helped the Debtors to

resolve objections to seven proofs of claim by achieving settlements that reduced claims

by more than $17.4 million. Moreover, Applicant helped the Debtors mediate a

comprehensive settlement of claim objections with claimants who agreed to reduce

their proofs of claim by more than $7,000,000.

 In addition, and as more fully described below, TS&S continued to assist

the Debtors with: (i) the enforcement of pre-petition supply agreements to ensure

continued deliveries of product for the Debtors' "just in time" inventory system; (ii) the

resolution of disputes with certain vendors which demanded post-petition payment on

account of pre-petition obligations; and (iii) the enforcement of rights pursuant to the

Debtors D&O policy (defined below).

## I.    FEES AND EXPENSES FOR WHICH ALLOWANCE IS SOUGHT

 1.    This Application is made pursuant to section 331 of title 11 of the

United States Code (the "Bankruptcy Code"), Rule 2016(a) of the Federal Rules of

Bankruptcy Procedure, and the November 4, 2005 Order of the Court establishing

procedures for compensation and reimbursement of professionals, as amended (the

"Administrative Fee Order"), for an allowance of interim compensation for services

rendered to the Debtors during the Fifth Interim Period in the amount of $804,365.50, and for reimbursement of expenses in the amount of $7,223.62.

      2.      TS&S attorneys and paraprofessionals expended a total of 1,610.4[1] hours during the Fifth Interim Period.  A schedule setting forth the number of hours expended by the firm's partners, counsel, associates and paraprofessionals, their respective hourly rates, and the year in which each attorney was admitted to practice is attached as Exhibit "1."  A schedule specifying the type of expenses for which TS&S is seeking reimbursement and the total amount of each category is attached as Exhibit "2." To the extent that time or disbursement charges for services rendered or disbursements incurred relate to the Fifth Interim Period, but are not processed until after the date of this Application, TS&S reserves the right to request additional compensation and reimbursement in a future application.

      3.      TS&S maintains computerized records of the daily time slips completed by all attorneys and paraprofessionals.  Preceding the time entries is a chart listing the names, billing rates and time spent by each of the attorneys and paraprofessionals rendering services on behalf of the Debtors.  In support of this Application, copies of these computerized records, together with a computer generated detailed itemization of the expenses incurred, have been filed electronically with the Bankruptcy Court for the Southern District of New York (the "Court") as a supplement to this Application and furnished to the service parties who are identified in the Administrative Order.

---

[1]      Consistent with this Court's General Order M-151, Section E, Applicant has reviewed its monthly invoices for the Fifth Interim Period and has deemed it appropriate to delete and/or correct time entries by certain timekeepers, resulting in a reduction of Applicant's request for compensation for the Fifth Interim Period by $246.00.  See Exhibit "3" annexed hereto.

4.      On April 26, 2006, TS&S filed its first application (the "First Application") for an award of interim compensation in the amount of $789,874 and reimbursement of expenses of $14,531.15 for the period of October 8, 2005 through and including January 31, 2006 (the "First Interim Period").

5.      On July 27, 2006, TS&S filed its second application (the "Second Application") for an award of interim compensation in the amount of $1,045,443.50 and reimbursement of expenses of $13,940.08 for the period of February 1, 2006 through and including May 31, 2006 (the "Second Interim Period").

6.      On December 5, 2006, TS&S filed its third application (the "Third Application," together with the First Application and the Second Application, the "Prior Applications") for an award of interim compensation in the amount of $776,175.50 and reimbursement of expenses of $4,879.63 for the period of June 1, 2006 through and including September 30, 2006 (the "Third Interim Period," together with the First Interim Period and the Second Interim Period, the "Prior Interim Periods").  Pursuant to an Order of the Court dated December 11, 2006, the hearing to consider the Prior Applications was scheduled for February 15, 2007.

7.      Pursuant to Orders dated February 15, 2007, TS&S was awarded: (i) $781,058 for legal fees and $14,531.15 for reimbursement of expenses requested in the First Application;  (ii) $1,036,627.50 for legal fees and $13,940.08 for reimbursement of expenses requested in the Second Application;  and (iii) $767,359.50 for legal fees and $4,879.63 for reimbursement of expenses requested in the Third Application.

8.      Pursuant to an Order of the Court dated December 11, 2006, the Debtors were authorized to pay all amounts held back during the Prior Interim Periods to applicants once they resolved objections and/or comments that were made to their

4

respective fee applications by the Joint Fee Review Committee (the "Fee Committee") in this case.  TS&S reached such a resolution with the Fee Committee.

9.    On March 30, 2007, TS&S filed its fourth application (the "Fourth Application") for an award of interim compensation in the amount of $593,308 and reimbursement of expenses of $5,790.70 for the period of October 1, 2006 through and including January 31, 2007 (the "Fourth Interim Period").  Pursuant to an Order of the Court dated June 27, 2007, TS&S was awarded $566,308 for legal fees and $5,790.70 for reimbursement of expenses requested in the Fourth Application.[2]

10.    Other than the payments made by the Debtors to TS&S for fees and expenses incurred during the Prior Interim Periods and the Fourth Interim Period pursuant to the Administrative Fee Order, as amended, and disclosed in the Prior Applications, and those payments described below made during the Fifth Interim Period in accordance with the terms of the Administrative Fee Order, TS&S has not received payment of compensation or reimbursement of expenses in this chapter 11 case.

11.    Pursuant to the Administrative Fee Order, TS&S submitted four (4) monthly invoices during the Fifth Interim Period:  (i) for February 1, 2007 through February 28, 2007 in the amounts of $117,445 for fees and $688.54 for expenses;  (ii) for March 1, 2007 through March 31, 2007 in the amounts of $278,060.50 for fees and $2,680.64 for expenses;  (iii) for April 1, 2007 through April 30, 2007 in the amounts of $220,694.50 for fees and $2,440.52 for expenses;  and (iv) for May 1,  2007 through May 31, 2007 in the amounts of $188,400.50 for fees and $1,413.92 for expenses.

---

[2]    The amount awarded by the Court reflects a voluntary reduction of $27,000 by TS&S after consultation with the Fee Committee.  Pursuant to the June 27, 2007 Order, holdbacks for the Fourth Interim Period are being released.

12.    As of the date hereof and in accordance with the Administrative Fee Order, TS&S has received payment from the Debtors representing 80% of its fees and 100% of its expenses through and including the period of March 2007.  TS&S has not yet received any payments from the Debtors for fees and expenses for services rendered during April and May 2007.

13.    As confirmed by the Certification of Neil Berger, a member of TS&S, attached as Exhibit "4," all of the services rendered by TS&S during the case for which interim compensation is sought herein were rendered for and on behalf of the Debtors in connection with their chapter 11 cases.

## II.    RETENTION OF TS&S[3]

14.    TS&S was retained by the Debtors just prior to the Initial Filing Date in October 2005 to serve as conflicts counsel and to work with the Debtors' lead bankruptcy counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden").  TS&S is responsible for handling all bankruptcy-related matters where Skadden has an actual or perceived conflict, and discrete tasks assigned by Skadden that can be more efficiently handled by TS&S.  TS&S has not received a retainer.

15.    By Order dated November 4, 2005, the Debtors were authorized to retain TS&S on a final basis (Docket No. 1034).

16.    Since its retention and through the Fifth Interim Period, TS&S and Skadden have continued to carefully coordinate their efforts and their work is complementary.[4]

---

[3]    A description of the Debtors' business operations and the commencement of the Debtors' chapter 11 cases is contained in the First Application and other pleadings filed in this Court.

[4]    A description of TS&S' qualifications to provide services to the Debtors is set forth at length in the First Application, and that description is incorporated herein by reference.

17. All of the work summarized in this Fifth Application for which TS&S seeks interim compensation was performed efficiently, at the lowest cost to the Debtors' estates, and with minimal duplication of services in an effort to keep the administration expenses to a minimum. TS&S staffed its projects in a manner that would permit it to bill fewer hours than would have otherwise been possible.

## III. SERVICES RENDERED BY TS&S DURING THE FIFTH INTERIM PERIOD

18. All of the professional services provided by TS&S are set forth in TS&S' computerized time records, and the Court is respectfully referred to those records for the details of all of the work performed.

19. Prior to the filing of the Debtors' chapter 11 cases, the Debtors and Skadden determined that a clear division of litigation-related duties was necessary to avoid potential conflicts that might have arisen had Skadden had been responsible for the resolution of all such matters.

20. During the Fifth Interim Period, TS&S continued to take primary responsibility for representing the Debtors in the various matters, among others, that would not be addressed by Skadden including:

    (a) motions and demands made by creditors asserting setoff and/or recoupment rights pursuant to section 553 of the Bankruptcy Code and this Court's DIP Financing Orders dated October 28, 2005 and January 5, 2007 (together, the "DIP Orders");

    (b) objections to proofs of claim filed in the Debtors' cases;

    (c) motions and demands by parties-in-interest for relief from the automatic stay pursuant to section 362 of the Bankruptcy Code (the "Automatic Stay");

    (d) issues related to the Essential Supplier Motion (as defined below), including the resolution of Orders to

Show Cause addressing payments made to non-conforming suppliers;

(e)    issues concerning potential injunction litigation with various suppliers to prevent cessation of shipment of products necessary for uninterrupted manufacturing activities of the Debtors;

(f)    efforts to collect amounts due to the Debtors; and

(g)    the prosecution of an adversary proceeding on behalf of the Debtors to enforce coverage rights under one of their D&O Policies.

A.    **Setoff Issues:**

21.    As part of their negotiations regarding post-petition financing, the Debtors included a detailed mechanism in the DIP Orders to enable the Debtors' suppliers to exercise setoff claims and/or recoupment rights regarding their pre-petition payables, subject to certain conditions.  Following the procedures contained in the DIP Orders, a supplier may seek to exercise a setoff right that arose during the Debtors' ordinary course of business without such assertion being subject to section 362 of the Bankruptcy Code.[5]  Setoffs that are subject to the DIP Orders may include claims arising out of, for example, pre-petition warranty and/or product recall, customer adjustments, customer rebates and allowances, overpricing, short shipments and credits for damaged goods.

22.    Any claimant that seeks to exercise setoff rights must submit a written request with supporting documentation to the Debtors and the Official Committee of Unsecured Creditors (the "Committee") (with a copy to JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), as Administrative Agent for the Debtors).  If within 10

---

[5]    Nothing contained herein is meant to modify the provisions of the DIP Orders or any right or obligation of any party thereunder.

business days after sending such request, unless the parties extend that time, the Debtors and any particular claimant have failed to agree on the allowed amount of a requested setoff, they may seek resolution of the matter through an agreed-upon mediator or the Court.  If the mediator cannot resolve the dispute within thirty days, the parties may submit the matter to binding arbitration.

23.    At the end of the Fifth Interim Period, 98 non-General Motors claimants had asserted one or more setoff claims.  The Debtors received five new setoff demands seeking approximately $4 million during the Fifth Interim Period, and TS&S continued to devote substantial time assisting the Debtors with the continued resolution of the setoff and/or recoupment requests.

24.    During the Fifth Interim Period, Applicant worked with the Debtors and FTI Consultants, Inc. ("FTI"), the Debtors' financial advisors, to resolve 17 setoff demands, which sought an aggregate of approximately $12 million.  None of the resolutions that TS&S negotiated during the Fifth Interim Period required Court intervention, mediation or arbitration.

25.    Moreover, Applicant assisted the Debtors in identifying setoff claimants who had been holding accounts payable for amounts exceeding their setoff demands.  Applicant obtained agreements with those setoff claimants and collected approximately $814,000 of accounts receivable[6], while preserving all of the Debtors' rights to challenge such claimants' setoff rights and to pursue additional accounts receivable claims.

---

[6]    Since the Initial Filing Date, TS&S has assisted in the collection of more than $33 million of accounts receivable from setoff claimants.

9

26.    To effectively resolve these setoff demands, TS&S continued to (i) regularly communicate with the Debtors' personnel to facilitate their ability to obtain and analyze data needed to reconcile the amounts of the receivables against the payables owed to the setoff claimants;  (ii) assist in the claim objection/reconciliation process;  (iii) develop strategies for responding to setoff motions and prepare for possible litigation if settlement negotiations failed;  (iv) engage in negotiations with counsel for the setoff claimants;  and (v) conduct necessary legal and factual research regarding issues raised in the motions and letter demands.

27.    TS&S also continued to work with the Debtors to ensure that mutuality existed to prevent setoffs.  In instances where the amounts to be setoff have involved a pre-petition overpayment by the Debtors, TS&S has conducted necessary forensic/factual and legal research.

28.    During the Fifth Interim Period, TS&S continued to have primary responsibility for all of the unresolved setoff claims that have been asserted pursuant to the DIP Orders, except those made by General Motors.  Recognizing the number and size of setoff demands made by vendors and the relationship that setoff claims have to other areas of the Debtors' cases (such as claims reconciliation), it has been necessary for the Debtors, TS&S, Skadden and FTI to continue to communicate with each other regularly to know the status of the setoff demands.  TS&S provides periodic status reports to the Debtors, FTI and Skadden concerning progress made in the resolution of setoff claims.

29.    Throughout the Fifth Interim Period, the Debtors, TS&S and FTI participated in weekly status calls with the Debtors to review pending setoff demands and to help coordinate the participants' efforts.  During these calls, among other things, the parties:  (i) discussed new demands that the Debtors received (including an analysis

of the merits of each new demand);  (ii) monitored the status of the Debtors' and setoff

claimant's exchange of information to reconcile the accounts;  (iii) analyzed the factual

and legal issues implicated by the demands;  and (iv) developed uniform strategies on

behalf of the Debtors regarding each of the demands.  These calls have proven essential

in safeguarding the Debtors' interests because they have permitted TS&S to efficiently

address the setoff demands without duplicating the efforts of Skadden or the Debtors.

30.     The services provided by TS&S to assist the Debtors in the

resolution of setoff claims has been highly beneficial and efficient:  during the Fifth

Interim Period, 17 claims seeking to setoff approximately $12 million against trade

receivables were resolved and concluded, and the Debtors collected approximately

$814,000 of trade accounts receivable that were withheld by setoff claimants.

31.     As claim objections continue to be made by the Debtors, setoff

demands continue to be asserted, and TS&S continues to assist the Debtors as they

review, analyze and resolve setoff demands.

**B.     Claims**

**1.     Pre-Petition Claims**

32.     One of the targets of the framework to facilitate the Debtors'

successful emergence is to reduce the aggregate of certain pre-petition trade and other

unsecured claims to $1.7 billion or less.  As of January 31, 2007, more than 16,500 proofs

of claim and scheduled liabilities sought liquidated and unliquidated amounts from the

Debtors for amounts in excess of $1.7 billion.  Before and during the Fifth Interim

Period, the Debtors asked TS&S to assist them and their other retained professionals in

the claims objection and resolution process.

33.    During the Fifth Interim Period, TS&S helped resolve claims asserted by parties (a) with whom Skadden had a conflict and (b) with whom TS&S negotiated setoff and other settlements.  As part of that process, TS&S (i) regularly communicated with the Debtors' personnel to facilitate their ability to obtain and analyze data needed to reduce and expunge claims;  (ii) assisted in the claim objection/reconciliation process;  (iii) engaged in settlement negotiations with counsel for claimants;  (iv) prepared for possible litigation if settlement negotiations failed; (v) conducted necessary legal and factual research regarding issues raised by claimants; and (vi) participated in weekly claims administration and strategy calls with the Debtors and Skadden to monitor developments in the claims process and to avoid duplication of services.

34.    TS&S assisted the Debtors and negotiated settlement agreements and Joint Stipulations and Agreed Orders with claimants to (a) disallow and expunge duplicative claims, (b) withdraw contingent, unliquidated and protective claims, (c) migrate claims asserted against incorrect debtors to appropriate debtor estates, and (d) reduce claims.

35.    Among the claims withdrawn, expunged or reduced as a result of services provided by TS&S to the Debtors were:  (i) claim number 14180, filed against Delphi by SBC Global Services and which totaled nearly $16.25 million was reduced and capped in the amount of $341,676.55 pursuant to a Joint Stipulation and Agreed Order, and then disallowed and expunged in its entirety; (ii) claim number 12935, filed by Textron Financial Corporation in the amount of $288,679.23, was disallowed and expunged in its entirety pursuant to a Joint Stipulation and Agreed Order;  and (iii) claim number 2299, filed by Constellation New Energy-Gas Division, LLC in the amount of $93,001.07 and claim number 2300 filed by Constellation NewEnergy, Inc. in

12

the amount of $793,411.29, were both disallowed and expunged in their entirety
pursuant to a Joint Stipulation and Agreed Order.  All of those claim reductions were
negotiated and achieved by TS&S without the need for any Court intervention.

36.    To date, TS&S has submitted Joint Stipulations and Orders
reducing or expunging seven claims filed against the Debtors by more than $17.4
million.  Moreover, during the Fifth Interim Period, TS&S continued to assist the
Debtors by negotiating additional Joint Stipulations and Orders that will be submitted
for Court approval in subsequent fee periods.

### 2.    Wachovia Administrative Expense Motion

37.    In addition to assistance to the Debtors with the resolution of the
pre-petition claims discussed above, TS&S assisted the Debtors in the resolution of the
Motion by Wachovia Bank, N.A. for allowance and payment of an administrative
expense claim and Request for Payment (the "Wachovia Administrative Expense
Motion").  On March 21, 2007, Wachovia filed its Administrative Expense Motion and
sought the allowance and payment of an administrative expense claim in the amount of
$1,695,387.23 on account of (i) payments that were alleged to be have been due from the
Debtors to Vanguard Distributors, Inc. ("Vanguard"), one of Wachovia's borrowers,
and which was expected to fund Vanguard's payments to certain of the Debtors' Tier II
suppliers and (ii) Vanguard's management fees.

38.    TS&S worked closely with the Debtors to review their pre- and
post-petition business relationship with Vanguard and the communications between
the Debtors, Vanguard, and Wachovia concerning the amounts sought in the Wachovia
Administrative Expense Motion.  While conducting a factual investigation, and
although TS&S sought to achieve a consensual resolution of Wachovia's Motion, TS&S
also researched the legal bases to oppose the relief sought by Wachovia.

39.    Ultimately, TS&S provided Wachovia with a factual and legal presentation which demonstrated why the administrative claims that it was pursuing as successor to Vanguard had no merit.  On May 24, 2007, Wachovia filed its Notice of Withdrawal of the Administrative Expense Motion.  By negotiating the withdrawal of the Wachovia Administrative Expense Claim, TS&S eliminated the $1.7 million administrative claim sought by Wachovia.

### 3.    **Wachovia Stay Motion**

40.    On July 14, 2006, Lextron Corporation filed proofs of claim numbers 9524 ("Claim 9524") and 9807 ("Claim 9807") (together, the "Lextron Claims") against Delphi and Delphi Automotive Systems, LLC ("DAS LLC"), respectively, and asserted an unsecured non-priority claim in the amount of $800,000, plus incidental and punitive damages in amounts to be determined.  Lextron asserted that Delphi and DAS LLC wrongfully terminated Lextron as a supplier.  Lextron asserted its claims for damages in counterclaims against DAS LLC in a replevin action that DAS LLC commenced against Lextron in the United States District Court for the Southern District of Mississippi (Jackson) (the "Mississippi Federal Court Action") during March 2003.

41.    On July 31, 2006, Wachovia Bank, N.A., as successor by merger to SouthTrust Bank, filed proofs of claim numbers 14912 ("Claim 14912") and 14913 ("Claim 14913") (together, the "Wachovia Claims") against Delphi and DAS LLC, respectively, as unsecured non-priority claims, each in the amount of $6,656,624.92. Wachovia first asserted its Claims in a Complaint, as amended, in its action against the Debtors and Larry Graves, one of the Debtors' employees, in the Circuit Court for the Second Judicial District of Hinds County Mississippi (the "Mississippi State Court Action") to recover compensatory damages, attorneys' fees and costs, and punitive damages.

42.    On October 31, 2006, the Debtors objected to the Lextron Claims pursuant to the Debtors' (i) Third Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (a) Claims With Insufficient Documentation, (b) Claims Unsubstantiated By Debtors' Books And Records, And (c) Claims Subject To Modification And (ii) Motion To Estimate Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (Docket No. 5452) (the "Third Omnibus Claims Objection").  On November 22, 2006, Lextron filed its Response to Debtors' Third Omnibus Claims Objection (Docket No. 5757).

43.    Subsequently, on April 27, 2007, the Debtors objected to Wachovia's Claim 14912 pursuant to the Debtors' (i) Twelfth Omnibus Objection (Procedural) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (a) Duplicate and Amended Claims and (b) Equity Claims (Docket No. 7824) (the "Twelfth Omnibus Claims Objection").

44.    On April 27, 2007, the Debtors objected to Wachovia's Claim 14913 pursuant to the Debtors' (i) Thirteenth Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (a) Insufficiently Documented Claims; (b) Claims Not Reflected on Debtors' Books and Records; (c) Protective Insurance Claims; (d) Insurance Claims Not Reflected on Debtors' Books and Records; (e) Untimely Claims and Untimely Tax Claims;  and (f) Claims Subject to Modification, Tax Claims Subject to Modification, and Claims Subject to Modification and Reclamation Agreement (Docket No. 7825) (the "Thirteenth Omnibus Claims Objection").  On May 24, 2007, Wachovia filed its Response to Debtors' Thirteenth Omnibus Claims Objection (Docket No. 8025).

45.    Thereafter, on November 29, 2006, Wachovia filed its Motion (the "Stay Relief Motion") for an Order pursuant to 11 U.S.C. § 362 to modify the automatic

15

stay to proceed with litigation against Mr. Graves in the Mississippi State Court Action
(Docket No. 5951).

46.    Delphi advised Wachovia that the Debtors objected to the
Wachovia Claims.  Delphi and Wachovia agreed to attempt to mediate a settlement of
that objection and they selected the Honorable Francis G. Conrad (Retired) to serve as
mediator.  TS&S worked with the Debtors to prepare and submit a written mediation
statement to Judge Conrad.

47.    On March 16, 2007, TS&S attended a full-day mediation session in
Jackson, Mississippi with DAS LLC and Wachovia.  However, that mediation session
ended without a settlement.  Thereafter, Judge Conrad presided over continued
negotiations, which occurred by telephone conferences and other communications
throughout March and April 2007.  The parties were still unable to settle.

48.    After the parties' mediation ended in an impasse, Wachovia
expressed a desire to proceed in this Court with its Stay Relief Motion.  Consequently,
TS&S was required to research and prepare an objection to the Stay Relief Motion.  As
part of that process, TS&S consulted with the Debtors' state court counsel in the
Mississippi State Court Action to identify the factual and legal bases to prepare the
Debtors' Objection.  TS&S prepared, filed and served the Debtors' Objection.

49.    TS&S appeared before this Court in opposition to the Stay Relief
Motion on April 20, 2007, and at the conclusion of that hearing, the Court denied the
Stay Relief Motion.  On May 2, 2007, this Court entered its Order denying the Stay
Relief Motion in its entirety (the "Order Denying Stay Relief") (Docket No. 7840).

50.    Based upon this Court's bench ruling and the Order Denying Stay
Relief, on May 3, 2007, Graves filed his Motion for Expenses and Fees against Wachovia

in the Mississippi State Court Action (the "Sanctions Motion"), and on June 1, 2007,
Wachovia filed its Response to the Sanctions Motion.

51.     Thereafter, by a Notice of Appeal, dated May 11, 2007, Wachovia
appealed (the "Wachovia Appeal") from the Order Denying Stay Relief to the United
States District Court for the Southern District of New York (the "New York District
Court").  TS&S prepared, filed and served a Designation of additional items to be
included in the record on appeal.

52.     On June 18, 2007, the parties attended a continued mediation,
which this time included Lextron, and which was conducted and supervised by Judge
Conrad in New York City.  The mediation was successful and Delphi, Wachovia and
Lextron reached a global settlement which resolved:  the Third, Twelfth and Thirteenth
Omnibus Claims Objections regarding to the Wachovia Claims and the Lextron Claims;
the Mississippi State Court Action;  the Mississippi Federal Court Action;  the Wachovia
Appeal;  and the Sanctions Motion.

53.     After diligence and extensive arms-length negotiations among the
Debtors, Wachovia and Lextron, and under the supervision of Judge Conrad, the parties
executed the Settlement Agreement, the significant portions of which are[7]:

    a)  Reduce Wachovia Claim number 14913 from approximately $6.5
million to $500,000 and expunge Wachovia Claim number 14912;

    b)  Withdraw all of the Lextron Claims;

    c)  Exchanged mutual releases, including a release to Mr. Graves,
pertaining to the facts arising in the Wachovia and Lextron Claims;

    d)  Withdraw the Sanctions Motions;

---

[7]     This Application provides a summary of the Settlement Agreement.  The provisions of the
Settlement Agreement govern the Parties' agreement.

e)  Discontinue the Mississippi State Court Action and the Mississippi Federal Court Action;  and

f)  Dismiss the Wachovia Appeal.

54.    In light of the parties' proposed settlement, on June 25, 2007, the New York District Court entered a Consent Order and stayed the Wachovia Appeal and tolled all briefing deadlines.

55.    Given the significant cost of litigation regarding the Wachovia Claims and the Lextron Claims, the results of which were not certain, the reduction of Claim 14193 by $6,156,625.00, the elimination of duplicate Claim No. 14912, and the elimination of the Lextron Claims, each totaling at least $800,000, along with the dismissal of the Wachovia Appeal and Mississippi litigations, the Debtors concluded that the Settlement Agreement was fair and reasonable and in the best interests of the Debtors and their creditors.

56.    Based on these considerations, TS&S prepared the Debtors' Motion for an Order pursuant to Bankruptcy Rule 9019 approving the parties' Settlement Agreement and appeared before this Court at the July 19, 2007 Omnibus Hearing, at the conclusion of which, the Court approved the Settlement Agreement.

B.    **Automatic Stay Issues:**

57.    During the Fifth Interim Period, TS&S continued to share responsibility in addressing contested motions filed by parties-in-interest for relief from the Automatic Stay.  To resolve these requests, TS&S:  (i) had telephone conferences with the Debtors' in-house attorneys and business representatives to discuss strategy for settlement and/or potential responses to the motions;  (ii) communicated with counsel for movants to discuss legal issues that were implicated by their clients' motions and attempted to negotiate consensual resolutions;  (iii) reviewed documents

provided by the Debtors and counsel to the movants (e.g., term sheets, contracts, related pleadings, etc.);  and (iv) performed legal research, when necessary.

**C.**    **Injunction Issues:**

58.    During the Fifth Interim Period, Applicant continued to prepare pleadings at the request of the Debtors and Skadden to enjoin suppliers who threatened to stop shipping parts, despite enforceable "sole source" contracts with the Debtors.

59.    Generally, the Debtors contracted with their suppliers to purchase parts at a specific time, which is often tied directly to the production run of a particular Original Equipment Manufacturer ("OEM") vehicle.  These requirements contracts generally take the form of purchase orders, which constitute the Debtors' requirements for a particular product over a specified period of time.  The Debtors' standard General Terms and Conditions (the "Terms and Conditions") are incorporated into these contracts.  The Terms and Conditions provide that if a supplier "commences any of the work or services which are the subject of this Contract, [supplier] will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification."  The Terms and Conditions also contain the supplier's acknowledgment that in the event of an actual, anticipatory or threatened breach of the contract, the Debtors are entitled to specific performance and injunctive or other equitable relief.

60.    During the Fifth Interim Period, certain suppliers threatened to stop shipping parts to the Debtors.  These suppliers asserted, among other things, that the price increases in raw materials made it unprofitable for them to continue to meet the Debtors' requirements.  The consequences of a supplier unilaterally stopping shipment of parts would have been catastrophic.  The Debtors' manufacturing facilities would be forced to shut down within a matter of days after the missed shipment.

Within one to two days after a shutdown of one of the Debtors' facilities, the Debtors' OEM customers would likely be forced to halt production of their products on one or more of their assembly lines. A shutdown of even one assembly line of an OEM could cause the manufacturer millions of dollars of damages which would be asserted against the Debtors.

61.     Consequently, when it was required, Applicant prepared comprehensive pleadings against several suppliers that had threatened to stop shipments. These pleadings sought temporary, preliminary and permanent relief to: (i) enjoin the suppliers from breaching, terminating, or attempting to terminate the pre-petition requirements contracts between the suppliers and the Debtors; and (ii) direct the suppliers to continue to perform under those contracts. For each supplier, Applicant drafted a complaint, motion for a temporary restraining order, a memorandum of law, and a proposed Order. Applicant was prepared to file those documents with the Court in the event that the Debtors were not able to negotiate acceptable business solutions with their suppliers and in that regard, litigation support was unavoidable.

62.     To date, the Debtors' negotiations with suppliers who threatened to stop shipments, with assistance from Applicant, have been successful. No injunction pleadings have had to be filed, in part because the suppliers' knew that the Debtors and TS&S were prepared to seek expedited relief from this Court.

**D.     Accounts Receivable**

63.     Throughout the Fifth Interim Period, Applicant continued to assist the Debtors in their efforts to collect account receivable.

### i.    Askys Adversary Proceeding:

64.    On August 1, 2006, TS&S commenced an adversary proceeding on behalf of Delphi Medical Systems Colorado Corporation ("DMSCC") against Aksys (the "Aksys Proceeding") to: (a) compel the turnover and payment of $4,008,576.38 plus all interest accrued thereon from June 5, 2006 pursuant to section 542(b) of the Bankruptcy Code; and (b) disallow any claims in favor of Aksys in the Debtors' chapter 11 cases pursuant to Bankruptcy Code section 502(d).

65.    On August 28, 2006, Aksys demanded that, in accordance with section 27 of its written agreement with DMSCC, the issues raised in the Aksys Proceeding be decided pursuant to binding arbitration at the American Arbitration Association in Chicago, Illinois. Aksys also demanded that DMSCC voluntarily dismiss the Aksys Proceeding.

66.    DMSCC agreed to the Aksys arbitration demand, but it did not agree to dismiss the Aksys Proceeding. The parties entered into a Stipulation, which was "So Ordered" by the Court on October 24, 2006, and agreed to continue negotiations.

67.    In a series of conversations between the parties in late November and early December 2006, Aksys indicated to DMSCC that it was financially distressed and not able to pay the entire amount of the Receivable. TS&S sought and obtained financial disclosure from Aksys following the negotiation and execution of a confidentiality agreement governing the review and use of such documents, including the Committee's review of the documents provided by Aksys.

68.    Ultimately, Aksys failed to participate in the selection of an arbitrator or otherwise engage in settlement negotiations. Consistent with the Court's

October 24, 2006 Stipulation and Order, TS&S made written demand upon Askys for an Answer in the Askys Proceeding.

69.    Askys failed to file and serve an Answer in the Aksys Proceeding and Applicant prepared, filed and served a Notice of Proposed Order granting a default judgment, which was entered by the Court on July 18, 2007 in the amount of $4,800,576.38.

### ii.    Miscellaneous Accounts Receivable

70.    During the Fifth Interim Period, the Debtors asked TS&S to assist them in the collection of accounts receivable from various customers and shippers. TS&S worked with the Debtors to review and analyze foundation documents and information in support of these accounts receivable claims, and prepared and sent demand letters to account debtors.

71.    TS&S engaged in telephone conferences with numerous parties from whom the Debtors sought payment, and participated in status calls and conferences with the Debtors regarding those negotiations.

### E.    Insurance Issues:

### i.    National Union Adversary Proceeding:

72.    On or about February 5, 2004, National Union Fire Insurance Company of Pittsburgh, PA ("National Union") issued to the Debtors the Delphi Executive and Organization Liability Insurance policy number 931-88-56 (the "D&O Policy") and the Delphi Employee Benefit Plan Fiduciary Liability Insurance, policy number 931-88-61 (the "Fiduciary Policy"). A dispute arose between the Debtors and National Union regarding National Union's obligation to provide coverage for certain fees and expenses that the Debtors incurred in connection with certain investigations by the Securities and Exchange Commission ("SEC"). After settlement negotiations failed,

Applicant prepared and filed a Complaint on behalf of the Debtors for Declaratory

Judgment against National Union on January 31, 2007 (the "National Union

Complaint").[8]

73.    Pursuant to its obligations to its current and former officers,

directors and employees, and for its own defense, Delphi paid the reasonable fees, costs

and expenses charged by professionals that were retained in connection with the SEC

investigation.  In addition, pursuant to the Debtors' obligations pursuant to their by-

laws, the Debtors advanced the reasonable costs and expenses charged by counsel for

certain of its current and former directors, officers and employees in connection with

the SEC investigation.

74.    In March of 2005, the Debtors announced that they intended to

restate certain of its filed financial disclosures (the "Restatement Announcement").  The

Restatement Announcement triggered the filing of numerous lawsuits against the

Debtors and certain of their current and former directors, officers and employees,

including securities fraud actions and derivative litigation (collectively, the "Securities

and Derivative Litigation") and Employee Retirement Income Security Act actions (the

"ERISA Actions").

75.    The Debtors retained and paid counsel to defend the Debtors and

certain of its current and former directors, officers and employees in response to the

Securities and Derivate Litigation and the ERISA Actions.  In addition, pursuant to the

Debtors' obligations to its current and former directors, officers and employees, and

subject to the Bankruptcy Court's Order dated October 8, 2005, the Debtors advanced

---

[8]    Nothing contained here is intended to constitute or may be construed to constitute a waiver of
any of the Debtors' rights, claims or defenses, all of which are expressly preserved.

the fees, costs and expenses of certain of their current and former directors, officers and employees in response to the Securities and Derivative Litigation and the ERISA Actions.

76.    Between October 14, 2005, when the SEC issued its first subpoena to a former officer of the Debtors concerning the allegations asserted in the SEC's formal order of investigation, and January 31, 2007, when the National Union Complaint was filed, the Debtors expended approximately $19 million to jointly defend itself and, pursuant to its obligations, certain of its current and former directors, officers, and employees, in response to the SEC investigation, the Securities and Derivate Litigation and the ERISA Actions.

77.    National Union refused to reimburse the Debtors in full, or to pay on behalf of the Debtors and their directors, officers and employees, costs paid by the Debtors in excess of the retention under the D&O Policy.

78.    In late December 2006, after negotiations regarding the scope of National Union's obligations to the Debtors were unsuccessful, the Debtors asked TS&S to commence an adversary proceeding in this Court for declaratory relief regarding National Union's obligations under the D&O Policy.  TS&S coordinated with Delphi and Delphi's insurance counsel, Neal, Gerber & Eisenberg LLP ("Neal Gerber"), and prepared the National Union Complaint.

79.    During the Fourth Interim Period, TS&S reviewed documents and analyzed correspondence and conferred with Neal Gerber to frame and limit the issues for which declaratory relief was needed.  Additionally, TS&S reviewed the terms of the D&O Policy and the Fiduciary Policy in light of the allegations made by the SEC, and in the various complaints filed in the Securities and Derivate Litigation and the ERISA

Actions, to ascertain that coverage was available to the Debtors in excess of the National Union coverage that had been provided to date.

80.     During the Fifth Interim Period, the Debtors and National Union agreed that, in light of the alternative dispute resolution provisions of the D&O Policy, the parties would seek to resolve the National Union Complaint either through mediation or by arriving at a settlement outside of the mediation process.  TS&S helped the Debtors to form a framework for those negotiations.

**F.     Miscellaneous Matters Addressed by TS&S:**

81.     In addition to the matters discussed above, TS&S rendered services for, or on behalf of, the Debtors in connection with other miscellaneous matters during the Fifth Interim Period, such as:

(a)     reviewing various motions and other pleadings filed with the Court regarding case and project strategy;

(b)     participating in numerous (i) "task" and senior strategy calls;  and (ii) status and strategy meetings with the Debtors, the Debtors' professionals, and the Committee;

(c)     attending omnibus hearings and addressing various matters at such hearings;

(d)     attending meetings with the Debtors and the statutory committees in these cases;

(e)     preparing and regularly updating status charts for Debtors regarding assorted matters;

(f)     conferring with Skadden regarding the delegation of responsibilities of certain matters to TS&S to ensure no duplication of effort between the two firms;  and

(g)     frequently communicating with various third parties, including the Court, the United States Trustee, the Committee and individual creditors and other parties-in-interest concerning the status, conduct and administration of the Debtors' chapter 11 cases.

## IV.     THE COMPENSATION REQUESTED

82.     There are numerous factors to be considered by the Court in determining allowances of compensation.  *See, e.g.*, *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir.), *cert. denied*, 431 U.S. 904 (1977);  *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974);  *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13 (Bankr. S.D.N.Y. 1991).  *See also In re Nine Associates, Inc.*, 76 B.R. 943 (S.D.N.Y. 1987);  *In re Cuisine Magazine, Inc.*, 61 B.R. 210 (Bankr. S.D.N.Y. 1986).

83.     The perspective from which an application for an allowance of compensation should be viewed in a reorganization case was aptly stated by Congressman Edwards on the floor of the House of Representatives on September 28, 1978, when he made the following statement in relation to section 330 of the Bankruptcy Code:

> [B]ankruptcy legal services are entitled to command the same competency of counsel as other cases.  In that light, the policy of this section is to compensate attorneys and other professionals serving in a case under title 11 at the same rate as the attorney or other professional would be compensated for performing comparable services other than in a case under title 11.  Contrary language in the Senate report accompanying S.2266 is rejected, and *Massachusetts Mutual Life Insurance Company v. Brock*, 405 F.2d 429, 432 (5th Cir. 1968) is overruled.  Notions of economy of the estate in fixing fees are outdated and have no place in a bankruptcy code.

124 Cong. Rec. H11,092 (daily ed. Sept. 28, 1978) (emphasis added).  *See also In re McCombs*, 751 F.2d 286 (8th Cir. 1984);  *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13 (Bankr. S.D.N.Y. 1991);  *In re Carter*, 101 B.R. 170 (Bankr. D.S.D. 1989);  *In re Public Service Co. of New Hampshire*, 93 B.R. 823, 830 (Bankr. D.N.H. 1988);  *In re White Motor Credit Corp.*, 50 B.R. 885 (Bankr. N.D. Ohio 1985).

84.    In awarding compensation pursuant to section 330 of the

Bankruptcy Code to professional persons employed under section 327, the Court must

take into account, among other factors, the cost of comparable non-bankruptcy services.

Section 330 of the Bankruptcy Code provides, in pertinent part, for payment of:

- reasonable compensation for actual, necessary
  services rendered by the trustee, examiner,
  professional person, or attorney and by any
  paraprofessional persons employed by such person;
  and

- reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).

85.    As the court in *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13

(Bankr. S.D.N.Y. 1991), stated:

> With due recognition of the historical position of Bankruptcy
> Courts in compensation matters, we recognize that creditors
> have agreed to pay rates for retained counsel of their choice
> because of the needs of the particular case.  One could posit
> other situations or cases where a presumption of prior
> informed judgment might not be as strong.  Here, however,
> we have a multi-debtor, multi-committee case involving
> sophisticated creditors who have determined that the rates
> charged and tasks undertaken by attorneys are appropriate.
> We should not, and will not, second guess the determination
> of those parties, who are directed by Congress, under the
> Bankruptcy Code, to shape and resolve the case, and who
> are in fact bearing the cost.  To do so, of course, would be to
> continue what Congress specifically intended to stop in
> 1978: Courts, instead of markets, setting rates, with the
> inevitable consequence that all the legal specialists required
> by the debtor or official committees would demur to
> participate.

*Drexel*, 133 B.R. at 20-21.

86.    The professional services rendered by TS&S have required

expenditure of substantial time and effort.  During the Fifth Interim Period, TS&S

professionals and paraprofessionals recorded 1,610.4 hours in providing the required professional services for which TS&S seeks compensation.

87.    Time and labor devoted is only one of many factors to be considered in awarding attorney compensation.  The number of hours expended must be considered in light of (i) the amount involved and the results achieved to date, (ii) the novelty and difficulty of the questions presented, (iii) the skill requisite to perform properly the legal services, (iv) the preclusion of other employment on behalf of other clients, (v) the customary fee charged to a private client for the services rendered, (vi) awards in similar cases, (vii) time constraints required by the exigencies of the case, including the frequency and amount of time required to be devoted other than during regular business hours, (viii) the experience, reputation and ability of the attorneys rendering services, and (ix) the nature and length of the professional relationship with the client (the "Johnson Factors").  *See Johnson v. Georgia Highway Express*, 488 F.2d at 717-19 (enumerating factors to be considered in awarding attorneys' fees in equal employment opportunities cases under Title VII);  *In re First Colonial Corp. of America*, 544 F.2d at 1294 (applying the Johnson Factors in bankruptcy cases).

88.    The majority of the Johnson Factors are codified in section 330(a) of the Bankruptcy Code, and have been applied by various courts in making determinations that requested attorneys' fees constitute reasonable compensation.  It is well settled that the "lodestar method,"[9] as opposed to an application solely of the

---

[9]    Application of the "lodestar method" involves multiplying the number of hours reasonably expended on the case by the reasonable hourly rate of compensation for each attorney.  *See Shaw v. Travelers Indemnity Co. (In re Grant Assocs.)*, 154 B.R. 836, 843 (S.D.N.Y. 1993).  This method of calculating attorney fees is appropriate in light of section 330(a) of the Bankruptcy Code, which serves as a starting point, permitting bankruptcy courts, in their own discretion, to consider other factors, such as the novelty and difficulty of the issues, the special skills of counsel, and their results obtained.  *See In re Copeland*, 154 B.R. 693, 698 (Bankr. W.D. Mich. 1993).

Johnson Factors, is the best means of determining attorney fees in bankruptcy cases.[10]
The Supreme Court, however, has clearly articulated that the "lodestar method" is
presumed to subsume the Johnson Factors, as does section 330(a) of the Bankruptcy
Code. *Delaware Valley I*, 478 U.S. at 563; *Cena's Fine Furniture*, 109 B.R. at 581.

89.    TS&S respectfully submits that application of the foregoing criteria
more than justifies the compensation requested in this Fifth Application. The
professional services rendered in these chapter 11 cases have been performed by
attorneys with broad expertise and high levels of skill in their practice areas or
specialty.

90.    At all times throughout the Fifth Interim Period, TS&S successfully
avoided expensive litigation by brokering reasonable settlements among the parties.
TS&S' efforts have therefore been of significant value to the Debtors and the creditors of
these estates.

91.    TS&S has not sought to burden this Court by setting forth all of the
services rendered to the Debtors and for the benefit of creditors. TS&S has reviewed all
of its office files which indicate numerous legal situations and problems resolved over
and above those detailed in this Fifth Application, and which are more fully
summarized in the time sheet entries annexed hereto and made a part hereof which
were contemporaneously prepared when the services were rendered.

---

[10]    *See, e.g., Pennsylvania v. Delaware Valley Citizens Counsel for Clean Air*, 483 U.S. 711 ("*Delaware Valley II*"), on remand, 826 F.2d 238 (3rd Cir. 1987); *Pennsylvania v. Delaware Valley Citizens Counsel for Clean Air*, 478 U.S. 546 (1986) ("*Delaware Valley I*"); *United States Football League v. National Football League*, 887 F.2d 408, 413 (2nd Cir. 1989), *cert. denied*, 493 U.S. 1071 (1990); *Lindy Bros. Builders Inc. v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161 (3rd Cir. 1973), *vacated on other grounds*, 540 F.2d 102 (3rd Cir. 1976); *In re Cena's Fine Furniture, Inc.*, 109 B.R. 575 (E.D.N.Y. 1990); *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13, 21 (Bankr. S.D.N.Y. 1991).

92. TS&S has devoted 1,610.4 hours of actual recorded time during the Fifth Interim Period resulting in time charges of $804,365.50.

93. This Interim Application reflects (a) a voluntary reduction by Applicant in connection with each monthly statement to (a) reflect the elimination of all fees related to any timekeeper who billed fewer than two total hours during the Fifth Application Period and (b) to correct a discreet billing error. See Exhibit "3." Consequently, Applicant's request for compensation for the Fifth Interim Period equals $804,365.50.

94. Throughout the Fifth Interim Period, TS&S sought to assign projects in this case to associates, law clerks, and paraprofessionals who could most efficiently and expeditiously handle them. TS&S respectfully submits that the legal services reflected in the annexed time slip entries are fair and reasonable and are commensurate with the quality of services provided herein.

95. In addition to the fees sought for legal services, TS&S has incurred $7,223.62 in out-of-pocket expenses during the Fifth Interim Period directly attributable to the representation of the Debtors.

96. No part of the compensation to be received pursuant to this Application will be shared with any other person or firm, and no other agreements, either express or implied, to share any compensation received as attorneys for the Debtors has been, or will be, made by TS&S.

97. Copies of this Application have been given to: (i) the Debtors; (ii) counsel for the Debtors; (iii) counsel for the Committee; (iv) the United States Trustee; (v) counsel for the agent under the Debtors' pre-petition credit facility; (vi) counsel for the agent under the Debtors' post-petition credit facility; and (vii) the Fee Committee.

30

## V.    <u>CONCLUSION</u>

**WHEREFORE**, TS&S respectfully requests that this Fifth Application be granted and that it be awarded an allowance of $804,365.50 for legal services rendered to the Debtors during the Fifth Interim Period, and $7,223.62 for reimbursement of expenses, and that the Debtors be authorized and directed to pay such amounts as may be just and proper.

Dated:    New York, New York
          July 31, 2007

                              TOGUT, SEGAL & SEGAL LLP,
                              Conflicts Counsel for the Debtors
                              and Debtors in Possession
                              By:

                              _____/s/ Albert Togut_____
                              ALBERT TOGUT (AT-9759)
                              NEIL BERGER (NB-3599)
                              Members of the Firm
                              One Penn Plaza, Suite 3335
                              New York, New York 10119
                              (212) 594-5000