**Hearing Date: October 25, 2007**
**Hearing Time: 10:00 a.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                         :
          In re                                          :     Chapter 11
                                                         :
DELPHI CORPORATION, et al.,                              :     Case No. 05-44481 (RDD)
                                                         :
                                                         :     (Jointly Administered)
          Debtors.                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

FIFTH INTERIM APPLICATION OF SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP, COUNSEL TO DEBTORS-IN-POSSESSION, SEEKING
ALLOWANCE AND PAYMENT OF INTERIM COMPENSATION AND REIMBURSEMENT
OF EXPENSES UNDER 11 U.S.C. §§ 330 AND 331

("FIFTH SKADDEN INTERIM FEE APPLICATION")

| | |
|---|---|
| Name of Applicant: | Skadden, Arps, Slate, Meagher & Flom LLP |
| Authorized to Provide Professional Services to: | Delphi Corporation and the Affiliate Debtors |
| Date of Retention Order: | November 4, 2005 |
| Period for Which Compensation and Reimbursement are Sought: | February 1, 2007 through May 31, 2007 |
| Amount of Compensation Sought as Actual, Reasonable, and Necessary: | **$12,589,501** |
| Amount of Expense Reimbursement Sought as Actual, Reasonable, and Necessary: | **$678,644** |
| Voluntary Reductions: | |
|    Monthly Fee Statements: | **$1,344,403** |
|    Fifth Fee Application: | **$121,602** |
| Total Voluntary Reductions: | **$1,466,005** |

This is an/(a):    X    Interim    _____ Final Application.

Aggregate Amounts Paid to Date: **$54,434,438**

## PRIOR FEE APPLICATIONS

| Prior Fee Application | Date Filed | Period Covered | Interim Fees Requested (Awarded) | Interim Expense Reimbursement Requested (Awarded) |
|---|---|---|---|---|
| First | 05/31/06 | 10/08/05 – 01/31/06 | $9,200,920 ($9,187,586.67) | $622,420 ($622,420) |
| Second | 07/31/06 | 02/01/06 – 05/31/06 | $11,310,231 ($11,296,897.67) | $825,854 ($825,854) |
| Third | 11/30/06 | 06/01/06 – 09/30/06 | $10,025,538 ($10,012,204.66) | $848,232 ($848,232) |
| Fourth | 03/30/07 | 10/01/06 –01/31/07 | $12,820,504 ($12,820,504) | $708,096 ($708,096) |

TIME SUMMARY TO FIFTH INTERIM FEE APPLICATION OF
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
FEBRUARY 1, 2007 – MAY 31, 2007

| Name | Year Of Admission | Rate[1] | Hours | Amount |
|---|---|---|---|---|
| **PARTNERS** | | | | |
| Butler, Jr., John Wm. | 1980 | $768 | 952.8 | $731,733 |
| Marafioti, Kayalyn A. | 1980 | $830 | 589.4 | $489,202 |
| Lyons, John K. | 1989 | $691 | 650.6 | $449,624 |
| Hogan, III, Albert L. | 1997 | $677 | 488.3 | $330,791 |
| Cochran, Eric L. | 1987 | $826 | 389.3 | $321,741 |
| Panagakis, George N. | 1990 | $758 | 354.5 | $268,637 |
| Meisler, Ron E.* | 1999 | $597 | 447.1 | $266,900 |
| Berlin, Kenneth | 1974 | $794 | 186.4 | $148,028 |
| Hiestand, N. Lynn | 1981 | $821 | 105.0 | $86,189 |
| Leff, Neil M. | 1981 | $774 | 75.8 | $58,640 |
| Saggese, Nick P. | 1980 | $822 | 61.0 | $50,139 |
| Furfaro, John P. | 1981 | $810 | 38.9 | $31,509 |
| Gibson, Marie L. | 1997 | $670 | 46.0 | $30,820 |
| Gross, Cliff | 1989 | $830 | 29.5 | $24,485 |
| Noel, Gregg A. | 1982 | $845 | 27.8 | $23,492 |
| Wexler, Marian P. | 1977 | $810 | 17.9 | $14,499 |
| **Partner Total** | | | **4,460.3** | **$3,326,429** |
| **COUNSEL** | | | | |
| Matz, Thomas J. | 1976 | $625 | 717.5 | $448,451 |
| Ramlo, Kurt | 1993 | $616 | 422.2 | $260,101 |
| Gasaway, Michelle | 1998 | $617 | 166.9 | $103,032 |
| Amodeo, John A. | 1977 | $625 | 141.2 | $88,251 |
| Sensenbrenner, Eric B. | 1996 | $607 | 129.6 | $78,689 |
| Garner, Lee P. | 1995 | $625 | 104.1 | $65,066 |
| Strobert, Andrew F. | 1993 | $625 | 23.2 | $14,501 |
| MacDonald, F. Neil** | 1997 | $502 | 22.4 | $11,247 |
| McKeon, Peter T. | 1979 | $595 | 16.3 | $9,699 |
| Zisk, Matthew B. | 1998 | $625 | 13.4 | $8,375 |
| **Counsel Total** | | | **1,756.8** | **$1,087,412** |
| **ASSOCIATES** | | | | |
| Stuart, Nathan L. | 2002 | $483 | 934.5 | $451,523 |
| Wharton, Joseph N. | 1998 | $527 | 842.5 | $444,065 |
| Connors, Christopher P. | 1999 | $576 | 745.6 | $429,362 |
| Fern, Brian M. | 1996 | $558 | 737.5 | $411,470 |
| Hardin, Adlai S. | 1998 | $585 | 645.5 | $377,626 |
| Grant, T. Kellan | 2000 | $461 | 814.8 | $375,601 |
| Perl, Michael W. | 2004 | $421 | 889.0 | $374,063 |
| Diaz, Lisa B. | 2006 | $358 | 1,042.7 | $372,880 |

---

[1]    The blended rates set forth for certain professionals reflect the average billing rate for the entire Application Period and incorporate a reduced billing rate for nonworking travel time.

| Name | Year Of Admission | Rate[1] | Hours | Amount |
|---|---|---|---|---|
| Platt, Sarah J. | 2006 | $354 | 972.3 | $343,930 |
| Ganitsky, Daniel I. | 2001 | $585 | 571.7 | $334,449 |
| VanLonkhuyzen, Courtney E. | 2004 | $433 | 721.4 | $312,636 |
| Meisler, Ron E.* | 1999 | $547 | 498.5 | $272,706 |
| Howe, Eric J. | 2005 | $379 | 714.9 | $271,032 |
| Bolton, Ian S. | 2005 | $368 | 701.8 | $258,357 |
| Houston, Brent M. | 2003 | $435 | 555.8 | $241,777 |
| Van Gelder, Amy | 2003 | $466 | 434.7 | $202,782 |
| Halper, Adam | 2005 | $390 | 519.5 | $202,605 |
| De Elizalde, Dolores | 2003 | $495 | 359.0 | $177,707 |
| Guzzardo, John | 2004 | $430 | 413.1 | $177,592 |
| Campanario, Nick D. | 2002 | $527 | 332.2 | $175,109 |
| Gartner, Matthew | 2006 | $352 | 488.9 | $172,018 |
| Lederer, J.R. | 2007 | $330 | 493.2 | $162,984 |
| Hill, Laverne F. | 2005 | $385 | 406.2 | $156,390 |
| Kaloudis, Denise | 2003 | $495 | 282.5 | $139,840 |
| Kahn, Melissa T. | 2003 | $470 | 223.5 | $105,045 |
| Ogunsanya, Gregory O. | 2004 | $495 | 194.3 | $96,181 |
| Lazarova, Natalia F. | 2002 | $470 | 122.3 | $57,481 |
| Jjingo, M. Janine | 2006 | $390 | 126.5 | $49,335 |
| Pilkington, Christian | Foreign (1999) | $585 | 82.3 | $48,147 |
| MacDonald, F. Neil** | 1997 | $562 | 80.7 | $45,367 |
| Feinberg, Aaron S. | 2002 | $535 | 84.3 | $45,102 |
| Park, Young M. | 2001 | $565 | 72.2 | $40,793 |
| Louko, Tero | 2000 | $585 | 58.1 | $33,989 |
| Schockett, Paul | 2006 | $390 | 73.9 | $28,821 |
| Furman, Erin C. | 2000 | $585 | 42.1 | $24,629 |
| Goetz, Amy J. | 2006 | $355 | 66.1 | $23,466 |
| Danz, Catherine E. | 2001 | $535 | 41.2 | $22,042 |
| Carter, P. Gifford | 2002 | $535 | 36.4 | $19,475 |
| McLeod, John M. | 1999 | $585 | 27.3 | $15,971 |
| Todryk, Jenelle M. | 2001 | $535 | 28.2 | $15,087 |
| Malone, Elizabeth A. | 2002 | $495 | 28.8 | $14,257 |
| Belin, Rita Sinkfield | 1996 | $585 | 20.8 | $12,168 |
| Kohut, Ronald D. | 2004 | $470 | 21.3 | $10,011 |
| Ketchens, Jason P. | 2000 | $565 | 16.0 | $9,040 |
| Wilson, Louis D. | 2000 | $585 | 14.3 | $8,366 |
| Schohn, Erica | 2004 | $470 | 16.3 | $7,661 |
| Hortsmann, Britta | 2005 | $390 | 12.0 | $4,680 |
| **Associate Total** | | | **16,606.7** | **$7,575,618** |
| **PARAPROFESSIONALS** | | | | |
| Demma, Jeffrey | N/A | $248 | 587.6 | $145,638 |
| Zsoldos, Andrew F. | N/A | $188 | 501.5 | $94,240 |
| Chavali, Aruna | N/A | $160 | 578.3 | $92,528 |
| Rosen, Ruth | N/A | $246 | 366.3 | $90,250 |
| Klimek, Marsha V. | N/A | $250 | 267.8 | $66,950 |

| Name | Year Of Admission | Rate[1] | Hours | Amount |
|------|------------------|---------|-------|--------|
| Donnelly, Neal P. | N/A | $214 | 105.1 | $22,490 |
| Rivera, Maira | N/A | $80 | 281.0 | $22,480 |
| Worscheck, Toby M. | N/A | $80 | 234.2 | $18,736 |
| Nowicki, John A. | N/A | $250 | 68.8 | $17,200 |
| Gilchrist, Julie M. | N/A | $250 | 49.5 | $12,375 |
| Nakai, Karen M. | N/A | $225 | 38.1 | $8,573 |
| Ivanov, Ivailo K. | N/A | $190 | 30.3 | $5,757 |
| Nelson, Vanessa P. | N/A | $250 | 11.3 | $2,825 |
| **Paraprofessional Total** | | | **3,119.8** | **$600,042** |
| **TOTAL ALL PROFESSIONALS** | | | 25,943.6 | $12,589,501 |
| This summary excludes voluntary fee reductions of $1,358,956, of which $1,237,354 was reduced on the monthly statements and $121,602[2] is an additional accommodation made to this Interim Application. | | | | |

*On April 1, 2007, Ron E. Meisler was promoted to partner.  Because the promotion occurred during the Application Period, for statistical purposes, Mr. Meisler's time billed as a partner is included in the partner category, while his time billed as an associate is included in the associate category.

** On May 1, 2007, F. Neil MacDonald was promoted to counsel.  Because the promotion occurred during the Application Period, for statistical purposes, Mr. MacDonald's time billed as a counsel is included in the counsel category, while his time billed as an associate is included in the associate category.

---

[2]    In accordance with Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases, adopted by the Court on April 19, 1995, Skadden has identified those entries within Exhibits D-1 through D-35 for which accommodations are being provided pursuant to this Interim Application.

SUMMARY OF SERVICES RENDERED BY
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
FEBRUARY 1, 2007 – MAY 31, 2007

| Activities | Hours | Fees |
|---|---|---|
| Claims Administration (General) | 7,474.8 | $3,336,137 (26.5%) |
| Reorganization Plan / Plan Sponsors | 4,979.2 | $2,515,285 (20.0%) |
| Rights Offering | 1,073.2 | $661,516 (5.3%) |
| Case Administration | 1,781.1 | $628,123 (5.0%) |
| Asset Dispositions (General) | 981.8 | $543,556 (4.3%) |
| General Corporate Advice | 786.3 | $475,902 (3.8%) |
| Nonworking Travel Time | 1,396.6 | $413,181 (3.3%) |
| Supplier Matters | 935.7 | $396,217 (3.1%) |
| Business Operations / Strategic Planning | 572.6 | $358,708 (2.8%) |
| Customer Matters (GM) | 499.5 | $308,254 (2.4%) |
| Employee Matters (General) | 483.0 | $294,905 (2.3%) |
| Retention / Fee Matters / Objections (Others) | 688.2 | $280,261 (2.2%) |
| Creditor Meetings / Statutory Committees | 494.5 | $258,775 (2.1%) |
| Environmental Matters | 360.7 | $254,016 (2.0%) |
| Retention / Fee Matters (SASM&F) | 511.4 | $223,508 (1.8%) |
| Litigation (Insurance Recovery) | 374.8 | $220,208 (1.7%) |
| Employee Matters (Labor Unions) | 328.6 | $192,231 (1.5%) |
| Global Subsidiaries (Non-U.S.) | 265.6 | $186,086 (1.5%) |
| Tax Matters | 330.3 | $185,480 (1.5%) |
| Disclosure Statement / Voting Issues | 318.9 | $165,839 (1.3%) |
| Leases (Real Property) | 246.9 | $133,549 (1.1%) |
| Asset Analysis and Recovery | 215.1 | $113,719 (0.9)% |
| Executory Contracts (Personalty) | 222.5 | $107,072 (0.9%) |
| Customer Matters (Reviews/Investigations) | 122.4 | $66,985 (0.5%) |
| Liquidation/Feasibility | 111.6 | $64,538 (0.5)% |
| Employee Matters (Pension) | 100.0 | $57,919 (0.5%) |
| Automatic Stay (Relief Actions) | 113.5 | $53,883 (0.4%) |
| Real Estate (Owned) | 66.4 | $35,695 (0.3%) |
| Litigation (General) | 66.8 | $30,997 (0.2%) |
| Reports and Schedules | 21.3 | $14,268 (0.1%) |

| Activities | Hours | Fees |
|---|---|---|
| Intellectual Property | 20.3 | $12,688 (0.1%) |
| **Total** | **25,943.6** | **$12,589,501** |

**Hearing Date: October 25, 2007**
**Hearing Time: 10:00 a.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                         :

        In re                       :    Chapter 11
                                               :

DELPHI CORPORATION, et al.,     :    Case No. 05-44481 (RDD)
                                               :

                                             :    (Jointly Administered)

                Debtors.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

FIFTH INTERIM APPLICATION OF SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP, COUNSEL TO DEBTORS-IN-POSSESSION, SEEKING
ALLOWANCE AND PAYMENT OF INTERIM COMPENSATION AND REIMBURSEMENT
OF EXPENSES UNDER 11 U.S.C. §§ 330 AND 331

("FIFTH SKADDEN INTERIM FEE APPLICATION")

Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), counsel for Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (the "Reorganization Cases"), submits this fifth interim application (the "Interim Application") seeking interim allowance and payment of compensation and reimbursement of expenses under 11 U.S.C. §§ 330 and 331 for the period from February 1, 2007 through May 31, 2007 (the "Application Period"). Skadden submits this Interim Application for (a) allowance of compensation for professional services rendered by Skadden to the Debtors and (b) reimbursement of actual and necessary charges and disbursements incurred by Skadden in the rendition of required professional services on behalf of the Debtors. In support of this Interim Application, Skadden represents as follows:

<u>The Chapter 11 Filings</u>

1. On October 8 and 14, 2005 (the "Petition Dates"), Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtors' chapter 11 cases.

2. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee," and together with the Creditors' Committee, the "Statutory Committees"). No trustee or examiner has been appointed in the Debtors' cases.

2

3.    On May 5, 2006, this Court authorized the establishment of a joint fee review committee (the "Fee Review Committee") and approved a protocol regarding the committee, its composition, mandate, and procedures (Docket No. 3630) (the "Fee Review Protocol").  The Fee Review Committee is comprised of representatives of each of: (a) the U.S. Trustee for this District, (b) the Debtors, and (c) the Creditors' Committee.

4.    This Court has jurisdiction over this application pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

5.    The statutory predicates for the relief requested herein are sections 330 and 331 of the Bankruptcy Code, Rule 2016 of the Federal Rules of Bankruptcy Procedure, and Rule 2016-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules").  This Interim Application has been prepared in accordance with the Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases, adopted by the Court on April 19, 1995 (the "Local Guidelines"), and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 (Appendix A to 28 C.F.R. § 58), dated May 17, 1996 (the "UST Guidelines" and, together with the Local Guidelines, the "Guidelines").  Pursuant to the Local Guidelines, a certification regarding compliance with the Guidelines is attached hereto as Exhibit A.

## Retention Of Skadden

6.    Upon the commencement of the Reorganization Cases, the Debtors applied to this Court for an order approving the retention of Skadden as their principal restructuring and bankruptcy counsel (the "Retention Application") to perform legal services under a general

3

retainer that was necessary to enable the Debtors to faithfully execute their duties as

debtors-in-possession.  On November 4, 2005, this Court entered an order (the "Retention

Order")[3] authorizing the Debtors to employ Skadden as their counsel under the terms set forth in

the Retention Application.[4]

    7.  In the Retention Application, the Debtors disclosed that Skadden's fees for

professional services are based on its guideline hourly rates, which are periodically adjusted.  The

Debtors also disclosed in the Retention Application that Skadden's charges and disbursements are

invoiced pursuant to Skadden's Policy Statement Concerning Charges and Disbursements, a copy

of which is attached to the Engagement Agreement.  Certain charges and disbursements are not

charged separately under the bundled rate structure as described in the Retention Application.

Other than an arrangement between Skadden and its members, there is no agreement or

understanding between Skadden and any person for the sharing of compensation to be received

for services rendered in this case.

Fee Procedures And Monthly Fee Statements

    8.  On November 4, 2005, this Court entered the Order Under 11 U.S.C. § 331

Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of

Professionals (Docket No. 869) (the "Initial Interim Compensation Order").  This order was

subsequently amended on March 8, 2006 (Docket No. 2747), March 28, 2006 (Docket No. 2986),

May 5, 2006 (Docket No. 3630), July 12, 2006 (Docket No. 4545), October 13, 2006 (Docket No.

---

[3] A copy of the Retention Application, the supporting declaration, and the Retention Order are attached collectively hereto as <u>Exhibit B</u>.  These materials include factual information regarding the experience and standing at the bar of certain of Skadden's senior attorneys.

[4] The Retention Order incorporates the terms of an engagement agreement dated as of July 12, 2005 (the "Engagement Agreement"), between Skadden and the Debtors, a copy of which is attached as Exhibit A to the declaration supporting the Retention Application.

4

5310), and December 11, 2006 (Docket No. 6145) (collectively and together with the Initial

Interim Compensation Order, the "Interim Compensation Order").

9.     To monitor costs to the Debtors' estates and avoid duplicative efforts in the

review of fee applications filed in these Reorganization Cases, the Debtors, the Creditors'

Committee, and the U.S. Trustee negotiated the formation of the Fee Review Committee to

review, comment on, and, if necessary, object to the various fee applications filed in these

Reorganization Cases.  As stated above, on May 5, 2006, this Court authorized the establishment

of the Fee Review Committee and approved the Fee Review Protocol.  On August 17, 2006, this

Court entered an order authorizing the Fee Review Committee to retain Legal Cost Control, Inc.

("LCC") as fee a analyst to assist the Fee Review Committee (Docket No. 4959).

10.    Pursuant to paragraphs 2(a), 2(j), and 7 of the Interim Compensation Order,

as supplemented, and the Fee Review Protocol, Skadden is submitting this Interim Application to

the Debtors, the U.S. Trustee, counsel to the Creditors' Committee, counsel to the agent under the

Debtors' former prepetition credit facility, counsel to the agent under the Debtors' postpetition

credit facility, and the members of the Fee Review Committee and its fee auditors.

<u>Overview Of Delphi Corporation</u>

11.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as of

December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4

billion.[5]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company

business reorganization in terms of revenues and the thirteenth largest public company business

---

[5]     The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and
its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

5

reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court. [6]

12.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

13.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

<u>Events Leading To The Chapter 11 Filing</u>

14.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported

---

[6]    On March 20 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding. The application was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

a net loss of approximately $4.8 billion on $28.6 billion in net sales.[7]  Reflective of a continued

downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on

net sales of $26.9 billion.  Moreover, in 2006, the Debtors incurred a net loss of $5.5 billion, $3.0

billion of which comprised charges related to the U.S. employee special attrition programs.

15.    The Debtors believe that the Company's financial performance deteriorated

because of (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven

by collectively bargained agreements, including restrictions that prevented the Debtors from

exiting non-profitable, non-core operations, thereby effectively creating largely-fixed labor costs,

(b) an extraordinarily competitive U.S. vehicle production environment for domestic original

equipment manufacturers, causing a reduction in the number of motor vehicles that GM produces

annually in the United States, and pricing pressures related thereto, and (c) increasing commodity

prices.

16.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005,

the Company commenced these chapter 11 cases for its U.S. businesses to complete its

transformation plan and preserve value for its stakeholders.

The Debtors' Transformation Plan

17.    On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

---

[7]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss
in calendar year 2004 was $482 million.

operations. The Debtors stated that they needed to focus on five key areas:[8] first, modifying the

Company's labor agreements to create a competitive arena in which to conduct business;[9] second,

concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy

and labor costs and to ascertain GM's business commitment to the Company;[10] third, streamlining

their product portfolio to capitalize on their world-class technology and market strengths and make

the necessary manufacturing alignment with their new focus;[11] fourth, transforming their salaried

---

[8]    In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution
of an equity purchase and commitment agreement (the "EPCA") with certain investors, and a plan framework
support agreement (the "PSA") with those investors and GM. On April 19, 2007, Delphi confirmed that it
anticipated negotiating changes to the agreements, primarily as a result of addressing differences in views
regarding the Company's reorganization enterprise value among the investors, GM, the Statutory Committees,
and the Company. On July 9, 2007, Delphi confirmed that it had formally terminated the EPCA and PSA but that
it expected to enter into new framework agreements with plan investors presently. Subsequently, on July 18,
2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement
(the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors
(affiliates of Appaloosa Management L.P. ("Appaloosa"), Harbinger Capital Partners Master Fund I, Ltd.
("Harbinger"), Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill"), and UBS Securities LLC ("UBS") as well
as, Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan
Investors")). Under the Delphi-Appaloosa EPCA, which is subject to Court approval, the New Plan Investors
would invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the
Company's transformation plan and plan of reorganization.

[9]    Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International Union,
United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM that (a)
modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the
UAW, and its various locals, (b) provides that GM will undertake certain financial obligations to Delphi's
UAW-represented employees and retirees to facilitate these modifications, and (c) modifies retiree welfare
benefits for certain UAW-represented retirees of the Debtors. This agreement, which was approved by this Court
on July 19, 2007, should facilitate the Debtors' reaching consensual resolutions of their labor issues with the
remaining unions and GM and permit the Debtors to continue to implement their transformation plan and to
develop, prosecute, confirm, and consummate a plan of reorganization. Delphi is currently engaged in settlement
discussions with its remaining U.S. labor unions and is working to conclude discussions with those unions as soon
as practicable.

[10]    On July 9, 2007, Delphi confirmed that its discussions with GM on a comprehensive settlement agreement had
entered the documentation phase and that it expected that a settlement with GM would be incorporated into the
Debtors' plan of reorganization rather than filed with this Court for separate approval.

[11]    In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and
"non-core" product lines and plants. The Debtors have been working to divest non-core assets so as to maximize
the value of the estate for stakeholders. During the 2006 and 2007 calendar years, for example, the Debtors sold
substantially all of the assets related to MobileAria, Inc., its chapter 11 affiliate, obtained court approval for the
sale of substantially all of the assets of their brake hose and Saltillo, Mexico brake plant businesses, and obtained
court approval of bid procedures related to the upcoming sale of substantially all assets used in their catalyst
business. In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including,
without limitation, their steering, interior, and closures businesses.

workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint;[12] and finally, devising a workable solution to their current pension situation.[13]

18.    Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Significant Events During The Application Period</u>

A.    <u>Continued Progress Under The Framework Agreements</u>

19.    Prior to the Application Period, the Debtors reached significant milestones in their reorganization.  On December 18, 2006, Delphi announced that it had accepted a proposal for an equity purchase and commitment agreement with affiliates of Appaloosa, Cerberus Capital Management, L.P. ("Cerberus"), and Harbinger, as well as Merrill and UBS (collectively, the

---

[12]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.  The Debtors also made significant progress in ensuring that their organizational and cost structure is competitive in obtaining the entry of this Court's Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order").  The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[13]    To that end, on May 31, 2007, the Bankruptcy Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 plan year funding waivers, which were approved by the IRS, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Plans").  On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively.

9

"Original Plan Investors") to invest up to $3.4 billion in preferred and common equity in the

reorganized Delphi to support the company's transformation plan and the reorganization plan

framework agreement signed by Delphi, the Original Plan Investors, and GM on December 18,

2006, which was intended to facilitate the Debtors' emergence from chapter 11.

   20. The EPCA, the PSA, and several ancillary instruments (together, the

"Original Framework Agreements") were approved by this Court through the entry of an order on

January 12, 2007, after two days of testimony and arguments.  However, the parties still needed to

satisfy numerous contingencies under the Original Framework Agreements, including, without

limitation, satisfying the Original Plan Investors' due diligence requests and reaching agreements

with Delphi's labor unions and with GM.  The Debtors devoted a significant amount of resources

to this effort during the Application Period.  In addition, as contemplated by the EPCA, on March

7, 2007, Delphi filed with the United States Securities and Exchange Commission (the "SEC") a

registration statement on Form S-1 (the "Registration Statement") relating to a proposed rights

offering to purchase shares of common stock of Delphi.

   21. Under the EPCA, the Original Plan Investors could terminate the EPCA,

among other reasons, if the Original Plan Investors were not satisfied with their due diligence

investigation of the Company.  Therefore, beginning prior to and continuing during the

Application Period, the Debtors provided due diligence materials to the Original Plan Investors in

Troy, Michigan and in various countries across Asia and Europe.  Specifically, in response to

expansive due diligence requests submitted by Appaloosa/Harbinger and Cerberus, Skadden

professionals worked with the Debtors to review the requests and to identify responsive

documents.  After collecting such documents, Skadden assisted the Debtors in creating,

maintaining, and continuously updating a data room in Troy, Michigan for counsel to the Original

Plan Investors to conduct their due diligence.

22.     During the Application Period, numerous attorneys for

Appaloosa/Harbinger and Cerberus visited the data room in Troy, Michigan on various occasions

to review documents.  Additionally, to facilitate the Original Plan Investors' due diligence efforts,

the Debtors made certain documents available for review in Skadden's New York office, at the

request of counsel to the Original Plan Investors.  Skadden professionals also (a) participated in

numerous conference calls and in-person meetings between the Debtors and counsel for the

Original Plan Investors and (b) assisted the Debtors in responding to requests submitted by the

Original Plan Investors for copies of documents that were reviewed in the data room to ensure a

timely and efficient flow of information between the parties.  In part, as a result of these due

diligence efforts, unlike the EPCA which was subject to the Original Plan Investors' due

diligence, the Delphi-Appaloosa EPCA is not subject to further due diligence by the New Plan

Investors.

23.     On July 9, 2007, after the Application Period, Delphi announced that it

formally terminated the EPCA and PSA.  Furthermore, over a three-day period beginning on July

16, 2007, Delphi's Board of Directors (the "Board") met to consider two proposals for a new equity

purchase and commitment agreement – one put forward by Highland Capital Management, L.P.

and the other proposed by the New Plan Investors.  The Board evaluated both the proposals and on

July 18, 2007, Delphi announced that it had accepted the Delphi-Appaloosa EPCA.  Under the

Delphi-Appaloosa EPCA, the New Plan Investors would invest up to $2.55 billion in preferred and

common equity in the reorganized Delphi to support the Company's transformation plan and plan

of reorganization.  The Delphi-Appaloosa EPCA is subject to Bankruptcy Court approval at a

hearing scheduled for August 2, 2007.

B.    GM And Labor Negotiations

24.    During the Application Period, Skadden assisted the Debtors in reviewing,

evaluating, and providing guidance on various proposals from the Debtors' labor unions and a

potential resolution to the Debtors' Motion For Order Under 11 U.S.C. § 1113(c) Authorizing

Rejection of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing

Modification Of Retiree Welfare Benefits (Docket No. 3035) (the "Section 1113 And 1114

Motion") previously filed on March 31, 2006.  After conducting a contested hearing through the

close of the Debtors' direct case, in June 2006 this Court adjourned the hearing on the Section 1113

And 1114 Motion through the Summer and subsequently through the rest of the 2006 calendar year

and ultimately, at the end of January 2007, this Court suspended further hearings on the motion to

permit the parties the opportunity to reach a consensual resolution.  As a result, during the

Application Period, the Debtors were involved in negotiations with their U.S. labor unions in an

effort to resolve the outstanding issues.

25.    Due to extensive negotiations during the Application Period, on June 22,

2007, Delphi achieved a significant milestone in its transformation and a major step toward

emergence when it reached an agreement with the United Automobile, Aerospace, and

Agricultural Implement Workers of America (the "UAW") and GM (the "UAW Settlement

Agreement").  The UAW Settlement Agreement is a comprehensive agreement that modifies,

extends, or terminates the provisions of the existing collective bargaining agreements among

Delphi, the UAW, and its various locals; provides that GM and Delphi will undertake certain

financial obligations to Delphi's UAW-represented employees and retirees to facilitate those

modifications; and settles the contested matter regarding the Debtors' Section 1113 And 1114

Motion.  The UAW membership ratified the UAW Settlement Agreement on June 28, 2007.  The

following day, the Debtors filed a motion seeking this Court's approval of the UAW Settlement

Agreement.[14]  The motion was approved by this Court on July 19, 2007.  In addition, the Debtors

have engaged in discussions and collective bargaining sessions with their other five labor unions

and have been working on reaching a consensual agreement with each of these unions as soon as

practicable.

           26.    Also during the Application Period, the Debtors continued their discussions

and negotiations with GM concerning Delphi's proposals regarding GM's contributions towards,

among other things, resolution of GM legacy issues and the overall supplier/customer

relationship between Delphi and GM.  These discussions yielded multiple proposals from both

sides aimed at addressing a wide range of matters, including the treatment of certain legacy

agreements between the parties and resolution of various commercial matters, including certain

warranty claims and the future use of certain of the Debtors' intellectual property.  As a result of

these negotiations, a substantial portions of which occurred during the Application Period, on

July 18, 2007 Delphi confirmed that its discussions with GM regarding a comprehensive

settlement agreement had entered the documentation phase and are expected to be incorporated

into the Debtors' plan of reorganization.

C.    <u>Claims Administration</u>

           27.    One of the conditions in both the Original Framework Agreements and the

Delphi-Appaloosa EPCA is that certain "trade and other unsecured claims" shall not exceed $1.7

---

[14]  <u>See</u> Motion For Order Under 11 U.S.C. §§ 363, 1113 And 1114 And Fed. R. Bankr. P. 6004 And 9019 Approving
Memorandum Of Understanding Among UAW, Delphi, And General Motors Corporation Including
Modification Of UAW Collective Bargaining Agreements And Retiree Welfare Benefits For Certain
UAW-Represented Retirees, dated June 29, 2007 (Docket No. 8445).

billion.  As of May 31, 2007, the end of the Application Period, the Debtors had received more

than 16,600 proofs of claim, a portion of which assert, in part or in whole, unliquidated claims.  In

addition, the Debtors have compared proofs of claim received to scheduled liabilities and

determined that there are certain scheduled liabilities for which no proof of claim was filed.  In the

aggregate, these proofs of claim and scheduled liabilities assert more than $37 billion in

liquidated amounts plus certain unliquidated amounts.

28.    During the Application Period, the Debtors and their advisors have devoted

a significant amount of time to the claims resolution process.  Specifically, during the Application

Period, the Debtors with the assistance of their advisors (a) filed eight omnibus claims objections

which ultimately disallowed, expunged, or reduced approximately 3,200 claims in the

approximate amount of $146 million, (b) consensually resolved 543 claims that had been

adjourned pursuant to the claims objection procedures approved by this Court (the "Claims

Procedures"), resulting in the entry of stipulated orders disallowing, expunging, or reducing the

claims in the approximate amount of $173 million, and (c) consensually resolved 22 claims that

had been scheduled for a hearing, resulting in the entry of stipulated orders disallowing,

expunging, or reducing the claims in the approximate amount of $36.1 million.  With respect to

the two contested claims that proceeded to hearing during the Application Period, the Debtors

obtained orders disallowing and expunging approximately $17.9 million of such claims.  As of

May 31, 2007 (the end of the Application Period), this Court had entered orders (i) disallowing

approximately 9,000 proofs of claim, which reduced the amount of asserted claims by

approximately $8.67 billion in aggregate liquidated amounts plus additional unliquidated

amounts and (ii) modifying approximately 2,100 claims, which reduced the aggregate amounts

asserted in those claims from $113 million to $103 million.

14

Requested Fees And Reimbursement Of Expenses

29.     Skadden has been directly involved with advising the Debtors in all aspects

of their restructuring efforts.  As a result of its efforts during the Application Period, Skadden now

seeks interim allowance of $12,589,501 in fees calculated at the applicable guideline hourly

billing rates of the firm's personnel who have worked on the Reorganization Cases, and $678,644

in charges and disbursements actually and necessarily incurred by Skadden while providing

services to the Debtors during the Application Period.

30.     This Interim Application reflects (a) a voluntary reduction by Skadden in

connection with each monthly statement in the aggregate amount of $1,237,354 with respect to

fees (generally including the elimination from any matter of any timekeeper who recorded less

than one hour and the elimination of any timekeeper who recorded less than $2,500 in the

aggregate on all Delphi matters) and $107,049 with respect to charges and disbursements

(including, among other things, certain reductions to in-firm food catering services utilized for

various Delphi stakeholder meetings to comply with the Fee Review Committee's guidelines) and

(b) an additional voluntary reduction in the amount of $121,602 in connection with this Interim

Application to reflect, among other things, the elimination of all fees related to (i) any timekeeper

who billed fewer than ten total hours during the Application Period, (ii) any timekeeper who

billed less than $1,000 during the Application Period, (iii) any instance in which a timekeeper

billed less than $1,000 to a particular matter during the Application Period, and (iv) the

elimination of any matter to which fewer than ten hours were billed during the Application

Period.  Accordingly, including the voluntary client accommodations in connection with each

monthly statement, Skadden is voluntarily reducing its fees by $1,358,956, or approximately

9.7%, and its charges and disbursements by $107,049, or approximately 13.6%, for a total

reduction of $1,466,005 for items that Skadden normally would bill its clients.[15]

31.    In staffing this case, in budgeting and incurring charges and disbursements,

and in preparing and submitting this Interim Application, Skadden has been mindful of the need

to be efficient while providing appropriate and vigorous representation of the Debtors.  As

described in detail herein, Skadden believes that the requests made in this Interim Application

comply with this Court's standards in the context of the unique circumstances surrounding these

unusually large and complex cases.

### Summary Of Services Rendered By
### Skadden During The Application Period

32.    Throughout the Application Period, Skadden has worked closely with the

Debtors and their advisors to administer these estates and maximize the return for

parties-in-interest.  These services have been directed toward a myriad of tasks necessary to

achieve this result.  To meet the Debtors' needs, Skadden has provided multi-disciplinary services

on a daily basis, often working nights, weekends, and holidays.  Throughout this process, certain

of the principal Skadden attorneys working on the Reorganization Cases were required to devote

the vast majority of their time to this matter, often to the exclusion of other clients.  As a result of

the efforts of the Debtors and their professionals, the Debtors continued to make substantial

progress in evaluating their businesses and pursuing their transformation plan; continued to

negotiate with GM, the Statutory Committees, and other key parties-in-interest in an effort to

---

[15]    Skadden believes that the amounts requested in this Interim Application are reasonable in relation to the services rendered.  The amounts requested are already reduced to reflect the client accommodations described herein.  To the extent that a party objects to this Interim Application, Skadden reserves the right to recapture such client accommodations and seek up to the full amount of fees and expenses actually incurred in connection with this engagement.  Furthermore, Skadden reserves its right to recapture and seek allowance of all client accommodations as part of its final fee application, including by way of illustration, $26,622 in fees incurred by summer associates working on these cases during the Application Period.

resolve certain contingencies contained in the Framework Agreements; and continued to

reconcile claims asserted against the Debtors at an intense pace, all designed to facilitate the

Debtors' goal of emerging from chapter 11 by the end of this calendar year.

33.    At the commencement of the Reorganization Cases, Skadden created 45

different matter numbers or subject-matter categories (the "Matter Categories") to which its

professionals assigned the time billed by them, all of which are related to the tasks performed by

Skadden on behalf of the Debtors.[16]  Skadden has kept a contemporaneous record of the time

spent rendering such services and, consistent with the Guidelines, separated tasks in billing

increments of one-tenth of an hour.  All of the services performed by Skadden have been legal in

nature and necessary for the proper administration of the Reorganization Cases.

34.    Skadden devoted approximately 62.8% of its time to the following five

matters, each of which was responsible for fees in excess of $500,000 during the Application

Period:  Claims Administration (General), Reorganization Plan/Plan Sponsors, Rights Offering,

Case Administration, and Asset Dispositions (General).

35.    Skadden devoted approximately 34.8% of its time in the aggregate to the

following 18 matters, billings for each of which were between $100,000 and $500,000 during the

Application Period:  General Corporate Advice, Nonworking Travel Time, Supplier Matters,

Business Operations/Strategic Planning, Customer Matters (GM), Employee Matters (General),

Retention/Fee Matters/Objections (Others), Creditor Meetings/Statutory Committees,

Environmental Matters, Retention/Fee Matters (SASM&F), Litigation (Insurance Recovery),

Employee Matters (Labor Unions), Global Subsidiaries (Non-U.S.), Tax Matters, Disclosure

---

[16]    There are now 47 Matter Categories because Skadden added two additional matter categories since the Petition
Date: Customer Matters (Review and Investigations) and Rights Offering.  Exhibit C contains a table of all matter
numbers used by Skadden in these Reorganization Cases, as well as a description of certain business statistics of
Skadden in these Reorganization Cases.

17

Statement/Voting Issues, Leases (Real Property), Asset Analysis and Recovery, and Executory

Contracts (Personalty).

36.    The remainder of time billed by Skadden (approximately 2.4%) was

devoted to the following eight matters, each of which accounted for less than $100,000 during the

Application Period:  Customer Matters (Reviews/Investigations), Liquidation/Feasibility,

Employee Matters (Pension), Automatic Stay (Relief Actions), Real Estate (Owned), Litigation

(General), Reports and Schedules, and Intellectual Property.

Matters Exceeding $500,000

A.    Claims Administration (General)

37.    As of May 31, 2007, the Debtors had received more than 16,600 proofs of

claim, a portion of which assert, in part or in whole, unliquidated claims.  In addition, the Debtors

have compared proofs of claim received to scheduled liabilities and determined that there are

certain scheduled liabilities for which no proof of claim was filed.  In the aggregate, these proofs

of claim and scheduled liabilities assert more than $37 billion in liquidated amounts plus certain

unliquidated amounts.

38.    One of the conditions in both the Original Framework Agreements and the

Delphi-Appaloosa EPCA is that certain "trade and other unsecured claims" be reduced to $1.7

billion or less.  Accordingly, during the Application Period, the Debtors, with the assistance of

Skadden and other professionals, devoted a significant amount of time to (i) identifying disputed

proofs of claim, (ii) objecting to these proofs of claim pursuant to omnibus claims objections, (iii)

presenting omnibus objections at omnibus hearings, and (iv) litigating and/or resolving contested

claim objections.

18

39.    During the Application Period, the Debtors, with the assistance of Skadden and other professionals, continued their identification of numerous proofs of claim subject to objection on both procedural and substantive grounds and filed eight omnibus claims objections. These eight omnibus claims objections ultimately resulted in the entry of orders, both during and after the Application Period, disallowing, expunging, or reducing approximately 3,200 proofs of claims in the approximate amount of $146 million.

40.    Also during the Application Period, Skadden assisted the Debtors in working on many contested claims for which the applicable hearings had been adjourned pursuant to the Claims Procedures. The Debtors, with the assistance of Skadden, were able to consensually resolve 543 of these claims without the need to notice them for further contested hearings, resulting in the entry during the Application Period of orders disallowing, expunging, or reducing the claims in the approximate amount of $173 million. Skadden also assisted the Debtors in filing two motions with this Court to approve the settlements reached with two claimants, and successfully obtained this Court's approval these settlement motions.

41.    Pursuant to the Claims Procedures, Skadden also assisted the Debtors during the Application Period in identifying 23 contested claims to be noticed for further contested hearings. Eight of the 23 claims asserted environmental liabilities totaling $2.4 million for which the Debtors believed they were not responsible. As a result of the Debtors' efforts with the assistance of Skadden, these claims were withdrawn by the claimants with prejudice prior to the hearing.

42.    In addition, during the Application Period, Skadden continued to work on the remaining 15 contested claims that were noticed for further contested hearings during the Application Period and approximately 15 additional claims that were already noticed prior to the

19

Application Period for further contested hearings.  Skadden worked on resolving these claims by (i) participating in multiple "meet and confer" discussions and mediations, (ii) engaging in extensive negotiations leading to the ultimate resolution of a large number of the claims, and (iii) litigating the remaining claims, each at different stages of the Claims Procedures.  This litigation required drafting and responding to discovery requests, preparing witnesses, and drafting trial briefs.  As a result of these services provided by Skadden, the Debtors were able to negotiate, during the Application Period, the consensual resolution of 22 contested claims noticed for further contested hearings.  The consensual resolution of these 22 claims resulted in the entry, during the Application Period, of orders disallowing, expunging, or reducing the claims in the approximate amount of $36.1 million.

   43. Skadden also assisted the Debtors in litigating two unresolved contested claims that were noticed for further contested hearings during the Application Period.  The additional hearing on one contested claim was held on March 1, 2007, and resulted in an order (Docket No. 7173) disallowing and expunging the over $2 million claim in its entirety.  The additional hearing on the other contested claim was held on March 21, 2007, and resulted in an order (Docket No. 7499) disallowing and expunging all but a fraction of the approximately $15.9 million claim.  The remaining portion of that claim is still being litigated.

   44. Finally, during the Application Period, Skadden assisted the Debtors in amending the settlement procedures approved by this Court by (i) filing a motion with the Court, (ii) negotiating its proposed order with counsel for the Creditors' Committee and counsel for Wilmington Trust Company, and (iii) successfully obtaining this Court's approval of the relief requested in the motion.  The settlement procedures were amended to clarify that the Debtors

have the authority to allow certain claims against the estates of particular debtors and at

classifications different from that which are asserted by claimants in their proofs of claim.

45.    In connection with the foregoing services, Skadden expended 7,474.8 hours

during the Application Period for which Skadden seeks compensation of $3,336,137, or 26.5% of

the total compensation sought in this Interim Application.[17]  Detailed time entries of each

Skadden professional related to these services are attached hereto as Exhibit D-1.  A summary of

the hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|---|---|---|---|
| Christopher P. Connors | $585 | 722.3 | $422,547 |
| Joseph N. Wharton | $565 | 619.2 | $349,849 |
| Courtney E. VanLonkhuyzen | $435 | 711.8 | $309,634 |
| Sarah J. Platt | $355 | 843.7 | $299,515 |
| Lisa B. Diaz | $390 | 623.7 | $243,243 |
| Eric J. Howe | $390 | 622.3 | $242,697 |
| John K. Lyons | $775 | 308.7 | $239,243 |
| Amy Van Gelder | $470 | 428.2 | $201,254 |
| Albert L. Hogan III | $695 | 267.8 | $186,122 |
| Nick D. Campanario | $535 | 180.6 | $96,622 |
| Laverne F. Hill | $390 | 199.9 | $77,961 |
| John Guzzardo | $435 | 151.0 | $65,686 |
| Thomas J. Matz | $625 | 97.9 | $61,189 |
| Michael W. Perl | $435 | 113.7 | $49,461 |
| Kayalyn A. Marafioti | $830 | 57.4 | $47,642 |
| Melissa T. Kahn | $470 | 99.0 | $46,530 |
| Ron E. Meisler | $620 | 44.1 | $27,320 |
| Matthew Gartner | $355 | 74.8 | $26,555 |
| John (Jack) Wm. Butler, Jr. | $875 | 22.0 | $19,251 |

---

[17]    This compares to $31,974, or 0.3%, $151,245, or 1.3%, $467,214 or 4.7%, and $2,081,005 or 16.2%, of the total
fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications,
respectively.

21

| Name | Rate | Time | Amount |
|------|------|------|--------|
| George N. Panagakis | $810 | 19.6 | $15,876 |
| Adlai S. Hardin | $585 | 20.3 | $11,877 |
| Kurt Ramlo | $625 | 10.5 | $6,564 |
| Ian S. Bolton | $390 | 16.8 | $6,552 |
| Nathan L. Stuart | $495 | 11.0 | $5,445 |
| Kellan Grant | $470 | 8.5 | $3,995 |
| Brian M. Fern | $565 | 6.7 | $3,786 |
| J.R. Lederer | $355 | 8.5 | $3,019 |
| Brent M. Houston | $235 | 5.3 | $2,306 |
| Lee P. Garner | $625 | 2.7 | $1,688 |
| Dolores De Elizalde | $495 | 3.0 | $1,485 |
| Jenelle M. Todryk | $535 | 2.5 | $1,338 |
| Paraprofessional Total | | 1,171.3 | $259,885 |
| **Total** | | **7,474.8** | **$3,336,137 (26.5%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$128,693** |

B.    Reorganization Plan/Plan Sponsors

46.    During the Application Period, the Debtors continued to negotiate with their key stakeholders and the Original Plan Investors regarding certain elements of the EPCA, PSA, and potential plan of reorganization.  The Debtors also devoted a significant amount of time to fulfilling their contractual obligations under the terms of the EPCA and PSA, including, among other things, providing due diligence materials to the Original Plan Investors, and complying with various regulatory requirements, including antitrust regulations in multiple jurisdictions.  During the Application Period, the Debtors, with the assistance of Skadden, also began developing a reorganization plan based on the terms of the EPCA and PSA.

47.    Under the EPCA, the Debtors agreed to provide due diligence materials to the Original Plan Investors.  Prior to the Application Period, the Debtors received expansive legal due diligence requests from Appaloosa/Harbinger and Cerberus.  In response to these requests,

22

prior to and continuing during the Application Period, Skadden professionals worked with the

Debtors to review the requests, identify responsive documents, and provide those documents in

response to the Original Plan Investors' diligence requests.  Skadden professionals also conducted

numerous in-person meetings and teleconferences with various employees of the Debtors to

gather certain responsive documents to be made available for the Original Plan Investors' review.

Skadden professionals reviewed and, with the assistance of paraprofessionals, indexed each

document that was provided and continued to maintain and update a data room in Troy, Michigan

for counsel to the Original Plan Investors to review.  This data room was in addition to the other

data rooms that were established prior to the Application Period by the Debtors with the

assistance of Skadden in response to legal due diligence requests.

    48.  Additionally, during the Application Period, numerous attorneys for

Appaloosa/Harbinger and Cerberus visited the data room in Troy, Michigan on various occasions

to review documents.  Furthermore, to accommodate the Original Plan Investors' due diligence

efforts, the Debtors made certain documents available for review in Skadden's New York office.

To facilitate this review process, Skadden professionals were on site in Troy and New York to

prepare and update the data rooms and to coordinate with counsel to the Original Plan Investors to

ensure sufficient access to the requested documents.  Following the on-site visits, Skadden also

assisted the Debtors in responding to dozens of requests submitted by the Original Plan Investors

for copies of documents that were reviewed in the data room in Troy.  Throughout this process,

Skadden professionals participated in numerous conference calls and in-person meetings between

the Debtors and counsel to the Original Plan Investors to facilitate a timely and efficient flow of

information between the parties.  Additionally, Skadden assisted the Debtors' domestic and

international in-house counsel in an attempt to find additional responsive documents to these
supplemental diligence requests.

49.      In addition to the due diligence efforts in Troy, Skadden worked with the
Debtors' international legal staff to coordinate due diligence efforts by the Original Plan Investors
abroad.  With the guidance of Skadden, the Debtors set up various data rooms across the
Americas, Asia, and Europe and Skadden assisted the Debtors with the procedures in connection
with setting up these data rooms.  Skadden also answered numerous inquires raised by the
Debtors in connection with the foreign diligence efforts.  Finally, Skadden worked closely with
the Debtors' global offices to obtain additional documents to be included in the data room in Troy.

50.      The Original Plan Investors also conducted financial and other
business-related due diligence.  In connection with these due diligence efforts, the Debtors, with
the assistance of their advisors, provided documents and presentations to the Original Plan
Investors to assist the Original Plan Investors in their due diligence efforts.  To maintain
coordination between the legal and business due diligence, Skadden attorneys maintained
constant communication with PricewaterhouseCoopers LLP, the Debtors' professional retained to
perform an independent due diligence review of the Company, and the Debtors' business
personnel leading the business diligence.  As of the end of the Application Period, these due
diligence efforts were substantially complete.  As a result of the substantial completion of the due
diligence project with the Original Plan Investors, the Delphi-Appaloosa EPCA is not
conditioned upon further due diligence.

51.      In addition, during the Application Period and in connection with the
Original Framework Agreements, Skadden assisted the Debtors in preparing a required antitrust

24

filing in Brazil and in analyzing and coordinating potential additional filings with antitrust authorities throughout the Americas, Asia, and the European Union.

52.    Skadden also assisted the Debtors in negotiating additional changes to the EPCA and PSA. On April 19, 2007, the Debtors announced that they anticipated negotiating changes to the EPCA and PSA. The Debtors stated that any changes to the EPCA and PSA would be primarily as a result of addressing differences in views regarding Delphi's reorganization enterprise value among the Original Plan Investors, GM, the Statutory Committees, and the Debtors.

53.    Finally, during the Application Period, Skadden assisted the Debtors in drafting, reviewing, and executing various nondisclosure agreements with other potential plan investors. The nondisclosure agreements were important for the Debtors to work with those potential plan investors to conduct due diligence, among other things, which ultimately led to new proposals for agreements to support the Debtors' plan of reorganization. Working with these potential plan investors was part of the overall process that ultimately assisted the Debtors in entering into the Delphi-Appaloosa EPCA.

54.    In connection with the foregoing services, Skadden expended 4,979.2 hours during the Application Period for which Skadden seeks compensation of $2,515,285, or 20.0% of the total compensation sought in this Interim Application.[18] Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-2. A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

---

[18]    This compares to $14,195, or 0.2%, $20,728, or 0.2%, $820,818, or 8.2%, and $4,147,192, or 32.3%, of the total fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Michael W. Perl | $435 | 511.1 | $222,330 |
| Ian S. Bolton | $390 | 570.0 | $222,300 |
| Daniel I. Ganitsky | $585 | 319.1 | $186,674 |
| Ron E. Meisler | $604 | 303.5 | $183,313 |
| Nathan L. Stuart | $495 | 346.3 | $171,420 |
| J.R. Lederer | $355 | 408.0 | $144,841 |
| Kayalyn A. Marafioti | $830 | 172.4 | $143,092 |
| Eric L. Cochran | $845 | 163.1 | $137,821 |
| John (Jack) Wm. Butler, Jr. | $875 | 154.4 | $135,101 |
| George N. Panagakis | $810 | 158.2 | $128,142 |
| Adlai S. Hardin | $585 | 190.4 | $111,385 |
| Matthew Gartner | $355 | 297.3 | $105,543 |
| Kellan Grant | $470 | 153.7 | $72,239 |
| John Guzzardo | $435 | 163.3 | $71,036 |
| Adam Halper | $390 | 178.6 | $69,654 |
| Thomas J. Matz | $625 | 110.5 | $69,063 |
| Natalia F. Lazarova | $470 | 122.3 | $57,481 |
| Melissa T. Kahn | $470 | 88.3 | $41,501 |
| Brent M. Houston | $435 | 93.3 | $40,586 |
| Tero Louko | $585 | 55.6 | $32,526 |
| Brian M. Fern | $565 | 31.3 | $17,685 |
| Denise Kaloudis | $495 | 29.7 | $14,702 |
| Albert L. Hogan III | $695 | 18.1 | $12,580 |
| Lee P. Garner | $625 | 20.1 | $12,563 |
| John M. McCleod | $585 | 21.2 | $12,402 |
| Joseph N. Wharton | $565 | 20.4 | $11,526 |
| Dolores De Elizalde | $495 | 21.6 | $10,692 |
| Rita Sinkfield Belin | $585 | 14.8 | $8,658 |
| Gregory O. Ogunsanya | $495 | 14.3 | $7,079 |
| Britta Hortsmann | $390 | 12.0 | $4,680 |
| Marie L. Gibson | $670 | 6.7 | $4,489 |
| Lisa B. Diaz | $390 | 7.2 | $2,808 |
| Neil MacDonald | $595 | 3.7 | $2,202 |
| Sarah J. Platt | $355 | 4.7 | $1,669 |

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Christian Pilkington | $585 | 1.8 | $1,053 |
| Paraprofessional Total | | 192.2 | 44,449 |
| **Total** | | **4,979.2** | **$2,515,285 (20.0%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$161,193** |

C.    Rights Offering

55.    In connection with the EPCA, and in contemplation of a rights offering in connection with the Debtors' reorganization plan as outlined in the EPCA and the PSA, during the Application Period, the Debtors, with the assistance of Skadden, devoted a significant amount of time to the development and drafting of the Registration Statement that was filed with the SEC on March 7, 2007.  The Debtors, with the assistance of Skadden, devoted a significant amount of time discussing and negotiating the Registration Statement with the Original Plan Investors and the Statutory Committees.  Skadden  professionals also assisted the Debtors with respect to the diligence necessary to file the Registration Statement and dedicated time during the Application Period to researching certain issues, including tax related issues, related to the rights offering as contemplated by the Registration Statement.

56.    In connection with the foregoing services, Skadden expended 1,073.2 hours during the Application Period for which Skadden seeks compensation of $661,516, or 5.3% of the total compensation sought in this Interim Application.[19]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-3.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

---

[19]    This compares to $444,341, or 3.5%, of the total fees requested for this matter in Skadden's Fourth Interim Fee Application.  Skadden did not request compensation for this matter in its First, Second, or Third Interim Fee Applications.

27

| Name | Rate | Time | Amount |
|---|---|---|---|
| Michelle Gasaway | $625 | 162.8 | $101,751 |
| Nathan L. Stuart | $495 | 105.1 | $52,025 |
| Adlai S. Hardin | $585 | 86.3 | $50,486 |
| Eric L. Cochran | $845 | 59.6 | $50,363 |
| Kayalyn A. Marafioti | $830 | 60.0 | $49,800 |
| Nick P. Saggese | $875 | 53.6 | $46,901 |
| Daniel I. Ganitsky | $585 | 61.9 | $36,212 |
| Adam Halper | $390 | 89.1 | $34,749 |
| George N. Panagakis | $810 | 36.9 | $29,889 |
| Thomas J. Matz | $625 | 47.7 | $29,813 |
| Erin C. Furman | $585 | 42.1 | $24,629 |
| Eric B. Sesenbrenner | $625 | 37.6 | $23,500 |
| Gregg A. Noel | $845 | 27.8 | $23,492 |
| Amy J. Goetz | $355 | 66.1 | $23,466 |
| John (Jack) Wm. Butler, Jr. | $875 | 22.4 | $19,601 |
| Paul Schockett | $390 | 35.1 | $13,689 |
| Peter T. McKeon | $595 | 16.3 | $9,699 |
| Marie L. Gibson | $670 | 12.6 | $8,442 |
| Matthew B. Zisk | $625 | 13.4 | $8,375 |
| Cliff Gross | $830 | 10.0 | $8,300 |
| Ron E. Meisler | $592 | 10.8 | $6,390 |
| John P. Furfaro | $810 | 3.9 | $3,159 |
| Nick D. Campanario | $535 | 5.9 | $3,157 |
| Louis D. Wilson | $585 | 3.7 | $2,165 |
| Tero Louko | $585 | 2.5 | $1,463 |
| **Total** | | **1,073.2** | **$661,516 (5.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$21,360** |

D.    Case Administration

        57.    This category is comprised of matters relating to, among other things, (a)

general preparation for, and attendance at, court hearings, (b) general communications with

creditors and other parties-in-interest, (c) general case administration, including duties pertaining

28

to service of process, (d) general advice with respect to the prosecution of the Reorganization

Cases, and (e) general advice with respect to the rights and duties of debtors-in-possession in the

administration of the Reorganization Cases.

        58.     Skadden devoted significant time preparing for and attending the omnibus

and special hearings that this Court established.  The omnibus hearings have streamlined the

administration of these Reorganization Cases by establishing a schedule known to all

parties-in-interest for Court hearings and consolidating multiple matters in a single hearing, thus

eliminating unnecessary time and expense spent appearing before the Court on numerous

occasions each month regarding disparate matters.  Indeed, despite the fact that the Debtors are

the largest manufacturing company ever to have sought reorganization relief, the Debtors have

held only 20 omnibus hearings to date, including four omnibus hearings during the Application

Period.[20]  At these four omnibus hearings, 43 discrete matters were heard.  This omnibus hearing

schedule requires a carefully coordinated, but limited, team of Skadden attorneys to attend the

hearings, to meet with numerous parties-in-interest who appear, and to resolve as many issues as

possible without litigation.  In fact, it is not unusual for differences to be bridged at the courthouse

just prior to the applicable hearing.  Indeed, the Debtors, with the assistance of Skadden and the

Debtors' other professionals, have succeeded in presenting the great majority of these matters as

uncontested or resolved.  But for the coordinated efforts of Skadden (as well as the Debtors' other

retained professionals) in connection with these hearings, this simply would not be possible.  To

date, there have been relatively few contested matters in these cases, and even fewer matters that

actually required contested evidentiary hearings.  Following the hearings, Skadden occasionally

---

[20]    During the Application Period there were also six claims hearings.

modified proposed orders to comply with the Court's rulings and subsequently submit those orders to this Court for entry and docketing.

59.    The internal coordination of motions, responses, objections, witnesses, and other related matters requires close and careful attention by the entire Skadden team. The omnibus hearing schedule established in these Reorganization Cases is designed to efficiently address nearly all matters arising in these cases but requires that multiple professionals and paraprofessionals assist with various functions with respect to each omnibus hearing. For example, the monthly omnibus hearing agendas that Skadden prepares require significant attention by Skadden paraprofessionals. Skadden attorneys are then requested to review and approve the particular matter(s) on the agenda for which they have principal responsibility to ensure that all relevant filings are properly reflected.

60.    Moreover, given the size and complexity of these Reorganization Cases, the Debtors and Skadden are presented with a unique set of challenges in administering the cases, tracking motions filed by others, responding to inquiries from parties-in-interest, and maintaining organization and control over a case that could quickly become disorganized if attention were not provided to case administration matters on a continual basis. Thus, for instance, Skadden worked closely with the Debtors, this Court's Clerk's Office, representatives of this Court's Chambers, the U.S. Trustee's Office, the Debtors' notice and claims agent (Kurtzman Carson Consultants LLC ("KCC")), the Debtors' public relations advisors, and the Debtors' other advisors in coordinating the various procedures and processes to aid in the administration of the Reorganization Cases, including a dedicated website (which required periodic updates to communicate significant events during these cases), telephone hotlines, and e-mail information sites to assist in responding to the numerous inquiries that this case has generated. At the commencement of the

30

Reorganization Cases, for example, the Debtors and Skadden established a telephone hotline that provides basic information to callers and allows them to leave voicemail messages to be returned by an appropriate Skadden attorney.  During the Application Period, approximately 345 messages were submitted to the hotline.  In addition, numerous parties contacted Skadden directly with their inquires.  When necessary, Skadden researched responses to more complicated voicemail messages and otherwise responded to inquiries left directly on the hotline.  A considerable amount of time was devoted to these efforts.

61.    Skadden also estimates that it received hundreds of pieces of written correspondence during the Application Period, all of which were routed to appropriate professionals within Skadden and answered either orally or in writing.  Skadden necessarily devoted significant resources responding to these matters.  These efforts assured responsive answers to parties, ensured that the Debtors continued to conduct their affairs in accordance with the Bankruptcy Code and applicable nonbankruptcy law, and also assisted the Debtors and their estates by resolving numerous matters that might otherwise have resulted in pleadings filed with this Court.

62.    In addition to communications matters, various files were maintained by paraprofessionals that were critical to the ability of Skadden and others to promptly address issues that arose during the Application Period.  Skadden reviewed all pleadings and orders filed in the Reorganization Cases and worked with KCC to ensure that entities entitled to notice were kept informed of significant events in the Reorganization Cases.  The efficient management of administrative matters in a paper-intensive case of this size is a significant task.  Each week, the Debtors and Skadden are inundated with correspondence, documents, requests, pleadings, and other papers.  During the Application Period, nearly 1,352 items were docketed.  On average, at

least 11 pleadings were filed and docketed each day (including weekends and holidays) during the 120 days in the Application Period. As of May 31, 2007, approximately 8,145 items had been docketed.

63.    Given this volume of activity, Skadden maintained various procedures to create efficiencies in the management of the Reorganization Cases and to avoid unnecessary duplication of effort between its own professionals and its advisors. For instance, during the Application Period, Skadden kept detailed calendars of future events in the Reorganization Cases and maintained other planning tools to ensure that critical deadlines were met in this large and highly complex case and that a specific professional was assigned principal responsibility for nearly each discrete task to be completed.

64.    Skadden is also required to devote substantial attention and resources to notice and related matters in these cases. As of the end of the Application Period, there were approximately 476 parties on the core service lists, including approximately 62 parties on the Master Service List,[21] and an additional 414 parties who had filed a notice of appearance or request for notice in these cases (the "2002 List Parties"). Skadden, through its paraprofessionals, updates and maintains these lists to ensure proper notice by reviewing each notice of appearance and related pleading filed and updating the entities that firms represent as well as recording relevant addresses, reviewing all electronic and written correspondence to ensure that all lists are accurate, and reviewing all notices of appearance to minimize the chance that a party-in-interest is inadvertently excluded from a mailing.

---

[21]    The Master Service List is comprised of (a) the Debtors and their counsel, (b) the Office of the United States Trustee, (c) the members of and counsel for the Creditors' Committee and the Equity Committee, (d) counsel for the agent under the Debtors' former prepetition credit facility, (e) counsel for the agent under the Debtors' postpetition credit facility, and (f) those parties which may be added to the Master Service List upon written request to the Debtors or as may be otherwise ordered by the Court for good and sufficient cause.

65.    In connection with the foregoing services, Skadden expended 1,781.1 hours during the Application Period for which Skadden seeks compensation of $628,123, or 5.0% of the total compensation sought in this Interim Application.[22]  Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-4</u>.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Thomas J. Matz | $625 | 124.8 | $78,000 |
| Ron E. Meisler | $607 | 123.9 | $75,254 |
| Laverne F. Hill | $390 | 174.7 | $68,133 |
| Kayalyn A. Marafioti | $830 | 76.3 | $63,329 |
| Adlai S. Hardin | $585 | 88.0 | $51,480 |
| Brian M. Fern | $565 | 39.3 | $22,206 |
| John K. Lyons | $775 | 16.2 | $12,557 |
| Kurt Ramlo | $625 | 17.5 | $10,938 |
| John (Jack) Wm. Butler, Jr. | $875 | 11.9 | $10,413 |
| Nathan L. Stuart | $495 | 20.0 | $9,902 |
| M. Janine Jjingo | $390 | 19.8 | $7,722 |
| George N. Panagakis | $810 | 6.0 | $4,860 |
| Dolores De Elizalde | $495 | 9.1 | $4,505 |
| Lisa B. Diaz | $390 | 10.2 | $3,978 |
| Brent M. Houston | $435 | 8.2 | $3,567 |
| Sarah J. Platt | $355 | 9.6 | $3,409 |
| Kellan Grant | $470 | 7.2 | $3,384 |
| Denise Kaloudis | $495 | 6.6 | $3,267 |
| Michael W. Perl | $435 | 6.6 | $2,872 |
| J.R. Lederer | $355 | 5.3 | $1,882 |
| Joseph N. Wharton | $565 | 3.3 | $1,864 |
| Melissa T. Kahn | $470 | 3.5 | $1,645 |

---

[22]    This compares to $1,136,809, or 12.4%, $603,278, or 5.3%, $604,443, or 6.0%, and $613,369, or 4.8%, of the total fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Ian S. Bolton | $390 | 3.5 | $1,365 |
| Eric J. Howe | $390 | 3.3 | $1,287 |
| Matthew Gartner | $355 | 3.2 | $1,136 |
| Jenelle M. Todryk | $535 | 2.1 | $1,123 |
| Paraprofessional Total | | 981.0 | 178,045 |
| **Total** | | **1,781.1** | **$628,123 (5.0%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$97,467** |

E.    Asset Dispositions (General)

66.    The Debtors have stated that to achieve the necessary cost savings and operational effectiveness envisioned in their transformation plan, they must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus. As part of this effort, the Debtors identified non-core product lines that do not fit into the Company's future strategic framework and planned to sell or wind-down these product lines. These non-core product lines include Brake and Chassis Systems, Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering, and Wheel Bearings. During the Application Period, Skadden allocated significant resources to advising the Debtors with respect to various contemplated divestitures of significant assets and began drafting, analyzing, and reviewing various pleadings and purchase agreements in connection with the contemplated transactions.

67.    As part of this process, prior to and during the Application Period, Skadden advised the Debtors with respect to the sale of the Company's brake hose manufacturing business in Dayton, Ohio (the "Brake Hose Business") to Harco Manufacturing Group, LLC ("Harco"). Because the Brake Hose Business did not fit within the Debtors' anticipated product portfolio under their transformation plan, the Debtors, with the assistance of their professional advisors, marketed and negotiated the sale of that business. In that regard, among other things, Skadden

34

reviewed, analyzed, and negotiated terms of the applicable asset purchase agreement, and it

drafted and filed a motion (the "Brake Hose Business Sale Motion") (Docket No. 6742) seeking

approval of bidding procedures and certain bid protections for Harco as the stalking horse bidder.

The Brake Hose Business Sale Motion also sought approval at a later date of (a) the sale of the

Brake Hose Business to Harco for $9.75 million, subject to a higher or otherwise better bid, (b)

the assumption and assignment of certain executory contracts and unexpired leases to Harco or

the successful bidder, as the case may be, and (c) the assumption of certain liabilities by Harco or

the successful bidder.  During the Application period, the Court approved the bidding procedures

and bid protections.  In addition, at an omnibus hearing held on March 13, 2007, the Court

approved that sale of the brake hose business to Harco.  In addition, Skadden assisted the Debtors

with drafting, analyzing, and serving Cure Notices and Notice of Assumption and Assignment of

Contracts in connection with the brake hose divestiture (Docket No. 7107).

       68.    In addition, during the Application Period, Skadden advised the Debtors in

connection with the sale of the Company's catalyst solutions business (the "Catalyst Business").

The Debtors believe that the Catalyst Business is fundamentally strong, but like the Brake Hose

Business, the Catalyst Business does not fit within the Debtors' anticipated product portfolio

under their transformation plan.  Accordingly, during the Application Period, Skadden worked

with the Debtors to review, analyze, and negotiate terms of a master sale and purchase agreement

for the sale of the Catalyst Business.  In connection with this transaction, Skadden drafted and

filed, days after the conclusion of the Application Period, a motion (the "Catalyst Sale Motion")

(Docket No. 8179) seeking approval of bidding procedures and certain bid protections for

Umicore as the stalking horse bidder in the sale of the Catalyst Business.  The Catalyst Sale

Motion also sought approval at a later date of (a) the sale of the Catalyst Business to Umicore

(subject to higher or otherwise better bids) for $55.6 million and other consideration, (b) the assumption and assignment of certain executory contracts and unexpired leases to Umicore or the successful bidder at auction, as the case may be, and (c) the assumption of certain liabilities by Umicore or the successful bidder.  After the Application Period, the court entered an order establishing bidding procedures for the sale of the Catalyst Business and approving certain bid protections for Umicore (Docket No. 8436).  Pursuant to the bidding procedures for the sale of the Catalyst Business, qualified bidders must submit a bid for the Catalyst Business by July 31, 2007. If the Debtors receive at least one qualified bid, the Debtors, with the assistance of Skadden and other professional advisors, would conduct an auction for the sale of the Catalyst Business on August 8, 2007.

69.    Similarly, during the Application Period, Skadden advised the Debtors with respect to the sale of the Company's assets used in the brake and chassis modules product lines manufactured in a plant located in Saltillo, Mexico (the "Mexico Brake Plant Business") to Robert Bosch LLC and Frenados Mexicanos S.A. de C.V. (together with Robert Bosch LLC, "Bosch").  Accordingly, during the Application Period, Skadden worked with the Debtors to review, analyze, and negotiate terms of an asset sale and purchase agreement for the sale of the Mexico Brake Plant Business.  Additionally, Skadden drafted and, after the Application Period, filed a motion (the "Mexico Brake Plant Sale Motion") (Docket No. 8249) seeking approval of bidding procedures and certain bid protections for Bosch as the stalking horse bidder.  The Mexico Brake Plant Sale Motion also sought approval at a later date of (a) the sale of the Mexico Brake Plant Business to Bosch (subject to higher or otherwise better bids) for $15.0 million and other consideration, (b) the assumption and assignment of certain executory contracts and

36

unexpired leases to Bosch or the successful bidder, as the case may be, and (c) the assumption of certain liabilities by Bosch or the successful bidder.

70.    Furthermore, during the Application Period, Skadden assisted the Debtors with preparation for potential divestures of several other of the Debtors' non-core business lines, including, among other things, the sale of Delphi's steering and closures businesses.  Skadden worked with the Debtors to assess various bids and term sheets, reviewed, analyzed, and drafted asset purchase agreements, and began preparing pleadings, notices, and drafting proposed orders customary for such transactions to be submitted for Court approval.  By the end of the Application Period, the Debtors were continuing to negotiate the terms of the steering and closures business sales.

71.    In connection with the foregoing services, Skadden expended 981.8 hours during the Application Period for which Skadden seeks compensation of $543,556, or 4.3% of the total compensation sought in this Interim Application.[23]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-5.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Brian M. Fern | $565 | 263.6 | $148,935 |
| Denise Kaloudis | $495 | 201.1 | $99,546 |
| John K. Lyons | $775 | 98.6 | $76,417 |
| Kellan Grant | $470 | 155.0 | $72,850 |
| Ron E. Meisler | $609 | 87.7 | $53,384 |

---

[23]    This compares to $117,199, or 1.3%, $375,042, or 3.3%, $554,644 or 5.5%, and $492,762, or 3.8%, of the total fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| P. Gifford Carter | $535 | 36.4 | $19,475 |
| Jenelle M. Todryk | $535 | 23.6 | $12,626 |
| Jason P. Ketchens, | $565 | 16.0 | $9,040 |
| Marie L. Gibson | $670 | 13.1 | $8,777 |
| Joseph N. Wharton | $565 | 10.9 | $6,159 |
| George N. Panagakis | $810 | 6.0 | $4,860 |
| Adlai S. Hardin | $585 | 8.0 | $4,680 |
| John (Jack) Wm. Butler, Jr. | $875 | 5.3 | $4,638 |
| John M. McLeod | $585 | 6.1 | $3,569 |
| Sarah J. Platt | $355 | 6.7 | $2,379 |
| Thomas J. Matz | $625 | 3.8 | $2,376 |
| Andrew F. Strobert | $625 | 2.9 | $1,813 |
| Adam Halper | $390 | 4.1 | $1,599 |
| Nathan L. Stuart | $495 | 3.0 | $1,485 |
| Kayalyn A. Marafioti | $830 | 1.5 | $1,245 |
| Christian Pilkington | $585 | 1.8 | $1,053 |
| Paraprofessional Total | | 26.6 | $6,650 |
| **Total** | | **981.8** | **$543,556 (4.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$18,834** |

## Matters Between $100,000 And $500,000

F.    General Corporate Advice

72.    During the Application Period, Skadden attended meetings of the Board and certain of the Board's standing committees.  Skadden assisted the Board and Delphi senior management in part by preparing detailed analyses and other materials for distribution and discussion.  Skadden also advised the Board and the Debtors' management (during these meetings, throughout the continuing framework negotiations, and in the course of the Debtors' daily operations) on corporate governance matters related to the framework discussions and the reorganization generally.

38

73.    Also during the Application Period, Skadden advised the Debtors in connection with the preparation of the Debtors' regulatory filings with the SEC.  Specifically, during the Application Period, Skadden assisted with the preparation of nearly one dozen Form 8-Ks, which are issued in connection with disclosure issues on matters such as material agreements (such as the EPCA and the PSA), the Debtors' monthly operating reports, as well as in connection with internal and external communication matters.  In addition, during the Application Period, Skadden assisted the Debtors in preparing the Form 10-Q for the quarterly period ended September 30, 2006, which was filed on February 13, 2007, the Form 10-K for the year ended December 31, 2006, which was filed on February 27, 2007, and the Form 10-Q for the period ended March 31, 2007, which was filed on May 7, 2007.

74.    In connection with the foregoing services, Skadden expended 786.3 hours during the Application Period for which Skadden seeks compensation of $475,902, or 3.8% of the total compensation sought in this Interim Application.[24]  Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-6</u>.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| John (Jack) Wm. Butler, Jr. | $875 | 121.2 | $106,051 |
| Adam Halper | $390 | 194.7 | $75,933 |
| Daniel I. Ganitsky | $585 | 116.2 | $67,979 |
| Eric L. Cochran | $845 | 58.4 | $49,349 |
| Kayalyn A Marafioti | $830 | 29.3 | $24,319 |
| Thomas J. Matz | $625 | 33.4 | $20,876 |
| Nathan L Stuart. | $495 | 40.0 | $19,800 |

---

[24]    This compares to $340,687, or 3.7%, $249,312, or 2.2%, $161,208, or 1.6 %, and $253,853, or 2.0%, of the total fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Ron E. Meisler | $598 | 30.5 | $18,252 |
| Gregory O. Ogunsanya | $495 | 24.8 | $12,277 |
| Neil M. Leff | $830 | 14.5 | $12,035 |
| Adlai S. Hardin | $585 | 15.9 | $9,302 |
| Lisa B. Diaz | $390 | 19.1 | $7,449 |
| Kenneth Berlin | $810 | 9.0 | $7,290 |
| Louis D. Wilson | $585 | 10.6 | $6,201 |
| Joseph N. Wharton | $565 | 9.2 | $5,199 |
| Dolores De Elizalde | $495 | 10.3 | $5,099 |
| Marie L Gibson | $670 | 7.4 | $4,958 |
| George N. Panagakis | $810 | 5.4 | $4,374 |
| Neil MacDonald | $585 | 6.6 | $3,861 |
| Rita Sinkfield Belin | $585 | 6.0 | $3,510 |
| Kellan Grant | $470 | 7.0 | $3,290 |
| Erica Schohn | $470 | 6.6 | $3,102 |
| John Pl Furfaro | $810 | 2.9 | $2,349 |
| Paul Schockett | $390 | 4.8 | $1,872 |
| Ronald D. Kohut | $470 | 2.5 | $1,175 |
| **Total** | | **786.3** | **$475,902 (3.8%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$31,576** |

G.    Nonworking Travel Time

75.    Because of the extensive breadth of services that Skadden is providing to the Debtors in these Reorganization Cases, Skadden draws upon the experience and talent of a number of professionals from its worldwide organization including offices located primarily in Chicago, London, Los Angeles, New York, and Washington, D.C.  As this Court is aware, the Debtors are headquartered in Troy, Michigan, members of the Statutory Committees are based in several states across the United States, the Debtors' postpetition lenders are based in New York, and many of the Debtors' other primary constituencies, including its largest U.S. union and GM, are based in Michigan.  As a consequence of these disparate locations and the Debtors'

40

expectation and determined need that certain Skadden partners, counsel, associates, and paraprofessionals be on site in Michigan on a regular basis as well as in other locations, including New York, for specific events, Skadden professionals frequently must travel among these and other locations. Among other things, Skadden professionals travel to meet with the Board and senior management, creditor and equity constituencies, plan sponsors, and to attend Court hearings. Skadden's professionals who spend time traveling, but not otherwise working, allocate their time to this billing category.

76.    Skadden expended 1,396.6 hours during the Application Period devoted to nonworking travel time for which Skadden seeks compensation of $413,181, or 3.3% of the total compensation sought in the Interim Application.[25] This amount reflects an approximate fifty-five percent (55%)[26] reduction from Skadden's guideline hourly rates. Detailed time entries of each Skadden professional are attached hereto as <u>Exhibit D-7</u>. A summary of the hours expended and the corresponding dollar amount of the travel time for each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| John (Jack) Wm. Butler, Jr. | $438 | 233.1 | $101,982 |
| John K. Lyons | $388 | 140.9 | $54,599 |
| Lisa B. Diaz | $195 | 173.2 | $33,775 |
| Ron E. Meisler | $302 | 111.6 | $33,699 |
| Joseph N. Wharton | $283 | 113.1 | $31,951 |
| George N. Panagakis | $405 | 45.7 | $18,509 |
| Ian S. Bolton | $195 | 78.7 | $15,348 |

---

[25]    This compares to $290,270, or 3.2%, $376,303, or 3.3%, $351,261, or 3.5%, and $393,436, or 3.1%, of the total fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications.

[26]    This reduction is comprised of the following: the elimination of approximately 142.5 hours of billed time during the Application Period as an additional accommodation to the Debtors, and thereafter, a fifty-percent (50%) reduction to the guideline hourly rates. The eliminated time charges primarily related to extended travel time occasioned by weather and air traffic control delays.

41

| Name | Rate | Time | Amount |
|---|---|---|---|
| Michael W. Perl | $217 | 58.2 | $12,658 |
| J.R. Lederer | $178 | 68.2 | $12,106 |
| Nathan L. Stuart | $248 | 44.7 | $11,064 |
| Albert L. Hogan III | $348 | 24.7 | $8,584 |
| Eric J. Howe | $195 | 39.9 | $7,782 |
| Kellan Grant | $235 | 31.3 | $7,356 |
| Eric L. Cochran | $423 | 17.1 | $7,225 |
| Christopher P. Connors | $292 | 23.3 | $6,815 |
| N. Lynn Hiestand | $438 | 13.0 | $5,688 |
| Brian M. Fern | $283 | 18.5 | $5,227 |
| Neil M. Leff | $415 | 10.3 | $4,275 |
| Neil MacDonald | $295 | 13.3 | $3,926 |
| Kurt Ramlo | $312 | 12.1 | $3,781 |
| Nick P. Saggese | $438 | 7.4 | $3,238 |
| Kenneth Berlin | $405 | 7.3 | $2,957 |
| Nick D. Campanario | $268 | 9.8 | $2,622 |
| Eric B. Sesenbrenner | $313 | 7.4 | $2,313 |
| John Guzzardo | $218 | 9.7 | $2,110 |
| Laverne F. Hill | $195 | 10.4 | $2,028 |
| Matthew Gartner | $177 | 8.7 | $1,544 |
| Amy Van Gelder | $235 | 6.5 | $1,528 |
| Michelle Gasaway | $312 | 4.1 | $1,281 |
| Sarah J. Platt | $178 | 7.0 | $1,243 |
| Courtney E. VanLonkhuyzen | $218 | 5.4 | $1,175 |
| Paraprofessional Total | | 42.0 | $4,792 |
| **Total** | | **1,396.6** | **$413,181 (3.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$495,014** |

## H.    Supplier Matters

77.    As previously stated, Delphi is the largest industrial company ever to seek chapter 11 relief.  The Debtors' manufacturing operations depend upon the timely delivery of goods and services from thousands of separate suppliers which are party to more than 96,000

42

distinct supply agreements.  Management of the Debtors' supply chain issues is further
complicated by the Debtors' reliance, consistent with normal automotive industry practice, on
"just-in-time" inventory management systems and "sole source" supply methods.  As discussed in
detail in motions filed earlier in these cases,[27] use of the just-in-time supply method means that
the Debtors do not maintain a significant inventory of the components supplied by many of their
suppliers.  Under this sole source supply method, the Debtors frequently purchase from one
supplier all their requirements for a particular part, which must meet demanding specifications
imposed by both the Debtors and their OEM customers before it can be used in manufacturing the
Debtors' products.

78.    The Debtors' use of just-in-time inventory management and sole-source
supply methods results in, among other things, the following unique risks to the Debtors'
businesses:  (a) a failure by a supplier to timely ship goods may force the Debtors' manufacturing
facilities using those parts to shut down less than 24 hours after the missed shipment and the
Debtors' OEM customer's manufacturing facilities to shut down less than 48 hours after the
missed shipment and (b) the Debtors are unable to re-source parts to another supplier in the short
term.  The Debtors' post-filing supply chain management has been further complicated by the fact
that many of the Debtors' suppliers are facing similar financial pressures to those faced by the
Debtors.  The financial instability of some of those suppliers was significantly exacerbated by the
Debtors' chapter 11 filings and the large prepetition amounts owed to suppliers at the time of the
Debtors' filings.

---

[27]    See, e.g., Motion for Order Under 11 U.S.C. §§ 105(a), 363, 364, 1107, And 1108 And Fed. R. Bankr. P. 6004 and
9019 Authorizing Continuation of Vendor Rescue Program And Payment Of Prepetition Claims Of
Financially-Distressed Sole Source Suppliers And Vendors Without Contracts, dated October 13, 2005 (Docket
No. 17); Motion For Order Under 11 U.S.C. §§ 363(b) And 365(a) And Fed. R. Bankr. P. 9019 Approving
Procedures To Assume Certain Amended And Restated Sole Source Supplier Agreements, dated November 18,
2005 (Docket No. 1098).

79.     During the Application Period, Skadden continued to assist the Debtors in managing numerous supply chain issues to avoid any interruptions in the supply of goods and services to the Debtors' manufacturing operations.  In particular, the Debtors continued to address supplier issues in accordance with various supplier-related "first day" orders that were approved by the Court early in these cases, as well as this Court's order, dated December 12, 2005 (Docket No. 1494) (the "SAAP Order"), granting the Debtors authority to assume agreements covering the supply of goods that the Debtors determine are critical to their ongoing business operations.  This required the Debtors, with the assistance of Skadden, to negotiate a significant number of agreements with multiple suppliers pursuant to those orders.  During the Application Period, Skadden also devoted time to negotiations with suppliers regarding the extension or replacement of expiring supply agreements, including use of the procedures established by the SAAP Order.

80.     In addition, before the Application Period, Skadden assisted the Debtors in responding to a complaint filed in state court by one of its suppliers, Clarion Corporation of America ("Clarion"), relating to a dispute under three supply agreements.  With Skadden's assistance, the Debtors successfully removed the case to federal court and negotiated a stay of the action.  Clarion then filed a motion in this Court for payment of an administrative expense claim with respect to the same allegations asserted in the complaint.  During the Application Period, Skadden continued to conduct discovery, prepare the matter for trial, and assist the Debtors in their attempt to resolve the disputes through the use of a formal mediation process.  As a result of these efforts, the Debtors and Clarion have negotiated a proposed settlement agreement that has been submitted for approval in accordance with the settlement procedures established by this Court.

81.    In connection with the foregoing services, Skadden expended 935.7 hours during the Application Period for which Skadden seeks compensation of $396,217, or 3.1% of the total compensation sought in this Interim Application.[28]  Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-8</u>.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Kurt Ramlo | $625 | 221.0 | $138,126 |
| Brent M. Houston | $435 | 193.6 | $84,217 |
| John K. Lyons | $775 | 67.4 | $52,236 |
| Joseph N. Wharton | $565 | 57.9 | $32,714 |
| Albert L. Hogan III | $695 | 34.0 | $23,630 |
| Nick D. Campanario | $535 | 22.5 | $12,038 |
| Kellan Grant | $470 | 25.5 | $11,985 |
| Ron E. Meisler | $630 | 14.7 | $9,261 |
| Nathan L. Stuart | $495 | 16.6 | $8,217 |
| John (Jack) Wm. Butler, Jr. | $875 | 1.5 | $1,313 |
| Paraprofessional Total | | 281.0 | $22,480 |
| **Total** | | **935.7** | **$396,217 (3.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$9,818** |

I.    <u>Business Operations/Strategic Planning</u>

82.    This matter covers Skadden's work with the Debtors' senior management, investment bankers, financial advisors, and other business and legal advisors in considering restructuring strategies and initiatives.  Among other matters, senior Skadden lawyers participated in weekly meetings at the Company's headquarters, including Delphi Transformation

---

[28]    This compares to $1,032,388, or 11.2%, $539,862, or 4.8%, $331,877, or 3.3%, and $182,296, or 1.4%, of the total fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications, respectively.

Committee meetings. Skadden also participated in numerous strategy sessions, meetings, and calls to consider such major case issues as the Debtors' development of (a) their transformation plan, (b) 2007-2011 preliminary restructuring business plan, (c) the framework discussions, and (d) various scenarios, considerations, and ramifications regarding the Reorganization Cases. Furthermore, Skadden assisted the Debtors with respect to operational issues as they relate to these Reorganization Cases, including, without limitation, conducting negotiations with the Creditors' Committee and the Equity Committee as well as analyzing certain proposed strategic intercompany transactions.

83.    In addition, Skadden advises the Debtors' management of the Debtors' rights and duties as debtors-in-possession, noting proscribed, permitted, and required conduct. Skadden frequently advises the Debtors' management with respect to specific business questions posed by management that arise from events occurring in the Reorganization Cases. Part of Skadden's advice in this regard involves the participation of Skadden professionals in periodic planning and strategy conferences with the Debtors' senior management team.

84.    To assist the Debtors in continuing to perform their fiduciary duties, Skadden works with the Debtors in implementing procedures for the Debtors to operate their businesses in accordance with the requirements of the Bankruptcy Code. Skadden reviews certain of the Debtors' proposed expenditures, contractual relationships, dispositions of property, and other transactions to aid the Debtors in evaluating whether the contemplated transactions are within the ordinary course of business or are outside the ordinary course of business and require Court approval.

85.    In addition, in furtherance of the Debtors' transformation plan, prior to and during the Application Period, the Debtors, with the assistance of Skadden and other outside

46

counsel, entered into an agreement with Genpact International, LLC, which provides for the outsourcing of certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes (the "Finance Outsourcing Agreement").  The projected cost of the Finance Outsourcing Agreement is approximately $180 to $220 million over the 88-month term of the agreement.  After the projected one-time transition costs of $78 million, the Debtors expect that the Finance Outsourcing Agreement will result in a net operating savings of $150 million over its term.

86.    Moreover, in furtherance of the Debtors' transformation plan, prior to and during the Application Period, the Debtors, with the assistance of Skadden and other outside counsel, entered into two agreements for the outsourcing of certain application maintenance and support services.  This initiative is in furtherance of one of the key tenets of the Debtors' transformation plan, which includes transforming the Company's salaried workforce to ensure a competitive organizational and cost structure.  Specifically, one agreement was with Electronic Data Systems Corporation and EDS Information Services, LLC, which provides for the outsourcing of engineering systems support (the "EDS Agreement").  The second agreement was between Delphi and Computer Sciences Corporation, which provides for the system support of SAP,[29] commercial, supply chain, and manufacturing services (and, together with the EDS Agreement, the "Application Maintenance Agreements").  The aggregate projected cost of the Application Maintenance Agreements is approximately $150 to $200 million over the five-year term of the agreements, and after one-time transition costs of $25 million, the Debtors expect that the Application Maintenance Agreements will result in a net operating savings of $13 million over the term of the agreements.  Entering into the Application Maintenance Agreement is the

---

[29]    SAP is a leading international inter-enterprise software company that provides enterprise resource planning software to integrate accounting, distribution, human resources, and manufacturing, among other functions.

second phase of the Debtors' three-phase project to outsource certain information technology in an effort to reduce their selling, general, and administrative expenses.

87.    Both prior to and during the Application Period, Skadden took the lead role in drafting and preparing the necessary motions to obtain this Court's approval of both the Finance Outsourcing Agreement and Application Maintenance Agreements (collectively, the "Outsourcing Agreements") and assisted the Debtors throughout the process to apprise the Debtors' key constituencies of the facts so as to minimize litigation risk in the Debtors' pursuit of Court approval.  To this end, Skadden assisted the Debtors in preparing material for, and holding working group sessions with, the Creditors' Committee to communicate the substance of the Debtors' request and apprise the Creditors' Committee of the rationale behind the Debtors' business judgment.  The Debtors believe that these working group sessions contributed to the fact that both motions were uncontested.

88.    Finally, due to proprietary and confidential information contained in the Outsourcing Agreements, during the Application Period, the Debtors, with the assistance of Skadden, prepared and filed an ex parte application for authority to file the Application Maintenance Agreements under seal (Docket No. 7438), which was granted on March 28, 2007 (Docket No. 7453).  In addition, the Debtors, with the assistance of Skadden, prepared and filed an ex parte application for authority to file a redacted version of the Finance Outsourcing Agreement (Docket No. 7475), which was granted on March 29, 2007 (Docket No. 7476).  During the Application Period, Skadden worked with the Debtors' business team, their financial advisors, and in-house counsel in preparing for the hearing related to the Outsourcing Agreements.  On April 23, 2007, the Court entered an order approving the Application

48

Maintenance Agreements (Docket No. 7774) and an order approving the Finance Outsourcing

Agreement (Docket No. 7773).

89.    In connection with the foregoing services, Skadden expended 572.6 hours

during the Application Period for which Skadden seeks compensation of $358,708, or 2.8% of the

total compensation sought in this Interim Application.[30]  Detailed time entries of each Skadden

professional related to these services are attached hereto as <u>Exhibit D-9</u>.  A summary of the hours

expended and the corresponding dollar amount of the services performed by each professional is

provided in the following table:

| Name | Rate | Time | Amount |
|---|---|---|---|
| Brian M. Fern | $565 | 207.3 | $117,127 |
| John (Jack) Wm. Butler, Jr. | $875 | 82.2 | $71,925 |
| Eric L. Cochran | $845 | 51.2 | $43,265 |
| Thomas J. Matz | $625 | 38.3 | $23,938 |
| Melissa T. Kahn | $470 | 32.7 | $15,369 |
| Ron E. Meisler | $604 | 23.6 | $14,248 |
| Kayalyn A. Marafioti | $830 | 16.3 | $13,529 |
| George N. Panagakis | $810 | 10.5 | $8,505 |
| Nathan L. Stuart | $495 | 15.5 | $7,673 |
| Denise Kaloudis | $495 | 14.2 | $7,029 |
| Daniel I. Ganitsky | $585 | 10.5 | $6,143 |
| John K. Lyons | $775 | 7.1 | $5,503 |
| Adam Halper | $390 | 13.4 | $5,226 |
| Kurt Ramlo | $625 | 6.4 | $4,001 |
| Adlai S. Hardin | $585 | 6.3 | $3,686 |
| Albert L. Hogan III | $695 | 5.2 | $3,614 |

---

[30]    This compares to $258,753, or 2.8%, $192,132, or 1.7%, $304,824, or 3.0%, and $188,290, or 1.5%, of the total
fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications,
respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Marie L. Gibson | $670 | 4.0 | $2,680 |
| Paraprofessional Total | | 27.9 | $5,247 |
| **Total** | | **572.6** | **$358,708 (2.8%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$19,896** |

J.    Customer Matters (GM)

90.    As in previous Application Periods, Skadden assisted the Debtors with many matters related to GM, the Debtors' largest customer and former parent. The principal activity during the Application Period was assisting the Debtors with direct negotiations with GM concerning GM legacy issues and the overall supplier/customer relationship between Delphi and GM. Although the Debtors filed a motion to reject certain unprofitable GM supply contracts (Docket No. 3033) (the "GM Contract Rejection Motion") in March 2006, as a result of the progress achieved in connection with the Original Framework Agreements, the Debtors sought, and this Court approved, an order suspending prosecution of the GM Contract Rejection Motion indefinitely, effective January 31, 2007 (Docket No. 6778), the day prior to the Application Period. The suspension of the GM Contract Rejection Motion continued in effect throughout the Application Period while the Debtors continued to pursue a consensual resolution of various commercial and structural issues with GM with Skadden's assistance. These discussions have yielded multiple proposals from both sides aimed at addressing a wide range of matters, including the treatment of certain legacy agreements between the parties and resolution of various commercial matters.

91.    In connection with the foregoing services, Skadden expended 499.5 hours during the Application Period for which Skadden seeks compensation of $308,254, or 2.4% of the

total compensation sought in this Interim Application.[31]  Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-10.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Gregory O. Ogunsanya | $495 | 155.2 | $76,825 |
| John (Jack) Wm. Butler, Jr. | $875 | 80.8 | $70,701 |
| Daniel I. Ganitsky | $585 | 61.8 | $36,154 |
| Eric L. Cochran | $845 | 35.9 | $30,337 |
| Brian M. Fern | $565 | 31.7 | $17,911 |
| Kayalyn A. Marafioti | $830 | 20.1 | $16,683 |
| Adlai S. Hardin | $585 | 27.8 | $16,264 |
| Adam Harper | $390 | 39.6 | $15,444 |
| Thomas J. Matz | $625 | 16.4 | $10,250 |
| Kurt Ramlo | $625 | 12.5 | $7,813 |
| Ron E. Meisler | $621 | 6.1 | $3,789 |
| Nathan L. Stuart | $495 | 6.3 | $3,119 |
| Kellan Grant | $470 | 3.2 | $1,504 |
| Albert L. Hogan III | $695 | 2.1 | $1,460 |
| **Total** | | **499.5** | **$308,254 (2.4%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$7,761** |

K.    Employee Matters (General)

92.    As of the Petition Dates, the Company employed approximately 180,000

employees worldwide, of whom 50,600 were employees in the United States at approximately 44

manufacturing sites, 13 technical centers, and Delphi's Troy, Michigan headquarters.

Approximately 34,750 of the Debtors' U.S. employees were hourly employees as of the Petition

Dates, and 96% of these are union-represented.  Outside the United States, the Company's foreign

---

[31]    This compares to $458,182, or 5.0%, $1,789,803, or 15.8%, $1,699,180, or 16.9%, and 80,818, or 0.6%, of the
total fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications,
respectively.

entities employed more than 134,000 people on the Petition Dates, supporting 120 manufacturing sites and 20 technical centers in nearly 40 countries around the globe.

93.    During the Reorganization Cases, the Debtors have been attempting to restructure the compensation programs of all of their employees to market-competitive levels. Among other human capital programs, Skadden, along with the Debtors' other advisors, continue to advise the Debtors in connection with the Debtors' reassessment of the employment proposition that the Company could offer its executive workforce in light of current U.S. and marketplace economic realities.  The result of this evaluation led to Skadden's drafting, prior to the Application Period, of a motion to implement a key employee compensation program ("KECP") based on recommendations made by the Debtors' outside compensation consultant as adopted by the Compensation and Executive Development Committee of the Board.

94.    During the Application Period, Skadden continued discussions with the Creditors' Committee on issues related to both the KECP at-risk emergence payment program and a short-term annual at-risk emergence performance payment program for the first half of 2007 that would be substantially consistent with the program designed for calendar year 2006.  During the Application Period, Skadden took the lead role in drafting and preparing the necessary filings to obtain this Court's approval of a short-term annual at-risk emergence performance payment program for the first half of 2007.  Objections to an at-risk emergence performance payment program for the first half of 2007 were filed by the six unions representing hourly employees working in the domestic U.S. portion of Delphi's business operations.  On March 22, 2007, the Bankruptcy Court conducted an evidentiary hearing on the Debtors' request to restore a limited portion of the at-risk compensation opportunities for the Debtors' executives by implementing a short-term annual at-risk emergence performance payment program ("AIP") for the first half of

2007. Skadden prosecuted the Debtors' motion and successfully defended against the objections

filed. On March 29, 2007, the Court approved the AIP proposed by the Debtors (Docket No.

7474).

95.    In connection with the foregoing services, Skadden expended 483.0 hours

during the Application Period for which Skadden seeks compensation of $294,905, or 2.3% of the

total compensation sought in this Interim Application.[32]  Detailed time entries of each Skadden

professional related to these services are attached hereto as <u>Exhibit D-11</u>.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Nick D. Campanario | $535 | 113.4 | $60,670 |
| Brian M. Fern | $565 | 89.9 | $50,794 |
| Neil M. Leff | $830 | 51.0 | $42,330 |
| Young M. Park | $565 | 72.2 | $40,793 |
| Albert L. Hogan III | $695 | 54.3 | $37,739 |
| John (Jack) Wm. Butler, Jr. | $875 | 26.9 | $23,538 |
| Eric J. Howe | $390 | 23.2 | $9,048 |
| Ron E. Meisler | $621 | 14.3 | $8,879 |
| Thomas J. Matz | $625 | 8.8 | $5,501 |
| Erica Schohn | $470 | 9.7 | $4,559 |
| John K. Lyons | $775 | 5.6 | $4,340 |
| Kayalyn A. Marafioti | $830 | 3.1 | $2,573 |
| Brent M. Houston | $435 | 3.8 | $1,653 |
| Joseph N. Wharton | $565 | 2.5 | $1,413 |
| Paraprofessional Total | | 4.3 | $1,075 |
| **Total** | | **483.0** | **$294,905 (2.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$28,669** |

---

[32]    This compares to $879,786, or 9.6%, $359,097, or 3.2%, $308,544, or 3.1%, and $127,626, or 1.0%, of the total
fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications,
respectively.

L.    Retention/Fee Matters/Objections (Others)

96.    Reorganization cases as large and complex as these require the coordinated efforts of a number of restructuring advisors and professionals.  To this end, during the Application Period, Skadden, on behalf of the Debtors, worked with Ernst & Young LLP and KPMG LLP to expand the scope of each firm's respective engagements.  In addition, during the Application Period, the Debtors, with the assistance of Skadden, began the process of preparing additional retention and supplemental retention applications for other professional firms, which applications the Debtors anticipate will be filed in the near term.  When necessary, Skadden conferred with the Debtors and the professionals to be retained and provided assistance with evaluating discrete issues affecting the Debtors' retention of these professionals.

97.    Furthermore, during the Application Period, Skadden advised the Debtors regarding the retention, pursuant to the Order Under 11 U.S.C. §§ 327, 330, and 331 Authorizing Retention Of Professionals Utilized By Debtors In Ordinary Course Of Business (the "Ordinary Course Professionals Order") (Docket No. 883), of four ordinary course professionals who provide the Debtors with various non-restructuring legal and other professional services.  Because the Ordinary Course Professional Order requires any ordinary course professional to file an affidavit prior to being retained and compensated by the Debtors, Skadden assisted the Debtors in tracking which professionals had filed such affidavits and when the expiration of the individual objection period had occurred, permitting the Debtors then to pay such ordinary course professionals.

98.    In accordance with the requests of the U.S. Trustee, the Ordinary Course Professionals Order requires that any ordinary course professional whose fees exceed $50,000 per month or $500,000 in the aggregate during these Reorganization Cases must be retained pursuant

to a formal retention application to receive future compensation from the Debtors. Accordingly, Skadden assisted in the drafting of Ivins, Phillips & Barker's retention application (the Debtors' special pension benefits tax counsel) converting Ivins, Phillips & Barker from an ordinary course professional to a formally retained professional. The order approving this retention application was entered by the Court on February 26, 2007 (Docket No. 7049).

99.    Additionally, during the Application Period, this Court conducted a hearing to consider the interim fee applications of 33 professionals for the first, second, and third interim fee periods. Just prior to the hearing, at the Fee Review Committee's request and direction, Skadden coordinated with various professionals regarding the negotiation of certain fee accommodations. At the direction of this Court, Skadden prepared three proposed orders, one for each interim fee period, approving all fee applications (in the amounts recommended by the Fee Review Committee). .

100.    Finally, the Fee Review Committee reviewed the applications filed by 38 professionals for the fourth interim fee period. To facilitate and centralize this review by the Fee Review Committee, Skadden, at the Fee Review Committee's request and direction, coordinated with various professionals and arranged telephonic meetings with such professionals and the Fee Review Committee (i) to consider the preliminary reports by the Fee Review Committee on the allowance of such fee applications and (ii) to allow an opportunity to meet and confer with the Fee Review Committee to provide additional input.

101.    In connection with the foregoing services, Skadden expended 688.2 hours during the Application Period for which Skadden seeks compensation of $280,261, or 2.2% of the

total compensation sought in this Interim Application.[33]  Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-12.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Dolores De Elizalde | $495 | 264.4 | $130,879 |
| Thomas J. Matz | $625 | 92.9 | $58,064 |
| M. Janine Jjingo | $390 | 106.7 | $41,613 |
| John (Jack) Wm. Butler, Jr. | $875 | 3.7 | $3,238 |
| Denise Kaloudis | $495 | 6.2 | $3,069 |
| Ron E. Meisler | $585 | 4.2 | $2,458 |
| Kayalyn A. Marafioti | $830 | 2.1 | $1,743 |
| Michael W. Perl | $435 | 3.7 | $1,610 |
| Paraprofessional Total | | 204.3 | $37,587 |
| **Total** | | **688.2** | **$280,261 (2.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$21,809** |

M.    Creditor Meetings/Statutory Committees

        102.   This category relates to meetings with various creditor and equity

constituencies, and, in particular, with the Creditors' Committee and the Equity Committee and

their respective legal and financial advisors.  Throughout the Application Period, Skadden

regularly communicated with the Creditors' Committee and the Equity Committee and their

respective advisors regarding the progress and status of the Reorganization Cases.

        103.   In addition to day-to-day communications, during the Application Period,

Skadden represented the Debtors at five formal meetings with the Statutory Committees and their

professional advisors.  The formal monthly meetings have provided a forum for the Statutory

---

[33]   This compares to  $377,176, 4.1%, $431,545, or 3.8%, $241,482, or 2.4%, and $384,393, or 3.0%, of the total fees
       requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications, respectively.

Committees (including their members) to address general and specific concerns.  In addition to the formal meetings with the Statutory Committees, during the Application Period, the Debtors also held smaller sessions with the professionals for the Statutory Committees.  These meetings have allowed the Debtors to keep the Statutory Committee members and professionals informed as to upcoming issues, such as motions to be heard at the monthly omnibus hearings, the status of the Debtors' transformation plan, development and negotiations concerning the framework agreement, and actions to be undertaken in furtherance of the transformation plan and the framework agreement.  The Debtors believe that these efforts have likely eliminated potential objections that the Statutory Committees might have filed to some of the Debtors' motions by communicating and consulting with the Statutory Committees in advance of filings and anticipated transactions, thus avoiding unnecessary litigation expenses.  Skadden assisted the Debtors in preparing for these meetings, including assisting with the provision of information and status reports.

104.   In connection with the foregoing services, Skadden expended 494.5 hours during the Application Period for which Skadden seeks compensation of $258,775, or 2.1% of the total compensation sought in this Interim Application.[34]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-13.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Lisa B. Diaz | $390 | 184.5 | $71,955 |
| Ron E. Meisler | $608 | 68.6 | $41,720 |

---

[34]   This compares to $415,954, or 4.5%, $1,527,032, or 13.5%, $341,135, or 3.4%, and $215,231, or 1.7%, of the total fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| John (Jack) Wm. Butler, Jr. | $875 | 47.4 | $41,476 |
| Kayalyn A. Marafioti | $830 | 35.2 | $29,216 |
| Thomas J. Matz | $625 | 45.0 | $28,126 |
| Adlai S. Hardin | $585 | 30.9 | $18,078 |
| Sarah J. Platt | $355 | 16.2 | $5,752 |
| Kellan Grant | $470 | 7.2 | $3,384 |
| Eric L. Cochran | $845 | 4.0 | $3,381 |
| Michael W. Perl | $435 | 6.1 | $2,654 |
| George N. Panagakis | $810 | 1.9 | $1,539 |
| Brian M. Fern | $565 | 2.2 | $1,243 |
| Paraprofessional Total | | 45.3 | $10,251 |
| **Total** | | **494.5** | **$258,775 (2.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$17,245** |

N.   Environmental Matters

105.   Skadden assisted the Debtors in their efforts to comply with environmental law while also complying with the requirements of the Bankruptcy Code.  Analysis of the Debtors' potential environmental liabilities raises particularly complex factual issues because, among other reasons, a large portion of those liabilities arises from actions or operations that took place before the Debtors' separation from GM.  As a result, Skadden was required to research and analyze many legal issues in connection with this matter.

106.   In addition, many of the U.S. plants that Delphi intends to wind down may present environmental concerns.  Therefore, Skadden assisted the Debtors in developing a strategy regarding possible alternatives for addressing these potential environmental liabilities in connection with emergence from chapter 11 and analyzing the legal issues that may arise from implementation of such strategies.

107.   Furthermore, in connection with the ongoing claims review, Skadden has assisted the Debtors in analyzing various environmental claims that have been filed in these cases.

In particular, Skadden analyzed claims by neighboring property owners, alleging damages resulting from environmental contamination at a plant operated by the Debtors.  In connection with the Debtors' opposition to those claims, Skadden assisted the Debtors in preparing and drafting briefs and participated in settlement negotiations with respect to those claims.  Skadden also assisted the Debtors in analyzing claims under an environmental indemnification agreement entered into as part of a sale/leaseback transaction.  In addition, Skadden assisted the Debtors with analysis and review of environmental conditions associated with the Debtors' properties in certain states, and developed provisions for resolving potential environmental liabilities in connection with possible property sales, lease rejections, or other transactional agreements.  Skadden also assisted the Debtors in negotiating with regulatory authorities to obtain a consent order for the remediation of environmental conditions at the Debtors' plant in Anaheim, California and in preparing and serving a notice of that settlement on certain stakeholders as required under the court-approved procedures for settling non-ordinary course claims.

108.   In connection with the foregoing services, Skadden expended 360.7 hours during the Application Period for which Skadden seeks compensation of $254,016, or 2.0% of the total compensation sought in this Interim Application.[35]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-14.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Kenneth Berlin | $810 | 170.1 | $137,781 |
| John A. Amodeo | $625 | 141.2 | $88,251 |

---

[35] This compares to $163,396, or 1.8%, $140,142, or 1.2%, $129,158, or 1.3%, and $211,507, or 1.6%, of the total fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Elizabeth A. Malone | $495 | 28.8 | $14,257 |
| Brian M. Fern | $565 | 10.2 | $5,763 |
| Kayalyn A. Marafioti | $830 | 5.1 | $4,233 |
| Ron E. Meisler | $630 | 3.7 | $2,331 |
| John (Jack) Wm. Butler, Jr. | $875 | 1.6 | $1,400 |
| **Total** | | **360.7** | **$254,016 (2.0%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$22,872** |

O.    Retention/Fee Matters (SASM&F)

109.    Skadden is one of the largest law firms in the world, with more than 1,900 attorneys located in 22 offices in 11 countries.  Because of the number of the Debtors' business relationships and the number of Skadden's business clients, Skadden has been required to devote time since the commencement of the Reorganization Cases with respect to retention and fee issues.  In particular, Skadden conducted an extensive relationship and disclosure search in connection with being retained as Debtors' counsel.  In addition, as new parties have become involved in aspects of these cases, Skadden has conducted supplementary disclosure searches and has also periodically refreshed its searches to ensure the disclosure of new clients when warranted.  When appropriate, Skadden prepares and files supplemental declarations disclosing certain significant relationships that Skadden may have with a party-in-interest.  Finally, pursuant to the requirements of the Interim Compensation Order, Skadden prepares detailed monthly compensation packages for distribution and is required to prepare and file interim fee applications in accordance with the established procedures.

110.    In addition, as discussed above, prior to the Application Period, the Fee Review Committee retained LCC to serve as its fee analyst.  During the Application Period, LCC issued a summary report which included recommendations to the Fee Review Committee on Skadden's fourth interim fee application.  Skadden professionals were required to review,

60

analyze, and reconcile the fee data and recommendations proposed by LCC to effectively respond to the Fee Review Committee.

111.    In connection with the foregoing services, Skadden expended 511.4 hours during the Application Period for which Skadden seeks compensation of $223,508, or 1.8% of the total compensation sought in this Interim Application.[36]  Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-15</u>.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|---|---|---|---|
| Michael W. Perl | $435 | 124.4 | $54,115 |
| John (Jack) Wm. Butler, Jr. | $875 | 34.1 | $29,838 |
| Matthew Gartner | $355 | 62.3 | $22,117 |
| Sarah J. Platt | $355 | 61.1 | $21,691 |
| Dolores De Elizalde | $495 | 36.6 | $18,117 |
| Ron E. Meisler | $587 | 23.8 | $13,977 |
| Nathan L. Stuart | $495 | 14.5 | $7,178 |
| Thomas J. Matz | $625 | 10.5 | $6,564 |
| Kellan Grant | $470 | 13.6 | $6,392 |
| Kayalyn A. Marafioti | $830 | 7.7 | $6,391 |
| Adlai S. Hardin | $585 | 10.6 | $6,201 |
| Brian M. Fern | $565 | 7.0 | $3,955 |
| Eric J. Howe | $390 | 9.5 | $3,705 |
| Joseph N. Wharton | $565 | 6.0 | $3,390 |
| Lisa B. Diaz | $390 | 2.6 | $1,014 |

---

[36]    This compares to $58,023, or 0.6%, $191,088, or 1.7%, $134,152, or 1.3%, and $284,463, or 2.2%, of the total fees requested for this matter in Skadden's First, Second, Third , and Fourth Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Paraprofessional Total | | 87.1 | $18,863 |
| **Total** | | **511.4** | **$223,508 (1.8%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$61,185** |

P.    Litigation (Insurance Recovery)

112.    Before the commencement of these chapter 11 cases, Delphi, Delphi Trust I, Delphi Trust II, current and former directors of Delphi, certain current and former officers and employees of Delphi or its subsidiaries, and others were named as defendants in several lawsuits following Delphi's announced intention to restate certain of its financial statements.  The Judicial Panel on Multidistrict Litigation entered an order transferring each of theses related federal actions to the United States District Court for the Eastern District of Michigan (the "Michigan District Court").  One group of class action lawsuits (the "Securities Litigation") alleges, among other things, that Delphi and certain of its current and former directors and officers and others made materially false and misleading statements in violation of federal securities laws.  A second group of class actions, which are purportedly brought on behalf of participants in certain of Delphi's and its subsidiaries' defined contribution employee benefit pension plans who invested in Delphi common stock (the "ERISA Actions"), is brought under the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  The ERISA Actions allege, among other things, that the plans suffered losses as a result of alleged breaches of fiduciary duties under ERISA.[37]

113.    Prior to the Application Period, the lead plaintiffs in the Securities Litigation (the "Lead Plaintiffs") filed a motion in this Court for relief from the automatic stay to serve discovery requests on the Debtors.  This Court permitted limited relief from the stay solely to allow the Lead Plaintiffs to seek modification of the stay of discovery contained in the Private

---

[37]    Through the claims reconciliation process, prior to the Application Period, the Debtors objected to the proof of claim asserting liability on account of the ERISA Actions and that proof of claim was subsequently expunged.

Securities Litigation Reform Act of 1995 ("PSLRA").  During the Application Period, the

Michigan District Court partially granted the Lead Plaintiffs' motion to lift the PSLRA stay,

allowing the Lead Plaintiffs to obtain certain discovery from certain defendants, including the

Debtors.  Subsequently and also during the Application Period, the Lead Plaintiffs renewed their

motion for relief from the automatic stay to serve discovery requests on the Debtors.  The

Debtors, with the assistance of Skadden, objected to the renewed motion.  Skadden, on behalf of

the Debtors, negotiated a resolution and the parties reached a compromise for limited stay relief

as granted in the Agreed Order Regarding Interim Disposition With Respect To Lead Plaintiffs'

Motion For Limited Modification Of Automatic Stay (Docket No. 7718), entered by this Court on

April 16, 2007, pursuant to which the Debtors agreed to provide certain discovery to the Lead

Plaintiffs.

114.    Also during the Application Period, after the Michigan District Court

partially lifted the PSLRA stay, the plaintiffs in the ERISA Actions (the "ERISA Plaintiffs")

approached the Debtors to seek discovery from the Debtors in the ERISA Actions.  Skadden

assisted the Debtors in reaching an agreement with the ERISA Plaintiffs to provide the same

discovery to the ERISA Plaintiffs as was provided to the Lead Plaintiffs.  Skadden, on behalf of

the Debtors, drafted and prosecuted a motion seeking approval of this agreement to lift the

automatic stay to provide discovery to the ERISA Plaintiffs and this Court entered an agreed

order approving that agreement on May 31, 2007.

115.    In connection with the foregoing services, Skadden professionals expended

374.8 hours during the Application Period for which Skadden seeks compensation of $220,208,

or 1.7% of the total compensation sought in this Interim Application.[38]  Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-16</u>.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Kurt Ramlo | $625 | 88.9 | $55,563 |
| Albert L. Hogan III | $695 | 72.1 | $50,111 |
| Nathan L. Stuart | $495 | 101.2 | $50,094 |
| Michael W. Perl | $435 | 46.3 | $20,141 |
| John (Jack) Wm. Butler, Jr. | $875 | 22.3 | $19,513 |
| Kayalyn A. Marafioti | $830 | 10.6 | $8,798 |
| John Guzzardo | $435 | 9.9 | $4,307 |
| Lee P. Garner | $625 | 5.9 | $3,688 |
| Laverne F. Hill | $390 | 9.4 | $3,666 |
| Thomas J. Matz | $625 | 4.0 | $2,500 |
| Courtney E. VanLonkhuyzen | $435 | 4.2 | $1,827 |
| **Total** | | **374.8** | **$220,208 (1.7%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$9,749** |

Q.    <u>Employee Matters (Labor Unions)</u>

116.    As of the Petition Dates, substantially all of the Debtors' approximately 34,750 hourly employees in the United States were represented by three principal unions – the UAW, the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America (the "IUE-CWA"), and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union, AFL-CIO (the "USW").  The Debtors have master collective bargaining agreements with each of these three unions as well as "local agreements" with affiliated local

---

[38]    This compares to $83,523, or 0.9%, and $280,759, or 2.2%, of the total fees requested for this matter in Skadden's First and Fourth Interim Fee Applications, respectively.  Skadden did not request compensation for this matter in Skadden's Second and Third Interim Fee Applications.

unions covering primarily local issues that are worksite or business specific. The Debtors also have collective bargaining agreements with three other unions – the International Association of Machinists and Aerospace Workers (the "IAM"), the International Brotherhood of Electrical Workers (the "IBEW"), and the International Union of Operating Engineers (the "IUOE") covering approximately 135 employees (the six foregoing unions (the UAW, IUE-CWA, USW, IAM, IBEW, and IUOE) are collectively referred to herein as the "Unions").

117.    As this Court is aware, on March 31, 2006, the Debtors filed the Section 1113 And 1114 Motion and the Court later held a contested hearing on that motion that was adjourned following completion of the Debtors' direct case. The proceedings on the Section 1113 And 1114 Motion were subsequently suspended by this Court to facilitate a consensual resolution of the Section 1113 And 1114 Motion and remain suspended as of the filing of this Interim Application with respect to five of the Debtors' Unions and is settled with respect to the UAW as described below. During the Application Period, Skadden worked with the Debtors and other professionals to further the negotiations between the Debtors and their Unions. Throughout the Application Period, Skadden worked closely (being mindful not to duplicate efforts) with O'Melveny & Myers, LLP ("O'Melveny"), special labor counsel retained by the Debtors to advise with respect to the prosecution, continuance, and ultimate suspension of the Debtors' Section 1113 And 1114 Motion.

118.    Indeed, throughout the Application Period, the Debtors, with the assistance of Skadden, have continued to provide information to, and engage in discussions and negotiations with, the Unions and the Debtors' stakeholders in an effort to resolve the labor matters forming the basis of the Section 1113 And 1114 Motion. In particular, Skadden assisted the Debtors with analyzing and responding to proposals by the UAW to settle the Section 1113 And 1114 Motion

as it related to the UAW.  To apprise the Court of the progress of the framework discussions and other matters, the Court held two <u>in-camera</u> status conferences during the Application Period. Skadden advised and represented the Debtors at each of these conferences.

119.    As a result of the negotiations that occurred primarily during the Application Period, on June 22, 2007, after the Application Period, the Debtors agreed to the UAW Settlement Agreement which was ratified by the UAW on June 28, 2007 and approved by this Court on July 19, 2007.  The UAW Settlement Agreement modifies, extends, or terminates provisions of the Debtor's existing collective bargaining agreements with the UAW and its various locals and provides that GM will undertake certain financial obligations to the Debtors' UAW-represented employees and retirees to facilitate these modifications.

120.    In addition, during the Application Period, the Debtors, with Skadden's assistance, continued to negotiate with the USW, as well as their other unions, regarding programs similar to the UAW and IUE-CWA attrition programs previously approved by this Court.

121.    In connection with the foregoing services, Skadden expended 328.6 hours during the Application Period for which Skadden seeks compensation of $192,231, or 1.5% of the total compensation sought in this Interim Application.[39]  Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-17</u>.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

---

[39]    This compares to $414,991, or 4.5%, $2,590,790, or 22.9%, $1,387,983, or 13.8%, and $180,964, or 1.4%, of the total fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| John (Jack) Wm. Butler, Jr. | $875 | 47.4 | $41,475 |
| John P. Furfaro | $810 | 32.1 | $26,001 |
| Neil MacDonald | $588 | 41.3 | $24,278 |
| Thomas J. Matz | $625 | 27.4 | $17,126 |
| Adlai S. Hardin | $585 | 24.2 | $14,157 |
| Nathan L. Stuart | $495 | 22.6 | $11,188 |
| Ron E. Meisler | $594 | 18.0 | $10,693 |
| Ronald D. Kohut | $470 | 18.8 | $8,836 |
| Lisa B. Diaz | $390 | 22.2 | $8,658 |
| Kayalyn A. Marafioti | $830 | 10.2 | $8,466 |
| Brian M. Fern | $565 | 8.5 | $4,803 |
| Kurt Ramlo | $625 | 7.6 | $4,750 |
| Sarah J. Platt | $355 | 8.6 | $3,053 |
| Michael W. Perl | $435 | 3.7 | $1,610 |
| Daniel I. Ganitsky | $585 | 2.2 | $1,287 |
| Paraprofessional Total | | 33.8 | $5,850 |
| **Total** | | **328.6** | **$192,231 (1.5%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$31,677** |

R.    Global Subsidiaries (Non-U.S.)

122.    During the Application Period, Skadden devoted time advising the

Company on matters relating to its non-U.S. global subsidiaries, including consideration of

strategic alternatives in relation to its Spanish affiliate, DASE.  Specifically, during the

Application Period, Skadden advised the Company regarding DASE's filing of its "Concurso"

application (similar to a bankruptcy petition) in Spanish court on March 20, 2007.  On April 13,

2007, the Spanish court declared DASE to be in voluntary Concurso and appointed receivers for

DASE.  Following the filing of its Concurso application, Skadden worked with Spanish counsel

to help negotiate a proposed a social plan for DASE's employees and implement a

communications package related thereto.  In addition, Skadden liaised with the Statutory

67

Committees, keeping them apprised of the transpiring events and responding to questions related to the DASE Concurso proceeding.[40]

123.    In connection with the foregoing services, Skadden expended 265.6 hours during the Application Period for which Skadden seeks compensation of $186,086, or 1.5% of the total compensation sought in this Interim Application.[41]  Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-18</u>.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| N. Lynn Hiestand | $875 | 92.0 | $80,501 |
| Christian Pilkington | $585 | 78.7 | $46,041 |
| Kellan Grant | $470 | 44.8 | $21,056 |
| John (Jack) Wm. Butler, Jr. | $875 | 23.8 | $20,826 |
| Ron E. Meisler | $624 | 16.6 | $10,355 |
| Kayalyn A. Marafioti | $830 | 3.8 | $3,154 |
| John K. Lyons | $775 | 3.1 | $2,403 |
| Thomas J. Matz | $625 | 2.8 | $1,750 |
| **Total** | | **265.6** | **$186,086 (1.5%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$11,507** |

---

[40]    Following the Application Period, on July 4, 2007, DASE, the DASE Receivers, and the workers' councils and unions representing the affected employees reached a settlement on a social plan of €120 million for a separation allowance of approximately 45 days of salary per year of service to each employee.  At that time, Delphi and Delphi Automotive Systems (Holding), Inc. ("DASHI") concluded that it was in their best interests to voluntarily provide the €120 million to DASE as well as additional funds to DASE in an amount not to exceed €10 million for the purpose of funding payment of the claims of DASE's suppliers and other non-labor creditors.  Subsequently, with Skadden's assistance, the Debtors filed a motion authorizing DASHI to provide funds to DASE for these purposes.  This Court granted that motion on July 19, 2007.

[41]    This compares to $330,534, or 3.6%, $205,234, or 1.8%, $32,906, or 0.3%, and $46,676, or 0.4%, of the total fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications, respectively.

S.    <u>Tax Matters</u>

124.    To lay the groundwork for a potential plan of reorganization and emergence

from chapter 11, during the Application Period, Skadden continued analyzing certain complex tax

ramifications in connection with the Original Framework Agreements.  In particular, Skadden

professionals researched and analyzed the Debtors' ability to utilize certain favorable tax rules

available under section 382 of the Internal Revenue Code as they relate to various scenarios

proposed in the framework discussions.  These issues include, among other things, matters related

to change-in-control and potential limitations on the uses of net operating losses and other tax

assets after emerging from chapter 11.  In addition, Skadden assisted the Debtors in reviewing and

analyzing certain issues in connection with reconciling proofs of claim filed by various federal,

state, and local taxing authorities.  Finally, during the Application Period, Skadden assisted the

Debtors in negotiating and filing a joint stipulation with this Court to address and resolve issues

that arose from certain securities transactions that violated this Court's Final Order Under 11

U.S.C. §§ 105, 363, And 541 And Fed. R. Bankr. P. 3001 (A) Establishing Notification

Procedures Applicable To Substantial Holders Of Claims And Equity Securities And (B)

Establishing Notification And Hearing Procedures For Trading In Claims And Equity  (Docket

No. 1780).

125.    In connection with the foregoing services, Skadden expended 330.3 hours

during the Application Period for which Skadden seeks compensation of $185,480, or 1.5% of the

total compensation sought in this Interim Application.[42]  Detailed time entries of each Skadden

professional related to these services are attached hereto as <u>Exhibit D-19</u>.  A summary of the

---

[42]    This compares to $932,086, or 10.1%, $82,775, or 0.7%, $319,866, or 3.2%, $417,360, or 3.3%, of the total fees
requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications, respectively.

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Eric B. Sensenbrenner | $625 | 84.6 | $52,876 |
| Aaron S. Feinberg | $535 | 84.3 | $45,102 |
| Cliff Gross | $830 | 19.5 | $16,185 |
| Adlai S. Hardin | $585 | 26.5 | $15,503 |
| Kayalyn A. Marafioti | $830 | 17.2 | $14,276 |
| Paul Schockett | $390 | 34.0 | $13,260 |
| Matthew Gartner | $355 | 24.6 | $8,733 |
| Michael W. Perl | $435 | 15.2 | $6,612 |
| Denise Kaloudis | $495 | 11.3 | $5,594 |
| Thomas J. Matz | $625 | 6.8 | $4,250 |
| Ron E. Meisler | $630 | 3.1 | $1,953 |
| J. R. Lederer | $355 | 3.2 | $1,136 |
| **Total** | | **330.3** | **$185,480 (1.5%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$39,781** |

T.    Disclosure Statement / Voting Issues

126.   In connection with the development and preparation of the Debtors' plan of

reorganization, during the Application Period, Skadden continued to assist the Debtors in the

conceptual development of a disclosure statement that will be prepared and filed together with a

plan of reorganization.  Additionally, Skadden professionals began developing and reviewing

solicitation procedures that may ultimately be the basis for soliciting votes on the plan of

reorganization.  Finally, Skadden began considering and preparing potential plan solicitation

materials.

127.   In connection with the foregoing services, Skadden expended 318.9 hours

during the Application Period for which Skadden seeks compensation of $165,839, or 1.3% of the

total compensation sought in this Interim Application.[43]  Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-20.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Nathan L. Stuart | $495 | 163.6 | $80,983 |
| Kellan Grant | $470 | 72.8 | $34,216 |
| George N. Panagakis | $810 | 28.7 | $23,247 |
| Dolores De Elizalde | $495 | 14.0 | $6,930 |
| Ron E. Meisler | $630 | 9.8 | $6,174 |
| Laverne F. Hill | $390 | 11.8 | $4,602 |
| Eric J. Howe | $390 | 9.9 | $3,861 |
| John (Jack) Wm. Butler, Jr. | $875 | 3.1 | $2,713 |
| Thomas J. Matz | $625 | 2.9 | $1,813 |
| Brian M. Fern | $565 | 2.3 | $1,300 |
| **Total** | | **318.9** | **$165,839 (1.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$5,612** |

U.    Leases (Real Property)

128.    The Debtors are currently lessors or lessees with respect to approximately

80 real property leases.  During the Application Period, Skadden worked closely with the Debtors

on matters related to such real property leases including (a) advising the Debtors regarding

negotiating the renewal or amendments of certain leases, (b) reviewing proposed new leases and

negotiating entry into certain new leases, (c) preparing and servicing notices under the Order

Under 11 U.S.C. §§ 363, 1107, and 1108 Approving Procedures to Enter Into or Renew Real

Property Leases Without Further Court Approval, entered on January 6, 2006 (Docket No. 1777)

_____

[43]    This compares to $62,694, or 0.5%, of the total fees requested for this matter in Skadden's Fourth Interim Fee
Application.  Skadden did not request compensation for this matter in its First, Second, or Third Interim Fee
Applications.

71

for new or renewed leases, (d) assisting the Debtors with their decision-making process regarding

the rejection of leases, including advising the Debtors regarding lease rejection claims and lease

rejection strategies, (e) researching and advising the Debtors on the effect of a leasehold

assignor's liability for a rejection, (f) reviewing and advising the Debtors with respect to

environmental issues concerning the Debtors' nonresidential real property leases, and (g)

researching, advising, and resolving various mechanics' lien claims with respect to the Debtors'

leased real property.

129.    In addition, during the Application Period, the Debtors, with Skadden's

assistance, completed the negotiation of a sale-leaseback of a facility comprised of 347,800

square-feet of office space and 90,000 square-feet of lab space situated on approximately 35 acres

located in Auburn Hills, Michigan.  Through this transaction, the Debtors expect to obtain

significant economic advantages from the consolidation of six leased and owned facilities in

Michigan and Illinois, create a single, state-of-the-art technical center located in close proximity

to the Debtors' major customers, accelerate the development of new products and innovations,

foster better communications among employees, and properly project Delphi's image of technical

and technological excellence.  Skadden continued to assist the Debtors with the development of a

strategic plan to accomplish the proposed consolidation and implementation of that plan by

negotiating with brokers, sellers, investors, and other related parties regarding the numerous

issues that arose in connection with the proposals to consolidate these sites.  Ultimately, the

Debtors secured an investor to purchase the property for $33 million and lease it to the Debtors for

a 10-year term.

130.    Following the conclusion of these negotiations, on March 2, 2007 Skadden

filed the Motion For Order Under 11 U.S.C. §§ 363(b), 365(a), And 365(d) And Fed. R. Bankr. P.

6004 And 6006 Authorizing Debtors To (A) Enter Into And Assign Purchase Agreement, (B) Enter Into Lease Agreement, And (C) Reject Certain Unexpired Leases Of Nonresidential Real Property (the "Lease Transaction Motion") (Docket No. 7111).  As part of the Lease Transaction Motion, the Debtors sought to reject two leases of nonresidential real property.  The lessor under one of the rejected leases, Milwaukee Investment Company, filed an Objection to the Lease Transaction Motion on March 13, 2007 (Docket No. 7207).  Skadden assisted the Debtors in consensually resolving this Objection and filed a reply on March 21, 2007 (Docket No. 7371).  This Court entered an order approving the Lease Transaction Motion on March 27, 2007 (Docket. No. 7425), and the Debtors closed the transaction on April 30, 2007.

131.    Finally, during the Application Period, Skadden assisted the Debtors in drafting and prosecuting a motion under 11 U.S.C. § 365(d)(4) to further extend the deadline by which the Debtors must assume or reject unexpired leases of nonresidential real property.  The deadline was set to expire on June 7, 2007, and Skadden assisted the Debtors in obtaining an order, which was entered by this Court on April 23, 2007, further extending such deadline to the earlier of September 30, 2007 or the date on which the Court confirms a plan of reorganization in these chapter 11 cases.[44]

132.    In connection with the foregoing services, Skadden expended 246.9 hours during the Application Period for which Skadden seeks compensation of $133,549, or 1.1% of the

---

[44]    After the Application Period, on July 27, 2007, the Debtors filed a motion pursuant to 11 U.S.C. § 365(d)(4) to further extend the deadline by which the Debtors must assume or reject unexpired leases of nonresidential real property to the earlier of the date when a plan of reorganization in Delphi's chapter 11 cases is confirmed and February 29, 2008, which is consistent with the extension the Debtors received for the exclusive right to file a plan of reorganization in these cases.

total compensation sought in this Interim Application.[45]  Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-21.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Kellan Grant | $470 | 113.6 | $53,392 |
| Neil MacDonald | $585 | 38.2 | $22,347 |
| Catherine E. Danz | $535 | 41.2 | $22,042 |
| Kayalyn A. Marafioti | $830 | 12.3 | $10,209 |
| Ron E. Meisler | $590 | 12.0 | $7,079 |
| Marian P. Wexler | $810 | 8.4 | $6,804 |
| Kurt Ramlo | $625 | 7.4 | $4,625 |
| Albert L. Hogan III | $695 | 4.1 | $2,850 |
| John (Jack) Wm. Butler, Jr. | $875 | 1.9 | $1,663 |
| Denise Kaloudis | $495 | 2.4 | $1,188 |
| Paraprofessional Total | | 5.4 | $1,350 |
| **Total** | | **246.9** | **$133,549 (1.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$7,658** |

V.    Asset Analysis And Recovery

133.    Under Bankruptcy Code sections 108(a)(2) and 546(a)(1)(A), the Debtors

have until two years after the entry of the order for relief to commence (i) avoidance and other

causes of action under chapter 5 of the Bankruptcy Code and (ii) various causes of action under

applicable bankruptcy and non-bankruptcy law for which the applicable statute of limitations, but

for the chapter 11 filing, would otherwise have expired (collectively, the "Adversary

Proceedings").  To preserve these causes of action, the Debtors arguably must commence them by

---

[45]    This compares to $143,190, or 1.6%, $290,834, or 2.6%, $81,111, or 0.8%, and $145,356, or 1.1%, of the total
fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications,
respectively.

October 8, 2007 or October 14, 2007, as applicable, or consensually toll the Debtors' respective

deadlines to file these actions.

134.   Complex chapter 11 cases like the Debtors' can result in the filing of

thousands of Adversary Proceedings.  Simply identifying potential Adversary Proceedings

requires a diligent review of tens of thousands of prepetition transactions by the Debtors and their

advisors.  The Debtors in these cases continue to analyze relevant financial information and

payment histories to identify those causes of action which they believe warrant preservation and

which might yield value to these estates.  The Debtors, however, intend to emerge from

chapter 11 under a reorganization plan consistent with the framework attached to the

Delphi-Appaloosa EPCA.  Under such a plan, most avoidance actions would remain unnecessary

because all allowed claims would be satisfied in full.  Moreover, some (and perhaps most) of the

Adversary Proceedings which the Debtors identify in the course of their review may ultimately be

subject to releases or other forms of resolution in connection with any reorganization plan

confirmed in these cases.  But because the statutory deadlines for filing the Adversary

Proceedings will pass before the Debtors emerge from chapter 11, the Debtors must consider in

the exercise of their fiduciary duties to their stakeholders how to preserve the Adversary

Proceedings while seeking to emerge from chapter 11 under a plan in which most Adversary

Proceedings would remain unnecessary and later be dismissed.  The Debtors thus also continue to

examine permissible alternatives to filing the Adversary Proceedings before the statutory

deadlines.

135.   During the Application Period, Skadden played a central role in helping the

Debtors develop a comprehensive strategy for preparing and filing the Adversary Proceedings

and, to the extent possible, effectively obviating any need to file Adversary Proceedings by the

statutory deadlines. In addition, Skadden has prepared various materials related to these

activities, including draft court filings and detailed legal analyses on the relevant issues.

136.    In connection with the foregoing services, Skadden expended 215.1 hours

during the Application Period for which Skadden seeks compensation of $113,719, or 0.9% of the

total compensation sought in this Interim Application.[46]  Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-22.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Adlai S. Hardin | $585 | 90.5 | $52,943 |
| John Guzzardo | $435 | 40.5 | $17,618 |
| Thomas J. Matz | $625 | 21.9 | $13,688 |
| George N. Panagakis | $810 | 8.1 | $6,561 |
| Nathan L. Stuart | $495 | 12.2 | $6,039 |
| Sarah J. Platt | $355 | 14.7 | $5,219 |
| Kellan Grant | $470 | 6.3 | $2,961 |
| Lee P. Garner | $625 | 4.7 | $2,938 |
| Albert L. Hogan III | $695 | 2.9 | $2,016 |
| Denise Kaloudis | $495 | 2.2 | $1,089 |
| Kayalyn A. Marafioti | $830 | 1.3 | $1,079 |
| Paraprofessional Total | | 9.8 | $1,568 |
| **Total** | | **215.1** | **$113,719 (0.9%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$5,044** |

W.    Executory Contracts (Personalty)

137.    The Debtors estimate that, as of the Petition Dates, they were parties to

347,000 scheduled executory contracts and unexpired leases, which collectively involve billions

---

[46]    Skadden did not seek compensation for this matter in its First, Second, Third, and Fourth Interim Fee
Applications.

of dollars of liabilities.  During the Application Period, Skadden participated in meetings with numerous internal and external representatives and employees of the Debtors to coordinate the review of various executory contracts and, together with the Debtors' senior management and business advisors, to evaluate contracts and leases for assumption or rejection.  In addition, Skadden worked closely with business personnel and external representatives of the Debtors to facilitate a reconciliation of allegedly outstanding invoices with the Debtors' internal records to determine the Debtors' postpetition payment obligations.  Moreover, Skadden participated in numerous meetings and teleconferences with contract counterparties regarding contractual matters, termination notices, and other related issues.  Finally, during the Application Period, Skadden researched various issues relating to assumption and rejection of executory contracts that may arise in connection with a plan of reorganization.

138.    In connection with the foregoing services, Skadden expended 222.5 hours during the Application Period for which Skadden seeks compensation of $107,072, or 0.9% of the total compensation sought in this Interim Application.[47]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-23.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Brent M. Houston | $435 | 98.0 | $42,630 |
| Ian S. Bolton | $390 | 32.8 | $12,792 |
| Kellan Grant | $470 | 24.1 | $11,327 |
| Brian M. Fern | $565 | 19.0 | $10,735 |
| Kurt Ramlo | $625 | 13.3 | $8,314 |
| Kayalyn A. Marafioti | $830 | 8.5 | $7,055 |

---

[47]    This compares to $153,055, or 1.7%, $38,078, or 0.3%, $69,027, or 0.7%, and $50,562, or 0.4%, of the total fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Ron E. Meisler | $623 | 7.9 | $4,923 |
| Denise Kaloudis | $495 | 8.8 | $4,356 |
| Eric J. Howe | $390 | 6.8 | $2,652 |
| John K. Lyons | $775 | 1.5 | $1,163 |
| Thomas J. Matz | $625 | 1.8 | $1,125 |
| **Total** | | **222.5** | **$107,072 (0.9%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$4,432** |

### Matters Under $100,000

X.    Customer Matters (Reviews/Investigations)

139.    Early in these cases, the Debtors listed unliquidated claims against GM in their Statement of Financial Affairs and Schedules of Assets and Liabilities.  Prior to the Application Period, the Creditors' Committee filed a motion seeking court authority to prosecute certain claims and defenses belonging to the Debtors against GM and certain former officers of Delphi on the Debtors' behalf (also known as the "STN Motion") (Docket No. 4718), to which the Debtors filed a preliminary objection on August 4, 2006 (Docket No. 4859).  The Equity Committee also filed an objection and set forth its views regarding potential claims and defenses against GM (Docket No. 5070).  As of the end of the Application Period, the STN Motion was adjourned to the June 26, 2007 omnibus hearing and has subsequently been adjourned to the August 16, 2007 omnibus hearing.  During the Application Period, Skadden continued to review the results of its factual inquiry, conduct legal research, and assist the Debtors and the Board in evaluating the legal merits of potential claims and defenses against GM.  Skadden also assisted the Debtors and their financial advisors in analyzing and evaluating potential damages recoveries in various potential litigation scenarios.

140.    In connection with the foregoing services, Skadden professionals expended 122.4 hours during the Application Period for which Skadden seeks compensation of $66,985, or

0.5% of the total compensation sought in this Interim Application.[48]  Detailed time entries of each

Skadden professional related to these services are attached hereto as <u>Exhibit D-24</u>.  A summary of

the hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Lee P. Garner | $625 | 70.7 | $44,189 |
| John Guzzardo | $435 | 38.7 | $16,835 |
| Albert L. Hogan III | $695 | 3.0 | $2,085 |
| John (Jack) Wm. Butler, Jr. | $875 | 2.2 | $1,926 |
| Paraprofessional Total | | 7.8 | $1,950 |
| **Total** | | **122.4** | **$66,985 (0.5%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$8,836** |

Y.    <u>Liquidation/Feasibility</u>

            141.   During the Application Period, Skadden worked with the Debtors' financial

advisors to assist with preparation of a liquidation analysis in anticipation of an ultimate plan of

reorganization.  As part of this work, Skadden conducted research regarding various feasibility

issues to advise the Debtors on appropriate assumptions for any such analysis.

            142.   In connection with the foregoing services, Skadden expended 111.6 hours

during the Application Period for which Skadden seeks compensation of $64,538, or 0.5% of the

total compensation sought in this Interim Application.[49]  Detailed time entries of each Skadden

professional related to these services are attached hereto as <u>Exhibit D-25</u>.  A summary of the

---

[48]   This compares to $743,110, or 7.4%, and $661,440, or 5.2%, of the total fees requested for this matter in
        Skadden's Third and Fourth Interim Fee Applications, respectively.  Skadden did not request compensation for
        this matter in its First or Second Interim Fee Applications.

[49]   Skadden did not seek compensation for this matter in its First, Second, Third, and Fourth Interim Fee
        Applications.

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| George N. Panagakis | $810 | 27.5 | $22,275 |
| Kellan Grant | $470 | 39.8 | $18,706 |
| Matthew Gartner | $355 | 18.0 | $6,390 |
| Kayalyn A. Marafioti | $830 | 6.9 | $5,727 |
| Nathan L. Stuart | $495 | 9.7 | $4,802 |
| Kurt Ramlo | $625 | 7.4 | $4,625 |
| John (Jack) Wm. Butler, Jr. | $875 | 2.3 | $2,013 |
| **Total** | | **111.6** | **$64,538 (0.5%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$742** |

Z.    Employee Matters (Pension)

143.    During the Application Period, Skadden assisted the Debtors in furtherance

of another key tenet of the Debtors' transformation plan, devising a workable solution to the

Debtors' pension situation.  Skadden assisted the Debtors in connection with bankruptcy and

restructuring advice related to the Debtors' defined benefit pension plans covered by termination

insurance programs administered by the PBGC.  During the Application Period, Skadden assisted

the Debtors by researching and analyzing various issues in connection with the contemplated

treatment of the pension plans and by analyzing various tax-related issues in connection with the

pension funding obligations.  Skadden also worked with the Debtors in negotiating pension plan

funding waivers from the IRS for their hourly and salaried pension plans.  These waivers will

enable the Debtors to achieve their stated goal of resolving pension funding deficiencies upon

emergence from chapter 11.  With the assistance of Skadden during the Application Period, the

Debtors filed a motion and received this Court's approval to comply with the terms of the waivers.

144. In connection with the foregoing services, Skadden expended 100.0 hours during the Application Period for which Skadden seeks compensation of $57,919, or 0.5 % of the total compensation sought in this Interim Application.[50]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-26. A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Kellan Grant | $470 | 53.6 | $25,192 |
| Kayalyn A. Marafioti | $830 | 21.4 | $17,762 |
| Adlai S. Hardin | $585 | 17.5 | $10,238 |
| Thomas J. Matz | $625 | 4.0 | $2,500 |
| John (Jack) Wm. Butler, Jr. | $875 | 1.3 | $1,138 |
| Nathan L. Stuart | $495 | 2.2 | $1,089 |
| **Total** | | **100.0** | **$57,919 (0.5%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$8,913** |

AA.    Automatic Stay (Relief Actions)

145. As of the Petition Dates, the Debtors were parties to more than 200 active and threatened lawsuits. Since the Petition Dates, the Debtors have received numerous requests, including approximately 51 motions that have been filed, one of which was filed during the Application Period, seeking modification of the stay under section 362 of the Bankruptcy Code. During the Application Period, Skadden continued to work with the Debtors to reach consensual resolutions to these lift stay relief matters. In addition, Skadden attorneys continued to work closely with the Debtors and the Debtors' local, non-bankruptcy litigation counsel to reconcile

---

[50]   This compares to $58,190, or 0.5%, $28,202, or 0.3%, and $77,033, or 0.6%, of the total fees requested for this matter in Skadden's Second, Third, and Fourth Interim Fee Applications, respectively.  Skadden did not request any compensation for this matter in its First Interim Fee Application.

claims under certain lift stay procedures approved by this Court (the "Lift Stay Procedures"),[51] as well as assist the Debtors with the preparation of reports to the Creditors' Committee and its financial advisors that are required under the Lift Stay Procedures.  Finally, Skadden continued to advise the Debtors frequently regarding the application of the Lift Stay Procedures to various claims, strategies for facilitating settlements thereunder, and proper documentation of such settlements–three of which were finalized during the Application Period.

146.    In connection with the foregoing services, Skadden expended 113.5 hours during the Application Period for which Skadden seeks compensation of $53,883, or 0.4% of the total compensation sought in this Interim Application.[52]  Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-27</u>.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|---|---|---|---|
| Brent M. Houston | $435 | 97.0 | $42,196 |
| Kayalyn A. Marafioti | $830 | 5.6 | $4,648 |
| Kurt Ramlo | $625 | 7.4 | $4,626 |
| Thomas J. Matz | $625 | 2.0 | $1,250 |
| John K. Lyons | $775 | 1.5 | $1,163 |
| **Total** | | **113.5** | **$53,883 (0.4%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$8,189** |

---

[51]  Prior to the Application Period, Skadden professionals worked with the Debtors' legal department, other employees of the Debtors, and the Debtors' insurers to develop procedures for consensually modifying the automatic stay to permit cost-effective and timely liquidation and settlement of certain prepetition litigation claims that are covered under the Debtors' general, product, and automobile liability insurance policies.  This Court approved the implementation of the Lift Stay Procedures on June 26, 2006 (Docket No. 4366).

[52]  This compares to $64,079, or 0.7%, $140,233, or 1.2%, $356,684, or 3.6%, and $248,725, or 1.9%, of the total fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications, respectively.

BB.    Real Estate (Owned)

147.    Skadden assisted the Debtors in reviewing the Debtors' owned real estate and the potential purchase of real property related to the Debtors' contemplated consolidation of certain office and research facilities.  Specifically, during the Application Period, Skadden assisted the Debtors in determining the means for consolidating these facilities and engaged in discussions with potential investors for a sale-leaseback.  These issues required numerous communications with the Debtors' real estate and facilities personnel.[53]  In addition, Skadden worked together with the Debtors in coordinating various matters related to the Debtors' owned real estate, including resolving claims related to alleged statutory real property liens and entering into agreements to list properties that the Debtors intend to sell.

148.    In connection with the foregoing services, Skadden expended 66.4 hours during the Application Period for which Skadden seeks compensation of $35,695, or 0.3% of the total compensation sought in this Interim Application.[54]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-28.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Kellan Grant | $470 | 47.6 | $22,372 |
| Marian P. Wexler | $810 | 9.5 | $7,695 |
| Ron E. Meisler | $585 | 7.1 | $4,154 |

---

[53]    Due to the nature of this transaction, some of the work on this transaction was also described in an earlier section of this Interim Application.

[54]    This compares to $63,413, or 0.7%, $44,502, or 0.4%, $31,005, or 0.3%, and $42,465, or 0.3%, of the total fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Marie L. Gibson | $670 | 2.2 | $1,474 |
| **Total** | | **66.4** | **$35,695 (0.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$1,283** |

## CC.    Litigation (General)

149.    During the Application Period, Skadden was required to devote resources to various litigation matters not within the purview of other billing categories.  Skadden assisted the Debtors in negotiations relating to some of the non-bankruptcy litigation matters.  Moreover, Skadden continued to conduct legal research and advise the Debtors about removing certain actions from state courts.  Additionally, Skadden moved to extend the period within which the Debtors may seek removal, which was approved by this Court on April 23, 2007 (Docket No. 7770) to the later of (i) September 30, 2007 and (ii) 30 days after entry of an order terminating the automatic stay with respect to the action.[55]

150.    In connection with the foregoing services, Skadden expended 66.8 hours during the Application Period for which Skadden seeks compensation of $30,997, or 0.2% of the total compensation sought in this Interim Application.[56]  Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-29</u>.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

---

[55]    On July 27, 2007, after the Application Period, the Debtors filed a motion asking this Court to further extend the period within which the Debtors may seek removal, including the later of (i) February 29, 2008 and (ii) 30 days after entry of an order terminating the automatic stay with respect to the action.

[56]    This compares to $21,112, or 0.2%, $33,598, or 0.3%, $11,076, or 0.1%, and $37,702, or 0.3%, of the total fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Brent M. Houston | $435 | 56.6 | $24,622 |
| Kurt Ramlo | $625 | 10.2 | $6,375 |
| **Total** | | **66.8** | **$30,997 (0.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$15,958** |

DD.    Reports And Schedules

151.    The Debtors are required to submit periodic Operating Reports which

provide detailed information regarding the Debtors' assets, liabilities, and operations on a

monthly basis.  During the Application Period, Skadden worked with the Debtors' finance and

accounting personnel, as well as the Debtors' financial advisors and the U.S. Trustee, to review

and file Monthly Operating Reports for the months of January, February, March, and April 2007.

152.    In connection with the foregoing services, Skadden expended 21.3 hours

during the Application Period for which Skadden seeks compensation of $14,268, or 0.1% of the

total compensation sought in this Interim Application.[57]  Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-30.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Thomas J. Matz | $625 | 13.9 | $8,689 |
| Kayalyn A. Marafioti | $830 | 5.1 | $4,233 |
| Adlai S. Hardin | $585 | 2.3 | $1,346 |
| **Total** | | **21.3** | **$14,268 (0.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$6,938** |

---

[57]    This compares to $187,152, or 2.0%, $22,844, or 0.2%, $8,325, or 0.1%, and $7,546, or 0.1%, of the total fees
requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications, respectively.

EE.    Intellectual Property

153.    Throughout the Application Period, Skadden provided legal advice regarding bankruptcy-related issues affecting the Debtors' intellectual property, particularly patents and licenses.  During the Application Period, Skadden performed a specialized review of numerous intellectual property documents in connection with a possible plan of reorganization. Additionally, Skadden professionals participated in numerous conference calls with the Debtors to ensure a timely and efficient flow of information between Skadden, the Debtors, and the Original Plan Investors.

154.    In connection with the foregoing services, Skadden expended 20.3 hours during the Application Period for which Skadden seeks compensation of $12,688, or 0.1% of the total compensation sought in this Interim Application.[58]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-31.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Andrew F. Strobert | $625 | 20.3 | $12,688 |
| **Total** | | **20.3** | **$12,688 (0.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$7,959** |

Relief Requested

155.    Skadden has submitted monthly fee statements for the period from February 1, 2007 through May 31, 2007, and, in accordance with the Interim Compensation Order, now submits this Interim Application covering the Application Period.  Based on the firm's customary

---

[58]    This compares to $22,186, or 0.2%, $65,656, or 0.6%, $32,050, or 0.3%, and $47,649, or 0.4%, of the total fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications, respectively.

billing practices, the Debtors ordinarily would be billed a total of $13,948,457 for fees and $785,693 for charges and disbursements. In keeping with Skadden's commitment to self-policing its fees, charges, and disbursements, and based on various accommodations to the Debtors, Skadden, as part of its monthly fee statements, voluntarily reduced its fees by $1,237,354, or approximately 8.9%, and its charges and disbursements by $107,049, or approximately 13.6%. As a result, the actual amount billed to the Debtors was $12,711,103 for fees and $678,044 for charges and disbursements.

156.    Moreover, as an additional accommodation, Skadden has voluntarily reduced the amount sought in this Interim Application by $121,602 to reflect, among other accommodations, the elimination of (i) fees related to any timekeeper who billed fewer than ten total hours during the Application, (ii) fees related to any timekeeper who billed less than $1,000 during the Application Period, (iii) fees related to any instance in which a timekeeper billed less than $1,000 to a particular matter during the Application Period, and (iv) fees related to any matter to which fewer than ten hours were billed during the Application Period. As a result, the actual amount sought herein is $12,589,501 for fees. This represents a total reduction with respect to fees, charges, and disbursements of $1,466,005, or approximately 9.9%, from those amounts that Skadden would customarily charge.

157.    The Interim Compensation Order provides that, when seeking interim compensation, professionals must submit monthly fee statements to the Debtors, counsel to the Debtors, the U.S. Trustee, counsel to the Creditors' Committee, counsel to the agent under the Debtors' former prepetition credit facility, counsel to the agent under the Debtors' postpetition credit facility, and members of the Fee Review Committee. Each person receiving a statement has at least 15 days after its receipt to review it. If no objection to a monthly fee statement is made

within 45 days after the end of the applicable billing period, the Debtors are authorized to pay

80% of the fees requested (with the remaining 20% of the fees requested referred to herein as the

"Holdback") and 100% of the charges and disbursements requested.  Skadden has submitted

monthly fee statements as described above for each of the months covered by the Application

Period.

158.    Upon payment by Delphi for the amount owed to Skadden for the

Application Period, Skadden will have received $10,168,883 on account of billed fees and

$678,644 on account of billed charges and disbursements and will have accrued a Holdback in the

amount of $2,542,220.[59]  After application of an additional client accommodation of $121,602,

Skadden is requesting payment of 50% of the Holdback, or $1,271,110, leaving $1,271,110 of the

Holdback for this Application Period outstanding, for which Skadden will later seek payment.

Skadden submits that payment of one half of the Holdback amount for this Application Period

upon approval of this Interim Application is an appropriate balance between the interest of

professionals in receiving prompt payment and the interest of the estates in ensuring reasonable

professional compensation and reimbursement for actual or necessary expenses.

A.    Allowance Of Professional Fees

159.    During the Application Period, professionals at Skadden billed an aggregate

of 25,943.6 hours reflected in this Interim Application working on matters concerning the

Debtors' Reorganization Cases.[60]  Of such time spent, 4,460.3 hours were spent by partners,

1,756.8 hours were spent by counsel, 16,606.7 hours were spent by associates, and 3,119.8 hours

---

[59]    Skadden's monthly statements for May 2007 was submitted on July 31, 2007.  Pursuant to the Interim
Compensation Order, parties receiving the monthly statement have 15 days after receipt of such monthly
statement to object to such statement.  Therefore, the objection deadline for the May monthly statement is August
15, 2007.

[60]    Skadden maintains records of the time it expended in the rendition of all professional services, which time records
are made concurrently with the rendition of professional services.

were spent by legal assistants. A summary showing the name and position of each such partner, counsel, associate, and legal assistant, together with that person's date of admission to the bar (as applicable), net hours during the Application Period, and blended hourly billing rate, is provided in the Summary of Services found at the beginning of this Interim Application.[61]

B.      Reimbursement Of Charges And Disbursements

160.    As disclosed in the Retention Application that this Court approved, it is Skadden's standard policy to charge its clients in all areas of practice for certain charges and disbursements incurred in connection with such clients' cases. The charges and disbursements charged to clients include, among others, charges for messenger services, photocopying, court fees, travel expenses, postage, long distance telephone charges, computerized legal research, investigative searches, and other charges customarily billed by law firms. Certain charges and disbursements are not separately charged for under the bundled rate structure as described in the Engagement Agreement.

161.    Skadden has attempted to minimize the charges and disbursements associated with the Debtors' Reorganization Cases, particularly for items such as reproduction and delivery, which have been lowered as a result of the restricted service list and the ability to serve the 2002 List Parties electronically, which Skadden proposed and this Court approved. During the Application Period, Skadden disbursed the following sums for actual and necessary charges and disbursements in the rendition of professional services in the Reorganization Cases, and requests that it be reimbursed therefor:

---

[61]    In addition to the matter list, Exhibit C also sets forth the blended hourly rate and certain other business statistics associated with the Reorganization Cases.

Charges And Disbursements Incurred[62]

| | |
|---|---|
| Travel Expenses | $285,173 |
| Reproduction And Document Preparation | $179,720 |
| Computer Legal Research | $137,549 |
| Electronic Document Management | $19,551 |
| Courier, Express Delivery, And Postage | $17,886 |
| Filing/Court Fees | $9,819 |
| Telecommunications | $9,447 |
| Court Reporting | $8,642 |
| Outside Research | $7,357 |
| Professional Fees | $3,500 |
| **TOTAL** | **$678,644** |

162.    The charges and disbursements listed above are reasonable and are

consistent with those incurred by other bankruptcy practitioners in other large, complex chapter

11 reorganization cases in this and other districts.  Moreover, Skadden believes that the unique

size and complexity of these cases, including the terms of this Court's case management order, as

amended, which require, among other things, overnight delivery of most pleadings, warrant

reimbursement of the foregoing charges and disbursements.

Reasonableness Of Fees, Charges, And Disbursements

163.    Under section 330 of the Bankruptcy Code, a Bankruptcy Court may award

to a professional employed by the estates "reasonable compensation for actual, necessary

services" rendered by the professional, plus "reimbursement for actual, necessary expenses."  See

11 U.S.C. § 330(a)(1).  See generally In re Cenargo Int'l, 294 B.R. 571 (Bankr. S.D.N.Y. 2003);

In re Child World, Inc., 185 B.R. 14 (Bankr. S.D.N.Y. 1995).

164.    In determining the amount of "reasonable compensation," the Court must

consider the nature, extent, and value of the services, taking into account all the relevant factors,

including the time spent on such services, the rates charged for such services, whether the services

---

[62]    The details relating to the charges and disbursements can be found in Exhibits D-1 through D-35 on a matter by
matter basis.

were necessary and beneficial, whether the services were performed in a reasonable amount of

time commensurate with the complexity, importance, and nature of the problem, issue, or task

addressed, and whether the compensation is reasonable based on the customary compensation

charged by comparably skilled practitioners in cases other than cases under the Bankruptcy Code.

See 11 U.S.C. § 330(a)(3).

165.    In assessing attorneys' fees, courts use several different approaches.  The

Second Circuit and bankruptcy courts in this district frequently utilize the "lodestar" method,

which is a determination as to the number of hours of service reasonably devoted to the case

multiplied by the attorney's reasonable rates.  See Savoie v. Merchants Bank, 166 F.3d 456, 460

(2d Cir. 1999) (applying lodestar approach to non-bankruptcy case); Masterwear Corp. v. Angel

& Frankel, P.C. (In re Masterwear Corp.), 233 B.R. 266, 277 (Bankr. S.D.N.Y. 1999).  When

applying the lodestar approach, courts in this district incorporate the familiar factors set forth in

Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974).[63]  See, e.g., Betancourt

v. Giuliani, 325 F. Supp. 2d 330, 332 n.3 (S.D.N.Y. 2004) ("In adjusting the lodestar, courts

generally consider the . . .  factors set forth in Johnson v. Georgia Highway Express, Inc."); Sucre

v. MIC Leasing Corp. (In re Sucre), 226 B.R. 340, 351-52 (Bankr. S.D.N.Y. 1998) ("To

determine the 'lodestar fee' the Court must make an initial objective determination as to the

number of hours reasonably expended and the reasonable hourly rate.  After multiplying the two,

the Court may adjust the product by a consideration of [the Johnson] factors." (citation omitted)).

---

[63]    The twelve Johnson factors are (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) the time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.  Johnson, 488 F.2d at 717-19.

166.    In awarding attorneys' fees, courts will also consider whether the services rendered were reasonably likely to benefit the debtor's estate.  See, e.g., In re Ames Dep't Stores, Inc., 76 F.3d 66, 71 (2d Cir. 1996), rev'd on other grounds, Lamie v. U.S. Trustee, 540 U.S. 526 (2004); In re Granite Partners, L.P., 213 B.R. 440, 447 (Bankr. S.D.N.Y. 1997); In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 22 (Bankr. S.D.N.Y. 1991).  Thus, the Court should focus on what a reasonable lawyer would have done at the time and not invoke a hindsight analysis.

> [I]t is important for a court to maintain "a sense of overall proportion," and not "become enmeshed in meticulous analysis of every detailed facet of the professional representation."  It is easy to speculate in retrospect that the work could have been done in less time or with fewer attorneys or with an associate rather than a partner.  On the other hand, it is also possible that [the debtor] would not have enjoyed the success it did had its counsel managed matters differently.

Boston & Maine Corp. v. Moore, (In re Boston & Maine Corp.), 776 F.2d 2, 10 (1st Cir. 1985) (citations omitted).

167.    In accordance with the factors enumerated in 11 U.S.C. § 330 and applicable case law, the amount requested herein by Skadden is fair and reasonable, in light of (a) the nature of the Reorganization Cases, (b) the novelty and complexity of the Reorganization Cases, (c) the time and labor required to represent the Debtors effectively, (d) the time limitations imposed by the Reorganization Cases, (e) the nature and extent of the services rendered, (f) Skadden's experience, reputation, and ability, (g) the value of Skadden's services, and (h) the cost of comparable services other than in a case under the Bankruptcy Code.

C.    Nature, Complexity, And Duration Of Cases

168.    As should be evident from the summary of Skadden's services as described above in this Interim Application, the Debtors' chapter 11 reorganization presents a particularly unique set of circumstances.  Unquestionably, these are large and complex cases.  The nature and

92

complexity of the Reorganization Cases has required Skadden to develop case management and

staffing solutions at every stage of the proceedings.  These tasks have been particularly complex

in light of the Debtors' widespread operations and the relative sophistication of other

parties-in-interest in these Reorganization Cases.  Skadden nonetheless has assisted the Debtors

by employing a streamlined case management structure that generally consists of relatively small,

core teams, and has assigned various attorneys to other discrete tasks to avoid the performance of

duplicative or unnecessary work.

   169. Given the size of these Reorganization Cases and the number of matters that

continually need to be addressed simultaneously, there have been occasions when a number of

Skadden attorneys must be present and participate in the discussions and negotiations.  This is

particularly true of meetings with the Creditors' Committee and the Equity Committee and also

with respect to the monthly omnibus hearings.  Skadden believes that, as is evident from the

summaries contained in this Interim Application and the time entries attached hereto, it has

articulated specific reasons for attendance by multiple attorneys on such occasions.

D. Experience Of Skadden

   170. The experience of Skadden also has benefited the estates.  Skadden is

among the largest firms and has one of the largest restructuring groups in the world.  As more

fully set forth in the Retention Application, Skadden's restructuring attorneys and attorneys from

other practice areas have extensive knowledge and experience in dealing with the multitude of

fast-paced issues that arise in similar chapter 11 cases.  Accordingly, Skadden's depth of

experience in chapter 11 matters has ensured that a number of pressing matters could be

addressed promptly.  In addition, Skadden's commitment to monitoring the administrative

expenses of the estates, including its own legal fees, has been a constant element of its

93

representation of the Debtors.  Indeed, this emphasis has been manifested in Skadden's careful

review of its fees, charges, and disbursements and a voluntary client accommodation of

$1,466,005, including a voluntary aggregate accommodation of $1,344,403 on Skadden's

monthly fee statements and an additional $121,602 voluntary reduction on this Interim

Application.

E.    Comparable Services

171.    An award of compensation also must be based on the cost of comparable

services other than in a bankruptcy case.  Skadden's rates are consistent with rate structures

charged to other clients in non-bankruptcy matters.  Moreover, its rate structure was disclosed

clearly in its Retention Application, which this Court approved and to which none of the major

constituencies objected.  The amounts sought by Skadden are consistent with the fees, charges,

and disbursements incurred by other chapter 11 debtors in cases of similar size, complexity, and

duration.  Accordingly, the cost of comparable services supports the Interim Application, and the

services performed during the Application Period more than warrant the allowance of

compensation, particularly in view of the results achieved.

F.    Compliance With Guidelines

172.    Skadden believes that this Interim Application, together with the

attachments hereto, substantially complies in all material respects with the Guidelines.  The

Debtors have paid all quarterly fees currently due and payable to the U.S. Trustee. To the extent

that this Application does not comply in every respect with the requirements of such guidelines,

Skadden respectfully requests a waiver for any such technical non-compliance.

94

Notice

173.    In compliance with the Sixth Supplemental Order Under 11 U.S.C. § 331

Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of

Professionals, entered by this Court on December 11, 2006 (Docket No. 6145), notice of the filing

of this Interim Application will be provided to all parties who have filed a notice of appearance

with the Clerk of this Court and requested notice of pleadings in these chapter 11 cases.  In

addition, the Interim Application in its entirety will be served on the following parties: (i) Delphi

Corporation, 5725 Delphi Drive, Troy, Michigan 48098, Att'n: David M. Sherbin, Esq. and John

D. Sheehan, (ii) the Office of the United States Trustee for the Southern District of New York, 33

Whitehall Street, Suite 2100, New York, New York 10004, Att'n: Alicia M. Leonhard, Esq., (iii)

counsel for the Creditors' Committee, Latham & Watkins LLP, 885 Third Avenue, New York,

New York 10022-4802, Att'n: Robert J. Rosenberg, Esq., (iv) counsel for the Equity Committee,

Fried, Frank, Harris, Shriver & Jacobson, LLP, One New York Plaza, New York, New York

10004, Att'n: Bonnie Steingart, Esq., (v) counsel for the agent under the Debtors' former

prepetition credit facility, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York,

New York 10017, Att'n: Kenneth S. Ziman, Esq. and Robert H. Trust, Esq., (vi) counsel for the

agent under the Debtors' postpetition credit facility, Davis Polk & Wardell, 450 Lexington

Avenue, New York, New York 10017, Att'n: Donald S. Bernstein, Esq. and Brian M. Resnick,

Esq., and (vii) the members of the Fee Review Committee and its advisor, Legal Cost Control,

Inc., 255 Kings Highway East, Haddonfield, New Jersey 08033, Att'n: John J. Marquess.  In light

of the nature of the relief requested, the Debtors submit that no other or further notice is

necessary.

95

<u>Memorandum Of Law</u>

174.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, Skadden respectfully requests that the Court (a) enter an order allowing interim compensation of $12,589,501 to Skadden for professional services rendered as attorneys for the Debtors during the Application Period, plus reimbursement of actual and necessary charges and disbursements incurred in the amount of $678,644, (b) authorize and direct the Debtors to pay to Skadden the amount of $1,271,110 to reduce the Holdback accrued during the Application Period, with the remaining Holdback amount of $1,271,110 to be held by the Debtors until further order of this Court, and (c) grant it such other and further relief as is just.

Dated: New York, New York
      July 31, 2007

                              SKADDEN, ARPS, SLATE, MEAGHER
                               &FLOM LLP

                              By: /s/ John Wm. Butler, Jr.
                                 John Wm. Butler, Jr. (JB 4711)
                                 John K. Lyons (JL 4951)
                                 Ron E. Meisler (RM 3026)
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois 60606
                              (312) 407-0700

                                    - and -

                              By: /s/ Kayalyn A. Marafioti
                                 Kayalyn A. Marafioti (KM 9632)
                                 Thomas J. Matz (TM 5986)
                              Four Times Square
                              New York, New York 10036
                              (212) 735-3000

                              Attorneys for Delphi Corporation, et al.,
                              Debtors and Debtors-in-Possession