Hearing Date:  August 2, 2007
Hearing Time:  10:00 a.m. (prevailing Eastern time)

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                                             :
      In re                                                  :    Chapter 11
                                                             :
DELPHI CORPORATION, et al.,                                  :    Case No. 05-44481 (RDD)
                                                             :
                                                             :    (Jointly Administered)
                     Debtors.                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' REPLY IN SUPPORT OF DELPHI-APPALOOSA
INVESTMENT AND PLAN FRAMEWORK MOTION

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (the "Debtors"), hereby submit

this response (the "Reply") in support of the Debtors' Expedited Motion For Order Authorizing

And Approving Delphi-Appaloosa Investment Equity Purchase And Commitment Agreement

Pursuant To 11 U.S.C. §§ 105(a), 363(b), 503(b), And 507(a), dated July 18, 2007 (Docket No.

8673) (the "Motion").

   The Motion is essentially unopposed – the only response filed by a party-in-

interest is the quasi-opposition of a disappointed potential plan investor whose proposal was not

accepted by the Debtors and was not supported by either Statutory Committee or GM.

   On July 19, 2007, the Court entered an Order requiring parties-in-interest to show

cause . . . why an order should not be entered granting the [Motion]."  (Docket No. 8694).  On

July 27, 2007, Highland Capital Management, LP ("Highland") filed a four-paragraph

"Statement Regarding [the Motion]" (Docket No. 8754) (the "Statement").  In its Statement,

Highland expressed its disappointment that the Debtors chose to proceed with the Delphi-

Appaloosa EPCA instead of Highland's competing proposal, but confirmed that Highland does

not intend to submit testimony or documentary evidence in opposition to the Motion.  (Highland

Statement ¶¶ 3-4.)

<u>Preliminary Statement</u>

   1. As this Court has observed, the Debtors and their stakeholders have a

unique opportunity in time:  under current conditions, a largely consensual reorganization of the

Debtors' businesses is possible, and stakeholders could benefit to a degree beyond the

expectations of many at the beginning of these chapter 11 cases.  The Debtors and their

stakeholders are striving to realize this opportunity.

   2. For example, on July 9, 2007, Delphi confirmed publicly that its

comprehensive settlement discussions with GM had entered the documentation phase.  Then,

with the support of both Statutory Committees, this Court approved the milestone settlement

agreement reached between Delphi, the UAW, and GM on July 19, 2007.  Earlier this week, the

Debtors reached definitive labor settlements with two additional U.S. unions, and hope to reach

consensual resolutions with their other unions in the near future.

3.      Now the Debtors are prepared to take another significant step in

furtherance of their transformation goals.  After careful consideration and deliberation, the

Debtors have determined that entering into the Delphi-Appaloosa EPCA should facilitate a

consensual reorganization of the Debtors' estates that is in the best interests of all stakeholders.

4.      The Delphi-Appaloosa EPCA is the product of intense negotiations among

the Debtors, the Statutory Committees, GM, and numerous potential plan investors that have

taken place for more than a year, since the Debtors initiated framework discussions in August

2006.  Since the Court approved the Original EPCA in January 2007, the Debtors have continued

to engage in negotiations and discussions in a competitive process with the goal of developing a

transaction that will best meet the Debtors' transformation objectives.  As a result, the investment

and plan framework contemplated by the Delphi-Appaloosa EPCA should provide full recovery

to unsecured creditors and significant value to current equity holders at the expected

reorganization enterprise value, and should facilitate resolution of the Debtors' legacy issues with

GM, the UAW, and its other unions.

5.      Likely for these reasons, the Delphi-Appaloosa EPCA enjoys broad-based

support from the Debtors' constituencies.  Both Statutory Committees endorse the Delphi-

Appaloosa EPCA.  GM supports it, as does the Ad Hoc Trade Committee.  Moreover, neither the

U.S. Trustee nor any of the Debtors' unions has objected to the Motion.  This is in stark contrast

to the Debtors' December 2006 motion for approval of the Original EPCA, which initially drew

objections from the U.S. Trustee, both Statutory Committees, the Ad Hoc Trade Committee, four

of the Debtors' unions, and Highland.

6.      Only Highland, the remaining alternative plan investor, submitted an answering paper expressing any degree of dissent.  And even Highland does not urge the Court to reject the Motion, or assert that the Debtors' choice of the Delphi-Appaloosa EPCA over the Highland proposal was outside the bounds of reasonable business judgment.  Although the Debtors understand Highland's expression of disappointment, nothing Highland says in its Statement undercuts the fact that the Debtors have executed a careful and prudent process, and have reached a decision based on sound business judgment.  The Debtors, with the support of their key stakeholders, respectfully request that the Court approve the Motion.

<u>The Debtors' Business Judgment Is Sound</u>

A.      <u>The Board And Management Conducted A Thorough And Fair Process</u>

7.      The Board was well informed, capably advised, and thoroughly prepared when it met on July 16, 17, and 18, 2007, to assess the merits of the competing frameworks from Highland and Appaloosa.  From the time the Court approved the Original EPCA through the Debtors' submission of the current Motion, the Board met more than 15 times, either telephonically or in person.  At these meetings, the Board consulted its advisors and the Debtors' management about the discussions between the Debtors, their principal U.S. labor unions, and GM regarding efforts to resolve the parties' outstanding commercial, legacy, and labor issues; implementation of the Debtors' business transformation plan; discussions with potential plan investors, the Statutory Committees, and other stakeholders; and various scenarios for the Debtors' emergence from chapter 11.

8.      The Board and management also ensured that the Debtors fostered an open and transparent process to facilitate interest from potential plan investors, including Highland.  On April 18, 2007, as the Debtors were preparing to announce that modifications might be made to the Original EPCA, Highland expressed renewed interest in Delphi after more

4

than three months of silence.  Highland entered into an NDA as a potential co-investor with

Pardus on May 25, 2007, and thereafter had full access to Delphi's common set of investor due

diligence materials.  After Pardus decided to join Appaloosa, the Board reviewed three potential

transaction structures for a Highland-led investment of up to $6.25 billion.  Once Highland

demonstrated serious interest in negotiating and developing an investment framework, the Board

unanimously concurred with management's recommendation to facilitate an expedited due

diligence review by Highland.  On July 1, 2007, Delphi received a Highland investment

framework from Lehman Brothers.

        9.      The Debtors worked throughout July to develop the Appaloosa and

Highland frameworks into competing proposals that would meet the Debtors' objectives.  On

July 11, 2007, the Debtors conducted separate six-hour negotiating sessions with each of

Appaloosa and Highland based on issues lists that Delphi and its advisors had developed with

respect to both Highland and Appaloosa in the days prior to the meetings.  This positioned the

Debtors to request Appaloosa and Highland to submit their respective "final and best"

investment proposals.

        10.      Rather than continue to pursue its prior investment structure involving a

$6.25 billion rights offering and cash out to creditors, Highland ultimately submitted a revised

framework for a $3.3 billion investment that contained a convertible preferred feature, a break up

fee, and a more insular governance structure.  As compared to its prior frameworks, Highland's

new structure essentially mirrored the Appaloosa structure.

        11.      On Monday, July 16, 2007, at a Board meeting that lasted more than six

hours, Delphi's management and legal and financial advisors reviewed the Appaloosa and

Highland frameworks with the Board, reported to the Board that GM representatives had

indicated that GM supported moving forward with Appaloosa, and reported on the status of the

negotiations with both Appaloosa and Highland, which were ongoing. The Board scheduled a

telephonic meeting for the next evening to further consider the matter, the views of the Statutory

Committees, any developments in the negotiations, and management's recommendation.

        12.     On July 17, 2007, following Delphi's receipt of final formal written

proposals from each of Appaloosa and Highland, the Board held a further two hour telephonic

meeting to further consider the two formal proposals. During the meeting, management reported

to the Board that the Creditors' Committee and GM had indicated their formal support for the

Appaloosa proposal. Negotiations with the Equity Committee were continuing, and the Equity

Committee had agreed to consider the Debtors' final proposal to the Committee overnight. After

extensive discussion, the Board expressed its support for the Appaloosa proposal subject to

understanding the Equity Committee's view, and formed a special Transaction Committee with

the authority to make a final decision once the Equity Committee responded to the Debtors.

        13.     At a telephonic meeting of the Transaction Committee the next morning,

Delphi's management and legal and financial advisors reported that the Equity Committee had

accepted Delphi's final proposal for a proposed treatment of equity security holders in a

subsequent plan of reorganization, and reported that with these changes the Equity Committee

formally supported the Appaloosa proposal. At the meeting, after further considering both

proposals, the formal endorsement of the Appaloosa proposal by both Statutory Committees, and

the support of GM, the Transaction Committee resolved to approve entry into the Delphi-

Appaloosa EPCA. Later that day, Delphi publicly announced that it had accepted the Delphi-

Appaloosa EPCA and filed the Motion.

B.    <u>Reasons Supporting The Debtors' Business Judgment</u>

14.    After the careful consideration described above, the Board determined that the Delphi-Appaloosa EPCA is in the best interests of the Debtors and their stakeholders.

15.    Indicative of the soundness of the Debtors' business judgment to accept the Delphi-Appaloosa EPCA is the fact that both of the Debtors' Statutory Committees and GM expressly support the Motion, and no other stakeholder has filed an objection.  Against the backdrop of prior contested motions in these cases regarding key transformation milestones, that level of consensus is remarkable.

16.    The Debtors' judgment is also supported by their familiarity with Appaloosa, based on Appaloosa's consistent involvement in these cases and the length of time that Appaloosa has been considering similar investment proposals.  As Mr. Sheehan stated in his declaration, the Debtors believe that Appaloosa has achieved a level of knowledge regarding Delphi and its businesses such that the risks associated with those businesses are factored into Appaloosa's investment decision. As a result, the Debtors perceive a relatively low risk that Appaloosa would seek to exit the transaction based on a claim of material unknown information.

17.    The Debtors also considered that they were able to negotiate certain terms with Appaloosa that represented improvements over the Original EPCA.  As Mr. Sheehan stated in his declaration, some of the these improvements included less conditionality; the timing of the rights offering; Board independence, composition, and nominating procedures; a five-year cap on Appaloosa's ownership of reorganized Delphi, and an increase in the threshold amount triggering Appaloosa's extraordinary transactions veto right.

18.    The Board also considered the evolution of the discussion with Highland such that by the time the Board evaluated the final proposals, Highland's proposal was in the same range economically and largely mirrored the structure of the Delphi-Appaloosa EPCA, and

differed from Highland's January 9, 2007, and July 1, 2007, structures.  Highland's total

investment had decreased from $6.25 billion in its July 1 proposal to $3.3 billion in its July 14

proposal, versus Appaloosa's proposal of $2.55 billion.  Moreover, Highland's commitment fee

percentage grew from 1.0% to 1.8% (plus extension fees) between its July 1 and July 14

structures, versus Appaloosa's proposal of 2.5%; and Highland's proposed exercise price for the

rights offering decreased from $41.75 per share to $39.28 per share, versus $38.38 in

Appaloosa's proposal at that point.  Similarly, although preferred stock has always been a feature

of Appaloosa's proposals, Highland first included preferred stock in its July 14, 2007,

framework.

19.    This convergence was important for at least two reasons.  First, the fact

that the proposals were within the same range increased the importance of the qualitative factors

in the Debtors' evaluation of the proposals.  Second, the similarity of the proposals served as a

market validation for the terms of the proposals.

20.    The Debtors considered that Appaloosa already had arranged syndication

of its investment.  By the time the Board approved the Delphi-Appaloosa EPCA, Appaloosa had

also completed the process of reaffirming its syndicate investors' commitment to the transaction.

This was in contrast to Highland, which had only recently begun and had not completed its

syndication process, and instead proposed to underwrite 100% of its investment while using

commercially reasonable efforts to syndicate its new investment down to 15% (not taking into

account its existing ownership).

21.    The Highland proposal thus created the risk of concentrated ownership of

reorganized Delphi.  If Highland encountered difficulty in syndication, Highland could end up

owning as much as 55% of the equity of reorganized Delphi, versus a maximum ownership of

8

17.5% for Appaloosa under the Delphi-Appaloosa EPCA.  Although Highland communicated

that at least one other investor was considering a substantial investment in the Highland proposal

that could alter this analysis, no confirmation of a commitment from that investor was provided

to Delphi prior to the Board's acceptance of the Appaloosa proposal.  In addition, while

Appaloosa agreed to cap its ownership at 25% for a five year period, Highland only agreed to

cap its ownership at 25% conditionally for a one year period, provided that it was already below

25% after the conclusion of the rights offering.  As Mr. Sheehan stated in his declaration, Delphi

management was concerned that having a single entity with such a large ownership stake in

reorganized Delphi could negatively impact execution of its business plan.

    22.  The Debtors also considered that Highland chose to make significant

unfavorable modifications to the proposal letter and commitment letters that the Court previously

approved in connection with the Original EPCA, while Appaloosa's were consistent with those

previously approved.  The Highland commitment letters (i) omitted the provision expressly

granting Delphi the right to assert its rights under the letters directly against the commitment

parties, whereas Appaloosa's letters expressly provide Delphi that right; (ii) inserted an express

exclusion of liability for consequential damages for breach in the Highland letters, whereas

Appaloosa's letters do not exclude consequential damages (subject to a mutual liability cap); and

(iii) limited the commitment to be used to purchase the unsubscribed shares in the rights offering,

whereas the Appaloosa commitment letters cover all equity being purchased by the Investors and

their other obligations under the Delphi-Appaloosa EPCA.

C.  Highland's Statement

    23.  In its Statement, Highland contends, without further explanation, that its

proposal is "(i) less conditional than the Appaloosa proposal, (ii) subject to less fees, (iii)

distributes more value to creditors, including GM, (iv) distributes more value to shareholders, (v) has a broader based corporate governance structure, (vi) puts less debt on the reorganized company, and (vii) has a less restrictive capital structure." (Statement ¶ 2.)

24.    Although the Debtors agree with some of these assertions and disagree with others, in reality the two proposals are within the same range with respect to these issues. Moreover, these comparisons were considered by the Debtors in the context of qualitative considerations, including speed of execution, likelihood of execution of both the framework agreements and the Debtors' five year business plan, and corporate governance considerations, broadly defined.

25.    Highland's assertions with respect to stakeholder recoveries are belied by the endorsements of the stakeholders themselves. The Creditors' Committee formally endorsed Appaloosa's proposal. Both the Highland and Appaloosa proposals call for payment in full to unsecured creditors and could not provide for more. And while Highland's proposal on its face provides for GM to recover almost $100 million more than Appaloosa's does, GM is in the best position to judge the adequacy of its own recovery and has expressed its support for Appaloosa, presumably based on its internal qualitative assessment of the speed, execution, and corporate governance risk factors, among others. Similarly, the Equity Committee evaluated both proposals and voted to endorse Appaloosa's instead of Highland's.

26.    Some of Highland's other assertions are based on subjective rather than objective assessments with which the Debtors respectfully disagree. For example, the Debtors believe that the Appaloosa proposal is less conditional than Highland's. Appaloosa's agreement to a uniform "material impact" standard with respect to certain closing conditions was an important improvement over the Original EPCA, but Highland refused to adopt the "material

10

impact" standard with respect to closing conditions regarding the plan of reorganization, the disclosure statement, and the confirmation order, among others.  Similarly, as discussed above, although Highland had access to the proposal letter and commitment letters previously approved by the Court, Highland chose to modify them in ways unfavorable to the Debtors.

27.    With respect to corporate governance, both proposals call for reorganized Delphi to have a nine-member three-year classified board, with six directors meeting the definition of "independent" on the relevant stock exchange where the common stock of reorganized Delphi will be traded.  However, Appaloosa also adopted the Debtors' additional objectives to have six directors be independent of the Investors, and also to have a robust social process led by a search committee.  Highland refused to adopt the Debtors' request regarding independence from investors, and did not provide for a search committee process that would be as influential as the one in the Delphi-Appaloosa EPCA.  As an example, Appaloosa's proposal gives the search committee the power to veto any nominated director, while Highland's proposal exempts two of the three Highland directors and two of three Creditors' Committee directors from the search committee process (and requires a 2/3 vote of the search committee to block nominations to the other five board positions).   And, as discussed above, Highland's syndication proposal also created a risk of concentrated ownership, and Highland was only willing to cap its ownership at 25% conditionally for one year, provided that it did not own more than 25% immediately after completion of the rights offering.

28.    The Debtors agree that the Delphi-Appaloosa EPCA calls for marginally higher fees, marginally higher debt levels for reorganized Delphi, and marginally greater restrictions on capital structure, than does the Highland proposal.  As discussed above, however, the economic terms are within the same range.

11

29.     The Debtors believe that the transactions contemplated by the Delphi-Appaloosa EPCA are superior to those contemplated by Highland's proposal.  Given the lengthy negotiations over the past year, the similarity of the Highland proposal, the involvement of other parties in due diligence and transaction discussions, the support of the Debtors' stakeholders, and the Debtors' need to complete their reorganization without further delay, the Debtors believe that the transactions contemplated by the Delphi-Appaloosa EPCA are the best the Debtors could reasonably negotiate under the circumstances presented in these cases.

<u>Modifications To Agreements</u>

30.     After the Debtors filed the Motion on July 18, 2007, they continued their discussions with the Plan Investors and stakeholders regarding the terms of the Delphi-Appaloosa EPCA and related papers.  As a result of those discussions, Delphi and the Plan Investors agreed to a number of clarifications to the Delphi-Appaloosa EPCA and the form of order granting the Motion, which are summarized below.  Delphi has submitted as proposed Exhibits 8, 12, and 94, respectively, blacklines reflecting these changes to the Delphi-Appaloosa EPCA, the Plan Framework and Special Statutory Committee Provisions (Exhibit B to the Delphi-Appaloosa EPCA), and the form of order.

D.      <u>Modifications To Delphi-Appaloosa EPCA</u>

31.     Since the submission of the Delphi-Appaloosa EPCA to the Court in connection with the Motion, the parties have agreed to make certain clarifications and minor corrections to the document.  (<u>See</u> blackline at Exhibit 8.)

12

E.     Modifications To Plan Framework And Special Statutory Committee Provisions
       (Delphi-Appaloosa EPCA Exhibit B)

            32.     The Debtors and the Plan Investors have agreed to several clarifications

and amendments to the Plan Framework and Special Statutory Committee Provisions.  (See

blackline at Exhibit 12.)  These include the following:

- The $478 million recovery contemplated for subordinated debt claims will
  be increased by postpetition interest accruing after July 1, 2007, as
  provided for in the Debtors' plan of reorganization.  (Amended Plan
  Framework Provisions and Special Statutory Committee Provisions § 1.6.)

- The equity securities class's rights to purchase 45.6 million out of 147.6
  million shares of common stock at an estimated exercise price of $38.39
  per share (based on discounted TEV of $12.8 billion at emergence) will be
  transferable.  (Id. § 1.8(ii).)

- The equity securities class will receive non-transferable rights to purchase,
  on a proportionate basis, $572 million of the common stock that would
  otherwise be distributable to unsecured claims for a price of $45.00 per
  share consisting of:  (x) $522 million of the common stock that would
  otherwise be distributable to all general unsecured claims (less the plan
  value of the common stock available for the par rights offering pursuant to
  (z) below), (y) $50 million of the common stock (in excess of the $522
  million in (x) above) that would otherwise be distributable to Appaloosa,
  and (z) all of the common stock that would otherwise be distributable
  pursuant to the claim allowed by paragraph 8 of this Court's order
  approving the memorandum of understanding among the UAW, Delphi,
  and GM.[1]  (Id. § 1.8(iv).)

- The record date for the rights offering and the par rights offering will be
  not earlier than the date on which the confirmation hearing on the Debtors'
  plan of reorganization is first scheduled to commence.  (Id. § 1.8.)

- The equity securities class will receive five-year warrants to purchase an
  additional 5% of common stock for $45.00 per share or non-transferable
  rights to purchase, on a proportionate basis, $572 million of common
  stock at $45.00 per share, unless the Equity Committee does not support

---

[1]     See Order Under 11 U.S.C. §§ 363, 1113, And 1114 And Fed. R. Bankr. P. 6004 And 9019 Approving
Memorandum Of Understanding Among UAW, Delphi, And General Motors Corporation Including
Modification Of UAW Collective Bargaining Agreements And Retiree Welfare Benefits For Certain
UAW-Represented Retirees, dated July 19, 2007 (Docket No. 8693).  Paragraph 8 of the order provides
that the UAW will receive an allowed prepetition general unsecured claim against Delphi in the amount of
$140 million, subject to certain adjustments.

this Court's entry of the Debtors' form of order at the hearing on the
Motion, or if it appeals or seeks reconsideration or termination of the order.
(<u>Id.</u> § 1.8 n.3 & pp. 4-5.)

- Delphi will arrange for funding as of the effective date of the Debtors' plan
  of reorganization for all amounts required to meet ERISA funding
  requirements through 2011 for its U.S. pension obligations as estimated on
  the effective date of the plan. (<u>Id.</u> § 1.10.) (The provisions submitted to
  this Court on July 18, 2007 called for a contribution of $3.5 billion.)

- The Debtors will continue to consult with the Creditors' Committee and
  the Equity Committee with respect to issues relating to the multidistrict
  litigation pending against Delphi and others in the United States District
  Court for the Eastern District of Michigan, including, without limitation,
  any resolution and/or settlement of the litigation. (<u>Id.</u> § 2.1.)

F.    <u>Modifications To Form Of Order</u>

33.    The Debtors have made three changes to the form of order since they filed

the Motion. (<u>See</u> blackline at Exhibit 94.) The first makes clear that this Court's approval of the

Delphi-Appaloosa EPCA would not constitute approval of a sub rosa or de facto plan of

reorganization, and that nothing in the order will limit the rights of any party-in-interest to object

or present any evidence or argument in opposition to the confirmation of any plan of

reorganization that may be filed in these cases or the approval of any disclosure statement filed

in connection with any plan. These changes are consistent with this Court's oral ruling at the

hearing on the Original Framework Agreements, during which this Court stated:

> I do not believe . . . that these transactions, to the extent I'm being asked to
> approve them today, would constitute a sub-rosa or a de-facto plan. I do not
> believe I'm approving a de-facto plan today. . . . Nothing from this estate is being
> distributed as part of what I'm approving today, other than the fees, which are
> being dealt with on a standalone basis.

(<u>See</u> Docket No. 7118 at 124:14-124:24.)

34.    The second modification is the addition of a paragraph reiterating that,

notwithstanding Fed. R. Bankr. P. 6004(g) or any other bankruptcy rule, the order will take effect

immediately upon its entry by this Court. The Debtors requested this relief in the Motion and

explained that waiving the 10-day stay under Rule 6004(g) is appropriate in this matter because of the Debtors' business need to provide certainty in connection with the ongoing negotiations among the Debtors and their stakeholders.  (<u>See</u> Motion ¶¶ 55, 61-62.)  No party-in-interest objected to this relief.

35.    The third modification is the addition of language granting the Debtors and the Investors the authority to amend the Investment Agreements to the extent either that such amendments are not material to the Investment Agreements or are not objected to by the Statutory Committees after 5 business days notice (or such shorter period as they may agree).

WHEREFORE the Debtors respectfully request that the Court enter an order (i) granting the Motion and (ii) granting the Debtors such other and further relief as is just.

Dated:    New York, New York
          August 1, 2007

                                               SKADDEN, ARPS, SLATE, MEAGHER
                                                & FLOM LLP

By:    /s/ John Wm. Butler, Jr.
       John Wm. Butler, Jr. (JB 4711)
       George N. Panagakis (GP 0770)
       Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:    /s/ Kayalyn A. Marafioti
       Kayalyn A. Marafioti (KM 9632)
       Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, <u>et al.</u>,
 Debtors and Debtors-in-Possession

15