AMENDED

EXHIBIT B

PLAN FRAMEWORK AND SPECIAL STATUTORY COMMITTEE PROVISIONS

FRAMEWORK PROVISIONS

The Plan shall contain all of the following terms; provided, however, that nothing herein shall constitute an offer with respect to any securities or a solicitation of acceptances of a chapter 11 plan. Such offer or solicitation only will be made in compliance with all applicable securities laws and/or provisions of the Bankruptcy Code:

1.1     A condition precedent to the effectiveness of the Plan (subject to the waiver provisions to be negotiated in connection with the Plan) shall be that the aggregate amount of all trade claims and other unsecured claims (including any accrued interest) (excluding (i) unsecured funded debt claims, (ii) Flow-Through Claims (defined below), (ii) GM claims, which shall be treated as set forth below, and (iii) securities claims, which shall be treated as set forth below) (collectively, the "Trade and Other Unsecured Claims") that have been asserted or scheduled but not yet disallowed as of the effective date of the Plan shall be allowed or estimated for distribution purposes by the Bankruptcy Court to be no more than $1.7 billion, excluding all allowed accrued postpetition interest thereon.

1.2     All senior secured debt shall be refinanced and paid in full and all allowed administrative and priority claims shall be paid in full.

1.3     Trade and Other Unsecured Claims and unsecured funded debt claims shall be placed in a single class. All such claims that are allowed (including all allowed accrued interest, which for trade claims shall be at a rate to be agreed to or determined by the Bankruptcy Court, it being understood that with respect to trade claims, the Debtors and Plan Investors will not take the position that there should not be an entitlement to postpetition interest) shall be satisfied in full with (a) $3.48 billion of common stock (77.3 million out of a total of 147.6 million shares,[1] at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi and (b) the balance in cash[2]; provided, however, that the common stock and cash to be distributed pursuant to the immediately preceding clause shall be reduced proportionately by the amount that allowed Trade and Other Unsecured Claims are less than $1.7 billion, excluding allowed accrued postpetition interest thereon.

---

[1]     Inclusive of distributions to subordinated creditors under Section 1.6 below. References herein to the total number of shares of common stock gives effect to the conversion of the preferred stock issued pursuant to the Investment Agreement to common stock. The actual number of shares of common stock to be issued by Delphi and to be distributed to various classes under Sections 1.3, 1.6 and 1.8 of this Exhibit B is subject to final adjustment and reconciliation as well as negotiation of plan distribution mechanics in the Plan.

[2]     Such amounts to be adjusted by proceeds from the par rights offering to be conducted by Delphi in connection with Section 1.8(iv).

1.4 (i) Customer and environmental obligations, (ii) employee-related (excluding collective bargaining-related obligations) and other obligations (in each instance as to be agreed by the Debtors and Appaloosa) and (iii) litigation exposures and other liabilities that are covered by insurance (as to be agreed by the Debtors and Appaloosa and scheduled in the Plan) ((i), (ii) and (iii) together, the "Flow-Through Claims") will be unimpaired and will be satisfied in the ordinary course of business (subject to the preservation and flow-through of all estate rights, claims and defenses with respect thereto which shall be fully reserved).

1.5 GM will receive an allowed general unsecured claim for all claims and rights of GM and its affiliates (excluding in respect of the 414(l) Assumption, all Flow Through Claims and all other claims and amounts to be treated in the normal course or arising or paid pursuant to the Delphi/GM Definitive Documents) that will be satisfied with $2.70 billion in cash.

1.6 All Delphi subordinated debt claims (including all accrued interest thereon) will be allowed and, in resolution of the subordination rights of Delphi senior debt, all cash otherwise distributable to Delphi subordinated debt claims pursuant to Section 1.3 shall be distributed to Delphi senior debt, and the allowed Delphi subordinated debt claims will be satisfied with $478 million of common stock (10.6 million out of a total of 147.6 million shares, at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi.; provided, however that the $478 million referred to above shall be increased by post-petition interest accruing after July 1, 2007 as provided for in the Plan.

1.7 Any allowed securities claims, including all claims in the MDL litigation pending in the United States District Court for the Eastern District of Michigan, will be satisfied solely from available insurance or as otherwise agreed by Delphi and Appaloosa.

1.8 The equity securities class in the Plan shall receive, in the aggregate, (i) $66 million of common stock (1.5 million out of a total of 147.6 million shares, at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi, (ii) transferable rights to purchase 45.6 million out of a total of 147.6 million shares of common stock (to be reduced by the guaranteed minimum of 10% of the rights for the Plan Investors) in reorganized Delphi for $1.75 billion (at an estimated exercise price: of $38.39/share which is based on discounted TEV of $12.8 billion at emergence), (iii) 5-year warrants to purchase for $45/share an additional 5% of the common stock of Delphi, and (iv) the rightnon-transferable rights to purchase, on a proportionate basis, approximately$572 million of the common stock that would otherwise be distributable to unsecured claims pursuant to Section 1.3 for a price of $45/share consisting of: (x) $522 million of the common stock that would otherwise be distributable to all general unsecured claims plus an additional(less the plan value of the common stock made available for the par rights offering pursuant to subparagraph (z) hereof), (y) $50 million of the common stock in excess of subparagraph (x) hereof that would otherwise be distributable to Appaloosa (each pursuant to Section 1.3) for a price of $45/share, and (z) all of the common stock that would otherwise be distributable pursuant to the claim allowed pursuant to paragraph 8 of the Order Under 11 U.S.C §§ 363, 1113, And 1114 And Fed. R. Bankr. P. 6004 And 9019 Approving Memorandum Of Understanding Among UAW, Delphi, And General Motors Corporation Including Modification Of UAW Collective Bargaining Agreements And Retiree Welfare Benefits For Certain UAW-Represented Retirees (Docket No. 8693, July 19, 2007) (the "par rights offering"); provided, that Appaloosa (in its capacity as a stockholder of Delphi) shall agree not to participate

---

in the par rights offering and shall use commercially reasonable efforts to obtain such agreement from the other Plan Investors. The record date for the rights offering and the par rights offering shall be not earlier than the date on which the Confirmation Hearing is first scheduled to commence.[3]

1.9     The preferred stock to be issued pursuant to the Plan in connection with the Investment Agreement and the corporate governance of Reorganized Delphi shall be subject to the terms listed on the term sheet attached to the Investment Agreement ("Summary of Terms of Preferred Stock"), which are incorporated by reference herein.

1.10    Delphi will arrange for ~~payment~~funding as of the effective date of the Plan for all amounts required to meet ERISA funding requirements through 2011 for its US pension obligations as estimated on the effective date of the Plan ~~of $3.5 billion to fund its pension obligations~~.  Such payment will include GM taking up to $2.0 billion of net pension obligations pursuant to a 414(l) transaction (the "414(l) Assumption"), which amount shall be reduced to no less than $1.5 billion if (a) Delphi or Appaloosa determine that any greater amount will have an adverse impact on the Debtors or (b) Appaloosa determines that any greater amount will have an adverse impact on the Plan Investors' proposed investment in the Debtors.  GM will receive a note from Delphi in the amount of the 414(l) Assumption transferred in the 414(l) transaction, subject to agreed market terms to be specified in the Delphi/GM Definitive Documents; provided, however, that such note will be due, payable and paid in full at par plus accrued interest in cash within ten (10) days following the effective date of the Plan.

1.11    A joint claims oversight committee shall be established on the effective date of the Plan or as soon thereafter as practicable to monitor claims administration, provide guidance to the Debtors, and address the Bankruptcy Court if such post-effective date joint claims oversight committee disagrees with the Debtors' determinations requiring claims resolution.  The composition of the joint claims oversight committee shall be reasonably satisfactory to Appaloosa, but in any case, shall include at least one representative appointed by Appaloosa.

1.12    Ongoing management compensation, including the SERP, stock options, restricted stock, severance, change in control provisions and all other benefits will be on market terms (as determined by the Board of Directors, based on the advice of Watson-Wyatt, and such management compensation plan design shall be described in the Disclosure Statement and included in the Plan) and reasonably acceptable to Appaloosa; claims of former management and terminated/resigning management will be resolved on terms acceptable to Delphi and Appaloosa or by court order.  Equity awards will dilute all equity interests pro rata.

1.13    The amended and restated certificate of incorporation of Delphi to be effective immediately following the effective date of the Plan shall prohibit: (A) for so long as Appaloosa owns any shares of Series A Preferred Stock, any transactions between Delphi or any of its

---

[3]    Inclusion in the Plan of subsections 1.8 (iii) and (iv) is conditioned upon the "Equity Committee" (as defined below) supporting entry of the Approval Order and ~~there not occurring a "Withdrawal of Support" (as defined below). The rights in the par rights offering are to be equivalent to 15% of the common stock that~~not subsequently appealing or seeking reconsideration or termination of such Approval Order (none of which the Equity Committee would ~~otherwise be distributable to all unsecured claims plus an additional $50 million of the common stock that would otherwise be distributable to Appaloosa on mechanics to be agreed.~~ be entitled to seek following its support of entry of such order).

3    DeltaView comparison of pcdocs://chisr02a/638960/1 and pcdocs://chisr02a/641053/1.  Performed on 7/31/2007.

Subsidiaries (as defined in the Investment Agreement), on the one hand, and Appaloosa or its respective Affiliates (as defined in the Investment Agreement), on the other hand (including any "going private transaction" sponsored by Appaloosa) unless such transaction shall have been approved by directors constituting not less than 75% of the number of Common Directors (as defined in the Investment Agreement), and (B) any transaction between Delphi or any of its Subsidiaries, on the one hand, and a director, on the other hand, other than a director appointed by holders of Series A Preferred Stock (as defined in the Investment Agreement), unless such transaction shall have been approved by directors having no material interest in such transaction (a "Disinterested Director") constituting not less than 75% of the number of Disinterested Directors.

## SPECIAL STATUTORY COMMITTEE PROVISIONS

So long as the official committee of unsecured creditors appointed on October 17, 2005 in the Chapter 11 Cases (the "Creditors' Committee") and the ad hoc committee of trade creditors (the "Ad Hoc Trade Committee") shall support entry of the Approval Order and so long as the Creditors' Committee shall support the implementation of the Investment Agreement, this Exhibit B, and each of the transactions contemplated by the Investment Agreement and this Exhibit B, the following provisions shall be in effect, and to the extent such provisions are inconsistent with any other provisions of this Exhibit B, the following provisions shall supplant and supersede such; provided, that if the Creditors' Committee, in the exercise of its fiduciary duties, shall subsequently withdraw, qualify or modify in a manner adverse to the Plan Investors (or resolve to do any of the foregoing) its support for the entry of the Approval Order, the implementation of the Investment Agreement, this Exhibit B, or any of the transactions contemplated by the Investment Agreement or this Exhibit B, or shall have approved or recommended any competing or other transaction inconsistent with the Investment Agreement or this Exhibit B (each such action, a "Withdrawal of Support"), then Sections 2.1 (as it relates to the Creditors' Committee) and Sections 2.2 and 2.3 shall terminate and shall be of no further force or effect; provided further, that if the Creditors' Committee (a) objects in any pleading to (i) any of the terms of any Plan Document solely on the basis of comments provided by the Creditors' Committee pursuant to Section 2.1 hereof, but rejected by the Debtors or Appaloosa, or (ii) the position that the Debtors, any Plan Investor or any other Party takes as to the appropriate rate of interest on Trade and Other Unsecured Claims as permitted by Section 1.3 of this Exhibit B as amended hereby, or (b) unsuccessfully seeks the termination of the Investment Agreement pursuant to Section 2.3, then in each such case such objection or action shall not be considered a Withdrawal of Support. So long as the official committee of equity security holders appointed in the Chapter 11 Cases (the "Equity Committee") shall support entry of the Approval Order and so long as the Equity Committee shall support the implementation of the Investment Agreement, this Exhibit B, and each of the transactions contemplated by the Investment Agreement and this Exhibit B, the following provisions shall be in effect (as ~~they~~it relate~~s~~ to the Equity Committee), and to the extent such provision~~s are~~ is inconsistent with any other provisions of this Exhibit B, the following provisions shall supplant and supersede such; provided, that if the Equity Committee takes any action that constitutes a Withdrawal of Support, then Section~~s~~ 2.1 (as it relates to the Equity Committee) ~~and Section 2.4~~ shall terminate and shall be of no further force or effect; provided further, that if the Equity Committee ~~(a)~~ objects in any pleading to any of the terms of any Plan Document solely on the basis of comments provided by the Equity Committee pursuant to Section 2.1 hereof, but rejected by the Debtors or Appaloosa ~~or (b) unsuccessfully seeks to withdraw support pursuant to Section 2.4, then in each such case~~, then such objection or action shall not be considered a

---

4      DeltaView comparison of pcdocs://chisr02a/638960/1 and pcdocs://chisr02a/641053/1. Performed on 7/31/2007.

Withdrawal of Support; provided further, that Section 1.8 (iii) and (iv) shall terminate and be of no further force and effect only if the Equity Committee fails to affirmatively support entry of the Approval Order at the Bankruptcy Court hearing held with respect to entry of such order or, following entry of such order, should the Equity Committee seek to appeal, reconsider or terminate such order.

2.1     The Debtors will provide Creditors' Committee and the Equity Committee with periodic working drafts of the Plan, the Disclosure Statement, the Confirmation Order and any Plan Documents that each such committee reasonably believes could have a material impact on the recovery of their constituents, and any amendments thereto, and with a reasonable opportunity to review and comment on such documents prior to such documents being filed with the Bankruptcy Court. The Debtors and the Plan Investors will consider in good faith any comments consistent with the Investment Agreement and this Exhibit B, and any other reasonable comments of the Creditors' Committee and/or the Equity Committee, and will not reject such comments without first discussing the reasons therefore with counsel to the Creditors' Committee and/or the Equity Committee and giving due consideration to the views of the Creditors' Committee and/or the Equity Committee. The Debtors will continue to consult with the Creditors' Committee and the Equity Committee, as they have been doing, with respect to issues relating to the MDL litigation referenced in Section 1.7 hereof, including, without limitation, any resolution and/or settlement thereof.

2.2     The Creditors' Committee will have consultation rights through the Confirmation Date with respect to executive compensation under the Plan and as described in the Disclosure Statement. The Creditors' Committee shall also have one representative of the Creditors' committee placed on the joint claims oversight committee contemplated by Section 1.11 of this Exhibit B, it being understood that such member shall not have veto rights over any committee action.

2.3     In the event that the Debtors and the Plan Investors agree to (a) substantive and material changes in the overall deal as set forth in the Investment Agreement and this Exhibit B after the date of the Approval Order, (b) Flow-Through Claims (as defined in Section 1.4 of this Exhibit B) other than claims arising out of or resulting from customer claims and environmental claims, or (c) any alternative treatment of securities claims from estate assets other than available insurance, any of which would have a material adverse effect on the economics of the recovery of general unsecured creditors under the plan of reorganization to be funded through the EPCA, the Creditors' Committee shall have the right to seek termination of the EPCA by the Bankruptcy Court by establishing by a preponderance of the evidence that there has been a material adverse effect on the economics of the recovery to general unsecured creditors under the plan of reorganization to be funded through the EPCA as a result of such actions.

2.4     ~~In the event that the Debtors and the Plan Investors agree to substantive and material changes in Section 1.7 of this Exhibit B after the date of the Approval Order which would have a material adverse effect on the economics of the recovery of current equity security holders of Delphi under the plan of reorganization to be funded through the EPCA, the Equity Committee shall have the right to withdraw its support of the EPCA by the Bankruptcy Court by establishing by a preponderance of the evidence that there has been a material adverse effect on the economics of the recovery to current equity holders of Delphi under the plan of reorganization to be funded~~

---

5       DeltaView comparison of pcdocs://chisr02a/638960/1 and pcdocs://chisr02a/641053/1. Performed on 7/31/2007.

~~through the EPCA as a result of such actions in which event there shall be no reduction in the recoveries to the equity securities class under Section 1.8(iii) and (iv) of this Exhibit B.~~

---

6    DeltaView comparison of pcdocs://chisr02a/638960/1 and pcdocs://chisr02a/641053/1. Performed on 7/31/2007.