IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                         :
        In re                            :    Chapter 11
                                         :
DELPHI CORPORATION, et al.,              :    Case No. 05-44481 (RDD)
                                         :
                         Debtors.        :    (Jointly Administered)
                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

AFFIDAVIT OF SERVICE

I, Evan Gershbein, being duly sworn according to law, depose and say that I am
employed by Kurtzman Carson Consultants LLC, the Court appointed claims and noticing
agent for the Debtors in the above-captioned cases.

On July 19, 2007, I caused to be served the documents listed below (i) upon the
parties listed on Exhibit A hereto via overnight delivery, (ii) upon the parties listed on
Exhibit B hereto via electronic notification and (iii) upon the parties listed on Exhibit C
hereto via postage pre-paid U.S. mail:

1) Expedited Motion For Order Authorizing And Approving Delphi-Appaloosa
   Equity Purchase And Commitment Agreement Pursuant To 11 U.S.C. §§
   105(a), 363(b), 503(b), And 507(a) ("Delphi-Appaloosa Investment And Plan
   Framework Motion") (Docket No. 8673) [a copy of which is attached hereto as
   Exhibit D]

2) Order Under 11 U.S.C. §§ 363, 1113, And 1114 And Fed. R. Bankr. P. 6004
   And 9019 Approving Memorandum Of Understanding Among UAW, Delphi,
   And General Motors Corporation Including Modification Of UAW Collective
   Bargaining Agreements And Retiree Welfare Benefits For Certain UAW-
   Represented Retirees (Docket No. 8693) [a copy of which is attached hereto as
   Exhibit E]

3) Order To Show Cause Why Motion For Order Authorizing And Approving
   Delphi-Appaloosa Equity Purchase And Commitment Agreement Pursuant To
   11 U.S.C. §§ 105(a), 363(b), And 507(a) Should Not Be Granted (Docket No.
   8694) [a copy of which is attached hereto as Exhibit F]

4) Affidavit Of Kayalyn A. Marafioti In Support Of Application For Expedited
   Hearing On Motion For Order Authorizing And Approving Delphi-Appaloosa
   Equity Purchase And Commitment Agreement Pursuant To 11 U.S.C. §§
   105(a), 363(b), And 507(a) [a copy of which is attached hereto as Exhibit G]

5) Notice Of Filing Of Agreement And Stipulation Of Enrique Bujidos, Adalberto
Canadas Castillo, And Fernando Gomez Martin Relating To Separation Plan
And DASE Funding Motion, And On Jurisdiction Of The United States
Bankruptcy Court For The Southern District Of New York (Docket No. 8698)
[a copy of which is attached hereto as Exhibit H]

On July 19, 2007, I caused to be served the documents listed below (i) upon the
parties listed on Exhibit I hereto via overnight delivery and (ii) upon the parties listed on
Exhibit J hereto via electronic notification:

6) Expedited Motion For Order Authorizing And Approving Delphi-Appaloosa
Equity Purchase And Commitment Agreement Pursuant To 11 U.S.C. §§
105(a), 363(b), 503(b), And 507(a) ("Delphi-Appaloosa Investment And Plan
Framework Motion") (Docket No. 8673) [a copy of which is attached hereto as
Exhibit D]

7) Order To Show Cause Why Motion For Order Authorizing And Approving
Delphi-Appaloosa Equity Purchase And Commitment Agreement Pursuant To
11 U.S.C. §§ 105(a), 363(b), And 507(a) Should Not Be Granted (Docket No.
8694) [a copy of which is attached hereto as Exhibit F]

8) Affidavit Of Kayalyn A. Marafioti In Support Of Application For Expedited
Hearing On Motion For Order Authorizing And Approving Delphi-Appaloosa
Equity Purchase And Commitment Agreement Pursuant To 11 U.S.C. §§
105(a), 363(b), And 507(a) [a copy of which is attached hereto as Exhibit G]

On July 19, 2007, I caused to be served the document listed below (i) upon the
parties listed on Exhibit K hereto via overnight delivery, (ii) upon the parties listed on
Exhibit L hereto via electronic notification and (iii) upon the parties listed on Exhibit M
hereto via facsimile:

9) Proposed Tenth Claims Hearing Agenda; Hearing To Be Held On July 20, 2007
At 10:00 A.M. (Docket No. 8682) [a copy of which is attached hereto as
Exhibit N]

On July 19, 2007, I caused to be served the document listed below upon the parties
listed on Exhibit O hereto via overnight delivery:

10) Order Under 11 U.S.C. §§ 363, 1113, And 1114 And Fed. R. Bankr. P. 6004
And 9019 Approving Memorandum Of Understanding Among UAW, Delphi,
And General Motors Corporation Including Modification Of UAW Collective
Bargaining Agreements And Retiree Welfare Benefits For Certain UAW-

Represented Retirees (Docket No. 8693) [a copy of which is attached hereto as
Exhibit E]

On July 19, 2007, I caused to be served the document listed below upon the parties
listed on Exhibit P hereto via overnight delivery:

11) Notice Of Filing Of Agreement And Stipulation Of Enrique Bujidos, Adalberto
Canadas Castillo, And Fernando Gomez Martin Relating To Separation Plan
And DASE Funding Motion, And On Jurisdiction Of The United States
Bankruptcy Court For The Southern District Of New York (Docket No. 8698)
[a copy of which is attached hereto as Exhibit H]

Dated: August 1, 2007

_____ */s/ Evan Gershbein* _____
Evan Gershbein

State of California
County of Los Angeles

Subscribed and sworn to (or affirmed) before me on this 1st day of August, 2007, by
Evan Gershbein, personally known to me or proved to me on the basis of satisfactory
evidence to be the person who appeared before me.

Signature: _____ */s/ Shannon J. Spencer* _____

Commission Expires: ___ *6/20/10* _____

# EXHIBIT A

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|-------|-----|-------|------------------|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2491 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Counsel to Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel to Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com sliviri@ffhsj.com | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel to Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 1540 Broadway | 24th Fl | New York | NY | 10036 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Internal Revenue Service | Attn: Insolvency Department | 477 Michigan Ave | Mail Stop 15 | Detroit | MI | 48226 | 313-628-3648 | 313-628-3602 | | Michigan IRS |
| Internal Revenue Service | Attn: Insolvency Department, Maria Valerio | 290 Broadway | 5th Floor | New York | NY | 10007 | 212-436-1038 | 212-436-1931 | mariaivalerio@irs.gov | IRS |
| IUE-CWA | Conference Board Chairman | 2360 W. Dorothy Lane | Suite 201 | Dayton | OH | 45439 | 937-294-7813 | 937-294-9164 | | Creditor Committee Member |
| Jefferies & Company, Inc, | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Richard Duker | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | richard.duker@jpmorgan.com | Prepetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Susan Atkins, Gianni Russello | 277 Park Ave 8th Fl | | New York | NY | 10172 | 212-270-0426 | 212-270-0430 | gianni.russello@jpmorgan.com susan.atkins@jpmorgan.com | Postpetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | Sheryl Betance | 2335 Alaska Ave | | El Segundo | CA | 90245 | 310-823-9000 | 310-823-9133 | sbetance@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Law Debenture Trust of New York | Daniel R. Fisher | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| Law Debenture Trust of New York | Patrick J. Healy | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 3

7/24/2007 10:34 AM
Master Service List Overnight Mail

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| McDermott Will & Emery LLP | David D. Cleary | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | dcleary@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Jason J. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | jdejonker@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Mohsin N. Khambati | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | mkhambati@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Peter A. Clark | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | pclark@mwe.com | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | 213-629-5063 | gbray@milbank.com tkreller@milbank.com jtill@milbank.com | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | william.dornbos@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | garrick.sandra@pbgc.gov efile@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel to the Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | 2122185500 | 2122185526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com trust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel to Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Tyco Electronics Corporation | MaryAnn Brereton, Assistant General Counsel | 60 Columbia Road | | Morristown | NJ | 7960 | 973-656-8365 | 973-656-8805 | | Creditor Committee Member |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 3

7/24/2007 10:34 AM
Master Service List Overnight Mail

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| United States Trustee | Alicia M. Leonhard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | 212-510-0500 | 212-668-2255 does not take service via fax | | Counsel to United States Trustee |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel to the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Harvey R. Miller | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8500 | 212-310-8077 | harvey.miller@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

7/24/2007 10:34 AM
Master Service List Overnight Mail

# EXHIBIT B

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2491 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Counsel to Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel to Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L. Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com sliviri@ffhsj.com | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel to Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 1540 Broadway | 24th Fl | New York | NY | 10036 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Jefferies & Company, Inc. | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Richard Duker | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | richard.duker@jpmorgan.com | Prepetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Susan Atkins, Gianni Russello | 277 Park Ave 8th Fl | | New York | NY | 10172 | 212-270-0426 | 212-270-0430 | gianni.russello@jpmorgan.com susan.atkins@jpmorgan.com | Postpetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | Sheryl Betance | 2335 Alaska Ave | | El Segundo | CA | 90245 | 310-823-9000 | 310-823-9133 | sbetance@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Law Debenture Trust of New York | Daniel R. Fisher | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| Law Debenture Trust of New York | Patrick J. Healy | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |
| McDermott Will & Emery LLP | Jason C. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | jdejonker@mwe.com | Counsel to Recticel North America, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 3

7/19/2007 12:31 PM
Master Service List Email

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| McDermott Will & Emery LLP | Peter A. Clark | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | pclark@mwe.com | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | 213-629-5063 | gbray@milbank.com tkreller@milbank.com jtill@milbank.com | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | william.dornbos@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | efile@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel to the Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | 2122185500 | 2122185526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel to Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel to the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Harvey R. Miller | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8500 | 212-310-8077 | harvey.miller@weil.com | Counsel to General Motors Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 3

7/19/2007 12:31 PM
Master Service List Email

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|-------|-----|-------|------------------|
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Adalberto Cañadas Castillo | | Avda Ramon de Carranza | 10-1º | Cadiz | | 11006 | Spain | 34 956 226 311 | | adalberto@canadas.com | Representative to DASE |
| Akin Gump Strauss Hauer & Feld, LLP | Peter J. Gurfein | 2029 Centure Park East | Suite 2400 | Los Angeles | CA | 90067 | | 310-552-6696 | 310-229-1001 | pgurfein@akingump.com | Counsel to Wamco, Inc. |
| Allen Matkins Leck Gamble & Mallory LLP | Michael S. Greger | 1900 Main Street | Fifth Floor | Irvine | CA | 92614-7321 | | 949-553-1313 | 949-553-8354 | mgreger@allenmatkins.com | Counsel to Kilroy Realty, L.P. |
| Alston & Bird, LLP | Craig E. Freeman | 90 Park Avenue | | New York | NY | 10016 | | 212-210-9400 | 212-922-3891 | craig.freeman@alston.com | Counsel to Cadence Innovation, LLC |
| Alston & Bird, LLP | Dennis J. Connolly; David A. Wender | 1201 West Peachtree Street | | Atlanta | GA | 30309 | | 404-881-7269 | 404-253-8554 | dconnolly@alston.com dwender@alston.com | Counsel to Cadence Innovation, LLC |
| Ambrake Corporation | Brandon J. Kessinger | 300 Ring Road | | Elizabethtown | KY | 42701 | | 270-234-5428 | 270-737-3044 | bkessinger@akebono-usa.com | Representative for Ambrake Corporation |
| American Axle & Manufacturing, Inc. | Steven R. Keyes | One Dauch Drive, Mail Code 6E-2-42 | | Detroit | MI | 48243 | | 313-758-4868 | | steven.keyes@aam.com | Representative for American Axle & Manufacturing, Inc. |
| Andrews Kurth LLP | Gogi Malik | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | gogimalik@andrewskurth.com | Counsel to ITW Mortgage Investments IV, Inc. |
| Andrews Kurth LLP | Monica S. Blacker | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | mblacker@andrewskurth.com | Counsel to  ITW Mortgage Investments IV, Inc. |
| Angelo, Gordon & Co. | Leigh Walzer | 245 Park Avenue | 26th Floor | New York | NY | 10167 | | 212-692-8251 | 212-867-6395 | lwalzer@angelogordon.com | |
| Anglin, Flewelling, Rasmussen, Campbell & Trytten, LLP | Mark T. Flewelling | 199 South Los Robles Avenue | Suite 600 | Pasadena | CA | 91101-2459 | | 626-535-1900 | 626-577-7764 | mtf@afrct.com | Counsel to Stanley Electric Sales of America, Inc. |
| Arent Fox PLLC | Mitchell D. Cohen | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Cohen.Mitchell@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arent Fox PLLC | Robert M. Hirsh | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Hirsh.Robert@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arnall Golden Gregory LLP | Darryl S. Laddin | 171 17th Street NW | Suite 2100 | Atlanta | GA | 30363-1031 | | 404-873-8120 | 404-873-8121 | dladdin@agg.com | Counsel to Daishinku (America) Corp. d/b/a KDS America ("Daishinku"), SBC Telecommunications, Inc. (SBC) |
| Arnold & Porter LLP | Joel M. Gross | 555 Twelfth Street, N.W. | | Washington | D.C. | 20004-1206 | | 202-942-5000 | 202-942-5999 | joel_gross@aporter.com | Counsel to CSX Transportation, Inc. |
| ATS Automation Tooling Systems Inc. | Carl Galloway | 250 Royal Oak Road | | Cambridge | Ontario | N3H 4R6 | Canada | 519-653-4483 | 519-650-6520 | cgalloway@atsautomation.com | Company |
| Barack, Ferrazzano, Kirschbaum & Nagelberg LLP | Kimberly J. Robinson | 200 W Madison St Ste 3900 | | Chicago | IL | 60606 | | 312-984-3100 | 312-984-3150 | kim.robinson@bfkn.com | Counsel to Motion Industries, Inc., EIS, Inc. and Johnson Industries, Inc. |
| Barack, Ferrazzano, Kirschbaum & Nagelberg LLP | William J. Barrett | 200 W Madison St Ste 3900 | | Chicago | IL | 60606 | | 312-984-3100 | 312-984-3150 | william.barrett@bfkn.com | Counsel to Motion Industries, Inc., EIS, Inc. and Johnson Industries, Inc. |
| Barnes & Thornburg LLP | Alan K. Mills | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | alan.mills@btlaw.com | Counsel to Mays Chemical Company |
| Barnes & Thornburg LLP | John T. Gregg | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3930 | 626-742-3999 | john.gregg@btlaw.com | Counsel to Priority Health; Clarion Corporation of America |
| Barnes & Thornburg LLP | Mark R. Owens | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | mark.owens@btlaw.com | Counsel to Clarion Corporation of America |
| Barnes & Thornburg LLP | Michael K. McCrory | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | michael.mccrory@btlaw.com | Counsel to Gibbs Die Casting Corporation; Clarion Corporation of America |
| Barnes & Thornburg LLP | Patrick E. Mears | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3936 | 616-742-3999 | pmears@btlaw.com | Counsel to Armada Rubber Manufacturing Company, Bank of America Leasing & Leasing & Capital, LLC, & AutoCam Corporation |
| Barnes & Thornburg LLP | Wendy D. Brewer | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | wendy.brewer@btlaw.com | Counsel to Gibbs Die Casting Corporation |
| Bartlett Hackett Feinberg P.C. | Frank F. McGinn | 155 Federal Street | 9th Floor | Boston | MA | 02110 | | 617-422-0200 | 617-422-0383 | ffm@bostonbusinesslaw.com | Counsel to Iron Mountain Information Management, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beeman Law Office | Thomas M Beeman | 33 West 10th Street | Suite 200 | Anderson | IN | 46016 | | 765-640-1330 | 765-640-1332 | tom@beemanlawoffice.com | Counsel to Madison County (Indiana) Treasurer |
| Bernstein Litowitz Berger & Grossman | Hannah E. Greenwald | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1411 | 2125541444 | hannah@blbglaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Bernstein Litowitz Berger & Grossman | John P. Coffey | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1409 | 2125541444 | sean@blbglaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Bernstein Litowitz Berger & Grossman | Wallace A. Showman | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1429 | 212-554-1444 | wallace@blbglaw.com | Counsel to SANLUIS Rassini International, Inc.; Rassini, S.A. de C.V. |
| Bialson, Bergen & Schwab | Kenneth T. Law, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | klaw@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc... |
| Bialson, Bergen & Schwab | Lawrence M. Schwab, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | lschwab@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc.; Solectron Corporation; Solectron De Mexico SA de CV; Solectron Invotronics; Coherent, Inc.; Veritas Software Corporation |
| Bialson, Bergen & Schwab | Patrick M. Costello, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | pcostello@bbslaw.com | Solectron Corporation; Solectron de Mexico SA de CV; Solectron Invotronics and Coherent, Inc. |
| Bialson, Bergen & Schwab | Thomas M. Gaa | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | tgaa@bbslaw.com | Counsel to  Veritas Software Corporation |
| Bingham McHale LLP | John E Taylor Whitney L Mosby | 10 West Market Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-635-8900 | 317-236-9907 | jtaylor@binghammchale.com wmosby@binghammchale.com | Counsel to Universal Tool & Engineering co., Inc. and M.G. Corporation |
| Blank Rome LLP | Marc E. Richards | The Chrysler Building | 405 Lexington Avenue | New York | NY | 10174 | | 212-885-5000 | 212-885-5002 | mrichards@blankrome.com | Counsel to DENSO International America, Inc. |
| Bodman LLP | Ralph E. McDowell | 100 Renaissance Center | 34th Floor | Detroit | MI | 48243 | | 313-393-7592 | 313-393-7579 | rmcdowell@bodmanllp.com | Counsel to Freudenberg-NOK; General Partnership; Freudenberg-NOK, Inc.; Flextech, Inc.; Vibracoustic de Mexico, S.A. de C.V.; Lear Corporation; American Axle & Manufacturing, Inc. |
| Bond, Schoeneck & King, PLLC | Camille W. Hill | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | chill@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp. |
| Bond, Schoeneck & King, PLLC | Charles J. Sullivan | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | csullivan@bsk.com | Counsel to Diemolding Corporation |
| Bond, Schoeneck & King, PLLC | Stephen A. Donato | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | sdonato@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp; Diemolding Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bose McKinney & Evans LLP | Jeannette Eisan Hinshaw | 135 N. Pennsylvania Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-684-5296 | 317-684-5173 | jhinshaw@boselaw.com | Counsel to Decatur Plastics Products, Inc. and Eikenberry & Associates, Inc.; Lorentson Manufacturing, Company, Inc.; Lorentson Tooling, Inc.; L & S Tools, Inc.; Hewitt Tool & Die, Inc. |
| Boult, Cummings, Conners & Berry, PLC | Austin L. McMullen | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | amcmullen@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Boult, Cummings, Conners & Berry, PLC | Roger G. Jones | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | rjones@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Brembo S.p.A. | Massimiliano Cini | Administration Department via Brembo 25 | 24035 Curno BG | Bergamo | | | Italy | 00039-035-605 529 | 0039-035-605-671 | massimiliano_cini@brembo.it | Creditor |
| Brown & Connery, LLP | Donald K. Ludman | 6 North Broad Street | | Woodbury | NJ | 08096 | | 856-812-8900 | 856-853-9933 | dludman@brownconnery.com | Counsel to SAP America, Inc. |
| Buchalter Nemer, A Profesional Corporation | Shawn M. Christianson | 333 Market Street | 25th Floor | San Francisco | CA | 94105-2126 | | 415-227-0900 | 415-227-0770 | schristianson@buchalter.com | Counsel to Oracle USA, Inc.; Oracle Credit Corporation |
| Burr & Forman LLP | Michael Leo Hall | 420 North Twentieth Street | Suite 3100 | Birmingham | AL | 35203 | | (205) 458-5367 | (205) 244-5651 | mhall@burr.com | Counsel to Mercedes-Benz U.S. International, Inc. |
| Cadwalader Wickersham & Taft LLP | Jeannine D'Amico | 1201 F St NW Ste 1100 | | Washington | DC | 20004 | | 202-862-2452 | 202-862-2400 | jeannine.damico@cwt.com | Attorneys for the Audit Committee of Dephi Corporation |
| Cahill Gordon & Reindel LLP | Jonathan Greenberg | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 732-205-6777 | jonathan.greenberg@BASF.C OM | Counsel to Engelhard Corporation |
| Cahill Gordon & Reindel LLP | Robert Usadi | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 212-269-5420 | rusadi@cahill.com | Counsel to Engelhard Corporation |
| Calfee, Halter & Griswold LLC | Jean R. Robertson, Esq. | 1400 McDonald Investment Ctr | 800 Superior Ave | Cleveland | OH | 44114 | | 216-622-8404 | 216-241-0816 | jrobertson@calfee.com | Counsel to Brush Engineered materials |
| Calinoff & Katz, LLp | Dorothy H. Marinis-Riggio | 140 East 45th Street | 17th Floor | New York | NY | 10017 | | 212-826-8800 | 212-644-5123 | driggio@candklaw.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Carson Fischer, P.L.C. | Robert A. Weisberg | 300 East Maple Road | Third Floor | Birmingham | MI | 48009-6317 | | 248-644-4840 | 248-644-1832 | rweisberg@carsonfischer.com | Counsel to Cascade Die Casting Group, Inc. |
| Carter Ledyard & Milburn LLP | Aaron R. Cahn | 2 Wall Street | | New York | NY | 10005 | | 212-732-3200 | 212-732-3232 | cahn@clm.com | Counsel to STMicroelectronics, Inc. |
| Chadbourne & Parke LLP | Douglas Deutsch, Esq. | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-408-5100 | 212-541-5369 | ddeutsch@chadbourne.com | Counsel to EagleRock Capital Management, LLC |
| Clark Hill PLC | Joel D. Applebaum | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | japplebaum@clarkhill.com | Counsel to 1st Choice Heating & Cooling, Inc.; BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLC | Shannon Deeby | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | sdeeby@clarkhill.com | Counsel to BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLLC | Robert D. Gordon | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8572 | 313-965-8252 | rgordon@clarkhill.com | Counsel to ATS Automation Tooling Systems Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cleary Gottlieb Steen & Hamilton LLP | Deborah M. Buell | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel to Arneses Electricos Automotrices, S.A.de C.V.; Cordaflex, S.A. de C.V. |
| Cleary, Gottlieb, Steen & Hamilton LLP | James L. Bromley | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel to Bear, Stearns, Co. Inc.; Citigroup, Inc.; Credit Suisse First Boston; Deutsche Bank Securities, Inc.; Goldman Sachs Group, Inc.; JP Morgan Chase & Co.; Lehman Brothers, Inc.; Merrill Lynch & Co.; Morgan Stanley & Co., Inc.; UBS Securities, LLC |
| Cohen & Grigsby, P.C. | Thomas D. Maxson | 11 Stanwix Street | 15th Floor | Pittsburgh | PA | 15222-1319 | | 412-297-4706 | 412-209-1837 | tmaxson@cohenlaw.com | Counsel to Nova Chemicals, Inc. |
| Cohen, Weiss & Simon LLP | Joseph J. Vitale Babette Ceccotti | 330 West 42nd Street | | New York | NY | 10036 | | 212-356-0238 | 646-473-8238 | jvitale@cwsny.com bceccotti@cwsny.com | Counsel to International Union, United Automobile, Areospace and Agriculture Implement Works of America (UAW) |
| Cohn Birnbaum & Shea P.C. | Scott D. Rosen, Esq. | 100 Pearl Street, 12th Floor | | Hartford | CT | 06103 | | 860-493-2200 | 860-727-0361 | srosen@cb-shea.com | Counsel to Floyd Manufacturing Co., Inc. |
| Conlin, McKenney & Philbrick, P.C. | Bruce N. Elliott | 350 South Main Street | Suite 400 | Ann Arbor | MI | 48104 | | 734-971-9000 | 734-971-9001 | Elliott@cmplaw.com | Counsel to Brazeway, Inc. |
| Connolly Bove Lodge & Hutz LLP | Jeffrey C. Wisler, Esq. | 1007 N. Orange Street | P.O. Box 2207 | Wilmington | DE | 19899 | | 302-658-9141 | 302-658-0380 | jwisler@cblh.com | Counsel to ORIX Warren, LLC |
| Contrarian Capital Management, L.L.C. | Mark Lee, Janice Stanton, Bill Raine, Seth Lax | 411 West Putnam Avenue | Suite 225 | Greenwich | CT | 06830 | | 203-862-8200 (230) 862-8231 | 203-629-1977 (203) 629-1977 | mlee@contrariancapital.com jstanton@contrariancapital.com wraine@contrariancapital.com solax@contrariancapital.com | Counsel to Contrarian Capital Management, L.L.C. |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Ronald S. Pretekin | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | Pretekin@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Sylvie J. Derrien | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | derrien@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| Cornell University | Nancy H. Pagliaro | Office of University Counsel | 300 CCC Building, Garden Avenue | Ithaca | NY | 14853-2601 | | 607-255-5124 | 607-254-3556 | nhp4@cornell.edu | Paralegal/Counsel to Cornell University |
| Covington & Burling | Susan Power Johnston | 1330 Avenue of the Americas | | New York | NY | 10019 | | 212-841-1005 | 646-441-9005 | sjohnston@cov.com | Special Counsel to the Debtor |
| Cox, Hodgman & Giarmarco, P.C. | Sean M. Walsh, Esq. | Tenth Floor Columbia Center | 101 W. Big Beaver Road | Troy | MI | 48084-5280 | | 248-457-7000 | 248-457-7001 | swalsh@chglaw.com | Counsel to Nisshinbo Automotive Corporation |
| Curtin & Heefner, LLP | Daniel P. Mazo | 250 N. Pennslyvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | dpm@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| Curtin & Heefner, LLP | Robert Szwajkos | 250 N. Pennslyvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | rsz@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| Damon & Morey LLP | William F. Savino | 1000 Cathedral Place | 298 Main Street | Buffalo | NY | 14202-4096 | | 716-856-5500 | 716-856-5510 | wsavino@damonmorey.com | Counsel to Relco, Inc.; The Durham Companies, Inc. |
| Day Pitney LLP | Richard M. Meth | P.O. Box 1945 | | Morristown | NJ | 07962-1945 | | 973-966-6300 | 973-966-1015 | rmeth@daypitney.com | Counsel to Marshall E. Campbell Company |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 4 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Day Pitney LLP | Ronald S. Beacher Conrad K. Chiu | 7 Times Square | | New York | NY | 10036 | | 212-297-5800 | 212-916-2940 | rbeacher@daypitney.com cchiu@daypitney.com | Counsel to IBJTC Business Credit Corporation, as successor to IBJ Whitehall Business Credit Corporation |
| Denso International America, Inc. | Carol Sowa | 24777 Denso Drive | | Southfield | MI | 48086 | | 248-372-8531 | 248-350-7772 | carol_sowa@denso-diam.com | Counsel to Denso International America, Inc. |
| Dinsmore & Shohl LLP | John Persiani | 1900 Chemed Center | 255 East Fifth Street | Cincinnati | OH | 45202 | | 513-977-8200 | 513-977-8141 | john.persiani@dinslaw.com | Counsel to The Procter & Gamble Company |
| DLA Piper Rudnick Gray Cary US LLP | Richard M. Kremen Maria Ellena Chavez-Ruark | The Marbury Building | 6225 Smith Avenue | Baltimore | Maryland | 21209-3600 | | 410-580-3000 | 410-580-3001 | richard.kremen@dlapiper.com | Counsel to Constellation NewEnergy, Inc. & Constellation NewEnergy - Gas Division, LLC |
| Dreier LLP | Maura I. Russell Wendy G. Marcari | 499 Park Ave | 14th Fl | New York | NY | 10022 | | 212-328-6100 | 212-652-3863 | jguerrier@dreierllp.com | Counsel to SPCP Group LLC |
| Drinker Biddle & Reath LLP | Andrew C. Kassner | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | andrew.kassner@dbr.com | Counsel to Penske Truck Leasing Co., L.P. |
| Drinker Biddle & Reath LLP | David B. Aaronson | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | david.aaronson@dbr.com | Counsel to Penske Truck Leasing Co., L.P. and Quaker Chemical Corporation |
| Drinker Biddle & Reath LLP | Janice B. Grubin | 140 Broadway 39th Fl | | New York | NY | 10005-1116 | | 212-248-3140 | 212-248-3141 | janice.grubin@dbr.com | Counsel to Vanguard Distributors, Inc. |
| Duane Morris LLP | Joseph H. Lemkin | 744 Broad Street | Suite 1200 | Newark | NJ | 07102 | | 973-424-2000 | 973-424-2001 | jhlemkin@duanemorris.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC; and Hosiden America Corporation |
| Duane Morris LLP | Margery N. Reed, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | dmdelphi@duanemorris.com | Counsel to ACE American Insurance Company |
| Duane Morris LLP | Wendy M. Simkulak, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | wmsimkulak@duanemorris.com | Counsel to ACE American Insurance Company |
| Eckert Seamans Cherin & Mellott LLC | Michael G. Busenkell | 300 Delaware Avenue | Suite 1360 | Wilmington | DE | 19801 | | 302-425-0430 | 302-425-0432 | mbusenkell@eckertseamans.com | Counsel to Chicago Miniature Optoelectronic Technologies, Inc. |
| Electronic Data Systems Corporation | Ayala Hassell | 5400 Legacy Dr. | Mail Stop H3-3A-05 | Plano | TX | 75024 | | 212-715-9100 | 212-715-8000 | ayala.hassell@eds.com | Representattive for Electronic Data Systems Corporation |
| Entergy Services, Inc. | Alan H. Katz | 639 Loyola Ave 26th Fl | | New Orleans | LA | 70113 | | | | akatz@entergy.com | Assistant General Counsel to Entergy Services, Inc. |
| Erman, Teicher, Miller, Zucker & Freedman, P.C. | David H. Freedman | 400 Galleria Officentre | Ste. 444 | Southfield | MI | 48034 | | 248-827-4100 | 248-827-4106 | dfreedman@ermanteicher.com | Counsel to Doshi Prettl International, LLC |
| Ettelman & Hochheiser, P.C. | Gary Ettelman | c/o Premium Cadillac | 77 Main Street | New Rochelle | NY | 10801 | | 516-227-6300 | 516-227-6307 | gettelman@e-hlaw.com | Counsel to Jon Ballin |
| Fagel Haber LLC | Lauren Newman | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | | 312-346-7500 | 312-580-2201 | lnewman@fagelhaber.com | Counsel to Aluminum International, Inc. |
| Filardi Law Offices LLC | Charles J. Filardi, Jr., Esq. | 65 Trumbull Street | Second Floor | New Haven | CT | 06510 | | 203-562-8588 | 866-890-3061 | charles@filardi-law.com | Counsel to Federal Express Corporation |
| Finkel Goldstein Rosenbloom & Nash LLP | Ted J. Donovan | 26 Broadway | Suite 711 | New York | NY | 10004 | | 212-344-2929 | 212-422-6836 | tdonovan@finkgold.com | Counsel to Pillarhouse (U.S.A.) Inc. |
| Foley & Lardner LLP | David G Dragich | 500 Woodward Ave Suite 2700 | | Detroit | MI | 48226-3489 | | 313-234-7100 | 313-234-2800 | ddragich@foley.com | Counsel to Intermet Corporation |
| Foley & Lardner LLP | Jill L. Murch | 321 North Clark Street | Suite 2800 | Chicago | IL | 60610-4764 | | 312-832-4500 | 312-832-4700 | jmurch@foley.com | Counsel to Kuss Corporation |
| Foley & Lardner LLP | John A. Simon | One Detroit Center | 500 Woodward Ave Suite 2700 | Detroit | MI | 48226-3489 | | 313-234-7100 | 313-234-2800 | jjsimon@foley.com | Counsel to Ernst & Young LLP |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Foley & Lardner LLP | Michael P. Richman | 90 Park Avenue | 37th Floor | New York | NY | 10016-1314 | | 212-682-7474 | 212-687-2329 | mrichman@foley.com | Counsel to Ernst & Young LLP |
| Fox Rothschild LLP | Fred Stevens | 13 East 37th Street | Suite 800 | New York | NY | 10016 | | 212-682-7575 | 212-682-4218 | fstevens@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Fox Rothschild LLP | Michael J. Viscount, Jr. | 1301 Atlantic Avenue | Suite 400 | Atlantic City | NJ | 08401-7212 | | 609-348-4515 | 609-348-6834 | mviscount@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Frederick T. Rikkers | | 419 Venture Court | P.O. Box 930555 | Verona | WI | 53593 | | 608-848-6350 | 608-848-6357 | ftrikkers@rikkerslaw.com | Counsel to Southwest Metal Finishing, Inc. |
| Fulbright & Jaworski LLP | David A Rosenzweig | 666 Fifth Avenue | | New York | NY | 10103-3198 | | 212-318-3000 | 212-318-3400 | drosenzweig@fulbright.com | Counsel to Southwest Research Institute  Attorney for Solvay Fluorides, LLC |
| Fulbright & Jaworski LLP | Michael M Parker | 300 Convent St Ste 2200 | | San Antonio | TX | 78205 | | 210-224-5575 | 210-270-7205 | mparker@fulbright.com | Counsel to Southwest Research Institute |
| Gibbons P.C. | David N. Crapo | One Gateway Center | | Newark | NJ | 07102-5310 | | 973-596-4523 | 973-639-6244 | dcrapo@gibbonslaw.com | Counsel to Epcos, Inc. |
| Goldberg, Stinnett, Meyers & Davis | Merle C. Meyers | 44 Montgomery Street | Suite 2900 | San Francisco | CA | 94104 | | 415-362-5045 | 415-362-2392 | mmeyers@gsmdlaw.com | Counsel to Alps Automotive, Inc. |
| Goodwin Procter LLP | Allan S. Brilliant | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | abrilliant@goodwinprocter.com | Counsel to UGS Corp. |
| Goodwin Procter LLP | Craig P. Druehl | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | cdruehl@goodwinprocter.com | Counsel to UGS Corp. |
| Gorlick, Kravitz & Listhaus, P.C. | Barbara S. Mehlsack | 17 State Street | 4th Floor | New York | NY | 10004 | | 212-269-2500 | 212-269-2560 | bmehlsack@gkllaw.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Goulston & Storrs, P.C. | Peter D. Bilowz | 400 Atlantic Avenue | | Boston | MA | 02110-333 | | 617-482-1776 | 617-574-4112 | pbilowz@goulstonstorrs.com | Counsel to Thermotech Company |
| Grant & Eisenhofer P.A. | Jay W. Eisenhofer | 45 Rockefeller Center | 650 Fifth Avenue | New York | NY | 10111 | | 212-755-6501 | 212-755-6503 | jeisenhofer@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Grant & Eisenhofer P.A. | Sharan Nirmul | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | | 302-622-7000 | 302-622-7100 | snirmul@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Gratz, Miller & Brueggeman, S.C. | Matthew R. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | mrr@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gratz, Miller & Brueggeman, S.C. | Timothy C. Hall | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | tch@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Graydon Head & Ritchey LLP | J. Michael Debbler, Susan M. Argo | 1900 Fifth Third Center | 511 Walnut Street | Cincinnati | OH | 45202 | | 513-621-6464 | 513-651-3836 | mdebbeler@graydon.com | Counsel to Grote Industries; Batesville Tool & Die; PIA Group; Reliable Castings |
| Greenberg Traurig, LLP | Maria J. DiConza | MetLife Bldg | 200 Park Avenue | New York | NY | 10166 | | 212-801-9200 | 212-801-6400 | diconzam@gtlaw.com | Counsel to Samtech Corporation |
| Greenberg Traurig, LLP | Shari L. Heyen | 1000 Louisiana | Suite 1800 | Houston | TX | 77002 | | 713-374-3500 | 713-374-3505 | heyens@gtlaw.com | Counsel to Samtech Corporation |
| Greensfelder, Hemker & Gale, P.C. | Cherie Macdonald J. Patrick Bradley | 10 S. Broadway | Suite 200 | St. Louis | MO | 63102 | | 314-241-9090 | 314-241-8624 | ckm@greensfelder.com jpb@greensfelder.com | Counsel to ARC Automotive, Inc. |
| Guaranty Bank | Herb Reiner | 8333 Douglas Avenue | | Dallas | TX | 75225 | | 214-360-2702 | 214-360-1940 | herb.reiner@guarantygroup.com | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Corporation |
| Halperin Battaglia Raicht, LLP | Alan D. Halperin Christopher J.Battaglia Julie D. Dyas | 555 Madison Avenue | 9th Floor | New York | NY | 10022 | | 212-765-9100 | 212-765-0964 | cbattaglia@halperinlaw.net ahalperin@halperinlaw.net jdyas@halperinlaw.net | Counsel to Pacific Gas Turbine Center, LLC and Chromalloy Gas Turbine Corporation; ARC Automotive, Inc. |
| Hancock & Estabrook LLP | R John Clark Esq | 1500 Tower I | PO Box 4976 | Syracuse | NY | 13221-4976 | | 315-471-3151 | 315-471-3167 | rjclark@hancocklaw.com | Counsel to Alliance Precision Plastics Corporation |
| Harris D. Leinwand | Harris D. Leinwand | 350 Fifth Avenue | Suite 2418 | New York | NY | 10118 | | 212-725-7338 | 212-244-6219 | hleinwand@aol.com | Counsel to Baker Hughes Incorporated; Baker Petrolite Corporation |
| Haynes and Boone, LLP | Judith Elkin | 153 East 53rd Street | Suite 4900 | New York | NY | 10022 | | 212-659-7300 | 212-918-8989 | judith.elkin@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Haynes and Boone, LLP | Lenard M. Parkins Kenric D. Kattner | 1 Houston Center | 1221 McKinney, Suite 2100 | Houston | TX | 77010 | | 713-547-2000 | 713-547-2600 | lenard.parkins@haynesboone.com kenric.kattner@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Heller Ehrman LLP | Timothy Mehok | Times Square Tower | Seven Times Square | New York | NY | 10036 | | 212-832-8300 | 212-763-7600 | timothy.mehok@hellerehrman.com | Counsel to @Road, Inc. |
| Herrick, Feinstein LLP | Paul Rubin | 2 Park Avenue | | New York | NY | 10016 | | 212-592-1448 | 212-545-3360 | prubin@herrick.com | Counsel to Canon U.S.A., Inc. and Schmidt Technology GmbH |
| Hewlett-Packard Company | Anne Marie Kennelly | 3000 Hanover St., M/S 1050 | | Palo Alto | CA | 94304 | | 650-857-6902 | 650-852-8617 | anne.kennelly@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Kenneth F. Higman | 2125 E. Katella Avenue | Suite 400 | Anaheim | CA | 92806 | | 714-940-7120 | 740-940-7539 | ken.higman@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Sharon Petrosino | 420 Mountain Avenue | | Murray Hill | NJ | 07974 | | 908-898-4760 | 908-898-4133 | sharon.petrosino@hp.com | Counsel to Hewlett-Packard Financial Services Company |
| Hiscock & Barclay, LLP | J. Eric Charlton | 300 South Salina Street | PO Box 4878 | Syracuse | NY | 13221-4878 | | 315-425-2716 | 315-425-8576 | echarlton@hiscockbarclay.com | Counsel to GW Plastics, Inc. |
| Hodgson Russ LLP | Julia S. Kreher | One M&T Plaza | Suite 2000 | Buffalo | NY | 14203 | | 716-848-1330 | 716-819-4645 | jkreher@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hodgson Russ LLP | Stephen H. Gross, Esq. | 230 Park Avenue | 17th Floor | New York | NY | 10169 | | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hogan & Hartson L.L.P. | Audrey Moog | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | 202-637-5910 | amoog@hhlaw.com | Counsel to Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Edward C. Dolan | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | 202-637-5910 | ecdolan@hhlaw.com | Counsel to Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Scott A. Golden | 875 Third Avenue | | New York | NY | 10022 | | 212-918-3000 | 212-918-3100 | sagolden@hhlaw.com | Counsel to XM Satellite Radio Inc. |
| Holme Roberts & Owen, LLP | Elizabeth K. Flaagan | 1700 Lincoln | Suite 4100 | Denver | CO | 80203 | | 303-861-7000 | 303-866-0200 | elizabeth.flaagan@hro.com | Counsel to CoorsTek, Inc.; Corus, L.P. |
| Honigman, Miller, Schwartz and Cohn, LLP | Donald T. Baty, Jr. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7314 | 313-465-7315 | dbaty@honigman.com | Counsel to Fujitsu Ten Corporation of America |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 7 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Honigman, Miller, Schwartz and Cohn, LLP | E. Todd Sable | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7548 | 313-465-7549 | tsable@honigman.com | Counsel to Valeo Climate Control Corp.; Valeo Electrical Systems, Inc. - Motors and Actuators Division;Valeo Electrical Systems, Inc. - Wipers Division; Valeo Switches & Detection System, Inc. |
| Honigman, Miller, Schwartz and Cohn, LLP | Seth A Drucker | 2290 First National Building | 660 Woodward Avenue Ste 2290 | Detroit | MI | 48226 | | 313-465-7626 | 313-465-7627 | sdrucker@honigman.com | Counsel for Valeo Climate Control, Corp. |
| Howard & Howard Attorneys PC | Lisa S Gretchko | 39400 Woodward Ave | Ste 101 | Bloomfield Hills | MI | 48304-5151 | | 248-723-0396 | 248-645-1568 | lgretchko@howardandhoward.com | Intellectual Property Counsel for Delphi Corporation, et al. |
| Howick, Westfall, McBryan & Kaplan, LLP | Louis G. McBryan | 3101 Tower Creek Parkway | Ste 600 One Tower Creek | Atlanta | GA | 30339 | | 678-384-7000 | 678-384-7034 | lmcbryan@hwmklaw.com | Counsel to Vanguard Distributors, Inc. |
| Hunton & Wiliams LLP | Michael P. Massad, Jr. | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | mmassad@hunton.com | Counsel to RF Monolithics, Inc. |
| Hunton & Wiliams LLP | Steven T. Holmes | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | sholmes@hunton.com | Counsel to RF Monolithics, Inc. |
| Hurwitz & Fine P.C. | Ann E. Evanko | 1300 Liberty Building | | Buffalo | NY | 14202 | | 716-849-8900 | 716-855-0874 | aee@hurwitzfine.com | Counsel to Jiffy-Tite Co., Inc. |
| Ice Miller | Ben T. Caughey | One American Square | Box 82001 | Indianapolis | IN | 46282-0200 | | 317-236-2100 | 317-236-2219 | Ben.Caughey@icemiller.com | Counsel to Sumco, Inc. |
| Infineon Technologies North America Corporation | Greg Bibbes | 1730 North First Street | M/S 11305 | San Jose | CA | 95112 | | 408-501-6442 | 408-501-2488 | greg.bibbes@infineon.com | General Counsel & Vice President for Infineon Technologies North America Corporation |
| Infineon Technologies North America Corporation | Jeff Gillespie | 2529 Commerce Drive | Suite H | Kokomo | IN | 46902 | | 765-454-2146 | 765-456-3836 | jeffery.gillispie@infineon.com | Global Account Manager for Infineon Technologies North America |
| InPlay Technologies Inc | Heather Beshears | 234 South Extension Road | | Mesa | AZ | 85201 | | | | heather@inplaytechnologies.com | Creditor |
| Intermet Corporation | Alan Miller | 301 Commerce Street | Ste 2901 | Fort Worth | TX | 76102 | | | | amiller@intermet.com | Creditor |
| International Union of Operating Engineers | Richard Griffin | 1125-17th Avenue, N.W. | | Washington | DC | 20036 | | 202-429-9100 | 202-778-2641 | rgriffin@iuoe.org | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Jaffe, Raitt, Heuer & Weiss, P.C. | Paige E. Barr | 27777 Franklin Road | Suite 2500 | Southfield | MI | 48034 | | 248-351-3000 | 248-351-3082 | pbarr@jaffelaw.com | Counsel to Trutron Corporation |
| James R Scheuerle | Parmenter O'Toole | 601 Terrace Street | PO Box 786 | Muskegon | MI | 49443-0786 | | 231-722-1621 | 231-728-2206 | JRS@Parmenterlaw.com | Counsel to Port City Die Cast and Port City Group Inc |
| Jenner & Block LLP | Ronald R. Peterson | One IBM Plaza | | Chicago | IL | 60611 | | 312-222-9350 | 312-840-7381 | rpeterson@jenner.com | Counsel to SPX Corporation (Contech Division), Alcan Rolled Products-Ravenswood, LLC, Tenneco Inc. and Contech LLC |
| Jones Day | Scott J. Friedman | 222 East 41st Street | | New York | NY | 10017 | | 212-326-3939 | 212-755-7306 | sjfriedman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Katten Muchin Rosenman LLP | John P. Sieger, Esq. | 525 West Monroe Street | | Chicago | IL | 60661 | | 312-902-5200 | 312-577-4733 | john.sieger@kattenlaw.com | Counsel to TDK Corporation America and MEMC Electronic Materials, Inc. |
| Kaye Scholer LLP | Richard G Smolev | 425 Park Avenue | | New York | NY | 10022-3598 | | 212-236-8000 | 212-836-8689 | rsmolev@kayescholer.com | Counsel to InPlay Technologies Inc |
| Kegler, Brown, Hill & Ritter Co., LPA | Kenneth R. Cookson | 65 East State Street | Suite 1800 | Columbus | OH | 43215 | | 614-426-5400 | 614-464-2634 | kcookson@keglerbrown.com | Counsel to Solution Recovery Services |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 8 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Keller Rohrback L.L.P. | Lynn Lincoln Sarko Cari Campen Laufenberg Erin M. Rily | 1201 Third Avenue | Suite 3200 | Seattle | WA | 98101 | | 206-623-1900 | 206-623-3384 | lsarko@kellerrohrback.com claufenberg@kellerrohrback.com eriley@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Keller Rohrback P.L.C. | Gary A. Gotto | National Bank Plaza | 3101 North Central Avenue, Suite 900 | Phoenix | AZ | 85012 | | 602-248-0088 | 602-248-2822 | ggotto@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Kennedy, Jennick & Murray | Larry Magarik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | lmagarik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Susan M. Jennik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | sjennik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Thomas Kennedy | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | tkennedy@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| King & Spalding, LLP | H. Slayton Dabney, Jr. Bill Dimos | 1185 Avenue of the Americas | | New York | NY | 10036 | | 212-556-2100 | 212-556-2222 | sdabney@kslaw.com bdimos@kslaw.com | Counsel to KPMG LLP |
| Kirkland & Ellis LLP | Jim Stempel | 200 East Randolph Drive | | Chicago | IL | 60601 | | 312-861-2000 | 312-861-2200 | jstempel@kirkland.com | Counsel to Lunt Mannufacturing Company |
| Kirkpatrick & Lockhart Nicholson Graham LLP | Edward M. Fox | 599 Lexington Avenue | | New York | NY | 10022 | | 212-536-4812 | 212-536-3901 | efox@klng.com | Counsel to Wilmington Trust Company, as Indenture trustee |
| Klett Rooney Lieber & Schorling | Eric L. Schnabel DeWitt Brown | The Brandywine Building | 1000 West Street, Suite 1410 | Wilmington | DE | 19801 | | (302) 552-4200 | | schnabel@klettrooney.com dbrown@klettrooney.com | Counsel to Entergy |
| Krugliak, Wilkins, Griffiths & Dougherty CO., L.P.A. | Sam O. Simmerman | 4775 Munson Street N.W. | P.O. Box 36963 | Canton | OH | 44735-6963 | | 330-497-0700 | 330-497-4020 | sosimmerman@kwgd.com | Counsel to for Millwood, Inc. |
| Kutak Rock LLP | Jay Selanders | 1010 Grand Blvd Ste 500 | | Kansas City | MO | 64106 | | 816-502-4617 | 816-960-0041 | jay.selanders@kutakrock.com | Counsel to DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrysler Canada, Inc. |
| Kutchin & Rufo, P.C. | Edward D. Kutchin | 155 Federal Street | 17th Floor | Boston | MA | 02110-1727 | | 617-542-3000 | 617-542-3001 | ekutchin@kutchinrufo.com | Counsel to Parlex Corporation |
| Kutchin & Rufo, P.C. | Kerry R. Northrup | 155 Federal Street | 17th Floor | Boston | MA | 02110-1727 | | 617-542-3000 | 617-542-3001 | knorthup@kutchinrufo.com | Counsel to Parlex Corporation |
| Lambert. Leser, Isackson, Cook & Guinta, P.C. | Susan M. Cook | 309 Davidson Building | PO Box 835 | Bay City | MI | 48707-0835 | | 989-893-3518 | | smcook@lambertleser.com | Counsel to Linamar Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 9 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Latham & Watkins | Erika Ruiz | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | erika.ruiz@lw.com | UCC Professional |
| Latham & Watkins | Henry P. Baer, Jr. | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | henry.baer@lw.com | UCC Professional |
| Latham & Watkins | John W. Weiss | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | john.weiss@lw.com | UCC Professional |
| Latham & Watkins | Mark A. Broude | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1384 | 212-751-4864 | mark.broude@lw.com | UCC Professional |
| Latham & Watkins | Michael J. Riela | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | michael.riela@lw.com | UCC Professional |
| Latham & Watkins | Mitchell A. Seider | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | mitchell.seider@lw.com | UCC Professional |
| Law Offices of Michael O'Hayer | Michael O'Hayer Esq | 22 N Walnut Street | | West Chester | PA | 19380 | | 610-738-1230 | 610-738-1217 | mkohayer@aol.com | Counsel to A-1 Specialized Services and Supplies Inc |
| Lewis and Roca LLP | Rob Charles, Esq. | One South Church Street | Suite 700 | Tucson | AZ | 85701 | | 520-629-4427 | 520-879-4705 | rcharles@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Lewis and Roca LLP | Susan M. Freeman, Esq. | 40 North Central Avenue | Suite 1900 | Phoenix | AZ | 85004-4429 | | 602-262-5756 | 602-734-3824 | sfreeman@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Linear Technology Corporation | John England, Esq. | General Counsel for Linear Technology Corporation | 1630 McCarthy Blvd. | Milpitas | CA | 95035-7417 | | 408-432-1900 | 408-434-0507 | jengland@linear.com | Counsel to Linear Technology Corporation |
| Linebarger Goggan Blair & Sampson, LLP | Diane W. Sanders | 1949 South IH 35 (78741) | P.O. Box 17428 | Austin | TX | 78760-7428 | | 512-447-6675 | 512-443-5114 | austin.bankruptcy@publicans.com | Counsel to Cameron County, Brownsville ISD |
| Linebarger Goggan Blair & Sampson, LLP | Elizabeth Weller | 2323 Bryan Street | Suite 1600 | Dallas | TX | 75201 | | 214-880-0089 | 4692215002 | dallas.bankruptcy@publicans.com | Counsel to Dallas County and Tarrant County |
| Linebarger Goggan Blair & Sampson, LLP | John P. Dillman | P.O. Box 3064 | | Houston | TX | 77253-3064 | | 713-844-3478 | 713-844-3503 | houston_bankruptcy@publicans.com | Counsel in Charge for Taxing Authorities: Cypress-Fairbanks Independent School District, City of Houston, Harris County |
| Loeb & Loeb LLP | P. Gregory Schwed | 345 Park Avenue | | New York | NY | 10154-0037 | | 212-407-4000 | | gschwed@loeb.com | Counsel to Creditor The Interpublic Group of Companies, Inc. and Proposed Auditor Deloitte & Touche, LLP |
| Loeb & Loeb LLP | William M. Hawkins | 345 Park Avenue | | New York | NY | 10154 | | 212-407-4000 | 212-407-4990 | whawkins@loeb.com | Counsel to Industrial Ceramics Corporation |
| Lord, Bissel & Brook | Timothy S. McFadden | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-0370 | 312-896-6394 | tmcfadden@lordbissell.com | Counsel to Methode Electronics, Inc. |
| Lord, Bissel & Brook | Timothy W. Brink | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-1832 | 312-443-896-6432 | tbrink@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. |
| Lord, Bissel & Brook LLP | Kevin J. Walsh | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | | 212-947-8304 | 212-947-1202 | kwalsh@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| Lowenstein Sandler PC | Bruce S. Nathan | 1251 Avenue of the Americas | | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | bnathan@lowenstein.com | Counsel to Daewoo International (America) Corp. |
| Lowenstein Sandler PC | Ira M. Levee | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | ilevee@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employes's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Lowenstein Sandler PC | Kenneth A. Rosen | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | krosen@lowenstein.com | Counsel to Cerberus Capital Management, L.P. |
| Lowenstein Sandler PC | Michael S. Etkin | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | metkin@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employes's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Lowenstein Sandler PC | Scott Cargill | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | scargill@lowenstein.com | Counsel to Cerberus Capital Management, L.P.; AT&T Corporation |
| Lowenstein Sandler PC | Vincent A. D'Agostino | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | vdagostino@lowenstein.com | Counsel to AT&T Corporation |
| Lyden, Liebenthal & Chappell, Ltd. | Erik G. Chappell | 5565 Airport Highway | Suite 101 | Toledo | OH | 43615 | | 419-867-8900 | 419-867-8909 | egc@lydenlaw.com | Counsel to Metro Fibres, Inc. |
| MacDonald, Illig, Jones & Britton LLP | Richard J. Parks | 100 State Street | Suite 700 | Erie | PA | 16507-1459 | | 814-870-7754 | 814-454-4647 | rparks@mijb.com | Counsel to Ideal Tool Company, Inc. |
| Maddin, Hauser, Wartell, Roth & Heller PC | Alexander Stotland Esq | 28400 Northwestern Hwy | Third Floor | Southfield | MI | 48034 | | 248-354-4030 | | axs@maddinhauser.com | Attorney for Danice Manufacturing Co. |
| Madison Capital Management | Joe Landen | 6143 South Willow Drive | Suite 200 | Greenwood Village | CO | 80111 | | 303-957-4254 | 303-957-2098 | jlanden@madisoncap.com | Representative for Madison Capital Management |
| Margulies & Levinson, LLP | Jeffrey M. Levinson, Esq. Leah N. Caplan, Esq. | 30100 Chagrin Boulevard | Suite 250 | Pepper Pike | OH | 44124 | | 216-514-4935 | 216-514-4936 | jml@ml-legal.com lmc@ml-legal.com | Counsel to Venture Plastics |
| Mastromarco & Jahn, P.C. | Victor J. Mastromarco, Jr. | 1024 North Michigan Avenue | P.O. Box 3197 | Saginaw | MI | 48605-3197 | | 989-752-1414 | | vmastromar@aol.com | Counsel to H.E. Services Company and Robert Backie and Counsel to Cindy Palmer, Personal Representative to the Estate of Michael Palmer |
| Masuda Funai Eifert & Mitchell, Ltd. | Gary D. Santella | 203 North LaSalle Street | Suite 2500 | Chicago | IL | 60601-1262 | | 312-245-7500 | 312-245-7467 | gsantella@masudafunai.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC and Hosiden America Corporation |
| Mayer, Brown, Rowe & Maw LLP | Jeffrey G. Tougas | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | jgtougas@mayerbrownrowe.com | Counsel to Bank of America, N.A. |
| Mayer, Brown, Rowe & Maw LLP | Raniero D'Aversa, Jr. | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | rdaversa@mayerbrown.com | Counsel to Bank of America, N.A. |
| McCarter & English, LLP | David J. Adler, Jr. Esq. | 245 Park Avenue, 27th Floor | | New York | NY | 10167 | | 212-609-6800 | 212-609-6921 | dadler@mccarter.com | Counsel to Ward Products, LLC |
| McCarter & English, LLP | Eduardo J. Glas, Esq. | Four Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4096 | | 913-622-4444 | 973-624-7070 | eglas@mccarter.com | Counsel to General Products Delaware Corporation |
| McCarthy Tetrault LLP | John J. Salmas Lorne P. Salzman | 66 Wellington Street West | Suite 4700 | Toronto | Ontario | M5K 1E6 | | 416-362-1812 | 416-868-0673 | jsalmas@mccarthy.ca lsalzman@mccarthy.ca | Counsel to Themselves (McCarthy Tetrault LLP) |
| McDermott Will & Emery LLP | James M. Sullivan | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5477 | 212-547-5444 | jmsullivan@mwe.com | Counsel to Linear Technology Corporation, National Semiconductor Corporation; Timken Corporation |
| McDermott Will & Emery LLP | Stephen B. Selbst | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5400 | 212-547-5444 | sselbst@mwe.com | Counsel to National Semiconductor Corporation |
| McDonald Hopkins Co., LPA | Scott N. Opincar, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sopincar@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McDonald Hopkins Co., LPA | Shawn M. Riley, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sriley@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McElroy, Deutsch, Mulvaney & Carpenter, LLP | Jeffrey Bernstein, Esq. | Three Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4079 | | 973-622-7711 | 973-622-5314 | jbernstein@mdmc-law.com | Counsel to New Jersey Self-Insurers Guaranty Association |
| McGuirewoods LLP | Aaron G McCollough Esq | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | | 804-775-1000 | 804-775-1061 | amccollough@mcguirewoods.com | Counsel to Siemens Energy & Automation, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 11 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Meyer, Suozzi, English & Klein, P.C. | Hanan Kolko | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | hkolko@msek.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Meyer, Suozzi, English & Klein, P.C. | Lowell Peterson, Esq. | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | lpeterson@msek.com | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Meyers, Rodbell & Rosenbaum, P.A. | M. Evan Meyers | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | emeyers@mrrlaw.net | Counsel to Prince George County, Maryland |
| Meyers, Rodbell & Rosenbaum, P.A. | Robert H. Rosenbaum | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | rrosenbaum@mrrlaw.net | Counsel to Prince George County, Maryland |
| Michael Cox | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | miag@michigan.gov | Attorney General for State of Michigan, Department of Treasury |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Dennis J. Raterink | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | raterinkd@michigan.gov | Assistant Attorney General for Worker's Compensation Agency |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Michael Cox | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | miag@michigan.gov | Attorney General for Worker's Compensation Agency |
| Michigan Heritage Bank | Janice M. Donahue | 28300 Orchard Lake Rd | Ste 200 | Farmington Hills | MI | 48334 | | 248-538-2529 | 248-786-3596 | jdonahue@miheritage.com | Counsel to  Michigan Heritage Bank; MHB Leasing, Inc. |
| Miles & Stockbridge, P.C. | Kerry Hopkins | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | 410-385-3700 | khopkins@milesstockbridge.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miles & Stockbridge, P.C. | Thomas D. Renda | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | 410-385-3700 | trenda@milesstockbridge.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miller Johnson | Thomas P. Sarb, Robert D. Wolford | 250 Monroe Avenue, N.W. | Suite 800, PO Box 306 | Grand Rapids | MI | 49501-0306 | | 616-831-1748, 616-831-1726 | 616-988-1748, 616-988-1726 | sarbt@millerjohnson.com, wolfordr@millerjohnson.com | Counsel to Pridgeon & Clay, Inc. |
| Miller, Canfield, Paddock and Stone, P.L.C. | Jonathan S. Green | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8452 | 313-496-7997 | greenj@millercanfield.com | Counsel to Wells Operating Partnership, LP |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 12 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Miller, Canfield, Paddock and Stone, P.L.C. | Timothy A. Fusco | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8435 | 313-496-8453 | fusco@millercanfield.com | Counsel to Niles USA Inc.; Techcentral, LLC; The Bartech Group, Inc.; Fischer Automotive Systems |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Paul J. Ricotta | One Financial Center | | Boston | MA | 02111 | | 617-542-6000 | 617-542-2241 | pjricotta@mintz.com | Counsel to Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Stephanie K. Hoos | The Chrysler Center | 666 Third Avenue | New York | NY | 10017 | | 212-935-3000 | 212-983-3115 | skhoos@mintz.com | Counsel to Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Molex Connector Corp | Jeff Ott | 2222 Wellington Ct. | | Lisle | IL | 60532 | | 630-527-4254 | 630-512-8610 | Jeff.Ott@molex.com | Counsel to Molex Connector Corp |
| Morgan, Lewis & Bockius LLP | Andrew D. Gottfried | 101 Park Avenue | | New York | NY | 10178-0060 | | 212-309-6000 | 212-309-6001 | agottfried@morganlewis.com | Counsel to ITT Industries, Inc.; Hitachi Chemical (Singapore), Ltd. |
| Morgan, Lewis & Bockius LLP | Menachem O. Zelmanovitz | 101 Park Avenue | | New York | NY | 10178 | | 212-309-6000 | 212-309-6001 | mzelmanovitz@morganlewis.com | Counsel to Hitachi Chemical (Singapore) Pte, Ltd. |
| Morgan, Lewis & Bockius LLP | Richard W. Esterkin, Esq. | 300 South Grand Avenue | | Los Angeles | CA | 90017 | | 213-612-1163 | 213-612-2501 | resterkin@morganlewis.com | Counsel to Sumitomo Corporation |
| Moritt Hock Hamroff & Horowitz LLP | Leslie Ann Berkoff | 400 Garden City Plaza | | Garden City | NY | 11530 | | 516-873-2000 | | lberkoff@moritthock.com | Counsel to Standard Microsystems Corporation and its direct and indirect subsidiaries Oasis SiliconSystems AG and SMSC NA Automotive, LLC (successor-in-interst to Oasis Silicon Systems, Inc.) |
| Morrison Cohen LLP | Michael R. Dal Lago | 909 Third Avenue | | New York | NY | 10022 | | 212-735-8757 | 917-522-3157 | mdallago@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Munsch Hardt Kopf & Harr, P.C. | Raymond J. Urbanik, Esq., Joseph J. Wielebinski, Esq. and Davor Rukavina, Esq. | 3800 Lincoln Plaza | 500 North Akard Street | Dallas | RX | 75201-6659 | | 214-855-7590 214-855-7561 214-855-7587 | 214-855-7584 | rurbanik@munsch.com jwielebinski@munsch.com drukavina@munsch.com | Counsel to Texas Instruments Incorporated |
| Nantz, Litowich, Smith, Girard & Hamilton, P.C. | Sandra S. Hamilton | 2025 East Beltline, S.E. | Suite 600 | Grand Rapids | MI | 49546 | | 616-977-0077 | 616-977-0529 | sandy@nlsg.com | Counsel to Lankfer Diversified Industries, Inc. |
| Nathan, Neuman & Nathan, P.C. | Kenneth A. Nathan | 29100 Northwestern Highway | Suite 260 | Southfield | MI | 48034 | | 248-351-0099 | 248-351-0487 | Knathan@nathanneuman.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| National City Commercial Capital | Lisa M. Moore | 995 Dalton Avenue | | Cincinnati | OH | 45203 | | 513-455-2390 | 866-298-4481 | lisa.moore2@nationalcity.com | Vice President and Senior Counsel to National City Commercial Capital |
| Nelson Mullins Riley & Scarborough | George B. Cauthen | 1320 Main Street, 17th Floor | PO Box 11070 | Columbia | SC | 29201 | | 803-7255-9425 | 803-256-7500 | george.cauthen@nelsonmullins.com | Counsel to Datwyler Rubber & Plastics, Inc.; Datwyler, Inc.; Datwyler i/o devices (Americas), Inc.; Rothrist Tube (USA), Inc. |
| New Jersey Attorney General's Office Division of Law | Tracy E Richardson Deputy Attorney General | R.J. Hughes Justice Complex | 25 Market St P.O. Box 106 | Trenton | NJ | 08628-0106 | | 609-292-1537 | 609-777-3055 | tracy.richardson@dol.lps.state.nj.us | Deputy Attorney General - State of New Jersey Division of Taxation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 13 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Nix, Patterson & Roach, L.L.P. | Bradley E. Beckworth | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | bbeckworth@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Nix, Patterson & Roach, L.L.P. | Jeffrey J. Angelovich | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | jangelovich@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Nix, Patterson & Roach, L.L.P. | Susan Whatley | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | susanwhatley@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| North Point | David G. Heiman | 901 Lakeside Avenue | | Cleveland | OH | 44114 | | 216-586-3939 | 216-579-0212 | dgheiman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Office of the Chapter 13 Trustee | Camille Hope | P.O. Box 954 | | Macon | GA | 31202 | | 478-742-8706 | 478-746-4488 | cahope@chapter13macon.com | Office of the Chapter 13 Trustee |
| Office of the Texas Attorney General | Jay W. Hurst | P.O. Box 12548 | | Austin | TX | 78711-2548 | | 512-475-4861 | 512-482-8341 | jay.hurst@oag.state.tx.us | Counsel to The Texas Comptroller of Public Accounts |
| Orbotech, Inc. | Michael M. Zizza, Legal Manager | 44 Manning Road | | Billerica | MA | 01821 | | 978-901-5025 | 978-667-9969 | michaelz@orbotech.com | Company |
| Orrick, Herrington & Sutcliffe LLP | Alyssa Englund, Esq. | 666 Fifth Avenue | | New York | NY | 10103 | | 212-506-5187 | 212-506-5151 | aenglund@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Frederick D. Holden, Jr., Esq. | 405 Howard Street | | San Francisco | CA | 94105 | | 415-773-5700 | 415-773-5759 | fholden@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Jonathan P. Guy | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | jguy@orrick.com | Counsel to Westwood Associates, Inc. |
| Orrick, Herrington & Sutcliffe LLP | Richard H. Wyron | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | rwyron@orrick.com | Counsel to Westwood Associates, Inc. |
| Pachulski Stang Ziehl Young Jones & Weintraub LLP | Michael R. Seidl | 919 N. Market Street, 17th Floor | P.O. Box 8705 | Wilmington | DE | 19899-8705 | | 302-652-4100 | 302- 652-4400 | mseidl@pszyjw.com | Counsel for Essex Group, Inc. |
| Pachulski Stang Ziehl Young Jones & Weintraub LLP | William P. Weintraub | 780 Third Avenue, 36th Floor | | New York | NY | 10017-2024 | | 212-561-7700 | 212-561-7777 | wweintraub@pszyjw.com | Counsel for Essex Group, Inc. |
| Paul, Weiss, Rifkind, Wharton & Garrison | Andrew N. Rosenberg Justin G. Brass | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | arosenberg@paulweiss.com jbrass@paulweiss.com | Counsel to Merrill Lynch, Pierce, Fenner & Smith, Incorporated |
| Paul, Weiss, Rifkind, Wharton & Garrison | Douglas R. Davis | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | ddavis@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Elizabeth R. McColm | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | emccolm@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Stephen J. Shimshak | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3133 | 212-373-2136 | sshimshak@paulweiss.com | Counsel to Ambrake Corporation |
| | Peggy Housner | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | housnerp@michigan.gov | Assistant Attorney General for State of Michigan, Department of Treasury |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 14 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Pepe & Hazard LLP | Kristin B. Mayhew | 30 Jelliff Lane | | Southport | CT | 06890-1436 | | 203-319-4022 | 203-259-0251 | kmayhew@pepehazard.com | Counsel for Illinois Tool Works Inc., Illinois Tool Works for Hobart Brothers Co., Hobart Brothers Company, ITW Food Equipment Group LLC and Tri-Mark, Inc. |
| Pepper, Hamilton LLP | Anne Marie Aaronson | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | aaronsona@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pepper, Hamilton LLP | Francis J. Lawall | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | lawallf@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pepper, Hamilton LLP | Henry Jaffe | 1313 Market Street | PO Box 1709 | Wilmington | DE | 19899-1709 | | 302-777-6500 | 302-421-8390 | jaffeh@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pepper, Hamilton LLP | Linda J. Casey | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | caseyl@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pierce Atwood LLP | Jacob A. Manheimer | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | jmanheimer@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p.A. |
| Pierce Atwood LLP | Keith J. Cunningham | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | kcunningham@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p.A. |
| Pillsbury Winthrop Shaw Pittman LLP | Karen B. Dine | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | karen.dine@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Margot P. Erlich | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | margot.erlich@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Mark D. Houle | 650 Town Center Drive | Ste 550 | Costa Mesa | CA | 92626-7122 | | 714-436-6800 | 714-436-2800 | mark.houle@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Richard L. Epling | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | richard.epling@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Robin L. Spear | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | robin.spear@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Porzio, Bromberg & Newman, P.C. | Brett S. Moore, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | bsmoore@pbnlaw.com | |

In re Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 15 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Porzio, Bromberg & Newman, P.C. | John S. Mairo, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | jsmairo@pbnlaw.com | Counsel to Neuman Aluminum Automotive, Inc. and Neuman Aluminum Impact Extrusion, Inc. |
| Previant, Goldberg, Uelman, Gratz, Miller & Brueggeman, S.C. | Jill M. Hartley and Marianne G. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | jh@previant.com mgr@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| PriceWaterHouseCoopers | Enrique Bujidos | Almagro | 40 | Madrid | | 28010 | Spain | 34 915 684 356 | | enrique.bujidos@es.pwc.com | Representative to DASE |
| QAD, Inc. | Jason Pickering, Esq. | 10,000 Midlantic Drive | | Mt. Laurel | NJ | 08054 | | 856-840-2489 | 856-840-2740 | jkp@qad.com | Counsel to QAD, Inc. |
| Quadrangle Debt Recovery Advisors LLC | Andrew Herenstein | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1742 | 866-741-2505 | andrew.herenstein@quadrangle group.com | Counsel to Quadrangle Debt Recovery Advisors LLC |
| Quadrangle Group LLC | Patrick Bartels | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1748 | 866-552-2052 | patrick.bartels@quadranglegroup.com | Counsel to Quadrangle Group LLC |
| Quarles & Brady Streich Lang LLP | John A. Harris | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | jharris@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Quarles & Brady Streich Lang LLP | Kasey C. Nye | One South Church Street | | Tucson | AZ | 85701 | | 520-770-8717 | 520-770-2203 | knye@quarles.com | Counsel to Offshore International, Inc.; Maquilas Teta Kawi, S.A. de C.V.; On Semiconductor Corporation |
| Quarles & Brady Streich Lang LLP | Scott R. Goldberg | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | sgoldber@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Reed Smith | Elena Lazarou | 599 Lexington Avenue | 29th Street | New York | NY | 10022 | | 212-521-5400 | 212-521-5450 | elazarou@reedsmith.com | Counsel to General Electric Capital Corporation, Stategic Asset Finance. |
| Reed Smith | Richard P. Norton | One Riverfront Plaza | 1st Floor | Newark | NJ | 07102 | | 973-621-3200 | 973-621-3199 | rnorton@reedsmith.com | Counsel to Jason Incorporated, Sackner Products Division |
| Riddell Williams P.S. | Joseph E. Shickich, Jr. | 1001 4th Ave. | Suite 4500 | Seattle | WA | 98154-1195 | | 206-624-3600 | 206-389-1708 | jshickich@riddellwilliams.com | Counsel to Microsoft Corporation; Microsoft Licensing, GP |
| Rieck and Crotty PC | Jerome F Crotty | 55 West Monroe Street | Suite 3390 | Chicago | IL | 60603 | | 312-726-4646 | 312-726-0647 | jcrotty@rieckcrotty.com | Counsel to Mary P. O'Neill and Liam P. O'Neill |
| Riemer & Braunstein LLP | Mark S. Scott | Three Center Plaza | | Boston | MA | 02108 | | 617-523-9000 | 617-880-3456 | mscott@riemerlaw.com | Counsel to ICX Corporation |
| Riverside Claims LLC | Holly Rogers | 2109 Broadway | Suite 206 | New York | NY | 10023 | | 212-501-0990 | 212-501-7088 | holly@regencap.com | Riverside Claims LLC |
| Robinson, McFadden & Moore, P.C. | Annemarie B. Mathews | P.O. Box 944 | | Columbia | SC | 29202 | | 803-779-8900 | 803-771-9411 | amathews@robinsonlaw.com | Counsel to Blue Cross Blue Shield of South Carolina |
| Ropes & Gray LLP | Gregory O. Kaden | One International Place | | Boston | MA | 02110-2624 | | 617-951-7000 | 617-951-7050 | gregory.kaden@ropesgray.com | Attorneys for D-J, Inc. |
| Ropes & Gray LLP | Marc E. Hirschfield | 45 Rockefeller Plaza | | New York | NY | 10111-0087 | | 212-841-5700 | 212-841-5725 | marc.hirschfield@ropesgray.com | Attorneys for D-J, Inc. |
| Rosen Slome Marder LLP | Thomas R. Slome | 333 Earle Ovington Boulevard | Suite 901 | Uniondale | NY | 11533 | | 516-227-1600 | | tslome@rsmllp.com | Counsel to JAE Electronics, Inc. |
| Russell Reynolds Associates, Inc. | Charles E. Boulbol, P.C. | 26 Broadway, 17th Floor | | New York | NY | 10004 | | 212-825-9457 | 212-825-9414 | rttrack@msn.com | Counsel to Russell Reynolds Associates, Inc. |
| Sachnoff & Weaver, Ltd | Charles S. Schulman | 10 South Wacker Drive | 40th Floor | Chicago | IL | 60606 | | 312-207-1000 | 312-207-6400 | agelman@sachnoff.com | Counsel to Infineon Technologies North America Corporation |
| Satterlee Stephens Burke & Burke LLP | Christopher R. Belmonte | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | cbelmonte@ssbb.com | Counsel to Moody's Investors Service |
| Satterlee Stephens Burke & Burke LLP | Pamela A. Bosswick | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | pbosswick@ssbb.com | Counsel to Moody's Investors Service |
| Schafer and Weiner PLLC | Daniel Weiner | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | dweiner@schaferandweiner.com | Counsel to Dott Industries, Inc. |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Schafer and Weiner PLLC | Howard Borin | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | hborin@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Ryan Heilman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | rheilman@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schiff Hardin LLP | Eugene J. Geekie, Jr. | 7500 Sears Tower | | Chicago | IL | 60606 | | 312-258-5635 | 312-258-5600 | egeekie@schiffhardin.com | Counsel to  Means Industries |
| Schiffrin & Barroway, LLP | Michael Yarnoff | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7056 | 610-667-7706 | myarnoff@sbclasslaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employes's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Schiffrin & Barroway, LLP | Sean M. Handler | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7706 | 610-667-7056 | shandler@sbclasslaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employes's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Schulte Roth & Sabel LLP | James T. Bentley | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2273 | 212-593-5955 | james.bentley@srz.com | Counsel to Panasonic Automotive Systems Company of America |
| Schulte Roth & Sabel LLP | Michael L. Cook | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | michael.cook@srz.com | Counsel to Panasonic Automotive Systems Company of America; D.C. Capital Partners, L.P. |
| Schulte Roth & Zabel LLP | Carol Weiner Levy | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | carol.weiner.levy@srz.com | Counsel to D.C. Capital Partners, L.P. |
| Seyfarth Shaw LLP | Paul M. Baisier, Esq. | 1545 Peachtree Street, N.E. | Suite 700 | Atlanta | GA | 30309-2401 | | 404-885-1500 | 404-892-7056 | pbaisier@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | Robert W. Dremluk, Esq. | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | | 212-218-5500 | 212-218-5526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | William J. Hanlon | World Trade Center East | Two Seaport Lane, Suite 300 | Boston | MA | 02210 | | 617-946-4800 | 617-946-4801 | whanlon@seyfarth.com | Counsel to le Belier/LBQ Foundry S.A. de C.V. |
| Sheehan Phinney Bass + Green Professional Association | Bruce A. Harwood | 1000 Elm Street | P.O. Box 3701 | Manchester | NH | 03105-3701 | | 603-627-8139 | 603-627-8121 | bharwood@sheehan.com | Counsel to Source Electronics, Inc. |
| Sheldon S. Toll PLLC | Sheldon S. Toll | 2000 Town Center | Suite 2550 | Southfield | MI | 48075 | | 248-358-2460 | 248-358-2740 | lawtoll@comcast.net | Counsel to Milwaukee Investment Company |
| Sheppard Mullin Richter & Hampton LLP | Eric Waters | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | 212-332-3888 | ewaters@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Malani J. Sternstein | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | 212-332-3888 | msternstein@sheppardmullin.com | Counsel to International Rectifier Corp. and Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theodore A. Cohen | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | 213-620-1398 | tcohen@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theresa Wardle | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | 213-620-1398 | twardle@sheppardmullin.com | Counsel to International Rectifier Corp. |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 5353 Essen Lane | Suite 650 | Baton Rouge | LA | 70809 | | 225-757-2185 | 225-757-7674 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 909 Poydras Street | 28th Floor | New Orleans | LA | 70112-1033 | | 504-299-2100 | 504-299-2300 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Sills, Cummis Epstein & Gross, P.C. | Andrew H. Sherman | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | asherman@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |
| Sills, Cummis Epstein & Gross, P.C. | Jack M. Zackin | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | jzackin@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |

In re: Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 17 of 20

7/24/2007 12:03 PM
Email

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Sills, Cummis Epstein & Gross, P.C. | Valerie A Hamilton Simon Kimmelman | 650 College Rd E | | Princeton | NJ | 08540 | | 609-227-4600 | 609-227-4646 | vhamilton@sillscummis.com skimmelman@sillscummis.com | Counsel to Doosan Infracore America Corp. |
| Silver Point Capital, L.P. | Chaim J. Fortgang | Two Greenwich Plaza | 1st Floor | Greenwich | CT | 06830 | | 203-542-4216 | 203-542-4100 | cfortgang@silverpointcapital.com | Counsel to Silver Point Capital, L.P. |
| Smith, Gambrell & Russell, LLP | Barbara Ellis-Monro | 1230 Peachtree Street, N.E. | Suite 3100 | Atlanta | GA | 30309 | | 404-815-3500 | 404-815-3509 | bellis-monro@sgrlaw.com | Counsel to Southwire Company |
| Smith, Katzenstein & Furlow LLP | Kathleen M. Miller | 800 Delaware Avenue, 7th Floor | P.O. Box 410 | Wilmington | DE | 19899 | | 302-652-8400 | 3026528405 | kmiller@skfdelaware.com | Counsel to Airgas, Inc. |
| Sonnenschein Nath & Rosenthal LLP | D. Farrington Yates | 1221 Avenue of the Americas | 24th Floor | New York | NY | 10020 | | 212-768-6700 | 212-768-6800 | fyates@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc. and United Plastics Group |
| Sonnenschein Nath & Rosenthal LLP | Monika J. Machen | 8000 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | 312-876-7934 | mmachen@sonnenschein.com | Counsel to United Plastics Group |
| Sonnenschein Nath & Rosenthal LLP | Robert E. Richards | 8000 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | 312-876-7934 | rrichards@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc. |
| Squire, Sanders & Dempsey L.L.P. | Eric Marcks | One Maritime Plaza | Suite 300 | San Francisco | CA | 94111-3492 | | | 415-393-9887 | emarcks@ssd.com | Counsel to Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| Squire, Sanders & Dempsey L.L.P. | Penn Ayers Butler | 600 Hansen Way | | Palo Alto | CA | 94304 | | 650-856-6500 | 650-843-8777 | pabutler@ssd.com | Counsel to Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| State of California Office of the Attorney General | Sarah E. Morrison | Deputy Attorney General | 300 South Spring Street Ste 1702 | Los Angeles | CA | 90013 | | 213-897-2640 | 213-897-2802 | sarah.morrison@doj.ca.gov | Attorneys for the State of California Department of Toxic Substances Control |
| State of Michigan Department of Labor & Economic Growth, Unemployment Insurance Agency | Roland Hwang Assistant Attorney General | 3030 W. Grand Boulevard | Suite 9-600 | Detroit | MI | 48202 | | 313-456-2210 | 313-456-2201 | hwangr@michigan.gov | Assistant Attorney General for State of Michigan, Unemployment Tax Office of the Department of Labor & Economic Growth, Unemployment Insurance Agency |
| Steel Technologies, Inc. | John M. Baumann | 15415 Shelbyville Road | | Louisville | KY | 40245 | | 502-245-0322 | 502-245-0542 | jmbaumann@steeltechnologies.com | Counsel to Steel Technologies, Inc. |
| Stein, Rudser, Cohen & Magid LLP | Robert F. Kidd | 825 Washington Street | Suite 200 | Oakland | CA | 94607 | | 510-287-2365 | 510-987-8333 | rkidd@srcm-law.com | Counsel to Excel Global Logistics, Inc. |
| Steinberg Shapiro & Clark | Mark H. Shapiro | 24901 Northwestern Highway | Suite 611 | Southfield | MI | 48075 | | 248-352-4700 | 248-352-4488 | shapiro@steinbergshapiro.com | Counsel to Bing Metals Group, Inc.; Gentral Transport International, Inc.; Crown Enerprises, Inc.; Economy Transport, Inc.; Logistics Insight Corp (LINC); Universal Am-Can, Ltd.; Universal Truckload Services, Inc. |
| Sterns & Weinroth, P.C. | Jeffrey S. Posta Michael A Spero Simon Kimmelman Valerie A Hamilton | 50 West State Street, Suite 1400 | PO Box 1298 | Trenton | NJ | 08607-1298 | | 609-392-2100 | 609-392-7956 | jposta@sternslaw.com jspecf@sternslaw.com | Counsel to Doosan Infracore America Corp. |
| Stevens & Lee, P.C. | Chester B. Salomon, Esq. Constantine D. Pourakis, Esq. | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | | 212-319-8500 | 212-319-8505 | cs@stevenslee.com cp@stevenslee.com | Counsel to Tonolli Canada Ltd.; VJ Technologies, Inc. and V.J. ElectroniX, Inc. |
| Stinson Morrison Hecker LLP | Mark A. Shaiken | 1201 Walnut Street | | Kansas City | MO | 64106 | | 816-842-8600 | 816-691-3495 | mshaiken@stinsonmoheck.com | Counsel to Thyssenkrupp Waupaca, Inc. and Thyssenkrupp Stahl Company |
| Stites & Harbison PLLC | Madison L.Cashman | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | robert.goodrich@stites.com | Counsel to Setech, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 18 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Stites & Harbison PLLC | Robert C. Goodrich, Jr. | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | madison.cashman@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison, PLLC | W. Robinson Beard, Esq. | 400 West Market Street | | Louisville | KY | 40202 | | 502-681-0448 | 502-779-8274 | wbeard@stites.com | Counsel to WAKO Electronics (USA), Inc. and Ambrake Corporation |
| Stroock & Stroock & Lavan, LLP | Kristopher M. Hansen | 180 Maiden Lane | | New York | NY | 10038 | | 212-806-5400 | 212-806-6006 | khansen@stroock.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| Taft, Stettinius & Hollister LLP | Richard L .Ferrell | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202-3957 | | 513-381-2838 | | ferrell@taftlaw.com | Counsel to Wren Industries, Inc. |
| Taft, Stettinius & Hollister LLP | W Timothy Miller Esq | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202 | | 513-381-2838 | 513-381-0205 | miller@taftlaw.com | Counsel to Select Industries Corporation and Gobar Systems, Inc. |
| Tennessee Department of Revenue | Marvin E. Clements, Jr. | c/o TN Attorney General's Office, Bankruptcy Division | PO Box 20207 | Nashville | TN | 37202-0207 | | 615-532-2504 | 615-741-3334 | marvin.clements@state.tn.us | Tennesse Department of Revenue |
| Terra Law LLP | David B. Draper | 60 S. Market Street | Suite 200 | San Jose | CA | 95113 | | 408-299-1200 | 408-998-4895 | ddraper@terra-law.com | Counsel to Maxim Integrated Products, Inc. |
| Thacher Proffitt & Wood LLP | Jonathan D. Forstot | Two World Financial Center | | New York | NY | 10281 | | 212-912-7679 | 212-912-7751 | jforstot@tpw.com | Counsel to TT Electronics, Plc |
| Thacher Proffitt & Wood LLP | Louis A. Curcio | Two World Financial Center | | New York | NY | 10281 | | 212-912-7607 | 212-912-7751 | lcurcio@tpw.com | Counsel to TT Electronics, Plc |
| The Furukawa Electric Co., Ltd. | Mr. Tetsuhiro Niizeki | 6-1 Marunouchi | 2-Chrome, Chiyoda-ku | Tokyo | Japan | 100-8322 | | | 81-3-3286-3919 | niizeki.tetsuhiro@furukawa.co.jp | Legal Department of The Furukawa Electric Co., Ltd. |
| The Timken Corporation BIC -08 | Robert Morris | 1835 Dueber Ave. SW | PO Box 6927 | Canton | OH | 44706-0927 | | 330-438-3000 | 1-330-471-4388 | robert.morris@timken.com | Representative for Timken Corporation |
| Thelen Reid Brown Raysman & Steiner LLP | David A. Lowenthal | 875 Third Avenue | | New York | NY | 10022 | | 212-603-2000 | 212-603-2001 | dlowenthal@thelenreid.com | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Corporation and Oki Semiconductor Company |
| Thompson & Knight | Rhett G. Cambell | 333 Clay Street | Suite 3300 | Houston | TX | 77002 | | 713-654-1871 | 713-654-1871 | rhett.campbell@tklaw.com | Counsel to STMicroelectronics, Inc. |
| Thompson & Knight LLP | Ira L. Herman | 919 Third Avenue | 39th Floor | New York | NY | 10022-3915 | | 212-751-3045 | 214-999-9139 | ira.herman@tklaw.com | Counsel to Victory Packaging |
| Thompson & Knight LLP | John S. Brannon | 1700 Pacific Avenue | Suite 3300 | Dallas | TX | 75201-4693 | | 214-969-1505 | 214-969-1609 | john.brannon@tklaw.com | Counsel to Victory Packaging |
| Thurman & Phillips, P.C. | Ed Phillips, Jr. | 8000 IH 10 West | Suite 1000 | San Antonio | TX | 78230 | | 210-341-2020 | 210-344-6460 | ephillips@thurman-phillips.com | Counsel to Royberg, Inc. d/b/a Precision Mold & Tool and d/b/a Precision Mold and Tool Group |
| Todd & Levi, LLP | Jill Levi, Esq. | 444 Madison Avenue | Suite 1202 | New York | NY | 10022 | | 212-308-7400 | | jlevi@toddlevi.com | Counsel to Bank of Lincolnwood |
| Tyler, Cooper & Alcorn, LLP | W. Joe Wilson | City Place | 35th Floor | Hartford | CT | 06103-3488 | | 860-725-6200 | 860-278-3802 | jwilson@tylercooper.com | Counsel to Barnes Group, Inc. |
| Underberg & Kessler, LLP | Helen Zamboni | 300 Bausch & Lomb Place | | Rochester | NY | 14604 | | 585-258-2800 | 585-258-2821 | hzamboni@underbergkessler.com | Counsel to McAlpin Industries, Inc. |
| Union Pacific Railroad Company | Mary Ann Kilgore | 1400 Douglas Street | MC 1580 | Omaha | NE | 68179 | | 402-544-4195 | 402-501-0127 | mkilgore@UP.com | Counsel to Union Pacific Railroad Company |
| Varnum, Riddering, Schmidt & Howlett LLP | Michael S. McElwee | Bridgewater Place | P.O. Box 352 | Grand Rapids | MI | 49501-0352 | | 616-336-6827 | 616-336-7000 | msmcelwee@varnumlaw.com | Counsel to Furukawa Electric North America APD and Co-Counsel to Tower Automotive, Inc. |
| Wachtell, Lipton, Rosen & Katz | Emil A. Kleinhaus | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | EAKleinhaus@wlrk.com | Counsel to Capital Research and Management Company |
| Wachtell, Lipton, Rosen & Katz | Richard G. Mason | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | RGMason@wlrk.com | Counsel to Capital Research and Management Company |
| Waller Lansden Dortch & Davis, PLLC | David E. Lemke, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | david.lemke@wallerlaw.com | Counsel to Nissan North America, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 19 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Waller Lansden Dortch & Davis, PLLC | Robert J. Welhoelter, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | robert.welhoelter@wallerlaw.com | Counsel to Nissan North America, Inc. |
| Warner Norcross & Judd LLP | Gordon J. Toering | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2185 | 616-222-2185 | gtoering@wnj.com | Counsel to Robert Bosch Corporation |
| Warner Norcross & Judd LLP | Michael G. Cruse | 2000 Town Center | Suite 2700 | Southfield | MI | 48075 | | 248-784-5131 | 248-603-9631 | mcruse@wnj.com | Counsel to Compuware Corporation |
| Warner Norcross & Judd LLP | Stephen B. Grow | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2158 | | growsb@wnj.com | Counsel to Behr Industries Corp. |
| Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP | Lei Lei Wang Ekvall | 650 Town Center Drive | Suite 950 | Costa Mesa | CA | 92626 | | 714-966-1000 | 714-966-1002 | lekvall@wgllp.com | Counsel to Toshiba America Electronic Components, Inc. |
| Weinstein, Eisen & Weiss LLP | Aram Ordubegian | 1925 Century Park East | #1150 | Los Angeles | CA | 90067 | | 310-203-9393 | 310-203-8110 | aordubegian@weineisen.com | Counsel to Orbotech, Inc. |
| Weltman, Weinberg & Reis Co., L.P.A. | Geoffrey J. Peters | 175 South Third Street | Suite 900 | Columbus | OH | 43215 | | 614-857-4326 | 614-222-2193 | gpeters@weltman.com | Counsel to Seven Seventeen Credit Union |
| White & Case LLP | Glenn Kurtz Gerard Uzzi Douglas Baumstein | 1155 Avenue of the Americas | | New York | NY | 10036-2787 | | 212-819-8200 | | gkurtz@ny.whitecase.com guzzi@whitecase.com dbaumstein@ny.whitecase.com | Counsel to Appaloosa Management, LP |
| White & Case LLP | Thomas Lauria Frank Eaton | Wachovia Financial Center | 200 South Biscayne Blvd., Suite 4900 | Miami | FL | 33131 | | 305-371-2700 | 305-358-5744 | tlauria@whitecase.com featon@miami.whitecase.com | Counsel to Appaloosa Management, LP |
| Whyte, Hirschboeck Dudek S.C. | Bruce G. Arnold | 555 East Wells Street | Suite 1900 | Milwaukee | WI | 53202-4894 | | 414-273-2100 | 414-223-5000 | barnold@whdlaw.com | Counsel to Schunk Graphite Technology |
| Winstead Sechrest & Minick P.C. | R. Michael Farquhar | 5400 Renaissance Tower | 1201 Elm Street | Dallas | TX | 75270 | | 214-745-5400 | 214-745-5390 | mfarquhar@winstead.com | Counsel to National Instruments Corporation |
| Winthrop Couchot Professional Corporation | Marc. J. Winthrop | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | mwinthrop@winthropcouchot.com | Counsel to Metal Surfaces, Inc. |
| Winthrop Couchot Professional Corporation | Sean A. O'Keefe | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | sokeefe@winthropcouchot.com | Counsel to Metal Surfaces, Inc. |
| Womble Carlyle Sandridge & Rice, PLLC | Lillian H. Pinto | 300 North Greene Street | Suite 1900 | Greensboro | NC | 27402 | | 336-574-8058 | 336-574-4528 | lpinto@wcsr.com | Counsel to Armacell |
| Zeichner Ellman & Krause LLP | Peter Janovsky | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | pjanovsky@zeklaw.com | Counsel to Toyota Tsusho America, Inc. and Karl Kufner, KG aka Karl Kuefner, KG |
| Zeichner Ellman & Krause LLP | Stuart Krause | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | skrause@zeklaw.com | Counsel to Toyota Tsusho America, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 20 of 20

7/24/2007 12:03 PM
Email

# EXHIBIT C

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| Airgas, Inc. | David Boyle | 259 Radnor-Chester Road, Suite 100 | P.O. Box 6675 | Radnor | PA | 19087-8675 | 610-230-3064 | Counsel to Airgas, Inc. |
| Akebono Corporation (North America) | Alan Swiech | 34385 Twelve Mile Road | | Farminton Hills | MI | 48331 | 248-489-7406 | Vice President of Administration for Akebono Corporation |
| APS Clearing, Inc. | Andy Leinhoff Matthew Hamilton | 1301 S. Capital of Texas Highway | Suite B-220 | Austin | TX | 78746 | 512-314-4416 | Counsel to APS Clearing, Inc. |
| Berry Moorman P.C. | James P. Murphy | 535 Griswold | Suite 1900 | Detroit | MI | 48226 | 313-496-1200 | Counsel to Kamax L.P.; Optrex America, Inc. |
| Bingham McHale LLP | Michael J Alerding | 10 West Market Street | Suite 2700 | Indianapolis | IN | 46204 | 317-635-8900 | Counsel to Universal Tool & Engineering co., Inc. and M.G. Corporation |
| Cage Williams & Abelman, P.C. | Steven E. Abelman | 1433 Seventeenth Street | | Denver | CO | 80202 | 303-295-0202 | Counsel to United Power, Inc. |
| Colbert & Winstead, P.C. | Amy Wood Malone | 1812 Broadway | | Nashville | TN | 37203 | 615-321-0555 | Counsel to Averitt Express, Inc. |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Steven M. Wachstein | 33 West First Street | Suite 600 | Dayton | OH | 45402 | 937-223-8177 | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | Andrew M. Thau | 101 Park Avenue | | New York | NY | 10178-0061 | 212-696-8898 | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | David S. Karp | 101 Park Avenue | | New York | NY | 10178-0061 | 212-696-6065 | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co. |
| DaimlerChrysler Corporation | Kim Kolb | CIMS 485-13-32 | 1000 Chrysler Drive | Auburn Hills | MI | 48326-2766 | 248-576-5741 | Counsel to DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrysler Canada, Inc. |
| DiConza Law, P.C. | Gerard DiConza, Esq. | 630 Third Avenue, 7th Floor | | New York | NY | 10017 | 212-682-4940 | Counsel to Tyz-All Plastics, Inc.; Furukawa Electric North America APD; and Co-Counsel to Tower Automotive, Inc. |
| Dykema Gossett PLLC | Gregory J. Jordan | 10 Wacker | Suite 2300 | Chicago | IL | 60606 | 312-627-2171 | Counsel to Tremont City Barrel Fill PRP Group |
| Fagel Haber LLC | Gary E. Green | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | 312-346-7500 | Counsel to Aluminum International, Inc. |
| Genovese Joblove & Battista, P.A. | Craig P. Rieders, Esq. | 100 S.E. 2nd Street | Suite 4400 | Miami | FL | 33131 | 305-349-2300 | Counsel to Ryder Integrated Logistics, Inc. |
| Grant & Eisenhofer P.A. | Geoffrey C. Jarvis | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | 302-622-7000 | Counsel to Teachers Retirement System of Oklahoma; Public Employes's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 3

7/24/2007 12:04 PM
US MAIL

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|-------|------------------|
| Heller Ehrman LLP | Carren Shulman | Times Square Tower | Seven Times Square | New York | NY | 10036 | 212-832-8300 | Counsel to @Road, Inc. |
| Hunter & Schank Co. LPA | John J. Hunter | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | 419-255-4300 | Counsel to ZF Group North America Operations, Inc. |
| Hunter & Schank Co. LPA | Thomas J. Schank | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | 419-255-4300 | Counsel to ZF Group North America Operations, Inc. |
| Jason, Inc. | Beth Klimczak, General Counsel | 411 E. Wisconsin Ave | Suite 2120 | Milwaukee | WI | 53202 | | General Counsel to Jason Incorporated |
| Johnston, Harris Gerde & Komarek, P.A. | Jerry W. Gerde, Esq. | 239 E. 4th St. | | Panama City | FL | 32401 | 850-763-8421 | Counsel to Peggy C. Brannon, Bay County Tax Collector |
| Kelley Drye & Warren, LLP | Mark I. Bane | 101 Park Avenue | | New York | NY | 10178 | 212-808-7800 | Counsel to the Pension Benefit Guaranty Corporation |
| Kelley Drye & Warren, LLP | Mark. R. Somerstein | 101 Park Avenue | | New York | NY | 10178 | 212-808-7800 | Counsel to the Pension Benefit Guaranty Corporation |
| Lord, Bissel & Brook LLP | Rocco N. Covino | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | 212-812-8340 | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| McGuirewoods LLP | Elizabeth L. Gunn | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | 804-775-1178 | Counsel to Siemens Logistics Assembly Systems, Inc. |
| Miami-Dade County Tax Collector | Metro-Dade Paralegal Unit | 140 West Flagler Street | Suite 1403 | Miami | FL | 33130 | 305-375-5314 | Paralegal Collection Specialist for Miami-Dade County |
| Norris, McLaughlin & Marcus | Elizabeth L. Abdelmasieh, Esq | 721 Route 202-206 | P.O. Box 1018 | Somerville | NJ | 08876 | 908-722-0700 | Counsel to Rotor Clip Company, Inc. |
| North Point | Michelle M. Harner | 901 Lakeside Avenue | | Cleveland | OH | 44114 | 216-586-3939 | Counsel to WL. Ross & Co., LLC |
| O'Rourke Katten & Moody | Michael C. Moody | 161 N. Clark Street | Suite 2230 | Chicago | IL | 60601 | 312-849-2020 | Counsel to Ameritech Credit Corporation d/b/a SBC Capital Services |
| Orrick, Herrington & Sutcliffe LLP | Matthew W. Cheney | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | 202-339-8400 | Counsel to Westwood Associates, Inc. |
| Paul, Weiss, Rifkind, Wharton & Garrison | Curtis J. Weidler | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | 212-373-3157 | Counsel to Ambrake Corporation; Akebono Corporation |
| Professional Technologies Services | John V. Gorman | P.O. Box #304 | | Frankenmuth | MI | 48734 | 989-385-3230 | Corporate Secretary for Professional Technologies Services |
| Republic Engineered Products, Inc. | Joseph Lapinsky | 3770 Embassy Parkway | | Akron | OH | 44333 | 330-670-3004 | Counsel to Republic Engineered Products, Inc. |
| Ropers, Majeski, Kohn & Bentley | Christopher Norgaard | 515 South Flower Street | Suite 1100 | Los Angeles | CA | 90071 | 213-312-2000 | Counsel to Brembo S.p.A; Bibielle S.p.A.; AP Racing |
| Sachnoff & Weaver, Ltd | Charles S. Schulman | 10 South Wacker Drive | 40th Floor | Chicago | IL | 60606 | 312-207-1000 | Counsel to Infineon Technologies North America Corporation |
| Schafer and Weiner PLLC | Max Newman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | 248-540-3340 | Counsel to Dott Industries, Inc. |
| Schiff Hardin LLP | William I. Kohn | 6600 Sears Tower | | Chicago | IL | 60066 | 312-258-5500 | Counsel to  Means Industries |
| Shipman & Goodwin LLP | Jennifer L. Adamy | One Constitution Plaza | | Hartford | CT | 06103-1919 | 860-251-5811 | Counsel to Fortune Plastics Company of Illinois, Inc.; Universal Metal Hose Co., |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 3

7/24/2007 12:04 PM
US MAIL

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|-------|------------------|
| Sony Electronics Inc. | Lloyd B. Sarakin - Chief Counsel, Finance and Credit | 1 Sony Drive | MD #1 E-4 | Park Ridge | NJ | 07656 | 201-930-7483 | Counsel to Sony Electronics, Inc. |
| Stroock & Stroock & Lavan, LLP | Joseph G. Minias | 180 Maiden Lane | | New York | NY | 10038 | 212-806-5400 | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. a |
| Swidler Berlin LLP | Robert N. Steinwurtzel | The Washington Harbour | 3000 K Street, N.W. Suite 300 | Washington | DC | 20007 | 202-424-7500 | Attorneys for Sanders Lead Co., Inc. |
| Togut, Segal & Segal LLP | Albert Togut, Esq. | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | Conflicts counsel to Debtors |
| United Steel, Paper and Forestry, Rubber, Manufacturing, Energy | Allied Industrial and Service Workers, Intl Union (USW), AFL-CIO | David Jury, Esq. | Five Gateway Center Suite 807 | Pittsburgh | PA | 15222 | 412-562-2549 | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Vorys, Sater, Seymour and Pease LLP | Robert J. Sidman, Esq. | 52 East Gay Street | P.O. Box 1008 | Columbus | OH | 43216-1008 | 614-464-6422 | |
| Vorys, Sater, Seymour and Pease LLP | Tiffany Strelow Cobb | 52 East Gay Street | | Columbus | OH | 43215 | 614-464-8322 | Counsel to America Online, Inc. and its Subsidiaries and Affiliates |
| Warner Stevens, L.L.P. | Michael D. Warner | 301 Commerce Street | Suite 1700 | Fort Worth | TX | 76102 | 817-810-5250 | Counsel to Electronic Data Systems Corp. and EDS Information Services, L.L.C. |
| Winstead Sechrest & Minick P.C. | Berry D. Spears | 401 Congress Avenue | Suite 2100 | Austin | TX | 78701 | 512-370-2800 | Counsel to National Instruments Corporation |
| WL Ross & Co., LLC | Stephen Toy | 600 Lexington Avenue | 19th Floor | New York | NY | 10022 | 212-826-1100 | Counsel to WL Ross & Co., LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

7/24/2007 12:04 PM
US MAIL

# EXHIBIT D

**Hearing Date, Time, And Related Schedule: TO BE ESTABLISHED BY COURT**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                     :
       In re                              :     Chapter 11
                                       :
DELPHI CORPORATION, et al.,       :     Case No. 05-44481 (RDD)
                                       :
                                       :     (Jointly Administered)
           Debtors.                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED MOTION FOR ORDER AUTHORIZING AND APPROVING
DELPHI-APPALOOSA EQUITY PURCHASE AND COMMITMENT AGREEMENT
PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), 503(b), AND 507(a)

("DELPHI-APPALOOSA INVESTMENT AND PLAN FRAMEWORK MOTION")

Delphi Corporation ("Delphi" or the "Company") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (the "Debtors"), submit this expedited motion (the "Motion") for an order authorizing and approving the Delphi-Appaloosa Equity Purchase and Commitment Agreement (as defined below) and certain related agreements pursuant to 11 U.S.C. §§ 105(a), 363(b), 503(b), as described herein, and respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  The Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the Creditors' Committee, the "Statutory Committees").

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are sections 105,

363(b), 503(b), and 507(a) of the Bankruptcy Code and rule 6004 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as

of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately

$15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues and the thirteenth largest public company

business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors and continue their business operations without supervision from the Bankruptcy Court.[2]

6.      The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer ("OEM").

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27,
2007.

[2]    On March 20, 2007, Delphi Automotive Systems Espana S.L., whose sole operation is a non-core automotive
component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding.  The
application was approved by the Spanish court on April 13, 2007.  The Concurso proceeding is consistent with
Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

accordance with the terms of a Master Separation Agreement between Delphi and GM. In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications. Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

C.      Events Leading To The Chapter 11 Filing

8.      In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income. Every year thereafter, however,

with the exception of 2002, the Company has suffered losses. In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006, the Debtors incurred

a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee

special attrition programs.

9.      The Debtors believe that the Company's financial performance has

deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which

have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production

environment for domestic OEMs resulting in the reduced number of motor vehicles that GM

---

[3]     Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating
loss in calendar year 2004 was $482 million.

produces annually in the United States and related pricing pressures, and (iii) increasing

commodity prices.

10.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major stakeholders had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its

transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined five key tenets of its

transformation plan.  First, Delphi must modify its labor agreements to create a competitive

arena in which to conduct business.[4]  Second, the Debtors must conclude their negotiations with

GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain

GM's business commitment to the Company.[5]  Third, the Debtors must streamline their product

portfolio to capitalize on their world-class technology and market strengths and make the

---

[4]    Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International Union,
United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM that (a)
modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi,
the UAW, and its various locals, (b) provides that GM and Delphi will undertake certain financial obligations to
Delphi's UAW-represented employees and retirees to facilitate these modifications, and (c) modifies retiree
welfare benefits for certain UAW-represented retirees of the Debtors.  This agreement, which is subject to
approval by this Court, should facilitate the Debtors' reaching consensual resolutions of their labor issues with
the remaining unions and GM and permit the Debtors to continue to implement their transformation plan and to
develop, prosecute, confirm, and consummate a plan of reorganization.  Delphi is currently engaged in
settlement discussions with its second and third largest U.S. labor unions and is working to conclude
discussions with those unions as well as three smaller unions as soon as practicable.

[5]    On July 9, 2007, Delphi confirmed that its discussions with GM on a comprehensive settlement agreement had
entered the documentation phase and that it expected that a settlement with GM would be incorporated into the
Debtors' plan of reorganization rather than filed with this Court for separate approval.

necessary manufacturing alignment with their new focus.[6]  Fourth, the Debtors must transform

their salaried workforce to ensure that the Company's organizational and cost structure is

competitive and aligned with its product portfolio and manufacturing footprint.[7]  Finally, the

Debtors must devise a workable solution to their current pension situation.[8]

12.    Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

---

[6]    In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants.  The Debtors have been working to divest non-core assets so as to maximize the value of the estate for stakeholders.  During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., its chapter 11 affiliate, they obtained court approval for the sale of substantially all of the assets of their brake hose business, and they obtained court approval of bid procedures related to the upcoming sale of substantially all assets used in their catalyst business and their Saltillo, Mexico brake plant business.  In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

[7]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.  The Debtors also made significant progress in ensuring that their organizational and cost structure is competitive in obtaining the entry of this Court's Order Under 11 U.S.C. Section 363(b) and Fed. R. Bankr. P. 6004 Authorizing Debtors to Enter into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order").  The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[8]    To that end, on May 31, 2007, the Bankruptcy Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 plan year funding waivers, which were approved by the IRS, for both the Delphi Hourly-Rate Employees Plan (the "Hourly Plan") and the Delphi Retirement Program for Salaried Employees (the "Salaried Plan" and together with the Hourly Plan, the "Plans").  On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively.

E.    The Original Equity Purchase And Commitment Agreement

13.    In the summer of 2006, Appaloosa Management L.P. ("Appaloosa") and

Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), as significant stakeholders of the

Debtors, negotiated and entered into non-disclosure agreements with the Debtors pursuant to

which they obtained certain information from and about the Debtors and their businesses and

engaged in discussions regarding various potential reorganization structures and related matters,

including the potential requirement for a substantial equity investment in Delphi to facilitate the

Debtors' restructuring.  Following several months of negotiations among Delphi, GM, the

Statutory Committees, Appaloosa, Harbinger, and other potential investors, on December 18,

2006, the Debtors announced their execution of an equity purchase and commitment agreement

(the "Original EPCA") with affiliates of Appaloosa, Cerberus Capital Management, L.P.

("Cerberus"), and Harbinger, as well as Merrill Lynch & Co. ("Merrill") and UBS Securities

LLC ("UBS") (collectively, the "Original Investors"), and a plan framework support agreement

(the "Original PSA," and together with the Original EPCA, the "Original Framework

Agreements") with the Original Investors and GM.  As previously discussed in the Debtors'

motion for approval of the Original EPCA and the Original PSA,[9] the Original EPCA and

Original PSA were the product of framework discussions that commenced in August 2006 and

culminated in the Debtors' December 18 announcement.  The Original PSA, as well as the

economics and structure of the plan framework itself, were expressly conditioned on reaching

consensual agreements with Delphi's U.S. labor unions and GM.  Both Delphi and the Original

Investors were permitted to terminate the Original EPCA (which would terminate the Original

---

[9]    See Expedited Motion for Order Authorizing and Approving The Equity Purchase and Commitment Agreement
Pursuant to Sections 105(a), 363(b), 503(b), and 507(a) of the Bankruptcy Code and the Plan Framework
Support Agreement Pursuant To Sections 105(a), 363(b), and 1125(e) of the Bankruptcy Code, dated December
18, 2006 (Docket No. 6179) (the "Original Framework Motion").

PSA) if consensual agreements were not reached with labor and GM that were acceptable to each party in their sole discretion.

14.    <u>The Framework Hearing</u>.  Despite the months of framework discussions and negotiations, the Original Framework Motion immediately drew objections from the Debtors' Statutory Committees.  The Debtors also received objections from the Ad Hoc Committee of Delphi Trade Claim Holders, the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America (the "IUE-CWA"), the International Union of Operating Engineers (the "IUOE"), the International Brotherhood of Electrical Workers (the "IBEW"), and the U.S. Trustee.

15.    On December 21, 2006, the Debtors received an unsolicited investment proposal from Highland Capital Management, L.P. ("Highland").  Highland issued a press release stating that it was prepared to offer a competing investment proposal, submitted a letter to the Board outlining the proposal's principal terms, and objected to the Original Framework Motion, attaching its alternative proposal as an exhibit to that objection.[10]  Prior to issuing its press release and letter to the Board, Highland had made no prior contact with the Debtors regarding participation in the Debtors' reorganization.  Nevertheless, Delphi acknowledged publicly on December 21, 2006 that it would carefully analyze and consider Highland's proposal and discuss its merit with the Board.

16.    Simultaneously, the Debtors and their advisors worked to resolve the objections received to the Original Framework Motion.  While attempting to resolve the objections to the Original Framework Motion, the Debtors' discussions and meetings with Highland continued, including attempts to negotiate the terms and conditions of a proposed

---

[10]    Unlike the transaction contemplated by the Original EPCA, the current transaction with Appaloosa as lead investors has the support of both Statutory Committees, as well as GM.

confidentiality agreement.  Subsequently, Highland agreed to provide additional information to

the Debtors, including proposed revisions to the existing Original Framework Agreements,

Highland's due diligence requests and timetable, and Highland's vision statement regarding

execution of the transaction and the value Highland would bring to the Debtors as a plan

investor.

17.    In early January 2007, the Board met and continued its evaluation of the

Highland proposal while the Debtors solicited input regarding the Highland proposal from their

key constituencies, including GM, the Statutory Committees, the labor unions, and other

stakeholders.  The Debtors advised Highland that they would proceed with the hearing on the

Original Framework Motion on January 11, 2007 because it was in the best interests of the

Company and its stakeholders, taken as a whole, to enter into the Original PSA and Original

EPCA and endeavor to carry out the terms of those agreements.  The Debtors advised Highland

that the Debtors could not then conclude that the Highland proposal, as a matter of fact, would

deliver superior value to the Debtors' stakeholders and that there were significant conditionality

and execution risks in the Highland proposal.

18.    At the hearing on the Original Framework Motion, four witnesses

testified, including the Executive Chairman of the Board, the Debtors' Chief Restructuring

Officer, and the Debtors' lead financial advisor.  After closing arguments, on January 12, 2007,

this Court rendered an opinion approving the Original Framework Approval Order,[11] which

reflected, among other things, that entry into the Original Framework Agreements was a proper

exercise of the Debtors' business judgment.  The Court noted that in reviewing the Original

---

[11]    See Order Authorizing and Approving The Equity Purchase and Commitment Agreement Pursuant to Sections
105(a), 363(b), 503(b) and 507(a) of the Bankruptcy Code and the Plan Framework Support Agreement
Pursuant to Sections 105(a), 363(b) and 1125(e) of the Bankruptcy Code, dated January 12, 2007 (Docket No.
6589).

9

Framework Agreements and the Highland proposal Delphi's Board "is not only independent and

without conflict but also one that acted with due care and responsibly and with a welcome degree

of responsiveness to the views of their constituents." (Transcript of January 12, 2007 Hearing at

112: 5, 116: 13-15.) On January 18, 2007, the Original Framework Agreements were fully

executed.

F.    Original EPCA Amendments, Termination, And Other Significant Events

19.    On February 28, 2007, Delphi announced that it had entered into an

amendment to the Original EPCA with the Original Investors. The amendment revised, among

other things, the provision of the Original EPCA granting Delphi and the affiliates of two

Original Investors, Cerberus and Appaloosa, the right to terminate the Original EPCA if Delphi

did not reach tentative labor agreements with its principal labor unions and a consensual

settlement of legacy issues with GM by January 31, 2007. The amendment extended the

termination deadline to a future date to be determined through a notice mechanism, and provided

further that Delphi and the affiliates of Cerberus and Appaloosa would not exercise their section

12(g) termination right before March 15, 2007. The amendment also extended the deadline for

making certain regulatory filings under the federal antitrust laws in connection with the Original

EPCA-related transactions.

20.    In furtherance of the transactions contemplated by the Original EPCA, on

March 7, 2007, Delphi filed with the United States Securities and Exchange Commission a

registration statement on Form S-1 regarding the rights offering for Delphi common stock.

21.    On April 18, 2007, Highland sent a letter to the Board asserting its

continued interest in going forward as a plan investor. After the completion of the hearing on the

Original Framework Agreements, Delphi invited Highland to enter into a non-disclosure and

standstill agreement similar to that executed by the Original Plan Investors and proceed with due

10

diligence on a "dual track" basis with the Original Plan Investors.  Highland declined Delphi's

invitation and initiated no formal communications with the Debtors until sending this letter.

Prior to this time, Highland made no effort to contact any of Delphi's senior officers with whom

Highland had extensive prior communication.  Delphi responded to Highland's letter on the same

day and pointed out the three-month lapse in communications from Highland, as well as

Highland's continuing refusal to enter into a non-disclosure and standstill agreement and

commence due diligence.[12]

22.    Delphi confirmed on April 19, 2007 that it anticipated negotiating

additional changes to the Original EPCA and amendments to the Original PSA, and that none of

the parties to the Original EPCA or the Original PSA had issued a termination notice.  The

primary reason for the negotiations were the differing views of Delphi, the Original Investors,

GM, and the Statutory Committees in these cases as to the enterprise value of a reorganized

Delphi.  Delphi's expectation at that time was that all of the Original Investors except Cerberus

would continue to participate as plan investors (possibly together with additional new plan

investors), and that Cerberus might participate in Delphi's exit financing.  Delphi met with its

Statutory Committees during this period to review these developments and potential revisions

regarding the treatment of Delphi's stakeholders under a plan of reorganization, including

increasing the equity portion of the recovery available to general unsecured creditors in order,

among other things, to reduce the cash raise required to fund more robust reorganization plan

distributions.

---

[12]    Following this correspondence, Highland ultimately entered into a non-disclosure and standstill agreement and
a diligence protocol agreement on May 25, 2007, as a co-investor in a transaction led by another potential
investor, Pardus Capital Management L.P. ("Pardus").  It was not until June 18, 2007 that Highland executed a
non-disclosure and standstill agreement and a diligence protocol agreement to lead its own investment group.

23.     During May and June, 2007 while continuing discussion with the Original
Plan Investors regarding an agreement to modify the Original EPCA, as well as conducting
discussions with alternative plan investors with respect to new equity purchase and commitment
agreements, Delphi was also focused intensely on negotiations with its principal U.S. labor
unions and GM.  During this time period, GM and Delphi agreed on the documentation
architecture for their settlement and restructuring agreements.

24.     On June 22, 2007, Delphi achieved another significant milestone in its
transformation and a major step toward emergence when it reached an agreement with the United
Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM
(the "UAW Settlement Agreement").  The UAW Settlement Agreement is a comprehensive
agreement that modifies, extends, or terminates the provisions of the existing collective
bargaining agreements among Delphi, the UAW, and its various locals; provides that GM and
Delphi will undertake certain financial obligations to Delphi's UAW-represented employees and
retirees to facilitate those modifications; and settles the contested matter regarding the Debtors'
motion under sections 1113 and 1114 of the Bankruptcy Code as it pertains to the UAW.[13]  The
UAW membership ratified the UAW Settlement Agreement on June 28, 2007.  The following
day, the Debtors filed a motion seeking this Court's approval of the UAW Settlement
Agreement.[14]  The motion, which is not contested, will be heard at the omnibus hearing on July
19, 2007.

---

[13]    See Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements
And Under 11 U.S.C. § 1114(g) Authorizing Modification Of Retiree Welfare Benefits ("Section 1113 And
1114 Motion"), dated March 31, 2006 (Docket No. 3035).

[14]    See Motion For Order Under 11 U.S.C. §§ 363, 1113 And 1114 And Fed. R. Bankr. P. 6004 And 9019
Approving Memorandum Of Understanding Among UAW, Delphi, And General Motors Corporation Including
Modification Of UAW Collective Bargaining Agreements And Retiree Welfare Benefits For Certain UAW-

12

25.    Delphi is currently engaged in active bargaining with its second- and third-largest unions – the International Union of Electronic, Electrical, Salaried, Machine, and Furniture Workers-Communications Workers of America and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC – with respect to consensual agreements resolving the labor issues affecting those unions.  Delphi is working to conclude those discussions, as well as discussions with its three remaining unions, as soon as possible.

26.    Despite many positive developments, over the Independence Day holiday Delphi determined that it would be unable reach agreements with its various constituencies and investors that would allow the Original Framework Agreements to continue or allow the Original Framework Agreements to serve as a basis for the Debtors' plan of reorganization.  On July 7, 2007, pursuant to section 12(g)[15] of the Original EPCA, Delphi sent a termination notice of the Original EPCA to the other parties to the Original EPCA.  As a result of the termination of the EPCA, a Termination Event (as defined in the Original PSA) occurred, and all obligations of the parties to the Original PSA under the Original PSA were immediately terminated and were of no further force and effect.  On July 9, 2007, Delphi publicly disclosed that it had terminated the Original EPCA and the Original PSA, and that it expected to enter into new framework agreements at some point in July 2007.  Delphi also confirmed on that date that its discussions with GM regarding a comprehensive settlement agreement had entered the documentation phase.

---

Represented Retirees ("UAW 1113/1114 Settlement Approval Motion"), dated June 29, 2007 (Docket No. 8445).

[15]    Section 12(g) of the Original EPCA was modified by an amendment entered into between Delphi and the Original Investors on February 28, 2007.  Under modified section 12(g), certain parties to the Original EPCA could deliver a notice of termination at any time before a specified date (as such term was defined in modified section 12(g)), but not after Delphi had entered into both (i) tentative labor agreements with its unions and (ii) the settlement with GM.

Delphi expects that a settlement with GM will be incorporated in its plan of reorganization, rather than filed with this Court for separate approval.

27.    Simultaneously, while the Debtors were negotiating the potential amendments to the Original EPCA and Original PSA, in late June and early July, the Debtors received an amended draft of the Original EPCA from Appaloosa and a draft of a potential investment agreement from Highland. The Debtors reviewed and evaluated the draft agreements and provided comments on the draft investment agreements at various times, including to Appaloosa on July 7 and to Highland on July 9. On July 11, the Debtors met with Appaloosa for more than six hours to further discuss and negotiate Appaloosa's investment agreement. That same day, the Debtors also met with Highland in the late afternoon for a negotiation session that lasted more than six hours. Through these meetings and negotiation sessions, the Debtors developed a set of competing investment proposals from Appaloosa and Highland.

28.    Following the meetings on July 11, both Appaloosa and Highland committed to sending the Debtors revised agreements that represented their "best and final" proposals on Friday, July 13. Appaloosa submitted a revised draft agreement late Friday night, and Highland sent its revised draft agreement on Saturday night, July 14. The Debtors also actively continued discussions with both Appaloosa and Highland following the meetings on July 11. While discussions with the potential investors were ongoing, the Debtors also kept their key stakeholders, including GM and the Statutory Committees, up to date on the plan investor developments.

29.    On July 16, 2007, Delphi's Board of Directors met to consider two proposals for a new equity purchase and commitment agreement – one put forward by an investor group led by Appaloosa, and the other proposed by Highland. At the meeting, the

14

Board received and reviewed presentations by Delphi's management and legal and financial advisors comparing and contrasting the proposals, and weighed the costs and benefits of proceeding with several courses of action.

30.    The Board met again on the night of July 17 to consider the proposals. The Board formed a special committee and delegated authority on behalf of the Company to the special committee.  The special committee acted pursuant to its authority, and following the special committee session on the morning of July 18, Delphi announced[16] that it had accepted a new proposal for an equity purchase and commitment agreement with the affiliates of lead investor Appaloosa Management L.P.; Harbinger Capital Partners Master Fund I, Ltd.; Merrill Lynch, Pierce, Fenner & Smith Inc., UBS Securities LLC; Goldman Sachs & Co.; and Pardus Capital Management L.P. (the "Delphi-Appaloosa EPCA"[17]).  The Delphi-Appaloosa EPCA outlines the terms of the investment and the expected treatment of the Debtors' stakeholders in its

---

[16]    A copy of Delphi's press release, issued on July 18, 2007, is attached hereto as Exhibit A.

[17]    As referenced in the Delphi-Appaloosa EPCA and used herein, "Investors" means A-D Acquisition Holdings, LLC (an affiliate of Appaloosa) ("ADAH"), Harbinger Del-Auto Investment Co. Ltd. (an affiliate of Harbinger), Pardus DPH Holding LLC (an affiliate of Pardus), GS, Merrill, and UBS.  In connection with the Delphi-Appaloosa EPCA, Appaloosa, Harbinger, and Pardus Special Opportunities Master Fund L.P. (collectively, the "Commitment Parties"), are also executing certain equity commitment letters (the "Commitment Letters," along with the Investment Proposal Letter (the "Proposal Letter") and the Delphi-Appaloosa EPCA, collectively, the "Investment Agreements")) in support of the obligations of their respective affiliate Investors under the Delphi-Appaloosa EPCA. The Commitment Letters, in turn, set forth the terms and conditions upon which the Commitment Parties will provide the funding to the Investors that will be necessary to enable the Investors to make the investment called for under the Delphi-Appaloosa EPCA.  The Investors and the Commitment Parties are collectively referred to herein as the "Plan Investors"; when the term "Plan Investors" is used in connection with a specific agreement, the term includes only those Plan Investors as defined in such agreement.  The discussion of the Delphi-Appaloosa EPCA contained herein is a summary only. The Delphi-Appaloosa EPCA is a complex and lengthy document, and many of the provisions of the agreement are not highlighted in this summary.  In the event of any inconsistency between this summary and the Delphi-Appaloosa EPCA, the terms of the agreement control.

anticipated plan of reorganization and provides a framework for several other aspects of the Debtors' reorganization.[18]

G.      The Revised Framework Agreements

31.      The negotiations between Appaloosa and the Debtors described above led to the development of the terms of the Delphi-Appaloosa EPCA described below.  The Debtors believe that the change in terms of the amended framework documents will materially benefit the estates and all of the Debtors' stakeholders.  For example, and as discussed in more detail below, unlike the Original EPCA, the closing conditions in the Delphi-Appaloosa EPCA are not subject to the completion of due diligence and the Plan Investors no longer have the ability to make determinations under the agreement in their sole discretion.[19]

(a).      Delphi-Appaloosa Equity Purchase And Commitment Agreement

32.      Plan Investor Investments.  The Delphi-Appaloosa EPCA sets forth the terms and conditions upon which the Plan Investors would (i) commit to purchase approximately $175 million of common stock in the reorganized Delphi (the "Direct Subscription Shares") and $800 million of preferred shares in the reorganized Delphi (the "Preferred Shares") and (ii) commit to purchasing any unsubscribed shares of common stock in connection with a rights offering (the "Rights Offering") to existing common stock holders (the "Back Stop Commitment").[20]

---

[18]   Attached as Exhibit B hereto is a copy of the executed Proposal Letter, dated July 18, 2007, and its attachments, including the Delphi-Appaloosa EPCA, the Preferred Stock Term Sheet, the Plan Framework and Special Statutory Committee Provisions, and the Commitment Letters from the Committee Parties that are using special purpose transaction entities as signatories to the Delphi-Appaloosa EPCA.

[19]   Exhibit C  attached hereto contains a marked version showing changes between the Original EPCA and certain of its exhibits and the Delphi-Appaloosa EPCA and certain of its exhibits.

[20]   The Original EPCA called for the Original Investors to purchase $220,500,000 of common stock through a direct purchase, $1.2 billion in preferred stock, and to back stop a $1.984 billion rights offering.

33.    The Rights Offering contemplated by the Delphi-Appaloosa EPCA provides that Delphi would distribute at no charge to each holder of common stock (an "Eligible Holder"), as of a record date to be determined, certain rights (the "Rights") to acquire new common stock in reorganized Delphi.  The Rights would permit Eligible Holders to purchase their pro rata share of 41,026,311 shares[21] of new common stock at a purchase price of $38.39 per share.  Under the Delphi-Appaloosa EPCA, the Rights would be issued to Eligible Holders after the confirmation of Delphi's plan of reorganization and the Rights Offering would remain open for 30 days after the distribution of the Rights.[22]  The Plan Investors would commit to purchase the number of shares that were offered through the Rights Offering to Eligible Holders, but whose rights were not properly exercised (the "Unsubscribed Shares").  In the event that no shareholders were to subscribe to the Rights Offering, the Plan Investors, through the Back Stop Commitment, would purchase all of the Unsubscribed Shares for approximately $1.575 billion. Altogether, through the Back Stop Commitment and the purchase of the Direct Subscription Shares and the Preferred Shares, the Plan Investors could invest up to $2.55 billion in the reorganized Debtors.[23]

---

[21]    References to the number of shares in various sections of this Motion and the Delphi-Appaloosa EPCA are preliminary estimates based on current assumptions regarding, among other items, amounts of unsecured claims and accrued interest, assumed net debt at emergence, and the date of emergence. Changes in these assumptions will impact the actual number of shares issued pursuant to the Delphi-Appaloosa EPCA and described in the Delphi-Appaloosa Agreement, the Preferred Stock Term Sheet, and Plan Framework Provisions.  See, e.g., Delphi-Appaloosa EPCA §§ 1(c), 2(a), 3(d).

[22]    The Original EPCA provided for a rights offering of 56,700,000 shares, with an exercise price of $35 per share. Under the terms of the Original EPCA, the rights offering would have taken place at the same time as solicitation on the Debtors' plan of reorganization.

[23]    Although the investments contemplated by the Delphi-Appaloosa EPCA have been fully committed to by the Plan Investors, Delphi has been advised that the allocation of investment amounts among the Plan Investors  (as described on Schedule 2 to the Delphi-Appaloosa EPCA) has not been finalized.  Such amounts will be finalized before the entry of the order approving this Motion.

34.    <u>Fees And Transaction Expenses</u>.  In connection with the Plan Investors'

commitment to purchase the Preferred Shares, the Debtors would pay the Plan Investors an

aggregate commitment fee of $18 million (the "Preferred Commitment Fee").[24]  In addition, to

compensate the Plan Investors for their undertakings in connection with their purchase of the

Direct Subscription Shares and the Backstop Commitment, the Debtors would pay an aggregate

commitment fee of $39.375 million (the "Standby Commitment Fee" and, together with the

Preferred Commitment Fee, the "Commitment Fees").[25]  The Debtors would also pay an

arrangement fee of $6.375 million to Appaloosa to compensate Appaloosa for arranging the

transactions contemplated in the amended framework agreements (the "Arrangement Fee," and

together with the Commitment Fees, the "Fees").  The total of the Fees payable to the Plan

Investors under the Delphi-Appaloosa EPCA would be $63.75 million.

35.    The Commitment Fees would be paid in stages.  The first payment of the

Commitment Fees, in the amount of $7,525,000, and the Agreement Fee will be paid on the first

business day following the first date that the order approving this Motion is issued by this Court.

The balance of the first 50% of the Commitment Fees, $21,162,500, will be paid on the date that

the disclosure statement is filed.  The balance of the Commitment Fees, $28,687,500, will be

paid on the first business day following the entry of an order by the Bankruptcy Court approving

the Debtors' disclosure statement.

36.    The Debtors will also agree to reimburse or pay the out-of-pocket costs

and expenses reasonably incurred by the Plan Investors to the extent the expenses are incurred on

or before the first to occur of the termination of the Delphi-Appaloosa EPCA and the effective

---

[24]    The preferred commitment fee under the Original EPCA was $21 million.

[25]    The standby commitment fee under the Original EPCA was $55.125 million.

date of Delphi's reorganization plan (the "Transaction Expenses"). If Transaction Expenses are

incurred by (i) ADAH or Harbinger prior to December 1, 2006 (which expenses do not exceed

$5 million and do not include Transaction Expenses incurred by ADAH or affiliates on or prior

to May 17, 2006) and (ii) by ADAH and Harbinger from and after December 1, 2006, by GS

after July 3, 2007, by Pardus after June 18, 2007, or by UBS or Merrill after July 30, 2006, and

the Transaction Expenses are not already paid, the Transaction Expenses would be paid promptly

(within 30 days) upon submission to Delphi of summary statements by each Plan Investor and

without further Bankruptcy Court review or order.

      37.     In addition, under the terms of the Delphi-Appaloosa EPCA (i)

Transaction Expenses incurred by ADAH on or before May 17, 2006 in an amount not to exceed

$5 million would be paid if and when the effective date of any plan of reorganization occurs, and

only if the plan results in a recovery for holders of existing Delphi common stock, (ii)

Transaction Expenses incurred by Pardus on or prior to June 18, 2007 will be paid to the extent

that they comprise the reasonable fees, costs, and expenses of legal counsel to Pardus related to

the negotiation of the Delphi-Appaloosa EPCA, the non-disclosure agreement between Pardus

and Delphi, and the transactions contemplated by the Delphi-Appaloosa EPCA, (iii) Transaction

Expenses incurred by GS on or prior to July 3, 2007 would be paid to the extent that they

comprise the reasonable fees, costs, and expenses of legal counsel to GS related to the

negotiation of the Delphi-Appaloosa EPCA, the non-disclosure agreement between GS and

Delphi related to the transactions contemplated by the Delphi-Appaloosa EPCA, and the

transactions contemplated by the Delphi-Appaloosa EPCA, and (iv) the filing fee, if any,

required to be made by any Investor or its affiliates under the HSR Act or any other competition

laws or regulations would be paid by Delphi.

38.    To the extent permitted under any order authorizing the Company to obtain postpetition financing and/or to utilize cash collateral then or thereafter in effect (each, a "Financing Order"), the Transaction Expenses incurred from and after the date of entry of the Original Framework Approval Order would be protected by and entitled to the benefits of the carve-out for professional fees provided in any such Financing Order.

39.    The Debtors believe that the fee structure described above is appropriate. The Fees represent a 2.5% weighted average for the investments contemplated by the Delphi-Appaloosa EPCA.  In addition, the Plan Investors would receive a guaranteed allocation of the Rights Offering, which would allow the Plan Investors to purchase shares at a discount to the assumed value of $45.00 per share.  The compensation structure was agreed to following substantial arms-length negotiations between the Debtors and the Plan Investors, in a competitive investment environment.

40.    Representations, Warranties, And Covenants.  The Delphi-Appaloosa EPCA, like the Original EPCA, contains extensive representations, warranties, and covenants made by Delphi, and a customary set of more limited representations, warranties, and covenants by the Plan Investors.  Like the Original EPCA, under the terms of the Delphi-Appaloosa EPCA, Delphi would have additional time to deliver a disclosure schedule qualifying the representations and warranties made in the agreement.  Under the terms of the Delphi-Appaloosa EPCA, Delphi would deliver the disclosure letter to the Plan Investors no later than 10 days prior to the filing of Delphi's disclosure statement.  Delphi has covenanted to deliver to the Plan Investors as soon as reasonably practicable a final five-year business plan (which includes a binding GM settlement)..  ADAH would not be required to accept a business plan unless it is reasonably satisfied that the business plan does not amend or deviate from the draft business plan provided by Delphi in such

20

a way as would have a material impact on the Plan Investors' proposed investment in Delphi.

Delphi has also covenanted to use its reasonable best effort to agree on, before the disclosure

statement filing date, a settlement agreement with GM that is consistent with the Delphi-

Appaloosa EPCA, the Debtors' plan of reorganization, and the UAW memorandum of

understanding..

41.    Conditions.  Unlike the Original EPCA, the Delphi-Appaloosa EPCA is

not subject to the completion of due diligence.  In addition, unlike the Original EPCA, which

included certain conditions to consummation of the investments contemplated by the Original

EPCA based on a sole discretion standard, the Delphi-Appaloosa EPCA contains no conditions

that are subject to a "sole discretion" standard.  For example, in the Original EPCA, each of the

affiliates of Appaloosa and Cerberus investing in Delphi had, during a specified time period, sole

discretion to approve the GM settlement and labor agreements with the UAW, IUE-CWA, and

the USW.  In the Delphi-Appaloosa EPCA, the applicable condition generally provides that

Appaloosa must be reasonably satisfied with the terms of certain specified documents, including

the plan and disclosure statement, confirmation order, business plan, certain constituent

documents, and labor agreements to the extent the terms thereof would have an impact on the

Plan Investors' proposed investment in Delphi.  The condition with respect to the GM Settlement

is based on a standard of the reasonable discretion of Appaloosa, taking into account whether the

GM settlement has a material impact on the Plan Investors' proposed investment in the

Company, and other relevant factors.

42.    Termination Provisions.  Another significant change between the Original

EPCA and the Delphi-Appaloosa EPCA is the ability of Delphi to cure a deficiency in the

satisfaction of certain conditions.  The Delphi-Appaloosa EPCA provides that termination can

occur for a period of 20 days following a cure period after a notice of deficiency is given by

ADAH with respect to failure to satisfy a condition relating to, among others, the plan, disclosure

statement, the confirmation order, the GM settlement, the business plan, or other constituent

documents.  The opportunity for Delphi to cure a failure to satisfy these conditions is of great

benefit to the Debtors and their stakeholders because the conditionality of the consummation of

the Delphi-Appaloosa EPCA could in certain circumstances be reduced.

   43. The Delphi-Appaloosa EPCA provides for other bases for termination,

including by mutual written consent of Delphi and ADAH.  In addition, Appaloosa, upon written

notice to Delphi, could terminate the agreement for certain reasons, including (i) if the order

approving the Motion has not become final order by the later of 10 days of the Bankruptcy

Court's entry of an order approving this Motion or August 16, 2007, (ii) if the effective date of

Delphi's plan of reorganization has not occurred by March 31, 2008, (iii) if the Debtors'

disclosure statement is not filed with the Bankruptcy Court on or before January 31, 2008, (iv) if

the Debtors breach the agreement, which causes a failure of certain conditions that are not cured,

(v) if there was a change of recommendation by the Company or the Company enters into an

alternate transaction agreement, and (vi) if there are modifications to the agreed forms of certain

transaction documents.

   44. <u>Alternate Transaction Fee</u>.  If the Delphi-Appaloosa EPCA is terminated

under certain circumstances, an alternate transaction fee of $82.5 million (the "Alternate

Transaction Fee") would be payable to the Plan Investors.[26]  The events that give rise to the

payment of the Alternate Transaction Fee are:  (i) termination of the Delphi-Appaloosa EPCA as

a result of the Company's entry into an Alternate Transaction (as defined below), (ii) termination

---

[26] The alternate transaction fee under the Original EPCA was $100 million.

of the Delphi-Appaloosa EPCA due to a change of recommendation by the Company and the

Company's entry into or consummation of an Alternate Transaction within a 24-month period

following the termination, and (iii) termination of the EPCA by the Plan Investors due to a

willful breach by the Company and the Company's entry into or consummation of an Alternate

Transaction within a 24-month period following the termination.  For the purposes of the Delphi-

Appaloosa EPCA, an Alternate Transaction is defined to include any plan, proposal, offer, or

transaction that is inconsistent with the Delphi-Appaloosa EPCA, the preferred stock term sheet

attached as an exhibit to the Delphi-Appaloosa EPCA, the Debtors' settlement with GM, or the

Debtors' plan of reorganization, other than a liquidation under chapter 7 of the Bankruptcy Code.

45.    <u>Maximum Liability And Indemnification</u>.  The aggregate liability for the

Commitment Parties, the Plan Investors, and the Debtors is limited by the terms of the Delphi-

Appaloosa EPCA.  The maximum dollar exposure in the aggregate for all of the Commitment

Parties and the Investors (or the Debtors) for any reason, including for any willful breach, for any

act or omission occurring on or prior to the date the Bankruptcy Court approves the Debtors'

disclosure statement would not exceed $100 million.  After the order approving the disclosure

statement is entered, the aggregate liability would not exceed $250 million.  Liability for any

party prior to filing of the disclosure statement with the Bankruptcy Court attaches only on a

several basis.  After the filing of the disclosure statement, liability attaches on a joint and several

basis.

46.    The Delphi-Appaloosa EPCA also provides for certain indemnification

rights to the Plan Investors, regardless of whether the Rights Offering is consummated or the

Delphi-Appaloosa EPCA is terminated or the transactions contemplated by the Delphi-

Appaloosa EPCA or the Debtors' plan are consummated.

(b).    <u>Corporate Governance</u>

47.    Under the Delphi-Appaloosa EPCA, a five-member committee (the "Search Committee") would be appointed, consisting of the Company's lead director (currently John Opie) as the representative of Delphi, one representative of Appaloosa, one representative of the Creditors' Committee, one representative of the co-lead investors other than UBS, GS, and Merrill (who would be determined by Appaloosa), and one representative of the Equity Committee reasonably acceptable to the other members of the Search Committee.  The Search Committee would select Delphi's post-emergence executive chairman, have veto rights over all directors nominated by the Plan Investors and the Statutory Committees, and appoint directors to all board committees.

48.    Under the terms of the preferred stock term sheet (the "Preferred Stock Term Sheet") attached as an exhibit to the Delphi-Appaloosa EPCA, reorganized Delphi would have a nine-member three-year classified board.  The members of the board would be the CEO, three members nominated by Appaloosa, an Executive Chairman, three members nominated by the Creditors' Committee, and one member nominated by the co-lead investor representative on the Search Committee with the approval of either Delphi or the Creditors' Committee.  The Class I directors would be the CEO, the Executive Chairman, and one member appointed by the Creditors' Committee.  The Class II directors would be the remaining Creditors' Committee appointees and the member appointed by the co-lead investors.  The Appaloosa appointees would constitute the Class III directors.  The Class I directors' terms will expire in 2009, Class II in 2010, and Class III in 2011.  Certain election provisions will be governed by the terms of the Preferred Shares.

24

49.    The structure of the board proposed under the terms of the Preferred Stock Term Sheet provides that six of the nine board members would be independent of the Plan Investors.  The Preferred Stock Term Sheet also requires that six of the nine board members be independent members as defined by the relevant stock exchange where the common stock of Reorganized Delphi will be traded.

50.    Finally, through the ownership of the Series A-1 Preferred Stock, Appaloosa has certain veto rights regarding extraordinary corporate transactions and acquisitions or investments in excess of $250 million in any twelve-month period.

(c).    Plan Framework And Special Statutory Committee Provisions

51.    Exhibit B to the Delphi-Appaloosa EPCA (the "Plan Framework Provisions") further outlines the Debtors' proposed framework for a plan of reorganization, which includes distributions to be made to creditors and shareholders, the treatment of GM's claims, and the corporate governance of the reorganized Company.  Many of the provisions of the Plan Framework Provisions had been the subject of the Original PSA between Delphi, GM, and the Original Investors.  Delphi previously reported that its discussions with GM on a comprehensive global settlement agreement have entered the documentation phase and that a settlement with GM will be incorporated into the Debtors' plan of reorganization rather than filed with the Bankruptcy Court for separate approval.

52.    The Plan Framework Provisions outlines the following potential recoveries to the Debtors' stakeholders:

- • All senior secured debt would be refinanced and paid in full and all allowed administrative and priority claims would be paid in full.

- • Trade and Other Unsecured Claims and unsecured funded debt claims shall be placed in a single class.  All such claims that are allowed (including all allowed accrued interest, which for trade claims shall be at a rate to be agreed to or determined by the Bankruptcy Court, it being understood that with respect to

25

trade claims, the Debtors and Plan Investors will not take the position that there should not be an entitlement to postpetition interest) will be satisfied in full with (a) $3.48 billion of common stock (77.3 million out of a total of 147.6 million shares,[27] at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi and (b) the balance in cash;[28] provided, however, that the common stock and cash to be distributed pursuant to the immediately preceding clause will be reduced proportionately by the amount that allowed Trade and Other Unsecured Claims are less than $1.7 billion, excluding allowed accrued postpetition interest thereon. A condition to effectiveness of the plan requires that the amount of allowed trade and unsecured claims (other than funded debt claims) not exceed $1.7 billion, excluding all allowed accrued postpetition interest thereon.

- In exchange for GM's financial contribution to Delphi's transformation plan and in satisfaction of GM's claims against the Debtors, GM will receive $2.70 billion in cash, and an unconditional release of any alleged estate claims against GM. In addition, as with other customers, certain GM claims would flow-through the chapter 11 cases and be satisfied by the reorganized company in the ordinary course of business. The plan framework outlined in the Plan Framework Provisions anticipates that GM's financial contribution to the Debtors' transformation plan would be consistent with the items identified in the Original PSA. While the actual value of the potential GM contribution cannot be determined until the Delphi-GM global settlement and master restructuring agreement are finalized, Delphi is aware that GM has publicly estimated its potential exposure related to the Debtors' chapter 11 filing.

- All Delphi subordinated debt claims (including all accrued interest thereon) will be allowed and, in resolution of the subordination rights of Delphi senior debt, all cash otherwise distributable to Delphi subordinated debt claims pursuant to section 1.3 of the Plan Framework Provisions will be distributed to Delphi senior debt, and the allowed Delphi subordinated debt claims will be satisfied with $478 million of common stock (10.6 million out of a total of 147.6 million shares, at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi.

- Any allowed securities claims, including all claims in the MDL litigation pending in the United States District Court for the Eastern District of Michigan, will be satisfied solely from available insurance or as otherwise agreed by Delphi and Appaloosa.

---

[27] Inclusive of distributions to subordinated debt claims described in section 1.6 of the Plan Framework Provisions. References to the total number of shares of common stock gives effect to the conversion of the preferred stock issued pursuant to the Delphi-Appaloosa EPCA to common stock. The actual number of shares of common stock to be issued by Delphi and to be distributed to various classes is subject to final adjustment and reconciliation as well as negotiation of plan distribution mechanics in the plan of reorganization.

[28] Such amounts to be adjusted by proceeds from the Par Rights Offering to be conducted by Delphi as described in the treatment of the equity securities class.

26

- The equity securities class in the plan shall receive, in the aggregate, (i) $66 million of common stock (1.5 million out of a total of 147.6 million shares, at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi, (ii) rights to purchase 45.6 million out of a total of 147.6 million shares of common stock (to be reduced by the guaranteed minimum of 10% of the rights for the Plan Investors) in reorganized Delphi for $1.75 billion (exercise price: $38.39/share), (iii) 5-year warrants to purchase for $45/share an additional 5% of the common stock of Delphi, and (iv) the right to purchase on a proportionate basis, approximately $522 million of the common stock that would otherwise be distributable to unsecured claims plus an additional $50 million of the common stock that would otherwise be distributable to Appaloosa (each pursuant to Section 1.3 of the Plan Framework Provisions) for a price of $45/share (the "Par Rights Offering"); provided, that Appaloosa (in its capacity as a stockholder of Delphi) shall agree not to participate in the Par Rights Offering and shall use commercially reasonable efforts to obtain such agreement from the other Plan Investors.[29]

53.    The Plan Framework Provisions reaffirm Delphi's earlier commitment to the preservation of its salaried and hourly defined benefit pension plans and will include an arrangement to fund approximately $3.5 billion of its pension obligations.  As much as $2 billion (and no less than $1.5 billion) of this amount shall be satisfied through GM taking an assignment of Delphi's net pension obligations under applicable federal law.  GM will receive a note in the amount of such assignment on agreed market terms that will be paid in full within ten days following the effective date of the reorganization plan.  Through this funding, Delphi will make up required contributions to the pension plans that were not made in full during the chapter 11 cases.

54.    In addition, as more fully described in section 2.1 of the Plan Framework Provisions, the Creditors' Committee and Equity Committee would receive certain consultation and review rights regarding periodic working drafts of the plan, disclosure statement,

---

[29]    Inclusion in the Debtors' plan of subsections (iii) and (iv) is conditioned upon the Equity Committee supporting entry of the order approving this Motion and there not occurring a "Withdrawal of Support" by the Equity Committee as such term is defined the Special Statutory Committee Provisions of the Plan Framework Provisions.  The rights in the Par Rights Offering are to be equivalent to 15% of the common stock that would otherwise be distributable to all unsecured claims plus an additional $50 million of the common stock that would otherwise be distributable to Appaloosa on mechanics to be agreed.

27

confirmation order, and other related plan material that will exist so long as the Creditors'

Committee and the Equity Committee support the entry of the order approving the Delphi-

Appaloosa EPCA and the implementation of the Delphi-Appaloosa EPCA and the transactions

contemplated thereby.

<div align="center">Relief Requested</div>

55.     By this Motion, the Debtors seek entry of an order authorizing and

approving the Debtors' entry into the Delphi-Appaloosa EPCA pursuant to sections 105(a),

363(b), 503(b), and 507(a) of the Bankruptcy Code, and waiving the 10-day stay under

Bankruptcy Rule 6004(g).

<div align="center">Applicable Authority</div>

H.      Approval of the Delphi-Appaloosa EPCA

56.     Bankruptcy Code section 363(b)(1) permits a chapter 11 debtor to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  This Court may authorize use of estate property outside the ordinary

course of business if a debtor demonstrates a sound business justification for it.  In re Lionel

Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good

business reason exists to grant debtor's application under section 363(b)); In re Delaware Hudson

Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).  This "business judgment" test is premised on

the debtor's business judgment that the proposed use of property of the estate would be beneficial

to the estate.  Cf. Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),

4 F.3d 1095, 1099 (2d Cir. 1993) (analyzing business judgment standard under section 365).  To

a bankruptcy court, "'business judgment' . . . is just that – a judgment of the sort a businessman

would make."  Id.

<div align="center">28</div>

57.     Once the debtor articulates a valid business justification, the business judgment rule creates "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted).  The debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).  "Courts are both to interfere with corporate decisions absent a showing of bad faith, self interest or gross negligence." Integrated Resources,  147 B.R. at 656.

58.     A number of qualitative and quantitative factors were reviewed and evaluated in connection with the Delphi-Appaloosa EPCA.  In addition to the value and dollar amounts of the commitments, the Debtors considered, among many other factors, the speed of the consummation of the transaction, execution risks, and corporate governance factors.  Among the many factors considered by Delphi in connection with the Delphi-Appaloosa EPCA were that Appaloosa had completed its due diligence subject to closing conditions, Appaloosa had developed a syndicate for its backstop commitment, the Statutory Committees and GM supported the Delphi-Appaloosa EPCA, and under the corporate governance provisions the board of reorganized Delphi would have a nine-member three-year classified board, with two-thirds of the board members independent of Appaloosa.  The Debtors, in their sound business judgment, believe that the transactions contemplated by the Delphi-Appaloosa EPCA the other Investment Agreements, will facilitate the Debtors' transformation plan and their prosecution of a plan of reorganization, and is in the best interests of their creditors, shareholders, and other

parties-in-interest.  After considering the above factors, Delphi's management and Board believe

that the Delphi-Appaloosa EPCA presents the best result for Delphi and all of its stakeholders.

59.    Moreover, the Debtors believe that the Fees provided for in the Delphi-

Appaloosa EPCA are reasonable in the context of the Debtors' cases and the transactions

contemplated in the Delphi-Appaloosa framework agreements.  The Fees represent a small

fraction of the investment that the Plan Investors will make to acquire the Preferred Shares, the

Direct Subscription Shares, and the Unsubscribed Shares.  The purchase price for the Preferred

Shares and the Direct Subscription Shares totals nearly $1 billion, with an additional investment

to be made, if necessary, to acquire the Unsubscribed Shares.  In addition, the Debtors believe

that payment and reimbursement of the Transaction Expenses is reasonable under the

circumstances.  Moreover, the Debtors' commitment to pay the Fees and the Transaction

Expenses is an integral part of the transactions contemplated under the amended framework

agreements, and the Plan Investors would not otherwise enter into the agreements without such

commitment.  The payment of the Fees and Transaction Expenses are actual, necessary costs of

preserving the estate and should be entitled to administrative priority status under sections 503(b)

and 507(a).

60.    The Debtors further submit that the agreement to pay the Alternate

Transaction Fee constitutes a material inducement for, and a condition of, the Plan Investors'

entry into the EPCA.  See, e.g., In re Allegiance Telecom, Inc., Case No. 03-13057 (RDD)

(Bankr. S.D.N.Y. 2004) (allowing 2.8% break-up fee and expense reimbursement provision in

asset sale agreement); Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien

Environmental Energy, Inc.), 181 F.3d 527 (3d Cir. 1999) (break-up fees warranted when

necessary to preserve estate value).  Moreover, the Debtors believe that the requested Alternate

30

Transaction Fee is fair and reasonable in view of the Delphi-Appaloosa EPCA, which will allow

the Debtors to continue to develop its plan of reorganization on its previously announced

timetable.  Specifically, the Debtors have determined, with assistance from their investment

bankers and other financial advisors, that the amount of the Alternate Transaction Fee is within a

range of reasonableness given the nature and size of the proposed Rights Offering and the

circumstances under which the Plan Investors have agreed to make their investment.  Finally,

similar fees have been granted in connection with rights offerings of similar magnitude.  See,

e.g., In re Owens Corning, Case No. 00-03837 (Bankr. D. Del. June 29, 2006) (up to $130

million fee in connection with backstop of $2.2 billion rights offering); In re USG Corp., Case

No. 01-2094 (Bankr. D. Del. Feb. 23, 2006) (up to $120 million fee in connection with backstop

of $1.8 billion rights offering).

I.      Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

61.     Under Bankruptcy Rule 6004(g), "An order authorizing the use, sale, or

lease of property other than cash collateral is stayed until the expiration of 10 days after entry of

the order, unless the court orders otherwise."  Courts in this district have waived this stay upon a

showing of business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr.

S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the

order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr.P. 6004(g).");

In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of

"business exigency" for waiver of ten-day stay under Bankruptcy Rule 6004(g)).  In general,

courts will grant waivers when doing so is important to the debtor's financial health.  See In re

Second Grand Traverse School, 100 Fed. Appx. 430, 434-35 (6th Cir. 2004) (affirming decision

waiving 10-day stay because "time was of the essence"); In re Decora Industries, Inc., Case No.

31

00-4459 (JJF), 2002 WL 32332749, at *9 (D. Del. May 20, 2002) ("[T]he Court understands that

an immediate closing is required to remedy Debtors' precarious financial and business position.

Accordingly, the Court will waive the Rules 6004(g) and 6006(d), allowing the parties to

close.").

62.    As described in this Motion, the Delphi-Appaloosa EPCA is a the product

of discussions that originally began in the summer of 2006.  Delphi, the Statutory Committees,

the Plan Investors, and GM look forward to formulating and drafting developing a plan and the

consummation of Delphi's chapter 11 cases.  The Debtors submit that the waiver of the ten-day

stay is appropriate here to allow for the payment of the Commitment Fees, the Arrangement Fee,

and the Transaction Expenses, as described in the Delphi-Appaloosa EPCA, will add necessary

certainty to the ongoing plan negotiations among the stakeholders, and allow the Debtors and

their stakeholders to pursue the consummation of these cases.

63.    Based on the foregoing, the Debtors believe that they have exercised

sound business judgment in deciding to execute the Framework Agreements, and this Court

should authorize and approve the Debtors' entry into such agreements.

<u>Notice Of Motion</u>

64.    Notice of this Motion will be provided in accordance with this Court's

Order To Show Cause Why Motion For Order Authorizing And Approving Delphi-Appaloosa

Equity Purchase And Commitment Agreement Pursuant To 11 U.S.C. §§ 105(a), 363(b), 503(b),

And 507(a) Should Not Be Granted.[30]  In light of the nature of the relief requested, the Debtors

submit that no other or further notice is necessary.

---

[30]    The Order To Show Cause will be submitted to the Court on July 19, 2007, and the Debtors will comply with its
provisions.

WHEREFORE the Debtors respectfully request that the Court enter an order (i) authorizing and approving the Debtors' entry into the Delphi-Appaloosa EPCA and the payment of all associated fees, expenses, and damage claims, and of all related indemnities as and when provided for therein, pursuant to sections 105(a), 363(b), 503(b), and 507(a) of the Bankruptcy Code and Bankruptcy Rule 6004, and (ii) granting the Debtors such other and further relief as is just.

Dated:    New York, New York
          July 18, 2007

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By:   /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr. (JB 4711)
      George N. Panagakis (GP 0770)
      Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

                    - and -

By:   /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti (KM 9632)
      Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

**<u>EXHIBIT A</u>**

# DELPHI

## Driving Tomorrow's Technology

# news release

**FOR RELEASE:** July 18, 2007

**MEDIA CONTACTS:** Claudia Piccinin – 248-813-2942
Lindsey Williams – 248-813-2528

**INVESTOR CONTACT:** Al VanDenBergh – 248-813-2495

## DELPHI ANNOUNCES NEW PLAN FRAMEWORK AGREEMENT
*Appaloosa Management L.P. and investment syndicate commit up to $2.55 billion;*
*Agreement outlines reorganization framework, potential stakeholder recoveries and*
*corporate governance structure*

**TROY, Mich.** – Delphi Corp. (OTC:DPHIQ) today announced that it has accepted a new proposal for an Equity Purchase and Commitment Agreement with affiliates of lead investor Appaloosa Management L.P.; Harbinger Capital Partners Master Fund I, Ltd.; Merrill Lynch, Pierce, Fenner & Smith Inc.; UBS Securities LLC;  Goldman Sachs & Co.; and Pardus Capital Management, L.P. (collectively the "Plan Investors") to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the company's transformation plan announced on March 31, 2006 and its plan of reorganization.

Delphi earlier reported that on July 7, 2007, it had formally terminated a prior Equity Purchase and Commitment Agreement and a related Plan Framework Support agreement but that it expected to enter into new framework agreements with plan investors by the end of July 2007.

Delphi will be filing motions later today seeking an expedited hearing and approval of the agreement with the Bankruptcy Court.  The company said the new investment agreement is supported by both of Delphi's Statutory Committees as well as General Motors Corp. (GM).

 "Today's equity purchase and commitment agreement – and the support that it has received from our statutory committees and GM -- represents additional progress in our transformation and provides further evidence to customers and other stakeholders that Delphi should receive the financial support necessary to emerge successfully from Chapter 11 reorganization," said John Sheehan, Delphi chief restructuring officer. "With the recent ratification of the UAW/Delphi/GM memorandum – still subject to court approval later this week -- Delphi is now focusing on reaching labor agreements with its remaining U.S. unions and finalizing a settlement agreement with GM. We're pleased with our recent momentum.  We now expect to file our plan of reorganization before the end of the third quarter and to emerge from Chapter 11 reorganization by the end of the year."

 "We are happy to have a consensual agreement and are looking forward to working with Delphi in the future," said David A. Tepper, president of Appaloosa.

-more-

The proposed Equity Purchase and Commitment Agreement, which is subject to Bankruptcy Court approval, outlines the terms of the investment and the expected treatment of the company's stakeholders in its anticipated plan of reorganization and provides a framework for several other aspects of the company's Chapter 11 reorganization.  The investment agreement also incorporates Delphi's earlier commitment to preserve its salaried and hourly defined benefit U.S. pension plans and will include an arrangement to fund required contributions to the plans that were not made in full during the Chapter 11 process.

## EQUITY INVESTMENT

Under the terms of the Equity Purchase and Commitment Agreement announced today, the Plan Investors will commit to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in the reorganized company. Additionally, the Plan Investors will commit to purchasing any unsubscribed shares of common stock in connection with an approximately $1.6 billion rights offering that will be made available to existing common stockholders subject to approval of the Bankruptcy Court and satisfaction of other terms and conditions.  The rights offering would commence following confirmation of Delphi's plan of reorganization and conclude 30 days thereafter prior to Delphi's emergence from Chapter 11 reorganization. Altogether, the Plan Investors could invest up to $2.55 billion in the reorganized company.

Unlike the prior terminated investment agreement, closing conditions in the new agreement with the Plan Investors are not subject to the completion of due diligence and the Plan Investors no longer have the ability to make determinations under the agreement in their sole discretion. However, the investment agreement is subject to the satisfaction or waiver of numerous conditions and the non-exercise by either Delphi or the Plan Investors of certain termination rights, all of which are more fully described in the Equity Purchase and Commitment Agreement.

## PLAN OF REORGANIZATION FRAMEWORK

The Equity Purchase and Commitment Agreement further outlines Delphi's proposed framework for a plan of reorganization, which includes distributions to be made to creditors and shareholders, the treatment of GM's claims, and the corporate governance of the reorganized company.  These provisions had been the subject of a separate plan framework support agreement between Delphi, GM and the plan investors in the earlier terminated transaction.  The company previously reported that its discussions with GM on a comprehensive global settlement agreement have entered the documentation phase and that it expected that a settlement with GM will be incorporated into the company's plan of reorganization rather than filed with the Bankruptcy Court for separate approval.

-more-

The proposed treatment of claims and interest in Delphi's Chapter 11 plan of reorganization is as follows (subject to adjustment for allowed accrued interest after June 30, 2007):

- All senior secured debt would be refinanced and paid in full and all allowed administrative and priority claims would be paid in full.

- Trade and other unsecured claims and unsecured funded debt claims (exclusive of subordinated debt claims) would be satisfied in full with $3.0 billion of common stock (66.7 million out of a total of 147.6 million shares) in the reorganized Delphi, at a deemed value of $45 per share, and approximately $1.2 billion in cash.  The framework requires that the amount of allowed trade and unsecured claims (other than funded debt claims and post-petition accrued interest claims) not exceed $1.7 billion.

- In exchange for GM's financial contribution to Delphi's transformation plan, and in satisfaction of GM's claims against the company, GM will receive $2.7 billion in cash, and an unconditional release of any alleged estate claims against GM.  In addition, as with other customers, certain GM claims would flow-through the Chapter 11 cases and be satisfied by the reorganized company in the ordinary course of business.  The plan framework anticipates that GM's financial contribution to Delphi's transformation plan would be consistent with the items identified in Delphi's former framework agreement announced on Dec. 18, 2006.  While the actual value of the potential GM contribution cannot be determined until the Delphi-GM global settlement agreement and master restructuring agreement are finalized, Delphi is aware that GM has publicly estimated its potential exposure related to Delphi's Chapter 11 filing.

- All subordinated debt claims would be allowed and satisfied with $478 million of common stock (10.6 million out of a total of 147.6 million shares) in the reorganized Delphi at a deemed value of $45 per share.

- The equity securities class in Delphi's plan of reorganization would receive: 1) $66 million of common stock (1.5 million out of a total of 147.6 million shares) in the reorganized Delphi (at a deemed value of $45 per share); 2) warrants to purchase an additional 5 percent of the common stock of reorganized Delphi during a five-year period (at an exercise price of $45 per share); 3) rights to purchase approximately 41 million shares of common stock in the reorganized Delphi for $1.6 billion at a deemed exercise price of approximately $38 per share; and 4) rights to purchase $572 million of common stock (at an exercise price of $45 per share), which will result in adjustments to the stock and cash distributions to be made to the unsecured creditors and Appaloosa.

Delphi cautioned that nothing in the plan investment agreement, the Court or regulatory filings being made in connection with the agreements or the company's public disclosures (including this press release) shall be deemed a solicitation to accept or reject a plan in contravention of the Bankruptcy Code nor an offer to sell or a solicitation of an offer to buy any securities of the company.

-more-

## EMERGENCE CORPORATE GOVERNANCE STRUCTURE

The Equity Purchase and Commitment Agreement also includes certain corporate governance provisions for the reorganized Delphi.  Under the terms of the proposed plan, the reorganized Delphi would be governed by a nine-member Board of Directors including an Executive Chairman and the company's CEO.  Subject to certain conditions, a majority of the directors (6 of 9) would be required to be independent of reorganized Delphi under applicable exchange rules and independent of the Plan Investors.

A five-member selection committee will select the company's post-emergence Executive Chairman, have veto rights over all directors nominated by the plan investors and statutory committees, and appoint directors to all Board committees.  The selection committee will consist of John D. Opie, Delphi Board of Directors' lead independent director, a representative of each of Delphi's two statutory committees and a representative from Appaloosa and one of the other co-investors. Appaloosa, through its proposed Series A-1 preferred stock ownership, would have certain veto rights regarding extraordinary corporate actions such as change of control transactions and acquisitions or investments in excess of $250 million in any twelve-month period.

Executive compensation for the reorganized company must be on market terms, must be reasonably satisfactory to the lead plan investor, and the overall executive compensation plan design must be described in the company's disclosure statement and incorporated into the plan of reorganization.

Delphi's Chapter 11 cases were filed on October 8, 2005, in the United States Bankruptcy Court for the Southern District of New York and were assigned to the Honorable Robert D. Drain under lead case number 05-44481 (RDD).  Rothschild Inc. serves as investment banker to Delphi and Skadden, Arps, Slate, Meagher & Flom LLP serves as lead counsel to Delphi on the transaction and in the Chapter 11 reorganization cases.

More information on Delphi's U.S. restructuring and access to court documents, the agreements referenced in this press release and other general information about the Chapter 11 cases is available at www.delphidocket.com.  Information on the case can also be obtained on the Bankruptcy Court's website with Pacer registration: http://www.nysb.uscourts.gov.  For more information about Delphi and its operating subsidiaries, visit Delphi's website at www.delphi.com.

-more-

**FORWARD-LOOKING STATEMENTS**

This press release, as well as other statements made by Delphi, may contain forward-looking statements that reflect, when made, the Company's current views with respect to current events and financial performance. Such forward-looking statements are and will be, as the case may be, subject to many risks, uncertainties and factors relating to the Company's operations and business environment which may cause the actual results of the Company to be materially different from any future results, express or implied, by such forward-looking statements.  In some cases, you can identify these statements by forward-looking words such as "may," "might," "will," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "potential" or "continue," the negative of these terms and other comparable terminology.  Factors that could cause actual results to differ materially from these forward-looking statements include, but are not limited to, the following: the ability of the Company to continue as a going concern; the ability of the Company to operate pursuant to the terms of the debtor-in-possession financing facility; the terms of any reorganization plan ultimately confirmed; the Company's ability to obtain Court approval with respect to motions in the chapter 11 cases prosecuted by it from time to time; the ability of the Company to develop, prosecute, confirm and consummate one or more plans of reorganization with respect to the chapter 11 cases; the Company's ability to satisfy the terms and conditions of the revised Equity Purchase and Commitment Agreement; risks associated with third parties seeking and obtaining Court approval to terminate or shorten the exclusivity period for the Company to propose and confirm one or more plans of reorganization, for the appointment of a chapter 11 trustee or to convert the cases to chapter 7 cases; the ability of the Company to obtain and maintain normal terms with vendors and service providers; the Company's ability to maintain contracts that are critical to its operations; the potential adverse impact of the chapter 11 cases on the Company's liquidity or results of operations; the ability of the Company to fund and execute its business plan (including the transformation plan described in Item 1. Business "Potential Divestitures, Consolidations and Wind-Downs" of the Annual Report on Form 10-K for the year ended December 31, 2006 filed with the SEC) and to do so in a timely manner; the ability of the Company to attract, motivate and/or retain key executives and associates; the ability of the Company to avoid or continue to operate during a strike, or partial work stoppage or slow down by any of its unionized employees and the ability of the Company to attract and retain customers.  Additional factors that could affect future results are identified in the Company's Annual Report on Form 10-K for the year ended December 31, 2006, including the risk factors in Part I. Item 1A. Risk Factors, contained therein and the Company's quarterly periodic reports for the subsequent periods, including the risk factors in Part II. Item 1A. Risk Factors, contained therein, filed with the SEC. Delphi disclaims any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events and/or otherwise.

Similarly, these and other factors, including the terms of any reorganization plan ultimately confirmed, can affect the value of the Company's various prepetition liabilities, common stock and/or other equity securities. Additionally, no assurance can be given as to what values, if any, will be ascribed in the bankruptcy cases to each of these constituencies. A plan of reorganization could result in holders of Delphi's common stock receiving no distribution on account of their interest and cancellation of their interests. In addition, under certain conditions specified in the Bankruptcy Code, a plan of reorganization may be confirmed notwithstanding its rejection by an impaired class of creditors or equity holders and notwithstanding the fact that equity holders do not receive or retain property on account of their equity interests under the plan. In light of the foregoing, the Company considers the value of the common stock to be highly speculative and cautions equity holders that the stock may ultimately be determined to have no value. Accordingly, the Company urges that appropriate caution be exercised with respect to existing and future investments in Delphi's common stock or other equity interests or any claims relating to prepetition liabilities.

# # #

**<u>EXHIBIT B</u>**

July 18, 2007


Delphi Corporation
5725 Delphi Drive
Troy, MI  48098

Attn:   Robert S. "Steve" Miller
        Chairman and Chief Executive Officer

Re: Proposed Investment in Delphi Corporation

Dear Mr. Miller:

       As you know, the signatories hereto have been engaged in discussions with Delphi
Corporation ("Delphi" or the "Company") and various other parties in interest in the jointly
administered chapter 11 cases (the "Chapter 11 Cases") pending in the United States Bankruptcy
Court for the Southern District of New York (the "Bankruptcy Court") with respect to Delphi
and certain of its subsidiaries (collectively, the "Debtors") regarding a potential global resolution
of the Chapter 11 Cases that would be implemented pursuant to a plan of reorganization for the
Debtors (the "Plan") and be funded in part by an equity investment in Delphi (the "Investment").

       Pursuant to the Company's request, the undersigned severally, not jointly, submit this
proposal (the "Proposal") to make the Investment on the terms and subject to the conditions
contained in the attached form of Equity Purchase and Commitment Agreement (the "Investment
Agreement").  Upon the entry by the Bankruptcy Court of the Initial Approval Order (as defined
and described below) and the satisfaction of the other conditions described in this letter, the
undersigned will severally, not jointly, enter into the Investment Agreement and each of A-D
Acquisition Holdings, LLC, Pardus DPH Holding LLC and Harbinger Del-Auto Investment
Company, Ltd. will deliver an Equity Commitment Letter in the form attached hereto.  Our
several obligations to enter into the Investment Agreement, however, are subject to your using
your commercially reasonable efforts to have the Bankruptcy Court enter the Initial Approval
Order by, among other things: (a) preparing and filing with the Bankruptcy Court, no later than
July 18, 2007, the Approval Motion referred to in the Investment Agreement and (b) using
commercially reasonable efforts to obtain a hearing on the Initial Motion on or before August
16, 2007.

       The undersigned and their advisors have devoted substantial time and resources to
preparing this Proposal.  We appreciate the significant amount of time and resources that Delphi
has dedicated to assist our teams in developing a deeper understanding of the Company's
business.  Based on this work, the undersigned are prepared to take appropriate action to move
forward toward the full formulation and implementation of the transactions contemplated by the
Investment Agreement, including engaging in the preparation and negotiation of additional
definitive documents as contemplated thereby and supporting the Debtors' efforts to obtain entry
of the Initial Approval Order.

This Proposal is subject to, and expressly conditioned on, (1) the execution and delivery by all signatories thereto of the Investment Agreement in the form attached to this letter and (2) the entry by the Bankruptcy Court of an order, in form and substance reasonably satisfactory to each of us (the "Initial Approval Order"): (a) approving, and authorizing the Debtors to enter into and perform their obligations under the Investment Agreement and (b) authorizing the payment of the Commitment Fees, the Arrangement Fee, the Alternate Transaction Fee and Transaction Expenses (as such terms are defined in the Investment Agreement) on the terms and subject to the conditions set forth in the Investment Agreement.

This Proposal will remain open until 5:00 p.m., Eastern Standard Time on July 18, 2007, at which point it will expire unless Delphi has filed a motion, in form and substance reasonably acceptable to us, seeking entry by the Bankruptcy Court of the Initial Approval Order and requesting a hearing on such motion on or before August 16, 2007. In addition, even if accepted by Delphi this Proposal shall terminate and be of no further force of effect if, on or before August 16, 2007: (1) the Initial Approval Order has not been entered by the Bankruptcy Court, (2) the Investment Agreement has not been executed and delivered to us by Delphi, or (3) any of the undersigned determines in its sole discretion that either (a) the conditions to the obligations of the undersigned contained in the Investment Agreement are incapable of being satisfied or (b) the undersigned is entitled to exercise a termination right contained in the Investment Agreement.

<p align="center">*    *    *    *</p>

Based on our work to date, we are very enthusiastic about Delphi and look forward to pursuing the transactions contemplated by the Investment Agreement to an expeditious and mutually successful conclusion.

A-D ACQUISITION HOLDINGS, LLC

By: _____
Name:
Title:

HARBINGER DEL-AUTO INVESTMENT
COMPANY, LTD.

By: _____
Name:
Title:

MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED

By: _____
Name:
Title:

UBS SECURITIES LLC

By: _____
Name:
Title:

By: _____
Name:
Title:

Based on our work to date, we are very enthusiastic about Delphi and look forward to pursuing the transactions contemplated by the Investment Agreement ~~and the Plan Support Agreement~~ to an expeditious and mutually successful conclusion.

A-D ACQUISITION HOLDINGS, LLC

By:_____
    Name:
    Title:

HARBINGER DEL-AUTO INVESTMENT
    COMPANY, LTD.

By:_____
    Name:  Charles D. Miller
    Title:  Vice President

MERRILL LYNCH, PIERCE, FENNER &
    SMITH INCORPORATED

By:_____
    Name:
    Title:

UBS SECURITIES LLC

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

Based on our work to date, we are very enthusiastic about Delphi and look forward to pursuing the transactions contemplated by the Investment Agreement to an expeditious and mutually successful conclusion.

A-D ACQUISITION HOLDINGS, LLC

By:_____
    Name:
    Title:

HARBINGER DEL-AUTO INVESTMENT
    COMPANY, LTD.

By:_____
    Name:
    Title:

MERRILL LYNCH, PIERCE, FENNER &
    SMITH INCORPORATED

By:_____
    Name: Graham Goldsmith
    Title: Managing Director

UBS SECURITIES LLC

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

Based on our work to date, we are very enthusiastic about Delphi and look forward to pursuing the transactions contemplated by the Investment Agreement ~~and the Plan Support Agreement~~ to an expeditious and mutually successful conclusion.

A-D ACQUISITION HOLDINGS, LLC

By:_____
    Name:
    Title:

HARBINGER DEL-AUTO INVESTMENT
COMPANY, LTD.

By:_____
    Name:
    Title:

MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED

By:_____
    Name:
    Title:

UBS SECURITIES LLC

By:_____
    Name: Steven Smith
    Title: Managing Director

By:_____
    Name: Andrew Kramer
    Title: Managing Director

GOLDMAN SACHS & CO.

By: _____
   Name: *Thomas A. Nasard*
   Title: *Managing Director*

PARDUS DPH HOLDING LLC

By: _____
   Name:
   Title:

GOLDMAN SACHS & CO.

By:_____
   Name:
   Title:

PARDUS DPH HOLDING LLC

By:_____
   Name:
   Title:

Signature Page for Bid Letter

## EQUITY PURCHASE AND COMMITMENT AGREEMENT

THIS EQUITY PURCHASE AND COMMITMENT AGREEMENT (as from time to time amended, restated, amended and restated, modified or supplemented in accordance with the terms hereof, this "**Agreement**"), dated as of [_____], 2007, is made by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware ("**ADAH**"), Harbinger Del-Auto Investment Company, Ltd., an exempted company incorporated in the Cayman Islands ("**Harbinger**"), Merrill Lynch, Pierce, Fenner & Smith Incorporated, a Delaware corporation ("**Merrill**"), UBS Securities LLC, a Delaware limited liability company ("**UBS**"), Goldman Sachs & Co., a New York limited partnership ("**GS**"), Pardus DPH Holding LLC, a Delaware limited liability company ("**Pardus**"), and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "**Company**"). ADAH, Harbinger, Merrill, UBS, GS and Pardus are each individually referred to herein as an "**Investor**" and collectively as the "**Investors**". Capitalized terms used in the agreement have the meanings assigned thereto in the sections indicated on Schedule 1 hereto.

WHEREAS, the Company and certain of its subsidiaries and affiliates (the "**Debtors**") commenced jointly administered cases (the "**Chapter 11 Cases**") under United States Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended and in effect on October 8, 2005 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, ADAH, Harbinger, UBS, Merrill, Dolce Investments LLC ("**Dolce**") (collectively, the "**Original Investors**") and the Company negotiated and entered into the that certain Equity Purchase and Commitment Agreement, dated as of January 18, 2007 (the "**Original Agreement**"). The Original Agreement set forth the terms on which the Original Investors would provide certain financial accommodations that would facilitate the implementation of a plan of reorganization under the Bankruptcy Code for the Debtors having terms consistent with the Original Agreement and that certain Plan Framework Support Agreement, dated as of December 18, 2006 by and among the Company, General Motors Corporation ("**GM**"), Appaloosa Management L.P. ("**Appaloosa**"), Cerberus Capital Management, L.P. ("**Cerberus**"), Harbinger Capital Partners Master Fund I, Ltd. ("**Harbinger Fund**"), Merrill and UBS (as previously amended by the Amendment and Supplement to the Plan Framework Support Agreement, dated as of January 18, 2007, the "**Original PSA**");

WHEREAS, the Company filed a motion (the "**Original Approval Motion**") with the Bankruptcy Court for entry of an order: (i) approving and authorizing the Company to enter into the Original Agreement and the Original PSA; (ii) authorizing the Company to make certain payments contemplated by the Original Agreement; and (iii) granting certain related relief;

WHEREAS, after holding a contested evidentiary hearing on the Original Approval Motion on January 11 and 12, 2007, and considering the evidentiary record, the objections to the relief requested, and the argument of counsel, the Bankruptcy Court over-ruled such objections and entered its order granting the relief requested by the Company in the Original Approval Motion as it was modified at the hearing (the "**Original Approval Order**");

WHEREAS, the Original Agreement and the Original PSA were terminated by the Company on July 7, 2007;

WHEREAS, the Company has filed its motion (the "**Approval Motion**") seeking an order (the "**Approval Order**") from the Bankruptcy Court that all of the findings, conclusions and rulings contained in the Original Approval Order (i) apply to this Agreement (including the Commitment Fees, the Arrangement Fee, the Alternate Transaction Fees and the Transaction Expenses provided for herein), the Plan Terms attached hereto as Exhibit B (the "**Plan Terms**"), the parties thereto and the transactions contemplated thereby, and (ii) continue in full force and effect with respect thereto;

WHEREAS, the Company intends to propose and submit to the Bankruptcy Court for its approval a plan of reorganization for the Debtors that is consistent with this Agreement and the Plan Terms;

WHEREAS, the Company has requested that the Investors participate in the plan of reorganization, and the Investors are willing to participate in the plan of reorganization, on the terms and subject to the conditions contained in this Agreement; and

WHEREAS, each of Appaloosa, Harbinger Fund and Pardus Special Opportunities Master Fund L.P. (collectively, the "**Commitment Parties**") will provide, on the date hereof, commitment letters addressed to ADAH, Harbinger and Pardus respectively, and the Company whereby each Commitment Party will confirm its commitment to provide equity financing to ADAH, Harbinger and Pardus, respectively, on the terms and subject to the limitations set forth in the commitment letters.

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, each of the parties hereto hereby agrees as follows:

1.    Rights Offering.

    (a)    The Company proposes to offer and sell shares of its new common stock, par value $0.01 per share (the "**New Common Stock**"), pursuant to a rights offering (the "**Rights Offering**") whereby the Company will distribute at no charge to

each holder (each, an "**Eligible Holder**") of Common Stock, including, to the extent applicable, the Investors, that number of rights (each, a "**Right**") in respect of shares of Common Stock outstanding and held of record as of the close of business on a record date (the "**Record Date**") to be set by the Board of Directors of the Company that will enable each Eligible Holder to purchase up to its pro rata portion of 41,026,311 shares in the aggregate of New Common Stock (each, a "**Share**") at a purchase price of $38.39 per Share (the "**Purchase Price**").

(b)    The Company will conduct the Rights Offering pursuant to a plan of reorganization of the Debtors (such plan of reorganization, the "**Plan**"), which shall reflect the Company's proposed restructuring transactions described in this Agreement, the Summary of Terms of Preferred Stock attached hereto as Exhibit A (the "**Preferred Term Sheet**") and the Plan Terms.

(c)    The Rights Offering will be conducted as follows:

(i)    On the terms and subject to the conditions of this Agreement and subject to applicable law, the Company shall offer Shares for subscription by holders of Rights as set forth in this Agreement.

(ii)    Promptly, and no later than four (4) Business Days, following the occurrence of both (1) the date that the Confirmation Order shall have been entered by the Bankruptcy Court and (2) the effectiveness under the Securities Act of 1933, as amended (the "**Securities Act**"), of the Rights Offering Registration Statement filed with the Securities and Exchange Commission (the "**Commission**") relating to the Rights Offering, the Company shall issue to each Eligible Holder, Rights to purchase up to its pro rata portion of 41,026,311 Shares in the aggregate (the date of such distribution, the "**Rights Distribution Date**"). The Company will be responsible for effecting the distribution of certificates representing the Rights, the Rights Offering Prospectus and any related materials to each Eligible Holder.

(iii)    The Rights may be exercised during a period (the "**Rights Exercise Period**") commencing on the Rights Distribution Date and ending at the Expiration Time. The Rights shall be transferable. "**Expiration Time**" means the date that is 30 days after the Rights Distribution Date, or such later date and time as the Company, subject to the prior written approval of ADAH, may specify in a notice provided to the Investors before 9:00 a.m., New York City time, on the Business Day before the then-effective Expiration Time. The Company shall use its reasonable best efforts to cause the effective date of the Plan (the "**Effective Date**") to occur as promptly as reasonably practicable after the Expiration Time. For the

purpose of this Agreement, "**Business Day**" means each Monday,
Tuesday, Wednesday, Thursday and Friday that is not a day on which
banking institutions in New York City are generally authorized or
obligated by law or executive order to close. Each Eligible Holder who
wishes to exercise all or a portion of its Rights shall (i) during the Rights
Exercise Period return a duly executed document to a subscription agent
reasonably acceptable to the Company and ADAH (the "**Subscription
Agent**") electing to exercise all or a portion of the Rights held by such
Eligible Holder and (ii) pay an amount, equal to the full Purchase Price of
the number of Shares that the Eligible Holder elects to purchase, by wire
transfer of immediately available funds by the Expiration Time to an
escrow account established for the Rights Offering.

(iv)    Unless otherwise required by ADAH, there will be no over-subscription
rights provided in connection with the Rights Offering.

(v)    As soon as reasonably practicable following the Effective Date, the
Company will issue to each Eligible Holder who validly exercised its
Rights the number of Shares to which such Eligible Holder is entitled
based on such exercise.

(vi)    The Company hereby agrees and undertakes to give each Investor by
electronic facsimile transmission the certification by an executive officer
of the Company of either (i) the number of Shares elected to be purchased
by Eligible Holders pursuant to validly exercised Rights, the aggregate
Purchase Price therefor, the number of Unsubscribed Shares and the
aggregate Purchase Price therefor (a "**Purchase Notice**") or (ii) in the
absence of any Unsubscribed Shares, the fact that there are no
Unsubscribed Shares and that the commitment set forth in Section 2(a)(iv)
is terminated (a "**Satisfaction Notice**") as soon as practicable after the
Expiration Time and, in any event, reasonably in advance of the Closing
Date (the date of transmission of confirmation of a Purchase Notice or a
Satisfaction Notice, the "**Determination Date**").

(vii)    The Rights Offering will provide each Eligible Holder who validly
exercised its Rights with the right to withdraw a previous exercise of
Rights after the withdrawal deadline established in the Rights Offering
Registration Statement if there are changes to the Plan after the
withdrawal deadline that the Bankruptcy Court determines are materially
adverse to the holders of the Rights and the Bankruptcy Court requires
resolicitation of votes under Section 1126 of the Bankruptcy Court or an
opportunity to change previously cast acceptances or rejections of the Plan.

2.    <u>The Commitment; Fees and Expenses</u>.

(a)    On the terms and subject to the conditions set forth in this Agreement:

(i)    each Investor agrees, severally and not jointly, to subscribe for and purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to subscribe for and purchase, and the Company agrees to sell and issue, on the Closing Date (A) for the Purchase Price per Share, each Investor's proportionate share of 4,558,479 Shares as is set forth opposite such Investor's name on Schedule 2 hereto (the "**Direct Subscription Shares**") and (B) for $38.39, that number of shares of Series B Senior Convertible Preferred Stock, par value $0.01 per share (the "**Series B Preferred Stock**"), as is set forth opposite such Investor's name on Schedule 2 hereto, which shares shall be created pursuant to a Certificate of Designations (the "**Series B Certificate of Designations**") that is consistent with the terms set forth in the Preferred Term Sheet and, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to ADAH;

(ii)    [Reserved];

(iii)    ADAH agrees to subscribe for and purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to subscribe for and purchase, and the Company agrees to sell, on the Closing Date, for the purchase price of $31.28 per Share (the "**Series A Purchase Price**"), 12,787,724 shares of Series A-1 Senior Convertible Preferred Stock, par value $0.01 per share (the "**Series A Preferred Stock**") which shares shall be created pursuant to a Certificate of Designations (the "**Series A Certificate of Designations**") that is consistent with the terms set forth in the Preferred Term Sheet and with such other terms that, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to ADAH; and

(iv)    each Investor agrees, severally and not jointly, to purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to purchase, on the Closing Date, and the Company agrees to sell for the Purchase Price per Share that number of Shares issuable pursuant to the aggregate number of Rights that were not properly exercised by the Eligible Holders thereof during the Rights Exercise Period, in proportion to the Investor's share of the Direct Subscription Shares (such Shares in the aggregate, the "**Unsubscribed**

**Shares**"), rounded among the Investors as they may determine, in their sole discretion, to avoid fractional shares.

In connection with each of clauses (i) through (iv) above, subject to delivering prior written notice to each other Investor and the prior approval of ADAH, prior to the Securities Act Effective Date each Investor shall have the right to arrange for one or more of its Affiliates (each a "**Related Purchaser**") (A) to purchase Investor Shares, by written notice to the Company, which notice shall be signed by the Investor and each Related Purchaser, shall contain the Related Purchaser's agreement to be bound by this Agreement and shall contain a confirmation by the Related Purchaser of the accuracy with respect to it of the representations set forth in Section 4 or (B) to designate that some or all of the Investor Shares be issued in the name of and delivered to, one or more Related Purchasers which designation shall be signed by the Investor and each Related Purchaser, shall contain the Related Purchaser's agreement to be bound by this Agreement and shall contain a confirmation by the Related Purchaser of the accuracy with respect to it of the representations set forth in Section 4; provided, that the total number of Investors, Related Purchasers and Ultimate Purchasers shall not exceed the Maximum Number. The "**Maximum Number**" shall be 35 unless the Company consents to a higher number, such consent not to be unreasonably withheld; provided, further, that nothing in this Agreement shall limit or restrict in any way any Investor's ability to transfer or otherwise dispose of any Investor's Shares or any interests therein after the Closing Date pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements thereunder and subject to applicable state securities laws. The Investors agree that each Related Purchaser will be a "Qualified Institutional Buyer" under Rule 144A of the Securities Act.

The Series A Preferred Stock and the Series B Preferred Stock are referred to herein collectively as the "**Preferred Shares**". The Unsubscribed Shares, the Direct Subscription Shares and the Preferred Shares are referred to herein collectively as the "**Investor Shares**". The term "**Affiliate**" shall have the meaning ascribed to such term in Rule 12b-2 under the Securities Exchange Act of 1934 in effect on the date hereof.

(b)    Upon the occurrence of an Investor Default or a Limited Termination, within five (5) Business Days of the occurrence of such Investor Default or Limited Termination, the Investors (other than any non-purchasing Investor) shall have the right to agree to purchase on the Closing Date, in the case of a Limited Termination, or to purchase, in the case of an Investor Default (or, in either case, arrange for the purchase through a Related Purchaser or an Ultimate Purchaser), all but not less than all, of the Available Investor Shares on the terms and subject to the conditions set forth in this Agreement and in such proportions as determined by the Investors in their sole discretion (an "**Alternative Financing**");

provided, that only in the case of a Limited Termination, ADAH will be required within ten (10) Business Days of the occurrence of such Limited Termination to agree to purchase on the Closing Date (or arrange for the purchase through a Related Purchaser or an Ultimate Purchaser) any Available Investor Shares attributable to the Limited Termination and not otherwise purchased pursuant to the Alternative Financing (unless ADAH has otherwise terminated this Agreement in accordance with its terms); provided, further, that the total number of Investors, Related Purchasers and Ultimate Purchasers pursuant to this Agreement shall not exceed the Maximum Number.  The term "**Investor Default**" shall mean the breach by any Investor of its obligation to purchase any Investor Shares which it is obligated to purchase under this Agreement.  The term "**Available Investor Shares**" shall mean any Investor Shares which any Investor is not purchasing as a result of an Investor Default or Limited Termination.  The exercise by any Investor of the right to purchase (or arrange a purchase of) any Available Investor Shares shall not relieve any defaulting Investor of any obligation to each other Investor or the Company of such defaulting Investor's breach of this Agreement.

(c)     As soon as practicable after the Expiration Time, and in any event reasonably in advance of the Closing Date, the Company will provide a Purchase Notice or a Satisfaction Notice to each Investor as provided above, setting forth a true and accurate determination of the aggregate number of Unsubscribed Shares, if any; provided, that on the Closing Date, on the terms and subject to the conditions in this Agreement, the Investors will purchase, and the Company will sell, only such number of Unsubscribed Shares as are listed in the Purchase Notice, without prejudice to the rights of the Investors to seek later an upward or downward adjustment if the number of Unsubscribed Shares in such Purchase Notice is inaccurate.

(d)     Delivery of the Investor Shares will be made by the Company to the account of each Investor (or to such other accounts as any Investor may designate in accordance with this Agreement) at 10:00 a.m., New York City time, on the Effective Date (the "**Closing Date**") against payment of the aggregate Purchase Price for the Investor Shares by wire transfer of immediately available funds in U.S. dollars to the account specified by the Company to the Investors at least 24 hours prior to the Closing Date.

(e)     All Investor Shares will be delivered with any and all issue, stamp, transfer, sales and use, or similar Taxes or duties payable in connection with such delivery duly paid by the Company.

(f)     The documents to be delivered on the Closing Date by or on behalf of the parties hereto and the Investor Shares will be delivered at the offices of White & Case

LLP, 1155 Avenue of the Americas, New York, New York 10036 on the Closing Date.

(g)    Subject to the provisions of Sections 2(a), 2(b) and 2(k) hereof, and subject to prior written notice to each other Investor and the prior approval of ADAH, any Investor may designate that some or all of the Unsubscribed Shares, Direct Subscription Shares or shares of Preferred Stock be issued in the name of, and delivered to, one or more Ultimate Purchasers.

(h)    On the basis of the representations and warranties herein contained, the Company shall pay the following fees to the Investors in accordance with Section 2(i) or 12(g), as the case may be:

(i)    an aggregate commitment fee of eighteen million dollars ($18,000,000) to be paid to the Investors in proportion to their undertakings herein relative to Preferred Shares as set forth in Schedule 2 (the "**Preferred Commitment Fee**");

(ii)    an aggregate commitment fee of thirty nine million, three hundred seventy five thousand dollars ($39,375,000) to be paid to the Investors as set forth in Schedule 2 to compensate the Investors for their undertakings herein relative to Investor Shares other than Preferred Shares (the "**Standby Commitment Fee**" and together with the Preferred Commitment Fee, the "**Commitment Fees**");

(iii)    a fee of six million, three hundred seventy five thousand dollars ($6,375,000) to ADAH to compensate ADAH for arranging the transactions contemplated hereby (the "**Arrangement Fee**"); and

(iv)    an Alternate Transaction Fee, if any, which shall be paid by the Company as provided in Section 12(g).

(i)    Seven million, five hundred twenty-five thousand dollars ($7,525,000) of the Commitment Fees shall be paid on the first Business Day following the first date that the Approval Order is issued by the Bankruptcy Court, and twenty-one million, one hundred sixty-two thousand, five hundred dollars ($21,162,500), representing the balance of the first fifty percent (50%) of the Commitment Fees, on the first Business Day following the Disclosure Statement Filing Date. The balance of twenty-eight million, six hundred eighty-seven thousand, five hundred dollars ($28,687,500), representing the remaining fifty percent (50%) of the Commitment Fees, shall be paid on the first Business Day following the

Disclosure Statement Approval Date. The Arrangement Fee shall be paid to ADAH upon entry of the Approval Order. Payment of the Commitment Fees, Arrangement Fee and the Alternate Transaction Fee, if any, will be made by wire transfer of immediately available funds in U.S. dollars to the account specified by each Investor to the Company at least 24 hours prior to such payment. The Commitment Fees, Arrangement Fee and the Alternate Transaction Fee, if any, will be nonrefundable and non-avoidable when paid. The provision for the payment of the Commitment Fees and Arrangement Fee is an integral part of the transactions contemplated by this Agreement and without this provision the Investors would not have entered into the Agreement and such Commitment Fees and Arrangement Fee shall constitute an allowed administrative expense of the Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code.

(j)     The Company will reimburse or pay, as the case may be, the out-of-pocket costs and expenses reasonably incurred by each Investor or its Affiliates (which, for the avoidance of doubt, shall not include any Ultimate Purchaser) to the extent incurred on or before the first to occur of the date on which this Agreement terminates in accordance with its terms and the Effective Date (and reasonable post-closing costs and expenses relating to the closing of the transactions contemplated hereby), including reasonable fees, costs and expenses of counsel to each of the Investors or its Affiliates, and reasonable fees, costs and expenses of any other professionals retained by any of the Investors or its Affiliates in connection with the transactions contemplated hereby (including investigating, negotiating and completing such transactions) and the Chapter 11 Cases and other judicial and regulatory proceedings related to such transactions and the Chapter 11 Cases other than costs and expenses relating to any transactions with Ultimate Purchasers and, with respect to expenses that would not otherwise be incurred by the related Investor, Related Purchasers (collectively, "**Transaction Expenses**"); from and after (i) in the case of ADAH and Harbinger, December 1, 2006, (ii) in the case of GS, July 3, 2007, in the case of Pardus, June 18, 2007 and in the case of UBS and Merrill, July 30, 2006, promptly upon submission to the Company of summary statements therefor by such Investor, in each case, without Bankruptcy Court review or further Bankruptcy Court order, whether or not the transactions contemplated hereby are consummated and, in any event, within 30 days of the submission of such statements. Notwithstanding the foregoing, (i) Transaction Expenses incurred by ADAH or its Affiliates on or prior to May 17, 2006 in an amount not to exceed $5,000,000 shall be paid if and when the effective date of any plan of reorganization for the Company occurs and only if such plan results in holders of Common Stock receiving any recovery under such plan, (ii) Transaction Expenses incurred by Pardus on or prior to June 18, 2007 shall be paid to the extent that they comprise the reasonable fees, costs and expenses of legal counsel to Pardus related to the negotiation of this Agreement, the non-disclosure agreement between Pardus and the Company dated June 18, 2007 and the Transactions contemplated hereby or thereby, (iii) Transaction Expenses incurred by GS on or prior to July 3, 2007 shall be paid to the extent that they comprise the reasonable fees, costs and expenses of legal counsel to GS related to the negotiation of this Agreement, the non-disclosure agreement between GS and

the Company and the Transactions contemplated hereby or thereby and (iv) the filing fee, if any, required to be paid in connection with any filings required to be made by any Investor or its Affiliates under the HSR Act or any other competition laws or regulations shall be paid by the Company on behalf of the Investors or such Affiliate when filings under the HSR Act or any other competition laws or regulations are made, together with all expenses of the Investors or its Affiliates incurred to comply therewith.

The provision for the payment of the Transaction Expenses is an integral part of the transactions contemplated by this Agreement and without this provision the Investors would not have entered into this Agreement and such Transaction Expenses shall constitute an allowed administrative expense of the Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code. In addition, to the extent permitted under any order authorizing the Debtors to obtain post-petition financing and/or to utilize cash collateral then or thereafter in effect (each a "**Financing Order**"), the Transaction Expenses incurred from and after the date of entry of the Original Approval Order shall be protected by and entitled to the benefits of the carve-out for professional fees provided in any such Financing Order.

(k)     The Company acknowledges that the Investors and certain persons and entities (collectively, the "**Ultimate Purchasers**") have entered into an agreement and may, prior to the Securities Act Effective Date, enter into one or more new agreements or amend existing agreements (collectively, the "**Additional Investor Agreement**"), pursuant to which the Investors have arranged for a number of Ultimate Purchasers to purchase certain of the Unsubscribed Shares and the Direct Subscription Shares. The Investors severally and not jointly acknowledge that they have not agreed and, without the prior written consent of ADAH, will not prior to the Closing agree, directly or indirectly, to sell, transfer, assign, pledge, hypothecate, donate or otherwise encumber or dispose of any Investor Shares or any interest or participation therein other than pursuant to the Additional Investor Agreement (as it may be amended from time to time) and other than an arrangement that was entered into among ADAH, Merrill, Harbinger and certain of their Affiliates regarding participation interests in the Series A-2 Senior Convertible Preferred Stock that was to be issued pursuant to the Original Agreement, which agreement has been terminated. The total number of Investors, Related Purchasers and Ultimate Purchasers as of the Closing Date shall not exceed the Maximum Number. Each Additional Investor Agreement shall contain each Ultimate Purchaser's agreement to be bound by this Agreement and a confirmation by each Ultimate Purchaser of the accuracy with respect to it of the representations set forth in Section 4 and a copy of such confirmation shall be provided to the Company prior to the Securities Act Effective Date. Each Investor proposing to enter into an Additional Investor Agreement with any Ultimate Purchaser or proposing to transfer Investor Shares to, or to arrange for Investor Shares to be purchased by or delivered to, any Related Purchaser, in either case, which would result in the Maximum Number being exceeded agrees to notify the Company and ADAH prior to entering into such agreement or

effecting such transfer and will not undertake such agreement or effect such transfer without the consent of the Company and ADAH, which shall not be unreasonably withheld. The Investors severally and not jointly agree that with respect to any offer or transfer to an Ultimate Purchaser prior to the Closing Date, they have not offered and shall not offer any Investor Shares to, and they have not entered into and shall not enter into the Additional Investor Agreement with, any person or entity (A) on or after the Securities Act Effective Date and (B) that is not a "Qualified Institutional Buyer" as defined in Rule 144A under the Securities Act; provided, that the total number of Investors, Related Purchasers and the Ultimate Purchasers pursuant to this Agreement shall not exceed the Maximum Number; provided, further, that nothing in this Agreement shall limit or restrict in any way any Investor's ability to transfer or otherwise dispose of any Investor's Shares or any interest therein after the Closing Date pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements thereunder and pursuant to applicable state securities laws.

3.    <u>Representations and Warranties of the Company</u>. Except as set forth in a disclosure letter to be delivered pursuant to <u>Section 5(s)</u> (the "**Disclosure Letter**"), the Company represents and warrants to, and agrees with, each of the Investors as set forth below. Any item disclosed in a section of the Disclosure Letter shall be deemed disclosed in all other sections of the Disclosure Letter to the extent the relevance of such disclosure or matter is reasonably apparent and shall qualify the representations and warranties contained in this <u>Section 3</u>. Except for representations, warranties and agreements that are expressly limited as to their date, each representation, warranty and agreement shall be deemed made as of the date of delivery of the Disclosure Letter (the "**Disclosure Letter Delivery Date**") and as of the Closing Date:

(a)    <u>Organization and Qualification</u>. The Company and each of its Significant Subsidiaries has been duly organized and is validly existing in good standing under the laws of its respective jurisdiction of incorporation, with the requisite power and authority to own its properties and conduct its business as currently conducted. Each of the Company and its Subsidiaries has been duly qualified as a foreign corporation or organization for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification, except to the extent that the failure to be so qualified or be in good standing has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. For the purpose of this Agreement, "**Material Adverse Effect**" means (i) any material adverse effect on the business, results of operations, liabilities, property or condition (financial or otherwise) of the Company or its Subsidiaries, taken as a whole, or (ii) any material adverse effect on the ability of the Company, subject to the approvals and other authorizations set forth in <u>Section 3(g)</u> below, to consummate the transactions contemplated by this Agreement or the Plan other than, in either case, any effect relating to or resulting from (i) changes in general economic conditions or securities or

financial markets in general that do not disproportionately impact the Company and its Subsidiaries; (ii) general changes in the industry in which the Company and its Subsidiaries operate and not specifically relating to, or having a disproportionate effect on, the Companies and its Subsidiaries taken as a whole (relative to the effect on other persons operating in such industry); (iii) any changes in law applicable to the Company or any of its Subsidiaries or any of their respective properties or assets or interpretations thereof by any governmental authority which do not have a disproportionate effect on, the Company and its Subsidiaries; (iv) any outbreak or escalation of hostilities or war (whether declared or not declared) or any act of terrorism which do not have a disproportionate effect on, the Company and its Subsidiaries; (v) the announcement or the existence of, or compliance with, this Agreement and the transactions contemplated hereby (including without limitation the impact thereof on relationships with suppliers, customers or employees); (vi) any accounting regulations or principles or changes in accounting practices or policies that the Company or its Subsidiaries are required to adopt, including in connection with the audit of the Company's financial statements in accordance with GAAP or any failure to timely file periodic reports or timely prepare financial statements and the costs and effects of completing the preparation of the Company's financial statements and periodic reports; or (vii) any change in the market price or trading volumes of the Company's securities (it being understood for the purposes of this subclause (vii) that any facts underlying such change that are not otherwise covered by the immediately preceding clauses (i) through (vi) may be taken into account in determining whether or not there has been a Material Adverse Effect). For the purposes of this Agreement, (x) a "**Subsidiary**" of any person means, with respect to such person, any corporation, partnership, joint venture or other legal entity of which such person (either alone or through or together with any other subsidiary), owns, directly or indirectly, more than 50% of the stock or other equity interests, has the power to elect a majority of the board of directors or similar governing body, or has the power to direct the business and policies, and (y) a "**Significant Subsidiary**" is a Subsidiary that satisfies the definition contained in Article 1, Rule 1-02 of Regulation S-X promulgated pursuant to the Securities Act of 1933, as amended.

(b)    <u>Corporate Power and Authority</u>.

(i)    The Company has or, to the extent executed in the future, will have when executed, the requisite corporate power and authority to enter into, execute and deliver this Agreement and each other agreement to which it will be a party as contemplated by this Agreement (this Agreement and such other agreements collectively, the "**Transaction Agreements**") and, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Rules 6004(h) and 3020(e) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), respectively, to perform its obligations hereunder and thereunder,

including the issuance of the Rights and Investor Shares. The Company has taken or will take all necessary corporate action required for the due authorization, execution, delivery and performance by it of this Agreement, including the issuance of the Rights and Investor Shares.

(ii)     Prior to the execution by the Company and filing with the Bankruptcy Court of the Plan, the Company and each Subsidiary entering into the Plan will have the requisite corporate power and authority to execute the Plan and to file the Plan with the Bankruptcy Court and, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rule 3020(e), to perform its obligations thereunder, and will have taken by the Effective Date all necessary corporate actions required for the due authorization, execution, delivery and performance by it of the Plan.

(c)     <u>Execution and Delivery; Enforceability</u>.

(i)     Each Transaction Agreement has been, or prior to its execution and delivery will be, duly and validly executed and delivered by the Company, and, upon the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rule 6004(h), each such document will constitute the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

(ii)     The Plan will be duly and validly filed with the Bankruptcy Court by the Company and each of its Subsidiaries executing the Plan and, upon the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rule 3020(e), will constitute the valid and binding obligation of the Company and such Subsidiary, enforceable against the Company and such Subsidiaries in accordance with its terms.

(d)     <u>Authorized and Issued Capital Stock</u>.  The authorized capital stock of the Company consists of (i) 1,350,000,000 shares of Common Stock and (ii) 650,000,000 shares of preferred stock, par value $0.10 per share.  At the close of business on June 30, 2007 (the "**Capital Structure Date**") (i) 561,781,500 shares of Common Stock were issued and outstanding, (ii) no shares of the preferred stock were issued and outstanding, (iii) 3,244,317 shares of Common Stock were held by the Company in its treasury, (iv) 85,978,864 shares of Common Stock were reserved for issuance upon exercise of stock options and other rights to purchase shares of Common Stock and vesting of restricted stock units (each, an "**Option**" and, collectively, the "**Options**") granted under any stock option or stock-based compensation plan of the Company or otherwise (the "**Stock Plans**"),

and (v) 200,000 shares of Series A participating preferred stock were reserved for issuance pursuant to that certain Rights Agreement by and between the Company and BankBoston, N.A., as Rights Agent, dated as of February 1, 1999, as amended (the "**Existing Shareholder Rights Plan**"). All issued and outstanding shares of capital stock of the Company and each of its Subsidiaries have been duly authorized and validly issued and are fully paid and nonassessable, and the holders thereof do not have any preemptive rights. Except as set forth in this Section 3(d) or issuances pursuant to the Stock Plans, at the close of business on the Capital Structure Date, no shares of capital stock or other equity securities or voting interest in the Company were issued, reserved for issuance or outstanding. Since the close of business on the Capital Structure Date, no shares of capital stock or other equity securities or voting interest in the Company have been issued or reserved for issuance or become outstanding, other than shares described in clause (iv) of the second sentence of this Section 3(d) that have been issued upon the exercise of outstanding Options granted under the Stock Plans and other than the shares to be issued hereunder or pursuant to the Plan Terms. Except as described in this Section 3(d), and except as will be required by the Plan, neither the Company nor any of its Subsidiaries is party to or otherwise bound by or subject to any outstanding option, warrant, call, subscription or other right (including any preemptive right), agreement or commitment which (w) obligates the Company or any of its Subsidiaries to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any shares of the capital stock of, or other equity or voting interests in, the Company or any security convertible or exercisable for or exchangeable into any capital stock of, or other equity or voting interest in, the Company, (x) obligates the Company or any of its Subsidiaries to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, contract, arrangement or undertaking, (y) restricts the transfer of any shares of capital stock of the Company or (z) relates to the voting of any shares of capital stock of the Company. On the Effective Date, the authorized capital stock of the Company and the issued and outstanding shares of capital stock of the Company shall be consistent with the description set forth in the Preferred Term Sheet, the Plan Terms and the Plan. On the Effective Date, the authorized capital stock of the Company shall consist of such number of shares of New Common Stock as shall be set forth in the Amended and Restated Constituent Documents and 23,207,104 shares of new preferred stock. On the Effective Date, assuming consummation of the transactions contemplated by this Agreement: (i) 124,400,000 shares of New Common Stock will be outstanding; (ii) 12,787,724 shares of Series A Preferred Stock will be issued and outstanding and (iii) 10,419,380 shares of Series B Preferred Stock will be issued and outstanding.

(e)    Issuance. The Investor Shares to be issued and sold by the Company to the Investors hereunder, when the Investor Shares are issued and delivered against payment therefor by the Investors hereunder, shall have been duly and validly authorized, issued and delivered and shall be fully paid and non-assessable, and

free and clear of all Taxes, liens, preemptive rights, rights of first refusal, subscription and similar rights, other than (i) any rights contained in the terms of the Preferred Shares as set forth in the Company's Certificate of Incorporation and (ii) any rights contained in any shareholders agreement to which one or more of the Investors shall be a party.

(f)     No Conflict. Subject to the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, the distribution of the Rights, the sale, issuance and delivery of the Shares upon exercise of the Rights, the consummation of the Rights Offering by the Company and the execution and delivery (or, with respect to the Plan, the filing) by the Company of the Transaction Agreements and the Plan and compliance by the Company with all of the provisions hereof and thereof and the Preferred Term Sheet and the Plan Terms and the consummation of the transactions contemplated herein and therein (including compliance by each Investor with its obligations hereunder and thereunder) (i) will not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent to be specified in the Plan, in the acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound or to which any of the property or assets of the Company or any of its Subsidiaries is subject, (ii) will not result in any violation of the provisions of the Certificate of Incorporation or Bylaws of the Company or any of its Subsidiaries, (iii) will not result in any material violation of, or any termination or material impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Company or any of its Subsidiaries or any of their properties, and (iv) will not trigger the distribution under the Existing Shareholders Rights Plan of Rights Certificates (as defined therein) or otherwise result in any Investor being or becoming an Acquiring Person, except in any such case described in subclause (i) for any conflict, breach, violation, default, acceleration or lien which has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(g)     Consents and Approvals. No consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Company or any of its Subsidiaries or any of their properties is required for the distribution of the Rights, the sale, issuance and delivery of Shares upon exercise of the Rights or the Investor Shares to each Investor hereunder and the consummation of the Rights Offering by the Company and the execution and delivery by the Company of the Transaction Agreements or the Plan and performance of and compliance by the Company with all of the

provisions hereof and thereof and the Preferred Term Sheet and the Plan Terms and the consummation of the transactions contemplated herein and therein, except (i) the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, (ii) the registration under the Securities Act of the issuance of the Rights and the Shares pursuant to the exercise of Rights, (iii) filings with respect to and the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**"), and any other comparable laws or regulations in any foreign jurisdiction relating to the sale or issuance of Investor Shares to the Investors, (iv) the filing with the Secretary of State of the State of Delaware of the Certificate of Incorporation to be applicable to the Company from and after the Effective Date and (v) such consents, approvals, authorizations, registrations or qualifications (x) as may be required under the rules and regulations of the New York Stock Exchange or the Nasdaq Stock Exchange to consummate the transactions contemplated herein, (y) as may be required under state securities or Blue Sky laws in connection with the purchase of the Investor Shares by the Investors or the distribution of the Rights and the sale of Shares to Eligible Holders or (z) the absence of which will not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(h)    Arm's Length.  The Company acknowledges and agrees that the Investors are acting solely in the capacity of an arm's length contractual counterparty to the Company with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering) and not as a financial advisor or a fiduciary to, or an agent of, the Company or any other person or entity.  Additionally, the Investors are not advising the Company or any other person or entity as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.  The Company shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and the Investors shall have no responsibility or liability to the Company, its Affiliates, or their respective shareholders, directors, officers, employees, advisors or other representatives with respect thereto.  Any review by the Investors of the Company, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of the Investors and shall not be on behalf of the Company, its Affiliates, or their respective shareholders, directors, officers, employees, advisors or other representatives and shall not affect any of the representations or warranties contained herein or the remedies of the Investors with respect thereto.

(i)    Financial Statements.  The financial statements and the related notes of the Company and its consolidated Subsidiaries included or incorporated by reference in the Company SEC Documents and the Rights Offering Registration Statement, and to be included or incorporated by reference in the Disclosure Statement and

the Rights Offering Registration Statement and the Rights Offering Prospectus, comply or will comply, as the case may be, in all material respects with the applicable requirements of the Securities Act, the Securities Exchange Act of 1934, as amended, and the rules and regulation of the Commission thereunder (the "**Exchange Act**") and the Bankruptcy Code, as applicable, and present fairly or will present fairly in all material respects the financial position, results of operations and cash flows of the Company and its Subsidiaries as of the dates indicated and for the periods specified; such financial statements have been prepared in conformity with U.S. generally accepting accounting principles ("**GAAP**") applied on a consistent basis throughout the periods covered thereby (except as disclosed in the Company SEC Documents filed prior to the date hereof), and the supporting schedules included or incorporated by reference in the Company SEC Documents and the Rights Offering Registration Statement, and to be included or incorporated by reference in the Disclosure Statement, the Rights Offering Registration Statement and the Rights Offering Prospectus, present fairly or will present fairly the information required to be stated therein; and the other financial information included or incorporated by reference in the Company SEC Documents and the Rights Offering Registration Statement, and to be included or incorporated by reference in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus, has been or will be derived from the accounting records of the Company and its Subsidiaries and presents fairly or will present fairly the information shown thereby; and the pro forma financial information and the related notes included or incorporated by reference in the Company SEC Documents and the Rights Offering Registration Statement, and to be included or incorporated by reference in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus, have been or will be prepared in accordance with the applicable requirements of the Securities Act and the Exchange Act, as applicable, and the assumptions underlying such pro forma financial information are reasonable and are set forth in the Company SEC Documents and will be set forth in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus.

(j)     Company SEC Documents and Disclosure Statement.  The Company has filed all required reports, schedules, forms, statements and other documents (including exhibits and all other information incorporated therein but not including the Rights Offering Registration Statement or the other documents referred to in Section 3(k) below) with the Commission ("**Company SEC Documents**").  As of their respective dates, each of the Company SEC Documents complied in all material respects with the requirements of the Securities Act or the Exchange Act and the rules and regulations of the Commission promulgated thereunder applicable to such Company SEC Documents.  The Company has filed with the Commission all "material contracts" (as such term is defined in Item 601(b)(10) of Regulation S-K under the Exchange Act) that are required to be filed as exhibits to the Company SEC Documents.  No Company SEC Document filed after December 31, 2005, when filed, contained any untrue statement of a material

fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. The Disclosure Statement, when submitted to the Bankruptcy Court and upon confirmation and effectiveness, will conform in all material respects to the requirements of the Bankruptcy Code. The Disclosure Statement, when submitted to the Bankruptcy Court and upon confirmation and effectiveness, and any future Company SEC Documents filed with the Commission prior to the Closing Date, when filed, will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading.

(k)     <u>Rights Offering Registration Statement and Rights Offering Prospectus</u>. The Rights Offering Registration Statement and any post-effective amendment thereto, as of the applicable Securities Act Effective Date and, if applicable, as of the date of such post-effective amendment, will comply in all material respects with the Securities Act, and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading; and as of the applicable filing date of the Rights Offering Prospectus, the Rights Offering Prospectus, and as of the filing date of any amendment or supplement thereto and during the Rights Offering Period, and as of the Closing Date, the Rights Offering Prospectus as so amended or supplemented, will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading. On the Rights Distribution Date, during the Rights Offering Period, and at the Expiration Time, the Investment Decision Package will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading. Each Issuer Free Writing Prospectus, at the time of use thereof, when considered together with the Investment Decision Package, will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading. Each Preliminary Rights Offering Prospectus, at the time of filing thereof, complied (in the case of a Preliminary Rights Offering Prospectus filed prior to the date hereof) and will comply in all material respects with the Securities Act and did not (in the case of a Preliminary Rights Offering Prospectus filed prior to the date hereof) and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading. Notwithstanding the foregoing, the Company makes no representation and warranty with respect to any statements or omissions made in reliance on and in conformity with information relating to each Investor or the Ultimate Purchasers furnished to the Company in writing by such Investor or the Ultimate Purchasers

expressly for use in the Rights Offering Registration Statement and the Rights Offering Prospectus and any amendment or supplement thereto.  On March 21, 2007, the Staff of the Commission delivered a letter to the Company which will be included in Schedule 3(k) of the Disclosure Letter.

For the purposes of this Agreement, (i) the term "**Rights Offering Registration Statement**" means the Registration Statement filed with the Commission relating to the Rights Offering, including all exhibits thereto, as amended as of the Securities Act Effective Date, and any post-effective amendment thereto that becomes effective; (ii) the term "**Rights Offering Prospectus**" means the final prospectus contained in the Rights Offering Registration Statement at the Securities Act Effective Date (including information, if any, omitted pursuant to Rule 430A and subsequently provided pursuant to Rule 424(b) under the Securities Act ), and any amended form of such prospectus provided under Rule 424(b) under the Securities Act or contained in a post-effective amendment to the Rights Offering Registration Statement; (iii) the term "**Investment Decision Package**" means the Rights Offering Prospectus, together with any Issuer Free Writing Prospectus used by the Company to offer the Shares to Eligible Holders pursuant to the Rights Offering, (iv) the term "**Issuer Free Writing Prospectus**" means each "issuer free writing prospectus" (as defined in Rule 433 of the rules promulgated under the Securities Act) prepared by or on behalf of the Company or used or referred to by the Company in connection with the Rights Offering, (v) the term "**Preliminary Rights Offering Prospectus**" means each prospectus included in the Rights Offering Registration Statement (and any amendments thereto) before it becomes effective, any prospectus filed with the Commission pursuant to Rule 424(a) under the Securities Act and the prospectus included in the Rights Offering Registration Statement, at the time of effectiveness that omits information permitted to be excluded under Rule 430A under the Securities Act; and (vi) "**Securities Act Effective Date**" means the date and time as of which the Rights Offering Registration Statement, or the most recent post-effective amendment thereto, was declared effective by the Commission which shall not be requested by the Company before the Confirmation Order is issued without the prior consent of ADAH.

(l)     <u>Free Writing Prospectuses</u>.  Each Issuer Free Writing Prospectus will conform in all material respects to the requirements of the Securities Act as of the date of first use or as otherwise provided for in Rule 433 under the Securities Act, and the Company will comply with all prospectus delivery and all filing requirements applicable to such Issuer Free Writing Prospectus under the Securities Act.  The Company has retained in accordance with the Securities Act all Issuer Free Writing Prospectuses that were not required to be filed pursuant to the Securities Act.

(m)    <u>Absence of Certain Changes</u>.  Since December 31, 2006, other than as disclosed in the Company SEC Documents filed prior to the date hereof, and except for actions to be taken pursuant to the Transaction Agreements and the Plan:

    (i)    there has not been any change in the capital stock from that set forth in <u>Section 3(d)</u> or any material change in long-term debt of the Company or any of its Subsidiaries, or any dividend or distribution of any kind declared, set aside for payment, paid or made by the Company on any class of capital stock;

    (ii)    no event, fact or circumstance has occurred which has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

    (iii)    neither the Company nor any of its Subsidiaries has made any changes with respect to accounting policies or procedures, except as required by law or changes in GAAP;

    (iv)    neither the Company nor any of its Subsidiaries has paid, discharged, waived, compromised, settled or otherwise satisfied any material Legal Proceeding, whether now pending or hereafter brought, (A) at a cost materially in excess of the amount accrued or reserved for it in the Company SEC Documents filed prior to the date hereof, (B) pursuant to terms that impose material adverse restrictions on the business of the Company and its Subsidiaries as currently conducted or (C) on a basis that reveals a finding or an admission of a material violation of law by the Company or its Subsidiaries;

    (v)    other than in the ordinary course of business, neither the Company nor any of its Subsidiaries has (A) made, changed or revoked any material Tax election, (B) entered into any settlement or compromise of any material Tax liability, (C) filed any amended Tax Return with respect to any material Tax, (D) changed any annual Tax accounting period, (E) entered into any closing agreement relating to any material Tax, (F) knowingly failed to claim a material Tax refund for which it is entitled, or (G) made material changes to their Tax accounting methods or principles;

    (vi)    there has not been (A) any increase in the base compensation payable or to become payable to the officers or employees of the Company or any of its Subsidiaries with annual base compensation in excess of $500,000 (except for compensation increases in the ordinary course of business and consistent with past practice) or (B) except in the ordinary course of

business and consistent with past practice, any establishment, adoption, entry into or material amendment of any collective bargaining, bonus, profit sharing, thrift, compensation, employment, termination, severance or other plan, agreement, trust, fund, policy or arrangement for the benefit of any director, or for the benefit of a group of employees or for any individual officer or employee with annual base compensation in excess of $500,000, in each case;

(vii)    except in a manner consistent with (i) the Company's transformation plan previously disclosed in the Company SEC Documents prior to the date hereof (the "**Transformation Plan**") and (ii) (A) prior to the satisfaction of the condition with respect to the Business Plan in accordance with Section 9(a)(xxviii) of this Agreement, that certain draft business plan delivered to the Investors dated February 28, 2007, as amended by the revisions thereto delivered to the Investors dated April 5, 2007 (collectively the "**Draft Business Plan**") or (B) after the satisfaction of the condition with respect to the Business Plan in accordance with Section 9(a)(xxviii) of this Agreement, the Business Plan approved by ADAH in accordance with this Agreement neither the Company nor any of its Subsidiaries have sold, transferred, leased, licensed or otherwise disposed of any assets or properties material to the Company and its Subsidiaries, taken as a whole, except for (A) sales of inventory in the ordinary course of business consistent with past practice and (B) leases or licenses entered into in the ordinary course of business consistent with past practice; and

(viii)    except in a manner consistent with (i) the Transformation Plan and (ii) (A) prior to the satisfaction of the condition with respect to the Business Plan in accordance with Section 9(a)(xxviii) of this Agreement, the Draft Business Plan or (B) after the satisfaction of the condition with respect to the Business Plan in accordance with this Section 9(a)(xxviii) of Agreement, the Business Plan approved by ADAH in accordance with this Agreement, neither the Company nor any of its Subsidiaries have acquired any business or entity material to the Company and its Subsidiaries, taken as a whole, by merger or consolidation, purchase of assets or equity interests, or by any other manner, in a single transaction or a series of related transactions, or entered into any contract, letter of intent or similar arrangement (whether or not enforceable) with respect to the foregoing.

(n)    <u>Descriptions of the Transaction Agreement</u>.  The statements in the Rights Offering Registration Statement and the Rights Offering Prospectus insofar as they purport to constitute summaries of each of the Transaction Agreements, the Plan, the Original Approval Order or the Approval Order and the Confirmation Order, or the terms of statutes, rules or regulations, legal or governmental

proceedings or contracts, will constitute accurate summaries in all material respects.

(o)     <u>No Violation or Default; Compliance with Laws</u>.  Neither the Company nor any of its Significant Subsidiaries is in violation of its charter or by-laws or similar organizational documents.  Neither the Company nor any of its Subsidiaries is, except as a result of the Chapter 11 Cases, in default, and no event has occurred that, with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound or to which any of the property or assets of the Company or any of its Subsidiaries is subject, except for any such default that has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Neither the Company nor any of its Subsidiaries is, or has been at any time since January 1, 2002, in violation of any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority, except for any such violation that has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(p)     <u>Legal Proceedings</u>.  Except as described in the Company SEC Documents filed prior to the date hereof, there are no legal, governmental or regulatory actions, suits, proceedings or, to the knowledge of the Company, investigations pending to which the Company or any of its Subsidiaries is or may be a party or to which any property of the Company or any of its Subsidiaries is or may be the subject that, individually or in the aggregate, has had or, if determined adversely to the Company or any of its Subsidiaries, would reasonably be expected to have a Material Adverse Effect, and no such actions, suits or proceedings or, to the knowledge of the Company, investigations are pending, threatened or contemplated, by any governmental or regulatory authority or by others.  There are no current or pending legal, governmental or regulatory actions, suits or proceedings that are required under the Exchange Act to be described in the Company SEC Documents or the Rights Offering Registration Statement or Rights Offering Prospectus that are not or will not be so described, and there are no statutes, regulations or contracts or other documents that are required under the Exchange Act to be filed as exhibits to the Company SEC Documents or the Rights Offering Registration Statement or Rights Offering Prospectus or described in the Company SEC Documents or the Rights Offering Registration Statement or Rights Offering Prospectus that are not so filed or described.

(q)     <u>Independent Accountants</u>.  Ernst & Young LLP ("<u>E&Y</u>"), the Company's public accountants, are independent public accountants with respect to the Company and its Subsidiaries as required by the Securities Act.

(r)     Labor Relations.  Except as set forth in the Company SEC Documents filed prior
to the date hereof:

(i)     neither the Company nor any of its Subsidiaries is a party to, or bound by,
any material collective bargaining agreement, contract or other agreement
or understanding with a labor union or labor organization (other than
contracts or other agreements or understandings with labor unions or labor
organizations in connection with products and services offered and sold to
such unions and organizations by the Company or its Subsidiaries);

(ii)    neither the Company nor any of its Subsidiaries is the subject of any
proceeding asserting that it or any Subsidiary has committed an unfair
labor practice or sex, age, race or other discrimination or seeking to
compel it to bargain with any labor organization as to wages or conditions
of employment, which, individually or in the aggregate, has had or would
reasonably be expected to have a Material Adverse Effect;

(iii)   there are no material current or, to the knowledge of the Company,
threatened organizational activities or demands for recognition by a labor
organization seeking to represent employees of the Company or any
Subsidiary and no such activities have occurred during the past 24 months;

(iv)    no grievance, arbitration, litigation or complaint or, to the knowledge of
the Company, investigations relating to labor or employment matters is
pending or, to the knowledge of the Company, threatened against the
Company or any of its Subsidiaries which, except as has not had, and
would not reasonably be expected to have, individually or in the aggregate,
a Material Adverse Effect;

(v)     the Company and each of its Subsidiaries has complied and is in
compliance in all respects with all applicable laws (domestic and foreign),
agreements, contracts, and policies relating to employment, employment
practices, wages, hours, and terms and conditions of employment and is
not engaged in any material unfair labor practice as determined by the
National Labor Relations Board (or any foreign equivalent) except where
the failure to comply has not had or would not reasonably be expected to
have, individually or in the aggregate, a Material Adverse Effect;

(vi)    the Company has complied in all respects with its payment obligations to
all employees of the Company and its Subsidiaries in respect of all wages,
salaries, commissions, bonuses, benefits and other compensation due and
payable to such employees under any Company policy, practice,

agreement, plan, program or any statute or other law, except to the extent that any noncompliance, either individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect; and

(vii)   the Company has complied and is in compliance in all material respects with its obligations pursuant to the Worker Adjustment and Retraining Notification Act of 1988 (and any similar state or local law) to the extent applicable, and all material other employee notification and bargaining obligations arising under any collective bargaining agreement or statute.

(s)   <u>Title to Intellectual Property</u>.  The Company and its Subsidiaries own or possess valid and enforceable rights to use all material patents, patent applications, trademarks, service marks, trade names, trademark registrations, service mark registrations, copyrights, licenses and know-how (including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures) (collectively, "**Intellectual Property**") used in the conduct of their respective businesses other than Intellectual Property, the failure to own or possess which has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  All registrations with and applications to governmental or regulatory authorities in respect of such Intellectual Property are valid and in full force and effect, have not, except in accordance with the ordinary course practices of the Company and its Subsidiaries, lapsed, expired or been abandoned (subject to the vulnerability of a registration for trademarks to cancellation for lack of use), are not the subject of any opposition filed with the United States Patent and Trademark Office or any other applicable Intellectual Property registry.  The consummation of the transaction contemplated hereby and by the Plan will not result in the loss or impairment of any rights to use such Intellectual Property or obligate any of the Investors to pay any royalties or other amounts to any third party in excess of the amounts that would have been payable by Company and its Subsidiaries absent the consummation of this transactions.  The Company and its Subsidiaries have taken reasonable security measures to protect the confidentiality and value of its and their trade secrets (or other Intellectual Property for which the value is dependent upon its confidentiality), and no such information, has been misappropriated or the subject of an unauthorized disclosure, except to the extent that such misappropriation or unauthorized disclosure has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  The Company and its Subsidiaries have not received any notice that it is or they are, in default (or with the giving of notice or lapse of time or both, would be in default) under any contract relating to such Intellectual Property.  No Intellectual Property rights of the Company or its Subsidiaries are being infringed by any other person, except to the extent that such infringement has not had and would not have, individually or in the aggregate, a Material Adverse Effect.  The conduct of the businesses of the Company and its Subsidiaries will

not conflict in any respect with any Intellectual Property rights of others, and the Company and its Subsidiaries have not received any notice of any claim of infringement or conflict with any such rights of others which has had or would in any such case be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(t)     Title to Real and Personal Property.  The Company and its Subsidiaries have good and marketable title to all real property owned by the Company and its Subsidiaries and good title to all other tangible and intangible properties (other than Intellectual Property covered by Section 3(s)) owned by them, in each case, free and clear of all mortgages, pledges, liens, security interests, claims, restrictions or encumbrances of any kind except such as (i) are described in the consolidated balance sheets included in the Company SEC Documents filed prior to the date hereof or (ii) individually and in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect.  All of the leases and subleases to which the Company or its Subsidiaries are a party are in full force and effect and enforceable by the Company or such Subsidiary in accordance with their terms, and neither the Company nor any Subsidiary has received any notice of any claim of any sort that has been asserted by anyone adverse to the rights of the Company or any Subsidiary under any of the leases or subleases mentioned above, or affecting or questioning the rights of the Company or such Subsidiary to the continued possession of the leased or subleased property by under any such lease or sublease, except where any such claim or failure to be enforceable would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(u)     No Undisclosed Relationships.  As of the date hereof, no relationship, direct or indirect, exists between or among the Company or any of its Subsidiaries, on the one hand, and the directors, officers, stockholders, customers or suppliers of the Company or any of its Subsidiaries, on the other, that is required by the Exchange Act to be described in the Company SEC Documents and that are not so described, except for the transactions pursuant to this Agreement.

(v)     Investment Company Act.  As of the date hereof, the Company is not and, after giving effect to the consummation of the Plan, including the offering and sale of the Investor Shares and Shares upon exercise of Rights, and the application of the proceeds thereof, will not be required to register as an "investment company" or an entity "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, and the rules and regulations of the Commission thereunder.

(w)     Licenses and Permits.  The Company and its Subsidiaries possess all licenses, certificates, permits and other authorizations issued by, and have made all declarations and filings with, the appropriate federal, state, local or foreign

governmental or regulatory authorities that are necessary for the ownership or lease of their respective properties or the conduct of their respective businesses as described in the Company SEC Documents except any such licenses, certificates, permits or authorization the absence of which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Except as described in the Company SEC Documents filed prior to the date hereof and except as, individually and in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect, neither the Company nor any of its Subsidiaries has received notice of any revocation or modification of any such license, certificate, permit or authorization or has any reason to believe that any such license, certificate, permit or authorization will not be renewed in the ordinary course.

(x)     <u>Compliance with Environmental Laws</u>.

    (i)     The Company and its Subsidiaries have complied and are in compliance with any and all applicable federal, state, local and foreign laws, rules, regulations, decisions and orders, including all civil and common law, relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants (collectively, "**<u>Environmental Laws</u>**");

    (ii)     the Company and its Subsidiaries have (a) received and are in compliance with all permits, licenses or other approvals required of them under applicable Environmental Laws to conduct their respective businesses, (b) are not subject to any action to revoke, terminate, cancel, limit, amend or appeal any such permits, licenses or approvals, and (c) have paid all fees, assessments or expenses due under any such permits, licenses or approvals;

    (iii)     the Company and its Subsidiaries have not received notice from any governmental authority of any actual or potential liability for the investigation or remediation of any disposal or release of hazardous or toxic substances or wastes, pollutants or contaminants, or for any violation of Environmental Laws;

    (iv)     there are no facts, circumstances or conditions relating to the past or present business or operations of the Company, its Subsidiaries or any of their predecessors (including the disposal of any hazardous or toxic substances or wastes, pollutants or contaminants), or to any real property currently or formerly owned or operated by the Company, its Subsidiaries or any of their predecessors, that would reasonably be expected to give rise to any claim, proceeding or action, or to any liability, under any Environmental Law;

(v)     neither the Company nor any of its Subsidiaries has agreed to assume or accept responsibility for, by contract or otherwise, any liability of any other person under Environmental Laws;

(vi)    neither the Company nor any of its Subsidiaries is required or reasonably expected to incur material capital expenditures during the current and the subsequent five fiscal years to reach or maintain compliance with existing or reasonably anticipated Environmental Laws;

(vii)   none of the transactions contemplated under this Agreement will give rise to any obligations to obtain the consent of or provide notice to any governmental or regulatory authority under any Environmental Laws; and

(viii)  none of the Company, nor any of its subsidiaries nor their respective predecessors has manufactured, marketed, distributed, or sold asbestos or any products containing asbestos.

except, in the case of each of subclauses (i) through (vi) and in subclause (viii) above, as disclosed in the Company SEC Documents filed prior to the date hereof, as have been, as of the date of this Agreement, adequately provided for in accordance with GAAP in the financial statements of the Company included in the Company SEC Documents filed prior to the date hereof, or as, individually and in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect.

(y)     <u>Tax Matters</u>.  Except as described in the Company SEC Documents filed with the Commission prior to the date hereof:

(i)     The Company has timely filed or caused to be timely filed (taking into account any applicable extension of time within which to file) with the appropriate taxing authorities all material tax returns, statements, forms and reports (including elections, declarations, disclosures, schedules, estimates and information Tax Returns) for Taxes ("**Tax Returns**") that are required to be filed by, or with respect to, the Company and its Subsidiaries on or prior to the Closing Date.  The Tax Returns accurately reflect all material liability for Taxes of the Company and its Subsidiaries for the periods covered thereby;

(ii)    all material Taxes and Tax liabilities due by or with respect to the income, assets or operations of the Company and its Subsidiaries for all taxable years or other taxable periods that end on or before the Closing Date have been or will, prior to the Closing, be timely paid in full or accrued and

fully provided for in accordance with GAAP on the financial statements of
the Company included in the Company SEC Documents;

(iii)    neither the Company nor any of its Subsidiaries has received any written
notices from any taxing authority relating to any material issue that has not
been adequately provided for in accordance with GAAP in the financial
statements of the Company included in the Company SEC Documents
filed prior to the date hereof;

(iv)    all material Taxes which the Company and each or any of its Subsidiaries
is (or was) required by law to withhold or collect in connection with
amounts paid or owing to any employee, independent contractor, creditor,
stockholder or other third party have been duly withheld or collected, and
have been timely paid to the proper authorities to the extent due and
payable;

(v)    neither the Company nor any of its subsidiaries has been included in any
"consolidated," "unitary" or "combined" Tax Return provided for under
the law of the United States, any foreign jurisdiction or any state or
locality with respect to Taxes for any taxable period for which the statute
of limitations has not expired (other than a group of which the Company
and/or its subsidiaries are the only members);

(vi)    except for the tax sharing allocations and similar agreements entered into
with GM at the time of the spin-off, there are no tax sharing, allocation,
indemnification or similar agreements in effect as between the Company
or any of its Subsidiaries or any predecessor or affiliate thereof and any
other party (including any predecessors or affiliates thereof) under which
the Company or any of its Subsidiaries would be liable for any material
Taxes or other claims of any party;

(vii)    the Company has not been a "United States real property holding
corporation" within the meaning of Section 897(c)(2) of the Code at any
time during the five-year period ending on the date hereof; and

(viii)    the Company is not a party to any agreement other than certain Change In
Control Agreements in the Company SEC Documents filed prior to the
date hereof that would require the Company or any affiliate thereof to
make any material payment that would constitute an "excess parachute
payment" for purposes of Sections 280G and 4999 of the Code.

For purposes of this Agreement, "**Taxes**" shall mean all taxes, assessments, charges, duties, fees, levies or other governmental charges, including, without limitation, all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, property, excise, severance, windfall profits, stamp, license, payroll, social security, withholding and other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest and shall include any liability for such amounts as a result either of being a member of a combined, consolidated, unitary or affiliated group or of a contractual obligation to indemnify any person or other entity.

(z)    Compliance With ERISA.

(i)    Correct and complete copies of the following documents, with respect to all material domestic and foreign benefit and compensation plans, programs, contracts, commitments, practices, policies and arrangements, whether written or oral, that have been established, maintained or contributed to (or with respect to which an obligation to contribute has been undertaken) or with respect to which any potential liability is borne by the Company or any of its Subsidiaries, including, but not limited to, "employee benefit plans" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), and deferred compensation, stock option, stock purchase, restricted stock, stock appreciation rights, stock based, incentive and bonus plans (the "**Company Plans**"), have been delivered or made available to the Investors by the Company, to the extent applicable: (i) all material Company Plan documents, together with all amendments and attachments thereto (including, in the case of any Company Plan not set forth in writing, a written description thereof); (ii) all material trust documents, declarations of trust and other documents establishing other funding arrangements, and all amendments thereto and the latest financial statements thereof; (iii) the most recent annual report on IRS Form 5500 for each of the past three years and all schedules thereto and the most recent actuarial report; (iv) the most recent IRS determination letter; (v) summary plan descriptions and summaries of material modifications; and (vi) the two most recently prepared actuarial valuation reports.

(ii)    Except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or except as described in the Company SEC Documents filed prior to the date hereof: (A) each Company Plan, other than any "multiemployer plans" within the meaning of Section 3(37) of ERISA ("**Multiemployer Plans**"), is in compliance with ERISA, the Internal Revenue Code of 1986, as amended

(the "**Code**") and other applicable laws; (B) each Company Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the IRS covering all Tax law changes prior to the Economic Growth and Tax Relief Reconciliation Act of 2001 or has applied to the IRS for such favorable determination within the applicable remedial amendment period under Section 401(b) of the Code, and the Company is not aware of any circumstances likely to result in the loss of the qualification of such Company Plan under Section 401(a) of the Code; (C) no liability under Subtitle C or D of Title IV of ERISA has been or is reasonably expected to be incurred by the Company or any of its Subsidiaries with respect to any ongoing, frozen or terminated "single-employer plan," within the meaning of Section 4001(a)(15) of ERISA ("**Single-Employer Plan**") currently maintained or contributed to (or with respect to which an obligation to contribute has been undertaken), or the Single-Employer Plan of any entity which is considered one employer with the Company under Section 4001 of ERISA or Section 414 of the Code (a "**Company ERISA Affiliate**"); (D) the Company and its Subsidiaries have not incurred any withdrawal liability (including any contingent or secondary withdrawal liability) with respect to a Multiemployer Plan under Subtitle E of Title IV of ERISA (regardless of whether based on contributions of a Company ERISA Affiliate) that has not been satisfied in full and no condition or circumstance has existed that presents a risk of the occurrence of any withdrawal from or the partition, termination, reorganization or insolvency of any such Multiemployer Plan; (E) no notice of a "reportable event," within the meaning of Section 4043 of ERISA has occurred or is expected to occur for any Company Plan or by any Company ERISA Affiliate; (F) all contributions required to be made under the terms of any Company Plan have been timely made or have been reflected in the financial statements of the Company included in the Company SEC Reports filed prior to the date hereof; and (G) there has been no amendment to, announcement by the Company or any of its Subsidiaries relating to, or change in employee participation or coverage under, any Company Plan which would increase the expense of maintaining such plan above the level of the expense incurred therefor for the most recent fiscal year.

(iii)    Except as disclosed in the Company SEC Documents filed prior to the date hereof: (A) neither any Company Plan nor any Single-Employer Plan of a Company ERISA Affiliate has an "accumulated funding deficiency" (whether or not waived) within the meaning of Section 412 of the Code or Section 302 of ERISA and neither the Company nor any of its Subsidiaries nor any Company ERISA Affiliate has applied for or obtained a funding waiver; (B) the Company expects that required minimum contributions to any Company Plan under Section 412 of the Code will not be materially increased by application of Section 412(l) of the Code; (C) neither the Company nor any of its Subsidiaries has provided, or is required to

provide, security to any Company Plan or to any Single-Employer Plan of a Company ERISA Affiliate pursuant to Section 401(a)(29) of the Code; and (D) neither the execution of this Agreement, stockholder approval of this Agreement nor the consummation of the transactions contemplated hereby will limit or restrict the right of the Company to merge, amend or terminate any of the Company Plans.

(aa)   <u>Internal Control Over Financial Reporting</u>.  Except as set forth in the Company SEC Documents filed prior to the date hereof, the Company and its Subsidiaries (i) make and keep books and records that accurately and fairly represent the Company's transactions, and (ii) maintain and have maintained effective internal control over financial reporting as defined in Rule 13a-15 under the Exchange Act and a system of internal accounting controls sufficient to provide reasonable assurance that: (A) transactions are executed in accordance with management's general or specific authorizations; (B) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset accountability; (C) access to assets is permitted only in accordance with management's general or specific authorization; and (D) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.  The Company has disclosed, based on the most recent evaluation of its chief executive officer and its chief financial officer prior to the date hereof, to the Company's auditors and the audit committee of the Company's board of directors (i) any significant deficiencies in the design or operation of its internal controls over financial reporting that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information and has identified for the Company's auditors and the audit committee of the Company's board of directors any material weaknesses in internal control over financial reporting and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

(bb)   <u>Disclosure Controls and Procedures</u>.  Except as disclosed in the Company SEC Documents filed prior to the date hereof, the Company maintains disclosure controls and procedures required by Rule 13a-15 or 15d-15 under the Exchange Act.  Such disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company is recorded and reported on a timely basis to the individuals responsible for the preparation of the Company's filings with the Commission and other public disclosure documents.

(cc)   <u>Insurance</u>.  The Company and its Subsidiaries have insurance covering their respective properties, operations, personnel and businesses, including business interruption insurance, which insurance is in amounts and insures against such losses and risks as are customary for companies whose businesses are similar to

the Company and its Subsidiaries. Neither the Company nor any of its Subsidiaries has (i) received written notice from any insurer or agent of such insurer that capital improvements or other expenditures are required or necessary to be made to continue such insurance or (ii) any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage at reasonable cost from similar insurers as may be necessary to continue its business.

(dd)     No Unlawful Payments. Neither the Company nor any of its Subsidiaries nor, to the knowledge of the Company, any director, officer, agent, employee or other person associated with or acting on behalf of the Company or any of its Subsidiaries has: (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977; or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment in each case other than clause (iii) that has been or would reasonably be expected to be, individually or in the aggregate, material to the Company and its Subsidiaries, taken as a whole.

(ee)     Compliance with Money Laundering Laws. The Company and its Subsidiaries are and have been conducted at all times in compliance with applicable financial recordkeeping and reporting requirements of the Bank Secrecy Act, as amended, the money laundering statutes of all jurisdictions, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "**Money Laundering Laws**") and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its Subsidiaries with respect to Money Laundering Laws is pending or, to the knowledge of the Company, threatened.

(ff)     Compliance with Sanctions Laws. Neither the Company nor any of its Subsidiaries nor, to the knowledge of the Company, any director, officer, agent, employee or affiliate of the Company or any of its Subsidiaries is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**"). The Company will not directly or indirectly use the proceeds of the Rights Offering or the sale of the Investor Shares, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other person or entity, for the purpose of financing the activities of any person that, to the Company's knowledge, is currently subject to any U.S. sanctions administered by OFAC.

(gg)    <u>No Restrictions on Subsidiaries</u>. Except as described in the Company SEC Documents filed prior to the date hereof or otherwise set forth in the record of the Chapter 11 Cases on or prior to the date hereof, and subject to the Bankruptcy Code, no Subsidiary of the Company is currently prohibited, directly or indirectly, under any agreement or other instrument to which it is a party or is subject, from paying any dividends to the Company, from making any other distribution on such Subsidiary's capital stock, from repaying to the Company any loans or advances to such Subsidiary from the Company or from transferring any of such Subsidiary's properties or assets to the Company or any other Subsidiary of the Company.

(hh)    <u>No Broker's Fees</u>. Neither the Company nor any of its Subsidiaries is a party to any contract, agreement or understanding with any person (other than this Agreement) that would give rise to a valid claim against the Investors for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Investor Shares.

(ii)    <u>No Registration Rights</u>. Except as provided for pursuant to the registration rights agreement contemplated by <u>Section 8(c)(iv)</u>, no person has the right to require the Company or any of its Subsidiaries to register any securities for sale under the Securities Act by reason of the filing of the Rights Offering Registration Statement with the Commission or in connection with Rights Offering or the sale of the Investor Shares.

(jj)    <u>No Stabilization</u>. The Company has not taken and will not take, directly or indirectly, any action designed to or that would reasonably be expected to cause or result in any stabilization or manipulation of the price of the Shares.

(kk)    <u>Margin Rules</u>. Neither the issuance, sale and delivery of the Rights or the Shares in connection with Rights Offering or the sale of the Investor Shares nor the application of the proceeds thereof by the Company as described and to be described in the Rights Offering Registration Statement and the Rights Offering Prospectus will violate Regulation T, U or X of the Board of Governors of the Federal Reserve System or any other regulation of such Board of Governors.

(ll)    <u>Forward-Looking Statements</u>. No forward-looking statement (within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act) contained in the Company SEC Documents has been made or reaffirmed, and in the case of the Rights Offering Registration Statement and the Rights Offering Prospectus, will be made or reaffirmed, without a reasonable basis or has been disclosed other than in good faith.

(mm) <u>Statistical and Market Data</u>. Nothing has come to the attention of the Company that has caused the Company to believe that the statistical and market-related data included and to be included in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus is not based on or derived from sources that are reliable and accurate in all material respects.

(nn) <u>Rights Agreement</u>. The Company and the Board of Directors of the Company has taken all necessary action to render the Existing Shareholder Rights Plan inapplicable to the sale and issuance of the Investor Shares and the other transactions contemplated by the Original Agreement, this Agreement, the Original PSA, the Plan Terms, the Plan and the Transaction Agreements (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser).

(oo) <u>Takeover Statutes; Charter</u>. The Company and the Board of Directors of the Company has taken all such action necessary to render the restrictions contained in Section 203 of the General Corporation Law of the State of Delaware (the "**DGCL**") and Article IX of the Company's Certificate of Incorporation inapplicable to the Investors and the sale and issuance of the Investor Shares and the other transactions contemplated by the Original Agreement, this Agreement, the Original PSA, the Plan Terms, the Plan and the Transaction Agreements (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser). Except for Section 203 of the DGCL (which has been rendered inapplicable), no other "fair price," "moratorium," "control share acquisition", "business combination" or other similar anti-takeover statute or regulation (a "**Takeover Statute**") is applicable to the Company, the Common Stock, the Shares, the sale and issuance of the Investor Shares or the other transactions contemplated by the Original Agreement, this Agreement, the Original PSA, the Plan Terms, the Plan and the Transaction Agreements. Other than Article IX of the Company's Certificate of Incorporation, which has been rendered inapplicable, no anti-takeover provision in the Company's certificate of incorporation or by-laws is applicable to the Company, the Common Stock, the Shares, the sale and issuance of the Investor Shares or the other transactions contemplated by the Preferred Term Sheet, the Plan or the Transaction Agreements.

(pp) <u>UAW MOU</u>. On June 22, 2007, the Company entered into a Memorandum of Understanding (the "**UAW MOU**") with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("**UAW**") and GM. The UAW MOU has been ratified by the membership of the UAW and a true and complete copy thereof has been made available to ADAH.

4.    <u>Representations and Warranties of the Investors</u>. Each Investor represents and warrants as to itself only, and agrees with the Company, severally and not jointly, as set forth

below. Each such representation, warranty and agreement is made as of the date hereof and as of the Closing Date.

(a)     <u>Incorporation</u>. The Investor has been duly organized and, if applicable, is validly existing as a corporation, limited partnership or limited liability company, in good standing under the laws of the jurisdiction of its incorporation or organization.

(b)     <u>Corporate Power and Authority</u>. The Investor has the requisite corporate, limited partnership or limited liability company power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary corporate, limited partnership or limited liability company action required for the due authorization, execution, delivery and performance by it of this Agreement.

(c)     <u>Execution and Delivery</u>. This Agreement has been duly and validly executed and delivered by the Investor and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d)     <u>No Registration</u>. The Investor understands that the Investor Shares have not been registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of such Investor's representations as expressed herein or otherwise made pursuant hereto.

(e)     <u>Investment Intent</u>. The Investor is acquiring the Investor Shares for investment for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof not in compliance with applicable securities laws, and such Investor has no present intention of selling, granting any participation in, or otherwise distributing the same, except in compliance with applicable securities laws.

(f)     <u>Securities Laws Compliance</u>. The Investor Shares will not be offered for sale, sold or otherwise transferred by the Investor except pursuant to a registration statement or in a transaction exempt from, or not subject to, registration under the Securities Act and any applicable state securities laws and any sale or placement of Investor Shares pursuant to <u>Sections 2(a)</u>, <u>2(b)</u> or <u>2(k)</u> will not affect the validity of the private placement to the Investors under this Agreement or result in the private placement being integrated with the Rights Offering. The Investors have not and will not solicit offers for, or offer to sell, the Investor Shares by means of any general solicitation or general advertising within the meaning of Rule 502(c) under Regulation D under the Securities Act or in any manner

involving a public offering within the meaning of the Securities Act (other than pursuant to the Resale Registration Statement).

(g)    <u>Sophistication</u>. The Investor has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment in the Investor Shares being acquired hereunder. The Investor is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act. The Investor understands and is able to bear any economic risks associated with such investment (including, without limitation, the necessity of holding the Investor Shares for an indefinite period of time).

(h)    <u>No Conflict</u>. The execution and delivery by the Investor of each of the Transaction Agreements to which it is a party and the compliance by the Investor with all of the provisions hereof and thereof and the Preferred Term Sheet and the Plan Terms and the consummation of the transactions contemplated herein and therein (i) will not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, in the acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Investor is a party or by which the Investor is bound or to which any of the property or assets of the Investor or any of its Subsidiaries is subject, (ii) will not result in any violation of the provisions of the certificate of incorporation or bylaws or similar governance documents of the Investor, and (iii) will not result in any material violation of, or any termination or material impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Investor or any of their properties, except in any such case described in subclause (i) for any conflict, breach, violation, default, acceleration or lien which has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(i)    <u>Consents and Approvals</u>. No consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Investor or any of its properties is required to be obtained or made by the Investor for the purchase of the Investor Shares hereunder and the execution and delivery by the Investor of this Agreement or the Transaction Agreements to which it is a party and performance of and compliance by the Investor with all of the provisions hereof and thereof and the Preferred Term Sheet and the Plan Terms and the consummation of the transactions contemplated herein and therein, except filings with respect to and the expiration or termination of the waiting period under the HSR Act or any comparable laws or regulations in any foreign jurisdiction relating to the purchase of Investor Shares and except for

any consent, approval, authorization, order, registration or qualification which, if not made or obtained, has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(j)    <u>Arm's Length</u>.  The Investor acknowledges and agrees that the Company is acting solely in the capacity of an arm's length contractual counterparty to the Investor with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering).  Additionally, the Investor is not relying on the Company for any legal, tax, investment, accounting or regulatory advice, except as specifically set forth in this Agreement.  The Investor shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby.

(k)    <u>No Violation or Default; Compliance with Laws</u>.  The Investor is not in default, and no event has occurred that, with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Investor is a party or by which the Investor is bound or to which any of the property or assets of the Investor is subject, individually or in the aggregate, that would prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.  The Investor is not and has not been at any time since January 1, 2002, in violation of any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority, except for any such violation that has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(l)    <u>Legal Proceedings</u>.  There are no actions, suits or proceedings to which the Investor is a party or to which any property of the Investor is the subject that, individually or in the aggregate, has or, if determined adversely to the Investor, would reasonably be expected to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement and no such actions, suits or proceedings are threatened or, to the knowledge of the Investor, contemplated and, to the knowledge of the Investor, no investigations are threatened by any governmental or regulatory authority or threatened by others that has or would reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(m)     <u>No Broker's Fees</u>. The Investor is not a party to any contract, agreement or understanding with any person (other than this Agreement) that would give rise to a valid claim against the Company, other than pursuant to <u>Section 2(j)</u>, for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Investor Shares.

(n)     <u>No Undisclosed Written Agreements</u>. Other than the (i) Additional Investor Agreement; (ii) Agreement Among Initial Investors, by and among ADAH, Harbinger, UBS and Merrill; and (iii) that certain Letter Agreement, by and among ADAH, Harbinger, UBS, Merrill, Pardus and GS (substantially in the form delivered to the Company on July 17, 2007), the Investor has not entered into any material written agreements between or among the Investors directly relating to such Investor's Investor Shares or the performance of the Transaction Agreements, and any such written agreement hereafter entered into will be disclosed promptly to the Company.

(o)     <u>Available Funds</u>. To the extent the Investor is ADAH, Harbinger or Pardus, the Investor has provided the Company with a true and complete copy of an executed commitment letter from the parties signatory thereto to provide equity financing to such Investor (the "**Equity Commitment Letter**"). Each such Investor represents as to itself that its Equity Commitment Letter is in full force and effect and is a valid and binding obligation of the parties thereto enforceable in accordance with its terms except as the enforcement thereof is subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors rights and to general equitable principles. The Equity Commitment Letters are not subject to any condition or contingency with respect to financing that is not set forth in such letter other than the terms and conditions of this Agreement.

5.     <u>Additional Covenants of the Company</u>. The Company agrees with each of the Investors as set forth below.

(a)     <u>Approval Motion and Approval Order</u>. The Company agrees that it shall use reasonable best efforts to cause the Approval Order to become a Final Approval Order as soon as practicable following the filing of the Approval Motion.

(b)     <u>Plan and Disclosure Statement</u>. The Company shall authorize, execute, file with the Bankruptcy Court and seek confirmation of, a Plan (and a related disclosure statement (the "**Disclosure Statement**")) (i) the terms of which are consistent with this Agreement, the Preferred Term Sheet, the Plan Terms and the GM Settlement, (ii) that provides for the release and exculpation of each Investor, its Affiliates, shareholders, partners, directors, officers, employees and advisors from liability for participation in the transactions contemplated by the Original Agreement, this Agreement, the Preferred Term Sheet, the Original PSA, the Plan

Terms and the Plan to the fullest extent permitted under applicable law (provided, that such release and exculpation shall not prohibit or impede the Company's ability to assert defenses or counterclaims in connection with or relating to the Original Agreement or the Original PSA) and (iii) that has conditions to confirmation and the Effective Date of the Plan (and to what extent any such conditions can be waived and by whom) that are consistent with this Agreement, the Preferred Term Sheet, the Plan Terms and the GM Settlement. The Company will (i) provide to ADAH and its counsel a copy of the Plan and the Disclosure Statement, and any amendments thereto, and a reasonable opportunity to review and comment on such documents prior to such documents being filed with the Bankruptcy Court, and (ii) duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the Plan Terms, and any other reasonable comments of ADAH and its counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH or its counsel and giving due consideration to the views of ADAH and its counsel. In addition, the Company will (i) provide to ADAH and its counsel a copy of the Confirmation Order and a reasonable opportunity to review and comment on such order prior to such order being filed with the Bankruptcy Court and (ii) duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the Plan Terms and any other reasonable comments of each of ADAH and its counsel, into such Confirmation Order, and shall not reject such comments without first discussing the reasons therefor with ADAH or its counsel and giving due consideration to the views of ADAH and its counsel. As soon as practicable following the entry of an order by the Bankruptcy Court approving the Disclosure Statement (the "**Disclosure Statement Approval Date**") and the effectiveness under the Securities Act of the Rights Offering Registration Statement, the Company shall distribute ballot form(s) in connection with the solicitation of acceptance of the Plan.

(c)     <u>Rights Offering</u>. The Company shall use its reasonable best efforts to effectuate the Rights Offering as provided herein.

(d)     <u>Securities Laws; Rights Offering Registration Statement</u>. The Company shall take all action as may be necessary or advisable so that the Rights Offering and the issuance and sale of the Investor Shares and the other transactions contemplated by this Agreement will be effected in accordance with the Securities Act and the Exchange Act and any state or foreign securities or Blue Sky laws. The Rights Offering Registration Statement was filed with the Commission on March 7, 2007. As promptly as practicable following the date the GM Settlement is agreed, the Company shall file an amended Rights Offering Registration Statement with the Commission. The Company shall: (i) provide ADAH with a reasonable opportunity to review the Rights Offering Registration Statement, and any amendment or supplement thereto, before any filing with the Commission and shall duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the Plan Terms, and any other reasonable comments

of ADAH and its counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH or its counsel and giving due consideration to the views of ADAH and its counsel; (ii) advise ADAH, promptly after it receives notice thereof, of the time when the Rights Offering Registration Statement has been filed or has become effective or any Rights Offering Prospectus or Rights Offering Prospectus supplement has been filed and shall furnish ADAH with copies thereof; (iii) advise ADAH promptly after it receives notice of any comments or inquiries by the Commission (and furnish the Investors with copies of any correspondence related thereto), of the issuance by the Commission of any stop order or of any order preventing or suspending the use of the Rights Offering Prospectus or Issuer Free Writing Prospectus, of the initiation or threatening of any proceeding for any such purpose, or of any request by the Commission for the amending or supplementing of the Rights Offering Registration Statement or a Rights Offering Prospectus or for additional information, and in each such case, provide ADAH with a reasonable opportunity to review any such comments, inquiries, request or other communication from the Commission and to review any amendment or supplement to the Rights Offering Registration Statement or the Rights Offering Prospectus before any filing with the Commission, and to duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the Plan Terms, and any other reasonable comments of ADAH and its counsel, and not reject such comments without first discussing the reasons therefor with ADAH or its counsel and giving due consideration to the views of ADAH and its counsel; and (iv) in the event of the issuance of any stop order or of any order preventing or suspending the use of a Rights Offering Prospectus or any Issuer Free Writing Prospectus or suspending any such qualification, use promptly its reasonable best efforts to obtain its withdrawal.

(e)     Listing.  The Company shall use its commercially reasonable efforts to list and maintain the listing of the New Common Stock on the New York Stock Exchange or, if approved by ADAH, the Nasdaq Global Select Market.

(f)     Rule 158.  The Company will generally make available to the Company's security holders as soon as practicable an earnings statement of the Company covering a twelve-month period beginning after the date of this Agreement, which shall satisfy the provisions of Section 11(a) of the Securities Act.

(g)     Notification.  The Company shall notify, or cause the Subscription Agent to notify the Investors, on each Friday during the Rights Exercise Period and on each Business Day during the five Business Days prior to the Expiration Time (and any extensions thereto), or more frequently if reasonably requested by any of the Investors, of the aggregate number of Rights known by the Company or the Subscription Agent to have been exercised pursuant to the Rights Offering as of

the close of business on the preceding Business Day or the most recent practicable time before such request, as the case may be.

(h)    <u>Unsubscribed Shares</u>.  The Company shall determine the number of Unsubscribed Shares, if any, in good faith, shall provide a Purchase Notice or a Satisfaction Notice that accurately reflects the number of Unsubscribed Shares as so determined and shall provide to ADAH a certification by the Subscription Agent of the Unsubscribed Shares or, if such certification is not available, such written backup to the determination of the Unsubscribed Shares as ADAH may reasonably request.

(i)    <u>HSR</u>.  The Company shall use its reasonable best efforts to promptly prepare and file all necessary documentation and to effect all applications and seek all approvals or consents that are necessary or advisable under the HSR Act and any comparable laws or regulations in any foreign jurisdiction so that any applicable waiting period shall have expired or been terminated thereunder with respect to the purchase of Investor Shares hereunder, and shall not take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the transactions contemplated by this Agreement.  The Company shall file, to the extent that it is required to file, the Notification and Report Form required under the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission no later than the fifteenth day following the Disclosure Statement Approval Date.

(j)    <u>Clear Market</u>.  For a period of 180 days after the Closing Date (the "**Restricted Period**"), the Company will not (i) offer, pledge, announce the intention to sell, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase or otherwise transfer or dispose of, directly or indirectly, any shares of capital stock of the Company or any securities convertible into or exercisable or exchangeable for capital stock of the Company or (ii) enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of the capital stock of the Company, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of capital stock of the Company or such other securities, in cash or otherwise, without the prior written consent of ADAH, except for (A) Rights and New Common Stock issuable upon exercise of Rights, (B) shares of New Common Stock issued upon the exercise of any stock options outstanding as of the Effective Date and (C) the issuance of New Common Stock and other equity interests as set forth in the Preferred Term Sheet, the Plan Terms and pursuant to the Plan.  Notwithstanding the foregoing, if (i) during the last 17 days of the Restricted Period, the Company issues an earnings release or material news or a material event relating to the Company occurs or (ii)

prior to the expiration of the Restricted Period, the Company announces that it will release earnings results during the 16-day period beginning on the last day of the Restricted Period, the restrictions imposed by this Agreement shall continue to apply until the expiration of the 18-day period beginning on the issuance of the earnings release or the occurrence of the material news or material event.

(k)     Use of Proceeds.  The Company will apply the net proceeds from the sale of the Rights and the Investor Shares as provided in the Rights Offering Prospectus.

(l)     No Stabilization.  The Company will not take, directly or indirectly, any action designed to or that would reasonably be expected to cause or result in any stabilization or manipulation of the price of the Shares.

(m)     Reports.  So long as any Investor holds Shares, the Company will furnish to such Investor, as soon as they are available, copies of all reports or other communications (financial or other) furnished to holders of the Rights or the Shares, as the case may be, and copies of any reports and financial statements furnished to or filed with the Commission or any national securities exchange or automatic quotation system.

(n)     Conduct of Business.  During the period from the date of this Agreement to the Closing Date (except as otherwise expressly provided by the terms of this Agreement (including the Disclosure Letter accepted by ADAH in accordance with Section 5(s) of this Agreement), the Plan Terms, the Plan or any other order of the Bankruptcy Court entered on or prior to the date hereof in the Chapter 11 Cases), the Company and its Subsidiaries shall carry on their businesses in the ordinary course (subject to any actions which are consistent with the Draft Business Plan or the Business Plan approved by ADAH in accordance with Section 9(a)(xxviii) of this Agreement) and, to the extent consistent therewith, use their commercially reasonable efforts to preserve intact their current business organizations, keep available the services of their current officers and employees and preserve their relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with the Company or its Subsidiaries.  Without limiting the generality of the foregoing, except as set forth in the Disclosure Letter approved by ADAH in accordance with Section 5(s) of this Agreement, the Company and its Subsidiaries shall carry on their businesses in all material respects in accordance with the Draft Business Plan (and, if amended in a manner that satisfies the condition with respect to amendments to the Draft Business Plan set forth in Section 9(a)(xxviii), as so amended) prior to the satisfaction of the condition with respect to the Business Plan in accordance with Section 9(a)(xxviii) of this Agreement and at all times after the satisfaction of the condition with respect to the Business Plan set forth in Section 9(a)(xxviii), the Business Plan (and, if amended in a manner that satisfies the condition with respect to the Business Plan set forth in Section 9(a)(xxviii), as so amended) and

shall not enter into any transaction that, at all times prior to the satisfaction of the condition with respect to the Business Plan set forth in Section 9(a)(xxviii), would be inconsistent with the Draft Business Plan (and, if amended in a manner that satisfies the condition with respect to amendments to the Draft Business Plan set forth in Section 9(a)(xxviii), as so amended) or at all times after the satisfaction of the condition with respect to the Business Plan set forth in Section 9(a)(xxviii), the Business Plan (and, if amended in a manner that satisfies the condition with respect to the Business Plan set forth in Section 9(a)(xxviii), as so amended) by ADAH in accordance with Section 9(a)(xxviii) of this Agreement and shall use its commercially reasonable efforts to effect such Draft Business Plan and the Business Plan.  Without limiting the generality of the foregoing, and except as otherwise expressly provided or permitted by this Agreement (including the Disclosure Letter accepted by ADAH in accordance with Section 5(s) of this Agreement), the Plan Terms, the Plan or any other order of the Bankruptcy Court entered as of the date of the Original Agreement in these Chapter 11 Cases, prior to the Closing Date, the Company shall not, and shall cause its Subsidiaries not to, take any of the following actions without the prior written consent of ADAH, which consent shall not be unreasonably withheld, conditioned or delayed:

(i)     (A) declare, set aside or pay any dividends on, or make any other distributions in respect of, any of its capital stock, (B) split, combine or reclassify any of its capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock or (C) purchase, redeem or otherwise acquire, except in connection with the Plan, any shares of capital stock of the Company or any other securities thereof or any rights, warrants or options to acquire any such shares or other securities;

(ii)    except for intercompany transactions and any financing activities which are consistent with the Company's existing financing, issue, deliver, grant, sell, pledge, dispose of or otherwise encumber any of its capital stock or any securities convertible into, or any rights, warrants or options to acquire, any such capital stock at less than fair market value;

(iii)   acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the stock, or other ownership interests in, or substantial portion of assets of, or by any other manner, any business or any corporation, partnership, association, joint venture, limited liability company or other entity or division thereof except in the ordinary course of business;

(iv)    sell, lease, mortgage, pledge, grant a lien, mortgage, pledge, security interest, charge, claim or other encumbrance of any kind or nature on or otherwise encumber or dispose of any of its properties or assets, except (A)

in the ordinary course of business consistent with past practice and (B) other transactions involving not in excess of $100 million in any 12 month period;

(v)    (A) incur any indebtedness for borrowed money or guarantee any such indebtedness of another individual or entity, issue or sell any debt securities or warrants or other rights to acquire any debt securities of the Company, guarantee any debt securities of another individual or entity, enter into any "keep well" or other agreement to maintain any financial statement condition of another person (other than a Subsidiary) or enter into any arrangement having the economic effect of any of the foregoing in excess of $100 million in any 12 month period, except for (x) working capital borrowings and increases in letters of credit necessary in the ordinary course of business under the Company's existing or any amended or replacement revolving credit facilities, and (y) indebtedness solely between the Company and its Subsidiaries or between such Subsidiaries or (B) except for transactions between the Company and any of its Subsidiaries or between such Subsidiaries, make any loans, advances or capital contributions to, or investments in, any other individual or entity, other than customary advances of business and travel expenses to employees of the Company in the ordinary course of business consistent with past practice;

(vi)    enter into any new, or amend or supplement any existing, collective bargaining agreement, which is inconsistent with the Transformation Plan or the Business Plan satisfying the condition with respect to the Business Plan set forth in Section 9(a)(xxviii) of this Agreement , this Agreement, the Plan Terms, the Plan and the GM Settlement; or

(vii)    authorize any of, or commit or agree to take any of, the foregoing actions.

(o)    Actions Regarding Conditions.  During the period from the date of this Agreement to the Closing Date, the Company shall not take any action or omit to take any action that would reasonably be expected to result in the conditions to the Agreement set forth in Section 9 not being satisfied.

(p)    GM Settlement.  The Company shall use its reasonable best efforts to agree on, prior to the date of filing by the Company with the Bankruptcy Court of a Disclosure Statement (the "**Disclosure Statement Filing Date**"), a settlement agreement (the "**GM Settlement**") between the Company and GM that is consistent with this Agreement, the Plan Terms, the Plan and the UAW MOU. The Company will (i) provide to ADAH and its counsel a copy of the GM Settlement and a reasonable opportunity to review and comment on such

documents prior to such documents being executed or delivered or filed with the Bankruptcy Court, and (ii) duly consider in good faith any comments of ADAH and its counsel consistent with this Agreement, the Preferred Term Sheet and the Plan Terms and any other reasonable comments of each of ADAH and its counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH or its counsel and giving due consideration to the views of ADAH and its counsel. The Company shall not enter into any other agreement with GM that (i) is materially inconsistent with this Agreement, the Plan Terms and the Plan, (ii) is outside the ordinary course of business or (iii) the terms of which would have a material impact on the Investors' proposed investment in the Company. The Company has not entered into any material written agreements between or among the Company or any of its Subsidiaries and GM or any of its Subsidiaries directly relating to the Plan or the GM Settlement or the performance of the Transaction Agreements, and any such written agreements hereafter entered into will be disclosed promptly to ADAH.

(q)    <u>Access to Information</u>. Subject to applicable law and existing confidentiality agreements between the parties, upon reasonable notice, the Company shall (and shall cause its Subsidiaries to) afford the Investors (and any prospective Ultimate Purchaser that executes a confidentiality agreement reasonably acceptable to the Company, which agreement will provide that, unless otherwise determined by the Company, all contact between such Ultimate Purchaser and the Company shall be through ADAH) and their directors, officers, employees, investment bankers, attorneys, accountants and other advisors or representatives, reasonable access, throughout the period prior to the Closing Date, to its employees, properties, books, contracts and records and, during such period, the Company shall (and shall cause its Subsidiaries to) furnish promptly to the Investors all information concerning its business, properties and personnel as may reasonably be requested by any Investor; <u>provided</u>, that the foregoing shall not require the Company (i) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company would cause the Company to violate any of its obligations with respect to confidentiality to a third party if the Company shall have used commercially reasonable efforts to obtain the consent of such third party to such inspection or disclosure, (ii) to disclose any privileged information of the Company or any of its Subsidiaries or (iii) to violate any laws; <u>provided</u>, <u>further</u>, that the Company shall deliver to the Investors a schedule setting in forth in reasonable detail a description of any information not provided to the Investors pursuant to subclauses (i) through (iii) above. All requests for information and access made pursuant to this <u>Section 5(q)</u> shall be directed to the Chief Restructuring Officer or such other person as may be designated by such person.

(r)    <u>Financial Information</u>. For each month, beginning June 2007 until the Closing Date, the Company shall provide to each Investor an unaudited consolidated balance sheet and related unaudited consolidated statements of operations, consolidated statements of stockholders' equity and consolidated statements of

cash flows for the month then ended within 30 days of the end of such month (the "**Monthly Financial Statements**"). The Monthly Financial Statements, except as indicated therein, shall be prepared in accordance with the Company's normal financial reporting practices. The Monthly Financial Statements shall fairly present in all material respects the financial position, results of operations and cash flows of the Company and its Subsidiaries as of the dates indicated and for the periods specified.

(s)   Business Plan and Disclosure Letter. The Company shall use its commercially reasonable efforts to provide to ADAH as soon as practicable a final five-year business plan approved by the Company's board of directors and prepared in good faith and based on reasonable assumptions, which business plan shall provide for the amount of EBITDA for each of fiscal years 2007 through 2011 (the "**Business Plan**"); provided, that (i) the Company shall not be required to deliver a Business Plan that does not reflect a final and binding GM Settlement and (ii) ADAH shall not be required to accept the Business Plan unless it is reasonably satisfied that such Business Plan does not amend or deviate from the Draft Business Plan in any manner that would have a material impact on the Investors' proposed investment in the Company. The Company shall deliver a Disclosure Letter to ADAH in no event later than ten (10) Business Days prior to the Disclosure Statement Filing Date which provides for exceptions from the representations and warranties of the Company in Section 3; provided, that ADAH shall not be required to accept any Disclosure Letter unless it is reasonably satisfied that such Disclosure Letter does not contain any information or exception to a representation that (i) was not disclosed to ADAH prior to the date of this Agreement and (ii) which information or exception reflects facts or circumstances that would have a material impact on the Investor's proposed investment in the Company.

(t)   Financing Assistance. The Company and its Subsidiaries shall obtain the debt financing from financing sources consistent with those previously discussed with ADAH and in amounts sufficient to consummate the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms, the GM Settlement and the Plan, such financing to be on then-prevailing market terms with respect to the applicable interest rate, redemption provisions and fees, and otherwise to be on terms that are acceptable to ADAH not to be unreasonably withheld (the "**Debt Financing**"); provided, that if the Company delivers to ADAH definitive term sheets for such proposed debt financing that have been approved by the Company's board of directors and executed by the banks or other financing sources providing such debt financing reflecting then-prevailing market terms with respect to the applicable interest rate, redemption provisions and fees (a "**Company Financing Proposal**"), then ADAH shall inform the Company in writing (a "**Financing Notice**") whether or not the Company Financing Proposal is acceptable to it within five (5) Business Days of its receipt of the definitive term sheets for such Company Financing Proposal. If, after the Company delivers to ADAH a Company Financing Proposal, ADAH fails to deliver a Financing

Notice within five (5) Business Days or each of the following circumstances occurs, then the Company may terminate this Agreement and the transactions contemplated hereby may be abandoned: (x) ADAH delivers a Financing Notice in which it does not approve the Company Financing Proposal, (y) ADAH does not present to the Company, within 30 days of the delivery of the Financing Notice (the "**Financing Decision Date**"), an alternative written expression of interest to provide the Debt Financing with financing sources reasonably acceptable to the Company on terms more favorable to the Company than the Company Financing Proposal (a "**Preferred Debt Financing**") and (z) ADAH does not provide to the Company commitment letters executed by the banks or other financing sources providing such Preferred Debt Financing within 60 days of the Financing Decision Date. Delphi shall use its reasonable best efforts to implement any Preferred Debt Financing and to fulfill its other obligations pursuant to this Section 5(t). Subject to applicable regulatory or NASD requirements, Merrill and UBS (or their Affiliates) shall be entitled to participate in such Debt Financing on market terms. The Company and its Subsidiaries shall execute and deliver any commitment letters, underwriting or placement agreements, registration statements, pledge and security documents, other definitive financing documents, or other requested certificates or documents necessary or desirable to obtain the Debt Financing. The Company will (i) provide to ADAH and its counsel a copy of all marketing information, term sheets, commitment letters and agreements related to the Debt Financing and a reasonable opportunity to review and comment on such documents prior to such document being distributed, executed or delivered or filed with the Bankruptcy Court, (ii) duly consider in good faith any comments of ADAH and its counsel consistent with the Agreement, the Preferred Term Sheet and the Plan Terms and any other reasonable comments of ADAH and its counsel and shall not reject such comments without first discussing the reasons therefor with ADAH or its counsel and giving due consideration to the views of ADAH and its counsel, and (iii) keep ADAH reasonably informed on a timely basis of developments in connection with the Debt Financing and provide the Investors with an opportunity to attend and participate in meetings and/or roadshows with potential providers of the Debt Financing.

(u)     Labor Agreements. The Company and its Subsidiaries shall use their reasonable best efforts to enter into: (A) tentative labor agreements with each of the International Union of Electrical, Salaried, Machine and Furniture Workers – Communications Workers of America ("**IUE-CWA**") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC (the "**USW**") which adequately address, among other things, the following matters: (i) permit achievement of the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms and the Plan (including plant closings, asset dispositions and resolution of union claims); (ii) permit achievement of the Business Plan; and (B) an agreement that GM will be responsible for certain hourly labor costs (compensation, benefits and other labor costs) at certain of the Company's facilities. The Company will (i)

provide to ADAH and its counsel a copy of the foregoing labor agreements and a reasonable opportunity to review and comment on such document prior to such document being executed or delivered or filed with the Bankruptcy Court, and (ii) duly consider in good faith any comments of ADAH and its counsel consistent with this Agreement, the Preferred Term Sheet and the Plan Terms and any other reasonable comments of ADAH and its counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH or its counsel and giving due consideration to the views of ADAH and its counsel.

(v)    <u>Other Actions by the Company</u>.

(i)    <u>Existing Shareholder Rights Plan</u>.  The Company and the Board of Directors of the Company (A) has taken all necessary action to amend the Existing Shareholder Rights Plan to provide that none of the Investors (including any Related Purchaser or Ultimate Purchaser) shall be deemed an "Acquiring Person" as defined in the Existing Shareholder Rights Plan and that the rights will not separate from the Common Stock pursuant to the Existing Shareholder Rights Plan as a result of entering into the Original Agreement, this Agreement, the Original PSA, the Plan and the Transaction Agreements or consummating the transactions contemplated hereby (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser) or thereby and (B) will take all such action as is necessary to terminate the Existing Shareholder Rights Plan effective as of the Closing Date.

(ii)    <u>Takeover Statutes and Charter</u>.  The Company and the Board of Directors of the Company has taken all action necessary (A) to ensure that no Takeover Statute or similar statue or regulation is or becomes applicable to the Original Agreement, this Agreement, the Original PSA, the Plan or the Transaction Agreements or any transaction contemplated hereby or thereby (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser), (B) if any Takeover Statute is or may become applicable to the transactions contemplated by the Original Agreement, this Agreement, the Original PSA, the Plan or the Transaction Agreements (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser), to grant such approvals and take such actions as are necessary so that such transactions may be consummated as promptly as practicable on the terms contemplated hereby and thereby and otherwise act to eliminate or minimize the effects of such statute or regulation on such transactions and (C) to ensure that this Agreement or any transaction contemplated hereby (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser) or thereby are approved for purposes of Article IX of the Company's Amended and Restated Certificate of Incorporation, dated January 26, 1999, as amended

to date, and that such provision shall not apply to the transactions contemplated hereby or thereby.

(w) <u>Agreement on Key Documentation</u>.  The Company shall use its commercially reasonable efforts to agree on or prior to the Disclosure Statement Filing Date on (a) the terms of the GM Settlement, (b) the agreements contemplated by <u>Section 5(u)</u>, and (c) the terms of the Amended and Restated Constituent Documents, the Series A Certificate of Designations and the Series B Certificate of Designations, the Shareholders Agreement and the Registration Rights Agreement with ADAH.

(x) <u>Investment Decision Package</u>.  If at any time prior to the Expiration Date, any event occurs as a result of which the Investment Decision Package, as then amended or supplemented, would include an untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, or if it shall be necessary to amend or supplement the Investment Decision Package to comply with applicable law, the Company will promptly notify the Investors of any such event and prepare an amendment or supplement to the Investment Decision Package that is reasonably acceptable in form and substance to ADAH that will correct such statement or omission or effect such compliance.

(y) <u>Termination of Commitment Letters</u>.  The Company acknowledges and agrees that (i) the commitment letter of Appaloosa in favor of ADAH and the Company and (ii) the commitment letter of Harbinger Fund in favor of Harbinger and the Company, each dated January 18, 2007 have been terminated and are of no further force or effect and that each of Appaloosa and Harbinger Fund shall have no further liability or obligation under those commitment letters.

(z) <u>Pension Plan Contributions</u>.  The Company and its Subsidiaries shall have made all contributions to any pension plan of the Company and its Subsidiaries required to be made prior to or contemporaneous with the Effective Time pursuant to any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority or any requirement of the GM Settlement any labor agreement or any other contract, agreement, arrangement or understanding.

6. <u>Additional Covenants of the Investors</u>.  Each Investor agrees, severally and not jointly, with the Company:

(a) <u>Information</u>.  To provide the Company with such information as the Company reasonably requests regarding the Investor for inclusion in the Rights Offering Registration Statement and the Disclosure Statement.

(b)  <u>HSR Act</u>. To use reasonable best efforts to promptly prepare and file all necessary documentation and to effect all applications and to obtain all authorizations, approvals and consents that are necessary or advisable under the HSR Act and any comparable laws or regulations in any foreign jurisdiction so that any applicable waiting period shall have expired or been terminated thereunder and any applicable notification, authorization, approval or consent shall have been made or obtained with respect to the purchase of Investor Shares hereunder, and not to take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the transactions contemplated by this Agreement. Each Investor shall file, to the extent that it is required to file, the Notification and Report Form required under the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission no later than the fifteenth day following the Disclosure Statement Filing Date.

(c)  <u>Bankruptcy Court Filings</u>. To not file any pleading or take any other action in the Bankruptcy Court with respect to this Agreement, the Plan, the Disclosure Statement or the Confirmation Order or the consummation of the transactions contemplated hereby or thereby that is inconsistent in any material respect with this Agreement or the Company's efforts to obtain the entry of the Confirmation Order consistent with this Agreement.

(d)  <u>Reasonable Best Efforts</u>. Each Investor shall use its reasonable best efforts to take all actions, and do all things, reasonably necessary, proper or advisable on its part under this Agreement and applicable laws to cooperate with the Company and to consummate and make effective the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms, the GM Settlement and the Plan.

7.  <u>Additional Joint Covenant of Company And Each Investor</u>. Without limiting the generality of the undertakings pursuant to <u>Sections 5(i)</u> and <u>6(b)</u>, the Company and each Investor shall, severally and not jointly, use its reasonable best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary under the HSR Act and any comparable laws or regulations in any foreign jurisdiction to consummate and make effective the transactions contemplated by this Agreement and the other Transaction Agreements, including furnishing all information required by applicable law in connection with approvals of or filings with any governmental authority, and filing, or causing to be filed, as promptly as practicable, following the Disclosure Statement Filing Date any required notification and report forms under other applicable competition laws with the applicable governmental antitrust authority. Any filings under any laws or regulations in any foreign jurisdiction comparable to the HSR Act that are necessary to consummate and make effective the transactions contemplated by this Agreement and the other Transaction Agreements shall be made, to the extent permitted by law or regulation, after the filings in the United States described in Section 5(i) and 6(b) hereof have been

made.  The parties shall consult with each other as to the appropriate time of filing such notifications and shall agree upon the timing of such filings.  Subject to appropriate confidentiality safeguards, each party shall:  (i) respond promptly to any request for additional information made by the antitrust agency; (ii) promptly notify counsel to the other party of, and if in writing, furnish counsel to the other party with copies of (or, in the case of material oral communications, advise the other party orally of) any communications from or with the antitrust agency in connection with any of the transactions contemplated by this Agreement; (iii) not participate in any meeting with the antitrust agency unless it consults with counsel to the other party in advance and, to the extent permitted by the agency, give the other party a reasonable opportunity to attend and participate thereat; (iv) furnish counsel to the other party with copies of all correspondence, filings and communications between it and the antitrust agency with respect to any of the transactions contemplated by this Agreement; and (v) furnish counsel to the other party with such necessary information and reasonable assistance as may be reasonably necessary in connection with the preparation of necessary filings or submission of information to the antitrust agency.  The Parties shall use their reasonable best efforts to cause the waiting periods under the applicable competitions laws to terminate or expire at the earliest possible date after the date of filing.

Notwithstanding anything in this Agreement to the contrary, nothing shall require any Investor or its Affiliates to dispose of any of its or its Subsidiaries' or its Affiliates' assets or to limit its freedom of action with respect to any of its or its Subsidiaries' businesses, or to consent to any disposition of the Company's or the Company Subsidiaries' assets or limits on the Company's or the Company Subsidiaries' freedom of action with respect to any of its or the Company Subsidiaries' businesses, or to commit or agree to any of the foregoing, and nothing in this Agreement shall authorize the Company or any Company Subsidiary to commit or agree to any of the foregoing, to obtain any consents, approvals, permits or authorizations to remove any impediments to the transactions contemplated hereby or by any Transaction Agreement relating to antitrust or competition laws or to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other order in any action relating to antitrust or competition laws.

8.    Reasonable Best Efforts.  The Company shall use its reasonable best efforts (and shall cause its Subsidiaries to use their respective reasonable best efforts) to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable on its or their part under this Agreement and applicable laws to cooperate with the Investors and to consummate and make effective the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms, the GM Settlement and the Plan, including:

(a)    preparing and filing as promptly as practicable all documentation to effect all necessary notices, reports and other filings and to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party or governmental entity;

provided, however, that, notwithstanding the foregoing, in connection with obtaining such consents, the Company shall not, without the prior written consent of ADAH in its reasonable discretion, pay or commit to pay any person or entity whose consent is being solicited in cash or other consideration to the extent such payment could reasonably be expected to prevent the Company from, at all times prior to the satisfaction of the condition with respect to the Business Plan in accordance with Section 9(a)(xxviii), complying in all material respects with the Draft Business Plan (and, if amended in a manner that satisfies the condition with respect to amendments to the Draft Business Plan set forth in Section 9(a)(xxviii), as so amended) and, at all times after the satisfaction of the condition with respect to the Business Plan in accordance with Section 9(a)(xxviii), complying in all material respects with the Business Plan (and, if amended in a manner that satisfies the condition with respect to the Business Plan set forth in Section 9(a)(xxviii), as so amended);

(b)    defending any lawsuits or other actions or proceedings, whether judicial or administrative, challenging this Agreement, the Preferred Term Sheet, the GM Settlement, the Plan or the Transaction Agreements or any other agreement contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement, the Plan or the Transaction Agreements or the consummation of the transactions contemplated hereby and thereby, including seeking to have any stay or temporary restraining order entered by any court or other governmental entity vacated or reversed;

(c)    executing, delivering and filing, as applicable, any additional ancillary instruments or agreements necessary to consummate the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement, the Plan or the Transaction Agreements and to fully carry out the purposes of this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement, the Plan, the Transaction Agreements and the transactions contemplated hereby and thereby including, without limitation: (i) employment agreements and other compensation arrangements with senior management of the Company relating to compensation, benefits, supplemental retirement benefits, stock options and restricted stock awards, severance and change in control provisions and other benefits on market terms (as determined by the Company's board of directors based on the advice of Watson-Wyatt and reasonably acceptable to ADAH); (ii) agreements and other arrangements acceptable to ADAH or otherwise ordered by the Bankruptcy Court with respect to claims against the Company of former members of the Company's management and members of the Company's management, if any, who are resigning or being terminated in accordance with the implementation of the Plan; (iii) a shareholders agreement among the Company, and certain of the Investors reasonably satisfactory to ADAH (the "**Shareholders Agreement**"); (iv) a registration rights agreement (the "**Registration Rights Agreement**") among the Company and the Investors, consistent with the Preferred Term Sheet and reasonably satisfactory to

ADAH to the extent that the material terms of such Registration Rights Agreement would have a material impact on the Investors' proposed investment in the Company, and providing that the Company shall (a) as soon as practicable after the Closing Date, and in any event no later than seven (7) days after the Closing Date, prepare and file with the Commission a registration statement, including all exhibits thereto, pursuant to Rule 415 under the Securities Act registering offers and sales by the Investors, any Related Purchasers and the Ultimate Purchasers of the Unsubscribed Shares, the Direct Subscription Shares and the Series B Preferred Shares (the "**Resale Registration Statement**" and, together with the final prospectus contained in the Resale Registration Statement as of its effective date (including information, if any, omitted pursuant to Rule 430A and subsequently provided pursuant to Rule 424(b) under the Securities Act), and any amended form of such prospectus provided under Rule 424(b) under the Securities Act or contained in a post-effective amendment to the Resale Registration Statement) and any issuer free writing prospectus as defined in Rule 433 under the Securities Act used in connection with the resale of such shares, the "**Resale Registration Documents**"); (b) use its reasonable best efforts to cause the Resale Registration Statement to be declared effective by the Commission as soon as practicable after the filing thereof, and in any event no later than thirty (30) days after the Closing Date; (c) obtain such comfort letters from the Company's independent certified public accountants addressed to the Investors covering such matters of the type customarily covered by comfort letters and as ADAH reasonably requests; and (d) obtain a customary opinion or opinions and negative assurance statement, in customary form and scope from counsel to the Company to be furnished to each Investor; (v) an amended and restated certificate of incorporation and amended by-laws of the Company, in each case, that is consistent with this Agreement, the Plan Terms and the Preferred Term Sheet; provided, that the amended and restated certificate of incorporation of the Company to be effective immediately following the Effective Date shall prohibit (A) for so long as ADAH or its Affiliates, as the case may be, owns any shares of Series A-1 Preferred Stock, any transactions between the Company or any of its Subsidiaries, on the one hand, and ADAH or its Affiliates, as the case may be, on the other hand (including any "going private transaction" sponsored by ADAH or its Affiliates), unless such transaction shall have been approved by directors constituting not less than 75% of the number of Common Directors, and (B) any transaction between the Company or any of its Subsidiaries, on the one hand, and a director, other than a director appointed by holders of Series A Preferred Stock, on the other hand, unless such transaction shall have been approved by directors having no material interest in such transaction (a "**Disinterested Director**") constituting not less than 75% of the number of Disinterested Directors (such amended and restated certificate of incorporation and amended bylaws are herein referred to as the "**Amended and Restated Constituent Documents**"); and (vi) the Series A Certificate of Designations and the Series B Certificate of Designations, in each case, that is consistent with the terms set forth in the Preferred Term Sheet. Subject to applicable laws and regulations relating to the exchange of information, the Investors and the Company shall have the right to

review in advance, and to the extent practicable each will consult with the other on all of the information relating to Investors or the Company, as the case may be, and any of their respective Subsidiaries, that appears in any filing made with, or written materials submitted to, any third party and/or any governmental entity in connection with the transactions contemplated by this Agreement or the Plan. In exercising the foregoing rights, each of the Company and the Investors shall act reasonably and as promptly as practicable.

9.    Conditions to the Obligations of the Parties.

(a)    Subject to Section 9(b), the obligations of each of the Investors hereunder to consummate the transactions contemplated hereby shall be subject to the satisfaction prior to the Closing Date of each of the following conditions:

(i)    Approval Order. The Approval Order shall have become a Final Approval Order. "**Final Approval Order**" shall mean an Approval Order of the Bankruptcy Court, which has not been reversed, stayed, modified or amended, and as to which (a) the time to appeal, seek certiorari or request reargument or further review or rehearing has expired and no appeal, petition for certiorari or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought or to which the request was made and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted.

(ii)    [Reserved]

(iii)    Plan of Reorganization. The Company shall have complied in all material respects with the terms and conditions of the Plan that are to be performed by the Company prior to the Closing Date.

(iv)    [Reserved]

(v)    Alternate Transaction. The Company shall not have entered into any letter of intent, memorandum of understanding, agreement in principle or other agreement (other than a confidentiality agreement with terms that are not materially less favorable to the Company than the terms of that certain Amended Confidentiality Information, Standstill and Nondisclosure

Agreement, dated July 3, 2007, among the Company, Appaloosa and Harbinger Fund, as it may be amended from time to time) or taken any action to seek any Bankruptcy Court approval relating to, any Alternate Transaction (an "**Alternate Transaction Agreement**"). For the purpose of this Agreement, an "**Alternate Transaction**" means any plan, proposal, offer or transaction that is inconsistent with this Agreement, the Preferred Term Sheet, the Plan Terms and the GM Settlement or the Plan, other than a Chapter 7 liquidation.

(vi)    Change of Recommendation.  There shall not have been a Change of Recommendation. For purposes of this Agreement, a "**Change of Recommendation**" shall mean, (i) the Company or its board of directors or any committee thereof shall have withheld, withdrawn, qualified or modified (or resolved or proposed to withhold, withdraw, qualify or modify), in a manner adverse to the Investors, its approval or recommendation of this Agreement, the Preferred Term Sheet, the Plan Terms, the GM Settlement or the Plan or the transactions contemplated hereby or thereby or (ii) the Company or its board of directors or any committee thereof shall have approved or recommended, or proposed to approve or recommend (including by filing any pleading or document with the Bankruptcy Court), any Alternate Transaction.

(vii)   Confirmation Order.  The Confirmation Order approving the Plan shall have been entered by the Bankruptcy Court and such order shall be non-appealable, shall not have been appealed within ten calendar days of entry or, if such order is appealed, shall not have been stayed pending appeal, and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such order (the "**Confirmation Order**"); provided, that the absence of a stay pending appeal shall be considered for purposes of determining whether the foregoing condition has been satisfied only if ADAH concludes, in its reasonable discretion, that the appeal would be rendered moot under the doctrine of "equitable mootness" as a result of the occurrence of the Effective Date.

(viii)  [Reserved]

(ix)    Conditions to Effective Date.  The conditions to the occurrence of the Effective Date of the Confirmed Plan shall have been satisfied or waived by the Company and ADAH in accordance with the Plan.

(x)     Rights Offering Registration Statement.  The Rights Offering Registration Statement shall be effective not later than the Rights Distribution Date and

no stop order shall have been entered by the Commission with respect thereto.

(xi)    <u>Rights Offering</u>.  The Rights Offering shall have been conducted in all material respects in accordance with this Agreement and the Disclosure Statement and the Expiration Time shall have occurred.

(xii)    <u>Purchase Notice</u>.  Each of the Investors shall have received a Purchase Notice from the Company, dated as of the Determination Date, certifying as to the number of Unsubscribed Shares to be purchased or a Satisfaction Notice.

(xiii)    <u>Antitrust Approvals</u>.  All terminations or expirations of waiting periods imposed by any governmental or regulatory authority necessary for the consummation of the transactions contemplated by this Agreement, including under the HSR Act and any comparable regulations in any foreign jurisdiction, shall have occurred and all other notifications, consents, authorizations and approvals required to be made or obtained from any competition or antitrust authority shall have been made or obtained for the transactions contemplated by this Agreement.

(xiv)    <u>Consents</u>.  All other governmental and third party notifications, filings, consents, waivers and approvals required for the consummation of the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms and the Plan shall have been made or received.

(xv)    <u>No Legal Impediment to Issuance</u>.  No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority, and no judgment, injunction, decree or order of any federal, state or foreign court shall have been issued, that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms and the GM Settlement.

(xvi)    <u>Representations and Warranties</u>.  The representations and warranties of Company contained in this Agreement shall be true and correct (disregarding all qualifications and exceptions contained therein relating to materiality, Material Adverse Effect or similar qualifications, other than such qualifications contained in <u>Sections 3(i)</u> and <u>3(j)</u>) as of the Disclosure Letter Delivery Date and as of the Closing Date with the same effect as if made on and as of the Disclosure Letter Delivery Date and the Closing Date (except for representations and warranties made as of a specified date,

which shall be true and correct only as of the specified date), except where the failure to be so true and correct, individually or in the aggregate, has not had, and would not reasonably be expected to have, a Material Adverse Effect, other than with respect to the representations in Sections 3(b), 3(c), 3(d), 3(e) and 3(m)(ii) and 3(oo), which shall be true and correct in all respects. The representations and warranties of each Investor (other than the Investor asserting the failure of this condition) contained in this Agreement and in any other document delivered pursuant to this Agreement shall be true and correct (disregarding all qualifications and exceptions contained therein relating to materiality or material adverse effect on the Investor's performance of its obligations or similar qualifications) as of the Disclosure Letter Delivery Date and as of the Closing Date with the same effect as if made on the Disclosure Letter Delivery Date and the Closing Date (except for the representations and warranties made as of a specified date which shall be true and correct only as of such specified date); except where the failure to be so true and correct, individually or in the aggregate, has not and would not reasonably be expected, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(xvii)   Covenants. The Company and each Investor (other than the Investor asserting the failure of this condition) shall have performed and complied with all of its covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement (including in any Transaction Agreement) in all material respects through the Closing Date.

(xviii)  [Reserved]

(xix)    Financing. The Company shall have received the proceeds of the Debt Financings and the Rights Offering that, together with the proceeds of the sale of the Investor Shares, are sufficient to fund fully the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms, the GM Settlement (to the extent the Company is to fund such transactions) and the Plan.

(xx)     [Reserved]

(xxi)    Management Compensation. The Company shall have (i) entered into employment agreements and other compensation arrangements with senior management of the Company relating to compensation, benefits, supplemental retirement benefits, stock options and restricted stock awards, severance and change in control provisions and other benefits on

market terms (as determined by the Company's board of directors based on the advice of Watson-Wyatt and reasonably acceptable to ADAH); and (ii) resolved any claims of former executive officers, or executive officers that have resigned or been terminated, on terms acceptable to ADAH or otherwise ordered by the Bankruptcy Court.

(xxii)   [Reserved]

(xxiii)  [Reserved]

(xxiv)   [Reserved]

(xxv)    [Reserved]

(xxvi)   <u>No Strike</u>.  There shall not have occurred any material strike or material labor stoppage or slowdown involving the UAW, IUE-CWA or USW at either GM or the Company or any of their respective Subsidiaries.  There shall not have occurred any strike, labor stoppage or slowdown involving the UAW, IUE-CWA or USW at either Ford Motor Company or Chrysler Group (or its successors) or any of their respective subsidiaries that would have a material impact on the Investors' proposed investment in the Company.

(xxvii)  <u>Capitalization</u>.  As of the Closing Date and giving effect to the transactions contemplated by the Plan, (i) the Company's Net Amount shall not exceed by more than $250 million the Net Amount set forth in the final Business Plan satisfying the condition with respect to the Business Plan set forth in <u>Section 9(a)(xxviii)</u> of this Agreement; (ii) the Company's share capital shall be consistent with the last three sentences of Section 3(d); (iii) the Company's accounts payable to trade creditors and accrued expenses shall be in amounts consistent with the final Business Plan satisfying the condition with respect to the Business Plan set forth in <u>Section 9(a)(xxviii)</u> of this Agreement, and shall have been incurred in the ordinary course of business consistent with past practice; and (iv) ADAH shall have received from Delphi a certificate of a senior executive officer with knowledge of the foregoing to the effect set forth in clauses (i), (ii) and (iii) with reasonably detailed supporting documentation to support such amount.  "**Net Amount**" shall mean: (i) the sum of (A) Indebtedness; (B) the actuarially determined amount of pension plan contributions required, pursuant to ERISA to be made by the Company to its U.S. Hourly Rate Pension Plan from and after the Closing Date through December 31, 2008; and (C) all other accrued or contingent liabilities

(excluding pension and salaried OPEB liabilities on the Company's balance sheet and accounts payable and accrued expenses referred to in the preceding sentence); less (ii) the Company's cash on hand as of the Closing Date. In addition, as of the Closing Date and giving effect to the transactions contemplated by the Plan the sum of (A) and (B), less (ii), shall not exceed $7,159 million by more than $250 million.

"**Indebtedness**" shall mean: (i) indebtedness for borrowed money or indebtedness issued or incurred in substitution or exchange for indebtedness for borrowed money, (ii) indebtedness evidenced by any note, bond, debenture, mortgage or other debt instrument or debt security, (iii) commitments or obligations assuring a creditor against loss (including contingent reimbursement obligations with respect to letters of credit), (iv) indebtedness described in clauses (i)-(iii) secured by an encumbrance on any assets or properties of the Company or any of its Subsidiaries, (v) guarantees or other contingent liabilities (including so called take-or-pay or keep-well agreements) with respect to any Indebtedness, obligation or liability of a type described in clauses (i) through (iv) above, and (vi) for clauses (i) through (iv) above, all accrued interest thereon and all penalty payments, premiums, charges, yield maintenance amounts and other expenses relating to any prepayment of any obligations related thereto. For the purpose of this Section 9(a)(xxvii) cash, Indebtedness and liabilities shall be determined in accordance with GAAP applied on a basis consistent with the Company's financial statements included in the Company SEC Documents filed prior to the date hereof, and shall be determined on the basis that all required pension plan contributions to be made by the Company or any of its Subsidiaries pursuant to any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority or any requirement of the GM Settlement any labor agreement or any other contract, agreement, arrangement or understanding prior to or contemporaneous with the Effective Time, shall have been made, whether or not they have actually been made.

(xxviii)  Plan and Material Investment Documents.

(A)      (i) The Company shall have delivered to ADAH and ADAH shall have made the determination referred to in Section 9(a)(xxviii)(B) with respect to, at each Relevant Date, (1) the Plan and any related documents, agreements and arrangements (A) the terms of which are consistent in all material respects with this Agreement, the Preferred Term Sheet, the Plan Terms and GM Settlement, (B) that provide for the release and exculpation of each Investor, its Affiliates, shareholders, partners, directors, officers, employees and advisors from any liability for participation of the transactions contemplated by the Original Agreement, this Agreement, the Original PSA, the Plan Terms and the Plan to the fullest extent

permitted under applicable law (<u>provided,</u> that such release and exculpation shall not prohibit or impede the Company's ability to assert defenses or counterclaims in connection with or relating to the Original Agreement or the Original PSA) and (C) that have conditions to confirmation and the Effective Date of the Plan (and to what extent such conditions can be waived and by whom) that are consistent with this Agreement, the Preferred Term Sheet, the Plan Terms and the GM Settlement and (2) all Material Investment Documents.  The term "**Material Investment Documents**" shall mean the Confirmation Order, the Disclosure Statement, the Rights Offering Registration Statement, the GM Settlement, any amendments and/or supplements to the Draft Business Plan, the Business Plan, any amendments and/or supplements to the UAW MOU, the labor agreements with the IUE-CWA and the USW, the Amended and Restated Constituent Documents, the Series A Certificate of Designations, the Series B Certificate of Designations, the Shareholders Agreement, the Registration Rights Agreement, the Transaction Agreements and any amendments and/or supplements to the foregoing.  The term "**Relevant Date**" shall mean the Disclosure Statement Filing Date, the Disclosure Statement Approval Date, the date of issuance of the Confirmation Order and the Closing Date.

(ii) With respect to any Material Investment Document entered into in satisfaction of the condition set forth in <u>Section 9(a)(xxviii)</u>, and the UAW MOU, at each Relevant Date (i) such Material Investment Document, or the UAW MOU, as the case may be, shall have been ratified by the union membership (but only with respect to the labor agreements with IUE-CWA and USW) and shall remain in full force and effect and shall not have been rescinded, terminated, challenged or repudiated by any party thereto and (ii) the parties to such Material Investment Document and the UAW MOU, as the case may be, shall have performed and complied with all of their respective covenants and agreements contained in such agreement in all material respects through the Closing Date.  The Business Plan satisfying the condition with respect to the Business Plan set forth in this <u>Section 9(a)(xxviii)</u> shall not have been rescinded or repudiated in any material respect by the Company or its Board of Directors.

(B)     With respect to the documents referred to in <u>Section 9(a)(xxviii)(A)(i)</u> (other than the GM Settlement),  ADAH shall have determined that it is reasonably satisfied with the terms thereof to the extent such terms would have a material impact on the Investors' proposed investment in the Company; <u>provided,</u> that

with respect to the GM Settlement ADAH shall have determined that it is satisfied with the GM Settlement in its reasonable discretion taking into account whether it has a material impact on the Investors' proposed investment in the Company and other relevant factors.

(C)    The conditions referred to in clause (A) above shall be deemed to have been conclusively satisfied without further action by any Party unless:

(1)    with respect to the Plan, any related documents, agreements and arrangements and any Material Investment Documents, in each case delivered to ADAH by the Company prior to the Disclosure Statement Filing Date, ADAH shall have delivered (and have not withdrawn) a written deficiency notice to the Company reasonably asserting with reasonable specificity that such condition was not satisfied prior to the Disclosure Statement Approval Date, and the Company shall not have cured such deficiency within twenty (20) days of the Company's receipt of such notice (the "**Cure Period**");

(2)    with respect to any amendments or supplements to the Plan, any related documents, agreements and arrangements, or any Material Investment Documents delivered to ADAH by the Company occurring after the Disclosure Statement Filing Date and prior to the Disclosure Statement Approval Date, ADAH has delivered (and has not withdrawn), a written deficiency notice to the Company reasonably asserting with reasonable specificity that such condition was not satisfied prior to the Disclosure Statement Approval Date, and the Company shall not have cured such deficiency during the Cure Period;

(3)    with respect to any amendments or supplements to the Plan, any related documents, agreements and arrangements, or any Material Investment Documents delivered to ADAH by the Company after the Disclosure Statement Approval Date and prior to the date of issuance of the Confirmation Order, ADAH has delivered (and has not withdrawn) a written deficiency notice to the Company asserting with reasonable specificity that such condition was not satisfied prior to the date of issuance of the Confirmation Order, and the

Company shall not have cured such deficiency during the Cure Period; and

(4)    with respect to any amendments or supplements to the Plan, any related documents, agreements and arrangements, or any Material Investment Documents delivered to ADAH by the Company after the date of issuance of the Confirmation Order and prior to the Closing Date, ADAH has delivered (and has not withdrawn), within five Business Days of delivery by the Company of the final form of such document accompanied by a written request for approval of such documents, a written deficiency notice to the Company reasonably asserting with reasonable specificity that such condition is not satisfied and the Company shall not have cured such deficiency during the Cure Period.

(D)    The Company shall have delivered, and ADAH shall have accepted, a Disclosure Letter in accordance with Section 5(s).

(b)    All or any of the conditions set forth in Section 9(a) may be waived in whole or in part with respect to all Investors by ADAH in its sole discretion.

(c)    The obligation of the Company to issue and sell the Investor Shares are subject to the following conditions, provided that the failure of a condition set forth in Sections 9(c)(vii) through (x) to be satisfied may not be asserted by the Company if such failure results from the failure of the Company to fulfill an obligation hereunder:

(i)    Approval Order.  The Approval Order shall have become a Final Approval Order.

(ii)    Antitrust Approvals.  All terminations or expirations of waiting periods imposed by any governmental or regulatory authority necessary for the consummation of the transactions contemplated by this Agreement, including under the HSR Act and any comparable regulations in any foreign jurisdiction, shall have occurred and all other notifications, consents, authorizations and approvals required to be made or obtained from any competition or antitrust authority shall have been made or obtained for the transactions contemplated by this Agreement.

(iii)    No Legal Impediment to Issuance.  No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued

by any federal, state or foreign governmental or regulatory authority, and no judgment, injunction, decree or order of any federal, state or foreign court shall have been issued, that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms and the GM Settlement.

(iv)   Representations and Warranties.  The representations and warranties of each Investor, each Related Purchaser and each Ultimate Purchaser to the Company contained in this Agreement or pursuant to Sections 2(a), 2(b) or 2(k) shall be true and correct (disregarding all qualifications and exceptions contained therein relating to materiality or material adverse effect on the Investor's performance of its obligations or similar qualifications) as of the Disclosure Letter Delivery Date and as of the Closing Date with the same effect as if made on the Disclosure Letter Delivery Date and the Closing Date (except for the representations and warranties made as of a specified date, which shall be true and correct only as of such specified date), except with respect to the Investors' representations in all Sections other than Sections 4(b) and 4(c) where the failure to be so true and correct, individually or in the aggregate, has not and would not reasonably be expected, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(v)   Covenants.  Each Investor shall have performed and complied with all of its covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement (including in any Transaction Agreement) in all material respects through the Closing Date.

(vi)   Bankruptcy Court Approval.  This Agreement shall have been approved by the Bankruptcy Court and the approval of the Bankruptcy Court shall not have been modified, amended or withdrawn in any manner adverse to the Company.

(vii)   Confirmation Order.  The Confirmation Order approving the Plan shall have been entered by the Bankruptcy Court and such order shall be non-appealable, shall not have been appealed within ten calendar days of entry or, if such order is appealed, shall not have been stayed pending appeal, and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such order; provided, that the absence of a stay pending appeal shall be considered for purposes of determining whether the foregoing condition has been satisfied only if the Company concludes, in its sole discretion, that the appeal would be rendered moot under the doctrine of "equitable mootness" as a result of the occurrence of the Effective Date.

(viii)    <u>Conditions to Effective Date</u>.  The conditions to the occurrence of the Effective Date of the Confirmed Plan shall have been satisfied or waived by the Company and ADAH in accordance with the Plan.

(ix)    <u>Rights Offering</u>.  The Rights Offering shall have been conducted in all material respects in accordance with this Agreement and the Disclosure Statement and the Expiration Time shall have occurred.

(x)    <u>Financing</u>.  The Company shall have received the proceeds of the Debt Financings and the Rights Offering that, together with the proceeds of the sale of the Investor Shares, are sufficient to fund fully the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms, the GM Settlement (to the extent the Company is to fund such transactions) and the Plan.

(d)    All of the conditions set forth in <u>Section 9(c)</u> may be waived in whole or in part by the Company in its sole discretion.

10.    <u>Indemnification and Contribution.</u>

(a)    Whether or not the Rights Offering is consummated or this Agreement is terminated or the transactions contemplated hereby or the Plan are consummated, the Company (in such capacity, the "**<u>Indemnifying Party</u>**") shall indemnify and hold harmless each Investor and the Ultimate Purchasers, their respective Affiliates and their respective officers, directors, employees, agents and controlling persons (each, an "**<u>Indemnified Person</u>**") from and against any and all losses, claims, damages, liabilities and reasonable expenses, joint or several, arising out of circumstances existing on or prior to the Closing Date ("**<u>Losses</u>**") to which any such Indemnified Person may become subject arising out of or in connection with any claim, challenge, litigation, investigation or proceeding ("**<u>Proceedings</u>**") instituted by a third party with respect to the Rights Offering, this Agreement or the other Transaction Documents, the Rights Offering Registration Statement, any Preliminary Rights Offering Prospectus, the Rights Offering Prospectus, any Issuer Free Writing Prospectus, the Investment Decision Package, the Resale Registration Documents, any amendment or supplement thereto or the transactions contemplated by any of the foregoing and shall reimburse such Indemnified Persons for any reasonable legal or other reasonable out-of-pocket expenses as they are incurred in connection with investigating, responding to or defending any of the foregoing; <u>provided</u> that the foregoing indemnification will not apply to Losses (i) arising out of or in connection with any Proceedings between or among any one or more Indemnified Persons, Related Purchasers and/or Ultimate Purchasers, any Additional Investor Agreement or the failure of such Indemnified Person to comply with the

covenants and agreements contained in this Agreement with respect to the sale or placement of Investor Shares; or (ii) to the extent that they resulted from (a) any breach by such Indemnified Person of this Agreement, (b) gross negligence, bad faith or willful misconduct on the part of such Indemnified Person or (c) statements or omissions in the Rights Offering Registration Statement, any Preliminary Rights Offering Prospectus, the Rights Offering Prospectus, any Issuer Free Writing Prospectus, the Resale Registration Documents or any amendment or supplement thereto made in reliance upon or in conformity with information relating to such Indemnified Person furnished to the Company in writing by or on behalf of such Indemnified Person expressly for use in the Rights Offering Registration Statement, any Rights Offering Preliminary Prospectus, the Rights Offering Prospectus, any Issuer Free Writing Prospectus, the Resale Registration Documents or any amendment or supplement thereto.  If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Losses in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party on the one hand and such Indemnified Person on the other hand but also the relative fault of the Indemnifying Party on the one hand and such Indemnified Person on the other hand as well as any relevant equitable considerations.  It is hereby agreed that the relative benefits to the Indemnifying Party on the one hand and all Indemnified Persons on the other hand shall be deemed to be in the same proportion as (i) the total value received or proposed to be received by the Company pursuant to the sale of the Shares and the Investor Shares contemplated by this Agreement bears to (ii) the Commitment Fees paid or proposed to be paid to the Investors.  The indemnity, reimbursement and contribution obligations of the Indemnifying Party under this <u>Section 10</u> shall be in addition to any liability that the Indemnifying Party may otherwise have to an Indemnified Person and shall bind and inure to the benefit of any successors, assigns, heirs and personal representatives of the Indemnifying Party and any Indemnified Person.

(b)     Promptly after receipt by an Indemnified Person of notice of the commencement of any Proceedings with respect to which the Indemnified Person may be entitled to indemnification hereunder, such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; <u>provided</u> that (i) the omission so to notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (ii) the omission so to notify the Indemnifying Party will not relieve it from any liability that it may have to an Indemnified Person otherwise than on account of this <u>Section 10</u>.  In case any such Proceedings are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, to the extent that it may elect by written notice delivered to such Indemnified Person, to assume the defense thereof, with counsel

reasonably satisfactory to such Indemnified Person; provided that if the defendants in any such Proceedings include both such Indemnified Person and the Indemnifying Party and such Indemnified Person shall have concluded that there may be legal defenses available to it that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Proceedings on behalf of such Indemnified Person. Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election so to assume the defense of such Proceedings and approval by such Indemnified Person of counsel, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the next preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel in any jurisdiction, approved by the Investors, representing the Indemnified Persons who are parties to such Proceedings), (ii) the Indemnifying Party shall not have employed counsel reasonably satisfactory to such Indemnified Person to represent such Indemnified Person within a reasonable time after notice of commencement of the Proceedings or (iii) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.

(c)    The Indemnifying Party shall not be liable for any settlement of any Proceedings effected without its written consent (which consent shall not be unreasonably withheld). If any settlement of any Proceeding is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Proceedings, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment in accordance with, and subject to the limitations of, the provisions of this Section 10. Notwithstanding anything in this Section 10 to the contrary, if at any time an Indemnified Person shall have requested the Indemnifying Party to reimburse such Indemnified Person for legal or other expenses aggregating in excess of $250,000 in connection with investigating, responding to or defending any Proceedings in connection with which it is entitled to indemnification or contribution pursuant to this Section 10, the Indemnifying Party shall be liable for any settlement of any Proceedings effected without its written consent if (i) such settlement is entered into more than (x) 60 days after receipt by the Indemnifying Party of such request for reimbursement and (y) 30 days after receipt by the Indemnified Person of the material terms of such settlement and (ii) the Indemnifying Party shall not have reimbursed such Indemnified Person in accordance with such request prior to the date of such settlement. The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall not be unreasonably withheld), effect any settlement of any pending or threatened Proceedings in respect of which indemnity has been sought hereunder by such Indemnified Person unless (i) such

settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Proceedings and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

(d)    All amounts paid by the Company to an Indemnified Person under this <u>Section 10</u> shall, to the extent the transactions contemplated hereby or the Plan are consummated and to the extent permitted by applicable law, be treated as adjustments to Purchase Price for all Tax purposes.

11.    <u>Survival of Representations and Warranties, Etc</u>.

(a)    The representations and warranties made in this Agreement shall not survive the Closing Date. Other than <u>Sections 2(b)</u>, <u>2(c)</u>, <u>2(e)</u>, <u>2(h)</u>, <u>2(i)</u>, <u>2(j)</u>, <u>2(k)</u>, <u>5(d)</u>, <u>5(e)</u>, <u>5(f)</u>, <u>5(j)</u>, <u>5(k)</u>, <u>5(l)</u>, <u>5(m)</u>, <u>10</u>, <u>11</u>, <u>13</u>, <u>14</u>, <u>15</u>, <u>16</u>, <u>18</u> and <u>20</u>, which shall survive the Closing Date in accordance with their terms (except <u>Section 5(l)</u> which shall survive for 90 days following the Closing Date), the covenants contained in this Agreement shall not survive the Closing Date.

(b)    Other than with respect to <u>Sections 2(h)</u>, <u>2(i)</u> and <u>2(j)</u> and <u>Sections 10</u> through <u>18</u>, which shall continue and survive any termination of this Agreement, (i) none of the Investors may assert any claim against the Company (both as Debtors-in-possession or the reorganized Debtors), and the Company (both as Debtors-in-possession or the reorganized Debtors), may not assert any claim against any Investor, in either case, arising from this Agreement other than for willful breach, and (ii) the Investors hereby release the Company (both as Debtors-in-possession and the reorganized Debtors) from any such claims, and the Company (both as Debtors-in-possession or the reorganized Debtors) hereby releases the Investors from any such claims. Notwithstanding the foregoing (w) the aggregate liability of all of the Investors under this Agreement for any reason (under any legal theory), including for any willful breach, for any act or omission occurring on or prior to the Disclosure Statement Approval Date shall not exceed $100 million, (x) the aggregate liability of all of the Investors under this Agreement for any reason (under any legal theory), including for any willful breach, for any act or omission occurring after the Disclosure Statement Approval Date shall not exceed $250 million, (y) the aggregate liability of all of the Debtors under this Agreement for any reason (under any legal theory), including for any willful breach, for any act or omission occurring on or prior to the Disclosure Statement Approval Date shall not exceed $100 million, and (z) the aggregate liability of all of the Debtors under this Agreement for any reason (under any legal theory), including for any willful breach, for any act or omission occurring after the Disclosure Statement Approval Date shall not exceed $250 million. Notwithstanding the foregoing, nothing contained in this <u>Section 11(b)</u> shall limit the liability of the Company for any

Transaction Expenses pursuant to Section 2(j) or 12(g).  The Investors and the Company acknowledge that such liability under subclauses (w) and (x) shall be on a several and not joint basis with respect to any willful breach occurring on or prior to the Disclosure Statement Filing Date.  The Investors and the Company acknowledge and agree that such liability under subclauses (w) and (x) shall be on a joint and several basis with respect to any willful breach occurring after the Disclosure Statement Filing Date; provided, that the aggregate liability of Harbinger shall not exceed $38,944,000, the aggregate liability of Merrill shall not exceed $16,358,805, the aggregate liability of UBS shall not exceed $16,358,805, the aggregate liability of GS shall not exceed $39,215,500 and the aggregate liability of Pardus shall not exceed $33,593,000.  Subject to the terms, conditions and limitation set forth in this Section 11(b), (i) the joint and several obligations referred to in the immediately preceding sentence mean that each Investor (an "**Assuming Investor**") assumes liability on a joint and several basis for any willful breach of this Agreement by any other Investor (a "**Breaching Investor**"), whether or not the Assuming Investor has breached this Agreement or is in any way responsible for such willful breach by the Breaching Investor and (ii) the Assuming Investors' obligations shall be a commitment to assure payment, not collection.  Under no circumstances shall any Investor be liable to the Company (as Debtors-in-possession or reorganized Debtors) for any punitive damages under this Agreement or any Equity Commitment Letter.  Under no circumstances shall the Company (both as Debtors-in-possession and reorganized Debtors) be liable to any Investor for any punitive damages under this Agreement.

12.    Termination.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date:

(a)    by mutual written consent of the Company and ADAH;

(b)    by any Investor if any of the Chapter 11 Cases shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or an interim or permanent trustee shall be appointed in any of the Chapter 11 Cases, or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases;

(c)    by any party to this Agreement if any statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority or any judgment, injunction, decree or order of any federal, state or foreign court shall have become final and non-appealable, that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms or the GM Settlement;

(d)    by ADAH upon written notice to the Company and each other Investor:

(i)    if the Approval Order has not become a Final Approval Order on or prior to the earlier of (A) the tenth (10th) day after the Bankruptcy Court enters the Approval Order, or, if such day is not a Business Day, the next Business Day and (B) August 16, 2007; provided, that notice of termination pursuant to this Section 12(d)(i) must be given on or prior to August 31, 2007;

(ii)    at any time prior to the last date established by the Bankruptcy Court for the filing of objections to the Disclosure Statement, if the Company shall not have delivered a Disclosure Letter as contemplated by Section 5(s) on or prior to the tenth (10th) Business Day preceding the Disclosure Statement Filing Date or shall have delivered a Disclosure Letter which shall not have satisfied the condition with respect to the Disclosure Letter in accordance with Section 9(a)(xxviii).

(iii)    on or after March 31, 2008 (such date, being the "**Closing Date Outside Date**"); provided that the Closing Date has not occurred by such date;

(iv)    on or after January 31, 2008 (such date, being the "**Disclosure Statement Outside Date**"); provided that, in either case, the Disclosure Statement has not been filed for approval with the Bankruptcy Court by such date;

(v)    if the Company or any Investor shall have breached any provision of this Agreement, which breach would cause the failure of any condition set forth in Section 9(a)(xvi) or (xvii) hereof to be satisfied, which failure cannot be or has not been cured on the earliest of (A) the tenth (10th) Business Day after the giving of written notice thereof to the Company or such Investor by any Investor and (B) the third (3rd) Business Day prior to the Closing Date Outside Date; provided, that the right to terminate this Agreement under this Section 12(d)(v) shall not be available to any Investor whose breach is the cause of the failure of the condition in Section 9(a)(xvi) or (xvii) to be satisfied; provided, further, that the right to terminate under this Section 12(d)(v) shall not be available as a result of a breach of Section 5(o) to the extent, and only to the extent, that the circumstances giving rise to the breach of Section 5(o) previously gave rise to a termination right under Section 12(d)(vii) and ADAH did not exercise such termination right under Section 12(d)(vii) by the end of the twenty (20) day period referred to therein;

(vi)     (A) there shall have been a Change of Recommendation or (B) the Company shall have entered into an Alternate Transaction Agreement; or

(vii)    for a period of twenty (20) days following the Cure Period if ADAH has delivered a deficiency notice in accordance with Section 9(a)(xxviii)(C) and the condition set forth in Section 9(a)(xxviii) shall not have been satisfied at the end of the Cure Period;

provided, that notwithstanding anything in the foregoing to the contrary, any Investor other than ADAH shall be entitled to terminate this Agreement as to itself (but not as to any other party) at any time on or after June 30, 2008 (a "**Limited Termination**");

(e)     [Reserved]

(f)     by the Company upon written notice to each Investor:

(i)     subject to the establishment of Alternative Financing in accordance with Section 2(b), if any Investor shall have breached any provision of this Agreement, which breach would cause the failure of any condition set forth in Section 9(c)(iv) or (v) hereof to be satisfied, which failure cannot be or has not been cured on the earliest of (A) the tenth (10th) Business Day after the giving of written notice thereof to the Investors by the Company and (B) the third (3rd) Business Day prior to the Closing Date Outside Date;

(ii)     if the Company enters into any Alternate Transaction Agreement; provided, that the Company may only terminate this Agreement under the circumstances set forth in this Section 12(f)(ii) if: (x) the Company's board of directors has determined in good faith, after having consulted with its outside legal counsel and its independent financial advisors, that such Alternate Transaction is a Superior Transaction and the failure to enter into such an Alternate Transaction Agreement would result in a breach of the applicable fiduciary duties of the board of directors, (y) before taking such action the Company has given the Investors at least ten (10) Business Days' (or, in the event of any Alternate Transaction that has been materially revised or modified, at least five (5) Business Days') prior written notice (the "**Consideration Period**") of the terms of such Alternate Transaction and of its intent to take such action, and, during the Consideration Period, the Company has, if requested by any Investor, engaged in good faith negotiations regarding any revisions to this Agreement, the Plan or any other agreement or document proposed by

ADAH and again has determined in good faith, after consultation with its outside legal counsel and its independent financial advisors, that such Alternate Transaction remains a Superior Transaction and (z) prior to or contemporaneously with such termination the Company shall pay to the Investors the Alternate Transaction Fee;

(iii)    on or after March 31, 2008; provided, that the Closing Date has not occurred by such date; or

(iv)    in accordance with Section 5(t).

For the purposes of this Section 12(f), a "**Superior Transaction**" shall mean an Alternate Transaction, which the board of directors of the Company, after consultation with its outside legal counsel and its independent financial advisors, determines in good faith to be more favorable to the bankruptcy estate of the Company than the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms and the Plan, taking into account, all legal, financial, regulatory and other aspects of such Alternate Transaction, the likelihood of consummating the Alternate Transaction, the likely consummation date of the Alternate Transaction and the identity of the parties or proposed parties to such Alternate Transaction and after taking into account any revisions to the terms of this Agreement, the Plan and/or any other agreement or document proposed during the Consideration Period.

(g)    In addition to any other rights or remedies any Investor may have under this Agreement (for breach or otherwise), the Company shall pay a fee of $82,500,000 (the "**Alternate Transaction Fee**") to the Investors in such proportions as are set forth on Schedule 2 hereto, and, in any case, the Company shall pay to the Investors any Transaction Expenses and any other amounts certified by the Investors to be due and payable hereunder that have not been paid theretofore if this Agreement is terminated pursuant to one of the following:

(i)    pursuant to (x) Section 12(d)(vi)(B) or (y) Section 12(f)(ii);

(ii)    pursuant to Section 12(d)(vi)(A) and, within the twenty-four (24) month period following the date of such termination, an Alternate Transaction Agreement is entered into or an Alternate Transaction is consummated;

(iii)    pursuant to Section 12(d)(v) based on a willful breach by the Company and within the twenty-four (24) month period following the date of such

termination, an Alternate Transaction Agreement is entered into or an Alternate Transaction is consummated.

Payment of the amounts due under this Section 12(g) will be made (i) no later than the close of business on the next Business Day following the date of such termination in the case of a payment pursuant to Section 12(g)(i)(x), (ii) prior to or contemporaneously with such termination by the Company in the case of a payment pursuant to Section 12(g)(i)(y) and (iii) prior to or contemporaneously with the entry into an Alternate Transaction Agreement or the consummation of an Alternate Transaction in the case of a payment pursuant to Sections 12(g)(ii) or (iii). Under no circumstances shall the Company be required to pay more than one Alternate Transaction Fee plus Transaction Expenses. The provision for the payment of the Alternate Transaction Fee is an integral part of the transactions contemplated by this Agreement and without this provision the Investors would not have entered into this Agreement and shall constitute an allowed administrative expense of the Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code.

(h)     Upon termination under this Section 12, all rights and obligations of the parties under this Agreement shall terminate without any liability of any party to any other party except that (x) nothing contained herein shall release any party hereto from liability for any willful breach and (y) the covenants and agreements made by the parties herein in Sections 2(h), 2(i) and 2(j), and Sections 10 through 18 will survive indefinitely in accordance with their terms.

13.     Notices. All notices and other communications in connection with this Agreement will be in writing and will be deemed given if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the parties at the following addresses (or at such other address for a party as will be specified by like notice):

(a)     If to:

A-D Acquisition Holdings, LLC
c/o Appaloosa Management L.P.
26 Main Street
Chatham, New Jersey 07928
Facsimile:  (973) 701-7055
Attention:  James Bolin

with a copy to:

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard

Suite 4900
Miami, Florida 33131-2352
Facsimile: (305) 358-5744/5766
Attention: Thomas E. Lauria

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Facsimile: (212) 354-8113
Attention: John M. Reiss
   Gregory Pryor

(b)  If to:

Harbinger Del-Auto Investment Company, Ltd.
c/o Harbinger Capital Partners Offshore Manager, LLC
555 Madison Avenue, 16th Floor
New York, NY 10022
Attn: Philip A. Falcone

with a copy to:

Harbert Management Corp.
One Riverchase Parkway South
Birmingham, AL 35244
Facsimile: (205) 987-5505
Attention: General Counsel

with a copy to:

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131-2352
Facsimile: (305) 358-5744/5766
Attention: Thomas E. Lauria

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Facsimile: (212) 354-8113
Attention: John M. Reiss
   Gregory Pryor

with a copy to:

Kaye Scholer LLP
425 Park Avenue
New York, NY 10022-3598
Facsimile: (212) 836-8689
Attention: Benjamin Mintz and Lynn Toby Fisher

(c)    If to:

Merrill Lynch, Pierce, Fenner & Smith Incorporated.
4 World Financial Center
New York, New York 10080
Facsimile: (212) 449-0769
Attention: Robert Spork / Rick Morris

with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Facsimile: (212) 757-3990
Attention: Andrew N. Rosenberg

(d)    If to:

UBS Securities LLC
299 Park Avenue
New York, New York 10171
Facsimile: (212) 821-3008 / (212) 821-4042
Attention: Steve Smith / Osamu Watanabe

with a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Facsimile: (212) 225-3999
Attention: Leslie N. Silverman

(e)    If to:

Goldman Sachs & Co
1 New York Plaza
New York, NY 10004
Facsimile: (212) 823-0145
Attention: David Mullen / Tom Wagner

with a copy to:

Goldman Sachs & Co.
1 New York Plaza
New York, NY  10004
Facsimile:  (212) 428-4769
Attention:  Sandip Khosla

with a copy to:

Sullivan & Cromwell
125 Broad Street
New York, NY  10004
Facsimile:  (212) 558-3588
Attention:  Robert Reeder

(f)    If to:

Pardus DPH Holding LLC
590 Madison Avenue
Suite 25E
New York, NY 10022
Facsimile: (212) 381-7771
Attention: Timothy Bass

with a copy to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, N.Y. 10019-6099
Facsimile: (212) 728-8111
Attention: Rachel C. Strickland
         Morgan D. Elwyn

(g)    If to the Company, to:

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098
Attention: John Sheehan – Facsimile: (248) 813-2612
             David Sherbin / Sean Corcoran – Facsimile:  (248) 813-2491

with a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Facsimile: (212) 735-2000/1
Attention: Eric L. Cochran
             Marie L. Gibson

and

Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Chicago, IL 60606
Facsimile: (312) 407-0411
Attention: John Wm. Butler, Jr.
             George Panagakis

14.    <u>Assignment; Third Party Beneficiaries</u>.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement will be assigned by any of the parties (whether by operation of law or otherwise) without the prior written consent of the other parties, except to an Ultimate Purchaser or to a Related Purchaser pursuant to <u>Sections 2(a)</u>, <u>2(b)</u> and <u>2(k)</u>.  Notwithstanding the previous sentence, subject to the provisions of <u>Sections 2(a)</u>, <u>2(b)</u> and <u>2(k)</u>:  this Agreement, or the Investors' obligations hereunder, may be assigned, delegated or transferred, in whole or in part, by any Investor to any Affiliate of such Investor over which such Investor or any of its Affiliates exercise investment authority, including, without limitation, with respect to voting and dispositive rights; <u>provided</u>, that any such assignee assumes the obligations of such Investor hereunder and agrees in writing to be bound by the terms of this Agreement in the same manner as such Investor.  Notwithstanding the foregoing or any other provisions herein, except pursuant to an Additional Investor Agreement acceptable to the Company and ADAH no such assignment will relieve an Investor of its obligations hereunder if such assignee fails to perform such obligations.  Except as provided in <u>Section 10</u> with respect to the Indemnified Persons, this Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any person other than the parties hereto any rights or remedies under this Agreement.

15.    <u>Prior Negotiations; Entire Agreement</u>.  This Agreement (including the agreements attached as exhibits to and the documents and instruments referred to in this Agreement)

constitutes the entire agreement of the parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement, except that the parties hereto acknowledge that any confidentiality agreements, heretofore executed among the parties will continue in full force and effect.

16.    GOVERNING LAW; VENUE.  THIS AGREEMENT WILL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK.  THE INVESTORS HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR VALIDITY OF THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

17.    Counterparts.  This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the parties and delivered to the other party (including via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

18.    Waivers and Amendments.  This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions of this Agreement may be waived, only by a written instrument signed by all the parties or, in the case of a waiver, by the party waiving compliance, and subject, to the extent required, to the approval of the Bankruptcy Court.  No delay on the part of any party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.  The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity.

19.    Adjustment to Shares.  If, in accordance with the terms of this Agreement, the Company effects a reclassification, stock split (including a reverse stock split), stock dividend or distribution, recapitalization, merger, issuer tender or exchange offer, or other similar transaction with respect to any shares of its capital stock, references to the numbers of such shares and the prices therefore shall be equitably adjusted to reflect such change and,

as adjusted, shall, from and after the date of such event, be subject to further adjustment in accordance herewith.

20.    <u>Headings</u>.  The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

21.    <u>Publicity</u>.  The initial press release regarding this Agreement shall be a joint press release. Thereafter, the Company and Investors each shall consult with each other prior to issuing any press releases (and provide each other a reasonable opportunity to review and comment upon such release) or otherwise making public announcements with respect to the transactions contemplated by this Agreement and the Plan, and prior to making any filings with any third party or any governmental entity (including any national securities exchange or interdealer quotation service) with respect thereto, except as may be required by law or by the request of any governmental entity.

22.    <u>Knowledge; Sole Discretion</u>.  The phrase "**knowledge of the Company**" and similar phrases shall mean the actual knowledge of the Chief Restructuring Officer of the Company and such other officers as the Company and ADAH shall reasonably agree. Whenever in this Agreement any party is permitted to take an action or make a decision in its "sole discretion," the parties hereto acknowledge that such party is entitled to make such decision or take such action in such party's sole and absolute and unfettered discretion and shall be entitled to make such decision or take such action without regard for the interests of any other party and for any reason or no reason whatsoever.  Each party hereto acknowledges, and agrees to accept, all risks associated with the granting to the other parties of the ability to act in such unfettered manner.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by their respective officers thereunto duly authorized, all as of the date first written above.

DELPHI CORPORATION

By: _____

     Name:
     Title:

A-D ACQUISITION HOLDINGS, LLC

By: _____

     Name:
     Title:

HARBINGER DEL-AUTO INVESTMENT COMPANY, LTD.

By: _____

     Name:
     Title:

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

By: _____

     Name:
     Title:

UBS SECURITIES LLC

By: _____
     Name:
     Title:


By: _____
     Name:
     Title:


GOLDMAN SACHS & CO.


By: _____
     Name:
     Title:


PARDUS DPH HOLDING LLC


By: _____
     Name:
     Title:

| Defined Term | Section |
|---|---|
| ADAH | Preamble |
| Additional Investor Agreement | Section 2 (k) |
| Affiliate | Section 2 (a) |
| Agreement | Preamble |
| Alternate Transaction | Section 9 (a)(v) |
| Alternate Transaction Agreement | Section 9 (a)(v) |
| Alternate Transaction Fee | Section 12 (g) |
| Alternative Financing | Section 2 (b) |
| Amended and Restated Constituent Documents | Section 8 (c) |
| Appaloosa | Recitals |
| Approval Motion | Recitals |
| Approval Order | Recitals |
| Arrangement Fee | Section 2 (h)(iii) |
| Assuming Investor | Section 11 (b) |
| Available Investor Shares | Section 2 (b) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Rules | Section 3 (b)(i) |
| Breaching Investor | Section 11 (b) |
| Business Day | Section 1 (c)(iii) |
| Business Plan | Section 5 (s) |
| Capital Structure Date | Section 3 (d) |
| Cerberus | Recitals |
| Change of Recommendation | Section 9 (a)(vi) |
| Chapter 11 Cases | Recitals |
| Closing Date | Section 2 (d) |
| Closing Date Outside Date | Section 12 (d)(iii) |
| Code | Section 3 (z)(ii) |
| Commission | Section 1 (c)(ii) |
| Commitment Fees | Section 2 (h)(ii) |
| Commitment Parties | Recitals |
| Company | Preamble |
| Company ERISA Affiliate | Section 3 (z)(ii) |
| Company Financing Proposal | Section 5 (t) |
| Company Plans | Section 3 (z)(i) |
| Company SEC Documents | Section 3 (j) |
| Confirmation Order | Section 9 (a)(vii) |
| Confirmed Plan | Section 9 (a)(viii) |
| Consideration Period | Section 12 (f)(ii) |
| Cure Period | Section 9(a)(xxviii)(C)(1) |
| Debt Financing | Section 5 (t) |
| Debtors | Recitals |
| Determination Date | Section 1 (c)(vi) |

| Defined Term | Section |
|---|---|
| DGCL | Section 3 (oo) |
| Direct Subscription Shares | Section 2 (a)(i) |
| Disclosure Letter | Section 3 |
| Disclosure Letter Delivery Date | Section 3 |
| Disclosure Statement | Section 5 (b) |
| Disclosure Statement Approval Date | Section 5 (b) |
| Disclosure Statement Filing Date | Section 5 (p) |
| Disclosure Statement Outside Date | Section 12 (d)(iv) |
| Disinterested Director | Section 8 (c) |
| Dolce | Recitals |
| Draft Business Plan | Section 3 (m)(vii) |
| Due Diligence Expiration Date | Section 12 (d)(ii) |
| Effective Date | Section 1 (c)(iii) |
| Eligible Holder | Section 1 (a) |
| Environmental Laws | Section 3 (x)(i) |
| Equity Commitment Letter | Section 4 (o) |
| ERISA | Section 3 (z)(i) |
| Exchange Act | Section 3 (i)(i) |
| Existing Shareholder Rights Plan | Section 3 (d) |
| Expiration Time | Section 1 (c)(iii) |
| E&Y | Section 3 (q) |
| Final Approval Order | Section 9 (a)(i) |
| Financing Decision Date | Section 5 (t) |
| Financing Notice | Section 5 (t) |
| Financing Order | Section 2 (j) |
| GAAP | Section 3 (i)(i) |
| GM | Recitals |
| GM Settlement | Section 5 (p) |
| GS | Preamble |
| Harbinger | Preamble |
| Harbinger Fund | Recitals |
| HSR Act | Section 3 (g) |
| Indebtedness | Section 9 (a)(xxvii) |
| Indemnified Person | Section 10 (a) |
| Indemnifying Party | Section 10 (a) |
| Intellectual Property | Section 3 (s) |
| Investment Decision Package | Section 3 (k) |
| Investor | Preamble |
| Investor Default | Section 2 (b) |
| Investors | Preamble |
| Investor Shares | Section 2 (a) |
| Issuer Free Writing Prospectus | Section 3 (k) |
| IUE-CWA | Section 5 (u) |
| knowledge of the Company | Section 22 |

| Defined Term | Section |
|---|---|
| Limited Termination | Section 12 (d) |
| Losses | Section 10 (a) |
| Material Adverse Effect | Section 3 (a) |
| Material Investment Documents | Section 9 (a)(xxviii) |
| Maximum Number | Section 2 (a) |
| Merrill | Preamble |
| Money Laundering Laws | Section 3 (ee) |
| Monthly Financial Statements | Section 5 (r) |
| Multiemployer Plans | Section 3 (z)(ii) |
| New Common Stock | Section 1 (a) |
| OFAC | Section 3 (ff) |
| Option | Section 3 (d) |
| Options | Section 3 (d) |
| Original Agreement | Recitals |
| Original Approval Motion | Recitals |
| Original Approval Order | Recitals |
| Original Investors | Recitals |
| Original PSA | Recitals |
| Pardus | Preamble |
| Plan | Section 1 (b) |
| Plan Terms | Recitals |
| Preferred Commitment Fee | Section 2 (h)(i) |
| Preferred Debt Financing | Section 5 (t) |
| Preferred Shares | Section 2 (a) |
| Preferred Term Sheet | Section 1 (b) |
| Preliminary Rights Offering Prospectus | Section 3 (k) |
| Proceedings | Section 10 (a) |
| Purchase Notice | Section 1 (c)(vi) |
| Purchase Price | Section 1 (a) |
| Record Date | Section 1 (a) |
| Registration Rights Agreement | Section 8 (c) |
| Related Purchaser | Section 2 (a) |
| Relevant Date | Section 9 (a)(xxviii)(A)(i) |
| Resale Registration Documents | Section 8 (c) |
| Resale Registration Statement | Section 8 (c) |
| Restricted Period | Section 5 (j) |
| Right | Section 1 (a) |
| Rights Distribution Date | Section 1 (c)(ii) |
| Rights Exercise Period | Section 1 (c)(iii) |
| Rights Offering | Section 1 (a) |
| Rights Offering Prospectus | Section 3 (k) |
| Rights Offering Registration Statement | Section 3 (k) |
| Satisfaction Notice | Section 1 (c)(vi) |
| Securities Act | Section 1 (c)(ii) |

| Defined Term | Section |
|---|---|
| Securities Act Effective Date | Section 3 (k) |
| Series A Certificate of Designations | Section 2 (a)(iii) |
| Series A Preferred Stock | Section 2 (a)(iii) |
| Series A Purchase Price | Section 2 (a)(iii) |
| Series B Certificate of Designations | Section 2 (a)(i) |
| Series B Preferred Stock | Section 2 (a)(i) |
| Share | Section 1 (a) |
| Shareholders Agreement | Section 8 (c) |
| Significant Subsidiary | Section 3 (a) |
| Single-Employer Plan | Section 3 (z)(ii) |
| Standby Commitment Fee | Section 2 (h)(ii) |
| Stock Plans | Section 3 (d) |
| Subscription Agent | Section 1 (c)(iii) |
| Subsidiary | Section 3 (a) |
| Superior Transaction | Section 12 (f) |
| Takeover Statute | Section 3 (oo) |
| Taxes | Section 3 (y) |
| Tax Returns | Section 3 (y)(i) |
| Transaction Agreements | Section 3 (b)(i) |
| Transaction Expenses | Section 2 (j) |
| Transformation Plan | Section 3 (m)(vi) |
| UAW | Section 3 (pp) |
| UAW MOU | Section 3 (pp) |
| UBS | Preamble |
| Ultimate Purchasers | Section 2 (k) |
| Unsubscribed Shares | Section 2 (a)(iv) |
| USW | Section 5 (u) |

SCHEDULE 2

| Investor | Direct Subscription Shares | Direct Subscription Shares Purchase Price | Maximum Backstop Shares | Maximum Backstop Shares Purchase Price | Maximum Total Common Shares | Maximum Total Common Shares Purchase Price | Series A Preferred Stock[1] | Purchase Price | Series B Preferred Stock[2] | Purchase Price | Total Purchase Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ADAH | 1,761,878 | $67,638,500 | 15,856,906 | $608,746,500 | 17,618,784 | $676,385,000 | 12,787,724 | $400,000,000 | - | $- | $1,076,385,000 |
| Del-Auto | 702,594 | $26,972,600 | 6,323,348 | $242,753,400 | 7,025,942 | $269,726,000 | - | - | 3,321,178 | $127,500,000 | $397,226,000 |
| Merrill | 265,347 | $10,186,650 | 2,388,118 | $91,679,850 | 2,653,465 | $101,866,500 | - | - | 1,693,149 | $65,000,000 | $166,866,500 |
| UBS | 265,347 | $10,186,650 | 2,388,118 | $91,679,850 | 2,653,465 | $101,866,500 | - | - | 1,693,149 | $65,000,000 | $166,866,500 |
| GS | 950,768 | $36,500,000 | 8,556,914 | $328,500,000 | 9,507,682 | $365,000,000 | - | - | 911,696 | $35,000,000 | $400,000,000 |
| Pardus | 612,545 | $23,515,600 | 5,512,907 | $211,640,400 | 6,125,452 | $235,156,000 | - | - | 2,800,208 | $107,500,000 | $342,656,000 |
| Total | 4,558,479 | $175,000,000 | 41,026,311 | $1,575,000,000 | 45,584,790 | $1,750,000,000 | 12,787,724 | $400,000,000 | 10,419,380 | $400,000,000 | $2,550,000,000 |

**Proportionate Share of Preferred Commitment Fee:**

| Investor | |
|---|---|
| ADAH | 50.4861% |
| Del-Auto | 15.9375% |
| Merrill | 8.1250% |
| UBS | 8.1250% |
| GS | 3.8889% |
| Pardus | 13.4375% |
| Total | 100% |

**Proportionate Share of Standby Commitment Fee:**

| Investor | |
|---|---|
| ADAH | 40.3977% |
| Del-Auto | 15.4712% |
| Merrill | 6.0769% |
| UBS | 6.0769% |
| GS | 18.5397% |
| Pardus | 13.4375% |
| Total | 100% |

**Proportionate Share of Alternate Transaction Fee[3]:**

| Investor | If full Commitment Fee received | If no Commitment Fee received |
|---|---|---|
| ADAH | 54.3750% | 46.8555% |
| Del-Auto | 15.9375% | 15.7150% |
| Merrill | 8.1250% | 7.1475% |
| UBS | 8.1250% | 7.1475% |
| GS | 0% | 9.6970% |
| Pardus | 13.4375% | 13.4375% |
| Total | 100% | 100% |

[1] Common stock equivalent units.

[2] Common stock equivalent units.

[3] Percentages will fluctuate depending on the amount of any Commitment Fee received.

NEWYORK 609548 v31 (2K)

## SUMMARY OF TERMS OF
## PREFERRED STOCK

*Set forth below is a summary of indicative terms for a potential investment in Delphi Corporation by entities or funds controlled by Appaloosa Management, Harbinger Capital Partners, Merrill Lynch, Pierce, Fenner & Smith Incorporated., UBS Securities, Goldman Sachs & Co. and Pardus Special Opportunities Master Fund L.P. The investment is being made in connection with a Plan of Reorganization of Delphi Corporation under chapter 11 of the Bankruptcy Code. The terms set forth below are intended solely to provide a framework for the parties as they proceed with discussions of the proposed transaction and do not constitute any agreement with respect to the definitive terms for any transaction or any agreement to agree or any solicitation of acceptances or rejections of any plan of reorganization. While the parties expect to negotiate in good faith with respect to the terms for a transaction, any party shall be free to discontinue discussions and negotiations at any time for any reason or no reason. No party shall be bound by the terms hereof and only execution and delivery of definitive documentation relating to the transaction shall result in any binding or enforceable obligations of any party relating to the transaction.*

| | |
|---|---|
| **Issuer**: | Delphi Corporation (the "***Company***"), a corporation organized under the laws of Delaware and a successor to Delphi Corporation, as debtor in possession in the chapter 11 reorganization case (the "***Bankruptcy Case***") pending in the United States Bankruptcy Court for the Southern District of New York. |
| **Investors**: | Entities or funds controlled by Appaloosa Management ("***Appaloosa***"), Harbinger Capital Partners ("***Harbinger***"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("***Merrill***"), UBS Securities ("***UBS***"), Goldman Sachs & Co. ("***GS***") and Pardus Special Opportunities Master Fund L.P. ("***Pardus***" and together with Harbinger, Merrill, UBS and GS, the "***Co-Lead Investors***"), with the Series B Preferred Stock to be purchased by the Co-Lead Investors allocated as follows: (a) Harbinger—31.875%; (b) Merrill—16.25%; (c) UBS—16.25%; (d) GS—8.75%; and (e) Pardus—26.875%. Appaloosa or any Permitted Holder (as defined below) shall be the exclusive purchaser and sole beneficial owner for all purposes hereunder of the Series A-1 Preferred Stock (as defined below). Appaloosa, Harbinger, Merrill, UBS, GS and Pardus are collectively referred to as the "***Investors***." |
| **Securities to be Issued**: | Series A-1 Senior Convertible Preferred Stock, par value $0.01 per share (the "***Series A-1 Preferred Stock***"). The Series A-1 Preferred Stock shall convert to Series A-2 Preferred Stock (the "***Series A-2 Preferred Stock***" and, together with the Series A-1 Preferred Stock, the "***Series A Preferred Stock***") in certain circumstances described in this term sheet. |
| | Series B Senior Convertible Preferred Stock, par value $0.01 per share (the "***Series B Preferred Stock***" and, together with the Series A |

Preferred Stock, the *"Preferred Stock"*).

The Series B Preferred Stock shall be identical in all respect to the Series A-1 Preferred Stock except as specifically set forth below.

The Series A-2 Preferred Stock shall be identical in all respect to the Series A-1 Preferred Stock except it shall not have Voting Rights and Governance Rights (as defined below).

The (i) Series A-1 Preferred Stock and the shares of Common Stock underlying such Series A-1 Preferred Stock may not be, directly or indirectly, sold, transferred, assigned, pledged, donated, or otherwise encumbered or disposed of by any Series A Preferred Stock Holder (as defined below), during the two years following the effective date (the *"Effective Date"*) of the Company's plan of reorganization in the Bankruptcy case (the *"Plan"*) other than in whole pursuant to a sale of the Company (as defined below) (provided, however, that in any sale of Series A-1 Preferred Stock in connection with a sale of the Company, the seller of the Series A-1 Preferred Stock may receive consideration with a value no greater than the greater of (i) the fair market value of the Series A-1 Preferred Stock (or a preferred security of equivalent economic value), such fair market value not to reflect the value of the Voting Rights and Governance Rights attributable to the Series A-1 Preferred Stock, and (ii) the Liquidation Value) and (ii) Series B Preferred Stock and the shares of Common Stock underlying such Series B Preferred Stock, or any interest or participation therein may not be, directly or indirectly, sold, transferred, assigned, pledged or otherwise encumbered or disposed of (including by exercise of any registration rights) during the ninety days following the Effective Date other than in whole pursuant to a sale of the Company (each of (i) and (ii), the *"Transfer Restriction"*). A *"sale of the Company"* means the sale of the Company to a party or parties other than, and not including, Appaloosa or any affiliate of Appaloosa (for this purpose, an "affiliate" of Appaloosa shall not include any company in which a fund managed by Appaloosa or its affiliates invests and does not control) pursuant to which such party or parties acquire (i) the capital stock of the Company possessing the voting power under normal circumstances to elect a majority of the Company's Board of Directors (whether by merger, consolidation or sale or transfer of the Company's capital stock) or (ii) all or substantially all of the Company's assets determined on a consolidated basis.

| | |
|---|---|
| **Purchase of Preferred Stock**: | At the Effective Date, (i) Appaloosa will purchase all of the 12,787,724 shares of Series A-1 Preferred Stock for an aggregate purchase price of $400 million and (ii) the Co-Lead Investors shall purchase all of the 10,419,880 shares of Series B Preferred Stock, for an aggregate purchase price of $400 million. The aggregate stated value of the Series A-1 Preferred Stock shall be $400 million and the aggregate stated value of |

the Series B Preferred Stock shall be $400 million (in each case, the "*Stated Value*").

**Mandatory Conversion into Common Stock:**

The Company shall convert into Common Stock all, but not less than all, of the (i) Series A Preferred Stock on the first date the Mandatory Conversion Requirements are satisfied (but in no event earlier than June 30, 2012[1]) at the Conversion Price (as defined below) of the Series A Preferred Stock in effect on such conversion date, and (ii) Series B Preferred Stock on the first day the Mandatory Conversion Requirements are satisfied (but in no event earlier than the third anniversary of the Effective Date) at the Conversion Price (as defined below) of the Series B Preferred Stock in effect on such conversion date.

The *"Mandatory Conversion Requirements"* set forth in this section are as follows: (i) the closing price for the Common Stock for at least 35 trading days in the period of 45 consecutive trading days immediately preceding the date of the notice of conversion shall be equal to or greater than $55[2] per share and (ii) the Company has at the conversion date an effective shelf registration covering resales of the shares of Common Stock received upon such conversion of the Preferred Stock.

The Company will provide each Preferred Stock Holder (as defined below) with notice of conversion at least five (5) business days prior to the date of conversion.

The holders of the Series A Preferred Stock (the "*Series A Preferred Stock Holders*" and each, a "*Series A Preferred Stock Holder*") will agree not to take any action to delay or prevent such registration statement from becoming effective.

**Liquidation Rights:**

In the event of any liquidation, dissolution or winding up of the business of the Company, whether voluntary or involuntary, the holders of Preferred Stock (the "*Preferred Stock Holders*" and each, a "*Preferred Stock Holder*") shall receive, in exchange for each share, out of legally available assets of the Company, (A) a preferential amount in cash equal to (i) the Stated Value plus (ii) the aggregate amount of all accrued and unpaid dividends or distributions with respect to such share (such amount being referred to as the "*Liquidation Value*") and (B) a non-preferential amount (if any) (the "*Common Equivalent Amount*") equal to (i) the amount that Preferred Stock Holder would have received pursuant to the liquidation if it had converted its Preferred Stock into Common Stock immediately prior to the liquidation minus (ii) any amounts received pursuant to (A)(i) and (ii) hereof (the Stated Value and dividends and distributions). For the avoidance of doubt, this paragraph

---

[1] Assuming emergence by January 1, 2008. Conversion date to be adjusted day-by-day to reflect any later emergence.

[2] Equivalent to a TEV of $15.3 billion at emergence.

should operate so that in the event of a liquidation, dissolution or winding up of the business of the Company, a Preferred Stock Holder shall receive a total amount equal to the greater of: (i) the Liquidation Value and (ii) the amount that a Preferred Stock Holder would have received pursuant to the liquidation, dissolution or winding up of the business if it converted its Preferred Stock into Common Stock immediately prior to the liquidation.

**Ranking:**

The Series A Preferred Stock and the Series B Preferred Stock shall rank *pari passu* with respect to any distributions upon liquidation, dissolution or winding up of the Company. The Preferred Stock will rank senior to any other class or series of capital stock of the Company with respect to any distributions upon liquidation, dissolution or winding up of the Company.

**Conversion of Preferred Stock into Common Stock:**

Each share of Preferred Stock shall be convertible at any time, without any payment by the Preferred Stock Holder, into a number of shares of Common Stock equal to (i) the Liquidation Value <u>divided by</u> (ii) the Conversion Price. The Conversion Price shall initially be $[____][3], with respect to the Series A Preferred Stock, and $[____][4] with respect to the Series B Preferred Stock, in each case subject to adjustment from time to time pursuant to the anti-dilution provisions of the Preferred Stock (as so adjusted, the "*Conversion Price*"). The anti-dilution provisions will contain customary provisions with respect to stock splits, recombinations and stock dividends and customary weighted average anti-dilution provisions in the event of, among other things, the issuance of rights, options or convertible securities with an exercise or conversion or exchange price below the Conversion Price, the issuance of additional shares at a price less than the Conversion Price and other similar occurrences.

**Conversion of Series A-1 Preferred Stock Into Series A-2 Preferred Stock:**

If (a) Appaloosa or any Permitted Holder (as defined below) sells, transfers, assigns, pledges, donates or otherwise encumbers to any person other than a Permitted Holder, or converts into Common Stock, shares of Series A-1 Preferred Stock with an aggregate Liquidation Value in excess of $100 million, or (b) David Tepper no longer controls Appaloosa and James Bolin is no longer an executive officer of Appaloosa, then all the shares of Series A-1 Preferred Stock shall automatically convert into Series A-2 Preferred Stock without any action on the part of the holder thereof; <u>provided</u>, that with respect to clause (a), no such conversion shall be effective until the Company has in effect a registration statement covering resales of the Common Stock issuable upon conversion of the Preferred Stock. The Series A Preferred Stock Holders will agree not to take any action to delay or prevent such

---

[3] Equivalent to a TEV of $11.75 billion at emergence.
[4] Equivalent to a TEV of $12.8 billion at emergence.

registration statement from becoming effective.

If Appaloosa transfers shares of Series A-1 Preferred Stock to any person other than an affiliate of Appaloosa (such affiliate being a "*Permitted Holder*"), then all the shares of Series A-1 Preferred Stock so transferred shall automatically convert into Series A-2 Preferred Stock without any action on the part of the holder thereof.

The direct or indirect transfer of ownership interests in any Permitted Holder that owns shares of Series A-1 Preferred Stock such that such Permitted Holder ceases to be an affiliate of Appaloosa shall constitute a transfer of such Series A-1 Preferred Stock to a person other than a Permitted Holder for the purpose of this provision.

Each event described above in the previous two paragraphs of this section "Conversion of Series A Preferred Stock into Series A-2 Preferred Stock" is referred to as a "*Series A-2 Conversion Event*."

Subject to compliance with applicable securities laws and the Transfer Restriction, shares of Preferred Stock will be freely transferable.

| | |
|---|---|
| **Dividends**: | Each Preferred Stock Holder shall be entitled to receive dividends and distributions on the Preferred Stock at an annual rate of 6.5% of the Liquidation Value thereof, with respect to the Series A Preferred Stock, and 3.25% of the Liquidation Value thereof, with respect to the Series B Preferred Stock, in each case payable quarterly in cash as declared by the Company's Board.  Unpaid dividends shall accrue.  In addition, if any dividends are declared and paid on the Common Stock, the Series A Preferred Stock shall be entitled to receive, in addition to the dividend on the Series A Preferred Stock at the stated rate, the dividends that would have been payable on the number of shares of Common Stock that would have been issued on the Series A Preferred Stock had it been converted immediately prior to the record date for such dividend. |
| **Preference with Respect to Dividends**: | Each Preferred Stock Holder shall, prior to the payment of any dividend or distribution in respect of the Common Stock or any other class of capital stock of the Company ranking junior to the Preferred Stock, be entitled to be paid in full the dividends and distributions payable in respect of the Preferred Stock. |
| **Restriction on Redemptions of Junior Stock**: | So long as shares of Series A Preferred Stock having a Liquidation Value of $200 million or more remain outstanding, the Company shall not and shall not permit any of its subsidiaries to, purchase, redeem or otherwise acquire for value any shares of Common Stock or any shares of any other class of capital stock of the Company ranking junior to the Preferred Stock, except customary provisions with respect to repurchase of employee equity upon termination of employment and except for |

purchases, redemptions or other acquisitions for value of Common Stock not to exceed $50 million in any calendar year.

**Governance –
Board of
Directors:**

A committee (the "*Search Committee*") shall be appointed consisting of one (1) representative of Appaloosa, one (1) representative of the Company, being the Company's lead director (currently John Opie), one (1) representative of the Unsecured Creditors Committee, being David Daigle, one (1) representative of the Co-Lead Investors other than UBS, GS and Merrill (who shall be determined by Appaloosa), and one (1) representative of the Equity Committee reasonably acceptable to the other members of the Search Committee. Each member of the Search Committee shall be entitled to require the Search Committee to interview any person to serve as a director unless such proposed candidate is rejected by each of the Appaloosa representative, the Company representative and the representative of the Unsecured Creditors' Committee. The entire Search Committee shall be entitled to participate in such interview and in a discussion of such potential director following such interview.

The board of directors of the Company shall consist of nine (9) directors (which number shall not be expanded at all times that the Series A-1 Preferred Stock has Series A-1 Board Rights (as defined below)), three (3) of whom (who shall be Class III Directors) shall initially be nominated by Appaloosa and elected at the time of emergence from Chapter 11 by the Series A Preferred Stock Holders (and thereafter shall be elected directly by the Series A Preferred Stock Holders) (the "*Series A Directors*"), one (1) of whom (who shall be a Class I Director) shall be the Executive Chairman selected as described below under "Executive Chairman", one (1) of whom (who shall be a Class I Director) shall be the Chief Executive Officer, one (1) of whom (who shall be a Class I Director) shall initially be selected by the Co-Lead Investor representative on the Search Committee with the approval of either the Company or the Unsecured Creditors' Committee (the "*Joint Investor Director*"), one (1) of whom (who shall be a Class I Director) shall initially be selected by the Unsecured Creditors' Committee and two (2) of whom (who shall be Class II Directors) shall initially be selected by the Unsecured Creditors' Committee (such directors selected by the Unsecured Creditors' Committee and the Joint Investor Director, being the "*Common Directors*"). For the avoidance of doubt, all directors selected in accordance with this paragraph, shall have been interviewed and/or discussed by the Search Committee. Each director so selected shall be appointed to the initial Board of Directors of the Company unless at least three members of the following four members of the Search Committee objects to the appointment of such individual: the Appaloosa representative, the Company representative; the representative of the Unsecured Creditors' Committee; and the representative of the Equity Committee. Initially, the Board shall be

comprised of (a) six (6) directors who satisfy all applicable independence requirements of the relevant stock exchange on which it is expected the Common Stock would be traded and (b) six (6) directors who are independent from the Investors; provided, that the requirements of this sentence may be waived by the unanimous consent of the Company, Appaloosa and the Unsecured Creditors Committee. Additionally, the Joint Investor Director must be independent from the Investors.

Directors initially will be placed as set forth above in three (3) classes: directors in the first class will have an initial term expiring at the annual meeting of stockholders to be held in 2009 (each a "*Class I Director*"), directors in the second class will have an initial term expiring at the annual meeting of stockholders to be held in 2010 (each a "*Class II Director*"), and directors in the final class will have an initial term expiring at the annual meeting of stockholders to be held in 2011 (each a "*Class III Director*"). After the expiration of each initial term of each class of directors, the directors will thereafter each have a one year term elected annually.

Following the initial election of the Executive Chairman and the Chief Executive Officer, the Executive Chairman and Chief Executive Officer shall be nominated for election to the Board by the Nominating and Corporate Governance Committee of the Board and elected to the board by the holders of the Common Stock and the Preferred Stock, voting as a class. The Executive Chairman of the Board shall be selected as described below under "Executive Chairman." The initial Chief Executive Officer shall be Rodney O'Neal, who shall become the Chief Executive Officer and President not later than the effective date of the Plan.

After the initial selection of the Series A Directors, until the earlier of the expiration of the term of the Class III Directors and the conversion of all Series A-1 Preferred Stock to Series A-2 Preferred Stock or Common Stock, (a) the Series A Preferred Stock shall continue to directly elect (including removal and replacement) the Series A Directors subject to the ability of the Nominating and Corporate Governance Committee to, by majority vote, veto the selection of up to two proposed Series A Directors for each Series A director position on the Board and (b) the number of directors on the board of directors may not be increased. The rights of Series A-1 Preferred Stock described in this paragraph are referred to as "*Series A-1 Board Rights*". Upon the earlier of such date, the Series A-1 Directors shall serve out their remaining term and thereafter be treated as Common Directors.

After the initial selection of the Common Directors, the nominees for election of the Common Directors shall be determined by the Nominating and Corporate Governance Committee of the Company's

Board of Directors, with the Series A Directors on such committee not entitled to vote on such determination at any time the Series A-1 Preferred Stock retains Series A-1 Board Rights, and recommended to the Company's Board of Directors for nomination by the Board. Only holders of Common Stock, Series B Preferred Stock and Series A Preferred Stock that is not entitled to Series A Board Rights shall be entitled to vote on the election of the Common Directors.

The Search Committee shall determine by majority vote the Committee assignments of the initial Board of Directors; provided, that for the initial Board and at all times thereafter that the Series A-1 Preferred Stock retains Series A-1 Board Rights at least one Series A Director shall be on all committees of the Board and a Series A Director shall constitute the Chairman of the Compensation Committee of the Board; provided, further, that so long as the Series A-1 Preferred Stock retains Series A-1 Board Rights, the Series A Directors shall not constitute a majority of the Nominating and Corporate Governance Committee. Committee assignments shall be subject to all applicable independence and qualification requirements for directors including those of the relevant stock exchange on which the Common Stock is expected to be traded. Pursuant to a stockholders' agreement or other arrangements, the Company shall maintain that composition.

| | |
|---|---|
| **Governance – Executive Chairman:** | The Executive Chairman shall initially be selected by majority vote of the Search Committee, which must include the approval of the representatives of Appaloosa and the Unsecured Creditors' Committee. Any successor Executive Chairman shall be selected by the Nominating and Corporate Governance Committee of the Board, subject (but only for so long as any of the Series A-1 Preferred Stock remains outstanding) to the approval of the Series A-1 Preferred Stock Holders. Upon approval, such candidate shall be recommended by the Nominating and Corporate Governance Committee to the Company's Board of Directors for appointment as the Executive Chairman and nomination to the Board. The Preferred Stock Holders will vote on the candidate's election to the Board on an as-converted basis together with holders of Common Stock. Notwithstanding the foregoing, if there shall occur any vacancy in the office of the Executive Chairman during the initial one (1) year term, the successor Executive Chairman shall be nominated by the Series A-1 Preferred Stock Holders (but only for so long any of as the Series A-1 Preferred Stock remains outstanding) subject to the approval of the Nominating and Corporate Governance Committee of the Board. |

The Executive Chairman shall be a full-time employee of the Company with his or her principal office in the Company's world headquarters in Troy, Michigan and shall devote substantially all of his or her business activity to the business affairs of the Company.

The Executive Chairman shall cause the Company to and the Company shall be obligated to meaningfully consult with the representatives of the Series A-1 Preferred Stock Holders with respect to the annual budget and material modifications thereto prior to the time it is submitted to the Board for approval.

The employment agreements entered into by the Company with the Executive Chairman and the Chief Executive Officer shall provide that (i) upon any termination of employment, the Executive Chairman and/or the Chief Executive Officer shall resign as a director (and the employment agreements shall require delivery at the time such agreements are entered into of an executed irrevocable resignation that becomes effective upon such termination) and (ii) the right to receive any payments or other benefits upon termination of employment shall be conditioned upon such resignation. If for any reason the Executive Chairman or the Chief Executive Officer does not resign or the irrevocable resignation is determined to be ineffective, then the Series A-1 Preferred Stock Holders may remove the Executive Chairman and/or Chief Executive Officer as a director, subject to applicable law. The employment agreement of the Chief Executive Officer will provide that if the Chief Executive Officer is not elected as a member of the Company's Board, the Chief Executive Officer may resign for "cause" or "good reason".

The special rights of the Series A-1 Preferred Stock referred to in "Governance – Board of Directors" and in this "Executive Chairman" section are referred to as the "*Governance Rights*".

| | |
|---|---|
| **Governance –**<br>**Voting Rights:** | Except with respect to the election of directors, who shall be elected as specified above, the Preferred Stock Holders shall vote, on an "as converted" basis, together with the holders of the Common Stock, on all matters submitted to shareholders. |

The Series A-1 Preferred Stock Holders shall be entitled to propose individuals for appointment as Chief Executive Officer and Chief Financial Officer, subject to a vote of the Board. The Series A-1 Preferred Stock Holders shall also have the non-exclusive right to propose the termination of the Executive Chairman (but only during the initial one (1) year term of the Executive Chairman and only for so long as the Series A-1 Preferred Stock remains outstanding), the Chief Executive Officer and Chief Financial Officer, in each case, subject to a vote of the Board. If the Series A Preferred Stock Holders propose the appointment or termination of the Chief Executive Officer or Chief Financial Officer, the Board shall convene and vote on such proposal within ten (10) days of the Board's receipt of notice from the Series A-1 Preferred Stock Holders; provided, that the then current Chief Executive Officer shall not be entitled to vote on either the appointment or

termination of the Chief Executive Officer and shall not be entitled to vote on the termination of the Chief Financial Officer.

The Company shall not, and shall not permit its subsidiaries to, take any of the following actions (subject to customary exceptions as applicable) unless (i) the Company shall provide the Series A-1 Preferred Stock Holders with at least 20 business days advance notice and (ii) it shall not have received, prior to the 10th business day after the receipt of such notice by the Series A-1 Preferred Stock Holders, written notice from all of the Series A-1 Preferred Stock Holders that they object to such action:

- any action to liquidate the Company;

- any amendment of the charter or bylaws that adversely affects the Series A Preferred Stock (any expansion of the Board of Directors would be deemed adverse); or

- at all times that the Series A Preferred Stock is subject to the Transfer Restriction:

    - a sale, transfer or other disposition of all or substantially all of the assets of the Company and its subsidiaries, on a consolidated basis;

    - any merger or consolidation involving a change of control of the Company; or

    - any acquisition of or investment in any other person or entity having a value in excess of $250 million in any twelve-month period after the Issue Date.

The approval rights set forth above shall be in addition to the other rights set forth above and any voting rights to which the Series A Preferred Stock Holders are entitled above and under Delaware law.

In a merger or consolidation involving a change of control of the Company (a "***Change of Control***"), the Series A-1 Preferred Stock will be converted into the greater of (i) the consideration with a value equal to the fair market value of the Series A-1 Preferred Stock (or a preferred security of equivalent economic value), such fair market value shall not reflect the value of the Voting Rights and Governance Rights attributable to the Series A-1 Preferred Stock, and (ii) the Liquidation Value.  In a Change of Control transaction, the Series B Preferred Stock will be converted into the greater of (i) the consideration with a value equal to the fair market value of the Series B Preferred Stock (or a preferred security of equivalent economic value) and (ii) the Liquidation Value.

The special rights of the Series A-1 Preferred Stock described above in

this section "Governance – Voting Rights" are referred to as the "***Voting Rights***". The Series A-1 Preferred Stock Holders shall have no Voting Rights after no shares of Series A-1 Preferred Stock are outstanding.

Appaloosa and the Permitted Holders shall not receive, in exchange for the exercise or non-exercise of voting or other rights in connection with a any transaction subject to Voting Rights, any compensation or remuneration; <u>provided</u>, that this restriction shall not prohibit the reimbursement of expenses incurred by Appaloosa or any Permitted Holders and shall not prohibit the payment of fees by the Company to Appaloosa or any Permitted Holder if the Company has engaged Appaloosa or its affiliates as an advisor or consultant in connection with any such transaction.

**Reservation of Unissued Stock:**

The Company shall maintain sufficient authorized but unissued securities of all classes issuable upon the conversion or exchange of shares of Preferred Stock and Common Stock.

**Transferability:**

The Series A Preferred Stock Holders may sell or otherwise transfer such stock as follows:

- to any Permitted Holder; or

- subject to the Transfer Restriction, to any other person; <u>provided, however,</u> that upon any such transfer, the shares of Series A-1 Preferred Stock so transferred shall automatically convert into Series A-2 Preferred Stock.

**Registration Rights:**

The Investors shall be entitled to registration rights as set forth below. The registration rights agreement shall contain customary terms and provisions consistent with such terms, including customary hold-back, cutback and indemnification provisions.

<u>Demand Registrations</u>. Subject to the Transfer Restriction, the Preferred Stock Holders shall be entitled to an aggregate of five (5) demand registrations, in addition to any shelf registration statement required by the Equity Purchase and Commitment Agreement among the Company and the Investors (which shelf registration shall be renewed or remain available so long as the Company is not eligible to use Form S-3); <u>provided</u>, that all but one such demand right requires the prior written consent of Appaloosa and the one demand not requiring the consent of Appaloosa shall be at the request of the holders of a majority of the shares of Series B Preferred Stock; <u>provided, further</u>, that following the time that the Company is eligible to use Form S-3, the Preferred Stock Holders shall be entitled to an unlimited number of demand registrations (without the need for Appaloosa's consent). Any demand registration may, at the option of the Preferred Stock Holders be a "shelf"

registration pursuant to Rule 415 under the Securities Act of 1933. All registrations will be subject to customary "windows."

Piggyback Registrations. In addition, subject to the Transfer Restriction, the Preferred Stock Holders shall be entitled to unlimited piggyback registration rights, subject to customary cut-back provisions.

Registrable Securities:  The Series B Preferred Stock, any shares of Common Stock issuable upon conversion of the Preferred Stock, any other shares of Common Stock held by any Investor (including shares acquired in the rights offering or upon the exercise of preemptive rights), and any additional securities issued or distributed by way of a dividend or other distribution in respect of any securities. Securities shall cease to be Registrable Securities upon sale to the public pursuant to a registration statement or Rule 144, or when all shares held by an Investor may be transferred without restriction pursuant to Rule 144(k).

Expenses.  All registrations shall be at the Company's expense (except underwriting fees, discounts and commissions agreed to be paid by the selling holders), including, without limitation, fees and expenses of one counsel for any holders selling Registrable Securities in connection with any such registration.

**Preemptive Rights:**    So long as shares of Series A-1 Preferred Stock having a Liquidation Value of $250 million or more remain outstanding, the Preferred Stock Holders shall be entitled to participate *pro rata* in any offering of equity securities of the Company, other than with respect to (i) shares issued or underlying options issued to management and employees and (ii) shares issued in connection with business combination transactions.

**Commitment Fee:**    (a) A commitment fee of 2.25% of total commitment shall be earned by and payable to the Investors and (b) an additional arrangement fee of 0.25% of total commitment shall be earned by and payable to Appaloosa, all as provided for in the EPCA.

**Standstill**    For a period of five (5) years from the Closing Date, Appaloosa will not (a) acquire, offer or propose to acquire, solicit an offer to sell or donate or agree to acquire, or enter into any arrangement or undertaking to acquire, directly or indirectly, by purchase, gift or otherwise, record or direct or indirect beneficial ownership (as such term is defined in Rule 13d-3 of the Exchange Act) of more than 25% of the Company's common stock or any direct or indirect rights, warrants or options to acquire record or direct or indirect beneficial ownership of more than 25% of the Company's common stock or (b) sell, transfer, pledge, dispose, distribute or assign ("*Transfer*") to any person in a single transaction, Company Common Stock or any securities convertible into or exchangeable for or representing the right to acquire the Company's

Common Stock ("***Common Stock Equivalents***") representing more than 15% of the Company's then issued and outstanding (on a fully diluted basis) Common Stock; <u>provided</u>, that Appaloosa shall be permitted to Transfer the Company's Common Stock or Common Stock Equivalents (i) to Permitted Holders, (ii) as part of a broadly distributed public offering effected in accordance with an effective registration statement, (iii) in a sale of the Company, (iv) pursuant to any tender or exchange offer or (v) as otherwise approved by (A) during the initial three year term of the Series A Directors, a majority of Directors who are not Series A Directors or (B) after the initial three year term of the Series A Directors, a majority of the Directors (customary exceptions shall apply for Transfers to partners, stockholders, family members and trusts and Transfers pursuant to the laws of succession, distribution and descent).

| | |
|---|---|
| **Stockholders Agreement**: | Certain of the provisions hereof will be contained in a Stockholders Agreement to be executed and delivered by ADAH and the Company on the Effective Date. |
| **Governing Law**: | State of Delaware |

EXHIBIT B

PLAN FRAMEWORK AND SPECIAL STATUTORY COMMITTEE PROVISIONS

FRAMEWORK PROVISIONS

The Plan shall contain all of the following terms; provided, however, that nothing herein shall constitute an offer with respect to any securities or a solicitation of acceptances of a chapter 11 plan.  Such offer or solicitation only will be made in compliance with all applicable securities laws and/or provisions of the Bankruptcy Code:

1.1    A condition precedent to the effectiveness of the Plan (subject to the waiver provisions to be negotiated in connection with the Plan) shall be that the aggregate amount of all trade claims and other unsecured claims (including any accrued interest) (excluding (i) unsecured funded debt claims, (ii) Flow-Through Claims (defined below), (ii) GM claims, which shall be treated as set forth below, and (iii) securities claims, which shall be treated as set forth below) (collectively, the "Trade and Other Unsecured Claims") that have been asserted or scheduled but not yet disallowed as of the effective date of the Plan shall be allowed or estimated for distribution purposes by the Bankruptcy Court to be no more than $1.7 billion, excluding all allowed accrued postpetition interest thereon.

1.2    All senior secured debt shall be refinanced and paid in full and all allowed administrative and priority claims shall be paid in full.

1.3    Trade and Other Unsecured Claims and unsecured funded debt claims shall be placed in a single class.  All such claims that are allowed (including all allowed accrued interest, which for trade claims shall be at a rate to be agreed to or determined by the Bankruptcy Court, it being understood that with respect to trade claims, the Debtors and Plan Investors will not take the position that there should not be an entitlement to postpetition interest) shall be satisfied in full with (a) $3.48 billion of common stock (77.3 million out of a total of 147.6 million shares,[1] at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi and (b) the balance in cash[2]; provided, however, that the common stock and cash to be distributed pursuant to the immediately preceding clause shall be reduced proportionately by the amount that allowed Trade and Other Unsecured Claims are less than $1.7 billion, excluding allowed accrued postpetition interest thereon.

1.4    (i) Customer and environmental obligations, (ii) employee-related (excluding collective bargaining-related obligations) and other obligations (in each instance as to be agreed by the Debtors and Appaloosa) and (iii) litigation exposures and other liabilities that are covered

---

[1]    Inclusive of distributions to subordinated creditors under Section 1.6 below.  References herein to the total number of shares of common stock gives effect to the conversion of the preferred stock issued pursuant to the Investment Agreement to common stock.  The actual number of shares of common stock to be issued by Delphi and to be distributed to various classes is subject to final adjustment and reconciliation as well as negotiation of plan distribution mechanics in the Plan.

[2]    Such amounts to be adjusted by proceeds from the par rights offering to be conducted by Delphi in connection with Section 1.8(iv).

by insurance (as to be agreed by the Debtors and Appaloosa and scheduled in the Plan) ((i), (ii) and (iii) together, the "Flow-Through Claims") will be unimpaired and will be satisfied in the ordinary course of business (subject to the preservation and flow-through of all estate rights, claims and defenses with respect thereto which shall be fully reserved).

1.5     GM will receive an allowed general unsecured claim for all claims and rights of GM and its affiliates (excluding in respect of the 414(l) Assumption, all Flow Through Claims and all other claims and amounts to be treated in the normal course or arising or paid pursuant to the Delphi/GM Definitive Documents) that will be satisfied with $2.70 billion in cash.

1.6     All Delphi subordinated debt claims (including all accrued interest thereon) will be allowed and, in resolution of the subordination rights of Delphi senior debt, all cash otherwise distributable to Delphi subordinated debt claims pursuant to Section 1.3 shall be distributed to Delphi senior debt, and the allowed Delphi subordinated debt claims will be satisfied with $478 million of common stock (10.6 million out of a total of 147.6 million shares, at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi.

1.7     Any allowed securities claims, including all claims in the MDL litigation pending in the United States District Court for the Eastern District of Michigan, will be satisfied solely from available insurance or as otherwise agreed by Delphi and Appaloosa.

1.8     The equity securities class in the Plan shall receive, in the aggregate, (i) $66 million of common stock (1.5 million out of a total of 147.6 million shares, at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi, (ii) rights to purchase 45.6 million out of a total of 147.6 million shares of common stock (to be reduced by the guaranteed minimum of 10% of the rights for the Plan Investors) in reorganized Delphi for $1.75 billion (exercise price: $38.39/share), (iii) 5-year warrants to purchase for $45/share an additional 5% of the common stock of Delphi, and (iv) the right to purchase on a proportionate basis, approximately $522 million of the common stock that would otherwise be distributable to unsecured claims plus an additional $50 million of the common stock that would otherwise be distributable to Appaloosa (each pursuant to Section 1.3) for a price of $45/share (the "par rights offering"); provided, that Appaloosa (in its capacity as a stockholder of Delphi) shall agree not to participate in the par rights offering and shall use commercially reasonable efforts to obtain such agreement from the other Plan Investors.[3]

1.9     The preferred stock to be issued pursuant to the Plan in connection with the Investment Agreement and the corporate governance of Reorganized Delphi shall be subject to the terms listed on the term sheet attached to the Investment Agreement ("Summary of Terms of Preferred Stock"), which are incorporated by reference herein.

1.10    Delphi will arrange for payment on the effective date of the Plan of $3.5 billion to fund its pension obligations. Such payment will include GM taking up to $2.0 billion of net

---

[3]     Inclusion in the Plan of subsections 1.8 (iii) and (iv) is conditioned upon the "Equity Committee" (as defined below) supporting entry of the Approval Order and there not occurring a "Withdrawal of Support" (as defined below). The rights in the par rights offering are to be equivalent to 15% of the common stock that would otherwise be distributable to all unsecured claims plus an additional $50 million of the common stock that would otherwise be distributable to Appaloosa on mechanics to be agreed.

pension obligations pursuant to a 414(l) transaction (the "414(l) Assumption"), which amount shall be reduced to no less than $1.5 billion if (a) Delphi or Appaloosa determine that any greater amount will have an adverse impact on the Debtors or (b) Appaloosa determines that any greater amount will have an adverse impact on the Plan Investors' proposed investment in the Debtors. GM will receive a note from Delphi in the amount of the 414(l) Assumption transferred in the 414(l) transaction, subject to agreed market terms to be specified in the Delphi/GM Definitive Documents; provided, however, that such note will be due, payable and paid in full at par plus accrued interest in cash within ten (10) days following the effective date of the Plan.

1.11    A joint claims oversight committee shall be established on the effective date of the Plan or as soon thereafter as practicable to monitor claims administration, provide guidance to the Debtors, and address the Bankruptcy Court if such post-effective date joint claims oversight committee disagrees with the Debtors' determinations requiring claims resolution. The composition of the joint claims oversight committee shall be reasonably satisfactory to Appaloosa, but in any case, shall include at least one representative appointed by Appaloosa.

1.12    Ongoing management compensation, including the SERP, stock options, restricted stock, severance, change in control provisions and all other benefits will be on market terms (as determined by the Board of Directors, based on the advice of Watson-Wyatt, and such management compensation plan design shall be described in the Disclosure Statement and included in the Plan) and reasonably acceptable to Appaloosa; claims of former management and terminated/resigning management will be resolved on terms acceptable to Delphi and Appaloosa or by court order. Equity awards will dilute all equity interests pro rata.

1.13    The amended and restated certificate of incorporation of Delphi to be effective immediately following the effective date of the Plan shall prohibit: (A) for so long as Appaloosa owns any shares of Series A Preferred Stock, any transactions between Delphi or any of its Subsidiaries (as defined in the Investment Agreement), on the one hand, and Appaloosa or its respective Affiliates (as defined in the Investment Agreement), on the other hand (including any "going private transaction" sponsored by Appaloosa) unless such transaction shall have been approved by directors constituting not less than 75% of the number of Common Directors (as defined in the Investment Agreement), and (B) any transaction between Delphi or any of its Subsidiaries, on the one hand, and a director, on the other hand, other than a director appointed by holders of Series A Preferred Stock (as defined in the Investment Agreement), unless such transaction shall have been approved by directors having no material interest in such transaction (a "Disinterested Director") constituting not less than 75% of the number of Disinterested Directors.

## SPECIAL STATUTORY COMMITTEE PROVISIONS

So long as the official committee of unsecured creditors appointed on October 17, 2005 in the Chapter 11 Cases (the "Creditors' Committee") and the ad hoc committee of trade creditors (the "Ad Hoc Trade Committee") shall support entry of the Approval Order and so long as the Creditors' Committee shall support the implementation of the Investment Agreement, this Exhibit B, and each of the transactions contemplated by the Investment Agreement and this Exhibit B, the following provisions shall be in effect, and to the extent such provisions are inconsistent with any other provisions of this Exhibit B, the following provisions shall supplant

and supersede such; <u>provided</u>, that if the Creditors' Committee, in the exercise of its fiduciary duties, shall subsequently withdraw, qualify or modify in a manner adverse to the Plan Investors (or resolve to do any of the foregoing) its support for the entry of the Approval Order, the implementation of the Investment Agreement, this Exhibit B, or any of the transactions contemplated by the Investment Agreement or this Exhibit B, or shall have approved or recommended any competing or other transaction inconsistent with the Investment Agreement or this Exhibit B (each such action, a "<u>Withdrawal of Support</u>"), then Sections 2.1 (as it relates to the Creditors' Committee) and Sections 2.2 and 2.3 shall terminate and shall be of no further force or effect; <u>provided</u> <u>further</u>, that if the Creditors' Committee (a) objects in any pleading to (i) any of the terms of any Plan Document solely on the basis of comments provided by the Creditors' Committee pursuant to Section 2.1 hereof, but rejected by the Debtors or Appaloosa, or (ii) the position that the Debtors, any Plan Investor or any other Party takes as to the appropriate rate of interest on Trade and Other Unsecured Claims as permitted by Section 1.3 of this Exhibit B as amended hereby, or (b) unsuccessfully seeks the termination of the Investment Agreement pursuant to Section 2.3, then in each such case such objection or action shall not be considered a Withdrawal of Support.  So long as the official committee of equity security holders appointed in the Chapter 11 Cases (the "<u>Equity</u> <u>Committee</u>") shall support entry of the Approval Order and so long as the Equity Committee shall support the implementation of the Investment Agreement, this Exhibit B, and each of the transactions contemplated by the Investment Agreement and this Exhibit B, the following provisions shall be in effect (as they relate to the Equity Committee), and to the extent such provisions are inconsistent with any other provisions of this Exhibit B, the following provisions shall supplant and supersede such; <u>provided</u>, that if the Equity Committee takes any action that constitutes a Withdrawal of Support, then Sections 2.1 (as it relates to the Equity Committee) and Section 2.4 shall terminate and shall be of no further force or effect; <u>provided</u> <u>further</u>, that if the Equity Committee (a) objects in any pleading to any of the terms of any Plan Document solely on the basis of comments provided by the Equity Committee pursuant to Section 2.1 hereof, but rejected by the Debtors or Appaloosa or (b) unsuccessfully seeks to withdraw support pursuant to Section 2.4, then in each such case such objection or action shall not be considered a Withdrawal of Support.

      2.1     The Debtors will provide Creditors' Committee and the Equity Committee with periodic working drafts of the Plan, the Disclosure Statement, the Confirmation Order and any Plan Documents that each such committee reasonably believes could have a material impact on the recovery of their constituents, and any amendments thereto, and with a reasonable opportunity to review and comment on such documents prior to such documents being filed with the Bankruptcy Court.  The Debtors and the Plan Investors will consider in good faith any comments consistent with the Investment Agreement and this Exhibit B, and any other reasonable comments of the Creditors' Committee and/or the Equity Committee, and will not reject such comments without first discussing the reasons therefore with counsel to the Creditors' Committee and/or the Equity Committee and giving due consideration to the views of the Creditors' Committee and/or the Equity Committee.

      2.2     The Creditors' Committee will have consultation rights through the Confirmation Date with respect to executive compensation under the Plan and as described in the Disclosure Statement.  The Creditors' Committee shall also have one representative of the Creditors' committee placed on the joint claims oversight committee contemplated by Section 1.11 of this

Exhibit B, it being understood that such member shall not have veto rights over any committee action.

2.3     In the event that the Debtors and the Plan Investors agree to (a) substantive and material changes in the overall deal as set forth in the Investment Agreement and this Exhibit B after the date of the Approval Order, (b) Flow-Through Claims (as defined in Section 1.4 of this Exhibit B) other than claims arising out of or resulting from customer claims and environmental claims, or (c) any alternative treatment of securities claims from estate assets other than available insurance, any of which would have a material adverse effect on the economics of the recovery of general unsecured creditors under the plan of reorganization to be funded through the EPCA, the Creditors' Committee shall have the right to seek termination of the EPCA by the Bankruptcy Court by establishing by a preponderance of the evidence that there has been a material adverse effect on the economics of the recovery to general unsecured creditors under the plan of reorganization to be funded through the EPCA as a result of such actions.

2.4     In the event that the Debtors and the Plan Investors agree to substantive and material changes in Section 1.7 of this Exhibit B after the date of the Approval Order which would have a material adverse effect on the economics of the recovery of current equity security holders of Delphi under the plan of reorganization to be funded through the EPCA, the Equity Committee shall have the right to withdraw its support of the EPCA by the Bankruptcy Court by establishing by a preponderance of the evidence that there has been a material adverse effect on the economics of the recovery to current equity holders of Delphi under the plan of reorganization to be funded through the EPCA as a result of such actions in which event there shall be no reduction in the recoveries to the equity securities class under Section 1.8(iii) and (iv) of this Exhibit B.

**APPALOOSA MANAGEMENT L.P.**
26 Main Street
Chatham, New Jersey 07928

[    ], 2007

A-D Acquisition Holdings, LLC
c/o Appaloosa Management L.P.
26 Main Street
Chatham, New Jersey, 07928
Attention: Jim Bolin

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098

Ladies and Gentlemen:

Reference is made to that certain Equity Purchase and Commitment Agreement (the "Agreement"), dated as of the date hereof, by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware (the "Investor"), Harbinger Del-Auto Investment Company, Ltd., an exempted company formed under the laws of the Cayman Islands, Merrill Lynch, Pierce Fenner & Smith Incorporated, a Delaware corporation, UBS Securities LLC, a limited liability company formed under the laws of the State of Delaware, Goldman Sachs & Co., a New York limited partnership, and Pardus DPH Holding LLC, a limited liability company formed under the laws of the State of Delaware, on the one hand, and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company"), on the other hand. Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

This letter will confirm the commitment of Appaloosa Management L.P. ("AMLP"), on behalf of one or more of its affiliated funds or managed accounts to be designated, to provide or cause to be provided funds (the "Funds") to the Investor in an amount up to $1,076,400,000, subject to the terms and conditions set forth herein. If (i) a Limited Termination has occurred, (ii) the Agreement has not been terminated by the Investor in accordance with its terms within ten (10) Business Days of the occurrence of such Limited Termination, and (iii) the Investor becomes obligated in accordance with Section 2(b) of the Agreement to purchase the Available Investor Shares as a result of such Limited Termination (an "Escalation Trigger"), the maximum amount of Funds referred to in the immediately preceding sentence shall be increased as follows: (i) by $166,860,000 if an Escalation Trigger arises as a result of a Limited Termination by Merrill Lynch, Pierce, Fenner & Smith Incorporated; (ii) by $166,860,000 if an Escalation Trigger arises as a result of a Limited Termination by UBS Securities LLC; (iii) by $397,230,000 if an Escalation Trigger arises as a result of a Limited Termination by Harbinger Del-Auto Investments Company, Ltd.; (iv) by $400,000,000 if an Escalation Trigger arises as a result of a Limited Termination by Goldman Sachs & Co.; and (v) by $342,650,000 if an Escalation Trigger arises as a result of a Limited Termination by Pardus DPH Holding LLC. The Funds to be

A-D Acquisition Holdings, LLC
Delphi Corporation
[    ], 2007
Page 2

provided by or on behalf of AMLP to the Investor will be used to provide the financing for the Investor (i) to purchase the Investor Shares pursuant to the Agreement (the "Purchase Obligation") and (ii) to satisfy the Investor's other obligations under the Agreement, if any; provided, however, that the aggregate liability of AMLP under the immediately preceding clauses (i) and (ii) shall under no circumstances exceed the Cap (as defined below). AMLP shall not be liable to fund to the Investor any amounts hereunder (other than to fund the Purchase Obligation), unless and until, any party to the Agreement, other than the Company, commits a willful breach of the Agreement. For purposes of this letter agreement, the "Cap" shall mean (i) at all times on or prior to the Disclosure Statement Approval Date, $100,000,000 and (ii) after the Disclosure Statement Approval Date, $250,000,000. Our commitment to fund the Investor's Purchase Obligation is subject to the satisfaction, or waiver in writing by AMLP and the Investor, of all of the conditions, if any, to the Investor's obligations at such time contained in the Agreement.

Notwithstanding any other term or condition of this letter agreement, (i) under no circumstances shall the liability of AMLP hereunder or for breach of this letter agreement exceed, in the aggregate, the Cap for any reason, (ii) under no circumstances shall AMLP be liable for punitive damages and (iii) the liability of AMLP shall be limited to monetary damages only. There is no express or implied intention to benefit any person or entity not party hereto and nothing contained in this letter agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than the Investor and the Company. Subject to the terms and conditions of this letter agreement, the Company shall have the right to assert its rights hereunder directly against AMLP.

The terms and conditions of this letter agreement may be amended, modified or terminated only in a writing signed by all of the parties hereto. AMLP's obligations hereunder may not be assigned, except its obligations to provide the Funds may be assigned to one or more of its affiliated funds or managed accounts affiliated with AMLP, provided that such assignment will not relieve AMLP of its obligations under this letter agreement.

This commitment will be effective upon the Investor's acceptance of the terms and conditions of this letter agreement (by signing below) and the execution of the Agreement by the Company and will expire on the earliest to occur of (i) the closing of the transactions contemplated by the Agreement, and (ii) termination of the Agreement in accordance with its terms; provided, however, that in the event that the Agreement is terminated, AMLP's obligations hereunder to provide funds to the Investor to fund the Investor's obligations under the Agreement on account of any willful breach of the Agreement for which the Investor would be liable shall survive; provided, further, that the Company shall provide AMLP with written notice within 90 days after the termination of the Agreement of any claim that a willful breach of the Agreement has occurred for which the Investor would be liable and if the Company fails to timely provide such notice then all of AMLP's obligations hereunder shall terminate, this letter agreement shall expire and any claims hereunder shall forever be barred. Upon the termination

A-D Acquisition Holdings, LLC
Delphi Corporation
[      ], 2007
Page 3

or expiration of this letter agreement, all rights and obligations of the parties hereunder shall terminate and there shall be no liability on the part of any party hereto.

AMLP hereby represents and warrants as follows:

(a)  AMLP is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(b)  AMLP has the requisite limited partnership power and authority to enter into, execute and deliver this letter agreement and to perform its obligations hereunder and all necessary action required for the due authorization, execution, delivery and performance by it of this letter agreement has been taken.

(c)  This letter agreement has been duly and validly executed and delivered by AMLP and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d)  AMLP has, and will have on the Closing Date, available funding necessary to provide the Funds in accordance with this letter agreement.

No director, officer, employee, partner, member or direct or indirect holder of any equity interests or securities of AMLP, or any of its affiliated funds or managed accounts, and no director, officer, employee, partner or member of any such persons other than any general partner (collectively, the "Party Affiliates") shall have any liability or obligation of any nature whatsoever in connection with or under this letter or the transactions contemplated hereby, and each party hereto hereby waives and releases all claims against such Party Affiliates related to such liability or obligation.

This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the conflict of laws principles thereof). AMLP, THE INVESTOR AND THE COMPANY HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.

This letter agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and same instrument.

*  *  *  *

A-D Acquisition Holdings, LLC
Delphi Corporation
[      ], 2007
Page 4

Sincerely,

**APPALOOSA MANAGEMENT L.P.**


By: _____
    Name:
    Title:

Agreed to and accepted as of the date first
above written:

**A-D ACQUISITION HOLDINGS, LLC**


By:_____
    Name:
    Title:


**DELPHI CORPORATION**


By:_____
    Name:
    Title:

**Harbinger Capital Partners Master Fund I, Ltd.**
c/o 555 Madison Avenue
New York, New York 10122

[        ], 2007

Harbinger Del-Auto Investment Company Ltd.
c/o Harbinger Capital Partners Master Fund I, Ltd.
555 Madison Avenue
New York, New York 10022

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098

Ladies and Gentlemen:

Reference is made to that certain Equity Purchase and Commitment Agreement (the "Agreement"), dated as of the date hereof, by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware, Harbinger Del-Auto Investment Company, Ltd., an exempted company formed under the laws of the Cayman Islands (the "Investor"), Merrill Lynch, Pierce Fenner & Smith, Incorporated, a Delaware corporation, UBS Securities LLC, a limited liability company formed under the laws of the State of Delaware, Goldman Sachs & Co., a New York limited partnership, and Pardus DPH Holding LLC, a limited liability company formed under the laws of the State of Delaware, on the one hand, and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company"), on the other hand. Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

This letter will confirm the commitment of Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), on behalf of one or more of its affiliated funds or managed accounts to be designated, to provide or cause to be provided funds (the "Funds") to the Investor in an amount up to $397,230,000, subject to the terms and conditions set forth herein. The Funds to be provided by or on behalf of Harbinger to the Investor will be used to provide the financing for the Investor (i) to purchase the Investor Shares pursuant to the Agreement (the "Purchase Obligation") and (ii) to satisfy the Investor's other obligations under the Agreement, if any; provided, however, that the aggregate liability of Harbinger under clauses (i) and (ii) shall under no circumstances exceed the Cap (as defined below). Harbinger shall not be liable to fund to the Investor any amounts hereunder (other than to fund the Purchase Obligation), unless, and until, any party to the Agreement other than the Company commits a willful breach of the Agreement. For purposes of this letter agreement, the "Cap" shall mean at all times $38,944,000. Our commitment to fund the Investor's Purchase Obligation is subject to the satisfaction, or waiver in writing by Harbinger and the Investor, of all of the conditions, if any, to the Investor's obligations at such time contained in the Agreement.

Notwithstanding any other term or condition of this letter agreement, (i) under no circumstances shall the liability of Harbinger hereunder or for breach of this letter agreement exceed, in the aggregate, the Cap for any reason, (ii) under no circumstances shall Harbinger be liable for punitive damages, and (iii) the liability of Harbinger shall be limited to monetary damages only. There is no express or implied intention to benefit any person or entity not party

Harbinger Del-Auto Investment Company Ltd.
Delphi Corporation
[        ], 2007
Page 2

hereto and nothing contained in this letter agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than the Investor and the Company.  Subject to the terms and conditions of this letter agreement, the Company shall have the right to assert its rights hereunder directly against Harbinger.

The terms and conditions of this letter agreement may be amended, modified or terminated only in a writing signed by all of the parties hereto.  Harbinger's obligations hereunder may not be assigned, except its obligations to provide the Funds may be assigned to one or more of its affiliated funds or managed accounts affiliated with Harbinger, provided that such assignment will not relieve Harbinger of its obligations under this letter agreement.

This commitment will be effective upon the Investor's acceptance of the terms and conditions of this letter agreement (by signing below) and the execution of the Agreement by the Company and will expire on the earliest to occur of (i) the closing of the transactions contemplated by the Agreement, and (ii) termination of the Agreement in accordance with its terms; provided, however, that in the event that the Agreement is terminated, Harbinger' obligations hereunder to provide funds to the Investor to fund the Investor's obligations under the Agreement on account of any willful breach of the Agreement for which the Investor would be liable shall survive; provided, further, that the Company shall provide Harbinger with written notice within 90 days after the termination of the Agreement of any claim that a willful breach of the Agreement has occurred for which the Investor would be liable and if the Company fails to timely provide such notice then all of Harbinger' obligations hereunder shall terminate, this letter agreement shall expire and any claims hereunder shall be forever barred.  Upon the termination or expiration of this letter agreement all rights and obligations of the parties hereunder shall terminate and there shall be no liability on the part of any party hereto.

Harbinger hereby represents and warrants as follows:

(a)   Harbinger is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(b)   Harbinger has the requisite corporate power and authority to enter into, execute and deliver this letter agreement and to perform its obligations hereunder and all necessary action required for the due authorization, execution, delivery and performance by it of this letter agreement has been taken.

(c)   This letter agreement has been duly and validly executed and delivered by Harbinger and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d)   Harbinger has, and will have on the Closing Date, available funding necessary to provide the Funds in accordance with this letter agreement.

No director, officer, employee, partner, member or direct or indirect holder of any equity interests or securities of Harbinger, or any of its affiliated funds or managed accounts, and no director, officer, employee, partner or member of any such persons other than any general partner (collectively, the "Party Affiliates") shall have any liability or obligation of any nature whatsoever in connection with or under this letter or the transactions contemplated

Harbinger Del-Auto Investment Company Ltd.
Delphi Corporation
[        ], 2007
Page 3

hereby, and each party hereto hereby waives and releases all claims against such Party Affiliates related to such liability or obligation.

This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the conflict of laws principles thereof). HARBINGER, THE INVESTOR AND THE COMPANY HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.

This letter agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and same instrument.

Harbinger Del-Auto Investment Company Ltd.
Delphi Corporation
[          ], 2007
Page 4

Sincerely,

HARBINGER CAPITAL PARTNERS MASTER
FUND I, LTD.

By:   Harbinger Capital Partners Offshore
      Manager, L.L.C., as investment manager


By:_____
      Name:   Philip A. Falcone
      Title:    Senior Managing Director


Agreed to and accepted as of the date first
above written:

**Harbinger Del-Auto Investment Company, Ltd.**


By:_____
      Name:
      Title:


**DELPHI CORPORATION**


By:_____
      Name:
      Title:

_____, 2007

Pardus DPH Holding LLC
590 Madison Ave.
Suite 25E
New York, NY 10022


Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098


Ladies and Gentlemen:

      Reference is made to that certain Equity Purchase and Commitment Agreement (the "Agreement"), dated as of the date hereof, by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware, Harbinger Del-Auto Investment Company, Ltd., an exempted company formed under the laws of the Cayman Islands, Merrill Lynch, Pierce Fenner & Smith Incorporated, a Delaware corporation, UBS Securities LLC, a limited liability company formed under the laws of the State of Delaware, Goldman Sachs & Co., a limited partnership formed under the laws of the State of New York and Pardus DPH Holding LLC, a limited liability company formed under the laws of the State of Delaware (the "Investor"), on the one hand, and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company"), on the other hand. Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

      This letter will confirm the commitment of Pardus Special Opportunities Master Fund L.P. ("Pardus"), to provide or cause to be provided funds (the "Funds") to the Investor in an amount up to $342,650,000, subject to the terms and conditions set forth herein. The Funds to be provided by or on behalf of Pardus to the Investor will be used to provide the financing for the Investor (i) to purchase the Investor Shares pursuant to the Agreement (the "Purchase Obligation") and (ii) to satisfy the Investor's other obligations under the Agreement, if any; provided, however, that the aggregate liability of Pardus under the immediately preceding clauses (i) and (ii) shall under no circumstances exceed the Cap (as defined below). Pardus shall not be liable to fund to the Investor any amounts hereunder (other than to fund the Purchase Obligation), unless and until, any party to the Agreement, other than the Company, commits a willful breach of the Agreement. For purposes of this letter agreement, the "Cap" shall mean $33,593,000. Our commitment to fund the Investor's Purchase Obligation is subject to the satisfaction, or waiver in writing by Pardus and the Investor, of all of the conditions, if any, to the Investor's obligations at such time contained in the Agreement.

      Notwithstanding any other term or condition of this letter agreement, (i) under no circumstances shall the liability of Pardus hereunder or for breach of this letter agreement exceed, in the aggregate, the Cap for any reason, (ii) under no circumstances shall Pardus be

Delphi Corporation

_____, 2007

Page 2

liable for punitive damages and (iii) the liability of Pardus shall be limited to monetary damages only. There is no express or implied intention to benefit any person or entity not party hereto and nothing contained in this letter agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than the Investor and the Company. Subject to the terms and conditions of this letter agreement, the Company shall have the right to assert its rights hereunder directly against Pardus.

The terms and conditions of this letter agreement may be amended, modified or terminated only in a writing signed by all of the parties hereto. The obligations of Pardus hereunder may not be assigned, except its obligations to provide the Funds may be assigned to one or more of its affiliated funds or managed accounts affiliated with Pardus, provided that such assignment will not relieve Pardus of its obligations under this letter agreement.

This commitment will be effective upon the Investor's acceptance of the terms and conditions of this letter agreement (by signing below) and the execution of the Agreement by the Company and will expire on the earliest to occur of (i) the closing of the transactions contemplated by the Agreement, and (ii) termination of the Agreement in accordance with its terms; provided, however, that in the event that the Agreement is terminated, the obligations of Pardus hereunder to provide funds to the Investor to fund the Investor's obligations under the Agreement on account of any willful breach of the Agreement for which the Investor would be liable shall survive; provided further, that the Company shall provide Pardus with written notice within 90 days after the termination of the Agreement of any claim that a willful breach of the Agreement has occurred for which the Investor would be liable and if the Company fails to timely provide such notice then all of the obligations of Pardus hereunder shall terminate, this letter agreement shall expire and any claims hereunder shall forever be barred. Upon the termination or expiration of this letter agreement, all rights and obligations of the parties hereunder shall terminate and there shall be no liability on the part of any party hereto.

Pardus hereby represents and warrants as follows:

(a) Pardus is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(b) Pardus has the requisite limited partnership power and authority to enter into, execute and deliver this letter agreement and to perform its obligations hereunder and all necessary action required for the due authorization, execution, delivery and performance by it of this letter agreement has been taken.

(c) This letter agreement has been duly and validly executed and delivered by Pardus and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d) Pardus has, and will have on the Closing Date, available funding necessary to provide the Funds in accordance with this letter agreement.

Delphi Corporation
_____, 2007
Page 3

No director, officer, employee, partner, member or direct or indirect holder of any equity interests or securities of Pardus, or any of its affiliated funds or managed accounts, and no director, officer, employee, partner or member of any such persons other than any general partner (collectively, the "Party Affiliates") shall have any liability or obligation of any nature whatsoever in connection with or under this letter or the transactions contemplated hereby, and each party hereto hereby waives and releases all claims against such Party Affiliates related to such liability or obligation.

This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the conflict of laws principles thereof). PARDUS, THE INVESTOR AND THE COMPANY HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.

This letter agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and same instrument.

\* \* \* \*

Sincerely,

**PARDUS SPECIAL OPPORTUNITIES MASTER FUND L.P.**

By: Pardus Capital Management L.P., its
    Investment Manager

By: Pardus Capital Management LLC, its
    general partner

By: _____
    Name: Karim Samii
    Title: Sole Member

- 3 -

Delphi Corporation
_____, 2007
Page 4

Agreed to and accepted as of the date first
above written:

**PARDUS DPH HOLDING LLC**

By:_____

    Name:
    Title:

**DELPHI CORPORATION**

By:_____

    Name:
    Title:

## EXHIBIT C

**<u>Redline Of January 18, 2007 Original EPCA Against Delphi-Appaloosa EPCA</u>**

~~EXECUTION COPY~~

## EQUITY PURCHASE AND COMMITMENT AGREEMENT

THIS EQUITY PURCHASE AND COMMITMENT AGREEMENT (~~this "~~**as from time to time amended, restated, amended and restated, modified or supplemented in accordance with the terms hereof, this "Agreement"**"), dated as of ~~January 18,~~ **[_____ ]**, 2007, is made by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware ("**"ADAH"**"), Harbinger Del-Auto Investment Company, Ltd., an exempted company incorporated in the Cayman Islands ("**"Harbinger"**)~~,~~ ~~Dolce Investments LLC ("Dolce"), a limited liability company formed under the laws of the State of Delaware")~~, Merrill Lynch, Pierce, Fenner & Smith Incorporated, a Delaware corporation ("**"Merrill"**"), UBS Securities LLC, a Delaware limited liability company ("~~UBS~~"**"UBS"), Goldman Sachs & Co., a New York limited partnership ("GS"), Pardus DPH Holding LLC, a Delaware** limited liability company **("Pardus"**), and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "**"Company"**"). ADAH, Harbinger, ~~Dolce,~~ Merrill**, UBS, GS** and ~~UBS~~**Pardus** are each individually referred to herein as an "**"Investor"**" and collectively as the "**"Investors"**". Capitalized terms used in the agreement have the meanings assigned thereto in the sections indicated on Schedule 1 hereto.

WHEREAS, the Company and certain of its subsidiaries and affiliates (the "**"Debtors"**") commenced jointly administered cases (the "**"Chapter 11 Cases"**") under United States Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended and in effect on October 8, 2005 (the "**"Bankruptcy Code"**") in the United States Bankruptcy Court for the Southern District of New York (the "**"Bankruptcy Court"**");

**WHEREAS, ADAH, Harbinger, UBS, Merrill, Dolce Investments LLC ("Dolce") (collectively, the Original Investors) and the Company negotiated and entered into the that certain Equity Purchase and Commitment Agreement, dated as of January 18, 2007 (the "Original Agreement").  The Original Agreement set forth the terms on which the Original Investors would provide certain financial accommodations that would facilitate the implementation of a plan of reorganization under the Bankruptcy Code for the Debtors having terms consistent with the Original Agreement and that certain Plan Framework Support Agreement, dated as of December 18, 2006 by and among the Company, General Motors Corporation ("GM"), Appaloosa Management L.P. ("Appaloosa"), Cerberus Capital Management, L.P. ("Cerberus"), Harbinger** Capital Partners **Master Fund** I, Ltd. **("Harbinger Fund"), Merrill and UBS (as previously amended by the Amendment and Supplement to the Plan Framework Support Agreement, dated as of January 18, 2007, the "Original PSA");**

**WHEREAS, the Company filed a motion (the Original Approval Motion) with the Bankruptcy Court for entry of an order:  (i) approving and authorizing the Company to enter into the Original Agreement and the Original PSA; (ii) authorizing the**

**Company to make certain payments contemplated by the Original Agreement; and (iii) granting certain related relief;**

**WHEREAS, after holding a contested evidentiary hearing on the Original Approval Motion on January 11 and 12, 2007, and considering the evidentiary record, the objections to the relief requested, and the argument of counsel, the Bankruptcy Court over-ruled such objections and entered its order granting the relief requested by the Company in the Original Approval Motion as it was modified at the hearing (the Original Approval Order);**

**WHEREAS, the Original Agreement and the Original PSA were terminated by the Company on July 7, 2007;**

**WHEREAS, the Company has filed its motion (the "Approval Motion") seeking an order (the "Approval Order") from the Bankruptcy Court that all of the findings, conclusions and rulings contained in the Original Approval Order (i) apply to this Agreement (including the Commitment Fees, the Arrangement Fee,** the Alternate Transaction Fees and the Transaction Expenses provided for herein**), the Plan Terms attached hereto as Exhibit B (the "Plan Terms"), the parties thereto and the transactions contemplated thereby, and (ii) continue** in full force and effect **with respect thereto;**

WHEREAS, the Company intends to propose and submit to the Bankruptcy Court for its approval a plan of reorganization for the Debtors that is consistent with this Agreement and the ~~PSA~~**Plan Terms**;

WHEREAS, the Company has requested that the Investors participate in the plan of reorganization, and the Investors are willing to participate in the plan of reorganization, on the terms and subject to the conditions contained in this Agreement; **and**

~~WHEREAS, the Company has filed a motion and supporting papers (the "Initial Approval Motion") seeking an order of the Bankruptcy Court (the "Initial Approval Order") (i) approving and authorizing the Company to enter into this Agreement, (ii) authorizing the payment of the Commitment Fees, the Alternate Transaction Fee and the Transaction Expenses provided for herein, and (iii) approving and authorizing the Company to enter into the PSA, and the Bankruptcy Court has entered the Initial Approval Order; and~~

WHEREAS, each of Appaloosa ~~Management L.P.,~~ Harbinger ~~Capital Partners~~**Fund and Pardus Special Opportunities** Master Fund ~~I, Ltd. and Cerberus Capital Management,~~ L.P. (collectively, the "~~"~~**Commitment Parties**"~~"~~) will provide, on the date hereof, commitment letters addressed to ADAH, Harbinger~~,~~ and ~~Dolce,~~**Pardus** respectively, and the Company whereby each Commitment Party will confirm its commitment to provide equity

financing to ADAH, Harbinger and ~~Dolce~~**Pardus**, respectively, on the terms and subject to the limitations set forth in the commitment letters.

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, each of the parties hereto hereby agrees as follows:

1.  Rights Offering**.**

(a)  The Company proposes to offer and sell shares of its new common stock, par value $0.01 per share (the "**"New Common Stock"**"), pursuant to a rights offering (the "**"Rights Offering"**") whereby the Company will distribute at no charge to each holder (each, an "**"Eligible Holder"**") of Common Stock, including, to the extent applicable, the Investors, that number of rights (each, a "**"Right"**") in respect of shares of Common Stock outstanding and held of record as of the close of business on a record date (the "**"Record Date"**") to be set by the Board of Directors of the Company that will enable each Eligible Holder to purchase up to its pro rata portion of ~~56,700,000~~**41,026,311** shares in the aggregate of New Common Stock (each, a "**"Share"**") at a purchase price of $~~35.00~~**38.39** per Share (the "**"Purchase Price"**").

(b)  The Company will conduct the Rights Offering pursuant to a plan of reorganization of the Debtors (such plan of reorganization, the "**"Plan"**"), which shall reflect the Company'"s proposed restructuring transactions described in this Agreement, the Summary of Terms of Preferred Stock attached hereto as <u>Exhibit A</u> (the "**"Preferred Term Sheet"**") and the Plan ~~Framework Support Agreement attached hereto as~~ <u>~~Exhibit B~~</u> ~~(the "PSA")~~**Terms**.

(c)  The Rights Offering will be conducted as follows:

(i)  On the terms and subject to the conditions of this Agreement and subject to applicable law, the Company shall offer Shares for subscription by holders of Rights as set forth in this Agreement.

(ii)  ~~As soon as practicable~~**Promptly, and no later than four (4) Business Days,** following the ~~entry of an order~~**occurrence of both (1) the date that the Confirmation Order shall have been entered** by the Bankruptcy Court ~~approving the Disclosure Statement (the "Disclosure Statement Approval Date")~~ and **(2)** the effectiveness under the Securities Act of 1933, as amended (the "**Securities Act**"), of the Rights Offering Registration Statement ~~to be~~ filed with the Securities and Exchange

Commission (the "**Commission**") relating to the Rights Offering, the Company shall issue to each Eligible Holder, Rights to purchase up to its pro rata portion of ~~56,700,000~~**41,026,311** Shares in the aggregate ~~and distribute simultaneously the ballot form(s) in connection with the solicitation of acceptances of the Plan~~ (the date of such distribution, the "**"Rights Distribution Date"**"). The Company will be responsible for effecting the distribution of certificates representing the Rights, the Rights Offering Prospectus and any related materials to each Eligible Holder.

(iii)   The Rights may be exercised during a period (the "**"Rights Exercise Period"**") commencing on the **Rights** Distribution Date and ending at the Expiration Time. The Rights shall be transferable. "**"Expiration Time"** ~~means the date and time by which holders of claims or interests are entitled to vote on the Plan (or if such day is not a Business Day, the next Business Day)~~**" means the date that is 30 days after the Rights Distribution Date**, or such later date and time as the Company, subject to the prior written approval of ~~each of~~ ADAH ~~and Dolce~~, may specify in a notice provided to the Investors before 9:00 a.m., New York City time, on the Business Day before the then-effective Expiration Time. The Company shall use its reasonable best efforts to cause the effective date of the Plan (the "**"Effective Date"**") to occur as promptly as reasonably practicable after the Expiration Time ~~and the Confirmation Hearing~~. For the purpose of this Agreement, "**"Business Day"**" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in New York City are generally authorized or obligated by law or executive order to close. Each Eligible Holder who wishes to exercise all or a portion of its Rights shall (i) during the Rights Exercise Period return a duly executed document to a subscription agent reasonably acceptable to the Company and ~~each of~~ ADAH ~~and Dolce~~ (the "**Subscription Agent**") electing to exercise all or a portion of the Rights held by such Eligible Holder and (ii) pay an amount**,** equal to the full Purchase Price of the number of Shares that the Eligible Holder elects to purchase**,** by wire transfer of immediately available funds by ~~a specified date reasonably in advance of the date on which the hearing to confirm the Plan is scheduled to commence (the "Confirmation Hearing")~~**the Expiration Time** to an escrow account established for the Rights Offering.

(iv)   Unless otherwise required by ADAH ~~and Dolce~~, there will be no over-subscription rights provided in connection with the Rights Offering.

(v)   As soon as reasonably practicable following the Effective Date, the Company will issue to each Eligible Holder who validly exercised its

Rights the number of Shares to which such Eligible Holder is entitled based on such exercise.

(vi)     The Company hereby agrees and undertakes to give each Investor by electronic facsimile transmission the certification by an executive officer of the Company of either (i) the number of Shares elected to be purchased by Eligible Holders pursuant to validly exercised Rights, the aggregate Purchase Price therefor, the number of Unsubscribed Shares and the aggregate Purchase Price therefor (a "**Purchase Notice**") or (ii) in the absence of any Unsubscribed Shares, the fact that there are no Unsubscribed Shares and that the commitment set forth in <u>Section 2(a)(iv)</u> is terminated (a "**Satisfaction Notice**") as soon as practicable after the Expiration Time and, in any event, reasonably in advance of the Closing Date (the date of transmission of confirmation of a Purchase Notice or a Satisfaction Notice, the "**Determination Date**").

**<u>(vii)     The Rights Offering will provide each Eligible Holder who validly exercised its Rights with the right to withdraw a previous exercise of Rights after the withdrawal deadline established in the Rights Offering Registration Statement if there are changes to the Plan after the withdrawal deadline that the Bankruptcy Court determines are materially adverse to the holders of the Rights and the Bankruptcy Court requires resolicitation of votes under Section 1126 of the Bankruptcy Court or an opportunity to change previously cast acceptances or rejections of the Plan.</u>**

2.     <u>The Commitment; Fees and Expenses</u>.

(a)     On the terms and subject to the conditions set forth in this Agreement:

(i)     each Investor agrees, severally and not jointly, to subscribe for and purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to subscribe for and purchase, and the Company agrees to sell and issue, on the Closing Date (A) for the Purchase Price per Share, each Investor's proportionate share of ~~6,300,000~~**4,558,479** Shares as is set forth opposite such Investor's name on <u>Schedule 2</u> hereto (the "**Direct Subscription Shares**") and (B) for ~~the Purchase Price per Share,~~**$38.39,** that number of shares of Series B Senior Convertible Preferred Stock, par value $0.01 per share (the "**Series B Preferred Stock**"), as is set forth opposite such Investor's name on <u>Schedule 2</u> hereto, which shares shall be created pursuant to a Certificate of ~~Designation~~**Designations** (the "**Series B Certificate of Designations**") that is consistent with the terms set forth

in the Preferred Term Sheet and, to the extent they have a material impact on the Investors~~'~~**'** proposed investment in the Company, are reasonably satisfactory to ~~each of~~ ADAH ~~and Dolce; provided that prior to the Due Diligence Expiration Date, such terms shall be satisfactory to each of ADAH and Dolce in its sole discretion;~~**;**

(ii)     ~~Dolce agrees to subscribe for and purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to subscribe for and purchase, and the Company agrees to sell, on the Closing Date, for the Purchase Price per share, 8,571,429 shares of Series A-1 Senior Convertible Preferred Stock, par value $0.01 per share (the "Series A-1 Preferred Stock"), which shares shall be created pursuant to a Certificate of Designations (the "Series A-1 Certificate of Designations") that is consistent with the terms set forth in the Preferred Term Sheet and with such other terms that, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to each of ADAH and Dolce; provided, that prior to the Due Diligence Expiration Date, such other terms shall be satisfactory to each of ADAH and Dolce in its sole discretion;~~**[Reserved];**

(iii)    ADAH agrees to subscribe for and purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to subscribe for and purchase, and the Company agrees to sell, on the Closing Date, for the **purchase price of $31.28 per Share (the "Series A Purchase Price** ~~per share, 8,571,429~~**"), 12,787,724** shares of Series A-~~2~~**1** Senior Convertible Preferred Stock, par value $0.01 per share (the "**"Series A-~~2~~ Preferred Stock"**~~, and together with the Series A-1 Preferred Stock, the "Series A Preferred Stock"~~**".)** which shares shall be created pursuant to a Certificate of Designations (the "**"Series A-~~2~~ Certificate of Designations"**"**)** that is consistent with the terms set forth in the Preferred Term Sheet and with such other terms that, to the extent they have a material impact on the Investors~~'~~**'** proposed investment in the Company, are reasonably satisfactory to ~~each of~~ ADAH ~~and Dolce; provided, that prior to the Due Diligence Expiration Date, such other terms shall be satisfactory to each of ADAH and Dolce in its sole discretion; and~~**; and**

(iv)    each Investor agrees, severally and not jointly, to purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to purchase, on the Closing Date, and the Company agrees to sell for the Purchase Price per Share that number of Shares issuable pursuant to the aggregate number of Rights that were not properly exercised by the Eligible Holders thereof during the

Rights Exercise Period, in proportion to the Investor's share of the Direct Subscription Shares (such Shares in the aggregate, the "**"Unsubscribed Shares"**"), rounded among the Investors as they may determine, in their sole discretion, to avoid fractional shares.

In connection with each of clauses (i) through (iv) above, ~~prior to the filing of the Rights Offering Registration Statement with the Commission,~~**subject to delivering prior written notice to each other Investor and the prior approval of ADAH, prior to the Securities Act Effective Date** each Investor shall have the right to arrange for one or more of its Affiliates (each~~,~~ a "**"Related Purchaser"**") **(A)** to purchase Investor Shares, by written notice to the Company, which notice shall be signed by the Investor and each Related Purchaser, shall contain the Related Purchaser's agreement to be bound by this Agreement and shall contain a confirmation by the Related Purchaser of the accuracy with respect to it of the representations set forth in **Section 4 or (B) to designate that** some or all of the Investor Shares be issued in the name of **and delivered to, one or more Related Purchasers which designation shall be signed by the Investor and each Related Purchaser, shall contain the Related Purchaser's agreement to be bound by this Agreement and shall contain a confirmation by the Related Purchaser of the accuracy with respect to it of the representations set forth in** Section 4; provided, that the total number of Investors, Related Purchasers and Ultimate Purchasers shall not exceed the Maximum Number.  The "**"Maximum Number"**" shall be 35 unless the Company consents to a higher number, such consent not to be unreasonably withheld; provided, **further,** that~~,~~ nothing in this Agreement shall limit or restrict in any way any Investor's ability to transfer or otherwise dispose of any Investor's Shares or any interests therein after the Closing Date pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements thereunder and subject to applicable state securities laws.  The Investors agree that each Related Purchaser will be a "**"Qualified Institutional Buyer"**" under Rule 144A of the Securities Act.

The Series A ~~1 Preferred Stock, the Series A-2~~ Preferred Stock and the Series B Preferred Stock are referred to herein collectively as the "**"Preferred Shares"**".  The Unsubscribed Shares, the Direct Subscription Shares and the Preferred Shares are referred to herein collectively as the "**"Investor Shares"**".  The term "**"Affiliate"**" shall have the meaning ascribed to such term in Rule 12b-2 under the Securities Exchange Act of 1934 in effect on the date hereof.

(b)    Upon the occurrence of an Investor Default or a Limited Termination, within five (5) Business Days of the occurrence of such Investor Default or Limited Termination, the Investors (other than any non-purchasing Investor) shall have the right to agree to purchase on the Closing Date, in the case of a Limited Termination, or to purchase, in the case of an Investor Default (or, in either case, arrange for the purchase through a Related Purchaser ~~pursuant to~~ ~~Section 2(a)~~ or

an Ultimate Purchaser ~~pursuant to Section 2(k)~~), all but not less than all, of the Available Investor Shares on the terms and subject to the conditions set forth in this Agreement and in such proportions as determined by the Investors in their sole discretion (an **"Alternative Financing"**); provided, that only in the case of a Limited Termination, ~~to the extent that a Limited Termination is attributable to any Investor other than Dolce,~~ ADAH will be required within ten (10) Business Days of the occurrence of such Limited Termination to agree to purchase on the Closing Date (or arrange for the purchase through a Related Purchaser ~~pursuant to Section 2(a)~~ or an Ultimate Purchaser ~~pursuant to Section 2(k)~~) any Available Investor Shares attributable to the Limited Termination and not otherwise purchased pursuant to the Alternative Financing (unless ADAH has otherwise terminated this Agreement in accordance with its terms); provided, further, that the total number of Investors, Related Purchasers and Ultimate Purchasers pursuant to this Agreement shall not exceed the Maximum Number.  The term **"Investor Default"** shall mean the breach by any Investor of its obligation to purchase any Investor Shares which it is obligated to purchase under this Agreement.  The term **"Available Investor Shares"** shall mean any Investor Shares which any Investor is not purchasing as a result of an Investor Default or Limited Termination.  The exercise by any Investor of the right to purchase (or arrange a purchase of) any Available Investor Shares shall not relieve any defaulting Investor of any obligation to each other Investor or the Company of such defaulting Investor's breach of this Agreement.

(c)    As soon as practicable after the Expiration Time, and in any event reasonably in advance of the Closing Date, the Company will provide a Purchase Notice or a Satisfaction Notice to each Investor as provided above, setting forth a true and accurate determination of the aggregate number of Unsubscribed Shares, if any; provided, that on the Closing Date, on the terms and subject to the conditions in this Agreement, the Investors will purchase, and the Company will sell, only such number of Unsubscribed Shares as are listed in the Purchase Notice, without prejudice to the rights of the Investors to seek later an upward or downward adjustment if the number of Unsubscribed Shares in such Purchase Notice is inaccurate.

(d)    Delivery of the Investor Shares will be made by the Company to the account of each Investor (or to such other accounts as any Investor may designate in accordance with this Agreement) at 10:00 a.m., New York City time, on the Effective Date (the **"Closing Date"**) against payment of the aggregate Purchase Price for the Investor Shares by wire transfer of immediately available funds in U.S. dollars to the account specified by the Company to the Investors at least 24 hours prior to the Closing Date.

(e)       All Investor Shares will be delivered with any and all issue, stamp, transfer, sales and use, or similar Taxes or duties payable in connection with such delivery duly paid by the Company.

(f)       The documents to be delivered on the Closing Date by or on behalf of the parties hereto and the Investor Shares will be delivered at the offices of White & Case LLP, 1155 Avenue of the Americas, New York, New York 10036 on the Closing Date.

(g)       Subject to the provisions of Sections 2(a), 2(b) and 2(k) hereof, **and subject to prior written notice to each other Investor and the prior approval of ADAH,** any Investor may designate that ~~(i) some or all of the Investor Shares be issued in the name of, and delivered to, one or more Related Purchasers and (ii)~~ some or all of the Unsubscribed Shares, Direct Subscription Shares or shares of ~~Series B~~ Preferred Stock be issued in the name of, and delivered to, one or more Ultimate Purchasers.

(h)       On the basis of the representations and warranties herein contained, the Company shall pay the following fees to the Investors in accordance with Section 2(i) or 12(~~h~~g), as the case may be:

(i)       an aggregate commitment fee of ~~twenty-one~~**eighteen** million dollars ($~~21,000,000~~**18,000,000**) to be paid to the Investors in proportion to their undertakings herein relative to Preferred Shares as set forth in Schedule 2 (the "~~"~~**"Preferred Commitment Fee**"~~"~~");

(ii)      an aggregate commitment fee of ~~fifty-five~~**thirty nine** million ~~one~~ **, three** hundred ~~twenty~~ **seventy** five thousand dollars ($~~55,125,000~~**39,375,000**) to be paid to the Investors as set forth in Schedule 2 to compensate the Investors for their undertakings herein relative to Investor Shares other than Preferred Shares (the "~~"~~**"Standby Commitment Fee**"~~"~~" and together with the Preferred Commitment Fee, the "~~"~~**"Commitment Fees**"~~"); and~~**");**

**(iii)      a fee of six million, three hundred seventy five thousand dollars ($6,375,000) to ADAH to compensate ADAH for arranging the transactions contemplated hereby (the "Arrangement Fee"); and**

**(iv)**      ~~(iii)~~an Alternate Transaction Fee, if any, which shall be paid by the Company as provided in Section 12(~~h~~g).

(i)        ~~$10~~**Seven** million**, five hundred twenty-five thousand dollars ($7,525,000)** of
           the Commitment Fees shall be paid on the first Business Day following the first
           date that ~~either (A) each of ADAH and Dolce has waived in writing the due~~
           ~~diligence termination right contained in Section 12(d)(ii) or (B) the due diligence~~
           ~~termination right contained in Section 12(d)(ii) has expired in accordance with its~~
           ~~terms, and $28,062,500,~~**the Approval Order is issued by the Bankruptcy**
           **Court, and twenty-one million, one hundred sixty-two thousand, five**
           **hundred dollars ($21,162,500),** representing the balance of the first fifty percent
           (50%) of the Commitment Fees, on the first Business Day following the ~~date that~~
           ~~each of ADAH and Dolce notify the Company in writing that each of them has~~
           ~~approved the GM Settlement.  The balance of $38,062,500,~~**Disclosure Statement**
           **Filing Date.  The balance of twenty-eight million, six hundred eighty-seven**
           **thousand, five hundred dollars ($28,687,500),** representing the remaining fifty
           percent (50%) of the Commitment Fees, shall be paid on the first Business Day
           following the Disclosure Statement Approval Date.  **The Arrangement Fee shall**
           **be paid to ADAH upon entry of the Approval Order.**  Payment of the
           Commitment Fees**, Arrangement Fee** and the Alternate Transaction Fee, if any,
           will be made by wire transfer of immediately available funds in U.S. dollars to the
           account specified by each Investor to the Company at least 24 hours prior to such
           payment.  The Commitment Fees**, Arrangement Fee** and the Alternate
           Transaction Fee, if any, will be nonrefundable and non-avoidable when paid.  The
           provision for the payment of the Commitment Fees **and Arrangement Fee** is an
           integral part of the transactions contemplated by this Agreement and without this
           provision the Investors would not have entered into the Agreement and such
           Commitment Fees **and Arrangement Fee** shall constitute an allowed
           administrative expense of the Company under Section 503(b)(1) and 507(a)(1) of
           the Bankruptcy Code.

(j)        The Company will reimburse or pay, as the case may be, the out-of-pocket costs
           and expenses reasonably incurred by each Investor or its Affiliates (which, for the
           avoidance of doubt, shall not include any Ultimate Purchaser) to the extent
           incurred on or before the **first to occur of the date on which this Agreement**
           **terminates in accordance with its terms and the** Effective Date (and reasonable
           post-closing costs and expenses relating to the closing **of the transactions**
           **contemplated hereby**), including reasonable fees, costs and expenses of counsel to
           each of the Investors or its Affiliates, and reasonable fees, costs and expenses of
           any other professionals retained by any of the Investors or its Affiliates in
           connection with the transactions contemplated hereby (including investigating,
           negotiating and completing such transactions) and the Chapter 11 Cases and other
           judicial and regulatory proceedings related to such transactions and the Chapter
           11 Cases other than costs and expenses relating to any transactions with Ultimate
           Purchasers and, with respect to expenses that would not otherwise be incurred by
           the related Investor, Related Purchasers (collectively, **"**~~"~~**"Transaction Expenses"**~~);~~
           ~~from and after the commencement of negotiations between such Investor or its~~
           ~~Affiliates and the Company with respect to its non-disclosure agreements in~~
           ~~connection with the Chapter 11 Cases and/or the transactions contemplated~~
           ~~hereby, or~~**"); from and after (i) in the case of ADAH and Harbinger,**

**December 1, 2006, (ii) in the case of GS, July 3, 2007, in the case of Pardus, June 18, 2007 and** in the case of UBS and Merrill, ~~from and after July 30, 2006, in the following manner:~~ **July 30, 2006,** promptly upon submission to the Company of summary statements therefor by such Investor, in each case, without Bankruptcy Court review or further Bankruptcy Court order, whether or not the transactions contemplated hereby are consummated and, in any event, within 30 days of the submission of such statements. **Notwithstanding the foregoing, (i)** Transaction Expenses incurred by ADAH or its Affiliates on or prior to May 17, 2006 in an amount not to exceed $5,000,000 shall be paid if and when the effective date of any plan of reorganization for the Company occurs and only if such plan results in holders of Common Stock receiving any recovery under such plan, **(ii) Transaction Expenses incurred by Pardus on or prior to June 18, 2007 shall be paid to the extent that they comprise the reasonable fees, costs and expenses of legal counsel to Pardus related to the negotiation of this Agreement, the non-disclosure agreement between Pardus and the Company dated June 18, 2007 and the Transactions contemplated hereby or thereby, (iii) Transaction Expenses incurred by GS on or prior to July 3, 2007 shall be paid to the extent that they comprise the reasonable fees, costs and expenses of legal counsel to GS related to the negotiation of this Agreement, the non-disclosure agreement between GS and the Company and the Transactions contemplated hereby or thereby and (iv)** the filing fee, if any, required to be paid in connection with any filings required to be made by any Investor or its Affiliates under the HSR Act or any other competition laws or regulations shall be paid by the Company on behalf of the Investors or such Affiliate when filings under the HSR Act or any other competition laws or regulations are made, together with all expenses of the Investors or its Affiliates incurred to comply therewith.

~~(i)        to the extent Transaction Expenses are or were incurred prior to December 1, 2006, such Transaction Expenses, in an amount not to exceed $13,000,000 (which amount does not include Transaction Expenses incurred by ADAH or its Affiliates on or prior to May 17, 2006 in an amount not to exceed $5,000,000), shall be paid promptly upon the Bankruptcy Court's entry of the Initial Approval Order; provided, that Transaction Expenses incurred by ADAH or its Affiliates on or prior to May 17, 2006 in an amount not to exceed $5,000,000 shall be paid if and when the effective date of any plan of reorganization for the Company occurs and only if such plan results in holders of Common Stock receiving any recovery under such plan;~~

~~(ii)       to the extent Transaction Expenses are incurred by any Investor on or after December 1, 2006, such Transaction Expenses shall be paid promptly upon submission to the Company of summary statements therefor by such Investor, in each case, without Bankruptcy Court review or further Bankruptcy Court order, whether or not the transactions contemplated~~

~~hereby are consummated and, in any event, within 30 days of the submission of such statements; and~~

~~(iii)    the filing fee, if any, required to be paid in connection with any filings required to be made by any Investor or its Affiliates under the HSR Act or any other competition laws or regulations shall be paid by the Company on behalf of the Investors or such Affiliate when filings under the HSR Act or any other competition laws or regulations are made, together with all expenses of the Investors or its Affiliates incurred to comply therewith.~~

The provision for the payment of the Transaction Expenses is an integral part of the transactions contemplated by this Agreement and without this provision the Investors would not have entered into this Agreement and such Transaction Expenses shall constitute an allowed administrative expense of the Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code.  In addition, ~~(i)~~ to the extent permitted under any order authorizing the Debtors to obtain post-petition financing and/or to utilize cash collateral then or thereafter in effect (each a "**Financing Order**")**,** the Transaction Expenses incurred from and after the date of entry of the ~~Initial~~**Original** Approval Order shall be protected by and entitled to the benefits of the carve-out for professional fees provided in any such Financing Order.

(k)    The Company acknowledges that the Investors and certain persons and entities (collectively, the "**Ultimate Purchasers**") ~~may~~**have entered into an agreement and may, prior to the Securities Act Effective Date,** enter into one or more **new agreements or amend existing** agreements (**collectively,** the "**Additional Investor** ~~Agreements~~**Agreement**"), pursuant to which ~~such Investor may arrange for one or more~~**the Investors have arranged for a number of** Ultimate Purchasers to purchase certain of the Unsubscribed Shares~~,~~**: and** the Direct Subscription Shares ~~or the Series B Preferred Stock~~**.  The Investors severally and not jointly acknowledge that they have not agreed and, without the prior written consent of ADAH, will not prior to the Closing agree, directly or indirectly, to sell, transfer, assign, pledge, hypothecate, donate or otherwise encumber or dispose of any Investor Shares or any interest or participation therein other than pursuant to the Additional Investor Agreement (as it may be amended from time to time) and other than an arrangement that was entered into among ADAH, Merrill, Harbinger and certain of their Affiliates regarding participation interests in the Series A-2 Senior Convertible Preferred Stock that was to be issued pursuant to the Original Agreement, which agreement has been terminated.  The total number of Investors, Related Purchasers and Ultimate Purchasers as of the Closing Date shall not exceed the Maximum Number**.  Each Additional Investor Agreement ~~entered into prior to the Closing Date~~ shall contain ~~the~~**each** Ultimate Purchaser~~'~~**'**s agreement to be bound by this Agreement and ~~shall contain~~ a confirmation by ~~such~~**each** Ultimate Purchaser of the accuracy with respect to it of the representations set forth in Section ~~4.~~**4 and a copy of such confirmation shall be**

**provided to the Company prior to the Securities Act Effective Date.** Each Investor proposing to enter into an Additional Investor Agreement ~~prior to the Closing Date~~ with any Ultimate Purchaser or proposing to transfer Investor Shares to**, or to arrange for Investor Shares to be purchased by or delivered to,** any Related Purchaser**,** in either case**,** which would result in the Maximum Number being exceeded agrees to notify the Company **and ADAH** prior to entering into such agreement or effecting such transfer and will not undertake such agreement or effect such transfer without the consent of the Company **and ADAH**, which shall not be unreasonably withheld.  The Investors **severally and not jointly** agree that with respect to any offer or transfer to an Ultimate Purchaser prior to the Closing Date, they **have not offered and** shall not offer any Investor Shares to, ~~or~~**and they have not entered into and shall not** enter into ~~any~~**the** Additional Investor Agreement with, any person or entity (A) ~~after the initial filing of the Rights Offering Registration Statement with the Commission~~**on or after the Securities Act Effective Date** and (B) that is not a "~~"~~**"**Qualified Institutional Buyer"**"**~~"~~ as defined in Rule 144A under the Securities Act; provided**,** that the total number of Investors, Related Purchasers and **the** Ultimate Purchasers pursuant to this Agreement shall not exceed the Maximum Number; provided, further, that nothing in this Agreement shall limit or restrict in any way any Investor's ability to transfer or otherwise dispose of any Investor's Shares or any interest therein after the Closing Date pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements thereunder and pursuant to applicable state securities laws.

3.    <u>Representations and Warranties of the Company</u>.  Except as set forth in a disclosure letter to be delivered pursuant to <u>Section 5(s)</u> (the "**"Disclosure Letter"**"), the Company represents and warrants to, and agrees with, each of the Investors as set forth below.  Any item disclosed in a section of the Disclosure Letter shall be deemed disclosed in all other sections of the Disclosure Letter to the extent the relevance of such disclosure or matter is reasonably apparent and shall qualify the representations and warranties contained in this <u>Section 3</u>.  Except for representations, warranties and agreements that are expressly limited as to their date, each representation, warranty and agreement shall be deemed made as of the date of delivery of the Disclosure Letter (the "**"Disclosure Letter Delivery Date"**") and as of the Closing Date:

(a)    <u>Organization and Qualification</u>.  The Company and each of its Significant Subsidiaries has been duly organized and is validly existing in good standing under the laws of its respective jurisdiction of incorporation, with the requisite power and authority to own its properties and conduct its business as currently conducted.  Each of the Company and its Subsidiaries has been duly qualified as a foreign corporation or organization for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification, except to the extent that the failure to be so qualified or be in good standing has not had and would not reasonably be expected to have, individually or in the aggregate, a

Material Adverse Effect.  For the purpose of this Agreement, "**"Material Adverse Effect"**" means (i) any material adverse effect on the business, results of operations, liabilities, property or condition (financial or otherwise) of the Company or its Subsidiaries, taken as a whole, or (ii) any material adverse effect on the ability of the Company, subject to the approvals and other authorizations set forth in <u>Section 3(g)</u> below, to consummate the transactions contemplated by this Agreement or the Plan other than, in either case, any effect relating to or resulting from (i) changes in general economic conditions or securities or financial markets in general that do not disproportionately impact the Company and its Subsidiaries; (ii) general changes in the industry in which the Company and its Subsidiaries operate and not specifically relating to, or having a disproportionate effect on, the Companies and its Subsidiaries taken as a whole (relative to the effect on other persons operating in such industry); (iii) any changes in law applicable to the Company or any of its Subsidiaries or any of their respective properties or assets or interpretations thereof by any governmental authority which do not have a disproportionate effect on, the Company and its Subsidiaries; (iv) any outbreak or escalation of hostilities or war (whether declared or not declared) or any act of terrorism which do not have a disproportionate effect on, the Company and its Subsidiaries; (v) the announcement or the existence of, or compliance with, this Agreement and the transactions contemplated hereby (including without limitation the impact thereof on relationships with suppliers, customers or employees); (vi) any accounting regulations or principles or changes in accounting practices or policies that the Company or its Subsidiaries are required to adopt, including in connection with the audit of the Company"s financial statements in accordance with GAAP or any failure to timely file periodic reports or timely prepare financial statements and the costs and effects of completing the preparation of the Company"s financial statements and periodic reports; or (vii) any change in the market price or trading volumes of the Company"s securities (it being understood for the purposes of this subclause (vii) that any facts underlying such change that are not otherwise covered by the immediately preceding clauses (i) through (vi) may be taken into account in determining whether or not there has been a Material Adverse Effect). For the purposes of this Agreement, (x) a "**"Subsidiary"**" of any person means, with respect to such person, any corporation, partnership, joint venture or other legal entity of which such person (either alone or through or together with any other subsidiary), owns, directly or indirectly, more than 50% of the stock or other equity interests, has the power to elect a majority of the board of directors or similar governing body, or has the power to direct the business and policies, and (y) a "**"Significant Subsidiary"**" is a Subsidiary that satisfies the definition contained in Article 1, Rule 1-02 of Regulation S-X promulgated pursuant to the Securities Act of 1933, as amended.

(b)    <u>Corporate Power and Authority</u>.

(i)    The Company has or, to the extent executed in the future, will have when executed**,** the requisite corporate power and authority to enter into, execute and deliver this Agreement and each other agreement to which it will be a party as contemplated by this Agreement ~~and the PSA~~ (this Agreement and such other agreements collectively, the **""Transaction Agreements""**) and, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Rules 6004(h) and 3020(e) of the Federal Rules of Bankruptcy Procedure (the **""Bankruptcy Rules""**), respectively, to perform its obligations hereunder and thereunder, including the issuance of the Rights and Investor Shares.  The Company has taken or will take all necessary corporate action required for the due authorization, execution, delivery and performance by it of this Agreement, including the issuance of the Rights and Investor Shares.

(ii)    Prior to the execution by the Company and filing with the Bankruptcy Court of the Plan, the Company and each Subsidiary entering into the Plan will have the requisite corporate power and authority to execute the Plan and to file the Plan with the Bankruptcy Court and, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rule 3020(e), to perform its obligations thereunder, and will have taken by the Effective Date all necessary corporate actions required for the due authorization, execution, delivery and performance by it of the Plan.

(c)    <u>Execution and Delivery; Enforceability</u>.

(i)    Each Transaction Agreement has been, or prior to its execution and delivery will be, duly and validly executed and delivered by the Company, and, upon the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rule 6004(h), each such document will constitute the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

(ii)    The Plan will be duly and validly filed with the Bankruptcy Court by the Company and each of its Subsidiaries executing the Plan and, upon the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rule 3020(e), will constitute the valid and binding obligation of the Company and such Subsidiary, enforceable against the Company and such Subsidiaries in accordance with its terms.

(d)     Authorized and Issued Capital Stock.  The authorized capital stock of the Company consists of (i) 1,350,000,000 shares of Common Stock and (ii) 650,000,000 shares of preferred stock, par value $0.10 per share.  At the close of business on ~~November~~**June** 30, ~~2006~~**2007** (the "~~"~~**"Capital Structure Date**~~"~~**"**) (i) 561,781,500 shares of Common Stock were issued and outstanding, (ii) no shares of the preferred stock were issued and outstanding, (iii) 3,244,317 shares of Common Stock were held by the Company in its treasury, (iv) 85,978,864 shares of Common Stock were reserved for issuance upon exercise of stock options and other rights to purchase shares of Common Stock and vesting of restricted stock units (each, an "~~"~~**"Option**~~"~~**"** and, collectively, the "~~"~~**"Options**~~"~~**"**) granted under any stock option or stock-based compensation plan of the Company or otherwise (the "~~"~~**"Stock Plans**~~"~~**"**), and (v) 200,000 shares of Series A participating preferred stock were reserved for issuance pursuant to that certain Rights Agreement by and between the Company and BankBoston, N.A., as Rights Agent, dated as of February 1, 1999, as amended (the "~~"~~**"Existing Shareholder Rights Plan**~~"~~**"**).  All issued and outstanding shares of capital stock of the Company and each of its Subsidiaries have been duly authorized and validly issued and are fully paid and nonassessable, and the holders thereof do not have any preemptive rights.  Except as set forth in this Section 3(d) or issuances pursuant to the Stock Plans, at the close of business on the Capital Structure Date, no shares of capital stock or other equity securities or voting interest in the Company were issued, reserved for issuance or outstanding.  Since the close of business on the Capital Structure Date, no shares of capital stock or other equity securities or voting interest in the Company have been issued or reserved for issuance or become outstanding, other than shares described in clause (iv) of the second sentence of this Section 3(d) that have been issued upon the exercise of outstanding Options granted under the Stock Plans and other than the shares to be issued hereunder or pursuant to the ~~PSA~~**Plan Terms**.  Except as described in this Section 3(d), and except as will be required by the Plan, neither the Company nor any of its Subsidiaries is party to or otherwise bound by or subject to any outstanding option, warrant, call, subscription or other right (including any preemptive right), agreement or commitment which (w) obligates the Company or any of its Subsidiaries to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any shares of the capital stock of, or other equity or voting interests in, the Company or any security convertible or exercisable for or exchangeable into any capital stock of, or other equity or voting  interest in, the Company, (x) obligates the Company or any of its Subsidiaries to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, contract, arrangement or undertaking, (y) restricts the transfer of any shares of capital stock of the Company or (z) relates to the voting of any shares of capital stock of the Company.  On the Effective Date, the authorized capital stock of the Company and the issued and outstanding shares of capital stock of the Company ~~will conform to~~**shall be consistent with** the description set forth in the Preferred Term Sheet, the ~~PSA~~**Plan Terms** and the Plan.  On the Effective Date, the authorized capital stock of the Company shall consist of such number of shares of New

Common Stock as shall be set forth in the Amended and Restated Constituent Documents and ~~34,285,716~~**23,207,104** shares of new preferred stock. On the Effective Date, assuming consummation of the transactions contemplated by this Agreement: (i) ~~101,000,000~~**124,400,000** shares of New Common Stock will be outstanding; (ii) ~~8,571,429~~**12,787,724** shares of Series A ~~1~~ Preferred Stock will be issued and outstanding; ~~(iii) 8,571,429 shares of Series A-2 Preferred Stock will be issued and outstanding; and (iv) 17,142,858~~ **and (iii) 10,419,380** shares of Series B Preferred Stock will be issued and outstanding.

(e)    <u>Issuance</u>.  The Investor Shares to be issued and sold by the Company to the Investors hereunder, when the Investor Shares are issued and delivered against payment therefor by the Investors hereunder, shall have been duly and validly authorized, issued and delivered and shall be fully paid and non-assessable, and free and clear of all Taxes, liens, preemptive rights, rights of first refusal, subscription and similar rights, other than (i) any rights contained in the terms of the Preferred Shares as set forth in the Company~~'~~'s Certificate of Incorporation and (ii) any rights contained in any shareholders agreement to which one or more of the Investors shall be a party.

(f)    <u>No Conflict</u>.  Subject to the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, the distribution of the Rights, the sale, issuance and delivery of the Shares upon exercise of the Rights, the consummation of the Rights Offering by the Company and the execution and delivery (or, with respect to the Plan, the filing) by the Company of the Transaction Agreements and the Plan and compliance by the Company with all of the provisions hereof and thereof and the Preferred Term Sheet and the ~~PSA~~**Plan Terms** and the consummation of the transactions contemplated herein and therein (including compliance by each Investor with its obligations hereunder and thereunder) (i) will not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent to be specified in the Plan, in the acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound or to which any of the property or assets of the Company or any of its Subsidiaries is subject, (ii) will not result in any violation of the provisions of the Certificate of Incorporation or Bylaws of the Company or any of its Subsidiaries, (iii) will not result in any material violation of, or any termination or material impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Company or any of its Subsidiaries or any of their properties, and (iv) will not trigger the distribution under the Existing Shareholders Rights Plan of Rights Certificates (as defined therein) or otherwise result in any Investor being or becoming an Acquiring

Person, except in any such case described in subclause (i) for any conflict, breach, violation, default, acceleration or lien which has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(g)    <u>Consents and Approvals</u>.  No consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Company or any of its Subsidiaries or any of their properties is required for the distribution of the Rights, the sale, issuance and delivery of Shares upon exercise of the Rights or the Investor Shares to each Investor hereunder and the consummation of the Rights Offering by the Company and the execution and delivery by the Company of the Transaction Agreements or the Plan and performance of and compliance by the Company with all of the provisions hereof and thereof and the Preferred Term Sheet and the ~~PSA~~**Plan Terms** and the consummation of the transactions contemplated herein and therein, except (i) the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, (ii) the registration under the Securities Act of the issuance of the Rights and the Shares pursuant to the exercise of Rights, (iii) filings with respect to and the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "**"HSR Act"**"), and any other comparable laws or regulations in any foreign jurisdiction relating to the sale or issuance of Investor Shares to the Investors, (iv) the filing with the Secretary of State of the State of Delaware of the Certificate of Incorporation to be applicable to the Company from and after the Effective Date and (v) such consents, approvals, authorizations, registrations or qualifications (x) as may be required under the rules and regulations of the New York Stock Exchange or the Nasdaq Stock Exchange to consummate the transactions contemplated herein, (y) as may be required under state securities or Blue Sky laws in connection with the purchase of the Investor Shares by the Investors or the distribution of the Rights and the sale of Shares to Eligible Holders or (z) the absence of which will not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(h)    <u>Arm's Length</u>.  The Company acknowledges and agrees that the Investors are acting solely in the capacity of an arm's length contractual counterparty to the Company with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering) and not as a financial advisor or a fiduciary to, or an agent of, the Company or any other person or entity.  Additionally, the Investors are not advising the Company or any other person or entity as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.  The Company shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and the Investors shall have no responsibility or liability to the Company, its Affiliates, or

their respective shareholders, directors, officers, employees, advisors or other representatives with respect thereto.  Any review by the Investors of the Company, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of the Investors and shall not be on behalf of the Company, its Affiliates, or their respective shareholders, directors, officers, employees, advisors or other representatives and shall not affect any of the representations or warranties contained herein or the remedies of the Investors with respect thereto.

(i)    <u>Financial Statements</u>.  The financial statements and the related notes of the Company and its consolidated Subsidiaries included or incorporated by reference in the Company SEC Documents **<u>and the Rights Offering Registration Statement</u>**, and to be included or incorporated by reference in the Disclosure Statement and the Rights Offering Registration Statement and the Rights Offering Prospectus, comply or will comply, as the case may be, in all material respects with the applicable requirements of the Securities Act, the Securities Exchange Act of 1934, as amended, and the rules and regulation of the Commission thereunder (the "**"<u>Exchange Act</u>"**") and the Bankruptcy Code, as applicable, and present fairly or will present fairly in all material respects the financial position, results of operations and cash flows of the Company and its Subsidiaries as of the dates indicated and for the periods specified; such financial statements have been prepared in conformity with U.S. generally accepting accounting principles ("**"<u>GAAP</u>"**") applied on a consistent basis throughout the periods covered thereby (except as disclosed in the Company SEC Documents filed prior to the date hereof), and the supporting schedules included or incorporated by reference in the Company SEC Documents **<u>and the Rights Offering Registration Statement</u>**, and to be included or incorporated by reference in the Disclosure Statement, the Rights Offering Registration Statement and the Rights Offering Prospectus, present fairly or will present fairly the information required to be stated therein; and the other financial information included or incorporated by reference in the Company SEC Documents **<u>and the Rights Offering Registration Statement</u>**, and to be included or incorporated by reference in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus, has been or will be derived from the accounting records of the Company and its Subsidiaries and presents fairly or will present fairly the information shown thereby; and the <u>pro</u> <u>forma</u> financial information and the related notes included or incorporated by reference in the Company SEC Documents **<u>and the Rights Offering Registration Statement</u>**, and to be included or incorporated by reference in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus, have been or will be prepared in accordance with the applicable requirements of the Securities Act and the Exchange Act, as applicable, and the assumptions underlying such <u>pro</u> <u>forma</u> financial information are reasonable and are set forth in the Company SEC Documents and will be set forth in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus.

(j)     Company SEC Documents and Disclosure Statement.  ~~Except for the Company's Quarterly Report on Form 10-Q for the period ended September 30, 2006, (which has not been filed as of the date hereof) the~~**The** Company has filed all required reports, schedules, forms, statements and other documents (including exhibits and all other information incorporated therein **but not including the Rights Offering Registration Statement or the other documents referred to in Section 3(k) below**) with the Commission (~~"~~**"Company SEC Documents"**~~"~~).  As of their respective dates, each of the Company SEC Documents complied in all material respects with the requirements of the Securities Act or the Exchange Act and the rules and regulations of the Commission promulgated thereunder applicable to such Company SEC Documents.  The Company has filed with the Commission all ~~"~~**"**material contracts~~"~~**"** (as such term is defined in Item 601(b)(10) of Regulation S-K under the Exchange Act) that are required to be filed as exhibits to the Company SEC Documents.  No Company SEC Document filed after December 31, 2005, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.  The Disclosure Statement, when submitted to the Bankruptcy Court and upon confirmation and effectiveness, will conform in all material respects to the requirements of the Bankruptcy Code.  The Disclosure Statement, when submitted to the Bankruptcy Court and upon confirmation and effectiveness, and any future Company SEC Documents filed with the Commission prior to the Closing Date, when filed, will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading.

(k)     Rights Offering Registration Statement and Rights Offering Prospectus.  The Rights Offering Registration Statement ~~or~~**and** any post-effective amendment thereto, as of the **applicable** Securities Act Effective Date **and, if applicable, as of the date of such post-effective amendment**, will comply in all material respects with the Securities Act, and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading; and as of the applicable filing date of the Rights Offering Prospectus ~~and~~**, the Rights Offering Prospectus, and as of the filing date of** any amendment or supplement thereto and **during the Rights Offering Period, and** as of the Closing Date, the Rights Offering Prospectus **as so amended or supplemented,** will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.  On the **Rights** Distribution Date**, during the Rights Offering Period,** and **at** the Expiration ~~Date~~**Time**, the Investment Decision Package will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.  Each Issuer Free Writing Prospectus, at

the time of use thereof, when considered together with the Investment Decision Package, will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.  Each Preliminary Rights Offering Prospectus, at the time of filing thereof, **complied (in the case of a Preliminary Rights Offering Prospectus filed prior to the date hereof) and** will comply in all material respects with the Securities Act and **did not (in the case of a Preliminary Rights Offering Prospectus filed prior to the date hereof) and** will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.  Notwithstanding the foregoing, the Company makes no representation and warranty with respect to any statements or omissions made in reliance on and in conformity with information relating to each Investor or the Ultimate Purchasers furnished to the Company in writing by such Investor or the Ultimate Purchasers expressly for use in the Rights Offering Registration Statement and the Rights Offering Prospectus and any amendment or supplement thereto.  **On March 21, 2007, the Staff of the Commission delivered a letter to the Company which will be included in Schedule 3(k) of the Disclosure Letter.**

For the purposes of this Agreement, (i) the term **"Rights Offering Registration Statement"** means the Registration Statement ~~to be~~ filed with the Commission relating to the Rights Offering, including all exhibits thereto, as amended as of the Securities Act Effective Date, and any post-effective amendment thereto that becomes effective; (ii) the term **"Rights Offering Prospectus"** means the final prospectus contained in the Rights Offering Registration Statement at the Securities Act Effective Date (including information, if any, omitted pursuant to Rule 430A and subsequently provided pursuant to Rule 424(b) under the Securities Act ), and any amended form of such prospectus provided under Rule 424(b) under the Securities Act or contained in a post-effective amendment to the Rights Offering Registration Statement; (iii) the term **"Investment Decision Package"** means the Rights Offering Prospectus, together with any Issuer Free Writing Prospectus used by the Company to offer the Shares to Eligible Holders pursuant to the Rights Offering, (iv) the term **"Issuer Free Writing Prospectus"** means each **"issuer free writing prospectus"** (as defined in Rule 433 of the rules promulgated under the Securities Act) prepared by or on behalf of the Company or used or referred to by the Company in connection with the Rights Offering, (v) the term **"Preliminary Rights Offering Prospectus"** means each prospectus included in the Rights Offering Registration Statement (and any amendments thereto) before it becomes effective, any prospectus filed with the Commission pursuant to Rule 424(a) under the Securities Act and the prospectus included in the Rights Offering Registration Statement, at the time of effectiveness that omits information permitted to be excluded under Rule 430A under the Securities Act; and (vi) **"Securities Act Effective Date"** means the date and time as of which the Rights Offering Registration Statement, or the most

recent post-effective amendment thereto, was declared effective by the Commission **which shall not be requested by the Company before the Confirmation Order is issued without the prior consent of ADAH**.

(l)     <u>Free Writing Prospectuses</u>.  Each Issuer Free Writing Prospectus will conform in all material respects to the requirements of the Securities Act as of the date of first use or as otherwise provided for in Rule 433 under the Securities Act, and the Company will comply with all prospectus delivery and filing requirements applicable to such Issuer Free Writing Prospectus under the Securities Act.  The Company has retained in accordance with the Securities Act all Issuer Free Writing Prospectuses that were not required to be filed pursuant to the Securities Act.

(m)     <u>Absence of Certain Changes</u>.  Since December 31, ~~2005,~~**2006,** other than as disclosed in the Company SEC Documents filed prior to the date hereof, and except for actions to be taken pursuant to the Transaction Agreements and the Plan:

(i)     there has not been any change in the capital stock from that set forth in <u>Section 3(d)</u> or any material change in long-term debt of the Company or any of its Subsidiaries, or any dividend or distribution of any kind declared, set aside for payment, paid or made by the Company on any class of capital stock;

(ii)     no event, fact or circumstance has occurred which has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(iii)     neither the Company nor any of its Subsidiaries has made any changes with respect to accounting policies or procedures, except as required by law or changes in GAAP;

(iv)     neither the Company nor any of its Subsidiaries has paid, discharged, waived, compromised, settled or otherwise satisfied any material Legal Proceeding, whether now pending or hereafter brought, (A) at a cost materially in excess of the amount accrued or reserved for it in the Company SEC Documents filed prior to the date hereof, (B) pursuant to terms that impose material adverse restrictions on the business of the Company and its Subsidiaries as currently conducted or (C) on a basis that reveals a finding or an admission of a material violation of law by the Company or its Subsidiaries;

(v)     other than in the ordinary course of business, neither the Company nor any of its Subsidiaries has (A) made, changed or revoked any material Tax election, (B) entered into any settlement or compromise of any material Tax liability, (C) filed any amended Tax Return with respect to any material Tax, (D) changed any annual Tax accounting period, (E) entered into any closing agreement relating to any material Tax, (F) knowingly failed to claim a material Tax refund for which it is entitled, or (G) made material changes to their Tax accounting methods or principles;

(vi)    there has not been (A) any increase in the base compensation payable or to become payable to the officers or employees of the Company or any of its Subsidiaries with annual base compensation in excess of $500,000 (except for compensation increases in the ordinary course of business and consistent with past practice) or (B) except in the ordinary course of business and consistent with past practice, any establishment, adoption, entry into or material amendment of any collective bargaining, bonus, profit sharing, thrift, compensation, employment, termination, severance or other plan, agreement, trust, fund, policy or arrangement for the benefit of any director, or for the benefit of a group of employees or for any individual officer or employee with annual base compensation in excess of $500,000, in each case;

(vii)   except in a manner consistent with **(i)** the Company'**'**s transformation plan previously disclosed in the Company SEC Documents ~~filed~~ prior to the date hereof~~,~~ (the "**Transformation Plan**") **and (ii) (A) prior to the satisfaction of the condition with respect to the Business Plan in accordance with Section 9(a)(xxviii) of this Agreement, that certain draft business plan delivered to the Investors dated February 28, 2007, as amended by the revisions thereto delivered to the Investors dated April 5, 2007 (collectively the "Draft Business Plan") or (B) after the satisfaction of the condition with respect to the Business Plan in accordance with Section 9(a)(xxviii) of this Agreement, the Business Plan approved by ADAH in accordance with this Agreement** neither the Company nor any of its Subsidiaries have sold, transferred, leased, licensed or otherwise disposed of any assets or properties material to the Company and its Subsidiaries, taken as a whole, except for (A) sales of inventory in the ordinary course of business consistent with past practice and (B) leases or licenses entered into in the ordinary course of business consistent with past practice; and

(viii)  except in a manner consistent with ~~the Transformation Plan~~**(i) the Transformation Plan and (ii) (A) prior to the satisfaction of the condition with respect to the Business Plan in accordance with Section 9(a)(xxviii) of this Agreement, the Draft Business Plan or (B) after the**

**satisfaction of the condition with respect to the Business Plan in accordance with this Section 9(a)(xxviii) of Agreement, the Business Plan approved by ADAH in accordance with this Agreement**, neither the Company nor any of its Subsidiaries have acquired any business or entity material to the Company and its Subsidiaries, taken as a whole, by merger or consolidation, purchase of assets or equity interests, or by any other manner, in a single transaction or a series of related transactions, or entered into any contract, letter of intent or similar arrangement (whether or not enforceable) with respect to the foregoing.

(n)     <u>Descriptions of the Transaction Agreement</u>.  The statements in the Rights Offering Registration Statement and the Rights Offering Prospectus insofar as they purport to constitute summaries of each of the Transaction Agreements, the Plan, the ~~Initial~~**Original Approval Order or the** Approval Order and the Confirmation Order, or the terms of statutes, rules or regulations, legal or governmental proceedings or contracts, will constitute accurate summaries in all material respects.

(o)     <u>No Violation or Default; Compliance with Laws</u>.  Neither the Company nor any of its Significant Subsidiaries is in violation of its charter or by-laws or similar organizational documents.  Neither the Company nor any of its Subsidiaries is, except as a result of the Chapter 11 Cases ~~or the failure to file its Quarterly Report on Form 10-Q for the period ended September 30, 2006,~~**,** in default, and no event has occurred that, with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound or to which any of the property or assets of the Company or any of its Subsidiaries is subject, except for any such default that has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Neither the Company nor any of its Subsidiaries is, or has been at any time since January 1, 2002, in violation of any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority, except for any such violation that has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(p)     <u>Legal Proceedings</u>.  Except as described in the Company SEC Documents filed prior to the date hereof, there are no legal, governmental or regulatory actions, suits, proceedings or, to the knowledge of the Company, investigations pending to which the Company or any of its Subsidiaries is or may be a party or to which any property of the Company or any of its Subsidiaries is or may be the subject that, individually or in the aggregate, has had or, if determined adversely to the Company or any of its Subsidiaries, would reasonably be expected to have a

Material Adverse Effect, and no such actions, suits or proceedings or, to the knowledge of the Company, investigations are pending, threatened or contemplated, by any governmental or regulatory authority or by others.  There are no current or pending legal, governmental or regulatory actions, suits or proceedings that are required under the Exchange Act to be described in the Company SEC Documents or the Rights Offering Registration Statement or Rights Offering Prospectus that are not or will not be so described, and there are no statutes, regulations or contracts or other documents that are required under the Exchange Act to be filed as exhibits to the Company SEC Documents or the Rights Offering Registration Statement or Rights Offering Prospectus or described in the Company SEC Documents or the Rights Offering Registration Statement or Rights Offering Prospectus that are not so filed or described.

(q)    <u>Independent Accountants</u>.  Ernst & Young LLP ("<u>**E&Y**</u>"), the Company's public accountants, are independent public accountants with respect to the Company and its Subsidiaries as required by the Securities Act.

(r)    <u>Labor Relations</u>.  Except as set forth in the Company SEC Documents filed prior to the date hereof:

(i)    neither the Company nor any of its Subsidiaries is a party to, or bound by, any material collective bargaining agreement, contract or other agreement or understanding with a labor union or labor organization (other than contracts or other agreements or understandings with labor unions or labor organizations in connection with products and services offered and sold to such unions and organizations by the Company or its Subsidiaries);

(ii)    neither the Company nor any of its Subsidiaries is the subject of any proceeding asserting that it or any Subsidiary has committed an unfair labor practice or sex, age, race or other discrimination or seeking to compel it to bargain with any labor organization as to wages or conditions of employment, which, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect;

(iii)    there are no material current or, to the knowledge of the Company, threatened organizational activities or demands for recognition by a labor organization seeking to represent employees of the Company or any Subsidiary and no such activities have occurred during the past 24 months;

(iv)    no grievance, arbitration, litigation or complaint or, to the knowledge of the Company, investigations relating to labor or employment matters is pending or, to the knowledge of the Company, threatened against the

Company or any of its Subsidiaries which, except as has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(v)    the Company and each of its Subsidiaries has complied and is in compliance in all respects with all applicable laws (domestic and foreign), agreements, contracts, and policies relating to employment, employment practices, wages, hours, and terms and conditions of employment and is not engaged in any material unfair labor practice as determined by the National Labor Relations Board (or any foreign equivalent) except where the failure to comply has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(vi)    the Company has complied in all respects with its payment obligations to all employees of the Company and its Subsidiaries in respect of all wages, salaries, commissions, bonuses, benefits and other compensation due and payable to such employees under any Company policy, practice, agreement, plan, program or any statute or other law, except to the extent that any noncompliance, either individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect; and

(vii)    the Company has complied and is in compliance in all material respects with its obligations pursuant to the Worker Adjustment and Retraining Notification Act of 1988 (and any similar state or local law) to the extent applicable, and all material other employee notification and bargaining obligations arising under any collective bargaining agreement or statute.

(s)    <u>Title to Intellectual Property</u>.  The Company and its Subsidiaries own or possess valid and enforceable rights to use all material patents, patent applications, trademarks, service marks, trade names, trademark registrations, service mark registrations, copyrights, licenses and know-how (including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures) (collectively, "**"Intellectual Property"**") used in the conduct of their respective businesses other than Intellectual Property, the failure to own or possess which has not had and would not reasonably be expected to have, individually or in the aggregate,_**a** Material Adverse Effect.  All registrations with and applications to governmental or regulatory authorities in respect of such Intellectual Property are valid and in full force and effect, have not, except in accordance with the ordinary course practices of the Company and its Subsidiaries, lapsed, expired or been abandoned (subject to the vulnerability of a registration for trademarks to cancellation for lack of use), are not the subject of any opposition filed with the United States Patent and Trademark Office or any other applicable Intellectual Property registry.  The consummation of the

transaction contemplated hereby and by the Plan will not result in the loss or impairment of any rights to use such Intellectual Property or obligate any of the Investors to pay any royalties or other amounts to any third party in excess of the amounts that would have been payable by Company and its Subsidiaries absent the consummation of this transactions.  The Company and its Subsidiaries have taken reasonable security measures to protect the confidentiality and value of its and their trade secrets (or other Intellectual Property for which the value is dependent upon its confidentiality), and no such information, has been misappropriated or the subject of an unauthorized disclosure, except to the extent that such misappropriation or unauthorized disclosure has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  The Company and its Subsidiaries have not received any notice that it is or they are, in default (or with the giving of notice or lapse of time or both, would be in default) under any contract relating to such Intellectual Property.  No Intellectual Property rights of the Company or its Subsidiaries are being infringed by any other person, except to the extent that such infringement has not had and would not have, individually or in the aggregate, a Material Adverse Effect.  The conduct of the businesses of the Company and its Subsidiaries will not conflict in any respect with any Intellectual Property rights of others, and the Company and its Subsidiaries have not received any notice of any claim of infringement or conflict with any such rights of others which has had or would in any such case be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(t)     _Title to Real and Personal Property_.  The Company and its Subsidiaries have good and marketable title to all real property owned by the Company and its Subsidiaries and good title to all other tangible and intangible properties (other than Intellectual Property covered by _Section 3(s)_) owned by them, in each case, free and clear of all mortgages, pledges, liens, security interests, claims, restrictions or encumbrances of any kind except such as (i) are described in the consolidated balance sheets included in the Company SEC Documents filed prior to the date hereof or (ii) individually and in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect.  All of the leases and subleases to which the Company or its Subsidiaries are a party are in full force and effect and enforceable by the Company or such Subsidiary in accordance with their terms, and neither the Company nor any Subsidiary has received any notice of any claim of any sort that has been asserted by anyone adverse to the rights of the Company or any Subsidiary under any of the leases or subleases mentioned above, or affecting or questioning the rights of the Company or such Subsidiary to the continued possession of the leased or subleased property by under any such lease or sublease, except where any such claim or failure to be enforceable would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(u)     <u>No Undisclosed Relationships</u>.  As of the date hereof, no relationship, direct or indirect, exists between or among the Company or any of its Subsidiaries, on the one hand, and the directors, officers, stockholders, customers or suppliers of the Company or any of its Subsidiaries, on the other, that is required by the Exchange Act to be described in the Company SEC Documents and that are not so described, except for the transactions pursuant to this Agreement.

(v)     <u>Investment Company Act</u>.  As of the date hereof, the Company is not and, after giving effect to the consummation of the Plan, including the offering and sale of the Investor Shares and Shares upon exercise of Rights, and the application of the proceeds thereof, will not be required to register as an "*"investment company"*" or an entity "*"controlled"*" by an "*"investment company"*" within the meaning of the Investment Company Act of 1940, as amended, and the rules and regulations of the Commission thereunder.

(w)     <u>Licenses and Permits</u>.  The Company and its Subsidiaries possess all licenses, certificates, permits and other authorizations issued by, and have made all declarations and filings with, the appropriate federal, state, local or foreign governmental or regulatory authorities that are necessary for the ownership or lease of their respective properties or the conduct of their respective businesses as described in the Company SEC Documents except any such licenses, certificates, permits or authorization the absence of which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Except as described in the Company SEC Documents filed prior to the date hereof and except as, individually and in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect, neither the Company nor any of its Subsidiaries has received notice of any revocation or modification of any such license, certificate, permit or authorization or has any reason to believe that any such license, certificate, permit or authorization will not be renewed in the ordinary course.

(x)     <u>Compliance with Environmental Laws</u>.

        (i)     The Company and its Subsidiaries have complied and are in compliance with any and all applicable federal, state, local and foreign laws, rules, regulations, decisions and orders, including all civil and common law, relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants (collectively, "*"**Environmental Laws**"*");

        (ii)     the Company and its Subsidiaries have (a) received and are in compliance with all permits, licenses or other approvals required of them under applicable Environmental Laws to conduct their respective businesses, (b)

are not subject to any action to revoke, terminate, cancel, limit, amend or appeal any such permits, licenses or approvals, and (c) have paid all fees, assessments or expenses due under any such permits, licenses or approvals;

(iii)    the Company and its Subsidiaries have not received notice from any governmental authority of any actual or potential liability for the investigation or remediation of any disposal or release of hazardous or toxic substances or wastes, pollutants or contaminants, or for any violation of Environmental Laws;

(iv)    there are no facts, circumstances or conditions relating to the past or present business or operations of the Company, its Subsidiaries or any of their predecessors (including the disposal of any hazardous or toxic substances or wastes, pollutants or contaminants), or to any real property currently or formerly owned or operated by the Company, its Subsidiaries or any of their predecessors, that would reasonably be expected to give rise to any claim, proceeding or action, or to any liability, under any Environmental Law;

(v)    neither the Company nor any of its Subsidiaries has agreed to assume or accept responsibility for, by contract or otherwise, any liability of any other person under Environmental Laws;

(vi)    neither the Company nor any of its Subsidiaries is required or reasonably expected to incur material capital expenditures during the current and the subsequent five fiscal years to reach or maintain compliance with existing or reasonably anticipated Environmental Laws;

(vii)    none of the transactions contemplated under this Agreement will give rise to any obligations to obtain the consent of or provide notice to any governmental or regulatory authority under any Environmental Laws; and

(viii)    none of the Company, nor any of its subsidiaries nor their respective predecessors has manufactured, marketed, distributed, or sold asbestos or any products containing asbestos.

except, in the case of each of subclauses (i) through (vi) and in subclause (viii) above, as disclosed in the Company SEC Documents filed prior to the date hereof, as have been, as of the date of this Agreement, adequately provided for in accordance with GAAP in the financial statements of the Company included in the Company SEC Documents filed

prior to the date hereof, or as, individually and in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect.

(y)    <u>Tax Matters</u>.  Except as described in the Company SEC Documents filed with the Commission prior to the date hereof:

(i)    The Company has timely filed or caused to be timely filed (taking into account any applicable extension of time within which to file) with the appropriate taxing authorities all material tax returns, statements, forms and reports (including elections, declarations, disclosures, schedules, estimates and information Tax Returns) for Taxes ("**Tax Returns**") that are required to be filed by, or with respect to, the Company and its Subsidiaries on or prior to the Closing Date.  The Tax Returns accurately reflect all material liability for Taxes of the Company and its Subsidiaries for the periods covered thereby;

(ii)    all material Taxes and Tax liabilities due by or with respect to the income, assets or operations of the Company and its Subsidiaries for all taxable years or other taxable periods that end on or before the Closing Date have been or will, prior to the Closing, be timely paid in full or accrued and fully provided for in accordance with GAAP on the financial statements of the Company included in the Company SEC Documents;

(iii)    neither the Company nor any of its Subsidiaries has received any written notices from any taxing authority relating to any material issue that has not been adequately provided for in accordance with GAAP in the financial statements of the Company included in the Company SEC Documents filed prior to the date hereof;

(iv)    all material Taxes which the Company and each or any of its Subsidiaries is (or was) required by law to withhold or collect in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party have been duly withheld or collected, and have been timely paid to the proper authorities to the extent due and payable;

(v)    neither the Company nor any of its subsidiaries has been included in any "consolidated," "unitary" or "combined" Tax Return provided for under the law of the United States, any foreign jurisdiction or any state or locality with respect to Taxes for any taxable period for which the statute of limitations has not expired (other than a group of which the Company and/or its subsidiaries are the only members);

(vi)     except for the tax sharing allocations and similar agreements entered into with GM at the time of the spin-off, there are no tax sharing, allocation, indemnification or similar agreements in effect as between the Company or any of its Subsidiaries or any predecessor or affiliate thereof and any other party (including any predecessors or affiliates thereof) under which the Company or any of its Subsidiaries would be liable for any material Taxes or other claims of any party;

(vii)    the Company has not been a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code at any time during the five-year period ending on the date hereof; and

(viii)   the Company is not a party to any agreement other than certain Change In Control Agreements in the Company SEC Documents filed prior to the date hereof that would require the Company or any affiliate thereof to make any material payment that would constitute an "excess parachute payment" for purposes of Sections 280G and 4999 of the Code.

For purposes of this Agreement, "**Taxes**" shall mean all taxes, assessments, charges, duties, fees, levies or other governmental charges, including, without limitation, all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, property, excise, severance, windfall profits, stamp, license, payroll, social security, withholding and other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest and shall include any liability for such amounts as a result either of being a member of a combined, consolidated, unitary or affiliated group or of a contractual obligation to indemnify any person or other entity.

(z)     <u>Compliance With ERISA</u>.

(i)     Correct and complete copies of the following documents, with respect to all material domestic and foreign benefit and compensation plans, programs, contracts, commitments, practices, policies and arrangements, whether written or oral, that have been established, maintained or contributed to (or with respect to which an obligation to contribute has been undertaken) or with respect to which any potential liability is borne by the Company or any of its Subsidiaries, including, but not limited to, "employee benefit plans" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), and deferred compensation, stock option, stock purchase, restricted stock, stock appreciation rights, stock based, incentive and

bonus plans (the "**"Company Plans"**"), have been ~~or will be~~ delivered or made available to the Investors by the Company, to the extent applicable: (i) all material Company Plan documents, together with all amendments and attachments thereto (including, in the case of any Company Plan not set forth in writing, a written description thereof); (ii) all material trust documents, declarations of trust and other documents establishing other funding arrangements, and all amendments thereto and the latest financial statements thereof; (iii) the most recent annual report on IRS Form 5500 for each of the past three years and all schedules thereto and the most recent actuarial report; (iv) the most recent IRS determination letter; (v) summary plan descriptions and summaries of material modifications; and (vi) the two most recently prepared actuarial valuation reports.

(ii)      Except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or except as described in the Company SEC Documents filed prior to the date hereof: (A) each Company Plan, other than any "**"**multiemployer plans**"**" within the meaning of Section 3(37) of ERISA ("**"Multiemployer Plans"**"), is in compliance with ERISA, the Internal Revenue Code of 1986, as amended (the "**"Code"**") and other applicable laws; (B) each Company Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the IRS covering all Tax law changes prior to the Economic Growth and Tax Relief Reconciliation Act of 2001 or has applied to the IRS for such favorable determination within the applicable remedial amendment period under Section 401(b) of the Code, and the Company is not aware of any circumstances likely to result in the loss of the qualification of such Company Plan under Section 401(a) of the Code; (C) no liability under Subtitle C or D of Title IV of ERISA has been or is reasonably expected to be incurred by the Company or any of its Subsidiaries with respect to any ongoing, frozen or terminated "**"**single-employer plan,**"**" within the meaning of Section 4001(a)(15) of ERISA ("**"Single-Employer Plan"**") currently maintained or contributed to (or with respect to which an obligation to contribute has been undertaken), or the Single-Employer Plan of any entity which is considered one employer with the Company under Section 4001 of ERISA or Section 414 of the Code (a "**"Company ERISA Affiliate"**"); (D) the Company and its Subsidiaries have not incurred any withdrawal liability (including any contingent or secondary withdrawal liability) with respect to a Multiemployer Plan under Subtitle E of Title IV of ERISA (regardless of whether based on contributions of a Company ERISA Affiliate) that has not been satisfied in full and no condition or circumstance has existed that presents a risk of the occurrence of any withdrawal from or the partition, termination, reorganization or insolvency of any such Multiemployer Plan; (E) no notice of a "**"**reportable event,**"**" within the meaning of Section 4043 of ERISA has occurred or is expected to occur for any Company Plan or by any Company ERISA Affiliate; (F) all contributions required to

be made under the terms of any Company Plan have been timely made or have been reflected in the financial statements of the Company included in the Company SEC Reports filed prior to the date hereof; and (G) there has been no amendment to, announcement by the Company or any of its Subsidiaries relating to, or change in employee participation or coverage under, any Company Plan which would increase the expense of maintaining such plan above the level of the expense incurred therefor for the most recent fiscal year.

(iii)    Except as disclosed in the Company SEC Documents filed prior to the date hereof: (A) neither any Company Plan nor any Single-Employer Plan of a Company ERISA Affiliate has an ""accumulated funding deficiency"" (whether or not waived) within the meaning of Section 412 of the Code or Section 302 of ERISA and neither the Company nor any of its Subsidiaries nor any Company ERISA Affiliate has applied for or obtained a funding waiver; (B) the Company expects that required minimum contributions to any Company Plan under Section 412 of the Code will not be materially increased by application of Section 412(l) of the Code; (C) neither the Company nor any of its Subsidiaries has provided, or is required to provide, security to any Company Plan or to any Single-Employer Plan of a Company ERISA Affiliate pursuant to Section 401(a)(29) of the Code; and (D) neither the execution of this Agreement, stockholder approval of this Agreement nor the consummation of the transactions contemplated hereby will limit or restrict the right of the Company to merge, amend or terminate any of the Company Plans.

(aa)    <u>Internal Control Over Financial Reporting</u>.  Except as set forth in the Company SEC Documents filed prior to the date hereof, the Company and its Subsidiaries (i) make and keep books and records that accurately and fairly represent the Company''s transactions, and (ii) maintain and have maintained effective internal control over financial reporting as defined in Rule 13a-15 under the Exchange Act and a system of internal accounting controls sufficient to provide reasonable assurance that: (A) transactions are executed in accordance with management''s general or specific authorizations; (B) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset accountability; (C) access to assets is permitted only in accordance with management''s general or specific authorization; and (D) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.  The Company has disclosed, based on the most recent evaluation of its chief executive officer and its chief financial officer prior to the date hereof, to the Company''s auditors and the audit committee of the Company''s board of directors (i) any significant deficiencies in the design or operation of its internal controls over financial reporting that are reasonably likely

to adversely affect the Company"'s ability to record, process, summarize and report financial information and has identified for the Company"'s auditors and the audit committee of the Company"'s board of directors any material weaknesses in internal control over financial reporting and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company"'s internal control over financial reporting.

(bb)   <u>Disclosure Controls and Procedures</u>.  Except as disclosed in the Company SEC Documents filed prior to the date hereof, the Company maintains disclosure controls and procedures required by Rule 13a-15 or 15d-15 under the Exchange Act.  Such disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company is recorded and reported on a timely basis to the individuals responsible for the preparation of the Company"'s filings with the Commission and other public disclosure documents.

(cc)   <u>Insurance</u>.  The Company and its Subsidiaries have insurance covering their respective properties, operations, personnel and businesses, including business interruption insurance, which insurance is in amounts and insures against such losses and risks as are customary for companies whose businesses are similar to the Company and its Subsidiaries.  Neither the Company nor any of its Subsidiaries has (i) received written notice from any insurer or agent of such insurer that capital improvements or other expenditures are required or necessary to be made to continue such insurance or (ii) any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage at reasonable cost from similar insurers as may be necessary to continue its business.

(dd)   <u>No Unlawful Payments</u>.  Neither the Company nor any of its Subsidiaries nor, to the knowledge of the Company, any director, officer, agent, employee or other person associated with or acting on behalf of the Company or any of its Subsidiaries has: (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977; or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment in each case other than clause (iii) that has been or would reasonably be expected to be, individually or in the aggregate, material to the Company and its Subsidiaries, taken as a whole.

(ee)   <u>Compliance with Money Laundering Laws</u>.  The Company and its Subsidiaries are and have been conducted at all times in compliance with applicable financial recordkeeping and reporting requirements of the Bank Secrecy Act, as amended, the money laundering statutes of all jurisdictions, the rules and regulations

thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "**"Money Laundering Laws"**") and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its Subsidiaries with respect to Money Laundering Laws is pending or, to the knowledge of the Company, threatened.

(ff)    <u>Compliance with Sanctions Laws</u>.  Neither the Company nor any of its Subsidiaries nor, to the knowledge of the Company, any director, officer, agent, employee or affiliate of the Company or any of its Subsidiaries is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("**"OFAC"**").  The Company will not directly or indirectly use the proceeds of the Rights Offering or the sale of the Investor Shares, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other person or entity, for the purpose of financing the activities of any person that, to the Company's knowledge, is currently subject to any U.S. sanctions administered by OFAC.

(gg)    <u>No Restrictions on Subsidiaries</u>.  Except as described in the Company SEC Documents filed prior to the date hereof or otherwise set forth in the record of the Chapter 11 Cases on or prior to the date hereof, and subject to the Bankruptcy Code, no Subsidiary of the Company is currently prohibited, directly or indirectly, under any agreement or other instrument to which it is a party or is subject, from paying any dividends to the Company, from making any other distribution on such Subsidiary's capital stock, from repaying to the Company any loans or advances to such Subsidiary from the Company or from transferring any of such Subsidiary's properties or assets to the Company or any other Subsidiary of the Company.

(hh)    <u>No Broker's Fees</u>.  Neither the Company nor any of its Subsidiaries is a party to any contract, agreement or understanding with any person (other than this Agreement) that would give rise to a valid claim against the Investors for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Investor Shares.

(ii)    <u>No Registration Rights</u>.  Except as provided for pursuant to the registration rights agreement contemplated by <u>Section 8(c)(iv)</u>, no person has the right to require the Company or any of its Subsidiaries to register any securities for sale under the Securities Act by reason of the filing of the Rights Offering Registration Statement with the Commission or in connection with Rights Offering or the sale of the Investor Shares.

(jj)    <u>No Stabilization</u>.  The Company has not taken and will not take, directly or indirectly, any action designed to or that would reasonably be expected to cause or result in any stabilization or manipulation of the price of the Shares.

(kk)    <u>Margin Rules</u>.  Neither the issuance, sale and delivery of the Rights or the Shares in connection with Rights Offering or the sale of the Investor Shares nor the application of the proceeds thereof by the Company as **described and** to be described in the Rights Offering Registration Statement and the Rights Offering Prospectus will violate Regulation T, U or X of the Board of Governors of the Federal Reserve System or any other regulation of such Board of Governors.

(ll)    <u>Forward-Looking Statements</u>.  No forward-looking statement (within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act) contained in the Company SEC Documents has been made or reaffirmed, and in the case of the Rights Offering Registration Statement and the Rights Offering Prospectus, will be made or reaffirmed, without a reasonable basis or has been disclosed other than in good faith.

(mm)   <u>Statistical and Market Data</u>.  Nothing has come to the attention of the Company that has caused the Company to believe that the statistical and market-related data **included and** to be included in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus is not based on or derived from sources that are reliable and accurate in all material respects.

(nn)    <u>Rights Agreement</u>.  The **Company and the** Board of Directors of the Company has taken all necessary action to render the Existing Shareholder Rights Plan inapplicable to the sale and issuance of the Investor Shares and the other transactions contemplated ~~hereby and by the Preferred Term Sheet~~**by and by the Original Agreement, this Agreement, the Original PSA, the Plan Terms**, the Plan and the Transaction Agreements (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser).

(oo)    <u>Takeover Statutes; Charter</u>.  The **Company and the** Board of Directors of the Company has taken all such action necessary to render the restrictions contained in Section 203 of the General Corporation Law of the State of Delaware (the "**"DGCL""**) and Article IX of the Company'"s Certificate of Incorporation inapplicable to the Investors and the sale and issuance of the Investor Shares and the other transactions contemplated by **the Original Agreement,** this Agreement, the ~~Preferred Term Sheet, the PSA~~**Original PSA, the Plan Terms**, the Plan and the Transaction Agreements (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser).  Except for Section 203 of the DGCL (which has been rendered inapplicable), no other ""**"**fair price," "**"** "moratorium," "**"** "control share acquisition""**"**, ""**"**business combination""**"** or other similar anti-

takeover statute or regulation (a "**"Takeover Statute"**") is applicable to the Company, the Common Stock, the Shares, the sale and issuance of the Investor Shares or the other transactions contemplated by **the Original Agreement,** this Agreement, the ~~Preferred Term Sheet, the PSA~~**Original PSA, the Plan Terms**, the Plan and the Transaction Agreements.  Other than Article IX of the Company'**'**s Certificate of Incorporation, which has been rendered inapplicable, no anti-takeover provision in the Company'**'**s certificate of incorporation or by-laws is applicable to the Company, the Common Stock, the Shares, the sale and issuance of the Investor Shares or the other transactions contemplated by the Preferred Term Sheet, the Plan or the Transaction Agreements.

> **(pp)**     **UAW MOU.  On June 22, 2007, the Company entered into a Memorandum of Understanding (the "UAW MOU") with the** International Union, United Automobile, Aerospace and Agricultural Implement Workers of America **("UAW") and GM.  The UAW MOU has been ratified by the membership of the UAW and a true and complete copy thereof has been made available to ADAH.**

4.     <u>Representations and Warranties of the Investors</u>.  Each Investor represents and warrants as to itself only, and agrees with the Company, severally and not jointly, as set forth below.  Each such representation, warranty and agreement is made as of the date hereof and as of the Closing Date.

> (a)     <u>Incorporation</u>.  The Investor has been duly organized and, if applicable, is validly existing as a corporation, limited partnership or limited liability company, in good standing under the laws of the jurisdiction of its incorporation or organization.

> (b)     <u>Corporate Power and Authority</u>.  The Investor has the requisite corporate, limited partnership or limited liability company power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary corporate, limited partnership or limited liability company action required for the due authorization, execution, delivery and performance by it of this Agreement .

> (c)     <u>Execution and Delivery</u>.  This Agreement has been duly and validly executed and delivered by the Investor and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

> (d)     <u>No Registration</u>.  The Investor understands that the Investor Shares have not been registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the bona fide nature of the investment intent and the

accuracy of such Investor''s representations as expressed herein or otherwise
made pursuant hereto.

(e)    <u>Investment Intent</u>.  The Investor is acquiring the Investor Shares for investment
for its own account, not as a nominee or agent, and not with the view to, or for
resale in connection with, any distribution thereof not in compliance with
applicable securities laws, and such Investor has no present intention of selling,
granting any participation in, or otherwise distributing the same, except in
compliance with applicable securities laws.  ~~Notwithstanding the foregoing, as to
ADAH, subject to the provisions of Sections 2(a), 2(b) and 2(k), the Company
acknowledges that ADAH may provide for a participation interest or other
arrangement whereby the economic benefits of ownership of the Series A-2
Preferred Stock are shared with Merrill and Harbinger or their Affiliates, but
ADAH shall not, pursuant to such arrangements, transfer any voting or
investment power or control over the Series A-2 Preferred Stock.~~

(f)    <u>Securities Laws Compliance</u>.  The Investor Shares will not be offered for sale,
sold or otherwise transferred by the Investor except pursuant to a registration
statement or in a transaction exempt from, or not subject to, registration under the
Securities Act and any applicable state securities laws and any sale or placement
of Investor Shares pursuant to <u>Sections 2(a)</u>, <u>2(b)</u> or <u>2(k)</u> will not affect the
validity of the private placement to the Investors under this Agreement **or result
in the private placement being integrated with the Rights Offering.  The
Investors have not and will not solicit offers for, or offer to sell, the Investor
Shares by means of any general solicitation or general advertising within the
meaning of Rule 502(c) under Regulation D under the Securities Act or in
any manner involving a public offering within the meaning of the Securities
Act (other than pursuant to the Resale Registration Statement)**.

(g)    <u>Sophistication</u>.  The Investor has such knowledge and experience in financial and
business matters that it is capable of evaluating the merits and risks of its
investment in the Investor Shares being acquired hereunder.  The Investor is a
''"qualified institutional buyer''" within the meaning of Rule 144A under the
Securities Act.  The Investor understands and is able to bear any economic risks
associated with such investment (including, without limitation, the necessity of
holding the Investor Shares for an indefinite period of time).

(h)    <u>No Conflict</u>.  The execution and delivery by the Investor of each of the
Transaction Agreements to which it is a party and the compliance by the Investor
with all of the provisions hereof and thereof and the Preferred Term Sheet and the
~~PSA~~**Plan Terms** and the consummation of the transactions contemplated herein
and therein (i) will not conflict with, or result in a breach or violation of, any of
the terms or provisions of, or constitute a default under (with or without notice or
lapse of time, or both), or result, in the acceleration of, or the creation of any lien

under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Investor is a party or by which the Investor is bound or to which any of the property or assets of the Investor or any of its Subsidiaries is subject, (ii) will not result in any violation of the provisions of the certificate of incorporation or bylaws or similar governance documents of the Investor, and (iii) will not result in any material violation of, or any termination or material impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Investor or any of their properties, except in any such case described in subclause (i) for any conflict, breach, violation, default, acceleration or lien which has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor''s performance of its obligations under this Agreement.

(i)     <u>Consents and Approvals</u>.  No consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Investor or any of its properties is required to be obtained or made by the Investor for the purchase of the Investor Shares hereunder and the execution and delivery by the Investor of this Agreement or the Transaction Agreements to which it is a party and performance of and compliance by the Investor with all of the provisions hereof and thereof and the Preferred Term Sheet and the ~~PSA~~**Plan Terms** and the consummation of the transactions contemplated herein and therein, except filings with respect to and the expiration or termination of the waiting period under the HSR Act or any comparable laws or regulations in any foreign jurisdiction relating to the purchase of Investor Shares and except for any consent, approval, authorization, order, registration or qualification which, if not made or obtained, has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor''s performance of its obligations under this Agreement.

(j)     <u>Arm''s Length</u>.  The Investor acknowledges and agrees that the Company is acting solely in the capacity of an arm''s length contractual counterparty to the Investor with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering).  Additionally, the Investor is not relying on the Company for any legal, tax, investment, accounting or regulatory advice, except as specifically set forth in this Agreement.  The Investor shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby.

(k)     <u>No Violation or Default; Compliance with Laws</u>.  The Investor is not in default, and no event has occurred that , with notice or lapse of time or both, would

constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Investor is a party or by which the Investor is bound or to which any of the property or assets of the Investor is subject, individually or in the aggregate, that would prohibit, materially delay or materially and adversely impact the Investor''s performance of its obligations under this Agreement.  The Investor is not and has not been at any time since January 1, 2002, in violation of any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority, except for any such violation that has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor''s performance of its obligations under this Agreement.

(l)     <u>Legal Proceedings</u>.  There are no actions, suits or proceedings to which the Investor is a party or to which any property of the Investor is the subject that, individually or in the aggregate, has or, if determined adversely to the Investor, would reasonably be expected to prohibit, materially delay or materially and adversely impact the Investor''s performance of its obligations under this Agreement and no such actions, suits or proceedings are threatened or, to the knowledge of the Investor, contemplated and, to the knowledge of the Investor, no investigations are threatened by any governmental or regulatory authority or threatened by others that has or would reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor''s performance of its obligations under this Agreement.

(m)    <u>No Broker''s Fees</u>.  The Investor is not a party to any contract, agreement or understanding with any person (other than this Agreement) that would give rise to a valid claim against the Company**, other than pursuant to Section 2(j),** for a brokerage commission, finder''s fee or like payment in connection with the Rights Offering or the sale of the Investor Shares.

(n)     <u>No Undisclosed Written Agreements</u>.  ~~The~~**Other than the (i) Additional Investor Agreement; (ii) Agreement Among Initial Investors, by and among ADAH, Harbinger, UBS and Merrill; and (iii) that certain Letter Agreement, by and among ADAH, Harbinger, UBS, Merrill, Pardus and GS (substantially in the form delivered to the Company on July 17, 2007), the** Investor has not entered into any material written agreements between or among the Investors directly relating to such Investor''s Investor Shares or the performance of the Transaction Agreements, and any such written agreement hereafter entered into will be disclosed promptly to the Company.

(o)     <u>Available Funds</u>.  To the extent the Investor is ADAH, ~~Dolce or~~ Harbinger **or Pardus**, the Investor has provided the Company with a true and complete copy of

an executed commitment letter from the parties signatory thereto to provide equity financing to such Investor (the "**"Equity Commitment Letter"**"). Each such Investor represents as to itself that its Equity Commitment Letter is in full force and effect and is a valid and binding obligation of the parties thereto enforceable in accordance with its terms except as the enforcement thereof is subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors rights and to general equitable principles.  The Equity Commitment Letters are not subject to any condition or contingency with respect to financing that is not set forth in such letter other than the terms and conditions of this Agreement.

5.     <u>Additional Covenants of the Company</u>.  The Company agrees with each of the Investors as set forth below.

(a)     ~~Initial~~ Approval Motion and ~~Initial~~ Approval Order.  The Company agrees that it shall use reasonable best efforts to cause the ~~Initial~~ Approval Order to become a Final Approval Order as soon as practicable following the filing of the Approval Motion.

(b)     <u>Plan and Disclosure Statement</u>.  The Company shall authorize, execute, file with the Bankruptcy Court and seek confirmation of, a Plan (and a related disclosure statement (the "**"Disclosure Statement"**")) (i) the terms of which are consistent with this Agreement, the Preferred Term Sheet, the ~~PSA and the GM Settlement, and with such other terms that, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to each of ADAH and Dolce; provided,~~ however, ~~that prior to the Due Diligence Expiration Date, the standard for the approval by each of ADAH and Dolce of such other terms shall be each in its sole discretion~~**Plan Terms and the GM Settlement**, (ii) that provides for the release and exculpation of each Investor, its Affiliates, shareholders, partners, directors, officers, employees and advisors from liability for participation in the transactions contemplated by **the Original Agreement,** this Agreement, the Preferred Term Sheet, the **Original** PSA**, the Plan Terms** and the Plan to the fullest extent permitted under applicable law **(provided, that such release and exculpation shall not prohibit or impede the Company's ability to assert defenses or counterclaims in connection with or relating to the Original Agreement or the Original PSA)** and (iii) that has conditions to confirmation and the Effective Date of the Plan (and to what extent any such conditions can be waived and by whom) that are consistent with this Agreement, the Preferred Term Sheet, the ~~PSA and the GM Settlement and with such other terms that, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to each of ADAH and Dolce; provided,~~ however, ~~that prior to the Due Diligence Expiration Date, the standard for the approval by each of ADAH and Dolce of such other terms shall be each in its sole discretion~~**Plan Terms and the GM Settlement**.  The Company will (i) provide to ~~each Investor~~**ADAH** and its counsel a copy of

the Plan and the Disclosure Statement, and any amendments thereto, and a reasonable opportunity to review and comment on such documents prior to such documents being filed with the Bankruptcy Court, and (ii) duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the ~~PSA~~**Plan Terms**, and any other reasonable comments of ~~each of the Investors~~**ADAH** and ~~their respective~~**its** counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH ~~and Dolce~~ or ~~their~~**its** counsel and giving due consideration to the views of ADAH and ~~Dolce and their~~**its** counsel.  In addition, the Company will (i) provide to ~~each Investor~~**ADAH** and its counsel a copy of the Confirmation Order and a reasonable opportunity to review and comment on such order prior to such order being filed with the Bankruptcy Court and (ii) duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the ~~PSA~~**Plan Terms** and any other reasonable comments of each of ~~the Investors~~**ADAH** and ~~their respective~~**its** counsel, into such Confirmation Order, and shall not reject such comments without first discussing the reasons therefor with ADAH ~~and Dolce~~ or ~~their~~**its** counsel and giving due consideration to the views of ADAH and ~~Dolce and their counsel.~~**its counsel.  As soon as practicable following the entry of an order by the Bankruptcy Court approving the Disclosure Statement (the "Disclosure Statement Approval Date") and the effectiveness under the Securities Act of the Rights Offering Registration Statement, the Company shall distribute** ballot form(s) in connection with the solicitation of **acceptance of the Plan.**

(c)     Rights Offering.  The Company shall use its reasonable best efforts to effectuate the Rights Offering as provided herein.

(d)     Securities Laws; Rights Offering Registration Statement.  The Company shall take all action as may be necessary or advisable so that the Rights Offering and the issuance and sale of the Investor Shares and the other transactions contemplated by this Agreement will be effected in accordance with the Securities Act and the Exchange Act and any state or foreign securities or Blue Sky laws.  **The Rights Offering Registration Statement was filed with the Commission on March 7, 2007.**  As promptly as practicable following the ~~later of the Due Diligence Expiration Date and the~~ date the GM Settlement is agreed, the Company shall file a~~a~~**n amended** Rights Offering Registration Statement with the Commission.  The Company shall: (i) provide ~~the Investors~~**ADAH** with a reasonable opportunity to review the Rights Offering Registration Statement, and any amendment or supplement thereto, before any filing with the Commission and shall duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the ~~PSA~~**Plan Terms**, and any other reasonable comments of ~~the Investors~~**ADAH** and ~~their respective~~**its** counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH ~~and Dolce~~ or ~~their~~**its** counsel and giving due consideration to the views of ADAH and ~~Dolce and their~~**its** counsel; (ii) advise ~~the Investors~~**ADAH**, promptly after it

receives notice thereof, of the time when the Rights Offering Registration Statement has been filed or has become effective or any Rights Offering Prospectus or Rights Offering Prospectus supplement has been filed and shall furnish ~~the Investors~~**ADAH** with copies thereof; (iii) advise ~~the Investors~~**ADAH** promptly after it receives notice of any comments or inquiries by the Commission (and furnish the Investors with copies of any correspondence related thereto), of the issuance by the Commission of any stop order or of any order preventing or suspending the use of the Rights Offering Prospectus or Issuer Free Writing Prospectus, of the initiation or threatening of any proceeding for any such purpose, or of any request by the Commission for the amending or supplementing of the Rights Offering Registration Statement or a Rights Offering Prospectus or for additional information, and in each such case, provide ~~the Investors~~**ADAH** with a reasonable opportunity to review any such comments, inquiries, request or other communication from the Commission and to review any amendment or supplement to the Rights Offering Registration Statement or the Rights Offering Prospectus before any filing with the Commission, and to duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the ~~PSA~~**Plan Terms**, and any other reasonable comments of ~~the Investors~~**ADAH** and ~~their respective~~**its** counsel, and not reject such comments without first discussing the reasons therefor with ADAH ~~and Dolce~~ or ~~their~~**its** counsel and giving due consideration to the views of ADAH and ~~Dolce and their~~**its** counsel; and (iv) in the event of the issuance of any stop order or of any order preventing or suspending the use of a Rights Offering Prospectus or any Issuer Free Writing Prospectus or suspending any such qualification, ~~to~~ use promptly its reasonable best efforts to obtain its withdrawal.

(e)   <u>Listing</u>.  The Company shall use its commercially reasonable efforts to list and maintain the listing of the New Common Stock on the New York Stock Exchange or, if approved by ~~each of~~ ADAH ~~and Dolce~~, the Nasdaq Global Select Market.

(f)   <u>Rule 158</u>.  The Company will generally make available to the Company'~~'~~s security holders as soon as practicable an earnings statement of the Company covering a twelve-month period beginning after the date of this Agreement, which shall satisfy the provisions of Section 11(a) of the Securities Act.

(g)   <u>Notification</u>.  The Company shall notify, or cause the Subscription Agent to notify the Investors, on each Friday during the Rights Exercise Period and on each Business Day during the five Business Days prior to the Expiration Time (and any extensions thereto), or more frequently if reasonably requested by any of the Investors, of the aggregate number of Rights known by the Company or the Subscription Agent to have been exercised pursuant to the Rights Offering as of the close of business on the preceding Business Day or the most recent practicable time before such request, as the case may be.

(h)     Unsubscribed Shares.  The Company shall determine the number of Unsubscribed Shares, if any, in good faith, shall provide a Purchase Notice or a Satisfaction Notice that accurately reflects the number of Unsubscribed Shares as so determined and shall provide to ~~the Investors~~**ADAH** a certification by the Subscription Agent of the Unsubscribed Shares or, if such certification is not available, such written backup to the determination of the Unsubscribed Shares as ~~any Investor~~**ADAH** may reasonably request.

(i)     HSR.  The Company shall use its reasonable best efforts to promptly prepare and file all necessary documentation and to effect all applications and seek all approvals or consents that are necessary or advisable under the HSR Act and any comparable laws or regulations in any foreign jurisdiction so that any applicable waiting period shall have expired or been terminated thereunder with respect to the purchase of Investor Shares hereunder, and shall not take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the transactions contemplated by this Agreement.  The Company shall file, to the extent that it is required to file, the Notification and Report Form required under the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission no later than ~~30 calendar days following the date the Initial Approval Order is entered by the Bankruptcy Court (and if such date is not a Business Day on the next succeeding Business Day)~~**the fifteenth day following the Disclosure Statement Approval Date**.

(j)     Clear Market.  For a period of 180 days after the Closing Date (the "**"Restricted Period"**"), the Company will not (i) offer, pledge, announce the intention to sell, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase or otherwise transfer or dispose of, directly or indirectly, any shares of capital stock of the Company or any securities convertible into or exercisable or exchangeable for capital stock of the Company or (ii) enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of the capital stock of the Company, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of capital stock of the Company or such other securities, in cash or otherwise, without the prior written consent of ~~each of the~~ ADAH ~~and Dolce~~, except for (A) Rights and New Common Stock issuable upon exercise of Rights, (B) shares of New Common Stock issued upon the exercise of any stock options outstanding as of the Effective Date and (C) the issuance of New Common Stock and other equity interests as set forth in the Preferred Term Sheet, the ~~PSA~~**Plan Terms** and pursuant to the Plan. Notwithstanding the foregoing, if (i) during the last 17 days of the Restricted Period, the Company issues an earnings release or material news or a material event relating to the Company occurs or (ii) prior to the expiration of the Restricted Period, the Company announces that it will release earnings results

during the 16-day period beginning on the last day of the Restricted Period, the
restrictions imposed by this Agreement shall continue to apply until the expiration
of the 18-day period beginning on the issuance of the earnings release or the
occurrence of the material news or material event.

(k)   Use of Proceeds.  The Company will apply the net proceeds from the sale of the
Rights and the Investor Shares as provided in the Rights Offering Prospectus.

(l)   No Stabilization.  The Company will not take, directly or indirectly, any action
designed to or that would reasonably be expected to cause or result in any
stabilization or manipulation of the price of the Shares.

(m)   Reports.  So long as any Investor holds Shares, the Company will furnish to such
Investor, as soon as they are available, copies of all reports or other
communications (financial or other) furnished to holders of the Rights or the
Shares, as the case may be, and copies of any reports and financial statements
furnished to or filed with the Commission or any national securities exchange or
automatic quotation system.

(n)   Conduct of Business.  During the period from the date of this Agreement to the
Closing Date (except as otherwise expressly provided by the terms of this
Agreement (including the Disclosure Letter), the PSA **accepted by ADAH in
accordance with Section 5(s) of this Agreement), the Plan Terms**, the Plan or
any other order of the Bankruptcy Court entered on or prior to the date hereof in
the Chapter 11 Cases), the Company and its Subsidiaries shall carry on their
businesses in the ordinary course (subject to any actions which are consistent with
the ~~Transformation Plan~~**Draft Business Plan or the Business Plan approved by
ADAH in accordance with Section 9(a)(xxviii) of this Agreement**) and, to the
extent consistent therewith, use their commercially reasonable efforts to preserve
intact their current business organizations, keep available the services of their
current officers and employees and preserve their relationships with customers,
suppliers, licensors, licensees, distributors and others having business dealings
with the Company or its Subsidiaries.  Without limiting the generality of the
foregoing, except as set forth in the Disclosure Letter~~, on and after the date on
which the Business Plan is~~ approved ~~and accepted~~ by ADAH ~~and Dolce~~**in
accordance with Section 5(s) of this Agreement**, the Company and its
Subsidiaries shall carry on their businesses in all material respects in accordance
with ~~such Business Plan~~**the Draft Business Plan (and, if amended in a manner
that satisfies the condition with respect to amendments to the Draft Business
Plan set forth in Section 9(a)(xxviii), as so amended) prior to the satisfaction
of the condition with respect to the Business Plan in accordance with Section
9(a)(xxviii) of this Agreement and at all times after the satisfaction of the
condition with respect to the Business Plan set forth in Section 9(a)(xxviii),
the Business Plan (and, if amended in a manner that satisfies the condition**

**with respect to the Business Plan set forth in Section 9(a)(xxviii), as so amended)** and shall not enter into any transaction that**, at all times prior to the satisfaction of the condition with respect to the Business Plan set forth in Section 9(a)(xxviii),** would be inconsistent with ~~such Business Plan~~**the Draft Business Plan (and, if amended in a manner that satisfies the condition with respect to amendments to the Draft Business Plan set forth in Section 9(a)(xxviii), as so amended) or at all times after the satisfaction of the condition with respect to the Business Plan set forth in Section 9(a)(xxviii), the Business Plan (and, if amended in a manner that satisfies the condition with respect to the Business Plan set forth in Section 9(a)(xxviii), as so amended) by ADAH in accordance with Section 9(a)(xxviii) of this Agreement** and shall use its commercially reasonable efforts to effect such **Draft Business Plan and the** Business Plan.  Without limiting the generality of the foregoing, and except as otherwise expressly provided or permitted by this Agreement (including the Disclosure Letter~~), the PSA~~ **accepted by ADAH in accordance with Section 5(s) of this Agreement), the Plan Terms**, the Plan or any other order of the Bankruptcy Court entered as of the date ~~hereof~~**of the Original Agreement** in these Chapter 11 Cases, prior to the Closing Date, the Company shall not, and shall cause its Subsidiaries not to, take any of the following actions without the prior written consent of ~~each of~~ ADAH ~~and Dolce~~, which consent shall not be unreasonably withheld, conditioned or delayed:

(i)   (A) declare, set aside or pay any dividends on, or make any other distributions in respect of, any of its capital stock, (B) split, combine or reclassify any of its capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock or (C) purchase, redeem or otherwise acquire, except in connection with the Plan, any shares of capital stock of the Company or any other securities thereof or any rights, warrants or options to acquire any such shares or other securities;

(ii)   except for intercompany transactions and any financing activities which are consistent with the Company''s existing financing, issue, deliver, grant, sell, pledge, dispose of or otherwise encumber any of its capital stock or any securities convertible into, or any rights, warrants or options to acquire, any such capital stock at less than fair market value;

(iii)   acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the stock, or other ownership interests in, or substantial portion of assets of, or by any other manner, any business or any corporation, partnership, association, joint venture, limited liability company or other entity or division thereof except in the ordinary course of business;

    (iv)      sell, lease, mortgage, pledge, grant a lien, mortgage, pledge, security interest, charge, claim or other encumbrance of any kind or nature on or otherwise encumber or dispose of any of its properties or assets, except (A) in the ordinary course of business consistent with past practice and (B) other transactions involving not in excess of $100 million in any 12 month period;

    (v)      (A) incur any indebtedness for borrowed money or guarantee any such indebtedness of another individual or entity, issue or sell any debt securities or warrants or other rights to acquire any debt securities of the Company, guarantee any debt securities of another individual or entity, enter into any ~~""~~"keep well~~""~~" or other agreement to maintain any financial statement condition of another person (other than a Subsidiary) or enter into any arrangement having the economic effect of any of the foregoing in excess of $100 million in any 12 month period, except for (x) working capital borrowings and increases in letters of credit necessary in the ordinary course of business under the Company~~'~~'s existing or any amended or replacement revolving credit facilities, and (y) indebtedness solely between the Company and its Subsidiaries or between such Subsidiaries or (B) except for transactions between the Company and any of its Subsidiaries or between such Subsidiaries, make any loans, advances or capital contributions to, or investments in, any other individual or entity, other than customary advances of business and travel expenses to employees of the Company in the ordinary course of business consistent with past practice;

    (vi)      enter into any new, or amend or supplement any existing, collective bargaining agreement, which is inconsistent with the Transformation Plan~~, this Agreement, the PSA~~ **or the Business Plan satisfying the condition with respect to the Business Plan set forth in Section 9(a)(xxviii) of this Agreement , this Agreement, the Plan Terms**, the Plan and the GM Settlement; or

    (vii)      authorize any of, or commit or agree to take any of, the foregoing actions.

    (o)    <u>Actions Regarding Conditions</u>.  During the period from the date of this Agreement to the Closing Date, the Company shall not take any action or omit to take any action that would reasonably be expected to result in the conditions to the Agreement set forth in <u>Section 9</u> not being satisfied.

    (p)    <u>GM Settlement</u>.  The Company shall use its reasonable best efforts to agree on, prior to ~~January 31, 2007,~~**the date of filing by the Company with the Bankruptcy Court of a Disclosure Statement (the "Disclosure Statement**

**Filing Date"),** a settlement agreement (the ~~"~~**"GM Settlement**~~"~~**")** between the Company and GM that is consistent with this Agreement, the ~~PSA and the Plan, and satisfactory to each of ADAH and Dolce in its sole discretion~~**Plan Terms, the Plan and the UAW MOU**.  The Company will (i) provide to ~~the Investors~~**ADAH** and ~~their respective~~**its** counsel a copy of the GM Settlement and a reasonable opportunity to review and comment on such documents prior to such documents being executed or delivered or filed with the Bankruptcy Court, and (ii) duly consider in good faith any comments of ~~each of~~ ADAH and ~~Dolce and their respective~~**its** counsel consistent with this Agreement, the Preferred Term Sheet and the ~~PSA~~**Plan Terms** and any other reasonable comments of each of ~~the Investors~~**ADAH** and ~~their respective~~**its** counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH ~~and Dolce~~ or ~~their~~**its** counsel and giving due consideration to the views of ADAH and ~~Dolce and their~~**its** counsel.  The Company shall not enter into any other agreement with GM that (i) is materially inconsistent with this Agreement, the ~~PSA~~**Plan Terms** and the Plan, (ii) is outside the ordinary course of business or (iii) the terms of which would have a material impact on the Investors~~'~~**'** proposed investment in the Company.  **The Company has not entered into any material written agreements between or among the Company or any of its Subsidiaries and GM or any of its Subsidiaries directly relating to the Plan or the GM Settlement or the performance of the Transaction Agreements, and any such written agreements hereafter entered into will be disclosed promptly to ADAH.**

(q)    <u>Access to Information</u>.  Subject to applicable law and existing confidentiality agreements between the parties, upon reasonable notice, the Company shall (and shall cause its Subsidiaries to) afford the Investors (and any prospective Ultimate Purchaser that executes a confidentiality agreement reasonably acceptable to the Company, which agreement will provide that, unless otherwise determined by the Company, all contact between such Ultimate Purchaser and the Company shall be through ADAH ~~or Dolce~~) and their directors, officers, employees, investment bankers, attorneys, accountants and other advisors or representatives, reasonable access, throughout the period prior to the Closing Date, to its employees, properties, books, contracts and records and, during such period, the Company shall (and shall cause its Subsidiaries to) furnish promptly to the Investors all information concerning its business, properties and personnel as may reasonably be requested by any Investor; <u>provided</u>, that the foregoing shall not require the Company (i) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company would cause the Company to violate any of its obligations with respect to confidentiality to a third party if the Company shall have used commercially reasonable efforts to obtain the consent of such third party to such inspection or disclosure, (ii) to disclose any privileged information of the Company or any of its Subsidiaries or (iii) to violate any laws; <u>provided, further</u>, that the Company shall deliver to the Investors a schedule setting in forth in reasonable detail a description of any information not provided to the Investors pursuant to subclauses (i) through (iii) above.  All requests for information and

access made pursuant to this <u>Section 5(q)</u> shall be directed to the Chief Restructuring Officer or such other person as may be designated by such person.

(r)     <u>Financial Information</u>.  For each month, beginning ~~November 2006~~**June 2007** until the Closing Date, the Company shall provide to each Investor an unaudited consolidated balance sheet and related unaudited consolidated statements of operations, consolidated statements of stockholders~~'~~**'** equity and consolidated statements of cash flows for the month then ended within 30 days of the end of such month (the "~~"~~**"Monthly Financial Statements**~~"~~**"**).  The Monthly Financial Statements, except as indicated therein, shall be prepared in accordance with the Company's normal financial reporting practices.  The Monthly Financial Statements shall fairly present in all material respects the financial position, results of operations and cash flows  of the Company and its Subsidiaries as of the dates indicated and for the periods specified.

(s)     <u>Business Plan and Disclosure Letter</u>.  The Company shall use its commercially reasonable efforts to provide to ~~the Investors~~**ADAH** as soon as practicable a final five-year business plan approved by the Company~~'~~**'**s board of directors and prepared in good faith and based on reasonable assumptions, which business plan shall provide for the amount of EBITDA for each of fiscal years 2007 through 2011 (the "**Business Plan**"); <u>provided</u>, that **(i)** the Company shall not be required to deliver ~~and neither ADAH nor Dolce shall be required to approve or accept for consideration by them any~~**a** Business Plan that does not reflect a final and binding GM Settlement **and (ii) ADAH shall not be required to accept the Business Plan unless it is reasonably satisfied that such Business Plan does not amend or deviate from the Draft Business Plan in any manner that would have a material impact on the Investors' proposed investment in the Company**.  The Company shall deliver ~~with the Business Plan~~a Disclosure Letter **to ADAH in no event later than ten (10) Business Days prior to the Disclosure Statement Filing Date** which provides for exceptions from the representations and warranties of the Company in <u>Section 3 ~~.3~~**.3; provided, that ADAH shall not be required to accept any Disclosure Letter unless it is reasonably satisfied that such Disclosure Letter does not contain any information or exception to a representation that (i) was not disclosed to ADAH prior to the date of this Agreement and (ii) which information or exception reflects facts or circumstances that would have a material impact on the Investor's proposed investment in the Company.**

(t)     <u>Financing Assistance</u>.  The Company and its Subsidiaries shall obtain the debt financing from financing sources ~~reasonably satisfactory to Dolce and~~**consistent with those previously discussed with** ADAH and in amounts sufficient to consummate the transactions contemplated by this Agreement, the Preferred Term Sheet, the ~~PSA~~**Plan Terms**, the GM Settlement and the Plan, such financing to be on then-prevailing market terms with respect to the applicable interest rate,

redemption provisions and fees, and otherwise to be on terms that are acceptable to ~~each of~~ ADAH ~~and Dolce~~ not to be unreasonably withheld (the ~~"Debt Financing"~~**"Debt Financing"); provided, that if the Company delivers to ADAH definitive term sheets for such proposed debt financing that have been approved by the Company's board of directors and executed by the banks or other financing sources providing such debt financing reflecting then-prevailing market terms with respect to the applicable interest rate, redemption provisions and fees (a "Company Financing Proposal"), then ADAH shall inform the Company in writing (a "Financing Notice") whether or not the Company Financing Proposal is acceptable to it within five (5) Business Days of its receipt of the definitive term sheets for such Company Financing Proposal.  If, after the Company delivers to ADAH a Company Financing Proposal, ADAH fails to deliver a Financing Notice within five (5) Business Days or each of the following circumstances occurs, then the Company may terminate this Agreement and the transactions contemplated hereby may be abandoned:  (x) ADAH delivers a Financing Notice in which it does not approve the Company Financing Proposal, (y) ADAH does not present to the Company, within 30 days of the delivery of the Financing Notice (the "Financing Decision Date"), an alternative written expression of interest to provide the Debt Financing with financing sources reasonably acceptable to the Company on terms more favorable to the Company than the Company Financing  Proposal (a "Preferred Debt Financing") and (z) ADAH does not provide to the Company commitment letters executed by the banks or other financing sources providing such Preferred Debt Financing within 60 days of the Financing Decision Date.  Delphi shall use its reasonable best efforts to implement any Preferred Debt Financing and to fulfill its other obligations pursuant to this Section 5(t)**).  Subject to applicable regulatory or NASD requirements, Merrill ~~Lynch, Pierce, Fenner & Smith, Incorporated~~ and UBS ~~Securities LLC~~ (or their Affiliates) shall be entitled to participate in such Debt Financing on market terms.  The Company and its Subsidiaries shall execute and deliver any commitment letters, underwriting or placement agreements, registration statements, pledge and security documents, other definitive financing documents, or other requested certificates or documents necessary or desirable to obtain the Debt Financing.  The Company will (i) provide to ~~the Investors~~**ADAH** and ~~their respective~~**its** counsel a copy of all marketing information, term sheets, commitment letters and agreements related to the Debt Financing and a reasonable opportunity to review and comment on such documents prior to such document being distributed, executed or delivered or filed with the Bankruptcy Court, (ii) duly consider in good faith any comments of ~~the Investors~~**ADAH** and ~~their respective~~**its** counsel consistent with the Agreement, the Preferred Term Sheet and the ~~PSA~~**Plan Terms** and any other reasonable comments of ~~the Investors~~**ADAH** and ~~their respective~~**its** counsel and shall not reject such comments without first discussing the reasons therefor with ADAH ~~and Dolce~~ or ~~their~~**its** counsel and giving due consideration to the views of ADAH and ~~Dolce and their~~**its** counsel, and (iii) keep ~~the Investors~~**ADAH** reasonably informed on a timely basis of developments in connection with the

Debt Financing and provide the Investors with an opportunity to attend and participate in meetings and/or roadshows with potential providers of the Debt Financing.

(u)     Labor Agreements.  The Company and its Subsidiaries shall use their reasonable best efforts to enter into **:** (A) tentative labor agreements with each of ~~The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"),~~ the International Union of ~~Electronic,~~ Electrical, Salaried, Machine and Furniture Workers – Communications Workers of America ("**"IUE-CWA"**") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC (the "**USW**") ~~that each of ADAH and Dolce shall have approved in its sole discretion and~~ which adequately address, among other things, the following matters:  (i) permit achievement of the transactions contemplated by this Agreement, the Preferred Term Sheet, the ~~PSA~~**Plan Terms** and the Plan (including plant closings, asset dispositions and resolution of union claims)~~;~~**;** (ii) permit achievement of the Business Plan ~~and the EBITDA Target~~; and (B) an agreement that GM will be responsible for certain hourly labor costs (compensation, benefits and other labor costs) ~~acceptable to each of ADAH and Dolce in each of its sole discretion~~ at certain of the Company~~'~~**'**s facilities.  The Company will (i) provide to ~~the Investors~~**ADAH** and ~~their respective~~**its** counsel a copy of ~~any~~**the foregoing** labor ~~agreement~~**agreements** and a reasonable opportunity to review and comment on such document prior to such document being executed or delivered or filed with the Bankruptcy Court, and (ii) duly consider in good faith any comments of ~~the Investors~~**ADAH** and ~~their respective~~**its** counsel consistent with this Agreement, the Preferred Term Sheet and the ~~PSA~~**Plan Terms** and any other reasonable comments of ~~the Investors~~**ADAH** and ~~their respective~~**its** counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH ~~and Dolce~~ or ~~their~~**its** counsel and giving due consideration to the views of ADAH and ~~Dolce and their~~**its** counsel.

(v)     Other Actions by the Company.

        (i)     Existing Shareholder Rights Plan.  The Company and the Board of Directors of the Company (A) has taken all necessary action to amend the Existing Shareholder Rights Plan to provide that none of the Investors (including any Related Purchaser or Ultimate Purchaser) shall be deemed an "**"**Acquiring Person~~"~~**"** as defined in the Existing Shareholder Rights Plan and that the rights will not separate from the Common Stock pursuant to the Existing Shareholder Rights Plan as a result of entering into **the Original Agreement,** this Agreement ~~or the PSA~~**, the Original PSA, the Plan and the Transaction Agreements** or consummating the transactions contemplated hereby (including any transfer of Investor Shares to any

Related Purchaser or Ultimate Purchaser) or ~~by the Preferred Term Sheet, the PSA or the Plan,~~**thereby** and (B) will take all such action as is necessary to terminate the Existing Shareholder Rights Plan effective as of the Closing Date.

(ii)    <u>Takeover Statutes and Charter</u>.  The Company and the Board of Directors of the Company has taken all action necessary (A) to ensure that no Takeover Statute or similar statue or regulation is or becomes applicable to **the Original Agreement,** this Agreement**, the Original PSA, the Plan or the Transaction Agreements** or any transaction contemplated hereby **or thereby** (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser) ~~or by the Preferred Term Sheet, the PSA or the Plan~~, (B) if any Takeover Statute is or may become applicable to the transactions contemplated by **the Original Agreement,** this Agreement**, the Original PSA, the Plan or the Transaction Agreements** (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser) ~~or the Plan~~, to grant such approvals and take such actions as are necessary so that such transactions may be consummated as promptly as practicable on the terms contemplated ~~by this Agreement~~**thereby** and ~~the Plan~~**thereby** and otherwise act to eliminate or minimize the effects of such statute or regulation on such transactions and (C) to ensure that this Agreement or any transaction contemplated hereby (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser) or ~~by the Preferred Term Sheet, the PSA or the Plan~~**thereby** are approved for purposes of Article IX of the Company~~'~~**'**s Amended and Restated Certificate of Incorporation, dated January 26, 1999, as amended to date, and that such provision shall not apply to the transactions contemplated hereby or ~~by the Preferred Term Sheet, the PSA or the Plan.~~ **thereby.**

(w)    <u>Agreement on Key Documentation</u> .  The Company shall use its commercially reasonable efforts to agree on or prior to ~~January 31, 2007~~**the Disclosure Statement Filing Date** on (a) the terms of the GM Settlement, (b) the agreements contemplated by <u>Section 5(u)</u>, and (c) the terms of the Amended and Restated Constituent Documents, the Series A~~-1 Certificate of Designations, the Series A-2~~ Certificate of Designations and the Series B Certificate of Designations, the Shareholders Agreement and the Registration Rights Agreement with ADAH~~ and Dolce~~.

(x)    <u>Investment Decision Package</u> .  If at any time prior to the Expiration Date, any event occurs as a result of which the Investment Decision Package, as then amended or supplemented, would include an untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, or if it shall be necessary to amend or supplement the Investment Decision Package

to comply with applicable law, the Company will promptly notify the Investors of any such event and prepare an amendment or supplement to the ~~Investor~~**Investment** Decision Package that is reasonably acceptable in form and substance to ~~each of~~ ADAH ~~and Dolce~~ that will correct such statement or omission or effect such compliance.

**(y)** **Termination of Commitment Letters.  The Company acknowledges and agrees that (i) the commitment letter of Appaloosa in favor of ADAH and the Company and (ii) the commitment letter of Harbinger Fund in favor of Harbinger and the Company, each dated January 18, 2007 have been terminated and are of no further force or effect and that each of Appaloosa and Harbinger Fund shall have no further liability or obligation under those commitment letters.**

**(z)** **Pension Plan Contributions.  The Company and its Subsidiaries shall have made all contributions to any pension plan of the Company and its Subsidiaries required to be made prior to or contemporaneous with the Effective Time pursuant to any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority or any requirement of the GM Settlement any labor agreement or any other contract, agreement, arrangement or understanding.**

6.    <u>Additional Covenants of the Investors</u>.  Each Investor agrees, severally and not jointly, with the Company:

(a)    <u>Information</u>.  To provide the Company with such information as the Company reasonably requests regarding the Investor for inclusion in the Rights Offering Registration Statement and the Disclosure Statement.

(b)    <u>HSR Act</u>.  To use reasonable best efforts to promptly prepare and file all necessary documentation and to effect all applications and to obtain all authorizations, approvals and consents that are necessary or advisable under the HSR Act and any comparable laws or regulations in any foreign jurisdiction so that any applicable waiting period shall have expired or been terminated thereunder and any applicable notification, authorization, approval or consent shall have been made or obtained with respect to the purchase of Investor Shares hereunder, and not to take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the transactions contemplated by this Agreement.  Each Investor shall file, to the extent that it is required to file, the Notification and Report Form required under the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission no later than ~~30 calendar days following the date the Initial Approval Order is entered by~~

~~the Bankruptcy Court (and if such date is not a Business Day on the next succeeding Business Day)~~**the fifteenth day following the Disclosure Statement Filing Date**.

(c)  <u>Bankruptcy Court Filings</u>.  To not file any pleading or take any other action in the Bankruptcy Court with respect to this Agreement, the Plan, the Disclosure Statement or the Confirmation Order or the consummation of the transactions contemplated hereby or thereby that is inconsistent in any material respect with this Agreement or the Company'~~'~~s efforts to obtain the entry of the Confirmation Order consistent with this Agreement.

(d)  <u>Reasonable Best Efforts</u>.  Each Investor shall use its reasonable best efforts to take all actions, and do all things, reasonably necessary, proper or advisable on its part under this Agreement and applicable laws to cooperate with the Company and to consummate and make effective the transactions contemplated by this Agreement, the Preferred Term Sheet, the ~~PSA~~**Plan Terms**, the GM Settlement and the Plan.

7.  <u>Additional Joint Covenant of Company And Each Investor</u>.  Without limiting the generality of the undertakings pursuant to <u>Sections 5(i)</u> and <u>6(b)</u>, the Company and each Investor shall**, severally and not jointly,** use its reasonable best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary under the HSR Act and any comparable laws or regulations in any foreign jurisdiction to consummate and make effective the transactions contemplated by this Agreement and the other Transaction Agreements, including furnishing all information required by applicable law in connection with approvals of or filings with any governmental authority, and filing, or causing to be filed, as promptly as practicable, **following the Disclosure Statement Filing Date** any required notification and report forms under other applicable competition laws with the applicable governmental antitrust authority.  **Any filings under any laws or regulations in any foreign jurisdiction comparable to the HSR Act that are necessary to consummate and make effective the transactions contemplated by this Agreement and the other Transaction Agreements shall be made, to the extent permitted by law or regulation, after the filings in the United States described in Section 5(i) and 6(b) hereof have been made.**  The parties shall consult with each other as to the appropriate time of filing such notifications and shall agree upon the timing of such filings.  Subject to appropriate confidentiality safeguards, each party shall **:** (i) respond promptly to any request for additional information made by the antitrust agency; (ii) promptly notify counsel to the other party of, and if in writing, furnish counsel to the other party with copies of (or, in the case of material oral communications, advise the other party orally of) any communications from or with the antitrust agency in connection with any of the transactions contemplated by this Agreement; (iii) not participate in any meeting with the antitrust agency unless it consults with counsel to the other party in advance and, to the extent permitted by the agency, give the other party a reasonable opportunity to attend and participate thereat; (iv) furnish counsel to the other party with copies of all correspondence, filings and communications

between it and the antitrust agency with respect to any of the transactions contemplated by this Agreement; and (v) furnish counsel to the other party with such necessary information and reasonable assistance as may be reasonably necessary in connection with the preparation of necessary filings or submission of information to the antitrust agency. The Parties shall use their reasonable best efforts to cause the waiting periods under the applicable competitions laws to terminate or expire at the earliest possible date after the date of filing.

Notwithstanding anything in this Agreement to the contrary, nothing shall require any Investor or its Affiliates to dispose of any of its or its Subsidiaries' or its Affiliates' assets or to limit its freedom of action with respect to any of its or its Subsidiaries' businesses, or to consent to any disposition of the Company's or the Company Subsidiaries' assets or limits on the Company's or the Company Subsidiaries' freedom of action with respect to any of its or the Company Subsidiaries' businesses, or to commit or agree to any of the foregoing, and nothing in this Agreement shall authorize the Company or any Company Subsidiary to commit or agree to any of the foregoing, to obtain any consents, approvals, permits or authorizations to remove any impediments to the transactions contemplated hereby or by any Transaction Agreement relating to antitrust or competition laws or to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other order in any action relating to antitrust or competition laws.

8. ~~Reasonable Best Efforts.~~

**8.** **Reasonable Best Efforts.**  The Company shall use its reasonable best efforts (and shall cause its Subsidiaries to use their respective reasonable best efforts) to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable on its or their part under this Agreement and applicable laws to cooperate with the Investors and to consummate and make effective the transactions contemplated by this Agreement, the Preferred Term Sheet, the ~~PSA~~**Plan Terms**, the GM Settlement and the Plan, including:

(a) preparing and filing as promptly as practicable all documentation to effect all necessary notices, reports and other filings and to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party or governmental entity; provided, however, that, notwithstanding the foregoing, in connection with obtaining such consents, the Company shall not, without the prior written consent of ~~each of~~ ADAH ~~and Dolce in their sole~~**in its reasonable** discretion, pay or commit to pay any person or entity whose consent is being solicited in cash or other consideration to the extent such payment could reasonably be expected to prevent the Company from ~~achieving the EBITDA targets set forth in Section 9(a)(xviii) hereof~~**, at all times prior to the satisfaction of the condition with respect to the Business Plan in accordance with Section 9(a)(xxviii), complying in all material respects with the Draft Business Plan (and, if**

**amended in a manner that satisfies the condition with respect to amendments to the Draft Business Plan set forth in Section 9(a)(xxviii), as so amended) and, at all times after the satisfaction of the condition with respect to the Business Plan in accordance with Section 9(a)(xxviii), complying in all material respects with the Business Plan (and, if amended in a manner that satisfies the condition with respect to the Business Plan set forth in Section 9(a)(xxviii), as so amended)**;

(b)    defending any lawsuits or other actions or proceedings, whether judicial or administrative, challenging this Agreement, the Preferred Term Sheet, the ~~PSA, the~~ GM Settlement**, the Plan** or the ~~Plan~~**Transaction Agreements** or any other agreement contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement ~~or,~~ the Plan **or the Transaction Agreements** or the consummation of the transactions contemplated hereby and thereby, including seeking to have any stay or temporary restraining order entered by any court or other governmental entity vacated or reversed;

(c)    executing, delivering and filing, as applicable, any additional ancillary instruments or agreements necessary to consummate the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement**, the Plan** or the ~~Plan~~**Transaction Agreements** and to fully carry out the purposes of this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement, the Plan**, the Transaction Agreements** and the transactions contemplated hereby and thereby including, without limitation:  (i) employment agreements and other compensation arrangements with senior management of the Company relating to compensation, benefits, supplemental retirement benefits, stock options and restricted stock awards, severance and change in control provisions and other benefits on market terms (as determined by the Company‛'s board of directors based on the advice of Watson-Wyatt and reasonably acceptable to ADAH ~~and Dolce~~); (ii) agreements and other arrangements acceptable to ~~each of~~ ADAH ~~and Dolce~~ or otherwise ordered by the Bankruptcy Court with respect to claims against the Company of former members of the Company‛'s management and members of the Company‛'s management, if any, who are resigning or being terminated in accordance with the implementation of the Plan; (iii) a shareholders agreement among the Company, ~~ADAH~~ and ~~Dolce~~**certain of the Investors** reasonably satisfactory to ADAH ~~and Dolce~~ (the "**Shareholders Agreement**"); (iv) a registration rights agreement (the "**"Registration Rights Agreement"**") among the Company and the Investors, **consistent with the Preferred Term Sheet and** reasonably satisfactory to ~~each of~~ ADAH ~~and Dolce~~ to the extent that the material terms of such Registration Rights Agreement would have a material impact on the Investors‛' proposed investment in the Company, and providing that the Company shall (a) as soon as practicable after the Closing Date, and in any event no later than seven (7) days after the Closing Date, prepare and file with the Commission a registration statement, including all exhibits thereto, pursuant to Rule 415 under the Securities

Act registering offers and sales by the Investors, **any Related Purchasers** and the Ultimate Purchasers of the Unsubscribed Shares, the Direct Subscription Shares and the Series B Preferred ~~Stock~~**Shares** (the "**"Resale Registration Statement"**" and, together with the final prospectus contained in the Resale Registration Statement as of its effective date (including information, if any, omitted pursuant to Rule 430A and subsequently provided pursuant to Rule 424(b) under the Securities Act), and any amended form of such prospectus provided under Rule 424(b) under the Securities Act or contained in a post-effective amendment to the Resale Registration Statement) and any issuer free writing prospectus as defined in Rule 433 under the Securities Act used in connection with the resale of such shares, the "**"Resale Registration Documents"**"); (b) **use its reasonable best efforts to** cause the Resale Registration Statement to be declared effective by the Commission as soon as practicable after the filing thereof, and in any event no later than thirty (30) days after the Closing Date; (c) obtain such comfort letters from the Company's independent certified public accountants addressed to the Investors covering such matters of the type customarily covered by comfort letters and as ADAH ~~and Dolce~~ reasonably ~~request~~**requests**; and (d) ~~cause~~**obtain** a customary opinion or opinions and negative assurance statement, in customary form and scope from counsel to the Company to be furnished to each Investor; (v) an amended and restated certificate of incorporation and amended by-laws of the Company, in each case, that is consistent with this Agreement, the ~~PSA~~**Plan Terms** and the Preferred Term Sheet ~~and reasonably satisfactory to each of ADAH and Dolce to the extent that the material terms of such certificate of incorporation and by-laws would have a material impact on the Investors' proposed investment in the Company~~; provided, that the amended and restated certificate of incorporation of the Company to be effective immediately following the Effective Date shall prohibit; (A) for so long as ADAH or ~~Dolce or their respective~~**its** Affiliates, as the case may be, owns any shares of Series A **-1** Preferred Stock, any transactions between the Company or any of its Subsidiaries, on the one hand, and ADAH or ~~Dolce or their respective~~**its** Affiliates, as the case may be, on the other hand (including any "~~going~~**going** private transaction" sponsored by ADAH or ~~Dolce or their respective~~**its** Affiliates)**,** unless such transaction shall have been approved by ~~(x)~~ directors constituting not less than 75% of the number of Common Directors ~~and (y) in the case of any transaction with ADAH or its Affiliates, Dolce, and in the case of any transaction with Dolce or its Affiliates, ADAH~~, and (B) any transaction between the Company or any of its Subsidiaries, on the one hand, and a director~~, on the other hand~~, other than a director appointed by holders of Series A Preferred Stock, **on the other hand,** unless such transaction shall have been approved by directors having no material interest in such transaction (a "**Disinterested Director**") constituting not less than 75% of the number of Disinterested Directors~~; provided, that nothing in this provision shall require any approval of any arrangements in effect as of December 18, 2006 with either General Motors Acceptance Corporation ("GMAC") or General Motors ("GM") as a result of the ownership by Dolce and its Affiliates of securities of GMAC or Dolce's and its Affiliates' other arrangements in effect as of December 18, 2006 with GM with respect to GMAC~~ (such amended and

restated certificate of incorporation and amended bylaws are herein referred to as the "**Amended and Restated Constituent Documents**"); and (vi) the Series A 1 Certificate of Designations, the Series A 2 Certificate of Designations and the Series B Certificate of Designations, in each case, that is consistent with the terms set forth in the Preferred Term Sheet and that, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to each of ADAH and Dolce; provided, that prior to the Due Diligence Expiration Date, the standard for the approval by each of ADAH and Dolce shall be each in its sole discretion. Subject to applicable laws and regulations relating to the exchange of information, the Investors and the Company shall have the right to review in advance, and to the extent practicable each will consult with the other on all of the information relating to Investors or the Company, as the case may be, and any of their respective Subsidiaries, that appears in any filing made with, or written materials submitted to, any third party and/or any governmental entity in connection with the transactions contemplated by this Agreement or the Plan. In exercising the foregoing rights, each of the Company and the Investors shall act reasonably and as promptly as practicable.

9.      Conditions to the Obligations of the Parties.

(a)      Subject to Section 9(b), the obligations of each of the Investors hereunder to consummate the transactions contemplated hereby shall be subject to the satisfaction prior to the Closing Date of each of the following conditions:

(i)      Initial Approval Order. The Initial Approval Order shall have become a Final Approval Order. "**Final Approval Order**" shall mean an Initial Approval Order of the Bankruptcy Court, which has not been reversed, stayed, modified or amended, and as to which (a) the time to appeal, seek certiorari or request reargument or further review or rehearing has expired and no appeal, petition for certiorari or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought or to which the request was made and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted.

(ii)      Approval of Plan. To the extent that the material terms of the following have a material impact on the Investors' proposed investment in the Company, each of ADAH and Dolce shall be reasonably satisfied with, prior to filing with the Bankruptcy Court: (i) the Plan and any related documents, agreements or arrangements, (A) the terms of which are consistent in all material respects with this Agreement, the Preferred Term

~~Sheet, the PSA and the GM Settlement, (B) that provide for the release and exculpation of each Investor, its Affiliates, shareholders, partners, directors, officers, employees and advisors from any liability for participation in the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the Plan to the fullest extent permitted under applicable law and (C) that have conditions to confirmation and the Effective Date of the Plan (and to what extent any such conditions can be waived and by whom) that are consistent with this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement; (ii) a Disclosure Statement that is consistent in all material respects with the Plan, this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement; (iii) a Confirmation Order, that is consistent in all material respects with the provisions of the Plan, this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement; and (iv) any amendments or supplements to any of the foregoing. Notwithstanding the foregoing, prior to the Due Diligence Expiration Date, the standard for the approval by each of ADAH and Dolce of the documents referred to in subsections (i), (ii), (iii) and (iv) shall be each in its sole discretion.~~ **[Reserved]**

(iii)     <u>Plan of Reorganization</u>. The Company shall have complied in all material respects with the terms and conditions of the Plan that are to be performed by the Company prior to the Closing Date.

(iv)     ~~GM Settlement. Each of ADAH and Dolce shall have approved in its sole discretion the GM Settlement prior to its filing with the Bankruptcy Court. The GM Settlement shall remain in full force and effect and shall not have been rescinded, terminated, challenged or repudiated by any party thereto and shall not have been amended in any manner that is not acceptable to each of ADAH and Dolce in its sole discretion. The parties to the GM Settlement shall have performed and complied with all of their respective covenants and agreements contained in the GM Settlement in all material respects through the Closing Date.~~ **[Reserved]**

(v)     <u>Alternate Transaction</u>. The Company shall not have entered into any letter of intent, memorandum of understanding, agreement in principle or other agreement (other than a confidentiality agreement with terms that are not materially less favorable to the Company than the terms of that certain Amended Confidentiality Information, Standstill and Nondisclosure Agreement, dated ~~August 25, 2006,~~**July 3, 2007,** among the Company, Appaloosa ~~Management L.P.~~ and Harbinger ~~Capital Partners Master~~ Fund ~~I, Ltd.~~**, as it may be amended from time to time**) or taken any action to seek any Bankruptcy Court approval relating to, any Alternate Transaction (an "**"Alternate Transaction Agreement"**"). For the purpose of this Agreement, an "**"Alternate Transaction"**" means any plan, proposal,

offer or transaction that is inconsistent with this Agreement, the Preferred
Term Sheet, the ~~PSA~~**Plan Terms** and the GM Settlement or the Plan,
other than a Chapter 7 liquidation.

(vi)     Change of Recommendation.  There shall not have been a Change of
         Recommendation.  For purposes of this Agreement, a **"**~~"~~**Change of
         Recommendation"**~~"~~**"** shall mean, (i) the Company or its board of directors
         or any committee thereof shall have withheld, withdrawn, qualified or
         modified (or resolved or proposed to withhold, withdraw, qualify or
         modify), in a manner adverse to the Investors, its approval or
         recommendation of this Agreement, the Preferred Term Sheet, the
         ~~PSA~~**Plan Terms**, the GM Settlement or the Plan or the transactions
         contemplated hereby or thereby or (ii) the Company or its board of
         directors or any committee thereof shall have approved or recommended,
         or proposed to approve or recommend (including by filing any pleading or
         document with the Bankruptcy Court), any Alternate Transaction.

(vii)    Confirmation Order.  The Confirmation Order approving the Plan ~~in form
         and substance approved by each of ADAH and Dolce in accordance with
         Section 9(a)(ii) above,~~ shall have been entered by the Bankruptcy Court
         and such order shall be non-appealable, shall not have been appealed
         within ten calendar days of entry or, if such order is appealed, shall not
         have been stayed pending appeal, and there shall not have been entered by
         any court of competent jurisdiction any reversal, modification or vacation,
         in whole or in part, of such order (the ~~"Confirmation
         Order")~~**"Confirmation Order"); provided, that the absence of a stay
         pending appeal shall be considered for purposes of determining
         whether the foregoing condition has been satisfied only if ADAH
         concludes, in its reasonable discretion, that the appeal would be
         rendered moot under the doctrine of "equitable mootness" as a result
         of the occurrence of the Effective Date**.

(viii)   ~~Plan and Confirmation Order.  To the extent that the material terms of the
         following have a material impact on the Investors' proposed investment in
         the Company, (a) the Plan confirmed by the Bankruptcy Court in the
         Confirmation Order (the "Confirmed Plan") and the Confirmation Order
         shall be in the form and with such terms as are reasonably satisfactory to
         each of ADAH and Dolce in accordance with Section 9(a)(ii) above and
         (b) the Disclosure Statement approved by the Bankruptcy Court shall be in
         form and substance reasonably satisfactory to each of ADAH and Dolce in
         accordance with Section 9(a)(ii) above.  Notwithstanding the foregoing,
         prior to the Due Diligence Expiration Date, the standard for the approval
         by each of ADAH and Dolce of the Confirmed Plan, the Confirmation~~

~~Order and the Disclosure Statement shall be each in its sole discretion.~~**[Reserved]**

(ix)   <u>Conditions to Effective Date</u>.  The conditions to the occurrence of the Effective Date of the Confirmed Plan shall have been satisfied or waived by the Company and ~~each of~~ ADAH ~~and Dolce~~ in accordance with the Plan.

(x)   <u>Rights Offering Registration Statement</u>.  The Rights Offering Registration Statement shall be effective not later than the **Rights** Distribution Date and ~~shall continue to be effective and~~ no stop order shall have been entered by the Commission with respect thereto.

(xi)   <u>Rights Offering</u>.  The Rights Offering shall have been conducted in all material respects in accordance with this Agreement and the Disclosure Statement and the Expiration Time shall have occurred.

(xii)   <u>Purchase Notice</u>.  Each of the Investors shall have received a Purchase Notice from the Company, dated as of the Determination Date, certifying as to the number of Unsubscribed Shares to be purchased or a Satisfaction Notice.

(xiii)   <u>Antitrust Approvals</u>.  All terminations or expirations of waiting periods imposed by any governmental or regulatory authority necessary for the consummation of the transactions contemplated by this Agreement, including under the HSR Act and any comparable regulations in any foreign jurisdiction, shall have occurred and all other notifications, consents, authorizations and approvals required to be made or obtained from any competition or antitrust authority shall have been made or obtained for the transactions contemplated by this Agreement.

(xiv)   <u>Consents</u>.  All other governmental and third party notifications, filings, consents, waivers and approvals required for the consummation of the transactions contemplated by this Agreement, the Preferred Term Sheet, the ~~PSA~~**Plan Terms** and the Plan shall have been made or received.

(xv)   <u>No Legal Impediment to Issuance</u>.  No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority, and no judgment, injunction, decree or order of any federal, state or foreign court shall have been issued, that prohibits the implementation of the Plan

or the Rights Offering or the transactions contemplated by this Agreement, the Preferred Term Sheet, the ~~PSA~~**Plan Terms** and the GM Settlement.

(xvi)   <u>Representations and Warranties</u>.  The representations and warranties of Company contained in this Agreement shall be true and correct (disregarding all qualifications and exceptions contained therein relating to materiality, Material Adverse Effect or similar qualifications, other than such qualifications contained in <u>Sections 3(i)</u> and <u>3(j)</u>) as of the Disclosure Letter Delivery Date and as of the Closing Date with the same effect as if made on and as of the Disclosure Letter Delivery Date and the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure to be so true and correct, individually or in the aggregate, has not had, and would not reasonably be expected to have, a Material Adverse Effect, other than with respect to the representations in <u>Sections 3(b)</u>, <u>3(c)</u>, <u>3(d)</u>, <u>3(e)</u>, and <u>3(m)(ii)</u> and <u>3(oo)</u>, which shall be true and correct in all respects.  The representations and warranties of each Investor (other than the Investor asserting the failure of this condition) contained in this Agreement and in any other document delivered pursuant to this Agreement shall be true and correct (disregarding all qualifications and exceptions contained therein relating to materiality or material adverse effect on the Investor'~~'~~s performance of its obligations or similar qualifications) as of the Disclosure Letter Delivery Date and as of the Closing Date with the same effect as if made on the Disclosure Letter Delivery Date and the Closing Date (except for the representations and warranties made as of a specified date which shall be true and correct only as of such specified date); except where the failure to be so true and correct, individually or in the aggregate, has not and would not reasonably be expected, to prohibit, materially delay or materially and adversely impact the Investor'~~'~~s performance of its obligations under this Agreement.

(xvii)   <u>Covenants</u>.  The Company and each Investor (other than the Investor asserting the failure of this condition) shall have performed and complied with all of its covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement (including in any Transaction Agreement) in all material respects through the Closing Date.

(xviii)   ~~EBITDA.  Each of ADAH and Dolce shall be reasonably satisfied that the Company will achieve EBITDA at least equal to the 2008 EBITDA Amount in 2008 and $2.4 billion in each of 2009 and 2010 (exclusive of the Restructuring Charges to the extent the same had been deducted to determine EBITDA) (the "EBITDA Target").~~**[Reserved]**

(xix)  <u>Financing</u>.  The Company shall have received the proceeds of the Debt Financings and the Rights Offering that, together with the proceeds of the sale of the Investor Shares, are sufficient to fund fully the transactions contemplated by this Agreement, the Preferred Term Sheet, the ~~PSA~~**Plan Terms**, the GM Settlement (to the extent the Company is to fund such transactions) and the Plan.

(xx)  ~~Labor Agreements.  Each of ADAH and Dolce shall have been presented with and approved, in its sole discretion, on or before the Specified Date, tentative labor agreements between the Company and its applicable Subsidiaries, on the one hand, and each of the UAW, the IUE-CWA and the USW, on the other hand.  Such tentative labor agreements as so approved shall remain in full force and effect and shall not have been rescinded, terminated, challenged or repudiated by any party thereto and shall not have been amended in any manner that is not acceptable to each of ADAH and Dolce in its sole discretion.  The parties to the tentative labor agreements shall have performed and complied with all of their respective covenants and agreements contained in such tentative labor agreements approved by each of ADAH and Dolce in all material respects through the Closing Date.~~**[Reserved]**

(xxi)  <u>Management Compensation</u>.  The Company shall have (i) entered into employment agreements and other compensation arrangements with senior management of the Company relating to compensation, benefits, supplemental retirement benefits, stock options and restricted stock awards, severance and change in control provisions and other benefits on market terms (as determined by the Company's board of directors based on the advice of Watson-Wyatt and reasonably acceptable to ADAH ~~and Dolce~~); and (ii) resolved any claims of former executive officers, or executive ~~officer's~~**officers** that have resigned or been terminated, on terms acceptable to ~~each of~~ ADAH ~~and Dolce~~ or otherwise ordered by the Bankruptcy Court.

(xxii)  ~~Shareholders Agreement.  The Company shall have entered into the Shareholders Agreement with ADAH and Dolce in accordance with Section 8(c)(iii);~~ **[Reserved]**

(xxiii)  ~~Registration Rights Agreement.  The Company shall have entered into the Registration Rights Agreement with the Investors in accordance with Section 8(c)(iv), reasonably satisfactory to each of ADAH and Dolce to the extent that the material terms of such Registration Rights Agreement would have a material impact on the Investors' proposed investment in the Company; provided, that prior to the Due Diligence Expiration Date, such~~

~~Registration Rights Agreement shall be satisfactory to each of ADAH and Dolce in its sole discretion.~~**[Reserved]**

(xxiv) ~~Amended and Restated Constituent Documents.  The Company shall have adopted the Amended and Restated Constituent Documents, the Series A-1 Certificate of Designations, the Series A-2 Certificate of Designations and the Series B Certificate of Designations consistent with this Agreement, the PSA and the Term Sheet and otherwise reasonably satisfactory to each of ADAH and Dolce to the extent that the material terms of such documents would have a material impact on the Investors' proposed investment in the Company; provided, that prior to the Due Diligence Expiration Date, such documents shall be satisfactory to each of ADAH and Dolce in its sole discretion.~~**[Reserved]**

**(xxv)   [Reserved]**

**(xxvi)  No Strike.  There shall not have occurred any material strike or material labor stoppage or slowdown involving the UAW, IUE-CWA or USW at either GM or the Company or any of their respective Subsidiaries.  There shall not have occurred any strike, labor stoppage or slowdown involving the UAW, IUE-CWA or USW at either Ford Motor Company or Chrysler Group (or its successors) or any of their respective subsidiaries that** would have a material impact on the Investors' proposed investment in the Company**.**

**(xxvii) Capitalization.  As of the Closing Date and giving effect to the transactions contemplated by the Plan, (i) the Company's Net Amount shall not exceed by more than $250 million the Net Amount set forth in the final Business Plan satisfying the condition with respect to the Business Plan set forth in Section 9(a)(xxviii) of this Agreement; (ii) the Company's share capital shall be consistent with the last three sentences of Section 3(d); (iii) the Company's accounts payable to trade creditors and accrued expenses shall be in amounts consistent with the final Business Plan satisfying the condition with respect to the Business Plan set forth in Section 9(a)(xxviii) of this Agreement, and shall have been incurred in the ordinary course of business consistent with past practice; and (iv) ADAH shall have received from Delphi a certificate of a senior executive officer with knowledge of the foregoing to the effect set forth in clauses (i), (ii) and (iii) with reasonably detailed supporting documentation to support such amount.  "Net Amount" shall mean: (i) the sum of (A) Indebtedness; (B) the actuarially determined amount of pension plan contributions required, pursuant to ERISA to be made by the Company to its U.S. Hourly Rate Pension Plan from and after the Closing Date through**

**December 31, 2008; and (C) all other accrued or contingent liabilities (excluding pension and salaried OPEB liabilities on the Company's balance sheet and accounts payable and accrued expenses referred to in the preceding sentence); less (ii) the Company's cash on hand as of the Closing Date.   In addition, as of the Closing Date and giving effect to the transactions contemplated by the Plan the sum of (A) and (B), less (ii), shall not exceed $7,159 million by more than $250 million. "Indebtedness" shall mean: (i) indebtedness for borrowed money or indebtedness issued or incurred in substitution or exchange for indebtedness for borrowed money, (ii) indebtedness evidenced by any note, bond, debenture, mortgage or other debt instrument or debt security, (iii) commitments or obligations assuring a creditor against loss (including contingent reimbursement obligations with respect to letters of credit), (iv) indebtedness described in clauses (i)-(iii) secured by an encumbrance on any assets or properties of the Company or any of its Subsidiaries, (v) guarantees or other contingent liabilities (including so called take-or-pay or keep-well agreements) with respect to any Indebtedness, obligation or liability of a type described in clauses (i) through (iv) above, and (vi) for clauses (i) through (iv) above, all accrued interest thereon and all penalty payments, premiums, charges, yield maintenance amounts and other expenses relating to any prepayment of any obligations related thereto.  For the purpose of this Section 9(a)(xxvii) cash, Indebtedness and liabilities shall be determined in accordance with GAAP applied on a basis consistent with the Company's financial statements included in the Company SEC Documents filed prior to the date hereof, and shall be determined on the basis that all required pension plan contributions to be made by the Company or any of its Subsidiaries pursuant to any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority or any requirement of the GM Settlement any labor agreement or any other contract, agreement, arrangement or understanding prior to or contemporaneous with the Effective Time, shall have been made, whether or not they have actually been made.**

**(xxviii)    Plan and Material Investment Documents.**

        **(A)    (i) The Company shall have delivered to ADAH and ADAH shall have made the determination referred to in Section 9(a)(xxviii)(B) with respect to, at each Relevant Date, (1) the Plan and any related documents, agreements and arrangements (A) the terms of which are consistent in all material respects with this Agreement, the Preferred Term Sheet, the Plan Terms and** GM Settlement, (B) that provide for the release and exculpation of each Investor, its Affiliates, shareholders, partners, directors, officers, employees and advisors

from any liability for participation **of** the transactions contemplated by **the Original Agreement, this Agreement, the Original PSA, the Plan Terms** and the Plan to the fullest extent permitted under applicable law **(provided, that such release and exculpation shall not prohibit or impede the Company's ability to assert defenses or counterclaims in connection with or relating to the Original Agreement or the Original PSA)** and (C) that have conditions to confirmation and the Effective Date of the Plan (and to what extent such conditions can be waived and by whom) that are consistent with this Agreement, the Preferred Term Sheet, the **Plan Terms and the GM Settlement and (2) all Material Investment Documents.  The term "Material Investment Documents" shall mean the Confirmation Order, the Disclosure Statement, the Rights Offering Registration Statement, the GM Settlement, any amendments and/or supplements to the Draft Business Plan, the Business Plan, any amendments and/or supplements to the UAW MOU, the labor agreements with the IUE-CWA and the USW, the** Amended and Restated Constituent Documents**, the Series A Certificate of Designations, the Series B Certificate of Designations, the Shareholders Agreement, the Registration Rights Agreement, the Transaction Agreements and any amendments and/or supplements to the foregoing.  The term "Relevant Date" shall mean the Disclosure Statement Filing Date, the Disclosure Statement Approval Date, the date of issuance of the Confirmation Order and the Closing Date.**

**(ii) With respect to any Material Investment Document entered into in satisfaction of the condition set forth in Section 9(a)(xxviii), and the UAW MOU, at each Relevant Date (i) such Material Investment Document, or the UAW MOU, as the case may be, shall have been ratified by the union membership (but only with respect to the labor agreements with IUE-CWA and USW) and** shall remain in full force and effect and shall not have been rescinded, terminated, challenged or repudiated by any party thereto and **(ii) the parties to such Material Investment Document and the UAW MOU, as the case may be,** shall have performed and complied with all of their respective covenants and agreements contained in such **agreement in all material respects through the Closing Date.  The Business Plan satisfying the condition with respect to the Business Plan set forth in this Section 9(a)(xxviii)** shall not have been rescinded **or repudiated in any material respect by the Company or its Board of Directors.**

(B)     **With respect to the documents referred to in Section 9(a)(xxviii)(A)(i) (other than the GM Settlement),  ADAH shall have determined that it is reasonably satisfied with the terms thereof to the extent such terms would have a material impact on the Investors' proposed investment in the Company; provided, that with respect to the GM Settlement ADAH shall have determined that it is satisfied with the GM Settlement in its reasonable discretion taking into account whether it has a material impact on the Investors' proposed investment in the Company and other relevant factors.**

(C)     **The conditions referred to in clause (A) above shall be deemed to have been conclusively satisfied without further action by any Party unless:**

(1)     **with respect to the Plan, any related documents, agreements and arrangements and any Material Investment Documents, in each case delivered to ADAH by the Company prior to the Disclosure Statement Filing Date, ADAH shall have delivered (and have not withdrawn) a written deficiency notice to the Company reasonably asserting with reasonable specificity that such condition was not satisfied prior to the Disclosure Statement Approval Date, and the Company shall not have cured such deficiency within twenty (20) days of the Company's receipt of such notice (the "Cure Period");**

(2)     **with respect to any amendments or supplements to the Plan, any related documents, agreements and arrangements, or any Material Investment Documents delivered to ADAH by the Company occurring after the Disclosure Statement Filing Date and prior to the Disclosure Statement Approval Date, ADAH has delivered (and has not withdrawn), a written deficiency notice to the Company reasonably asserting with reasonable specificity that such condition was not satisfied prior to the Disclosure Statement Approval Date, and the Company shall not have cured such deficiency during the Cure Period;**

(3)     **with respect to any amendments or supplements to the Plan, any related documents, agreements and arrangements, or any Material Investment Documents**

**delivered to ADAH by the Company after the Disclosure Statement Approval Date and prior to the date of issuance of the Confirmation Order, ADAH has delivered (and has not withdrawn) a written deficiency notice to the Company asserting with reasonable specificity that such condition was not satisfied prior to the date of issuance of the Confirmation Order, and the Company shall not have cured such deficiency during the Cure Period; and**

**(4)    with respect to any amendments or supplements to the Plan, any related documents, agreements and arrangements, or any Material Investment Documents delivered to ADAH by the Company after the date of issuance of the Confirmation Order and prior to the Closing Date, ADAH has delivered (and has not withdrawn), within five Business Days of delivery by the Company of the final form of such document accompanied by a written request for approval of such documents, a written deficiency notice to the Company reasonably asserting with reasonable specificity that such condition is not satisfied and the Company shall not have cured such deficiency during the Cure Period.**

**(D)    The Company shall have delivered, and ADAH shall have accepted, a Disclosure Letter in accordance with Section 5(s).**

(b)    All or any of the conditions set forth in Section 9(a) may be waived in whole or in part with respect to all Investors by ~~both~~ ADAH ~~and Dolce, acting together, in their~~**in its** sole discretion.

(c)    The obligation of the Company to issue and sell the Investor Shares are subject to the following conditions, provided that the failure of a condition set forth in Sections 9(c)(vii) through (x) to be satisfied may not be asserted by the Company if such failure results from the failure of the Company to fulfill an obligation hereunder:

(i)    ~~Initial~~ Approval Order.  The ~~Initial~~ Approval Order shall have become a Final Approval Order.

(ii)    Antitrust Approvals.  All terminations or expirations of waiting periods imposed by any governmental or regulatory authority necessary for the consummation of the transactions contemplated by this Agreement,

including under the HSR Act and any comparable regulations in any foreign jurisdiction, shall have occurred and all other notifications, consents, authorizations and approvals required to be made or obtained from any competition or antitrust authority shall have been made or obtained for the transactions contemplated by this Agreement.

(iii)  <u>No Legal Impediment to Issuance</u>.  No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority, and no judgment, injunction, decree or order of any federal, state or foreign court shall have been issued, that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement, the Preferred Term Sheet, the ~~PSA~~**Plan Terms** and the GM Settlement.

(iv)  <u>Representations and Warranties</u>.  The representations and warranties of each Investor, each Related Purchaser and each Ultimate Purchaser **to the Company** contained in this Agreement or pursuant to <u>Sections 2(a)</u>, <u>2(b)</u> or <u>2(k)</u> shall be true and correct (disregarding all qualifications and exceptions contained therein relating to materiality or material adverse effect on the Investor's performance of its obligations or similar qualifications) as of the Disclosure Letter Delivery Date and as of the Closing Date with the same effect as if made on the Disclosure Letter Delivery Date and the Closing Date (except for the representations and warranties made as of a specified date, which shall be true and correct only as **of** such specified date), except with respect to the Investors' representations in all Sections other than <u>Sections 4(b)</u> and <u>4(c)</u> where the failure to be so true and correct, individually or in the aggregate, has not and would not reasonably be expected, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(v)  <u>Covenants</u>.  Each Investor shall have performed and complied with all of its covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement (including in any Transaction Agreement) in all material respects through the Closing Date.

(vi)  <u>Bankruptcy Court Approval</u>.  This Agreement shall have been approved by the Bankruptcy Court and the approval of the Bankruptcy Court shall not have been modified, amended or withdrawn in any manner adverse to the Company.

(vii)  <u>Confirmation Order</u>.  The Confirmation Order approving the Plan shall have been entered by the Bankruptcy Court and such order shall be non-

appealable, shall not have been appealed within ten calendar days of entry or, if such order is appealed, shall not have been stayed pending appeal, and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such order**; provided, that the absence of a stay pending appeal shall be considered for purposes of determining whether the foregoing condition has been satisfied only if the Company concludes, in its sole discretion, that the appeal would be rendered moot under the doctrine of "equitable mootness" as a result of the occurrence of the Effective Date**.

(viii)   <u>Conditions to Effective Date</u>.  The conditions to the occurrence of the Effective Date of the Confirmed Plan shall have been satisfied or waived by the Company and ~~each of~~ ADAH ~~and Dolce~~ in accordance with the Plan.

(ix)   <u>Rights Offering</u>.  The Rights Offering shall have been conducted in all material respects in accordance with this Agreement and the Disclosure Statement and the Expiration Time shall have occurred.

(x)   <u>Financing</u>.  The Company shall have received the proceeds of the Debt Financings and the Rights Offering that, together with the proceeds of the sale of the Investor Shares, are sufficient to fund fully the transactions contemplated by this Agreement, the Preferred Term Sheet, the ~~PSA~~**Plan Terms**, the GM Settlement (to the extent the Company is to fund such transactions) and the Plan.

(d)   All of the conditions set forth in <u>Section 9(c)</u> may be waived in whole or in part by the Company in its sole discretion.

10.   <u>Indemnification and Contribution.</u>

(a)   Whether or not the Rights Offering is consummated or this Agreement is terminated or the transactions contemplated hereby or the Plan are consummated, the Company (in such capacity, the "**Indemnifying Party**") shall indemnify and hold harmless each Investor and the Ultimate Purchasers, their respective Affiliates and their respective officers, directors, employees, agents and controlling persons (each, an "**Indemnified Person**") from and against any and all losses, claims, damages, liabilities and reasonable expenses, joint or several, arising out of circumstances existing on or prior to the Closing Date ("**Losses**") to which any such Indemnified Person may become subject arising out of or in connection with any claim, challenge, litigation, investigation or proceeding

("**Proceedings**") instituted by a third party with respect to the Rights Offering, this Agreement or the other Transaction Documents, the Rights Offering Registration Statement, any Preliminary Rights Offering Prospectus, the Rights Offering Prospectus, any Issuer Free Writing Prospectus, the Investment Decision Package, the Resale Registration Documents, any amendment or supplement thereto or the transactions contemplated by any of the foregoing and shall reimburse such Indemnified Persons for any reasonable legal or other reasonable out-of-pocket expenses as they are incurred in connection with investigating, responding to or defending any of the foregoing; provided that the foregoing indemnification will not apply to Losses (i) arising out of or in connection with any Proceedings between or among any one or more Indemnified Persons, Related Purchasers and/or Ultimate Purchasers, any Additional Investor Agreement or the failure of such Indemnified Person to comply with the covenants and agreements contained in this Agreement with respect to the sale or placement of Investor Shares; or (ii) to the extent that they resulted from (a) any breach by such Indemnified Person of this Agreement, (b) gross negligence, bad faith or willful misconduct on the part of such Indemnified Person or (c) statements or omissions in the Rights Offering Registration Statement, any Preliminary Rights Offering Prospectus, the Rights Offering Prospectus, any Issuer Free Writing Prospectus, the Resale Registration Documents or any amendment or supplement thereto made in reliance upon or in conformity with information relating to such Indemnified Person furnished to the Company in writing by or on behalf of such Indemnified Person expressly for use in the Rights Offering Registration Statement, any Rights Offering Preliminary Prospectus, the Rights Offering Prospectus, any Issuer Free Writing Prospectus, the Resale Registration Documents or any amendment or supplement thereto.  If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Losses in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party on the one hand and such Indemnified Person on the other hand but also the relative fault of the Indemnifying Party on the one hand and such Indemnified Person on the other hand as well as any relevant equitable considerations.  It is hereby agreed that the relative benefits to the Indemnifying Party on the one hand and all Indemnified Persons on the other hand shall be deemed to be in the same proportion as (i) the total value received or proposed to be received by the Company pursuant to the sale of the Shares and the Investor Shares contemplated by this Agreement bears to (ii) the Commitment Fees paid or proposed to be paid to the Investors.  The indemnity, reimbursement and contribution obligations of the Indemnifying Party under this Section 10 shall be in addition to any liability that the Indemnifying Party may otherwise have to an Indemnified Person and shall bind and inure to the benefit of any successors, assigns, heirs and personal representatives of the Indemnifying Party and any Indemnified Person.

(b)     Promptly after receipt by an Indemnified Person of notice of the commencement of any Proceedings with respect to which the Indemnified Person may be entitled to indemnification hereunder, such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; provided that (i) the omission so to notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (ii) the omission so to notify the Indemnifying Party will not relieve it from any liability that it may have to an Indemnified Person otherwise than on account of this Section 10. In case any such Proceedings are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, to the extent that it may elect by written notice delivered to such Indemnified Person, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Person; provided that if the defendants in any such Proceedings include both such Indemnified Person and the Indemnifying Party and such Indemnified Person shall have concluded that there may be legal defenses available to it that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Proceedings on behalf of such Indemnified Person. Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election so to assume the defense of such Proceedings and approval by such Indemnified Person of counsel, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the next preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel in any jurisdiction, approved by the Investors, representing the Indemnified Persons who are parties to such Proceedings), (ii) the Indemnifying Party shall not have employed counsel reasonably satisfactory to such Indemnified Person to represent such Indemnified Person within a reasonable time after notice of commencement of the Proceedings or (iii) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.

(c)     The Indemnifying Party shall not be liable for any settlement of any Proceedings effected without its written consent (which consent shall not be unreasonably withheld). If any settlement of any Proceeding is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Proceedings, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment in accordance with, and subject to the limitations of, the provisions of this Section 10. Notwithstanding anything in this Section 10 to the contrary, if at any time an Indemnified Person shall have requested the

Indemnifying Party to reimburse such Indemnified Person for legal or other expenses aggregating in excess of $250,000 in connection with investigating, responding to or defending any Proceedings in connection with which it is entitled to indemnification or contribution pursuant to this Section 10, the Indemnifying Party shall be liable for any settlement of any Proceedings effected without its written consent if (i) such settlement is entered into more than (x) 60 days after receipt by the Indemnifying Party of such request for reimbursement and (y) 30 days after receipt by the Indemnified ~~Party~~**Person** of the material terms of such settlement and (ii) the Indemnifying Party shall not have reimbursed such Indemnified Person in accordance with such request prior to the date of such settlement.  The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall not be unreasonably withheld), effect any settlement of any pending or threatened Proceedings in respect of which indemnity has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Proceedings and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

(d)     All amounts paid by the Company to an Indemnified Person under this Section 10 shall, to the extent the transactions contemplated hereby or the Plan are consummated and to the extent permitted by applicable law, be treated as adjustments to Purchase Price for all Tax purposes.

11.     Survival of Representations and Warranties, Etc.

(a)     The representations and warranties made in this Agreement shall not survive the Closing Date.  Other than Sections 2(b), 2(c), 2(e), 2(h), 2(i), 2(j), 2(k), **5(d),** 5(e), 5(f), 5(j), 5(k), 5(l), 5(m), 10, 11, 13, 14, 15, 16, 18 and 20, which shall survive the Closing Date in accordance with their terms (except Section 5(l) which shall survive for 90 days following the Closing Date), the covenants contained in this Agreement shall not survive the Closing Date.

(b)     Other than with respect to Sections 2(h), 2(i) and 2(j) and Sections 10 through 18, which shall continue and survive any termination of this Agreement, (i) none of the Investors may assert any claim against the Company (both as Debtors-in-possession or the reorganized Debtors), and the Company (both as Debtors-in-possession or the reorganized Debtors), may not assert any claim against any Investor, in either case, arising from this Agreement other than for willful breach, and (ii) the Investors hereby release the Company (both as Debtors-in-possession and the reorganized Debtors) from any such claims, and the Company (both as Debtors-in-possession or the reorganized Debtors) hereby releases the Investors from any such claims.  Notwithstanding the foregoing (w) the aggregate liability

of all of the Investors under this Agreement for any reason (under any legal theory)**,** including for any willful breach**, for any act or omission** occurring on or prior to the Disclosure Statement Approval Date shall not exceed $100 million, (x) the aggregate liability of all of the Investors under this Agreement for any reason (under any legal theory)**,** including for any willful breach**, for any act or omission** occurring after the Disclosure Statement Approval Date shall not exceed $250 million, (y) the aggregate liability of all of the Debtors under this Agreement for any reason (under any legal theory)**,** including for any willful breach**, for any act or omission** occurring on or prior to the Disclosure Statement Approval Date shall not exceed $100 million, and (z) the aggregate liability of all of the Debtors under this Agreement for any reason (under any legal theory)**,** including for any willful breach**, for any act or omission** occurring after the Disclosure Statement Approval Date shall not exceed $250 million**.  Notwithstanding the foregoing, nothing contained in this Section 11(b) shall limit the liability of the Company for any Transaction Expenses pursuant to Section 2(j) or 12(g)**. The Investors and the Company acknowledge that such liability under subclauses (w) and (x) shall be on a several and not joint basis with respect to any willful breach occurring on or prior to the ~~Due Diligence Expiration~~**Disclosure Statement Filing** Date.  The Investors and the Company acknowledge and agree that such liability under subclauses (w) and (x) shall be on a joint and several basis with respect to any willful breach occurring after the ~~Due Diligence Expiration~~**Disclosure Statement Filing** Date; provided, that the aggregate liability of Harbinger shall not exceed $~~38,442,731~~**38,944,000,** the aggregate liability of Merrill shall not exceed $~~32,038,546 and~~**16,358,805,** the aggregate liability of UBS shall not exceed $~~25,743,392~~**16,358,805, the aggregate liability of GS shall not exceed $39,215,500 and the aggregate liability of Pardus shall not exceed $33,593,000.**  Subject to the terms, conditions and limitation set forth in this <u>Section 11(b)</u>, (i) the joint and several obligations referred to in the immediately preceding sentence mean that each Investor (an "**"Assuming Investor"**"**)** assumes liability on a joint and several basis for any willful breach of this Agreement by any other Investor (a "**"Breaching Investor"**"**)**, whether or not the Assuming Investor has breached this Agreement or is in any way responsible for such willful breach by the Breaching Investor and (ii) the Assuming Investors**'** obligations shall be a commitment to assure payment, not collection. Under no circumstances shall any Investor be liable to the Company (as Debtors-in-possession or reorganized Debtors) for any punitive damages under this Agreement or any Equity Commitment Letter.  Under no circumstances shall the Company (both as Debtors-in-possession and reorganized Debtors) be liable to any Investor for any punitive damages under this Agreement.

12.    ~~Termination~~.

**12.**    **Termination.**  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date:

(a)    by mutual written consent of the Company and ~~both of~~ ADAH ~~and Dolce~~;

(b)    by any Investor if any of the Chapter 11 Cases shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or an interim or permanent trustee shall be appointed in any of the Chapter 11 Cases, or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases;

(c)    by any party to this Agreement if ~~(i)~~ any statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority or any judgment, injunction, decree or order of any federal, state or foreign court shall have become final and non-appealable, that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement, the Preferred Term Sheet, the ~~PSA~~**Plan Terms** or the GM Settlement ~~or (ii) the PSA shall have been terminated in accordance with its terms; provided, that the right to terminate this Agreement under this Section 12(c)(ii) shall not be available to any party whose breach of the PSA is the cause of the termination of the PSA; provided, further, that (A) the Company shall not have any right to terminate this Agreement under this Section 12(c)(ii) if the PSA is terminated in accordance with Article 3.2(b) of the PSA as a result of or arising from a notice of termination of the PSA delivered by either the Company or GM as described in Article 3.1(b) of the PSA and (B) no Investor shall have any right to terminate this Agreement under this Section 12(c)(ii) if the PSA is terminated in accordance with Article 3.2(b) of the PSA as a result of or arising from a notice of termination of the PSA delivered by any Investor as described in Article 3.1(b) of the PSA;~~**;**

(d)    by ADAH ~~or Dolce~~ upon written notice to the Company and each other Investor:

(i)    if the ~~Initial~~ Approval Order has not become a Final Approval Order on or prior to the earlier of (A) the tenth (10th) day after the Bankruptcy Court enters the ~~Initial~~ Approval Order, or, if such day is not a Business Day, the next Business Day and (B) ~~January 22,~~**August 16,** 2007; provided, that notice of termination pursuant to this Section 12(d)(i) must be given on or prior to ~~February 28,~~**August 31,** 2007;

(ii)      ~~prior to the later of (A) January 31, 2007 and (B) the date that is twenty~~
~~(20) calendar days after the date on which the Company has delivered to~~
~~each Investor both the Business Plan reflecting the GM Settlement and the~~
~~Disclosure Letter (such date, the "Due Diligence Expiration Date"), if any~~
~~Investor is not satisfied in its sole discretion with (x) the results of its due~~
~~diligence investigation of the Company and its Subsidiaries, the~~
~~Disclosure Letter and the Business Plan (the "Due Diligence~~
~~Investigation") or (y) the terms of the Shareholders Agreement,~~
~~Registration Rights Agreement, the Amended and Restated Constituent~~
~~Documents, the Series A-1 Certificate of Designations, the Series A-2~~
~~Certificate of Designations, the Series B Certificate of Designations or any~~
~~other Transaction Agreement;~~**at any time prior to the last date
established by the Bankruptcy Court for the filing of objections to the
Disclosure Statement, if the Company shall not have delivered a
Disclosure Letter as contemplated by Section 5(s) on or prior to the
tenth (10th) Business Day preceding the Disclosure Statement Filing
Date or shall have delivered a Disclosure Letter which shall not have
satisfied the condition with respect to the Disclosure Letter in
accordance with Section 9(a)(xxviii).**

(iii)     on or after ~~the earlier of (A) August 31, 2007, or (B) the later of (x) June
30, 2007~~**March 31, 2008** (such date, being the "**Closing Date Outside
Date**")~~, or (y) the first Business Day that is one-hundred eighty (180) days
after the Due Diligence Expiration Date.~~**;** provided that~~, in either case,~~ the
Closing Date has not occurred by such date;

(iv)      on or after ~~the later of (x) May 1, 2007~~**January 31, 2008** (such date, being
the "**Disclosure Statement Outside Date**")~~, or (y) the first Business Day
that is one-hundred twenty (120) days after the Due Diligence Expiration
Date.~~**;** provided that, in either case, the Disclosure Statement has not been
filed for approval with the Bankruptcy Court by such date;

(v)       if the Company or any Investor shall have breached any provision of this
Agreement, which breach would cause the failure of any condition set
forth in Section 9(a)(xvi) or (xvii) hereof to be satisfied, which failure
cannot be or has not been cured on the earliest of (A) the tenth (10th)
Business Day after the giving of written notice thereof to the Company or
such Investor by any Investor and (B) the third (3rd) Business Day prior to
the Closing Date Outside Date; provided, that the right to terminate this
Agreement under this Section 12(d)(v) shall not be available to any
Investor whose breach is the cause of the failure of the condition in
Section 9(a)(xvi) or (xvii) to be satisfied; **provided, further, that the
right to terminate under this Section 12(d)(v) shall not be available as
a result of a breach of Section 5(o) to the extent, and only to the**

**extent, that the circumstances giving rise to the breach of Section 5(o) previously gave rise to a termination right under Section 12(d)(vii) and ADAH did not exercise such termination right under Section 12(d)(vii) by the end of the twenty (20) day period referred to therein;**

(vi)    ~~either of ADAH or Dolce shall have determined in its reasonable discretion that the Company will not achieve EBITDA for 2008 at least equal to the 2008 EBITDA Amount and EBITDA of at least $2.4 billion in each of 2009 and 2010 (exclusive of the Restructuring Charges to the extent the same had been deducted to determine EBITDA);~~

**(vi)**    ~~(vii)~~ (A) there shall have been a Change of Recommendation or (B) the Company shall have entered into an Alternate Transaction Agreement; or

(viii)    ~~if, subsequent to the Company, ADAH and Dolce having previously approved in writing the form of document referred to in Sections 9(a)(iv), (xx), (xxii), (xxiii) or (xxiv), the conditions set forth in Sections 9(a)(iv), (xx), (xxii), (xxiii) or (xxiv), shall become not satisfied as a result of an amendment or modification thereto.~~

**(vii)**    **for a period of twenty (20) days following the Cure Period if ADAH has delivered a deficiency notice in accordance with Section 9(a)(xxviii)(C) and the condition set forth in Section 9(a)(xxviii) shall not have been satisfied at the end of the Cure Period;**

provided, that notwithstanding anything in the foregoing to the contrary, any Investor other than ADAH ~~and Dolce~~ shall be entitled to terminate this Agreement as to itself (but not as to any other party) ~~(A) in any of the circumstances described in Section 12(d)(i)-(viii)~~ at any time prior to the Due Diligence Expiration Date, ~~and (B)~~ at any time on or after ~~December 31, 2007 (each of (A) and (B) being~~ **June 30, 2008 (**a "**Limited Termination**"); ~~provided, further, that if there is a Limited Termination, any deadline contained in Section 12(d)(i), (ii), (v) and (vi) by which ADAH must exercise a termination right under Section 12 shall be extended by ten (10) Business Days so as to give it sufficient time to comply with its obligations under Section 2(b);~~

(e)    ~~on or prior to the Due Diligence Expiration Date, by ADAH or Dolce by notice to the other parties if, on or prior to such date, (i) a target amount of EBITDA for fiscal year 2008  (but in any event not to exceed $2.4 billion) has not been agreed to by each of ADAH and Dolce in its sole discretion and included in the Business Plan (the "2008 EBITDA Amount") or (ii) restructuring charges for 2009 and~~

~~2010 have not been agreed to by each of ADAH or Dolce in its sole discretion and included in the Business Plan (the "Restructuring Charges");~~**[Reserved]**

(f)    by the Company upon written notice to each Investor:

(i)    subject to the establishment of Alternative Financing in accordance with Section 2(b), if any Investor shall have breached any provision of this Agreement, which breach would cause the failure of any condition set forth in Section 9(c)(iv) or (v) hereof to be satisfied, which failure cannot be or has not been cured on the earliest of (A) the tenth (10th) Business Day after the giving of written notice thereof to the **Investors by the** Company ~~or such Investor by any Investor~~ and (B) the third (3rd) Business Day prior to the Closing Date Outside Date;

(ii)    if the Company enters into any Alternate Transaction Agreement; provided, that the Company may only terminate this Agreement under the circumstances set forth in this Section 12(f)(ii) if:  (x) the Company's board of directors has determined in good faith, after having consulted with its outside legal counsel and its independent financial advisors, that such Alternate Transaction is a Superior Transaction and the failure to enter into such an Alternate Transaction Agreement would result in a breach of the applicable fiduciary duties of the board of directors, (y) before taking such action the Company has given the Investors at least ten (10) Business Days' (or, in the event of any Alternate Transaction that has been materially revised or modified, at least five (5) Business Days') prior written notice (the "**Consideration Period**") of the terms of such Alternate Transaction and of its intent to take such action, and, during the Consideration Period, the Company has, if requested by ~~the Investors~~**any Investor**, engaged in good faith negotiations regarding any revisions to this Agreement, the Plan or any other agreement or document proposed by ADAH and ~~Dolce and~~ again has determined in good faith, after consultation with its outside legal counsel and its independent financial advisors, that such Alternate Transaction remains a Superior Transaction and (z) prior to or contemporaneously with such termination the Company shall pay to the Investors the Alternate Transaction Fee; ~~or~~

(iii)    on or after ~~August~~**March** 31, ~~2007~~**2008**; provided, that the Closing Date has not occurred by such date**; or**

**(iv)    in accordance with Section 5(t).**

For the purposes of this <u>Section 12(f)</u>, a "**Superior Transaction**" shall mean an Alternate Transaction, which the board of directors of the Company, after consultation with its outside legal counsel and its independent financial advisors, determines in good faith to be more favorable to the bankruptcy estate of the Company than the transactions contemplated by this Agreement, the Preferred Term Sheet, the ~~PSA~~**Plan Terms** and the Plan, taking into account, all legal, financial, regulatory and other aspects of such Alternate Transaction, the likelihood of consummating the Alternate Transaction, the likely consummation date of the Alternate Transaction and the identity of the parties or proposed parties to such Alternate Transaction and after taking into account any revisions to the terms of this Agreement, the Plan and/or any other agreement or document proposed during the Consideration Period.

~~(g)     by ADAH, Dolce or the Company by notice given to the other parties on or before February 28, 2007 (unless this date is extended by agreement of ADAH, Dolce and the Company (as it may be so extended, the "Specified Date")) if the Company and its Subsidiaries have not entered into on or prior to January 31, 2007, (x) tentative labor agreements between the Company and its applicable Subsidiaries, on the one hand, and each of the UAW, the IUE-CWA and the USW, on the other hand or (y) the GM Settlement, in each case, on terms and conditions presented by the Company and satisfactory to each of ADAH and Dolce in its sole discretion.~~

**(g)**     ~~(h)~~ In addition to any other rights or remedies any Investor may have under this Agreement (for breach or otherwise) ~~but subject to~~ <u>Section 11(b)</u>, the Company shall pay a fee of $~~100,000,000~~**82,500,000** (the "**Alternate Transaction Fee**") to the Investors in such proportions as are set forth on <u>Schedule 2</u> hereto, and, in any case, the Company shall pay to the Investors any Transaction Expenses and any other amounts certified by the Investors to be due and payable hereunder that have not been paid theretofore if this Agreement is terminated pursuant to one of the following:

(i)     pursuant to (x) <u>Section 12(d)(</u>~~vii~~**vi**<u>)(B)</u> or (y) <u>Section 12(f)(ii);</u>

(ii)     pursuant to <u>Section 12(d)(</u>~~vii~~**vi**<u>)(A)</u> and, within the twenty-four (24) month period following the date of such termination, an Alternate Transaction Agreement is entered into or an Alternate Transaction is consummated~~; or~~

(iii)     pursuant to <u>Section 12(d)(v)</u> based on a willful breach by the Company and within the twenty-four (24) month period following the date of such termination, an Alternate Transaction Agreement is entered into or an Alternate Transaction is consummated.

Payment of the amounts due under this Section 12(~~h~~g) will be made (i) no later than the close of business on the next Business Day following the date of such termination in the case of a payment pursuant to Section 12(~~h~~g)(i)(x), (ii) prior to or contemporaneously with such termination by the Company in the case of a payment pursuant to Section 12(~~h~~g)(i)(y) and (iii) prior to or contemporaneously with the entry into an Alternate Transaction Agreement or the consummation of an Alternate Transaction in the case of a payment pursuant to ~~Section~~**Sections** 12(~~h~~g)(ii) or (iii).  Under no circumstances shall the Company be required to pay more than one Alternate Transaction Fee **plus Transaction Expenses**.  The provision for the payment of the Alternate Transaction Fee is an integral part of the transactions contemplated by this Agreement and without this provision the Investors would not have entered into this Agreement and shall constitute an allowed administrative expense of the Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code.

**(h)** ~~(i)~~ Upon termination under this Section 12, all rights and obligations of the parties under this Agreement shall terminate without any liability of any party to any other party except that (x) nothing contained herein shall release any party hereto from liability for any willful breach and (y) the covenants and agreements made by the parties herein in Sections 2(h), 2(i) and 2(j), and Sections 10 through 18 will survive indefinitely in accordance with their terms.

13.  Notices.  All notices and other communications in connection with this Agreement will be in writing and will be deemed given ~~(and will be deemed to have been duly given upon receipt)~~ if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the parties at the following addresses (or at such other address for a party as will be specified by like notice):

(a)      If to:

~~Dolce Investments LLC~~
~~c/o Cerberus Capital Management L.P.~~
~~299 Park Avenue~~
~~New York, New York 10171~~
~~Facsimile:  (212) 421-2958 / (212) 909-1409 / (212) 935-8749~~
~~Attention:  Scott Cohen / Dev Kapadia / Seth Gardner~~

~~with a copy to:~~

~~Milbank, Tweed, Hadley & McCloy LLP~~
~~One Chase Manhattan Plaza~~
~~New York, New York 10005-1413~~
~~Facsimile:  (212) 822-5899~~
~~Attention:  Thomas C. Janson~~

~~and~~

~~Milbank, Tweed, Hadley & McCloy LLP~~
~~601 South Figueroa Street, 30th Floor~~
~~Los Angeles, California 90017-5735~~
~~Facsimile:  (213) 892-4470~~
~~Attention:  Gregory A. Bray~~

**(a)**      ~~(b)~~      If to:

A-D Acquisition Holdings, LLC
c/o Appaloosa Management L.P.
26 Main Street~~,~~
Chatham, New Jersey 07928
Facsimile:  (973) 701-7055
Attention:  ~~Ronald Goldstein~~

**James Bolin**

with a copy to:

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131-2352
Facsimile:  (305) 358-5744/5766
Attention:  Thomas E. Lauria

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Facsimile:  (212) 354-8113
Attention:  John M. Reiss
          Gregory Pryor

**(b)**    (c)——If to:

Harbinger Del-Auto Investment Company, Ltd.
c/o Harbinger Capital Partners Offshore Manager, LLC
555 Madison Avenue, 16th Floor
New York, NY 10022
Attn:  Philip A. Falcone


with a copy to:


Harbert Management Corp.
One Riverchase Parkway South
Birmingham, AL 35244
Facsimile:  (205) 987-5505
Attention:  General Counsel


with a copy to:


White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131-2352
Facsimile:  (305) 358-5744/5766
Attention:  Thomas E. Lauria


White & Case LLP
1155 Avenue of the Americas

-82-

New York, New York 10036-2787
Facsimile:  (212) 354-8113
Attention:  John M. Reiss
                  Gregory Pryor

with a copy to:

Kaye Scholer LLP

425 Park Avenue
New York, NY  10022-3598
Facsimile:  (212) 836-8689
Attention:  Benjamin Mintz and Lynn Toby Fisher

**(c)**    ~~(d)~~ If to:

Merrill Lynch, Pierce, Fenner & Smith Incorporated.
4 World Financial Center
New York, New York  10080
Facsimile:  (212) 449-0769
Attention:  Robert Spork / Rick Morris

with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Facsimile:  (212) 757-3990
Attention:  Andrew N. Rosenberg

**(d)**    ~~(e)~~ If to:

UBS Securities LLC
299 Park Avenue
New York, New York  10171
Facsimile:  (212) 821-3008 / (212) 821-4042
Attention:  Steve Smith / Osamu Watanabe

with a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York  10006
Facsimile:  (212) 225-3999
Attention:  Leslie N. Silverman

(e)    **If to:**

**Goldman Sachs & Co**
**1 New York Plaza**
**New York, NY  10004**
**Facsimile:  (212) 823-0145**
**Attention:  David Mullen / Tom Wagner**

**with a copy to:**

**Goldman Sachs & Co.**
**1 New York Plaza**
**New York, NY  10004**
**Facsimile:  (212) 428-4769**
**Attention:  Sandip Khosla**

**with a copy to:**

**Sullivan & Cromwell**
**125 Broad Street**
**New York, NY  10004**
**Facsimile:  (212) 558-3588**
**Attention:  Robert Reeder**

(f)    **If to:**

**Pardus DPH Holding LLC**
**590 Madison Avenue**
**Suite 25E**
**New York, NY 10022**
**Facsimile: (212) 381-7771**
**Attention: Timothy Bass**

**with a copy to:**

**Willkie Farr & Gallagher LLP**
**787 Seventh Avenue**
**New York, N.Y. 10019-6099**
**Facsimile: (212) 728-8111**
**Attention: Rachel C. Strickland**
**                    Morgan D. Elwyn**

**(g)**     (f)——If to the Company, to:

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098
Attention:  John Sheehan – Facsimile:  (248) 813-2612
                     David Sherbin / Sean Corcoran – Facsimile:  (248) 813-2491


with a copy to:


Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Facsimile:  (212) 735-2000/1
Attention:  Eric L. Cochran
                     Marie L. Gibson


and


Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Chicago, IL 60606
Facsimile:  (312) 407-0411
Attention:  John Wm. Butler, Jr.
                     George Panagakis

14.    <u>Assignment; Third Party Beneficiaries</u>.  Neither this Agreement nor any of the rights,
interests or obligations under this Agreement will be assigned by any of the parties
(whether by operation of law or otherwise) without the prior written consent of the other
parties, except to an Ultimate Purchaser or to a Related Purchaser pursuant to <u>Sections
2(a)</u>, <u>2(b)</u> and <u>2(k)</u>.  Notwithstanding the previous sentence, subject to the provisions of
<u>Sections 2(a)</u>, <u>2(b)</u> and <u>2(k)</u>: (1) this Agreement, or the Investors' obligations hereunder,
may be assigned, delegated or transferred, in whole or in part, by any Investor to any
Affiliate of such Investor over which such Investor or any of its Affiliates exercise
investment authority, including, without limitation, with respect to voting and dispositive
rights; <u>provided</u>, that any such assignee assumes the obligations of such Investor
hereunder and agrees in writing to be bound by the terms of this Agreement in the same
manner as such Investor; and (2) ADAH may provide for a participation interest or other
arrangement whereby the economic benefits of ownership of the Series A-2 Preferred

~~Stock are shared with Merrill, Harbinger or their Affiliates, but ADAH shall not, pursuant to such arrangements, transfer any voting or investment power or control over the Series A-2 Preferred Stock~~.  Notwithstanding the foregoing or any other provisions herein, except pursuant to an Additional Investor Agreement acceptable to the Company~~,~~ **and** ADAH ~~and Dolce~~ no such assignment will relieve an Investor of its obligations hereunder if such assignee fails to perform such obligations.  Except as provided in <u>Section 10</u> with respect to the Indemnified Persons, this Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any person other than the parties hereto any rights or remedies under this Agreement.

15.    <u>Prior Negotiations; Entire Agreement</u>.  This Agreement (including the agreements attached as exhibits to and the documents and instruments referred to in this Agreement**)** constitutes the entire agreement of the parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement, except that the parties hereto acknowledge that any confidentiality agreements**,** heretofore executed among the parties will continue in full force and effect.

16.    <u>GOVERNING LAW; VENUE</u>.  THIS AGREEMENT WILL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK.  THE INVESTORS HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK  AND WAIVE ANY OBJECTION BASED ON <u>FORUM NON CONVENIENS</u>.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR VALIDITY OF THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

17.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the parties and delivered to the other party (including via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

18.    <u>Waivers and Amendments</u>.  This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions of this Agreement may be waived, only by a written instrument signed by all the parties or, in the case of a waiver, by the party waiving compliance, and subject, to the extent required, to the approval of the Bankruptcy Court.  No delay on the part of any party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver

on the part of any party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.  The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity.

19.    <u>Adjustment to Shares</u>.  If, in accordance with the terms of this Agreement, the Company effects a reclassification, stock split (including a reverse stock split), stock dividend or distribution, recapitalization, merger, issuer tender or exchange offer, or other similar transaction with respect to any shares of its capital stock, references to the numbers of such shares and the prices therefore shall be equitably adjusted to reflect such change and, as adjusted, shall, from and after the date of such event, be subject to further adjustment in accordance herewith.

20.    <u>Headings</u>.  The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

21.    <u>Publicity</u>.  The initial press release regarding this Agreement shall be a joint press release.  Thereafter, the Company and Investors each shall consult with each other prior to issuing any press releases (and provide each other a reasonable opportunity to review and comment upon such release) or otherwise making public announcements with respect to the transactions contemplated by this Agreement and the Plan, and prior to making any filings with any third party or any governmental entity (including any national securities exchange or interdealer quotation service) with respect thereto, except as may be required by law or by the request of any governmental entity.

22.    <u>Knowledge; Sole Discretion</u>.  The phrase "**<u>knowledge of the Company</u>**" and similar phrases shall mean the actual knowledge of the Chief Restructuring Officer of the Company and such other officers as the Company<u>, **and**</u> ADAH ~~and Dolce~~ shall reasonably agree.  Whenever in this Agreement any party is permitted to take an action or make a decision in its "sole discretion," the parties hereto acknowledge that such party is entitled to make such decision or take such action in such party's sole and absolute and unfettered discretion and shall be entitled to make such decision or take such action without regard for the interests of any other party and for any reason or no reason whatsoever.  Each party hereto acknowledges, and agrees to accept, all risks associated with the granting to the other parties of the ability to act in such unfettered manner.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by their respective officers thereunto duly authorized, all as of the date first written above.

DELPHI CORPORATION

By: _____
       Name:
       Title:

A-D ACQUISITION HOLDINGS, LLC

By: _____
       Name:
       Title:

HARBINGER DEL-AUTO INVESTMENT COMPANY, LTD.

By: _____
       Name:
       Title:

~~DOLCE INVESTMENTS LLC~~

~~By:  Cerberus Capital Management L.P., its~~
~~Managing Member~~

~~By: _____~~
       ~~Name:~~
       ~~Title:~~

MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED


By: _____
     Name:
     Title:


UBS SECURITIES LLC


By: _____
     Name:
     Title:


By: _____
     Name:
     Title:


**GOLDMAN SACHS & CO.**


**By:** _____
     **Name:**
     **Title:**


**PARDUS DPH HOLDING LLC**


**By:** _____
     **Name:**
     **Title:**

SCHEDULE 1

| Defined Term | Section |
|---|---|
| 2008 EBITDA Amount............................................... | ~~Section 12 (e)~~ |
| ADAH .................................................................... | ~~Recitals~~**Preamble** |
| Additional Investor ~~Agreements~~**Agreement** ................. | Section 2 (k) |
| Affiliate ................................................................ | Section 2 (a) |
| Agreement.............................................................. | ~~Recitals~~**Preamble** |
| ~~Alternative Financing~~.............................................. | ~~Section 2 (b)~~ |
| Alternate Transaction............................................... | Section 9 (a)(v) |
| Alternate Transaction Agreement ................................ | Section 9 (a)(v) |
| Alternate Transaction Fee ......................................... | Section 12 (~~h~~g) |
| **Alternative Financing** | **Section 2 (b)** |
| Amended and Restated Constituent Documents............... | Section 8 (c) |
| **Appaloosa** | **Recitals** |
| **Approval Motion** | **Recitals** |
| **Approval Order** | **Recitals** |
| **Arrangement Fee** | **Section 2 (h)(iii)** |
| Assuming Investor ................................................... | **Section** 11 (b) |
| Available Investor Shares ......................................... | Section 2 (b) |
| Bankruptcy Code .................................................... | Recitals |
| Bankruptcy Court.................................................... | Recitals |
| Bankruptcy Rules.................................................... | Section 3 (b)(i) |
| Breaching Investor .................................................. | **Section** 11 (b) |
| Business Day.......................................................... | Section 1 (c)(iii) |
| Business Plan......................................................... | Section 5 (s) |
| Capital Structure Date.............................................. | Section 3 (d) |
| **Cerberus** | **Recitals** |
| Change of Recommendation........................................ | Section 9 (a)(vi) |
| Chapter 11 Cases.................................................... | Recitals |
| Closing Date........................................................... | Section 2 (d) |
| Closing Date Outside Date......................................... | Section 12 (d)(iii) |
| Code .................................................................... | Section 3 (z)(ii) |
| Commission ........................................................... | Section 1 (c)(ii) |
| Commitment Fees.................................................... | Section 2 (h)(ii) |
| Commitment Parties................................................. | Recitals |
| Company................................................................ | ~~Recitals~~**Preamble** |
| Company ERISA Affiliate.......................................... | Section 3 (z)(ii) |
| **Company Financing Proposal** | **Section 5 (t)** |
| Company Plans ....................................................... | Section 3 (z)(i) |
| Company SEC Documents .......................................... | Section 3 (j) |
| ~~Confirmation Hearing~~.............................................. | ~~Section 1 (c)(iii)~~ |
| Confirmation Order.................................................. | Section 9 (a)(vii) |
| Confirmed Plan ...................................................... | Section 9 (a)(viii) |
| Consideration Period................................................ | Section 12 (f)(ii) |
| **Cure Period** | **Section 9(a)(xxviii)(C)(1)** |
| Debt Financing........................................................ | Section 5 (t) |

| Defined Term | Section |
|---|---|
| Debtors | Recitals |
| Determination Date | Section 1 (c)(vi) |
| DGCL | Section 3 (oo) |
| ~~DIP Order~~ | ~~Section 2(j)~~ |
| Direct Subscription Shares | Section 2 (a)(i) |
| Disclosure Letter | Section 3 |
| Disclosure Letter Delivery Date | Section 3 |
| Disclosure Statement | Section 5 (b) |
| Disclosure Statement Approval Date | Section ~~1~~**5** ~~(c)(ii~~**b**) |
| Disclosure Statement ~~Outside~~**Filing** Date | Section ~~12~~**5** ~~(d)(iv~~**p**) |
| **Disclosure Statement Outside Date** | **Section 12 (d)(iv)** |
| Disinterested Director | Section 8 (c) |
| ~~Distribution Date~~ | ~~Section 1 (c)(ii)~~ |
| Dolce | Recitals |
| **Draft Business Plan** | **Section 3 (m)(vii)** |
| Due Diligence Expiration Date | Section 12 (d)(ii) |
| ~~Due Diligence Investigation~~ | ~~Section 12 (d)(ii)~~ |
| ~~EBITDA Target~~ | ~~Section 9 (a)(xviii)~~ |
| Effective Date | Section 1 (c)(iii) |
| Eligible Holder | Section 1 (a) |
| Environmental Laws | Section 3 (x)(i) |
| ~~E&Y~~ | ~~Section 3 (q)~~ |
| Equity Commitment Letter | Section 4 (o) |
| ERISA | Section 3 (z)(i) |
| Exchange Act | Section 3 (i)**(i)** |
| Existing Shareholder Rights Plan | Section 3 (d) |
| Expiration Time | Section 1 (c)(iii) |
| **E&Y** | **Section 3 (q)** |
| Final Approval Order | Section 9 (a)(i) |
| **Financing Decision Date** | **Section 5 (t)** |
| **Financing Notice** | **Section 5 (t)** |
| **Financing Order** | **Section 2 (j)** |
| GAAP | Section 3 (i)**(i)** |
| GM | ~~Section 8 (c)~~**Recitals** |
| GM Settlement | Section 5 (p) |
| ~~GMAC~~**GS** | ~~Section 8 (c)~~**Preamble** |
| Harbinger | ~~Recitals~~**Preamble** |
| **Harbinger Fund** | **Recitals** |
| HSR Act | Section 3 (g) |
| **Indebtedness** | **Section 9 (a)(xxvii)** |
| ~~IUE-CWA~~ | ~~Section 5 (u)~~ |
| Indemnified Person | Section 10 (a) |
| Indemnifying Party | Section 10 (a) |
| Intellectual Property | Section 3 (s) |
| ~~Initial Approval Motion~~ | ~~Recitals~~ |

| Defined Term | Section |
|---|---|
| ~~Initial Approval Order~~ | ~~Recitals~~ |
| Investment Decision Package | Section 3 (k) |
| Investor | ~~Recitals~~**Preamble** |
| ~~Investors~~ | ~~Recitals~~ |
| Investor Default | Section 2 (b) |
| **Investors** | **Preamble** |
| Investor Shares | Section 2 (a) |
| Issuer Free Writing Prospectus | Section 3 (k) |
| **IUE-CWA** | **Section 5 (u)** |
| **knowledge of the Company** | **Section 22** |
| Limited Termination | Section 12 (d) |
| Losses | Section 10 (a) |
| Material Adverse Effect | Section 3 (a) |
| **Material Investment Documents** | **Section 9 (a)(xxviii)** |
| Maximum Number | Section 2 (a) |
| Merrill | ~~Recitals~~**Preamble** |
| Money Laundering Laws | Section 3 (ee) |
| Monthly Financial Statements | Section 5 (r) |
| Multiemployer Plans | Section 3 (z)(ii) |
| New Common Stock | Section 1 (a) |
| OFAC | Section 3 (ff) |
| Option | Section 3 (d) |
| Options | Section 3 (d) |
| **Original Agreement** | **Recitals** |
| **Original Approval Motion** | **Recitals** |
| **Original Approval Order** | **Recitals** |
| **Original Investors** | **Recitals** |
| **Original PSA** | **Recitals** |
| **Pardus** | **Preamble** |
| Plan | Section 1 (b) |
| **Plan Terms** | **Recitals** |
| Preferred Commitment Fee | Section 2 (h)(i) |
| **Preferred Debt Financing** | **Section 5 (t)** |
| Preferred Shares | Section 2 (a) |
| Preferred Term Sheet | Section 1 (b) |
| Preliminary Rights Offering Prospectus | Section 3 (k) |
| Proceedings | Section 10 (a) |
| ~~PSA~~ | ~~Section 1 (b)~~ |
| Purchase Notice | Section 1 (c)(vi) |
| Purchase Price | Section 1 (a) |
| Record Date | Section 1 (a) |
| ~~Related Purchaser~~ | ~~Section 2 (a)~~ |
| Registration Rights Agreement | Section 8 (c) |
| **Related Purchaser** | **Section 2 (a)** |
| **Relevant Date** | **Section 9 (a)(xxviii)(A)(i)** |

| Defined Term | Section |
|---|---|
| Resale Registration Documents | Section 8 (c) |
| Resale Registration Statement | Section 8 (c) |
| Restricted Period | Section 5 (j) |
| ~~Restructuring Charges~~ | ~~Section 12 (e)~~ |
| Right | Section 1 (a) |
| **Rights Distribution Date** | **Section 1 (c)(ii)** |
| Rights Exercise Period | Section 1 (c)(iii) |
| Rights Offering | Section 1 (a) |
| Rights Offering Prospectus | Section 3 (k) |
| Rights Offering Registration Statement | Section 3 (k) |
| Satisfaction Notice | Section 1 (c)(vi) |
| Securities Act | Section 1 (c)(ii) |
| Securities Act Effective Date | Section 3 (k) |
| Series A~~-1~~ Certificate of Designations | Section 2 (a)(~~ii~~**iii**) |
| Series A~~-1~~ Preferred Stock | Section 2 (a)(~~ii~~**iii**) |
| Series A ~~Preferred Stock~~**Purchase Price** | Section 2 (a)(~~ii~~**iii**) |
| ~~Series A-2 Certificate of Designations~~ | ~~Section 2 (a)(iii)~~ |
| ~~Series A-2 Preferred Stock~~ | ~~Section 2 (a)(iii)~~ |
| Series B Certificate of Designations | Section 2 (a)(i) |
| Series B Preferred Stock | Section 2 (a)(i) |
| Share | Section 1 (a) |
| Shareholders Agreement | Section 8 (c) |
| Significant Subsidiary | Section 3 (a) |
| Single-Employer Plan | Section 3 (z)(ii) |
| ~~Specified Date~~ | ~~Section 12(g)~~ |
| Standby Commitment Fee | Section 2 (h)(ii) |
| Stock Plans | Section 3 (d) |
| Subscription Agent | Section 1 (c)(iii) |
| Subsidiary | Section 3 (a) |
| Superior Transaction | Section 12 (f) |
| Takeover Statute | Section 3 (oo) |
| Taxes | Section 3 (y) |
| Tax Returns | Section 3 (y)(i) |
| Transaction Agreements | Section 3 (b)(i) |
| Transaction Expenses | Section 2 (j) |
| Transformation Plan | Section 3 (m)(~~vii~~**vi**) |
| UAW | Section ~~5~~**3** (~~u~~**pp**) |
| **UAW MOU** | **Section 3 (pp)** |
| UBS | ~~Recitals~~**Preamble** |
| Ultimate Purchasers | Section 2 (k) |
| Unsubscribed Shares | Section 2 (a)(iv) |
| USW | Section 5 (u) |

SCHEDULE 2

| Investor | Direct Subscription Shares | Direct Subscription Shares Purchase Price | Maximum Backstop Shares | Maximum Backstop Shares Purchase Price | Maximum Total Common Shares | Maximum Total Common Shares Purchase Price | Series A-1 Preferred Stock[1] | Purchase Price | Series A-2 Preferred Stock | Purchase Price | Series B Preferred Stock[2] | Purchase Price | Total Purchase Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dolce Investments LLC-ADAH | 3,150,0004,761,878 | $110,250,0046,7,638,500 | 15,856,906 | $608,746,500 | 17,618,784 | $676,385,000 | — | $— | — | $— | 8,571,42— 9— | $300,000,000 | $710,750,0001,076,385,000 |
| A-D Acquisition Holdings, LLC-ADAH | 1,800,0004,702,594 | 66,150,0004526,972,600 | 6,323,348 | $242,753,400 | 7,025,942 | $269,726,000 | — | 300,000,000 | 8,571,429 | 300,000,0000,400,000,00 00 | 5,142,8573, 321,178 | 180,000,004512,346,150,000525,000 | 226,000 |
| Harbinger Del-Auto Investment Company Ltd. | 472,500265,347 | 46,537,5005510,186,650 | 2,388,118 | $91,679,850 | 2,653,465 | $101,866,500 | — | — | — | — | 1,285,7141, 693,149 | 45,000,00065,64,537,500516,5 000,000 | 66,500 |
| Merrill Lynch, Pierce, Fener & Smith Incorporated | 393,750265,347 | 1,781,2504510,186,650 | 2,388,118 | $91,679,850 | 2,653,465 | $101,866,500 | — | — | — | — | 1,071,4291, 693,149 | 37,500,00065,64,281,250516,5 000,000 | 66,500 |
| UBS Securities LLC | 393,750950,768 | 1,781,2504536,586,650 | 8,556,914 | $328,500,000 | 9,507,682 | $365,000,000 | — | — | — | — | 1,071,4292,691 800,000 | 37,500,00035,4,281,250564,000,0 00 | 00,000 |
| Pardus | 612,545 | $23,515,600 | 5,512,907 | $211,640,400 | 6,125,452 | $235,156,000 | 8,571,42912, 787,724 | $— | 8,571,429 | $— | 2,800,208 | $107,500,000 | $342,656,000 |
| Total | 6,300,0004,558,47 9 | 220,500,0004175, 000,000 | 41,026,311 | $1,575,000,000 | 45,584,790 | $1,750,000,000 | 8,571,42912, 787,724 | 300,000,000 300,000,00040 0,000,000 | 8,571,429 | 300,000,00040 0,000,000 | 8,419,380 | 600,000,000400 ,000,000 | 550,000,000 |
| Proportionate Share of Preferred | | | | | | | | | | | | | |
| Dolce Investments: A-D Acquisition Holdings, LLC-ADAH | 4050.4861% | | | | | | | | | | | | |
| Harbinger Del-Auto Investment Company Ltd. | 3.75015.9375% | | | | | | | | | | | | |
| Merrill Lynch, Pierce, Fener & Smith Incorporated | 3.1258.1250% | | | | | | | | | | | | |
| UBS Securities LLC | 3.1258.1250% | | | | | | | | | | | | |
| GS: Pardus | 3.88899% 13.4375% | | | | | | | | | | | | |
| Total | 100% | | | | | | | | | | | | |

Dolce Investments LLC ...................... 50%

__[1] **Common stock equivalent units.**__

__[2] **Common stock equivalent units.**__

NEWYORK 6090548 v11 (2K)

SCHEDULE 1
Page 2

**Proportionate Share of Participation**

| | |
|---|---|
| A-D Acquisition Holdings, LLC/ADAH | ~~77.~~40.3977% |
| Harbinger Del-Auto Investment Company Ltd. | ~~7.5~~15.4712% |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | ~~6.25~~6.0769% |
| UBS Securities LLC | ~~6.25~~6.0769% |
| GS | 18.5397% |
| Pardus | 13.4375% |

**Proportionate Share of Alternate Transaction Fee[3]**

| | If full Commitment Fee received | If no Commitment Fee received |
|---|---|---|
| A-D Acquisition Holdings, LLC/ADAH | ~~54.~~54.3750% | 46.8855% |
| Harbinger Del-Auto Investment Company Ltd. | ~~7.5~~15.9375% | 15.7150% |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | ~~6.25~~8.1250% | 7.1475% |
| UBS Securities LLC | ~~6.25~~8.1250% | 7.1475% |
| GS | 0% | 9.6970% |
| Pardus | 13.4375% | 13.4375% |
| Total | 100% | 100% |

| | |
|---|---|
| Delcie Investments LLC | ~~50~~% |
| Delcie Investments LLC | ~~50~~% |

[3] **Percentages will fluctuate depending on the amount of any Commitment Fee received.**

NEWYORK 6090548 v~~11~~ (2K)

**Redline Of Preferred Stock Term Sheet Attached To January 18, 2007 Original EPCA**
**<u>Against Preferred Stock Term Sheet Attached To Delphi-Appaloosa EPCA</u>**

## SUMMARY OF TERMS OF
## PREFERRED STOCK

*Set forth below is a summary of indicative terms for a potential investment in Delphi Corporation by ~~(i) certain funds and accounts, to be designated, managed, directly or indirectly, by Cerberus Capital Management L.P. and its affiliates and (ii)~~ entities or funds controlled by Appaloosa Management, Harbinger Capital Partners, Merrill Lynch ~~& Co. and UBS Securities. The Investment~~__, Pierce, Fenner & Smith Incorporated., UBS Securities, Goldman Sachs & Co. and Pardus Special Opportunities Master Fund L.P. The investment__ is being made in connection with a Plan of Reorganization of Delphi Corporation under chapter 11 of the Bankruptcy Code. The terms set forth below are intended solely to provide a framework for the parties as they proceed with discussions of the proposed transaction and do not constitute any agreement with respect to the definitive terms for any transaction or any agreement to agree or any solicitation of acceptances or rejections of any plan of reorganization. While the parties expect to negotiate in good faith with respect to the terms for a transaction, ~~either__any__ party shall be free to discontinue discussions and negotiations at any time for any reason or no reason. ~~Neither__No__ party shall be bound by the terms hereof and only execution and delivery of definitive documentation relating to the transaction shall result in any binding or enforceable obligations of any party relating to the transaction.*

**Issuer**:        Delphi Corporation (the "**Company**"), a corporation organized under the laws of Delaware and a successor to Delphi Corporation, as debtor in possession in the chapter 11 reorganization case (the "**Bankruptcy Case**") pending in the United States Bankruptcy Court for the Southern District of New York.

**Investors**:     ~~Certain funds and accounts, to be designated, managed, directly or indirectly, by Cerberus Capital Management L.P. and its affiliates (collectively, "Cerberus"); entities__Entities__ or funds controlled by Appaloosa Management ("**Appaloosa**"), Harbinger Capital Partners ("**Harbinger**"), Merrill Lynch ~~& Co.__, Pierce, Fenner & Smith Incorporated__ ("**Merrill**") ~~and__,__ UBS Securities ("**UBS**~~", and,__)__, Goldman Sachs & Co. ("GS") and Pardus Special Opportunities Master Fund L.P. ("Pardus" and__ together with Harbinger ~~and__,__ Merrill, ~~"HUM__ UBS and GS, the "Co-Lead Investors__"), with the ~~economic interests in the__Series B__ Preferred Stock to be purchased by the ~~Appaloosa__Co-Lead__ Investors allocated as follows: (a) ~~Appaloosa—60.0%; (b) Harbinger—15.0%; and (c) UBS and Merrill—12.5% each; provided, that Appaloosa__Harbinger—31.875%; (b) Merrill—16.25%; (c) UBS—16.25%; (d) GS—8.75%; and (e) Pardus—26.875%. Appaloosa or any Permitted Holder (as defined below)__ shall be the exclusive purchaser and sole beneficial owner for all purposes hereunder of the Series A ~~2 Preferred Stock and shall hold and retain all control rights with respect thereto, including voting and disposition rights. HUM and Appaloosa__1 Preferred Stock (as defined below). Appaloosa, Harbinger, Merrill, UBS, GS and Pardus__ are collectively referred to as the "~~Appaloosa Investors__" and Cerberus and the Appaloosa Investors are collectively~~

refered to as the "~~*Investors*.~~"***Investors.***"

| | |
|---|---|
| **Securities to be Issued**: | Series A-1 Senior Convertible Preferred Stock, par value $0.01 per share (the "***Series A-1 Preferred Stock***") |

**.  The** Series A-~~2 Senior Convertible~~**1** Preferred Stock~~, par value $0.01 per share~~ **shall convert to Series A-2 Preferred Stock** (the "***Series A-2 Preferred Stock***~~"~~**"** and, together with the Series A-1 Preferred Stock, the "***Series A Preferred Stock***")**  in certain circumstances described in this term sheet.**

Series B Senior Convertible Preferred Stock, par value $0.01 per share (the "***Series B Preferred Stock***" and, together with the Series A Preferred Stock, the ***"Preferred Stock"***)**.**

**The Series B Preferred Stock shall be identical in all respect to the Series A-1 Preferred Stock except as specifically set forth below.**

**The Series A-2 Preferred Stock shall be identical in all respect to the Series A-1 Preferred Stock except it shall not have Voting Rights and Governance Rights (as defined below).**

~~Except as set forth below under "Voting Rights" the Series A-1 Preferred Stock and the Series A-2 Preferred Stock are identical in all respects.  In addition, the Series A Preferred Stock shall automatically convert into shares of Series B Preferred Stock, on a one for one basis, upon the happening of certain events as outlined below.  The Series B Preferred Stock shall be identical in all respect to the Series A Preferred Stock except with respect to voting rights, as set forth below.~~**The (i) Series A-1 Preferred Stock and the shares of Common Stock underlying such Series A-1 Preferred Stock may not be, directly or indirectly, sold, transferred, assigned, pledged, donated, or otherwise encumbered or disposed of by any Series A Preferred Stock Holder (as defined below), during the two years following the effective date (the "*Effective Date*") of the Company's plan of reorganization in the Bankruptcy case (the "*Plan*") other than in whole pursuant to a sale of the Company (as defined below) (provided, however, that in any sale of Series A-1 Preferred Stock in connection with a sale of the Company, the seller of the Series A-1 Preferred Stock may receive consideration with a value no greater than the greater of (i) the fair market value of the Series A-1 Preferred Stock (or a preferred security of equivalent economic value), such fair market value not to reflect the value of the Voting Rights and Governance Rights**

2

**attributable to the Series A-1 Preferred Stock, and (ii) the Liquidation Value) and (ii) Series B Preferred Stock and the shares of Common Stock underlying such Series B Preferred Stock, or any interest or participation therein may not be, directly or indirectly, sold, transferred, assigned, pledged or otherwise encumbered or disposed of (including by exercise of any registration rights) during the ninety days following the Effective Date other than in whole pursuant to a sale of the Company (each of (i) and (ii), the "*Transfer Restriction*"). A "*sale of the Company*" means the sale of the Company to a party or parties other than, and not including, Appaloosa or any affiliate of Appaloosa (for this purpose, an "affiliate" of Appaloosa shall not include any company in which a fund managed by Appaloosa or its affiliates invests and does not control) pursuant to which such party or parties acquire (i) the capital stock of the Company possessing the voting power under normal circumstances to elect a majority of the Company's Board of Directors (whether by merger, consolidation or sale or transfer of the Company's capital stock) or (ii) all or substantially all of the Company's assets determined on a consolidated basis.**

| | |
|---|---|
| **Purchase of Preferred Stock**: | At the Effective ~~Time (the "*Issue Date*") of the Plan of Reorganization (the "Plan") in the Bankruptcy Case, (i) Cerberus shall purchase all of the 8,571,429 shares of Series A-1 Preferred Stock for an aggregate of $300 million; (ii~~**Date, (i)** Appaloosa will purchase all of the ~~8,571,429~~**12,787,724** shares of Series A-~~2~~**1** Preferred Stock for an aggregate purchase price of $~~300 million, (iii) Cerberus shall purchase 8,571,429 shares of Series B Preferred Stock, representing 50% of the shares of Series B Preferred Stock to be outstanding, for an aggregate of $300 million and (iv) the Appaloosa~~**400 million and (ii) the Co-Lead** Investors shall purchase~~, in the aggregate, 8,571,429 shares of Series B Preferred Stock, representing 50% of the shares of Series B Preferred Stock to be outstanding, for an aggregate of $300 million. The Stated Value of the Preferred Stock shall be $35.00 per share~~ **all of the 10,419,880 shares of Series B Preferred Stock, for an aggregate purchase price of $400 million.  The aggregate stated value of the Series A-1 Preferred Stock shall be $400 million and the aggregate stated value of the Series B Preferred Stock shall be $400 million (in each case, the "*Stated Value*")**. |
| **Mandatory Conversion into Common Stock:** | The Company shall convert **into Common Stock** all, but not less than all, of the **(i) Series A** Preferred Stock on ~~or after the seventh anniversary of the Issue Date~~**the first date the Mandatory Conversion Requirements are satisfied (but in no event earlier than June 30, 2012[1]) at the Conversion Price (as defined below) of the Series A Preferred Stock in effect on such conversion date, and (ii) Series B Preferred Stock on the first day the Mandatory Conversion Requirements are satisfied (but in no event** |

---

[1]  **Assuming emergence by January 1, 2008.  Conversion date to be adjusted day-by-day to reflect any later emergence.**

3

**earlier than the third anniversary of the Effective Date)** at the Conversion Price **(as defined below) of the Series B Preferred Stock** in effect on such conversion date~~; provided, that no such conversion may be made unless the Closing Price~~**.**

**The *"Mandatory Conversion Requirements"* set forth in this section are as follows: (i) the closing price** for the Common Stock for at least 35 trading days in the period of 45 consecutive trading days immediately preceding the date of the notice of conversion shall be ~~in excess of 150% of the initial per share plan value.  The Company may not effect the conversion unless~~**equal to or greater than $55[2] per share and (ii)** the Company has at the conversion date an effective shelf registration covering resales of the shares of Common Stock received upon such conversion of the Preferred Stock.

**The Company will provide each Preferred Stock Holder (as defined below) with notice of conversion at least five (5) business days prior to the date of conversion.**

The holders of the Series A Preferred Stock **(the "*Series A Preferred Stock Holders*" and each, a "*Series A Preferred Stock Holder*")** will agree not to take any action to delay or prevent such registration statement from becoming effective.

| | |
|---|---|
| Liquidation<br><br>Rights: | In the event of any liquidation, dissolution or winding up of the business of the Company, whether voluntary or involuntary, ~~each holder of~~ **the holders of Preferred Stock (the "*Preferred Stock Holders*" and each, a "*Preferred Stock Holder*")** shall receive, in exchange for each share, out of legally available assets of the Company, **(A)** a preferential amount in cash equal to (i) the Stated Value plus (ii) the aggregate amount of all accrued and unpaid dividends or distributions with respect to such share (such amount being referred to as the "*Liquidation Value*")~~.~~ **and (B) a non-preferential amount (if any) (the "*Common Equivalent Amount*") equal to (i) the amount that Preferred Stock Holder would have received pursuant to the liquidation if it had converted its Preferred Stock into Common Stock immediately prior to the liquidation minus (ii) any amounts received pursuant to (A)(i) and (ii) hereof (the Stated Value and dividends and distributions).  For the avoidance of doubt, this paragraph should operate so that in the event of a liquidation, dissolution or winding up of the business of the Company, a Preferred Stock Holder shall receive a total amount equal to the greater of: (i) the Liquidation Value and (ii) the amount that a Preferred Stock Holder would have received pursuant to the liquidation, dissolution or winding up of the business if it converted its Preferred Stock into Common Stock** |

---

[2]   **Equivalent to a TEV of $15.3 billion at emergence.**

4

**immediately prior to the liquidation.**

| | |
|---|---|
| **Ranking:** | The Series A Preferred Stock and the Series B Preferred Stock shall rank *pari passu* with respect to any distributions upon liquidation, dissolution or winding up of the Company.  The Preferred Stock will rank senior to any other class or series of capital stock of the Company  with respect to any distributions upon liquidation, dissolution or winding up of the Company. |
| **Conversion of Preferred Stock into Common Stock:** | Each share of Preferred Stock shall be convertible at any time, without any payment by the **Preferred Stock** Holder ~~thereof~~, into a number of shares of Common Stock equal to (i) the Liquidation Value <u>divided by</u> (ii) the Conversion Price.  The Conversion Price shall initially be $~~35.00,~~**[___]³, with respect to the Series A Preferred Stock, and $[___]⁴ with respect to the Series B Preferred Stock, in each case** subject to adjustment from time to time pursuant to the anti-dilution provisions of the Preferred Stock (as so adjusted, the "***Conversion Price***").  The anti-dilution provisions will contain customary provisions with respect to stock splits, recombinations and stock dividends and customary weighted average anti-dilution provisions in the event of, among other things, the issuance of rights, options or convertible securities with an exercise or conversion or exchange price below the Conversion Price, the issuance of additional shares at a price less than the Conversion Price and other similar occurrences. |
| **Conversion of Series A<u>-1</u> Preferred Stock ~~into Class B~~<u>Into Series A-2</u> Preferred Stock:** | If ~~at any time Cerberus and Appaloosa cease to beneficially own, in the aggregate, Series A~~**(a) Appaloosa or any Permitted Holder (as defined below) sells, transfers, assigns, pledges, donates or otherwise encumbers to any person other than a Permitted Holder, or converts into Common Stock, shares of Series A-1** Preferred Stock with a~~n aggregate~~ Liquidation Value **in excess** of $~~250~~**100** million, or ~~more~~**(b) David Tepper no longer controls Appaloosa and James Bolin is no longer an executive officer of Appaloosa**, then all ~~of~~<u>the</u> shares of Series A<u>-1</u> Preferred Stock shall automatically convert into ~~shares of~~ Series B<u>A-2</u> Preferred Stock~~, on a one for one basis,~~ without any action on the part of the holder thereof; <u>provided,</u> that **with respect to clause (a),** no such conversion ~~may occur unless at that time,~~ **shall be effective until** the Company has in effect a registration statement covering resales of the ~~Series B Preferred Stock and~~ Common Stock issuable upon conversion of the Preferred Stock.   The ~~holders of the~~ Series A Preferred Stock <u>**Holders**</u> will agree not to take any action to delay or prevent such registration statement from becoming effective. |

---

³ **Equivalent to a TEV of $11.75 billion at emergence.**
⁴ **Equivalent to a TEV of $12.8 billion at emergence.**

5

If ~~any holder~~**Appaloosa** transfers shares of Series A**-1** Preferred Stock to any person other than an ~~Affiliate~~**affiliate** of **Appaloosa (**such ~~holder (~~**affiliate being** a "*Permitted Holder*"**),** then all ~~of~~ the shares of Series A**-1** Preferred Stock so transferred shall automatically, ~~upon such transfer, convert into shares of Series B Preferred Stock, on a one for one basis.~~ **convert into Series A-2 Preferred Stock without any action on the part of the holder thereof.**

~~In addition, any holder of Series A Preferred Stock may convert all or any portion of its Series A Preferred Stock into shares of Series B Preferred Stock, on a one for one basis, at any time at its option.~~

**The direct or indirect transfer of ownership interests in any Permitted Holder that owns shares of Series A-1 Preferred Stock such that such Permitted Holder ceases to be an affiliate of Appaloosa shall constitute a transfer of such Series A-1 Preferred Stock to a person other than a Permitted Holder for the purpose of this provision.**

**Each event described above in the previous two paragraphs of this section "Conversion of Series A Preferred Stock into Series A-2 Preferred Stock" is referred to as a "*Series A-2 Conversion Event.*"**

Subject to compliance with applicable securities laws **and the Transfer Restriction**, shares of ~~Series B~~ Preferred Stock will be freely transferable.

| | |
|---|---|
| **Dividends**: | ~~The holder of each share of~~**Each** Preferred Stock **Holder** shall be entitled to receive dividends and distributions on the Preferred Stock at an annual rate of **6.5% of the Liquidation Value thereof, with respect to the Series A Preferred Stock, and** 3.25% of the Liquidation Value thereof, **with respect to the Series B Preferred Stock, in each case** payable quarterly in cash **as declared by the Company's Board**.  Unpaid dividends shall accrue.  In addition, if any dividends are declared **and paid** on the Common Stock, the **Series A** Preferred Stock shall be entitled to receive, in addition to the dividend on the **Series A** Preferred Stock at the stated rate, the dividends that would have been payable on the number of shares of Common Stock that would have been issued on the **Series A** Preferred Stock had it been converted immediately prior to the record date for such dividend. |
| **Preference with Respect to Dividends**: | Each ~~holder of~~ Preferred Stock **Holder** shall, prior to the payment of any dividend or distribution in respect of the Common Stock or any other class of capital stock of the Company ranking junior to the Preferred Stock, be entitled to be paid in full the dividends and distributions payable in respect of |

the Preferred Stock.

**Restriction on**

**Redemptions
of Junior Stock**:

So long as shares of **Series A** Preferred Stock having a Liquidation Value of $~~250~~**200** million or more remain outstanding, the Company shall not~~,~~ and shall not permit any of its subsidiaries to, purchase, redeem or otherwise acquire for value any shares of Common Stock or any shares of any other class of capital stock of the Company ranking junior to the Preferred Stock**,** except customary provisions with respect to repurchase of employee equity upon termination of employment **and except for purchases, redemptions or other acquisitions for value of Common Stock not to exceed $50 million in any calendar year**.

**Governance –
Board of
Directors:**

~~So long as the Series A Preferred Stock is outstanding, the following provisions shall be effective:~~**A committee (the "*Search Committee*") shall be appointed consisting of one (1) representative of Appaloosa, one (1) representative of the Company, being the Company's lead director (currently John Opie), one (1) representative of the Unsecured Creditors Committee, being David Daigle, one (1) representative of the Co-Lead Investors other than UBS, GS and Merrill (who shall be determined by Appaloosa), and one (1) representative of the Equity Committee reasonably acceptable to the other members of the Search Committee. Each member of the Search Committee shall be entitled to require the Search Committee to interview any person to serve as a director unless such proposed candidate is rejected by each of the Appaloosa representative, the Company representative and the representative of the Unsecured Creditors' Committee. The entire Search Committee shall be entitled to participate in such interview and in a discussion of such potential director following such interview.**

The board of directors of the Company shall consist of ~~twelve~~**nine** (~~12~~**9**) ~~directors, three (3) of whom shall initially be elected by the holders of the Series A-1 Preferred Stock Holders, three (3) of whom shall initially be elected by the holders of the Series A-2 Preferred Stock, one (1) of whom~~ **directors (which number shall not be expanded at all times that the Series A-1 Preferred Stock has Series A-1 Board Rights (as defined below)), three (3) of whom (who shall be Class III Directors) shall initially be nominated by Appaloosa and elected at the time of emergence from Chapter 11 by the Series A Preferred Stock Holders (and thereafter shall be elected directly by the Series A Preferred Stock Holders) (the "*Series A Directors*"), one (1) of whom (who shall be a Class I Director)** shall be the Executive Chairman selected as described below under "Executive Chairman~~,~~" ~~one (1) of whom shall be the CEO, and four (4) of whom shall be elected by the holders of the Common Stock and the Series B Preferred Stock, voting as a class (the "Common Directors") (it being~~

~~understood that the Series A Preferred Stock shall not vote with respect to the Common Directors and any holder of Series A Preferred Stock shall not vote its shares of Series B Preferred Stock in respect of the Common Directors~~**", one (1) of whom (who shall be a Class I Director) shall be the Chief Executive Officer, one (1) of whom (who shall be a Class II Director) shall initially be selected by the Co-Lead Investor representative on the Search Committee with the approval of either the Company or the Unsecured Creditors' Committee (the "*Joint Investor Director*"), one (1) of whom (who shall be a Class I Director) shall initially be selected by the Unsecured Creditors' Committee and two (2) of whom (who shall be Class II Directors) shall initially be selected by the Unsecured Creditors' Committee (such directors selected by the Unsecured Creditors' Committee and the Joint Investor Director, being the "*Common Directors*"**). For the avoidance of doubt, ~~the Executive Chairman and the CEO shall be~~**all directors selected in accordance with this paragraph, shall have been interviewed and/or discussed by the Search Committee. Each director so selected shall be appointed to the initial Board of Directors of the Company unless at least three members of the following four members of the Search Committee objects to the appointment of such individual: the Appaloosa representative, the Company representative; the representative of the Unsecured Creditors' Committee; and the representative of the Equity Committee. Initially, the Board shall be comprised of (a) six (6) directors who satisfy all applicable independence requirements of the relevant stock exchange on which it is expected the Common Stock would be traded and (b) six (6) directors who are independent from the Investors; provided, that the requirements of this sentence may be waived by the unanimous consent of the Company, Appaloosa and the Unsecured Creditors Committee. Additionally, the Joint Investor Director must be independent from the Investors.**

**Directors initially will be placed as set forth above in three (3) classes: directors in the first class will have an initial term expiring at the annual meeting of stockholders to be held in 2009 (each a "*Class I Director*"), directors in the second class will have an initial term expiring at the annual meeting of stockholders to be held in 2010 (each a "*Class II Director*"), and directors in the final class will have an initial term expiring at the annual meeting of stockholders to be held in 2011 (each a "*Class III Director*"). After the expiration of each initial term of each class of directors, the directors will thereafter each have a one year term elected annually.**

**Following the initial election of the Executive Chairman and the Chief Executive Officer, the Executive Chairman and Chief Executive Officer shall be nominated for election to the Board by the Nominating and Corporate Governance Committee of the Board**

**and** elected to the board by the holders of the Common Stock and the Preferred Stock, voting as a class.  The Executive Chairman of the Board shall ~~initially~~ be selected as described below under "Executive Chairman." ~~The initial CEO~~  **The initial Chief Executive Officer** shall be Rodney O'Neal, who shall become the ~~CEO~~**Chief Executive Officer** and President not later than the effective date of the ~~plan of reorganization.  The four (4) Common Directors shall be selected by a search committee (the "*Selection Committee*") consisting of a representative of each of Cerberus, Appaloosa, the Unsecured Creditors Committee, the Equity Committee and the Company[1], which selection shall be made by unanimous vote of the Selection Committee with the Appaloosa and Cerberus representatives on the Selection Committee not entitled to vote on such selection.  Thereafter, (i)~~**Plan.**

**After the initial selection of the Series A Directors, until the earlier of the expiration of the term of the Class III Directors and the conversion of all Series A-1 Preferred Stock to Series A-2 Preferred Stock or Common Stock, (a) the Series A Preferred Stock shall continue to directly elect (including removal and replacement) the Series A Directors subject to the ability of the Nominating and Corporate Governance Committee to, by majority vote, veto the selection of up to two proposed Series A Directors for each Series A director position on the Board and (b) the number of directors on the board of directors may not be increased.  The rights of Series A-1 Preferred Stock described in this paragraph are referred to as "*Series A-1 Board Rights*".  Upon the earlier of such date, the Series A-1 Directors shall serve out their remaining term and thereafter be treated as Common Directors.**

**After the initial selection of the Common Directors,** the nominees for election of the Common Directors shall be ~~selected~~**determined** by the Nominating and Corporate Governance Committee of the ~~Board with the Appaloosa and Cerberus representatives on the Committee not entitled to vote on such selection and (ii) any successor Executive Chairman shall be selected as described below under "Executive Chairman."  At least one Common Director shall serve on each committee of the Board subject, in the case of the Audit Committee, to applicable qualification requirements.~~**Company's Board of Directors, with the Series A Directors on such committee not entitled to vote on such determination at any time the Series A-1 Preferred Stock retains Series A-1 Board Rights, and recommended to the Company's Board of Directors for nomination by the Board.  Only holders of Common Stock,** ~~Series B Preferred Stock~~ **and Series A Preferred Stock that is not entitled to Series A Board Rights shall be entitled to vote on the election of the Common Directors.**

---

[1] ~~Company representative shall be John D. Opie, the current lead director of the Company.~~

~~9~~

~~The directors selected by the holders of the Series A Preferred Stock shall be reallocated between the holders of the Series A-1 Preferred Stock and the Series A-2 Preferred Stock as follows if any changes occur in the number of outstanding shares of Series A Preferred Stock: If either series of Series A Preferred Stock represents less than 33 1/3% and 16 2/3% or more of the outstanding shares of Series A Preferred Stock then the series with the fewer number of shares shall elect two (2) directors and the series with the larger number of shares shall elect four (4) directors; if either series of Series A Preferred Stock represents less than 16 2/3% and more than 0% of the Series A Preferred Stock, then the series with the fewer number of shares shall elect one (1) director and the series with the larger number of shares shall elect five (5) directors; and if any series of the Series A Preferred Stock shall cease to be outstanding, then the holders of the other series shall elect all six (6) directors to which the Series A Preferred Stock is entitled (unless both series shall cease to be outstanding).~~ **The Search Committee shall determine by majority vote the Committee assignments of the initial Board of Directors; provided, that for the initial Board and at all times thereafter that the Series A-1 Preferred Stock retains Series A-1 Board Rights at least one Series A Director shall be on all committees of the Board and a Series A Director shall constitute the Chairman of the Compensation Committee of the Board; provided, further, that so long as the Series A-1 Preferred Stock retains Series A-1 Board Rights, the Series A Directors shall not constitute a majority of the Nominating and Corporate Governance Committee. Committee assignments shall be subject to all applicable independence and qualification requirements for directors including those of the relevant stock exchange on which the Common Stock is expected to be traded. Pursuant to a stockholders' agreement or other arrangements, the Company shall maintain that composition.**

**Governance – Executive Chairman:**

~~So long as the Series A Preferred Stock is outstanding, the following provisions shall be effective:~~

The ~~initial~~ Executive Chairman shall ~~be selected by the Selection Committee by a supermajority vote of four of the five members of the Selection Committee, including the affirmative vote of both the Appaloosa and Cerberus representatives.~~**initially be selected by majority vote of the Search Committee, which must include the approval of the representatives of Appaloosa and the Unsecured Creditors' Committee.** Any successor Executive Chairman shall be selected by the Nominating and Corporate Governance Committee ~~with the affirmative approval of the holders~~**of the Board, subject (but only for so long as any** of the Series A-1 Preferred Stock ~~and the Series A-2 Preferred Stock.~~ **remains outstanding) to the approval of the Series A-1 Preferred Stock Holders. Upon approval, such candidate shall be recommended by the Nominating and Corporate Governance**

~~10~~

NEWYORK 6090550 v35 (2K)

NY1:# 3436209

**Committee to the Company's Board of Directors for appointment as the Executive Chairman and nomination to the Board. The Preferred Stock Holders will vote on the candidate's election to the Board on an as-converted basis together with holders of Common Stock. Notwithstanding the foregoing, if there shall occur any vacancy in the office of the Executive Chairman during the initial one (1) year term, the successor Executive Chairman shall be nominated by the Series A-1 Preferred Stock Holders (but only for so long any of as the Series A-1 Preferred Stock remains outstanding) subject to the approval of the Nominating and Corporate Governance Committee of the Board.**

The Executive Chairman shall be a full-time employee of the Company with his or her principal office in the Company's world headquarters in Troy, Michigan and shall devote substantially all of his or her business activity to the business affairs of the Company.

The Executive Chairman ~~may be removed at any time by the affirmative vote of all of the holders of the Series A Preferred Stock.~~

~~The Executive Chairman~~ shall cause the Company to and the Company shall be obligated to meaningfully consult with the representatives of the ~~holders of the~~ Series A**-1** Preferred Stock **Holders** with respect to the annual budget and material modifications thereto prior to the time it is submitted to the Board for approval.

The employment agreements entered into by the Company with the Executive Chairman and the Chief Executive Officer shall provide that (i) upon any termination of employment, the Executive Chairman and/or the Chief Executive Officer shall resign as a director (and the employment agreements shall require delivery at the time such agreements are entered into of an executed irrevocable resignation that becomes effective upon such termination) and (ii) the right to receive any payments or other benefits upon termination of employment shall be conditioned upon such resignation. If for any reason the Executive Chairman or the Chief Executive Officer does not resign or the irrevocable resignation is determined to be ineffective, then the ~~holders of the~~ Series A**-1** Preferred Stock~~, acting together as a single class,~~ **Holders** may remove the Executive Chairman and/or Chief Executive Officer as a director~~.~~**, subject to applicable law. The employment**

**agreement of the Chief Executive Officer will provide that if the Chief Executive Officer is not elected as a member of the Company's Board, the Chief Executive Officer may resign for "cause" or "good reason".**

**The special rights of the Series A-1 Preferred Stock referred to in "Governance – Board of Directors" and in this "Executive Chairman" section are referred to as the "*Governance Rights*".**

| | |
|---|---|
| **Governance – Voting Rights:** | Except with respect to the election of directors, who shall be elected as specified above, the ~~holders of the~~ Preferred Stock **Holders** shall vote, on an "as converted" basis, together with the holders of the Common Stock, on all matters submitted to shareholders. |

~~Until the Liquidation Value of the Preferred Stock beneficially owned by Appaloosa and Cerberus together with all Common Stock directly owned by Appaloosa and Cerberus (valued for this purpose at the Plan Value of $45.00 per share) is less than $600 million, the following Governance – Voting Rights shall be in effect:~~

~~The holders of the Series A Preferred Stock shall have the right to select, and to cause the Company to terminate, the Chief Executive Officer, the Chief Operating Officer and the Chief Financial Officer of the Company.    The majority of the members of the Company's compensation committee shall initially be made up of directors designated by Cerberus and Appaloosa.  Pursuant to a stockholder agreement or other arrangements, the Company shall agree to maintain that majority.~~

**The Series A-1 Preferred Stock Holders shall be entitled to propose individuals for appointment as Chief Executive Officer and Chief Financial Officer, subject to a vote of the Board.  The Series A-1 Preferred Stock Holders shall also have the non-exclusive right to propose the termination of the Executive Chairman (but only during the initial one (1) year term of the Executive Chairman and only for so long as the Series A-1 Preferred Stock remains outstanding), the Chief Executive Officer and Chief Financial Officer, in each case, subject to a vote of the Board.  If the Series A Preferred Stock Holders propose the appointment or termination of the Chief Executive Officer or Chief Financial Officer, the Board shall convene and vote on such proposal within ten (10) days of the Board's receipt of notice from the Series A-1 Preferred Stock Holders; provided, that the then current Chief Executive Officer shall not be entitled to vote on either the appointment or termination of the Chief Executive Officer and shall not be entitled to vote on the**

**termination of the Chief Financial Officer.**

The Company shall not, and shall not permit its subsidiaries to, take any of the following actions (subject to customary exceptions as applicable) unless (i) the Company shall provide the ~~holders of the~~ Series A**-1** Preferred Stock **Holders** with at least 20 business days advance notice and (ii) it shall not have received, prior to the 10th business day after the receipt of such notice by the ~~holders of~~ Series A**-1** Preferred Stock **Holders**, written notice from all of the ~~holders of the~~ Series A**-1** Preferred Stock **Holders** that they object to such action:

- any action to liquidate the Company;

- any ~~new debt or lease financing or guarantees in excess of $100 million in any twelve-month period after the Issue Date;~~**amendment of the charter or bylaws that adversely affects the Series A Preferred Stock (any expansion of the Board of Directors would be deemed adverse); or**

- ~~the grant of any new lien, mortgage or security interest in any assets having a value in excess of $100 million in any twelve-month period after the issue Date;~~**at all times that the Series A Preferred Stock is subject to the Transfer Restriction:**

    - a sale, transfer or other disposition of all or substantially all of the assets of the Company and its subsidiaries, on a consolidated basis;

    - any merger or consolidation involving a change of control of the Company;**or**

    - any acquisition of or investment in any other person or entity having a value in excess of $~~100~~**250** million in any twelve-month period after the Issue Date~~;~~**.**

    - ~~any action to liquidate the Company;~~

    - ~~any issuance of equity securities or rights to acquire equity securities at less than fair market value;~~
    **The approval rights set forth above shall be in addition to the other rights set forth above and any voting rights to which the Series A Preferred Stock Holders are entitled above and under Delaware law.**

~~13~~

**NEWYORK 6090550 v35 (2K)**

NY1:# 3436209

**In a merger or consolidation involving a change of control of the Company (a "_Change of Control_"), the Series A-1 Preferred Stock will be converted into the greater of (i) the consideration with a value equal to the fair market value of the Series A-1 Preferred Stock (or a preferred security of equivalent economic value), such fair market value shall not reflect the value of the Voting Rights and Governance Rights attributable to the Series A-1 Preferred Stock, and (ii) the Liquidation Value.  In a Change of Control transaction, the Series B Preferred Stock will be converted into the greater of (i) the consideration with a value equal to the fair market value of the Series B Preferred Stock (or a preferred security of equivalent economic value) and (ii) the Liquidation Value.**

**The special rights of the Series A-1 Preferred Stock described above in this section "Governance – Voting Rights" are referred to as the "_Voting Rights_".  The Series A-1 Preferred Stock Holders shall have no Voting Rights after no shares of Series A-1 Preferred Stock are outstanding.**

**Appaloosa and the Permitted Holders shall not receive, in exchange for the exercise or non-exercise of voting or other rights in connection with a any transaction subject to Voting Rights, any compensation or remuneration; provided, that this restriction shall not prohibit the reimbursement of expenses incurred by Appaloosa or any Permitted Holders and shall not prohibit the payment of fees by the Company to Appaloosa or any Permitted Holder if the Company has engaged Appaloosa or its affiliates as an advisor or consultant in connection with any such transaction.**

- other than pursuant to any conversion provisions set forth herein, any redemption, repurchase or other acquisition of shares of capital stock involving aggregate payments in excess of $10 million in any twelve month period after the Issue Date;

- payment of any dividends in cash or other assets (other than additional shares of Common Stock); or

- any amendment of the charter or bylaws.

The approval rights set forth above shall be in addition to the other voting rights set forth above and any voting rights to which the holders of the shares of Series A Preferred Stock are entitled under Delaware law; provided, however, in a merger or consolidation involving a change of control of the Company, the Series A Preferred Stock will be converted into the greater of (i) the consideration with a value equal to the fair market value of the Series B Preferred Stock into which such Series A Shares are then convertible (or a preferred security of equivalent economic value) and (ii) the Liquidation Preference.

14

NEWYORK 6090550 v35 (2K)

NY1:# 3436209

These limitations shall not apply to debt or lease financing or guarantees or lien, mortgage or security interests which constitute refinancings, replacements and extensions thereof that are (i) on prevailing market terms with respect to the economics thereof and (ii) on substantially the same terms (including with respect to the obligors, tenor, security and ranking) as the obligations being refinanced, replaced or extended with respect to other terms.

The Series B Preferred Stock shall be identical in all respects to Series A Preferred Stock except the Series B Preferred Stock shall have no voting rights other than (i) the right to vote, together with the Common Stock as one class on an "as converted basis" on all matters submitted to the Common Stock (subject to restrictions on voting by holders of Series A Preferred Stock for Common Directors as set forth above) and (ii) as required by law.

Appaloosa and Cerberus shall not receive compensation or remuneration of any kind in connection with their exercise or non-exercise of voting or other rights under the Series A Preferred Stock.

| | |
|---|---|
| **Reservation of Unissued Stock**: | The Company shall maintain sufficient authorized but unissued securities of all classes issuable upon the conversion or exchange of shares of Preferred Stock and Common Stock. |
| **Transferability** ~~and Right of First Offer~~: | **The Series A Preferred Stock** Holders ~~of Series A Preferred Stock~~ may sell or otherwise transfer such stock as follows: |

- to any Permitted Holder**; or**

- **subject to the Transfer Restriction,** to any other person ~~subject to the right of first offer provided below~~; provided, however, that upon any such transfer, the shares of **Series A-1** Preferred Stock so transferred shall automatically convert into ~~shares of~~ Series B**A-2** Preferred Stock.

If any transfer or conversion of Series A Preferred Stock would result in the holders of the Series A Preferred Stock owning insufficient shares of Series A Preferred Stock to avoid the mandatory conversion of the Series A Preferred Stock, then the other holders of Series A Preferred Stock shall have the right to purchase the shares of Series A Preferred Stock proposed to be transferred or converted at a purchase price equal to the Current Market Value. The selling holder shall give the other holders at least 15 days' notice of a proposed transfer or conversion to which these rights apply. Upon such notice, the holders may elect to purchase the shares, *pro rata,* on the terms offered within 15 days following the date of such notice.

-

NEWYORK 6090550 v35 (2K)

NY1:# 3436209

**Registration**

**Rights**:

The Investors shall be entitled to registration rights as set forth below.  The registration rights agreement shall contain customary terms and provisions consistent with such terms, including customary hold-back, cutback and indemnification provisions.

Demand Registrations.  ~~The holders of~~**Subject to the Transfer Restriction,** the Preferred Stock **Holders** shall be entitled to ~~four demand registrations~~**an aggregate of five (5) demand registrations, in addition to any shelf registration statement required by the Equity Purchase and Commitment Agreement among the Company and the Investors (which shelf registration shall be renewed or remain available so long as the Company is not eligible to use Form S-3)**; provided**, that all but one such demand right requires the prior written consent of Appaloosa and the one demand not requiring the consent of Appaloosa shall be at the request of the holders of a majority of the shares of** Series B Preferred Stock**; provided, further,** that following the time that the Company is eligible to use Form S-3, the ~~holders~~**Preferred Stock Holders** shall be entitled to an unlimited number of demand registrations **(without the need for Appaloosa's consent)**.  Any demand registration may, at the option of the ~~holder~~**Preferred Stock Holders** be a "shelf" registration pursuant to Rule 415 under the Securities Act of 1933.  All registrations will be subject to customary "windows.~~"~~**"**

Piggyback Registrations.  In addition, ~~the holders~~**subject to the Transfer Restriction, the Preferred Stock Holders** shall be entitled to unlimited piggyback registration rights, subject to customary cut-back provisions.

Registrable Securities:  The Series B Preferred Stock, any shares of Common Stock issuable upon conversion of the Preferred Stock ~~or the Series B Preferred Stock~~, any other shares of Common Stock held by any Investor (including shares acquired in the rights offering or upon the exercise of preemptive rights), and any additional securities issued or distributed by way of a dividend or other distribution in respect of any securities.  Securities shall cease to be Registrable Securities upon sale to the public pursuant to ~~an~~**a** registration statement or Rule 144, or when all shares held by an Investor may be transferred without restriction pursuant to Rule 144(k).

Expenses.  All registrations shall be at the Company's expense (except underwriting fees, discounts and commissions agreed to be paid by the selling holders), including, without limitation, fees and expenses of one

~~16~~

counsel for any holders selling Registrable Securities in connection with any such registration.

| | |
|---|---|
| **Preemptive Rights:** | So long as ~~Cerberus and Appaloosa beneficially own, in the aggregate~~ **shares of** Series A~~-~~**1** Preferred Stock ~~with~~**having** a Liquidation Value of $250 million or more **remain outstanding**, the ~~holders of~~ Preferred Stock **Holders** shall be entitled to participate *pro rata* in any offering of equity securities of the Company, other than with respect to (i) shares issued or underlying options issued to management and employees and (ii) shares issued in connection with business combination transactions. |

**Commitment Fee:** **(a) A commitment fee of 2.25% of total commitment shall be earned by and payable to the Investors and (b) an additional arrangement fee of 0.25% of total commitment shall be earned by and payable to Appaloosa, all as provided for in the EPCA.**

| | |
|---|---|
| ~~**Commitment Fee:**~~**Standstill** | ~~A commitment fee of $21 million shall be earned by and payable to the Investors as provided in the Discussion Points~~**For a period of five (5) years from the Closing Date, Appaloosa will not (a) acquire, offer or propose to acquire, solicit an offer to sell or donate or agree to acquire, or enter into any arrangement or undertaking to acquire, directly or indirectly, by purchase, gift or otherwise, record or direct or indirect beneficial ownership (as such term is defined in Rule 13d-3 of the Exchange Act) of more than 25% of the Company's common stock or any direct or indirect rights, warrants or options to acquire record or direct or indirect beneficial ownership of more than 25% of the Company's common stock or (b) sell, transfer, pledge, dispose, distribute or assign ("*Transfer*") to any person in a single transaction, Company Common Stock or any securities convertible into or exchangeable for or representing the right to acquire the Company's Common Stock ("*Common Stock Equivalents*") representing more than 15% of the Company's then issued and outstanding (on a fully diluted basis) Common Stock; provided, that Appaloosa shall be permitted to Transfer the Company's Common Stock or Common Stock Equivalents (i) to Permitted Holders, (ii) as part of a broadly distributed public offering effected in accordance with an effective registration statement, (iii) in a sale of the Company, (iv) pursuant to any tender or exchange offer or (v) as otherwise approved by (A) during the initial three year term of the Series A Directors, a majority of Directors who are not Series A Directors or (B) after the initial three year term of the Series A Directors, a majority of the Directors (customary exceptions shall apply for Transfers to partners, stockholders, family members and trusts and Transfers pursuant to the laws of succession, distribution and descent)**. |
| **Stockholders Agreement:** | Certain of the provisions hereof will be contained in a Stockholders Agreement to be executed and delivered by ~~the Investors~~**ADAH** and the |

~~17~~

Company on the ~~Issue~~**Effective** Date.

**Governing Law**:   State of Delaware

Redline of Article 6 Of Original PSA Against Exhibit B (Plan Framework And Special Statutory
<u>Committee Provisions Framework Provisions) To Delphi-Appaloosa EPCA</u>

EXECUTION COPY

commercial relationship between Delphi and GM; (i) the wind-down of certain Delphi facilities and the sales of certain Delphi business lines and sites; (j) the Debtors' support for GM's efforts to resource products purchased by GM; (k) licensing of the Debtors' intellectual property to GM or for its benefit; (l) treatment of the Environmental Matters Agreement between Delphi and GM; (m) treatment of normal course items, such as warranty, recall and product liability obligations; and (n) treatment of all other executory contracts between the Debtors and GM.  The Parties agree to negotiate in good faith all of the documents and transactions described in this Article (it being understood that (i) no Party has any obligation to enter into any such documents or consummate any such transactions and (ii) the delivery by any Party of a termination notice pursuant to Section 3.1(b) hereof shall not constitute a breach of this Article V).

ARTICLE VI

PLAN FRAMEWORK

## PLAN FRAMEWORK AND SPECIAL STATUTORY COMMITTEE PROVISIONS

### FRAMEWORK PROVISIONS

The Plan shall contain all of the following terms; provided, however, that nothing herein shall constitute an offer with respect to any securities or a solicitation of acceptances of a chapter 11 plan.  Such offer or solicitation only will be made in compliance with all applicable securities laws and/or provisions of the Bankruptcy Code:

1.1  6.1 A condition precedent to the effectiveness of the Plan (subject to the waiver provisions to be negotiated in connection with the Plan) shall be that the aggregate amount of all trade claims and other unsecured claims (including any accrued interest) (excluding (i) unsecured funded debt claims, (ii) Flow-Through Claims (defined below), (ii) GM claims, which shall be treated as set forth below, and (iii) subordinated debt claims, which shall be treated as set forth below, and (iv) securities claims, which shall be treated as set forth below) (collectively, the "Trade and Other Unsecured Claims") that have been asserted or scheduled but not yet disallowed as of the effective date of the Plan shall be allowed or estimated for distribution purposes by the Bankruptcy Court to be no more than $1.7 billion, excluding all allowed accrued postpetition interest thereon.

1.2  6.2 All senior secured debt shall be refinanced and paid in full and all allowed administrative and priority claims shall be paid in full.

1.3  6.3 Trade and Other Unsecured Claims and unsecured funded debt claims shall be placed in a single class.  All such claims that are allowed (including all allowed accrued interest, which for trade claims shall be at a rate to be agreed to or determined by the Bankruptcy Court, it being understood that with respect to trade claims, the Debtors and Plan Investors will not take the position that there should not be an entitlement to postpetition interest) shall be satisfied in full with (a) $810 million3.48 billion of common stock (18,000,00077.3 million out of a total of

EXECUTION COPY

135,285,714147.6 million shares,[1] at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi and (b) the balance in cash[2]; provided, however, that the common stock and cash to be distributed pursuant to the immediately preceding clause shall be reduced proportionately by the amount that allowed Trade and Other Unsecured Claims are less than $1.7 billion., excluding allowed accrued postpetition interest thereon.

1.4      6.4 (i) Customer and environmental obligations, (ii) employee-related (excluding collective bargaining-related obligations) and other obligations (in each instance as to be agreed by the Debtors and the Plan InvestorsAppaloosa) and (iii) litigation exposures and other liabilities that are covered by insurance (as to be agreed by the Debtors and the Plan InvestorsAppaloosa and scheduled in the Plan) ((i), (ii) and (iii) together, the "Flow-Through Claims") will be unimpaired and will be satisfied in the ordinary course of business (subject to the preservation and flow-through of all estate rights, claims and defenses with respect thereto which shall be fully reserved).

1.5      6.5 GM will receive an allowed general unsecured claim for all claims and rights of GM and its affiliates (excluding in respect of the 414(l) Assumption, all Flow Through Claims and all other claims and amounts to be treated in the normal course or arising or paid pursuant to the Delphi/GM Definitive Documents) that will be satisfied with (a) 7,000,000 out of a total of 135,285,714 shares of common stock in reorganized Delphi and (b) $2.63$2.70 billion in cash.

1.6      6.6 All Delphi subordinated debt claims (including all accrued interest) will be allowed and will be satisfied with (a) $450 thereon) will be allowed and, in resolution of the subordination rights of Delphi senior debt, all cash otherwise distributable to Delphi subordinated debt claims pursuant to Section 1.3 shall be distributed to Delphi senior debt, and the allowed Delphi subordinated debt claims will be satisfied with $478 million of common stock (10,000,00010.6 million out of a total of 135,285,714147.6 million shares, at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi and (b) the balance in cash.

1.7      6.7 AllowedAny allowed securities claims, including all claims in the MDL litigation pending in the United States District Court for the Eastern District of Michigan, will be satisfied solely from available insurance or as otherwise agreed by the Plan InvestorsDelphi and Appaloosa.

1.8      6.8 Holders of existingThe equity securities class in Delphithe Plan shall receive, in the aggregate, (ai) $13566 million of common stock (3,000,0001.5 million out of a total of 135,285,714147.6 million shares, at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi and, (bii) rights to purchase 63,000,00045.6 million out of a total of 135,285,714147.6 million shares of common stock (to be reduced by the guaranteed minimum

---

[1]      Inclusive of distributions to subordinated creditors under Section 1.6 below.  References in this Article VIherein to the total number of shares of common stock gives effect to the conversion of the preferred stock issued pursuant to the Investment Agreement to common stock.  The actual number of shares of common stock to be issued by Delphi and to be distributed to various classes is subject to final adjustment and reconciliation as well as negotiation of plan distribution mechanics in the Plan.

[2]      Such amounts to be adjusted by proceeds from the par rights offering to be conducted by Delphi in connection with Section 1.8(iv).

EXECUTION COPY

of 10% of the rights for the Plan Investors) in reorganized Delphi for $~~2.205~~1.75 billion (exercise price: $~~35/share).~~38.39/share), (iii) 5-year warrants to purchase for $45/share an additional 5% of the common stock of Delphi, and (iv) the right to purchase on a proportionate basis, approximately $522 million of the common stock that would otherwise be distributable to unsecured claims plus an additional $50 million of the common stock that would otherwise be distributable to Appaloosa (each pursuant to Section 1.3) for a price of $45/share (the "par rights offering"); provided, that Appaloosa (in its capacity as a stockholder of Delphi) shall agree not to participate in the par rights offering and shall use commercially reasonable efforts to obtain such agreement from the other Plan Investors.[3]

1.9   ~~6.9~~ The preferred stock to be issued pursuant to the Plan in connection with the Investment Agreement and the corporate governance of Reorganized Delphi shall be subject to the terms listed on the term sheet attached to the Investment Agreement ("Summary of Terms of Preferred Stock"), which are incorporated by reference herein.

1.10   ~~6.10~~ Delphi will arrange for payment on the effective date of the Plan of $3.5 billion to fund its pension obligations. Such payment will include GM taking up to $2.0 billion of net pension obligations pursuant to a 414(l) transaction (the "414(l) Assumption"), which amount shall be reduced to no less than $1.5 billion if (a) Delphi ~~and the Plan Investors~~or Appaloosa determine that any greater amount will have an adverse impact on the Debtors or (b) ~~the Plan Investors determine~~Appaloosa determines that any greater amount will have an adverse impact on the Plan Investors' proposed investment in the Debtors. GM will receive a note from Delphi in the amount of the 414(l) Assumption transferred in the 414(l) transaction, subject to agreed market terms to be specified in the Delphi/GM Definitive Documents; provided, however, that such note will be due, payable and paid in full at par plus accrued interest in cash within ten (10) days following the effective date of the Plan.

1.11   ~~6.11~~ A joint claims oversight committee shall be established on the effective date of the Plan or as soon thereafter as practicable to monitor claims administration, provide guidance to the Debtors, and address the Bankruptcy Court if such post-effective date joint claims oversight committee disagrees with the Debtors' determinations requiring claims resolution. The composition of the joint claims oversight committee shall be reasonably satisfactory to ~~the Plan Investors in their sole and absolute discretion~~Appaloosa, but in any case, shall include at least one representative appointed by ~~the Plan Investors~~Appaloosa.

*6.12   Reorganized Delphi will be subject to the following corporate governance provisions:*

a.   A five-member selection committee (the "Selection Committee") will select a new executive chair of reorganized Delphi. The Selection Committee will consist of the following members: (i) John D. Opie, currently a member of Delphi's board of directors and its lead independent director; (ii) one (1) representative appointed by the statutory committee of

---

[3]   Inclusion in the Plan of subsections 1.8 (iii) and (iv) is conditioned upon the "Equity Committee" (as defined below) supporting entry of the Approval Order and there not occurring a "Withdrawal of Support" (as defined below). The rights in the par rights offering are to be equivalent to 15% of the common stock that would otherwise be distributable to all unsecured claims plus an additional $50 million of the common stock that would otherwise be distributable to Appaloosa on mechanics to be agreed.

EXECUTION COPY

~~unsecured creditors appointed in the Chapter 11 Cases; (iii) one (1) representative appointed by the statutory committee of equity security holders appointed in the Chapter 11 Cases; and (iv) two (2) representatives appointed by the Plan Investors.  The new executive chair will be chosen by a super majority of four (4) of the five (5) members of the Selection Committee, which must include both representatives appointed by the Plan Investors.~~

~~b.        The board of directors of reorganized Delphi will consist of twelve (12) members:  (i) the new executive chair; (ii) Rodney O'Neal, who will be appointed chief executive officer and president of reorganized Delphi not later than the effective date of the Plan; (iii) four (4) members (who may include one (1) existing independent director) chosen by a unanimous vote of the Selection Committee, provided, however, that the representatives of the Selection Committee appointed by the Plan Investors will not be entitled to vote on these four (4) directors (the "Common Directors"); (iv) three (3) members chosen by Appaloosa; and (v) three (3) members chosen by Cerberus.  All twelve (12) new directors will be publicly identified not later than the day that is ten (10) days prior to the date scheduled for the hearing of the Bankruptcy Court to confirm the Plan.  The board of directors of reorganized Delphi will satisfy all applicable exchange/NASDAQ independence requirements.~~

<u>1.12</u>    ~~c.~~ Ongoing management compensation, including the SERP, stock options, restricted stock, severance, change in control provisions and all other benefits will be on market terms (as determined by the Board of Directors, based on the advice of Watson-Wyatt, and such management compensation plan design shall be described in the Disclosure Statement and included in the Plan) and reasonably acceptable to ~~the Plan Investors~~<u>Appaloosa</u>; claims of former management and terminated/resigning management will be resolved on terms acceptable to Delphi and ~~the Plan Investors~~<u>Appaloosa</u> or by court order.  Equity awards will dilute all equity interests <u>pro</u> <u>rata</u>.

<u>1.13</u>    ~~d.~~ The amended and restated certificate of incorporation of Delphi to be effective immediately following the effective date of the Plan shall prohibit~~;~~<u>:</u> (A) for so long as Appaloosa ~~or Dolce Investments, LLC ("Dolce"), as the case may be,~~ owns any shares of Series A Preferred Stock, any transactions between Delphi or any of its Subsidiaries (as defined in the Investment Agreement), on the one hand, and Appaloosa or ~~Dolce or their~~<u>its</u> respective Affiliates (as defined in the Investment Agreement)~~, as the case may be~~, on the other hand (including any "going private transaction" sponsored by Appaloosa ~~or Dolce~~) unless such transaction shall have been approved by ~~(x)~~ directors constituting not less than 75% of the number of Common Directors (as defined in the Investment Agreement)~~and (y) in the case of any transaction with Appaloosa or its Affiliates, Dolce, and in the case of any transaction with Dolce or its Affiliates, Appaloosa~~, and (B) any transaction between Delphi or any of its Subsidiaries, on the one hand, and a director, on the other hand, other than a director appointed by holders of Series A Preferred Stock (as defined in the Investment Agreement), unless such transaction shall have been approved by directors having no material interest in such transaction (a "<u>Disinterested Director</u>") constituting not less than 75% of the number of Disinterested Directors~~; provided, that nothing in this provision shall require any approval of any arrangements in effect as of December 18, 2006 with either General Motors Acceptance Corporation ("GMAC") or GM as a result of the ownership by Dolce and its Affiliates of securities of GMAC or Dolce's and its Affiliates' other arrangements in effect as of December 18, 2006 with GM with respect to GMAC~~.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
   In re                       :   Chapter 11
:
DELPHI CORPORATION, et al.,     :   Case No.  05 - 44481 (RDD)
:
           Debtors.     :   (Jointly Administered)
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER AUTHORIZING AND APPROVING DELPHI-APPALOOSA
EQUITY PURCHASE AND COMMITMENT AGREEMENT
PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), 503(b), AND 507(a)

("DELPHI-APPALOOSA INVESTMENT AND PLAN SUPPORT ORDER")

Upon the motion (the "Motion")[1], dated July 18, 2007, of Delphi Corporation ("Delphi")

and certain of its domestic subsidiaries and affiliates, debtors and debtor-in-possession

(collectively, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"), for an order

authorizing and approving the entry into the Equity Purchase and Commitment Agreement (the

"Delphi-Appaloosa EPCA") and associated Investment Proposal Letter (the "Proposal Letter")

and Commitment Letters (the "Commitment Letters," and together with the Proposal Letter and

Delphi-Appaloosa EPCA, the "Investment Agreements")[2] pursuant to sections 105(a), 363(b),

503(b), and 507(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended and

in effect on October 8, 2005 (the "Bankruptcy Code"); and the Court having reviewed the

Motion and having heard the statements of counsel and the evidence presented regarding the

relief requested in the Motion at a hearing before the Court (the "Hearing"); and due and

---

[1]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[2]     The Investment Agreements are attached to this order as Exhibit 1.

appropriate notice of the Motion having been given in accordance with this Court's Order To

Show Cause Why Motion For Order Authorizing And Approving Delphi-Appaloosa Equity

Purchase And Commitment Agreement Pursuant To 11 U.S.C. §§ 105(a), 363(b), 503(b), And

507(a)  Should Not Be Granted, entered on July [19], 2007; and sufficient cause appearing

therefor; now, therefore,

IT IS HEREBY FOUND AND DETERMINED THAT:[3]

1.    <u>Jurisdiction</u>.  This Court has core jurisdiction over the Chapter 11 Cases, the

Motion, this order, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b)

and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The

statutory predicates for the relief requested herein are sections 105(a), 363(b), 503(b), 507(a),

and 1125(e) of the Bankruptcy Code.

2.    <u>Notice</u>.  The notice given by the Debtors of the Motion and the Hearing

constitutes proper, timely, adequate, and sufficient notice thereof and complies with the

Bankruptcy Code, the Bankruptcy Rules, and applicable local rules, and no other or further

notice is necessary.

3.    <u>Findings</u>.

(a)    On October 8 and October 14, 2005, the Debtors commenced the Chapter

11 Cases for the purpose of restructuring their businesses and related financial obligations

pursuant to an overall transformation strategy (the "Transformation Plan") that would

incorporate the following structural components:

(i)    Modification of the Debtors' labor agreements;

---

[3]    This Order constitutes the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, as made
applicable herein by Bankruptcy Rules 7052 and 9014.  Any and all findings of fact shall constitute
findings of fact even if stated as conclusions of law, and any and all conclusions of law shall constitute
conclusions of law even if stated as findings of fact.

(ii)    Resolution of all issues and disputes between the Debtors and General Motors Corporation ("GM") and its subsidiaries and affiliates regarding (A) certain legacy obligations, including allocating responsibility for various pension and other post-employment benefit obligations; (B) all alleged claims and causes of action arising from the spin off of Delphi from GM; (C) costs associated with the transformation of the Debtors' businesses (including the establishment of support to be provided by GM in connection with certain of those businesses that the Debtors intend to shut down or otherwise dispose of); (D) the restructuring of ongoing contractual relationships with respect to continuing operations; and (E) the amount and treatment of GM's claims in the Chapter 11 Cases (together, the "Designated Issues");

(iii)    Development of a strategically focused product portfolio and realignment of production capacity to support it;

(iv)    Transformation of the Debtors' work force in keeping with a sustainable cost structure and streamlined product portfolio;

(v)    Resolution of the Debtors' pension issues; and

(vi)    Restructuring of the Debtors' balance sheet to accommodate the transformed business.

(b)    The Debtors continue to operate their respective businesses and manage their respective properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.  Pursuant to an Order of this Court, the Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered.

3

(c)    Pursuant to its authority under section 1102 of the Bankruptcy Code, the
United States Trustee for the Southern District of New York appointed the Creditors'
Committee and the Equity Committee in the Chapter 11 Cases.

(d)    In the summer of 2006, Appaloosa Management L.P. ("Appaloosa") and
Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), as significant stakeholders
of the Debtors, and other potential investors negotiated and entered into non-disclosure
agreements with the Debtors pursuant to which they obtained certain information from
and about the Debtors and their businesses and engaged in discussions regarding various
potential reorganization structures and related matters, including the potential
requirement for a substantial equity investment in Delphi to facilitate the Debtors'
restructuring.

(e)    As a result of those discussions, on December 18, 2006, Delphi filed a
motion (the "Original Approval Motion") seeking approval of the plan framework
support agreement among Delphi, Appaloosa, Cerberus Capital Management, L.P.
("Cerberus"), Harbinger, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill"),
GM, and UBS Securities LLC ("UBS"), dated as of December 18, 2006 (as amended by
the Amendment and Supplement to the Plan Framework Support Agreement, dated as of
January 18, 2007, the "Original PSA"), and equity purchase and commitment agreement
among Delphi, affiliates of Appaloosa, Harbinger, and Cerberus, Merrill, and UBS, dated
as of January 18, 2007 (as amended by (i) a Supplement to the Equity Purchase and
Commitment Agreement dated as of January 18, 2007 and (ii) an Amendment to the
Equity Purchase and Commitment Agreement, dated February 29, 2007, the "Original
EPCA").

4

(f)    After holding a contested evidentiary hearing on the Original Approval Motion on January 11 and 12, 2007, and considering the evidentiary record, the objections to the relief requested, and the arguments of counsel, the Bankruptcy Court overruled all objections not withdrawn or settled and entered its order granting the relief requested by the Debtors in the Original Approval Motion as it was modified at the hearing (the "Original Approval Order").

(g)    On July 7, 2007, the Original EPCA was terminated pursuant to section 12(g) and the Original PSA was correspondingly terminated.  Due the Delphi's termination of the Original EPCA under section 12 (g), no Alternate Transaction Fee (as defined in the Original EPCA) is due and owing to the Original Plan Investors.  After the termination of the Original EPCA, Delphi continued discussions with potential investors.

(h)    The parties subsequently agreed on a proposed equity investment by certain affiliates of Appaloosa, Harbinger, Pardus Capital Management L.P. ("Pardus"), Merrill, UBS, and Goldman Sachs & Co.("GS") (GS, together with Merrill, UBS, and certain affiliates of Appaloosa, Harbinger, and Pardus, the "Investors") in Delphi (the "Investment").

(i)    The Investment, which would be an integral component of the Plan, will be made pursuant to the Delphi-Appaloosa EPCA, which sets forth the terms and conditions under which the Investors would (i) purchase any unsubscribed shares issued under a rights offering of new common stock of Delphi to be issued pursuant to the Plan and (ii) purchase newly issued shares of common stock and preferred stock of Delphi.

(j)    In connection with the Delphi-Appaloosa EPCA, Appaloosa, Harbinger, and Pardus (collectively, the "Commitment Parties," and together with the Investors, the

5

"Plan Investors") will provide the Commitment Letters to the Investors and Delphi,
pursuant to which each Commitment Party will provide funding to the Investors under
the terms and subject to the limitations set forth in the Commitment Letters.

(k)    The Investment Agreements are fair and equitable to all parties.

(l)    The Debtors' decision to enter into the Investment Agreements is a sound
exercise of their business judgment, is consistent with their fiduciary duties, and is based
on good, sufficient, and sound business purposes and justifications.

(m)    The Investment Agreements were negotiated at arms' length and in good
faith.

(n)    The Investment Agreements are fair, reasonable, and in the best interests
of the Debtors, their estates, shareholders, creditors, and all parties-in-interest.

(o)    The provisions in the Delphi-Appaloosa EPCA for the payment of the
indemnities provided in Section 10 of the EPCA (the "Indemnity"), the Transaction
Expenses, the Commitment Fees, the Arrangement Fee, and the Alternate Transaction
Fee (each as defined in the Delphi-Appaloosa EPCA) are integral parts of the transactions
contemplated by the Delphi-Appaloosa EPCA, without any one of which the Plan
Investors would not enter into the Investment Agreements.

(p)    The incurrence of the Indemnity, the Transaction Expenses, the
Commitment Fees, the Arrangement Fee, the Alternate Transaction Fee, and any damage
claims ("Damage Claims") that may arise against the Debtors pursuant to the terms of the
Delphi-Appaloosa EPCA shall be deemed to have been incurred in good faith, as such
term is used in section 363(m) of the Bankruptcy Code, and the priorities extended to the

6

Plan Investors pursuant to this order (as described below) shall be entitled to all of the

protections provided herein or otherwise contemplated hereby.

(q)      The relief requested in the Motion is in the best interests of the Debtors,

their estates, shareholders, creditors, and all parties-in-interest.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND

DECREED THAT:

1.      The Motion is GRANTED in its entirety, and shall not be subject to stay under

Bankruptcy Rule 6004(g).

2.      Any objection to the Motion not withdrawn or otherwise resolved as set forth in

this order is hereby overruled.

3.      Pursuant to sections 105(a), 363(b), 503(b), and 507(a) of the Bankruptcy Code,

the Debtors and the applicable Plan Investors are hereby authorized, but not directed, to execute,

deliver, and implement the Investment Agreements and all exhibits and attachments thereto, and

to take any and all actions necessary and proper to implement the terms of the Investment

Agreements, and such agreements and documents shall be binding and enforceable against the

Debtors, their estates, and the other parties thereto in accordance with their terms and subject to

the conditions contained therein.

4.      The Debtors are authorized to pay the Indemnity (if applicable), the Transaction

Expenses, the Commitment Fees, the Arrangement Fee, the Alternate Transaction Fee (if

applicable), and any Damage Claim (if applicable, and to the extent allowed), each in accordance

with its terms and as and when required by the Investment Agreements, except as otherwise

provided below, without further order of the Court.  The Debtors are authorized to make all other

payments to or for the benefit of the Plan Investors as and when required by the Investment

Agreements and any exhibit, schedule or attachment thereto, on the terms set forth therein,

without further order of the Court.  Any such payments shall be fully earned when paid, non-

refundable, and not subject to avoidance or disgorgement under any theory at law or in equity;

provided, however, that notwithstanding the foregoing, so long as the Creditors' Committee shall

support the Investment Agreements and the transactions contemplated thereby, the Plan Investors

shall provide to the Creditors' Committee an itemization of any Transaction Expenses for which

payment is being sought, together with appropriate back-up therefor, and 90% of such

Transaction Expenses shall be paid in accordance with the terms of the Investment Agreements

as and when required thereby without further order of the Court, with the remaining 10% (the

"Holdback") to be paid ten days subsequent to the delivery of such itemization and backup to the

Creditors' Committee, unless prior to the expiration of such ten-day period, the Creditors'

Committee objects to any of the amounts submitted for payment, in which case an amount equal

to the amount of Transaction Expenses objected to (up to the maximum amount of the Holdback)

shall be retained and not paid to the Investors pending resolution of the dispute with the

Creditors' Committee or further order of the Court, and subject to further to the U.S. Trustee's

review.

5.       Each of the Indemnity (if applicable), the Transaction Expenses, the Commitment

Fees, the Arrangement Fee, the Alternate Transaction Fee (if applicable), and any Damage Claim

against the Debtors (if applicable) provided for or permitted by the Investment Agreements shall

constitute allowed claims pursuant to sections 503(b)(1)(A) and 507(a)(1) of the Bankruptcy

Code and shall be paid as and when provided for in the Investment Agreements without further

application to or order of the Bankruptcy Court except that (i) in the case of any Damage Claim

against the Debtors provided for or permitted by the Investment Agreements, such Damage

Claim shall be allowed in the amount determined by the Bankruptcy Court after notice and a

hearing, (ii) in the case of any Indemnity claim against the Debtors provided for or permitted by

the Investment Agreements, such claim shall be resolved in a manner pursuant to the Investment

Agreement with any disputes to be resolved by the Bankruptcy Court, and (iii) in the case of the

Transaction Expenses incurred by A-D Acquisition Holdings, LLC (an affiliate of Appaloosa)

("ADAH") or its affiliates on or prior to May 17, 2006 (see Delphi-Appaloosa EPCA § 2(j)), as

set forth in the transcript of the hearing of the Original Approval Motion (Transcript of January

12, 2007 Hearing at 79:16-84:18).  In addition, to the extent permitted under any order

authorizing the Debtors to obtain postpetition financing and/or to utilize cash collateral then or

thereafter in effect (each, a "Financing Order"), the Transaction Expenses incurred from and after

the date of entry of the Initial Approval Order shall be protected by and entitled to the benefits of

the carve-out for professionals as provided in any such Financing Order.

6.      If the Committee of Delphi Trade Claim Holders has not subsequently withdrawn,

qualified or modified in a manner adverse to the Plan Investors (or resolved to do any of the

foregoing) its support for the entry of this Order, the implementation of the Investment

Agreements, or any of the transactions contemplated by the Investment Agreements, the Plan

Investors, the Debtors, and the Creditors' Committee shall not oppose any application by the

Committee of Delphi Trade Claim Holders for the payment of fees and expenses of their

professionals pursuant to section 503(b) of the Bankruptcy Code provided that the Plan

Investors, the Creditors' Committee and the Debtors may oppose the reimbursement of fees and

expenses in excess of $750,000.

7.      This Order is a final and non-interlocutory order and is immediately subject to

appeal pursuant to 28 U.S.C. § 158(a).

9

8.      This Court shall retain jurisdiction to hear and determine all matters arising from

the implementation of this order.

9.      The requirement under Local Rule 9013-1(b) for the service and filing of a

separate memorandum of law is deemed satisfied by the Motion.


Dated:    _____, 2007
              New York, New York

_____
       UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT 1**

July 18, 2007


Delphi Corporation
5725 Delphi Drive
Troy, MI 48098

Attn:   Robert S. "Steve" Miller
        Chairman and Chief Executive Officer

Re: Proposed Investment in Delphi Corporation

Dear Mr. Miller:

        As you know, the signatories hereto have been engaged in discussions with Delphi
Corporation ("Delphi" or the "Company") and various other parties in interest in the jointly
administered chapter 11 cases (the "Chapter 11 Cases") pending in the United States Bankruptcy
Court for the Southern District of New York (the "Bankruptcy Court") with respect to Delphi
and certain of its subsidiaries (collectively, the "Debtors") regarding a potential global resolution
of the Chapter 11 Cases that would be implemented pursuant to a plan of reorganization for the
Debtors (the "Plan") and be funded in part by an equity investment in Delphi (the "Investment").

        Pursuant to the Company's request, the undersigned severally, not jointly, submit this
proposal (the "Proposal") to make the Investment on the terms and subject to the conditions
contained in the attached form of Equity Purchase and Commitment Agreement (the "Investment
Agreement"). Upon the entry by the Bankruptcy Court of the Initial Approval Order (as defined
and described below) and the satisfaction of the other conditions described in this letter, the
undersigned will severally, not jointly, enter into the Investment Agreement and each of A-D
Acquisition Holdings, LLC, Pardus DPH Holding LLC and Harbinger Del-Auto Investment
Company, Ltd. will deliver an Equity Commitment Letter in the form attached hereto. Our
several obligations to enter into the Investment Agreement, however, are subject to your using
your commercially reasonable efforts to have the Bankruptcy Court enter the Initial Approval
Order by, among other things: (a) preparing and filing with the Bankruptcy Court, no later than
July 18, 2007, the Approval Motion referred to in the Investment Agreement and (b) using
commercially reasonable efforts to obtain a hearing on the Initial Motion on or before August
16, 2007.

        The undersigned and their advisors have devoted substantial time and resources to
preparing this Proposal. We appreciate the significant amount of time and resources that Delphi
has dedicated to assist our teams in developing a deeper understanding of the Company's
business. Based on this work, the undersigned are prepared to take appropriate action to move
forward toward the full formulation and implementation of the transactions contemplated by the
Investment Agreement, including engaging in the preparation and negotiation of additional
definitive documents as contemplated thereby and supporting the Debtors' efforts to obtain entry
of the Initial Approval Order.

This Proposal is subject to, and expressly conditioned on, (1) the execution and delivery by all signatories thereto of the Investment Agreement in the form attached to this letter and (2) the entry by the Bankruptcy Court of an order, in form and substance reasonably satisfactory to each of us (the "Initial Approval Order"): (a) approving, and authorizing the Debtors to enter into and perform their obligations under the Investment Agreement and (b) authorizing the payment of the Commitment Fees, the Arrangement Fee, the Alternate Transaction Fee and Transaction Expenses (as such terms are defined in the Investment Agreement) on the terms and subject to the conditions set forth in the Investment Agreement.

This Proposal will remain open until 5:00 p.m., Eastern Standard Time on July 18, 2007, at which point it will expire unless Delphi has filed a motion, in form and substance reasonably acceptable to us, seeking entry by the Bankruptcy Court of the Initial Approval Order and requesting a hearing on such motion on or before August 16, 2007. In addition, even if accepted by Delphi this Proposal shall terminate and be of no further force of effect if, on or before August 16, 2007: (1) the Initial Approval Order has not been entered by the Bankruptcy Court, (2) the Investment Agreement has not been executed and delivered to us by Delphi, or (3) any of the undersigned determines in its sole discretion that either (a) the conditions to the obligations of the undersigned contained in the Investment Agreement are incapable of being satisfied or (b) the undersigned is entitled to exercise a termination right contained in the Investment Agreement.

*   *   *   *

Based on our work to date, we are very enthusiastic about Delphi and look forward to pursuing the transactions contemplated by the Investment Agreement to an expeditious and mutually successful conclusion.

A-D ACQUISITION HOLDINGS, LLC

By: _____
   Name:
   Title:

HARBINGER DEL-AUTO INVESTMENT
   COMPANY, LTD.

By: _____
   Name:
   Title:

MERRILL LYNCH, PIERCE, FENNER &
   SMITH INCORPORATED

By: _____
   Name:
   Title:

UBS SECURITIES LLC

By: _____
   Name:
   Title:

By: _____
   Name:
   Title:

Based on our work to date, we are very enthusiastic about Delphi and look forward to pursuing the transactions contemplated by the Investment Agreement ~~and the Plan Support Agreement~~ to an expeditious and mutually successful conclusion.

A-D ACQUISITION HOLDINGS, LLC

By:_____
    Name:
    Title:

HARBINGER DEL-AUTO INVESTMENT
    COMPANY, LTD.

By:_____
    Name:  Charles D. Miller
    Title:  Vice President

MERRILL LYNCH, PIERCE, FENNER &
    SMITH INCORPORATED

By:_____
    Name:
    Title:

UBS SECURITIES LLC

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

Based on our work to date, we are very enthusiastic about Delphi and look forward to pursuing the transactions contemplated by the Investment Agreement to an expeditious and mutually successful conclusion.

A-D ACQUISITION HOLDINGS, LLC

By:_____

    Name:
    Title:

HARBINGER DEL-AUTO INVESTMENT
    COMPANY, LTD.

By:_____

    Name:
    Title:

MERRILL LYNCH, PIERCE, FENNER &
    SMITH INCORPORATED

By:_____

    Name: Graham Goldsmith
    Title: Managing Director

UBS SECURITIES LLC

By:_____

    Name:
    Title:

By:_____

    Name:
    Title:

Based on our work to date, we are very enthusiastic about Delphi and look forward to pursuing the transactions contemplated by the Investment Agreement ~~and the Plan Support Agreement~~ to an expeditious and mutually successful conclusion.

A-D ACQUISITION HOLDINGS, LLC

By: _____
    Name:
    Title:

HARBINGER DEL-AUTO INVESTMENT COMPANY, LTD.

By: _____
    Name:
    Title:

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

By: _____
    Name:
    Title:

UBS SECURITIES LLC

By: _____
    Name: Steven Smith
    Title: Managing Director

By: _____
    Name: Andrew Kramer
    Title: Managing Director

GOLDMAN SACHS & CO.

By: _____
   Name: Thomas A. Nagoda
   Title: Managing Director

PARDUS DPH HOLDING LLC

By: _____
   Name:
   Title:

GOLDMAN SACHS & CO.

By:_____
     Name:
     Title:

PARDUS DPH HOLDING LLC

By:_____
     Name:
     Title:

Signature Page for Bid Letter

## EQUITY PURCHASE AND COMMITMENT AGREEMENT

THIS EQUITY PURCHASE AND COMMITMENT AGREEMENT (as from time to time amended, restated, amended and restated, modified or supplemented in accordance with the terms hereof, this "**Agreement**"), dated as of [_____], 2007, is made by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware ("**ADAH**"), Harbinger Del-Auto Investment Company, Ltd., an exempted company incorporated in the Cayman Islands ("**Harbinger**"), Merrill Lynch, Pierce, Fenner & Smith Incorporated, a Delaware corporation ("**Merrill**"), UBS Securities LLC, a Delaware limited liability company ("**UBS**"), Goldman Sachs & Co., a New York limited partnership ("**GS**"), Pardus DPH Holding LLC, a Delaware limited liability company ("**Pardus**"), and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "**Company**"). ADAH, Harbinger, Merrill, UBS, GS and Pardus are each individually referred to herein as an "**Investor**" and collectively as the "**Investors**". Capitalized terms used in the agreement have the meanings assigned thereto in the sections indicated on Schedule 1 hereto.

WHEREAS, the Company and certain of its subsidiaries and affiliates (the "**Debtors**") commenced jointly administered cases (the "**Chapter 11 Cases**") under United States Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended and in effect on October 8, 2005 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, ADAH, Harbinger, UBS, Merrill, Dolce Investments LLC ("**Dolce**") (collectively, the "**Original Investors**") and the Company negotiated and entered into the that certain Equity Purchase and Commitment Agreement, dated as of January 18, 2007 (the "**Original Agreement**"). The Original Agreement set forth the terms on which the Original Investors would provide certain financial accommodations that would facilitate the implementation of a plan of reorganization under the Bankruptcy Code for the Debtors having terms consistent with the Original Agreement and that certain Plan Framework Support Agreement, dated as of December 18, 2006 by and among the Company, General Motors Corporation ("**GM**"), Appaloosa Management L.P. ("**Appaloosa**"), Cerberus Capital Management, L.P. ("**Cerberus**"), Harbinger Capital Partners Master Fund I, Ltd. ("**Harbinger Fund**"), Merrill and UBS (as previously amended by the Amendment and Supplement to the Plan Framework Support Agreement, dated as of January 18, 2007, the "**Original PSA**");

WHEREAS, the Company filed a motion (the "**Original Approval Motion**") with the Bankruptcy Court for entry of an order: (i) approving and authorizing the Company to enter into the Original Agreement and the Original PSA; (ii) authorizing the Company to make certain payments contemplated by the Original Agreement; and (iii) granting certain related relief;

NEWYORK 6090548 v31 (2K)

WHEREAS, after holding a contested evidentiary hearing on the Original Approval Motion on January 11 and 12, 2007, and considering the evidentiary record, the objections to the relief requested, and the argument of counsel, the Bankruptcy Court over-ruled such objections and entered its order granting the relief requested by the Company in the Original Approval Motion as it was modified at the hearing (the "**Original Approval Order**");

WHEREAS, the Original Agreement and the Original PSA were terminated by the Company on July 7, 2007;

WHEREAS, the Company has filed its motion (the "**Approval Motion**") seeking an order (the "**Approval Order**") from the Bankruptcy Court that all of the findings, conclusions and rulings contained in the Original Approval Order (i) apply to this Agreement (including the Commitment Fees, the Arrangement Fee, the Alternate Transaction Fees and the Transaction Expenses provided for herein), the Plan Terms attached hereto as Exhibit B (the "**Plan Terms**"), the parties thereto and the transactions contemplated thereby, and (ii) continue in full force and effect with respect thereto;

WHEREAS, the Company intends to propose and submit to the Bankruptcy Court for its approval a plan of reorganization for the Debtors that is consistent with this Agreement and the Plan Terms;

WHEREAS, the Company has requested that the Investors participate in the plan of reorganization, and the Investors are willing to participate in the plan of reorganization, on the terms and subject to the conditions contained in this Agreement; and

WHEREAS, each of Appaloosa, Harbinger Fund and Pardus Special Opportunities Master Fund L.P. (collectively, the "**Commitment Parties**") will provide, on the date hereof, commitment letters addressed to ADAH, Harbinger and Pardus respectively, and the Company whereby each Commitment Party will confirm its commitment to provide equity financing to ADAH, Harbinger and Pardus, respectively, on the terms and subject to the limitations set forth in the commitment letters.

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, each of the parties hereto hereby agrees as follows:

1.    Rights Offering.

(a)    The Company proposes to offer and sell shares of its new common stock, par value $0.01 per share (the "**New Common Stock**"), pursuant to a rights offering (the "**Rights Offering**") whereby the Company will distribute at no charge to

each holder (each, an "**Eligible Holder**") of Common Stock, including, to the extent applicable, the Investors, that number of rights (each, a "**Right**") in respect of shares of Common Stock outstanding and held of record as of the close of business on a record date (the "**Record Date**") to be set by the Board of Directors of the Company that will enable each Eligible Holder to purchase up to its pro rata portion of 41,026,311 shares in the aggregate of New Common Stock (each, a "**Share**") at a purchase price of $38.39 per Share (the "**Purchase Price**").

(b)    The Company will conduct the Rights Offering pursuant to a plan of reorganization of the Debtors (such plan of reorganization, the "**Plan**"), which shall reflect the Company's proposed restructuring transactions described in this Agreement, the Summary of Terms of Preferred Stock attached hereto as Exhibit A (the "**Preferred Term Sheet**") and the Plan Terms.

(c)    The Rights Offering will be conducted as follows:

(i)    On the terms and subject to the conditions of this Agreement and subject to applicable law, the Company shall offer Shares for subscription by holders of Rights as set forth in this Agreement.

(ii)    Promptly, and no later than four (4) Business Days, following the occurrence of both (1) the date that the Confirmation Order shall have been entered by the Bankruptcy Court and (2) the effectiveness under the Securities Act of 1933, as amended (the "**Securities Act**"), of the Rights Offering Registration Statement filed with the Securities and Exchange Commission (the "**Commission**") relating to the Rights Offering, the Company shall issue to each Eligible Holder, Rights to purchase up to its pro rata portion of 41,026,311 Shares in the aggregate (the date of such distribution, the "**Rights Distribution Date**"). The Company will be responsible for effecting the distribution of certificates representing the Rights, the Rights Offering Prospectus and any related materials to each Eligible Holder.

(iii)    The Rights may be exercised during a period (the "**Rights Exercise Period**") commencing on the Rights Distribution Date and ending at the Expiration Time. The Rights shall be transferable. "**Expiration Time**" means the date that is 30 days after the Rights Distribution Date, or such later date and time as the Company, subject to the prior written approval of ADAH, may specify in a notice provided to the Investors before 9:00 a.m., New York City time, on the Business Day before the then-effective Expiration Time. The Company shall use its reasonable best efforts to cause the effective date of the Plan (the "**Effective Date**") to occur as promptly as reasonably practicable after the Expiration Time. For the

purpose of this Agreement, "**Business Day**" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in New York City are generally authorized or obligated by law or executive order to close. Each Eligible Holder who wishes to exercise all or a portion of its Rights shall (i) during the Rights Exercise Period return a duly executed document to a subscription agent reasonably acceptable to the Company and ADAH (the "**Subscription Agent**") electing to exercise all or a portion of the Rights held by such Eligible Holder and (ii) pay an amount, equal to the full Purchase Price of the number of Shares that the Eligible Holder elects to purchase, by wire transfer of immediately available funds by the Expiration Time to an escrow account established for the Rights Offering.

(iv)     Unless otherwise required by ADAH, there will be no over-subscription rights provided in connection with the Rights Offering.

(v)     As soon as reasonably practicable following the Effective Date, the Company will issue to each Eligible Holder who validly exercised its Rights the number of Shares to which such Eligible Holder is entitled based on such exercise.

(vi)     The Company hereby agrees and undertakes to give each Investor by electronic facsimile transmission the certification by an executive officer of the Company of either (i) the number of Shares elected to be purchased by Eligible Holders pursuant to validly exercised Rights, the aggregate Purchase Price therefor, the number of Unsubscribed Shares and the aggregate Purchase Price therefor (a "**Purchase Notice**") or (ii) in the absence of any Unsubscribed Shares, the fact that there are no Unsubscribed Shares and that the commitment set forth in Section 2(a)(iv) is terminated (a "**Satisfaction Notice**") as soon as practicable after the Expiration Time and, in any event, reasonably in advance of the Closing Date (the date of transmission of confirmation of a Purchase Notice or a Satisfaction Notice, the "**Determination Date**").

(vii)     The Rights Offering will provide each Eligible Holder who validly exercised its Rights with the right to withdraw a previous exercise of Rights after the withdrawal deadline established in the Rights Offering Registration Statement if there are changes to the Plan after the withdrawal deadline that the Bankruptcy Court determines are materially adverse to the holders of the Rights and the Bankruptcy Court requires resolicitation of votes under Section 1126 of the Bankruptcy Court or an opportunity to change previously cast acceptances or rejections of the Plan.

2.    <u>The Commitment; Fees and Expenses</u>.

(a)    On the terms and subject to the conditions set forth in this Agreement:

(i)    each Investor agrees, severally and not jointly, to subscribe for and purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to subscribe for and purchase, and the Company agrees to sell and issue, on the Closing Date (A) for the Purchase Price per Share, each Investor's proportionate share of 4,558,479 Shares as is set forth opposite such Investor's name on <u>Schedule 2</u> hereto (the "**Direct Subscription Shares**") and (B) for $38.39, that number of shares of Series B Senior Convertible Preferred Stock, par value $0.01 per share (the "**Series B Preferred Stock**"), as is set forth opposite such Investor's name on <u>Schedule 2</u> hereto, which shares shall be created pursuant to a Certificate of Designations (the "**Series B Certificate of Designations**") that is consistent with the terms set forth in the Preferred Term Sheet and, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to ADAH;

(ii)    [Reserved];

(iii)    ADAH agrees to subscribe for and purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to subscribe for and purchase, and the Company agrees to sell, on the Closing Date, for the purchase price of $31.28 per Share (the "**Series A Purchase Price**"), 12,787,724 shares of Series A-1 Senior Convertible Preferred Stock, par value $0.01 per share (the "**Series A Preferred Stock**") which shares shall be created pursuant to a Certificate of Designations (the "**Series A Certificate of Designations**") that is consistent with the terms set forth in the Preferred Term Sheet and with such other terms that, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to ADAH; and

(iv)    each Investor agrees, severally and not jointly, to purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to purchase, on the Closing Date, and the Company agrees to sell for the Purchase Price per Share that number of Shares issuable pursuant to the aggregate number of Rights that were not properly exercised by the Eligible Holders thereof during the Rights Exercise Period, in proportion to the Investor's share of the Direct Subscription Shares (such Shares in the aggregate, the "**Unsubscribed**

**Shares**"), rounded among the Investors as they may determine, in their sole discretion, to avoid fractional shares.

In connection with each of clauses (i) through (iv) above, subject to delivering prior written notice to each other Investor and the prior approval of ADAH, prior to the Securities Act Effective Date each Investor shall have the right to arrange for one or more of its Affiliates (each a "**Related Purchaser**") (A) to purchase Investor Shares, by written notice to the Company, which notice shall be signed by the Investor and each Related Purchaser, shall contain the Related Purchaser's agreement to be bound by this Agreement and shall contain a confirmation by the Related Purchaser of the accuracy with respect to it of the representations set forth in <u>Section 4</u> or (B) to designate that some or all of the Investor Shares be issued in the name of and delivered to, one or more Related Purchasers which designation shall be signed by the Investor and each Related Purchaser, shall contain the Related Purchaser's agreement to be bound by this Agreement and shall contain a confirmation by the Related Purchaser of the accuracy with respect to it of the representations set forth in <u>Section 4</u>; provided, that the total number of Investors, Related Purchasers and Ultimate Purchasers shall not exceed the Maximum Number. The "**Maximum Number**" shall be 35 unless the Company consents to a higher number, such consent not to be unreasonably withheld; provided, further, that nothing in this Agreement shall limit or restrict in any way any Investor's ability to transfer or otherwise dispose of any Investor's Shares or any interests therein after the Closing Date pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements thereunder and subject to applicable state securities laws. The Investors agree that each Related Purchaser will be a "Qualified Institutional Buyer" under Rule 144A of the Securities Act.

The Series A Preferred Stock and the Series B Preferred Stock are referred to herein collectively as the "**Preferred Shares**". The Unsubscribed Shares, the Direct Subscription Shares and the Preferred Shares are referred to herein collectively as the "**Investor Shares**". The term "**Affiliate**" shall have the meaning ascribed to such term in Rule 12b-2 under the Securities Exchange Act of 1934 in effect on the date hereof.

(b)    Upon the occurrence of an Investor Default or a Limited Termination, within five (5) Business Days of the occurrence of such Investor Default or Limited Termination, the Investors (other than any non-purchasing Investor) shall have the right to agree to purchase on the Closing Date, in the case of a Limited Termination, or to purchase, in the case of an Investor Default (or, in either case, arrange for the purchase through a Related Purchaser or an Ultimate Purchaser), all but not less than all, of the Available Investor Shares on the terms and subject to the conditions set forth in this Agreement and in such proportions as determined by the Investors in their sole discretion (an "**Alternative Financing**");

provided, that only in the case of a Limited Termination, ADAH will be required within ten (10) Business Days of the occurrence of such Limited Termination to agree to purchase on the Closing Date (or arrange for the purchase through a Related Purchaser or an Ultimate Purchaser) any Available Investor Shares attributable to the Limited Termination and not otherwise purchased pursuant to the Alternative Financing (unless ADAH has otherwise terminated this Agreement in accordance with its terms); provided, further, that the total number of Investors, Related Purchasers and Ultimate Purchasers pursuant to this Agreement shall not exceed the Maximum Number.  The term "**Investor Default**" shall mean the breach by any Investor of its obligation to purchase any Investor Shares which it is obligated to purchase under this Agreement.  The term "**Available Investor Shares**" shall mean any Investor Shares which any Investor is not purchasing as a result of an Investor Default or Limited Termination.  The exercise by any Investor of the right to purchase (or arrange a purchase of) any Available Investor Shares shall not relieve any defaulting Investor of any obligation to each other Investor or the Company of such defaulting Investor's breach of this Agreement.

(c)     As soon as practicable after the Expiration Time, and in any event reasonably in advance of the Closing Date, the Company will provide a Purchase Notice or a Satisfaction Notice to each Investor as provided above, setting forth a true and accurate determination of the aggregate number of Unsubscribed Shares, if any; provided, that on the Closing Date, on the terms and subject to the conditions in this Agreement, the Investors will purchase, and the Company will sell, only such number of Unsubscribed Shares as are listed in the Purchase Notice, without prejudice to the rights of the Investors to seek later an upward or downward adjustment if the number of Unsubscribed Shares in such Purchase Notice is inaccurate.

(d)     Delivery of the Investor Shares will be made by the Company to the account of each Investor (or to such other accounts as any Investor may designate in accordance with this Agreement) at 10:00 a.m., New York City time, on the Effective Date (the "**Closing Date**") against payment of the aggregate Purchase Price for the Investor Shares by wire transfer of immediately available funds in U.S. dollars to the account specified by the Company to the Investors at least 24 hours prior to the Closing Date.

(e)     All Investor Shares will be delivered with any and all issue, stamp, transfer, sales and use, or similar Taxes or duties payable in connection with such delivery duly paid by the Company.

(f)     The documents to be delivered on the Closing Date by or on behalf of the parties hereto and the Investor Shares will be delivered at the offices of White & Case

LLP, 1155 Avenue of the Americas, New York, New York 10036 on the Closing Date.

(g)     Subject to the provisions of Sections 2(a), 2(b) and 2(k) hereof, and subject to prior written notice to each other Investor and the prior approval of ADAH, any Investor may designate that some or all of the Unsubscribed Shares, Direct Subscription Shares or shares of Preferred Stock be issued in the name of, and delivered to, one or more Ultimate Purchasers.

(h)     On the basis of the representations and warranties herein contained, the Company shall pay the following fees to the Investors in accordance with Section 2(i) or 12(g), as the case may be:

(i)     an aggregate commitment fee of eighteen million dollars ($18,000,000) to be paid to the Investors in proportion to their undertakings herein relative to Preferred Shares as set forth in Schedule 2 (the "**Preferred Commitment Fee**");

(ii)    an aggregate commitment fee of thirty nine million, three hundred seventy five thousand dollars ($39,375,000) to be paid to the Investors as set forth in Schedule 2 to compensate the Investors for their undertakings herein relative to Investor Shares other than Preferred Shares (the "**Standby Commitment Fee**" and together with the Preferred Commitment Fee, the "**Commitment Fees**");

(iii)   a fee of six million, three hundred seventy five thousand dollars ($6,375,000) to ADAH to compensate ADAH for arranging the transactions contemplated hereby (the "**Arrangement Fee**"); and

(iv)    an Alternate Transaction Fee, if any, which shall be paid by the Company as provided in Section 12(g).

(i)     Seven million, five hundred twenty-five thousand dollars ($7,525,000) of the Commitment Fees shall be paid on the first Business Day following the first date that the Approval Order is issued by the Bankruptcy Court, and twenty-one million, one hundred sixty-two thousand, five hundred dollars ($21,162,500), representing the balance of the first fifty percent (50%) of the Commitment Fees, on the first Business Day following the Disclosure Statement Filing Date. The balance of twenty-eight million, six hundred eighty-seven thousand, five hundred dollars ($28,687,500), representing the remaining fifty percent (50%) of the Commitment Fees, shall be paid on the first Business Day following the

Disclosure Statement Approval Date. The Arrangement Fee shall be paid to ADAH upon entry of the Approval Order. Payment of the Commitment Fees, Arrangement Fee and the Alternate Transaction Fee, if any, will be made by wire transfer of immediately available funds in U.S. dollars to the account specified by each Investor to the Company at least 24 hours prior to such payment. The Commitment Fees, Arrangement Fee and the Alternate Transaction Fee, if any, will be nonrefundable and non-avoidable when paid. The provision for the payment of the Commitment Fees and Arrangement Fee is an integral part of the transactions contemplated by this Agreement and without this provision the Investors would not have entered into the Agreement and such Commitment Fees and Arrangement Fee shall constitute an allowed administrative expense of the Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code.

(j)    The Company will reimburse or pay, as the case may be, the out-of-pocket costs and expenses reasonably incurred by each Investor or its Affiliates (which, for the avoidance of doubt, shall not include any Ultimate Purchaser) to the extent incurred on or before the first to occur of the date on which this Agreement terminates in accordance with its terms and the Effective Date (and reasonable post-closing costs and expenses relating to the closing of the transactions contemplated hereby), including reasonable fees, costs and expenses of counsel to each of the Investors or its Affiliates, and reasonable fees, costs and expenses of any other professionals retained by any of the Investors or its Affiliates in connection with the transactions contemplated hereby (including investigating, negotiating and completing such transactions) and the Chapter 11 Cases and other judicial and regulatory proceedings related to such transactions and the Chapter 11 Cases other than costs and expenses relating to any transactions with Ultimate Purchasers and, with respect to expenses that would not otherwise be incurred by the related Investor, Related Purchasers (collectively, "**Transaction Expenses**"); from and after (i) in the case of ADAH and Harbinger, December 1, 2006, (ii) in the case of GS, July 3, 2007, in the case of Pardus, June 18, 2007 and in the case of UBS and Merrill, July 30, 2006, promptly upon submission to the Company of summary statements therefor by such Investor, in each case, without Bankruptcy Court review or further Bankruptcy Court order, whether or not the transactions contemplated hereby are consummated and, in any event, within 30 days of the submission of such statements. Notwithstanding the foregoing, (i) Transaction Expenses incurred by ADAH or its Affiliates on or prior to May 17, 2006 in an amount not to exceed $5,000,000 shall be paid if and when the effective date of any plan of reorganization for the Company occurs and only if such plan results in holders of Common Stock receiving any recovery under such plan, (ii) Transaction Expenses incurred by Pardus on or prior to June 18, 2007 shall be paid to the extent that they comprise the reasonable fees, costs and expenses of legal counsel to Pardus related to the negotiation of this Agreement, the non-disclosure agreement between Pardus and the Company dated June 18, 2007 and the Transactions contemplated hereby or thereby, (iii) Transaction Expenses incurred by GS on or prior to July 3, 2007 shall be paid to the extent that they comprise the reasonable fees, costs and expenses of legal counsel to GS related to the negotiation of this Agreement, the non-disclosure agreement between GS and

the Company and the Transactions contemplated hereby or thereby and (iv) the filing fee, if any, required to be paid in connection with any filings required to be made by any Investor or its Affiliates under the HSR Act or any other competition laws or regulations shall be paid by the Company on behalf of the Investors or such Affiliate when filings under the HSR Act or any other competition laws or regulations are made, together with all expenses of the Investors or its Affiliates incurred to comply therewith.

The provision for the payment of the Transaction Expenses is an integral part of the transactions contemplated by this Agreement and without this provision the Investors would not have entered into this Agreement and such Transaction Expenses shall constitute an allowed administrative expense of the Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code. In addition, to the extent permitted under any order authorizing the Debtors to obtain post-petition financing and/or to utilize cash collateral then or thereafter in effect (each a "**Financing Order**"), the Transaction Expenses incurred from and after the date of entry of the Original Approval Order shall be protected by and entitled to the benefits of the carve-out for professional fees provided in any such Financing Order.

(k)　　The Company acknowledges that the Investors and certain persons and entities (collectively, the "**Ultimate Purchasers**") have entered into an agreement and may, prior to the Securities Act Effective Date, enter into one or more new agreements or amend existing agreements (collectively, the "**Additional Investor Agreement**"), pursuant to which the Investors have arranged for a number of Ultimate Purchasers to purchase certain of the Unsubscribed Shares and the Direct Subscription Shares. The Investors severally and not jointly acknowledge that they have not agreed and, without the prior written consent of ADAH, will not prior to the Closing agree, directly or indirectly, to sell, transfer, assign, pledge, hypothecate, donate or otherwise encumber or dispose of any Investor Shares or any interest or participation therein other than pursuant to the Additional Investor Agreement (as it may be amended from time to time) and other than an arrangement that was entered into among ADAH, Merrill, Harbinger and certain of their Affiliates regarding participation interests in the Series A-2 Senior Convertible Preferred Stock that was to be issued pursuant to the Original Agreement, which agreement has been terminated. The total number of Investors, Related Purchasers and Ultimate Purchasers as of the Closing Date shall not exceed the Maximum Number. Each Additional Investor Agreement shall contain each Ultimate Purchaser's agreement to be bound by this Agreement and a confirmation by each Ultimate Purchaser of the accuracy with respect to it of the representations set forth in Section 4 and a copy of such confirmation shall be provided to the Company prior to the Securities Act Effective Date. Each Investor proposing to enter into an Additional Investor Agreement with any Ultimate Purchaser or proposing to transfer Investor Shares to, or to arrange for Investor Shares to be purchased by or delivered to, any Related Purchaser, in either case, which would result in the Maximum Number being exceeded agrees to notify the Company and ADAH prior to entering into such agreement or

effecting such transfer and will not undertake such agreement or effect such transfer without the consent of the Company and ADAH, which shall not be unreasonably withheld.  The Investors severally and not jointly agree that with respect to any offer or transfer to an Ultimate Purchaser prior to the Closing Date, they have not offered and shall not offer any Investor Shares to, and they have not entered into and shall not enter into the Additional Investor Agreement with, any person or entity (A) on or after the Securities Act Effective Date and (B) that is not a "Qualified Institutional Buyer" as defined in Rule 144A under the Securities Act; provided, that the total number of Investors, Related Purchasers and the Ultimate Purchasers pursuant to this Agreement shall not exceed the Maximum Number; provided, further, that nothing in this Agreement shall limit or restrict in any way any Investor's ability to transfer or otherwise dispose of any Investor's Shares or any interest therein after the Closing Date pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements thereunder and pursuant to applicable state securities laws.

3.    Representations and Warranties of the Company.  Except as set forth in a disclosure letter to be delivered pursuant to Section 5(s) (the "**Disclosure Letter**"), the Company represents and warrants to, and agrees with, each of the Investors as set forth below.  Any item disclosed in a section of the Disclosure Letter shall be deemed disclosed in all other sections of the Disclosure Letter to the extent the relevance of such disclosure or matter is reasonably apparent and shall qualify the representations and warranties contained in this Section 3.  Except for representations, warranties and agreements that are expressly limited as to their date, each representation, warranty and agreement shall be deemed made as of the date of delivery of the Disclosure Letter (the "**Disclosure Letter Delivery Date**") and as of the Closing Date:

(a)    Organization and Qualification.  The Company and each of its Significant Subsidiaries has been duly organized and is validly existing in good standing under the laws of its respective jurisdiction of incorporation, with the requisite power and authority to own its properties and conduct its business as currently conducted. Each of the Company and its Subsidiaries has been duly qualified as a foreign corporation or organization for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification, except to the extent that the failure to be so qualified or be in good standing has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  For the purpose of this Agreement, "**Material Adverse Effect**" means (i) any material adverse effect on the business, results of operations, liabilities, property or condition (financial or otherwise) of the Company or its Subsidiaries, taken as a whole, or (ii) any material adverse effect on the ability of the Company, subject to the approvals and other authorizations set forth in Section 3(g) below, to consummate the transactions contemplated by this Agreement or the Plan other than, in either case, any effect relating to or resulting from (i) changes in general economic conditions or securities or

financial markets in general that do not disproportionately impact the Company and its Subsidiaries; (ii) general changes in the industry in which the Company and its Subsidiaries operate and not specifically relating to, or having a disproportionate effect on, the Companies and its Subsidiaries taken as a whole (relative to the effect on other persons operating in such industry); (iii) any changes in law applicable to the Company or any of its Subsidiaries or any of their respective properties or assets or interpretations thereof by any governmental authority which do not have a disproportionate effect on, the Company and its Subsidiaries; (iv) any outbreak or escalation of hostilities or war (whether declared or not declared) or any act of terrorism which do not have a disproportionate effect on, the Company and its Subsidiaries; (v) the announcement or the existence of, or compliance with, this Agreement and the transactions contemplated hereby (including without limitation the impact thereof on relationships with suppliers, customers or employees); (vi) any accounting regulations or principles or changes in accounting practices or policies that the Company or its Subsidiaries are required to adopt, including in connection with the audit of the Company's financial statements in accordance with GAAP or any failure to timely file periodic reports or timely prepare financial statements and the costs and effects of completing the preparation of the Company's financial statements and periodic reports; or (vii) any change in the market price or trading volumes of the Company's securities (it being understood for the purposes of this subclause (vii) that any facts underlying such change that are not otherwise covered by the immediately preceding clauses (i) through (vi) may be taken into account in determining whether or not there has been a Material Adverse Effect). For the purposes of this Agreement, (x) a "**Subsidiary**" of any person means, with respect to such person, any corporation, partnership, joint venture or other legal entity of which such person (either alone or through or together with any other subsidiary), owns, directly or indirectly, more than 50% of the stock or other equity interests, has the power to elect a majority of the board of directors or similar governing body, or has the power to direct the business and policies, and (y) a "**Significant Subsidiary**" is a Subsidiary that satisfies the definition contained in Article 1, Rule 1-02 of Regulation S-X promulgated pursuant to the Securities Act of 1933, as amended.

(b)    Corporate Power and Authority.

(i)    The Company has or, to the extent executed in the future, will have when executed, the requisite corporate power and authority to enter into, execute and deliver this Agreement and each other agreement to which it will be a party as contemplated by this Agreement (this Agreement and such other agreements collectively, the "**Transaction Agreements**") and, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Rules 6004(h) and 3020(e) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), respectively, to perform its obligations hereunder and thereunder,

including the issuance of the Rights and Investor Shares. The Company has taken or will take all necessary corporate action required for the due authorization, execution, delivery and performance by it of this Agreement, including the issuance of the Rights and Investor Shares.

(ii)    Prior to the execution by the Company and filing with the Bankruptcy Court of the Plan, the Company and each Subsidiary entering into the Plan will have the requisite corporate power and authority to execute the Plan and to file the Plan with the Bankruptcy Court and, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rule 3020(e), to perform its obligations thereunder, and will have taken by the Effective Date all necessary corporate actions required for the due authorization, execution, delivery and performance by it of the Plan.

(c)    <u>Execution and Delivery; Enforceability</u>.

(i)    Each Transaction Agreement has been, or prior to its execution and delivery will be, duly and validly executed and delivered by the Company, and, upon the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rule 6004(h), each such document will constitute the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

(ii)    The Plan will be duly and validly filed with the Bankruptcy Court by the Company and each of its Subsidiaries executing the Plan and, upon the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rule 3020(e), will constitute the valid and binding obligation of the Company and such Subsidiary, enforceable against the Company and such Subsidiaries in accordance with its terms.

(d)    <u>Authorized and Issued Capital Stock</u>. The authorized capital stock of the Company consists of (i) 1,350,000,000 shares of Common Stock and (ii) 650,000,000 shares of preferred stock, par value $0.10 per share. At the close of business on June 30, 2007 (the "**Capital Structure Date**") (i) 561,781,500 shares of Common Stock were issued and outstanding, (ii) no shares of the preferred stock were issued and outstanding, (iii) 3,244,317 shares of Common Stock were held by the Company in its treasury, (iv) 85,978,864 shares of Common Stock were reserved for issuance upon exercise of stock options and other rights to purchase shares of Common Stock and vesting of restricted stock units (each, an "**Option**" and, collectively, the "**Options**") granted under any stock option or stock-based compensation plan of the Company or otherwise (the "**Stock Plans**"),

and (v) 200,000 shares of Series A participating preferred stock were reserved for issuance pursuant to that certain Rights Agreement by and between the Company and BankBoston, N.A., as Rights Agent, dated as of February 1, 1999, as amended (the "**Existing Shareholder Rights Plan**"). All issued and outstanding shares of capital stock of the Company and each of its Subsidiaries have been duly authorized and validly issued and are fully paid and nonassessable, and the holders thereof do not have any preemptive rights. Except as set forth in this Section 3(d) or issuances pursuant to the Stock Plans, at the close of business on the Capital Structure Date, no shares of capital stock or other equity securities or voting interest in the Company were issued, reserved for issuance or outstanding. Since the close of business on the Capital Structure Date, no shares of capital stock or other equity securities or voting interest in the Company have been issued or reserved for issuance or become outstanding, other than shares described in clause (iv) of the second sentence of this Section 3(d) that have been issued upon the exercise of outstanding Options granted under the Stock Plans and other than the shares to be issued hereunder or pursuant to the Plan Terms. Except as described in this Section 3(d), and except as will be required by the Plan, neither the Company nor any of its Subsidiaries is party to or otherwise bound by or subject to any outstanding option, warrant, call, subscription or other right (including any preemptive right), agreement or commitment which (w) obligates the Company or any of its Subsidiaries to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any shares of the capital stock of, or other equity or voting interests in, the Company or any security convertible or exercisable for or exchangeable into any capital stock of, or other equity or voting interest in, the Company, (x) obligates the Company or any of its Subsidiaries to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, contract, arrangement or undertaking, (y) restricts the transfer of any shares of capital stock of the Company or (z) relates to the voting of any shares of capital stock of the Company. On the Effective Date, the authorized capital stock of the Company and the issued and outstanding shares of capital stock of the Company shall be consistent with the description set forth in the Preferred Term Sheet, the Plan Terms and the Plan. On the Effective Date, the authorized capital stock of the Company shall consist of such number of shares of New Common Stock as shall be set forth in the Amended and Restated Constituent Documents and 23,207,104 shares of new preferred stock. On the Effective Date, assuming consummation of the transactions contemplated by this Agreement: (i) 124,400,000 shares of New Common Stock will be outstanding; (ii) 12,787,724 shares of Series A Preferred Stock will be issued and outstanding and (iii) 10,419,380 shares of Series B Preferred Stock will be issued and outstanding.

(e)    Issuance. The Investor Shares to be issued and sold by the Company to the Investors hereunder, when the Investor Shares are issued and delivered against payment therefor by the Investors hereunder, shall have been duly and validly authorized, issued and delivered and shall be fully paid and non-assessable, and

free and clear of all Taxes, liens, preemptive rights, rights of first refusal, subscription and similar rights, other than (i) any rights contained in the terms of the Preferred Shares as set forth in the Company's Certificate of Incorporation and (ii) any rights contained in any shareholders agreement to which one or more of the Investors shall be a party.

(f)    No Conflict.  Subject to the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, the distribution of the Rights, the sale, issuance and delivery of the Shares upon exercise of the Rights, the consummation of the Rights Offering by the Company and the execution and delivery (or, with respect to the Plan, the filing) by the Company of the Transaction Agreements and the Plan and compliance by the Company with all of the provisions hereof and thereof and the Preferred Term Sheet and the Plan Terms and the consummation of the transactions contemplated herein and therein (including compliance by each Investor with its obligations hereunder and thereunder) (i) will not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent to be specified in the Plan, in the acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound or to which any of the property or assets of the Company or any of its Subsidiaries is subject, (ii) will not result in any violation of the provisions of the Certificate of Incorporation or Bylaws of the Company or any of its Subsidiaries, (iii) will not result in any material violation of, or any termination or material impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Company or any of its Subsidiaries or any of their properties, and (iv) will not trigger the distribution under the Existing Shareholders Rights Plan of Rights Certificates (as defined therein) or otherwise result in any Investor being or becoming an Acquiring Person, except in any such case described in subclause (i) for any conflict, breach, violation, default, acceleration or lien which has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(g)    Consents and Approvals.  No consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Company or any of its Subsidiaries or any of their properties is required for the distribution of the Rights, the sale, issuance and delivery of Shares upon exercise of the Rights or the Investor Shares to each Investor hereunder and the consummation of the Rights Offering by the Company and the execution and delivery by the Company of the Transaction Agreements or the Plan and performance of and compliance by the Company with all of the

provisions hereof and thereof and the Preferred Term Sheet and the Plan Terms and the consummation of the transactions contemplated herein and therein, except (i) the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, (ii) the registration under the Securities Act of the issuance of the Rights and the Shares pursuant to the exercise of Rights, (iii) filings with respect to and the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**"), and any other comparable laws or regulations in any foreign jurisdiction relating to the sale or issuance of Investor Shares to the Investors, (iv) the filing with the Secretary of State of the State of Delaware of the Certificate of Incorporation to be applicable to the Company from and after the Effective Date and (v) such consents, approvals, authorizations, registrations or qualifications (x) as may be required under the rules and regulations of the New York Stock Exchange or the Nasdaq Stock Exchange to consummate the transactions contemplated herein, (y) as may be required under state securities or Blue Sky laws in connection with the purchase of the Investor Shares by the Investors or the distribution of the Rights and the sale of Shares to Eligible Holders or (z) the absence of which will not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(h)     Arm's Length.  The Company acknowledges and agrees that the Investors are acting solely in the capacity of an arm's length contractual counterparty to the Company with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering) and not as a financial advisor or a fiduciary to, or an agent of, the Company or any other person or entity.  Additionally, the Investors are not advising the Company or any other person or entity as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.  The Company shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and the Investors shall have no responsibility or liability to the Company, its Affiliates, or their respective shareholders, directors, officers, employees, advisors or other representatives with respect thereto.  Any review by the Investors of the Company, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of the Investors and shall not be on behalf of the Company, its Affiliates, or their respective shareholders, directors, officers, employees, advisors or other representatives and shall not affect any of the representations or warranties contained herein or the remedies of the Investors with respect thereto.

(i)     Financial Statements.  The financial statements and the related notes of the Company and its consolidated Subsidiaries included or incorporated by reference in the Company SEC Documents and the Rights Offering Registration Statement, and to be included or incorporated by reference in the Disclosure Statement and

the Rights Offering Registration Statement and the Rights Offering Prospectus, comply or will comply, as the case may be, in all material respects with the applicable requirements of the Securities Act, the Securities Exchange Act of 1934, as amended, and the rules and regulation of the Commission thereunder (the "**Exchange Act**") and the Bankruptcy Code, as applicable, and present fairly or will present fairly in all material respects the financial position, results of operations and cash flows of the Company and its Subsidiaries as of the dates indicated and for the periods specified; such financial statements have been prepared in conformity with U.S. generally accepting accounting principles ("**GAAP**") applied on a consistent basis throughout the periods covered thereby (except as disclosed in the Company SEC Documents filed prior to the date hereof), and the supporting schedules included or incorporated by reference in the Company SEC Documents and the Rights Offering Registration Statement, and to be included or incorporated by reference in the Disclosure Statement, the Rights Offering Registration Statement and the Rights Offering Prospectus, present fairly or will present fairly the information required to be stated therein; and the other financial information included or incorporated by reference in the Company SEC Documents and the Rights Offering Registration Statement, and to be included or incorporated by reference in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus, has been or will be derived from the accounting records of the Company and its Subsidiaries and presents fairly or will present fairly the information shown thereby; and the pro forma financial information and the related notes included or incorporated by reference in the Company SEC Documents and the Rights Offering Registration Statement, and to be included or incorporated by reference in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus, have been or will be prepared in accordance with the applicable requirements of the Securities Act and the Exchange Act, as applicable, and the assumptions underlying such pro forma financial information are reasonable and are set forth in the Company SEC Documents and will be set forth in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus.

(j)    Company SEC Documents and Disclosure Statement.  The Company has filed all required reports, schedules, forms, statements and other documents (including exhibits and all other information incorporated therein but not including the Rights Offering Registration Statement or the other documents referred to in Section 3(k) below) with the Commission ("**Company SEC Documents**").  As of their respective dates, each of the Company SEC Documents complied in all material respects with the requirements of the Securities Act or the Exchange Act and the rules and regulations of the Commission promulgated thereunder applicable to such Company SEC Documents.  The Company has filed with the Commission all "material contracts" (as such term is defined in Item 601(b)(10) of Regulation S-K under the Exchange Act) that are required to be filed as exhibits to the Company SEC Documents.  No Company SEC Document filed after December 31, 2005, when filed, contained any untrue statement of a material

fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. The Disclosure Statement, when submitted to the Bankruptcy Court and upon confirmation and effectiveness, will conform in all material respects to the requirements of the Bankruptcy Code. The Disclosure Statement, when submitted to the Bankruptcy Court and upon confirmation and effectiveness, and any future Company SEC Documents filed with the Commission prior to the Closing Date, when filed, will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading.

(k)    Rights Offering Registration Statement and Rights Offering Prospectus. The Rights Offering Registration Statement and any post-effective amendment thereto, as of the applicable Securities Act Effective Date and, if applicable, as of the date of such post-effective amendment, will comply in all material respects with the Securities Act, and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading; and as of the applicable filing date of the Rights Offering Prospectus, the Rights Offering Prospectus, and as of the filing date of any amendment or supplement thereto and during the Rights Offering Period, and as of the Closing Date, the Rights Offering Prospectus as so amended or supplemented, will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading. On the Rights Distribution Date, during the Rights Offering Period, and at the Expiration Time, the Investment Decision Package will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading. Each Issuer Free Writing Prospectus, at the time of use thereof, when considered together with the Investment Decision Package, will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading. Each Preliminary Rights Offering Prospectus, at the time of filing thereof, complied (in the case of a Preliminary Rights Offering Prospectus filed prior to the date hereof) and will comply in all material respects with the Securities Act and did not (in the case of a Preliminary Rights Offering Prospectus filed prior to the date hereof) and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading. Notwithstanding the foregoing, the Company makes no representation and warranty with respect to any statements or omissions made in reliance on and in conformity with information relating to each Investor or the Ultimate Purchasers furnished to the Company in writing by such Investor or the Ultimate Purchasers

expressly for use in the Rights Offering Registration Statement and the Rights Offering Prospectus and any amendment or supplement thereto.  On March 21, 2007, the Staff of the Commission delivered a letter to the Company which will be included in Schedule 3(k) of the Disclosure Letter.

For the purposes of this Agreement, (i) the term "**Rights Offering Registration Statement**" means the Registration Statement filed with the Commission relating to the Rights Offering, including all exhibits thereto, as amended as of the Securities Act Effective Date, and any post-effective amendment thereto that becomes effective; (ii) the term "**Rights Offering Prospectus**" means the final prospectus contained in the Rights Offering Registration Statement at the Securities Act Effective Date (including information, if any, omitted pursuant to Rule 430A and subsequently provided pursuant to Rule 424(b) under the Securities Act ), and any amended form of such prospectus provided under Rule 424(b) under the Securities Act or contained in a post-effective amendment to the Rights Offering Registration Statement; (iii) the term "**Investment Decision Package**" means the Rights Offering Prospectus, together with any Issuer Free Writing Prospectus used by the Company to offer the Shares to Eligible Holders pursuant to the Rights Offering, (iv) the term "**Issuer Free Writing Prospectus**" means each "issuer free writing prospectus" (as defined in Rule 433 of the rules promulgated under the Securities Act) prepared by or on behalf of the Company or used or referred to by the Company in connection with the Rights Offering, (v) the term "**Preliminary Rights Offering Prospectus**" means each prospectus included in the Rights Offering Registration Statement (and any amendments thereto) before it becomes effective, any prospectus filed with the Commission pursuant to Rule 424(a) under the Securities Act and the prospectus included in the Rights Offering Registration Statement, at the time of effectiveness that omits information permitted to be excluded under Rule 430A under the Securities Act; and (vi) "**Securities Act Effective Date**" means the date and time as of which the Rights Offering Registration Statement, or the most recent post-effective amendment thereto, was declared effective by the Commission which shall not be requested by the Company before the Confirmation Order is issued without the prior consent of ADAH.

(l)    Free Writing Prospectuses.  Each Issuer Free Writing Prospectus will conform in all material respects to the requirements of the Securities Act as of the date of first use or as otherwise provided for in Rule 433 under the Securities Act, and the Company will comply with all prospectus delivery and all filing requirements applicable to such Issuer Free Writing Prospectus under the Securities Act.  The Company has retained in accordance with the Securities Act all Issuer Free Writing Prospectuses that were not required to be filed pursuant to the Securities Act.

(m)    <u>Absence of Certain Changes</u>.  Since December 31, 2006, other than as disclosed in the Company SEC Documents filed prior to the date hereof, and except for actions to be taken pursuant to the Transaction Agreements and the Plan:

    (i)    there has not been any change in the capital stock from that set forth in <u>Section 3(d)</u> or any material change in long-term debt of the Company or any of its Subsidiaries, or any dividend or distribution of any kind declared, set aside for payment, paid or made by the Company on any class of capital stock;

    (ii)    no event, fact or circumstance has occurred which has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

    (iii)    neither the Company nor any of its Subsidiaries has made any changes with respect to accounting policies or procedures, except as required by law or changes in GAAP;

    (iv)    neither the Company nor any of its Subsidiaries has paid, discharged, waived, compromised, settled or otherwise satisfied any material Legal Proceeding, whether now pending or hereafter brought, (A) at a cost materially in excess of the amount accrued or reserved for it in the Company SEC Documents filed prior to the date hereof, (B) pursuant to terms that impose material adverse restrictions on the business of the Company and its Subsidiaries as currently conducted or (C) on a basis that reveals a finding or an admission of a material violation of law by the Company or its Subsidiaries;

    (v)    other than in the ordinary course of business, neither the Company nor any of its Subsidiaries has (A) made, changed or revoked any material Tax election, (B) entered into any settlement or compromise of any material Tax liability, (C) filed any amended Tax Return with respect to any material Tax, (D) changed any annual Tax accounting period, (E) entered into any closing agreement relating to any material Tax, (F) knowingly failed to claim a material Tax refund for which it is entitled, or (G) made material changes to their Tax accounting methods or principles;

    (vi)    there has not been (A) any increase in the base compensation payable or to become payable to the officers or employees of the Company or any of its Subsidiaries with annual base compensation in excess of $500,000 (except for compensation increases in the ordinary course of business and consistent with past practice) or (B) except in the ordinary course of

business and consistent with past practice, any establishment, adoption, entry into or material amendment of any collective bargaining, bonus, profit sharing, thrift, compensation, employment, termination, severance or other plan, agreement, trust, fund, policy or arrangement for the benefit of any director, or for the benefit of a group of employees or for any individual officer or employee with annual base compensation in excess of $500,000, in each case;

(vii)   except in a manner consistent with (i) the Company's transformation plan previously disclosed in the Company SEC Documents prior to the date hereof (the "**Transformation Plan**") and (ii) (A) prior to the satisfaction of the condition with respect to the Business Plan in accordance with Section 9(a)(xxviii) of this Agreement, that certain draft business plan delivered to the Investors dated February 28, 2007, as amended by the revisions thereto delivered to the Investors dated April 5, 2007 (collectively the "**Draft Business Plan**") or (B) after the satisfaction of the condition with respect to the Business Plan in accordance with Section 9(a)(xxviii) of this Agreement, the Business Plan approved by ADAH in accordance with this Agreement neither the Company nor any of its Subsidiaries has sold, transferred, leased, licensed or otherwise disposed of any assets or properties material to the Company and its Subsidiaries, taken as a whole, except for (A) sales of inventory in the ordinary course of business consistent with past practice and (B) leases or licenses entered into in the ordinary course of business consistent with past practice; and

(viii)   except in a manner consistent with (i) the Transformation Plan and (ii) (A) prior to the satisfaction of the condition with respect to the Business Plan in accordance with Section 9(a)(xxviii) of this Agreement, the Draft Business Plan or (B) after the satisfaction of the condition with respect to the Business Plan in accordance with this Section 9(a)(xxviii) of Agreement, the Business Plan approved by ADAH in accordance with this Agreement, neither the Company nor any of its Subsidiaries have acquired any business or entity material to the Company and its Subsidiaries, taken as a whole, by merger or consolidation, purchase of assets or equity interests, or by any other manner, in a single transaction or a series of related transactions, or entered into any contract, letter of intent or similar arrangement (whether or not enforceable) with respect to the foregoing.

(n)   Descriptions of the Transaction Agreement.  The statements in the Rights Offering Registration Statement and the Rights Offering Prospectus insofar as they purport to constitute summaries of each of the Transaction Agreements, the Plan, the Original Approval Order or the Approval Order and the Confirmation Order, or the terms of statutes, rules or regulations, legal or governmental

proceedings or contracts, will constitute accurate summaries in all material respects.

(o) <u>No Violation or Default; Compliance with Laws</u>. Neither the Company nor any of its Significant Subsidiaries is in violation of its charter or by-laws or similar organizational documents. Neither the Company nor any of its Subsidiaries is, except as a result of the Chapter 11 Cases, in default, and no event has occurred that, with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound or to which any of the property or assets of the Company or any of its Subsidiaries is subject, except for any such default that has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Neither the Company nor any of its Subsidiaries is, or has been at any time since January 1, 2002, in violation of any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority, except for any such violation that has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(p) <u>Legal Proceedings</u>. Except as described in the Company SEC Documents filed prior to the date hereof, there are no legal, governmental or regulatory actions, suits, proceedings or, to the knowledge of the Company, investigations pending to which the Company or any of its Subsidiaries is or may be a party or to which any property of the Company or any of its Subsidiaries is or may be the subject that, individually or in the aggregate, has had or, if determined adversely to the Company or any of its Subsidiaries, would reasonably be expected to have a Material Adverse Effect, and no such actions, suits or proceedings or, to the knowledge of the Company, investigations are pending, threatened or contemplated, by any governmental or regulatory authority or by others. There are no current or pending legal, governmental or regulatory actions, suits or proceedings that are required under the Exchange Act to be described in the Company SEC Documents or the Rights Offering Registration Statement or Rights Offering Prospectus that are not or will not be so described, and there are no statutes, regulations or contracts or other documents that are required under the Exchange Act to be filed as exhibits to the Company SEC Documents or the Rights Offering Registration Statement or Rights Offering Prospectus or described in the Company SEC Documents or the Rights Offering Registration Statement or Rights Offering Prospectus that are not so filed or described.

(q) <u>Independent Accountants</u>. Ernst & Young LLP ("**E&Y**"), the Company's public accountants, are independent public accountants with respect to the Company and its Subsidiaries as required by the Securities Act.

(r)   <u>Labor Relations</u>.  Except as set forth in the Company SEC Documents filed prior to the date hereof:

(i)   neither the Company nor any of its Subsidiaries is a party to, or bound by, any material collective bargaining agreement, contract or other agreement or understanding with a labor union or labor organization (other than contracts or other agreements or understandings with labor unions or labor organizations in connection with products and services offered and sold to such unions and organizations by the Company or its Subsidiaries);

(ii)   neither the Company nor any of its Subsidiaries is the subject of any proceeding asserting that it or any Subsidiary has committed an unfair labor practice or sex, age, race or other discrimination or seeking to compel it to bargain with any labor organization as to wages or conditions of employment, which, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect;

(iii)   there are no material current or, to the knowledge of the Company, threatened organizational activities or demands for recognition by a labor organization seeking to represent employees of the Company or any Subsidiary and no such activities have occurred during the past 24 months;

(iv)   no grievance, arbitration, litigation or complaint or, to the knowledge of the Company, investigations relating to labor or employment matters is pending or, to the knowledge of the Company, threatened against the Company or any of its Subsidiaries which, except as has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(v)   the Company and each of its Subsidiaries has complied and is in compliance in all respects with all applicable laws (domestic and foreign), agreements, contracts, and policies relating to employment, employment practices, wages, hours, and terms and conditions of employment and is not engaged in any material unfair labor practice as determined by the National Labor Relations Board (or any foreign equivalent) except where the failure to comply has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(vi)   the Company has complied in all respects with its payment obligations to all employees of the Company and its Subsidiaries in respect of all wages, salaries, commissions, bonuses, benefits and other compensation due and payable to such employees under any Company policy, practice,

agreement, plan, program or any statute or other law, except to the extent that any noncompliance, either individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect; and

(vii)    the Company has complied and is in compliance in all material respects with its obligations pursuant to the Worker Adjustment and Retraining Notification Act of 1988 (and any similar state or local law) to the extent applicable, and all material other employee notification and bargaining obligations arising under any collective bargaining agreement or statute.

(s)    <u>Title to Intellectual Property</u>. The Company and its Subsidiaries own or possess valid and enforceable rights to use all material patents, patent applications, trademarks, service marks, trade names, trademark registrations, service mark registrations, copyrights, licenses and know-how (including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures) (collectively, "**Intellectual Property**") used in the conduct of their respective businesses other than Intellectual Property, the failure to own or possess which has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. All registrations with and applications to governmental or regulatory authorities in respect of such Intellectual Property are valid and in full force and effect, have not, except in accordance with the ordinary course practices of the Company and its Subsidiaries, lapsed, expired or been abandoned (subject to the vulnerability of a registration for trademarks to cancellation for lack of use), are not the subject of any opposition filed with the United States Patent and Trademark Office or any other applicable Intellectual Property registry. The consummation of the transaction contemplated hereby and by the Plan will not result in the loss or impairment of any rights to use such Intellectual Property or obligate any of the Investors to pay any royalties or other amounts to any third party in excess of the amounts that would have been payable by Company and its Subsidiaries absent the consummation of this transactions. The Company and its Subsidiaries have taken reasonable security measures to protect the confidentiality and value of its and their trade secrets (or other Intellectual Property for which the value is dependent upon its confidentiality), and no such information, has been misappropriated or the subject of an unauthorized disclosure, except to the extent that such misappropriation or unauthorized disclosure has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The Company and its Subsidiaries have not received any notice that it is or they are, in default (or with the giving of notice or lapse of time or both, would be in default) under any contract relating to such Intellectual Property. No Intellectual Property rights of the Company or its Subsidiaries are being infringed by any other person, except to the extent that such infringement has not had and would not have, individually or in the aggregate, a Material Adverse Effect. The conduct of the businesses of the Company and its Subsidiaries will

not conflict in any respect with any Intellectual Property rights of others, and the Company and its Subsidiaries have not received any notice of any claim of infringement or conflict with any such rights of others which has had or would in any such case be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(t)    <u>Title to Real and Personal Property</u>. The Company and its Subsidiaries have good and marketable title to all real property owned by the Company and its Subsidiaries and good title to all other tangible and intangible properties (other than Intellectual Property covered by <u>Section 3(s)</u>) owned by them, in each case, free and clear of all mortgages, pledges, liens, security interests, claims, restrictions or encumbrances of any kind except such as (i) are described in the consolidated balance sheets included in the Company SEC Documents filed prior to the date hereof or (ii) individually and in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect. All of the leases and subleases to which the Company or its Subsidiaries are a party are in full force and effect and enforceable by the Company or such Subsidiary in accordance with their terms, and neither the Company nor any Subsidiary has received any notice of any claim of any sort that has been asserted by anyone adverse to the rights of the Company or any Subsidiary under any of the leases or subleases mentioned above, or affecting or questioning the rights of the Company or such Subsidiary to the continued possession of the leased or subleased property by under any such lease or sublease, except where any such claim or failure to be enforceable would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(u)    <u>No Undisclosed Relationships</u>. As of the date hereof, no relationship, direct or indirect, exists between or among the Company or any of its Subsidiaries, on the one hand, and the directors, officers, stockholders, customers or suppliers of the Company or any of its Subsidiaries, on the other, that is required by the Exchange Act to be described in the Company SEC Documents and that are not so described, except for the transactions pursuant to this Agreement.

(v)    <u>Investment Company Act</u>. As of the date hereof, the Company is not and, after giving effect to the consummation of the Plan, including the offering and sale of the Investor Shares and Shares upon exercise of Rights, and the application of the proceeds thereof, will not be required to register as an "investment company" or an entity "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, and the rules and regulations of the Commission thereunder.

(w)    <u>Licenses and Permits</u>. The Company and its Subsidiaries possess all licenses, certificates, permits and other authorizations issued by, and have made all declarations and filings with, the appropriate federal, state, local or foreign

governmental or regulatory authorities that are necessary for the ownership or
lease of their respective properties or the conduct of their respective businesses as
described in the Company SEC Documents except any such licenses, certificates,
permits or authorization the absence of which would not reasonably be expected
to have, individually or in the aggregate, a Material Adverse Effect.  Except as
described in the Company SEC Documents filed prior to the date hereof and
except as, individually and in the aggregate, has not had and would not reasonably
be expected to have a Material Adverse Effect, neither the Company nor any of its
Subsidiaries has received notice of any revocation or modification of any such
license, certificate, permit or authorization or has any reason to believe that any
such license, certificate, permit or authorization will not be renewed in the
ordinary course.

(x)    <u>Compliance with Environmental Laws.</u>

(i)    The Company and its Subsidiaries have complied and are in compliance
with any and all applicable federal, state, local and foreign laws, rules,
regulations, decisions and orders, including all civil and common law,
relating to the protection of human health and safety, the environment or
hazardous or toxic substances or wastes, pollutants or contaminants
(collectively, "**Environmental Laws**");

(ii)    the Company and its Subsidiaries have (a) received and are in compliance
with all permits, licenses or other approvals required of them under
applicable Environmental Laws to conduct their respective businesses, (b)
are not subject to any action to revoke, terminate, cancel, limit, amend or
appeal any such permits, licenses or approvals, and (c) have paid all fees,
assessments or expenses due under any such permits, licenses or approvals;

(iii)    the Company and its Subsidiaries have not received notice from any
governmental authority of any actual or potential liability for the
investigation or remediation of any disposal or release of hazardous or
toxic substances or wastes, pollutants or contaminants, or for any violation
of Environmental Laws;

(iv)    there are no facts, circumstances or conditions relating to the past or
present business or operations of the Company, its Subsidiaries or any of
their predecessors (including the disposal of any hazardous or toxic
substances or wastes, pollutants or contaminants), or to any real property
currently or formerly owned or operated by the Company, its Subsidiaries
or any of their predecessors, that would reasonably be expected to give
rise to any claim, proceeding or action, or to any liability, under any
Environmental Law;

(v)     neither the Company nor any of its Subsidiaries has agreed to assume or accept responsibility for, by contract or otherwise, any liability of any other person under Environmental Laws;

(vi)    neither the Company nor any of its Subsidiaries is required or reasonably expected to incur material capital expenditures during the current and the subsequent five fiscal years to reach or maintain compliance with existing or reasonably anticipated Environmental Laws;

(vii)   none of the transactions contemplated under this Agreement will give rise to any obligations to obtain the consent of or provide notice to any governmental or regulatory authority under any Environmental Laws; and

(viii)  none of the Company, nor any of its subsidiaries nor their respective predecessors has manufactured, marketed, distributed, or sold asbestos or any products containing asbestos.

except, in the case of each of subclauses (i) through (vi) and in subclause (viii) above, as disclosed in the Company SEC Documents filed prior to the date hereof, as have been, as of the date of this Agreement, adequately provided for in accordance with GAAP in the financial statements of the Company included in the Company SEC Documents filed prior to the date hereof, or as, individually and in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect.

(y)     <u>Tax Matters</u>.  Except as described in the Company SEC Documents filed with the Commission prior to the date hereof:

(i)     The Company has timely filed or caused to be timely filed (taking into account any applicable extension of time within which to file) with the appropriate taxing authorities all material tax returns, statements, forms and reports (including elections, declarations, disclosures, schedules, estimates and information Tax Returns) for Taxes ("**Tax Returns**") that are required to be filed by, or with respect to, the Company and its Subsidiaries on or prior to the Closing Date.  The Tax Returns accurately reflect all material liability for Taxes of the Company and its Subsidiaries for the periods covered thereby;

(ii)    all material Taxes and Tax liabilities due by or with respect to the income, assets or operations of the Company and its Subsidiaries for all taxable years or other taxable periods that end on or before the Closing Date have been or will, prior to the Closing, be timely paid in full or accrued and

fully provided for in accordance with GAAP on the financial statements of the Company included in the Company SEC Documents;

(iii)    neither the Company nor any of its Subsidiaries has received any written notices from any taxing authority relating to any material issue that has not been adequately provided for in accordance with GAAP in the financial statements of the Company included in the Company SEC Documents filed prior to the date hereof;

(iv)    all material Taxes which the Company and each or any of its Subsidiaries is (or was) required by law to withhold or collect in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party have been duly withheld or collected, and have been timely paid to the proper authorities to the extent due and payable;

(v)    neither the Company nor any of its subsidiaries has been included in any "consolidated," "unitary" or "combined" Tax Return provided for under the law of the United States, any foreign jurisdiction or any state or locality with respect to Taxes for any taxable period for which the statute of limitations has not expired (other than a group of which the Company and/or its subsidiaries are the only members);

(vi)    except for the tax sharing allocations and similar agreements entered into with GM at the time of the spin-off, there are no tax sharing, allocation, indemnification or similar agreements in effect as between the Company or any of its Subsidiaries or any predecessor or affiliate thereof and any other party (including any predecessors or affiliates thereof) under which the Company or any of its Subsidiaries would be liable for any material Taxes or other claims of any party;

(vii)    the Company has not been a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code at any time during the five-year period ending on the date hereof; and

(viii)    the Company is not a party to any agreement other than certain Change In Control Agreements in the Company SEC Documents filed prior to the date hereof that would require the Company or any affiliate thereof to make any material payment that would constitute an "excess parachute payment" for purposes of Sections 280G and 4999 of the Code.

For purposes of this Agreement, "**Taxes**" shall mean all taxes, assessments, charges, duties, fees, levies or other governmental charges, including, without limitation, all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, property, excise, severance, windfall profits, stamp, license, payroll, social security, withholding and other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest and shall include any liability for such amounts as a result either of being a member of a combined, consolidated, unitary or affiliated group or of a contractual obligation to indemnify any person or other entity.

(z)    Compliance With ERISA.

(i)    Correct and complete copies of the following documents, with respect to all material domestic and foreign benefit and compensation plans, programs, contracts, commitments, practices, policies and arrangements, whether written or oral, that have been established, maintained or contributed to (or with respect to which an obligation to contribute has been undertaken) or with respect to which any potential liability is borne by the Company or any of its Subsidiaries, including, but not limited to, "employee benefit plans" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), and deferred compensation, stock option, stock purchase, restricted stock, stock appreciation rights, stock based, incentive and bonus plans (the "**Company Plans**"), have been delivered or made available to the Investors by the Company, to the extent applicable: (i) all material Company Plan documents, together with all amendments and attachments thereto (including, in the case of any Company Plan not set forth in writing, a written description thereof); (ii) all material trust documents, declarations of trust and other documents establishing other funding arrangements, and all amendments thereto and the latest financial statements thereof; (iii) the most recent annual report on IRS Form 5500 for each of the past three years and all schedules thereto and the most recent actuarial report; (iv) the most recent IRS determination letter; (v) summary plan descriptions and summaries of material modifications; and (vi) the two most recently prepared actuarial valuation reports.

(ii)    Except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or except as described in the Company SEC Documents filed prior to the date hereof: (A) each Company Plan, other than any "multiemployer plans" within the meaning of Section 3(37) of ERISA ("**Multiemployer Plans**"), is in compliance with ERISA, the Internal Revenue Code of 1986, as amended

(the "**Code**") and other applicable laws; (B) each Company Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the IRS covering all Tax law changes prior to the Economic Growth and Tax Relief Reconciliation Act of 2001 or has applied to the IRS for such favorable determination within the applicable remedial amendment period under Section 401(b) of the Code, and the Company is not aware of any circumstances likely to result in the loss of the qualification of such Company Plan under Section 401(a) of the Code; (C) no liability under Subtitle C or D of Title IV of ERISA has been or is reasonably expected to be incurred by the Company or any of its Subsidiaries with respect to any ongoing, frozen or terminated "single-employer plan," within the meaning of Section 4001(a)(15) of ERISA ("**Single-Employer Plan**") currently maintained or contributed to (or with respect to which an obligation to contribute has been undertaken), or the Single-Employer Plan of any entity which is considered one employer with the Company under Section 4001 of ERISA or Section 414 of the Code (a "**Company ERISA Affiliate**"); (D) the Company and its Subsidiaries have not incurred any withdrawal liability (including any contingent or secondary withdrawal liability) with respect to a Multiemployer Plan under Subtitle E of Title IV of ERISA (regardless of whether based on contributions of a Company ERISA Affiliate) that has not been satisfied in full and no condition or circumstance has existed that presents a risk of the occurrence of any withdrawal from or the partition, termination, reorganization or insolvency of any such Multiemployer Plan; (E) no notice of a "reportable event," within the meaning of Section 4043 of ERISA has occurred or is expected to occur for any Company Plan or by any Company ERISA Affiliate; (F) all contributions required to be made under the terms of any Company Plan have been timely made or have been reflected in the financial statements of the Company included in the Company SEC Reports filed prior to the date hereof; and (G) there has been no amendment to, announcement by the Company or any of its Subsidiaries relating to, or change in employee participation or coverage under, any Company Plan which would increase the expense of maintaining such plan above the level of the expense incurred therefor for the most recent fiscal year.

(iii)    Except as disclosed in the Company SEC Documents filed prior to the date hereof: (A) neither any Company Plan nor any Single-Employer Plan of a Company ERISA Affiliate has an "accumulated funding deficiency" (whether or not waived) within the meaning of Section 412 of the Code or Section 302 of ERISA and neither the Company nor any of its Subsidiaries nor any Company ERISA Affiliate has applied for or obtained a funding waiver; (B) the Company expects that required minimum contributions to any Company Plan under Section 412 of the Code will not be materially increased by application of Section 412(l) of the Code; (C) neither the Company nor any of its Subsidiaries has provided, or is required to

provide, security to any Company Plan or to any Single-Employer Plan of a Company ERISA Affiliate pursuant to Section 401(a)(29) of the Code; and (D) neither the execution of this Agreement, stockholder approval of this Agreement nor the consummation of the transactions contemplated hereby will limit or restrict the right of the Company to merge, amend or terminate any of the Company Plans.

(aa)    Internal Control Over Financial Reporting.  Except as set forth in the Company SEC Documents filed prior to the date hereof, the Company and its Subsidiaries (i) make and keep books and records that accurately and fairly represent the Company's transactions, and (ii) maintain and have maintained effective internal control over financial reporting as defined in Rule 13a-15 under the Exchange Act and a system of internal accounting controls sufficient to provide reasonable assurance that: (A) transactions are executed in accordance with management's general or specific authorizations; (B) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset accountability; (C) access to assets is permitted only in accordance with management's general or specific authorization; and (D) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.  The Company has disclosed, based on the most recent evaluation of its chief executive officer and its chief financial officer prior to the date hereof, to the Company's auditors and the audit committee of the Company's board of directors (i) any significant deficiencies in the design or operation of its internal controls over financial reporting that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information and has identified for the Company's auditors and the audit committee of the Company's board of directors any material weaknesses in internal control over financial reporting and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

(bb)    Disclosure Controls and Procedures.  Except as disclosed in the Company SEC Documents filed prior to the date hereof, the Company maintains disclosure controls and procedures required by Rule 13a-15 or 15d-15 under the Exchange Act.  Such disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company is recorded and reported on a timely basis to the individuals responsible for the preparation of the Company's filings with the Commission and other public disclosure documents.

(cc)    Insurance.  The Company and its Subsidiaries have insurance covering their respective properties, operations, personnel and businesses, including business interruption insurance, which insurance is in amounts and insures against such losses and risks as are customary for companies whose businesses are similar to

the Company and its Subsidiaries. Neither the Company nor any of its Subsidiaries has (i) received written notice from any insurer or agent of such insurer that capital improvements or other expenditures are required or necessary to be made to continue such insurance or (ii) any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage at reasonable cost from similar insurers as may be necessary to continue its business.

(dd)     <u>No Unlawful Payments</u>. Neither the Company nor any of its Subsidiaries nor, to the knowledge of the Company, any director, officer, agent, employee or other person associated with or acting on behalf of the Company or any of its Subsidiaries has: (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977; or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment in each case other than clause (iii) that has been or would reasonably be expected to be, individually or in the aggregate, material to the Company and its Subsidiaries, taken as a whole.

(ee)     <u>Compliance with Money Laundering Laws</u>. The Company and its Subsidiaries are and have been conducted at all times in compliance with applicable financial recordkeeping and reporting requirements of the Bank Secrecy Act, as amended, the money laundering statutes of all jurisdictions, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "**Money Laundering Laws**") and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its Subsidiaries with respect to Money Laundering Laws is pending or, to the knowledge of the Company, threatened.

(ff)     <u>Compliance with Sanctions Laws</u>. Neither the Company nor any of its Subsidiaries nor, to the knowledge of the Company, any director, officer, agent, employee or affiliate of the Company or any of its Subsidiaries is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**"). The Company will not directly or indirectly use the proceeds of the Rights Offering or the sale of the Investor Shares, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other person or entity, for the purpose of financing the activities of any person that, to the Company's knowledge, is currently subject to any U.S. sanctions administered by OFAC.

(gg)    No Restrictions on Subsidiaries. Except as described in the Company SEC Documents filed prior to the date hereof or otherwise set forth in the record of the Chapter 11 Cases on or prior to the date hereof, and subject to the Bankruptcy Code, no Subsidiary of the Company is currently prohibited, directly or indirectly, under any agreement or other instrument to which it is a party or is subject, from paying any dividends to the Company, from making any other distribution on such Subsidiary's capital stock, from repaying to the Company any loans or advances to such Subsidiary from the Company or from transferring any of such Subsidiary's properties or assets to the Company or any other Subsidiary of the Company.

(hh)    No Broker's Fees. Neither the Company nor any of its Subsidiaries is a party to any contract, agreement or understanding with any person (other than this Agreement) that would give rise to a valid claim against the Investors for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Investor Shares.

(ii)    No Registration Rights. Except as provided for pursuant to the registration rights agreement contemplated by Section 8(c)(iv), no person has the right to require the Company or any of its Subsidiaries to register any securities for sale under the Securities Act by reason of the filing of the Rights Offering Registration Statement with the Commission or in connection with Rights Offering or the sale of the Investor Shares.

(jj)    No Stabilization. The Company has not taken and will not take, directly or indirectly, any action designed to or that would reasonably be expected to cause or result in any stabilization or manipulation of the price of the Shares.

(kk)    Margin Rules. Neither the issuance, sale and delivery of the Rights or the Shares in connection with Rights Offering or the sale of the Investor Shares nor the application of the proceeds thereof by the Company as described and to be described in the Rights Offering Registration Statement and the Rights Offering Prospectus will violate Regulation T, U or X of the Board of Governors of the Federal Reserve System or any other regulation of such Board of Governors.

(ll)    Forward-Looking Statements. No forward-looking statement (within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act) contained in the Company SEC Documents has been made or reaffirmed, and in the case of the Rights Offering Registration Statement and the Rights Offering Prospectus, will be made or reaffirmed, without a reasonable basis or has been disclosed other than in good faith.

(mm) <u>Statistical and Market Data</u>.  Nothing has come to the attention of the Company that has caused the Company to believe that the statistical and market-related data included and to be included in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus is not based on or derived from sources that are reliable and accurate in all material respects.

(nn) <u>Rights Agreement</u>.  The Company and the Board of Directors of the Company has taken all necessary action to render the Existing Shareholder Rights Plan inapplicable to the sale and issuance of the Investor Shares and the other transactions contemplated by the Original Agreement, this Agreement, the Original PSA, the Plan Terms, the Plan and the Transaction Agreements (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser).

(oo) <u>Takeover Statutes; Charter</u>.  The Company and the Board of Directors of the Company has taken all such action necessary to render the restrictions contained in Section 203 of the General Corporation Law of the State of Delaware (the "**DGCL**") and Article IX of the Company's Certificate of Incorporation inapplicable to the Investors and the sale and issuance of the Investor Shares and the other transactions contemplated by the Original Agreement, this Agreement, the Original PSA, the Plan Terms, the Plan and the Transaction Agreements (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser).  Except for Section 203 of the DGCL (which has been rendered inapplicable), no other "fair price," "moratorium," "control share acquisition", "business combination" or other similar anti-takeover statute or regulation (a "**Takeover Statute**") is applicable to the Company, the Common Stock, the Shares, the sale and issuance of the Investor Shares or the other transactions contemplated by the Original Agreement, this Agreement, the Original PSA, the Plan Terms, the Plan and the Transaction Agreements.  Other than Article IX of the Company's Certificate of Incorporation, which has been rendered inapplicable, no anti-takeover provision in the Company's certificate of incorporation or by-laws is applicable to the Company, the Common Stock, the Shares, the sale and issuance of the Investor Shares or the other transactions contemplated by the Preferred Term Sheet, the Plan or the Transaction Agreements.

(pp) <u>UAW MOU</u>.  On June 22, 2007, the Company entered into a Memorandum of Understanding (the "**UAW MOU**") with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("**UAW**") and GM.  The UAW MOU has been ratified by the membership of the UAW and a true and complete copy thereof has been made available to ADAH.

4.    <u>Representations and Warranties of the Investors</u>.  Each Investor represents and warrants as to itself only, and agrees with the Company, severally and not jointly, as set forth

below.  Each such representation, warranty and agreement is made as of the date hereof
and as of the Closing Date.

(a)     Incorporation.  The Investor has been duly organized and, if applicable, is validly
        existing as a corporation, limited partnership or limited liability company, in good
        standing under the laws of the jurisdiction of its incorporation or organization.

(b)     Corporate Power and Authority.  The Investor has the requisite corporate, limited
        partnership or limited liability company power and authority to enter into, execute
        and deliver this Agreement and to perform its obligations hereunder and has taken
        all necessary corporate, limited partnership or limited liability company action
        required for the due authorization, execution, delivery and performance by it of
        this Agreement.

(c)     Execution and Delivery.  This Agreement has been duly and validly executed and
        delivered by the Investor and constitutes its valid and binding obligation,
        enforceable against it in accordance with its terms.

(d)     No Registration.  The Investor understands that the Investor Shares have not been
        registered under the Securities Act by reason of a specific exemption from the
        registration provisions of the Securities Act, the availability of which depends
        upon, among other things, the bona fide nature of the investment intent and the
        accuracy of such Investor's representations as expressed herein or otherwise made
        pursuant hereto.

(e)     Investment Intent.  The Investor is acquiring the Investor Shares for investment
        for its own account, not as a nominee or agent, and not with the view to, or for
        resale in connection with, any distribution thereof not in compliance with
        applicable securities laws, and such Investor has no present intention of selling,
        granting any participation in, or otherwise distributing the same, except in
        compliance with applicable securities laws.

(f)     Securities Laws Compliance.  The Investor Shares will not be offered for sale,
        sold or otherwise transferred by the Investor except pursuant to a registration
        statement or in a transaction exempt from, or not subject to, registration under the
        Securities Act and any applicable state securities laws and any sale or placement
        of Investor Shares pursuant to Sections 2(a), 2(b) or 2(k) will not affect the
        validity of the private placement to the Investors under this Agreement or result in
        the private placement being integrated with the Rights Offering.  The Investors
        have not and will not solicit offers for, or offer to sell, the Investor Shares by
        means of any general solicitation or general advertising within the meaning of
        Rule 502(c) under Regulation D under the Securities Act or in any manner

involving a public offering within the meaning of the Securities Act (other than pursuant to the Resale Registration Statement).

(g)    <u>Sophistication</u>.  The Investor has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment in the Investor Shares being acquired hereunder.  The Investor is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act.  The Investor understands and is able to bear any economic risks associated with such investment (including, without limitation, the necessity of holding the Investor Shares for an indefinite period of time).

(h)    <u>No Conflict</u>.  The execution and delivery by the Investor of each of the Transaction Agreements to which it is a party and the compliance by the Investor with all of the provisions hereof and thereof and the Preferred Term Sheet and the Plan Terms and the consummation of the transactions contemplated herein and therein (i) will not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, in the acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Investor is a party or by which the Investor is bound or to which any of the property or assets of the Investor or any of its Subsidiaries is subject, (ii) will not result in any violation of the provisions of the certificate of incorporation or bylaws or similar governance documents of the Investor, and (iii) will not result in any material violation of, or any termination or material impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Investor or any of their properties, except in any such case described in subclause (i) for any conflict, breach, violation, default, acceleration or lien which has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(i)    <u>Consents and Approvals</u>.  No consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Investor or any of its properties is required to be obtained or made by the Investor for the purchase of the Investor Shares hereunder and the execution and delivery by the Investor of this Agreement or the Transaction Agreements to which it is a party and performance of and compliance by the Investor with all of the provisions hereof and thereof and the Preferred Term Sheet and the Plan Terms and the consummation of the transactions contemplated herein and therein, except filings with respect to and the expiration or termination of the waiting period under the HSR Act or any comparable laws or regulations in any foreign jurisdiction relating to the purchase of Investor Shares and except for

any consent, approval, authorization, order, registration or qualification which, if not made or obtained, has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(j)    <u>Arm's Length</u>.  The Investor acknowledges and agrees that the Company is acting solely in the capacity of an arm's length contractual counterparty to the Investor with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering).  Additionally, the Investor is not relying on the Company for any legal, tax, investment, accounting or regulatory advice, except as specifically set forth in this Agreement.  The Investor shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby.

(k)    <u>No Violation or Default; Compliance with Laws</u>.  The Investor is not in default, and no event has occurred that, with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Investor is a party or by which the Investor is bound or to which any of the property or assets of the Investor is subject, individually or in the aggregate, that would prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.  The Investor is not and has not been at any time since January 1, 2002, in violation of any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority, except for any such violation that has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(l)    <u>Legal Proceedings</u>.  There are no actions, suits or proceedings to which the Investor is a party or to which any property of the Investor is the subject that, individually or in the aggregate, has or, if determined adversely to the Investor, would reasonably be expected to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement and no such actions, suits or proceedings are threatened or, to the knowledge of the Investor, contemplated and, to the knowledge of the Investor, no investigations are threatened by any governmental or regulatory authority or threatened by others that has or would reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(m)   No Broker's Fees.  The Investor is not a party to any contract, agreement or understanding with any person (other than this Agreement) that would give rise to a valid claim against the Company, other than pursuant to Section 2(j), for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Investor Shares.

(n)   No Undisclosed Written Agreements.  Other than the (i) Additional Investor Agreement; (ii) Agreement Among Initial Investors, by and among ADAH, Harbinger, UBS and Merrill; and (iii) that certain Letter Agreement, by and among ADAH, Harbinger, UBS, Merrill, Pardus and GS (substantially in the form delivered to the Company on July 17, 2007), the Investor has not entered into any material written agreements between or among the Investors directly relating to such Investor's Investor Shares or the performance of the Transaction Agreements, and any such written agreement hereafter entered into will be disclosed promptly to the Company.

(o)   Available Funds.  To the extent the Investor is ADAH, Harbinger or Pardus, the Investor has provided the Company with a true and complete copy of an executed commitment letter from the parties signatory thereto to provide equity financing to such Investor (the "**Equity Commitment Letter**").  Each such Investor represents as to itself that its Equity Commitment Letter is in full force and effect and is a valid and binding obligation of the parties thereto enforceable in accordance with its terms except as the enforcement thereof is subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors rights and to general equitable principles.  The Equity Commitment Letters are not subject to any condition or contingency with respect to financing that is not set forth in such letter other than the terms and conditions of this Agreement.

5.   Additional Covenants of the Company.  The Company agrees with each of the Investors as set forth below.

(a)   Approval Motion and Approval Order.  The Company agrees that it shall use reasonable best efforts to cause the Approval Order to become a Final Approval Order as soon as practicable following the filing of the Approval Motion.

(b)   Plan and Disclosure Statement.  The Company shall authorize, execute, file with the Bankruptcy Court and seek confirmation of, a Plan (and a related disclosure statement (the "**Disclosure Statement**")) (i) the terms of which are consistent with this Agreement, the Preferred Term Sheet, the Plan Terms and the GM Settlement, (ii) that provides for the release and exculpation of each Investor, its Affiliates, shareholders, partners, directors, officers, employees and advisors from liability for participation in the transactions contemplated by the Original Agreement, this Agreement, the Preferred Term Sheet, the Original PSA, the Plan

Terms and the Plan to the fullest extent permitted under applicable law (provided, that such release and exculpation shall not prohibit or impede the Company's ability to assert defenses or counterclaims in connection with or relating to the Original Agreement or the Original PSA) and (iii) that has conditions to confirmation and the Effective Date of the Plan (and to what extent any such conditions can be waived and by whom) that are consistent with this Agreement, the Preferred Term Sheet, the Plan Terms and the GM Settlement.  The Company will (i) provide to ADAH and its counsel a copy of the Plan and the Disclosure Statement, and any amendments thereto, and a reasonable opportunity to review and comment on such documents prior to such documents being filed with the Bankruptcy Court, and (ii) duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the Plan Terms, and any other reasonable comments of ADAH and its counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH or its counsel and giving due consideration to the views of ADAH and its counsel.  In addition, the Company will (i) provide to ADAH and its counsel a copy of the Confirmation Order and a reasonable opportunity to review and comment on such order prior to such order being filed with the Bankruptcy Court and (ii) duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the Plan Terms and any other reasonable comments of each of ADAH and its counsel, into such Confirmation Order, and shall not reject such comments without first discussing the reasons therefor with ADAH or its counsel and giving due consideration to the views of ADAH and its counsel.  As soon as practicable following the entry of an order by the Bankruptcy Court approving the Disclosure Statement (the "**Disclosure Statement Approval Date**") and the effectiveness under the Securities Act of the Rights Offering Registration Statement, the Company shall distribute ballot form(s) in connection with the solicitation of acceptance of the Plan.

(c)    Rights Offering.  The Company shall use its reasonable best efforts to effectuate the Rights Offering as provided herein.

(d)    Securities Laws; Rights Offering Registration Statement.  The Company shall take all action as may be necessary or advisable so that the Rights Offering and the issuance and sale of the Investor Shares and the other transactions contemplated by this Agreement will be effected in accordance with the Securities Act and the Exchange Act and any state or foreign securities or Blue Sky laws.  The Rights Offering Registration Statement was filed with the Commission on March 7, 2007.  As promptly as practicable following the date the GM Settlement is agreed, the Company shall file an amended Rights Offering Registration Statement with the Commission.  The Company shall: (i) provide ADAH with a reasonable opportunity to review the Rights Offering Registration Statement, and any amendment or supplement thereto, before any filing with the Commission and shall duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the Plan Terms, and any other reasonable comments

of ADAH and its counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH or its counsel and giving due consideration to the views of ADAH and its counsel; (ii) advise ADAH, promptly after it receives notice thereof, of the time when the Rights Offering Registration Statement has been filed or has become effective or any Rights Offering Prospectus or Rights Offering Prospectus supplement has been filed and shall furnish ADAH with copies thereof; (iii) advise ADAH promptly after it receives notice of any comments or inquiries by the Commission (and furnish the Investors with copies of any correspondence related thereto), of the issuance by the Commission of any stop order or of any order preventing or suspending the use of the Rights Offering Prospectus or Issuer Free Writing Prospectus, of the initiation or threatening of any proceeding for any such purpose, or of any request by the Commission for the amending or supplementing of the Rights Offering Registration Statement or a Rights Offering Prospectus or for additional information, and in each such case, provide ADAH with a reasonable opportunity to review any such comments, inquiries, request or other communication from the Commission and to review any amendment or supplement to the Rights Offering Registration Statement or the Rights Offering Prospectus before any filing with the Commission, and to duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the Plan Terms, and any other reasonable comments of ADAH and its counsel, and not reject such comments without first discussing the reasons therefor with ADAH or its counsel and giving due consideration to the views of ADAH and its counsel; and (iv) in the event of the issuance of any stop order or of any order preventing or suspending the use of a Rights Offering Prospectus or any Issuer Free Writing Prospectus or suspending any such qualification, use promptly its reasonable best efforts to obtain its withdrawal.

(e)     Listing. The Company shall use its commercially reasonable efforts to list and maintain the listing of the New Common Stock on the New York Stock Exchange or, if approved by ADAH, the Nasdaq Global Select Market.

(f)     Rule 158. The Company will generally make available to the Company's security holders as soon as practicable an earnings statement of the Company covering a twelve-month period beginning after the date of this Agreement, which shall satisfy the provisions of Section 11(a) of the Securities Act.

(g)     Notification. The Company shall notify, or cause the Subscription Agent to notify the Investors, on each Friday during the Rights Exercise Period and on each Business Day during the five Business Days prior to the Expiration Time (and any extensions thereto), or more frequently if reasonably requested by any of the Investors, of the aggregate number of Rights known by the Company or the Subscription Agent to have been exercised pursuant to the Rights Offering as of

the close of business on the preceding Business Day or the most recent practicable time before such request, as the case may be.

(h)    <u>Unsubscribed Shares</u>. The Company shall determine the number of Unsubscribed Shares, if any, in good faith, shall provide a Purchase Notice or a Satisfaction Notice that accurately reflects the number of Unsubscribed Shares as so determined and shall provide to ADAH a certification by the Subscription Agent of the Unsubscribed Shares or, if such certification is not available, such written backup to the determination of the Unsubscribed Shares as ADAH may reasonably request.

(i)    <u>HSR</u>. The Company shall use its reasonable best efforts to promptly prepare and file all necessary documentation and to effect all applications and seek all approvals or consents that are necessary or advisable under the HSR Act and any comparable laws or regulations in any foreign jurisdiction so that any applicable waiting period shall have expired or been terminated thereunder with respect to the purchase of Investor Shares hereunder, and shall not take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the transactions contemplated by this Agreement. The Company shall file, to the extent that it is required to file, the Notification and Report Form required under the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission no later than the fifteenth day following the Disclosure Statement Approval Date.

(j)    <u>Clear Market</u>. For a period of 180 days after the Closing Date (the "**Restricted Period**"), the Company will not (i) offer, pledge, announce the intention to sell, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase or otherwise transfer or dispose of, directly or indirectly, any shares of capital stock of the Company or any securities convertible into or exercisable or exchangeable for capital stock of the Company or (ii) enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of the capital stock of the Company, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of capital stock of the Company or such other securities, in cash or otherwise, without the prior written consent of ADAH, except for (A) Rights and New Common Stock issuable upon exercise of Rights, (B) shares of New Common Stock issued upon the exercise of any stock options outstanding as of the Effective Date and (C) the issuance of New Common Stock and other equity interests as set forth in the Preferred Term Sheet, the Plan Terms and pursuant to the Plan. Notwithstanding the foregoing, if (i) during the last 17 days of the Restricted Period, the Company issues an earnings release or material news or a material event relating to the Company occurs or (ii)

prior to the expiration of the Restricted Period, the Company announces that it will release earnings results during the 16-day period beginning on the last day of the Restricted Period, the restrictions imposed by this Agreement shall continue to apply until the expiration of the 18-day period beginning on the issuance of the earnings release or the occurrence of the material news or material event.

(k)    <u>Use of Proceeds</u>.  The Company will apply the net proceeds from the sale of the Rights and the Investor Shares as provided in the Rights Offering Prospectus.

(l)    <u>No Stabilization</u>.  The Company will not take, directly or indirectly, any action designed to or that would reasonably be expected to cause or result in any stabilization or manipulation of the price of the Shares.

(m)    <u>Reports</u>.  So long as any Investor holds Shares, the Company will furnish to such Investor, as soon as they are available, copies of all reports or other communications (financial or other) furnished to holders of the Rights or the Shares, as the case may be, and copies of any reports and financial statements furnished to or filed with the Commission or any national securities exchange or automatic quotation system.

(n)    <u>Conduct of Business</u>.  During the period from the date of this Agreement to the Closing Date (except as otherwise expressly provided by the terms of this Agreement (including the Disclosure Letter accepted by ADAH in accordance with <u>Section 5(s)</u> of this Agreement), the Plan Terms, the Plan or any other order of the Bankruptcy Court entered on or prior to the date hereof in the Chapter 11 Cases), the Company and its Subsidiaries shall carry on their businesses in the ordinary course (subject to any actions which are consistent with the Draft Business Plan or the Business Plan approved by ADAH in accordance with <u>Section 9(a)(xxviii)</u> of this Agreement) and, to the extent consistent therewith, use their commercially reasonable efforts to preserve intact their current business organizations, keep available the services of their current officers and employees and preserve their relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with the Company or its Subsidiaries.  Without limiting the generality of the foregoing, except as set forth in the Disclosure Letter approved by ADAH in accordance with <u>Section 5(s)</u> of this Agreement, the Company and its Subsidiaries shall carry on their businesses in all material respects in accordance with the Draft Business Plan (and, if amended in a manner that satisfies the condition with respect to amendments to the Draft Business Plan set forth in <u>Section 9(a)(xxviii)</u>, as so amended) prior to the satisfaction of the condition with respect to the Business Plan in accordance with <u>Section 9(a)(xxviii)</u> of this Agreement and at all times after the satisfaction of the condition with respect to the Business Plan set forth in <u>Section 9(a)(xxviii)</u>, the Business Plan (and, if amended in a manner that satisfies the condition with respect to the Business Plan set forth in <u>Section 9(a)(xxviii)</u>, as so amended) and

shall not enter into any transaction that, at all times prior to the satisfaction of the condition with respect to the Business Plan set forth in Section 9(a)(xxviii), would be inconsistent with the Draft Business Plan (and, if amended in a manner that satisfies the condition with respect to amendments to the Draft Business Plan set forth in Section 9(a)(xxviii), as so amended) or at all times after the satisfaction of the condition with respect to the Business Plan set forth in Section 9(a)(xxviii), the Business Plan (and, if amended in a manner that satisfies the condition with respect to the Business Plan set forth in Section 9(a)(xxviii), as so amended) by ADAH in accordance with Section 9(a)(xxviii) of this Agreement and shall use its commercially reasonable efforts to effect such Draft Business Plan and the Business Plan.  Without limiting the generality of the foregoing, and except as otherwise expressly provided or permitted by this Agreement (including the Disclosure Letter accepted by ADAH in accordance with Section 5(s) of this Agreement), the Plan Terms, the Plan or any other order of the Bankruptcy Court entered as of the date of the Original Agreement in these Chapter 11 Cases, prior to the Closing Date, the Company shall not, and shall cause its Subsidiaries not to, take any of the following actions without the prior written consent of ADAH, which consent shall not be unreasonably withheld, conditioned or delayed:

(i)     (A) declare, set aside or pay any dividends on, or make any other distributions in respect of, any of its capital stock, (B) split, combine or reclassify any of its capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock or (C) purchase, redeem or otherwise acquire, except in connection with the Plan, any shares of capital stock of the Company or any other securities thereof or any rights, warrants or options to acquire any such shares or other securities;

(ii)    except for intercompany transactions and any financing activities which are consistent with the Company's existing financing, issue, deliver, grant, sell, pledge, dispose of or otherwise encumber any of its capital stock or any securities convertible into, or any rights, warrants or options to acquire, any such capital stock at less than fair market value;

(iii)   acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the stock, or other ownership interests in, or substantial portion of assets of, or by any other manner, any business or any corporation, partnership, association, joint venture, limited liability company or other entity or division thereof except in the ordinary course of business;

(iv)    sell, lease, mortgage, pledge, grant a lien, mortgage, pledge, security interest, charge, claim or other encumbrance of any kind or nature on or otherwise encumber or dispose of any of its properties or assets, except (A)

in the ordinary course of business consistent with past practice and (B) other transactions involving not in excess of $100 million in any 12 month period;

(v)    (A) incur any indebtedness for borrowed money or guarantee any such indebtedness of another individual or entity, issue or sell any debt securities or warrants or other rights to acquire any debt securities of the Company, guarantee any debt securities of another individual or entity, enter into any "keep well" or other agreement to maintain any financial statement condition of another person (other than a Subsidiary) or enter into any arrangement having the economic effect of any of the foregoing in excess of $100 million in any 12 month period, except for (x) working capital borrowings and increases in letters of credit necessary in the ordinary course of business under the Company's existing or any amended or replacement revolving credit facilities, and (y) indebtedness solely between the Company and its Subsidiaries or between such Subsidiaries or (B) except for transactions between the Company and any of its Subsidiaries or between such Subsidiaries, make any loans, advances or capital contributions to, or investments in, any other individual or entity, other than customary advances of business and travel expenses to employees of the Company in the ordinary course of business consistent with past practice;

(vi)    enter into any new, or amend or supplement any existing, collective bargaining agreement, which is inconsistent with the Transformation Plan or the Business Plan satisfying the condition with respect to the Business Plan set forth in Section 9(a)(xxviii) of this Agreement , this Agreement, the Plan Terms, the Plan and the GM Settlement; or

(vii)    authorize any of, or commit or agree to take any of, the foregoing actions.

(o)    Actions Regarding Conditions.  During the period from the date of this Agreement to the Closing Date, the Company shall not take any action or omit to take any action that would reasonably be expected to result in the conditions to the Agreement set forth in Section 9 not being satisfied.

(p)    GM Settlement.  The Company shall use its reasonable best efforts to agree on, prior to the date of filing by the Company with the Bankruptcy Court of a Disclosure Statement (the "**Disclosure Statement Filing Date**"), a settlement agreement (the "**GM Settlement**") between the Company and GM that is consistent with this Agreement, the Plan Terms, the Plan and the UAW MOU. The Company will (i) provide to ADAH and its counsel a copy of the GM Settlement and a reasonable opportunity to review and comment on such

documents prior to such documents being executed or delivered or filed with the Bankruptcy Court, and (ii) duly consider in good faith any comments of ADAH and its counsel consistent with this Agreement, the Preferred Term Sheet and the Plan Terms and any other reasonable comments of each of ADAH and its counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH or its counsel and giving due consideration to the views of ADAH and its counsel. The Company shall not enter into any other agreement with GM that (i) is materially inconsistent with this Agreement, the Plan Terms and the Plan, (ii) is outside the ordinary course of business or (iii) the terms of which would have a material impact on the Investors' proposed investment in the Company. The Company has not entered into any material written agreements between or among the Company or any of its Subsidiaries and GM or any of its Subsidiaries directly relating to the Plan or the GM Settlement or the performance of the Transaction Agreements, and any such written agreements hereafter entered into will be disclosed promptly to ADAH.

(q)    Access to Information. Subject to applicable law and existing confidentiality agreements between the parties, upon reasonable notice, the Company shall (and shall cause its Subsidiaries to) afford the Investors (and any prospective Ultimate Purchaser that executes a confidentiality agreement reasonably acceptable to the Company, which agreement will provide that, unless otherwise determined by the Company, all contact between such Ultimate Purchaser and the Company shall be through ADAH) and their directors, officers, employees, investment bankers, attorneys, accountants and other advisors or representatives, reasonable access, throughout the period prior to the Closing Date, to its employees, properties, books, contracts and records and, during such period, the Company shall (and shall cause its Subsidiaries to) furnish promptly to the Investors all information concerning its business, properties and personnel as may reasonably be requested by any Investor; provided, that the foregoing shall not require the Company (i) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company would cause the Company to violate any of its obligations with respect to confidentiality to a third party if the Company shall have used commercially reasonable efforts to obtain the consent of such third party to such inspection or disclosure, (ii) to disclose any privileged information of the Company or any of its Subsidiaries or (iii) to violate any laws; provided, further, that the Company shall deliver to the Investors a schedule setting in forth in reasonable detail a description of any information not provided to the Investors pursuant to subclauses (i) through (iii) above. All requests for information and access made pursuant to this Section 5(q) shall be directed to the Chief Restructuring Officer or such other person as may be designated by such person.

(r)    Financial Information. For each month, beginning June 2007 until the Closing Date, the Company shall provide to each Investor an unaudited consolidated balance sheet and related unaudited consolidated statements of operations, consolidated statements of stockholders' equity and consolidated statements of

cash flows for the month then ended within 30 days of the end of such month (the "**Monthly Financial Statements**"). The Monthly Financial Statements, except as indicated therein, shall be prepared in accordance with the Company's normal financial reporting practices. The Monthly Financial Statements shall fairly present in all material respects the financial position, results of operations and cash flows of the Company and its Subsidiaries as of the dates indicated and for the periods specified.

(s)    <u>Business Plan and Disclosure Letter</u>. The Company shall use its commercially reasonable efforts to provide to ADAH as soon as practicable a final five-year business plan approved by the Company's board of directors and prepared in good faith and based on reasonable assumptions, which business plan shall provide for the amount of EBITDA for each of fiscal years 2007 through 2011 (the "**Business Plan**"); <u>provided,</u> that (i) the Company shall not be required to deliver a Business Plan that does not reflect a final and binding GM Settlement and (ii) ADAH shall not be required to accept the Business Plan unless it is reasonably satisfied that such Business Plan does not amend or deviate from the Draft Business Plan in any manner that would have a material impact on the Investors' proposed investment in the Company. The Company shall deliver a Disclosure Letter to ADAH in no event later than ten (10) Business Days prior to the Disclosure Statement Filing Date which provides for exceptions from the representations and warranties of the Company in <u>Section 3</u>; <u>provided,</u> that ADAH shall not be required to accept any Disclosure Letter unless it is reasonably satisfied that such Disclosure Letter does not contain any information or exception to a representation that (i) was not disclosed to ADAH prior to the date of this Agreement and (ii) which information or exception reflects facts or circumstances that would have a material impact on the Investor's proposed investment in the Company.

(t)    <u>Financing Assistance</u>. The Company and its Subsidiaries shall obtain the debt financing from financing sources consistent with those previously discussed with ADAH and in amounts sufficient to consummate the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms, the GM Settlement and the Plan, such financing to be on then-prevailing market terms with respect to the applicable interest rate, redemption provisions and fees, and otherwise to be on terms that are acceptable to ADAH not to be unreasonably withheld (the "**Debt Financing**"); <u>provided,</u> that if the Company delivers to ADAH definitive term sheets for such proposed debt financing that have been approved by the Company's board of directors and executed by the banks or other financing sources providing such debt financing reflecting then-prevailing market terms with respect to the applicable interest rate, redemption provisions and fees (a "**Company Financing Proposal**"), then ADAH shall inform the Company in writing (a "**Financing Notice**") whether or not the Company Financing Proposal is acceptable to it within five (5) Business Days of its receipt of the definitive term sheets for such Company Financing Proposal. If, after the Company delivers to ADAH a Company Financing Proposal, ADAH fails to deliver a Financing

Notice within five (5) Business Days or each of the following circumstances occurs, then the Company may terminate this Agreement and the transactions contemplated hereby may be abandoned: (x) ADAH delivers a Financing Notice in which it does not approve the Company Financing Proposal, (y) ADAH does not present to the Company, within 30 days of the delivery of the Financing Notice (the "**Financing Decision Date**"), an alternative written expression of interest to provide the Debt Financing with financing sources reasonably acceptable to the Company on terms more favorable to the Company than the Company Financing Proposal (a "**Preferred Debt Financing**") and (z) ADAH does not provide to the Company commitment letters executed by the banks or other financing sources providing such Preferred Debt Financing within 60 days of the Financing Decision Date. Delphi shall use its reasonable best efforts to implement any Preferred Debt Financing and to fulfill its other obligations pursuant to this Section 5(t). Subject to applicable regulatory or NASD requirements, Merrill and UBS (or their Affiliates) shall be entitled to participate in such Debt Financing on market terms. The Company and its Subsidiaries shall execute and deliver any commitment letters, underwriting or placement agreements, registration statements, pledge and security documents, other definitive financing documents, or other requested certificates or documents necessary or desirable to obtain the Debt Financing. The Company will (i) provide to ADAH and its counsel a copy of all marketing information, term sheets, commitment letters and agreements related to the Debt Financing and a reasonable opportunity to review and comment on such documents prior to such document being distributed, executed or delivered or filed with the Bankruptcy Court, (ii) duly consider in good faith any comments of ADAH and its counsel consistent with the Agreement, the Preferred Term Sheet and the Plan Terms and any other reasonable comments of ADAH and its counsel and shall not reject such comments without first discussing the reasons therefor with ADAH or its counsel and giving due consideration to the views of ADAH and its counsel, and (iii) keep ADAH reasonably informed on a timely basis of developments in connection with the Debt Financing and provide the Investors with an opportunity to attend and participate in meetings and/or roadshows with potential providers of the Debt Financing.

(u)    Labor Agreements. The Company and its Subsidiaries shall use their reasonable best efforts to enter into: (A) tentative labor agreements with each of the International Union of Electrical, Salaried, Machine and Furniture Workers – Communications Workers of America ("**IUE-CWA**") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC (the "**USW**") which adequately address, among other things, the following matters: (i) permit achievement of the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms and the Plan (including plant closings, asset dispositions and resolution of union claims); (ii) permit achievement of the Business Plan; and (B) an agreement that GM will be responsible for certain hourly labor costs (compensation, benefits and other labor costs) at certain of the Company's facilities. The Company will (i)

provide to ADAH and its counsel a copy of the foregoing labor agreements and a reasonable opportunity to review and comment on such document prior to such document being executed or delivered or filed with the Bankruptcy Court, and (ii) duly consider in good faith any comments of ADAH and its counsel consistent with this Agreement, the Preferred Term Sheet and the Plan Terms and any other reasonable comments of ADAH and its counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH or its counsel and giving due consideration to the views of ADAH and its counsel.

    (v)    <u>Other Actions by the Company</u>.

        (i)    <u>Existing Shareholder Rights Plan</u>.  The Company and the Board of Directors of the Company (A) has taken all necessary action to amend the Existing Shareholder Rights Plan to provide that none of the Investors (including any Related Purchaser or Ultimate Purchaser) shall be deemed an "Acquiring Person" as defined in the Existing Shareholder Rights Plan and that the rights will not separate from the Common Stock pursuant to the Existing Shareholder Rights Plan as a result of entering into the Original Agreement, this Agreement, the Original PSA, the Plan and the Transaction Agreements or consummating the transactions contemplated hereby (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser) or thereby and (B) will take all such action as is necessary to terminate the Existing Shareholder Rights Plan effective as of the Closing Date.

        (ii)    <u>Takeover Statutes and Charter</u>.  The Company and the Board of Directors of the Company has taken all action necessary (A) to ensure that no Takeover Statute or similar statue or regulation is or becomes applicable to the Original Agreement, this Agreement, the Original PSA, the Plan or the Transaction Agreements or any transaction contemplated hereby or thereby (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser), (B) if any Takeover Statute is or may become applicable to the transactions contemplated by the Original Agreement, this Agreement, the Original PSA, the Plan or the Transaction Agreements (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser), to grant such approvals and take such actions as are necessary so that such transactions may be consummated as promptly as practicable on the terms contemplated hereby and thereby and otherwise act to eliminate or minimize the effects of such statute or regulation on such transactions and (C) to ensure that this Agreement or any transaction contemplated hereby (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser) or thereby are approved for purposes of Article IX of the Company's Amended and Restated Certificate of Incorporation, dated January 26, 1999, as amended

to date, and that such provision shall not apply to the transactions contemplated hereby or thereby.

(w)    <u>Agreement on Key Documentation</u>.  The Company shall use its commercially reasonable efforts to agree on or prior to the Disclosure Statement Filing Date on (a) the terms of the GM Settlement, (b) the agreements contemplated by <u>Section 5(u)</u>, and (c) the terms of the Amended and Restated Constituent Documents, the Series A Certificate of Designations and the Series B Certificate of Designations, the Shareholders Agreement and the Registration Rights Agreement with ADAH.

(x)    <u>Investment Decision Package</u>.  If at any time prior to the Expiration Date, any event occurs as a result of which the Investment Decision Package, as then amended or supplemented, would include an untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, or if it shall be necessary to amend or supplement the Investment Decision Package to comply with applicable law, the Company will promptly notify the Investors of any such event and prepare an amendment or supplement to the Investment Decision Package that is reasonably acceptable in form and substance to ADAH that will correct such statement or omission or effect such compliance.

(y)    <u>Termination of Commitment Letters</u>.  The Company acknowledges and agrees that (i) the commitment letter of Appaloosa in favor of ADAH and the Company and (ii) the commitment letter of Harbinger Fund in favor of Harbinger and the Company, each dated January 18, 2007 have been terminated and are of no further force or effect and that each of Appaloosa and Harbinger Fund shall have no further liability or obligation under those commitment letters.

(z)    <u>Pension Plan Contributions</u>.  The Company and its Subsidiaries shall have made all contributions to any pension plan of the Company and its Subsidiaries required to be made prior to or contemporaneous with the Effective Time pursuant to any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority or any requirement of the GM Settlement any labor agreement or any other contract, agreement, arrangement or understanding.

6.    <u>Additional Covenants of the Investors</u>.  Each Investor agrees, severally and not jointly, with the Company:

(a)    <u>Information</u>.  To provide the Company with such information as the Company reasonably requests regarding the Investor for inclusion in the Rights Offering Registration Statement and the Disclosure Statement.

(b)    <u>HSR Act</u>. To use reasonable best efforts to promptly prepare and file all necessary documentation and to effect all applications and to obtain all authorizations, approvals and consents that are necessary or advisable under the HSR Act and any comparable laws or regulations in any foreign jurisdiction so that any applicable waiting period shall have expired or been terminated thereunder and any applicable notification, authorization, approval or consent shall have been made or obtained with respect to the purchase of Investor Shares hereunder, and not to take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the transactions contemplated by this Agreement. Each Investor shall file, to the extent that it is required to file, the Notification and Report Form required under the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission no later than the fifteenth day following the Disclosure Statement Filing Date.

(c)    <u>Bankruptcy Court Filings</u>. To not file any pleading or take any other action in the Bankruptcy Court with respect to this Agreement, the Plan, the Disclosure Statement or the Confirmation Order or the consummation of the transactions contemplated hereby or thereby that is inconsistent in any material respect with this Agreement or the Company's efforts to obtain the entry of the Confirmation Order consistent with this Agreement.

(d)    <u>Reasonable Best Efforts</u>. Each Investor shall use its reasonable best efforts to take all actions, and do all things, reasonably necessary, proper or advisable on its part under this Agreement and applicable laws to cooperate with the Company and to consummate and make effective the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms, the GM Settlement and the Plan.

7.    <u>Additional Joint Covenant of Company And Each Investor</u>. Without limiting the generality of the undertakings pursuant to <u>Sections 5(i)</u> and <u>6(b)</u>, the Company and each Investor shall, severally and not jointly, use its reasonable best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary under the HSR Act and any comparable laws or regulations in any foreign jurisdiction to consummate and make effective the transactions contemplated by this Agreement and the other Transaction Agreements, including furnishing all information required by applicable law in connection with approvals of or filings with any governmental authority, and filing, or causing to be filed, as promptly as practicable, following the Disclosure Statement Filing Date any required notification and report forms under other applicable competition laws with the applicable governmental antitrust authority. Any filings under any laws or regulations in any foreign jurisdiction comparable to the HSR Act that are necessary to consummate and make effective the transactions contemplated by this Agreement and the other Transaction Agreements shall be made, to the extent permitted by law or regulation, after the filings in the United States described in Section 5(i) and 6(b) hereof have been

made. The parties shall consult with each other as to the appropriate time of filing such notifications and shall agree upon the timing of such filings. Subject to appropriate confidentiality safeguards, each party shall: (i) respond promptly to any request for additional information made by the antitrust agency; (ii) promptly notify counsel to the other party of, and if in writing, furnish counsel to the other party with copies of (or, in the case of material oral communications, advise the other party orally of) any communications from or with the antitrust agency in connection with any of the transactions contemplated by this Agreement; (iii) not participate in any meeting with the antitrust agency unless it consults with counsel to the other party in advance and, to the extent permitted by the agency, give the other party a reasonable opportunity to attend and participate thereat; (iv) furnish counsel to the other party with copies of all correspondence, filings and communications between it and the antitrust agency with respect to any of the transactions contemplated by this Agreement; and (v) furnish counsel to the other party with such necessary information and reasonable assistance as may be reasonably necessary in connection with the preparation of necessary filings or submission of information to the antitrust agency. The Parties shall use their reasonable best efforts to cause the waiting periods under the applicable competitions laws to terminate or expire at the earliest possible date after the date of filing.

Notwithstanding anything in this Agreement to the contrary, nothing shall require any Investor or its Affiliates to dispose of any of its or its Subsidiaries' or its Affiliates' assets or to limit its freedom of action with respect to any of its or its Subsidiaries' businesses, or to consent to any disposition of the Company's or the Company Subsidiaries' assets or limits on the Company's or the Company Subsidiaries' freedom of action with respect to any of its or the Company Subsidiaries' businesses, or to commit or agree to any of the foregoing, and nothing in this Agreement shall authorize the Company or any Company Subsidiary to commit or agree to any of the foregoing, to obtain any consents, approvals, permits or authorizations to remove any impediments to the transactions contemplated hereby or by any Transaction Agreement relating to antitrust or competition laws or to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other order in any action relating to antitrust or competition laws.

8.    **Reasonable Best Efforts.** The Company shall use its reasonable best efforts (and shall cause its Subsidiaries to use their respective reasonable best efforts) to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable on its or their part under this Agreement and applicable laws to cooperate with the Investors and to consummate and make effective the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms, the GM Settlement and the Plan, including:

(a)    preparing and filing as promptly as practicable all documentation to effect all necessary notices, reports and other filings and to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party or governmental entity;

provided, however, that, notwithstanding the foregoing, in connection with obtaining such consents, the Company shall not, without the prior written consent of ADAH in its reasonable discretion, pay or commit to pay any person or entity whose consent is being solicited in cash or other consideration to the extent such payment could reasonably be expected to prevent the Company from, at all times prior to the satisfaction of the condition with respect to the Business Plan in accordance with Section 9(a)(xxviii), complying in all material respects with the Draft Business Plan (and, if amended in a manner that satisfies the condition with respect to amendments to the Draft Business Plan set forth in Section 9(a)(xxviii), as so amended) and, at all times after the satisfaction of the condition with respect to the Business Plan in accordance with Section 9(a)(xxviii), complying in all material respects with the Business Plan (and, if amended in a manner that satisfies the condition with respect to the Business Plan set forth in Section 9(a)(xxviii), as so amended);

(b)     defending any lawsuits or other actions or proceedings, whether judicial or administrative, challenging this Agreement, the Preferred Term Sheet, the GM Settlement, the Plan or the Transaction Agreements or any other agreement contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement, the Plan or the Transaction Agreements or the consummation of the transactions contemplated hereby and thereby, including seeking to have any stay or temporary restraining order entered by any court or other governmental entity vacated or reversed;

(c)     executing, delivering and filing, as applicable, any additional ancillary instruments or agreements necessary to consummate the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement, the Plan or the Transaction Agreements and to fully carry out the purposes of this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement, the Plan, the Transaction Agreements and the transactions contemplated hereby and thereby including, without limitation: (i) employment agreements and other compensation arrangements with senior management of the Company relating to compensation, benefits, supplemental retirement benefits, stock options and restricted stock awards, severance and change in control provisions and other benefits on market terms (as determined by the Company's board of directors based on the advice of Watson-Wyatt and reasonably acceptable to ADAH); (ii) agreements and other arrangements acceptable to ADAH or otherwise ordered by the Bankruptcy Court with respect to claims against the Company of former members of the Company's management and members of the Company's management, if any, who are resigning or being terminated in accordance with the implementation of the Plan; (iii) a shareholders agreement among the Company, and certain of the Investors reasonably satisfactory to ADAH (the "**Shareholders Agreement**"); (iv) a registration rights agreement (the "**Registration Rights Agreement**") among the Company and the Investors, consistent with the Preferred Term Sheet and reasonably satisfactory to

ADAH to the extent that the material terms of such Registration Rights Agreement would have a material impact on the Investors' proposed investment in the Company, and providing that the Company shall (a) as soon as practicable after the Closing Date, and in any event no later than seven (7) days after the Closing Date, prepare and file with the Commission a registration statement, including all exhibits thereto, pursuant to Rule 415 under the Securities Act registering offers and sales by the Investors, any Related Purchasers and the Ultimate Purchasers of the Unsubscribed Shares, the Direct Subscription Shares and the Series B Preferred Shares (the "**Resale Registration Statement**" and, together with the final prospectus contained in the Resale Registration Statement as of its effective date (including information, if any, omitted pursuant to Rule 430A and subsequently provided pursuant to Rule 424(b) under the Securities Act), and any amended form of such prospectus provided under Rule 424(b) under the Securities Act or contained in a post-effective amendment to the Resale Registration Statement) and any issuer free writing prospectus as defined in Rule 433 under the Securities Act used in connection with the resale of such shares, the "**Resale Registration Documents**"); (b) use its reasonable best efforts to cause the Resale Registration Statement to be declared effective by the Commission as soon as practicable after the filing thereof, and in any event no later than thirty (30) days after the Closing Date; (c) obtain such comfort letters from the Company's independent certified public accountants addressed to the Investors covering such matters of the type customarily covered by comfort letters and as ADAH reasonably requests; and (d) obtain a customary opinion or opinions and negative assurance statement, in customary form and scope from counsel to the Company to be furnished to each Investor; (v) an amended and restated certificate of incorporation and amended by-laws of the Company, in each case, that is consistent with this Agreement, the Plan Terms and the Preferred Term Sheet; provided, that the amended and restated certificate of incorporation of the Company to be effective immediately following the Effective Date shall prohibit (A) for so long as ADAH or its Affiliates, as the case may be, owns any shares of Series A-1 Preferred Stock, any transactions between the Company or any of its Subsidiaries, on the one hand, and ADAH or its Affiliates, as the case may be, on the other hand (including any "going private transaction" sponsored by ADAH or its Affiliates), unless such transaction shall have been approved by directors constituting not less than 75% of the number of Common Directors, and (B) any transaction between the Company or any of its Subsidiaries, on the one hand, and a director, other than a director appointed by holders of Series A Preferred Stock, on the other hand, unless such transaction shall have been approved by directors having no material interest in such transaction (a "**Disinterested Director**") constituting not less than 75% of the number of Disinterested Directors (such amended and restated certificate of incorporation and amended bylaws are herein referred to as the "**Amended and Restated Constituent Documents**"); and (vi) the Series A Certificate of Designations and the Series B Certificate of Designations, in each case, that is consistent with the terms set forth in the Preferred Term Sheet. Subject to applicable laws and regulations relating to the exchange of information, the Investors and the Company shall have the right to

review in advance, and to the extent practicable each will consult with the other on all of the information relating to Investors or the Company, as the case may be, and any of their respective Subsidiaries, that appears in any filing made with, or written materials submitted to, any third party and/or any governmental entity in connection with the transactions contemplated by this Agreement or the Plan. In exercising the foregoing rights, each of the Company and the Investors shall act reasonably and as promptly as practicable.

9.    Conditions to the Obligations of the Parties.

(a)    Subject to Section 9(b), the obligations of each of the Investors hereunder to consummate the transactions contemplated hereby shall be subject to the satisfaction prior to the Closing Date of each of the following conditions:

(i)    Approval Order.  The Approval Order shall have become a Final Approval Order.  "**Final Approval Order**" shall mean an Approval Order of the Bankruptcy Court, which has not been reversed, stayed, modified or amended, and as to which (a) the time to appeal, seek certiorari or request reargument or further review or rehearing has expired and no appeal, petition for certiorari or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought or to which the request was made and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted.

(ii)    [Reserved]

(iii)    Plan of Reorganization.  The Company shall have complied in all material respects with the terms and conditions of the Plan that are to be performed by the Company prior to the Closing Date.

(iv)    [Reserved]

(v)    Alternate Transaction.  The Company shall not have entered into any letter of intent, memorandum of understanding, agreement in principle or other agreement (other than a confidentiality agreement with terms that are not materially less favorable to the Company than the terms of that certain Amended Confidentiality Information, Standstill and Nondisclosure

Agreement, dated July 3, 2007, among the Company, Appaloosa and Harbinger Fund, as it may be amended from time to time) or taken any action to seek any Bankruptcy Court approval relating to, any Alternate Transaction (an "**Alternate Transaction Agreement**"). For the purpose of this Agreement, an "**Alternate Transaction**" means any plan, proposal, offer or transaction that is inconsistent with this Agreement, the Preferred Term Sheet, the Plan Terms and the GM Settlement or the Plan, other than a Chapter 7 liquidation.

(vi)   Change of Recommendation.  There shall not have been a Change of Recommendation. For purposes of this Agreement, a "**Change of Recommendation**" shall mean, (i) the Company or its board of directors or any committee thereof shall have withheld, withdrawn, qualified or modified (or resolved or proposed to withhold, withdraw, qualify or modify), in a manner adverse to the Investors, its approval or recommendation of this Agreement, the Preferred Term Sheet, the Plan Terms, the GM Settlement or the Plan or the transactions contemplated hereby or thereby or (ii) the Company or its board of directors or any committee thereof shall have approved or recommended, or proposed to approve or recommend (including by filing any pleading or document with the Bankruptcy Court), any Alternate Transaction.

(vii)   Confirmation Order.  The Confirmation Order approving the Plan shall have been entered by the Bankruptcy Court and such order shall be non-appealable, shall not have been appealed within ten calendar days of entry or, if such order is appealed, shall not have been stayed pending appeal, and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such order (the "**Confirmation Order**"); provided, that the absence of a stay pending appeal shall be considered for purposes of determining whether the foregoing condition has been satisfied only if ADAH concludes, in its reasonable discretion, that the appeal would be rendered moot under the doctrine of "equitable mootness" as a result of the occurrence of the Effective Date.

(viii)   [Reserved]

(ix)   Conditions to Effective Date.  The conditions to the occurrence of the Effective Date of the Confirmed Plan shall have been satisfied or waived by the Company and ADAH in accordance with the Plan.

(x)   Rights Offering Registration Statement.  The Rights Offering Registration Statement shall be effective not later than the Rights Distribution Date and

no stop order shall have been entered by the Commission with respect thereto.

(xi)    <u>Rights Offering</u>.  The Rights Offering shall have been conducted in all material respects in accordance with this Agreement and the Disclosure Statement and the Expiration Time shall have occurred.

(xii)    <u>Purchase Notice</u>.  Each of the Investors shall have received a Purchase Notice from the Company, dated as of the Determination Date, certifying as to the number of Unsubscribed Shares to be purchased or a Satisfaction Notice.

(xiii)    <u>Antitrust Approvals</u>.  All terminations or expirations of waiting periods imposed by any governmental or regulatory authority necessary for the consummation of the transactions contemplated by this Agreement, including under the HSR Act and any comparable regulations in any foreign jurisdiction, shall have occurred and all other notifications, consents, authorizations and approvals required to be made or obtained from any competition or antitrust authority shall have been made or obtained for the transactions contemplated by this Agreement.

(xiv)    <u>Consents</u>.  All other governmental and third party notifications, filings, consents, waivers and approvals required for the consummation of the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms and the Plan shall have been made or received.

(xv)    <u>No Legal Impediment to Issuance</u>.  No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority, and no judgment, injunction, decree or order of any federal, state or foreign court shall have been issued, that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms and the GM Settlement.

(xvi)    <u>Representations and Warranties</u>.  The representations and warranties of Company contained in this Agreement shall be true and correct (disregarding all qualifications and exceptions contained therein relating to materiality, Material Adverse Effect or similar qualifications, other than such qualifications contained in <u>Sections 3(i)</u> and <u>3(j)</u>) as of the Disclosure Letter Delivery Date and as of the Closing Date with the same effect as if made on and as of the Disclosure Letter Delivery Date and the Closing Date (except for representations and warranties made as of a specified date,

which shall be true and correct only as of the specified date), except where the failure to be so true and correct, individually or in the aggregate, has not had, and would not reasonably be expected to have, a Material Adverse Effect, other than with respect to the representations in Sections 3(b), 3(c), 3(d), 3(e) and 3(m)(ii) and 3(oo), which shall be true and correct in all respects. The representations and warranties of each Investor (other than the Investor asserting the failure of this condition) contained in this Agreement and in any other document delivered pursuant to this Agreement shall be true and correct (disregarding all qualifications and exceptions contained therein relating to materiality or material adverse effect on the Investor's performance of its obligations or similar qualifications) as of the Disclosure Letter Delivery Date and as of the Closing Date with the same effect as if made on the Disclosure Letter Delivery Date and the Closing Date (except for the representations and warranties made as of a specified date which shall be true and correct only as of such specified date); except where the failure to be so true and correct, individually or in the aggregate, has not and would not reasonably be expected, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(xvii)   Covenants. The Company and each Investor (other than the Investor asserting the failure of this condition) shall have performed and complied with all of its covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement (including in any Transaction Agreement) in all material respects through the Closing Date.

(xviii)  [Reserved]

(xix)    Financing. The Company shall have received the proceeds of the Debt Financings and the Rights Offering that, together with the proceeds of the sale of the Investor Shares, are sufficient to fund fully the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms, the GM Settlement (to the extent the Company is to fund such transactions) and the Plan.

(xx)     [Reserved]

(xxi)    Management Compensation. The Company shall have (i) entered into employment agreements and other compensation arrangements with senior management of the Company relating to compensation, benefits, supplemental retirement benefits, stock options and restricted stock awards, severance and change in control provisions and other benefits on

market terms (as determined by the Company's board of directors based on the advice of Watson-Wyatt and reasonably acceptable to ADAH); and (ii) resolved any claims of former executive officers, or executive officers that have resigned or been terminated, on terms acceptable to ADAH or otherwise ordered by the Bankruptcy Court.

(xxii)  [Reserved]

(xxiii)  [Reserved]

(xxiv)  [Reserved]

(xxv)  [Reserved]

(xxvi)  <u>No Strike</u>.  There shall not have occurred any material strike or material labor stoppage or slowdown involving the UAW, IUE-CWA or USW at either GM or the Company or any of their respective Subsidiaries.  There shall not have occurred any strike, labor stoppage or slowdown involving the UAW, IUE-CWA or USW at either Ford Motor Company or Chrysler Group (or its successors) or any of their respective subsidiaries that would have a material impact on the Investors' proposed investment in the Company.

(xxvii)  <u>Capitalization</u>.  As of the Closing Date and giving effect to the transactions contemplated by the Plan, (i) the Company's Net Amount shall not exceed by more than $250 million the Net Amount set forth in the final Business Plan satisfying the condition with respect to the Business Plan set forth in <u>Section 9(a)(xxviii)</u> of this Agreement; (ii) the Company's share capital shall be consistent with the last three sentences of Section 3(d); (iii) the Company's accounts payable to trade creditors and accrued expenses shall be in amounts consistent with the final Business Plan satisfying the condition with respect to the Business Plan set forth in <u>Section 9(a)(xxviii)</u> of this Agreement, and shall have been incurred in the ordinary course of business consistent with past practice; and (iv) ADAH shall have received from Delphi a certificate of a senior executive officer with knowledge of the foregoing to the effect set forth in clauses (i), (ii) and (iii) with reasonably detailed supporting documentation to support such amount.  "**Net Amount**" shall mean: (i) the sum of (A) Indebtedness; (B) the actuarially determined amount of pension plan contributions required, pursuant to ERISA to be made by the Company to its U.S. Hourly Rate Pension Plan from and after the Closing Date through December 31, 2008; and (C) all other accrued or contingent liabilities

(excluding pension and salaried OPEB liabilities on the Company's balance sheet and accounts payable and accrued expenses referred to in the preceding sentence); less (ii) the Company's cash on hand as of the Closing Date. In addition, as of the Closing Date and giving effect to the transactions contemplated by the Plan the sum of (A) and (B), less (ii), shall not exceed $7,159 million by more than $250 million. "**Indebtedness**" shall mean: (i) indebtedness for borrowed money or indebtedness issued or incurred in substitution or exchange for indebtedness for borrowed money, (ii) indebtedness evidenced by any note, bond, debenture, mortgage or other debt instrument or debt security, (iii) commitments or obligations assuring a creditor against loss (including contingent reimbursement obligations with respect to letters of credit), (iv) indebtedness described in clauses (i)-(iii) secured by an encumbrance on any assets or properties of the Company or any of its Subsidiaries, (v) guarantees or other contingent liabilities (including so called take-or-pay or keep-well agreements) with respect to any Indebtedness, obligation or liability of a type described in clauses (i) through (iv) above, and (vi) for clauses (i) through (iv) above, all accrued interest thereon and all penalty payments, premiums, charges, yield maintenance amounts and other expenses relating to any prepayment of any obligations related thereto. For the purpose of this Section 9(a)(xxvii) cash, Indebtedness and liabilities shall be determined in accordance with GAAP applied on a basis consistent with the Company's financial statements included in the Company SEC Documents filed prior to the date hereof, and shall be determined on the basis that all required pension plan contributions to be made by the Company or any of its Subsidiaries pursuant to any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority or any requirement of the GM Settlement any labor agreement or any other contract, agreement, arrangement or understanding prior to or contemporaneous with the Effective Time, shall have been made, whether or not they have actually been made.

(xxviii)  Plan and Material Investment Documents.

(A)  (i) The Company shall have delivered to ADAH and ADAH shall have made the determination referred to in Section 9(a)(xxviii)(B) with respect to, at each Relevant Date, (1) the Plan and any related documents, agreements and arrangements (A) the terms of which are consistent in all material respects with this Agreement, the Preferred Term Sheet, the Plan Terms and GM Settlement, (B) that provide for the release and exculpation of each Investor, its Affiliates, shareholders, partners, directors, officers, employees and advisors from any liability for participation of the transactions contemplated by the Original Agreement, this Agreement, the Original PSA, the Plan Terms and the Plan to the fullest extent

permitted under applicable law (provided, that such release and exculpation shall not prohibit or impede the Company's ability to assert defenses or counterclaims in connection with or relating to the Original Agreement or the Original PSA) and (C) that have conditions to confirmation and the Effective Date of the Plan (and to what extent such conditions can be waived and by whom) that are consistent with this Agreement, the Preferred Term Sheet, the Plan Terms and the GM Settlement and (2) all Material Investment Documents. The term "**Material Investment Documents**" shall mean the Confirmation Order, the Disclosure Statement, the Rights Offering Registration Statement, the GM Settlement, any amendments and/or supplements to the Draft Business Plan, the Business Plan, any amendments and/or supplements to the UAW MOU, the labor agreements with the IUE-CWA and the USW, the Amended and Restated Constituent Documents, the Series A Certificate of Designations, the Series B Certificate of Designations, the Shareholders Agreement, the Registration Rights Agreement, the Transaction Agreements and any amendments and/or supplements to the foregoing. The term "**Relevant Date**" shall mean the Disclosure Statement Filing Date, the Disclosure Statement Approval Date, the date of issuance of the Confirmation Order and the Closing Date.

(ii) With respect to any Material Investment Document entered into in satisfaction of the condition set forth in Section 9(a)(xxviii), and the UAW MOU, at each Relevant Date (i) such Material Investment Document, or the UAW MOU, as the case may be, shall have been ratified by the union membership (but only with respect to the labor agreements with IUE-CWA and USW) and shall remain in full force and effect and shall not have been rescinded, terminated, challenged or repudiated by any party thereto and (ii) the parties to such Material Investment Document and the UAW MOU, as the case may be, shall have performed and complied with all of their respective covenants and agreements contained in such agreement in all material respects through the Closing Date. The Business Plan satisfying the condition with respect to the Business Plan set forth in this Section 9(a)(xxviii) shall not have been rescinded or repudiated in any material respect by the Company or its Board of Directors.

(B)    With respect to the documents referred to in Section 9(a)(xxviii)(A)(i) (other than the GM Settlement), ADAH shall have determined that it is reasonably satisfied with the terms thereof to the extent such terms would have a material impact on the Investors' proposed investment in the Company; provided, that

with respect to the GM Settlement ADAH shall have determined that it is satisfied with the GM Settlement in its reasonable discretion taking into account whether it has a material impact on the Investors' proposed investment in the Company and other relevant factors.

(C)  The conditions referred to in clause (A) above shall be deemed to have been conclusively satisfied without further action by any Party unless:

    (1)  with respect to the Plan, any related documents, agreements and arrangements and any Material Investment Documents, in each case delivered to ADAH by the Company prior to the Disclosure Statement Filing Date, ADAH shall have delivered (and have not withdrawn) a written deficiency notice to the Company reasonably asserting with reasonable specificity that such condition was not satisfied prior to the Disclosure Statement Approval Date, and the Company shall not have cured such deficiency within twenty (20) days of the Company's receipt of such notice (the "**Cure Period**");

    (2)  with respect to any amendments or supplements to the Plan, any related documents, agreements and arrangements, or any Material Investment Documents delivered to ADAH by the Company occurring after the Disclosure Statement Filing Date and prior to the Disclosure Statement Approval Date, ADAH has delivered (and has not withdrawn), a written deficiency notice to the Company reasonably asserting with reasonable specificity that such condition was not satisfied prior to the Disclosure Statement Approval Date, and the Company shall not have cured such deficiency during the Cure Period;

    (3)  with respect to any amendments or supplements to the Plan, any related documents, agreements and arrangements, or any Material Investment Documents delivered to ADAH by the Company after the Disclosure Statement Approval Date and prior to the date of issuance of the Confirmation Order, ADAH has delivered (and has not withdrawn) a written deficiency notice to the Company asserting with reasonable specificity that such condition was not satisfied prior to the date of issuance of the Confirmation Order, and the

Company shall not have cured such deficiency during the Cure Period; and

(4)   with respect to any amendments or supplements to the Plan, any related documents, agreements and arrangements, or any Material Investment Documents delivered to ADAH by the Company after the date of issuance of the Confirmation Order and prior to the Closing Date, ADAH has delivered (and has not withdrawn), within five Business Days of delivery by the Company of the final form of such document accompanied by a written request for approval of such documents, a written deficiency notice to the Company reasonably asserting with reasonable specificity that such condition is not satisfied and the Company shall not have cured such deficiency during the Cure Period.

(D)   The Company shall have delivered, and ADAH shall have accepted, a Disclosure Letter in accordance with Section 5(s).

(b)   All or any of the conditions set forth in Section 9(a) may be waived in whole or in part with respect to all Investors by ADAH in its sole discretion.

(c)   The obligation of the Company to issue and sell the Investor Shares are subject to the following conditions, provided that the failure of a condition set forth in Sections 9(c)(vii) through (x) to be satisfied may not be asserted by the Company if such failure results from the failure of the Company to fulfill an obligation hereunder:

(i)   Approval Order.  The Approval Order shall have become a Final Approval Order.

(ii)   Antitrust Approvals.  All terminations or expirations of waiting periods imposed by any governmental or regulatory authority necessary for the consummation of the transactions contemplated by this Agreement, including under the HSR Act and any comparable regulations in any foreign jurisdiction, shall have occurred and all other notifications, consents, authorizations and approvals required to be made or obtained from any competition or antitrust authority shall have been made or obtained for the transactions contemplated by this Agreement.

(iii)   No Legal Impediment to Issuance.  No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued

by any federal, state or foreign governmental or regulatory authority, and no judgment, injunction, decree or order of any federal, state or foreign court shall have been issued, that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms and the GM Settlement.

(iv)    Representations and Warranties.  The representations and warranties of each Investor, each Related Purchaser and each Ultimate Purchaser to the Company contained in this Agreement or pursuant to Sections 2(a), 2(b) or 2(k) shall be true and correct (disregarding all qualifications and exceptions contained therein relating to materiality or material adverse effect on the Investor's performance of its obligations or similar qualifications) as of the Disclosure Letter Delivery Date and as of the Closing Date with the same effect as if made on the Disclosure Letter Delivery Date and the Closing Date (except for the representations and warranties made as of a specified date, which shall be true and correct only as of such specified date), except with respect to the Investors' representations in all Sections other than Sections 4(b) and 4(c) where the failure to be so true and correct, individually or in the aggregate, has not and would not reasonably be expected, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(v)    Covenants.  Each Investor shall have performed and complied with all of its covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement (including in any Transaction Agreement) in all material respects through the Closing Date.

(vi)    Bankruptcy Court Approval.  This Agreement shall have been approved by the Bankruptcy Court and the approval of the Bankruptcy Court shall not have been modified, amended or withdrawn in any manner adverse to the Company.

(vii)    Confirmation Order.  The Confirmation Order approving the Plan shall have been entered by the Bankruptcy Court and such order shall be non-appealable, shall not have been appealed within ten calendar days of entry or, if such order is appealed, shall not have been stayed pending appeal, and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such order; provided, that the absence of a stay pending appeal shall be considered for purposes of determining whether the foregoing condition has been satisfied only if the Company concludes, in its sole discretion, that the appeal would be rendered moot under the doctrine of "equitable mootness" as a result of the occurrence of the Effective Date.

(viii)    <u>Conditions to Effective Date</u>.  The conditions to the occurrence of the Effective Date of the Confirmed Plan shall have been satisfied or waived by the Company and ADAH in accordance with the Plan.

(ix)    <u>Rights Offering</u>.  The Rights Offering shall have been conducted in all material respects in accordance with this Agreement and the Disclosure Statement and the Expiration Time shall have occurred.

(x)    <u>Financing</u>.  The Company shall have received the proceeds of the Debt Financings and the Rights Offering that, together with the proceeds of the sale of the Investor Shares, are sufficient to fund fully the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms, the GM Settlement (to the extent the Company is to fund such transactions) and the Plan.

(d)    All of the conditions set forth in <u>Section 9(c)</u> may be waived in whole or in part by the Company in its sole discretion.

10.    <u>Indemnification and Contribution.</u>

(a)    Whether or not the Rights Offering is consummated or this Agreement is terminated or the transactions contemplated hereby or the Plan are consummated, the Company (in such capacity, the "**Indemnifying Party**") shall indemnify and hold harmless each Investor and the Ultimate Purchasers, their respective Affiliates and their respective officers, directors, employees, agents and controlling persons (each, an "**Indemnified Person**") from and against any and all losses, claims, damages, liabilities and reasonable expenses, joint or several, arising out of circumstances existing on or prior to the Closing Date ("**Losses**") to which any such Indemnified Person may become subject arising out of or in connection with any claim, challenge, litigation, investigation or proceeding ("**Proceedings**") instituted by a third party with respect to the Rights Offering, this Agreement or the other Transaction Documents, the Rights Offering Registration Statement, any Preliminary Rights Offering Prospectus, the Rights Offering Prospectus, any Issuer Free Writing Prospectus, the Investment Decision Package, the Resale Registration Documents, any amendment or supplement thereto or the transactions contemplated by any of the foregoing and shall reimburse such Indemnified Persons for any reasonable legal or other reasonable out-of-pocket expenses as they are incurred in connection with investigating, responding to or defending any of the foregoing; <u>provided</u> that the foregoing indemnification will not apply to Losses (i) arising out of or in connection with any Proceedings between or among any one or more Indemnified Persons, Related Purchasers and/or Ultimate Purchasers, any Additional Investor Agreement or the failure of such Indemnified Person to comply with the

covenants and agreements contained in this Agreement with respect to the sale or placement of Investor Shares; or (ii) to the extent that they resulted from (a) any breach by such Indemnified Person of this Agreement, (b) gross negligence, bad faith or willful misconduct on the part of such Indemnified Person or (c) statements or omissions in the Rights Offering Registration Statement, any Preliminary Rights Offering Prospectus, the Rights Offering Prospectus, any Issuer Free Writing Prospectus, the Resale Registration Documents or any amendment or supplement thereto made in reliance upon or in conformity with information relating to such Indemnified Person furnished to the Company in writing by or on behalf of such Indemnified Person expressly for use in the Rights Offering Registration Statement, any Rights Offering Preliminary Prospectus, the Rights Offering Prospectus, any Issuer Free Writing Prospectus, the Resale Registration Documents or any amendment or supplement thereto.  If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Losses in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party on the one hand and such Indemnified Person on the other hand but also the relative fault of the Indemnifying Party on the one hand and such Indemnified Person on the other hand as well as any relevant equitable considerations.  It is hereby agreed that the relative benefits to the Indemnifying Party on the one hand and all Indemnified Persons on the other hand shall be deemed to be in the same proportion as (i) the total value received or proposed to be received by the Company pursuant to the sale of the Shares and the Investor Shares contemplated by this Agreement bears to (ii) the Commitment Fees paid or proposed to be paid to the Investors.  The indemnity, reimbursement and contribution obligations of the Indemnifying Party under this Section 10 shall be in addition to any liability that the Indemnifying Party may otherwise have to an Indemnified Person and shall bind and inure to the benefit of any successors, assigns, heirs and personal representatives of the Indemnifying Party and any Indemnified Person.

(b)    Promptly after receipt by an Indemnified Person of notice of the commencement of any Proceedings with respect to which the Indemnified Person may be entitled to indemnification hereunder, such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; provided that (i) the omission so to notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (ii) the omission so to notify the Indemnifying Party will not relieve it from any liability that it may have to an Indemnified Person otherwise than on account of this Section 10.  In case any such Proceedings are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, to the extent that it may elect by written notice delivered to such Indemnified Person, to assume the defense thereof, with counsel

reasonably satisfactory to such Indemnified Person; provided that if the
defendants in any such Proceedings include both such Indemnified Person and the
Indemnifying Party and such Indemnified Person shall have concluded that there
may be legal defenses available to it that are different from or additional to those
available to the Indemnifying Party, such Indemnified Person shall have the right
to select separate counsel to assert such legal defenses and to otherwise participate
in the defense of such Proceedings on behalf of such Indemnified Person. Upon
receipt of notice from the Indemnifying Party to such Indemnified Person of its
election so to assume the defense of such Proceedings and approval by such
Indemnified Person of counsel, the Indemnifying Party shall not be liable to such
Indemnified Person for expenses incurred by such Indemnified Person in
connection with the defense thereof (other than reasonable costs of investigation)
unless (i) such Indemnified Person shall have employed separate counsel in
connection with the assertion of legal defenses in accordance with the proviso to
the next preceding sentence (it being understood, however, that the Indemnifying
Party shall not be liable for the expenses of more than one separate counsel in any
jurisdiction, approved by the Investors, representing the Indemnified Persons who
are parties to such Proceedings), (ii) the Indemnifying Party shall not have
employed counsel reasonably satisfactory to such Indemnified Person to represent
such Indemnified Person within a reasonable time after notice of commencement
of the Proceedings or (iii) the Indemnifying Party shall have authorized in writing
the employment of counsel for such Indemnified Person.

(c)     The Indemnifying Party shall not be liable for any settlement of any Proceedings
effected without its written consent (which consent shall not be unreasonably
withheld). If any settlement of any Proceeding is consummated with the written
consent of the Indemnifying Party or if there is a final judgment for the plaintiff in
any such Proceedings, the Indemnifying Party agrees to indemnify and hold
harmless each Indemnified Person from and against any and all Losses by reason
of such settlement or judgment in accordance with, and subject to the limitations
of, the provisions of this Section 10. Notwithstanding anything in this Section 10
to the contrary, if at any time an Indemnified Person shall have requested the
Indemnifying Party to reimburse such Indemnified Person for legal or other
expenses aggregating in excess of $250,000 in connection with investigating,
responding to or defending any Proceedings in connection with which it is entitled
to indemnification or contribution pursuant to this Section 10, the Indemnifying
Party shall be liable for any settlement of any Proceedings effected without its
written consent if (i) such settlement is entered into more than (x) 60 days after
receipt by the Indemnifying Party of such request for reimbursement and (y) 30
days after receipt by the Indemnified Person of the material terms of such
settlement and (ii) the Indemnifying Party shall not have reimbursed such
Indemnified Person in accordance with such request prior to the date of such
settlement. The Indemnifying Party shall not, without the prior written consent of
an Indemnified Person (which consent shall not be unreasonably withheld), effect
any settlement of any pending or threatened Proceedings in respect of which
indemnity has been sought hereunder by such Indemnified Person unless (i) such

settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Proceedings and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

(d)    All amounts paid by the Company to an Indemnified Person under this Section 10 shall, to the extent the transactions contemplated hereby or the Plan are consummated and to the extent permitted by applicable law, be treated as adjustments to Purchase Price for all Tax purposes.

11.    Survival of Representations and Warranties, Etc.

(a)    The representations and warranties made in this Agreement shall not survive the Closing Date. Other than Sections 2(b), 2(c), 2(e), 2(h), 2(i), 2(j), 2(k), 5(d), 5(e), 5(f), 5(j), 5(k), 5(l), 5(m), 10, 11, 13, 14, 15, 16, 18 and 20, which shall survive the Closing Date in accordance with their terms (except Section 5(l) which shall survive for 90 days following the Closing Date), the covenants contained in this Agreement shall not survive the Closing Date.

(b)    Other than with respect to Sections 2(h), 2(i) and 2(j) and Sections 10 through 18, which shall continue and survive any termination of this Agreement, (i) none of the Investors may assert any claim against the Company (both as Debtors-in-possession or the reorganized Debtors), and the Company (both as Debtors-in-possession or the reorganized Debtors), may not assert any claim against any Investor, in either case, arising from this Agreement other than for willful breach, and (ii) the Investors hereby release the Company (both as Debtors-in-possession and the reorganized Debtors) from any such claims, and the Company (both as Debtors-in-possession or the reorganized Debtors) hereby releases the Investors from any such claims. Notwithstanding the foregoing (w) the aggregate liability of all of the Investors under this Agreement for any reason (under any legal theory), including for any willful breach, for any act or omission occurring on or prior to the Disclosure Statement Approval Date shall not exceed $100 million, (x) the aggregate liability of all of the Investors under this Agreement for any reason (under any legal theory), including for any willful breach, for any act or omission occurring after the Disclosure Statement Approval Date shall not exceed $250 million, (y) the aggregate liability of all of the Debtors under this Agreement for any reason (under any legal theory), including for any willful breach, for any act or omission occurring on or prior to the Disclosure Statement Approval Date shall not exceed $100 million, and (z) the aggregate liability of all of the Debtors under this Agreement for any reason (under any legal theory), including for any willful breach, for any act or omission occurring after the Disclosure Statement Approval Date shall not exceed $250 million. Notwithstanding the foregoing, nothing contained in this Section 11(b) shall limit the liability of the Company for any

Transaction Expenses pursuant to <u>Section 2(j)</u> or <u>12(g)</u>.  The Investors and the Company acknowledge that such liability under subclauses (w) and (x) shall be on a several and not joint basis with respect to any willful breach occurring on or prior to the Disclosure Statement Filing Date.  The Investors and the Company acknowledge and agree that such liability under subclauses (w) and (x) shall be on a joint and several basis with respect to any willful breach occurring after the Disclosure Statement Filing Date; <u>provided,</u> that the aggregate liability of Harbinger shall not exceed $38,944,000, the aggregate liability of Merrill shall not exceed $16,358,805, the aggregate liability of UBS shall not exceed $16,358,805, the aggregate liability of GS shall not exceed $39,215,500 and the aggregate liability of Pardus shall not exceed $33,593,000.  Subject to the terms, conditions and limitation set forth in this <u>Section 11(b)</u>, (i) the joint and several obligations referred to in the immediately preceding sentence mean that each Investor (an "**Assuming Investor**") assumes liability on a joint and several basis for any willful breach of this Agreement by any other Investor (a "**Breaching Investor**"), whether or not the Assuming Investor has breached this Agreement or is in any way responsible for such willful breach by the Breaching Investor and (ii) the Assuming Investors' obligations shall be a commitment to assure payment, not collection.  Under no circumstances shall any Investor be liable to the Company (as Debtors-in-possession or reorganized Debtors) for any punitive damages under this Agreement or any Equity Commitment Letter.  Under no circumstances shall the Company (both as Debtors-in-possession and reorganized Debtors) be liable to any Investor for any punitive damages under this Agreement.

12.    <u>Termination</u>.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date:

(a)    by mutual written consent of the Company and ADAH;

(b)    by any Investor if any of the Chapter 11 Cases shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or an interim or permanent trustee shall be appointed in any of the Chapter 11 Cases, or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases;

(c)    by any party to this Agreement if any statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority or any judgment, injunction, decree or order of any federal, state or foreign court shall have become final and non-appealable, that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms or the GM Settlement;

(d)    by ADAH upon written notice to the Company and each other Investor:

(i)    if the Approval Order has not become a Final Approval Order on or prior to the earlier of (A) the tenth (10th) day after the Bankruptcy Court enters the Approval Order, or, if such day is not a Business Day, the next Business Day and (B) August 16, 2007; <u>provided</u>, that notice of termination pursuant to this <u>Section 12(d)(i)</u> must be given on or prior to August 31, 2007;

(ii)    at any time prior to the last date established by the Bankruptcy Court for the filing of objections to the Disclosure Statement, if the Company shall not have delivered a Disclosure Letter as contemplated by <u>Section 5(s)</u> on or prior to the tenth (10th) Business Day preceding the Disclosure Statement Filing Date or shall have delivered a Disclosure Letter which shall not have satisfied the condition with respect to the Disclosure Letter in accordance with <u>Section 9(a)(xxviii)</u>.

(iii)    on or after March 31, 2008 (such date, being the "**Closing Date Outside Date**"); <u>provided</u> that the Closing Date has not occurred by such date;

(iv)    on or after January 31, 2008 (such date, being the "**Disclosure Statement Outside Date**"); <u>provided</u> that, in either case, the Disclosure Statement has not been filed for approval with the Bankruptcy Court by such date;

(v)    if the Company or any Investor shall have breached any provision of this Agreement, which breach would cause the failure of any condition set forth in <u>Section 9(a)(xvi)</u> or <u>(xvii)</u> hereof to be satisfied, which failure cannot be or has not been cured on the earliest of (A) the tenth (10th) Business Day after the giving of written notice thereof to the Company or such Investor by any Investor and (B) the third (3rd) Business Day prior to the Closing Date Outside Date; <u>provided</u>, that the right to terminate this Agreement under this <u>Section 12(d)(v)</u> shall not be available to any Investor whose breach is the cause of the failure of the condition in <u>Section 9(a)(xvi)</u> or <u>(xvii)</u> to be satisfied; <u>provided</u>, <u>further</u>, that the right to terminate under this <u>Section 12(d)(v)</u> shall not be available as a result of a breach of <u>Section 5(o)</u> to the extent, and only to the extent, that the circumstances giving rise to the breach of <u>Section 5(o)</u> previously gave rise to a termination right under <u>Section 12(d)(vii)</u> and ADAH did not exercise such termination right under <u>Section 12(d)(vii)</u> by the end of the twenty (20) day period referred to therein;

(vi)    (A) there shall have been a Change of Recommendation or (B) the Company shall have entered into an Alternate Transaction Agreement; or

(vii)    for a period of twenty (20) days following the Cure Period if ADAH has delivered a deficiency notice in accordance with Section 9(a)(xxviii)(C) and the condition set forth in Section 9(a)(xxviii) shall not have been satisfied at the end of the Cure Period;

provided, that notwithstanding anything in the foregoing to the contrary, any Investor other than ADAH shall be entitled to terminate this Agreement as to itself (but not as to any other party) at any time on or after June 30, 2008 (a "**Limited Termination**");

(e)    [Reserved]

(f)    by the Company upon written notice to each Investor:

(i)    subject to the establishment of Alternative Financing in accordance with Section 2(b), if any Investor shall have breached any provision of this Agreement, which breach would cause the failure of any condition set forth in Section 9(c)(iv) or (v) hereof to be satisfied, which failure cannot be or has not been cured on the earliest of (A) the tenth (10th) Business Day after the giving of written notice thereof to the Investors by the Company and (B) the third (3rd) Business Day prior to the Closing Date Outside Date;

(ii)    if the Company enters into any Alternate Transaction Agreement; provided, that the Company may only terminate this Agreement under the circumstances set forth in this Section 12(f)(ii) if: (x) the Company's board of directors has determined in good faith, after having consulted with its outside legal counsel and its independent financial advisors, that such Alternate Transaction is a Superior Transaction and the failure to enter into such an Alternate Transaction Agreement would result in a breach of the applicable fiduciary duties of the board of directors, (y) before taking such action the Company has given the Investors at least ten (10) Business Days' (or, in the event of any Alternate Transaction that has been materially revised or modified, at least five (5) Business Days') prior written notice (the "**Consideration Period**") of the terms of such Alternate Transaction and of its intent to take such action, and, during the Consideration Period, the Company has, if requested by any Investor, engaged in good faith negotiations regarding any revisions to this Agreement, the Plan or any other agreement or document proposed by

ADAH and again has determined in good faith, after consultation with its outside legal counsel and its independent financial advisors, that such Alternate Transaction remains a Superior Transaction and (z) prior to or contemporaneously with such termination the Company shall pay to the Investors the Alternate Transaction Fee;

(iii)   on or after March 31, 2008; <u>provided,</u> that the Closing Date has not occurred by such date; or

(iv)   in accordance with <u>Section 5(t)</u>.

For the purposes of this <u>Section 12(f)</u>, a "**Superior Transaction**" shall mean an Alternate Transaction, which the board of directors of the Company, after consultation with its outside legal counsel and its independent financial advisors, determines in good faith to be more favorable to the bankruptcy estate of the Company than the transactions contemplated by this Agreement, the Preferred Term Sheet, the Plan Terms and the Plan, taking into account, all legal, financial, regulatory and other aspects of such Alternate Transaction, the likelihood of consummating the Alternate Transaction, the likely consummation date of the Alternate Transaction and the identity of the parties or proposed parties to such Alternate Transaction and after taking into account any revisions to the terms of this Agreement, the Plan and/or any other agreement or document proposed during the Consideration Period.

(g)   In addition to any other rights or remedies any Investor may have under this Agreement (for breach or otherwise), the Company shall pay a fee of $82,500,000 (the "**Alternate Transaction Fee**") to the Investors in such proportions as are set forth on <u>Schedule 2</u> hereto, and, in any case, the Company shall pay to the Investors any Transaction Expenses and any other amounts certified by the Investors to be due and payable hereunder that have not been paid theretofore if this Agreement is terminated pursuant to one of the following:

(i)   pursuant to (x) <u>Section 12(d)(vi)(B)</u> or (y) <u>Section 12(f)(ii)</u>;

(ii)   pursuant to <u>Section 12(d)(vi)(A)</u> and, within the twenty-four (24) month period following the date of such termination, an Alternate Transaction Agreement is entered into or an Alternate Transaction is consummated;

(iii)   pursuant to <u>Section 12(d)(v)</u> based on a willful breach by the Company and within the twenty-four (24) month period following the date of such

termination, an Alternate Transaction Agreement is entered into or an Alternate Transaction is consummated.

Payment of the amounts due under this Section 12(g) will be made (i) no later than the close of business on the next Business Day following the date of such termination in the case of a payment pursuant to Section 12(g)(i)(x), (ii) prior to or contemporaneously with such termination by the Company in the case of a payment pursuant to Section 12(g)(i)(y) and (iii) prior to or contemporaneously with the entry into an Alternate Transaction Agreement or the consummation of an Alternate Transaction in the case of a payment pursuant to Sections 12(g)(ii) or (iii). Under no circumstances shall the Company be required to pay more than one Alternate Transaction Fee plus Transaction Expenses. The provision for the payment of the Alternate Transaction Fee is an integral part of the transactions contemplated by this Agreement and without this provision the Investors would not have entered into this Agreement and shall constitute an allowed administrative expense of the Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code.

(h)    Upon termination under this Section 12, all rights and obligations of the parties under this Agreement shall terminate without any liability of any party to any other party except that (x) nothing contained herein shall release any party hereto from liability for any willful breach and (y) the covenants and agreements made by the parties herein in Sections 2(h), 2(i) and 2(j), and Sections 10 through 18 will survive indefinitely in accordance with their terms.

13.    Notices. All notices and other communications in connection with this Agreement will be in writing and will be deemed given if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the parties at the following addresses (or at such other address for a party as will be specified by like notice):

(a)    If to:

A-D Acquisition Holdings, LLC
c/o Appaloosa Management L.P.
26 Main Street
Chatham, New Jersey 07928
Facsimile: (973) 701-7055
Attention: James Bolin

with a copy to:

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard

Suite 4900
Miami, Florida 33131-2352
Facsimile:  (305) 358-5744/5766
Attention:  Thomas E. Lauria

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Facsimile:  (212) 354-8113
Attention:  John M. Reiss
          Gregory Pryor

(b)     If to:

Harbinger Del-Auto Investment Company, Ltd.
c/o Harbinger Capital Partners Offshore Manager, LLC
555 Madison Avenue, 16th Floor
New York, NY 10022
Attn:  Philip A. Falcone

with a copy to:

Harbert Management Corp.
One Riverchase Parkway South
Birmingham, AL 35244
Facsimile:  (205) 987-5505
Attention:  General Counsel

with a copy to:

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131-2352
Facsimile:  (305) 358-5744/5766
Attention:  Thomas E. Lauria

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Facsimile:  (212) 354-8113
Attention:  John M. Reiss
          Gregory Pryor

with a copy to:

Kaye Scholer LLP
425 Park Avenue
New York, NY 10022-3598
Facsimile: (212) 836-8689
Attention: Benjamin Mintz and Lynn Toby Fisher

(c)     If to:

Merrill Lynch, Pierce, Fenner & Smith Incorporated.
4 World Financial Center
New York, New York 10080
Facsimile: (212) 449-0769
Attention: Robert Spork / Rick Morris

with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Facsimile: (212) 757-3990
Attention: Andrew N. Rosenberg

(d)     If to:

UBS Securities LLC
299 Park Avenue
New York, New York 10171
Facsimile: (212) 821-3008 / (212) 821-4042
Attention: Steve Smith / Osamu Watanabe

with a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Facsimile: (212) 225-3999
Attention: Leslie N. Silverman

(e)     If to:

Goldman Sachs & Co
1 New York Plaza
New York, NY 10004
Facsimile: (212) 823-0145
Attention: David Mullen / Tom Wagner

with a copy to:

Goldman Sachs & Co.
1 New York Plaza
New York, NY  10004
Facsimile:  (212) 428-4769
Attention:  Sandip Khosla

with a copy to:

Sullivan & Cromwell
125 Broad Street
New York, NY  10004
Facsimile:  (212) 558-3588
Attention:  Robert Reeder

(f)      If to:

Pardus DPH Holding LLC
590 Madison Avenue
Suite 25E
New York, NY 10022
Facsimile: (212) 381-7771
Attention: Timothy Bass

with a copy to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, N.Y. 10019-6099
Facsimile: (212) 728-8111
Attention: Rachel C. Strickland
         Morgan D. Elwyn

(g)    If to the Company, to:

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098
Attention: John Sheehan – Facsimile: (248) 813-2612
              David Sherbin / Sean Corcoran – Facsimile: (248) 813-2491

with a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Facsimile: (212) 735-2000/1
Attention: Eric L. Cochran
              Marie L. Gibson

and

Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Chicago, IL 60606
Facsimile: (312) 407-0411
Attention: John Wm. Butler, Jr.
              George Panagakis

14.    Assignment; Third Party Beneficiaries.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement will be assigned by any of the parties (whether by operation of law or otherwise) without the prior written consent of the other parties, except to an Ultimate Purchaser or to a Related Purchaser pursuant to Sections 2(a), 2(b) and 2(k).  Notwithstanding the previous sentence, subject to the provisions of Sections 2(a), 2(b) and 2(k):  this Agreement, or the Investors' obligations hereunder, may be assigned, delegated or transferred, in whole or in part, by any Investor to any Affiliate of such Investor over which such Investor or any of its Affiliates exercise investment authority, including, without limitation, with respect to voting and dispositive rights; provided, that any such assignee assumes the obligations of such Investor hereunder and agrees in writing to be bound by the terms of this Agreement in the same manner as such Investor.  Notwithstanding the foregoing or any other provisions herein, except pursuant to an Additional Investor Agreement acceptable to the Company and ADAH no such assignment will relieve an Investor of its obligations hereunder if such assignee fails to perform such obligations.  Except as provided in Section 10 with respect to the Indemnified Persons, this Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any person other than the parties hereto any rights or remedies under this Agreement.

15.    Prior Negotiations; Entire Agreement.  This Agreement (including the agreements attached as exhibits to and the documents and instruments referred to in this Agreement)

constitutes the entire agreement of the parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement, except that the parties hereto acknowledge that any confidentiality agreements, heretofore executed among the parties will continue in full force and effect.

16.    GOVERNING LAW; VENUE. THIS AGREEMENT WILL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK. THE INVESTORS HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR VALIDITY OF THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

17.    Counterparts. This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the parties and delivered to the other party (including via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

18.    Waivers and Amendments. This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions of this Agreement may be waived, only by a written instrument signed by all the parties or, in the case of a waiver, by the party waiving compliance, and subject, to the extent required, to the approval of the Bankruptcy Court. No delay on the part of any party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement. The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity.

19.    Adjustment to Shares. If, in accordance with the terms of this Agreement, the Company effects a reclassification, stock split (including a reverse stock split), stock dividend or distribution, recapitalization, merger, issuer tender or exchange offer, or other similar transaction with respect to any shares of its capital stock, references to the numbers of such shares and the prices therefore shall be equitably adjusted to reflect such change and,

as adjusted, shall, from and after the date of such event, be subject to further adjustment in accordance herewith.

20.    <u>Headings</u>.  The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

21.    <u>Publicity</u>.  The initial press release regarding this Agreement shall be a joint press release. Thereafter, the Company and Investors each shall consult with each other prior to issuing any press releases (and provide each other a reasonable opportunity to review and comment upon such release) or otherwise making public announcements with respect to the transactions contemplated by this Agreement and the Plan, and prior to making any filings with any third party or any governmental entity (including any national securities exchange or interdealer quotation service) with respect thereto, except as may be required by law or by the request of any governmental entity.

22.    <u>Knowledge; Sole Discretion</u>.  The phrase "**knowledge of the Company**" and similar phrases shall mean the actual knowledge of the Chief Restructuring Officer of the Company and such other officers as the Company and ADAH shall reasonably agree. Whenever in this Agreement any party is permitted to take an action or make a decision in its "sole discretion," the parties hereto acknowledge that such party is entitled to make such decision or take such action in such party's sole and absolute and unfettered discretion and shall be entitled to make such decision or take such action without regard for the interests of any other party and for any reason or no reason whatsoever.  Each party hereto acknowledges, and agrees to accept, all risks associated with the granting to the other parties of the ability to act in such unfettered manner.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by their respective officers thereunto duly authorized, all as of the date first written above.

DELPHI CORPORATION

By:  _____

Name:

Title:


A-D ACQUISITION HOLDINGS, LLC

By:  _____

Name:

Title:


HARBINGER DEL-AUTO INVESTMENT COMPANY, LTD.

By:  _____

Name:

Title:


MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

By:  _____

Name:

Title:

UBS SECURITIES LLC

By: _____
    Name:
    Title:


By: _____
    Name:
    Title:


GOLDMAN SACHS & CO.


By: _____
    Name:
    Title:


PARDUS DPH HOLDING LLC


By: _____
    Name:
    Title:

-80-

SCHEDULE 1

| Defined Term | Section |
|---|---|
| ADAH | Preamble |
| Additional Investor Agreement | Section 2 (k) |
| Affiliate | Section 2 (a) |
| Agreement | Preamble |
| Alternate Transaction | Section 9 (a)(v) |
| Alternate Transaction Agreement | Section 9 (a)(v) |
| Alternate Transaction Fee | Section 12 (g) |
| Alternative Financing | Section 2 (b) |
| Amended and Restated Constituent Documents | Section 8 (c) |
| Appaloosa | Recitals |
| Approval Motion | Recitals |
| Approval Order | Recitals |
| Arrangement Fee | Section 2 (h)(iii) |
| Assuming Investor | Section 11 (b) |
| Available Investor Shares | Section 2 (b) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Rules | Section 3 (b)(i) |
| Breaching Investor | Section 11 (b) |
| Business Day | Section 1 (c)(iii) |
| Business Plan | Section 5 (s) |
| Capital Structure Date | Section 3 (d) |
| Cerberus | Recitals |
| Change of Recommendation | Section 9 (a)(vi) |
| Chapter 11 Cases | Recitals |
| Closing Date | Section 2 (d) |
| Closing Date Outside Date | Section 12 (d)(iii) |
| Code | Section 3 (z)(ii) |
| Commission | Section 1 (c)(ii) |
| Commitment Fees | Section 2 (h)(ii) |
| Commitment Parties | Recitals |
| Company | Preamble |
| Company ERISA Affiliate | Section 3 (z)(ii) |
| Company Financing Proposal | Section 5 (t) |
| Company Plans | Section 3 (z)(i) |
| Company SEC Documents | Section 3 (j) |
| Confirmation Order | Section 9 (a)(vii) |
| Confirmed Plan | Section 9 (a)(viii) |
| Consideration Period | Section 12 (f)(ii) |
| Cure Period | Section 9(a)(xxviii)(C)(1) |
| Debt Financing | Section 5 (t) |
| Debtors | Recitals |
| Determination Date | Section 1 (c)(vi) |

| Defined Term | Section |
|---|---|
| DGCL | Section 3 (oo) |
| Direct Subscription Shares | Section 2 (a)(i) |
| Disclosure Letter | Section 3 |
| Disclosure Letter Delivery Date | Section 3 |
| Disclosure Statement | Section 5 (b) |
| Disclosure Statement Approval Date | Section 5 (b) |
| Disclosure Statement Filing Date | Section 5 (p) |
| Disclosure Statement Outside Date | Section 12 (d)(iv) |
| Disinterested Director | Section 8 (c) |
| Dolce | Recitals |
| Draft Business Plan | Section 3 (m)(vii) |
| Due Diligence Expiration Date | Section 12 (d)(ii) |
| Effective Date | Section 1 (c)(iii) |
| Eligible Holder | Section 1 (a) |
| Environmental Laws | Section 3 (x)(i) |
| Equity Commitment Letter | Section 4 (o) |
| ERISA | Section 3 (z)(i) |
| Exchange Act | Section 3 (i)(i) |
| Existing Shareholder Rights Plan | Section 3 (d) |
| Expiration Time | Section 1 (c)(iii) |
| E&Y | Section 3 (q) |
| Final Approval Order | Section 9 (a)(i) |
| Financing Decision Date | Section 5 (t) |
| Financing Notice | Section 5 (t) |
| Financing Order | Section 2 (j) |
| GAAP | Section 3 (i)(i) |
| GM | Recitals |
| GM Settlement | Section 5 (p) |
| GS | Preamble |
| Harbinger | Preamble |
| Harbinger Fund | Recitals |
| HSR Act | Section 3 (g) |
| Indebtedness | Section 9 (a)(xxvii) |
| Indemnified Person | Section 10 (a) |
| Indemnifying Party | Section 10 (a) |
| Intellectual Property | Section 3 (s) |
| Investment Decision Package | Section 3 (k) |
| Investor | Preamble |
| Investor Default | Section 2 (b) |
| Investors | Preamble |
| Investor Shares | Section 2 (a) |
| Issuer Free Writing Prospectus | Section 3 (k) |
| IUE-CWA | Section 5 (u) |
| knowledge of the Company | Section 22 |

| Defined Term | Section |
|---|---|
| Limited Termination | Section 12 (d) |
| Losses | Section 10 (a) |
| Material Adverse Effect | Section 3 (a) |
| Material Investment Documents | Section 9 (a)(xxviii) |
| Maximum Number | Section 2 (a) |
| Merrill | Preamble |
| Money Laundering Laws | Section 3 (ee) |
| Monthly Financial Statements | Section 5 (r) |
| Multiemployer Plans | Section 3 (z)(ii) |
| New Common Stock | Section 1 (a) |
| OFAC | Section 3 (ff) |
| Option | Section 3 (d) |
| Options | Section 3 (d) |
| Original Agreement | Recitals |
| Original Approval Motion | Recitals |
| Original Approval Order | Recitals |
| Original Investors | Recitals |
| Original PSA | Recitals |
| Pardus | Preamble |
| Plan | Section 1 (b) |
| Plan Terms | Recitals |
| Preferred Commitment Fee | Section 2 (h)(i) |
| Preferred Debt Financing | Section 5 (t) |
| Preferred Shares | Section 2 (a) |
| Preferred Term Sheet | Section 1 (b) |
| Preliminary Rights Offering Prospectus | Section 3 (k) |
| Proceedings | Section 10 (a) |
| Purchase Notice | Section 1 (c)(vi) |
| Purchase Price | Section 1 (a) |
| Record Date | Section 1 (a) |
| Registration Rights Agreement | Section 8 (c) |
| Related Purchaser | Section 2 (a) |
| Relevant Date | Section 9 (a)(xxviii)(A)(i) |
| Resale Registration Documents | Section 8 (c) |
| Resale Registration Statement | Section 8 (c) |
| Restricted Period | Section 5 (j) |
| Right | Section 1 (a) |
| Rights Distribution Date | Section 1 (c)(ii) |
| Rights Exercise Period | Section 1 (c)(iii) |
| Rights Offering | Section 1 (a) |
| Rights Offering Prospectus | Section 3 (k) |
| Rights Offering Registration Statement | Section 3 (k) |
| Satisfaction Notice | Section 1 (c)(vi) |
| Securities Act | Section 1 (c)(ii) |

| Defined Term | Section |
|---|---|
| Securities Act Effective Date | Section 3 (k) |
| Series A Certificate of Designations | Section 2 (a)(iii) |
| Series A Preferred Stock | Section 2 (a)(iii) |
| Series A Purchase Price | Section 2 (a)(iii) |
| Series B Certificate of Designations | Section 2 (a)(i) |
| Series B Preferred Stock | Section 2 (a)(i) |
| Share | Section 1 (a) |
| Shareholders Agreement | Section 8 (c) |
| Significant Subsidiary | Section 3 (a) |
| Single-Employer Plan | Section 3 (z)(ii) |
| Standby Commitment Fee | Section 2 (h)(ii) |
| Stock Plans | Section 3 (d) |
| Subscription Agent | Section 1 (c)(iii) |
| Subsidiary | Section 3 (a) |
| Superior Transaction | Section 12 (f) |
| Takeover Statute | Section 3 (oo) |
| Taxes | Section 3 (y) |
| Tax Returns | Section 3 (y)(i) |
| Transaction Agreements | Section 3 (b)(i) |
| Transaction Expenses | Section 2 (j) |
| Transformation Plan | Section 3 (m)(vi) |
| UAW | Section 3 (pp) |
| UAW MOU | Section 3 (pp) |
| UBS | Preamble |
| Ultimate Purchasers | Section 2 (k) |
| Unsubscribed Shares | Section 2 (a)(iv) |
| USW | Section 5 (u) |

SCHEDULE 2

| Investor | Direct Subscription Shares | Direct Subscription Shares Purchase Price | Maximum Backstop Shares | Maximum Backstop Shares Purchase Price | Maximum Total Common Shares | Maximum Total Common Shares Purchase Price | Series A Preferred Stock[1] | Purchase Price | Series B Preferred Stock[2] | Purchase Price | Total Purchase Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ADAH | 1,761,878 | $67,638,500 | 15,856,906 | $608,746,500 | 17,618,784 | $676,385,000 | 12,787,724 | $400,000,000 | - | $- | $1,076,385,000 |
| Del-Auto | 702,594 | $26,972,600 | 6,323,348 | $242,753,400 | 7,025,942 | $269,726,000 | - | - | 3,321,178 | $127,500,000 | $397,226,000 |
| Merrill | 265,347 | $10,186,650 | 2,388,118 | $91,679,850 | 2,653,465 | $101,866,500 | - | - | 1,693,149 | $65,000,000 | $166,866,500 |
| UBS | 265,347 | $10,186,650 | 2,388,118 | $91,679,850 | 2,653,465 | $101,866,500 | - | - | 1,693,149 | $65,000,000 | $166,866,500 |
| GS | 950,768 | $36,500,000 | 8,556,914 | $328,500,000 | 9,507,682 | $365,000,000 | - | - | 911,696 | $35,000,000 | $400,000,000 |
| Pardus | 612,545 | $23,515,600 | 5,512,907 | $211,640,400 | 6,125,452 | $235,156,000 | - | - | 2,800,208 | $107,500,000 | $342,656,000 |
| Total | 4,558,479 | $175,000,000 | 41,026,311 | $1,575,000,000 | 45,584,790 | $1,750,000,000 | 12,787,724 | $400,000,000 | 10,419,380 | $400,000,000 | $2,550,000,000 |

**Proportionate Share of Preferred Commitment Fee:**

| Investor | |
|---|---|
| ADAH | 50.4861% |
| Del-Auto | 15.9375% |
| Merrill | 8.1250% |
| UBS | 8.1250% |
| GS | 3.8889% |
| Pardus | 13.4375% |
| Total | 100% |

**Proportionate Share of Standby Commitment Fee:**

| Investor | |
|---|---|
| ADAH | 40.3977% |
| Del-Auto | 15.4712% |
| Merrill | 6.0769% |
| UBS | 6.0769% |
| GS | 18.5397% |
| Pardus | 13.4375% |
| Total | 100% |

**Proportionate Share of Alternate Transaction Fee:[3]**

| Investor | If full Commitment Fee received | If no Commitment Fee received |
|---|---|---|
| ADAH | 54.3750% | 46.8555% |
| Del-Auto | 15.9375% | 15.7150% |
| Merrill | 8.1250% | 7.1475% |
| UBS | 8.1250% | 7.1475% |
| GS | 0% | 9.6970% |
| Pardus | 13.4375% | 13.4375% |
| Total | 100% | 100% |

[1] Common stock equivalent units.

[2] Common stock equivalent units.

[3] Percentages will fluctuate depending on the amount of any Commitment Fee received.

NEWYORK 609548 v31 (2K)

## SUMMARY OF TERMS OF
## PREFERRED STOCK

*Set forth below is a summary of indicative terms for a potential investment in Delphi Corporation by entities or funds controlled by Appaloosa Management, Harbinger Capital Partners, Merrill Lynch, Pierce, Fenner & Smith Incorporated., UBS Securities, Goldman Sachs & Co. and Pardus Special Opportunities Master Fund L.P.  The investment is being made in connection with a Plan of Reorganization of Delphi Corporation under chapter 11 of the Bankruptcy Code.  The terms set forth below are intended solely to provide a framework for the parties as they proceed with discussions of the proposed transaction and do not constitute any agreement with respect to the definitive terms for any transaction or any agreement to agree or any solicitation of acceptances or rejections of any plan of reorganization.  While the parties expect to negotiate in good faith with respect to the terms for a transaction, any party shall be free to discontinue discussions and negotiations at any time for any reason or no reason.  No party shall be bound by the terms hereof and only execution and delivery of definitive documentation relating to the transaction shall result in any binding or enforceable obligations of any party relating to the transaction.*

| | |
|---|---|
| **Issuer**: | Delphi Corporation (the "***Company***"), a corporation organized under the laws of Delaware and a successor to Delphi Corporation, as debtor in possession in the chapter 11 reorganization case (the "***Bankruptcy Case***") pending in the United States Bankruptcy Court for the Southern District of New York. |
| **Investors**: | Entities or funds controlled by Appaloosa Management ("***Appaloosa***"), Harbinger Capital Partners ("***Harbinger***"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("***Merrill***"), UBS Securities ("***UBS***"), Goldman Sachs & Co. ("***GS***") and Pardus Special Opportunities Master Fund L.P. ("***Pardus***" and together with Harbinger, Merrill,  UBS and GS, the "***Co-Lead Investors***"), with the Series B Preferred Stock to be purchased by the Co-Lead Investors allocated as follows: (a) Harbinger—31.875%; (b) Merrill—16.25%; (c) UBS—16.25%; (d) GS—8.75%; and (e) Pardus—26.875%.  Appaloosa or any Permitted Holder (as defined below) shall be the exclusive purchaser and sole beneficial owner for all purposes hereunder of the Series A-1 Preferred Stock (as defined below). Appaloosa, Harbinger, Merrill, UBS, GS and Pardus are collectively referred to as the "***Investors***." |
| **Securities to be Issued**: | Series A-1 Senior Convertible Preferred Stock, par value $0.01 per share (the "***Series A-1 Preferred Stock***").   The Series A-1 Preferred Stock shall convert to Series A-2 Preferred Stock (the "***Series A-2 Preferred Stock***" and, together with the Series A-1 Preferred Stock, the "***Series A Preferred Stock***") in certain circumstances described in this term sheet. |
| | Series B Senior Convertible Preferred Stock, par value $0.01 per share (the "***Series B Preferred Stock***" and, together with the Series A |

Preferred Stock, the *"Preferred Stock"*).

The Series B Preferred Stock shall be identical in all respect to the Series A-1 Preferred Stock except as specifically set forth below.

The Series A-2 Preferred Stock shall be identical in all respect to the Series A-1 Preferred Stock except it shall not have Voting Rights and Governance Rights (as defined below).

The (i) Series A-1 Preferred Stock and the shares of Common Stock underlying such Series A-1 Preferred Stock may not be, directly or indirectly, sold, transferred, assigned, pledged, donated, or otherwise encumbered or disposed of by any Series A Preferred Stock Holder (as defined below), during the two years following the effective date (the *"Effective Date"*) of the Company's plan of reorganization in the Bankruptcy case (the *"Plan"*) other than in whole pursuant to a sale of the Company (as defined below) (provided, however, that in any sale of Series A-1 Preferred Stock in connection with a sale of the Company, the seller of the Series A-1 Preferred Stock may receive consideration with a value no greater than the greater of (i) the fair market value of the Series A-1 Preferred Stock (or a preferred security of equivalent economic value), such fair market value not to reflect the value of the Voting Rights and Governance Rights attributable to the Series A-1 Preferred Stock, and (ii) the Liquidation Value) and (ii) Series B Preferred Stock and the shares of Common Stock underlying such Series B Preferred Stock, or any interest or participation therein may not be, directly or indirectly, sold, transferred, assigned, pledged or otherwise encumbered or disposed of (including by exercise of any registration rights) during the ninety days following the Effective Date other than in whole pursuant to a sale of the Company (each of (i) and (ii), the *"Transfer Restriction"*). A *"sale of the Company"* means the sale of the Company to a party or parties other than, and not including, Appaloosa or any affiliate of Appaloosa (for this purpose, an "affiliate" of Appaloosa shall not include any company in which a fund managed by Appaloosa or its affiliates invests and does not control) pursuant to which such party or parties acquire (i) the capital stock of the Company possessing the voting power under normal circumstances to elect a majority of the Company's Board of Directors (whether by merger, consolidation or sale or transfer of the Company's capital stock) or (ii) all or substantially all of the Company's assets determined on a consolidated basis.

**Purchase of Preferred Stock**:   At the Effective Date, (i) Appaloosa will purchase all of the 12,787,724 shares of Series A-1 Preferred Stock for an aggregate purchase price of $400 million and (ii) the Co-Lead Investors shall purchase all of the 10,419,880 shares of Series B Preferred Stock, for an aggregate purchase price of $400 million. The aggregate stated value of the Series A-1 Preferred Stock shall be $400 million and the aggregate stated value of

the Series B Preferred Stock shall be $400 million (in each case, the "*Stated Value*").

| | |
|---|---|
| **Mandatory Conversion into Common Stock:** | The Company shall convert into Common Stock all, but not less than all, of the (i) Series A Preferred Stock on the first date the Mandatory Conversion Requirements are satisfied (but in no event earlier than June 30, 2012[1]) at the Conversion Price (as defined below) of the Series A Preferred Stock in effect on such conversion date, and (ii) Series B Preferred Stock on the first day the Mandatory Conversion Requirements are satisfied (but in no event earlier than the third anniversary of the Effective Date) at the Conversion Price (as defined below) of the Series B Preferred Stock in effect on such conversion date. |

The "*Mandatory Conversion Requirements*" set forth in this section are as follows: (i) the closing price for the Common Stock for at least 35 trading days in the period of 45 consecutive trading days immediately preceding the date of the notice of conversion shall be equal to or greater than $55[2] per share and (ii) the Company has at the conversion date an effective shelf registration covering resales of the shares of Common Stock received upon such conversion of the Preferred Stock.

The Company will provide each Preferred Stock Holder (as defined below) with notice of conversion at least five (5) business days prior to the date of conversion.

The holders of the Series A Preferred Stock (the "*Series A Preferred Stock Holders*" and each, a "*Series A Preferred Stock Holder*") will agree not to take any action to delay or prevent such registration statement from becoming effective.

| | |
|---|---|
| **Liquidation Rights:** | In the event of any liquidation, dissolution or winding up of the business of the Company, whether voluntary or involuntary, the holders of Preferred Stock (the "*Preferred Stock Holders*" and each, a "*Preferred Stock Holder*") shall receive, in exchange for each share, out of legally available assets of the Company, (A) a preferential amount in cash equal to (i) the Stated Value plus (ii) the aggregate amount of all accrued and unpaid dividends or distributions with respect to such share (such amount being referred to as the "*Liquidation Value*") and (B) a non-preferential amount (if any) (the "*Common Equivalent Amount*") equal to (i) the amount that Preferred Stock Holder would have received pursuant to the liquidation if it had converted its Preferred Stock into Common Stock immediately prior to the liquidation minus (ii) any amounts received pursuant to (A)(i) and (ii) hereof (the Stated Value and dividends and distributions). For the avoidance of doubt, this paragraph |

---

[1] Assuming emergence by January 1, 2008. Conversion date to be adjusted day-by-day to reflect any later emergence.

[2] Equivalent to a TEV of $15.3 billion at emergence.

should operate so that in the event of a liquidation, dissolution or winding up of the business of the Company, a Preferred Stock Holder shall receive a total amount equal to the greater of: (i) the Liquidation Value and (ii) the amount that a Preferred Stock Holder would have received pursuant to the liquidation, dissolution or winding up of the business if it converted its Preferred Stock into Common Stock immediately prior to the liquidation.

**Ranking:**

The Series A Preferred Stock and the Series B Preferred Stock shall rank *pari passu* with respect to any distributions upon liquidation, dissolution or winding up of the Company. The Preferred Stock will rank senior to any other class or series of capital stock of the Company with respect to any distributions upon liquidation, dissolution or winding up of the Company.

**Conversion of Preferred Stock into Common Stock:**

Each share of Preferred Stock shall be convertible at any time, without any payment by the Preferred Stock Holder, into a number of shares of Common Stock equal to (i) the Liquidation Value <u>divided by</u> (ii) the Conversion Price. The Conversion Price shall initially be $[____][3], with respect to the Series A Preferred Stock, and $[____][4] with respect to the Series B Preferred Stock, in each case subject to adjustment from time to time pursuant to the anti-dilution provisions of the Preferred Stock (as so adjusted, the "***Conversion Price***"). The anti-dilution provisions will contain customary provisions with respect to stock splits, recombinations and stock dividends and customary weighted average anti-dilution provisions in the event of, among other things, the issuance of rights, options or convertible securities with an exercise or conversion or exchange price below the Conversion Price, the issuance of additional shares at a price less than the Conversion Price and other similar occurrences.

**Conversion of Series A-1 Preferred Stock Into Series A-2 Preferred Stock:**

If (a) Appaloosa or any Permitted Holder (as defined below) sells, transfers, assigns, pledges, donates or otherwise encumbers to any person other than a Permitted Holder, or converts into Common Stock, shares of Series A-1 Preferred Stock with an aggregate Liquidation Value in excess of $100 million, or (b) David Tepper no longer controls Appaloosa and James Bolin is no longer an executive officer of Appaloosa, then all the shares of Series A-1 Preferred Stock shall automatically convert into Series A-2 Preferred Stock without any action on the part of the holder thereof; <u>provided</u>, that with respect to clause (a), no such conversion shall be effective until the Company has in effect a registration statement covering resales of the Common Stock issuable upon conversion of the Preferred Stock. The Series A Preferred Stock Holders will agree not to take any action to delay or prevent such

---

[3] Equivalent to a TEV of $11.75 billion at emergence.
[4] Equivalent to a TEV of $12.8 billion at emergence.

registration statement from becoming effective.

If Appaloosa transfers shares of Series A-1 Preferred Stock to any person other than an affiliate of Appaloosa (such affiliate being a "*Permitted Holder*"), then all the shares of Series A-1 Preferred Stock so transferred shall automatically convert into Series A-2 Preferred Stock without any action on the part of the holder thereof.

The direct or indirect transfer of ownership interests in any Permitted Holder that owns shares of Series A-1 Preferred Stock such that such Permitted Holder ceases to be an affiliate of Appaloosa shall constitute a transfer of such Series A-1 Preferred Stock to a person other than a Permitted Holder for the purpose of this provision.

Each event described above in the previous two paragraphs of this section "Conversion of Series A Preferred Stock into Series A-2 Preferred Stock" is referred to as a "*Series A-2 Conversion Event*."

Subject to compliance with applicable securities laws and the Transfer Restriction, shares of Preferred Stock will be freely transferable.

|  |  |
|---|---|
| **Dividends**: | Each Preferred Stock Holder shall be entitled to receive dividends and distributions on the Preferred Stock at an annual rate of 6.5% of the Liquidation Value thereof, with respect to the Series A Preferred Stock, and 3.25% of the Liquidation Value thereof, with respect to the Series B Preferred Stock, in each case payable quarterly in cash as declared by the Company's Board. Unpaid dividends shall accrue. In addition, if any dividends are declared and paid on the Common Stock, the Series A Preferred Stock shall be entitled to receive, in addition to the dividend on the Series A Preferred Stock at the stated rate, the dividends that would have been payable on the number of shares of Common Stock that would have been issued on the Series A Preferred Stock had it been converted immediately prior to the record date for such dividend. |
| **Preference with Respect to Dividends**: | Each Preferred Stock Holder shall, prior to the payment of any dividend or distribution in respect of the Common Stock or any other class of capital stock of the Company ranking junior to the Preferred Stock, be entitled to be paid in full the dividends and distributions payable in respect of the Preferred Stock. |
| **Restriction on Redemptions of Junior Stock**: | So long as shares of Series A Preferred Stock having a Liquidation Value of $200 million or more remain outstanding, the Company shall not and shall not permit any of its subsidiaries to, purchase, redeem or otherwise acquire for value any shares of Common Stock or any shares of any other class of capital stock of the Company ranking junior to the Preferred Stock, except customary provisions with respect to repurchase of employee equity upon termination of employment and except for |

purchases, redemptions or other acquisitions for value of Common Stock not to exceed $50 million in any calendar year.

**Governance –
Board of
Directors:**

A committee (the "*Search Committee*") shall be appointed consisting of one (1) representative of Appaloosa, one (1) representative of the Company, being the Company's lead director (currently John Opie), one (1) representative of the Unsecured Creditors Committee, being David Daigle, one (1) representative of the Co-Lead Investors other than UBS, GS and Merrill (who shall be determined by Appaloosa), and one (1) representative of the Equity Committee reasonably acceptable to the other members of the Search Committee. Each member of the Search Committee shall be entitled to require the Search Committee to interview any person to serve as a director unless such proposed candidate is rejected by each of the Appaloosa representative, the Company representative and the representative of the Unsecured Creditors' Committee. The entire Search Committee shall be entitled to participate in such interview and in a discussion of such potential director following such interview.

The board of directors of the Company shall consist of nine (9) directors (which number shall not be expanded at all times that the Series A-1 Preferred Stock has Series A-1 Board Rights (as defined below)), three (3) of whom (who shall be Class III Directors) shall initially be nominated by Appaloosa and elected at the time of emergence from Chapter 11 by the Series A Preferred Stock Holders (and thereafter shall be elected directly by the Series A Preferred Stock Holders) (the "*Series A Directors*"), one (1) of whom (who shall be a Class I Director) shall be the Executive Chairman selected as described below under "Executive Chairman", one (1) of whom (who shall be a Class I Director) shall be the Chief Executive Officer, one (1) of whom (who shall be a Class I Director) shall initially be selected by the Co-Lead Investor representative on the Search Committee with the approval of either the Company or the Unsecured Creditors' Committee (the "*Joint Investor Director*"), one (1) of whom (who shall be a Class I Director) shall initially be selected by the Unsecured Creditors' Committee and two (2) of whom (who shall be Class II Directors) shall initially be selected by the Unsecured Creditors' Committee (such directors selected by the Unsecured Creditors' Committee and the Joint Investor Director, being the "*Common Directors*"). For the avoidance of doubt, all directors selected in accordance with this paragraph, shall have been interviewed and/or discussed by the Search Committee. Each director so selected shall be appointed to the initial Board of Directors of the Company unless at least three members of the following four members of the Search Committee objects to the appointment of such individual: the Appaloosa representative, the Company representative; the representative of the Unsecured Creditors' Committee; and the representative of the Equity Committee. Initially, the Board shall be

comprised of (a) six (6) directors who satisfy all applicable independence requirements of the relevant stock exchange on which it is expected the Common Stock would be traded and (b) six (6) directors who are independent from the Investors; provided, that the requirements of this sentence may be waived by the unanimous consent of the Company, Appaloosa and the Unsecured Creditors Committee. Additionally, the Joint Investor Director must be independent from the Investors.

Directors initially will be placed as set forth above in three (3) classes: directors in the first class will have an initial term expiring at the annual meeting of stockholders to be held in 2009 (each a "*Class I Director*"), directors in the second class will have an initial term expiring at the annual meeting of stockholders to be held in 2010 (each a "*Class II Director*"), and directors in the final class will have an initial term expiring at the annual meeting of stockholders to be held in 2011 (each a "*Class III Director*"). After the expiration of each initial term of each class of directors, the directors will thereafter each have a one year term elected annually.

Following the initial election of the Executive Chairman and the Chief Executive Officer, the Executive Chairman and Chief Executive Officer shall be nominated for election to the Board by the Nominating and Corporate Governance Committee of the Board and elected to the board by the holders of the Common Stock and the Preferred Stock, voting as a class. The Executive Chairman of the Board shall be selected as described below under "Executive Chairman." The initial Chief Executive Officer shall be Rodney O'Neal, who shall become the Chief Executive Officer and President not later than the effective date of the Plan.

After the initial selection of the Series A Directors, until the earlier of the expiration of the term of the Class III Directors and the conversion of all Series A-1 Preferred Stock to Series A-2 Preferred Stock or Common Stock, (a) the Series A Preferred Stock shall continue to directly elect (including removal and replacement) the Series A Directors subject to the ability of the Nominating and Corporate Governance Committee to, by majority vote, veto the selection of up to two proposed Series A Directors for each Series A director position on the Board and (b) the number of directors on the board of directors may not be increased. The rights of Series A-1 Preferred Stock described in this paragraph are referred to as "*Series A-1 Board Rights*". Upon the earlier of such date, the Series A-1 Directors shall serve out their remaining term and thereafter be treated as Common Directors.

After the initial selection of the Common Directors, the nominees for election of the Common Directors shall be determined by the Nominating and Corporate Governance Committee of the Company's

Board of Directors, with the Series A Directors on such committee not entitled to vote on such determination at any time the Series A-1 Preferred Stock retains Series A-1 Board Rights, and recommended to the Company's Board of Directors for nomination by the Board. Only holders of Common Stock, Series B Preferred Stock and Series A Preferred Stock that is not entitled to Series A Board Rights shall be entitled to vote on the election of the Common Directors.

The Search Committee shall determine by majority vote the Committee assignments of the initial Board of Directors; provided, that for the initial Board and at all times thereafter that the Series A-1 Preferred Stock retains Series A-1 Board Rights at least one Series A Director shall be on all committees of the Board and a Series A Director shall constitute the Chairman of the Compensation Committee of the Board; provided, further, that so long as the Series A-1 Preferred Stock retains Series A-1 Board Rights, the Series A Directors shall not constitute a majority of the Nominating and Corporate Governance Committee. Committee assignments shall be subject to all applicable independence and qualification requirements for directors including those of the relevant stock exchange on which the Common Stock is expected to be traded. Pursuant to a stockholders' agreement or other arrangements, the Company shall maintain that composition.

| | |
|---|---|
| **Governance – Executive Chairman:** | The Executive Chairman shall initially be selected by majority vote of the Search Committee, which must include the approval of the representatives of Appaloosa and the Unsecured Creditors' Committee. Any successor Executive Chairman shall be selected by the Nominating and Corporate Governance Committee of the Board, subject (but only for so long as any of the Series A-1 Preferred Stock remains outstanding) to the approval of the Series A-1 Preferred Stock Holders. Upon approval, such candidate shall be recommended by the Nominating and Corporate Governance Committee to the Company's Board of Directors for appointment as the Executive Chairman and nomination to the Board. The Preferred Stock Holders will vote on the candidate's election to the Board on an as-converted basis together with holders of Common Stock. Notwithstanding the foregoing, if there shall occur any vacancy in the office of the Executive Chairman during the initial one (1) year term, the successor Executive Chairman shall be nominated by the Series A-1 Preferred Stock Holders (but only for so long any of as the Series A-1 Preferred Stock remains outstanding) subject to the approval of the Nominating and Corporate Governance Committee of the Board. |

The Executive Chairman shall be a full-time employee of the Company with his or her principal office in the Company's world headquarters in Troy, Michigan and shall devote substantially all of his or her business activity to the business affairs of the Company.

The Executive Chairman shall cause the Company to and the Company shall be obligated to meaningfully consult with the representatives of the Series A-1 Preferred Stock Holders with respect to the annual budget and material modifications thereto prior to the time it is submitted to the Board for approval.

The employment agreements entered into by the Company with the Executive Chairman and the Chief Executive Officer shall provide that (i) upon any termination of employment, the Executive Chairman and/or the Chief Executive Officer shall resign as a director (and the employment agreements shall require delivery at the time such agreements are entered into of an executed irrevocable resignation that becomes effective upon such termination) and (ii) the right to receive any payments or other benefits upon termination of employment shall be conditioned upon such resignation. If for any reason the Executive Chairman or the Chief Executive Officer does not resign or the irrevocable resignation is determined to be ineffective, then the Series A-1 Preferred Stock Holders may remove the Executive Chairman and/or Chief Executive Officer as a director, subject to applicable law. The employment agreement of the Chief Executive Officer will provide that if the Chief Executive Officer is not elected as a member of the Company's Board, the Chief Executive Officer may resign for "cause" or "good reason".

The special rights of the Series A-1 Preferred Stock referred to in "Governance – Board of Directors" and in this "Executive Chairman" section are referred to as the "*Governance Rights*".

| | |
|---|---|
| **Governance – Voting Rights:** | Except with respect to the election of directors, who shall be elected as specified above, the Preferred Stock Holders shall vote, on an "as converted" basis, together with the holders of the Common Stock, on all matters submitted to shareholders. |

The Series A-1 Preferred Stock Holders shall be entitled to propose individuals for appointment as Chief Executive Officer and Chief Financial Officer, subject to a vote of the Board. The Series A-1 Preferred Stock Holders shall also have the non-exclusive right to propose the termination of the Executive Chairman (but only during the initial one (1) year term of the Executive Chairman and only for so long as the Series A-1 Preferred Stock remains outstanding), the Chief Executive Officer and Chief Financial Officer, in each case, subject to a vote of the Board. If the Series A Preferred Stock Holders propose the appointment or termination of the Chief Executive Officer or Chief Financial Officer, the Board shall convene and vote on such proposal within ten (10) days of the Board's receipt of notice from the Series A-1 Preferred Stock Holders; provided, that the then current Chief Executive Officer shall not be entitled to vote on either the appointment or

termination of the Chief Executive Officer and shall not be entitled to vote on the termination of the Chief Financial Officer.

The Company shall not, and shall not permit its subsidiaries to, take any of the following actions (subject to customary exceptions as applicable) unless (i) the Company shall provide the Series A-1 Preferred Stock Holders with at least 20 business days advance notice and (ii) it shall not have received, prior to the 10th business day after the receipt of such notice by the Series A-1 Preferred Stock Holders, written notice from all of the Series A-1 Preferred Stock Holders that they object to such action:

- any action to liquidate the Company;

- any amendment of the charter or bylaws that adversely affects the Series A Preferred Stock (any expansion of the Board of Directors would be deemed adverse); or

- at all times that the Series A Preferred Stock is subject to the Transfer Restriction:

    - a sale, transfer or other disposition of all or substantially all of the assets of the Company and its subsidiaries, on a consolidated basis;

    - any merger or consolidation involving a change of control of the Company; or

    - any acquisition of or investment in any other person or entity having a value in excess of $250 million in any twelve-month period after the Issue Date.

The approval rights set forth above shall be in addition to the other rights set forth above and any voting rights to which the Series A Preferred Stock Holders are entitled above and under Delaware law.

In a merger or consolidation involving a change of control of the Company (a "***Change of Control***"), the Series A-1 Preferred Stock will be converted into the greater of (i) the consideration with a value equal to the fair market value of the Series A-1 Preferred Stock (or a preferred security of equivalent economic value), such fair market value shall not reflect the value of the Voting Rights and Governance Rights attributable to the Series A-1 Preferred Stock, and (ii) the Liquidation Value. In a Change of Control transaction, the Series B Preferred Stock will be converted into the greater of (i) the consideration with a value equal to the fair market value of the Series B Preferred Stock (or a preferred security of equivalent economic value) and (ii) the Liquidation Value.

The special rights of the Series A-1 Preferred Stock described above in

this section "Governance – Voting Rights" are referred to as the "***Voting Rights***". The Series A-1 Preferred Stock Holders shall have no Voting Rights after no shares of Series A-1 Preferred Stock are outstanding.

Appaloosa and the Permitted Holders shall not receive, in exchange for the exercise or non-exercise of voting or other rights in connection with a any transaction subject to Voting Rights, any compensation or remuneration; <u>provided</u>, that this restriction shall not prohibit the reimbursement of expenses incurred by Appaloosa or any Permitted Holders and shall not prohibit the payment of fees by the Company to Appaloosa or any Permitted Holder if the Company has engaged Appaloosa or its affiliates as an advisor or consultant in connection with any such transaction.

| | |
|---|---|
| **Reservation of Unissued Stock**: | The Company shall maintain sufficient authorized but unissued securities of all classes issuable upon the conversion or exchange of shares of Preferred Stock and Common Stock. |
| **Transferability**: | The Series A Preferred Stock Holders may sell or otherwise transfer such stock as follows: |

- to any Permitted Holder; or

- subject to the Transfer Restriction, to any other person; <u>provided, however</u>, that upon any such transfer, the shares of Series A-1 Preferred Stock so transferred shall automatically convert into Series A-2 Preferred Stock.

| | |
|---|---|
| **Registration Rights**: | The Investors shall be entitled to registration rights as set forth below. The registration rights agreement shall contain customary terms and provisions consistent with such terms, including customary hold-back, cutback and indemnification provisions. |

<u>Demand Registrations</u>. Subject to the Transfer Restriction, the Preferred Stock Holders shall be entitled to an aggregate of five (5) demand registrations, in addition to any shelf registration statement required by the Equity Purchase and Commitment Agreement among the Company and the Investors (which shelf registration shall be renewed or remain available so long as the Company is not eligible to use Form S-3); <u>provided</u>, that all but one such demand right requires the prior written consent of Appaloosa and the one demand not requiring the consent of Appaloosa shall be at the request of the holders of a majority of the shares of Series B Preferred Stock; <u>provided, further</u>, that following the time that the Company is eligible to use Form S-3, the Preferred Stock Holders shall be entitled to an unlimited number of demand registrations (without the need for Appaloosa's consent). Any demand registration may, at the option of the Preferred Stock Holders be a "shelf"

registration pursuant to Rule 415 under the Securities Act of 1933. All registrations will be subject to customary "windows."

Piggyback Registrations.  In addition, subject to the Transfer Restriction, the Preferred Stock Holders shall be entitled to unlimited piggyback registration rights, subject to customary cut-back provisions.

Registrable Securities:  The Series B Preferred Stock, any shares of Common Stock issuable upon conversion of the Preferred Stock, any other shares of Common Stock held by any Investor (including shares acquired in the rights offering or upon the exercise of preemptive rights), and any additional securities issued or distributed by way of a dividend or other distribution in respect of any securities.  Securities shall cease to be Registrable Securities upon sale to the public pursuant to a registration statement or Rule 144, or when all shares held by an Investor may be transferred without restriction pursuant to Rule 144(k).

Expenses.  All registrations shall be at the Company's expense (except underwriting fees, discounts and commissions agreed to be paid by the selling holders), including, without limitation, fees and expenses of one counsel for any holders selling Registrable Securities in connection with any such registration.

| | |
|---|---|
| **Preemptive Rights**: | So long as shares of Series A-1 Preferred Stock having a Liquidation Value of $250 million or more remain outstanding, the Preferred Stock Holders shall be entitled to participate *pro rata* in any offering of equity securities of the Company, other than with respect to (i) shares issued or underlying options issued to management and employees and (ii) shares issued in connection with business combination transactions. |
| **Commitment Fee**: | (a) A commitment fee of 2.25% of total commitment shall be earned by and payable to the Investors and (b) an additional arrangement fee of 0.25% of total commitment shall be earned by and payable to Appaloosa, all as provided for in the EPCA. |
| **Standstill** | For a period of five (5) years from the Closing Date, Appaloosa will not (a) acquire, offer or propose to acquire, solicit an offer to sell or donate or agree to acquire, or enter into any arrangement or undertaking to acquire, directly or indirectly, by purchase, gift or otherwise, record or direct or indirect beneficial ownership (as such term is defined in Rule 13d-3 of the Exchange Act) of more than 25% of the Company's common stock or any direct or indirect rights, warrants or options to acquire record or direct or indirect beneficial ownership of more than 25% of the Company's common stock or (b) sell, transfer, pledge, dispose, distribute or assign ("***Transfer***") to any person in a single transaction, Company Common Stock or any securities convertible into or exchangeable for or representing the right to acquire the Company's |

Common Stock ("***Common Stock Equivalents***") representing more than 15% of the Company's then issued and outstanding (on a fully diluted basis) Common Stock; <u>provided</u>, that Appaloosa shall be permitted to Transfer the Company's Common Stock or Common Stock Equivalents (i) to Permitted Holders, (ii) as part of a broadly distributed public offering effected in accordance with an effective registration statement, (iii) in a sale of the Company, (iv) pursuant to any tender or exchange offer or (v) as otherwise approved by (A) during the initial three year term of the Series A Directors, a majority of Directors who are not Series A Directors or (B) after the initial three year term of the Series A Directors, a majority of the Directors (customary exceptions shall apply for Transfers to partners, stockholders, family members and trusts and Transfers pursuant to the laws of succession, distribution and descent).

**Stockholders Agreement:**     Certain of the provisions hereof will be contained in a Stockholders Agreement to be executed and delivered by ADAH and the Company on the Effective Date.

**Governing Law:**     State of Delaware

EXHIBIT B

PLAN FRAMEWORK AND SPECIAL STATUTORY COMMITTEE PROVISIONS

FRAMEWORK PROVISIONS

The Plan shall contain all of the following terms; provided, however, that nothing herein shall constitute an offer with respect to any securities or a solicitation of acceptances of a chapter 11 plan.  Such offer or solicitation only will be made in compliance with all applicable securities laws and/or provisions of the Bankruptcy Code:

1.1    A condition precedent to the effectiveness of the Plan (subject to the waiver provisions to be negotiated in connection with the Plan) shall be that the aggregate amount of all trade claims and other unsecured claims (including any accrued interest) (excluding (i) unsecured funded debt claims, (ii) Flow-Through Claims (defined below), (ii) GM claims, which shall be treated as set forth below, and (iii) securities claims, which shall be treated as set forth below) (collectively, the "Trade and Other Unsecured Claims") that have been asserted or scheduled but not yet disallowed as of the effective date of the Plan shall be allowed or estimated for distribution purposes by the Bankruptcy Court to be no more than $1.7 billion, excluding all allowed accrued postpetition interest thereon.

1.2    All senior secured debt shall be refinanced and paid in full and all allowed administrative and priority claims shall be paid in full.

1.3    Trade and Other Unsecured Claims and unsecured funded debt claims shall be placed in a single class.  All such claims that are allowed (including all allowed accrued interest, which for trade claims shall be at a rate to be agreed to or determined by the Bankruptcy Court, it being understood that with respect to trade claims, the Debtors and Plan Investors will not take the position that there should not be an entitlement to postpetition interest) shall be satisfied in full with (a) $3.48 billion of common stock (77.3 million out of a total of 147.6 million shares,[1] at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi and (b) the balance in cash[2]; provided, however, that the common stock and cash to be distributed pursuant to the immediately preceding clause shall be reduced proportionately by the amount that allowed Trade and Other Unsecured Claims are less than $1.7 billion, excluding allowed accrued postpetition interest thereon.

1.4    (i) Customer and environmental obligations, (ii) employee-related (excluding collective bargaining-related obligations) and other obligations (in each instance as to be agreed by the Debtors and Appaloosa) and (iii) litigation exposures and other liabilities that are covered

_____

[1]    Inclusive of distributions to subordinated creditors under Section 1.6 below.  References herein to the total number of shares of common stock gives effect to the conversion of the preferred stock issued pursuant to the Investment Agreement to common stock.  The actual number of shares of common stock to be issued by Delphi and to be distributed to various classes is subject to final adjustment and reconciliation as well as negotiation of plan distribution mechanics in the Plan.

[2]    Such amounts to be adjusted by proceeds from the par rights offering to be conducted by Delphi in connection with Section 1.8(iv).

by insurance (as to be agreed by the Debtors and Appaloosa and scheduled in the Plan) ((i), (ii) and (iii) together, the "Flow-Through Claims") will be unimpaired and will be satisfied in the ordinary course of business (subject to the preservation and flow-through of all estate rights, claims and defenses with respect thereto which shall be fully reserved).

1.5    GM will receive an allowed general unsecured claim for all claims and rights of GM and its affiliates (excluding in respect of the 414(l) Assumption, all Flow Through Claims and all other claims and amounts to be treated in the normal course or arising or paid pursuant to the Delphi/GM Definitive Documents) that will be satisfied with $2.70 billion in cash.

1.6    All Delphi subordinated debt claims (including all accrued interest thereon) will be allowed and, in resolution of the subordination rights of Delphi senior debt, all cash otherwise distributable to Delphi subordinated debt claims pursuant to Section 1.3 shall be distributed to Delphi senior debt, and the allowed Delphi subordinated debt claims will be satisfied with $478 million of common stock (10.6 million out of a total of 147.6 million shares, at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi.

1.7    Any allowed securities claims, including all claims in the MDL litigation pending in the United States District Court for the Eastern District of Michigan, will be satisfied solely from available insurance or as otherwise agreed by Delphi and Appaloosa.

1.8    The equity securities class in the Plan shall receive, in the aggregate, (i) $66 million of common stock (1.5 million out of a total of 147.6 million shares, at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi, (ii) rights to purchase 45.6 million out of a total of 147.6 million shares of common stock (to be reduced by the guaranteed minimum of 10% of the rights for the Plan Investors) in reorganized Delphi for $1.75 billion (exercise price: $38.39/share), (iii) 5-year warrants to purchase for $45/share an additional 5% of the common stock of Delphi, and (iv) the right to purchase on a proportionate basis, approximately $522 million of the common stock that would otherwise be distributable to unsecured claims plus an additional $50 million of the common stock that would otherwise be distributable to Appaloosa (each pursuant to Section 1.3) for a price of $45/share (the "par rights offering"); provided, that Appaloosa (in its capacity as a stockholder of Delphi) shall agree not to participate in the par rights offering and shall use commercially reasonable efforts to obtain such agreement from the other Plan Investors.[3]

1.9    The preferred stock to be issued pursuant to the Plan in connection with the Investment Agreement and the corporate governance of Reorganized Delphi shall be subject to the terms listed on the term sheet attached to the Investment Agreement ("Summary of Terms of Preferred Stock"), which are incorporated by reference herein.

1.10    Delphi will arrange for payment on the effective date of the Plan of $3.5 billion to fund its pension obligations. Such payment will include GM taking up to $2.0 billion of net

---

[3]    Inclusion in the Plan of subsections 1.8 (iii) and (iv) is conditioned upon the "Equity Committee" (as defined below) supporting entry of the Approval Order and there not occurring a "Withdrawal of Support" (as defined below). The rights in the par rights offering are to be equivalent to 15% of the common stock that would otherwise be distributable to all unsecured claims plus an additional $50 million of the common stock that would otherwise be distributable to Appaloosa on mechanics to be agreed.

pension obligations pursuant to a 414(l) transaction (the "414(l) Assumption"), which amount shall be reduced to no less than $1.5 billion if (a) Delphi or Appaloosa determine that any greater amount will have an adverse impact on the Debtors or (b) Appaloosa determines that any greater amount will have an adverse impact on the Plan Investors' proposed investment in the Debtors. GM will receive a note from Delphi in the amount of the 414(l) Assumption transferred in the 414(l) transaction, subject to agreed market terms to be specified in the Delphi/GM Definitive Documents; provided, however, that such note will be due, payable and paid in full at par plus accrued interest in cash within ten (10) days following the effective date of the Plan.

1.11    A joint claims oversight committee shall be established on the effective date of the Plan or as soon thereafter as practicable to monitor claims administration, provide guidance to the Debtors, and address the Bankruptcy Court if such post-effective date joint claims oversight committee disagrees with the Debtors' determinations requiring claims resolution. The composition of the joint claims oversight committee shall be reasonably satisfactory to Appaloosa, but in any case, shall include at least one representative appointed by Appaloosa.

1.12    Ongoing management compensation, including the SERP, stock options, restricted stock, severance, change in control provisions and all other benefits will be on market terms (as determined by the Board of Directors, based on the advice of Watson-Wyatt, and such management compensation plan design shall be described in the Disclosure Statement and included in the Plan) and reasonably acceptable to Appaloosa; claims of former management and terminated/resigning management will be resolved on terms acceptable to Delphi and Appaloosa or by court order. Equity awards will dilute all equity interests pro rata.

1.13    The amended and restated certificate of incorporation of Delphi to be effective immediately following the effective date of the Plan shall prohibit: (A) for so long as Appaloosa owns any shares of Series A Preferred Stock, any transactions between Delphi or any of its Subsidiaries (as defined in the Investment Agreement), on the one hand, and Appaloosa or its respective Affiliates (as defined in the Investment Agreement), on the other hand (including any "going private transaction" sponsored by Appaloosa) unless such transaction shall have been approved by directors constituting not less than 75% of the number of Common Directors (as defined in the Investment Agreement), and (B) any transaction between Delphi or any of its Subsidiaries, on the one hand, and a director, on the other hand, other than a director appointed by holders of Series A Preferred Stock (as defined in the Investment Agreement), unless such transaction shall have been approved by directors having no material interest in such transaction (a "Disinterested Director") constituting not less than 75% of the number of Disinterested Directors.

## SPECIAL STATUTORY COMMITTEE PROVISIONS

So long as the official committee of unsecured creditors appointed on October 17, 2005 in the Chapter 11 Cases (the "Creditors' Committee") and the ad hoc committee of trade creditors (the "Ad Hoc Trade Committee") shall support entry of the Approval Order and so long as the Creditors' Committee shall support the implementation of the Investment Agreement, this Exhibit B, and each of the transactions contemplated by the Investment Agreement and this Exhibit B, the following provisions shall be in effect, and to the extent such provisions are inconsistent with any other provisions of this Exhibit B, the following provisions shall supplant

and supersede such; provided, that if the Creditors' Committee, in the exercise of its fiduciary duties, shall subsequently withdraw, qualify or modify in a manner adverse to the Plan Investors (or resolve to do any of the foregoing) its support for the entry of the Approval Order, the implementation of the Investment Agreement, this Exhibit B, or any of the transactions contemplated by the Investment Agreement or this Exhibit B, or shall have approved or recommended any competing or other transaction inconsistent with the Investment Agreement or this Exhibit B (each such action, a "Withdrawal of Support"), then Sections 2.1 (as it relates to the Creditors' Committee) and Sections 2.2 and 2.3 shall terminate and shall be of no further force or effect; provided further, that if the Creditors' Committee (a) objects in any pleading to (i) any of the terms of any Plan Document solely on the basis of comments provided by the Creditors' Committee pursuant to Section 2.1 hereof, but rejected by the Debtors or Appaloosa, or (ii) the position that the Debtors, any Plan Investor or any other Party takes as to the appropriate rate of interest on Trade and Other Unsecured Claims as permitted by Section 1.3 of this Exhibit B as amended hereby, or (b) unsuccessfully seeks the termination of the Investment Agreement pursuant to Section 2.3, then in each such case such objection or action shall not be considered a Withdrawal of Support.  So long as the official committee of equity security holders appointed in the Chapter 11 Cases (the "Equity Committee") shall support entry of the Approval Order and so long as the Equity Committee shall support the implementation of the Investment Agreement, this Exhibit B, and each of the transactions contemplated by the Investment Agreement and this Exhibit B, the following provisions shall be in effect (as they relate to the Equity Committee), and to the extent such provisions are inconsistent with any other provisions of this Exhibit B, the following provisions shall supplant and supersede such; provided, that if the Equity Committee takes any action that constitutes a Withdrawal of Support, then Sections 2.1 (as it relates to the Equity Committee) and Section 2.4 shall terminate and shall be of no further force or effect; provided further, that if the Equity Committee (a) objects in any pleading to any of the terms of any Plan Document solely on the basis of comments provided by the Equity Committee pursuant to Section 2.1 hereof, but rejected by the Debtors or Appaloosa or (b) unsuccessfully seeks to withdraw support pursuant to Section 2.4, then in each such case such objection or action shall not be considered a Withdrawal of Support.

2.1    The Debtors will provide Creditors' Committee and the Equity Committee with periodic working drafts of the Plan, the Disclosure Statement, the Confirmation Order and any Plan Documents that each such committee reasonably believes could have a material impact on the recovery of their constituents, and any amendments thereto, and with a reasonable opportunity to review and comment on such documents prior to such documents being filed with the Bankruptcy Court.  The Debtors and the Plan Investors will consider in good faith any comments consistent with the Investment Agreement and this Exhibit B, and any other reasonable comments of the Creditors' Committee and/or the Equity Committee, and will not reject such comments without first discussing the reasons therefore with counsel to the Creditors' Committee and/or the Equity Committee and giving due consideration to the views of the Creditors' Committee and/or the Equity Committee.

2.2    The Creditors' Committee will have consultation rights through the Confirmation Date with respect to executive compensation under the Plan and as described in the Disclosure Statement.  The Creditors' Committee shall also have one representative of the Creditors' committee placed on the joint claims oversight committee contemplated by Section 1.11 of this

Exhibit B, it being understood that such member shall not have veto rights over any committee action.

2.3    In the event that the Debtors and the Plan Investors agree to (a) substantive and material changes in the overall deal as set forth in the Investment Agreement and this Exhibit B after the date of the Approval Order, (b) Flow-Through Claims (as defined in Section 1.4 of this Exhibit B) other than claims arising out of or resulting from customer claims and environmental claims, or (c) any alternative treatment of securities claims from estate assets other than available insurance, any of which would have a material adverse effect on the economics of the recovery of general unsecured creditors under the plan of reorganization to be funded through the EPCA, the Creditors' Committee shall have the right to seek termination of the EPCA by the Bankruptcy Court by establishing by a preponderance of the evidence that there has been a material adverse effect on the economics of the recovery to general unsecured creditors under the plan of reorganization to be funded through the EPCA as a result of such actions.

2.4    In the event that the Debtors and the Plan Investors agree to substantive and material changes in Section 1.7 of this Exhibit B after the date of the Approval Order which would have a material adverse effect on the economics of the recovery of current equity security holders of Delphi under the plan of reorganization to be funded through the EPCA, the Equity Committee shall have the right to withdraw its support of the EPCA by the Bankruptcy Court by establishing by a preponderance of the evidence that there has been a material adverse effect on the economics of the recovery to current equity holders of Delphi under the plan of reorganization to be funded through the EPCA as a result of such actions in which event there shall be no reduction in the recoveries to the equity securities class under Section 1.8(iii) and (iv) of this Exhibit B.

**APPALOOSA MANAGEMENT L.P.**
26 Main Street
Chatham, New Jersey 07928


[   ], 2007


A-D Acquisition Holdings, LLC
c/o Appaloosa Management L.P.
26 Main Street
Chatham, New Jersey, 07928
Attention: Jim Bolin


Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098


Ladies and Gentlemen:

      Reference is made to that certain Equity Purchase and Commitment Agreement (the "Agreement"), dated as of the date hereof, by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware (the "Investor"), Harbinger Del-Auto Investment Company, Ltd., an exempted company formed under the laws of the Cayman Islands, Merrill Lynch, Pierce Fenner & Smith Incorporated, a Delaware corporation, UBS Securities LLC, a limited liability company formed under the laws of the State of Delaware, Goldman Sachs & Co., a New York limited partnership, and Pardus DPH Holding LLC, a limited liability company formed under the laws of the State of Delaware, on the one hand, and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company"), on the other hand. Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

      This letter will confirm the commitment of Appaloosa Management L.P. ("AMLP"), on behalf of one or more of its affiliated funds or managed accounts to be designated, to provide or cause to be provided funds (the "Funds") to the Investor in an amount up to $1,076,400,000, subject to the terms and conditions set forth herein. If (i) a Limited Termination has occurred, (ii) the Agreement has not been terminated by the Investor in accordance with its terms within ten (10) Business Days of the occurrence of such Limited Termination, and (iii) the Investor becomes obligated in accordance with Section 2(b) of the Agreement to purchase the Available Investor Shares as a result of such Limited Termination (an "Escalation Trigger"), the maximum amount of Funds referred to in the immediately preceding sentence shall be increased as follows: (i) by $166,860,000 if an Escalation Trigger arises as a result of a Limited Termination by Merrill Lynch, Pierce, Fenner & Smith Incorporated; (ii) by $166,860,000 if an Escalation Trigger arises as a result of a Limited Termination by UBS Securities LLC; (iii) by $397,230,000 if an Escalation Trigger arises as a result of a Limited Termination by Harbinger Del-Auto Investments Company, Ltd.; (iv) by $400,000,000 if an Escalation Trigger arises as a result of a Limited Termination by Goldman Sachs & Co.; and (v) by $342,650,000 if an Escalation Trigger arises as a result of a Limited Termination by Pardus DPH Holding LLC. The Funds to be

A-D Acquisition Holdings, LLC
Delphi Corporation
[      ], 2007
Page 2

provided by or on behalf of AMLP to the Investor will be used to provide the financing for the Investor (i) to purchase the Investor Shares pursuant to the Agreement (the "Purchase Obligation") and (ii) to satisfy the Investor's other obligations under the Agreement, if any; provided, however, that the aggregate liability of AMLP under the immediately preceding clauses (i) and (ii) shall under no circumstances exceed the Cap (as defined below). AMLP shall not be liable to fund to the Investor any amounts hereunder (other than to fund the Purchase Obligation), unless and until, any party to the Agreement, other than the Company, commits a willful breach of the Agreement. For purposes of this letter agreement, the "Cap" shall mean (i) at all times on or prior to the Disclosure Statement Approval Date, $100,000,000 and (ii) after the Disclosure Statement Approval Date, $250,000,000. Our commitment to fund the Investor's Purchase Obligation is subject to the satisfaction, or waiver in writing by AMLP and the Investor, of all of the conditions, if any, to the Investor's obligations at such time contained in the Agreement.

Notwithstanding any other term or condition of this letter agreement, (i) under no circumstances shall the liability of AMLP hereunder or for breach of this letter agreement exceed, in the aggregate, the Cap for any reason, (ii) under no circumstances shall AMLP be liable for punitive damages and (iii) the liability of AMLP shall be limited to monetary damages only. There is no express or implied intention to benefit any person or entity not party hereto and nothing contained in this letter agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than the Investor and the Company. Subject to the terms and conditions of this letter agreement, the Company shall have the right to assert its rights hereunder directly against AMLP.

The terms and conditions of this letter agreement may be amended, modified or terminated only in a writing signed by all of the parties hereto. AMLP's obligations hereunder may not be assigned, except its obligations to provide the Funds may be assigned to one or more of its affiliated funds or managed accounts affiliated with AMLP, provided that such assignment will not relieve AMLP of its obligations under this letter agreement.

This commitment will be effective upon the Investor's acceptance of the terms and conditions of this letter agreement (by signing below) and the execution of the Agreement by the Company and will expire on the earliest to occur of (i) the closing of the transactions contemplated by the Agreement, and (ii) termination of the Agreement in accordance with its terms; provided, however, that in the event that the Agreement is terminated, AMLP's obligations hereunder to provide funds to the Investor to fund the Investor's obligations under the Agreement on account of any willful breach of the Agreement for which the Investor would be liable shall survive; provided, further, that the Company shall provide AMLP with written notice within 90 days after the termination of the Agreement of any claim that a willful breach of the Agreement has occurred for which the Investor would be liable and if the Company fails to timely provide such notice then all of AMLP's obligations hereunder shall terminate, this letter agreement shall expire and any claims hereunder shall forever be barred. Upon the termination

A-D Acquisition Holdings, LLC
Delphi Corporation
[      ], 2007
Page 3

or expiration of this letter agreement, all rights and obligations of the parties hereunder shall terminate and there shall be no liability on the part of any party hereto.

AMLP hereby represents and warrants as follows:

(a)  AMLP is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(b)  AMLP has the requisite limited partnership power and authority to enter into, execute and deliver this letter agreement and to perform its obligations hereunder and all necessary action required for the due authorization, execution, delivery and performance by it of this letter agreement has been taken.

(c)  This letter agreement has been duly and validly executed and delivered by AMLP and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d)  AMLP has, and will have on the Closing Date, available funding necessary to provide the Funds in accordance with this letter agreement.

No director, officer, employee, partner, member or direct or indirect holder of any equity interests or securities of AMLP, or any of its affiliated funds or managed accounts, and no director, officer, employee, partner or member of any such persons other than any general partner (collectively, the "Party Affiliates") shall have any liability or obligation of any nature whatsoever in connection with or under this letter or the transactions contemplated hereby, and each party hereto hereby waives and releases all claims against such Party Affiliates related to such liability or obligation.

This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the conflict of laws principles thereof). AMLP, THE INVESTOR AND THE COMPANY HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.

This letter agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and same instrument.

\* \* \* \*

A-D Acquisition Holdings, LLC
Delphi Corporation
[      ], 2007
Page 4

Sincerely,

**APPALOOSA MANAGEMENT L.P.**

By: _____
    Name:
    Title:

Agreed to and accepted as of the date first
above written:

**A-D ACQUISITION HOLDINGS, LLC**

By:_____
    Name:
    Title:

**DELPHI CORPORATION**

By:_____
    Name:
    Title:

**Harbinger Capital Partners Master Fund I, Ltd.**
c/o 555 Madison Avenue
New York, New York 10122

[      ], 2007

Harbinger Del-Auto Investment Company Ltd.
c/o Harbinger Capital Partners Master Fund I, Ltd.
555 Madison Avenue
New York, New York 10022

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098

Ladies and Gentlemen:

Reference is made to that certain Equity Purchase and Commitment Agreement (the "Agreement"), dated as of the date hereof, by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware, Harbinger Del-Auto Investment Company, Ltd., an exempted company formed under the laws of the Cayman Islands (the "Investor"), Merrill Lynch, Pierce Fenner & Smith, Incorporated, a Delaware corporation, UBS Securities LLC, a limited liability company formed under the laws of the State of Delaware, Goldman Sachs & Co., a New York limited partnership, and Pardus DPH Holding LLC, a limited liability company formed under the laws of the State of Delaware, on the one hand, and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company"), on the other hand. Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

This letter will confirm the commitment of Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), on behalf of one or more of its affiliated funds or managed accounts to be designated, to provide or cause to be provided funds (the "Funds") to the Investor in an amount up to $397,230,000, subject to the terms and conditions set forth herein. The Funds to be provided by or on behalf of Harbinger to the Investor will be used to provide the financing for the Investor (i) to purchase the Investor Shares pursuant to the Agreement (the "Purchase Obligation") and (ii) to satisfy the Investor's other obligations under the Agreement, if any; provided, however, that the aggregate liability of Harbinger under clauses (i) and (ii) shall under no circumstances exceed the Cap (as defined below). Harbinger shall not be liable to fund to the Investor any amounts hereunder (other than to fund the Purchase Obligation), unless, and until, any party to the Agreement other than the Company commits a willful breach of the Agreement. For purposes of this letter agreement, the "Cap" shall mean at all times $38,944,000. Our commitment to fund the Investor's Purchase Obligation is subject to the satisfaction, or waiver in writing by Harbinger and the Investor, of all of the conditions, if any, to the Investor's obligations at such time contained in the Agreement.

Notwithstanding any other term or condition of this letter agreement, (i) under no circumstances shall the liability of Harbinger hereunder or for breach of this letter agreement exceed, in the aggregate, the Cap for any reason, (ii) under no circumstances shall Harbinger be liable for punitive damages, and (iii) the liability of Harbinger shall be limited to monetary damages only. There is no express or implied intention to benefit any person or entity not party

Harbinger Del-Auto Investment Company Ltd.
Delphi Corporation
[          ], 2007
Page 2

hereto and nothing contained in this letter agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than the Investor and the Company.  Subject to the terms and conditions of this letter agreement, the Company shall have the right to assert its rights hereunder directly against Harbinger.

The terms and conditions of this letter agreement may be amended, modified or terminated only in a writing signed by all of the parties hereto.  Harbinger's obligations hereunder may not be assigned, except its obligations to provide the Funds may be assigned to one or more of its affiliated funds or managed accounts affiliated with Harbinger, provided that such assignment will not relieve Harbinger of its obligations under this letter agreement.

This commitment will be effective upon the Investor's acceptance of the terms and conditions of this letter agreement (by signing below) and the execution of the Agreement by the Company and will expire on the earliest to occur of (i) the closing of the transactions contemplated by the Agreement, and (ii) termination of the Agreement in accordance with its terms; provided, however, that in the event that the Agreement is terminated, Harbinger' obligations hereunder to provide funds to the Investor to fund the Investor's obligations under the Agreement on account of any willful breach of the Agreement for which the Investor would be liable shall survive; provided, further, that the Company shall provide Harbinger with written notice within 90 days after the termination of the Agreement of any claim that a willful breach of the Agreement has occurred for which the Investor would be liable and if the Company fails to timely provide such notice then all of Harbinger' obligations hereunder shall terminate, this letter agreement shall expire and any claims hereunder shall be forever barred.  Upon the termination or expiration of this letter agreement all rights and obligations of the parties hereunder shall terminate and there shall be no liability on the part of any party hereto.

Harbinger hereby represents and warrants as follows:

(a)  Harbinger is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(b)  Harbinger has the requisite corporate power and authority to enter into, execute and deliver this letter agreement and to perform its obligations hereunder and all necessary action required for the due authorization, execution, delivery and performance by it of this letter agreement has been taken.

(c)  This letter agreement has been duly and validly executed and delivered by Harbinger and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d)  Harbinger has, and will have on the Closing Date, available funding necessary to provide the Funds in accordance with this letter agreement.

No director, officer, employee, partner, member or direct or indirect holder of any equity interests or securities of Harbinger, or any of its affiliated funds or managed accounts, and no director, officer, employee, partner or member of any such persons other than any general partner (collectively, the "Party Affiliates") shall have any liability or obligation of any nature whatsoever in connection with or under this letter or the transactions contemplated

Harbinger Del-Auto Investment Company Ltd.
Delphi Corporation
[          ], 2007
Page 3

hereby, and each party hereto hereby waives and releases all claims against such Party Affiliates related to such liability or obligation.

This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the conflict of laws principles thereof). HARBINGER, THE INVESTOR AND THE COMPANY HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.

This letter agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and same instrument.

Harbinger Del-Auto Investment Company Ltd.
Delphi Corporation
[          ], 2007
Page 4

Sincerely,

HARBINGER CAPITAL PARTNERS MASTER
FUND I, LTD.

By:    Harbinger Capital Partners Offshore
       Manager, L.L.C., as investment manager

By:_____
       Name:   Philip A. Falcone
       Title:    Senior Managing Director

Agreed to and accepted as of the date first
above written:

**Harbinger Del-Auto Investment Company, Ltd.**

By:_____
       Name:
       Title:

**DELPHI CORPORATION**

By:_____
       Name:
       Title:

_____, 2007

Pardus DPH Holding LLC
590 Madison Ave.
Suite 25E
New York, NY 10022

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098

Ladies and Gentlemen:

Reference is made to that certain Equity Purchase and Commitment Agreement (the "Agreement"), dated as of the date hereof, by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware, Harbinger Del-Auto Investment Company, Ltd., an exempted company formed under the laws of the Cayman Islands, Merrill Lynch, Pierce Fenner & Smith Incorporated, a Delaware corporation, UBS Securities LLC, a limited liability company formed under the laws of the State of Delaware, Goldman Sachs & Co., a limited partnership formed under the laws of the State of New York and Pardus DPH Holding LLC, a limited liability company formed under the laws of the State of Delaware (the "Investor"), on the one hand, and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company"), on the other hand. Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

This letter will confirm the commitment of Pardus Special Opportunities Master Fund L.P. ("Pardus"), to provide or cause to be provided funds (the "Funds") to the Investor in an amount up to $342,650,000, subject to the terms and conditions set forth herein. The Funds to be provided by or on behalf of Pardus to the Investor will be used to provide the financing for the Investor (i) to purchase the Investor Shares pursuant to the Agreement (the "Purchase Obligation") and (ii) to satisfy the Investor's other obligations under the Agreement, if any; provided, however, that the aggregate liability of Pardus under the immediately preceding clauses (i) and (ii) shall under no circumstances exceed the Cap (as defined below). Pardus shall not be liable to fund to the Investor any amounts hereunder (other than to fund the Purchase Obligation), unless and until, any party to the Agreement, other than the Company, commits a willful breach of the Agreement. For purposes of this letter agreement, the "Cap" shall mean $33,593,000. Our commitment to fund the Investor's Purchase Obligation is subject to the satisfaction, or waiver in writing by Pardus and the Investor, of all of the conditions, if any, to the Investor's obligations at such time contained in the Agreement.

Notwithstanding any other term or condition of this letter agreement, (i) under no circumstances shall the liability of Pardus hereunder or for breach of this letter agreement exceed, in the aggregate, the Cap for any reason, (ii) under no circumstances shall Pardus be

Delphi Corporation
_____, 2007
Page 2

liable for punitive damages and (iii) the liability of Pardus shall be limited to monetary damages only. There is no express or implied intention to benefit any person or entity not party hereto and nothing contained in this letter agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than the Investor and the Company. Subject to the terms and conditions of this letter agreement, the Company shall have the right to assert its rights hereunder directly against Pardus.

The terms and conditions of this letter agreement may be amended, modified or terminated only in a writing signed by all of the parties hereto. The obligations of Pardus hereunder may not be assigned, except its obligations to provide the Funds may be assigned to one or more of its affiliated funds or managed accounts affiliated with Pardus, provided that such assignment will not relieve Pardus of its obligations under this letter agreement.

This commitment will be effective upon the Investor's acceptance of the terms and conditions of this letter agreement (by signing below) and the execution of the Agreement by the Company and will expire on the earliest to occur of (i) the closing of the transactions contemplated by the Agreement, and (ii) termination of the Agreement in accordance with its terms; provided, however, that in the event that the Agreement is terminated, the obligations of Pardus hereunder to provide funds to the Investor to fund the Investor's obligations under the Agreement on account of any willful breach of the Agreement for which the Investor would be liable shall survive; provided further, that the Company shall provide Pardus with written notice within 90 days after the termination of the Agreement of any claim that a willful breach of the Agreement has occurred for which the Investor would be liable and if the Company fails to timely provide such notice then all of the obligations of Pardus hereunder shall terminate, this letter agreement shall expire and any claims hereunder shall forever be barred. Upon the termination or expiration of this letter agreement, all rights and obligations of the parties hereunder shall terminate and there shall be no liability on the part of any party hereto.

Pardus hereby represents and warrants as follows:

(a) Pardus is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(b) Pardus has the requisite limited partnership power and authority to enter into, execute and deliver this letter agreement and to perform its obligations hereunder and all necessary action required for the due authorization, execution, delivery and performance by it of this letter agreement has been taken.

(c) This letter agreement has been duly and validly executed and delivered by Pardus and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d) Pardus has, and will have on the Closing Date, available funding necessary to provide the Funds in accordance with this letter agreement.

- 2 -

Delphi Corporation
_____, 2007

Page 3

No director, officer, employee, partner, member or direct or indirect holder of any equity interests or securities of Pardus, or any of its affiliated funds or managed accounts, and no director, officer, employee, partner or member of any such persons other than any general partner (collectively, the "Party Affiliates") shall have any liability or obligation of any nature whatsoever in connection with or under this letter or the transactions contemplated hereby, and each party hereto hereby waives and releases all claims against such Party Affiliates related to such liability or obligation.

This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the conflict of laws principles thereof). PARDUS, THE INVESTOR AND THE COMPANY HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.

This letter agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and same instrument.

\* \* \* \*

Sincerely,

**PARDUS SPECIAL OPPORTUNITIES MASTER FUND L.P.**

By: Pardus Capital Management L.P., its
Investment Manager

By: Pardus Capital Management LLC, its
general partner

By: _____
Name: Karim Samii
Title: Sole Member

Delphi Corporation
_____, 2007
Page 4

Agreed to and accepted as of the date first
above written:

**PARDUS DPH HOLDING LLC**

By:_____

    Name:
    Title:

**DELPHI CORPORATION**

By:_____

    Name:
    Title:

# EXHIBIT E

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                          :
     In re                                 :     Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :     Case No. 05-44481 (RDD)
                                          :
                  Debtors.              :     (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


ORDER UNDER 11 U.S.C §§ 363, 1113, AND 1114
AND FED. R. BANKR. P. 6004 AND 9019 APPROVING MEMORANDUM OF
UNDERSTANDING AMONG UAW, DELPHI, AND GENERAL MOTORS CORPORATION
INCLUDING MODIFICATION OF UAW COLLECTIVE BARGAINING AGREEMENTS
AND RETIREE WELFARE BENEFITS FOR CERTAIN UAW-REPRESENTED RETIREES

("UAW 1113/1114 SETTLEMENT APPROVAL ORDER")

Upon the motion ("UAW 1113/1114 Settlement Approval Motion" or the

"Motion"), dated June 29, 2007, of Delphi Corporation ("Delphi") and certain of its subsidiaries

and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the

"Debtors"), for an order under 11 U.S.C. §§ 363, 1113, and 1114 of the Bankruptcy Code and

Fed. R. Bankr. P. 6004 and 9019 approving (i) a memorandum of understanding regarding

Delphi's restructuring entered into among the United Automobile, Aerospace and Agricultural

Implement Workers of America (the "UAW"), Delphi, and General Motors Corporation ("GM"),

dated June 22, 2007 (with the attachments thereto, the "UAW Settlement Agreement" or the

"Memorandum of Understanding"), that (a) modifies, extends, or terminates provisions of the

existing collective bargaining agreements among Delphi, the UAW, and its various locals (the

"UAW CBAs"), and (b) provides that Delphi and GM will undertake certain financial obligations

to Delphi's UAW-represented employees and retirees to facilitate these modifications, (ii)

withdrawal without prejudice of the Debtors' Motion For Order Under 11 U.S.C. § 1113(c)

Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g)

Authorizing  Modification Of Retiree Welfare Benefits, dated March 31, 2006 (the "1113/1114

Motion") solely as it pertains to the UAW and approving the parties' settlement of the 1113/1114

Motion solely as it pertains to the UAW, and (iii) modification of retiree welfare benefits for

certain UAW-represented retirees of the Debtors, all as more fully set forth in the UAW

1113/1114 Settlement Approval Motion; and the Court having been advised by counsel to the

UAW that the UAW Settlement Agreement was ratified by the UAW membership as of June 28,

2007, such that the only remaining condition to the effectiveness of the UAW Settlement

Agreement pursuant to Section K.1 thereof is this Court's entry of an approval order satisfactory

in form and substance to the UAW, GM, and Delphi; and this Court having been advised by

counsel to the UAW, GM, and Delphi that the form and substance of this Order is satisfactory to

each of the UAW, GM, and Delphi as required by Section K.1 of the UAW Settlement

Agreement; and this Court having determined that the relief requested in the Motion is in the best

interests of the Debtors, their estates, their creditors, and other parties-in-interest; and it

appearing that proper and adequate notice of the Motion has been given and that no other or

further notice is necessary; and after due deliberation thereon; and good and sufficient cause

appearing therefor, it is hereby

     ORDERED, ADJUDGED, AND DECREED THAT:

     1.     The Motion is GRANTED.

     2.     The Debtors are hereby authorized to enter into the UAW Settlement

Agreement, a copy of which is attached hereto as Exhibit 1, and to implement the terms of such

UAW Settlement Agreement.

2

3.    Each of the signatories to the UAW Settlement Agreement (each such

party, a "Signatory," and collectively, the "Signatories") is directed to take all actions necessary

or appropriate to effectuate the terms of this order and the terms of the UAW Settlement

Agreement, including, without limitation, any and all actions necessary or appropriate to such

Signatory's implementation of and performance under the UAW Settlement Agreement.

4.    The UAW Settlement Agreement is binding on the Debtors, GM, and the

UAW subject to its terms and constitutes a valid and binding amendment to the UAW CBAs

with authorized representatives of all individuals who were or are in a bargaining unit

represented by the UAW, as permitted by section 1113 of the Bankruptcy Code and the UAW

CBAs as amended, or otherwise, and the UAW CBAs, in accordance with the UAW Settlement

Agreement, are binding on the Debtors and the UAW.

5.    The UAW Settlement Agreement constitutes a valid and binding

amendment to existing retiree health and welfare benefits, as permitted by section 1114 of the

Bankruptcy Code, or otherwise.

6.    Notice of the UAW 1113/1114 Settlement Approval Motion was properly

and timely served in accordance with the Amended Eighth Supplemental Order Under 11 U.S.C.

§§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing

Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures,

entered on October 26, 2006 (Docket No. 5418), the Supplemental Order Under 11 U.S.C.

Sections 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing

Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures,

entered on March 17, 2006 (Docket No. 2883), and by service upon (a) the UAW at 8000 East

Jefferson, Detroit, Michigan 48214, (b) counsel to the UAW, Cohen, Weiss, and Simon LLP at

3

330 West 42nd Street, 25th Floor, New York, N.Y. 10036-6976, and (c) the active Delphi hourly

employees and hourly retirees who are represented by the UAW at their individual addresses,

pursuant to an informational form of notice, a copy of which was attached to the UAW

1113/1114 Settlement Approval Motion as Exhibit 1.

      7.     The Debtors are authorized to withdraw, without prejudice, their

1113/1114 Motion solely as it pertains to the UAW.  The 1113/1114 Motion is settled solely as it

pertains to the UAW.

      8.     As provided for in the Motion and with the consent of the UAW and

Delphi, Sections H.3 and J.3 of the UAW Settlement Agreement are clarified to provide for the

continuance of CHR accruals through October 1, 2007 and to provide that the UAW will receive

on the Effective Date an allowed prepetition general unsecured claim against Delphi in the

amount of $140 million consisting of UAW-GM Center for Human Resources ("CHR")  existing

accruals of $134 million and UAW-Delphi Legal Services Plan accruals of $6 million (such

allowed claim amount to be adjusted by the difference between accruals through October 1, 2007

and expenditures until the effective date of the Debtors' plan of reorganization (the "Delphi

Reorganization Plan")) in complete settlement of the UAW and the CHR claims asserted as to

CHR Joint Funds[1] and the UAW-Delphi Legal Services Plan accruals and expenses.  The

allowed claim provided for in this paragraph shall be paid pursuant to the plan of reorganization

following substantial consummation of a plan of reorganization.  The amount of $30 million will

be directed to the CHR and the balance will be paid directly to the DC VEBA established

pursuant to the settlement agreement approved by the court in the case of International Union,

UAW, et al. v. General Motors Corp., Civil Action No. 05-73991.  Until the effective date of a

---

[1]     Capitalized terms used and not otherwise defined herein have the meanings ascribed to
them in the Memorandum of Understanding.

Delphi Reorganization Plan, Delphi shall continue to make CHR and Legal Service Plan

payments consistent with past practices in the ordinary course of business.

      9.    As a condition precedent to the effectiveness of certain obligations of the

parties pursuant to Section K.2 of the UAW Settlement Agreement and as provided in Section

K.3 of the UAW Settlement Agreement, any Delphi Reorganization Plan that is consistent with

the UAW Settlement Agreement and any confirmation order entered into with respect to such

plan shall include the following provisions:

    (a)    On the effective date of the Delphi Reorganization Plan, the UAW, all employees and former employees of Delphi represented or formerly represented by the UAW, and all persons or entities with claims derived from or related to any relationship with such employees or former employees of Delphi, shall waive and release and be deemed to have waived and released any and all claims of any nature, whether liquidated or unliquidated, contingent or non-contingent, asserted or unasserted, existing and/or arising in the future against Delphi, its subsidiaries, or affiliates, the Delphi HRP, the Delphi Health Care Program for Hourly Employees and the Delphi Life and Disability Benefits Program for Hourly Employees, GM, its subsidiaries or affiliates, the GM HRP, the GM Health Care Program for Hourly Employees and the GM Life and Disability Benefits Program for Hourly Employees, and the officers, directors, employees, fiduciaries, and agents of each, arising directly or indirectly from or in any way related to any obligations under the UAW CBAs and the collective bargaining agreement between GM and the UAW related to such employees and the UAW-GM-Delphi Memorandum of Understanding Benefit Plan Treatment related to such employees (provided, however, that claims for benefits provided for or explicitly not waived under the provisions of the UAW Settlement Agreement are not waived; and provided further that claims for workers' compensation benefits against Delphi, its subsidiaries, or affiliates, are not waived).

    (b)    A plan exculpation and release provision (which provision shall be at least as comprehensive as the plan exculpation and release provision under the Delphi Reorganization Plan) for the UAW released parties (which shall include the UAW and each of their current or former members, officers, committee members, employees, advisors, attorneys, accountants, investment bankers, consultants, agents, and other representatives) with respect to any liability such person or entity may have in connection with or

5

related to the Delphi bankruptcy cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the Delphi Reorganization Plan, the disclosure statement concerning the plan, the UAW Settlement Agreement, or the Agreements on Attachment E thereto, or any contract, employee benefit plan, instrument, release, or other agreement or document created, modified, amended, or entered into in connection with either the Delphi Reorganization Plan or any agreement between the UAW or Delphi, or any other act taken or omitted to be taken consistent with the UAW Settlement Agreement in connection with the Delphi bankruptcy.

(c)    The UAW Settlement Agreement and the agreements referenced in Attachment E thereof and listed on <u>Exhibit 2</u> attached hereto shall be assumed under 11 U.S.C. § 365.

10.    Nothing contained in the UAW Settlement Agreement shall constitute an assumption of any agreement described therein, including, without limitation, any UAW CBA (except as provided for in Section K.3 of the UAW Settlement Agreement) or any commercial agreement between GM and Delphi, nor shall anything therein be deemed to create an administrative or priority claim with respect to GM or convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party.  The UAW Settlement Agreement is without prejudice to any party-in-interest (including the parties to the UAW Settlement Agreement and the Debtors' statutory committees) in all other aspects of Delphi's chapter 11 cases, and each party to the UAW Settlement Agreement shall reserve all rights not expressly waived therein.  Further, nothing in the Motion, the UAW Settlement Agreement, this Court's approval of such agreement, the performance of any obligation thereunder, or any other document shall prejudice any right or remedy of any Debtor against any other Debtor with respect to the allocation of Delphi's obligations under the UAW Settlement Agreement or claims asserted against, or payments by, Delphi thereunder, all of which rights are expressly preserved.

11.     In furtherance of the UAW Settlement Agreement, as soon as reasonably practicable after the Effective Date, Delphi shall pay approximately (but in no event more than) $993,000 in cash severance and vacation payments to former UAW-represented hourly employees of Manufacturers Products Co. ("MPC"), a former distressed supplier which provided parts to Delphi pursuant to an accommodation agreement.  These MPC-related payments are to be in full satisfaction of all claims against the Debtors arising from or related to MPC, and the Debtors and their estates shall be released from any liability from MPC and its former UAW-represented employees with respect thereto.  In order to receive payment from Delphi pursuant to this paragraph, any payment recipient shall execute a complete release and discharge in favor of the Debtors; accordingly all claims filed in the Debtors' chapter 11 cases arising from or relating to the subject matter of severance and/or vacation claims by MPC employees or former employees are hereby expunged and released, including claim number 13270.

12.     This Court shall retain jurisdiction to hear and determine all matters arising from the implementation and performance of this order and the UAW Settlement Agreement, and over each of the Signatories in connection therewith, through the effective date of a plan of reorganization proposed by the Debtors and confirmed by this Court (and thereafter to the extent provided for in such reorganization plan); provided, however, that the Court's jurisdiction shall not extend to any bilateral agreements of the UAW and GM.

13.     Notwithstanding Rule 6004(g) of the Federal Rules of Bankruptcy Procedure or any other Bankruptcy Rule, (a) this order shall take effect immediately upon its entry, (b) upon entry of this order, the Debtors are authorized to take any and all necessary actions to implement the terms of the UAW Settlement Agreement, including executing any amendments to existing collective bargaining agreements consistent in all material respects with

7

the UAW Settlement Agreement, and (c) the UAW Settlement Agreement shall become effective

upon entry of this order and, to the extent required, satisfaction of the conditions set forth in the

UAW Settlement Agreement; provided, however, that MPC's release of the parties as set forth in

paragraph 11 hereof shall be effective 10 days after service of this order upon MPC at its last

known address unless MPC files an objection to such release within such 10-day period.

       14.    The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York for the service and

filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated: New York, New York
      July 19, 2007

                    _____/s/ Robert D. Drain_____
                    UNITED STATES BANKRUPTCY JUDGE

## **Exhibit 1**

**UAW Settlement Agreement**

**UAW-DELPHI-GM**
**MEMORANDUM OF UNDERSTANDING**
**DELPHI RESTRUCTURING**

## INTRODUCTION

The International Union, UAW, Delphi Corporation and General Motors Corporation ("the Parties") have discussed the challenges impacting Delphi and its UAW-represented operations.  As GM's largest supplier and the employer of thousands of UAW-represented employees, indirectly supporting tens of thousands of dependents, retirees and surviving spouses, the Parties have a critical interest in Delphi's successful emergence from bankruptcy with certain UAW-represented operations.  The Parties acknowledge that restructuring actions are necessary and commit to take specific actions to protect the needs of the Parties and their constituencies, continuing progress already made toward transforming Delphi's labor cost structure and ongoing business operations.

The UAW has already agreed to an attrition program pursuant to which thousands of employees at traditional Big Three wages and benefits took buy outs, flowbacks to GM, or retired, and the UAW waived Delphi obligations to hire thousands of new employees as a result of the departures caused by the attrition program.  The Parties have also agreed to the "Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and GM Consensual Triggering of Benefit Guarantee" (attached as Attachment B, hereinafter the "Term Sheet"), facilitating the freeze of Delphi's pension plan and the assumption of billions of dollars of OPEB liabilities by GM, thereby dramatically reducing Delphi's ongoing benefit costs and liabilities.

In addition to the above, to enable continued transformation to more competitive wage and benefit levels, to address capacity, divestiture, work rules and staffing level issues, and to better position Delphi to retain existing business and attract new business, the Parties agree as follows on a two-party or three-party basis, as applicable, (the "Agreement") subject to ratification by the membership.

## A.  DURATION

1.  This Agreement will continue until 11:59 p.m. on September 14, 2011.

2.  Delphi and the UAW agree that the UAW-Delphi Supplemental Agreement dated April 29, 2004 (the "Supplemental Agreement") shall continue in full force and effect, as modified herein, for its stated duration, i.e. until 11:59 p.m. on September 14, 2011.  The 2003-2007

UAW-Delphi National Agreement, and including without limitation the supplemental agreements attached as exhibits thereto (the "National Agreement"), are hereby extended, as modified herein, until 11:59 p.m. on September 14, 2011.

3. Delphi and the UAW agree that the current Local Agreements are extended until 11:59 p.m. on September 14, 2011, except as may be mutually modified by the local parties pursuant to Section E below, and as modified by this Agreement as modified by this Agreement and summarized in the matrix of modified and eliminated provisions in Attachment E hereto.

4. The agreements comprising the UAW-Delphi collective bargaining agreements, national and local, following the date of this Agreement are set forth in Attachment E hereto.

## B. SITE PLAN

The UAW and Delphi agree that Article 2 of the Supplemental Agreement, Document 13 and Document 91 of the National Agreement shall remain in effect through September 14, 2011, and are waived to the extent necessary to implement the site plans outlined below and as described in detail in Attachment A ("Site Plans").  GM and Delphi agree to implement the site plans as outlined below and described in detail in Attachment A.

1. Sites to remain owned and operated by Delphi ("Keep Sites"):

   Kokomo
   Lockport
   Rochester
   Grand Rapids

2. Sites to be held for divestiture as ongoing businesses by Delphi ("Sell Sites"):

   Saginaw Steering - Saginaw
   Sandusky
   Adrian
   Cottondale

The Parties agree that if divestiture of the Saginaw Steering – Saginaw, Sandusky and Adrian sites are not concluded (by December 31, 2008, for Sandusky and Adrian, and by December 31, 2010 for Saginaw), GM will cause the operations and all active and inactive bargaining unit employees to be transferred to employment with a third

party so that Delphi will have no further operational or employment responsibility for the site(s).  If the respective transfers will not be completed by the dates identified above, the Parties agree that prior to the required date, GM and the UAW will implement a solution such that Delphi will have no further responsibility for the operation of future production at the Saginaw, Sandusky and Adrian sites as identified above, nor will the bargaining unit employees remain as Delphi employees, but the terms and conditions of the current collective bargaining agreement will continue to apply to such employees.

3.  Footprint Sites

Flint East – Business operated by GM or provided by GM to a third party designated by GM will operate at a geographically proximate site, providing a total of approximately 1,000 jobs.  No later than December 31, 2008, the Parties agree that GM will cause the active and inactive bargaining unit employees at Flint – East to transfer to employment with a third party.  Delphi and the UAW will cooperate with the transfer.  If the transfers of the active and inactive bargaining unit employees will not be completed by this date, the Parties agree that prior to December 31, 2008 GM and the UAW will implement a solution such that Delphi will have no further responsibility for the operation of future production at the Flint East site, nor will the bargaining unit employees remain as Delphi employees.  If it remains necessary after December 31, 2008 for Delphi to complete the currently existing cluster programs through their OE expiration dates, Delphi would manage such programs using contracted need-to-run UAW labor from the third party or from other resources as specified by GM.  From time to time, commencing on October 1, 2007, as Delphi's need-to-run ("NTR") headcount declines, GM will cause the active and inactive bargaining unit employees to transfer to employment with a third party.  Delphi and the UAW will also cooperate with these transfers.  If new work is not available for these employees, then GM and the UAW will implement a solution such that these bargaining unit employees will no longer remain as Delphi employees.

Needmore Rd. – Business operated by GM or provided by GM to a third party will operate at a geographically proximate site designated by GM, providing a total of approximately 750 jobs. On the earlier of thirty (30) days following the end of OE production of current programs at Needmore Road (which is currently scheduled for June 30, 2008), or December 31, 2008, the Parties agree that GM will cause the active and inactive bargaining unit employees at Needmore Road to transfer to employment with a third party.  Delphi and the UAW will cooperate with the transfer.  If the transfer of all active and inactive bargaining unit employees will not be completed as described above, the Parties

agree that prior to the required date GM and the UAW will implement a solution such that Delphi will have no further responsibility for the operation of future production at the Needmore Rd. site, nor will the bargaining unit employees remain as Delphi employees.

Saginaw Mfg. – Business provided by GM to a third party will operate at the current site or another geographically proximate site designated by GM, providing approximately 500 jobs. No later than December 31, 2008, the Parties agree that GM will cause the active and inactive bargaining unit employees at Saginaw Manufacturing to transfer to employment with a third party.  Delphi and the UAW will cooperate with the transfer.  If the transfer of all active and inactive bargaining unit employees to a third party is not completed by the date identified above, GM and the UAW will, prior to the required date, implement a solution such that Delphi will have no further responsibility for the operation of future production at the Saginaw Mfg. site, nor will the bargaining unit employees remain as Delphi employees.

4. Sites to be wound down or consolidated by Delphi in accordance with Delphi's restructuring plan and timing ("Wind Down Sites"):

> Columbus
> Milwaukee PWT (E&C)
> Milwaukee E&S
> Coopersville
> Anderson
> Wichita Falls
> Fitzgerald
> Olathe
> Laurel
> Athens

## C. WORKFORCE TRANSITION

1. <u>Current Employee Flowback</u>

Employees on roll prior to October 8, 2005 ("Flowback-Eligible Employees") without a valid flowback application on file will be afforded a final opportunity to make application for flowback by October 1, 2007.

Eligible Delphi employees hired prior to October 18, 1999 will receive closed plant treatment for purposes of job offers at GM plants. Employees from those plants who apply will have their seniority co-mingled with the seniority of GM employees who are eligible for closed plant treatment for purposes of job offers to GM openings in accordance with Appendix A.4 and 5 of the 2003 UAW-GM National

Agreement. A $67,000 relocation allowance will be paid to otherwise eligible employees from AHG – Anderson, PT – Coopersville, AHG – Wichita Falls, AHG – Fitzgerald, AHG – Columbus (except MFD – Mansfield), PT – Milwaukee, E&S – Milwaukee, and Steering – Athens (except Spring Hill assembly plant) who flow at the time the plant ceases operations to a General Motors Extended Area Hire plant. All other Flowback-eligible employees will be eligible for a relocation allowance in accordance with Paragraph (96a)(2)(a) of the 2003 UAW-Delphi National Agreement.

AHG-Columbus will be in the MFD-Mansfield plant Area Hire area and employees will be eligible for relocation allowance in accordance with Paragraph (96a)(2)(a) of the UAW-Delphi National Agreement.

Delphi – Athens will be placed in the General Motors Spring Hill area hire for purposes of placement. Flowback opportunities to Spring Hill will be made available to 300 Traditional Delphi employees (defined in Section C.5.a below) or the number of Traditional employees remaining after the Delphi Special Attrition Program whichever is less. No relocation will be paid for the flowback. The flowback opportunities will begin at the earlier of:

a)   March 1, 2009
b)   When layoffs begin at Athens
c)   Spring Hill needs people

Upon transfer to Spring Hill from Athens, if no jobs are available, the employee will be placed on layoff and then will be under the SUB and Job Security terms of the GM-UAW National Agreement. No employee being transferred can take a job in the plant unless a job is available. If there are surplus people at Spring Hill, the parties agree to look for ways to reduce the surplus including, but not limited to:

a)   A Special Attrition Program at Spring Hill
b)   Placement at other GM plants such as Bowling Green

As of the Effective Date of this Agreement (defined in Section K.1 below), Delphi employees who are otherwise eligible and who have an application on file will be eligible for flowback opportunities for the same length of time as the length of their seniority (time-for-time).

GM employees are no longer eligible for flowback to Delphi.

2.   <u>UAW-Delphi Employees Hired After October 18, 1999 and Prior to October 8, 2005 – Agreement between the Parties to offer job</u>

opportunities at GM

a.  Employees will be offered the job opportunities at GM after the Appendix A Placement Process and the UAW-GM-Delphi Flowback Agreement have been exhausted.

b.  Employees will be eligible for relocation allowance in accordance with Appendix A VI and Paragraphs (96a)(1), (2), (3), and (4) of the 2003 UAW-Delphi National Agreement.

c.  Employees will acquire GM seniority on the date of hire at the new location and will receive a new plant seniority date that is the effective date of hire.  The new plant seniority date will also be the date used in the administration of Appendix A, Memorandum of Understanding – Employee Placement in the UAW-GM National Agreement.

d.  Employees hired by GM will receive the same benefits treatment as other employees who transfer to GM under the UAW-GM-Delphi Flowback Agreement in accordance with the UAW-GM-Delphi Memorandum of Understanding, Benefit Plan Treatment dated September 30, 1999 as amended.

e.  Initial vacation entitlement at GM will be the same as that at Delphi as of the date immediately prior to the transfer.

f.  Employees will receive a wage rate in the same progression as they were in at Delphi and in accordance with Paragraph (98) of the UAW-GM National Agreement.

g.  These employees will be SEL protected at GM unless noted otherwise.

3.  <u>Delphi to Delphi Transfers</u>

Delphi employees (excluding temporary employees) covered by the Supplemental Agreement ("Supplemental Employees") with seniority as of the Effective Date of this Agreement, will have rights to other Delphi plants outside their own Area Hire area prior to permanent new hires and will be eligible for relocation allowance in accordance with Paragraph (96a)(2)(a).

4.  <u>Temporary Employees</u>

It is mutually agreed between the parties that employees hired as temporary employees in UAW-Delphi plants  will be converted to

permanent employees on the Effective Date of this Agreement.  Such employees will receive credit for time worked as a temporary employee toward establishing a seniority date pursuant to Paragraph (57) of the UAW-Delphi National Agreement.  Employees who worked for Delphi as of January 1, 1999 or later, or employees who accepted an option under the GM or Delphi Special Attrition Programs, are not eligible to be converted to permanent status.  Employees hired July 2, 2007 and later will be hired as temporary employees under the provisions of Appendix A. X – Memorandum of Understanding Employee Placement-Section X-Vacation Replacements and Other Employees Hired for Temporary Work, subject to review of the National Parties.

5.  <u>Transformation Program Options</u>

Delphi and the UAW agree on the following Transformation Program options which will be offered at all Delphi sites.  The Retirement Incentives and Buy Out are subject to the terms of Attachment C, and are generally described below.

a.  <u>Retirement Incentives – Traditional Employees</u>

Retirement options will be provided for Delphi employees not covered by the Supplemental Agreement  to be effective no later than September 1, 2007 as described in Attachment C and summarized below:

1)  $35,000 for normal or early voluntary retirements

2)  50 & 10 Mutually Satisfactory Retirement (MSR)

3)  Pre-retirement program covering employees with at least 26 years of credited service but less than 30 years as of September 1, 2007

4)  These retiring employees will be considered to have flowed back to GM for purposes of retirement ("Check the Box") and be treated consistent with the Check the Box retirements under the UAW-GM-Delphi Special Attrition Program.

5)  Participation conditioned on release of claims

b.  <u>Buy Out – Traditional Employees</u>

1)  The amount of the Buy Out Payments shall be as follows, subject to release of claims:

i.  Traditional Employees with 10 or more years of seniority or credited service, whichever is greater, will be eligible for a Buy Out payment of $140,000

ii.  Traditional Employees with less than 10 years of seniority will be eligible for a Buy Out payment of $70,000

2)  Buy Outs will be effective when the employee's services are no longer required, but in any event no later than September 15, 2007.  Employees will sever all ties with GM and Delphi except for any vested pension benefits (as such no pension supplements are payable).

3)  As necessary, employees who have accepted a Buy Out may be rehired as temporary employees to satisfy any operating needs. Any employee rehired as a temporary employee will not be eligible for any coverage or benefits under the Term Sheet. Further, any employee rehired as a temporary employee shall receive the starting wage rate applicable for a new temporary employee.  Such temporary employees will not be eligible for any future attrition or Severance Payments.

c.  <u>Buy Down – Traditional Employees</u>

1)  Effective October 1, 2007 all Traditional Employees, both production and skilled trades, other than pre-retirement program participants, will become Supplemental Employees and will be covered by all provisions of the Supplemental Agreement.

2)  Buy Down payments will be made to Traditional production employees as described below and will not exceed $105,000.

a)  Traditional production employees on active status (including Protected Status, but excluding pre-retirement program participants), and Traditional production employees on temporary layoff as of October 1, 2007 will be eligible for the Buy Down payments.

b)  The $105,000 Buy Down payment will be paid out in three (3) equal installments of $35,000, less applicable withholding, in the first pay ending after October 1, 2007, October 1, 2008, and October 1, 2009 provided the employee is on active status, receiving holiday pay, paid vacation, jury duty, military leave, or temporary layoff status on each of those three (3) dates.  The October 1, 2008 and October 1, 2009 payments will be prorated based on the

number of pay periods worked and the rate of compensation in the preceding 52-week period.  Treatment of employees on disability or Workers' Compensation leave is in accordance with (d) and (e), below.

c)  Traditional production employees who are on a leave of absence other than Sickness and Accident (S&A), Extended Disability (EDB), and Workers Compensation on October 1, 2007 will be eligible for the first $35,000 payment, less applicable withholding, at the time they return to work if they return to work prior to October 1, 2008.  The two (2) subsequent payments will be pro-rated based on the number of pay periods worked during the year immediately prior to the October 1st date. Additionally, the two (2) subsequent payments also will be adjusted by time spent on disability during the year immediately prior to the October 1st date, as described in (e), below.

d)  Sickness & Accident (S&A) benefits, Extended Disability Benefits (EDB), health care, life insurance and other applicable benefits will be reduced on October 1, 2007 to Supplemental Agreement levels for Traditional Employees who are on disability or Workers' Compensation leave on October 1, 2007. Traditional production employees will be eligible to receive a $35,000 Buy Down payment on October 1, 2007.

e)  Traditional production employees who are eligible for Buy Down payments and who are on or commence a disability or Worker's Compensation leave on or after October 1, 2007, will be eligible for the 2nd and 3rd Buy Down payments pro-rated for the time they spent on disability or Worker's Compensation leave during the year immediately preceding the date of each subsequent Buy Down payment. The pro-rated amount that will be included in the Buy Down payment for the period spent on disability or Workers' Compensation leave will have the same percentage relationship to the full Buy Down amount as the employee's applicable Sickness & Accident or Extended Disability Benefit schedule of benefits has to their base hourly rate for the applicable periods of leave.

f)  Traditional Production employees on active status (including Protected Status, but excluding pre-retirement program participants), and Traditional production employees on temporary layoff as of October 1, 2007 who do not elect an

option as described in Attachment C will become Supplemental Employees and will be covered by all provisions of the Supplemental Agreement as described in Paragraph C.5.c. 1-2 e of this Buy Down section. Employees must sign a Conditions of Participation Release Form in order to receive the $35,000 lump sum payment.

g)  Traditional production employees who are in a plant that is wound down on October 1, 2007 who do not elect an option under the Special Attrition Program – Transformation (Attachment C), will become Supplemental employees and will be covered by all provisions of the Supplemental Agreement as described in Paragraph C.5.c.1-2 e of this Buy Down section and will be placed on layoff effective October 1, 2007.  The employees will receive the October 1, 2007 $35,000 lump sum payment, less applicable withholding, if they sign the Conditions of Participation Release Form. These laid off employees will not be eligible for any future Buy Down payments, but can collect SUB, if otherwise eligible.

h)  Traditional skilled trades employees who are on roll October 1, 2007 and receiving compensation will be eligible for a one time buy down payment of $10,000, less applicable withholding, in the first pay ending after October 1, 2007. Traditional skilled trades employees will have the COLA in effect as of the Effective Date of this Agreement frozen at that level through October 1, 2007.  Any Traditional skilled trades employees who are Bought Down and remain on roll will have such frozen COLA folded into their base rate effective October 1, 2007, and will thereafter be covered by the skilled trades wage and benefit provisions of the Supplemental Agreement.

i)  Employees must sign a Conditions of Participation Release Form in order to receive the lump sum payments.

j)  No further Buy Down payments will be payable to any employee who flows back to GM or severs their employment with Delphi.

3)  In determining the wages and benefits for Traditional Employees who Buy Down to Supplemental Employee status, such employees will be given credit for time spent as a Delphi Traditional Employee at traditional wages and benefits (i.e., will

not be treated as new hires for purposes of applying
Supplemental Agreement wage and benefit schedules).

4) Traditional Employees electing a Buy Down will retain eligibility
for OPEB and pension benefit treatment under the Term Sheet
without regard to such election.

6. <u>Severance Payments</u>

Delphi and the UAW agree that any Supplemental or Temporary
Employees on the active employment rolls as of the Effective Date of
this Agreement at any "Keep," "Sell," "Footprint," or "Wind Down" sites
(excluding employees who previously received a Buy Out payment
from Delphi and were rehired as temporary employees), who are
permanently laid off prior to September 14, 2011, shall be eligible for a
lump sum severance payment equal to $1,500 for each month of
his/her combined service with Delphi and, in the case of sold facilities,
the new owner.  The maximum amount of severance pay is $40,000,
less applicable withholdings.  Employees must sign a Conditions of
Participation Release Form in order to receive the Severance
Payment.  The Parties agree that employees who are separated will
sever all ties with GM and Delphi except for any vested pension
benefits (as such no pension supplements are payable), if any.

Employees who are on roll on the Effective Date of this Agreement
who are also eligible for Supplemental Employee Benefits (SUB) will
have their choice of SUB or the Severance Payment specified above
but will not be entitled to both.

Employees hired after the Effective Date of this Agreement who have 3
or more years of seniority at the time their services are no longer
required but prior to September 14, 2011 may elect a $40,000
severance payment or SUB as specified in the Supplemental
Agreement.

Permanent employees covered by the Supplemental Agreement
placed on indefinite layoff from the AHG- Fitzgerald plant after May 1,
2007 and prior to the Effective Date of this Agreement will be eligible
for the severance payment provided they sign the required Conditions
of Participation Release form.

7. Any problems with the implementation of this Transformation section
will be discussed by the National Parties in order to agree on an
equitable solution.

### D. MODIFICATIONS TO THE 2004 SUPPLEMENTAL AGREEMENT

The UAW and Delphi agree to the following Supplemental Agreement modifications:

1. <u>Wages</u>

The UAW and Delphi agree that wages for Supplemental Employees, and for Traditional Employees who Buy Down will continue to be determined in accordance with the Supplemental Agreement except as modified below:

a. Wage Progression.  For production employees hired prior to the Effective Date of this Agreement, the 3% wage progression increases will be discontinued subject to the following:

(i)     Employees in groups A, B, or C (as defined in the Supplemental Agreement) hired before the Effective Date whose base hourly wage rate , as of the Effective Date, exceeds the respective group's 2007 Floor Rate as described below, will receive his/her next scheduled wage progression increase, as defined in the 2004 Supplemental Agreement, following the Effective Date, and will thereafter receive wage increases only as described in Section D.1.d below.  In the event such final wage progression increase occurs on or after December 31, 2007, it shall be adjusted upward to reflect the impact of any Wage Formula increase effective on that date, as described in Section D.1.d below.

(ii)    Employees in groups A, B, or C hired before the Effective Date whose base hourly wage rate , as of the Effective Date, is at or below the respective group's 2007 Floor Rate as described below will continue to receive scheduled wage progression increases as defined in the 2004 Supplemental Agreement, if any, required to bring such employee up to the respective group's 2007 Floor Rate.  Any employee who has not reached his/her respective Floor Rate through scheduled wage progression increases will be automatically moved to the Floor Rate effective December 31, 2007, and will thereafter receive wage increases only as described in D.1.d below.  Any wage increases described in D.1.d. below will be applied to an employee's base wage rate following application of any automatic increase up to his/her respective group's Floor Rate.   (The examples provided in Attachment F are provided for reference in the administration of this provision).

| Supplemental Wage Group | 2007 Floor Rate* |
|---|---|
| A | $16.23 |
| B | $15.30 |
| C | $14.50 |

*The Floor Rate will be adjusted at the beginning of each year as described in Section D.1.d below.

(iii) An employee in Group D ("Screw Machine Operator" and "Screw Machine Operator – Trainee") hired before the Effective Date whose base hourly rate , as of the Effective Date of this Agreement, is at or below his/her first progression step (i.e. $18.50) shall have his/her base rate increased to this first progression step on such date, and increased further to the second (and final) progression step of $19.50, effective December 31, 2007.  The final progression step of $19.50 shall be the initial Floor Rate for Group D employees. Thereafter, such employees will receive wage increases only as described in Section D.1.d below, and consistent with the methodology as described in D.1.a.(i) and (ii) above.

(iv) Traditional Employees taking the Buy-Down to Supplemental Employee status will be given credit in the wage progression schedule for time as a Traditional Employee up to the current wage maximum in each respective Supplemental Agreement wage group and will thereafter be treated as described in Section D.1.a.(i) above.

b. Production Employee New Hire Rates

For all production employees hired after the Effective Date of this Agreement, new hire rates shall be established at the greater of (a) $14.00 per hour, or (b) 90% of the prevailing Floor Rate for the respective classification.  As a temporary exception, employees newly hired into classifications belonging to Wage Group A between the Effective Date of this Agreement and December 31, 2007, will start at an initial hire rate of $14.42 per hour.  The wage rate of employees hired under this temporary exception will be adjusted to $14.61 effective December 31, 2007, and thereafter proceed under the normal progression schedule as described below based on his/her hire date.  Employees hired at the 90% level will receive four wage progression increases, one every 26 weeks in an amount equal to 2.5% of the then-prevailing Floor Rate, until reaching the Floor Rate for the relevant classification

over the course of 104 weeks.  Employees hired at the $14.00 rate will receive four wage progression increases, one every 26 weeks, in the amount necessary to achieve the then-prevailing Floor Rate over the course of 104 weeks in four proportional increases.  These proportional increases shall be equal to the difference between the then-prevailing Floor Rate for the classification and the employee's then-current rate multiplied by 25% for the first progression increase; 33% for the second; 50% for the third; and 100% for the fourth and final progression increase.  All new hires will also receive the wage increases described in Section D.1.d below.

c.  COLA

As of the Effective Date of this Agreement, Skilled Trades employees covered by the Supplemental Agreement will have all accrued COLA folded into their base rates.  Thereafter, future COLA adjustments shall be eliminated and replaced by Wage Formula increases as described in Section D.1.d below.  With respect to the January, 2008 Wage Formula increase, the applicable percentage adjustment shall be applied to each employee's base wage rate, including any applicable COLA folded in as of the Effective Date.   Supplemental Production Employees hired prior to the Effective Date, and on active status as of August 1, 2007, will be eligible to receive a one-time COLA make-up adjustment payment in the amount of $350 payable during the week of August 6, 2007.

d.  Wage Formula Increases

Effective with the Monday of the week that includes the first scheduled workday of 2008 (12/31/2007), 2009 (1/5/2009), 2010 1/4/2010) and 2011 (1/3/2011), the hourly wage rate for each production and Skilled Trades employee will be increased  by a percentage equal to the greater of (a) the annual percentage increase in average hourly earnings, excluding overtime, of employees in the Manufacturing sector (BLS Series CEU3000000033) or (b) the annual percentage increase in the All Items, Less Medical, CPI-W Index (1982-84=100), both as calculated for the 12 month period ending with the month of August prior to the respective increase date.  In the event a calculated increase exceeds 3.75%, wages will be increased by 3.75% and the parties will determine a mutually acceptable disposition of the excess, guided by the twin goals of enhancing UAW members' job and income security and the company's competitiveness.  In the event the wage formula generates a negative result, wages will not be reduced.  Instead, the negative result, up to a negative 3.75%,

would be used as a direct offset to the next subsequent formula increase (and subsequent increases after that, if necessary, until fully offset). For example, if the formula produced a negative result of 1.34% in one year followed by a 2.45% increase in the next year, the adjusted increase in the second year would be a net 1.11%. The engineering method of rounding will be adopted for all Wage Formula calculations: to three decimal places for the Manufacturing sector average hourly earnings component; to four decimal places for the annual inflation component; to four decimal places for year-to-year percentage changes for each of these components; and to two decimal places for new base hourly wage rates following application of a four decimal Wage Formula increase.

e. Wage Formula Basis

In the event that either of the BLS Series data as referenced above is eliminated, the parties will adopt a mutually agreeable successor or replacement series for use in future calculations. When calculating a Wage Formula result for a current year, BLS data from the preceding year's calculation will become the basis for the current year formula and will not be changed to reflect subsequent revisions in the published data, nor will a Wage Formula adjustment for a prior year be changed as a result of subsequent revisions in the underlying data.

2. <u>Individual Retirement Plan and Personal Savings Plan</u>
Covered Employees under the Term Sheet (Attachment B) are not eligible to participate in the Individual Retirement Plan provisions of the Delphi pension plan or receive a company match to the Personal Savings Plan for the period of time they are eligible to accrue credited service in the GM pension plan in accordance with the Term Sheet.

3. <u>Post Retirement Health Care Account</u>

Covered Employees who can attain eligibility to receive GM OPEB under the Term Sheet (Attachment B) are not eligible to receive credits in the Retiree Medical Account.

## E. LOCAL NEGOTIATIONS

The UAW and Delphi agree that local negotiations regarding work rules and other local agreement issues will be conducted on an expedited basis immediately upon ratification of this Agreement, with the support and assistance of the National Parties, at all "Keep", "Sell" and "Footprint" sites (see Section B and Attachment A, D). At facilities to be sold/transferred, such local negotiations will involve the new owner.

## F.  PENSION AND OPEB / BENEFIT GUARANTEE

1. The Parties have agreed to a Term Sheet with respect to the freezing of Delphi's pension plan, the cessation of Other Post Employment Benefits (OPEB) for Delphi employees and retirees and the consensual triggering of the GM-UAW Benefit Guarantee.  That agreement, the Term Sheet, is attached as Attachment B,  and is incorporated by reference herein.

2.

a.  GM and the UAW agree that the period of time on or before which GM's obligations under sections b., c., d., and e. of the Benefit Guarantee Agreement between GM and the UAW, dated September 30, 1999 ("Benefit Guarantee"), may be triggered shall be extended to December 31, 2007 (and to March 31, 2008 if Delphi has commenced solicitation of acceptances of its chapter 11 plan of reorganization prior to December 31, 2007 but the plan has not been confirmed and substantially consummated or such later date as Delphi and GM shall agree to extend the Indemnification Agreement expiration in Section F.2.c)), provided, however that notwithstanding the foregoing or any other provision of this Agreement, this extension shall be without prejudice to any rights, defenses or claims of any Party with respect to the Benefit Guarantee.

b.  Notwithstanding anything to the contrary in the Benefit Guarantee, this Agreement, or the Benefit Guarantee Term Sheet  (Attachment B), GM and the UAW hereby agree that if, at any time prior to the Effective Date, as defined in Attachment B  (including the event that such Effective Date never occurs):

1) Delphi or its successor company(ies) terminates its pension plan covering the Covered Employees or ceases to provide on-going credited service for the Covered Employees working at Delphi or its successor company(ies), as applicable, section b. of the Benefit Guarantee will be triggered for such Covered Employees to whom such cessation or termination applies; or

2) Delphi fails or refuses to provide post-retirement medical benefits to Covered Employees retired from Delphi with eligibility for such benefits prior to September 1, 2007, or Delphi reduces the level of post-retirement medical benefits for such Covered Employees below the level of benefits which GM is providing to its UAW-represented retirees, section c. of the Benefit Guarantee will be triggered for all such Covered Employees to whom such failure,

refusal or reduction applies, except for any Covered Employee who is a "check the box" retiree.

Any such triggering in this Section F.2.b. will be subject to all other terms and conditions of the Benefit Guarantee. All terms of this Section F.2.b (even any that have already become effective) will be superseded in their entirety by Attachment B if and when Attachment B becomes effective. Notwithstanding the foregoing or any other provision of this Agreement, any triggering of the Benefit Guarantee hereunder as between GM and the UAW shall be without prejudice to the rights, defenses or claims of any Party with respect to the Benefit Guarantee (including, without limitation, Delphi, which the UAW and GM acknowledge has neither agreed nor consented to the triggering of the Benefit Guarantee pursuant to this Agreement or otherwise), except as to GM regarding its agreement to trigger as specifically provided for in this section F.2.b.

c.   Delphi and GM agree that the eighth anniversary date reference in paragraph L of the Agreement between Delphi and GM, with respect to the Benefit Guarantee, dated as of December 22, 1999 (the "Indemnification  Agreement"), i.e. October 18, 2007, shall be extended to December 31, 2007 (and to March 31, 2008 if Delphi has commenced solicitation of acceptances of its chapter 11 plan of reorganization prior to December 31, 2007 but the plan has not been confirmed and substantially consummated or such later date as Delphi and GM shall mutually agree); provided, however that notwithstanding the foregoing or any other provision of this Agreement, this extension shall be subject to a full reservation of rights to challenge on any grounds the validity or enforceability of the Indemnity Agreement or any claim GM has made or may make in connection with the Indemnity Agreement, and GM expressly agrees and acknowledges that nothing herein shall be deemed to be, or shall be evidence of, any waiver of any defense Delphi has concerning the Indemnity Agreement or any claim there under or otherwise including defenses arising out or related to the triggering of the Benefit Guarantee under this Agreement without Delphi's approval or consent as an indemnitor under the Indemnity Agreement.

3.   Notwithstanding anything to the contrary in this Agreement or any other agreement between (a) the UAW and GM or (b) the UAW and Delphi, in the event that the Benefit Guarantee expires as described in Section F-2, and the Effective Date (as defined in the Benefit Guarantee Term Sheet (Attachment B)) has not occurred, and Delphi has unilaterally modified, terminated or in any way reduced or diminished any of the benefits covered by the Benefit Guarantee, the

UAW shall be immediately released from any obligations to refrain from striking and shall be allowed to call a strike against Delphi and/or GM on two days written notice. This limited right to strike will terminate on the Effective Date of Attachment B or as provided in a substitute agreement between the UAW, Delphi and GM.

## G. INTENTIONALLY OMITTED

## H. OTHER NATIONAL AND LOCAL AGREEMENT MODIFICATIONS

1. <u>Hiring requirements</u>

   The UAW and Delphi agree that all existing and future hiring obligations and all such provisions contained in the Existing Agreements as defined below in Section 7 are eliminated.

2. <u>Transfer of Pension Assets and Liabilities – (414)(l)</u>

   A transfer of pension assets and liabilities will occur as provided in the Term Sheet pursuant to Internal Revenue Code Section (414)(l).

3. <u>Existing CHR/Legal Services</u>

   The Parties agree as follows:

   a. As of October 1, 2007, all Delphi funding and participation in the Legal Services Plan (Attachment I to the 2003 UAW-Delphi National Agreement) and all programs associated with the UAW-GM Center for Human Resources (CHR) will be terminated. Discussions about any joint programs to be continued, and the method for their administration at the local level in the absence of the CHR, will be a matter of Local Negotiations.

   b. CHR joint training fund accruals will be addressed as specified in Section J, below.

   c. The CHR/Joint Training Funds New Allocation Agreement dated April 2, 2001 is terminated as of the Effective Date of this Agreement.

   d. Existing Legal Services fund (cash and accruals) will be reserved for the exclusive use of eligible participants or to pay administrative expenses incurred by the Plan until depleted.  Any excess (cash and accruals) will be addressed as specified in Section J below.

4. <u>Holiday Schedule</u>

Delphi and the UAW agree to adopt the same specified holidays as agreed to by General Motors and the UAW through September 14, 2011 (not including any paid Independence Week days except for the specified Independence Day holiday itself).

5. <u>Workers' Compensation Letter</u>

The Workers' Compensation letter agreement attached to the 2003 Delphi HRP will be subject to the same modifications that may be made to the Workers' Compensation letter agreement in the 2003 UAW – GM National Agreement as a result of 2007 National Negotiations between GM and the UAW.

6. <u>Temporary Employees</u>

The UAW and Delphi agree that temporary employees may be used to satisfy need-to-run requirements in plants that are considered "Wind Downs", "Sell" and "Footprint". Temporary employees may be used in "Keep" sites to bridge any difficulties arising from the implementation of the attrition portion of this Agreement (Attachment C). The use of temporary employees at any site for any reason is subject to the approval of the UAW-Delphi National Parties.

7. <u>Existing Agreements</u>

The UAW and Delphi agree that the Supplemental Agreement, the UAW-Delphi National Agreement dated September 18, 2003 and supplemental agreements attached as Exhibits thereto and UAW-Delphi Local Agreements (collectively the "Existing Agreements") are modified or eliminated to conform to the provisions of this Agreement, as listed in Attachment E.

8. <u>Document 13</u>

The UAW and Delphi agree that the Document 13 commitment in Article 2 of the Supplemental Agreement and Document 13 of the National Agreement shall remain in effect through and expire on September 14, 2011, and that both are waived to the extent necessary to implement the site plans outlined in Section B. and as described in detail in Attachment A ("Site Plans").

9. <u>Appendix L</u>

The UAW and Delphi agree that the terms of the existing Appendix L provisions of the 2003 UAW/Delphi National Agreement will be

applicable with the understanding that upon the conclusion of these negotiations, the UAW-Delphi Joint National Sourcing Committee will identify the proper variable wage and benefit cost elements to be utilized in the Net Present Value Costing Methodology.

10. GIS

The UAW and Delphi agree that the Guaranteed Income Stream (GIS) Program (Exhibit E to the 2003 UAW-Delphi National Agreement) will be eliminated.

11. AOL

The UAW and Delphi agree that the Corporation-paid subsidy for AOL will be discontinued.

## I.   EQUIVALENCE OF SACRIFICE

Delphi reaffirms its commitment to the principle of "equivalence of sacrifice" when establishing compensation and benefit levels for salaried employees and management, to ensure that sacrifices by UAW-represented employees are reflected in the pay and benefit practices of all non-represented employees.

Information provided by Delphi related to this matter will be in accordance with the requirements of the Supplemental Agreement.

## J.   SETTLEMENT OF ALL EMPLOYEE, RETIREE, AND UNION ASSERTED AND UNASSERTED CLAIMS

The Parties agree to the following in partial consideration for the UAW entering into this Agreement and in consideration for the releases to be provided pursuant to Section K.

1. Individual settlements pursuant to Transformation Program terms and conditions.

2. The UAW has asserted a claim against Delphi in the amount of $450 million as a result of the modifications encompassed by this Agreement and various other UAW agreements during the course of Delphi's bankruptcy.  Although Delphi has not acknowledged this claim, GM has agreed to settle this claim by making a payment in the amount of $450 million, which the UAW has directed to be paid directly to the DC VEBA established pursuant to the settlement agreement approved by

the court in the case of Int'l Union, UAW, et. al. v. General Motors Corp., Civil Action No. 05-73991.

3.  Delphi is current in its payment of Delphi-related CHR expenses and Legal Services through year end 2006 and to date in 2007.  In addition, on October 1, 2007, the UAW will receive payment for an allowed claim against Delphi in the amount of $140 million consisting of CHR existing accruals of $134 million and UAW-Delphi Legal Services Plan accruals of $6 million (adjusted by the difference between accruals and expenditures until the effective date of the plan of reorganization) in complete settlement of the UAW and the UAW-GM Center for Human Resources claims asserted as to CHR Joint Funds and the UAW-Delphi Legal Services Plan accruals and expenses.  The amount of $30 million will be directed to the UAW-GM Center for Human Resources and the balance will be paid directly to the DC VEBA established pursuant to the settlement agreement approved by the court in the case of Int'l Union, UAW, et. al. v. General Motors Corp., Civil Action No. 05-73991.

4.  Excludes waiver of rights to vested pension benefits, workers compensation benefits, unemployment compensation benefits and pursuance of pending ordinary course grievances of employees remaining in the workforce.

5.  All other consideration and concessions provided by GM and Delphi under the terms of this Agreement and all attachments to this Agreement.

The Parties also acknowledge that (i) the consideration provided by GM pursuant to this Agreement and all attachments to this Agreement constitutes a substantial contribution to Delphi's plan of reorganization, (ii) this contribution is necessary to the success of Delphi's plan of reorganization, and (iii) GM would not have made this contribution without obtaining the waivers and releases provided for herein.  The Parties further acknowledge that nothing in the preceding sentence shall give rise to or entitle GM to seek or be allowed any claim against or consideration from any entity, including Delphi, other than as specifically approved by the Bankruptcy Court as agreed to by Delphi and GM in a comprehensive settlement agreement resolving the financial, commercial, and other matters between them.

## K.  EFFECTIVE DATES AND BANKRUPTCY PROCEEDINGS

1.  Subject to its terms and conditions, this Agreement is a final, binding and conclusive commitment and agreement that will be effective on the later of entry of an Order by the U.S. Bankruptcy Court approving this Agreement that is satisfactory to the UAW, GM and Delphi (the

"Approval Order"), or the first Monday following receipt by Delphi of written notice of ratification from the UAW (the "Effective Date").  The ratification process will commence as soon as practical following the date of this Agreement. In connection with Delphi's prosecution of a motion to obtain entry of the Approval Order in the Bankruptcy Court, (a) Delphi shall use its best efforts to file a motion for approval of this Agreement in form and substance reasonably acceptable to the Parties to be heard not later than the first monthly omnibus hearing at which the motion can be considered under the case management orders entered in the Bankruptcy Court, (b) Delphi shall provide, to the extent reasonably practicable, both the UAW and GM with copies of, and a reasonable opportunity to comment on, all motions, applications, proposed orders, pleadings and supporting papers prepared by Delphi for filing with the bankruptcy court relating to court approval of this Agreement, and (c) the Parties shall support the approval of this Agreement in the Bankruptcy Court without condition, qualification or exception.

2.  The parties acknowledge that the following provisions of this Agreement will not become effective until all of the following events have occurred and as of the date when the last of such events shall have occurred:  (a) execution by Delphi and GM of a comprehensive settlement agreement resolving the financial, commercial, and other matters between them and (b) the substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by the Bankruptcy Court which incorporates, approves and is consistent with all of the terms of this Agreement and the comprehensive settlement agreement between Delphi and GM:

   a.  The Benefit Guarantee Term Sheet (Attachment B)
   b.  Delphi pension freeze (Section F and Attachment B)
   c.  Cessation of Delphi OPEB (Section F and Attachment B)
   d.  414(l) transfer (Section H.2 and Attachment B)
   e.  Section J.2.

3.  The Parties agree that the order of the Bankruptcy Court approving this Agreement shall provide that any plan of reorganization consistent with this Agreement and any confirmation order entered into with respect to such plan shall include the following provisions:

   a)  On the effective date of such plan of reorganization, the UAW, all employees and former employees of Delphi represented or formerly represented by the UAW, and all persons or entities with claims derived from or related to any relationship with such employees or former employees of Delphi, waive and release and be deemed to have waived and released any and all claims of any nature, whether liquidated, unliquidated, contingent, non-

contingent, asserted or unasserted, existing and/or arising in the future against Delphi, its subsidiaries or affiliates, the Delphi HRP, the Delphi Health Care Program for Hourly Employees and the Delphi Life and Disability Benefits Program for Hourly Employees, GM, its subsidiaries or affiliates, the GM HRP, the GM Health Care Program for Hourly Employees and the GM Life and Disability Benefits Program for Hourly Employees, and the officers, directors, employees, fiduciaries, and agents of each, arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements between Delphi and the UAW and between GM and the UAW related to such employees and the UAW-GM-Delphi Memorandum of Understanding Benefit Plan Treatment related to such employees (provided, however, that claims for benefits provided for or explicitly not waived under the provisions of this Agreement are not waived).

b) A plan exculpation and release provision (which provision shall be at least as comprehensive as the plan exculpation and release provision under the plan of reorganization for the debtor) for the UAW released parties (which shall include the UAW and each of their current or former members, officers, committee members, employees, advisors, attorneys, accountants, investment bankers, consultants, agents and other representatives) with respect to any liability such person or entity may have in connection with or related to the Delphi bankruptcy cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the plan of reorganization, the disclosure statement concerning the plan of reorganization, this Agreement or the Agreements on Attachment E hereto or any contract, employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with either the plan of reorganization or any agreement between the UAW or Delphi, or any other act taken or omitted to be taken consistent with this Agreement in connection with the Delphi bankruptcy.

c) This Agreement and the agreements referenced in Attachment E shall be assumed under 11 U.S.C. §365.

4. The Parties agree that they will cause the UAW-GM Center for Human Resources to enter into a consent order in the Bankruptcy Court agreeing to the treatment of the CHR claim provided for in Section J of this Agreement.

5. Nothing contained herein shall constitute an assumption of any agreement described herein, including, without limitation any collective bargaining agreement between the UAW and Delphi (except as provided for in Section K.3) or any commercial agreement between GM and Delphi, nor shall anything herein be deemed to create an administrative or priority claim with respect to GM or convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party.  The Parties further agree (and the Bankruptcy Court order shall also provide) that this Agreement is without prejudice to any interested party (including the parties to this Agreement and the statutory committees) in all other aspects of Delphi's Chapter 11 cases and that each Party to this Agreement reserves all rights not expressly waived herein.

6. Unless this Agreement is consummated following all required approvals, nothing herein shall bind any of the Parties nor shall the Agreement be admissible in any judicial or other proceeding on behalf of or against any Party.

The parties, by their duly authorized officers and representatives, agree accordingly this 22nd day of June 2007.

International Union, UAW            Delphi Corporation            General Motors Corporation

**Attachment A**

### SITE PLANS

### <u>OVERVIEW</u>

- The following site documents describe GM's and Delphi's product program commitments to the sites (Keep, Sell and Footprint).  At the Sell Sites, the Parties understand that the new owners' involvement and perspective will be needed as part of the process.
- General Motors will suspend all Sourcing on current products and new products (identified in Attachment A-1) at the Keep, Sell and Footprint Sites (after their transformation) for the life cycles of the identified engine programs, vehicle programs, warehousing, unitizing, trucking-related and component manufacturing.
- Program name changes will not alter the commitments made for the Keep Sell and Footprint Sites in this document.  In the event a product program identified in Attachment A-1 is cancelled, discussions will be held between General Motors, Delphi and the UAW to find alternative solutions.
- Grand Rapids, Kokomo, Rochester and Lockport (the "Keep" Sites) will retain all current parts, including their current respective percentage of the total volume, through the life cycles of the identified engine and vehicle programs which they supply to General Motors.
- General Motors will award new work to the Keep Sites as identified in Attachment A-1, and Delphi will produce the associated products at the Keep Sites.
- Delphi will suspend all Sourcing relative to the above referenced current product programs manufactured for GM at the Keep sites, as well as the new products identified in Attachment A-1, through the life cycles of the engine and vehicle programs associated with these commodities.  If a component in the above program awards causes the product to become uncompetitive, the local parties will meet to resolve the problem.  If the local parties cannot reach resolution, the National Parties will provide assistance.  If the parties are still unable to reach resolution, Appendix L will be utilized.
- A few GM products are dual sourced.  If future volume reductions occur at the Keep, Sell and Footprint sites, GM and/or Delphi will maintain the previously identified volume percentage at the impacted locations.
- Revenue and jobs as identified in this document (including Attachment A-1) are based on current estimates of program volumes which are subject to change based on future market conditions and are not financial or volume guarantees.
- Investment and engineering figures are estimates based on the current understanding of program requirements which are subject to change based on future program revisions, and are not financial or volume guarantees.

## GRAND RAPIDS

## CURRENT STATE

- Booked revenue projected to increase from $174 million in 2007 to $195 million in 2011 (reference Attachment A-1).

## GM COMMITMENT

- GM will award the new product programs starting in 2010-2012, including Cylinder Deactivation, Lash Adjusters, Lifter Guide Assemblies, and the 4.5 HO V-8 12mm HLA.  GM will commit these product programs (for specific program details see the charts included in Attachment A-1), with the potential for additional new product programs as they are released. The majority of the specific program replacement for incumbent work is beyond the GM program planning horizon at this time.

## DELPHI COMMITMENT

- Engineering and capital investment of approximately $22.5 million will be made by Delphi at the Grand Rapids facility as required to support the above-designated product programs.

## ROCHESTER

## CURRENT STATE

- Booked revenue projected to decrease from $583 million in 2007 to $343 million in 2011 (reference Attachment A-1).

## GM COMMITMENT

- GM will award the new product programs for Fuel Rails, IAFM's & IAM's, SIDI, LOMA and Canisters (Note:  E85 injectors are included as part of the Fuel Rails/SIDI system).  GM will commit these product programs (for specific program details see the charts included in Attachment A-1), with the potential for additional new product programs as they are released.

   o   The most significant programs for the site are the GMPT SIDI programs for the next generation (Gen V) engines.

   o   GM has confirmed that Delphi has demonstrated the technical capability to satisfy product requirements and compete for SIDI programs as future applications are identified.

## DELPHI COMMITMENT

- Engineering and capital investment of approximately $134 million will be made by Delphi at the Rochester facility as required to support the Gen V SIDI program.

# LOCKPORT

## CURRENT STATE

- Booked revenue projected to decline from $753 million in 2007 to $457 million in 2011 (reference Attachment A-1).

## GM COMMITMENT

- GM will award the new product programs for a variety of HVAC and Powertrain Cooling (PTC) products.  GM is committing these product programs (for specific program details see the charts included in Attachment A-1), with the potential for additional product programs as they are released.

- The most significant future programs for the site are a large portion of the C3XX HVAC and PTC products.

## DELPHI COMMITMENT

- Engineering and capital investment of approximately $48 million will be made by Delphi at the Lockport facility as required to support the C3XX HVAC/PTC product programs.

## KOKOMO

## CURRENT STATE

- Booked revenue projected to decline from $666 million in 2007 to $310 million in 2012 (reference Attachment A-1).

## GM COMMITMENT

- GM will award the new product programs for a variety of powertrain and electronics related products.  GM is committing these product programs (for specific program details see the charts included in Attachment A-1), with the potential for additional product programs as they are released.

- The most significant future product programs for the site are:

  o Gen V SIDI Engine Controllers.
  o TEHCM Controllers (T-90, T-76).
  o GM BAS+ APM/BPIM (electronics & system assembly).
  o Crash sensing SDM.
  o Note:  Delphi will relocate ECM/BCM from Milwaukee to Kokomo per the timing in the transition plan shared with the Union June 15, 2007.

- The basis of competition for manufacturing this electronics product line is generally dominated by low-cost non-U.S. manufacturers (favorable packing density logistics).  Therefore, it is critical for the future of the site that the parties work together to address this competitive challenge, including evaluation of ongoing wafer fabrication operations.

# SANDUSKY

## GENERAL

- Intent of all parties is to complete sale as soon as possible, but in any event by the end of 2008.
- Objective is to accomplish a sale of the Sandusky operation to a new owner who is committed to bearing manufacturing as an on-going business.
- The below defined commitments from GM and Delphi are contingent upon this business being sold to an acceptable buyer.
- Investment of an estimated $40 million in engineering and capital will be required to support the various Gen III Bearing programs.
- If the sale of the Sandusky site is not concluded by December 31, 2008, GM will cause the Sandusky operations to be transferred as set forth in Section B.2 of this Memorandum of Understanding.

## GM COMMITMENT

- Support the sale of the business.
- Provide/award a book of business for extended period of time.
  - o GM has agreed to award new programs with annual volume estimated at approximately 6.0 million bearings, for product programs as follows:
    - N.A. Delta fronts and rears.
    - Theta Epsilon, Zeta.
    - N.A. Epsilon, Theta.
- GM has issued purchase orders for five years subject to the above stated conditions, i.e. a sale or transfer to a third party.
- GM has confirmed that Sandusky has demonstrated the technical capability to satisfy product requirements and compete for bearing program opportunities as future applications are identified.

## DELPHI COMMITMENT

- Support the sale of the business.
- Agree to asset sale as appropriate to support sale of Sandusky.
- Support hourly workforce transformation.
- Support the transition of technical expertise and resources.
- Until the business is sold, or December 31, 2008, whichever is sooner, Delphi will operate the facility.

## UAW COMMITMENT

- Waive Document 13 of the National Agreement to the extent necessary to complete the sale/transformation.

# ADRIAN

## GENERAL

- Intent of all parties is to complete the divestiture as soon as possible and in any event by end of 2007.
- Objective is to accomplish a transfer of operations to a new owner as an on-going business.
- If the sale of the Adrian site is not concluded by December 31, 2008, GM will cause the Adrian operations to be transferred as set forth in Section B.2 of this Memorandum of Understanding.
- GM will not impede the future site owner's efforts to attract non-GM business.

## GM COMMITMENT

- Support the sale of the business.
- Provide/award a book of business for extended period of time.
- Negotiate long-term supply agreement with buyer.
- GM will commit to similar levels of content for the C3XX instrument panel components as Adrian currently produces for the GMT 900 program.

## DELPHI COMMITMENT

- Support the sale of the business.
- Agree to sale of assets as appropriate to support sale of the business.
- Support hourly workforce transformation.
- Support the transition of technical expertise and resources.
- Until the business is sold, or December 31, 2008, whichever is sooner, Delphi will operate the facility.

## UAW COMMITMENT

- Waive Document 13 of the National Agreement to the extent necessary to complete the sale/transformation.

## SAGINAW STEERING - SAGINAW

### GENERAL

- Intent of all parties is to complete the divestiture as soon as possible and in any event by end of 2007.
- Objective is to accomplish a transfer of operations to a new owner as an on-going business.
- If the sale of the Saginaw site is not concluded by December 31, 2010, GM will cause the Saginaw operations to be transferred as set forth in Section B.2 of this Memorandum of Understanding.

### GM COMMITMENT

- Support the sale of the business.
- Provide/award a book of business for extended period of time.
- Negotiate long-term supply agreement with buyer.
- GM will commit to product programs as described in Attachment A-1. These programs will remain in the Saginaw, Michigan site for the duration of the product life cycle.
- GM agrees to award to Saginaw, Michigan the C3XX front half shafts, rack & pinion gear, integral gear, steering columns and (if technical capability is demonstrated to GM Engineering satisfaction) steering pumps and rear half shafts.
- Based upon future product applications for the Electronic Power Steering (EPS), GM will award the C3XX EPS to the Saginaw, Michigan site if the technical and engineering capability of the organization is demonstrated to GM Engineering.
- In the event that it is determined that the technical specifications cannot be met, GM, the Company and the UAW will initiate discussions so that alternative job opportunities for future available product programs are identified that are within the technical capabilities of the Company.

### DELPHI COMMITMENT

- Support the sale of the business.
- Agree to sale of assets as appropriate to support sale of the business.
- Support hourly workforce transformation.
- Support the transition of technical expertise and resources.
- Until the business is sold, or December 31, 2010, whichever is sooner, Delphi will operate the facility.

### UAW COMMITMENT

- Waive Document 13 of the National Agreement to the extent necessary to complete the sale/transformation.

## SAGINAW MFG. NEWCO

### GENERAL

- Intent of all parties is to complete transfer as soon as possible.
- Objective is to maintain presence in Saginaw County area
- Objective is to create a successful on-going business entity, operated by a third party, and provide jobs
- If the transfer of the Saginaw Manufacturing site is not concluded by December 31, 2008, the operations will be handled in accordance with Section B.3 of this Memorandum of Understanding.

### GM COMMITMENT

- GM will award new product programs as outlined in Attachment A-1, which includes brake corner machining and brake corner assembly.
- Grant Newco a ROLR for next generation replacement programs or next generation value-added assembly (VAA) opportunities as they are identified through the GM Product Development Process for the programs described above.
- GM will fund engineering design and development and start-up costs for Newco to enable a competitive piece price environment for long-term viability.
- The job opportunities described above will provide an initial commitment of 500 jobs.

### DELPHI COMMITMENT

- Support the transfer of the business.
- Agree to sale of assets as appropriate for transfer of Saginaw Mfg.
- Agree to support the transfer of work to the Saginaw area from other Delphi sites providing acceptable commercial terms and conditions can be reached between the parties (GM and Delphi).
- Consider facility lease proposals as appropriate with respect to the transfer process.
- Support transfer of hourly workforce.
- Until the transfer of the business is complete, or December 31, 2008, whichever is sooner, Delphi will operate the facility.

### UAW COMMITMENT

- Waive Document 13 of the National Agreement to the extent necessary to implement the plan.

## **FLINT – EAST**

### **GENERAL**
- Objective is to maintain presence in Flint area.
- Objective over time is to bring new work into the area operated by a third party as an ongoing business entity and provide jobs as existing legacy work exits from the Flint-East site without successor program replacement.
- After December 31, 2008, Delphi will no longer have ongoing responsibility for the hourly employees, but will continue to own, operate and support the site through the end of current OE production at the site.
- After December 31, 2008, all remaining hourly employees will be handled in accordance with Section B.3 of this Memorandum of Understanding.
- Employees who become redundant after October 1, 2007 and prior to new work being available to the site, will be transferred to a third party and placed on layoff and, if eligible, will be paid unemployment benefits and applicable SUB.

### **GM COMMITMENT**
- GM will develop and implement a unitizing facility (or facilities) in the Flint area (to be named later) to be represented by Local 651 by transitioning certain work beginning January, 2008 that is currently contracted to third party packagers (230 jobs). This work will be staffed by current employees represented by Local 651, who will become GM employees at the wage and benefit levels as contained within the modified UAW-Delphi Supplemental Agreement.  Any issues, administrative details or the application of the modified Supplemental Agreement will be resolved by GM and the GM Department of the International Union, UAW.  This work is anticipated to be fully transitioned by July, 2008 and will remain through January 1, 2015.
- In addition, GM is prepared to commit this business on new and replacement service parts, not unitized by suppliers, for unitizing awards through the 2011 model year.
- GM also commits to provide 220 "trucking-related" jobs with ramp-up timing beginning no later than the fall of 2007 with the commitment level attained by July 2008.  Local 651 employees will be able to make application for these "trucking-related" jobs in conjunction with the selection process managed by Local 659 and the Company responsible for the "trucking-related" jobs.
- GM also commits to identify 550 additional job opportunities for Local 651, in addition to the work described above to provide 1,000 total jobs upon full implementation. In the event that a sufficient number of job opportunities are not identified by July 1, 2008, GM will allocate the C3XX cluster to replace the existing GMT 900 cluster work.  GM will also identify

additional replacement work to be placed in Flint – East to attain the committed employment level of 1,000 jobs by July 1, 2008.

## DELPHI COMMITMENT

- Support hourly workforce transformation.
- Provide approximately 350 instrument cluster jobs at the Flint – East site until the end of their respective program life cycles and/or in accordance with the transition plan.
- Additionally Delphi will support an initial complement of approximately 150 jobs related to GM service MRA's through the end of current OE cluster production.

## UAW COMMITMENT

- Waive Document 13 of the National Agreement to the extent necessary to implement the transformation plan.

## **NEEDMORE RD.**

### **GENERAL**
- Objective is to maintain presence in Dayton area.
- Objective over time is to bring new work into the area as an on-going business entity and provide jobs.
- If the transfer of the Needmore Rd. site employees has not been completed within 30 days following the end of OE production (currently scheduled for June 30, 2008), or December 31, 2008, whichever is sooner, the employees will be transferred in accordance with Section B.3 of this Memorandum of Understanding.
- Employees who become redundant prior to new work being available to the site, will be transferred to a third party and placed on layoff and, if eligible, will be paid unemployment benefits and applicable SUB.

### **GM COMMITMENT**
- GM will develop and implement a warehousing facility (or facilities) in the Dayton area (location to be named later) to be represented by Local 696 by transitioning certain work beginning July, 2008 that is currently contracted to third party logistics providers (160 jobs). These employees will become GM employees at the wage and benefit levels as contained within the modified UAW-Delphi Supplemental Agreement. Any issues, administrative details or the application of the modified Supplemental Agreement will be resolved by GM and the GM Department of the International Union, UAW. This work is anticipated to be fully transitioned by March, 2009, and will remain through January 1, 2015.
- As new vehicle programs are launched, GM will commit service parts warehousing work for these vehicles through the 2011 model year.
- GM also commits to provide 140 "trucking-related" jobs with ramp-up timing beginning on or about September, 2008, with the commitment level attained by March, 2009.
- GM will transition IPC/CKD services from a current third party supplier, which currently employs approximately 250 employees beginning in July, 2008 with the commitment level attained by January, 2009.
- GM also commits, by March, 2008, to identify 200 additional job opportunities for Local 696, in addition to the work described above to provide 750 total jobs upon full implementation.

### **DELPHI COMMITMENT**
- Support the transfer of the hourly workforce.
- Delphi will manage the current existing programs through the end of production, or December 31, 2008, whichever is sooner.
- Until the transfer of the employees is complete, or December 31, 2008, whichever is sooner, Delphi will operate the facility.

## <u>UAW COMMITMENT</u>
- Waive Document 13 of the National Agreement to the extent necessary to implement the transformation plan.

# COTTONDALE

## GENERAL

- Intent of all parties is to complete the divestiture as soon as possible and in any event by end of 2007.
- Objective is to accomplish a transfer of operations to a new owner as an on-going business.

## CURRENT STATE

- Booked revenue projected to decline from $324.7 million in 2007 to $101.5 million in 2011 (reference attached documents).
- New work opportunities at the Mercedes assembly plant include future cockpit programs (W-166, X-166 and W-251 NG).  This new business represents an annual revenue stream of approximately $320 million. Winning this new business will be dependent upon the plant's ability to satisfy Mercedes' requirements in the areas of quality, technology and cost.
- The basis of competition for assembly of this product is generally dominated by low-cost U.S.-based assemblers.  Therefore, it is critical for the future of the plant that the parties work together to address this ongoing competitive challenge.

## DELPHI COMMITMENT

- Support the sale of the business.
- Agree to sale of assets as appropriate to support sale the business.
- Support hourly workforce transformation.
- Support the transition of technical expertise and resources.

## UAW COMMITMENT

- Waive Document 13 of the National Agreement to the extent necessary to complete the sale/transformation.
- Work with the new buyer to develop a competitive agreement that will support the plant in winning new business.

## Attachment A-1

UAW Site Revenue & Headcount Projections

Attached Separately

**Attachment B**

Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and
GM Consensual Triggering of Benefit Guarantee"

Attached Separately

## Attachment C

Special Attrition Plan

Attached Separately

**Attachment D**

**COMPETITIVE OPERATING AGREEMENT FRAMEWORK**



<span style="color:red">Local Negotiations
Competitive Operating Agreement Framework</span>

**To improve plant competitiveness, promote operating viability and better position the plants to win new business, the following represents Delphi's and GM's view of critical elements for discussion during Local Negotiations at all Keep, Sell and Footprint sites.**

- ◆ Process
  - – Commence local negotiations at all Keep, Sell and Footprint Issue sites as promptly following ratification
  - – Conclude local COA negotiations within 60 days following ratification
  - – Wages and benefits not included in Local Negotiations
- ◆ Top Priority Local COA Issues:
  - – Effective utilization of workforce capabilities to achieve competitive direct to indirect ratios
    - » Elimination of uncompetitive activities (direct and indirect): outsource/subcontract as required
  - – Flexibility to use skilled trades efficiently, focusing on direct support of production operations
    - » Reduce skilled trades classifications (ultimately to Electrical, Mechanical)
    - » No restrictions on combination of jobs or "right of access" (eliminate LODs)
    - » Operate production equipment as required
  - – Flexibility to use production employees efficiently
    - » Reduce production classifications to a minimum
    - » No restrictions on combination of jobs
    - » Enhancing production employee skills and utilizing them to their fullest capabilities (maintenance of tooling/equipment, changeovers, etc.)
  - – Reduce employee movement to protect quality of product and operating efficiencies
  - – Overtime
    - » Resolve uncompetitive skilled trades Full Utilization restrictions
    - » Simplify scheduling and equalization administration
  - – Attendance
    - » Implement a local No Fault Attendance Program
    - » FMLA Administration as allowed by law
- ◆ Eliminate prior agreements and practices that generate unnecessary operating costs
- ◆ The local parties will not be constrained in achieving a COA by existing agreements/past practices

*Delphi Confidential – Subject to Protective Order*

<span style="color:red">Industrial Relations</span>

**Attachment E**

List of Agreements

Attached Separately

**Attachment F**

## Illustrative Example of Wage Progression Scales

| Group A Hire Date | | | | |
|---|---|---|---|---|
| 7/1/05 | 8/1/06 | 10/1/06 | 11/1/06 | 2/1/07 |

| | 7/1/05 | 8/1/06 | 10/1/06 | 11/1/06 | 2/1/07 |
|---|---|---|---|---|---|
| Initial Base | 14.00 | 14.00 | 14.00 | 14.00 | 14.00 |
| 6 Mth Progression #1 | 14.42 | 14.42 | 14.42 | 14.42 | - |
| 6 Mth Progression #2 | 14.85 | - | - | - | - |
| 6 Mth Progression #3 | 15.30 | - | - | - | - |
| Base As Of June 30, 2007 | 15.30 | 14.42 | 14.42 | 14.42 | 14.00 |
| Incremental Next Wage Progression | 0.46 | 0.43 | 0.43 | 0.43 | 0.42 |
| Revised Base | 15.76 | 14.85 | 14.85 | 14.85 | 14.42 |
| December 30, 2007 Incr. Conversion To Floor | 0.47 | 1.38 | 1.38 | 1.38 | 1.81 |
| Wages As Of December 30, 2007 | 16.23 | 16.23 | 16.23 | 16.23 | 16.23 |
| January 2008 Base With Accrued COLA | 16.23 | 16.23 | 16.23 | 16.23 | 16.23 |
| *Multiplied By Wage Formula %, Greater Of* | CPI-W / Mfg. Sector Earnings Change | | | | |
| *Equals* | Revised January Base | | | | |

| Group B Hire Date | | | | |
|---|---|---|---|---|
| 7/1/05 | 8/1/06 | 10/1/06 | 11/1/06 | 2/1/07 |

| | 7/1/05 | 8/1/06 | 10/1/06 | 11/1/06 | 2/1/07 |
|---|---|---|---|---|---|
| Initial Base | 14.00 | 14.00 | 14.00 | 14.00 | 14.00 |
| 6 Mth Progression #1 | 14.42 | 14.42 | 14.42 | 14.42 | - |
| 6 Mth Progression #2 | 14.85 | - | - | - | - |
| 6 Mth Progression #3 | 15.30 | - | - | - | - |
| Base As Of June 30, 2007 | 15.30 | 14.42 | 14.42 | 14.42 | 14.00 |
| Incremental Next Wage Progression | - | 0.43 | 0.43 | 0.43 | 0.42 |
| Revised Base | 15.30 | 14.85 | 14.85 | 14.85 | 14.42 |
| December 30, 2007 Incr. Conversion To Floor | - | 0.45 | 0.45 | 0.45 | 0.88 |
| Wages As Of December 30, 2007 | 15.30 | 15.30 | 15.30 | 15.30 | 15.30 |
| January 2008 Base With Accrued COLA | 15.30 | 15.30 | 15.30 | 15.30 | 15.30 |
| *Multiplied By Wage Formula %, Greater Of* | CPI-W / Mfg. Sector Earnings Change | | | | |
| *Equals* | Revised January Base | | | | |

| Group C Hire Date | | | | |
|---|---|---|---|---|
| 7/1/05 | 8/1/06 | 10/1/06 | 11/1/06 | 2/1/07 |

| | 7/1/05 | 8/1/06 | 10/1/06 | 11/1/06 | 2/1/07 |
|---|---|---|---|---|---|
| Initial Base | 14.00 | 14.00 | 14.00 | 14.00 | 14.00 |
| 6 Mth Progression #1 | 14.42 | 14.42 | 14.42 | 14.42 | - |
| 6 Mth Progression #2 | 14.50 | - | - | - | - |
| 6 Mth Progression #3 | 14.50 | - | - | - | - |
| Base As Of June 30, 2007 | 14.50 | 14.42 | 14.42 | 14.42 | 14.00 |
| Incremental Next Wage Progression | - | 0.08 | 0.08 | 0.08 | 0.42 |
| Revised Base | 14.50 | 14.50 | 14.50 | 14.50 | 14.42 |
| December 30, 2007 Incr. Conversion To Floor | - | - | - | - | 0.08 |
| Wages As Of December 30, 2007 | 14.50 | 14.50 | 14.50 | 14.50 | 14.50 |
| January 2008 Base With Accrued COLA | 14.50 | 14.50 | 14.50 | 14.50 | 14.50 |
| *Multiplied By Wage Formula %, Greater Of* | CPI-W / Mfg. Sector Earnings Change | | | | |
| *Equals* | Revised January Base | | | | |

Attachment A-1

# UAW Site
# Revenue & Headcount Projections

June 21, 2007

**DELPHI**

For Discussion Only – Subject to Fed. R. EVID. 408

Delphi Confidential

1



Attachment A-1

# GM Major Products Pipeline – Grand Rapids

$ Millions Revenue

| CY | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| Brown Line (Includes Injectors From Coopersville) (Booked + Contract Extensions) | 174.0 | 199.0 | 204.5 | 199.5 | 194.8 | 168.2 |
| **New Product Program Awards** | | | | | | |
| Gen V OHC (6.2) - Cylinder Deac - Standard Lash Adjuster | | | | | 0.5 | 1.9 |
| Gen V OHC (6.2) - Cylinder Deac - Deac Lash Adjuster | | | | | 1.7 | 7.2 |
| Gen V OHV (5X) - Cylinder Deac - Lifter Guide Assembly | | | | | 2.4 | 19.0 |
| 4.5 HO Diesel HLA | | | | 0.5 | 1.0 | 1.0 |
| **Sub Total New Programs** | | | | **0.5** | **5.6** | **29.1** |
| **Total Site Revenue** | **174.0** | **199.0** | **204.5** | **200.0** | **200.4** | **197.3** |
| **Not Awarded Due to Technical Capability:** Gen V Cam Phasing | | | | | 2.1 | 12.1 |

**Note:**
GM & Delphi have discussed & jointly agreed on the above specified new product program awards.  Revenue estimates for these awards shown above are based upon volume, price, & market share data consistent with Delphi's budget/business plan.

Delphi Confidential

For Discussion Only – Subject to Fed. R. EVID. 408

**DELPHI**

3

Attachment A-1

# Grand Rapids Major Program Share

| Major Program | % of Business | Remarks |
|---|---|---|
| Gen V OHV (5X) - Cylinder Deac - Lifter Guide Assembly | 50% | Engine Driven; V8 Application |
| Gen V OHC (6.2) - Cylinder Deac - Standard Lash Adjuster | 100% | Engine Driven; V8 Application |
| Gen V OHC (6.2) - Cylinder Deac - Deac Lash Adjuster | 100% | Engine Driven; V8 Application |
| 4.5 HO V8 Diesel 12mm HLA | 100% | Engine Driven; New Engine - Jan 2010 |

**DELPHI**

4

Delphi Confidential    For Discussion Only – Subject to Fed. R. EVID. 408

Attachment A-1

# Grand Rapids Product Plan



## GM-Delphi Proposal

|  | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|

**Current Business**

HFV6 Cam Phaser — 2013

12mm Lash Adjusters — 2013

Valve Lifters

Gen IV Cylinder Deactivation

Line Engine (L4; L5; L6) Cam Phasers

**New Product Program Awards**

Gen V Cylinder Deactivation (6.2 DOHC & 5X OHV) — 2015

Gen V Lash Adjusters (6.2 DOHC) — 2015

*Gen V Cam Phasing

4.5 HO V8 Diesel 12mm Lash Adjuster — 2015

*Not awarded due to technical capability



GM Confidential



Attachment A-1

# Revenue – Headcount Projection – Rochester

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| Average Headcount (Brown Line Rev) | 1,185 | 1,025 | 909 | 863 | 824 | 555 |
| Average Headcount (Green Line Rev) | 1,185 | 1,025 | 925 | 880 | 922 | TBD |

**DELPHI**

Delphi Confidential    For Discussion Only – Subject to Fed. R. EVID. 408

6

## Attachment A-1

# GM Major Products Pipeline – Rochester

$ Millions Revenue

| CY | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| Brown Line (Booked + Contract Extensions) | 583.0 | 516.0 | 454.0 | 387.0 | 343.0 | 231.0 |
| **New Product Program Awards** | | | | | | |
| Gen V OHV (5X) Application of SIDI - Rail / Injectors Only | | | | | 38.3 | 115.4 |
| Gen V MPFI - Fuel System (Rail, Injectors) | | | | | 8.7 | 20.4 |
| Gen V MPFI - Intake Manifold | | | | | 7.2 | 16.8 |
| Gen V OHV (5X) - Lifter Oil Manifold Assembly (LOMA) | | | | | 1.9 | 14.4 |
| Gen V OHC (6.2) - Lifter Oil Manifold Assembly (LOMA) | | | | | 3.0 | 13.5 |
| IAM - Gen V OHV (5X) Truck | | | | | 14.8 | 42.9 |
| IAM - Gen V OHC (6.2) Truck | | | | | 6.5 | 14.8 |
| Canister - GMT560 | | | | 0.5 | 1.2 | 1.2 |
| Canister - NG Sigma | | | 2.5 | 2.4 | 2.3 | 2.5 |
| Canister - GMX553/556 | | | | 0.3 | 2.1 | 2.0 |
| Canister - GMX511/521/551 | | | 5.1 | 6.8 | 6.1 | 5.6 |
| Canister - NG GMT355; GMT721/722/731/732/741/742 | | | 0.3 | 1.9 | 4.4 | 4.1 |
| **Sub Total New Programs** | | | 7.9 | 11.9 | 96.5 | 253.6 |
| **Total Site Revenue** | 583.0 | 516.0 | 461.9 | 398.9 | 439.5 | 484.6 |
| **LOST**: Gen V OHC (6.2) Application of SIDI - Rail / Injectors Only | | | | | 16.8 | 38.2 |

*Note:*
GM & Delphi have discussed & jointly agreed on the above specified new product program awards.  Revenue estimates for these awards shown above are based upon volume, price, & market share data consistent with Delphi's budget/business plan.

Delphi Confidential
For Discussion Only – Subject to Fed. R. EVID. 408

DELPHI

7

Attachment A-1

# Rochester Major Program Share

| Major Program | % of Business | Remarks |
|---|---|---|
| Gen V OHV (5X) Application of SIDI - Rail / Injectors Only | 100% | Gen V Trucks; V8 Engine Application |
| Gen V MPFI - Fuel System (Rail, Injectors, IAM) | 100% | Gen V Trucks; Engine Driven |
| Gen V OHV (5X) - Lifter Oil Manifold Assembly (LOMA) | 100% | Engine Driven; V8 Application |
| Gen V OHC (6.2) - Lifter Oil Manifold Assembly (LOMA) | 100% | Engine Driven; V8 Application |
| IAM - Gen V OHV (5X) Truck | 100% | Gen V Trucks; V8 Engine Application |
| IAM - Gen V OHC (6.2) Truck | 100% | Gen V Trucks; V8 Engine Application |

**DELPHI**

For Discussion Only – Subject to Fed. R. EVID. 408

Delphi Confidential

# Rochester Product Plan

Attachment A-1

## GM-Delphi Proposal



| | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|
| **Current Business** | | | | | |
| Canister - GMT345/355 | | | | | |
| - GMT360/560 | | | | | |
| - GMT610/9XX | | | | | |
| - GMX222/295 | | | | | |
| EGR Valves | | | | | |
| Fuel Rails    - HVV6 (3.5/3.9L) | | | | | 2013 |
| - L850 (2.2L) | | | | | |
| - L4 (2.8L); L5 (3.5L); L6 (4.2L) | | | | | |
| - 3800V6, 8.1V8 (3.8L/8.1L) | | | | | |
| IAFM          - GEN IV | | | | | |
| - 4.3L | | | | | |
| Intake Manifold (3.8L) | | | | | |
| Gen IV LOMA | | | | | |
| **New Product Program Awards** | | | | | |
| Gen V IAM - SIDI Truck (5X OHV & 6.2 DOHC) | | | | | 2015 |
| Gen V Rails; Injectors - SIDI 5X OHV | | | | | 2015 |
| Gen V MPFI (Intake Manifold; Rails; Injectors) | | | | | 2015 |
| Canister - NG Sigma/Zeta/GMT7XX/GMT560 | | | | | 2015 |
| Gen V LOMA (5X OHV & 6.2 DOHC) | | | | | 2015 |

Note: As of this writing, Fuel Cell products are not fully developed and associated costs and market prices are not well defined. In that regard, Delphi will commit the North American work to the Rochester Site with the understanding that the local parties will develop, as soon as feasible, a manufacturing plan that financially supports the production and assembly work being placed at the Site. If any disputes arise between the local parties concerning the plan, either party may request assistance from the National Parties.



*GM Confidential*

9



Delphi Confidential

For Discussion Only – Subject to Fed. R. EVID. 408

Attachment A-1

# GM Major Products Pipeline – Lockport

**$ Millions Revenue**

| CY | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | |
|---|---|---|---|---|---|---|---|
| Brown Line (Booked) | 753.0 | 684.0 | 525.0 | 465.0 | 457.0 | 285.0 | |
| **New Product Program Awards** | | | | | | | |
| C3XX Pick-up PTC | | | | | | 42.2 | |
| C3XX Utility PTC | | | | | 16.7 | 31.4 | |
| C3XX Pick-up HVAC | | | | | | 56.5 | |
| C3XX Utility HVAC | | | | | 22.4 | 42.0 | |
| GMX245 HVAC | | | | 1.7 | | | |
| GMX245 PTC | | | | 1.7 | | | |
| GMT560 HVAC | | 3.9 | 8.2 | 7.5 | 7.9 | 7.8 | |
| GMT560 PTC | | 1.3 | 2.8 | 2.5 | 2.7 | 2.7 | |
| GMT610 HVAC | | | 8.7 | 19.3 | 18.4 | 17.1 | |
| GMT610 PTC | | | 7.5 | 16.5 | 15.7 | 14.7 | |
| GMT913/915 - H2 NG HVAC | | | 0.9 | 1.7 | 1.8 | 0.7 | |
| GMT913/915 - H2 NG PTC | | | 0.8 | 1.4 | 1.6 | 0.6 | |
| GMX711/721/731 Corvette NG HVAC | | | | | 3.4 | 3.8 | |
| GMX711/721/731 Corvette NG PTC | | | | | 3.3 | 3.6 | |
| GMX716 NG XLR HVAC | | | | 0.1 | 0.2 | 0.6 | |
| GMX716 NG XLR PTC | | | | 0.1 | 0.2 | 0.6 | |
| GMX553/Lucerne PTC | | | | 5.1 | 10.0 | 8.9 | |
| GMX556/ DTS PTC | | | | 2.3 | 7.9 | 7.1 | |
| GMX553/Lucerne HVAC | | | | 4.6 | 8.9 | 7.8 | |
| GMX556/ DTS HVAC | | | | 2.3 | 7.9 | 7.2 | |
| GMT9XX Diesel & Gas RAD/CAC | | 0.0 | 0.0 | 0.0 | 29.4 | 29.4 | |
| **Sub Total New Programs** | | 5.2 | 28.9 | 66.9 | 158.4 | 284.7 | |
| **Total Site Revenue** | 753.0 | 689.2 | 553.9 | 531.9 | 615.4 | 569.7 | |

**Contract Extensions**

*Note:*
GM & Delphi have discussed & jointly agreed on the above specified new product program awards. Revenue estimates for these awards shown above are based upon volume, price, & market share data consistent with Delphi's budget/business plan.

DELPHI

Attachment A-1

# Lockport Major Program Share

| Major Program | % of Business | Remarks |
|---|---|---|
| C3XX Pick-up PTC | 100% | 71% Lockport; 29% Mexico - Same As Today (Mexico Supports Silao Assembly Plant) |
| C3XX Utility PTC | 100% | 71% Lockport; 29% Mexico - Same As Today (Mexico Supports Silao & Arlington Assembly Plants) |
| C3XX Pick-up HVAC | 80% | 82% Lockport; 18% Mexico - Same As Today (Mexico Supports Silao Assembly Plant) |
| C3XX Utility HVAC Front | 100% | 78% Lockport; 22% Mexico - Same As Today (Mexico Supports Silao Assembly Plant) |
| C3XX Utility HVAC Rear | 100% | 100% Lockport - Same As Today |

**DELPHI**

12



# Lockport Product Plan

Attachment A-1

## GM-Delphi Proposal

| Current Business | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|

**HVAC/PTC**
- GMX245
- GMT360/370
- GMT560/610 — 2015+
- H2
- GMT900
- GMX211
- GMX215

**PT Cooling**
- Delta/Epsilon
- GMX222/272
- Epsilon 2

## New Product Program Awards

| | |
|---|---|
| C3XX HVAC/PTC | 2015/2016 |
| GMT913/915 H2 HVAC/PTC | 2015 |
| GMX553/556 HVAC/PTC | 2015 |
| GMX711/721/731 HVAC/PTC | 2016 |
| GMX716 XLR HVAC/PTC | 2016 |
| GMT9XX Diesel & Gas RAD/CAC | 2016 |

13





*GM Confidential*



Attachment A-1

# Revenue – Headcount Projection – Kokomo

| CY | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| Average Headcount (Brown Line Rev) | 1,477 | 1,183 | 1,224 | 983 | 847 | 709 |
| Average Headcount (Green Line Rev) | 1,477 | 1,183 | 1,224 | 1,050 | 1,018 | TBD |

Brown Line = Booked + Contract Extensions

Dashed Green Line = Total Site Revenue With Identified Projects

**DELPHI**

Delphi Confidential

For Discussion Only – Subject to Fed. R. EVID. 408

14

Attachment A-1

# GM Major Products Pipeline – Kokomo

$ Millions Revenue

| CY | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| Brown Line (Booked + Contract Extensions) | 666.0 | 558.2 | 543.7 | 421.9 | 381.3 | 309.9 |
| **New Product Program Awards** | | | | | | |
| Gen V V8 SIDI Eng Controller (E92) | | | | | 3.0 | 15.0 |
| TEHCM Controllers - T90 | | | | 3.3 | 14.9 | 31.7 |
| TEHCM Controllers - T76 | | | | 28.1 | 49.2 | 47.7 |
| GM BAS+ APM/BPIM Electronics [With Premium] | | | | 17.1 | 46.5 | 62.2 |
| GM BAS+ APM/BPIM System Assembly | | | | 3.8 | 10.4 | 13.8 |
| *Crash Sensing SDM | | | 0.0 | 3.3 | 15.0 | 42.8 |
| **Sub Total New Programs** | 0.0 | 0.0 | 0.0 | 55.6 | 139.0 | 213.3 |
| **Total Site Revenue** | **666.0** | **558.2** | **543.7** | **477.5** | **520.3** | **523.2** |

* Includes:  C3XX (Utility & Pick-up); GMT721/722/731/732/741/742; GMX711/721/731; GMT915; GMT745; GMX716

**Note:**
GM & Delphi have discussed & jointly agreed on the above specified new product program awards.  Revenue estimates for these awards shown above are based upon volume, price, & market share data consistent with Delphi's budget/business plan.

For Discussion Only – Subject to Fed. R. EVID. 408

**DELPHI**

15

Delphi Confidential

For Discussion Only – Subject to Fed. R. EVID. 408



16

Attachment A-1

# Kokomo Major Program Share

| | | |
|---|---|---|
| Gen V V8 SIDI Eng Controller (E92) | 100% | Engine Driven; V8 Application |
| TEHCM Controllers - T76 | 40% | 6 Speed Transmission Driven; Controller Only; Various Engines |
| TEHCM Controllers - T90 | 100% | 6 Speed Transmission Driven; Controller Only; Various Engines |
| C3XX Pick-up/Utility Crash Sensing SDM | 100% | Crash Sensing SDM Portion Only |

Attachment A-1

# Kokomo Product Plan



## GM-Delphi Proposal

| Current Business | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|
| Gas Control Modules | | | | | |
| ECM/BCM (From Milwaukee) | Q3 '08 | | | | |
| Transmission Control Module | | | | | |
| Crash Sensors | | | | | |
| Pressure Sensors | | | | | |

### New Product Program Awards

| | |
|---|---|
| TEHCM - RWD (T90) | 2015 |
| TEHCM - FWD (T76) | 2015 |
| SIDI (E92 Controller) - Gen V V8 Engine | 2016 |
| Crash Sensing SDM | 2015/2016 |
| BAS+ APM/BPIM Electronics | 2016 |
| BAS+ APM/BPIM System Assembly | 2016 |



17



*GM Confidential*



Attachment A-1

Revenue – Headcount Projection – Sandusky

| CY | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| Average Headcount (Brown Line Rev) | 829 | 608 | 264 | 180 | 143 | 105 |
| Average Headcount (Green Line Rev) | 829 | 608 | 538 | 485 | 453 | TBD |

Dashed Green Line = Total Site Revenue With Identified Projects

Brown Line = Booked + Contract Extensions

DELPHI

Delphi Confidential          For Discussion Only – Subject to Fed. R. EVID. 408          18

Attachment A-1

# GM Major Products Pipeline – Sandusky

$ Millions Revenue

| CY | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| Brown Line (Booked + Contract Extensions) | 282.8 | 271.2 | 117.7 | 80.5 | 64.0 | 67.5 |

**New Product Program Awards**

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| Global Epsilon (NA Front & Rear) Wheel Bearings | | | 40.1 | 49.7 | 49.5 | 47.7 |
| Delta Family II (Front & Rear) Wheel Bearings | | | 43.8 | 45.4 | 56.7 | 52.7 |
| Zeta (GMX511/521/551) Front & Rear Wheel Bearings | | | 33.8 | 42.3 | 42.6 | 40.7 |
| Theta Epsilon (GMT166/168) Front & Rear Wheel Bearings | | | 3.0 | 4.6 | 4.5 | 4.1 |
| Theta (GMT172/177) Front Wheel Bearings | | | 3.5 | 4.3 | 4.3 | 4.3 |
| **Sub Total New Programs** | **0.0** | **0.0** | **124.2** | **146.3** | **157.6** | **149.5** |
| **Total Site Revenue** | **282.8** | **271.2** | **241.9** | **226.8** | **221.6** | **217.0** |

**DELPHI**

19

*Note:*
GM & Delphi have discussed & jointly agreed on the above specified new product program awards. Revenue estimates for these awards shown above are based upon volume, price, & market share data consistent with Delphi's budget/business plan.

Delphi Confidential          For Discussion Only – Subject to Fed. R. EVID. 408



GM Confidential




Attachment A-1

# Revenue – Headcount Projection – Adrian

Delphi Confidential                    For Discussion Only – Subject to Fed. R. EVID. 408

Attachment A-1

# GM Major Products Pipeline – Adrian

$ Millions Revenue

| CY | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| Brown Line (Booked + Contract Extensions) | 145.9 | 127.6 | 124.1 | 120.6 | 105.8 | 40.1 |

**New Product Program Award**

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| C3XX - Instrument Panel | | | | | 15.3 | 75.0 |

| **Total Site Revenue** | **145.9** | **127.6** | **124.1** | **120.6** | **121.1** | **115.1** |

*Note:*
GM & Delphi have discussed & jointly agreed on the above specified new product program awards.  Revenue estimates for these awards shown above are based upon volume, price, & market share data consistent with Delphi's budget/business plan.

Delphi Confidential

For Discussion Only – Subject to Fed. R. EVID. 408

**DELPHI**

22



# Adrian Product Plan

Attachment A-1

## GM-Delphi Proposal

| Current Business | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|
| GMT900 Pick-up/Utility Instrument Panel | | | | | |
| Non-GM Instrument Panel | | | | | |
| GMT610 Upper Instrument Panel | | | | | 2015 |

| New Product Program Awards | | | | | |
|---|---|---|---|---|---|
| C3XX Pick-up/Utility Instrument Panel | | 2015/2016 | | | |

*GM Confidential*



23



# Attachment A-1 Saginaw Steering Product Plan (1/2)

| Program Name | R&P Gear | Integral Gears | Pumps | CEPS | Columns | Half-shafts |
|---|---|---|---|---|---|---|
| GMT345 | | | | | Tilt | |
| GMT355 | | | CB | | Tilt | 32 DO |
| GMT360 | Base | | CB | | Tilt | 32 TP |
| GMT530 | | X | | | X | |
| GMT560 | | | | | X | |
| GMT610 | Base | 680 | P | | | |
| GMT610 | | | | | Tilt | |
| GMT900 | Base | 680 | P | | Tilt | 37 / 60 TP |
| H2 | | 680 | P | | Tilt | 60 TP |
| Epsilon | Manual | | | X | | 27 / 32TP |
| Epsilon | Base | | CB | | R&T | 27 / 32TP |
| GMT201 | Base | | CB | | | 32 TG |
| GMT265 | | | | | X | |
| GMT319 | | | CB | | | |
| GMX001 | | | | | | 27TP |
| GMX211 | Base | | CB | | Tilt | 27 / 32 TP |
| GMX215 | Magnasteer | | | | Tilt: Pwr | |
| GMX222 | Base / Mag-E | | CB | | Tilt: Base/Pwr | 27 TP/32 UTJ |
| GMX231 | Base | | CB | | Tilt | 27 / 32 TP |
| GMX245 | Magnasteer | | F | | Tilt | |
| GMX272 | Mag-E | | CB | | Tilt: Pwr | 32 UTJ |
| GMX295 | | | | | Tilt: Pwr | |
| GMX320 | | | | | X | X |
| GMX365 | Base / Mag | | CB | | Tilt | 27 / 32 TP |
| GMX367 | Magnasteer | | CB | | Tilt | 27 / 32 TP |
| S-Car | Manual | | | | | |
| S-Car | | | | | X | |



# Attachment A-1   Saginaw Steering Product Plan (2/2)

| Program Name | R&P Gear | Integral Gears | Pumps | CEPS | Columns | Half-shafts | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

## Future Production Booked Business

**GMNA Cars**

| Program Name | R&P Gear | Integral Gears | Pumps | CEPS | Columns | Half-shafts | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NA Delta II | | | | | | X | | | | | 2014 | |
| NA Epsilon II | X | | | | | X | | | | | 2015 | |
| Zeta: GMX511/521/551 | | | | | X | X | | | | | 2014 | |
| GMX553/556 | | | | | X | X | | | | | 2015 | |

## New Product Program Awards

| Program Name | R&P Gear | Integral Gears | Pumps | CEPS | Columns | Half-shafts | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| C3xx | X | X | X | | X (Hydraulic and EPS) | Frt X , RR X | | | | | 2015/2016 | |
| GMT915 | | X | X | | X | X | | | | | 2014 | |
| Next Gen GMT355 | | | | | X | | | | Program Not Defined | | | |
| Family A Steering Pump | | | X | | | | | | | | | |






GM Confidential

Attachment A-1

# Saginaw Manufacturing Newco Product Plan

| New Product Program Awards | Rotors | Knuckles | Corners | Extender | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|
| NA Global Epsilon | Frt-Rear | | Frt-Rear | | | | | 2015 |
| NA Global Delta GMX001 | Frt-Rear | Frt | Frt | | | | | 2015 |
| NA Global Delta GMT001 | Frt | Frt | Frt | | | | | 2015 |
| Zeta | Frt-Rear | Frt-Rear | Frt-Rear | | | | | 2015 |
| Theta | Frt | | | | | | | 2015 |
| GMT900 Sys 5&6 HD, H2 | Frt | Frt | Frt | Sys 6 | | | | 2015 |
| TE 5+2 | | Frt-Rear | | | | | 2015 | |
| GMT721/722 | | Frt | | | | 2015 | | |
| TE GMT166/168 | Frt-Rear | Frt-Rear | | | | | | 2015 |

 
GM Confidential

26

Attachment A-1

# Flint-East Product Plan



**Current Product**

| | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|

Cluster's

GM OE MRA's

GM Service MRA's

Delphi Aftermarket MRA's

**New Work Awards**

Unitizing — 2015

Trucking — Q3 '07 — 2015

C3XX Clusters — 2015



27



*GM Confidential*

# Needmore Rd. Product Plan

Attachment A-1

| | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** |
|---|---|---|---|---|---|---|

**Current Product**

Brake Components

**New Work Awards**

Trucking — 2015

Warehousing — 2015

IPC / CKD — 2015

GM Confidential

28



# Major Products Pipeline – Cottondale

$ Millions Revenue

| CY | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| **Brown Line** (Booked + Contract Extensions) | 324.7 | 317.5 | 317.3 | 317.3 | 101.5 | 0.0 |

**New Product Program Opportunities (Non-GM)**

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| W166 Cockpit | | | | | 184.3 | 189.3 |
| X166 Cockpit | | | | | | 88.0 |
| W251 NG Cockpit | | | | | 31.5 | 63.0 |
| **Sub Total New Programs** | | | | | 215.8 | 340.3 |
| **Total Site Revenue** | 324.7 | 317.5 | 317.3 | 317.3 | 317.3 | 340.3 |

**DELPHI**

For Discussion Only – Subject to Fed. R. EVID. 408

Delphi Confidential

30

# Cottondale Product Plan

## Delphi Proposal



| | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|
| **Mercedes M Class Cockpit** | | | | Q2-2011 | |
| **Mercedes R Class Cockpit** | | | | Q2-2011 | |
| **Mercedes GL Class Cockpit** | | | | Q2-2011 | |

**DELPHI**

Delphi Confidential

For Discussion Only – Subject to Fed. R. EVID. 408

ATTACHMENT B

**<u>Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and</u>**
**<u>GM Consensual Triggering of Benefit Guarantee</u>**

1) This Term Sheet sets forth the agreement of General Motors Corporation ("GM"), Delphi Corporation, or any successor to Delphi as a result of the acquisition of substantially all the stock or assets of Delphi Corporation or a merger of Delphi Corporation, or any plan sponsor of the Delphi Hourly-Rate Employees Pension Plan ("Delphi"), and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its applicable Local Unions ("UAW") regarding the freeze of the 2003 Delphi Hourly-Rate Employees Pension Plan ("Delphi HRP"), Delphi's cessation of post-retirement health care benefits and employer-paid post-retirement life insurance benefits (hereinafter referred to as "OPEB"), and the terms of a consensual triggering and application of the Benefit Guarantee agreement between GM and the UAW, dated September 30, 1999 ("Benefit Guarantee").   For purposes of this Term Sheet, the term "Covered Employee" will have the same meaning as in the Benefit Guarantee and the term Trigger Date means January 1, 2007.  Except as otherwise expressly stated herein, the terms of the respective Delphi and GM employee benefit plans and programs will govern. This Term Sheet does not, and is not intended to, constitute an employee benefit plan under the meaning of ERISA.

2) The parties acknowledge that this Term Sheet will become effective (the "Effective Date") when all of the following events have occurred and as of the date when the last of such events shall have occurred:  (a) the entry of an approval order by the Bankruptcy Court in Delphi's chapter 11 cases approving UAW-Delphi-GM Memorandum of Understanding-Delphi Restructuring which incorporates (among other subject matters) this Term Sheet and approves modifications to the existing collective bargaining agreements between Delphi and the UAW resolving any Section 1113 and 1114 motions pending in the Bankruptcy Court as between Delphi and the UAW; (b) successful ratification by the UAW membership of such of the agreements referred to in the preceding clause as are determined by the UAW to require such ratification; (c) execution by Delphi and GM of a comprehensive settlement agreement resolving the financial, commercial, and other matters between them; and (d) the substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases (the "Plan") and confirmed by the Bankruptcy Court which incorporates, approves and is consistent with all of the terms of this Term Sheet and the comprehensive settlement agreement between Delphi and GM.

**<u>Pensions</u>**

3) Pursuant to the Plan and this Term Sheet, Delphi will as of the first of the month next following the Effective Date or as soon as practicable thereafter in accordance with applicable law (the "Freeze Date"), amend the Delphi HRP so as to freeze benefit accruals for future credited service in the Delphi HRP, except as set forth in

paragraph 4.b. of this Term Sheet. This freeze does not apply to the Individual Retirement Plan provisions of the Delphi HRP.

4)  With regard to such amendment and freeze of the Delphi HRP, Delphi will cause the frozen Delphi HRP to pay benefits in accordance with the terms of the Delphi HRP and applicable law.  In this regard, the parties agree as follows:

    a)  Covered Employees, who are retired as of the Freeze Date, will continue to be eligible for and receive from the Delphi HRP all benefits, including but not limited to any applicable supplements and benefit redetermination provided for in the Delphi HRP as of the date immediately preceding the Effective Date.

    b)  Delphi employees (without regard to whether they are also "Covered Employees") who are participants in the UAW-GM-Delphi Special Attrition Program, the Supplement to UAW Special Attrition Program, or the Special Attrition Program-Transformation provided for in Attachment C of the UAW-Delphi-GM Memorandum of Understanding-Delphi Restructuring (collectively the "SAP"), and who are not retired or separated from service under the SAP as of the Freeze Date, will receive credited service in the Delphi HRP for all purposes, including but not limited to eligibility, vesting and future benefit accruals, as if there were no freeze, until the earlier of their retirement or separation from service under the terms of the SAP.  For the avoidance of doubt, the Delphi HRP is solely responsible for all credited service for accrual, vesting and eligibility purposes for all Delphi participants in the SAP, including but not limited to participants in the pre-retirement program option.  Further, all Delphi SAP participants will be eligible for and will receive full Delphi HRP benefits upon their retirement under the terms of the SAP, including but not limited to any applicable supplements and benefit redetermination provided for in the Delphi HRP as of the date immediately preceding the Effective Date. Delphi SAP participants are not eligible to participate in the Individual Retirement Plan provisions of the Delphi HRP and are not eligible to receive Delphi matching contributions under the Delphi Personal Savings Plan.

    c)  Covered Employees (other than those referred to in paragraph 4.b. of this Term Sheet) who are eligible to retire as of the Freeze Date will, upon their retirement, receive from the frozen Delphi HRP all benefits provided for in the Delphi HRP under the terms in effect as of the date immediately preceding the Effective Date, including but not limited to any applicable supplements and benefit redetermination provided for in the Delphi HRP.

    d)  Covered Employees (other than those referred to in paragraph 4.b. of this Term Sheet) who become eligible to retire after the Freeze Date, when taking into account Delphi credited service, their age at retirement, any GM credited service provided for under paragraph 8. of this Term Sheet, and any other applicable credited service (including credited service as recognized by the Delphi HRP in accordance with paragraph 5 of this Term Sheet), will upon their retirement

2

receive from the Delphi HRP all benefits provided for in the Delphi HRP, including but not limited to any applicable supplements and benefit redetermination provided for in the Delphi HRP under the terms in effect as of the date immediately preceding the Effective Date.

e) For the avoidance of doubt, Covered Employees referred to in paragraphs 4.c. and 4.d. of this Term Sheet, will, upon retirement, receive from the Delphi HRP in addition to any other applicable Delphi HRP benefits the:

    i. full amount of the 30 & out benefit (except as specified in paragraph 9. of this Term Sheet for Covered Employees who flowed back or flowback to GM) through age 62 and one month, or the 80% date for those born on or before September 14, 1945, including, but not limited to, the full Early Retirement Supplement, in effect as of the date immediately preceding the Effective Date;

    ii. portion of the Interim Supplement (which is applicable in both 85 point and 60 & 10 retirements) in effect under the Delphi HRP based on the credited service accrued as of the date immediately preceding the Freeze Date and age at the time of retirement; and

    iii. portion of the Temporary Benefit (T&PD and mutual retirements) in effect under the Delphi HRP based on the credited service accrued as of the date immediately preceding the Freeze Date, not to exceed 30 years.

f) For the avoidance of doubt, no Delphi HRP participants, including the Covered Employees referred to in paragraphs 4.a. through 4.d. of this Term Sheet, will receive lump sum payments or any increase in benefits above the level of those provided for in the Delphi HRP as of January 1, 2007, except as may be mutually agreed by the UAW and Delphi after the term of the extended 2003 UAW-Delphi National Agreement, i.e. after September 14, 2011. Additionally, no new participants will be allowed to join the frozen Delphi HRP.

g) Until the Freeze Date, Covered Employees who buydown, pursuant to the UAW-Delphi-GM Memorandum of Understanding-Delphi Restructuring, to the UAW-Delphi Supplemental Agreement dated April 29, 2004, as amended, will continue to receive credited service in the Delphi HRP for all purposes, including but not limited to, eligibility, vesting, and future benefit accruals under the same terms and conditions in the Delphi HRP as prior to the buydown. During this period, such Covered Employees will not be eligible for the Individual Retirement Plan provisions of the Delphi HRP or matching contributions under the Delphi Personal Savings Plan.

h) Covered Employees who continue to be employed by Delphi after the period of time they are eligible to accrue credited service in the GM HRP under paragraph 8.a. of this Term Sheet will become eligible to participate in the Individual

3

Retirement Plan provisions of the Delphi HRP and be eligible to receive matching contributions under the Delphi Personal Savings Plan following the expiration of such period.

5) After the Freeze Date, all Delphi HRP participants (other than those referred to in paragraph 4.b. of this Term Sheet), including, but not limited to, Covered Employees who are employed at a Delphi operation divested after October 8, 2005, who had not retired or separated from service as of the Freeze Date will, subject to the other terms of the Delphi HRP in effect as of the date immediately preceding the Effective Date, be treated in the Delphi HRP as active participants for all purposes, other than future benefit accruals based on additional credited service, for all periods of time on or after the Freeze Date and prior to retirement or separation from service from Delphi, GM, or any Delphi operation divested after October 8, 2005; provided, however, that for any Delphi operation divested after October 8, 2005 and prior to the Effective Date such active participant treatment is subject to paragraph 6 of this Term Sheet. Treatment of employees who flowback under the UAW-GM-Delphi Flowback Agreement is addressed in paragraph 9 of this Term Sheet. Moreover, Delphi HRP participants who are separated from Delphi as part of a divestiture of a Delphi operation will not be eligible to participate in the Individual Retirement Plan provisions of the Delphi HRP following such separation.

6) The Delphi HRP's ability to treat separated employees who are employed at a Delphi operation divested after October 8, 2005 and prior to the Effective Date, as active participants for all purposes other than future benefit accruals based on additional credited service in accordance with paragraph 5 of this Term Sheet is contingent upon Delphi obtaining all required governmental approvals (which Delphi is seeking). If Delphi does not obtain such governmental approvals, Delphi will provide an alternative to enable such participants to continue to accrue credited service for purposes of vesting and eligibility to retire the same as other similar active Delphi HRP participants. Such alternatives include, but are not limited to, temporarily leasing the employees to a successor employer or amending the frozen Delphi HRP on a retroactive basis (i.e., after the Effective Date) to recognize credited service with a successor employer for purposes of vesting and eligibility (but not benefit accrual).

7) In furtherance of the Plan, the parties agree that Delphi's action to freeze the Delphi HRP as set forth in paragraph 3. of this Term Sheet will trigger sections b. and e. of the Benefit Guarantee for Covered Employees as of the Freeze Date.

8) In accordance with GM's obligations under section b. of the Benefit Guarantee, GM and the UAW agree that as of the Freeze Date the General Motors Hourly-Rate Employee Pension Plan ("GM HRP") will be amended to provide the following:

a) Covered Employees, who are Delphi employees as of the Freeze Date or Covered Employees who are employed at a Delphi operation divested after October 8, 2005 and prior to the Freeze Date (other than those referred to in paragraph 4.b. of

4

this Term Sheet), will be eligible to accrue credited service under the GM HRP for all purposes, including but not limited to eligibility, vesting, and future benefit accruals for the seven (7) year period commencing on the Freeze Date. Any such benefits provided by the GM HRP shall be at the level and scope in effect at Delphi on the day immediately preceding the Effective Date and shall be secondary to benefits provided by Delphi, the Delphi HRP, any of their subsidiaries, affiliates or successors or associated pension plans, and/or the PBGC. In no event shall the GM HRP provide pension benefits on such credited service at a level and scope that exceeds that being provided to hourly retirees of GM. The amount of such credited service accrued will equal:

   i. the amount of credited service that, but solely for the Freeze, would have been earned after the Freeze Date under Article III of the Delphi HRP in effect as of the date immediately preceding the Effective Date; and

   ii. to the extent not taken into account in paragraph 8.a.(i) of this Term Sheet, the amount of credited service that, but solely for the Freeze and divestiture, would have been earned while working after the Freeze Date at any Delphi operation divested after October 8, 2005.

Nothing in this Term Sheet shall be deemed to require GM to grant credited service beyond that described in this section 8.a. Employees shall be provided only the amount of credited service earned as described in this section 8.a, and shall not receive credited service otherwise.

b) In regard to the credited service accrued in the GM HRP under paragraph 8.a. of this Term Sheet, the GM HRP will recognize Delphi HRP credited service accrued prior to the Freeze Date for purposes of vesting and eligibility to retire for any Covered Employee. No other Delphi HRP credited service will be recognized by the GM HRP.

c) The GM HRP benefit payable to a Covered Employee, who retires as a normal retirement under Article II, section 1. of the Delphi HRP and GM HRP , will be a Basic Benefit based on GM HRP  credited service accrued under paragraph 8.a. of this Term Sheet and the rates in effect under the Delphi HRP as of the Effective Date.

d) The GM HRP benefit payable to a Covered Employee, who retires under Article II, section 2(a)(3) of the Delphi HRP and GM HRP  with 30 or more years of credited service prior to age 62 and one month, will be a Basic Benefit payable beginning at age 62 and one month based on the number of years of credited service accrued under the GM HRP  under paragraph 8.a. of this Term Sheet and the rates in effect under the Delphi HRP as of the Effective Date.

e) The GM HRP benefit payable to a Covered Employee, who retires under the Delphi HRP and GM HRP  prior to age 65 with 85 Points or age at least 60 with

10 or more years of credited service, under Article II, section 2(a)(1) or 2(a)(2) of the Delphi HRP and GM HRP or as a Total and Permanent Disability retirement under Article II, section 3 of the Delphi HRP approved both by Delphi pursuant to the procedures applicable to the Delphi HRP as of the date immediately preceding the Effective Date and approved by GM under the procedures applicable to the GM HRP, or as a retirement under mutually satisfactory conditions pursuant to Article II, section 2(b) of the Delphi HRP for the plants identified in section B.4 (excluding Athens) of the UAW-Delphi-GM Memorandum of Understanding-Delphi Restructuring, will consist of the following:

    i.   the Basic Benefit based on the number of years of credited service accrued under the GM HRP under paragraph 8.a. of this Term Sheet, age at time of retirement, and the rates in effect under the Delphi HRP as of the Effective Date. Such benefits from the GM HRP are payable beginning upon the date of retirement and will be redetermined, if applicable at age 62 and one month, under the terms of the Delphi HRP in effect as of the date immediately preceding the Effective Date; and

    ii.   if applicable, an interim supplement based on the rates in effect under the Delphi HRP as of the date immediately preceding the Effective Date for the number of years of credited service accrued under the GM HRP under paragraph 8.a. of this Term Sheet and age at time of retirement. The duration of such interim supplement is modified as set forth in the letter in the Delphi HRP entitled Social Security.

    iii.   if applicable, a temporary benefit based on the rates in effect under the Delphi HRP as of the date immediately preceding the Effective Date for the number of years of credited service accrued under the GM HRP under paragraph 8.a. of this Term Sheet. Provided, however, that such number of years of credited service when added to the number of years of credited service in the Delphi HRP will not exceed 30. The duration of such temporary benefit is modified as set forth in the letter in the Delphi HRP entitled Social Security.

f)   Any Covered Employee who, after considering: i) the credited service accrued in the GM HRP under paragraph 8.a. of this Term Sheet; ii) the Delphi HRP credited service recognized in the GM HRP for eligibility to retire under paragraph 8.b. of this Term Sheet; and iii) age at retirement or separation from service from Delphi, or any Delphi operation divested after October 8, 2005, is not eligible for retirement under the GM HRP as described in paragraph 8.c., 8.d., or 8.e. of this Term Sheet, will receive only a deferred vested benefit from the GM HRP based on the years of credited service accrued under the GM HRP under paragraph 8.a. of this Term Sheet. The Basic Benefit will be based on the number of years of credited service accrued under the GM HRP under paragraph 8.a. of this Term Sheet, age at time of benefit commencement, and the rates in effect under the Delphi HRP as of the date immediately preceding the Effective Date.

Additionally, if Delphi does not obtain all required government approvals referenced in paragraph 5 of this Term Sheet and does not otherwise treat a participant as an active participant as described in paragraph 5 of this Term Sheet, such participant will receive only a deferred vested benefit from the GM HRP based on the years of credited service accrued under the GM HRP under paragraph 8.a. of this Term Sheet. The Basic Benefit will be based on the number of years of credited service accrued under the GM HRP under paragraph 8.a. of this Term Sheet, age at time of benefit commencement, and the rates in effect under the Delphi HRP as of the date immediately preceding Effective Date. Neither GM, or the GM HRP, will have any obligation to supplement the deferred vested amounts set forth above.

g) Provided that Delphi complies with its obligations set forth in sections 3, 4, and 5 of this Term Sheet, GM's adherence to the provisions of sections 8.a through 8.f of this Term Sheet shall constitute full compliance with its obligations under section b. of the Benefit Guarantee.

h) For the avoidance of doubt, for the purposes of paragraph 8 of this Term Sheet for Covered Employees who have not retired or separated from service from Delphi, GM, or any Delphi operation divested after October 8, 2005, the GM HRP will continue to recognize the growth in age of such Covered Employees during the period they are considered an active participant in the Delphi HRP pursuant to paragraph 5 of this Term Sheet. For purposes of such recognition of growth in age in the GM HRP, such Covered Employees will not be considered by the GM HRP to have separated from service from GM on a "time for time" basis during the period they are considered an active participant in the Delphi HRP pursuant to paragraph 5 of this Term Sheet.

9) The parties agree that the pension benefits payable to employees who flowed back or flowback to GM pursuant to the UAW-GM-Delphi Flowback Agreement as amended (the "Flow Back Employees"), will be as provided for in the UAW-GM-Delphi Memorandum of Understanding Benefit Plan Treatment dated September 30, 1999, as amended ("Benefit MOU"). Such treatment includes, but is not limited to, the combining of credited service for pension vesting, eligibility to retire, and benefit accrual (including without limitation pro rating the 30 & out supplement payable between the Delphi HRP and the GM HRP). Additionally, the parties recognize that the Benefit MOU is not inconsistent with paragraph 4.f. of this Term Sheet, and that in the absence of mutual agreement otherwise between the UAW and Delphi after the term of the extended 2003 UAW-Delphi National Agreement, i.e., after September 14, 2011, Delphi will have no obligation after December 2006 to pay lump sum payments or any portion thereof and GM's responsibility regarding lump sum payments will be the pro rata amount as set forth in the September 18, 2003 amendment to the UAW-GM-Delphi Memorandum of Understanding Benefit Plan Treatment dated September 30, 1999. Unless GM and the UAW otherwise agree in future bargaining, the benefit rate applicable to any service accrued in the GM HRP under paragraph 8.a. of this Term Sheet will be the rate in effect in the

Delphi HRP on the Effective Date. The benefit rate applicable to service accrued in the Delphi HRP will be the rate in effect under the Delphi HRP on the date immediately preceding the Effective Date. Non-Covered Employees who flowback to GM following any employment under the terms and conditions of the UAW-Delphi Supplemental Agreement dated April 29, 2004, as amended will remain eligible for any benefits earned under the Individual Retirement Plan provisions of the Delphi HRP prior to the flowback that become vested but will be ineligible for any RMA (defined in paragraph 18) or other OPEB from Delphi.

10) In regard to the triggering of section e. of the Benefit Guarantee as of the Freeze Date, no benefits will be paid pursuant to section e. of the Benefit Guarantee unless Delphi or the Delphi HRP fail to pay pension benefits to Covered Employees as set forth in this Term Sheet. Any benefits provided pursuant to section e. of the Benefit Guarantee will when combined with any pension benefits received (x) from a pension plan sponsored by Delphi, any of its subsidiaries or affiliates or any of their successor company(ies), (y) from the PBGC, and/or (z) from a pension plan sponsored by GM, result in the retired Covered Employees receiving pension benefits equal to those called for in the UAW-Delphi agreement applicable as of the date immediately preceding the Freeze Date.

11) In the event that anytime after the Freeze Date, the Delphi HRP is terminated or Delphi further amends the Delphi HRP in a manner that diminishes the benefits from the Delphi HRP to a level below those required by this Term Sheet, sections b. and e. of the Benefit Guarantee will continue in full force and effect with respect to such subsequent termination and/or amendment, regardless of whether such subsequent termination and/or amendment occurs before or after the eighth anniversary of the effective date of the 1999-2003 GM-UAW National Agreement.

12) For purposes of determining Base Hourly Rate in the Delphi HRP and the GM HRP for all Covered Employees who are SAP participants, the highest straight time hourly rate plus any cost-of-living allowance in effect during the last 13 consecutive pay periods the Covered Employee actually worked will be utilized. For all other Covered Employees, Base Hourly Rate for purposes of then Delphi HRP and GM HRP will be the higher of Base Hourly Rate calculated (a) on the day preceding the date they transition to employment under the terms and conditions of the UAW-Delphi Supplemental Agreement dated April 29, 2004, as may be amended, or (b) on the date of retirement. The Delphi HRP and GM HRP benefit class code applied to a Covered Employee who becomes covered by the terms of the UAW-Delphi Supplemental Agreement dated April 29, 2004, as amended will be no lower than the benefit class code in effect for such employee on the date immediately preceding their becoming covered by such agreement.

13) The parties agree that, except as otherwise mutually agreed by the UAW and Delphi after the term of the extended 2003 UAW-Delphi National Agreement, i.e. after September 14, 2011, Delphi will not amend the frozen Delphi HRP or successor plan to allow for lump sum distributions, to provide a more lucrative benefit

formula, or to provide for an expansion of credited service provisions or benefits. Additionally, at no time shall Delphi take such actions at levels exceeding those provided for in the GM HRP as the GM HRP may be amended from time to time, unless all GM and GM HRP obligations under sections b. and e. of the Benefit Guarantee are extinguished. Except as otherwise mutually agreed by the UAW and Delphi after the term of the extended 2003 UAW-Delphi National Agreement, i.e., after September 14, 2011, the Delphi HRP will not be required to recognize any extra grants of age or credited service, or other acceleration of retirement eligibility not provided for under the terms of the GM HRP as of the date immediately preceding the Effective Date, given to past or future Delphi flowbacks (including Covered Employees) by GM and/or the GM HRP or successor plan,.

**OPEB**

14) Pursuant to the Plan and this Term Sheet, as of the Effective Date or as soon as practicable thereafter in accordance with applicable law and administrative requirements (the "Cessation Date"), Delphi will cease to provide, offer, or have any liability for OPEB to its UAW represented hourly employees and retirees and their spouses, surviving spouses, dependents or other beneficiaries. The cessation will be administered on a "claims incurred" basis, and Delphi will therefore retain responsibility for all claims incurred but either unfiled or unpaid as of the Cessation Date. This cessation will include elimination of the Special Benefit relating to Medicare Part B. This cessation does not include the cessation of OPEB provided to Delphi employees or retirees subject to the terms of the UAW-Delphi Supplemental Agreement dated April 29, 2004, as amended, except as provided in paragraph 18 of this Term Sheet.

15) In furtherance of the Plan and this Term Sheet, the parties agree that Delphi's action to cease providing or offering OPEB on the basis referred to in paragraph 14 of this Term Sheet will trigger sections c. and d. of the Benefit Guarantee as of the Cessation Date as set forth herein. The parties further agree that the scope or manner in which GM satisfies its obligations under sections c. and d. of the Benefit Guarantee and this Term Sheet will not result in OPEB liability to Delphi. The parties further agree that GM will not satisfy its obligations under the Benefit Guarantee and this Term Sheet by reimbursing employees for COBRA continuation premiums.

16) The parties agree to fully cooperate with the efficient transfer of administrative responsibilities from Delphi to GM so that the Cessation Date will be the Effective Date or as soon as possible after the Effective Date, but in no case later than 3 months after the Effective Date (unless mutually agreed to by the parties). The parties further agree that there may be differing Cessation Dates for different portions of post-retirement medical plan benefits depending on the benefit and how quickly administrative responsibilities can be transferred. The parties further agree that the Cessation Date shall not occur unless and until GM is prepared to assume

responsibility for all covered claims incurred on and after the Cessation Date, in order to assure a smooth transition of the obligation.

17) In full satisfaction of the GM's obligations under sections c. and d. of the Benefit Guarantee, GM agrees to provide post-retirement medical and employer paid post-retirement life insurance to eligible Covered Employees as described herein. The parties further agree that the Special Benefit described in Article 5 of the UAW-Delphi health care agreement is a post-retirement medical benefit as defined in paragraph c.2 of the Benefit Guarantee, and is therefore covered by the Benefit Guarantee and the obligations set forth in the preceding sentence. The parties further agree as follows:

    A.  This triggering of sections c. and d. of the Benefit Guarantee shall apply only to Covered Employees :

        i.  who as of the Effective Date are retired from Delphi with eligibility for OPEB under the terms of the 1999 or 2003 Delphi-UAW National Agreements;

        ii.  who as of the Effective Date are eligible to retire from Delphi on a normal retirement basis under Article II, section 1 of the Delphi HRP (i.e., age 65) or an early retirement basis under Article II, sections 2(a)(1), 2(a)(2) or 2(a)(3) of the Delphi HRP (i.e., 60 & 10, 85 Point or 30 & Out ) or as a retirement under mutually satisfactory conditions pursuant to Article II, section 2(b) of the Delphi HRP for the plants identified in section B.4 (excluding Athens) of the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring,  with OPEB under the terms of the 2003 Delphi-UAW National Agreement in effect on the date immediately preceding the Effective Date; or

        iii.  who when considering all Delphi HRP credited service accrued prior to the Freeze Date and GM HRP credited service obtained pursuant to paragraph 8.a. of this Term Sheet, become eligible to retire on a normal retirement basis under Article II, section 1 of the Delphi HRP (i.e., age 65) or an early retirement basis under Article II, sections 2(a)(1), 2(a)(2) or 2(a)(3) of the Delphi HRP (i.e., 60 & 10, 85 Point or 30 & Out) or as a retirement under mutually satisfactory conditions pursuant to Article II, section 2(b) of the Delphi HRP for the plants identified in section B.4 (excluding Athens) of the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring or as a Total and Permanent Disability retirement under Article II, section 3 of the Delphi HRP approved both by Delphi pursuant to the procedures applicable to the Delphi HRP as of the date immediately preceding the Effective Date and

approved by GM under the procedures applicable to the GM HRP, within 7 years of the Effective Date.

B. The parties agree that there is no triggering of sections c. and d. of the Benefit Guarantee for any Covered Employees other than those specifically identified in sub-paragraph A. of this paragraph of the Term Sheet. Additionally there is no triggering of sections c. and d. of the Benefit Guarantee for any Covered Employee who does not meet the conditions of paragraph 17 A. i., 17 A. ii, or 17 A iii. of this Term Sheet and is treated as deferred vested in the GM HRP or  under the provisions of 8.f. of this Term Sheet.

C. All post-retirement medical benefits provided with respect to Covered Employees by GM will be in accordance with all the ongoing terms, conditions and eligibility requirements of the GM Health Care Program for Hourly Employees.   As such, GM will provide the applicable unmitigated level of post retirement medical benefits consistent with the terms of the Modified Plan, as defined in the Settlement Agreement, on the same basis as such benefits are provided to GM-UAW hourly employees who retired from GM with eligibility to participate in the GM Health Care Program. All Delphi UAW represented employees who participated in the March 22, 2006 SAP and who elected an SAP option that permitted them to "check the box" and Delphi represented employees who retire meeting the conditions of 17. A. ii or 17.A. iii of this Term Sheet will for purposes of OPEB flowback to GM and will be treated for such purposes as a "check the box" retiree.. With regard to Mitigation as defined in the Settlement Agreement, for Covered Employees who retired from Delphi prior to October 1, 2005 with eligibility for corporate contributions under the Delphi Health Care Program for Hourly Employees (the "Delphi Retired Covered Employees"), the GM Health Care Program will also provide, during the term of the settlement agreement (the "Settlement Agreement") approved by the court in the case of *Int'l Union, UAW, et. Al. v. General Motors Corp., Civil Action No. 05-73991,* the same level (including dental) of post-retirement medical benefit Mitigation as that provided by the DC VEBA in place for GM-UAW retirees under the Settlement Agreement. Notwithstanding the above the parties agree that: (a) with regard to dental benefits for Delphi Retired Covered Employees, benefits and coverages will not exceed those outlined in Appendix C of the GM Health Care Program and benefits and coverages will be reduced to the extent the DC VEBA reduces dental benefits and coverages; and (b) with regard to other health care benefits the Mitigation provided by the GM Health Care Program will not exceed the initial level of Mitigation as of the Implementation Date specified in paragraph 14. A. of the Settlement Agreement.   It is, otherwise, the intent of the parties that the eligibility of Covered Employees for post-retirement

medical benefits and the eligibility of Delphi Retired Covered Employees for Mitigation will be according to the same terms and conditions that such benefits are provided to GM-UAW retirees, including future changes or modifications, if any, to either unmitigated or mitigated coverage or the establishment of a new health care program covering GM-UAW retirees. This Agreement does not waive any rights, except as provided for in paragraph 21 of this Term Sheet, that GM, the UAW or the retirees have under either the GM Health Care Program or the terms of the Settlement Agreement. In addition the exercise by GM or the UAW of their rights under either the GM Health Care Program or the terms of the Settlement Agreement will have the same effect or consequence to Covered Employees and Delphi Retired Covered Employees that it has on GM-UAW hourly retirees.

D.  All employer-paid post-retirement Basic Life Insurance benefits provided with respect to Covered Employees by GM will be in accordance with all the ongoing terms, conditions and eligibility requirements of the GM Life and Disability Benefits Program for Hourly Employees and will be at the level provided for Delphi UAW retirees on the date immediately preceding the Effective Date, provided however that in no event shall GM be required to provide benefits to Covered Employees at a level and scope that exceeds that being provided for UAW-represented hourly retirees of GM.

E.  The parties also agree that, if any Covered Employee other than those specifically identified in sub-paragraph A of this paragraph of the Term Sheet does not flowback to GM under the terms of the UAW-GM-Delphi Flowback Agreement or per the SAP, he or she will be deemed ineligible for OPEB from GM, or Delphi except in regard to Delphi as may be provided by Delphi under the UAW-Delphi Supplemental Agreement dated April 29, 2004, as amended. Provided however, that if a Covered Employee meets all of the following conditions: (a) is on an approved Extended Disability Leave of Absence from Delphi as of the Effective Date; (b) cannot become eligible to retire with GM post-retirement medical and employer paid post-retirement life insurance pursuant to paragraph 17. A. of this Term Sheet; (c) has applied for a Total and Permanent Disability retirement under Article II, Section 3 of the Delphi HRP within 7 years of the Effective Date and if approved retires; (d) meets the requirements to retire with GM provided post-retirement medical and employer paid post-retirement life insurance under the provisions of paragraph 17 of this Term Sheet without regard to the reference to "within 7 years of the Effective Date" contained in paragraph 17.A. iii. of this Term Sheet; and (e) has unbroken seniority with Delphi when they retire; such Covered Employee will be treated as a flowback to GM "check the box" only for purposes of post-retirement medical and

employer paid post-retirement life insurance. This provision addressing Covered Employees on Extended Disability Leave from Delphi will not apply to any other leave of absence, paid or unpaid, and does not impact any pension provision in this Term Sheet.

### General Provisions

18) It is the intent of the parties that, except as specifically required by this Term Sheet, no employee covered by this Term Sheet can simultaneously receive, earn or accrue credited service, pension contributions, OPEB contributions or eligibility in more than one pension or OPEB plan sponsored or funded by GM, Delphi, a successor company and/or any Delphi operation divested after October 8, 2005, i.e. no "double dip". As a result, the parties agree as follows:

  a) During the period of time a Covered Employee is eligible to accrue credited service in the GM HRP under paragraph 8.a. of this Term Sheet, such Covered Employee will not be eligible to participate in the Individual Retirement Plan provisions of the Delphi HRP or receive matching contributions under the Delphi Personal Savings Plan as provided for in the UAW-Delphi Supplemental Agreement dated April 29, 2004, as amended, or receive accruals in or contributions to any other defined benefit or defined contribution pension plan that is established or maintained by Delphi, a successor company or any Delphi operation divested after October 8, 2005;

  b) Neither Delphi, a successor company, nor any Delphi operation divested after October 8, 2005 will provide any payments, contributions or accruals relating to OPEB including, but not limited to payments, contributions or accruals in the Retiree Medical Account (the "RMA") as provided for in the UAW-Delphi Supplemental Agreement dated April 29, 2004, as amended, to any Covered Employee who can attain eligibility to receive OPEB from GM pursuant to paragraph 17 of this Term Sheet; and

  c) Neither Delphi, a successor company, nor any Delphi operation divested after October 8, 2005 will provide any payments, contributions or accruals relating to OPEB including, but not limited to payments, contributions or accruals in the RMA, to any Covered Employee or other employee who attains eligibility for GM provided or GM funded OPEB through any means.

19) Delphi, GM, and the UAW agree to make all collective bargaining agreement, pension, and benefit plan amendments and modifications necessary to implement and comply with the terms contained herein.

20) Covered Employees electing a Buy Down under the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring will retain eligibility for OPEB and pension benefit treatment under this Term Sheet without regard to such election.

13

21) This Term Sheet shall not be effective unless the confirmation order approving the Plan incorporates and approves all of the terms of this Term Sheet (including the releases provided for herein), does not include terms that are inconsistent with this Term Sheet, and provides that on the Effective Date, the UAW, all employees and former employees of Delphi represented or formerly represented by the UAW, and all persons or entities with claims derived from or related to any relationship with such employees or former employees of Delphi, waive and be deemed to have waived any and all claims of any nature, whether liquidated, un-liquidated, contingent, non-contingent, asserted, unasserted, existing and/or arising in the future against Delphi, the Delphi HRP, the Delphi Health Care Program for Hourly Employees and the Delphi Life and Disability Benefits Program for Hourly Employees, GM, the GM HRP, the GM Health Care Program for Hourly Employees and the GM Life and Disability Benefits Program for Hourly Employees, and the officers, directors, employees, fiduciaries, and agents of each, arising from or related to any obligations of Delphi, GM and/or such employee benefits plans to provide OPEB or pension benefits, or related in any way to the amendment and freeze of the Delphi HRP, the cessation of Delphi OPEB and the triggering of the Benefit Guarantee; provided however, that claims for benefits provided for under the provisions of this Term Sheet or ordinary course claims by participants and beneficiaries of the GM HRP, the GM Health Care Program for Hourly Employees, the GM Life and Disability Benefits Program for Hourly Employees, Delphi HRP, the Delphi Health Care Program for Hourly Employees and the Delphi Life and Disability Benefits Program for Hourly Employees, arising after the Effective Date based on the denial or miscalculation of benefits under such plans are not waived. The parties acknowledge that Delphi and/or GM may seek additional waivers of other claims, other than ordinary course grievances and workers' compensation claims, in connection with the resolution of its current labor negotiations with the UAW. The parties also acknowledge that (i) the consideration provided by GM in this Term Sheet constitutes a substantial contribution to the Plan, (ii) this contribution is necessary to the success of the Plan, and (iii) GM would not have made this contribution without obtaining the releases provided for herein. The Parties further acknowledge that nothing in the preceding sentence shall give rise to or entitle GM to seek or be allowed any claim against or consideration from any entity, including Delphi, other than as specifically approved by the Bankruptcy Court as agreed to by Delphi and GM in a comprehensive settlement agreement resolving the financial, commercial, and other matters between them.

22) Delphi and GM will cause a transfer of pension assets and liabilities from the Delphi HRP to the GM HRP. This transfer is part of the overall Delphi restructuring and is designed to improve the funding level of the Delphi HRP. The transfer will have no effect on accrued pension benefits for employees who either remain in the Delphi HRP or are transferred to the GM HRP. Such transfer will be in an amount agreed to between GM and Delphi and will be conducted in accordance with Section 414(l) of the Internal Revenue Code of 1986, as amended, and Section 208 of the Employee Retirement Income Security Act of 1974, as amended.

a) Any such transfer will be subject to the Internal Revenue Service ("IRS") ruling issued to Delphi and GM on May 29, 2007 related to the transfer, as may be amended from time to time.

b) The participants and their corresponding assets and liabilities to be included in the transfer will proceed in the following order to the extent necessary to achieve the amount of the transfer agreed upon by GM and Delphi.

   i) All UAW-represented employees who, before the date of the transfer ("the Transfer Date"), have flowed back to GM from Delphi (retired and active) or IUE-CWA represented employees who return to GM under a flowback or preferential hiring agreement.

   ii) Participants on a proportionate basis by union in any pre-retirement program ("PRP") option offered and selected as part of the UAW-GM-Delphi Special Attrition Program, the IUE-CWA-GM-Delphi Special Attrition Program, any such Delphi PRP option included in any special attrition program negotiated with the USWA, and any other PRP option in a special attrition program implemented prior to the Transfer Date. Within a given union, retired participants will be selected prior to active participants.

   iii) Participants on a proportionate basis by union in the MSR option offered by Delphi to Delphi employees (the "Delphi MSR") in the UAW-GM-Delphi Special Attrition Program, the IUE-CWA-GM-Delphi Special Attrition Program, any such Delphi MSR option included in any special attrition program negotiated with the USWA, and any other MSR option in a special attrition program implemented prior to the Transfer Date.

   iv) The selection of retired or active PRP participants will be based on the highest seniority with Delphi as of the participant's retirement date for retired PRP participants, or the Transfer Date for active PRP participants. The selection of Delphi MSR participants will be based on the highest seniority with Delphi as of the participant's retirement date.

c) Except as otherwise agreed in future bargaining, the benefit payable by the GM HRP relating to the liability transferred to the GM HRP for a participant whose assets and liabilities were transferred will be based on the Delphi HRP rate in effect as of the Transfer Date. To the extent assets and liabilities associated with active flowbacks and PRP participants are included in the transfer, GM will assume the responsibility for recognizing all past and future benefit service for this population under the GM HRP, including but not limited to the payment of any early retirement supplement.

d) After the transfer, the Delphi HRP will not retain any obligations for or relating to the pension liabilities transferred.

23) Nothing in this Term Sheet shall be deemed to prevent the UAW and Delphi, after the term of the extended 2003 National Agreement, i.e., after September 14, 2011,

from negotiating future changes in pension or other benefits payable to any Covered Employee.

24) The parties have developed a series of examples (the "Examples"), attached hereto as Appendix 1, to show the operation of the provisions of this Term Sheet. The Examples are incorporated herein and made part of this Term Sheet. For the Examples which include individuals whose assets and liabilities are transferred in the 414(l) transfer, the pension benefit amount to be paid from the Delphi HRP will be payable from the GM HRP.

25) In the event a situation involving the pension benefits of a Covered Employee arises that is not addressed by the terms of this Term Sheet or the examples that are a part of this Term Sheet, the intent of the parties is as follows. The pension benefits provided under paragraph 8 of this Term Sheet when combined with pension benefits payable by Delphi plans and the PBGC will in the aggregate equal the benefits that would have been provided under the terms of the Delphi HRP in effect on the date immediately preceding the Effective Date, assuming the Delphi HRP was not frozen until expiration of a period of 7 years from the Freeze Date. In applying this paragraph all conditions set forth in this Term Sheet continue to apply. Except as otherwise provided in this Term Sheet, neither GM nor the GM HRP will recognize Mutual Retirements from the Delphi HRP or any extra grants of age or credited service, or other acceleration of retirement eligibility by Delphi or the Delphi HRP, unless specifically agreed to in writing by GM in its sole discretion. Nothing in this paragraph shall expand any obligation under paragraph 8 of this Term Sheet or require GM or the GM HRP to provide more years of credited service to a Covered Employee than are provided for under paragraph 8.a. i and ii of this Term Sheet.

## Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and GM Consensual Triggering of Benefit Guarantee

### Basic Life Insurance Examples – June 21 2007

## This document fully replaces the document distributed on February 19, 2007

## Example #1- "30 and Out" Retirement within 7 years of the Effective Date

Assumes Effective Date, Cessation Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 26.5 years
Employee continues to work at Delphi for another 7 years

30&Out Retirement
Retirement effective 7/1/2014 with 33.5 years of credited service
Age 58 at retirement

Employee's Wage as of 6/30/2007 is $26.85/hr
Employee's Wage reduced to $18.84/hr on 7/1/2007 and remains the same until date of retirement (example assumes no future increases)

Assumes utilization of the 2003 Delphi Life and Disability Benefits Program schedule Art. II, 1
Assumes the Ultimate Amount calculation is based on the credited service accrued under the Delphi HRP prior to the Freeze Date and the credited service accrued under the GM HRP

### Calculation of Basic Life Coverage:

- At date of retirement, life insurance coverage is reinstated by GM and equals **$61,000** (based on $26.85 wage level)

- Upon attainment of age 65 in 2021, the $61,000 amount begins to reduce by 2% per month over approximately 25 months until reaching the Ultimate Amount

- Ultimate Amount equals **$30,653** (33.5 years of credited service x 1.5% = 50.25%; Eligible for 50.25% of $61,000)

Note: In no event will a Delphi retiree's Basic Life insurance benefit exceed that of a similarly situated GM retiree.

## **Example #2- "30 and Out" Retirement within 7 years of the Effective Date But The Employee Continues to Work For Longer than 7 years**

Assumes Effective Date, Cessation Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 26.5 years
Employee continues to work at Delphi for another 8.5 years

30&Out Retirement
Retirement effective 1/1/2016 with 35 years of service
Age 58 at retirement

Employee's Wage as of 6/30/2007 is $26.85/hr
Employee's Wage reduced to $18.84/hr on 7/1/2007 and remains the same until date of retirement (example assumes no future increases)

Assumes utilization of the 2003 Delphi Life and Disability Benefits Program schedule Art. II, 1
Assumes the Ultimate Amount calculation is based on the credited service accrued under the Delphi HRP prior to the Freeze Date and the credited service accrued under the GM HRP

### **Calculation of Basic Life Coverage:**

- At date of retirement, life insurance coverage is reinstated by GM and equals **$61,000** (based on $26.85 wage level)

- Upon attainment of age 65 in 2023, the $61,000 amount begins to reduce by 2% per month over approximately 25 months until reaching the Ultimate Amount

- Ultimate Amount equals **$30,653** (33.5 years of credited service x 1.5% = 50.25%; Eligible for 50.25% of $61,000)
-

Note: In no event will a Delphi retiree's Basic Life insurance benefit exceed that of a similarly situated GM retiree.

## Example #3- "85 Point" Retirement within 7 years of the Effective Date

Assumes Effective Date, Cessation Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 24 years
Employee continues to work at Delphi for another 3 years

85 Point Retirement
Retirement effective 7/1/2010 with 27 years of credited service
Age 58 at retirement

Employee's Wage as of 6/30/2007 is $26.85/hr
Employee's Wage reduced to $18.84/hr on 7/1/2007 and remains the same until date of retirement (example assumes no future increases)

Assumes utilization of the 2003 Delphi Life and Disability Benefits Program schedule Art. II, 1
Assumes the Ultimate Amount calculation is based on the credited service accrued under the Delphi HRP prior to the Freeze Date and the credited service accrued under the GM HRP

## Calculation of Basic Life Coverage:

- At date of retirement, life insurance coverage is reinstated by GM and equals **$61,000** (based on $26.85 wage level)

- Upon attainment of age 65 in 2017, the $61,000 amount begins to reduce by 2% per month over approximately 30 months until reaching the Ultimate Amount

- Ultimate Amount equals **$24,705** (27 years of credited service x 1.5% = 40.50%; Eligible for 40.50% of $61,000)

Note: In no event will a Delphi retiree's Basic Life insurance benefit exceed that of a similarly situated GM retiree.

## Example #4- "60 and 10" Retirement within 7 years of the Effective Date

Assumes Effective Date, Cessation Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 17 years
Employee continues to work at Delphi for another 2 years

60 & 10 Retirement
Retirement effective 7/1/2010 with 19 years of credited service
Age 60 at retirement

Employee's Wage as of 6/30/2007 is $26.85/hr
Employee's Wage reduced to $18.84/hr on 7/1/2007 and remains the same until date of retirement (example assumes no future increases)

Assumes utilization of the 2003 Delphi Life and Disability Benefits Program schedule Art. II, 1
Assumes the Ultimate Amount calculation is based on the credited service accrued under the Delphi HRP prior to the Freeze Date and the credited service accrued under the GM HRP

### Calculation of Basic Life Coverage:

- At date of retirement, life insurance coverage is reinstated by GM and equals **$61,000** (based on $26.85 wage level)

- Upon attainment of age 65 in 2015, the $61,000 amount begins to reduce by 2% per month over approximately 36 months until reaching the Ultimate Amount

- Ultimate Amount equals **$17,385** (19 years of credited service x 1.5% = 28.50%; Eligible for 28.50% of the $61,000)


Note: In no event will a Delphi retiree's Basic Life insurance benefit exceed that of a similarly situated GM retiree.

## Example #5- 30 Years of Service

Assumes Effective Date, Cessation Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 15 years
Employee continues to work at Delphi for another 15 years

30&Out Retirement
Retirement effective 7/1/2022 with 30 years of service
Age 58 at retirement
Employee had a total of 22 years of credited service as of the 7 year anniversary of the Freeze Date

Employee's Wage as of 6/30/2007 is $26.85/hr
Employee's Wage reduced to $18.84/hr on 7/1/2007 and remains the same until date of retirement (example assumes no future increases)


This example employee would not be eligible for OPEB in retirement from GM. Employee did not reach retirement eligibility within 7 years of the Effective Date.  As of July 1, 2014, employee was age 50 with 22 years of credited service.  As such, this employee is not eligible for Basic Life coverage from GM in retirement.

Note:  Under the Delphi-UAW Supplemental Agreement, this employee can receive Basic Life Insurance in retirement provided that they meet the eligibility requirements.

## Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and GM Consensual Triggering of Benefit Guarantee

## Pension Examples – June 21, 2007

In no event shall any employee be credited with more than one year of credited service in any calendar year between the Delphi Hourly-Rate Employees Pension Plan and any credited service provided under the Benefit Guarantee.

## Example #1- Employee Flows Back to GM Prior to Delphi Plan Freeze

Employee flows back to GM 1/1/2005
Employee's Credited Service as of 12/31/2004 = 26.5 years
Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
30&Out Retirement
Retirement effective 7/1/2011 with 33 years of credited service
Single – Age 58 at retirement
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan

## Calculation of Benefit:

## Total Benefit prior to age 62 and one month:

### Delphi Share:

| | |
|---|---|
| Basic Benefit:  $51.40 x 26.5 = $1,362.10  x .752 (due to age reduction)   = | $1,024.30 |
| Early Retirement Supplement: | $1,400.85 |
| | $2,425.15 |

### GM Share: (GM Credited Service)

| | |
|---|---|
| Basic Benefit:  $51.40 x 6.5 = $334.10  x .752 (due to age reduction)       = | $ 251.24 |
| Early Retirement Supplement: | $ 343.61 |
| | $ 594.85 |

| | |
|---|---|
| **Total to Retiree:** | **$3,020.00** |

## Total Benefit at age 62 and one month:

### Delphi Share:

| | |
|---|---|
| Basic Benefit:  $51.40 x 26.5 = | **$1,362.10** |

### GM Share: (GM Credited Service)

| | |
|---|---|
| Basic Benefit:  $51.40 x 6.5 = | **$  334.10** |

| | |
|---|---|
| **Total to Retiree:** | **$1,696.20** |

**Note:  This example retiree would be eligible for OPEB in retirement from GM.**

## Example #2- Employee Flows Back to GM After Delphi Plan Freeze Date

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 26.5 years
Employee continues to work at Delphi for another 1.5 years and then flows back to GM 1/1/2009

30&Out Retirement
Retirement effective 1/1/2014 with 33 years of credited service
Single – Age 58 at retirement
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan

### Calculation of Benefit:

### Total Benefit prior to age 62 and one month:

**Delphi Share:**
Basic Benefit:  $51.40 x 26.5 = $1,362.10  x .752 (due to age reduction)  =    $1,024.30
Early Retirement Supplement:                                                     $1,400.85
                                                                                 $2,425.15

**GM Share:**
Basic Benefit:  $51.40 x 6.5 = $334.10  x .752 (due to age reduction)    =    $  251.24  **(1.5 yrs of BG CS; 5yrs of GM CS)**

Early Retirement Supplement:                                                  $  343.61  **(1.5 yrs of BG CS; 5 yrs of GM CS)**
                                                                             $  594.85

**Total to Retiree:**                                                        **$3,020.00**


### Total Benefit at age 62 and one month:

**Delphi Share:**
Basic Benefit:  $51.40 x 26.5 =          **$1,362.10**

**GM Share:**
Basic Benefit:  $51.40 x 6.5 =           **$  334.10**  **(1.5 yrs of BG Credited Service; 5 yrs of GM Credited Service)**

**Total to Retiree:**            **$1,696.20**


**Note:  This example retiree would be eligible for OPEB in retirement from GM.**

# Employees Who Continue To Work At Delphi

## Example #3- Employee Has Less Than 30 Years of Credited Service as of Delphi Plan Freeze Date, Retires With More Than 30 Years of Credited Service and Becomes Eligible for OPEB Within 7 Years of the Effective Date

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 26.5 years
Employee continues to work at Delphi for another 7 years

30&Out Retirement
Retirement effective 7/1/2014 with 33.5 years of credited service
Single – Age 58 at retirement
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan


## Calculation of Benefit:


### Total Benefit prior to age 62 and one month:

**Delphi Share:**
Basic Benefit:  $51.40 x 26.5 = $1,362.10  x .752 (due to age reduction)    =    $1,024.30
Early Retirement Supplement:                                                 <u>$1,995.70</u>
                                                                            **$3,020.00**

**GM Share:**                                                               **$      0**

**Total to Retiree:**                                                       **$3,020.00**


### Total Benefit at age 62 and one month:

**Delphi Share:**
Basic Benefit:  $51.40 x 26.5 =        **$1,362.10**

**GM Share: (BG Credited Service)**
Basic Benefit:  $51.40 x 7 =           **$  359.80**

**Total to Retiree:**                  **$1,721.90**


**Note:  This example retiree would be eligible for OPEB in retirement from GM.  Employee reached retirement eligibility within 7 years of the Effective Date.**

## Example #4- Employee Has At Least 30 Years of Credited Service as of Delphi Plan Freeze Date

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 30 years
Employee continues to work at Delphi for another 7 years

30&Out Retirement
Retirement effective 7/1/2014 with 37 years of credited service
Single – Age 58 at retirement
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan

### Calculation of Benefit:

### Total Benefit prior to age 62 and one month:

**Delphi Share:**
Basic Benefit:  $51.40 x 30 = $1,542  x .752 (due to age reduction)    =    $1,159.58
Early Retirement Supplement:                                                          $1,860.42
                                                                                     **$3,020.00**

**GM Share:**                                                            **$        0**

**Total to Retiree:**                                                    **$3,020.00**

### Total Benefit at age 62 and one month:

**Delphi Share:**
Basic Benefit:  $51.40 x 30 =          **$1,542.00**

**GM Share: (BG Credited Service)**
Basic Benefit:  $51.40 x 7 =           **$   359.80**

**Total to Retiree:**                  **$1,901.80**

**Note:  This example retiree would be eligible for OPEB in retirement from GM.  Employee was already retirement eligible as of the Effective Date.**

## Example #5A- Employee Has 15 Years of Credited Service as of Delphi Plan Freeze Date & Retires with 30 Years of Service

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 15 years
Employee continues to work at Delphi for another 15 years

30&Out Retirement
Retirement effective 7/1/2022 with 30 years of service
Single – Age 58 at retirement
Employee had a total of 22 years of credited service as of the 7 year anniversary of the Freeze Date
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan

### Calculation of Benefit:

#### Total Benefit prior to age 62 and one month:

**Delphi Share:**
Basic Benefit: $51.40 x 15 = $771 x .752 (due to age reduction)      =         $  579.79
Early Retirement Supplement:                                                     $2,440.21
                                                                                **$3,020.00**

**GM Share:**                                                          $        0

**Total:**                                                            **$3,020.00**

#### Total Benefit at age 62 and one month:

**Delphi Share:**
Basic Benefit: $51.40 x 15  =                                          $  771.00
(Note: At age 62 and one month, the Basic Benefit is redetermined.  An age reduction
factor is no longer applied, since the employee  retired with at least 30 years of service
for retirement eligibility purposes).

**GM Share: (BG Credited Service)**
Deferred Vested Basic Benefit: $51.40 x 7 x .79  (due to age reduction)      =      **$   284.24**
(Note: A deferred vested age reduction factor is applied to the benefit, since the
employee is age 58 at the time of retirement but only had 22 years of credited
service as of the 7 year anniversary of the Freeze Date.  Employee is not considered
retirement eligible by GM.  The age reduction factor that is applied is based on
commencing the deferred vested pension benefit at age 62 and one month versus age 65).

**Total:**                                                            **$ 1,055.24**

**Note:  This example employee would not be eligible for OPEB in retirement from GM. Employee did not reach retirement eligibility within 7 years of the Effective Date.  As of July 1, 2014, employee was age 50 with 22 years of credited service.**

## Example #5B- Employee Has 15 Years of Credited Service as of Delphi Plan Freeze Date & Retires with 30 Years of Service

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 15 years
Employee continues to work at Delphi for another 15 years

30&Out Retirement
Retirement effective 7/1/2022 with 30 years of service
Single – Age 60 at retirement
Employee had a total of 22 years of credited service as of the 7 year anniversary of the Freeze Date
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan

### Calculation of Benefit:

### Total Benefit prior to age 62 and one month:

### Delphi Share:
Basic Benefit: $51.40 x 15 = $771 x .867 (due to age reduction)     =          $  668.46
Early Retirement Supplement:                                                                    $2,351.54
                                                                                                              $3,020.00

### GM Share:                                                                                       $       0

### Total:                                                                                            $3,020.00

### Total Benefit at age 62 and one month:

### Delphi Share:
Basic Benefit: $51.40 x 15  =                                                        $   771.00
(Note: At age 62 and one month, the Basic Benefit is redetermined.
An age reduction factor is no longer applied, since the employee retired
with at least 30 years of service for retirement eligibility purposes).

### GM Share: (BG Credited Service)
Basic Benefit: $51.40  x 7  x  .867 (due to age reduction)          =          $   311.95
(Note: Since the employee was age 60 at the time of retirement and
had 22 years of credited service as of the 7 year anniversary of the
Freeze Date, GM recognizes this is a 60 & 10 retirement for pension
purposes.  Since the employee does not have 85 points, an age
reduction factor is applied to the GM portion of the Basic Benefit).

### Total:                                                                                          $ 1,082.95

**Note:  This example employee would not be eligible for OPEB in retirement from GM.  Employee did not reach retirement eligibility within 7 years of the Effective Date.  As of July 1, 2014, employee was age 52 with 22 years of credited service.**

## Example #5C- Employee Has 20 Years of Credited Service as of Delphi Plan Freeze Date & Retires with at least 30 Years of Service

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 20 years
Employee continues to work at Delphi for another 15 years

30&Out Retirement
Retirement effective 7/1/2022 with 35 years of service
Single – Age 58 at retirement
Employee had a total of 27 years of credited service as of the 7 year anniversary of the Freeze Date
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan

### Calculation of Benefit:

### Total Benefit prior to age 62 and one month:

**Delphi Share:**
Basic Benefit:  $51.40 x 20 = $1,028 x .752 (due to age reduction)     =     $  773.06
Early Retirement Supplement:                                                          $2,246.94
                                                                                     **$3,020.00**

**GM Share:**                                                          **$          0**

**Total:**                                                            **$3,020.00**

### Total Benefit at age 62 and one month:

**Delphi Share:**
Basic Benefit:  $51.40 x 20   =                                       **$1,028.00**
(Note: At age 62 and one month, the Basic Benefit is redetermined.
An age reduction factor is no longer applied, since the employee
retired with at least 30 years of service for retirement
eligibility purposes).

**GM Share: (BG Credited Service)**
Basic Benefit:  $51.40 x 7     =                                       **$  359.80**
(Note: No age reduction factor is applied to the benefit since the
employee is age 58 at the time of retirement and had 27 years of
credited service as of the 7 year anniversary of the Freeze Date.
GM recognizes this is an 85 point retirement for pension purposes).

**Total:**                                                            **$1,387.80**

**Note:  This example employee would not be eligible for OPEB in retirement from GM.  Employee did not reach retirement eligibility within 7 years of the Effective Date.  As of July 1, 2014, employee was age 50 with 27 years of credited service.**

**Example #5D- Employee Has Less Than 30 Years of Credited Service as of Delphi Plan Freeze Date, Retires With At Least 30 Years of Service and Becomes Eligible for OPEB Within 7 Years of the Effective Date**

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 22.5 years
Employee continues to work at Delphi for another 9 years

30&Out Retirement
Retirement effective 7/1/2016 with 31.5 years of service
Single – Age 58 at retirement
Employee had a total of 29.5 years of credited service as of the 7 year anniversary of the Freeze Date
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan


**Calculation of Benefit:**


**Total Benefit prior to age 62 and one month:**

**Delphi Share:**
Basic Benefit: $51.40 x 22.5 = $1,156.50 x .752 (due to age reduction)   =   $  869.69
Early Retirement Supplement:                                          $2,150.31
                                                                      **$3,020.00**

**GM Share:**                                                          $         0

**Total:**                                                            **$3,020.00**


**Total Benefit at age 62 and one month:**

**Delphi Share:**
Basic Benefit:  $51.40 x 22.5  =                                      **$1,156.50**
(Note: At age 62 and one month, the Basic Benefit is redetermined.
An age reduction factor is no longer applied, since the employee
retired with at least 30 years of service for retirement eligibility purposes).

**GM Share: (BG Credited Service)**
Basic Benefit:  $51.40 x 7     =                                      **$  359.80**
(Note: No age reduction factor is applied to the benefit, since the
employee is age 58 at the time of retirement and had 29.5 years of
credited service as of the 7 year anniversary of the Freeze Date.
GM recognizes this is an 85 point retirement for pension purposes).

**Total:**                                                            **$1,516.30**


**Note:  This example retiree would be eligible for OPEB in retirement from GM.  Employee reached retirement eligibility within 7 years of the Effective Date.  As of July 1, 2014, employee was age 56 with 29.5 years of credited service.  Employee attained 85 Points.**

## Example #6- Employee Retires Under an 85 Point Retirement

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 24 years
Employee continues to work at Delphi for another 3 years

85 Point Retirement
Retirement effective 7/1/2010 with 27 years of credited service
Single – Age 58 at retirement
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan

### Calculation of Benefit:

### Total Benefit prior to age 62 and one month:

**Delphi Share:**
Basic Benefit:  $51.40 x 24 = $1,233.60  x .752 (due to age reduction)     =     $  927.67
Interim Supplement:  $36.60 x 24 =                                          $  878.40
                                                                           **$1,806.07**

**GM Share: (BG Credited Service)**
Basic Benefit:  $51.40 x 3 = $154.20  x .752 (due to age reduction)     =     $  115.96
Interim Supplement:  $36.60 x 3 =                                         $  109.80
                                                                        **$  225.76**

**Total to Retiree:**                                                   **$2,031.83**


### Total Benefit at age 62 and one month:

**Delphi Share:**
Basic Benefit:  $51.40 x 24 =          **$1,233.60**

**GM Share: (BG Credited Service)**
Basic Benefit:  $51.40 x 3  =          **$  154.20**

**Total to Retiree:**                  **$ 1,387.80**


**Note:  This example retiree would be eligible for OPEB in retirement from GM.  Employee reached retirement eligibility within 7 years of the Effective Date.**

## Example #7- Any Delphi SAP Participant

GM is not responsible for any portion of the pension benefit.  100% paid by Delphi.  Note:  If the SAP Participant was a flow back to Delphi from GM, GM would be responsible for a pro-rata portion of the pension benefit based on the Participant's credited service accrued prior to the flow back under the GM Hourly-Rate Employees Pension Plan.

Additional Note:  This example retiree would be eligible for OPEB in retirement from GM.

## **Example #8- Employee Retires Under a 60 & 10 Retirement**

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 18.5 years
Employee continues to work at Delphi another 6 months

60 & 10 Retirement
Retirement effective 1/1/2008 with 19 years of credited service
Single – Age 60 at retirement
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan

### **Calculation of Benefit:**

### **Total Benefit prior to age 62 and one month:**

**Delphi Share:**
Basic Benefit:  $51.40 x 18.5 = $950.90  x .867 (due to age reduction)   =          $    824.43
Interim Supplement:  $47.30 x 18.5 =                                                         $    875.05
                                                                                                          **$ 1,699.48**

**GM Share: (BG Credited Service)**
Basic Benefit:  $51.40 x 0.5 = $25.70  x .867 (due to age reduction)  =          $      22.28
Interim Supplement:  $47.30 x 0.5 =                                                          $      23.65
                                                                                                          **$      45.93**

**Total to Retiree:**                                                                              **$1,745.41**

### **Total Benefit at age 62 and one month:**

**Delphi Share:**
Basic Benefit:  $51.40 x 18.5 x .867(due to age reduction)   =            **$    824.43**

**GM Share: (BG Credited Service)**
Basic Benefit:  $51.40 x 0.5 x .867 (due to age reduction)   =            **$      22.28**

**Total to Retiree:**                                                                       **$    846.71**

**Note:  This example retiree would be eligible for OPEB in retirement from GM.  Employee reached retirement eligibility within 7 years of the Effective Date.**

## Example #9- Employee Has 15 Years of Credited Service as of the Delphi Plan Freeze Date & Quits 3 Years Later

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 15 years
Employee continues to work at Delphi for another 3 years

Employee quits Delphi
Single – Age 48 at time of termination
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan

### Calculation of Benefit:

### Total Benefit Payable at Age 65 (Note: Benefit will be reduced for age if commenced prior to age 65):

### Delphi Share:
Deferred Vested Basic Benefit:  $51.40 x 15   =          **$ 771.00**

### GM Share: (BG Credited Service)
Deferred Vested Basic Benefit:  $51.40 x   3   =          **$  154.20**


**Total:**                                                    **$  925.20**


**Note:  This example employee would not be eligible for OPEB in retirement from GM.**

## Example #10- Employee Has 10 Years of Credited Service as of Delphi Plan Freeze Date, Works An Additional 1.5 Years at Delphi, Is Then Placed On Lay-off Status at Delphi & Then Breaks Time for Time

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 10 years

Employee continues to work at Delphi for another 1.5 years and is then put on lay-off status as of 1/1/2009
Employee eventually breaks time-for-time – Age 48 at time of break
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan

**Calculation of Benefit:**

**Total Benefit Payable at Age 65** (Note: Benefit will be reduced for age if commenced prior to age 65):

**Delphi Share:**
Deferred Vested Basic Benefit:  $51.40 x 10   =        **$  514.00**

**GM Share:** **(BG Credited Service)**
Deferred Vested Basic Benefit:  $51.40 x 3.4   =        **$  174.76**

**Total:**                                              **$  688.76**

**Note:  This example employee would not be eligible for OPEB in retirement from GM.**

## Example #11- Employee Continues to Work at Delphi & Retires With 30 Years of Credited Service- 70% Rule Example

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 24 years
Employee works 6 more years at Delphi after the Freeze

Maximum base hourly rate for job classification as of 6/30/2007 is $25.00/hr
Supplemental Employee Group B maximum base hourly rate of $16.50/hr on 7-1-2007 and at date of retirement (example assumes no future increases)
Benefit Class Code A prior to wage reduction and at time of retirement

30&Out Retirement
Retirement effective 7/1/2013 with 30 years of credited service
Single – Age 58 at retirement
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan


## Calculation of Benefit:

### 70% Rule Calculation

$25.00 x 173 1/3 = $4,333.33 x 70%  = $3,033.33          =     < No Adj.>


### Total Benefit prior to age 62 and one month:

**Delphi Share:**
Basic Benefit:  $50.90 x 24 years x .752 (due to age reduction)    =    $  918.64
Early Retirement Supplement:                                      =    $2,101.36
                                                                      **$3,020.00**

**GM Share:**                                                        $       0

**Total to Retiree:**                                                **$3,020.00**


### Total Benefit at age 62 and one month:

**Delphi Share:**
Basic Benefit:  $50.90 x 24  =          **$1,221.60**

**GM Share: (BG Credited Service)**
Basic Benefit:  $50.90 x  6  =          **$  305.40**

**Total to Retiree:**                   **$1,527.00**


**Note:  This example retiree would be eligible for OPEB in retirement from GM.  Employee reached retirement eligibility within 7 years of the Effective Date.**

## Example #12- Employee Retires At Age 64- Benefit Class Code Example

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 24 years
Employee works 4 more years at Delphi after the Freeze

Maximum base hourly rate for job classification as of 6/30/2007 is $27.00/hr
Supplemental Employee Group B maximum base hourly rate of $16.50/hr on 7-1-2007 and at date of retirement (example assumes no future increases)
Benefit Class Code B prior to wage reduction; Benefit Class Code B at time of retirement

Voluntary Retirement- Age 60 to 64
Retirement effective 7/1/2011 with 28 years of credited service
Single – Age 64 at retirement
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan

### Calculation of Benefit:

### Total Benefit Payable:

**Delphi Share:**
Basic Benefit:  $51.15 x 24   =                          **$ 1,227.60**
(Years of credited service accrued prior to wage reduction
based on Benefit Class Code B)

**GM Share: (BG Credited Service)**
Basic Benefit:  $51.15 x  4   =                          **$    204.60**
(Years of credited service accrued after wage reduction
based on Benefit Class Code B)

**Total To Retiree:**                                    **$  1,432.20**

**Note:  This example retiree would be eligible for OPEB in retirement from GM.  Employee was already retirement eligible as of the Effective Date.**

## Example #13- Employee Flows Back to GM After Delphi Plan Freeze Date

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 24 years
Employee works 2 more years at Delphi after the Freeze
Employee flows back to GM and works 4 more years

Maximum base hourly rate for job classification as of 6/30/2007 is $27.00/hr
Supplemental Employee Group B maximum base hourly rate of $16.50/hr on 7-1-2007
Benefit Class Code B at Delphi prior to wage reduction
Benefit Class Code C at GM ($28.25/hr) at time of retirement

30&Out Retirement
Retirement effective 7/1/2013 with 30 years of credited service
Single – Age 58 at retirement
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan

### Calculation of Benefit:

### Total Benefit prior to age 62 and one month:

Basic Benefit:  24 years at $51.15 = $1,227.60 x .752 (due to age reduction) = $ 923.16
                2 years at $51.15 = $  102.30 x .752 (due to age reduction) = $  76.93
                4 years at $51.40 = $  205.60 x .752 (due to age reduction) = $  154.61
                                                                              $1,154.70

Early Retirement Supplement:  $3,020 - $1,154.70                          =    $1865.30
                                                                              $3020.00

### 70% Rule Adjustment

$28.25 x 173 1/3 = $4,896.67 x 70% = $3,427.67          =       < No Adj.>

### Delphi Share:
Basic Benefit:  $51.15 x 24 years x .752 (due to age reduction)     =    $ 923.16
Early Retirement Supplement:   24/30 x $1,865.30                    =    $1,492.24
                                                                         $2,415.40
### GM Share:
Basic Benefit:  $51.15 x 2 years x .752 (due to age reduction)     =    $  76.93 **(BG Credited Service)**
Basic Benefit:  $51.40 x 4 years x .752 (due to age reduction)     =    $ 154.61 **(GM Credited Service)**
Early Retirement Supplement:   6/30 x $1,865.30                     =    $ 373.06 **(2 yrs. of BG Credited Service;**
                                                                                  **4 yrs. of GM Credited Service)**
                                                                         $ 604.60

**Total to Retiree:**                                          =    **$3,020.00**

**Total Benefit at age 62 and one month:**

**Delphi Share:**
Basic Benefit:  $51.15 x 24 =          **$1,227.60**

**GM Share:**
Basic Benefit:  $51.15 x 2   =          **$   102.30**  **(BG Credited Service)**
Basic Benefit:  $51.40 x 4   =          **$   205.60**  **(GM Credited Service)**
                                        **$   307.90**

**Total to Retiree:**                   **$1,535.50**


**Note:  This example retiree would be eligible for OPEB in retirement from GM.**

## Example #14- Employee Has Less Than 30 Years of Credited Service as of Delphi Plan Freeze Date and the Plant is Divested in the Future

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 26.5 years
Employee continues to work at Delphi for another 2.5 years and then the plant is sold effective 1/1/2010
At the time of the divestiture, the employee has 29 years of credited service
**Employee works for the New Company for an additional 2 years and then retires**

**Example assumes that the Delphi Hourly-Rate Employees Pension Plan IS AMENDED to treat employees at the New Company as active participants for all purposes, other than future benefit accruals based on additional credited service, for all periods of time on or after the Freeze Date and prior to retirement or separation from service from Delphi or any Delphi operation divested after October 8, 2005.**

30&Out Retirement
Retirement effective 1/1/2012 with 31 years of total eligibility service
Single – Age 55 at time of retirement (age 53 at time of divestiture)
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan

[Example also assumes that the New Company offers a new Defined Benefit (DB) Pension Plan. The value of the monthly annuity accrued under the new DB plan for the two years that this employee works at the New Company is assumed to be $100 per month in this example.] An alternative approach is under review by the parties.

### Calculation of Benefit:

### Total Benefit prior to age 62 and one month:

**Delphi Share:**

| | | |
|---|---|---|
| Basic Benefit: $51.40 x 26.5 = $1,362.10 x .579 (due to age reduction) = | $ 788.66 | |
| Early Retirement Supplement | $2,231.34 | |
| | **$3,020.00** [1] | |
| [Less New Company's DB Plan | ($ 100.00) [2] | |

An alternative approach is under review by the parties.

| | |
|---|---|
| Monthly Benefit Payable = | **$2,920.00** |
| **GM Share:** | $ 0 |
| **New Company Share:** Monthly Benefit Payable = | **$ 100.00** |
| **Total to Retiree:** | **$3,020.00** |

[1] Since this example assumes that the Delphi Hourly-Rate Employees Pension Plan IS AMENDED as noted, this example retiree is eligible for a 30&Out Retirement under the Delphi pension plan

based on 31 years of total eligibility service.  Prior to attaining age 62 and one month, Delphi is responsible for paying a Basic Benefit based on the years of credited service accrued as of the Freeze Date, which is 26.5 years, and the full Early Retirement Supplement.  Since the Delphi pension plan recognizes the service at the New Company for retirement eligibility purposes, so will GM as it relates to the credited service accrued under the Benefit Guarantee as depicted below.

[(2) Delphi shall also be entitled to offset from any Supplement paid prior to age 62 and one month, the full value of any benefits applicable to an employee covered under a successor company defined benefit or defined contribution pension plan, regardless of when payable, other than those benefits solely attributable to employee contributions.] An alternative approach is under review by the parties.

**Total Benefit at age 62 and one month:**

**Delphi Share:**
Basic Benefit:  $51.40 x 26.5 =                     **$1,362.10**

**GM Share: (BG Credited Service)**
Basic Benefit:  $51.40 x 4.5 =                      $   231.30
[Less New Company's  DB Plan                  (($   100.00)] An alternative approach is under review by the
parties.
Monthly Benefit Payable =                         **$   131.30** [(1) (3)]

**New Company Share:**
Monthly Benefit Payable =                         **$   100.00**

**Total to Retiree:**                                    **$1,593.40**

[(3) GM shall also be entitled to offset from any obligation under the Benefit Guarantee the full value of any benefits applicable to a Covered Employee under a Delphi or successor company defined benefit or defined contribution pension plan, regardless of when payable, other than those benefits solely attributable to employee contributions.  Furthermore, GM's obligations to provide a particular benefit under the Benefit Guarantee will not apply to the extent Delphi or a successor company carves out any Covered Employee from all or part of any Delphi or successor company benefits provided to non-Covered Employees.] An alternative approach is under review by the parties.

**Note: Since Delphi is recognizing the service accrued at the New Company for retirement eligibility purposes and this employee reached retirement eligibility within 7 years of the Effective Date, this example retiree is eligible for OPEB in retirement from GM.**

[GM shall also be entitled to offset from any obligation under the Benefit Guarantee the full value of any benefits applicable to a Covered Employee under a Delphi or successor company post-retirement health care or life insurance plan, regardless of when payable, other than those benefits solely attributable to employee contributions.  Furthermore, GM's obligations to provide a particular benefit under the Benefit Guarantee will not apply to the extent Delphi or a successor company carves out any Covered Employee from all or part of any Delphi or successor company benefits provided to non-Covered Employees.]  An alternative approach is under review by the parties.

## Example #15- Employee Has Less Than 30 Years of Credited Service as of Delphi Plan Freeze Date and the Plant is Closed in the Future

Assume Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 26.5 years
Employee continues to work at Delphi for another 2.5 years and then the plant is permanently closed effective 1/1/2010
At the time of the closure, the employee has 29 years of credited service
**This example assumes that the employee is placed on lay-off status after the plant closure. After being on lay-off status for 3 years, the employee elects to retire.**

30&Out Retirement
Retirement is effective 1/1/2013 with 30.9 years of credited service.  Under the Delphi pension plan, the employee is entitled to receive up to 1.9 years of credited service while on lay-off status.
Single – Age 55 at retirement (age 52 at time of plant closure)
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan


## Calculation of Benefit:


## Total Benefit prior to age 62 and one month:

### Delphi Share:
Basic Benefit:  $51.40 x 26.5 = $1,362.10  x .579 (due to age reduction)   =          $   788.66
Early Retirement Supplement:                                                             $2,231,34
                                                                                        **$3,020.00**

### GM Share:                                                                $          0

**Total to Retiree:**                                                        **$3,020.00**



## Total Benefit at age 62 and one month:

### Delphi Share:
Basic Benefit:  $51.40 x 26.5 =          **$1,362.10**

### GM Share: (BG Credited Service)
Basic Benefit:  $51.40 x 4.4 =          **$   226.16**

**Total to Retiree:**          **$1,588.26**


**Note:  This example retiree would be eligible for OPEB in retirement from GM.  Employee reached retirement eligibility within 7 years of the Effective Date.**

## Example #16- Employee Has Less Than 30 Years of Credited Service as of Delphi Plan Freeze Date & Retires With More Than 30 Years of Credited Service- Surviving Spouse Coverage Example

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 26.5 years
Employee continues to work at Delphi for another 6.5 years

30&Out Retirement
Retirement effective 1/1/2014 with 33 years of credited service
Age 58 at retirement
Married at retirement- age difference between retiree and spouse within 5 years
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan

### Calculation of Benefit:

### Total Benefit prior to age 62 and one month:

**Delphi Share:**
Basic Benefit:  $51.40 x 26.5 = $1,362.10  x .752 **(due to age reduction)**    =    $1,024.30
Early Retirement Supplement:                                                     $1,995.70
                                                                                $3,020.00
Less Cost of Surviving Spouse Coverage: $51.40 x 26.5 = $1,362.10 x 0.05  =    ($     68.11)
Monthly Amount Payable:                                                        **$2,951.89**

**GM Share:**                                                                  $         0

**Total to Retiree:**                                                          **$2,951.89**

### Total Benefit at age 62 and one month:

**Delphi Share:**
Basic Benefit:  $51.40 x 26.5  =                                               $1,362.10
Less Cost of Surviving Spouse Coverage: $51.40 x 26.5 = $1,362.10 x 0.05  =    ($     68.11)
Monthly Amount Payable:                                                        **$1,293.99**

**GM Share: (BG Credited Service)**
Basic Benefit:  $51.40 x 6.5 =                                                 $   334.10
Less Cost of Surviving Spouse Coverage: $51.40 x 6.5 = $334.10 x 0.05  =       ($     16.71)
Monthly Amount Payable:                                                        **$   317.39**

**Total to Retiree:**                                                          **$1,611.38**

Note: The GM HRP is owed for the cost of the surviving spouse coverage for those months between retirement and attaining age 62 and one month.  Even though a Basic Benefit was not being paid by GM during these months, the surviving spouse coverage has been in place since date of retirement and would have been invoked if the retiree died prior to attaining age 62 and one month.

**Calculation of the Cost of the GM Surviving Spouse Coverage for the period 1/1/2014 through 1/1/2018:**

| | | |
|---|---|---|
| Monthly Cost of Surviving Spouse Coverage: $51.40 x 6.5 = $334.10 x 0.05  = | $ | 16.71 per month |
| Times the number of months | x | 49 months |
| **Total Cost That Retiree Owes GM:** | **$** | **818.79** |

The parties will discuss administrative procedures to collect the $818.79 that is owed to the GM HRP for the cost of the surviving spouse coverage.

**Note:  This example retiree would be eligible for OPEB in retirement from GM.  Employee reached retirement eligibility within 7 years of the Effective Date.**

## Continuation of Example #16: Instead of the Retiree Living to at Least Age 62 and One Month, the Following Assumes that the Retiree Dies At Age 60- Calculation of Surviving Spouse Benefit

**Calculation of Benefit to Surviving Spouse:**

**Total Benefit Payable the Month Following the Date of Death- Effective 2/1/2016:**

**Delphi Share:**

| | |
|---|---|
| Basic Benefit:  $51.40 x 26.5  = | $1,362.10 |
| Less Cost of Surviving Spouse Coverage: $51.40 x 26.5 = $1,362.10 x 0.05  = | ($   68.11) |
| Monthly Amount Payable to Retiree: | $1,293.99 |

**Monthly Amount Payable to Surviving Spouse:** $1,293.99 x 0.65        =        **$  841.09**

**GM Share: (BG Credited Service)**

| | |
|---|---|
| Basic Benefit:  $51.40 x 6.5 = | $  334.10 |
| Less Cost of Surviving Spouse Coverage: $51.40 x 6.5 = $334.10 x 0.05  = | ($   16.71) |
| Monthly Amount Payable to Retiree: | $  317.39 |

**Monthly Amount Payable to Surviving Spouse:** $317.39 x 0.65        =        **$  206.30**

**Total to Surviving Spouse:**                                          **$1,047.39**

Note: The GM HRP is owed for the cost of the surviving spouse coverage for those months between the retiree's date of retirement and the retiree's date of death.  Even though a Basic Benefit was not being paid by GM during these months, the surviving spouse coverage has been in place since date of retirement.

**Calculation of the Cost of the GM Surviving Spouse Coverage for the period 1/1/2014 through 1/1/2016:**

| | |
|---|---|
| Monthly Cost of Surviving Spouse Coverage: $51.40 x 6.5 = $334.10 x 0.05  = | $  16.71 per month |
| Times the number of months | x    25 months |
| **Total Cost That Surviving Spouse Owes GM:** | **$  417.75** |

The parties will discuss administrative procedures to collect the $417.75 that is owed to the GM HRP for the cost of the surviving spouse coverage.

**Note:  This example surviving spouse continues to be eligible for health care from GM after the retiree's death.**

## Example #17- Employee Retires Under an 85 Point Retirement- Surviving Spouse Coverage Example

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 24 years
Employee continues to work at Delphi for another 3 years

85 Point Retirement
Retirement effective 7/1/2010 with 27 years of credited service
Age 58 at retirement
Married at retirement- age difference between retiree and spouse within 5 years
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan

### Calculation of Benefit:

### Total Benefit prior to age 62 and one month:

#### Delphi Share:
Basic Benefit:  $51.40 x 24 = $1,233.60  x .752 **(due to age reduction)**    =     $   927.67
Interim Supplement:  $36.60 x 24 =                                                 $   878.40
                                                                                    $1,806.07
Less Cost of Surviving Spouse Coverage: $51.40 x 24 = $1,233.60 x 0.05  =    ($     61.68)
Monthly Amount Payable:                                                        **$1,744.39**

#### GM Share: (BG Credited Service)
Basic Benefit:  $51.40 x 3 = $154.20  x .752 **(due to age reduction)**        =     $   115.96
Interim Supplement:  $36.60 x 3 =                                              $   109.80
                                                                              $   225.76
Less Cost of Surviving Spouse Coverage: $51.40 x 3 = $154.20 x 0.05  =    ($      7.71)
Monthly Amount Payable:                                                    **$   218.05**

### Total to Retiree:                                                        **$ 1,962.44**

### Total Benefit at age 62 and one month:

#### Delphi Share:
Basic Benefit:  $51.40 x 24 =                                                  $1,233.60
Less Cost of Surviving Spouse Coverage: $51.40 x 24 = $1,233.60 x 0.05  =    ($     61.68)
Monthly Amount Payable:                                                        **$1,171.92**

#### GM Share: (BG Credited Service)
Basic Benefit:  $51.40 x 3  =                                                  $   154.20
Less Cost of Surviving Spouse Coverage: $51.40 x 3 = $154.20 x 0.05  =    ($      7.71)
Monthly Amount Payable:                                                    **$   146.49**

### Total to Retiree:                                                        **$ 1,318.41**

**Note:  This example retiree would be eligible for OPEB in retirement from GM.  Employee reached retirement eligibility within 7 years of the Effective Date.**

## Continuation of Example #17: Instead of the Retiree Living to at Least Age 62 and One Month, the Following Assumes that the Retiree Dies At Age 60- Calculation of Surviving Spouse Benefit

**Calculation of Benefit to Surviving Spouse:**
**Total Benefit Payable the Month Following the Date of Death- Effective 8/1/2012:**

**Delphi Share:**
Basic Benefit:  $51.40 x 24 =                                    $1,233.60
Less Cost of Surviving Spouse Coverage: $51.40 x 24 = $1,233.60 x 0.05  =   ($    61.68)
Monthly Amount Payable to Retiree:                               $1,171.92

**Monthly Amount Payable to Surviving Spouse:** $1,171.92 x 0.65      =   **$  761.75**


**GM Share: (BG Credited Service)**
Basic Benefit:  $51.40 x 3  =                                    $  154.20
Less Cost of Surviving Spouse Coverage: $51.40 x 3 = $154.20 x 0.05  =   ($     7.71)
Monthly Amount Payable to Retiree:                               $  146.49

**Monthly Amount Payable to Surviving Spouse:** $146.49 x 0.65     =   **$    95.22**


**Total to Surviving Spouse:**                                   **$  856.97**


**Note:  This example surviving spouse continues to be eligible for health care from GM after the retiree's death.**

## Example #18- Employee Retires Under a T&PD Retirement Within 7 Years of the Freeze Date

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 25 years
Employee continues to work at Delphi for another 6 years

T&PD Retirement Approved By Both Delphi and GM- Denied SSDIB
Retirement effective 7/1/2013 with 31 years of service
Single – Age 59 at retirement
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan
Note:  As stated in the 2003 Hourly-Rate Employees Pension Plan, a maximum of 30 years of credited service is used to calculate the Temporary Benefit

### Calculation of Benefit:

### Total Benefit prior to age 62 and one month:

**Delphi Share:**
Basic Benefit:  $51.40 x 25 =                                      $1,285.00
Temporary Benefit:  $49.80 x 25 =                          $1,245.00
                                                                                  **$2,530.00**

**GM Share: (BG Credited Service)**
Basic Benefit:  $51.40 x 6 =                                     $  308.40
Temporary Benefit:  $49.80 x 5 =                           $  249.00
                                                                                  **$  557.40**

**Total to Retiree:**                                              **$3,087.40**


### Total Benefit at age 62 and one month:

**Delphi Share:**
Basic Benefit:  $51.40 x 25 =          **$1,285.00**

**GM Share: (BG Credited Service)**
Basic Benefit:  $51.40 x 6  =          **$  308.40**

**Total to Retiree:**          **$1,593.40**


**Note:  This example retiree would be eligible for OPEB in retirement from GM.  Employee retired T&PD, which was approved by GM, within 7 years of the Effective Date.**

## Example #19- Employee Retires Under a T&PD Retirement Within 7 Years of the Freeze Date

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 15 years
Employee continues to work at Delphi for another 6 years

T&PD Retirement Approved By Both Delphi and GM -  Denied SSDIB
Retirement effective 7/1/2013 with 21 years of credited service
Single – Age 49 at retirement
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan

### Calculation of Benefit:

### Total Benefit prior to age 62 and one month:

**Delphi Share:**

| | |
|---|---|
| Basic Benefit:  $51.40 x 15 = | $  771.00 |
| Temporary Benefit:  $49.80 x 15 = | $  747.00 |
| | **$1,518.00** |

**GM Share:** (BG Credited Service)

| | |
|---|---|
| Basic Benefit:  $51.40 x 6 = | $  308.40 |
| Temporary Benefit:  $49.80 x 6 = | $  298.80 |
| | **$  607.20** |

**Total to Retiree:**                                    **$2,125.20**

### Total Benefit at age 62 and one month:

**Delphi Share:**
Basic Benefit:  $51.40 x 15 =          **$  771.00**

**GM Share:** (BG Credited Service)
Basic Benefit:  $51.40 x 6  =          **$  308.40**

**Total to Retiree:**          **$ 1,079.40**

**Note:  This example retiree would be eligible for OPEB in retirement from GM.  Employee retired T&PD, which was approved by GM, within 7 years of the Effective Date.**

## Example #20- Employee Retires Under a T&PD Retirement After the 7 Year Anniversary of the Freeze Date

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 20 years
Employee continues to work at Delphi for another 8 years

T&PD Retirement Approved by Delphi- Denied SSDIB
Retirement effective 7/1/2015 with 28 years of service
Single – Age 55 at retirement
Employee had a total of 27 years of credited service as of the 7 year anniversary of the Freeze Date
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan


## Calculation of Benefit:


### Total Benefit prior to age 62 and one month:

**Delphi Share:**

| | |
|---|---|
| Basic Benefit:  $51.40 x 20 = | $1,028.00 |
| Temporary Benefit:  $49.80 x 20 = | $  996.00 |
| | $2,024.00 |

**GM Share: (BG Credited Service)**
Deferred Vested Basic Benefit:  $51.40 x 7 x .428  (due to age reduction)   =    **$   153.99**

(Note: GM does not recognize as a T&PD retirement, since it was effective after the
7 year anniversary of the Freeze Date.  GM only recognizes those T&PD retirements,
which are approved by both Delphi and GM within 7 years of the Freeze Date.

A deferred vested age reduction factor is applied to the benefit, since the employee
is age 55 at the time of retirement and only had 27 years of credited service as of the
7 year anniversary of the Freeze Date.  Employee is not considered retirement eligible
by GM.  The age reduction factor that Is applied is based on commencing the deferred
vested pension benefit at age 55 versus age 65).

**Total to Retiree:**                                                            **$2,177.99**


### Total Benefit at age 62 and one month:

**Delphi Share:**
Basic Benefit: $51.40 x 20 =                                          **$1,028.00**

**GM Share: (BG Credited Service)**
Deferred Vested Basic Benefit:  $51.40 x 7 x .428  (due to age reduction)   =    **$   153.99**

**Total to Retiree:**                                                       **$1,181.99**


**Note:  This example retiree would not be eligible for OPEB in retirement from GM.  Employee did not
reach retirement eligibility within 7 years of the Effective Date.  As of July 1, 2014, employee was age
54 with 27 years of credited service.  Additionally, the employee is not a T&PD retirement approved by
GM within 7 years of the Effective Date.**

## Example #21- Employee Approved for T&PD Retirement From Delphi But T&PD Is Not Approved By GM

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 15 years
Employee continues to work at Delphi for another 6 years

T&PD Retirement Approved By Delphi But Denied by GM -  Also Denied SSDIB
Retirement effective 7/1/2013 with 21 years of credited service
Single – Age 55 at retirement
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan

## Calculation of Benefit:

### Total Benefit prior to age 62 and one month:

**Delphi Share:**
Basic Benefit:  $51.40 x 15 =                                          $  771.00
Temporary Benefit:  $49.80 x 15 =                                 $  747.00
                                                                                      $1,518.00

**GM Share: (BG Credited Service)**
Deferred Vested Basic Benefit:  $51.40 x 6 x .428  (due to age reduction)  =    $  132.00
(Note: A deferred vested age reduction factor is applied to the benefit,
since the employee is age 55 at the time of retirement and only had
21 years of credited service. Employee is not considered retirement eligible
by GM.  The age reduction factor that Is applied is based on commencing
the deferred vested pension benefit at age 55 versus age 65).

**Total to Retiree:**                                                         $1,650.00

### Total Benefit at age 62 and one month:

**Delphi Share:**
Basic Benefit:  $51.40 x 15 =                                          $  771.00

**GM Share: (BG Credited Service)**
Deferred Vested Basic Benefit:  $51.40 x 6 x .428  (due to age reduction)  =    $  132.00

**Total to Retiree:**                                                         $  903.00

**Note:  This example retiree would not be eligible for OPEB in retirement from GM.  Employee did not reach retirement eligibility.  As of the date of retirement, employee was age 55 with 21 years of credited service.  Additionally, the employee is not a T&PD retirement approved by GM.**

## Example #22- Employee Retires At Age 65 With Less Than 10 Years of Credited Service

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 8 years
Employee works 1 additional year at Delphi after the Freeze

Normal Retirement- Age 65
Retirement effective 7/1/2008 with 9 years of credited service
Single – Age 65 at retirement
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan

### Calculation of Benefit:

### Total Benefit Payable:

**Delphi Share:**
Basic Benefit:  $51.40  x  8  =                    **$411.20**

**GM Share: (BG Credited Service)**
Basic Benefit:  $51.40  x  1  =                    **$  51.40**

**Total To Retiree:**                    **$462.60**

**Note:  This example retiree would not be eligible for OPEB in retirement from GM, since the employee retired with less than 10 years of credited service.**

## Example #23- Employee Retires Under an 85 Point Retirement But Does Not Become Eligible for OPEB Within 7 Years of the Effective Date

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 20 years
Employee continues to work at Delphi for another 8 years

85 Point Retirement
Retirement effective 7/1/2015 with 28 years of service
Single – Age 58 at retirement
Employee had a total of 27 years of credited service as of the 7 year anniversary of the Freeze Date
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan

## Calculation of Benefit:

## Total Benefit prior to age 62 and one month:

### Delphi Share:
Basic Benefit:  $51.40 x 20 = $1,028.00  x .752 (due to age reduction)     =     $   773.06
Interim Supplement:  $36.60 x 20 =                                                       $   732.00
                                                                                         **$1,505.06**

### GM Share: (BG Credited Service)
Basic Benefit:  $51.40 x 7 = $359.80  x .752 (due to age reduction)     =     $   270.57
Interim Supplement:  $36.60 x 7 =                                                    $   256.20
                                                                                     **$   526.77**

(Note: GM is responsible for a portion of the Interim Supplement since
the employee is age 58 at the time of retirement and had 27 years of
credited service as of the 7 year anniversary of the Freeze Date.
GM recognizes this is an 85 point retirement for pension purposes).

**Total to Retiree:**                                                    **$2,031.83**

## Total Benefit at age 62 and one month:

### Delphi Share:
Basic Benefit:  $51.40 x 20 =          **$1,028.00**

### GM Share: (BG Credited Service)
Basic Benefit:  $51.40 x 7  =          **$   270.57**

**Total to Retiree:**          **$ 1,298.57**

**Note:  This example employee would not be eligible for OPEB in retirement from GM.
Employee did not reach retirement eligibility within 7 years of the Effective Date.  As of July 1,
2014, employee was age 57 with 27 years of credited service.**

## Example #24- Death of a Delphi Employee

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 26.5 years
Employee continues to work at Delphi for another 6.5 years and then dies while still employed

Date of death 1/1/2014 with 33 years of credited service
Employee deemed to be a 30 & Out Retirement as of the date of death
Age 58 on date of death
Married at least one year as of the date of death- age difference between retiree and spouse within 5 years
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan

### Calculation of Benefit to Surviving Spouse:

**Delphi Share:**

| | |
|---|---|
| Basic Benefit:  $51.40 x 26.5  = | $1,362.10 |
| Less Cost of Surviving Spouse Coverage: $51.40 x 26.5 = $1,362.10 x 0.05  = | ($    68.11) |
| Monthly Amount Payable to Retiree: | $1,293.99 |

**Monthly Amount Payable to Surviving Spouse:** $1,293.99 x 0.65         =         **$  841.09**

**GM Share: (BG Credited Service)**

| | |
|---|---|
| Basic Benefit:  $51.40 x 6.5 = | $  334.10 |
| Less Cost of Surviving Spouse Coverage: $51.40 x 6.5 = $334.10 x 0.05  = | ($    16.71) |
| Monthly Amount Payable to Retiree: | $  317.39 |

**Monthly Amount Payable to Surviving Spouse:** $317.39 x 0.65         =         **$  206.30**

**Total to Surviving Spouse:**                                 **$1,047.39**

**Note:  This example surviving spouse would be eligible for health care from GM since the employee reached retirement eligibility within 7 years of the Effective Date.  However, Delphi is responsible for the employee's Basic life insurance benefit since he was still actively employed at the time of death.**

## Example #25- Death of a Pre-Retirement Leave Participant (PRP) under the SAP

Assume Effective Date and Delphi Plan Freeze Date is 7/1/2007
Employee's Credited Service as of 6/30/2007 = 27 years
Employee continues to be on the PRP leave for another 2 years and then dies before reaching 30 years of credited service

Date of death 7/1/2009 with 29 years of credited service
Age 55 on date of death
Employee is not retirement eligible as of the date of death
Married at least one year as of the date of death- age difference between retiree and spouse within 5 years
Benefit Class Code C
Assumes the benefit rate levels in effect under the 2003 Hourly-Rate Employees Pension Plan

**Delphi is responsible for the entire pension benefit payable to the surviving spouse, the Survivor Income Benefit Insurance (SIBI) benefit, and the Basic life insurance benefit since the employee was still considered employed.**

**Since this employee was not retirement eligible at the time of death, the surviving spouse would not be eligible for any post-retirement health care from GM.**

**ATTACHMENT C**

## UAW-Delphi-GM Special Attrition Program
## –Transformation

1. Delphi and the UAW agree on the following Special Attrition Program –
   Transformation (SAP-T) for Delphi employees:
   a. An attrition program will be run for Delphi employees as follows:
       i. $35,000 for normal or early voluntary retirements retroactive to
          February 1, 2007 but no later than September 1, 2007.
       ii. 50 & 10 Mutually Satisfactory Retirement (MSR) effective September
          1, 2007.
   b. Any employee with at least 26 and less than 30 years of credited service
      regardless of age will be eligible for special voluntary placement in a pre-
      retirement program under the following terms:
       i. Employees electing this pre-retirement program must be eligible no
          later than September 1, 2007
       ii. Employees will retire without additional incentives when they first
          accrue 30 years of credited service under the provisions of the Delphi
          Hourly-Rate Employees Pension Plan ("Delphi HRP").
       iii. The gross monthly wages while in the program will be:
          1. 29 years credited service      $2,900
          2. 28 years credited service      $2,850
          3. 27 years credited service      $2,800
          4. 26 years credited service      $2,750
      Wages will be paid weekly on an hourly basis (2,080 hours per year) and
      will remain at that rate until 30 years of credited service is accrued.
      Employees will be treated the same as protected status employees with
      the following exceptions: (1) not eligible for Cost of Living Allowance
      (COLA); (2) not eligible for vacation pay except as was earned and unpaid
      prior to the commencement of this Pre-Retirement Program; (3) for
      purposes of pension benefits, the Benefit Class Code will be determined
      using the twenty-four month look back period as specified in Appendix A
      of the Delphi HRP, with said period starting from the last day worked prior
      to the commencement of the pre-retirement program; (4) for purposes of
      life insurance, the amount of life insurance will be based on the base rate
      as of the last day worked prior to the commencement of the pre-retirement
      program.
   c. Buy-out of $140,000 for traditional employees with 10 or more years of
      seniority or credited service or $70,000 for traditional employees with less
      than 10 years of seniority to sever all ties with GM and Delphi except any
      vested pension benefits.  Employees will buy-out when their services are no

Info pkg UAW-Delphi plants                                                    6/27/07

**IMPLEMENTATION OF THE SPECIAL ATTRITION PROGRAM –
TRANSFORMATION IS SUBJECT TO U.S. BANKRUPTCY COURT APPROVAL AND
NO PAYMENTS OR RETIREMENTS WILL BE PROCESSED
UNTIL AFTER COURT APPROVAL.**

**ATTACHMENT C**

longer required but no later than September 15, 2007. An employee electing a buyout whose spouse is employed at Delphi, may, if they meet all plan requirements to do so, be eligible for health care coverage as a dependent pursuant to their spouse's health care program.

d. An employee may only select one of the options described above.

e. Effective October 1, 2007, all Traditional Employees (other than those participating in option 1.b.), both production and skilled trades, not electing an attrition option will become Supplemental Employees consistent with the UAW-Delphi-GM Memorandum of Understanding -Delphi Restructuring.

f. Temporary employees will be used as needed to bridge any difficulties arising from the implementation of the Special Attrition Program – Transformation subject to approval of the National parties.

2. GM, the UAW and Delphi agree that any employee electing to retire under options 1.a.i., 1.a.ii, or 1.b. will be treated as a flowback to GM for purposes of retirement ("check the box"). Such employees will be considered a flowback to GM effective the day of retirement for purposes of the U.S. Employee Matters Agreement and all GM, UAW and Delphi agreements governing flowbacks, including this SAP-T. Any employee choosing option 1.b. above will be considered a Delphi employee until they retire. In exchange for eligibility to receive post-retirement health care and life insurance benefits from GM, employees electing to "check the box" will waive any and all rights to post retirement health care and life insurance benefits from Delphi including but not limited to any and all rights to COBRA continuation through Delphi.

3. The parties acknowledge the following matters regarding the Special Attrition Program - Transformation:
a. Delphi's participation in this SAP-T is subject to the approval of the U.S. Bankruptcy Court; which approval Delphi will seek promptly at the next available omnibus hearing. In the event such participation is not allowed by the Bankruptcy Court, GM and the UAW will have no obligations hereunder. GM's obligations hereunder are subject to approval of this SAP-T by the U.S. Bankruptcy Court pursuant to entry of an order that provides for the treatment of GM's claims as described in this SAP-T and is otherwise reasonably satisfactory to GM, Delphi and the UAW based on the prior UAW special attrition program orders approved in Delphi's chapter 11 cases.

Info pkg UAW-Delphi plants                                                6/27/07

**IMPLEMENTATION OF THE SPECIAL ATTRITION PROGRAM – TRANSFORMATION IS SUBJECT TO U.S. BANKRUPTCY COURT APPROVAL AND NO PAYMENTS OR RETIREMENTS WILL BE PROCESSED UNTIL AFTER COURT APPROVAL.**

**ATTACHMENT C**

b. For the avoidance of doubt, any obligations assumed by GM under this SAP-T with respect to OPEB under paragraph 2 above or active health care and life insurance under paragraph 3.d. below shall be conclusively deemed to be comprehended by, included within, and shall constitute a prepetition, general unsecured claim assertable by GM against the estate of Delphi Corporation under the U.S. Employee Matters Agreement (including without limitation, related flowback agreements and the UAW-GM-Delphi Memorandum of Understanding – Benefit Plan Treatment and the UAW-GM-Delphi Flowback Agreements contained in the 1999 and 2003 GM-UAW and Delphi-UAW Contract Settlement Agreements, as amended), Delphi's Agreement dated December 22, 1999 to indemnify GM for its liability under the Benefit Guarantee as if all conditions for the triggering of GM's claim shall have occurred, and Delphi's general indemnity of GM under the Master Separation Agreement. GM agrees to assume and pay OPEB payments to Delphi employees who "check the box" and/or flow back to GM for purposes of retirement, and to pay the amounts due under Paragraph 1 a.i. above. The presumed triggering of GM's claim against Delphi Corporation described above is only for purposes of this SAP-T and does not trigger any contractual claims against either Delphi or GM beyond their respective obligations under this SAP-T.

c. This SAP-T shall not be subject to abrogation, modification or rejection without the mutual consent of the UAW, GM and Delphi and the order obtained in the Bankruptcy Court by Delphi approving this SAP-T shall so provide. The parties further agree (and the Bankruptcy Court order shall also provide) that this SAP-T is without prejudice to any interested party (including the parties to this SAP-T and the Official Committee of Unsecured Creditors) in all other aspects of Delphi's Chapter 11 cases, including by illustration, Delphi's and GM's respective positions in all commercial discussions and claims matters between them, all collective bargaining matters involving the parties, in any potential proceedings under Sections 1113 and/or 1114 of the Bankruptcy Code with respect to the UAW and under Section 365 of the Bankruptcy Code with respect to GM's contracts with Delphi, in any pension termination proceeding under ERISA and/or the Bankruptcy Code, and all claims administration and allowance matters.

d. Nothing in this SAP-T shall limit or otherwise modify (a) Delphi's rights under Section 4041 of ERISA, or (b) Delphi's rights under Section 1113 and/or 1114 of the Bankruptcy Code with regard to any obligations which pre-existed this SAP-T (including pre-existing obligations referenced within this SAP-T), such as (by way of illustration only) the obligation to maintain the Delphi HRP or provide retirees or active employees (including employees/retirees participating in the attrition programs contained in this SAP-T) with levels of healthcare or other benefits as

**IMPLEMENTATION OF THE SPECIAL ATTRITION PROGRAM –
TRANSFORMATION IS SUBJECT TO U.S. BANKRUPTCY COURT APPROVAL AND
NO PAYMENTS OR RETIREMENTS WILL BE PROCESSED
UNTIL AFTER COURT APPROVAL.**

**ATTACHMENT C**

specified in pre-existing labor agreements.  Under no circumstances shall Delphi freeze the Delphi HRP in a manner that prevents employees in the pre-retirement program described in Paragraph 1. b. above from receiving on-going credited service sufficient to reach 30 years of credited service.  Delphi shall provide the same healthcare and life insurance coverage to employees participating in Paragraph 1.b. above that it provides to its other active UAW employees; provided, however, that if Delphi reduces or eliminates such coverage provided to its active UAW employees, GM shall subsidize such coverage provided to employees participating in Paragraph 1.b. above up to the level provided to GM-UAW active employees.  Except as otherwise expressly provided herein, nothing in this SAP-T shall limit, expand or otherwise modify the rights or obligations of any party under the Benefit Guarantee between GM and the UAW.

e.  Nothing contained herein shall constitute an assumption of any agreement described herein, including, without limitation any collective bargaining agreement between the UAW and Delphi or any commercial agreement between GM and Delphi, nor shall anything herein be deemed to create an administrative or priority claim with respect to GM or convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party.

f.  For the avoidance of doubt, any employee participating in the Special Attrition Program - Transformation under 1.a.i, 1.a.ii, or 1.b above, who flows back to GM for purposes of retirement ("check the box"), will be eligible to retire in accordance with Sections 3.a.6. and 3.b.6. of the UAW-GM-Delphi Memorandum of Understanding Benefit Plan Treatment ("MOU").  For illustrative purposes, as provided in the MOU, such Delphi employees will be eligible for pro-rata pension benefits as defined in the MOU, including but not limited to eligibility for all basic benefits and supplements.  For example, such employees checking the box who have 100% of his/her credited service in the Delphi HRP will receive 100% of their pension benefit from the Delphi HRP.

| | | |
|---|---|---|
| _Mike Grimes_ | _(signature)_ | _(Darrell R. Kitt)_ |
| International Union, UAW | General Motors Corporation | Delphi Corporation |
| _Rick McKinley_ | _(signature)_ | _(signature)_ |
| International Union, UAW | General Motors Corporation | Delphi Corporation |

Info pkg UAW-Delphi plants                                                  6/27/07

**IMPLEMENTATION OF THE SPECIAL ATTRITION PROGRAM – TRANSFORMATION IS SUBJECT TO U.S. BANKRUPTCY COURT APPROVAL AND NO PAYMENTS OR RETIREMENTS WILL BE PROCESSED UNTIL AFTER COURT APPROVAL.**

ATTACHMENT E

## UAW Agreement Check-Off List
### (Assumes Full Implementation of Agreement)

| Agreement Clause | Continues Unchanged | No Continuing Application | Superseded by Supplement as Modified | Changed by Supplement as Modified | Needs to Be Addressed | Comments (based on current state of discussions) |
|---|---|---|---|---|---|---|
| **National Agreement Paragraphs** | | | | | | |
| Introduction | X | | | | | |
| Preface | X | | | | | |
| Agreement [Introductory statement] | X | | | | | |
| Recognition - Para. (1) - (3) | X | | | | | |
| Union Security & Dues Check-Off - Para (4) - (4s) | X | | | | | |
| Orderly Collective Bargaining - Para. (5) - (5a) | X | | | | | |
| Mgt. Non-Discrimination - Para. (6) - (6a) | X | | | | | |
| Union Non-Discrimination - Para. (7) | X | | | | | |
| Managements Rights - Para. (8) | X | | | | | |
| Representation - Para. (9) - (22b) | X | | | | | |
| Job Status - Local Union Officials - Para. (23) - (27) | X | | | | | |
| Grievance Procedure - Para. (28) - (55) | X | | | | | |
| Seniority - Para. (56) - (59) | X | | | | | |
| Seniority Lists - Para. (60) - (61c) | X | | | | | |
| Transfers - Para. (62) - (63)(b) | X | | | | | |
| Loss of Seniority - Para. (64) - (64)(d) | X | | | | | |
| Loss of Seniority - Time-for-Time - Para. (64)(e) | X | | | | | |
| Loss of Seniority - Retirement - Para. (64)(f) | X | | | | | |
| Separation Payment Under SUB Plan - Para. (64)(g) | X | | | | | |
| Reinstatement of Seniority - Para. (64)(h) | X | | | | | |
| Layoff and Rehiring Procedure - Para. (65) - (70) | X | | | | | |
| Equalization of Overtime - Para. (71) | X | | | | | |
| Placement of Workers Comp. Cases - Para. (72) | X | | | | | |
| Exclusions from Seniority Rules - Para. (73) | X | | | | | |
| Seniority Treatment of Co-Ops - Para (73a) | X | | | | | |
| Notification of Address of Record - Para (74) | X | | | | | |
| Lists of Employees & Addresses - Para. (74a) | X | | | | | |
| Shift Preference Agreements - Para. (75) | X | | | | | |
| Disciplinary Layoffs & Discharges - Para. (76) - (77) | X | | | | | |
| Production Standards - Para. (78) - (79i) | X | | | | | |
| Call-In Pay - Para. (80) | X | | | | | |
| Working Hours - Std. Work Week - Para (81) - (83) | X | | | | | |
| Working Hours - Straight Time - Para. (84)(a) - (84)(c) | X | | | | | |
| Working Hours - Time & 1/2 - Para. (85)(a) - (85)(c) | X | | | | | |
| Working Hours - Double Time - Para. (86) | X | | | | | |
| Overtime Exceptions - Seven-Day Operations - Para. (87) - (87)(6) | | | | X | | Delete Indep. Week reference after 2007; rest still applies |
| Change in Shift Hours - Para. (88) | X | | | | | |
| Night Shift Premiums - Para (89) | X | | | | | |
| Three-Shift Opers. - Paid Lunch - Para. (89a) | X | | | | | |
| Wage Payment Plans - Para. (90) | X | | | | | |
| (Placeholder -- Para. (91) deleted during 1993 negotiations) | | X | | | | Paragraph number retained to avoid extensive renumbering |
| Union Bulletin Boards - Para. (92) - (94) | X | | | | | |
| Establishment of New Plants - Para. (95) | X | | | | | |
| Transfer of Major Operations - Para. (96) | X | | | | | |
| Relocation Allowance - Para. (96a)(1) - Para. (96a)(4) | X | | | | | |
| Wage Scales - Para. (97) | X | | | | | |
| Hiring Rates & Progression - Para. (98) - (98)(5) | | | | X | | Revise 156 weeks, max. base rate & Indep. Week (after 2007); rest applies |
| Computing Credit Toward Wage Progression - Para. (98)(6) | | | | X | | Concepts apply, but new employees progress to "Floor Rate" |
| Wage Rate upon Rehire - Para. (98)(b) | | | | X | | |

ATTACHMENT E

## UAW Agreement Check-Off List
### (Assumes Full Implementation of Agreement)

6/22/07

| Agreement Clause | Continues Unchanged | No Continuing Application | Superseded by Supplement as Modified | Changed by Supplement as Modified | Needs to Be Addressed | Comments (based on current state of discussions) |
|---|---|---|---|---|---|---|
| Skilled Trades Exclusion - Para. (99) | X | | | | | |
| Wages of Skilled Trades Hired in Secondary Plant - Para. (99a) | X | | | | | |
| Local Wage Agreements - Para. 100 | X | | | | | |
| General Wage Increases - Para. (101)(a)(1) - Para. (101)(a)(2) | | | | X | | Note re: "wage rule" classifications would still apply |
| Skilled Trades Tools Allowance Adjustment - Para. (101)(a)(3) | | X | | | | One-time adjustment in 2003 |
| Performance Bonus - Para. (101)(b) | | | | X | | Methods of calculation would still apply; skilled trades not covered |
| Performance Bonus (Retirement or Death) -- Para. (101)(b)(1) - (101)(b)(2) | X | | | | | |
| Base Rate Increases - Para. (101)(c) | | | | X | | |
| Cost of Living Allowance - Para. (101)(d) - (101)(i) | | X | X | | | No ongoing COLA under new Supplement |
| New Jobs - Para. (102) - (102)(a) | X | | | | | |
| Leaves of Absence - Para. (103) - (105a) | X | | | | | |
| Leaves of Absence - Sick Leave - Para. (106) | X | | | | | |
| Leaves of Absence - Para. (107) - (111)(b) | X | | | | | |
| Return from Leave - No Work Available - Para. (111)(c) | X | | | | | |
| Leaves of Absence - Para. (112) - (114) | X | | | | | |
| Strikes, Stoppages & Lockouts - Para. (115) - (118) | X | | | | | |
| Skilled Trades - Apprentices - Para. (119) - (127)(f) | X | | | | | |
| Pre-Apprentice Counseling - Tuition Assistance - Para. (127)(g) | | X | X | | | No Tuition Assistance under Supplement |
| Skilled Trades - Apprentices - Para. (127)(h) - (150) | X | | | | | |
| Apprentice Wage Rates - Para. (151) | | | | X | | Future increases per Supplement, including Rate Schedules; will need to be done each year -- send letter to Union when increase known |
| Skilled Trades Vacancies - Para. (152) - (154) | X | | | | | |
| Employees-in-Training (EIT and EITS) - Para. (155) - (162) | X | | | | | |
| Wage Rates of Employees-in-Training - Para. (163) - (164) | | | | X | | Future increases per Supplement, including Rate Schedules; will need to be done each year -- send letter to Union when increase known |
| EIT Transfer to Other Skilled Classifications - Para. (165) | X | | | | | |
| Reclassification to Jryn Status & Seniority Rights - Para. (166) - (177) | X | | | | | |
| Definition of Jryn. - Para. (178) - (178a) | X | | | | | |
| Model Change/Plant Rearrangement - Para. (179) | X | | | | | |
| Related Training - EIT - Para. (180)(a) - (180)(e) | X | | | | | |
| Maintenance Helpers - Para. (181) | X | | | | | |
| Wage Rate upon Reclassification to EITS/Jryn - Para. (181a) | X | | | | | |
| Local Agreements - Para. (181b) | X | | | | | |
| Lines of Demarcation - Para. (182)(a) - (182)(d) | X | | | | | |
| Subcontracting - Para. (183)(a) - (183)(e) | X | | | | | |
| Vacation Entitlement - Para. (184) - (190) | X | | | | | Drop reference to Indep. Week in Para. (189) after 2007; rest unchanged |
| Vacation Entitlement Hours - Para. (191) | | | | X | | Vacation capped at 160 hours under Supplement |
| Vacation Entitlement - Para. (192) - (201) | | | | X | | |
| Vacation Time Off Procedure - Para. (202) | X | | | | | |
| Independence Week - Para. (202a) | | X | X | | | No Independence Week Pay under Supplement |
| Plant Vacation Shutdown Week (202b) | X | | | | | |
| Notification of Operations Scheduled to Run - Para. (202c) | X | | | | | Drop reference to Indep. Week after 2007; remainder unchanged |
| Independence Week Pay & Additional Time Off - Para. (202d) - (202g) | | X | X | | | No Indep. Week pay or ATO days after 2007 |
| Scheduling Vacation Time Off - Para. (202h) - (202i) | X | | | | | |
| Vacation Pay & Advance Vacation Pay - Para. (202k) - (202m)(3) | X | | | | | |
| Holidays - Para. (203) | | | | X | | |
| Holiday Pay - Para. (203)(1) - (203b) | X | | | | | Will adopt GM holidays through 9/14/11 |
| Weekends during Christmas Holiday Period - Para. (203c) | X | | | | | |
| Holiday Pay - Para. (204) - (213a)(b) | | | | X | | Will adopt GM dates through 9/14/11 |
| Smoking Rules - Para. (214) | X | | | | | |

ATTACHMENT E

## UAW Agreement Check-Off List
### (Assumes Full Implementation of Agreement)

| Agreement Clause | Continues Unchanged | No Continuing Application | Superseded by Supplement as Modified | Changed by Supplement as Modified | Needs to Be Addressed | Comments (based on current state of discussions) |
|---|---|---|---|---|---|---|
| Supervisors Working - Para. (215) | X | | | | | |
| Reports of Physical Exams - Para. (216) | X | | | | | |
| Pay Procedures - Para. (217) | X | | | | | |
| Jury Duty Pay - Para. (218) | X | | | | | |
| Short-term Military Duty Pay - Para. (218a) | X | | | | | |
| Bereavement Pay - Para. (218b) | X | | | | | |
| Limitations on Local Negotiations - Para. (219) | X | | | | | |
| Supremacy of National Agreement - Para. (220) | X | | | | | |
| Termination of Local Agreements - Para. (221) | X | | | | | |
| No Retroactivity - Para. (222) | X | | | | | |
| Duration of Agreement & Notification Procedures - Para. (223) | | | | X | | Insert new termination date; rest unchanged |
| Benefit Plans - Para. (224) | | | | X | | Drop references to GIS and Legal Services Plans -- Under discussion |
| Waiver - Para. (225) | X | | | | | |
| Partial Invalidity - Para. (226) | X | | | | | |
| Separability - Para. (227) | X | | | | | |
| **National Agreement Appendices** | | | | | | |
| Appendix A - MOU Employee Placement | | | | X | | Only sections specified in Supplement continue to apply; Modified. Supplement adds transfer rights to other Delphi plants |
| Appendix B - Date of Entry Status - Apprentices & EIT's | X | | | | | |
| Appendix C - Calculation of Skilled Trades Seniority | X | | | | | |
| Appendix D - Interpretation of Para. (4) thru (4c) and Para. (57) | X | | | | | |
| Appendix F - Utilization of ST Maintenance Employees | X | | | | | |
| Appendix F-1 - Subcontracting Skilled Trades Work | X | | | | | |
| Appendix F-2 - Para. (42a)(2) Procedure Issues | X | | | | | |
| Appendix H - Selection of EIT's | X | | | | | |
| Appendix I - Special Skilled Trades Representative | X | | | | | |
| Appendix K - MOU Job Security (JOBS) Program | | X | X | | | Does not apply to employees covered by Supplement |
| Appendix L - Sourcing | X | | | | | Parties to work on costing criteria |
| **National Agreement Memoranda of Understanding** | | | | | | |
| MOU - WEMR Classification | X | | | | | |
| MOU - Overtime | X | | | | | |
| MOU - Work Centers | X | | | | | |
| MOU - Joint Activities | | | | X | | No joint funds; Joint administration at local level |
| MOU - Human Resource Development | | | | X | | No joint funds; Joint administration at local level |
| MOU - Tuition Assistance Plan | | | X | | | No funding or participation after effective date of Modified Supplement |
| MOU - Voluntary Political Contributions | X | | | | | |
| MOU - Delphi Corporation | | | X | | | Enabling language for Supplement; completed in 2004 |
| **National Agreement Documents** | | | | | | |
| Doc. 1 - Interpretation of Time & One-Half - Short Shift Case | X | | | | | |
| Doc. 2 - Interpretation of Working Hours Section - Delayed Sun. Start | X | | | | | |
| Doc. 3 - Interpretation of Working Hours Section - Double Time Case | X | | | | | |
| Doc. 4 - Interpretation of Wkg. Hours Section - Protracted Work Period | X | | | | | |
| Doc. 5 - Relieving Employee for Committeeman Discussion | X | | | | | |
| Doc. 6 - Union Racks - Official Publications | X | | | | | |
| Doc. 7 - MOU - Health & Safety | | | | X | | No joint funds; Joint administration at local level |
| Doc. 7 - MOU - Health & Safety - Sec. VI (H&S Representatives) | X | | | | | |
| Doc. 7 - MOU - Health & Safety - Attachment "A" | | | | X | | No joint funds; Joint administration at local level |
| Doc. 8 - MOU - Special Procedure for Attendance | X | | | | | |

ATTACHMENT E

## UAW Agreement Check-Off List
### (Assumes Full Implementation of Agreement)

| Agreement Clause | Continues Unchanged | No Continuing Application | Superseded by Supplement as Modified | Changed by Supplement as Modified | Needs to Be Addressed | Comments (based on current state of discussions) |
|---|---|---|---|---|---|---|
| Doc. 9 - Enhancement of Component & Service Parts Operations | X | | | | | |
| Doc. 10 - JOBS Program - Volume-Related Layoffs | | X | X | | | No JOBS Program under Supplement |
| Doc. 11 - Full Utilization of Protected Employees | | X | X | | | No JOBS Program under Supplement |
| Doc. 12 - Growth & Opportunity Committee | | | | | | |
| Doc. 13 - Plant Closing and Sale Moratorium | X | | | X | | |
| Doc. 14 - Divisional Health & Safety | X | | | | | |
| Doc. 15 - Temporary Openings | | | | X | | No Local JOBS Committee; change to Key Four |
| Doc. 16 - Purchasing Activity Communication | X | | | | | |
| Doc. 17 - Exchange of Views | X | | | | | |
| Doc. 18 - Financial Secretaries – Dues Check-Off | X | | | | | |
| Doc. 19 - Financial Secretaries - Temporary Delay of Dues Check-Off | X | | | | | |
| Doc. 20 - Apprentice Placement - Closed Plants or Discontinued Prog. | X | | | | | |
| Doc. 21 - Memo of Joint Commitment – Employee Placement | X | | | | | |
| Doc. 22 - Notice of Anticipated Recall | X | | | | | |
| Doc. 23 - Employee Rating Forms | X | | | | | |
| Doc. 24 - Representation During Management Meetings | X | | | | | |
| Doc. 25 - Closed Plants Policy - Vacation Pay | X | | | | | |
| Doc. 26 - Prior Seniority - Vacation Pay | X | | | | | |
| Doc. 27 - MOU Regarding Drug Testing | | | | X | | Delete reference to National Work/Family Committee; rest applies |
| Doc. 28 - Drug Testing - Federally Mandated | X | | | | | |
| Doc. 29 - Personnel Practices | X | | | | | |
| Doc. 30 - Delphi EEO Policy | X | | | | | |
| Doc. 31 - Equal Application Committee - National and Local | X | | | | | |
| Doc. 32 - Delphi Policy re: Employment of Individuals with Disabilities | X | | | | | |
| Doc. 33 - Delphi Policy re: Disabled Veterans & Vietnam Era Veterans | X | | | | | |
| Doc. 34 - Review Personnel Records | X | | | | | |
| Doc. 36 - Paid Educational Leave | | | | | | No funding or participation after effective date of Modified Supplement |
| Doc. 37 - Resource & Referral - Work/Family Program | | X | X | X | | No joint funds; Crit. Incident & Workplace Violence remain |
| Doc. 38 - Orientation Program | X | | | | | |
| Doc. 39 - MOU - Employee Assistance Program | | | | X | | No joint funds; Joint administration at local level |
| Doc. 40 - MOU - Quality Network & Attachments A - D | | | | X | | No joint funds; Joint administration at local level |
| Doc. 41 - Commitment to Diversity | X | | | | | |
| Doc. 42 - Paragraph 64(e) Extension | X | | | | | |
| Doc. 43 - Career Development Program | | | | X | | No joint funds; Crit. Incident & Workplace Violence remain |
| Doc. 44 - Expeditious Grievance Handling - Delphi to UAW | | X | | | | |
| Doc. 45 - Expeditious Grievance Handling - UAW-Delphi | | X | | | | |
| Doc. 46 - Joint Program Representatives | | | | X | | Funding and participation in some programs discontinued under Supp. |
| Doc. 47 - Temporary Employees | X | | | | | |
| Doc. 48 - Arbitration Letter | X | | | | | |
| Doc. 49 - Management Representatives in Disciplinary Interview | X | | | | | |
| Doc. 50 - Holiday Pay and Disciplinary Layoffs | X | | | | | |
| Doc. 51 - Discipline for Garnishments | X | | | | | |
| Doc. 52 - Reinstatement of Grievances | X | | | | | |
| Doc. 53 - Furnishing Work Elements - Standards Cases | X | | | | | |
| Doc. 54 - Employee Transfer or Re-Assignment | X | | | | | |
| Doc. 55 - Implementation of Production Standards Settlements | X | | | | | |
| Doc. 56 - Relief Time - Certain Operations | X | | | | | |
| Doc. 58 - Subcontracting - Implementation of Para. (183)(d) | X | | | | | |
| Doc. 60 - Pre-Apprentice Training | X | | | | | |
| Doc. 61 - Apprentice Committee Members - Management Expertise | X | | | | | |
| Doc. 62 - Apprentice Testing and the Local Apprentice Committee | X | | | | | |

ATTACHMENT E

## UAW Agreement Check-Off List
### (Assumes Full Implementation of Agreement)

| Agreement Clause | Continues Unchanged | No Continuing Application | Superseded by Supplement as Modified | Changed by Supplement as Modified | Needs to Be Addressed | Comments (based on current state of discussions) |
|---|---|---|---|---|---|---|
| Doc. 63 - Job Security - Apprentice Training & Jryn. Development | X | | | | | |
| Doc. 64 - Apprentice Work Assignments | X | | | | | |
| Doc. 65 - Related Training Bonus | X | | | | | |
| Doc. 66 - Layoffs - Apprentices and EIT's | X | | | | | |
| Doc. 67 - Conversion to Metric System | X | | | | | |
| Doc. 68 - Administration of Para. (178) | X | | | | | |
| Doc. 69 - Para. (63)(a) - State Labor Protective Laws | X | | | | | |
| Doc. 70 - Transfers and Promotions - Local Suspension | X | | | | | |
| Doc. 71 - Para. (63)(a)(2) - Definition of "Within the Plant" | X | | | | | |
| Doc. 72 - Para. (63)(a)(2) - Filing for a Single Classification | X | | | | | |
| Doc. 73 - Union Work Centers | X | | | | | |
| Doc. 74 - Center for Benefit Plans and H&S Representatives | X | | | | | |
| Doc. 75 - Facilities for Union Members of Local Apprentice Comm. | X | | | | | |
| Doc. 76 - Space & Furnishings for Benefit, H&S and Appr. Comm. | X | | | | | |
| Doc. 77 - Local Union Presidents | X | | | | | |
| Doc. 78 - Anticipated Termination of Sick Leaves | X | | | | | |
| Doc. 79 - Changes in Established Shift Hours or Lunch Periods | X | | | | | |
| Doc. 80 - Christmas Holiday Period | X | | | | | |
| Doc. 81 - Federal Income Tax Withholding | X | | | | | |
| Doc. 82 - Major Plant Rearrangement - Advance Discussion | X | | | | | |
| Doc. 83 - Overtime Policies | X | | | | | |
| Doc. 84 - Weather Conditions & Riot Letter | X | | | | | |
| Doc. 85 - Innovative Wage Structure | X | | | | | |
| Doc. 86 - Modification to Paragraph (69) | X | | | | | |
| Doc. 87 - COLA Calculation | | | X | | | No COLA under new Supplement |
| Doc. 88 - Transfer Provisions - Joint & Benefit Representatives | X | X | | | | |
| Doc. 89 - SEL and Sourcing - Expenses | | | | X | | Delete references to SEL administration / Job Security |
| Doc. 90 - Personal Privacy | X | | | | | |
| Doc. 91 - Sale of Business | X | | | | | |
| Doc. 92 - Up-Front Lump Sum Payment | | X | | | | One-time payment in 2003 |
| Doc. 93 - Bereavement - Vacation with Pay | X | | | | | |
| Doc. 94 - Holidays Occurring During an Approved Vacation | X | | | | | |
| Doc. 95 - Grievance Procedure | X | | | | | |
| Doc. 96 - "Cooling Off" Period | X | | | | | |
| Doc. 97 - Promotions - Para. (63) | X | | | | | |
| Doc. 98 - Subcontracting Communications | X | | | | | |
| Doc. 99 - Delphi Policy Regarding Sexual Harassment | X | | | | | |
| Doc. 100 - Warranties | X | | | | | |
| Doc. 101 - COLA Calculation Conversion | | X | X | | | No COLA under new Supplement |
| Doc. 102 - Tuition Assistance Program - College Recognition | | X | X | | | No Tuition Assistance under new Supplement |
| Doc. 103 - Joint Programs Television Communications Service | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Doc. 104 - Movement of Work - Advance Notice | X | | | | | |
| Doc. 105 - Health & Safety Representatives - Role and Responsibility | | | | X | | No funding by National Joint Committee |
| Doc. 106 - Skill Centers - Training in Plant | | | | X | | No joint funds; Joint administration at local level |
| Doc. 107 - Training of Individuals with Disabilities | X | | | | | |
| Doc. 108 - Work/Family Program | | | | X | | No funding or participation after effective date of Modified Supplement, except retain Dependent Care Spending Acct. |
| Doc. 109 - Pre- and Post-Retirement Programs | | X | | | | No funding or participation after effective date of Modified Supplement |
| Doc. 110 - Dislocated Workers (Pre-Post Layoff Services) | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Doc. 111 - Special Assignment - Overtime | X | | | | | Note: Error in current language - should refer to App. A-X |
| Doc. 112 - Work Assignments - Skilled Trades | X | | | | | |

ATTACHMENT E

## UAW Agreement Check-Off List
### (Assumes Full Implementation of Agreement)

| Agreement Clause | Continues Unchanged | No Continuing Application | Superseded by Supplement as Modified | Changed by Supplement as Modified | Needs to Be Addressed | Comments (based on current state of discussions) |
|---|---|---|---|---|---|---|
| Doc. 113 - EDS Work Assignments | X | | | | | |
| Doc. 114 - EAP - Early Intervention | X | | | | | |
| Doc. 115 - POW/MIA Flags | X | | | | | |
| Doc. 116 - Overtime | X | | | | | |
| Doc. 117 - JOBS Program - Voluntary Retirement Leaves | | X | X | | | No JOBS Program under new Supplement |
| Doc. 118 - Attritional Credit - Unique Situations | | X | X | | | Appendix K does not apply to employees covered by Supplement |
| Doc. 119 - Flying UAW Flag at Delphi Facilities | X | | | | | |
| Doc. 120 - Coordination of Sourcing Evaluations | X | | | | | No funding; participation & administration for local discussion |
| Doc. 121 - ADAPT Program | X | | | | | |
| Doc. 122 - Metal Removal Fluids | | X | X | | | No funding after effective date of Modified Supplement |
| Doc. 123 - Joint Activities Funds | X | | | | | |
| Doc. 124 - Employee Social Security Numbers | | X | X | | | |
| Doc. 125 - Compliance with FMLA | X | | | | | |
| Doc. 126 - Procedure to Correct Pay Shortages | X | | | | | |
| Doc. 127 - Sourcing Evaluation | X | | | | | |
| Doc. 128 - Retirees - Fitness Centers | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Doc. 129 - Retiree Tuition Assistance Plan | | X | X | | | No Tuition Assistance under new Supplement;No funding or participation after effective date of Modified Supplement |
| Doc. 130 - Scholarship Program for Dependent Children | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Doc. 131 - Supplier Corporate Citizenship | X | | | | | |
| Doc. 132 - Transition Centers - Joint Programs | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Doc. 133 - Collective Bargaining Agreement Training Program | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Doc. 134 - Working on a Holiday - Vacation Entitlement Conversion | | X | | | | |
| Doc. 135 - Plant Seniority - Vacation Entitlement Eligibility | | X | | | | |
| Doc. 136 - Independence Week Shutdown Layoff | X | | | | | No Independence Week Shutdown after 2007 |
| Doc. 137 - Individual Work Schedules - Indep. Week & Vac. Shutdown | | X | | X | | Delete reference to Independence Week after 2007; remainder applies |
| Doc. 139 - Near Miss Accidents | X | | | | | |
| Doc. 140 - Product Development and Transformation | X | | | | | |
| Doc. 141 - Paragraph (69) Administration | X | | | | | |
| Doc. 143 - Implementation of Para. (76a) | X | | | | | |
| Doc. 144 - Temporary Employees | X | | | | | Note: Error in current language - should refer to App. A-X |
| Doc. 145 - Processing of Grievances | X | | | | | |
| Doc. 146 - Wage Progression | X | | | | | |
| Doc. 147 - Payroll Related Matters | X | | | | | |
| Doc. 148 - DMS Relationship to Quality Network Process | X | | | | | |
| Doc. 149 - Outside Vendors | X | | | | | |
| Doc. 150 - Pedestrian / In-Plant Vehicle Team | X | | | | | |
| Doc. 151 - Pre-Production Operations - Doc. 10 | | X | X | | | No JOBS Program under new Supplement |
| Doc. 152 - Tool Room Operations | X | | | | | |
| Doc. 153 - New Work Opportunities | X | | | | | |
| Doc. 154 - Undercover Agents | X | | | | | |
| **Contract Settlement Agreement Terms** | | | | | | |
| Para. 1 - New National Agreement | | | | X | | Additional Paragraphs changed by 2004 & 2007 Supplements |
| Para. 2 - Unchanged Paragraphs | | | | X | | Additional Paragraphs changed by 2004 & 2007 Supplements |
| Para. 3 - Amendments, Additions, Substitutions and Deletions | | | | X | | Additional Paragraphs changed by 2004 & 2007 Supplements |
| Para. 4 - Personal Relief for Certain Employees | X | | | | | |
| Para. 5 - Union Bulletin Boards & Publication Racks | X | | | | | |
| Para. 6 - Indemnity Agreement | X | | | | | |
| Para. 7 - Miscellaneous Agreements | | | | | | |
| Para. 8 - Grievances Under Old Agreement | X | | | X | | Continue in effect except as modified by 2004 & 2007 Supplements |

ATTACHMENT E

## UAW Agreement Check-Off List
### (Assumes Full Implementation of Agreement)

| Agreement Clause | Continues Unchanged | No Continuing Application | Superseded by Supplement as Modified | Changed by Supplement as Modified | Needs to Be Addressed | Comments (based on current state of discussions) |
|---|---|---|---|---|---|---|
| Para. 9 - Local Agreements | | | | | X | |
| Para. 10 - Hiring Rates | | | | X | | Hiring rates and progression modified by new Supplement |
| Para. 11 - National Agreement Changes and/or Waivers | X | | | | | |
| Para. 12 - Local Issues Strikes | X | | | | | |
| Para. 13 - Related Supplemental Agreements | | | | X | | GIS eliminated; Pension freeze; OPEB termination |
| Para. 14 - Life and Disability Benefits Program & Health Care Prog. | | | | X | | OPEB terminated |
| Para. 15 - Personal Savings Plan | | | | X | | Coverage as modified by Supplement |
| Para. 16 - Eff. Date of Life & Disability Benefits Program | | | | X | | Coverage as modified by Supplement |
| Para. 17 - Corporation-Union Committee on Health Care Benefits | | X | | | | Funding period expires four years from effective date |
| Para. 18 - Funding - Growth & Opportunity Committee | | X | X | | | No funding |
| Para. 19 - Funding Health & Safety Activities | | X | X | | | No funding after effective date of Modified Supplement |
| Para. 20 - Wages Earned Definition | X | | | | | |
| Para. 21 - Statement on Technological Progress | X | | | | | |
| Para. 22 - Apprentice Safety Training | X | | | | | |
| Para. 23 - Group Legal Services Plan | | X | X | | | |
| Para. 24 - Employee Benefit Plans and Programs | | | | X | | |
| Para. 25 - UAW-GM-Delphi Flowback Agreement | | | | X | | |
| Para. 26 - Center for Human Resources | | | X | | | No funding or participation after effective date of Modified Supplement |
| Para. 27 - Ratification and Effective Date | X | | | | | |
| Para. 28 - New Vehicle Purchase Program | X | | | | | |
| Para. 29 - Service Parts Purchase | X | | | | | |
| Para. 30 - Counterpart Signatures | X | | | | | |
| **Supplemental Agreements Attached as Exhibits** | | | | | | |
| Supplemental Agreement - Pension Plan (Exhibit A) | | | | X | | DB Plan frozen |
| Supplemental Agreement - Life & Disability Benefits Program (Exhibit B) | | | | X | | Coverage per 2004 Supplemental Agreement |
| Supplemental Agreement - Health Care Program (Exhibit C) | | | | X | | Coverage per 2004 Supplemental Agreement |
| Supplemental Agreement - SUB Plan (Exhibit D) | | | | X | | Coverage per 2004 Supplemental Agreement |
| Supplemental Agreement - GIS (Exhibit E) | | | X | | | GIS Plan eliminated |
| Supplemental Agreement - Profit Sharing Plan (Exhibit F) | X | | | | | |
| Supplemental Agreement - Personal Savings Plan (Exhibit G) | | | | X | | Coverage per 2004 Supplemental Agreement |
| Supplemental Agreement - Legal Services Plan (Exhibit I) | | X | X | | | Legal Services Plan eliminated |
| **2004 Supplemental Agreement** | | | | | | |
| Preamble | X | | | | | |
| Article 1 - Duration | X | | | | | |
| Article 1 - Applicability | | | | X | | After 10/1/07 will also apply to Traditional Employees who Buy Down |
| Article 1 - Seniority and Transfers | X | | | | | |
| Article 1 - Wage and Classification Groupings | | | | X | | New progression, COLA eliminated, annual wage increases added |
| Article 1 - Vacation Entitlement | X | | | | | |
| Article 1 - Independence Week Period | X | | | | | No Independence Week after 2007 |
| Article 1 - Memorandum of Joint Activities and Legal Services | X | | | | | |
| Article 1 - Doc.38 - Orientation Program | X | | | | | |
| Article 1 - Benefit Plans | X | | | | | |
| Article 1 - Preferential Hiring Opportunities at GM Plants | | X | X | | | New Supplement defines flowback & hiring opportunities |
| Article 1 - Appendix A | | | | X | | Transfers to other Delphi Keep plants added |
| Article 1 - Appendix K | X | | | | | Appendix K does not apply under Supplemental Agreement |
| Article 2 - Capital Investments & New Product Allocation | X | | | | | |
| Article 2 - GM Business | | | | X | | Outdated; Attachments A & A-1 deal with programs |
| Article 2 - Supervisory Staffing | X | | | | | |
| Article 2 - Equivalence of Sacrifice | X | | | | | |

ATTACHMENT E

## UAW Agreement Check-Off List
### (Assumes Full Implementation of Agreement)

| Agreement Clause | Continues Unchanged | No Continuing Application | Superseded by Supplement as Modified | Changed by Supplement as Modified | Needs to Be Addressed | Comments (based on current state of discussions) |
|---|---|---|---|---|---|---|
| Article 2 - Local Operating Practices | X | | | | | |
| Article 2 - Flowback to GM Facilities | | | | X | | New Supplement defines flowback & hiring opportunities |
| Article 2 - Enhanced Retirement and Separation Incentives | | | | X | | Commitment completed; Terms negotiated as part of New Supplement |
| Article 2 - Document 13 | X | | | | | Clarify that Document 13 does not extend beyond 9/14/11 |
| Article 3 - Scope | X | | | | | |
| Article 3 - Compliance - Dispute Resolution | X | | | | | |
| Attachment A - Supplemental Agreement Wage Structure | | | | X | | Extended by GM, insert new date |
| Attachment B - Supplemental Agreement Benefit Plans | | | | X | | Extended by GM, insert new date |
| **Miscellaneous Documents** | | | | | | |
| 1999 Benefits MOU | | | | X | | Certain provisions need to be deleted |
| 9/29/99 Letter re "Post-2003 Delphi Agreement" ("The Mirror Letter"): | | X | | | | |
| 2001 MOU on CHR Expenses (23%) | | X | X | | | No funding or participation after effective date of Modified Supplement |
| **Unpublished Letters & Documents - 2003 National Agreement** | | | | | | |
| Verbal Agreement - Hiring Requirements/Doc. 46 Representation | | X | X | | | No hiring requirements under Modified Supplement |
| Unpublished Letter - Additional Funding | | X | X | | | No funding after effective date of Modified Supplement |
| Unpublished Letter - Neutrality | X | | | | | |
| Unpublished Letter - Skilled Trades/Indirect Labor Audits | | | | X | | No job security provisions under Supplement |
| Unpublished Letter - Special Active Duty – Armed Service | X | | | | | |
| Unpublished Letter - Union Membership Dues | X | | | | | |
| Exerpt - Data & Information | X | | | | | |
| Excerpt - Adapt Audit, Implementation & Training Curriculum | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Excerpt - Compliance Report Review & bi-annual meeting | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Excerpt - Tooling or Work Transferred between Plants | X | | | | | |
| Excerpts - Timely Job Offers | X | | | | | |
| Excerpt - Job Swaps | X | | | | | |
| Excerpt - Access to Local Joint Fund Screens | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Excerpt - Electronic Joint Fund Requests | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Excerpt - Access to Employee Discipline Record | X | | | | | |
| Excerpt - Expeditious Handling of Grievances | X | | | | | |
| Excerpt - Grievance Procedure - Full Disclosure | X | | | | | |
| Excerpt - Grievance Procedure – Paragraph (20) | X | | | | | |
| Excerpt - Paragraph (21a) and (21b) - Representation across shifts | X | | | | | |
| Excerpt - Para.(108) Conversion to Para. (106) - Tracking credited service | X | | | | | |
| Excerpt - Secondary Ergonomic Analysis Tools | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Design-in Early JETT Involvement | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Industrial Hygiene Activities | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Ergonomics Technicians Computer Equipment | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - High Efficiency Filtration in Air Houses | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Measuring Effectiveness of Joint Ergonomics Programs | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - New Processes and Technological Advances | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Ergonomics Evaluation Process for ST Jobs | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Testing for Confined Space Entry | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - H&S Issue Resolution Procedure | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Hearing Protection Equipment Pilot | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - ST Safety Awareness & Powered Vehicle Safety Issues | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Emergency Response Teams and Joint H&S Audit Process | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Fitness Center Needs Analysis | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Excerpt - Use of Probationary Employees for Production Standards | X | | | | | |
| Excerpt - Personal Privacy & Disclosure | X | | | | | |

ATTACHMENT E

## UAW Agreement Check-Off List
### (Assumes Full Implementation of Agreement)

| Agreement Clause | Continues Unchanged | No Continuing Application | Superseded by Supplement as Modified | Changed by Supplement as Modified | Needs to Be Addressed | Comments (based on current state of discussions) |
|---|---|---|---|---|---|---|
| Excerpt - Paragraph (215) Violations | X | | | | | |
| Excerpt - AOL Subsidy & Other Employee Discounts | | | | X | | AOL discontinued; other non-subsidized discounts continue |
| Excerpt - Paid Educational Leave (PEL) | | X | | | | No National PEL under Supplemental Agreement |
| Excerpt - Pre/Post Retirement Program | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Excerpt - Changing Shift Hours & Lunch Periods | X | | | | | |
| Excerpt - Acquiring Seniority – Time Lost for Bereavement | X | | | | | |
| Excerpt - Proposed Plant Consolidation | X | | | | | Complete |
| Excerpt - Quality Network Budget Planning & Funding | | | | X | | No joint funds; Joint administration at local level |
| Excerpts from the Minutes - Quality Network Planned Maintenance | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Quality Network – Internal Communications Process | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Quality Network Action Strategies Review & Update | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Quality Network Suggestion Plan Review | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Quality Network Suggestion Plan Administration Letter | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Reissue MAXIMO Help Desk letter | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - QN Representative Training Guidelines | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Simulated Work Environment | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Skilled Trades Supervisory Experience | X | | | | | |
| Excerpt - Joint Training Funds to Support Skilled Trades | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Excerpt - Maintenance of Tool, Die & Engrg. Room Equipment | X | | | | | |
| Excerpt - Doc #63 Retraining - Tool Allowance | X | | | | | |
| Excerpt - Apprentice Placements & Training Plans/Rotations | X | | | | | |
| Excerpt - Working Alone "High Risk" Job Assignment | X | | | | | |
| Excerpt - H&S Training Schedule for Apprentices & EIT's | X | | | | | |
| Excerpt - "Normal Warranty" | X | | | | | |
| Excerpt - Balancing Doc. 63 Placement vs. Apprentices | X | | | | | |
| Excerpt - Tool List for Apprentices | X | | | | | |
| Excerpt - Changes in Licensing or Certification Ordinances | X | | | | | |
| Excerpt - Special Skilled Trades Representation | X | | | | | |
| Excerpt - Software Changes and Program Modifications | X | | | | | |
| Excerpt - Re-testing Apprentice Applicants | X | | | | | |
| Excerpt - Tool Box at Time Apprentice Indentured | X | | | | | |
| Excerpt – Workspace for Union Members of Local Apprentice Committee | X | | | | | |
| Excerpt - Decision to Initiate Apprentice Program | X | | | | | |
| Excerpt – Applicants for Pre-Apprentice Training Program | X | | | | | |
| Excerpt – Planned/Predictive Maintenance Training Guide | X | | | | | |
| Excerpt - Doc #63 Demographic Studies & Needs Analysis | X | | | | | |
| Excerpt – Tool Allowance EIT Program | X | | | | | |
| Excerpt – Rate Progression Inequity - Division I vs. Apprentice | X | | | | | |
| Excerpt – Additional Tool Allowance for Apprentices | X | | | | | |
| Excerpt - Repair Work on Leased/Rented Equipment | X | | | | | |
| Excerpt – Attrition in Non-Apprenticeable Classifications | X | | | | | |
| Excerpt - Precision Toolbox for Jryn Being Retrained | X | | | | | |
| Excerpt – Updating Sourcing Database | X | | | | | |
| Excerpt - On-Line Training Module for Appendix L | X | | | | | |
| Excerpt – Performing Identical or Nearly Identical Work | X | | | | | |
| Excerpt – Sourcing – Plant Audits | X | | | | | |
| Excerpt – Appendix L - Calculation of Employee Impact | X | | | | | |
| Excerpt – Training & Retraining – Review and Re-evaluation | X | | | X | | No joint funds; Joint administration at local level |
| Excerpt - List of Training Contacts | X | | | | | |
| Excerpt - Tuition Assistance Plan & W-2 Forms for Retirees | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Excerpt - Addressing Unwarranted Absenteeism | X | | | | | |

ATTACHMENT E

## UAW Agreement Check-Off List
### (Assumes Full Implementation of Agreement)

| Agreement Clause | Continues Unchanged | No Continuing Application | Superseded by Supplement as Modified | Changed by Supplement as Modified | Needs to Be Addressed | Comments (based on current state of discussions) |
|---|---|---|---|---|---|---|
| Except - Wage Inequity Fund | X | | | | | |
| Except - Explanation of Overpayment Recovery | X | | | | | No funding or participation after effective date of Modified Supplement |
| Except - Childcare Needs | | X | X | | | Complete |
| Except - Panic Buttons & Fax Machines – Work/Family offices | X | | | | | No joint funds; Joint administration at local level |
| Except - EAP Process Audit | | | | X | | |
| Letter - Sourcing Pipeline | X | | | | | |
| Special Minutes - Employee Placement | | X | X | | | No GM to Delphi flow under Modified Supplemental Agreement |
| **Unpublished Letters & Documents - 1999 National Agreement** | | | | | | |
| Letter & MOU - Post-2003 Delphi Agreement ("Mirror Agreement") | | | | | X | |
| Letter - Undercover Agents | | X | | | | Now covered by 2003 Document 154 (ongoing) |
| Letter - Delphi Automotive Systems Selection Process | | X | | | | Complete; AON Selection Process discontinued |
| Unpublished Letter - Equal Application Training | X | | | | | Complete; no funding after effective date of Modified Supplement |
| Except - Apprentice Tool List | X | | | | | Repeated in 2003 as unpublished excerpt |
| Except - Special Skilled Trades Representation | X | | | | | Repeated in 2003 as unpublished excerpt |
| Except - Decision to Initiate Apprentice Program | X | | | | | Repeated in 2003 as unpublished excerpt |
| Except - Tool Box at Time Apprentice Indentured | X | | | | | Repeated in 2003 as unpublished excerpt |
| Except - Re-testing Apprentice Applicants | X | | | | | Repeated in 2003 as unpublished excerpt |
| Except - Work/Family Matters & Needs Analysis | | | | X | | Dependent Care Spending Acct. remains; rest no longer applies |
| Except - Transition center participation | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Except - EAP & Other Work/Family matters | | | | X | | No joint funds; Joint administration at local level |
| Except - Access to Local Joint Fund Screens | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Except - CHEMISTRI Database for Tracking Chemicals | | X | X | | | Replaced by MSDSNET; see 2003 unpublished excerpt |
| Except - Quality Network Common Agenda | X | | | | | |
| Except - Contractor Safety | X | | | | | |
| Except - Costing Criteria for Sourcing Decisions | X | | | | | |
| Except - Testing for Confined Space Entry | X | | | | | Repeated in 2003 as unpublished excerpt |
| Except - Doc #63 Demographic Studies & Needs Analysis | X | | | | | Repeated in 2003 as unpublished excerpt |
| Except - Discipline for Insubordination & Leaving Plant without Permission | X | | | | | |
| Except - Tool Allowance EIT Program | X | | | | | Repeated in 2003 as unpublished excerpt |
| Except - Diversity Training Modules | | | | X | | No joint funds; Joint administration at local level |
| Except - Mfg. Engineering Ergonomics Guidelines | | | | X | | No joint funds; Joint administration at local level |
| Except - Ergonomics Job Analysis & Other Matters | | | | X | | No joint funds; Joint administration at local level |
| Except - Plans for Evacuation & Taking Shelter | X | | | | | Complete |
| Except - Drug & Alcohol Testing | X | | | | | |
| Except - Worldwide Facilities Group & Competitive Indirect Labor Practices | X | | | | | |
| Except - Aisle Widths | X | | | | | |
| Except - Health and Safety Training | | | | X | | No joint funds; Joint administration at local level |
| Except - Maintenance of Safety-Related Equipment | | | | X | | No joint funds; Joint administration at local level |
| Except - Transfer of Medical Records, Ergo Tools & ST superv. Training | X | | | | | Complete |
| Except - Emergency Medical Response Teams | X | | | | | Complete |
| Except - Quality Network – Internal Communications Process | X | | | | | Repeated in 2003 as unpublished excerpt |
| Except - Childcare Needs | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Except - Quality Network Mfg. System Training | X | | | | | Repeated in 2003 as unpublished excerpt |
| Except - Workspace for Union Members of Local Apprentice Committee | X | | | | | Repeated in 2003 as unpublished excerpt |
| Except - Changes in Licensing or Certification Ordinances | X | | | | | |
| Except - Health & Safety Suggestion Awards | | | | X | | No joint funds; Joint administration at local level |
| Except - Meetings with Mfg. Managers re: Training Issues | | | | X | | No joint funds; Joint administration at local level |
| Except - New Hire Orientation H&S Training | X | | | | | Complete |
| Except - Calculating Employee Impact Under Appendix L | X | | | | | |
| Except - Occupational Exposure Guidelines | X | | | | | Complete |

**ATTACHMENT E**

## UAW Agreement Check-Off List
### (Assumes Full Implementation of Agreement)

| Agreement Clause | Continues Unchanged | No Continuing Application | Superseded by Supplement as Modified | Changed by Supplement as Modified | Needs to Be Addressed | Comments (based on current state of discussions) |
|---|---|---|---|---|---|---|
| Excerpt - Vendors Operating on Site | X | | | | | |
| Excerpt - Para. 96 Moves Coordinated Through National Parties | X | | | | | |
| Excerpt - National PEL | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Excerpt - Comprehensive Training Program | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Use of Probationary Employees for Production Standards | X | | | | | Repeated in 2003 as unpublished excerpt |
| Excerpt - Movement of Specified Holidays - National Party Approval | X | | | | | |
| Excerpt - 1996 Planned/Predictive Maintenance Training Guide | X | | | | | Complete |
| Excerpt - Pre-Post Retirement | | | X | | | No funding or participation after effective date of Modified Supplement |
| Excerpt - Applicants for Pre-Apprentice Training Program | X | | | | | Repeated in 2003 as unpublished excerpt |
| Excerpt - Time off Job for Training | X | | | | | |
| Excerpt - Pay for Pre-Post Retirement Trainers | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Excerpt - Retiree Tuition Assistance at Closed Plants | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Excerpt - Health Information System (HIS) & Reports | X | | | | | Repeated in 2003 as unpublished excerpt |
| Excerpt - Repair Work on Leased/Rented Equipment | X | | | | | Repeated in 2003 as unpublished excerpt |
| Excerpt - Balancing Doc. 63 Placement vs. Apprentices | X | | | | | Repeated in 2003 as unpublished excerpt |
| Excerpt - Software Changes and Program Modifications | X | | | | | Repeated in 2003 as unpublished excerpt |
| Excerpt - Skill Center Internet Access & On-Line College Courses | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Review of Training Manual Specifications for New Equipment | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Doc #63 Retraining - Tool Allowance | X | | | | | Repeated in 2003 as unpublished excerpt |
| Excerpt - Skill Development and Training System Rollout | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Meeting with Purchasing re: training issues | | X | | | | Complete; No funding or participation after effective date of Mod. Supp. |
| Excerpt - Adequacy of Plant Training Facilities | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Deduction of Payroll Taxes from Dependent Scholarship Grants | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Excerpt - Dependent Scholarship Eligibility in Divorce Cases | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Letter - Collection of Union Membership Dues Paragraph 4(s) | X | | | | | Complete |
| Excerpt - Rate Progression Inequity - Division I vs. Apprentice | X | | | | | Repeated in 2003 as unpublished excerpt |
| Excerpt - "Normal Warranty" | X | | | | | Repeated in 2003 as unpublished excerpt |
| Excerpt - Recovery of Overpayments - Amount of Installments | X | | | | | |
| Excerpt - Wage Inequity Fund | X | | | | | Repeated in 2003 as unpublished excerpt |
| Letter - Training for New Processes & Launches | | X | | X | | No joint funds; Joint administration at local level |
| Letter - Seniority of 109(a) Leaves After Delphi Spin-Off | X | | | | | |
| Letter - Deleting references to Certain dates | X | | | | | |
| Letter - Wage Progression Credit - Vac Shutdown Following Week | X | | | | | |
| Letter - Near Miss Incidents | X | | | | | |
| Letter - Neutrality | X | | | | | |
| Letter - Retain Shift Premium During In-Plant Training | X | | | | | Repeated in 2003 as unpublished letter |
| Letter - Special Activity Duty Armed Forces | X | | | | | Complete |
| Letter - Calculation of Net Sourcing for Supplier Sourcing Decisions | X | | | | | Repeated in 2003 as unpublished letter |
| Letter - Additional Tool Allowance for Apprentices | X | | | | | Complete |
| Excerpt - Spouses and Dependent Children Utilizing Area Centers | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Excerpt - Design-In H&S Specifications | X | | | | | Complete |
| Letter - Deleted GM-UAW Documents | X | | | | | Complete |
| **Unpublished Letters & Documents - 1996 National Agreement** | | | | | | |
| Letter - Baseline Secured Employment Level Adjustments | | X | X | | | Appendix K does not apply under Supplemental Agreement |
| Unpublished Letter - Employees with Automatic SEL Protection | | X | X | | | Appendix K does not apply under Supplemental Agreement |
| Excerpt - ACE Benchmarking of Tuition Assistance Program | | X | X | | | No Tuition Assistance under Supplemental Agreement |
| Excerpt - EAP Audit & Other Matters | | | | X | | No joint funds; Joint administration at local level |
| Letter - Vehicle Purchase Program | | X | | | | Superseded by Contract Settlement Agreement Item 28 |
| Excerpt - Pay for Pre-Post Retirement Trainers | | X | X | | | |
| Excerpt - Availability of Management QN representatives | X | | | | | Repeated in 1999 excerpt – no funding or particip. under Mod. Supp. |

ATTACHMENT E

## UAW Agreement Check-Off List
### (Assumes Full Implementation of Agreement)

| Agreement Clause | Continues Unchanged | No Continuing Application | Superseded by Supplement as Modified | Changed by Supplement as Modified | Needs to Be Addressed | Comments (based on current state of discussions) |
|---|---|---|---|---|---|---|
| Excerpt - ST & Apprentice Committee Request for Joint Funds | X | | | | | Complete; No funding after effective date of Modified Supplement |
| Excerpt - Training Matters | | | | X | | No joint funds; Joint administration at local level |
| Excerpt - Planned/Predictive Maintenance Training Guide | X | | | | | Repeated in 1999 excerpt |
| Excerpt - National Apprentice Comm. Autority over Training Schedules | X | | | | | |
| Letter - GM Policy re: Sexual Orientation | | | | | | GM Policy does not apply to Delphi |
| Excerpt - Joint Program Funding | | X | | | | No joint funds after effective date of Modified Supplement |
| Excerpt - Scheduling Problems with Local PEL | | X | | | | No funding or participation after effective date of Modified Supplement |
| Excerpt - Collection of Overpayments Without Notice | X | | | | | Complete |
| Excerpt - Child & Elder Care Referral Service | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Excerpt - ADAPT Matters | | X | X | | | No funding, participation & administration for local discussion |
| Excerpt - Outside Contracting Checklist | X | | | | | Complete |
| Excerpt - Vacation Pay Eligibility | X | | | | | |
| Excerpt - Notification of Individual Schedule for Independence Week | | X | | | | No Independence Week After 2007 |
| Letter - Relationship with the UAW | | X | | | | GM Document; Superseded by later Delphi documents |
| Letter - Job Security Program Appeals | | X | | | | Completed; Appendix K does not apply to Supplemental Agreement |
| Letter - Tuition Assistance - Courses In-Plant or at Union Hall | | X | X | | | No funding or participation after effective date of Modified Supplement |
| Letter - Movement of Protected Employees Within SEL Group | | X | X | | | Appendix K does not apply to Supplemental Agreement |
| Excerpt - Pilot of Modified PEL Program | | X | X | | | Complete; No funding or participation after effective date of Mod. Supp. |
| Letter - Updates of Personal Data | | X | | | | Complete |
| Letter - Employee Movement within Area Hire Area | X | | | | | |
| Letter - Rehabilitation Center Pilot & Research Agenda | | X | | | | Complete |
| Letter - Diversity Training | X | | | | | Complete |
| Letter - Tuition Assistance - Labor Studies | X | X | X | | | No funding or participation after effective date of Modified Supplement |
| **Local Agreements** | | | | | | |
| Delphi AHG – Anderson, IN and UAW Local 662 Local Agreements | X | | | | Wind Down | Except as required to conform to Modified Supplemental Agreement |
| Anderson - 3/27/85 MOU - Job Security for Skilled Trades Employees | | X | X | | | Superseded by Site Plans and Transformation Plan |
| Anderson - 3/27/85 MOU - Delco Remy guarantee on ST Job Security | | X | X | | | Superseded by Site Plans and Transformation Plan |
| Delphi E&S – Athens, AL and UAW Local 2195 Local Agreements | X | | | | Sell Site | Except as required to conform to Modified Supplemental Agreement |
| Delphi AHG – Fitzgerald, GA and UAW Local 2188 Local Agreements | X | | | | Wind Down | Except as required to conform to Modified Supplemental Agreement |
| Delphi AHG – Flint East, MI and UAW Local 651 Local Agreements | X | | | | Footprint | Except as required to conform to Modified Supplemental Agreement |
| Flint East - 7/13/98 Handley Letter re: Employment Floor | | X | X | | | Superseded by Site Plans and Transformation Plan |
| Flint East - 2/20/01 Handley Letter re: Employment Floor | | X | X | | | Superseded by Site Plans and Transformation Plan |
| Flint East - 7/27/04 Butler Letter re: Ongoing 3,000 Employment Level | | X | X | | | Superseded by Site Plans and Transformation Plan |
| Delphi AHG – Laurel, MS and UAW Local 2190 Local Agreements | X | | | | Wind Down | Except as required to conform to Modified Supplemental Agreement |
| Delphi E&S – Olathe, KS and UAW Local 1021 Local Agreements | X | | | | Wind Down | Except as required to conform to Modified Supplemental Agreement |
| Delphi E&C – Wisc./Need, Dayton OH and UAW Local 696 Local Agr. | X | | | | Footprint | Except as required to conform to Modified Supplemental Agreement |
| Delphi E&S – Kokomo, IN and UAW Local 292 Local Agreements | X | | | | Keep | Except as required to conform to Modified Supplemental Agreement |
| Delphi E&S – Milwaukee, WI and UAW Local 438 Local Agreements | X | | | | Wind Down | Except as required to conform to Modified Supplemental Agreement |
| Delphi E&C – Coopersville, MI and UAW Local 2151 Local Agreements | X | | | | Wind Down | Plant closed |
| Delphi E&C – Grand Rapids, MI and UAW Local 167 Local Agreements | X | | | | Keep | Except as required to conform to Modified Supplemental Agreement |
| Delphi E&C – Milwaukee, WI and UAW Local 1866 Local Agreements | X | | | | Wind Down | Except as required to conform to Modified Supplemental Agreement |
| Delphi E&C – Rochester, NY and UAW Local 1097 Local Agreements | X | | | | Keep | Except as required to conform to Modified Supplemental Agreement |
| Rochester - 1987 Understanding - Voluntary reduction for machinists | | | X | | | Superseded by Transformation Program |
| Delphi E&C – Saginaw, MI and UAW Local 467 Local Agreements | X | | | | Footprint | Except as required to conform to Modified Supplemental Agreement |
| Delphi E&C – Sandusky, OH and UAW Local 913 Local Agreements | X | | | | Sell Site | Except as required to conform to Modified Supplemental Agreement |
| Delphi E&C – Wichita Falls, TX and UAW Local 2157 Local Agreements | X | | | | Wind Down | Except as required to conform to Modified Supplemental Agreement |
| Wichita Falls - 1999 agreement – "Oxygen Sensor Mfg. Site Commitment" | | X | | | | Superseded by Site Plans & Transformation Plan |
| Delphi Steering – Saginaw, MI and UAW Local 699 Local Agreements | X | | | | Sell Site | Except as required to conform to Modified Supplemental Agreement |
| Delphi T&I – Adrian, MI and UAW Local 2031 Local Agreements | X | | | | Sell Site | Except as required to conform to Modified Supplemental Agreement |
| Delphi T&I – Columbus, Ohio and UAW Local 969 Local Agreements | X | | | | Wind Down | Except as required to conform to Modified Supplemental Agreement |

ATTACHMENT E

## UAW Agreement Check-Off List
## (Assumes Full Implementation of Agreement)

| Agreement Clause | Continues Unchanged | No Continuing Application | Superseded by Supplement as Modified | Changed by Supplement as Modified | Needs to Be Addressed | Comments (based on current state of discussions) |
|---|---|---|---|---|---|---|
| Delphi T & I – Cottondale, AL and UAW Local 2083 Local Agreements | X | | | | Sell Site | Except as required to conform to Modified Supplemental Agreement |
| Delphi T & I – Lockport, NY and UAW Local 686 Local Agreements | X | | | | Keep | Except as required to conform to Modified Supplemental Agreement |

6/22/07

Page 13 of 13

Attachment E_Final_062207

## **Exhibit 2**

**List of UAW-Delphi National and Local Collective Bargaining Agreements**

Attachment E-1

<div align="center">List of Delphi – UAW Agreements</div>

National Agreements

- The Agreement Between Delphi Corporation and the UAW, dated September 18, 2003 (the "UAW-Delphi National Agreement"), amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The Supplemental Agreement Covering Pension Plan, Exhibit A to Agreement between Delphi Corporation and UAW, dated September 18, 2003, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The Supplemental Agreement Covering Life and Disability Benefits Program, Exhibit B to Agreement between Delphi Corporation and UAW, dated September 18, 2003, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The Supplemental Agreement Covering Health Care Program, Exhibit C to Agreement between Delphi Corporation and UAW, dated September 18, 2003, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The Supplemental Agreement Covering Supplemental Unemployment Benefit Plan, Exhibit D to Agreement between Delphi Corporation and UAW, dated September 18, 2003, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The Supplemental Agreement Covering Profit Sharing Plan, Exhibit F to Agreement between Delphi Corporation and UAW, dated September 18, 2003, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The Supplemental Agreement Covering Personal Savings Plan, Exhibit G to Agreement between Delphi Corporation and UAW, dated September 18,

2003, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The Supplemental Agreement Covering UAW-Delphi Legal Services Plan, Exhibit I to Agreement between Delphi Corporation and UAW, dated September 18, 2003, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The UAW-GM-Delphi "Memorandum of Understanding Benefit Plan Treatment" dated September 30, 1999 and the Amendment thereto dated September 18, 2003, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The UAW-Delphi Supplemental Agreement dated April 29, 2004, as amended by the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- Any and all other agreements, supplements, appendices, documents, memoranda, letters, minutes and understandings, published and unpublished, between Delphi Corporation and the International Union, UAW to the extent they are still applicable in conformance with the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007, but specifically excluding:

Local Agreements

- The agreements between Delphi Automotive Holdings Group – Anderson, Indiana and UAW Local 662, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The agreements between Delphi Automotive Holdings Group – Athens, Alabama and UAW Local 2195, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The agreements between Delphi Automotive Holdings Group – Fitzgerald, Georgia and UAW Local 2188, amended as necessary to conform to the

provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The agreements between Delphi Automotive Holdings Group – Flint East, Michigan and UAW Local 651, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The agreements between Delphi Automotive Holdings Group – Laurel, Mississippi and UAW Local 2190, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The agreements between Delphi Automotive Holdings Group – Olathe, Kansas and UAW Local 1021, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The agreements between Delphi Automotive Holdings Group – Wisconsin/Needmore Plants, Dayton, Ohio and UAW Local 696, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The agreements between Delphi Electronics and Safety – Kokomo, Indiana and UAW Local 292, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The agreements between Delphi Electronics and Safety – Milwaukee, Wisconsin and UAW Local 438, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The agreements between Delphi Energy and Chassis – Coopersville, Michigan and UAW Local 2151, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The agreements between Delphi Energy and Chassis – Grand Rapids, Michigan and UAW Local 167, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The agreements between Delphi Energy and Chassis – Milwaukee, Wisconsin and UAW Local 1866, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The agreements between Delphi Energy and Chassis – Rochester, New York and UAW Local 1097, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The agreements between Delphi Energy and Chassis – Saginaw, Michigan and UAW Local 467, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The agreements between Delphi Energy and Chassis – Sandusky, Ohio and UAW Local 913, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The agreements between Delphi Energy and Chassis – Wichita Falls, Texas and UAW Local 2157, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The agreements between Delphi Steering – Saginaw Michigan and UAW Local 699, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The agreements between Delphi Thermal and Interior – Adrian, Michigan and UAW Local 2031, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The agreements between Delphi Thermal and Interior – Columbus, Ohio and UAW Local 969, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The agreements between Delphi Thermal and Interior – Cottondale, Alabama and UAW Local 2083, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- The agreements between Delphi Thermal and Interior – Lockport, New York and UAW Local 686, amended as necessary to conform to the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007;

- Any and all other agreements, supplements, appendices, documents, memoranda, letters, minutes and understandings, published and unpublished, between Delphi and the UAW local unions, to the extent they are still applicable in conformance with the provisions of the UAW-Delphi Supplemental Agreement dated April 29, 2004 and/or the provisions of the UAW-Delphi-GM Memorandum of Understanding dated June 22, 2007.

# EXHIBIT F

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                              :
      In re                        :     Chapter 11
                              :
DELPHI CORPORATION, et al.,    :     Case No. 05-44481 (RDD)
                              :
              Debtors.     :     (Jointly Administered)
                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ORDER TO SHOW CAUSE WHY MOTION FOR ORDER AUTHORIZING
AND APPROVING DELPHI-APPALOOSA EQUITY PURCHASE AND COMMITMENT
AGREEMENT PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), 503(b), AND 507(a)
SHOULD NOT BE GRANTED

Upon the above-captioned debtors' (the "Debtors") (the "Debtors") Motion

Authorizing And Approving Delphi-Appaloosa Equity Purchase And Commitment Agreement

Pursuant To 11 U.S.C. §§ 105(a), 363(b), 503(b), And 507(a) (the "Delphi-Appaloosa

Investment Motion"), dated July 18, 2007; and upon the affidavit of Kayalyn A. Marafioti, sworn

to July 18, 2007 in support of the application for an expedited hearing on the Delphi-Appaloosa

Investment Motion; and good cause having been shown, and sufficient cause appearing therefor,

it is hereby

ORDERED that parties-in-interest shall show cause before the Honorable Robert

D. Drain, United States Bankruptcy Court for the Southern District of New York, One Bowling

Green, Room 610, New York, New York 10004, on August 2, 2007 at 10:00 a.m. (prevailing

Eastern time), such hearing to continue if necessary on August 3, 2007 at 10:00 a.m. (prevailing

Eastern time), why an order should not be entered granting the Delphi-Appaloosa Investment

Motion; and it is further

ORDERED that service of this order to show cause and the pleadings on which it

is based shall be made by hand or overnight delivery AND by electronic mail (except with

respect to the office of the United States Trustee and any person or entity whose email address is

not known to counsel for the Debtors) as soon as practicable after the entry hereof but in any

event so as to be RECEIVED no later than July 20, 2007 at 6:00 p.m. (prevailing Eastern time)

upon: (i) counsel for A-D Acquisition Holdings, LLC c/o Appaloosa Management L.P., White &

Case LLP, Wachovia Financial Center, 200 South Biscayne Boulevard, Suite 4900, Miami,

Florida 33131 (Att'n:  Thomas E. Lauria) and White & Case LLP, 1155 Avenue of the Americas,

New York, New York 10036 (Att'n:  Glenn M. Kurtz and Gregory Pryor), (ii) counsel for

Harbinger Del-Auto Investment Company, Ltd., White & Case LLP, Wachovia Financial Center,

200 South Biscayne Boulevard, Suite 4900, Miami, Florida 33131 (Att'n:  Thomas E. Lauria),

White & Case LLP, 1155 Avenue of the Americas, New York, New York 10036 (Att'n:  John M.

Reiss and Gregory Pryor), and Kaye Scholer LLP, 425 Park Avenue, New York, New York

10022 (Att'n: Benjamin Mintz and Lyn Toby Fisher), (iii) counsel for Merrill Lynch, Pierce,

Fenner & Smith Incorporated, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of

the Americas, New York, New York 10019 (Att'n: Andrew N. Rosenberg), (iv) counsel for UBS

Securities LLC, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New

York 10006 (Att'n: Leslie N. Silverman), (v) counsel for Goldman Sachs & Co., Sullivan &

Cromwell, 125 Broad Street, New York, New York 10004 (Att'n: Robert Reeder), (vi) counsel

for Pardus DPH Holding LLC, Wilkie Farr & Gallagher LLP, 787 Seventh Avenue, New York,

New York 10019 (Att'n: Rachel C. Stickland and Morgan D. Elwyn), (vii) the Office of the

United States Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100,

New York, New York 10004 (Att'n:  Alicia M. Leonhard), (viii) counsel for the official

2

committee of unsecured creditors, Latham & Watkins LLP, 885 Third Avenue, New York, New

York 10022 (Att'n: Robert J. Rosenberg and Mark A. Broude),  (ix) counsel for the agent under

the Debtors' postpetition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New

York, New York 10017 (Att'n: Donald S. Bernstein and Brian Resnick), (x) counsel for the

official committee of equity security holders, Fried, Frank, Harris, Shriver & Jacobson LLP, One

New York Plaza, New York, New York 10004 (Att'n: Bonnie Steingart); and (xi) counsel for any

person or entity that filed an objection to the original EPCA motion; and it is further

ORDERED that Notice of this Motion also shall be provided in accordance with

the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m),

9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case

Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883) (the

"Case Management order") and the Amended Eighth Supplemental Order Under 11 U.S.C. §§

102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus

Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered

October 26, 2006 (Docket No. 5418); and it is further

ORDERED that answering papers, if any, including any declarations in support of

such papers, if any, shall be served upon (i) counsel to the above-captioned Debtors, Skadden,

Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606

(Att'n:  John Wm. Butler, Jr. and Ron E. Meisler) and Skadden, Arps, Slate, Meagher & Flom

LLP, Four Times Square, New York, New York  10036 (Att'n: Kayalyn A. Marafioti and

Thomas J. Matz) and (ii) counsel for A-D Acquisition Holdings, LLC c/o Appaloosa

Management L.P., White & Case LLP, Wachovia Financial Center, 200 South Biscayne

Boulevard, Suite 4900, Miami, Florida 33131 (Att'n:  Thomas E. Lauria) and White & Case LLP,

1155 Avenue of the Americas, New York, New York 10036 (Att'n:  Glenn M. Kurtz and

Gregory Pryor) (with a hard copy to Chambers and the Office of the United States Trustee (Att'n:

Alicia M. Leonhard)) SO AS TO BE RECEIVED in person or by electronic mail no later that

July 27, 2007 at 4:00 p.m. (prevailing Eastern time); and it is further

ORDERED that any parties-in-interest objecting to the Delphi-Appaloosa

Investment Motion and the Debtors in the above-captioned cases shall conduct a meet and confer

conference at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square,

New York, New York 10036 on July 30, 2007 at 8:30 a.m. (prevailing Eastern time), consistent

with Paragraph 5 of the Case Management Order, to discuss a possible resolution of any such

objection(s) and the process of identification of the proposed evidence to be introduced and the

witnesses to be called so that the hearing can be conducted in an orderly manner; and it is further

ORDERED that declarations of any witnesses to testify in support of the Delphi-

Appaloosa Investment Motion shall be served upon the objecting parties so as to be RECEIVED

no later than July 30, 2007 at 4:00 p.m. (prevailing Eastern time); and it is further

ORDERED that depositions related to the Delphi-Appaloosa Investment Motion,

if any, shall take place in New York City on July 31, 2007 and August 1, 2007 and that absent a

showing of good cause any such depositions shall be limited to five hours for expert witnesses

and three hours for fact witnesses; and it is further

ORDERED that parties objecting to the Delphi-Appaloosa Investment Motion, if

any, and the Debtors in the above-captioned cases, shall exchange with one another any exhibits

to be introduced at the hearing in support of or in opposition to the Delphi-Appaloosa Investment

Motion no later than August 1, 2007 at 4:00 p.m. (prevailing Eastern time); and it is further

ORDERED that any objections to such exhibits shall be filed with the Court and

served on any objecting party or the Debtors in the above-captioned cases, as the case may be,

pursuant to the provisions of this order so as to be RECEIVED by August 2, 2007 at 8:00 a.m.

(prevailing Eastern time); and it is further

ORDERED that responses, if any, to objections properly filed with the Court and

served pursuant to this order shall be served upon the objections and the above-mentioned parties,

including counsel to the above-mentioned Debtors (with a copy to Chambers), so as to be

RECEIVED no later than August 2, 2007 at 8:00 a.m. (prevailing Eastern time).

Dated: New York, New York
     July 19, 2007


_____/s/Robert D. Drain_____
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT G

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                      :

    In re              :    Chapter 11
                      :

DELPHI CORPORATION, et al.,    :    Case No. 05-44481 (RDD)
                      :

                      :    (Jointly Administered)
        Debtors.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AFFIDAVIT OF KAYALYN A. MARAFIOTI
IN SUPPORT OF APPLICATION
FOR EXPEDITED HEARING ON MOTION FOR ORDER AUTHORIZING AND
APPROVING DELPHI-APPALOOSA EQUITY PURCHASE AND COMMITMENT
AGREEMENT PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), 503(b), AND 507(a)

STATE OF NEW YORK       )
                            ) ss:
COUNTY OF NEW YORK     )

KAYALYN A. MARAFIOTI, being duly sworn, deposes and says:

1.      I am a member of the firm of Skadden, Arps, Slate, Meagher & Flom LLP,

counsel to the debtors in the above-captioned cases (the "Debtors").  I submit this affidavit in

support of the Debtors' application for an expedited hearing on their Motion Authorizing And

Approving Delphi-Appaloosa Equity Purchase And Commitment Agreement Pursuant To 11

U.S.C. §§ 105(a), 363(b), 503(b), And 507(a) (the "Delphi-Appaloosa Investment Motion"),

dated July 18, 2007.

2.      On January 12, 2007, this Court entered the Order Authorizing And Approving

The Equity Purchase And Commitment Agreement (the "Original EPCA") Pursuant To Sections

105(a), 363(b), 503(b) And 507(a) Of The Bankruptcy Code And Plan Framework Support

Agreement (the "Original PSA") Pursuant To Sections 105(a), 363(b), And 1125(e) Of The

Bankruptcy Code (Docket No. 6589).  On February 28, 2007, the Debtors announced that they

had entered into an amendment to the EPCA, and on April 19, 2007, the Debtors announced

further potential changes to that agreement.  Following the signing of a memorandum of

understanding among the Debtors, General Motors Corporation, and the United Automobile,

Aerospace and Agricultural Implement Workers of American on June 22, 2007, the Debtors

confirmed on July 9, 2007 that they had formally terminated the Original EPCA and the Original

PSA and that they expected to enter into new framework agreements at some point in July 2007.

3.      On July 16 and 17, 2007, Delphi Corporation's Board of Directors convened

special meetings to consider a series of proposals for a new equity purchase and investment

agreement.  The proposals were sponsored by two competing groups of investors.  The first

group, led by Appaloosa Asset Management, L.P. ("Appaloosa"), comprised a number of the parties to the Original EPCA (together with Appaloosa, the "Appaloosa Investment Group"). The other group was led by Highland Capital Management, L.P.  As set forth in greater detail in the Delphi-Appaloosa Investment Motion, on July 18, 2007, the Debtors announced that they had reached an agreement with the Appaloosa Investment Group to enter into a new equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA").

4.    Pursuant to the Delphi-Appaloosa Investment Motion, the Debtors seek an order of this Court authorizing and approving the Delphi-Appaloosa EPCA.  In light of the Debtors' recent termination of the Original EPCA and the Original PSA, and given the central importance of the Delphi-Appaloosa EPCA to the Debtors' ability to propose a plan of reorganization and emerge successfully from chapter 11, the Debtors believe that expedited consideration of the Delphi-Appaloosa Investment Motion is warranted.  All of the Debtors' stakeholders will benefit from the increased certainty that this Court's approval of the Delphi-Appaloosa EPCA will provide.

5.    In the event that there is opposition to the Delphi-Appaloosa Investment Motion, the Debtors request that a proposed schedule for briefing and witness preparation in connection with the Delphi-Appaloosa Investment Motion be established.

6.    The Debtors believe that the relief requested in the Delphi-Appaloosa Investment Motion is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest.  The Debtors further believe that these interests would be best served by a prompt hearing on the Delphi-Appaloosa Investment Motion.

3

7.      No previous application for the relief requested herein has been made to this or

any other court.

<u>/s/ Kayalyn A. Marafioti</u>
KAYALYN A. MARAFIOTI

Sworn to before me
this 18th day of July, 2007

<u>/s/ Sylvia Marquez</u>
    Notary Public

4

# EXHIBIT H

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                           :
        In re                              :    Chapter 11
                                           :
DELPHI CORPORATION, et al.,                :    Case No. 05-44481 (RDD)
                                           :
                        Debtors.           :    (Jointly Administered)
                                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF FILING OF AGREEMENT AND STIPULATION OF ENRIQUE BUJIDOS,
ADALBERTO CAÑADAS CASTILLO, AND FERNANDO GÓMEZ MARTÍN
RELATING TO SEPARATION PLAN AND DASE FUNDING MOTION,
AND ON JURISDICTION OF THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

PLEASE TAKE NOTICE of the filing of the Agreement and Stipulation Of

Enrique Bujidos, Adalberto Cañadas Castillo, And Fernando Gómez Martín Relating To

Separation Plan And DASE Funding Motion, And On Jurisdiction Of The United States

Bankruptcy Court For The Southern District of New York, a copy of which is attached hereto as

Exhibit A.

Dated:  New York, New York
       July 19, 2007

                    SKADDEN, ARPS, SLATE, MEAGHER
                      & FLOM LLP

                    By:  /s/ John Wm. Butler, Jr.
                      John Wm. Butler, Jr. (JB 4711)
                      John K. Lyons (JL 4951)
                      Ron E. Meisler (RM 3026)
                  333 West Wacker Drive, Suite 2100
                  Chicago, Illinois  60606
                  (312) 407-0700

                      - and -

                  By:  /s/ Kayalyn A. Marafioti
                      Kayalyn A. Marafioti (KM 9632)
                      Thomas J. Matz (TM 5986)
                  Four Times Square
                  New York, New York 10036
                  (212) 735-3000

                  Attorneys for Delphi Corporation, et al.,
                      Debtors and Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                      :

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05–44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### AGREEMENT AND STIPULATION OF ENRIQUE BUJIDOS, ADALBERTO CAÑADAS CASTILLO, AND FERNANDO GÓMEZ MARTÍN RELATING TO SEPARATION PLAN AND DASE FUNDING MOTION, AND ON JURISDICTION OF THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK



Enrique Bujidos, Adalberto Cañadas Castillo, and Fernando Gómez Martín,
acting in their capacity as duly appointed receivers (Administradores Concursales) for the
Concurso estate of Delphi Automotive Systems España S.L. ("DASE") (collectively, the "DASE
Receivers") respectfully submit this Agreement and Stipulation Of Enrique Bujidos, Adalberto
Cañadas Castillo, And Fernando Gómez Martín Relating To Separation Plan And DASE
Funding Motion, And On Jurisdiction Of The United States Bankruptcy Court For The Southern
District of New York and agree and state as follows:

On October 8, 2005, the Delphi Corporation ("Delphi") and certain of its
subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases
(collectively, the "Debtors"), filed voluntary petitions under chapter 11 of title 11 of the United
States Code, 11 U.S.C. §§ 101-1330, as amended, in the United States Bankruptcy Court for the
Southern District of New York.. On March 20, 2007 DASE, a Spanish non-Debtor affiliate and
wholly-owned subsidiary of Delphi Automotive Systems (Holding), Inc. ("DASHI"), filed a
"Concurso" application for a Spanish insolvency proceeding, and on April 13, 2007 the Spanish

Mercantile Judge (the "Concurso Court") declared DASE to be in voluntary Concurso and

appointed Enrique Bujidos, Adalberto Cañadas Castillo, and Fernando Gómez Martín as the

DASE Receivers.

The DASE Receivers, according to Spanish Law, are auxiliaries of the Concurso

Court. Their legal role is to, among other things, (i) address the legal interests of DASE

employees, suppliers and other creditors; (ii) prepare a report for the Concurso Court setting

forth the assets and liabilities of DASE; (iii) supervise and approve expenditures of funds by

DASE during Concurso; and (iv) give an opinion to the Concurso Court on DASE's plan of

reorganization in Concurso.

On July 4, 2007, DASE, the DASE Receivers, and the Cadiz workers councils,

assemblies and unions, based on the efforts of the Concurso Court, reached a settlement on a

social plan for a separation allowance of approximately 45 days of salary per year of service to

each DASE employee (the "Separation Plan"). In order to meet its obligations under the

Separation Plan, DASE requires €120 million from its sole shareholder, DASHI, to fund the

Separation Plan. In addition, DASE estimates that it will require up to €10 million in additional

funds from DASHI to pay supplier and other non-labor related claims against DASE.

In accordance with the terms of the Separation Plan, the DASE Receivers

acknowledge that, upon (i) approval of a social plan and collective layoff procedure (an "ERE")

by the Concurso Court and its completion by DASE, (ii) approval of DASE's plan of

reorganization (Convenio de Acreedores), such plan providing for payment of no less than 66%

(2/3%) of creditors' pre-Concurso claims within three years, by the requisite number of DASE

creditors and by the Concurso Court and its completion by DASE (in which case the liquidation

phase of the Concurso process would not be commenced), and (iii) payment of all Concurso

2

claims and expenses, then, according to art. 163 of the Concurso Act, no action to investigate and

pursue potential Concurso liabilities ("Pieza de Calificacion") may be commenced by the DASE

Receivers or third parties against DASHI, Delphi, any other Delphi affiliates, or any of their

directors or officers, resulting in the release of such parties from any liability related to or arising

out of the termination of the existing labor agreements or DASE's Concurso application

(according to art. 163 et seq of the Concurso Act, other than Pieza de Calificacion, neither the

DASE Receivers nor any third party may bring an action for insolvency-related liability against

DASHI, Delphi, Delphi affiliates or their directors or officers).  The DASE Receivers cannot

currently quantify the amounts necessary to cover the above conditions.

On July 9, 2007 Debtors filed an Expedited Motion For Order Under 11 U.S.C. §§

363,1107, and 1108 Authorizing Delphi Automotive Systems (Holding), Inc. To Provide Funds

To Delphi Automotive Systems España S.L. ("DASE Funding Motion") (Docket No. 8501)

seeking an order that authorizes, but does not direct, DASHI to provide funds to or on behalf of

DASE in amounts up to:  (1) €120 million for purposes of funding the Separation Plan and (2)

€10 million for purposes of funding the payment of outstanding claims of DASE's suppliers and

non-labor creditors.  In the Separation Plan, the DASE Receivers agreed to use their best efforts

to support the DASE Funding Motion.

Accordingly, in support of and for purposes of the DASE Funding Motion, the

DASE Receivers submit to the jurisdiction of the United States Bankruptcy Court for the

Southern District of New York and agree to abide by and comply all orders and judgments of the

United States Bankruptcy Court for the Southern District of New York in connection with any

matters over which relate to or arise out of the Separation Plan and the DASE Funding Motion

and related order; provided, however, that the DASE Receivers do not submit to such jurisdiction

3

if to do so would be contrary to the exclusive jurisdiction of the Concurso Court, or contrary to

any order of the Concurso Court relating to the actions of the DASE Receivers.



4

/s/

Enrique Bujidos
RECEIVER FOR DELPHI AUTOMOTIVE
  SYSTEMS ESPANA S.L.

/s/

Adalberto Cañadas Castillo
RECEIVER FOR DELPHI AUTOMOTIVE
  SYSTEMS ESPANA S.L.`

/s/

Fernando Gómez Martín
RECEIVER FOR DELPHI AUTOMOTIVE
  SYSTEMS ESPANA S.L.

5

# EXHIBIT I

Delphi Corporation
Special Parties

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| Cleary, Gottlieb, Steen & Hamilton LLP | Leslie N Silverman | One Liberty Plaza | | New York | NY | 10006 | lsilverman@cgsh.com | Counsel to UBS Securities, LLC |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Fried, Frank, Harris, Shriver & Jacobson | Bonnie Steingart | One New York Plaza | | New York | NY | 10004 | steinbo@friedfrank.com | Counsel to Equity Security Holders Committee |
| Kaye Scholer LLP | Benjamin Mintz Lynn Toby Fisher | 425 Park Avenue | | New York | NY | 10022 | bmintz@kayescholer.com lfisher@kayescholer.com | Counsel to Harbinger Del-Auto Investment Company, Ltd. |
| Latham & Watkins LLP | Robert J Rosenberg Mark A Broude | 885 Third Avenue | | New York | NY | 10022 | robert.rosenberg@lw.com mark.broude@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Paul, Weiss, Rifkind, Wharton & Garrison | Andrew N Rosenberg | 1285 Avenue of the Americas | | New York | NY | 10019 | arosenberg@paulweiss.com | Counsel to Merrill Lynch, Pierce, Fenner & Smith, Incorporated |
| Sullivan & Cromwell | Robert Reeder | 125 Broad Street | | New York | NY | 10004 | reederr@sullcrom.com | Counsel to Goldman Sachs & Co. |
| United States Trustee | Alicia M Leonhard | 33 Whitehall Street | Suite 2100 | New York | NY | 10004 | | Counsel to United States Trustee |
| White & Case LLP | Glenn Kurtz Gregory Pryor | 1155 Avenue of the Americas | | New York | NY | 10036 | gkurtz@ny.whitecase.com gpryor@whitecase.com | Counsel to A-D Acquisition Holdings, LLC c/o Appaloosa Management, LP |
| White & Case LLP | John M Reiss Gregory Pryor | 1155 Avenue of the Americas | | New York | NY | 10036 | jreiss@whitecase.com gpryor@whitecase.com | Counsel to Harbinger Del-Auto Investment Company, Ltd. |
| White & Case LLP | Thomas E Lauria | Wachovia Financial Center | 200 South Biscayne Blvd., Suite 4900 | Miami | FL | 33131 | tlauria@whitecase.com | Counsel to A-D Acquisition Holdings, LLC c/o Appaloosa Management, LP; Harbinger Del-Auto Investment Company, Ltd. |
| Wilkie Farr & Gallagher LLP | Rachel C Strickland Morgan D Elwyn | 787 Seventh Avenue | | New York | NY | 10019 | rstrickland@willkie.com melwyn@willkie.com | Counsel to Pardus DPH Holding LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

7/24/2007 11:55 AM
Equity Purchase and Commitment Agreement special parties Overnight Mail

Delphi Corporation
Special Parties

| Company | Contact | Address 1 | Address 2 | City | State | Zip |
|---------|---------|-----------|-----------|------|-------|-----|
| Delphi Trade Committee | Judith Elkin | Haynes & Boone | 153 E 53rd St Ste 4900 | New York | NY | 10022 |
| Delphi Trade Committee | Attn David S Rosner | Kasowitz Benson Torres & Friedman LLP | 1633 Broadway | New York | NY | 10019 |
| Haynes & Boone | Lenard M Parkins | Highland Capital | 1 Houston Ctr 1221 McKinney Ste 2100 | Houston | TX | 77010 |
| Haynes & Boone | Judith Elkin | Highland Capital | 153 E 53rd St Ste 4900 | New York | NY | 10022 |
| IBEW & IAMAW | Attn Marriane Robbins | Previant Goldberg Uelman Gratz Miller & Brueggeman SC | 1555 N RiverCenter Dr Ste 202 | Milwaukee | WI | 53212 |
| IUE CWA | Attn Tom Kennedy | Kennedy Jennick & Murray | 1113 University Pl 7th Fl | New York | NY | 10003 |
| IUOE | Attn Barbara Mehlsack | Gorlick Kravitz & Listhaus PC | 17 State St 4th Fl | New York | NY | 10004 |
| Milbank | Thomas C Janson Crayton L Bell | Cerberus | One Chase Manhattan | New York | NY | 10005 |

In re Delphi Corporation, et al.
Case No. 05-44481

Page 1 of 2

7/24/2007 11:56 AM
Additional EPCA Parties

# EXHIBIT J

Delphi Corporation
Special Parties

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| Cleary, Gottlieb, Steen & Hamilton LLP | Leslie N Silverman | One Liberty Plaza | | New York | NY | 10006 | lsilverman@cgsh.com | Counsel to UBS Securities, LLC |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Fried, Frank, Harris, Shriver & Jacobson | Bonnie Steingart | One New York Plaza | | New York | NY | 10004 | steinbo@friedfrank.com | Counsel to Equity Security Holders Committee |
| Kaye Scholer LLP | Benjamin Mintz Lynn Toby Fisher | 425 Park Avenue | | New York | NY | 10022 | bmintz@kayescholer.com lfisher@kayescholer.com | Counsel to Harbinger Del-Auto Investment Company, Ltd. |
| Latham & Watkins LLP | Robert J Rosenberg Mark A Broude | 885 Third Avenue | | New York | NY | 10022 | robert.rosenberg@lw.com mark.broude@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Paul, Weiss, Rifkind, Wharton & Garrison | Andrew N Rosenberg | 1285 Avenue of the Americas | | New York | NY | 10019 | arosenberg@paulweiss.com | Counsel to Merrill Lynch, Pierce, Fenner & Smith, Incorporated |
| Sullivan & Cromwell | Robert Reeder | 125 Broad Street | | New York | NY | 10004 | reederr@sullcrom.com | Counsel to Goldman Sachs & Co. |
| White & Case LLP | Glenn Kurtz Gregory Pryor | 1155 Avenue of the Americas | | New York | NY | 10036 | gkurtz@ny.whitecase.com gpryor@whitecase.com | Counsel to A-D Acquisition Holdings, LLC c/o Appaloosa Management, LP |
| White & Case LLP | John M Reiss Gregory Pryor | 1155 Avenue of the Americas | | New York | NY | 10036 | jreiss@whitecase.com gpryor@whitecase.com | Counsel to Harbinger Del-Auto Investment Company, Ltd. |
| White & Case LLP | Thomas E Lauria | Wachovia Financial Center | 200 South Biscayne Blvd., Suite 4900 | Miami | FL | 33131 | tlauria@whitecase.com | Counsel to A-D Acquisition Holdings, LLC c/o Appaloosa Management, LP; Harbinger Del-Auto Investment Company, Ltd. |
| Wilkie Farr & Gallagher LLP | Rachel C Strickland Morgan D Elwyn | 787 Seventh Avenue | | New York | NY | 10019 | rstrickland@willkie.com melwyn@willkie.com | Counsel to Pardus DPH Holding LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)                    Page 1 of 1                    7/24/2007 12:11 PM
Equity Purchase and Commitment Agreement special parties Email

# EXHIBIT K

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2491 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel to Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com sliviri@ffhsj.com | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel to Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 1540 Broadway | 24th Fl | New York | NY | 10036 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Internal Revenue Service | Attn: Insolvency Department | 477 Michigan Ave | Mail Stop 15 | Detroit | MI | 48226 | 313-628-3648 | 313-628-3602 | | Michigan IRS |
| Internal Revenue Service | Attn: Insolvency Department, Maria Valerio | 290 Broadway | 5th Floor | New York | NY | 10007 | 212-436-1038 | 212-436-1931 | mariaivalerio@irs.gov | IRS |
| IUE-CWA | Conference Board Chairman | 2360 W. Dorothy Lane | Suite 201 | Dayton | OH | 45439 | 937-294-7813 | 937-294-9164 | | Creditor Committee Member |
| Jefferies & Company, Inc, | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Richard Duker | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | richard.duker@jpmorgan.com | Prepetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Susan Atkins, Gianni Russello | 277 Park Ave 8th Fl | | New York | NY | 10172 | 212-270-0426 | 212-270-0430 | gianni.russello@jpmorgan.com susan.atkins@jpmorgan.com | Postpetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | Sheryl Betance | 2335 Alaska Ave | | El Segundo | CA | 90245 | 310-823-9000 | 310-823-9133 | sbetance@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Law Debenture Trust of New York | Daniel R. Fisher | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| Law Debenture Trust of New York | Patrick J. Healy | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 3

7/24/2007 10:34 AM
Master Service List Overnight Mail

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| McDermott Will & Emery LLP | David D. Cleary | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | dcleary@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Jason J. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | jdejonker@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Mohsin N. Khambati | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | mkhambati@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Peter A. Clark | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | pclark@mwe.com | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | 213-629-5063 | gbray@milbank.com tkreller@milbank.com jtill@milbank.com | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | william.dornbos@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | garrick.sandra@pbgc.gov efile@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel to the Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | 2122185500 | 2122185526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel to Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Tyco Electronics Corporation | MaryAnn Brereton, Assistant General Counsel | 60 Columbia Road | | Morristown | NJ | 7960 | 973-656-8365 | 973-656-8805 | | Creditor Committee Member |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 3

7/24/2007 10:34 AM
Master Service List Overnight Mail

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|-------|-----|-------|------------------|
| United States Trustee | Alicia M. Leonhard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | 212-510-0500 | 212-668-2255 does not take service via fax | | Counsel to United States Trustee |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel to the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Harvey R. Miller | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8500 | 212-310-8077 | harvey.miller@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

7/24/2007 10:34 AM
Master Service List Overnight Mail

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| Airgas, Inc. | David Boyle | 259 Radnor-Chester Road, Suite 100 | P.O. Box 6675 | Radnor | PA | 19087-8675 | 610-230-3064 | Counsel to Airgas, Inc. |
| Akebono Corporation (North America) | Alan Swiech | 34385 Twelve Mile Road | | Farminton Hills | MI | 48331 | 248-489-7406 | Vice President of Administration for Akebono Corporation |
| Cage Williams & Abelman, P.C. | Steven E. Abelman | 1433 Seventeenth Street | | Denver | CO | 80202 | 303-295-0202 | Counsel to United Power, Inc. |
| Colbert & Winstead, P.C. | Amy Wood Malone | 1812 Broadway | | Nashville | TN | 37203 | 615-321-0555 | Counsel to Averitt Express, Inc. |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Steven M. Wachstein | 33 West First Street | Suite 600 | Dayton | OH | 45402 | 937-223-8177 | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| DaimlerChrysler Corporation | Kim Kolb | CIMS 485-13-32 | 1000 Chrysler Drive | Auburn Hills | MI | 48326-2766 | 248-576-5741 | Counsel to DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrysler Canada, Inc. |
| Dykema Gossett PLLC | Gregory J. Jordan | 10 Wacker | Suite 2300 | Chicago | IL | 60606 | 312-627-2171 | Counsel to Tremont City Barrel Fill PRP Group |
| Genovese Joblove & Battista, P.A. | Craig P. Rieders, Esq. | 100 S.E. 2nd Street | Suite 4400 | Miami | FL | 33131 | 305-349-2300 | Counsel to Ryder Integrated Logistics, Inc. |
| Jason, Inc. | Beth Klimczak, General Counsel | 411 E. Wisconsin Ave | Suite 2120 | Milwaukee | WI | 53202 | | General Counsel to Jason Incorporated |
| Miami-Dade County Tax Collector | Metro-Dade Paralegal Unit | 140 West Flagler Street | Suite 1403 | Miami | FL | 33130 | 305-375-5314 | Paralegal Collection Specialist for Miami-Dade County |
| Norris, McLaughlin & Marcus | Elizabeth L. Abdelmasieh, Esq | 721 Route 202-206 | P.O. Box 1018 | Somerville | NJ | 08876 | 908-722-0700 | Counsel to Rotor Clip Company, Inc. |
| Professional Technologies Services | John V. Gorman | P.O. Box #304 | | Frankenmuth | MI | 48734 | 989-385-3230 | Corporate Secretary for Professional Technologies Services |
| Sachnoff & Weaver, Ltd | Charles S. Schulman | 10 South Wacker Drive | 40th Floor | Chicago | IL | 60606 | 312-207-1000 | Counsel to Infineon Technologies North America Corporation |
| Schafer and Weiner PLLC | Max Newman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | 248-540-3340 | Counsel to Dott Industries, Inc. |
| Sony Electronics Inc. | Lloyd B. Sarakin - Chief Counsel, Finance and Credit | 1 Sony Drive | MD #1 E-4 | Park Ridge | NJ | 07656 | 201-930-7483 | Counsel to Sony Electronics, Inc. |
| United Steel, Paper and Forestry, Rubber, Manufacturing, Energy | Allied Industrial and Service Workers, Intl Union (USW), AFL-CIO | David Jury, Esq. | Five Gateway Center Suite 807 | Pittsburgh | PA | 15222 | 412-562-2549 | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Vorys, Sater, Seymour and Pease LLP | Robert J. Sidman, Esq. | 52 East Gay Street | P.O. Box 1008 | Columbus | OH | 43216-1008 | 614-464-6422 | |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

7/24/2007 12:04 PM
Agenda Overnight Mail - All

# EXHIBIT L

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2491 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Counsel to Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel to Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L. Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com sliviri@ffhsj.com | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel to Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 1540 Broadway | 24th Fl | New York | NY | 10036 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Jefferies & Company, Inc, | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Richard Duker | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | richard.duker@jpmorgan.com | Prepetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Susan Atkins, Gianni Russello | 277 Park Ave 8th Fl | | New York | NY | 10172 | 212-270-0426 | 212-270-0430 | gianni.russello@jpmorgan.com susan.atkins@jpmorgan.com | Postpetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | Sheryl Betance | 2335 Alaska Ave | | El Segundo | CA | 90245 | 310-823-9000 | 310-823-9133 | sbetance@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Law Debenture Trust of New York | Daniel R. Fisher | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| Law Debenture Trust of New York | Patrick J. Healy | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |
| McDermott Will & Emery LLP | Jason C. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | jdejonker@mwe.com | Counsel to Recticel North America, Inc. |

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| McDermott Will & Emery LLP | Peter A. Clark | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | pclark@mwe.com | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | 213-629-5063 | gbray@milbank.com tkreller@milbank.com jtill@milbank.com | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | william.dornbos@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | efile@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel to the Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | 2122185500 | 2122185526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel to Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel to the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Harvey R. Miller | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8500 | 212-310-8077 | harvey.miller@weil.com | Counsel to General Motors Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 3

7/19/2007 12:31 PM
Master Service List Email

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|-------|-----|-------|------------------|
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

7/19/2007 12:31 PM
Master Service List Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Adalberto Cañadas Castillo | | Avda Ramon de Carranza | 10-1º | Cadiz | | 11006 | Spain | 34 956 226 311 | | adalberto@canadas.com | Representative to DASE |
| Akin Gump Strauss Hauer & Feld, LLP | Peter J. Gurfein | 2029 Centure Park East | Suite 2400 | Los Angeles | CA | 90067 | | 310-552-6696 | 310-229-1001 | pgurfein@akingump.com | Counsel to Wamco, Inc. |
| Allen Matkins Leck Gamble & Mallory LLP | Michael S. Greger | 1900 Main Street | Fifth Floor | Irvine | CA | 92614-7321 | | 949-553-1313 | 949-553-8354 | mgreger@allenmatkins.com | Counsel to Kilroy Realty, L.P. |
| Alston & Bird, LLP | Craig E. Freeman | 90 Park Avenue | | New York | NY | 10016 | | 212-210-9400 | 212-922-3801 | craig.freeman@alston.com | Counsel to Cadence Innovation, LLC |
| Alston & Bird, LLP | Dennis J. Connolly; David A. Wender | 1201 West Peachtree Street | | Atlanta | GA | 30309 | | 404-881-7269 | 404-253-8554 | dconnolly@alston.com dwender@alston.com | Counsel to Cadence Innovation, LLC |
| Ambrake Corporation | Brandon J. Kessinger | 300 Ring Road | | Elizabethtown | KY | 42701 | | 270-234-5428 | 270-737-3044 | bkessinger@akebono-usa.com | Representative for Ambrake Corporation |
| American Axle & Manufacturing, Inc. | Steven R. Keyes | One Dauch Drive, Mail Code 6E-2-42 | | Detroit | MI | 48243 | | 313-758-4868 | | steven.keyes@aam.com | Representative for American Axle & Manufacturing, Inc. |
| Andrews Kurth LLP | Gogi Malik | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | gogimalik@andrewskurth.com | Counsel to ITW Mortgage Investments IV, Inc. |
| Andrews Kurth LLP | Monica S. Blacker | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | mblacker@andrewskurth.com | Counsel to  ITW Mortgage Investments IV, Inc. |
| Angelo, Gordon & Co. | Leigh Walzer | 245 Park Avenue | 26th Floor | New York | NY | 10167 | | 212-692-8251 | 212-867-6395 | lwalzer@angelogordon.com | |
| Anglin, Flewelling, Rasmussen, Campbell & Trytten, LLP | Mark T. Flewelling | 199 South Los Robles Avenue | Suite 600 | Pasadena | CA | 91101-2459 | | 626-535-1900 | 626-577-7764 | mtf@afrct.com | Counsel to Stanley Electric Sales of America, Inc. |
| Arent Fox PLLC | Mitchell D. Cohen | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Cohen.Mitchell@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arent Fox PLLC | Robert M. Hirsh | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Hirsh.Robert@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arnall Golden Gregory LLP | Darryl S. Laddin | 171 17th Street NW | Suite 2100 | Atlanta | GA | 30363-1031 | | 404-873-8120 | 404-873-8121 | dladdin@agg.com | Counsel to Daishinku (America) Corp. d/b/a KDS America ("Daishinku"), SBC Telecommunications, Inc. (SBC) |
| Arnold & Porter LLP | Joel M. Gross | 555 Twelfth Street, N.W. | | Washington | D.C. | 20004-1206 | | 202-942-5000 | 202-942-5999 | joel_gross@aporter.com | Counsel to CSX Transportation, Inc. |
| ATS Automation Tooling Systems Inc. | Carl Galloway | 250 Royal Oak Road | | Cambridge | Ontario | N3H 4R6 | Canada | 519-653-4483 | 519-650-6520 | cgalloway@atsautomation.com | Company |
| Barack, Ferrazzano, Kirschbaum & Nagelberg LLP | Kimberly J. Robinson | 200 W Madison St Ste 3900 | | Chicago | IL | 60606 | | 312-984-3100 | 312-984-3150 | kim.robinson@bfkn.com | Counsel to Motion Industries, Inc., EIS, Inc. and Johnson Industries, Inc. |
| Barack, Ferrazzano, Kirschbaum & Nagelberg LLP | William J. Barrett | 200 W Madison St Ste 3900 | | Chicago | IL | 60606 | | 312-984-3100 | 312-984-3150 | william.barrett@bfkn.com | Counsel to Motion Industries, Inc., EIS, Inc. and Johnson Industries, Inc. |
| Barnes & Thornburg LLP | Alan K. Mills | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | alan.mills@btlaw.com | Counsel to Mays Chemical Company |
| Barnes & Thornburg LLP | John T. Gregg | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3930 | 626-742-3999 | john.gregg@btlaw.com | Counsel to Priority Health; Clarion Corporation of America |
| Barnes & Thornburg LLP | Mark R. Owens | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | mark.owens@btlaw.com | Counsel to Clarion Corporation of America |
| Barnes & Thornburg LLP | Michael K. McCrory | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | michael.mccrory@btlaw.com | Counsel to Gibbs Die Casting Corporation; Clarion Corporation of America |
| Barnes & Thornburg LLP | Patrick E. Mears | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3936 | 616-742-3999 | pmears@btlaw.com | Counsel to Armada Rubber Manufacturing Company, Bank of America Leasing & Leasing & Capital, LLC, & AutoCam Corporation |
| Barnes & Thornburg LLP | Wendy D. Brewer | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | wendy.brewer@btlaw.com | Counsel to Gibbs Die Casting Corporation |
| Bartlett Hackett Feinberg P.C. | Frank F. McGinn | 155 Federal Street | 9th Floor | Boston | MA | 02110 | | 617-422-0200 | 617-422-0383 | ffm@bostonbusinesslaw.com | Counsel to Iron Mountain Information Management, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beeman Law Office | Thomas M Beeman | 33 West 10th Street | Suite 200 | Anderson | IN | 46016 | | 765-640-1330 | 765-640-1332 | tom@beemanlawoffice.com | Counsel to Madison County (Indiana) Treasurer |
| Bernstein Litowitz Berger & Grossman | Hannah E. Greenwald | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1411 | 2125541444 | hannah@blbglaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Bernstein Litowitz Berger & Grossman | John P. Coffey | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1409 | 2125541444 | sean@blbglaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Bernstein Litowitz Berger & Grossman | Wallace A. Showman | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1429 | 212-554-1444 | wallace@blbglaw.com | Counsel to SANLUIS Rassini International, Inc.; Rassini, S.A. de C.V. |
| Bialson, Bergen & Schwab | Kenneth T. Law, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | klaw@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc. |
| Bialson, Bergen & Schwab | Lawrence M. Schwab, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | lschwab@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc.; Solectron Corporation; Solectron De Mexico SA de CV; Solectron Invotronics; Coherent, Inc.; Veritas Software Corporation |
| Bialson, Bergen & Schwab | Patrick M. Costello, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | pcostello@bbslaw.com | Solectron Corporation; Solectron de Mexico SA de CV; Solectron Invotronics and Coherent, Inc. |
| Bialson, Bergen & Schwab | Thomas M. Gaa | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | tgaa@bbslaw.com | Counsel to  Veritas Software Corporation |
| Bingham McHale LLP | John E Taylor Whitney L Mosby | 10 West Market Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-635-8900 | 317-236-9907 | jtaylor@binghammchale.com wmosby@binghammchale.com | Counsel to Universal Tool & Engineering co., Inc. and M.G. Corporation |
| Blank Rome LLP | Marc E. Richards | The Chrylser Building | 405 Lexington Avenue | New York | NY | 10174 | | 212-885-5000 | 212-885-5002 | mrichards@blankrome.com | Counsel to DENSO International America, Inc. |
| Bodman LLP | Ralph E. McDowell | 100 Renaissance Center | 34th Floor | Detroit | MI | 48243 | | 313-393-7592 | 313-393-7579 | rmcdowell@bodmanllp.com | Counsel to Freudenberg-NOK; General Partnership; Freudenberg-NOK, Inc.; Flextech, Inc.; Vibracoustic de Mexico, S.A. de C.V.; Lear Corporation; American Axle & Manufacturing, Inc. |
| Bond, Schoeneck & King, PLLC | Camille W. Hill | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | chill@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp. |
| Bond, Schoeneck & King, PLLC | Charles J. Sullivan | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | csullivan@bsk.com | Counsel to Diemolding Corporation |
| Bond, Schoeneck & King, PLLC | Stephen A. Donato | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | sdonato@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp; Diemolding Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bose McKinney & Evans LLP | Jeannette Eisan Hinshaw | 135 N. Pennsylvania Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-684-5296 | 317-684-5173 | jhinshaw@boselaw.com | Counsel to Decatur Plastics Products, Inc. and Eikenberry & Associates, Inc.; Lorentson Manufacturing, Company, Inc.; Lorentson Tooling, Inc.; L & S Tools, Inc.; Hewitt Tool & Die, Inc. |
| Boult, Cummings, Conners & Berry, PLC | Austin L. McMullen | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | amcmullen@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Boult, Cummings, Conners & Berry, PLC | Roger G. Jones | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | rjones@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Brembo S.p.A. | Massimiliano Cini | Administration Department via Brembo 25 | 24035 Curno BG | Bergamo | | | Italy | 00039-035-605 529 | 0039-035-605-671 | massimiliano_cini@brembo.it | Creditor |
| Brown & Connery, LLP | Donald K. Ludman | 6 North Broad Street | | Woodbury | NJ | 08096 | | 856-812-8900 | 856-853-9933 | dludman@brownconnery.com | Counsel to SAP America, Inc. |
| Buchalter Nemer, A Profesional Corporation | Shawn M. Christianson | 333 Market Street | 25th Floor | San Francisco | CA | 94105-2126 | | 415-227-0900 | 415-227-0770 | schristianson@buchalter.com | Counsel to Oracle USA, Inc.; Oracle Credit Corporation |
| Burr & Forman LLP | Michael Leo Hall | 420 North Twentieth Street | Suite 3100 | Birmingham | AL | 35203 | | (205) 458-5367 | (205) 244-5651 | mhall@burr.com | Counsel to Mercedes-Benz U.S. International, Inc. |
| Cadwalader Wickersham & Taft LLP | Jeannine D'Amico | 1201 F St NW Ste 1100 | | Washington | DC | 20004 | | 202-862-2452 | 202-862-2400 | jeannine.damico@cwt.com | Attorneys for the Audit Committee of Delphi Corporation |
| Cahill Gordon & Reindel LLP | Jonathan Greenberg | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 732-205-6777 | jonathan.greenberg@BASF.C OM | Counsel to Engelhard Corporation |
| Cahill Gordon & Reindel LLP | Robert Usadi | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 212-269-5420 | rusadi@cahill.com | Counsel to Engelhard Corporation |
| Calfee, Halter & Griswold LLC | Jean R. Robertson, Esq. | 1400 McDonald Investment Ctr | 800 Superior Ave | Cleveland | OH | 44114 | | 216-622-8404 | 216-241-0816 | jrobertson@calfee.com | Counsel to Brush Engineered materials |
| Calinoff & Katz, LLp | Dorothy H. Marinis-Riggio | 140 East 45th Street | 17th Floor | New York | NY | 10017 | | 212-826-8800 | 212-644-5123 | driggio@candklaw.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Carson Fischer, P.L.C. | Robert A. Weisberg | 300 East Maple Road | Third Floor | Birmingham | MI | 48009-6317 | | 248-644-4840 | 248-644-1832 | rweisberg@carsonfischer.com | Counsel to Cascade Die Casting Group, Inc. |
| Carter Ledyard & Milburn LLP | Aaron R. Cahn | 2 Wall Street | | New York | NY | 10005 | | 212-732-3200 | 212-732-3232 | cahn@clm.com | Counsel to STMicroelectronics, Inc. |
| Chadbourne & Parke LLP | Douglas Deutsch, Esq. | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-408-5100 | 212-541-5369 | ddeutsch@chadbourne.com | Counsel to EagleRock Capital Management, LLC |
| Clark Hill PLC | Joel D. Applebaum | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | japplebaum@clarkhill.com | Counsel to 1st Choice Heating & Cooling, Inc.; BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLC | Shannon Deeby | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | sdeeby@clarkhill.com | Counsel to BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLLC | Robert D. Gordon | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8572 | 313-965-8252 | rgordon@clarkhill.com | Counsel to ATS Automation Tooling Systems Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cleary Gottlieb Steen & Hamilton LLP | Deborah M. Buell | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel to Arneses Electricos Automotrices, S.A.de C.V.; Cordaflex, S.A. de C.V. |
| Cleary, Gottlieb, Steen & Hamilton LLP | James L. Bromley | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel to Bear, Stearns, Co. Inc.; Citigroup, Inc.; Credit Suisse First Boston; Deutsche Bank Securities, Inc.; Goldman Sachs Group, Inc.; JP Morgan Chase & Co.; Lehman Brothers, Inc.; Merrill Lynch & Co.; Morgan Stanley & Co., Inc.; UBS Securities, LLC |
| Cohen & Grigsby, P.C. | Thomas D. Maxson | 11 Stanwix Street | 15th Floor | Pittsburgh | PA | 15222-1319 | | 412-297-4706 | 412-209-1837 | tmaxson@cohenlaw.com | Counsel to Nova Chemicals, Inc. |
| Cohen, Weiss & Simon LLP | Joseph J. Vitale Babette Ceccotti | 330 West 42nd Street | | New York | NY | 10036 | | 212-356-0238 | 646-473-8238 | jvitale@cwsny.com bceccotti@cwsny.com | Counsel to International Union, United Automobile, Areospace and Agriculture Implement Works of America (UAW) |
| Cohn Birnbaum & Shea P.C. | Scott D. Rosen, Esq. | 100 Pearl Street, 12th Floor | | Hartford | CT | 06103 | | 860-493-2200 | 860-727-0361 | srosen@cb-shea.com | Counsel to Floyd Manufacturing Co., Inc. |
| Conlin, McKenney & Philbrick, P.C. | Bruce N. Elliott | 350 South Main Street | Suite 400 | Ann Arbor | MI | 48104 | | 734-971-9000 | 734-971-9001 | Elliott@cmplaw.com | Counsel to Brazeway, Inc. |
| Connolly Bove Lodge & Hutz LLP | Jeffrey C. Wisler, Esq. | 1007 N. Orange Street | P.O. Box 2207 | Wilmington | DE | 19899 | | 302-658-9141 | 302-658-0380 | jwisler@cblh.com | Counsel to ORIX Warren, LLC |
| Contrarian Capital Management, L.L.C. | Mark Lee, Janice Stanton, Bill Raine, Seth Lax | 411 West Putnam Avenue | Suite 225 | Greenwich | CT | 06830 | | 203-862-8200 (230) 862-8231 | 203-629-1977 (203) 629-1977 | mlee@contrariancapital.com jstanton@contrariancapital.com wraine@contrariancapital.com solax@contrariancapital.com | Counsel to Contrarian Capital Management, L.L.C. |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Ronald S. Pretekin | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | Pretekin@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Sylvie J. Derrien | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | derrien@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| Cornell University | Nancy H. Pagliaro | Office of University Counsel | 300 CCC Building, Garden Avenue | Ithaca | NY | 14853-2601 | | 607-255-5124 | 607-254-3556 | nhp4@cornell.edu | Paralegal/Counsel to Cornell University |
| Covington & Burling | Susan Power Johnston | 1330 Avenue of the Americas | | New York | NY | 10019 | | 212-841-1005 | 646-441-9005 | sjohnston@cov.com | Special Counsel to the Debtor |
| Cox, Hodgman & Giarmarco, P.C. | Sean M. Walsh, Esq. | Tenth Floor Columbia Center | 101 W. Big Beaver Road | Troy | MI | 48084-5280 | | 248-457-7000 | 248-457-7001 | swalsh@chglaw.com | Counsel to Nisshinbo Automotive Corporation |
| Curtin & Heefner, LLP | Daniel P. Mazo | 250 N. Pennslyvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | dpm@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| Curtin & Heefner, LLP | Robert Szwajkos | 250 N. Pennslyvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | rsz@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| Damon & Morey LLP | William F. Savino | 1000 Cathedral Place | 298 Main Street | Buffalo | NY | 14202-4096 | | 716-856-5500 | 716-856-5510 | wsavino@damonmorey.com | Counsel to Relco, Inc.; The Durham Companies, Inc. |
| Day Pitney LLP | Richard M. Meth | P.O. Box 1945 | | Morristown | NJ | 07962-1945 | | 973-966-6300 | 973-966-1015 | rmeth@daypitney.com | Counsel to Marshall E. Campbell Company |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 4 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Day Pitney LLP | Ronald S. Beacher Conrad K. Chiu | 7 Times Square | | New York | NY | 10036 | | 212-297-5800 | 212-916-2940 | rbeacher@daypitney.com cchiu@daypitney.com | Counsel to IBJTC Business Credit Corporation, as successor to IBJ Whitehall Business Credit Corporation |
| Denso International America, Inc. | Carol Sowa | 24777 Denso Drive | | Southfield | MI | 48086 | | 248-372-8531 | 248-350-7772 | carol_sowa@denso-diam.com | Counsel to Denso International America, Inc. |
| Dinsmore & Shohl LLP | John Persiani | 1900 Chemed Center | 255 East Fifth Street | Cincinnati | OH | 45202 | | 513-977-8200 | 513-977-8141 | john.persiani@dinslaw.com | Counsel to The Procter & Gamble Company |
| DLA Piper Rudnick Gray Cary US LLP | Richard M. Kremen Maria Ellena Chavez-Ruark | The Marbury Building | 6225 Smith Avenue | Baltimore | Maryland | 21209-3600 | | 410-580-3000 | 410-580-3001 | richard.kremen@dlapiper.com | Counsel to Constellation NewEnergy, Inc. & Constellation NewEnergy - Gas Division, LLC |
| Dreier LLP | Maura I. Russell Wendy G. Marcari | 499 Park Ave | 14th Fl | New York | NY | 10022 | | 212-328-6100 | 212-652-3863 | jguerrier@dreierllp.com | Counsel to SPCP Group LLC |
| Drinker Biddle & Reath LLP | Andrew C. Kassner | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | andrew.kassner@dbr.com | Counsel to Penske Truck Leasing Co., L.P. |
| Drinker Biddle & Reath LLP | David B. Aaronson | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | david.aaronson@dbr.com | Counsel to Penske Truck Leasing Co., L.P. and Quaker Chemical Corporation |
| Drinker Biddle & Reath LLP | Janice B. Grubin | 140 Broadway 39th Fl | | New York | NY | 10005-1116 | | 212-248-3140 | 212-248-3141 | janice.grubin@dbr.com | Counsel to Vanguard Distributors, Inc. |
| Duane Morris LLP | Joseph H. Lemkin | 744 Broad Street | Suite 1200 | Newark | NJ | 07102 | | 973-424-2000 | 973-424-2001 | jhlemkin@duanemorris.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC; and Hosiden America Corporation |
| Duane Morris LLP | Margery N. Reed, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | dmdelphi@duanemorris.com | Counsel to ACE American Insurance Company |
| Duane Morris LLP | Wendy M. Simkulak, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | wmsimkulak@duanemorris.com | Counsel to ACE American Insurance Company |
| Eckert Seamans Cherin & Mellott LLC | Michael G. Busenkell | 300 Delaware Avenue | Suite 1360 | Wilmington | DE | 19801 | | 302-425-0430 | 302-425-0432 | mbusenkell@eckertseamans.com | Counsel to Chicago Miniature Optoelectronic Technologies, Inc. |
| Electronic Data Systems Corporation | Ayala Hassell | 5400 Legacy Dr. | Mail Stop H3-3A-05 | Plano | TX | 75024 | | 212-715-9100 | 212-715-8000 | ayala.hassell@eds.com | Representattive for Electronic Data Systems Corporation |
| Entergy Services, Inc. | Alan H. Katz | 639 Loyola Ave 26th Fl | | New Orleans | LA | 70113 | | | | akatz@entergy.com | Assistant General Counsel to Entergy Services, Inc. |
| Erman, Teicher, Miller, Zucker & Freedman, P.C. | David H. Freedman | 400 Galleria Officentre | Ste. 444 | Southfield | MI | 48034 | | 248-827-4100 | 248-827-4106 | dfreedman@ermanteicher.com | Counsel to Doshi Prettl International, LLC |
| Ettelman & Hochheiser, P.C. | Gary Ettelman | c/o Premium Cadillac | 77 Main Street | New Rochelle | NY | 10801 | | 516-227-6300 | 516-227-6307 | gettelman@e-hlaw.com | Counsel to Jon Ballin |
| Fagel Haber LLC | Lauren Newman | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | | 312-346-7500 | 312-580-2201 | lnewman@fagelhaber.com | Counsel to Aluminum International, Inc. |
| Filardi Law Offices LLC | Charles J. Filardi, Jr., Esq. | 65 Trumbull Street | Second Floor | New Haven | CT | 06510 | | 203-562-8588 | 866-890-3061 | charles@filardi-law.com | Counsel to Federal Express Corporation |
| Finkel Goldstein Rosenbloom & Nash LLP | Ted J. Donovan | 26 Broadway | Suite 711 | New York | NY | 10004 | | 212-344-2929 | 212-422-6836 | tdonovan@finkgold.com | Counsel to Pillarhouse (U.S.A.) Inc. |
| Foley & Lardner LLP | David G Dragich | 500 Woodward Ave Suite 2700 | | Detroit | MI | 48226-3489 | | 313-234-7100 | 313-234-2800 | ddragich@foley.com | Counsel to Internet Corporation |
| Foley & Lardner LLP | Jill L. Murch | 321 North Clark Street | Suite 2800 | Chicago | IL | 60610-4764 | | 312-832-4500 | 312-832-4700 | jmurch@foley.com | Counsel to Kuss Corporation |
| Foley & Lardner LLP | John A. Simon | One Detroit Center | 500 Woodward Ave Suite 2700 | Detroit | MI | 48226-3489 | | 313-234-7100 | 313-234-2800 | jjsimon@foley.com | Counsel to Ernst & Young LLP |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 5 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Foley & Lardner LLP | Michael P. Richman | 90 Park Avenue | 37th Floor | New York | NY | 10016-1314 | | 212-682-7474 | 212-687-2329 | mrichman@foley.com | Counsel to Ernst & Young LLP |
| Fox Rothschild LLP | Fred Stevens | 13 East 37th Street | Suite 800 | New York | NY | 10016 | | 212-682-7575 | 212-682-4218 | fstevens@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Fox Rothschild LLP | Michael J. Viscount, Jr. | 1301 Atlantic Avenue | Suite 400 | Atlantic City | NJ | 08401-7212 | | 609-348-4515 | 609-348-6834 | mviscount@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Frederick T. Rikkers | | 419 Venture Court | P.O. Box 930555 | Verona | WI | 53593 | | 608-848-6350 | 608-848-6357 | ftrikkers@rikkerslaw.com | Counsel to Southwest Metal Finishing, Inc. |
| Fulbright & Jaworski LLP | David A Rosenzweig | 666 Fifth Avenue | | New York | NY | 10103-3198 | | 212-318-3000 | 212-318-3400 | drosenzweig@fulbright.com | Counsel to Southwest Research Institute
Attorney for Solvay Fluorides, LLC |
| Fulbright & Jaworski LLP | Michael M Parker | 300 Convent St Ste 2200 | | San Antonio | TX | 78205 | | 210-224-5575 | 210-270-7205 | mparker@fulbright.com | Counsel to Southwest Research Institute |
| Gibbons P.C. | David N. Crapo | One Gateway Center | | Newark | NJ | 07102-5310 | | 973-596-4523 | 973-639-6244 | dcrapo@gibbonslaw.com | Counsel to Epcos, Inc. |
| Goldberg, Stinnett, Meyers & Davis | Merle C. Meyers | 44 Montgomery Street | Suite 2900 | San Francisco | CA | 94104 | | 415-362-5045 | 415-362-2392 | mmeyers@gsmdlaw.com | Counsel to Alps Automotive, Inc. |
| Goodwin Proctor LLP | Allan S. Brilliant | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | abrilliant@goodwinproctor.com | Counsel to UGS Corp. |
| Goodwin Proctor LLP | Craig P. Druehl | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | cdruehl@goodwinproctor.com | Counsel to UGS Corp. |
| Gorlick, Kravitz & Listhaus, P.C. | Barbara S. Mehlsack | 17 State Street | 4th Floor | New York | NY | 10004 | | 212-269-2500 | 212-269-2540 | bmehlsack@gkllaw.com | Counsel to International Brotherod of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Goulston & Storrs, P.C. | Peter D. Bilowz | 400 Atlantic Avenue | | Boston | MA | 02110-333 | | 617-482-1776 | 617-574-4112 | pbilowz@goulstonstorrs.com | Counsel to Thermotech Company |
| Grant & Eisenhofer P.A. | Jay W. Eisenhofer | 45 Rockefeller Center | 650 Fifth Avenue | New York | NY | 10111 | | 212-755-6501 | 212-755-6503 | jeisenhofer@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Grant & Eisenhofer P.A. | Sharan Nirmul | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | | 302-622-7000 | 302-622-7100 | snirmul@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Gratz, Miller & Brueggeman, S.C. | Matthew R. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | mrr@previant.com | Counsel to International Brotherod of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gratz, Miller & Brueggeman, S.C. | Timothy C. Hall | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | tch@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Graydon Head & Ritchey LLP | J. Michael Debbler, Susan M. Argo | 1900 Fifth Third Center | 511 Walnut Street | Cincinnati | OH | 45202 | | 513-621-6464 | 513-651-3836 | mdebbeler@graydon.com | Counsel to Grote Industries; Batesville Tool & Die; PIA Group; Reliable Castings |
| Greenberg Traurig, LLP | Maria J. DiConza | MetLife Bldg | 200 Park Avenue | New York | NY | 10166 | | 212-801-9200 | 212-801-6400 | diconzam@gtlaw.com | Counsel to Samtech Corporation |
| Greenberg Traurig, LLP | Shari L. Heyen | 1000 Louisiana | Suite 1800 | Houston | TX | 77002 | | 713-374-3500 | 713-374-3505 | heyens@gtlaw.com | Counsel to Samtech Corporation |
| Greensfelder, Hemker & Gale, P.C. | Cherie Macdonald J. Patrick Bradley | 10 S. Broadway | Suite 200 | St. Louis | MO | 63102 | | 314-241-9090 | 314-241-8624 | ckm@greensfelder.com jpb@greensfelder.com | Counsel to ARC Automotive, Inc. |
| Guaranty Bank | Herb Reiner | 8333 Douglas Avenue | | Dallas | TX | 75225 | | 214-360-2702 | 214-360-1940 | herb.reiner@guarantygroup.com | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Corporation |
| Halperin Battaglia Raicht, LLP | Alan D. Halperin Christopher J.Battaglia Julie D. Dyas | 555 Madison Avenue | 9th Floor | New York | NY | 10022 | | 212-765-9100 | 212-765-0964 | cbattaglia@halperinlaw.net ahalperin@halperinlaw.net jdyas@halperinlaw.net | Counsel to Pacific Gas Turbine Center, LLC and Chromalloy Gas Turbine Corporation; ARC Automotive, Inc. |
| Hancock & Estabrook LLP | R John Clark Esq | 1500 Tower I | PO Box 4976 | Syracuse | NY | 13221-4976 | | 315-471-3151 | 315-471-3167 | rjclark@hancocklaw.com | Counsel to Alliance Precision Plastics Corporation |
| Harris D. Leinwand | Harris D. Leinwand | 350 Fifth Avenue | Suite 2418 | New York | NY | 10118 | | 212-725-7338 | 212-244-6219 | hleinwand@aol.com | Counsel to Baker Hughes Incorporated; Baker Petrolite Corporation |
| Haynes and Boone, LLP | Judith Elkin | 153 East 53rd Street | Suite 4900 | New York | NY | 10022 | | 212-659-7300 | 212-918-8989 | judith.elkin@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Haynes and Boone, LLP | Lenard M. Parkins Kenric D. Kattner | 1 Houston Center | 1221 McKinney, Suite 2100 | Houston | TX | 77010 | | 713-547-2000 | 713-547-2600 | lenard.parkins@haynesboone.com kenric.kattner@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Heller Ehrman LLP | Timothy Mehok | Times Square Tower | Seven Times Square | New York | NY | 10036 | | 212-832-8300 | 212-763-7600 | timothy.mehok@hellerehrman.com | Counsel to @Road, Inc. |
| Herrick, Feinstein LLP | Paul Rubin | 2 Park Avenue | | New York | NY | 10016 | | 212-592-1448 | 212-545-3360 | prubin@herrick.com | Counsel to Canon U.S.A., Inc. and Schmidt Technology GmbH |
| Hewlett-Packard Company | Anne Marie Kennelly | 3000 Hanover St., M/S 1050 | | Palo Alto | CA | 94304 | | 650-857-6902 | 650-852-8617 | anne.kennelly@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Kenneth F. Higman | 2125 E. Katella Avenue | Suite 400 | Anaheim | CA | 92806 | | 714-940-7120 | 740-940-7539 | ken.higman@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Sharon Petrosino | 420 Mountain Avenue | | Murray Hill | NJ | 07974 | | 908-898-4760 | 908-898-4133 | sharon.petrosino@hp.com | Counsel to Hewlett-Packard Financial Services Company |
| Hiscock & Barclay, LLP | J. Eric Charlton | 300 South Salina Street | PO Box 4878 | Syracuse | NY | 13221-4878 | | 315-425-2716 | 315-425-8576 | echarlton@hiscockbarclay.com | Counsel to GW Plastics, Inc. |
| Hodgson Russ LLP | Julia S. Kreher | One M&T Plaza | Suite 2000 | Buffalo | NY | 14203 | | 716-848-1330 | 716-819-4645 | jkreher@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hodgson Russ LLP | Stephen H. Gross, Esq. | 230 Park Avenue | 17th Floor | New York | NY | 10169 | | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hogan & Hartson L.L.P. | Audrey Moog | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | 202-637-5910 | amoog@hhlaw.com | Counsel to Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Edward C. Dolan | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | 202-637-5910 | ecdolan@hhlaw.com | Counsel to Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Scott A. Golden | 875 Third Avenue | | New York | NY | 10022 | | 212-918-3000 | 212-918-3100 | sagolden@hhlaw.com | Counsel to XM Satellite Radio Inc. |
| Holme Roberts & Owen, LLP | Elizabeth K. Flaagan | 1700 Lincoln | Suite 4100 | Denver | CO | 80203 | | 303-861-7000 | 303-866-0200 | elizabeth.flaagan@hro.com | Counsel to CoorsTek, Inc.; Corus, L.P. |
| Honigman, Miller, Schwartz and Cohn, LLP | Donald T. Baty, Jr. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7314 | 313-465-7315 | dbaty@honigman.com | Counsel to Fujitsu Ten Corporation of America |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 7 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Honigman, Miller, Schwartz and Cohn, LLP | E. Todd Sable | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7548 | 313-465-7549 | tsable@honigman.com | Counsel to Valeo Climate Control Corp.; Valeo Electrical Systems, Inc. - Motors and Actuators Division;Valeo Electrical Systems, Inc. - Wipers Division; Valeo Switches & Detection System, Inc. |
| Honigman, Miller, Schwartz and Cohn, LLP | Seth A Drucker | 2290 First National Building | 660 Woodward Avenue Ste 2290 | Detroit | MI | 48226 | | 313-465-7626 | 313-465-7627 | sdrucker@honigman.com | Counsel for Valeo Climate Control, Corp. |
| Howard & Howard Attorneys PC | Lisa S Gretchko | 39400 Woodward Ave | Ste 101 | Bloomfield Hills | MI | 48304-5151 | | | | lgretchko@howardandhoward.com | Intellectual Property Counsel for Delphi Corporation, et al. |
| Howick, Westfall, McBryan & Kaplan, LLP | Louis G. McBryan | 3101 Tower Creek Parkway | Ste 600 One Tower Creek | Atlanta | GA | 30339 | | 678-384-7000 | 678-384-7034 | lmcbryan@hwmklaw.com | Counsel to Vanguard Distributors, Inc. |
| Hunton & Wiliams LLP | Michael P. Massad, Jr. | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | mmassad@hunton.com | Counsel to RF Monolithics, Inc. |
| Hunton & Wiliams LLP | Steven T. Holmes | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | sholmes@hunton.com | Counsel to RF Monolithics, Inc. |
| Hurwitz & Fine P.C. | Ann E. Evanko | 1300 Liberty Building | | Buffalo | NY | 14202 | | 716-849-8900 | 716-855-0874 | aee@hurwitzfine.com | Counsel to Jiffy-Tite Co., Inc. |
| Ice Miller | Ben T. Caughey | One American Square | Box 82001 | Indianapolis | IN | 46282-0200 | | 317-236-2100 | 317-236-2219 | Ben.Caughey@icemiller.com | Counsel to Sumco, Inc. |
| Infineon Technologies North America Corporation | Greg Bibbes | 1730 North First Street | M/S 11305 | San Jose | CA | 95112 | | 408-501-6442 | 408-501-2488 | greg.bibbes@infineon.com | General Counsel & Vice President for Infineon Technologies North America Corporation |
| Infineon Technologies North America Corporation | Jeff Gillespie | 2529 Commerce Drive | Suite H | Kokomo | IN | 46902 | | 765-454-2146 | 765-456-3836 | jeffery.gillispie@infineon.com | Global Account Manager for Infineon Technologies North America |
| InPlay Technologies Inc | Heather Beshears | 234 South Extension Road | | Mesa | AZ | 85201 | | | | heather@inplaytechnologies.com | Creditor |
| Intermet Corporation | Alan Miller | 301 Commerce Street | Ste 2901 | Fort Worth | TX | 76102 | | | | amiller@intermet.com | Creditor |
| International Union of Operating Engineers | Richard Griffin | 1125-17th Avenue, N.W. | | Washington | DC | 20036 | | 202-429-9100 | 202-778-2641 | rgriffin@iuoe.org | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Jaffe, Raitt, Heuer & Weiss, P.C. | Paige E. Barr | 27777 Franklin Road | Suite 2500 | Southfield | MI | 48034 | | 248-351-3000 | 248-351-3082 | pbarr@jaffelaw.com | Counsel to Trutron Corporation |
| James R Scheuerle | Parmenter O'Toole | 601 Terrace Street | PO Box 786 | Muskegon | MI | 49443-0786 | | 231-722-1621 | 231-728-2206 | JRS@Parmenterlaw.com | Counsel to Port City Die Cast and Port City Group Inc |
| Jenner & Block LLP | Ronald R. Peterson | One IBM Plaza | | Chicago | IL | 60611 | | 312-222-9350 | 312-840-7381 | rpeterson@jenner.com | Counsel to SPX Corporation (Contech Division), Alcan Rolled Products-Ravenswood, LLC, Tenneco Inc. and Contech LLC |
| Jones Day | Scott J. Friedman | 222 East 41st Street | | New York | NY | 10017 | | 212-326-3939 | 212-755-7306 | sjfriedman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Katten Muchin Rosenman LLP | John P. Sieger, Esq. | 525 West Monroe Street | | Chicago | IL | 60661 | | 312-902-5200 | 312-577-4733 | john.sieger@kattenlaw.com | Counsel to TDK Corporation America and MEMC Electronic Materials, Inc. |
| Kaye Scholer LLP | Richard G Smolev | 425 Park Avenue | | New York | NY | 10022-3598 | | 212-236-8000 | 212-836-8689 | rsmolev@kayescholer.com | Counsel to InPlay Technologies |
| Kegler, Brown, Hill & Ritter Co., LPA | Kenneth R. Cookson | 65 East State Street | Suite 1800 | Columbus | OH | 43215 | | 614-426-5400 | 614-464-2634 | kcookson@keglerbrown.com | Counsel to Solution Recovery Services |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 8 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Keller Rohrback L.L.P. | Lynn Lincoln Sarko Cari Campen Laufenberg Erin M. Rily | 1201 Third Avenue | Suite 3200 | Seattle | WA | 98101 | | 206-623-1900 | 206-623-3384 | lsarko@kellerrohrback.com claufenberg@kellerrohrback.com eriley@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Keller Rohrback P.L.C. | Gary A. Gotto | National Bank Plaza | 3101 North Central Avenue, Suite 900 | Phoenix | AZ | 85012 | | 602-248-0088 | 602-248-2822 | ggotto@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Kennedy, Jennick & Murray | Larry Magarik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | lmagarik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Susan M. Jennik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | sjennik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Thomas Kennedy | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | tkennedy@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| King & Spalding, LLP | H. Slayton Dabney, Jr. Bill Dimos | 1185 Avenue of the Americas | | New York | NY | 10036 | | 212-556-2100 | 212-556-2222 | sdabney@kslaw.com bdimos@kslaw.com | Counsel to KPMG LLP |
| Kirkland & Ellis LLP | Jim Stempel | 200 East Randolph Drive | | Chicago | IL | 60601 | | 312-861-2000 | 312-861-2200 | jstempel@kirkland.com | Counsel to Lunt Mannufacturing Company |
| Kirkpatrick & Lockhart Nicholson Graham LLP | Edward M. Fox | 599 Lexington Avenue | | New York | NY | 10022 | | 212-536-4812 | 212-536-3901 | efox@klng.com | Counsel to Wilmington Trust Company, as Indenture trustee |
| Klett Rooney Lieber & Schorling | Eric L. Schnabel DeWitt Brown | The Brandywine Building | 1000 West Street, Suite 1410 | Wilmington | DE | 19801 | | (302) 552-4200 | | schnabel@klettrooney.com dbrown@klettrooney.com | Counsel to Entergy |
| Krugliak, Wilkins, Griffiths & Dougherty CO., L.P.A. | Sam O. Simmerman | 4775 Munson Street N.W. | P.O. Box 36963 | Canton | OH | 44735-6963 | | 330-497-0700 | 330-497-4020 | sosimmerman@kwgd.com | Counsel to for Millwood, Inc. |
| Kutak Rock LLP | Jay Selanders | 1010 Grand Blvd Ste 500 | | Kansas City | MO | 64106 | | 816-502-4617 | 816-960-0041 | jay.selanders@kutakrock.com | Counsel to DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrysler Canada, Inc. |
| Kutchin & Rufo, P.C. | Edward D. Kutchin | 155 Federal Street | 17th Floor | Boston | MA | 02110-1727 | | 617-542-3000 | 617-542-3001 | ekutchin@kutchinrufo.com | Counsel to Parlex Corporation |
| Kutchin & Rufo, P.C. | Kerry R. Northrup | 155 Federal Street | 17th Floor | Boston | MA | 02110-1727 | | 617-542-3000 | 617-542-3001 | knorthup@kutchinrufo.com | Counsel to Parlex Corporation |
| Lambert, Leser, Isackson, Cook & Guinta, P.C. | Susan M. Cook | 309 Davidson Building | PO Box 835 | Bay City | MI | 48707-0835 | | 989-893-3518 | | smcook@lambertleser.com | Counsel to Linamar Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 9 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Latham & Watkins | Erika Ruiz | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | erika.ruiz@lw.com | UCC Professional |
| Latham & Watkins | Henry P. Baer, Jr. | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | henry.baer@lw.com | UCC Professional |
| Latham & Watkins | John W. Weiss | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | john.weiss@lw.com | UCC Professional |
| Latham & Watkins | Mark A. Broude | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1384 | 212-751-4864 | mark.broude@lw.com | UCC Professional |
| Latham & Watkins | Michael J. Riela | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | michael.riela@lw.com | UCC Professional |
| Latham & Watkins | Mitchell A. Seider | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | mitchell.seider@lw.com | UCC Professional |
| Law Offices of Michael O'Hayer | Michael O'Hayer Esq | 22 N Walnut Street | | West Chester | PA | 19380 | | 610-738-1230 | 610-738-1217 | mkohayer@aol.com | Counsel to A-1 Specialized Services and Supplies Inc |
| Lewis and Roca LLP | Rob Charles, Esq. | One South Church Street | Suite 700 | Tucson | AZ | 85701 | | 520-629-4427 | 520-879-4705 | rcharles@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Lewis and Roca LLP | Susan M. Freeman, Esq. | 40 North Central Avenue | Suite 1900 | Phoenix | AZ | 85004-4429 | | 602-262-5756 | 602-734-3824 | sfreeman@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Linear Technology Corporation | John England, Esq. | General Counsel for Linear Technology Corporation | 1630 McCarthy Blvd. | Milpitas | CA | 95035-7417 | | 408-432-1900 | 408-434-0507 | jengland@linear.com | Counsel to Linear Technology Corporation |
| Linebarger Goggan Blair & Sampson, LLP | Diane W. Sanders | 1949 South IH 35 (78741) | P.O. Box 17428 | Austin | TX | 78760-7428 | | 512-447-6675 | 512-443-5114 | austin.bankruptcy@publicans.com | Counsel to Cameron County, Brownsville ISD |
| Linebarger Goggan Blair & Sampson, LLP | Elizabeth Weller | 2323 Bryan Street | Suite 1600 | Dallas | TX | 75201 | | 214-880-0089 | 4692215002 | dallas.bankruptcy@publicans.com | Counsel to Dallas County and Tarrant County |
| Linebarger Goggan Blair & Sampson, LLP | John P. Dillman | P.O. Box 3064 | | Houston | TX | 77253-3064 | | 713-844-3478 | 713-844-3503 | houston_bankruptcy@publicans.com | Counsel in Charge for Taxing Authorities: Cypress-Fairbanks Independent School District, City of Houston, Harris County |
| Loeb & Loeb LLP | P. Gregory Schwed | 345 Park Avenue | | New York | NY | 10154-0037 | | 212-407-4000 | | gschwed@loeb.com | Counsel to Creditor The Interpublic Group of Companies, Inc. and Proposed Auditor Deloitte & Touche, LLP |
| Loeb & Loeb LLP | William M. Hawkins | 345 Park Avenue | | New York | NY | 10154 | | 212-407-4000 | 212-407-4990 | whawkins@loeb.com | Counsel to Industrial Ceramics Corporation |
| Lord, Bissel & Brook | Timothy S. McFadden | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-0370 | 312-896-6394 | tmcfadden@lordbissell.com | Counsel to Methode Electronics, Inc. |
| Lord, Bissel & Brook | Timothy W. Brink | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-1832 | 312-443-896-6432 | tbrink@lordbissell.com | Counsel to Sedgwick Claims Management Services. Inc. |
| Lord, Bissel & Brook LLP | Kevin J. Walsh | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | | 212-947-8304 | 212-947-1202 | kwalsh@lordbissell.com | Counsel to Sedgwick Claims Management Services. Inc. and Methode Electronics, Inc. |
| Lowenstein Sandler PC | Bruce S. Nathan | 1251 Avenue of the Americas | | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | bnathan@lowenstein.com | Counsel to Daewoo International (America) Corp. |
| Lowenstein Sandler PC | Ira M. Levee | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | ilevee@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employes's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Lowenstein Sandler PC | Kenneth A. Rosen | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | krosen@lowenstein.com | Counsel to Cerberus Capital Management, L.P. |
| Lowenstein Sandler PC | Michael S. Etkin | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | metkin@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employes's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 10 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Lowenstein Sandler PC | Scott Cargill | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | scargill@lowenstein.com | Counsel to Cerberus Capital Management, L.P.; AT&T Corporation |
| Lowenstein Sandler PC | Vincent A. D'Agostino | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | vdagostino@lowenstein.com | Counsel to AT&T Corporation |
| Lyden, Liebenthal & Chappell, Ltd. | Erik G. Chappell | 5565 Airport Highway | Suite 101 | Toledo | OH | 43615 | | 419-867-8900 | 419-867-8909 | egc@lydenlaw.com | Counsel to Metro Fibres, Inc. |
| MacDonald, Illig, Jones & Britton LLP | Richard J. Parks | 100 State Street | | Erie | PA | 16507-1459 | | 814-870-7754 | 814-454-4647 | rparks@mijb.com | Counsel to Ideal Tool Company, Inc. |
| Maddin, Hauser, Wartell, Roth & Heller PC | Alexander Stotland Esq | 28400 Northwestern Hwy | Third Floor | Southfield | MI | 48034 | | 248-354-4030 | | axs@maddinhauser.com | Attorney for Danice Manufacturing Co. |
| Madison Capital Management | Joe Landen | 6143 South Willow Drive | Suite 200 | Greenwood Village | CO | 80111 | | 303-957-4254 | 303-957-2098 | jlanden@madisoncap.com | Representative for Madison Capital Management |
| Margulies & Levinson, LLP | Jeffrey M. Levinson, Esq. Leah M. Caplan, Esq. | 30100 Chagrin Boulevard | Suite 250 | Pepper Pike | OH | 44124 | | 216-514-4935 | 216-514-4936 | jml@ml-legal.com lmc@ml-legal.com | Counsel to Venture Plastics |
| Mastromarco & Jahn, P.C. | Victor J. Mastromarco, Jr. | 1024 North Michigan Avenue | P.O. Box 3197 | Saginaw | MI | 48605-3197 | | 989-752-1414 | | vmastromar@aol.com | Counsel to H.E. Services Company and Robert Backie and Counsel to Cindy Palmer, Personal Representative for the Estate of Michael Palmer |
| Masuda Funai Eifert & Mitchell, Ltd. | Gary D. Santella | 203 North LaSalle Street | Suite 2500 | Chicago | IL | 60601-1262 | | 312-245-7500 | 312-245-7467 | gsantella@masudafunai.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC and Hosiden America Corporation |
| Mayer, Brown, Rowe & Maw LLP | Jeffrey G. Tougas | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | jgtougas@mayerbrownrowe.com | Counsel to Bank of America, N.A. |
| Mayer, Brown, Rowe & Maw LLP | Raniero D'Aversa, Jr. | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | rdaversa@mayerbrown.com | Counsel to Bank of America, N.A. |
| McCarter & English, LLP | David J. Adler, Jr. Esq. | 245 Park Avenue, 27th Floor | | New York | NY | 10167 | | 212-609-6800 | 212-609-6921 | dadler@mccarter.com | Counsel to Ward Products, LLC |
| McCarter & English, LLP | Eduardo J. Glas, Esq. | Four Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4096 | | 913-622-4444 | 973-624-7070 | eglas@mccarter.com | Counsel to General Products Delaware Corporation |
| McCarthy Tetrault LLP | John J. Salmas Lorne P. Salzman | 66 Wellington Street West | Suite 4700 | Toronto | Ontario | M5K 1E6 | | 416-362-1812 | 416-868-0673 | jsalmas@mccarthy.ca lsalzman@mccarthy.ca | Counsel to Themselves (McCarthy Tetrault LLP) |
| McDermott Will & Emery LLP | James M. Sullivan | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5477 | 212-547-5444 | jmsullivan@mwe.com | Counsel to Linear Technology Corporation, National Semiconductor Corporation; Timken Corporation |
| McDermott Will & Emery LLP | Stephen B. Selbst | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5400 | 212-547-5444 | sselbst@mwe.com | Counsel to National Semiconductor Corporation |
| McDonald Hopkins Co., LPA | Scott N. Opincar, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sopincar@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McDonald Hopkins Co., LPA | Shawn M. Riley, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sriley@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McElroy, Deutsch, Mulvaney & Carpenter, LLP | Jeffrey Bernstein, Esq. | Three Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4079 | | 973-622-7711 | 973-622-5314 | jbernstein@mdmc-law.com | Counsel to New Jersey Self-Insurers Guaranty Association |
| McGuirewoods LLP | Aaron G McCollough Esq | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | | 804-775-1000 | 804-775-1061 | amccollough@mcguirewoods.com | Counsel to Siemens Energy & Automation, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 11 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Meyer, Suozzi, English & Klein, P.C. | Hanan Kolko | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | hkolko@msek.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Meyer, Suozzi, English & Klein, P.C. | Lowell Peterson, Esq. | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | lpeterson@msek.com | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Meyers, Rodbell & Rosenbaum, P.A. | M. Evan Meyers | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | emeyers@mrrlaw.net | Counsel to Prince George County, Maryland |
| Meyers, Rodbell & Rosenbaum, P.A. | Robert H. Rosenbaum | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | rrosenbaum@mrrlaw.net | Counsel to Prince George County, Maryland |
| Michael Cox | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | miag@michigan.gov | Attorney General for State of Michigan, Department of Treasury |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Dennis J. Raterink | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | raterinkd@michigan.gov | Assistant Attorney General for Worker's Compensation Agency |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Michael Cox | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | miag@michigan.gov | Attorney General for Worker's Compensation Agency |
| Michigan Heritage Bank | Janice M. Donahue | 28300 Orchard Lake Rd | Ste 200 | Farmington Hills | MI | 48334 | | 248-538-2529 | 248-786-3596 | jdonahue@miheritage.com | Counsel to  Michigan Heritage Bank; MHB Leasing, Inc. |
| Miles & Stockbridge, P.C. | Kerry Hopkins | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | 410-385-3700 | khopkins@milesstockbridge.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miles & Stockbridge, P.C. | Thomas D. Renda | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | 410-385-3700 | trenda@milesstockbridge.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miller Johnson | Thomas P. Sarb Robert D. Wolford | 250 Monroe Avenue, N.W. | Suite 800, PO Box 306 | Grand Rapids | MI | 49501-0306 | | 616-831-1748 616-831-1726 | 616-988-1748 616-988-1726 | sarbt@millerjohnson.com wolfordr@millerjohnson.com | Counsel to Pridgeon & Clay, Inc. |
| Miller, Canfield, Paddock and Stone, P.L.C. | Jonathan S. Green | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8452 | 313-496-7997 | greenj@millercanfield.com | Counsel to Wells Operating Partnership, LP |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 12 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Miller, Canfield, Paddock and Stone, P.L.C. | Timothy A. Fusco | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8435 | 313-496-8453 | fusco@millercanfield.com | Counsel to Niles USA Inc.; Techcentral, LLC; The Bartech Group, Inc.; Fischer Automotive Systems |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Paul J. Ricotta | One Financial Center | | Boston | MA | 02111 | | 617-542-6000 | 617-542-2241 | pjricotta@mintz.com | Counsel to Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Stephanie K. Hoos | The Chrysler Center | 666 Third Avenue | New York | NY | 10017 | | 212-935-3000 | 212-983-3115 | skhoos@mintz.com | Counsel to Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Molex Connector Corp | Jeff Ott | 2222 Wellington Ct. | | Lisle | IL | 60532 | | 630-527-4254 | 630-512-8610 | Jeff.Ott@molex.com | Counsel to Molex Connector Corp |
| Morgan, Lewis & Bockius LLP | Andrew D. Gottfried | 101 Park Avenue | | New York | NY | 10178-0060 | | 212-309-6000 | 212-309-6001 | agottfried@morganlewis.com | Counsel to ITT Industries, Inc.; Hitachi Chemical (Singapore), Ltd. |
| Morgan, Lewis & Bockius LLP | Menachem O. Zelmanovitz | 101 Park Avenue | | New York | NY | 10178 | | 212-309-6000 | 212-309-6001 | mzelmanovitz@morganlewis.com | Counsel to Hitachi Chemical (Singapore) Pte, Ltd. |
| Morgan, Lewis & Bockius LLP | Richard W. Esterkin, Esq. | 300 South Grand Avenue | | Los Angeles | CA | 90017 | | 213-612-1163 | 213-612-2501 | resterkin@morganlewis.com | Counsel to Sumitomo Corporation |
| Moritt Hock Hamroff & Horowitz LLP | Leslie Ann Berkoff | 400 Garden City Plaza | | Garden City | NY | 11530 | | 516-873-2000 | | lberkoff@moritthock.com | Counsel to Standard Microsystems Corporation and its direct and indirect subsidiaries Oasis SiliconSystems AG and SMSC NA Automotive, LLC (successor-in-interst to Oasis Silicon Systems, Inc.) |
| Morrison Cohen LLP | Michael R. Dal Lago | 909 Third Avenue | | New York | NY | 10022 | | 212-735-8757 | 917-522-3157 | mdallago@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Munsch Hardt Kopf & Harr, P.C. | Raymond J. Urbanik, Esq., Joseph J. Wielebinski, Esq. and Davor Rukavina, Esq. | 3800 Lincoln Plaza | 500 North Akard Street | Dallas | RX | 75201-6659 | | 214-855-7590 214-855-7561 214-855-7587 | 214-855-7584 | rurbanik@munsch.com jwielebinski@munsch.com drukavina@munsch.com | Counsel to Texas Instruments Incorporated |
| Nantz, Litowich, Smith, Girard & Hamilton, P.C. | Sandra S. Hamilton | 2025 East Beltline, S.E. | Suite 600 | Grand Rapids | MI | 49546 | | 616-977-0077 | 616-977-0529 | sandy@nlsg.com | Counsel to Lankfer Diversified Industries, Inc. |
| Nathan, Neuman & Nathan, P.C. | Kenneth A. Nathan | 29100 Northwestern Highway | Suite 260 | Southfield | MI | 48034 | | 248-351-0099 | 248-351-0487 | Knathan@nathanneuman.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| National City Commercial Capital | Lisa M. Moore | 995 Dalton Avenue | | Cincinnati | OH | 45203 | | 513-455-2390 | 866-298-4481 | lisa.moore2@nationalcity.com | Vice President and Senior Counsel to National City Commercial Capital |
| Nelson Mullins Riley & Scarborough | George B. Cauthen | 1320 Main Street, 17th Floor | PO Box 11070 | Columbia | SC | 29201 | | 803-7255-9425 | 803-256-7500 | george.cauthen@nelsonmullins.com | Counsel to Datwyler Rubber & Plastics, Inc.; Datwyler, Inc.; Datwyler i/o devices (Americas), Inc.; Rothrist Tube (USA), Inc. |
| New Jersey Attorney General's Office Division of Law | Tracy Richardson Deputy Attorney General | R.J. Hughes Justice Complex | 25 Market St P.O. Box 106 | Trenton | NJ | 08628-0106 | | 609-292-1537 | 609-777-3055 | tracy.richardson@dol.lps.state.nj.us | Deputy Attorney General - State of New Jersey Division of Taxation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 13 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Nix, Patterson & Roach, L.L.P. | Bradley E. Beckworth | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | bbeckworth@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Nix, Patterson & Roach, L.L.P. | Jeffrey J. Angelovich | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | jangelovich@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Nix, Patterson & Roach, L.L.P. | Susan Whatley | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | susanwhatley@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| North Point | David G. Heiman | 901 Lakeside Avenue | | Cleveland | OH | 44114 | | 216-586-3939 | 216-579-0212 | dgheiman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Office of the Chapter 13 Trustee | Camille Hope | P.O. Box 954 | | Macon | GA | 31202 | | 478-742-8706 | 478-746-4488 | cahope@chapter13macon.com | Office of the Chapter 13 Trustee |
| Office of the Texas Attorney General | Jay W. Hurst | P.O. Box 12548 | | Austin | TX | 78711-2548 | | 512-475-4861 | 512-482-8341 | jay.hurst@oag.state.tx.us | Counsel to The Texas Comptroller of Public Accounts |
| Orbotech, Inc. | Michael M. Zizza, Legal Manager | 44 Manning Road | | Billerica | MA | 01821 | | 978-901-5025 | 978-667-9969 | michaelz@orbotech.com | Company |
| Orrick, Herrington & Sutcliffe LLP | Alyssa Englund, Esq. | 666 Fifth Avenue | | New York | NY | 10103 | | 212-506-5187 | 212-506-5151 | aenglund@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Frederick D. Holden, Jr., Esq. | 405 Howard Street | | San Francisco | CA | 94105 | | 415-773-5700 | 415-773-5759 | fholden@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Jonathan P. Guy | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | jguy@orrick.com | Counsel to Westwood Associates, Inc. |
| Orrick, Herrington & Sutcliffe LLP | Richard H. Wyron | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | rwyron@orrick.com | Counsel to Westwood Associates, Inc. |
| Pachulski Stang Ziehl Young Jones & Weintraub LLP | Michael R. Seidl | 919 N. Market Street, 17th Floor | P.O. Box 8705 | Wilmington | DE | 19899-8705 | | 302-652-4100 | 302- 652-4400 | mseidl@pszyjw.com | Counsel for Essex Group, Inc. |
| Pachulski Stang Ziehl Young Jones & Weintraub LLP | William P. Weintraub | 780 Third Avenue, 36th Floor | | New York | NY | 10017-2024 | | 212-561-7700 | 212-561-7777 | wweintraub@pszyjw.com | Counsel for Essex Group, Inc. |
| Paul, Weiss, Rifkind, Wharton & Garrison | Andrew N. Rosenberg Justin G. Brass | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | arosenberg@paulweiss.com jbrass@paulweiss.com | Counsel to Merrill Lynch, Pierce, Fenner & Smith, Incorporated |
| Paul, Weiss, Rifkind, Wharton & Garrison | Douglas R. Davis | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | ddavis@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Elizabeth R. McColm | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | emccolm@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Stephen J. Shimshak | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3133 | 212-373-2136 | sshimshak@paulweiss.com | Counsel to Ambrake Corporation |
| | Peggy Housner | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | housnerp@michigan.gov | Assistant Attorney General for State of Michigan, Department of Treasury |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 14 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pepe & Hazard LLP | Kristin B. Mayhew | 30 Jelliff Lane | | Southport | CT | 06890-1436 | | 203-319-4022 | 203-259-0251 | kmayhew@pepehazard.com | Counsel for Illinois Tool Works Inc., Illinois Tool Works for Hobart Brothers Co., Hobart Brothers Company, ITW Food Equipment Group LLC and Tri-Mark, Inc. |
| Pepper, Hamilton LLP | Anne Marie Aaronson | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | aaronsona@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pepper, Hamilton LLP | Francis J. Lawall | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | lawallf@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pepper, Hamilton LLP | Henry Jaffe | 1313 Market Street | PO Box 1709 | Wilmington | DE | 19899-1709 | | 302-777-6500 | 302-421-8390 | jaffeh@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pepper, Hamilton LLP | Linda J. Casey | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | caseyl@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pierce Atwood LLP | Jacob A. Manheimer | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | jmanheimer@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p.A. |
| Pierce Atwood LLP | Keith J. Cunningham | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | kcunningham@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p.A. |
| Pillsbury Winthrop Shaw Pittman LLP | Karen B. Dine | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | karen.dine@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Margot P. Erlich | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | margot.erlich@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Mark D. Houle | 650 Town Center Drive | Ste 550 | Costa Mesa | CA | 92626-7122 | | 714-436-6800 | 714-436-2800 | mark.houle@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Richard L. Epling | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | richard.epling@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Robin L. Spear | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | robin.spear@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Porzio, Bromberg & Newman, P.C. | Brett S. Moore, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | bsmoore@pbnlaw.com | |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 15 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Porzio, Bromberg & Newman, P.C. | John S. Mairo, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | jsmairo@pbnlaw.com | Counsel to Neuman Aluminum Automotive, Inc. and Neuman Aluminum Impact Extrusion, Inc. |
| Previant, Goldberg, Uelman, Gratz, Miller & Brueggeman, S.C. | Jill M. Hartley and Marianne G. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | jh@previant.com mgr@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| PriceWaterHouseCoopers | Enrique Bujidos | Almagro | 40 | Madrid | | 28010 | Spain | 34 915 684 356 | | enrique.bujidos@es.pwc.com | Representative to DASE |
| QAD, Inc. | Jason Pickering, Esq. | 10,000 Midlantic Drive | | Mt. Laurel | NJ | 08054 | | 856-840-2489 | 856-840-2740 | jkp@qad.com | Counsel to QAD, Inc. |
| Quadrangle Debt Recovery Advisors LLC | Andrew Herenstein | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1742 | 866-741-2505 | andrew.herenstein@quadrangle group.com | Counsel to Quadrangle Debt Recovery Advisors LLC |
| Quadrangle Group LLC | Patrick Bartels | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1748 | 866-552-2052 | patrick.bartels@quadranglegro up.com | Counsel to Quadrangle Group LLC |
| Quarles & Brady Streich Lang LLP | John A. Harris | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | jharris@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Quarles & Brady Streich Lang LLP | Kasey C. Nye | One South Church Street | | Tucson | AZ | 85701 | | 520-770-8717 | 520-770-2203 | knye@quarles.com | Counsel to Offshore International, Inc.; Maquilas Teta Kawi, S.A. de C.V.; On Semiconductor Corporation |
| Quarles & Brady Streich Lang LLP | Scott R. Goldberg | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | sgoldber@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Reed Smith | Elena Lazarou | 599 Lexington Avenue | 29th Street | New York | NY | 10022 | | 212-521-5400 | 212-521-5450 | elazarou@reedsmith.com | Counsel to General Electric Capital Corporation, Stategic Asset Finance. |
| Reed Smith | Richard P. Norton | One Riverfront Plaza | 1st Floor | Newark | NJ | 07102 | | 973-621-3200 | 973-621-3199 | rnorton@reedsmith.com | Counsel to Jason Incorporated, Sackner Products Division |
| Riddell Williams P.S. | Joseph E. Shickich, Jr. | 1001 4th Ave. | Suite 4500 | Seattle | WA | 98154-1195 | | 206-624-3600 | 206-389-1708 | jshickich@riddellwilliams.com | Counsel to Microsoft Corporation; Microsoft Licensing, GP |
| Rieck and Crotty PC | Jerome F Crotty | 55 West Monroe Street | Suite 3390 | Chicago | IL | 60603 | | 312-726-4646 | 312-726-0647 | jcrotty@rieckcrotty.com | Counsel to Mary P. O'Neill and Liam P. O'Neill |
| Riemer & Braunstein LLP | Mark S. Scott | Three Center Plaza | | Boston | MA | 02108 | | 617-523-9000 | 617-880-3456 | mscott@riemerlaw.com | Counsel to ICX Corporation |
| Riverside Claims LLC | Holly Rogers | 2109 Broadway | Suite 206 | New York | NY | 10023 | | 212-501-0990 | 212-501-7088 | holly@regencap.com | Riverside Claims LLC |
| Robinson, McFadden & Moore, P.C. | Annemarie B. Mathews | P.O. Box 944 | | Columbia | SC | 29202 | | 803-779-8900 | 803-771-9411 | amathews@robinsonlaw.com | Counsel to Blue Cross Blue Shield of South Carolina |
| Ropes & Gray LLP | Gregory O. Kaden | One International Place | | Boston | MA | 02110-2624 | | 617-951-7000 | 617-951-7050 | gregory.kaden@ropesgray.co m | Attorneys for D-J, Inc. |
| Ropes & Gray LLP | Marc E. Hirschfield | 45 Rockefeller Plaza | | New York | NY | 10111-0087 | | 212-841-5700 | 212-841-5725 | marc.hirschfield@ropesgray.co m | Attorneys for D-J, Inc. |
| Rosen Slome Marder LLP | Thomas R. Slome | 333 Earle Ovington Boulevard | Suite 901 | Uniondale | NY | 11533 | | 516-227-1600 | | tslome@rsmllp.com | Counsel to JAE Electronics, Inc. |
| Russell Reynolds Associates, Inc. | Charles E. Boulbol, P.C. | 26 Broadway, 17th Floor | | New York | NY | 10004 | | 212-825-9457 | 212-825-9414 | rtrack@msn.com | Counsel to Russell Reynolds Associates, Inc. |
| Sachnoff & Weaver, Ltd | Charles S. Schulman | 10 South Wacker Drive | 40th Floor | Chicago | IL | 60606 | | 312-207-1000 | 312-207-6400 | agelman@sachnoff.com | Counsel to Infineon Technologies North America Corporation |
| Satterlee Stephens Burke & Burke LLP | Christopher R. Belmonte | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | cbelmonte@ssbb.com | Counsel to Moody's Investors Service |
| Satterlee Stephens Burke & Burke LLP | Pamela A. Bosswick | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | pbosswick@ssbb.com | Counsel to Moody's Investors Service |
| Schafer and Weiner PLLC | Daniel Weiner | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | dweiner@schaferandweiner.co m | Counsel to Dott Industries, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 16 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Schafer and Weiner PLLC | Howard Borin | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | hborin@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Ryan Heilman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | rheilman@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schiff Hardin LLP | Eugene J. Geekie, Jr. | 7500 Sears Tower | | Chicago | IL | 60606 | | 312-258-5635 | 312-258-5600 | egeekie@schiffhardin.com | Counsel to  Means Industries |
| Schiffrin & Barroway, LLP | Michael Yarnoff | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7056 | 610-667-7706 | myarnoff@sbclasslaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Schiffrin & Barroway, LLP | Sean M. Handler | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7706 | 610-667-7056 | shandler@sbclasslaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Schulte Roth & Sabel LLP | James T. Bentley | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2273 | 212-593-5955 | james.bentley@srz.com | Counsel to Panasonic Automotive Systems Company of America |
| Schulte Roth & Sabel LLP | Michael L. Cook | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | michael.cook@srz.com | Counsel to Panasonic Automotive Systems Company of America; D.C. Capital Partners, L.P. |
| Schulte Roth & Zabel LLP | Carol Weiner Levy | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | carol.weiner.levy@srz.com | Counsel to D.C. Capital Partners, L.P. |
| Seyfarth Shaw LLP | Paul M. Baisier, Esq. | 1545 Peachtree Street, N.E. | Suite 700 | Atlanta | GA | 30309-2401 | | 404-885-1500 | 404-892-7056 | pbaisier@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | Robert W. Dremluk, Esq. | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | | 212-218-5500 | 212-218-5526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | William J. Hanlon | World Trade Center East | Two Seaport Lane, Suite 300 | Boston | MA | 02210 | | 617-946-4800 | 617-946-4801 | whanlon@seyfarth.com | Counsel to le Belier/LBQ Foundry S.A. de C.V. |
| Sheehan Phinney Bass + Green Professional Association | Bruce A. Harwood | 1000 Elm Street | P.O. Box 3701 | Manchester | NH | 03105-3701 | | 603-627-8139 | 603-627-8121 | bharwood@sheehan.com | Counsel to Source Electronics, Inc. |
| Sheldon S. Toll PLLC | Sheldon S. Toll | 2000 Town Center | Suite 2550 | Southfield | MI | 48075 | | 248-358-2460 | 248-358-2740 | lawtoll@comcast.net | Counsel to Milwaukee Investment Company |
| Sheppard Mullin Richter & Hampton LLP | Eric Waters | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | 212-332-3888 | ewaters@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Malani J. Sternstein | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | 212-332-3888 | msternstein@sheppardmullin.com | Counsel to International Rectifier Corp. and Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theodore A. Cohen | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | 213-620-1398 | tcohen@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theresa Wardle | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | 213-620-1398 | twardle@sheppardmullin.com | Counsel to International Rectifier Corp. |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 5353 Essen Lane | Suite 650 | Baton Rouge | LA | 70809 | | 225-757-2185 | 225-757-7674 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 909 Poydras Street | 28th Floor | New Orleans | LA | 70112-1033 | | 504-299-2100 | 504-299-2300 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Sills, Cummis Epstein & Gross, P.C. | Andrew H. Sherman | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | asherman@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |
| Sills, Cummis Epstein & Gross, P.C. | Jack M. Zackin | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | jzackin@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 17 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Sills, Cummis Epstein & Gross, P.C. | Valerie A Hamilton Simon Kimmelman | 650 College Rd E | | Princeton | NJ | 08540 | | 609-227-4600 | 609-227-4646 | vhamilton@sillscummis.com skimmelman@sillscummis.com | Counsel to Doosan Infracore America Corp. |
| Silver Point Capital, L.P. | Chaim J. Fortgang | Two Greenwich Plaza | 1st Floor | Greenwich | CT | 06830 | | 203-542-4216 | 203-542-4100 | cfortgang@silverpointcapital.com | Counsel to Silver Point Capital, L.P. |
| Smith, Gambrell & Russell, LLP | Barbara Ellis-Monro | 1230 Peachtree Street, N.E. | Suite 3100 | Atlanta | GA | 30309 | | 404-815-3500 | 404-815-3509 | bellis-monro@sgrlaw.com | Counsel to Southwire Company |
| Smith, Katzenstein & Furlow LLP | Kathleen M. Miller | 800 Delaware Avenue, 7th Floor | P.O. Box 410 | Wilmington | DE | 19899 | | 302-652-8400 | 3026528405 | kmiller@skfdelaware.com | Counsel to Airgas, Inc. |
| Sonnenschein Nath & Rosenthal LLP | D. Farrington Yates | 1221 Avenue of the Americas | 24th Floor | New York | NY | 10020 | | 212-768-6700 | 212-768-6800 | fyates@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc. and United Plastics Group |
| Sonnenschein Nath & Rosenthal LLP | Monika J. Machen | 8000 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | 312-876-7934 | mmachen@sonnenschein.com | Counsel to United Plastics Group |
| Sonnenschein Nath & Rosenthal LLP | Robert E. Richards | 8000 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | 312-876-7934 | rrichards@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc. |
| Squire, Sanders & Dempsey L.L.P. | Eric Marcks | One Maritime Plaza | Suite 300 | San Francisco | CA | 94111-3492 | | | 415-393-9887 | emarcks@ssd.com | Counsel to Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| Squire, Sanders & Dempsey L.L.P. | Penn Ayers Butler | 600 Hansen Way | | Palo Alto | CA | 94304 | | 650-856-6500 | 650-843-8777 | pabutler@ssd.com | Counsel to Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| State of California Office of the Attorney General | Sarah E. Morrison | Deputy Attorney General | 300 South Spring Street Ste 1702 | Los Angeles | CA | 90013 | | 213-897-2640 | 213-897-2802 | sarah.morrison@doj.ca.gov | Attorneys for the State of California Department of Toxic Substances Control |
| State of Michigan Department of Labor & Economic Growth, Unemployment Insurance Agency | Roland Hwang Assistant Attorney General | 3030 W. Grand Boulevard | Suite 9-600 | Detroit | MI | 48202 | | 313-456-2210 | 313-456-2201 | hwangr@michigan.gov | Assistant Attorney General for State of Michigan, Unemployment Tax Office of the Department of Labor & Economic Growth, Unemployment Insurance Agency |
| Steel Technologies, Inc. | John M. Baumann | 15415 Shelbyville Road | | Louisville | KY | 40245 | | 502-245-0322 | 502-245-0542 | jmbaumann@steeltechnologies.com | Counsel to Steel Technologies, Inc. |
| Stein, Rudser, Cohen & Magid LLP | Robert F. Kidd | 825 Washington Street | Suite 200 | Oakland | CA | 94607 | | 510-287-2365 | 510-987-8333 | rkidd@srcm-law.com | Counsel to Excel Global Logistics, Inc. |
| Steinberg Shapiro & Clark | Mark H. Shapiro | 24901 Northwestern Highway | Suite 611 | Southfield | MI | 48075 | | 248-352-4700 | 248-352-4488 | shapiro@steinbergshapiro.com | Counsel to Bing Metals Group, Inc.; Gentral Transport International, Inc.; Crown Enerprises, Inc.; Economy Transport, Inc.; Logistics Insight Corp (LINC); Universal Am-Can, Ltd.; Universal Truckload Services, Inc. |
| Sterns & Weinroth, P.C. | Jeffrey S. Posta Michael A Spero Simon Kimmelman Valerie A Hamilton | 50 West State Street, Suite 1400 | PO Box 1298 | Trenton | NJ | 08607-1298 | | 609-392-2100 | 609-392-7956 | jposta@sternslaw.com jspecf@sternslaw.com | Counsel to Doosan Infracore America Corp. |
| Stevens & Lee, P.C. | Chester B. Salomon, Esq. Constantine D. Pourakis, Esq. | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | | 212-319-8500 | 212-319-8505 | cs@stevenslee.com cp@stevenslee.com | Counsel to Tonolli Canada Ltd.; VJ Technologies, Inc. and V.J. ElectroniX, Inc. |
| Stinson Morrison Hecker LLP | Mark A. Shaiken | 1201 Walnut Street | | Kansas City | MO | 64106 | | 816-842-8600 | 816-691-3495 | mshaiken@stinsonmoheck.com | Counsel to Thyssenkrupp Waupaca, Inc. and Thyssenkrupp Stahl Company |
| Stites & Harbison PLLC | Madison L.Cashman | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | robert.goodrich@stites.com | Counsel to Setech, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 18 of 20

7/24/2007 12:03 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Stites & Harbison PLLC | Robert C. Goodrich, Jr. | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | madison.cashman@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison, PLLC | W. Robinson Beard, Esq. | 400 West Market Street | | Louisville | KY | 40202 | | 502-681-0448 | 502-779-8274 | wbeard@stites.com | Counsel to WAKO Electronics (USA), Inc. and Ambrake Corporation |
| Stroock & Stroock & Lavan, LLP | Kristopher M. Hansen | 180 Maiden Lane | | New York | NY | 10038 | | 212-806-5400 | 212-806-6006 | khansen@stroock.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| Taft, Stettinius & Hollister LLP | Richard L .Ferrell | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202-3957 | | 513-381-2838 | | ferrell@taftlaw.com | Counsel to Wren Industries, Inc. |
| Taft, Stettinius & Hollister LLP | W Timothy Miller Esq | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202 | | 513-381-2838 | 513-381-0205 | miller@taftlaw.com | Counsel to Select Industries Corporation and Gobar Systems, Inc. |
| Tennessee Department of Revenue | Marvin E. Clements, Jr. | c/o TN Attorney General's Office, Bankruptcy Division | PO Box 20207 | Nashville | TN | 37202-0207 | | 615-532-2504 | 615-741-3334 | marvin.clements@state.tn.us | Tennesse Department of Revenue |
| Terra Law LLP | David B. Draper | 60 S. Market Street | Suite 200 | San Jose | CA | 95113 | | 408-299-1200 | 408-998-4895 | ddraper@terra-law.com | Counsel to Maxim Integrated Products, Inc. |
| Thacher Proffitt & Wood LLP | Jonathan D. Forstot | Two World Financial Center | | New York | NY | 10281 | | 212-912-7679 | 212-912-7751 | jforstot@tpw.com | Counsel to TT Electronics, Plc |
| Thacher Proffitt & Wood LLP | Louis A. Curcio | Two World Financial Center | | New York | NY | 10281 | | 212-912-7607 | 212-912-7751 | lcurcio@tpw.com | Counsel to TT Electronics, Plc |
| The Furukawa Electric Co., Ltd. | Mr. Tetsuhiro Niizeki | 6-1 Marunouchi | 2-Chrome, Chiyoda-ku | Tokyo | Japan | 100-8322 | | | 81-3-3286-3919 | niizeki.tetsuhiro@furukawa.co.jp | The Furukawa Electric Co., Ltd. |
| The Timpken Corporation BIC -08 | Robert Morris | 1835 Dueber Ave. SW | PO Box 6927 | Canton | OH | 44706-0927 | | 330-438-3000 | 1-330-471-4388 | robert.morris@timken.com | Legal Department of The Timpken Corporation Representative for Timken Corporation |
| Thelen Reid Brown Raysman & Steiner LLP | David A. Lowenthal | 875 Third Avenue | | New York | NY | 10022 | | 212-603-2000 | 212-603-2001 | dlowenthal@thelenreid.com | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Corporation and Oki Semiconductor Company |
| Thompson & Knight | Rhett G. Cambell | 333 Clay Street | Suite 3300 | Houston | TX | 77002 | | 713-654-1871 | 713-654-1871 | rhett.campbell@tklaw.com | Counsel to STMicroelectronics, Inc. |
| Thompson & Knight LLP | Ira L. Herman | 919 Third Avenue | 39th Floor | New York | NY | 10022-3915 | | 212-751-3045 | 214-999-9139 | ira.herman@tklaw.com | Counsel to Victory Packaging |
| Thompson & Knight LLP | John S. Brannon | 1700 Pacific Avenue | Suite 3300 | Dallas | TX | 75201-4693 | | 214-969-1505 | 214-969-1609 | john.brannon@tklaw.com | Counsel to Victory Packaging |
| Thurman & Phillips, P.C. | Ed Phillips, Jr. | 8000 IH 10 West | Suite 1000 | San Antonio | TX | 78230 | | 210-341-2020 | 210-344-6460 | ephillips@thurman-phillips.com | Counsel to Royberg, Inc. d/b/a Precision Mold & Tool and d/b/a Precision Mold and Tool Group |
| Todd & Levi, LLP | Jill Levi, Esq. | 444 Madison Avenue | Suite 1202 | New York | NY | 10022 | | 212-308-7400 | | jlevi@toddlevi.com | Counsel to Bank of Lincolnwood |
| Tyler, Cooper & Alcorn, LLP | W. Joe Wilson | City Place | 35th Floor | Hartford | CT | 06103-3488 | | 860-725-6200 | 860-278-3802 | jwilson@tylercooper.com | Counsel to Barnes Group, Inc. |
| Underberg & Kessler, LLP | Helen Zamboni | 300 Bausch & Lomb Place | | Rochester | NY | 14604 | | 585-258-2800 | 585-258-2821 | hzamboni@underbergkessler.com | Counsel to McAlpin Industries, Inc. |
| Union Pacific Railroad Company | Mary Ann Kilgore | 1400 Douglas Street | MC 1580 | Omaha | NE | 68179 | | 402-544-4195 | 402-501-0127 | mkilgore@UP.com | Counsel to Union Pacific Railroad Company |
| Varnum, Riddering, Schmidt & Howlett LLP | Michael S. McElwee | Bridgewater Place | P.O. Box 352 | Grand Rapids | MI | 49501-0352 | | 616-336-6827 | 616-336-7000 | msmcelwee@varnumlaw.com | Counsel to Furukawa Electric North America APD and Co-Counsel to Tower Automotive, Inc. |
| Wachtell, Lipton, Rosen & Katz | Emil A. Kleinhaus | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | EAKleinhaus@wlrk.com | Counsel to Capital Research and Management Company |
| Wachtell, Lipton, Rosen & Katz | Richard G. Mason | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | RGMason@wlrk.com | Counsel to Capital Research and Management Company |
| Waller Lansden Dortch & Davis, PLLC | David E. Lemke, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | david.lemke@wallerlaw.com | Counsel to Nissan North America, Inc. |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Waller Lansden Dortch & Davis, PLLC | Robert J. Welhoelter, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | robert.welhoelter@wallerlaw.com | Counsel to Nissan North America, Inc. |
| Warner Norcross & Judd LLP | Gordon J. Toering | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2185 | 616-222-2185 | gtoering@wnj.com | Counsel to Robert Bosch Corporation |
| Warner Norcross & Judd LLP | Michael G. Cruse | 2000 Town Center | Suite 2700 | Southfield | MI | 48075 | | 248-784-5131 | 248-603-9631 | mcruse@wnj.com | Counsel to Compuware Corporation |
| Warner Norcross & Judd LLP | Stephen B. Grow | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2158 | | growsb@wnj.com | Counsel to Behr Industries Corp. |
| Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP | Lei Lei Wang Ekvall | 650 Town Center Drive | Suite 950 | Costa Mesa | CA | 92626 | | 714-966-1000 | 714-966-1002 | lekvall@wgllp.com | Counsel to Toshiba America Electronic Components, Inc. |
| Weinstein, Eisen & Weiss LLP | Aram Ordubegian | 1925 Century Park East | #1150 | Los Angeles | CA | 90067 | | 310-203-9393 | 310-203-8110 | aordubegian@weineisen.com | Counsel to Orbotech, Inc. |
| Weltman, Weinberg & Reis Co., L.P.A. | Geoffrey J. Peters | 175 South Third Street | Suite 900 | Columbus | OH | 43215 | | 614-857-4326 | 614-222-2193 | gpeters@weltman.com | Counsel to Seven Seventeen Credit Union |
| White & Case LLP | Glenn Kurtz Gerard Uzzi Douglas Baumstein | 1155 Avenue of the Americas | | New York | NY | 10036-2787 | | 212-819-8200 | | gkurtz@ny.whitecase.com guzzi@whitecase.com dbaumstein@ny.whitecase.com | Counsel to Appaloosa Management, LP |
| White & Case LLP | Thomas Lauria Frank Eaton | Wachovia Financial Center | 200 South Biscayne Blvd., Suite 4900 | Miami | FL | 33131 | | 305-371-2700 | 305-358-5744 | tlauria@whitecase.com featon@miami.whitecase.com | Counsel to Appaloosa Management, LP |
| Whyte, Hirschboeck Dudek S.C. | Bruce G. Arnold | 555 East Wells Street | Suite 1900 | Milwaukee | WI | 53202-4894 | | 414-273-2100 | 414-223-5000 | barnold@whdlaw.com | Counsel to Schunk Graphite Technology |
| Winstead Sechrest & Minick P.C. | R. Michael Farquhar | 5400 Renaissance Tower | 1201 Elm Street | Dallas | TX | 75270 | | 214-745-5400 | 214-745-5390 | mfarquhar@winstead.com | Counsel to National Instruments Corporation |
| Winthrop Couchot Professional Corporation | Marc J. Winthrop | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | mwinthrop@winthropcouchot.com | Counsel to Metal Surfaces, Inc. |
| Winthrop Couchot Professional Corporation | Sean A. O'Keefe | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | sokeefe@winthropcouchot.com | Counsel to Metal Surfaces, Inc. |
| Womble Carlyle Sandridge & Rice, PLLC | Lillian H. Pinto | 300 North Greene Street | Suite 1900 | Greensboro | NC | 27402 | | 336-574-8058 | 336-574-4528 | lpinto@wcsr.com | Counsel to Armacell |
| Zeichner Ellman & Krause LLP | Peter Janovsky | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | pjanovsky@zeklaw.com | Counsel to Toyota Tsusho America, Inc. and Karl Kufner, KG aka Karl Kuefner, KG |
| Zeichner Ellman & Krause LLP | Stuart Krause | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | skrause@zeklaw.com | Counsel to Toyota Tsusho America, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 20 of 20

7/24/2007 12:03 PM
Email

# EXHIBIT M

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|-------|-----|-------|------------------|
| Internal Revenue Service | Attn: Insolvency Department | 477 Michigan Ave | Mail Stop 15 | Detroit | MI | 48226 | 313-628-3648 | 313-628-3602 | | Michigan IRS |
| Internal Revenue Service | Attn: Insolvency Department, Maria Valerio | 290 Broadway | 5th Floor | New York | NY | 10007 | 212-436-1038 | 212-436-1931 | mariaivalerio@irs.gov | IRS |
| IUE-CWA | Conference Board Chairman | 2360 W. Dorothy Lane | Suite 201 | Dayton | OH | 45439 | 937-294-7813 | 937-294-9164 | | Creditor Committee Member |
| McDermott Will & Emery LLP | David D. Cleary | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | dcleary@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Mohsin N. Khambati | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | mkhambati@mwe.com | Counsel to Recticel North America, Inc. |
| Tyco Electronics Corporation | MaryAnn Brereton, Assistant General Counsel | 60 Columbia Road | | Morristown | NJ | 7960 | 973-656-8365 | 973-656-8805 | | Creditor Committee Member |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

7/19/2007 12:30 PM
Master Service List Overnight Mail

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|-------|------------------|
| APS Clearing, Inc. | Andy Leinhoff Matthew Hamilton | 1301 S. Capital of Texas Highway | Suite B-220 | Austin | TX | 78746 | 512-314-4416 | Counsel to APS Clearing, Inc. |
| Berry Moorman P.C. | James P. Murphy | 535 Griswold | Suite 1900 | Detroit | MI | 48226 | 313-496-1200 | Counsel to Kamax L.P.; Optrex America, Inc. |
| Bingham McHale LLP | Michael J Alerding | 10 West Market Street | Suite 2700 | Indianapolis | IN | 46204 | 317-635-8900 | Counsel to Universal Tool & Engineering co., Inc. and M.G. Corporation |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | Andrew M. Thau | 101 Park Avenue | | New York | NY | 10178-0061 | 212-696-8898 | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | David S. Karp | 101 Park Avenue | | New York | NY | 10178-0061 | 212-696-6065 | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co. |
| DiConza Law, P.C. | Gerard DiConza, Esq. | 630 Third Avenue, 7th Floor | | New York | NY | 10017 | 212-682-4940 | Counsel to Tyz-All Plastics, Inc.; Furukawa Electric North America APD; and Co-Counsel to Tower Automotive, Inc. |
| Fagel Haber LLC | Gary E. Green | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | 312-346-7500 | Counsel to Aluminum International, Inc. |
| Grant & Eisenhofer P.A. | Geoffrey C. Jarvis | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | 302-622-7000 | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Heller Ehrman LLP | Carren Shulman | Times Square Tower | Seven Times Square | New York | NY | 10036 | 212-832-8300 | Counsel to @Road, Inc. |
| Hunter & Schank Co. LPA | John J. Hunter | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | 419-255-4300 | Counsel to ZF Group North America Operations, Inc. |
| Hunter & Schank Co. LPA | Thomas J. Schank | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | 419-255-4300 | Counsel to ZF Group North America Operations, Inc. |
| Johnston, Harris Gerde & Komarek, P.A. | Jerry W. Gerde, Esq. | 239 E. 4th St. | | Panama City | FL | 32401 | 850-763-8421 | Counsel to Peggy C. Brannon, Bay County Tax Collector |
| Kelley Drye & Warren, LLP | Mark I. Bane | 101 Park Avenue | | New York | NY | 10178 | 212-808-7800 | Counsel to the Pension Benefit Guaranty Corporation |
| Kelley Drye & Warren, LLP | Mark. R. Somerstein | 101 Park Avenue | | New York | NY | 10178 | 212-808-7800 | Counsel to the Pension Benefit Guaranty Corporation |
| Lord, Bissel & Brook LLP | Rocco N. Covino | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | 212-812-8340 | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| McGuirewoods LLP | Elizabeth L. Gunn | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | 804-775-1178 | Counsel to Siemens Logistics Assembly Systems, Inc. |
| North Point | Michelle M. Harner | 901 Lakeside Avenue | | Cleveland | OH | 44114 | 216-586-3939 | Counsel to WL. Ross & Co., LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 2

7/24/2007 12:03 PM
Fax - Agenda Only

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| O'Rourke Katten & Moody | Michael C. Moody | 161 N. Clark Street | Suite 2230 | Chicago | IL | 60601 | 312-849-2020 | Counsel to Ameritech Credit Corporation d/b/a SBC Capital Services |
| Orrick, Herrington & Sutcliffe LLP | Matthew W. Cheney | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | 202-339-8400 | Counsel to Westwood Associates, Inc. |
| Paul, Weiss, Rifkind, Wharton & Garrison | Curtis J. Weidler | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | 212-373-3157 | Counsel to Ambrake Corporation; Akebono Corporation |
| Republic Engineered Products, Inc. | Joseph Lapinsky | 3770 Embassy Parkway | | Akron | OH | 44333 | 330-670-3004 | Counsel to Republic Engineered Products, Inc. |
| Ropers, Majeski, Kohn & Bentley | Christopher Norgaard | 515 South Flower Street | Suite 1100 | Los Angeles | CA | 90071 | 213-312-2000 | Counsel to Brembo S.p.A; Bibielle S.p.A.; AP Racing |
| Schiff Hardin LLP | William I. Kohn | 6600 Sears Tower | | Chicago | IL | 60066 | 312-258-5500 | Counsel to  Means Industries |
| Shipman & Goodwin LLP | Jennifer L. Adamy | One Constitution Plaza | | Hartford | CT | 06103-1919 | 860-251-5811 | Counsel to Fortune Plastics Company of Illinois, Inc.; Universal Metal Hose Co., |
| Stroock & Stroock & Lavan, LLP | Joseph G. Minias | 180 Maiden Lane | | New York | NY | 10038 | 212-806-5400 | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. a |
| Swidler Berlin LLP | Robert N. Steinwurtzel | The Washington Harbour | 3000 K Street, N.W. Suite 300 | Washington | DC | 20007 | 202-424-7500 | Attorneys for Sanders Lead Co., Inc. |
| Togut, Segal & Segal LLP | Albert Togut, Esq. | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | Conflicts counsel to Debtors |
| Vorys, Sater, Seymour and Pease LLP | Tiffany Strelow Cobb | 52 East Gay Street | | Columbus | OH | 43215 | 614-464-8322 | Counsel to America Online, Inc. and its Subsidiaries and Affiliates |
| Warner Stevens, L.L.P. | Michael D. Warner | 301 Commerce Street | Suite 1700 | Fort Worth | TX | 76102 | 817-810-5250 | Counsel to Electronic Data Systems Corp. and EDS Information Services, L.L.C. |
| Winstead Sechrest & Minick P.C. | Berry D. Spears | 401 Congress Avenue | Suite 2100 | Austin | TX | 78701 | 512-370-2800 | Counsel to National Instruments Corporation |
| WL Ross & Co., LLC | Stephen Toy | 600 Lexington Avenue | 19th Floor | New York | NY | 10022 | 212-826-1100 | Counsel to WL. Ross & Co., LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 2

7/24/2007 12:03 PM
Fax - Agenda Only

# EXHIBIT N

<div align="right">
**Hearing Date: July 20, 2007**
**Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**
</div>

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                  :
    In re                                         :    Chapter 11
                                                  :
DELPHI CORPORATION, et al.,                       :    Case No. 05-44481 (RDD)
                                                  :
                        Debtors.                  :    (Jointly Administered)
                                                  :
                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

<div align="center">

PROPOSED TENTH CLAIMS HEARING AGENDA
</div>

Location Of Hearing:          United States Bankruptcy Court for the Southern District of New
                              York, Alexander Hamilton Custom House, Room 610, 6th Floor,
                              One Bowling Green, New York, New York 10004-1408

The matters set for hearing are divided into the following categories for the purposes of this Proposed Agenda:

    A.     Introduction

    B.     Continued Or Adjourned Omnibus Claims Objection (1 Matter)

    C.     Uncontested, Agreed, Or Settled Omnibus Claims Objection Matters (5 Matters)

        1)     Third Omnibus Objection Matter (1 Matter)

        2)     Ninth Omnibus Objection Matters (3 Matters)

        3)     Eleventh Omnibus Objection Matter (1 Matter)

**B.**    **Continued Or Adjourned Omnibus Claims Objection**

    1.    **"Motion To Amend Proof Of Claim Of Robert Bosch GmbH"** – Motion To Amend Proof Of Claim On Behalf Of Robert Bosch GmbH (Docket No. 8420)

| | |
|---|---|
| *Response Filed:* | *Debtors' Objection To Robert Bosch GmbH's Motion To Amend Proof Of Claim (Docket No. 8618)* |
| | *Declaration Of William Cosnowski, Jr. In Support Of Debtors' Objection To Robert Bosch GmbH's Motion To Amend Proof Of Claim (Docket No. 8619)* |
| *Reply Filed:* | *None.* |
| *Related Filings:* | *Debtors' (I) Third Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (A) Claims With Insufficient Documentation, (B) Claims Unsubstantiated By Debtors' Books And Records, And (C) Claims Subject To Modification And (II) Motion To Estimate Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(C) (Docket No. 5452)* |
| | *Debtors' Omnibus Reply In Support Of Debtors' (I) Third Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (A) Claims With Insufficient Documentation, (B) Claims Unsubstantiated By Debtors' Books And Records, And (C) Claims Subject To Modification And (II) Motion To Estimate Contingent And* |

*Unliquidated Claims Pursuant To 11 U.S.C. § 502(c)
(Docket No. 5944)*

*Order Pursuant to 11 U.S.C. § 502(b) And Fed. R.
Bankr. P. 3007 (I) Disallowing And Expunging
Certain (A) Claims With Insufficient Documentation
And (B) Claims Unsubstantiated By Debtors' Books
And Records, (II) Modifying Certain Claims, And
(III) Adjourning Hearing On Certain Contingent
And Unliquidated Claims Pursuant To 11 U.S.C. §
502(c) Identified In Third Omnibus Claims
Objection (Docket No. 6224)*

Status:          *This matter is being adjourned, future hearing date
is to be determined.*

## C.    Uncontested, Agreed, Or Settled Omnibus Claims Objection Matters

## 1)    Third Omnibus Claims Objection Matter

2.    **"Claims Objection Hearing Regarding Claim Of Panasonic Automotive
Systems Company Of America, Division Of Panasonic Corporation Of North
America"** – Claims Objection Hearing Regarding Claim Of Panasonic
Automotive Systems Company Of America, Division Of Panasonic Corporation Of
North America As Objected To On The Debtors' (I) Third Omnibus Objection
(Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To
Certain (A) Claims With Insufficient Documentation, (B) Claims Unsubstantiated
By Debtors' Books And Records, And (C) Claims Subject To Modification And (II)
Motion To Estimate Contingent And Unliquidated Claims Pursuant To 11 U.S.C. §
502(c) (Docket No. 5452)

Responses Filed:          *Response Of Panasonic Automotive Systems
Company Of America, Division Of Panasonic
Corporation Of North America To Debtors' Third
Omnibus Claims Objection; Exhibit A (Docket No.
5772)*

Reply Filed:          *Debtors' Omnibus Reply In Support Of Debtors' (I)
Third Omnibus Objection (Substantive) Pursuant To
11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To
Certain (A) Claims With Insufficient Documentation,
(B) Claims Unsubstantiated By Debtors' Books And
Records, And (C) Claims Subject To Modification
And (II) Motion To Estimate Contingent And
Unliquidated Claims Pursuant To 11 U.S.C. § 502(c)
(Docket No. 5944)*

3

|  |  |
|---|---|
| *Related Filings:* | *Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 (I) Disallowing And Expunging Certain (A) Claims With Insufficient Documentation And (B) Claims Unsubstantiated By Debtors' Books And Records, (II) Modifying Certain Claims, And (III) Adjourning Hearing On Certain Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) Identified In Third Omnibus Claims Objection (Docket No. 6224)* |
|  | *Notice Of Presentment Of Joint Stipulation And Agreed Order Compromising And Allowing Proof Of Claim Number 14318 (Panasonic Automotive Systems Company Of America (Docket No. 8296)* |
|  | *Notice Of Presentment Of Joint Stipulation And Agreed Order Compromising And Allowing Proof Of Claim Number 14318 (Panasonic Automotive Systems Company Of America, Division Of Panasonic Corporation Of North America) (Docket No. 8633)* |
| *Status:* | *A joint stipulation and agreed order will be submitted for consideration by the Court.* |

## 2)   Ninth Omnibus Claims Objection Matters

3.   **"Claims Objection Hearing Regarding Claim Of Sierra Liquidity Fund LLC As Assignee Of Applied Tech Industries, Inc."** – Claims Objection Hearing Regarding Claim Of Sierra Liquidity Fund LLC As Assignee Of Applied Tech Industries, Inc. As Objected To On The Debtors' Ninth Omnibus Objection (Substantive) Pursuant To 11 U.S.C. Section 502(b) And Fed. R. Bankr. P. 3007 To Certain (A) Insufficiently Documented Claims, (B) Claims Not Reflected On Debtors' Books And Records, (C) Untimely Claims, And (D) Claims Subject To Modification (Docket No. 6968)

|  |  |
|---|---|
| *Response Filed:* | *Response To Ninth Omnibus Objection To Claims; Sierra Liquidity Fund, LLC (Assignee); Applied Tech Industries, Inc. (Assignor) (Docket No. 7233)* |

4

*Reply Filed:*  *Debtors' Omnibus Reply In Support Of Debtors' Ninth Omnibus Objection (Substantive) Pursuant To 11 U.S.C. Section 502(b) And Fed. R. Bankr. P. 3007 To Certain (A) Insufficiently Documented Claims, (B) Claims Not Reflected On Debtors' Books And Records, (C) Untimely Claims, And (D) Claims Subject To Modification (Docket No. 7372)*

*Related Filings:*  *Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 Disallowing And Expunging Certain (A) Insufficiently Documented Claims, (B) Claims Not Reflected On Debtors' Books And Records, (C) Untimely Claims, And (D) Claims Subject To Modification (Docket No. 7507)*

*Notice Of Presentment Of Joint Stipulation And Agreed Order Compromising And Allowing Proof Of Claim Number 2440 (Sierra Liquidity Fund, LLC As Assignee Of Applied Tech Industries, Inc.) (Docket No. 8604)*

*Status:*  *A joint stipulation and agreed order will be submitted for consideration by the Court.*

4. **"Claims Objection Hearing Regarding Claim Of Sierra Liquidity Fund LLC As Assignee Of Fair-Rite Products Corporation"** – Claims Objection Hearing Regarding Claim Of Sierra Liquidity Fund LLC As Assignee Of Fair-Rite Products Corporation As Objected To On The Debtors' Ninth Omnibus Objection (Substantive) Pursuant To 11 U.S.C. Section 502(b) And Fed. R. Bankr. P. 3007 To Certain (A) Insufficiently Documented Claims, (B) Claims Not Reflected On Debtors' Books And Records, (C) Untimely Claims, And (D) Claims Subject To Modification (Docket No. 6968)

*Response Filed:*  *Response To Ninth Omnibus Objection To Claims; Sierra Liquidity Fund, LLC (Assignee); Fair-Rite Products Corporation (Assignor), Claim No. 14663 (Docket No. 7237)*

*Reply Filed:*  *Debtors' Omnibus Reply In Support Of Debtors' Ninth Omnibus Objection (Substantive) Pursuant To 11 U.S.C. Section 502(b) And Fed. R. Bankr. P. 3007 To Certain (A) Insufficiently Documented Claims, (B) Claims Not Reflected On Debtors' Books And Records, (C) Untimely Claims, And (D) Claims Subject To Modification (Docket No. 7372)*

5

| | |
|---|---|
| *Related Filings:* | *Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 Disallowing And Expunging Certain (A) Insufficiently Documented Claims, (B) Claims Not Reflected On Debtors' Books And Records, (C) Untimely Claims, And (D) Claims Subject To Modification (Docket No. 7507)* |
| | *Notice Of Presentment Of Joint Stipulation And Agreed Order Compromising And Allowing Proof Of Claim Number 14663 (Sierra Liquidity Fund, LLC, As Assignee Of Fair-Rite Products Corporation) (Docket No. 8605)* |
| *Status:* | *A joint stipulation and agreed order will be submitted for consideration by the Court.* |

5.   **"Claims Objection Hearing Regarding Claim Of Klash, Inc."** – Claims Objection Hearing Regarding Claim Klash, Inc. As Objected To On The Debtors' Ninth Omnibus Objection (Substantive) Pursuant To 11 U.S.C. Section 502(b) And Fed. R. Bankr. P. 3007 To Certain (A) Insufficiently Documented Claims, (B) Claims Not Reflected On Debtors' Books And Records, (C) Untimely Claims, And (D) Claims Subject To Modification (Docket No. 6968)

| | |
|---|---|
| *Response Filed:* | *Response To Ninth Omnibus Objection To Claim Filed By Klash, Inc. (Docket No. 7321)* |
| *Reply Filed:* | *Debtors' Omnibus Reply In Support Of Debtors' Ninth Omnibus Objection (Substantive) Pursuant To 11 U.S.C. Section 502(b) And Fed. R. Bankr. P. 3007 To Certain (A) Insufficiently Documented Claims, (B) Claims Not Reflected On Debtors' Books And Records, (C) Untimely Claims, And (D) Claims Subject To Modification (Docket No. 7372)* |
| *Related Filings:* | *Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 Disallowing And Expunging Certain (A) Insufficiently Documented Claims, (B) Claims Not Reflected On Debtors' Books And Records, (C) Untimely Claims, And (D) Claims Subject To Modification (Docket No. 7507)* |
| | *Notice Of Presentment Of Joint Stipulation And Agreed Order Compromising And Allowing Proof Of Claim Number 8914 (Klash, Inc.) (Docket No.8598)* |

6

<table>
<tbody>
<tr><td>*Status:*</td><td>*A joint stipulation and agreed order will be submitted for consideration by the Court.*</td></tr>
</tbody>
</table>

**3)  Eleventh Omnibus Claims Objection Matter**

6.  **"Claims Objection Hearing Regarding Claim Of Bona Vista Programs, Inc."** – Claims Objection Hearing Regarding Claim Bona Vista Programs, Inc. As Objected To On The Debtors' Eleventh Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (A) Insufficiently Documented Claims (B) Claims Not Reflected On Debtors' Books And Records, (C) Untimely Claims, And (D) Claims Subject To Modification  (Docket No. 7301)

|  |  |
|---|---|
| *Response Filed:* | *Response To Claim Subject To Objections, Claim # 9402 Filed By Bona Vista. (Docket No. 7650)* |
| *Reply Filed:* | *Debtors' Omnibus Reply In Support Of Debtors' Eleventh Omnibus Objection (Substantive) Pursuant To 11 U.S.C. Section 502(b) And Fed. R. Bankr. P. 3007 To Certain (A) Insufficiently Documented Claims, (B) Claims Not Reflected On Debtors' Books And Records, (C) Untimely Claims, And (D) Claims Subject To Modification (Docket No. 7755)* |
| *Related Filings:* | *Order Pursuant To 11 U.S.C. § 502(B) And Fed. R. Bankr. P. 3007 Disallowing And Expunging Certain (A) Insufficiently Documented Claims, (B) Claims Not Reflected On Debtors' Books And Records, (C) Untimely Claims, And (D) Claims Subject To Modification Identified In Eleventh Omnibus Claims Objection (Docket No. 7771)* |
|  | *Notice Of Presentment Of Joint Stipulation And Agreed Order Compromising And Allowing Proof Of Claim Number 9402 (Bona Vista Programs, Inc.) (Docket No. 8607)* |

7

Status:            *A joint stipulation and agreed order will be
                   submitted for consideration by the Court.*

Dated:  New York, New York
        July 19, 2007

                        SKADDEN, ARPS, SLATE, MEAGHER
                          & FLOM LLP

                        By: /s/ John Wm. Butler, Jr.
                            John Wm. Butler, Jr. (JB 4711)
                            John K. Lyons (JL 4951)
                            Ron E. Meisler (RM 3026)
                        333 West Wacker Drive, Suite 2100
                        Chicago, Illinois  60606
                        (312) 407-0700

                            - and -

                        By: /s/ Kayalyn A. Marafioti
                            Kayalyn A. Marafioti (KM 9632)
                            Thomas J. Matz (TM 5986)
                        Four Times Square
                        New York, New York 10036
                        (212) 735-3000

                        Attorneys for Delphi Corporation, et al.,
                            Debtors and Debtors-in-Possession

# EXHIBIT O

Delphi Corporation
Union Counsel List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|
| Cohen, Weiss & Simon LLP | Bruce Levine<br>Babette Ceccotti<br>Bruce Simon<br>David Hock | 330 West 42nd Street | | New York | NY | 10036 | Counsel for International Union, United Automobile, Areospace and Agriculture Implement Works of America (UAW) |
| Electrical and Space Technicians | Kevin Dodd | 13144 Prairie Ave | | Hawthorne | CA | 90250 | |
| Gorlick, Kravitz & Listhaus, P.C. | Barbara S. Mehlsack | 17 State Street | 4th Floor | New York | NY | 10004 | Counsel for International Brotherood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| IAM & AW | Robert V Thayer | 9000 Machinists Place | | Upper Marlboro | MD | 20772 | |
| IBEW | Edwin D Hill | 900 Seventh Street NW | | Washington | DC | 20001 | |
| International Union of Operating Engineers | Richard Griffin | 1125-17th Avenue, N.W. | | Washington | DC | 20036 | Counsel for International Brotherood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Intl Union of Operating Engineers | Vincent J Giblin | 1125 17th St NW | | Washington | DC | 20036 | |
| IUE-CWA | James D Clark | 501 Third St NW | Sixth Fl | Washington | DC | 20001 | |
| IUE-CWA | Peter Mitchell | 501 Third St NW | Sixth Fl | Washington | DC | 20001 | |
| Kennedy, Jennick & Murray, P.C. | Thomas Kennedy<br>Susan Jennick | 113 University Place | 7th Floor | New York | NY | 10003 | Attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America |
| Meyer, Suozzi, English & Klein, P.C. | Lowell Peterson, Esq. | 1350 Broadway | Suite 501 | New York | NY | 10018 | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Meyer, Suozzi, English & Klein, P.C. | Hanan Kolko | 1350 Broadway | Suite 501 | New York | NY | 10018 | Counsel for The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Previant, Goldberg, Uelman, Gratz, Miller & Brueggeman, S.C. | Jill M. Hartley<br>Marianne G. Robbins<br>Timothy C. Hall | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | Counsel to International Brotherood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| United Auto Workers | Daniel Sherrick | 8000 E Jefferson Ave | | Detroit | MI | 48214 | |
| United Steelworkers Of America | Robert D Clark | Five Gateway Center | | Pittsburgh | PA | 15222 | |
| United Steelworkers Of America | General Counsel | Five Gateway Center | | Pittsburgh | PA | 15222 | |

In re Delphi Corporation, et al.
Case No. 05-44481.

Page 1 of 1

7/24/2007 10:34 AM
Union Counsel List 070628

Union List

| Contact | Company | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|
| Al Coven | UAW Local 699 | 1191 Bagley St | | Saginaw | MI | 48601 |
| Bennie Calloway | UAW Local 2188 | 342 Perry House Rd. | | Fitzgerald | GA | 31750 |
| Bill Riddle | UAW Local 659 | 1222 Glenwood | | Flint | MI | 48502 |
| Carl Kolb, Ted Williams | IUE-CWA Local 698 | International Union of Electrical Workers | 1001 Industrial Park Dr | Clinton | MS | 39056-3211 |
| Charles Scherer | IUOE 18S | 12106 Rhodes Rd | | Wayne | OH | 43466 |
| Conference Board Chairman | IUE-CWA Automotive Conf Board | 2360 Dorothy Lane | Ste. 201 | Dayton | OH | 45439 |
| Dan Riley | IBEW - Delphi E&C | 7929 S. Howell Ave. | MC: 1-2 | Oak Creek | WI | 53154 |
| Danny Baird | IUOE 101S | 6601 Winchester | | Kansas City | MO | 64133 |
| Darel Green | UAW Local 1021 | 804 Meadowbrook Dr. | | Olathe | KS | 66062 |
| Darrell Shepard | UAW Local 2157 | 4403 City View Dr. | | Wichita Falls | TX | 76305 |
| David York | UAW Local 438 | 7435 S. Howell Ave. | | Oak Creek | WI | 53154 |
| Dennis Bingham, Gary Adams | USW Local 87 | 21 Abbey Avenue | | Dayton | OH | 45417 |
| Edwin Hill | IBEW | 900 Seventh Street NW | | Washington | DC | 20001 |
| Frank Andrews | UAW Local 686 | 524 Walnut St. | | Lockport | NY | 14094 |
| Gary Resier | IUE-CWA Local 717 | 2950 Sierra Dr. NW | | Warren | OH | 44483 |
| Jack White | UAW Local 167 | 5545 Fieldstone Ct. | | Middleville | MI | 49333 |
| James Clark | IUE-CWA Industrial Division | 501 Third Street NW | | Washington | DC | 20001-2797 |
| James Hurren | UAW Local 467 | 2104 Farmer St. | | Saginaw | MI | 48601 |
| Jeff Curry | IAM District 10 | 1650 South 38th Street | | Milwaukee | WI | 53215 |
| Joe Buckley | UAW Local 696 | 1543 Alwildy Ave | | Dayton | OH | 45408 |
| John Clark | UAW Local 2031 | 5075 Belmere Dr. | | Manitou Beach | MI | 49253 |
| John Huber | UAW Local 1097 | 221 Dewey Ave | | Rochester | NY | 14608 |
| Kizziah Polke | UAW Local 2083 | c/o Delphi T & I  Garry Gilliam | | Cottondale | AL | 35453 |
| Larry Phillips | IUE-CWA Local 711 | 4605 Airport Rd. | | Gadsden | AL | 35904 |
| Larry West | IUE-CWA Local 755 | 1675 Woodman Dr. | | Dayton | OH | 45432 |
| Lattie Slusher | UAW Local 913 | 3114 S. Hayes Ave. | | Sandusky | OH | 44870 |
| Leo W Gerard | United Steelworkers | Five Gateway Center | | Pittsburg | PA | 15222 |
| Mark Profitt | IUE-CWA Local 801 | 1250 W. Dorothy Lane | Suite 301 | Dayton | OH | 45439 |
| Mark Sweazy | UAW Local 969 | 3761 Harding Dr. | | Columbus | OH | 43228 |
| Mike Socha | IBEW - Delphi E&S | 7929 S. Howell Ave. | MC: 1B01 | Oak Creek | WI | 53154 |
| Niraj R Ganatra | International Union UAW | Associate General Counsel | Solidarity House 8000 E Jefferson Ave | Detroit | MI | 48214 |
| Randal Middleton | IBEW Local 663 | W223 S8625 Chateau Lane | | Big Bend | WI | 53103 |
| Richard Shoemaker | Vice-President GM Department | 8000 E Jefferson | | Detroit | MI | 48214 |
| Rick Zachary | UAW Local 662 | 2715 Rangeline Dr. | | Anderson | IN | 46017 |
| Rob Betts | UAW Local 2151 | 140 64th Ave. | | Coopersville | MI | 49404 |
| Robert Thayer | IAM | 9000 Machinists Place | | Upper Marlboro | MD | 20772-2687 |
| Ron Gettelfinger | UAW President | 8000 E Jefferson | | Detroit | MI | 48214 |
| Russ Reynolds | UAW Local 651 | 3518 Robert T. Longway Blvd. | | Flint | MI | 48506 |
| Scott Painter | IUE-CWA Local 1111 | 1051 S. Rockerfeller Ave. | | Ontario | CA | 91761 |
| Skip Dziedzic | UAW Local 1866 | 7435 S. Howell Ave. | | Oak Creek | WI | 53154 |
| Sona Camp | UAW Local 292 | 1201 W. Alto Rd. | | Kokomo | IN | 46902 |
| Steve Ishee | UAW Local 2190 | 1 Thames Ave. | | Laurel | MS | 39440 |
| Terry Scruggs | UAW Local 2195 | 20564 Sandy Rd. | | Tanner | AL | 35671 |
| Thomas Charles, James N. Glathar | IUOE 832S | 3174 Brighton-Henrietta Town Line Rd. | | Rochester | NY | 14692 |
| Vincent Giblin | IUOE | 1125 17th Street NW | | Washington | DC | 20036 |
| William Humber | IUE-CWA Local 416 | 760 Jersey Avenue | | New Brunswick | NJ | 08901 |
| ZebWells | IUE-CWA Local 718 | 925 Industrial Park Rd. | | Brookhaven | MS | 39601 |

Delphi Corporation
Special Parties

| Company | Contact | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|
| Burr Forman LLP | Paul Burke O'Hearn | 171 17th St NW Ste 1100 | | Atlanta | GA | 30363 |
| Kirkpatrick & Lockhart Nicholson Graham LLP | Eric Moser | 599 Lexington Ave | | New York | NY | 10022 |
| White & Case LLP | Glenn M Kurtz<br>Gerard Uzzi<br>Douglas P Baumstein | 1155 Avenue of the Americas | | New York | NY | 10036-2787 |
| White & Case LLP | Thomas E Lauria<br>Frank L Eaton<br>Ileana A Cruz | Wachovia Financial Ctr | 200 S Biscayne Blvd | Miami | FL | 33131 |

In re Delphi Corporation, et al.
Case No. 05-44481

Page 1 of 1

7/24/2007 10:35 AM
Union Other Respondents List 070628

Delphi Corporation
Special Parties

| Name | Address 1 | Address 2 | City | State | Zip |
|------|-----------|-----------|------|-------|-----|
| Mrs. Kellie J. Hurley | 214 Lou Ann Drive | | Depwe | NY | 14043 |

In re Delphi Corporation, et al.
Case No. 05-44481

Page 1 of 1

7/24/2007 10:33 AM
Addition to Union service 070718

# EXHIBIT P

Delphi Corporation
Special Parties

| Company | Contact | Address 1 | Address 2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| Pricewaterhouse Coopers | Mr Enrique Bujidos | C/ Almagro 40 | | Madrid | | 28010 | Spain |
| Receiver appointed by Sidenor | Mr Fernando Gomez Martin | Paseo del Parque s/n | Club de Golf Bungalow Las Arenas | San Roque | Cadiz | 11310 | Spain |
| | Mr Adalberto Canadas Castillo | Avda Ramon de Carranza 10-1° | | Cadiz | | 11006 | Spain |

In re Delphi Corporation, et al.
Case No. 05-44481

Page 1 of 1

7/24/2007 11:57 AM
DASE Special Parties