IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
In re                             :      Chapter 11
:
DELPHI CORPORATION, et al.,     :      Case No. 05-44481 (RDD)
:
               Debtors.   :      (Jointly Administered)
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

AFFIDAVIT OF SERVICE

     I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

     On July 20, 2007, I caused to be served the documents listed below (i) upon the parties listed on Exhibit A hereto via overnight delivery, (ii) upon the parties listed on Exhibit B hereto via electronic notification and (iii) upon the parties listed on Exhibit C hereto via postage pre-paid U.S. mail:

    1) Order Under 11 U.S.C. §§ 363, 1107, And 1108 Authorizing Delphi Automotive Systems (Holding), Inc. To Provide Funds To Delphi Automotive Systems Espana S.L. ("DASE Funding Order") (Docket No. 8684) [a copy of which is attached hereto as Exhibit D]

    2) Order Under 11 U.S.C. §§ 363 And 365 And Fed. R. Bankr. P. 2002, 6004, 6006, And 9014 Authorizing And Approving (I) Sale Of Delphi Automotive Systems LLC'S Mexico Brake Plant Assets Free And Clear Of Liens, Claims, And Encumbrances, (II) Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (III) Assumption Of Certain Liabilities ("Mexico Brake Plant Asset Sale Approval Order") (Docket No. 8705) [a copy of which is attached hereto as Exhibit E]

     On July 20th, 2007, I caused to be served the document listed below upon the parties listed on Exhibit F hereto via overnight delivery:

    3) Order Under 11 U.S.C. §§ 363, 1107, And 1108 Authorizing Delphi Automotive Systems (Holding), Inc. To Provide Funds To Delphi Automotive Systems Espana S.L. ("DASE Funding Order") (Docket No. 8684) [a copy of which is attached hereto as Exhibit D]

On July 20th, 2007, I caused to be served the document listed below upon the parties listed on Exhibit G hereto via overnight delivery:

4)  Debtors' Response To Damages Brief Of Joseph Reno With Respect To Proof Of Claim Number 9956 (Docket No. 8713) [a copy of which is attached hereto as Exhibit H]

Dated: August 1, 2007

_____ /s/ Evan Gershbein _____
Evan Gershbein


State of California
County of Los Angeles

Subscribed and sworn to (or affirmed) before me on this 1st day of August, 2007, by Evan Gershbein, personally known to me or proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: _____ /s/ Shannon J. Spencer _____

Commission Expires: ___ 6/20/10 _____

# EXHIBIT A

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|-------|-----|-------|------------------|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2491 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Counsel to Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel to Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com sliviri@ffhsj.com | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel to Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 1540 Broadway | 24th Fl | New York | NY | 10036 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Internal Revenue Service | Attn: Insolvency Department | 477 Michigan Ave | Mail Stop 15 | Detroit | MI | 48226 | 313-628-3648 | 313-628-3602 | | Michigan IRS |
| Internal Revenue Service | Attn: Insolvency Department, Maria Valerio | 290 Broadway | 5th Floor | New York | NY | 10007 | 212-436-1038 | 212-436-1931 | mariaivalerio@irs.gov | IRS |
| IUE-CWA | Conference Board Chairman | 2360 W. Dorothy Lane | Suite 201 | Dayton | OH | 45439 | 937-294-7813 | 937-294-9164 | | Creditor Committee Member |
| Jefferies & Company, Inc, | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Richard Duker | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | richard.duker@jpmorgan.com | Prepetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Susan Atkins, Gianni Russello | 277 Park Ave 8th Fl | | New York | NY | 10172 | 212-270-0426 | 212-270-0430 | gianni.russello@jpmorgan.com susan.atkins@jpmorgan.com | Postpetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | Sheryl Betance | 2335 Alaska Ave | | El Segundo | CA | 90245 | 310-823-9000 | 310-823-9133 | sbetance@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Law Debenture Trust of New York | Daniel R. Fisher | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| Law Debenture Trust of New York | Patrick J. Healy | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 3

7/24/2007 9:37 PM
Master Service List Overnight Mail

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|-------|-----|-------|------------------|
| McDermott Will & Emery LLP | David D. Cleary | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | dcleary@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Jason J. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | jdejonker@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Mohsin N. Khambati | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | mkhambati@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Peter A. Clark | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | pclark@mwe.com | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | 213-629-5063 | gbray@milbank.com tkreller@milbank.com jtill@milbank.com | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | william.dornbos@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | garrick.sandra@pbgc.gov efile@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel to the Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | 2122185500 | 2122185526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel to Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Tyco Electronics Corporation | MaryAnn Brereton, Assistant General Counsel | 60 Columbia Road | | Morristown | NJ | 7960 | 973-656-8365 | 973-656-8805 | | Creditor Committee Member |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 3

7/24/2007 9:37 PM
Master Service List Overnight Mail

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| United States Trustee | Alicia M. Leonhard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | 212-510-0500 | 212-668-2255 does not take service via fax | | Counsel to United States Trustee |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel to the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Harvey R. Miller | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8500 | 212-310-8077 | harvey.miller@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

7/24/2007 9:37 PM
Master Service List Overnight Mail

# EXHIBIT B

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2491 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Counsel to Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel to Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L. Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com sliviri@ffhsj.com | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel to Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 1540 Broadway | 24th Fl | New York | NY | 10036 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Jefferies & Company, Inc, | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Richard Duker | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | richard.duker@jpmorgan.com | Prepetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Susan Atkins, Gianni Russello | 277 Park Ave 8th Fl | | New York | NY | 10172 | 212-270-0426 | 212-270-0430 | gianni.russello@jpmorgan.com susan.atkins@jpmorgan.com | Postpetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | Sheryl Betance | 2335 Alaska Ave | | El Segundo | CA | 90245 | 310-823-9000 | 310-823-9133 | sbetance@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Law Debenture Trust of New York | Daniel R. Fisher | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| Law Debenture Trust of New York | Patrick J. Healy | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |
| McDermott Will & Emery LLP | Jason J. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | jdejonker@mwe.com | Counsel to Recticel North America, Inc. |

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| McDermott Will & Emery LLP | Peter A. Clark | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | pclark@mwe.com | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | 213-629-5063 | gbray@milbank.com tkreller@milbank.com jtill@milbank.com | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | william.dornbos@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | efile@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel to the Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | 2122185500 | 2122185526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thacher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtors's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel to Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel to the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Harvey R. Miller | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8500 | 212-310-8077 | harvey.miller@weil.com | Counsel to General Motors Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 3

7/24/2007 9:37 PM
Master Service List Email

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

7/24/2007 9:37 PM
Master Service List Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Adalberto Cañadas Castillo | | Avda Ramon de Carranza | 10-1º | Cadiz | | 11006 | Spain | 34 956 226 311 | | adalberto@canadas.com | Representative to DASE |
| Akin Gump Strauss Hauer & Feld, LLP | Peter J. Gurfein | 2029 Centure Park East | Suite 2400 | Los Angeles | CA | 90067 | | 310-552-6696 | 310-229-1001 | pgurfein@akingump.com | Counsel to Wamco, Inc. |
| Allen Matkins Leck Gamble & Mallory LLP | Michael S. Greger | 1900 Main Street | Fifth Floor | Irvine | CA | 92614-7321 | | 949-553-1313 | 949-553-8354 | mgreger@allenmatkins.com | Counsel to Kilroy Realty, L.P. |
| Alston & Bird, LLP | Craig E. Freeman | 90 Park Avenue | | New York | NY | 10016 | | 212-210-9400 | 212-922-3891 | craig.freeman@alston.com | Counsel to Cadence Innovation, LLC |
| Alston & Bird, LLP | Dennis J. Connolly; David A. Wender | 1201 West Peachtree Street | | Atlanta | GA | 30309 | | 404-881-7269 | 404-253-8554 | dconnolly@alston.com dwender@alston.com | Counsel to Cadence Innovation, LLC |
| Ambrake Corporation | Brandon J. Kessinger | 300 Ring Road | | Elizabethtown | KY | 42701 | | 270-234-5428 | 270-737-3044 | bkessinger@akebono-usa.com | Representative for Ambrake Corporation |
| American Axle & Manufacturing, Inc. | Steven R. Keyes | One Dauch Drive, Mail Code 6E-2-42 | | Detroit | MI | 48243 | | 313-758-4868 | | steven.keyes@aam.com | Representative for American Axle & Manufacturing, Inc. |
| Andrews Kurth LLP | Gogi Malik | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | gogimalik@andrewskurth.com | Counsel to ITW Mortgage Investments IV, Inc. |
| Andrews Kurth LLP | Monica S. Blacker | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | mblacker@andrewskurth.com | Counsel to  ITW Mortgage Investments IV, Inc. |
| Angelo, Gordon & Co. | Leigh Walzer | 245 Park Avenue | 26th Floor | New York | NY | 10167 | | 212-692-8251 | 212-867-6395 | lwalzer@angelogordon.com | |
| Anglin, Flewelling, Rasmussen, Campbell & Trytten, LLP | Mark T. Flewelling | 199 South Los Robles Avenue | Suite 600 | Pasadena | CA | 91101-2459 | | 626-535-1900 | 626-577-7764 | mtf@afrct.com | Counsel to Stanley Electric Sales of America, Inc. |
| Arent Fox PLLC | Mitchell D. Cohen | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Cohen.Mitchell@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arent Fox PLLC | Robert M. Hirsh | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Hirsh.Robert@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arnall Golden Gregory LLP | Darryl S. Laddin | 171 17th Street NW | Suite 2100 | Atlanta | GA | 30363-1031 | | 404-873-8120 | 404-873-8121 | dladdin@agg.com | Counsel to Daishinku (America) Corp. d/b/a KDS America ("Daishinku"), SBC Telecommunications, Inc. (SBC) |
| Arnold & Porter LLP | Joel M. Gross | 555 Twelfth Street, N.W. | | Washington | D.C. | 20004-1206 | | 202-942-5000 | 202-942-5999 | joel_gross@aporter.com | Counsel to CSX Transportation, Inc. |
| ATS Automation Tooling Systems Inc. | Carl Galloway | 250 Royal Oak Road | | Cambridge | Ontario | N3H 4R6 | Canada | 519-653-4483 | 519-650-6520 | cgalloway@atsautomation.com | Company |
| Barack, Ferrazzano, Kirschbaum & Nagelberg LLP | Kimberly J. Robinson | 200 W Madison St Ste 3900 | | Chicago | IL | 60606 | | 312-984-3100 | 312-984-3150 | kim.robinson@bfkn.com | Counsel to Motion Industries, Inc., EIS, Inc. and Johnson Industries, Inc. |
| Barack, Ferrazzano, Kirschbaum & Nagelberg LLP | William J. Barrett | 200 W Madison St Ste 3900 | | Chicago | IL | 60606 | | 312-984-3100 | 312-984-3150 | william.barrett@bfkn.com | Counsel to Motion Industries, Inc., EIS, Inc. and Johnson Industries, Inc. |
| Barnes & Thornburg LLP | Alan K. Mills | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | alan.mills@btlaw.com | Counsel to Mays Chemical Company |
| Barnes & Thornburg LLP | John T. Gregg | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3930 | 626-742-3999 | john.gregg@btlaw.com | Counsel to Priority Health; Clarion Corporation of America |
| Barnes & Thornburg LLP | Mark R. Owens | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | mark.owens@btlaw.com | Counsel to Clarion Corporation of America |
| Barnes & Thornburg LLP | Michael K. McCrory | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | michael.mccrory@btlaw.com | Counsel to Gibbs Die Casting Corporation; Clarion Corporation of America |
| Barnes & Thornburg LLP | Patrick E. Mears | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3936 | 616-742-3999 | pmears@btlaw.com | Counsel to Armada Rubber Manufacturing Company, Bank of America Leasing & Leasing & Capital, LLC, & AutoCam Corporation |
| Barnes & Thornburg LLP | Wendy D. Brewer | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | wendy.brewer@btlaw.com | Counsel to Gibbs Die Casting Corporation |
| Bartlett Hackett Feinberg P.C. | Frank F. McGinn | 155 Federal Street | 9th Floor | Boston | MA | 02110 | | 617-422-0200 | 617-422-0383 | ffm@bostonbusinesslaw.com | Counsel to Iron Mountain Information Management, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 20

7/24/2007 9:37 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Beeman Law Office | Thomas M Beeman | 33 West 10th Street | Suite 200 | Anderson | IN | 46016 | | 765-640-1330 | 765-640-1332 | tom@beemanlawoffice.com | Counsel to Madison County (Indiana) Treasurer |
| Bernstein Litowitz Berger & Grossman | Hannah E. Greenwald | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1411 | 2125541444 | hannah@blbglaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Bernstein Litowitz Berger & Grossman | John P. Coffey | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1409 | 2125541444 | sean@blbglaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Bernstein Litowitz Berger & Grossman | Wallace A. Showman | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1429 | 212-554-1444 | wallace@blbglaw.com | Counsel to SANLUIS Rassini International, Inc.; Rassini, S.A. de C.V. |
| Bialson, Bergen & Schwab | Kenneth T. Law, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | klaw@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc. |
| Bialson, Bergen & Schwab | Lawrence M. Schwab, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | lschwab@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc.; Solectron Corporation; Solectron De Mexico SA de CV; Solectron Invotronics; Coherent, Inc.; Veritas Software Corporation |
| Bialson, Bergen & Schwab | Patrick M. Costello, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | pcostello@bbslaw.com | Counsel to Solectron Corporation; Solectron de Mexico SA de CV; Solectron Invotronics and Coherent, Inc. |
| Bialson, Bergen & Schwab | Thomas M. Gaa | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | tgaa@bbslaw.com | Counsel to  Veritas Software Corporation |
| Bingham McHale LLP | John E Taylor Whitney L Mosby | 10 West Market Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-635-8900 | 317-236-9907 | jtaylor@binghammchale.com wmosby@binghammchale.com | Counsel to Universal Tool & Engineering co., Inc. and M.G. Corporation |
| Blank Rome LLP | Marc E. Richards | The Chrylser Building | 405 Lexington Avenue | New York | NY | 10174 | | 212-885-5000 | 212-885-5002 | mrichards@blankrome.com | Counsel to DENSO International America, Inc. |
| Bodman LLP | Ralph E. McDowell | 100 Renaissance Center | 34th Floor | Detroit | MI | 48243 | | 313-393-7592 | 313-393-7579 | rmcdowell@bodmanllp.com | Counsel to Freudenberg-NOK; General Partnership; Freudenberg-NOK, Inc.; Flextech, Inc.; Vibracoustic de Mexico, S.A. de C.V.; Lear Corporation; American Axle & Manufacturing, Inc. |
| Bond, Schoeneck & King, PLLC | Camille W. Hill | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | chill@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp. |
| Bond, Schoeneck & King, PLLC | Charles J. Sullivan | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | csullivan@bsk.com | Counsel to Diemolding Corporation |
| Bond, Schoeneck & King, PLLC | Stephen A. Donato | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | sdonato@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp; Diemolding Corporation |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bose McKinney & Evans LLP | Jeannette Eisan Hinshaw | 135 N. Pennslyvania Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-684-5296 | 317-684-5173 | jhinshaw@boselaw.com | Counsel to Decatur Plastics Products, Inc. and Eikenberry & Associates, Inc.; Lorentson Manufacturing, Company, Inc.; Lorentson Tooling, Inc.; L & S Tools, Inc.; Hewitt Tool & Die, Inc. |
| Boult, Cummings, Conners & Berry, PLC | Austin L. McMullen | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | amcmullen@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Boult, Cummings, Conners & Berry, PLC | Roger G. Jones | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | rjones@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Brembo S.p.A. | Massimiliano Cini | Administration Department via Brembo 25 | 24035 Curno BG | Bergamo | | | Italy | 00039-035-605 529 | 0039-035-605-671 | massimiliano_cini@brembo.it | Creditor |
| Brown & Connery, LLP | Donald K. Ludman | 6 North Broad Street | | Woodbury | NJ | 08096 | | 856-812-8900 | 856-853-9933 | dludman@brownconnery.com | Counsel to SAP America, Inc. |
| Buchalter Nemer, A Profesional Corporation | Shawn M. Christianson | 333 Market Street | 25th Floor | San Francisco | CA | 94105-2126 | | 415-227-0900 | 415-227-0770 | schristianson@buchalter.com | Counsel to Oracle USA, Inc.; Oracle Credit Corporation |
| Burr & Forman LLP | Michael Leo Hall | 420 North Twentieth Street | Suite 3100 | Birmingham | AL | 35203 | | (205) 458-5367 | (205) 244-5651 | mhall@burr.com | Counsel to Mercedes-Benz U.S. International, Inc. |
| Cadwalader Wickersham & Taft LLP | Jeannine D'Amico | 1201 F St NW Ste 1100 | | Washington | DC | 20004 | | 202-862-2452 | 202-862-2400 | jeannine.damico@cwt.com | Attorneys for the Audit Committee of Dephi Corporation |
| Cahill Gordon & Reindel LLP | Jonathan Greenberg | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 732-205-6777 | jonathan.greenberg@BASF.COM | Counsel to Engelhard Corporation |
| Cahill Gordon & Reindel LLP | Robert Usadi | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 212-269-5420 | rusadi@cahill.com | Counsel to Engelhard Corporation |
| Calfee, Halter & Griswold LLC | Jean R. Robertson, Esq. | 1400 McDonald Investment Ctr | 800 Superior Ave | Cleveland | OH | 44114 | | 216-622-8404 | 216-241-0816 | jrobertson@calfee.com | Counsel to Brush Engineered materials |
| Calinoff & Katz, LLp | Dorothy H. Marinis-Riggio | 140 East 45th Street | 17th Floor | New York | NY | 10017 | | 212-826-8800 | 212-644-5123 | driggio@candklaw.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Carson Fischer, P.L.C. | Robert A. Weisberg | 300 East Maple Road | Third Floor | Birmingham | MI | 48009-6317 | | 248-644-4840 | 248-644-1832 | rweisberg@carsonfischer.com | Counsel to Cascade Die Casting Group, Inc. |
| Carter Ledyard & Milburn LLP | Aaron R. Cahn | 2 Wall Street | | New York | NY | 10005 | | 212-732-3200 | 212-732-3232 | cahn@clm.com | Counsel to STMicroelectronics, Inc. |
| Chadbourne & Parke LLP | Douglas Deutsch, Esq. | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-408-5100 | 212-541-5369 | ddeutsch@chadbourne.com | Counsel to EagleRock Capital Management, LLC |
| Clark Hill PLC | Joel D. Applebaum | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | japplebaum@clarkhill.com | Counsel to 1st Choice Heating & Cooling, Inc.; BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLC | Shannon Deeby | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | sdeeby@clarkhill.com | Counsel to BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLLC | Robert D. Gordon | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8572 | 313-965-8252 | rgordon@clarkhill.com | Counsel to ATS Automation Tooling Systems Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 20

7/24/2007 9:37 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cleary Gottlieb Steen & Hamilton LLP | Deborah M. Buell | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel to Arneses Electricos Automotrices, S.A.de C.V.; Cordaflex, S.A. de C.V. |
| Cleary, Gottlieb, Steen & Hamilton LLP | James L. Bromley | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel to Bear, Stearns, Co. Inc.; Citigroup, Inc.; Credit Suisse First Boston; Deutsche Bank Securities, Inc.; Goldman Sachs Group, Inc.; JP Morgan Chase & Co.; Lehman Brothers, Inc.; Merrill Lynch & Co.; Morgan Stanley & Co., Inc.; UBS Securities, LLC |
| Cohen & Grigsby, P.C. | Thomas D. Maxson | 11 Stanwix Street | 15th Floor | Pittsburgh | PA | 15222-1319 | | 412-297-4706 | 412-209-1837 | tmaxson@cohenlaw.com | Counsel to Nova Chemicals, Inc. |
| Cohen, Weiss & Simon LLP | Joseph J. Vitale Babette Ceccotti | 330 West 42nd Street | | New York | NY | 10036 | | 212-356-0238 | 646-473-8238 | jvitale@cwsny.com bceccotti@cwsny.com | Counsel to International Union, United Automobile, Areospace and Agriculture Implement Works of America (UAW) |
| Cohn Birnbaum & Shea P.C. | Scott D. Rosen, Esq. | 100 Pearl Street, 12th Floor | | Hartford | CT | 06103 | | 860-493-2200 | 860-727-0361 | srosen@cb-shea.com | Counsel to Floyd Manufacturing Co., Inc. |
| Conlin, McKenney & Philbrick, P.C. | Bruce N. Elliott | 350 South Main Street | Suite 400 | Ann Arbor | MI | 48104 | | 734-971-9000 | 734-971-9001 | Elliott@cmplaw.com | Counsel to Brazeway, Inc. |
| Connolly Bove Lodge & Hutz LLP | Jeffrey C. Wisler, Esq. | 1007 N. Orange Street | P.O. Box 2207 | Wilmington | DE | 19899 | | 302-658-9141 | 302-658-0380 | jwisler@cblh.com | Counsel to ORIX Warren, LLC |
| Contrarian Capital Management, L.L.C. | Mark Lee, Janice Stanton, Bill Raine, Seth Lax | 411 West Putnam Avenue | Suite 225 | Greenwich | CT | 06830 | | 203-862-8200 (230) 862-8231 | 203-629-1977 (203) 629-1977 | mlee@contrariancapital.com jstanton@contrariancapital.com wraine@contrariancapital.com solax@contrariancapital.com | Counsel to Contrarian Capital Management, L.L.C. |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Ronald S. Pretekin | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | Pretekin@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Sylvie J. Derrien | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | derrien@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| Cornell University | Nancy H. Pagliaro | Office of University Counsel | 300 CCC Building, Garden Avenue | Ithaca | NY | 14853-2601 | | 607-255-5124 | 607-254-3556 | nhp4@cornell.edu | Paralegal/Counsel to Cornell University |
| Covington & Burling | Susan Power Johnston | 1330 Avenue of the Americas | | New York | NY | 10019 | | 212-841-1005 | 646-441-9005 | sjohnston@cov.com | Special Counsel to the Debtor |
| Cox, Hodgman & Giarmarco, P.C. | Sean M. Walsh, Esq. | Tenth Floor Columbia Center | 101 W. Big Beaver Road | Troy | MI | 48084-5280 | | 248-457-7000 | 248-457-7001 | swalsh@chglaw.com | Counsel to Nisshinbo Automotive Corporation |
| Curtin & Heefner, LLP | Daniel P. Mazo | 250 N. Pennslyvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | dpm@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| Curtin & Heefner, LLP | Robert Szwajkos | 250 N. Pennslyvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | rsz@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| Damon & Morey LLP | William F. Savino | 1000 Cathedral Place | 298 Main Street | Buffalo | NY | 14202-4096 | | 716-856-5500 | 716-856-5510 | wsavino@damonmorey.com | Counsel to Relco, Inc.; The Durham Companies, Inc. |
| Day Pitney LLP | Richard M. Meth | P.O. Box 1945 | | Morristown | NJ | 07962-1945 | | 973-966-6300 | 973-966-1015 | rmeth@daypitney.com | Counsel to Marshall E. Campbell Company |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Day Pitney LLP | Ronald S. Beacher Conrad K. Chiu | 7 Times Square | | New York | NY | 10036 | | 212-297-5800 | 212-916-2940 | rbeacher@daypitney.com cchiu@daypitney.com | Counsel to IBJTC Business Credit Corporation, as successor to IBJ Whitehall Business Credit Corporation |
| Denso International America, Inc. | Carol Sowa | 24777 Denso Drive | | Southfield | MI | 48086 | | 248-372-8531 | 248-350-7772 | carol_sowa@denso-diam.com | Counsel to Denso International America, Inc. |
| Dinsmore & Shohl LLP | John Persiani | 1900 Chemed Center | 255 East Fifth Street | Cincinnati | OH | 45202 | | 513-977-8200 | 513-977-8141 | john.persiani@dinslaw.com | Counsel to The Procter & Gamble Company |
| DLA Piper Rudnick Gray Cary US LLP | Richard M. Kremen Maria Ellena Chavez-Ruark | The Marbury Building | 6225 Smith Avenue | Baltimore | Maryland | 21209-3600 | | 410-580-3000 | 410-580-3001 | richard.kremen@dlapiper.com | Counsel to Constellation NewEnergy, Inc. & Constellation NewEnergy - Gas Division, LLC |
| Dreier LLP | Maura I. Russell Wendy G. Marcari | 499 Park Ave | 14th Fl | New York | NY | 10022 | | 212-328-6100 | 212-652-3863 | jguerrier@dreierllp.com | Counsel to SPCP Group LLC |
| Drinker Biddle & Reath LLP | Andrew C. Kassner | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | andrew.kassner@dbr.com | Counsel to Penske Truck Leasing Co., L.P. |
| Drinker Biddle & Reath LLP | David B. Aaronson | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | david.aaronson@dbr.com | Counsel to Penske Truck Leasing Co., L.P. and Quaker Chemical Corporation |
| Drinker Biddle & Reath LLP | Janice B. Grubin | 140 Broadway 39th Fl | | New York | NY | 10005-1116 | | 212-248-3140 | 212-248-3141 | janice.grubin@dbr.com | Counsel to Vanguard Distributors, Inc. |
| Duane Morris LLP | Joseph H. Lemkin | 744 Broad Street | Suite 1200 | Newark | NJ | 07102 | | 973-424-2000 | 973-424-2001 | jhlemkin@duanemorris.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC; and Hosiden America Corporation |
| Duane Morris LLP | Margery N. Reed, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | dmdelphi@duanemorris.com | Counsel to ACE American Insurance Company |
| Duane Morris LLP | Wendy M. Simkulak, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | wmsimkulak@duanemorris.com | Counsel to ACE American Insurance Company |
| Eckert Seamans Cherin & Mellott LLC | Michael G. Busenkell | 300 Delaware Avenue | Suite 1360 | Wilmington | DE | 19801 | | 302-425-0430 | 302-425-0432 | mbusenkell@eckertseamans.com | Counsel to Chicago Miniature Optoelectronic Technologies, Inc. |
| Electronic Data Systems Corporation | Ayala Hassell | 5400 Legacy Dr. | Mail Stop H3-3A-05 | Plano | TX | 75024 | | 212-715-9100 | 212-715-8000 | ayala.hassell@eds.com | Representattive for Electronic Data Systems Corporation |
| Entergy Services, Inc. | Alan H. Katz | 639 Loyola Ave 26th Fl | | New Orleans | LA | 70113 | | | | akatz@entergy.com | Assistant General Counsel to Entergy Services, Inc. |
| Erman, Teicher, Miller, Zucker & Freedman, P.C. | David H. Freedman | 400 Galleria Officentre | Ste. 444 | Southfield | MI | 48034 | | 248-827-4100 | 248-827-4106 | dfreedman@ermanteicher.com | Counsel to Doshi Prettl International, LLC |
| Ettelman & Hochheiser, P.C. | Gary Ettelman | c/o Premium Cadillac | 77 Main Street | New Rochelle | NY | 10801 | | 516-227-6300 | 516-227-6307 | gettelman@e-hlaw.com | Counsel to Jon Ballin |
| Fagel Haber LLC | Lauren Newman | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | | 312-346-7500 | 312-580-2201 | lnewman@fagelhaber.com | Counsel to Aluminum International, Inc. |
| Filardi Law Offices LLC | Charles J. Filardi, Jr., Esq. | 65 Trumbull Street | Second Floor | New Haven | CT | 06510 | | 203-562-8588 | 866-890-3061 | charles@filardi-law.com | Counsel to Federal Express Corporation |
| Finkel Goldstein Rosenbloom & Nash LLP | Ted J. Donovan | 26 Broadway | Suite 711 | New York | NY | 10004 | | 212-344-2929 | 212-422-6836 | tdonovan@finkgold.com | Counsel to Pillarhouse (U.S.A.) Inc. |
| Foley & Lardner LLP | David G Dragich | 500 Woodward Ave Suite 2700 | | Detroit | MI | 48226-3489 | | 313-234-7100 | 313-234-2800 | ddragich@foley.com | Counsel to Intermet Corporation |
| Foley & Lardner LLP | Jill L. Murch | 321 North Clark Street | Suite 2800 | Chicago | IL | 60610-4764 | | 312-832-4500 | 312-832-4700 | jmurch@foley.com | Counsel to Kuss Corporation |
| Foley & Lardner LLP | John A. Simon | One Detroit Center | 500 Woodward Ave Suite 2700 | Detroit | MI | 48226-3489 | | 313-234-7100 | 313-234-2800 | jsimon@foley.com | Counsel to Ernst & Young LLP |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 5 of 20

7/24/2007 9:37 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Foley & Lardner LLP | Michael P. Richman | 90 Park Avenue | 37th Floor | New York | NY | 10016-1314 | | 212-682-7474 | 212-687-2329 | mrichman@foley.com | Counsel to Ernst & Young LLP |
| Fox Rothschild LLP | Fred Stevens | 13 East 37th Street | Suite 800 | New York | NY | 10016 | | 212-682-7575 | 212-682-4218 | fstevens@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Fox Rothschild LLP | Michael J. Viscount, Jr. | 1301 Atlantic Avenue | Suite 400 | Atlantic City | NJ | 08401-7212 | | 609-348-4515 | 609-348-6834 | mviscount@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Frederick T. Rikkers | | 419 Venture Court | P.O. Box 930555 | Verona | WI | 53593 | | 608-848-6350 | 608-848-6357 | ftrikkers@rikkerslaw.com | Counsel to Southwest Metal Finishing, Inc. |
| Fulbright & Jaworski LLP | David A Rosenzweig | 666 Fifth Avenue | | New York | NY | 10103-3198 | | 212-318-3000 | 212-318-3400 | drosenzweig@fulbright.com | Counsel to Southwest Research Institute Attorney for Solvay Fluorides, LLC |
| Fulbright & Jaworski LLP | Michael M Parker | 300 Convent St Ste 2200 | | San Antonio | TX | 78205 | | 210-224-5575 | 210-270-7205 | mparker@fulbright.com | Counsel to Southwest Research Institute |
| Gibbons P.C. | David N. Crapo | One Gateway Center | | Newark | NJ | 07102-5310 | | 973-596-4523 | 973-639-6244 | dcrapo@gibbonslaw.com | Counsel to Epcos, Inc. |
| Goldberg, Stinnett, Meyers & Davis | Merle C. Meyers | 44 Montgomery Street | Suite 2900 | San Francisco | CA | 94104 | | 415-362-5045 | 415-362-2392 | mmeyers@gsmdlaw.com | Counsel to Alps Automotive, Inc. |
| Goodwin Proctor LLP | Allan S. Brilliant | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | abrilliant@goodwinproctor.com | Counsel to UGS Corp. |
| Goodwin Proctor LLP | Craig P. Druehl | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | cdruehl@goodwinproctor.com | Counsel to UGS Corp. |
| Gorlick, Kravitz & Listhaus, P.C. | Barbara S. Mehlsack | 17 State Street | 4th Floor | New York | NY | 10004 | | 212-269-2500 | 212-269-2540 | bmehlsack@gkllaw.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Goulston & Storrs, P.C. | Peter D. Bilowz | 400 Atlantic Avenue | | Boston | MA | 02110-333 | | 617-482-1776 | 617-574-4112 | pbilowz@goulstonstorrs.com | Counsel to Thermotech Company |
| Grant & Eisenhofer P.A. | Jay W. Eisenhofer | 45 Rockefeller Center | 650 Fifth Avenue | New York | NY | 10111 | | 212-755-6501 | 212-755-6503 | jeisenhofer@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Grant & Eisenhofer P.A. | Sharan Nirmul | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | | 302-622-7000 | 302-622-7100 | snirmul@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Gratz, Miller & Brueggeman, S.C. | Matthew R. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | mrr@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 6 of 20

7/24/2007 9:37 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gratz, Miller & Brueggeman, S.C. | Timothy C. Hall | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | tch@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Graydon Head & Ritchey LLP | J. Michael Debbler, Susan M. Argo | 1900 Fifth Third Center | 511 Walnut Street | Cincinnati | OH | 45202 | | 513-621-6464 | 513-651-3836 | mdebbeler@graydon.com | Counsel to Grote Industries; Batesville Tool & Die; PIA Group; Reliable Castings |
| Greenberg Traurig, LLP | Maria J. DiConza | MetLife Bldg | 200 Park Avenue | New York | NY | 10166 | | 212-801-9200 | 212-801-6400 | diconzam@gtlaw.com | Counsel to Samtech Corporation |
| Greenberg Traurig, LLP | Shari L. Heyen | 1000 Louisiana | Suite 1800 | Houston | TX | 77002 | | 713-374-3500 | 713-374-3505 | heyens@gtlaw.com | Counsel to Samtech Corporation |
| Greensfelder, Hemker & Gale, P.C. | Cherie Macdonald J. Patrick Bradley | 10 S. Broadway | Suite 200 | St. Louis | MO | 63102 | | 314-241-9090 | 314-241-8624 | ckm@greensfelder.com jpb@greensfelder.com | Counsel to ARC Automotive, Inc. |
| Guaranty Bank | Herb Reiner | 8333 Douglas Avenue | | Dallas | TX | 75225 | | 214-360-2702 | 214-360-1940 | herb.reiner@guarantygroup.com | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Corporation |
| Halperin Battaglia Raicht, LLP | Alan D. Halperin Christopher J.Battaglia Julie D. Dyas | 555 Madison Avenue | 9th Floor | New York | NY | 10022 | | 212-765-9100 | 212-765-0964 | cbattaglia@halperinlaw.net ahalperin@halperinlaw.net jdyas@halperinlaw.net | Counsel to Pacific Gas Turbine Center, LLC and Chromalloy Gas Turbine Corporation; ARC Automotive, Inc |
| Hancock & Estabrook LLP | R John Clark Esq | 1500 Tower I | PO Box 4976 | Syracuse | NY | 13221-4976 | | 315-471-3151 | 315-471-3167 | rjclark@hancocklaw.com | Counsel to Alliance Precision Plastics Corporation |
| Harris D. Leinwand | Harris D. Leinwand | 350 Fifth Avenue | Suite 2418 | New York | NY | 10118 | | 212-725-7338 | 212-244-6219 | hleinwand@aol.com | Counsel to Baker Hughes Incorporated; Baker Petrolite Corporation |
| Haynes and Boone, LLP | Judith Elkin | 153 East 53rd Street | Suite 4900 | New York | NY | 10022 | | 212-659-7300 | 212-918-8989 | judith.elkin@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Haynes and Boone, LLP | Lenard M. Parkins Kenric D. Kattner | 1 Houston Center | 1221 McKinney, Suite 2100 | Houston | TX | 77010 | | 713-547-2000 | 713-547-2600 | lenard.parkins@haynesboone.com kenric.kattner@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Heller Ehrman LLP | Timothy Mehok | Times Square Tower | Seven Times Square | New York | NY | 10036 | | 212-832-8300 | 212-763-7600 | timothy.mehok@hellerehrman.com | Counsel to @Road, Inc. |
| Herrick, Feinstein LLP | Paul Rubin | 2 Park Avenue | | New York | NY | 10016 | | 212-592-1448 | 212-545-3360 | prubin@herrick.com | Counsel to Canon U.S.A., Inc. and Schmidt Technology GmbH |
| Hewlett-Packard Company | Anne Marie Kennelly | 3000 Hanover St., M/S 1050 | | Palo Alto | CA | 94304 | | 650-857-6902 | 650-852-8617 | anne.kennelly@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Kenneth F. Higman | 2125 E. Katella Avenue | Suite 400 | Anaheim | CA | 92806 | | 714-940-7120 | 740-940-7539 | ken.higman@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Sharon Petrosino | 420 Mountain Avenue | | Murray Hill | NJ | 07974 | | 908-898-4760 | 908-898-4133 | sharon.petrosino@hp.com | Counsel to Hewlett-Packard Financial Services Company |
| Hiscock & Barclay, LLP | J. Eric Charlton | 300 South Salina Street | PO Box 4878 | Syracuse | NY | 13221-4878 | | 315-425-2716 | 315-425-8576 | echarlton@hiscockbarclay.com | Counsel to GW Plastics, Inc. |
| Hodgson Russ LLP | Julia S. Kreher | One M&T Plaza | Suite 2000 | Buffalo | NY | 14203 | | 716-848-1330 | 716-819-4645 | jkreher@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hodgson Russ LLP | Stephen H. Gross, Esq. | 230 Park Avenue | 17th Floor | New York | NY | 10169 | | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hogan & Hartson L.L.P. | Audrey Moog | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | 202-637-5910 | amoog@hhlaw.com | Counsel to Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Edward C. Dolan | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | 202-637-5910 | ecdolan@hhlaw.com | Counsel to Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Scott A. Golden | 875 Third Avenue | | New York | NY | 10022 | | 212-918-3000 | 212-918-3100 | sagolden@hhlaw.com | Counsel to XM Satellite Radio Inc. |
| Holme Roberts & Owen, LLP | Elizabeth K. Flaagan | 1700 Lincoln | Suite 4100 | Denver | CO | 80203 | | 303-861-7000 | 303-866-0200 | elizabeth.flaagan@hro.com | Counsel to CoorsTek, Inc.; Corus, L.P. |
| Honigman, Miller, Schwartz and Cohn, LLP | Donald T. Baty, Jr. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7314 | 313-465-7315 | dbaty@honigman.com | Counsel to Fujitsu Ten Corporation of America |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Honigman, Miller, Schwartz and Cohn, LLP | E. Todd Sable | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7548 | 313-465-7549 | tsable@honigman.com | Counsel to Valeo Climate Control Corp.; Valeo Electrical Systems, Inc. - Motors and Actuators Division;Valeo Electrical Systems, Inc. - Wipers Division; Valeo Switches & Detection System, Inc. |
| Honigman, Miller, Schwartz and Cohn, LLP | Seth A Drucker | 2290 First National Building | 660 Woodward Avenue Ste 2290 | Detroit | MI | 48226 | | 313-465-7626 | 313-465-7627 | sdrucker@honigman.com | Counsel for Valeo Climate Control, Corp. |
| Howard & Howard Attorneys PC | Lisa S Gretchko | 39400 Woodward Ave | Ste 101 | Bloomfield Hills | MI | 48304-5151 | | 248-723-0396 | 248-645-1568 | lgretchko@howardandhoward.com | Intellectual Property Counsel for Delphi Corporation, et al. |
| Howick, Westfall, McBryan & Kaplan, LLP | Louis G. McBryan | 3101 Tower Creek Parkway | Ste 600 One Tower Creek | Atlanta | GA | 30339 | | 678-384-7000 | 678-384-7034 | lmcbryan@hwmklaw.com | Counsel to Vanguard Distributors, Inc. |
| Hunton & Wiliams LLP | Michael P. Massad, Jr. | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | mmassad@hunton.com | Counsel to RF Monolithics, Inc. |
| Hunton & Wiliams LLP | Steven T. Holmes | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | sholmes@hunton.com | Counsel to RF Monolithics, Inc. |
| Hurwitz & Fine P.C. | Ann E. Evanko | 1300 Liberty Building | | Buffalo | NY | 14202 | | 716-849-8900 | 716-855-0874 | aee@hurwitzfine.com | Counsel to Jiffy-Tite Co., Inc. |
| Ice Miller | Ben T. Caughey | One American Square | Box 82001 | Indianapolis | IN | 46282-0200 | | 317-236-2100 | 317-236-2219 | Ben.Caughey@icemiller.com | Counsel to Sumco, Inc. |
| Infineon Technologies North America Corporation | Greg Bibbes | 1730 North First Street | M/S 11305 | San Jose | CA | 95112 | | 408-501-6442 | 408-501-2488 | greg.bibbes@infineon.com | General Counsel & Vice President for Infineon Technologies North America Corporation |
| Infineon Technologies North America Corporation | Jeff Gillespie | 2529 Commerce Drive | Suite H | Kokomo | IN | 46902 | | 765-454-2146 | 765-456-3836 | jeffery.gillispie@infineon.com | Global Account Manager for Infineon Technologies North America |
| InPlay Technologies Inc | Heather Beshears | 234 South Extension Road | | Mesa | AZ | 85201 | | | | heather@inplaytechnologies.com | Creditor |
| Intermet Corporation | Alan Miller | 301 Commerce Street | Ste 2901 | Fort Worth | TX | 76102 | | | | amiller@intermet.com | Creditor |
| International Union of Operating Engineers | Richard Griffin | 1125-17th Avenue, N.W. | | Washington | DC | 20036 | | 202-429-9100 | 202-778-2641 | rgriffin@iuoe.org | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Jaffe, Raitt, Heuer & Weiss, P.C. | Paige E. Barr | 27777 Franklin Road | Suite 2500 | Southfield | MI | 48034 | | 248-351-3000 | 248-351-3082 | pbarr@jaffelaw.com | Counsel to Trutron Corporation |
| James R Scheuerle | Parmenter O'Toole | 601 Terrace Street | PO Box 786 | Muskegon | MI | 49443-0786 | | 231-722-1621 | 231-728-2206 | JRS@Parmenterlaw.com | Counsel to Port City Die Cast and Port City Group Inc |
| Jenner & Block LLP | Ronald P. Peterson | One IBM Plaza | | Chicago | IL | 60611 | | 312-222-9350 | 312-840-7381 | rpeterson@jenner.com | Counsel to SPX Corporation (Contech Division), Alcan Rolled Products-Ravenswood, LLC, Tenneco Inc. and Contech LLC |
| Jones Day | Scott J. Friedman | 222 East 41st Street | | New York | NY | 10017 | | 212-326-3939 | 212-755-7306 | sjfriedman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Katten Muchin Rosenman LLP | John P. Sieger, Esq. | 525 West Monroe Street | | Chicago | IL | 60661 | | 312-902-5200 | 312-577-4733 | john.sieger@kattenlaw.com | Counsel to TDK Corporation America and MEMC Electronic Materials, Inc. |
| Kaye Scholer LLP | Richard G Smolev | 425 Park Avenue | | New York | NY | 10022-3598 | | 212-236-8000 | 212-836-8689 | rsmolev@kayescholer.com | Counsel to InPlay Technologies |
| Kegler, Brown, Hill & Ritter Co., LPA | Kenneth R. Cookson | 65 East State Street | Suite 1800 | Columbus | OH | 43215 | | 614-426-5400 | 614-464-2634 | kcookson@keglerbrown.com | Counsel to Solution Recovery Services |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 8 of 20

7/24/2007 9:37 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Keller Rohrback L.L.P. | Lynn Lincoln Sarko Cari Campen Laufenberg Erin M. Rily | 1201 Third Avenue | Suite 3200 | Seattle | WA | 98101 | | 206-623-1900 | 206-623-3384 | lsarko@kellerrohrback.com claufenberg@kellerrohrback.com erilley@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Keller Rohrback P.L.C. | Gary A. Gotto | National Bank Plaza | 3101 North Central Avenue, Suite 900 | Phoenix | AZ | 85012 | | 602-248-0088 | 602-248-2822 | ggotto@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Kennedy, Jennick & Murray | Larry Magarik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | lmagarik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Susan M. Jennik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | sjennik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Thomas Kennedy | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | tkennedy@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| King & Spalding, LLP | H. Slayton Dabney, Jr. Bill Dimos | 1185 Avenue of the Americas | | New York | NY | 10036 | | 212-556-2100 | 212-556-2222 | sdabney@kslaw.com bdimos@kslaw.com | Counsel to KPMG LLP |
| Kirkland & Ellis LLP | Jim Stempel | 200 East Randolph Drive | | Chicago | IL | 60601 | | 312-861-2000 | 312-861-2200 | jstempel@kirkland.com | Counsel to Lunt Manufacturing Company |
| Kirkpatrick & Lockhart Nicholson Graham LLP | Edward M. Fox | 599 Lexington Avenue | | New York | NY | 10022 | | 212-536-4812 | 212-536-3901 | efox@klng.com | Counsel to Wilmington Trust Company, as Indenture trustee |
| Klett Rooney Lieber & Schorling | Eric L. Schnabel DeWitt Brown | The Brandywine Building | 1000 West Street, Suite 1410 | Wilmington | DE | 19801 | | (302) 552-4200 | | schnabel@klettrooney.com dbrown@klettrooney.com | Counsel to Entergy |
| Krugliak, Wilkins, Griffiths & Dougherty CO., L.P.A. | Sam O. Simmerman | 4775 Munson Street N.W. | P.O. Box 36963 | Canton | OH | 44735-6963 | | 330-497-0700 | 330-497-4020 | sosimmerman@kwgd.com | Counsel to for Millwood, Inc. |
| Kutak Rock LLP | Jay Selanders | 1010 Grand Blvd Ste 500 | | Kansas City | MO | 64106 | | 816-502-4617 | 816-960-0041 | jay.selanders@kutakrock.com | Counsel to DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrysler Canada, Inc. |
| Kutchin & Rufo, P.C. | Edward D. Kutchin | 155 Federal Street | 17th Floor | Boston | MA | 02110-1727 | | 617-542-3000 | 617-542-3001 | ekutchin@kutchinrufo.com | Counsel to Parlex Corporation |
| Kutchin & Rufo, P.C. | Kerry R. Northrup | 155 Federal Street | 17th Floor | Boston | MA | 02110-1727 | | 617-542-3000 | 617-542-3001 | knorthup@kutchinrufo.com | Counsel to Parlex Corporation |
| Lambert. Leser, Isackson, Cook & Guinta, P.C. | Susan M. Cook | 309 Davidson Building | PO Box 835 | Bay City | MI | 48707-0835 | | 989-893-3518 | | smcook@lambertleser.com | Counsel to Linamar Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 9 of 20

7/24/2007 9:37 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Latham & Watkins | Erika Ruiz | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | erika.ruiz@lw.com | UCC Professional |
| Latham & Watkins | Henry P. Baer, Jr. | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | henry.baer@lw.com | UCC Professional |
| Latham & Watkins | John W. Weiss | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | john.weiss@lw.com | UCC Professional |
| Latham & Watkins | Mark A. Broude | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1384 | 212-751-4864 | mark.broude@lw.com | UCC Professional |
| Latham & Watkins | Michael J. Riela | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | michael.riela@lw.com | UCC Professional |
| Latham & Watkins | Mitchell A. Seider | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | mitchell.seider@lw.com | UCC Professional |
| Law Offices of Michael O'Hayer | Michael O'Hayer Esq | 22 N Walnut Street | | West Chester | PA | 19380 | | 610-738-1230 | 610-738-1217 | mkohayer@aol.com | Counsel to A-1 Specialized Services and Supplies Inc |
| Lewis and Roca LLP | Rob Charles, Esq. | One South Church Street | Suite 700 | Tucson | AZ | 85701 | | 520-629-4427 | 520-879-4705 | rcharles@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Lewis and Roca LLP | Susan M. Freeman, Esq. | 40 North Central Avenue | Suite 1900 | Phoenix | AZ | 85004-4429 | | 602-262-5756 | 602-734-3824 | sfreeman@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Linear Technology Corporation | John England, Esq. | General Counsel for Linear Technology Corporation | 1630 McCarthy Blvd. | Milpitas | CA | 95035-7417 | | 408-432-1900 | 408-434-0507 | jengland@linear.com | Counsel to Linear Technology Corporation |
| Linebarger Goggan Blair & Sampson, LLP | Diane W. Sanders | 1949 South IH 35 (78741) | P.O. Box 17428 | Austin | TX | 78760-7428 | | 512-447-6675 | 512-443-5114 | austin.bankrptcy@publicans.com | Counsel to Cameron County, Brownsville ISD |
| Linebarger Goggan Blair & Sampson, LLP | Elizabeth Weller | 2323 Bryan Street | Suite 1600 | Dallas | TX | 75201 | | 214-880-0089 | 4692215002 | dallas.bankrptcy@publicans.com | Counsel to Dallas County and Tarrant County |
| Linebarger Goggan Blair & Sampson, LLP | John P. Dillman | P.O. Box 3064 | | Houston | TX | 77253-3064 | | 713-844-3478 | 713-844-3503 | houston_bankrptcy@publicans.com | Counsel in Charge for Taxing Authorities: Cypress-Fairbanks Independent School District, City of Houston, Harris County |
| Loeb & Loeb LLP | P. Gregory Schwed | 345 Park Avenue | | New York | NY | 10154-0037 | | 212-407-4000 | | gschwed@loeb.com | Counsel to Creditor The Interpublic Group of Companies, Inc. and Proposed Auditor Deloitte & Touche, LLP |
| Loeb & Loeb LLP | William M. Hawkins | 345 Park Avenue | | New York | NY | 10154 | | 212-407-4000 | 212-407-4990 | whawkins@loeb.com | Counsel to Industrial Ceramics Corporation |
| Lord, Bissel & Brook | Timothy S. McFadden | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-0370 | 312-896-6394 | tmcfadden@lordbissell.com | Counsel to Methode Electronics, Inc. |
| Lord, Bissel & Brook | Timothy W. Brink | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-1832 | 312-443-896-6432 | tbrink@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. |
| Lord, Bissel & Brook LLP | Kevin J. Walsh | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | | 212-947-8304 | 212-947-1202 | kwalsh@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| Lowenstein Sandler PC | Bruce S. Nathan | 1251 Avenue of the Americas | | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | bnathan@lowenstein.com | Counsel to Daewoo International (America) Corp. |
| Lowenstein Sandler PC | Ira M. Levee | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | ilevee@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Lowenstein Sandler PC | Kenneth A. Rosen | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | krosen@lowenstein.com | Counsel to Cerberus Capital Management, L.P. |
| Lowenstein Sandler PC | Michael S. Etkin | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | metkin@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 10 of 20

7/24/2007 9:37 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Lowenstein Sandler PC | Scott Cargill | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | scargill@lowenstein.com | Counsel to Cerberus Capital Management, L.P.; AT&T Corporation |
| Lowenstein Sandler PC | Vincent A. D'Agostino | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | vdagostino@lowenstein.com | Counsel to AT&T Corporation |
| Lyden, Liebenthal & Chappell, Ltd. | Erik G. Chappell | 5565 Airport Highway | Suite 101 | Toledo | OH | 43615 | | 419-867-8900 | 419-867-8909 | egc@lydenlaw.com | Counsel to Metro Fibres, Inc. |
| MacDonald, Illig, Jones & Britton LLP | Richard J. Parks | 100 State Street | | Erie | PA | 16507-1459 | | 814-870-7754 | 814-454-4647 | rparks@mijb.com | Counsel to Ideal Tool Company, Inc. |
| Maddin, Hauser, Wartell, Roth & Heller PC | Alexander Stotland Esq | 28400 Northwestern Hwy | Third Floor | Southfield | MI | 48034 | | 248-354-4030 | | axs@maddinhauser.com | Attorney for Danice Manufacturing Co. |
| Madison Capital Management | Joe Landen | 6143 South Willow Drive | Suite 200 | Greenwood Village | CO | 80111 | | 303-957-4254 | 303-957-2098 | jlanden@madisoncap.com | Representative for Madison Capital Management |
| Margulies & Levinson, LLP | Jeffrey M. Levinson, Esq. Leah M. Caplan, Esq. | 30100 Chagrin Boulevard | Suite 250 | Pepper Pike | OH | 44124 | | 216-514-4935 | 216-514-4936 | jml@ml-legal.com lmc@ml-legal.com | Counsel to Venture Plastics |
| Mastromarco & Jahn, P.C. | Victor J. Mastromarco, Jr. | 1024 North Michigan Avenue | P.O. Box 3197 | Saginaw | MI | 48605-3197 | | 989-752-1414 | | vmastromar@aol.com | Counsel to H.E. Services Company and Robert Backie and Counsel to Cindy Palmer, Personal Representative to the Estate of Michael Palmer |
| Masuda Funai Eifert & Mitchell, Ltd. | Gary D. Santella | 203 North LaSalle Street | Suite 2500 | Chicago | IL | 60601-1262 | | 312-245-7500 | 312-245-7467 | gsantella@masudafunai.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC and Hosiden America Corporation |
| Mayer, Brown, Rowe & Maw LLP | Jeffrey G. Tougas | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | jgtougas@mayerbrownrowe.com | Counsel to Bank of America, N.A. |
| Mayer, Brown, Rowe & Maw LLP | Raniero D'Aversa, Jr. | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | rdaversa@mayerbrown.com | Counsel to Bank of America, N.A. |
| McCarter & English, LLP | David J. Adler, Jr. Esq. | 245 Park Avenue, 27th Floor | | New York | NY | 10167 | | 212-609-6800 | 212-609-6921 | dadler@mccarter.com | Counsel to Ward Products, LLC |
| McCarter & English, LLP | Eduardo J. Glas, Esq. | Four Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4096 | | 913-622-4444 | 973-624-7070 | eglas@mccarter.com | Counsel to General Products Delaware Corporation |
| McCarthy Tetrault LLP | John J. Salmas Lorne P. Salzman | 66 Wellington Street West | Suite 4700 | Toronto | Ontario | M5K 1E6 | | 416-362-1812 | 416-868-0673 | jsalmas@mccarthy.ca lsalzman@mccarthy.ca | Counsel to Themselves (McCarthy Tetrault LLP) |
| McDermott Will & Emery LLP | James M. Sullivan | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5477 | 212-547-5444 | jmsullivan@mwe.com | Counsel to Linear Technology Corporation, National Semiconductor Corporation; Timken Corporation |
| McDermott Will & Emery LLP | Stephen B. Selbst | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5400 | 212-547-5444 | sselbst@mwe.com | Counsel to National Semiconductor Corporation |
| McDonald Hopkins Co., LPA | Scott N. Opincar, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sopincar@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McDonald Hopkins Co., LPA | Shawn M. Riley, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sriley@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McElroy, Deutsch, Mulvaney & Carpenter, LLP | Jeffrey Bernstein, Esq. | Three Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4079 | | 973-622-7711 | 973-622-5314 | jbernstein@mdmc-law.com | Counsel to New Jersey Self-Insurers Guaranty Association |
| McGuirewoods LLP | Aaron G McCollough Esq | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | | 804-775-1000 | 804-775-1061 | amccollough@mcguirewoods.com | Counsel to Siemens Energy & Automation, Inc. |

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Meyer, Suozzi, English & Klein, P.C. | Hanan Kolko | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | hkolko@msek.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Meyer, Suozzi, English & Klein, P.C. | Lowell Peterson, Esq. | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | lpeterson@msek.com | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Meyers, Rodbell & Rosenbaum, P.A. | M. Evan Meyers | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | emeyers@mrrlaw.net | Counsel to Prince George County, Maryland |
| Meyers, Rodbell & Rosenbaum, P.A. | Robert H. Rosenbaum | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | rrosenbaum@mrrlaw.net | Counsel to Prince George County, Maryland |
| Michael Cox | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | miag@michigan.gov | Attorney General for State of Michigan, Department of Treasury |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Dennis J. Raterink | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | raterinkd@michigan.gov | Assistant Attorney General for Worker's Compensation Agency |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Michael Cox | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | miag@michigan.gov | Attorney General for Worker's Compensation Agency |
| Michigan Heritage Bank | Janice M. Donahue | 28300 Orchard Lake Rd | Ste 200 | Farmington Hills | MI | 48334 | | 248-538-2529 | 248-786-3596 | jdonahue@miheritage.com | Counsel to  Michigan Heritage Bank; MHB Leasing, Inc. |
| Miles & Stockbridge, P.C. | Kerry Hopkins | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | 410-385-3700 | khopkins@milesstockbridge.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miles & Stockbridge, P.C. | Thomas D. Renda | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | 410-385-3700 | trenda@milesstockbridge.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miller Johnson | Thomas P. Sarb / Robert D. Wolford | 250 Monroe Avenue, N.W. | Suite 800, PO Box 306 | Grand Rapids | MI | 49501-0306 | | 616-831-1748 / 616-831-1726 | 616-988-1748 / 616-988-1726 | sarbt@millerjohnson.com / wolfordr@millerjohnson.com | Counsel to Pridgeon & Clay, Inc. |
| Miller, Canfield, Paddock and Stone, P.L.C. | Jonathan S. Green | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8452 | 313-496-7997 | greenj@millercanfield.com | Counsel to Wells Operating Partnership, LP |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 12 of 20

7/24/2007 9:37 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Miller, Canfield, Paddock and Stone, P.L.C. | Timothy A. Fusco | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8435 | 313-496-8453 | fusco@millercanfield.com | Counsel to Niles USA Inc.; Techcentral, LLC; The Bartech Group, Inc.; Fischer Automotive Systems |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Paul J. Ricotta | One Financial Center | | Boston | MA | 02111 | | 617-542-6000 | 617-542-2241 | pjricotta@mintz.com | Counsel to Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Stephanie K. Hoos | The Chrysler Center | 666 Third Avenue | New York | NY | 10017 | | 212-935-3000 | 212-983-3115 | skhoos@mintz.com | Counsel of Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Molex Connector Corp | Jeff Ott | 2222 Wellington Ct. | | Lisle | IL | 60532 | | 630-527-4254 | 630-512-8610 | Jeff.Ott@molex.com | Counsel to Molex Connector Corp |
| Morgan, Lewis & Bockius LLP | Andrew D. Gottfried | 101 Park Avenue | | New York | NY | 10178-0060 | | 212-309-6000 | 212-309-6001 | agottfried@morganlewis.com | Counsel to ITT Industries, Inc.; Hitachi Chemical (Singapore), Ltd. |
| Morgan, Lewis & Bockius LLP | Menachem O. Zelmanovitz | 101 Park Avenue | | New York | NY | 10178 | | 212-309-6000 | 212-309-6001 | mzelmanovitz@morganlewis.com | Counsel to Hitachi Chemical (Singapore) Pte, Ltd. |
| Morgan, Lewis & Bockius LLP | Richard W. Esterkin, Esq. | 300 South Grand Avenue | | Los Angeles | CA | 90017 | | 213-612-1163 | 213-612-2501 | resterkin@morganlewis.com | Counsel to Sumitomo Corporation |
| Moritt Hock Hamroff & Horowitz LLP | Leslie Ann Berkoff | 400 Garden City Plaza | | Garden City | NY | 11530 | | 516-873-2000 | | lberkoff@moritthock.com | Counsel to Standard Microsystems Corporation and its direct and indirect subsidiaries Oasis SiliconSystems AG and SMSC NA Automotive, LLC (successor-in-interst to Oasis Silicon Systems, Inc.) |
| Morrison Cohen LLP | Michael R. Dal Lago | 909 Third Avenue | | New York | NY | 10022 | | 212-735-8757 | 917-522-3157 | mdallago@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Munsch Hardt Kopf & Harr, P.C. | Raymond J. Urbanik, Esq., Joseph J. Wielebinski, Esq. and Davor Rukavina, Esq. | 3800 Lincoln Plaza | 500 North Akard Street | Dallas | RX | 75201-6659 | | 214-855-7590 214-855-7561 214-855-7587 | 214-855-7584 | rurbanik@munsch.com jwielebinski@munsch.com drukavina@munsch.com | Counsel to Texas Instruments Incorporated |
| Nantz, Litowich, Smith, Girard & Hamilton, P.C. | Sandra S. Hamilton | 2025 East Beltline, S.E. | Suite 600 | Grand Rapids | MI | 49546 | | 616-977-0077 | 616-977-0529 | sandy@nlsg.com | Counsel to Lankfer Diversified Industries, Inc. |
| Nathan, Neuman & Nathan, P.C. | Kenneth A. Nathan | 29100 Northwestern Highway | Suite 260 | Southfield | MI | 48034 | | 248-351-0099 | 248-351-0487 | Knathan@nathanneuman.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| National City Commercial Capital | Lisa M. Moore | 995 Dalton Avenue | | Cincinnati | OH | 45203 | | 513-455-2390 | 866-298-4481 | lisa.moore2@nationalcity.com | Vice President and Senior Counsel to National City Commercial Capital |
| Nelson Mullins Riley & Scarborough | George B. Cauthen | 1320 Main Street, 17th Floor | PO Box 11070 | Columbia | SC | 29201 | | 803-7255-9425 | 803-256-7500 | george.cauthen@nelsonmullins.com | Counsel to Datwyler Rubber & Plastics, Inc.; Datwyler, Inc.; Datwyler i/o devices (Americas), Inc.; Rothrist Tube (USA), Inc. |
| New Jersey Attorney General's Office Division of Law | Tracy E Richardson Deputy Attorney General | R.J. Hughes Justice Complex | 25 Market St P.O. Box 106 | Trenton | NJ | 08628-0106 | | 609-292-1537 | 609-777-3055 | tracy.richardson@dol.lps.state.nj.us | Deputy Attorney General - State of New Jersey Division of Taxation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 13 of 20

7/24/2007 9:37 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Nix, Patterson & Roach, L.L.P. | Bradley E. Beckworth | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | bbeckworth@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Nix, Patterson & Roach, L.L.P. | Jeffrey J. Angelovich | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | jangelovich@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Nix, Patterson & Roach, L.L.P. | Susan Whatley | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | susanwhatley@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| North Point | David G. Heiman | 901 Lakeside Avenue | | Cleveland | OH | 44114 | | 216-586-3939 | 216-579-0212 | dgheiman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Office of the Chapter 13 Trustee | Camille Hope | P.O. Box 954 | | Macon | GA | 31202 | | 478-742-8706 | 478-746-4488 | cahope@chapter13macon.com | Office of the Chapter 13 Trustee |
| Office of the Texas Attorney General | Jay W. Hurst | P.O. Box 12548 | | Austin | TX | 78711-2548 | | 512-475-4861 | 512-482-8341 | jay.hurst@oag.state.tx.us | Counsel to The Texas Comptroller of Public Accounts |
| Orbotech, Inc. | Michael M. Zizza, Legal Manager | 44 Manning Road | | Billerica | MA | 01821 | | 978-901-5025 | 978-667-9969 | michaelz@orbotech.com | Company |
| Orrick, Herrington & Sutcliffe LLP | Alyssa Englund, Esq. | 666 Fifth Avenue | | New York | NY | 10103 | | 212-506-5187 | 212-506-5151 | aenglund@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Frederick D. Holden, Jr., Esq. | 405 Howard Street | | San Francisco | CA | 94105 | | 415-773-5700 | 415-773-5759 | fholden@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Jonathan P. Guy | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | jguy@orrick.com | Counsel to Westwood Associates, Inc. |
| Orrick, Herrington & Sutcliffe LLP | Richard H. Wyron | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | rwyron@orrick.com | Counsel to Westwood Associates, Inc. |
| Pachulski Stang Ziehl Young Jones & Weintraub LLP | Michael R. Seidl | 919 N. Market Street, 17th Floor | P.O. Box 8705 | Wilmington | DE | 19899-8705 | | 302-652-4100 | 302- 652-4400 | mseidl@pszyjw.com | Counsel for Essex Group, Inc. |
| Pachulski Stang Ziehl Young Jones & Weintraub LLP | William P. Weintraub | 780 Third Avenue, 36th Floor | | New York | NY | 10017-2024 | | 212-561-7700 | 212-561-7777 | wweintraub@pszyjw.com | Counsel for Essex Group, Inc. |
| Paul, Weiss, Rifkind, Wharton & Garrison | Andrew N. Rosenberg Justin G. Brass | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | arosenberg@paulweiss.com jbrass@paulweiss.com | Counsel to Merrill Lynch, Pierce, Fenner & Smith, Incorporated |
| Paul, Weiss, Rifkind, Wharton & Garrison | Douglas R. Davis | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | ddavis@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Elizabeth R. McColm | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | emccolm@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Stephen J. Shimshak | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3133 | 212-373-2136 | sshimshak@paulweiss.com | Counsel to Ambrake Corporation |
| | Peggy Housner | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | housnerp@michigan.gov | Assistant Attorney General for State of Michigan, Department of Treasury |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pepe & Hazard LLP | Kristin B. Mayhew | 30 Jelliff Lane | | Southport | CT | 06890-1436 | | 203-319-4022 | 203-259-0251 | kmayhew@pepehazard.com | Counsel for Illinois Tool Works Inc., Illinois Tool Works for Hobart Brothers Co., Hobart Brothers Company, ITW Food Equipment Group LLC and Tri-Mark, Inc. |
| Pepper, Hamilton LLP | Anne Marie Aaronson | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | aaronsona@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pepper, Hamilton LLP | Francis J. Lawall | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | lawallf@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pepper, Hamilton LLP | Henry Jaffe | 1313 Market Street | PO Box 1709 | Wilmington | DE | 19899-1709 | | 302-777-6500 | 302-421-8390 | jaffeh@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pepper, Hamilton LLP | Linda J. Casey | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | caseyl@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pierce Atwood LLP | Jacob A. Manheimer | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | jmanheimer@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p.A. |
| Pierce Atwood LLP | Keith J. Cunningham | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | kcunningham@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p.A. |
| Pillsbury Winthrop Shaw Pittman LLP | Karen B. Dine | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | karen.dine@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Margot P. Erlich | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | margot.erlich@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Mark D. Houle | 650 Town Center Drive | Ste 550 | Costa Mesa | CA | 92626-7122 | | 714-436-6800 | 714-436-2800 | mark.houle@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Richard L. Epling | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | richard.epling@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Robin L. Spear | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | robin.spear@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Porzio, Bromberg & Newman, P.C. | Brett S. Moore, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | bsmoore@pbnlaw.com | |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 15 of 20

7/24/2007 9:37 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Porzio, Bromberg & Newman, P.C. | John S. Mairo, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | jsmairo@pbnlaw.com | Counsel to Neuman Aluminum Automotive, Inc. and Neuman Aluminum Impact Extrusion, Inc. |
| Previant, Goldberg, Uelman, Gratz, Miller & Brueggeman, S.C. | Jill M. Hartley and Marianne G. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | jh@previant.com mgr@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| PriceWaterHouseCoopers | Enrique Bujidos | Almagro | 40 | Madrid | | 28010 | Spain | 34 915 684 356 | | enrique.bujidos@es.pwc.com | Representative to DASE |
| QAD, Inc. | Jason Pickering, Esq. | 10,000 Midlantic Drive | | Mt. Laurel | NJ | 08054 | | 856-840-2489 | 856-840-2740 | jkp@qad.com | Counsel to QAD, Inc. |
| Quadrangle Debt Recovery Advisors LLC | Andrew Herenstein | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1742 | 866-741-2505 | andrew.herenstein@quadrangl egroup.com | Counsel to Quadrangle Debt Recovery Advisors LLC |
| Quadrangle Group LLC | Patrick Bartels | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1748 | 866-552-2052 | patrick.bartels@quadranglegro up.com | Counsel to Quadrangle Group LLC |
| Quarles & Brady Streich Lang LLP | John A. Harris | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | jharris@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Quarles & Brady Streich Lang LLP | Kasey C. Nye | One South Church Street | | Tucson | AZ | 85701 | | 520-770-8717 | 520-770-2203 | knye@quarles.com | Counsel to Offshore International, Inc.; Maquilas Teta Kawi, S.A. de C.V.; On Semiconductor Corporation |
| Quarles & Brady Streich Lang LLP | Scott R. Goldberg | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | sgoldber@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Reed Smith | Elena Lazarou | 599 Lexington Avenue | 29th Street | New York | NY | 10022 | | 212-521-5400 | 212-521-5450 | elazarou@reedsmith.com | Counsel to General Electric Capital Corporation, Stategic Asset Finance. |
| Reed Smith | Richard P. Norton | One Riverfront Plaza | 1st Floor | Newark | NJ | 07102 | | 973-621-3200 | 973-621-3199 | rnorton@reedsmith.com | Counsel to Jason Incorporated, Sackner Products Division |
| Riddell Williams P.S. | Joseph E. Shickich, Jr. | 1001 4th Ave. | Suite 4500 | Seattle | WA | 98154-1195 | | 206-624-3600 | 206-389-1708 | jshickich@riddellwilliams.com | Counsel to Microsoft Corporation; Microsoft Licensing, GP |
| Rieck and Crotty PC | Jerome F Crotty | 55 West Monroe Street | Suite 3390 | Chicago | IL | 60603 | | 312-726-4646 | 312-726-0647 | jcrotty@rieckcrotty.com | Counsel to Mary P. O'Neill and Liam P. O'Neill |
| Riemer & Braunstein LLP | Mark S. Scott | Three Center Plaza | | Boston | MA | 02108 | | 617-523-9000 | 617-880-3456 | mscott@riemerlaw.com | Counsel to ICX Corporation |
| Riverside Claims LLC | Holly Rogers | 2109 Broadway | Suite 206 | New York | NY | 10023 | | 212-501-0990 | 212-501-7088 | holly@regencap.com | Riverside Claims LLC |
| Robinson, McFadden & Moore, P.C. | Annemarie B. Mathews | P.O. Box 944 | | Columbia | SC | 29202 | | 803-779-8900 | 803-771-9411 | amathews@robinsonlaw.com | Counsel to Blue Cross Blue Shield of South Carolina |
| Ropes & Gray LLP | Gregory O. Kaden | One International Place | | Boston | MA | 02110-2624 | | 617-951-7000 | 617-951-7050 | gregory.kaden@ropesgray.co m | Attorneys for D-J, Inc. |
| Ropes & Gray LLP | Marc E. Hirschfield | 45 Rockefeller Plaza | | New York | NY | 10111-0087 | | 212-841-5700 | 212-841-5725 | marc.hirschfield@ropesgray.co m | Attorneys for D-J, Inc. |
| Rosen Slome Marder LLP | Thomas R. Slome | 333 Earle Ovington Boulevard | Suite 901 | Uniondale | NY | 11533 | | 516-227-1600 | | tslome@rsmllp.com | Counsel to JAE Electronics, Inc. |
| Russell Reynolds Associates, Inc. | Charles E. Boulbol, P.C. | 26 Broadway, 17th Floor | | New York | NY | 10004 | | 212-825-9457 | 212-825-9414 | rtrack@msn.com | Counsel to Russell Reynolds Associates, Inc. |
| Sachnoff & Weaver, Ltd | Charles S. Schulman | 10 South Wacker Drive | 40th Floor | Chicago | IL | 60606 | | 312-207-1000 | 312-207-6400 | agelman@sachnoff.com | Counsel to Infineon Technologies North America Corporation |
| Satterlee Stephens Burke & Burke LLP | Christopher R. Belmonte | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | cbelmonte@ssbb.com | Counsel to Moody's Investors Service |
| Satterlee Stephens Burke & Burke LLP | Pamela A. Bosswick | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | pbosswick@ssbb.com | Counsel to Moody's Investors Service |
| Schafer and Weiner PLLC | Daniel Weiner | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | dweiner@schaferandweiner.co m | Counsel to Dott Industries, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 16 of 20

7/24/2007 9:37 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Schafer and Weiner PLLC | Howard Borin | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | hborin@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Ryan Heilman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | rheilman@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schiff Hardin LLP | Eugene J. Geekie, Jr. | 7500 Sears Tower | | Chicago | IL | 60606 | | 312-258-5635 | 312-258-5600 | egeekie@schiffhardin.com | Counsel to  Means Industries |
| Schiffrin & Barroway, LLP | Michael Yarnoff | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7056 | 610-667-7706 | myarnoff@sbclasslaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Schiffrin & Barroway, LLP | Sean M. Handler | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7706 | 610-667-7056 | shandler@sbclasslaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Schulte Roth & Sabel LLP | James T. Bentley | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2273 | 212-593-5955 | james.bentley@srz.com | Counsel to Panasonic Automotive Systems Company of America |
| Schulte Roth & Sabel LLP | Michael L. Cook | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | michael.cook@srz.com | Counsel to Panasonic Automotive Systems Company of America; D.C. Capital Partners, L.P. |
| Schulte Roth & Zabel LLP | Carol Weiner Levy | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | carol.weiner.levy@srz.com | Counsel to D.C. Capital Partners, L.P. |
| Seyfarth Shaw LLP | Paul M. Baisier, Esq. | 1545 Peachtree Street, N.E. | Suite 700 | Atlanta | GA | 30309-2401 | | 404-885-1500 | 404-892-7056 | pbaisier@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | Robert W. Dremluk, Esq. | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | | 212-218-5500 | 212-218-5526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | William J. Hanlon | World Trade Center East | Two Seaport Lane, Suite 300 | Boston | MA | 02210 | | 617-946-4800 | 617-946-4801 | whanlon@seyfarth.com | Counsel to le Belier/LBQ Foundry S.A. de C.V. |
| Sheehan Phinney Bass + Green Professional Association | Bruce A. Harwood | 1000 Elm Street | P.O. Box 3701 | Manchester | NH | 03105-3701 | | 603-627-8139 | 603-627-8121 | bharwood@sheehan.com | Counsel to Source Electronics, Inc. |
| Sheldon S. Toll PLLC | Sheldon S. Toll | 2000 Town Center | Suite 2550 | Southfield | MI | 48075 | | 248-358-2460 | 248-358-2740 | lawtoll@comcast.net | Counsel to Milwaukee Investment Company |
| Sheppard Mullin Richter & Hampton LLP | Eric Waters | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | 212-332-3888 | ewaters@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Malani J. Sternstein | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | 212-332-3888 | msternstein@sheppardmullin.com | Counsel to International Rectifier Corp. and Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theodore A. Cohen | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | 213-620-1398 | tcohen@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theresa Wardle | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | 213-620-1398 | twardle@sheppardmullin.com | Counsel to International Rectifier Corp. |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 5353 Essen Lane | Suite 650 | Baton Rouge | LA | 70809 | | 225-757-2185 | 225-757-7674 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 909 Poydras Street | 28th Floor | New Orleans | LA | 70112-1033 | | 504-299-2100 | 504-299-2300 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Sills, Cummis Epstein & Gross, P.C. | Andrew H. Sherman | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | asherman@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |
| Sills, Cummis Epstein & Gross, P.C. | Jack M. Zackin | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | jzackin@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 17 of 20

7/24/2007 9:37 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Sills, Cummis Epstein & Gross, P.C. | Valerie A Hamilton Simon Kimmelman | 650 College Rd E | | Princeton | NJ | 08540 | | 609-227-4600 | 609-227-4646 | vhamilton@sillscummis.com skimmelman@sillscummis.com | Counsel to Doosan Infracore America Corp. |
| Silver Point Capital, L.P. | Chaim J. Fortgang | Two Greenwich Plaza | 1st Floor | Greenwich | CT | 06830 | | 203-542-4216 | 203-542-4100 | cfortgang@silverpointcapital.com | Counsel to Silver Point Capital, L.P. |
| Smith, Gambrell & Russell, LLP | Barbara Ellis-Monro | 1230 Peachtree Street, N.E. | Suite 3100 | Atlanta | GA | 30309 | | 404-815-3500 | 404-815-3500 | bellis-monro@sgrlaw.com | Counsel to Southwire Company |
| Smith, Katzenstein & Furlow LLP | Kathleen M. Miller | 800 Delaware Avenue, 7th Floor | P.O. Box 410 | Wilmington | DE | 19899 | | 302-652-8400 | 3026528405 | kmiller@skfdelaware.com | Counsel to Airgas, Inc. |
| Sonnenschein Nath & Rosenthal LLP | D. Farrington Yates | 1221 Avenue of the Americas | 24th Floor | New York | NY | 10020 | | 212-768-6700 | 212-768-6800 | fyates@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc. and United Plastics Group |
| Sonnenschein Nath & Rosenthal LLP | Monika J. Machen | 8000 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | 312-876-7934 | mmachen@sonnenschein.com | Counsel to United Plastics Group |
| Sonnenschein Nath & Rosenthal LLP | Robert E. Richards | 8000 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | 312-876-7934 | rrichards@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc. |
| Squire, Sanders & Dempsey L.L.P. | Eric Marcks | One Maritime Plaza | Suite 300 | San Francisco | CA | 94111-3492 | | | 415-393-9887 | emarcks@ssd.com | Counsel to Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| Squire, Sanders & Dempsey L.L.P. | Penn Ayers Butler | 600 Hansen Way | | Palo Alto | CA | 94304 | | 650-856-6500 | 650-843-8777 | pabutler@ssd.com | Counsel to Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| State of California Office of the Attorney General | Sarah E. Morrison | Deputy Attorney General | 300 South Spring Street Ste 1702 | Los Angeles | CA | 90013 | | 213-897-2640 | 213-897-2802 | sarah.morrison@doj.ca.gov | Attorneys for the State of California Department of Toxic Substances Control |
| State of Michigan Department of Labor & Economic Growth, Unemployment Insurance Agency | Roland Hwang Assistant Attorney General | 3030 W. Grand Boulevard | Suite 9-600 | Detroit | MI | 48202 | | 313-456-2210 | 313-456-2201 | hwangr@michigan.gov | Assistant Attorney General for State of Michigan, Unemployment Tax Office of the Department of Labor & Economic Growth, Unemployment Insurance Agency |
| Steel Technologies, Inc. | John M. Baumann | 15415 Shelbyville Road | | Louisville | KY | 40245 | | 502-245-0322 | 502-245-0542 | jmbaumann@steeltechnologies.com | Counsel to Steel Technologies, Inc. |
| Stein, Rudser, Cohen & Magid LLP | Robert F. Kidd | 825 Washington Street | Suite 200 | Oakland | CA | 94607 | | 510-287-2365 | 510-987-8333 | rkidd@srcm-law.com | Counsel to Excel Global Logistics, Inc. |
| Steinberg Shapiro & Clark | Mark H. Shapiro | 24901 Northwestern Highway | Suite 611 | Southfield | MI | 48075 | | 248-352-4700 | 248-352-4488 | shapiro@steinbergshapiro.com | Counsel to Bing Metals Group, Inc.; Central Transport International, Inc.; Crown Enerprises, Inc.; Economy Transport, Inc.; Logistics Insight Corp (LINC); Universal Am-Can, Ltd.; Universal Truckload Services, Inc. |
| Sterns & Weinroth, P.C. | Jeffrey S. Posta Michael A Spero Simon Kimmelman Valerie A Hamilton | 50 West State Street, Suite 1400 | PO Box 1298 | Trenton | NJ | 08607-1298 | | 609-392-2100 | 609-392-7956 | jposta@sternslaw.com jspecf@sternslaw.com | Counsel to Doosan Infracore America Corp. |
| Stevens & Lee, P.C. | Chester B. Salomon, Esq. Constantine D. Pourakis, Esq. | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | | 212-319-8500 | 212-319-8505 | cs@stevenslee.com cp@stevenslee.com | Counsel to Tonolli Canada Ltd.; VJ Technologies, Inc. and V.J. ElectroniX, Inc. |
| Stinson Morrison Hecker LLP | Mark A. Shaiken | 1201 Walnut Street | | Kansas City | MO | 64106 | | 816-842-8600 | 816-691-3495 | mshaiken@stinsonmoheck.com | Counsel to Thyssenkrupp Waupaca, Inc. and Thyssenkrupp Stahl Company |
| Stites & Harbison PLLC | Madison L.Cashman | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | robert.goodrich@stites.com | Counsel to Setech, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 18 of 20

7/24/2007 9:37 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Stites & Harbison PLLC | Robert C. Goodrich, Jr. | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | madison.cashman@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison, PLLC | W. Robinson Beard, Esq. | 400 West Market Street | | Louisville | KY | 40202 | | 502-681-0448 | 502-779-8274 | wbeard@stites.com | Counsel to WAKO Electronics (USA), Inc. and Ambrake Corporation |
| Stroock & Stroock & Lavan, LLP | Kristopher M. Hansen | 180 Maiden Lane | | New York | NY | 10038 | | 212-806-5400 | 212-806-6006 | khansen@stroock.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| Taft, Stettinius & Hollister LLP | Richard L .Ferrell | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202-3957 | | 513-381-2838 | | ferrell@taftlaw.com | Counsel to Wren Industries, Inc. |
| Taft, Stettinius & Hollister LLP | W Timothy Miller Esq | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202 | | 513-381-2838 | 513-381-0205 | miller@taftlaw.com | Counsel to Select Industries Corporation and Gobar Systems, Inc. |
| Tennessee Department of Revenue | Marvin E. Clements, Jr. | c/o TN Attorney General's Office, Bankruptcy Division | PO Box 20207 | Nashville | TN | 37202-0207 | | 615-532-2504 | 615-741-3334 | marvin.clements@state.tn.us | Tennesse Department of Revenue |
| Terra Law LLP | David B. Draper | 60 S. Market Street | Suite 200 | San Jose | CA | 95113 | | 408-299-1200 | 408-998-4895 | ddraper@terra-law.com | Counsel to Maxim Integrated Products, Inc. |
| Thacher Proffitt & Wood LLP | Jonathan D. Forstot | Two World Financial Center | | New York | NY | 10281 | | 212-912-7679 | 212-912-7751 | jforstot@tpw.com | Counsel to TT Electronics, Plc |
| Thacher Proffitt & Wood LLP | Louis A. Curcio | Two World Financial Center | | New York | NY | 10281 | | 212-912-7607 | 212-912-7751 | lcurcio@tpw.com | Counsel to TT Electronics, Plc |
| The Furukawa Electric Co., Ltd. | Mr. Tetsuhiro Niizeki | 6-1 Marunouchi | 2-Chrome, Chiyoda-ku | Tokyo | Japan | 100-8322 | | | 81-3-3286-3919 | niizeki.tetsuhiro@furukawa.co.jp | The Furukawa Electric Co., Ltd. |
| The Timpken Corporation BIC - 08 | Robert Morris | 1835 Dueber Ave. SW | PO Box 6927 | Canton | OH | 44706-0927 | | 330-438-3000 | 1-330-471-4388 | robert.morris@timken.com | Legal Department of The Timken Corporation Representative for Timken Corporation |
| Thelen Reid Brown Raysman & Steiner LLP | David A. Lowenthal | 875 Third Avenue | | New York | NY | 10022 | | 212-603-2000 | 212-603-2001 | dlowenthal@thelenreid.com | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Corporation and Oki Semiconductor Company |
| Thompson & Knight | Rhett G. Cambell | 333 Clay Street | Suite 3300 | Houston | TX | 77002 | | 713-654-1871 | 713-654-1871 | rhett.campbell@tklaw.com | Counsel to STMicroelectronics, Inc. |
| Thompson & Knight LLP | Ira L. Herman | 919 Third Avenue | 39th Floor | New York | NY | 10022-3915 | | 212-751-3045 | 214-999-9139 | ira.herman@tklaw.com | Counsel to Victory Packaging |
| Thompson & Knight LLP | John S. Brannon | 1700 Pacific Avenue | Suite 3300 | Dallas | TX | 75201-4693 | | 214-969-1505 | 214-969-1609 | john.brannon@tklaw.com | Counsel to Victory Packaging |
| Thurman & Phillips, P.C. | Ed Phillips, Jr. | 8000 IH 10 West | Suite 1000 | San Antonio | TX | 78230 | | 210-341-2020 | 210-344-6460 | ephillips@thurman-phillips.com | Counsel to Royberg, Inc. d/b/a Precision Mold & Tool and d/b/a Precision Mold and Tool Group |
| Todd & Levi, LLP | Jill Levi, Esq. | 444 Madison Avenue | Suite 1202 | New York | NY | 10022 | | 212-308-7400 | | jlevi@toddlevi.com | Counsel to Bank of Lincolnwood |
| Tyler, Cooper & Alcorn, LLP | W. Joe Wilson | City Place | 35th Floor | Hartford | CT | 06103-3488 | | 860-725-6200 | 860-278-3802 | jwilson@tylercooper.com | Counsel to Barnes Group, Inc. |
| Underberg & Kessler, LLP | Helen Zamboni | 300 Bausch & Lomb Place | | Rochester | NY | 14604 | | 585-258-2800 | 585-258-2821 | hzamboni@underbergkessler.com | Counsel to McAlpin Industries, Inc. |
| Union Pacific Railroad Company | Mary Ann Kilgore | 1400 Douglas Street | MC 1580 | Omaha | NE | 68179 | | 402-544-4195 | 402-501-0127 | mkilgore@UP.com | Counsel to Union Pacific Railroad Company |
| Varnum, Riddering, Schmidt & Howlett LLP | Michael S. McElwee | Bridgewater Place | P.O. Box 352 | Grand Rapids | MI | 49501-0352 | | 616-336-6827 | 616-336-7000 | msmcelwee@varnumlaw.com | Counsel to Furukawa Electric North America APD and Co-Counsel to Tower Automotive, Inc. |
| Wachtell, Lipton, Rosen & Katz | Emil A. Kleinhaus | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | EAKleinhaus@wlrk.com | Counsel to Capital Research and Management Company |
| Wachtell, Lipton, Rosen & Katz | Richard G. Mason | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | RGMason@wlrk.com | Counsel to Capital Research and Management Company |
| Waller Lansden Dortch & Davis, PLLC | David E. Lemke, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | david.lemke@wallerlaw.com | Counsel to Nissan North America, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 19 of 20

7/24/2007 9:37 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Waller Lansden Dortch & Davis, PLLC | Robert J. Welhoelter, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | robert.welhoelter@wallerlaw.com | Counsel to Nissan North America, Inc. |
| Warner Norcross & Judd LLP | Gordon J. Toering | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2185 | 616-222-2185 | gtoering@wnj.com | Counsel to Robert Bosch Corporation |
| Warner Norcross & Judd LLP | Michael G. Cruse | 2000 Town Center | Suite 2700 | Southfield | MI | 48075 | | 248-784-5131 | 248-603-9631 | mcruse@wnj.com | Counsel to Compuware Corporation |
| Warner Norcross & Judd LLP | Stephen B. Grow | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2158 | | growsb@wnj.com | Counsel to Behr Industries Corp. |
| Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP | Lei Lei Wang Ekvall | 650 Town Center Drive | Suite 950 | Costa Mesa | CA | 92626 | | 714-966-1000 | 714-966-1002 | lekvall@wgllp.com | Counsel to Toshiba America Electronic Components, Inc. |
| Weinstein, Eisen & Weiss LLP | Aram Ordubegian | 1925 Century Park East | #1150 | Los Angeles | CA | 90067 | | 310-203-9393 | 310-203-8110 | aordubegian@weineisen.com | Counsel to Orbotech, Inc. |
| Weltman, Weinberg & Reis Co., L.P.A. | Geoffrey J. Peters | 175 South Third Street | Suite 900 | Columbus | OH | 43215 | | 614-857-4326 | 614-222-2193 | gpeters@weltman.com | Counsel to Seven Seventeen Credit Union |
| White & Case LLP | Glenn Kurtz Gerard Uzzi Douglas Baumstein | 1155 Avenue of the Americas | | New York | NY | 10036-2787 | | 212-819-8200 | | gkurtz@ny.whitecase.com guzzi@whitecase.com dbaumstein@ny.whitecase.com | Counsel to Appaloosa Management, LP |
| White & Case LLP | Thomas Lauria Frank Eaton | Wachovia Financial Center | 200 South Biscayne Blvd., Suite 4900 | Miami | FL | 33131 | | 305-371-2700 | 305-358-5744 | tlauria@whitecase.com featon@miami.whitecase.com | Counsel to Appaloosa Management, LP |
| Whyte, Hirschboeck Dudek S.C. | Bruce G. Arnold | 555 East Wells Street | Suite 1900 | Milwaukee | WI | 53202-4894 | | 414-273-2100 | 414-223-5000 | barnold@whdlaw.com | Counsel to Schunk Graphite Technology |
| Winstead Sechrest & Minick P.C. | R. Michael Farquhar | 5400 Renaissance Tower | 1201 Elm Street | Dallas | TX | 75270 | | 214-745-5400 | 214-745-5390 | mfarquhar@winstead.com | Counsel to National Instruments Corporation |
| Winthrop Couchot Professional Corporation | Marc. J. Winthrop | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | mwinthrop@winthropcouchot.com | Counsel to Metal Surfaces, Inc. |
| Winthrop Couchot Professional Corporation | Sean A. O'Keefe | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | sokeefe@winthropcouchot.com | Counsel to Metal Surfaces, Inc. |
| Womble Carlyle Sandridge & Rice, PLLC | Lillian H. Pinto | 300 North Greene Street | Suite 1900 | Greensboro | NC | 27402 | | 336-574-8058 | 336-574-4528 | lpinto@wcsr.com | Counsel to Armacell |
| Zeichner Ellman & Krause LLP | Peter Janovsky | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | pjanovsky@zeklaw.com | Counsel to Toyota Tsusho America, Inc. and Karl Kufner, KG aka Karl Kuefner, KG |
| Zeichner Ellman & Krause LLP | Stuart Krause | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | skrause@zeklaw.com | Counsel to Toyota Tsusho America, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 20 of 20

7/24/2007 9:37 PM
Email

# EXHIBIT C

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| Airgas, Inc. | David Boyle | 259 Radnor-Chester Road, Suite 100 | P.O. Box 6675 | Radnor | PA | 19087-8675 | 610-230-3064 | Counsel to Airgas, Inc. |
| Akebono Corporation (North America) | Alan Swiech | 34385 Twelve Mile Road | | Farminton Hills | MI | 48331 | 248-489-7406 | Vice President of Administration for Akebono Corporation |
| APS Clearing, Inc. | Andy Leinhoff Matthew Hamilton | 1301 S. Capital of Texas Highway | Suite B-220 | Austin | TX | 78746 | 512-314-4416 | Counsel to APS Clearing, Inc. |
| Berry Moorman P.C. | James P. Murphy | 535 Griswold | Suite 1900 | Detroit | MI | 48226 | 313-496-1200 | Counsel to Kamax L.P.; Optrex America, Inc. |
| Bingham McHale LLP | Michael J Alerding | 10 West Market Street | Suite 2700 | Indianapolis | IN | 46204 | 317-635-8900 | Counsel to Universal Tool & Engineering co., Inc. and M.G. Corporation |
| Cage Williams & Abelman, P.C. | Steven E. Abelman | 1433 Seventeenth Street | | Denver | CO | 80202 | 303-295-0202 | Counsel to United Power, Inc. |
| Colbert & Winstead, P.C. | Amy Wood Malone | 1812 Broadway | | Nashville | TN | 37203 | 615-321-0555 | Counsel to Averitt Express, Inc. |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Steven M. Wachstein | 33 West First Street | Suite 600 | Dayton | OH | 45402 | 937-223-8177 | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | Andrew M. Thau | 101 Park Avenue | | New York | NY | 10178-0061 | 212-696-8898 | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | David S. Karp | 101 Park Avenue | | New York | NY | 10178-0061 | 212-696-6065 | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co. |
| DaimlerChrysler Corporation | Kim Kolb | CIMS 485-13-32 | 1000 Chrysler Drive | Auburn Hills | MI | 48326-2766 | 248-576-5741 | Counsel to DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrysler Canada, Inc. |
| DiConza Law, P.C. | Gerard DiConza, Esq. | 630 Third Avenue, 7th Floor | | New York | NY | 10017 | 212-682-4940 | Counsel to Tyz-All Plastics, Inc.; Furukawa Electric North America APD; and Co-Counsel to Tower Automotive, Inc. |
| Dykema Gossett PLLC | Gregory J. Jordan | 10 Wacker | Suite 2300 | Chicago | IL | 60606 | 312-627-2171 | Counsel to Tremont City Barrel Fill PRP Group |
| Fagel Haber LLC | Gary E. Green | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | 312-346-7500 | Counsel to Aluminum International, Inc. |
| Genovese Joblove & Battista, P.A. | Craig P. Rieders, Esq. | 100 S.E. 2nd Street | Suite 4400 | Miami | FL | 33131 | 305-349-2300 | Counsel to Ryder Integrated Logistics, Inc. |
| Grant & Eisenhofer P.A. | Geoffrey C. Jarvis | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | 302-622-7000 | Counsel to Teachers Retirement System of Oklahoma; Public Employes's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 3

7/24/2007 9:36 PM
US MAIL

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| Heller Ehrman LLP | Carren Shulman | Times Square Tower | Seven Times Square | New York | NY | 10036 | 212-832-8300 | Counsel to @Road, Inc. |
| Hunter & Schank Co. LPA | John J. Hunter | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | 419-255-4300 | Counsel to ZF Group North America Operations, Inc. |
| Hunter & Schank Co. LPA | Thomas J. Schank | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | 419-255-4300 | Counsel to ZF Group North America Operations, Inc. |
| Jason, Inc. | Beth Klimczak, General Counsel | 411 E. Wisconsin Ave | Suite 2120 | Milwaukee | WI | 53202 | | General Counsel to Jason Incorporated |
| Johnston, Harris Gerde & Komarek, P.A. | Jerry W. Gerde, Esq. | 239 E. 4th St. | | Panama City | FL | 32401 | 850-763-8421 | Counsel to Peggy C. Brannon, Bay County Tax Collector |
| Kelley Drye & Warren, LLP | Mark I. Bane | 101 Park Avenue | | New York | NY | 10178 | 212-808-7800 | Counsel to the Pension Benefit Guaranty Corporation |
| Kelley Drye & Warren, LLP | Mark. R. Somerstein | 101 Park Avenue | | New York | NY | 10178 | 212-808-7800 | Counsel to the Pension Benefit Guaranty Corporation |
| Lord, Bissel & Brook LLP | Rocco N. Covino | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | 212-812-8340 | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| McGuirewoods LLP | Elizabeth L. Gunn | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | 804-775-1178 | Counsel to Siemens Logistics Assembly Systems, Inc. |
| Miami-Dade County Tax Collector | Metro-Dade Paralegal Unit | 140 West Flagler Street | Suite 1403 | Miami | FL | 33130 | 305-375-5314 | Paralegal Collection Specialist for Miami-Dade County |
| Norris, McLaughlin & Marcus | Elizabeth L. Abdelmasieh, Esq | 721 Route 202-206 | P.O. Box 1018 | Somerville | NJ | 08876 | 908-722-0700 | Counsel to Rotor Clip Company, Inc. |
| North Point | Michelle M. Harner | 901 Lakeside Avenue | | Cleveland | OH | 44114 | 216-586-3939 | Counsel to WL. Ross & Co., LLC |
| O'Rourke Katten & Moody | Michael C. Moody | 161 N. Clark Street | Suite 2230 | Chicago | IL | 60601 | 312-849-2020 | Counsel to Ameritech Credit Corporation d/b/a SBC Capital Services |
| Orrick, Herrington & Sutcliffe LLP | Matthew W. Cheney | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | 202-339-8400 | Counsel to Westwood Associates, Inc. |
| Paul, Weiss, Rifkind, Wharton & Garrison | Curtis J. Weidler | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | 212-373-3157 | Counsel to Ambrake Corporation; Akebono Corporation |
| Professional Technologies Services | John V. Gorman | P.O. Box #304 | | Frankenmuth | MI | 48734 | 989-385-3230 | Corporate Secretary for Professional Technologies Services |
| Republic Engineered Products, Inc. | Joseph Lapinsky | 3770 Embassy Parkway | | Akron | OH | 44333 | 330-670-3004 | Counsel to Republic Engineered Products, Inc. |
| Ropers, Majeski, Kohn & Bentley | Christopher Norgaard | 515 South Flower Street | Suite 1100 | Los Angeles | CA | 90071 | 213-312-2000 | Counsel to Brembo S.p.A; Bibielle S.p.A.; AP Racing |
| Sachnoff & Weaver, Ltd | Charles S. Schulman | 10 South Wacker Drive | 40th Floor | Chicago | IL | 60606 | 312-207-1000 | Counsel to Infineon Technologies North America Corporation |
| Schafer and Weiner PLLC | Max Newman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | 248-540-3340 | Counsel to Dott Industries, Inc. |
| Schiff Hardin LLP | William I. Kohn | 6600 Sears Tower | | Chicago | IL | 60066 | 312-258-5500 | Counsel to  Means Industries |
| Shipman & Goodwin LLP | Jennifer L. Adamy | One Constitution Plaza | | Hartford | CT | 06103-1919 | 860-251-5811 | Counsel to Fortune Plastics Company of Illinois, Inc.; Universal Metal Hose Co., |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 3

7/24/2007 9:36 PM
US MAIL

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| Sony Electronics Inc. | Lloyd B. Sarakin - Chief Counsel, Finance and Credit | 1 Sony Drive | MD #1 E-4 | Park Ridge | NJ | 07656 | 201-930-7483 | Counsel to Sony Electronics, Inc. |
| Stroock & Stroock & Lavan, LLP | Joseph G. Minias | 180 Maiden Lane | | New York | NY | 10038 | 212-806-5400 | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. a |
| Swidler Berlin LLP | Robert N. Steinwurtzel | The Washington Harbour | 3000 K Street, N.W. Suite 300 | Washington | DC | 20007 | 202-424-7500 | Attorneys for Sanders Lead Co., Inc. |
| Togut, Segal & Segal LLP | Albert Togut, Esq. | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | Conflicts counsel to Debtors |
| United Steel, Paper and Forestry, Rubber, Manufacturing, Energy | Allied Industrial and Service Workers, Intl Union (USW), AFL-CIO | David Jury, Esq. | Five Gateway Center Suite 807 | Pittsburgh | PA | 15222 | 412-562-2549 | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Vorys, Sater, Seymour and Pease LLP | Robert J. Sidman, Esq. | 52 East Gay Street | P.O. Box 1008 | Columbus | OH | 43216-1008 | 614-464-6422 | |
| Vorys, Sater, Seymour and Pease LLP | Tiffany Strelow Cobb | 52 East Gay Street | | Columbus | OH | 43215 | 614-464-8322 | Counsel to America Online, Inc. and its Subsidiaries and Affiliates |
| Warner Stevens, L.L.P. | Michael D. Warner | 301 Commerce Street | Suite 1700 | Fort Worth | TX | 76102 | 817-810-5250 | Counsel to Electronic Data Systems Corp. and EDS Information Services, L.L.C. |
| Winstead Sechrest & Minick P.C. | Berry D. Spears | 401 Congress Avenue | Suite 2100 | Austin | TX | 78701 | 512-370-2800 | Counsel to National Instruments Corporation |
| WL Ross & Co., LLC | Stephen Toy | 600 Lexington Avenue | 19th Floor | New York | NY | 10022 | 212-826-1100 | Counsel to WL Ross & Co., LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

7/24/2007 9:36 PM
US MAIL

# EXHIBIT D

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
       In re                    :       Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :       Case No. 05-44481 (RDD)
                                          :
                  Debtors.    :       (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. §§ 363, 1107, AND 1108 AUTHORIZING
DELPHI AUTOMOTIVE SYSTEMS (HOLDING), INC. TO PROVIDE
<u>FUNDS TO DELPHI AUTOMOTIVE SYSTEMS ESPANA S.L.</u>
("DASE FUNDING ORDER")

          Upon the expedited motion, dated July 9, 2007 (the "Motion"), of Delphi

Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-

in-possession in the above-captioned cases (collectively, the "Debtors"), for an order

under 11 U.S.C. § 363, 1107, and 1108 authorizing, but not directing, Delphi Automotive

Systems (Holding), Inc. ("DASHI") to provide funds to Delphi Automotive Systems

Espana S.L. ("DASE"); and upon the record of the hearing held on the Motion; and this

Court having determined that the receivers appointed to oversee DASE's Spanish

Concurso proceeding (the "DASE Receivers") have submitted to the jurisdiction of this

Court pursuant to the Stipulation admitted into evidence at the hearing on July 19, 2007;

and this Court having determined that the relief requested in the Motion is in the best

interests of the Debtors, their estates, their stakeholders, and other parties-in-interest; and

it appearing that proper and adequate notice of the Motion has been given and that no

other or further notice is necessary; and after due deliberation thereon, and sufficient

cause appearing therefor, it is hereby

          ORDERED, ADJUDGED, AND DECREED THAT:

1.    The Motion is GRANTED.

2.    DASHI is authorized, but not directed, to provide funds to or on behalf of DASE in amounts up to €120 million for purposes of funding a social plan that would provide employees of DASE's automotive component plant in Cadiz, Spain a separation allowance (the "Separation Plan") as set forth in the agreement attached hereto as <u>Exhibit 1</u>; provided, however, that the foregoing funding shall be subject to the Spanish court presiding over DASE's Concurso proceeding (the "Spanish Court") accepting the Separation Plan and the release of Delphi, DASHI, their subsidiaries and affiliates, and each of their directors and officers from any and all liability related to or arising out of the termination of the existing labor and employment agreements.

3.    Subject to the Spanish Court's acceptance of the Separation Plan, DASHI is authorized, but not directed, to provide funds to or on behalf of DASE in amounts up to €10 million for purposes of funding the payment of outstanding claims of DASE's suppliers and non-labor creditors.

4.    DASHI's source of funding for the Separation Plan and the payment of outstanding claims of DASE's suppliers and non-labor creditors shall be limited to those funds provided by foreign, non-Debtor subsidiaries.

5.    Notwithstanding Rule 6004(g) of the Federal Rules of Bankruptcy Procedure or any other Bankruptcy Rule, this Order shall take effect immediately upon its entry.

6.    This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this order.

7.     The requirement under Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York for

the service and filing of a separate memorandum of law is satisfied by the Motion.

Dated:    New York, New York
          July 19, 2007

/s/Robert D. Drain
UNITED STATES BANKRUPTCY JUDGE

| FINAL OFFICIAL RECORD OF JULY 4, 2007 |
|---|

**Receivers**
Mr. Adalberto Cañadas (Lawyer)
Mr. Enrique Bujidos (for the auditor)
Mr. Fernando Gómez (for the creditor)


**Directly-elected representatives of the workers**
Mr. Antonio Pina Enríquez (CCOO)
Mr. Salvador Marchante Grille (CCOO)
Mr. José Mª Castaño Gómez (USO)
Mr. José Rojas Alvarez (CGT)
Mr. José Mª Calle Hurtado (CCOO)
Mr. José Antonio Salvador de los
Santos (CCOO)
Mr. Pedro Lloret Linar (CCOO)
Mr. Pedro Salinas Armario (CCOO)
Mr. José Manuel Fernández Catalán
(CCOO)
Mr. Felipe Salvador González (CCOO)
Mr. Alberto Alvarez Cabas (USO)
Mr. Miguel Paramio Carrión (USO)
Mr. Francisco Javier Carretero Gavira
(CGT)
Mr. José Pérez Corona (CGT)
Mr. Antonio Montoro Núñez (UGT)
Mr. Francisco Pérez Vasco (UGT)
Mr. Alfonso Valiente Chamizo (UGT)
Mr. Manuel Jaime Ibáñez (UGT)
Mr. Juan Jesús Toledo Nieto (UGT)


**Labor union representatives of the workers**
Mr. Juan Berrocal (CCOO)
Mr. José Barriga (UGT)
Mr. Isidro Jiménez (CGT)
Mr. Juan José Herrera Andrés (USO)

**Insolvent party**
Mr. Gonzalo Herrera


**Social partners**
Mr. Enrique Mª Jiménez (CCOO)
Mr. Manuel Jiménez Gallardo (UGT)


**Public authorities**
Mr. Javier Guerrero Benítez (Executive
Director of Labor and Social Security
of the Andalucía Autonomous
Community Government)

Mr. Juan Mª Bouza (Department of
Employment of the Andalucía
Autonomous Community Government)
Ms. Angelines Ortiz del Rio
(Department of Innovation, Science
and Enterprise of the Andalucía
Autonomous Community Government)
Mr. Ramón Díaz Alcaraz (Labor
Adviser to the Department of
Employment of Andalucía Autonomous
Community Government)
Mr. Miguel Aramburu González
(Employment Office of the Andalucía
Autonomous Community Government
in Cadiz)

**Advisers**
Javier Martín-Gamero (for the
receivers)
Jorge Martín (for the insolvent party)
Juan Vaz (for the insolvent party)
José Miguel Caballero (for the
insolvent party)
Alfonso Martínez Escribano (for the
insolvent party)
Juan A. López de Carvajal (for the
insolvent party)
Ms. Maribel Román (for UGT)
Mr. Miguel Conde Villuendas (for
CCOO)

In Seville, on July 4, 2007, the aforementioned persons, acting in the above-mentioned
capacities, appeared in this act and agreed to state and agree as follows

## BACKGROUND

**I.** In view of the critical economic, financial and net worth position in which it found
itself, on March 20, 2007, DASE filed a petition for a voluntary insolvency proceeding,
the hearing of which fell to the Mercantile Court of Cadiz, which issued the related
insolvency order on April 13, 2007.

**II.** Subsequently, on May 16, 2007, the Company filed with such Court a petition to
terminate the employment contracts maintained by DASE, the consultation period for
which was initiated on June 5, 2007.

**III.** After holding various meetings during such period, the parties deemed the
**CONSULTATION PERIOD TO HAVE ENDED WITH AGREEMENT**, in
accordance with the following

## CLAUSES

**1.** It is agreed that all of the employment contracts of DASE shall be terminated on July 31, 2007. However, in order to carry out and culminate the outstanding tasks at the Company, before the end of the period referred to in Clause Five of this document, July 20, 2007, DASE shall designate the employment contracts that are necessary to perform such tasks, and such contracts shall be terminated in any event within not more than one year.

**2.** For the pursuit of the non-industrial activities that the Company continues to pursue, the workers of DASE shall have absolute priority, based on the criteria of specialization, professional profile and length of service. These workers must also be designated by DASE before July 20, 2007.

**3.** In order to carry out the aforesaid terminations, a lump sum of €120 million is committed in accordance with the following conditions and procedure:

    **a).** Within not more than 7 days following the notification of the Court Order accepting this agreement, DASHI, expanding the voluntary offer originally made, shall finance the above-mentioned gross sum of €120 million for the sole purpose of paying the amounts corresponding to the employment contract terminations. This sum constitutes in any event the maximum limit of the severance payable. DASHI shall deposit such amount in an account which it holds and which shall be available to the receivers for the sole purpose of applying this Agreement. For such purpose, the receivers shall receive the corresponding mandate to pay the amounts that apply as a result of the termination of the employment contracts. A copy of the notice from DASHI stating its commitment is attached as **Schedule I**.

    **b).** Once each worker's contract has been terminated, the receivers shall pay out of the aforementioned deposit until it is exhausted the severance pay corresponding to each worker on the basis of the following criteria:

        1. with a view to attending to the objectively most precarious situation of the workers with the lowest incomes, thereby balancing the consequence derived from the contract terminations in a more equitable and supportive manner among all of the workers, and taking into account that the overall severance payable offered by the Company is limited to the already-mentioned figure of €120 million gross; as a matter of preference it is established that each worker shall receive 45 days' pay per year worked, having regard to his or her annual compensation in wages for the period running from July 1, 2006 to June 30, 2007, and with the length of service recognized by the company as of July 31, 2007, regardless of the effective date of contractual termination, and the individual resulting amount may not exceed TWO HUNDRED THOUSAND EUROS (€200,000) gross;

        2. if, once the above criterion has been applied, there is any remainder, the excess shall, until the overall amount of €120 million is exhausted, be distributed equally among the workers referred to in this Agreement,

thereby dividing such excess by the number of workers affected by this termination measure;

3. the application of the above criteria ensures in any event:

- the minimum individual statutory severance of 20 days' pay per year, up to the limit of one year's pay, and

- shall not exceed in any case the maximum overall severance limit of €120 million gross.

The payment of the individual severance packages in accordance with above criteria and the performance of the corresponding legal obligations is subject in all cases to authorization from DASE; in particular, because it is the party subject to the tax obligation, prior to the payment of the severance, DASE must express its agreement with the amount of the tax withholdings that should be made.

Before July 18, 2007, in implementation of this Agreement, DASE and the workers' representatives shall specify in accordance with the agreed parameters the individualized amounts that apply in order to inform the interested parties; in the event of a disagreement, the matter shall be submitted to the decision of the Mercantile Court.

Simultaneously with such payment, DASE shall pay each worker the amounts corresponding to accrued salaries to which he or she is entitled, and each worker shall be required to sign the corresponding final settlement (**Schedule II**).

With the payment of the above-mentioned €120 million, all of the obligations, both collective and individual, of DASE to the employees as result of the termination of their contracts shall be fully and totally fulfilled.

    **c).** DASE's financing commitment of €120 million is conditional on the date of termination of the employment contracts being at the latest July 31, 2007, except for the contracts designated by DASE for the purposes of carrying out and culminating the outstanding tasks and of continuing with the non-industrial activities.

**4.** The Public Authorities have repeatedly stated the importance of the business assets of DASE as elements that prevent the de-industrialization of the area. This expectation, without the transfer of such assets, would be impossible to achieve.

As the signing parties are aware that DASE is not going to continue with the industrial activity, the transfer of the assets must take place in any event in accordance with the terms of this Clause.

Based on these circumstances, and with a view to achieving the optimal conditions for the continuation of the industrial activities through the establishment of business projects with a guaranteed future, DASE hereby gives a commitment to the Andalucía Autonomous Community Government (the "Andalucía Government") that, once the contracts have been terminated, except for the contracts necessary to carry out and culminate the outstanding tasks at the Company as referred to in Clause One of this

Agreement, it shall transfer "as is" (in their present locations and states) the land, installations and machinery, tangible fixed assets owed by DASE, located at the Puerto Real plant that are necessary for the future pursuit of any industrial activities. For these purposes, the parties refer to the list of assets stated in the official report prepared by the Services of Industry, Energy, Mines and Economic Cooperation and Technological Development of the Provincial Office of Cadiz of the Department of Innovation, Science and Enterprise of the Andalucía Government, which was furnished in the insolvency proceeding by the Legal Office of the aforementioned Government. In this connection, the assets that form part of the Agreement are the tangible fixed assets, land, installations and machinery located in Puerto Real and owned by DASE and which, moreover, are listed in the aforementioned Report.

To that end, the Andalucía Government signs this Agreement.

The procedure and conditions for carrying out the transfer shall be the following:

**a).** Given the insolvency-related determining factors present in this case, the transfer of title to the assets may only take place once the arrangement with creditors referred to in Articles 99 et seq. of the Insolvency Law has been fulfilled. In this respect, DASE undertakes to propose to the creditors an arrangement without a postponement, so that it can be fulfilled immediately. DASE states that an approximate time period for the arrangement to be fulfilled could be 5 months following the signing of this Agreement.

**b).** The proposed arrangement shall include the grant to the receivers of the authority to participate in the acts of administration and disposition over the assets by way of their authorization and agreement, on the same terms as in the ordinary phase of the insolvency proceeding.

**c).** Once the circumstances referred to in letter a) above are present, DASE shall notify the Andalucía Government of such situation. Within not more than 15 calendar days following such notification, the Andalucía Government shall notify the managing body of DASE by duly authenticated means of the identity of the person or entity to whom the assets must be transferred, as well as the conditions of the transfer (identity of the transferee and price). Any expenses and taxes, including the tax on the increase in urban land value, derived from the transaction shall be borne by the transferee.

If such notification does not take place, the commitment to transfer assets shall become void automatically with no need for any formality.

The transfer shall be carried out by DASE with the participation of the receivers, who shall ensure at all times compliance with the legal obligations inherent in the transfer.

**d).** In order to facilitate the transfer of the assets of DASE, as well as the approval and fulfillment of the arrangement with the creditors, DASHI, Delphi Corporation and their investees and any other specially related entity that has claims against DASE, shall forgive or capitalize such claims in the arrangement

with the creditors, or shall unconditionally waive them by way of any formula that does not impede strict compliance with what is agreed on herein.

**5.** This Agreement shall be submitted to the workers' Assembly and for approval by the managing body of DASHI and/or Dephi Corporation, by the Creditors' Committee of the insolvency proceeding that DASHI and Delphi Corporation are undergoing in the United States and/or by the Court before which such proceeding is being conducted (Chapter 11).

These approvals must take place by July 20, 2007 at the latest so that this Agreement can be submitted for acceptance by the Mercantile Court of Cadiz.

Both DASE and the receivers shall lend their assistance to the parties, including DASHI, in order to obtain the ratifications and authorizations provided for in this Agreement. In particular, if necessary, they shall support the motion made by DASHI or DELPHI CORPORATION to the Judge of the Chapter 11 proceeding requesting authorization for this Agreement.

**6.** With the acceptance of the collective termination of the employment contracts by the Cadiz Mercantile Court, compliance by DASE with the obligations provided for therein, and the approval and completion of an arrangement with creditors with the payment of more than two-thirds of claims and waiting periods of less than three years, even in the event that the liquidation phase of the insolvency process is not commenced, Article 163 of the Insolvency Law provides that no subfile to assess ("pieza de calificación") the insolvency would be opened. Accordingly, in such case, DASE, DASHI, Delphi Corporation and their subsidiaries would not be subject to any liability for insolvency forming the subject matter of such assessment subfile.

In such case, Articles 163 et seq. of the Insolvency Law establish that outside of such assessment subfile, neither the receivers nor any third party may bring action for insolvency-related liability.

The receivers state that they cannot currently quantify the amounts necessary to cover the above-mentioned conditions.

In witness of the content of this document, this **OFFICIAL RECORD OF AGREEMENT** is signed in the place and on the date first above indicated.

**SCHEDULE I**

# DELPHI

Delphi Automotive Systems (Holding), Inc.
5725 Delphi Drive
Troy, Michigan
48098-2815 USA

July 4, 2007

Delphi Automotive Systems España, S.L.
Puerto Real y CIF B11316031
Spain

Attention:  Mr. Gonzalo Herrera Avilés, Sole Administrator

Re:    Agreement Among, Delphi Automotive Systems España, S.L. ("DASE") DASE
       Receivers, DASE Workers Council, and DASE Unions (the "Agreement")

Dear Mr. Herrera:

This will confirm the willingness of Delphi Automotive Systems (Holding) Inc.
("DASHI") to provide voluntarily funds to Delphi Automotive Systems España, S.L.
("DASE") in an amount not to exceed One Hundred Twenty Million Euros (€120
million) for collective labor terminations and an amount not to exceed Ten Million Euros
(€10 million) for payments to DASE trade creditors to assist DASE to fulfill its
obligations under the above-referenced Agreement and on the terms set forth therein.

Our willingness to provide such funds is subject to the following: (i) the Agreement is
entered into by all the above-mentioned parties no later than close of business today, July
4, 2007 (subject to the ratifications and other conditions specified in said Agreement); (ii)
the current employment agreements of the DASE employees are terminated no later than
July 31, 2007, except as otherwise specified in said Agreement; and (iii) the voluntary
funding from DASHI is approved by the Board of Directors of Delphi Corporation and
DASHI and by the U.S. Bankruptcy Court for the Southern District of New York.
Waiver of any of the foregoing conditions is solely at the discretion of DASHI. The
foregoing offer supersedes the one contained in our letter of March 19, 2007.

Yours truly,

Marc C. McGuire
Assistant Secretary &
Assistant General Counsel--International

**SCHEDULE II**

**FINAL SETTLEMENT**

In [PLACE], on [DATE]

I, [NAME AND SURNAMES], of legal age, with Spanish I.D. Card [NUMBER], and domicile at [ADDRESS], a worker of DELPHI AUTOMOTIVE SYSTEMS ESPAÑA, S.L. (hereinafter, **DASE**), **STATE**:

1.  Pursuant to the Order passed by the Commercial Court of Cadiz on [DATE], in proceedings 84/2007, on [DATE] I was notified of the termination of my employment relationship with the Company.

2.  A net severance pay of [AMOUNT] euros has been paid to me for the termination of my employment contract.

    I have also received the amount of [AMOUNT] as settlement.

    A breakdown of the amounts delivered to me is attached as a Schedule.

3.  I have received said amounts through [FORM], which is delivered to me and which I hereby accept.

4.  Therefore, on receiving the aforementioned amounts, I consider that I have received full and final settlement of all severance, salary and non- salary amounts and of any rights I may have for the termination of my employment contract, and hereby issue the most full and final receipt for DASE, its shareholder, Delphi Corporation, and the remaining companies in which Delphi holds an interest and the directors and executives of all said companies, and that I have no further claim in court or out of court for any item and I expressly recognize that I am not entitled to take any action for the terminated employment relationship.

In witness whereof, I sign this document in [PLACE], on [DATE]

Signed, _____

# EXHIBIT E

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                          :
      In re                       :     Chapter 11
                                          :
DELPHI CORPORATION, et al.,     :     Case No. 05-44481 (RDD)
                                          :
                 Debtors.    :     (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ORDER UNDER 11 U.S.C. §§ 363 AND 365 AND FED. R. BANKR. P. 2002, 6004, 6006,
AND 9014 AUTHORIZING AND APPROVING (I) SALE OF DELPHI AUTOMOTIVE
SYSTEMS LLC'S MEXICO BRAKE PLANT ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, AND ENCUMBRANCES, (II) ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
AND (III) ASSUMPTION OF CERTAIN LIABILITIES

("MEXICO BRAKE PLANT ASSET SALE APPROVAL ORDER")

          Upon the unopposed motion, dated June 15, 2007 (the "Motion"), of Delphi

Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-

possession in the above-captioned cases (collectively, the "Debtors"), for orders pursuant to 11

U.S.C. §§ 363 and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 (i) approving bidding

procedures, (ii) granting certain bid protections, (iii) approving the form and manner of sale

notices, and (iv) setting a sale hearing (the "Sale Hearing") in connection with the sale (the

"Sale") of certain assets of Delphi Automotive Systems LLC ("DAS LLC") and Delphi Sistemas

de Energia, S.A. de C.V. (together with DAS LLC, the "Sellers") comprising substantially all of

the assets primarily used in the brake and chassis modules product lines in the manufacturing

plant located in Saltillo, Mexico (the "Mexico Brake Plant Business"), including the machinery,

equipment, inventories, personnel and medical records, water well rights, and all other assets of

DAS LLC to be sold to the Purchasers (as defined below) pursuant to the Agreement (the

"Acquired Assets") related to the Mexico Brake Plant Business for $15.0 million and other

consideration, free and clear of liens, claims, and encumbrances related to assets being sold by

DAS LLC, to Robert Bosch LLC and Frenados Mexicanos S.A. de C.V. (together, the

"Purchasers") pursuant to the Asset Sale And Purchase Agreement, dated June 13, 2007 (the

"Agreement"),[1] by and between the Sellers and the Purchasers or to the party  submitting the

highest or otherwise best bid (the "Successful Bidder").  The Sale would include the assumption

and assignment of certain prepetition executory contracts and unexpired leases (the "Assumed

Contracts") and the assignment of certain postpetition executory contracts and unexpired leases

(the "Postpetition Contracts," and together with the Assumed Contracts, the "Transferred

Contracts") to the Purchasers or the Successful Bidder.  And the assumption of certain liabilities

(the "Assumed Liabilities") by the Purchasers or the Successful Bidder; and the Court having

entered an order on June 29, 2007 (the "Bidding Procedures Order") (Docket No. 8440) (a)

approving bidding procedures, (b) granting certain bid protections, (c) approving the form and

manner of sale notices, and (d) setting the Sale Hearing; and the Sale Hearing having been held

on July 19, 2007, at which time all interested parties were offered an opportunity to be heard

with respect to the Motion; and the Court having reviewed and considered the Motion, and the

arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and it

appearing that the relief requested in the Motion is in the best interests of DAS LLC, its estate,

its creditors, and all other parties-in-interest; and after due deliberation thereon, and sufficient

cause appearing therefor,

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
Agreement.  A true and correct copy of the Agreement is attached hereto as <u>Schedule 1</u>.

IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.     The Court has jurisdiction over the Motion and the transactions

contemplated by the Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these cases and the Motion

in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.     The statutory predicates for the relief sought in the Motion are sections

363 and 365 of 11 U.S.C. §§ 101-1330, as amended and in effect on October 8, 2005 (the

"Bankruptcy Code"), and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014.

C.     As evidenced by the affidavits of service previously filed with the Court,

and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate, and

sufficient notice of the Motion, the Sale Hearing, the Sale, the assumption and assignment of the

Assumed Contracts, and the Cure Amounts has been provided in accordance with 11 U.S.C. §§

102(l), 363, and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014, (ii) such notice was good,

sufficient, and appropriate under the circumstances, and (iii) no other or further notice of the

Motion, the Sale Hearing, the Sale, or the assumption and assignment of the Assumed Contracts

or the assignment of the Postpetition Contracts is or shall be required.

D.     As demonstrated by (i) the testimony and other evidence proffered or

adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale

Hearing, DAS LLC has marketed the Acquired Assets and conducted the sale process in

compliance with the Bidding Procedures Order and the Auction was duly noticed and conducted

in a non-collusive, fair, and good faith manner.

---

[2]     Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings
of fact when appropriate.  See Fed. R. Bankr. P. 7052.

3

E.      DAS LLC (i) has full power and authority to execute the Agreement and
all other applicable documents contemplated thereby, and the transfer and conveyance of the
Acquired Assets by DAS LLC has been duly and validly authorized by all necessary action of
DAS LLC, (ii) has all of the power and authority necessary to consummate the transactions
contemplated by the Agreement, and (iii) has taken all action necessary to authorize and approve
the Agreement and to consummate the transactions contemplated thereby, and no consents or
approvals, other than those expressly provided for in the Agreement, are required for DAS LLC
to consummate such transactions.

F.      DAS LLC has demonstrated (i) good, sufficient, and sound business
purposes and justification for the Sale because, among other things, DAS LLC and its advisors
diligently and in good faith analyzed all other available options in connection with the
disposition of the Acquired Assets and determined that (a) the terms and conditions set forth in
the Agreement, (b) the transfer to the Purchasers of the Acquired Assets pursuant thereto, and (c)
the Purchase Price agreed to as reflected in the Agreement are each fair and reasonable and
together constitute the highest or otherwise best value obtainable for the Acquired Assets and (ii)
compelling circumstances for the Sale pursuant to 11 U.S.C. § 363(b) prior to, and outside of, a
plan of reorganization because, among other things, absent the Sale, the value of the Acquired
Assets will be substantially diminished.

G.      A reasonable opportunity to object or be heard with respect to the Motion
and the relief requested therein has been afforded to all interested persons and entities, including
without limitation: (i) the Office of the United States Trustee for the Southern District of New
York, (ii) counsel for the Purchasers, (iii) counsel for the official committee of unsecured
creditors appointed in these chapter 11 cases, (iv) counsel for the official committee of equity

4

security holders appointed in these chapter 11 cases, (v) all entities known to have expressed an interest in a transaction with respect to the Acquired Assets during the past six months, (vi) all entities known to have asserted any Interests and/or Claims (as defined below) in or upon the Acquired Assets, (vii) all federal, state, and local regulatory or taxing authorities or recording offices, including but not limited to environmental regulatory authorities, which have a reasonably known interest in the relief requested by the Motion, (viii) all parties to Assumed Contracts, (ix) the United States Attorney's office, (x) the United States Department of Justice, (xi) the Securities and Exchange Commission, (xii) the Internal Revenue Service, (xiii) all entities on the Master Service List (as defined by the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(M), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures (Docket No. 2883) (the "Supplemental Case Management Order")), and (xiv) such other entities as are required to be served with notices under the Supplemental Case Management Order.

H.    The Purchasers are not "insiders" of any of the Debtors as that term is defined in 11 U.S.C. § 101(31).

I.    The Agreement was negotiated, proposed, and entered into by the Sellers and the Purchasers without collusion, in good faith, and from arm's-length bargaining positions. Neither the Sellers nor the Purchasers have engaged in any conduct that would cause or permit the Sale to be avoidable under 11 U.S.C. § 363(n).

J.    The Purchasers are good faith purchasers under 11 U.S.C. § 363(m) and, as such, are entitled to all of the protections afforded thereby. The Purchasers will be acting in good faith within the meaning of 11 U.S.C. § 363(m) in closing the transactions contemplated by the Agreement at all times after the entry of this Sale Approval Order.

5

K.      The consideration provided by the Purchasers for the Acquired Assets pursuant to the Agreement (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Acquired Assets, (iii) will provide a greater recovery for DAS LLC's creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

L.      The Sale must be approved and consummated promptly to preserve the viability of the Mexico Brake Plant Business as a going concern.

M.      The transfer of Acquired Assets by DAS LLC to the Purchasers shall be a legal, valid, and effective transfer of the Acquired Assets, and shall vest the Purchasers with all right, title, and interest of DAS LLC to the Acquired Assets free and clear of any and all liens, claims, interests, and encumbrances of any type whatsoever (whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to October 8, 2005, and whether imposed by agreement, understanding, law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability), including but not limited to those (i) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of DAS LLC's or the Purchasers' interest in the Acquired Assets, or any similar rights, and (ii) relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Mexico Brake Plant Business prior to the transfer of the Acquired Assets to the Purchasers (collectively, the "Interests and/or Claims").

6

N.      If DAS LLC's sale of Acquired Assets were not free and clear of all Interests and/or Claims as set forth in the Agreement and this Sale Approval Order, or if the Purchasers would, or in the future could, be liable for any of the Interests and/or Claims as set forth in the Agreement and this Sale Approval Order, the Purchasers would not have entered into the Agreement and would not consummate the Sale or the transactions contemplated by the Agreement, thus adversely affecting DAS LLC, its estate, its stakeholders, and its creditors.

O.      DAS LLC may sell its interests in the Acquired Assets free and clear of all Interests and/or Claims because, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied.  All holders of Interests and/or Claims who did not object, or withdrew their objections to the Sale, are deemed to have consented to the Sale pursuant to 11 U.S.C. § 363(f)(2).  No holders of Interests and/or Claims objected to the Motion.  The holder of Interest and/or Claim are adequately protected by having their Interests and/or Claims, if any, attach to the cash proceeds of the Sale ultimately attributable to the property against or in which they claim an Interest or Claim with the same priority, validity, force and effect as they attached to such property immediately before the closing of the Sale.

P.      The (i) transfer of the Acquired Assets to the Purchasers and (ii) assumption and/or assignment to the Purchasers of the Transferred Contracts and Assumed Liabilities will not subject the Purchasers to any liability whatsoever with respect to the operation of the Mexico Brake Plant Business prior to the Closing of the Sale or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia based, in whole or in part, directly or indirectly, on any theory of law or equity including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust or successor or transferee liability.

7

Q.    DAS LLC has demonstrated that it is an exercise of its sound business judgment to assume and/or assign the Transferred Contracts to the Purchasers in connection with the consummation of the Sale, and the assumption and/or assignment of the Transferred Contracts is in the best interests of DAS LLC, its estates, and its stakeholders.  The Transferred Contracts being assigned to, and the liabilities being assumed by, the Purchasers are an integral part of the Acquired Assets being Acquired by the Purchasers and, accordingly, such assumption and/or assignment of Transferred Contracts and liabilities is reasonable and enhances the value of the DAS LLC's estate.

R.    DAS LLC  has (i) cured, or has provided adequate assurance of cure of, any default existing prior to the Closing of the Sale under any of the Assumed Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(A), by payment of the amounts provided on Schedule 2 hereto and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(B).  The Purchasers have provided adequate assurance of their future performance of and under the Assumed Contracts, within the meaning of 11 U.S.C. §§ 365(b)(1)(C) and 365(f)(2)(B).   Pursuant to 11 U.S.C. § 365(f), the Assumed Contracts to be assumed and assigned under the Agreement shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Purchasers notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer.

S.    Approval of the Agreement and consummation of the Sale of the Acquired Assets and assignment of the Transferred Contracts at this time are in the best interests of DAS LLC, its stakeholders, its estate, and other parties-in-interest.

8

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND

DECREED THAT:

General Provisions

1.    The Motion is GRANTED.

Approval Of The Agreement

2.    Pursuant to 11 U.S.C. § 363(b), the Agreement and all of the terms and

conditions thereof are hereby approved.

3.    Pursuant to 11 U.S.C. § 363(b), DAS LLC is authorized, but not directed, to

perform its obligations under the Agreement and comply with the terms thereof and consummate

the Sale in accordance with and subject to the terms and conditions of the Agreement.

4.    Each of the signatories to the Agreement authorized, but not directed, to

take all actions necessary or appropriate to effectuate the terms of this Sale Approval Order.

5.    DAS LLC is authorized, but not directed, to execute and deliver, and

empowered to perform under, consummate, and implement, the Agreement, together with all

additional instruments and documents as may be reasonably necessary or desirable to implement

the Agreement, and to take all further actions as may be requested by the Purchasers for the

purpose of assigning, transferring, granting, conveying, and conferring to the Purchasers or

reducing to possession the Acquired Assets and the Transferred Contracts, or as may be

necessary or appropriate to the performance of the obligations as contemplated by the Agreement.

6.    This Sale Approval Order and the Agreement shall be binding in all

respects upon all creditors (whether known or unknown) of DAS LLC, the Purchasers, all

successors and assigns of the Purchasers and DAS LLC, all affiliates and subsidiaries of the

Purchasers and DAS LLC, and any subsequent trustees appointed in DAS LLC's chapter 11 case

10

or upon a conversion to chapter 7 under the Bankruptcy Code, and shall not be subject to

rejection.  To the extent that any provision of this Sale Approval Order is inconsistent with the

terms of the Agreement, this Sale Approval Order shall govern.

7.    The Agreement and any related agreements, documents, or other

instruments may be modified, amended, or supplemented by the parties thereto in accordance

with the terms thereof without further order of the Court; <u>provided</u> that any such modification,

amendment, or supplement is not material.

Sale And Transfer Of The Acquired Assets

8.    Pursuant to 11 U.S.C. §§ 363(b) and 363(f), upon the consummation of the

Agreement, DAS LLC's right, title, and interest in the Acquired Assets shall be transferred to the

Purchasers free and clear of all Interests and/or Claims, with all such Interests and/or Claims to

attach to the cash proceeds of the Sale in the order of their priority, with the same validity, force,

and effect which they had as against the Acquired Assets immediately before such transfer,

subject to any claims and defenses DAS LLC may possess with respect thereto.

9.    The transfer of the Acquired Assets to the Purchasers pursuant to the

Agreement constitutes a legal, valid, and effective transfer of the Acquired Assets, and shall vest

the Purchasers with all right, title, and interest of DAS LLC in and to the Acquired Assets free

and clear of all Interests and/or Claims of any kind or nature whatsoever.

10.    If any person or entity which has filed financing statements, mortgages,

mechanic's liens, <u>lis pendens,</u> or other documents or agreements evidencing Interests and/or

Claims against or in the Acquired Assets shall not have delivered to DAS LLC prior to the

Closing of the Sale, in proper form for filing and executed by the appropriate parties, termination

11

statements, instruments of satisfaction, releases of all Interests and/or Claims that the person or

entity has with respect to the Acquired Assets, or otherwise, then (a) DAS LLC is hereby

authorized to execute and file such statements, instruments, releases, and other documents on

behalf of the person or entity with respect to the Acquired Assets and (b) the Purchasers are

hereby authorized to file, register, or otherwise record a certified copy of this Sale Approval

Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence

of the release of all Interests and/or Claims in the Acquired Assets of any kind or nature

whatsoever.

> 11.    This Sale Approval Order (a) shall be effective as a determination that,

upon the Closing of the Sale, all Interests and/or Claims of any kind or nature whatsoever

existing as to DAS LLC or the Acquired Assets prior to the Closing of the Sale have been

unconditionally released, discharged, and terminated (other than any surviving obligations), and

that the conveyances described herein have been effected and (b) shall be binding upon and shall

govern the acts of all entities including, without limitation, all filing agents, filing officers, title

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,

administrative agencies, governmental departments, secretaries of state, federal, state, and local

officials, and all other persons and entities who may be required by operation of law, the duties

of their office, or contract, to accept, file, register, or otherwise record or release any documents

or instruments, or who may be required to report or insure any title or state of title in or to any of

the Acquired Assets.

> 12.    All persons and entities, including, but not limited to, all debt security

holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade

creditors, and other creditors, holding Interests and/or Claims of any kind or nature whatsoever

against or in DAS LLC or the Acquired Assets being sold by DAS LLC (whether legal or

equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or

subordinated), arising under or out of, in connection with, or in any way relating to, the Mexico

Brake Plant Business, the Acquired Assets, the operation of the Mexico Brake Plant Business

prior to the Closing of the Sale, or the transfer of the Acquired Assets to the Purchasers, hereby

are forever barred, estopped, and permanently enjoined from asserting against the Purchasers,

their successors or assigns, their property, or the Acquired Assets, such persons' or entities'

Interests and/or Claims.

<u>Assumption And/Or Assignment To The Purchasers Of The Transferred Contracts</u>

13.    Pursuant to 11 U.S.C. § 365, and subject to and conditioned upon the

Closing of the Sale, DAS LLC's assumption and assignment to the Purchasers, and the

Purchasers' assumption on the terms set forth in the Agreement, of the Assumed Contracts is

hereby approved, and the requirements of 11 U.S.C. §§ 365(b)(1) and 365(f) with respect thereto

are hereby deemed satisfied.

14.    DAS LLC is hereby authorized in accordance with 11 U.S.C. §§ 363 and

365 to (a) assume and/or assign to the Purchasers, effective upon the Closing of the Sale, the

Transferred Contracts free and clear of all Interests and/or Claims of any kind or nature

whatsoever and (b) execute and deliver to the Purchasers such documents or other instruments as

may be necessary to assign and transfer the Transferred Contracts and Assumed Liabilities to the

Purchasers.

15.    The Assumed Contracts shall be transferred to, and remain in full force and

effect for the benefit of, the Purchasers in accordance with their respective terms,

13

notwithstanding any provision in any such Assumed Contract (including those of the type

described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or

conditions such assignment or transfer and, pursuant to 11 U.S.C. § 365(k), DAS LLC shall be

relieved from any further liability with respect to the Assumed Contracts after the assignment to

and assumption of such contracts by the Purchasers.

16.    All defaults or other obligations of DAS LLC under the Assumed Contracts

arising or accruing prior to the Closing of the Sale (without giving effect to any acceleration

clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy

Code) shall be cured by DAS LLC at the Closing of the Sale or as soon thereafter as practicable,

and the Purchasers shall have no liability or obligation arising or accruing prior to the date of the

Closing of the Sale, except as otherwise expressly provided in the Agreement.  Each non-debtor

party to any Assumed Contract shall be deemed to have consented to the assumption and/or

assignment of the Assumed Contracts to the Purchasers and shall be forever barred, estopped,

and permanently enjoined from asserting against DAS LLC or the Purchasers, or the property of

any of them, any default existing, arising, or accruing as of the date of the Closing or any

purported written or oral modification to the Assumed Contracts.  The failure of DAS LLC or the

Purchasers to enforce prior to the Closing of the Sale one or more terms or conditions of any

Assumed Contract shall not be a waiver of such terms or conditions or of DAS LLC's or

Purchasers' rights to enforce every term and condition of any such Assumed Contract.

Additional Provisions

17.    The consideration provided by the Purchasers for the Acquired Assets under

the Agreement is hereby deemed to constitute reasonably equivalent value and fair consideration

under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent

14

Transfer Act, and under the laws of the United States, and any state, territory, possession, or the District of Columbia.

18.     Upon the Closing of the Sale, this Sale Approval Order shall be construed as and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Acquired Assets and Transferred Contracts or a bill of sale transferring good and marketable title in the Acquired Assets and Transferred Contracts to the Purchasers pursuant to the terms of the Agreement.

19.     Upon the Closing of the Sale, each of DAS LLC's creditors is authorized and directed to execute such documents and take all other such actions as may be necessary to release their respective Interests and/or Claims against the Acquired Assets, if any, as may have been recorded or may otherwise exist.

20.     Each and every federal, state, and governmental agency or department, and any other person or entity, is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

21.     All entities which are currently, or as of the Closing of the Sale may be, in possession of some or all of the Acquired Assets to be sold, transferred, or conveyed pursuant to the Agreement are hereby directed to surrender possession of the Acquired Assets to the Purchasers upon the Closing of the Sale.

22.     The Purchasers shall have no liability or responsibility for any liability or other obligation of DAS LLC arising under or related to the Acquired Assets other than for the Assumed Liabilities.  Without limiting the generality of the foregoing, and except as otherwise

15

specifically provided herein and in the Agreement, the Purchasers shall not be liable for any

claims against DAS LLC or any of its predecessors or affiliates, and the Purchasers shall have no

successor or vicarious liability of any kind or character whether known or unknown as of the

Closing of the Sale, whether now existing or hereafter arising, or whether fixed or contingent,

with respect to the Mexico Brake Plant Business or any obligations of DAS LLC arising prior to

the Closing of the Sale, including, but not limited to, liabilities on account of any taxes arising,

accruing, or payable under, out of, in connection with, or in any way relating to the operation of

the Mexico Brake Plant Business prior to the Closing of the Sale.

23.    All persons holding Interests and/or Claims against or in DAS LLC or the

Acquired Assets of any kind or nature whatsoever shall be, and hereby are, forever barred,

estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such

Interests and/or Claims of any kind or nature whatsoever against the Purchasers, their property,

their successors and assigns, or the Acquired Assets with respect to any Interest or Claim of any

kind or nature whatsoever which such person or entity had, has, or may have against or in DAS

LLC, its estate, its officers, its directors, its shareholders, or the Acquired Assets.  Following the

Closing of the Sale, no holder of an Interest and/or Claim in or against the Debtors shall interfere

with the Purchasers' title to or use and enjoyment of the Acquired Assets based on or related to

such Interest or Claim or any actions that the Debtors may take in their chapter 11 cases.

24.    The transactions contemplated by the Agreement are undertaken by the

Purchasers in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and

accordingly, the reversal or modification on appeal of the authorization provided herein to

consummate the sale of the Acquired Assets shall not affect the validity of the Sale to the

Purchasers, unless such authorization is duly stayed pending such appeal.  The Purchasers are

16

purchasers in good faith of the Acquired Assets, and are entitled to all of the protections afforded

by section 363(m) of the Bankruptcy Code.

25.    The consideration provided by the Purchasers for the Acquired Assets under

the Agreement is fair and reasonable and the Sale may not be avoided under section 363(n) of

the Bankruptcy Code.

26.    DAS LLC, including, but not limited to, its officers, employees, and agents,

is hereby authorized to execute such documents and do such acts as are necessary or desirable to

carry out the transactions contemplated by the terms and conditions of the Agreement and this

Sale Approval Order.  DAS LLC shall be, and hereby is, authorized to take all such actions as

may be necessary to effectuate the terms of this Sale Approval Order.

27.    The terms and provisions of the Agreement and this Sale Approval Order

shall be binding in all respects upon, and shall inure to the benefit of, DAS LLC, its estate, and

its creditors, the Purchasers, and their respective affiliates, successors, and assigns, and any

affected third parties, including, but not limited to, all persons asserting an Interest and/or Claim

against or in the Acquired Assets to be sold to the Purchasers pursuant to the Agreement,

notwithstanding any subsequent appointment of any trustee, party, entity, or other fiduciary

under any section of any chapter of the Bankruptcy Code, as to which trustee, party, entity, or

other fiduciary such terms and provisions likewise shall be binding.

28.    Notwithstanding anything contained herein to the contrary, the term

"Acquired Assets" as defined herein does not include property that is not property of DAS LLC's

estate, such as funds that are trust funds under any applicable state lien laws.

17

29.    To the extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Acquired Assets sold, transferred, or conveyed to the Purchasers on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale.

30.    The failure specifically to include or to reference any particular provision of the Agreement in this Sale Approval Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety.

31.    The Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on DAS LLC's estate.

32.    Nothing in this Sale Approval Order shall alter or amend the Agreement and the obligations of DAS LLC and the Purchasers thereunder.

33.    This Court retains exclusive jurisdiction to interpret, construe, enforce, and implement the terms and provisions of this Sale Approval Order, the Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets to the Purchasers, (b) compel delivery of the purchase price or performance of other obligations owed to DAS LLC pursuant to the Agreement, (c) resolve any disputes arising under or related to the Agreement, except as otherwise provided therein, (d) interpret, implement, and enforce the provisions of this Sale Approval Order, (e)

18

protect the Purchasers against any Interests and/or Claims against or in DAS LLC or the

Acquired Assets, of any kind or nature whatsoever, attaching to the proceeds of the Sale, and (f)

determine all disputes among DAS LLC, the Purchasers, and any non-debtor parties to any

Transferred Contract concerning, inter alia, DAS LLC's assumption and/or assignment of any

Transferred Contract to the Purchasers under the Agreement.

34.    The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York for the service and

filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated: New York, New York
       July 19, 2007

/s/ Robert D. Drain
UNITED STATES BANKRUPTCY JUDGE

## Exhibit D

**Asset Sale And Purchase Agreement**

**Execution Copy**

## ASSET SALE AND PURCHASE AGREEMENT

**THIS ASSET SALE AND PURCHASE AGREEMENT** (this "Agreement") dated June 14, 2007, by and among Delphi Automotive Systems LLC, a Delaware limited liability company ("Delphi"), Delphi Sistemas de Energia, S.A. de C.V., a Mexican corporation with a productive facility in the municipality of Ramos Arizpe, State of Coahuila, Mexico ("DSE"), each a "Seller" and, collectively, the "Sellers", and Delphi Controladora S.A. de C.V., a Mexican corporation, as guarantor of certain obligations, and Robert Bosch LLC, a Delaware limited liability company ("RBUS") and Frenados Mexicanos S.A. de C.V., a Mexican corporation ("FRMX"), each a "Purchaser" and, collectively, the "Purchasers".

## RECITALS:

**WHEREAS,** Delphi is engaged in the business of designing and selling brake systems and components to Original Equipment Manufacturers, Tier 1 suppliers and the automotive aftermarket; and

**WHEREAS**, DSE is engaged in providing Services (as hereinafter defined) to Delphi in connection with the Business (as hereinafter defined); and

**WHEREAS**, Delphi owns certain machinery and equipment, most of them imported into Mexico on a temporary basis, located in the Premises (as hereafter defined), and used by DSE in providing the Services to Delphi; and

**WHEREAS**, on October 8, 2005, Delphi and certain of its affiliates filed voluntary petitions for relief under Chapter 11 of Title 11, U.S.C. §§101 et seq. (as then amended) (the "Bankruptcy Code") (such petitions for relief hereafter referred to as the "Bankruptcy Cases"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and

**WHEREAS**, upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 363 and 365 of the Bankruptcy Code, Delphi desires to sell to RBUS all right, title and interest of Delphi in and to the Acquired Assets (as hereinafter defined), and RBUS desires to make such purchase, subject to Purchaser's assumption of the Assumed Liabilities and the conditions set forth in this Agreement; and

**WHEREAS**, upon the terms and subject to the conditions set forth in this Agreement, FRMX desires to offer employment to substantially all of the employees of DSE;

**NOW, THEREFORE**, in consideration of the premises, mutual promises, representations, warranties and covenants contained in this Agreement and other good and valuable consideration, and intending to be legally bound hereby, the Parties agree:

1

## DEFINITIONS

The following terms, as used in this Agreement, shall have the following meanings whether used in the singular or plural (other terms are defined in Sections or Schedules to which they pertain):

"**$**" means United States Dollars, unless other currency is specified.

"**Acquired Assets**" means the assets referred to in Section 1.1.1.

"**Administrative Assets**" means books, records and other administrative assets used in or necessary for continuing to provide the Services, including but not limited to, correspondence, customer lists, vendor lists, production data, sales materials and records, purchasing materials and records, personnel records of employees, billing records, accounting records, other financial records, and sale order files; provided, however that Administrative Assets do not include Technical Documentation.

"**Affiliate**" means with respect to any Party any business or other entity directly or indirectly controlling, controlled by or under common control with such specified entity. For purposes of this definition, control means ownership of more than fifty percent (50%) of the shares or other equity interest having power to elect directors or persons performing a similar function.

"**Agreement**" means this Asset Sale and Purchase Agreement, including its Exhibits and Schedules.

"**Allocation**" means allocation of the Purchase Price, as described in Section 4.2.

"**Alternate Bid(s)**" shall have the meaning set forth in Section 11.11.

"**Alternate Bidder(s)**" shall have the meaning set forth in Section 11.11.

"**Alternative Transaction**" shall have the meaning set forth in Section 9.3.1.

"**Ancillary Agreements**" means the agreements referred to in Section 7.2.

"**Assumed Contracts**" means those Transferred Contracts entered into by Seller before the Petition Date that Delphi, at Purchasers' request,  which such request shall be made to Delphi no later than entry of the Bidding Procedures Order, moves to assume and assign to the Purchaser under section 365 of the Bankruptcy Code.

"**Assumed Liabilities**" means the obligations assumed by Purchaser pursuant to Article 2, but only to the extent that an obligation: (a) arises on or after the Closing; and (b) with respect to obligations arising under Transferred Contracts: (i) does not arise from or relate to any breach by a  Seller of any provision of any of the Transferred Contracts; (ii)

2

does not arise from or relate to any event, circumstance or condition occurring or existing on or prior to the Closing that, with or without notice or lapse of time, would constitute or result in a breach of any of the Transferred Contracts; and (iii) is ascertainable by reference to the express terms of the Transferred Contracts.

"**Auction**" shall have the meaning set forth in Section 11.9.

"**Bankruptcy Cases**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Code**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Court**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**Bid Deadline**" shall have the meaning set forth in Section 11.4.

"**Bidding Procedures**" means the bidding procedures set forth in Section 11.1.

"**Bidding Procedures Order**" means the order of the Bankruptcy Court approving the Bidding Procedures in form and substance satisfactory to the Purchasers.

"**Bidding Process**" shall have the meaning set forth in Section 11.1.

"**Break-Up Fee**" shall have the meaning set forth in Section 9.3.1.

"**Business**" means the production of Products for the GMT 900 Programs being carried out at the Premises, including, without limitation, the GMT900 Light Duty Brake Corner Program, and other related programs.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which banks in New York, New York are authorized or obligated by law or executive order to close.

"**Claims**" mean losses, liabilities, claims (as defined in Section 101 of the Bankruptcy Code), damages or expenses (including reasonable legal fees and expenses) whatsoever, whether known or unknown, fixed, liquidated, contingent or otherwise.

"**Closing**" shall have the meaning set forth in Section 7.1.

"**Closing Date**" means the date of Closing.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Cases.

"**Contracts**" mean all written or material oral purchase orders, sales agreements,

3

service contracts, employment or consulting agreements, leases (for real property, personal property or otherwise), product warranty or service agreements and other commitments, agreements and undertakings of any nature, but not including quotations and bids of Sellers outstanding on the Closing Date.

"**Cure Amounts**" means all cure amounts payable in order to cure any monetary defaults required to be cured under Section 365(b)(1) of the Bankruptcy Code or otherwise effectuate, pursuant to the Bankruptcy Code, the assumption by Delphi and assignment to RBUS of the Assumed Contracts under the Sale Approval Order.

"**Defending Party**" shall have the meaning set forth in Section 13.18.

"**Demanding Party**" shall have the meaning set forth in Section 13.18.

"**Deposit Amount**" shall have the meaning set forth in Section 4.1.1.

"**Disclosure Schedule**" means, collectively, the Schedules to Sellers' Representations and Warranties contained in Section 5.1.

"**Employees**" shall have the meaning set forth in Section 3.1.

"**Escrow Agent**" means the escrow agent under the Escrow Agreement.

"**Escrow Agreement**" shall have the meaning set forth in Section 4.1.1.

"**Escrow Amount**" shall have the meaning set forth in Section 4.1.2.

"**Excluded Assets**" means assets not included in the Acquired Assets, as set forth in Section 1.1.2.

"**Excluded Contracts**" shall have the meaning set forth in Section 1.1.2.C.

"**Expense Reimbursement**" shall have the meaning set forth in Section 9.3.2.

"**Expiration Date**" shall have the meaning set forth in Section 5.3.

"**Final Order**" means an order or judgment: (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending or (ii) if an appeal, writ of certiorari, re-argument or rehearing has been filed or sought, the order or judgment has been affirmed by the highest court to which such order or judgment was appealed or certiorari has been denied, or re-argument or rehearing shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal or to seek certiorari or further re-argument or rehearing has expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with

4

respect to such order or judgment shall not prevent such order or judgment from being considered a Final Order.

"**Full Escrow Period**" shall have the meaning set forth in Section 4.1.2.

"**GMT 900 Light Duty Brake Corner Program**" means the GMT 900 Light Duty Brake Corner Program and such other GM Programs for brake-related business with General Motors Corporation in which RBUS currently acts as a Tier 1 supplier and Delphi acts as a Tier 2 supplier to RBUS.

"**Good Faith Deposit**" shall have the meaning set forth in Section 11.6.3.

"**Governmental Entity**" means any United States or Mexican federal, state or local, tribunal, legislative, executive, governmental, quasi-governmental or regulatory authority, self-regulatory authority, agency, department, commission, instrumentality or body having governmental authority with respect to the transactions contemplated hereby, under applicable law.

"**Hazardous Material**" means all matter or the effect of matter (and whether alone or in combination with other matter, and whether solid, liquid, gas or other state) which is a pollutant, contaminant, chemical, material, substance, constituent or waste, including without limitation, petroleum, petroleum-based products, polychlorinated biphenyls, asbestos and asbestos-containing materials, and noxious, radioactive, flammable, corrosive, caustic materials, all of which are governed under a Law, or are hazardous or toxic to biota, the ecosystem, or the environment.

"**Including**" means, whether or not initially capitalized, including without limitation.

"**Indemnification Claim**" shall have the meaning set forth in Section 12.4.

"**Initial Escrow Period**" shall have the meaning set forth in Section 4.1.2.

"**Intellectual Property**" means any and all patent rights, trademark rights, copyrights, software, Technical Documentation, trade secrets and know-how used by the Sellers in providing the Services.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

"**Inventory**" means, raw materials, work-in-process, packaging, stores, stock, and supplies, wherever located, but not Products, related to the Business.

"**Land**" means the land on which the Premises are located and which is leased by Fraccionadora  Industrial Del Norte, S.A. de C.V. from Alambrados y Circuitos Electricos, S.A. de C.V. as described in public deed number 618 dated October 15, 1998, issued by Onésimo Flores Rodríguez, Notary Public No. 9, of Saltillo, Coahuila.

5

"**Laws**" means laws, ordinances, codes, standards, administrative rulings or regulations of any applicable Governmental Entity.

"**Licensed Intellectual Property**" means the Intellectual Property necessary to fulfill the Transferred Contracts which will be, or has been, licensed to RBUS.

"**Lien**" means any lien, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction or similar statutes as applicable under Mexican law).

"**Listed Contracts**" means the Seller's contracts and commitments listed on Schedule 5.1.14.A.

"**M&E**" shall have the meaning set forth in Section 5.1.5.D.

"**Marked Agreement**" shall have the meaning set forth in Section 11.6.2.

"**Material Adverse Effect**" means any change or event that has a material adverse effect on the Acquired Assets or properties being purchased pursuant to this Agreement, except any change or event resulting from, relating to or arising out of: (a) any act or omission of a Seller taken with the prior written consent of a Purchaser; (b) any action taken by a Seller or a Purchaser or any of their respective representatives required by the terms of this Agreement; (c) general business or economic conditions; (d) conditions affecting the industry and markets in which the Business generally operates; (e) increases in energy, electricity, natural gas, raw materials or other operating costs; (f) changes resulting from any action required by the Bankruptcy Court; (g) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon such country, any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of any of such

countries; (h) acts of God; (i) changes in United States generally accepted accounting principles or generally accepted accounting principles of any foreign jurisdiction; (j) changes in any Law; (k) any existing event, occurrence or circumstance listed in the Disclosure Schedule as of the date hereof; (l) any adverse change in or effect on the Business, or an adverse change in or effect on the Services that is entirely cured by Seller before the earlier of: (1) the Closing Date; and (2) the date on which this Agreement is terminated pursuant to Section 6.3 hereof; or (m) the regulatory status of a Purchaser.

"**Notice**" shall have the meaning set forth in Section 13.18.

"**Ordinary Course of Business**" means, with respect to the Business, the ordinary

course of business consistent with custom and practice of the Business prior to the Petition Date or to the extent consistent with orders issued in the Bankruptcy Cases.

"**Party**" or "**Parties**" means any Purchaser and/or Seller.

"**Permits**" means permits, concessions, grants, franchises, licenses and other governmental authorizations and approvals issued to a Seller and that are currently used exclusively for the purpose of carrying on the Business or that relate exclusively to the Acquired Assets.

"**Person**" means an individual, a corporation, a partnership, a limited liability company, an association, a trust or other entity or organization.

"**Personal Property**" means tangible personal property other than Inventory, including production machinery, equipment, tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, related spare parts, business machines, computer hardware and other IT assets other than Intellectual Property, office furniture and fixtures, in-factory vehicles, trucks, model shop equipment, laboratory test fixtures and other tangible personal property, whether located on the premises of DSE, at the place of business of a vendor or elsewhere.

"**Petition Date**" shall mean October 8, 2005.

"**Post-Petition Contracts**" means the Contracts that Delphi entered into on or after the Petition Date relating to the Business entered into in the Ordinary Course of Business or approved by the Bankruptcy Court.

"**Potential Bidder**" shall have the meaning set forth in Section 11.3.

"**Premises**" means the building  leased by DSE from Fraccionadora Industrial Del Norte, S.A. de C.V. on the Saltillo-Piedras Negras Highway at Km. 8.54, Number 8540, Ramos Arizpe, Coahuila, Mexico, C.P. 25900.

"**Premises Lease**" means the lease for the Premises.

"**Products**" means finished products consisting of master cylinder bodies, brake drums, front corner modules, knuckles and rotors for OEMs, Tier 1 suppliers and the automotive aftermarket.

"**Purchase Price**" means the payment referred to in Section 4.1.

"**Purchaser Damages**" shall have the meaning set forth in Section 12.1.

"**Qualified Bid**" shall have the meaning set forth in Section 11.7.7.

"**Qualified Bidder**" shall have the meaning set forth in Section 11.3.3.

"**Required Bid Documents**" shall have the meaning set forth in Section 11.6.

"**Retained Liabilities**" shall have the meaning set forth in Section 2.3.

"**Sale**" means the sale of the Acquired Assets, the leasehold interest in the Premises and the Land in accordance with the Bidding Procedures.

"**Sale Approval Order**" means an order or orders of the Bankruptcy Court approving the Sale pursuant to Sections 363 and 365 of the Bankruptcy Code in form and substance reasonably satisfactory to Purchaser, authorizing and approving, among other things, the sale, transfer and assignment of the Acquired Assets and Assumed Liabilities of Delphi to RBUS, in accordance with the terms and conditions of this Agreement, free and clear of all Liens.

"**Sale Hearing**" shall have the meaning set forth in Section 11.10.

"**Sale Approval Motion**" means the motion to obtain the Sale Approval Order.

"**Seller Damages**" shall have the meaning set forth in Section 12.2.

"**Sellers' Knowledge**" or "**Knowledge of Seller(s)**" means the actual knowledge after reasonable investigation of the individuals listed on Schedule A, in each of their respective functional areas without imputation of the knowledge of any other Person.

"**Services**" means the assembly and manufacturing operations that DSE performs for Delphi at the Premises.

"**Software**" means computer software and programs, including, without limitation, source code, shareware, firmware, middleware, courseware, open source code, operating systems and specifications, system data, record and table layouts, databases, files documentation, storage media, manuals and other materials related thereto.

"**Subsequent Bid**" shall have the meaning set forth in Section 11.7.7.

"**Successful Bid(s)**" shall have the meaning set forth in Section 11.9.6.

"**Successful Bidder(s)**" shall have the meaning set forth in Section 11.9.6.

"**Tax Return**" means any return, declaration, report, claim for refund or information return, or statement, or any other similar filings, related to Taxes, including any Schedule or attachment thereto.

"**Tax(es)**" means, without limiting the generality of the following, all taxes, duties, fees, premiums, assessments, imposts, levies and other charges of any kind whatsoever

8

imposed by any Governmental Entity under applicable Law, together with all interest, penalties, fines, additions to tax or other additional amounts imposed in respect thereof, including those levied on, or measured by, or referred to as income, value added tax, profits, single business, capital, transfer, land transfer, sales, goods and services, harmonized sales, use, value-added, excise, stamp, withholding, business, franchising, property, employer health, payroll, employment, unemployment, social security (or similar) taxes, all surtaxes, all customs duties and import and export taxes, all license, franchise and registration fees; for the avoidance of doubt, the term "taxes" shall include each and all of the concepts referred to in articles 2, 3 and 4 of the Mexican Tax Code ("*Código Fiscal de la Federación*").

"**Technical Documentation**" means all documented technical information currently in the files of the Business primarily used in the Business owned by Delphi, in each case pertaining to the design or manufacture of the Products including the items listed on Schedule 5.1.7.

"**Termination Date**" shall have the meaning set forth in Section 9.1.1.E.

"**Third Party Bailed Assets**" shall have the meaning set forth in Section 1.1.2.A.

"**Third-Party Requirements**" shall have the meaning set forth in Section 5.1.3.

"**Transferred Contracts**" means the Contracts of the Sellers to be assigned to Purchaser at Closing as described in Section 2.1.1.

"**United States**" or "**U.S.**" means the fifty (50) states and the District of Columbia of the United States of America.

"**Warranties**" refers to the representations and warranties provided by either Seller to the Purchasers, or by either Purchaser to a Seller, as the case may be, in each case as referred to in Article 5 of this Agreement.

"**Water Concession**" shall have the meaning set forth in Section 1.l.1.E.

1.    **CONVEYANCE OF THE ACQUIRED ASSETS**:

**1.1. Acquired Assets Transaction**. Upon the terms and subject to the conditions set forth in this Agreement, at Closing Delphi and DSE shall sell, transfer, assign, convey and deliver to RBUS and to FRMX, and RBUS and FRMX (as the case may be) shall purchase, accept and acquire from Delphi or DSE, as the case may be, all of the assets and properties described in Section 1.1.1 below (collectively, the "**Acquired Assets**"), subject in each case to Section 1.1.2, free and clear of all Liens except the DSE liens specified in Section 5.1.15.E below.

**1.1.1. Acquired Assets**.

A.    **Machinery and Equipment.** The Acquired Assets consist of all of Sellers' right, title and interest in and to the machinery and equipment listed on Schedule

9

1.1.1 hereto, Permits, Inventory, rights under Transferred Contracts (including Delphi 's rights against third party manufacturers to the extent any liability is assumed by a Purchaser pursuant to Section 2.1),  Intellectual Property and  Administrative Assets.  The Acquired Assets shall be transferred by Sellers to RBUS in full compliance with any legal and/or administrative provision that may apply in order to, when applicable, preserve the Acquired Assets' temporary importation customs regime. Specifically, Sellers shall transfer temporary imported Acquired Assets through the so called "virtual customs operations" or through any similar or equivalent  method that may achieve the same result.

    **B.**  **Premises.**  DSE shall transfer to FRMX at Closing a leasehold interest in the Premises. DSE shall obtain the consent of Fraccionadora Industrial del Norte, S.A. de C.V. (the "Landlord") for the transfer of the leasehold.  At Closing, DSE and FRMX will execute an assignment agreement in the form of Exhibit 1.1.1B-1 attached hereto, pursuant to which DSE shall assign to FRMX all of DSE's rights and obligations deriving from that certain Lease Agreement entered into between the Landlord and DSE on November 11, 1998, as amended, and shall deliver to Purchasers the written consent of the Landlord to such assignment and assumption.  In the event DSE and the Sellers are successful in negotiating with the Landlord the purchase of the Premises then, at Closing, the Landlord and FRMX shall complete the transfer of the Premises by signing a transfer deed in the form of Exhibit 1.1.B-2 hereto at Closing.

    C.  **Land**. DSE shall cause Alambrados y Circuitos Electricos S.A. de C.V. (the "Owner") to transfer the Land to FRMX by having the Owner sign a transfer deed in the form of Exhibit 1.1.1C at Closing. FRMX shall be solely responsible for paying the applicable acquisition tax, the notarial fees for such transfer and for the physical structures to separate the Land from the contiguous property, such as fences.

    D.  **Personnel and Medical Records**. All work histories, personnel and medical records of Employees and former employees of DSE who worked at any time for any reason at the Premises for whom a record exists at the Premises at the time of Closing; provided, however, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws: FRMX will be provided the originals of all personnel and medical records of Employees of DSE who have accepted employment with FRMX in connection with the sale hereunder, with the prior written consent of such Employee or after posted written notice or other appropriate notice to such Employees if legally required. If an Employee objects to provision of personnel or medical records to Purchaser, the records will not be provided.  DSE will be entitled to retain a copy of any originals provided to FRMX, and, in the event of any employment litigation that DSE would be required to defend under this Agreement, and that would require DSE to produce such original documentation, FMRX will cooperate with DSE to provide such original documentation or certified copies, as appropriate.

    E.  **Water Well Rights**. Any and all rights and obligations for the extraction, use, and exploitation of underground national water with an aggregate water demand of 60,000 cubic meters per annum under the Water Concession number 06COA113347/24FMGR04  issued on July 29, 1998 by the National Water Commission

("Comisión Nacional del Agua") (the "Water Concession").

   F. **Discharge of Water Rights**. Any and all rights and obligations for the discharge of 25,118.30 cubic meters of water per annum under the Discharge of Water Concession number 06COA111504/24IMGE06 issued on March 23, 2006 by the National Water Commission ("Comisión Nacional del Agua").

   G. **Electricity Rights.** Subject to Section 5.1.8 below, the right to use electricity from DSE's electric substation until the date that FRMX obtains delivery of electricity from the Mexican Federal Electricity Commission (Comision Federal de Electricidad or "CFE").

  **1.1.2. Excluded Assets**. Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreement, the following properties and assets shall not be included in the Acquired Assets:

   A. **Bailed Assets**. Any machinery, equipment, tools, Inventory, tooling, dies, molds, patterns, jigs, gauges, production fixtures, special material handling equipment, customer dunnage and containers owned by any other third party listed in Schedule 1.1.2.A ("Third Party Bailed Assets").

   B. **Certain Financial Assets**. Cash, cash equivalents, bank accounts and all accounts receivable.

   C. **Certain Contracts**. All Contracts of Delphi that are not Transferred Contracts, including Contracts set forth on Schedule 1.1.2.C ("**Excluded Contracts**").

   D. **Tax Refunds**. Any refund of Taxes paid, or claim for refund of Taxes paid, of any kind relating to the Acquired Assets for any period prior to the Closing Date.

   E. **Privileged Information and Materials**. Information and materials protected by the attorney-client privilege or that, in the case of environmental-related documents, a Seller considers to be proprietary information, and the lack of which excluded information and materials is not material to the  manufacture of the Products or the provision of the Services.

   F. **Insurance**. The benefit of any of Sellers' or Sellers' Affiliates' insurance policies relating to the operation of the Business or the provision of the Services (including any right to proceeds thereunder).

   G. **Certain Rights**. All of the rights and claims of Delphi available to Delphi under the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, and any other applicable provisions of the Bankruptcy Code, and any related claims and actions arising under such sections by operation of law or otherwise, including any and all proceeds of the foregoing.

**H.**    **Other Excluded Assets**. All computer hardware, equipment, or other assets listed on Schedule 1.1.2. H.

**I.**    **Finished Goods**.  All  Products manufactured at the Premises prior to Closing.

**J.**    **Electricity**.  All electrical materials and equipment, including substations and metering equipment, related to the supply of Electricity to FRMX.

**1.1.3. Post-Closing Asset Deliveries**. Should a Seller or a Purchaser, in its reasonable discretion, determine after the Closing that books, records or other similar materials constituting Acquired Assets are still in the possession of such Seller, such Seller shall promptly deliver them to the appropriate Purchaser at no cost to that Purchaser. Should a Seller or a Purchaser, in its reasonable discretion, determine after the Closing that books, records or other materials constituting Excluded Assets were delivered to a Purchaser, such Purchaser shall promptly return them to the appropriate Seller at no cost to such Seller other than reimbursing Purchaser's reasonable out-of-pocket costs, but only if and to the extent such costs exceed, in the aggregate, $5,000.

**1.1.4. Prorations**:

**A.**    To the extent that a Seller has made any payment relating to the Products or the Services prior to the Closing Date with respect to any item listed in Subparagraph B below relating to periods on or following the Closing Date, RBUS or FRMX, as the case may be,  shall reimburse Seller on a per diem basis; and

**B.**    To the extent either Purchaser makes any payment relating to the Business or the Services following the Closing Date with respect to any item listed below relating to periods prior to the Closing Date,  the appropriate Seller shall reimburse the appropriate Purchaser on a per diem basis;

**C.**    The per diem under the preceding paragraphs A and B shall in each case be only for the following concepts:

(i)    Rent for the Premises and copier leases and other pre-paid amounts under Transferred Contracts (such other pre-paids to be mutually agreed by the parties before Closing);

(ii)    Personal, real property and other ad valorem Taxes, allocated in accordance with local custom;

(iii)    Water, wastewater treatment, sewer charges and other similar types of charges with respect to the Premises;

12

(iv)    Electric, fuel, gas, telephone and internet services and other utility charges; and

**C.    Further Assurance**. The parties will use commercially reasonable efforts to determine the amounts of the above prorations and settle such amounts at Closing. To the extent that, within sixty (60) days after Closing, a Seller, on the one hand, or a Purchaser, on the other hand, receives any bill or other invoice for any of the items listed in this Section 1.1.4 or similar items, relating to both pre-Closing and post-Closing periods, such Seller or Purchaser shall, as soon as practicable but no later than ninety (90) days after Closing, send any such bill or invoice to the other Party. If necessary to avoid incurring interest, penalties and/or late charges, a Purchaser may pay all amounts shown to be due thereon, and may invoice the appropriate Seller for all amounts owed by such Seller thereunder, and in such case such Seller shall reimburse such amounts.

Any payments due under this Section 1.1.4 that have not been settled at Closing shall be made within thirty (30) days after the end of the month in which a bill or invoice is sent to a Party (or Affiliate thereof); provided, however, that the disputed portion of any such item shall be paid within thirty (30) days after the final determination thereof on an item-by-item basis. When a Party makes a payment to a third party which is required to be reimbursed to such Party by the other Party, the reimbursement payment shall be considered the repayment of an advance.

**1.1.5. Non-Assignable Permits and Contracts:**

**A.    Non-Assignability**. After giving effect to the Sale Approval Order, to the extent that any Permit included in the Acquired Assets or any Transferred Contract is not capable of being assigned to Purchaser at the Closing without the consent or waiver of the issuer thereof or the other party thereto or any third party (including a Governmental Entity), or if such assignment or attempted assignment would constitute a breach thereof, or a violation of any Law, this Agreement shall not constitute an assignment thereof, or an attempted assignment, until any such consent or waiver is obtained.

**B.    Efforts to Obtain Consents and Waivers**. At Purchasers' request, Sellers shall, at their expense, use commercially reasonable efforts, and Purchasers shall, at Purchasers' expense, cooperate with Sellers, to obtain the consents and waivers and to resolve the impracticalities of assignment referred to in Section 1.1.5.A after the Closing.

**C.    Waivers or Consents that Cannot be Obtained.** Schedule 1.1.5.C lists the Permits and Transferred Contracts, if any, that Sellers have been unable to assign to Purchasers by Closing. Until the impracticalities of assignment referred to therein are resolved, such Seller's sole responsibility with respect to such matters, notwithstanding Section 1. 1, shall be to use, during the one hundred eighty (180) day period commencing with the Closing, all commercially reasonable efforts, at no cost to either Purchaser (other than pursuant to Section 1.1.5.D below), to: (i) cooperate in any reasonable and lawful arrangement designed to provide such benefits to the appropriate Purchaser, without incurring any financial obligation to such Purchaser or to any third party; and (ii) at the

request and direction of a Purchaser, take all reasonable actions to enforce for the account of such Purchaser and at the cost of such Purchaser any rights of the Seller arising from the Permits included in the Acquired Assets or Transferred Contracts referred to in Section 1.1.5.A against such issuer thereof or other party or parties thereto.

      **D.**    **Obligation of Purchaser to Perform**. To the extent that a Purchaser is provided the benefits pursuant to Section 1.1.5.C of any Permit included in the Acquired Assets or Transferred Contracts, such Purchaser shall perform, on behalf of the Seller providing such benefits, for the benefit of the issuer thereof or the other party or parties thereto the obligations of the Seller thereunder or in connection therewith and if such Purchaser shall fail to perform to the extent required herein, the  Seller, without waiving any rights or remedies that it may have under this Agreement or applicable Laws, may suspend its performance under Section 1.1.5.C in respect of the instrument which is the subject of such failure to perform unless and until such situation is remedied; or, at Purchaser's request, such Seller may perform at such Purchaser's sole reasonable cost and expense, in which case such Purchaser shall reimburse the Seller's reasonable costs of such performance immediately upon receipt of an invoice.

**2.**      **ASSUMPTION OF LIABILITIES:**

    **2.1. Assumed Liabilities**. At and as of the Closing, each Purchaser shall assume and agree to pay, perform and discharge when due, and shall be liable with respect to, all obligations, liabilities and responsibilities specifically referred to in this Section 2.1 ("Assumed Liabilities"), other than the Retained Liabilities, as follows:

      **2.1.1.**  The obligations of each Seller to be performed under the Contracts listed on Schedule 2.1.1 (the "Transferred Contracts") and the obligations of such Seller to be performed under licenses and Permits included in the Acquired Assets that are assigned or otherwise transferred to a Purchaser pursuant to this Agreement.

      **2.1.2**. The obligation to pay for all the costs and expenses related to the separation between the Land and the contiguous piece of land along the property boundary, including without limitation the placing of appropriate fences, and the cost of all goods and services related to the installation of independent utility and other services to the Premises, including without limitation electricity, telephone, water, internet, sewer and the like.

      **2.1.3.** Liabilities and obligations arising out of, resulting from, or relating to sales pursuant to Transferred Contracts for Products or Services by the Business, including all Product warranty, Product returns, Product liability (other than design defects) and Product recall liability related thereto, but only to the extent such liabilities and obligations result from a Purchaser's performance under a Transferred Contract after the Closing.

    **2.2. No Expansion of Third Party Rights.** The assumption by a Purchaser of any Assumed Liability shall in no way expand the rights or remedies of any third party against a Purchaser or a Seller as compared to the rights and remedies which such third party would have had against such Seller absent the Bankruptcy Cases, had such Purchaser not assumed

14

such Assumed Liability. Without limiting the generality of the preceding sentence, the assumption by either Purchaser of the Assumed Liabilities shall not create any third-party beneficiary rights other than with respect to the Person that is the obligee of such Assumed Liability.

**2.3. Retained Liabilitie**s. Notwithstanding anything in this Agreement to the contrary, no Purchaser shall assume or be deemed to have assumed, nor shall have any liability or obligation with respect thereto, any other liabilities of Delphi or DSE (collectively, "Retained Liabilities") including without limitation the following: (i) liabilities in respect of employment or services performed on or prior to the Closing; (ii) product liability claims to the extent based on a defective design for Products designed by Seller and sold prior to the Closing Date or manufactured by Sellers (whether sold prior to or after the Closing Date) except as expressly set forth in Section 2.1.3; (iii) existing litigation for which a claim has been made to or threatened in writing against either Seller on or before the Closing Date; (iv) all Tax liabilities of each Seller for all periods prior to Closing (but excluding any Tax liabilities allocated to Purchaser pursuant to Section 10.3 of this Agreement); (v) any liability or obligation of either Seller for administrative fees and expenses, including, without limitation, "allowed administrative expenses" under Section 503(b) of the Bankruptcy Code; (vi) any liability or obligation of either Seller for transaction fees and expenses and fees and expenses payable to lenders, brokers, financial advisors, legal counsel, accountants and other professionals in connection with this Agreement; (vii) all Debt owed by either Seller to any party; (viii) all Claims, except for Assumed Liabilities; ; (ix) Customs duties and ancillary charges for importations made prior to the Closing date; (x) any liability or obligation not expressly assumed pursuant to Section 2.1 hereof; (xi) any accounts payable on the books of Sellers prior to the Closing; (xii) all liabilities to Employees arising out of their employment by DSE or any affiliate thereof or payment of severance amounts at their termination prior to Closing; and (xiii) all  PBGC-related liabilities  accruing  prior to Closing with respect to Sellers or the Sellers' assets.

**3.     ACQUIRED ASSETS - PERSONNEL MATTERS – TRANSFERRED EMPLOYEES**:

**3.1. DSE Employees**. Listed on Schedule 5.1.16.A are all employees of DSE who perform services exclusively or primarily for the Business (each employee required to be so listed an "Employee" and, collectively, "Employees"). With respect to each such Employee (as limited in definition for purposes of this Article 3 only) included thereon, Schedule 5.1.16.A lists each Employee's: (i) title or job/position; (ii) job designation (i.e., salaried or hourly); (iii) location of employment; and (iv) annual base rate of compensation.

**3.1.1. Pre Closing Severance.**  At the request of Purchasers, DSE has agreed to and will cause all Employees to be terminated pursuant to the Federal Labor Law prior to Closing (but only after determining that RBUS or Purchasers are the Successful Bidders) and shall be responsible for all termination procedures and expenses.   Not later than ten (10) calendar days prior to the Closing Date, FRMX will offer employment to those Employees of DSE whom FRMX wishes to employ.  On the first business day following the Closing Date, FRMX will hire the Employees who accept the offer of Employment extended by

FRMX.

### 3.1.2 Employment Liabilities.

A.  Except as otherwise provided for in this Agreement, Purchasers shall be responsible for, and shall assume and thereafter pay, perform and discharge, any and all employment, compensation and employee benefit liabilities, responsibilities and obligations, including, without limitation, any and all claims under applicable law, including breach of any contract of service or claim for compensation or redress for wrongful or unfair dismissal or discrimination or failure to comply with an order for reinstatement or re-engagement or failure to comply with any provisions of all or any existing laws with respect to the employees, which liabilities, responsibilities and obligations related to the period of employment which began after the Closing Date.

B.    Except as otherwise provided for in this Agreement, Sellers shall be responsible for, and shall assume and thereafter pay, perform and discharge, any and all employment, compensation and employee benefit liabilities, responsibilities and obligations, including, without limitation, any and all claims under applicable law, including breach of any contract of service or claim for compensation or redress for wrongful or unfair dismissal or discrimination or failure to comply with an order for reinstatement or re-engagement or failure to comply with any provisions of all or any existing laws with respect to the Employees, which liabilities, responsibilities and obligations related to the period of employment (or its termination) before the Closing Date.

**3.1.3.** FRMX's offer of employment to substantially all persons identified on Schedule 5.1.16.A, will be on such terms and conditions as FRMX, in its sole discretion, shall determine.

**3.2. <u>Cooperation</u>**. DSE and FRMX will provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this Article 3.

**3.3. <u>No Third Party Rights</u>**. No provision of this Agreement confers rights or remedies upon any person, including Employees, other than the parties to this Agreement.

## 4.    PURCHASE PRICE:

**4.1. <u>Purchase Price; Deposit Amount</u>**. Subject to the terms and conditions of this Agreement, in consideration of the Sale, the aggregate purchase price for the Acquired Assets shall be the amount of: (i) fifteen million Dollars (US$ 15,000,000) (the "Purchase Price").

**4.1.1. Deposit Amount**. Upon execution of this Agreement, RBUS has delivered to the Escrow Agent, pursuant to the terms of the Escrow Agreement attached hereto as Exhibit 4.1.1 (the "Escrow Agreement"), $500,000 in immediately available funds (such amount, together with the interest accrued thereon prior to the Closing, the "Deposit

Amount"), to be held by the Escrow Agent in an interest bearing account reasonably acceptable to Purchaser to serve as an earnest money deposit and also as the Good Faith Deposit defined in Section 11.6.3 below, and to be released in accordance with the following procedures and the Bid Procedures set forth in Section 11 hereof:

        **A.**    **Deposit Instructions**. On the Closing Date, Delphi and RBUS shall jointly instruct the Escrow Agent to deliver the Deposit Amount, by wire transfer of immediately available funds, to an account or accounts designated by Delphi in the Escrow Agreement (and such amount shall be applied towards the payment of the Purchase Price);

        **B.**    **Termination of Agreement**. Upon any failure by RBUS to consummate the transactions contemplated hereby pursuant to this Agreement if and as required by Section 7.1 hereof, the Escrow Agent shall deliver the Deposit Amount, in accordance with the terms of the Escrow Agreement, by wire transfer of immediately available funds, to an account designated by Delphi in the Escrow Agreement, to be retained by Delphi. Any such payment shall constitute Delphi's sole recourse in connection with such failure to consummate the transactions contemplated hereby; and

        **C.**    **Other Reason**. Upon termination of this Agreement for any other reason, or upon the failure by Delphi and DSE to consummate the transactions contemplated hereby pursuant to this Agreement if and as required by Section 7.1 hereof by September 28, 2007, the Escrow Agent to deliver the Deposit Amount, by wire transfer of immediately available funds, to an account designated by RBUS in the Escrow Agreement, to be retained by RBUS.

      **4.1.2. <u>Delivery of Purchase Price</u>**. At Closing,  Purchasers  shall pay to Sellers an aggregate amount equal to the Purchase Price less the Deposit Amount (apportioned pursuant to the allocation referred to in Section 4.2) and less $2,000,000.00  (two million dollars) (the "Escrow Amount") by wire transfer in U.S. Dollars in immediately available funds to the account of the appropriate Seller, pursuant to this Agreement and a notice delivered by each Seller to Purchasers prior to Closing. At Closing, Purchasers shall pay to JP Morgan Trust Company, National Association as "Escrow Agent" hereunder the Escrow Amount  to be held by the Escrow Agent as collateral to secure the rights of the parties under Article 12 hereof. The Escrow Amount shall be held pursuant to the provisions of the Escrow Agreement. The entire  Escrow Amount will be held by the Escrow Agent from the Closing Date until the one   (1) year anniversary of the Closing Date (the "Initial Escrow Period"), at which time $1,000,000 of the Escrow Amount will be released to the Sellers; provided, however, that in the event a Purchaser has made a claim under Article 12 prior to the end of the Initial Escrow Period, then such Escrow Period shall continue (and the Escrow Agent will continue to hold in escrow that portion of the Escrow Amount which is equal to the amount which is necessary to satisfy such indemnity claim) until such claim is fully and finally resolved. The remainder of the Escrow Amount will be held by the Escrow Agent from the Closing Date until the two (2) year anniversary of the Closing Date (the "Full Escrow Period") provided, however, that in the event a Purchaser has made a claim under Article 12 after the first anniversary of the Closing Date but prior to the end of the Full Escrow Period, then the Full Escrow  Period shall continue (and the Escrow Agent will

continue to hold in escrow that portion of the Escrow Amount which is equal to the amount which is necessary to satisfy such indemnity claim) until such claim is fully and finally resolved. The costs and expenses of the Escrow Agent will be paid from and borne solely by the Escrow Amount.

**4.2. Allocation of Purchase Price**. The Parties agree to allocate the Purchase Price among the Acquired Assets, for all purposes (including financial, accounting and tax) (the "Allocation") in a manner consistent with the Allocation Schedule set forth in Schedule 4.2 to be mutually agreed upon by RBUS and Delphi in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended, based on the fair market value of the Acquired Assets. RBUS shall provide to Delphi a draft Allocation within fifteen (15) days following the Closing Date. This Allocation shall become final and binding on the parties, unless Delphi notifies RBUS within fifteen (15) days after receipt of such Allocation of Delphi's disagreement with such Allocation. In the event Delphi timely notifies RBUS of such disagreement, the parties shall resolve such disagreement in the manner described in Section 13.18 of this Agreement. RBUS and Delphi shall each report the federal, state and local income and other Tax consequences of the purchase and sale contemplated hereby in a manner consistent with the Allocation, including, if applicable, the preparation and filing of Forms 8594 under Section 1060 of the Internal Revenue Code (or any successor form or successor provision of any future tax law) with their respective federal income Tax Returns for the taxable year which includes the Closing Date, and neither will take any position inconsistent with the Allocation unless otherwise required under applicable law. Delphi shall provide RBUS and RBUS shall provide Delphi with a copy of any information required to be furnished to the Secretary of the Treasury under Internal Revenue Code Section 1060.

**5.     REPRESENTATIONS AND WARRANTIES:**

**5.1. Representations and Warranties of Seller**. All information set forth in the Disclosure Schedules with respect to any clause of this Section 5.1 shall be deemed disclosed under and incorporated into any other clause of this Section 5.1 as to which such disclosure would clearly be appropriate based solely on the language in such disclosure and such other clause. Each Seller represents and warrants to the Purchasers as follows:

**5.1.1. Organization and Good Standing**. Except as otherwise set forth on Schedule 5.1.1, each Seller is a legal entity duly organized, validly existing and in good standing under the laws of its jurisdiction of formation, and has all requisite corporate or other organizational power and, subject to any required Bankruptcy Court approval, authority to own, lease and operate its properties and assets and to carry on the Business as presently conducted, and is in good standing in all jurisdictions where it owns or leases real property.

**5.1.2. Corporate Power; Due Authorization**. DSE has, and Delphi, subject to Bankruptcy Court approval, also has the corporate or other organizational power and authority to execute and deliver this Agreement and the Ancillary Agreements, subject to Bankruptcy Court approval, to which such Seller is a party, and to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated herein and

18

therein. The execution, delivery and performance of this Agreement and the Ancillary Agreements by DSE, and subject to Bankruptcy Court approval, the execution, delivery and performance of this Agreement and the Ancillary Agreements by Delphi, and the consummation of the contemplated transactions have been duly authorized by all necessary action on the part of such Seller. Subject to the entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, this Agreement, and the Ancillary Agreements, have been duly and validly executed and delivered by or on behalf of the Sellers and (assuming this Agreement constitutes a valid and binding obligation of Purchasers) constitutes a legal, valid and binding agreement of Sellers, enforceable against each Seller in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and to general equitable principles.

**5.1.3. No Violations**. No consent, approval, authorization of, declaration, filing or registration with any domestic or foreign government or regulatory authority or any other third party is required to be made or obtained by either Seller in connection with the execution, delivery and performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements (including the assignment of all Transferred Contracts), except for: (i) consents, approvals, authorizations of, declarations or filings with, the Bankruptcy Court that have been made or obtained, or will be made or obtained prior to the Closing; and (ii) consents, approvals, authorizations, declarations, filings and registrations set forth on Schedule 5.1.3, the lack of which would not have a Material Adverse Effect. The items referred to in clauses (i) through (ii) of this Section 5.1.3 are hereinafter referred to as the "Third-Party Requirements".

**5.1.4. Sufficiency of Acquired Assets**. The Acquired Assets comprise all of the assets reasonably necessary to continue the supply of Products in a manner consistent with DSE's supply of Products the, pursuant to RBUS's and Delphi's Tier 1/Tier 2 arrangement.

**5.1.5. Personal Property; Condition of Personal Property**:

**A.    Title to Personal Property**. Except for the Personal Property leases and other Personal Property referred to in Schedule 5.1.5.A, each of the Sellers has good, valid and marketable title to its respective Personal Property and Inventory included in the Acquired Assets. Upon entry by the Bankruptcy Court of the Sale Approval Order, Delphi shall transfer the Acquired Assets free and clear of any Lien.

**B.    Condition of Personal Property**. The Personal Property included in the Acquired Assets is in such condition at Closing (considering age, wear and tear, and purpose for which used) as to enable fulfillment of the Transferred Contracts as they are currently being fulfilled without material disruption, but Sellers make no representation or warranty as to the duration of such condition after Closing.

**C.    Inventory**. Except to the extent identified in Schedule 5.1.5.C, the

19

Inventory included in the Acquired Assets will, as of the Closing, be located at the Premises and such other locations as set forth on Schedule 5.1.5.C, be fit for the purpose for which it is ordinarily acquired.

      **D.    Machinery, Equipment and Tools**. Regarding the Acquired Assets, Schedule 5.1.5.D sets forth a list of substantially all machinery, equipment and capitalized tools (collectively, the "M&E") with an acquisition value greater than $5,000 USD, included in the Acquired Assets and primarily used in or related to the Services.  The M&E included in the Acquired Assets is in such condition at Closing (considering age, wear and tear, and purpose for which used) as to enable fulfillment of the Transferred Contracts as they are currently being fulfilled without material disruption, but Sellers make no representation or warranty as to the duration of such condition after Closing.

      **E.    Imported Assets**. Except for matters referred to in Schedule 5.1.5.E, all imported assets included in the Acquired Assets (i) have been imported in full compliance with Applicable Laws and regulations and customs documentation requirements and, where applicable, any special customs regime to which the Sellers are subject, including PITEX, Maquila, IMMEX PROSEC or others; (ii) all customs filings, reports and certifications required to be filed have been duly and timely filed; (iii) all custom duties, Taxes and other fees have been duly and timely paid; and (iv) all documents legally required to be maintained with respect thereto, including but not limited to the customs documentation evidencing the correct import as well as the assets legal stay in Mexico, have been and are being maintained by Sellers in the Ordinary Course of Business.

   **5.1.6. Litigation.** Except for the pendency of the Bankruptcy Cases, including all proofs of claim filed by creditors in the Bankruptcy Cases, and any Claims referred to in Schedule 5.1.6, there is no suit, action, proceeding or, to either Seller's Knowledge, investigation (whether at law or equity, before or by any federal, state or foreign commission, court, tribunal, board, agency or instrumentality, or before any arbitrator) pending or, to any Seller's Knowledge, threatened against or affecting either Seller.

   **5.1.7. Intellectual Property** .  The parties agree and acknowledge that Delphi has provided RBUS with all Intellectual Property required to conduct the Business in arrangements that precede this Agreement, in furtherance of RBUS Tier 1 arrangements with General Motors, including the licenses listed on Schedule 5.1.7 which licenses are enforceable in accordance with  their terms.

      A.    Schedule 5.1.7.A. sets forth a true and complete list of the Intellectual Property.  Except as set forth in Schedule 5.1.7.A, there are no impediments to the ability of any Seller under any agreement with a third party or under applicable Law to grant to Purchasers the rights to use the Intellectual Property as contemplated in this Agreement.

      B.    To Sellers' Knowledge, Sellers are conducting the Business in a manner that does not violate the intellectual property right of another Person and no Claim has been made by any third party against any Seller of Intellectual Property infringement or misappropriation in connection with the Intellectual Property resulting from the operation of

the Business, except as set forth in Schedule 5.1.7.B.

**5.1.8. Electricity.** DSE will allow FRMX to use electricity from DSE's substation until the date that FRMX is able to obtain its own electricity from the CFE, provided that such date does not exceed 18 months from the date of Closing.

**5.1.9. Compliance with Other Instruments and Laws; Permits**. Each Seller is in compliance with all Laws applicable to the manufacture of the Products and the provision of the Services and all Permits. All Permits that are necessary for the manufacture of the Products and the ownership and operation of the Acquired Assets have been duly obtained, are in full force and effect, and, to any Seller's Knowledge, are listed on Schedule 5.1.9, and there are no proceedings pending or, to either Seller's Knowledge, threatened, which may result in the revocation, cancellation or suspension, or any materially adverse modification, of any such Permit. The execution, delivery and performance of, and compliance with, this Agreement and the Ancillary Agreements by either Seller will not, with or without the passage of time or the giving of notice, result in any such violation or be in conflict with or constitute a default under any Permit.

**5.1.10. Brokers**. No Seller has employed a finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which a Purchaser would be liable.

**5.1.11. Consents and Approvals**. Assuming that the Third-Party Requirements will be satisfied, made or obtained and will remain in full force and effect, and assuming receipt of the consents, approvals and authorizations listed in Schedule 5.1.11, neither the execution, delivery or performance of this Agreement and the Ancillary Agreements by the Sellers, nor the consummation by the Sellers of the Sale, nor compliance by any Seller with any of the provisions hereof and of the Ancillary Agreements, will, with or without the passage of time or the giving of notice: (i) result in any breach of any provisions of the articles of incorporation or bylaws or similar organizational documents of any Seller; (ii) result in a material violation, or breach of, or constitute (with or without due notice or lapse of time) a default (or give rise to any right of termination, cancellation, amendment, vesting, payment, exercise, acceleration, suspension or revocation) under any of the terms, conditions or provisions of any note, bond, mortgage, deed of trust, security interest, indenture, loan or credit agreement, license, permit, contract, lease, agreement, plan or other instrument, commitment or obligation to which a Seller is a party or by which its properties or assets may be bound or affected; (iii) violate any order, writ, governmental authorization, injunction, decree, statute, rule or regulation applicable to any Seller or to any of its properties or assets; or (iv) result in the creation or imposition of any Lien on any Delphi asset that is part of the Acquired Assets; *provided, however,* that the representations and warranties in clauses (ii) and (iii) above shall not apply to the extent they relate to violations, breaches, defaults, terminations, cancellations, accelerations, creations, impositions, suspensions or revocations that are excused by or unenforceable as a result of the filing of the Bankruptcy Cases or the applicability of any provision of or any applicable law of the Bankruptcy Code.

**5.1.12. Intentionally Omitted.**

**5.1.13. Intentionally Omitted.**

**5.1.14. <u>Contracts</u>**:

     **A.**    Schedule 5.1.14.A lists all Transferred Contracts together with any other agreements included in the Assumed Liabilities related to the manufacture of the Products and the provision of the Services that involve payment or performance obligations that individually exceed $5,000, and such Schedule includes all other Contracts to which either Seller is a party or by which any of its properties are bound or that primarily relate to, are primarily used in, are primarily arising from, or are necessary for the conduct of the manufacture of the Products or the provision of the Services under the Transferred Contracts (collectively, "Listed Contracts"). Each Seller has delivered or made available to the Purchasers true, correct and complete copies of the Listed Contracts, except as set forth on Schedule 5.1.14.A. Schedule 5.1.14.A identifies all Post-Petition Contracts included within the Listed Contracts other than immaterial Post-Petition Contracts and open purchase orders entered into in the Ordinary Course of Business. Except as set forth on Schedule 5.1.14.A, and except for Post-Petition Contracts that are immaterial to the Business, none of the Post-Petition Contracts included within the Listed Contracts contains any provisions restricting its assignment to Purchaser pursuant to the terms of this Agreement.

     **B.**    Each of the Listed Contracts is valid, binding and, subject to payment of all Cure Amounts, if applicable (which Cure Amounts will be paid by Delphi as set forth in the Sale Approval Order), enforceable against the relevant Seller, to the extent set forth therein, and, to Sellers' Knowledge, the other parties thereto, in accordance with its terms, and is in full force and effect. Except as set forth on Schedule 5.1.14.B, and other than with respect to monetary defaults by Delphi under Listed Contracts that are curable by payment of all Cure Amounts, if applicable, Delphi, and to Sellers' Knowledge each of the other parties thereto, has performed all obligations required to be performed by it to date under, and is not in default (except with respect to defaults that need not be cured under Section 365 of the Bankruptcy Code for Delphi to assume and assign such Listed Contracts to a Purchaser, if applicable) in respect of, any of such Listed Contracts, on the part of a Seller, or to Sellers' Knowledge, on the part of any other party thereto. Except as set forth in Schedule 5.1.14.B, and other than with respect to monetary defaults by Delphi under Listed Contracts that are curable by payment of all Cure Amounts, if applicable, Sellers have received no written claim or notice from any other party to any such Listed Contract that such Seller has breached any obligations to be performed by it thereunder, or is otherwise in default or delinquent in performance thereunder (except with respect to defaults, delinquencies or obligations that need not be cured or performed, as appropriate, under Section 365 of the Bankruptcy Code for Delphi to assume and assign such Listed Contracts to Purchaser, if applicable).

**5.1.15. <u>Tax Matters</u>**:

     **A.**    Each Seller has: (i) duly and timely filed with the appropriate federal, state,

local and foreign authorities or governmental agencies, all material Tax Returns required to be filed and such Tax Returns were true, correct and complete; and (ii) and have paid all Taxes shown thereon as due and owing, except where the failure to file such Tax Returns or to pay such Taxes would not result in any liability to either Purchaser or any Lien on the Acquired Assets.

      **B.**     Except as set forth on Schedule 5.1.15.A, each Seller has properly and timely withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor or other third party (including federal income taxes, sales and use taxes, personal property taxes, Federal Insurance Contribution Act taxes and Federal Unemployment Tax Act taxes) and has properly and timely paid the same to the proper Tax receiving officers or authorized depositories, except in each case where such failure would not result in any liability to either Purchaser or any Lien on the Acquired Assets.

      **C.**     Delphi is not a party to any Tax allocation, Tax sharing agreement or Tax indemnity arrangement, except as provided in this Agreement, under which Purchaser could be subject to Tax or other liability after the Closing.

      **D.**     No claim has ever been made by Mexican tax authorities that Delphi is or may be subject to taxation in Mexico; and no claim has ever been made by US tax authorities that DSE is or may be subject to taxation in the United States.

      **E.**     There are no Tax liens on any of Sellers' assets, except for liens asserted by the PBGC against assets of DSE which, to Sellers' knowledge, are not perfected.

      **F.**     Except for Transfer Taxes relating to the Sale, since  January 1, 2002, neither Seller has incurred any Taxes other than in the ordinary course of business and each Seller has made adequate provisions on its books of account for all Taxes with respect to the Acquired Assets and the Business for such period, except for Taxes that would not result in any liability to either Purchaser or any Lien on the Acquired Assets.

      **G.**     Neither Seller has any liability for the Taxes of any Person other than a Seller or any of its subsidiaries (i) under Treasury Regulation 1.1502-6 (or any similar Treasury Regulations), (ii) as a transferee or successor, (iii) by contract, or (iv) otherwise, except in each case where such liability would not result in any liability to either Purchaser or any Lien on the Acquired Assets.

      **H.**     In the event the Mexican Tax authorities assert that either of the Purchasers is jointly liable with DSE pursuant to paragraph IV of Article 26 of the Mexican Federal Tax Code (Código Fiscal de la Federación) for any taxes not paid by DSE, DSE and Delphi Controladora S.A. de C.V., a Mexican corporation agree, jointly and severally,  to hold the Purchasers safe and harmless from any claim filed against them by the tax authorities and to indemnify the Purchasers for any damages   incurred by  the Purchasers as a result of such tax claims.

**5.1.16. Employee Issues**:

       **A.**     **Employees**. Schedule 5.1.16.A contains a list of all DSE Employees, and the information thereon is true, complete and correct in all material respects.

       **B.**     **Seller Performance**. DSE has performed and discharged, or will perform and discharge on or before the Closing Date, its obligations with respect to all of the Employees, up to and including the Closing Date, including working time, payment of wages and salaries, benefits, employer's contributions to any relevant social security, health, welfare and occupational pension scheme, severance or any other payments, and payment of all other costs and expenses relating to their employment (including without limitation any taxation, accrued holiday and vacation pay, accrued bonus or other sums payable with respect to employment) up to and including the Closing Date, except as otherwise set forth on Schedule 5.1.16.B.

**5.1.17. Environmental**.

       **A.**     Since January 1, 1999, the operation of the Premises is in material compliance with all applicable environmental laws.

       **B**.     Except as set forth in Schedule 5.1.17, there are no Hazardous Materials present in the surface water, groundwater or soil (either surface or subsurface) at the Premises in excess of the amounts permitted under applicable Laws.

       **5.1.18. Absence of Other Representations or Warranties**. Except for the Warranties expressly set forth in this Agreement and the Ancillary Agreements, no Seller makes any representations or warranties, express or implied, with respect to the Acquired Assets, the Assumed Liabilities, and in particular but without limitation, Sellers make no representations with respect to any plan(s) of Purchaser for the future conduct of the Business. For the avoidance of doubt, no warranty or representation is given on the contents of the documents provided in due diligence, on any other documents or other information not contained in this Agreement or the Ancillary Agreements, all of which were produced only for information purposes.

**5.2. Representations and Warranties of Purchasers.** Purchasers warrant and represent to Sellers as follows:

       **5.2.1. Corporate Data**. Each Purchaser is a legal entity duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, and has all requisite corporate or other organization power and authority to own, lease and operate its properties and assets.

       **5.2.2. Corporate Power; Due Authorization.** Each Purchaser has the corporate or other organizational power and authority to execute and deliver this Agreement and the

24

Ancillary Agreements and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated herein and therein. The execution, delivery and performance of this Agreement and the Ancillary Agreements have been duly authorized by all necessary action on the part of Purchaser. This Agreement is, and the Ancillary Agreements to which Purchaser is a party will be, when executed and delivered (assuming this Agreement constitutes a legal, valid and binding obligation of the Sellers), valid and legally binding obligations of Purchasers, enforceable against each Purchaser in accordance with their respective terms, except as enforcement of such terms may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws or proceedings affecting the enforcement of creditors' rights generally and by the availability of equitable remedies and defenses.

**5.2.3. No Violations**. Neither the execution, delivery or performance of this Agreement by Purchaser, nor the consummation by either Purchaser of the transactions contemplated herein, nor compliance by a Purchaser with any of the provisions hereof, will: (i) except for the Third-Party Requirements listed on Schedule 5.1.3, require a Purchaser to obtain any consent, approval or action of, or make any filing with or give notice to, any domestic or foreign governmental or regulatory body or any other Person; (ii) conflict with or result in any breach of any provisions of the certificate of incorporation or bylaws of Purchaser; or (iii) violate any order, writ, injunction, decree, statute, rule or regulation applicable to either Purchaser or such Purchaser's properties or assets.

**5.2.4. Litigation**. Except for the pendency of the Bankruptcy Cases, including all proofs of claim filed by creditors in the Bankruptcy Cases, there is no suit, action, proceeding or investigation (whether at law or equity, before or by any federal, state or foreign commission, court, tribunal, board, agency or instrumentality, or before any arbitrator) pending or, to the knowledge of either Purchaser, threatened against or affecting Purchaser which could reasonably be expected to result in the issuance of an Order outstanding restraining, enjoining or otherwise prohibiting Purchaser from consummating the transactions contemplated by this Agreement.

**5.2.5. Brokers**. Neither Purchaser has employed a finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which a Seller would be liable.

**5.2.6. Intentionally Omitted.**

**5.2.7. Intentionally Omitted.**

**5.2.8. Adequate Assurance of Future Performance**. Purchasers have provided or will be able to provide, at or prior to the Sale Hearing, adequate assurance of their future performance under each Assumed Contract to the parties thereto (other than Sellers) in satisfaction of Section 365(f)(2)(B) of the Bankruptcy Code, and no other or further assurance shall be necessary thereunder with respect to any Assumed Contract.

**5.2.9. Compliance with Law**. Each Purchaser is in compliance with all Laws

applicable to it, except with respect to those violations that could not reasonably be expected to result in the issuance of an order outstanding restraining, enjoining or otherwise prohibiting Purchaser from consummating the transactions contemplated by this Agreement.

**5.2.10. Intentionally Omitted.**

**5.3. Survival of Representations, Warranties and Covenants of the Seller.** The representations and warranties made by the Sellers in Section 5.1 shall survive the Closing and shall expire on the  second anniversary of the Closing Date (the "Expiration Date") except for  the representations and warranties made by Sellers in Section 5.1.5.A, which shall survive indefinitely; provided, however, that if, at any time prior to the Expiration Date, a Purchaser delivers to Sellers a written notice alleging the existence of an inaccuracy in or a breach of any of the representations and warranties made by a Seller and asserting a claim for recovery in accordance with Article 12 based on such alleged inaccuracy or breach, then the claim asserted in such notice shall survive the Expiration Date until such time as such claim is fully and finally resolved. The covenants made by the Sellers shall survive the Closing and shall expire on the Expiration Date.

**5.4. Survival of Representations, Warranties and Covenants of the Purchaser**. The representations and warranties made by the Purchasers in Section 5.2 shall survive the Closing and shall expire on the Expiration Date; provided, however, that if, at any time prior to the Expiration Date, a Seller delivers to a Purchaser a written notice alleging the existence of an inaccuracy in or a breach of any of the representations and warranties made by the Purchaser and asserting a claim for recovery in accordance with Article 12 based on such alleged inaccuracy or breach, then the claim asserted in such notice shall survive the Expiration Date  until such time as such claim is fully and finally resolved. The covenants made by the Purchasers shall survive the Closing and shall expire on the Expiration Date.

**6.     CONDITIONS TO CLOSING**:

**6.1. Conditions to Obligations of Seller and Purchaser**. The respective obligations of each party to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver at or prior to the Closing Date of the following conditions precedent:

**6.1.1. Sale Approval Order**. The Sale Approval Order shall be entered by the Bankruptcy Court and shall not be subject to a stay or injunction.

**6.1.2. No Law, Judgments, etc.** No provisions of any applicable Law and no judgment, injunction (preliminary or permanent), order or decree that prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement shall be in effect (each party taking any and all steps required by Section 8.2 of this Agreement).

**6.2. Conditions to Obligations of Purchasers**. The obligation of Purchasers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which

may be waived in whole or in part by Purchasers):

      **6.2.1. Accuracy of Representations and Warranties**. Except as otherwise permitted by this Agreement, and after giving effect to the Sale Approval Order, the representations and warranties of Sellers contained in this Agreement shall be true and correct in all material respects, in each case as of the date hereof and as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which shall be true and correct only as of such date or time) except where the failure of such representation and warranty to be true and correct would not have a Material Adverse Effect. Subject to the preceding sentence, Sellers may update or supplement the Disclosure Schedule prior to Closing by written notice to Purchasers.

      **6.2.2. Performance of Covenants**. Each of the Ancillary Agreements to which a Seller is a party shall have been executed and delivered by such Seller to Purchaser, and all other agreements and transactions contemplated hereby or in any Ancillary Agreement to be performed by such Seller on or before the Closing shall have been performed in all material respects.

      **6.2.3. Payment of Amounts due under Certain Contracts**. Delphi shall have paid all Cure Amounts with respect to Assumed Contracts as set forth in Section 8.4 hereof. Delphi shall have paid all outstanding amounts that arose post-petition under Transferred Contracts that are Post-Petition Contracts and became due and owing prior to the Closing Date.

      **6.2.4. Certification.** Sellers shall furnish to Purchasers a certification in a form acceptable to Purchaser pursuant to Treasury Regulation Section 1.1445-2(b)(2) that Seller is not a foreign person.

      **6.2.5. Other Approvals**. The third party consents set forth in Schedule 6.2.5 shall have been received and all consents, approvals and filings in connection with Third-Party Requirements shall have been obtained or made in form and substance reasonably satisfactory to the Purchaser.

      **6.2.6 Sump Remediation.**  Sellers shall have completed the "sump remediation" as described in that certain Phase II Environmental Site Assessment dated May, 2007, Ref. No. 049354 delivered by Delphi to RBUS.

      **6.2.7 Continued Supply of Products.**  Sellers shall have continued to meet their obligations under their existing supply agreements and to have otherwise continued to conduct the Business substantially as it was conducted prior to the execution of this Agreement.

      **6.2.8. Maintenance of Assets**.  Sellers shall maintain the Personal Property included in the Acquired Assets and the  M&E up to the date of  Closing, substantially as it has maintained them while fulfilling its existing supply contracts.

**6.2.9 Confirmation of Electrical Service**.  Purchasers shall have obtained from the CFE written confirmation that it is possible for FRMX to obtain the necessary electricity from CFE to operate the Premises as presently operated by DSE.    **6.2.10  Importation Documents**. Sellers shall have provided to Purchasers, on or before the Closing Date, all the documentation available to or in the possession of Sellers establishing legal importation into, and continued presence in Mexico of all the Acquired Assets.

**6.2.11. Water and Discharge of Water Concessions Obligations**. As of the Closing Date the Sellers are in compliance with all of their obligations under applicable Laws with respect to the Water Concession  and the Water Discharge Concession and the payment of all water fees, and there no procedure shall have been initiated, or threatened to be initiated by the Mexican National Water Commission to revoke the Sellers' Water Concession or the Sellers' Water Discharge Concession.

**6.2.12 Regularization of the legal import and/or stay in Mexico of the Acquired Assets**. In accordance with subsection E of section 5.1.5 above, Sellers shall, before the Closing Date, regularize the legal import and/or stay in Mexico of all assets included in the Acquired Assets whose legal import and/or stay in Mexico cannot be evidenced with the proper customs documentation or with an invoice complying with all mandatory requirements issued by a taxpayer duly registered in the Mexican Federal Taxpayers Registry. The said regularization shall comply with the applicable tax and/or customs provisions and/or regulations. Sellers shall bear any taxes, fines, fees or any amount necessary for duly carrying out the regularization of any Acquired Assets.  Sellers shall provide to Purchasers, on or before the Closing Date, all the documentation evidencing the proper regularization of the legal import and/or stay in the country of the Acquired Assets.

**6.3. Conditions to Obligations of Sellers**. Except as otherwise permitted by this Agreement, the obligation of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Seller):

**6.3.1. Accuracy of Representations and Warranties**. Except as otherwise permitted by this Agreement, and after giving effect to the Sale Approval Order, the representations and warranties of Purchasers contained in this Agreement shall be true and correct in all material respects, in each case as of the Closing Date if made on such date (except for representations and warranties that speak as of a specific date or time, which shall be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a material adverse effect on either Purchaser's ability to consummate the transactions contemplated by this Agreement.

**6.3.2. Performance of Covenants**. Each of the Ancillary Agreements to which a Purchaser is a party shall have been executed and delivered by such Purchaser to Sellers, and all other agreements and transactions contemplated hereby or in any Ancillary Agreement to be performed by a Purchaser on or before the Closing shall have been performed in all material respects.

28

**6.3.3. Delivery of Purchase Price**. RBUS shall have delivered to Delphi the Purchase Price by wire transfer, in immediately available funds, to such bank account or bank accounts as shall be specified by Delphi to RBUS on the Closing Date.

**7.**    **CLOSING**:

**7.1.**    **The Closing**. Subject to the satisfaction of the conditions set forth in Article 6 of this Agreement, the closing (the "Closing") of the transactions contemplated hereby shall take place at the offices of Robert Bosch LLC, 38000 Hills Tech Drive, Farmington Hills, Michigan 48331 at 10:00 a.m. on the second Business Day after the conditions set forth in Article 6 shall have been satisfied or waived (other than conditions which by their nature can be satisfied only at the Closing) and in any case on a mutually agreeable date no later than September 28 , 2007, or on such other date or at such other time as the Parties may agree. For tax and accounting purposes, the effective time of the transaction shall be 11:59 p.m. EDT on the Closing Date.

**7.2.**    **Ancillary Agreements**. At the Closing, the Parties shall execute and deliver each to the other the following agreements to which they are a party:

**7.2.1.** Assignment of Lease of the Premises or Transfer Deed as set forth in Section 1.1.1B above.

**7.2.2.**   Transfer Deed as set forth in Section 1.1.1.C above.

**7.2.3.** Shared Facilities and Maintenance Agreement in the form attached hereto as Exhibit 7.2.3.

**7.2.4.** Assignment and Assumption Agreement relating to the Transferred Contracts, consistent with the Sale Approval Order substantially in the form attached hereto as Exhibit 7.2.4.

**7.2.5.** Escrow Agreement between Seller, Purchaser and the Escrow Agent substantially in the form attached hereto as Exhibit 4.1.1.

**7.2.6.** Bill of Sale substantially in the form attached hereto as Exhibit 7.2.5.

**7.3.**    **Seller's Deliveries**. At the Closing, Sellers shall deliver to Purchasers the following, in proper form for recording where appropriate:

**7.3.1**. Executed assignments for the Permits and Contracts to be acquired by Purchaser pursuant to Article 1.

**7.3.2**. An officer's certificate, dated as of the Closing Date, executed on behalf of Sellers, certifying that the conditions specified in Section 6.2 have been fulfilled.

**7.3.3.** A certificate, dated as of the Closing Date, executed on behalf of each Seller by a Secretary or an Assistant Secretary, certifying: (i) a true and correct copy of the resolutions of Seller's board authorizing the execution, delivery and performance of this Agreement and any Ancillary Agreement to which such Seller is a party and the consummation of the transactions contemplated hereby and thereby.

**7.3.4**. Copies of all orders of the Bankruptcy Court pertaining to the contemplated transactions contemplated by this Agreement and the Ancillary Agreements, including the Bidding Procedures Order and the Sale Approval Order.

**7.3.5**. Duly executed Bill of Sale transferring the Acquired Assets to Purchaser.

**7.3.6.** Appropriate receipts. When applicable, DSE or any other Seller shall deliver to Purchasers invoices covering all of the Assets that require the delivery of an invoice in accordance with Applicable Law, duly issued in favor of Purchasers. The invoices delivered to Purchasers by DSE shall comply with all the applicable requirements set forth in the Mexican Federal Fiscal Code (Código Fiscal de la Federación). DSE shall deliver to Purchasers true and correct copies of invoices for Acquired Assets that have been definitely imported by DSE, if applicable, each of which shall include the date and number of the custom document (pedimento de importación), the customs office where the goods were imported into Mexico, and the legend "first-hand sale of imported goods" (venta de primera mano de bienes importacion).

**7.3.7.** A public deed signed before a notary public by Centro Técnico Herramental, S.A. de C.V. ("CENTEC") in which CENTEC grants a temporary easement (servidumbre de paso) in terms of article 1642 of the Civil Code for the State of Coahuila on and through the land in which the CENTEC plant is built, giving FRMX access to the Premises. Such easement shall be in effect until the earliest to occur of (a) the date that FRMX builds its own access to the Land or (b) 36 months from the date of the Closing.  The public deed will be in the form of Exhibit "7.3.7".

**7.3.8**. An assignment of water rights agreement in the form of Exhibit 7.3.8 duly executed by DSE before a notary public.

**7.3.9**.  An assignment of rights agreement in the form of Exhibit 7.3.9 duly executed by DSE before a notary public under which DSE transfers all of its rights and obligations under the Discharge of Water Concession.

**7.4.**    **Purchaser's Deliveries**. At the Closing, Purchaser shall deliver to Seller, in proper form for recording where appropriate:

**7.4.1**. The Purchase Price less the Deposit Amount as required by, and in accordance with, Section 4.1.

**7.4.2**. An Assignment and Assumption Agreement pursuant to which the Purchaser assumes the Assumed Liabilities.

**7.4.3**. An officer's certificate, dated as of the Closing Date, executed on behalf of each Purchaser, certifying that the conditions specified in Section 6.3 have been fulfilled.

**7.4.4**. A certificate, dated as of the Closing Date, executed on behalf of each Purchaser by its Secretary or an Assistant Secretary, certifying: (i) a true and correct copy of the resolutions of the Purchaser's board authorizing the execution, delivery and performance of this Agreement by Purchaser and the consummation of the transactions contemplated hereby.

## 8.    CERTAIN ADDITIONAL COVENANTS:

### 8.1.    Bankruptcy Actions:

**8.1.1**. The Bidding Procedures are set forth in Section 11.1. As further specified below, Delphi shall file a motion or motions (and related notices and proposed orders) with the Bankruptcy Court seeking approval of the Bidding Procedures Order and the Sale Approval Order.

**8.1.2**. Delphi shall use commercially reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Bankruptcy Rules as modified by order, if any, of the Bankruptcy Court, in connection with obtaining approval of the sale of the Acquired Assets under the Agreement, including serving on all required Persons in the Bankruptcy Cases, notice of the Sale Approval Motion, the Sale Hearing (as hereinafter defined) and the objection deadline in accordance with Rules 2002, 6004, 6006 and 9014 of the Bankruptcy Rules, the Bidding Procedures Order or other orders of the Bankruptcy Court, and any applicable local rules of the Bankruptcy Court.

**8.1.3**.  Notwithstanding Purchasers' obligations with respect to the Assumed Contracts, if at any time prior to August 31, 2007, Purchasers request that Delphi move to assume and assign to Purchasers one or more prepetition executory contract or unexpired lease related to the Business other than the Assumed Contracts (the "Remaining Contracts"), Delphi will use its reasonable best efforts to assume and assign the Remaining Contracts to Purchasers under Section 365 of the Bankruptcy Code.  Purchasers shall provide, at or prior to the hearing on the motion to assume and assign the Remaining Contracts, adequate assurance of their future performance under each Remaining Contract to the parties thereto (other than Sellers) in satisfaction of Section 365(f)(2)(B) of the Bankrutpcy Code.

**8.2. Registrations, Filings and Consents; Further Actions.** Upon the terms and subject to the conditions of this Agreement, each of the parties hereto shall use commercially reasonable efforts to take, or cause to be taken, all appropriate actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as promptly as practicable including, without limitation, using their reasonable best efforts to cause the satisfaction of all conditions to Closing.

**8.3.** **Operation of the Business Pending Closing**:

   **8.3.1.** Except: (i) as otherwise provided herein; (ii) as required by or resulting from the Bankruptcy Cases or otherwise approved by the Bankruptcy Court; (iii) pursuant to any changes that may be required under applicable Laws; (iv) as set forth in the following sentence, until the Closing, Sellers will (a) carry on the Business in substantially the same manner as heretofore (except for the treatment of Products, which Delphi shall store at a location other than the Premises and shall sell to RBUS as set forth in Section 8.5.6 below); (b) will perform in all material respects all of their respective obligations under all Listed Contracts and not amend, alter or modify in any significant respect that is adverse to the Business any provision of any Listed Contract, unless pursuant to the preceding sentence 8.3.1(iv)(a), and Sellers agree to advise Purchasers of any such amendment, alteration or modification if it is foreseeable that the change will result in an adverse financial impact exceeding $10,000; (c) keep in full force and effect insurance comparable in amount and scope to coverage maintained by it on the date of this Agreement; (d) use commercially reasonable efforts to maintain and preserve relations with customers, suppliers, employees and others having business relations with the Business; (e) endeavor to maintain the goodwill of the Business; and (f) promptly advise Purchasers of any material and adverse change in the business condition (financial or other) of the Business or the Acquired Assets. No Seller shall make a capital expenditure in relation to the Business in excess of $5000 without prior notification to RBUS.

   **8.3.2.** Delphi shall promptly notify Purchasers if it becomes aware of the occurrence of any event or circumstance that could reasonably be expected to cause the conditions set forth in Sections 6.1.1, 6.1.2, 6.2.1 or 6.2.5 hereof not to be satisfied including, without limitation, any event or circumstance that, upon the occurrence of such event or circumstance, causes any representation or warranty of the Seller to be untrue in any material (except for any representation or warranty qualified by materiality) respect at the time of the occurrence of such event or condition.

   **8.3.3.** RBUS shall promptly notify Sellers if  it becomes aware of the occurrence of any event or circumstance that could reasonably be expected to cause the conditions set forth in Sections 6.1.1, 6.1.2 or 6.3.1 hereof not to be satisfied including, without limitation, any event or circumstance that, upon the occurrence of such event or circumstance, causes any representation or warranty of the Purchasers to be untrue in any material (except for any representation or warranty qualified by materiality) respect at the time of the occurrence of such event or condition.

   **8.4.** **Assumed Contracts; Cure Amounts**. As soon as practicable after the date hereof, Delphi shall, pursuant to a motion reasonable in form and substance (which motion may be incorporated into the Sale Approval Motion), move to assume and assign to Purchasers the Assumed Contracts and shall provide notice thereof in accordance with all applicable Bankruptcy Rules as modified by orders of the Bankruptcy Court. Delphi shall pay Cure Amounts as agreed to by it and each party to an Assumed Contract or, absent such agreement, by order of Court in the time and manner specified by the Sale Approval Order.

Notwithstanding anything in this Agreement to the contrary, at any time prior to the conclusion of the Sale Hearing, RBUS may notify Delphi  that it has elected not to take an assignment of one or more Assumed Contracts and Delphi shall have no obligation to assume or make payment of the Cure Amount with respect to any such Assumed Contract. Delphi agrees to make such information available as RBUS reasonably requests in order to make a determination with respect to such Assumed Contracts.

**8.5.** __Post-Closing Covenants__. From and after the Closing, each of the Parties will perform its respective covenants and agreements set forth below:

**8.5.1. Seller Post-Closing Covenants**:

**A**.    **Intentionally omitted.**

**B**.    **Intentionally Omitted**

**C.**    **Electricity**.  Purchasers shall assist and cooperate with DSE on a best efforts basis to put into place alternative electricity metering for FRMX to receive electricity in conformance with applicable law prior to and after Closing, including, without limitation, by making any governmental applications for the submission of such electricity as may necessary or desirable, seeking confirmation by the CFE that the CFE will supply FRMX with sufficient electricity subsequent to Closing sufficient to carry on the Business at the Premises as is presently conducted by DSE, constructing (at Purchasers' expense) the necessary infrastructure to receive the electricity once approved by the CFE, and the like.

**8.5.2.** __Technical Documentation__. Delphi has delivered, or will deliver on or before the Closing, to the RBUS, a copy of all Intellectual Property to be used in connection with the Transferred Contracts included in the Acquired Assets. For a period of not less than one (1) year commencing at Closing, RBUS and its Affiliates shall use reasonable efforts to maintain all Technical Documentation applicable to product design, test, release, validation and manufacture, including quotations and it acquires from Sellers and their  Affiliates in connection with the purchase of the Acquired Assets under Article 1 of this Agreement and its obligations under the Transferred Contracts, at a location at which they shall be reasonably accessible to Delphi and its Affiliates upon reasonable request and with reasonable advance notice. During such one (1) year period, RBUS shall not intentionally destroy or give up possession of its final copy of such documentation without offering Delphi the opportunity, at its expense but without any payment to RBUS, to obtain a copy of such documentation

**8.5.3.** __Books and Records and Litigation Assistance From and After Closing__:

**A.**    Purchasers and their respective Affiliates shall use reasonable efforts to preserve and keep all books, records, computer files, software programs and any data processing files delivered to Purchasers by Sellers and their respective Affiliates pursuant to the provisions of this Agreement for a period of not less than five (5) years from the Closing

33

Date, or for any longer period as may be required of the Business by any government agency, law, regulation, audit or appeal of Taxes, or Tax examination at Purchaser's sole cost and expense. If and when Delphi believes that such records are no longer legally required, it will notify RUBS. During such period,  RBUS shall: (i) provide Delphi or its Affiliates with such documents and information as necessary, consistent with past practice, to complete the accounting books and records of the Business as of December 31, 2007; and (ii) make such books and records available to Delphi and its Affiliates as may be reasonably required by Delphi or its Affiliates in connection with any legal proceedings against, or governmental investigations of, Delphi and its Affiliates, or in connection with any Tax examination, audit or appeal of Taxes of Sellers and  their respective Affiliates, the Business or the Acquired Assets during such period. Sellers or their Affiliates shall reimburse Purchasers for the reasonable out-of-pocket expenses incurred in connection with any request by Dephi to make available records pursuant to the foregoing sentence. In the event a Purchaser wishes to destroy or dispose of such books and records after five (5) years from the Closing Date, it shall first give not less than thirty (30) days' prior written notice to Sellers or their Affiliates, and Sellers or their Affiliates shall have the right, at its option, upon prior written notice given to Purchaser within twenty (20) days of receipt of Purchaser's notice, to take possession of said records within thirty (30) days after the date of Purchaser's notice to Sellers hereunder.

   **B**.  RBUS, for itself and on behalf of its Affiliates, agrees to: (i) retain all documents required to be maintained by federal, state, national or local legislation or regulations; (ii) make available documents and records delivered to it by Sellers reasonably necessary in connection with any pursuit, contest or defense related to the Business, including documents that may be considered to be "confidential" or subject to trade secret protection (except that: (a) no documents or records protected by the attorney client privilege in favor of Purchaser must be made available if making these documents or records available would cause the loss of this privilege (in any case, however, Purchaser must notify Seller of the existence of such privileged documents); and (b) Seller and its Affiliates will agree to keep confidential and not use for any other purpose documents and records that are confidential or are subject to trade secret protection); (iii) make available, as may be reasonably necessary and upon reasonable advance notice and for reasonable periods so as not to significantly interfere with Purchaser's business, mutually acceptable engineers, technicians or other knowledgeable individuals to assist Seller and its Affiliates in connection with such claim.

  **8.5.4. Payment and Collections**. Any proceeds from the sales of Products by Delphi prior to the Closing shall be the property of Delphi even if payment therefor occurs after Closing, and any proceeds from the sale of Products by Sellers after Closing shall belong to Sellers.  Sellers shall take such action as may be reasonably necessary to segregate payments made or collections received on behalf of Purchasers after Closing, and Purchasers shall take such action as may be reasonably necessary to segregate payments made or collections received on behalf of Sellers after Closing, in order to ensure that the cost of the related liability or the benefits of the related assets accrue to the appropriate Party in accordance with the terms of this Agreement. To the extent that any such collections are received after Closing in the form of checks or other negotiable instruments payable to the other Party,

Sellers or Purchasers, as appropriate, shall promptly take all necessary action to endorse such checks or instruments to permit the appropriate Party to collect the proceeds of such checks and instruments. Sellers shall promptly send Purchasers copies of all remittance advices and checks related to payments received by a Seller with respect to such items. Purchasers shall notify the Business' customers of the change in address of the owner of the Acquired Assets as may be required in order for such customers to properly remit any payments required under any applicable Acquired Asset and Sellers shall cooperate with Purchasers as is reasonably necessary to so notify such customers, including providing appropriate contact information for each such customer.

8.5.5.    **Visual Review of DFMEA Materials.**  Following the Closing and for 12 months thereafter, Sellers agree to provide Purchasers with access to DFMEA materials ("DFMEAs") relating to the Business for purposes of visual review and to make knowledgeable engineers available at Delphi's location for discussion regarding the DFMEAs.  Purchasers shall not have the right to copy the DFMEAs, where to copy means copy, scan, photograph, or in any way duplicate the DFMEAs, except that if a design change to the Product becomes necessary, RBUS shall send Delphi written notice of the same, specifying in reasonable detail the changes and reasons therefor, and Delphi will not unreasonably deny RBUS the opportunity to make a copy of the portion of the materials that is relevant for making such change.

8.5.6.    **Purchase of Products.**  Purchasers agree to purchase from Delphi all and not less than all the Products on hand at Closing, such purchases to be completed after Closing under the same purchase terms as existed prior to Closing, provided, however, that Purchasers shall not be obligated to buy Products for the GMT 900 Light Duty Brake Corner Program valued in excess of One Million Dollars ($1,000,000.00). Such purchases shall be carried out on a first-in-first-out basis, provided, however, that, subject to the limitation contained in the preceding sentence,  Purchasers will complete the purchase of all Products on hand at Closing on or before FRMX's output begins to include Products.

8.5.7.    <u>**Removal of Non Business Materials.**</u>  Prior to and continuing after the Closing, DSE shall use its best efforts to remove all assets unrelated to the Business and which are not part of this transaction from the Premises.  Removal of such assets shall be complete no later than October 31, 2007.  Sellers will consider any offer from Purchasers for the purchase of any such assets separately from this Agreement.

8.6. <u>**Further Assurances**</u>. If at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instructions and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under this Agreement).

8.7.    **Intentionally omitted.**

35

**8.8.    Intentionally omitted.**

**8.9. Communications with Customers and Suppliers**. Prior to the Closing, neither Purchaser shall, nor shall either Purchaser cause its  Affiliates or  representatives  to, contact, engage in any discussions or otherwise communicate with any of the Sellers' Business customers, suppliers and others with whom it has material commercial dealings, regarding the Business, without obtaining the prior written consent of Delphi (which may be conditioned on Delphi's having the right to participate in any meetings or discussion with any such customers, suppliers or others but which may not otherwise be unreasonably withheld); provided, that RBUS and Delphi shall work together in good faith to arrange for an orderly transition of customer, supplier, and other third party relationships, including, without limitation, at the request of RBUS, meetings and other correspondence with such customers, suppliers, and other third parties to ensure such orderly transition.

**8.10. Assignment of Water Rights and of the Discharge of Water Rights**. The Parties hereby agree that the assignment of the water rights under the Water Concession and of the discharge of water rights under the Discharge of Water Concession shall be subject to notification of such assignment to the Public Registry of Water Rights pursuant to the Mexican Law of National Waters and, Sellers hereby agree to use  their best efforts to assist Purchasers with the filing of such notices before the Public Registry of Water Rights, at no cost to Sellers and subject to Purchasers' reimbursement of Sellers reasonable out-of-pocket costs.

**9.    TERMINATION:**

**9.1. Termination.** Anything contained herein to the contrary notwithstanding, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing Date:

**9.1.1. By Either Party:**

**A.**    By mutual written consent of Seller and Purchaser.

**B.**    Provided the terminating Party is not in default of its obligations under this Agreement, if consummation of the Sale would violate any non-appealable Final Order of any regulatory Governmental Entity, other than the Bankruptcy Court.

**C.**    If Seller consummates an Alternative Transaction.

**D.**    Provided the terminating Party is not in default of its obligations under this Agreement, by either Seller or Purchaser if the Closing shall not have occurred by September 28, 2007.

**E.**    If the Bankruptcy Court has not entered the Sale Approval Order, on or before August 27, 2007 (the "Termination Date") or such Sale Approval Order is subject to a stay or injunction; provided, however, that the right to terminate this Agreement

36

pursuant to this Section 9.1.1.E shall not be available to Purchaser if Purchaser shall have failed to perform, or caused any of its respective Affiliates to perform, any of its respective material obligations under this Agreement.

**9.1.2. By Purchaser**. By RBUS (provided that it or FRMX are not then in material breach of any representation, warranty, covenant or other agreement contained herein) at any time prior to Closing, if a Material Adverse Effect shall have occurred, so long as (A) RBUS provides Delphi written notice of termination in conformance with Section 9.2 below within ten (10) Business Days after receiving written notice of such event, and (B) and such Material Adverse Effect is continuing at the time of any such termination. Nothing in this Section 9.1.2 or elsewhere in this Agreement shall be construed as obligating RBUS to submit a Subsequent Bid.

In the event of such termination under Section 9.1.2, Purchaser's sole remedy shall be the prompt return of the Deposit Amount, and Seller shall have no other liability to Purchaser whatsoever, whether a Break-Up Fee, Expense Reimbursement or otherwise .

**9.1.3. By Seller.** If Delphi declares a Qualified Bid other than that of Purchaser the Successful Bid (as defined in Section 11.9.6), provided that such termination shall be of no effect if  Delphi  does not: (i) enter into an agreement with respect to such Qualified Bid within two (2) Business Days after such declaration; and (ii) subsequently consummates the Sale pursuant to an Alternative Transaction.

**9.2.     Notice of Termination**. In the event of any termination pursuant to this Article 9, written notice thereof setting forth the reasons therefor shall promptly be given to the other Party and the transactions contemplated by this Agreement shall be terminated, without further action by any Party.

**9.3. Break-Up Fee; Expense Reimbursement:**

**9.3.1. Break-Up Fee**. In the event that: Delphi terminates the Agreement under Section 9.1.1.C or Section 9.1.3  and sells, transfers, leases or otherwise disposes, directly or indirectly, including through an asset sale, stock sale, merger or other similar transaction, all or substantially all of the Acquired Assets in a transaction or a series of related transactions with one or more parties other than RBUS (such event being an "Alternative Transaction"); Delphi shall, within two (2) Business Days after the consummation of an Alternative Transaction(s), pay to RBUS an amount equal to three percent (3.0%) of the Purchase Price (the "Break-Up Fee"). The claim of RBUS for a Break-up Fee shall be paid to RBUS from the sale proceeds of an Alternative Transaction and, until paid in full, shall constitute a superpriority administrative expense claim under Section 364(c)(1) of the Bankruptcy Code. Notwithstanding the foregoing, RBUS shall not be entitled to a Break-Up Fee if either or both Purchasers are in material breach of this Agreement.

**9.3.2.** **Expense Reimbursement**.

In the event this Agreement is terminated pursuant to Sections 9.1.1.D or 9.1.1.E, and as a
further condition to the above, provided that the Purchasers are not then in breach of this
Agreement for which Sellers had previously notified either Purchaser, and, in the case of
Section 9.1.1.D, the failure or occurrence of the event giving rise to any such termination
results solely from the status of Seller or any action, inaction or conduct of Seller and not
from the status of RBUS or any intentional action, inaction or conduct of RBUSthen Seller
shall be obligated to pay RBUS an amount equal to RBUS's reasonable, actual out-of-pocket
fees and expenses (including, without limitation, reasonable attorneys' fees, expenses of its
financial advisors, and expenses of other consultants) incurred in connection with the
transactions contemplated by this Agreement (the "Expense Reimbursement") up to a
maximum of $200,000. Any Expense Reimbursement payable upon termination of this
Agreement shall be immediately earned upon such termination and payable by Delphi  to
RBUS promptly upon the delivery of an invoice related to such Expense Reimbursement to
Seller by RBUS to be delivered to Delphi  within ten (10) Business days of termination of
this Agreement; provided, however, that if Delphi believes , in good faith, that the amount of
the Expense Reimbursement sought by RBUS is not reasonable, then Delphi will have the
right to seek Bankruptcy Court review thereof prior to paying such amount. The claim of
RBUS for an Expense Reimbursement shall constitute a superpriority administrative expense
under Section 364(c)(1) of the Bankruptcy Code.


**9.3.3.** Payments to RBUS pursuant to this Section 9.3 shall be by wire transfer of
immediately available funds in U.S. Dollars, to such account or accounts as RBUS shall
designate in writing.

**9.4.** **Procedure and Effect of Termination**. In the event of termination and
abandonment of the transactions contemplated hereby pursuant to Section 9.1, written notice
thereof shall forthwith be given to the other Parties to this Agreement, and this Agreement
shall terminate (subject to the provisions of this Article 9) and the transactions contemplated
by this Agreement shall be abandoned, without further action by any of the parties hereto. If
this Agreement is terminated as provided herein no Party shall have any liability or further
obligation to any other Party resulting from such termination except for the provisions of:
(i)(a) Purchasers' obligations under that certain confidentiality agreement between the
Parties dated October 18, 2006; (b) Article 9 (Termination); and (c) Sections 4.1.1 (Deposit
Amount), 13.2 (Notice), 13.3 (Assignment), 13.4 (Entire Agreement), 13.5 (Waiver), 13.8
(Expenses), 13.12 (Governing Law), 13.13 (Public Announcements), 13.15 (Venue and
Retention of Jurisdiction) and 13.18 (Dispute Resolution), all of which shall remain in full
force and effect for  two years following the date this Agreement is terminated; and (ii) no
party waives any claim or right against a breaching party in respect of any of its
representations, warranties, covenants or agreements set forth in this Agreement occurring
prior to such termination; provided, however, that in the event Purchaser is entitled to
receive the Break-Up Fee or Expense Reimbursement, the right of a Purchaser to receive
such amounts shall constitute such Purchaser's sole remedy for (and such amount shall
constitute liquidated damages in respect of) any breach by a Seller of any of its

38

representations, warranties, covenants or agreements set forth in this Agreement, and provided, further, that in the event Delphi is entitled to receive the Deposit Amount, Delphi's right to receive such amount shall constitute its sole remedy for (and such amount shall constitute liquidated damages in respect of) any breach by a Purchaser of any of its representations, warranties, covenants or agreements set forth in this Agreement. In connection with any termination of this Agreement, all filings, applications and other submissions made pursuant to the transactions contemplated by this Agreement shall, to the extent practicable, be withdrawn from the agency or Person to which made.

**10. OTHER TAX MATTERS**:

**10.1.** Sellers will be responsible for the preparation and filing of all Tax Returns for the Business for all periods for which Tax Returns are due prior to the Closing, including amended returns, applications for loss carryback refunds and applications for estimated tax refunds. Purchaser shall make available to Sellers (and to Sellers' accountants and attorneys) any and all books and records and other documents and information in its possession or control reasonably requested by Sellers to prepare these Tax Returns. Sellers will make all payments required with respect to any such Tax Return.

**10.2**. Purchasers will be responsible for the preparation and filing of all Tax Returns in connection with the conduct of its business after the Closing for all periods for which Tax Returns are due after the Closing (other than for Taxes with respect to periods for which the consolidated, unitary and Tax Returns of Sellers will include the operations of the Business). RBUS shall be responsible for and shall pay when due all Taxes attributable, levied or imposed upon or incurred in connection with the Acquired Assets and the transactions arising out of or in connection with the Transferred Contracts pertaining to any period ending after the Closing Date.

**10.3**. Sellers and Purchasers will cooperate in connection with: (i) the preparation of filing of any Tax Return, Tax election, Tax consent or certification or any claim for a Tax refund; (ii) any determination of liability for Taxes; and (iii) any audit, examination or other proceeding in respect of Taxes related to the Business or the Acquired Assets. Such cooperation includes a reasonable amount of direct access to accounting, engineering and contracting personnel, subject to availability, which shall not be unreasonably restricted, and advance notice to RBUS's chief financial officer.

**10.4**. Sellers shall not, and shall not cause the Business to make, revoke or amend any tax election, execute any waiver of restrictions or tax assessments or collections or extensions if there will be any impact on Purchaser as a result of doing so.

**11.    BIDDING PROCEDURES:**

**11.1.  Delphi Initial Bankruptcy Actions**. This Article 11 sets forth the bidding procedures (the "Bidding Procedures") to be employed with respect to the Agreement and the sale (the "Sale") of the Acquired Assets. The Sale is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court in the Sale Approval Order. The

following overbid provisions and related bid protections are designed to compensate the Purchaser for its efforts and agreements to date and to facilitate a full and fair process (the "Bidding Process") designed to maximize the value of the Acquired Assets for the benefit of Delphi and its Affiliates' creditors, shareholders and bankruptcy estate.

**11.2. Intentionally Omitted**.

**11.3. <u>Qualified Bidder</u>**. Unless otherwise ordered by the Bankruptcy Court, for cause shown, or as otherwise determined by Delphi, in order to participate in the bidding process, each person (a "Potential Bidder"), other than the Purchaser, must deliver (unless previously delivered) to Delphi:

**11.3.1**. An executed confidentiality agreement in form and substance satisfactory to Delphi.

**11.3.2.** Current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Acquired Assets and the Business, current audited financial statements of the equity holders of the Potential Bidder who shall guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement acceptable to Delphi and its financial advisors; and

**11.3.3**. A preliminary (non-binding) written proposal regarding: (i) the purchase price; (ii) any assets and/or equity interests expected to be excluded; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the Purchase Price and the requisite financial assurance); (iv) any anticipated regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) any conditions to closing that it may wish to impose in addition to those set forth in this Agreement; and (vi) the nature and extent of additional due diligence it may wish to conduct and the date by which such due diligence will be completed.

A Potential Bidder that delivers the documents described in the previous subparagraphs above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of the Potential Bidder to consummate the Sale, if selected as a successful bidder, and that Delphi determines in its sole discretion is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale within the time frame provided by this Agreement shall be deemed a **"Qualified Bidder"**. As promptly as practicable, after a Potential Bidder delivers all of the materials required above, Delphi shall determine, and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that Delphi notifies the Potential Bidder that it is a Qualified Bidder, Delphi shall allow the Qualified Bidder to begin to conduct due diligence with respect to the Acquired Assets and the Business as provided in Section 11.5 below. Notwithstanding the foregoing, Purchaser shall be deemed a Qualified Bidder for purposes of the Bidding Process.

40

**11.4. <u>Bid Deadline</u>**. A Qualified Bidder (other than Purchaser) that desires to make a bid shall deliver written copies of its bid to: (i) Delphi Automotive Systems LLC, 5725 Delphi Drive, Troy, Michigan, 48098, Attention: John P. Carney; (ii) Delphi's restructuring counsel, Skadden, Arps, Slate, Meagher & Flom LLP, at 333 West Wacker Drive, Chicago, Illinois 60601-1285, Attention: John K. Lyons and Brian Fern; (iii) Delphi's financial advisor FTI Consulting, Inc., Three Times Square, New York, New York 10036, Attention: Randall S. Eisenberg; (iv) Delphi's Deputy General Counsel, Attention Sean Corcoran, at 5725 Delphi Drive, Troy, Michigan, 48098; (v) counsel to the Creditors' Committee, Latham & Watkins LLP, at 885 Third Avenue, New York, New York 10022, Attention: Robert J. Rosenberg and Mark A. Broude; (vi) the Creditors' Committee's financial advisor, Mesirow Financial Consulting LLC, 666 Third Avenue, 21st Floor, New York, New York 10017, Attention: Ben Pickering; and (vii) counsel for the agent under Delphi's post-petition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017, Attention: Donald S. Bernstein and Brian Resnick, so as to be received not later than 11:00 A.M. (New York Time), on a date to be determined by Delphi that is at least five (5) Business Days before the Sale Hearing (the "Bid Deadline"). As soon as reasonably practicable following receipt of each Qualified Bid, Delphi shall deliver to RBUS and its counsel complete copies of all items and information enumerated in Section 11.6 of this Agreement.

**11.5. <u>Due Diligence</u>**. Delphi shall afford each Qualified Bidder due diligence access to the Acquired Assets and the Business. Due diligence access may include management presentations as may be scheduled by Delphi, access to data rooms, on site inspections and such other matters which a Qualified Bidder may request and as to which Delphi, in its sole discretion, may agree to. Delphi shall designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. Any additional due diligence shall close after the Bid Deadline. Delphi may, in its discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. Neither Delphi nor any of its Affiliates (or any of their respective representatives) shall be obligated to furnish any information relating to Acquired Assets and the Business to any Person other than to Qualified Bidders who make an acceptable preliminary proposal and execute mutually agreeable confidentiality agreements.

**11.6. <u>Bid Requirements</u>**. All bids must include the following documents (the "Required Bid Documents"):

**11.6.1**. A letter stating that the bidder's offer is irrevocable until two (2) Business Days after the closing of the Sale of the Acquired Assets.

**11.6.2.** An executed copy of the Agreement, together with all schedules a ("Marked Agreement") marked to show those amendments and modifications to such agreement and schedules that the Qualified Bidder proposes, including the Purchase Price.

**11.6.3**. A good faith deposit (the "Good Faith Deposit") in the form of a

certified bank check from a U.S. bank or by wire transfer (or other form acceptable to Delphi in its sole discretion) payable to the order of Delphi (or such other party as Delphi may determine) in an amount equal to US$500,000.

**11.6.4**. Written evidence of a commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to Delphi and its advisors.

**11.7. <u>Qualified Bids</u>**. A bid will be considered only if the bid:

**11.7.1**. Is on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to Delphi than, those contained in the Agreement.

**11.7.2**. Is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder.

**11.7.3**. Proposes a transaction that Delphi determines, in its sole discretion, has a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum of the Purchase Price plus the amount of the Break-Up Fee, plus (i) in the case of the initial Qualified Bid, $ 200,000; and (ii) $100,000 in the case of any subsequent Qualified Bids, over the immediately preceding highest Qualified Bid.

**11.7.4**. Is not conditioned upon any bid protections, such as a break-up fee, termination fee, expense reimbursement or similar type of payment.

**11.7.5**. An acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreement.

**11.7.6**. Includes a commitment to consummate the purchase of the Acquired Assets (including the receipt of any required governmental or regulatory approvals) within not more than fifteen (15) days after entry of an order by the Bankruptcy Court approving such purchase, subject to the receipt of any governmental or regulatory approvals which must be obtained within twenty (20) days after entry of such order.

**11.7.7**. Is received by the Bid Deadline.

A bid received from a Qualified Bidder will constitute a "Qualified Bid" only if it includes all of the Required Bid Documents and meets all of the above requirements; provided, however, that Delphi shall have the right, in its sole discretion, to entertain bids for the

Acquired Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids. Notwithstanding the foregoing, the Purchaser shall be deemed a Qualified Bidder, and the Agreement shall be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale. A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction. Each Qualified Bid other than that contained in this Agreement is referred to as a "Subsequent Bid".

If Delphi does not receive any Qualified Bids other than the Agreement received from the Purchaser, Delphi will report the same to the Bankruptcy Court and will proceed with the Sale pursuant to the terms of the Agreement and will report the same to the Bankruptcy Court.

    **11.8.** __Bid Protection__.   Recognizing Purchaser's expenditure of time, energy and resources, Delphi has agreed to provide certain bidding protections to the Purchaser. Specifically, Delphi has determined that the Agreement will further the goals of the Bidding Procedures by setting a floor that all other Potential Bids must exceed.  As a result, Delphi has agreed that it will pay to RBUS  the Break-Up Fee or the Expense Reimbursement, as applicable, pursuant to, and subject to the terms of, Section 9.3 hereof.

    **11.9.** __Auction, Bidding Increments and Bids Remaining Open__. If Delphi receives at least one (1) Qualified Bid in addition to the Agreement, Delphi will conduct an auction (the "Auction") of the Acquired Assets and the Business upon notice to all Qualified Bidders who have submitted Qualified Bids at 10:00 a.m. EST on or before July 17, 2007, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, or 333 West Wacker Drive, Chicago, Illinois 60606 or such later time or other place as Delphi will notify (with RBUS's consent not to be unreasonably withheld) all Qualified Bidders who have submitted Qualified Bids, but in no event later than the second (2nd) Business Day prior to the Sale Hearing, in accordance with the following procedures:

    **11.9.1**. Only Delphi, RBUS, any representative of the Committee, any representative of Delphi's post-petition credit facility (and the legal and financial advisers to each of the foregoing), and any Qualified Bidder who has timely submitted a Qualified Bid shall be entitled to attend the Auction, and only RBUS and Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

    **11.9.2.** At least two (2) Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform Delphi whether it intends to participate in the Auction and at least one (1) Business Day prior to the Auction, Delphi shall provide copies of the Qualified Bid or combination of Qualified Bids which Delphi believes is the highest or otherwise best offer to all Qualified Bidders who have informed Delphi of their intent to participate in the Auction. Should an Auction take place, Purchaser shall have the right, but not the obligation, to participate in the Auction. Purchaser's election not to participate in an Auction shall in no way impair its entitlement to receive the Break-Up Fee or Expense Reimbursement, as applicable.

**11.9.3**. All bidders shall be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction.

**11.9.4**. Delphi may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith.

**11.9.5**. Bidding at the Auction shall begin with the highest or otherwise best Qualified Bid or combination of Qualified Bids and continue in minimum increments of at least $100,000 higher than the previous bid or bids. The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit an additional Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid or bids. For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), Delphi shall give  RBUS  a credit in an amount equal to the greater of any Break-Up Fee or Expense Reimbursement, as applicable, that may be payable to RBUS under this Agreement and shall give effect to any assets and/or equity interests to be retained by Delphi.

**11.9.6**. At the conclusion of the Auction, or as soon thereafter as practicable, Delphi, in consultation with its advisors, shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale; and (ii) identify the highest or otherwise best offer(s) for the Acquired Assets and the Business received at the Auction (the "Successful Bid(s)" and the bidder(s) making such bid, the "Successful Bidder(s)").

**11.10.** **Acceptance of Qualified Bids**. Delphi shall sell the Acquired Assets for the highest or otherwise best Qualified Bid upon the approval of such Qualified Bid by the Bankruptcy Court after the hearing (the "Sale Hearing"). If, after an Auction in which the Purchaser: (i) shall have bid an amount in excess of the consideration presently provided for in the Agreement with respect to the transactions contemplated under the Agreement; and (ii) is the Successful Bidder, it shall, at the Closing under the Agreement, pay, in full satisfaction of the Successful Bid, an amount equal to: (a) the amount of the Successful Bid; less (b) the Break-Up Fee.

**11.11.** **Sale Hearing**. The Sale Hearing will be held before the Honorable Robert Drain on July 19, 2007  at 10:00 a.m. (New York City time) at the United States Bankruptcy Court for the Southern District of New York, located in New York, New York, but may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing, provided,  however, that the Sale Hearing shall not be adjourned or rescheduled to a date later than August 31, 2007. If Delphi does not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), Delphi will report the same to the

Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Acquired Assets to the Purchaser following entry of the Sale Order. If Delphi does receive additional Qualified Bids, then, at the Sale Hearing, Delphi shall seek approval of the Successful Bid(s), as well as the second highest or best Qualified Bid(s) (the "Alternate Bid(s)" and such bidder(s), the "Alternate Bidder(s)"). Delphi's presentation to the Bankruptcy Court of the Successful Bid(s) and Alternate Bid(s) shall not constitute Delphi's acceptance of either or any such bid(s), which acceptance shall only occur upon approval of such bid(s) by the Bankruptcy Court at the Sale Hearing. Following approval of the sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of: (i) failure of a condition precedent beyond the control of either Delphi or the Successful Bidder; or (ii) a breach or failure to perform on the part of such Successful Bidder(s), then the Alternate Bid(s) shall be deemed to be the Successful Bid(s) and Delphi shall effectuate a sale to the Alternate Bidder(s) without further order of the Bankruptcy Court.

**11.12. <u>Return of Good Faith Deposit</u>.** Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) shall be held in an interest-bearing escrow account and all Qualified Bids shall remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders), until two (2) Business Days following the closing of the Sale (the "Return Date"). Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Successful Bidder(s), together with interest thereon, shall be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder(s). If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, Delphi will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become property of Delphi. On the Return Date, Delphi shall return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

**11.13. <u>Reservation of Rights</u>.** Delphi, after consultation with the Committee: (i) may determine, which Qualified Bid, if any, is the highest or otherwise best offer; and (ii) may reject at any time, any bid (other than the Purchaser's bid) that is: (a) inadequate or insufficient; (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of the Sale; or (c) contrary to the best interests of Delphi, its estate and creditors as determined by Delphi in its sole discretion.

**12.    INDEMNIFICATION:**

**12.1. <u>Seller's Agreement to Indemnify.</u>** If the Closing occurs and a Purchaser makes a written claim for indemnification against Seller in accordance with the procedures set forth in this Article 12 prior to the applicable Expiration Date, then Seller agrees to indemnify and hold harmless the Purchasers subject to the terms of this Article 12, from and after the Closing, from and against all out-of-pocket liabilities, claims, assessments, losses, judgments, settlements, damages, costs and expenses (including, without limitation, reasonable attorneys' and consultants' fees and expenses) (collectively, the "Purchaser Damages") incurred by a Purchaser as a result of or arising out of: (i) those Retained Liabilities and those Excluded Assets that are retained at Closing by Sellers; (ii) a breach of

any representation or warranty in this Agreement; (iii) any failure to perform a covenant that this Agreement required be performed on or before Closing; or (iv) a breach of any agreement or covenant of Seller in this Agreement to be performed after Closing; and the sole source to satisfy any remedy with respect to any claim for indemnification shall be the Escrow Amount, and under no circumstances shall Sellers be responsible for indemnity in any amounts exceeding the Escrow Amount. Notwithstanding the foregoing, any claim based on clause (iii) must be made within one hundred eighty (180) days after the Closing Date. As soon as possible after the applicable Expiration Date, the Escrow Amount, including all cash, interest accrued thereon and other property retained by the Escrow Agent, will be delivered to Sellers by the Escrow Agent, less an amount necessary to satisfy the amount of all then outstanding claims by Purchaser for Purchaser Damages in accordance with the terms of the Escrow Agreement.

**12.2. <u>Purchaser's Agreement to Indemnify</u>**. If the Closing occurs and a Seller makes a written claim for indemnification against a Purchaser in accordance with the procedures set forth in this Article 12, then, from and after the Closing, Purchaser shall indemnify and hold harmless Seller from and against all out-of-pocket liabilities, claims, assessments, losses, judgments, settlements, damages, costs and expenses (including, without limitation, reasonable attorneys' and consultants' fees and expenses) (collectively, the "Seller Damages") incurred by Seller as a result of or arising out of: (i) the Assumed Liabilities; (ii) a breach of any representation or warranty of Purchaser contained herein; (iii) any covenant to be performed on or before Closing; (iv) a breach of any agreement or covenant of Purchaser contained herein to be performed after Closing; or (v) the use, operation or ownership of the Business or any of the Acquired Assets after the Closing unless such matters are of a nature also subject to indemnification pursuant to Section 12.1. The maximum amount of Purchaser's obligations under clauses (i), (ii) and (iii) above shall be $1,000,000.00 . Notwithstanding the foregoing, any claim based on clause (iii) must be made within one hundred eighty (180) days after the Closing Date.

**12.3<u>. Limitations on Agreements to Indemnify</u>**. The obligations of either Party to indemnify the other pursuant to this Article 12 are subject to the following limitations:

**12.3.1**. Each Party agrees that, from and after the Closing, the indemnification provided in this Article 12 is the exclusive remedy for a breach by the other Party of any representation, warranty, agreement or covenant contained in this Agreement, and that there shall be no other remedy for any breach by a party in respect of any claim for monetary damages arising out of or under this Agreement;

**12.3.2**. In calculating amounts payable to an indemnified party, the amount of any indemnified Purchaser Damages or Seller Damages, as the case may be, shall be determined without duplication of any other damages for which a claim has been made or could be made under any other representation, warranty, covenant or agreement included herein;

**12.3.3**. Any written notice delivered by an indemnified party to an indemnifying party seeking indemnification pursuant to this Agreement shall set forth, with

as much specificity as is reasonably practicable, the basis of the claim, the sections of this Agreement which form the basis for the claim, and, to the extent reasonably practicable, a reasonable estimate of the amount of the Purchaser Damages or Seller Damages, as the case may be, that have been or may be sustained by such indemnified party; and

**12.3.4**. Notwithstanding any other provision of this Agreement, in no event shall an indemnified party be entitled to indemnification pursuant to this Agreement to the extent any Purchaser Damages or Seller Damages, as the case may be, were attributable solely to the indemnified party's acts or omissions.

**12.3.5**. No indemnifying party shall be liable to an indemnified party until the amount of all indemnifiable damages of such indemnified party in the aggregate exceeds USD $20,000.00, after which point the indemnifying party will be obligated to the indemnified party for all damages (and not just the amount in excess of such amount) up to but not to exceed the indemnity coverage ceilings established in this Section 12.  To the extent an indemnifying party makes any indemnification payment pursuant this Article 12 for which the indemnified party has a right to recover against a third party (including an insurance company), the indemnifying party shall be subrogated to the right of the indemnified party to seek and obtain recovery from such third party.

**12.3.6**. Subject to the foregoing, Sellers shall not be obligated to provide indemnification with respect to an environmental condition and/or any representation or warranty related to an environmental condition under this Agreement, to the extent that :

**12.3.6.1**. the Premises are, after the Closing Date, put to use under a zoning or land use classification other than industrial use, or where FRMX or FRMX's successor in interest seeks to or changes the zoning or land use classification of the Premises to a classification more sensitive than the industrial classification; or

**12.3.6.2**. the Purchasers did not take reasonable steps to mitigate Seller Damages; or

**12.3.6.3** Where a Purchaser discloses information related to environmental conditions at the Premises to a Governmental Entity or third party based on such Purchaser's reasonable belief that such disclosure is required by applicable law, without, prior to such disclosure, obtaining the prior written consent of the Sellers, such consent of the Sellers not to be unreasonably withheld, except where the information is clearly in the public domain through no fault of the Purchaser.

**12.4.  Third Party Indemnification Procedures**. The obligations of any indemnifying party to indemnify any indemnified party under Sections 12.1 or 12.2 with respect to Purchaser Damages or Seller Damages, as the case may be, resulting from the assertion of liability by third parties (including Governmental Entities) (an "Indemnification Claim"), shall be subject to the following terms and conditions:

**12.4.1**. Any party against whom any Indemnification Claim is asserted shall give the party required to provide indemnity hereunder written notice of any such Indemnification Claim promptly after learning of such Indemnification Claim (with such notice satisfying the requirements of Section 12.3.3), and, to the extent such matter involves a third party claim, the indemnifying party may, at its option, undertake the defense thereof by representatives of its own choosing and shall provide written notice of any such undertaking to the indemnified party. The indemnified party's failure to give prompt written notice of an Indemnification Claim hereunder shall not affect the indemnifying party's obligations under this Article 12, except to the extent that the indemnifying party is actually prejudiced by such failure to give prompt written notice. The indemnified party, at the indemnifying party's expense, shall, and shall cause its employees and representatives to, reasonably cooperate with the indemnifying party in connection with the settlement or defense of such Indemnification Claim and shall provide the indemnifying party with all available information and documents concerning such Indemnification Claim. If the indemnifying party, within thirty (30) days after written notice of any such Indemnification Claim, fails to assume the defense of such Indemnification Claim, the indemnified party against whom such claim has been made shall (upon further written notice to the indemnifying party) have the right to undertake the defense, compromise or settlement of such claim on behalf of and for the account and risk, and at the expense, of the indemnifying party.

**12.4.2.** Anything in this Section 12.4 to the contrary notwithstanding: (i) the indemnified party shall not settle a claim for which it is indemnified without the prior written consent of the indemnifying party, which consent shall not be unreasonably withheld, conditioned or delayed; and (ii) the indemnifying party shall not enter into any settlement or compromise of any action, suit or proceeding, or consent to the entry of any judgment for relief other than monetary damages to be borne exclusively by the indemnifying party, without the prior written consent of the indemnified party, which consent shall not be unreasonably withheld, conditioned or delayed.

### 13. MISCELLANEOUS:

**13.1. <u>Bulk Sales Laws</u>**. Sellers and Purchasers hereby waive compliance by Seller with the provisions of the bulk sales Law of any state or foreign jurisdiction.

**13.2. <u>Notices</u>**. All notices, requests, consents or other communications permitted or required under this Agreement shall be in writing and shall be deemed to have been given when personally delivered, or when sent if sent via facsimile (with receipt confirmed), or on the first business day after sent by reputable overnight carrier, or on the third business day after sent by registered or certified first class mail (with receipt confirmed), to the following:
If to Seller:
DELPHI Automotive Systems LLC
5725 Delphi Drive
Troy, Michigan 48098
Attn: Assistant General Counsel - Commercial & Transactional
Fax No.: 248-813-2491

48

With a copy to:
AHG – Attn: John P. Carney
5725 Delphi Drive
Troy, Michigan 48098
Fax No.: 248-813-2410

If to Purchaser:
Robert Bosch LLC
38000 Hills Tech Drive
Farmington Hills, Michigan 48331
Attn.: Mr. Devesh Sharma
Fax No.: 248-876-6540

With a copy to:
Robert Bosch LLC
2800 South 25th Avenue
Broadview, Illinois 60155
Attn.:  General Counsel
Fax No.: 708-786-3673

provided, however, if either Party shall have designated a different addressee by notice, then to the last addressee so designated.

   **13.3. Assignment**. This Agreement shall be binding and inure to the benefit of the successors and assigns of each of the Parties and their Affiliates, but no rights, obligations, duties or liabilities of either Party may be assigned without the prior written consent of the other, which shall not be unreasonably withheld.

   **13.4. Entire Agreement**. This Agreement, together with the Ancillary Agreements, represents the entire agreement and understanding between the Parties with respect to the transactions contemplated herein. This Agreement supersedes all prior agreements, understandings, arrangements, covenants, representations or warranties, written or oral, by any officer, employee or representative of either Party dealing with the subject matter hereof.

   **13.5. Waiver.** Any waiver by Seller or Purchaser of any breach or of a failure to comply with any provision of this Agreement: (i) shall be valid only if set forth in a written instrument signed by the Party to be bound; and (ii) shall not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any provision of this Agreement. At any time prior to the Closing Date, the Parties may: (a) extend the time for the performance of any of the obligations or other acts of the other Parties hereto; (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions contained herein. Except as otherwise expressly provided herein, any agreement on the part of a Party to any such extension or waiver shall

49

be valid only if set forth in an instrument in writing signed on behalf of such Party.

**13.6. <u>Severability</u>**. Should any provision, or any portion thereof, of this Agreement for any reason be held invalid or unenforceable, such decision shall not affect the validity or enforceability of any of the other provisions, or portions thereof, of this Agreement, which other provisions, and portions, shall remain in full force and effect, and the application of such invalid or unenforceable provision, or portion thereof, to persons or circumstances other than those as to which it is held invalid or unenforceable shall be valid and be enforced to the fullest extent permitted by Law.

**13.7. <u>Amendment</u>**. This Agreement may only be amended only in writing by duly authorized representatives or officers of the Parties.

**13.8. <u>Expenses</u>**. Except as otherwise expressly provided in Section 9.3 of this Agreement or an Ancillary Agreement, each Party shall be responsible for its own expenses incurred in connection with the preparation of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby.

**13.9. <u>Third Parties</u>**. Nothing contained in this Agreement, express or implied, is intended to or shall be construed to confer upon or give to any person, firm, corporation, association, labor union or trust (other than the Parties, their Affiliates and their respective permitted successors and assigns), any claims, rights or remedies under or by reason of this Agreement.

**13.10. <u>Headings</u>**. The headings contained in this Agreement are inserted for convenience only and shall not be deemed to constitute a part of this Agreement.

**13.11. <u>Counterparts</u>**. More than one counterpart of this Agreement may be executed by the Parties, and each fully executed counterpart shall be deemed an original. A facsimile signature shall be deemed an original for purposes of this Agreement, provided, however, that they shall be promptly replaced by signature pages bearing original signatures.

**13.12. <u>Governing Law</u>**. This Agreement shall be construed and enforced in accordance with the laws of the State of Michigan and, to the extent applicable the Bankruptcy Code, without giving effect to rules governing the conflict of laws.

**13.13. <u>Public Announcements</u>**. Except for the public filings and notices contemplated in this Agreement, Sellers and Purchasers will consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and shall not issue any press release or make any public statement without mutual consent, except as may be required by Law and then only with such prior consultation.

**13.14. <u>Sales or Transfer Taxes</u>**. All sales taxes, documentary and stamp taxes, transfer taxes, use taxes, gross receipts taxes, excise taxes, value-added gross receipt taxes or

similar charges and all charges for filing and recording documents in connection with the transfer of the Acquired Assets (including intellectual property filing and recording fees) shall be paid by Purchaser.

**13.15. <u>Venue and Retention of Jurisdiction</u>**. All actions brought, arising out of or related to the transactions contemplated in this Agreement shall be brought in the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction to determine any and all such actions.

**13.16. <u>Risk of Loss</u>**. Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Acquired Assets or the Business shall be borne exclusively by the Sellers.

**13.17. <u>Enforcement of Agreement</u>**. The Parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or were otherwise breached. It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to all other remedies available at law or in equity.

**13.18. <u>Dispute Resolution.</u>** Sellers and Purchasers will, in the first instance, attempt to settle any and all claims or disputes arising in connection with this Agreement or any Ancillary Agreement by good faith negotiations by senior management of each party. If the dispute is not resolved by senior management within thirty (30) days after delivery of a written request for such negotiation by either party to the other, either party may make a written demand (the "Demanding Party") for formal dispute resolution (the "Notice") and specify therein in reasonable detail the nature of the dispute. Within fifteen (15) business days after receipt of the Notice, the receiving party (the "Defending Party") shall submit to the other a written response. The Notice and the response shall include: (i) a statement of the respective party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that party and of any other person who will accompany the executive to meetings of the parties. Within fifteen (15) business days after such written notification, the executives (and others named in the Notice or response) will meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute. All reasonable requests for information made by one party to the other will be honored promptly. All negotiations pursuant to this Section 13.18 are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence. In any case, the Parties agree not to commence any litigation actions until the expiration of ninety (90) days after the date of the Notice, and all such actions are subject to Section 13.15 above.

**13.19. <u>No Right of Setoff</u>**. Neither party hereto nor any Affiliate thereof may deduct from, set off, holdback or otherwise reduce in any manner whatsoever any amount owed to it hereunder or pursuant to any Ancillary Agreement against any amounts owed hereunder or pursuant to any Ancillary Agreement by such Persons to the other party hereto or any of such other party's Affiliates.

**13.20.** <u>**Limitation on Damages**</u>. NOTWITHSTANDING ANY OTHER
PROVISION OF THIS AGREEMENT, INCLUDING ARTICLE 12, IN NO EVENT
SHALL PURCHASERS OR SELLERS BE LIABLE FOR, OR BEAR ANY OBLIGATION
IN RESPECT OF, ANY PUNITIVE, INCIDENTAL, INDIRECT, SPECIAL,
EXEMPLARY OR CONSEQUENTIAL DAMAGES OF ANY KIND OR CHARACTER
OR ANY DAMAGES RELATING TO, OR ARISING OUT OF, DIMINUTION IN
VALUE, LOST PROFITS OR CHANGES IN RESTRICTIONS ON BUSINESS
PRACTICES.

**13.21**. <u>**Bankruptcy Court Approval**</u>.  Notwithstanding anything to the contrary
herein, Delphi's obligations under Section 9.3 are expressly subject to entry of the Bidding
Procedures Order.  All other obligations of the Sellers hereunder are expressly subject to
entry of the Sale Approval Order.

**IN WITNESS WHEREOF**, each of the parties hereto has caused this
Agreement to be executed by its duly authorized officer, in each case as of the date first
above written.

**THIS SPACE INTENTIONALLY LEFT BLANK**

**SELLERS**

**DELPHI  AUTOMOTIVE SYSTEMS LLC**

By:_____

_____
Name:
Title:

**DELPHI SISTEMAS DE ENERGIA, S.A. DE C.V.**

By:_____

_____
Name:
Title:

**DELPHI CONTROLADORA, S.A. DE C.V.**, APPEARING AS INDEMNITOR ONLY
FOR PURPOSES OF SECTION 5.1.15.H HEREOF AND NO OTHER PURPOSE

By:_____

_____
Name:
Title:

**Witnesses**

_____          _____

**PURCHASERS**

**ROBERT BOSCH LLC**

By:_____
_____
Name:
Title:


By:_____
_____
Name:
Title:



**FRENADOS MEXICANOS S.A. DE C.V.**

By:_____
_____
Name:
Title:


By:_____
_____
Name:
Title

**Witnesses**

_____          _____

## Schedule 2

| Counterparty | Agreement(s) | Cure Amount |
| --- | --- | --- |
| ATF Inc. | Purchase Order No. 550074000 | $0.00 |
| Robert Bosch Corp. | Purchase Order Nos. 550072723, 550073345, 5500026332, 5500026338, 5500026333, 5500026339, 5500026344, 5500026350, 5500026345, 5500026351, 5500033443, 5500034788, 5500028684 and 5500027610 | $0.00 |
| The Cold Heading Co. | Purchase Order No. 550001271 | $0.00 |
| Fortech Products Inc. | Purchase Order No. 550076650 | $26,628.00 |
| Intermet Corporation | Purchase Order No. 550078567 | $166,191.92 |
| Mac Arthur Corp. | Purchase Order No. 550008788 | $102.33 |
| Magni Industries | Purchase Order No. 550001548 | $12,852.00 |
| Midwest Stamping & & Manufacturing Co | Purchase Order No. 550072468 | $7,603.20 |
| PBR Knoxville LLC | Purchase Order No. 550053219 | $0.00 |
| Thyssen Krupp Waupaca Inc. | Purchase Order Nos. 550070456 and 550078566 | $0.00 |

1

# EXHIBIT F

Delphi Corporation
Special Parties

| Company | Contact | Address 1 | Address 2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| Pricewaterhouse Coopers | Mr Enrique Bujidos | C/ Almagro 40 | | Madrid | | 28010 | Spain |
| Receiver appointed by Sidenor | Mr Fernando Gomez Martin | Paseo del Parque s/n | Club de Golf Bungalow Las Arenas | San Roque | Cadiz | 11310 | Spain |
| | Mr Adalberto Canadas Castillo | Avda Ramon de Carranza 10-1° | | Cadiz | | 11006 | Spain |

In re Delphi Corporation, et al.
Case No. 05-44481

Page 1 of 1

7/24/2007 9:37 PM
DASE Special Parties

# EXHIBIT G

Delphi Corporation
Response Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2491 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com sliviri@ffhsj.com | Counsel to Equity Security Holders Committee |
| JPMorgan Chase Bank, N.A. | Richard Duker | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | richard.duker@jpmorgan.com | Prepetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Susan Atkins, Gianni Russello | 277 Park Ave 8th Fl | | New York | NY | 10172 | 212-270-0426 | 212-270-0430 | gianni.russello@jpmorgan.com susan.atkins@jpmorgan.com | Postpetition Administrative Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| United States Trustee | Alicia M. Leonhard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | 212-510-0500 | 212-668-2255 does not take service via fax | | Counsel to United States Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

7/24/2007 9:40 PM
Response Service List 070530

Delphi Corporation
Special Party

| Claimant | Contact | Address1 | Address2 | City | State | Zip |
|----------|---------|----------|----------|------|-------|-----|
| Joseph Reno | Brad A. Chalker | Law Offices of Brad A. Chalker | P.O. Box 750726 | Dayton | OH | 45475 |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

7/24/2007 9:37 PM
Reno Special Party

# EXHIBIT H

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
Albert L. Hogan III (AH 8807)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

— and —

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| – - – - – - – - – - – - – - – - – - – - – x | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| – - – - – - – - – - – - – - – - – - – - – x | : | |

DEBTORS' RESPONSE TO DAMAGES BRIEF OF JOSEPH
RENO WITH RESPECT TO PROOF OF CLAIM NUMBER 9956

("DAMAGES RESPONSE — JOSEPH RENO")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively the "Debtors"),

hereby submit their Response to Damages Brief Of Joseph Reno With Respect To Proof Of

Claim No. 9956 (Joseph Reno) (the "Damages Response") and respectfully represent as follows:[1]

Introduction

1.    During the liability phase of this bifurcated proceeding, Claimant Joseph

Reno ("Reno") raised against the Debtors seven claims: (i) a claim under the antiretaliatory

provisions of Ohio's whistleblower statute; (ii) a wrongful discharge claim; (iii) a wage payment

claim; (iv) a defamation claim; (v) a Fair Credit Reporting Act claim; (vi) a claim under the

Consolidated Omnibus Reconciliation Act ("COBRA"); and (vii) a claim under the Employee

Retirement Income Security Act of 1974 ("ERISA").  Reno alleged nearly $16 million in

damages stemming from these seven claims. During the March 21, 2007, claims objection

hearing, this Court disallowed and expunged all of Reno's claims except those arising under

COBRA and ERISA.

2.    Now, during the damages phase of the proceeding, Reno seeks to recover

not only the mutually agreed-upon ERISA damages but also the maximum per diem penalty

under COBRA and 100 percent of his attorney's fees and costs for prosecuting all seven claims.

Reno overreaches.  The maximum COBRA penalty is reserved only for the most egregious

cases, in particular those where the defendant exhibited bad faith.  Where, as here, the defendant

proceeded in good faith and the plaintiff suffered no resultant prejudice, a statutory penalty is

inappropriate.  Similarly, Reno is not entitled to recover his attorney's fees and costs both

because Delphi exhibited good faith and because Reno failed to meet his burden to prove any

entitlement to such fees.

---

[1]    The Debtors have not engaged in formal discovery on damages issues on the agreement that Reno, in his opening damages brief, would articulate any basis for and present any evidence regarding his claim for damages.

2

<u>Mutually Agreed-Upon ERISA Damages</u>

3.      Debtors agree that the value of Reno's ERISA claim is $5,433.52 plus

interest.[2]  Reno requests interest at the "statutory rate from the date of April 12, 2004."  (Reno

Br. at 2.)  However, "[t]here is no federal statute that controls the rate of pre-judgment interest."

<u>Klimbach</u>, 467 F. Supp. 2d at 334.  Courts often utilize the postjudgment interest rate provided

for in 28 U.S.C. § 1961 to determine prejudgment interest in the ERISA context.  <u>See id.</u> at 334-

35; <u>see also</u> <u>Ford v. Uniroyal Pension Plan</u>, 154 F.3d 613, 619 (6th Cir. 1998) ("[T]he statutory

postjudgment framework set forth in 28 U.S.C. § 1961 is a reasonable method for calculating

prejudgment interest awards.").  Section 1961 provides that interest "shall be calculated . . . at a

rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the

Board of Governors of the Federal Reserve System . . . ."  28 U.S.C. § 1961(a).  Accordingly, the

Debtors agree that the value of Reno's ERISA claim is $5,433.52 plus interest under Section

1961 from April 12, 2004, to the present.

<u>COBRA Penalty</u>

4.      Reno claims that he is entitled to $60,225 in connection with his COBRA

claim, based on a statutory daily "penalty" that he maintains should be asserted against Delphi at

the maximum $110 level for every day for eighteen months.  The assessment of a statutory

penalty for an employer's violation of the COBRA notification requirements is not automatic;

---

[2]      "Whether to award pre-judgment interest in a suit to recover benefits under ERISA is ordinarily left to the
discretion of the . . . court."  <u>Klimbach v. Spherion Corp.</u>, 467 F. Supp. 2d 323, 334 (W.D.N.Y. 2006).  In
determining whether prejudgment interest is appropriate, the court should consider "(i) the need to fully
compensate the wronged party for actual damages suffered, (ii) considerations of fairness and relative equities
of the award, (iii) the remedial purposes of the statute involved, and/or (iv) such other general principles as are
deemed relevant by the court."  <u>Id.</u>  In the interests of judicial economy and as a show of good faith, Delphi
does not dispute an award of prejudgment interest in this case.

3

rather, whether to award any penalty is a discretionary matter for the court. <u>See</u> 29 U.S.C. §

1132(c)(1).[3]

5.    In determining whether to exercise discretion to assess a penalty, courts,

including the Second Circuit, consider various factors, including, among others, "'bad faith or

intentional conduct on the part of the administrator . . . and the existence of any prejudice to the

participant. . . .'" <u>Devlin v. Empire Blue Cross & Blue Shield</u>, 274 F.3d 76, 90 (2d Cir. 2001)

(quoting <u>Pagovich v. Moskowitz</u>, 865 F. Supp. 130, 137 (S.D.N.Y. 1994)). Indeed, many courts

refuse to assess penalties in the absence of a showing of bad-faith action by the defendant or

prejudice to the plaintiff. <u>See</u> <u>De Nicola v. Adelphi Acad.</u>, No. CV-05-4231, 2006 WL 2844384,

at *9 (E.D.N.Y. Sept. 29, 2006) (collecting cases); <u>Chambers v. European Am. Bank & Trust

Co.</u>, 601 F. Supp 630, 638-39 (E.D.N.Y. 1985) ("The weight of authority indicates that penalties

are not imposed when a plaintiff has failed to demonstrate that his rights were harmed or

otherwise prejudiced by the delay in receipt of the information." (collecting cases)).

6.    Here the factors weigh strongly against the assessment of any COBRA

penalty. This Court conclusively found that Beth Patrick had a legitimate reason for terminating

Reno on March 17, 2004, and that Reno did not show that the reason she articulated for firing

him was a pretext. (Tr. at 93:4-5.)[4] Moreover the only evidence here is that Patrick believed in

good faith that Reno's misconduct constituted gross misconduct making Reno ineligible for

continued coverage. (Declaration of Elizabeth Patrick ("Patrick Decl.") ¶ 13(g), attached hereto

as <u>Exhibit 2</u>.) Accordingly, on April 5, 2004, nineteen days after Reno's termination, the plan

---

[3]    "Penalties under ERISA were increased to $110 per day pursuant to the Federal Civil Penalties Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996." <u>De Nicola</u>, 2006 WL 2844384, at *7 (citing 29 C.F.R. 2575.502c-1).

[4]    All citations to "Tr. at __" refer to the transcript of the March 21, 2007, claims objection hearing. A copy of the portion of the transcript containing the Court's ruling is attached hereto as <u>Exhibit 1</u>.

administrator sent out a timely COBRA notice that it believed to satisfy the notification

requirements.  (Notice dated Apr. 5, 2004, attached hereto as <u>Exhibit 3</u>.)  The notice provided

information concerning how Reno could seek further clarification regarding Delphi's

determination, and Reno did seek such clarification.  (<u>Id.</u>)  On May 24, 2004, Reno received

even more information concerning Delphi's determination of his COBRA status.  (Letter dated

May 24, 2004, attached as <u>Exhibit 4</u>.)  Thus, the notification function envisioned in the statute

was clearly met here:  Delphi based its eligibility determination on its good-faith interpretation of

the facts and gave full notice and information concerning that determination.  Under these

circumstances, a statutory COBRA penalty is not warranted.[5]

        7.        Even if some penalty were appropriate — which the Debtors strongly

dispute — Reno's proposed maximum $110 per day penalty for an eighteen-month period should

be rejected as excessive and unreasonable.  Indeed, in factually comparable circumstances where

courts awarded some penalty — as opposed to *no* penalty, as is often the case — nominal

penalties of $10 per day were usually awarded.  <u>See, e.g.</u>, <u>Disabatino v. Disabatino Bros.</u>, 894 F.

Supp. 810, 816-17 (D. Del. 1995) (assessing a penalty of $10 per day where the administrator

proceeded in good faith and the participant suffered no cognizable injury as a result of the failure

to notify); <u>Paris v. F. Korbel & Bros.</u>, 751 F. Supp. 834, 840 (N.D. Cal. 1990) (assessing a

penalty of $10 per day where the administrator proceeding on the good-faith belief that the

participant was terminated for gross misconduct); <u>Cooper v. Harbour Inns of Baltimore, Inc.</u>, No.

L-98-2173, 2000 WL 351373, at *6 (D. Md. Mar. 20, 2000) (assessing a penalty of $10 per day

where the administrator proceeded in good faith and any harm to participant was subsequently

cured).  As to the duration of any penalty, it would run — if at all — from the forty-fifth day

---

[5]     Reno suggests that "when Delphi denied Reno a COBRA continuation of his family insurance plan, he was not
        the only one touched by Delphi's animus."  (Reno Br. at 2.)  However, there is absolutely no evidence that Reno
        or any of his family members were prejudiced by the content of the notification.

following Reno's termination (May 1, 2004) to eighteen months after his termination (September

17, 2005), or 504 days. See Disabatino, 894 F. Supp. at 817; Rodriguez v. Int'l College of Bus.

& Tech., Inc., 356 F. Supp. 2d 92, 94-95 (D. P.R. 2005).  If any penalty is awarded to Reno, it

should be commensurate both with Delphi's minimal fault and good faith and with penalties

assessed in analogous cases: no more than $10 per day for 504 days.  Accordingly, the maximum

penalty that Reno should be awarded is $5,040.00.[6]

Statutory Attorney's Fees and Costs

8.    The evidence does not support any discretionary award of attorney's fees

and costs in this case.  The Second Circuit weighs five factors in assessing the propriety of an

award of attorney's fees under 29 U.S.C. § 1132(g)(1):

> (1) the degree of the offending party's culpability or bad faith,
> (2) the ability of the offending party to satisfy an award of
> attorney's fees, (3) whether an award of fees would deter other
> persons from acting similarly under like circumstances, (4) the
> relative merits of the parties' positions, and (5) whether the action
> conferred a common benefit on a group of pension plan
> participants.

Salovaara v. Eckert, 222 F.3d 19, 27-28 (2d Cir. 2000); see Paris, 751 F. Supp. at 840 (weighing

the same factors and concluding that the plaintiff was not entitled to recover attorney's fees

because administrator "truly, although erroneously, believed that [the plaintiff] committed gross

misconduct").

---

[6]    The sole case upon which Reno relies in his brief regarding the COBRA penalty, Cooper, 2000 WL 351373,
observed that "it would be highly inconsistent for the defendants to have reinstated [the employee's] health
insurance coverage . . . at their own expense while at the same time believing that she had been terminated for
gross misconduct."  Id. at *6 n.15.  Yet that "highly inconsistent" behavior is the very behavior that Reno seeks
to have this Court sanction.  To adopt such a rule would create a Hobson's choice for employers and virtually
force employers to continue health coverage for all employees, including for employees the employer correctly
believes were fired for gross misconduct, for fear of the maximum statutory penalty if the employer's good-faith
belief turns out later to be mistaken.

9.      Here the factors weigh against an award of attorney's fees. *First*, as discussed above, Delphi did not act with bad faith in its refusal to notify Reno of continuation coverage.  To the contrary, the only admissible evidence is that Delphi properly terminated Reno and believed — in good faith — that his termination was based on gross misconduct obviating the need for notice under 29 U.S.C. § 1166.  Supra ¶ 6.  *Second*, although Delphi is able to pay attorney's fees and costs, such ability to pay should be discounted because Delphi is a bankruptcy debtor.  *Third*, an award of attorney's fees in this case will not deter Delphi — or any other employer — from acting similarly under like circumstances.  See De Nicola, 2006 WL 2844384, at *9 ("The goal of deterrence is not to compel employers who believe that their former employees have committed gross misconduct to provide COBRA notices solely out of fear of large penalties."); Cooper, 2000 WL 351373 at *6 n.15.  *Fourth*, as to the relative merits of the parties' positions, Debtors prevailed on five of the seven claims Reno raised, evidencing that Debtors' position had more merit than Reno's.  Even as to the COBRA claim, the Court declined to rule that Reno did *not* engage in gross misconduct, but the Court found only that it did not have enough of a factual record to make a determination on the issue.  (Tr. at 92:3 – 93:11.)  Thus, it cannot be said that Delphi's position on the COBRA claim was without merit, especially because the Court found that Reno was terminated for a nonretaliatory reason.  (Tr. at 92:23-25.)  *Fifth and finally*, Reno's action did not confer a common benefit on plan participants; rather, litigation of the discrete, individual circumstances surrounding Reno's termination was personal to Reno.  Moreover, resolution of Reno's claims did not provide any guidance to future litigants by, for example, defining gross misconduct.  Because the factors weigh in Debtors' favor, the Court should decline to award attorney's fees and costs to Reno.  See De Nicola, 2006 WL 2844384, at *12 ("Because defendant has limited culpability with respect to the COBRA notices

and has acted in good faith during this litigation, the plaintiffs' request for attorneys' fees and costs is denied.").

10.     Even if the Court determines that some award of attorney's fees is appropriate in this case, an award totaling $85,334.04 is incongruous with the results Reno obtained. Attorney's fees are awarded based upon a determination of the "presumptively reasonable fee" (traditionally called the "lodestar"),[7] which is a "reasonable hourly rate" multiplied by the number of hours reasonably expended on the litigation. See Arbor Hill, --- F.3d ---, 2007 WL 2004106, at *7; Klimbach v. Spherion Corp., 467 F. Supp. 2d 323, 330 (W.D.N.Y. 2006) (citing Hensley v. Eckerhart, 461 U.S. 424, 433-34 (1983)). Courts "must exclude any hours that were 'excessive, redundant, or otherwise unnecessary.'" Klimbach, 467 F. Supp. 2d at 331 (citations omitted).

11.     As an initial matter, courts must "consider the 'critical factor' of the 'results obtained' and adjust the [fees requested] upward or downward accordingly." Id. at 330-31 (citations omitted); see also LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 760 (2d Cir. 1998) ("The most important factor in determining a reasonable fee for a prevailing plaintiff is 'the degree of success obtained.'"(citations omitted)). In this analysis, courts "exclude any hours dedicated to severable, unsuccessful claims." Klimbach, 467 F. Supp. 2d at 331 (citations omitted); see also Knoll v. Equinox Fitness Clubs, No. 02 Civ. 9120 (SAS) (DFE), 2006 WL 2998754, at *1 (S.D.N.Y. Oct. 20, 2006) (explaining that work on unsuccessful claims must be severed from an award of attorney's fees where such claims were based on different facts and

---

[7]     The Second Circuit only recently introduced the term "presumptively reasonable rate," abandoning use of the term "lodestar," which has traditionally signified the product of the number of hours reasonably expended on litigation and a reasonable hourly rate. See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, --- F.3d ---, 2007 WL 2004106, at *7 (2d Cir. 2007). In Arbor Hill, the Second Circuit clarified the method by which courts are to determine the reasonable hourly rate. See generally id. Because the reasonableness of the hourly rate assessed by Reno's attorney is not in dispute here, it is unnecessary to consider the analysis approved in Arbor Hill.

legal theories). Attorney's fees may be awarded for unsuccessful claims, but only if they are "'inextricably intertwined' and 'involve a common core of facts.'" <u>Klimbach</u>, 467 F. Supp. 2d at 331 (citation omitted). Thus, when a plaintiff puts forth alternative grounds for obtaining relief, and ultimately obtains the *desired* relief based on some — but not all — of plaintiff's legal theories, the unsuccessful theories are not severable from the successful theories for purposes of obtaining attorney's fees and costs.

12.    Here Reno did not obtain his desired relief. To the contrary, during the liability phase of this proceeding, the Debtors won on 5 out of the 7 claims and succeeded in eliminating over 99% of the damages Reno sought in his proof of claim. Moreover, under the "common core of facts" test, Reno overlooks that this Court previously recognized that Reno's COBRA and ERISA claims did <u>not</u> arise from the same common core of facts as those underlying his disallowed claims. (Tr. at 73:17-22.)  Accordingly, the COBRA and ERISA claims are severable, and, at most, Reno may recover only those fees and costs that directly relate to those claims. <u>See, e.g.</u>, <u>Nero v. Univ. Hosp. Mgmt. Servs. Org.</u>, No. 1:04CV1833, 2006 WL 2933957, at *6 (N.D. Ohio Oct. 12, 2006) (finding that plaintiff was not entitled to all attorney's fees where the majority of the litigation arose from discrimination claims on which plaintiff did not prevail; plaintiff was entitled only to fees for work exclusively related to the COBRA claim on which she prevailed).[8]

---

[8]    Although the Court noted that the Debtors' defense of Reno's COBRA claim was related to the facts of the other claims (Tr. at 73:17-22), the Debtors do not believe their discrete defense — that Reno's misconduct constituted gross misconduct obviating the need for a COBRA notice — involves the "common core of facts" at issue in Reno's failed claims. The facts that Reno tried to prove were that he was engaged in protected activity and intentionally terminated as a result. Indeed, Reno's trial brief does not advance <u>any</u> argument whatsoever regarding his COBRA or ERISA claims. <u>See</u> <u>Kirsch v. Fleet St., Ltd.</u>, 148 F.3d 149, 173 (2d Cir. 1998) (plaintiff's successful Age Discrimination in Employment Act ("ADEA") claim did not involve "common core of facts" as his unsuccessful labor law claim because "[t]he key issue for the labor law claim was whether [plaintiff] was an employee or an independent contractor in that pre-1990 period, which was not an issue with respect to his ADEA claim"). (A copy of Reno's trial brief is attached to his Motion for Leave to File Claimant Joseph Reno's Trial Brief and Declaration (Docket No. 7103).)

9

13.     The party seeking attorney's fees bears the burden of "'establishing

entitlement to an award and documenting the appropriate hours expended and hourly rates.'"

Savoie v. Merchants Bank, 166 F.3d 456, 463 (2d Cir. 1999) (quoting Cruz v. Local Union No. 3

of the Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1160 (2d Cir. 1994)).    Reno fails to meet this

burden because the Application and Affidavit Regarding Bill of Costs and Statutory Attorney

Fees for Claimant Joseph Reno (Docket No. 8315) (the "Application") does not clearly delineate

the hours devoted to the COBRA and ERISA claims.    Indeed, where severable claims such as the

alleged wage payment violation for Delphi's alleged failure to pay Reno's wages due and for

vacation time accrued — a claim that was not allowed — have no associated breakout of fees,

there is no way to eliminate such fees and costs.    Because Reno has not met his burden to

demonstrate, with any degree of precision, the attorney's fees relevant to the claims on which he

prevailed, this Court should decline to award fees, except for work described as "pension" or

COBRA-related.    See id. (declining to award fees where the applicant did not break out those

fees that were related to the relevant work).[9]

14.     Alternatively, in the event that this Court determines that Reno's ERISA

and COBRA claims are inextricably intertwined with his remaining, unsuccessful claims, any

award of attorney's fees still should not be fully compensatory.    As an initial matter,  the

Supreme Court recognizes that an award of attorney's fees for unsuccessful claims may be

unreasonable even though such claims arise from facts common to the successful claims.    See

---

[9]    The Application includes only seven entries specifically relevant to work on the pension (ERISA) claim and one
entry specifically relevant to the COBRA claim.    Additionally, each of these entries refers to other work that is
performed contemporaneously and unrelated to the ERISA and COBRA claims.    Taken together, these entries
represent only $2,062.50 in attorney's fees prior to reductions for work unrelated to the ERISA and COBRA
claims and reductions for vague and duplicative entries.    Notably, because Reno invites the Court to either "(1)
award fees for all time billed [in this case]; or (2) review *on its own* all the time records in order to ascertain
how many hours were spent on [relevant claims]," this Court may decline to award fees entirely.    Savoie, 166
F.3d at 463 (declining to any award fees accrued after settlement announcement because the applicant did not
delineate which hours were devoted to reimbursable matters).

Hensley, 461 U.S. at 435-36 (explaining that if a plaintiff achieved only partial or limited

success, recovery of fully compensatory attorney's fees is excessive); see also Grant v. Martinez,

973 F.2d 96, 101-02 (2d Cir. 1992) (courts may reduce fees based on limited success in

prosecuting related claims); Avila v. Coca-Cola Co., 849 F.2d 511 (11th Cir. 1988) (refusing to

award attorney's fees for related but unsuccessful discrimination claim because plaintiff achieved

considerably less relief by prevailing only on his retaliation claim).[10]  Reno lost the case he was

trying to prove, to wit: a case that Reno was engaged in protected activity and that Delphi

intentionally retaliated against him for such protected activity by firing him.  Indeed, the

damages amounts listed in Reno's trial brief for his ERISA loss ($6,099.59) and COBRA penalty

($18,590) amount to less than $25,000 of the nearly $16 million he sought.[11]  It is therefore no

wonder that Reno did not even develop an argument in his trial brief regarding these two

nominal claims, which amounted to less than one-fifth of 1% of the total damages he sought.

Because Reno's success was extremely limited, this Court should reduce substantially Reno's

attorney fees award to the extent one is awarded.  See Knoll, 2006 WL 2998754, at *1 n.11

(citing Harris v. Marhoefer, 24 F.3d 16, 18-19 (9th Cir. 1994) (approving district court's 50

percent reduction based on the partial success of the prevailing party, a comparison of relief

---

[10]    The authority cited by Reno is in accord.  See Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville &
Davidson County, Tennessee, 421 F.3d 417, 423-24 (6th Cir. 2005), cert. denied, 126 S. Ct. 2916 (2006)
(finding that because plaintiff obtained its preferred, and an undeniably "excellent," result — a permanent
injunction against the defendant — plaintiff was entitled to recover its full attorney's fees even though it had not
prevailed on some alternative theories for achieving the same relief); Hollingsworth v. Time Warner Cable, 861
N.E.2d 580, 600 (Ohio Ct. App. 2006), appeal not allowed, 861 N.E.2d 145 (2007) (acknowledging that a court
may adjust attorney's fees based on the "'significance of the overall relief obtained by the plaintiff'" (citation
omitted)).  Here Reno's result of obtaining a very small percentage of the nearly $16 million relief sought and
victory on two claims with respect to which he did not even develop an argument in his trial brief can hardly be
considered an "excellent" result justifying a full attorney's fees and costs award.

[11]    Page 11 of Reno's Motion for Leave to File Reno's Trial Brief and Declaration (attached as Exhibit 5) lists the
damages Reno sought to prove at trial.

requested versus relief obtained, and the number of successful claims versus unsuccessful claims).[12]

15.    Moreover, most of Reno's counsel's entries are generic, making it impossible to determine whether the entries are necessary and not duplicative. See Klimbach, 467 F. Supp. 2d at 332 (imposing a 10 percent reduction on vague billing entries where it was impossible to tell whether the hours were duplicative or justifiably billed); Anderson v. Rochester-Genesee Reg'l Transp. Auth., 388 F. Supp. 2d 159, 167 (W.D.N.Y. 2005) (imposing a 20 percent reduction of hours claimed due to, among other reasons, generic descriptions of work performed). This Court should further reduce an attorney's fees and costs award because of the generic nature of the entries.

## Conclusion

16.    The Court should award Reno only the agreed-upon ERISA damages of $5,433.52 plus interest. Because Delphi proceeded on the good-faith belief that it terminated Reno for gross misconduct and because Reno has offered no evidence that he was injured as a result of the COBRA violation, Reno should not be entitled to recover a statutory COBRA penalty or attorney's fees or costs.

---

[12]    The Debtors believe that, given the various ways of thinking about a reasonable attorney fee award, no reasonable attorney fee award could exceed 15% of the total attorney fees in this case based on Reno's extremely limited success. This percentage fits comfortably between the percentage of claims Reno won – 29% (2 claims out of the 7 asserted) – and the percentage of damages, before attorney fees, Reno sought in his trial brief for which he was successful – nearly 0% ($25,000 out of almost $16 million).

WHEREFORE, the Debtors respectfully request that the Court enter an order (i) awarding Reno $5,433.52 for ERISA damages plus interest on that amount from April 12, 2004, to the present, (ii) denying Reno any statutory COBRA penalty, (iii) denying Reno attorney's fees and costs, and (iv) granting such further and other relief the Court deems just and proper.

Dated: New York, New York
      July 20, 2007

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

By: /s/ Albert L. Hogan III
  John Wm. Butler, Jr. (JB 4711)
  Albert L. Hogan III (AH 8807)
  John K. Lyons (JL 4951)
  Ron E. Meisler (RM 3026)
  333 West Wacker Drive, Suite 2100
  Chicago, Illinois 60606
  (312) 407-0700

      – and –

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

By: /s/ Kayalyn A. Marafioti
  Kayalyn A. Marafioti (KM 9632)
  Thomas J. Matz (TM 5986)
  Four Times Square
  New York, New York 10036
  (212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

13

# **<u>EXHIBIT 1</u>**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION ET AL,


          Debtor.


- - - - - - - - - - - - - - - - - - - -x


                    United States Bankruptcy Court

                    One Bowling Green

                    New York, New York


                    March 21, 2007

                    10:29 AM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

72

1    Credit Reporting Act those being -- to provide a summary of his

2    report to the object of the adverse employee action.

3              THE COURT:  Okay.  All right.

4              MR. HOGAN:  Judge, other than if you have any

5    questions on the 1681, I don't have anything further.

6              THE COURT:  Well, I mean, I think -- are you at least

7    going to tell me what I thought I just said which is that --

8              MR. HOGAN:  Real quickly, Judge 1681 is --

9              THE COURT:  -- that this provision doesn't change the

10   definition of consumer reporting.

11             MR. HOGAN:  It doesn't change, first of all, the

12   provision exception was effective March 31, 2004, after this --

13   very close but after the report.  It's an exception and it

14   says, but for this subsection, the communication would be --

15   would be a consumer report.  It uses the same term and then it

16   goes through the exceptions.

17             THE COURT:  And that consumer report is someone -- is

18   a report issued by a consumer reporting --

19             MR. HOGAN:  Consumer reporting agency.

20             THE COURT:  -- agency.

21             MR. HOGAN:  Okay?  Thank you.

22             THE COURT:  All right.  Okay.  I'm going to take a

23   break till 12:30 and then come back.

24        (Recess from 12:17 till 12:30 PM)

25             THE COURT:  Please be seated.  Okay.  We're back on

73

1  the record in Delphi Corporation and in particular I'm going to

2  give a bench ruling on the debtor's objection to the proof of

3  claim filed by Mr. Joseph Reno.  As I general do with fairly

4  lengthy bench decisions, I'll give it because I think it's

5  important for the parties to know the result right away, but I

6  will review the transcript.  And I'll review it not only for

7  accuracy but also reserve the right to edit it if what came out

8  of my mouth, remarkably didn't make sense when it did so and to

9  correct it and that will be my final ruling.  But I -- I will

10  not change the gist of my ruling.

11          The claim by Mr. Reno sets forth a number of theories

12  of recovery and I should note first that today's hearing, by

13  agreement of the parties, was limited to the merits of those

14  theories with the parties reserving to a subsequent hearing, if

15  necessary, a determination of damages in connection with any

16  claims that I found to be meritorious.

17          The theories all stem from the same common facts,

18  except the last one which is a claim under ERISA for damages

19  resulting from a -- a delayed payment of ERISA benefits.  The

20  claimant also makes a claim under COBRA and obviously that

21  claim itself does not derive from the facts that I'm going to

22  go to -- go through in a moment but the debtor's defense does.

23  Essentially, as both parties have stated, those facts pertain

24  to Mr. Reno's termination as an employee of Delphi in March of

25  2004.  Mr. Reno contends that that termination was a wrongful

74

1    discharge and done in retaliation for his view expressed to his

2    supervisor and ultimately to in-house lawyer at Delphi.  That

3    Delphi needed to take certain steps to correct a condition in a

4    waste water container and that might exist in another waste

5    water container.  And that consequently he has a wrongful

6    discharge claim and/or a claim under Ohio's Whistle Blower

7    statute because he was terminated after the letter informing

8    Delphi of the waste water container issue was received.

9          He also contends that Delphi did not comply with the

10   Fair Credit Reporting Act in the conduct and provision of

11   information in connection with Delphi's investigation of him.

12   This is not only a claim but is also offered as evidence to

13   show the motivation or protectoral basis for Delphi's

14   termination of Mr. Reno.

15         Delphi, on the other hand, contends that Mr. Reno was

16   fired, not because of the environmental information and point

17   of view that he raised with his supervisor, and ultimately with

18   in-house legal staff, but rather because of information that

19   Delphi learned pertaining to Mr. Reno's conduct on the job and

20   in connection with an investigation of that conduct.

21   Consequently, Delphi argues that his termination was not

22   wrongful but proper.  And certainly was not retaliatory.  It

23   contends that because Mr. Reno was properly terminated for such

24   reasons, it did not have a responsibility, under COBRA, to him.

25   And that it also is not liable for the remaining cause of

75

1    action, which I have not yet described which is a defamation

2    cause of action.

3            Finally, Delphi contends that the investigation that

4    it commissioned and the provision of -- or the use of that

5    investigation was not covered within the ambit of the Fair

6    Credit Reporting Act and consequently that there was nothing

7    improper in connection with the investigation.  And further,

8    that no inference can be drawn from any alleged impropriety

9    under the Fair Credit Reporting Act as to Delphi's motivation

10   in terminating Mr. Reno's employment.

11           As with any or at least most claims of this nature,

12   the parties have very different views as to the underlying

13   facts.  They have set forth those facts in a written record

14   before the court, in a joint exhibit binder that includes

15   witness declarations as well as prior testimony of witnesses

16   and letters and e-mails, which I've reviewed.  And I think that

17   in light of the difference in the underlying testimony and the

18   nature of the claims here, it's important to delineate the

19   burden of proof, which I think the parties generally agree

20   upon, as the claimant, Mr. Reno, has the ultimate burden of

21   proof here.  However his claim, in large measure, comes down to

22   an assertion that the proffered reason for his termination or

23   the reason proffered for his termination by Delphi was and is

24   merely a pretext.  And under those circumstances the courts

25   have developed a burden shifting regime which shows or -- or

76

1    provides that under the proper circumstances in showing a prima

2    facie case of retaliation the claimant may shift the burden to

3    the defendant to articulate a legitimate non-retaliatory reason

4    for its employment decision.  Depending upon the nature of

5    the -- the pretextual argument that is responded to the

6    employer meets that burden by showing an alternative reason

7    than the discriminatory one stated by the claimant.

8            In my view, although -- and I'll get to this in a

9    moment, at oral argument claimant may be setting a different

10   process for shifting the burden.  Once the employer has come

11   forward with a non-discriminatory reason for firing the

12   claimant -- I'm sorry -- firing the claimant, the plaintiff

13   again has or the claimant again has the ultimate burden.  The

14   area of potential doubt is whether that burden must be one that

15   shows that it is more likely the case that the claimant was

16   fired for the discriminatory reason or that there must be

17   wholly non-discriminatory reason available and provide a basis

18   for the termination.  In the pretext cases, I believe that the

19   burden is on the claimant to show that it is more likely that

20   he or she was terminated for a discriminatory, an improper

21   reason or retaliatory reason, see Manzer vs. Diamond Shamrock

22   Chemicals 29 F.3d 1078, (6th Cir. 1994).  In a title seven

23   context the latter view was adopted by a plurality opinion of

24   the Supreme Court in Price Waterhouse vs. Hopkins 490 US 228,

25   (1989), although, again, that wasn't a title seven context not

77

1  focusing on the pretextual argument that the claimant is making

2  here.

3          In any event, let me proceed through the factual

4  record and address first the wrongful discharge claims, since I

5  believe that the other claims, with the exception of the ERISA

6  claim, all flow from that analysis.

7          First, it should be noted that Mr. Reno asserts

8  claims under both Ohio's Whistle Blower Statute and then

9  second, or alternatively, under Ohio Common Law, that his

10  termination violated Ohio Public Policy for raising a

11  legitimate workplace concern regulated by federal and state

12  environmental laws dealing with hazardous wastes.

13          The Ohio Whistle Blower Statute should be addressed

14  first.  Because at least based on my reading of it, as well as

15  the cases interpreting it, it contains procedural requirements

16  that obviously do not exist under the Ohio Common Law wrongful

17  termination cases.  And I find that Mr. Reno did not comply

18  with those procedural requirements.  And under the case law

19  interpreting RC 40113.52(a) 1, he would therefore not have a

20  claim under the Whistle Blower Statute.  That statute requires

21  that an employee orally notify his or her supervisor, or other

22  responsible officer of the employer, of the alleged violation.

23  And (b) subsequently file with that person a written report

24  that provides sufficient detail to identify and describe the

25  violation.  And then it provides for a mechanism if those

78

1   requirements have been satisfied, for the employer to correct

2   the violation or make a reasonable and good faith effort to

3   correct it within twenty-four hours after the oral notification

4   or the receipt of the written report, which ever is earlier.

5   And then an opportunity for the employee to seek appropriate

6   redress.

7            The debtors contend that Mr. Reno did not comply with

8   this provision in two respects.  One I don't accept, although

9   it's somewhat of a close call.  But I believe he did provide in

10  sufficient detail the environmental concerns or hazardous

11  substance concerns that he claims, legitimately, existed with

12  respect to the container tanks.  However, procedurally, he had

13  not provided oral notification of those conditions to the

14  person that he sent the written report to.  That is, he

15  informed Mr. Gooding, his supervisor, orally of the conditions

16  and subsequently mailed his letter to Mr. Wally, the in-house

17  counsel at Delphi.

18           Given the timing constraints and specific language of

19  this statute, that means that he's not complied and we don't

20  have a cause of action under it, see Heney vs. Chrysler

21  Corporation, 699 NE 2.d 121 at 122, Ohio Court of Appeals

22  (1997).

23           There are other potential defenses to this cause of

24  action but I believe that they are best dealt with in the

25  context of the other wrongful discharge claim raised by Mr.

79

1    Reno, which is that he was suspended or terminated contrary to

2    Ohio Public Policy.  That policy is a doctrine adopted by the

3    Ohio Supreme Court in Greeley vs. Miami Valley Maintenance

4    Contractors, Inc., 551 NE 2.d 981, Ohio (1989).  It's an

5    exception to Ohio's general at will employment standard which

6    permits an employer to terminate an employee at will for any

7    cause at any time whatsoever.

8         In order to support a claim for discharge in

9    violation of Public Policy, the plaintiff must show (1) the

10   existence of a clear public policy that has the clarity

11   element.  (2) Dismissal under the circumstances would

12   jeopardize that policy, the jeopardy element.  (3) Dismissal

13   related to public policy, the causation element and (4) lack of

14   overriding business justification for the employer's action.

15   The debtors do not dispute the clarity or jeopardy elements

16   laid out in the Ohio cases including Painter vs. Graily, 639 NE

17   2.d 51, Ohio (1994) and Urban vs. Osborne Manufacturing, Inc,

18   847 NE 2.d 1272, Ohio Court of Appeals (2006).  They do,

19   however, dispute causation arguing strenuously that Mr. Reno

20   was not dismissed contrary to the -- or because of his

21   championing the public policy of the State of Ohio and United

22   States to have an environmentally clean and safe workplace but

23   for a wholly separate reason.

24        They also contend, relatingly -- relatedly -- excuse

25   me, that the overriding business justification for his

80

1    termination was, again, because of his personal conduct in

2    violation of Delphi policies as opposed to his disagreement

3    with Mr. Gooding over the proper maintenance and protection of

4    the container tanks and the surrounding environment or his

5    making that concern known to Mr. Wally in his written letter.

6         I've been through the factual record and as is often

7    the case with claims of this kind, there is no smoking gun and

8    the claimant relies upon the Court drawing inferences from

9    circumstantial evidence.  On its face that circumstantial

10   evidence, to my mind, does set forth a prima facie case in that

11   on the very day that Mr. Reno had his dispute with Mr. Gooding

12   about the container tanks he was put on administrative

13   suspension, albeit with full pay and benefits.

14        Moreover, he was terminated just short of a month

15   thereafter.  After he had notified Mr. Wally on, I believe it

16   was May 4th -- May 2nd, but I may be wrong.  Let me check.

17   Yes, May 2, 2004, of his concern about the container as well as

18   his concern about being put on suspension.  Between the 20th,

19   when he was suspended, and the date of his termination that

20   letter on its face is a -- one of only two significant factual

21   developments.  The other is some additional investigatory work

22   done by the third party investigator, Mr. Brown, that the

23   debtors had hired to investigate a situation that I will talk

24   about in a moment.  But those facts alone, in my mind, raise

25   enough of a concern to shift the burden to Delphi.

81

1          I find, however, based on my review of the factual

2     record including, not only the declarations of Ms. Patrick and

3     Mr. Brown but also the depositions and prior testimony and

4     witness statements, that Delphi has met its burden to show that

5     it was not motivated by the hazardous waste or environmental

6     issues that Mr. Reno had raised with his supervisor and then

7     disclosed to Mr. Wally.  And having shifted the burden back to

8     Mr. Reno, I do not believe that Mr. Reno has overcome the

9     evidence that supports my conclusion that Delphi terminated him

10    for separate reasons that were legitimate and unrelated to

11    retaliation because of Mr. Reno's views as to the container

12    tanks.

13         Specifically, it became known to Delphi that a

14    dumpster of one of its contractors had been placed on the Troy

15    property, or the Troy site, containing garbage and debris that

16    was not Delphi's.  In and of itself that was a fairly innocuous

17    event, however, it was of enough concern, apparently, to cause

18    Mr. Reno's boss, Mr. Gooding, to arrange for a third party

19    investigator, Mr. Brown, to determine the circumstances under

20    which the dumpster came to the site.  The reason for that

21    concern appears to be that it was very quickly assumed and

22    assumed correctly, that the debris in the dumpster originated

23    with Mr. Reno.  Delphi has a clear policy against conflicts of

24    interest and separately and distinctly soliciting gifts or

25    favors from suppliers or vendors or customers.  And there was

82

1    an appearance that may have occurred here.  All of this

2    occurred well before the date that Mr. Reno says he first

3    learned of the waste water treatment container issue, which he

4    says was February 13, 2004.

5              The investigation started two weeks before then.  And

6    the investigator interviewed Mr. Reno on February 16th, as well

7    as other parties involved.  As a result of that investigation

8    process Mr. Brown concluded that Mr. Reno had obtained a favor

9    from Troy Calton, an employee of the company called Onyx that

10   works directly for, as a contractor, Mr. Reno to remove

11   material from his yard and/or house.  He also learned that this

12   arrangement may well have been a secret one.  And that it was,

13   at least, not cleared in advance with Mr. Reno's superiors.

14   And perhaps as important, that in the process of his

15   investigation Mr. Reno was not forthcoming as to the facts of

16   the relationship and had sought out from his subordinates

17   witness statements in connection with the relationship, that he

18   held in reserve.  All of this led Mr. Brown and also Delphi's

19   personnel officers to conclude that Mr. Reno had both violated

20   the favor policy and the conflict of interest policy, as well

21   as potentially put undue pressure on subordinates and perhaps

22   asked them to remember facts that they could not remember or

23   that were not, in fact, the truth.

24             The record, I should be clear, is not one where I can

25   ultimately decide whether Mr. Brown's conclusions were right or

83

1    not.  And beyond that the claimant contends that they were so

2    clearly incorrect that Delphi could not credibly be said to

3    have relied on them as a basis for termination, which is a

4    proper inquiry for me to make.

5              I'll note in considering the conclusions that Mr.

6    Brown made, that I do credit his conclusions with regard to the

7    underlying arrangements between Calton and Mr. Reno.  Mr.

8    Calton changed his story in a second interview with Mr. Brown;

9    in a way that I believe indicated that the second version is

10   the correct version.  It is, moreover, one that his -- Mr.

11   Calton's subsequent deposition in key respects corroborates.

12   Namely that the dumpster was filled and taken under an

13   arrangement with Mr. Reno -- with Mr. Reno's knowledge and, in

14   fact, at least under Calton's belief, the implied assumption

15   that ultimately this would be run through Delphi's accounting

16   system.  To my mind, having reviewed Delphi's Foundation of

17   Excellence Policy, at Exhibit 17, whether ultimately Mr. Reno

18   felt he was going to pay for this process or not, in full, is

19   less important than the fact that he engaged in it at all with

20   Mr. Calton without disclosing it to his supervisors.

21             I also believe that the issue about Mr. Reno not

22   being forthcoming about the facts of this relationship is

23   fairly well established through Mr. Brown's investigation.  And

24   that, in turn, lays some doubt on the witness statements that

25   he got out of his subordinates.  Particularly in light of the

84

1    fact that one of them did not provide a witness statement

2    although asked to do so.  That individual apparently no longer

3    working for Delphi and Mr. Calton's testimony that neither of

4    the individuals who did provide statements were present when he

5    had the discussion with Mr. Reno about the dumpster.

6            Ms. Patrick states in her affidavit, and I believe

7    that the record has to corroborate this, that Mr. Reno was put

8    on suspension before she, or anyone making that decision,

9    understood his contention about the container tanks.  And that

10   it was a coincidence that Gooding gave him this news on the

11   very day that they had that argument.

12           That leaves, therefore, the analysis to the

13   subsequent period.  And I think that this is where Mr. Reno and

14   his counsel properly turned their attention.  Their argument is

15   that, in essence, the work that Brown did and the -- and that

16   led Delphi to suspend Mr. Reno was not sufficient to lead to

17   his termination and could not be viewed to be sufficient to

18   lead to his termination.  But rather that it was the subsequent

19   development of his letter to Mr. Wally and his insistence of a

20   different approach to the container tank problem than Mr.

21   Gooding wanted to take that led to the termination.

22           There is no direct evidence of this in the record.

23   The claimant relies, therefore, on two things.  First, his

24   contention that the dumpster incident, as the parties have

25   referred to it, is simply too insignificant to lead to his

85

1    termination.  And I should note that he has spent his carrier

2    at Delphi.

3              The second is that Mr. Brown's investigation, by Mr.

4    Brown's own admission, was not complete at the time that Mr.

5    Reno was terminated in -- in March of 2004.  Why not wait, he

6    contends, until the investigation was complete -- for the

7    record to be done before making that decision and in answering

8    that question he says, because it was simply a facade or a

9    pretense -- or a pretext for a decision.

10             I've carefully considered those two points and I'll

11   deal with them in order.  It seems to me that it is regrettable

12   that an individual would be fired over something as foolish and

13   petty as this dumpster incident.  However, Mr. Reno is a person

14   charged with important duties that involve credibility and

15   adherence to proper procedures.  And I understand why Delphi

16   could legitimately conclude that not only the relationship with

17   the contractor but also the way that it appears the -- Mr. Reno

18   reacted to the investigation in terms of arguably not telling

19   the truth and arguably inducing subordinates to take positions

20   on his behalf, arguably improperly, all go to important issues

21   as to his reliability and Delphi's policies.

22             I have the impression, which I believe is

23   corroborated to some extent by some updating of the initial

24   investigation by Mr. Brown, that Delphi was concerned that this

25   was not an isolated matter but that Mr. Reno had involved other

86

1    people, both employees and contractors, in doing favors for

2    him.  For example, the statement by Mr. Ruble that he helped

3    with an aquarium business of his wife even though Mr. Ruble

4    testified that he did that work for Mr. Reno and his wife after

5    hours.

6          So, it does not appear to me that the dumpster

7    incident is, in fact, comparable to Captain Queeg's Ice Cream

8    and Strawberry incident in the Cayne Mutiny but that had

9    substance to it, particularly given Mr. Reno's position.

10          As far as the issue of what I should take away from

11   Mr. Brown's acknowledgement that his investigation was

12   incomplete, I have also considered that point and I believe

13   that in the absence of anything in the record to show how much

14   more Mr. Brown felt he needed to make it complete, and in what

15   sense he felt it was incomplete, I turn to the e-mail from him

16   to Delphi on the day that Mr. Reno was suspended.  In which he

17   said that it should be clear to everyone that Joe has violated

18   several rules, Joe meaning Mr. Reno.  He said that, in the same

19   paragraph -- in the same section he acknowledged he would like

20   to do more work.  I don't believe that, based on this record,

21   the fact that Mr. Brown believed the investigation was

22   incomplete is something that in and of itself shows that Delphi

23   was using his work as a pretext, given what had already been

24   disclosed.

25          Mr. Reno contends that I should look askance on his

87

1    investigation also because it was incompetent and illegal.  And

2    I've considered that argument as well.  As far as the

3    competency point, I'll note that he has been an investigator

4    for six years and I do not see, in his investigation or in the

5    subsequent testimony or record, any attempt to do anything

6    other than a -- a good job.  He does not appear to me to be

7    negligent or alternatively motivated to reach a certain result.

8    And I do not believe that the law requires him to conduct an

9    investigation beyond what he did.

10           As far as the illegal contention, that dovetails back

11   to Mr. Reno's claim that the investigation and the debtor's

12   failure to provide a copy of it to Mr. Reno violated the Fair

13   Credit Reporting Act.  There may be instances where the failure

14   to comply with a law, such as the Fair Credit Reporting Act,

15   may lead a Court to draw an inference that something very

16   serious was motivating the debtor to act contrary to law.  And

17   usually that something very serious may be an ulterior purpose.

18   For example, here it is argued, at least between the lines,

19   that why would the debtor violate the FCRA but for the fact

20   that he wanted to cover up that it was doing it -- doing the

21   whole exercise as a facade to hide a retaliatory purpose.  I,

22   however, do not accept that argument here.  I will determine,

23   later in this ruling, whether the FCRA was violated or not.

24   But I think, at a minimum, it is clear that it was not clearly

25   violated.  That is that someone in Ms. Patrick's position or

88

1    Mr. Gooding's position, or other people involved in this

2    process, would not have known, with any degree of clarity that

3    what they were doing was in violation of the FCRA which

4    undercuts the whole motivational or inferential argument about

5    motivation.

6            The argument as to whether the FCRA applies here is a

7    plain meaning argument that has been criticized by a number of

8    courts, particularly in respect of the version of the statute

9    that would be applicable here, which is that in addition to

10   applying to the provision of reports with regard to a

11   consumer's credit worthiness, credit standing and credit

12   capacity, the statute provides that it applies to such reports

13   going to a consumer's character, general reputation, personal

14   characteristics of mode of living with regard to employment

15   purposes.

16           I agree with Johnson vs. Federal Express Corporation,

17   147 F.2d, 1268 MD Alabama (2001), Heartland vs. Lyle Park

18   District, Northern District of Illinois (2001) and Rug vs.

19   Henack, Inc., 2002 U.S. District Lexus 18101 SDNY (2002).  As

20   to their skepticism that the FCRA applies to this type of

21   investigatory report dealing with a consumer's particular

22   workplace conduct that is in contrast to reports going to

23   decisions to hire or to fire based on general non-workplace

24   conduct, such as set forth in Comeaux, C-O-M-E-A-U-X, vs. Brown

25   and Williamson Tobacco Company, 915 F.2d, 1264 9th Cir. (1990)

89

1    and Hodge vs. Texaco, Inc., 975 F.2d 1093, 5th Cir. (1992).

2            In addition, I believe that the record, as it is,

3    does not enable me to find that Mr. Brown's company, which is

4    not described other than simply being a large investigatory

5    company, would be a credit reporting agency which is necessary

6    to fit within the FCRA's definitions of consumer report -- an

7    investigative consumer report which trigger the applicability

8    of the statute under 15 U.S.C. 1681 AF, which is defined as any

9    person which for monetary fees, dues or on a cooperative non-

10   profit basis, regularly engages in whole or in part in the

11   practice of assembling or evaluating consumer credit

12   information or other information on consumers for the purpose

13   of furnishing consumer reports to third parties and which uses

14   any means or facility of interstate commerce for the purpose of

15   preparing or furnishing consumer reports, see again Rug vs.

16   Henack, Inc., 2002 U.S. District Lexus 18101.

17           So, both on the merits, but as importantly since, as

18   was pointed out in oral argument, even if Mr. Reno were to

19   prevail on the merits of the FCRA claim he would get a very

20   small amount of money.  Therefore, not only on the merits, but

21   also in connection with evaluating whether Delphi was engaging

22   in a pretext when it said that it relied upon Mr. Brown's

23   investigation.  I conclude that the FCRA has no -- no bearing.

24           Therefore, in considering the circumstantial evidence

25   in the record before me where Delphi has come forward with a

90

1   non-retaliatory or a non-discriminatory reason for firing Mr.

2   Reno that I find credible, I do not believe that MR. Reno has

3   carried his burden of proof to show that that was not the

4   reason for his termination, but that to the contrary, it was

5   more likely that he was terminated in retaliation or for having

6   taken his views as to the container tank issue over Mr.

7   Gooding's head.

8        I'll note further, although ultimately this is a

9   lesser reason for my holding that Delphi in response to Mr.

10  Reno's letter apparently or at least shortly after the letter

11  was received, commissioned a third-party environmental

12  consultant to look at the tanks and that was done on March 6th.

13  And that consultant's report appears in the record at Exhibit

14  19.  So there does appear to be a prompt response by Delphi,

15  certainly no attempt to keep Mr. Reno's complaint under wraps

16  but to the contrary, to open it up to a third party.  And I

17  think the report not only has to speak for itself, because

18  there's been no further testimony about its bona fides, but I

19  think does speak for itself as a legitimate third party

20  corroboration of Delphi's actions.  It further, later that

21  summer in May, apparently involved the local authorities in

22  looking at the -- at the tanks, who also were satisfied.

23       So while I acknowledge that -- that sunshine aspect

24  of what Delphi did doesn't necessarily obviate Mr. Reno's

25  claim, because after all one could still infer if the

91

1   circumstantial evidence was sufficient that Delphi terminated

2   him anyway, because they were mad that he raised it in the

3   first place, it does further support Delphi's contention that

4   as far as that aspect of his performance was concerned, as

5   opposed to his dealing with Mr. Calton and subordinates, they

6   considered his advice and took it seriously.

7            The defamation claim, I believe, is based on those

8   findings, one that will not lie under Ohio law.  The stated

9   claim, under Ohio law, for defamation the plaintiff must show

10  that there was a false statement defamatory to the plaintiff

11  publish to a third party by a defendant who was, at least,

12  negligent and damaging to the plaintiff's reputation.  A

13  plaintiff must prove a defendant's negligence by clear and

14  convincing evidence, but need only prove the other elements by

15  a preponderance of the evidence.  In a defamation action,

16  however, falsity is an essential element.  Furthermore, in

17  defending against a defamation action it is sufficient for the

18  defendant to show that the imputation is substantially true or

19  as it is often put, to justify the gist, the sting or the

20  substantial truth of the defamation, see Perry vs. Mohawk

21  Motors of Michigan, 236 F.3d 299 at 312 6th Cir. (2001),

22  citations omitted.  Here the defamation was the statement

23  that -- or the alleged defamation was the statement that Mr.

24  Reno was being terminated because of the dumpster incident and

25  related investigation thereof.  And for the reasons I've

92

1    stated, there was, under the Ohio law, consequently no basis

2    for a defamation claim based on that statement.

3         The COBRA claim is, for me, somewhat more difficult

4    to decide, given the nature of this wrongful action.  The

5    statute provides, in 29 U.S.C., Section 16 -- I'm sorry,

6    1163(2) that continuing coverage is not required to be provided

7    to an employee after termination for a "gross misconduct".

8    That term's not defined.  The courts have grappled with that

9    definition in various ways.  One, at least, has said that gross

10   misconduct constitutes a deviation from the employer's business

11   ethics policy for, among other reasons, failing to disclose a

12   financial interest in a supplier, accepting favors and gifts

13   from a vendor and claiming reimbursement from the company for

14   non-official travel, see Karby vs. Standard Products Company,

15   1992 West Law 333931, District Court, South Carolina (1992).  A

16   case out of Texas has defined the term to mean a substantial

17   deviation from the high standards and obligations of a

18   managerial employee.  That would indicate that such an employee

19   cannot be entrusted with his management duties without danger

20   to the employer, Aveena vs. Texas Pink Stands, Inc., 1991 U.S.

21   District Lexus 13957, Western District Texas (1991).

22        As I said, I have not determined here, because I

23   cannot, on this record whether Mr. Brown was right or not.  I

24   have determined that there was enough basis in his

25   investigation for a proper termination of Mr. Reno.  But I do

93

1    not know from his investigation whether he has established

2    gross misconduct.  And I don't believe the debtors have here

3    either, as a matter of fact, for purposes of this statute.

4    They have, again, established that they had a valid basis for

5    terminating Mr. Reno, based on the investigation.  But I think

6    that proving gross misconduct, as opposed to proving that they

7    had enough basis to terminate him, requires a -- more in the

8    factual record.  So I believe that they have not established

9    what I think is their burden here, to show an established gross

10   misconduct.  So I believe that his claim is established on

11   COBRA.

12          Finally, as to the ERISA claim, I think it was made

13   clear at oral argument, that claim really does devolve into a

14   damages issue.  I did not see any opposition on the merits as

15   to, for example, an alleged defense that it was proper to delay

16   distribution of Mr. Reno's pension money.  And so the issue as

17   to whether that distribution included an element of interest

18   and/or if it didn't, what the proper damages would be for not

19   having received it from the date, which has also not been

20   established, that the pension money should have been

21   distributed and the date it was, which has been established,

22   should all await further trial if the parties choose to do so.

23   Although my hope is, given the amount claimed, that there can

24   be a resolution of that matter.

25          All right.  As I said, I'm going to go over the

94

1    transcript; because obviously this has gone on, probably far

2    too long for all of you, and I want to make sure it's accurate

3    and properly reflects my thinking on this issue.  But again,

4    the conclusions won't change.  So, Mr. Hogan, you should submit

5    an order consistent with my ruling which disallows all of the

6    claims except for the COBRA and ERISA claims.  Reserves the

7    ERISA issue for further trial on damages calculation and allows

8    the COBRA claim.

9              MR. HOGAN:  We'll do so, Judge.

10             THE COURT:  Okay.  Thank you.  Oh, you don't have to

11   settle the order but I -- I -- you'll circuit -- I'm sure but

12   I'll say it anyway, you'll provide it to counsel for Mr. Reno

13   so that he can make sure that it says what I just said.

14             MR. HOGAN:  We will, Judge.

15             THE COURT:  Okay.  Thank you.

16        (Proceedings concluded at 1:58 PM)

17

18

19

20

21

22

23

24

25

95

1

2                            **I N D E X**

3

4                              RULINGS

5                              Page      Line

6  Denial of all claims      72        25

7  except for COBRA and

8  ERISA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

96

1

2                    C E R T I F I C A T I O N

3

4    I, Pnina Eilberg, court approved transcriber, certify that the

5    foregoing is a correct transcript from the official electronic

6    sound recording of the proceedings in the above-entitled

7    matter.

8

9    _____ March 27, 2007

10   Signature of Transcriber              Date

11

12   Pnina Eilberg

13   typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25

Hearing Date and Time: March 21, 2007 at 10:00 a.m.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                       :
      In re                          :     Chapter 11
                                         :
DELPHI CORPORATION, et al.,     :     Case No. 05-44481 (RDD)
                                       :
                                       :     (Jointly Administered)
              Debtors.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF BETH PATRICK IN SUPPORT OF DEBTORS' SUPPLEMENTAL
REPLY WITH RESPECT TO PROOF OF CLAIM NO. 9956 (JOSEPH RENO)

State of North Carolina      )
                        ) ss:
New Hanover County        )

      Pursuant to 28 U.S.C Section 1746, I, Elizabeth Patrick, declare the following:

1

1.      My name is Elizabeth Patrick.  I am over age 18 and have personal knowledge of the facts contained in this declaration.  I am competent to testify to the facts contained herein.  Capitalized terms not otherwise defined in this declaration have the meanings ascribed to them in the Supplemental Reply.

2.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion, and my experience with and knowledge of Delphi's relationship with Joseph Reno.  If I were called upon to testify, I could and would testify to the facts set forth herein.

3.      At all times relevant to my involvement with the suspension and termination of Joseph Reno, my last name was Meyer.  I have since married and my last name is now Patrick.

4.      In 2004, I was employed by Delphi Corporation with responsibilities in the field of human resources.  My title was Director of Salaried Personnel for the Energy & Chassis Division of Delphi.  My office was located in Troy, Michigan.  In my position, I had two areas of responsibility: (a) all of the salaried personnel functions which were based out of Delphi's worldwide headquarters located in Troy, Michigan and (b) all salaried personnel and salaried human resource operations located throughout Delphi's Energy & Chassis manufacturing facilities worldwide.

5.      During the referenced time period, my staff was comprised of approximately 20 direct reports who were responsible for assisting and coordinating human resource activities.  This included responsibility over the specific site where Joseph Reno worked.

2

6.        At the time, I did not know Joseph Reno personally, but came to know of him starting in mid-February of 2004 when I was informed by one of my staff, Mary Ann Polvinen, that she had an investigative report indicating that Mr. Reno was engaged in conduct that violated Delphi's conflict of interest policies set forth in Delphi's *Foundation For Excellence* handbook, a true and correct copy of which is attached hereto as <u>Exhibit 1</u>.  I asked to see the report.

7.        I reviewed the report prepared by Mike Brown.  I learned that Mr. Reno had engaged a Delphi vendor, Onyx Industrial Systems, Inc. ("Onyx"), to deliver a dumpster to his home and later to retrieve it.  The dumpster was found on Delphi property, and Onyx had no record of any arrangements for Mr. Reno to pay for the services.  I had worked previously with Mr. Brown so I called him to discuss his investigation.  At that time it was clear to me from Mr. Brown's investigation that Reno had engaged in conduct that violated Delphi policies relating to conflicts of interest, in particular, and the misappropriation of Delphi resources. It also appeared as if Reno was interfering with Mr. Brown's investigation.  It appeared that Mr. Reno was soliciting fraudulent statements from subordinate employees to corroborate his story, and had made false statements to Mr. Brown.

8.        In addition to Mr. Brown, I also conferred with Ms. Polvinen and Glenn Howarth, the Director over Delphi's environmental operations in the area where Mr. Reno was employed.  As a result of these discussions, Mr. Brown was authorized to complete his investigation by conducting additional interviews he thought would be helpful before I finalized any action involving Mr. Reno.

9.        Within this same time frame, from February 18 to February 20, 2004, I made the decision to suspend Mr. Reno with pay pending the outcome of the investigation.  I

3

considered the suspension to be in the best interests of Delphi because it was apparent from Mr.

Brown's report that Mr. Reno was interfering with the investigation by providing false

information and imposing on subordinates and others to provide false information to Mr. Brown.

I also recall that Mr. Brown was going to be on vacation the following week.  Accordingly, I

gave instructions that Mr. Reno was to be suspended with pay until Mr. Brown returned from

vacation and was able to gather additional information.  Delphi's records show that the

suspension was effective as of February 20, 2004.

**Leaking Waste Water Treatment Tank at Delphi.**

10.    Following Mr. Reno's suspension, but before his termination, I became

aware of and saw a copy of a letter that Reno wrote to attorney James Walle of Delphi's Legal

Staff, which complained about the manner in which Delphi-Kettering Plant was repairing a

leaking waste water treatment tank.  The letter was shown to me because Mr. Reno mentioned

his suspension in the letter, and I needed to be aware of the fact that in his letter Mr. Reno had

linked the water tank issues to his suspension from Delphi.  This was the first I had heard of any

waste water leak.

11.    In my mind, and with my responsibilities, Reno's environmental complaint

and letter had no bearing on the investigation into Reno's conflict of interest with a Delphi

vendor that was uncovered by Mr. Brown's investigation. The water tank issue was not involved

in the matter Mr. Brown was investigating and the substantive handling of environmental issues

was not an area for which I had any responsibility.  Consequently, Mr. Reno's involvement with

the water tank had no bearing on my decisions regarding Mr. Reno's employment and no one

asked for my counsel or guidance on the manner in which that issue, the water tank, should be

handled.  Moreover, no one at Delphi, either subordinate to, equal to, or superior to me instructed

4

me, hinted at, or even suggested that Mr. Reno be terminated because of his complaint about the

water tank. The water tank matter was a separate and distinct matter to be handled by persons

responsible for environmental operations.

**Suspension with Pay Turns to Termination.**

12.    At some point in March following Mr. Brown's return from vacation, I

received and update on Mr. Brown's investigation.  The substance of this latest report was

substantially the same as the report I had reviewed in February and the information I had

received over the telephone from Mr. Brown.  I recall that Mr. Brown was conducting additional

interviews but those additional interviews only corroborated the existing information, and did not

provide anything new.

13.    Thus, based on the Brown report, I made the decision to terminate Mr.

Reno's employment on March 17, 2004.  My reasons for terminating Reno include the following:

(a)    Reno used his position at Delphi to leverage the use of a Delphi

vendor's dumpster for his own personal use on financial terms that were far more favorable to

him than the terms would have been had he contracted with the vendor at arms length. Such

conduct is directly contrary to Delphi's conflict of interest policies which prohibit employees

from using their position at Delphi to seek favors or more favorable terms from our vendors.  In

*Foundations For Excellence*, Delphi's policy describes a conflict of interest as

> . . . an obligation to or a relationship with any person or organization that competes
> or does business with Delphi that could affect an employee's judgment in fulfilling
> our responsibilities to Delphi to make business decisions solely in the best interests
> of the corporation *and without regard to personal gain. A conflict of interest can
> arise when an employee benefits, or even appears to benefit, from a Delphi business
> arrangement.*

See page 6 and 7 of Mr. Reno's acknowledged copy of *Foundations For Excellence*, attached
hereto.

Examples of conflicts of interest are set forth in the *Foundations* booklet and include

" * Accepting services . . . from a supplier, . . ."  See page 7.

(b)    Reno paid $100 in cash to our vendor's driver for the "favor" of delivering the Onyx dumpster to Reno's home, retrieving the dumpster after Reno had filled it with debris, and returning the dumpster to an area at the Delphi Plant where it sat for several months.

(c)    After Mr. Brown commenced his investigation, Reno imposed on several subordinate employees to provide statements for Mr. Brown's investigation so that it would appear as if Reno intended to pay for the services.  I was informed by Mr. Brown that one of Reno's subordinates was asked to provide a false statement corroborating Reno's story that he had agreed with the Onyx driver to take full responsibility for the costs of the dumpster.  That subordinate refused to make such a false statement.  As far as I was concerned, such impositions on subordinates is an intolerable abuse of one's supervisory authority.

(d)    After Mr. Brown commenced his investigation, Reno approached the Onyx driver and asked him to obtain an Onyx receipt for the $100 cash payment Reno had given to the driver for the favor of allowing Reno to use the dumpster.

(e)    Reno lied during the investigation.  I consider the Onyx driver's recanted statement to be truthful because he specifically asked what would happen to him after Mr. Brown completed his investigation.  When Mr. Brown assured him that nothing would happen as long as he was telling the truth, the Onyx driver asked to change his statement.  To me, the fear of bad consequences if one knows he can get in trouble for not telling the truth is powerful motivation to tell the truth and avoid consequences.  Thus, in reviewing Mr. Brown's reports I gave more weight to the recanted statement by the Onyx driver than to Mr. Reno's

version of what happened.  Moreover, because there was no credible evidence to validate an

arms length transaction between Mr. Reno and Delphi's vendor, Onyx, the Reno version - "I will

pay for it" - was not at all reliable.  The Onyx driver's second story was substantiated by the fact

that Onyx had no independent record of Mr. Reno's order for the dumpster, no any record of the

$100 payment.

(f)      Reno's efforts to take advantage of a relationship with a Delphi

vendor also resulted in a misappropriation of Delphi assets.

i.      Delphi human resources were diverted to this investigation.  Mr.

Brown's investigation required numerous, time consuming interviews in order to clarify

inconsistent information supplied by witnesses, including the lies from Reno.

ii.      When witnesses are interviewed or management is required to deal

with the results of this kind of investigation, human resources are diverted from Delphi's mission

to resolving matters that distract from, take time away from and do not advance Delphi's purpose

as a world class producer of automotive parts.  Moreover, significant financial resources are

expended when an outside investigator is required to devote time to conduct such an

investigation.

(g)      Finally, the fact  that Reno lied about the facts in an effort to

misdirect the investigation is equally intolerable and, in my opinion, the lies coupled with the

other infractions constituted gross misconduct warranting a termination for cause.

14.      I was the final decision maker in this matter.  Although I got input from

Mr. Brown and others regarding his investigation, the final decision was mine.

15.      Based on all of the foregoing, it was my decision, to terminate Mr. Reno

effective March 17, 2004.

7

16.     Reno was terminated for gross misconduct, so he was not eligible to

receive COBRA benefits.


Dated this 21 day of February, 2007.


_____   */s/ Elizabeth Patrick*_____
                            Elizabeth Patrick

# **EXHIBIT 1**

## Employee Acknowledgement

I acknowledge that I have received a copy of the booklet, "Foundation for Excellence."

JOSEPH M. RENO
_____
Name

_Jorph u Rey_
_____
Signature

4/3/01
_____
Date

*Please return this signed form to your local Human Resources Department.*

**DELPHI**
Automotive Systems



```
DEFENDANT'S
EXHIBIT
   3
 RENO
```

DC 180

DC 181

## TABLE OF CONTENTS

*Foundation for Excellence*

A MESSAGE FROM J.T. BATTENBERG III ———— 2

PERSONAL INTEGRITY ———— 3
   Complying with the Law

EXCELLENCE IN THE WORKPLACE ———— 5
   Managing Diversity
   Health & Safety Policy
   Conflicts of Interest
   Protecting Corporate Property
   Accurate Information, Records & Communications
   Responding to Legal Investigations
   Information Requests
   Communicating with the Media
   Internet/Intranet Usage
   Internet Chat Rooms

EXCELLENCE IN THE MARKETPLACE ———— 11
   Product & Service Quality
   Fair Competition
   Suppliers & Fair Treatment
   Honest Communications
   Gifts, Entertainment & Gratuities
   Soliciting Gifts or Favors
   Accepting Gifts or Favors
   Accepting Invitation of Entertainment
   Customer/Supplier Entertainment Policies
   Others

EXCELLENCE IN SOCIETY & OUR COMMUNITIES ———— 16
   Avoiding Improper Payments
   Import/Export Controls
   Delphi Insider Trading Policy
   Corporate Citizenship
   Environmental Principles

THE DELPHI PRINCIPLES ———— 21

**DELPHI**
Automotive Systems

FOUNDATION
FOR EXCELLENCE

*A GUIDE TO REPRESENTING
DELPHI WITH INTEGRITY*

DC 182

## Personal Integrity

**INTEGRITY** – We are dedicated to complying fully with the letter and spirit of the laws, regulations and ethical principles that govern us. We will protect all confidential information we receive from our customers or business partners.

Integrity begins with each of us – the judgments and decisions that we make as individuals.

How do we define personal integrity? First, it means exemplifying the Principles and Absolutes of Excellence in our own conduct and complying with Delphi policies, even when we may not agree with them. In a global enterprise, legitimate differences of opinion may arise as to the appropriateness of the corporate policies across worldwide operations.

While such differences are understandable, and can lead to a healthy discussion of choices, they do not excuse us from observing the existing policies. We are always welcome to voice our concerns and to request exceptions for special circumstances through appropriate leadership when warranted. It is important that we use our judgment not only to consider the precise meaning of our stated values or policies, but also the spirit and intended purpose of them as we make these choices.

Second, it means we have a responsibility to voice concerns when we believe Delphi or fellow employees are acting contrary to existing policies. Collectively, we are the corporation, and the actions of one individual can damage the reputation of all. When someone compromises the Principles of Excellence or policies, we should either inform them directly, or use other available channels to voice our concerns. The best option is usually to discuss the situation with a manager. Alternatively, we can bring our concerns to functional experts such as the

3

---

Dear Colleagues,

Delphi is establishing a culture based on the Principles and Absolutes of Excellence, a culture encompassing passion, creativity and common business processes. It is a culture that brings us together as a team, and makes each of us responsible for examining our own actions, to ensure that we represent Delphi with excellence.

Achieving our vision – to be recognized by our customers as their best supplier – can only be achieved through consideration, fairness and dignity in all that we do. Each of us represents the entire Delphi organization. As we conduct our business, we need to respect the people and environments in which we work.

Foundation for Excellence is our guide for employee conduct. I encourage you to read this document thoroughly, while keeping in mind that the guidelines cover a wide range of Delphi's business processes. It is important that we all understand them in order to support our fellow colleagues and our corporate vision. Following these policies and guidelines will help make Delphi an excellent company to work with, both for our customers and our employees.

Regards,

*J.T. Battenberg III*
Chairman, CEO and President
Delphi Automotive Systems

DC 183

2

## Excellence in the Workplace

**TRUST IN RELATIONSHIPS** – *We expect our people to build and maintain a foundation of trust and respect in everything we do.*

### MANAGING DIVERSITY

Delphi values its diverse, dedicated global workforce that is committed to Excellence and a culture where individual strengths, combined with teamwork, are a recognized source of our mutual success. As a leader in automotive components, systems and modules, we draw on the unique background of each employee to offer new perspectives and solutions as we strive to be our customers' best supplier.

We believe that attracting and retaining qualified talent is vital to Delphi's continued success. Delphi has an ongoing commitment to diversity, equal opportunity, and non-discrimination. Opportunities are extended to qualified applicants and employees on a non-discriminatory basis. The organization is enriched through the representation of diverse experiences, backgrounds, ethnicity, lifestyles, cultural orientation and beliefs. Reasonable accommodations are made for the physically challenged and persons with disabilities.

Consistent with the above philosophy, Delphi is dedicated to creating a workplace environment that enables every team member to contribute fully. It is our policy to comply with applicable employment laws wherever we conduct business. It is every employee's responsibility to act in a manner that supports this policy and to maintain the workplace environment free from all discrimination, hostility and harassment, including sexual harassment.

---

Legal Staff, Audit Staff, Security or Human Resources. We also have available the EthicsLine (888.679.8848) in many countries for employees who are uncomfortable discussing their concerns with their leadership.

### COMPLYING WITH THE LAW

In order to comply with the law, we must know the law. For many of us, this means we will need advice or training from experts to understand our responsibilities. Common sense, our conscience and good intentions are not always enough. At a minimum, we must learn enough about the laws that affect what we do to spot potential issues and then follow through to get answers about the right way to proceed.

Complying with the law requires more than knowledge, it requires action. This takes a high degree of cooperation and communication – the essential elements of teamwork. As a member of the team, if someone thinks some aspect of Delphi's business may be in violation of the law they should raise the issue with management or the Legal Staff.

The worst thing we can do is to ignore or try to cover up a potential problem and allow it to grow more severe over time.

4

DC 184

business with Delphi, that could affect an employee's judgment in fulfilling our responsibilities to Delphi to make business decisions solely in the best interests of the corporation and without regard to personal gain. A conflict of interest can arise when an employee benefits, or even appears to benefit, from a Delphi business arrangement. The appearance of a conflict can be just as damaging to reputations as an actual conflict of interest.

Examples of potential conflicts of interest include:

- Investing in a supplier, customer or competitor
- Accepting services or receiving payment from a supplier, customer or competitor
- Having close family members who work for suppliers, customers or competitors
- Working outside Delphi without department director approval

Occasionally conflicts of interest may arise through involvement in public service or charitable activities, such as holding public office or involvement in charitable organizations. Before accepting such responsibilities, we need to familiarize ourselves with the extent to which Delphi has interests or business affected by our involvement, and ensure that no corporate assets, including the Delphi name, are used or referred to in connection with such activities.

Outside employment can also create conflicts of interest. We are expected to devote our full time and attention to our work during regular business hours and for whatever additional time may be required.

Delphi expects all employees to disclose promptly any situation that could result in an actual or potential conflict of interest. If we are not sure the situation creates a

7

Supervisors and managers are held accountable to prevent discrimination and to support equity in addressing employee concerns and/or complaints. Delphi will not tolerate behavior that is inconsistent with this policy and will take appropriate action to prevent such behavior from occurring.

Full support of the corporation's policy on diversity and equal opportunity along with the necessary efforts to ensure that all recruitment, employment, training, promotions and other personnel actions comply with these principles is essential. This policy reflects our belief that a capable and committed workforce perpetuates Delphi's creativity, innovation, growth and success.

## HEALTH & SAFETY POLICY

Delphi is committed to protecting the health and safety of each employee as our overriding priority. We believe that all occupational injuries and illnesses are preventable. There will be no compromise of an individual's well-being in anything we do. The implementation of actions to help our employees realize a healthy, injury-free environment is a leadership responsibility. Continuing support of this effort is the responsibility of everyone. We will lead the Delphi team to ensure that we protect the well-being of every member.

## CONFLICTS OF INTEREST

For us to help Delphi earn and maintain its reputation as a company that conducts business with the utmost integrity, we must avoid actions or relationships that might conflict or even appear to conflict with our job responsibilities or Delphi's interests.

A conflict of interest is an obligation to or relationship with any person or organization that competes or does

6

DC 185

interpretation. Litigation is a fact of life in societies governed by many laws that give a variety of authorities broad investigative powers.

Legal papers and investigations normally flow through established channels, but there may be occasions where inquiries and legal papers are received by other employees. If you should receive these types of papers in your capacity as a representative of Delphi, consult the Legal Staff immediately, before submitting to an interview, answering questions about Delphi business, producing any documents or even responding to any requests made in connection with litigation or an investigation.

## INFORMATION REQUESTS

Information is one of Delphi's most valuable assets in the competitive global marketplace for our products and services. We all share a responsibility to protect valuable Delphi information for our mutual benefit.

Delphi information includes all information related to our business, created or acquired using Delphi resources, regardless of the specific nature or form of the information. We will maintain confidentiality of customer information.

## COMMUNICATING WITH THE MEDIA

We strive to maintain integrity in our relationships with the media and general public by providing clear and accurate communication. All Delphi divisions and regions have a designated Public Affairs or Communications function, which is responsible for communicating the Corporation's position on a range of issues.

If you are contacted by a member of the press, you should notify your manager and your division or regional

9

---

conflict, we should seek the help of our supervisor or Human Resources contact person.

## PROTECTING CORPORATE PROPERTY

We have an obligation to safeguard corporate assets by ensuring they are properly maintained and used to further Delphi business interests. We should always consider whether our decision to use or commit a resource is in the best business interest of the corporation.

Business assets should not be used for personal reasons. However, situations may arise where infrequent and limited personal use is acceptable. When such situations arise, use sound judgment, common sense and discuss the issue with your manager if there are doubts about the appropriateness of the use.

## ACCURATE INFORMATION, RECORDS & COMMUNICATIONS

Decisions are made based on the accuracy of information recorded at all levels of the organization. Inaccurate information can lead to poor decision making. Additionally, our customers, suppliers and government officials rely on us to be honest and provide accurate information on subjects ranging from our products and services to Delphi's financial performance and our environmental practices.

It is our responsibility to ensure that all information and records are maintained honestly and accurately, and that any errors are promptly recognized, communicated to appropriate management and corrected.

## RESPONDING TO LEGAL INVESTIGATIONS

Despite our best efforts to comply with all applicable laws and regulations, there will always be matters of

8

DC 186

***Please Note:***
***Amendment to paragraph 2 on preceding page.***

## INTERNET/INTRANET USAGE

The Delphi provided internet connection is intended to be used primarily for business purposes. Any personal use must not interfere with normal business activities, involve solicitation, be associated with any for-profit outside business activity or potentially embarrass Delphi. Users are expected to act responsibly and in Delphi's best interests whenever they use the Delphi provided internet connection.

---

Communications department to ensure that the most appropriate person or team responds. Employees are generally not authorized to immediately respond to journalists. Responsible members of the media do not expect impromptu answers. As a general rule, even if a Delphi employee is the subject matter expert, media questions should be referred to the Delphi Communications or Corporate Affairs Staff.

## INTERNET/INTRANET USAGE
Use of the intranet, as with other Delphi assets, should be limited to situations related to our work assignments. It is never acceptable to use Delphi equipment to access or create material that is illegal or inappropriate. If in doubt, ask your supervisor or the Information Systems & Services group.

## INTERNET CHAT ROOMS
It is Delphi's policy not to respond to chat room rumor or speculation.

To maintain confidentiality of Delphi information, employees are not to respond to any inquiries or post any information on the Internet relative to Delphi unless specifically asked to do so by their supervisor and the response is cleared through Corporate Affairs and/or Legal.

10

DC 187

# Excellence in the Marketplace

## CUSTOMER ENTHUSIASM – Our customers' interests
always come first. We are committed to products, services, business practices and an attitude that creates customer enthusiasm. This is the foundation of our security.

## PRODUCT & SERVICE QUALITY
It is our goal to be our customers' best supplier. We must be mindful of that goal at every phase of our relationship with customers – from the design of our products to the discussions we may have with them about service issues. We must passionately pursue customer satisfaction by being entrepreneurial, fast, less bureaucratic, customer focused, innovative and excellent in everything we do.

## FAIR COMPETITION
We believe in competing fairly because we all benefit from fair, free and open markets. We compete strictly on the merits of our products and services and make no attempts to restrain or limit trade.

Specifically:

- We never discuss such matters as prices, pricing strategies, product or marketing plans or terms of sale with competitors. Should a prohibited subject come up during a discussion or meeting, leave and inform leadership or the Legal Staff.

- We do not enter into agreements with our competitors concerning prices, production volumes, customers or sales territories.

11

DC 188

## HONEST COMMUNICATIONS

Customers, suppliers, government agencies and communities depend on the honesty and accuracy of our communications. We are each responsible to communicate in a forthright and honest way, free of any misleading or inaccurate information. This includes not overcommitting on what we can deliver, and promptly informing affected parties when changes occur. When we make a mistake in what we have told someone, we must take prompt action to correct it.

## GIFTS, ENTERTAINMENT & GRATUITIES

Our policy on gifts, entertainment and gratuities is designed to reflect our values. We are charged with the responsibility to make decisions, based upon business considerations. The terms "suppliers" and "customers" in the policy below are used in the broadest possible sense. A supplier is any person or organization, inside or outside the Corporation, who furnishes goods or services to the Corporation. A customer is an individual or organization, inside or outside the Corporation, who receives goods and services.

## SOLICITING GIFTS OR FAVORS

Employees may not solicit, for personal reasons, any gifts or favors from an individual or an organization that does business with Delphi – or one which seeks to do so. The size of the gift or favor is immaterial. Soliciting gifts or favors – either directly or indirectly – from customers, suppliers, potential customers or suppliers, is strictly prohibited. All conduct in this regard that creates even the appearance of impropriety must be avoided.

13

- We do not link purchase of one product to another or compel suppliers to buy from us to retain their Delphi business.

- We do not disparage the products or services of a competitor.

- We collect competitive information through proper public or other lawful channels and do not use information that was obtained illegally or improperly by others, including through misrepresentation, invasion of property or privacy or coercion.

Not only is fair competition a matter of our own values, it is also a matter of law in most every country Delphi conducts business. Competition law requirements may exist in specific countries. Contact the Legal Staff for more information.

## SUPPLIERS & FAIR TREATMENT

Our suppliers are valued partners in the success of our business. Our relationships with suppliers must be characterized by honesty and fairness. They are selected on the basis of quality, service, technology and price. Terms and conditions defining our relationship with suppliers are communicated during the request for quote process and agreements to such terms and conditions, or any acceptable modifications, are reached before work begins. Included in the standard terms and conditions are Delphi's policies regarding payment terms, confidentiality, the use of intellectual property and labor practice expectations.

12

DC 189

## CUSTOMER/SUPPLIER ENTERTAINMENT POLICIES

To the extent our customers and suppliers discourage or forbid the receiving of gifts, entertainment or other gratuities by their employees, Delphi employees are expected to know and respect those customer and supplier policies and practices.

### OTHERS

Other important relationships that Delphi maintains can impact our business. Examples of this are our relationships with governmental officials, unions and union representatives.

Gifts, entertainment, or other gratuities should never be provided to a governmental official without first getting approval from a senior officer responsible for Delphi operations in the particular country or region involved. Due to the complexity of relevant laws and regulations, and varying cultural and ethical norms, any decision to provide a gift, entertainment or gratuity, including meals, to a government official should be discussed with the Legal Staff.

Similarly, it may be illegal to provide a gift, entertainment, or other gratuity to a union or union official in the United States or other countries. Do not hesitate to obtain advice from the Human Resource or Legal Staffs before providing a gift, entertainment or other gratuity to a union or union official.

15

## ACCEPTING GIFTS OR FAVORS

It is permissible to accept gifts or gratuities from a customer, supplier and/or a potential customer or supplier where they are freely offered, it's legal and a business-related purpose exists. Acceptance from that particular supplier or customer should be infrequent, and generally the value, not the cost, is less than $50.00 (US$). As a general guideline you should not accept anything that:

1. Compromises, or appears to compromise the integrity of the business relationship

2. Places you or others in an unsafe environment (e.g., alcohol-related activities)

3. Potentially embarrasses or damages your reputation or the reputation of the company

Specific questions should be discussed with your supervisor, the local Human Resources representative or the Legal Staff.

## ACCEPTING INVITATION OF ENTERTAINMENT

Accepting an invitation of entertainment from customers, suppliers and potential customers or suppliers is permissible where the invitations are freely offered, and a business-related purpose exists. Acceptance from that particular supplier or customer should be infrequent and entertainment and meals should not be lavish. Employees are to be accompanied by the person or organization providing the entertainment. As a general guideline you should not accept an invitation of entertainment that: 1) compromises the integrity of the business relationship, or 2) places you or others in an unsafe or inappropriate environment (e.g., alcohol-related activities, adult entertainment clubs).

Specific questions should be discussed with your supervisor, the Human Resources representative or the Legal Staff.

14

DC 190

*Excellence in Society*
*& Our Communities*

## RESPONSIBILITY TO SOCIETY – *We hold ourselves accountable to the highest standards of conduct relative to our broadest corporate responsibilities to society as a whole. We will strive to build and maintain effective relationships with the communities and institutions with which we interact.*

## AVOIDING IMPROPER PAYMENTS

We believe in promoting good governance and the fair and impartial administration of laws. It is, therefore, strictly prohibited to give anything of value directly or indirectly to a government official in order to influence his or her judgment in the performance of official duties.

In addition, as a United States-incorporated company, bribery payments by any Delphi employee or agent to foreign officials are illegal under the U.S. Foreign Corrupt Practices Act (FCPA). Under FCPA, Delphi is accountable for the actions of its employees, including non-United States citizens and employees of non-U.S. based subsidiaries and agents throughout the world. Similar legislation is being enacted in many countries, including France, Germany and Japan as part of a global effort to combat corruption and bribery. There are circumstances where facilitating payments may be appropriate, but those situations must be discussed with the Legal Staff prior to any action being taken. Any questions as to whether a gift or payment would be considered improper under our guidelines or national laws must be discussed with the Legal Staff.

16

## IMPORT/EXPORT CONTROLS

We must abide by special laws and regulations that apply to the export of products and technical data. All employees who are involved with exports have an obligation to become familiar with the regulations and procedures that apply in their location. We must also comply with anti-boycott and international embargo regulations in all locations where we do business.

## DELPHI INSIDER TRADING POLICY

As employees of Delphi, it is illegal to trade Delphi securities on the basis of material inside information. Inside information is information that is known inside Delphi but is not known to the general investing public. It is sometimes called "non-public information." "Material" information is that which a reasonable investor would consider important in a decision to buy, hold or sell Delphi's stock. If the information could change the price of Delphi's stock, it is material.

Some examples of information, whether positive or negative, that are material include:

- Earnings and dividend amounts

- Projections of future earnings or losses

- Pending labor negotiations or disputes, including possible strikes

- Pending or proposed mergers, acquisitions or tender offers

- Significant sales of assets or the disposition of a subsidiary

- Changes in dividend policies, the offering of additional securities or a stock split

- Changes in top management

17

DC 191

- Significant new products or technological advances
- Significant changes in production schedules or product planning
- The gain or loss of a substantial customer or contract; or extraordinary borrowing, changes in debt ratings or impending bankruptcy or liquidity problems

Every manager is responsible to see that any employee who could learn of material inside information is aware of the complete Delphi Insider Trading Policy and implications of the policy.

The complete Delphi Insider Trading Policy is posted on Delphi's Intranet, Apollo. For questions about Insider Trading, please contact the Delphi Legal Staff, in particular, the Assistant General Counsel – Corporate and Securities.

## CORPORATE CITIZENSHIP

Delphi Automotive Systems strives to achieve an effective global philanthropic program that supports our business objectives while helping society, particularly in the communities in which we reside. Delphi's three-pronged approach to corporate citizenship includes:

**The Delphi Foundation** – The umbrella for our philanthropy effort is our self-funding Foundation. Its priority is education, primarily in the areas of science and technology.

**Delphi Community Relations** – As a corporate citizen in numerous communities around the world, this effort seeks to ensure the presence of the Delphi brand in our local communities in such a way that our company is viewed as a "neighbor of choice." The priority also is largely educational in focus, but contributions are tailored to local needs and priorities as well.

**Delphi Volunteers** – A philosophy aimed at enabling and inspiring our employees to give to the community in the way they tell us is most meaningful: through the provision of personal time and talent.

Overall, Delphi targets educational opportunities and support systems aimed at helping young people reach their full potential. Special – though not exclusive – consideration is given to educational programs focused on science and technology. Primary consideration is given to requests that:

- Link to Delphi's business vision and mission
- Are innovative in approach
- Demonstrate an ability to measure effectiveness
- Are customer-driven
- Are global programs that encourage international reach and involvement
- Clearly articulate the benefits to Delphi and its local communities

## ENVIRONMENTAL PRINCIPLES

As a responsible corporate citizen, Delphi Automotive Systems is dedicated to protecting human health, natural resources and the global environment. This dedication reaches further than compliance with the law to encompass the integration of sound environmental practices in our business decisions.

The following environmental principles provide guidance to Delphi Automotive Systems personnel worldwide in the conduct of their daily business practices.

- We are committed to actions to restore and preserve the environment

18

DC 192

# The Delphi Principles

**Customer Enthusiasm** – Our customers' interests always come first. We are committed to products, services, business practices and an attitude that creates customer enthusiasm. This is the foundation of our security.

**Trust in Relationships** – We expect our people to build and maintain a foundation of trust and respect in everything they do.

**Integrity** – We are dedicated to complying fully with the letter and spirit of the laws, regulations and ethical principles that govern us. We will protect all confidential information we receive from our customers or business partners.

**Responsibility to Society** – We hold ourselves accountable to the highest standards of conduct relative to our broadest corporate responsibilities to society as a whole. We will strive to build and maintain effective relationships with the communities and institutions with which we interact.

**Dedication to EXCELLENCE** –
We are determined to achieve EXCELLENCE in everything we do. Our future success depends on uncompromising adherence to our vision and the absolutes of EXCELLENCE.

For more information about Excellence visit Apollo, Delphi's employee home page, at http://apollo.delphiauto.com/excellence/.

- We are committed to reducing waste and pollutants, conserving resources and recycling materials at every stage of the product life cycle.

- We will continue to participate actively in educating the public regarding environmental conservation.

- We will continue to pursue vigorously the development and implementation of technologies for minimizing pollutant emissions.

- We will continue to work with all governmental entities for the development of technically sound and financially responsible environmental laws and regulations.

- We will continually assess the impact of our plants and products on the environment and the communities in which we live and operate, with a goal of continuous improvement.

20

DC 193



# **EXHIBIT 3**

MetLife            4/5/04 4:50  PAGE  2/3    MetLife

**NATIONAL BENEFIT CENTER**
P.O. Box 14673
Lexington, KY 40512-4673
1-866-335-7444
Fax: (908) 547-2316
Website address: www.delphinbc.com
Telecommunications Device for the Deaf
TDD: 1-800-872-8682

## NOTICE OF INELIGIBILITY FOR COBRA CONTINUATION COVERAGE

April 5, 2004

Joseph M. Reno
7777 Cliffview Ct.
Centerville, OH 45459

We regret to inform you that you are not eligible for Delphi Corporation COBRA Continuation
Coverage for the following reason:

☐   You were not an active dependent of a Delphi employee at the time of the
    employee's COBRA qualifying event.

☐   You did not elect COBRA Continuation within the 60-day election period.

☐   You were covered under another continuation program, such as
    Delphi Program Continuation.

☐   You have not been cancelled from the Delphi Health Care Program. In this case,
    you must contact our office for further information regarding the cancellation of your
    coverages.

☐   The loss of your dependent status was not reported within the required 60-day time
    period.

☒   Other: Due to your employment status code

You may appeal this decision by sending a written request to the National Benefit Center at
P.O. Box 5175, Southfield, MI 48086-5175, within 180 days of the date you receive this letter.
Please include in your appeal letter the reason(s) you believe this determination of ineligibility
should be reconsidered and submit any additional comments, documents, records or other
information that you deem appropriate for us to give your appeal consideration. Upon request,
the National Benefit Center will provide you with a copy of the documents, records or other
information we have that are relevant to the determination.

PLAINTIFF'S
EXHIBIT
#37  KJ
Patrick 9-37-05

# EXHIBIT 4

1 April 15, 2004

NATIONAL BENEFIT CENTER
P.O. Box 14673
Lexington, KY 40512-4673
1-866-335-7444
Fax: (908) 547-2316
E-mail address: www.delphinbc.com
Telecommunications Device for the Deaf
TDD: 1-800-872-8682

May 24, 2004

Joseph M. Reno
7777 Cliffview Ct.
Centerville, OH  45459

Dear Mr Reno:

This letter is in response to your correspondence received in our office May 14, 2004, regarding enrollment in health care coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA).

A review of your records indicates a termination status of 2A effective March 17, 2004. The 2A status is defined as "a release or discharge, which does not offer COBRA enrollment". Therefore, you remain ineligible for COBRA coverage under the Delphi Corporation Salaried Health Care Program.

If you have questions regarding your termination status, please contact the Human Resources office at your former location.

If you have questions or concerns regarding this correspondence, please contact our office at the toll-free number above.

Sincerely,

Janie T.
Sr. Benefit Administrator
National Benefit Center

PLAINTIFF'S
EXHIBIT
#39 KJ
Patrick 9-27-05

# **EXHIBIT 5**

IV.    <u>DAMAGES</u>.

1.) COBRA penalty (as of Sept. 2, 2004, when Case #3:04-CV-00321 was first filed).$18,590.00

2.) Lost wages and benefits ...................................................................................$1,580,074.00

3.) ERISA (pension) loss ...........................................................................................$6,099.59

4.) Punitive damages ..........................................................................................$14,220,666.00

5.) Court costs and expenses ................................................................................$19,670.30

6.) Attorney's fees (as of Feb. 2007) .....................................................................$76,385.72

7.) + pre and post-judgment interest ......................................................... (to be determined)

   Total ..........................................................................................................$15,921,485.61