SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                             :
    In re                                  :   Chapter 11
                                                             :
DELPHI CORPORATION, et al.,                                  :   Case No. 05-44481 (RDD)
                                                             :
                        Debtors.   :   (Jointly Administered)
                                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

MOTION FOR SUPPLEMENTAL ORDER UNDER 11 U.S.C. §§ 327, 330,
AND 331 AUTHORIZING RETENTION OF PROFESSIONALS UTILIZED
BY DEBTORS IN ORDINARY COURSE OF BUSINESS

("SUPPLEMENTAL ORDINARY COURSE PROFESSIONALS MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Supplemental OCP Motion") for a supplemental order under 11 U.S.C. §§ 327, 330, and 331 authorizing (a) the termination of the formal retention of certain professional firms in these chapter 11 cases and (b) the retention and employment of those professional firms as ordinary course professionals. In support of this Supplemental OCP Motion, the Debtors respectfully represent as follows:

## Background

A.  The Chapter 11 Filings

1.  On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. The Court has ordered joint administration of these cases.

2.  No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the Creditors' Committee"). On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the official committee of unsecured creditors, the "Statutory Committees").

3.  This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.  The statutory predicates for the relief requested herein are sections 327, 330, and 331 of the Bankruptcy Code.

B.  Current Business Operations Of The Debtors

5.  Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.[2]

6.  The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

7.  Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with

---

[1] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[2] On March 20 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding.  The application was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.   Events Leading To The Chapter 11 Filing

8.   In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006, the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

9.   The Debtors believe that the Company's financial performance has deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

---

[3]   Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

4

10. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.   The Debtors' Transformation Plan

11. On March 31, 2006, the Company outlined five key tenets of its transformation plan.[4] First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.[5] Second, the Debtors must conclude their negotiations with

---

[4]   In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors, and a plan framework support agreement with those investors and GM. On April 19, 2007, Delphi confirmed that it anticipated negotiating changes to the agreements, primarily as a result of addressing differences in views regarding the Company's reorganization enterprise value among the investors, GM, the Statutory Committees, and the Company. On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework support agreement but that it expected to enter into new framework agreements with plan investors presently. Subsequently, on July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as, Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors"). Under the Delphi-Appaloosa EPCA, which is subject to Court approval, the New Plan Investors would invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization.

[5]   Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM that (a) modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the UAW, and its various locals, (b) provides that GM will undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate these modifications, and (c) modifies retiree welfare benefits for certain UAW-represented retirees of the Debtors. This agreement, which was approved by this Court on July 19, 2007, should facilitate the Debtors' reaching consensual resolutions of their labor issues with the remaining unions and GM and permit the Debtors to continue to implement their transformation plan and to develop, prosecute, confirm, and consummate a plan of reorganization. Delphi is currently engaged in settlement discussions with its second and third largest U.S. labor unions and is working to conclude discussions with those unions as well as three smaller unions as soon as practicable.

GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.[6] Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.[7] Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.[8] Finally, the Debtors must devise a workable solution to their current pension situation.[9]

  12. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-

---

[6] On July 9, 2007, Delphi confirmed that its discussions with GM on a comprehensive settlement agreement had entered the documentation phase and that it expected that a settlement with GM would be incorporated into the Debtors' plan of reorganization rather than filed with this Court for separate approval.

[7] In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants. The Debtors have been working to divest non-core assets so as to maximize the value of the estate for stakeholders. During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., its chapter 11 affiliate, obtained court approval for the sale of substantially all of the assets of their brake hose and Saltillo, Mexico brake plant businesses, and obtained court approval of bid procedures related to the upcoming sale of substantially all assets used in their catalyst business. In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

[8] As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages. The Company's revised operating structure consists of its four core business segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture. The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan. The Debtors also made significant progress in ensuring that their organizational and cost structure is competitive in obtaining the entry of this Court's Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order"). The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[9] To that end, on May 31, 2007, the Bankruptcy Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 plan year funding waivers, which were approved by the IRS, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Plans"). On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively.

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

### Relief Requested

13.    On October 8, 2005 the Debtors filed a motion (the "Initial OCP Motion") for an order under sections 327, 330, and 331 of the Bankruptcy Code authorizing the retention of professionals utilized by the Debtors in the ordinary course of business (collectively, the "Ordinary Course Professionals").  On November 4, 2005 this Court entered an order granting the relief requested in the Initial OCP Motion (the "Initial OCP Order") (Docket No. 883).  By this Supplemental OCP Motion, the Debtors seek an order (the "Supplemental OCP Order") authorizing (a) the termination of the formal retention of five professional firms[10] who have been retained by the Debtors, with Court approval, pursuant to formal retention applications (collectively, the "Five Firms") and (b) the retention and employment of the Five Firms as Ordinary Course Professionals.

### Basis For Relief

14.    Paragraph 3 of the Initial OCP Order authorized the Debtors to make monthly payments for fees and expenses to each of the Ordinary Course Professionals in the ordinary course of business, <u>provided</u>, <u>however</u>, that fees paid to an Ordinary Course Professional could not exceed either (a) $50,000 per month for each Ordinary Course Professional (the "Monthly OCP Threshold") or (b) $500,000 in the aggregate for each Ordinary Course Professional over the course of these chapter 11 cases (the "Case OCP Threshold" and, together with the Monthly

---

[10]    Banner & Witcoff, Ltd., Cadwalader, Wickersham & Taft LLP, Dickinson Wright PLLC, DLA Piper LLP, and Quinn Emanuel Urquhart Oliver & Hedges LLP.

7

OCP Threshold, the "OCP Thresholds"). Under paragraph 4 of the Initial OCP Order, if the fees payable to any Ordinary Course Professional exceeded either of the OCP Thresholds, the Debtors were required to formally retain such Ordinary Course Professional.

15. Banner & Witcoff, Ltd., Cadwalader, Wickersham & Taft LLP, Dickinson Wright PLLC, DLA Piper LLP, and Quinn Emanuel Urquhart Oliver & Hedges LLP,[11] each of which was originally retained as an Ordinary Course Professional, were subsequently formally retained because each of them had exceeded the Monthly OCP Threshold.

16. Although in the past each of the Five Firms exceeded the Monthly OCP Threshold, none has done so since at least February 2007. Set forth below is a summary of the monthly fees billed by each of the Five Firms from February 2007 through May 2007, as well as the aggregate[12] fees billed to the Debtors by each firm in these chapter 11 cases through May 2007:

---

[11] See Order Under 11 U.S.C. §§ 327(e) And 1107(b) And Fed. R. Bankr. P. 2014 Authorizing Employment And Retention Of Banner & Witcoff, Ltd. As Intellectual Property Counsel To Debtors (Docket No. 1708), entered January 3, 2006; Order Under 11 U.S.C. §§ 327(e) And 1107(b) And Fed. R. Bankr. P. 2014 Authorizing Employment And Retention Of Cadwalader, Wickersham & Taft LLP As Government Investigations Counsel To Debtors (Docket No. 2786), entered March 9, 2006; Order Under 11 U.S.C. §§ 327(e) And 1107(b) And Fed. R. Bankr. P. 2014 Authorizing Employment And Retention Of Dickinson Wright PLLC As Intellectual Property Counsel To Debtors (Docket No. 2772), entered March 9, 2006; Order Under 11 U.S.C. §§ 327(e) And 1107(b) And Fed. R. Bankr. P. 2014 Authorizing Employment And Retention Of DLA Piper LLP As Corporate, Employment , And Intellectual Property Counsel To Debtor Mobilearia, Inc. Nunc Pro Tunc to May 1, 2006 (Docket No. 5562), entered on November 16, 2006; and Order Under 11 U.S.C. §§ 327(e) And 1107(b) And Fed. R. Bankr. P. 2014 Authorizing Employment And Retention Of Quinn Emanuel Urquhart Oliver & Hedges, LLP As Special Litigation Counsel To Debtors (Docket No. 2784), entered on March 10, 2006.

[12] Includes fees awarded by the Court on the first, second, third, and fourth interim fee periods, plus fees billed for the months of February, March, April, and May, 2007.

8

| Professional | February | March | April | May | Aggregate Fees |
|---|---|---|---|---|---|
| Banner & Witcoff, Ltd. | $6,786.00 | $7,177.50 | $10,330.00 | $21,940.50 | $253,562.71 |
| Cadwalader, Wickersham & Taft, LLP | $328.50 | Not billed yet | Not billed yet | Not billed yet | $244,987.97 |
| DLA Piper US, LLP | Not billed yet | Not billed yet | Not billed yet | Not billed yet | $288,801.25 |
| Dickinson Wright PLLC | $11,492.50 | $26,250.50 | $20,191.00 | $20,063.00 | $402,200.50 |
| Quinn Emanuel Urquhart Oliver & Hedges LLP | $122.00 | $36,743.00 | $37,883.00 | $8,678.5 | $125,137.00 |

17. As stated in paragraph 19 of the Initial OCP Motion, the procedures established in the Initial OCP Order were established to relieve this Court, the U.S. Trustee, the joint fee review committee (the "Fee Committee"), and the Creditors' Committee of the burden of reviewing numerous fee applications involving relatively small fees and expenses.

18. The amounts now being billed by each of the Five Firms make it inefficient and costly to require them to file interim and final fee applications in accordance with sections 330(a) and 331 of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the applicable guidelines established by the U.S. Trustee, and the applicable orders of this Court. Consequently, the Debtors, with the agreement of the U.S. Trustee and the Fee Committee, request that this Court (a) terminate the formal retention of each of the Five Firms and (b) authorize the Debtors to retain each of the Five Firms as Ordinary Course Professionals, provided, however, that each of the Five Firms will continue to file interim and final fee applications with respect to all fees and expenses incurred by them on or before the date of entry of the Supplemental OCP Order.

9

19. From and after the date of entry of the Supplemental OCP Order, and in accordance with the terms of the Initial OCP Order, if the fees payable to any of the Five Firms exceed either of the OCP Thresholds, such firm shall be required to be retained once again pursuant to a formal retention application before any further fees or expenses may be paid to such firm.

20. In addition, from and after the date of entry of the Supplemental OCP Order, and in accordance with the terms of the Initial OCP Order, each of the Five Firms will be required to file and serve an affidavit of legal ordinary course professional (the "OCP Affidavit") in the form attached as <u>Exhibit 2</u> to the Initial OCP Order. Pursuant to paragraph 7 of the Initial OCP Order, if no objection to the retention of any of the Five Firms is received 10 days after the receipt of the applicable OCP Affidavit, the Debtors shall be authorized to retain such professional as a final matter, effective to the date of entry of the Supplemental OCP Order.

21. The Debtors submit that the retention of the Five Firms as Ordinary Course Professionals and the payment of compensation on the basis set forth herein is in the best interests of the Debtors, their estates, and creditors and should be approved by this Court.

Memorandum Of Law

22. Because the legal points and authorities upon which this Supplemental OCP Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order authorizing (a) the termination of the formal retention of the Five Firms which have been retained by the Debtors with Court approval pursuant to formal retention applications, (b) the retention and employment of the Five Firms as Ordinary Course Professionals, and (c) granting the Debtors such other and further relief as is just.

Dated: New York, New York
      August 3, 2007

          SKADDEN, ARPS, SLATE, MEAGHER
            & FLOM LLP

          By: /s/ John Wm. Butler, Jr.
             John Wm. Butler, Jr.
             John K. Lyons
             Ron E. Meisler
          333 West Wacker Drive, Suite 2100
          Chicago, Illinois 60606
          (312) 407-0700

          - and -

          By: /s/ Kayalyn A. Marafioti
             Kayalyn A. Marafioti (KM 9632)
             Thomas J. Matz (TM 5986)
          Four Times Square
          New York, New York 10036
          (212) 735-3000

          Attorneys for Delphi Corporation, et al.,
            Debtors and Debtors-in-Possession