Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
In re                                          :    Chapter 11
:
DELPHI CORPORATION, et al.,                    :    Case No. 05-44481 (RDD)
:
Debtors.                  :    (Jointly Administered)
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SECOND SUPPLEMENTAL APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(e)
AND 1107(b) AND FED. R. BANKR. P. 2014 AUTHORIZING EMPLOYMENT
AND RETENTION OF WILMER CUTLER PICKERING HALE AND DORR LLP
AS SPECIAL COUNSEL TO DELPHI NUNC PRO TUNC TO MARCH 29, 2007

("WCPHD SECOND SUPPLEMENTAL RETENTION APPLICATION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors") hereby submits this Second Supplemental Retention Application (the "Second Supplemental Retention Application") for an order under 11 U.S.C. §§ 327(e) and 1107(b) and Fed. R. Bankr. P. 2014 authorizing the employment and retention of Wilmer Cutler Pickering Hale and Dorr LLP ("WCPHD") as special counsel to the Debtors, nunc pro tunc to March 29, 2007. In support of this Second Supplemental Retention Application, the Debtors submit the supplemental declaration and disclosure statement of David A. Wilson in support of the Second Supplemental Retention Application, executed on July 31, 2007 (the "Wilson Declaration"). In further support of this Second Supplemental Retention Application, the Debtors respectfully represent as follows:

Background

A.   The Chapter 11 Filings

1.   On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. The Court has ordered joint administration of these cases.

2.   No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the official committee of unsecured creditors, the "Statutory Committees").

3.   This Court has jurisdiction over this application pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.   The statutory predicates for the relief requested herein are sections 327(e) and 1107(b) of the Bankruptcy Code and rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.   Current Business Operations Of The Debtors

5.   Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately

$15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.[2]

        6.       The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

        7.       Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's

---

[1]    The aggregated financial data used in this Second Supplemental Retention Application generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[2]    On March 20 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding.  The application was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

3

single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

8.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006, the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

9.      The Debtors believe that the Company's financial performance has deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

10.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

---

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

4

with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.   The Debtors' Transformation Plan

11.   On March 31, 2006, the Company outlined five key tenets of its transformation plan.[4] First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.[5] Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.[6] Third, the Debtors must streamline their product

---

[4]   In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors, and a plan framework support agreement with those investors and GM. On April 19, 2007, Delphi confirmed that it anticipated negotiating changes to the agreements, primarily as a result of addressing differences in views regarding the Company's reorganization enterprise value among the investors, GM, the Statutory Committees, and the Company. On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework support agreement but that it expected to enter into new framework agreements with plan investors presently. Subsequently, on July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as, Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors"). Under the Delphi-Appaloosa EPCA, which is subject to Court approval, the New Plan Investors would invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization.

[5]   Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM that (a) modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the UAW, and its various locals, (b) provides that GM will undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate these modifications, and (c) modifies retiree welfare benefits for certain UAW-represented retirees of the Debtors. This agreement, which was approved by this Court on July 19, 2007, should facilitate the Debtors' reaching consensual resolutions of their labor issues with the remaining unions and GM and permit the Debtors to continue to implement their transformation plan and to develop, prosecute, confirm, and consummate a plan of reorganization. Delphi is currently engaged in settlement discussions with its second and third largest U.S. labor unions and is working to conclude discussions with those unions as well as three smaller unions as soon as practicable.

[6]   On July 9, 2007, Delphi confirmed that its discussions with GM on a comprehensive settlement agreement had entered the documentation phase and that it expected that a settlement with GM would be incorporated into the Debtors' plan of reorganization rather than filed with this Court for separate approval.

5

portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.[7] Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.[8] Finally, the Debtors must devise a workable solution to their current pension situation.[9]

        12.      Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

---

[7]    In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants.  The Debtors have been working to divest non-core assets so as to maximize the value of the estate for stakeholders.  During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., its chapter 11 affiliate, obtained court approval for the sale of substantially all of the assets of their brake hose and Saltillo, Mexico brake plant businesses, and obtained court approval of bid procedures related to the upcoming sale of substantially all assets used in their catalyst business.  In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

[8]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.  The Debtors also made significant progress in ensuring that their organizational and cost structure is competitive in obtaining the entry of this Court's Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order").  The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[9]    To that end, on May 31, 2007, the Bankruptcy Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 plan year funding waivers, which were approved by the IRS, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Plans").  On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively.

6

Relief Requested

13.     By this Second Supplemental Retention Application, the Debtors seek to employ and retain WCPHD, as special counsel to Delphi in connection with the matters described below, effective March 29, 2007.  Accordingly, the Debtors respectfully request entry of an order under sections 327(e) and 1107(b) of the Bankruptcy Code and Bankruptcy Rule 2014 authorizing the employment and retention of WCPHD as special counsel in accordance with the terms set forth in this Second Supplemental Retention Application, the Wilson Declaration, and the engagement letter dated June 14, 2007 (the "June 14, 2007 Engagement Letter"), attached to the Wilson Declaration as Exhibit 1.

Prior Retention Applications

14.     Since 2004, the Securities and Exchange Commission (the "SEC") and other authorities have been investigating Delphi's accounting and adequacy of disclosures for a number of transactions (the "SEC Investigation").  The Audit Committee of the Company's Board of Directors (the "Audit Committee") undertook the task of examining the circumstances giving rise to the SEC Investigation and ensuring that appropriate actions were taken with respect thereto, including disciplinary actions against certain employees and communicating and cooperating fully with the SEC and other government authorities.  In connection with this matter, Delphi retained WCPHD to represent the Audit Committee for these purposes under the terms of that certain engagement letter dated August 24, 2004 (the "Original Engagement Letter").

15.     After the commencement of these chapter 11 cases, the Debtors filed the Application For Entry Of Order Under 11 U.S.C. §§ 327(e) And 1107(b) Authorizing Employment And Retention Of Wilmer Cutler Pickering Hale And Dorr LLP As Special Regulatory Counsel (Docket No. 999) (the "First Retention Application").  On December 2, 2005, the Court entered an order granting the First Retention Application (Docket No. 1430).

7

16.    On November 1, 2006, Delphi expanded WCPHD's retention to include the provision of legal advice to the Audit Committee in connection with Delphi's annual report, executive compensation, and related disclosure matters, as described in the engagement letter dated November 1, 2006 (the "Second Engagement Letter").  On December 26, 2006, the Debtors submitted a supplemental retention application for authorization to employ and retain WCPHD in such capacity (the "First Supplemental Retention Application").  The Court entered an order granting the First Supplemental Retention Application on January 18, 2007 (Docket No. 6675).

### Services To Be Rendered

17.    As set forth in the Wilson Declaration and the June 14, 2007 Engagement Letter, the Debtors are seeking to engage WCPHD to advise the Debtors in connection with the allegations made by Robert Mothershead (the Mothershead Allegations) in the Creditor's Request To Hold Matter In Abeyance, In Response To Debtors' Eleventh Omnibus Claims Objection, filed on April 13, 2007 (Docket No. 7665), which allegations are related to securities laws violations.

18.    The Debtors anticipate that such services will include:

(a)    investigating and advising the Company in connection with the Mothershead Allegations;

(b)    representing the Company before governmental authorities to whom Mr. Mothershead has transmitted his allegations; and

(c)    performing the full range of services normally associated with matters such as those identified above, as special counsel, which WCPHD is in a position to provide.

19.    WCPHD has indicated its desire and willingness to represent the Debtors as set forth herein and to render the necessary professional services as special counsel.

20. The Debtors may request that WCPHD undertake specific matters beyond the scope of the responsibilities set forth above. Should WCPHD agree in its discretion to undertake any such matter, the Debtors shall seek further order of this Court.

<u>The Debtors' Employment Of WCPHD Is In The Best Interest Of The Estates</u>

21. The Debtors selected WCPHD to provide legal advice in connection with the Mothershead Allegations because of the firm's reputation and extensive experience and knowledge, and in particular, its national reputation and recognized expertise in the field of securities law and government investigations.

22. As stated above, WCPHD has performed regulatory work for the Audit Committee and the Debtors since 2004, and is therefore familiar with the Debtors' businesses and operations and certain regulatory issues affecting the Company.

23. The Debtors therefore believe that WCPHD is both well-qualified and uniquely able to provide legal services in connection with the matters described herein.

24. Furthermore, the employment of WCPHD will enhance and will not duplicate the efforts of the other retained professionals in these chapter 11 cases. The Debtors understand that WCPHD will work with the other professionals retained in these chapter 11 cases to avoid any such duplication.

25. The Debtors submit that WCPHD's proposed retention meets all the prerequisites for retention of special counsel under section 327(e) of the Bankruptcy Code, which permits a debtor-in-possession, with court approval, to employ counsel for a "specified special purpose" if such employment is in the best interest of the Debtors.

Disinterestedness Of Professionals

26.   Pursuant to the Retention Application, WCPHD is presently employed as special regulatory counsel to the Audit Committee. WCPHD is not the Debtors' bankruptcy counsel in these chapter 11 cases. Accordingly, for purposes of obtaining the Court's approval of the present Second Supplemental Retention Application, section 327(e) does not require that WCPHD and its attorneys be "disinterested persons" as defined in section 101(14) of the Bankruptcy Code. Rather, section 327(e) instead requires that WCPHD not represent or hold any interest adverse to Delphi or its estates with respect to the matters on which WCPHD is to be employed herein. As discussed below, the employment of WCPHD to provide the aforementioned legal advice to the Company is in Delphi's and its estates' best interests and WCPHD does not represent or hold any interest adverse to Delphi or its estates with respect to the matters on which WCPHD is to be employed herein.

27.   As required by Bankruptcy Rule 2014(a), the Wilson Declaration filed in support of this Second Supplemental Retention Application sets forth information concerning WCPHD's connections with the Debtors, and certain other parties-in-interest in these chapter 11 cases. To the best of the Debtors' knowledge, and based on the information in the attached Wilson Declaration, neither WCPHD nor any of its partners, junior partners, counsel, or associates holds or represents any interest adverse to Delphi or its estates with respect to the matters on which WCPHD is to be employed.

28.   As set forth in the Wilson Declaration, WCPHD has in the past represented, currently represents, and likely in the future will represent, certain creditors and other parties-in-interest herein in matters unrelated to the Debtors, or their chapter 11 cases. WCPHD does not believe that the foregoing raises any actual or potential conflict of interest of WCPHD relating to

10

its engagement as special counsel in these chapter 11 cases, but such connections are disclosed out of an abundance of caution. The Debtors understand that, to vitiate any actual or potential conflicts of interest, WCPHD will not assist the Debtors in connection with their analysis, negotiations, and litigation, if any, with parties with whom WCPHD has existing client relationships, and that Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") (or other counsel if Skadden has a conflict), instead, will handle these tasks.

Professional Compensation

29.    WCPHD intends to apply to this Court for compensation and reimbursement of expenses in accordance with sections 330(a) and 331 of the Bankruptcy Code, the Bankruptcy Rules, applicable guidelines established by the U.S. Trustee, the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District Of New York (the "Local Rules"), and orders of this Court. WCPHD acknowledges that all compensation will be subject to this Court's final review and approval, following notice and opportunity for a hearing.

30.    Subject to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the guidelines established by the U.S. Trustee, the Local Rules, and orders of this Court, the Debtors and WCPHD have agreed to the following compensation arrangement. The WCPHD attorney who will be primarily responsible for the services described in the June 14, 2007 Engagement Letter is David Wilson, a partner at WCPHD whose hourly rate is $595. The 2007 rates for other attorneys who may also be staffed on the matter are as follows:

| | |
|---|---|
| WCPHD partners | $475 to $850 |
| WCPHD counsel | $425 to $675 |
| WCPHD associates | $275 to $520 |

After such date if the project is still ongoing, WCPHD may request an adjustment in professional rates billed for these matters to reflect the regular hourly rates charged to its other clients at that

time. Prior to any adjustment, WCPHD will contact Delphi to discuss any requested rate adjustment and obtain written approval from Delphi of any proposed adjustment. WPCHD and Delphi agree that WCPHD's hourly billing rates include all overhead and internal charges associated with WCPHD's practice.

31. Furthermore, the Debtors' in-house counsel will be fully engaged on the matters for which WCPHD is being retained pursuant to this Second Supplemental Retention Application. Accordingly, WCPHD and Delphi agree that before WCPHD undertakes an in-depth research project, or any other significant project, WCPHD will first obtain the Debtors' consent as they may choose to handle such project internally using their own resources.

32. No arrangement is proposed between WCPHD and the Debtors for compensation to be paid in these chapter 11 cases other than as set forth above and in the Wilson Declaration.

## Conclusion

33. For the foregoing reasons, Delphi submits that the employment of WCPHD as special counsel to Delphi on the terms set forth herein is in its and its estates' best interest.

## Memorandum Of Law

34. Because the legal points and authorities upon which this Second Supplemental Retention Application relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, Delphi respectfully requests that this Court enter an order (a) authorizing Delphi to employ and retain WCPHD as special counsel to Delphi to perform the services set forth herein, <u>nunc</u> <u>pro</u> <u>tunc</u> to March 29, 2007 and (b) granting Delphi such other and further relief as is just.

Dated:   New York, New York
        July 31, 2007

                DELPHI CORPORATION, on behalf of itself and certain of its subsidiaries and affiliates, as Debtors and Debtors-in-Possession

                By:   /s/ John D. Sheehan
                      Name: John D. Sheehan
                      Title:   Vice President, Chief Restructuring Officer, and Controller