**Hearing Date And Time: August 16, 2007 at 10:00 a.m.**
**Objection Deadline: August 13, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

      -and-

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

      -and-

O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
Tom A. Jerman (TJ 1129)
Jessica Kastin (JK 2288)

Attorneys for Delphi Corporation, et al.,
   Debtor and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698
Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. §§ 363, 1113, AND 1114 AND FED. R. BANKR. P. 6004 AND 9019
APPROVING (I) MEMORANDA OF UNDERSTANDING AMONG IUOE, IBEW, IAM, DELPHI,
AND GENERAL MOTORS CORPORATION INCLUDING MODIFICATION OF IUOE, IBEW, AND IAM
COLLECTIVE BARGAINING AGREEMENTS AND RETIREE WELFARE BENEFITS FOR CERTAIN IUOE, IBEW, AND IAM-
REPRESENTED RETIREES AND (II) MODIFICATION OF, AND TERM SHEET REGARDING,
RETIREE WELFARE BENEFITS FOR CERTAIN NON-REPRESENTED HOURLY ACTIVE EMPLOYEES AND RETIREES

("IUOE, IBEW, AND IAM 1113/1114 SETTLEMENT
AND RETIREE BENEFIT APPROVAL MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this expedited motion (the "Motion")[1] for an order under 11 U.S.C. §§ 363, 1113,

and 1114 of the Bankruptcy Code and Fed. R. Bankr. P. 6004 and 9019 approving (i)

memoranda of understanding regarding Delphi's restructuring entered into among the

International Union of Operating Engineers Locals 832S, 18S, and 101S ("IUOE"),[2] the

International Brotherhood of Electrical Workers and its Local 663 ("IBEW"),[3] and the

International Association of Machinists and Aerospace Workers and its District 10 and Tool and

Die Makers Lodge 78 ("IAM"),[4] Delphi, and General Motors Corporation ("GM") (collectively,

the "IUOE, IBEW, and IAM Settlement Agreements" or the "Memoranda of Understanding"),[5]

---

[1]   A copy of the informational notice provided to active Delphi hourly employees and hourly retirees represented by the IUOE, IBEW, and IAM, as well as certain non-represented hourly such employees and retirees, in connection with the Motion is attached hereto as Exhibit 1.

[2]   There are three IUOE memoranda of understanding that are the basis of this Motion, the first with the International Union of Operating Engineers Local 832S (the "IUOE Local 832S Settlement Agreement" or the "IUOE Local 832S Memorandum of Understanding"), the second with the International Union of Operating Engineers Locals 18S (the "IUOE Local 18S Settlement Agreement" or the "IUOE Local 18S Memorandum of Understanding"), and the third with the International Union of Operating Engineers Local 101S (the "IUOE Local 101S Settlement Agreement" or the "IUOE Local 101S Memorandum of Understanding"). Notwithstanding any language therein to the contrary, Attachment B to each of these three IUOE memoranda of understanding and Attachment C to the IUOE Local 832S Memorandum of Understanding and IUOE Local 18S Memorandum of Understanding are clarified to provide that the International Union of Operating Engineers is not a party to these agreements; rather, only its aforesaid locals are parties to each local's respective agreements.

[3]   There are two IBEW memoranda of understanding that are the basis of this Motion, the first with the International Brotherhood of Electrical Workers and its Local 663 relating to Delphi Electronics and Safety (the "IBEW E&S Settlement Agreement" or the "IBEW E&S Memorandum of Understanding") and the second with the International Brotherhood of Electrical Workers and its Local 663 relating to Delphi Powertrain (the "IBEW Powertrain Settlement Agreement" or the "IBEW Powertrain Memorandum of Understanding").

[4]   There is one IAM memorandum of understanding that is the basis of this Motion (the "IAM Settlement Agreement" or the "IAM Memorandum of Understanding").

[5]   Copies of the IUOE, IBEW, and IAM Settlement Agreements are annexed to the Proposed Order which is attached hereto as Exhibit 2. Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the IUOE, IBEW, and IAM Settlement Agreements.

comprehensive agreements that (a) modify, extend, or terminate provisions of the existing collective bargaining agreements among Delphi, the IUOE, IBEW, IAM, and their various locals (the "IUOE, IBEW, and IAM CBAs") and (b) provide that GM and Delphi will undertake certain financial obligations to Delphi's IUOE, IBEW, and IAM-represented employees and retirees to facilitate these modifications, (ii) withdrawal without prejudice of the Debtors' Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing  Modification Of Retiree Welfare Benefits (the "1113/1114 Motion") solely as it pertains to the IUOE, IBEW, and IAM and IUOE, IBEW, and IAM-represented retirees and approving the parties' settlement of the 1113/1114 Motion solely as it pertains to the IUOE, IBEW, and IAM and IUOE, IBEW, and IAM-represented retirees, (iii) modification of retiree welfare benefits for certain IUOE, IBEW, and IAM-represented retirees of the Debtors pursuant to the IUOE, IBEW, and IAM Settlement Agreements, and (iv) pursuant to 11 U.S.C. § 363, modification of retiree welfare benefits for certain non-represented hourly active employees and retirees of the Debtors and approval of a term sheet between Delphi and GM regarding Delphi's cessation and GM's provision certain benefits for such employees.

Introduction

1.      The IUOE, IBEW, IAM, Delphi, and GM have discussed the challenges impacting Delphi and its IUOE, IBEW, and IAM-represented operations.  These parties acknowledge that restructuring actions are necessary and commit to take specific actions to protect the needs of these parties and their constituencies, continuing progress already made toward transforming Delphi's labor cost structure and ongoing business operations.

2.      The IUOE, IBEW, IAM, Delphi, and GM have agreed to the "Term Sheet – Delphi Cessation and GM Provision of OPEB"[6] and the assumption of significant OPEB liabilities by GM, thereby reducing Delphi's ongoing benefit costs and liabilities.

3.      In addition, to enable continued transformation to more competitive wage and benefit levels, to address capacity and staffing level issues, to facilitate the freeze of the Delphi HRP, and to better position Delphi to retain existing business and attract new business, the IUOE, IBEW, IAM, Delphi, and GM have entered into various agreements in the Memoranda of Understanding on a two-party or three-party basis, as applicable, subject to ratification.

4.      The Debtors filed the 1113/1114 Motion on March 31, 2006, after they were unable to consummate consensual modifications to the Debtors' collective bargaining agreements and retiree welfare benefits with the IUOE, IBEW, and IAM and the other unions representing certain of the Debtors' U.S. employees and retirees (the "Unions")[7] during the first six months of their chapter 11 reorganization cases.  The Debtors believe that they continued to negotiate with the Unions even after they filed the 1113/1114 Motion, and represented that they would continue to negotiate with the Unions even if Debtors obtained the order requested in the 1113/1114 Motion.[8]  The parties were unable to reach a consensus before the scheduled

---

[6]   This agreement is Attachment B to the Memoranda of Understanding.

[7]   These unions include the United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), the United Steelworkers of America (the "USW"), the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America (the "IUE-CWA"), and their local affiliates.

[8]   The Debtors' proposed modifications to the IUOE, IBEW, and IAM CBAs upon which their 1113/1114 Motion was based are described in detail in the 1113/1114 Motion and the accompanying Declaration Of Darrell Kidd In Support of the 1113/1114 Motion (Docket No. 3039).  In sum, the Debtors' proposed modifications contemplated two possible scenarios: one in which they received no or inadequate financial support from GM (the "Competitive Benchmark Proposals") and the other in which they received financial support from GM adequate to offer less restrictive or severe modifications to their national and local labor agreements (the "GM Consensual Proposals").  The IUOE, IBEW, and IAM, as well as the Debtors' other Unions, rejected the

commencement of the hearing on the 1113/1114 Motion on May 9, 2006. This Court conducted

hearings on the contested motion on various trial dates in May and June 2006, the record of

which constitutes part of the basis for the relief requested in this Motion. Throughout the

1113/1114 proceedings, however, the Debtors and the Unions continued to seek negotiated

alternatives to litigation.

5.        On June 8, 2006, the Debtors and all respondents to the 1113/1114 Motion

conducted a "meet and confer" at which the parties agreed to submit a scheduling order to this

Court which provided for a recess of the hearings until August 11, 2006 (Docket No. 4170).

During the next five months, the Debtors' discussions with the Unions, GM, and other

stakeholders continued. As a consequence of those negotiations, the parties submitted to this

Court further scheduling orders adjourning the 1113/1114 Motion through the balance of 2006

and, on January 31, 2007, this Court suspended further proceedings on the 1113/1114 Motion

(Docket No. 6779). Further orders continuing the suspension of the 1113/1114 Motion have

been granted by this Court with the intention of allowing the parties additional time to negotiate

consensual modifications to Delphi's labor agreements.

6.        On June 22, 2007, Delphi reached a tentative agreement and signed a

Memorandum of Understanding with the UAW and GM covering site plans, workforce

transition, and other comprehensive transformational issues (the "UAW Settlement Agreement"),

which was ratified by the UAW on June 28, 2007. On August 5, 2007, the Debtors reached

similar tentative agreement with the IUE-CWA (the "IUE-CWA Settlement Agreement"). The

UAW Settlement Agreement is analogous to the IUOE, IBEW, and IAM Settlement Agreements

---

Competitive Benchmark Proposals and took the position that the Competitive Benchmark and GM Consensual
Proposals did not provide a framework for resolution. The Memoranda of Understanding that are the basis of
this Motion are essentially fully negotiated GM Consensual Proposals on terms acceptable to the IUOE, IBEW,
IAM, Delphi, and GM.

because the UAW Settlement Agreement similarly is a comprehensive agreement that modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the UAW, and its various UAW locals and provides that GM and Delphi will undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate these modifications.  On June 29, 2007, Delphi filed a motion with this Court for an order approving the UAW Settlement Agreement, approving withdrawal without prejudice of the 1113/1114 Motion solely as it pertains to the UAW and UAW-represented retirees, approving the settlement of the 1113/1114 Motion solely as it pertains to the UAW and UAW-represented retirees, and approving modification of retiree welfare benefits for certain UAW-represented retirees of Delphi.  After a hearing on this motion on July 19, 2007, this Court issued an order approving that motion (Docket No. 8693).  By a motion filed on August 6, 2007, Delphi is also seeking an order approving the IUE-CWA Settlement Agreements.

7.    The IUOE, IBEW, and IAM Settlement Agreements apply only to the IUOE, IBEW, and IAM and do not resolve the 1113/1114 Motion as to the remaining Unions. As of the date of this Motion, however, the Debtors have achieved a settlement with the IUE-CWA and stand ready to renew bargaining with the USW in an effort to reach a consensual agreement.  Any such agreement could be considered by this Court as early as the September 27, 2007 omnibus hearing or perhaps earlier if an expedited notice and hearing schedule is approved by this Court.

8.    The IUOE, IBEW, and IAM Settlement Agreements, among other subject matters, provide that: [9]

---

[9]    The summary of the IUOE, IBEW, and IAM Settlement Agreements set forth in this Motion is qualified entirely by and is subject to the actual terms and conditions of the IUOE, IBEW, and IAM Settlement Agreements.

(A)    Effective upon the later of entry of this Court's approval order in respect of the Motion[10] or the first Monday following receipt of written notice of ratification from the respective Union:[11]

- Certain collective bargaining agreements are extended until September 14, 2011, subject to their termination provisions, certain operations are scheduled to be closed, and certain operations are acknowledged as closed;

- A workforce transition program is implemented for eligible employees that provides eligible employees with transformation plan options, including (i) attrition options similar to the previously-approved UAW and IUE-CWA attrition program for eligible employees who are participants in the Delphi Hourly-Rate Employees Pension Plan, (ii) provision of a lump sum "buy-down" payment totaling $10,000 for eligible employees, and (iii) severance payments up to $40,000 to eligible employees who are permanently laid off prior to September 14, 2011;[12]

- Certain terms of certain collective bargaining agreements are modified;[13] and

- All employee, retiree, and union asserted and unasserted claims are settled (except for waiver of rights to vested pension benefits, workers compensation benefits, unemployment compensation

---

[10]    The IUOE Local 101S Settlement Agreement becomes effective upon entry of this Court's approval order in respect of the Motion without ratification because there are no active bargaining unit members at the Olathe site.

[11]    Until the effective date of a plan of reorganization, nothing in the IUOE, IBEW, and IAM Settlement Agreements will constitute an assumption of any agreement described in the IUOE, IBEW, and IAM Settlement Agreements, including, without limitation, any collective bargaining agreement between any of these aforesaid unions and Delphi (except as provided for in Section E.3 of the IUOE Local 101S Settlement Agreement and Section F.3 of the other IUOE, IBEW, and IAM Settlement Agreements) or any commercial agreement between GM and Delphi, nor will anything in the IUOE, IBEW, and IAM Settlement Agreements be deemed to create an administrative or priority claim with respect to GM or convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party. The IUOE, IBEW, and IAM Settlement Agreements also provide that the respective parties agree (and the order approving this Motion must also provide) that the IUOE, IBEW, and IAM Settlement Agreements are without prejudice to any interested party (including the respective parties and the statutory committees) in all other aspects of Delphi's chapter 11 cases and the respective parties reserve all rights not expressly waived in the IUOE, IBEW, and IAM Settlement Agreements.

[12]    The IUOE Local 101S Settlement Agreement does not contain this workforce transition program because there are no remaining active or laid off employees at the Olathe facility. GM will receive certain claims in connection with certain of these commitments as specified in Attachment C to the other IUOE, IBEW, and IAM Settlement Agreements.

[13]    The IUOE Local 101S Settlement Agreement terminates and supersedes the 2003 IUOE Local 101S – Delphi Agreements and all related agreements and understandings.

benefits, and the right to pursue pending ordinary course grievance except for employees who have signed individual releases of claims).

(B)    Effective upon the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM and substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by this Court which incorporates, approves, and is consistent with all of the terms of the IUOE, IBEW, and IAM Settlement Agreements and Delphi-GM settlement:

- Delphi's obligation to provide certain retiree welfare benefits is eliminated and GM is obligated to provide certain retiree welfare benefits for certain IUOE, IBEW, and IAM-represented retirees and eligible employees covered as provided in the Term Sheet – Delphi Cessation and GM Provision of OPEB;[14]

- Delphi's existing pension plan is frozen in certain respects effective upon emergence from chapter 11 for certain IUOE, IBEW, and IAM-represented employees as provided in Section C of the IUOE Local 101S Settlement Agreement and Section D.2 of the other IUOE, IBEW, and IAM Settlement Agreements;

- The Memoranda of Understanding (including certain collective bargaining agreements) are assumed pursuant to 11 U.S.C. § 365;

- Certain released parties are exculpated and released in connection with the Memoranda of Understanding and Delphi's chapter 11 cases; and

- Delphi and GM receive releases from the IUOE, IBEW, and IAM, all employees and former employees of Delphi represented or formerly represented by the IUOE, IBEW, and IAM, and all persons or entities with claims derived from or related to any relationship with such employees of Delphi arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements or the Memoranda of Understanding (except for claims for benefits provided for or explicitly not waived under the Memoranda of Understanding, including, but not limited to, workers' compensation benefits and unemployment compensation benefits against Delphi, its

---

[14]    Delphi has agreed to reimburse GM for 50% of the actual liability assumed by GM for IUOE, IBEW, and IAM retirees and those IUOE, IBEW, and IAM employees that "check the box" and 100% of other IUOE, IBEW, and IAM employees.

subsidiaries, or affiliates that are otherwise assertable under applicable law).

9.      This Motion also requests that the Court approve modification of retiree welfare benefits for certain non-represented hourly active employees and retirees of the Debtors pursuant to 11 U.S.C. § 363.  There are six current active employees and 23 current Delphi retirees who are not represented by any of the Unions but who participate in the same health and welfare plans as the Union-represented retirees at the respective work sites.  On July 23, 2007, Delphi and GM agreed to the treatment of these non-represented hourly individuals, and on August 3, 2007, this agreement was formalized in the Term Sheet – Delphi Cessation and GM Provision of OPEB For Certain Non-Represented Delphi Employees and Retirees (the "Non-Represented Term Sheet").[15]

10.      Upon the effective date[16] of the Non-Represented Term Sheet, GM will provide post-retirement medical benefits to certain of the non-represented hourly active employees and retirees in accordance with all the ongoing terms, conditions, and eligibility requirements of the GM Health Care Program for Hourly Employees and GM will provide the applicable level of post retirement medical benefits consistent with the terms of the Modified Plan, as defined in the settlement agreement approved by the court in the case IUE, et al. v. General Motors Corporation (case number 2:06-cv-12151), on the same basis as such benefits are provided to GM-IUE-CWA hourly employees who retired from GM with eligibility to participate in the GM Health Care Program.  Further, GM will provide all employer-paid post-

---

[15]   A Copy of the Non-Represented Term Sheet is annexed as Exhibit 7 to the Proposed Order.  The summary of the Non-Represented Term Sheet set forth in this Motion is qualified entirely by and is subject to the actual terms and conditions of the Non-Represented Term Sheet.

[16]   The Non-Represented Term Sheet requires execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM and substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by this Court which incorporates, approves, and is consistent with all of the terms of the Non-Represented Term Sheet and Delphi-GM settlement.

retirement Basic Life Insurance benefits to certain of the non-represented hourly active

employees and retirees in accordance with all the ongoing terms, conditions, and eligibility

requirements of the GM Life and Disability Benefits Program for Hourly Employees and at the

level provided for non-represented hourly retirees on the date immediately preceding the GM's

provision of such benefits, provided, however, that GM will not be required to provide life

insurance benefits at a level and scope that exceeds that being provided for similarly situated

IBEW or IAM-represented hourly retirees of GM.  Delphi has in turn agreed to reimburse GM

for the actuarial present value of GM's actual liability with respect to the provision of OPEB to

certain of Delphi's non-represented hourly active employees and retirees.  The six active non-

represented hourly active employees, each working at the same IUE-CWA worksite, may be

eligible for a future attrition program substantially similar to the special attrition program, known

as the SAP-T, currently agreed to by the IUE-CWA (for submission through a separate motion to

this Court for approval) patterned after the UAW SAP-T previously approved by this Court.

       11.     The Debtors submit that approval of non-represented hourly retiree

welfare benefit modification under 11 U.S.C. § 363 and approval of the IUOE, IBEW, and IAM

Settlement Agreements, which resolve Delphi's 1113/1114 Motion as it pertains to the IUOE,

IBEW, and IAM, are in the best interests of the Debtors and their stakeholders.  The Debtors

believe that approval of the IUOE, IBEW, and IAM Settlement Agreements will facilitate the

Debtors' continued progress toward transformation and emergence.

Background

A.    The Chapter 11 Filings

       12.     On October 8 and 14, 2005 (collectively, the "Petition Date"), the Debtors

filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the

United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The

Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

13.    No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

14.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

15.    The statutory predicates for the relief requested herein are sections 363, 1113, and 1114 of the Bankruptcy Code and Rule 6004 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.    Business Operations Of The Debtors

16.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[17] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from this Court.[18]

---

[17]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[18]    On March 20 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency

17.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

18.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

19.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[19]

---

proceeding.  The application was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

[19]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

12

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006, the Debtors incurred

a net loss of $5.5 billion, $3.0 billion of which comprised charges related to Special Attrition

Programs.

20.    The Debtors believe that the Company's financial performance has

deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which

have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production

environment for domestic automakers resulting in the reduced number of motor vehicles that

GM produces annually in the United States and related pricing pressures, and (iii) increasing

commodity prices.

21.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the

Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors'

transformation plan and preserve value for its stakeholders.

22.    On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations.  The Debtors stated that they needed to focus on five key areas:[20] first, modifying the

_____

[20]    In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their
execution of an equity purchase and commitment agreement with certain investors, and a plan framework
support agreement with those investors and GM.   On July 9, 2007, Delphi confirmed that it had formally
terminated the equity purchase and commitment agreement and related plan framework support agreement but
that it expected to enter into new framework agreements with plan investors presently.  Subsequently, on July
18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment

Company's labor agreements to create a competitive arena in which to conduct business;[21]

second, concluding their negotiations with GM to finalize GM's financial support for the

Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[22]

third, streamlining their product portfolio to capitalize on their world-class technology and

market strengths and make the necessary manufacturing alignment with their new focus;[23]

fourth, transforming their salaried workforce to ensure that the Company's organizational and

---

agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as, Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors").  Under the Delphi-Appaloosa EPCA,  the New Plan Investors would invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization.  This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.

[21]    Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM that (a) modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the UAW, and its various locals, (b) provides that Delphi and GM will undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate these modifications, and (c) modifies retiree welfare benefits for certain UAW-represented retirees of the Debtors.  This agreement, which was approved by this Court on July 19, 2007, should facilitate the Debtors' reaching consensual resolutions of their labor issues with the remaining unions and GM and permit the Debtors to continue to implement their transformation plan and to develop, prosecute, confirm, and consummate a plan of reorganization.  As of August 6, 2007, similar agreements have been reached with the International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America and its local unions, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers.  Delphi is currently engaged in settlement discussions with its  remaining U.S. labor union and is working to conclude discussions with that union as soon as practicable.

[22]    On July 9, 2007, Delphi confirmed that its discussions with GM on a comprehensive settlement agreement had entered the documentation phase and that it expected that a settlement with GM would be incorporated into the Debtors' plan of reorganization rather than filed with this Court for separate approval.

[23]    In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants.  The Debtors have been working to divest non-core assets so as to maximize the value of the estate for stakeholders.  During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., its chapter 11 affiliate, obtained court approval for the sale of substantially all of the assets of their brake hose and Saltillo, Mexico brake plant businesses, and obtained court approval of bid procedures related to the upcoming sale of substantially all assets used in their catalyst business.  In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

cost structure is competitive and aligned with its product portfolio and manufacturing footprint;[24]

and devising a workable solution to their current pension situation.[25]

D.      The Debtors' Prior Special Attrition Programs

23.      The Debtors and GM have previously entered into agreements with the

UAW and the IUE-CWA that provided similar options to those presented in the IUOE, IBEW,

and IAM Settlement Agreements.  On March 22, 2006, Delphi, GM and the UAW entered into a

three-party agreement establishing a special attrition program, which was approved by order of

this Court on May 8, 2006 (Docket No. 3648) and amended on May 12, 2006 (Docket No. 3754).

On June 5, 2006, Delphi, GM, and the UAW agreed on a supplemental program and on June 16,

2006, Delphi, GM, and the IUE-CWA reached agreement on the terms of a special attrition

program which mirrored in all material respects the prior UAW attrition programs.  The UAW

supplemental attrition program and the IUE-CWA attrition program were approved by this Court

on June 29, 2006, and on July 7, 2006, this Court entered the approval order (Docket No. 4461).

24.      These attrition programs provided nearly two-thirds of Delphi's existing

UAW and IUE-CWA represented long-term hourly employees (as of September 26, 2006 and

---

[24]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product
        portfolio on core technologies for which the Company believes it has significant competitive and technological
        advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics
        and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also
        has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the
        Company's transformation plan.  The Debtors also made significant progress in ensuring that their
        organizational and cost structure is competitive in obtaining the entry of this Court's Order Under 11 U.S.C.
        § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on
        April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order").  The Finance Outsourcing Order
        authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets,
        travel and expense reporting, general ledger, and contract administration processes and significantly reduce
        SG&A expenses as part of their transformation plan.

[25]    To that end, on May 31, 2007, this Court granted the Debtors' motion for authority to perform under the terms
        of those certain September 30, 2006 plan year funding waivers, which were approved by the IRS, for both the
        Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively,
        the "Plans").  On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to
        the Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from
        chapter 11 to December 31, 2007 and February 28, 2008, respectively.

August 18, 2006, respectively) with "soft landings" through a combination of incentivized

retirement programs and, as to UAW-represented employees, GM flowback rights.

E.    This Court Has Already Approved A Similar Settlement Of The 1113/1114 Motion As It
Pertained To The UAW Through The UAW Settlement Agreement

        25.    On June 22, 2007, Delphi signed the UAW Settlement Agreement with the

UAW and GM covering site plans, workforce transition, and as other comprehensive

transformational issues, which was ratified by the UAW on June 28, 2007.  Similar to the IUOE,

IBEW, and IAM Settlement Agreements, the UAW Settlement Agreement is a comprehensive

agreement that modifies, extends, or terminates provisions of the existing collective bargaining

agreements among Delphi, the UAW, and its various UAW locals and provides that GM and

Delphi will undertake certain financial obligations to Delphi's UAW-represented employees and

retirees to facilitate these modifications.  On June 29, 2007, Delphi filed a motion with this Court

for an order approving the UAW Settlement Agreement, approving withdrawal without prejudice

of the 1113/1114 Motion as it solely pertains to the UAW and UAW-represented retirees,

approving the settlement of the 1113/1114 Motion as it solely pertains to the UAW and UAW-

represented retirees, and approving modification of retiree welfare benefits for certain UAW-

represented retirees of Delphi.  After a hearing on this motion on July 19, 2007, this Court issued

an order approving that motion (Docket No. 8693).

F.      Settlement Of The 1113/1114 Motion As It Pertains To The IUOE, IBEW, And IAM
        Through The IUOE, IBEW, And IAM Settlement Agreements Presented For This Court's
        Approval On The Instant Motion

        26.      On July 31 and August 1, 2007, the Debtors reached the IUOE, IBEW,

and IAM Settlement Agreements that include significant and necessary modifications to the

IUOE, IBEW, and IAM CBAs, subject to ratification.[26]

        27.      As set forth above, Attachment B to all IUOE memoranda of

understanding and Attachment C to the IUOE Local 832S Memorandum of Understanding and

IUOE Local 18S Memorandum of Understanding are clarified to provide that the International

Union of Operating Engineers (the "International") is not a party, to these agreements and

instead, only its Locals 832S, 18S, and 101S are respective parties to these agreements.  In this

vein, Debtors' counsel received a letter dated August 6, 2007 from Barbara Mehlsack of Gorlick,

Kravitz & Listhaus, P.C., counsel to the International, stating that such counsel was authorized to

advise Delphi, on behalf of International, that International (i) is not, and never has been, a party

to the IUOE CBAs, (ii) is not, and never has been, a representative under 11 U.S.C. §§ 1113 and

1114 of any IUOE bargaining-unit employees, (iii) is not a party to any of the IUOE memoranda

of understanding, including their respective Attachment Bs and/or Attachment Cs, (iv) has no

position on any of the IUOE memoranda of understanding, and (v) does not have any claims

against the Debtors or GM in connection with the IUOE bargaining units, their members, or

---

[26]    The Debtors do not believe that the IUOE, IBEW, and IAM Settlement Agreements or the Non-Represented
        Term Sheet will have any material adverse effect on the Debtors' five year business plan through December,
        2011 or the Debtors' ability to comply with Section 1.1 of Exhibit B to the Delphi-Appaloosa EPCA which
        requires that the aggregate amount of all trade claims and other unsecured claims (including any accrued
        interest but excluding certain categories of other unsecured claims) that have been asserted or scheduled but not
        yet disallowed as of the effective date of the reorganization plan shall be allowed or estimated for distribution
        purposes by this Court to be no more than $1.7 billion, excluding all allowed accrued postpetition interest
        thereon.

retirees.  Notwithstanding any language to the contrary in the 1113/1114 Motion, the Debtors

confirm that International is not a named party to the 1113/1114 Motion.

28.    The IUOE Local 832S Settlement Agreement, among other subject

matters, provides that:

(A)    Effective upon the later of entry of this Court's approval order in respect of the Motion or the first Monday following receipt of written notice of ratification from the International Union of Operating Engineers and its Local 832S ("IUOE Local 832S"):

- The 2003 IUOE Local 832S – Delphi Powertrain – Rochester Agreements and all related agreements and understandings are extended until September 14, 2011, subject to their termination provisions;

- A workforce transition program is implemented for eligible IUOE Local 832S-represented employees that provides eligible employees with transformation plan options, including (i) attrition options similar to the previously-approved UAW and IUE-CWA attrition program for eligible IUOE Local 832S employees who are participants in the Delphi Hourly-Rate Employees Pension Plan, (ii) provision of a lump sum "buy-down" payment totaling $10,000 for eligible employees, and (iii) severance payments up to $40,000 to eligible employees who are permanently laid off prior to September 14, 2011;

- Certain terms of certain IUOE CBAs are modified with respect to wages, personal savings plans, Independence Week Pay, holidays, vacation accrual, GIS, job security and/or guaranteed employment levels, subsidized discount programs, tuition assistance, attendance, representation, and dispute resolution; and

- All employee, retiree, and union asserted and unasserted claims are settled (except for waiver of rights to vested pension benefits, workers compensation benefits, unemployment compensation benefits, and the right to pursue pending ordinary course grievance except for employees who have signed individual releases of claims).

(B)    Effective upon the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM and substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by this Court which incorporates, approves, and is consistent

with all of the terms of the IUOE Local 832S Settlement Agreement and Delphi-GM settlement:

- Delphi's obligation to provide certain retiree welfare benefits is eliminated and GM is obligated to provide certain retiree welfare benefits for certain IUOE Local 832S-represented retirees and eligible employees covered as provided in the Term Sheet – Delphi Cessation and GM Provision of OPEB;

- Delphi's existing pension plan is frozen in certain respects effective upon emergence from chapter 11 for certain covered IUOE Local 832S-represented employees as provided in Section D.2 of the IUOE Local 832S Settlement Agreement;

- The Memorandum of Understanding (including certain IUOE CBAs) is assumed pursuant to 11 U.S.C. § 365;

- The IUOE Local 832S released parties are exculpated and released in connection with the IUOE Local 832S Memorandum of Understanding and Delphi's chapter 11 cases; and

- Delphi and GM receive releases from the IUOE Local 832S, all employees and former employees of Delphi represented or formerly represented by the IUOE Local 832S, and all persons or entities with claims derived from or related to any relationship with such employees of Delphi arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements or the IUOE Local 832S Memorandum of Understanding (except for claims for benefits provided for or explicitly not waived under the IUOE Local 832S Memorandum of Understanding, including, but not limited to, workers' compensation benefits and unemployment compensation benefits against Delphi, its subsidiaries, or affiliates that are otherwise assertable under applicable law).

29.    The IUOE Local 18S Settlement Agreement, among other subject matters, provides that:

(A)    Effective upon the later of entry of this Court's approval order in respect of the Motion or the first Monday following receipt of written notice of ratification from the International Union of Operating Engineers and its Local 18S ("IUOE Local 18S"):

- The IUOE Local 18S, Delphi, and GM acknowledge that the Delphi Thermal & Interior – Columbus operation is scheduled to be closed;

- The term of the 2003 IUOE Local 18S – Delphi Agreements and all related agreements and understandings are extended until September 14, 2011, subject to their termination provisions;

- A workforce transition program is implemented for eligible IUOE Local 18S-represented employees that provides eligible employees with transformation plan options, including (i) attrition options similar to the previously-approved UAW and IUE-CWA attrition program for eligible IUOE Local 18S employees who are participants in the Delphi Hourly-Rate Employees Pension Plan, (ii) provision of a lump sum "buy-down" payment totaling $10,000 for eligible employees, and (iii) severance payments up to $40,000 to eligible employees who are permanently laid off prior to September 14, 2011;

- Certain terms of certain IUOE CBAs are modified with respect to wages, personal savings plans, Independence Week Pay, holidays, vacation accrual, GIS, job security and/or guaranteed employment levels, Plant Closing and Sale Moratorium, subsidized discount programs, tuition assistance, and representation;

- On a case-by-case basis, Delphi employees transferring from a Delphi plant to another Delphi plant may be eligible for a Relocation Allowance based on actual expenses incurred, up to a maximum of $10,000; and

- All employee, retiree, and union asserted and unasserted claims are settled (except for waiver of rights to vested pension benefits, workers compensation benefits, unemployment compensation benefits, and the right to pursue pending ordinary course grievance except for employees who have signed individual releases of claims).

(B)    Effective upon the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM and substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by this Court which incorporates, approves, and is consistent with all of the terms of the IUOE Local 18S Settlement Agreement and Delphi-GM settlement:

- Delphi's obligation to provide certain retiree welfare benefits is eliminated and GM is obligated to provide certain retiree welfare benefits for certain IUOE Local 18S-represented retirees and eligible employees covered as provided in the Term Sheet – Delphi Cessation and GM Provision of OPEB;

- Delphi's existing pension plan is frozen in certain respects effective upon emergence from chapter 11 for certain covered IUOE Local 18S-represented employees as provided in Section D.2 of the IUOE Local 18S Settlement Agreement;

- The Memorandum of Understanding (including certain IUOE CBAs) is assumed pursuant to 11 U.S.C. § 365;

- The IUOE Local 18S released parties are exculpated and released in connection with the IUOE Local 18S Memorandum of Understanding and Delphi's chapter 11 cases; and

- Delphi and GM receive releases from the IUOE Local 18S, all employees and former employees of Delphi represented or formerly represented by the IUOE Local 18S, and all persons or entities with claims derived from or related to any relationship with such employees of Delphi arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements or the IUOE Local 18S Memorandum of Understanding (except for claims for benefits provided for or explicitly not waived under the IUOE Local 18S Memorandum of Understanding, including, but not limited to, workers' compensation benefits and unemployment compensation benefits against Delphi, its subsidiaries, or affiliates that are otherwise assertable under applicable law).

30.    The IUOE Local 101S Settlement Agreement, among other subject matters, provides that:

(A)    Effective upon the entry of this Court's approval order in respect of the Motion:

- The International Union of Operating Engineers Local 101S ("IUOE Local 101S"), Delphi, and GM acknowledge that the Delphi Automotive Holdings Group – Olathe operations are closed, and that Delphi no longer employs any Olathe bargaining unit employees;

- The IUOE Local 101S Settlement Agreement terminates and supersedes the 2003 IUOE Local 101S – Delphi Agreements and all related agreements and understandings; and

- All employee, retiree, and union asserted and unasserted claims are settled (except for waiver of rights to vested pension benefits, workers compensation benefits, unemployment compensation benefits, and the right to pursue pending ordinary course grievance

21

except for employees who have signed individual releases of claims).

(B)    Effective upon the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM and substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by this Court which incorporates, approves, and is consistent with all of the terms of the IUOE Local 101S Settlement Agreement and Delphi-GM settlement:

- Delphi's obligation to provide certain retiree welfare benefits is eliminated and GM is obligated to provide certain retiree welfare benefits for certain IUOE Local 101S-represented retirees and eligible employees covered as provided in the Term Sheet – Delphi Cessation and GM Provision of OPEB;

- Delphi's existing pension plan is frozen in certain respects effective upon emergence from chapter 11 for certain covered IUOE Local 101S-represented employees as provided in Section C of the IUOE Local 101S Settlement Agreement;

- The Memorandum of Understanding (including certain IUOE agreements) is assumed pursuant to 11 U.S.C. § 365;

- The IUOE Local 101S  released parties are exculpated and released in connection with the IUOE Local 101S Memorandum of Understanding and Delphi's chapter 11 cases; and

- Delphi and GM receive releases from the IUOE Local 101S , all employees and former employees of Delphi represented or formerly represented by the IUOE Local 101S, and all persons or entities with claims derived from or related to any relationship with such employees of Delphi arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements or the IUOE Local 101S Memorandum of Understanding (except for claims for benefits provided for or explicitly not waived under the IUOE Local 101S Memorandum of Understanding, including, but not limited to, workers' compensation benefits and unemployment compensation benefits against Delphi, its subsidiaries, or affiliates that are otherwise assertable under applicable law).

31.    The IBEW E&S Settlement Agreement, among other subject matters,

provides that:

(A)    Effective upon the later of entry of this Court's approval order in respect of the Motion or the first Monday following receipt of written notice of ratification from the IBEW:

- The IBEW, Delphi, and GM acknowledge that the Delphi Electronics & Safety – Milwaukee operation is scheduled to be closed;

- The term of the 2003 IBEW – Delphi E&S Agreements and all related agreements and understandings are extended until September 14, 2011, subject to their termination provisions;

- A workforce transition program is implemented for eligible IBEW-represented employees that provides eligible employees with transformation plan options, including (i) attrition options similar to the previously-approved UAW and IUE-CWA attrition program for eligible IBEW employees who are participants in the Delphi Hourly-Rate Employees Pension Plan, (ii) provision of a lump sum "buy-down" payment totaling $10,000 for eligible employees, and (iii) severance payments up to $40,000 to eligible employees who are permanently laid off prior to September 14, 2011;

- Certain terms of the IBEW CBAs are modified with respect to wages, personal savings plans, Independence Week Pay, holidays, vacation accrual, Plant Closing and Sale Moratorium, GIS, job security and/or guaranteed employment levels, tuition assistance, subsidized discount programs, strikes, and stoppages; and

- All employee, retiree, and union asserted and unasserted claims are settled (except for waiver of rights to vested pension benefits, workers compensation benefits, unemployment compensation benefits, and the right to pursue pending ordinary course grievance except for employees who have signed individual releases of claims).

(B)    Effective upon the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM and substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by this Court which incorporates, approves, and is consistent with all of the terms of the IBEW E&S Settlement Agreement and Delphi-GM settlement:

- Delphi's obligation to provide certain retiree welfare benefits is eliminated and GM is obligated to provide certain retiree welfare benefits for certain IBEW-represented retirees and eligible employees covered as provided in the Term Sheet – Delphi Cessation and GM Provision of OPEB;

23

- Delphi's existing pension plan is frozen in certain respects effective upon emergence from chapter 11 for certain covered IBEW-represented employees as provided in Section D.2 of the IBEW E&S Settlement Agreement;

- The Memorandum of Understanding (including certain IBEW CBAs) is assumed pursuant to 11 U.S.C. § 365;

- The IBEW released parties are exculpated and released in connection with the IBEW E&S Memorandum of Understanding and Delphi's chapter 11 cases; and

- Delphi and GM receive releases from the IBEW, all employees and former employees of Delphi represented or formerly represented by the IBEW, and all persons or entities with claims derived from or related to any relationship with such employees of Delphi arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements or the IBEW E&S Memorandum of Understanding (except for claims for benefits provided for or explicitly not waived under the IBEW E&S Memorandum of Understanding, including, but not limited to, workers' compensation benefits and unemployment compensation benefits against Delphi, its subsidiaries, or affiliates that are otherwise assertable under applicable law).

32.    The IBEW Powertrain Settlement Agreement, among other subject

matters, provides that:

(A)    Effective upon the later of entry of this Court's approval order in respect of the Motion or the first Monday following receipt of written notice of ratification from the IBEW:

- The IBEW, Delphi, and GM acknowledge that the Delphi Powertrain – Milwaukee operation is scheduled to be closed;

- The term of the 2003 IBEW – Delphi Powertrain (formerly Delphi E&C) – Milwaukee Operations Agreements and all related agreements and understandings are extended until September 14, 2011, subject to their termination provisions;

- A workforce transition program is implemented for eligible IBEW-represented employees that provides eligible employees with transformation plan options, including (i) attrition options similar to the previously-approved UAW and IUE-CWA attrition program for eligible IBEW employees who are participants in the Delphi Hourly-Rate Employees Pension Plan, (ii) provision of a lump sum "buy-down" payment totaling $10,000 for eligible employees, and

24

(iii) severance payments up to $40,000 to eligible employees who are permanently laid off prior to September 14, 2011;

- Certain terms of the IBEW CBAs are modified with respect to wages, personal savings plans, Independence Week Pay, holidays, vacation accrual, Plant Closing Restrictions, GIS, job security and/or guaranteed employment levels, tuition assistance, subsidized discount programs, strikes, and stoppages; and

- All employee, retiree, and union asserted and unasserted claims are settled (except for waiver of rights to vested pension benefits, workers compensation benefits, unemployment compensation benefits, and the right to pursue pending ordinary course grievance except for employees who have signed individual releases of claims).

(B)    Effective upon the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM and substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by this Court which incorporates, approves, and is consistent with all of the terms of the IBEW Powertrain Settlement Agreement and Delphi-GM settlement:

- Delphi's obligation to provide certain retiree welfare benefits is eliminated and GM is obligated to provide certain retiree welfare benefits for certain IBEW-represented retirees and eligible employees covered as provided in the Term Sheet – Delphi Cessation and GM Provision of OPEB;

- Delphi's existing pension plan is frozen in certain respects effective upon emergence from chapter 11 for certain covered IBEW-represented employees as provided in Section D.2 of the IBEW Powertrain Settlement Agreement;

- The Memorandum of Understanding (including certain IBEW CBAs) is assumed pursuant to 11 U.S.C. § 365;

- The IBEW released parties are exculpated and released in connection with the IBEW Powertrain Memorandum of Understanding and Delphi's chapter 11 cases; and

- Delphi and GM receive releases from the IBEW, all employees and former employees of Delphi represented or formerly represented by the IBEW, and all persons or entities with claims derived from or related to any relationship with such employees of Delphi arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements or the

25

IBEW Powertrain Memorandum of Understanding (except for claims for benefits provided for or explicitly not waived under the IBEW Powertrain Memorandum of Understanding, including, but not limited to, workers' compensation benefits and unemployment compensation benefits against Delphi, its subsidiaries, or affiliates that are otherwise assertable under applicable law).

33.    The IAM Settlement Agreement, among other subject matters, provides that:

(A)    Effective upon the later of entry of this Court's approval order in respect of the Motion or the first Monday following receipt of written notice of ratification from the IAM:

- The IAM, Delphi, and GM acknowledge that the Delphi Electronics & Safety – Milwaukee operation is scheduled to be closed;

- The term of the 2003 IAM – Delphi Electronics & Safety – Milwaukee Operations Agreements and all related agreements and understandings are extended until September 14, 2011, subject to their termination provisions;

- A workforce transition program is implemented for eligible IAM-represented employees that provides eligible employees with transformation plan options, including (i) attrition options similar to the previously-approved UAW and IUE-CWA attrition program for eligible IAM employees who are participants in the Delphi Hourly-Rate Employees Pension Plan, (ii) provision of a lump sum "buy-down" payment totaling $10,000 for eligible employees, and (iii) severance payments up to $40,000 to eligible employees who are permanently laid off prior to September 14, 2011;

- Certain terms of the IAM CBAs are modified with respect to wages, personal savings plans, Independence Week Pay, holidays, vacation accrual, Plant Closing and Sale Moratorium, GIS, job security and/or guaranteed employment levels, tuition assistance, subsidized discount programs, strikes, and stoppages; and

- All employee, retiree, and union asserted and unasserted claims are settled (except for waiver of rights to vested pension benefits, workers compensation benefits, unemployment compensation benefits, and the right to pursue pending ordinary course grievance except for employees who have signed individual releases of claims).

(B)     Effective upon the execution by Delphi and GM of a comprehensive
settlement agreement resolving certain financial, commercial, and other
matters between Delphi and GM and substantial consummation of a plan
of reorganization proposed by Delphi in its chapter 11 cases and
confirmed by this Court which incorporates, approves, and is consistent
with all of the terms of the IAM Settlement Agreement and Delphi-GM
settlement:

- Delphi's obligation to provide certain retiree welfare benefits is
  eliminated and GM is obligated to provide certain retiree welfare
  benefits for certain IAM-represented retirees and eligible
  employees covered as provided in the Term Sheet – Delphi
  Cessation and GM Provision of OPEB;

- Delphi's existing pension plan is frozen in certain respects effective
  upon emergence from chapter 11 for certain covered IAM-
  represented employees as provided in Section D.2 of the IAM
  Settlement Agreement;

- The Memorandum of Understanding (including certain IAM CBAs)
  is assumed pursuant to 11 U.S.C. § 365;

- The IAM released parties are exculpated and released in
  connection with the IAM Memorandum of Understanding and
  Delphi's chapter 11 cases; and

- Delphi and GM receive releases from the IAM, all employees and
  former employees of Delphi represented or formerly represented
  by the IAM, and all persons or entities with claims derived from or
  related to any relationship with such employees of Delphi arising
  directly or indirectly from or in any way related to any obligations
  under the collective bargaining agreements or the IAM
  Memorandum of Understanding (except for claims for benefits
  provided for or explicitly not waived under the IAM Memorandum
  of Understanding, including, but not limited to, workers'
  compensation benefits and unemployment compensation benefits
  against Delphi, its subsidiaries, or affiliates that are otherwise
  assertable under applicable law).

34.     As set forth above, Delphi, GM, and the IUOE, IBEW, and IAM will

implement certain terms of the IUOE, IBEW, and IAM Settlement Agreements as of the

Effective Date (defined in the IUOE, IBEW, and IAM Settlement Agreements as the later of

entry of an order by the Court approving the IUOE, IBEW, and IAM Settlement Agreements that

27

is satisfactory to the parties (the "Approval Order") or the first Monday following receipt by

Delphi of written notice of ratification from the IUOE, IBEW, and IAM.[27]

        35.     The IUOE, IBEW, and IAM Settlement Agreements settle the 1113/1114

Motion as it pertains to the IUOE, IBEW, and IAM, enabling the Debtors to seek authority by

this Motion to withdraw, without prejudice, the 1113/1114 Motion with respect to the IUOE,

IBEW, and IAM.

G.      Agreement With GM Regarding Non-Represented Hourly Active Employees And
        Retirees Participating In Delphi's Health And Welfare Plans Presented For This Court's
        Approval On The Instant Motion

        36.     There are six current active employees and 23 current Delphi retirees who

are not represented by any of the Unions.  Historically, these non-represented hourly individuals

received substantially the same terms and conditions of employment, including retiree benefits,

as those Union-represented employees and retirees working at the same site.  These individuals

participate in the same health and welfare plans as Union-represented retirees at the respective

work sites.

        37.     This Motion also requests that the Court approve modification of retiree

welfare benefits for certain non-represented hourly active employees and retirees of the Debtors

pursuant to 11 U.S.C. § 363.  On July 23, 2007, Delphi and GM agreed to the treatment of these

non-represented hourly individuals, and on August 3, 2007, this agreement was formalized in

Non-Represented Term Sheet.  Upon the effective date of the Non-Represented Term Sheet, GM

will provide post-retirement medical benefits to certain of the non-represented hourly active

employees and retirees in accordance with all the ongoing terms, conditions and eligibility

requirements of the GM Health Care Program for Hourly Employees and GM will provide the

---

[27]    As noted above, the effective date of certain provisions of the IUOE, IBEW, and IAM Settlement Agreements
    is conditioned upon confirmation of the Debtors' reorganization plan and resolution of certain financial,
    commercial, and other issues between Delphi and GM.

applicable level of post retirement medical benefits consistent with the terms of the Modified

Plan, as defined in the settlement agreement approved by the court in the case IUE, et al. v.

General Motors Corporation (case number 2:06-cv-12151), on the same basis as such benefits

are provided to GM-IUE-CWA hourly employees who retired from GM with eligibility to

participate in the GM Health Care Program.  Further, at that time GM will provide all employer-

paid post-retirement Basic Life Insurance benefits to certain of the non-represented hourly active

employees and retirees in accordance with all the ongoing terms, conditions, and eligibility

requirements of the GM Life and Disability Benefits Program for Hourly Employees and at the

level provided for non-represented hourly retirees on the date immediately preceding the GM's

provision of such benefits, provided, however, GM will not be required to provide life insurance

benefits at a level and scope that exceeds that being provided for similarly situated IBEW or

IAM-represented hourly retirees of GM.  Delphi has in turn agreed to reimburse GM for the

actuarial present value of GM's actual liability with respect to the provision of OPEB to certain

of the non-represented hourly active employees and retirees.

38.     In addition, although it is under no obligation to provide such benefits,

Delphi may provide a future attrition program for its six non-represented hourly active

employees at the same IUE-CWA Packard Warren site offering substantially similar benefits to

those currently proposed to the IUE-CWA, patterned after the UAW SAP-T previously approved

by this Court.

Relief Requested

39.     By this Motion, the Debtors seek entry of an order under 11 U.S.C. §§

363, 1113, and 1114 of the Bankruptcy Code and Fed. R. Bankr. P. 6004 and 9019 approving (i)

the IUOE, IBEW, and IAM Settlement Agreements, (ii) withdrawal without prejudice of the

1113/1114 Motion solely as it pertains to the IUOE, IBEW, and IAM and approving the parties'

29

settlement of the 1113/1114 Motion solely as it pertains to the IUOE, IBEW, and IAM, (iii) modification of retiree welfare benefits for certain IUOE, IBEW, and IAM-represented retirees of the Debtors pursuant to the IUOE, IBEW, and IAM Settlement Agreements, and (iv) pursuant to 11 U.S.C. § 363, modification of retiree welfare benefits for certain non-represented hourly active employees and retirees of the Non-Represented Term Sheet.

<u>Basis For Relief</u>

40.    The IUOE, IBEW, and IAM Settlement Agreements require a court order approving the IUOE, IBEW, and IAM Settlement Agreements, which encompasses a settlement of the 1113/1114 Motion as it pertains to the IUOE, IBEW, and IAM. <u>See</u> IUOE Local 101S Settlement Agreement, Section E and other IUOE, IBEW, and IAM Settlement Agreements, Section F. Thus, as noted above and consistent with the terms and spirit of the IUOE, IBEW, and IAM Settlement Agreements, this Motion is brought under sections 363, 1113, and 1114 of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019.[28] Consistent with the spirit of these Settlement Agreements, this Motion also seeks approval for modification of retiree welfare benefits for certain non-represented hourly active employees and retirees of the Debtors.[29]

---

[28]    The Debtors do not concede through this Motion that the modifications to the IUOE, IBEW, and IAM CBAs contained in the IUOE, IBEW, and IAM Settlement Agreements require court approval either because such modifications are outside the ordinary course of business under section 363 or pursuant to sections 1113 or 1114 of the Bankruptcy Code. Out of an abundance of caution in connection with GM's unique role here and consistent with the terms of the IUOE, IBEW, and IAM Settlement Agreements, however, the Debtors are seeking this Court's approval of the IUOE, IBEW, and IAM Settlement Agreements. <u>See</u> <u>In re The Leslie Fay Cos.</u>, 168 B.R. 294, 303 (Bankr. S.D.N.Y. 1994) (debtors can enter into agreement modifying existing collective bargaining agreements postpetition without notice or hearing).

[29]    The Debtors do not concede through this Motion that the modifications of certain non-represented hourly active employees' and retirees' welfare benefits require court approval either because such modifications are outside the ordinary course of business under section 363 or pursuant to section 1114 of the Bankruptcy Code. Out of an abundance of caution in connection with GM's unique role here, however, the Debtors are seeking this Court's approval of such modifications under 11 U.S.C. § 363.

H.    Approval Of The IUOE, IBEW, and IAM Settlement Agreements And Modification Of
Retiree Welfare Benefits For Certain Non-Represented Hourly Active Employees And
Retirees Is Warranted Under Bankruptcy Code Section 363

41.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  Whether modifications to a collective bargaining agreement are ordinary-

course transactions under section 363 of the Bankruptcy Code or whether such modifications are

outside the ordinary course requiring approval under the Bankruptcy Code has generally been

determined on a case-by-case basis.  See In re N. Am. Royalties, Inc., 267 B.R. 587, 593 (Bankr.

E.D. Tenn. 2002) (collecting and comparing relevant authority).

42.    Use of estate property outside the ordinary course of business may be

authorized if the debtor demonstrates a sound business justification for it.  See Comm. Of Equity

Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business

judgment rule requires finding that good business reason exists to grant debtor's application

under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 178-179 (D.

Del. 1991).

43.    The Second Circuit has held that, although the bankruptcy court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming an "arbiter of disputes between

creditors and the estate."  Orion Pictures Corp. v. Showtime Network, Inc. (In re Orion Pictures

Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's consideration of a debtor's section

363(b) motion is a "summary proceeding," intended merely as a means "to efficiently review the

. . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate.  It

is not the time or place for prolonged discovery or a lengthy trial with disputed issues."  Id. at

1098-99.

44.    Once the debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992). Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." Id. To satisfy its burden, it is not enough for an objector simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections." Lionel Corp., 722 F.2d at 1071.

45.    As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

46.    The Debtors have demonstrably sound business reasons for entering into the IUOE, IBEW, and IAM Settlement Agreements at this time. The IUOE, IBEW, and IAM Settlement Agreements, which are the result of careful deliberations and extensive negotiations, include modifications to the IUOE, IBEW, and IAM CBAs that equitably address many of the Debtors' substantial financial, transformational, and labor relations roadblocks in a manner that will best serve the economic interests of the Debtors' estates and their stakeholders.

47.    First, once implemented, the modifications to the IUOE, IBEW, and IAM CBAs contemplated by the IUOE, IBEW, and IAM Settlement Agreements will generate a level of labor cost savings that will improve the Debtors' ability to emerge from chapter 11 successfully.

48.    Second, the IUOE, IBEW, and IAM Settlement Agreements provide the

Debtors with the flexibility necessary to transform their operations to compete as a supplier to

nearly every major global automotive original equipment manufacturer while furthering the

legitimate interests of Delphi's employees, retirees, and other stakeholders.  As evidenced by the

summaries provided above, the IUOE, IBEW, and IAM Settlement Agreements achieve

significant cost savings through wage reductions, work rule and operational changes, and buy-

outs and buy-downs that will enable Delphi to better meet its competitive challenges.

Accordingly, there is a sound business purpose for consummating the transactions contemplated

in the IUOE, IBEW, and IAM Settlement Agreements promptly.

49.    In the exercise of their business judgment, the Debtors believe that the

terms of the IUOE, IBEW, and IAM Settlement Agreements are reasonable based upon the

significant benefits that they will receive, as summarized above, as well as the potential harm to

the estates if the relief requested herein is not granted.[30]

50.    Similarly, the Debtors have demonstrably sound business reasons for

modifying the retiree welfare benefits of their non-represented hourly active employees and

retirees.  The modifications offered to such individuals are akin to those being offered to Delphi-

represented employees with respect to OPEB and an attrition option.   The terms of those

agreements are the product of extensive negotiations with Delphi's Unions and are consistent

with the pattern treatment that Delphi has historically afforded these non-represented hourly

---

[30]    For certain of the agreements in the IUOE, IBEW, and IAM Settlement Agreements to be implemented, the
Debtors' plan of reorganization must contain provisions consistent with the IUOE, IBEW, and IAM Settlement
Agreements and the confirmation order for such plan must provide for the assumption of the IUOE, IBEW, and
IAM Settlement Agreements and the agreements referenced in Attachment A thereto under section 365 of the
Bankruptcy Code.  Indeed, by their terms, the IUOE, IBEW, and IAM Settlement Agreements themselves do
not constitute an assumption of the IUOE, IBEW, and IAM CBAs.  See IUOE Local 101S Settlement
Agreement, Section E and the other IUOE, IBEW, and IAM Settlement Agreements, Section F.  It is relevant to
note that this undertaking by the Debtors constitutes a condition to the effectiveness of certain provisions rather
than a covenant by the Debtors that might impermissibly restrict the plan of reorganization that could be
prosecuted by them.

active employees and retirees. Cessation of Delphi's OPEB obligations for its represented
employees while maintaining those same benefit plans for the sole purpose of providing them to
a small group of non-represented hourly active employees and retirees is clearly not in the best
interests of the Debtors and their estates. Thus, the Debtors have determined in their business
judgment that the proposed modifications to retiree welfare benefits, and a potential
accompanying attrition program offered to the six current active non-represented hourly
employees, are in the best interest of the Debtors and their estates.

I.     Approval Of The IUOE, IBEW, and IAM Settlement Agreements Is Warranted Under
       Bankruptcy Rule 9019

       51.     Bankruptcy Rule 9019 provides, in relevant part, that "[o]n motion by the
trustee and after notice and a hearing, the court may approve a compromise or settlement."
Bankruptcy Rule 9019(a). Settlements and compromises are "a normal part of the process of
reorganization." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.
Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 308 U.S. 106,
130 (1939)); In re Adelphia Communications Corp., 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005)
(decision to accept or reject settlement lies within sound discretion of bankruptcy court), adhered
to on reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

       52.     In addition, Rule 9019 applies to settlements such as the IUOE, IBEW,
and IAM Settlement Agreements that modify (i) the terms of a collective bargaining agreement
pursuant to 11 U.S.C. § 1113 and (ii) retiree benefits pursuant to 11 U.S.C. § 1114. See Nellis v.
Shugrue, 165 B.R. 115, 116-17, 121 (S.D.N.Y. 1994) (applying Bankruptcy Rule 9019 to
approval of settlement under 11 U.S.C. § 1113); In re Tower Automotive, 241 F.R.D. 162, 170
(S.D.N.Y. 2006) (applying Bankruptcy Rule 9019 to approval of settlements and compromises

34

under 11 U.S.C. § 1114); see also In re GF Corp., 120 B.R. 421, 425 (Bankr. D. Ohio 1990)

(applying Bankruptcy Rule 9019 to settlement pursuant to 11 U.S.C. §§ 1113, 1114).[31]

       53.    Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate

when the compromise is fair and equitable and is in the best interests of the debtor's estate.  See,

e.g., TMT Trailer Ferry, 390 U.S. at 424; Adelphia, 327 B.R. at 159 ("The settlement need not be

the best that the debtor could have obtained.  Rather, the settlement must fall 'within the

reasonable range of litigation possibilities.'") (citations and internal quotations omitted); Nellis,

165 B.R. at 121 ("The obligation of the bankruptcy court is to determine whether a settlement is

in the best interest of an estate before approving it.")  In general, compromises in the bankruptcy

context should be approved unless they "'fall below the lowest point in the range of

reasonableness.'"  Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983)

(citation omitted).

       54.    The Supreme Court in TMT Trailer Ferry set forth the following factors

that courts should consider in determining whether a proposed settlement or compromise is in the

best interests of a debtor's estate:  (a) the probability of the debtor's success in the litigation, (b)

the difficulties associated with collection, (c) the complexity of the litigation and the attendant

expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors.

TMT Trailer Ferry, 390 U.S. at 424-25; see also Nellis, 165 B.R. at 122.

       55.    Courts in this district have further elaborated on the following relevant

factors: (a) the balance between the likelihood of plaintiffs' or defendants' success should the

---

[31]   No retiree committee was formed under section 1114 of the Bankruptcy Code in these cases because under the
Order (I) Appointing Unions As Authorized Representatives For Union Represented Retirees Under 11 U.S.C.
§§ 1114(c) And 1114(d) Or, In The Alternative, (II) Establishing Procedures For Solicitation, Nomination, And
Appointment Of Committee Of Retired Employees granted by this Court on October 13, 2005 (Docket No.
231), the IUOE, IBEW, and IAM (and the other Unions) elected to serve and have been acting as the authorized
representative for purposes of section 1114 of the Bankruptcy Code throughout these chapter 11 cases of the
Delphi retirees who were previously represented by the Unions as active employees.

case go to trial vis-à-vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures, (b) the prospect of complex and protracted litigation if the settlement is not approved, (c) the competency and experience of counsel who support the settlement, (d) the relative benefits to be received by individuals or groups within the class, and (e) the extent to which the settlement is truly the product of arm's-length bargaining, and not of fraud or collusion.  Adelphia, 327 B.R. at 159-60; accord In re Texaco Inc., 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

56.    The bankruptcy court need not determine that all of the foregoing criteria favor approval of a compromise, and the proposed compromise need not be the best agreement that the debtor could have achieved under the circumstances.  See Adelphia, 327 B.R. at 159-60; Nellis, 165 B.R. at 123.  Instead, the court's proper role is to familiarize itself with all the facts necessary for an intelligent and objective opinion, and determine whether the settlement is fair and equitable.  In re Best Products Co., Inc., 168 B.R. 35, 49-51 (Bankr. S.D.N.Y. 1994).  To that end, courts should not substitute their own judgment for that of the debtor, but rather should "'canvass the issues'" to affirm that the proposed settlement falls above "'the lowest point in the range of reasonableness.'"  Adelphia, 327 B.R. at 159 (quoting W.T. Grant Co., 699 F.2d at 608); accord Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd sub nom. Sobchack v. Am. Nat'l Bank & Trust Co., 17 F.3d 600 (2d Cir. 1994); In re Best Products Co., 168 B.R. at 49-51.

57.    Because the IUOE, IBEW, and IAM Settlement Agreements are a resolution or settlement of the issues raised in the 1113/1114 Motion as it pertains to the IUOE, IBEW, and IAM, they should be approved under Bankruptcy Rule 9019(a) because their terms are fair and equitable, fall well within the range of reasonableness, and are in the best interests of the Debtors, their estates, their creditors, and their stakeholders.  Most significantly, the IUOE,

36

IBEW, and IAM Settlement Agreements clarify and provide certainty regarding the manner in which Delphi's labor, pension, and OPEB issues with the IUOE, IBEW, and IAM will be resolved.

58.    Moreover, the Court is not required to find that the terms of the settlements are the most favorable that the Debtors could have obtained in order to approve the IUOE, IBEW, and IAM Settlement Agreements.  In re W.T. Grant Co., 699 F.2d at 608 (noting that court is only required to "see whether the settlement falls below the lowest point in the range of reasonableness") (citation omitted); Nellis, 165 B.R. at 123; In re Best Products Co., Inc., 168 B.R. at 49-51.

59.    As recognized by this Court on various occasions, a consensual resolution to the Debtors' need to reduce labor costs is in the best interests of the Debtors' estates.  See, e.g., May 12, 2006 Hearing Transcript at pp. 201-02 (noting that representatives of Delphi and Unions, rather than Court, are the most important in an 1113/1114 proceeding, and urging parties to reach good-faith agreement).  Consensual agreements are recognized generally as a normal part of the reorganization process and as beneficial to the estate in part because of the inevitable reduction in administrative costs and other burdens associated with protracted litigation.  This is especially the case here, in light of the many employees and retirees who would be affected by the non-consensual modifications proposed in the 1113/1114 Motion, should that motion ultimately be granted by the Court.  See, e.g., TMT Trailer Ferry, Inc., 390 U.S. at 424 ("[c]ompromises are a normal part of the process of reorganization."); Nellis, 165 B.R. at 123 (stating "the general rule that settlements are favored and, in fact, encouraged by the bankruptcy approval process").

37

J.    Section 1114 Of The Bankruptcy Code Is Inapplicable To The Proposed Modification To Retiree Welfare Benefits Of Delphi's Non-Represented Hourly Active Employees And Retirees

60.    The Debtors believe that the procedures outlined in section 1114(d) of the Bankruptcy Code are inapplicable to the modifications to retiree welfare benefits of its non-represented hourly active employees and retirees proposed here.  Section 1114(d) provides that:

> The court, upon a motion by any party in interest, and after notice and a hearing, shall appoint a committee of retired employees if the debtor seeks to modify or not pay the retiree benefits or if the court otherwise determines that it is appropriate, to serve as the authorized representative, under this section, of those persons receiving any retiree benefits not covered by a collective bargaining agreement.

Section 1114(a) defines "retiree benefits" as:

> payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title.

11 U.S.C. § 1114(a).

61.    Where the terms of a plan unambiguously state that benefits can be modified or terminated at any time, the modification procedure provided in section 1114(d) of the Bankruptcy Code is not applicable, and a debtor may modify or terminate benefits without any obligation to comply with such section.  See In re Doskocil Cos., 130 B.R. 870 (Bankr. D. Kan. 1991) (where debtor has no legal obligation under ERISA to refrain from modifying or terminating future benefits, bankruptcy court is not required to appoint section 1114(d) committee). See also CF & I Steel Corp. v. Conners (In re CF & I Fabricators of Utah Inc.), 163 B.R. 858,874 (Bankr. C.D. Utah 1994) (section 1114 does not protect retiree benefits beyond contractual obligations of debtors); In re Federated Dept. Stores, Inc., 132 B.R. 572, 574 (Bankr. S.D. Ohio 1991) (section 1129(a)(13) creates no new substantive rights to benefits for pre-

petition retirees; expiration of old contract rights makes modification process of section 1114 inapplicable).  But see  In re Farmland Indus., Inc., 294 B.R. 903 (Bankr. W.D. Mo. 2003) (holding that § 1114 prohibits debtor from terminating or modifying any retiree benefits during chapter 11 case unless debtor complies with section 1114, regardless of whether debtor has prepetition non-bankruptcy right to unilaterally terminate or modify benefits).

      62.     Delphi has the right to modify OPEB unilaterally under the terms of its benefit plans with respect to the non-represented hourly active employees and retirees.  As set forth in Doskocil, there is no provision of section 1114 indicating that Congress intended section 1114 to apply to benefit plans that are terminable by their own terms.  In Doskocil, the court, relying on precedent from the Southern District of New York and citing the legislative history of section 1114, held that section 1114 applies only in situations where a debtor has a continuing legal obligation to pay retiree benefits.  Doskocil, 130 B.R. at 875, citing In re Chateaugay Corp., 111 B.R. 399 (S.D.N.Y. 1990).  "Congress intended to focus primarily on the modification of [a] debtor's legal obligations to retirees as opposed to creating for the debtor some new obligation not already imposed by the terms of the retiree benefit plan." Doskocil, 130 B.R. at 876.

      63.     Because the terms of Delphi's retiree health and welfare plans with respect to its non-represented hourly active employees and retirees provide that they may be amended or terminated at any time, the Debtors are under no contractual obligation to refrain from effectuating the proposed modifications.   Therefore, section 1114 of the Bankruptcy Code does not apply to the Debtors' proposed OPEB modifications with respect to its non-represented hourly active employees and retirees, and the non-represented hourly active employees and retirees have no right to be represented by a statutory committee, the appointment of which would be an administrative expense to the Debtors' estates and which could delay the Debtors' efforts to emerge from chapter 11.

Notice Of Motion

64.     Notice of this Motion has been provided in accordance with the Amended

Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m),

9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case

Management, And Administrative Procedures, entered by this Court on October 26, 2006

(Docket No. 5418), and the Supplemental Order Under 11 U.S.C. Sections 102(1) And 105 And

Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And

Certain Notice, Case Management, And Administrative Procedures (Docket No. 2883).  The

Debtors have also provided the informational notice of this Motion, a copy of which is attached

hereto as Exhibit 1, as a courtesy to all of the IUOE, IBEW, and IAM-represented employees

and IUOE, IBEW, and IAM-represented retirees and non-represented hourly active employees

and retirees affected by this Motion.  In light of the relief requested, the Debtors submit that no

other or further notice is necessary.

Memorandum Of Law

65.     Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of service and filing of

a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.


WHEREFORE the Debtors respectfully request that the Court enter an

order pursuant to 11 U.S.C. §§ 363, 1113, and 1114 of the Bankruptcy Code and Fed. R. Bankr.

P. 6004 and 9019 (i) approving the IUOE, IBEW, and IAM Settlement Agreements, (ii)

authorizing the withdrawal without prejudice of the Debtors' 1113/1114 Motion solely as it

pertains to the IUOE, IBEW, and IAM and approving the parties' settlement of the 1113/1114

40

Motion solely as it pertains to the IUOE, IBEW, and IAM, (iii) authorizing the Debtors'

modification of retiree welfare benefits for certain IUOE, IBEW, and IAM-represented retirees,

(iv) pursuant to 11 U.S.C. § 363, authorizing the Debtors' modification of retiree welfare benefits

for certain non-represented hourly active employees and retirees and approval of the Non-

Represented Term Sheet, and (v) granting the Debtors such other and further relief as is just.

Dated:    New York, New York
          August 6, 2007

                              SKADDEN, ARPS, SLATE, MEAGHER
                               & FLOM LLP

                    By:    /s/ John Wm. Butler, Jr.
                           John Wm. Butler, Jr. (JB 4711)
                           John K. Lyons (JL 4951)
                           Ron E. Meisler (RM 3026)
                           333 West Wacker Drive, Suite 2100
                           Chicago, Illinois 60606
                           (312) 407-0700

                               - and -

                    By:    /s/ Kayalyn A. Marafioti
                           Kayalyn A. Marafioti (KM 9632)
                           Thomas J. Matz (TM 5986)
                           Four Times Square
                           New York, New York 10036
                           (212) 735-3000

                               - and-

                    O'MELVENY & MYERS LLP

                    By:    /s/ Tom A. Jerman
                           Tom A. Jerman (TJ 1129)
                           Jessica Kastin (JK 2288)
                           1625 Eye Street, NW
                           Washington, DC 20006
                           (202) 383-5300

                    Attorneys for Delphi Corporation, et al.,
                     Debtors and Debtors-in-Possession