# Exhibit 4

OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.
230 Park Avenue
New York, New York 10169
Stanley L. Lane, Jr. (SL 8400)
Jenette A. Barrow-Bosshart (JB 5117)

Hearing Date and Time:
August 16, 2007 at 10:00 a.m.

Response Date and Time:
August 9, 2007 at 4:00 p.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x

In re:

    Delphi Corporation, et al.,

                Debtors.

    :  Chapter 11

    :  Case No. 05-44481 (RDD)
    :  (Jointly Administered)

    :  AFFIDAVIT OF THOMAS
    :  D. CASEY IN RESPONSE
    :  TO DEBTOR'S NINTH
    :  OMNIBUS OBJECTION

-------------------------------------------------- x

STATE OF NEW YORK   )
                      ) ss.:
COUNTY OF NEW YORK )

THOMAS D. CASEY, being duly sworn, deposes and says:

    1.    I am the Market Credit Manager of claimant Milliken & Company ("Milliken") primarily responsible for overseeing the collection of the outstanding indebtedness owed Milliken by the Debtors and Debtors-in-possession arising from their pre-petition and post-petition purchases of various styles of airbag cushions and covers from Milliken. I am fully familiar with the facts set forth herein, and make this affidavit in response and opposition to that portion of the Debtors' Nineteenth Omnibus Objection ( "Debtors' Objection") that seeks, without reason or justification, to reduce the aggregate

amount of Milliken's filed Proof of Claim by $296,373.83, from $1,190,981.30 to $894,607.47.[1]

2.      While the Debtors have offered no support or explanation for the bulk of the $296,373.83 claim reduction they are seeking, the Debtors have taken issue with the prices charged by Milliken in connection with the sales represented by fifty (50) of the 135 invoices listed on the open receivables schedule annexed to Milliken's filed Proof of Claim.  Specifically, the Debtors notified Milliken prior to the filing of the Debtors' Objection, that the Debtors' believed that these 50 invoices "contain variances with quantity and/or price unit costs" amounting to $24,525.15.  Accordingly, the Debtors requested that Milliken furnish copies of the Debtors' purchase orders (each a "PO") for these sales to permit the reconciliation of these alleged price or quantity variances.

3.      After receiving notice of the variances claimed by the Debtors, I (together with Milliken's counsel), undertook to review all 50 of the allegedly discrepant invoices identified by the Debtors.  These included invoices issued under the name of Milliken & Co, and also under the name of the American Bag Corporation, the Milliken entity under which Milliken continues to invoice all of its North American sales of airbag cushions.  The results of our effort to reconcile the $24,525.15 amount of the pricing discrepancy claimed by the Debtors is reflected on Exhibit 5 to Milliken's Response.

4.      What I discovered in reviewing the 50 invoices listed on Exhibit 5 is that each of these 50 sales was made in accordance with delivery requests Milliken received from the Debtors under a "Requirements Contract" entered into between Milliken and

---

[1] As pointed out in Milliken's Response, it does appear that an arithmetic error (which may have escaped the Debtors' attention, as well as Milliken's) occurred in the preparation of Milliken's Proof of Claim, and that the amount of Milliken's claim, as originally filed, is *overstated* by $34,354.65.  Milliken has no objection to its Claim being adjusted to correct this arithmetic error.

debtor Delphi Automotive Systems, Inc. ("DAS") that was confirmed on a Delphi form

dated November 15, 2004 prepared under the name of "Delphi Electronics and Safety"

and designated as "PO Number 550063123" (a copy of which is annexed hereto as

Exhibit A). This is the same Delphi PO Number referenced on each of the 50 price

discrepancy invoices.

5.     Under the Delphi form that confirmed the November 15, 2004

Requirements Contract, *which form Milliken NEVER signed*, the unit prices for the

various listed styles of airbag cushions and woven covers were quoted per 1,000 units,

and were to adjust down effective August 1, 2005, and then again on August 1 2006. So,

for example, the applicable price through July 31, 2005 for Milliken's style 16898247 (a

so-called "life curtain") was initially set at $16,240.00 @ 1,000 (*i.e.*, $16.24 @ piece)

with a price reduction to $15,830.00 @ 1,000 (*i.e.*, $15.83 @ piece) to go into effect on

August 1, 2005. The price discrepancy claimed by the Debtors arises because all 50 of

questioned invoices were issued *after* August 1, 2005, but reflected billings at the pre-

August 1, 2005 per unit prices.

6.     The only problem with the Debtors' analysis is that the scheduled price

reductions were never agreed to by Milliken *and never took effect!* The fact is that

Milliken and the Debtors had several discussions in July 2005 concerning Milliken's

unwillingness to implement the price reductions that the Debtors wanted. This was

confirmed in various correspondence (annexed hereto collectively as Exhibit B),

including a letter dated July 21, 2005 from Milliken's Kip Johnson to Tom Nevius at

DAS that stated unambiguously that "*our current product prices will be kept intact due to*

*the cost increases we have incurred.*" In fact, when the Debtors tried again to negotiate

down the unit prices for these items later in the fall, Milliken made it plain that it would

not ship at the reduced prices. The Debtors may not have liked it, but they ultimately

capitulated in order to continue receiving product. The fact is that right through the time

of the Debtors' filing in October 2005, Milliken continued to transact business with the

Debtors at the pre-August 1, 2005. Indeed, those prices have never been reduced and the

same goods have continued to be sold by Milliken (and paid for by the Debtors) since

their bankruptcy filings at the pre-August 1, 2005 prices, *or higher*. Accordingly,

Milliken is entitled to have its claim allowed for the full invoice price of the products it

sold and delivered, and the $24,525.15 claim reduction sought by the Debtors in respect

of the 50 price variance invoices should be denied.

7.    The only other basis for any portion of the claim reduction sought in

Debtors' Objection is the alleged absence of proofs of delivery with respect to 21

additional Milliken and American Bag Corporation invoices totaling $62,065.23. In the

first place, Milliken has located and is providing with its Response copies of the Proofs of

Delivery for 7 of the 21 invoices questioned by Debtors. These 7 invoices (the Proofs of

Delivery for which are annexed collectively as Exhibit 6 to Milliken's Response) total

$32,757.32. Therefore, the actual amount of Milliken's claim that is subject to dispute

based upon missing Proofs of Delivery is only $29,307.91. (The 14 invoices representing

this amount are scheduled and annexed to Milliken's Response as Exhibit 7.)

8.    Of the 14 invoices included in Exhibit 7, six (totaling $15,678) relate to

the Debtors' purchases from Milliken of different styles of laser cut One Piece Woven

(OPW) airbag curtains. This particular product was woven and silicone coated by

Milliken in LaGrange Georgia, and then transported by Milliken to its plant in Winfield

Tennessee for laser cutting into the individual cushions that were then sold and shipped to the Debtors. Milliken, however, ceased all operations its Winfield Tennessee facility in March, 2004. As a result of the closure of that facility, the Proofs of Delivery for these shipments are simply no longer available to Milliken.

9.      Although the Proofs of Delivery can no longer be obtained, I do note that the Debtors' "Excel" spreadsheet identifying the various invoices for which Proofs of delivery are missing (Response, Exhibit 3) lists Bill of Lading ("B/L") numbers for each of these shipments that do not appear on the faces of the invoices themselves. Therefore, the Debtors must have had records of the B/L numbers for these shipments which they no doubt obtained upon their receipt of these goods.[2]    These goods were shipped by Milliken in 2004, and Milliken's invoices were received and accepted without objection. Since the Debtors have never claimed that they did not receive these goods, there is no justification for not allowing Milliken's claim for these invoices in full, notwithstanding Milliken's inability now -- almost three years after the fact -- to locate copies of the proofs of delivery.

10.      Finally, as addressed in Milliken's Response, the net amount of Milliken's filed Proof of Claim was arrived at after applying against Milliken's outstanding pre-petition receivables balance the sum of $916,717.20 (out of a total of $1,092,146) that Milliken received from the Debtors by wire transfer just prior to their bankruptcy filing. I was directly involved in the discussions that led to Milliken's receipt of these funds as a

---

[2] For the sake of completeness, I note that the first of the invoices for which the Debtors requested Proof of Delivery was not actually a shipping invoice at all. Invoice No. 040661 in the face amount of $6,581.79, was actually a credit adjustment invoice which reflects the reversal of certain merchandise credits previously issued by Milliken in error. Of this amount, the portion of the reversed credit not already applied (and paid by the Debtors) is only $427.14 (which is the amount for which the credit adjustment invoice was scheduled on Milliken's Proof of Claim).

condition of its agreeing to continue selling goods to the Debtors.

11.    In this regard, in early October 2005, when rumors of the Debtors
financial problems were rampant, Milliken became reluctant to continue shipments other
than on a "cash before delivery" basis. To allay Milliken's concerns and induce Milliken
to make new sales, the Debtors agreed to post roughly $1,000,000 in cash collateral with
Milliken to be applied and replenished as new sales were made. What the Debtors did
not disclose as those discussions were being finalized was that the Debtors intended
almost immediately to file for bankruptcy, thereby potentially subjecting Milliken's "cash
collateral" to avoidance and recovery as a pre-petition preferential payment.

12.    In fact, the Debtors filed their petitions less than 24 hours following
Milliken's receipt of the agreed "cash collateral" payment of $1,092,146, which was
intended as contemporaneous payment for Milliken's early October shipments and the
$916,717.20 balance of which was to be held as cash collateral for future sales (subject to
being "topped off" to a full $1,000,000).    When the Debtors filed for bankruptcy,
however, Milliken's preference fears were realized and Milliken refused to treat the
$916,717.20 surplus amount as cash collateral for future shipments.  Instead, Milliken
applied the $916,717.20 against the sum total of its then outstanding pre-petition
receivables and demanded that the Debtors furnish additional cash collateral before
Milliken would agree to ship any goods post-petition.

13.    The Debtors ultimately agreed to provide Milliken with replacement "cash
collateral" to support their post-petition purchases, and since that time Milliken has
gradually reduced its cash collateral requirements for its ongoing business with the
Debtors.  The Debtors have, however, from time to time, objected to Milliken's prior

application of the $916,717.20 from the Debtors' "eve of filing" payment to its then outstanding pre-petition receivables. At one point, the Debtors even tried to take a unilateral credit against their new purchases for this amount.

14.    Milliken is prepared at this time to grant such a credit, provided that Milliken is allowed to increase is filed claim to compensate for the reversal of its prior application of the $916,717.20 in reduction of its unpaid pre-petition receivables balance. Thus, Milliken would grant the Debtors an immediate $916,717.20 credit against all amounts due (or to become due) for Debtors' pre-petition purchase, and Milliken's claim in the Debtors' Chapter 11 case would be allowed in the increased amount of **$2,073,343.85**, consisting of Milliken's original claim amount of $1,190,981.30 *minus* a $34,354.65 adjustment on account of Milliken's arithmetic error (discussed in footnote 1 above) *plus* $916,717.20 on account of Milliken's re-application of the Debtors' eve-of-filing payment.

_____
                                          Thomas D. Casey

Sworn to before me this
9th day of August, 2007

_____
NOTARY PUBLIC

            MARY F. BOHUN
    Notary Public, State of New York
          No. 01BO6018364
    - Qualified in Westchester County
    Commission Expires Jan. 11, 20 11

862868.1                              - 7 -

# Exhibit A

JUN. 12. 2007  7:49AM                                              NO. 507   P. 1

# DELPHI

_____Delphi Electronics and Safety

Page 1 of 5

---

**Buyer:**
DELPHI
ELECTRONICS & SAFETY
P.O. Box 9005
KOKOMO IN 46904-9005

| **Requirements Contract** | |
|---|---|
| PO Number | Date Issued |
| 550063123 | 15-Nov-2004 |
| Version | |
| 15-Jul-2005 11:05:06 | |

**Deliver to:**
Delphi E&S Rimir
LIDC Receiving Warehouse
702 Joaquin Cavazos Rd
LOS INDIOS TX 78567

MILLIKEN & CO
1300 4TH AVE
LA GRANGE GA 30240

| Vendor No: 1008707 | |
|---|---|
| DUNS No: 628068405 | |
| **Payment Terms:** ZMN2 | **Currency:** USD |
| Payment settled on 2nd, 2nd Month | |
| **Incoterms:** FOB- Freight Collect | |

---

| Item No. | Material No. Description | | Plant | | | |
|---|---|---|---|---|---|---|
| 00080 | 16869875 CUSHION - RRAB | | DARY Delphi E&S Rimir | | | |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 08-Oct-2004 | 31-Jul-2005 | USD | 15,050.00 | 1,000 | PC |
| 01-Aug-2005 | 31-Jul-2006 | USD | 14,600.00 | 1,000 | PC |
| 01-Aug-2006 | 31-Jul-2007 | USD | 14,270.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

| Item No. | Material No. Description | | Plant | | | |
|---|---|---|---|---|---|---|
| 00160 | 16870417 CUSHION - WOVEN | | DARY Delphi E&S Rimir | | | |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 01-Apr-2005 | 31-Jul-2006 | USD | 12,300.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

| Item No. | Material No. Description | | Plant | | | |
|---|---|---|---|---|---|---|
| 00090 | 16871654 CUSHION - WOVEN | | DARY Delphi E&S Rimir | | | |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 08-Oct-2004 | 31-Jul-2005 | USD | 12,300.00 | 1,000 | PC |

---

Purchasing Contact: Nevius, T (elec)
Phone: 937-356-2534
Fax: 937-356-2550

Contact Address:
Delphi Electronics & Safety
250 Northwoods Blvd,
VANDALIA OH 45377

Date and Time Printed: 15-Jul-2005 11:05:06

JUN. 12. 2007  7:49AM                                                          NO. 507   P. 2

# DELPHI ────────────────────────────

_Delphi Electronics and Safety_

Page 2 of 5

MILLIKEN & CO
1300 4TH AVE
LA GRANGE GA 30240

## Requirements Contract

| PO Number | Date Issued |
|---|---|
| 550063123 | 15-Nov-2004 |
| Version | |
| 15-Jul-2005 11:05:06 | |

| Item No. | Material No. Description | Plant | | | |
|---|---|---|---|---|---|

| | Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|---|
| | 01-Aug-2005 | 31-Jul-2006 | USD | 11,980.00 | 1,000 | PC |
| | 01-Aug-2006 | 31-Jul-2007 | USD | 11,680.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.
00100    16898247
PANEL-MAIN-360                                    DARY Delphi E&S Rimir

| | Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|---|
| | 08-Oct-2004 | 31-Jul-2005 | USD | 16,240.00 | 1,000 | PC |
| | 01-Aug-2005 | 31-Jul-2006 | USD | 15,830.00 | 1,000 | PC |
| | 01-Aug-2006 | 31-Jul-2007 | USD | 15,440.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.
00110    16898248
PANEL-MAIN (GMT305/370)                          DARY Delphi E&S Rimir

| | Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|---|
| | 08-Oct-2004 | 31-Jul-2005 | USD | 16,640.00 | 1,000 | PC |
| | 01-Aug-2005 | 31-Jul-2006 | USD | 16,220.00 | 1,000 | PC |
| | 01-Aug-2006 | 31-Jul-2007 | USD | 15,820.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.
00150    16899037
CUSHION - WOVEN                                   DARY Delphi E&S Rimir

| | Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|---|
| | 01-Nov-2004 | 31-Jul-2006 | USD | 15,810.00 | 1,000 | PC |
| | 01-Aug-2006 | 31-Jul-2007 | USD | 15,330.00 | 1,000 | PC |
| | 01-Aug-2007 | 31-Jul-2011 | USD | 14,860.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.
00050    M0101384
CLOTH, 630d 39X39, Uncoated                       DARY Delphi E&S Rimir

| | Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|---|
| | 29-Jun-2004 | 31-Jul-2004 | USD | 3,550.00 | 1,000 | LY |
| | 01-Aug-2004 | 31-Jul-2005 | USD | 3,460.00 | 1,000 | LY |
| | 01-Aug-2005 | 31-Jul-2006 | USD | 3,360.00 | 1,000 | LY |
| | 01-Aug-2006 | 31-Jul-2007 | USD | 3,260.00 | 1,000 | LY |

This Requirement Contract is for 100% unless otherwise specified.
00020    M101281
FABRIC 630D NYLON                                 DARY Delphi E&S Rimir

| | Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|---|
| | 29-Jun-2004 | 31-Jul-2004 | USD | 3,610.00 | 1,000 | LY |
| | 01-Aug-2004 | 31-Jul-2005 | USD | 3,550.00 | 1,000 | LY |
| | 01-Aug-2005 | 31-Jul-2006 | USD | 3,490.00 | 1,000 | LY |

This Requirement Contract is for 100% unless otherwise specified.
00030    M101285
FABRIC 420D SILICON                               DARY Delphi E&S Rimir

# DELPHI

Delphi Electronics and Safety

Page 3 of 5

| MILLIKEN & CO<br>1300 4TH AVE<br>LA GRANGE GA 30240 | **Requirements Contract** |
|---|---|
| | PO Number: 550063123       Date Issued: 15-Nov-2004<br>Version<br>15-Jul-2005  11:05:06 |

| Item No. | Material No.<br>Description | Plant |
|---|---|---|

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 29-Jun-2004 | 31-Jul-2004 | USD | 4,000.00 | 1,000 | LY |
| 01-Aug-2004 | 31-Jul-2005 | USD | 3,880.00 | 1,000 | LY |
| 01-Aug-2005 | 31-Jul-2006 | USD | 3,760.00 | 1,000 | LY |
| 01-Aug-2006 | 31-Jul-2007 | USD | 3,570.00 | 1,000 | LY |
| 01-Aug-2007 | 31-Jul-2008 | USD | 3,460.00 | 1,000 | LY |
| 01-Aug-2008 | 31-Jul-2009 | USD | 3,380.00 | 1,000 | LY |
| 01-Aug-2009 | 31-Jul-2010 | USD | 3,290.00 | 1,000 | LY |

This Requirement Contract is for 100% unless otherwise specified.

**00040**  M101329                          DARY Delphi E&S Rimir
**FABRIC 315 DENIER SILICON COATED**

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 01-Aug-2003 | 31-Jul-2006 | USD | 4,840.00 | 1,000 | LY |

This Requirement Contract is for 100% unless otherwise specified.

**00060**  M101411                          DARY Delphi E&S Rimir
**FABRIC 420D MICROPERM**

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 29-Jun-2004 | 31-Jul-2004 | USD | 4,320.00 | 1,000 | LY |
| 01-Aug-2004 | 31-Jul-2005 | USD | 4,190.00 | 1,000 | LY |
| 01-Aug-2005 | 31-Jul-2006 | USD | 4,060.00 | 1,000 | LY |
| 01-Aug-2006 | 31-Jul-2007 | USD | 3,940.00 | 1,000 | LY |

This Requirement Contract is for 100% unless otherwise specified.

**00070**  M101454                          DARY Delphi E&S Rimir
**630 DENIER UNCOATED**

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 01-Aug-2003 | 31-Jul-2006 | USD | 4,300.00 | 1,000 | LY |

This Requirement Contract is for 100% unless otherwise specified.

**00130**  M101573                          DARY Delphi E&S Rimir
**M101573-CLOTH (630D,38x38 SiCt)**

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 16-Oct-2004 | 31-Jul-2006 | USD | 4,920.00 | 1,000 | LY |

This Requirement Contract is for 100% unless otherwise specified.

Notes:
This Contract replaces previous contract # 550056779.
*****************

**********************************************************************************
Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the
Delphi website www.delphi.com, (by clicking on the "Suppliers" in the header).

JUN. 12. 2007  7:50AM                                                                    NO. 507    P. 4

# DELPHI

Delphi Electronics and Safety

Page 4 of 5

| | |
|---|---|
| MILLIKEN & CO<br>1300 4TH AVE<br>LA GRANGE GA 30240 | |

## Requirements Contract

| PO Number | Date Issued |
|---|---|
| 550063123 | 15-Nov-2004 |
| Version | |
| 15-Jul-2005 11:05:06 | |

| Item No. | Material No.<br>Description | Plant |
|---|---|---|
| | | |

**Notes Continued:**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Restricted, toxic and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the saleable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Seller acknowledges and agrees that Buyer's General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as the "Contract"). A copy of Buyer's General Terms and Conditions is available upon written request to Buyer or via the internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including any such proposals in writing) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Material Pull System Terms and Conditions:
1. Delphi requires 100% on time delivery performance from suppliers.

# DELPHI

Delphi Electronics and Safety

Page  5  of 5

| | |
|---|---|
| MILLIKEN & CO<br>1300 4TH AVE<br>LA GRANGE GA 30240 | **Requirements Contract**<br><br>PO Number                    Date Issued<br>550063123                    15-Nov-2004<br>Version<br>15-Jul-2005  11:05:06 |

| Item No. | Material No.<br>Description | Plant |
|---|---|---|
| | | |

**Notes Continued:**

2. Quantities or weights required against this order will in all cases be as buyer's current material delivery schedule. This order does not give any commitment to quantities, weights or materials except as shown by buyer's material delivery schedule and described below.

3. Delivery Schedules: The buyer shall transmit to the seller a delivery schedule Kanban DELJIT (Pull Signal) from time to time by electronic means that is specified by the Buyer. The Pull Signal shall Specify quantity, and time that delivery of the goods shall be made from the Seller to the Buyer. The buyer shall not be required to make payment for goods delivered to Buyer which are in excess of the quantity specified in the Buyer's Pull Signal.

4. Material Commitment Authorization: The Buyer agrees to purchase from the Seller a specific amount of goods (Hereafter referred to as "The Committed Quantity") listed on the Buyer's forecast delivery schedule. The committed quantity shall be measured on the Forecast as a total quantity over the period of time between the most recent planning week and twelve (4) consecutive, subsequent weeks, inclusive. The Buyer reserves the right to update and change the forecast delivery schedule from time to time. The Seller agrees that no more than four (2) weeks of the committed quantity shall be processed into a finished state that is ready for delivery to the Buyer unless otherwise approved by the Buyer in writing. The balance of the committed material is to be work in process valued at no more than fifty percent (50%) of the purchase price.

**************************

# Exhibit B

Global Airbag Products
Milliken Automotive

Mr. Tom Nevius                                                      July 21, 2005
Delphi Safety Systems
250 Northwoods Blvd.
Vandalia, OH. 45377

Dear Tom,

Thank you for your time today to discuss Milliken's cost reduction efforts with Delphi. Since the communication of your Enterprise Wide Material Attack on Costs (EMAC) initiative in January, Milliken has embraced the EMAC approach to mutually work together to design cost out of our products and processes. Our initial suggestions were provided within weeks of this meeting for both our OPW curtain airbag and flat airbag fabric products. We have since entertained an EMAC team at our weaving and finishing manufacturing facilities to further brainstorm and implement additional cost reduction suggestions. I have attached a copy of our team meeting notes provided by Mr. Bob Forsterling, EMAC Supplier Suggestion Engineer, which outlines our efforts.

Delphi acknowledged that they recognize the effect of raw material and fuel cost increases throughout their supply chain during the January meeting, and that the mutual effort of true cost reduction was a necessity that led to the EMAC initiative. Mr. Dave Nelson stated that cost reduction through EMAC, as opposed to annual price downs, were the future of Delphi as they address Delphi's raw material costs and can provide even greater savings . We have provided communications to Delphi from our raw material suppliers which outline the multiple price increases Milliken has incurred in the last twelve months, and the global demand for the nylon intermediate chemicals suggests that this will continue to be a concern. We expect that our current product prices will be kept intact due to the cost increases we have incurred, and that the cost reductions identified by our EMAC suggestions will continue to be provided to Delphi immediately upon their implementation.

Thank you for your guidance and assistance with implementing those cost reduction projects already in place, and for continuing to help us on those still in process. Bob Forsterling has agreed to continue to assist in bringing these projects to completion, and he has scheduled a teleconference with us and appropriate Delphi engineers for July 28 for our next review. Please let us know if any additional information is needed.

Best regards,
Kip Johnson



"robert.b.forsterling"
<robert.b.forsterling@delphi.c
om>

07/18/2005 11:48 AM

To  kip.johnson@milliken.com

cc

bcc

Subject  FW: Milliken EMAC trip report

Kip,

    Sorry, I tried to send this without the dot separating your name. I hope this one works.

*Bob Forsterling*

EMAC Supplier Suggestions

Solder/adhesive/misc. group

MS: CT-10-C

Phone: (765) 451-5422

Fax: (765) 451-0542

E-mail: robert.b.forsterling@delphi.com

From: Forsterling, Robert B
Sent: Monday, July 18, 2005 10:47 AM
To: Moore, George R
Cc: 'John Finke(Milliken)'; Brown, Clinton C; Sanftleben, Henry M; Glover, Matt; Abraham,
Brian L; Damian, Steven A; Jenkins, James S; 'stevenalford@milliken.com';
'bob.walsh@milliken.com'; Nevius, Thomas L; 'kipjohnson@millikencom'
Subject: Milliken EMAC trip report

George,

    On June 30, we had a workshop at Milliken which was very productive. I have attached a summary of the ideas that were discussed, a few of which have

already been entered, with the rest requiring calculation or some additional study before entry.

First, I want to thank the Milliken management copied on this report for their hospitality and openness with us during our workshop and tour. We had very frank discussions and this should help us work the correct path forward for both companies. Milliken is indeed very eager to work with us on savings ideas.

The other participants in the workshop were:

| | |
|---|---|
| John Finke | Milliken account manager |
| Steve Alford | Milliken business manager, OPW |
| Kip Johnson | Milliken market manager |
| Brian Abraham | Delphi project engineer OPS |
| Paul Van Hulle | Milliken product/process improvement specialist |
| Bob Walsh | Milliken market manager |
| Wayne Shelnutt | Milliken product/process improvement manager |
| James Jenkins | Delphi manufacturing engineer OPS |
| George Graham | Milliken development manager |

At the Pine Mountain facility we saw the many rapier looms used to weave the air bags. The facility was clean, well lit, and they exhibited good monitoring of the primary cost drivers, fill trim and yield, We also discussed their preventative maintenance program, since the rapier looms obviously endure considerable wear and tear. The sizing, applied temporarily to fibers so that they hold up through the weaving process was also applied in this facility, in a well-controlled application process.

At the Valway facility we went through the sizing removal process, silicone application and cure, and the subsequent fabric roll-up or air bag cutting processes prior to shipment. Again we saw good facility control in terms of cleanliness and lighting. There was automatic camera inspection, performed twice, looking for defects in the air bags. Good process control was evident in the

silicone application thickness and cure. The FTQ in most of the processes we saw were in the very high nineties. There was a separate facility for the solvent-based silicone, which was very impressive in the recycling of the lost

solvent driven off during the cure, in reusing it for boiler fuel to generate the heat used in curing. Again, process control in the batch mixing and application was very evident with very high FTQ as a result.

Some opportunities that surfaced, other than the attached suggestions, were:

1.2.3.freight.

**The major issue discovered was a lack of suitable implementation rate on some existing suggestions.**

As a result, I took an action item to kick off a conference call meeting to:

1. Get the proper personnel to create an achievement plan on the 360/370 GMT implementation of C8

with and without LAT.

2.

As you'll see from the attachment, there were a lot of good ideas, with some work remaining on some to determine the

cost savings potential.

Thanks again to all participants.

*Bob Forsterling*

EMAC Supplier Suggestions

Solder/adhesive/misc. group

MS: CT-10-C

Phone: (765) 451-5422

Fax:  (765) 451-0542

E-mail:  robert.b.forsterling@delphi.com

 - Milliken Savings Ideas list.xls

**Brad Leach**

11/28/2005 09:38 AM

To  Kip Johnson
cc  Joel Wernert
Subject  Fw: Price Discrepancy


Kip,

Did we get any progress with Nevius on this ??

Are we still on track for stop shipment on Nov 30?

Thanks,
Brad

----- Forwarded by Brad Leach/Milliken on 11/28/2005 09:37 AM -----

**Kip Johnson**

11/10/2005 05:17 PM

To  thomas.l.nevius@delphi.com
cc  Brad Leach, Steven Alford, Tom Davenport, john.finke@milliken.com
Subject  Fw: Price Discrepancy


Tom,

　　Payments received this week continue to reflect the pricing discrepancy as compared to our invoice price. As we discussed last week, we must rectify the payment price and the outstanding invoice amounts for product shipped since October 8, 2005 forward, or we will be forced to stop shipments on November 30, 2005. We believe that we have provided sufficient notification of our concerns as listed in the attached email in an attempt to avoid this type of action. Please let us know if any additional information is needed.

Best regards,
Kip

----- Forwarded by Kip Johnson/Milliken on 11/10/2005 04:58 PM -----

**Kip Johnson/Milliken**

10/30/2005 08:21 PM

To  thomas.l.nevius@delphi.com
cc  john.finke@milliken.com, Steven Alford, Tom Davenport, Tom Casey
Subject  Price Discrepancy


Tom,

　　Payments received from Delphi since October 8, 2005 continue to reflect a payment discrepancy as compared to the invoice price. Milliken provided written notification on July 21, 2005 that price reductions would only be possible through the Delphi EMAC initiative, and we also discussed this situation on September 29, 2005 with yourself and Mark Shively. During that conversation, the potential of shipment interruptions was mentioned, and Delphi expressed appreciation that no actions had been taken at that time. We are now at a point where we must quickly rectify the payment price in order to avoid future shipment disruptions.

Please find listed below the parts that must be amended. I have listed the current invoice price, along with the price Delphi is paying.

1.  M101285    $3.88    $3.77

2.  M101411    $4.19    $4.06

3.  M101281    $3.55    $3.49

4.  M101384    $3.46    $3.36

5.  16898247   $16.24   $15.83

6.  16898248   $16.64   $16.22

We will provide the total dollar difference accumulated since October 8, 2005 this week during our review in LaGrange. John will be available this week to provide any additonal information needed. Thank you for your asistance.

Best regards,
Kip

**Brad Leach**

11/29/2005 09:07 AM

To Kip Johnson
cc Joel Wernert, Steven Alford, Tom Davenport
Subject Re: Fw: Price Discrepancy Link

Kip,

I believe that we should give this opportunity for discussion during Jeff's meeting with Delphi on Dec 13.

I think we should advise Delphi that we will delay the stop ship until Dec 14 with the expectation that resolution will come out of the Dec 13 meeting.

Thanks,
Brad

**Kip Johnson**

11/28/2005 06:00 PM

To Brad Leach
cc Joel Wernert, Tom Davenport, Steven Alford
Subject Re: Fw: Price Discrepancy Link

Brad,

I spoke to Mark Shivley, who is Tom's boss. His position is as follows:

1.  They feel that they have an enforceable Long Term Contract, even though Milliken did not agree or sign the contract to which he refers.

2.  Any price increase will have to be reviewed and approved by the Chapter 11 Credit Committee. This will require some degree of Cost Modeling on our part to show actual cost increases.

Mark stated that Delphi understands that we have absorbed cost increases, and that they are not opposed to working with us in a fair and equitable manner to resolve the issue. He stated that he thought that this was the purpose of our visit to Kokomo with Jeff Price on December 13, and that any discussions of Stop Shipments would be resolved during that meeting.

Since the December 13 meeting with Jeff was scheduled after our letter to Tom Nevius to communicate the November 30 Stop Shipment date, I can understand their thought that no action would be taken until that meeting, but I did not imply that to Mark. I told him I would give him a call tomorrow for an update. Please let me know if you believe we should table until Jeff's review with their Business Leaders.

Thanks,

Kip

**Brad Leach**                                                    To Kip Johnson
                                                                 cc Joel Wernert
11/28/2005 09:38 AM                                              Subject Fw: Price Discrepancy

Kip,

Did we get any progress with Nevius on this ??

Are we still on track for stop shipment on Nov 30?

Thanks,
Brad

----- Forwarded by Brad Leach/Milliken on 11/28/2005 09:37 AM -----
**Kip Johnson**                                                  To thomas.l.nevius@delphi.com
                                                                 cc Brad Leach, Steven Alford, Tom Davenport, john.finke@milliken.com
11/10/2005 05:17 PM                                              Subject Fw: Price Discrepancy

Tom,

    Payments received this week continue to reflect the pricing discrepancy as compared to our invoice price. As
we discussed last week, we must rectify the payment price and the outstanding invoice amounts for product shipped
since October 8, 2005 forward, or we will be forced to stop shipments on November 30, 2005. We believe that we
have provided sufficient notification of our concerns as listed in the attached email in an attempt to avoid this type
of action. Please let us know if any additional information is needed.

Best regards,
Kip
----- Forwarded by Kip Johnson/Milliken on 11/10/2005 04:58 PM -----
**Kip Johnson/Milliken**                                         To thomas.l.nevius@delphi.com
                                                                 cc john.finke@milliken.com, Steven Alford, Tom Davenport, Tom Casey
10/30/2005 08:21 PM                                              Subject Price Discrepancy

Tom,

    Payments received from Delphi since October 8, 2005 continue to reflect a payment discrepancy as compared
to the invoice price. Milliken provided written notification on July 21, 2005 that price reductions would only be

possible through the Delphi EMAC initiative, and we also discussed this situation on September 29, 2005 with yourself and Mark Shively. During that conversation, the potential of shipment interruptions was mentioned, and Delphi expressed appreciation that no actions had been taken at that time. We are now at a point where we must quickly rectify the payment price in order to avoid future shipment disruptions.

Please find listed below the parts that must be amended. I have listed the current invoice price, along with the price Delphi is paying.

1. M101285     $3.88     $3.77

2. M101411     $4.19     $4.06

3. M101281     $3.55     $3.49

4. M101384     $3.46     $3.36

5. 16898247     $16.24     $15.83

6. 16898248     $16.64     $16.22

We will provide the total dollar difference accumulated since October 8, 2005 this week during our review in LaGrange. John will be available this week to provide any additonal information needed. Thank you for your asistance.

Best regards,
Kip