**Hearing Date And Time: August 29, 2007 at 10:00 a.m.**
**Objection Deadline: August 27, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

      -and-

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

      -and-

O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
Tom A. Jerman (TJ 1129)
Jessica Kastin (JK 2288)

Attorneys for Delphi Corporation, et al.,
   Debtor and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698
Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                         :
          In re                          :        Chapter 11
                                         :
DELPHI CORPORATION, et al.,              :        Case No. 05-44481 (RDD)
                                         :
                         Debtors.        :        (Jointly Administered)
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. §§ 363, 1113, AND 1114
AND FED. R. BANKR. P. 6004 AND 9019 APPROVING MEMORANDA OF UNDERSTANDING
AMONG USW, DELPHI, AND GENERAL MOTORS CORPORATION
INCLUDING MODIFICATION OF USW COLLECTIVE BARGAINING AGREEMENTS
AND RETIREE WELFARE BENEFITS FOR CERTAIN USW-REPRESENTED RETIREES

("USW 1113/1114 SETTLEMENT APPROVAL MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this expedited motion (the "Motion")[1] for an order approving under 11 U.S.C. §§

363, 1113, and 1114 of the Bankruptcy Code and Fed. R. Bankr. P. 6004 and 9019, (i) two

memoranda of understanding regarding Delphi's restructuring entered into among the United

Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service

Workers International Union and its Local Union 87L (together, the "USW")[2], Delphi, and

General Motors Corporation ("GM") (and, together with their attachments, the "USW Settlement

Agreements" or the "Memoranda of Understanding"),[3] comprehensive agreements that (a)

modify, extend, or terminate provisions of the existing collective bargaining agreements among

Delphi and the USW (the "USW CBAs"), and (b) provide that GM and Delphi will undertake

certain financial obligations to Delphi's USW-represented employees and retirees to facilitate

these modifications, (ii) withdrawal without prejudice of the Debtors' Motion For Order Under

11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11

U.S.C. § 1114(g) Authorizing  Modification Of Retiree Welfare Benefits (the "1113/1114

Motion") as it solely pertains to the USW and USW-represented retirees and approving the

---

[1]   A copy of the informational notice provided to Delphi active hourly employees and hourly retirees represented
      by the USW in connection with the Motion is attached hereto as <u>Exhibit 1</u>.

[2]   There are two USW memoranda of understanding that are the basis of this Motion, the first with the USW
      relating to the Debtors' operations at Home Avenue (the "USW Home Avenue Settlement Agreement" or the
      "USW Home Avenue Memorandum of Understanding") and the second with the USW relating to the Debtors'
      operations at Vandalia (the "USW Vandalia Settlement Agreement" or the "USW Vandalia Memorandum of
      Understanding").

[3]   Copies of the USW Home Avenue Settlement Agreement and the USW Vandalia Settlement Agreement are
      annexed to the Proposed Order which is attached hereto as <u>Exhibit 2</u>.  Capitalized terms used and not otherwise
      defined herein have the meanings ascribed to them in the USW Home Avenue Settlement Agreement or the
      USW Vandalia Settlement Agreement, as the case may be.

2

parties' settlement of the 1113/1114 Motion as it solely pertains to the USW and USW-represented retirees, and (iii) modification of retiree welfare benefits for certain USW-represented retirees of the Debtors pursuant to the USW Settlement Agreements.

Introduction

1.      The USW, Delphi, and GM acknowledge that restructuring actions are necessary and commit to take specific actions to protect the needs of these parties and their constituencies, continuing progress already made toward transforming Delphi's labor cost structure and ongoing business operations.

2.      To enable continued transformation to more competitive wage and benefit levels, to address capacity, divestiture, work rules, and staffing level issues, and to better position Delphi to retain existing business and attract new business, the USW, Delphi, and GM have entered into various agreements in the Memoranda of Understanding on a two-party or three-party basis, as applicable, subject to ratification.[4]

3.      The Debtors filed the 1113/1114 Motion on March 31, 2006, after they were unable to consummate consensual modifications to the Debtors' collective bargaining agreements and retiree welfare benefits with the USW and the other unions representing certain of the Debtors' U.S. employees and retirees (the "Unions")[5] during the first six months of their chapter 11 reorganization cases.  The Debtors continued to negotiate with the Unions even after

---

[4]    Such bilateral agreements include three letters, each dated August 16, 2007, two of which are from Dean Munger, Executive Director at GM, and one of which is from Arthur Schwartz, Executive Director at GM, to Dennis Bingham, President of USW Local 87L and a healthcare summary document.  These documents and the USW Settlement Agreements confirm GM's treatment of certain benefits to Delphi employees and former employees.

[5]    These unions include the United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America ("IUE-CWA"), the International Association of Machinists and Aerospace Workers (the "IAM"), the International Brotherhood of Electrical Workers (the "IBEW"), the International Union of Operating Engineers (the "IUOE"), and/or their local affiliates.

they filed the 1113/1114 Motion, and represented that they would continue to negotiate with the

Unions even if Debtors obtained the order requested in the 1113/1114 Motion.[6]  The parties were

unable to reach a consensus before the scheduled commencement of the hearing on the

1113/1114 Motion on May 9, 2006.  This Court conducted hearings on the contested motion on

various trial dates in May and June 2006, the record of which constitutes part of the basis for the

relief requested in this Motion.  Throughout the 1113/1114 proceedings, however, the Debtors

and the Unions continued to seek negotiated alternatives to litigation.

4.    On June 8, 2006, the Debtors and all respondents to the 1113/1114 Motion

conducted a "meet and confer" at which the parties agreed to submit a scheduling order to this

Court which provided for a recess of the hearings until August 11, 2006 (Docket No. 4170).

During the next five months, the Debtors' discussions with the Unions, GM, and other

stakeholders continued.  As a consequence of those negotiations, the parties submitted to this

Court further scheduling orders adjourning the 1113/1114 Motion through the balance of 2006

and, on January 31, 2007, this Court suspended further proceedings on the 1113/1114 Motion

(Docket No. 6779).  Further orders continuing the suspension of the 1113/1114 Motion have

been granted by this Court with the intention of allowing the parties additional time to negotiate

consensual modifications to Delphi's labor agreements.

5.    On June 22, 2007, Delphi reached a tentative agreement and signed a

memorandum of understanding with the UAW and GM covering site plans, workforce transition,

---

[6]    The Debtors' proposed modifications to the USW CBAs upon which their 1113/1114 Motion was based are
described in detail in the 1113/1114 Motion and the accompanying Declaration Of Darrell Kidd In Support of
the 1113/1114 Motion (Docket No. 3039).  In sum, the Debtors' proposed modifications contemplated two
possible scenarios: one in which they received no or inadequate financial support from GM (the "Competitive
Benchmark Proposals") and the other in which they received financial support from GM adequate to offer less
restrictive or severe modifications to their national and local labor agreements (the "GM Consensual
Proposals").  The USW, as well as the Debtors' other Unions, rejected the Competitive Benchmark Proposals
and took the position that the Competitive Benchmark and GM Consensual Proposals did not provide a
framework for resolution.  The Memorandum of Understanding that is the basis of this Motion is a fully
negotiated agreement on terms acceptable to the USW, Delphi, and GM.

4

and other comprehensive transformational issues (the "UAW Settlement Agreement"), which

was ratified by the UAW on June 28, 2007.  On July 31, August 1, and August 5, 2007, the

Debtors reached similar tentative agreements with the IUOE, IBEW, IAM, and IUE-CWA.

(collectively, with the UAW Settlement Agreement, the "Prior Settlement Agreements").

      6.      On June 29, 2007, Delphi filed a motion with this Court for an order

approving the UAW Settlement Agreement, approving withdrawal without prejudice of the

1113/1114 Motion solely as it pertains to the UAW and UAW-represented retirees, approving

the settlement of the 1113/1114 Motion solely as it pertains to the UAW and UAW-represented

retirees, and approving modification of retiree welfare benefits for certain UAW-represented

retirees of Delphi.  After a hearing on this motion on July 19, 2007, this Court issued an order

approving that motion (Docket No. 8693).  Similar motions relating to the IUE-CWA, IUOE,

IBEW, and IAM settlement agreements were filed on August 6, 2007.  After a hearing on these

motions on August 16, 2007, this Court issued an order approving the motion for approval of the

IUE-CWA settlement agreement (Docket No. 9106) and an order approving the motion for

approval of the IUOE, IAM, and IBEW settlement agreements (Docket No. 9107).

      7.      The USW Settlement Agreements are analogous to the Prior Settlement

Agreements approved by this Court because they are all similar comprehensive agreements with

Unions that modify, extend, or terminate provisions of existing collective bargaining agreements

among Delphi, the Unions, and/or their various locals and provide that GM and Delphi will

undertake certain financial obligations to Delphi's Union-represented employees and retirees to

facilitate these modifications.  The USW Settlement Agreements are subject to ratification by the

membership.

      8.      The USW Settlement Agreements apply only to the USW, the last

remaining Union party to the 1113/1114 Motion.

9.      The USW Home Avenue Settlement Agreement, among other subject

matters, provides that: [7]

(A)     Effective upon the later of entry of this Court's approval order in respect of
the Motion or the first Monday following receipt of written notice of
ratification from the USW:[8]

- The terms of the USW CBAs are extended until September 14,
2011;

- Delphi and the USW agree that the businesses at the Home Avenue
Operations will be sold or closed;

- A workforce transition program is implemented for eligible USW-
represented employees that provides eligible employees with
transformation plan options, including attrition options similar to
the previously-approved UAW and IUE-CWA attrition programs
(see USW Home Avenue Settlement Agreement Attachment C,
USW-Delphi-GM Special Attrition Program-Transformation);[9]

- Certain terms of the USW CBAs are modified with respect to
provisions covering Plant Closing and Sale Moratorium, Sourcing,
Job Security (Job Opportunity Bank (JOBS) Program), AOL,
COLA, Independence Week Pay, Vacation Entitlement, Joint
Activities funding, tuition assistance, Guaranteed Income Stream,
benefits, temporary employees, and holidays;

- All employee, retiree, and union asserted and unasserted claims are
settled (except for rights, if any, to vested pension benefits,
workers' compensation benefits, unemployment compensation
benefits, future claims arising out of the modified USW CBAs and

---

[7]  The summary of the USW Settlement Agreements set forth in this Motion is qualified entirely by and is subject
to the actual terms and conditions of the USW Settlement Agreements.

[8]  Until the effective date of a plan of reorganization, nothing in the USW Settlement Agreements will constitute
an assumption of any agreement described in the USW Settlement Agreements, including, without limitation,
any collective bargaining agreement between the USW and Delphi (except as provided for in Section G.3) or
any commercial agreement between GM and Delphi, nor will anything in the USW Settlement Agreements be
deemed to create an administrative or priority claim with respect to GM or convert a prepetition claim into a
postpetition claim or an administrative expense with respect to any party.  The USW Settlement Agreements
also provide that the USW, Delphi, and GM agree (and the order approving this Motion must also provide) that
the USW Settlement Agreements are without prejudice to any interested party (including the USW, Delphi,
GM, and the statutory committees) in all other aspects of Delphi's chapter 11 cases and the USW, Delphi, and
GM reserve all rights not expressly waived in the USW Settlement Agreements.

[9]  GM will receive certain claims in connection with certain of these commitments as specified in Attachment C to
the USW Home Avenue Settlement Agreement.

pending ordinary course grievances of employees remaining in the workforce); and

(B)    Effective upon the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM and substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by this Court which incorporates, approves, and is consistent with all of the terms of the USW Home Avenue Settlement Agreement and Delphi-GM settlement:

- Delphi's obligation to provide certain retiree welfare benefits is eliminated and GM is obligated to provide certain retiree welfare benefits for certain USW-represented employees covered as provided in the Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and GM Consensual Triggering of Benefit Guarantee;[10]

- A transfer of certain pension assets and liabilities from Delphi's pension plans to GM's pension plans is effectuated pursuant to Internal Revenue Code Section 414(l);

- Delphi's existing pension plan is frozen in certain respects effective upon emergence from chapter 11 and GM is obligated to pay certain benefits for certain USW-represented employees covered as provided in Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and GM Consensual Triggering of Benefit Guarantee;

- The USW will receive an allowed general unsecured prepetition claim in the amount of $3 million against Delphi in complete settlement of all asserted and unasserted USW claims, including without limitation asserted and unasserted claims of current and former Vandalia Operations bargaining unit members.  The proceeds realized by the USW and/or the voluntary employees' beneficiary association ("VEBA") trust, to be established by an entity other than GM, Delphi, or their respective benefit plans, will be contributed directly to the VEBA trust to provide certain retiree welfare benefits to certain eligible employees and retirees, including certain current or future participants in the Delphi Hourly Rate Employee Pension Plan or the GM Hourly Rate Employee Pension Plan, and their dependents;

- The amount of $9 million will be paid by GM to the VEBA in resolution of certain claims asserted by the USW, including in connection with the modification of retiree benefit programs, and

---

[10]    This agreement is Attachment B to the USW Memoranda of Understanding.

without any acknowledgment by either GM or Delphi of those claims;

- The USW Home Avenue Memorandum of Understanding (including the USW CBAs) is assumed pursuant to 11 U.S.C. § 365;

- The USW released parties are exculpated and released in connection with the USW Home Avenue Memorandum of Understanding and Delphi's chapter 11 cases; and

- Delphi and GM receive releases from the USW, all employees and former employees of Delphi represented or formerly represented by the USW, and all persons or entities with claims derived from or related to any relationship with such employees of Delphi arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements between Delphi and the USW and between GM and the USW (except for claims for benefits provided for or explicitly not waived under the USW Home Avenue Memorandum of Understanding, including, but not limited to, workers' compensation benefits against Delphi, its subsidiaries, or affiliates that are otherwise assertable under applicable law).

10.     The USW Vandalia Settlement Agreement, among other subject matters,

provides that:

(A)     Effective upon the later of entry of this Court's approval order in respect of the Motion or the first Monday following receipt of written notice of ratification from the USW:

- The terms of the USW CBAs are extended until September 14, 2011;

- A site plan is implemented with respect to the Vandalia Thermal Operation for which it is necessary to achieve an all-in blended labor wage and benefit rate of $19.57 per hour as soon as possible and maintain that rate for the life of the Vandalia local agreement; otherwise failure to accomplish and maintain this all-in blended wage and benefit rate will result in the Vandalia Thermal Operations being closed during the term of the Vandalia local agreements;

- A workforce transition program is implemented for eligible USW-represented employees that provides eligible employees with transformation plan options, including attrition options similar to the previously-approved UAW and IUE-CWA attrition programs

8

(see USW Vandalia Settlement Agreement, Section C, Special Attrition Program);[11]

- Certain terms of the USW CBAs are modified with respect to provisions covering Guaranteed Income Stream, benefits, vacation accrual, holidays, Income Security Plan, Joint Activities funding, Independence Week Pay, COLA, Shift Premium, AOL, and overtime;

- All employee, retiree, and union asserted and unasserted claims are settled (except for rights to vested pension benefits, workers' compensation benefits, unemployment compensation benefits, and pending ordinary course grievances of employees remaining in the workforce); and

(B)    Effective upon the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM and substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by this Court which incorporates, approves, and is consistent with all of the terms of the USW Vandalia Settlement Agreement and Delphi-GM settlement:

- Delphi's obligation to provide certain retiree welfare benefits is eliminated and GM is obligated to provide certain retiree welfare benefits for certain USW-represented employees covered as provided in the Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and GM Consensual Triggering of Benefit Guarantee;

- A transfer of certain pension assets and liabilities from Delphi's pension plans to GM's pension plans is effectuated pursuant to Internal Revenue Code Section 414(l);

- Delphi's existing pension plan is frozen in certain respects effective upon emergence from chapter 11 and GM is obligated to pay certain benefits for certain USW-represented employees covered as provided in Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and GM Consensual Triggering of Benefit Guarantee;

- The USW asserted and unasserted claims are resolved pursuant to Section F.2 and F.3 of the USW Home Avenue Settlement Agreement;

---

[11]    GM will receive certain claims in connection with certain of these commitments as specified in the USW Vandalia Settlement Agreement.

9

- The USW Vandalia Memorandum of Understanding (including the USW CBAs) is assumed pursuant to 11 U.S.C. § 365;

- The USW released parties are exculpated and released in connection with the USW Vandalia Memorandum of Understanding and Delphi's chapter 11 cases; and

- Delphi and GM receive releases from the USW, all employees and former employees of Delphi represented or formerly represented by the USW, and all persons or entities with claims derived from or related to any relationship with such employees of Delphi arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements between Delphi and the USW and between GM and the USW (except for claims for benefits provided for or explicitly not waived under the USW Vandalia Memorandum of Understanding).

11.    The Debtors submit that approval of the USW Settlement Agreements, which resolve Delphi's 1113/1114 Motion as it pertains to the USW, is in the best interests of the Debtors and their stakeholders.  The Debtors believe that approval of the USW Settlement Agreements will facilitate the Debtors' continued progress toward transformation and emergence.

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

12.    On October 8 and 14, 2005 (collectively, the "Petition Date"), the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

13.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

10

14.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

15.     The statutory predicates for the relief requested herein are sections 363, 1113, and 1114 of the Bankruptcy Code and Rule 6004 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.    Business Operations Of The Debtors

16.     Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[12]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from this Court.[13]

17.     The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

---

[12]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[13]    On March 20 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding.  The application was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

18.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

19.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[14] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006, the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to Special Attrition Programs.

20.      The Debtors believe that the Company's financial performance has deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production

_____

[14]   Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

environment for domestic automakers resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

21.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

22.    On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas:[15] first, modifying the Company's labor agreements to create a competitive arena in which to conduct business;[16]

---

[15]    In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors, and a plan framework support agreement with those investors and GM.  On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework support agreement but that it expected to enter into new framework agreements with plan investors presently.  Subsequently, on July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as, Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors").  Under the Delphi-Appaloosa EPCA, the New Plan Investors would invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization.  This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.

[16]    Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the UAW and GM that (a) modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the UAW, and its various locals, (b) provides that Delphi and GM will undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate these modifications, and (c) modifies retiree welfare benefits for certain UAW-represented retirees of the Debtors.  This agreement was approved by this Court on July 19, 2007.  By August 6, 2007, Delphi reached similar agreements with the IAM and its District 10 and Tool and Die Makers Lodge 78, the IBEW and its Local 663, the IUE-CWA and its local unions, and Locals 832S, 18S, and 101S of the IUOE.  The Prior Settlement Agreements and the USW Settlement

second, concluding their negotiations with GM to finalize GM's financial support for the

Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[17]

third, streamlining their product portfolio to capitalize on their world-class technology and

market strengths and make the necessary manufacturing alignment with their new focus;[18]

fourth, transforming their salaried workforce to ensure that the Company's organizational and

cost structure is competitive and aligned with its product portfolio and manufacturing footprint;[19]

and devising a workable solution to their current pension situation.[20]

---

Agreement should permit the Debtors to continue to implement their transformation plan and to develop, prosecute, confirm, and consummate a plan of reorganization.

[17]   On July 9, 2007, Delphi confirmed that its discussions with GM on a comprehensive settlement agreement had entered the documentation phase and that it expected that a settlement with GM would be incorporated into the Debtors' plan of reorganization rather than filed with this Court for separate approval.

[18]   In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants.  The Debtors have been working to divest non-core assets so as to maximize the value of the estate for stakeholders.  During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., its chapter 11 affiliate, obtained court approval for the sale of substantially all of the assets of their brake hose and Saltillo, Mexico brake plant businesses, and obtained court approval of bid procedures related to the upcoming sale of substantially all assets used in their catalyst business.  In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

[19]   As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.  The Debtors also made significant progress in ensuring that their organizational and cost structure is competitive in obtaining the entry of this Court's Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order").  The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[20]   To that end, on May 31, 2007, this Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 plan year funding waivers, which were approved by the IRS, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Plans").  On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively.

D.    The Debtors' Prior Special Attrition Programs

23.    The Debtors and GM have previously entered into attrition agreements

with the UAW and the IUE-CWA that provided similar options to the attrition options presented

in the USW Settlement Agreements.  On March 22, 2006, Delphi, GM and the UAW entered

into a three-party agreement establishing a special attrition program, which was approved by

order of this Court on May 8, 2006 (Docket No. 3648) and amended on May 12, 2006 (Docket

No. 3754).  On June 5, 2006, Delphi, GM, and the UAW agreed on a supplemental program and

on June 16, 2006, Delphi, GM, and the IUE-CWA reached agreement on the terms of a special

attrition program which mirrored in all material respects the prior UAW attrition programs.  The

UAW supplemental attrition program and the IUE-CWA attrition program were approved by this

Court on June 29, 2006, and on July 7, 2006, this Court entered the approved order (Docket No.

4461).

E.    This Court Has Already Approved Similar Settlements Of The 1113/1114 Motion As It
       Pertained To The UAW, IUE-CWA, IUOE, IBEW, And IAM Through The Prior
       Settlement Agreements

24.    On June 22, 2007, Delphi signed the UAW Settlement Agreement with the

UAW and GM covering site plans, workforce transition and other comprehensive

transformational issues, which was ratified by the UAW on June 28, 2007.  Similar to the Prior

Settlement Agreements, the USW Settlement Agreements are comprehensive agreements that

modify, extend, or terminate provisions of the existing collective bargaining agreements among

Delphi, the USW, and the various USW locals and provides that GM and Delphi will undertake

certain financial obligations to Delphi's USW-represented employees and retirees to facilitate

these modifications.  On June 29, 2007, Delphi filed a motion with this Court for an order

approving the UAW Settlement Agreement, approving withdrawal without prejudice of the

1113/1114 Motion solely as it pertains to the UAW and UAW-represented retirees, approving

the settlement of the 1113/1114 Motion solely as it pertains to the UAW and UAW-represented

retirees, and approving modification of retiree welfare benefits for certain UAW-represented

retirees of Delphi.  After a hearing on this motion on July 19, 2007, this Court issued an order

approving that motion (Docket No. 8693).

          25.     By motions filed on August 6, 2007, Delphi sought an order approving the

IUE-CWA, IUOE, IBEW, and IAM settlement agreements.  After a hearing on these motions on

August 16, 2007, this Court issued an order approving the motion for approval of the IUE-CWA

settlement agreement (Docket No. 9106) and an order approving the motion for approval of the

IUOE, IAM, and IBEW settlement agreements (Docket No. 9107).

F.      Settlement Of The 1113/1114 Motion As It Pertains To The USW Settlement
       Agreements Presented For This Court's Approval On The Instant Motion

          26.     On August 16, 2007, the Debtors reached the USW Settlement

Agreements that include significant and necessary modifications to the USW CBAs.[21]  As set

forth above, Delphi, GM, and the USW will implement certain terms of the USW Settlement

Agreements as of the Effective Date (defined in the USW Settlement Agreements as the later of

entry of an order by the Court approving the USW Settlement Agreements that is satisfactory to

the parties (the "Approval Order") or the first Monday following receipt by Delphi of written

notice of ratification from the USW).[22]

---

[21]    The Debtors do not believe that the USW Settlement Agreements will have any material adverse effect on the
Debtors' five year business plan through December, 2011 or the Debtors' ability to comply with Section 1.1 of
Exhibit B to the Delpi-Appaloosa EPCA which requires that the aggregate amount of all trade claims and other
unsecured claims (including any accrued interest but excluding certain categories of other unsecured claims)
that have been asserted or scheduled but not yet disallowed as of the effective date of the reorganization plan
shall be allowed or estimated for distribution purposes by the Bankruptcy Court to be no more than $1.7 billion,
excluding all allowed accrued postpetition interest thereon.

[22]    As noted above, the effective date of certain provisions of the USW Settlement Agreements is conditioned upon
confirmation of the Debtors' reorganization plan and resolution of certain financial, commercial, and other
issues between Delphi and GM.

27.    The USW Settlement Agreements settle the 1113/1114 Motion as it pertains to the USW, enabling the Debtors to seek authority to withdraw, without prejudice, the 1113/1114 Motion with respect to the USW.

Relief Requested

28.    By this Motion, the Debtors seek entry of an order, under 11 U.S.C. §§ 363, 1113, and 1114 of the Bankruptcy Code and Fed. R. Bankr. P. 6004 and 9019, approving (i) the USW Settlement Agreements, (ii) withdrawal without prejudice of the 1113/1114 Motion solely as it pertains to the USW and approving the parties' settlement of the 1113/1114 Motion solely as it pertains to the USW, and (iii) modification of retiree welfare benefits for certain USW-represented retirees of the Debtors.

Basis For Relief

29.    The USW Settlement Agreements require a court order approving the USW Settlement Agreements, which encompasses a settlement of the 1113/1114 Motion as it pertains to the USW.  See USW Settlement Agreements Section G.  Thus, as noted above and consistent with the terms and spirit of the USW Settlement Agreements, this Motion is brought before this Court under sections 363, 1113, and 1114 of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019.[23]

---

[23]    The Debtors do not concede through this Motion that the modifications to the USW CBAs contained in the USW Settlement Agreements require court approval either because such modifications are outside the ordinary course of business under section 363 or pursuant to sections 1113 or 1114 of the Bankruptcy Code.  Out of an abundance of caution in connection with GM's unique role here and consistent with the terms of the USW Settlement Agreements, however, the Debtors are seeking this Court's approval of the USW Settlement Agreements.  See  In re The Leslie Fay Cos., 168 B.R. 294, 303 (Bankr. S.D.N.Y. 1994) (debtors can enter into agreement modifying existing collective bargaining agreements postpetition without notice or hearing).

G.    Approval Of The USW Settlement Agreements Is Warranted Under Bankruptcy Code
       Section 363

30.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1).  Whether modifications to a collective bargaining agreement are ordinary-course transactions under section 363 of the Bankruptcy Code or whether such modifications are outside the ordinary course requiring approval under the Bankruptcy Code has generally been determined on a case-by-case basis.  See In re N. Am. Royalties, Inc., 267 B.R. 587, 593 (Bankr. E.D. Tenn. 2002) (collecting and comparing relevant authority).

31.    Use of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it.  See Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 178-179 (D. Del. 1991).

32.    The Second Circuit has held that, although the bankruptcy court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming an "arbiter of disputes between creditors and the estate."  Orion Pictures Corp. v. Showtime Network, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's consideration of a debtor's section 363(b) motion is a "summary proceeding," intended merely as a means "to efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate.  It is not the time or place for prolonged discovery or a lengthy trial with disputed issues."  Id. at 1098-99.

18

33.     Once the debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." Id.  To satisfy its burden, it is not enough for an objector simply to raise and argue an objection.  Rather, an objector "is required to produce some evidence respecting its objections." Lionel Corp., 722 F.2d at 1071.

34.     As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

35.     The Debtors have demonstrably sound business reasons for entering into the USW Settlement Agreements at this time.  The USW Settlement Agreements, which are the result of careful deliberations and extensive negotiations, include modifications to the USW CBAs that equitably address many of the Debtors' substantial financial, transformational, and labor relations roadblocks in a manner that will best serve the economic interests of the Debtors' estates and their stakeholders.

36.     First, once implemented, the modifications to the USW CBAs contemplated by the USW Settlement Agreements will generate a level of labor cost savings that will improve the Debtors' ability to emerge from chapter 11 successfully.

37.    Second, the USW Settlement Agreements provide the Debtors with the flexibility necessary to transform their operations to compete as a supplier to nearly every major global automotive original equipment manufacturer while furthering the legitimate interests of Delphi's employees, retirees, and other stakeholders.  As evidenced by the summary provided above, the USW Settlement Agreements achieves significant cost savings through wage reductions, work rule and operational changes, and buy-outs that will enable Delphi to better meet its competitive challenges.  Accordingly, there is a sound business purpose for consummating the transactions contemplated in the USW Settlement Agreements promptly.

38.    In the exercise of their business judgment, the Debtors believe that the terms of the USW Settlement Agreements are reasonable based upon the significant benefits that they will receive, as summarized above, as well as the potential harm to the estates if the relief requested herein is not granted.[24]

H.    Approval Of The USW Settlement Agreements Is Warranted Under Bankruptcy Rule 9019

39.    Bankruptcy Rule 9019 provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Bankruptcy Rule 9019(a).  Settlements and compromises are "a normal part of the process of reorganization."  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 308 U.S. 106, 130 (1939)); In re Adelphia Communications Corp., 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005)

---

[24]    For certain of the agreements in the USW Settlement Agreements to be implemented, the Debtors' plan of reorganization must contain provisions consistent with the USW Settlement Agreements and the confirmation order for such plan must provide for the assumption of the USW Settlement Agreements and the agreements referenced in Attachment E thereto under section 365 of the Bankruptcy Code.  Indeed, by their terms, the USW Settlement Agreements themselves do not constitute an assumption of the USW CBAs.  See USW Settlement Agreements Section G.  It is relevant to note that this undertaking by the Debtors constitutes a condition to the effectiveness of certain provisions rather than a covenant by the Debtors that might impermissibly restrict the plan of reorganization that could be prosecuted by them.

(decision to accept or reject settlement lies within sound discretion of bankruptcy court), <u>adhered to on reconsideration</u>, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

40.    In addition, Rule 9019 applies to settlements such as the USW Settlement Agreements that modify (i) the terms of a collective bargaining agreement pursuant to 11 U.S.C. § 1113 and (ii) retiree benefits pursuant to 11 U.S.C. § 1114.  <u>See</u> <u>Nellis v. Shugrue</u>, 165 B.R. 115, 116-17, 121 (S.D.N.Y. 1994) (applying Bankruptcy Rule 9019 to approval of settlement under 11 U.S.C. § 1113); <u>In re Tower Automotive</u>, 241 F.R.D. 162, 170 (S.D.N.Y. 2006) (applying Bankruptcy Rule 9019 to approval of settlements and compromises under 11 U.S.C. § 1114); <u>see also</u> In re GF Corp., 120 B.R. 421, 425 (Bankr. D. Ohio 1990) (applying Bankruptcy Rule 9019 to settlement pursuant to 11 U.S.C. §§ 1113, 1114).[25]

41.    Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate when the compromise is fair and equitable and is in the best interests of the debtor's estate.  <u>See, e.g.</u>, <u>TMT Trailer Ferry</u>, 390 U.S. at 424; <u>Adelphia</u>, 327 B.R. at 159 ("The settlement need not be the best that the debtor could have obtained.  Rather, the settlement must fall 'within the reasonable range of litigation possibilities.'") (citations and internal quotations omitted); <u>Nellis</u>, 165 B.R. at 121 ("The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it.")  In general, compromises in the bankruptcy context should be approved unless they "'fall below the lowest point in the range of reasonableness.'"  <u>Cosoff v. Rodman</u> (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (citation omitted).

---

[25]    No retiree committee was formed under section 1114 of the Bankruptcy Code in these cases because under the Order (I) Appointing Unions As Authorized Representatives For Union Represented Retirees Under 11 U.S.C. §§ 1114(c) And 1114(d) Or, In The Alternative, (II) Establishing Procedures For Solicitation, Nomination, And Appointment Of Committee Of Retired Employees granted by this Court on October 13, 2005 (Docket No. 231), the USW (and the other Unions) elected to serve and have been acting as the authorized representative for purposes of section 1114 of the Bankruptcy Code throughout these chapter 11 cases of the Delphi retirees who were previously represented by the Unions as active employees.

42.    The Supreme Court in TMT Trailer Ferry set forth the following factors

that courts should consider in determining whether a proposed settlement or compromise is in the

best interests of a debtor's estate:  (a) the probability of the debtor's success in the litigation, (b)

the difficulties associated with collection, (c) the complexity of the litigation and the attendant

expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors.

TMT Trailer Ferry, 390 U.S. at 424-25; see also Nellis, 165 B.R. at 122.

43.    Courts in this district have further elaborated on the following relevant

factors: (a) the balance between the likelihood of plaintiffs' or defendants' success should the

case go to trial vis-à-vis the concrete present and future benefits held forth by the settlement

without the expense and delay of a trial and subsequent appellate procedures, (b) the prospect of

complex and protracted litigation if the settlement is not approved, (c) the competency and

experience of counsel who support the settlement, (d) the relative benefits to be received by

individuals or groups within the class, and (e) the extent to which the settlement is truly the

product of arm's-length bargaining, and not of fraud or collusion.  Adelphia, 327 B.R. at 159-60;

accord In re Texaco Inc., 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

44.    The bankruptcy court need not determine that all of the foregoing criteria

favor approval of a compromise, and the proposed compromise need not be the best agreement

that the debtor could have achieved under the circumstances.  See Adelphia, 327 B.R. at 159-60;

Nellis, 165 B.R. at 123.  Instead, the court's proper role is to familiarize itself with all the facts

necessary for an intelligent and objective opinion, and determine whether the settlement is fair

and equitable.  In re Best Products Co., Inc., 168 B.R. 35, 49-51 (Bankr. S.D.N.Y. 1994).  To

that end, courts should not substitute their own judgment for that of the debtor, but rather should

"'canvass the issues'" to affirm that the proposed settlement falls above "'the lowest point in the

range of reasonableness.'"  Adelphia, 327 B.R. at 159 (quoting W.T. Grant Co., 699 F.2d at 608);

accord Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.),

156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd sub nom. Sobchack v. Am. Nat'l Bank & Trust Co., 17

F.3d 600 (2d Cir. 1994); In re Best Products Co., 168 B.R. at 49-51.

45.    Given that the USW Settlement Agreements are a resolution or settlement

of the issues raised in the 1113/1114 Motion as they pertain to the USW, the USW Settlement

Agreements should be approved under Bankruptcy Rule 9019(a) because their terms are fair and

equitable, fall well within the range of reasonableness, and are in the best interests of the

Debtors, their estates, their creditors, and their stakeholders.  Most significantly, the USW

Settlement Agreements clarify and provide certainty regarding the manner in which Delphi's

labor, pension, and OPEB issues with the USW will be resolved.

46.    Moreover, the Court is not required to find that the terms of the settlement

are the most favorable that the Debtors could have obtained in order to approve the USW

Settlement Agreements.  In re W.T. Grant Co., 699 F.2d at 608 (noting that court is only required

to "see whether the settlement falls below the lowest point in the range of reasonableness")

(citation omitted); Nellis, 165 B.R. at 123; In re Best Products Co., 168 B.R. at 49-51.

47.    And, as recognized by this Court on various occasions, a consensual

resolution to the Debtors' need to reduce labor costs is in the best interests of the Debtors' estates.

See, e.g., May 12, 2006 Hearing Transcript at pp. 201-02 (noting that representatives of Delphi

and Unions, rather than Court, are the most important in an 1113/1114 proceeding, and urging

parties to reach good-faith agreement).  Consensual agreements are recognized generally as a

normal part of the reorganization process and as beneficial to the estate in part because of the

inevitable reduction in administrative costs and other burdens associated with protracted

litigation.  This is especially the case here, given the hundreds of employees and retirees who

would be affected by the non-consensual modifications proposed in the 1113/1114 Motion,

should that motion ultimately be granted by the Court.  See, e.g., TMT Trailer Ferry, Inc., 390

U.S. at 424 ("[c]ompromises are a normal part of the process of reorganization."); Nellis, 165

B.R. at 123 (stating "the general rule that settlements are favored and, in fact, encouraged by the

bankruptcy approval process").

## Notice Of Motion

48.    Notice of this Motion has been provided in accordance with the Amended

Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m),

9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case

Management, And Administrative Procedures, entered by this Court on October 26, 2006

(Docket No. 5418), and the Supplemental Order Under 11 U.S.C. Sections 102(1) And 105 And

Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And

Certain Notice, Case Management, And Administrative Procedures (Docket No. 2883).  The

Debtors have also provided an informational notice of this Motion, a copy of which is attached

hereto as Exhibit 1, as a courtesy to all of the USW-represented employees and USW-

represented retirees affected by this Motion.  In light of the relief requested, the Debtors submit

that no other or further notice is necessary.

## Memorandum Of Law

49.    Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of service and filing of

a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an

order pursuant to 11 U.S.C. §§ 363, 1113, and 1114 of the Bankruptcy Code and Fed. R. Bankr.

P. 6004 and 9019 (i) approving the USW Settlement Agreement, (ii) authorizing the withdrawal

without prejudice of the Debtors' 1113/1114 Motion solely as it pertains to the USW and

approving the parties' settlement of the 1113/1114 Motion solely as it pertains to the USW, (iii)

authorizing the Debtors' modification of retiree welfare benefits for certain USW-represented

retirees of the Debtors, and (iv) granting the Debtors such other and further relief as is just.

Dated:    New York, New York
          August 17, 2007

                    SKADDEN, ARPS, SLATE, MEAGHER
                      & FLOM LLP

By:     /s/ John Wm. Butler, Jr.
        John Wm. Butler, Jr. (JB 4711)
        John K. Lyons (JL 4951)
        Ron E. Meisler (RM 3026)
        333 West Wacker Drive, Suite 2100
        Chicago, Illinois 60606
        (312) 407-0700

        - and -

By:     /s/ Kayalyn A. Marafioti
        Kayalyn A. Marafioti (KM 9632)
        Thomas J. Matz (TM 5986)
        Four Times Square
        New York, New York 10036
        (212) 735-3000

        - and-

O'MELVENY & MYERS LLP

By:    /s/ Tom A. Jerman
       Tom A. Jerman (TJ 1129)
       Jessica Kastin (JK 2288)
       1625 Eye Street, NW
       Washington, DC 20006
       (202) 383-5300

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession