Victor J. Mastromarco, Jr. (Mich Bar No P34564)     Hearing Date: September 6, 2007
Russell C. Babcock (Mich Bar No P57662)              Time: 10:00 a.m. (Eastern Standard)
THE MASTROMARCO FIRM
Counsel to H.E. Services Company &
Robert Backie
1024 North Michigan Avenue
Post Office Box 3197
Saginaw, Michigan 48605-3197
(989) 752-1414

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

DELPHI CORPORATION, et al.,

Chapter 11
Case No. 05-44481 (RDD)
(Jointly Administered)

Debtors.

**H.E. SERVICES COMPANY AND ROBERT BACKIE'S AMENDED
SUPPLEMENTAL RESPONSE TO DEBTORS' (I) THIRD OMNIBUS
OBJECTION (SUBSTANTIVE) PURSUANT TO 11 U.S.C. § 502(b) AND FED. R.
BANKR. P. 3007 TO CERTAIN (A) CLAIMS WITH INSUFFICENT
DOCUMENTATION, (B) CLAIMS UNSUBSTANTIATED BY DEBTORS'
BOOKS AND RECORDS, AND (C) CLAIMS SUBJECT TO MODIFICATION
AND (II) MOTION TO ESTIMATE CONTINGENT AND UNLIQUIDATED
CLAIMS PURSUANT TO 11 U.S.C. § 502 (c)**

1.      The Creditor, H.E. Services Company [hereinafter referred to as H.E. Services Company[1] and jointly as Creditors] is a Michigan Corporation.[2] The Creditor, Robert Backie [hereinafter referred to as Mr. Backie and jointly as Creditors] is a Native American and is the majority shareholder and Chief Executive Officer of H.E. Services Company.[3] H.E. Services Company consists of several divisions including an H.E. Services Engineering and Testing Division, a Universal Tool Division, Universal Inspection Division, Universal Manufacturing Division, and an Ancon Prototype & Machine Division. H.E. Services Company's facilities included a facility in Flint, Michigan.

2.      As explained by H.E. Services Company's former banker, Richard Bolt, H.E. Services Company was known as a professional company with a history and reputation of being a very competent business.[4] (Bolt Deposition pg. 18-23 - **Exhibit 5**). In fact, H.E.

---

[1] H.E. Services Company was incorporated in 1982.
[2] Unless indicated otherwise, all factual statements arise from Mr. Backie's Affidavit which is attached as **Exhibit 1**. Mr. Backie will be testifying live at the hearing, and the information provided is to provide the Court an idea as to the testimony Counsel anticipates being provided by Mr. Backie.
[3] The Creditors were encouraged by Debtor to obtain minority status with the promise from Debtor that Creditors would be given favorable status by Debtor pursuant to its internal policies. In fact, the Creditors did obtain minority status for H.E. Services Company, and is in fact certified by the United States Small Business Administration as a firm owned and operated by socially and economically disadvantaged individuals eligible to receive federal contracts under the Small Business Administration's business development program. See 42 USC § 637. Debtor is not a minority corporation.
[4] Mr. Bolt first became acquainted with H.E. Services Company in the mid-1990s. (Bolt Deposition pg. 6 - **Exhibit 5**). Mr. Bolt was DNN's Senior Commercial Lender and Senior Vice President. (Bolt Deposition pg. 6 - **Exhibit 5**). Mr. Bolt worked for Republic Bank when it was acquired by Republic Bank. (Bolt Deposition pg. 5 - **Exhibit 5**).

1

Services Company was DNN's (i.e. Detroit Northern) largest commercial customer.[5] (Bolt Deposition pg. 17-18 - **Exhibit 5**).

3.      The Creditors have filed their claims against Delphi Corporation et. seq.[6] [hereinafter referred to collectively as Debtor]. This Amended supplemental response is divided into four parts. The first part sets forth Creditors' minority status and Debtors' abuse of and failure to follow its policies. The second part sets forth the services and goods which were performed by the Creditors for the Debtor and which have not been paid as promised. The third part sets forth the business dealings which the Creditors initiated in reliance upon Debtor's words and actions and the damages which have resulted from Debtors' wrongful actions. The fourth part sets forth a legal discussion for each of Creditors claims against the Debtor.

4.      For the reasons as set forth below, the Debtors' defenses are unavailing and, accordingly, this Court should deny the Third Omnibus Objection and allow the Proofs of Claim in full.

**PART ONE**

I.      **DEBTOR VIOLATED ITS POLICIES (INCLUDING ITS MINORITY POLICIES) IN THE CONTEXT OF CREDITORS.**

---

[5] When Republic Bank acquired DNN, H.E. Services Company remained in the top ten commercial customers. (Bolt Deposition pg. 17-18 - **Exhibit 5**).

[6] The Debtor in is statement of disputed issues, claims that the Creditors did not file a proof of claim against Delphi Automotive Systems, LLC. Debtor is mistaken. The proofs of claims filed by Creditors names all of the Delphi corporate entities including Delphi Automotive Systems, LLC. The Court should note that the debtor is identified as "Delphi Corporation **et. seq.**". The Court should also note that exhibit to the proof of claims is an amended complaint which identifies the defendant as Delphi Automotive Systems, LLC which further evidences the fact that the proof of claim was not limited to the Delphi Corporation.

2

5.      Creditors are a minority supplier for Debtor and, as such, Creditors have a unique

status with rights and privileges pursuant to Debtor's policies[7] including the following:

> Seek out and buy from minority suppliers who are qualified or where
> strong potential to become qualified in indicated. (Deviation from normal
> supplier criteria, within the constraints of good business practice, on an
> interim basis may be necessary in order to accomplish this objective.)

(Minority Supplier Development Program pg. 3 - **Exhibit 6**).

6.      Mr. Thomas Arnold, a former Product Line Planner for Debtor, explained how

Debtor abused and ignored the minority process in the context of the Creditors. (Arnold

Deposition pg. 1-11 - **Exhibit 7**).

## PART TWO

**II.     SERVICES AND GOODS PROVIDED TO DEBTOR IN RELIANCE
UPON DEBTORS' REPRESENTATIONS – PAYMENT NOT MADE BY
DEBTOR.**

7.      With regards to the Creditors' Universal Inspection Division, the invoices, [8]

purchase orders and other paperwork establishes that Debtor, at a minimum, owes

Creditors at least **$247,746.58**. (See Universal Inspection supporting documentation –

**Exhibit 2**).[9] With regards to the Ancon Prototype & Machine Division, the invoices,

purchase orders and other paperwork establishes that Debtor, at a minimum, owes

Creditors **$133,291.20**. (See Ancon supporting documentation – **Exhibit 3**). With regards

to the H.E. Services Company Engineering and Testing Division, the invoices, purchase

orders and other paperwork establishes that Debtor, at a minimum, owes Creditors

---

[7] These policies were enacted before Delphi split from General Motors. (Minority
Supplier Development Program - **Exhibit 6**).
[8] Within the invoices are those that were initially sent to Prince Manufacturing but which
should have been submitted to Debtor for services which were performed by Creditors
for Debtor. Those invoices were submitted to Debtor and have not been paid. (See
Universal Inspection supporting documentation – **Exhibit 2**).
[9] These invoices have been previously authenticated by Mr. Backie in his affidavit.

3

**$598,201.24.** (See Additional Invoices and Purchase Orders for H.E. Services Company

Engineering and Testing Division – **Exhibit 4**).

8.      The scope of these outstanding invoices have been substantiated by Ms. Robin

Schembri. (See Schembri Deposition pg. 1-12 & 18-19 - **Exhibit 8**).

9.      Debtor had (and was mandated to have) policies and procedures as to how the

dock workers were supposed to record shipments received and Debtor was required to

maintain those records for a period of at least seven (7) years.[10] (Arnold Deposition pg. 5-

8 - **Exhibit 7**).

---

[10] With regards to the outstanding invoices, Debtor relies solely upon Mr. William
Locricchio an independent contractor/accountant who has only worked with Delphi since
August 2006. (Locricchio Deposition pg. 7 - **Exhibit 9**). It is undisputed that Mr.
Locricchio was not employed when Creditors were doing business with Debtor.
(Locricchio Deposition pg. 21 - **Exhibit 9**). In making his determinations as to which
invoices were paid and which had not been paid, Mr. Locricchio has relied upon
information contained within a computer program (DACOR) which he did not develop
and which he has had no prior experience with. (Locricchio Deposition pg. 16-17 -
**Exhibit 9**). In fact, his only experience with the program was a three (3) hour training
program. (Locricchio's Deposition pg. 44-45 - **Exhibit 9**). Beyond the computer program,
Mr. Locricchio has relied upon hearsay statements from other individuals. (Locricchio
Deposition pg. 16 - **Exhibit 9**).
Mr. Locricchio's lack of knowledge is illustrated by the fact that he claims that there was
no uniform method of recording shipments back when Creditor was sending shipments to
Debtor. (Locricchio Deposition pg. 17 & 24 - **Exhibit 9**). Mr. Locricchio claims that
generally invoices are not included with shipments sent to Debtor; however, he admits
that he cannot identify the source of this information. (Locricchio Deposition pg. 22-23 -
**Exhibit 9**). It is undisputed that Mr. Locricchio was not on the docks when the shipments
were received, and has never spoken to anyone on the docks. (Locricchio Deposition pg.
18-19 & 24 - **Exhibit 9**). In fact, Mr. Locricchio works out of a leased office in Troy,
Michigan which is not even a part of Debtor's property. (Locricchio Deposition pg. 4 &
49-50 - **Exhibit 9**). Not only does Mr. Locricchio not have a foundation for making such
a statement, Mr. Locricchio's testimony directly contradicts the testimony from Mr.
Arnold who was employed by Debtor and who had personal knowledge as to the manner
in which shipments were recorded. In fact, Mr. Locricchio admits that he never asked
anyone why different numbers were allegedly put into the DACOR system. (Locricchio
Deposition pg. 25 - **Exhibit 9**).
Mr. Locricchio also relied solely upon the DACOR system in determining whether an
invoice was paid. (Locricchio Deposition pg. 29 & 45-46 - **Exhibit 9**). Mr. Locricchio

4

## PART THREE

III. **EXPENDITURES MADE BY CREDITORS IN RELIANCE UPON DEBTOR'S REPRESENTATIONS – JUAREZ, MEXICO.**

10.    Debtor asked H.E. Services' Ancon Division to attend a series of meetings in Juarez, Mexico, through Debtor's agent Greg A. Novak along with other representatives from Debtor, to entice Creditors to open a facility to support Delphi-Juarez.[11] At that time H.E. Services was Debtors' major source of prototypes.

11.    At the urging of Debtor, H.E. Services Company organized a team of corporate executives to concentrate their efforts on the Delphi-Juarez program, including sending a representative to live in neighboring El Paso, Texas, for purposes of meeting Delphi-Juarez's demands. Furthermore, and at Debtor's request, H.E. Services personnel made multiple trips to the El Paso, Texas area, including Tim Fortier (President of H.E. Services), Joe Stearns (V.P. of Manufacturing for H.E. Services), Eric Jacob (V.P. of Sales for H.E. Services), Joel Karwat (Director of Quality Control for H.E. Services), Patrick Harmon (Director of Manufacturing and Facilities for H.E. Services) and John Chisa (Manager of the Ancon Division for H.E. Services).

12.    At the same time, Mr. Backie and Mr. Richard Bolt (Senior Vice President of Republic Bank), scheduled a meeting with Mr. Jerry Haller and Debtor's purchasing staff

---

admits that he does not know the manner of the alleged payment, and that he can only speculate based upon what appears on the invoices. (Locricchio Deposition pg. 50-51 - **Exhibit 9**). Mr. Locricchio admits that the DACOR system does not indicate the method of payment. (Locricchio Deposition pg. 52 - **Exhibit 9**). In fact and as an example, Mr. Locricchio admitted that he had no direct evidence that over $222,000.00 worth of invoices were paid by Debtor. (Locricchio Deposition pg. 80 - **Exhibit 9**).
While Mr. Locricchio admits that a prior audit report was generated by Debtor with regards to the amount that was owed, he also admits that it was never provided to him by Debtor. (Locricchio Deposition pg. 60 - **Exhibit 9**).
[11] The Creditors were told that the facility should be modeled after Creditors' Ancon prototype facility which was an approved minority source for Debtor.

5

to determine the validity of Delphi-Juarez's needs as well as the timing and financial responsibilities involved. (Bolt Deposition pg. 8 & 10 - **Exhibit 5**). Mr. Haller stated that if Creditor moved down to El Paso they would load Creditor's shop and Creditors would be given the sixty-one Mexican Plants to calibrate. (Bolt Deposition pg. 11 - **Exhibit 5**, See also Harmon Deposition pg. 24 - **Exhibit 10**). It is undisputed that Debtor needed its suppliers close by. (Haller Deposition pg. 7 - **Exhibit 11**, See also Harmon Deposition pg. 7-8, 21 - **Exhibit 10**).

13.     Debtor also promised the Creditors that if they built the facility that they would be Debtors' exclusive supplier of prototype parts, assembly, inspection and related services. Ultimately the Debtor breached its promise when it failed to recognize the exclusive nature of the services provided by Creditors and failed to utilize the Creditors as its exclusive source of the goods and services for that local. In fact, Debtor now claims that there was never an intent to make Creditors the exclusive source.

14.     After having made their due diligence efforts to examine the Delphi-Juarez Facility, and also on the urging of Debtor's personnel, including Jerry Haller, the engineer in charge of the prototype area for Debtor, H.E. Services did construct a state of the art facility in El Paso, Texas, a few miles from the border, and the Delphi-Juarez facility, for the purposes of achieving the Delphi-Juarez requested assistance.

15.     Soon thereafter, H.E. Services installed a "state of the art" machining and inspection facility in a leased site in El Paso, Texas, in conformity with Debtor's requirements. (Harmon Deposition pg. 13, 18 & 24 - **Exhibit 10**). No other Michigan supplier moved down to El Paso. (Haller Deposition pg. 46 - **Exhibit 11**). The grand opening was attended by Debtor's personnel amid fanfare with local dignitaries. At that

6

point in time and based on the promises of Debtor and their principals, with regard to the

Delphi-Juarez project, H.E. Services Company had an investment of over $1,350,000.00.

16.    When the El Paso facility opened, Debtor continued, contrary to its earlier

promises, to utilize competitors in Michigan who were performing the same services

which the El Paso facility was capable of performing.[12] (See J. Stearns Deposition pg. 24

& 26 - **Exhibit 12**). As a result of the above-mentioned failures on Debtor's part,

Creditors' costs exceeded its revenue, since the promised work never came to fruition.

(Perna Deposition pg. 12 - **Exhibit 13**, See also Bolt Deposition pg. 15 - **Exhibit 5**).

17.    All of Creditors' investment was subsequently lost due to the failure on the part of

Debtor to meet the projected and promised revenues.[13] This includes the expense of the

A2 LA laboratory certification and inspection equipment which was never used, or if

used, to a minimal extent. All such certification was <u>required</u> by Debtor. Due to the lack

of work and the failure of promises, the site was closed down in July of 2000.

---

[12] The Debtor relies upon the testimony from Enrique Chavez who claims that other
Michigan suppliers received orders because they were more competitive then Creditors.
Signicantly, Mr. Chavez could not provide a single example in support of this assertion.
(Chavez Deposition pg. 42 - **Exhibit 16**). Mr. Chavez did admit that the response time for
the Michigan companies was slower then the response time in Texas. (Chavez Deposition
pg. 39 - **Exhibit 16**).

[13] Mr. Waslusky in his affidavit claimed that <u>he</u> sent approximately 20 RFQ's to
Creditors' El Paso facility; however, he admitted at his deposition that this was not a true
statement and that he did not know the identity of the person who allegedly sent the
RFQs. (See Waslusky Deposition pg. 13-14 - **Exhibit 14**). Mr. Waslusky in his affidavit
affirmatively stated that Mr. Backie never brought up discrimination or broken promises
when he closed down the El Paso facility; however, Mr. Waslusky admitted that this was
not a true statement. (Waslusky Deposition pg. 19 - **Exhibit 14**). Mr. Waslusky also
admits that he has no personal knowledge of whether any of Creditors' equipment in El
Paso was sold at auction despite the representations appearing in his affidavit. (Waslusky
Deposition pg. 22 - **Exhibit 14**). In fact Mr. Waslusky's willingness to distort and rewrite
history may be the result of the fact that Mr. Waslusky was named in a lawsuit wherein
Creditors' Counsel represented the plaintiff and wherein Mr. Backie testified as a witness.
(Waslusky Deposition pg. 4-5 - **Exhibit 14**).

7

Furthermore, Debtor refused to pay in a timely manner the delinquent invoices for this site which are contained within the Ancon invoices.

## IV.    EXPENDITURES MADE IN RELIANCE UPON DEBTOR'S REPRESENTATIONS - H.E. SERVICES FLINT MANUFACTURING DIVISION.

18.    Prior to opening the operation of the H.E. Services Flint Manufacturing Division, H.E. Services had been awarded by Debtor a number of production and assembly jobs at plant locations in Saginaw, Michigan. These programs were presented to H.E. Services through the years 1997 through 1999. Included in these commodities requested and purchased, were tie rods, flanges and lock modules. The equipment and machinery was supplied by Debtor's Saginaw facility for this project and the quality control rating was always "excellent."

19.    In approximately October and November of 1999, Debtor made additional requests of H.E. Services. Specifically, H.E. Services was asked by Debtor to provide several new parts and services namely "lower column bracket assemblies", "diamond size and assembly pump housings", "machine shift tubes", "machine PLT 2 aluminum side covers", "press pins to support housing", machine sides 600 gear side covers", and "assembly lock modules". H.E. Services was also asked to produce the following with a high probability rating: "assembly of tilt housings" and "attainment of lock modules". (See also Harmon Deposition pg. 26 & 31 - **Exhibit 10**).

20.    Along with these programs were several additional projects with high volume production. Specifically, H.E. Services was required to give a "piece price" per given yearly volumes and Debtor's Saginaw facility was to supply all the machinery and

8

tooling. (See also Harmon Deposition pg. 28-30 & 43 - **Exhibit 10**). It is undisputed that annual estimates were given by Debtor to Creditors so that bids could be made.

21.    The next step was to establish a plant in the "Flint area". H.E. Services was required as part of this promise and agreement, to lease a building, provide a plant layout and to receive approval from Debtor's Management for the property which they were to lease. (See also Harmon Deposition pg. 29-30 - **Exhibit 10**). As a result, H.E. Services obtained Cooper Real Estate in Flint, Michigan, to find a suitable accommodation which would satisfy Debtor. Several buildings were looked at but were not approved by Debtor. When Debtor was requested to explain why these particular buildings were not suitable, Debtor's management's reply was, "we don't want this facility being too close to any union activity." Eventually, H.E. Services did get approval from Debtor on a building located at 5117 South Dort Highway, Flint, Michigan. The building consisted of over 60,000 square feet of office and warehouse space, with additional parking and easements for driveways.

22.    Leasing terms for the building was for five years with an annual base rent of $227,950.00. This also required a security deposit of $25,000 triple net. H.E. Services took possession of the building on March 27, 2000.

23.    When Debtor's Saginaw facility was ready to ship equipment from Saginaw to Flint, H.E. Services obtained manufactured parts for the purpose of inspection. This request was made by H.E. Services as part of their due diligence and to ensure that the machines and tooling equipment being supplied by Debtor could indeed make the parts within specification (i.e. it appeared that the machines and tooling that Delphi was

9

supplying to H.E. Services were very old and antiquated). This fact was later confirmed.[14]

24.     Significantly, the orders which were subsequently received were only a fraction of the estimates which had been promised to the Creditors, and Creditors could not sustain itself based on the volume of orders they were actually receiving. (See Harmon Deposition pg. 32-33 & 45 - **Exhibit 10**, See also D. Stearns Deposition pg. 14-15, 25-26 - **Exhibit 15**). Furthermore, Creditors were not getting paid for the work it had performed. (Harmon Deposition pg. 45 - **Exhibit 10**). Finally, at least one program (i.e. Linear Shift) was not given to the Creditors despite earlier promises resulting in additional costs. (See Harmon Deposition pg. 34-36 - **Exhibit 10**).

25.     When Steve Dawe of Debtor's Saginaw Purchasing group became aware of H.E. Services' concerns, and the fact that H.E. Services believed Debtor had previously misrepresented what they intended H.E. Services to do, Mr. Dawe began to immediately threaten H.E. Services' operations in Saginaw. He stated that regardless of any agreements on various purchase orders that he would remove all work, regardless of agreements, if Creditors did not comply with his demands. When H.E. Services explained to Steve Dawe that they would be unable to run this facility based on the amount of volume that they were being provided, as opposed to promised, and that they needed more work or higher prices per unit, Mr. Dawe again threatened to pull all work from

---

[14] Checking some of the units on H.E. Services Inspections Division's Zeiss Co-ordinate Measuring Machines, H.E. Services had found several dimensions to be out of specifications. Specifically, H.E. Services' engineers noted that these parts would be rejected (as being out of spec) and sent to a "containment level" as unusable parts, and H.E. Services specifically informed Debtor they did not want to take on these programs until it was decided who would repair the tooling and who would pay for it.

THE MASTROMARCO FIRM, 1024 N. Michigan Avenue, P.O. Box 3197, Saginaw, MI 48605-3197  (989) 752-1414

H.E. Services. After multiple meetings to try to establish a "win/win" solution, Mr. Dawe

stated that his instructions were to, "pull the jobs if price increases were asked for."

Making good on his threat, in July of 2003, Mr. Dawe had the equipment pulled from

both H.E. Services' Saginaw and Flint plants and sent the business to non-minority

companies including Prince Manufacturing.[15] (See also Harmon Deposition pg. 48-50 -

**Exhibit 10**).

26.     H.E. Services' losses in sales because of the failure of Debtor to make good in its

promises in the Flint location alone has caused losses to exceed $10,600,000.00 and

amortized tooling repairs and accommodations exceeded $1,850,000.00.

## V.     EXPENDITURES MADE IN RELIANCE UPON DEBTOR'S REPRESENTATIONS - EX-CELL-O GRIDING MACHINE XJ690.

27.     As with the above-mentioned situations, H.E. Services was approached by

Creditor regarding this machine. (See also J. Stearns Deposition pg. 48 - **Exhibit 12**).

Specifically, Creditor asked about a collaboration with Debtor on the purchase of a

grinding machine to produce spindle shafts, since Creditor did not have the funds to

purchase the machine. (See also J. Stearns Deposition pg. 48 - **Exhibit 12**). Essentially,

the way that the purchase was to work, was that Debtor promised to purchase a certain

number of spindle shafts over a period of several years, and a portion of the purchases

would be delegated or designated towards the purchase of the machine. The machine in

question was a universal single spindle CNC (computer numerical control) ball track

grinder, which was to be built in Germany by EX-CELL-O. A purchase order, number

---

[15] Like the problems pointed out by H.E. Services, the parts made by Prince immediately
fell into "Level II Containment." Interestingly, Mr. Dawe then hired H.E. Services to sort
the parts from Prince Manufacturing. H.E. Services in line with their attempts to help
facilitate Debtor's business relationships, sent a bill to Debtor as requested but they have
still not been paid for this service as reflected in the Universal Inspection Invoices.

11

PO53B0028 to H.E. Services, was issued on December 14, 1999. In return and in reliance

thereon, H.E. Services issued its purchase order to EX-CELL-O, PO53510057 on the

same date, for the purchase of the machine. The machine was to be delivered to Saginaw,

Michigan, on September 15, 2000, at a price of $621,696.00 to H.E. Services.

28.    The reason for the purchase was based not only on Debtor's promises to pay H.E.

Services Company back for its costs and servicing in the purchase of this product through

amortizing the cost of this machine over piece price, but also for the promised future

economic benefits to H.E. Services. Debtor assumed orders for this machine at 7000

pieces per year.

29.    The machine never worked and the source of the problem surrounded the

Debtor's design requirements. (Arnold Deposition pg. 12-13 - **Exhibit 7,** See also J.

Stearns Deposition pg. 50-51 & 53 - **Exhibit 12**). Mr. Waslusky admitted that Creditors

could not deviate from the specifications. (Waslusky Deposition pg. 45-47 - **Exhibit 14**).

Also extraordinary, was Debtor's requirement of EX-CELL-O that the machine be

equipped with "Fanuc" controls as opposed to the "Seimen" controls that normally came

with such a machine.[16] (J. Stearns Deposition pg. 53-56 - **Exhibit 12,** See also D. Stearns

Deposition pg. 53 - **Exhibit 15**).   Debtor's interference and control over EX-CELL-O on

the actual design of this machine, precipitated many of the problems which later occurred

with the machine. [17]

---

[16] In his affidavit Mr. Waslusky claimed that Fanuc controls were the industry standard;
however, in his deposition Mr. Waslusky admitted that he did not know what the industry
standards were after 1999. (See Waslusky Deposition pg. 34-43 - **Exhibit 14**).

[17] Mr. Waslusky's deposition tesimony purports to have clear recollection as to a number
of things; however, the truth (or more accurately lack thereof) of the testimony was
revealed during his deposition. (Compare pg. 55 with 56 of Waslusky Deposition -
**Exhibit 14**).

THE MASTROMARCO FIRM, 1024 N. Michigan Avenue, P.O. Box 3197, Saginaw, MI 48605-3197  (989) 752-1414

30.   In addition to a loss of over $2 million dollars over the duration of the program,[18]

Creditors also lost the following in out-of-pocket expenses:

| | |
|---|---|
| ▪ Lost Business- | $ 80,010.00 |
| ▪ Wasted trips to Germany | $ 18,500.00 |
| ▪ Financial Commitments to Bank | $ 66,110.00 |
| ▪ Employee Labor Costs | $ 43,200.00 |
| **Losses at of 1-23-04** | **$207,820.00**[19] |

31.   During the delay part orders were still submitted. Instead of submitting orders for

the above-mentioned parts to the Creditors, the Debtor instead submitted orders for those

parts to a non-minority corporation despite the fact that Creditors were making a good

faith effort to work with Debtors on an engineering disaster created by Debtor.

## PART FOUR

32.   Prior to the Voluntary Petition for Bankruptcy, the Creditors had initiated a

lawsuit against the Debtor seeking recovery for damages arising from Debtor's wrongful

actions. A copy of the Amended Complaint has been attached for the Court's

convenience. (See Amended Complaint – **Exhibit 18**).

## VI.   COUNT ONE – CREDITORS' 42 U.S.C. § 1981 CLAIM.

---

[18] See the Delphi Purchase Request. (**Exhibit 17**).

[19] Essentially, Creditors were being improperly burdened with costs directly related to Debtor's improper modifications of the machine. (See also J. Stearns Deposition pg. 61-62 - **Exhibit 12**). Creditors did seek reimbursement from the EX-CELL-O Corporation; however, the German Company refused to reimburse the Creditors for the extra $207,820.00. Subsequently, it was learned that EX-CELL-O was contacted by Bruce Waslusky of Debtor's Saginaw Division. Mr. Waslusky indicated that EX-CELL-O should sue to get the machine back and that "he and Delphi" would "make a deal" with another vendor to facilitate obtaining the machine. Again, the problems were the result of design issues created by Debtor.

30. Even though this EX-CELL-O machine was in H.E. Services' possession, Mr. Waslusky took it upon himself to encourage EX-CELL-O Corporation to sue H.E. Services so that they could obtain and provide the machine to a hand-picked third party vendor for purposes of doing work for Delphi in Saginaw.

13

33.    The Creditors have alleged that the Debtor seek damages arising from contractual

breaches on the basis of race discrimination. As the Court is aware, 42 U.S.C. § 1981

states in relevant part:

> [a]ll persons within the jurisdiction of the United States shall have the
> same right in every State and Territory to make and enforce contracts, to
> sue, be parties, give evidence, and to the full and equal benefit of all laws
> and proceedings for the security of persons and property as is enjoyed by
> white citizens, and shall be subject to like punishment, pains, penalties,
> taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.[20] The Sixth Circuit has noted that Section 1981 exists as a federal

remedy for unlawful discrimination:

> Section 1981 has been held to afford a federal remedy against
> discrimination on the basis of race in private employment contracts.
> Johnson v. Railway Express Agency, 421 U.S. 454, 459-460, 95 S.Ct.
> 1716, 44 L.Ed.2d 295.

Winston v. Lear-Siegler, Inc., 558 F.2d 1266, 1268 (6th Cir. 1977).

34.    As illustrated in the evidentiary statement as set forth above, evidence exists that

the Debtor breached contractual obligations with the Creditors and, in at least some cases,

in favor of non-minority competitors. Accordingly, the Creditors seek a recovery of all

money damages permitted by statute. Specifically, the Creditors seek the damages as set

forth in their Amended Complaint. (Amended Complaint – **Exhibit 18**).[21]

**VII.    COUNT TWO – CREDITORS' INNOCENT AND/OR NEGLIGENT
MISREPRESENTATIONS.**

---

[20] Section 1981 has been extended to Corporate Plaintiffs with a racial identity. See
Thinket Ink. Information Resources, Inc. v. Sun Microsystems, Inc., 368 F.3d 1053 (9th
Cir. 2004).

[21] See 42 USC § 1981a.

14

35.     The Creditors also allege that the Debtor seeks to enforce the contracts which

existed between themselves and Debtor.  The elements for innocent misrepresentation

under Michigan law includes the following:

> Claims for fraudulent misrepresentation require proof that (1) the
> defendant made a material representation, (2) it was false, (3) the
> defendant knew it was false when made, or made it recklessly, without
> knowledge of its truth and as a positive assertion, (4) it was made with the
> intention to induce reliance by the plaintiff, (5) the plaintiff acted in
> reliance upon it, and (6) the plaintiff thereby suffered injury. Temborius v.
> Slatkin, 157 Mich App 587, 597, 403 NW2d 821 (1986). A claim for
> "innocent" misrepresentation requires proof of the same elements except
> that the misrepresentation need not be made knowingly or recklessly.
> Innocent misrepresentation also requires proof of the additional element
> that the plaintiff's injury actually benefited the defendant. Id.

State-Williams Partnership vs. Gale, 169 Mich App 170, 178, 425 NW2d 756 (1988).

36.     As illustrated in the evidentiary statement as set forth above, evidence exists that

the Debtor innocently and/or negligently misrepresented its intentions with the Creditors.

Accordingly, the Creditors seek a recovery of all money damages permitted by Michigan

law.  Specifically, the Creditors seek the damages as set forth in their Amended

Complaint.  (Amended Complaint – **Exhibit 18**).

**VIII.  COUNT   THREE   &   FIVE   –   CREDITORS'   FRAUDULENT
MISREPRESENTATIONS.**

37.     The Michigan Court of Appeals in the case of Phinney v. Perlmutter, 222 Mich

App 513, 525; 564 NW2d 532 (1997), has reiterated the elements for fraud:

> In order to prove fraud or misrepresentation, plaintiff had to show: (1) that
> Perlmutter made a material misrepresentation, (2) that it was false, (3) that
> Perlmutter knew it was false or made the promise recklessly without
> knowledge of its truth or falsity, (4) that Perlmutter made the promise with
> the intent that plaintiff would act on it, (5) that plaintiff acted in reliance,
> and (6) that plaintiff suffered damage. Arim v. General Motors Corp., 206
> Mich App 178, 195, 520 NW2d 695 (1994). A fraudulent
> misrepresentation may be based on a promise made in bad faith without

15

intention of performance. <u>Hi-Way Motor Co. v. Int'l Harvester Co.</u>, 398
Mich 330, 337-338, 247 NW2d 813 (1976).

38.    The Court should note that unfulfilled promise to perform in the future is

actionable under Michigan law where there is evidence that it was made with a present

undisclosed intent not to perform. <u>Foreman v. Foreman</u>, 266 Mich App 132, 143, 701

NW2d 167 (2005), citing <u>Rutan v. Straehly</u>, 289 Mich 341, 348-349; 286 NW 639

(1930). Additionally, liability for fraud may be predicated on statements that relate to

future events when the statements were intended to be and accepted as representations of

fact that involved matters peculiarly within the knowledge of the speaker. <u>Foreman v.

Foreman</u>, 266 Mich App 132, 143, 701 NW2d 167 (2005), quoting <u>Crook v. Ford</u>, 249

Mich 500, 504-505; 229 NW 587 (1930).

39.    As illustrated in the evidentiary statement as set forth above, evidence exists that

the Debtor fraudulently misrepresented its intentions with the Creditors. Accordingly, the

Creditors seek a recovery of all money damages permitted by Michigan law. Specifically,

the Creditors seek the damages as set forth in their Amended Complaint. (Amended

Complaint – **Exhibit 18**).

## IX.    COUNT FOUR – CREDITORS' SILENT FRAUD.

40.    With regards to silent fraud, the Michigan Court of Appeals has described the

nature of silent fraud:

> A legal duty to disclose commonly arises from a circumstance in which
> the plaintiff inquires regarding something, to which the defendant makes a
> false or misleading representation by replying incompletely with answers
> that are truthful but omit material information. <u>Id</u>.

<u>The Marble Cleary Trust vs. The Edward-Marlah Muzyl Trust</u>, 262 Mich App 485, 500,

686 NW2d 770 (2004).

16

41.     As illustrated in the evidentiary statement as set forth above, evidence exists that

the Debtor withheld information when it owed a duty with the Creditors. Accordingly,

the Creditors seek a recovery of all money damages permitted by Michigan law.

Specifically, the Creditors seek the damages as set forth in their Amended Complaint.

(Amended Complaint – **Exhibit 18**).

## X.    COUNT SIX – CREDITORS' CLAIM OF PROMISSORY ESTOPPEL.

42.     The Michigan Supreme Court has explained the cause of action for Promissory

Estoppel:

> "A promise which the promisor should reasonably expect to induce action
> or forbearance on the part of the promisee or a third person and which
> does induce such action or forbearance is binding if injustice can be
> avoided only by enforcement of the promise. The remedy granted for
> breach may be limited as justice requires."

State Bank of Standish v. Curry, 442 Mich 76, 83; 500 NW2d 104 (1993), citing to

Restatement Contracts 2d §90 pg. 242, see also Ardt v. Titan Ins. Co., 233 Mich App

685, 692, 593 NW2d 215 (1999), and Mt. Carmel Mercy Hosp. v. Allstate Ins. Co., 194

Mich App 580, 589, 487 NW2d 849 (1992).

43.     The rational for enforcing promises has also been explained by the Michgian

Supreme Court:

> Promissory estoppel developed to protect the ability of individuals to trust
> promises in circumstances where trust is essential. It is the value of trust
> that forms the basis of the entitlement to rely. (internal citation omitted).

State Bank of Standish v. Curry, 442 Mich 76, 83-84; 500 NW2d 104 (1993). In other

words, not every element to an agreement must be spelled out in the promise in order for

that promise to be enforceable under a theory of promissory estoppel as explained by the

Michigan Supreme Court:

17

> This approach is consistent with the general rule of contract that, where
> the parties have left open some matters to be determined in the future,
> enforcement is not precluded if there exists a method of determining the
> terms of the contract either by examining the agreement itself or by other
> usage or custom that is independent of a party's mere "wish, will and
> desire." An enforceable agreement may be found "even though the
> determination is left to one of the contracting parties [as long as] he is
> required to make it 'in good faith' in accordance with [an] existing
> standard or with facts capable of objective proof." 1 Corbin, Contracts, §
> 95, p. 402.

State Bank of Standish v. Curry, 442 Mich 76, 89-90; 500 NW2d 104 (1993). The

Michigan Supreme Court has explained that a Court should also consider the following

when considering the promises:

> Variables such as the nature of the relationship between the parties, the
> clarity of the representation, as well as the circumstances surrounding the
> making of the representation, are important to the determination of
> whether the manifestation rises to the level of a promise.

State Bank of Standish v. Curry, 442 Mich 76, 86; 500 NW2d 104 (1993).

44.     As illustrated in the evidentiary statement as set forth above, evidence exists that

the Debtor made certain promises which the Creditors relied upon to their detriment.

Accordingly, the Creditors seek a recovery of all money damages permitted by Michigan

law. Specifically, the Creditors seek the damages as set forth in their Amended

Complaint. (Amended Complaint – **Exhibit 18**).

## XI.    COUNT SEVEN – CREDITORS' BREACH OF CONTRACT (UCC) CLAIM AGAINST DEBTOR.

45.     The Creditors also seek damages arising from contractual breaches in the context

of the sale of goods. A contract for the sale of goods exists when a buyer offers to buy

goods and a seller accepts that offer. MCL § 440.2206, see also MCL § 440.2207.

Acceptance occurs when the seller through words or actions indicates in any reasonable

manner that it intends to enter into a contract under the terms proposed by the buyer.

18

MCL § 440.2206, see also MCL § 440.2207. Upon nonpayment of the goods, the

Plaintiffs are entitled to seek damages arising from the nonpayment. MCL § 440.2209.

46.    As illustrated in the evidentiary statement as set forth above, evidence exists that

the Debtor made certain agreements with the Creditors with regards to the sale of goods

which the Debtor has subsequently breached. Accordingly, the Creditors seek a recovery

of all money damages permitted by statute. Specifically, the Creditors seek the damages

as set forth in their Amended Complaint. (Amended Complaint – **Exhibit 18**).[22]

## XII.    COUNT EIGHT – CREDITORS' BREACH OF CONTRACT CLAIM AGAINST DEBTOR.

47.    The Michigan Court of Appeals has explained the elements for a breach of

contract cause of action:

> The essential elements of a valid contract are the following: "(1) parties
> competent to contract, (2) a proper subject matter, (3) a legal
> consideration, (4) mutuality of agreement, and (5) mutuality of
> obligation." Thomas v. Leja, 187 Mich App 418, 422, 468 NW2d 58
> (1991).

Hess v. Cannon Township, 265 Mich App 582, 592, 696 NW2d 742 (2005).

48.    As illustrated in the evidentiary statement as set forth above, evidence exists that

the Debtor made certain agreements with the Creditors with regards to services which the

Debtor has subsequently breached. Accordingly, the Creditors seek a recovery of all

money damages permitted by Michigan law. Specifically, the Creditors seek the damages

as set forth in their Amended Complaint. (Amended Complaint – **Exhibit 18**).[23]

---

[22] See MCL § 440.2709 & MCL § 440.2710, See also Haken v. Scheffler, 24 Mich App
196; 180 NW2d 206 (1970).
[23] See Jim Bob, Inc. v. Mehling, 178 Mich App 71, 443 NW2d 451 (1989), Lawrence v.
Will Darrah & Assoc., 445 Mich 1, 516 NW2d 43 (1994); Earl Dubey & Sons, Inc. v.
Macomb Concrete Corp., 81 Mich App 662, 266 NW2d 152 (1978); Tross v. HE Clark
Co., 274 Mich 263, 264 NW 365 (1936); Dierickx v. Vulcan Indus., 10 Mich App 67,

19

## MEMORANDUM OF LAW

49.     Since the legal authorities relied on by Creditors are set forth herein, Creditors have not filed a separate memorandum of law. Creditors reserve the right to file a separate memorandum of law in reply to any response filed by Debtor.

## RESERVATION OF RIGHTS

50.     Claimants reserve the right to further amend or supplement (i.) their filed Proof of Claims, (ii) the documentary evidence filed in support of the Proof of Claims, (iii) this Amended Supplemental Response, and (iv) the evidentiary record in support of the Proof of Claims at a later date.

## RELIEF SOUGHT

51.     Wherefore, the Creditors again request that this Honorable Court award the monies owed which have been requested in the Amended Complaint which has been previously submitted to this Court as an attachment to Creditors' Proofs of Claims.[24]

Dated:   August 30, 2007                    Respectfully submitted,

                                            s/ Victor J. Mastromarco, Jr.
                                            Victor J. Mastromarco, Jr. (P34564)
                                            Attorney for Creditors
                                            1024 N. Michigan Avenue, P.O. Box 3197
                                            Saginaw, Michigan 48605-3197
                                            (989) 752-1414

---

158 NW2d 778 (1968), Kolton v. Nassar, 358 Mich 154, 99 NW2d 362 (1959); The Vogue v. Shopping Centers, Inc., 402 Mich 546, 266 NW2d 148 (1978); Joerger v. Gordon Food Serv., 224 Mich App 167, 568 NW2d 365 (1997); Fera v. Village Plaza, 396 Mich 639, 242 NW2d 372 (1976); Getman v. Mathews, 125 Mich App 245, 335 NW2d 671 (1983); Holton v. Monarch Motor Car Co., 202 Mich 271, 168 NW 539 (1918); Earl Dubey & Sons, Inc. v. Macomb Concrete Corp., 81 Mich App 662, 266 NW2d 152 (1978); Huler v. Nassar, 322 Mich 1, 33 NW2d 637 (1948).

[24] Contrary to Debtor's assertions, the Creditors have set forth claims of which directly involve Mr. Backie. For example, evidence has been submitted and evidence will be provided at hearing that promises were made to Mr. Backie in the context of El Paso. Accordingly, Defendant's assertion is without merit.

20

Victor J. Mastromarco, Jr. (Mich Bar No P34564)      Hearing Date: September 6, 2007
Russell C. Babcock (Mich Bar No P57662)                Time: 10:00 a.m. (Eastern Standard)
THE MASTROMARCO FIRM
Counsel to H.E. Services Company &
Robert Backie
1024 North Michigan Avenue
Post Office Box 3197
Saginaw, Michigan 48605-3197
(989) 752-1414

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

DELPHI CORPORATION, et al.,

Chapter 11
Case No. 05-44481 (RDD)
(Jointly Administered)

Debtors.

**CERTIFICATE OF SERVICE**

Victor J. Mastromarco, Jr. being duly admitted to practice before the Southern District of New York, certifies that on the 30th day of August 2007, I caused service of the Amended Supplemental Response to the above-captioned Debtors' Third Omnibus Claims Objections by overnight courier on the parties listed below:

Skadden, Arps, Slate, Meagher & Flom
333 West Wacker Drive
Suite 2100
Chicago, Illinois 60606
Attn:   John Wm. Butler, Jr., Esq., Al Hogan, Esq.
        John K. Lyons, Esq., Christopher Conners, Esq.
        Sarah J. Platt, Esq.
        Courtney E. VanLonkHuyzen, Esq.

Dated:  August 30, 2007

                                    s/ Victor J. Mastromarco, Jr.
                                    Victor J. Mastromarco, Jr. (P34564)

1
