**Hearing Date and Time: September 6, 2007, at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
Albert L. Hogan III (AH 8807)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

— and —

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- — - — - — - — - — - — - — - — - — - — - — - —  x
                                                 :
        In re                                    :     Chapter 11
                                                 :
DELPHI CORPORATION, et al.,                      :     Case No. 05-44481 (RDD)
                                                 :
                                                 :     (Jointly Administered)
            Debtors.                             :
- — - — - — - — - — - — - — - — - — - — - — - —  x

DEBTORS' OMNIBUS AMENDED SUPPLEMENTAL REPLY WITH
RESPECT TO PROOFS OF CLAIM NUMBERS 837 AND 838
           (H.E. SERVICES COMPANY AND ROBERT BACKIE)

("AMENDED SUPPLEMENTAL REPLY — H.E. SERVICES, ET AL.")

Delphi Corporation and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (the "Debtors," "DAS LLC," or "Delphi"), hereby submit their Amended Supplemental Reply With Respect To Proofs Of Claim Nos. 837 and 838 (H.E. Services Company and Robert Backie) and respectfully represent as follows:[1]

## Introduction

1.    H.E. Services Company ("H.E. Services"), a longtime former supplier of goods and services to Delphi and its predecessor the GM Corporation ("GM")[2] since the 1990s, made a number of business decisions that were not as lucrative as H.E. Services hoped.  Instead of accepting that its decisions to invest in new facilities or new equipment did not yield desirable results, H.E. Services seeks to recoup the money it invested over the years (as well as any lost profits and other damages) by alleging that various individuals from Delphi — most of whom are unnamed in H.E. Services' papers — *guaranteed* H.E. Services a stream of future purchase orders if it made the investments.  However, H.E. Services, as a longtime and sophisticated supplier of Delphi, knew full well that Delphi does not promise future business outside its request for quotation (or "RFQ") process and does not guarantee its projections or the success of supplier investments.  Simply put, H.E. Services took a number of business risks that did not pan out; it was not guaranteed an endless stream of business regardless of whether, as happened here, the cost and quality of H.E. Services' goods and services made it noncompetitive or whether Delphi's needs declined because of decreased demand for its parts from its major customers.

---

[1]    On June 14, 2007, Richard Janes withdrew his claim number 14762 because he lacked standing, as a shareholder, to raise claims on behalf of the corporate entity, H.E. Services. (Doc. No. 8241.) For the same reason, Backie's individual claims should be disallowed and expunged (apart from his discrimination claim) for lack of standing. See Belle Isle Grill Corp. v. Detroit, 666 N.W.2d 271, 278 (Mich. Ct. App. 2003).

[2]    Prior to Delphi's January 1, 1999 divestiture from GM, H.E. Services supplied parts and services to GM.  For convenience "Delphi" is used throughout this Reply regardless of the time frame at issue.

2.    H.E. Services' underlying complaint articulates three discrete investments that H.E. Services allegedly made based on some apparently verbal agreement or guarantee of future business from Delphi: (i) construction of a facility in El Paso, Texas, to service the prototype needs of Delphi's Steering division in Juarez, Mexico (the "Juarez Relationship"); (ii) establishment of a manufacturing facility in Flint, Michigan, to service Delphi's Saginaw Steering Division's needs (the "Flint Relationship"); and (iii) the purchase of an EX-CELL-O grinding machine to manufacture prototype parts for Delphi's Saginaw Steering Division (the "EX-CELL-O Relationship") (collectively the "Relationships").  Based on these alleged promises, H.E. Services asserts a variety of claims, including fraud, misrepresentation, promissory estoppel, and breach of contact — all allegedly done because H.E. Services is a minority-owned firm.  These claims must fail, however, because Delphi never promised future business to H.E. Services; Delphi represented to suppliers then, as it continues to represent to suppliers today, that purchase orders are issued as a result of its RFQ process and the supplier with the most competitive quote, in terms of price, quality, and delivery, will be awarded the business.  H.E. Services made its investments so that it could *compete* for Delphi's business — not be guaranteed such business *ad infinitum.*

3.    The claims also fail for a variety of other reasons, including H.E. Services' and Backie's failure to (i) file claims by the deadline set forth in the applicable statutes of limitations; (ii) come forward with any evidence of discrimination; (iii) prove facts supporting their fraud and misrepresentation claims; (iv) set forth facts of a clear and definite promise upon which H.E. Services reasonably relied; and (v) explain how alleged oral agreements or promises would be enforceable in light of Delphi's general terms and conditions that contain an integration clause and written amendment requirement. The only somewhat meritorious claim is H.E.

2

Services' claim for unpaid invoices, which the Debtors value at a small fraction of the amount of money H.E. Services believes it is owed.  All other claims asserted by H.E. Services and Backie should be disallowed and expunged in their entirety.

<u>Background</u>

4.       H.E. Services' relationship with Delphi, and its predecessor GM, began in the 1990s and lasted until spring 2004 when H.E. Services permanently went out of business. From the inception of the relationship, Delphi purchased automotive components that H.E. Services engineered pursuant to various purchase orders incorporating Delphi's general terms and conditions.  Delphi hired H.E. Services to perform inspection and assembly services, also pursuant to purchase orders incorporating the same general terms and conditions.

5.       Experienced and sophisticated Delphi suppliers, including H.E. Services, understand that Delphi issues written RFQs to multiple potential suppliers in connection with all products or services Delphi desires to purchase.  (Am. Decl. Of Stephen Dawe In Supp. Of Debtors' Supplemental Reply (the "Dawe Am. Decl.") ¶ 7, attached as <u>Ex. 1</u>.)[3]  Once an RFQ is issued, suppliers have the opportunity to bid on the prospective business; after a series of negotiations (the "RFQ Process"), Delphi chooses the most competitive supplier to fulfill its needs.  (<u>Id.</u> ¶¶ 7-8.)  Suppliers never receive business — or the promise of business — from Delphi without first going through the RFQ Process.  (<u>See id.</u> ¶¶ 7-9, 17.)

6.       Over the years, H.E. Services received numerous RFQs from Delphi.  In all cases, Delphi based decisions not to award business to H.E. Services after the RFQ Process solely on H.E. Services' relative lack of competitiveness in terms of value, quality, or delivery

---

[3]    The Debtors have redacted confidential pricing information from declaration exhibits pursuant to paragraph 9(f)(ii) of the Claim Objection Procedures Order but will provide unredacted versions to the Court and counsel.

time.  Similarly, Delphi premised decisions to terminate contracts with H.E. Services, from time to time, on H.E. Services' relative lack of competitiveness.  Such decisions were not based on H.E. Services' or Backie's minority status.  (See, e.g., id. ¶¶ 8, 18.)

A.    H.E. Services' Decision to Open a Facility in El Paso, Texas, to Service Delphi's Saginaw Steering Division's Prototype Needs in Juarez, Mexico

7.    In 1995 Delphi's Steering Division ("Steering") decided to globalize its engineering capabilities.  (Haller 5:3-20.)  Accordingly, in June 1995, Steering sent Jerry Haller to set up an engineering design center at the Mexico Technical Center (the "Tech Center") located in Juarez, Mexico.  (Id. 6:16-21; 8:24-10:2.)  Steering's wanted to relocate some of its design work from Saginaw to Juarez.  (Chavez 8:11-19, 11:14-12:3; Haller 7:9-8:11.)  To that end, Enrique Chavez, who was in charge of Steering purchasing in Juarez, began assembling a local supplier base to service Steering's needs out of the Tech Center.  (Chavez 7:8-22, 8:20-9:1, 12:6-13:4; Haller 14:17-15:9.)  By late 1996 Chavez held joint supplier meetings attended by both Mexican-based suppliers and Saginaw-based suppliers, including H.E. Services.  (Chavez 13:5-23; Haller 14:17-15:9, 17:22-18:12.)  As H.E. Services' management admits, Delphi invited many suppliers to the meetings to "express[] their interest in having *suppliers* similar to [H.E. Services] in that region." (Jacob 7:4-16 (emphasis added).)

8.    Subsequently, as early as 1997, Backie; H.E. Services' vice president of manufacturing and engineering, Joe Stearns; and H.E. Services' banker, Richard Bolt, met with Haller. (Backie 7:25-9:3; Haller 32:24-34:4.)  Backie claims that, at this meeting, Haller said to him, "You build this facility. . . . You're getting all of our prototype work."  (Backie 53:12-20.)  However, Joe Stearns, who attended the meeting, admitted Haller never made such a promise:

Q      Sure. Taking the other end of the spectrum, did Mr. Heller [sic] ever tell you that if you built the El Paso facility that you would be guaranteed to be the sole prototype supplier for the Juarez facility?

A      No. He just said it was a great opportunity.

(J. Stearns 90:15-19.) Instead Steering's work out of the Tech Center was to be awarded based on Delphi's standard bidding process — not based on an alleged sole supplier agreement. (Jacob 7:4-16, 38:10-15, 40:11-43:11.)

9.      Ultimately, on February 1, 1997, H.E. Services opened a facility in El Paso, a town just across the border from Juarez, Mexico. (Am. Compl. ¶ 38.) Since then, Steering continued to include H.E. Services on its bid lists and to send H.E. Services all RFQs on which it could bid. (Haller 31:12-32:7; Chavez 25:9-20; Am. Decl. Of Bruce Waslusky In Supp. Of Debtors' Supplemental Reply (the "Waslusky Am. Decl.") ¶ 5, attached as Ex. 2.) In fact, H.E. Services' operations manager, Eric Jacob, admitted that his expectations regarding H.E. Services' business with Delphi actually materialized after H.E. Services opened its facility. (Jacob 37:22-38:1, 50:16-25.) When H.E. Services was not awarded certain business as part of the RFQ Process, the reason was solely H.E. Services' relative lack of competitiveness in terms of value or quality. (Chavez 44:4-22; Waslusky Am. Decl. ¶ 5.) Ultimately, in July 2000, H.E. Services closed its El Paso facility. (Backie Aff. ¶ 29(C).)

10.      Although H.E. Services claims, in its papers, that there was some sort of exclusive supplier agreement that Delphi breached, every H.E. Services' representative who was asked about such an agreement was unaware of anything in writing. For example, Backie admitted that he did not know of anything in writing reflecting any alleged sole supplier agreement between Steering and H.E. Services. (Backie 60:6-9.) Moreover, H.E. Services' president at the time, Tim Fortier; its vice president of manufacturing and engineering, Joe

5

Stearns; and H.E. Services' El Paso operations manager, Eric Jacob, all conceded that they did

not know of any exclusive prototype supplier arrangement for Juarez. (Fortier 26:3-7; J. Stearns

90:15-19; Jacob 47:7-16.) And H.E. Services' banker, Richard Bolt, testified, "We kept hoping

to see a contract but we never did. It never came to fruition as far as I know." (Bolt 31:9-15.)[4]

   11. Moreover, any alleged reasonable expectation of an exclusive supplier

relationship based on something other than a written agreement is untenable. As Backie

admitted during his deposition, there was no discussion about how many parts would be

required, the timing of delivery, or information on pricing. (Backie 65:25-66:1.) Nor was

Backie given any specific information — oral or written — about the volume of business that

H.E. Services was to expect for the El Paso facility. (Id. 52:1-11, 53:21-24, 65:25-66:1, 72:12-

73:1.) In addition, when H.E. Services' president, Tim Fortier, was asked about his expectations

going into El Paso, he said: "I believe that we had certain expectations. Obviously you know

when you're in our line of business you can't have too many . . . ." (Fortier 14:16-23.) Fortier,

Joe Stearns, and Jacob had no expectation of a sole supplier relationship with Delphi. (Id. 26:3-

7; J. Stearns 90:15-19; Jacob 47:7-16.) Rather, Jacob admits his expectation was that all Steering

work in Juarez would be subject to Delphi's standard RFQ process. (Jacob 37:22-38:1, 45:17-

47:6.) And, as Backie admits, the parties' course of dealing never involved verbal exclusive

prototype support contracts of indefinite length. (Backie 57:4-7; Haller 24:14-23.)

---

[4] The only writing on which H.E. Services and Backie appear to rely to support the alleged exclusive supplier
arrangement is an October 1996 engineering support center proposal, which H.E. Services alleges Steering
"accepted" that same month. (See Am. Compl. ¶¶ 33-36 & Ex. 1A.) However, the plain language of the
proposal does not reflect that H.E. Services bid on an exclusive prototype supplier agreement. (Am. Compl.,
Ex. 1A.) Moreover, Backie admitted that he did not recall such a proposal (Backie 59:23-60:5, 60:17-21), and
other H.E. Services representatives admitted that they did not believe that Delphi participated in the
development of H.E. Services facility or that Delphi was involved in discussions about plant location. (J.
Stearns 18:23-19:1; Jacob 21:24-22:1, 25:16-23.) Rather, as H.E. Services' management conceded, the
prototype jobs coming out of Juarez were not exempt from Delphi's competitive bid process that required an
RFQ and a written purchase order for all jobs. (Jacob 38:10-15, 42:20-43:11; J. Stearns 65:21-66:13, 89:16-25.)

B.    H.E. Services' Decision to Open a Facility in Flint, Michigan

12.    In March 2000 H.E. Services decided to expand its business in Michigan by moving some of its existing operations to a larger facility in Flint, Michigan. (Backie Aff. ¶ 39.) Contrary to H.E. Services' allegations, Delphi did not promise H.E. Services anything in return if H.E. Services moved such operations to Flint. Nor was Delphi involved in establishing the larger facility in Flint. For example, Backie admitted that, before opening up the larger Flint facility, he did not discuss with anyone at Delphi what H.E. Services should expect, in terms of business, after the Flint plant opened. (Backie 124:2-6.) Backie also admitted that he never asked to see any commitment in writing from Delphi. (Id. 125:14-19.) Moreover, Dave Stearns, H.E. Services' vice president of manufacturing and operations who was involved in the setup of the Flint facility, admitted that he had no recollection of Delphi being involved in H.E. Services' selection of a facility in Flint. (D. Stearns 21:3-9.)[5]

13.    After H.E. Services opened up its larger Flint facility, Delphi continued to issue RFQs to H.E. Services for the production or assembly of many products, and H.E. Services was awarded business. (Dawe Am. Decl. ¶¶ 15, 18.) H.E. Services' president, Tim Fortier, and its vice president, Dave Stearns, admit that all work offered to H.E. Services was subject to Delphi's standard RFQ Process and that H.E. Services was awarded work only if it submitted the most competitive bids. (D. Stearns 31:3-12; Fortier 25:8-11.) When H.E. Services failed to win the bid, the reason was solely H.E. Services' relative lack of competitiveness. (Dawe Am. Decl. ¶ 18.) Therefore, work was not awarded to H.E. Services simply if it built itself a larger facility

---

[5]    Backie testified that, before H.E. Services decided to open up the larger Flint facility, he believed Joe Stearns memorialized some commitment made by Delphi in a letter. (Backie 128:7-14.) Yet Backie, who was admittedly the "last word" on decisions to build a facility, conceded that he never reviewed any such letter from Joe Stearns before deciding to build the larger Flint facility. (Id. 48:11-25, 129:5-14.)

in Flint.  (D. Stearns 31:3-12; Fortier 25:8-11.)  If Delphi awarded business to H.E. Services as

part of the RFQ Process, the award would have resulted in a written purchase order.

14.    Although H.E. Services failed to attach any purchase order to or refer to

any part number in its papers, Delphi nevertheless was able to locate contracts concerning the

parts about which H.E. Services apparently complains Delphi ordered less than the estimated

volumes. (See Dawe Am. Decl. ¶ 15 (citing purchase order numbers 90I3412, 90I4266, 90I4400,

90I4317, and 90I4322 (collectively, the "Flint POs")).)  The Flint POs were requirements

contracts on Delphi's standard "90I" form. (Id.; J. Stearns 88:17-24.)[6]

15.    As requirements contracts, the Flint POs did not state any estimated —

much less guaranteed — volume of parts to be purchased. (Dawe Am. Decl. ¶ 15.) H.E. Services'

management knew that volumes associated with the Flint Relationship could change. For

example, Dave Stearns conceded that volume could change:

> Q    We talked about variability and the volume of contracts before,
> how some go up and some go down. Did H.E. Services ever
> attempt to have a guaranteed volume arrangement with any of its
> customers?
>
> A    I don't think there was ever a guarantee in the volume [with
> Delphi].

(D. Stearns 41:11-18; see also id. 35:9-12, 36:6-21.) Joe Stearns admitted the same:

> Q    . . . Were you aware of that fact that volumes can vary from
> projections at the time that H.E. Services was setting up the Flint
> facility, for instance?
>
> * * *
>
> A    Yes.

---

[6]    The Flint POs cover orders for certain parts, including, among others, lower column bracket assemblies, pump
housings, shift tubes, press pins, sidecovers, and lock modules (Dawe Am. Decl. ¶ 15), which H.E. Services
apparently alleges it was promised on the condition it opened the Flint facility yet never received. (See Am.
Compl. ¶ 49 (referring to a contract for 7,586,999 parts in the first year) & Ex. 3 thereto ("current project" parts
totaling 7,586,999 parts a year and including lower column bracket assemblies, pump housings, etc.).)

(J. Stearns 85:17-21, 85:25.)[7]

16.    Moreover, as H.E. Services admits, the 90I purchase orders that Delphi

issued to H.E. Services in connection with the Flint Relationship contained Delphi's general

terms and conditions. (Backie 130:14-131:8; D. Stearns 40:1-7, 40:14-18; Harmon 57:8-10,

57:13-20, 57:22-24; see Dawe Am. Decl. ¶¶ 7, 10, 16, 17.) These general terms and conditions

permit Delphi to change or suspend the delivery schedules for the parts at issue. (Dawe Am.

Decl. ¶ 7.) They require H.E. Services "to comply with all quality requirements and procedures

specified by [Delphi], as revised from time to time . . . ." (Id. Ex. A § 6 & Ex. B § 4.) And they

permit Delphi to terminate the purchase order if H.E. Services repudiates or breaches any of its

terms or for convenience. (Id. Ex. A §§ 12, 13 & Ex. B §§ 10, 11.) Backie concedes that he never

contested the applicability of the general terms and conditions concerning any purchase orders

issued by Delphi in connection with the Flint Relationship. (Backie 131:4-8.)

17.    Around early 2002 Delphi began learning of serious quality issues with

respect to products produced at H.E. Services' Flint and Saginaw facilities. (Dawe Am. Decl.

¶¶ 19-24.)  Indeed, on or about March 22 and March 26, 2002, Delphi audited H.E. Services'

Saginaw facility, which was called Universal Manufacturing, in response to customer

complaints.  (Id. ¶ 21.)  The Delphi auditor documented the major quality control issues at that

---

[7]    As Backie also admits, customers, like Delphi, entering requirements contracts with H.E. Services do not
commit to buy goods or services they do not need.  (Backie 89:6-12.)  H.E. Services overlooks the fact that,
during the Flint Relationship, there was a General Motors market share general reduction that affected the
volume of parts Delphi would need to make and, consequently, order from H.E. Services. (D. Stearns 37:3-25.)

facility, including the "absence or total breakdown of [quality systems]," which resulted in H.E.

Services' Universal Manufacturing division being placed on "major nonconformity status." (Id.)[8]

18.     Around the same time that the quality of H.E. Services' products began

deteriorating, H.E. Services demanded that Delphi pay increased prices for the parts H.E.

Services manufactured and assembled because H.E. Services was not turning a profit. (Id. ¶ 25.)

Delphi first refused the requested increases in February 2002. (Id.) Nevertheless, H.E. Services

continued to request price increases, going so far as refusing to correct its quality problems

before being awarded a price increase. (Id. ¶ 26.) H.E. Services' persistent requests for price

increases culminated in meetings between H.E. Services and Delphi personnel on or about April

9, 2002, October 8, 2002, and December 4, 2002. (Id. ¶¶ 26-28.) During the meetings, H.E.

Services indicated that it would not continue to produce the parts at the previously agreed-upon

prices. (Id.) Delphi reiterated that it would not agree to the increased prices. (Id.) As a result,

H.E. Services and Delphi mutually agreed that Delphi would begin resourcing the H.E. Services

business to more competitive suppliers. (Id. ¶ 28.)[9]

19.     On December 6, 2002, Delphi documented the decision to terminate its

contracts with H.E. Services' Flint Manufacturing and Universal Manufacturing divisions

pursuant to Delphi's general terms and conditions. (Id. ¶ 29.) Delphi's decision to terminate was

based on the diminishing quality of H.E. Services' products and H.E. Services' refusal to honor

---

[8]     David Stearns, who was in charge of manufacturing and operations for H.E. Services, conceded that the
equipment as delivered by Delphi was capable of making the parts required under the relevant purchase orders.
(D. Stearns 33:25-34:3.) Indeed, Delphi's Quality Group certifies that consigned machines are working
properly *before* Delphi accepts any parts manufactured on that machine. (Dawe Am. Decl. ¶ 10 n.9.) With
respect to the Flint Relationship, all consigned equipment was subject to this approval process. (Id.) The
quality issues that served as a basis for Delphi's termination of the relevant contracts arose two years *after*
Delphi consigned this equipment. (See id. ¶¶ 19-24.)

[9]     Delphi eventually did resource this business to three suppliers, including one minority-owed supplier. These
suppliers offered prices lower than H.E. Services' prices. (Id. ¶ 30.)

the contractual prices.  (Id. ¶¶ 26-29.)  Indeed, Delphi continued to contract with other divisions

of H.E. Services until H.E. Services went out of business in spring 2004.  (See id. ¶ 31.)

20.    Delphi's terminations of its contracts with H.E. Services' Flint

Manufacturing and Universal Manufacturing divisions were proper under the terms of the

relevant purchase orders.  Delphi fully performed under the purchase orders prior to the

terminations and therefore did not breach any contractual obligation to H.E. Services.  (Id. ¶ 29.)

Moreover, H.E. Services agreed to Delphi's general terms and conditions, which permit Delphi to

terminate the purchase orders for various reasons.  Finally, during the performance of the

contracts, H.E. Services assumed the risk of variations in Delphi's requirements, as conceded by

several H.E. Services managers at the relevant time.  (See supra ¶ 15.)  H.E. Services cannot

complain that Delphi ultimately ordered fewer parts than originally anticipated.

C.    H.E. Services' Purchase of an EX-CELL-O Machine

21.    In about mid-1999, Delphi's Steering Division in Saginaw sought to

produce prototype constant velocity (or C/V) joint components, specifically inner and outer

races.  (Waslusky Am. Decl. ¶ 7.)  Delphi sent to many existing suppliers an RFQ seeking bids

on a new project:  making these parts for Delphi using a precision EX-CELL-O Model XG-690

grinding machine with certain specifications. (Id. ¶¶ 7-11; Backie 74:10-22.)  H.E. Services

management admits knowing that such a machine had never been built before and thus no one

would have any experience operating it.  (D. Stearns 40:22-41:10; J. Stearns 72:3-8.)  Even

Backie admitted, "We know nothing at H.E. Services about the design, the fabrication inside the

machine."  (Backie 95:15-17.)  H.E. Services nevertheless bid on the project and won.

(Waslusky Am. Decl. ¶ 8.)  Delphi thus issued a blanket purchase order for the parts dated on or

about October 29, 1999.  (Id. ¶ 12; see 10/29/99 Purchase Request (attached as Ex. 3).)  There is

no evidence that, as part of the RFQ Process or the purchase order, Delphi guaranteed that the machine would work or that the winning supplier would make a profit in the venture.[10]

22.     The purchase order originally was structured so that Delphi agreed to repay the winning supplier for the cost of the machine through a volume-driven variable monthly payment based on the number of parts ordered.  (Waslusky Am. Decl. ¶ 12.)  The purchase order anticipated Delphi needing 7,000 parts annually.  (Ex. 3, 10/29/99 Purchase Request.)  However, in the event that Delphi did not need such parts, the purchase order contemplated that the per-part price would "go up or down based on actual[] volume ever[y] [quarter] to insure payment of the machine."  (Id.)  In turn, as Backie admits, H.E. Services was to buy the machine from EX-CELL-O and be responsible for running it, maintaining it, and repairing it, as necessary.  (Backie 74:10-75:22, 76:3-22.)  Delphi consistently informed H.E. Services management that it did not intend to become involved with the purchase of the EX-CELL-O machine or any related commercial issues between H.E. Services and EX-CELL-O.  (Waslusky Am. Decl. ¶ 10.)  H.E. Services agreed to those terms.

23.     After being awarded the business, H.E. Services contracted with EX-CELL-O for the purchase of the machine.  H.E. Services hired a contract engineer who worked on the design, building, and fabrication of the machine and who was trained by EX-CELL-O in Germany.  (Backie 76:3-22.)  H.E. Services did so because, as Backie admitted, H.E. Services was responsible for "learn[ing] how to operate" and "for the maintenance and upkeep" of this new machine.  (Backie 75:5-19.)  EX-CELL-O was to deliver the machine to H.E. Services on or about September 15, 2000.  (Waslusky Am. Decl. ¶ 13.)

---

[10]   Although Delphi could locate only the purchase request — as opposed to the purchase order — the purchase order contained the same terms as the purchase request. (Waslusky Am. Decl. ¶ 12.)

24.    By September 15, 2000, however, EX-CELL-O had not been able to create a functioning machine due to various internal problems with getting the machine to work, and thus EX-CELL-O delayed the delivery of the machine.  Joe Stearns, one of the key architects of the deal, had informed EX-CELL-O of all of the required specifications.  (J. Stearns 50:8-11, 50:21-51:1.)  Yet, after many attempts to produce a functioning machine, EX-CELL-O was unable to do so.  (Waslusky Am. Decl. ¶ 13; J. Stearns 50:13-51:1, 51:10-21; 52:5-9.)  Both H.E. Services and Delphi personnel tried to help EX-CELL-O resolve the myriad problems EX-CELL-O encountered.  (J. Stearns 51:10-21.)  As Backie admits, the parties engaged in "a concerted effort on both sides to get the machine to run, to function."  (Backie 94:8-9.)  And as Joe Stearns conceded, he was dissatisfied because EX-CELL-O did not "live up to what was expected from it from H.E. Services' standpoint."  (J. Stearns 70:17-71:6; see id. 83:17-20.)

25.    After many meetings with EX-CELL-O, H.E. Services still had "concerns about [EX-CELL-O's] ability to produce this machine."  (Id. 72:1-2.)  Accordingly, on May 23, 2001, Joe Stearns wrote EX-CELL-O a letter complaining that EX-CELL-O could not build a functioning machine and threatening to terminate H.E. Services' contract to buy it:

> This letter is to inform you [EX-CELL-O] that the subject grinding machine must be demonstrated to our satisfaction to be in complete compliance per the purchase contract and specifications and then delivered to our floor in Saginaw, Michigan by no later than July 15, 2001, or we reserve the right to terminate this purchase order in its entirety.  Termination will result in no payment from us with respect to this project and we would reserve the right to claim the damages we have incurred due to your breach of the purchase contract.

(Letter dated May 23, 2001, from J. Stearns, attached as Ex. 4; J. Stearns 76:4-77:8.)  Backie also admitted that, at that time, he knew that the machine did not work:

> We sent people to Europe.  The machine didn't work there but then they [EX-CELL-O] said the machine was ready.  Now how else are we going to know? We aren't going to send people to Europe every week.  We're going to take their word.  EX-CELL-O is a prominent company.

(Backie 97:23-98:2.)

26.     Subsequently, between June and July 2001, Joe Stearns wrote EX-CELL-O more letters complaining that the machine still did not work "satisfactorily" and that it would pose "too great a risk" for H.E. Services to pay EX-CELL-O for the machine and accept delivery before the machine functioned properly.  On June 21, 2001, Joe Stearns wrote to EX-CELL-O:

> Your proposal to us in your June 7th, 2001 letter was to demonstrate capability on only three of the eight parts at your German facility and then ship the machine.  This proposal is not acceptable as it is not in compliance with the contract and poses too great a risk.

(Letter dated June 21, 2001, from J. Stearns (attached as Ex. 5).)  On July 20, 2001, Joe Stearns wrote again to EX-CELL-O:

> H.E. Services received your letter dated June 28, 2001 discussing possible shipment of the Grinding Machine XG 690 to our location in advance of satisfactorily completing 100% part acceptance on all eight part numbers, per contract.  Consideration of equally shared risk was to be paramount in the discussion.

(Letter dated July 20, 2001, from J. Stearns (attached as Ex. 6).)

27.     Nevertheless, H.E. Services decided to assume that "risk" when it instructed EX-CELL-O to deliver the machine and partially paid for it *before* it functioned properly.  (J. Stearns 81:4-14; Backie 97:17-98:14.) Throughout this entire period, there is no letter, memorandum, or e-mail to Delphi from anyone at H.E. Services indicating that H.E. Services believed that Delphi — as opposed to EX-CELL-O — had somehow breached an agreement or a promise because of EX-CELL-O's failure to build a working machine. Indeed,

14

Backie admits that he does not remember hearing anyone say that Delphi was "somehow inappropriately interfering or controlling with the EX-CELL-O design." (Backie 93:12-94:11.) Rather, as Backie concedes, EX-CELL-O had the specifications and "an obligation to send [H.E. Services] a machine that works" but "the machine never did function." (Backie 107:19-108:2, 108:10-11, 112:16-24.) As of October 25, 2001, H.E. Services still had not paid anything to EX-CELL-O for the machine. (J. Stearns 71:7-13; Letter dated Oct. 25, 2001, from J. Stearns (attached as <u>Ex. 7</u>).) On December 13, 2001 — fourteen months after the initial delivery date — EX-CELL-O finally delivered the machine to H.E. Services. (Waslusky Am. Decl. ¶ 13.)[11]

28.    Meanwhile, because of the problems and delay that H.E. Services experienced in getting EX-CELL-O to deliver the machine, H.E. Services asked Delphi to restructure the deal so that Delphi would make a consistent monthly payment to H.E. Services to cover the amount that H.E. Services paid to EX-CELL-O for the machine — irrespective of the number of parts ordered. (<u>Id.</u> ¶ 14; Backie 77:12-78:14, 98:16-99:11, 100:15-17, 101:7-102:1; J. Stearns 69:13-24, 98:11-17; Letter dated Nov. 13, 2001, from J. Stearns (attached as <u>Ex. 8</u>).) This monthly payment was to be in lieu of the originally anticipated volume-driven variable monthly payment to H.E. Services based on the number of parts ordered. (Waslusky Am. Decl. ¶ 14.) As Backie admits, Delphi also agreed to increase the price per part over the previous deal. (Backie 100:15-17.) If Delphi needed parts in any given month, it would pay an amount above and beyond the guaranteed monthly payment. (Waslusky Am. Decl. ¶ 14.)

29.    Delphi memorialized the parties' revised deal by issuing two new purchase orders. On April 30, 2002, Delphi issued a purchase order authorizing payment to H.E. Services

---

[11]    Contrary to Backie's statement that H.E. Services received the machine on September 15, 2000 (Backie Aff. ¶ 56), the machine was in fact not received until December 13, 2001. (Waslusky Am. Decl. ¶ 13.)

of $22,926.00 per month, for thirty-six months, to cover H.E. Services' costs associated with

acquiring the EX-CELL-O machine.  (04/30/02 Purchase Order (attached as Ex. 9); Waslusky

Am. Decl. ¶ 15.)  At the same time, Delphi internally circulated a purchase request that led to a

new purchase order that was issued on May 1, 2002, and revised on May 6, 2002. (05/01/02

Purchase Order & 05/06/02 Revised Purchase Order (attached as Ex. 10); Waslusky Am. Decl.

¶ 16.) The purchase order expressly cancelled the volume and quarterly price analysis clauses in

the original purchase order issued on October 29, 1999. (Id.) Under the revised purchase order,

Delphi agreed to pay a higher per-part price for the components produced on the EX-CELL-O

machine.  (Id.)  Both purchase orders were subject to Delphi's general terms and conditions. (Id.)

30.    Problems persisted.  H.E. Services could not efficiently meet Delphi's

need for parts.  (Id. ¶ 17.)  For instance, H.E. Services experienced problems with the machine's

programming, with which H.E. Services struggled for many months.  (Id. ¶ 18.)  Additionally,

the permanent tooling for the machine presented continuous problems because H.E. Services was

unable to alter efficiently the EX-CELL-O machine — as it was expected to do — in order to

meet Delphi's requirements.  (Id.)

31.    H.E. Services' problems were exacerbated by its ongoing commercial

dispute with EX-CELL-O.  (Id. ¶ 19.)  H.E. Services refused to pay EX-CELL-O the full price of

the machine because it was delivered late.  (Id.)  In fact, H.E. Services paid EX-CELL-O only 70

percent of the original purchase price or roughly $432,698.  (Backie 81:10-82:15; Ex. 7, Letter

dated Oct. 25, 2001, from J. Stearns; Letter dated Jan. 3, 2003, from M. Lesperance (attached as

Ex. 11).)  EX-CELL-O consequently refused to honor its warranty for the machine or to assist

with the programming and tooling issues that arose.  (Waslusky Am. Decl. ¶ 19.)  Yet, as Joe

16

Stearns admitted, H.E. Services lacked the required expertise with the machine.  (J. Stearns

73:11-74:5, 74:18-75:6.)

32.    As a result of these problems, H.E. Services failed to meet Delphi's

requirements.  (Waslusky Am. Decl. ¶¶ 20-21.)  Where the alternative was defaulting on

obligations to its customers, Delphi resourced production of some inner and outer race

prototypes to another supplier, Ranger Tool & Die, at a substantially higher cost to Delphi.  (Id.

¶¶ 21-22.)  Despite Ranger's involvement, Delphi remained committed to the EX-CELL-O

Relationship and continued to make monthly payments to H.E. Services.  (Id. ¶ 22.)  Although

H.E. Services did not pay EX-CELL-O more than $432,698 for the machine, Delphi continued to

make its scheduled monthly payments to H.E. Services to cover H.E. Services' costs for the

machine.  (Id.)  The twenty monthly payments that Delphi made to H.E. Services until H.E.

Services permanently closed its business amounted to $458,520.  Thus, Delphi paid *more* to H.E.

Services for the machine than H.E. Services paid to EX-CELL-O.

33.    As such, Delphi fully performed on the contracts related to the EX-CELL-

O Relationship and did not breach any obligations to H.E. Services.  In fact, because the EX-

CELL-O machine never performed adequately, Delphi lost money on the EX-CELL-O

Relationship.  (Id. ¶ 23.)  Not only did Delphi have to resource production to Ranger at

substantially higher prices, but also Delphi devoted to the EX-CELL-O Relationship a significant

amount of time and effort, which it never recouped.  (Id.)[12]

---

[12]    Despite H.E. Services' position that Delphi needed to buy 7,000 parts annually, the fact is that H.E. Services
could not even timely and properly make the parts that Delphi was ordering. Moreover, as discussed supra ¶ 29,
the revised purchase orders eliminated any reference to a specific number of parts.  (See Ex. 9, 04/30/02
Purchase Order.)

D.    H.E. Services' Alleged Unpaid Invoices

34.    H.E. Services attached over 700 pages of allegedly unpaid invoices to its Supplemental Response.  (See Supplemental Resp. Exs. 2-4.)  In his affidavit, Backie states that these invoices are due and owing. (Backie Aff. ¶¶ 11-13.)  Yet, at his deposition, Backie did not even remember the invoices attached to his affidavit.  (Backie 32:12-15.)  Nor did he know how the invoices were collected or what his accounting department did to determine whether any particular invoice was owed.  (Id. 39:1-6, 40:9-16.)  He also testified that "some of them [H.E. Services' own invoices] are so vague that [he] wasn't able to come to a conclusion on" whether there were even glaring inaccuracies.  (Id. 38:2-6.)  Instead Backie merely attached a stack of invoices that he received from an outside consultant who was attempting to reconcile the invoices in 2004.  (Id. 36:6-14.)  He has no idea whether any of the invoices were paid by Delphi after May or June 2004.  (Id. 36:15-37:21.)

35.    H.E. Services' only other witness on unpaid invoices, Robin Schembri, admitted that she had never seen invoices in the form they were attached to Backie's affidavit. (Schembri 17:7-10.)  In or around 2004 Schembri, who before that time had no experience reconciling invoices at H.E. Services, was asked to gather Delphi invoices from various departments and determine which invoices were unpaid.  (Id. 6:2-12.)  Her deposition testimony does not reflect anything resembling a studied analysis of the accuracy of the invoices or a thorough reconciliation process.  Indeed, Schembri admits that she was not asked to go through the invoices and determine their accuracy.  (Id. 18:5-9.)  And, after April 2004, she was not privy to information regarding whether Delphi paid any additional invoices. (Id. 8:10-16, 10:6-18.)

36.    By contrast, Delphi's reconciliation process, as reflected in the declaration of William Locricchio, reflects a deliberative and methodical attempt to reconcile every one of the many invoices attached to Backie's declaration.  (See Am. Decl. Of William Locricchio In

18

Supp. Of Debtors' Am. Supplemental Reply (the "Locricchio Am. Decl."), attached as Ex. 12.)

Locricchio first aggregated the amounts of all of the invoices and arrived at a number fairly close

to the amount Backie claims is due — roughly $975,000.  (Locricchio Am. Decl. ¶ 5.)  Almost

immediately, Locricchio spotted a few obvious inaccuracies with some of H.E. Services' alleged

unpaid invoices.  (Id. ¶ 5.)  Upon further review he identified a significant number of duplicative

invoices.  (Id. ¶¶ 6-11.)  Then, checking Delphi's accounts payable system himself, he confirmed

that over half of the alleged unpaid invoices already had been paid.  (Id. ¶¶ 12-19.)  Locricchio

next discovered and eliminated invoices that were submitted twice for payment to Delphi.  (Id.

¶ 20.)  Other invoices were accompanied by insufficient proof that H.E. Services performed the

work for which it billed Delphi.  (Id. ¶ 21.)  Ultimately Locricchio concluded that the remaining

open invoices totaled around $115,847 due and owing to H.E. Services.  (Id. ¶ 29.)  H.E.

Services' unpaid invoices claim should be limited to that amount.

      E.      H.E. Services' and Backie's Allegations of Discrimination

      37.      Backie could supply only one reason for his belief that Delphi

discriminated against him due to his minority status:  he testified that discrimination occurred

when an "existing supplier would lower their cost and Delphi would award the business to the

existing supplier because they undercut [H.E. Services] on price."  (Backie 152:23-153:5.)

However, awarding business to the most competitive bidder is not discriminatory; it is Delphi's

standard competitive bidding process.  Indeed, concerning the Flint Relationship, Backie

acknowledged that Delphi resourced some of the work to another minority supplier.  (Id. 138:14-

139:8.)  There is absolutely no evidence of discrimination, and H.E. Services' witnesses testified

consistently that they were not aware of any such discrimination.  (Chavez 28:21-25; Haller

39:17-23; Harmon 51:24-52:3; J. Stearns 83:23-85:5; Backie 105:17-106:4, 145:10-146:21; <u>see</u> <u>also</u> Waslusky Am. Decl. ¶ 5.)[13]

<u>Argument</u>

38.    At the outset, the claims asserted by H.E. Services and Backie suffer from several legal defects.  All of Backie's claims fail because, as a former H.E. Services shareholder, he lacks standing to bring his nondiscrimination claims and there is no evidence supporting any claim of discrimination.  Moreover, many of the claims are barred by the applicable statute of limitations.  And many of H.E. Services' claims are based on alleged oral agreements the enforcement of which is prohibited by the statute of frauds.

39.    H.E. Services' claims fail for other reasons as well.  *First*, H.E. Services' fraud and misrepresentation claims fail.  H.E. Services failed to prove — with clear and convincing evidence — a misrepresentation or reasonable reliance regarding any Relationship.  Nor has H.E. Services proven any nonspeculative damages.  For similar reasons, H.E. Services failed to prove any of the other fraud or misrepresentation claims.  *Second*, H.E. Services' promissory estoppel claim fails because written agreements govern the parties' Relationships and H.E. Services is merely disputing the terms of such agreements.  Under such circumstances, a promissory estoppel action cannot lie.  Moreover, H.E. Services can show neither a clear and definite promise nor reasonable reliance.  And *third*, the breach-of-contract claims fail to the extent that H.E. Services relied on alleged oral promises because each Relationship was governed by a purchase order, which contained an integration clause and written amendment

---

[13]    Some Delphi employees did not even know Backie was a minority or that H.E. Services was a minority supplier, which is not unusual, according to Backie.  (Backie 151:21-25; Chavez 23:23-24:1; Haller 39:17-23.)

requirement.  Moreover, H.E. Services cannot show that Delphi breached any contract it entered

into with H.E. Services.

40.    H.E. Services simply made a number of investments that were not as

profitable as H.E. Services had hoped.  Delphi did not guarantee future business if H.E. Services

made such investments; nor did Delphi otherwise deceive H.E. Services.  Rather, Delphi

communicated to H.E. Services that investments simply permitted H.E. Services to *compete* for

business — not be *guaranteed* business regardless of whether H.E. Services was competitive.

Except for a small portion of H.E. Services' unpaid invoices claim, all of H.E. Services' and

Backie's claims should be disallowed and expunged in their entirety.

A.    Backie Lacks Standing to Bring the Claims of H.E. Services.

41.    As an initial matter, all the claims in the Amended Complaint — with the

one possible exception of Backie's individual discrimination claim — belong solely to H.E.

Services.  Backie lacks standing to assert H.E. Services' claims in his individual capacity as

shareholder of the company:  "The doctrine of standing provides that a suit to enforce corporate

rights or to redress or prevent injury to a corporation, whether arising from contract or tort,

ordinarily must be brought in the name of the corporation, and not that of a stockholder, officer,

or employee." Belle Isle Grill Corp. v. Detroit, 666 N.W.2d 271, 278 (Mich. Ct. App. 2003).

There is no evidence of any Backie injury that is separate and apart from Backie's injury as

shareholder of H.E. Services. Accordingly, because Backie has no evidence of an actionable

individual injury, the Court must disallow and expunge all Counts of the Amended Complaint

(except for the discrimination claim) as to Backie.[14]

---

[14]    In connection with Counts I through VI, the Amended Complaint alleges in a conclusory fashion that Backie
"suffered non-economic loss including emotional distress, anguish, mortification, humiliation, and loss of
pleasures of life."  (Am. Compl. ¶¶ 94, 103, 112, 121, 129, 136.)  However, Backie proffers no factual support

*(cont'd)*

21

B.    H.E. Services' and Backie's Discrimination Claims Must Fail.

42.    H.E. Services' and Backie's discrimination claims fail for at least two reasons. *First*, the four-year statute of limitations for claims under 42 U.S.C.§ 1981 bars their claim. See 28 U.S.C. § 1658(a).  H.E. Services and Backie filed their original complaint on February 16, 2005. H.E. Services and Backie failed to prove any discriminatory act occurring after February 16, 2001. *Second*, they cannot prove — as they must — an intent to discriminate on the basis of race.  See Burton v. Plastics Research Corp., 134 F. Supp. 2d 881, 885-86 (E.D. Mich. 2001).  Here there is absolutely no evidence suggesting an intent on the part of Delphi to discriminate *on the basis of race*.  (See Backie 105:17-106:4, 145:10-146:21; Harmon 51:24-52:3; J. Stearns 83:23-85:5.)  Backie freely admits that the only reason he felt discriminated against was that, at times, Delphi would choose to award business to nonminority suppliers who quoted lower prices than H.E. Services. (Backie 152:23-153:5.)  This is not discrimination; it is a legitimate business reason for awarding one supplier business over another. Claimants have not come forward with enough evidence to establish a prima facie case of discrimination — let alone evidence to show that Delphi's decision to choose the lowest cost supplier was merely a pretext for discrimination. Accordingly, this Court should disallow and expunge their discrimination claims in their entirety.

_____

(cont'd from previous page)

for these allegations.  Mere allegations of injury without specific facts showing injury or damage are insufficient to state a cause of action.  See Kloian v. Schwartz, 725 N.W.2d 671, 677-78 (Mich. Ct. App. 2006) (finding that plaintiff failed to state a cause of action where plaintiff alleged he suffered, among other ills, anguish, emotional distress, humiliation, and mortification without supporting factual allegations); Lear Corp. v. Butzel Long, PC, No. 258669, 2006 WL 1360286, at *3-4 (Mich. Ct. App. May 18, 2006) (finding that plaintiff's "[f]actually unsupported conclusions" that it suffered damages were "inadequate to state a claim on which relief can be granted").  It follows that Backie fails to prove any individual injury separate and apart from his injury as a shareholder of H.E. Services.

C.    H.E. Services Cannot Recover on Its Fraud and Misrepresentation Claims.[15]

43.    H.E. Services' claims arising from Delphi's alleged misrepresentations and

omissions , which are asserted in Count II (innocent/negligent misrepresentation), Count III

(fraudulent misrepresentation), Court IV (silent fraud), and Count V (fraud based on a bad-faith

promise) of their Amended Complaint (collectively the "Fraud Claims"), fail for a variety of

reasons.[16]

(i)    *Juarez Fraud Claims Are Barred by the Statute of Limitations.*

44.    H.E. Services did not file its Juarez fraud claims within the six-year

statute-of-limitations period.  See MCLA § 600.5813; Kwasny v. Driessen, 202 N.W.2d 443, 445

(Mich. Ct. App. 1972).  H.E. Services may not recover for such claims if the fraud or

misrepresentation occurred before February 16, 1999. See Boyle v. Gen. Motors Corp., 661

N.W.2d 557, 560 (Mich. 2003) (discovery rule does not apply to the accrual of actions for fraud;

rather the claim accrues at the time of the wrong); MCLA § 600.5827. Here the only alleged

fraud or misrepresentation arguably meeting the standards of Rule 9 of the Federal Rules of Civil

Procedure took place either when Delphi allegedly misrepresented that H.E. Services would be

its exclusive supplier in Juarez when it "accepted [H.E. Services'] proposal in October of 1996"

(Am. Compl. ¶ 36) or during a meeting Backie had with Jerry Haller "as early as 1997." (Backie

---

[15]    Because the remaining claims are claims of H.E. Services — and not Backie — the Debtors will refer only to
H.E. Services when discussing these claims. The analysis, however, applies with equal force to Backie.

[16]    Claims of fraud must be proven by clear and convincing evidence.  See Flynn v. Korneffel, 547 N.W.2d 249,
254 (Mich. 1996); Hi-Way Motor Co. v. Int'l Harvester Co., 247 N.W.2d 813, 816 (Mich. 1976); Groening v.
Opsata, 34 N.W.2d 560, 562 (Mich. 1948); Foodland Distribs. v. Al-Naimi, 559 N.W.2d 379, 382 (Mich. Ct.
App. 1996).  Moreover, Federal Rule of Civil Procedure 9(b) requires plaintiffs asserting fraudulent and
negligent misrepresentation claims to "(1) specify the statements that the plaintiff contends were fraudulent, (2)
identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements
were fraudulent." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied
where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'"); see Aetna Cas. &
Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 583 (2d Cir. 2005) (applying Rule 9(b) to negligent
misrepresentation claims).

Aff. ¶ 20; Backie 7:25-9:3.) Either way, both instances of alleged fraud occurred prior to

February 16, 1999 and, thus, claims based on them are barred by the statute of limitations.

> (ii)    *H.E. Services' Actual Fraud Claim Fails on the Merits.*

45.    To recover based on its fraud claim, H.E. Services must establish for each

Relationship that (1) the defendant made a material representation; (2) the representation was

false; (3) the defendant knew the representation was false when it was made, or made it

recklessly without any knowledge of its truth, and as a positive assertion; (4) the defendant made

the representation intending the plaintiff would act on it; (5) the plaintiff acted in reliance on the

representation; and (6) the plaintiff suffered injury due to his reliance on the representation. See

Hord v. Envtl. Research Inst. of Mich., 617 N.W.2d 543, 546 (Mich. 2000); M&D, Inc. v.

McConkey, 585 N.W.2d 33, 36 (Mich. Ct. App. 1998). A party's reliance on the false statements

must be reasonable. Novak v. Nationwide Mut. Ins. Co., 599 N.W.2d 546, 554 (Mich. Ct. App.

1999). H.E. Services has not proven *any* of these elements as to any Relationship.

46.    As an initial matter, assuming H.E. Services' allegations, H.E. Services

cannot show, with respect to any of the Relationships, that Delphi had an intent to defraud or that

it made a material representation that is actionable as fraud or misrepresentation.  Claims for

misrepresentation or fraud must be predicated on a false statement of past or existing fact.  E.g.,

Hi-Way Motor Co., 247 N.W.2d at 816 ("Future promises are contractual and do not constitute

fraud."); Kovacs v. Elec. Data Sys. Corp., 762 F. Supp. 161, 166 (E.D. Mich. 1990) ("The

nonperformance of a promise . . . is not fraud nor is it any evidence of fraud."), aff'd, 929 F.2d

701 (6th Cir. 1991); Marrero v. McDonnell Douglas Capital Corp., 505 N.W.2d 275, 279 (Mich.

Ct. App. 1993).  Here, in connection with each Relationship, H.E. Services argues that Delphi

misrepresented its "present need for services and parts."  (E.g., Am. Compl. ¶ 37; see also id.

¶¶ 29, 48, 51, 54, 61, 65, 82.)  Notwithstanding H.E. Services' minced words, the allegations here amount to nothing more than breach-of-contract claims; H.E. Services complains that Delphi allegedly breached "promises" to purchase a certain amount of products or services from H.E. Services in the future.

47.    Concerning the Juarez Relationship, H.E. Services fails to prove a misrepresentation or reasonable reliance. *First*, H.E. Services cannot show that Haller made a representation that if H.E. Services came to Juarez, it would be Delphi's exclusive prototype supplier. Apart from Backie who claims he heard such an oral promise, no H.E. Services manager ever heard of such a representation, including H.E. Services' president (Fortier 26:3-7); H.E. Services' vice president of engineering, who was at the meeting at which this alleged representation was made (J. Stearns 90:15-19); and H.E. Services' head of operations in Juarez who testified that all prototype work coming out of Juarez was subject to Delphi's competitive bid process and required a written purchase order (Jacob 38:10-15, 42:20-43:11). *Second*, H.E. Services cannot show reasonable reliance. H.E. Services opened a shop in El Paso to make various parts for Delphi. Yet no one from H.E. Services knew which parts, how many parts were needed, the timing of delivery, the duration of any contract or purchase order, or any information on pricing. (Backie 52:1-11, 53:21-24, 65:25-66:1, 72:12-73:1.) H.E. Services' president testified about his expectations going into El Paso: "[Y]ou can't have too many."  (Fortier 14:16-23.)  And the parties never entered into a verbal exclusive prototype support contract of indefinite length in the past. (Backie 57:4-7; Haller 24:14-23.) Any reliance that H.E. Services placed on an alleged verbal, unclear, and indefinite promise of exclusivity was unreasonable.

48.    Concerning the Flint Relationship, H.E. Services again fails to prove a misrepresentation or reasonable reliance. *First*, H.E. Services fails to prove that, in or around late

1999, Delphi misrepresented that if H.E. Services opened the Flint plant, H.E. Services would be

guaranteed future business in the form of specific volume commitments. There is no evidence

regarding who at Delphi made this alleged promise. Moreover, the contracts at issue in the Flint

Relationship were requirements contracts. Backie admits that requirements contracts only

commit buyers to buy goods or services they need. (Backie 89:6-12.) There is no evidence that,

during the pendency of the requirements contracts, Delphi gave H.E. Services orders for less

than all of its requirements. *Second*, any reliance that H.E. Services placed on Delphi's estimates

regarding future volumes was unreasonable. There is no evidence that any of the purchase orders

at issue guaranteed any specific volume. In fact, H.E. Services admits knowing that volumes

associated with the Flint Relationship could change. (D. Stearns 41:11-20; J. Stearns 85:17-21,

85:25. Moreover, Delphi's general terms and conditions were incorporated into every purchase

order related to the Flint Relationship (Dawe Am. Decl. ¶¶ 16-18; Backie 130:14-131:8; D.

Stearns 40:1-7, 40:13-18; Harmon 57:8-10, 57:13-20, 57:22-24), and such terms and conditions

contain an integration clause that prohibits oral contracts regarding the Flint Relationship that are

not memorialized in writing, including any alleged oral contract concerning the opening of the

Flint facility. See <u>UAW-GM Human Res. Ctr. v. KSL Recreation Corp.</u>, 579 N.W.2d 411, 419

(Mich. Ct. App. 1998) (reliance on precontractual representations is unreasonable as a matter of

law when the contract contains an integration clause).

   49.  Concerning EX-CELL-O, H.E. Services also fails to prove a

misrepresentation or reasonable reliance. *First*, there is no evidence that any specific individual

at Delphi guaranteed that the machine would work, that H.E. Services would turn a profit, or that

Delphi assumed the responsibility for maintaining or repairing the machine as necessary. To the

contrary, H.E. Services knew that such a machine had never been built before and thus no one

would have any experience operating it (D. Stearns 40:22-41:10; J. Stearns 72:3-8; Backie 95:15-17), and that H.E. Services was the entity solely responsible for buying, running, maintaining, and repairing the machine as necessary (Backie 74:10-75:22, 76:3-22). *Second*, H.E. Services cannot show reasonable reliance. The purchase orders reflecting the parties' revised deal contain integration clauses that would prohibit any prior alleged oral promise or guarantee. See UAW-GM, 579 N.W.2d at 419.

50.    Moreover, H.E. Services cannot prove any nonspeculative damages. For example, in response to Delphi's interrogatory regarding "the amount of [H.E. Services'] loss related to the investment in the facility associated with the Juarez Relationship and how that amount was calculated," H.E. Services answered, "See Amended Complaint." (A copy of H.E. Services' and Backie's Answers to Debtors' First Set of Interrogatories is attached at Ex. 13.) Yet the Amended Complaint contains no damage figure for the Juarez Relationship. Moreover, H.E. Services managers testified to substantially different figures as to the amount H.E. Services invested in the El Paso facility. (Backie Aff. ¶ 27 (over $1,350,000); J. Stearns 90:20-91:6 ($750,000 to $1 million). And H.E. Services cannot show that the *amount it invested* in the El Paso facility is the same as its *damages*, especially in light of the fact that H.E. Services shipped equipment it bought for the El Paso facility back to Michigan, where it was either used or sold. (J. Stearns 90:25-91:6; Waslusky Am. Decl. ¶ 6.) Concerning the EX-CELL-O Relationship, the purchase orders reflecting the revised deal between the parties never guaranteed H.E. Services any profit and H.E. Services received more than what it paid to EX-CELL-O for the machine.[17]

---

[17]    Even if, as H.E. Services claims, there was an enforceable 7,000-part annual commitment — and there was not — H.E. Services still could not have delivered such parts because the machine never was able to manufacture all of the parts that Delphi needed. (Waslusky Am. Decl. ¶¶ 17-18, 20-21.)

*(iii)*    *H.E. Services' Innocent Misrepresentation Claim Fails on the Merits.*[18]

51.    An innocent misrepresentation is actionable only when "a party detrimentally relies on a false representation in such a manner that the injury inures to the benefit of the party making the misrepresentation," and the parties are in "privity of contract."  Forge v. Smith, 580 N.W.2d 876, 883 (Mich. 1998).  Innocent-misrepresentation claims resemble fraud claims with a few distinguishing characteristics: (i) the elimination of the need to prove a fraudulent purpose or an intent on the part of the defendant that the misrepresentation be acted upon by the plaintiff, (ii) the necessity that the false representation be made in connection with the making of a contract, and (iii) the injury suffered as a consequence of the misrepresentation must inure to the benefit of the party making the misrepresentation. See U.S. Fid. & Guar. Co. v. Black, 313 N.W.2d 77, 85 (Mich. 1981).

52.    Here H.E. Services' innocent-misrepresentation claim fails for the reasons that its actual fraud claim fails (*e.g.*, H.E. Services cannot show a misrepresentation, reasonable reliance, or nonspeculative damages); it also fails because H.E. Services cannot prove that the damages it allegedly suffered as a consequence of the misrepresentation inured to Delphi's benefit. Concerning the Juarez Relationship, although Delphi hoped that prices for prototype work done in H.E. Services' El Paso facility would be less than prices charged by H.E. Services' Michigan facilities, there is no evidence to that effect. Concerning the Flint Relationship, there

---

[18]    Count II of H.E. Services' Amended Complaint is for "innocent/negligent misrepresentations." Under Michigan law, a negligent-misrepresentation claim is not the same as an innocent-misrepresentation claim. Negligent-misrepresentation claims consist of the same elements as those constituting a claim for fraud, except that the claimant need not prove intent or recklessness on the part of the offending party. See Derda, Inc. v. Foley-Belsaw Co., No. 1:90-CV-965, 1992 WL 71815, at *5 (W.D. Mich. Mar. 2, 1992), aff'd, 16 F.3d 1219 (6th Cir. 1994). Instead the claimant must show that the offending party acted negligently, i.e., that the party breached a duty of care. Id. H.E. Services has not cited any authority in its papers thus far for the proposition that Delphi owed a duty of care to H.E. Services under contract or tort principles. In any event, the negligent-misrepresentation claim fails for the same reasons that H.E. Services' fraud claim fails.

likewise is no evidence that Delphi benefited (in terms of the cost of parts) from H.E. Services' opening of the Flint facility. And concerning the EX-CELL-O Relationship, there similarly is no evidence that Delphi benefited from H.E. Services' purchase of the EX-CELL-O machine. The opposite is true. Delphi reimbursed H.E. Services *more* for the machine than H.E. Services paid EX-CELL-O for it, and Delphi still had to resource the work to other, more expensive suppliers.

(iv)    *H.E. Services' Silent Fraud Claim Fails on the Merits.*

53.    The elements of silent fraud are the same as common-law fraud, apart from the nature of the representation. See McMullen v. Joldersma, 435 N.W.2d 428, 430 (Mich. Ct. App. 1988). Mere nondisclosure is insufficient to support an allegation of silent fraud; instead "[t]here must be circumstances that establish a legal duty to make a disclosure." Hord, 617 N.W.2d at 550. "[A] legal duty to make a disclosure will arise most commonly in a situation where inquiries are made by the plaintiff, to which the defendant makes incomplete replies that are truthful in themselves but omit material information." Id.  H.E. Services' silent fraud claim suffers the same problems as H.E. Services' other misrepresentation and fraud claims (*e.g.*, H.E. Services cannot show a misrepresentation, reasonable reliance, or nonspeculative damages). Moreover, H.E. Services did not present any evidence — much less the clear and convincing evidence it needed to present — that Delphi failed to respond to inquiries or requests for information in such a way that would have given rise to a legal duty of disclosure. Accordingly, H.E. Services' silent fraud claim must be disallowed and expunged.

(v)    *H.E. Services' Fraud Based on a Bad-Faith Promise Fraud Claim Fails.*

54.    As discussed above, the general rule is that promises of future action may not constitute fraud. However, the "bad faith" exception to that rule holds that promises may be actionable as torts when "a promise [is] made in bad faith without intention of performance." Hi-

Way Motor Co., 247 N.W.2d at 816.  For a claim to fall within this exception, H.E. Services must prove facts sufficient to show fraudulent intent "'at the very time of making the representations, or almost immediately thereafter.'"  Id. (citing Danto v. Charles C. Robbins, Inc., 230 N.W.2d 188, 190 (Mich. 1930)); see also Colby v. Zimmerman, No. 220395, 2001 WL 1219414, at *1 (Mich. Ct. App. Oct. 12, 2001).

55.    This claim fails for the same reasons H.E. Services' actual fraud claim fails (e.g., H.E. Services cannot show a misrepresentation, reasonable reliance, or nonspeculative damages).  Moreover, in its general allegations, H.E. Services identifies three purported "bad-faith" promises.  (Am. Compl. ¶¶ 29-31 (alleging that Delphi promised that H.E. Services would be "given the exclusive contract to serve" Delphi's needs concerning the Juarez Relationship), ¶ 48 (alleging that Delphi promised future business to H.E. Services concerning the Flint Relationship); and ¶ 82 (alleging that Delphi promised to purchase parts from H.E. Services concerning the EX-CELL-O Relationship).)  However, H.E. Services utterly fails to allege — let alone prove with clear and convincing evidence — any facts showing a contemporaneous fraudulent intent on the part of Delphi.  See Colby, 2001 WL 1219414, at *1.  Accordingly, H.E. Services' bad-faith promise claim fails.

D.    H.E. Services' Promissory Estoppel Claim Must Fail.

56.    As an initial matter, at least with respect to the Juarez Relationship, the claim is barred by the statute of limitations.  Claims for promissory estoppel are subject to a six-year statute of limitations, which in this case means that H.E. Services cannot maintain a promissory estoppel claim that accrued after February 16, 1999. See Huhtala v. Travelers Ins. Co., 257 N.W.2d 640, 643 (Mich. 1977) (finding that a promissory estoppel claim is subject to the six-year statute of limitations for contract actions).  "[A] claim for promissory estoppel accrues when the promisor fails to perform the alleged promise."  Alliance Assocs., L.C. v.

30

Alliance Shippers, Inc., No. 265101, 2006 WL 1506687, at *4 (Mich. Ct. App. June 1, 2006).

Here H.E. Services opened its El Paso plant on or around February 1, 1997 (Am. Compl. ¶ 38)

and, according to Backie, Delphi allegedly "breached its promise when it failed to recognize the

exclusive nature of the services provided by [H.E. Services] and failed to utilize my company as

its exclusive source of the goods and services." (Backie Aff. ¶ 28.) However, *before* February 16,

1999, Delphi did not use H.E. Services as its exclusive source of goods and services. (See

07/14/98 Purchase Order issued to Ranger Tool & Die; 09/08/98 Purchase Order issued to H.E.

Services' El Paso facility; 01/15/99 Purchase Order issued to Bell Engineering (collectively

attached as Ex. 14).)  Accordingly, H.E. Services' Juarez claim for promissory estoppel fails.[19]

57.    H.E. Services' promissory estoppel claim also fails as a matter of law

because H.E. Services alleges that contracts govern each of the Relationships.  Michigan law

provides that "[w]here the parties have an enforceable contract and merely dispute its terms,

scope, or effect, one party cannot recover for promissory estoppel." Terry Barr Sales Agency,

Inc. v. All-Lock Co., 96 F.3d 174, 181 (6th Cir. 1996) (applying Michigan law); see also

Advanced Plastics Corp. v. White Consol. Indus., Inc., 828 F. Supp. 484, 491 (E.D. Mich. 1993)

(explaining that an action for promissory estoppel does not lie "[i]f the parties admit that a

contract exists, but dispute its terms or effect"), aff'd, 47 F.3d 1167 (6th Cir. 1995).  In

connection with the Juarez Relationship, H.E. Services alleges that a contract was formed in

October 1996.  (Am. Compl. ¶ 36.)  Similarly, with respect to the Flint Relationship, H.E.

Services alleges that Delphi and H.E. Services "entered into a contract."  (Am. Compl. ¶ 49.)

Finally, as to the EX-CELL-O Relationship, H.E. Services alleges that a "purchase order"

---

[19]    H.E. Services was being included on all the bid lists but nevertheless was not receiving all of Delphi's work, as
noted above.  (Chavez 25:9-20.) Accordingly, H.E. Services was aware it was not getting all of Delphi's work.

contains the terms of the parties' agreement. (Am. Compl. ¶ 73.) Because it is clear that written

agreements govern the parties' Relationships, an action for promissory estoppel cannot lie.

58.    In the alternative, H.E. Services' promissory estoppel claim fails because it

proved neither definite and clear promises, nor reasonable reliance. To recover on a claim for

promissory estoppel, a plaintiff must prove (1) a promise by one party, (2) which the promisor

should reasonably expect to induce action or forbearance on the part of the promise, (3) which

does in fact induce such action or forbearance, and (4) in circumstances in which the promise

must be enforced in order to avoid injustice. See State Bank of Standish v. Curry, 500 N.W.2d

104, 107 (Mich. 1993).  "The sine qua non of promissory estoppel is a promise that is definite

and clear."  Marrero, 505 N.W.2d at 278.  Moreover, the claimant must show *reasonable* reliance

on the promise.  See State Bank of Standish, 500 N.W.2d at 107; see also HMS Prop. Mgmt.

Group, Inc. v. Miller, 69 F.3d 537 (6th Cir. 1995) (dismissing a promissory estoppel claim

because plaintiff failed to allege reasonable reliance on oral statements where parties

contemplated that agreements would be reduced to writing); Dochenetz v. Elliot Leveling, Inc.,

No. 257057, 2005 WL 3481446, at *5 (Mich. Ct. App. Dec. 20, 2005) (dismissing a promissory

estoppel claim where plaintiff failed to allege reasonable reliance because oral promise

contradicted terms of written agreement).

59.    The many alleged promises H.E. Services claims Delphi made are not

definite and clear.  The Amended Complaint alleges several "promises" that Delphi purportedly

made over the course of the Relationships:  (i) that, in connection with the Juarez Relationship,

Delphi would exclusively utilize H.E. Services' Juarez facility (Am. Compl.¶¶ 29, 32, 37, 40,

44); and (ii) that, in connection with the Flint Relationship, Delphi would purchase a number of

parts from H.E. Services over multiple years, with "probable" increases each year (Am. Compl.

¶¶ 49, 65).  Concerning the Juarez Relationship, Backie did not know much if anything about the promise, including which parts were promised, how many parts were needed, the timing of delivery, the duration of any contract or purchase order, or any information on pricing. (Backie 52:1-11, 53:21-24, 65:25-66:1, 72:12-73:1.)  Concerning the Flint Relationship, H.E. Services' managers freely admit that Delphi's estimates were not guaranteed and could change. (D. Stearns 41:11-20; J. Stearns 85:17-21, 85:25.) And concerning the EX-CELL-O Relationship, apparently H.E. Services is implying a promise through actions that Delphi would guarantee that the machine would work and that H.E. Services would turn a profit.  See State Bank of Standish, 500 N.W.2d at 107 (explaining that "'reliance is reasonable only if it is induced by an actual promise'" (citation omitted)). These promises are neither definite nor clear.

60.    Moreover, the evidence clearly shows that any reliance H.E. Services' managers placed on Delphi's volume projections or oral promises of guaranteed future volume would have been unreasonable. As discussed above, concerning the Juarez Relationship, there was no discussion of volume, timing of delivery, duration of an exclusive contract, or pricing before H.E. Services opened its facility.  H.E. Services' president, vice president of engineering, and operations manager were unaware of any exclusive supply contract. And the parties' course of dealing always involved Delphi's standard RFQ competitive bidding process and never involved verbal exclusive prototype support contracts of indefinite length.  Concerning the Flint Relationship, Backie did not ask, before H.E. Services opened the facility, to see a contract in which Delphi promised a certain amount of business if H.E. Services opened the plant. Although Backie thought someone would have memorialized the deal in a letter before H.E. Services opened the Flint facility, there is no evidence that anyone did so.  H.E. Services' managers concede that Delphi awarded work to H.E. Services only if H.E. Services submitted the most

33

competitive bids in response to RFQs, and that, in any event, even projected volumes could

change. Concerning EX-CELL-O, there is simply no evidence that Delphi ever guaranteed that

the EX-CELL-O machine would work or that H.E. Services would turn a profit. As a longtime

and sophisticated Delphi supplier, H.E. Services' reliance on volume projections or notification

of business opportunities was simply unreasonable as it knew that Delphi awarded business only

through the written RFQ process. Moreover, with respect to the Relationships, the purchase

orders contained an integration clause and written amendment requirement. See UAW-GM, 579

N.W.2d at 419.

     E.    H.E. Services' UCC And Contract Claims Fail.

    61.    H.E. Services alleges that Delphi breached contracts for the sale of goods

under Michigan's version of the Uniform Commercial Code (the "UCC claim") and for the sale

of goods and services under Michigan common law (the "Contract Claims"). (See Am. Compl.

¶¶ 137-58.)[20] In the Contract Claims, H.E. Services alleges that Delphi breached various

"contractual obligations" and purchase orders with respect to the Juarez Relationship, the Flint

Relationship, and the EX-CELL-O Relationship. (Id. ¶¶ 142, 153.)[21]

    (i)    *H.E. Services' UCC Claims Are Barred by the Statute of Limitations.*

    62.    As an initial matter, the UCC Claim is barred by the four-year statute of

limitations because the alleged breaches for each Relationship occurred before February 16,

2001. See MCLA § 440.2725(1). Concerning the Juarez Relationship, H.E. Services alleges that,

as a result of Delphi's alleged breach, H.E. Services sustained damages in 2000. Similarly,

---

[20]  The UCC claim is different only to the extent that it relates to the sale of goods only and does not encompass
the Juarez Relationship. (See Am. Compl. ¶¶ 142, 153.)

[21]  In the Contract Claims, H.E. Services also alleges that Delphi "fail[ed] to pay on invoices in excess of
$400,000" (the "Unpaid Invoices Claim"). (Am. Compl. ¶¶ 142, 153.) The Debtors have treated this Unpaid
Invoices Claim separately. (See infra ¶ 64.)

concerning the Flint Relationship, H.E. Services states that contract negotiations began in

October 1999 and after "subsequent meetings" a contract was entered under which Delphi agreed

to purchase parts from H.E. Services over the course of multiple years.  (Am. Compl. ¶¶ 47-49.)

H.E. Services next alleges that "at the end of year one" Delphi breached the contract.  (Id. ¶ 50.)

H.E. Services also states that, on March 27, 2000, it took possession of the building in

connection with the Flint Relationship, and "it quickly became apparent" that Delphi allegedly

provided H.E. Services "inferior" machines to perform the contracted work.  (Am. Compl. ¶¶ 59-

60; Backie Aff. ¶ 41.)  And concerning the EX-CELL-O Relationship, Backie admits that, by at

least January 23, 2001, he knew of "the problems precipitated by Debtor." (Backie Aff. ¶ 62.)

Accordingly, the four-year statute of limitations bars H.E. Services' UCC claims.[22]

> (ii)    *H.E. Services' Juarez Claim Is Barred By The Statute Of Frauds.*[23]

63.    Concerning the Juarez Relationship, H.E. Services argues that there was

an enforceable oral requirements contract: if H.E. Services opened up an El Paso facility, the

Delphi would "give[] [H.E. Services] the contracts to serve the needs of [Delphi's] new Tech

Center" as its "exclusive source of the goods and services." (Backie Aff. ¶¶ 22, 28.)[24] Not so. A

---

[22]    In addition, any oral agreement or understanding for the sale of goods would be barred by the statute of frauds
as all of these contracts were for the sale of goods over $1,000.  MCLA § 440.2201.  (Ex. 14, 09/08/98 Purchase
Order issued to H.E. Services (Juarez); Ex. 3 to Am. Compl. (Flint); Backie Aff. ¶¶ 56, 62 (EX-CELL-O).)

[23]    Bankruptcy courts must apply the choice-of-law rules of the forum state, which in this case is Michigan. See
Bianco v. Erkins (In re Gaston & Snow), 243 F.3d 599, 601-02 (2d Cir. 2001). Michigan has adopted Section
188 of the Second Restatement of Conflict of Laws, which calls for the application of the laws of the state with
the most significant relationship to the transaction and parties. See Chrysler Corp. v. Skyline Indus. Servs., 528
N.W.2d 698 (Mich. 1995).  Here, Texas — where H.E. Services built the facility and performed work for the
Tech Center — would likely be the state with the most significant relationships with the Juarez Relationship.

[24]    The only written supply contracts are individual purchase orders issued to H.E. Services' El Paso facility, not an
exclusive supply contract for all Delphi's goods-and-services needs in Juarez. The only written instruments
highlighted by H.E. Services are a capacity profile (which is generic and freely given to all potential customers)
and a preliminary site plan for the facility H.E. Services wanted to open in El Paso. Neither of these documents
even remotely resembles a written contract. They contain no specific goods listed, no quantities, no price, no
contract duration, and no terms governing the parties' relationship. See Cohen v. McCutchin, 565 S.W.2d 230,

*(cont'd)*

35

contract that cannot be performed in one year from its making is subject to the statute of frauds. See Tex. Bus. & Com. Code Ann. § 26.01(b)(6). When an alleged oral contract does not specify the length of performance, its duration may be inferred based on "whatever term of days or years might be reasonable in the light of the circumstances before [the parties] at the date of the contract." Hall v. Hall, 308 S.W.2d 12, 16 (Tex. 1957); see Schroeder v. Tex. Iron Works, Inc., 813 S.W.2d 483, 489 (Tex. 1991). H.E. Services asserts that it had a verbal agreement whereby it could force Delphi to give H.E. Services' El Paso facility all of Delphi's purchase orders indefinitely until H.E. Services, in its sole discretion, decided it no longer wanted to do business in El Paso. Here, given that H.E. Services allegedly invested more than $1.35 million in order to service Delphi's Juarez plant (Backie Aff. ¶ 27), the alleged contract's reasonable duration would be at least as long as necessary for H.E. Services to recoup its initial investment — which it could not do even during its three years of operation from 1997 to 2000. Backie confirms that he intended the agreement to last at least this long. (Backie Dep. 55:13-56:3.) See Schroeder, 813 S.W.2d at 489 (inferring the contract's duration based on the promisee's understanding of the agreement). Accordingly, H.E. Services' claim must fail.[25]

_____

(cont'd from previous page)
232 (Tex.1978) (statute of frauds requires writing covering "every material detail" and "all of the essential elements of the agreement").

[25]    That H.E. Services could have hypothetically terminated the alleged exclusive contract unilaterally does not take the alleged contract outside the statute of frauds. See Ellison v. Halff, 94 S.W.2d 528, 529 (Tex. Civ. App. 1936) ("It is true that a contract which may be performed within one year because of the happening or not happening of some contingency is not void under the [statute of frauds], but the contingency must be beyond the control of both of the parties and not entirely within the control of one of the parties."); see also Americana Petroleum Corp. v. Northville Indus. Corp., 200 A.D.2d 646, 647, 606 N.Y.S.2d 906, 907 (2d Dep't 1994) ("While the plaintiff could unilaterally terminate the agreement within one year, the defendant was required to supply gasoline indefinitely, unless the plaintiff terminated the contract or the defendant went out of business. From the defendant's point of view, such possibility of performance within one year is illusory, and the Statute of Frauds is designed to protect the defendant from just such an oral agreement.").

(iii)    *H.E. Services Cannot Establish Its Unpaid Invoice Claim.*

64.    As discussed above, H.E. Services utterly failed to present any compelling evidence demonstrating that Delphi breached any of the purchase orders related to the over 700 pages of invoices H.E. Services attached to its Supplemental Response. By contrast, Delphi carefully considered and reviewed each invoice and determined that it likely owes H.E. Services $115,847 for the invoices that H.E. Services believes were due but not paid. Accordingly, Delphi does not object to an allowed nonpriority claim in that amount.

(iv)    *H.E. Services' Other Contract Claims Fail on the Merits.*

65.    As an initial matter, each Relationship was governed by written purchase orders, issued by Delphi and accepted by H.E. Services. (See Backie Aff. ¶¶ 23, 54; Dawe Am. Decl. ¶¶ 15-16; Waslusky Am. Decl. ¶¶ 12, 15-16.) The purchase orders expressly incorporate Delphi's general terms and conditions, which contain an integration clause. Id.  It is well established that Michigan follows the parol evidence rule, which bars the introduction of extrinsic evidence to "contradict the terms of a written agreement that was intended to be the final and complete expression of the parties' agreement." Cook v. Little Caesar Enters., 210 F.3d 653, 656 (6th Cir. 2000) (interpreting Michigan law).  Inclusion of an integration clause in a contract is conclusive proof that the parties intended the written contract to be their final and complete agreement. See id. (quoting UAW-GM, 579 N.W.2d 411).  Because integrated purchase orders govern the Relationships between H.E. Services and Delphi, H.E. Services may not base its breach-of-contract claims, as it does, on evidence of oral or written promises

extrinsic to those agreements.  And H.E. Services fails to prove that Delphi breached the terms of

any particular purchase order and thus the breach-of-contract claims must fail.[26]

66.    In addition, as to the Flint Relationship, the purchase orders Delphi issued

to H.E. Services were requirements contracts under which Delphi agreed to purchase from H.E.

Services 100 percent of Delphi's requirements over a certain time period.  (Dawe Am. Decl. ¶ 15

& Exs. C – G.)  As such, H.E. Services cannot complain that it received orders for less than the

volumes estimated by the parties at the time the contracts were entered.  See, e.g., Brewster of

Lynchburg, Inc. v. Dial Corp., 33 F.3d 355, 365 (4th Cir. 1994) (explaining that "'the seller

assumes the risk of all good faith variations in the buyer's requirements'" (quoting NCC Sunday

Inserts, Inc. v. World Color Press, Inc., 759 F. Supp. 1004, 1008 (S.D.N.Y. 1991))).  To the

contrary, so long as Delphi acted in good faith — and it did — Delphi was free to order less than

the estimated volumes and even eliminate its requirements altogether.  See, e.g., Wiseco, Inc. v.

Johnson Controls, Inc., 155 Fed. Appx. 815, 817 (6th Cir. 2005) (explaining the UCC permits

"'good faith reductions in requirements, as opposed to increases, even though the reductions may

be highly disproportionate to stated estimates'" (citation omitted)); Tigg Corp. v. Dow Corning

Corp., 962 F.2d 1119, 1126 (3d Cir. 1992) (applying Michigan law and explaining that if buyer

has "good faith reason for demanding no goods from the seller . . . the buyer does not breach by

ordering no goods").  H.E. Services offers *no* evidence — as it must — that Delphi acted in bad

faith in reducing or eliminating its requirements from time to time.  See Tigg Corp., 962 F.2d at

---

[26]    Indeed, this Court previously recognized that the parol evidence rule, as applied in Michigan, bars the
introduction of parol evidence where the parties' "intent that a written instrument be the complete expression of
their agreement is clear on the face of the agreement."  (Claims Obj. Hrg. Regarding Claim of LaborSource
2000, Inc. Tr. at 25 (Mar. 1, 2007), attached as Ex. 15.)  Moreover, this Court previously found that integration
and no oral modification provisions — terms present in the contracts at issue here — clearly indicate such an
intent.  (See id.)  In addition, to the extent H.E. Services proffered no written contract for these goods
undisputedly over $1,000, the contract would be unenforceable under the statute of frauds.  MCLA § 440.2201.

38

1124 (explaining that the seller bears the burden of proving bad faith). This is because, while the requirements contracts relevant to the Flint Relationship remained in effect, Delphi ordered 100 percent of its requirements from H.E. Services. (Dawe Am. Decl. ¶ 29.)

67. Any variations in Delphi's actual requirements from earlier estimates were made in good faith and resulted, in part, because of GM's diminishing market share and reduced orders to Delphi — not some nefarious plot to allow Delphi to evade the terms of the requirements contracts. See, e.g., R.A. Weaver & Assocs., Inc. v. Asphalt Constr., Inc., 587 F.2d 1315 (D.C. Cir. 1978) (finding that a change in the requirements of the buyer's own customers is a sufficient justification for the buyer to make a corresponding change in the quantity of goods requested under a requirements contract); TVA v. Imperial Prof'l Coatings, 599 F. Supp. 436 (E.D. Tenn. 1984) (same). It follows that Delphi did not breach the requirements contracts relevant to the Flint Relationship.[27]

## Conclusion

68. H.E. Services' and Backie's claims fail either as a matter of law or on the merits. The evidence shows that, in connection with each Relationship, Delphi's conduct is not actionable. Rather, H.E. Services essentially ask this Court to hold Delphi responsible for H.E. Services' poor business management and resulting financial losses. Because H.E. Services has not met — and cannot meet — its burden of proving each of the essential elements of the eight

---

[27] Similarly, there is no evidence that Delphi breached any written contracts with respect to either the Juarez or the EX-CELL-O Relationships. As to Juarez, H.E. Services offered no evidence of a written exclusive supplier contract. Indeed, no such contract ever existed; therefore Delphi could not have breached the alleged contract. Moreover, as to the EX-CELL-O Relationship, which was also governed by a requirements contract, (1) the parties modified the contract to eliminate reference to the estimated volume (Waslusky Am. Decl. ¶¶ 14-16) and (2) Delphi purchased 100 percent of its requirements from H.E. Services except in cases where H.E. Services first breached the contract by failing to supply Delphi parts according to Delphi's needs (Dawe Am. Decl. ¶ 29).

causes of action, the Proof of Claims asserted by H.E. Services and Backie should be disallowed and expunged in their entirety, except for possibly a portion of the unpaid invoices claim.

WHEREFORE the Debtors respectfully request the Court enter an order (i) sustaining the Third Omnibus Claims Objection as to the Proof of Claims, (ii) allowing a $115,847.00 nonpriority claim in connection with H.E. Services Unpaid Invoices claim, (iii) disallowing and expunging the remaining claims in the Proof of Claims, and (iv) granting such further and other relief the Court deems just and proper.

Dated: New York, New York
     August 30, 2007

SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP

By: _/s/ Albert L. Hogan III_
    John Wm. Butler, Jr.  (JB 4711)
    Albert L. Hogan III  (AH 8807)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
    333 West Wacker Drive, Suite 2100
    Chicago, Illinois 60606
    (312) 407-0700

     – and –

SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP

By: _/s/ Kayalyn A. Marafioti_
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
    Four Times Square
    New York, New York 10036
    (212) 735-3000

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession