Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :
     In re                     :    Chapter 11
                                    :
DELPHI CORPORATION, et al.,         :    Case No. 05-44481 (RDD)
                                    :
                 Debtors.   :    (Jointly Administered)
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DEBTORS' APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a) AND 328 AND FED. R. BANKR. P. 2014 AND 3017 FOR AUTHORIZATION TO EMPLOY AND RETAIN FINANCIAL BALLOTING GROUP LLC AS SPECIAL PLAN BALLOTING, SOLICITATION, AND INFORMATION AGENT FOR PUBLICLY-HELD SECURITIES

### ("FBG RETENTION APPLICATION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this application (the "FBG Retention Application") for an order under 11 U.S.C.

§§ 327(a) and 328 and Fed. R. Bankr. P. 2014 and 3017 authorizing the Debtors to employ and

retain Financial Balloting Group LLC ("FBG") as the Debtors' special plan balloting, solicitation,

and information agent for publicly-held securities, pursuant to the terms and conditions of the

engagement agreement (the "FBG Agreement"), dated August 15, 2007, a copy of which is

attached hereto as Exhibit A.  In support of the FBG Retention Application, the Debtors submit

the Declaration Of Jane Sullivan In Support Of Debtors' Application For Order Under 11 U.S.C.

§§ 327(a) And 328 And Fed. R. Bankr. P. 2014 And 3017 For Authorization To Employ And

Retain Financial Balloting Group LLC As Special Plan Balloting, Solicitation, And Information Agent For Publicly-Held Securities, executed on August 24, 2007 (the "Sullivan Declaration"), a copy of which is attached hereto as <u>Exhibit B</u>, and respectfully represent as follows:

Background

A.    <u>The Chapter 11 Filings</u>

      1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  The Court has ordered joint administration of these cases.

      2.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the official committee of unsecured creditors, the "Statutory Committees").

      3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

      4.    The statutory predicates for the relief requested herein are sections 327(a) and 328 of the Bankruptcy Code and rules 2014 and 3017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.    <u>Business Operations Of The Debtors</u>

      5.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately

2

$15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues and the thirteenth largest public company

business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors and continue their business operations without supervision from the Bankruptcy Court. [2]

6.    The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer ("OEM").

7.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary

of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's

business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and

liabilities of these divisions and subsidiaries were transferred to the Company in accordance with

the terms of a Master Separation Agreement between Delphi and GM.  In connection with these

transactions, Delphi accelerated its evolution from a North American-based, captive automotive

supplier to a global supplier of components, integrated systems, and modules for a wide range of

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from
Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on
February 27, 2007.

[2]    On March 20 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core
automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency
proceeding.  The application was approved by the Spanish court on April 13, 2007.  On July 4, 2007,
DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social
plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the
social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to
optimize its manufacturing footprint and to lower its overall cost structure.

customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

       8.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

       9.    The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

       10.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions

---

[3]     Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

with its major stakeholders had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its

transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

       11.    On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations.  The Debtors stated that they needed to focus on five key areas:[4] first, modifying the

Company's labor agreements to create a competitive arena in which to conduct business;[5]

second, concluding their negotiations with GM to finalize GM's financial support for the

---

[4]    In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors and a plan framework support agreement with those investors and GM.   On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework support agreement but that it expected to enter into new framework agreements with plan investors presently.  Subsequently, on July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors").  Under the Delphi-Appaloosa EPCA,  the New Plan Investors would invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization.  This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.

[5]    Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM that (a) modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the UAW, and its various locals, (b) provides that GM will undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate these modifications, and (c) modifies retiree welfare benefits for certain UAW-represented retirees of the Debtors.  This agreement, which was approved by this Court on July 19, 2007, should permit the Debtors to continue to implement their transformation plan and to develop, prosecute, confirm, and consummate a plan of reorganization.  On August 6, 2007, similar agreements were reached with the International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America and its local unions, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers.  Such agreements were approved by this Court on August 16, 2007.  On August 16, 2007, Delphi also reached a similar agreement with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and USW Local 87L.  A hearing on Delphi's motion to approve this agreement is scheduled for August 29, 2007.

Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[6] third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus;[7] fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint;[8] and devising a workable solution to their current pension situation.[9]

        12.    Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

---

[6]    On July 9, 2007, Delphi confirmed that its discussions with GM on a comprehensive settlement agreement had entered the documentation phase and that it expected that a settlement with GM would be incorporated into the Debtors' plan of reorganization rather than filed with this Court for separate approval.

[7]    In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants.  The Debtors have been working to divest non-core assets so as to maximize the value of their estates for stakeholders.  During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, and obtained court approval for the sale of substantially all of the assets of their brake hose, catalyst, and Saltillo, Mexico brake plant businesses..  In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

[8]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.  To ensure that their organizational and cost structure is competitive, the Debtors obtained an Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order").  The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[9]    To that end, on May 31, 2007, the Bankruptcy Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 plan year funding waivers, which were approved by the IRS, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Plans").  On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively.

its resources to continue to deliver high-quality products to its customers globally. Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

### Relief Requested

13.    The Debtors respectfully request the entry of an order under sections 327(a)

and 328 of the Bankruptcy Code and Bankruptcy Rules 2014 and 3017 authorizing the Debtors

to employ and retain FBG as their special plan balloting, solicitation, and information agent for

publicly-held securities pursuant to the terms and conditions of the FBG Agreement.

### Basis For Relief

14.    The solicitation of votes on the Debtors' plan of reorganization will be

complicated because of the volume of claims asserted in these chapter 11 cases and the amount

of publicly-traded debt and equity securities issued prepetition. To ensure the solicitation of

appropriate parties and the accurate tabulation of ballots, the Debtors have determined in the

exercise of their business judgment that it is necessary and appropriate to retain the services of

experienced personnel to assist in the solicitation of holders of publicly-held securities. To this

end, because of FBG's vast experience in facilitating the solicitation process of holders of public

securities, the Debtors are seeking to retain FBG as special plan balloting, solicitation, and

information agent to assist the Debtors in performing plan-related solicitation services such as

noticing, consultation, and vote tabulation services solely for holders of Delphi's public

securities.[10]

---

[10]    FBG will be responsible for noticing, balloting, tabulation, and solicitation only with respect to the public
securities of Delphi. The Debtors have previously retained Kurtzman Carson Consultants ("KCC") as
claims and noticing agent of the Bankruptcy Court in these chapter 11 cases. KCC's responsibilities pertain
to general noticing, claims administration, solicitation, and vote tabulation services with respect to creditors
whose claims are derived from all matters other than the holding of Delphi's securities. FBG will

7

15.    Delphi's current public securities include one issue of public equity and the following public debt issuances:

| 2006 Notes | 6.55% Notes due 2006, dated May 31, 2001 |
|---|---|
| 2009 Notes | 6.50% Notes due 2009, dated April 28, 1999 |
| 2013 Notes | 6.50% Notes due 2013, dated July 22, 2003 |
| 2029 Notes | 7.125% Notes due 2029, dated April 28, 1999 |
| ToPRs Note | Adjustable Rate Junior Subordinated Note, Due 2033 |

16.    In chapter 11 cases, the solicitation of votes from holders of public securities and the distribution of solicitation materials to such holders present complexities which do not exist with respect to other types of creditors.  These complexities stem from the fact that public securities often are held in a "Street" name by a custodian (such as a bank, broker, or other nominee) rather than in the name of the beneficial owner.  In most instances, the identities of beneficial owners of public securities entitled to receive notices and solicitation materials are not easily known or determinable.

17.    The successful dissemination of solicitation materials to beneficial owners of public securities requires close coordination with numerous parties (including banks, brokerages, or other nominees) to ensure that these entities properly forward solicitation materials to their customers.  The collection of votes from beneficial holders of public securities similarly requires close coordination and cooperation with the record holders of these securities. The Debtors submit that retaining a special balloting and noticing agent with specialized knowledge regarding the solicitation of public security holders is necessary to ensure that the Debtors satisfy applicable requirements under the Bankruptcy Code and Bankruptcy Rules in a cost-effective and efficient manner.

coordinate its efforts with KCC and any other retained personnel to make use of any existing information databases to minimize or avoid duplication of efforts and costs to the estates.

18.    FBG is well-qualified to act as the Debtors' publicly-held securities plan
balloting, solicitation, and information agent.  FBG specializes in transactions involving public
securities, particularly in the context of a plan of reorganization.  Jane Sullivan, who is the
Executive Director of FBG, has broad experience in all types of bankruptcy solicitations and has
significant experience in providing services, advice, and support to large, complex chapter 11
solicitations including the solicitation of votes of, or distribution of notices to, beneficial owners
through their nominee holders.  FBG also utilizes a state-of-the-art mailing facility and tabulation
system, which are vital to ensuring an orderly and proper bankruptcy solicitation.

19.    Jane Sullivan will have primary responsibility for ensuring that the Debtors
satisfy their solicitation requirements in these cases.  Ms. Sullivan has more than 20 years of
experience in public securities solicitations and other transactions and has specialized in
bankruptcy solicitations since 1991.  Ms. Sullivan has worked on more than 100 prepackaged
and traditional bankruptcy solicitations, including In re Armstrong World Industries, Inc., No.
00-4471 (Bankr. D. Del. 2000), In re Comdisco, Inc., No. 01-24795 (Bankr. N.D. Ill. 2001), In re
Enron Corp., No. 01-16034 (Bankr. S.D.N.Y. 2001), In re Fruit of the Loom, Inc., No. 99-4497
(Bankr. D. Del. 1999), In re Global Crossing, Ltd., No. 02-40188 (Bankr. S.D.N.Y. 2002), In re
Kmart Corporation, No. 02-B02474 (Bankr. N.D. Ill. 2002), In re NTL Incorporated, No. 02 B
41316 (Bankr. S.D.N.Y. 2002), In re Owens-Corning, No. 00-03837 (Bankr. D. Del. 2000), In re
Refco, Inc., No. 05-60006 (Bankr. S.D.N.Y. 2005), and In re WorldCom, Inc., No. 02-13533
(Bankr. S.D.N.Y. 2002).  Ms. Sullivan will work closely with other members of FBG's staff,
each of whom is experienced in all aspects of public securities plan solicitations, including
working with banks and brokerage firms to conduct the proposed solicitation in these chapter 11
cases.

9

20.    The Debtors submit that FBG is highly familiar with the necessary processes involved and uniquely qualified to perform the services needed in these cases.  In light of the above, the Debtors submit that the retention of FBG is necessary and in the best interests of the Debtors, their estates, and creditors.

<u>Services To Be Rendered</u>

21.    Pursuant to the FBG Agreement, FBG has agreed, among other things, to:

(a)    Advise the Debtors and their counsel regarding all aspects of the plan solicitation to holders of publicly-held securities, including timing issues, solicitation issues and documents related to the same, and voting and tabulation procedures;

(b)    Review the voting portions of the disclosure statement, ballots, and other documents, particularly as they may relate to holders of publicly-held securities;

(c)    Work with the Debtors to request appropriate information from The Depository Trust Company ("DTC") and the trustee(s) under the public debt issues to obtain appropriate information necessary to solicit the votes of holders of publicly-held securities;

(d)    With respect to any registered holders of securities entitled to vote, place the solicitation package into envelopes to be addressed by FBG, include return address envelopes addressed to FBG for the return of the completed ballots, and implement the mailing of solicitation packages;

(e)    Coordinate the distribution of solicitation packages to holders in Street name of any voting securities by forwarding the appropriate solicitation packages and instructions to the appropriate departments and personnel of the banks and brokerage firms holding the securities (or their agent), who in turn will forward it to the beneficial owners for voting and follow up with banks and brokers to help ensure compliance with FBG's instructions;

(f)    Distribute copies of the master ballots and instructions (after the initial distribution of materials) to the appropriate nominees so that firms may cast votes on behalf of beneficial owners of publicly-held securities and follow up with nominees to ensure compliance with FBG's instructions;

(g)    Prepare a certificate of service for filing with this Court;

10

(h)    Handle requests for documents from parties-in-interest, including brokerage firms, banks, and institutional holders;

(i)    Work with the Debtors and their counsel to establish a protocol for, and respond to, telephone inquiries from holders and nominees regarding the disclosure statement and the voting procedures;

(j)    If requested to do so, make telephone calls to non-objecting holders and nominees to confirm receipt of the solicitation package and respond to questions about voting procedures;

(k)    Receive and examine all ballots and master ballots and date- and time-stamp the originals of all such ballots upon receipt;

(l)    Track any solicitation packages that are returned as undeliverable and report to the Debtors and their counsel regarding the same;

(m)    Tabulate all ballots and master ballots received prior to the voting deadline in accordance with established procedures, and prepare a vote certification for filing with this Court; and

(n)    Provide mailing lists produced in the course of FBG's engagement to the Debtors in a manipulable format.

<u>Fees And Expenses</u>

22.    The Debtors propose to compensate FBG in accordance with the FBG Agreement, as summarized below.  FBG's projected fees and expenses are estimated at $400,000-$600,000, on account of the following[11]:

(a)    For acting as solicitation and information agent for holders in "Street" name: a project fee of $20,000, plus $3,000 for each debt issue of public securities entitled to vote on the Plan; $1,500 for each debt issue not entitled to vote on the Plan but entitled to receive notice; and $7,500 for common stock;

(b)    For responding to telephone calls from security holders and other parties during the solicitation period: a minimum charge of $4,000 plus $8.00 per call for every call over 500 calls;

---

[11]    The Debtors may advance funds for certain expenses incurred by FBG related to the notice of hearing on the Debtors' disclosure statement prior to this Application being approved by the Court.

(c)    For assembly and mailing of solicitation packages (per mailing) to registered record holders of stock and any other voting party: $1.75 - $2.25 per package ($500 minimum);

(d)    For notice mailings to holders of debt and equity securities in "Street" name: $12,500 plus applicable consulting fees;

(e)    For notice mailings to any registered record holders of securities (or other individual parties): $0.50-$0.65 per envelope (for up to two paper notices that fold into an envelope) ($250 minimum) plus applicable consulting fees;

(f)    To tabulate ballots: $5,000 setup fee plus a charge of $125 per hour for labor;

(g)    For FBG consulting services for matters including the review and development of materials, including the disclosure statement, plan, ballots, and master ballots; participation in telephone conferences, strategy meetings, and the development of strategy relative to the project; efforts related to special balloting procedures, including issues that may arise during the balloting or tabulation process; computer programming or other project-related data processing services; visits to cities outside New York for client meetings or legal or other matters; efforts related to the preparation of testimony and attendance at court hearings; and the preparation of affidavits, certifications, fee applications, invoices, and reports: standard hourly consulting fee rates; and

(h)    Additional out-of-pocket expenses for printing, messengers, telephone usage, copies ($0.10 per copy), and postage.

23.    FBG's current hourly consulting fee rates, which are subject to adjustment based on FBG's ordinary billing practices, are as follows:

| | |
|---|---|
| Executive Director | $410 per hour |
| Director | $360 per hour |
| Senior Case Manager | $300 per hour |
| Case Manager | $240 per hour |
| Junior Case Manager | $190 per hour |
| Programmer II | $195 per hour |
| Programmer I | $165 per hour |
| Clerical | $ 65 per hour |

24.    FBG will, on a monthly basis, submit detailed invoices to the Debtors for services rendered, with a copy to the Office of the United States Trustee. The Debtors request that FBG's fees and expenses incurred in the performance of the services described above be treated as an administrative expense of the Debtors' chapter 11 cases, and be paid by the Debtors in the ordinary course of business without further order of this Court.[12]

Indemnification

25.    Delphi has agreed to indemnify and hold FBG harmless against any loss, damage, expense, liability, or claim arising out of FBG's fulfillment of the FBG Agreement; provided, however, that should such loss, damage, expense, liability, or claim arise as a result of FBG's gross negligence or willful misconduct, Delphi will not indemnify FBG for any such loss, damage, expense, liability, or claim.

26.    The Debtors submit that the fee payment and expense reimbursement provisions contained in the FBG Agreement are the reasonable and customary terms of engagement for FBG and are competitive with those charged by comparable firms.

Disinterestedness

27.    To the best of the Debtors' knowledge, information, and belief, except as set forth in the Sullivan Declaration, FBG has no connection with, and holds no interest adverse to, the Debtors, their creditors, or any other party-in-interest, or their respective attorneys or accountants, in the matters for which FBG is proposed to be retained.

---

[12]    The Debtors do not believe that FBG, as an administrative agent, is a "professional" whose retention is subject to Bankruptcy Code sections 327 and 328 or whose compensation is subject to Bankruptcy Code sections 330 and 331. Nevertheless, out of an abundance of caution, the Debtors are filing this Application under Bankruptcy Code sections 327 and 328 and seeking a waiver of requirements under Bankruptcy Code sections 330 and 331.

28.    To the best of the Debtors' knowledge, FBG is a "disinterested person" as
such term is defined in section 101(14) of the Bankruptcy Code and as required under section
327(a) of the Bankruptcy Code.  The Sullivan Declaration, executed on behalf of FBG in
accordance with section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014, is filed
contemporaneously herewith.  The Debtors' knowledge, information, and belief regarding the
matters set forth in this Retention Application are based on, and are made in reliance upon, the
Sullivan Declaration.

Conclusion

29.    For the foregoing reasons, the Debtors submit that the retention of FBG as
special plan balloting, solicitation, and information agent in the Debtors' cases pursuant to the
terms described herein and in the attached documents is in the best interests of the Debtors and
their estates and stakeholders and should be approved.

Notice

30.    Notice of this Motion has been provided in accordance with the
Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,
9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,
And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Amended
Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m),
9006, 9007, and 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case
Management, And Administrative Procedures, entered October 26, 2006 (Docket No. 5418).  In
light of the nature of the relief requested, the Debtors submit that no other or further notice is
necessary.

14

<u>Memorandum Of Law</u>

31.    Because the legal points and authorities upon which this FBG Retention Application relies are incorporated herein, Delphi respectfully requests that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing the Debtors' employment and retention of FBG as special plan balloting, solicitation, and information agent for publicly-held securities to perform the services set forth in the FBG Agreement and (b) granting the Debtors such other and further relief as is just.

Dated:    New York, New York
          September 4, 2007

                              DELPHI CORPORATION, as Debtor and Debtor-in-possession

                              By:     /s/ David M. Sherbin
                                      Name: David M. Sherbin
                                      Title:   Vice President, General Counsel and
                                               Chief Compliance Officer

# EXHIBIT A

FBG Agreement

### FINANCIAL BALLOTING GROUP LLC
### 757 THIRD AVENUE, 3RD FLOOR
### NEW YORK, NY 10017

August 23, 2007

Delphi Corporation
5725 Delphi Drive
Troy, MI 48098
Attn:   David M. Sherbin, Esq., Vice President,
        General Counsel and Chief Compliance Officer

### AGREEMENT

This Agreement sets forth the terms and conditions under which Financial Balloting Group LLC
("FBG") will serve Delphi Corporation ("Delphi") as Plan Balloting, Solicitation Mailing, and
Information Agent for Publicly Held Securities.

### Assumptions

We are making the following assumptions about public securities entitled to vote and/or receive
notice:

- There are six issues of public securities, including:

  - five issues of public debt (2006 Notes, 2009 Notes, 2029 Notes, 2013 Notes and
    ToPRs Note); and

  - one issue of public equity, held both by beneficial holders in "Street" name and
    holders in registered record form;

### 1. Balloting and Tabulation Services

1. Advise the Debtors and their counsel regarding all aspects of the plan solicitation to
   holders of publicly held securities, including timing issues, solicitation issues and
   documents related to the same, and voting and tabulation procedures.

2. Review the voting portions of the disclosure statement, ballots, and other documents,
   particularly as they may relate to holders of publicly held securities.

3. Work with the Debtors to request appropriate information from The Depository Trust
   Company ("DTC") and the trustee(s) under the public debt issues to obtain appropriate
   information necessary to solicit the votes of holders of publicly held securities.

4. With respect to any registered holders of securities entitled to vote, place the solicitation
   package into envelopes to be addressed by FBG, include return address envelopes
   addressed to FBG for the return of the completed ballots, and implement the mailing of
   solicitation packages.

5.  Coordinate the distribution of solicitation packages to holders in Street name of any voting securities by forwarding the appropriate solicitation packages and instructions to the appropriate departments and personnel of the banks and brokerage firms holding the securities (or their agent), who in turn will forward it to the beneficial owners for voting and follow up with banks and brokers to help ensure compliance with FBG's instructions.

6.  Distribute copies of the master ballots and instructions (after the initial distribution of materials) to the appropriate nominees so that firms may cast votes on behalf of beneficial owners of publicly-held securities and follow up with nominees to ensure compliance with FBG's instructions.

7.  Prepare a certificate of service for filing with the court.

8.  Handle requests for documents from parties-in-interest, including brokerage firms, banks, and institutional holders.

9.  Work with the Debtors and their counsel to establish a protocol for, and respond to, telephone inquiries from holders and nominees regarding the disclosure statement and the voting procedures.

10.  If requested to do so, make telephone calls to non-objecting holders and nominees to confirm receipt of the solicitation package and respond to questions about voting procedures.

11.  Receive and examine all ballots and master ballots and date- and time-stamp the originals of all such ballots upon receipt.

12.  Track any solicitation packages that are returned as undeliverable and report to the Debtors and their counsel regarding the same.

13.  Tabulate all ballots and master ballots received prior to the voting deadline in accordance with established procedures, and prepare a vote certification for filing with the court.

14.  Provide mailing lists produced in the course of FBG's engagement to the Debtors in a manipulable format.

15.  Undertake such other duties as may be agreed upon by Delphi and FBG.

**Pricing for Balloting and Tabulation**

For the above mentioned services, Delphi agrees to pay FBG on the following basis:

1.  For the holders in "Street" name, a project fee of $20,000, plus $3,000 for each debt issue (i.e., each cusip number or ISIN number) of public securities entitled to vote on the Plan; $1,500 for each debt issue not entitled to vote on the Plan but entitled to receive notice; and $7,500 for the common stock. This covers the coordination with all brokerage firms, banks, institutions and other interested parties, including the distribution of voting documents and any non-voting materials. This assumes a single

distribution, which will be directed to the firms' proxy departments (as described above),
a single plan, and no extensions of the voting deadline.

2.  For the mailing to registered record holders of stock and any other voting party, we
    would estimate labor charges at $1.75 - $2.25 per voting package, depending on the
    complexity of the mailing, with a $500 minimum for each file. The charge indicated
    assumes the voting package, for example, would include the disclosure statement, a
    ballot, a return envelope, and one other document. It also assumes that a window
    envelope will be used for the mailing, and will therefore not require a matched mailing.

3.  A minimum charge of $4,000 to take up to 500 telephone calls from security holders and
    other parties within a 30-day solicitation period. If more than 500 calls are received
    within the period, those additional calls will be charged at $8.00 per call. Any calls to
    security holders and other parties will be charged at $8.00 per call.

4.  A charge of $125 per hour for the tabulation of ballots and master ballots, plus set up
    charges of $5,000. Standard hourly rates (as enumerated below) will apply for any time
    spent by senior executives reviewing and certifying the tabulation and dealing with
    special issues that may develop.

5.  If a website is requested for the posting of documents, hourly programming charges to
    customize the site for the case, and a monthly hosting charge of $100 to $150, depending
    on the complexity of the site.

6.  We will bill for consulting hours at our then applicable standard hourly rates. Listed
    below are our current standard hourly rates. Consulting services by FBG would include
    the review and development of materials, including the disclosure statement, plan,
    ballots, master ballots, participation in telephone conferences, strategy meetings or the
    development of strategy relative to the project; efforts related to special balloting
    procedures, including issues that may arise during the balloting or tabulation process;
    computer programming or other project-related data processing services; visits to cities
    outside of New York for client meetings or legal or other matters; efforts related to the
    preparation of testimony and attendance at court hearings; and the preparation of
    affidavits, certifications, fee applications (if required by the court), invoices, and reports.

|  Hourly rates: | |
| --- | --- |
| Executive Director | $410 per hour |
| Director | $360 per hour |
| Senior Case Manager | $300 per hour |
| Case Manager | $240 per hour |
| Junior Case Manager | $190 per hour |
| Programmer II | $195 per hour |
| Programmer I | $165 per hour |
| Clerical | $65 per hour |

**2. Notice Mailings**

FBG would receive printed copies of the notice (or print them) and work with the company to
request appropriate information to ensure that the mailing can be done correctly. Mailings are
completed as quickly and efficiently as possible. A certificate of service will be prepared for
filing with the court.

Notice mailings to creditors and registered holders of the stock are straightforward, because their
identities are known and notices can be sent directly to them. The mailing process is more
complex for security holders in street name, because the notices need to be forwarded to
beneficial owners of securities by the brokers or banks holding the securities, or their agent. We
will coordinate with the firms in question, deliver the appropriate documents to them with
instructions for mailing, and follow-up to be certain the notices are forwarded to beneficial
owners.

**Pricing for Notice Mailings**

For the above mentioned services, Delphi agrees to pay FBG on the following basis:

*Mailings to Registered Holders:*
Mailings to any registered record holders of securities (or other individual parties) will be
charged at $0.50 - $0.65 per holder, for up to two paper notices included in the same envelope,
with a $250 minimum. This assumes that labels and/or electronic data for these holders would
be provided by the transfer agent, trustee, or other party maintaining the records.

*Mailings to Stockholders in "Street" name:*
FBG's charges for a notice mailing to holders of debt and equity securities in Street name will be
$12,500.

Hourly rates, as enumerated above, would apply for any related consulting work in connection
with notice mailings.

**Out of Pocket Expenses**

All out-of-pocket expenses relating to any work undertaken by FBG will be charged separately,
and will include such items as travel costs, postage, messengers and couriers, etc., expenses
incurred by FBG in obtaining or converting depository participant, creditor, shareholder and/or
lists of Non-Objecting Beneficial Owners; and appropriate charges for supplies, in-house
photocopying, telephone usage, etc. Faxes will not be charged; in-house copies will be charged
at $0.10 per page.

**Charges**

For services rendered by FBG under this Agreement, Delphi shall pay the charges set forth
above. FBG will bill Delphi monthly. All invoices shall be due and payable upon receipt.

-4-

In addition to all charges for services, Delphi shall pay to FBG all taxes, however designated, levied or based that are applicable to this Agreement or are measured directly by payments made under this Agreement and are required to be collected by FBG or paid by FBG to taxing authorities. This provision includes, but is not limited to, sales, use and excise taxes, but does not include personal property taxes or taxes based on net income.

Where Delphi requires measures that are unusual and beyond normal business practice of FBG such as, but not limited to, CPA audit, errors and omissions insurance, or off-premises storage of data, the cost of such measures, if provided by FBG, shall be charged to Delphi at a competitive rate.

In the event of termination due to Delphi's default, Delphi shall be liable for all amounts then owing.


**Term**

This Agreement shall become effective on the later of (i) the date it has been accepted by both FBG and Delphi or (ii) if Bankruptcy Court approval is required, the date of entry of an order by the Bankruptcy Court approving this Agreement or such earlier date set by the Bankruptcy Court. The agreement shall remain in effect until it is terminated by Delphi or FBG on one (1) month's prior written notice.

**Indemnity**

Delphi agrees to indemnify and hold FBG harmless against any loss, damage, expense (including, without limitation, legal and other related fees and expenses), liability or claim arising out of FBG's fulfillment of the Agreement (except for any loss, damage, expense, liability or claim resulting out of FBG's own gross negligence or willful misconduct). At its election, Delphi may assume the defense of any such action. FBG hereby agrees to advise Delphi of any such liability or claim promptly after receipt of the notice thereof; provided however, that FBG's right to indemnification hereunder shall not be limited by its failure to promptly advise Delphi of any such liability or claim, except to the extent that Delphi is prejudiced by such failure. The indemnification contained in this paragraph will survive the term of the Agreement. Except as provided herein, FBG's liability to Delphi or any person claiming through or under Delphi for any claim, loss, damage, expense of any kind, or for any lost profits, loss of business or other consequential damages even if FBG has been advised of the possibility of such damages, whether direct or indirect and unless due to gross negligence or willful misconduct of FBG shall be limited to the total amount billed or billable to Delphi for the portion of the particular work which gave rise to the loss or damage. In no event shall FBG be liable to Delphi for any special or consequential damages (including loss of anticipated profits) incurred by Delphi in connection with or arising out of the services provided for in this Agreement.

**Confidentiality**

FBG agrees to preserve the confidentiality of all non-public information provided by Delphi or
its agents for its use in providing services under this Agreement, or information developed by
FBG based upon such non-public information. All of Delphi's data given to FBG will be
safeguarded by FBG to the same extent that FBG safeguards data relating to its own business;
provided, however, that if data is publicly available, was already in FBG's possession or known
to it, or was rightfully obtained by FBG from a third party, FBG shall bear no responsibility for
disclosure. Delphi agrees that FBG shall not be liable beyond the limits provided under
"Indemnity," above, for damages or losses of any nature whatsoever arising out of the
unauthorized acquisition or use of any material supplied by Delphi to FBG in the performance of
this Agreement.

**General**

No waiver alteration, amendment or modification of any of the provisions of this Agreement
shall be binding upon either party unless signed in writing by a duly authorized representative of
both parties.

This agreement may not be assigned by Delphi without the express written consent of FBG,
which consent shall not be unreasonably withheld. The services provided under this Agreement
are for the sole benefit and use of Delphi, and shall not be made available to any other persons.

This Agreement shall be governed by the laws of the State of New York, without regard to that
state's provisions for choice of law.

The parties agree that this Agreement is the complete and exclusive statement of the agreement
between the parties which supersedes all proposals or prior agreements, oral or written, and all
other communications between the parties relating to the subject matter of this Agreement.

Notices to be given or submitted by either party to the other, pursuant to this Agreement, shall be
sufficiently given or made if given or made in writing and sent by certified mail or overnight
courier, postage prepaid, and addressed as follows:

If to FBG:

       Financial Balloting Group LLC
       757 Third Avenue, 3rd Floor
       New York, New York 10017
       Attn:    Jane Sullivan, Executive Director

If to Delphi:

       Delphi Corporation
       5725 Delphi Drive
       Troy, MI 48098
       Attn:    David M. Sherbin, Esq., Vice President,
               General Counsel and Chief Compliance Officer

**If the above is agreed to by you, please sign and return this Agreement to Financial
Balloting Group LLC, Attention: Jane Sullivan, 757 Third Avenue, 3rd Floor, New York,
NY 10017.**

ACCEPTED:

DELPHI CORPORATION                              FINANCIAL BALLOTING GROUP LLC

By: _____                  By: _____
        David M. Sherbin                                Jane Sullivan
                                                        Executive Director

Title: Vice President, General Counsel
        and Chief Compliance Officer

Date _____

<u>EXHIBIT B</u>

Declaration of Jane Sullivan

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                   :
           In re                           :      Chapter 11
                                     :
DELPHI CORPORATION, et al.,        :      Case No. 05-44481 (RDD)
                                     :
                     Debtors.    :      (Jointly Administered)
                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF JANE SULLIVAN IN SUPPORT OF DEBTORS' APPLICATION
FOR ORDER UNDER 11 U.S.C. §§ 327(a) AND 328 AND FED. R. BANKR. P. 2014
AND 3017 FOR AUTHORIZATION TO EMPLOY AND RETAIN
FINANCIAL BALLOTING GROUP LLC AS SPECIAL PLAN BALLOTING,
<u>SOLICITATION, AND INFORMATION AGENT FOR PUBLICLY-HELD SECURITIES</u>

("SULLIVAN DECLARATION")

Jane Sullivan, under penalty of perjury, declares and says:

1.       I am the Executive Director of Financial Balloting Group LLC ("FBG"),

having offices at 757 Third Avenue, 3rd Floor, New York, New York 10017.  I submit this

declaration in support of the application (the "Application") of Delphi Corporation ("Delphi")

and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-

captioned cases (collectively, the "Debtors"), for authorization to employ FBG as the Debtors'

special plan balloting, solicitation, and information agent for publicly-held securities, pursuant to

the terms and conditions of the engagement agreement (the "FBG Agreement"), a copy of which

is attached to the Application as <u>Exhibit A</u>.

1

2.     FBG is a firm with significantly experienced employees in all areas of bankruptcy balloting and related assignments, and with a specialization in soliciting, tabulating, and noticing holders of public debt and equity securities.

3.     As the Executive Director of FBG and based on my familiarity with the Debtors' proposed solicitation requirements as described in the Application, I would be the person with primary responsibility for fulfilling such requirements in these chapter 11 cases should the Court approve the Application, but I would work closely with other members of FBG's staff, who are highly experienced in all aspects of plan solicitations, including in dealing with the back offices of banks and brokerage firms (the "Nominees"), and who would be instrumental in carrying out the assignment.

4.     I have more than 20 years of experience in public securities solicitations and other transactions and have specialized in bankruptcy solicitations since 1991.  I have worked on more than 100 complex bankruptcy solicitations, including In re Armstrong World Industries, Inc., No. 00-4471 (Bankr. D. Del. 2000), In re Comdisco, Inc., No. 01-24795 (Bankr. N.D. Ill. 2001), In re Enron Corp., No. 01-16034 (Bankr. S.D.N.Y. 2001), In re Fruit of the Loom, Inc., No. 99-4497 (Bankr. D. Del. 1999), In re Global Crossing, Ltd., No. 02-40188 (Bankr. S.D.N.Y. 2002), In re Kmart Corporation, No. 02-B02474 (Bankr. N.D. Ill. 2002), In re NTL Incorporated, No. 02 B 41316 (Bankr. S.D.N.Y. 2002), In re Owens-Corning, No. 00-03837 (Bankr. D. Del. 2000), In re Refco, Inc., No. 05-60006 (Bankr. S.D.N.Y. 2005), and In re WorldCom, Inc., No. 02-13533 (Bankr. S.D.N.Y. 2002).

5.     The solicitation process contemplated by the Debtors is complex.  I have extensive experience in executing complex solicitation procedures and am thoroughly versed in

all aspects of the anticipated voting and election processes.  I possess the specialized knowledge to help the Debtors establish workable voting procedures and then carry out those procedures.

6.      FBG will be responsible for the noticing, balloting, and tabulation with respect to the public securities of the Debtors only.  Kurtzman Carson Consultants ("KCC") will remain responsible for all other noticing, balloting, and tabulation for the Debtors.  FBG will coordinate its efforts with KCC and any other personnel retained to participate in the plan solicitation process to make use of any information database that already exists and to avoid the duplication of efforts and costs to the estates.

7.      The fee payment and expense reimbursement provisions contained in the Agreement are the reasonable and customary terms of engagement for FBG and are competitive with those charged by comparable firms.  Pending this Court's approval of the Debtors' request, FBG's fees and expenses will be treated as an administrative expense of the Debtors' estates and will be paid by the Debtors in the ordinary course of business.

8.      To the best of my knowledge, FBG has not represented and does not represent any creditor or party-in-interest in matters adverse to the Debtors' estates.  FBG is a "disinterested person" as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, for the reasons discussed below.

9.      Although FBG does have a relationship with the following parties as described below, such relationships are in no way connected with FBG's representation of the Debtors:

| Party | Relationship To The Debtors | Relationship To FBG |
|---|---|---|
| AIG | Insurance Provider | Insurance Provider |
| Chubb | Insurance Provider | Insurance Provider |
| Zurich American Insurance Co. | Insurance Provider | Insurance Provider |
| Marsh USA (Broker) | Insurance Provider | Insurance Provider (broker) |
| Blue Cross Blue Shield of Michigan | Insurance Provider | Insurance Provider (Blue Cross Blue Shield of Kansas City) |
| Morgan Stanley | Underwriter of Securities | 401(k) Administrator |
| Deloitte & Touche | Vendor | Audit Firm |

10.     In addition, it is possible that FBG may have rendered services to certain creditors or equity interest holders of the Debtors, in matters unrelated to the Debtors, that I have not discovered, or may have been involved in matters unrelated to the Debtors in which these creditors or equity interest holders were also involved.  Similarly, employees of FBG may have had business associations with certain creditors or parties-in-interest which have no connection to FBG's representation of the Debtors.   FBG does not currently maintain any relationships or interests, and does not intend to develop additional relationships or interests during its representation of the Debtors in these chapter 11 cases, in matters that would be adverse to the Debtors' estates.

11.     None of the services that FBG currently provides to the potential parties-in-interest listed in paragraph 9 above, regardless of the size or significance of the relationship

4

involved, would compromise in any way FBG's ability to provide the services to the Debtors

outlined in the Application, nor will FBG agree at any point in the future to provide services to

any party that could compromise its ability to serve the Debtors in these chapter 11 cases.

            12.    FBG has no agreement with any other person or entity, prohibited by

section 504 of title 11 of the United States Code (the "Bankruptcy Code"), to share with such

person or entity any compensation received or to be received by FBG or any other person in

connection with these chapter 11 cases.

            I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct to the best of my knowledge, information, and belief.


            Executed this 24th day of August, 2007, in New York, New York.



                                            _____/s/ Jane Sullivan_____
                                                Jane Sullivan

5