Exhibit 7. 20(a)

Delphi-GM Global Settlement Agreement

**EXECUTION COPY**

**GLOBAL SETTLEMENT AGREEMENT**

**BETWEEN**

**DELPHI CORPORATION,**
**on behalf of itself and certain of its subsidiaries and Affiliates,**

**AND**

**GENERAL MOTORS CORPORATION**

**DATED SEPTEMBER 6, 2007**

## Table of Contents

Page

RECITALS ........................................................................................................................1
ARTICLE I DEFINITIONS ..............................................................................................4
    Section 1.01    "Active Splinter EPBO" ..................................................4
    Section 1.02    "Actual HMO and DHMO Premiums" ............................4
    Section 1.03    "Actual Prescription Drug PBM Rebate Amount" .........................4
    Section 1.04    "Additional Releasing Parties" .......................................4
    Section 1.05    "Affiliates" ......................................................................5
    Section 1.06    "Bankruptcy Code" .........................................................5
    Section 1.07    "Bankruptcy Court" ........................................................5
    Section 1.08    "Bankruptcy Rules" ........................................................5
    Section 1.09    "Benefit Guarantees" ......................................................5
    Section 1.10    "Benefit Guarantee Term Sheets" ...................................5
    Section 1.11    "Carrier Administrative Fees" .........................................5
    Section 1.12    "Chapter 11 Cases" .........................................................5
    Section 1.13    "Completion Costs" ........................................................5
    Section 1.14    "Confirmation Order" .....................................................5
    Section 1.15    "Continuing Agreements" ...............................................6
    Section 1.16    "Covered Employees" .....................................................6
    Section 1.17    "DAS" .............................................................................6
    Section 1.18    "Debtors" ........................................................................6
    Section 1.19    "Delphi" ..........................................................................6
    Section 1.20    "Delphi Affiliate Parties" ...............................................6
    Section 1.21    "Delphi-Related Parties" .................................................6
    Section 1.22    "Delphi HRP" ..................................................................6
    Section 1.23    "Delphi Pension Trust" ...................................................6
    Section 1.24    "Delphi Surviving Claims" .............................................6
    Section 1.25    "DIP Agent" ....................................................................6
    Section 1.26    "DIP Credit Agreement" .................................................6
    Section 1.27    "DIP Lenders" .................................................................7
    Section 1.28    "Disclosure Statement" ...................................................7
    Section 1.29    "Disclosure Statement Approval Date" ...........................7
    Section 1.30    "Effective Date" ..............................................................7
    Section 1.31    "EPBO" ...........................................................................7
    Section 1.32    "EPCA" ...........................................................................7
    Section 1.33    "Equity Committee" ........................................................7
    Section 1.34    "ERISA" ..........................................................................7
    Section 1.35    "Final Order" ...................................................................7
    Section 1.36    "First Tranche Date" .......................................................8
    Section 1.37    "GM" ...............................................................................8
    Section 1.38    "GM HRP" .......................................................................8
    Section 1.39    "GM IUE-CWA Payment" ..............................................8

| Section 1.40 | "GM Pension Trust" | 8 |
| Section 1.41 | "GM Proof of Claim" | 8 |
| Section 1.42 | "GM Purchase Order" | 8 |
| Section 1.43 | "GM-Related Parties" | 8 |
| Section 1.44 | "GM Surviving Claims" | 8 |
| Section 1.45 | "Gross Liability" | 8 |
| Section 1.46 | "IAM" | 8 |
| Section 1.47 | "IAM MOU" | 8 |
| Section 1.48 | "IAM Releasing Parties" | 9 |
| Section 1.49 | "IBEW" | 9 |
| Section 1.50 | "IBEW MOUs" | 9 |
| Section 1.51 | "IBEW Releasing Parties" | 9 |
| Section 1.52 | "Incremental PRP Obligation" | 9 |
| Section 1.53 | "Initial UAW SAP" | 9 |
| Section 1.54 | "IP License" | 9 |
| Section 1.55 | "IRS" | 9 |
| Section 1.56 | "IRS Ruling" | 9 |
| Section 1.57 | "IUE-CWA" | 9 |
| Section 1.58 | "IUE-CWA Benefit Guarantee" | 9 |
| Section 1.59 | "IUE-CWA Benefit Guarantee Term Sheet" | 10 |
| Section 1.60 | "IUE-CWA Buy Down Amount" | 10 |
| Section 1.61 | "IUE-CWA Buy Down Amount Invoice" | 10 |
| Section 1.62 | "IUE-CWA Buy Out Payments" | 10 |
| Section 1.63 | "IUE-CWA MOU" | 10 |
| Section 1.64 | "IUE-CWA-Related Reimbursements" | 10 |
| Section 1.65 | "IUE-CWA Reimbursement Invoice" | 10 |
| Section 1.66 | "IUE-CWA Releasing Parties" | 10 |
| Section 1.67 | "IUE-CWA Retirement Incentives" | 10 |
| Section 1.68 | "IUE-CWA SAP" | 10 |
| Section 1.69 | "IUOE" | 10 |
| Section 1.70 | "IUOE MOUs" | 10 |
| Section 1.71 | "IUOE Releasing Parties" | 11 |
| Section 1.72 | "Labor MOUs" | 11 |
| Section 1.73 | "Medical Claims Reimbursement Amount" | 11 |
| Section 1.74 | "Medicare Part D Subsidy Receipts" | 11 |
| Section 1.75 | "Net Liability Transfer" | 11 |
| Section 1.76 | "Non-Represented Employees Releasing Parties" | 11 |
| Section 1.77 | "Non-Represented EPBO" | 11 |
| Section 1.78 | "Non-Represented and Splinter EPBO Payment" | 11 |
| Section 1.79 | "Non-Represented Employees Term Sheet" | 11 |
| Section 1.80 | "Normal Cost" | 11 |
| Section 1.81 | "Note" | 11 |
| Section 1.82 | "OPEB" | 11 |
| Section 1.83 | "Ordinary Course Relationship" | 11 |
| Section 1.84 | "Outstanding Issues" | 12 |
| Section 1.85 | **"Party"** or **"Parties"** | 12 |

Section 1.86        "PBM" ..............................................................................................12
Section 1.87        "PBO" ..............................................................................................12
Section 1.88        "Petition Date" ................................................................................12
Section 1.89        "Plan" ...............................................................................................12
Section 1.90        "Plan Investors" ..............................................................................12
Section 1.91        "Preliminary Transferred Asset Amount".......................................12
Section 1.92        "Professional" ..................................................................................12
Section 1.93        "Proof of Claim" .............................................................................12
Section 1.94        "PVB" ..............................................................................................12
Section 1.95        "Reimbursement Period" .................................................................12
Section 1.96        "Restructuring Agreement".............................................................13
Section 1.97        "Retired Splinter EPBO"................................................................13
Section 1.98        "Second Tranche Date"....................................................................13
Section 1.99        "Section 365 Motion" .....................................................................13
Section 1.100       "Separation" .....................................................................................13
Section 1.101       "Settlement Dispute".......................................................................13
Section 1.102       "Splinter Union Employees" ...........................................................13
Section 1.103       "Standard GM Terms" .....................................................................13
Section 1.104       "Transfer Date" ...............................................................................13
Section 1.105       "Transferred Asset Amount"...........................................................13
Section 1.106       "True-up Amount" ...........................................................................13
Section 1.107       "UAW"..............................................................................................13
Section 1.108       "UAW Benefit Guarantee" ..............................................................14
Section 1.109       "UAW Benefit Guarantee Term Sheet"...........................................14
Section 1.110       "UAW Buy Down Payments"..........................................................14
Section 1.111       "UAW Buy Out Payments" .............................................................14
Section 1.112       "UAW MOU" ...................................................................................14
Section 1.113       "UAW Reimbursement Invoice" .....................................................14
Section 1.114       "UAW-Related Reimbursements" ...................................................14
Section 1.115       "UAW Retirement Incentives" ........................................................14
Section 1.116       "UAW Releasing Parties"................................................................14
Section 1.117       "UAW SAP" .....................................................................................14
Section 1.118       "UCC" ..............................................................................................14
Section 1.119       "Unsecured Claims".........................................................................14
Section 1.120       "USW" ..............................................................................................15
Section 1.121       "USW Benefit Guarantee" ..............................................................15
Section 1.122       "USW Benefit Guarantee Term Sheet"...........................................15
Section 1.123       "USW Buy Out Payments" .............................................................15
Section 1.124       "USW MOUs" ..................................................................................15
Section 1.125       "USW-Related Reimbursements" ....................................................15
Section 1.126       "USW Reimbursement Invoice" .....................................................15
Section 1.127       "USW Releasing Parties".................................................................15
Section 1.128       "USW Retirement Incentives" ........................................................15
Section 1.129       "Warranty Settlement Agreement" .................................................15
ARTICLE II COMMITMENTS REGARDING OPEB AND PENSION OBLIGATIONS.........16
Section 2.01        The Labor MOUs.............................................................................16

iii

Section 2.02        Certain Payments Between GM and Delphi Relating To Hourly Employee Benefits.................................................................................16
Section 2.03        Treatment of Delphi's Pension Plans ...............................................25
ARTICLE III OTHER GM CONTRIBUTIONS TO LABOR MATTERS ...................................29
Section 3.01        Assumption of Labor-Related Obligations .....................................30
Section 3.02        UAW.................................................................................................30
Section 3.03        IUE-CWA ........................................................................................32
Section 3.04        USW.................................................................................................36
ARTICLE IV RELEASES AND CLAIMS TREATMENT.........................................................38
Section 4.01        Release of GM-Related Parties........................................................38
Section 4.02        Release of Delphi-Related Parties and the Delphi Affiliate Parties        41
Section 4.03        Surviving Claims. .........................................................................42
Section 4.04        Cash to Be Paid to GM ...................................................................43
ARTICLE V IMPLEMENTATION ...........................................................................................44
Section 5.01        Bankruptcy Court Filing .................................................................44
Section 5.02        Actions Concerning Debtors' Section 365 Motion .........................44
Section 5.03        Actions Concerning Debtors' 1113/1114 Motions..........................44
ARTICLE VI CONDITIONS TO EFFECTIVENESS.................................................................44

ARTICLE VII MISCELLANEOUS.............................................................................................46
Section 7.01        Resolution of Pending Setoff Issues ...............................................46
Section 7.02        No Undisclosed Agreements or Commitments................................46
Section 7.03        Termination......................................................................................46
Section 7.04        No Offset...........................................................................................47
Section 7.05        Governing Law; Jurisdiction; Venue ..............................................48
Section 7.06        Dispute Resolution...........................................................................48
Section 7.07        Joint Communication Program ......................................................48
Section 7.08        No Solicitation..................................................................................48
Section 7.09        Negotiations Not Admissible...........................................................49
Section 7.10        Specific Performance .......................................................................49
Section 7.11        Representations and Warranties of the Debtors and GM...............49
Section 7.12        Waiver; Modification; Amendment................................................49
Section 7.13        Binding Effect; Assignments ...........................................................50
Section 7.14        Third Party Beneficiaries ...............................................................50
Section 7.15        Notices .............................................................................................50
Section 7.16        Waiver of Right to Trial by Jury.....................................................52
Section 7.17        Service of Process............................................................................52
Section 7.18        Interpretation....................................................................................52
Section 7.19        Expenses ..........................................................................................53
Section 7.20        Entire Agreement; Parties' Intentions; Construction .....................53
Section 7.21        Severability ......................................................................................53
Section 7.22        Headings ..........................................................................................53
Section 7.23        Affiliates ..........................................................................................53
Section 7.24        Counterparts.....................................................................................54

## EXHIBITS

**Exhibit A**        **Warranty Settlement Agreement**

**Exhibit B**        **IP License**

**Exhibit C**        **Master Restructuring Agreement**

**Exhibit D**        **PHI Protection Agreement**

**Exhibit E**        **Outstanding Delphi Invoices for which GM Has Withheld
                     Payment Due To Outstanding Prepetition Activities**

## GLOBAL SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement"), is entered into as of September 6, 2007, by and between Delphi Corporation ("Delphi"), on behalf of itself and its subsidiaries and Affiliates operating as debtors and debtors in possession in the Chapter 11 Cases (together with Delphi, the "Debtors"), and General Motors Corporation ("GM"). Each of the Debtors and GM is referred to herein individually as a "Party," and collectively, as the "Parties." As used herein, the phrases "this Agreement," "hereto," "hereunder," and phrases of like import shall mean this Agreement. All capitalized terms shall have the meanings ascribed to them in Article I hereof. Unless otherwise defined in this Agreement, capitalized terms in Articles II and III hereof shall have the meanings as set forth in the Labor MOUs.

### RECITALS

WHEREAS, on October 8, 2005 and October 14, 2005, the Debtors commenced the Chapter 11 Cases in the Bankruptcy Court for the purpose of restructuring their businesses and related financial obligations pursuant to an overall transformation strategy that would incorporate the following structural components:

(i)     Modification of Delphi's labor agreements;

(ii)    Allocation of responsibilities between Delphi and GM concerning (a) certain legacy obligations, including various pension and other post-employment benefit obligations; (b) costs associated with the transformation of the Debtors' business (including the provision of financial and other forms of support by GM in connection with certain businesses that Delphi will retain and certain businesses that Delphi intends to sell or wind down); (c) the restructuring of ongoing contractual relationships; and (d) the amount and treatment of GM's claims in the Chapter 11 Cases;

(iii)   Streamlining of Delphi's product portfolio to capitalize on its world-class technology and market strengths and making the necessary manufacturing alignment with its new focus;

(iv)    Transformation of Delphi's salaried work force in keeping with a sustainable cost structure and streamlined product portfolio; and

(v)     Resolution of Delphi's pension issues.

WHEREAS, on March 22, 2006 Delphi, GM, and the UAW entered into the Initial UAW SAP, which was authorized and approved by the Bankruptcy Court by order entered on May 12, 2006 (Docket No. 3754);

GSA-1

WHEREAS, on March 31, 2006, Delphi filed a motion under Bankruptcy Code sections 1113 and 1114 seeking to reject the majority of its collective bargaining agreements with its key unions and to modify retiree benefits (Docket No. 3035);

WHEREAS, on March 31, 2006, the Debtors filed the Section 365 Motion seeking authority to reject 5,472 supply contracts with GM pursuant to section 365 of the Bankruptcy Code (Docket No. 3033);

WHEREAS, on June 5, 2006, Delphi, GM, and the UAW entered into a supplement to the Initial UAW SAP to provide hourly UAW-represented employees with certain expanded options under the Initial UAW SAP, which was authorized and approved by the Bankruptcy Court by order entered on July 7, 2006 (Docket No. 4461);

WHEREAS, on June 16, 2006, Delphi, GM, and the IUE-CWA entered into the IUE-CWA SAP to provide, with financial support from GM, an attrition program to certain of the Debtors' IUE-CWA-represented employees, which was authorized and approved by the Bankruptcy Court by order entered on July 7, 2006 (Docket No. 4461);

WHEREAS, the Debtors, the UCC, and the Equity Committee have asserted that they may have causes of action against GM and defenses to any claims GM may have against the Debtors, including but not limited to those set forth in the GM Proof of Claim, arising from the Separation, post-Separation conduct by GM, and other matters;

WHEREAS, on June 22, 2007, Delphi, GM, and the UAW entered into the UAW MOU, which was ratified by Delphi's UAW-represented employees on June 28, 2007 and the UAW MOU was authorized and approved by the Bankruptcy Court by order entered on July 19, 2007 (Docket No. 8693) and is attached to the Plan as Exhibit 7.21(a);

WHEREAS, on June 22, 2007, Delphi, GM, and the UAW entered into the UAW Benefit Guarantee Term Sheet regarding (i) the freezing of the Delphi HRP, (ii) Delphi's cessation of OPEB, and (iii) the terms of a consensual triggering and application of the UAW Benefit Guarantee; the UAW Benefit Guarantee Term Sheet is annexed as Attachment B to the UAW MOU and was authorized and approved by the Bankruptcy Court by order entered on July 19, 2007 (Docket No. 8693);

WHEREAS, on July 31, 2006, GM, on behalf of itself and certain of its Affiliates and subsidiaries, filed the GM Proof of Claim;

WHEREAS, on July 31, 2007, Delphi, GM, and each of the IAM and IBEW entered into the IAM MOU and the IBEW MOUs, respectively, and on August 1, 2007, Delphi, GM, and the IUOE entered into the IUOE MOUs, each of which has been ratified by the Splinter Union Employees; the IAM MOU, the IBEW MOUs, and the IUOE MOU were authorized and approved by the Bankruptcy Court by order entered on August 16, 2007 (Docket No. 9107) and are attached to the Plan as Exhibits 7.21(d)-(i);

GSA-2

WHEREAS, on July 31, 2007, Delphi, GM, and each of the IAM, IBEW, and IUOE entered into the "Term Sheet – Delphi Cessation and GM Provision of OPEB," which is annexed as Attachment B to each of the IAM MOU, IBEW MOU, and IUOE MOU and was authorized and approved by the Bankruptcy Court by order entered on August 16, 2007 (Docket No. 9107);

WHEREAS, on August 3, 2007, Delphi and GM entered into the Non-Represented Employees Term Sheet which was authorized and approved by the Bankruptcy Court by order entered on August 16, 2007 (Docket No. 9107);

WHEREAS, on August 5, 2007, Delphi, GM, and the IUE-CWA entered into the IUE-CWA MOU, which was ratified by Delphi's IUE-CWA-represented employees on August 18, 2007, which was authorized and approved by the Bankruptcy Court by order entered on August 16, 2007 (Docket No. 9106) and is attached to the Plan as Exhibit 7.21(b);

WHEREAS, on August 5, 2007, Delphi, GM, and the IUE-CWA entered into the IUE-CWA Benefit Guarantee Term Sheet regarding (i) the freezing of the Delphi HRP, (ii) Delphi's cessation of OPEB, and (iii) the terms of a consensual triggering and application of the IUE-CWA Benefit Guarantee; the IUE-CWA Benefit Guarantee Term Sheet is annexed as Attachment B to the IUE-CWA MOU and was authorized and approved by the Bankruptcy Court by order entered on August 16, 2007 (Docket No. 9106);

WHEREAS, on August 16, 2007, Delphi, GM, and the USW entered into the USW MOUs, which were ratified by Delphi's USW-represented employees on August 31, 2007; the USW MOUs were authorized and approved by the Bankruptcy Court by order entered on August 29, 2007 (Docket No. 9169) and are attached to the Plan as Exhibit 7.21(c);

WHEREAS, on August 16, 2007, Delphi, GM, and the USW entered into the USW Benefit Guarantee Term Sheet regarding (i) the freezing of the Delphi HRP, (ii) Delphi's cessation of OPEB, and (iii) the terms of a consensual triggering and application of the USW Benefit Guarantee; the USW Benefit Guarantee Term Sheet is annexed as Attachment B to the USW MOU and was authorized and approved by the Bankruptcy Court by order entered on August 29, 2007 (Docket No. 9169);

WHEREAS, on August 14, 2007, Delphi and GM entered into the Warranty Settlement Agreement to resolve, compromise, and/or settle certain outstanding warranty claims and issues; the Warranty Settlement Agreement is subject to Bankruptcy Court approval and is attached hereto as **Exhibit A**;

WHEREAS, on September __, 2007, Delphi and GM entered into the IP License, which is subject to Bankruptcy Court approval and which is attached hereto as **Exhibit B**;

WHEREAS, contemporaneously herewith, the Parties are entering into the Restructuring Agreement, which is attached hereto as **Exhibit C**;

GSA-3

WHEREAS, on the date hereof the Debtors have filed with the Bankruptcy Court a disclosure statement and a proposed Plan, to which this Agreement is attached as Exhibit 7.20(a), and to which the Restructuring Agreement is attached as Exhibit 7.20(b);

WHEREAS, by this Agreement the Parties desire to resolve all outstanding issues among them that have arisen or may hereafter arise prior to the effective date of this Agreement and the Plan (collectively, the "Outstanding Issues");

WHEREAS, resolution of the Outstanding Issues requires the Parties to make certain commitments, take certain actions, and receive certain consideration pursuant to, and subject to the terms and conditions of, this Agreement, the Non-Represented Employee Term Sheet, the Labor MOUs, the UAW SAP, the IUE-CWA SAP, the IP License, the Warranty Settlement Agreement, the Restructuring Agreement, and the Plan.

NOW, THEREFORE, in consideration for the mutual promises and agreements, the receipt and adequacy of which are mutually acknowledged, each Party hereby agrees as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01   **"Active Splinter EPBO"** shall have the meaning ascribed to such term in section 2.02(e)(ii)(2) hereof.

Section 1.02   **"Actual HMO and DHMO Premiums"** shall have the meaning ascribed to such term in section 2.02(a)(ii) hereof.

Section 1.03   **"Actual Prescription Drug PBM Rebate Amount"** shall have the meaning ascribed to such term in section 2.02(a)(iv) hereof.

Section 1.04   **"Additional Releasing Parties"** shall mean (i) creditors of any of the Debtors and current and former holders of equity interests in Delphi, (ii) the Creditors' Committee and all current and former members of the Creditors' Committee in their respective capacities as such, (iv) the Equity Committee and all current and former members of the Equity Committee in their respective capacities as such, (v) the DIP Agent in its capacity as such, (vi) the DIP Lenders solely in their capacities as such, (vii) all Professionals, (viii) the Plan Investors, and (ix) with respect to each of the above-named persons or entities, and only in their aforementioned capacities, such person's or entity's Affiliates, current and former principals, officers, directors, agents, employees, advisors, and representatives (including any attorneys, financial advisors, investment bankers, and other professionals retained by such persons or entities), in their capacities as such, but shall not include the Delphi-Related Parties, the Delphi Affiliate Parties, the UAW Releasing Parties, the IUE-CWA Releasing Parties, the USW Releasing Parties, the IAM Releasing Parties, the IBEW Releasing Parties, the IUOE Releasing Parties, and the Non-Represented Employees Releasing Parties.

GSA-4

Section 1.05   **"Affiliates"** shall mean, with respect to any entity, any other entity directly or indirectly, controlling, controlled by or under direct or indirect common control with such entity.

Section 1.06   **"Bankruptcy Code"** shall mean the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended and in effect on the Petition Date.

Section 1.07   **"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the Southern District of New York or such other court as may have jurisdiction over the Chapter 11 Cases.

Section 1.08   **"Bankruptcy Rules"** shall mean the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

Section 1.09   **"Benefit Guarantees"** shall mean the UAW Benefit Guarantee, the IUE Benefit Guarantee, and the USW Benefit Guarantee, collectively.

Section 1.10   **"Benefit Guarantee Term Sheets"** shall mean, collectively, the UAW Benefit Guarantee Term Sheet, the IUE-CWA Benefit Guarantee Term Sheet, and the USW Benefit Guarantee Term Sheet, the IAM, IBEW, and IUOE "Term Sheet-Delphi Cessation and GM Provision of OPEB," and the Non-Represented Term Sheet.

Section 1.11   **"Carrier Administrative Fees"** shall have the meaning ascribed to such term in section 2.02(a)(iii) hereof.

Section 1.12   **"Chapter 11 Cases"** shall mean the chapter 11 cases of the Debtors pending in the Bankruptcy Court and being jointly administered with one another under Case No. 05-44481, and the phrase "Chapter 11 Case" when used with reference to a particular Debtor shall mean the particular case under Chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court.

Section 1.13   **"Completion Costs"** shall have the meaning ascribed to such term in section 2.02(a)(i) hereof.

Section 1.14   **"Confirmation Order"** shall mean the order entered by the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code and which shall, among other things, contain a finding by the Bankruptcy Court in connection with the feasibility of the Plan that Delphi has or will have on the Effective Date the financial wherewithal to consummate all transactions contemplated by section 2.03(c) hereof in accordance with the terms of such section and shall direct Delphi to consummate such transactions.

GSA-5

Section 1.15   **"Continuing Agreements"** shall mean the agreements that will be assumed, ratified, or reinstated pursuant to section 5.01 of the Restructuring Agreement and any agreements entered into by any Delphi-Related Party and/or Delphi Affiliate Party, on the one hand, and any GM Related Party, on the other hand, after October 8, 2005.

Section 1.16   **"Covered Employees"** shall have the meaning ascribed to such term in each of the Benefit Guarantee Term Sheets.

Section 1.17   **"DAS"** shall mean Delphi Automotive Systems LLC, a Delaware limited liability company.

Section 1.18   **"Debtors"** shall have the meaning ascribed to such term in the Recitals.

Section 1.19   **"Delphi"** shall have the meaning ascribed to such term in the Preamble.

Section 1.20   **"Delphi Affiliate Parties"** shall mean Affiliates of the Debtors (other than the Delphi-Related Parties), and each of such Affiliate's current and former principals, officers, directors, agents, employees, advisors, and representatives (including any attorneys, financial advisors, investment bankers, and other professionals retained by such persons or entities) in their respective capacities.

Section 1.21   **"Delphi-Related Parties"** shall mean the Debtors, the estates of the Debtors as created under Bankruptcy Code section 541, the Delphi HRP, the Delphi Health Care Program for Hourly Employees, the Delphi Life and Disability Benefits Program for Hourly Employees, any other Delphi pension or welfare benefit plan, and each of their respective current and former principals, officers, directors, agents, employees, advisors, and representatives (including any attorneys, financial advisors, investment bankers, and other professionals retained by such persons or entities) in their respective capacities.

Section 1.22   **"Delphi HRP"** shall mean the Delphi Hourly-Rate Employees Pension Plan.

Section 1.23   **"Delphi Pension Trust"** shall have the meaning ascribed to such term in section 2.03(c)(vi) hereof.

Section 1.24   **"Delphi Surviving Claims"** shall have the meaning ascribed to such term in section 4.03(a) hereof.

Section 1.25   **"DIP Agent"** shall mean the administrative agent for the DIP Lenders as defined in the DIP Credit Agreement.

Section 1.26   **"DIP Credit Agreement"** shall mean that certain Revolving Credit, Term Loan and Guaranty Agreement, dated as of January 9, 2007, by and among the Debtors, the DIP Agent, and the DIP Lenders, which was executed by the Debtors in connection

with the DIP Facility, as amended, supplemented, or otherwise modified from time to time, and all documents executed in connection therewith.

Section 1.27 **"DIP Lenders"** shall mean the lenders and issuers from time to time party to the DIP Credit Agreement.

Section 1.28 **"Disclosure Statement"** shall mean the written disclosure statement (including all schedules thereto or referenced therein) that relates to the Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, as such disclosure statement may be amended, modified, or supplemented from time to time.

Section 1.29 **"Disclosure Statement Approval Date"** shall mean the date on which the Bankruptcy Court enters an order approving the Disclosure Statement.

Section 1.30 **"Effective Date"** shall mean the Business Day determined by the Debtors as provided in [Article 12.3] of the Plan on which all conditions to the consummation of the Plan set forth in [Article 12.2] of the Plan have been either satisfied or waived and the day upon which the Plan is substantially consummated.

Section 1.31 **"EPBO"** shall have the meaning ascribed to such term in section 2.02(e) hereof.

Section 1.32 **"EPCA"** shall mean that certain Equity Purchase and Commitment Agreement, dated August 3, 2007, between Delphi and the Plan Investors, as in effect on the date hereof and without giving effect to any subsequent amendments, waivers, or other modifications thereto.

Section 1.33 **"Equity Committee"** shall mean the official committee of equity security holders appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases on April 28, 2006, as reconstituted from time to time.

Section 1.34 **"ERISA"** shall have the meaning ascribed to such term in section 2.01(f) hereof.

Section 1.35 **"Final Order"** shall mean an order or judgment, the operation or effect of which has not been reversed, stayed, modified or amended, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted.

GSA-7

Section 1.36    **"First Tranche Date"** shall have the meaning ascribed to such term in section 2.03(c)(iii)(2) hereof.

Section 1.37    **"GM"** shall have the meaning ascribed to such term in the Preamble.

Section 1.38    **"GM HRP"** shall mean the General Motors Hourly-Rate Employees Pension Plan.

Section 1.39    **"GM IUE-CWA Payment"** shall have the meaning ascribed to such term in section 3.03(b) hereof.

Section 1.40    **"GM Pension Trust"** shall have the meaning ascribed to such term in section 2.03(c)(vi) hereof.

Section 1.41    **"GM Proof of Claim"** shall mean proof of claim no. 13659 filed by GM on August 6, 2006 in the Chapter 11 Cases.

Section 1.42    **"GM Purchase Order"** shall mean a purchase order issued by GM or any and all of its Affiliates and accepted by DAS according to Standard GM Terms, it being agreed by the Parties that DAS shall be deemed to have accepted all such purchase orders accepted by the Delphi-Related Parties pursuant to Standard GM Terms; provided, however, that no purchase orders issued or to be issued by GM or any of its Affiliates to any Affiliate of Delphi that is not a Delphi-Related Party shall be a GM Purchase Order.

Section 1.43    **"GM-Related Parties"** shall mean GM, each of its Affiliates, the GM HRP, the GM Health Care Program for Hourly Employees, the GM Life and Disability Benefits Program for Hourly Employees, any other GM pension or welfare benefit plan, and each of their respective current and former principals, officers, directors, agents, employees, advisors, and representatives (including any attorneys, financial advisors, investment bankers, and other professionals retained by such persons or entities) in their respective capacities.

Section 1.44    **"GM Surviving Claims"** shall have the meaning ascribed to such term in section 4.03(b) hereof.

Section 1.45    **"Gross Liability"** shall have the meaning ascribed to such term in section 2.03(c)(iii)(1) hereof.

Section 1.46    **"IAM"** shall mean, collectively, the International Association of Machinists and Aerospace Workers and its local unions that represent or formerly represented employees and former employees of the applicable Debtor entity.

Section 1.47    **"IAM MOU"** shall mean the "IAM-Delphi GM Memorandum of Understanding-Delphi Restructuring" entered into as of July 31, 2007, as approved by the Bankruptcy Court on August 16, 2007, by and among Delphi, GM, and the IAM, including all attachments and exhibits thereto and all IAM-Delphi collective bargaining agreements referenced therein as modified.

GSA-8

Section 1.48   **"IAM Releasing Parties"** shall mean the IAM, all employees and former employees of Delphi-Related Parties represented or formerly represented by the IAM, and all persons or entities with claims derived from or related to any relationship with such employees or former employees of Delphi-Related Parties.

Section 1.49   **"IBEW"** shall mean, collectively, the International Brotherhood of Electrical Workers and its local unions that represent or formerly represented employees and former employees of the applicable Debtor entity.

Section 1.50   **"IBEW MOUs"** shall mean the "IBEW-Delphi Powertrain-GM Memorandum of Understanding – Delphi Restructuring" and the "IBEW-Delphi Electronics & Safety – GM Memorandum of Understanding – Delphi Restructuring," entered into as of July 31, 2007, as approved by the Bankruptcy Court on August 16, 2007, by and among Delphi, GM, and the IBEW, including all attachments and exhibits thereto and all IBEW-Delphi collective bargaining agreements referenced therein as modified.

Section 1.51   **"IBEW Releasing Parties"** shall mean the IBEW, all employees and former employees of Delphi-Related Parties represented or formerly represented by the IBEW, and all persons or entities with claims derived from or related to any relationship with such employees or former employees of Delphi-Related Parties.

Section 1.52   **"Incremental PRP Obligation"** shall have the meaning ascribed to such term in section 2.03(c)(v) hereof.

Section 1.53   **"Initial UAW SAP"** shall mean the "UAW GM Delphi Special Attrition Program" entered into as of March 22, 2006, by and among Delphi, GM, and the UAW and subsequently clarified by the parties on March 27, 2006.

Section 1.54   **"IP License"** shall mean the intellectual property license agreement between Delphi and GM, dated as of September __, 2007.

Section 1.55   **"IRS"** shall have the meaning ascribed to such term in section 2.03(c)(ii) hereof.

Section 1.56   **"IRS Ruling"** shall have the meaning ascribed to such term in section 2.03(c)(ii) hereof.

Section 1.57   **"IUE-CWA"** shall mean the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America and its applicable local unions.

Section 1.58   **"IUE-CWA Benefit Guarantee"** shall mean the Benefit Guarantee agreement between GM and the IUE-CWA, dated November 13, 1999, and signed November 14, 1999.

Section 1.59 **"IUE-CWA Benefit Guarantee Term Sheet"** shall mean the agreement among Delphi, GM, and the IUE-CWA, dated as of August 5, 2007, and annexed as Attachment B to the IUE-CWA MOU.

Section 1.60 **"IUE-CWA Buy Down Amount"** shall have the meaning ascribed to such term in section 3.03(a)(iv) of this Agreement.

Section 1.61 **"IUE-CWA Buy Down Amount Invoice"** shall have the meaning ascribed to such term in section 3.03(a)(iv)(2) of this Agreement.

Section 1.62 **"IUE-CWA Buy Out Payments"** shall mean the buy out payments required to be made by Delphi pursuant to Section C.3.b of the IUE-CWA MOU.

Section 1.63 **"IUE-CWA MOU"** shall mean the IUE-CWA-Delphi-GM Memorandum of Understanding – Delphi Restructuring, entered into as of August 5, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IUE-CWA, Delphi, and GM, and all attachments and exhibits thereto and the IUE-CWA-Delphi National Agreement referenced therein as modified.

Section 1.64 **"IUE-CWA-Related Reimbursements"** shall have the meaning ascribed to such term in section 3.03(e)(i) hereof.

Section 1.65 **"IUE-CWA Reimbursement Invoice"** shall have the meaning ascribed to such term in section 3.03(e)(iv) hereof.

Section 1.66 **"IUE-CWA Releasing Parties"** shall mean the IUE-CWA, all employees and former employees of Delphi-Related Parties represented or formerly represented by the IUE-CWA, and all persons or entities with claims derived from or related to any relationship with such employees or former employees of Delphi-Related Parties.

Section 1.67 **"IUE-CWA Retirement Incentives"** shall mean the $35,000 retirement incentives to be offered by Delphi pursuant to Section C.3.a of the IUE-CWA MOU and Attachment C thereto.

Section 1.68 **"IUE-CWA SAP"** shall mean the "IUE-CWA-GM-Delphi Special Attrition Program" entered into as of June 16, 2006, by and among Delphi, GM, and the IUE-CWA.

Section 1.69 **"IUOE"** shall mean collectively the International Union of Operating Engineers and its local unions that represent or formerly represented employees and former employees of the applicable Debtor entity.

Section 1.70 **"IUOE MOUs"** shall mean the "IOUE Local 18S-Delphi-GM Memorandum of Understanding – Delphi Restructuring," the "IUOE Local 101S-Delphi-GM Memorandum of Understanding – Delphi Restructuring," and the "IUOE Local 832S-Delphi-GM Memorandum of Understanding – Delphi Restructuring," all entered into as of August 1, 2007, as approved by the Bankruptcy Court on August 16, 2007, by and among Delphi, GM, and

the IUOE, including all attachments and exhibits thereto and all IUOE-Delphi collective
bargaining agreements referenced therein as modified.

Section 1.71   **"IUOE Releasing Parties"** shall mean the IUOE, all employees
and former employees of Delphi-Related Parties represented or formerly represented by the
IUOE, and all persons or entities with claims derived from or related to any relationship with
such employees or former employees of the Delphi-Related Parties.

Section 1.72   **"Labor MOUs"** shall mean the UAW MOU, the IUE-CWA
MOU, the USW MOUs, the IAM MOU, the IBEW MOUs, and IUOE MOUs, collectively.

Section 1.73   **"Medical Claims Reimbursement Amount"** shall have the
meaning ascribed to such term in section 2.02(a)(i) hereof.

Section 1.74   **"Medicare Part D Subsidy Receipts"** shall have the meaning
ascribed to such term in section 2.02(a)(v) hereof.

Section 1.75   **"Net Liability Transfer"** shall have the meaning ascribed to such
term in section 2.03(c)(iii) hereof.

Section 1.76   **"Non-Represented Employees Releasing Parties"** shall mean all
non-represented hourly employees and former hourly employees of Delphi-Related Parties, and
all persons or entities with claims derived from or related to any relationship with such
employees or former employees of the Delphi-Related Parties.

Section 1.77   **"Non-Represented EPBO"** shall have the meaning ascribed to
such term in section 2.02(e)(ii)(1) hereof.

Section 1.78   **"Non-Represented and Splinter EPBO Payment"** shall have the
meaning ascribed to such term in section 2.02(e) hereof.

Section 1.79   **"Non-Represented Employees Term Sheet"** shall mean the
"Term Sheet - Delphi Cessation and GM Provision of OPEB for Certain Unrepresented Delphi
Employee and Retirees" entered into on or about July 31, 2007, by and among Delphi and GM.

Section 1.80   **"Normal Cost"** shall have the meaning ascribed to such term in
section 2.03(b)(iii) hereof.

Section 1.81   **"Note"** shall have the meaning ascribed to such term in section
2.03(c)(iv) hereof.

Section 1.82   **"OPEB"** shall mean post-retirement health care benefits and
employer-paid post-retirement basic life insurance benefits, collectively.

Section 1.83   **"Ordinary Course Relationship"** shall mean the ordinary course
customer/supplier obligations owing between any Delphi-Related Party or any Delphi Affiliate
Party, on the one hand, and any GM-Related Party, on the other hand, and matters related to,

GSA-11

environmental, recall, product liability, and warranty obligations, but excluding matters relating
to the agreements entered into in connection with the Separation and Settled Claims (as defined
in the Warranty Settlement Agreement) other than the Environmental Matters Agreement (as
defined in the Restructuring Agreement).

           Section 1.84    **"Outstanding Issues"** shall have the meaning ascribed to such
term in the Recitals hereof.

           Section 1.85    **"Party"** or **"Parties"** shall have the meanings ascribed to such
terms in the Preamble.

           Section 1.86    **"PBM"** shall have the meaning ascribed to such term in section
2.02(a)(iv) hereof.

           Section 1.87    **"PBO"** shall have the meaning ascribed to such term in section
2.03(c)(iii) hereof.

           Section 1.88    **"Petition Date"** shall mean, as applicable, (a) October 8, 2005
with respect to those Debtors filing their petitions for relief in the Bankruptcy Court on such
date, or (b) October 14, 2005 with respect to those Debtors filing their petitions for relief in the
Bankruptcy Court on such date.

           Section 1.89    **"Plan"** shall mean the chapter 11 plan of reorganization proposed
by the Debtors in the Chapter 11 Cases, the terms of which are acceptable to GM which was
filed with the Bankruptcy Court on September 6, 2007 and to which this Agreement is attached
as Appendix 7.20(b).

           Section 1.90    **"Plan Investors"** shall mean A-D Acquisition Holdings, LLC,
Harbinger Del-Auto Investment Company, Ltd., Merrill Lynch, Pierce, Fenner & Smith
Incorporated, UBS Securities LLC, Goldman Sachs & Co., and Pardus DPH Holding LLC.

           Section 1.91    **"Preliminary Transferred Asset Amount"** shall have the
meaning ascribed to such term in section 2.03(c)(iii)(2)(A) hereof.

           Section 1.92    **"Professional"** shall mean any Person retained in the Chapter 11
Cases by separate Bankruptcy Court order pursuant to sections 327 and 1103 of the Bankruptcy
Code or otherwise; provided, however, that Professional does not include any Person retained
pursuant to the Ordinary Course Professionals Order.

           Section 1.93    **"Proof of Claim"** shall mean the proof of claim, as amended, filed
by GM, on behalf of itself and certain of its Affiliates and subsidiaries, in the Chapter 11 Cases.

           Section 1.94    **"PVB"** shall have the meaning ascribed to such term in section
2.03(c)(v)(1) hereof.

           Section 1.95    **"Reimbursement Period"** shall have the meaning ascribed to
such term in section 2.02(a) hereof.

Section 1.96   **"Restructuring Agreement"** shall mean the Master Restructuring Agreement between Delphi and GM, dated as of September 6, 2007.

Section 1.97   **"Retired Splinter EPBO"** shall have the meaning ascribed to such term in section 2.02(e)(ii)(3) hereof.

Section 1.98   **"Second Tranche Date"** shall have the meaning ascribed to such term in section 2.03(c)(iii)(2)(B) hereof.

Section 1.99   **"Section 365 Motion"** shall mean the motion filed by the Debtors on March 31, 2006, with the Bankruptcy Court seeking authority to reject 5,472 supply contracts with GM pursuant to section 365 of the Bankruptcy Code.

Section 1.100   **"Separation"** shall mean the transactions among GM, the Debtors, and Delphi Affiliate Parties occurring in connection with the entry into the Master Separation Agreement between Delphi and GM on January 1, 1999 and the transfer by GM and certain of its Affiliates of assets, liabilities, manufacturing sites, and employees relating to the former Delphi business sector of GM to certain of the Debtors and Delphi Affiliate Parties.

Section 1.101   **"Settlement Dispute"** shall mean one or more defaults or disputes between GM and any of the Debtors in which (i) the aggregate amount in controversy (including the monetary value or impact of any injunctive relief) exceeds $500,000 (five hundred thousand dollars) and (ii) the claims asserted require the application or construction of this Agreement, the attachments or exhibits hereto (except for the Restructuring Agreement), or the provisions of the Plan relating to the subject matter of this Agreement. By way of clarification, it is not intended by the Parties that the term Settlement Dispute shall include commercial disputes that arise in the ordinary course of business with respect to the various current and future contracts pursuant to which any of the Debtors and/or the Delphi Affiliate Parties supplies components, component systems, goods, or services to any of the GM-Related Parties.

Section 1.102   **"Splinter Union Employees"** shall mean the Delphi hourly employees or retirees who are or were represented by the IAM, the IBEW, or the IUOE.

Section 1.103   **"Standard GM Terms"**   shall mean the GM Terms and Conditions as revised in September 2004.

Section 1.104   **"Transfer Date"** shall have the meaning ascribed to such term in section 2.03(c)(iii) hereof.

Section 1.105   **"Transferred Asset Amount"** shall have the meaning ascribed to such term in section 2.03(c)(iii)(1) hereof.

Section 1.106   **"True-up Amount"** shall have the meaning ascribed to such term in section 2.03(c)(iii)(2)(B) hereof.

Section 1.107   **"UAW"** means the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its applicable local unions.

GSA-13

Section 1.108 **"UAW Benefit Guarantee"** shall mean the Benefit Guarantee agreement between GM and the UAW, dated as of September 30, 1999.

Section 1.109 **"UAW Benefit Guarantee Term Sheet"** shall mean the agreement among Delphi, GM, and the UAW, dated June 22, 2007, and annexed as Attachment B to the UAW MOU.

Section 1.110 **"UAW Buy Down Payments"** shall mean the buy down payments required to be made by Delphi pursuant to Section C.5.c of the UAW MOU.

Section 1.111 **"UAW Buy Out Payments"** shall mean the buy out payments required to be made by Delphi pursuant to Section C.5.b of the UAW MOU.

Section 1.112 **"UAW MOU"** shall mean the "UAW-Delphi-GM Memorandum of Understanding – Delphi Restructuring" entered into as of June 22, 2007, as approved by the Bankruptcy Court on July 19, 2007, by and among Delphi, GM, and the UAW, including all attachments and exhibits thereto and the UAW-Delphi National Agreement referenced therein as modified.

Section 1.113 **"UAW Reimbursement Invoice"** shall have the meaning ascribed to such term in section 3.02(j)(iv) hereof.

Section 1.114 **"UAW-Related Reimbursements"** shall have the meaning ascribed to such term in section 3.02(j)(i) hereof.

Section 1.115 **"UAW Retirement Incentives"** shall mean the $35,000 retirement incentives to be offered by Delphi pursuant to Section C.5.a of the UAW MOU and Attachment C thereto.

Section 1.116 **"UAW Releasing Parties"** shall mean the UAW, all employees and former employees of Delphi-Related Parties represented or formerly represented by the UAW, and all persons or entities with claims derived from or related to any relationship with such employees or former employees of Delphi-Related Parties.

Section 1.117 **"UAW SAP"** shall mean the Initial UAW SAP, as supplemented by the "Supplement to UAW-GM-Delphi Special Attrition Program Agreement Dated March 22, 2006" entered into as of June 5, 2006, by and among Delphi, GM, and the UAW.

Section 1.118 **"UCC"** shall mean the statutory committee of unsecured claimholders appointed in the Chapter 11 Cases.

Section 1.119 **"Unsecured Claims"** shall mean trade claims and other unsecured claims (excluding unsecured funded debt claims, claims by the GM Parties, GM Surviving Claims, securities claims, customer and environmental obligations, employee-related (excluding collective bargaining obligations) and other obligations, and litigation exposure and other liabilities that are covered by insurance) against the Debtors in the Chapter 11 Cases that are either (x) allowed or (y) asserted but not yet expunged or disallowed.

Section 1.120 **"USW"** shall mean collectively the United Steelworkers of America and its local unions that represent or formerly represented the employees or former employees of the applicable Debtor entity.

Section 1.121 **"USW Benefit Guarantee"** shall mean the Benefit Guarantee agreement between GM and the USW, dated December 13, 1999, and signed December 16 and 17, 1999.

Section 1.122 **"USW Benefit Guarantee Term Sheet"** shall mean the agreement among Delphi, GM, and the USW, dated as of August 16, 2007, and annexed as Attachment B to the USW MOUs.

Section 1.123 **"USW Buy Out Payments"** shall mean the buy out payment required to be made by Delphi pursuant to Section C.2 of the USW MOU – Home Avenue and Section C.1 of the USW MOU – Vandalia and Attachment C thereto.

Section 1.124 **"USW MOUs"** shall mean collectively the "USW-Delphi-GM Memorandum of Understanding and Special Attrition Program – Vandalia – Delphi Restructuring" ("USW MOU – Vandalia") and the "USW-Delphi-GM Memorandum of Understanding – Home Avenue – Delphi Restructuring" ("USW MOU – Home Avenue"), each entered into as of August 16, 2007, as approved by the Bankruptcy Court on August 29, 2007, by and among Delphi, GM, and the USW, including all attachments and exhibits thereto and all USW-Delphi collective bargaining agreements referenced therein as modified.

Section 1.125 **"USW-Related Reimbursements"** shall have the meaning ascribed to such term in section 3.04(d)(i) hereof.

Section 1.126 **"USW Reimbursement Invoice"** shall have the meaning ascribed to such term in section 3.04(d)(iv) hereof.

Section 1.127 **"USW Releasing Parties"** shall mean the USW, all employees and former employees of Delphi-Related Parties represented or formerly represented by the USW, and all persons or entities with claims derived from or related to any relationship with such employees or former employees of Delphi-Related Parties.

Section 1.128 **"USW Retirement Incentives"** shall mean the $35,000 retirement incentives to be offered by Delphi pursuant to Section C.1.a of the USW- MOU - Home Avenue and Attachment C thereto and the payments required to be made by Delphi pursuant to Section C.6 of the USW - MOU - Home Avenue.

Section 1.129 **"Warranty Settlement Agreement"** shall mean the Warranty, Settlement and Release Agreement and Covenant Not to Sue between Delphi and GM, dated as of August 14, 2007.

GSA-15

## ARTICLE II

## COMMITMENTS REGARDING OPEB AND PENSION OBLIGATIONS

Section 2.01 **The Labor MOUs**. To help facilitate the Debtors' business, financial and operational restructuring, the Parties have resolved certain matters concerning Delphi's OPEB and pension obligations by entering into the Labor MOUs and Non-Represented Term Sheet, all of which are incorporated herein by reference as if fully set forth herein. This summary of the terms of the Labor MOUs is qualified entirely by, and is subject to, the actual terms and conditions of the Labor MOUs. Nothing in Article II or III hereof is intended to limit, amend, modify, or supersede any term or condition in any of the Labor MOUs. The Labor MOUs provide, among other things, for:

        (a)    the freezing in certain respects of the Delphi HRP;

        (b)    Delphi's cessation of hourly OPEB;

        (c)    the extension of the period of time on or before which GM's obligations under the GM-UAW Benefit Guarantee and GM – USW Benefit Guarantee may be triggered;

        (d)    the extension of the period of time on or before which certain of Delphi's obligations under the GM-Delphi Indemnification Agreement as to the UAW may be triggered;

        (e)    the consensual triggering of the Benefit Guarantees and GM provision of OPEB to certain Delphi employees and retirees in a manner which relieves Delphi's provision of OPEB;

        (f)    the transfer of certain assets and liabilities from the Delphi HRP to the GM HRP pursuant to section 414(l) of the Internal Revenue Code of 1986, as amended (the "Code") and Section 208 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"); and

        (g)    GM provision of OPEB as referenced in the UAW SAP, the IUE-CWA SAP, the Non-Represented Term Sheet, and the special attrition programs negotiated with each union as part of the Labor MOUs.

Section 2.02 **Certain Payments Between GM and Delphi Relating To Hourly Employee Benefits.**

        (a)    GM Reimbursement for Delphi OPEB Costs. GM shall reimburse Delphi for Delphi's aggregate cash spending for all actual, documented amounts paid by Delphi to provide OPEB to hourly retirees under the Delphi Health Care Program for Hourly Employees and the Delphi Life and Disability Benefits Program for Hourly Employees for the period commencing on January 1, 2007 and continuing through the Cessation Date (the

GSA-16

"Reimbursement Period"). The first two reimbursement payments of amounts due under this section 2.02(a) shall be made within thirty (30) days of receipt of all of the documentation referenced in sections 2.02(b)(i) through 2.02(b)(iii) hereof reasonably sufficient to support such amounts and a representation from Delphi that such documentation is substantially complete and substantially accurate in all respects. The final reimbursement payment of amounts due under this section 2.02(a) shall be made within thirty (30) days of receipt of all of the documentation referenced in sections 2.02(b)(i) through 2.02(b)(vi) hereof supporting such amounts and a representation from Delphi that such documentation is substantially complete and substantially accurate in all respects. The reimbursement amount shall be calculated as follows: the amounts set forth in sections 2.02(a)(i), 2.02(a)(ii), 2.02(a)(iii), 2.02(c), and any other amounts that the Parties may mutually agree in writing to include, reduced by the amounts set forth in sections 2.02(a)(iv) and 2.02(a)(v).

(i) The actual self-insured Medical Claims (HSM, Durable Medical Equipment, Mental Health, Substance Abuse, Prescription Drug, Dental and Vision) for hourly retirees incurred in the Reimbursement Period and paid through the Cessation Date plus six months; plus the estimated additional claims costs completion value (the "Completion Costs") for incurred but not paid claims for hourly retirees as calculated by Watson Wyatt and agreed to by GM (the "Medical Claims Reimbursement Amount"). No additional reimbursement shall be provided for the value of any medical claims costs associated with payment run-out not comprehended by the six month period and Completion Costs. GM shall reimburse Delphi for the Medical Claims Reimbursement Amount in three payments. The first payment shall reimburse claims incurred in the Reimbursement Period that are paid through the Cessation Date. The second payment shall reimburse the claims incurred in the Reimbursement Period that are paid in the three months following the Cessation Date. The third and final payment shall reimburse the claims incurred in the Reimbursement Period that are paid in the four to six months following the Cessation Date plus the Completion Costs.

(ii) The actual paid HMO and DHMO premiums for hourly retirees (the "Actual HMO and DHMO Premiums") for the Reimbursement Period.

(iii) Actual administration fees paid to Delphi Health Care Program for Hourly Employees carriers (the "Carrier Administrative Fees") based only on Delphi hourly retired contract counts for the Reimbursement Period; provided, however, that for carriers whom Delphi does not pay on a per contract basis, the Carrier Administrative Fees shall be determined by taking Delphi's total administrative fees paid to such carrier during the Reimbursement Period, dividing that amount by the total population of Delphi participants serviced by the carrier during the Reimbursement Period, and then multiplying the quotient by the total number of retirees for whose OPEB GM is obligated to reimburse Delphi during the Reimbursement Period.

GSA-17

(iv)    Allocated actual Prescription Drug Pharmacy Benefit
Manager ("PBM") rebates (the "Actual Prescription Drug PBM Rebate Amount")
received by Delphi from its PBM for the value of Delphi hourly retiree
Prescription Drug claims for the Reimbursement Period.  The Actual Prescription
Drug PBM Rebate Amount shall consist of the amount of total PBM rebates
attributable to hourly retirees received by Delphi for claims incurred during the
Reimbursement Period.  The Actual Prescription Drug PBM Rebate Amount shall
be a credit against GM's third and final payment of the Medical Claims
Reimbursement Amount referenced in section 2.02(a)(i) hereof.  If the Actual
Prescription Drug PBM Rebate Amount is not available at the time the third and
final payment of the Medical Claims Reimbursement Amount referenced in
section 2.02(a)(i) is due, such payment shall be delayed until the Actual
Prescription Drug PBM Rebate Amount is available; provided, however, that no
later than one hundred eighty (180) days after GM receives the documentation
referenced in sections 2.02(b)(i) through 2.02(b)(vi) (other than any incomplete or
missing documentation under sections 2.02(b)(iv) and (b)(v) hereof), GM shall
make an estimated payment to Delphi of the third and final payment of the
Medical Claims Reimbursement Amount, which shall be reconciled upon receipt
of any remaining documentation under sections 2.02(b)(iv) and (b)(v) hereof.

(v)    Actual Medicare Part D subsidy receipts related to
Prescription Drug claims for Delphi hourly retirees incurred during the
Reimbursement Period (the "Medicare Part D Subsidy Receipts").  The Medicare
Part D Subsidy Receipts shall be a credit against GM's third and final payment of
the Medical Claims Reimbursement Amount referenced in section 2.02(a)(i)
hereof.  If the Medicare Part D Subsidy Receipts amount is not available at the
time the third and final payment of the Medical Claims Reimbursement Amount,
referenced in section 2.02(a)(i) is due, such payment shall be delayed until the
Medicare Part D Subsidy Receipts amount is available; provided, however, that
no later than one hundred eighty (180) days after GM receives the documentation
referenced in sections 2.02(b)(i) through 2.02(b)(vi) hereof (other than any
incomplete or missing documentation under sections 2.02(b)(iv) and (b)(v)
hereof), GM shall make an estimated payment to Delphi of the third and final
payment of the Medical Claims Reimbursement Amount, which shall be
reconciled upon receipt of any remaining documentation under sections
2.02(b)(iv) and (b)(v) hereof.

(vi)    Upon final settlement of sections 2.02(a)(i), (a)(ii),
(a)(iii), (a)(iv), and (a)(v), Delphi shall advise GM of any open credits,
uncollected receivables, potential litigation settlements or other recoverable
amounts directly associated with or allocable to Delphi hourly retirees for
Medical Claims incurred in the Reimbursement Period.  At that time, GM and
Delphi shall establish a mutually agreed upon process to ensure GM is reimbursed
these recoverable amounts within thirty (30) days of Delphi's receipt of such
recoveries.  GM shall only be reimbursed for credits, uncollected receivables,

GSA-18

potential litigation settlements, or other recoverable amounts to the extent GM paid Delphi for the initial claim; provided, however, that where such amounts are not tied to specific claims, the reimbursement amount shall be determined as follows: (x) for carriers and service providers that only provide services relating to Delphi's hourly plan, the reimbursement amount shall be determined by taking the amount of the credits, uncollected receivables, potential litigation settlements, and other recoverable amounts, dividing that amount by the total population of Delphi hourly participants, and then multiplying the quotient by the total number of Delphi's hourly retirees, and (y) for carriers and service providers which provide services for both the Delphi and salaried plans, the reimbursement amount shall be determined by taking the amount of the credits, uncollected receivables, potential litigation settlements, and other recoverable amounts, dividing that amount by the total population of Delphi participants, and then multiplying the quotient by the total number of Delphi's hourly retirees.

(vii)   Escheatment responsibility for self-insured carriers' uncashed checks, including those payments reimbursed by GM in section 2.02(a)(i) hereof, remain with Delphi or its carriers. GM does not assume any responsibility for escheatments related to the Delphi Health Care Program for Hourly Employees.

(viii)   Any hourly retiree claims appeals associated with Medical Claims or HMO and DHMO premiums incurred in the Reimbursement Period and any retroactive adjustments related to sections 2.02(a)(ii) and (a)(iii) hereof not comprehended in the original billing documentation shall be aggregated and addressed once per year following the final reimbursement payment.

(b)   Health Care Information Sharing. GM shall execute the PHI Protection Agreement, a copy of which is attached hereto as **Exhibit D**. Subject to GM's execution of the PHI Protection Agreement, Delphi shall provide (to the extent available) GM with the eligibility records, self-insured Medical Claims, and insured health care arrangements for Delphi retirees for health care coverage provided by Delphi during the Reimbursement Period. The following documentation (to the extent available), including social security numbers and all identifying information, shall be made readily available to GM to document Delphi's costs for the Delphi retirees, surviving spouses and dependents:

(i)   To document all incurred and paid self-insured Medical Claims (the Medical Claims Reimbursement Amount), Delphi shall provide to GM, as of the Cessation Date and monthly thereafter for a period of six months, full electronic claims and eligibility records, as available, transferred from Delphi's data warehouse to GM's similar data warehouse. Delphi shall also provide to GM claims data, in a mutually agreeable format, to document self-insured dental and vision coverages;

GSA-19

(ii)   To document Actual HMO and DHMO Premiums,
Delphi shall provide to GM, as of the Cessation Date, a data file listing all of the
Delphi retirees enrolled for coverage under these insured arrangements along with
the plan name, family status, and total individual monthly premium paid;

(iii)   To document Carrier Administrative Fees, Delphi
shall provide GM mutually agreed upon eligibility records supporting hourly
retiree contract counts and appropriate Carrier agreement schedules that document
per contract administrative fees;

(iv)   To document the Actual Prescription Drug PBM
Rebate Amount, Delphi shall provide PBM, banking, or other cash disbursement
records to substantiate the amount of total PBM rebates received by Delphi for
claims incurred during the Reimbursement Period and the amount of total Delphi
prescription drug claims incurred during the Reimbursement Period;

(v)   To document Final Medicare Part D Subsidy
Receipts, Delphi shall provide a data file, in a mutually agreeable format, of
complete claim levels Medicare Part D subsidy reimbursement records and rebate
factors applied; and

(vi)   Delphi shall also provide the most recent
documentation and audit papers relative to claims or eligibility records along with
supporting documentation on collection of overpayments incurred but not fully
collected during the Reimbursement Period;

(vii)   GM recognizes that some of the information that
Delphi will provide pursuant to this section 2.02 is proprietary to Delphi and its
carriers and administrators. GM agrees that such information, which Delphi
identifies in writing as being proprietary, including but not limited to rebate
amounts, carrier administrative fees, and HMO/DHMO premium rates, shall not
be disclosed to third parties (other than GM's employees, agents, and advisors)
except to the extent required by law, or to the extent such information otherwise
becomes publicly available.

(c)   Post-Retirement Basic Life Insurance Reimbursement.   GM agrees
that reimbursement payments for employer paid life insurance premiums and administration of
employer paid life insurance shall be made within thirty (30) days of receipt of appropriate
documentation supporting such premiums and life insurance administration costs paid by Delphi
relating to providing hourly employer-paid post-retirement life insurance benefits for the
Reimbursement Period.

(i)   Until Covered Employees can be enrolled in the GM
Life and Disability Benefits Program and the systems that support that program,
Delphi shall maintain administration of the hourly employer-paid post-retirement
life insurance benefits for employees through the current administrator (MetLife).

GSA-20

Delphi and its current administrator shall assist GM in the transition of records to
the GM life insurance administrator to be completed by March 1, 2008.

(ii)   Delphi shall immediately direct and use commercially
reasonable efforts to cause its life insurance carrier (MetLife) to transfer to GM
current reserves as of January 1, 2007, associated with Delphi hourly employer-
paid post-retirement life insurance.

(iii)   Delphi shall immediately direct and use commercially
reasonable efforts to cause its Optional Life, Dependent Life and Personal
Accident Insurance Plan carrier (MetLife) to transfer the Delphi Rate Reduction
Reserves for the Optional Life, Dependent Life and Personal Accident Insurance
Plans to GM. The amount that will be transferred for each Plan shall be
calculated by MetLife using the methodology agreed upon for flowbacks and
check the box retirees. Upon the transfer, GM shall assume any and all
obligations from Delphi to provide the benefits relating to the Delphi Rate
Reduction Reserves for the Optional Life, Dependent Life and Personal Accident
Insurance Plans transferred.

(d)   Delphi Payments for Benefit Avoidance.

(i)   Consistent with the applicable Benefit Guarantee
Term Sheet, neither Delphi, a successor company, nor any Delphi operation
divested after October 8, 2005 shall provide to Covered Employees any payments,
contributions (matching or otherwise), or accruals to any defined benefit plan,
defined contribution plan, or retiree welfare benefit plan (including, but not
limited to payments, contributions, or accruals in a retiree medical account):

(1)   relating to pension, for the period of time the
Covered Employee is eligible to accrue credited service in the GM HRP in
accordance with the applicable Benefit Guarantee Term Sheet; and

(2)   relating to OPEB, to any Covered Employee or
other employee who attains or can attain eligibility for GM provided or GM
funded OPEB through any means; provided, however, that UAW-represented
employees shall not be excluded solely by reason of the possibility that they could
flow back to GM and, provided further, that IUE-CWA represented employees
shall not be excluded solely by reason of the possibility that they could participate
in the SEPO (i.e., Attachment G to the IUE-CWA MOU).

(ii)   UAW-Represented Covered Employees. During the
period when UAW-represented Covered Employees accrue credited service in the
GM HRP under paragraph 8.a of the UAW Benefit Guarantee Term Sheet, Delphi
shall pay GM annually, by January 31 of each year for the preceding calendar
year, an amount equal to (x) the FAS-87 service cost for a non-elective 5.4% of
wages contribution to the Individual Retirement Plan provisions of the Delphi

GSA-21

HRP that, but for the UAW Benefit Guarantee Term Sheet, these Covered Employees would otherwise be eligible for under the UAW-Delphi Supplemental Agreement dated April 29, 2004, as amended; provided, however, that such amount shall be adjusted for interest based on Delphi's discount rate for FAS-87 pension accounting, and/or (y) if Delphi provides accruals in or contributions to any other defined benefit or defined contribution pension plan, the FAS-87 service cost of such benefits/accruals or the amount of such contributions that, but for the UAW Benefit Guarantee Term Sheet, such Covered Employees would otherwise be eligible for, provided, however, that such amount shall be adjusted for interest based on Delphi's discount rate for FAS-87 pension accounting. Delphi shall have no reimbursement obligation relating to the Delphi Personal Savings Plan matching contribution that, but for the UAW Benefit Guarantee Term Sheet, these Covered Employees would otherwise be eligible for under the UAW-Delphi Supplemental Agreement dated April 29, 2004, as amended.

(iii)   IUE-CWA Represented Covered Employees.

(1)   During the period IUE-CWA-represented Covered Employees accrue credited service in the GM HRP under paragraph 8.a of the IUE-CWA Benefit Guarantee Term Sheet, Delphi shall pay GM annually, by January 31 of each year for the preceding calendar year, an amount equal to (x) the non-elective 7% defined contributions based upon a standard 2,080 hour work year that these Covered Employees would otherwise be eligible for under the Delphi Personal Savings Plan in accordance with the IUE-CWA MOU, and/or (y) if Delphi provides accruals in or contributions to any other defined benefit or defined contribution pension plan, the FAS-87 service cost of such benefits/accruals or the amount of such contributions that, but for the IUE-CWA Benefit Guarantee Term Sheet, such Covered Employees would otherwise be eligible for.

(2)   Commencing on the Effective Date of the IUE-CWA MOU (as defined therein), Delphi shall pay GM annually, by January 31 of each year for the preceding year, an amount equal to (x) the 1% defined contributions in lieu of OPEB, based upon a standard 2,080 hour work year, that IUE-CWA Covered Employees who can attain eligibility for GM-provided or GM-funded OPEB through any means (other than becoming employed by GM pursuant to the SEPO attachment to the IUE-CWA MOU) would otherwise be eligible for under the Delphi Personal Savings Plan in accordance with the IUE-CWA MOU, but for the IUE-CWA Benefit Guarantee Term Sheet, and/or (y) if Delphi provides accruals in or contributions to any other retiree welfare benefit plan, the FAS-87 service cost of such benefits/accruals or the amount of such contributions that, but for the IUE-CWA Benefit Guarantee Term Sheet, such Covered Employees would otherwise be eligible for.  Such payments shall continue until the year following the year the last such Covered Employee separates or retires from Delphi.

GSA-22

(iv)  USW Represented Covered Employees.

(1)  During the period USW-represented Covered Employees accrue credited service in the GM HRP under paragraph 8.a of the USW Benefit Guarantee Term Sheet, Delphi shall pay GM annually, by January 31 of each year for the preceding calendar year, an amount equal to (x) the non-elective 7% defined contributions based upon a standard 2,080 hour work year that these Covered Employees would otherwise be eligible for under the Delphi Personal Savings Plan in accordance with the USW MOU, and/or (y) if Delphi provides accruals in or contributions to any other defined benefit or defined contribution pension plan, the FAS-87 service cost of such benefits/accruals or the amount of such contributions that, but for the USW Benefit Guarantee Term Sheet, such Covered Employees would otherwise be eligible for.

(2)  Commencing on the Effective Date of the USW MOUs (as defined therein), Delphi shall pay GM annually, by January 31 of each year for the preceding year, an amount equal to (x) 25% of the notional accrual amount for Delphi-paid post retirement life insurance and the retiree medical account that USW Covered Employees who can attain eligibility for GM-provided or GM-funded OPEB through any means would otherwise be eligible for in accordance with the USW MOUs, but for the USW Benefit Guarantee Term Sheet, and/or (y) if Delphi provides accruals in or contributions to any other retiree welfare benefit plan, the FAS-87 service cost of such benefits/accruals or the amount of such contributions that, but for the USW Benefit Guarantee Term Sheet, such Covered Employees would otherwise be eligible for. Such payments shall continue until the year following the year the last such Covered Employee separates or retires from Delphi.

(v)  Forecasts.  By December 1 of each year (including 2007), Delphi shall provide to GM a forecast of all payments referenced in this section 2.02(d) that are to be made by January 31 for the following two years.

(vi)  Supporting Documentation.  In conjunction with the payments referenced in this section 2.02(d), Delphi shall provide to GM at the time of such payment supporting documentation by individual employee.

(e)  Delphi Payment for GM Assumption of OPEB for Active and Retired Splinter Union Employees and Active and Retired Non-Represented Hourly Employees. Consistent with Attachment B to the IAM MOU, IBEW MOUs, and IUOE MOUs and the Non-Represented Employees Term Sheet, GM is assuming OPEB responsibility for certain active and retired Splinter Union Employees and non-represented hourly active and retired employees. In exchange for this, Delphi shall pay GM within thirty (30) days of receipt of all of the documentation referenced in section 2.02(e)(i) the amounts of the Expected Post Retirement Benefit Obligation ("EPBO") assumed by GM for active and retired Splinter Union Employees and non-represented hourly active and retired employees (the "Non-Represented and Splinter EPBO Payment").

GSA-23

(i)    To document the Non-Represented and Splinter
EPBO Payment, GM shall provide Delphi within ninety (90) days of the Effective
Date a calculation by GM's actuaries (Watson Wyatt and MetLife). The EPBO
shall be valued at the GM's IUE plan value, as measured in GM's first OPEB
valuation on or after the Effective Date.

(ii)    The Non-Represented and Splinter EPBO Payment
shall be the sum of the following:

(1)    100% of the EPBO assumed by GM as of or
prior to the Effective Date for active and retired non-represented hourly
employees, eligible to receive OPEB from GM (the "Non-Represented EPBO");

(2)    100% of the EPBO assumed by GM as of the
Effective Date for active Splinter Union Employees (the "Active Splinter
EPBO"); and

(3)    50% of the EPBO assumed by GM as of or prior
to the Effective Date for retired Splinter Union Employees eligible to receive
OPEB from GM (the "Retired Splinter EPBO").

(f)    Cessation of Delphi OPEB True-up Obligations. Delphi has no
obligation to make any OPEB true-up payments for or in relation to hourly employees at
business units divested from Delphi prior to May 28, 1999 or Delphi-to-GM flowback employees
regardless of when such flowback occurred or occurs.

(g)    Audit Rights. GM and its representatives at GM's expense shall
have the right to audit all information used to derive any calculation or payment amount
referenced in this section 2.02; provided, however, that (1) GM shall provide reasonable advance
written notice of such audit and (2) such audit shall be conducted during normal business hours
to the extent feasible without unreasonably interfering with Delphi's normal operations. Delphi's
service providers, subject to and consistent with the applicable service provider contract, shall
fully cooperate with any such audit. Each Party's actuaries shall have the right to review the
actuarial calculations, including underlying actuarial assumptions, for payments referenced in
this section 2.02. Delphi and GM shall comply with reasonable requests from the other
company's principal outside corporate auditors regarding this section 2.02.

(h)    Information List. Delphi shall provide to GM within ten (10)
business days after the Effective Date an initial list of the following information as of the
Effective Date for all Delphi active (with a seniority date on or before May 28, 1999) and retired
hourly employees: social security number, name, birth date, credited service, wage rate, union
affiliation, and active or retired status, and whether Delphi has them designated as a Covered
Employee who can attain eligibility for GM-provided or GM-funded OPEB through any means
(other than becoming employed by GM pursuant to the SEPO attachment to the IUE-CWA
MOU or becoming a flowback pursuant to the UAW CBA). The final determination of who is
such a Covered Employee shall be made by GM. The list shall also include the applicable

GSA-24

information for eligible surviving spouses of such Covered Employees. Three months after the date the initial list is provided, Delphi shall provide a final list with the information requested.

(i) Offset. Notwithstanding anything to the contrary in this Agreement or the Restructuring Agreement, any payment by GM or Delphi of any invoiced amount pursuant to this section 2.02 shall be subject to the right of GM or Delphi, as applicable, to offset all or part of such payment as provided in section 7.04 hereof.

Section 2.03 **Treatment of Delphi's Pension Plans**. To help facilitate the Debtors' business and financial restructuring, the Parties have resolved certain matters concerning Delphi's pension obligations by entering into the Labor MOUs, all of which are incorporated herein by reference as if fully set forth herein. The Parties agree to the following actions with respect to Delphi's pension plans:

(a) Pension Freeze. Pursuant to the Plan and the Labor MOUs, Delphi shall amend the Delphi HRP as set forth in the Labor MOUs so as to freeze benefit accruals for future service as soon as practicable following the Effective Date; provided, however, that the Individual Retirement Plan provisions of the Delphi HRP shall not be frozen.

(b) GM Reimbursement for Delphi Normal Cost Credited Service.

(i) GM shall reimburse Delphi for the "Normal Cost" of credited service accrued in the Delphi HRP by hourly employees (other than employees participating in the 2006 UAW or IUE-CWA Special Attrition Programs and, for employees participating in the pre-retirement program option in the 2007 UAW, IUE-CWA, or USWA Special Attrition Program – Transformation, other than normal cost of credited service accrued following the commencement of the pre-retirement program period) between the Trigger Date and the Freeze Date.

(ii) Payment shall be made by GM to Delphi following the Freeze Date and within thirty (30) days of receipt by GM of an agreed-upon calculation from Watson Wyatt that sets forth the "normal cost" of such accrued credited service. The amount shall be calculated by Watson Wyatt acting on behalf of Delphi and confirmed by Watson Wyatt acting on behalf of GM; provided, however, that GM shall make such payment within thirty (30) days of GM's receipt of the original calculation made by Watson Wyatt acting on behalf of Delphi.

(iii) "Normal Cost" shall be defined as the current liability normal cost at the Trigger Date (as defined under ERISA calculated at the highest allowable interest rate) incurred by Delphi to the Delphi HRP for credited service earned by such individuals in the specified time period less the normal cost that would have been incurred with respect to such individuals during this time period had the Delphi HRP been frozen as of the Trigger Date.

GSA-25

(c)     Transfer of Certain Pension-Related Assets and Liabilities.

(i)   Delphi and GM shall cause a transfer of pension
assets and liabilities from the Delphi HRP to the GM HRP as set forth in the
Labor MOUs. This transfer is part of the overall Delphi restructuring and is
designed to improve the funding level of the Delphi HRP. The transfer shall have
no effect on accrued pension benefits for employees who either remain in the
Delphi HRP or are transferred to the GM HRP. Such transfer shall be in the
amount set forth in section 2.03(c)(iii)(1) hereof and shall be conducted in
accordance with Section 414(l) of the Code and Section 208 of ERISA.

(ii)   IRS Ruling.

The transfer shall be subject to the Internal Revenue Service
("IRS") ruling issued to Delphi and GM on May 29, 2007 related to the transfer (the "IRS
Ruling") and the continued application of the funding waiver with respect to the Delphi
HRP issued to Delphi by the IRS on May 1, 2007, as modified by the IRS on July 13,
2007, including any modifications to either of such rulings approved by the IRS. Delphi
shall use all commercially reasonable efforts to promptly seek any other rulings that may
be required in the future to minimize the inclusion of contributions receivable in the
transfer calculation and to otherwise minimize the level of assets to be transferred while
still achieving the full net liability transfer.

(iii)   Mechanics.

(1)   Notwithstanding the valuation of assets and
liabilities under the IRS Ruling (including the required assumptions), it is agreed
that the Net Liability Transfer from the Delphi HRP to the GM HRP shall
approximate $1.5 billion, within $0.5 million, calculated as of the Transfer Date.
For purposes of this Agreement, the "Transfer Date" shall mean the effective date
of the 414(l) transfer which shall occur as soon as practicable in calendar year
2008 provided that the Effective Date has occurred and in no event later than five
(5) days after the occurrence of the Effective Date. For purposes of this
Agreement, the term "Net Liability Transfer" shall be defined as the FAS 87
Projected Benefit Obligation (the "PBO") transferred from the Delphi HRP as of
the Transfer Date, based on GM's assumptions and methods as of the latest
measurement date for annual pension expense purposes of the GM HRP and the
discount rate as of the last day of the month when the transfer takes place (the
"Gross Liability"), less the market value of corresponding assets calculated
pursuant to Section 414(l) of the Code and the IRS Ruling using assumptions and
methods agreed to with the IRS and agreed upon by GM and Delphi actuaries,
that are transferred to the GM HRP as of the Transfer Date (the "Transferred
Asset Amount").

(2)   Delphi shall make the transfer of the
Transferred Asset Amount in two tranches. The first tranche shall be completed

within ten (10) days of the Transfer Date, or such later date as agreed to by GM
and Delphi (the "First Tranche Date").

(A) With the first tranche, 90% of the
Transferred Asset Amount shall be transferred from the Delphi
HRP to the GM HRP based on the most recent valuation work by
Delphi's actuaries, Watson Wyatt, projected to the Transfer Date
(the "Preliminary Transferred Asset Amount"). The Delphi HRP
shall make all benefit payments after the Transfer Date and
through the First Tranche Date, and the GM HRP shall reimburse
the Delphi HRP for these benefit payments after the First Tranche
Date with applicable interest at the FAS 87 discount rate for the
GM HRP used to calculate the Net Liability Transfer. The GM
HRP shall make all benefit payments after the First Tranche Date
or, if not administratively practicable, such later date as agreed to
by GM and Delphi.

(B) The second tranche shall be
completed within five months of the First Tranche Date, or such
later date as agreed to by GM and Delphi (the "Second Tranche
Date"). The second tranche shall consist of the remaining plan
assets (the "True-up Amount") necessary to be transferred so that
100% of the Transferred Asset Amount is transferred. The True-
Up Amount shall equal the amount of the 414(l) assets based on
actual data as of the Transfer Date less the Preliminary Transferred
Asset Amount. The assets transferred on the First or Second
Tranche Date shall be adjusted to reflect the Delphi HRP's actual
rate of return on assets for the time period between the Transfer
Date and the date the assets are actually transferred to the GM
HRP.

(3) Additional terms of the transfer, including the
determination of the participants for whom benefit liabilities and corresponding
assets shall be included in the transfer, shall be as set forth in the Benefit
Guarantee Term Sheets.

(iv) Delphi Note. On the Transfer Date, Delphi shall
issue a note (the "Note") to GM in the principal amount of $1.5 billion, with an
interest rate to be agreed upon such that the market value of the Note will be equal
to $1.5 billion. The Note shall be paid within ten (10) days of the Transfer Date.
Within ten (10) days after the date the True-up Amount is determined, the Delphi
actuary shall calculate the actual amount of the Net Liability Transfer using the
actuarial assumptions and methods described above. GM or Delphi shall pay,
within ten (10) days after determination of the Net Liability Transfer, to the other
party the difference between the Net Liability Transfer and $1.5 billion, plus
applicable interest. GM shall pay Delphi if the Net Liability Transferred is less

than $1.5 billion. Delphi shall pay GM if the Net Liability Transfer is greater
than $1.5 billion. The applicable interest rate shall be the discount rate used to
calculate the Gross Liability as of the Transfer Date. The GM HRP actuary shall
be entitled to review the calculations of the Net Liability Transfer to confirm their
reasonableness and accuracy. In the event that due to an error or omission
regarding the individuals whose assets and liabilities are transferred, any net
liability in addition to the amounts described above is subsequently transferred to
the GM HRP or returned to the Delphi HRP, Delphi or GM, as applicable, shall
make a cash payment to the other company equal to such additional amount.

     (v) Delphi Obligation for Delphi Active PRP
Participants. To the extent that active Delphi PRP participants are included in the
transfer, GM shall assume the responsibility for providing future service for this
population under the GM HRP subject to Delphi providing GM with
compensation equal to the value of this additional obligation ("Incremental PRP
Obligation") through an increase in the value of the Note or direct cash payment
on the Transfer Date. The Incremental PRP Obligation shall equal the difference
between:

     (1) the present value of benefits ("PVB") for Delphi
PRP participants assuming the full Delphi HRP basic benefit and early retirement
supplement (and related benefits) payable at thirty (30) years of credited service
shall be earned; and

     (2) the PBO for Delphi PRP participants including
the portion of the Delphi HRP basic benefit and early retirement supplement (and
related benefits) earned based on credited service on the Transfer Date. For this
purpose, the early retirement supplement shall be deemed "earned" pro rata over
thirty (30) years of service, even though a participant who terminates before thirty
(30) years of service generally is not entitled to a supplement.

     (3) The PBO and PVB referenced in this section
2.03(c)(v) shall be calculated based on GM's assumptions and methods as of the
latest measurement date for pension expense purposes of the GM HRP and the
discount rate as of the last day of the month in which the Transfer Date takes
place.

     (vi) Description of Delphi Pension Trust. Assets of the
Delphi HRP are held in a pension trust (the "Delphi Pension Trust") and the assets
of the GM HRP are also held in a pension trust (the "GM Pension Trust"). The
Delphi Pension Trust and the GM Pension Trust have assets invested in the same
commingled trusts and other investment vehicles. The assets involve a
combination of privately-held and publicly held securities and other investment
forms. GMIMCo shall determine, subject to Delphi's approval, which Delphi
HRP assets are transferred on each of the First Tranche Date and Second Tranche
Date. The determination shall be in accordance with the 414(l) asset allocation of

the Delphi HRP participant liabilities to be transferred. Assets shall be transferred in-kind in a trust-to-trust transfer.

(vii)   Tax Treatment of the Note. The Note shall be deducted by Delphi and included in the taxable income of GM when issued.

(d)   Pension Funding. As soon as practicable following the Effective Date, Delphi shall fund an amount that satisfies the minimum funding standard for the Delphi HRP under Code Section 412 but in no event before the transfer of Delphi HRP liabilities under Code Section 414(l) discussed in Section 2.03 above.

(e)   Rights to Review Calculations. Each Party's actuaries shall have the right to review the actuarial calculations, including underlying actuarial assumptions, for payments referenced in this section 2.03. Delphi and GM shall comply with reasonable requests from the other company's principal outside corporate auditors regarding this section 2.03.

(f)   Information List. Delphi shall provide to GM within ten (10) business days after the Effective Date an initial list of the following information as of the Effective Date for all Delphi active (with a seniority date on or before May 28, 1999) and retired hourly employees: social security number, name, birth date, credited service, wage rate, union affiliation, and active or retired status, and whether Delphi has them designated as a Covered Employee. The final determination of who is a Covered Employee shall be made by GM. The list shall also include information regarding surviving spouses of potential Covered Employees who may have a pension benefit under the Retirement Equity Act of 1984. Three months after the initial list is provided, Delphi shall provide a final list with the information requested.

(g)   Offset. Notwithstanding anything to the contrary in this Agreement or the Restructuring Agreement, any payment by GM or Delphi of any invoiced amount pursuant to this section 2.03 shall be subject to the right of GM or Delphi, as applicable, to offset all or part of such payment as provided in section 7.04 hereof.

## ARTICLE III

## OTHER GM CONTRIBUTIONS TO LABOR MATTERS

To assist Delphi in its continued transformation to more competitive wage and benefit levels, to address capacity, divestiture, work rules, and staffing level issues, and to better position Delphi to retain existing business and attract new business, GM has agreed to make or hereby agrees to make, as applicable, certain additional contributions as set forth below. All references herein to contributions already agreed to by GM in the Restructuring Agreement, the UAW SAP, the IUE-CWA SAP, and the Labor MOUs are qualified entirely by, and are subject to, the actual terms and conditions of such agreements. Nothing in Article III hereof is intended to limit, amend, modify, or supersede any term or condition in any of the Restructuring Agreement, the UAW SAP, the IUE-CWA SAP, or the Labor MOUs.

GSA-29

Section 3.01 **Assumption of Labor-Related Obligations**. GM is agreeing in the Restructuring Agreement to assume certain labor-related obligations set forth in Article IV therein.

Section 3.02 **UAW**. With respect to the UAW-represented employees:

(a) UAW SAP. GM agreed in the UAW SAP to provide financial support for an attrition program to certain UAW-represented employees as set forth therein, which support included: (i) reimbursing Delphi for certain retirement incentives; (ii) assuming OPEB for certain UAW-represented employees; (iii) backstopping active healthcare and life insurance coverage for certain UAW-represented employees; and (iv) reimbursing Delphi for one-half of certain buy-out payments actually paid by Delphi;

(b) UAW MOU. GM agreed pursuant to the UAW MOU to provide financial support for an additional attrition program to certain UAW-represented employees as set forth in Section C.5 of the UAW MOU and Attachment C thereto, which support included: (i) assuming OPEB for certain UAW-represented employees and (ii) backstopping active healthcare and life insurance coverage for certain UAW-represented employees;

(c) UAW Retirement Incentives. GM agrees to reimburse Delphi using the procedure set forth in section 3.02(j) herein for the $35,000 UAW Retirement Incentives actually paid by Delphi pursuant to Section C.5.a of the UAW MOU and Attachment C thereto;

(d) UAW Buy Out Payments. GM agrees to reimburse Delphi using the procedure set forth in section 3.02(j) herein for one-half of the UAW Buy Out Payments actually paid by Delphi pursuant to Section C.5.b of the UAW MOU and Attachment C thereto;

(e) UAW Buy Down Payments. GM agrees to reimburse Delphi using the procedure set forth in section 3.02(j) herein for all of the UAW Buy Down Payments actually paid by Delphi pursuant to Section C.5.c of the UAW MOU;

(f) Flowbacks. GM agreed pursuant to the UAW MOU to provide UAW-represented employees, who were on roll prior to October 8, 2005, without a valid flowback application on file, a final opportunity to apply for flowback by October 1, 2007, as set forth in Section C.1 therein;

(g) Job Opportunities. GM agreed pursuant to the UAW MOU to offer job opportunities at GM, as set forth in Section C.2 therein, to certain UAW-represented employees who were hired after October 18, 1999, but prior to October 8, 2005;

(h) UAW Claim. GM agreed pursuant to the UAW MOU to settle the UAW's claim against Delphi, which claim Delphi has not acknowledged, by making a payment in the amount of $450 million, which the UAW has directed to be paid directly to the DC VEBA established pursuant to the settlement agreement approved by the court in the case of Int'l Union, UAW, et al. v. General Motors Corp., Civil Action No. 05-73991, in the United States District Court for the Eastern District of Michigan; and

GSA-30

(i)   Costs of Pre-Retirement Program.  Delphi agrees to continue to
provide monthly wage payments and active employment benefits to PRP participants pursuant to
the UAW MOU.  Commencing October 1, 2007, notwithstanding the requirements of the UAW
MOU, Delphi shall continue to provide PRP participants with active health care coverage from
Delphi in accordance with the "traditional option" of its pre-October 1, 2007 hourly health care
program.  This level of coverage shall be higher than that called for in the UAW-Delphi
Supplemental Agreement dated April 29, 2004.  GM shall bear the financial responsibility for
any difference in the level of coverage between that which Delphi is continuing to provide per
this section 3.02(i) and that which Delphi otherwise provides to its active UAW-represented
employees as of October 1, 2007.  Upon the conclusion of the GM-UAW national contract
negotiations but in no event later than December 31, 2007, GM and Delphi shall cooperate to
implement an appropriate administrative fix consistent with their respective contractual
obligations regarding the level of health care for PRP participants; it being understood that
Delphi shall bear financial responsibility for the level of PRP active health care coverage Delphi
provides other active UAW represented employees as of October 1, 2007, and GM shall bear
financial responsibility only to the extent that the GM level of active health care coverage for
active GM UAW-represented employees exceeds the Delphi level.

(j)   Reimbursement Procedure. The reimbursements of the UAW
Retirement Incentives, the UAW Buy Out Payments, and the UAW Buy Down Payments shall
be made according to the following procedure:

(i)   GM shall reimburse Delphi for 100% of the UAW
Retirement Incentives, 50% of the UAW Buy Out Payments, and 100% of the
UAW Buy Down Payments, as applicable, plus 100% of the incremental Delphi
portion of FICA taxes paid due to the UAW Retirement Incentives, 50% of the
incremental Delphi portion of FICA taxes paid due to the UAW Buy Out
Payments, and 100% of the incremental Delphi portion of FICA taxes paid due to
the UAW Buy Down Payments, as applicable (collectively, the "UAW-Related
Reimbursements").

(ii)   The UAW Retirement Incentives, the UAW Buy Out
Payments, and the UAW Buy Down Payments shall be made through Delphi
payroll in the month that the employee retirement or buy out is effective, or,
regarding buy down, the month each required payment is made, or as soon as
possible thereafter.  Delphi shall be responsible for all information reporting
obligations arising from the UAW Retirement Incentives, the UAW Buy Out
Payments, and the UAW Buy Down Payments and for remittance of all associated
tax withholding and payroll taxes to the applicable taxing authorities.

(iii)   The UAW Retirement Incentives, the UAW Buy Out
Payments, and the UAW Buy Down Payments shall be reviewed by Delphi for
garnishments, child support, or other payments for which Delphi is legally
required to reduce payments to be made to an employee.  GM shall reimburse
Delphi the full amount due hereunder without regard to any legally required
reduction of payments to an employee.

(iv)   The amount of the UAW-Related Reimbursements and supporting detail showing the UAW Retirement Incentives, the UAW Buy Out Payments, and the UAW Buy Down Payments made by Delphi shall be provided in an invoice to GM (the "UAW Reimbursement Invoice"). The UAW Reimbursement Invoice shall be supported by the following information regarding each Delphi employee receiving such payment: name, social security number, CISCO code, last plant location, last employment status, date of retirement (if applicable), retirement type code (if applicable) (e.g. 30 & out, 85 point, 60 & 10, normal), date of separation (if applicable), the nature and amount of the payment, payment date, roll number, and detail showing the incremental Delphi portion of FICA tax payments made due to the UAW Retirement Incentives, the UAW Buy Out Payments, or the UAW Buy Down Payments, as applicable. Such UAW Reimbursement Invoice shall contain a representation that such information is substantially complete and substantially accurate in all respects.

(v)   GM shall pay all amounts in each UAW Reimbursement Invoice that contains all information and representations required by section 3.02(j)(iv) hereof within thirty (30) days following the receipt by GM of each respective UAW Reimbursement Invoice or as otherwise agreed by GM and Delphi (if the 30th day falls on a weekend or holiday, GM shall pay Delphi on the next business day).

(k)   Audit Rights. Delphi shall (a) permit GM and/or its agents at GM's expense to audit all information used to derive any calculation or payment amount referenced in this section 3.02, and (b) reasonably cooperate with GM and its agents in any such audit activities in a timely manner; provided, however, that (x) GM shall provide Delphi with reasonable advance written notice identifying the records and information that GM intends to audit, and (y) GM shall reasonably cooperate with Delphi and its agents in any such audit activities.

(l)   Offset. Notwithstanding anything to the contrary in this Agreement or the Restructuring Agreement, any payment by GM of any invoiced amount pursuant to this section 3.02 shall be subject to GM's right to offset all or part of such payment as provided in section 7.04 hereof.

Section 3.03   **IUE-CWA**. With respect to the IUE-CWA-represented employees:

(a)   IUE-CWA Labor Transformation.

(i)   IUE-CWA SAP. GM agreed in the IUE-CWA SAP to provide financial support for an attrition program to certain IUE-CWA-represented employees as set forth therein, which support included: (1) assuming OPEB for certain IUE-CWA-represented employees; (2) backstopping active healthcare and life insurance coverage for certain IUE-CWA-represented

GSA-32

employees; (3) reimbursing Delphi for certain retirement incentives; and (4) reimbursing Delphi for one-half of certain buy-out payments actually paid by Delphi.

(ii) IUE-CWA MOU. GM agreed pursuant to the IUE-CWA MOU to provide financial support for an attrition program for certain IUE-CWA-represented employees as set forth in Section C.3 of the IUE-CWA MOU and Attachment C thereto, which support included: (1) assuming OPEB for certain IUE-CWA-represented employees; and (2) backstopping active healthcare and life insurance coverage for certain IUE-CWA-represented employees.

(iii) SEPO Opportunities. GM agreed pursuant to the IUE-CWA MOU to offer SEPO Opportunities to all current active IUE-CWA Employees hired prior to October 18, 1999 (other than those IUE-CWA Employees employed at the Gadsden Site) as set forth in Attachment G of the IUE-CWA MOU.

(iv) IUE-CWA Buy Down Amount.

(1) To fund the IUE-CWA buy downs, GM agrees to pay to Delphi an amount equal to the sum of $105,000 times the number of production employees who do not accept an attrition option in any amount at any site (excluding Gadsden and temporary employees) plus $10,000 times the number of skilled trades employees who do not accept an attrition option in any amount at any site (excluding Gadsden and temporary employees) as set forth in Section C.3.c. and Attachments A and F of the IUE-CWA MOU (the "IUE-CWA Buy Down Amount").

(2) No later than thirty (30) days before the Effective Date, Delphi shall deliver to GM an invoice for the IUE-CWA Buy Down Amount (the "IUE-CWA Buy Down Amount Invoice"), which shall include the names of the Delphi employees referenced in section 3.03(a)(iv)(1), and the last plant location, last employment status, job classification of, and shall contain a representation that such information is substantially complete and substantially accurate in all respects.

(3) GM shall pay the amount in the IUE-CWA Buy Down Amount Invoice on the later of (i) the Effective Date and (ii) thirty (30) days following the receipt by GM of the IUE-CWA Buy Down Amount Invoice that contains all information and representations required by section 3.03(a)(iv)(2).

(v) IUE-CWA Buy Out Payments. GM agrees to reimburse Delphi using the procedure set forth in section 3.03(e) herein for one-half of the IUE-CWA Buy Out Payments actually paid by Delphi pursuant to Section C.3.b of the IUE-CWA MOU and Attachment C thereto.

GSA-33

(vi) Retirement Incentives. GM agrees to reimburse Delphi using the procedure set forth in section 3.03(e) herein for the $35,000 IUE-CWA Retirement Incentives actually paid by Delphi pursuant to Section C.3.a of the IUE-CWA MOU and Attachment C thereto.

(b) GM IUE-CWA Payment. GM agrees to pay Delphi a sum total amount of $25 million (the "GM IUE-CWA Payment") on the Effective Date to provide for costs and expenses incurred by Delphi in connection with the execution and performance of the IUE-CWA MOU.

(c) IUE-CWA Claim. GM agrees to pay an amount equal to $26 million on the Effective Date as reimbursement to Delphi for a portion of the allowed claim under the IUE-CWA MOU.

(d) Costs of Pre-Retirement Program. Delphi agrees to continue to provide monthly wage payments and active employment benefits to PRP participants pursuant to the IUE-CWA MOU. Commencing October 1, 2007, notwithstanding the requirements of the IUE-CWA MOU, Delphi shall continue to provide PRP participants with active health care coverage from Delphi in accordance with the pre-October 1, 2007 hourly health care program option applicable to each of the PRP participants. This level of coverage shall be higher than called for in the IUE-CWA MOU. GM shall bear the financial responsibility for any difference in the level of coverage between that which Delphi is continuing to provide per this section 3.03(d) and that which Delphi otherwise provides to its active IUE-CWA represented employees as of October 1, 2007. Upon the conclusion of the GM-IUE-CWA national contract negotiations but in no event later than December 31, 2007, GM and Delphi shall cooperate to implement an appropriate administrative fix consistent with their respective contractual obligations regarding the level of health care for PRP participants; it being understood that Delphi shall bear financial responsibility for the level of PRP active health care coverage Delphi provides other active IUE-CWA represented employees as of October 1, 2007, and GM shall bear financial responsibility only to the extent that the GM level of active health care coverage for active GM IUE-CWA represented employees exceeds the Delphi level.

(e) Reimbursement Procedure. The reimbursement or payment, as applicable, of the IUE-CWA Retirement Incentives and the IUE-CWA Buy Out Payments shall be made according to the following procedures:

(i) GM shall reimburse Delphi for 100% of the IUE-CWA Retirement Incentives, 50% of the IUE-CWA Buy Out Payments, 100% of the incremental Delphi portion of FICA taxes paid due to the IUE-CWA Retirement Incentives, and 50% of the incremental Delphi portion of FICA taxes paid due to the IUE-CWA Buy Out Payments, as applicable (collectively, the "IUE-CWA-Related Reimbursements").

(ii) The IUE-CWA Retirement Incentives, and the IUE-CWA Buy Out Payments shall be made through Delphi payroll in the month that the employee retirement or buy out is made, or as soon as possible thereafter.

Delphi shall be responsible for all information reporting obligations arising from the IUE-CWA Retirement Incentives and the IUE-CWA Buy Out Payments, and for remittance of all associated tax withholding and payroll taxes to the applicable taxing authorities.

(iii)   The IUE-CWA Retirement Incentives and the IUE-CWA Buy Out Payments shall be reviewed by Delphi for garnishments, child support, or other payments for which Delphi is legally required to reduce payments to be made to an employee. GM shall reimburse Delphi the full amount due hereunder with respect to the IUE-CWA Retirement Incentives and the IUE-CWA Buy Out Payments without regard to any legally required reduction of payments to an employee.

(iv)   The amount of the IUE-CWA-Related Reimbursements and the supporting detail showing the IUE-CWA Retirement Incentives and the IUE-CWA Buy Out Payments made by Delphi shall be provided in an invoice to GM (the "IUE-CWA Reimbursement Invoice"). The IUE-CWA Reimbursement Invoice shall be supported by the following information regarding each Delphi employee receiving such payment: name, social security number, CISCO code, last plant location, last employment status, date of retirement (if applicable), retirement type code (if applicable) (e.g. 30 & out, 85 point, 60 & 10, normal), date of separation (if applicable), the nature and amount of the payment, payment date, roll number, and detail showing the incremental Delphi portion of FICA tax payments made related to the IUE-CWA-Related Reimbursements. Such IUE-CWA Reimbursement Invoice shall contain a representation that such information is substantially complete and substantially accurate in all respects.

(v)   GM shall pay all amounts in each IUE-CWA Reimbursement Invoice that contains all information and representations required by section 3.03(e)(iv) hereof within thirty (30) days following the receipt by GM of each respective IUE-CWA Reimbursement Invoice or as otherwise agreed by GM and Delphi (if the 30th day falls on a weekend or holiday, GM shall pay Delphi on the next business day).

(f)   Audit Rights. Delphi shall (i) permit GM and/or its agents at GM's expense to audit all information used to derive any calculation or payment amount referenced in this section 3.03 and (ii) reasonably cooperate with GM and its agents in any such audit activities in a timely manner; provided, however, that (x) GM shall provide Delphi with reasonable advance written notice identifying the records and information that GM intends to audit and (y) GM shall reasonably cooperate with Delphi and its agents in any such audit activities.

(g)   Notwithstanding anything to the contrary in this Agreement, GM shall make no payments or reimbursements under this section 3.03 that relate to the Gadsden facility.

(h)  Offset.  Notwithstanding anything to the contrary in this Agreement or the Restructuring Agreement, any payment by GM of any invoiced amount pursuant to this section 3.03 shall be subject to GM's right to offset all or part of such payment as provided in section 7.04 hereof.

Section 3.04   **USW**.  With respect to the USW-represented employees:

(a)  USW MOUs.

(i)  USW SAP.  GM agreed pursuant to the USW MOUs to provide financial support for the USW SAP as set forth in Section C of the USW MOU-Home Avenue and Attachment C thereto, which support shall include: (i) assuming OPEB for certain USW-represented employees and (ii) backstopping active healthcare and life insurance coverage for certain USW-represented employees.

(ii)  USW Buy Out Payments.  GM agrees to reimburse Delphi using the procedure set forth in section 3.04(d) herein for one-half of the USW Buy Out Payments actually paid by Delphi pursuant to Section C.2 of the USW MOU – Home Avenue and Section C.1 of the USW MOU – Vandalia and Attachment C thereto.

(iii)  Retirement Incentives.  GM agrees to reimburse Delphi using the procedure set forth in section 3.04(d) herein for the USW Retirement Incentives actually paid by Delphi pursuant to Section C of the USW MOU-Home Avenue and Attachment C thereto.

(b)  USW Claim.  In resolution of certain claims asserted by the USW, including in connection with the modification of retiree benefit programs, and without any acknowledgement by either GM or Delphi of those claims, GM agreed pursuant to the USW MOU – Home Avenue to pay the amount of $9 million to the VEBA described in Section F.3 of the USW MOU – Home Avenue.

(c)  Costs of Pre-Retirement Program.  Delphi agrees to continue to provide monthly wage payments and active employment benefits to PRP participants pursuant to the USW MOU – Home Avenue.  Delphi shall provide such PRP participants active health care as described in Section E.12 of the USW MOU – Home Avenue.  GM shall have no obligation to reimburse Delphi for providing this level of active health care to the USW PRP participants.

(d)  Reimbursement Procedure.  The reimbursement or payment, as applicable of the USW Retirement Incentives and the USW Buy Out Payments shall be made according to the following procedure:

(i)  GM shall reimburse Delphi for 100% of the USW Retirement Incentives and 50% of the USW Buy Out Payments, as applicable, plus 100% of the incremental Delphi portion of FICA taxes paid due to the USW

Retirement Incentives and 50% of the incremental Delphi portion of FICA taxes paid due to the USW Buy Out Payments, as applicable (collectively, the "USW-Related Reimbursements").

(ii)   The USW Retirement Incentives and the USW Buy Out Payments shall be made through Delphi payroll in the month that the employee retirement or buy out is made, or as soon as possible thereafter. Delphi shall be responsible for all information reporting obligations arising from the USW Retirement Incentives and the USW Buy Out Payments and for remittance of all associated tax withholding and payroll taxes to the applicable taxing authorities.

(iii)   The USW Retirement Incentives and the USW Buy Out Payments shall be reviewed by Delphi for garnishments, child support, or other payments for which Delphi is legally required to reduce payments to be made to an employee. GM shall reimburse Delphi the full amount due hereunder without regard to any legally required reduction of payments to an employee.

(iv)   The amount of the USW-Related Reimbursements and supporting detail showing the USW Retirement Incentives and the USW Buy Out Payments made by Delphi shall be provided in an invoice to GM (the "USW Reimbursement Invoice"). The USW Reimbursement Invoice shall be supported by the following information regarding each Delphi employee receiving such payment: name, social security number, CISCO code, last plant location, last employment status, date of retirement (if applicable), retirement type code (if applicable) (e.g. 30 & out, 85 point, 60 & 10, normal), date of separation (if applicable), the nature and amount of the payment, payment date, roll number, and detail showing the incremental Delphi portion of FICA tax payments made related to the USW-Related Reimbursements. Such USW Reimbursement Invoice shall contain a representation that such information is substantially complete and substantially accurate in all respects.

(v)   GM shall pay all amounts in each USW Reimbursement Invoice that contains all information and representations required by section 3.04(c)(iv) hereof within thirty (30) days following the receipt by GM of each respective USW Reimbursement Invoice or as otherwise agreed by GM and Delphi (if the 30th day falls on a weekend or holiday, GM shall pay Delphi on the next business day).

(e)   Audit Rights. Delphi shall (i) permit GM and/or its agents at GM's expense to audit all information used to derive any calculation or payment amount referenced in this section 3.04 and (ii) reasonably cooperate with GM and its agents in any such audit activities in a timely manner; provided, however, that (x) GM shall provide Delphi with reasonable advance written notice identifying the records and information that GM intends to audit, and (y) GM shall reasonably cooperate with Delphi and its agents in any such audit activities.

GSA-37

(f)    Offset. Notwithstanding anything to the contrary in this Agreement or the Restructuring Agreement, any payment by GM of any invoiced amount pursuant to this section 3.04 shall be subject to GM's right to offset all or part of such payment as provided in section 7.04 hereof.

## ARTICLE IV

## RELEASES AND CLAIMS TREATMENT

In partial consideration for the promises and agreements made by the Debtors and GM pursuant to this Agreement, the Restructuring Agreement, the Plan, the Labor MOUs, the Non-Represented Employees Term Sheet, the UAW SAP, the IUE-CWA SAP, the IP License and the Warranty Settlement Agreement, and subject to the provisions of section 4.03 of this Agreement, Delphi and GM agree to the following terms to resolve claims in existence as of the Effective Date that each of the Delphi-Related Parties or Delphi Affiliate Parties, on the one hand, and the GM-Related Parties, on the other hand, have or may have against each other, and that each of the Additional Releasing Parties, the UAW Releasing Parties, the IUE-CWA Releasing Parties, the USW Releasing Parties, the IAM Releasing Parties, the IBEW Releasing Parties, the IUOE Releasing Parties, and the Non-Represented Employees Releasing Parties have or may have against the GM-Related Parties.

Section 4.01    **Release of GM-Related Parties.**

**(a)    The Debtors agree, and the Plan shall provide, that effective as of the Effective Date, the GM-Related Parties shall be forever released by the Delphi-Related Parties from any and all claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever (excepting only the Delphi Surviving Claims), which the Delphi-Related Parties ever had, now have, or hereafter may have, whether known or unknown, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, foreseen or unforeseen, existing as of the Effective Date, in law, at equity, or otherwise, that are directly or indirectly related to any of the Delphi-Related Parties, including without limitation claims based in whole or in part upon any act or omission, transaction, agreement, event, action, or other occurrence taking place or failing to take place on or before the Effective Date related to (i) the Separation, (ii) any collective bargaining agreements to which any Delphi-Related Party is now or has been a party, (iii) any agreement or obligation related to any employees or former employees of the Delphi-Related Parties, (iv) the Chapter 11 Cases, or (v) the formulation, preparation, negotiation, dissemination, confirmation, or consummation (but not performance) of the Plan, the Disclosure Statement, this Agreement, the Restructuring Agreement, the Labor MOUs, the Non-Represented Employees Term Sheet, the UAW SAP, the IUE-CWA SAP, the IP License, the Warranty Settlement Agreement, or any contract, instrument, or other agreement or document created, modified, amended, or entered into in connection with any of the foregoing. The releases provided for in this section 4.01(a) include any and all claims that any of the Delphi-Related Parties has or would have been legally entitled to assert in its own right (whether individually or collectively) and shall be effective against any person or entity (including, without limitation, any holder of a claim against or equity interest in**

GSA-38

any of the Delphi-Related Parties) that would have been legally entitled to assert such claim derivatively or otherwise on behalf of any of the Delphi-Related Parties.

(b)    The Debtors agree, and the Plan shall provide, that effective as of the Effective Date, the GM-Related Parties shall be forever released by the Delphi Affiliate Parties from any and all claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever (excepting only the Delphi Surviving Claims), which the Delphi Affiliate Parties ever had, now have, or hereafter may have, whether known or unknown, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, foreseen or unforeseen (whether based in whole or in part upon any act or omission, transaction, agreement, event, action, or other occurrence taking place or failing to take place on or before the Effective Date) existing as of the Effective Date, in law, at equity, or otherwise, that are related to (i) the Separation, (ii) any collective bargaining agreements to which any Delphi-Related Party is now or has been a party, (iii) any agreement or obligation related to any employees or former employees of the Delphi-Related Parties, (iv) the Chapter 11 Cases, (v) the formulation, preparation, negotiation, dissemination, confirmation, or consummation (but not performance) of the Plan, the Disclosure Statement, this Agreement, the Restructuring Agreement, the Labor MOUs, the Non-Represented Employees Term Sheet, the UAW SAP, the IUE-CWA SAP, the IP License, the Warranty Settlement Agreement, or any contract, instrument, or other agreement or document created, modified, amended, or entered into in connection with any of the foregoing or (vi) any obligation of the GM Related Parties which is directly related to any obligation which is being released by the Delphi-Related Parties pursuant to section 4.01(a) of this Agreement. The releases provided for in this section 4.01(b) include any and all claims that any of the Delphi Affiliate Parties have or would have been legally entitled to assert in its own right (whether individually or collectively) and shall be effective against any person or entity (including without limitation, any holder of a claim against or equity interest in any of the Delphi Affiliate Parties) that would have been legally entitled to assert such claim derivatively or otherwise on behalf of any of the Delphi Affiliate Parties.

(c)    The Plan shall provide that effective as of the Effective Date, the GM-Related Parties shall be forever released by the Additional Releasing Parties from any and all claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, which the Additional Releasing Parties ever had, now have, or hereafter may have, whether known or unknown, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, foreseen or unforeseen, existing as of the Effective Date, in law, at equity, or otherwise, that are directly or indirectly related to any of the Delphi-Related Parties, including without limitation claims based in whole or in part upon any act or omission, transaction, agreement, event, action, or other occurrence taking place or failing to take place on or before the Effective Date related to (i) the Separation, (ii) any collective bargaining agreements to which any Delphi-Related Party is now or has been a party, (iii) any agreement or obligation related to any employees or former employees of the Delphi-Related Parties, (iv) the Chapter 11 Cases, or (v) the formulation, preparation, negotiation, dissemination, confirmation, or consummation (but not performance) of the Plan, the Disclosure Statement, this Agreement, the Restructuring Agreement, the Labor

MOUs, the Non-Represented Employees Term Sheet, the UAW SAP, the IUE-CWA SAP,
the IP License, the Warranty Settlement Agreement, or any contract, instrument, or other
agreement or document created, modified, amended, or entered into in connection with any
of the foregoing.  The releases provided for in this section 4.01(c) shall include any and all
claims that any of the Additional Releasing Parties have or would have been legally entitled
to assert in its own right (whether individually or collectively) and shall be effective against
any person or entity that would have been legally entitled to assert such claim derivatively
or otherwise on behalf of any of the Additional Releasing Parties.

        (d)    The Plan shall provide that effective as of the Effective Date, the
GM-Related Parties shall be released by the UAW Releasing Parties as set forth in the
UAW MOU.

        (e)    The Plan shall provide that effective as of the Effective Date, the
GM-Related Parties shall be released by the IUE-CWA Releasing Parties as set forth in the
IUE-CWA MOU.

        (f)    The Plan shall provide that effective as of the Effective Date, the
GM-Related Parties shall be released by the USW Releasing Parties as set forth in the
USW MOUs.

        (g)    The Plan shall provide that effective as of the Effective Date, the
GM-Related Parties shall be released by the IAM Releasing Parties as set forth in the IAM
MOU.

        (h)    The Plan shall provide that effective as of the Effective Date, the
GM-Related Parties shall be released by the IBEW Releasing Parties as set forth in the
IBEW MOUs.

        (i)    The Plan shall provide that effective as of the Effective Date, the
GM-Related Parties shall be released by the IUOE Releasing Parties as set forth in the
IUOE MOUs.

        (j)    The Plan shall provide that effective as of the Effective Date, the
GM-Related Parties shall be released by the Non-Represented Employees Releasing Parties
as set forth in the Non-Represented Employees Term Sheet.

        (k)    The Parties acknowledge that (x) the consideration provided by
GM pursuant to this Agreement, the Restructuring Agreement, the Labor MOUs, the Non-
Represented Employees Term Sheet, the UAW SAP, the IUE-CWA SAP, the IP License,
and the Warranty Settlement Agreement constitutes a substantial contribution to the Plan
that is necessary to the success of the Plan, and (y) GM would not have made this
contribution without the releases provided for in this Agreement and in the Plan.  The
Parties further acknowledge that nothing in the preceding sentence shall give rise to, or
entitle GM to seek or be allowed, any claim against, or consideration from, any entity,
including Delphi, other than as specifically approved by the Bankruptcy Court in the

Confirmation Order and as agreed to by Delphi and GM in this Agreement or the
Restructuring Agreement.

Section 4.02    **Release of Delphi-Related Parties and the Delphi Affiliate
Parties.**

(a)    **GM agrees, and the Plan shall provide, that effective as of the
Effective Date, the Delphi-Related Parties shall be forever released by the GM-Related
Parties from any and all claims, debts, obligations, rights, suits, damages, actions, causes of
action, remedies, and liabilities whatsoever (excepting only the GM Surviving Claims),
which the GM-Related Parties ever had, now have, or hereafter may have, whether known
or unknown, liquidated or unliquidated, contingent or noncontingent, asserted or
unasserted, foreseen or unforeseen, existing as of the Effective Date, in law, at equity, or
otherwise, that are directly or indirectly related to any of the Delphi-Related Parties,
including without limitation claims based in whole or in part upon any act or omission,
transaction, agreement, event, action, or other occurrence taking place or failing to take
place on or before the Effective Date related to (i) Separation, (ii) any collective bargaining
agreements to which any Delphi-Related Party is now or has been a party, (iii) any
agreement or obligation related to any employees or former employees of the Delphi-
Related Parties, (iv) the Chapter 11 Cases, or (v) the formulation, preparation, negotiation,
dissemination, confirmation, or consummation (but not performance) of the Plan, the
Disclosure Statement, this Agreement, the Restructuring Agreement, the Labor MOUs, the
Non-Represented Employees Term Sheet, the UAW SAP, the IUE-CWA SAP, the IP
License, the Warranty Settlement Agreement, or any contract, instrument, or other
agreement or document created, modified, amended, or entered into in connection with any
of the foregoing.  The releases provided for in this section 4.02(a) shall include any and all
claims that any of the GM-Related Parties have or would have been legally entitled to
assert in its own right (whether individually or collectively) and shall be effective against
any person or entity that would have been legally entitled to assert such claim derivatively
or otherwise on behalf of any of the GM-Related Parties.**

(b)    **GM agrees, and the Plan shall provide, that effective as of the
Effective Date, the Delphi Affiliate Parties shall be forever released by the GM-Related
Parties from any and all claims, debts, obligations, rights, suits, damages, actions, causes of
action, remedies, and liabilities whatsoever (excepting only the GM Surviving Claims),
which the GM-Related Parties ever had, now have, or hereafter may have, whether known
or unknown, liquidated or unliquidated, contingent or noncontingent, asserted or
unasserted, foreseen or unforeseen, (whether based in whole or in part upon any act or
omission, transaction, agreement, event, action, or other occurrence taking place or failing
to take place on or before the Effective Date, existing as of the Effective Date,) in law, at
equity, or otherwise, that are related to (i) the Separation, (ii) any collective bargaining
agreements to which any Delphi-Related Party is now or has been a party, (iii) any
agreement or obligation related to any employees or former employees of the Delphi-
Related Parties, (iv) the Chapter 11 Cases, (v) the formulation, preparation, negotiation,
dissemination, confirmation, or consummation (but not performance) of the Plan, the**

Disclosure Statement, this Agreement, the Restructuring Agreement, the Labor MOUs, the Non-Represented Employees Term Sheet, the UAW SAP, the IUE-CWA SAP, the IP License, the Warranty Settlement Agreement, or any contract, instrument, or other agreement or document created, modified, amended, or entered into in connection with any of the foregoing, or (vi) any obligation of the Delphi Affiliate Parties which is directly related to any obligation which is being released by GM pursuant to section 4.02(a) of this Agreement.  The releases provided for in this section 4.02(b) include any and all claims that any of the GM-Related Parties have or would have been legally entitled to assert in its own right (whether individually or collectively) and shall be effective against any person or entity (including without limitation, any holder of a claim against or equity interest in any of the GM-Related Parties) that would have been legally entitled to assert such claim derivatively or otherwise on behalf of any of the GM-Related Parties.

(c)   Without limiting any of the foregoing releases contained in Article IV, GM agrees, and the Plan shall provide, that effective as of the Effective Date, Delphi and Delphi Canada Inc. shall be released by GM and General Motors of Canada Limited from any and all claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities which GM and General Motors of Canada Limited may have arising out of or related to the separation of leased employees from the Oshawa facility as contemplated in the Oshawa Labour and Management Services Agreement entered into as of May 1, 2000, by and among Delphi Canada Inc. and General Motors of Canada Limited.

Section 4.03   **Surviving Claims.**

(a)   Each release by a Delphi-Related Party or Delphi Affiliate Party of the GM-Related Parties pursuant to section 4.01 of this Agreement and the Plan shall not release the GM-Related Parties from any claims arising in connection with the Ordinary Course Relationship, the Continuing Agreements, and rights, remedies, claims, or interests that such Delphi-Related Party or Delphi Affiliate Party may be expressly receiving or expressly retaining pursuant to this Agreement, the Restructuring Agreement, the Labor MOUs, the Non-Represented Employees Term Sheet, the UAW SAP, the IUE-CWA SAP, the IP License, or the Warranty Settlement Agreement on or after the Effective Date (collectively, the "Delphi Surviving Claims").

(b)   (i) Each GM-Related Party's release of the Delphi-Related Parties or Delphi Affiliate Parties pursuant to section 4.02 of this Agreement and the Plan shall not release (A) the Delphi-Related Parties from: (1) claims that arose in connection with the Ordinary Course Relationship; provided, however, that asserted claims arising from an Ordinary Course Relationship that are specifically identified in Section II of the GM Proof of Claim shall not survive except those in an amount that shall not exceed $8,000,869.04 in the aggregate for all such claims; provided further, however, that any payments by Delphi to GM with respect to any such claims shall be subject to either the Parties reaching agreement with respect to the issues related thereto or a judicial determination requiring Delphi to make such payments; (2) claims arising in connection with the Financial Services Supply Agreement and the Energy Services Agreement that are

GSA-42

specifically identified in Sections III (b) and (c) of the GM Proof of Claim, which shall be deemed an allowed claim in the amount of $448,245.28 for all such claims and shall be paid in full in cash on the Effective Date; (3) claims that arose in connection with the Assignment and Assumption Agreement – Industrial Revenue Bonds (as defined in the Restructuring Agreement) that are specifically identified in Section XII(b) of the GM Proof of Claim; provided, however, that any payments by Delphi to GM with respect to any such claims shall be subject to either the Parties reaching agreement with respect to the issues related thereto or a judicial determination requiring Delphi to make such payments; (4) claims asserted in Section XI of the GM Proof of Claim with respect to tax matters; provided further, however, that any payments by Delphi to GM with respect to any such claims shall be subject to either the Parties reaching agreement with respect to the issues related thereto or a judicial determination requiring Delphi to make such payments; and (5) any postpetition claims arising under Continuing Agreements or pursuant to the Ordinary Course Relationship, (B) the Delphi Affiliate Parties from any claims arising in connection with the Continuing Agreements or the Ordinary Course Relationship, provided that such claims as are identified in the GM Proof of Claim shall also be released with respect to the Delphi Affiliate Parties except to the extent that such parties are also liable for claims in the GM Proof of Claim described in subsections (A)(1), (3), (4) and (5) above but such liability shall not increase the aggregate claims cap established in (A)(1) above, or (C) any rights, remedies, claims, or interests that such GM-Related Party may be expressly receiving or expressly retaining pursuant to the Plan, this Agreement, the Restructuring Agreement, the Labor MOUs, the Non-Represented Employees Term Sheet, the IP License, or the Warranty Settlement Agreement (collectively, the "GM Surviving Claims") and (ii) the Plan and Confirmation Order shall expressly provide that the GM Surviving Claims are reinstated pursuant to Bankruptcy Code section 1124 and are not discharged pursuant to the Plan or the Confirmation Order subject to the subsequent allowance of the surviving portion of the GM Proof of Claim as to which the rights of the Delphi-Related Parties and Delphi Affiliate Parties are reserved.

Section 4.04   **Cash to Be Paid to GM**.

(a)   On the Effective Date, and pursuant to the Plan, Delphi shall pay in cash to GM the sum of $2,700,000,000 (two billion seven hundred million dollars).

(b)   The payments made to GM pursuant to this section 4.04 and the survival of the GM Surviving Claims shall be in (i) satisfaction of all claims asserted or assertable under sections 501, 502, 503, 506, and 507 of the Bankruptcy Code or otherwise by the GM-Related Parties against the Debtors in the Chapter 11 Cases, including those asserted in the GM Proof of Claim, and (ii) settlement of the GM Proof of Claim.

## ARTICLE V

## IMPLEMENTATION

Section 5.01 **Bankruptcy Court Filing**. Simultaneously with the filing of the Plan with the Bankruptcy Court, the Debtors shall file this Agreement with the Bankruptcy Court as an exhibit to the Plan.

Section 5.02 **Actions Concerning Debtors' Section 365 Motion**. Within ten (10) days following the Disclosure Statement Approval Date, the Debtors shall withdraw the Section 365 Motion without prejudice.

Section 5.03 **Actions Concerning Debtors' 1113/1114 Motions**. Upon approval by the Bankruptcy Court of a Labor MOU with respect to a particular Union, the Debtors shall withdraw, without prejudice, the 1113/1114 Motion solely with respect to such Union.

## ARTICLE VI

## CONDITIONS TO EFFECTIVENESS

Section 6.01 The provisions of this Agreement, except for the provisions in Article V hereof (which shall become effective upon execution of this Agreement), shall become effective upon the occurrence of all of the following events unless waived by consent of the Parties:

(a) All Unions shall have ratified their respective Labor MOUs, and the Bankruptcy Court shall have entered orders in form and substance satisfactory to Delphi, GM, and the applicable Union approving such MOUs, which orders shall have become Final Orders;

(b) (i) The Bankruptcy Court shall have approved this Agreement in the Confirmation Order in connection with confirmation of the Plan, and such order shall have become a Final Order;

(ii) The approval of this Agreement by the Bankruptcy Court as set forth in the Confirmation Order shall be in form and substance satisfactory to the Parties; and

(iii) GM shall have consented to all other provisions of the Confirmation Order; provided, however, that GM's consent shall be required only to the extent that such provisions would have a material impact on GM, on the benefits GM reasonably is expected to receive under the Plan (including, without limitation, GM's distributions thereunder), the Restructuring Agreement, or this Agreement, or on the ability of the Debtors to fulfill any obligations to any GM-Related Parties under the Plan, the Restructuring Agreement, this Agreement, or

GSA-44

any agreements assumed, reinstated, or ratified under the Restructuring
Agreement.

(c)     To the extent that the terms of any of the following would have a
material impact on GM, on the benefits GM reasonably is expected to receive under the Plan
(including, without limitation, GM's distributions thereunder), the Restructuring Agreement, or
this Agreement, or on the ability of any Debtors to fulfill any obligations to any GM-Related
Parties under the Plan, the Restructuring Agreement, this Agreement, or any agreements
assumed, reinstated, or ratified under the Restructuring Agreement, GM shall have consented in
writing to any and all of the following: (1) amendments, supplements, or other modifications to
the Plan; (2) (i) any exhibits or other attachments to the Plan, (ii) any documents or instruments
incorporated by reference or otherwise into the Plan or into any exhibits or other attachments
thereto, and (iii) any and all amendments, supplements, or other modifications to any of the
exhibits, attachments, documents, or instruments described in clauses (i) or (ii) of this sentence;
and (3) the proposed Confirmation Order and any and all amendments, supplements, or other
modifications thereto; provided, however, that GM shall provide written notice to Delphi of
which item described in clauses (1) through (3) of this sentence required GM's consent pursuant
to this sentence but was withheld, and Delphi may seek resolution by the Bankruptcy Court of
whether GM's consent was so required; provided further, however, that the Parties agree that,
among other things, any increase in the amount of distributions (or change in the form of
distributions) to holders of claims or equity interests under the Plan, any change in any of the
provisions of section 4.01, 4.02, or 4.03 hereof, or any change in the identity of the Plan
Investors other than as permitted by the EPCA shall be deemed for purposes of Articles VI and
VII of this Agreement to have a material impact on GM, on the benefits that GM is expected to
receive under the Plan, the Restructuring Agreement, and this Agreement, and on the ability of
the Debtors to fulfill obligations to GM-Related Parties under the Plan, the Restructuring
Agreement, this Agreement, and agreements assumed, reinstated, or ratified under the
Restructuring Agreement; and

(d)     The Effective Date shall have occurred and GM shall have received
a cash payment in the amount of $2,700,000,000 (two billion seven hundred million dollars)
under the Plan;

provided, however, that no statute, rule or regulation or order, judgment or decree of any court or
administrative agency or other governmental entity shall be in effect which prohibits the
consummation of one or more of the transactions to be consummated under this Agreement,
unless such transaction is severed pursuant to section 7.21 hereof; provided further, however,
that the substantial majority of all assets, whether real or personal, used to produce any products
pursuant to GM Purchase Orders shall be owned or leased by DAS (other than tooling owned by
GM) and all obligations pursuant to the GM Purchase Orders shall be the responsibility of DAS.
GM irrevocably consents to the performance of the GM Purchase Orders by DAS and any
Delphi-Related Party that is directly or indirectly wholly-owned by Delphi, as directed by DAS;
provided, however, that any change of the location of production shall require GM's prior written
consent. Regardless of whether the transaction is severed, each of the Parties shall use

reasonable efforts to prevent the entry of, and to appeal promptly, any injunction or other order prohibiting one or more of the transactions to be consummated under this Agreement.

## ARTICLE VII

## MISCELLANEOUS

Section 7.01  **Resolution of Pending Setoff Issues**.  On the MNS-2 payment date immediately following the Effective Date, GM shall pay to Delphi the aggregate amount of all outstanding Delphi invoices related to tooling procured by Delphi in accordance with GM Purchase Orders, for which GM has withheld payment due to outstanding prepetition amounts due to Delphi's sub-suppliers, including the invoices set forth on **Exhibit E** to this Agreement, provided that Delphi (i) confirms, in writing, GM's ownership of the applicable tooling free and clear of liens, claims and encumbrances, and (ii) agrees to indemnify and hold GM harmless from and against any liens, claims and encumbrances with respect to the applicable tooling.

Section 7.02  **No Undisclosed Agreements or Commitments**.  There are no undisclosed agreements or commitments between or among the Parties regarding matters subject to the terms of this Agreement.

Section 7.03  **Termination**.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned as follows:

(a)    by mutual written consent of both Delphi and GM;

(b)    by GM if Delphi files with, or presents to, the Bankruptcy Court without GM's prior written consent any of the following, but only to the extent that any of the following would have a material impact on GM, on the benefits GM reasonably is expected to receive under the Plan (including, without limitation, GM's distributions thereunder), the Restructuring Agreement, or this Agreement, or on the ability of any Debtors to fulfill any obligations to any GM-Related Parties under the Plan, the Restructuring Agreement, this Agreement, or any agreements assumed, reinstated, or ratified under the Restructuring Agreement: (i) amendments, supplements, or other modifications to the Plan; (ii) exhibits or other attachments to the Plan, or any amendments, supplements, or other modifications thereto; or (iii) the proposed Confirmation Order or any amendments, supplements, or other modifications thereto; provided, however, that GM shall provide Delphi with written notice of its intent to terminate this Agreement pursuant to this section 7.03(b), which notice shall indicate which item described in clauses (i) through (iii) of this sentence is the basis for GM's intent to terminate this Agreement pursuant to this section 7.03(b); provided further, however, that Delphi shall have thirty (30) days from the provision of such notice to (x) withdraw or amend such item in a manner that no longer gives rise to GM's termination right in respect of such item before GM may actually terminate this Agreement, and/or (y) obtain a determination by the Bankruptcy Court that GM does not have a right to terminate this Agreement pursuant to this section 7.03(b);

GSA-46

(c)     by GM if (i) any of the Chapter 11 Cases is converted into a case
under chapter 7 of the Bankruptcy Code, or (ii) a trustee is appointed pursuant to section 1104 of
the Bankruptcy Code in any of the Chapter 11 Cases;

(d)     by either Delphi or GM if the Effective Date has not occurred by
March 31, 2008 or, if the EPCA has not been terminated by such date, the first to occur of the
termination of the EPCA or April 30, 2008; or

(e)     by GM if it shall not have received a cash payment in the amount of
$2,700,000,000 (two billion seven hundred million dollars) under the Plan by March 31, 2008 or,
if the EPCA has not been terminated by such date, the first to occur of the termination of the
EPCA or April 30, 2008.

        Section 7.04   **No Offset**.  Notwithstanding anything to the contrary contained in
this Agreement or the Restructuring Agreement, the Parties' payment obligations under this
Agreement and the Restructuring Agreement are absolute and unconditional and will not be
subject to any offset (except as expressly set forth in the proviso below) or defense of any nature
whatsoever including upon a breach by Delphi or any of its Affiliates or GM or any of its
Affiliates, as applicable, of any of their obligations under this Agreement, the Restructuring
Agreement, or any other agreement; provided, however, that any payments by GM pursuant to
this Agreement or the Restructuring Agreement shall be subject to GM's right to offset all or part
of such payment from any future amounts GM owes Delphi under this Agreement or the
Restructuring Agreement only if (i) agreed upon by GM and Delphi or (ii) GM determines that it
made an overpayment of any amount paid pursuant to this Agreement or the Restructuring
Agreement and GM and Delphi are unable to resolve GM's claim for such amounts pursuant to
the applicable dispute resolution provisions of this Agreement or the Restructuring Agreement
and GM provides Delphi with five (5) days' written notice before implementing such offset;
provided further, however, that if it is judicially determined that GM did not have the right to
offset such amount, GM shall pay Delphi such amount plus interest accruing on such amount
from the date of setoff through the repayment date at the rate of 7.5% per annum.  Neither this
section 7.04 nor any other provision of this Agreement or the Restructuring Agreement shall
prohibit, restrict, or limit in any way the application of GM's contractual rights of setoff arising
under any GM Purchase Order pursuant to GM's standard purchase order terms and conditions
against other obligations arising under any GM Purchase Orders or agreements other than this
Agreement and the Restructuring Agreement.

Section 7.05 **Governing Law; Jurisdiction; Venue**. This Agreement shall be
governed and construed in accordance with the internal laws of the State of New York, the forum
state in which the Bankruptcy Court sits, without regard to any conflict of law provision that
could require the application of the law of any other jurisdiction. Pursuant to the Plan and the
Confirmation Order, this Agreement is incorporated by reference in its entirety into the Plan and
forms an integral part thereof. Accordingly, by its execution and delivery of this Agreement,
each Party hereby irrevocably and unconditionally agrees that the Bankruptcy Court shall retain
exclusive jurisdiction over all matters related to the construction, interpretation or enforcement
of this Agreement and the Restructuring Agreement; provided, however, that the Bankruptcy
Court shall not have jurisdiction over (i) disputes arising out of the provisions set forth in Article
III of the Restructuring Agreement or the agreements referenced in sections 5.01(c) and (d) of
the Restructuring Agreement, or (ii) disputes arising out of agreements between any Delphi-
Affiliate Party on the one hand and GM or any of its Affiliates on the other in which disputes no
Delphi-Related Party has an interest; and provided further that after the second anniversary of the
Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters
related to the construction, interpretation or enforcement of this Agreement and the Restructuring
Agreement; and provided further that the jurisdiction of the Bankruptcy Court over all matters
related to this Agreement and the Restructuring Agreement shall terminate upon the fourth
anniversary of the Effective Date. Each Party further agrees to waive any objection based on
forum non conveniens.

Section 7.06 **Dispute Resolution**. In the event a Settlement Dispute arises
among the Parties, upon the written request of either Party, such Settlement Dispute shall be
referred to the Director of Business Development at GM and the Finance Director of Automotive
Holdings Group or the Director, Strategic Planning at Delphi (at Delphi's discretion) for
resolution in good faith. In the event that GM's Director of Business Development and Delphi's
Finance Director of Automotive Holdings Group or the Director, Strategic Planning are unable to
resolve such dispute, such Settlement Dispute shall be referred, at either Party's written request,
to the Assistant Treasurer of GM and the Assistant Treasurer or Treasurer of Delphi (at Delphi's
discretion). If within ten (10) days after such referral, GM's Assistant Treasurer and Delphi's
Assistant Treasurer or Treasurer are unable to resolve the Settlement Dispute, the Settlement
Dispute may be elevated by either Party to GM's Treasurer or Chief Financial Officer (at GM's
discretion) and Delphi's Chief Executive Officer or Chief Financial Officer (at Delphi's
discretion) for resolution. To the extent that the job title of any of the foregoing positions is
changed, this section 7.06 shall be deemed to apply to such successor title or, if the position is
eliminated or vacated, to the job title of the party taking over the responsibility of the eliminated
or vacated position.

Section 7.07 **Joint Communication Program**. Delphi and GM shall work
together to develop and implement a joint communication plan with respect to the subject matter
of this Agreement.

Section 7.08 **No Solicitation**. Each Party acknowledges that this Agreement is
not and shall not be deemed to be a solicitation to accept or reject a plan in contravention of

Bankruptcy Code section 1125(b). Each Party further acknowledges that no securities of any Debtor are being offered or sold pursuant to this Agreement and that this Agreement does not constitute an offer to sell or a solicitation of an offer to buy any securities of any Debtor.

Section 7.09   **Negotiations Not Admissible.** Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto are not admissible into evidence in any proceeding; provided, however, that this Agreement may be admissible in a proceeding to enforce the terms of this Agreement.

Section 7.10   **Specific Performance.** Each Party acknowledges that the other Party would be irreparably damaged if this Agreement were not performed in accordance with its specific terms or were otherwise breached. Accordingly, each Party shall be entitled to seek an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically the terms of this Agreement in addition to any other remedy to which the Parties may be entitled, at law, in equity or under this Agreement.

Section 7.11   **Representations and Warranties of the Debtors and GM.** Each Party represents and warrants, as to itself only (other than Delphi which represents and warrants on behalf of itself and the other Debtors), to the other Parties, that the following statements, as applicable to it, are true, correct, and complete as of the date of this Agreement:

(a)   It is duly organized, validly existing, and in good standing under the laws of its state of organization and has all requisite corporate power and authority to enter into this Agreement and to perform its obligations hereunder;

(b)   The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate action on its part; provided, however, that the Debtors' authority to enter into this Agreement is subject to Bankruptcy Court approval;

(c)   This Agreement has been duly executed and delivered by it and constitutes its legal, valid, and binding obligation, enforceable against it and all of the parties for whom it signed this Agreement in accordance with the terms hereof, subject to satisfaction of all conditions set forth in Article VI of this Agreement; and

(d)   The execution, delivery, and performance by it (when such performance is due) of this Agreement do not and shall not (i) violate any current provision of law, rule, or regulation applicable to it or any of its subsidiaries or its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

Section 7.12   **Waiver; Modification; Amendment.** Except as otherwise specifically provided herein, this Agreement may not be modified, waived, amended or supplemented unless such modification, waiver, amendment or supplement is in writing and has been signed by each Party. No waiver of any of the provisions of this Agreement shall be

GSA-49

deemed or constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver.

Section 7.13   **Binding Effect; Assignments**. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, administrators, and representatives. Neither this Agreement nor any of the rights, interests, or obligations under this Agreement shall be sold, assigned, or otherwise transferred by any Party without the prior written consent of the other Parties; provided, however, that neither the foregoing nor any other provision of this Agreement shall limit (i) any assignment in connection with the transfer of all or substantially all of the assets of Delphi and its Affiliates or (ii) any assignment not reasonably expected to have a material impact on GM, on the benefits GM reasonably is expected to receive under the Plan (including, without limitation, GM's distributions thereunder), the Restructuring Agreement, or this Agreement, or on the ability of the Debtors to fulfill any obligations to any GM-Related Parties under the Plan, the Restructuring Agreement, this Agreement, or any agreements assumed, reinstated, or ratified under the Restructuring Agreement.

Section 7.14   **Third Party Beneficiaries**. Except as otherwise provided in Article IV hereof with respect to releases of GM-Related Parties, Delphi-Related Parties and Delphi Canada Inc., nothing contained in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any person or entity other than the Parties hereto, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third party to any Party to this Agreement, nor shall any provision give any third party any right of subrogation or action over or against any Party to this Agreement.

Section 7.15   **Notices**. All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given (and shall be deemed to have been duly given upon receipt) if delivered personally, mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the Parties at the following addresses (or at such other address for a Party as shall be specified by like notice):

If to Debtors:

> Delphi Corporation
> 5725 Delphi Drive
> Troy, Michigan 48098
> Attn:  John D. Sheehan
>        David M. Sherbin, Esq.
>        Sean P. Corcoran, Esq.

With a copy to:

> Skadden, Arps, Slate, Meagher & Flom LLP
> 333 West Wacker Drive
> Chicago, Illinois 60606-1285
> Attn:   John Wm. Butler, Jr., Esq.
>       Ron E. Meisler, Esq.

and

> Skadden, Arps, Slate, Meagher & Flom LLP
> Four Times Square
> New York, New York 10036
> Attn:   Eric L. Cochran, Esq.
>       Kayalyn A. Marafioti, Esq.

If to GM:

> General Motors Corporation
> 767 Fifth Avenue
> 14th Floor
> New York, New York 10153
> Attn:   Director of Business Development

and

> General Motors Corporation
> 300 GM Renaissance Center
> Detroit, Michigan 48265
> Attn:   General Counsel

With a copy to:

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attn:   Harvey R. Miller, Esq.
>       Jeffrey L. Tanenbaum, Esq.
>       Michael P. Kessler, Esq.

or to such other place and with such other copies as either party may designate as to itself by written notice to the other party. Rejection, any refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

GSA-51

Section 7.16   **Waiver of Right to Trial by Jury**. Each Party waives any right to trial by jury in any proceeding arising under or related to this Agreement.

Section 7.17   **Service of Process**. Each Party irrevocably consents to the service of process in any legal proceeding arising out of this Agreement by receipt of mailed copies thereof by national courier service or certified United States mail, postage prepaid, return receipt requested, to its applicable registered agent. The foregoing, however, shall not limit the right of a Party to effect service of process on the other Party by any other legally available method.

Section 7.18   **Interpretation**.

(a)   In the event of any conflict between this Agreement and any of the Labor MOUs, the Non-Represented Employees Term Sheet, the UAW SAP, the IUE-CWA SAP, the Warranty Settlement Agreement, and the IP License, the provisions of such documents other than this Agreement shall govern.

(b)   Notwithstanding anything to the contrary in the Plan (including any amendments, supplements or modifications thereto) or the Confirmation Order (and any amendments, supplements or modifications thereto), in the event that any of the terms of the Plan (including any amendments, supplements or modifications thereto) or Confirmation Order (including any amendments, supplements or modifications thereto) conflict with any of the terms of this Agreement, the terms of this Agreement shall govern.

(c)   Any reference herein to any section of this Agreement shall be deemed to include a reference to any exhibit, attachment or schedule referred to within such section.

(d)   All references to "$" and dollars shall refer to United States currency.

(e)   Consistent with Bankruptcy Rule 9006(a), if the due date for any action to be taken under this Agreement (including the delivery of notices) is not a business day, then such action shall be considered timely taken if performed on or prior to the next business day following such due date. Any reference to "days" in this Agreement shall mean calendar days unless otherwise specified.

Section 7.19 **Expenses**. Notwithstanding anything else contained in this Agreement or the Restructuring Agreement, each Party shall bear all costs and expenses incurred or to be incurred on or after the Effective Date by such Party in connection with this Agreement and the consummation and performance of the transactions contemplated hereby.

Section 7.20 **Entire Agreement; Parties' Intentions; Construction**. This Agreement, including all exhibits and attachments hereto and to the Plan (e.g., the Restructuring Agreement, the Labor MOUs, and the Non-Represented Employees Term Sheet) and the Confidentiality and Non-Disclosure Agreement between GM and Delphi dated September 12, 2005, as amended, constitute the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements, whether oral or written, with respect to such subject matter other than with respect to the agreements expressly assumed, ratified or reinstated in Article V of the Restructuring Agreement. The attachments and exhibits attached hereto are an integral part of this Agreement and are hereby incorporated into this Agreement and made a part hereof as if set forth in full herein. This Agreement is the product of negotiations between the Parties and represents the Parties' intentions. In any action to enforce or interpret this Agreement, this Agreement shall be construed in a neutral manner, and no term or provision of this Agreement, or this Agreement as a whole, shall be construed more or less favorably to any Party.

Section 7.21 **Severability**. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nonetheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal or unenforceable in any respect, the Parties shall negotiate in good faith to modify this Agreement to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the fullest extent possible.

Section 7.22 **Headings**. The table of contents and the headings of the Articles and sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

Section 7.23 **Affiliates**. The Confirmation Order shall provide that the Affiliates of GM and Delphi are deemed to have acknowledged and shall be bound by the terms hereof. GM and Delphi further agree to commercially reasonable efforts to cause their respective Affiliates to sign an acknowledgement agreeing to be bound by the terms hereof.

Section 7.24   **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement. Electronic delivery of an executed signature page of this Agreement shall be effective as delivery of a manually executed signature page of this Agreement.

[Signature pages follow.]

 

**IN WITNESS HEREOF**, the Parties hereto have caused this Agreement to be duly executed and delivered by their respective, duly authorized officers, all as of the date first written above.

**DELPHI CORPORATION,**
including on behalf of its Debtor subsidiaries
and Debtor Affiliates

**GENERAL MOTORS CORPORATION**

By:   /s/ John D. Sheehan
   Name:  John D. Sheehan
   Title:  Vice President, Chief Restructuring
     Officer

By:   /s/ Frederick A. Henderson
   Name: Frederick A. Henderson
   Title:  Vice Chairman and Chief Financial
     Officer

**Exhibit A**
**Warranty Settlement Agreement**

**Exhibit B**
**IP License**

GSA-B-1

Material Non-Public Information
Highly Confidential – Restricted Disclosure

**Exhibit C**
**Master Restructuring Agreement**

August 21, 2007
Key Stakeholder Draft

Material Non-Public Information
Highly Confidential – Restricted Disclosure

**Exhibit D**
**PHI Protection Agreement**

GSA-D-1

Material Non-Public Information
Highly Confidential – Restricted Disclosure

**Exhibit E**
**Amount of Outstanding Delphi Invoices for which GM Has Withheld Payment Due To
Outstanding Prepetition Activities**

GSA-E-1

Material Non-Public Information
Highly Confidential – Restricted Disclosure

## Exhibit A
## Warranty Settlement Agreement

## WARRANTY, SETTLEMENT AND RELEASE AGREEMENT
## AND COVENANT NOT TO SUE

This Warranty, Settlement and Release Agreement and Covenant Not to Sue

("Agreement") is entered into this 14th day of August, 2007 by and between General

Motors Corporation and Delphi Corporation, collectively the "Parties."

1.    **RECITALS**

    1.1    **GM**

"GM" is General Motors Corporation and each of its affiliates, subsidiaries, and

related entities, foreign and domestic.

    1.2    **Delphi**

"Delphi" is Delphi Corporation and each of its affiliates, subsidiaries, and related

entities, foreign and domestic.

    1.3    **The ███████████Claims**

The "███████████Claims" refer to those ███████████

warranty claims for the ███████████for which GM sought compensation

pursuant to its ███████████, as further described in the ███████████

███████between GM and Delphi dated ███████████GM's ███████████

███████filed in the pending arbitration between the Parties pursuant to the ███████

███████also dated ███████████and GM's Proof of Claim ("GM's Proof of Claim")

in the United States Bankruptcy Court for the Southern District of New York (the

"Bankruptcy Court") dated July 31, 2006. A copy of GM's Proof of Claim is

incorporated by reference.

GM / Delphi Warranty Agreement
August 14, 2007

    **1.4**   ████████████**Claims**

The ████████ Claims pertain to failures to ███████████ primarily

due to ██████s provided to Delphi by ████ that were installed into █████

████ used in the GM vehicles as described in GM's Proof of Claim.

    **1.5**   ████████ **Claims**

The T█████ Claims pertain to failures to ████████████ used in GM

vehicles as described in GM's Proof of Claim.

    **1.6**   ██████ **Claims**

The ████████████████████ Claims pertain to failures of

the ███████ located on the ██████████████████ of certain

GM vehicles as described in GM's Proof of Claim.

    **1.7**   ██████ **Claims**

The G██████ Claims pertain to failures of ███████████ provided

to Delphi by ██████ as described in GM's Proof of Claim.

    **1.8**   ███████████ **Claims**

The ████████ Claims pertain to the ████████████ for █████

████████ which GM attributes to the Delphi-produced ██████████

████████████ model year████ vehicles.

    **1.9**   **Other Warranty Claims**

"Other Warranty Claims" shall include any warranty claim or issue relating to a

Delphi supplied component or assembly for the model year and vehicles noted on Exhibit

#01. Exhibit #01 contains a complete list of those claims for which GM asserts Delphi is

GM / Delphi Warranty Agreement
August 14, 2007

financially or otherwise responsible in whole or in part, many of which are included and
more fully described in GM's Proof of Claim.

### 1.10 GM Representations

The warranty and recall issues for which GM has determined as of June 4, 2007,
that Delphi has responsibility are included in this Agreement and the attachments thereto.
Due to the large number of components supplied by Delphi in the ordinary course of
business, warranty and recall expense is incurred by GM that may be due in whole or in
part to defects in components supplied by Delphi. Where excessive warranty expenses or
recall expenses are incurred and GM believes there may be supplier responsibility for
such warranty or recall expenses, GM's normal process is to actively investigate the issue
and work with the supplier to determine the root cause of the issue and responsibility for
the excessive warranty expenses or recall expenses. As of the date of this Agreement, the
only issues with respect to a Delphi supplied component that are currently in GM's
investigation process and for which Delphi may have responsibility, other than the claims
settled by this Agreement, are (i) the ███████████████████████████ar
G██████████████████████s, and (ii) the ███████████████s i███████
██████████████████████. GM's investigation of these issues
(█████████████████████████████████) through its Field
Performance Evaluation process is ongoing and GM has not yet determined if Delphi has
any responsibility. Furthermore, GM has not deliberately withheld, delayed, and/or
avoided including any warranty or recall expenses from the GM Field Performance
Evaluation Process that GM determined may be in part the responsibility of Delphi.

GM / Delphi Warranty Agreement
August 14, 2007

GM will update the representations in this Section 30 days prior to Delphi's

emergence from bankruptcy, provided that Delphi in writing requests such an update at

least 60 days prior to Delphi's emergence from bankruptcy.

The representations in this Section are not intended to foreclose GM from later

investigating excessive warranty expenses or recall expenses associated with Delphi

supplied components and, if it determines that Delphi has responsibility, GM may seek

recovery from Delphi for any such expenses through its normal processes. This Section

shall, however, foreclose GM from bringing a claim against Delphi if it is shown that on

or before August 10, 2007, (i) GM did know about the claim, (ii) the amount of the claim

then exceeded $1 million, or GM then believed the claim would exceed $1 million, (iii)

the claim is then in GM's investigation process or GM determined that it should have

been in GM's investigation process but excluded it from that process for the purpose of

pursuing a claim against Delphi, and (iv) that GM then believed or reasonably should

have believed that Delphi had some responsibility for the claim.

For purposes of this Section, GM's investigation process shall mean its Field

Performance Evaluation Process and/or its Field Performance Evaluation Supplier

Quality Department.

### 1.11    Purpose of the Agreement

The purposes of this Agreement are to resolve, compromise and/or settle all

outstanding warranty claims and issues relating to a component or assembly supplied by

Delphi to GM that (i) are listed in Section 1 of this Agreement and (ii) are required to be

disclosed pursuant to Section 1.10 of this Agreement, that are not disclosed pursuant to

Section 1.10 hereof ((i) and (ii) in this Section are referred to in this Agreement as the

Page 4

GM / Delphi Warranty Agreement
August 14, 2007

"Settled Claims"); and to enter into a Covenant Not to Sue or Assert a claim against

Delphi with regard to the Settled Claims. Except as may be specifically set forth herein

pertinent to breach of this Agreement, the further purpose of this Agreement is to

foreclose any current, anticipated and/or potential assertion, litigation, arbitration or other

contested proceedings relating to the claims settled by this Agreement.

## 2.    HIERARCHY OF AGREEMENTS

The terms of this Agreement supersede and control of any previous agreement by

the Parties relating to compromising warranty and/or recall claims for the matters covered

by this Agreement; specifically,



> the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ er Claims
> ▮▮▮▮▮▮▮▮▮ Claims
> ▮▮▮▮ e Claims
> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ h Claims
> ▮▮▮▮▮ r Claims
> ▮▮▮▮▮▮▮▮▮ Claims and
> the 43 warranty claims identified in Exhibit #01.

All previous agreements entered into by the Parties relating to compromising warranty

and/or recall claims not addressed by this Agreement remain in effect.

## 3.    CONSIDERATION

In consideration of the promises and releases and Covenant Not to Sue or Assert

contained in this Agreement, the receipt and adequacy of which are mutually

acknowledged, the Parties agree as follows:

3.1    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Claims

Delphi shall pay to GM the sum of twenty-five million ($25,000,000.00) dollars

in full satisfaction of each and all of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

GM / Delphi Warranty Agreement
August 14, 2007

resulting from repairs made to vehicles that were submitted to GM for payment through
June 4, 2007 as reflected in the GM warranty system.

**3.1.1**    With regard to any ████████████████████ Claims
resulting from repairs made to vehicles as of or after June 5, 2007, the Parties agree that
Delphi shall pay to GM one hundred seventy-five ($175.00) dollars per repair claim for
up to 107,000 ███████████████████ Claims. Delphi shall have no
responsibility for payment of future ███████████████Claims under this
Section 3.1 and Agreement in excess of 107,000 repair claims received by GM on or after
June 5, 2007.

**3.1.2**    GM shall give Delphi notice of the number of ███████████████
██████Claims received by GM quarterly, starting June 5, 2007, and continuing until
GM has received 107,000 ███████████████████Claims on and
after June 5, 2007. The first quarter hereunder shall run from June 5, 2007 through
September 30, 2007 and each quarter thereafter shall be a three month period, the first of
which shall commence October 1, 2007. GM shall endeavor to provide the quarterly
notices within 30 days of the end of each quarterly period. Delphi shall remit payment to
GM within 30 days of receipt of each such quarterly notice. Delphi shall have the right
to audit the claims made under this paragraph, and GM will provide Delphi access to the
claims data in the GM warranty system necessary to audit the claims submitted by GM.
As a result of the audit, should Delphi believe the dollar amount or number of claims
submitted by GM is incorrect, representatives of the Parties with appropriate authority to
resolve the dispute will meet and negotiate in good faith a resolution before the quarterly
payment payable by Delphi under this paragraph.

Page 6

GM / Delphi Warranty Agreement
August 14, 2007

**3.1.3**    Prior to June 4, 2007, GM issued Delphi a debit notice against receivables
and withheld five million four hundred twenty-six thousand six hundred eighty-one
($5,426,681.00) dollars in cash payment.  As part of this Agreement, Delphi will issue a
credit memo in that amount of dollars on or before September 1, 2007 accepting GM's
debit notice, and agreeing to GM's withholding of the five million four hundred twenty-
six thousand six hundred eighty-one ($5,426,681.00) dollars.  This shall not constitute
payment of any amount Delphi is required to pay under any other paragraph of this
Agreement.

**3.2**    ▬▬▬▬▬▬▬**Claims**

With regard to those ▬▬▬▬▬▬ Claims resulting from repairs made to
vehicles through June 4, 2007, Delphi shall pay GM the sum of forty-seven million five
hundred thousand ($47,500,000.00) dollars in full satisfaction of each and every one of
those claims.  With regard to ▬▬▬▬▬▬ Claims resulting from repairs made to
vehicles on or after June 5, 2007, the Parties agree as follows:

**3.2.1.** Delphi will provide to GM ▬▬▬▬▬▬▬▬▬▬▬▬▬▬,
for ▬▬▬▬▬▬▬ model year ▬▬▬▬ (part numbers ▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬) (the "▬▬▬▬▬▬") at no charge to GM up to and including
the ▬▬▬▬▬▬▬▬ s to be provided consistent with this Agreement.

**3.2.2** For each ▬▬▬▬▬▬ r unit in excess of the 1,100,000 described in
Section 3.2.1, above, Delphi will sell additional ▬▬▬▬▬▬▬ to GM at an agreed
price not to exceed eighty-three ($83.00) dollars per unit.

Page 7

GM / Delphi Warranty Agreement
August 14, 2007

3.2.3 Delphi agrees to individually box and shrink wrap each ▮▮▮▮▮▮▮▮▮▮ provided pursuant to this Agreement.

3.2.4 Delphi agrees to make each box described in paragraph 3.2.3 "ship to dealer" ready. This includes protective packaging, markings, and the appropriate GM part number as specified in GM Supply Power. At Delphi's option and cost, the "boxing" may be done at the Service Center.

3.2.5 Delphi agrees to deliver each ▮▮▮▮▮▮▮▮ described in this Agreement, FOB to the Electronic Service Centers as designated by GM, or such other distribution center(s) that may reasonably be designated by GM.

3.2.6 The Parties agree that Delphi shall have the option, at its sole discretion, to provide new or re-manufactured ▮▮▮▮▮▮▮▮ units in satisfaction of its obligations under this Agreement. During the period before Delphi is prepared to ship new ▮▮▮▮, ▮▮▮▮▮▮▮ pursuant to this Agreement, at GM's election Delphi shall ship remanufactured ▮▮▮▮▮▮ to the Electronic Service Centers in accordance with this Agreement. Delphi agrees that the price to GM for those new or re-manufactured ▮▮▮▮ ▮▮▮▮▮▮ units shall be zero ($0) dollars per unit for those provided under paragraph 3.2.1, and not to exceed eighty-three ($83.00) dollar cost per unit agreed to in Paragraph 3.2.2., above.

3.2.7 Those new ▮▮▮▮▮▮▮▮ to be provided pursuant to this Agreement will be manufactured in Mexico.

3.2.8 If GM requires the manufacture of the ▮▮▮▮▮ Clusters in the United States, GM agrees that it will pay the per-unit difference in costs of manufacturing the ▮▮▮▮▮▮▮▮ in the United States rather than Mexico ("Manufacturing Costs"). The

Page 8

GM / Delphi Warranty Agreement
August 14, 2007

difference in Manufacturing Costs is the difference in "all in" labor cost, manufacturing

burden cost, material and freight costs, and any incremental investment (as measured by

depreciation). The difference in Manufacturing Costs shall not exceed $30 per unit for

purposes of this Agreement. At GM's request, Delphi will provide to GM the difference

in Manufacturing Costs prior to any movement of production, and in the case where GM

and Delphi cannot agree on the difference in Manufacturing Costs, Delphi will have no

obligation to meet GM's request to move the product to a United States manufacturing

site. Delphi's obligation to provide the 1,100,000 free ▮▮▮▮▮▮▮▮▮▮to GM expires

on January 1, 2014.

**3.2.9** With regard to those ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮vehicles equipped

with instrument clusters that incorporated Switec stepper motors (part numbers

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Delphi agrees to provide the bulbs and

stepper motors at Delphi's variable cost, and the associated lenses at $2.00 below the

existing price currently charged to the Re-manufacturing Center. The Parties will

identify the savings resulting from this paragraph and translate that into a per unit cluster

price reduction by part number which will be provided to GM as specified in Section

3.2.12, below. In the event of a verified net increase in Delphi's variable cost of the

▮▮▮▮▮▮▮▮or both, Delphi may pass on these increases to GM.

**3.2.10** The Parties agree that Delphi has, and retains, any right of action, in law,

equity or otherwise, against ▮▮▮▮with regard to the ▮▮▮▮▮▮▮▮' ▮▮▮▮▮▮▮▮

described in this Agreement. Delphi shall retain full control over the exercise and

prosecution of any such rights, and shall be entitled to pursue such remedies as it sees fit,

Page 9

GM / Delphi Warranty Agreement
August 14, 2007

in any manner and/or forum it deems fit, in its sole and exclusive discretion. The Parties

further agree that Delphi will share fifty (50%) percent of any gross recovery (e.g.,

money damages, parts, and discount on parts) it obtains from Switec with regard to any

such right of action with GM except for free or discounted stepper motors Delphi

receives from██████ on the█████████ and ████████Delphi supplies to GM

at cost. Further, the Parties acknowledge that the first priority will be to receive free

█████████ from████ to meet GM's production requirements fo██████████

███████ Delphi agrees to continue to keep GM reasonably informed regarding the

progress of its discussions and any claim it may file agains████████relating to this

Paragraph.

        **3.2.11**  Delphi will continue to cooperate with and assist GM with technical

assistance and any technology transfer reasonably required to enable ████████ on GM

vehicles equipped with $████████ to be████at authorized GM dealerships.

        **3.2.12**  Delphi will disclose to GM, exclusively to GM's Legal Staff, the per unit

cost breakdown for████████████ for GM to confirm Delphi's adherence with the

Agreement.  GM agrees that GM Legal Staff will keep the disclosed price break-down

information confidential and not share or disclose this information to GM personnel from

other GM units or groups, including but not limited to GM Purchasing or Engineering, or

any third parties, except their outside counsel, if any, or financial consultants, accountants

or auditors, as may be necessary for security and regulatory filings and so long as each

person agrees to maintain the confidentiality of the information in accordance with this

paragraph.

Page 10

GM / Delphi Warranty Agreement
August 14, 2007

### 3.3 ███████ Claims

Delphi agrees to pay GM the amount of seven million five hundred thousand

($7,500,000.00) dollars in full satisfaction of each and every one of the ███████

Claims. The Parties confirm that Delphi has and shall retain any right of action, in law,

equity or otherwise, against ███████████████████████TD;

S████████████████████████████████████████,

"███████). Delphi shall retain full control over the exercise and prosecution of any such

rights, and shall be entitled to pursue such remedies as it sees fit, in any manner and/or

forum it deems fit, in its sole and exclusive discretion. The Parties further agree that

Delphi shall share fifty (50%) percent of any gross recovery from ███████for such right

of action with GM, but only to the extent that such gross recovery exceeds eight million

($8,000,000.00) dollars. Delphi shall only be obligated to pay the 50% share of any gross

cost recovery over eight million ($8,000,000.00) dollars to GM upon receipt of

payment(s) of the recovered amount from███████. For example, should Delphi recover

ten million ($10,000,000.00) dollars as damages from███████Delphi would pay GM one

half of two million ($2,000,000) dollars or one million ($1,000,000.00) dollars from the

recovery following Delphi's receipt of███████ payment. Delphi agrees to continue to

keep GM reasonably informed regarding the progress of its discussions and any claim it

may filed against ██████ relating to this Paragraph.

### 3.4 ███████Claims, ███████Claims, and ███████ Claims

Delphi agrees to pay GM the amount of five hundred thousand ($500,000.00)

dollars in full satisfaction of each and every one of the ███████ Claims, the███████

███████ Claims, and the███████████Claims.

Page 11

GM / Delphi Warranty Agreement
August 14, 2007

### 3.5    GM's Waiver of Contribution Claims and Rights Relating to the ████████ Claims and ████████████ Claims.

Through this Agreement, GM expressly waives any right it has, or may have in

the future, for contribution from Delphi relating to the ████████ Claims and

██████████████ Claims, or the facts underlying those claims  If GM and Delphi

are named in a case, and the case proceeds to trial, Delphi is free to assert all defenses,

including those defenses adverse to GM.  GM will take no affirmative acts or cooperate

with any third party to sue, add, and/or join Delphi as part of any suit or action related to

the claims in this paragraph.

### 3.6  Other Warranty Claims

Delphi shall pay to GM thirty-one million five hundred thousand

($31,500,000.00) dollars in full satisfaction of each and every one of the Other Warranty

Claims (Exhibit #01).

### 4.    RELEASE

#### 4.1    GM's Release of Delphi

For and in consideration of the provisions of this Agreement, including the

consideration described in Section 3 of this Agreement, above, the adequacy of which are

hereby acknowledged, GM, on behalf of itself and its predecessors in interest,

subsidiaries, affiliates, parent corporations, divisions, partners, joint ventures,

shareholders, agents, representatives, attorneys, employees, officers, directors, customers,

executors, administrators, heirs, beneficiaries, successors, assigns and any and all other

persons or entities acting or purporting to act on its behalf, does hereby fully and forever

release, acquit, and discharge Delphi and its predecessors in interest, affiliates,

subsidiaries, parent corporations, divisions, partners, joint-ventures, shareholders, agents,

Page 12

GM / Delphi Warranty Agreement
August 14, 2007

representatives, attorneys, employees, customers, executors, administrators, heirs,

beneficiaries, successors, assigns and any and all other persons or entities acting or

purporting to act in their behalf from any and all claims, actions, demands, obligations,

and lawsuits of any kind or description whatsoever, and any compensation or damages

whatsoever, including but not limited to incidental, consequential, compensatory and

exemplary damages relating in any way to the Settled Claims or any and all claims,

damages, actions, demands, obligations, and lawsuits that could have been brought

related to the underlying subject matter of the Settled Claims. Affiliates and entities

acting or purporting to act on GM's behalf shall be limited to affiliates and entities for

which GM has management control.

### 4.2  Delphi's Release of GM

For and in consideration of the provisions of this Agreement, including the

consideration described in Section 3 of this Agreement, above, the adequacy of which are

hereby acknowledged, Delphi, on behalf of itself and its predecessors in interest,

subsidiaries, affiliates, parent corporations, divisions, partners, joint ventures,

shareholders, agents, representatives, attorneys, employees, officers, directors, customers,

executors, administrators, heirs, beneficiaries, successors, assigns and any and all other

persons or entities acting or purporting to act on its behalf, does hereby fully and forever

release, acquit, and discharge GM and its predecessors in interest, affiliates, subsidiaries,

parent corporations, divisions, partners, joint-ventures, shareholders, agents,

representatives, attorneys, employees, customers, executors, administrators, heirs,

beneficiaries, successors, assigns and any and all other persons or entities acting or

purporting to act in their behalf from any and all claims, actions, demands, obligations,

Page 13

GM / Delphi Warranty Agreement
August 14, 2007

and lawsuits of any kind or description whatsoever, and any compensation or damages

whatsoever, including but not limited to incidental, consequential, compensatory and

exemplary damages relating in any way to the Settled Claims or any and all claims,

damages, actions, demands, obligations, and lawsuits that could have been brought

related to the underlying subject matter of the Settled Claims. Affiliates and entities

acting or purporting to act on Delphi's behalf shall be limited to affiliates and entities for

which Delphi has management control.

### 4.3 GM's Proof of Claim

Delphi has advised GM that upon entry of an order approving this Agreement,

Delphi intends to instruct its claims agent to reduce the component relating to warranty

claims contained in GM's Proof of Claim by $530,081,671, which includes without

limitation the personal injury claims resulting from tailgate cable fractures asserted in

section VII(b) of GM's Proof of Claim, and expunge with prejudice the unliquidated

component relating to warranty claims. GM has made no representations to Delphi's

claims agent and is not making any representation to Delphi's claims agent in this

Section. Nothing contained herein shall be construed to reduce any amounts to be paid to

GM pursuant to the settlement agreement and/or restructuring agreement being

negotiated between GM and Delphi; provided that GM shall not receive any further

consideration, except as explicitly provided herein, on account of those warranty claims

settled hereby.

### 5. COVENANT NOT TO SUE

Neither GM nor Delphi shall initiate any action, cause of action lawsuit,

arbitration or any other activity in any court, administrative body or any other form of

Page 14

C:\DELPHI\GM WARRANTY 2007\Agreement (08-14-07 Final)

GM / Delphi Warranty Agreement
August 14, 2007

contested proceeding relating to any Settled Claims or the facts underlying such Settled

Claims. Both GM and Delphi understand, acknowledge and agree that this Agreement

and Covenant not to Assert or Sue may be pled by GM or Delphi as a complete defense

to any claim or entitlement relating to in any way the Settled Claims or the facts

underlying the Settled Claims.

6.    **DISMISSAL OF** ████████████████████████████

Upon execution of this Agreement, and following any order of the Bankruptcy

Court that may be required under paragraph 7 hereof, the parties shall, through their

respective attorneys, cause the █████████████████████████ described in

paragraph 1.3, above, to be immediately and permanently terminated with prejudice.

This Agreement shall supersede and terminate the████████████████████████

entered into between the Parties.

7.    **BANKRUPTCY PROCEEDINGS; NOTICE AND APPROVAL**

The Parties agree to work cooperatively to provide such notice, and to seek such

approval, of the provisions of this Agreement as shall be required under the applicable

United States bankruptcy laws, statutes and rules.

8.    **PAYMENT**

Delphi shall pay the amounts due under Sections 3.1, 3.2, 3.3 and 3.4 on or before

November 1, 2007, by wire transfer in accordance with instructions to be provided by

GM; provided, however, that at Delphi's election Delphi may defer these payments until

the time that it receives payments from GM, at or about the time of its emergence from

bankruptcy, pursuant to the proposed comprehensive settlement agreement and/or the

restructuring agreement to be entered into between Delphi and GM and that is expected

Page 15

GM / Delphi Warranty Agreement
August 14, 2007

to be incorporated into the plan of reorganization, and in the event of such a deferral GM
shall set off these payments against the amounts then payable to Delphi by GM. In the
event Delphi elects to defer these payments pursuant to this Section, interest shall run at
the rate of 6% percent per annum on the payment from November 1, 2007 until paid by
Delphi or set off against amounts payable by GM.

## 9. CONFIDENTIALITY

Except as may be required by a valid order signed by a court of competent
jurisdiction including, but not limited to, the United States Bankruptcy Court, or as
necessary for accounting, auditing, tax preparation, securities law reporting purposes,
and/or bankruptcy disclosure or approval purposes, including but not limited to,
disclosure to Delphi's statutory committees, prospective plan inventors and/or the
Bankruptcy Court, GM and Delphi shall not disclose, disseminate, reveal, or
communicate to any third person or entity, in any manner directly or indirectly, any
information concerning the negotiations resulting in this Agreement, the terms of this
Agreement, or a copy of this Agreement. If asked by anyone to whom disclosure is not
permitted about the resolution of the Settled Claims, or any of them, GM and Delphi shall
state only that the dispute between them has been resolved to their mutual satisfaction.
This paragraph shall not preclude disclosure to outside counsel for the Parties, provided
that such outside counsel agree to maintain the confidentiality of this Agreement in
accordance with this paragraph.

Notwithstanding anything set forth herein to the contrary, the Parties agree that a
mutually acceptable redacted version of this Agreement, the Parties' acceptance of which
shall not be unreasonably withheld, will be filed with the Bankruptcy Court for approval

Page 16

GM / Delphi Warranty Agreement
August 14, 2007

purposes. A complete copy of the Agreement shall be provided to the Bankruptcy Court,

counsel to the plan investors, Delphi's post petition lenders, the statutory committees, and

the United States Trustee, and shall be available to a third party upon request, provided

that the requesting third party is affected by the Agreement and executes a confidentiality

agreement acceptable to Delphi.

## 10.   APPROVALS OF SENIOR MANAGEMENT

The Parties hereby represent and confirm, through their signatures below, that

they have obtained all management approvals required to execute and enforce this

Agreement. Delphi also represents and confirms that it has obtained approval from its

Board of Directors to enter into this Agreement.

## 11.   BREACH OF THIS AGREEMENT

### 11.1   Notice Of Breach

To the extent that either of the Parties believes the other to be in material breach

of any provision of this Agreement, that Party shall give specific written notice of such

breach to the other party within 30 days of discovery of such alleged breach. The

responding parties shall have 30 days from receipt of the written notice within which to

respond and/or cure any such alleged breach.

### 11.2   Breach Of Any Particular Provision Of This Agreement Does Not
### Void Entire Agreement.

A breach of any particular provision set forth in this Agreement shall not

constitute a breach of the entire Agreement and shall not serve to void any other

provision of this Agreement.

GM / Delphi Warranty Agreement
August 14, 2007

## 12.   NO ADMISSION OF LIABILITY

The Parties acknowledge that this Agreement evidences the settlement of claims

disputed both as to liability and as to amount, and that the foregoing consideration shall

not be construed as an admission of responsibility or liability, as the same is now and

always has been expressly denied by each Party.

## 13.   CHOICE OF LAW AND JURISDICTION

This Agreement shall be construed and interpreted in accordance with the laws of

the State of Michigan. All actions brought, arising out of or related to this Agreement

shall be brought in the Bankruptcy Court, and the Bankruptcy Court shall retain exclusive

jurisdiction to determine any and all such actions.  The Parties irrevocably and

unconditionally consent to submit to the jurisdiction of the Bankruptcy Court for any

litigation arising out of or relating to this Agreement and the transactions contemplated

thereby (and agree not to commence any litigation relating thereto except in the

Bankruptcy Court).  To the extent the Bankruptcy Court declines jurisdiction, the sole

remedy for any alleged breach of this Agreement shall be to file suit in an appropriate

Michigan State Court located in Oakland County, Michigan.

## 14.   ENTIRE AGREEMENT

This Agreement contains the entire agreement between the Parties and supersedes

all prior oral or written agreements between the Parties with respect to the subject matter

of the Settled Claims.

## 15.   MODIFICATION

This Agreement may not be amended, changed or modified in any way, except by

a written instrument signed by all the parties.

Page 18

GM / Delphi Warranty Agreement
August 14, 2007

## 16.   BINDING NATURE

This Agreement inures to the benefit of and binds the Parties and their respective

successors and assigns.

## 17.   AUTHORIZATION

Each party represents and warrants that (a) before executing this Agreement, it

became fully informed of the terms, contents and conditions and effect of this

Agreement; (b) no promise or representation of any kind has been made to it by the other

party or by anyone acting on the other party's behalf except as expressly stated in this

Agreement; (c) it has relied solely on its own judgment and the advice of counsel in

executing this Agreement; (d) it has contributed to the preparation and drafting of this

Agreement and that any future interpretation or construction of this Agreement is to be

made without deference or bias to either party, and (e) the undersigned representative has

been duly authorized to enter into this Agreement, and has obtained all consents,

approvals, permissions, licenses, authorizations, corporate actions, powers and other

requirements and/or pre-requisites necessary to enter into and execute this Agreement on

behalf of GM and Delphi, respectively.

## 18.   COUNTERPARTS

This Agreement may be executed in any number of counterparts and each

counterpart shall be deemed to be an original. For purposes of executing this Agreement,

a document signed and transmitted by facsimile or email shall be treated as an original

document. The signature of any party on any document transmitted by facsimile or email

shall be considered an original signature, and the document transmitted shall be

Page 19

GM / Delphi Warranty Agreement
August 14, 2007

considered to have the same binding legal effect as a document containing an original

signature.

## 19.    NOTICE

Any notice or other communication under this Agreement shall be in writing and

shall be sent by facsimile or overnight mail, addressed to the respective parties as

follows:

| | |
|---|---|
| Michael J. French<br>Global Purchasing - Supplier<br>Quality and Development<br>General Motors Corporation<br>GM Tech Center<br>3B10-06<br>Cadillac Headquarters<br>3009 Van Dyke<br>Warren, MI 48090<br>Telephone 586 / 575-4347<br>Facsimile<br>Email: michael.j.french@gm.com | Lee A. Schutzman and<br>Lawrence S. Buonomo<br>Attorneys<br>GM Legal Staff<br>MC 482-026-601<br>PO Box 400<br>Detroit, MI 48265<br>Telephone 313/ 665-7338;<br>          313/ 665-7390<br>Facsimile   248/ 267-4371<br>          248/ 267-4291<br>Email: lee.a.schutzman@gm.com<br>          lawrence.s.buonomo@gm.com |
| Keith Stipp<br>Finance Director - AHG<br>Delphi Automotive Systems, LLC<br>5725 Delphi Drive<br>Troy, MI 48098<br>Telephone 248/ 813-6031<br>Facsimile 248/ 813-2410<br>Email: keith.stipp@delphi.com | Joseph E. Papelian<br>Deputy General Counsel – Litigation<br>Delphi Legal Staff<br>5725 Delphi Drive<br>Troy, MI 48098<br>Telephone 248/ 813-2535<br>Facsimile 248/ 813-3251<br>Email: joseph.e.papelian@delphi.com |

In the event a party to this agreement desires that notice be provided to a representative

other than the above listed representatives, it shall advise the other party in writing, by

email or by facsimile of the identity of such substitute representative and provide the

contact information.

GM / Delphi Warranty Agreement
August 14, 2007

## 20.    WAIVER

Failure by any party to enforce any of the remedies provided to it in this

Agreement shall not be deemed a waiver of such rights.

## 21.    TITLES

Titles and headings to articles, sections or paragraphs in this Agreement are

inserted for convenience of reference only and are not intended to affect the interpretation

or construction of the Agreement.

| GENERAL MOTORS CORPORATION | DELPHI CORPORATION |
|---|---|
| By: | By: |
| Zee A. Schutzman | David Sherbin |
| Title: Attorney | Title: General Counsel |
| Dated: August 14, 2007 | Dated: August 14, 2007 |

Page 21

**Exhibit B**
**IP License**

## LICENSE AGREEMENT

AGREEMENT by and between General Motors Global Technology Operations, Inc., a wholly owned subsidiary of General Motors Corporation, and General Motors Corporation, (the parties jointly referred to as "**GM**"), a corporation of the State of Delaware, USA, having an office at 300 Renaissance Center, Detroit, Michigan 48265, and DELPHI TECHNOLOGIES, INC., a wholly owned subsidiary of Delphi Corporation, and Delphi Corporation, (the parties jointly referred to as "DELPHI"), a corporation of the State of Delaware, having its principal office at 5725 Delphi Drive, Troy Michigan 48098, referred to individually as a "**Party**" or collectively as "**Parties**".

W I T N E S S E T H:

WHEREAS, DELPHI has been engaged in the development, manufacture and supply of various products to GM which may be needed by GM to maintain its manufacturing operations without disruption;

WHEREAS, DELPHI has identified certain businesses that manufacture and supply products that it wishes to exit ("**Wind-down, and/or Footprint Business"**) or wishes to sell ("**Sale Business**") in its effort to exit bankruptcy;

WHEREAS, GM and DELPHI have been in discussions regarding financial assistance that GM may provide in order to assist DELPHI in exiting the Wind-down, Footprint and Sale Businesses in a manner that allows GM to maintain its manufacturing operations without disruption;

WHEREAS DELPHI has agreed to assist GM in transitioning the manufacture and/or purchaser of products from itself to other suppliers or to GM itself;

WHEREAS, GM desires to acquire for itself and its Affiliates and designated Suppliers, manufacturing and technical information along with associated licenses and technical assistance relating thereto;

NOW, THEREFORE, in consideration of the premises, the agreements, covenants, and conditions herein contained, it is agreed as follows:

ARTICLE I

Definitions

1

1.1     **"Wind-down Products"** shall mean the GM products supplied by DELPHI facilities that are being wound-down, closed, and/or the products are being cooperatively resourced from DELPHI to another supplier, regardless of whether DELPHI intends to continue to make similar products outside of North America for sale to others, as specified in Schedule A attached hereto.

1.2     **"Footprint Products"** shall mean the GM products, as specified in Schedule B attached hereto, supplied by DELPHI from the facilities in Schedule C attached hereto.

1.3     **"Sale Products"** shall mean the GM Products supplied by DELPHI from facilities and/or lines of business where DELPHI is selling the assets of those operations to a third party with the expectation that the buyer will become GM's new supplier of such products, excluding Wind-down Products and Footprint Products.

1.4     **"DELPHI Licensed Intellectual Property"** means Intellectual Property owned or controlled by Delphi and required by GM, it Affiliates and/or designated suppliers to manufacture and supply Wind-down Products and Footprint Products as specified in Schedules A, and B, *(indicated in blue)* but excluding Delphi Retained Intellectual Property.

1.5     **"DELPHI Sale Intellectual Property"** means Intellectual Property owned or controlled by Delphi and required by buyers of Sale Businesses to manufacture and supply Sale Products.

1.6     **"DELPHI Retained Intellectual Property"** means Intellectual Property owned or controlled by Delphi and related to the Products as specified in Schedules A, and B, *(indicated in red)* which, at the time of this agreement, are not, to the knowledge of GM and DELPHI, required for GM, its Affiliates and/or designated suppliers to manufacture and supply Wind-down Products and Footprint Products.

1.7     **"Intellectual Property"** -- means (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, patents (including utility model patents and design patents), patent applications, other registrations and patent disclosures, together with all reissues, continuations, continuations in part, revisions, extensions and reexaminations thereof, (b) all copyrightable works, all copyrights and all applications, registrations and renewals in connection therewith, (c) all trade secrets and confidential information (including research and development, know how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, supplier lists, and sourcing information), and (d) all computer software (including models, algorithms, data and related documentation.

2

1.8    **"Affiliate "** An "Affiliate" of GM means any corporation, company, division or other entity of which GM owns or controls, directly or indirectly, ten percent (10%) or more of the voting stock or other voting interest, and also includes Original Equipment Manufacturers in which GM has an equity interest and those that share a product program with GM. An "Affiliate" of Delphi means an entity that controls, is controlled by or is under common control with Delphi. Control as applied to Delphi Affiliates means ownership of more than 50% of the voting stock or other voting interest of such entity.

1.9    **"Effective Date"** shall mean the date of complete execution of this Agreement.

1.10   **"Third Party"** means any person or legal entity that is not a Party to this Agreement.

1.11   **"Delphi Global Interiors and Closures Business"** means Delphi's global latches and door modules, cinching latches and strikers; and instrument panels and cockpit modules business.

1.12   **"Delphi Global Bearing Business"**  means Delphi's wheel bearings business conducted at the Sandusky Facility.

1.13   **"Delphi Global Steering Business"** means Delphi's global steering and halfshaft businesses.

1.14 **"Exclusivity Period"**  means a period of 5 years immediately following the closing, if any, of Delphi's proposed sale of the Global Interiors and Closures Business to Renco or an affiliate of Renco.

1.15   **"Buyer"** means the buyer of any of the Delphi Global Interiors & Closures Business, the Delphi Global Bearings Business, and/or the Delphi Global Steering Business as the case may be.


ARTICLE II


Documentation and Technical Assistance

2.1    Pursuant to the mutually agreed upon timetable set forth in Schedule D, DELPHI shall furnish GM with the information and data in DELPHI's possession as of the Effective date of this Agreement relating to Wind-down Products and Footprint Products, and piece parts, subassemblies, housings, components, and elements relating thereto ("Initial IP Data") as further set forth in Schedule D. Delphi will provide one reproducible set of each of the items set forth in Schedule D, which are necessary to permit GM to manufacture and/or purchase from a supplier designated by GM, Wind-down Products and Footprint Products and such piece parts, subassemblies, housings, components, and elements and to use such Wind-down Products and Footprint Products, Delphi will provide the reproducible set of each of the items set forth in Schedule D in such format (electronic or hard copy) as such exist in Delphi's possession, or as otherwise specified in Schedule D.

3

In the event that changes are made to the products supplied to GM by DELPHI that cause the Initial IP Data to no longer be complete and/or to accurately reflect products being supplied to GM by DELPHI, DELPHI shall promptly notify GM of such changes (but in no case in later than 30 calendar days after such change) and update the Initial IP Data as necessary to reflect such changes.

Thirty days prior to the "jointly agreed" expiration of DELPHI'S obligation to supply Wind-down Products and/or Footprint Products to GM, DELPHI shall review all data previously provided to GM hereunder, and shall provide to GM any and all final updates to the data which is necessary to bring such data into conformity with the products then being supplied to GM by DELPHI.

2.2     During the term of this Agreement, DELPHI shall provide Technical Support as set forth below to ensure smooth, seamless transition to new suppliers:

(a)     DELPHI and GM agree to an acceptable "Baseline Support" and other technical assistance as provided for in Attachment E.

(b)     DELPHI shall permit GM's technically skilled personnel designated by GM (with travel and living expenses paid by GM), or the technically skilled personnel of a supplier designated by GM, to make one or more visits to the facilities of DELPHI which are engaged in the manufacture of Wind-Down Products, Footprint Products and Sale Products, as reasonably necessary in order to inspect and be instructed in engineering and manufacturing techniques and procedures relating to the information and data to be supplied to GM pursuant to this Article 2, and DELPHI shall instruct them in, and assist them in securing, the complete know-how of fabricating parts, inspecting materials and components, testing parts, and testing Wind-down Products, Footprint Products and Sale Products.

(c)     DELPHI shall furnish technical personnel to consult in GM's plants, or the plants of a supplier designated by GM, with respect to the manufacture of Wind-down Products, Footprint Products and Sale Products  pursuant to Section 2.2 (a).

(d)     GM, or a supplier designated by GM, may at any time inquire by telephone or mail to DELPHI in regard to any information or data furnished pursuant to this Article 2 and such inquiries shall be answered as promptly as reasonably possible by DELPHI.

2.3     With respect to all visits of personnel of either Party to the plants of the other Party, the following conditions shall apply:

(a) Visitors shall comply with all reasonable rules which may be deemed necessary in the discretion of the host company; and

4

(b) Each Party to this Agreement will indemnify and hold the other Party harmless from any liability, claim, or loss whatsoever:

(i) For any injury to, or death of, any of its employees or agents while such persons are present at the plant of the other Party; and

(ii) For any damage to its own property or to the property of any such employee or agent which may occur during the presence of any such person at the plant of the other Party, regardless of how such damage occurs.

2.4    DELPHI agrees that, in order for the GM and its Affiliates to realize the expected benefit provided by this Agreement, the information and data disclosed to GM and its Affiliates pursuant to this Agreement shall be free from any obligations of confidentiality, notwithstanding any legends or markings to the contrary.

### ARTICLE III

### 3.1    License Grant- Wind-down Products

3.1(a)   DELPHI grants to GM, with the right to sublicense to its Affiliates and/or designated suppliers, a perpetual, fully paid up, worldwide, non-exclusive irrevocable license under DELPHI Licensed Intellectual Property to make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute Wind-down Products and any derivatives and/or re-use/extension thereof, for GM's OE and OE-S requirements.

3.1(b)   DELPHI for itself and its Affiliates, agrees not to assert any Intellectual Property claim against GM its Affiliates, or their designated suppliers, or their customers, mediate or immediate, because of the manufacture, purchase, use, offer for sale, sale, import or export of Wind-down Products and any derivatives and/or re-use/extension thereof by GM or its Affiliates or their designated suppliers.

DELPHI grants to GM, with the right to sublicense to its Affiliates and/or designated suppliers, a perpetual, fully paid up, worldwide, non-exclusive irrevocable license under DELPHI Retained Intellectual Property to make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute Wind-down Products and any derivatives and/or re-use/extension thereof, for GM's OE and OE-S requirements, provided, however, that operation of such license shall be expressly restricted to situations where DELPHI or any Third Party raises an infringement notice or claim against either GM, its Affiliates, or their designated suppliers.

### 3.2    License Grant – Footprint Products

5

3.2(a)   DELPHI grants to GM, with the right to sublicense to its Affiliates and/or designated suppliers, a perpetual, fully paid up, worldwide, non-exclusive irrevocable license under DELPHI Licensed Intellectual Property to make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute Footprint Products and any derivatives and/or re-use/extension thereof, for GM's OE and OE-S requirements.

### 3.3   License Grant – Sale Products

3.3(a)   DELPHI represents that, with respect to DELPHI Intellectual Property required for a buyer of any business which supplies Sale Products to GM it will either transfer to or license the buyers, as part of the sale of the business, all DELPHI Sale Intellectual Property necessary to make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute Sale Products, and any derivatives and/or re-use/extension thereof, to GM and/or Affiliates, or their designated suppliers, including for GM's OE and OE-S requirements.

3.3(c)   DELPHI for itself and its Affiliates, agrees not to assert any Intellectual Property claim against GM and/or GM Affiliates, or their designated suppliers, or their customers, mediate or immediate, because of the manufacture, purchase, use, offer for sale, sale, import or export of Sale Products and any derivatives and/or re-use/extension thereof by GM or its Affiliates or their designated suppliers (except for the Exclusivity Period).

3.3(d)   DELPHI grants to GM, with the right to sublicense to its Affiliates and/or designated suppliers, a perpetual, fully paid up, worldwide, non-exclusive irrevocable license under DELPHI Sale Intellectual Property to make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute Sale Products provided by the Delphi Global Bearing Business and the Delphi Global Steering Business and any derivatives and/or re-use/extension thereof, for GM's OE and OE-S requirements that is operative in the event of one or more of the following and in the events addressed in subparagraphs (1) and (2) only with respect to the products involved in the breach and related products produced by the Buyer that are necessary to maintain GM production for the current platform and next follow-on platform and for any derivatives and/or re-use extensions on such platforms:

(1) Buyer materially defaults under or repudiates and component supply agreements or purchase orders with GM or GM Affiliates or both and does not promptly cure such breach or repudiation within a commercially reasonable period of time following written notice from GM to the buyer;

6

(2) Buyer demands financial or other accommodations from GM and/or GM Affiliates in addition to GM's obligations under the supply agreements and purchase orders in existence between GM and the Buyer, in a manner which threatens to disrupt GM production in violation of the Buyer's obligations under the then existing supply agreements and purchase orders with the Buyer, and the Buyer fails to withdraw such demand/threat to disrupt GM production in writing within in one (1) business day of receipt by Buyer of written notice from GM , which notice shall have been delivered by GM to such designee as Buyer directs, and the communication by Buyer to GM of the withdrawal of the threat to production shall be delivered by Buyer to a GM designee identified by GM in such written notice;

(3) GM assumes financial responsibility for and control of the manufacturing sites from which the applicable products are supplied to GM by the Buyer;

(4) Buyer fails to fulfill its obligations to maintain a manufacturing presence at the Sandusky, Ohio or Saginaw, Michigan site as agreed with GM. This clause to only be effective through September 15, 2015 or such dates as may be mutually agreed between GM and the Buyer.


3.3(e)  Notwithstanding Section 3.3(a), in certain cases there may be DELPHI Sale Intellectual Property, which in DELPHI'S reasonable discretion must be retained by Delphi ("**DELPHI Retained Sale Intellectual Property**"). In the event DELPHI sells the Delphi Global Interiors and Closures Business, DELPHI shall grant to the buyer of the Delphi Global Interiors and Closures Business (the "Interiors & Closures Buyer") the right to sublicense to GM and GM Affiliates a perpetual, fully paid up, worldwide, non-exclusive irrevocable license under DELPHI Retained Sale Intellectual Property to make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute all products related to the Delphi Global Interiors and Closures Business and any derivatives and/or re-use/extension thereof, for GM's OE and OE-S requirements.  In the event the Interiors & Closures Buyer and GM agree that a direct license for such DELPHI Retained Sale Intellectual Property from Delphi to GM is more appropriate, Delphi agrees to grant GM a license on the DELPHI Retained Sale Intellectual Property for all products related to the Delphi Global  Interior & Closures Business on the same terms as the Interiors Closures Buyer agrees to license GM the DELPHI Sale Intellectual Property for such products, but in no event on broader terms than the Interiors & Closures Buyer's license from Delphi with respect to the  DELPHI Retained Sale Intellectual Property .

3.3(f)  In the event that  Delphi has not reached a signed agreement with Renco Inc. regarding the purchase of the Delphi Global Interiors and Closures Business before January 2, 2008, or in the event such an agreement is reached with Renco, Inc. but expires or is terminated prior to the consummation of the sale

7

contemplated therein, then DELPHI grants to GM, with the right to sublicense to its Affiliates and/or designated suppliers, a perpetual, fully paid up, worldwide, non-exclusive irrevocable license under DELPHI Retained Sale Intellectual Property to make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute all products related to the Delphi Global Interiors and Closures Business and any derivatives and/or re-use/extension thereof, for GM's OE and OE-S requirements that is operative in the event of one or more of the following and in the events addressed in subparagraphs (1) and (2) only with respect to the products involved in the breach and related products produced by the Buyer that are necessary to maintain GM production for the current platform and next follow-on platform and for any derivatives and/or re-use extensions on such platforms:

(1) Buyer materially defaults under or repudiates and component supply agreements or purchase orders with GM or GM Affiliates or both and does not promptly cure such breach or repudiation within a commercially reasonable period of time following written notice from GM to the buyer;

(2) Buyer demands financial or other accommodations from GM and/or GM Affiliates in addition to GM's obligations under the supply agreements and purchase orders in existence between GM and the Buyer, in a manner which threatens to disrupt GM production in violation of the Buyer's obligations under the then existing supply agreements and purchase orders with the Buyer, and the Buyer fails to withdraw such demand/threat to disrupt GM production in writing within in one (1) business day of receipt by Buyer of written notice from GM , which notice shall have been delivered by GM to such designee as Buyer directs, and the communication by Buyer to GM of the withdrawal of the threat to production shall be delivered by Buyer to a GM designee identified by GM in such written notice;

(3) GM assumes financial responsibility for and control of the manufacturing sites from which the applicable products are supplied to GM by the Buyer;

(4) Buyer fails to fulfill its obligations to maintain a manufacturing presence at the Sandusky, Ohio or Saginaw, Michigan site as agreed with GM.  This clause to only be effective through September 15, 2015 or such dates as may be mutually agreed between GM and the Buyer.

3.4     The Licenses granted to GM and its Affiliates pursuant to the above Sections 3.1, 3.2 and 3.3 shall include any Intellectual Property owned or controlled by DELPHI which is created by, or acquired from Third Parties, and which is required by GM to use, the Licenses provided for in this Agreement.

3.5     The Parties will work together in good faith to make any adjustments as are necessary to reflect the Parties' intent with respect to the matters set forth in Schedules A-G to this Agreement.

8

ARTICLE IV

Compensation

4.1     Within 10 business days after the Effective Date of this Agreement, GM shall pay to DELPHI  the sum of Thirty Eight Million Five Hundred Thousand Dollars.

4.2     The payment will be made in US dollars by electronic funds transfer directly to:

> J.P. Morgan Chase & Co.
> One Chase Manhattan Plaza
> New York, New York  10081, U.S.A.
> ABA# 021000021

for credit to:

> Account Number _____.

ARTICLE V

Title and Patents

5.1     DELPHI represents and warrants that:

(a)     Except as GM has been informed in writing in Schedule G  prior to the Effective Date, it owns and has the right to transfer or license the Intellectual Property it transfers or licenses pursuant to this Agreement.

(b)     To Delphi's knowledge after reasonable due diligence, the Intellectual Property transferred or licensed pursuant to this Agreement is valid and enforceable and has not been judged invalid or unenforceable in whole or in part.

(c)     To Delphi's knowledge after reasonable due diligence and except as GM may have been otherwise informed in writing by DELPHI prior to the Effective Date, the use of the Intellectual

9

Property by GM does not infringe or misappropriate the Intellectual Property rights of any Third Party.

(d)        Except as GM may have been otherwise informed in writing by DELPHI prior to the Effective Date, no unresolved written claim that could have a material adverse effect upon GM has been asserted against DELPHI at any time preceding the Effective Date that the use of such Intellectual Property infringes the Intellectual Property rights of any third party.

5.2      To Delphi's knowledge, after reasonable due diligence, and except as set forth in Schedule G to this Agreement, DELPHI represents and warrants that the DELPHI Licensed Intellectual Property and DELPHI Sale Intellectual Property that is the subject of this Agreement, represents all Intellectual Property necessary to produce the Wind-down Products, Footprint Products and Sale Products (except for technology used under license from PBR and KDAC) provided, however, that DELPHI makes no representation or warranty that GM, its Affiliates and/or designated suppliers can successfully manufacture products using the Intellectual Property.

5.3      DELPHI agrees to reimburse GM and its Affiliates for any damages awarded against GM, its Affiliates and/or designated suppliers as the result of any final determination that DELPHI did not have the right to grant any of the licenses granted herein.

5.4      GM agrees to indemnify Delphi for costs associated with warranty, recall campaigns and/or product liability actions for Wind-down Products and Footprint Products and any derivatives and/or re-use/extension thereof produced utilizing Intellectual Property licensed to GM and GM Affiliates under this Agreement; but not supplied to GM, its Affiliates and/or designated suppliers by DELPHI or a DELPHI Affiliate. In situations where Delphi remains the Tier 1 supplier to GM of a component system which includes products produced utilizing Intellectual Property licensed under this Agreement but not produced by Delphi or a Delphi affiliate (the "Non-Delphi Products") the Parties agree to use commercially reasonable best efforts to jointly pursue recovery of any warranty costs, recall campaigns and/or product liability actions related to the "Non-Delphi Products" against the lower tier supplier who produced such Non-Delphi Products; provided, however, that in all such situations both Parties shall reserve and retain their respective rights and obligations pursuant to the underlying purchase orders between GM and Delphi for the component system. In the event the licenses granted pursuant to Section 3.3 of this Agreement become effective, the indemnity specified above shall also include Sale Products and any derivatives and/or re-use/extension thereof produced under such licenses.

10

5.5     Prior to the Effective Date of this Agreement DELPHI has entered into certain license agreements with Third Parties, as specified in Schedule F attached hereto, related to Wind down Products and Footprint Products with the expectation that the buyer will become GM's new supplier of such products.  GM agrees that it will not interfere with the license agreements specified in Schedule F but reserves the right to sub-license such licensed Third Parties, as necessary, to bridge any difference in the scope, or coverage of the Third Party license agreements for GM production where the pre-existing licensee agreements are narrower in scope of coverage than the Licenses Provided for in this Agreement.

ARTICLE VI

Miscellaneous Provisions

6.1     Neither this Agreement nor any rights or obligations of a Party hereunder may be assigned without the written consent of the other Party, and any such assignment or attempted assignment not in accordance with this Section 6.1 shall be void.

6.2     All notices and statements given under this Agreement shall be in writing and shall be deemed to have been properly given when delivered personally or sent by prepaid registered or certified mail, or by electronic transmission to the following addresses:

If given to GM:                    If given to DELPHI:

Chief Patent Counsel               Delphi Technologies, Inc
General Motors Corporation         Delphi Technologies, Inc
M/C 482-C23-D24                    5725 Delphi Drive
300 Renaissance Center             Troy, MI 48098
P.O. Box 300
Detroit, MI  48265-3000

6.3     This Agreement will be governed by and construed in accordance with the laws of the State of Michigan, USA and/or applicable United States Federal laws, without regard to its law of conflicts.

6.4   This Agreement constitutes the entire understanding between the parties with respect to the subject matter hereof; all prior agreements, drafts, representations, statements, negotiations, and undertakings are superseded hereby. No amendment to this Agreement shall be effective unless it is in writing and signed by duly authorized representatives of both parties.

6.5   The obligations and benefits of this Agreement shall immediately be binding on and accrue to GM's Affiliates.

6.6   The parties will make no public announcement of the terms and conditions of this Agreement unless both parties agree. The parties will use their best efforts to maintain confidentiality of the terms of this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed in their names by their proper officers thereunto duly authorized.

| GENERAL MOTORS CORPORATION | DELPHI CORPORATION, INC. |
|---|---|
| By: | By: |
| Title: | Title: |
| Date: | Date: |

| GENERAL MOTORS GLOBAL TECHNOLOGY OPERATIONS, INC. | DELPHI TECHNOLOGIES, INC. |
|---|---|
| By: | By: |
| Title: | Title: |
| Date: | Date: |

12

*Delphi IP License 9-6-7 Schedules rev 3.0*

SCHEDULE A

WIND-DOWN PRODUCTS

## Attachment A: Wind-down Products

### Kettering AHG – Passive Leveling & Non – Core Products

| Current Platforms - Passive Shock and Leveling Systems | | Buy Components | Make Components | Final Assemblies |
|---|---|---|---|---|
| **Rear Lift Shock Modules & Direct Ship Components** | | | | |
| GMT-201 Rear Twin-Tube Airlift Shock | | | | |
| GMT-201 Compressor & Leveling Sensor, Accessory Air Inflator | | | | |
| GMX-222 Rear Twin-Tube Airlift Shock | | | | |
| GMX-222 Compressor & Leveling Sensor | | | | |
| GMX-222 Rear Monotube Airlift Shock - Compressor & Leveling Sensor | | | | |
| GMX-272 Rear Monotube Airlift Shock - Compressor & Leveling Sensor | | | | |
| GMX-272 PV Armored Rear Twin-Tube Airlift Shock | | | | |
| GMX-272 PV Limo/Hearse Rear Monotube Shock | | | | |
| GMX-272 PV Armored Rear Compressor & Leveling Sensor | | | | |
| Past Model Service - Twin-Tube Dampers | | | | |
| Past Model Service - ELC Sensors | | | | |
| Past Model Service - Monotube Dampers and Direct Ship Components | | | | |

| | |
|---|---|
| Required - Delphi View | |
| GM Required | |
| Not required | |

## Schedule A:  Wind-down Products

### AHG Needmore Road Brake Products

| GM Truck & Car Brake Programs @ Needmore | Booster | Master Cylinder | Calipers | Drum Brakes | ABS machined body |
|---|---|---|---|---|---|
| GMX215 XLR | | | | | |
| GMX245 Corvette | | | | | |
| GMX357 Ion | | | | | |
| GMX320 CTS | | | | | |
| GMX322 CTSng | | | | | |
| GMX365/367 LaCrosse, Grand Prix | | | | | |
| GMX211/231 Impala, Monte Carlo | | | | | |
| GMT265 SRX | | | | | |
| GMT201 Uplander, Terraza, Montana, Relay | | | | | |
| GMX380/381/384 Malibu, G6, Aura | | | | | |
| GMT355 Colorado, Canyon | | | | | |
| GMX295 STS | | | | | |
| GMX211/231 V8 Impala, Monte Carlo | | | | | |
| GMT360 Trailblazer, Envoy, Ranier, Ascender, 9-7x | | | | | |
| GMT368 SSR | | | | | |
| GMX367P Grand Prix GXP | | | | | |
| GMT800/900 Silverado, Sierra, Avalanche, Escalade, Escalade EXT, Escalade ESV, Suburban, Yukon, Yukon XL, Tahoe, Suburban - 1500 Series | | | | | |
| GMT800/900 Silverado, Sierra, Avalanche, Escalade, Escalade EXT, Escalade ESV, Suburban, Yukon, Yukon XL, Tahoe, Suburban - 2500 Series +3500 Series | Changed Hydroboost | | | | |
| H2 Master Cylinder(?) | Changed Hydroboost | | | | |
| GMX001 Colbalt, Pursuit, G4, G5 | | | | | |
| GMX222/272 Lucerne, DTS | | | | | |
| GMT610 Express, Savana - Light Duty | Changed Hydroboost | | | | |
| GMT610 Express, Savana - Heavy Duty | Changed Hydroboost | | | | |
| GMT560 C-series, T-series | | | | | |
| Past Model Service | | | | | |

| | |
|---|---|
| **IP Legend** | |
| Required - Delphi View | |
| GM Required | |
| Not required | |

1

*Delphi IP License 9-6-7 Schedules rev 3.0*

SCHEDULE B

## AHG Kettering
## Passive Damper Products

| Applications - Passive Strut Dampers | Buy Components | Make Components | Final Assemblies |
|---|---|---|---|
| **Strut Modules** | | | |
| GMX-001 Front Strut Module | | | |
| GMT-001 Front Strut Module | | | |
| GMX-211 Front Strut Module | | | |
| GMX-365 Front Strut Module | | | |
| GMX-222 Front Strut Module | | | |
| GMX-272 Front Strut Module | | | |
| GMX-272 PV Front Strut Module | | | |
| GMX-386 Front Strut Module | | | |
| GMX-381 Front Strut Module | | | |
| GMX-384 Front Strut Module | | | |
| | | | |
| **Struts** | | | |
| GMX-211 Rear Strut | | | |
| GMX-365 Rear Strut | | | |
| Past Model Service - Struts | | | |
| Past Model Service - Direct Buy Module Parts | | | |

IP Legend

| | |
|---|---|
| Required Delphi View | |
| GM Required | |
| Not required | |

## AHG Saginaw Chassis
## GM Truck Brake Programs

| GM Truck Brake Programs @ Saginaw | Corner Asy. | Rotor | Knuckle | Drum | Bearing |
|---|---|---|---|---|---|
| | | | | | |
| **GMT 001 HHR Front** | | | | | Changed |
| **GMT201 Uplander, Relay, Terraza, Montana Front and Rear Disc, Incl SGM rear disc** | | | | | |
| **GMT265 SRX Front** | | | | | |
| **GMT330 Brazil export Front** | | | | | |
| **GMT355 Colorado, Canyon Front** | | | | | |
| **GMT360 – Truck (Envoy, Trailblazer) Front** | | | | | |
| **GMT610 Van & MCE (Express, Savanna) Light Duty Front** | | | | | |
| **GMT610 Van & MCE (Express, Savanna) Heavy Duty Front** | | | | | |
| **GMT800 - 900 PU (Sierra, Silverado) – 1500 series Front** | | | Castings Only from Current 1 of 2 supplier | | |
| **GMT800 - 900 PU (Sierra, Silverado) – 2500/3500 Front** | | | | | |
| **GMT 800 – 900 SUV (Suburban, Tahoe, Yukon, Escalade, Avalanche) - 1500 Series Front** | | | Castings Only from Current 1 of 2 supplier | | |
| **GMT 800 – 900 SUV (Suburban, Tahoe, Yukon, Escalade, Avalanche) - 2500 Series Front** | | | | | |
| **H2 – SUV (Hummer) Front** | | | | | |
| **Past Model Service** | | | | | |

IP Legend

| | |
|---|---|
| Required - Delphi View | |
| Not required | |
| GM Required | |
| Sold with Sandusky Opns | |

*Delphi IP License 9-6-7 Schedules rev 3.0*

### SCHEDULE B

## AHG Saginaw Chassis
## GM Car Brake Programs



| GM Car Brake Programs @ Saginaw | Corner Asy. | Rotor | Knuckle | Drum | Rear Axle - Moved from Oshawa | Bearing |
|---|---|---|---|---|---|---|
| GMX001 – Cobalt Front | | | | | | |
| GMX 020/023 Solstice/Sky Front | | | | | | |
| GMX 211/231/365/367 (Impala, Monte Carlo, LaCrosse, Grand Prix) Front and Rear Corners | | | | | | |
| GMX 222/272 Lucerne/DTS (G) Front Corner and Rear Disc | | | | | | |
| GMX-295 STS/STS-V Front | | | | | | |
| GMX320 CTS/CTS-V Front | | | | | | |
| GMX 357 Saturn Ion Front | | | | | | |
| GMX 380/381/384/386 - Epsilon Front and Rear Corners | | | | | | |
| K - Limo Front Rotor | | | | | | |
| Past Model Service | | | | | | |

IP Legend
Required - Delphi View
Not Required
GM Required
Sold with Sandusky Opns

## AHG Saltillo Chassis
## Brake Products

| GM Brake & Module Programs @ Saltillo | Brake Corner Asy. | Vertical Module | Booster | Master Cylinder | Calipers | Machined Drums | Rotor | Knuckle |
|---|---|---|---|---|---|---|---|---|
| GMT800 & 900 Silverado, Sierra,, Avalanche, Escalade, Escalade ESV, Escalade EXT, Suburban, Tahoe, Yukon, Yukon XL LD Front Corner, Rear Disc, Rear Drum | | | | | | | | |
| Hummer H2 | | | | | | | | |
| GMT001 HHR Front Knuckle, Front Rotor, Drum | | | | | | | | |
| GMT257 Rendezvous | | | | | | | | |
| S4200 | | | | | | | | |
| GMT610 Express, Savana | | | | | | | | |
| GMT265 SRX Rear Rotor | | | | | | | | |
| GMX295  STS Rear Rotor | | | | | | | | |
| K - Limo | | | | | | | | |
| GMT201 Uplander, Terraza, Montana, Relay AWD | | | | | | | | |
| Past Model Service | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

IP Legend
Required - Delphi View
GM - Required
Not required

*Delphi IP License 9-6-7 Schedules rev 3.0*

### SCHEDULE B

## AHG Oshawa, Chassis
## Brakes & Related Products

| GM Brake & Module Programs @ Oshawa | Rear Axle Module | Brake Corner Asy. | Control Arms |
|---|---|---|---|
|  |  |  |  |
| GMX 211/231 Front and Rear | See Saginaw Cars | See Saginaw Cars |  |
| GMX 365/367 Rear Axle | See Saginaw Cars |  |  |
| GMT 900 |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  | IP Legend |  |  |
|  | Required - Delphi View |  |  |
|  | GM Required |  |  |
|  | Not required |  |  |

## AHG Spring Hill LOC
## Brake Products

|  | Brake Corner Asy. | Vertical Chassis Module |
|---|---|---|
| GM Brake & Chassis Module Programs @ Spring Hill |  |  |
|  |  |  |
| GMT315 Vue |  |  |
| GMX357 Ion |  |  |
| GMT355 Canyon, Colorado |  |  |
| GMX001 Cobalt, Pursuit, G4, G5 | See Saginaw Cars |  |
| GMT001 HHR | See Saginaw Cars |  |
| Past Model Service |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  | IP Legend |  |
|  | Required - Delphi View |  |
|  | GM Required |  |
|  | Not required |  |

*Delphi IP License 9-6-7 Schedules rev 3.0*

## SCHEDULE B

| GMNA & SGM Car Brake Programs @ Shanghai | Corner | Rotor | Booster | Master Cylinder | Drum Brake |
|---|---|---|---|---|---|
| GMT 001 Drum Brakes | | | | | ■ |
| GMT 900 Drum Brakes | | | | | ■ |
| J200 | ■ | ■ | | | |
| SGM 18 | ■ | ■ | ■ | ■ | |
| SGM 201 | ■ | ■ | ■ | ■ | |
| SGM 980 | ■ | ■ | ■ | ■ | |
| IP Legend | | | | | |
| Required - Delphi View | | | | | |
| Not Required | | | | | |
| GM Required | | | | | ■ |

5

SCHEDULE C

FOOTPRINT FACILITIES

- Saginaw E&C
- Dayton/Kettering
- Saltillo
- Oshawa
- Spring Hill
- Flint East
- Needmore Road

*Delphi IP License 9-6-7 Schedules rev 3.0*

SCHEDULE D

## KNOW-HOW – IP Agreement Elements

**Production Programs & Current Service**

1. Bills of Material

2. Assembly drawings and detail drawings of components (whether originated at Delphi or suppliers)
   - Includes casting and machining drawings. .
   - GM requires this to include GDT and KPC's. (on the print)
   - Material specifications Delphi will provide a hard copy of the materials spec if a Delphi spec is used.

3. Information relating to the detailed design, development, manufacture and testing of components, including ADVP&R results and detailed drawings of text fixtures
   - Includes delivery of the complete ADVP&R package supporting current designs of licensed products.  It is understood Delphi will provide the right to review other Delphi data relating to prior designs based on bona-fide business need by GM.
   - GM agrees the summary portion of the test reports is sufficient.  Delphi will provide a list of equivalent procedures used to compare with what GM uses.  Delphi to provide a linkage document to compare the GMUTS and Delphi procedures. Any variations will be called out.  "GMUTS are to be considered product specs and the DCT will be the method to prove conformance to the spec" per a reliability letter issued in November 2006.
   - GM requires signed ADVPR test plan, description of test set up, copy of and right to use test fixture detailed drawings, and all signed test reports associated with ADVPR.  GM needs the test reports summary for all components.

4. 3D Models

5. Delphi design specifications, test load requirements and customer sanctioned deviations to the GM standards, impacting licensed designs (e.g. Test set ups, performance, material and heat treat requirements, and final assembly specifications)

6. CAE analysis, techniques & interpretation (FEA – final reports)  - supporting the current design
   - GM needs load information, results and final reports.  Delphi will resend any existing FEA results and results that were provided initially.  CAE models will not be provided by Delphi.  Load information is on the print. Agreement to provide final component mesh models Knuckles, (Delta front, Epsilon front and rear, W Car Front and rear, Buick and Cadillac "Quads" fronts

7. Packaging studies (design stack sheet)

7

8. Component optimization
   - Defined as the load tables used to create product design and thermal analysis studies identified in the ADPV&R package
   - Load information is on the print.

9. DFMEA
   - Delphi DFEMA documents to be provided on a Delphi GM confidential basis (all documents stamped – Delphi GM confidential) parties agree to stamp these Delphi – GM confidential – GM agrees not to share this material with other suppliers

10. PPAP Documents
   - Design Record
   - Authorized Engineering Change documents
   - Design Failure Mode and Effects Analysis (Design FMEA)  -see #9
   - Process Flow Diagram(s)
   - Process Failure Mode and Effects Analysis (Process FMEA)
   - Control Plan
   - Measurement System Analysis Studies
   - Dimensional Results
   - Records of Material/Performance Test Results
   - Initial Process Studies
   - Qualified Laboratory Documentation
   - Warrants
   - Lab Reports
   - Delphi to keep the master files on site – GM and Delphi agree to archive the materials "in place" – files for the transitional sites to retain Delphi PPAP files – Delphi to designate archive locations

11. Manufacturing Documents
   - Receiving inspections requirements
   - Traceability System Specifications and data  (ie. Torque, etc.)
   - Error Proofing plan
   - Work instructions and special care items.- Delphi will transfer all operations or manage sale of equipment in a non-disruptive manner with all documentation – Point of discussion understood.  Delphi to coordinate information transfer based on NewCo asset sales agreements

12. Supplier Names and Addresses
   - Full access and ability to purchase parts from current supply base.

Parties agree to work together to support delivery of the IP elements within 14 calendar days for GM defined critical programs and 60 calendar days for the balance of the programs.

## Service

Delphi agrees to provide items 1, 2 & 12 for all parts and other documentation for items 3-10 as required on a best efforts basis under agreements with GMSPO for products listed below:

| Location | Customer Part Number | Delphi Part Number | Part Description | Product Type |
|---|---|---|---|---|
| Adrian | 12548022 | 12548022 | PANEL ASM,INSTRUMENT | IP |
| Adrian | 14057320 | | PANEL-SI F/D TR-RH*CHARC | Door Trim |
| Adrian | 6264137 | 6264137 | SHROUD-RAD FAN | Fan Shroud |
| Adrian | 15973615 | 15973615 | SHROUD-RAD FAN UPR | Fan Shroud |
| Adrian | 3889079 | 03889079 | SHROUD | Fan Shroud |
| Adrian | 3901443 | 03901443 | SHROUD | Fan Shroud |
| Adrian | 3973910 | 03973910 | SHROUD | Fan Shroud |
| Adrian | 3973912 | 03973912 | SHROUD   D FAN | Fan Shroud |
| Adrian | 15560555 | 15560555 | SHROUD-RAD FAN UPR | Fan Shroud |
| Adrian | 15560556 | 15560556 | SHROUD-RAD FAN LWR | Fan Shroud |
| Adrian | 15772404 | 15772404 | PANEL | IP |
| Adrian | 15956446 | 15956446 | BEZEL ASM-I/P CSTR TR PL | IP |
| Adrian | 10139548 | 10139548 | PANEL-FRT W/H - RH | Misc |
| Adrian | 10231873 | 10231873 | PANEL-FRT W/H UPR | Misc |
| Adrian | 10231874 | 10231874 | PANEL-FRT W/H UPR | Misc |
| Adrian | 14009835 | 14009835 | CAP ASM-HUB | Misc |
| Adrian | 14064291 | | SKIRT   W/H | Misc |
| Adrian | 14073768 | 14073768 | COVER   NS CONVER | Misc |
| Adrian | 14089301 | 14089301 | PANEL RAD UPR MT | Misc |
| Adrian | 15743587 | | MOLDING ASM-W/S SI GARN | Misc |
| Adrian | 465471 | 00465471 | UNDERPAN | Misc |
| Adrian | 14091903 | 14091903 | COVER | Misc |
| Adrian | 15044152 | 15044152 | PANEL ASM-L/GATE TR FIN | Misc |
| Adrian | 15044153 | 15044153 | PANEL ASM-L/GATE TR FIN | Misc |
| Adrian | 15047421 | 15047421 | PANEL ASM | Misc |
| Columbus | 15709797 | | ? | ? |
| Columbus | 15709798 | | ? | ? |
| Columbus | 16636122 | | ? | ? |
| Columbus | 16640915 | | ? | ? |
| Columbus | 16625874 | 16625874 | CHANNEL ASM-FRT S/ | Other-Bus Run Channel |
| Columbus | 16625875 | 16625875 | CHANNEL A | Other-Bus Run Channel |
| Columbus | 25643911 | 25643911 | CHANNEL ASM-FRT S/D WDO | Other-Bus Run Channel |
| Columbus | 25643917 | 25643917 | CHANNEL ASM-FRT S/D WDO | Other-Bus Run Channel |
| Columbus | 15588469 | 15588469-SR | CHNL | Other-Bus Run Channel |
| Columbus | 15588470 | 15588470-SR | CHNL   SM-FRT S/ | Other-Bus Run Channel |
| Columbus | 3547833 | 03547833 | MLDG F/WDFRT S/D W | Other-Door Trim |
| Columbus | 3547834 | 03547834 | MLDG F/SDFRT S/D W | Other-Door Trim |
| Columbus | 3547838 | 03547838 | MLDG R/SDRR S/D WD | Other-Door Trim |
| Columbus | 8775869 | 8775869 | MLDG | Other-Door Trim |

| Columbus | 8775872 | 08775872 | MOLD RH | Other-Door Trim |
|----------|---------|----------|---------|-----------------|
| Columbus | 8775873 | 08775873 | MOLD LH  DO SI RVL | Other-Door Trim |
| Columbus | 20364064 | 20364064 | MOULDING | Other-Door Trim |
| Columbus | 20364065 | 20364065 | MLDG | Other-Door Trim |
| Columbus | 88890455 | 88890455 | MOLDING ASM,FRT S/D WDO | Other-Door Trim |
| Columbus | 88890456 | 88890456 | MOLDING ASM,FRT S/D WDO | Other-Door Trim |
| Columbus | 88890457 | 88890457 | MOLDING ASM,RR S/D WDO B | Other-Door Trim |
| Columbus | 88890458 | 88890458 | MOLDING ASM,RR S/D WDO B | Other-Door Trim |
| Columbus | 16618542 | 16618542 | MLDG-RR | Other-Door Trim |
| Columbus | 16618543 | 16618543 | MOLDING RR | Other-Door Trim |
| Columbus | 16637392 | 16637392 | MLDG-F/FR | Other-Door Trim |
| Columbus | 16637393 | 16637393 | MLDG-F/FR | Other-Door Trim |
| Columbus | 16625914 | 16625914 | SUPPORT AS | Other-Misc |
| Columbus | 20432548 | 20432548 | WASHER-FLAT STEEL | Other-Misc |
| Columbus | 20009550 | 20009550 | PLATE | Other-Misc |
| Findlay | 10428509 | 10428509 | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10446596 | 10446596 | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10446597 | 10446597 | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10449023 | 10449023 | TRIM ASM-RR S/D | Direct Ship - Exit |
| Findlay | 10449025 | 10449025 | TRIM ASM-RR S/D | Direct Ship - Exit |
| Findlay | 10449028 | 10449028 | TRIM ASM-RR S/D | Direct Ship - Exit |
| Findlay | 10230461 | 10230461 | BEZEL-FRT S/D I/S | Direct Ship - Exit |
| Findlay | 10230462 | 10230462 | BEZEL-FRT S/D I/S | Direct Ship - Exit |
| Findlay | 10288484 | 10288484 | BEZEL-FRT | Direct Ship - Exit |
| Findlay | 10428482 | | TRIM ASM-RR S/D | Direct Ship - Exit |
| Findlay | 10428483 | | TRIM ASM-RR S/D | Direct Ship - Exit |
| Findlay | 10428549 | | SEAT ASM-PASS | Direct Ship - Exit |
| Findlay | 10428472 | 10428472 | TRIM | Direct Ship - Exit |
| Findlay | 10414680 | 10414680 | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10416661 | 10416661 | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10410253 | 10410253 | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10410254 | 10410254 | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10288485 | 10288485 | BEZEL-FRT S/D I/S HDL | Direct Ship - Exit |
| Findlay | 10413475 | 10413475 | BEZEL-FRT S/D I/S HDL | Direct Ship - Exit |
| Findlay | 10413476 | 10413476 | BEZEL HDL | Direct Ship - Exit |
| Findlay | 12458753 | 12458753 | TRIM ASM,FRT S/D | Direct Ship - Exit |
| Findlay | 12458754 | 12458754 | TRIM ASM,FRT S/D | Direct Ship - Exit |
| Findlay | 12458755 | 12458755 | TRIM ASM,FRT S/D | Direct Ship - Exit |
| Findlay | 12458756 | 12458756 | TRIM ASM,FRT S/D | Direct Ship - Exit |
| Findlay | 12458762 | 12458762 | TRIM ASM,FRT S/D | Direct Ship - Exit |
| Findlay | 12458763 | 12458763 | TRIM ASM,FRT S/D | Direct Ship - Exit |
| Findlay | 12458764 | 12458764 | TRIM ASM,FRT S/D | Direct Ship - Exit |
| Findlay | 88896045 | 88896045 | TRIM ASM,FRT S/D | Direct Ship - Exit |
| Findlay | 10410167 | 10410167 | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10410168 | 10410168 | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 16671364 | 16671364 | PKT ASM-FRT S/D MAP | Direct Ship - Exit |
| Findlay | 16671365 | 16671365 | PKT ASM-FRT S/D MAP | Direct Ship - Exit |
| Findlay | 10416660 | 10416660 | TRIM ASM-FRT S/D | Direct Ship - Exit |

| Findlay | 12514143 | | TRIM ASM,F | Direct Ship - Exit |
|---|---|---|---|---|
| Findlay | 10414678 | | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10414679 | | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 22603155 | 22603155 | TRIM | Direct Ship - Exit |
| Findlay | 22603168 | | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 22603981 | | TRIM ASM | Direct Ship - Exit |
| Findlay | 16638548 | | PKT-FRT S/D MAP | Direct Ship - Exit |
| Findlay | 16638549 | | PKT-FRT S/D MAP | Direct Ship - Exit |
| Findlay | 16651990 | 16651990 | PKT-FRT S/D MAP | Direct Ship - Exit |
| Findlay | 16651991 | 16651991 | POCKET AS/D MAP | Direct Ship - Exit |
| Findlay | 12458765 | | TRIM ASM,FRT S/D | Direct Ship - Exit |
| Findlay | 12458766 | | TRIM ASM,FRT S/D | Direct Ship - Exit |
| Findlay | 12523764 | | TRIM ASM,FRT S/D      * | Direct Ship - Exit |
| Findlay | 12533915 | 12533915 | TRIM ASM,FRT S/D | Direct Ship - Exit |
| Findlay | 12533916 | 12533916 | TRIM ASM,FRT S/D | Direct Ship - Exit |
| Findlay | 12533918 | 12533918 | TRIM ASM,FRT S/D | Direct Ship - Exit |
| Findlay | 12533922 | 12533922 | TRIM ASM,FRT S/D | Direct Ship - Exit |
| Findlay | 12535000 | | TRIM ASM,FRT S/D | Direct Ship - Exit |
| Findlay | 10414676 | 10414676 | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10414677 | | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10421373 | 10421373 | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10421400 | 10421400 | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10410190 | 10410190 | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10410191 | 10410191 | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10410206 | 10410206 | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10410207 | 10410207 | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10289159 | | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10289160 | | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10290195 | 10290195 | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10290196 | 10290196 | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10297791 | | TRIM ASM-FRT S/D-RH | Direct Ship - Exit |
| Findlay | 10281947 | | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10281948 | | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10281951 | | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10281952 | | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10281965 | | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10281966 | | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10281967 | | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10281968 | | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10281989 | 10281989 | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Findlay | 10288457 | | TRIM ASM-FRT S/D | Direct Ship - Exit |
| Harrison Twp | 15172894 | | PANEL ASM-FRT S/D TR | Direct Ship - Exit |
| Harrison Twp | 15757917 | | PANEL ASM-RR S/D TR | Direct Ship - Exit |
| Harrison Twp | 15711661 | 15711661 | PANEL ASM | Direct Ship - Exit |
| Harrison Twp | 15711662 | 15711662 | PANEL ASM- | Direct Ship - Exit |
| Juarez | | 10456115 | ABS Wheel Sensors | |
| Juarez | | 10456116 | ABS Wheel Sensors | |
| Juarez | | 10456535 | ABS Wheel Sensors | |

| Juarez | | 10457129 | ABS Wheel Sensors | |
|--------|--|----------|-------------------|--|
| Juarez | | 15715339 | ABS Wheel Sensors | |
| Juarez | | 15715340 | ABS Wheel Sensors | |
| Juarez | | 15715342 | ABS Wheel Sensors | |
| Juarez | | 15999173 | ABS Wheel Sensors | |
| Juarez | | 15999176 | ABS Wheel Sensors | |
| Kettering | 3798007 | 3798007 | Misc Components | |
| Kettering | 10382250 | 22230857 | Buy Direct | |
| Kettering | 11518989 | 22400492 | Buy Direct | |
| Kettering | 15207586 | 22400581 | Buy Direct | |
| Kettering | 15211372 | 22400895 | Recent Model SPO Service to Continue in Kettering | |
| Kettering | 15220434 | 22400897 | Recent Model SPO Service to Continue in Kettering | |
| Kettering | 15231865 | 22228875 | Saturn Parts | |
| Kettering | 15231866 | 22228874 | Saturn Parts | |
| Kettering | 15247245 | 22228896 | Recent Model SPO Service to Continue in Kettering | |
| Kettering | 15247246 | 22228897 | Recent Model SPO Service to Continue in Kettering | |
| Kettering | 15269823 | 22235280 | Buy Direct | |
| Kettering | 15829670 | 22227766 | Recent Model SPO Service to Continue in Kettering | |
| Kettering | 15864982 | 22227812 | Recent Model SPO Service to Continue in Kettering | |
| Kettering | 15864983 | 22227813 | Recent Model SPO Service to Continue in Kettering | |
| Kettering | 15864988 | 22227810 | Recent Model SPO Service to Continue in Kettering | |
| Kettering | 15864989 | 22227811 | Recent Model SPO Service to Continue in Kettering | |
| Kettering | 19149151 | 22239159 | Dampers | |
| Kettering | 21012456 | 22400559 | Buy Direct | |
| Kettering | 21013408 | 22400310 | Buy Direct | |
| Kettering | 21013409 | 22400311 | Buy Direct | |
| Kettering | 21992520 | 22400582 | Buy Direct | |
| Kettering | 22011964 | 22011964 | Dampers | |
| Kettering | 22016994 | 22016994 | EAD's | |
| Kettering | 22040870 | 22040870 | Buy Direct | |
| Kettering | 22063945 | 22063945 | Buy Direct | |
| Kettering | 22064594 | 22064594 | CVRTDS | |
| Kettering | 22064595 | 22064595 | CVRTDS | |
| Kettering | 22064596 | 22064596 | CVRTDS | |
| Kettering | 22064723 | 22064723 | Dampers | |
| Kettering | 22064724 | 22064724 | Dampers | |
| Kettering | 22064725 | 22064725 | CVRTDS | |
| Kettering | 22064726 | 22064726 | CVRTDS | |
| Kettering | 22064727 | 22064727 | CVRTDS | |
| Kettering | 22064728 | 22064728 | CVRTDS | |
| Kettering | 22064729 | 22064729 | CVRTDS | |

13

| Kettering | 22064765 | 22064765 | CVRTDS | |
|-----------|----------|----------|--------|--|
| Kettering | 22064766 | 22064766 | CVRTDS | |
| Kettering | 22064782 | 22064782 | CVRTDS | |
| Kettering | 22064783 | 22064783 | CVRTDS | |
| Kettering | 22064786 | 22064786 | Dampers | |
| Kettering | 22064787 | 22064787 | Dampers | |
| Kettering | 22064790 | 22064790 | Recent Model SPO Service to Continue in Kettering | |
| Kettering | 22064825 | 22064825 | CVRTDS | |
| Kettering | 22064826 | 22064826 | CVRTDS | |
| Kettering | 22064827 | 22064827 | CVRTDS | |
| Kettering | 22064828 | 22064828 | CVRTDS | |
| Kettering | 22064872 | 22064872 | CVRTDS | |
| Kettering | 22064873 | 22064873 | CVRTDS | |
| Kettering | 22081907 | 22081907 | EAD's | |
| Kettering | 22081908 | 22081908 | EAD's | |
| Kettering | 22091494 | 22091494 | EAD's | |
| Kettering | 22091495 | 22091495 | EAD's | |
| Kettering | 22105973 | 22105973 | EAD's | |
| Kettering | 22105975 | 22105975 | EAD's | |
| Kettering | 22126143 | 22126143 | Height Sensors | |
| Kettering | 22126145 | 22126145 | Buy Direct | |
| Kettering | 22136741 | 22136741 | EAD's | |
| Kettering | 22136742 | 22136742 | EAD's | |
| Kettering | 22136750 | 22136750 | EAD's | |
| Kettering | 22136751 | 22136751 | EAD's | |
| Kettering | 22136754 | 22136754 | EAD's | |
| Kettering | 22149575 | 22149575 | EAD's | |
| Kettering | 22149576 | 22149576 | EAD's | |
| Kettering | 22149577 | 22149577 | EAD's | |
| Kettering | 22149823 | 22149823 | EAD's | |
| Kettering | 22150403 | 22150403 | EAD's | |
| Kettering | 22152387 | 22152387 | Misc Components | |
| Kettering | 22153355 | 22153355 | Height Sensors | |
| Kettering | 22153656 | 22153656 | Height Sensors | |
| Kettering | 22153657 | 22153657 | Buy Direct | |
| Kettering | 22171356 | 22171356 | Buy Direct | |
| Kettering | 22175784 | 22175784 | Height Sensors | |
| Kettering | 22176332 | 22176332 | Height Sensors | |
| Kettering | 22177042 | 22177042 | EAD's | |
| Kettering | 22182407 | 22182407 | Buy Direct | |
| Kettering | 22189430 | 22189430 | Height Sensors | |
| Kettering | 22678795 | 22189796 | Height Sensors | |
| Kettering | 22189817 | 22189817 | Buy Direct | |
| Kettering | 22189819 | 22189819 | Height Sensors | |
| Kettering | 22400007 | 22400007 | Dampers | |
| Kettering | 22400008 | 22400008 | Dampers | |
| Kettering | 22672549 | 22400422 | Buy Direct | |
| Kettering | 22672552 | 22400427 | Buy Direct | |

14

| Kettering | 22687763 | 22400572 | Buy Direct | |
|-----------|----------|----------|------------|--|
| Kettering | 22687764 | 22400573 | Buy Direct | |
| Kettering | 22687774 | 22400577 | Buy Direct | |
| Kettering | 22687775 | 22400578 | Buy Direct | |
| Kettering | 22687776 | 22400579 | Buy Direct | |
| Kettering | 22687779 | 22400583 | Buy Direct | |
| Kettering | 22687780 | 22400584 | Buy Direct | |
| Kettering | 22695255 | 22400478 | Saturn Parts | |
| Kettering | 22695953 | 22400580 | Buy Direct | |
| Kettering | 22698911 | 22400564 | Saturn Parts | |
| Kettering | 22698912 | 22400565 | Saturn Parts | |
| Kettering | 22698913 | 22400566 | Saturn Parts | |
| Kettering | 22698914 | 22400567 | Saturn Parts | |
| Kettering | 22706316 | 22400558 | Buy Direct | |
| Kettering | 22707164 | 22400571 | Recent Model Saturn Service to Continue in Kettering | |
| Kettering | 22707165 | 22400570 | Recent Model Saturn Service to Continue in Kettering | |
| Kettering | 22707166 | 22400569 | Recent Model Saturn Service to Continue in Kettering | |
| Kettering | 22707167 | 22400568 | Recent Model Saturn Service to Continue in Kettering | |
| Kettering | 22708796 | 22064883 | Saturn Parts | |
| Kettering | 22711675 | 22064885 | Saturn Parts | |
| Kettering | 22720109 | 22400886 | Saturn Parts | |
| Kettering | 22721046 | 22400912 | Buy Direct | |
| Kettering | 22721253 | 22400909 | Buy Direct | |
| Kettering | 22725424 | 22400888 | Saturn Parts | |
| Kettering | 22725425 | 22400889 | Saturn Parts | |
| Kettering | 88955410 | 22400548 | Dampers | |
| Kettering | 88955411 | 22400549 | Dampers | |
| Kettering | 88955412 | 22400550 | Dampers | |
| Kettering | 88955413 | 22400551 | Dampers | |
| Kettering | 88964336 | 22227387 | Buy Direct | |
| Kettering | 88964541 | 22228008 | Dampers | |
| Kettering | 88964542 | 22228009 | Dampers | |
| Kettering | 88965457 | 22228001 | Dampers | |
| Kettering | 88965468 | 22228911 | Recent Model SPO Service to Continue in Kettering | |
| Kettering | 88965469 | 22228912 | Recent Model SPO Service to Continue in Kettering | |
| Kettering | 89047628 | 22400619 | Knuckle Struts | |
| Kettering | 89047629 | 22400620 | Knuckle Struts | |
| Kettering | 89047630 | 22400621 | Knuckle Struts | |
| Kettering | 89047631 | 22400622 | Knuckle Struts | |
| Needmore | 00357889 | 00357889 | LEVER ASM-BRK SHOE AUTO ADJ | |
| Needmore | 00357890 | 00357890 | LEVER ASM-BRK SHOE AUTO ADJ | |
| Needmore | 15154261 | 15154261 | LEVER ASM-PARKING BRAKE | |
| Needmore | 15154262 | 15154262 | LEVER ASM-PARKING BRAKE | |
| Needmore | 18010570 | 18010570 | KIT-RESERVOIR & GROMMET | |

*Delphi IP License 9-6-7 Schedules rev 3.0*

| Needmore | 18010585 | 18010585 | KIT-RESERVOIR & GROMMET | |
|----------|----------|----------|--------------------------|--|
| Needmore | 18012303 | 18012303 | KIT-WHEEL CYL | |
| Needmore | 18013180 | 18013180 | BACK PLT ASM-RR, 254 DIA X 57 | |
| Needmore | 18013181 | 18013181 | BACK PLT ASM-RR, 254 DIA X 57 | |
| Needmore | 18013433 | 18013433 | KIT-M/CYL ASM | |
| Needmore | 18013440 | 18013440 | KIT-M/CYL ASM | |
| Needmore | 18014164 | 18014164 | BACKING PLATE ASM-RR, 200 DIA X 45 | |
| Needmore | 18014165 | 18014165 | BACKING PLATE ASM-RR, 200 DIA X 45 | |
| Needmore | 18014328 | 18014328 | KIT-RESERVOIR & GROMMET | |
| Needmore | 18015427 | 18015427 | CALIPER ASM-FRT DISC BRK 74.6 DIA | |
| Needmore | 18015428 | 18015428 | CALIPER ASM-FRT DISC BRK 74.6 DIA | |
| Needmore | 18017412 | 18017412 | KIT-RESERVOIR & GROMMET | |
| Needmore | 18018626 | 18018626 | KIT-M/CYL RESERVOIR | |
| Needmore | 18020021 | 18020021 | KIT-RESERVOIR & GROMMET, M/CYL | |
| Needmore | 18021217 | 18021217 | KIT-MASTER CYLINDER | |
| Needmore | 18021940 | 18021940 | KIT-M/CYL ASM | |
| Needmore | 18022006 | 18022006 | KIT-M/CYL ASM | |
| Needmore | 18022582 | 18022582 | BACKING PLATE & SHIELD ASM - RR | |
| Needmore | 18022583 | 18022583 | BACKING PLATE & SHIELD ASM - RR | |
| Needmore | 18023114 | 18023114 | BACKING PLATE & SHIELD ASM, RR | |
| Needmore | 18023115 | 18023115 | BACKING PLATE & SHIELD ASM, RR | |
| Needmore | 18023761 | 18023761 | MASTER CYLINDER ASM KIT | |
| Needmore | 18023763 | 18023763 | MASTER CYLINDER RESERVOIR KIT | |
| Needmore | 18023764 | 18023764 | MASTER CYLINDER ASM KIT | |
| Needmore | 18023771 | 18023771 | KIT-PROPORTIONER VALVE ASM | |
| Needmore | 18024593 | 18024593 | BOOSTER ASM-FINAL, 240T | |
| Needmore | 18025172 | 18025172 | BACKING PLATE ASM-RR 225 DIA X 45 | |
| Needmore | 18025173 | 18025173 | BACKING PLATE ASM-RR 225 DIA X 45 | |
| Needmore | 18025180 | 18025180 | BACKING PLATE ASM-RR 225 DIA X 45 | |
| Needmore | 18025181 | 18025181 | BACKING PLATE ASM-RR 225 DIA X 45 | |
| Needmore | 18025197 | 18025197 | BACKING PLATE ASM-RR 225 DIA X 45 | |
| Needmore | 18025198 | 18025198 | BACKING PLATE ASM-RR 225 DIA X 45 | |
| Needmore | 18025205 | 18025205 | BACKING PLATE ASM-RR 225 DIA X 45 | |
| Needmore | 18025206 | 18025206 | BACKING PLATE ASM-RR 225 DIA X 45 | |
| Needmore | 18026033 | 18026033 | BOOSTER ASM,P/B | |
| Needmore | 18026149 | 18026149 | KIT-CALIPER ASM,RR,LH | |
| Needmore | 18026150 | 18026150 | KIT-CALIPER ASM,48.0 DIA,RR,RH | |
| Needmore | 18026154 | 18026154 | KIT-PISTON,CALIPER,48.0 DIA | |
| Needmore | 18026155 | 18026155 | KIT-BRACKET,MOUNTING,CALIPER | |
| Needmore | 18026162 | 18026162 | KIT-PISTON,CALIPER | |
| Needmore | 18026163 | 18026163 | KIT-BRACKET,MOUNTING,CALIPER | |
| Needmore | 18026208 | 18026208 | KIT-CALIPER ASM,FRT,LH,60.0 DIA | |
| Needmore | 18026209 | 18026209 | KIT-CALIPER ASM,FRT,RH,60.0 DIA | |
| Needmore | 18026215 | 18026215 | KIT-PISTON,CALIPER DIA | |
| Needmore | 18026268 | 18026268 | KIT-CALIPER ASM,RR,LH,38.0 DIA | |
| Needmore | 18026269 | 18026269 | KIT-CALIPER ASM,RR,RH,38.0 DIA | |
| Needmore | 18026271 | 18026271 | KIT-PISTON,CALIPER, 38.0 DIA | |
| Needmore | 18026272 | 18026272 | KIT-MOUNTING BRACKET,CALIPER,RR | |

Delphi IP License 9-6-7 Schedules rev 3.0

| Needmore | 18026274 | 18026274 | MASTER CYLINDER ASM KIT | |
|----------|----------|----------|-------------------------|--|
| Needmore | 18026281 | 18026281 | MASTER CYLINDER RESERVOIR KIT | |
| Needmore | 18029752 | 18029752 | KIT-BRACKET,CALIPER,LH | |
| Needmore | 18029753 | 18029753 | KIT-BRACKET,CALIPER,RH | |
| Needmore | 18029754 | 18029754 | KIT-CALIPER ASM,FRT,LH | |
| Needmore | 18029755 | 18029755 | KIT-CALIPER ASM,FRT,RH | |
| Needmore | 18029758 | 18029758 | M/CYL RESERVOIR AND GROMMET KIT | |
| Needmore | 18029759 | 18029759 | MASTER CYLINDER ASM KIT | |
| Needmore | 18029766 | 18029766 | WHEEL CYLINDER ASM-KIT 23.8 DIA | |
| Needmore | 18029793 | 18029793 | MASTER CYLINDER ASM KIT | |
| Needmore | 18029810 | 18029810 | KIT-PISTON,CALIPER | |
| Needmore | 18029814 | 18029814 | KIT-CALIPER ASM FRT DISC BRK 46.0 | |
| Needmore | 18029814 | 18029814 | KIT-CALIPER ASM FRT DISC BRK 46.0 | |
| Needmore | 18029829 | 18029829 | KIT-BRACKET CALIPER MOUNTING | |
| Needmore | 18029852 | 18029852 | MASTER CYLINDER ASM KIT | |
| Needmore | 18029860 | 18029860 | MASTER CYLINDER ASM KIT | |
| Needmore | 18029861 | 18029861 | MASTER CYLINDER RESERVOIR KIT | |
| Needmore | 18029862 | 18029862 | MASTER CYLINDER ASM KIT | |
| Needmore | 18029868 | 18029868 | WHEEL CYLINDER ASM KIT | |
| Needmore | 18029869 | 18029869 | WHEEL CYLINDER ASM KIT | |
| Needmore | 18029878 | 18029878 | BOOSTER ASM KIT | |
| Needmore | 18029881 | 18029881 | KIT-PISTON,CALIPER | |
| Needmore | 18029882 | 18029882 | KIT-FRT DISC BRAKE BRACKET | |
| Needmore | 18029914 | 18029914 | KIT-MASTER CYLINDER ASM | |
| Needmore | 18029921 | 18029921 | KIT-BOOSTER ASM | |
| Needmore | 18029937 | 18029937 | CALIPER ASM KIT | |
| Needmore | 18029938 | 18029938 | CALIPER ASM KIT | |
| Needmore | 18029939 | 18029939 | KIT-PISTON,CALIPER | |
| Needmore | 18029940 | 18029940 | KIT-CALIPER ASM | |
| Needmore | 18029941 | 18029941 | KIT-CALIPER ASM | |
| Needmore | 18029943 | 18029943 | PACKAGE-WHEEL CYLINDER ASM, 22.2DIA | |
| Needmore | 18029949 | 18029949 | KIT-MASTER CYLINDER ASM | |
| Needmore | 18029959 | 18029959 | BOOSTER ASM KIT | |
| Needmore | 18029961 | 18029961 | BOOSTER ASM KIT | |
| Needmore | 18029962 | 18029962 | KIT-MASTER CYLINDER ASM | |
| Needmore | 18029963 | 18029963 | KIT-MASTER CYLINDER ASM | |
| Needmore | 18029965 | 18029965 | KIT-MASTER CYLINDER ASM | |
| Needmore | 18029966 | 18029966 | KIT-MASTER CYLINDER ASM | |
| Needmore | 18029967 | 18029967 | KIT-MASTER CYLINDER ASM | |
| Needmore | 18029968 | 18029968 | KIT-MASTER CYLINDER ASM | |
| Needmore | 18029969 | 18029969 | KIT-MASTER CYLINDER ASM | |
| Needmore | 18029970 | 18029970 | KIT-MASTER CYLINDER ASM | |
| Needmore | 18029971 | 18029971 | KIT-MASTER CYLINDER ASM | |
| Needmore | 18029975 | 18029975 | BOOSTER ASM KIT | |
| Needmore | 18029976 | 18029976 | BOOSTER ASM KIT | |
| Needmore | 18029982 | 18029982 | BOOSTER ASM KIT | |
| Needmore | 18029985 | 18029985 | BOOSTER ASM KIT | |
| Needmore | 18029986 | 18029986 | BOOSTER ASM KIT | |

Delphi IP License 9-6-7 Schedules rev 3.0

| | | | |
|---|---|---|---|
| Needmore | 18029989 | 18029989 | BOOSTER ASM KIT | |
| Needmore | 18029991 | 18029991 | BOOSTER ASM KIT | |
| Needmore | 18029999 | 18029999 | BOOSTER ASM KIT | |
| Needmore | 18030000 | 18030000 | KIT-PSTN,CLPR | |
| Needmore | 18040108 | 18040108 | CALIPER MOUNTING BRACKET KIT | |
| Needmore | 18040240 | 18040240 | KIT-M/CYL ASM | |
| Needmore | 18040241 | 18040241 | M/CYL RESERVOIR AND GROMMET KIT | |
| Needmore | 18040249 | 18040249 | MASTER CYLINDER ASM KIT | |
| Needmore | 18040260 | 18040260 | VACUUM BOOSTER ASM KIT | |
| Needmore | 18041757 | 18041757 | BKG PLT&SHLD | |
| Needmore | 18041758 | 18041758 | BKG PLT&SHLD | |
| Needmore | 18042407 | 18042407 | KIT-RESERVOIR & GROMMET | |
| Needmore | 18042491 | 18042491 | KIT-CLPR,FRT | |
| Needmore | 18042492 | 18042492 | KIT-CLPR,FRT | |
| Needmore | 18042542 | 18042542 | KIT-BOOS,VAC OBS R4552B 7/05 RB 18087953 | |
| Needmore | 18042801 | 18042801 | KIT-MASTER CYLINDER 22.2 DIA | |
| Needmore | 18043590 | 18043590 | BOOSTER ASM KIT - 260T | |
| Needmore | 18043630 | 18043630 | KIT - BOOSTER ASM - 260T (FINAL) | |
| Needmore | 18044321 | 18044321 | KIT-PISTON,CALIPER,60.0 DIA | |
| Needmore | 18044442 | 18044442 | BOOSTER ASM KIT 260T | |
| Needmore | 18044831 | 18044831 | KIT-P/H 220T | |
| Needmore | 18045193 | 18045193 | M/CYL RESERVOIR AND GROMMET KIT | |
| Needmore | 18045276 | 18045276 | BKG PLT ASM-RR, 200 DIA X 45, WITH COVER | |
| Needmore | 18045277 | 18045277 | BKG PLT ASM-RR, 200 DIA X 45, WITH COVER | |
| Needmore | 18045787 | 18045787 | BOOSTER ASM KIT | |
| Needmore | 18046142 | 18046142 | KIT-CLPR,RR (LH) | |
| Needmore | 18046143 | 18046143 | KIT-CLPR,RR (RH) | |
| Needmore | 18046147 | 18046147 | KIT-BRKT,CLPR-RR | |
| Needmore | 18046192 | 18046192 | KIT-CALIPER ASM,FRT,LH | |
| Needmore | 18046193 | 18046193 | KIT-CALIPER ASM,FRT,RH | |
| Needmore | 18046196 | 18046196 | KIT-CALIPER ASM,LH,FRT | |
| Needmore | 18046197 | 18046197 | KIT-CALIPER ASM,FRT,RH | |
| Needmore | 18046200 | 18046200 | KIT-CALIPER ASM,LH,FRT | |
| Needmore | 18046201 | 18046201 | KIT-CALIPER ASM,RH,FRT | |
| Needmore | 18046219 | 18046219 | KIT-CALIPER ASM,FRT,LH | |
| Needmore | 18046220 | 18046220 | KIT-CALIPER ASM,FRT,RH | |
| Needmore | 18046221 | 18046221 | KIT-BRKT, CLPR, FRT LH | |
| Needmore | 18046222 | 18046222 | KIT-BRKT, CLPR, FRT, RH | |
| Needmore | 18046299 | 18046299 | KIT-CLPR,FRT | |
| Needmore | 18046300 | 18046300 | KIT-CLPR,FRT | |
| Needmore | 18046301 | 18046301 | KIT-BRACKET,MOUNTING,CALIPER | |
| Needmore | 18046412 | 18046412 | KIT-M/CYL ASM | |
| Needmore | 18046413 | 18046413 | KIT-M/CYL ASM | |
| Needmore | 18046507 | 18046507 | MASTER CYLINDER ASM KIT | |
| Needmore | 18046508 | 18046508 | M/CYL RESERVOIR AND GROMMET KIT | |
| Needmore | 18046510 | 18046510 | KIT-RSVR&GROM | |
| Needmore | 18046692 | 18046692 | KIT-MASTER CYL. ASM 40.0 DIA | |
| Needmore | 18046694 | 18046694 | M/CYL RESERVOIR AND GROMMET KIT | |

18

| | | | | |
|---|---|---|---|---|
| Needmore | 18046711 | 18046711 | KIT-M/CYL RESERVOIR & GROMMET | |
| Needmore | 89040311 | 18047045 | KIT - CALIPER ASM, 45.5, 15", LH | |
| Needmore | 89040312 | 18047046 | KIT - CALIPER ASM, 45.5, 15", RH | |
| Needmore | 89040314 | 18047050 | KIT - CALIPER PISTON, 45.5 DIA | |
| Needmore | 89040315 | 18047052 | KIT-CALIPER BRACKET, FRT | |
| Needmore | 18047188 | 18047188 | SBA MOUNTING HARDWARE KIT | |
| Needmore | 18047512 | 18047512 | KIT-M/CYL ASM 37.0 | |
| Needmore | 18047515 | 18047515 | KIT-M/CYL RESERVOIR | |
| Needmore | 18047519 | 18047519 | KIT-M/CYL ASM 34.0 DIA | |
| Needmore | 18047521 | 18047521 | KIT-M/CYL RES W/GROMMETS | |
| Needmore | 18047524 | 18047524 | KIT-M/CYL ASM 31.8 | |
| Needmore | 18047525 | 18047525 | KIT-M/CYL RES W/GROMMETS | |
| Needmore | 18047527 | 18047527 | KIT-M/CYL ASM 31.8 DIA | |
| Needmore | 18047528 | 18047528 | KIT-M/CYL RES W/GROMMETS | |
| Needmore | 18047529 | 18047529 | KIT-M/CYL ASM   31.8 | |
| Needmore | 18047532 | 18047532 | KIT - M/CYL RES W/GROMMETS | |
| Needmore | 18047541 | 18047541 | KIT RESERVOIR ASM | |
| Needmore | 18047557 | 18047557 | KIT-M/CYL RES W/GROMMETS | |
| Needmore | 18047594 | 18047594 | KIT-M/CYL ASM, 31.8 | |
| Needmore | 18047640 | 18047640 | SHOE & LINING ASM KIT 225 DIA X .45 | |
| Needmore | 18047641 | 18047641 | KIT - WHL CYL ASM | |
| Needmore | 18047667 | 18047667 | KIT-M/CYL ASM 25.4 DIA | |
| Needmore | 10379247 | 18047669 | KIT - W/CYL ASM | |
| Needmore | 18047678 | 18047678 | KIT-BOOSTER ASM, 240T | |
| Needmore | 18047682 | 18047682 | KIT-BOOSTER ASM, 240T | |
| Needmore | 18047687 | 18047687 | BOOSTER ASM-FINAL, 240T | |
| Needmore | 89058906 | 18047695 | SHOE & LINING ASM KIT | |
| Needmore | 89040283 | 18047779 | KIT-M/CYL ASM | |
| Needmore | 89040284 | 18047780 | KIT-RESERVOIR WITH O-RINGS | |
| Needmore | 18047787 | 18047787 | KIT-M/CYL ASM DIA 25.4 | |
| Needmore | 18047980 | 18047980 | KIT-CALIPER ASM - LH FRT | |
| Needmore | 18047981 | 18047981 | KIT-CALIPER ASM - RH FRT | |
| Needmore | 18047985 | 18047985 | KIT-PISTON 45.0 DIA | |
| Needmore | 18047987 | 18047987 | KIT-BRACKET | |
| Needmore | 22705345 | 18048100 | SHOE & LINING ASM KIT | |
| Needmore | 22688724 | 18048250 | SHOE & LINING ASM KIT | |
| Needmore | 22706785 | 18048251 | KIT - WHL CYL ASM 17.46 DIA | |
| Needmore | 18048572 | 18048572 | MASTER CYLINDER ASM KIT | |
| Needmore | 18048573 | 18048573 | M/CYL RESERVOIR AND GROMMET KIT | |
| Needmore | 22671546 | 18048576 | KIT - WHL CYL ASM 17.46 DIA | |
| Needmore | 18048674 | 18048674 | KIT - CALIPER ASM FRT  LH | |
| Needmore | 18048675 | 18048675 | KIT - CALIPER ASM FRT  RH | |
| Needmore | 22707256 | 18048693 | KIT-POWER BOOSTER ASM | |
| Needmore | 89058902 | 18048741 | KIT - WHL CYL ASM | |
| Needmore | 22698588 | 18048849 | KIT-RETAINER SPRING | |
| Needmore | 18048897 | 18048897 | KIT-M/CYL ASM   31.8 | |
| Needmore | 89040285 | 18048927 | KIT - BOOSTER ASM - 260T | |
| Needmore | 88957260 | 18049298 | KIT - CALIPER ASM FRT  LH | |

19

| | | | | |
|---|---|---|---|---|
| Needmore | 88957261 | 18049299 | KIT - CALIPER ASM FRT  RH | |
| Needmore | 89047649 | 18049319 | KIT - M/CYL ASM | |
| Needmore | 25778606 | 18049388 | KIT-MASTER CYL. ASM 23.8 DIA | |
| Needmore | 22717566 | 18049390 | KIT-RESERVOIR WITH O-RINGS | |
| Needmore | 89047764 | 18049435 | KIT-CALIPER ASM - LH FRT | |
| Needmore | 89047765 | 18049436 | KIT-CALIPER ASM - RH FRT | |
| Needmore | 89040424 | 18049479 | KIT-M/CYL RES W/GROMMETS | |
| Needmore | 15183822 | 18049517 | KIT - M/CYL ASM | |
| Needmore | 89059129 | 18049518 | KIT - M/CYL RES W/GROMMETS | |
| Needmore | 18060024 | 18060024 | KIT-W/CYL ASM | |
| Needmore | 18060026 | 18060026 | KIT-W/CYL ASM | |
| Needmore | 18060033 | 18060033 | KIT-P/H 240T | |
| Needmore | 18060039 | 18060039 | KIT-P/H 200T | |
| Needmore | 18060040 | 18060040 | KIT-P/H 200T | |
| Needmore | 18060043 | 18060043 | KIT-P/H 240S | |
| Needmore | 18060045 | 18060045 | KIT-P/H 240T | |
| Needmore | 18060046 | 18060046 | KIT-P/H 200T | |
| Needmore | 18060052 | 18060052 | KIT-P/H 240T | |
| Needmore | 18060053 | 18060053 | KIT-P/H 240T | |
| Needmore | 18060061 | 18060061 | KIT-P/H 240T | |
| Needmore | 18060069 | 18060069 | KIT-PSTN,CLPR | |
| Needmore | 18060070 | 18060070 | KIT-PSTN,CLPR | |
| Needmore | 18060072 | 18060072 | KIT-P/H 240T | |
| Needmore | 18060080 | 18060080 | KIT-ACTR ASM | |
| Needmore | 18060082 | 18060082 | KIT-P/H 200T | |
| Needmore | 18060084 | 18060084 | KIT-W/CYL ASM | |
| Needmore | 18060085 | 18060085 | KIT-M/CYL,QTU | |
| Needmore | 18060086 | 18060086 | KIT-M/CYL,QTU | |
| Needmore | 18060087 | 18060087 | KIT-M/CYL,QTU | |
| Needmore | 18060090 | 18060090 | KIT-W/CYL ASM | |
| Needmore | 18060091 | 18060091 | KIT-W/CYL ASM | |
| Needmore | 18060092 | 18060092 | KIT-W/CYL ASM | |
| Needmore | 18060105 | 18060105 | KIT-P/H 200T | |
| Needmore | 18060106 | 18060106 | KIT-CLPR,FRT | |
| Needmore | 18060107 | 18060107 | KIT-CLPR,FRT | |
| Needmore | 18060110 | 18060110 | KIT-M/CYL,QTU | |
| Needmore | 18060111 | 18060111 | KIT-M/CYL,QTU | |
| Needmore | 18060114 | 18060114 | KIT-M/CYL,CMP | |
| Needmore | 18060118 | 18060118 | KIT-W/CYL ASM | |
| Needmore | 18060120 | 18060120 | KIT-BOOS,200T | |
| Needmore | 18060124 | 18060124 | KIT-P/H 240T | |
| Needmore | 18060138 | 18060138 | KIT-M/CYL,CMP | |
| Needmore | 18060140 | 18060140 | KIT-P/H 240T | |
| Needmore | 18060142 | 18060142 | KIT-P/H 200T | |
| Needmore | 18060146 | 18060146 | KIT-BOOS,240T | |
| Needmore | 18060147 | 18060147 | KIT-PSTN,CLPR | |
| Needmore | 18060155 | 18060155 | KIT-P/H 200T | |
| Needmore | 18060156 | 18060156 | KIT-P/H 240T | |

Delphi IP License 9-6-7 Schedules rev 3.0

| | | | | |
|---|---|---|---|---|
| Needmore | 18060160 | 18060160 | KIT-W/CYL ASM | |
| Needmore | 18060163 | 18060163 | KIT-P/H 240T | |
| Needmore | 18060164 | 18060164 | KIT-M/CYL,CMP | |
| Needmore | 18060167 | 18060167 | KIT-W/CYL ASM | |
| Needmore | 18060169 | 18060169 | KIT-P/H 240T | |
| Needmore | 18060170 | 18060170 | KIT-M/CYL,CMP | |
| Needmore | 18060172 | 18060172 | KIT-W/CYL | |
| Needmore | 18060173 | 18060173 | KIT-P/H 200T | |
| Needmore | 18060176 | 18060176 | KIT-M/CYL ASM | |
| Needmore | 18060177 | 18060177 | KIT-P/H 240T | |
| Needmore | 18060178 | 18060178 | KIT-P/H 240T | |
| Needmore | 18060179 | 18060179 | KIT-M/CYL ASM | |
| Needmore | 18060184 | 18060184 | KIT-M/CYL,QTU | |
| Needmore | 18060192 | 18060192 | KIT-BOOS,240T | |
| Needmore | 18060194 | 18060194 | KIT-P/H 240T | |
| Needmore | 18060195 | 18060195 | KIT-P/H 240T | |
| Needmore | 18060196 | 18060196 | KIT-P/H 240T | |
| Needmore | 18060197 | 18060197 | KIT-MTG BRKT | |
| Needmore | 18060198 | 18060198 | KIT-P/H 240T | |
| Needmore | 18060199 | 18060199 | KIT-P/H 200T | |
| Needmore | 21010181 | 18060203 | KIT-P/H 240S | |
| Needmore | 21011666 | 18060204 | KIT-P/H 240S | |
| Needmore | 22683094 | 18060702 | KIT-M/CYL RESERVOIR CAP ASM | |
| Needmore | 22683095 | 18060703 | KIT-M/CYL ASM | |
| Needmore | 18060777 | 18060777 | KIT-VACUUM BOOSTER ASM | |
| Needmore | 18060779 | 18060779 | MASTER CYLINDER ASM KIT | |
| Needmore | 18060780 | 18060780 | MASTER CYLINDER ASM KIT | |
| Needmore | 18060781 | 18060781 | MASTER CYLINDER ASM KIT | |
| Needmore | 18060782 | 18060782 | KIT-MASTER CYL. ASM 25.4 DIA | |
| Needmore | 18060783 | 18060783 | KIT-M/CYL ASM | |
| Needmore | 18060784 | 18060784 | MASTER CYLINDER ASM KIT | |
| Needmore | 18060785 | 18060785 | MASTER CYLINDER ASM KIT | |
| Needmore | 18060787 | 18060787 | MASTER CYLINDER ASM KIT | |
| Needmore | 18060788 | 18060788 | KIT-MASTER CYLINDER 25.4 DIA | |
| Needmore | 18060791 | 18060791 | KIT-MASTER CYLINDER ASM | |
| Needmore | 18060792 | 18060792 | KIT-MASTER CYLINDER ASM | |
| Needmore | 18060793 | 18060793 | KIT-M/CYL ASM | |
| Needmore | 18060796 | 18060796 | KIT-RSVR&GROM | |
| Needmore | 18060799 | 18060799 | KIT - RESERVOIR & GROMMET | |
| Needmore | 18060801 | 18060801 | KIT - RESERVOIR & GROMMET | |
| Needmore | 89059131 | 18047473 | KIT-M/CYL SEAL BRK | |
| Needmore | 89058946 | 18084141 | SBA SERVICE KIT | |
| Needmore | 89060213 | 18084455 | KIT-POWER BOOSTER ASM - 8-9T | |
| Needmore | 15189238 | 18085679 | KIT-M/CYL ASM  25.4 DIA | |
| Needmore | 88964172 | 18085727 | KIT - CALIPER ASM FRT  LH | |
| Needmore | 88964173 | 18085728 | KIT - CALIPER ASM FRT  RH | |
| Needmore | 88964175 | 18085730 | KIT- BRACKET CALIPER MOUNTING | |
| Needmore | 10367561 | 18085732 | KIT-M/CYL ASM  25.4 DIA | |

| | | | | |
|---|---|---|---|---|
| Needmore | 10367562 | 18085733 | KIT-M/CYL ASM  25.4 DIA | |
| Needmore | 10366478 | 18085925 | KIT-SHOE & LINING ASM DRUM BRAKE | |
| Needmore | 10366347 | 18085926 | KIT - WHL CYL ASM | |
| Needmore | 10393184 | 18086309 | KIT-RSVR W / GROMMETS | |
| Needmore | 22721986 | 18086310 | KIT-M/ CYL ASM 22.2 DIA  A/TRANS | |
| Needmore | 10393183 | 18086311 | KIT-RSVR W / GROMMETS | |
| Needmore | 10337908 | 18087066 | KIT-M/CYL ASM 25.4 DIA | |
| Needmore | 10382902 | 18087067 | KIT - M/CYL ASM 25.4 DIA | |
| Needmore | 10382903 | 18087068 | KIT-M/CYL ASM  25.4 DIA | |
| Needmore | 21993086 | 18087162 | PISTON - KIT | |
| Needmore | 15251790 | 18087163 | BRACKET - KIT-FRT DISC BRAKE | |
| Needmore | 21993094 | 18087169 | KIT - CALIPER ASM  FRT  LH | |
| Needmore | 21993095 | 18087170 | KIT - CALIPER ASM  FRT  RH | |
| Needmore | 21993097 | 18087171 | KIT - BRACKET- CALIPER MOUNTING | |
| Needmore | 15251788 | 18087183 | KIT - CALIPER ASM FRT  LH | |
| Needmore | 15251789 | 18087184 | KIT - CALIPER ASM FRT  RH | |
| Needmore | 88967254 | 18087377 | KIT-POWER BOOSTER ASM - 8-9T | |
| Needmore | 15142479 | 18087391 | KIT - M/CYL ASM  27.0 DIA | |
| Needmore | 88967239 | 18087939 | KIT-POWER BOOSTER ASM - 220T | |
| Needmore | 15235028 | 18087941 | BOOSTER ASM KIT | |
| Needmore | 88967236 | 18087942 | KIT - BOOSTER ASM (220 DIA) | |
| Needmore | 15237761 | 18087944 | POWER BOOSTER ASM KIT | |
| Needmore | 15237762 | 18087945 | KIT - POWER BOOSTER ASM | |
| Needmore | 15235135 | 18087946 | BOOSTER ASM KIT | |
| Needmore | 15235136 | 18087947 | BOOSTER ASM KIT | |
| Needmore | 15234621 | 18087948 | KIT-BOOSTER ASM | |
| Needmore | 88967234 | 18087949 | KIT - POWER BOOSTER ASM   260T | |
| Needmore | 88967235 | 18087951 | KIT - POWER BOOSTER ASM   260T | |
| Needmore | 15237321 | 18087953 | POWER BOOSTER ASM KIT | |
| Needmore | 88967238 | 18087955 | KIT - POWER BOOSTER ASM - 260T | |
| Needmore | 88967101 | 18087957 | KIT-BOOSTER ASM ASII 260T (42MM) | |
| Needmore | 88967237 | 18087958 | KIT - BOOSTER ASM - SERVICE | |
| Needmore | 15234951 | 18087960 | BOOSTER ASM KIT | |
| Needmore | 88967260 | 18087961 | KIT - POWER BOOSTER ASM   260T | |
| Needmore | 15247618 | 18087963 | KIT - POWER BOOSTER ASM   260T | |
| Needmore | 15247617 | 18087964 | KIT - POWER BOOSTER ASM   260T | |
| Needmore | 15267004 | 18088494 | KIT - POWER BOOSTER ASM AS IID 240T | |
| Needmore | 15267005 | 18088495 | KIT - POWER BOOSTER ASM AS IID 240T | |
| Needmore | 15221998 | 18088697 | KIT-M/CYL ASM 23.8 DIA | |
| Needmore | 15261541 | 18088768 | BOOSTER ASM KIT - 8/8T | |
| Needmore | 88967264 | 18088828 | KIT- BRACKET CALIPER MOUNTING | |
| Needmore | 89027066 | 18089589 | KIT-CALIPER ASM FRT | |
| Needmore | 89027067 | 18089590 | KIT-CALIPER ASM FRT | |
| Needmore | 15784508 | 18089961 | CYLINDER ASM-BRK MAS | |
| Needmore | 15804966 | 18089995 | KIT-BOOSTER ASM  10-10.5T | |
| Needmore | 15269590 | 18090562 | KIT-M/CYL ASM 37.0 DIA | |
| Needmore | 15283583 | 18090563 | KIT - M/CYL ASM  25.4 DIA | |
| Needmore | 15269947 | 18090581 | KIT - M/CYL ASM  34.0 | |

Delphi IP License 9-6-7 Schedules rev 3.0

| Needmore | 19121403 | 18090595 | KIT - BOOSTER ASM  260T | |
|----------|----------|----------|--------------------------|--|
| Needmore | 15106442 | 18090783 | KIT-M/CYL ASM 37.0 | |
| Needmore | 15146189 | 18090785 | KIT-M/CYL ASM 37.0 | |
| Needmore | 15819263 | 18090786 | KIT-M/CYL RESERVOIR | |
| Needmore | 88967269 | 18090788 | KIT- BOOSTER ASM SERVICE 8/9T | |
| Needmore | 19122084 | 18091336 | BOOSTER ASM,P/B | |
| Needmore | 15839049 | 18091365 | KIT-BACKING PLATE - LH | |
| Needmore | 15839048 | 18091366 | KIT-BACKING PLATE - RH | |
| Needmore | 19121845 | 18091497 | SBA SERVICE KIT | |
| Needmore | 15835280 | 18092150 | KIT-M/CYL ASM | |
| Needmore | 15795983 | 18092151 | KIT-M/CYL ASM | |
| Needmore | 15795984 | 18092152 | KIT-M/CYL ASM | |
| Needmore | 15837546 | 18092381 | KIT-M/CYL ASM 37.0 | |
| Needmore | 15183823 | 18092758 | KIT - M/CYL ASM | |
| Needmore | 15925739 | 18093924 | KIT-M/CYL ASM 25.4 DIA | |
| Needmore | 25801713 | 18094635 | KIT-BOOSTER ASM | |
| Needmore | 15773763 | 18093158 | KIT-BSTR ASM | |
| Needmore | 15880724 | 18093273 | KIT-M/CYL ASM | |
| Needmore | 15857886 | 18094332 | KIT-M/CYL ASM | |
| Needmore | 15857887 | 18094333 | KIT-M/CYL ASM | |
| Needmore | 15267511 | 18094410 | KIT-BSTR ASM | |
| Needmore | 25778605 | 18094658 | KIT-BSTR ASM | |
| Needmore | 15267508 | 18094750 | KIT-M/CYL ASM | |
| Needmore | 15267509 | 18094751 | KIT-M/CYL ASM | |
| Needmore | 21010529 | 21010529 | KIT-M/CYL ASM | |
| Needmore | 21013194 | 21013194 | KIT-M/CYL,CMP | |
| Needmore | 21013195 | 21013195 | KIT-M/CYL,CMP | |
| Needmore | 21013196 | 21013196 | BOOSTER ASM PACKAGE (KIT) | |
| Needmore | 21013197 | 21013197 | BOOSTER ASM PACKAGE | |
| Needmore | 21013198 | 21013198 | KIT-RSVR&GROM | |
| Needmore | 21018892 | 21018892 | KIT-M/CYL RSVR W/GROMS | |
| Needmore | 21018998 | 21018998 | LEVER KIT,RR PARK BRK | |
| Needmore | 21018999 | 21018999 | KIT-SHOE & LINING | |
| Needmore | 21019000 | 21019000 | ADJUSTER KIT,RR PARK BRK | |
| Needmore | 21019001 | 21019001 | SPRING KIT,RR PARK BRK SHOE HOLD DOWN | |
| Needmore | 21019002 | 21019002 | SPRING KIT,PARK BRK LVR RTN | |
| Needmore | 21019008 | 21019008 | KIT-DRUM BRAKE SHOE & LINING | |
| Needmore | 21019009 | 21019009 | KIT-DRUM BRAKE SHOE HOLD DOWN | |
| Needmore | 21019010 | 21019010 | KIT-SELF ADJUSTER - LH | |
| Needmore | 21019011 | 21019011 | KIT-DRUM BRAKE SPRING | |
| Needmore | 21019204 | 21019204 | ADJUSTER KIT,RR BRK SLACK | |
| Needmore | 21019205 | 21019205 | KIT-WHL CYL ASM | |
| Needmore | 21019206 | 21019206 | BACK PLT ASM-RR | |
| Needmore | 21019207 | 21019207 | BACK PLT ASM-RR | |
| Needmore | 21019208 | 21019208 | KIT-PRK BRK BKG PLATE ASM - RH | |
| Needmore | 21019209 | 21019209 | KIT-PRK BRK BKG PLATE ASM - LH | |
| Needmore | 21019210 | 21019210 | PLUG,RR BRK ADJR ACC HOLE | |
| Needmore | 21019212 | 21019212 | CLIP,PARK BRK RR CBL | |

| Needmore | 21019225 | 21019225 | VALVE KIT,RR BRK BLEDR | |
|----------|----------|----------|------------------------|--|
| Needmore | 21019234 | 21019234 | CABLE ASM,PARK BRK RR | |
| Needmore | 21019660 | 21019660 | BOLT,RR BRK CYL | |
| Needmore | 21019721 | 21019721 | CABLE ASM,PARK BRK RR | |
| Oshawa | 18026285 | 18026285 | Kit, Park Brk Shoe & Lng | W-Car; U-Van; N-Ca |
| Oshawa | 18029886 | 18029886 | Kit, Park Brake Actuator Asm | U-Van |
| Oshawa | 18029887 | 18029887 | Kit, Park Brake Actuator Asm | U-Van |
| Oshawa | 18029888 | 18029888 | Kit, Park Brake Actuator Asm | W-Car |
| Oshawa | 18029889 | 18029889 | Kit, Park Brake Actuator Asm | W-Car |
| Oshawa | 18043106 | 18043106 | Kit, Park Brake Actuator Asm | N-Car |
| Oshawa | 18043107 | 18043107 | Kit, Park Brake Actuator Asm | N-Car |
| Oshawa | 10062855 | 18082015 | ROD ASM-RR WHL SPD | W-Car |
| Oshawa | 10062857 | 18082016 | ROD ASMRRR WHL SPD | W-Car |
| Oshawa | 10152132 | 18082019 | SUPPORT ASM | W-Car |
| Oshawa | 10227503 | 18082020 | ROD ASM-RR WHL SPD | W-Car |
| Oshawa | 10227504 | 18082021 | ROD ASM-RR WHL SPD | W-Car |
| Oshawa | 10242417 | 18082022 | ROD ASM | W-Car |
| Oshawa | 10242418 | 18082023 | ROD ASM | W-Car |
| Oshawa | 10257128 | 18082025 | ROD ASM | W-Car |
| Oshawa | 10283874 | 18082031 | ROD ASM-RRR WHL SP | W-Car |
| Oshawa | 10328903 | 18082089 | ARM | Pontiac W-Car |
| Oshawa | 10328904 | 18082090 | ARM | Pontiac W-Car |
| Oshawa | 10328905 | 18082091 | ARM | Buick W-Car (MS-2000) |
| Oshawa | 10328906 | 18082092 | ARM | Buick W-Car (MS-2000) |
| Oshawa | 22527858 | 18082132 | ARM, | E/K & V-Car |
| Oshawa | 22527859 | 18082133 | ARM | E/K & V-Car |
| Oshawa | 22588454 | 18082139 | ARM ASM | J-Car |
| Oshawa | 22588455 | 18082140 | ARM AY-FRT | J-Car |
| Oshawa | 22606761 | 18082149 | ROD ASM-RR SUSP KNU FRT | GMX-130 |
| Oshawa | 22606762 | 18082150 | ROD ASM | GMX-130 |
| Oshawa | 22606764 | 18082151 | ROD ASM-RR SUSP KNU RR | GMX-130 |
| Oshawa | 22606765 | 18082152 | ROD ASM | GMX-130 |
| Oshawa | 22611129 | 18082163 | ARM     FRT LWR C | N/L-Car |
| Oshawa | 22611130 | 18082164 | ARM ASM-FR | N/L-Car |
| Oshawa | 22611131 | 18082165 | ARM ASM-FR | N/L-Car |
| Oshawa | 22611132 | 18082166 | ARM ASM-FR | N/L-Car |
| Oshawa | 22611133 | 18082167 | ARM ASY | N/L-Car |
| Oshawa | 22611134 | 18082168 | ARM | N/L-Car |
| Oshawa | 52367654 | 18082200 | ARM ASM FR | F-Car |
| Oshawa | 52367655 | 18082201 | ARM ASM | F-Car |
| Oshawa | 52367656 | 18082202 | ARM ASM-FR | F-Car |
| Oshawa | 52367657 | 18082203 | ARM ASM | F-Car |
| Oshawa | 52367659 | 18082205 | ARM ASM-FRT LWR CONT | F-Car |
| Oshawa | 22204672 | 22204672 | ARM ASM-FRT UPR CONT (LH | F-Car |
| Oshawa | 22204673 | 22204673 | ARM ASM-FRT UPR CONT (RH | F-Car |
| Oshawa | 10344930 | 22205046 | ARM | U-Van |
| Oshawa | 10344931 | 22205047 | ARM | U-Van |

*Delphi IP License 9-6-7 Schedules rev 3.0*

| Oshawa | 10348654 | 22205116 | ARM ASM-FRT LWR CONT | Olds W-Car |
|--------|----------|----------|----------------------|------------|
| Oshawa | 10348655 | 22205117 | ARM | Olds W-Car |
| Oshawa | 10365843 | 22228664 | ARM | GMX-130 - P-90 |
| Oshawa | 10365844 | 22228665 | ARM ASM-FRT LWR CONT | GMX-130 - P-90 |
| Oshawa | 15216918 | 22230704 | ARM | GMX-130 - P-90 |
| Oshawa | 15216919 | 22230705 | ARM | GMX-130 - P-90 |
| Oshawa | 15236247 | 22231466 | ROD ASM-RR WHL SPDL | Buick GMX-365 |
| Oshawa | 15236248 | 22231467 | ROD ASM-RR WHL SPDL | Buick GMX-365 |
| Oshawa | 15235586 | 22231468 | ROD ASM-RR WHL SPDL | W-Car |
| Oshawa | 15235588 | 22231470 | ROD ASM-RR WHL SPDL | W-Car |
| Oshawa | 15235597 | 22231479 | ROD ASM-RR WHL SPDL | Pontiac GMX-367 |
| Oshawa | 15235598 | 22231480 | ROD ASM-RR WHL SPDL | Pontiac GMX-367 |
| Oshawa | 15293662 | 22232988 | ARM ASM-FRT LWR CONT | W-Car |
| Oshawa | 15293663 | 22232989 | ARM ASM-FRT LWR CONT | W-Car |
| Oshawa | 15293664 | 22232990 | ARM | W-Car |
| Oshawa | 15293665 | 22232991 | ARM | W-Car |
| Oshawa | 15293668 | 22232994 | ARM | W-Car |
| Oshawa | 15293669 | 22232995 | ARM ASM-FRT LWR CONT | W-Car |
| Oshawa | 15792919 | 22235888 | ARM ASM-FRT LWR CONT | W-Car |
| Oshawa | 15792920 | 22235889 | ARM ASM-FRT LWR CONT | W-Car |
| Saginaw | 00457707 | 00457707 | WASHER-STEERING | |
| Saginaw | 03961258 | 03961258 | BOLT-FRT WHL | |
| Saginaw | 15589426 | 15589426 | NUT-WHL SPDL | |
| Saginaw | 15703243 | 15703243 | M VAN SS&SENSOR | |
| Saginaw | 15703244 | 15703244 | M VAN SS&SENSOR | |
| Saginaw | 18014744 | 18014744 | CALIPER ASM-FRT DISC BRK, 74.6 DIA | |
| Saginaw | 18014745 | 18014745 | KIT-CALIPER ASM-FRT DISC BRK, 74.6 DIA | |
| Saginaw | 18014746 | 18014746 | KIT-CALIPER REPAIR, FRT | |
| Saginaw | 18014747 | 18014747 | KIT-CALIPER ASM-FRT DISC BRK, 80.0 DIA | |
| Saginaw | 18014748 | 18014748 | CALIPER ASM-FRT DISC BRK, 80.0 DIA | |
| Saginaw | 18014749 | 18014749 | KIT-CALIPER REPAIR, FRT | |
| Saginaw | 18026285 | 18026285 | KIT-PARK BRAKE SHOE & LINING | |
| Saginaw | 18029886 | 18029886 | KIT-ACTUATOR ASM LH | |
| Saginaw | 18029887 | 18029887 | KIT-ACTUATOR ASM RH | |
| Saginaw | 18029888 | 18029888 | KIT-ACTUATOR ASM LH | |
| Saginaw | 18029889 | 18029889 | KIT-ACTUATOR ASM RH | |
| Saginaw | 18029911 | 18029911 | KIT-CALIPER PISTON | |
| Saginaw | 18029913 | 18029913 | KIT-CALIPER PISTON | |
| Saginaw | 18043106 | 18043106 | KIT -ACTUATOR ASM LH | |
| Saginaw | 18043107 | 18043107 | KIT -ACTUATOR ASM RH | |
| Saginaw | 21013465 | 18047690 | KIT- HUB ASSEMBLY - SATURN Z-CAR | |
| Saginaw | 22671542 | 18047692 | DELTA DRUM - SERVICE KIT | |
| Saginaw | 18048228 | 18048228 | GMT800 SYS 2 SERV KNUCKLE KIT COATED-LH | |
| Saginaw | 18048229 | 18048229 | GMT800 SYS 2 SERV KNUCKLE KIT COATED-RH | |
| Saginaw | 18048698 | 18048698 | GMX367/365 FRONT SERVICE ROTOR - KIT | |
| Saginaw | 18048699 | 18048699 | GMX367/365 REAR SERVICE ROTOR - KIT | |
| Saginaw | 18048934 | 18048934 | GMT265 - ROTOR KIT | |
| Saginaw | 18048936 | 18048936 | GMT265 - KNUCKLE KIT | |

25

| Saginaw | 18048937 | 18048937 | GMT265 - KNUCKLE KIT | |
|---------|----------|----------|----------------------|---|
| Saginaw | 88957254 | 18049231 | P90 - DRUM SERVICE KIT | |
| Saginaw | 18060210 | 18060210 | L CAR SERV DISC | |
| Saginaw | 18060214 | 18060214 | 2C SERV ROTOR | |
| Saginaw | 18060215 | 18060215 | 3A SERV ROTOR | |
| Saginaw | 18060228 | 18060228 | GM10 RR SRV DSC | |
| Saginaw | 18060231 | 18060231 | GM10 CTD SV DSC | |
| Saginaw | 18060233 | 18060233 | U/W SERV DISC | |
| Saginaw | 18060234 | 18060234 | C-H CTD SV DISC | |
| Saginaw | 18060235 | 18060235 | E-K CTD SV DISC | |
| Saginaw | 18060236 | 18060236 | C-H RR SRV DISC | |
| Saginaw | 18060242 | 18060242 | 10.5 SERV ROTOR | |
| Saginaw | 18060559 | 18060559 | S UTIL SERV KNUCKLE | |
| Saginaw | 18060560 | 18060560 | S UTIL SERVICE KNUCKLE | |
| Saginaw | 18060561 | 18060561 | K10-20 SERV KNU | |
| Saginaw | 18060562 | 18060562 | K10-20 SERV KNU | |
| Saginaw | 18060563 | 18060563 | S TRK SERV KNU | |
| Saginaw | 18060564 | 18060564 | S TRK SERV KNU | |
| Saginaw | 18060567 | 18060567 | K30 SERV KNU | |
| Saginaw | 18060568 | 18060568 | K30 SERV KNU | |
| Saginaw | 18060569 | 18060569 | K20 SERV KNU | |
| Saginaw | 18060570 | 18060570 | K20 SERV KNU | |
| Saginaw | 18060573 | 18060573 | C10-20 SERV KNU | |
| Saginaw | 18060574 | 18060574 | C10-20 SERV KNU | |
| Saginaw | 18060575 | 18060575 | C30 SERV KNU | |
| Saginaw | 18060576 | 18060576 | C30 SERV KNU | |
| Saginaw | 18060600 | 18060600 | C-H SERV KNU | |
| Saginaw | 18060601 | 18060601 | C-H SERV KNU | |
| Saginaw | 18060608 | 18060608 | C/F IV SERV KNU | |
| Saginaw | 18060609 | 18060609 | C/F IV SERV KNU | |
| Saginaw | 18060620 | 18060620 | C/F IV SERV KNU | |
| Saginaw | 18060621 | 18060621 | C/F IV SERV KNU | |
| Saginaw | 18060622 | 18060622 | J CTD SERV KNU | |
| Saginaw | 18060623 | 18060623 | J CTD SERV KNU | |
| Saginaw | 18060627 | 18060627 | P90 RR SERV KNU | |
| Saginaw | 18060630 | 18060630 | P90 RR SERV KNU | |
| Saginaw | 18060631 | 18060631 | P90 RR SERV KNU | |
| Saginaw | 18060632 | 18060632 | X130 RR SRV KNU | |
| Saginaw | 18060633 | 18060633 | X130 RR SRV KNU | |
| Saginaw | 18060634 | 18060634 | C/G SERV KNU | |
| Saginaw | 18060635 | 18060635 | C/G SERV KNU | |
| Saginaw | 18060654 | 18060654 | ROTOR - SYS 3B SERVICE | |
| Saginaw | 21019788 | 18060659 | SERV-SAT LS FRT ROTOR | |
| Saginaw | 22672424 | 18060660 | LS RR CAL SERV | |
| Saginaw | 22672425 | 18060661 | LS RR CAL SERV | |
| Saginaw | 22678482 | 18060662 | LS RR DISC PADS-SERV | |
| Saginaw | 22672889 | 18060663 | LS RR PISTON SERV | |
| Saginaw | 18060665 | 18060665 | GMT370 ROTOR - SERVICE | |

Delphi IP License 9-6-7 Schedules rev 3.0

| | | | | |
|---|---|---|---|---|
| Saginaw | 18060666 | 18060666 | GMT 360 KNUCKLE ASSY SERVICE KIT | |
| Saginaw | 18060667 | 18060667 | GMT 360 KNUCKLE ASSY SERVICE KIT | |
| Saginaw | 18060674 | 18060674 | KNUCKLE SERVICE KIT - P90/GMX130 FRONT | |
| Saginaw | 18060675 | 18060675 | KNUCKLE SERVICE KIT - P90/GMX130 FRONT | |
| Saginaw | 88955416 | 18060678 | KNUCKLE SERVICE KIT - E CAR | |
| Saginaw | 88955417 | 18060679 | KNUCKLE SERVICE KIT - E CAR | |
| Saginaw | 88955418 | 18060680 | KNUCKLE SERVICE KIT - U/W | |
| Saginaw | 88955419 | 18060681 | KNUCKLE SERVICE KIT - U/W | |
| Saginaw | 18060682 | 18060682 | ROTOR SERVICE KIT - GMX320 | |
| Saginaw | 18060687 | 18060687 | M VAN KNUCKLE SERVICE KIT | |
| Saginaw | 18060688 | 18060688 | M VAN KNUCKLE SERVICE KIT | |
| Saginaw | 18060689 | 18060689 | GMT370 SERVICE FRONT KNUCKLE ASSM - KIT | |
| Saginaw | 18060690 | 18060690 | GMT370 SERVICE FRONT KNUCKLE ASSM - KIT | |
| Saginaw | 18060697 | 18060697 | GMT610  - KNUCKLE KIT | |
| Saginaw | 18060698 | 18060698 | GMT610  - KNUCKLE KIT | |
| Saginaw | 22667248 | 18060699 | DELTA KNUCKLE - SERVICE KIT | |
| Saginaw | 22667249 | 18060700 | DELTA KNUCKLE - SERVICE KIT | |
| Saginaw | 22702612 | 18064110 | DELTA ROTOR - COAT (SERVICE) | |
| Saginaw | 15178882 | 18064409 | KIT - HUB & BRG ASM W/SEN WIRE 15" 4X2 LH | |
| Saginaw | 15178881 | 18064410 | KIT - HUB & BRG ASM W/SEN WIRE 15" 4X2 RH | |
| Saginaw | 15100275 | 18064411 | KIT - HUB & BRG ASM W/SEN WIRE 15" 4X4 LH | |
| Saginaw | 15100274 | 18064412 | KIT - HUB & BRG ASM W/SEN WIRE 15" 4X4 RH | |
| Saginaw | 15178884 | 18064413 | KIT - HUB & BRG ASM W/SEN WIRE 17" 4X4 LH | |
| Saginaw | 15178883 | 18064414 | KIT - HUB & BRG ASM W/SEN WIRE 17" 4X4 RH | |
| Saginaw | 15170661 | 18064415 | KIT - HUB & BRG ASM W/SEN WIRE 15" 4X2 LH - HS | |
| Saginaw | 15170662 | 18064416 | KIT - HUB & BRG ASM W/SEN WIRE 15" 4X2 RH - HS | |
| Saginaw | 22669733 | 18082208 | EPSILON REAR KNUCKLE ASM KIT (LH) | |
| Saginaw | 22669734 | 18082209 | EPSILON REAR KNUCKLE ASM KIT (RH) | |
| Saginaw | 22705356 | 18082215 | EPSILON REAR ROTOR KIT | |
| Saginaw | 89040374 | 18082221 | GMT355 ROTOR - KIT | |
| Saginaw | 15178872 | 18082230 | GMT355 15" 4X2 KNUCKLE - KIT | |
| Saginaw | 15178871 | 18082231 | GMT355 15" 4X2 KNUCKLE - KIT | |
| Saginaw | 15184896 | 18082232 | GMT355 15" 4X4 KNUCKLE - KIT | |
| Saginaw | 15184895 | 18082233 | GMT355 15" 4X4 KNUCKLE - KIT | |
| Saginaw | 15178874 | 18082234 | GMT355 17" 4X2 KNUCKLE - KIT | |
| Saginaw | 15178873 | 18082235 | GMT355 17" 4X2 KNUCKLE - KIT | |
| Saginaw | 89047762 | 18082236 | GMX310 GXP - ROTOR - KIT | |
| Saginaw | 15125955 | 18083814 | ROTOR - BULK PACK | |
| Saginaw | 89047727 | 18084405 | KIT-CALIPER ASM, LH | |
| Saginaw | 89047726 | 18084406 | KIT-CALIPER ASM, RH | |
| Saginaw | 89047725 | 18084407 | KIT-DISC PAD, FRT | |
| Saginaw | 89047722 | 18084408 | KIT-CALIPER PISTON BOOTS | |
| Saginaw | 89047719 | 18084409 | KIT-BLEEDER SCREW | |
| Saginaw | 89047714 | 18084410 | KIT-CALIPER PISTON | |
| Saginaw | 89047711 | 18084411 | KIT-CALIPER PIN | |
| Saginaw | 25750248 | 18084412 | BREMBO GMX-320V FRONT ROTOR | |
| Saginaw | 89060203 | 18084566 | GMX295 - RWD FR KNU-MACH-SERVICE BULK | |
| Saginaw | 89060206 | 18084567 | GMX295 - RWD FR KNU-MACH-SERVICE BULK | |

| | | | | |
|---|---|---|---|---|
| Saginaw | 89060215 | 18084574 | GMX295 - AWD FR KNU-MACH - SERVICE BULK | |
| Saginaw | 89060216 | 18084575 | GMX295 - AWD FR KNU-MACH - SERVICE BULK | |
| Saginaw | 15147573 | 18084592 | ROTOR - FRT | |
| Saginaw | 21995733 | 18084650 | GMX380 - FR KNUCKLE KIT (LH) | |
| Saginaw | 88964169 | 18085721 | ROTOR - BULK BACK | |
| Saginaw | 88964176 | 18085723 | ROTOR - BULK BACK | |
| Saginaw | 88964102 | 18085928 | ROTOR - KIT | |
| Saginaw | 88964116 | 18086023 | ROTOR - KIT | |
| Saginaw | 18086332 | 18086332 | EXPORT PACK - KNUCKLE MACH'D - FRT | |
| Saginaw | 18086333 | 18086333 | EXPORT PACK - KNUCKLE MACH'D - FRT | |
| Saginaw | 09195294 | 18086345 | EXPORT PACK - ROTOR RR BRK | |
| Saginaw | 09195293 | 18086346 | EXPORT PACK - ROTOR FRT BRK | |
| Saginaw | 18086352 | 18086352 | EXPORT PACK - ROTOR FRT BRK | |
| Saginaw | 15225210 | 18086967 | GMX380/1 - FRT KNUCKLE KIT (RH) | |
| Saginaw | 25803423 | 18087189 | ROTOR, FRT- BULK PACK | |
| Saginaw | 15251335 | 18087191 | ROTOR, FRT- BULK PACK | |
| Saginaw | 15207874 | 18087192 | KNUCKLE LH - UNITIZED | |
| Saginaw | 15207920 | 18087193 | KNUCKLE RH - UNITIZED | |
| Saginaw | 21993756 | 18087195 | ROTOR, RR- BULK PACK | |
| Saginaw | 88965647 | 18087197 | ROTOR, RR - BULK PACK | |
| Saginaw | 21998532 | 18088125 | ROTOR FRT - BULK PACK | |
| Saginaw | 88967259 | 18088578 | KIT - ROTOR, FRONT | |
| Saginaw | 10377634 | 18088582 | KIT - ROTOR, REAR | |
| Saginaw | 15294229 | 18089074 | KNUCKLE - BULK PACK - LH | |
| Saginaw | 15294230 | 18089075 | KNUCKLE - BULK PACK - RH | |
| Saginaw | 10388030 | 18090028 | ROTOR FRT - BULK PACK | |
| Saginaw | 15294772 | 18090283 | KIT-ROTOR, FRT | |
| Saginaw | 15125944 | 18090877 | GMT900 MACHINED KNUCKLE BULK PACK - LH | |
| Saginaw | 15125945 | 18090878 | GMT900 MACHINED KNUCKLE BULK PACK - RH | |
| Saginaw | 15808572 | 18091220 | KIT - DRUM ASM, RR BRK | |
| Saginaw | 88965629 | 18091328 | KIT-CALIPER ASM, LH | |
| Saginaw | 88965630 | 18091329 | KIT-CALIPER ASM, RH | |
| Saginaw | 88965631 | 18091332 | KIT-CALIPER ASM, LH | |
| Saginaw | 88965632 | 18091333 | KIT-CALIPER ASM, RH | |
| Saginaw | 19151396 | 18093502 | W REAR SERV KNU | |
| Saginaw | 19151397 | 18093503 | W REAR SERV KNU | |
| Saginaw | 15274604 | 18093540 | ROTOR - FRONT DISC BRAKE - CTD | |
| Saginaw | 25797350 | 18094887 | EPSILON 16" FRONT ROTOR KIT | |
| Saginaw | 25797351 | 18094888 | EPSILON 15" FRONT ROTOR KIT | |
| Saginaw | 25863339 | 18096248 | ROTOR-FRT BRK | |
| Saginaw | 21011097 | 21011097 | RETAINING RING KIT | |
| Saginaw | 21011103 | 21011103 | KIT-KNUCKLE | |
| Saginaw | 21011104 | 21011104 | KIT-KNUCKLE | |
| Saginaw | 21011109 | 21011109 | KIT-BEARING MOUNTING BOLT | |
| Saginaw | 21011110 | 21011110 | KIT-CALIPER MTG BOLT | |
| Saginaw | 21011111 | 21011111 | SCREW,FRT SPD SENSOR MTG | |
| Saginaw | 21011906 | 21011906 | KIT-DRUM | |
| Saginaw | 21011953 | 21011953 | KIT-BEARING ASM | |

Delphi IP License 9-6-7 Schedules rev 3.0

| | | | | |
|---|---|---|---|---|
| Saginaw | 21012316 | 21012316 | KIT-SPLASH SHIELD, RR | |
| Saginaw | 21012317 | 21012317 | KIT-SPLASH SHIELD, RR | |
| Saginaw | 21012665 | 21012665 | KIT-ROTOR | |
| Saginaw | 21012705 | 21012705 | KIT-KNUCKLE AND BEARING ASM LH | |
| Saginaw | 21012706 | 21012706 | KIT-KNUCKLE AND BEARING ASM RH | |
| Saginaw | 21012880 | 21012880 | ROTOR KIT | |
| Saginaw | 21018784 | 21018784 | LS KNU FRT SERV - RH | |
| Saginaw | 21018785 | 21018785 | LS KNU FRT SERV - LH | |
| Saginaw | 21018786 | 21018786 | LS FRT BRG SERV | |
| Saginaw | 21018994 | 21018994 | KIT-BLEEDER VALVE, CALIPER | |
| Saginaw | 21018995 | 21018995 | KIT-CALIPER REPAIR | |
| Saginaw | 21018997 | 21018997 | KIT-BUSHING, CALIPER MOUNTING | |
| Saginaw | 21019006 | 21019006 | LS RR CAL REP | |
| Saginaw | 21019007 | 21019007 | LS RR CAL ACCES | |
| Saginaw | 21019226 | 21019226 | LS RR BLDR VALV | |
| Saginaw | 21019228 | 21019228 | LS SNAP RING | |
| Saginaw | 21019229 | 21019229 | LS SPINDLE PKG | |
| Saginaw | 21019230 | 21019230 | LS RTR MTG SCRW | |
| Saginaw | 21019231 | 21019231 | LS SPL SHLD PKG | |
| Saginaw | 21019232 | 21019232 | LS SS MTG SCREW | |
| Saginaw | 21019233 | 21019233 | LS CAL MTG BOLT | |
| Saginaw | 21019244 | 21019244 | LS BRG MTG NUT | |
| Saginaw | 21019245 | 21019245 | LS CAL MTG BOLT | |
| Saginaw | 21019246 | 21019246 | LS RH BRK PIPE | |
| Saginaw | 21019247 | 21019247 | LS LH BRK PIPE | |
| Saginaw | 21019248 | 21019248 | LS BRK HOSE PKG | |
| Saginaw | 21019249 | 21019249 | LS HOSE CLIP PK | |
| Saginaw | 21019250 | 21019250 | LS BRK LINE SUP | |
| Saginaw | 21019251 | 21019251 | LS BRK LINE SUP | |
| Saginaw | 21019252 | 21019252 | LS CTRL ARM ASM | |
| Saginaw | 21019253 | 21019253 | LS CTRL ARM ASM | |
| Saginaw | 21019254 | 21019254 | LS BALL JT KIT | |
| Saginaw | 21019255 | 21019255 | LS BUSHING KIT | |
| Saginaw | 21019256 | 21019256 | LS BRACKET KIT | |
| Saginaw | 21019257 | 21019257 | LS BRACKET KIT | |
| Saginaw | 21019258 | 21019258 | LS RR DISC KIT | |
| Saginaw | 21019259 | 21019259 | LS RTR MTG SCRW | |
| Saginaw | 21019262 | 21019262 | LS BRK PIPE ASM | |
| Saginaw | 21019263 | 21019263 | LS BRK PIPE ASM | |
| Saginaw | 21019604 | 21019604 | KIT - CALIPER SUPPORT SPRING | |
| Saginaw | 21019628 | 21019628 | KIT-CALIPER PAD | |
| Saginaw | 21019717 | 21019717 | KIT-CALIPER ASM, HOUSING | |
| Saginaw | 21019718 | 21019718 | KIT-CALIPER ASM, HOUSING | |
| Saginaw | 21019719 | 21019719 | KIT-CALIPER ASM, ANCHOR | |
| Saginaw | 21019722 | 21019722 | KIT-CALIPER ASM, PIN | |
| Saginaw | 25863340 | 28087973 | ROTOR-FRT BRK | |
| Saginaw | 15793340 | N/A | ROTOR, FRT- BULK PACK | |
| Saltillo | 15124101 | 18082217 | KIT - KNUCKLE LH | |

29

| Saltillo | 15124102 | 18082218 | KIT - KNUCKLE RH | |
|---|---|---|---|---|
| Saltillo | 15179159 | 18090879 | ROTOR - BULK PACK | |
| Saltillo | 15224504 | 18086906 | KIT-M/CYL ASM  34.0 DIA | |
| Saltillo | 15230127 | 18089950 | KIT-M/CYL ASM  34.0 DIA | |
| Saltillo | 15235140 | 18084811 | KIT - ROTOR REAR | |
| Saltillo | 15235141 | 18048935 | KIT - ROTOR - RR | |
| Saltillo | 18044522 | 18044522 | GMT 250 Master Cyl RESERVOIR SERVICE PACKAGE | |
| Saltillo | 18045967 | 18045967 | M/C KIT - OBS R9119A 9/04 RB18060786 | |
| Saltillo | 18047533 | 18047533 | KIT-M/CYL ASM 37MM H2 | |
| Saltillo | 18047534 | 18047534 | KIT MASTER CYLINDER REPAIR 37MM H2 | |
| Saltillo | 18047536 | 18047536 | KIT MASTER CYLINDER SECD PISTON 37MM H2 | |
| Saltillo | 18048101 | 18048101 | KIT, DISC PADS FOR SERVICE SPO | |
| Saltillo | 18048538 | 18048538 | MASTER CYL ASM GMT800 34MM SPO | |
| Saltillo | 18048539 | 18048539 | MASTER CYL ASM GMT800 37MM SPO | |
| Saltillo | 18048540 | 18048540 | MASTER CYL REPAIR KIT GMT800 37MM (SPO) | |
| Saltillo | 18048541 | 18048541 | MASTER CYL REPAIR KIT GMT800 34MM (SPO) | |
| Saltillo | 18048543 | 18048543 | RESERVOIR KIT W/GROMMET GMT800 37MM-SPO | |
| Saltillo | 18048544 | 18048544 | RESERVOIR KIT W/GROMMET GMT800 34MM-SPO | |
| Saltillo | 18060646 | 18060646 | GMT250 ROTOR SERVICE | |
| Saltillo | 18060647 | 18060647 | GMT250 KNUCKLE SERVICE LH/RH | |
| Saltillo | 18060648 | 18060648 | GMT250 KNUCKLE SERVICE LH/RH | |
| Saltillo | 18060684 | 18060684 | KNUCKLE SERVICE KIT GMT-250/7 LH | |
| Saltillo | 18060685 | 18060685 | KNUCKLE ASSY SERVICE KIT GMT-250/7 RH | |
| Saltillo | 18060693 | 18060693 | FRT KNUCKLE MACH (LH) L-VAN FOR SERVICE | |
| Saltillo | 18060694 | 18060694 | FRT KNUCKLE MACH (RH) L-VAN FOR SERVICE | |
| Saltillo | 18060695 | 18060695 | FRT KNUCKLE MACH (LH) M-VAN FOR SERVICE | |
| Saltillo | 18060696 | 18060696 | FRT KNUCKLE MACH (RH) M-VAN FOR SERVICE | |
| Saltillo | 18060786 | 18060786 | MASTER CYL ASSY 25.4MM GMT250-257 SERVICE | |
| Saltillo | 19133374 | 18089480 | REAR BRAKE DRUM | |
| Saltillo | 19149075 | 18089490 | KIT - CALIPER ASM | |
| Saltillo | 19149076 | 18089491 | KIT - CALIPER ASM | |
| Saltillo | 19149077 | 18089494 | KIT - CALIPER PISTON | |
| Saltillo | 19149233 | 18092153 | GMT250 ROTOR SERVICE | |
| Saltillo | 22064790 | 22064790 | GMT 250 STRUT SERVICE PACKAGE | |
| Saltillo | 22179331 | 22179331 | STRUT MOUNT ASM GREEN | |
| Saltillo | 22728988 | 18090019 | KIT - ROTOR, DISC BRK (CTD) | |
| Saltillo | 88964180 | 18085722 | KIT - ROTOR, DISC BRK (CTD) | |
| Saltillo | 88967270 | 18088580 | KIT - ROTOR, DISC BRK (CTD) | |
| Saltillo | 89059149 | 18083992 | KIT - DRUM BRAKE | |
| Saltillo | 89060243 | 22226852 | GMT250 STRUT SERVICE PACKAGE | |

| Saltillo | 93437941 | 22183777 | STEERING KNUCKLE - MACHINED, R/H | |
| Saltillo | 93437942 | 22183776 | STEERING KNUCKLE - MACHINED, L/H | |
| Vandalia | 10308420 | 10308420-SR | TRIM ASM-FRT S/D (RH) | Other-Door Trim |
| Vandalia | 10308421 | 10308421-SR | TRIM ASM-FRT S/D (LH) | Other-Door Trim |
| Vandalia | 10308422 | 10308422-SR | TRIM ASM-FRT S/D (RH) | Other-Door Trim |
| Vandalia | 10308423 | 10308423-SR | TRIM ASM-FRT S/D (LH) | Other-Door Trim |
| Vandalia | 10308424 | 10308424-SR | TRIM ASM-FRT S/D (RH) | Other-Door Trim |
| Vandalia | 10308425 | 10308425-SR | TRIM ASM-FRT S/D (LH) | Other-Door Trim |
| Vandalia | 10308426 | 10308426-SR | TRIM ASM-FRT S/D (RH) | Other-Door Trim |
| Vandalia | 10330611 | 10330611-SR | TRIM ASM-RR S/D | Other-Door Trim |
| Vandalia | 10413670 | 10413670-SR | TRIM ASM-FRT S/D | Other-Door Trim |
| Vandalia | 10413671 | 10413671-SR | TRIM ASM-FRT S/D | Other-Door Trim |
| Vandalia | 10413673 | 10413673-SR | TRIM ASM-FRT S/D | Other-Door Trim |
| Vandalia | 10428600 | 10428600-SR | TRIM ASM-FRT S/D (RH) | Other-Door Trim |
| Vandalia | 10428627 | 10428627-SR | TRIM ASM-FRT S/D (LH) | Other-Door Trim |
| Vandalia | 10428633 | 10428633-SR | TRIM | Other-Door Trim |
| Vandalia | 10428640 | | TRIM RR | Other-Door Trim |
| Vandalia | 10428641 | | TRIM RR | Other-Door Trim |
| Vandalia | 10428649 | 10428649-SR | TRIM ASM-FRT S/D (LH) | Other-Door Trim |
| Vandalia | 10428680 | | TRIM ASM-RR S/D (RH) | Other-Door Trim |
| Vandalia | 10428681 | | TRIM ASM-RR S/D (LH) | Other-Door Trim |
| Vandalia | 10438159 | 10438159-SR | TRIM ASM-FRT S/D (RH) | Other-Door Trim |
| Vandalia | 10438160 | 10438160-SR | TRIM ASM-FRT S/D (LH) | Other-Door Trim |
| Vandalia | 10438175 | | TRIM ASM-FRT S/D (RH) | Other-Door Trim |
| Vandalia | 10438176 | 10438176-SR | TRIM ASM-FRT S/D (LH) | Other-Door Trim |
| Vandalia | 10438183 | | TRIM ASM-FRT S/D (RH) | Other-Door Trim |
| Vandalia | 10438184 | | TRIM ASM-FRT S/D (LH) | Other-Door Trim |
| Vandalia | 10438191 | 10438191-SR | TRIM ASM-FRT S/D (RH) | Other-Door Trim |
| Vandalia | 10438199 | | TRIM ASM-FRT S/D (RH) | Other-Door Trim |
| Vandalia | 10438200 | | TRIM ASM-FRT S/D (LH) | Other-Door Trim |
| Vandalia | 10438696 | 10438696-SR | TRIM ASM-FRT S/D (RH) | Other-Door Trim |
| Vandalia | 10438697 | 10438697-SR | TRIM ASM-FRT S/D (LH) | Other-Door Trim |

| Vandalia | 10438705 |  | TRIM ASM-FRT S/D (LH) | Other-Door Trim |
|---|---|---|---|---|
| Vandalia | 10441770 | 10441770-SR | TRIM ASM-FRT S/D (RH) | Other-Door Trim |
| Vandalia | 10441771 | 10441771-SR | TRIM ASM-FRT S/D (LH) | Other-Door Trim |
| Vandalia | 10441772 | 10441772-SR | TRIM ASM-FRT S/D (RH) | Other-Door Trim |
| Vandalia | 10441773 | 10441773-SR | TRIM ASM-FRT S/D (LH) | Other-Door Trim |
| Vandalia | 10441774 | 10441774-SR | TRIM ASM-FRT S/D (RH) | Other-Door Trim |
| Vandalia | 10441776 |  | TRIM ASM-FRT S/D (RH) | Other-Door Trim |
| Vandalia | 10441778 | 10441778-SR | TRIM ASM-FRT S/D (RH) | Other-Door Trim |
| Vandalia | 10441781 |  | TRIM ASM-FRT S/D (LH) | Other-Door Trim |
| Vandalia | 10441782 | 10441782-SR | TRIM ASM-FRT S/D (RH) | Other-Door Trim |
| Vandalia | 10441783 | 10441783-SR | TRIM ASM-FRT S/D (LH) | Other-Door Trim |
| Vandalia | 10441786 |  | TRIM | Other-Door Trim |
| Vandalia | 10441788 |  | TRIM | Other-Door Trim |
| Vandalia | 10444841 | 10444841-SR | TRIM ASM-FRT S/D (RH) | Other-Door Trim |
| Vandalia | 10444843 | 10444843-SR | TRIM ASM-FRT S/D (RH) | Other-Door Trim |
| Vandalia | 10444845 | 10444845-SR | TRIM ASM-FRT S/D (RH) | Other-Door Trim |
| Vandalia | 10444846 | 10444846-SR | TRIM ASM-FRT S/D (LH) | Other-Door Trim |
| Vandalia | 10444847 | 10444847-SR | TRIM ASM-FRT S/D (RH) | Other-Door Trim |
| Vandalia | 10444848 | 10444848-SR | TRIM ASM-FRT S/D (LH) | Other-Door Trim |
| Vandalia | 10444849 | 10444849-SR | TRIM ASM-RR S/D (RH) | Other-Door Trim |
| Vandalia | 10444850 | 10444850-SR | TRIM ASM-RR S/D (LH) | Other-Door Trim |
| Vandalia | 15018126 |  | INSERT ASM-RR S/D UPR TR | Other-Door Trim |
| Vandalia | 15018127 | 15018127-SR | INSERT ASM-RR S/D UPR TR | Other-Door Trim |
| Vandalia | 15018128 |  | INSERT ASM-RR S/D UPR TR | Other-Door Trim |
| Vandalia | 15018129 | 15018129-SR | INSERT ASM-RR S/D UPR TR | Other-Door Trim |
| Vandalia | 15018138 |  | INSERT ASM-RR S/D UPR TR | Other-Door Trim |
| Vandalia | 15018139 |  | INSERT ASM-RR S/D UPR TR | Other-Door Trim |
| Vandalia | 15018142 | 15018142 | INSERT ASM-RR S/D UPR TR | Other-Door Trim |
| Vandalia | 15018143 |  | INSERT ASM-RR S/D UPR TR | Other-Door Trim |
| Vandalia | 15018146 |  | INSERT ASM-RR S/D UPR TR | Other-Door Trim |
| Vandalia | 15018147 | 15018147-SR | INSERT ASM-RR S/D UPR TR | Other-Door Trim |
| Vandalia | 15018151 |  | INSERT ASM-RR S/D UPR TR | Other-Door Trim |
| Vandalia | 15018153 |  | INSERT ASM-RR S/D UPR TR | Other-Door Trim |
| Vandalia | 15018155 |  | INSERT ASM,RR S/D TR | Other-Door Trim |

*Delphi IP License 9-6-7 Schedules rev 3.0*

| | | | | |
|---|---|---|---|---|
| Vandalia | 15018158 | | INSERT ASM-RR S/D UPR TR | Other-Door Trim |
| Vandalia | 15018159 | 15018159-SR | INSERT ASM-RR S/D UPR TR | Other-Door Trim |
| Vandalia | 15018162 | 15018162-SR | INSERT ASM-RR S/D UPR TR | Other-Door Trim |
| Vandalia | 15018323 | 15018323-SR | INSERT ASM | Other-Door Trim |
| Vandalia | 15018324 | | INSERT-FRT S/D | Other-Door Trim |
| Vandalia | 15018325 | 15018325-SR | INSERT-FRT S/D | Other-Door Trim |
| Vandalia | 15018326 | | INSERT-FRT S/D | Other-Door Trim |
| Vandalia | 15018327 | 15018327-SR | INSERT-FRT S/D | Other-Door Trim |
| Vandalia | 15018332 | | INSERT-FRT S/D | Other-Door Trim |
| Vandalia | 15018335 | | INSERT-FRT S/D | Other-Door Trim |
| Vandalia | 15018336 | | INSERT-FRT S/D | Other-Door Trim |
| Vandalia | 15018339 | 15018339-SR | INSERT-FRT S/D | Other-Door Trim |
| Vandalia | 15018343 | | INSERT ASM,FRT S/D T/PNL | Other-Door Trim |
| Vandalia | 15018344 | 15018344-SR | INSERT-FRT S/D | Other-Door Trim |
| Vandalia | 15018347 | 15018347-SR | INSERT-FRT S/D | Other-Door Trim |
| Vandalia | 15018348 | 15018348 | INSERT-FRT S/D | Other-Door Trim |
| Vandalia | 15018349 | | INSERT-FRT S/D | Other-Door Trim |
| Vandalia | 15018350 | 15018350-SR | INSERT-FRT S/D | Other-Door Trim |
| Vandalia | 15018351 | | INSERT-FRT S/D | Other-Door Trim |
| Vandalia | 15018352 | | INSERT-FRT S/D | Other-Door Trim |
| Vandalia | 15030461 | 15030461-SR | INSERT ASM-FRT S/D T/PNL | Other-Door Trim |
| Vandalia | 15032840 | 15032840-SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15032841 | | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15032843 | | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15032866 | | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15032869 | 15032869-SR | PNL F/S/D | Other-Door Trim |
| Vandalia | 15032870 | 15032870-SR | PNL F/S/D | Other-Door Trim |
| Vandalia | 15032871 | 15032871-SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15032872 | 15032872-SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15032873 | 15032873-SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15032879 | 15032879-SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15032885 | 15032885-SR | PNL F/S/D | Other-Door Trim |
| Vandalia | 15032886 | 15032886-SR | PNL F/S/D | Other-Door Trim |
| Vandalia | 15032887 | 15032887- | PANEL ASM-FRT S/D TR | Other-Door Trim |

*Delphi IP License 9-6-7 Schedules rev 3.0*

|  |  | SR |  |  |
|---|---|---|---|---|
|  |  | 15032888- |  |  |
| Vandalia | 15032888 | SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
|  |  | 15032889- |  |  |
| Vandalia | 15032889 | SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
|  |  | 15032890- |  |  |
| Vandalia | 15032890 | SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
|  |  | 15032893- |  |  |
| Vandalia | 15032893 | SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
|  |  | 15032894- |  |  |
| Vandalia | 15032894 | SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
|  |  | 15032895- |  |  |
| Vandalia | 15032895 | SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
|  |  | 15032897- |  |  |
| Vandalia | 15032897 | SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
|  |  | 15032901- |  |  |
| Vandalia | 15032901 | SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
|  |  | 15032902- |  |  |
| Vandalia | 15032902 | SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
|  |  | 15032903- |  |  |
| Vandalia | 15032903 | SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
|  |  | 15032905- |  |  |
| Vandalia | 15032905 | SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15032906 |  | PANEL ASM-FRT S/D TR | Other-Door Trim |
|  |  | 15032911- |  |  |
| Vandalia | 15032911 | SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
|  |  | 15032912- |  |  |
| Vandalia | 15032912 | SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15034442 |  | PANEL ASM-RR S/D TR | Other-Door Trim |
|  |  | 15034449- |  |  |
| Vandalia | 15034449 | SR | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15034450 |  | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15034451 |  | PANEL ASM-RR S/D TR | Other-Door Trim |
|  |  | 15034452- |  |  |
| Vandalia | 15034452 | SR | PANEL ASM-RR S/D TR | Other-Door Trim |
|  |  | 15034466- |  |  |
| Vandalia | 15034466 | SR | PANEL ASM-RR S/D TR | Other-Door Trim |
|  |  | 15034467- |  |  |
| Vandalia | 15034467 | SR | PANEL ASM-RR S/D TR | Other-Door Trim |
|  |  | 15034472- |  |  |
| Vandalia | 15034472 | SR | PANEL ASM-RR S/D TR | Other-Door Trim |
|  |  | 15034473- |  |  |
| Vandalia | 15034473 | SR | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15034474 |  | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15034475 |  | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15034476 |  | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15034480 |  | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15034481 |  | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15034482 |  | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15034483 |  | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15034484 |  | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15034485 |  | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15034488 | 15034488 | PANEL ASM-RR S/D TR | Other-Door Trim |

| | | 15034489-SR | PANEL ASM-RR S/D TR | Other-Door Trim |
|---|---|---|---|---|
| Vandalia | 15034489 | 15034489-SR | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15034490 | 15034490-SR | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15034491 | | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15034493 | | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15034510 | | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15104364 | | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15104365 | | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15104366 | 16645199-SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15104367 | 16645198-SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15104372 | 16645190-SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15104373 | 16645191-SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15104374 | | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15104375 | 16645193-SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15109479 | | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15109480 | | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15109481 | | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15109482 | | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15109485 | | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15109486 | | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15109487 | | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15109488 | | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15109496 | | INSERT ASM-FRT S/D T/PNL | Other-Door Trim |
| Vandalia | 15109497 | | INSERT ASM-FRT S/D T/PNL | Other-Door Trim |
| Vandalia | 15109498 | | INSERT ASM-FRT S/D T/PNL | Other-Door Trim |
| Vandalia | 15109499 | | INSERT ASM-FRT S/D T/PNL | Other-Door Trim |
| Vandalia | 15109506 | 16645208-SR | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15109507 | 16645209-SR | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15109508 | 16645210-SR | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15109509 | 16645211-SR | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15109510 | 16645214-SR | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15109511 | 16645215-SR | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15109512 | 16645216-SR | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15109513 | 16645217-SR | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15109518 | | INSERT ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15109519 | | INSERT ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15109520 | | INSERT ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15109521 | | INSERT ASM-RR S/D TR | Other-Door Trim |

| Vandalia | 15109522 |  | INSERT ASM-RR S/D TR | Other-Door Trim |
|---|---|---|---|---|
| Vandalia | 15109523 |  | INSERT ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15109524 |  | INSERT ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15109525 |  | INSERT ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15180956 | 15180956-SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15180957 | 15180957-SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15180958 | 15180958-SR | PANEL ASM-FRT S/D TR | Other-Door Trim |
| Vandalia | 15180959 | 15180959-SR | PANEL | Other-Door Trim |
| Vandalia | 15180966 | 15180966-SR | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15180967 | 15180967-SR | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15180968 | 15180968-SR | PANEL ASM-RR S/D TR. | Other-Door Trim |
| Vandalia | 15180969 | 15180969-SR | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15180970 | 15180970-SR | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15180971 | 15180971-SR | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15180972 | 15180972-SR | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15180973 | 15180973-SR | PANEL ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15181003 | 15181003-SR | INSERT ASM-FRT S/D T/PNL | Other-Door Trim |
| Vandalia | 15181004 | 15181004-SR | INSERT ASM-FRT S/D T/PNL | Other-Door Trim |
| Vandalia | 15181005 | 15181005-SR | INSERT ASM-FRT S/D T/PNL | Other-Door Trim |
| Vandalia | 15181006 | 15181006-SR | INSERT ASM-FRT S/D T/PNL | Other-Door Trim |
| Vandalia | 15181009 | 15181009-SR | INSERT ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15181010 | 15181010-SR | INSERT ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15181011 | 15181011-SR | INSERT ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15181012 | 15181012-SR | INSERT ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15181013 | 15181013-SR | INSERT ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15181014 | 15181014-SR | INSERT ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15181015 | 15181015-SR | INSERT ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15181016 | 15181016-SR | INSERT ASM-RR S/D TR | Other-Door Trim |
| Vandalia | 15750708 | 15750708-SR | PANEL ASM-FRT S/D TR | Other-Door Trim |

36

| Vandalia | 15048695 | 15048695-SR | PAD ASM-I/P UPR TR | | Other-IP |

Additional parts 9-6-07

| Delphi Part Number | GM Part Number | Description | System | Plant |
|---|---|---|---|---|
| 18019204 | 18019204 | SOLENOID VALVE ASM | ABS-VI | Juarez |
| 18020566 | 18020566 | SOLENOID VALVE ASM | ABS-VI | Juarez |
| 18041650 | 18041650 | ACCELEROMETER KIT | ABS-VI | Juarez |
| 18085916 | 10398071 | ISOLATION KIT | DBC7.4 | Juarez |
| 18085917 | 88964108 | BRACKET SERVICE KIT | DBC7.4 | Juarez |
| 18085918 | 88964109 | BRACKET SERVICE KIT | DBC7.4 | Juarez |
| 18085919 | 22697965 | BRACKET SERVICE KIT | DBC7.4 | Juarez |
| 21012643 | 21012643 | VALVE ASM-1-2,2-3 SHFT SOL | ABS-VI | Juarez |
| 18023770 | 18023770 | KIT-MOTOR PACK | ABS-VI | Chihuahua |
| 18024454 | 18024454 | KIT-ABS-6 MOTOR PACK ASM | ABS-VI | Chihuahua |
| 18024455 | 18024455 | KIT-TCS MOTOR PACK ASM | ABS-VI | Chihuahua |
| 18024456 | 18024456 | KIT-ABS-6 MOTOR PACK ASM | ABS-VI | Chihuahua |
| 18024466 | 18024466 | KIT-ABS-6 MOTOR PACK ASM | ABS-VI | Chihuahua |
| 18024482 | 18024482 | KIT-ABS-6 MOTOR PACK ASM | ABS-VI | Chihuahua |
| 18029776 | 18029776 | MOTOR PINION REPAIR KIT | ABS-VI | Chihuahua |
| 18029834 | 18029834 | MOTOR PACK ASSEMBLY KIT | ABS-VI | Chihuahua |
| 21013037 | 21013037 | KIT-MOTOR PACK | ABS-VI | Chihuahua |
| 91172172 | 91172172 | KIT-MOTOR PACK | ABS-VI | Chihuahua |
| 18019492 | 18019492 | KIT-MTG BOLT/TRANSFER TUBE ASM | ABS-VI | Needmore |
| 18020028 | 18020028 | KIT-COVER ASM - GEAR | ABS-VI | Needmore |
| 18020570 | 18020570 | KIT-PROPORTIONER VALVE ASM | ABS-VI | Needmore |
| 18020589 | 18020589 | KIT - COMBINATION VALVE KIT | ABS-VI | Needmore |
| 18021106 | 18021106 | KIT-GEAR AND NUT | ABS-VI | Needmore |
| 18029841 | 18029841 | PROPORTIONER VALVE ASM KIT | ABS-VI | Needmore |
| 18029842 | 18029842 | GEAR COVER ASM KIT | ABS-VI | Needmore |
| 21010996 | 21010996 | KIT-GEAR & NUT | ABS-VI | Needmore |
| 21012219 | 21012219 | GEAR COVER ASM KIT | ABS-VI | Needmore |

### SCHEDULE E

### BASELINE SUPPORT

In order to ensure the smooth seamless transition to new suppliers, the Licenses granted GM and its Affiliates pursuant to Sections 3.1, 3.2, and 3.3 of the License Agreement include (at no additional cost or expense to GM) the full time access to and use of the 25 Delphi engineering personal listed on Schedule 1 to this Attachment E, through the later of one year following the effective date of the License Agreement or July 31, 2008 (the Baseline Technical Support).

During the Baseline Technical Support period referenced above, Delphi will not reassign, transfer, or otherwise make unavailable any of the personnel listed on Schedule 1.

In the event it comes to either party's attention that an individual listed on Schedule 1 intends to leave Delphi during the Baseline Technical Support period, such party shall promptly notify the other party and the parties shall work together in good faith to develop a mutually acceptable retention strategy to endeavor to retain such personnel.

In the event an individual listed on Schedule 1 voluntarily resigns from Delphi, is dismissed from Delphi employment for cause, or is unable to work as the result of death or disability during the Baseline Technical Support period, the parties shall promptly designate a replacement for such employee of similar experience, technical background, and ability who is mutually acceptable to both parties. If no such replacement is found or made available, Delphi agrees to reimburse GM for the actual costs incurred by GM to replace such technical support, for the duration of the Baseline Technical Support period.

In addition to Baseline Technical Support described above, Delphi agrees to provide GM and its Affiliates with additional technical support as may be reasonably requested by GM over and above the Baseline Technical Support through the later of two years following effective date of the License Agreement or July 31, 2009, at a flat rate of $92.50 per hour. Delphi agrees that the full pool of individuals in Schedule 1 will be available on request through this extended period to the extent that GM has not agreed, as described below, that it no longer needs full time access to any of the individuals, and provided that GM is paying for full time access for the remaining individuals. The parties will continue to work in good faith during this period to retain the employees, but there shall be no penalty to the extent an individual is no longer available due to voluntary resignation from Delphi, dismissal from Delphi for cause, or is unable to work as the result of death or disability.

GM and Delphi agree to work cooperatively to minimize the time, effort and costs associated with the provision of the technical support described herein. In this regard, should GM determine at anytime during the Baseline Technical Support period that GM no longer needs full time access and use of one or more of the personnel listed on Schedule 1, GM shall promptly notify Delphi of such determination and Delphi shall be allowed to reassign or otherwise redeploy that individual as it deems appropriate, and Delphi shall not be penalized if upon later request by GM such individual(s) are not available; provided, however, that in the event of any such reduction in support the parties shall jointly determine the pro rata "man hour" reduction in Baseline Technical Support resulting from such action and GM shall be issued a credit for those "man hours" to be applied directly against any additional technical support which may be requested by GM under this Attachment E.

*Delphi IP License 9-6-7 Schedules rev 3.0*

Attachment E - Schedule 1

Delphi will make available baseline technical support including a total of 19 design/product engineers, 2 packaging engineers and 4 supplier quality assurance engineers as part of this agreement. This staff of 19 will support the damper and brakes requirements. Delphi agrees to support the IP transition effort with a minimum of 1 damper and 1 brake engineer at GM facilities in Southeast Michigan. Delphi agrees to identify the 25 individuals (names and job assignments) based on the project scope of work anticipated in the near future from GM Engineering.

SCHEDULE F

THIRD PARTY LICENSE AGREEMENTS

# Licensed Technology Used in Delphi Chassis Products at   Wind-down or Sale Locations

# Delphi Shanghai Brakes Operation

Shanghai GM: Delphi Shanghai
**Licenses (Production and Service)**

-J-200 front calipers (KDAC License)
-J-200 rear calipers (POA the Delphi rear corners) – KDAC License
- SGM 12 + SGM 200 cars - DIR – Park Brake Assembly
    (Delphi buys a shoe & lining from PBR) – PBR License

# Delphi Rayong Thailand

GM-Thailand: Delphi Thailand
**Licenses (Production and Service)**

-J-200 front calipers (KDAC License)
-J-200 rear calipers (KDAC License)

# Needmore Road, (Dayton Ohio)

**GMNO Requirements**
**PBR based Licenses**

Production
- DIR – Park Brake Assembly (Delphi buys a shoe and lining from PBR for this) (PBR License)

Service

- P90/GMX130 Front (PBR also made these) – Calipers (PBR License)
- T Truck Rear – Calipers (PBR License)
- CF 4 Front  - Calipers (PBR License)

*Delphi IP License 9-6-7 Schedules rev 3.0*

## SCHEDULE G

## **BANKRUPTCY CLAIMS:**

ALLIACENSE                  Allegedly involving every manufacturing technology
                            and product that relies on use of a microprocessor

PATENT HOLDING CO.          Related to airbags with potential application to
                            Delphi's steering business and/or interior and
                            closure business

TIP ENGINEERING             Related to the interior and closure business

AUTOLIV                     Related to airbags with potential application to
                            Delphi's steering business and/or interior and
                            closure business

HONDA                       Honda has a significant patent portfolio related
                            to electric power steering and they have written
                            to Delphi bringing this portfolio to our
                            attention.

**Exhibit C**
**Master Restructuring Agreement**

**MASTER RESTRUCTURING AGREEMENT**

**BETWEEN**

**DELPHI CORPORATION**

**AND**

**GENERAL MOTORS CORPORATION**

**DATED SEPTEMBER 6, 2007**

## TABLE OF CONTENTS

## ARTICLE I

## DEFINITIONS

Section 1.01   "401K Matching" ..........................................................................................3
Section 1.02   "Active Basic Life Insurance" ................................................................3
Section 1.03   "Actual Adjustment" ..............................................................................3
Section 1.04   "Actual Applicable Labor Reimbursement Percentage"...........................3
Section 1.05   "Actual Pre-Effective Date Subsidy" .......................................................3
Section 1.06   "Adjusted Sale Proceeds" .......................................................................3
Section 1.07   "Adjustment Determination Date" .........................................................3
Section 1.08   "Adjustment Payment Calculation" ..........................................................4
Section 1.09   "Adjustment Payment Date" ...................................................................4
Section 1.10   "Administrative Costs – National Benefit Center" ...................................4
Section 1.11   "Adrian Facility"....................................................................................4
Section 1.12   "Affiliates" .............................................................................................4
Section 1.13   "Agreement" ...........................................................................................4
Section 1.14   "Anaheim Facility" ................................................................................4
Section 1.15   "Anderson Facility" ...............................................................................4
Section 1.16   "Applicable Hours"................................................................................4
Section 1.17   "Applicable Labor Reimbursement Percentage" ....................................4
Section 1.18   "Applicable Production Cash Burn Percentage"......................................4
Section 1.19   "Applicable Workers' Compensation" ....................................................5
Section 1.20   "Approved Annual Amount" ...................................................................5
Section 1.21   "Article III Dispute"...............................................................................5
Section 1.22   "Assignment and Assumption Agreement – Industrial Revenue Bonds"................5
Section 1.23   "Assumed Liabilities" ............................................................................5
Section 1.24   "Athens Facility".....................................................................................5
Section 1.25   "Bankruptcy Code" .................................................................................5
Section 1.26   "Bankruptcy Court" ................................................................................5
Section 1.27   "Bankruptcy Rules" ................................................................................5
Section 1.28   "Base Monthly Warranty Level"..............................................................5
Section 1.29   "Bereavement Leave" .............................................................................6
Section 1.30   "Booked Business"..................................................................................6
Section 1.31   "Business Closing Date" .........................................................................6
Section 1.32   "Business Optionee" ...............................................................................6
Section 1.33   "Business Optionees"..............................................................................6
Section 1.34   "Business Optionor".................................................................................6
Section 1.35   "Business Outside Date" .........................................................................6
Section 1.36   "Business Transaction" ...........................................................................6
Section 1.37   "Brookhaven Facility" ............................................................................6

Section 1.38    "BTAB Process" ...................................................................................................6
Section 1.39    "Cancellation Claims" ...........................................................................................6
Section 1.40    "Capital Procurement Agreement" .........................................................................6
Section 1.41    "Capital Procurement Payment" .............................................................................6
Section 1.42    "Chapter 11 Cases" ...............................................................................................6
Section 1.43    "Clinton Facility" ..................................................................................................6
Section 1.44    "Closing Date" .......................................................................................................7
Section 1.45    "COLA" .................................................................................................................7
Section 1.46    "Columbus Facility"...............................................................................................7
Section 1.47    "Component Parts"..................................................................................................7
Section 1.48    "Confirmation Order" .............................................................................................7
Section 1.49    "Contract Term".....................................................................................................7
Section 1.50    "Contractual Savings".............................................................................................7
Section 1.51    "Contribution Date" ...............................................................................................7
Section 1.52    "Coopersville Facility"...........................................................................................7
Section 1.53    "DAS".....................................................................................................................7
Section 1.54    "Debtors"................................................................................................................7
Section 1.55    "Delphi" .................................................................................................................7
Section 1.56    "Delphi Assets"......................................................................................................7
Section 1.57    "Delphi Automotive Systems Business"...................................................................7
Section 1.58    "Delphi Material Impact".......................................................................................8
Section 1.59    "Delphi Guaranty Parties".......................................................................................8
Section 1.60    "Delphi Notice".....................................................................................................8
Section 1.61    "Delphi Parties" .....................................................................................................8
Section 1.62    "Delphi Products" ..................................................................................................8
Section 1.63    "Delphi-Related Parties".........................................................................................8
Section 1.64    "Delphi Retained Employment Liabilities" ..............................................................8
Section 1.65    "Delphi Supplier Cancellation Claims" ...................................................................8
Section 1.66    "Delphi Suppliers" .................................................................................................8
Section 1.67    "Disability/Sickness & Accident"............................................................................8
Section 1.68    "Dispute Resolution Termination Date" ..................................................................8
Section 1.69    "DTI"......................................................................................................................9
Section 1.70    "Effective Date" .....................................................................................................9
Section 1.71    "Employer Taxes" ..................................................................................................9
Section 1.72    "Employment Outside Date"....................................................................................9
Section 1.73    "Employment Party" ...............................................................................................9
Section 1.74    "Employment Transfer" ..........................................................................................9
Section 1.75    "Employment Transfer Facility"...............................................................................9
Section 1.76    "Encumbrance" ......................................................................................................9
Section 1.77    "Environmental Matters Agreement" .......................................................................9
Section 1.78    "Estimated Payment Amount" .................................................................................9
Section 1.79    "Excess Interiors Proceeds" ....................................................................................9
Section 1.80    "Excess Labor Costs"..............................................................................................9
Section 1.81    "Excess Sandusky Proceeds" .................................................................................10
Section 1.82    "Excess Steering Proceeds" ...................................................................................10
Section 1.83    "Existing Agreements".........................................................................................10

Section 1.84    "Financial Services Supply Agreement" ...............................................................10
Section 1.85    "Fitzgerald Facility" .................................................................................................10
Section 1.86    "Flint East Facility" .................................................................................................10
Section 1.87    "Flint West Facility" ................................................................................................10
Section 1.88    "Footprint Facilities" ...............................................................................................10
Section 1.89    "Global Interiors & Closures Business" ..................................................................10
Section 1.90    "Global Sourcing" .....................................................................................................11
Section 1.91    "Global Steering Business" ......................................................................................11
Section 1.92    "GM GPSC" ..............................................................................................................12
Section 1.93    "GM Parties" .............................................................................................................12
Section 1.94    "GM Purchase Order" ...............................................................................................12
Section 1.95    "GM-Related Parties" ...............................................................................................12
Section 1.96    "GM Suppliers" .........................................................................................................12
Section 1.97    "Grand Rapids Facility" ............................................................................................12
Section 1.98    "Guaranteed Agreements" ........................................................................................12
Section 1.99    "Holiday" ...................................................................................................................13
Section 1.100   "Home Avenue Facility" ...........................................................................................13
Section 1.101   "IAM MOU" .............................................................................................................13
Section 1.102   "IBEW MOUs" .........................................................................................................13
Section 1.103   "Including" or "including" ........................................................................................13
Section 1.104   "Income Tax Allocation Agreement" .......................................................................13
Section 1.105   "Independence Week" ...............................................................................................13
Section 1.106   "Information" .............................................................................................................13
Section 1.107   "Initial Payment Date" ..............................................................................................13
Section 1.108   "Initial Sale Proceeds" .............................................................................................13
Section 1.109   "Intellectual Property Contracts Transfer Agreement" ............................................13
Section 1.110   "Intellectual Property License Agreement" .............................................................13
Section 1.111   "Intellectual Property Transfer Agreement" ............................................................14
Section 1.112   "Interiors Advance" ..................................................................................................14
Section 1.113   "Invoice Delivery Date" ...........................................................................................14
Section 1.114   "IP License" ..............................................................................................................14
Section 1.115   "IUE-CWA" ..............................................................................................................14
Section 1.116   "IUE-CWA Business" ...............................................................................................14
Section 1.117   "IUE-CWA Keep Facilities" ....................................................................................14
Section 1.118   "IUE-CWA MOU" ....................................................................................................14
Section 1.119   "IUOE MOUs" ..........................................................................................................14
Section 1.120   "Jury Duty" ...............................................................................................................14
Section 1.121   "Kettering Facility" ...................................................................................................14
Section 1.122   "Kokomo Facility" ....................................................................................................14
Section 1.123   "Labor Cost Amount" ...............................................................................................15
Section 1.124   "Labor Cost Line Items" ...........................................................................................15
Section 1.125   "Labor MOUs" ..........................................................................................................16
Section 1.126   "Laurel Facility" ........................................................................................................16
Section 1.127   "Lockport Facility" ....................................................................................................16
Section 1.128   "Master Separation Agreement" ...............................................................................16
Section 1.129   "Military Leave" ........................................................................................................16

Section 1.130 "Milwaukee E&C Facility" .................................................................................16
Section 1.131 "Milwaukee E&S Facility" .................................................................................16
Section 1.132 "MNS-2 Payment" .............................................................................................16
Section 1.133 "Moraine Facility" .............................................................................................16
Section 1.134 "Needmore Road Facility" .................................................................................16
Section 1.135 "Net Working Capital" .......................................................................................16
Section 1.136 "Night Shift Premium" .......................................................................................16
Section 1.137 "Non-GM Business" ...........................................................................................17
Section 1.138 "Non-Income Tax Indemnification Agreement" ................................................17
Section 1.139 "OE" ...................................................................................................................17
Section 1.140 "OE Parts" ..........................................................................................................17
Section 1.141 "Olathe Facility" ................................................................................................17
Section 1.142 "Option Designee" .............................................................................................17
Section 1.143 "Outstanding GM Purchase Order" ...................................................................17
Section 1.144 "Overtime Premium" ..........................................................................................17
Section 1.145 "Paid Pre-Effective Date Subsidy" ...................................................................17
Section 1.146 "Party" or "Parties" ............................................................................................17
Section 1.147 "PAYGO Health Care" .......................................................................................17
Section 1.148 "Performance Bonus" .........................................................................................17
Section 1.149 "Permitted Encumbrance" ..................................................................................17
Section 1.150 "Person" ..............................................................................................................18
Section 1.151 "Petition Date" ...................................................................................................18
Section 1.152 "Plan" .................................................................................................................18
Section 1.153 "Possessor" .........................................................................................................18
Section 1.154 "Pre-Effective Date Subsidy Statement" ...........................................................18
Section 1.155 "Price Down Arrangements" ..............................................................................18
Section 1.156 "Prior Relationship" ...........................................................................................18
Section 1.157 "Production Cash Burn" ......................................................................................18
Section 1.158 "Profit Sharing" ..................................................................................................19
Section 1.159 "Proposed Purchaser" .........................................................................................19
Section 1.160 "PRP Employees" ...............................................................................................19
Section 1.161 "Red Circle Period" ............................................................................................19
Section 1.162 "Reimbursement Adjustment Amount" ..............................................................19
Section 1.163 "Related Parties" .................................................................................................19
Section 1.164 "Requestor" .........................................................................................................19
Section 1.165 "Restructuring Dispute" ......................................................................................19
Section 1.166 "Retained Liabilities" .........................................................................................20
Section 1.167 "Retention Period" ..............................................................................................20
Section 1.168 "Rochester Facility" ...........................................................................................20
Section 1.169 "Saginaw E&C Assets" .......................................................................................20
Section 1.170 "Saginaw E&C Facility" .....................................................................................20
Section 1.171 "Saginaw Steering Facility" ...............................................................................20
Section 1.172 "Sale Businesses" ...............................................................................................20
Section 1.173 "Sale Facility" ....................................................................................................20
Section 1.174 "Sale Proceeds" ..................................................................................................20
Section 1.175 "Sandusky Advance" ..........................................................................................20

iv

Section 1.176  "Sandusky Business" ............................................................................................20
Section 1.177  "Sandusky Facility" ..............................................................................................21
Section 1.178  "Separation Costs" ................................................................................................21
Section 1.179  "SEPO" ..................................................................................................................21
Section 1.180  "Settlement Agreement" .......................................................................................21
Section 1.181  "Severance" ...........................................................................................................22
Section 1.182  "Standard GM Terms" ..........................................................................................22
Section 1.183  "Straight Time" ......................................................................................................22
Section 1.184  "Steering Advance" ...............................................................................................22
Section 1.185  "Suggestion Awards" ............................................................................................22
Section 1.186  "Supplemental Unemployment Benefits" .............................................................22
Section 1.187  "Support End Date" ...............................................................................................22
Section 1.188  "Support Facilities" ...............................................................................................22
Section 1.189  "Support Period" ....................................................................................................22
Section 1.190  "Tooling" ................................................................................................................23
Section 1.191  "Trademark and Trade Name Agreement" ............................................................23
Section 1.192  "Training and Legal" .............................................................................................23
Section 1.193  "Transformation Plan" ..........................................................................................23
Section 1.194  "UAW" ...................................................................................................................23
Section 1.195  "UAW Footprint Facilities" ..................................................................................23
Section 1.196  "UAW Keep Business" ..........................................................................................23
Section 1.197  "UAW Keep Facilities" .........................................................................................23
Section 1.198  "UAW MOU" ........................................................................................................23
Section 1.199  "UAW Sale Business" ...........................................................................................23
Section 1.200  "UAW Wind-down Facilities" ..............................................................................23
Section 1.201  "Unrecovered Separation Costs" ...........................................................................23
Section 1.202  "Unsold Business" .................................................................................................24
Section 1.203  "USW" ...................................................................................................................24
Section 1.204  "USW MOUs" .......................................................................................................24
Section 1.205  "Vacation" ..............................................................................................................24
Section 1.206  "Vandalia Facility" ................................................................................................24
Section 1.207  "Warranty Settlement Agreement" ........................................................................24
Section 1.208  "Warren Facility" ...................................................................................................24
Section 1.209  "Wichita Falls Facility" .........................................................................................24
Section 1.210  "Wind-down Facilities" .........................................................................................24

## ARTICLE II

## CERTAIN EXHIBITS TO BE FILED UNDER SEAL

Section 2.01   Identification of Exhibits to the Filed Under Seal ..................................................25

## ARTICLE III

## REVENUE PLAN

Section 3.01   Existing Agreements...............................................................................................26

Section 3.02   Contract Extensions .............................................................................................27
Section 3.03   Price Down Arrangements.....................................................................................27
Section 3.04   New Business Awards at UAW Facilities ..............................................................29
Section 3.05   New Business Awards at IUE-CWA Facilities ......................................................29
Section 3.06   Reserved................................................................................................................29
Section 3.07   Other New Business Awards ..................................................................................29
Section 3.08   First Opportunity Process ......................................................................................30
Section 3.09   Pricing and Other Business Terms for New Business Awards................................30
Section 3.10   Dispute Resolution.................................................................................................30
Section 3.11   Limitations on Global Sourcing..............................................................................30
Section 3.12   Bidding Opportunities............................................................................................31

## ARTICLE IV

### FACILITIES PORTFOLIO

Section 4.01   Labor Reimbursement.............................................................................................32
Section 4.02   Production Cash Burn Breakeven............................................................................34
Section 4.03   Sunset Requirements..............................................................................................38
Section 4.04   GM Working Capital Backstop for Sale Facilities .................................................39
Section 4.05   Additional Terms Regarding Sale Facilities ...........................................................45
Section 4.06   Treatment of Unsold Businesses and the Transfer of Certain Employees.............46
Section 4.07   Additional Terms Regarding Wind-Down Facilities..............................................54
Section 4.08   Additional Terms Regarding Footprint Facilities ...................................................54
Section 4.09   Additional Terms Regarding UAW Keep Facilities................................................55

## ARTICLE V

### TREATMENT OF LEGACY AGREEMENTS; ORDINARY COURSE MATTERS; INDEMNIFICATION

Section 5.01   Disposition of Agreements with GM ......................................................................55
Section 5.02   Limitation of Existing Indemnification Obligations...............................................60
Section 5.03   Reserved................................................................................................................60
Section 5.04   Reserved................................................................................................................60
Section 5.05   Reserved................................................................................................................60
Section 5.06   Access to Information ............................................................................................60
Section 5.07   Record Retention ..................................................................................................61
Section 5.08   Reimbursement......................................................................................................63
Section 5.09   Product Liability Claims........................................................................................63
Section 5.10   Cooperation...........................................................................................................65
Section 5.11   Continuation of Limited Employee Related Matters..............................................65

## ARTICLE VI

### EFFECTIVENESS

Section 6.01    Effectiveness............................................................................................................66

## ARTICLE VII

### MISCELLANEOUS

Section 7.01    On-Going Setoff Provisions......................................................................................66
Section 7.02    Termination Provisions.............................................................................................66
Section 7.03    Guaranty by Delphi..................................................................................................67
Section 7.04    Continued Ownership of DAS..................................................................................68
Section 7.05    Reserved...................................................................................................................68
Section 7.06    Cancellation Claims..................................................................................................68
Section 7.07    Tooling Acknowledgment ........................................................................................69
Section 7.08    Reserved...................................................................................................................69
Section 7.09    No Undisclosed Agreements or Commitments.........................................................69
Section 7.10    Governing Law; Jurisdiction; Venue .......................................................................70
Section 7.11    Dispute Resolution...................................................................................................70
Section 7.12    No Solicitation..........................................................................................................70
Section 7.13    Negotiations Not Admissible....................................................................................70
Section 7.14    Specific Performance ...............................................................................................71
Section 7.15    Representations and Warranties of Delphi and GM .................................................71
Section 7.16    Waiver; Modification; Amendment...........................................................................71
Section 7.17    Binding Effect; Assignments....................................................................................71
Section 7.18    Third Party Beneficiaries .........................................................................................72
Section 7.19    Notices .....................................................................................................................72
Section 7.20    Waiver of Right to Trial by Jury...............................................................................73
Section 7.21    Service of Process....................................................................................................73
Section 7.22    Interpretation............................................................................................................73
Section 7.23    Expenses ..................................................................................................................74
Section 7.24    Entire Agreement; Parties' Intentions; Construction ...............................................74
Section 7.25    Severability ..............................................................................................................74
Section 7.26    Headings ..................................................................................................................74
Section 7.27    Counterparts.............................................................................................................75

## EXHIBITS

| Exhibit 1.23 | Assumed Liabilities |
|---|---|
| Exhibit 1.166 | Retained Liabilities |
| Exhibit 1.169 | Excluded Saginaw Assets |
| Exhibit 1.178 | Separation Costs |
| Exhibit 3.01(a) | Price Down Arrangements and Related Matters |
| Exhibit 3.01(a)(i) | Outstanding GM Purchase Orders |
| Exhibit 3.01(b) | Recently Awarded Business |
| Exhibit 3.02 | Contract Extensions |
| Exhibit 3.03(c) | Changes in Manufacturing Location |
| Exhibit 3.07 | New Business Awards |
| Exhibit 3.08(a) | FOP Programs |
| Exhibit 3.08(b) | First Opportunity Process |
| Exhibit 3.12 | Sites Providing Product Identified in Exhibit 3.01(a) That Are on New Business Hold As of August 29, 2007 |
| Exhibit 4.01(a) | Form of Monthly Invoice for Excess Labor Costs |
| Exhibit 4.02(b) | Form of Monthly Invoice for the Aggregate Amount of the Applicable Cash Burn Percentage of Production Cash Burn Incurred at all Support Facilities |
| Exhibit 4.02(i) | Letter from Bill Hurles, of GM, to Jeff Paprocki, of Delphi, dated February 1, 2007 |
| Exhibit 4.06(a)(xiv) | Proposed Purchaser |
| Exhibit 5.01(a)(i) | Environmental Matters Agreement between Delphi Automotive Systems Corporation (n/k/a Delphi) and GM, dated as of "October 1998" |
| Exhibit 5.01(a)(iii) | Financial Services Supply Agreement dated as of December 18, 1998 between DAS and GM |
| Exhibit 5.01(a)(iv) | Amended and Restated Agreement for the Allocation of United States Federal, State and Local Income Taxes dated as of December 16, 1998 between Delphi Automotive Systems Corporation (n/k/a Delphi) and GM |
| Exhibit 5.01(a)(v) | Agreement for Indemnification of United States Federal, State and Local Non-Income Taxes dated as of December 16, 1998 between Delphi Automotive Systems Corporation (n/k/a Delphi) and GM |
| Exhibit 5.01(a)(vi) | Assignment and Assumption Agreement – |

| | Industrial Development Bonds dated as of January 1, 1999 between DAS and GM |
|---|---|
| Exhibit 5.01(a)(vii)(i) | Lease Agreement dated as of May 1, 2000 between Delphi Canada Inc. and General Motors of Canada Limited, as amended August 1, 2002 |
| Exhibit 5.01(a)(vii)(ii) | Oshawa Labour & Management Agreement between Delphi Canada, Inc. and General Motors Canada Limited dated as of May 1, 2000. |
| Exhibit 5.01(a)(vii)(iii) | Administrative Services Agreement between Delphi Canada, Inc. and General Motors Canada Limited dated as of May 1, 2000. |
| Exhibit 5.01(a)(viii) | Trademark and Trade Name Agreement dated as of January 1, 1999 between Delphi Automotive Systems Corporation (n/k/a Delphi), DAS, and GM |
| Exhibit 5.01(a)(ix) | Intellectual Property Contracts Transfer Agreement dated as of December 4, 1998, between DTI and GM, as amended October 31, 2001 |
| Exhibit 5.01(a)(x) | Intellectual Property License Agreement dated as of December 4, 1998, between DTI and GM |
| Exhibit 5.01(a)(xi) | Intellectual Property Transfer Agreement dated as of December 4, 1998 between DTI and GM |
| Exhibit 5.01(a)(xiv) | Real Estate Assignment and Assumption Agreements |
| Exhibit 5.01(b)(i) | UAW – GM – Delphi Memorandum of Understanding Regarding Benefit Plan Treatment between UAW, GM, and Delphi Automotive Systems Corporation (n/k/a Delphi) dated September 30, 1999 |
| Exhibit 5.01(b)(ii) | Letter agreement dated March 4, 1999 between Delphi and GM concerning certain asbestos liability, as supplemented by letter agreement dated May 10, 1999 between Delphi and GM |
| Exhibit 5.01(b)(iii) | Investment Tax Credit Transfer Agreement dated December 8, 2000 between Delphi Automotive Systems Corporation (n/k/a Delphi) and GM |
| Exhibit 5.01(b)(iv) | Management Services Agreement dated September 19, 2002, as amended, among Delphi Corporation and General Motors |

ii

|  | Management Corporation, Delphi Mechatronic Systems, Inc., Packard-Hughes Interconnect Company and ASEC Manufacturing |
|---|---|
| Exhibit 5.01(b)(v) | Battery Facilitation Agreement – Transaction Summary dated as of March 21, 2005 between Delphi and GM |
| Exhibit 5.01(b)(vi) | Agreement dated as of June 3, 2005 between Delphi and GM concerning certain matters related to Collins & Aikman Corporation |
| Exhibit 5.11(c) | Certain Employment Related Claims |

## MASTER RESTRUCTURING AGREEMENT

This Master Restructuring Agreement (the "Agreement") is entered into as of
September 6, 2007, by and between Delphi Corporation ("Delphi") and General Motors
Corporation ("GM"). Each of Delphi and GM is referred to herein individually as a "Party," and
collectively, as the "Parties." As used herein, the phrases "this Agreement," "hereto,"
"hereunder," and phrases of like import shall mean this Agreement.

### RECITALS

WHEREAS, on October 8, 2005 and October 14, 2005, the Debtors commenced
the Chapter 11 Cases in the Bankruptcy Court for the purpose of restructuring their businesses
and related financial obligations pursuant to an overall transformation strategy (the
"Transformation Plan") that would incorporate the following structural components:

(i)     Modification of Delphi's labor agreements;

(ii)    Allocation of responsibilities between Delphi and GM concerning (a)
certain legacy obligations, including various pension and other post-
employment benefit obligations; (b) costs associated with the
transformation of the Debtors' business (including the provision of
financial and other forms of support by GM in connection with certain
businesses that Delphi shall retain and certain businesses that Delphi
intends to sell or wind down); (c) the restructuring of ongoing contractual
relationships; and (d) the amount and treatment of GM's claims in the
Chapter 11 Cases;

(iii)   Streamlining of Delphi's product portfolio to capitalize on its world-class
technology and market strengths and making the necessary manufacturing
alignment with Delphi's new focus;

(iv)    Transformation of Delphi's salaried work force in keeping with a
sustainable cost structure and streamlined product portfolio; and

(v)     Resolution of Delphi's pension issues.

WHEREAS, the Parties have an extensive commercial relationship and an
intertwined corporate and organizational history which has given rise to certain alleged claims
and causes of action. Prior to 1999, GM operated Delphi's businesses through various divisions
and subsidiaries. Delphi was incorporated as a wholly owned subsidiary of GM in 1998.
Effective January 1, 1999, GM transferred the assets and liabilities of certain divisions and
subsidiaries to Delphi in accordance with the terms of a Master Separation Agreement between
Delphi and GM. GM remains Delphi's single largest customer, and Delphi is GM's single largest
supplier. Accordingly, resolution of the issues identified in clause (ii) of the first Recital is
critical to the success of Delphi's restructuring and vitally important to GM.

WHEREAS, pursuant to the Plan and the Confirmation Order, and subject to the requirements of Bankruptcy Rule 9019, the Parties have determined to settle various disputes and compromise certain claims as provided by two principal agreements: (i) the Settlement Agreement and (ii) this Agreement. Together, the Settlement Agreement and this Agreement provide that the Parties shall perform the obligations set forth therein, financial or otherwise, in exchange for, among other things, the mutual releases of the Parties, their subsidiaries and Affiliates, and various third parties from all claims and causes of action other than as specified in the Settlement Agreement.

WHEREAS, the Settlement Agreement addresses primarily those matters for which the Parties have agreed upon resolutions that can be implemented in the short term. Accordingly, most obligations set forth in the Settlement Agreement are to be performed upon, or as soon as reasonably practicable after, the occurrence of the Effective Date. By contrast, resolution of most of the matters addressed in this Agreement shall require a significantly longer period that shall extend for a number of years after confirmation of the Plan. Performance of the obligations set forth in this Agreement is critical to the successful implementation of the Debtors' Transformation Plan and is also vitally important to GM.

WHEREAS, GM will work cooperatively with Delphi in good faith to address issues relating to competitiveness at the UAW Keep Facilities after the expiration of the current collective bargaining agreements referenced in the applicable Labor MOUs.

WHEREAS, the effectiveness of this Agreement is conditioned on the approval of the Bankruptcy Court and the satisfaction of other conditions set forth herein.

WHEREAS, as set forth in the Plan and the Confirmation Order, the Settlement Agreement and this Agreement are incorporated by reference in their entirety into the Plan and form integral parts thereof.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, and subject to the terms and conditions hereof, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01   "401K Matching" shall mean cash paid by Delphi related to company match of employee contributions to employee retirement accounts pursuant to the applicable collective bargaining agreement, to hourly employees during the time period included in calculating the Labor Cost Amount.

Section 1.02   "Active Basic Life Insurance" shall mean Basic Life Insurance, as defined in the applicable collective bargaining agreement, expenses accrued by Delphi to fund cash reserves maintained by METLife (or any other basic life insurance provider used by Delphi), with respect to hourly employees during the time period included in calculating the Labor Cost Amount.

Section 1.03   "Actual Adjustment" shall have the meaning ascribed to such term in section 3.03(a)(ii) of this Agreement.

Section 1.04   "Actual Applicable Labor Reimbursement Percentage" shall be calculated (i) for the calendar years 2008 through 2014, by (x) subtracting from the aggregate net sales across all the UAW Keep Facilities for a given calendar year the greater of zero or the excess, if any, of the Non-GM Business during such calendar year over the Approved Annual Amount, (y) dividing the remainder by the aggregate net sales across the UAW Keep Facilities for such calendar year, and (z) multiplying the quotient by 100 (i.e., (annual net sales – (the greater of zero or (Non-GM Business minus Approved Annual Amount))/ annual net sales) x 100); and (ii) for the calendar year 2015, by (x) subtracting from the aggregate net sales across all the UAW Keep Facilities from January 1, 2015 through September 14, 2015 the greater of zero or the excess, if any, of the Non-GM Business during such period over the Approved Annual Amount, (y) dividing the remainder by the aggregate net sales across the UAW Keep Facilities from January 1, 2015 through September 14, 2015, and (z) multiplying the quotient by 100.

Section 1.05   "Actual Pre-Effective Date Subsidy" shall have the meaning ascribed to such term in section 4.01(b)(i) of this Agreement.

Section 1.06   "Adjusted Sale Proceeds" shall mean the amount of the Sale Proceeds from the sale of any of the Sale Businesses following and taking into account any post-closing adjustments related to Net Working Capital, future gainsharing mechanisms or any other adjustments provided for in any purchase agreement between Delphi and the buyer; provided that Delphi shall use commercially reasonable efforts to mitigate any unfavorable post-closing adjustments.

Section 1.07   "Adjustment Determination Date" shall mean(a) the date or dates determination of any post-closing adjustments to the Sale Proceeds, including payments relating

to any gainsharing mechanism, should be known or can be determined, or (b) 30 days after any measurement or reassessment date of Net Working Capital.

Section 1.08     "Adjustment Payment Calculation" shall have the meaning given in Section 4.04(i).

Section 1.09     "Adjustment Payment Date" shall mean the date that is 30 days after Delphi's delivery of an Adjustment Payment Calculation.

Section 1.10     "Administrative Costs – National Benefit Center" shall mean accruals to fund a reserve to make cash payments by Delphi for administrative services provided for hourly employee benefit plans as applied to employees by the National Benefit Center for the period to which the calculation of the Labor Cost Amount applies.

Section 1.11     "Adrian Facility" shall mean the facility located at 1450 East Beecher Street, Adrian, Michigan 49221.

Section 1.12     "Affiliates" shall mean, with respect to any entity, any other entity directly or indirectly, controlling, controlled by or under direct or indirect common control with such entity.

Section 1.13     "Agreement" shall have the meaning ascribed to such term in the Preamble of this Agreement.

Section 1.14     "Anaheim Facility" shall mean the facility located at 1201 North Magnolia Avenue, Anaheim, California 92801.

Section 1.15     "Anderson Facility" shall mean the facility located at 2620 East 38th Street, Anderson, Indiana 46016.

Section 1.16     "Applicable Hours" shall mean the actual hours worked and estimated month end hours accrued consistent with current payroll processes for all active hourly employees (including straight time and overtime temporary employees, but excluding PRP Employees and employees in JOBs banks or on layoff or leaves) of Delphi at all Delphi Facilities for which Delphi is eligible to receive the labor reimbursement pursuant to section 4.01 hereof during any period referred to in section 4.01(c) hereof; provided, however, that hours worked by hourly employees of Delphi the cash expenditures in respect of which are not included in the definition of Labor Cost Amount shall not be Applicable Hours.

Section 1.17     "Applicable Labor Reimbursement Percentage" shall mean (a) for any calendar month during the calendar year 2008, 100%; and (b) for any calendar month during the calendar years 2009 through 2015, the Actual Applicable Labor Reimbursement Percentage for the immediately preceding calendar year.

Section 1.18     "Applicable Production Cash Burn Percentage" shall mean (x) for any month during which net sales to GM and GM's direct and indirect tiered suppliers for GM production are 95% or more of such Support Facility's total net sales, 100%; (y) for any month during which net sales to GM and GM's direct and indirect tiered suppliers for GM production

MRA-4

are less than 95% of such Support Facility's total net sales and such Support Facility has net sales to any other customer, the GM Percentage (as defined below); and (z) for any month in which a Support Facility has no net sales to any customer, the percentage that applied to the last month in which such Support Facility had net sales to any customer. "GM Percentage" shall mean the percentage of a Support Facility's total net sales comprised by net sales to GM and GM's direct and indirect tiered suppliers for GM production; provided, however, that for the last two (2) months of GM production at any Support Facility, the GM Percentage shall be the Applicable Production Cash Burn Percentage applicable to the month immediately preceding the last two months of GM production at such Support Facility.

Section 1.19   "Applicable Workers' Compensation" shall mean accrued expenses by Delphi for workers' compensation claims related to workers' compensation claims based on work performed on or after January 1, 2006, by hourly employees for the time period included in calculating the Labor Cost Amount.

Section 1.20   "Approved Annual Amount" shall mean (i) for calendar years 2008 through 2014, $240 million, unless GM and Delphi have otherwise agreed in writing, and (ii) for the period commencing on January 1, 2015 and ending on September 14, 2015, $170 million, unless GM and Delphi have otherwise agreed in writing.

Section 1.21   "Article III Dispute" shall have the meaning ascribed to such term in section 3.10 of this Agreement.

Section 1.22   "Assignment and Assumption Agreement – Industrial Revenue Bonds" shall have the meaning ascribed to such term in section 5.01(a)(vi).

Section 1.23   "Assumed Liabilities" shall have the meaning ascribed to such term on **Exhibit 1.23** to this Agreement.

Section 1.24   "Athens Facility" shall mean the facilities consisting of two buildings located on U.S. Highway 31 South, Athens, Alabama 35611.

Section 1.25   "Bankruptcy Code" shall mean the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as in effect on the Petition Date.

Section 1.26   "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of New York or such other court as may have jurisdiction over the Chapter 11 Cases.

Section 1.27   "Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure.

Section 1.28   "Base Monthly Warranty Level" shall have the meaning ascribed to such term in section 4.02(e) of this Agreement.

Section 1.29    "Bereavement Leave" shall mean cash paid by Delphi for paid time off for specified bereavement periods, pursuant to the applicable collective bargaining agreement, to hourly employees for the time period included in calculating the Labor Cost Amount.

Section 1.30    "Booked Business" shall have the meaning ascribed to such term in section 3.01(b) of this Agreement.

Section 1.31    "Business Closing Date" shall have the meaning set forth in section 4.06(a)(ii) of this Agreement.

Section 1.32    "Business Optionee" shall have the meaning set forth in section 4.06(a)(i) of this Agreement.

Section 1.33    "Business Optionees" shall have the meaning set forth in section 4.06(a)(i) of this Agreement.

Section 1.34    "Business Optionor" shall have the meaning set forth in section 4.06(a)(i) of this Agreement.

Section 1.35    "Business Outside Date" shall have the meaning set forth in section 4.06(a)(vi) of this Agreement.

Section 1.36    "Business Transaction" shall have the meaning set forth in section 4.06(a)(i) of this Agreement.

Section 1.37    "Brookhaven Facility" shall mean the facility located at 925 Industrial Park Road, Brookhaven, Mississippi 39601.

Section 1.38    "BTAB Process" shall have the meaning ascribed to such term in section 4.03(b) of this Agreement.

Section 1.39    "Cancellation Claims" shall have the meaning ascribed to such term in section 7.06(a) of this Agreement.

Section 1.40    "Capital Procurement Agreement" shall mean the Capital Procurement Agreement, dated June 5, 2007, between GM and Delphi.

Section 1.41    "Capital Procurement Payment" shall mean the amount due from Delphi to GM under that certain Capital Procurement Agreement dated June 5, 2007 pursuant to Delphi's purchase of the New Tooling and Equipment (as defined in the Capital Procurement Agreement) from GM in connection with a sale of the Sandusky Business.

Section 1.42    "Chapter 11 Cases" shall mean the cases commenced by the Debtors on October 8, 2005, and October 14, 2005, under the Bankruptcy Code in the Bankruptcy Court.

Section 1.43    "Clinton Facility" shall mean the facilities located at 1001 Clinton Industrial Park, Clinton, Mississippi 39056.

Section 1.44    "Closing Date" shall mean the date of closing of a sale of any of the Sale Businesses.

Section 1.45    "COLA" shall mean cash paid by Delphi for Cost of Living Allowance, as defined in the applicable collective bargaining agreement, to hourly employees for the time period included in calculating the Labor Cost Amount. The definition of the Labor Cost Amount shall not include COLA after it ceases to be paid under the applicable collective bargaining agreement.

Section 1.46    "Columbus Facility" shall mean the facility located at 200 Georgesville Road, Columbus, Ohio 43228.

Section 1.47    "Component Parts" shall have the meaning ascribed to such term in section 3.01(a) hereof.

Section 1.48    "Confirmation Order" shall mean the order entered by the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code and which shall, among other things, contain a finding by the Bankruptcy Court in connection with feasibility of the Plan that Delphi has or will have on the Effective Date the financial wherewithal to consummate all transactions contemplated by section 2.03(c) of the Settlement Agreement in accordance with the terms of such section and shall direct Delphi to consummate such transactions.

Section 1.49    "Contract Term" shall have the meaning ascribed to such term in section 3.01(b).

Section 1.50    "Contractual Savings" shall have the meaning ascribed to such term in section 3.03(c).

Section 1.51    "Contribution Date" shall have the meaning ascribed to such term in section 5.06 of this Agreement.

Section 1.52    "Coopersville Facility" shall mean the facility located at 999 Randall Road, Coopersville, Michigan 49404.

Section 1.53    "DAS" shall mean Delphi Automotive Systems LLC, a Delaware limited liability company.

Section 1.54    "Debtors" shall mean Delphi Corporation and its subsidiaries and Affiliates operating as debtors and debtors-in-possession in the Chapter 11 Cases.

Section 1.55    "Delphi" shall have the meaning ascribed to such term in the Preamble of this Agreement.

Section 1.56    "Delphi Assets" shall mean all assets contributed or transferred to Delphi or its Affiliates at the Contribution Date.

Section 1.57    "Delphi Automotive Systems Business" means the business conducted by the Delphi Automotive Systems Sector of GM at any time on or before the Contribution Date.

Section 1.58   "Delphi Material Impact" shall have the meaning ascribed to such term in section 7.03(e) of this Agreement.

Section 1.59   "Delphi Guaranty Parties" shall have the meaning ascribed to such term in section 7.03(a) of this Agreement.

Section 1.60   "Delphi Notice" shall have the meaning ascribed to such term in section 7.03(e) of this Agreement.

Section 1.61   "Delphi Parties" shall mean Delphi and any and all of its subsidiaries and Affiliates.

Section 1.62   "Delphi Products" shall have the meaning ascribed to such term in section 5.09(a) of this Agreement.

Section 1.63   "Delphi-Related Parties" shall mean the Debtors, the estates of the Debtors as created under Bankruptcy Code section 541, the Delphi Hourly-Rate Employees Pension Plan, the Delphi Health Care Program for Hourly Employees, the Delphi Life and Disability Benefits Program for Hourly Employees, any other Delphi pension or welfare benefit plan, and each of their respective current and former principals, officers, directors, agents, employees, advisors, and representatives (including any attorneys, financial advisors, investment bankers, and other professionals retained by such persons or entities) in their respective capacities.

Section 1.64   "Delphi Retained Employment Liabilities" shall mean all liabilities and obligations relating to employees and former employees at the Employment Transfer Facilities arising from acts or events relating to employment occurring on or before the date the Employment Transfer takes place (regardless of when any related claim is made), all Delphi obligations under the UAW Benefit Guarantee Term Sheet, all accrued or vested pension benefits, all Delphi obligations for retired employees or employees who are PRP participants, all WARN Act notice obligations arising from the transactions contemplated in section 4.06 hereof, and all Delphi obligations under the SAP and SAP-T. For the avoidance of doubt, obligations under Section 2.02(d) of the Settlement Agreement which are attributable to periods after the Employment Transfer Date shall be assumed by the applicable Employment Party.

Section 1.65   "Delphi Supplier Cancellation Claims" shall have the meaning ascribed to such term in section 7.06(b) of this Agreement.

Section 1.66   "Delphi Suppliers" shall mean any and all entities that supply components, component systems, goods, or services to Delphi Parties.

Section 1.67   "Disability/Sickness & Accident" shall mean cash paid by Delphi for sickness and accident and accrued expense for extended disability, pursuant to the applicable collective bargaining agreement, to hourly employees during the time period included in calculating the Labor Cost Amount.

Section 1.68   "Dispute Resolution Termination Date" shall have the meaning ascribed to such term in section 7.03(e) of this Agreement.

MRA-8

Section 1.69    "DTI" shall have the meaning ascribed to such term in section 5.01(a)(i) hereof.

Section 1.70    "Effective Date" shall have the meaning ascribed to such term in section 6.01 hereof.

Section 1.71    "Employer Taxes" shall mean cash paid by Delphi for state unemployment taxes, federal unemployment taxes, and social security taxes related to hourly employees for the time period included in calculating the Labor Cost Amount.

Section 1.72    "Employment Outside Date" shall have the meaning set forth in section 4.06(b)(i) of this Agreement.

Section 1.73    "Employment Party" shall have the meaning set forth in section 4.06(b)(i) of this Agreement.

Section 1.74    "Employment Transfer" shall have the meaning set forth in section 4.06(b)(i) of this Agreement.

Section 1.75    "Employment Transfer Facility" shall have the meaning set forth in section 4.06(b)(i) of this Agreement.

Section 1.76    "Encumbrance" shall mean: (i) with respect to the equity interests in the joint venture companies, any voting trust, shareholder agreement, proxy or other similar restriction; and (ii) with respect to any property or asset (including capital stock or other equity interests) any lien, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction or a similar law relating to security interests in and over personal property).

Section 1.77    "Environmental Matters Agreement" shall have the meaning ascribed to such term in section 5.01(a)(i) of this Agreement.

Section 1.78    "Estimated Payment Amount" shall have the meaning ascribed to such term in section 3.03(a) of this Agreement.

Section 1.79    "Excess Interiors Proceeds" shall mean an amount equal to (a) the Initial Sale Proceeds or Adjusted Sale Proceeds, as applicable, in connection with the sale of the Global Interiors & Closures Business, less (b) the lesser of (i) $91 million and (ii) the Net Working Capital associated with the Global Interiors & Closures Business as of the Closing Date (to the extent included as part of the sale), and less (c) any Unrecovered Separation Costs; provided, however, that in no event shall the Excess Interiors Proceeds be less than zero.

Section 1.80    "Excess Labor Costs" shall mean (x) the product of the number of Applicable Hours multiplied by $26 and subtracted from (y) the Labor Cost Amount.

Section 1.81   "Excess Sandusky Proceeds" shall mean an amount equal to (a) the Initial Sale Proceeds or Adjusted Sale Proceeds, as applicable, in connection with the sale of the Sandusky Business, less (b) the Capital Procurement Payment, less (c) the lesser of (i) $35 million and (ii) the Net Working Capital associated with the Sandusky Business as of the Closing Date (to the extent included as part of the sale), and less (d) any Unrecovered Separation Costs; provided, however, that in no event shall the Excess Sandusky Proceeds be less than zero.

Section 1.82   "Excess Steering Proceeds" shall mean an amount equal to (a) the Initial Sale Proceeds or Adjusted Sale Proceeds, as applicable, in connection with the sale of the Global Steering Business, less (b) the lesser of (i) $314.5 million and (ii) the Net Working Capital associated with the Steering Business as of the Closing Date (to the extent included as part of the sale), and less (c) any Unrecovered Separation Costs; provided, however, that in no event shall the Excess Steering Proceeds be less than zero.

Section 1.83   "Existing Agreements" shall have the meaning ascribed to such term in section 3.01(a) of this Agreement.

Section 1.84   "Financial Services Supply Agreement" shall have the meaning ascribed to such term in section 5.01(a)(iii) of this Agreement.

Section 1.85   "Fitzgerald Facility" shall mean the facility located at 342 Perry Road, Fitzgerald, Georgia 31750.

Section 1.86   "Flint East Facility" shall mean the facility located at 1300 Dort Highway, Flint, Michigan 48558.

Section 1.87   "Flint West Facility" shall mean the facility located at North Chevrolet Avenue, Flint, Michigan 48555.

Section 1.88   "Footprint Facilities" shall mean the UAW Footprint Facilities and the Kettering Facility.

Section 1.89   "Global Interiors & Closures Business" shall mean the properties, assets, rights, titles and interests owned by Delphi and its Affiliates that are primarily used or held for use in their global latches and door modules, cinching latches and strikers (except as set forth below), and instrument panels and cockpit modules business, including without limitation, the following assets, to the extent used primarily in, or primarily related to, such business: real property, personal property, inventory, contracts, administrative assets, permits, intellectual property, technical documentation, goodwill, interests in all joint ventures and any sale proceeds with respect to a sale of any of the foregoing (excluding de minimis asset sales and sales in the ordinary course of business, including sales of surplus and obsolete machinery and equipment), but excluding: (A) third party assets, including customer bailed assets such as tooling, dunnage, dies and molds, (B) Delphi corporate trademark rights (other than a transitional license to use any trademarks to the extent contained in tooling, molds, equipment, inventory or other stock on hand) and intellectual property which is not used primarily in connection with such business (subject to the non-exclusive license to use such intellectual property described in section 4.06(a)(viii)), (C) cash, cash equivalents and accounts receivable, (D) corporate insurance policies, (E) books and records that are required to be retained by law; provided that, subject to

MRA-10

applicable legal requirements, GM and the applicable Business Optionee shall have access at all
times to such books and records and such books and records will be retained and not destroyed
without providing GM or the applicable Business Optionee with a reasonable opportunity to
obtain them, (F) claims related to excluded assets and Retained Liabilities, (G) tax returns,
refunds, credits, prepayments and deferred tax assets; provided, however, that in no event shall a
Business Optionee or GM be required to make a payment to Delphi or a Business Optionor with
respect to any of the foregoing other than providing to Delphi any tax refunds received by GM or
the Business Optionee with respect to taxes paid by Delphi or any of its Affiliates, (H) assets
used in common Delphi services (including, without limitation, accounting, insurance, IT, tax,
legal, etc.) to the extent not primarily used in connection with such business; (I) pooled vehicles
and vehicles under Delphi's corporate vehicle program, (J) personnel records other than
transferable records relating to transferred employees; provided that, subject to applicable legal
requirements, GM and the applicable Business Optionee shall have access at all times to such
records and such records will be retained and not destroyed without providing GM or the
applicable Business Optionee with a reasonable opportunity to obtain them, (K) material subject
to an attorney-client privilege which has not been waived or otherwise invalidated, (L) pension
assets associated with Retained Liabilities, (M) the Columbus real property, (N) real property
and inventory at Vandalia, Ohio and Grossepetersdorf, Austria, (O) all shared technical center or
sales office properties, and (P) all assets relating to: (i) HVAC products, including condenser
radiator form modules, (ii) power products, and (iii) any integral cinching latch, advanced
development power cinching striker and advanced development power cinching latch products.

Section 1.90  "Global Sourcing" shall mean, for purposes of this Agreement only, the
transfer of production by GM of any Component Part to a new supplier.

Section 1.91  "Global Steering Business" shall mean the properties, assets, rights,
titles and interests owned by Delphi and its Affiliates that are  primarily used or held for use in
their global steering and halfshaft businesses, including without limitation, the following assets,
to the extent used primarily in, or primarily related to, such businesses: real property, personal
property, inventory, accounts receivable, contracts, administrative assets, permits, intellectual
property, technical documentation, goodwill, interests in all joint ventures (other than Korea
Delphi Automotive Systems Corporation ("KDAC")) and any sale proceeds with respect to a sale
of any of the foregoing (excluding (i) any proceeds received with respect to a disposition of any
of Delphi's interest in KDAC or any assets of KDAC and (ii) de minimis asset sales and sales in
the ordinary course of business, including sales of surplus and obsolete machinery and
equipment), but excluding:  (A) third party assets, including customer bailed assets such as
tooling, dunnage, dies and molds, (B) Delphi corporate trademark rights (other than a transitional
license to use any trademarks to the extent contained in tooling, molds, equipment, inventory or
other stock on hand) and intellectual property which is not used primarily in connection with
such business (subject to the non-exclusive license to use such intellectual property described in
section 4.06(a)(viii)), (C) cash and cash equivalents, (D) corporate insurance policies, (E) books
and records that are required to be retained by law; provided that, subject to applicable legal
requirements, GM and the applicable Business Optionee shall have access at all times to such
books and records and such books and records will be retained and not destroyed without
providing GM or the applicable Business Optionee with a reasonable opportunity to obtain them,
(F) claims related to excluded assets and Retained Liabilities, (G) tax returns, refunds, credits,
prepayments and deferred tax assets; provided that, in no event shall a Business Optionee or GM

MRA-11

be required to make a payment to Delphi or a Business Optionor with respect to any of the foregoing other than providing to Delphi any tax refunds received by GM or the Business Optionee with respect to taxes paid by Delphi or any of its Affiliates, (H) assets used in common Delphi services (including, without limitation, accounting, insurance, IT, tax, legal, etc.) to the extent not primarily used in connection with such business, (I) pooled vehicles and vehicles under Delphi's corporate vehicle program, (J) personnel records other than transferable records relating to transferred employees; provided that, subject to applicable legal requirements, GM and the applicable Business Optionee shall have access at all times to such records and such records will be retained and not destroyed without providing GM or the applicable Business Optionee with a reasonable opportunity to obtain them, (K) material subject to an attorney-client privilege which has not been waived or otherwise invalidated, (L) pension assets associated with Retained Liabilities, (M) real property located at Suzhou, China, Livorno, Italy and all shared technical center or sales office properties, (N) all properties, rights and obligations relating to the former facility of the Global Steering Business located at Cadiz, Spain (excluding any contract which may have been performed at the Cadiz facility but was transferred to another facility which is a part of the Global Steering Business) and (O) all assets, business lines, rights, contracts and claims of KDAC.

Section 1.92   "GM GPSC" shall mean GM's Global Purchasing and Supply Chain organization and any successor organization.

Section 1.93   "GM Parties" shall mean GM and any and all of its subsidiaries and Affiliates.

Section 1.94   "GM Purchase Order" shall mean a purchase order issued by GM or any and all of its Affiliates and accepted by DAS according to Standard GM Terms, it being agreed by the Parties that DAS shall be deemed to have accepted all such purchase orders accepted by the Delphi-Related Parties pursuant to Standard GM Terms; provided, however, that no purchase orders issued or to be issued by GM or any of its Affiliates to any Affiliate of Delphi that is not a Delphi-Related Party shall be a GM Purchase Order.

Section 1.95   "GM-Related Parties" shall mean GM, each of its Affiliates, the General Motors Hourly-Rate Employees Pension Plan, the GM Health Care Program for Hourly Employees, the GM Life and Disability Benefits Program for Hourly Employees, any other GM pension or welfare benefit plan, and each of their respective current and former principals, officers, directors, agents, employees, advisors, and representatives (including any attorneys, financial advisors, investment bankers, and other professionals retained by such persons or entities) in their respective capacities.

Section 1.96   "GM Suppliers" shall mean any and all entities that supply components, component systems, goods, or services to GM Parties (excepting only the Delphi Parties).

Section 1.97   "Grand Rapids Facility" shall mean the facility located at 21000 S.W. Burlingame, Wyoming, Michigan 40509.

Section 1.98   "Guaranteed Agreements" shall have the meaning ascribed to such term in section 7.03(a) hereof.

Section 1.99   "Holiday" shall mean cash paid by Delphi for specified holidays, pursuant to the applicable collective bargaining agreement, to hourly employees for the time period included in calculating the Labor Cost Amount, but not to include any straight time or overtime payments for hours worked.

Section 1.100  "Home Avenue Facility" shall mean the facility located at 2701 Home Avenue, Dayton, Ohio 45417.

Section 1.101  "IAM MOU" shall mean the "IAM-Delphi GM Memorandum of Understanding-Delphi Restructuring" entered into as of July 31, 2007, as approved by the Bankruptcy Court on August 16, 2007, by and among Delphi, GM, and the IAM, including all attachments and exhibits thereto and all IAM-Delphi collective bargaining agreements referenced therein as modified.

Section 1.102  "IBEW MOUs" shall mean the "IBEW-Delphi Powertrain-GM Memorandum of Understanding – Delphi Restructuring" and the "IBEW-Delphi Electronics & Safety – GM Memorandum of Understanding – Delphi Restructuring," entered into as of July 31, 2007, as approved by the Bankruptcy Court on August 16, 2007, by and among Delphi, GM, and the IBEW, including all attachments and exhibits thereto and all IBEW-Delphi collective bargaining agreements referenced therein as modified.

Section 1.103  "Including" or "including" shall mean including without limitation.

Section 1.104  "Income Tax Allocation Agreement" shall have the meaning ascribed to such term in section 5.01(a)(iv) of this Agreement.

Section 1.105  "Independence Week" shall mean cash paid by Delphi for the Independence Week, as defined in the applicable collective bargaining agreement, to hourly employees for the time period included in calculating the Labor Cost Amount, but not to include any straight time or overtime payments for hours worked. The definition of the Labor Cost Amount shall not include Independence Week after it ceases to be paid under the applicable collective bargaining agreement.

Section 1.106  "Information" shall have the meaning ascribed to such term in section 5.06 of this Agreement.

Section 1.107  "Initial Payment Date" shall mean the later of the Effective Date and January 2, 2008.

Section 1.108  "Initial Sale Proceeds" shall mean the amount of the Sale Proceeds from the sale of each of the Sale Businesses calculated as of the Closing Date without taking into account any post-closing adjustments.

Section 1.109  "Intellectual Property Contracts Transfer Agreement" shall have the meaning ascribed to such term in section 5.01(a)(ix) of this Agreement.

Section 1.110  "Intellectual Property License Agreement" shall have the meaning ascribed to such term in section 5.01(a)(x) of this Agreement.

Section 1.111 "Intellectual Property Transfer Agreement" shall have the meaning ascribed to such term in section 5.01(a)(xi) of this Agreement.

Section 1.112 "Interiors Advance" shall have the meaning ascribed to such term in section 4.04(c)(i) of this Agreement.

Section 1.113 "Invoice Delivery Date" shall mean (a) December 1, 2007 for the Interiors Advance, the Sandusky Advance and the Steering Advance; (b) 5 days prior to any Closing Date for payments owing under subsection 4.04(b)(i) or (b)(ii), (c)(ii), (d)(i) or (ii), (e)(ii), (f)(i) or (ii) or (g)(iii); and (c) 30 days after the end of each calendar year for adjustments under 4.04(g)(ii).

Section 1.114 "IP License" shall mean the intellectual property license agreement between Delphi and GM, dated as of September 6, 2007.

Section 1.115 "IUE-CWA" shall mean the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America and its applicable local unions.

Section 1.116 "IUE-CWA Business" shall have the meaning ascribed to such term in section 3.01(c).

Section 1.117 "IUE-CWA Keep Facilities" shall mean the Brookhaven Facility, the Clinton Facility, and the Warren Facility.

Section 1.118 "IUE-CWA MOU" shall mean the IUE-CWA-Delphi-GM Memorandum of Understanding – Delphi Restructuring, entered into as of August 5, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IUE-CWA, Delphi, and GM, and all attachments thereto and the IUE-Delphi National Agreement referenced therein as modified.

Section 1.119 "IUOE MOUs" shall mean the "IOUE Local 18S-Delphi-GM Memorandum of Understanding – Delphi Restructuring," the "IUOE Local 101S-Delphi-GM Memorandum of Understanding – Delphi Restructuring," and the "IUOE Local 832S-Delphi-GM Memorandum of Understanding – Delphi Restructuring," all entered into as of August 1, 2007, as approved by the Bankruptcy Court on August 16, 2007, by and among Delphi, GM, and the IUOE, including all attachments and exhibits thereto and all IUOE-Delphi collective bargaining agreements referenced therein as modified.

Section 1.120 "Jury Duty" shall mean cash paid by Delphi for paid time off for specified periods of jury duty, pursuant to the applicable collective bargaining agreement, to hourly employees for the time period included in calculating the Labor Cost Amount.

Section 1.121 "Kettering Facility" shall mean the facility located at 2000 Forrer Boulevard, Kettering, Ohio 05420.

Section 1.122 "Kokomo Facility" shall mean the facility located at 1800 East Lincoln, Kokomo, Indiana 46904.

Section 1.123 "Labor Cost Amount" shall mean Delphi's aggregate expense for the Labor Cost Line Items attributable to all hourly employees (including temporary employees, inactive employees, employees on layoff or leaves or in JOBs banks, but excluding PRP Employees) of Delphi at all Delphi facilities for which Delphi is eligible to receive the labor reimbursement pursuant to section 4.01 hereof during any period referred to in section 4.01(c) hereof; provided, however, that cash expenditures or accruals for Profit Sharing shall not be included in calculations of the Labor Cost Amount for periods after the Red Circle Period; provided further that with respect to any facility at which production for GM and GM's direct and indirect tiered suppliers ceases after October 1, 2007, beginning twenty (20) calendar days after the termination of GM production at any facility for which Delphi is receiving a labor subsidy under section 4.01 hereof, no cash expenditures other than for Supplemental Unemployment Benefits, Severance, and PAYGO Health Care (but only in respect of those hourly employees at such facility who are receiving Supplemental Unemployment Benefits) shall be included in calculations of the Labor Cost Amount in respect of such facility; provided further that if Delphi has not obtained GM's consent in writing prior to hiring any hourly employees at UAW Keep Sites after April 5, 2007 (which consent shall not be unreasonably withheld), then cash expenditures or accruals for any hourly employee hired by Delphi after April 5, 2007, at UAW Keep Sites shall not be included in calculations of the Labor Cost Amount for any periods unless (a) GM later consents in writing to any such hiring, which consent shall not be unreasonably withheld, and (b) with respect to any temporary employee who is converted to permanent employment status, Delphi has notified GM in writing as soon as practicable after Delphi's receipt of a request from the applicable union to convert such temporary employee to permanent employment status, but in no event later than two (2) weeks prior to the date such proposed conversion would occur; and, provided further, that in the event Delphi fails to seek GM's consent to the hiring of temporary employees at UAW Keep Facilities, cash expenditures and accruals for such hourly temporary employees shall be included in the calculations of the Labor Cost Amount. In the absence of GM's written consent, no amount shall be included in the Labor Cost Amount that is based on an increase in benefits or payment rates or requirements over those required by the terms of the applicable collective bargaining agreements (as modified by the applicable Labor MOU) in effect as of the Effective Date. Although it is the intent of the Parties that the Labor Cost Amount be based on cash cost, the Parties recognize that for administrative ease expenses or accruals are used instead of cash cost in some instances to measure certain of the Labor Cost Line Items. The Parties believe that amounts calculated based on expense or the accrual method should equal amounts calculated based on a cash method within a period not to exceed one (1) year. If either Party determines that these amounts do not equal each other within a period not to exceed one (1) year, the Parties shall consult to reach a mutually agreeable resolution to effect the intent of the Parties.

Section 1.124 "Labor Cost Line Items" shall mean Active Basic Life Insurance, Straight Time, COLA, Overtime Premium, Night Shift Premium, Independence Week, Vacation, Holiday, Bereavement Leave, Jury Duty, Military Leave, Profit Sharing, Suggestion Awards, Performance Bonus, Employer Taxes, Applicable Workers' Compensation, PAYGO Health Care, Supplemental Unemployment Benefits, Severance, Disability/Sickness & Accident, Administrative Costs – National Benefit Center, 401(k) matching, Training and Legal, and any other items that the Parties may mutually agree upon in writing (which may include grievance financial settlements) in order to reflect their intent that Delphi's Labor Cost Amount at Delphi facilities for which Delphi is entitled to receive a subsidy based on the Labor Cost Amount under

section 4.01 be capped at $26 per hour (subject to certain exclusions from the cost line items); provided, however, that Supplemental Unemployment Benefits (including any PAYGO Health Care associated therewith) and Severance shall not be included with respect to any of the Wind-down Facilities or Footprint Facilities.

Section 1.125 "Labor MOUs" shall mean the UAW MOU, the IUE-CWA MOU, the USW MOUs, the IAM MOU, the IBEW MOUs, and the IUOE MOUs, collectively.

Section 1.126 "Laurel Facility" shall mean the facility located at 1 Thames Avenue, Laurel, Mississippi 39440.

Section 1.127 "Lockport Facility" shall mean the facility located at 200 Upper Mountain Road, Lockport, New York 14094.

Section 1.128 "Master Separation Agreement" shall have the meaning ascribed to such term in section 5.01(a)(i) of this Agreement.

Section 1.129 "Military Leave" shall mean cash paid by Delphi for paid time off for specified periods of military duty, pursuant to the applicable collective bargaining agreement, to hourly employees included in the calculation of Labor Cost Amount for the time period included in calculating the Labor Cost Amount.

Section 1.130 "Milwaukee E&C Facility" shall mean the south part of the facility located at 7929 South Howell Avenue, Oak Creek, Wisconsin 53154, which is dedicated to production of catalytic converters.

Section 1.131 "Milwaukee E&S Facility" shall mean the north part of the facility located at 7929 South Howell Avenue, Oak Creek, Wisconsin 53154, which is dedicated to production of control modules (body, engine, powertrain and transmission) and other miscellaneous Component Parts.

Section 1.132 "MNS-2 Payment" shall mean GM's monthly payment to the Delphi Parties pursuant to GM's Multilateral Netting System.

Section 1.133 "Moraine Facility" shall mean the facility located at 3535 Kettering Boulevard, Moraine, Ohio 45439.

Section 1.134 "Needmore Road Facility" shall mean the facilities located at (i) 3100 Needmore Road, Ohio 45414 and (ii) 1515 Cincinnati Street, Dayton, Ohio 45408.

Section 1.135 "Net Working Capital" shall mean the sum of accounts receivable and inventory less accounts payable.

Section 1.136 "Night Shift Premium" shall mean cash paid by Delphi for the shift premium, pursuant to the applicable collective bargaining agreement, to hourly employees for the time period included in calculating the Labor Cost Amount, for working on specified shifts.

Section 1.137 "Non-GM Business"shall mean, during any given time period, the aggregate net sales, across all the UAW Keep Facilities, that are not attributable to GM or GM's direct and indirect tiered suppliers.

Section 1.138 "Non-Income Tax Indemnification Agreement" shall have the meaning ascribed to such term in section 5.01(a)(v) of this Agreement.

Section 1.139 "OE" shall mean original equipment.

Section 1.140 "OE Parts" shall mean original equipment parts.

Section 1.141 "Olathe Facility" shall mean the facility located at 400 West Dennis Avenue, Olathe, Kansas 66061.

Section 1.142 "Option Designee" shall have the meaning ascribed to such term in section 4.06(a) hereof.

Section 1.143 "Outstanding GM Purchase Order" shall have the meaning ascribed to such term in section 3.01(a) of this Agreement.

Section 1.144 "Overtime Premium" shall mean cash paid by Delphi for the overtime premium, pursuant to the applicable collective bargaining agreement, to hourly employees for the time period included in calculating the Labor Cost Amount.

Section 1.145 "Paid Pre-Effective Date Subsidy" shall have the meaning ascribed to such term in section 4.01(b)(i) of this Agreement.

Section 1.146 "Party" or "Parties" shall have the meanings ascribed to such terms in the Preamble of this Agreement.

Section 1.147 "PAYGO Health Care" shall mean health care accrual expenses related to Delphi's applicable collective bargaining agreements, during the time period included in calculating the Labor Cost Amount for hourly employees.

Section 1.148 "Performance Bonus" shall mean cash paid by Delphi for the additional pay based on qualified earnings, pursuant to the applicable collective bargaining agreement, to hourly employees included in the calculation of Labor Cost Amount for the time period included in calculating the Labor Cost Amount.

Section 1.149 "Permitted Encumbrance" shall mean: (i) security interests relating to vendor tooling arising in the ordinary course of business and not delinquent; (ii) any Encumbrance that may be created by or on behalf of GM, its affiliates or the Business Optionee; (iii) in relation to real property: (a) Encumbrances relating to any current real estate or ad valorem taxes or assessments not yet delinquent or being contested in good faith by appropriate proceedings; provided that Delphi provides GM with a specific indemnity with respect to such taxes or assessments; (b) mechanic's, materialmen's, laborer's and carrier's liens and other similar liens arising by operation of law or statute in the ordinary course of business for obligations which are not delinquent and which will be paid or discharged prior to the Business Closing Date

MRA-17

in the ordinary course of business; (c) matters which an ALTA survey, or a similar survey in any other country, would disclose (other than the failure of the applicable Business Optionee to own the relevant real property); (d) rights of the public and adjoining property owners in streets and highways abutting and adjacent to the real property; (e) easements, covenants, restrictions and other encumbrances of public record (provided that in the event any such Encumbrance relates to a sum owed, the applicable Business Optionor shall indemnify GM and the applicable Business Optionee against any costs or expenses arising therefrom); and (f) such other Encumbrances, the existence of which, in the aggregate, would not materially interfere with or materially affect the use of the respective underlying asset to which such Encumbrances relate as used on the Business Closing Date; and (iv) in the case of equity interests in the joint venture companies, restrictions contained in the joint venture agreement, shareholders agreement or related agreements affecting such equity interests.

Section 1.150 "Person" shall mean any individual, corporation, partnership, limited partnership, joint venture, limited liability company, association, trust, business trust, government, governmental subdivision, or other entity of any type whatsoever.

Section 1.151 "Petition Date" shall mean, as applicable, (a) October 8, 2005 with respect to those Debtors which filed their petitions for reorganization relief in the Bankruptcy Court on such date or (b) October 14, 2005 with respect to those Debtors which filed their petitions for reorganization relief in the Bankruptcy Court on such date.

Section 1.152 "Plan" shall mean the chapter 11 plan of reorganization proposed by the Debtors in the Chapter 11 Cases, the terms of which are acceptable to GM, which was filed with the Bankruptcy Court on September 6, 2007, and to which this Agreement is attached as Plan Appendix 7.20(a).

Section 1.153 "Possessor" shall have the meaning ascribed to such term in section 5.06 of this Agreement.

Section 1.154 "Pre-Effective Date Subsidy Statement" shall have the meaning ascribed to such term in section 4.01(b)(i) of this Agreement.

Section 1.155 "Price Down Arrangements" shall have the meaning ascribed to such term in section 3.03(a) of this Agreement.

Section 1.156 "Prior Relationship" shall have the meaning ascribed to such term in section 5.06 of this Agreement.

Section 1.157 "Production Cash Burn" for each facility shall mean, during a given period of time, the sum of all cash expenditures and, to the extent expressly indicated on **Exhibit 4.02(b)** hereto, accrued expenses by Delphi at any Support Facility for items marked "Included" on **Exhibit 4.02(b)** hereto less net sales attributable to such Support Facility (for the avoidance of doubt, any cash expenditures or accruals by Delphi for items marked as "Excluded" on **Exhibit 4.02(b)** hereto shall not be included in the calculation of Production Cash Burn); provided, however, that, sixty (60) calendar days after the termination of GM production at a Support Facility, Production Cash Burn for such Support Facility shall mean the sum of all cash expenditures by Delphi attributable to hourly employees (including temporary employees, but

MRA-18

excluding PRP Employees) of Delphi at such Support Facility for Severance, Supplemental
Unemployment Benefits, and PAYGO Health Care (but only, in the case of PAYGO Health Care,
in respect of those hourly employees at such Support Facility who are receiving Supplemental
Unemployment Benefits during such period), if such sum is less than what Production Cash Burn
would be for such Support Facility using the calculation described in the first clause of this
sentence. With respect to the Flint East Facility, each invoice for Production Cash Burn shall
exclude costs associated with warranty and recall, and costs in excess of $25,000 per month
associated with quality issues and plant disruptions related to quality. As set forth on **Exhibit
4.02(b)** hereto, with respect to the Flint East Facility, Production Cash Burn shall include an
additional payment equal to 6.5% of revenue derived from sale of VIDs manufactured for GM at
the Flint East Facility. As set forth in **Exhibit 4.02(b)** hereto, for the purposes of determining
Production Cash Burn, overhead shall be deemed to be a fixed 2.25% of net sales for all Support
Facilities except for the Flint East Facility, the Sandusky Facility, the Saginaw Steering Facility,
the Adrian Facility, and the Athens Facility where overhead shall be deemed to be 5.0% of net
sales. As set forth in **Exhibit 4.02(b)** hereto, overhead shall be substituted for SG&A and
allocated items which are marked "excluded-captured in % of sale" in **Exhibit 4.02(b)** hereof.

Section 1.158 "Profit Sharing" shall mean cash payments for Profit Sharing paid
pursuant to the applicable collective bargaining agreement, to hourly employees.

Section 1.159 "Proposed Purchaser" shall have the meaning set forth in Section
4.06(a)(xiv) of this Agreement.

Section 1.160 "PRP Employees" shall mean all employees of Delphi who are
participating in a pre-retirement program under any Delphi attrition program.

Section 1.161 "Red Circle Period" shall mean the period from October 1, 2006 through
September 14, 2007.

Section 1.162 "Reimbursement Adjustment Amount" shall mean the difference
between the Applicable Labor Reimbursement Percentage of Excess Labor Costs for each
calendar year and the Actual Applicable Labor Reimbursement Percentage of Excess Labor
Costs for such calendar year.

Section 1.163 "Related Parties" shall have the meaning ascribed to such term in section
5.06 of this Agreement.

Section 1.164 "Requestor" shall have the meaning ascribed to such term in section 5.06
of this Agreement.

Section 1.165 "Restructuring Dispute" shall mean one or more defaults or disputes
between GM and any of the Debtors in which (i) the aggregate amount in controversy (including
the monetary value or impact of any injunctive relief) exceeds $500,000 (five hundred thousand
dollars) and (ii) the claims asserted require the application or construction of this Agreement or
the provisions of the Plan relating to the subject matter of this Agreement. By way of
clarification, it is not intended by the Parties that the term Restructuring Dispute shall include
commercial disputes that arise in the ordinary course of business with respect to the various

current and future contracts pursuant to which any of the Delphi Parties supplies components, component systems, goods, or services to any of the GM-Related Parties.

Section 1.166 "Retained Liabilities" shall have the meaning ascribed to such term on **Exhibit 1.166** to this Agreement.

Section 1.167 "Retention Period" shall mean ten (10) years from the Contribution Date, or for any longer period as may be required by any government agency, litigation (including applicable "Litigation Holds"), law, regulation, audit, or appeal of taxes, tax examination, or the expiration of the periods described in section 5.07(a) hereof, where applicable.

Section 1.168 "Rochester Facility" shall mean the facility located at 1000 Lexington Avenue, Rochester, New York 14606.

Section 1.169 "Saginaw E&C Assets" shall mean the Saginaw E&C Facility and the manufacturing equipment, test and development equipment, and other personal property which is owned by DAS LLC and located at the Saginaw E&C Facility that is necessary for the production of Component Parts for GM (excluding the assets identified on **Exhibit 1.169** and any inventory).

Section 1.170 "Saginaw E&C Facility" shall mean the facility located at 2328 East Genesee, Saginaw, Michigan 48601.

Section 1.171 "Saginaw Steering Facility" shall mean the facility located at 3900 East Holland Road, Saginaw, Michigan 48601.

Section 1.172 "Sale Businesses" shall mean the Global Interiors & Closures Business, the Global Steering Business and the Sandusky Business, and "Sale Business" shall mean any of the Sale Businesses individually.

Section 1.173 "Sale Facility" or "Sale Facilities" shall mean the Adrian Facility, the Athens Facility, the Saginaw Steering Facility, and the Sandusky Facility.

Section 1.174 "Sale Proceeds" shall mean the gross amount received from a third party purchaser for the purchase of any of the Sale Businesses, whether as a going concern or an asset sale, in whole or in part, whether through cash, promissory note, assumption of indebtedness or other valuable consideration, less reasonable amounts actually paid by Delphi for break-up fees or expense reimbursement payments and a success fee for Delphi's investment banker.

Section 1.175 "Sandusky Advance" shall have the meaning ascribed to such term in section 4.04(e)(i) of this Agreement.

Section 1.176 "Sandusky Business" shall mean the properties, assets, rights, titles and interests owned by Delphi and its Affiliates that are primarily used or held for use in the wheel bearings business conducted at the Sandusky Facility, including without limitation, the following assets, to the extent used primarily in, or primarily related to, such business: the Sandusky Facility, all personal property, inventory, contracts, administrative assets, permits, intellectual property used primarily in the bearings business which is operated at the Sandusky Facility,

technical documentation, goodwill, interests in all joint ventures, if any, and any sale proceeds received or due with respect to a sale of any of the foregoing (excluding de minimis asset sales and sales in the ordinary course of business, including sales of surplus and obsolete machinery and equipment), but excluding: (A) third party assets, including customer bailed assets such as tooling, dunnage, dies and molds, (B) Delphi corporate trademark rights (other than a transitional license to use any trademarks to the extent contained in tooling, molds, equipment, inventory or other stock on hand) and intellectual property which is not used primarily in connection with such business (subject to the non-exclusive license to use such intellectual property described in section 4.06(a)(viii)), (C) cash, cash equivalents and accounts receivable, (D) corporate insurance policies, (E) books and records that are required to be retained by law; provided that, subject to applicable legal requirements, GM and the applicable Business Optionee shall have access at all times to such books and records and such books and records will be retained and not destroyed without providing GM or the applicable Business Optionee with a reasonable opportunity to obtain them, (F) claims related to excluded assets and Retained Liabilities, (G) tax returns, refunds, credits, prepayments and deferred tax assets; provided that in no event shall a Business Optionee or GM be required to make a payment to Delphi or a Business Optionor with respect to any of the foregoing other than providing to Delphi any tax refunds received by GM or the Business Optionee with respect to taxes paid by Delphi or any of its Afilliates, (H) assets used in common Delphi services (including, without limitation, accounting, insurance, IT, tax, legal, etc.) primarily used in connection with such business, (I) pooled vehicles and vehicles under Delphi's corporate vehicle program, (J) personnel records other than transferable records relating to transferred employees; provided that, subject to applicable legal requirements, GM and the applicable Business Optionee shall have access at all times to such records and such records will be retained and not destroyed without providing GM or the applicable Business Optionee with a reasonable opportunity to obtain them, (K) material subject to an attorney-client privilege which has not been waived or otherwise invalidated, (L) pension assets associated with Retained Liabilities, and (M) manufacturing assets at Cadiz, Spain.

Section 1.177 "Sandusky Facility" shall mean the facility located at 2509 Hayes Avenue, Sandusky, Ohio 44870.

Section 1.178 "Separation Costs" shall mean costs incurred by Delphi as a direct consequence of the sale of the Sale Businesses for information technology separation costs and also unrecovered transition costs and unrecovered restructuring costs related to the sale of the Global Interiors & Closures Business, in an amount equal to $74 million and as more fully described on **Exhibit 1.178** to this Agreement; provided, however, that Separation Costs shall be reduced by any amounts associated with line items on **Exhibit 1.178** which the buyer specifically agrees to pay.

Section 1.179 "SEPO" shall have the meaning ascribed to such term in section 5.11(a) of this Agreement.

Section 1.180 "Settlement Agreement" shall mean the Global Settlement Agreement, dated September 6, 2007, by and between Delphi, on behalf of itself and certain of its subsidiaries and Affiliates, and GM.

Section 1.181 "Severance" shall mean (x) for purposes of section 4.01 hereof, cash paid by Delphi for Severance Payments as specified in the workforce transition provisions of the Labor MOUs to hourly employees for the time period included in calculating the Labor Cost Amount, and (y) for purposes of section 4.02 hereof, cash paid by Delphi for Severance Payments as specified in the workforce transition provisions of the Labor MOUs to hourly employees for the time period included in calculating the Production Cash Burn.

Section 1.182 "Standard GM Terms" shall mean the GM Terms and Conditions as revised in September 2004.

Section 1.183 "Straight Time" shall mean cash paid by Delphi for the base wage, pursuant to the applicable collective bargaining agreement, to hourly employees for the time period included in the calculating Labor Cost Amount.

Section 1.184 "Steering Advance" shall have the meaning ascribed to such term in section 4.04(g) of this Agreement.

Section 1.185 "Suggestion Awards" shall mean cash paid by Delphi during the time period included in calculating the Labor Cost Amount, for cost savings ideas submitted under the applicable suggestion plan program, pursuant to the applicable collective bargaining agreement, to hourly employees included in the calculation of Labor Cost Amount.

Section 1.186 "Supplemental Unemployment Benefits" shall mean (x) for purposes of section 4.01 hereof, cash payments made by Delphi in lieu of straight time wages to hourly employees on layoff from Delphi and other applicable benefits, pursuant to the applicable collective bargaining agreement, for the time period included in calculating the Labor Cost Amount, and (y) for purposes of section 4.02 hereof, cash payments made by Delphi in lieu of straight time wages to hourly employees on layoff from Delphi, pursuant to the applicable collective bargaining agreement, for the time period included in calculating the Production Cash Burn.

Section 1.187 "Support End Date" shall mean the date that is the earlier of (x) the later of sixty (60) calendar days after the termination of GM production at the applicable facility or the last date on which Delphi makes any cash expenditure for any Severance, Supplemental Unemployment Benefits, or PAYGO Health Care (but only in respect of those hourly employees at such facility who are receiving Supplemental Unemployment Benefits) in respect of such facility, or (y) the date that responsibility for the operation of future production at such facility is transferred to any party other than Delphi and no bargaining unit employees at such facility remain as Delphi employees; provided, however, that no Support End Date shall be later than December 31, 2015.

Section 1.188 "Support Facilities" shall have the meaning set forth in section 4.02(a) of this Agreement.

Section 1.189 "Support Period" shall have the meaning set forth in section 4.02(a) of this Agreement.

Section 1.190 "Tooling" shall have the meaning ascribed to such term in section 7.07(a) hereof.

Section 1.191 "Trademark and Trade Name Agreement" shall have the meaning ascribed to such term in section 5.01(a)(viii) of this Agreement.

Section 1.192 "Training and Legal" shall mean accrual expenses associated with national, local and health and safety (training funds) and all legal related cash flows as applicable (legal funds), as identified in the applicable collective bargaining agreement, to hourly employees for the time period included in calculating the Labor Cost Amount. The definition of the Labor Cost Amount shall not include Training and Legal Funds cost after it ceases to be paid under the applicable collective bargaining agreement.

Section 1.193 "Transformation Plan" shall have the meaning ascribed to such term in the Recitals of this Agreement.

Section 1.194 "UAW" shall mean collectively the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its applicable local unions.

Section 1.195 "UAW Footprint Facilities" shall mean the Flint East Facility, the Needmore Road Facility, and the Saginaw E&C Facility.

Section 1.196 "UAW Keep Business" shall have the meaning ascribed to such term in section 3.01(c).

Section 1.197 "UAW Keep Facilities" shall mean the Grand Rapids Facility, the Kokomo Facility, the Lockport Facility, and the Rochester Facility.

Section 1.198 "UAW MOU" shall mean the "UAW-Delphi-GM Memorandum of Understanding – Delphi Restructuring" entered into as of June 22, 2007, as approved by the Bankruptcy Court on July 19, 2007, by and among Delphi, GM, and the UAW, including all attachments and exhibits thereto and the UAW-Delphi National Agreement referenced therein as modified.

Section 1.199 "UAW Sale Business" shall have the meaning ascribed to such term in section 3.01(c).

Section 1.200 "UAW Wind-down Facilities" shall mean the Anderson Facility, the Columbus Facility, the Coopersville Facility, the Fitzgerald Facility, the Flint West Facility, the Laurel Facility, the Milwaukee E&C Facility, the Milwaukee E&S Facility, the Olathe Facility, and the Wichita Falls Facility.

Section 1.201 "Unrecovered Separation Costs" shall mean any portion of the Separation Costs not previously recovered by Delphi from Sale Proceeds, reducing as the Separation Costs are recovered by Delphi from Sale Proceeds in accordance with the provisions of section 4.04.

Section 1.202 "Unsold Business" shall have the meaning set forth in Section 4.06(a)(i) of this Agreement.

Section 1.203 "USW" shall mean collectively the United Steelworkers of America and its local unions which represent Delphi employees.

Section 1.204 "USW MOUs" shall mean collectively the "USW- GM-Delphi Memorandum of Understanding – Vandalia Operations and Special Attrition Program" and the "USW-GM-Delphi Memorandum of Understanding – Home Avenue Operations and Special Attrition Program," each entered into as of August 16, 2007, as approved by the Bankruptcy Court on August 29, 2007, by and among Delphi, GM, and the USW, including all attachments and exhibits thereto and all USW-Delphi collective bargaining agreements referenced therein as modified.

Section 1.205 "Vacation" shall mean cash paid by Delphi during the time period included in calculating the Labor Cost Amount for paid vacation time off, pursuant to the applicable collective bargaining agreement, to hourly employees.

Section 1.206 "Vandalia Facility" shall mean the facility located at 250 Northwoods Boulevard, Vandalia, Ohio 45377.

Section 1.207 "Warranty Settlement Agreement" shall mean the Warranty, Settlement and Release Agreement and Covenant Not to Sue between Delphi and GM, dated as of August 14, 2007.

Section 1.208 "Warren Facility" shall mean the eight (8) facilities located at the following locations: (i) Larchmont & North River Road, Warren, Ohio 44483; (ii) 5245 South Prospect Street, Rootstown, Ohio 44266; (iii) 500 West Main Street, Cortland, Ohio 44410; (iv) 4551 Research Parkway, Education Drive, Warren, Ohio 44483; (v) 408 Dana Street, Warren, Ohio 44483; (vi) 3400 Acropark Drive, Vienna, Ohio 44473; (vii) Griswold Street & Paige Avenue, Warren, Ohio 44483; and (viii) 650 Mondial Parkway, Streetboro, Ohio 44241.

Section 1.209 "Wichita Falls Facility" shall mean the facility located at 8600 Central Freeway North, Wichita Falls, Texas 76305.

Section 1.210 "Wind-down Facilities" shall mean the Anaheim Facility, the Anderson Facility, the Columbus Facility, the Coopersville Facility, the Fitzgerald Facility, the Flint West Facility, the Home Avenue Facility, the Laurel Facility, the Milwaukee E&C Facility, the Milwaukee E&S Facility, the Moraine Facility, the Olathe Facility, and the Wichita Falls Facility.

## ARTICLE II

## CERTAIN EXHIBITS TO BE FILED UNDER SEAL

Section 2.01   Identification of Exhibits to the Filed Under Seal.

(a)   The Parties agree that certain documents attached as exhibits hereto contain sensitive and confidential business terms which, if publicly disclosed, could detrimentally affect the Debtors or GM. Certain of these documents contain detailed proprietary information describing certain aspects of the business relationship between the Parties and the Parties believe these documents contain sensitive and confidential information of a type not typically disclosed to the public or made available in the automotive industry. Moreover, certain of these documents contain confidentiality provisions which compel the Parties to maintain the confidentiality of the terms of such agreements.

(b)   The Parties agree to use commercially reasonable efforts to obtain approval by the Bankruptcy Court of an order authorizing the Parties to file the following exhibits hereto under seal:

- Exhibit 1.23. Assumed Liabilities.
- Exhibit 1.166. Retained Liabilities.
- Exhibit 1.169. Excluded Saginaw Assets.
- Exhibit 1.178. Separation Costs.
- Exhibit 3.01(a). Price Down Arrangements and Related Matters.
- Exhibit 3.01(a)(i). Outstanding GM Purchase Orders.
- Exhibit 3.01(b). Recently Awarded Business.
- Exhibit 3.02. Contract Extensions.
- Exhibit 3.03(c). Changes in Manufacturing Location.
- Exhibit 3.07. New Business Awards.
- Exhibit 3.08(a). FOP Programs.
- Exhibit 3.08(b). First Opportunity Process.
- Exhibit 3.12. Sites Providing Product Identified in Exhibit 3.01(a) That Are on New Business Hold As of August 29, 2007.
- Exhibit 4.02(b). Form of Monthly Invoice for the Aggregate Amount of the Applicable Cash Burn Percentage of Production Cash Burn Incurred at all Support Facilities.
- Exhibit 4.02(i). Letter from Bill Hurles, of GM, to Jeff Paprocki, of Delphi, dated February 1, 2007.
- Exhibit 4.06(a)(xiv). Proposed Purchaser.

## ARTICLE III

## REVENUE PLAN

Section 3.01   Existing Agreements.

(a)      Unless otherwise expressly provided in this Agreement or the Settlement
Agreement, GM and DAS shall continue to honor the terms and conditions of all existing GM
Purchase Orders and other contractual agreements with any of the Debtors (including long term
and lifetime contracts and other formal and verifiable agreements) in effect as of the Effective
Date regarding the purchase and supply of motor vehicle related components and component
systems ("Component Parts"), including all Component Parts that have been awarded to a Debtor
pursuant to an award letter issued by GM and not rejected by a Debtor in writing within a
commercially reasonable period of time not to exceed ten (10) business days, regardless of
whether the production of Component Parts for such program has commenced ("Existing
Agreements"); provided, however, that certain Existing Agreements shall be subject to the price
reductions specified in **Exhibit 3.01(a)** to this Agreement. The term "Existing Agreements"
includes all GM Purchase Orders issued to a Debtor by GM on or before the Effective Date that a
Debtor has accepted in accordance with the Standard GM Terms, regardless of whether a Debtor
has formally accepted the applicable GM Purchase Order in writing; provided, however, that
"Existing Agreements" do not include the GM Purchase Orders and award letters which a Debtor
has, in writing, rejected or otherwise declined to accept or which a Debtor has accepted subject
to conditions which remain outstanding (each an "Outstanding GM Purchase Order"). Other
than those purchase orders and award letters identified on **Exhibit 3.01(a)(i)**, neither GM nor
Delphi is aware of any Outstanding GM Purchase Orders. In the event that Outstanding GM
Purchase Orders are identified by either Party following the execution of this Agreement, GM
and Delphi shall cooperate to promptly resolve any disputes or open issues relating to such
Outstanding GM Purchase Order. In the event that the Parties are unable to promptly resolve the
disputes or open issues relating to such Outstanding GM Purchase Order, then such matters shall
be resolved in accordance with section 3.10 of this Agreement. On the Effective Date Delphi
hereby rescinds, those certain letters dated August 24, 2005, August 31, 2005 and March 31,
2006 along with any amendments and related correspondence, regarding Delphi's requirement
that all purchase order renewals and extensions be accepted in writing by authorized Delphi
executives in order to be binding on Delphi. Notwithstanding anything to the contrary contained
herein, the Parties acknowledge that pursuant to section 7.03 of this Agreement all Existing
Agreements shall be deemed assigned to DAS and, unless otherwise requested by Delphi, and
consented to by GM, all GM Purchase Orders issued on or after the date hereof and before
September 14, 2015, including confirming GM Purchase Orders issued pursuant to sections 3.02
and 3.03(c) of this Agreement and GM Purchase Orders issued in connection with business
awarded pursuant to sections 3.04 through 3.07 of this Agreement, shall be issued to DAS.

(b)      The business covered by the Existing Agreements together with any
business awarded pursuant to sections 3.04 through 3.06 of this Agreement, any business
awarded pursuant to section 3.07 of this Agreement that shall be produced at UAW Keep
Facilities or IUE-CWA Keep Facilities, and the business set forth on **Exhibit 3.01(b)** to this
Agreement constitutes the "Booked Business." On and after the Effective Date, the initial price
for Booked Business that is subject to an Existing Agreement shall be the price set forth on the

relevant GM Purchase Order or, if there is no GM Purchase Order, the relevant award letter, all
subject, as applicable, to section 3.03 below. The Existing Agreements for Booked Business are,
and the GM Purchase Orders issued in connection with the Booked Business that is not yet
subject to an Existing Agreement shall be, binding contracts for the "Contract Term" as defined
in section 3.01(c) below.

(c)      The "Contract Term" for each Component Part manufactured at UAW
Keep Facilities, whether subject to an Existing Agreement or to be awarded under section 3.04 or
3.07 below, is or shall be the life of the applicable program (the "UAW Keep Business"). The
"Contract Term" for each Component Part manufactured at UAW Sale Facilities, whether subject
to an Existing Agreement or to be awarded under section 3.04 or 3.07 below, is or shall be the
life of the applicable program until each Sale Facility is sold (the "UAW Sale Business").
Additionally, in no event shall either the UAW Keep Business or the UAW Sale Business be
subject to termination for convenience until after December 31, 2009 or such longer or shorter
period expressly provided for in this Agreement, including the exhibits to this Article III. The
"Contract Term" for each Component Part manufactured at IUE-CWA Keep Facilities, whether
subject to an Existing Agreement or awarded under section 3.05 or 3.07 below (the "IUE-CWA
Business"), is or shall be until October 12, 2011, and in any case shall not be subject to
termination for convenience until after December 31, 2009 or such shorter or longer period
expressly provided for in this Agreement, including the exhibits to this Article III. The "Contract
Term" for all other Booked Business which is not UAW Keep Business, UAW Sale Business, or
IUE-CWA Business is as set forth in this Agreement, including the exhibits to this Article III,
and if not set forth in this Agreement, including the exhibits to this Article III, as set forth in the
applicable Existing Agreement or as negotiated by the Parties in accordance with this Agreement.

Section 3.02   Contract Extensions. GM and Delphi have negotiated extensions of
certain Existing Agreements as set forth on **Exhibit 3.02** to this Agreement. The applicable
Existing Agreements are hereby amended to incorporate the terms set forth on **Exhibit 3.02** to
this Agreement, and GM shall issue confirming purchase orders to DAS in the course of GM's
normal business practices. To the extent that any confirming purchase order fails to reflect the
terms set forth in **Exhibit 3.02** to this Agreement or contains terms inconsistent with the terms
set forth in **Exhibit 3.02** to this Agreement, the terms of this Agreement shall control even if
Delphi continues to ship the applicable Component Parts following the issuance of the
confirming purchase order.

Section 3.03   Price Down Arrangements.

(a)      Subject to the terms and conditions of this Agreement, GM and Delphi
shall implement the price reductions specified on **Exhibit 3.01(a)** to this Agreement (the "Price
Down Arrangements") upon the occurrence of the Effective Date; provided, however, that on the
Effective Date, Delphi shall make a payment to GM via wire transfer in immediately available
funds in the amount of $75,000,000 (seventy five million dollars), which amount is estimated to
be equal to the total of all Price Down Arrangements that GM would have received prior to the
Effective Date had such Price Down Arrangements been implemented on the later of (x) January
1, 2007 or (y) such other date, if any, set forth on **Exhibit 3.01(a)** to this Agreement for the
initial implementation of such price reductions (the "Estimated Payment Amount").

(i)     Immediately following the Effective Date, the part number price changes associated with the Price Down Arrangements shall be activated within both the GM accounts payable system and the Delphi accounts receivable system. This activation will yield retroactive payment and billing adjustment detail that shall be shared by the Parties no later than the end of the month following the Effective Date.

(ii)     The subsequent MNS-2 payment due from GM to Delphi will capture the full impact of the Price Down Arrangements for the applicable prior periods (the "Actual Adjustment") and, as such, will reduce the amount of the MNS-2 payment otherwise due from GM to Delphi by the amount of the Actual Adjustment. To ensure that Delphi receives full credit for the payment of the Estimated Payment Amount, GM shall reverse (i.e., credit) the amount of the Estimated Payment Amount within the GM accounts payable system to offset the Actual Adjustment, resulting in a net debit or credit, as appropriate, to the amount of the MNS-2 payment that is equal to the difference between the Actual Adjustment and the Estimated Payment Amount.

(iii)     GM and Delphi shall continue to reconcile the detail associated with the Actual Adjustment with a target completion date for such reconciliation of fifteen (15) days following the MNS-2 payment date on which the above described adjustment was made. Should a dispute arise regarding the amount of the Actual Adjustment that cannot be resolved within a commercially reasonable period of time, at either Party's election, such dispute shall be resolved in accordance with section 3.10 of this Agreement.

(b)     The Price Down Arrangements which are calculated on a percentage basis are intended to create annualized savings in the amount of the applicable percentage as set forth in **Exhibit 3.01(a)** to this Agreement. For example, a Price Down Arrangement of two percent (2%) implemented on July 1 of a given year for a Component Part with a price on June 30 of the same given year of one hundred dollars ($100.00) will result in a new price on July 1 of ninety-eight dollars ($98.00) for such Component Part. (The foregoing example assumes that the pricing for the subject Component Part does not include any price escalation related to raw material price increases.) Such percentage-based Price Down Arrangements shall apply uniformly on a product-by-product basis unless otherwise noted in **Exhibit 3.01(a)** to this Agreement. The actual percentage of savings may vary from that set forth in **Exhibit 3.01(a)** to this Agreement based on volume and product mix. For those Price Down Arrangements calculated based on part number level unit price changes, as opposed to a percentage basis (as noted on **Exhibit 3.01(a)** to this Agreement), the specific price basis reductions shall control over the percentage specified in **Exhibit 3.01(a)** to this Agreement. For Component Parts where metal escalation is utilized, applicable Price Down Arrangements shall be applied using standard practices, whereby the price reductions are calculated from the base prices excluding those metals subject to escalation provisions.

(c)     Where specifically provided in **Exhibit 3.01(a)**, DAS shall honor the price reductions provided for in Existing Agreements (the "Contractual Savings") in addition to the applicable Price Down Arrangements. In addition, for each Component Part that is not identified

MRA-28

in **Exhibit 3.01(a)**, DAS shall honor the Contractual Savings with respect to each such Component Part. GM is not entitled to receive, and shall not request or require, directly or indirectly, additional price reductions from DAS for the Component Parts identified in **Exhibit 3.01(a)** to this Agreement; provided, however, that GM is entitled to receive additional price reductions in connection with (i) technical, engineering and other cost savings initiatives in accordance with the terms of the Existing Agreements (other than those technical, engineering and cost savings initiatives identified on **Exhibit 3.01(a)** to this Agreement), and (ii) changes in manufacturing location (other than the changes in manufacturing locations identified on **Exhibit 3.03(c)** to this Agreement). DAS is entitled to receive price increases from GM for the Component Parts in connection with technical and engineering initiatives in accordance with the terms of Existing Agreements. Notwithstanding the foregoing, commercial discussions regarding directed-buy components shall be handled in the ordinary course of business between the Parties.

(d) Other than as specifically identified on **Exhibit 3.01(a)**, GM is not entitled to receive, and shall not request or require, directly or indirectly, price reductions from Delphi for any Component Parts manufactured at any of the Wind-down Facilities.

(e) The applicable Existing Agreements are hereby amended to incorporate the Price Down Arrangements, and GM shall use commercially reasonable efforts to issue confirming purchase orders for currently impacted GM Purchase Orders within thirty (30) days of the Effective Date. Confirming purchase orders for future Price Down Arrangements shall be issued by GM in the course of GM's normal business practices. To the extent that any confirming purchase order fails to reflect the terms set forth in **Exhibit 3.01(a)** to this Agreement or contains terms inconsistent with the terms set forth in **Exhibit 3.01(a)** to this Agreement, the terms of this Agreement shall control even if DAS continues to ship the applicable Component Parts following the issuance of the confirming purchase order.

Section 3.04   New Business Awards at UAW Facilities. GM has agreed to award to Delphi certain new business under the terms identified in Exhibits A and A-1 of the UAW MOU, which is incorporated herein by reference, for production at the applicable UAW Facilities referenced therein. Consistent with the UAW MOU, Delphi shall place and keep all programs awarded to UAW Keep Facilities pursuant to this section 3.04 at the applicable UAW Keep Facilities for the lifetime of such programs.

Section 3.05   New Business Awards at IUE-CWA Facilities. GM has agreed to award to Delphi certain new business under the terms identified in Exhibits A and A-1 of the IUE-CWA MOU, which is incorporated herein by reference, for production at the applicable IUE-CWA Facilities referenced therein. Consistent with the IUE-CWA MOU, Delphi shall place and keep all programs awarded to IUE-CWA Keep Facilities pursuant to this section 3.05 at the applicable IUE-CWA Keep Facilities until October 12, 2011 or such later date as is set forth in **Exhibit 3.01(a)** to this Agreement.

Section 3.06   Reserved.

Section 3.07   Other New Business Awards. GM shall award to Delphi the new business set forth on **Exhibit 3.07** to this Agreement subject to agreement between the Parties on

MRA-29

the pricing and other business terms for such business as set forth in section 3.09 of this
Agreement.

Section 3.08    First Opportunity Process.  GM shall provide Delphi with preferential
bidding opportunities with respect to the business set forth in **Exhibit 3.08(a)** hereto pursuant to
a first opportunity process, the terms and conditions of which are set forth in **Exhibit 3.08(b)**
hereto.

Section 3.09    Pricing and Other Business Terms for New Business Awards.  Pricing
and other business terms for the new business to be awarded pursuant to sections 3.04 through
3.07 of this Agreement, to the extent not already established, shall be established through good
faith negotiations between the GM commercial team and the Delphi sales team with the intent to
award the applicable business to Delphi on terms mutually acceptable to Delphi and GM.
Negotiation of and agreement on terms of such new business awards shall take into consideration,
among other items, (i) the labor and other applicable cost differentials between the Delphi U.S.
manufacturing location where the applicable Component Parts will be manufactured, (ii) the
Delphi non-U.S. manufacturing locations where the applicable Component Parts could be
manufactured, (iii) the U.S. and non-U.S. manufacturing locations of Delphi's competitors where
the applicable parts could be manufactured and the relevant pricing available from such
competitors, and (iv) the Parties' respective obligations under the Labor MOUs.  In the event that
GM and Delphi are unable to reach agreement on pricing for any specific program or business
award, negotiations regarding such pricing shall be resolved in accordance with section 3.10 of
this Agreement.  Except as expressly set forth herein, GM has not agreed to negotiate or waive
Standard GM Terms with respect to new business awarded pursuant to sections 3.04 through
3.07 of this Agreement.

Section 3.10    Dispute Resolution.  In the event that a dispute arises among the Parties
relating to any term or provision of Article III (an "Article III Dispute"), upon the written request
of either Party, such Article III Dispute shall be referred to the applicable Purchasing Executive
Director at GM and applicable Product Business Unit or Divisional Sales Director at Delphi for
resolution in good faith.  In the event that such directors are unable to resolve such Article III
Dispute, such Article III Dispute shall be referred, at either Party's written request, to the Group
Vice-President, Global Purchasing and Supply Chain for GM and the appropriate Delphi
Divisional President.  If within ten (10) days after such referral, GM's Group Vice-President,
Global Purchasing and Supply Chain and the Delphi Divisional President are unable to resolve
the Article III Dispute, the Article III Dispute shall be elevated, at either Party's request, to either
GM's Chief Financial Officer or GM's President of GM North America (at GM's election) and
either Delphi's Chief Executive Officer or Delphi's Chief Financial Officer (at Delphi's election)
for resolution.  To the extent that the job title of any of the foregoing positions is changed, this
section 3.10 shall be deemed to apply to such successor title or, if the position is eliminated or
vacated, to the job title of the party taking over the responsibilities of the eliminated or vacated
position.

Section 3.11    Limitations on Global Sourcing.

(a)      Other than Global Sourcing as a result of (i) a material breach of the
applicable GM Purchase Order, subject to a commercially reasonable cure period under the

circumstances (understanding that there is no cure period for an actual interruption of GM assembly operations or the imminent threat of an interruption of GM assembly operations), or (ii) Delphi's failure, after a commercially reasonable cure period under the circumstances, to remain technologically competitive (taking into consideration solely technology and not price) with respect to a given Component Part, GM shall not engage in Global Sourcing with respect to (x) UAW Keep Business, UAW Sale Business and IUE-CWA Business, each for the applicable Contract Term, and (y) for those Component Parts listed on **Exhibit 3.01(a)** for which GM has agreed to forbear from Global Sourcing, for the applicable forbearance period specified in **Exhibit 3.01(a)**; provided, however, that nothing in this Agreement shall be construed to restrict GM in any way from Global Sourcing with respect to any other products or business. Notwithstanding anything to the contrary contained herein, GM's ability to Global Source shall in all cases be consistent with the Labor MOUs.

(b)   Nothing in this Agreement, the UAW MOU, the IUE-CWA MOU, the USW MOU, or any Exhibits hereto prohibits or otherwise limits in any way GM's ability to conduct benchmarking and/or market testing activities or enter into discussions, negotiations, and agreements (including, but not limited to, contingent supply agreements) regarding the production of Component Parts by any potential alternative supplier(s).

(c)   GM shall notify Delphi of its intent to Globally Source any UAW Keep Business or any IUE-CWA Business in accordance with section 3.11(a)(ii) above at least thirty (30) days prior to the scheduled implementation of such Global Sourcing. In the event that Delphi reasonably believes that such Global Sourcing is a breach of GM's obligations under this Agreement, then at Delphi's election the matter shall be resolved in accordance with section 3.10 of this Agreement and GM shall refrain from Global Sourcing until the thirty (30) day notice period has expired.

Section 3.12   Bidding Opportunities. In addition to the business awards and bidding opportunities provided by the foregoing provisions of this Article III, where identified for specific Component Parts in **Exhibit 3.01(a)**, Delphi shall be considered "Green" to the business plan through December 31, 2009 or such longer or shorter period set forth in **Exhibit 3.01(a)**. Such "Green" rating requires that GM provide Delphi with the full opportunity to quote on the applicable new business, provided that the Delphi facility producing the applicable Component Part is not placed on "New Business Hold" in accordance with GM's normal business practices utilized with other suppliers. GM agrees that as of the date of this Agreement and other than as specified on **Exhibit 3.12** to this Agreement, no Delphi facilities producing the Components Parts identified in **Exhibit 3.01(a)** to this Agreement are on "New Business Hold." GM shall consider Delphi's bids for such business in accordance with GM's normal business practices utilized with other suppliers. Delphi acknowledges and agrees that any sourcing of business pursuant to this section 3.12 shall be in GM's sole discretion.

## ARTICLE IV

## FACILITIES PORTFOLIO

Section 4.01   Labor Reimbursement.

(a)   Under the terms of, and pursuant to the process set forth in, this section 4.01, GM shall reimburse Delphi for certain labor costs as set forth below:

(i)   50% of Excess Labor Costs for the Red Circle Period at the Keep Facilities, Sale Facilities, Footprint Facilities, and Wind-down Facilities;

(ii)   100% of Excess Labor Costs for the period from September 15, 2007, through December 31, 2007, at the UAW Keep Facilities, the Sale Facilities, the UAW Footprint Facilities, and the UAW Wind-down Facilities; and

(iii)   The Applicable Labor Reimbursement Percentage of Excess Labor Costs at the UAW Keep Facilities for the period from January 1, 2008, through September 14, 2015; provided, however, that the amounts payable for December of each calendar year 2008 through 2014 and for September 2015 shall be decreased (in the event the Applicable Labor Reimbursement Percentage of Excess Labor Costs for such calendar year exceeds the Actual Applicable Labor Reimbursement Percentage of Excess Labor Costs for such calendar year) or increased (in the event the Applicable Labor Reimbursement Percentage of Excess Labor Costs for such calendar year is less than the Actual Applicable Labor Reimbursement Percentage of Excess Labor Costs for such calendar year) by the Reimbursement Adjustment Amount.

(b)   GM's reimbursement of Excess Labor Costs described in section 4.01(a) of this Agreement shall be paid by GM pursuant to the following procedure:

(i)   Delphi shall endeavor to deliver to GM, no later than sixty (60) days before the Effective Date, an invoice reflecting actual Excess Labor Costs from October 1, 2006, through August 31, 2007. Delphi shall further endeavor to deliver to GM, no later than 30 days before the Effective Date, and no earlier than forty-five (45) days before the Effective Date, another invoice reflecting any actual Excess Labor Costs for all months after August 31, 2007, for which Delphi has closed its books, and Delphi's good faith estimate of Excess Labor Costs for all subsequent periods through the Effective Date. GM shall pay amounts in such invoices containing all information and representations required by section 4.01(b)(iii) (the "Paid Pre-Effective Date Subsidy") on the later of (i) the Effective Date, (ii) the date that is the first business day on or after the sixtieth (60th) day after Delphi's delivery of the invoice described in the first sentence of this section 4.01(b)(i), or (iii) the date that is the first business day on or after the thirtieth (30th) day after Delphi's delivery of the invoice described in the second sentence of this section 4.01(b)(i). Delphi shall recalculate, within sixty (60) days after the Effective Date or within twenty-four (24) days after the year-end close of Delphi's books, whichever is later, the amount due for the period preceding the Effective Date based on actual Excess Labor Costs during that period and provide GM with a statement (the "Pre-Effective Date Subsidy Statement")

MRA-32

showing the actual amount due under section 4.01(a) (the "Actual Pre-Effective Date Subsidy").
If the Actual Pre-Effective Date Subsidy exceeds the Paid Pre-Effective Date Subsidy, GM shall
pay to Delphi the difference via wire transfer in immediately available funds within thirty (30)
days of receipt of the Pre-Effective Date Subsidy Statement. If the Actual Pre-Effective Date
Subsidy is less than the Paid Pre-Effective Date Subsidy, Delphi shall pay to GM the difference
via wire transfer in immediately available funds within thirty (30) days of GM's receipt of the
Pre-Effective Date Subsidy Statement from Delphi.

(ii)    Following the Effective Date, Delphi shall invoice GM on a
monthly basis for the Excess Labor Costs that GM is obligated to reimburse Delphi pursuant to
section 4.01(a) of this Agreement. Delphi shall endeavor to deliver such invoices to the Director
of Business Development at GM within twenty (20) days after month-end close of Delphi's
books (if the 20th day falls on a weekend or holiday, Delphi shall endeavor to deliver the invoice
to GM by the next business day).

(iii)    Such monthly invoices and invoices described in section 4.01(b)(i)
hereof shall be in the form set forth on **Exhibit 4.01(a)** to this Agreement and shall include all
supporting documentation referenced in **Exhibit 4.01(a)** to this Agreement and a representation
from Delphi that such documentation is substantially complete and substantially accurate in all
respects. GM and Delphi agree to work together in good faith to amend the form of invoices if
necessary due to changed circumstances. In addition, unless Delphi otherwise consents, the
invoices described herein and any information included in or specifically taken from such
invoices, except to the extent such information is publicly available or can be obtained from
other sources that are not, to GM's knowledge, subject to an obligation of confidentiality, (i)
shall be used solely for the purpose of confirming the amount of Excess Labor Costs and (ii)
shall not be disclosed to any member of GM GPSC.

(iv)    Prior to December 1 of each year (including 2007), Delphi shall
provide to GM a non-binding forecast of amounts that Delphi projects GM will be required to
pay pursuant to this section 4.01 for the following two (2) calendar years, and GM and Delphi
shall work together to update the first year of such forecast on a quarterly basis; provided,
however, that the amount of GM's obligation to pay any amount pursuant to this section 4.01
shall not be increased or decreased to equal any such forecast amounts, and Delphi's right to
receive payments from GM shall not be affected by the amount of such forecast amounts.

(v)    GM shall pay all amounts in each monthly invoice referred to in
section 4.01(b)(ii) containing all information and representations required by this section 4.01(b)
within twenty (20) days following receipt of the invoice or as otherwise agreed by GM and
Delphi (if the 20th day falls on a weekend or holiday, GM shall pay Delphi on the next business
day). Notwithstanding anything to the contrary in this Agreement or the Settlement Agreement,
any payment by GM or Delphi of any amount pursuant to this section 4.01 shall be subject to the
right of GM or Delphi, as applicable, to offset all or part of such payment as provided in section
7.01 hereof.

(c)    Delphi shall (i) permit GM (excluding the members of GM GPSC) and/or
its agents, at GM's expense, to audit Delphi's books and records relating to Excess Labor Costs,
and (ii) reasonably cooperate with GM and its agents in any such audit activities in a timely

manner; provided, however, that (x) GM shall provide Delphi with reasonable advance written notice identifying the records and information that GM intends to audit, (y) GM shall reasonably cooperate with Delphi and its agents in any such audit activities, and (z) GM shall, before seeking to audit Delphi's books and records regarding Excess Labor Costs, request that Delphi provide reasonably sufficient supporting information with respect to any inquiry by GM regarding Excess Labor Costs. In addition, unless Delphi otherwise consents, any and all information obtained by or through any audit of Delphi's books and/or records by GM and/or its agents, except to the extent such information is publicly available or can be obtained from other sources that are not, to GM's knowledge, subject to an obligation of confidentiality, (i) shall be used solely for the purpose of confirming the amount of Excess Labor Costs, and (ii) shall not be disclosed to any member of GM GPSC.

(d)     Delphi agrees to use commercially reasonable efforts to maximize the use of temporary employees and minimize the use of skilled labor, as work rules allow, with a goal of achieving a more competitive Labor Cost Amount, provided that Delphi's right to receive payments from GM shall not be affected by any failure to achieve a more competitive Labor Cost Amount.

Section 4.02   Production Cash Burn Breakeven.

(a)     With respect to any of the Sale Facilities or UAW Footprint Facilities (the "Support Facilities") for which GM requires production at any time on or after January 1, 2008, GM agrees, under the terms and pursuant to the process set forth in this section 4.02, to reimburse Delphi for the Applicable Production Cash Burn Percentage of Production Cash Burn at such facility from January 1, 2008 (or such later date agreed to by GM and Delphi) through the Support End Date for such facility (a "Support Period"); provided, however, that to the extent that net sales attributable to any Support Facility exceed the sum of cash expenditures and accrued expenses included in the definition of Production Cash Burn for such Support Facility during its Support Period, such excess amount shall offset amounts that GM would otherwise pay in respect of other Support Facilities for which GM is reimbursing Production Cash Burn during such Support Period.

(b)     GM shall reimburse Delphi as required in section 4.02(a) of this Agreement pursuant to the following procedure:

(i)     Following the Effective Date, Delphi shall invoice GM on a calendar month basis for the aggregate amount of the Applicable Production Cash Burn Percentage of Production Cash Burn actually incurred at all Support Facilities during the applicable month. Delphi shall deliver the invoice to the Director of Business Development at GM by the 20th day of the month following each invoice period (if the 20th day of the month falls on a weekend or holiday, Delphi shall endeavor to deliver the invoice to GM by the next business day).

(ii)     Each monthly invoice for the aggregate amount of the Applicable Production Cash Burn Percentage of Production Cash Burn actually incurred at all Support Facilities shall be in the form of **Exhibit 4.02(b)** hereto, shall have attached as supporting detail an invoice for each Support Facility (also in the form of **Exhibit 4.02(b)** hereto), and include a

MRA-34

representation from Delphi that the attached supporting detail is substantially complete and substantially accurate in all respects. GM and Delphi agree to work together in good faith to amend the form of invoice if necessary due to changed circumstances.

(iii)     GM shall pay all amounts in each invoice containing all information and representations required by section 4.02(b)(ii) within thirty (30) days following receipt of the invoice or as otherwise agreed by GM and Delphi (if the 30th day following receipt of the invoice falls on a weekend or holiday, GM shall pay Delphi on the next business day). Notwithstanding anything to the contrary in this Agreement or the Settlement Agreement, any payment by GM or Delphi of any amount pursuant to this section 4.02 shall be subject to the right of GM or Delphi, as applicable, to offset all or part of such payment as provided in section 7.01 hereof.

(iv)     If any monthly invoice submitted under this section 4.02 reflects an aggregate positive cash flow for all Support Facilities during the applicable month, the amount of the aggregate positive cash flow shall be a credit to GM solely against any future amounts GM owes Delphi pursuant to this section 4.02. For the avoidance of doubt, Delphi shall not be obligated to make any cash payment to GM with respect to any credit under this section 4.02 nor shall any credits under this section 4.02 be applied against any sums owed by GM under any other provision of this Agreement or any other agreement.

(c)     Delphi shall (i) with respect to the Flint East Facility, permit an outside auditor, at GM's expense, to audit Delphi's books and records relating to Production Cash Burn, (ii) with respect to all other Support Facilities, permit GM (excluding the members of GM GPSC) and/or its agents, at GM's expense, to audit Delphi's books and records relating to Production Cash Burn, and (iii) reasonably cooperate with GM and/or its agents in any such audit activities in a timely manner; provided, however, that (w) GM shall provide Delphi with reasonable advance written notice identifying the records and information that GM intends to audit, (x) GM shall reasonably cooperate with Delphi and its agents in any such audit activities, (y) GM shall, before seeking to audit Delphi's books and records regarding Production Cash Burn, request that Delphi provide reasonably sufficient supporting information with respect to any inquiry by GM regarding Production Cash Burn, and (z) any and all information obtained by or through any audit of Delphi's books and records shall not be disclosed to any member of GM GPSC, except to the extent such information is publicly available or can be obtained from other sources that are not, to GM's knowledge, subject to an obligation of confidentiality. Notwithstanding anything contained herein, neither GM nor any of its agents shall be entitled to audit pursuant to this section 4.02(c) Delphi or Delphi's books and records until GM has commenced making the payments required pursuant to section 4.02 hereof.

(d)     In consideration of GM's acceptance of responsibility for certain Supplemental Unemployment Benefits and Severance at the Footprint Sites, GM shall receive a credit in the full amount of the first $10 million for which GM is responsible under this section 4.02. The monthly invoices delivered by Delphi pursuant to this section 4.02 shall reflect and shall be reduced by the amount of the $10 million credit, with the credit applied dollar for dollar against the first and each subsequent invoice until applied in full.

(e)     On or before the date on which payment pursuant to this section 4.02 would be due from GM to Delphi with respect to the invoice pertaining to December of any year, Delphi shall pay to GM, with respect to each Sale Facility (so long as it was also a Support Facility at any point during such year), via wire transfer in immediately available funds an amount (the "Warranty Cost Amount") equal to one-third of the amount by which warranty costs associated with such facility during the portion of such calendar year such Sale Facility was a Support Facility exceeded an amount equal to the product of (x) the number of months during the year for which GM was obligated to cover warranty costs under Production Cash Burn and (y) 125% of (i) in respect of the Sandusky Facility, $0; (ii) in respect of the Adrian Facility, $0; (iii) in respect of the Saginaw Steering Facility, $1,148,000; and/or (iv) with respect of the Athens Facility, $20,000 (for each such facility, the "Base Monthly Warranty Level"), i.e.: one-third of (the warranty cost associated with the applicable facility for the portion of the current year the Sale Facility was a Support Facility - the number of months the Sale Facility was a Support Facility during the current year x 125% of Base Monthly Warranty Cost). If the warranty costs during any month in respect of any Sale Facility (so long as it is also a Support Facility) are more than the greater of $1 million or 200% of the Base Monthly Warranty Level, then, on or before the date on which payment pursuant to this section 4.02 would be due from GM to Delphi for such month, Delphi shall pay to GM via wire transfer in immediately available funds an amount equal to one-third of the amount by which the warranty costs exceed 125% of the Base Monthly Warranty Level; provided, however, that (i) the amount of any annual payment otherwise required to be made by Delphi pursuant to the first sentence of this section in respect of the year in which any monthly payment is made by Delphi pursuant to this sentence shall be reduced by the amount of any such monthly payment and (ii) if the aggregate amount of monthly payments made by Delphi pursuant to this sentence in any calendar year exceeds the amount of any annual payment otherwise required to be made by Delphi pursuant to the first sentence of this section in respect of such calendar year, GM shall pay to Delphi via wire transfer in immediately available funds within thirty (30) days of receipt by GM of the invoice under this section 4.02 for the month of December of such year an amount equal to such excess.

(f)     On or before December 1st of each year (including 2007), Delphi shall provide to the Director of Business Development at GM a forecast of Production Cash Burn for the following two calendar years for each Support Facility and GM shall review each forecast and provide any feedback on or before December 15th of each year. Actual Production Cash Burn shall be tracked against each annual forecast on a monthly basis. GM and Delphi shall work together to update each annual forecast on a quarterly basis for the current calendar year. The amount of GM's obligation to reimburse Delphi pursuant to this section 4.02 shall not be increased or decreased to reflect any amounts forecasted pursuant to this section 4.02(f).

(g)     At GM's direction, Delphi shall implement an incentive payment structure (the form and substance of which shall be subject to Delphi's consent, which shall not be unreasonably withheld) separate from and in addition to Delphi's current incentive payment structure, pursuant to terms designed by GM to meet certain objectives for Delphi's salaried employees at the Support Facilities, and any amounts paid by Delphi under such incentive payment structure shall be included as part of cost for purposes of the Production Cash Burn calculation; provided, however, that nothing herein shall require GM to direct Delphi to implement an incentive payment structure, and payments made under an incentive payment

MRA-36

structure shall not be included as part of the Production Cash Burn calculation unless GM directs
its implementation in writing.

(h)     On January 1, 2008, GM shall accelerate its payment terms (for all
payments made by GM after such date) to "net 10 days" for products purchased by GM from
Support Facilities that are not also Sale Facilities. The accelerated payment terms for each such
Support Facility shall end on the Support End Date for such Support Facility.

(i)     GM and Delphi have agreed to work together to minimize excess and
obsolete materials with respect to the Support Facilities in accordance with the letter from Bill
Hurles, of GM, to Jeff Paprocki, of Delphi, dated February 1, 2007, which is attached hereto as
**Exhibit 4.02(i)**.  GM and Delphi have further agreed to handle extended fabrication and material
obligations as set forth in such letter.

(j)     Any inventory banks requested by GM at any Support Facility shall be
produced by Delphi through the order schedule as outlined in section 4.02(h) of this Agreement.
The size and build schedule for any such inventory banks shall be mutually agreed upon by GM
and Delphi.  GM shall purchase the inventory upon production by Delphi and receipt of an
invoice, subject to "net 10 day" payment terms.  At GM's written direction, Delphi shall
warehouse and maintain such inventory at GM's cost.

(k)     Current GM contract terms, including pricing, shall remain in force with
no pricing changes to be proposed for GM products produced at the Support Facilities, except as
provided in **Exhibit 3.01(a)** to this Agreement.

(l)     Delphi shall use commercially reasonable efforts to minimize the
Production Cash Burn at each Support Facility.

(m)     GM may, in its sole discretion, assist the Delphi purchasing organization,
as requested by Delphi, in the negotiation and purchase of material for the Support Facilities
after December 31, 2007.

(n)     After such time as GM makes its first payment to Delphi under this
section 4.02, GM may, in its sole discretion, designate GM employee(s) or advisor(s),
compensated by GM, to work at any Support Facility (except for the Flint East Facility) as
advisors to Delphi to help minimize Production Cash Burn after (i) in the case of the Needmore
Road Facility, the Saginaw E&C Facility, the Sandusky Facility, or the Adrian Facility
December 31, 2007, and (ii) in the case of the Saginaw Steering Facility or the Athens Facility,
December 31, 2008.  As necessary to support GM's efforts to reduce Production Cash Burn,
Delphi shall provide such GM representatives with access to the operations of the Support
Facilities (except for the Flint East Facility) as well as to the books and records relating to such
Support Facilities.  The GM representatives may also review ongoing expenditures at any such
Support Facility during the Support Period for such Support Facility.

(o)     GM, with the concurrence of Delphi, which shall not be unreasonably
withheld, may, but shall not be required to, extend employment offers to Delphi salaried
employees affiliated with the products or operations of the Support Facilities after (i) in the case
of any employee associated with the Flint East Facility, June 30, 2008, (ii) in the case of any

MRA-37

employee associated with the Needmore Road Facility and the Saginaw E&C Facility, December 31, 2007, (iii) in the case of any employee associated with the Saginaw Steering Facility or the Athens Facility, December 31, 2008, and (iv) in the case of any employee associated with the Sandusky Facility or the Adrian Facility, December 31, 2007; provided, however, that with respect to any Sale Facility, GM's right to extend employment offers pursuant to this section 4.02(o) shall be suspended so long as there is a sale of such Sale Facility pending pursuant to a signed memorandum of understanding or purchase agreement. GM may, but shall not be required to, locate employees that GM hires under this section 4.02(o) at any Support Facility until such Support Facility is wound-down or its ownership is transferred to a party other than Delphi; provided, however, that no salaried employees employed by GM shall hold or be deemed by Delphi or GM to hold a managerial position at any Support Facility.

Section 4.03   Sunset Requirements.

(a)     GM has agreed, pursuant to section B of and Attachment A to the UAW MOU, to, among other things, provide certain support so that Delphi shall no longer have responsibility for production operations or for employment of UAW-represented employees by dates specified in the UAW MOU in respect of the Saginaw Steering Facility, the Sandusky Facility, the Adrian Facility, the Flint East Facility, the Needmore Road Facility and the Saginaw E&C Facility. For the avoidance of doubt, GM shall have no obligations (and shall not be responsible for any liabilities) in respect of such facilities, other than obligations expressly set forth in the UAW MOU, this Agreement or the Settlement Agreement, or such obligations, if any, expressly set forth in any Existing Agreements. Delphi agrees that it shall not seek any compensation from GM, the UAW or any other party in consideration of Delphi's cessation of responsibility pursuant to section B of the UAW MOU except as provided for in this Agreement, the Settlement Agreement or any Existing Agreements.

(b)     GM and Delphi acknowledge that Delphi expects to cease GM production at the Athens Facility on or before December 31, 2009. GM and Delphi agree to use commercially reasonable efforts to relocate or source, on or before such date, production of all Component Parts which are manufactured at the Athens Facility, which relocation shall be coordinated with and approved by GM in accordance with GM's Business Transfer Approval Board process (the "BTAB Process"). In the event the production of Component Parts for GM at the Athens Facility has not been completely relocated or sourced to other facilities by December 31, 2009 due to technical, sourcing or manufacturing- based impediments, and despite the Parties' having used commercially reasonable efforts to meet the December 31, 2009 date, GM and Delphi shall mutually discuss and reasonably cooperate to address any additional production that is necessary to support GM following such date. In connection with the closure of the Athens Facility, GM agrees to utilize commercially reasonable efforts to coordinate the timing of flowback opportunities in the most cost-effective manner practicable. Delphi agrees that a condition of any sale of the Athens Facility shall be that the buyer agrees in writing to comply with this section 4.03(b). GM agrees that there shall be no adverse economic impact to Delphi related to hourly and salaried separation costs and costs of moving equipment in connection with any closure of the Athens Facility, and GM shall be responsible for any such costs borne by Delphi. Delphi and GM agree that if the Athens Facility is sold, the buyer (who will reap the long-term benefit of closure of the Athens Facility) shall bear the entire economic impact of closure of the Athens Facility, including, without limitation, hourly and salaried separation costs

MRA-38

and costs of moving equipment, provided that GM shall provide flowback opportunities to GM locations or otherwise satisfy long-term employment commitments for approximately 390 Athens former Tier I employees.

(c)   GM and Delphi acknowledge that Delphi expects to close the Columbus Facility on or before December 31, 2007.  GM and Delphi agree to use commercially reasonable efforts to relocate or source, on or before such date, production of all Component Parts which are manufactured at the Columbus Facility, which relocation shall be coordinated with and approved by GM in accordance with GM's BTAB Process, subject to Delphi's right to close the Columbus Facility no later than December 31, 2008.  In the event the production of Component Parts at the Columbus Facility will not be relocated or sourced to other facilities by December 31, 2007 due to technical, sourcing or manufacturing-based impediments, and GM desires that Delphi continue operations at the Columbus Facility to support GM production, despite the Parties' having used commercially reasonable efforts to meet the December 31, 2007 date, GM shall provide Delphi with sixty (60) days' prior written notice and GM and Delphi shall use commercially reasonable efforts to expedite the relocation of production from the Columbus Facility, in which case Delphi shall continue to operate the Columbus Facility in support of GM's production requirements until a date to be agreed upon by GM and Delphi, provided that Delphi shall not be obligated to operate such facility beyond December 31, 2008.  In addition, the Parties agree to engage in good faith discussions regarding whether the Columbus Facility would be eligible for the Production Cash Burn subsidy under section 4.02 for the period after January 1, 2008.  Delphi agrees that a condition of any sale of the Columbus Facility shall be that the buyer agrees in writing to comply with this section 4.03(c).

(d)   GM and Delphi acknowledge that Delphi expects to close the Milwaukee E&C Facility on or before December 31, 2007.  GM and Delphi agree to use commercially reasonable efforts to relocate or source, on or before such date, production of all Component Parts which are manufactured at the Milwaukee E&C Facility, which relocation shall be coordinated with and approved by GM in accordance with GM's BTAB Process, subject to Delphi's right to close the Milwaukee E&C Facility no later than December 31, 2008.  In the event the production of Component Parts at the Milwaukee E&C Facility will not be relocated or sourced to other facilities by December 31, 2007 due to technical, sourcing or manufacturing-based impediments, and GM desires that Delphi continue operations at the Milwaukee E&C Facility to support GM production, despite the Parties' having used commercially reasonable efforts to meet the December 31, 2007 date, GM shall provide Delphi with sixty (60) days' prior written notice and GM and Delphi shall use commercially reasonable efforts to expedite the relocation of production from the Milwaukee E&C Facility, in which case Delphi shall continue to operate the Milwaukee E&C Facility in support of GM's production requirements until a date to be agreed upon by GM and Delphi, provided that Delphi shall not be obligated to operate such facility beyond December 31, 2008.  In addition, the Parties agree to engage in good faith discussions regarding whether the Milwaukee E&C Facility would be eligible for the Production Cash Burn subsidy under section 4.02 for the period after January 1, 2008.  Delphi agrees that a condition of any sale of the Milwaukee E&C Facility shall be that the buyer agrees in writing to comply with this section 4.03(d).

Section 4.04   GM Working Capital Backstop for Sale Facilities.

(a)     The Parties agree that the provisions of this section 4.04 are intended to provide Delphi with an agreed upon minimum recovery of the working capital that Delphi has invested in the Sale Businesses. The exercise of any Unsold Business Option under section 4.06 of this Agreement (other than with respect to the Saginaw E&C Assets), including the occurrence of any deemed transfer pursuant to section 4.06(c) of this Agreement, constitutes a sale under the provisions of this section 4.04.

(b)     If the closing of the sale of the Global Interiors & Closures Business occurs on or before the Effective Date:

(i)     GM will pay to Delphi on the Initial Payment Date a payment equal to the lesser of (A) $91 million, and (B) 100% of the amount, if any, by which the estimated Net Working Capital associated with the Global Interiors & Closures Business as of the Closing Date (to the extent included as part of the sale) exceeds the Initial Sale Proceeds (or, to the extent any adjustments have already been made, the Adjusted Sale Proceeds) for the Global Interiors & Closures Business; or

(ii)     Delphi will pay to GM on the Closing Date 60% of the Excess Interiors Proceeds, if any.

(iii)     On each Adjustment Payment Date, GM or Delphi, as applicable, will make payment to the other party of any adjustments required to the payments made under subsections (b)(i) and (b)(ii) above to reflect the Adjusted Sale Proceeds or actual Net Working Capital as of the Closing Date, in accordance with the procedures set forth in section 4.04(i).

(c)     If the closing of the sale of the Global Interiors & Closures Business has not occurred on or before the Effective Date:

(i)     GM will advance to Delphi (as an advance deposit against accounts payable to Delphi and its U.S. and Mexican Affiliates), on the later of the Effective Date and January 2, 2008, the lesser of (A) $91 million and (B) 100% of the estimated Net Working Capital associated with the Global Interiors & Closures Business as of December 31, 2007 (the "Interiors Advance").

(ii)     Upon the closing of a sale of the Global Interiors & Closures Business subsequent to GM making the Interiors Advance

(A)     On the Closing Date, Delphi will pay to GM the amount of the Interiors Advance (which payment shall reduce the Interiors Advance to zero) by wire transfer in immediately available funds;

(B)     On the Closing Date, GM will pay to Delphi the amount equal to the lesser of (x) $91 million, and (y) 100% of the amount, if any, by which the estimated Net Working Capital associated with the Global Interiors & Closures Business as of the Closing Date (to the extent included as part of the sale) exceeds the Initial Sale Proceeds (or, to the extent any adjustments

MRA-40

have already been made, the Adjusted Sale Proceeds), which
payment is not an advanced deposit, by wire transfer in
immediately available funds; and

(C)   Delphi will pay to GM on the
Closing Date an amount equal to 60% of the Excess Interiors
Proceeds, if any.

(iii)   On each Adjustment Payment Date, GM or Delphi, as applicable,
will make payment to the other party of any adjustments required to the payments made under
subsection (c)(ii) above to reflect the Adjusted Sale Proceeds or actual Net Working Capital as of
the Closing Date, in accordance with the procedures set forth in section 4.04(i).

(d)   If the closing of the sale of the Sandusky Business occurs on or before the
Effective Date:

(i)   Delphi will first pay to GM on the Initial Payment Date the Capital
Procurement Payment pursuant to the terms of the Capital Procurement Agreement.

(ii)   Subsequent to Delphi having paid the Capital Procurement
Payment to GM, GM will pay to Delphi on the Initial Payment Date the amount, if any, by which
(A) the lesser of (1) $35 million and (2) the estimated Net Working Capital associated with the
Sandusky Business as of the Closing Date (to the extent included as part of the sale) exceeds (B)
the Initial Sale Proceeds (or, to the extent any adjustments have already been made, the Adjusted
Sale Proceeds) for the Sandusky Business less the Capital Procurement Payment; or

(iii)   Delphi will pay to GM on the Closing Date 60% of the Excess
Sandusky Proceeds, if any.

(iv)   On each Adjustment Payment Date, GM or Delphi, as applicable,
will make payment to the other party of any adjustments required to the payments made under
subsections (d)(i) through (iii) above to reflect the Adjusted Sale Proceeds or actual Net Working
Capital as of the Closing Date, in accordance with the procedures set forth in section 4.04(i).

(e)   If the closing of the sale of the Sandusky Business has not occurred on or
before the Effective Date:

(i)   GM will advance to Delphi (as an advance deposit against
accounts payable to Delphi and its U.S. and Mexican Affiliates), on the later of the Effective
Date and January 2, 2008, the lesser of (A) $35 million and (B) 100% of the estimated Net
Working Capital associated with the Sandusky Business as of December 31, 2007 (the
"Sandusky Advance").

(ii)   Upon the closing of a sale of the Sandusky Business subsequent to
GM making the Sandusky Advance

(A)   On the Closing Date, Delphi will
pay to GM the amount of the Sandusky Advance (which payment

MRA-41

shall reduce the Sandusky Advance to zero) by wire transfer in immediately available funds.

(B)    On the Closing Date, Delphi will pay to GM the Capital Procurement Payment pursuant to the terms of the Capital Procurement Agreement.

(C)    Upon Delphi having paid the Capital Procurement Payment to GM, on the Closing Date, GM will pay to Delphi the amount, if any, by which (1) the lesser of (x) $35 million, and (y) the estimated Net Working Capital associated with the Sandusky Business as of the Closing Date (to the extent included as part of the sale) exceeds (B) the Initial Sale Proceeds (or, to the extent any adjustments have already been made, the Adjusted Sale Proceeds) for the Sandusky Business less the Capital Procurement Payment, which payment is not an advanced deposit, by wire transfer in immediately available funds; or

(D)    Delphi will pay to GM on the Closing Date 60% of the Excess Sandusky Proceeds, if any.

(iii)    On each Adjustment Payment Date, GM or Delphi, as applicable, will make payment to the other party of any adjustments required to the payments made under subsections (e)(i) and (e)(ii) above to reflect the Adjusted Sale Proceeds or actual Net Working Capital as of the Closing Date or December 31, 2007, as applicable, in accordance with the procedures set forth in section 4.04(i).

(f)    If the closing of the sale of the Global Steering Business occurs on or before the Effective Date:

(i)    GM will pay to Delphi on the Initial Payment Date a payment equal to the lesser of (A) $210 million, and (B) 66.6% of the amount, if any, by which the estimated Net Working Capital associated with the Global Steering Business as of the Closing Date (to the extent included as part of the sale) exceeds the Initial Sale Proceeds (or, to the extent any adjustments have already been made, the Adjusted Sale Proceeds) for the Global Steering Business; or

(ii)    Delphi will pay to GM on the Closing Date 60% of the Excess Steering Proceeds.

(iii)    On each Adjustment Payment Date, GM or Delphi, as applicable, will make payment to the other party of any adjustments required to the payments made under subsections (f)(i) and (f)(ii) above to reflect the Adjusted Sale Proceeds or actual Net Working Capital as of the Closing Date, in accordance with the procedures set forth in section 4.04(i).

(g)    If the closing of the sale of the Global Steering Business has not occurred on or before the Effective Date:

          (i)      GM will advance to Delphi (as an advance deposit against accounts payable to Delphi and its U.S. and Mexican Affiliates), on the later of the Effective Date and January 2, 2008, the lesser of (x) $210 million and (y) 66.6% of the estimated Net Working Capital associated with the Global Steering Business as of December 31, 2007 (the "Steering Advance").

          (ii)     Between the making of the Steering Advance and the Closing Date of any sale of the Steering Business, Net Working Capital will be reassessed as of the end of each calendar year in accordance with the procedures set forth in section 4.04(i) and any necessary adjustments to the Steering Advance will be made on the appropriate Adjustment Payment Date (A) in the case of an increase in the Steering Advance, through an additional advance deposit against accounts payable to Delphi and its U.S. Affiliates, and (B) in the case of a decrease in the Steering Advance, through repayment by Delphi of the amount of such reduction.

          (iii)    Upon the closing of a sale of the Steering Business subsequent to GM making the Steering Advance

                  (A)   On the Closing Date, Delphi will pay to GM the amount of the Steering Advance (which payment shall reduce the Steering Advance to zero) by wire transfer in immediately available funds;

                  (B)   On the Closing Date, GM will pay to Delphi the amount equal to the lesser of (x) 210 million, and (y) 66.6% of the amount, if any, by which the estimated Net Working Capital associated with the Steering Business as of the Closing Date (to the extent included as part of the sale) exceeds the Initial Sale Proceeds (or, to the extent any adjustments have already been made, the Adjusted Sale Proceeds), which payment is not an advanced deposit); or

                  (C)   Delphi will pay to GM on the Closing Date an amount equal to 60% of the Excess Steering Proceeds, if any.

          (iv)    On each Adjustment Payment Date, GM or Delphi, as applicable, will make payment to the other party of any adjustments required to the payments made under subsections (g)(i) through (g)(iii) above to reflect the Adjusted Sale Proceeds or actual Net Working Capital as of the Closing Date or December 31, 2007, as applicable, in accordance with the procedures set forth in section 4.04(i).

          (h)     On or before the applicable Invoice Delivery Date, Delphi shall deliver to GM its good faith estimate of the calculation of any estimated payment owing under section 4.04 along with any reasonably necessary and appropriate supporting financial statements and other information and, if applicable, a preliminary closing statement for any sale (collectively, the "Estimated Payment Calculation"). GM and/or Delphi shall pay all amounts owing with respect

to any Estimated Payment Calculation containing all information required by this section 4.04(h) on the dates such payments are due and owing under the terms of this section 4.04. Notwithstanding anything to the contrary in this Agreement or the Settlement Agreement, any payment by GM or Delphi of any amount pursuant to this section 4.04(h) shall be subject to the right of GM or Delphi, as applicable, to offset all or part of such payment as provided in section 7.01 hereof.

(i)     Within 20 days of each Adjustment Determination Date, Delphi shall deliver to GM the calculation of any adjustment owing under sections 4.04(a)-(g) along with all necessary and appropriate supporting financial statements and other information and, if applicable, a closing statement for any sale (collectively, the "Adjustment Payment Calculation"). The Adjustment Payment Calculation shall include all reasonably necessary supporting documentation and a representation from Delphi that such documentation is substantially complete and substantially accurate in all respects. GM and/or Delphi shall pay all amounts owing under any Adjustment Payment Calculation containing all information and representations required by this section 4.04(i) on the applicable Adjustment Payment Date. Notwithstanding anything to the contrary in this Agreement or the Settlement Agreement, any payment by GM or Delphi of any amount pursuant to this section 4.04(i) shall be subject to the right of GM or Delphi, as applicable, to offset all or part of such payment as provided in section 7.01 hereof.

(j)     Delphi shall (i) permit GM and/or its agents, at GM's expense, to audit Delphi's books and records relating to Adjustment Payment Calculations, and (ii) reasonably cooperate with GM and its agents in any such audit activities in a timely manner; provided, however, that (x) GM shall provide Delphi with reasonable advance written notice identifying the records and information that GM intends to audit, (y) GM shall reasonably cooperate with Delphi and its agents in any such audit activities, and (z) GM shall, before seeking to audit Delphi's books and records regarding Adjustment Payment Calculations, request that Delphi provide reasonably sufficient supporting information with respect to any inquiry by GM regarding Adjustment Payment Calculations. In addition, unless Delphi otherwise consents, any and all information obtained by or through any audit of Delphi's books and/or records by GM and/or its agents, except to the extent such information is publicly available or can be obtained from other sources that are not, to GM's knowledge, subject to an obligation of confidentiality, shall be used solely for the purpose of confirming any Adjustment Payment Calculations.

(k)     As a condition of receiving payment of the Unrecovered Separation Costs in accordance with section 4.04, Delphi agrees that it will not obligate buyers of the Global Interiors & Closures Business, Global Steering Business or the Sandusky Business to pay such costs unless GM otherwise agrees.

(l)     To the extent required under either Existing Agreements or agreements which GM or any of the Delphi Parties enter into in the future, Delphi shall ensure that GM receives required production from the Global Interiors & Closures Business, the Sandusky Business and the Global Steering Business through the earlier of the Closing Date related to the sale of such business or the applicable Business Outside Date.

Section 4.05   Additional Terms Regarding Sale Facilities.

(a)     GM shall have the right to consent to the identity of any buyer or buyers of all or any part of the Global Steering Business, Global Interiors & Closures Business, and/or the Sandusky Business which is sold as a going concern and to the amount of proceeds to be paid upon the sale or sales of any of such businesses if less than the Net Working Capital associated with the applicable business; provided, however, that the right to consent to the identity of any buyer or buyers shall not apply to any sale of assets that are no longer used for GM production, including the Athens Facility and Columbus Facility (at such time as such facilities are no longer used for GM production); and provided further, that any proceeds from the sale of such assets (except for the Athens Facility, the Columbus Facility and de minimis surplus asset sales) shall be treated as Sale Proceeds under section 4.04.

(b)     Delphi shall use commercially reasonable efforts to maximize the proceeds from and value of the Global Steering Business, Global Interiors & Closures Business, and the Sandusky Business (including working with GM to evaluate standalone options for such businesses or Facilities that are not sold on or prior to January 1, 2008); provided that nothing contained herein shall relieve GM of its obligation under section 4.06 hereof.

(c)     GM shall use commercially reasonable efforts to negotiate a revenue plan with potential buyers of the Global Steering Business, Global Interiors & Closures Business, and/or the Sandusky Business to facilitate sales of such facilities; provided, however, that GM shall not be obligated under any circumstances to enter into any such revenue plan.

(d)     With respect to the Global Steering Business, Global Interiors & Closures Business, and/or the Sandusky Business, as applicable, GM shall offer to any buyer of such facility or facilities to which GM consents under section 4.05(a) hereof, reimbursement of Excess Labor Costs for the period following the closing of the sale on terms that are substantially the same (and no less favorable to the buyer) as those set forth in section 4.01 of this Agreement.

Section 4.06    Treatment of Unsold Businesses and the Transfer of Certain Employees.

(a)    **Unsold Business Option**

(i)    In accordance with the terms of this section 4.06, Delphi on behalf of itself and its applicable Affiliates (each a "Business Optionor" and collectively, the "Business Optionors") hereby grants to one or more parties designated by GM in its discretion (each a "Business Optionee" and collectively, the "Business Optionees"), the options (each an "Unsold Business Option" and collectively, "Unsold Business Options") to purchase the Global Steering Business, the Sandusky Business, the Global Interiors & Closures Business and the Saginaw E&C Assets (each an "Unsold Business" and collectively, the "Unsold Businesses") each for $1.00, to be effectuated through one or more asset sales, stock or other equity interest sales, real estate leases, machinery and equipment leases (with respect to machinery and equipment located in facilities which are to be leased to the applicable Business Optionee) and assignments and assumptions (each a "Business Transaction" and collectively, the "Business Transactions"), or a combination thereof, as reasonably determined by the applicable Business Optionee (except to the extent Delphi is expressly entitled to determine the structure under this section 4.06).

(ii)    Each Business Transaction shall be structured such that the Business Optionee shall assume the Assumed Liabilities and Delphi and the Business Optionor, as applicable, shall retain the Retained Liabilities each with respect to the applicable Unsold Business. In addition, in connection with such Business Transaction, the Business Optionee shall offer employment to the U.S. salaried employees of the Unsold Business on terms substantially comparable in the aggregate to the terms of their employment with Delphi or its Affiliates for one year following the date of the closing of the applicable Business Transaction (the "Business Closing Date"), and, in the case of non-U.S. employees, the Business Optionee shall assume the employment contracts and all related obligations of the Unsold Business in accordance with applicable legal, works council and union agreement requirements. Also, the assets to be transferred in connection with each Business Transaction shall be accepted by the Business Optionee on an as-is, where-is basis.  GM may designate only one Business Optionee at a time for each Unsold Business (unless Delphi otherwise consents, which consent shall not unreasonably be withheld), provided that GM may designate separate Business Optionees with respect to discrete regional operations or lines of business which are a part of the Unsold Business where such discrete regional operations or lines of business may reasonably be sold as a separate ongoing concern.  The Business Optionee and GM shall be responsible for all costs associated with any such sales or, to the extent provided in section 4.06(a)(vii) below, the preparation therefor regardless of whether the sale to such Business Optionee closes.

(iii)    To the extent that an Unsold Business includes a contract or other obligations, including without limitation non-compete or non-solicitation agreements, which would restrict or inhibit a Business Optionee or any of its Affiliates from engaging in, owning an interest in any Person engaged in, or providing support (financial or otherwise) to any Person engaged in, any line of business, Delphi shall at the request of the applicable Business Optionee use commercially reasonable efforts to terminate such contract or obligations and, at the election of the applicable Business Optionee, such contract or obligation shall be excluded (at the cost

MRA-46

and expense of the Business Optionee) from the contracts and obligations being transferred or assumed by the Business Optionee pursuant to a Business Transaction; and in such case, Delphi, the applicable Business Optionor and GM shall use their respective commercially reasonable efforts to provide the Business Optionee with the rights and benefits of such excluded contract or obligation (other than with respect to joint ventures). To the extent that an Unsold Business includes a contract or obligations pursuant to which a third party has a preemptive or similar right to purchase any asset (including an equity interest in a joint venture) which constitutes a portion of the Unsold Business, Delphi shall use commercially reasonable efforts to cause such third party not to exercise such right and at the election of the applicable Business Optionee, such assets shall be excluded (at the cost and expense of the Business Optionee) from the assets being transferred or assumed by the Business Optionee pursuant to a Business Transaction; and in such case, Delphi, the applicable Business Optionor and GM shall use their respective commercially reasonable efforts to provide the Business Optionee with the rights and benefits of such asset (other than with respect to joint ventures). With respect to the Saginaw E&C Assets, Delphi shall be entitled to retain the working capital with respect to such Unsold Business.

(iv)     The Parties agree that in connection with a Business Transaction Delphi may as reasonably determined by Delphi in order to reduce the cost of the applicable Business Transaction, (A) transfer the assets to be sold in connection with an Unsold Business and Assumed Liabilities to be assumed in connection with the purchase of the Unsold Business to a newly-formed subsidiary with no other operations or operational history, and transfer the equity interests of such new subsidiary to the Business Optionee, or (B) in the case of wholly-owned subsidiaries that are engaged in no business other than the Unsold Business, transfer the equity interests of such subsidiaries to the Business Optionee. In no event shall the Business Optionee assume or otherwise become liable for any liabilities or obligations that are not Assumed Liabilities, Delphi and the Business Optionor shall, jointly and severally, indemnify, defend and hold GM and each Business Optionee harmless from and against all such liabilities. Notwithstanding anything to the contrary herein, the liabilities and obligations of any joint venture comprising part of an Unsold Business will not be affected by this Agreement and such liabilities and obligations shall remain liabilities and obligations of the joint venture, and Delphi and its Affiliates (other than the joint venture) shall have no liability or obligation with respect thereto.

(v)     Each Business Transaction shall be subject to customary and appropriate documentation reasonably acceptable to Delphi and the Business Optionee. The Business Optionor and Delphi shall jointly and severally warrant to the applicable Business Optionee that, other than assets excluded from the relevant Unsold Business definition, the assets and rights transferred to the Business Optionee, together with the rights and transition services provided for hereunder, are sufficient to operate the applicable Unsold Business in substantially the same manner as operated prior to the Business Closing Date. In addition, the Business Optionor shall provide a customary warranty to the Business Optionee that it is being transferred marketable title to all stock, equity interests and assets to be transferred to the Business Optionee, free and clear of all liens, claims and Encumbrances, subject only to Permitted Encumbrances. The Business Optionees and the Business Optionor shall take all commercially reasonable actions necessary to and shall execute and deliver, any documents or instruments, reasonably necessary to, perfect or confirm all transfers, assignments and assumptions in connection with each Business Transaction, including making all appropriate regulatory filings as soon as

MRA-47

practicable and obtaining all requisite regulatory approvals in advance of the Business Outside
Date (as defined below); provided that in no event shall a Business Optionee be obligated to
dispose of or divest itself of any line of business or restrict itself from engaging in a line of
business in order to obtain any regulatory approvals. To the extent a third party consent or
approval is not obtained with respect to any third party contract or agreement in connection with
a Business Transaction, the applicable contract or agreement shall be excluded from the Business
Transaction and Delphi shall and shall cause its Affiliates to use reasonable efforts to provide the
benefits therefrom to the Business Optionee.

           (vi)     Each Unsold Business Option may be exercised by a Business
Optionee (A) with respect to the Global Interiors & Closures Business, the Sandusky Business
and the Saginaw E&C Assets, on or after the earlier of (1) the date Delphi and GM agree in
writing that Delphi's marketing efforts have concluded for the applicable Unsold Business and (2)
September 30, 2008; and (B) with respect to the Global Steering Business, on or after the earlier
of (1) the date Delphi and GM agree in writing that Delphi's marketing efforts have concluded
for such business and (2) August 31, 2010; provided, however, that the Unsold Business Option
with respect to each Unsold Business shall terminate and expire upon any sale of such Unsold
Business by Delphi. In the event that an Unsold Business Option with respect to any of the
Global Interiors & Closures Business, the Sandusky Business, and the Saginaw E&C Assets is
not exercised on or before December 31, 2008, or if such option has been exercised but the
applicable Business Closing Date has not occurred on or before December 31, 2008, the Unsold
Business Option relating to the applicable Unsold Business shall terminate. In the event that an
Unsold Business Option with respect to the Global Steering Business is not exercised on or
before December 31, 2010, or if such option has been exercised but the Business Closing Date
with respect to the Global Steering Business has not occurred on or before December 31, 2010,
the Unsold Business Option relating to the Global Steering Business shall terminate. If the
Unsold Business Option is exercised in accordance with this section 4.06, the exercising
Business Optionee and Delphi shall take all commercially reasonable actions to close the
applicable Business Transaction for such Unsold Business Option on or before the applicable
termination dates provided for in the previous two sentences (each a "Business Outside Date"
and collectively, the "Business Outside Dates"). The Unsold Business Option shall be exercised
through notice to Delphi provided in accordance with section 7.19 hereof. Such notice shall be
in writing. In addition, GM shall in writing notify Delphi of the identity of the Business
Optionees as promptly as practicable, but in any event, at least 45 days prior to the applicable
Business Closing Date.

           (vii)    At each Business Optionee's expense, such Business Optionee may
begin preparations for the exercise of the Unsold Business Option, without any obligation to
exercise such option (A) on or after April 1, 2008, with respect to the Global Interiors &
Closures Business, the Sandusky Business, and the Saginaw E&C Assets, and (B) on or after
April 1, 2010 with respect to the Global Steering Business, subject to, in each case, the execution
of reasonable and customary confidentiality agreements. Delphi shall reasonably cooperate and
assist any Business Optionee in its preparations and shall undertake such actions as such
Business Optionee reasonably requests in order to complete such preparations, subject to
reimbursement by the applicable Business Optionee of Delphi's actual costs incurred relating to
such preparations. Such preparations may include, without limitation, due diligence (including
discussions regarding facilities relocation plans for stated facilities), information technology

systems conversion, payroll systems conversion, and inventory systems conversion, as well as other actions necessary or reasonably desirable in preparing for the establishment of each of the Global Steering Business, the Sandusky Business, the Global Interiors & Closures Business and the Saginaw E&C Assets as separate operating entities.

(viii)   Upon the applicable Business Closing Date, Delphi shall, except as provided in the following sentence, take all necessary and appropriate actions to allow the Business Optionee to acquire ownership or use of, or to receive the benefit of, as applicable, and the Business Optionee shall take all necessary and appropriate actions to receive and accept ownership, use or the benefit of, all contracts, leases, license agreements and other agreements with third parties, and all other assets (including all equipment, machinery and tools) owned by Delphi that are primarily used in the applicable Unsold Business. Ownership of all intellectual property primarily used in the operation of the applicable Unsold Business shall be transferred by Delphi (and/or the Business Optionor as appropriate) to GM. The Parties further agree that (A) with respect to any intellectual property transferred by Delphi that is used in any of Delphi's or its Affiliates' other businesses or facilities, GM grants to Delphi, with the right to sublicense to its Affiliates, successors, assigns and/or designated suppliers, a perpetual, fully paid up, worldwide, non-exclusive irrevocable license under such intellectual property to make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute all products of the type produced by Delphi or any of its Affiliates as of the Business Closing Date and any derivatives and/or re-use/extension thereof other than the GM products associated with the business acquired by the Business Optionee, and (B) with respect to any intellectual property retained by the Business Optionor or Delphi that is also used in connection with the applicable Unsold Business, the Business Optionor or Delphi, as appropriate, grants to GM, with the right to sublicense to its Affiliates, successors, assigns and/or designated suppliers, a perpetual, fully paid up, worldwide, non-exclusive irrevocable license under such intellectual property to make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute all products of the type produced by such Unsold Business as of the Business Closing Date and any derivatives and/or re-use/extension thereof. The provisions of subsections (A) and (B) hereof are sufficient to constitute a license and no further actions are required by any party to give effect to the terms thereof. GM shall release Delphi and the Business Optionor from any liabilities and obligations relating to the period commencing after the applicable Business Closing Date in connection with any production obligations under any applicable Purchase Orders or supply contracts to GM relating to the Unsold Business. If an Unsold Business Option is exercised, Delphi or the Business Optionor shall assist, at the Business Optionee's cost (except for information technology costs to the extent Delphi has been compensated for such costs under section 4.04), in the conversion of the information technology, payroll and inventory systems at the applicable Unsold Business.

(ix)   If, in connection with a Business Transaction, a Business Optionee determines to lease an Unsold Business facility, such lease or leases (A) shall be "triple net", (B) shall provide for no rent payments, (C) shall include an option exercisable at any time prior to the termination of such lease by the Business Optionee or its assignee, to purchase the such facility for $1.00 and (D) shall have a lease term until December 31, 2015 with two (2) four (4) year renewal options and contain such other terms which shall be reasonably acceptable to Delphi and the Business Optionee, and provided that the Business Optionee shall have the right

MRA-49

to terminate the applicable lease at any time without liability directly related to such termination
on six (6) month's prior written notice to Delphi. The Business Optionee shall remain
responsible for any liabilities that arose under such lease prior to the termination thereof.
Notwithstanding anything contained herein, the Parties expressly agree that in order for a
Business Optionee to have the right to execute a lease of any facility in connection with an
Unsold Business Option, Delphi shall have the right to require that all facilities, machinery and
equipment that are a part of such Unsold Business (other than any such facilities, machinery or
equipment which are owned by an entity, the equity of which would be directly or indirectly
transferred to the Business Optionee) shall be leased to such Business Optionee under a lease on
terms set forth in the first sentence of this section 4.06(a)(ix). With respect to any facility and
machinery and equipment owned by an entity, the equity interests of which were transferred,
directly or indirectly, to a Business Optionee, the Business Optionee shall have the right to
transfer, no later than December 31, 2023, the applicable facility and machinery and equipment
to the applicable Business Optionor or its designee for $1 upon six (6) months notice.

(x)     In connection with a Business Transaction, at a Business
Optionee's request, Delphi shall enter into reasonable and customary transition services
agreements for up to a twelve (12) month period following the Business Closing Date to
facilitate the operation of the applicable businesses after the exercise of such option, subject to
the Business Optionee's agreement to reimburse Delphi for its and its Affiliates actual costs and
expenses incurred in providing such transition services. At the option of the Business Optionee,
Delphi shall extend any such transition services agreement for an additional three month period,
subject to the Business Optionee's agreement to reimburse and compensate Delphi for one
hundred and twenty-five percent (125%) of its and its Affiliates actual costs and expenses
incurred in providing such transition services. Following the expiration of such additional three
month period, at the option of the Business Optionee but upon at least 90 days prior written
notice to Delphi, Delphi shall extend any such transition services agreement for an additional
three month period, subject to the Business Optionee's agreement to reimburse and compensate
Delphi for one hundred and fifty percent (150%) of its and its Affiliates actual costs and
expenses incurred in providing such transition services.

(xi)     In connection with the documentation of a Business Transaction,
the applicable Business Optionee shall agree to supply products as by directed by Delphi or its
Affiliates in connection with product warranty or product recalls for a period of six months after
the Business Closing Date at factory-level cost plus engineering cost (without mark-up) for any
warranty-related Retained Liabilities; thereafter the applicable Business Optionee shall agree to
supply products to Delphi or its Affiliates in connection with product warranty or product recalls
at 110% of factory-level cost plus engineering cost.

(xii)     Delphi and each applicable Business Optionor, jointly and
severally, shall indemnify the applicable Business Optionee and GM against the Retained
Liabilities, the Delphi Retained Employment Liabilities and all other obligations of Delphi or
any Business Optionor hereunder to be performed in connection with any Business Transaction
and GM and the applicable Business Optionee shall indemnify Delphi for all Assumed Liabilities
and other obligations hereunder to be performed by the Business Optionee in connection with
such Business Transaction. Delphi and each applicable Business Optionor shall jointly and
severally cause to be paid or performed when due each of the Retained Liabilities to the extent

MRA-50

that the failure to do so would reasonably be expected to have an adverse impact or effect on GM, a Business Optionee or any of their respective Affiliates.

(xiii)   In connection with the exercise of any Unsold Business Option, and prior to the closing of any Business Transaction, GM shall cause any Business Optionee to consult with Delphi and, the Business Optionee may consult with Delphi and, provided that Delphi is given a reasonable opportunity to make the first communication, the Business Optionee may consult with any customers of such Unsold Business, to discuss the potential impact of any Business Transaction on the ongoing commercial relationship between such Unsold Business and any such customers.

(xiv)   With respect to the Saginaw E&C Assets, GM agrees to use commercially reasonable efforts to accomplish the completion of the sale of the Saginaw E&C Assets as soon as practicable following the Effective Date. In addition, GM agrees that (i) neither the proposed purchaser identified on **Exhibit 4.06(a)(xiv)** hereto (the "Proposed Purchaser") nor any of its Affiliates shall be eligible to exercise an Unsold Business Option for the Saginaw E&C Assets and (ii) GM shall not and shall not permit the Business Optionee exercising the Unsold Business Option with respect to the Saginaw E&C Assets to directly or indirectly transfer any portion of the Saginaw E&C Assets to the Proposed Purchaser or any of its Affiliates within five (5) years of such transfer.

(xv)   GM agrees that in the event GM receives any consideration with respect to the designation of a Business Optionee pursuant to this section 4.06, the amount of such consideration shall be allocated between GM and Delphi as if such consideration was treated as Sale Proceeds pursuant to section 4.04 hereof.

### (b)   Employment Transfer No Later than Employment Outside Date

(i)   Subject to the terms of this section 4.06 and in accordance with section B.3 of the UAW MOU, GM shall cause all the active and inactive bargaining unit employees (other than those who are participating in the PRP) at each of the Flint East, Needmore Road and Saginaw E&C Facilities (each an "Employment Transfer Facility" and collectively, the "Employment Transfer Facilities") to transfer (each an "Employment Transfer" and collectively, the "Employment Transfers" ) to employment with a third party (each an "Employment Party" and collectively, the "Employment Parties") no later than the time set forth in clauses (A), (B) and (C) below, respectively (each an "Employment Outside Date" and collectively, the "Employment Outside Dates"). In connection with each such Employment Transfer each such Employment Party shall receive an assignment of all of Delphi's rights and obligations other than the Delphi Retained Employment Liabilities for all active and inactive bargaining unit employees at such Employment Transfer Facility and in connection therewith each Employment Party shall assume all of Delphi's obligations other than those related to the Delphi Retained Employment Liabilities for all such active and inactive bargaining unit employees. The Parties further agree that upon such assumption Delphi shall be relieved and released from any liabilities or obligations other than the Delphi Retained Employment Liabilities to such active and inactive bargaining unit employees arising from and after the date of the applicable Employment Transfer. The time period for completion of the Employment Transfers are as follows:

(A)   with respect to the Flint East
Facility, commencing on October 1, 2007, and from time to time
thereafter when Delphi notifies GM that Delphi's employment
requirements at Flint East are reducing, GM shall cause the
Employment Party to hire the active and inactive bargaining unit
employees at the Flint East Facility that Delphi no longer requires
for its ongoing production;

(B)   with respect to the Needmore Road
Facility, on or after the earlier of 30 days after the cessation of OE
Part production at the Needmore Road Facility (which is currently
scheduled for June 30, 2008) or December 31, 2008; and

(C)   with respect to the Saginaw E&C
Facility, December 31, 2008.

Delphi shall reasonably cooperate in connection with the Employment Transfer to
each Employment Party. With respect to the Flint East Facility, GM shall be obligated to cause
the Employment Party to permit Delphi's continued use of the employees transferred to the
Employment Party pursuant to the Employment Transfer (or substitute employees who are
members of the same bargaining unit), to the extent Delphi requires in order to manufacture
cluster and MRA products in accordance with the UAW MOU, and the cost of such use shall be
included in expenses for the purpose of determining Production Cash Burn.

### (c)   Deemed Transactions

(i)   If for any reason a Business Transaction with respect to any
Unsold Business other than the Saginaw E&C Assets has not been consummated by the
applicable Outside Date, GM, or an Affiliate of GM designated by GM in its discretion, shall be
deemed to be a Business Optionee with respect to such Unsold Business and to have exercised
and consummated the related Unsold Business Option, and the associated Business Transaction
(including the assumption of the Assumed Liabilities) shall be deemed to have been
consummated on the applicable Business Outside Date. Such transaction shall be deemed to
occur in a manner reasonably determined by Delphi and Delphi shall have the right to make, in
its reasonable discretion, any elections with respect to the terms of the applicable Business
Transaction which a Business Optionee would otherwise be entitled to make under section 4.06(a)
and which have not previously been made by GM, a Business Optionee or a designated GM
Affiliate at least 45 days before the Business Outside Date; provided, further, that such Business
Transaction shall exclude any foreign joint venture interests comprising a portion of such Unsold
Business that are subject to preemptive or similar rights that have not been waived and Delphi
shall use its commercially reasonable efforts to cause GM or its designee to receive any net
proceeds from the sale of any such joint venture interest. In the event that GM designates one or
more of its Affiliates under this section 4.06(c)(i), GM absolutely and unconditionally guarantees
all the obligations of such Affiliate with respect to the matters described in this section 4.06(c)(i).
Following the consummation of a Business Transaction pursuant to this section 4.06(c)(i), GM
and Delphi shall cooperate and provide each other appropriate documentation evidencing such
transaction. To the extent that an Unsold Business includes a contract or other obligations,

MRA-52

including without limitation non-compete or non-solicitation agreements, which would restrict or inhibit GM or any of its Affiliates from engaging in, owning an interest in any Person engaged in, or providing support (financial or otherwise) to any Person engaged in, any line of business, Delphi shall use commercially reasonable efforts to terminate such contract or obligations and at the election of GM or its designated Affiliate, such contract or obligation, shall be excluded (at the cost and expense of GM) from the contracts and obligations being transferred or assumed by GM or such Affiliate pursuant to a Business Transaction; provided, however Delphi shall be entitled to cause the deemed Business Transaction to occur without including such contract or obligation and, in such case, Delphi and GM shall use their respective commercially reasonable efforts to provide GM or the applicable GM Affiliate with the rights and benefits of such excluded contract or obligation. To the extent any contract, agreement or other asset is excluded from a Business Transaction pursuant to section 4.06(a), such contract, agreement or asset shall be treated as an "Unsold Business" for purposes of this section 4.06(c) and the provisions of this section 4.06(c) shall be deemed to apply such that GM or its designated Affiliate shall be deemed a "Business Optionee" with respect to such "Unsold Business" and to have exercised and consummated an "Unsold Business Option", and the associated "Business Transaction" (including the assumption of "Assumed Liabilities") shall be deemed to have been consummated on the applicable Business Outside Date associated with the Unsold Business from which such contract, agreement or other asset was excluded.

(ii)     GM acknowledges that as a result of the Business Transactions, certain of Delphi's customers may have concerns and issues relating thereto. GM agrees to permit Delphi to take such commercially reasonable actions as are necessary or desirable to address such concerns and issues, including cooperating with any customers to transfer production of non-GM business and associated tooling and equipment from any such facility to new sources of production as may be required or requested by any of the customers in the event of any transfer to GM under this section 4.06(c). In addition, GM or its designated Affiliate will consult with Delphi and, provided that Delphi is given a reasonable opportunity to make a first communication, GM may consult with any such customers of an Unsold Business, to discuss the potential impact of any Business Transaction on the ongoing commercial relationship between such Unsold Business, Delphi and any such customers.

(iii)    If for any reason an Employment Transfer with respect to an Employment Transfer Facility has not been consummated by the applicable Employment Outside Date (which shall in the case of the Flint East Facility be deemed to occur from time to time on the dates set forth in Delphi's notices to GM under section 4.06(b)(i)(A) above), the applicable active and inactive bargaining unit employees for each such Employment Transfer Facility shall transfer to employment with GM, or, an Affiliate of GM designated by GM in its discretion, in accordance with this section on the applicable Employment Outside Date. In the event that GM designates one or more of its Affiliates under this section 4.06(c)(iii), GM unconditionally guarantees all the obligations of such Affiliate with respect to the matters described in this section 4.06(c)(iii). With respect to the Flint East Facility, GM or its Affiliate shall be obligated to permit Delphi's continued use of the employees transferred to GM or its Affiliate pursuant to this section 4.06(c), to the extent Delphi requires in order to manufacture cluster and MRA products in accordance with the UAW MOU, and the cost of such use shall be included in expenses for the purpose of determining Production Cash Burn. Following the consummation of a Business Transaction or Employment Transfer pursuant to this section

MRA-53

4.06(c)(iii), GM and Delphi shall cooperate and provide each other appropriate documentation evidencing such transaction.

(iv)     GM's obligations under this section 4.06 are absolute and unconditional and shall not be subject to any defense of any nature whatsoever, including upon a breach by Delphi or any of its Affiliates of any of their obligations under this Agreement (including this section 4.06), the Settlement Agreement or any other agreement or any failure to consummate a Business Transaction pursuant to this section 4.06 for any reason. To the extent the consummation of a Business Transaction under this section 4.06 shall be illegal or shall require GM or its Affiliates to dispose of or divest any line of business or restrict itself from engaging in any line of business to which GM or its Affiliates are at that time actively engaged in order to obtain any regulatory approval, Delphi shall restructure such transaction in order to accomplish to the greatest extent legally permissible consummation of the applicable Business Transaction. GM shall pay the costs arising and resulting from such restructuring, including shutdown, closure and severance costs. Notwithstanding the foregoing, it will not be a breach of GM's obligations hereunder if a Business Transaction is not consummated as a result of Delphi's failure to restructure such Business Transaction in a manner which is not illegal or which does not require GM or its Affiliates to dispose of or divest any line of business in which GM or its Affiliates are at that time actively engaged.

Section 4.07   Additional Terms Regarding Wind-Down Facilities.

(a)     GM and Delphi shall work together to facilitate the wind-down of production at Delphi's facilities that are scheduled to be wound down.

(b)     Delphi shall use commercially reasonable efforts to support the resourcing of GM production at Delphi's Wind Down Facilities and the Athens Facility, which support shall include, among other things, inventory banks funded by GM, assignment of tier 2 supplier contracts and movement of tooling.

(c)     GM shall use commercially reasonable efforts to transition from each facility of Delphi that is scheduled to be wound down to alternate production sources the production of aftermarket parts within the same timeframe as the transition from such facility to alternate production sources for the production of OE Parts.

Section 4.08   Additional Terms Regarding Footprint Facilities.

(a)     Delphi shall be responsible for explaining to potential purchasers or transferees of businesses conducted at the Footprint Facilities the provisions of the UAW MOU or IUE MOU, as applicable.

(b)     Delphi shall commit the required engineering resources and capital improvements necessary to support all GM programs produced at the Flint East Facility as required to meet Delphi's obligations under Existing Agreements or agreements which Delphi and GM enter into in the future. To the extent required under Existing Agreements or agreements which Delphi and GM enter into in the future, Delphi shall ensure that GM receives required production from the Flint East Facility through the date on which Delphi has no further obligations under the UAW MOU relating to production at the Flint East Facility.

(c)     GM has agreed, pursuant to section B of and Attachment A to the IUE
MOU, to provide certain business to a third party so that Delphi would be relieved of
responsibility for production or operations at the Kettering Facility as soon as possible. GM and
Delphi shall continue to work together to support the transfer of the Kettering Facility as
contemplated by the IUE MOU.

Section 4.09   Additional Terms Regarding UAW Keep Facilities. At each of the
UAW Keep Facilities, Delphi shall commit the required engineering resources and capital
improvements necessary to support all GM programs produced at such UAW Keep Facility as
required to meet Delphi's obligations under Existing Agreements or agreements which Delphi
and GM enter into in the future.

## ARTICLE V

## TREATMENT OF LEGACY AGREEMENTS; ORDINARY COURSE MATTERS; INDEMNIFICATION

Section 5.01   Disposition of Agreements with GM.

(a)     Agreements Executed in Connection with the Separation to Be Assumed.
Pursuant to the Plan and the terms of this Agreement, as of the Effective Date, the agreements
identified in this section 5.01(a) shall, as applicable, be either assumed, reinstated, or ratified
(including as amended, as applicable):

(i)     Environmental Matters Agreement. The Environmental
Matters Agreement between Delphi Automotive Systems Corporation (n/k/a
Delphi) and GM, dated as of "October 1998" (the "Environmental Matters
Agreement"), attached hereto as **Exhibit 5.01(a)(i)**; provided, however, that in
light of the rejection of the Master Separation Agreement dated as of December
22, 1998 among Delphi Automotive Systems Corporation (n/k/a Delphi), DAS,
Delphi Technologies, Inc. ("DTI"), and GM (the "Master Separation Agreement"),
pursuant to the Plan and section 5.01(d) of this Agreement, all references in the
Environmental Matters Agreement to the Master Separation Agreement are
deemed deleted, and any grammatical corrections necessary as a result of such
deletions required to preserve the Parties' original intent with respect to remaining
provisions are deemed made;

(ii)     Reserved;

(iii)     Financial Services Supply Agreement. The Financial
Services Supply Agreement dated as of December 18, 1998 between DAS and
GM (the "Financial Services Supply Agreement") as amended and restated
pursuant to the terms set forth in **Exhibit 5.01(a)(iii)** of this Agreement;

(iv)     Income Tax Allocation Agreement. The Amended and
Restated Agreement for the Allocation of United States Federal, State and Local
Income Taxes dated as of December 16, 1998 between Delphi Automotive

MRA-55

Systems Corporation (n/k/a Delphi) and GM (the "Income Tax Allocation Agreement"), attached hereto as **Exhibit 5.01(a)(iv)**; provided, however, that all references in the Income Tax Allocation Agreement to the Master Separation Agreement are deemed deleted, and any grammatical corrections necessary as a result of such deletions required to preserve the Parties' intent with respect to remaining provisions are deemed made; and provided further that, as of the Effective Date, the provisions of the Income Tax Allocation Agreement concerning dispute resolution and record retention that refer to the Master Separation Agreement are deemed to refer to the corresponding provisions of this Agreement;

(v)     Non-Income Tax Indemnification Agreement. The Agreement for Indemnification of United States Federal, State and Local Non-Income Taxes dated as of December 16, 1998 between Delphi Automotive Systems Corporation (n/k/a Delphi) and GM (the "Non-Income Tax Indemnification Agreement"), attached hereto as **Exhibit 5.01(a)(v)**; provided, however, that all references in the Non-Income Tax Indemnification Agreement to the Master Separation Agreement are deemed deleted, and any grammatical corrections necessary as a result of such deletions required to preserve the Parties' intent with respect to remaining provisions are deemed made; and provided further that, as of the Effective Date, the provisions of the Non-Income Tax Indemnification Agreement concerning dispute resolution and record retention that refer to the Master Separation Agreement are deemed to refer to the corresponding provisions of this Agreement;

(vi)     Assignment and Assumption Agreement – Industrial Development Bonds. The Assignment and Assumption Agreement – Industrial Development Bonds dated as of January 1, 1999 between DAS and GM (the "Assignment and Assumption Agreement – Industrial Development Bonds"), attached hereto as **Exhibit 5.01(a)(vi)**;

(vii)     Oshawa Lease. The following agreements: (A) the Lease Agreement dated as of May 1, 2000 between Delphi Canada Inc. and General Motors of Canada Limited, as amended August 1, 2002, attached hereto as **Exhibit 5.01(a)(vii)(i)**, under which Delphi Canada, Inc. continues to occupy the premises specified in such Lease Agreement as a holdover tenant with the consent of General Motors of Canada Limited, (B) Oshawa Labour & Management Agreement between Delphi Canada, Inc. and General Motors Canada Limited dated as of May 1, 2000, attached hereto as **Exhibit 5.01(a)(vii)(ii)** (the "Oshawa Labour Agreement"); and (C) the Administrative Services Agreement between Delphi Canada, Inc. and General Motors Canada Limited dated as of May 1, 2000, attached hereto as **Exhibit 5.01(a)(vii)(iii)**; provided, however, that Delphi Canada, Inc. shall be released from any and all past, present or future claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities which GM and General Motors of Canada Limited may have arising out of or related to the separation of leased employees from the Oshawa facility as contemplated by the Oshawa Labour Agreement.

MRA-56

(viii)    Trademark and Trade Name Agreement. The Trademark
and Trade Name Agreement dated as of January 1, 1999 between Delphi
Automotive Systems Corporation (n/k/a Delphi), DAS, and GM (the "Trademark
and Trade Name Agreement"), attached hereto as **Exhibit 5.01(a)(viii)**;

(ix)    Intellectual Property Contracts Transfer Agreement. The
Intellectual Property Contracts Transfer Agreement dated as of December 4, 1998,
between DTI and GM, as amended October 31, 2001 (the "Intellectual Property
Contracts Transfer Agreement"), attached hereto as **Exhibit 5.01(a)(ix)**; provided,
however, that all references in the Intellectual Property Contracts Transfer
Agreement to the Master Separation Agreement are deemed deleted, and any
grammatical corrections necessary as a result of such deletions required to
preserve the parties' original intent with respect to remaining provisions are
deemed made; and provided further that, as of the Effective Date, the provisions
of the Intellectual Property Contracts Transfer Agreement concerning dispute
resolution and record retention that refer to the Master Separation Agreement
shall be deemed to refer to the corresponding provisions of this Agreement;

(x)    Intellectual Property License Agreement. The Intellectual
Property License Agreement dated as of December 4, 1998, between DTI and GM
(the "Intellectual Property License Agreement"), attached hereto as **Exhibit
5.01(a)(x)**; provided, however, that all references in the Intellectual Property
License Agreement to the Master Separation Agreement are deemed deleted, and
any grammatical corrections necessary as a result of such deletions required to
preserve the parties' original intent with respect to remaining provisions are
deemed made; and provided further that, as of the Effective Date, the provisions
of the Intellectual Property License Agreement concerning dispute resolution and
record retention that refer to the Master Separation Agreement shall be deemed to
refer to the corresponding provisions of this Agreement;

(xi)    Intellectual Property Transfer Agreement. The Intellectual
Property Transfer Agreement dated as of December 4, 1998 between DTI and
GM (the "Intellectual Property Transfer Agreement"), attached hereto as **Exhibit
5.01(a)(xi)**; provided, however, that all references in the Intellectual Property
Transfer Agreement to the Master Separation Agreement are deemed deleted, and
any grammatical corrections necessary as a result of such deletions required to
preserve the parties' original intent with respect to remaining provisions are
deemed made; and provided further that, as of the Effective Date, the provisions
of the Intellectual Property Transfer Agreement concerning dispute resolution and
record retention that refer to the Master Separation Agreement shall be deemed to
refer to the corresponding provisions of this Agreement; and provided further that
DTI and GM agree that (i) all obligations under the Intellectual Property Transfer
Agreement other than those concerning reconciliation of patent assignments and
the delivery of recordable patent assignments have been fully performed, and (ii)
they shall complete performance of any such obligations as soon as practicable
after the Effective Date;

(xii)    Technology Transfer Agreement. The GM-Delphi
Technology Transfer Agreement between Delphi Technologies, Inc. and GM
dated December 4, 1998 (the "Technology Transfer Agreement");

(xiii)    Reserved;

(xiv)    Real Estate Assignment and Assumption Agreements. The
real estate assignment and assumption agreements set forth on **Exhibit
5.01(a)(xiv)**.

(b)    Agreements Executed After the Separation to Be Assumed. Pursuant to
the Plan and the terms of this Agreement, as of the Effective Date, the agreements identified in
this section 5.01(b) shall, as applicable, be either assumed, reinstated, or ratified (including as
amended, as applicable):

(i)    UAW – GM – Delphi Memorandum of Understanding
Regarding Benefit Plan Treatment. The UAW – GM – Delphi Memorandum of
Understanding Regarding Benefit Plan Treatment between UAW, GM, and
Delphi Automotive Systems Corporation (n/k/a Delphi) dated September 30, 1999,
including any and all amendments thereto, attached hereto as **Exhibit 5.01(b)(i)**;

(ii)    Letter Agreement Concerning Certain Asbestos Liability.
The letter agreement dated March 4, 1999 between Delphi and GM concerning
certain asbestos liability, as supplemented by letter agreement dated May 10,
1999 between Delphi and GM, attached hereto as **Exhibit 5.01(b)(ii)**;

(iii)    Investment Tax Credit Transfer Agreement. The
Investment Tax Credit Transfer Agreement dated December 8, 2000 between
Delphi Automotive Systems Corporation (n/k/a Delphi) and GM, attached hereto
as **Exhibit 5.01(b)(iii)**;

(iv)    Management Services Agreement. The Management
Services Agreement dated September 19, 2002, as amended, among Delphi
Corporation and General Motors Management Corporation, Delphi Mechatronic
Systems, Inc., Packard-Hughes Interconnect Company and ASEC Manufacturing,
attached hereto as **Exhibit 5.01(b)(iv)**;

(v)    Battery Facilitation Agreement. The Battery Facilitation
Agreement – Transaction Summary dated as of March 21, 2005 between Delphi
and GM; the Letter Agreement dated August 10, 2004 regarding potential changes
in Delphi's battery operations signed by Mary Boland (GM) and John Blahnik
(Delphi); the Letter Agreement dated June 30, 2005 regarding the sale by Delphi
of its global battery business to JCI signed by Bo Andersson (GM) and Steve
Olsen (Delphi); the Letter Agreement dated June 30, 2005 regarding the potential
subsidy to be paid by Delphi to JCI for employees at the New Brunswick battery
plant; and the Letter Agreement dated June 30, 2005 regarding the future use of
the "Freedom" trade name and associated trademarks, attached hereto as **Exhibit
5.01(b)(v)**; and

(vi)     C&A Agreement. The Agreement dated as of June 3, 2005
between Delphi and GM concerning certain matters related to Collins & Aikman
Corporation, attached hereto as **Exhibit 5.01(b)(vi)**.

(c)     Existing Agreements. Pursuant to the Plan and the terms of this
Agreement, as of the Effective Date the Existing Agreements and all other contractual
commitments between the Debtors and GM or any of its Affiliates directly related to and
designed to enable the purchase and supply of Component Parts such as metal resale agreements
and advanced development agreements, shall be assumed or reinstated, as applicable.

(d)     Tooling Agreements. Pursuant to the Plan and the terms of this
Agreement, as of the Effective Date all GM Purchase Orders and other contractual commitments
between the Debtors and GM or any of its Affiliates relating to the manufacture and sale of
fixtures, gauges, jigs, patterns, casting patterns, dies, molds, and other Tooling utilized in the
production of GM Component Parts and Component Systems (collectively, the "Tooling
Agreements") shall be assumed or reinstated, as applicable.

(e)     Assumption, Reinstatement, or Ratification in the Entirety. All provisions
of the agreements that are assumed, reinstated, or ratified under this section 5.01 shall be
assumed in their entirety without modification, unless such modification is expressly set forth
herein.

(f)     Postpetition Agreements. All postpetition agreements between any Delphi
Party and GM and/or any of its Affiliates are hereby ratified, are enforceable in accordance with
their terms, and shall remain in full force and effect unaffected by this Agreement.

(g)     Debtor Agreements. Except as otherwise provided in this Agreement, as
of the Effective Date all prepetition agreements between the Debtors and GM and/or any of its
Affiliates shall be deemed rejected or terminated, as applicable; provided, however, that this
section 5.01(g) does not apply to (i) agreements to which third parties other than the Delphi
Parties, GM and/or GM's Affiliates are also parties or (ii) agreements that relate solely to the
Ordinary Course Relationship (as defined in the Settlement Agreement), which agreements
identified in clauses (i) and (ii) of this sentence shall be assumed or reinstated, as applicable, on
the Effective Date.

(h)     Non-Debtor Agreements. Except as otherwise provided in this Agreement,
with respect to the prepetition agreements between Affiliates of Delphi who are not Debtors, on
the one hand, and GM and/or any of its Affiliates, on the other hand:

(i)     Such agreements which were entered into prior to or in connection
with the Separation shall be terminated as of the Effective Date; and

(ii)     Such agreements (other than those identified in section 5.01(h)(i)
above) shall be ratified and continue in effect after the Effective Date; provided, however, that
any such agreement to which a Debtor is also a party shall terminate as of the Effective Date,
unless (a) such agreement relates solely to the Ordinary Course Relationship (as defined in the
Settlement Agreement), or (b) such agreement is an agreement to which third parties other than
the Delphi Parties, GM and/or GM's Affiliates are also parties, in both of which cases such

MRA-59

agreement shall be ratified and continue in effect after the Effective Date; provided, however, that any obligation of any of the Affiliates of Delphi to indemnify against any obligations of the Debtors shall be deemed to be extinguished.

(i)    Limitations on Cure Costs, Rejection Damages, or Assurances. Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, with respect to any and all agreements between any Delphi Party, on the one hand, and GM and/or any of its Affiliates, on the other hand, except as expressly provided for in section 4.03(b) of the Settlement Agreement, (a) GM irrevocably waives, on behalf of itself and all of its Affiliates, with respect to agreements being assumed or rejected pursuant to this Agreement, any cure amount claim or any claim for rejection, (b) each of Delphi and GM irrevocably waives, on behalf of itself and all of its Affiliates, with respect to agreements being terminated pursuant to this Agreement, termination damages, and (c) GM irrevocably waives, on behalf of itself and all of its Affiliates, with respect to any agreements being assumed pursuant to this Agreement, any requirement under the Bankruptcy Code that the Delphi-Related Parties provide adequate assurance of future performance.

Section 5.02    Limitation of Existing Indemnification Obligations. Any provision in any agreement between Delphi and/or its Affiliates on the one hand and GM and/or its Affiliates on the other that is not being assumed, reinstated or ratified pursuant to this Agreement and purports to require any party thereto or its Affiliates to indemnify, defend, or hold harmless any other party thereto or its Affiliates is null and void.

Section 5.03    Reserved.

Section 5.04    Reserved.

Section 5.05    Reserved.

Section 5.06    Access to Information.

(a)    During the Retention Period, each of the Parties hereto shall cooperate with and afford, and shall cause their respective affiliates, representatives, subsidiaries, successors and/or assignees, and shall use reasonable efforts to cause joint ventures that are not Affiliates (collectively, "Related Parties") to cooperate with and afford, to the other Party reasonable access upon reasonable advance written request to all information (other than information which is (i) protected from disclosure by the attorney client privilege or work product doctrine, (ii) proprietary in nature or (iii) the subject of a confidentiality agreement between such Party and a third party which prohibits disclosure to the other party) within such Party's or any Related Party's possession which was created prior to January 1, 1999 (the "Contribution Date") or, with respect to any information which would be relevant to the provision of a transitional service in connection with the separation of Delphi and GM on January 1, 1999, information created during the period in which one Party is providing the other Party with such transition service. Access to the requested information shall be provided so long as it relates to the requesting party's (the "Requestor") business, assets or liabilities, and access is reasonably required by the Requestor as a result of the ownership relationship between GM and

Delphi at any time prior to the Contribution Date or the transition services identified above
("Prior Relationship") for purposes of auditing, accounting, claims, or litigation (except for
claims or litigation between the Parties hereto), employee benefits, regulatory or tax purposes, or
fulfilling disclosure or reporting obligations including, without limitation, all records, books,
contracts, instruments, computer data, and other data ("Information") reasonably necessary for
the preparation of reports required by or filed under the Securities Exchange Act of 1934, as
amended, with respect to any period entirely or partially prior to the Contribution Date.

(b)     Access as used in this paragraph shall mean the obligation of a party in
possession of Information (the "Possessor") requested by the Requestor to exert its reasonable
best efforts to locate all requested Information that is owned and possessed by the Possessor or
any Related Party. The Possessor, at its own expense, shall conduct a diligent search designed to
identify all requested Information and shall collect all such Information for inspection by the
Requestor during normal business hours at the Possessor's place of business. Subject to
confidentiality and/or security provisions as the Possessor may reasonably deem necessary, the
Requestor may have all requested Information duplicated at the Requestor's expense.
Alternatively, the Possessor may choose to deliver, at its own expense, all requested Information
to the Requestor in the form it was requested by the Requestor. If so, the Possessor shall notify
the Requestor in writing at the time of delivery if such Information is to be returned to the
Possessor. In such case, the Requestor shall return such Information when no longer needed to
the Possessor at the Possessor's expense.

(c)     In connection with providing Information pursuant to this section 5.06,
each of the Parties hereto shall upon the request of the other Party make available its respective
employees (and those of their respective Related Parties, as applicable) to the extent that they are
reasonably necessary to discuss and explain all requested Information with and to the requesting
party.

Section 5.07   Record Retention.

(a)     Delphi shall preserve and keep all books and records included in the
Delphi Assets or otherwise in the possession of Delphi or its Related Parties as of the
Contribution Date, whether in electronic form or otherwise, for the Retention Period at Delphi's
sole cost and expense. If Delphi wishes to dispose of any books and records or other documents
which it is obligated to retain under this section 5.07 after the Retention Period, then Delphi shall
first provide ninety (90) days' written notice to GM and GM shall have the right, at its option and
expense, upon prior written notice within such ninety-day (90) period, to take possession of such
books or records or other documents within one hundred and eighty (180) days after the date of
Delphi's notice to GM hereunder. Written notice of intent to dispose of such books and records
shall include a description of the books and records in detail sufficient to allow GM to
reasonably assess its potential need to retain such materials. In the event that Delphi enters into
an agreement with a third party during the Retention Period to sell a portion of its business,
together with the books and records related thereto, GM shall have the right to duplicate such
books and records prior to any such disposition and, should the purchaser of the Delphi business
be a competitor of GM, GM shall have the right to prohibit the transfer or disclosure to such
party of that portion of the former books and records of GM which GM notifies Delphi contain
confidential and proprietary information.

MRA-61

(b)     (i)     In addition to the retention requirements of sections 5.07(a), for a period no less than the Retention Period, Delphi, at its sole cost and expense, shall use its reasonable best efforts to maintain all technical documentation in its possession or in the possession of any of its Related Parties applicable to product design, test, release, and validation at locations at which such technical documents shall be reasonably accessible to GM upon request (at GM's sole cost and expense) and, to the extent reasonably possible, through employees of Delphi who formerly performed that task for GM.  Delphi shall, from time to time, at the reasonable request of GM, cooperate fully with GM in providing GM, to the extent reasonably possible through Delphi employees formerly employed by GM who previously performed the same functions on behalf of GM, with technical assistance and information with respect to any claims brought against GM involving the conduct of the Delphi Automotive Systems Business prior to the Contribution Date, including consultation and/or the appearance(s) of such persons on a reasonable basis as expert or fact witnesses in trials or administrative proceedings.  GM shall reimburse Delphi for its reasonable out-of-pocket costs (travel, hotels, etc.) of providing such services, consistent with GM's policies and practices regarding such expenditures.

(ii)     In particular, Delphi shall: (i) retain all documents required to be maintained by international, national, state, provincial, regional, or local regulations and all documents that may be reasonably required to establish due care or to otherwise assist GM in pursuing, contesting or defending such claims; (ii) make available its documents and records in connection with any pursuit, contest, or defense, including, subject to an appropriate confidentiality agreement or protective order, documents that may be considered to be "confidential" or subject to trade secret protection; (iii) promptly respond to discovery requests in connection with such claim, understanding and acknowledging that the requirements of discovery in connection with litigation require timely responses to interrogatories, requests to produce, requests for admission, and depositions and also understanding and acknowledging that any delays in connection with responses to discovery may result in sanctions; (iv) make available, as may be reasonably necessary and upon reasonable advance notice and for reasonable periods so as not to interfere materially with Delphi's business, mutually acceptable engineers, technicians, or other knowledgeable individuals to assist GM in connection with such claim, including investigation into claims and occurrences described in this section and preparing for and giving factual and expert testimony at depositions, court proceedings, inquiries, hearings, and trial; (v) make available facilities and exemplar parts for the sole and limited use of assisting GM in the contest or defense; and (vi) acknowledge that GM is responsible for and shall control, as between GM and Delphi, the conduct of the pursuit, contest or defense.

(c)     (i)     GM and Delphi agree to retain all Income Tax Returns (as defined in the Income Tax Allocation Agreement), related schedules and workpapers, and all material records and other documents as required under Section 6001 of the Internal Revenue Code of 1986, as amended, as well as by any similar provision of state or local income tax law, until the later of (i) the expiration of the applicable statute of limitations for the tax period to which the records relate, or (ii) the Final Determination (as defined in the Income Tax Allocation Agreement) has been made with respect to all issues related to the final Consolidated Tax Period (as defined in the Income Tax Allocation Agreement).

(ii) With respect to Non-Income Taxes (as defined in the Non-Income Tax Indemnification Agreement), GM and Delphi agree to retain all Non-Income Tax Returns, related schedules and workpapers, and all material records and other documents as required under Federal, state, or local law, until the later of (i) the expiration of the applicable statute of limitations for the tax period to which the records relate or (ii) a Determination (as defined in the Non-Income Tax Indemnification Agreement) has been made with respect to all issues for the tax periods to which the Non-Income Tax Indemnification Agreement applies.

(iii) If either Party wishes to dispose of any such records or documents after such retention period, then the procedure described in (a) and (b) above shall apply.

Section 5.08 Reimbursement. Unless otherwise provided in this Article V, each Party to this Agreement providing access, information, or witnesses to another Party pursuant to sections 5.06 or 5.07 shall be entitled to receive from the recipient, upon the presentation of invoices therefor, payment for all reasonable out-of-pocket costs and expenses (excluding allocated compensation, salary, and overhead expense) as may be reasonably incurred in providing such information or witnesses.

Section 5.09 Product Liability Claims.

(a) GM and Delphi agree to the allocation of liability for all claims and causes of action, however presented, alleging that parts, components, or systems that have been (i) manufactured by the Delphi Automotive Systems Business or Delphi or its Affiliates or (ii) manufactured by a third party, whether sold or otherwise supplied separately, or incorporated into components or systems of Delphi or its Affiliates, in each case, which have been sold or otherwise supplied by the Delphi Automotive Systems Business, Delphi, or its Affiliates to GM, its Affiliates, or customers of Delphi other than GM or its Affiliates (the foregoing collectively constituting "Delphi Products"), have caused or been alleged to cause personal injuries, injuries to property, or other damages as set forth in this section 5.09. The provisions in this section 5.09 cover claims which include but are not limited to the following types of claims: claims premised on theories of negligence, strict liability, express or implied warranties of merchantability, fitness for ordinary use and/or compliance with reasonable consumer expectations, failure to issue adequate warnings, negligent and/or intentional misrepresentation, negligent and/or intentional infliction of emotional distress, failure to provide replacement and/or retrofit parts, and failure to conduct a recall or adequately conduct a recall that has been issued. The provisions set forth in this section 5.09 apply to claims for compensatory damages as well as all claims for punitive or exemplary damages and all claims for defective design as well as all claims for defective manufacture.

(b) (i) As between GM and Delphi, Delphi shall assume the defense of all such claims involving Delphi Products sold or otherwise supplied prior to January 1, 1999 to customers other than GM or an Affiliate or Subsidiary of GM. Delphi shall indemnify, defend, and hold harmless GM and its Affiliates against any and all such claims. Delphi shall reimburse GM and its Affiliates for any reasonable attorneys' fees or other expenses reasonably incurred by GM subsequent to December 31, 1998 in connection with investigating and/or defending against any such claim.

(ii)     GM shall retain and/or assume the defense of all such claims involving parts, components or systems manufactured by the Delphi Automotive Systems Business prior to January 1, 1999 and sold or otherwise supplied to GM or its Affiliates before, on, or after January 1, 1999. GM shall indemnify, defend, and hold harmless Delphi and its Affiliates against any and all such claims. GM shall reimburse Delphi and its Affiliates for any reasonable attorneys' fees or other expenses reasonably incurred by Delphi or its Affiliates subsequent to December 31, 1998 in connection with investigating and/or defending any such claim or securing the indemnification and/or defense that GM is required to provide pursuant to this paragraph.

(c)     (i)     Delphi shall defend GM and its Affiliates against all claims involving (A) parts, components, or systems manufactured by Delphi or its Affiliates, which on or subsequent to January 1, 1999 are sold or otherwise supplied to customers other than GM or its Affiliates and (B) parts, components or systems acquired by the Delphi Automotive Systems Business or Delphi or its Affiliates from suppliers thereto other than GM or its Affiliates and sold or otherwise supplied by Delphi or its Affiliates on or subsequent to January 1, 1999 to customers other than GM or its Affiliates. Delphi or its Affiliates shall indemnify, defend, and hold harmless GM and its Affiliates against any and all such claims. Delphi or its Affiliates shall reimburse GM and its Affiliates for any reasonable attorneys' fees or other expenses reasonably incurred by GM and its Affiliates in connection with investigating and/or defending any such claim or securing the indemnification and/or defense that Delphi and its Affiliates are required to provide pursuant to this paragraph.

(ii)     The rights, obligations, and liabilities of GM and Delphi with respect to claims involving parts, components or systems manufactured by Delphi or its affiliates subsequent to December 31, 1998 which are sold by Delphi or its Affiliates to GM or its Affiliates shall be determined according to the terms of the agreements relating to such sale.

(d)     Recall and Warranty Campaigns.  Except as otherwise released pursuant to agreements between the Parties executed prior to the Effective Date, including the Warranty Settlement Agreement, claims of GM or its Affiliates against the Delphi Automotive Systems Business in the nature of warranty and recall campaigns relating to parts, components, or systems sold by the Delphi Automotive Systems Business to GM or its Affiliates (regardless of when or by whom manufactured (but excluding parts or systems manufactured by GM or its Affiliates)) which arise prior to or after the Contribution Date shall be determined according to the terms of the agreements relating to the sale of such parts, components or systems, all of which agreements were assumed by Delphi and its Affiliates effective as of the Contribution Date.

(e)     Reserved.

(f)     Notice.  GM and Delphi agree that in the case of claims covered by either paragraphs (b) or (c) above, the Party receiving such a claim shall notify the other Party within thirty (30) days of receipt of written notice of the claim. Thereafter, the Party being notified of the claim shall have thirty (30) days to respond. The Party first receiving such a claim shall take all reasonable action necessary to defend against the claim including, but not limited to, responding to court ordered deadlines before the expiration of the time for response.

Section 5.10    Cooperation.

(a)    GM and Delphi and their respective Affiliates shall cooperate with each other in the defense of any and all claims covered under this Article V and afford to each other reasonable access upon reasonable advance notice to witnesses and information (other than information protected from disclosure by applicable privileges) that is reasonably required to defend these claims as set forth in Article V of this Agreement. The foregoing agreement to cooperate includes, but is not limited to, an obligation to provide access to qualified assistance to provide information, witnesses, and documents to respond to discovery requests in specific lawsuits. In such cases, cooperation shall be timely so that the Party responding to discovery may meet all court-imposed deadlines. The Party requesting information shall reimburse the party providing information consistent with the terms of section 5.08 of this Agreement. The obligations set forth in this paragraph are more clearly defined in section 5.01 through and including 5.10 of this Agreement, to which reference is hereby made.

(b)    GM agrees to consider in good faith any request from Delphi to shorten the Retention Period in connection with any businesses of Delphi that are to be wound-down or sold; provided, however, that the parties acknowledge that the Retention Period cannot be reduced for books and records related to open tax periods, safety products and those subject to litigation hold.

Section 5.11    Continuation of Limited Employee Related Matters.

(a)    Workers' compensation liability assumed by Delphi as a result of the Separation shall be retained by Delphi; provided, however, that the sending party in a flowback or Special Employment Placement Opportunities ("SEPO") situation shall bear any and all workers compensation liability for injuries or illnesses that arose prior to the flowback or a placement through SEPO, including claims asserted on or after the flowback or placement through SEPO. In addition, any cumulative trauma claim filed within twelve months of flowback or placement through SEPO, which originated at, or was the responsibility of, the sending party, shall be the responsibility of the sending party.

(b)    The relocation costs associated with the flowback or SEPO of employees, as applicable, shall be shared equally by GM and Delphi. These costs shall include relocation allowances, relocation services and other related expenses provided for in the applicable Labor MOUs or any other applicable collective bargaining agreements. Relocation costs associated with employees of closed or divested operations of Delphi or any of its Affiliates shall be allocated as follows: (i) shared equally where an employee transfers to a GM facility; (ii) paid 100% by Delphi where an employee transfers to a Delphi facility; and (iii) paid consistent with historical relocation cost share levels or as agreed by the Parties at the time of the relocation where an employee of a divested operation transfers to either Delphi or GM.

(c)    All employment related responsibility, obligation or liability of GM relating to Delphi Employees or Delphi Terminated Employees both as they were defined in the U.S. Employee Matters Agreement, and assumed by Delphi and/or the applicable Delphi benefit plans as a result of the Delphi spin-off from GM for claims described in **Exhibit 5.11(c)**, shall be retained by Delphi and/or the applicable Delphi benefit plans, except as otherwise specifically

provided in this Agreement, the Settlement Agreement, the attachments hereto or thereto, or the agreements or the attachments referenced herein or therein.

(d)     The National Employment Placement Center shall provide Delphi the following services through the term of the current UAW MOU and the current IUE-CWA MOU pursuant to current negotiated purchase terms and conditions: (i) processing of placement applications as submitted by eligible hourly employees; (ii) processing of requisitions for additional personnel; and (iii) processing of placement offers and filling open requisitions.

## ARTICLE VI

### EFFECTIVENESS

Section 6.01   Effectiveness. This Agreement shall not become effective until the date on which all conditions to effectiveness of the Settlement Agreement that are set forth in Article VI thereof are satisfied or waived by the parties thereto (the "Effective Date").

## ARTICLE VII

### MISCELLANEOUS

Section 7.01   On-Going Setoff Provisions. Notwithstanding anything to the contrary contained in this Agreement or the Settlement Agreement, the Parties' payment obligations under this Agreement and the Settlement Agreement are absolute and unconditional and shall not be subject to any offset (except as expressly set forth in the proviso below) or defense of any nature whatsoever including upon a breach by Delphi or any of its Affiliates or GM or any of its Affiliates, as applicable, of any of their obligations under this Agreement, the Settlement Agreement, or any other agreement; provided, however, that any payments by GM pursuant to this Agreement or the Settlement Agreement shall be subject to GM's right to offset all or part of such payment from any future amounts GM owes Delphi under this Agreement or the Settlement Agreement only if (i) agreed upon by GM and Delphi or (ii) GM determines that it made an overpayment of any amount paid pursuant to this Agreement or the Settlement Agreement and GM and Delphi are unable to resolve GM's claim for such amounts pursuant to the dispute resolution provisions of section 7.11 of this Agreement and GM provides Delphi with five (5) days' written notice before implementing such offset; provided further, however, that if it is judicially determined that GM did not have the right to offset such amount, GM shall pay Delphi such amount plus interest accruing on such amount from the date of setoff through the repayment date at the rate of 7.5% per annum. Neither this section 7.01 nor any other provision of this Agreement or the Settlement Agreement shall prohibit, restrict, or limit in any way the application of GM's contractual rights of setoff arising under any GM Purchase Order pursuant to GM's standard purchase order terms and conditions against other obligations arising under any GM Purchase Orders or agreements other than this Agreement and the Settlement Agreement.

Section 7.02   Termination Provisions. This Agreement may be terminated or shall terminate immediately and automatically, as applicable, and the transactions contemplated hereby abandoned, upon the occurrence of any of the following:

(a)    by mutual written consent of both Delphi and GM;

(b)    by GM or Delphi if, prior to the effectiveness of the Settlement Agreement pursuant to Article VI thereof, the Settlement Agreement is terminated pursuant to section 7.03 thereof; or

(c)    automatically on December 31, 2015.

Section 7.03    Guaranty by Delphi.

(a)    From and after the Effective Date, Delphi hereby irrevocably and unconditionally guarantees the due and punctual payment or performance, as the case may be, by DAS and its successors and assigns (collectively, the "Delphi Guaranty Parties") of all of their obligations under any and all Existing Agreements or future GM Purchase Orders incurred with respect to work performed or required to be performed on or before September 14, 2015 between any of DAS (or another Delphi Guaranty Party) and any of the GM Parties (collectively, the "Guaranteed Agreements"), whether issued and accepted before or after the Effective Date. In connection with this Agreement and for all purposes, all outstanding GM Purchase Orders shall be deemed to be assigned to DAS. GM further agrees that all GM Purchase Orders to be issued and accepted on or after the date hereof and before September 14, 2015, between any of the GM Parties and any of the Delphi-Related Parties shall be issued to and accepted by DAS rather than another Delphi-Related Party, subject, however, to the next to last sentence of section 6.01 of the Settlement Agreement.

(b)    Delphi hereby agrees that its obligations under section 7.03(a) hereof (i) are a guaranty of payment and performance when due and not of collectability, (ii) are a primary obligation of Delphi and not merely a contract of surety, (iii) shall be absolute, independent, unconditional, and irrespective of (1) the validity, regularity or enforceability of the Guaranteed Agreements, (2) any change therein or amendments thereto, (3) the absence of any action to enforce the same, (4) any waiver or consent by GM with respect to any provision thereof, (5) the recovery of any judgment against any of the other Delphi Parties or any action to enforce the same, or (6) any other circumstances which may otherwise constitute a legal or equitable discharge or defense of a guarantor or surety.

(c)    Delphi hereby waives presentment, demand of payment, protest or notice with respect to the Guaranteed Agreements and the obligations set forth therein or herein.

(d)    Delphi's obligations under section 7.03(a) hereof shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any amount owed to any of the GM Parties hereunder or under any of the Guaranteed Agreements is rescinded or must otherwise be returned by any of the GM Parties upon the insolvency, bankruptcy, or reorganization of any of the Delphi Parties or otherwise, all as though such payment had not been made.

(e)    If (I) GM breaches one or more of its payment obligations under this Agreement or the Settlement Agreement or any of its obligations under Article IV hereof (excluding obligations under any of the Continuing Agreements, as defined in the Settlement Agreement or any commercial disputes that arises in the Ordinary Course Relationship (as

MRA-67

defined in the Settlement Agreement)) and such breach or breaches would have a material impact
(1) on Delphi and its Affiliates or (2) on the benefits Delphi and its Affiliates are reasonably
expected to receive under the Settlement Agreement or this Agreement (the effects set forth in (1)
or(2) above shall hereinafter be referred to as, a "Delphi Material Impact") and (II) Delphi
provides written notice (the "Delphi Notice") of such breach or breaches, executed by either
Delphi's chief executive officer or chief financial officer, which notice describes in reasonable
detail the nature of the breach or breaches and relevant background information, then the
guaranty provided for in this section 7.03 shall, subject to the terms of this section 7.03(e),
automatically terminate without any further action; provided, however, that prior to such
termination becoming effective (A) if the breach or breaches relate to a payment obligation
hereunder or under the Settlement Agreement, GM shall have a ten (10) day period following
receipt of the Delphi Notice to cure such breach or breaches and (B) if the breach or breaches
relate to an obligation other than a payment obligation hereunder or under the Settlement
Agreement, GM shall have a thirty (30) day period following receipt of the Delphi Notice to cure
such breach or breaches; provided, further, however that if there is a disagreement between the
Parties as to whether GM has breached one or more of its obligations or whether such breach or
breaches has a Delphi Material Impact, at the election of either Party, the Parties shall engage in
the dispute resolution process specified in section 7.11 hereof with respect to such disagreement,
and such termination shall not become effective if such dispute resolution process is commenced
prior to the end of such cure period. Upon the conclusion of such process or, if earlier, thirty (30)
days after its commencement (the "Dispute Resolution Termination Date"), if Delphi still
believes that a breach with a Delphi Material Impact has occurred, GM shall have the right to
cure such default within ten (10) days after the Dispute Resolution Termination Date and, if so
cured, the guaranty shall not terminate. Either GM or Delphi may seek judicial determination at
any time as to whether Delphi has the right to terminate the guaranty pursuant to this section
7.03(e). If it is judicially determined by Final Order that Delphi did not have the right to
terminate the guaranty, it shall remain in full force and effect.

Section 7.04   Continued Ownership of DAS.   Until the earlier of September 14, 2015
and such time as the guaranty provided for pursuant to section 7.03 hereof is no longer in full
force and effect, without the prior written consent of GM, which consent shall not be
unreasonably withheld, Delphi shall not permit DAS to transfer (i) a material portion of its assets
necessary to satisfy production obligations to GM or (ii) more than 40% of its total assets (other
than to a Delphi Party; provided that all provisions of this section 7.04 shall apply to such Delphi
Party to the same extent they apply to DAS) and Delphi shall not cease to own, directly or
indirectly, at least a majority of the outstanding equity and voting equity of DAS; provided,
however, that neither of the restrictions in this sentence shall apply if such transfer or cessation,
as applicable, occurs as a result of a transfer by Delphi of all or substantially all of its assets.

Section 7.05   Reserved.

Section 7.06   Cancellation Claims.

(a)   Except as otherwise provided in section 7.06(b) hereof, the Delphi Parties
waive and are deemed to have waived (and Delphi shall cause the other Delphi Parties to so
waive) any and all claims, debts, obligations, rights, suits, damages, actions, causes of action,
remedies, and liabilities whatsoever, which the Delphi Parties ever had, now have, or hereafter

may have, whether known or unknown, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, or otherwise, arising out of or related to cancellation of any purchase orders or termination of any component or material supply agreements (regardless of whether the cancellation or termination occurs prior to or after the date hereof or the Effective Date) concerning products manufactured in the Wind-Down Facilities, the Footprint Facilities and the Sale Facilities; provided, however, that with respect to the Sale Facilities and the Kettering Facility (in the event the Kettering Facility is not sold as contemplated under 4.08(c)), the waiver in this section 7.06 would apply only in the case of cooperative resourcing by mutual written agreement (collectively, "Cancellation Claims") that any of the Delphi Parties have or may have against any of the GM Parties or any GM Supplier.

(b)     With respect to any Cancellation Claims that have been asserted as of the Effective Date or may be asserted thereafter by any Delphi Supplier against the Debtors (the "Delphi Supplier Cancellation Claims"):

(i)     the Debtors shall utilize their reasonable best efforts to minimize all Delphi Supplier Cancellation Claims;

(ii)     Delphi shall pay the first $30 million, on a cumulative basis, of any Delphi Supplier Cancellation Claims; and

(iii)     GM shall reimburse the Debtors for 50% of any Delphi Supplier Cancellation Claims actually paid by the Debtors in excess of the $30 million referred to in section 7.06(b)(ii) hereof.

Section 7.07     Tooling Acknowledgment.

(a)     Delphi acknowledges and agrees that all tooling, fixtures, gauges, jigs, patterns, dies, and molds (collectively, "Tooling") being used by the Debtors or their respective sub-suppliers in connection with the manufacture of Component Parts for GM, together with appurtenances, accessions and accessories thereto (collectively, the "Accessories"), which have been (i) furnished by GM to a Debtor at any time, directly or indirectly excluding Tooling the ownership of which was transferred to a Debtor on the Contribution Date, unless there was a written agreement which provided that the Debtor's interest would be other than as a bailee, or (ii) purchased by GM under a tooling purchase order with a Debtor, are owned by GM and are being held by DAS and, to the extent a Debtor has transferred the Tooling or Accessories to third parties, by such third parties, on a bailment basis consistent with paragraph 19 of the Standard GM Terms.

(b)     Nothing contained in this section 7.07 is intended to create or expand the rights, if any, of GM in any intellectual property owned by any Delphi Party.

Section 7.08     Reserved.

Section 7.09     No Undisclosed Agreements or Commitments.     There are no undisclosed agreements or commitments between or among the Parties regarding matters subject to the terms of this Agreement.

Section 7.10   Governing Law; Jurisdiction; Venue. This Agreement shall be governed
and construed in accordance with the internal laws of the State of New York, the forum state in
which the Bankruptcy Court sits, without regard to any conflict of law provision that could
require the application of the law of any other jurisdiction. Pursuant to the Plan and the
Confirmation Order, this Agreement is incorporated by reference in its entirety into the Plan and
forms an integral part thereof. Accordingly, by its execution and delivery of this Agreement,
each Party hereby irrevocably and unconditionally agrees that the Bankruptcy Court shall retain
exclusive jurisdiction over all matters related to the construction, interpretation or enforcement
of this Agreement and the Settlement Agreement; provided, however, that the Bankruptcy Court
shall not have jurisdiction over (i) disputes arising out of the provisions set forth in Article III of
this Agreement or the agreements referenced in sections 5.01(c) and 5.01(d) of this Agreement,
or (ii) disputes arising out of agreements between any Delphi-Affiliate Party on the one hand and
GM or any of its Affiliates on the other in which disputes no Delphi-Related Party has an interest;
and provided further that after the second anniversary of the Effective Date, the Bankruptcy
Court shall retain non-exclusive jurisdiction over all matters related to the construction,
interpretation or enforcement of this Agreement and the Settlement Agreement; and provided
further that the jurisdiction of the Bankruptcy Court over all matters related to this Agreement
and the Settlement Agreement shall terminate upon the fourth anniversary of the Effective Date.
Each Party further agrees to waive any objection based on forum non conveniens.

Section 7.11   Dispute Resolution. In the event a Restructuring Dispute arises among
the Parties (other than an Article III Dispute, which shall be governed and settled in accordance
with section 3.10 hereof), upon the written request of either Party, such Restructuring Dispute
shall be referred to the Director of Business Development at GM and the Finance Director of
Automotive Holdings Group or the Director, Strategic Planning at Delphi (at Delphi's discretion)
for resolution in good faith. In the event that GM's Director of Business Development and
Delphi's Finance Director of Automotive Holdings Group or the Director, Strategic Planning are
unable to resolve such dispute, such Restructuring Dispute shall be referred, at either Party's
written request, to the Assistant Treasurer of GM and the Assistant Treasurer or Treasurer of
Delphi (at Delphi's discretion). If within ten (10) days after such referral, GM's Assistant
Treasurer and Delphi's Assistant Treasurer or Treasurer are unable to resolve the Restructuring
Dispute, the Restructuring Dispute may be elevated by either Party to GM's Treasurer or Chief
Financial Officer (at GM's discretion) and Delphi's Chief Executive Officer or Chief Financial
Officer (at Delphi's discretion) for resolution. To the extent that the job title of any of the
foregoing positions is changed, this section 7.11 shall be deemed to apply to such successor title
or, if the position is eliminated or vacated, to the job title of the party taking over the
responsibilities of the eliminated or vacated position.

Section 7.12   No Solicitation. Each Party acknowledges that this Agreement is not
and shall not be deemed to be a solicitation to accept or reject a plan in contravention of section
1125(b) of the Bankruptcy Code. Each Party further acknowledges that no securities of any
Debtor are being offered or sold pursuant to this Agreement and that this Agreement does not
constitute an offer to sell or a solicitation of an offer to buy any securities of any Debtor.

Section 7.13   Negotiations Not Admissible. Pursuant to Rule 408 of the Federal Rules
of Evidence and any applicable state rules of evidence, this Agreement and all negotiations

MRA-70

relating hereto are not admissible into evidence in any proceeding; provided, however, that this Agreement may be admissible in a proceeding to enforce the terms of this Agreement.

Section 7.14    Specific Performance. Each Party acknowledges that the other Party would be irreparably damaged if this Agreement were not performed in accordance with its specific terms or were otherwise breached. Accordingly, each Party shall be entitled to seek an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically the terms of this Agreement in addition to any other remedy to which the Parties may be entitled, at law, in equity or under this Agreement.

Section 7.15    Representations and Warranties of Delphi and GM. Each Party represents and warrants to the other Party that the following statements, as applicable to it, are true, correct, and complete as of the date of this Agreement:

(a)    It is duly organized, validly existing, and in good standing under the laws of its state of organization and has all requisite corporate power and authority to enter into this Agreement and to perform its obligations hereunder;

(b)    The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate action on its part; provided, however, that Delphi's authority to enter into this Agreement is subject to Bankruptcy Court approval;

(c)    This Agreement has been duly executed and delivered by it and constitutes its legal, valid, and binding obligation, enforceable against it in accordance with the terms hereof, subject to the occurrence of the Effective Date; and

(d)    The execution, delivery, and performance by it (when such performance is due) of this Agreement do not and shall not (i) violate any current provision of law, rule, or regulation applicable to it or any of its subsidiaries or its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

Section 7.16    Waiver; Modification; Amendment. Except as otherwise specifically provided herein, this Agreement may not be modified, waived, amended, or supplemented unless such modification, waiver, amendment, or supplement is in writing and has been signed by each Party. No waiver of any of the provisions of this Agreement shall be deemed or constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver.

Section 7.17    Binding Effect; Assignments. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, administrators, and representatives. Neither this Agreement nor any of the rights, interests, or obligations under this Agreement (for the avoidance of doubt, including without limitation, the obligations set forth in sections 4.01 and 4.02 hereof) shall be sold, assigned, or otherwise transferred by any Party without the prior written consent of the other Parties; provided, however, that neither the foregoing nor any other provision of this Agreement shall limit (i) any assignment in connection

MRA-71

with the transfer of all or substantially all of the assets of Delphi and its Affiliates or (ii) any assignment not reasonably expected to have a material impact on GM, on the benefits GM reasonably is expected to receive under the Plan (including, without limitation, GM's distributions thereunder), the Settlement Agreement, or this Agreement, or on the ability of the Debtors to fulfill any obligations to any GM-Related Parties under the Plan, the Settlement Agreement, this Agreement, or any agreements assumed, reinstated, or ratified under this Agreement.

Section 7.18   Third Party Beneficiaries.  Except as otherwise provided in section 7.06 herein with respect to the releases of the GM Parties and GM Suppliers, nothing contained in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any person or entity other than the Parties hereto, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third party to any Party to this Agreement, nor shall any provision give any third party any right of subrogation or action over or against any Party to this Agreement.

Section 7.19   Notices.  All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given (and shall be deemed to have been duly given upon receipt) if delivered personally, mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the Parties at the following addresses (or at such other address for a Party as shall be specified by like notice):

If to Delphi, to:

> Delphi Corporation
> 5725 Delphi Drive
> Troy, Michigan 48098
> Att'n:   John D. Sheehan
>          David M. Sherbin, Esq.
>          Sean P. Corcoran, Esq.

With a copy to:

> Skadden, Arps, Slate, Meagher & Flom LLP
> 333 West Wacker Drive
> Chicago, Illinois 60606-1285
> Att'n:   John Wm. Butler, Jr., Esq.
>          Ron E. Meisler, Esq.

and

> Skadden, Arps, Slate, Meagher & Flom LLP
> Four Times Square
> New York, New York 10036
> Att'n:   Eric L. Cochran, Esq.
>          Kayalyn A. Marafioti, Esq.

MRA-72

If to GM, to:

> General Motors Corporation
> 767 Fifth Avenue
> 14th Floor
> New York, New York 10153
> Att'n:  Director of Business Development

and

> General Motors Corporation
> 300 GM Renaissance Center
> Detroit, Michigan 48265
> Att'n:  General Counsel

With a copy to:

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Att'n:  Harvey R. Miller, Esq.
>         Jeffrey L. Tanenbaum, Esq.
>         Michael P. Kessler, Esq.

or to such other place and with such other copies as either Party may designate as to itself by written notice to the other Party. Rejection, any refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

Section 7.20   Waiver of Right to Trial by Jury. Each Party waives any right to trial by jury in any proceeding arising under or related to this Agreement.

Section 7.21   Service of Process. Each Party irrevocably consents to the service of process in any legal proceeding arising out of this Agreement by receipt of mailed copies thereof by national courier service or certified United States mail, postage prepaid, return receipt requested, to its applicable registered agent. The foregoing, however, shall not limit the right of a Party to effect service of process on the other Party by any other legally available method.

Section 7.22 Interpretation.

(a)   In the event of any conflict between this Agreement and any of the Labor MOUs, the Non-Represented Employees Term Sheet, the UAW SAP, the IUE-CWA SAP, the Warranty Settlement Agreement, and the IP License, the provisions of such documents other than this Agreement shall govern.

(b)   Notwithstanding anything to the contrary in the Plan (including any amendments, supplements or modifications thereto) or the Confirmation Order (and any amendments, supplements or modifications thereto), in the event that any of the terms of the Plan

MRA-73

(including any amendments, supplements or modifications thereto) or Confirmation Order
(including any amendments, supplements or modifications thereto) conflict with any of the terms
of this Agreement, the terms of this Agreement shall govern.

(c)     Any reference herein to any section of this Agreement shall be deemed to
include a reference to any exhibit, attachment or schedule referred to within such section.

(d)     All references to "$" and dollars shall refer to United States currency.

(e)     Consistent with Bankruptcy Rule 9006(a), if the due date for any action to
be taken under this Agreement (including the delivery of notices) is not a business day, then such
action shall be considered timely taken if performed on or prior to the next business day
following such due date. Any reference to "days" in this Agreement shall mean calendar days
unless otherwise specified.

Section 7.23   Expenses. Notwithstanding anything else contained in this Agreement or
the Settlement Agreement, each Party shall bear all costs and expenses incurred or to be incurred
on or after the Effective Date by such Party in connection with this Agreement and the
consummation and performance of the transactions contemplated hereby.

Section 7.24   Entire Agreement; Parties' Intentions; Construction. This Agreement,
including all exhibits and attachments hereto and to the Plan (e.g., the Settlement Agreement, the
Labor MOUs, and the Non-Represented Employees Term Sheet) and the Confidentiality and
Non-Disclosure Agreement between GM and Delphi dated September 12, 2005, as amended,
constitute the entire agreement of the Parties with respect to the subject matter hereof and
supersedes all prior agreements, whether oral or written, with respect to such subject matter other
than with respect to the agreements expressly assumed, ratified or reinstated in Article V of this
Agreement. The attachments and exhibits attached hereto are an integral part of this Agreement
and are hereby incorporated into this Agreement and made a part hereof as if set forth in full
herein. This Agreement is the product of negotiations between the Parties and represents the
Parties' intentions. In any action to enforce or interpret this Agreement, this Agreement shall be
construed in a neutral manner, and no term or provision of this Agreement, or this Agreement as
a whole, shall be construed more or less favorably to any Party.

Section 7.25   Severability. If any term or other provision of this Agreement is invalid,
illegal, or incapable of being enforced by any rule of law or public policy, all other conditions
and provisions of this Agreement shall nonetheless remain in full force and effect so long as the
economic or legal substance of the transactions contemplated hereby is not affected in any
manner materially adverse to any Party. Upon such determination that any term or other
provision is invalid, illegal, or unenforceable in any respect, the Parties shall negotiate in good
faith to modify this Agreement so as to effect the original intent of the Parties as closely as
possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to
the fullest extent possible.

Section 7.26   Headings. The table of contents and the headings of the Articles and
sections herein are inserted for convenience of reference only and are not intended to be a part of,
or to affect the meaning or interpretation of, this Agreement.

Section 7.27   Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement. Electronic delivery of an executed signature page of this Agreement shall be effective as delivery of a manually executed signature page of this Agreement.

[Signature pages follow.]

**IN WITNESS WHEREOF,** the undersigned have each caused this Agreement to be duly executed and delivered by their respective, duly authorized officers as of the date first written above.

**DELPHI CORPORATION**          **GENERAL MOTORS CORPORATION**

By:  /s/ John D. Sheehan                    By:  /s/ Frederick A. Henderson
Name:  John D. Sheehan                   Name: Frederick A. Henderson
Title:  Vice President, Chief Restructuring          Title:  Vice Chairman and Chief Financial
      Officer                                         Officer

**<u>Exhibit D</u>**
**PHI Protection Agreement**

## PHI Protection Agreement

### Recitals

1. Delphi Corporation ("Delphi") has established, sponsors, and maintains a group health plan called the Delphi Health Care Program for Hourly Employees (the "Hourly Health Care Plan").

2. The Hourly Health Care Plan is subject to the Privacy and Security Rules promulgated under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), which regulates the disclosure of "protected health information" and "electronic PHI" ("ePHI") as defined under HIPAA (collectively "PHI").

3. As part of a broader Settlement Agreement relating to Delphi's emergence from Chapter 11, General Motors Corporation ("GM") has agreed to reimburse Delphi for certain Hourly Health Care Plan benefits Delphi has paid and provide post-retirement medical benefits for certain Delphi retirees.

4. As a result, GM requires access to certain information, including information which may be deemed PHI, relating to certain Delphi retirees.

5. Delphi and the Hourly Health Care Plan are required to take appropriate actions to protect PHI.

6. Delphi, the Hourly Health Care Plan, and GM desire that the parties provide appropriate safeguards for PHI that GM receives from Delphi in connection with reimbursing Delphi for the referenced benefits and providing post-retirement medical benefits for Delphi retirees.

7. This Agreement is being entered into with the intent to comply with all applicable laws.

9. This Agreement is supported by the consideration underlying the Settlement Agreement.

### Terms

### 1. Duties of GM

A.    To the extent GM obtains PHI in connection with reimbursing Delphi for or providing Delphi retirees the referenced benefits, GM will take the actions necessary to comply with the applicable legal requirements, including HIPAA and the Privacy and Security Rules promulgated thereunder, see 45 C.F.R. Parts 160, 162, to safeguard any such PHI. GM may not use or disclose such PHI in a manner that, if done by Delphi, the Hourly Health Care Plan, or any Business Associates (as defined under HIPAA) of Delphi, would violate HIPAA (i.e., GM is subject to the same

restrictions on use and disclosure of PHI as Delphi and the Hourly Health
Care Plan).

**B.**     Consistent with the above duties, GM will:

(1)     identify and inform Delphi or the Hourly Health Care Plan of the
minimum necessary PHI that is needed;

(2)     not use or further disclose such PHI other than as permitted or
required by the Settlement Agreement or as required by law;

(3)     use appropriate safeguards to prevent the use or disclosure of such
PHI to which GM has access by virtue of the Settlement
Agreement, this Agreement, or as permitted by applicable law;

(4)     as soon as reasonably practicable, but in no event more than five
(5) days following such occurrence, report to Delphi or the Hourly
Health Care Plan any impermissible use or disclosure of such PHI
of which GM becomes aware;

(5)     mitigate, to the extent practicable, any harmful effect that is known
to GM of a use or disclosure of such PHI in violation of the
requirements of this Agreement or applicable law;

(6)     ensure that any agents or subcontractors to whom GM
appropriately provides such PHI to which GM has access by virtue
of the Settlement Agreement agrees to the same restrictions and
conditions that apply to GM with respect to such PHI;

(7)     within thirty (30) days of receipt of Delphi or the Hourly Health
Care Plan's written request, make available to Delphi or the
Hourly Health Care Plan, as applicable, such PHI in accordance
with rules regarding access of individuals to information under 45
CFR § 164.524;

(8)     within sixty (60) days of Delphi or the Hourly Health Care Plan's
written request, amend, as applicable, such PHI requiring
amendment in accordance with the requirements under 45 CFR
§ 164.526;

(9)     document disclosures of such PHI and information related to such
disclosures as may be required for Delphi, or the Hourly Health
Care Plan, as applicable, to respond to a request by an Enrollee for
an accounting of disclosures of such PHI in accordance with 45
CFR § 164.528;

(10)    within thirty (30) days from receipt of Delphi or the Hourly Health
Care Plan's written request make available to Delphi or the Hourly
Health Care Plan, as applicable, an accounting of disclosures of
such PHI in accordance with 45 CFR § 164.528; and

(11)    make GM's internal practices, books, and records relating to the
use and disclosure of PHI received from, or created/received by
GM on behalf of Delphi or the Hourly Health Care Plan available
to the HHS Secretary for the purposes of determining Delphi's or
the Hourly Health Care Plan's compliance with HIPAA; provided,
however, that in such event GM will immediately notify Delphi or

2

the Hourly Health Care Plan upon receipt or notice of any request by the Secretary to conduct an investigation with respect to such PHI received from Delphi or the Hourly Health Care Plan.

**C.**  GM represents that it:

(1)  has in place administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any ePHI that it creates, receives, maintains, or transmits on behalf of Delphi as required by the Security Rule under HIPAA;

(2)  will ensure that any agent, including a subcontractor, to whom GM provides such ePHI agrees to implement reasonable and appropriate safeguards to protect it; and

(3)  will report to Delphi any security incident of which GM becomes aware in accordance with the Security Rule under HIPAA.

## 2. Permitted Uses and Disclosures

**A.**  GM may use and disclose PHI to perform its obligations under the Settlement Agreement to the extent that such use and disclosure is permitted by HIPAA.

**B.**  GM may, if necessary, use and disclose PHI for the proper management and administration of GM's business or to carry out its legal responsibilities; provided, however, that:

(1)  the disclosure must be required bylaw; or

(2)  GM must obtain reasonable assurances from the person to whom the information is disclosed that it will be held confidentially and used or further disclosed only as required by law or for the purpose for which it was disclosed to the person and the person notifies GM if confidentiality of the information has been breached.

**C.** GM may:

(1)  disclose PHI to authorized employees of Delphi and as permitted under HIPAA, including, but not limited to, the disclosure of eligibility information to Delphi (acting as plan sponsor) and its delegates and Claims data to the Hourly Health Care Plan;

(2)  obtain and use PHI which GM receives from Delphi, the Hourly Health Care Plan, or Delphi's Business Associates in order to perform its obligations under the Settlement Agreement;

(3)  disclose PHI to Delphi's or to GM's Business Associates as appropriate; and

(4)  use in conjunction with and disclose PHI to duly authorized representatives of Enrollees (e.g., Union Benefits Representatives) in relation to Claims.

3

.

## 3. GM Written Assurance

Upon ten (10) business days prior written notice to GM, GM will provide Delphi or the Hourly Health Care Plan and their representatives with appropriate written assurances to verify GM's compliance with the privacy and security requirements outlined in this Agreement.

## 4. Survival

The provisions of this Agreement will survive termination of the Settlement Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date indicated below.

**DELPHI CORPORATION**                **GENERAL MOTORS CORPORATION**

By: _____      By: _____

Name: _____      Name: _____
        **(printed)**                         **(printed)**
Title: _____      Title: _____

Date: _____      Date: _____

## Exhibit E
### Outstanding Delphi Invoices for which GM Has Withheld Payment
### Due To Outstanding Prepetition Activities

## Exhibit E

| Division | PO Number | PO Amount | Invoice No. | Invoice Date | Invoice Amount |
|----------|-----------|-----------|-------------|--------------|----------------|
| T&I | 0W9J008 | 2,342,610.00 | 97137408 | 11/30/2006 | 2,029,777.71 |
| T&I | ONHX00P | 761,100.00 | 97224590 | 12/18/2006 | 761,100.00 |
| T&I | DTG001NZ | 1,536,500.00 | 97426960 | 01/31/2007 | 1,536,500.00 |
| E&S | 19LJ00GF | 1,500,000.00 | 97265917 | 12/23/06 | 1,500,000.00 |
| S | 06HT02RD | 2,134,661.00 | 5784 | 03/27/07 | 2,134,661.00 |
| T&I | 0K9B001G | 1,910,000.00 | 97845829 | 04/19/07 | 1,576,266.37 |
| T&I | 153G000C | 316,125.00 | 98303090 | 07/31/07 | 316,125.00 |
| S | 09P1004B | 2,531,351.73 | 5826 | 06/29/07 | 2,531,351.73 |