(ii)    GM shall retain and/or assume the defense of all such claims involving parts, components or systems manufactured by the Delphi Automotive Systems Business prior to January 1, 1999 and sold or otherwise supplied to GM or its Affiliates before, on, or after January 1, 1999. GM shall indemnify, defend, and hold harmless Delphi and its Affiliates against any and all such claims. GM shall reimburse Delphi and its Affiliates for any reasonable attorneys' fees or other expenses reasonably incurred by Delphi or its Affiliates subsequent to December 31, 1998 in connection with investigating and/or defending any such claim or securing the indemnification and/or defense that GM is required to provide pursuant to this paragraph.

(c)    (i)    Delphi shall defend GM and its Affiliates against all claims involving (A) parts, components, or systems manufactured by Delphi or its Affiliates, which on or subsequent to January 1, 1999 are sold or otherwise supplied to customers other than GM or its Affiliates and (B) parts, components or systems acquired by the Delphi Automotive Systems Business or Delphi or its Affiliates from suppliers thereto other than GM or its Affiliates and sold or otherwise supplied by Delphi or its Affiliates on or subsequent to January 1, 1999 to customers other than GM or its Affiliates. Delphi or its Affiliates shall indemnify, defend, and hold harmless GM and its Affiliates against any and all such claims. Delphi or its Affiliates shall reimburse GM and its Affiliates for any reasonable attorneys' fees or other expenses reasonably incurred by GM and its Affiliates in connection with investigating and/or defending any such claim or securing the indemnification and/or defense that Delphi and its Affiliates are required to provide pursuant to this paragraph.

(ii)    The rights, obligations, and liabilities of GM and Delphi with respect to claims involving parts, components or systems manufactured by Delphi or its affiliates subsequent to December 31, 1998 which are sold by Delphi or its Affiliates to GM or its Affiliates shall be determined according to the terms of the agreements relating to such sale.

(d)    Recall and Warranty Campaigns. Except as otherwise released pursuant to agreements between the Parties executed prior to the Effective Date, including the Warranty Settlement Agreement, claims of GM or its Affiliates against the Delphi Automotive Systems Business in the nature of warranty and recall campaigns relating to parts, components, or systems sold by the Delphi Automotive Systems Business to GM or its Affiliates (regardless of when or by whom manufactured (but excluding parts or systems manufactured by GM or its Affiliates)) which arise prior to or after the Contribution Date shall be determined according to the terms of the agreements relating to the sale of such parts, components or systems, all of which agreements were assumed by Delphi and its Affiliates effective as of the Contribution Date.

(e)    Reserved.

(f)    Notice. GM and Delphi agree that in the case of claims covered by either paragraphs (b) or (c) above, the Party receiving such a claim shall notify the other Party within thirty (30) days of receipt of written notice of the claim. Thereafter, the Party being notified of the claim shall have thirty (30) days to respond. The Party first receiving such a claim shall take all reasonable action necessary to defend against the claim including, but not limited to, responding to court ordered deadlines before the expiration of the time for response.

Section 5.10    Cooperation.

(a)    GM and Delphi and their respective Affiliates shall cooperate with each other in the defense of any and all claims covered under this Article V and afford to each other reasonable access upon reasonable advance notice to witnesses and information (other than information protected from disclosure by applicable privileges) that is reasonably required to defend these claims as set forth in Article V of this Agreement.  The foregoing agreement to cooperate includes, but is not limited to, an obligation to provide access to qualified assistance to provide information, witnesses, and documents to respond to discovery requests in specific lawsuits.  In such cases, cooperation shall be timely so that the Party responding to discovery may meet all court-imposed deadlines.  The Party requesting information shall reimburse the party providing information consistent with the terms of section 5.08 of this Agreement.  The obligations set forth in this paragraph are more clearly defined in section 5.01 through and including 5.10 of this Agreement, to which reference is hereby made.

(b)    GM agrees to consider in good faith any request from Delphi to shorten the Retention Period in connection with any businesses of Delphi that are to be wound-down or sold; provided, however, that the parties acknowledge that the Retention Period cannot be reduced for books and records related to open tax periods, safety products and those subject to litigation hold.

Section 5.11    Continuation of Limited Employee Related Matters.

(a)    Workers' compensation liability assumed by Delphi as a result of the Separation shall be retained by Delphi; provided, however, that the sending party in a flowback or Special Employment Placement Opportunities ("SEPO") situation shall bear any and all workers compensation liability for injuries or illnesses that arose prior to the flowback or a placement through SEPO, including claims asserted on or after the flowback or placement through SEPO. In addition, any cumulative trauma claim filed within twelve months of flowback or placement through SEPO, which originated at, or was the responsibility of, the sending party, shall be the responsibility of the sending party.

(b)    The relocation costs associated with the flowback or SEPO of employees, as applicable, shall be shared equally by GM and Delphi. These costs shall include relocation allowances, relocation services and other related expenses provided for in the applicable Labor MOUs or any other applicable collective bargaining agreements.  Relocation costs associated with employees of closed or divested operations of Delphi or any of its Affiliates shall be allocated as follows:  (i) shared equally where an employee transfers to a GM facility; (ii) paid 100% by Delphi where an employee transfers to a Delphi facility; and (iii) paid consistent with historical relocation cost share levels or as agreed by the Parties at the time of the relocation where an employee of a divested operation transfers to either Delphi or GM.

(c)    All employment related responsibility, obligation or liability of GM relating to Delphi Employees or Delphi Terminated Employees both as they were defined in the U.S. Employee Matters Agreement, and assumed by Delphi and/or the applicable Delphi benefit plans as a result of the Delphi spin-off from GM for claims described in **Exhibit 5.11(c)**, shall be retained by Delphi and/or the applicable Delphi benefit plans, except as otherwise specifically

provided in this Agreement, the Settlement Agreement, the attachments hereto or thereto, or the agreements or the attachments referenced herein or therein.

(d)     The National Employment Placement Center shall provide Delphi the following services through the term of the current UAW MOU and the current IUE-CWA MOU pursuant to current negotiated purchase terms and conditions: (i) processing of placement applications as submitted by eligible hourly employees; (ii) processing of requisitions for additional personnel; and (iii) processing of placement offers and filling open requisitions.

## ARTICLE VI

## EFFECTIVENESS

Section 6.01     Effectiveness.  This Agreement shall not become effective until the date on which all conditions to effectiveness of the Settlement Agreement that are set forth in Article VI thereof are satisfied or waived by the parties thereto (the "Effective Date").

## ARTICLE VII

## MISCELLANEOUS

Section 7.01     On-Going Setoff Provisions.  Notwithstanding anything to the contrary contained in this Agreement or the Settlement Agreement, the Parties' payment obligations under this Agreement and the Settlement Agreement are absolute and unconditional and shall not be subject to any offset (except as expressly set forth in the proviso below) or defense of any nature whatsoever including upon a breach by Delphi or any of its Affiliates or GM or any of its Affiliates, as applicable, of any of their obligations under this Agreement, the Settlement Agreement, or any other agreement; provided, however, that any payments by GM pursuant to this Agreement or the Settlement Agreement shall be subject to GM's right to offset all or part of such payment from any future amounts GM owes Delphi under this Agreement or the Settlement Agreement only if (i) agreed upon by GM and Delphi or (ii) GM determines that it made an overpayment of any amount paid pursuant to this Agreement or the Settlement Agreement and GM and Delphi are unable to resolve GM's claim for such amounts pursuant to the dispute resolution provisions of section 7.11 of this Agreement and GM provides Delphi with five (5) days' written notice before implementing such offset; provided further, however, that if it is judicially determined that GM did not have the right to offset such amount, GM shall pay Delphi such amount plus interest accruing on such amount from the date of setoff through the repayment date at the rate of 7.5% per annum.  Neither this section 7.01 nor any other provision of this Agreement or the Settlement Agreement shall prohibit, restrict, or limit in any way the application of GM's contractual rights of setoff arising under any GM Purchase Order pursuant to GM's standard purchase order terms and conditions against other obligations arising under any GM Purchase Orders or agreements other than this Agreement and the Settlement Agreement.

Section 7.02     Termination Provisions.  This Agreement may be terminated or shall terminate immediately and automatically, as applicable, and the transactions contemplated hereby abandoned, upon the occurrence of any of the following:

(a)    by mutual written consent of both Delphi and GM;

(b)    by GM or Delphi if, prior to the effectiveness of the Settlement Agreement pursuant to Article VI thereof, the Settlement Agreement is terminated pursuant to section 7.03 thereof; or

(c)    automatically on December 31, 2015.

Section 7.03    Guaranty by Delphi.

(a)    From and after the Effective Date, Delphi hereby irrevocably and unconditionally guarantees the due and punctual payment or performance, as the case may be, by DAS and its successors and assigns (collectively, the "Delphi Guaranty Parties") of all of their obligations under any and all Existing Agreements or future GM Purchase Orders incurred with respect to work performed or required to be performed on or before September 14, 2015 between any of DAS (or another Delphi Guaranty Party) and any of the GM Parties (collectively, the "Guaranteed Agreements"), whether issued and accepted before or after the Effective Date. In connection with this Agreement and for all purposes, all outstanding GM Purchase Orders shall be deemed to be assigned to DAS. GM further agrees that all GM Purchase Orders to be issued and accepted on or after the date hereof and before September 14, 2015, between any of the GM Parties and any of the Delphi-Related Parties shall be issued to and accepted by DAS rather than another Delphi-Related Party, subject, however, to the next to last sentence of section 6.01 of the Settlement Agreement.

(b)    Delphi hereby agrees that its obligations under section 7.03(a) hereof (i) are a guaranty of payment and performance when due and not of collectability, (ii) are a primary obligation of Delphi and not merely a contract of surety, (iii) shall be absolute, independent, unconditional, and irrespective of (1) the validity, regularity or enforceability of the Guaranteed Agreements, (2) any change therein or amendments thereto, (3) the absence of any action to enforce the same, (4) any waiver or consent by GM with respect to any provision thereof, (5) the recovery of any judgment against any of the other Delphi Parties or any action to enforce the same, or (6) any other circumstances which may otherwise constitute a legal or equitable discharge or defense of a guarantor or surety.

(c)    Delphi hereby waives presentment, demand of payment, protest or notice with respect to the Guaranteed Agreements and the obligations set forth therein or herein.

(d)    Delphi's obligations under section 7.03(a) hereof shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any amount owed to any of the GM Parties hereunder or under any of the Guaranteed Agreements is rescinded or must otherwise be returned by any of the GM Parties upon the insolvency, bankruptcy, or reorganization of any of the Delphi Parties or otherwise, all as though such payment had not been made.

(e)    If (I) GM breaches one or more of its payment obligations under this Agreement or the Settlement Agreement or any of its obligations under Article IV hereof (excluding obligations under any of the Continuing Agreements, as defined in the Settlement Agreement or any commercial disputes that arises in the Ordinary Course Relationship (as

defined in the Settlement Agreement)) and such breach or breaches would have a material impact
(1) on Delphi and its Affiliates or (2) on the benefits Delphi and its Affiliates are reasonably
expected to receive under the Settlement Agreement or this Agreement (the effects set forth in (1)
or(2) above shall hereinafter be referred to as, a "Delphi Material Impact") and (II) Delphi
provides written notice (the "Delphi Notice") of such breach or breaches, executed by either
Delphi's chief executive officer or chief financial officer, which notice describes in reasonable
detail the nature of the breach or breaches and relevant background information, then the
guaranty provided for in this section 7.03 shall, subject to the terms of this section 7.03(e),
automatically terminate without any further action; provided, however, that prior to such
termination becoming effective (A) if the breach or breaches relate to a payment obligation
hereunder or under the Settlement Agreement, GM shall have a ten (10) day period following
receipt of the Delphi Notice to cure such breach or breaches and (B) if the breach or breaches
relate to an obligation other than a payment obligation hereunder or under the Settlement
Agreement, GM shall have a thirty (30) day period following receipt of the Delphi Notice to cure
such breach or breaches; provided, further, however that if there is a disagreement between the
Parties as to whether GM has breached one or more of its obligations or whether such breach or
breaches has a Delphi Material Impact, at the election of either Party, the Parties shall engage in
the dispute resolution process specified in section 7.11 hereof with respect to such disagreement,
and such termination shall not become effective if such dispute resolution process is commenced
prior to the end of such cure period. Upon the conclusion of such process or, if earlier, thirty (30)
days after its commencement (the "Dispute Resolution Termination Date"), if Delphi still
believes that a breach with a Delphi Material Impact has occurred, GM shall have the right to
cure such default within ten (10) days after the Dispute Resolution Termination Date and, if so
cured, the guaranty shall not terminate. Either GM or Delphi may seek judicial determination at
any time as to whether Delphi has the right to terminate the guaranty pursuant to this section
7.03(e). If it is judicially determined by Final Order that Delphi did not have the right to
terminate the guaranty, it shall remain in full force and effect.

Section 7.04    Continued Ownership of DAS. Until the earlier of September 14, 2015
and such time as the guaranty provided for pursuant to section 7.03 hereof is no longer in full
force and effect, without the prior written consent of GM, which consent shall not be
unreasonably withheld, Delphi shall not permit DAS to transfer (i) a material portion of its assets
necessary to satisfy production obligations to GM or (ii) more than 40% of its total assets (other
than to a Delphi Party; provided that all provisions of this section 7.04 shall apply to such Delphi
Party to the same extent they apply to DAS) and Delphi shall not cease to own, directly or
indirectly, at least a majority of the outstanding equity and voting equity of DAS; provided,
however, that neither of the restrictions in this sentence shall apply if such transfer or cessation,
as applicable, occurs as a result of a transfer by Delphi of all or substantially all of its assets.

Section 7.05    Reserved.

Section 7.06    Cancellation Claims.

(a)    Except as otherwise provided in section 7.06(b) hereof, the Delphi Parties
waive and are deemed to have waived (and Delphi shall cause the other Delphi Parties to so
waive) any and all claims, debts, obligations, rights, suits, damages, actions, causes of action,
remedies, and liabilities whatsoever, which the Delphi Parties ever had, now have, or hereafter

may have, whether known or unknown, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, or otherwise, arising out of or related to cancellation of any purchase orders or termination of any component or material supply agreements (regardless of whether the cancellation or termination occurs prior to or after the date hereof or the Effective Date) concerning products manufactured in the Wind-Down Facilities, the Footprint Facilities and the Sale Facilities; provided, however, that with respect to the Sale Facilities and the Kettering Facility (in the event the Kettering Facility is not sold as contemplated under 4.08(c)), the waiver in this section 7.06 would apply only in the case of cooperative resourcing by mutual written agreement (collectively, "Cancellation Claims") that any of the Delphi Parties have or may have against any of the GM Parties or any GM Supplier.

(b)     With respect to any Cancellation Claims that have been asserted as of the Effective Date or may be asserted thereafter by any Delphi Supplier against the Debtors (the "Delphi Supplier Cancellation Claims"):

(i)     the Debtors shall utilize their reasonable best efforts to minimize all Delphi Supplier Cancellation Claims;

(ii)     Delphi shall pay the first $30 million, on a cumulative basis, of any Delphi Supplier Cancellation Claims; and

(iii)     GM shall reimburse the Debtors for 50% of any Delphi Supplier Cancellation Claims actually paid by the Debtors in excess of the $30 million referred to in section 7.06(b)(ii) hereof.

Section 7.07     Tooling Acknowledgment.

(a)     Delphi acknowledges and agrees that all tooling, fixtures, gauges, jigs, patterns, dies, and molds (collectively, "Tooling") being used by the Debtors or their respective sub-suppliers in connection with the manufacture of Component Parts for GM, together with appurtenances, accessions and accessories thereto (collectively, the "Accessories"), which have been (i) furnished by GM to a Debtor at any time, directly or indirectly excluding Tooling the ownership of which was transferred to a Debtor on the Contribution Date, unless there was a written agreement which provided that the Debtor's interest would be other than as a bailee, or (ii) purchased by GM under a tooling purchase order with a Debtor, are owned by GM and are being held by DAS and, to the extent a Debtor has transferred the Tooling or Accessories to third parties, by such third parties, on a bailment basis consistent with paragraph 19 of the Standard GM Terms.

(b)     Nothing contained in this section 7.07 is intended to create or expand the rights, if any, of GM in any intellectual property owned by any Delphi Party.

Section 7.08     Reserved.

Section 7.09     No Undisclosed Agreements or Commitments.  There are no undisclosed agreements or commitments between or among the Parties regarding matters subject to the terms of this Agreement.

Section 7.10   Governing Law; Jurisdiction; Venue.  This Agreement shall be governed and construed in accordance with the internal laws of the State of New York, the forum state in which the Bankruptcy Court sits, without regard to any conflict of law provision that could require the application of the law of any other jurisdiction.  Pursuant to the Plan and the Confirmation Order, this Agreement is incorporated by reference in its entirety into the Plan and forms an integral part thereof.  Accordingly, by its execution and delivery of this Agreement, each Party hereby irrevocably and unconditionally agrees that the Bankruptcy Court shall retain exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement and the Settlement Agreement; provided, however, that the Bankruptcy Court shall not have jurisdiction over (i) disputes arising out of the provisions set forth in Article III of this Agreement or the agreements referenced in sections 5.01(c) and 5.01(d) of this Agreement, or (ii) disputes arising out of agreements between any Delphi-Affiliate Party on the one hand and GM or any of its Affiliates on the other in which disputes no Delphi-Related Party has an interest; and provided further that after the second anniversary of the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement and the Settlement Agreement; and provided further that the jurisdiction of the Bankruptcy Court over all matters related to this Agreement and the Settlement Agreement shall terminate upon the fourth anniversary of the Effective Date. Each Party further agrees to waive any objection based on forum non conveniens.

Section 7.11   Dispute Resolution.  In the event a Restructuring Dispute arises among the Parties (other than an Article III Dispute, which shall be governed and settled in accordance with section 3.10 hereof), upon the written request of either Party, such Restructuring Dispute shall be referred to the Director of Business Development at GM and the Finance Director of Automotive Holdings Group or the Director, Strategic Planning at Delphi (at Delphi's discretion) for resolution in good faith.  In the event that GM's Director of Business Development and Delphi's Finance Director of Automotive Holdings Group or the Director, Strategic Planning are unable to resolve such dispute, such Restructuring Dispute shall be referred, at either Party's written request, to the Assistant Treasurer of GM and the Assistant Treasurer or Treasurer of Delphi (at Delphi's discretion).  If within ten (10) days after such referral, GM's Assistant Treasurer and Delphi's Assistant Treasurer or Treasurer are unable to resolve the Restructuring Dispute, the Restructuring Dispute may be elevated by either Party to GM's Treasurer or Chief Financial Officer (at GM's discretion) and Delphi's Chief Executive Officer or Chief Financial Officer (at Delphi's discretion) for resolution.  To the extent that the job title of any of the foregoing positions is changed, this section 7.11 shall be deemed to apply to such successor title or, if the position is eliminated or vacated, to the job title of the party taking over the responsibilities of the eliminated or vacated position.

Section 7.12   No Solicitation.  Each Party acknowledges that this Agreement is not and shall not be deemed to be a solicitation to accept or reject a plan in contravention of section 1125(b) of the Bankruptcy Code.  Each Party further acknowledges that no securities of any Debtor are being offered or sold pursuant to this Agreement and that this Agreement does not constitute an offer to sell or a solicitation of an offer to buy any securities of any Debtor.

Section 7.13   Negotiations Not Admissible.  Pursuant to Rule 408 of the Federal Rules of Evidence and any applicable state rules of evidence, this Agreement and all negotiations

relating hereto are not admissible into evidence in any proceeding; provided, however, that this Agreement may be admissible in a proceeding to enforce the terms of this Agreement.

Section 7.14   Specific Performance. Each Party acknowledges that the other Party would be irreparably damaged if this Agreement were not performed in accordance with its specific terms or were otherwise breached. Accordingly, each Party shall be entitled to seek an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically the terms of this Agreement in addition to any other remedy to which the Parties may be entitled, at law, in equity or under this Agreement.

Section 7.15   Representations and Warranties of Delphi and GM. Each Party represents and warrants to the other Party that the following statements, as applicable to it, are true, correct, and complete as of the date of this Agreement:

(a)     It is duly organized, validly existing, and in good standing under the laws of its state of organization and has all requisite corporate power and authority to enter into this Agreement and to perform its obligations hereunder;

(b)     The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate action on its part; provided, however, that Delphi's authority to enter into this Agreement is subject to Bankruptcy Court approval;

(c)     This Agreement has been duly executed and delivered by it and constitutes its legal, valid, and binding obligation, enforceable against it in accordance with the terms hereof, subject to the occurrence of the Effective Date; and

(d)     The execution, delivery, and performance by it (when such performance is due) of this Agreement do not and shall not (i) violate any current provision of law, rule, or regulation applicable to it or any of its subsidiaries or its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

Section 7.16   Waiver; Modification; Amendment. Except as otherwise specifically provided herein, this Agreement may not be modified, waived, amended, or supplemented unless such modification, waiver, amendment, or supplement is in writing and has been signed by each Party. No waiver of any of the provisions of this Agreement shall be deemed or constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver.

Section 7.17   Binding Effect; Assignments. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, administrators, and representatives. Neither this Agreement nor any of the rights, interests, or obligations under this Agreement (for the avoidance of doubt, including without limitation, the obligations set forth in sections 4.01 and 4.02 hereof) shall be sold, assigned, or otherwise transferred by any Party without the prior written consent of the other Parties; provided, however, that neither the foregoing nor any other provision of this Agreement shall limit (i) any assignment in connection

with the transfer of all or substantially all of the assets of Delphi and its Affiliates or (ii) any assignment not reasonably expected to have a material impact on GM, on the benefits GM reasonably is expected to receive under the Plan (including, without limitation, GM's distributions thereunder), the Settlement Agreement, or this Agreement, or on the ability of the Debtors to fulfill any obligations to any GM-Related Parties under the Plan, the Settlement Agreement, this Agreement, or any agreements assumed, reinstated, or ratified under this Agreement.

Section 7.18   Third Party Beneficiaries.   Except as otherwise provided in section 7.06 herein with respect to the releases of the GM Parties and GM Suppliers, nothing contained in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any person or entity other than the Parties hereto, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third party to any Party to this Agreement, nor shall any provision give any third party any right of subrogation or action over or against any Party to this Agreement.

Section 7.19   Notices.   All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given (and shall be deemed to have been duly given upon receipt) if delivered personally, mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the Parties at the following addresses (or at such other address for a Party as shall be specified by like notice):

> If to Delphi, to:
>
>> Delphi Corporation
>> 5725 Delphi Drive
>> Troy, Michigan 48098
>> Att'n:   John D. Sheehan
>>      David M. Sherbin, Esq.
>>      Sean P. Corcoran, Esq.
>
> With a copy to:
>
>> Skadden, Arps, Slate, Meagher & Flom LLP
>> 333 West Wacker Drive
>> Chicago, Illinois  60606-1285
>> Att'n:   John Wm. Butler, Jr., Esq.
>>      Ron E. Meisler, Esq.
>
> and
>
>> Skadden, Arps, Slate, Meagher & Flom LLP
>> Four Times Square
>> New York, New York  10036
>> Att'n:   Eric L. Cochran, Esq.
>>      Kayalyn A. Marafioti, Esq.

If to GM, to:

> General Motors Corporation
> 767 Fifth Avenue
> 14th Floor
> New York, New York  10153
> Att'n:   Director of Business Development

and

> General Motors Corporation
> 300 GM Renaissance Center
> Detroit, Michigan  48265
> Att'n:   General Counsel

With a copy to:

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York  10153
> Att'n:   Harvey R. Miller, Esq.
>            Jeffrey L. Tanenbaum, Esq.
>            Michael P. Kessler, Esq.

or to such other place and with such other copies as either Party may designate as to itself by written notice to the other Party. Rejection, any refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

Section 7.20   Waiver of Right to Trial by Jury. Each Party waives any right to trial by jury in any proceeding arising under or related to this Agreement.

Section 7.21   Service of Process. Each Party irrevocably consents to the service of process in any legal proceeding arising out of this Agreement by receipt of mailed copies thereof by national courier service or certified United States mail, postage prepaid, return receipt requested, to its applicable registered agent. The foregoing, however, shall not limit the right of a Party to effect service of process on the other Party by any other legally available method.

Section 7.22 Interpretation.

(a)    In the event of any conflict between this Agreement and any of the Labor MOUs, the Non-Represented Employees Term Sheet, the UAW SAP, the IUE-CWA SAP, the Warranty Settlement Agreement, and the IP License, the provisions of such documents other than this Agreement shall govern.

(b)    Notwithstanding anything to the contrary in the Plan (including any amendments, supplements or modifications thereto) or the Confirmation Order (and any amendments, supplements or modifications thereto), in the event that any of the terms of the Plan

(including any amendments, supplements or modifications thereto) or Confirmation Order
(including any amendments, supplements or modifications thereto) conflict with any of the terms
of this Agreement, the terms of this Agreement shall govern.

(c)    Any reference herein to any section of this Agreement shall be deemed to
include a reference to any exhibit, attachment or schedule referred to within such section.

(d)    All references to "$" and dollars shall refer to United States currency.

(e)    Consistent with Bankruptcy Rule 9006(a), if the due date for any action to
be taken under this Agreement (including the delivery of notices) is not a business day, then such
action shall be considered timely taken if performed on or prior to the next business day
following such due date. Any reference to "days" in this Agreement shall mean calendar days
unless otherwise specified.

Section 7.23    Expenses. Notwithstanding anything else contained in this Agreement or
the Settlement Agreement, each Party shall bear all costs and expenses incurred or to be incurred
on or after the Effective Date by such Party in connection with this Agreement and the
consummation and performance of the transactions contemplated hereby.

Section 7.24    Entire Agreement; Parties' Intentions; Construction. This Agreement,
including all exhibits and attachments hereto and to the Plan (e.g., the Settlement Agreement, the
Labor MOUs, and the Non-Represented Employees Term Sheet) and the Confidentiality and
Non-Disclosure Agreement between GM and Delphi dated September 12, 2005, as amended,
constitute the entire agreement of the Parties with respect to the subject matter hereof and
supersedes all prior agreements, whether oral or written, with respect to such subject matter other
than with respect to the agreements expressly assumed, ratified or reinstated in Article V of this
Agreement. The attachments and exhibits attached hereto are an integral part of this Agreement
and are hereby incorporated into this Agreement and made a part hereof as if set forth in full
herein. This Agreement is the product of negotiations between the Parties and represents the
Parties' intentions. In any action to enforce or interpret this Agreement, this Agreement shall be
construed in a neutral manner, and no term or provision of this Agreement, or this Agreement as
a whole, shall be construed more or less favorably to any Party.

Section 7.25    Severability. If any term or other provision of this Agreement is invalid,
illegal, or incapable of being enforced by any rule of law or public policy, all other conditions
and provisions of this Agreement shall nonetheless remain in full force and effect so long as the
economic or legal substance of the transactions contemplated hereby is not affected in any
manner materially adverse to any Party. Upon such determination that any term or other
provision is invalid, illegal, or unenforceable in any respect, the Parties shall negotiate in good
faith to modify this Agreement so as to effect the original intent of the Parties as closely as
possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to
the fullest extent possible.

Section 7.26    Headings. The table of contents and the headings of the Articles and
sections herein are inserted for convenience of reference only and are not intended to be a part of,
or to affect the meaning or interpretation of, this Agreement.

Section 7.27    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.  Electronic delivery of an executed signature page of this Agreement shall be effective as delivery of a manually executed signature page of this Agreement.

[Signature pages follow.]

**IN WITNESS WHEREOF**, the undersigned have each caused this Agreement to be duly executed and delivered by their respective, duly authorized officers as of the date first written above.

**DELPHI CORPORATION**                    **GENERAL MOTORS CORPORATION**

By:  /s/ John D. Sheehan_____              By:  /s/ Frederick A. Henderson_____
Name:  John D. Sheehan                        Name: Frederick A. Henderson
Title:  Vice President, Chief Restructuring    Title:   Vice Chairman and Chief Financial
     Officer                                      Officer

**<u>Exhibit 1.23</u>**
**Assumed Liabilities**

## Exhibit 1.23

**Assumed Liabilities**

**FILED UNDER SEAL**

## Exhibit 1.166
### Retained Liabilities

# Exhibit 1.166

## Retained Liabilities

**FILED UNDER SEAL**

**Exhibit 1.169**
**Excluded Saginaw Assets**

## **Exhibit 1.169**

**Excluded Saginaw Assets**

**FILED UNDER SEAL**

**Exhibit 1.178**
**Separation Costs**

## Exhibit 1.178

## Separation Costs

**FILED UNDER SEAL**

## Exhibit 3.01(a)
### Price Down Arrangements and Related Matters

## Exhibit 3.01(a)

**Price Down Arrangements And Related Matters**

**FILED UNDER SEAL**

Master Restructuring Agreement

## **Exhibit 3.01(a)(i)**
### **Outstanding GM Purchase Orders**

## Exhibit 3.01(a)(i)

### Outstanding GM Purchase Orders

**FILED UNDER SEAL**

**Exhibit 3.01(b)**
**Recently Awarded Business**

## **Exhibit 3.01(b)**

### **Recently Awarded Business**

**FILED UNDER SEAL**

**Exhibit 3.02**
**Contract Extensions**

# Exhibit 3.02

## Contract Extensions

**FILED UNDER SEAL**

**Exhibit 3.03(c)**
**Changes in Manufacturing Location**

## Exhibit 3.03(c)

## Changes In Manufacturing Location

**FILED UNDER SEAL**

## Exhibit 3.07
### New Business Awards

## <u>Exhibit 3.07</u>

**New Business Awards**

**FILED UNDER SEAL**

**Exhibit 3.08(a)**
**FOP Programs**

## Exhibit 3.08(a)

**FOP Programs**

**FILED UNDER SEAL**

Master Restructuring Agreement

**<u>Exhibit 3.08(b)</u>**
**First Opportunity Process**

## Exhibit 3.08(b)

### First Opportunity Process

**FILED UNDER SEAL**

Master Restructuring Agreement

## **Exhibit 3.12**
### **Sites Providing Product Identified in Exhibit 3.01(a)**
### **That Are on New Business Hold As of August 29, 2007**

**<u>Exhibit 3.12</u>**

**Sites Providing Product Identified In Exhibit 3.01(a)**
**That Are On New Business Hold As Of August 29, 2007**

**FILED UNDER SEAL**

**<u>Exhibit 4.01(a)</u>**
**Form of Monthly Invoice for Excess Labor Costs**



Delphi Confidential - Subject to Protective Order

**EXHIBIT 4.01 A (II) - Actual Labor Subsidy for Ongoing Periods**
The information contained herein shall not be disclosed to any member of GM Global Purchasing and Supply Chain
NOTE: One such Invoice shall be provided on a monthly basis

| | Labor Cost ($/hr) | Memo: Total US $[4] ($ 000) | Labor Cost ($/hr) | Memo: Total US $[4] ($ 000) |
|---|---|---|---|---|
| Straight Time | xxx | | xxx | |
| COLA (only for Red Circle Period) | xxx | | xxx | |
| Subtotal Wages | · | · | · | · |
| Overtime Premium | | | | |
| Night Shift Premium | | | | |
| Independence Week (only for Red Circle Period) | | | | |
| Vacation | | | | |
| Holiday | xxx | | xxx | |
| Jury Duty | | | | |
| Bereavement Leave | | | | |
| Military Leave | | | | |
| Profit Sharing (only for Red Circle Period) | xxx | | xxx | |
| Suggestion Awards | | | | |
| Performance Bonus | | | | |
| Subtotal Wage Related | · | · | · | · |
| Total Wages & Related | · | · | · | · |
| Employer Taxes | | | | |
| Applicable Workers' Compensation | | | | |
| Total Legally Required | · | · | · | · |
| 401K Matching | | | | |
| PAYGO Healthcare | | | | |
| Training and Legal Funds (only for Red Circle Period) | | | | |
| Supplemental Unemployment Benefits and Severance | | | | |
| Disability/Sickness and Accident | | | | |
| Administrative Costs - NBC | | | | |
| Active Basic Life Insurance | | | | |
| Total Benefits | · | · | · | · |
| Item X ' | | | | |
| Item Y ' | | | | |
| Additional Agreed Upon Items *2 | · | · | · | · |
| **Total Labor Cost (included in Subsidy)** | · | · | · | · |

**Labor Subsidy Calculation**

| | | | | |
|---|---|---|---|---|
| Active Hours | | | | |
| Times $26/hr | X    26/hr | | X    26/hr | |
| Total labor cost @ $26/hr | · | · | · | · |
| **Labor Subsidy** | · | · | · | · |

**Memo: Costs Not Included[3]**
Signing Bonus (2003 Contract)
Workers' Compensation (Pre - 2006)
Other Non Agreed Upon Items
Pension
OPEB (Traditional and Ongoing)
Subtotal Legacy/Fixed Cost

[1] For costs that are not specific to the sites covered under the subsidy and have allocation amounts GM shall impute the total US labor cost associated with the line item.
[2] Parties to other labor cost items that the Parties agree upon in writing as per the definition of Labor Cost Line Items in the Restructuring Agreement. Such amounts will be itemized.
[3] Costs raised only by plants included in the labor subsidy
[4] Includes only existing locations as of emergence unless costs are allocated to additional US sites in the future

**EXHIBIT 4.01 A (iii) - Forecast Labor Subsidy**
The information contained herein shall not be disclosed to any member of GM Global Purchasing and Supply Chain



| | ALL PLANTS INCLUDED IN LABOR SUBSIDY | | | | | | | ALL PLANTS INCLUDED IN PRODUCTION CASH BURN | | | | | |
| | 2008 | | | | | 2009 | | 2008 | | | | | 2009 |
| | Q1 | Q2 | Q3 | Q4 | CY | | | Q1 | Q2 | Q3 | Q4 | CY | |
| Forecast headcount: | | | | | | | | | | | | | |
| Production | | | | | | | | | | | | | |
| Skilled | | | | | | | | | | | | | |
| Layoff/Separation | | | | | | | | | | | | | |
| Leave | | | | | | | | | | | | | |
| Total | | | | | | | | | | | | | |
| Estimated rate per hour | | | | | | | | | | | | | |
| Production | | | | | | | | | | | | | |
| Skilled | | | | | | | | | | | | | |
| Layoff/Separation (Per employee $000s) | | | | | | | | | | | | | |
| Leave (Per employee $000s) | | | | | | | | | | | | | |
| Total | | | | | | | | | | | | | |
| Hours | 500 | 500 | 500 | 500 | 2,000 | 2,000 | | | | | | | |
| Labor Subsidy $Mils | - | - | - | - | - | - | | | | | | | |

**EXHIBIT 4.01 A (iv) - Headcount Data**

The information contained herein shall not be disclosed to any member of GM Global Purchasing and Supply Chain

The following detail will be provide for actual headcount on a plant by plant basis for those plants included in both Labor Subsidy and Production Cash Burn

## SKILLED AND PRODUCTION

| PLANT | ACTIVE | BANK | TLO | LEAVES | TOTAL | ILO-VOL | ILO-OTH | TOTAL | TEMP | PRE-RETIRE | PERD | TFT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| All Plants Covered by Wage Subsidy | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

## PRODUCTION ONLY PLANT

| PLANT | ACTIVE | BANK | TLO | LEAVES | TOTAL | ILO-VOL | ILO-OTH | TOTAL | TEMP | PRE-RETIRE | PERD | TFT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| All Plants Covered by Wage Subsidy | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

## SKILLED ONLY PLANT

| PLANT | ACTIVE | BANK | TLO | LEAVES | TOTAL | ILO-VOL | ILO-OTH | TOTAL | TEMP | PRE-RETIRE | PERD | TFT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| All Plants Covered by Wage Subsidy | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

## EXHIBIT 4.01 A (v) - Facility Sales Data

The information contained herein shall not be disclosed to any member of GM Global Purchasing and Supply Chain

**NOTE:** Numbers used above are for illustrative purposes only.

**Monthly Facility Sales Detail**
*$ millions*

| | Month Actual | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Grand Rapids | Kokomo | Lockport | Rochester | Month Total | Year to Date |
| GM | 8 | 40 | 50 | 41 | 139 | 1,663 |
| Tier to GM | 1 | 2 | 5 | 1 | 9 | 107 |
| Allied - GM | 1 | 1 | 4 | 4 | 19 | 229 |
| Allied - Non-GM | 1 | 1 | 2 | 1 | 4 | 52 |
| Other (Non-GM) | 3 | 5 | 0 | 3 | 10 | 125 |
| TOTAL | 15 | 56 | 63 | 49 | 181 | 2,176 |
| | | | | | | |
| Memo:  Non-GM | 4 | 5 | 2 | 3 | 15 | 177 |
| Non-GM as a % of Total Sales | 28% | 9% | 4% | 7% | 8% | 8% |
| Non-GM Revenue Limit (Month/YTD) | | | | | 20 | 240 |

| Applicable Labor Reimbursement Percentage | 100% |
| --- | --- |

**NOTE:** Delphi will provide monthly sales data as soon as possible, but no later than 10 days following the delivery of monthly invoice (Exhibits 4.01A (i)-(iv)); The Applicable Labor Reimbursement Percentage will only be calculated once a year, in the final invoice for any

## Exhibit 4.02(b)

**Form of Monthly Invoice for the Aggregate Amount of the Applicable Cash Burn
Percentage of Production Cash Burn Incurred at all Support Facilities**

## Exhibit 4.02(b)

## Form Of Monthly Invoice For The Aggregate Amount Of
## The Applicable Cash Burn Percentage Of Production Cash Burn Incurred
## At All Support Facilities

**FILED UNDER SEAL**

**Exhibit 4.02(i)**
**Letter from Bill Hurles, of GM, to Jeff Paprocki, of Delphi, dated February 1, 2007**

**<u>Exhibit 4.02(i)</u>**

**Letter From Bill Hurles, Of GM, To Jeff Paprocki,
Of Delphi, Dated February 1, 2007**

**FILED UNDER SEAL**

**Exhibit 4.06(a)(xiv)**
**Proposed Purchaser**

**<u>Exhibit 4.06(a)(xiv)</u>**

**Proposed Purchaser**

FILED UNDER SEAL

## Exhibit 5.01(a)(i)

**Environmental Matters Agreement between Delphi Automotive Systems Corporation (n/k/a Delphi) and GM, dated as of "October 1998"**

**Exhibit C-1**

## ENVIRONMENTAL MATTERS AGREEMENT

This Environmental Matters Agreement ("Agreement"), dated as of October, 1998, is made among General Motors Corporation, a Delaware corporation ("GM"), with its principal place of business in Detroit, Michigan, and Delphi Automotive Systems Corporation, a Delaware corporation ("Delphi"), with its principal place of business in Troy, Michigan. GM and Delphi are sometimes referred to herein as a "Party" and collectively as the "Parties."

### RECITALS

WHEREAS, GM and Delphi are Parties to a Master Separation Agreement entered into in connection with the separation of the business heretofore carried on by the Delphi Automotive Systems Division as a part of GM into a business owned and operated by Delphi and completely separate and independent from GM; and

WHEREAS, the Parties desire to enter into this Agreement regarding environmental matters.

NOW, THEREFORE, in consideration of the mutual covenants and provisions hereunder contained, the Parties agree as follows:

### ARTICLE 1

#### Definitions

**1.1. Defined Terms.** As used in this Agreement, the following terms (in singular and plural forms) shall have the meanings below. Capitalized terms used, but not defined, herein shall have the meaning set forth in the Master Separation Agreement or elsewhere in this Agreement.

"Contribution Date" has the same meaning assigned to this term in the Master Separation Agreement.

"Corporate Successor" means any successor in interest of a Party by reason of a merger, reorganization or sale of all or substantially all of the assets of such Party.

"Delphi Assets" means the equipment, machinery and other personal property acquired by purchase, lease or otherwise by Delphi from GM as of the Contribution Date in accordance with the terms of the Master Separation Agreement whether or not associated with a Delphi Facility.

"Delphi Facility" means each parcel of real property, including all facilities and improvements thereon, acquired by purchase, lease or otherwise by Delphi as of the Contribution Date in accordance with the terms of the Master Separation Agreement as the same may

hereafter be revised as a result of the "true-up" process provided for in the Real Estate Matters Agreement between the Parties.

"Environmental Claim" shall mean any third-party (i.e., non-Party) accusation, allegation, notice of violation, action, claim, lien, demand, abatement or other order or directive (conditional or otherwise) for personal injury (including sickness, disease or death), tangible or intangible property damage, damage to the environment, nuisance, pollution, contamination of or other adverse effect on the environment or human health, or for fines, penalties, or restrictions, resulting from or based upon: (i) the existence, or the continuation of the existence of, a Release (including without limitation a sudden or non-sudden accidental or non-accidental Release), or, exposure to, any Hazardous Material, in, into or onto the indoor or outdoor environment, including, but not limited to, the air, soil, surface water or groundwater, at, on, by, from or related to any Facility; (ii) the use, management, handling, transportation, storage, treatment or disposal of Hazardous Material in connection with any Facility; or (iii) the violation or alleged violation of any Environmental Law relating to the ownership, use, operation, or remediation of any Facility or to the use, management, handling, transportation, Release, storage, treatment or disposal of Hazardous Materials thereon or therefrom.

"Environmental Costs and Liabilities" shall mean any and all losses, liabilities, obligations, damages, fines, penalties, judgments, actions, claims, reasonable costs and reasonable expenses (including without limitation attorneys' fees, disbursements and expenses of legal counsel, experts, engineers, and consultants and the costs of Remedial Action) arising from or under or related to any Environmental Law.

"Environmental Damages" shall refer to any and all Environmental Costs and Liabilities and Environmental Claims, including, but not limited to, costs, expenses and attorneys' or other experts' or consultants' fees in connection with any Remedial Action or enforcing any right of indemnification hereunder against any Indemnitor; provided, however, that Environmental Damages do not include consequential, special or incidental damages, including, but not limited to, loss of profits, loss of business opportunity, loss of use, diminution in value, stigma damages, or any attorneys' or consultant's fees or other expenses as to any matter as to which an Indemnitor has accepted its defense and indemnity obligations.

"Environmental Law" means, collectively, all applicable foreign, domestic, federal, state or local laws, statutes, ordinances, rules, regulations, codes, common law doctrines, or other legally binding requirements, including, but not limited to, orders, judgments, settlement agreements, consent orders, consent decrees, consent judgments or Environmental Permits, relating to regulation and protection of human health, the environment, or natural resources, including, but not limited to, all laws regulating Releases or threatened Releases of Hazardous Materials, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq.*, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and the Toxic Substances Control Act, 15 U.S.C. § 52601 *et seq.*, as any of the foregoing may have been, or may in the future be, amended.

2

"Environmental Permits" means permits, licenses, registrations, and other authorizations issued under any Environmental Law.

"Environmental Records" means any and all books, records, notes, reports, letters, memoranda, assessments, testing data, maps, Environmental Permits, certificates, applications, approvals, surveys or other written, printed, or electronically or magnetically recorded materials, communications or data relating to: (i) the use, management, handling, transportation, Release, storage, treatment or disposal of any Hazardous Material in, about or under any Delphi Facility; (ii) the environmental condition of the Delphi Facilities; and (iii) compliance with Environmental Laws at the Delphi Facilities.  By way of example, Environmental Records includes the following as they directly or indirectly relate to Delphi Facilities:  environmental bulletins, environmental performance criteria, NAO reference letters, EPCRA and TSCA manuals, environmental performance audit reports (IPSR & EPR), Phase I property transfer evaluations, release reports, GM SARA database, ISO 14001 certification guidance, Title V materials, (e.g., compliance assessments, compliance reports, outside counsel memoranda re issues, GM emission factors, and rule interpretations).

"Facility" means, as the context may require, either a GM Retained Facility or a Delphi Facility, or both.

"GM Retained Facility" means any and all real property and facilities which are not Delphi Facilities and which were owned, operated, occupied or possessed by GM or its direct or indirect wholly-owned subsidiaries prior to the Contribution Date.

"Hazardous Material" shall mean, collectively, any: (i) chemical, material or substance: (a) which is now or hereafter becomes defined as or included in the definition of "hazardous substance," "extremely hazardous substance," "hazardous waste," "hazardous material," "restricted hazardous waste," "contaminant," "pollutant," "toxic substance," or words of similar import under any Environmental Law; or (b) the emission, discharge, release, storage, transport, disposal, management, handling or use of which is regulated under or subject to any Environmental Law; and (ii) petroleum or petroleum products, or derivatives or fractions thereof, flammable materials, explosives, radioactive materials (including radon gas other than that which is naturally occurring), urea formaldehyde foam insulation ("UFI"), asbestos-containing materials ("ACM") and polychlorinated biphenyls ("PCBs").

"Identified Waste Disposal Sites" means those Off-Site Waste Disposal Sites known to the Parties as of the Contribution Date, where liability is known or alleged, which are identified on Exhibit A to this Agreement.

"Indemnifying Party" or "Indemnitor" means a person that is obligated to provide indemnification under Article 3 of this Agreement.

"Indemnitee" means a person that is entitled to seek indemnification under Article 3 of this Agreement.

"Newly Identified Waste Disposal Site" means an Off-Site Waste Disposal Site other than an Identified Waste Disposal Site where liability becomes known or is alleged after the Contribution Date.

"Off-Site Waste Disposal Site" means any site, other than a Facility, which is or becomes subject to an obligation for Remedial Action under an Environmental Law.

"Release" means any release, spill, emission, escape, abandonment of any container or receptacle containing any Hazardous Material, leaking, pumping, pouring, emptying, injection, deposit, disposal, discharge, dispersal, leaching, movement or migration of any Hazardous Material on or into the indoor or outdoor environment or into or out of any property.

"Remedial Action" means all investigations and/or actions to:  (i) clean up, remove, remediate, treat, or in any other way address any Hazardous Material under or pursuant to any Environmental Law; (ii) prevent the Release or threatened Release, or minimize the further Release of, any Hazardous Material so that it does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; (iv) perform corrective actions or obtain timely closure or closure certification related to any underground or aboveground tank, container storage area, treatment, storage or disposal facility or operation, solid waste management unit or other location of Hazardous Material use, management, handling, transportation, treatment, storage, or disposal; or (v) bring any matter, activity, practice or conduct into compliance with any Environmental Law.

## ARTICLE 2

### Allocation of Environmental Liabilities

### 2.1. Responsibility for GM Retained Facilities.

As of and after the Contribution Date, GM shall be solely responsible for all Environmental Damages arising from, relating to or in connection with all GM Retained Facilities, whether or not the circumstances or claims giving rise to such Environmental Damages occurred or were asserted before or after the Contribution Date; provided, however, that Delphi shall be responsible for all Environmental Damages at the GM Retained Facilities to the extent caused by Delphi's acts or omissions first occurring or continuing after the Contribution Date.  Where necessary for GM to fulfill its obligations under this Agreement, Delphi will use its best efforts to assign its rights with respect to GM Retained Facilities.

### 2.2. Responsibility for Delphi Facilities.

(a)    Subject to Section 2.2(b), as of and after the Contribution Date, Delphi shall be solely responsible for all Environmental Damages arising from, relating to or in connection with all Delphi Facilities and Delphi Assets, whether or not the circumstances or claims giving rise to such Environmental Damages occurred or were asserted before or after the Contribution Date; provided, however, that GM shall be responsible for all Environmental Damages at the Delphi

4

NOV-24-1998  14:11    HTSLC ENVIRON    313 256 7944    P.06/16

Facilities to the extent caused by GM's acts or omissions first occurring or continuing after the Contribution Date.

(b)    Notwithstanding Section 2.2(a), GM shall be solely responsible for all payments relating to any contract for Remedial Action and other environmental-related service or goods procurement contracts, or any stipulated penalties, fines or other sanctions under orders, decrees, judgments or settlements with respect to any environmental matter at a Delphi Facility, actually incurred but not paid by GM prior to the Contribution Date for services performed or acts or omissions occurring before the Contribution Date. Before the Contribution Date, Delphi shall procure environmental-related goods and services only on commercially reasonable terms and conditions, and in no event shall GM be responsible for any materials purchased by Delphi before the Contribution Date and not utilized by Delphi within ninety (90) days after the Contribution Date. Except as otherwise specifically provided in this Section 2.2(b), Delphi shall be solely responsible for all payments under any contracts for Remedial Action, other environmental-related service or goods procurement contracts, and any stipulated penalties, fines or other sanctions under orders, decrees, judgments, or settlements with respect to any environmental matter at a Delphi Facility.

(c)    Between the date of the execution of this Agreement and the Contribution Date, the Parties shall pursue, with reasonable diligence and in good faith, with respect to the Delphi Facilities: (i) compliance with Environmental Laws; (ii) the avoidance of any liability under any Environmental Law; and (iii) the resolution or continued performance of any activities necessary to resolve any Environmental Claim or satisfy or discharge any Environmental Damages before the Contribution Date.

**2.3.  Responsibility for Waste Disposal Sites.**

(a)    Identified Waste Disposal Sites.

As of and after the Contribution Date, GM shall be solely responsible for Environmental Damages and any other liabilities, to the extent due to contributions by GM before or after the Contribution Date, arising from, relating to or in connection with all Identified Waste Disposal Sites.

(b)    Newly Identified Waste Disposal Sites.

Within twenty (20) days after receiving notice or other information as to the existence of a Newly Identified Waste Disposal Site as to which the other Party may have liability under an Environmental Law, the Party receiving such notice or information shall notify the other Party and provide copies of all relevant correspondence and other documents relating thereto.

(c)    Allocation.

(i)    The Parties' respective liability with respect to:    (1) Newly Identified Waste Disposal Sites; and (2) contributions to Identified Waste Disposal Sites after the

5

NOV-24-1998   14:12          HYS&C ENVIRON...          313 256 7944   P.07/16

Contribution Date, shall be allocated based on each Party's respective contributions thereto, as follows:

(a)    GM's liability shall be based on contributions attributable to the GM Retained Facilities and any other facility owned or operated by GM before, on or after the Contribution Date except the Delphi Facilities.

(b)    Delphi's liability shall be based on contributions attributable to the Delphi Facilities and any other facility owned or operated by Delphi on or after the Contribution Date, whether or not such contributions were made before or after the Contribution Date. Delphi shall not be responsible for contributions to Identified Waste Disposal Sites occurring before the Contribution Date.

(ii)    The Parties shall use their reasonable best efforts to amicably resolve all liability and allocation issues using traditional factors, such as the volume, type and toxicity of the contributions to such Newly Identified Waste Disposal Site or Identified Waste Disposal Site by each Party.

**2.4.    Duty to Comply With Environmental Laws.**

(a)    GM.    As of and after the Contribution Date, GM shall comply with Environmental Laws at the GM Retained Facilities and the sole legal and financial responsibility for compliance with Environmental Laws applicable to GM's use of, operations at or occupancy of the GM Retained Facilities shall be that of GM.

(b)    Delphi.    As of and after the Contribution Date, Delphi shall comply with Environmental Laws at the Delphi Facilities and the sole legal and financial responsibility for compliance with Environmental Laws applicable to Delphi's use of, operations at or occupancy of the Delphi Facilities shall be that of Delphi.

(c)    The sole remedy of the Parties for breach of this Section 2.4 shall be under the indemnification provisions of Article 3 of this Agreement.

**2.5.    No Representations or Warranties.** Except as otherwise expressly set forth in this Agreement, the Delphi Facilities and Delphi Assets are being conveyed in their "as is, where is" condition and with all faults and without any representation or warranty of any nature whatsoever, express or implied, oral or written, and in particular without any implied warranty of merchantability or fitness for a particular purpose.

NOV-24-1998  14:12       HMSLC ENVIRON.                    313 256 7944    P.08/16

# ARTICLE 3

## Indemnification

**3.1.** __Indemnification by GM.__  GM shall indemnify, defend and hold harmless Delphi from and against all Environmental Damages which are caused by, relate to or arise in connection with:

(a)    The GM Retained Facilities, including, but not limited to, Environmental Damages caused by, relating to or arising in connection with circumstances occurring or claims asserted either on, before or after the Contribution Date; provided, however, that GM shall have no indemnity or defense obligations hereunder with respect to Environmental Damages to the extent caused by, relating to, or arising in connection with Delphi's acts or omissions first occurring or continuing after the Contribution Date.

(b)    Any act or omission by GM after the Contribution Date.

(c)    Contributions before the Contribution Date to all Identified Waste Disposal Sites attributable to a Delphi Facility as well as contributions attributable to a GM Retained Facility.

(d)    GM contributions to Newly Identified Waste Disposal Sites attributable to a GM Retained Facility.

(e)    Any breach of this Agreement.

(f)    Any imposition or acceleration of Environmental Costs and Liabilities or Environmental Claims regarding GM Retained Facilities under Section 9.2(b) under any applicable Environmental Transfer Law, as defined hereafter, as a result of the transactions contemplated by the Master Separation Agreement.

**3.2.** __Indemnification by Delphi.__  Delphi shall indemnify, defend and hold harmless GM from and against all Environmental Damages which are caused by, relate to or arise in connection with:

(a)    The Delphi Facilities and all Delphi Assets, including, but not limited to, Environmental Damages caused by, relating to or arising in connection with circumstances occurring or claims asserted either on, before or after the Contribution Date; provided, however, that Delphi shall have no indemnity or defense obligations hereunder with respect to Environmental Damages to the extent caused by, relating to or arising in connection with GM's acts or omissions first occurring or continuing after the Contribution Date.

(b)    Any act or omission by Delphi after the Contribution Date.

(c)    Any breach of this Agreement.

7

(d)    Delphi contributions on or after the Contribution Date to Identified Waste Disposal Sites.

(e)    Delphi contributions to Newly Identified Waste Disposal Sites attributable to a Delphi Facility.

(f)    Any imposition or acceleration of Environmental Costs and Liabilities or Environmental Claims regarding Delphi Facilities under Section 9.2(b) under any applicable Environmental Transfer Law, as defined hereafter, as a result of the transactions contemplated by the Master Separation Agreement.

### 3.3. Indemnification Procedures.

(a)    If any Indemnitee receives notice of any Environmental Claim or becomes aware of any Environmental Costs and Liabilities or other matter with respect to which an Indemnifying Party is or may be obligated under this Agreement to provide indemnification to such Indemnitee, the Indemnitee shall give the Indemnifying Party prompt written notice thereof (together with any information concerning the matter). Whenever practicable, such notice shall be provided at least ten (10) business days before the Indemnitee incurs any Environmental Damages in respect of such matter. If such advance notice is not practicable, then notice shall be provided as soon as practicable. Failure or delay of any Indemnitee to give notice as provided in this Section 3.3 shall not relieve any Indemnifying Party of its obligations except to the extent that such Indemnifying Party is actually prejudiced.

(b)    An Indemnifying Party may elect to defend any Environmental Claim at its own expense and through its counsel (which counsel shall be reasonably acceptable to the Indemnitee). If an Indemnifying Party elects to defend an Environmental Claim, it shall notify the Indemnitee of its intent to do so within ten (10) business days after receiving notice of such Environmental Claim (or sooner, if the nature of such Environmental Claim so requires). The Indemnitee shall cooperate in the defense of such Environmental Claim. The Indemnifying Party shall keep the Indemnitee reasonably informed as to the status of the defense of such Environmental Claim. The Indemnifying Party shall also pay such Indemnitee's reasonable out-of-pocket expenses incurred in connection with such cooperation, but shall not be responsible for any legal or other expenses subsequently incurred by such Indemnitee in connection with the defense of such Environmental Claim. The Indemnifying Party shall not, without the prior written consent of the Indemnitee: (i) settle or compromise any Environmental Claim or consent to the entry of any judgment which does not include a written release from all liability to the Indemnitee; or (ii) settle or compromise any Environmental Claim in any manner that would be reasonably likely to have a material adverse effect on the Indemnitee. If an Indemnifying Party elects not to defend against a Environmental Claim, or fails to properly notify an Indemnitee of its election, the Indemnitee may defend, compromise, and settle such Environmental Claim and shall be entitled to indemnification to the extent permitted hereunder; provided, however, that the Indemnitee may not compromise or settle any such Environmental Claim without the prior written consent of the Indemnifying Party, which shall not be unreasonably withheld or delayed.

8

**3.4    Mitigation.** No Party shall have any obligation to indemnify the other Party with respect to any Environmental Damages to the extent such Environmental Damages could have reasonably been avoided or mitigated.

**3.5.    Exclusive Remedy.** The Parties acknowledge that, except with respect to matters covered under Sections 9.3 and 9.4 of this Agreement: (a) the rights and obligations provided in this Agreement shall be the exclusive rights and obligations of the Parties with respect to environmental matters; and (b) the remedies in Articles 3 and 6 of this Agreement shall be the exclusive remedies of the Parties with respect to environmental matters and shall be in lieu of, and not in addition to, all other remedies which may exist in law, equity or under any other contract.

**3.6    No Initiation of Third Party Claims.** The Parties shall not initiate any action with any third party, including any governmental agency, which could reasonably be expected to lead to an Environmental Claim; provided, however, that nothing herein shall prevent either Party from performing its obligations or exercising its rights under this Agreement.

**3.7    Cooperation On Third Party Claims.** If either Party, in addressing a matter or in defending or resolving any Environmental Claim as to which it has defense or indemnification responsibility under this Agreement (for purposes of this Section 3.7, the "Indemnifying Party"), remediates or incurs costs or damages with respect to a matter for which a third party may be responsible or liable, the other party agrees to cooperate with the Indemnifying Party in pursuing any claim against such third party and the Parties shall assist each other so as to enable the Indemnifying Party to legally assert such claim against such third party and to recover its costs and damages from such third party, including acting as the real party in interest and assigning any rights or causes of action against any such third party relating to such claim or the proceeds thereof to the Indemnifying Party.


### ARTICLE 4

#### Environmental Reserves

**4.1.** As of the Contribution Date, each Party shall be responsible for establishing its own reserves for environmental liabilities in accordance with generally accepted accounting principles. At the time of Contribution, the environmental reserves established for the Delphi Facilities are shown on Exhibit B. These reserves were established in accordance with the same principles used to establish reserves for GM Retained Facilities.


### ARTICLE 5

#### Environmental Permits

**5.1.** Set forth on Exhibit C are all of the Environmental Permits identified and not yet expired with respect to the Delphi Facilities and the Delphi Assets. Exhibit C also identifies, with respect to each such Environmental Permit, whether each such Environmental Permit: (i)

9

relates to the Delphi Facilities and operations by GM on GM Retained Facilities, but shall not be transferred to Delphi by GM and shall remain with GM as permittee; (ii) may be transferred to Delphi under applicable Environmental Law; or (iii) may not be transferred to Delphi under applicable Environmental Law. The Parties shall use best efforts to: (i) effectuate the transfer of those Environmental Permits under clause (ii), above, that may be transferred to Delphi under applicable Environmental Law; (ii) obtain issuance to Delphi of new or replacement Environmental Permits for Delphi's operations now covered by the Environmental Permits described in clauses (i) or (iii), above; and (iii) mitigate problems that may arise during the transfer process. As of and after the Contribution Date, Delphi shall be solely responsible to obtain and comply with all Environmental Permits with respect to the Delphi Facilities and the Delphi Assets, whether or not GM was required under any Environmental Law to, but did not, obtain any such Environmental Permits. Prior to the Contribution Date, Delphi shall have obtained and GM shall also assist Delphi in obtaining new RCRA generator identification numbers which are or may be required under current or future Environmental Laws for hazardous waste, as defined under current or future Environmental Laws. If same cannot be obtained prior to the Contribution Date, Delphi will expeditiously obtain such identification number after the Contribution Date and, to the extent legally required, will use such number or obtain a substitute number for Delphi's use after the Contribution Date. Without the prior written consent of GM, Delphi will not use for any purpose any such numbers issued before the Contribution Date to GM with respect to the Delphi Facilities.

## ARTICLE 6

### Dispute Resolution

6.1.    The Parties shall use good faith, best efforts and sound and accepted engineering judgment in making all determinations under this Agreement. In the event of a dispute or disagreement under this Agreement, the Parties shall consult in good faith with each other and shall use best efforts to resolve the matter. It is the express intent of the Parties that any such disputes or disagreements shall be resolved through negotiation between the Parties or, if mutually agreeable as to a specific matter in each Party's discretion, a form of alternative dispute resolution, including binding or non-binding arbitration. It is further understood and agreed, however, that alternative dispute resolution and litigation under this Agreement shall be viewed as a last resort and that the results of any non-litigation dispute resolution procedure under this Article 6 shall not be admissible for any purposes in any litigation in which the Parties are involved and relating to this Agreement unless the Parties otherwise agree as part of such resolution or are utilized to enforce the terms thereof. Either Party shall have the right, after making a reasonable and good faith effort to resolve such dispute through other means, to seek judicial relief in connection with any dispute arising under this Agreement, and in the event that either Party resorts to litigation in order to resolve a dispute (including any breach of this Agreement) under this Agreement, the Party prevailing in connection with such dispute shall be entitled to recover its reasonable and actual attorneys' fees and costs incurred in connection with such litigation. In the event that the matter in litigation relates to a dispute involving a Party's failure to comply with its defense and indemnification obligations under this Agreement and the Party in favor of whom such obligations run has, as a result of the successful assertion of an Environmental Claim, spent money to resolve or otherwise dispose of any resulting

NOV-24-1998   14:14        HTSEC ENVIRON.                    ' 313 256 7944    P.12/16

Environmental Damages, the Indemnifying Party shall pay the Indemnitee's interest at the "prime rate" then in effect from the date due until fully paid, on and to the extent of any expenditures by the other Party in respect of such Environmental Damages.. Except with respect to matters covered by Section 2.4 (Duty to Comply with Environmental Laws), the procedures under this Article 6 shall apply to all disputes arising under this Agreement.

## ARTICLE 7

### Transfer Obligations and Non-Assignability

**7.1.   Duties Upon Transfer.**  Each Party, in connection with the execution and delivery of any lease, sublease, assignment, agreement of sale or other transfer, assignment or conveyance agreement relating to the Delphi Facilities, Delphi Assets or GM Retained Facilities ("Conveyance Document") in which any interest in or portion of any Delphi Facility, Delphi Asset or GM Retained Facility, respectively, is conveyed, sold, contributed, assigned, transferred, leased or subleased, shall use its reasonable best efforts to provide in such Conveyance Document that the non-transferring Party shall have no liability or responsibility for, and shall be fully released and exculpated from, all Environmental Costs and Liabilities and Environmental Claims with respect to the specific Delphi Facility, Delphi Asset or GM Retained Facility subject to such Conveyance Document, and to impose the obligations under this Section 7.1 on any subsequent user, occupant or transferee.

**7.2.   Non-Assignability.**  The Parties' respective rights, obligations, duties and liabilities under this Agreement, including, but not limited to, the indemnification provisions of Article 3, are personal to each of them and may not be assigned to, or assumed by, any successor, assignee, or any other person without the prior written consent of the other Party, which consent may be granted or withheld in the sole discretion of such other Party; provided, however, that either Party may assign their respective rights under this Agreement to a Corporate Successor without the consent of the other Party, but only if such Corporate Successor also agrees to assume such Party's duties, obligations and liabilities under this Agreement. No such assignment or assumption shall relieve either Party of its obligations under this Agreement unless so agreed in writing by the other Party.

## ARTICLE 8

### Mutual Releases and Covenants Not to Sue

**8.1.   Release.**  Except as otherwise expressly set forth in Articles 3 and 6 of this Agreement, each Party hereby fully and forever releases and discharges the other Party and its officers, directors, employees, shareholders, direct and indirect wholly-owned subsidiaries, representatives and agents from all manner of action and causes of action, suits, proceedings, arbitrations, choses in action, contracts, covenants, claims, bonds, bills, debts, dues, sums of money, damages, demands and rights whatsoever, in law or in equity, now existing or which may hereafter accrue by reason of any known or unknown facts existing either before or after the Contribution Date and which relate to matters under Environmental Laws, whether or not specifically addressed in this Agreement, including, but not limited to, the environmental

11

condition and compliance status of the Delphi Facilities, the Delphi Assets, the GM Retained Facilities, the Identified Waste Disposal Sites, and the Newly Identified Waste Disposal Sites, and all Environmental Damages, Environmental Costs and Liabilities, and Environmental Claims relating thereto.

8.2.    **Covenant Not to Sue**.  Except as otherwise expressly set forth in Articles 3 and 6 of this Agreement, each Party hereby covenants that it shall not commence any action, arbitration, proceeding or suit, or participate or assist in any manner in the commencement or prosecution of any action, arbitration, proceeding or suit, in law or in equity, in any judicial, administrative, or other forum, based upon or arising out of any matter subject to a release by such Party under Section 8.1 of this Agreement.

### ARTICLE 9

### Miscellaneous

9.1. **Environmental Records.**

(a)    As of the Contribution Date, GM shall transfer to Delphi either the originals or true and complete copies of all Environmental Records.

(b)    Subject to Section 9.1(c), for a period of seven (7) years from and after the date hereof, each Party covenants and agrees to keep and maintain at reasonably accessible locations all of the Environmental Records in its possession or control as of the date hereof or otherwise coming into the possession or control of such Party after the date hereof.  Following reasonable advance written notice, each Party shall make available for review and photocopying by the other Party each and all of its Environmental Records.

(c)    With respect to matters in dispute between the Parties or subject to an Environmental Claim at the end of the seven (7) year record retention period, such retention period shall be extended and shall continue with respect to all Environmental Records that may be relevant to the matter until the matter is finally and fully resolved.

9.2. **Environmental/Real Property Transfer Laws.**

(a)    The Parties shall reasonably cooperate in good faith with respect to compliance with any applicable Environmental Laws or other laws that require disclosures or other notifications regarding environmental matters to be made by or to either Party or any unit of government in connection with the transactions contemplated by the Master Separation Agreement (collectively, "Environmental Transfer Laws").  To the extent that any obligation exists under any Environmental Transfer Laws to report any information or make any report or notice, such obligation shall be jointly undertaken by the Parties.  Each Party hereby waives any requirements under any such Environmental Transfer Law that disclosures or other reports or notifications be made before the Contribution Date and agree that such disclosures and other notifications may be made on the Contribution Date.

12

(b)     The Parties shall each use their reasonable best efforts to avoid the imposition of or accelerating any Environmental Costs and Liabilities or Environmental Claims under any applicable Environmental Transfer Law as a result of the transactions contemplated by the Master Separation Agreement. Such avoidance strategies could include GM leasing assets to Delphi.  Subject to the preceding sentence, neither Party shall be liable or responsible for any Environmental Costs and Liabilities or Environmental Claims regarding the other Party's facilities under any Environmental Transfer Law resulting from the transactions contemplated by the Master Separation Agreement, and each Party shall indemnify and defend the other with respect thereto in accordance with the terms of Article 3.

9.3.  **Wastewaters, Stormwater and other Services Agreements.**  The Parties may enter into a Wastewaters and Stormwater Services Agreement, or other agreements, under which one Party shall provide certain services for the other Party.

9.4.  **Leases and Sub-leases Regarding Certain Facilities.**  The Parties have entered or will enter into leases and sub-leases with respect to certain facilities.  The terms and conditions with respect to environmental matters at such facilities shall be governed by the respective leases and sub-leases for those facilities.

9.5.  **Entire Agreement.**  Except for the Master Separation Agreement, the service agreements and the leases and sub-leases referenced in this Agreement, this Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings with respect to the subject matter hereof.  In the event of a conflict between this Agreement and the Master Separation Agreement, the terms of this Agreement shall supersede those of the Master Separation Agreement.  This Agreement is not intended to confer upon any other person any benefit, right or remedy.

9.6.  **No Arrangement for Disposal.**  The Parties each acknowledge that the transactions contemplated by this Agreement constitute a transfer of assets in the ordinary course of business and are not intended in any way, nor will they be deemed to be, an arrangement for treatment, storage or disposal of any of the Delphi Facilities or Delphi Assets or any substances or materials contained therein.  Delphi agrees that GM will not have any liability under any Environmental Law by virtue of such transfer alone and Delphi will not assert any claim or cause of action against GM based solely thereon.

9.7.  **Further Assurances.**  The Parties hereto, at any time before or after the Contribution Date, shall, at their own expense, execute, acknowledge and deliver any further assurances, documents and instruments reasonably requested by one another and shall take any other action consistent with the terms of this Agreement that may reasonably be requested by one another for the purpose of consummating the transactions contemplated by or fulfilling the intent of this Agreement.

9.8.  **Governing Law.**  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware regardless of the laws that otherwise govern under applicable principles of conflicts of laws.

13

**9.9.  Descriptive Headings.**  The descriptive headings herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

**9.10.  Notices.**  All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered in person, by express or overnight mail or messenger delivered by a nationally recognized air courier (delivery charges prepaid), or by registered or certified mail (postage prepaid, return receipt requested), to a Party as follows:

  If to GM:  Michelle T. Fisher, Esq.

  If to Delphi:  Mark A. Hester, Esq.

**9.11.  Amendment.**  No change or amendment shall be made to this Agreement except by an instrument in writing signed on behalf of each Party hereto.

**9.12.  Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

**9.13.  Severability.**  If any provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the subject matter hereof is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner so the intent hereof is fulfilled to the fullest extent possible.

**9.14.  Failure or Indulgence Not Waived.**  Subject to the express provisions of this Agreement, no failure or delay on the part of any Party hereto in the exercise of any right hereunder shall impair such right or be construed to be a waiver of, or acquiescence in, any breach of this Agreement, nor shall any single or partial exercise of any such right preclude other or further exercise thereof or of any other right.

**9.15.  Confidentiality.**  The terms of this Agreement shall remain confidential and each Party shall not disclose the same without the prior written consent of the other Party except:  (a) to such Party's directors, officers, partners, employees, legal counsel, accountants, engineers,

14

contractors, financial advisors and similar professionals and consultants to the extent such Party deems it necessary or appropriate and such Party shall inform each of the foregoing persons of such Party's obligations under this paragraph and shall secure the agreement of such persons to be bound by the terms hereof; (b) pursuant to contractual obligations existing as of the date hereof; or (c) as otherwise required by law or regulation.

9.16. No rights are created in any third party by this Agreement.

9.17. Each Party will cause its direct and indirect wholly-owned subsidiaries to take such actions as may be reasonably necessary to assist such Party to perform its obligations under this Agreement.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its authorized officers.

GENERAL MOTORS CORPORATION

By: _____

Name:

Title:

DELPHI   AUTOMOTIVE   SYSTEMS CORPORATION

By: _____

Name: _____

Title: Vice Pres. - Operations

EXECUTION RECOMMENDED
WORLDWIDE REAL ESTATE
BY: _____

DET_B\118240.4

15

**<u>Exhibit 5.01(a)(iii)</u>**

**Financial Services Supply Agreement dated as of December 18, 1998 between DAS and GM**

**Exhibit J-4**

### FINANCIAL SERVICES SUPPLY AGREEMENT

THIS FINANCIAL SERVICES SUPPLY AGREEMENT ("Agreement") is made and entered into as of _December 18_____, 199_8_, between GENERAL MOTORS CORPORATION, a Delaware corporation, whose address is 3044 West Grand Boulevard, Detroit, Michigan 48202 ("Supplier"), and DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company, whose address is 5725 Delphi Drive, Troy, Michigan 48098 ("Customer"), based upon the following:

      A.    Supplier owns certain facilities, equipment, materials and technology and employs certain personnel who are necessary for the performance of certain services.

      B.    Customer desires that Supplier provide, and Supplier desires to provide, certain services to Customer on the terms and conditions hereinafter set forth.

      NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Supplier and Customer agree as follows:

      1.    <u>Provision of Services</u>.  During the term of this Agreement ("Term"), Supplier will provide the following financial services to Customer's U.S.-based operations (the "Services"):

      Payroll Services
      Disbursement Services
      Travel Expense Accounting Services
      Invoicing and Accounts Receivable Services
      Real Estate Accounting Services

A description of the Services, including the processing responsibilities of Customer and Supplier, are set forth in the Customer Service Specifications for the above services as Attachments 1, 2, 3, 4, and 5 respectively.  The parties understand that Attachment 5 has not been prepared as of the date of this Agreement and they agree to work together in good faith to prepare such an attachment to the satisfaction of both parties.

Except as specified in Attachments 1 through 5, Services will be performed by Supplier in the same manner as Supplier performs or requires performance of the same services for its own organization. Supplier has the right to change the manner of rendering Services from time to time, but in no event will the change cause a material adverse effect on the ability of Customer to use such Services.

If, after the execution of this Agreement, Customer requests Supplier to provide a service that is provided by Supplier prior to January 1, 1999 but omitted from this Agreement, Supplier and Customer shall negotiate in good faith to attempt to agree on whether such services will be provided and the terms and conditions upon which such service would be added to this Agreement, it being agreed that the charges for such services should be determined on a basis consistent with the methodology for determining the prices provided for in this Agreement.

If Customer terminates the Invoicing and Accounts Receivable Services within eighteen (18) months of this Agreement, Customer will either (i) offer to hire the 27 employees that Customer transferred to Supplier during 1998 to perform such services, or (ii) reimburse Supplier for all costs incurred by it in connection with the separation of these employees.

2.    Pricing. The pricing charged to Customer for Services will be based on an allocated portion of Supplier's total budgeted costs (including third party expenses), to include any recurring cost increases relating to the provision of Services to Customer as a separate entity (but excluding any non-recurring costs). Fixed, budget-based pricing for calendar year 1999 will be established, consistent with past practice, and reviewed with Customer prior to the beginning of the 1999 calendar year. Fixed pricing for each subsequent calendar year will be established, consistent with past practice, and reviewed with Customer prior to the beginning of each such calendar year. Customer will pay one-twelfth of the annual budgeted cost each month. Supplier will use commercially reasonable efforts to reduce costs, and will notify Customer as soon as practicable if it becomes aware of any significant cost increases.

In addition to the fixed monthly charge set forth in the preceding paragraph, all cost increases for changes in Customer business requirements (e.g., required payroll calculations for labor contract changes or increases in transaction volume), including all costs relating to required changes in Supplier interfaces with Customer systems will be passed through to Customer. All costs relating to the consolidation of any activity from Customer into Supplier after January 1, 1999, will be borne by Customer. To the extent the budgeted costs increase under this paragraph, Supplier will revise the budget cost relating to the remainder of the calendar year and will notify Customer of the revised payment amount.

To the extent that Supplier undertakes projects in order to improve its cost structure, and such projects are beneficial to Customer and are approved in advance by Customer, costs or investments associated with the execution of such approved projects including, but not limited to, systems investments, property purchase or lease and furniture, fixtures and equipment will be shared between Supplier and Customer pro rata based on the annual volume of transactions performed. If a project is not approved by Customer, Customer will not be entitled to receive any cost benefit resulting from such project and, if such project requires modifications in Customer interfaces, Customer will bear the reasonable cost for such modifications.

Unless this Agreement has been earlier terminated, Customer and Supplier will negotiate arm's length, fair market value pricing with respect to all calendar years beginning on or after January 1, 2002.

3.    Payment. Customer will pay Supplier monthly on the date established by the Multilateral Netting System (MNS-2), which provides, on average, that payment is made on the second day of the second month following the date of services. All payments will be made in immediately available funds by Automated Clearing House credit.

4.    Term. The Term shall commence on January 1, 1999, and shall continue until terminated by either party upon giving 12 months written notice to the other party, except that Supplier must give at least 24 months notice to terminate the Payroll Services. In addition, either party may terminate any one or more of the Services upon giving 12 months

2

written notice, except that Supplier must give at least 24 months notice to terminate the
Payroll Services.

5.    Independent Contractor Relationship.  Supplier shall for all purposes be an
independent contractor of Customer with respect to the Services being provided under this
Agreement.  Supplier shall be solely responsible for (i) the supply, maintenance, repair and
replacement of all equipment, machinery, parts, materials and other products used in
connection with the provision of the Services, (ii) the fulfillment of all obligations to Supplier's
contractors, employees and subcontractors and (iii) the compliance with all laws, regulations,
orders and other governmental requirements applicable to Supplier's performance of the
Services.

6.    Limitation of Liability.  Neither Supplier nor Customer will be responsible to the
other for any damages, including, without limitation, incidental, consequential, punitive, or
special damages, arising out of either's performance or failure to perform under this
Agreement,  except where the party has committed gross negligence or willful misconduct.
With respect to any liability resulting from an act or omission of any third party vendor
providing a service under this Agreement, Supplier shall have no liability to Customer for any
amount in excess of the amount that may be recovered from the vendor.  Supplier will assign
any rights or causes of action it may have against the vendor to Customer to the extent
permitted and will cooperate with Customer in pursuing legal action against the vendor,
including permitting, if necessary, such action to be brought in the name of Supplier.

7.    Indemnification.  Customer shall indemnify, defend and hold harmless Supplier,
its directors, officers, employees and agents from and against any losses, claims, damages,
costs, expenses, liabilities or actions (including reasonable attorneys' fees) arising out of the
performance or failure to perform Services on behalf of Customer, except that no
indemnification shall be provided under this Agreement where Supplier has committed gross
negligence or willful misconduct.

8.    Audit Rights.  The cost of Services provided under this Agreement shall be
subject to audit by Customer or by certified public accountants retained by Customer at any
time during Supplier's normal business hours and upon reasonable notice to Supplier.
Supplier shall maintain all relevant records (including all relevant ledgers, books, vouchers,
time sheets, billing rates, billing calculation worksheets, invoices and backup information
related thereto from suppliers) in a manner to facilitate such audit throughout the Term of this
Agreement and for one (1) year after payment due date of the invoice. The provisions of this
Paragraph shall continue in full force and effect notwithstanding expiration or termination of
this Agreement for any reason.  In the event it is discovered, whether through an audit or
otherwise, that Customer has overpaid Supplier, such overpayment shall be refunded to
Customer without interest.  Such refund shall be without prejudice to any other remedies
Customer shall have under this Agreement or at law.

9.    Proprietary Information.  In the performance of this Agreement, certain
proprietary commercial and financial information of a party (the disclosing party) may be
made available to the other party (the receiving party).  The receiving party agrees to: (i)
exercise reasonable discretion so as to maintain the confidential nature of such proprietary
information consistent with the receiving party's procedures for handling similar information
of its own, (ii) use such information only in connection with its provision of services

3

hereunder, and (iii) not use, disclose, or otherwise divulge such information to others without the written authorization of the disclosing party. The receiving party has no obligation with respect to any information which is or becomes publicly known or available to the public through no wrongful act of the receiving party; which is already known to the receiving party at the time of receipt; or which is approved for release by written authorization of the disclosing party.

10.    Force Majeure; Disaster Recovery.  In the event that either party is rendered wholly or partially unable to carry out its obligations under this Agreement by causes beyond its reasonable control, including but not limited to, war (whether or not declared), sabotage, insurrection, rebellion, riot or other act of civil disobedience, labor disputes (including lockouts), act of a public enemy, act of any government or any agency or subdivision thereof, fire, accident, explosion, epidemic, quarantine, restrictions, storm, flood, earthquake or other act of God, or new laws or regulations forbidding or limiting the execution of this Agreement, then the performance of either party or both parties, as they are affected by such cause, is excused during the continuance of any such inability.

In the event of a local disaster that does not affect the Plano IPC (EDS), Supplier will use its reasonable commercial efforts to make critical services available within five business days and full services available within 15-30 business days, depending on the severity of the crisis. In the event of a disaster at the Plano IPC (EDS), Supplier will use its reasonable commercial efforts to make full services available within 10 business days. Supplier will make reasonable commercial efforts to reduce downtime; however, extreme or unforeseen circumstances may extend recovery time.  All costs incurred by Supplier in a disaster recovery effort will be shared with Customer pro rata based upon the actual service being provided to Customer.

11.    Notices. All notices, requests, consents, or other communications permitted or required under this Agreement shall be in writing and shall be deemed to have been given when personally delivered, or when sent if sent via facsimile (with receipt confirmed), or on the first business day after sent by reputable overnight carrier, or on the third business day after sent by registered or certified first-class mail (with receipt confirmed), to the following:

If to Customer:                    Delphi Automotive Systems LLC
                                   5725 Delphi Drive
                                   Troy, Michigan 48098
                                   Fax No. (248) 813-2490

with a copy to:                    Assistant General Counsel
                                   Commercial Practice
                                   Delphi Automotive Systems LLC
                                   5725 Delphi Drive
                                   Troy, Michigan 48098
                                   Fax No. (248) 813-2491

4

If to Supplier:                    General Motors Corporation Renaissance
                                   Center
                                   P.O. Box 400
                                   Detroit, Michigan  48265-4000
                                   MC # 482-D24-050
                                   Attn.: David Robson
                                   Fax # (313)667-5048

with a copy to:                    General Motors Corporation
                                   General Commercial Group
                                   New Center One Building
                                   3031 W. Grand Blvd.
                                   Detroit, Michigan  48202
                                   Fax No. (313) 974-0373

12.    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof.  All schedules attached to this Agreement are incorporated herein and made a part hereof by this reference.

13.    <u>Waiver</u>.  Any waiver by Supplier or Customer of any breach or of a failure to comply with any provision of this Agreement (i) shall be valid only if set forth in a written instrument signed by the party to be bound, and (ii) shall not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any provision of this Agreement.

14.    <u>Severability</u>.  Should any provision, or any portion thereof, of this Agreement for any reason be held invalid or unenforceable, such decision shall not affect the validity or enforceability of any of the other provisions, or portions thereof, of this Agreement, which other provisions, and portions, shall remain in full force and effect, and the application of such invalid or unenforceable provision, or portion thereof, to persons or circumstances other than those as to which it is held invalid or unenforceable shall be valid and be enforced to the fullest extent permitted by law.

15.    <u>Amendment</u>.  This Agreement may only be amended in writing by duly authorized representatives or officers of the parties.

16.    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall constitute an original although not fully executed, but all of which when taken together, shall constitute but one agreement.  Delivery by facsimile of this Agreement or an executed counterpart hereof shall be deemed a good and valid execution and delivery hereof.

17.    <u>Headings</u>.  The headings contained in this Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof.

5

18.    <u>Governing Law</u>.    This Agreement shall be construed and enforced in accordance with the laws of the State of Michigan, without giving effect to rules governing the conflict of laws, provided that with respect to Services performed outside of the United States, the law of the place where the Services are performed shall apply to the construction and enforcement of this Agreement.

19.    <u>Order of Precedence</u>.    The parties agree that if any term of this Agreement conflicts with terms in the Master Separation Agreement the terms of this Agreement will take precedence, and will govern with respect to the resolution of such conflict.

IN WITNESS WHEREOF, this Financial Services Supply Agreement has been duly executed by the parties hereto as of the day and year first above written.

GENERAL MOTORS CORPORATION          DELPHI AUTOMOTIVE SYSTEMS LLC

By _____          By _____
Title _GM - ENG_____          Title _____
Date _12/16/98_____          Date _____

6

18.    Governing Law.    This Agreement shall be construed and enforced in accordance with the laws of the State of Michigan, without giving effect to rules governing the conflict of laws, provided that with respect to Services performed outside of the United States, the law of the place where the Services are performed shall apply to the construction and enforcement of this Agreement.

19.    Order of Precedence.    The parties agree that if any term of this Agreement conflicts with terms in the Master Separation Agreement the terms of this Agreement will take precedence, and will govern with respect to the resolution of such conflict.

IN WITNESS WHEREOF, this Financial Services Supply Agreement has been duly executed by the parties hereto as of the day and year first above written.

GENERAL MOTORS CORPORATION          DELPHI AUTOMOTIVE SYSTEMS LLC

By _____          By _____
Title _____          Title _____
Date _____          Date _____

6