requested, postage prepaid, or may be sent by facsimile, with acknowledgment of receipt requested, to the parties at the following addresses (or such other address as one party may specify by Notice to the other parties):

If to GM:

Chief Tax Officer
GENERAL MOTORS CORPORATION
Mail Code 482-114-262
3044 West Grand Boulevard
Detroit, Michigan  48202

with a copy (which shall not constitute effective notice) to:

Assistant General Tax Counsel
GENERAL MOTORS CORPORATION
Mail Code 482-114-262
3044 West Grand Boulevard
Detroit, Michigan  48202

If to Delphi:

Chief Tax Officer
DELPHI AUTOMOTIVE SYSTEMS CORPORATION
Mail Code 483.400.626
5725 Delphi Drive
Troy, Michigan  48098

with a copy (which shall not constitute effective notice) to:

General Counsel
DELPHI AUTOMOTIVE SYSTEMS CORPORATION
Mail Code 483.400.603
5725 Delphi Drive
Troy, Michigan  48098

A Notice which is delivered personally is given as of the date specified in the written receipt.  A Notice sent by certified mail is given on the third Business Day following the date of mailing.  A Notice by facsimile is given on the date it is transmitted, provided acknowledgment of receipt is received by sender

6.6  Counterparts.  This Agreement may be executed in two or more counterparts, each of which will be an original, but all of which together will constitute one and the same instrument.

-8-

6.7  Change in Law.  If, due to any change in applicable law or regulation or the interpretation thereof by any court of law or other governing body having jurisdiction, subsequent to the date of the Agreement, performance of any provision of or any transaction contemplated by this Agreement shall become impracticable or impossible, the parties will use their best efforts to find and employ an alternative means to achieve the same or substantially the same result as is consistent with the intent of the parties, as described in Section 5.2 of this Agreement.

6.8  Non-U.S. Customs Duties.  The provisions of this Agreement shall apply to Customs Duties imposed by governments of countries other that the United States in the same manner as such provisions apply to Customs Duties imposed by the U.S. Federal government.

The parties have duly executed this Agreement for the Indemnification of United States Federal, State and Local Non-Income Taxes on the date indicated.

GENERAL MOTORS CORPORATION

By: _____     Date: __12/15/98__
Roger D. Wheeler
Chief Tax Officer

DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By: _____     Date: __12/16/98__
James P. Whitson
Chief Tax Officer

-9-

## **Exhibit 5.01(a)(vi)**
**Assignment and Assumption Agreement – Industrial Development Bonds dated as of
January 1, 1999 between DAS and GM**

## ASSIGNMENT AND ASSUMPTION AGREEMENT—
## INDUSTRIAL DEVELOPMENT BONDS

This ASSIGNMENT AND ASSUMPTION AGREEMENT by and between General Motors Corporation, a Delaware corporation ("GM"), and Delphi Automotive Systems LLC, a Delaware limited liability company ("Delphi") is made as of January 1, 1999.

WHEREAS, GM has organized Delphi as the wholly owned subsidiary of Delphi Automotive Systems Corporation, a Delaware corporation which is wholly owned by GM, and intends to transfer certain assets and corresponding liabilities to Delphi as of January 1, 1999, as part of preparations for establishing Delphi Automotive Systems Corporation and its subsidiaries as an entity operated separately and at arms' length from GM;

WHEREAS, GM has from time to time entered into loan or lease agreements in connection with industrial development bonds, tax abatement bonds, industrial revenue bonds or similar arrangements whereby a state or local government agency in the United States issues securities for the benefit of GM;

WHEREAS, certain of the real property, fixtures, and equipment to be transferred from GM to Delphi as described above is subject to loan or lease agreements of the type described in the preceding paragraph; and

WHEREAS, GM intends to transfer such real property, fixtures and equipment and is willing to transfer the benefits and Delphi is willing to assume the liabilities associated with such loan or lease agreements;

NOW THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound thereby, GM and Delphi hereby agree as follows:

1. <u>Assignment of Agreements.</u> GM hereby assigns, transfers, conveys, grants and delivers to Delphi (a) all of GM's right, title and interest in and to the loan agreements listed on Exhibit A (the "Loan Agreements") and the lease agreements listed on Exhibit B (the "Lease Agreements") (together with the Loan Agreements, the "Transferred Agreements"), (b) all of the notes, bonds, or other securities held by GM in connection with the Transferred Agreements, and (c) all of GM's residual ownership interest, if any, in any real property, fixtures, and equipment subject to the Transferred Agreements (collectively, the "Associated Assets").

2.  Assumption of Agreements. Delphi hereby accepts the assignment and transfer of the
    Associated Assets, assumes and agrees to pay and discharge the contractual
    obligations and liabilities of GM under and pursuant to the Transferred Agreements,
    and agrees to be bound by the terms of the Transferred Agreements to the extent that
    GM would have been bound by such terms.

3.  Transfer of Portion of Property Subject to Transferred Agreement. In certain
    instances, indicated on Exhibit A and Exhibit B, GM intends to transfer to Delphi an
    ownership interest in only a portion of the real property, fixtures or equipment subject
    to a Transferred Agreement. In such circumstances, GM hereby transfers, and Delphi
    hereby accepts the rights and obligations pursuant to such Transferred Agreement
    only to the extent that corresponds to the proportion of real property, fixtures, or
    equipment thus transferred. Further, in such circumstances, the term "Associated
    Assets" shall be deemed to refer to the securities held by GM in connection with such
    Transferred Agreement, and in such residual interest in property subject to such
    Transferred Agreement only to the extent that corresponds to the proportion of real
    property, fixtures, or equipment thus transferred.

4.  Notification and Further Assurances. Delphi covenants that it will promptly provide
    written notice of this Assignment and Assumption Agreement to the lender or lessor
    and to the trustee for each of the Transferred Agreements in compliance with the
    terms of the respective Transferred Agreement. GM, for itself and its successors and
    assignees, convenants with Delphi and its successors and assignees that GM will do,
    execute, act, and deliver, or will cause to be done, executed, acted, and delivered,
    such and all other acts, transfers, notices, assignments, deeds of conveyance, powers
    of attorney, and assurances as Delphi and its successors and assignees shall
    reasonably require to further effect the transfer and assignment to Delphi and its
    successors and assignees the Transferred Agreements and the Associated Assets as
    contemplated hereby.

5.  Power of Attorney. Solely for the purposes herein described, GM hereby constitutes
    and appoints Delphi as its true and lawful attorney in fact, with full power of
    substitution, and Delphi hereby accepts such appointment, to prosecute, defend and
    compromise any and all proceedings at law, in equity, or otherwise which GM and its
    successors and assignees may deem necessary or proper in order to collect, assert,
    enforce, or defend any claim, right, title, or interest of any kind in and to the
    Transferred Agreements or Associated Assets transferred, conveyed, and assigned to
    Delphi hereby, and to do all such acts and things in relation thereto as Delphi and its
    successors and assignees shall deem desirable. GM hereby declares that the
    appointment hereby made and powers hereby granted shall be irrevocable.

6. <u>Indemnification.</u> Delphi shall indemnify GM and its affiliates and hold GM and its affiliates harmless from and against any and all losses, liabilities, deficiencies, interest, costs and expenses (including all reasonable expenses incurred in preparing or defending any litigation or proceeding, whether commenced or threatened, including reasonable attorney's fees), whether contingent or otherwise, fixed or absolute, known or unknown, present or future or otherwise, relating directly or indirectly to, arising out of, or resulting from the Transferred Agreement or the Associated Assets.

7. <u>Correction of Exhibits.</u> As of the date of this Assignment and Assumption Agreement, each of GM and Delphi agrees that it is not aware of any omissions or misstatement contained in Exhibit A or Exhibit B. Each party agrees further that it will use its best efforts to confirm the accuracy and completeness of the information contained in Exhibit A or Exhibit B, and that it will promptly notify the other party in writing if and when it becomes aware of any misstatements or omissions. Unless either party promptly objects, Exhibit A and Exhibit B, as amended by such notices, will be deemed final, complete, and correct as of June 30, 1999.

8. <u>Counterparts.</u> This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have caused this Assignment and Assumption Agreement to be executed by their duly authorized officers.

GENERAL MOTORS CORPORATION

By: _____

Title:  <u>Vice President and Treasurer</u>

DELPHI AUTOMOTIVE SYSTEMS LLC

By: _____

Title:  <u>Vice President and Treasurer</u>

## Loan Agreements

| Counterparty | Agreement Date | Bond Series | Bond Information | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Notional on 1/1/99 ($000) | Delphi Portion | Delphi Notional | Maturity Date |
| Michigan Strategic Fund | April 15, 1988 | 1988A | 26,230 | 6.20% | 1,626 | 01-Apr-08 |
| Michigan Strategic Fund | July 1, 1995 | 1995 | 58,800 | 6.40% | 3,763 | 01-Sep-20 |
| County of Portage, Ohio | December 1, 1984 | 1984 | 10,000 | 100.00% | 10,000 | 01-Oct-00 |
| County of Trumbull, Ohio | July 1, 1994 | 1994 | 2,750 | 100.00% | 2,750 | 01-Jul-14 |
| Ohio Water Development Authority | June 15, 1978 | 1978A | 27,000 | 84.50% | 22,815 | 15-Jun-07 |

## Lease Agreements

| Counterparty | Agreement Date | Bond Information | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Bond Series | Notional on 1/1/99 ($000) | Delphi Portion | Delphi Notional | Maturity Date |
| City Of Saginaw, Michigan | June 1, 1978 | 1978 | 18,520 | 31.60% | 5,852 | 01-Jun-05 |
| City Of Laurel, Mississippi | May 1, 1977 | 1977 | 1,000 | 100.00% | 1,000 | 01-Jun-07 |
| City Of Brookhaven, Mississippi | May 1, 1977 | 1977 | 1,000 | 100.00% | 1,000 | 01-Jun-07 |
| Industrial Development Board of the City of Tuscaloosa, Alabama | April 1, 1988 | 1988 | 30,000 | 100.00% | 30,000 | 01-Feb-08 |
| Industrial Development Board of the City of Tuscaloosa, Alabama | February 1, 1991 | 1991 | 25,000 | 100.00% | 25,000 | 01-Feb-08 |
| County of Monroe Industrial Development Agency | December 1, 1985 | 1985 | 42,803 | 100.00% | 42,803 | 01-Dec-15 |

## Exhibit 5.01(a)(vii)(i)

**Lease Agreement dated as of May 1, 2000 between Delphi Canada Inc. and General Motors of Canada Limited, as amended August 1, 2002**

# TABLE OF CONTENTS

**Page**

SECTION 1.  PREMISES ............................................................................................ 1

SECTION 2.  TERM ................................................................................................. 3

SECTION 3.  RENT ................................................................................................. 3

SECTION 4.  USE OF THE DEMISED PREMISES ............................................... 4

SECTION 5.  TAXES ............................................................................................... 5

SECTION 6.  LANDLORD SERVICES ................................................................... 7

SECTION 7.  LANDLORD'S MAINTENANCE OBLIGATIONS .......................... 13

SECTION 8.  ALTERATIONS, ADDITIONS, MAINTENANCE AND REPAIRS ............... 14

SECTION 9.  REQUIREMENTS OF PUBLIC AUTHORITY .............................. 15

SECTION 10. COVENANT AGAINST LIENS ...................................................... 16

SECTION 11. RIGHT OF ENTRY .......................................................................... 17

SECTION 12. ASSIGNMENT AND SUBLETTING .............................................. 17

SECTION 13. SIGNS .............................................................................................. 17

SECTION 14. COVENANT TO HOLD HARMLESS .............................................. 18

SECTION 15. INSURANCE .................................................................................... 19

SECTION 16. WAIVER OF SUBROGATION ........................................................ 20

SECTION 17. DAMAGE AND DESTRUCTION .................................................... 21

SECTION 18. EXPROPRIATION ........................................................................... 22

SECTION 19. ESTOPPEL CERTIFICATE ............................................................. 23

SECTION 20. ATTORNMENT AND SUBORDINATION ..................................... 23

SECTION 21. DEFAULT OF TENANT ................................................................. 24

SECTION 22. TENANT'S SELF HELP REMEDY ................................................ 25

SECTION 23. QUIET ENJOYMENT ..................................................................... 26

# TABLE OF CONTENTS
## (continued)

Page

SECTION 24. TENANT'S PROPERTY .......................................................................... 26

SECTION 25. HOLDING OVER ................................................................................... 26

SECTION 26. COMMON AREAS ................................................................................. 26

SECTION 27. INTENTIONALLY DELETED ............................................................... 27

SECTION 28. ENVIRONMENTAL MATTERS ............................................................ 27

SECTION 29. MISCELLANEOUS ................................................................................ 28

SECTION 30. DISPUTE RESOLUTION ...................................................................... 31

SECTION 31. TERMINATION RIGHTS ...................................................................... 32

SCHEDULE "A" - DEMISED PREMISES

SCHEDULE "B" - LEGAL DESCRIPTION

SCHEDULE "C" - PLAN OF COMPLEX

SCHEDULE "D" - PERMITTED ENCUMBRANCES

SCHEDULE "E" - SERVICES RENT

LANDLORD:      **GENERAL MOTORS OF CANADA LIMITED,**

                              **a Canadian corporation**

– and –

TENANT:        **DELPHI CANADA INC.**

                              **an Ontario corporation**

---

# L E A S E

---

## LEASE

THIS LEASE, made as of this 1st day of May, 2000, between General Motors of Canada Limited, a Canadian corporation (hereinafter referred to as "Landlord"), and Delphi Canada Inc., an Ontario corporation (hereinafter referred to as "Tenant" and, together with Landlord, the "Parties").

### W I T N E S S E T H:

In consideration of Ten and 00/100 Dollars ($10.00), other good and valuable consideration and mutual covenants contained herein, and intending to be legally bound hereby, Landlord and Tenant hereby agree with each other as follows:

### Section 1.    PREMISES

(a)    Landlord hereby leases and lets to Tenant, and Tenant hereby takes and hires from Landlord, upon and subject to the terms, conditions, covenants and provisions hereof, premises consisting of approximately 193.964 square feet and more particularly detailed in Schedule "A" hereto (the "Demised Premises"), being part of a building (the whole of such building being hereinafter referred to as the "Building"), located on that certain tract, piece or parcel of land, situated in Oshawa, Ontario and known municipally as 700 Park Road South, as more particularly described in Schedule "B" hereto (the "Lands").  The responsibility of the Landlord or Tenant for payment of any costs associated with the physical separation of the Demised Premises from the remainder of the Building, such as the construction of demising walls, shall be as determined pursuant to the Amended and Restated Asset Purchase Agreement between Landlord and Tenant dated as of May 1, 2000 (the "Asset Purchase Agreement").

(b)    The Demised Premises is situated within a complex of industrial buildings and facilities (hereinafter referred to as the "Complex") containing a number of buildings and facilities operated by Landlord.  The Complex is shown on Schedule "C" hereto and made a part hereof.

(c)    Tenant acknowledges that the lease of the Demised Premises by Landlord to Tenant is being made without any warranty or representation of any nature whatsoever except as expressly set forth in this Lease and without the implied warranties of merchantability or of fitness for a particular purpose.  Tenant also acknowledges that the Demised Premises are subject to the Permitted Encumbrances listed in Schedule "D".

(d)    The Demised Premises are herein leased together with the non-exclusive right during the term of this Lease to have reasonable use of the Common Areas (as defined in Section 26 hereof) consistent with past practice, subject to the terms of this Lease and reasonable rules and regulations promulgated by Landlord from time to time for the efficient operation of the Complex and the right to receive utilities, including, without limitation, those more particularly described in Section 6 hereof, through lines, pipes, and facilities in, under or across the Complex in order to service the Demised Premises.  Notwithstanding anything herein contained to the contrary, upon at least 30 days' prior written notice to Tenant's plant manager (except in the event of an emergency) Landlord may at any time close temporarily any such Common Areas to

- 2 -

make repairs or changes, to prevent the acquisition of public rights in such areas or to discourage public use of any portion of the Complex and may do such other acts in and to the Complex excluding (subject to the remaining terms of this Lease) the Demised Premises as in its judgment may be desirable; provided, that Tenant shall be granted reasonable access to the Demised Premises at all times and Landlord shall use its commercially reasonable best efforts to ensure that there shall be no material interference with the Tenant's business operations in the Demised Premises and Common Areas.

(e)     Tenant acknowledges that certain steam lines, condensate lines, compressed air lines, water lines, stormwater lines, sanitary water lines, process wastewater lines, gas lines, electrical lines, communication facilities and lines, fire protection lines and other lines and facilities servicing other parts of the Complex run through, under, across and over the Demised Premises (including within the Building) (such lines and facilities are hereinafter referred to as the "Complex Utility Lines"). Landlord reserves the right to have the Complex Utility Lines run through, under, across and over the Demised Premises (including within the Building), to operate the same and as reasonably necessary to replace the same.  In addition, Landlord reserves the right to install and construct new and additional Complex Utility Lines running through, under, across and over the Demised Premises (but not within the Building) to governmental authorities and public and private utilities to service the Complex without Tenant's consent or joinder, provided that such easements and licenses shall not materially and adversely affect Tenant's use of the Demised Premises. Landlord shall provide to Tenant's Plant Engineer (or his designee) thirty (30) days' prior written notice of the installation of new lines.  In exercising its rights pursuant to this Section 1(e), Landlord shall use its commercially reasonable best efforts to ensure that there shall be no material interference with the Tenant's business operations in the Demised Premises and Common Areas and shall cooperate with Tenant to minimize interference with Tenant's operations in the Demised Premises and Common Areas.

(f)     Notwithstanding anything herein contained to the contrary, Landlord reserves the right at any time and from time to time (i) to make or permit changes or revisions in and to the Complex (other than the Demised Premises), including additions to, subtractions from, rearrangements of, alterations of, modifications of or supplements to the building areas, parking areas, roads, driveways or other areas; (ii) to construct other buildings or improvements and to make alterations thereof and additions thereto and/or demolish any existing buildings or improvements (except upon the Demised Premises or as otherwise expressly provided herein); and (iii) to make or permit changes or revisions on the Complex, including additions thereto and/or reductions thereof (other than the Demised Premises) and to convey portions of the Complex to others for the purpose of constructing buildings or improvements thereon (other than the Demised Premises); provided, however, that in exercising its rights pursuant to Sections 1(d) and (e) hereof and this Section 1(f), Landlord shall not materially and adversely affect Tenant's access to the Demised Premises, or parking thereon, or its operations in the Demised Premises or Common Areas or the providing of Landlord's Services, as hereinafter defined, to the Demised Premises.

- 3 -

**Section 2.    TERM**

(a)    The term of this Lease shall commence on May 1, 2000 (hereinafter referred to as the "Commencement Date"), and continue for a period of two (2) years and eight (8) months until December 31, 2002, unless sooner terminated or extended as herein provided.

(b)    Provided Tenant is not in default after notice and beyond any applicable cure periods, Tenant shall have the right to extend the term of this Lease for three consecutive periods of one year each, upon all of the terms and conditions herein contained. Tenant shall exercise such right, if at all, by written notice to Landlord at least six (6) months prior to the expiration of the term of this Lease as the same may be extended. The exercise of the first such right shall not constitute the exercise of the second such right and upon Tenant's failure to exercise the first right, the second right to extend shall be terminated and of no further force or effect. As used in this Lease, the phrase "term of this Lease" shall include any extension periods.

**Section 3.    RENT**

(a)    Tenant covenants and agrees to pay Landlord for the Demised Premises, without previous demand therefor, basic rent (hereinafter referred to as the "Basic Rent") during the original term of this Lease in the amount of Two Hundred and Seventy Nine Thousand One Hundred and Twenty Canadian Dollars (Cdn.$279,120.00) (calculated at U.S.$1.00 per square foot per annum using an exchange rate of Cdn.$1.439 equals U.S.$1.00 with estimated square footage of 193,964 square feet), annually for each year of the term, together with the amounts payable to Landlord by Tenant pursuant to Section 6 hereof (hereinafter referred to as the "Services Rent"), the amounts payable to Landlord by Tenant pursuant to Section 3(b) hereof and the amounts payable to Landlord by Tenant pursuant to Section 3(c) hereof (the amounts payable pursuant to Section 3(c) are hereinafter referred to as a "Common Areas Charge"). Basic Rent shall be paid in equal monthly instalments in arrears without any deduction or set-off on a Prox 15 basis, with the first payment of Basic Rent due on June 15, 2000. The Services Rent and Common Areas Charge shall be paid at the times and in the manner provided for in Sections 6 and 3(c) respectively. Payments under Section 3(b) shall be paid at the times and in the manner provided therein.

(b)    Tenant shall pay to Landlord as additional rent any money and charges required to be paid by Tenant pursuant to the terms of this Lease, whether or not the same may be designated "additional rent", including, without limitation, Tenant's proportionate share of Taxes in accordance with Section 5(a) hereof and Tenant's proportionate share of the costs of insurance required to be maintained by Landlord on the Complex pursuant to Section 15(a) hereof.

(c)    Tenant shall pay Landlord the amount of Twenty Three Thousand Canadian Dollars (Cdn.$23,000) per year in the term as a Common Areas Charge. Tenant shall pay Landlord an amount equal to 1/12th of Common Areas Charge per month on a Prox 15 basis.

(d)    If Tenant shall exercise its right to extend the term of this Lease pursuant to Section 2(b) hereof, the Basic Rent during each extended term shall be the fair market value rent based on terms and conditions arrived at by the parties bargaining at arms length taking into account the original components of original Basic Rent as same may have increased in cost plus

- 4 -

other factors applicable to original Basic Rent for the Demised Premises as reasonably determined by the parties; provided that such Basic Rent shall not decrease save and except for any reduction in square footage as a result of Tenant exercising its option to reduce the square footage leased hereunder pursuant to Section 1(g) hereof. Tenant acknowledges that if it exercises its right pursuant to Section 1(g) hereof, an increase in the fair market rent per square foot for the remainder of the Demised Premises so leased may result. As soon as practical after the exercise of the right to extend by Tenant, the parties shall meet and determine such Basic Rent, failing which the matter shall be determined in accordance with Section 30 hereof.

(e)    Save as expressly provided in this Lease, the rent provided for in Sections 3(a), 3(b), 3(c), 3(d) and 6 hereof shall be an absolutely net return to Landlord and shall continue unreduced and unabated throughout the entire term of this Lease.

(f)    Except as expressly provided herein, rental and additional rental shall be paid to Landlord, in lawful money of Canada at Landlord's address for notices hereunder or to such other person or at such other place as Landlord may from time to time designate in writing. All amounts payable by Tenant to Landlord and/or by, Landlord to Tenant hereunder if not paid within ten (10) days after receipt of notice by the payee that the same is past due, shall bear interest from the due date until paid at the rate equal to two percent (2%) in excess of the then annual rate of interest announced from time to time by The Toronto-Dominion Bank as the reference rate of interest then in effect for loans to customers of varying degrees of credit-worthiness, adjusted from time to time to reflect changes in such rate ("Rate of Interest"), but not in excess of the maximum rate allowed by law. Any payments required to be made by Tenant directly to any third party shall be paid on the due date as indicated in the invoice for payment.

(g)    "Prox 15" in this Lease means for invoices from Landlord to Tenant dated from the 1st to the 31st of the current month, payment by Tenant is due on the fifteenth day of the following month.

## Section 4.    USE OF THE DEMISED PREMISES

(a)    The Demised Premises shall be used for automotive component manufacturing and related uses provided there shall be no greater risk to the Complex than the current use thereof. In addition, Tenant may utilize all or any portions of the Demised Premises for office, warehousing and laboratory purposes in each case related to automotive component manufacture and uses directly related thereto and for no other use or purpose.

(b)    If any governmental license or permit shall be required for the proper and lawful conduct of Tenant's business or other activity carried on in the Demised Premises, Tenant, at Tenant's expense, shall duly procure and thereafter maintain such license or permit and submit the same for inspection by Landlord on request. Tenant shall, at Tenant's expense, at all times, comply with the requirements of each such license or permit.

(c)    Tenant shall not do or permit or suffer to be done in or about the Demised Premises, nor bring or keep or permit or suffer to be brought or anything which is prohibited by or will materially conflict with any applicable law, statute, ordinance or governmental rule or regulation, now in force or which may hereafter be enacted or promulgated, or which is

- 5 -

prohibited by or will materially conflict with any of the Permitted Encumbrances, or which is prohibited by the Casualty Policy, as hereinafter defined, or cause a cancellation of the Casualty Policy, or materially and adversely affect or interfere with any services required to be furnished by Landlord to Tenant hereunder or to other portions of the Complex, or with the proper and economical rendition of any such service. Tenant shall not do or permit anything to be done in or about the Demised Premises which will in any material way obstruct or interfere with the rights of Landlord or use or allow the Demised Premises to be used for any unlawful purpose, nor shall Tenant cause, maintain or permit any nuisance in, on or about the Demised Premises or commit or permit to be committed any waste in, on or about the Demised Premises or commit or permit to be committed any waste in, on or about the Demised Premises which has a material and adverse affect on the Complex or Landlord.

(d)     Tenant shall not do or permit anything to be done which will in any material way obstruct or interfere with the business or the rights (including occupancy rights) of any other tenant of the Building or Complex, including Landlord.

(e)     Landlord acknowledges that Tenant shall have the right during the term to use, at no additional cost to Tenant, the furniture and related personal property belonging to the Landlord located in the offices at the Demised Premises on an "as is where is basis".

(f)     Each of the Parties hereby acknowledges that certain of the Landlord's salaried and hourly employees will be operating the manufacturing business at the Demised Premises pursuant to the terms and conditions of the Oshawa Labour and Management Services Agreement between the Landlord and Tenant dated as of May 1, 2000 (the "Oshawa Labour and Management Services Agreement") and as such, may be performing obligations of the Tenant under this Lease.

**Section 5.     TAXES**

(a)     Tenant shall pay to Landlord Tenant's proportionate share of all Taxes on the Complex with respect to each calendar year (or part thereof) during the term.   Tenant's proportionate share of Taxes·shall be determined by the Landlord on a fair and equitable basis having regard to the square footage of the Demised Premises relative to the square footage of all buildings in the Complex among which the Taxes are allocated and/or a market-value based assessment, or a combination thereof.

(b)     "Taxes" shall be all taxes and existing and future assessments, general and special, and governmental charges of any kind or nature whatsoever, which may be levied or assessed by any lawful authority or become due and payable against the land, buildings and improvements comprising the Complex during the term of this Lease and including those taxes payable after the term of this Lease but attributable to the term of this Lease, and including, without limitation, all (i) ad valorem real property taxes and assessments (including installments of special assessments required to be paid during the calendar year); (ii) other taxes, other charges and impositions imposed by the Province of Ontario or any subdivision thereof which: (A) are in replacement of or in addition to all or any part of ad valorem taxes as sources of revenue; and (B) are based in whole or in part upon the land and building of which the Complex is a part or any ·interest therein or the ownership thereof, or the rents, profits or other income

- 6 -

therefrom, including, without limitation, excise, license, privilege, sales, use, and occupancy taxes; (iii) taxes or surcharges of any kind or nature upon, against or with respect to the parking areas or the number of parking spaces in the portion of the Complex covered by such tax bills; and (iv) taxes and/or assessments of any kind or nature upon, against or with respect to the rentals and other charges payable by Tenant to Landlord other than GST payable pursuant to Section 5(g).

(c)    Upon receipt of the appropriate tax bills, Landlord shall compute Tenant's proportionate share of the Taxes covered by such bills (and actually payable by Landlord) and shall deliver to Tenant a statement showing such computation together with a copy of such tax bills and Tenant shall pay to Landlord an amount equal to $1/12^{th}$ of its proportionate share of each installment of Taxes required to be paid by Landlord to the relevant governmental authority per month on a Prox 15 basis.  Landlord shall deliver to Tenant upon Tenant's written request reasonable supporting documentation sufficient to verify to Tenant the computation of Tenant's proportionate share.

(d)    For the calendar year in which the term of this Lease commences and terminates or expires, the provisions of this Section 5 shall apply, and Tenant's liability for its proportionate share of Taxes shall be subject to a pro rata adjustment in accordance with local custom for such prorations.

(e)    Any reasonable costs, expenses and legal fees (including without limitation the cost of tax consultants) incurred by Landlord in connection with the negotiations for reduction in the assessed valuation of land, buildings and improvements comprising the Complex and any protest or contest of real estate tax and/or assessments shall be made solely in the discretion of the Landlord and the cost thereof shall be included within the term "Taxes".  If Landlord obtains any tax refunds or rebates relating to any Taxes of which Tenant paid its proportionate share hereunder, Landlord shall promptly refund to Tenant, Tenant's proportionate share of any such refund, net of Tenant's proportionate share of Landlord's reasonable out-of-pocket expenses in obtaining the same.

(f)    In addition to the payment of Tenant's proportionate share of the Taxes as herein provided, Tenant shall pay any and all taxes whether or not now customary or within the contemplation of the parties (i) upon, measured by or reasonably attributable to the cost or value of Tenant's equipment, furniture, fixtures and other personal property located on the Demised Premises, and (ii) upon or with respect to the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy by Tenant of the Demised Premises or any portion thereof.  If Landlord is required to pay any of such taxes, Tenant shall reimburse Landlord therefor on a Prox 15 basis.

(g)    Tenant shall also pay any goods and services tax ("GST") and any applicable provincial sales tax ("PST") in respect of this Lease or the rent or other amounts payable by Tenant under this Lease.  Tenant shall pay GST and any applicable PST to Landlord at the same time as the amounts to which such taxes apply are payable to Landlord under the terms of this Lease. If Tenant fails to pay such GST or any applicable PST when due, Landlord shall have the right, but not the obligation, to make such payments to the relevant authorities and to collect the GST and any applicable PST together with any penalties and interest costs imposed by such

- 7 -

relevant authorities from Tenant upon demand. Notwithstanding any other provision of this Lease, GST and any applicable PST payable by Tenant under this subsection shall be deemed not to be Basic Rent, but in addition to Landlord's statutory rights and remedies, Landlord shall have all of the same remedies for and rights of recovery of such amounts as it has for recovery of Basic Rent under this Lease including without limitation, the right to collect interest thereon at the Rate of Interest from the date the relevant amount was due to the date of payment.

### Section 6.    LANDLORD SERVICES

(a)    During the term of this Lease, Landlord shall supply certain services to the Demised Premises and the operations therein (herein referred to as "Landlord's Services") and Tenant shall reimburse Landlord for Landlord's costs thereof (without any mark-up) as rent (herein referred to as the "Services Rent") in accordance with the terms and provisions of this Section 6 and Schedule E.

(b)    Electricity

The parties acknowledge that it is not presently practical for Tenant to obtain separate electric service for the Demised Premises. Therefore, Landlord shall supply electricity to the Demised Premises in a manner comparable to which such service was provided to the Demised Premises immediately prior to the Commencement Date, such service shall be separately metered to the Demised Premises and Tenant shall pay for such service on a Prox 15 basis. The responsibility of the Landlord or Tenant for payment of installation of such metering shall be as determined in the Asset Purchase Agreement. The payment by Tenant to Landlord of the supply of electricity pursuant to this Section 6(b) is herein referred to as one of the components comprising the "Services Rent". Landlord and Tenant acknowledge that in the event that it should become practical for Tenant to obtain separate electric service for the Demised Premises, the Tenant may obtain such service at the Tenant's sole cost, provided that Landlord's rates for such service are not increased, and thereafter the Tenant shall pay directly to the service provider all charges for such electricity on due date therefor and shall release Landlord from its obligations to supply electric service to the Demised Premises.

(c)    Steam

(i)    Steam service is currently provided to the Demised Premises by Landlord through a closed loop system (which returns condensate water to the powerhouse). Such steam is currently produced at a powerhouse in the Complex and transported to the Demised Premises through the existing integrated steam (and condensate) lines that cannot economically be separated readily so as to be capable of providing separate service to the Demised Premises. It is further understood that steam service is not readily available from any other provider.

(ii)    Landlord shall provide steam to the Demised Premises comparable to that being supplied thereto immediately preceding the Commencement Date, subject to adjustment for traditional cyclical and seasonal volume. Tenant shall return all condensate water (subject to normal loss) resulting from the supply and use of steam to the Demised Premises to the powerhouse through the condensate lines. Such condensate water shall be in materially the same condition as ordinarily results from its passage through the system and consistent with past

- 8 -

practices and Tenant shall be responsible for any damage resulting from condensate water being returned from the Demised Premises to the powerhouse other than in such condition, unless such condition has been caused by actions on the Complex other than upon the Demised Premises or caused by actions of Landlord or performance by employees of Landlord pursuant to Section 4(f) hereof (whether on or off of the Demised Premises). If Landlord reasonably determines that the condensate water being returned from the Demised Premises is injurious to the system due to conditions upon the Demised Premises, unless such condition has been caused by actions of Landlord or performance by employees of Landlord pursuant to Section 4(f) hereof (whether on or off of the Demised Premises), Landlord shall have the right to require Tenant to dispose of the condensate water other than by returning the same to the powerhouse and in accordance with all applicable laws, at Tenant's sole cost and expense.

     (iii)    Such steam services shall be metered to the Demised Premises and Tenant shall pay for such steam so consumed by it at a rate equal to Landlord's cost of producing the same. Tenant shall pay for such steam service on a Prox 15 basis. The responsibility of the Landlord or Tenant for payment of installation of such metering shall be as determined in the Asset Purchase Agreement. The payment to Landlord for steam service pursuant to this Section 6(c)(iii) is herein referred to as one of the components comprising the "Services Rent."

     (d)    <u>Natural Gas</u>

     (i)    Landlord shall supply gas service to the Demised Premises in accordance with the provisions of this Section 6(d), through the existing integrated lines and equipment that cannot economically be separated readily so as to be capable of providing separate service to the Demised Premises.

     (ii)    Landlord shall supply gas to the Demised Premises in a manner comparable to which such service was provided to the Demised Premises immediately prior to the Commencement Date, subject to adjustment for traditional cyclical and seasonal volume.

     (iii)    Such service shall be separately metered to the Demised Premises and Tenant shall pay for such service on a Prox 15 basis. The responsibility of the Landlord or Tenant for payment of installation of such metering shall be as determined in the Asset Purchase Agreement. The charge for such natural gas service shall be at the same rate paid by Landlord. The payment by Tenant to Landlord pursuant to this Section 6(d)(iii) is herein referred to as one of the components of the "Services Rent".

     (iv)    In the event that gas is supplied to the Demised Premises through a buy/sell or a bundled service arrangement, Landlord shall not be liable for any claims, damages or losses which Tenant may suffer as a result of any reduction, interruption or shutdown of service provided under such arrangement. If Landlord receives from the supplier notice of any such reduction, interruption or shutdown of service, Landlord shall provide notice of same to Tenant. Tenant agrees to enter into any agency agreement reasonably required by such natural gas supplier to ensure Landlord has the right to supply gas to Tenant.

- 9 -

(e)   <u>Compressed Air</u>

(i)   Landlord shall supply compressed air to Tenant in accordance with the provisions of this Section 6(e) hereof, through the existing integrated lines and equipment that cannot economically be separated readily so as to be capable of providing separate service to the Demised Premises. It is further understood that compressed air service is not readily available from any other provider.

(ii)   During the term of this Lease, Landlord shall supply compressed air to the Demised Premises in a manner comparable to which such service was provided to the Demised Premises immediately prior to the Commencement Date, subject to adjustment for traditional cyclical and seasonal volume.

(iii)   The payment by Tenant to Landlord pursuant to this Section 6(e)(iii) is herein referred to as one of the components of the "Services Rent". Such service shall be separately metered to the Demised Premises and Tenant shall pay for such service on a Prox 15 basis.

(f)   <u>Telephone, Communication and Technical Infrastructure – Autoplex</u>

(i)   Landlord shall supply telephone, communication and technical infrastructure service for the Complex to Tenant in accordance with the provisions of this Section 6(f), through the existing integrated infrastructure that cannot economically be separated readily so as to be capable of providing separate service to the Demised Premises. It is further understood that such service is not readily available from any other provider.

(ii)   During the term of this Lease, subject to obtaining any necessary consents, Landlord shall supply telephone, communication and technical infrastructure service to the Demised Premises in a manner comparable to which such service was provided to the Demised Premises immediately prior to the Commencement Date.

(iii)   Tenant shall pay Landlord the amount of $1,500 per month for the provision of such telephone, communication and technical service, which cost shall be fixed for the term of this Lease. Payment for such service will be made to Landlord on a Prox 15 basis. In addition, Tenant shall pay directly to the applicable vendor the cost of telephone services as billed by the applicable vendor to Tenant. The payment by Tenant to Landlord pursuant to this Section 6(f)(iii) is herein referred to as one of the components of the "Services Rent".

(g)   <u>Water Service</u>

(i)   Landlord shall supply water service to Tenant in accordance with the provisions of this Section 6(g) hereof, through the existing integrated lines and equipment that cannot economically be separated readily so as to be capable of providing separate service to the Demised Premises. It is further understood that water service is not readily available from any other provider.

(ii)   During the term of this Lease, Landlord shall supply water service to the Demised Premises in a manner comparable to which such service was provided to the Demised

- 10 -

Premises immediately prior to the Commencement Date, subject to adjustment for traditional cyclical and seasonal volume.

(iii)    Such service shall be separately metered to the Demised Premises and Tenant shall pay for such service on a Prox 15 basis. The responsibility of the Landlord or Tenant for payment of installation of such metering shall be as determined in the Asset Purchase Agreement. The charge for water service shall be at the same rate paid by Landlord.  The payment by Tenant to Landlord pursuant to this Section 6(g)(iii) is herein referred to as one of the components of "Services Rent".

(h)    Fire Protection Systems

During the entire  term of this Lease, Landlord shall provide high pressure fire protection water and fire watch and monitoring systems which include alarm and security systems which are maintained through a computer system operated and controlled by Landlord in a manner comparable to which such services were provided to the Demised Premises immediately prior to the Commencement Date and through the existing integrated lines and equipment that cannot economically be separated readily so as to be capable of providing separate service to the Demised Premises. It is further understood that fire protection water and fire water and monitoring services are not readily available from any other provider. The cost of this service is included in Basic Rent.

(i)    Janitorial Service

The Landlord shall provide janitorial services to the Demised Premises in a manner comparable to which such service was provided to the Demised Premises immediately prior to the Commencement Date.  Tenant shall pay Landlord for janitorial services based on the wages and benefits of a mutually agreeable number of services personnel.  The payment by Tenant to Landlord for such services shall be on a Prox 15 basis and the payment pursuant to this Section 6(i) is herein referred to as one of the components of the "Services Rent".  The Parties will determine annually on a calendar year basis whether a lesser number of employees would be sufficient, subject to the provisions of the "Collective Agreement" as defined in the Oshawa Labour and Management Services Agreement.

(j)    Wastewater Treatment Service

(i)    Landlord shall supply wastewater treatment service to Tenant in accordance with the provisions of this Section  6(j), through the existing integrated lines and equipment that cannot economically be separated readily so as to be capable of providing separate service to the Demised Premises.  It is further understood that wastewater treatment service is not readily available from any other provider.

(ii)    During the term of this Lease, Landlord shall supply wastewater treatment service to the Demised Premises in a manner comparable to which such service was provided to the Demised Premises immediately prior to the Commencement Date, subject to adjustment for recognized cyclical or seasonal volume.

- 11 -

(iii)   The charge for wastewater treatment service shall be based on an assessment arrived at in a manner fully consistent with the assessment conducted prior to the Commencement Date, which is based on total water delivery to the Demised Premises in the relevant period, and an estimate of the Demised Premises' requirement for wastewater treatment together with any supplementary charges imposed as a result of the delivery of overstrength waters from the Demised Premises.  Supplementary charges shall be imposed in a manner fully consistent with the manner in which they have been imposed prior to the Commencement Date. The charges for wastewater treatment service have been included as part of the environmental management services charge, which shall be paid in accordance with the provisions of the Administrative Services Agreement between the Landlord and Tenant dated as of April 30, 2000 (the "ASA").

(iv)   Tenant will take no steps which compromise the compliance status of the wastewater treatment plant or its ability to perform the services for which it was designed. Tenant will give notice to Landlord of all proposed changes to product, product components, or manufacturing processes which are likely to have environmental implications, or implications for the viability or compliance status of the wastewater treatment plant prior to implementation (which changes shall be subject to Landlord's prior written approval, acting reasonably), and sufficiently in advance of implementation to permit the impact of the proposed changes to be fully assessed and accounted for.  Landlord hereby approves the compliance status of products and manufacturing processes currently in use at the Demised Premises.

(k)   Security Services

The Landlord shall provide security services for the Building to the same standard as immediately prior to the Commencement Date subject to Tenant receiving the necessary approvals and executing any acknowledgements reasonably required by the security provider to the extent required by agreements between the security provider and Landlord.  Tenant shall pay to Landlord its proportionate share of such security services having regard to the square footage of the Demised Premises relative to the square footage of all buildings in the Complex to which Landlord provides such services.  Tenant shall pay Landlord for such services in accordance with the provisions of the ASA.

(l)   General

With respect to all Landlord's Services:

(i)   All Landlord's Services are provided on a commercially reasonable best efforts basis.

(ii)   Although Landlord will use commercially reasonable best efforts to provide Landlord's Services as required pursuant to the terms of this Section 6, Landlord makes no guarantees, warranties, representations or commitments with respect to the quantity under/or quality of the service to be provided, except as expressly provided herein.  Landlord shall provide Landlord's Services to Tenant hereunder on substantially the same basis as to quality and quantity as such services are supplied to the other portions of the Complex but not of less quantity or quality than that supplied to the Demised Premises on the Commencement Date

- 12 -

unless the quantity or quality supplied to the remainder of the Complex decreases to the same extent.

(iii)    All Landlord's Services shall be provided subject to the provisions of Section 29(d) hereof.

(iv)    Upon Tenant's written request, Landlord shall provide to Tenant reasonable supporting documentation relating to Landlord's computation of the Services Rent. Tenant acknowledges that should Landlord's costs of providing Landlord's Services increase, the cost to Tenant for Landlord's Services shall increase accordingly. During the term of the Lease and during the one year period thereafter, Landlord agrees to maintain back-up documentation, bills and invoices sufficient to verify to Tenant the Services Rent and will provide copies to Tenant once annually upon request within 90 days following calendar year end.

(v)    Tenant acknowledges and agrees that the providing of Landlord's Services by Landlord to Tenant does not constitute Landlord being a "public utility" or "regulated entity" and that Tenant is estopped during the term of this Lease or thereafter from asserting that Landlord is or was a "public utility" or "regulated entity" by virtue of Landlord providing any such Landlord's Services to Tenant.

(vi)    None of Landlord's Services shall be supplied by Tenant to or shared by Tenant with any third party and Tenant's right to receive the same is not assignable; provided, however, that other parties permitted to utilize or otherwise conduct business in the Demised Premises hereunder may utilize such services, together with Tenant.

(vii)    Notwithstanding anything to the contrary contained in this Section 6, Tenant shall pay to Landlord, if paid by Landlord, or be responsible for timely payment of any direct or indirectly allocable properly documented sales, use, services or other taxes imposed by any governmental authority which may be assessed or levied against Landlord or Tenant relating to supply of Landlord's Services, as the circumstances may require.    Such taxes shall not, however, include any income, excess profits or franchise taxes nor any environmental assessment attributable to the Demised Premises.

(viii)    Landlord shall have the right upon reasonable prior written notice to Tenant to terminate any Landlord's Services being provided by Landlord to Tenant pursuant to this Section 6 if (A) it is determined by any court or regulatory agency that Landlord is not permitted to provide any such Landlord's Services, or (B) any action, investigation or inquiry by any person, entity or regulatory agency is made or initiated which alleges that Landlord is not permitted to provide any such Landlord's Services and such allegation is reasonably likely to be proven true.    If Landlord cannot provide any such Landlord's Services and Tenant, after employing commercially reasonable best efforts is unable to obtain such services from another provider, Landlord and Tenant agree to negotiate in good faith to determine an appropriate solution with a view to minimizing the financial impact on both parties. Such negotiation may include a discussion of the termination of this Lease and may include a discussion of the payment by Landlord to Tenant of a reasonable relocation allowance.

- 13 -

(ix)     It is understood and agreed that occasional shutdowns of service described herein may be required for regularly scheduled or emergency non-routine maintenance services or during periods of non-supply to Landlord from its supplier of the services described herein. Except for emergencies or periods of non-supply to Landlord from its suppliers, the time and duration of such shutdowns for regularly scheduled maintenance will be scheduled by mutual agreement, but if the parties are unable to agree, the reasonable determination of Landlord shall be binding upon the parties; provided, that in connection therewith, Landlord will not discriminate against Tenant and will make commercially reasonable best efforts not to unreasonably interfere with Tenant's operations in the Demised Premises.

(x)     Notwithstanding anything herein contained to the contrary, but subject to the provisions of Section 6(l)(ii) hereof, Landlord shall not be liable for any damage whatsoever caused by any interruption to or for the quantity or quality of any of the services to be provided by Landlord to Tenant pursuant to this Section 6 for reasons other than those attributable solely to  Landlord's gross negligence or wilful misconduct hereunder nor shall Landlord be liable for any damage on the Demised Premises due to any defect, insufficiency, deterioration or corrosion of any Complex Utility Lines or other facilities for reasons other than those attributable solely to Landlord's gross negligence or wilful misconduct hereunder provided, however, that under no circumstances shall Landlord ever be liable for any liability described in Section 29(n) hereof. Tenant's sole and exclusive remedy for the failure of Landlord to supply any services to be provided under this Lease for reasons other than those attributable solely to Landlord's gross negligence or wilful misconduct hereunder shall be the right set forth in Section 22 and the right to withhold payment of Services Rent for such Landlord's Services not so supplied and to seek specific performance and other injunctive relief provided, however, that under no circumstances shall Landlord ever be liable for any liability described in Section 29(n) hereof.

(xi)     If it becomes commercially practicable for Tenant to obtain any Landlord's Services directly, then upon reasonable prior written notice to and consent of Landlord (which consent may be arbitrarily withheld if termination will result in any cost or penalty to Landlord or breach of contract by Landlord) Tenant may terminate Landlord's obligation to provide the Landlord's Services in question and Landlord shall (to the extent reasonably practicable) permit Tenant to utilize any facilities previously used for the provision of such service to the Demised Premises at Tenant's expense.

(xii)     Tenant shall cooperate with Landlord to obtain any necessary consents and provide such further documents or instruments as may be reasonably necessary or desirable to carry out the provisions under this Lease.

## Section 7.     LANDLORD'S MAINTENANCE OBLIGATIONS

(a)     Landlord shall, at Landlord's sole cost and expense, repair and maintain and operate and replace (provided replacement shall be required only if repair is not a commercially practicable alternative in light of factors such as the length of term and the risk to Tenant's business operations should repair be inadequate and provided that Landlord has the right to factor the short term nature of the Lease and the economics of replacement into its decision about what is an appropriate replacement) the Complex Utility Lines and pipes in such a manner so that Landlord may supply Landlord's Services to Tenant.

- 14 -

(b)     Landlord shall at Landlord's sole cost and expense repair and maintain and replace (provided replacement shall be required only if repair is not a commercially practicable alternative in light of factors such as the length of term and the potential detrimental effect of repair on Tenant's business operations should repair be inadequate and provided that Landlord has the right to factor the short term nature of the Lease and the economics of replacement into its decision about what is an appropriate replacement) both the Common Areas, as hereinafter defined, upon the Complex and the Demised Premises in such condition as is consistent with past practices and procedures of Landlord and considering the age and condition of such Common Areas and Demised Premises subject in each case to reasonable wear and tear, any gross negligence or wilful misconduct on the part of Tenant or those for whom the Tenant is at law responsible (which shall be the responsibility of the Tenant), and (subject to Section 17 hereof) any damage caused by fire, the elements or other casualty.

(c)     Landlord shall at its cost repair and maintain and replace (provided replacement shall be required only if repair is not a commercially practicable alternative in light of factors such as the length of term and the risk to Tenant's business operations should repair be inadequate and provided that Landlord has the right to factor the short term nature of the Lease and the economics of replacement into its decision about what is an appropriate replacement) the Building structure, roof and utility systems owned by Landlord (which do not exclusively serve the Demised Premises), and other improvements of a capital nature to the extent required to serve the Demised Premises so as to maintain same in such condition as is consistent with past practices and procedures of Landlord and considering the age and condition of the Building, subject to reasonable wear and tear, any gross negligence act or wilful misconduct of Tenant or those for whom it is in law responsible (which shall be Tenant's responsibility) and (subject to Section 17 hereof) any damage caused by fire, the elements or other casualty.

## Section 8.     ALTERATIONS, ADDITIONS, MAINTENANCE AND REPAIRS

(a)     Tenant shall have the right, at its own cost and expense, to make any interior, non-structural alterations to the Demised Premises at any time and from time to time, as Tenant shall from time to time determine, provided that (i) the same shall be in compliance with all then applicable building codes, laws and ordinances; (ii) the construction and/or existence of such improvement shall not adversely affect Landlord's operations upon the Complex and/or any of the Complex Utility Lines (which Tenant may relocate at its cost and expense, in a manner which does not disrupt service and subject to Landlord's prior written approval); (iii) the construction and/or existence of any such improvement shall not increase the cost of Landlord supplying Landlord's Services to Tenant pursuant to Section 6 hereof, unless Tenant agrees to pay all such increased costs in full, and in no event shall the construction and/or existence of any such improvement increase the cost of Landlord supplying such services to the remainder of the Complex; and (iv) where the Alteration Cost (as hereinafter defined) exceeds $100,000.00, Tenant must provide Landlord with plans and specifications for such alterations, which plans and specifications shall be subject to the approval of Landlord, such approval not to be unreasonably withheld or delayed ( "Alteration Cost" shall mean the cost of the total design, construction and related services required to complete the alteration in its entirety and shall include all phases or components of an alteration whether completed in stages or at different times.) In no event shall Landlord have any obligation to perform any work or expend any amounts in connection with

- 15 -

any such construction by Tenant. Tenant shall not make any exterior or structural alterations to the Building without Landlord's prior written consent.

(b)     Upon the expiration or earlier termination of the term of this Lease, Tenant shall surrender the Demised Premises together with alterations, additions and improvements made by Tenant in accordance with the terms of this Lease, in good order and condition, ordinary wear and tear and loss or damage by fire, the elements or other casualty (subject to the provisions of Section 17 hereof), and with all of Tenant's machinery, equipment, trade fixtures and personal property removed from the Demised Premises. Tenant shall leave the Demised Premises in a clean and safe condition plating over or barricading all pits, trenches or other openings in the floor and removing all conduits, pipes and ducts other than the Complex Utility Lines to a height of fifteen (15) feet above floor level. Tenant shall also remove and dispose of all waste arising from Tenant's process operations at the Demised Premises and pump and dispose of all oil, waste water and other liquids from trenches, pipe and lines and conduits on the Demised Premises, all in accordance with applicable law and with Section 28 hereof.

(c)     Except as set forth in Section 7 and except where such obligation may be performed by employees of the Landlord pursuant to Section 4(f), Tenant shall, at all times and during the term of this Lease, at its sole cost and expense, keep and maintain or cause to be kept and maintained in good repair, order and condition consistent with the past practices and procedures of Landlord and considering the age and condition of the Demised Premises upon the Commencement Date, the remainder of the Demised Premises.

## Section 9.   REQUIREMENTS OF PUBLIC AUTHORITY

(a)     Subject to the provisions of Section 9(e) hereof, during the term of this Lease, Tenant shall, at its own cost and expense, promptly observe and comply with all present and future laws, ordinances, requirements, orders, directives, rules and regulations of the Federal, Provincial, Municipal and City Governments and of all the governmental authorities affecting the Demised Premises or appurtenances thereto or any part thereof whether the same are in force at the commencement of the term of this Lease or may in the future be passed, enacted or directed, and Tenant shall pay all costs, expenses, liabilities, losses, damages, fines, penalties, claims and demands, including reasonable counsel, consultant and expert fees, that may in any manner arise out of or be imposed because of the failure of Tenant to comply with the covenants of this Section 9. Notwithstanding the foregoing, Tenant shall not be required to so comply to the extent such laws, ordinances, etc. require changes to improvements or facilities which Landlord is obligated to maintain under Section 7, or require changes to facilities used for the provision of Landlord's Services; instead, Landlord shall be required to so comply with such laws, ordinances, etc. provided, however, Tenant shall comply with laws, ordinances etc. requiring changes to mechanical and electrical facilities exclusively serving the Demised Premises if such changes are required due to Tenant's particular manner of use of the Demised Premises (as opposed to general manufacturing use).

(b)     Subject to the provisions of Section 9(e) hereof, during the term of this Lease, Landlord shall, at its own cost and expense, promptly observe and comply with all present and future laws, ordinances, requirements, orders, directives, rules and regulations of the Federal, Provincial, Municipal and City Governments and of all the governmental authorities affecting

- 16 -

the Complex (excluding the Demised Premises) whether the same are in force at the commencement of the term of this Lease or may in the future be passed, enacted or directed, and Landlord shall pay all costs, expenses, liabilities, losses, damages, fines, penalties, claims and demands, including reasonable counsel, consultant and expert fees, that may in any manner arise out of or be imposed because of the failure of Landlord to comply with the covenants of this Section 9, but only to the extent that Landlord's failure to comply will have a material adverse effect on Tenant's use of the Demised Premises and Common Areas.

(c)     Subject to the provisions of Section 9(e) hereof, Tenant shall have the right to contest by appropriate legal proceedings diligently conducted in good faith, in the name of Tenant, without cost or expense to Landlord, the validity or application of any law, ordinance, rule, regulation or requirement of the nature referred to in Section 9(a) hereof and, if by the terms of any such laws, ordinance, order, rule, regulation or requirement, compliance therewith may legally be delayed pending the prosecution of any such proceeding.

(d)     Subject to the provisions of Section 9(e) hereof, Landlord agrees to within a reasonable period of time execute and deliver any appropriate papers or other instruments which may be necessary or proper to permit Tenant so to contest the validity or application of any such law, ordinance, order, rule, regulation or requirement and to fully cooperate with Tenant in such contest.

(e)     Notwithstanding the foregoing provisions of this Section 9, the provisions of this Section 9 shall not be applicable with respect to: (i) environmental matters to the extent that the Landlord is responsible for such matters pursuant to Section 28 hereof and (ii) unless Tenant is preventing same, the services performed by Landlord or its affiliates under the Oshawa Labour and Management Services Agreement or the ASA which shall be governed by the provisions set out therein; or (iii) any breach of this Section 9 resulting from performance by employees of the Landlord pursuant to Section 4(f) hereof.

## Section 10.   COVENANT AGAINST LIENS

(a)     If because of any act or omission of Tenant, any construction lien or other lien, charge or order for the payment of money shall be filed against Landlord or any portion of the Demised Premises, Tenant shall, at its sole cost and expense, cause the same to be discharged of record or bonded within thirty (30) days after written notice from Landlord to Tenant of the filing thereof; and Tenant shall indemnify and save harmless Landlord against and from all costs, liabilities, suits, penalties, claims and demands, including reasonable counsel fees, resulting therefrom, except to the extent any failure to do so results from Landlord's failure to perform under the Oshawa Labour and Management Services Agreement or the ASA, unless Tenant is preventing such performance.

(b)     Notwithstanding the foregoing, the provisions of this Section 10(a) shall not be applicable to any liens arising with respect to environmental matters to the extent that the Landlord is responsible for such matters pursuant to Section 28 hereof. These matters shall be governed by the provisions of Section 28 hereof.

- 17 -

(c)    Provided Tenant is not in default under this Lease, at the request of Tenant Landlord shall execute and deliver in favour of an arms length lender providing financing to Tenant upon the security of Tenant's machinery, equipment, inventory, trade fixtures and other personal property, postponements of any statutory and/or common law rights of distraint granted to Landlord against such of Tenant's machinery, equipment, inventory, trade fixtures and other personal property located in or about the Demised Premises, in a form approved by Landlord which approval shall not be unreasonably withheld or delayed

## Section 11.    RIGHT OF ENTRY

Landlord or Landlord's agent shall have the right to enter the Demised Premises at all reasonable times or examine the same upon twenty-four (24) hours' written notice (except in an emergency), and to cure Tenant's failure to repair and maintain the Demised Premises in accordance with Section 8 hereof after reasonable written notice and an opportunity to cure (except in emergencies), and, Landlord shall be allowed to take all material into and upon the Demised Premises that may be required therefor without the same constituting an eviction of Tenant in whole or in part, and the rent reserved shall in no way abate while said repairs and alterations are being made, by reason of loss or interruption of business of Tenant, or otherwise. Tenant shall have the right to have its employees accompany Landlord or its agents when in the Demised Premises (unless impractical in an emergency situation).

## Section 12.    ASSIGNMENT AND SUBLETTING

(a)    Tenant agrees not to assign, mortgage, encumber or in any manner transfer, in whole or in part, this Lease or any estate or interest therein, and not to sublet the Demised Premises or any part or parts thereof without Landlord's consent, which Landlord may grant or withhold in its sole and absolute discretion. Any transfer, assignment or subletting in violation of this Section 12(a) shall be void. Consent by Landlord to one or more assignments of this Lease or to one or more subletting of the Demised Premises shall not operate to exhaust Landlord's rights under this Section 12.

(b)    Tenant acknowledges the special relationship between Landlord and Tenant which exists under the Lease and numerous other agreements between the Parties and further acknowledges that but for these relationships Landlord would not have entered into this Lease. Therefore, Tenant agrees to the provisions of this Section 12 as being fair and reasonable and binding upon Tenant.

## Section 13.    SIGNS

Subject to Landlord's prior written approval thereof not to be unreasonably withheld or delayed and subject to compliance with all requirements of any governmental authorities, Tenant shall have the right to install, maintain and replace signage in, on or over the Demised Premises and shall be granted street, building and directional signage consistent with the types of signage used by Landlord for Landlord's operations with sizes, types and locations to be mutually agreed upon in good faith (but no other signs or advertising matter other than usual traffic control and directional, safety, environmental and similar signs), and Tenant shall comply with any applicable requirements of any governmental authorities having jurisdiction

- 18 -

and shall obtain any necessary permits for such purposes. Such signs shall be similar in size and design with the other comparable signs on the Complex. Subject to the foregoing, Tenant shall be granted the right to install, maintain and replace signage in the Complex to the extent signage shall be of the types. and shall be in the locations, as the signage utilized for the operations in the Demised Premises prior to the Commencement Date. Failing agreement by Landlord and Tenant regarding the size, type and location of such signs, the reasonable determination of Landlord shall be binding.

## Section 14.    COVENANT TO HOLD HARMLESS

(a)    Tenant covenants to indemnify Landlord, and save it harmless, from and against any and all claims, actions, damages, liability and expense, including legal fees, in connection with loss of life, personal injury and/or damage to property (i) arising from or out of any occurrence in, upon or at the Demised Premises; or (ii) arising from or out of the occupancy or use by Tenant, Tenant's agents, contractors, employees, servants, customers, licensees or invitees, of the Demised Premises or Common Areas or any part thereof; or (iii) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, customers, licensees or invitees. Landlord shall not be responsible or liable for any damage or injury to any property, fixtures, buildings or other improvement, or to any person or persons, at any time on the Demised Premises, including any damage or injury to Tenant or to any of Tenant's agents, contractors, employees, servants, customers, licensees or invitees. The foregoing indemnity and hold harmless obligations of Tenant and exculpation of Landlord shall not apply to any occurrence to the extent resulting from (i) the gross negligence or wilful misconduct of Landlord, its agents, contractors, employees, servants, customers, licensees or invitees or (ii) acts or omissions of Landlord, Landlord's agents, contractors, employees, servants, licensees or invitees in connection with services provided under Sections 4(f) or 28 hereof, the Oshawa Labour and Management Services Agreement or the ASA; and Landlord will indemnify and hold harmless Tenant to such extent. Provided however that Tenant acknowledges that it shall nevertheless be liable for the acts and/or omissions of third party contractors and for the gross negligence and/or willful misconduct of Tenant and its affiliates. Notwithstanding the foregoing, under no circumstances shall Tenant ever be liable for any consequential damages or economic loss.

(b)    Save as set out in Section 14(a) as to Tenant's obligation to indemnify, Landlord covenants to indemnify Tenant, and save it harmless, from and against any and all claims, actions, damages, liability and expense, including legal fees, in connection with loss of life, personal injury and/or damage to property which are attributable solely to the gross negligence or wilful misconduct of Landlord: (i) arising from or out of any occurrence in, upon or at the Common Areas or the occupancy or use by Landlord, Landlord's agents, contractors, employees, servants, customers, licensees or invitees, of the Common Areas or any part thereof, or (ii) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, customers, licensees or invitees. Notwithstanding the foregoing, under no circumstances shall Landlord ever be liable for any consequential damages or economic loss.

- 19 -

## Section 15.    **INSURANCE**

(a)    Landlord shall, during the Term, self-insure or maintain insurance on the Complex, including the Building and the Common Areas, in accordance with Landlord's usual procedure (the "Casualty Policy") and Tenant shall pay to Landlord Tenant's proportionate share of all costs of such insurance with respect to each calendar year (or part thereof) during the term but only for such costs that relate to the Building (e.g., no additional charge for Common Areas). Tenant's proportionate share of the costs of such insurance shall be determined by the Landlord on a fair and equitable basis having regard to the square footage of the Demised Premises relative to the square footage of the Complex and the allocation to the Tenant of the Landlord's costs of self-insurance shall be done in a manner which is consistent with that done by the Landlord prior to the Commencement Date.    Landlord shall compute Tenant's proportionate share of the costs of such insurance and shall deliver to Tenant upon Tenant's written request reasonable supporting documentation sufficient to verify to Tenant the computation of Tenant's proportionate share.

(b)    During the term of this Lease, Tenant shall obtain and maintain pursuant to the terms of this Lease, at its sole cost and expense, insurance against fire, vandalism, windstorm, explosion, smoke damage, malicious mischief, and such other perils as are from time to time included in all risks policy, insuring Tenant's merchandise, trade fixtures, furnishings, equipment and all other items of personal property of Tenant located on or within the Demised Premises, in an amount equal to not less than one hundred percent (100%) of the actual replacement cost thereof and to furnish Landlord with a certificate evidencing such coverage. Tenant shall not carry any stock of goods or do anything in or about the Demised Premises, which will in any way invalidate any of Landlord's insurance policies on the Complex. If Tenant's manner of use with respect to the Demised Premises increases Landlord's insurance rates, Tenant will pay for such increases in Landlord's insurance rates. If Tenant installs any electrical equipment that overloads the lines in the Demised Premises, Tenant shall at its own expense make whatever changes are necessary to comply with the requirements of the insurance underwriters and governmental authorities having jurisdiction. All property kept, stored or maintained within the Demised Premises by Tenant shall be at Tenant's sole risk.

(c)    During the term of this Lease, Tenant shall obtain and maintain pursuant to the terms of this Lease, at its sole cost and expense, the following types of insurance, with the minimum limits as set forth below:

(i)    Commercial General Liability, including products completed operations and contractual liability, at a limit of not less than Five Million Dollars ($5,000,000) per occurrence for personal injury and property damage combined.

(ii)    Comprehensive Automobile Liability covering all owned, hired, and nonowned vehicles at a limit of not less than Five Million Dollars ($5,000,000) per occurrence for personal injury and property damage combined, including all statutory coverages.

(d)    The insurance provided for in Sections 15(a), (b) and (c) hereof may be subject to reasonable deductibles and the insurance provided for in Section 15(b) may, subject to Landlord's prior written approval, which may be given in Landlord's sole discretion, be made by

- 20 -

way of self-insurance, considering the financial condition, size and type of business conducted by Tenant in the Demised Premises, provided, that no such deductible shall exceed One Million United States Dollars (U.S.$1,000,000) per occurrence. Notwithstanding the foregoing, the Landlord will grant approval for self-insurance and will grant approval for reasonable increases in the deductible, in each case, so long as the Tenant is a wholly-owned subsidiary of Delphi Automotive Systems Corporation (the "Parent") and Parent has entered into an agreement with the Landlord acknowledging the responsibility of Parent to pay claims under such self-insurance and to cover such increase in deductible, in form and substance acceptable to the Landlord, acting reasonably.

(e)    From time to time during the term of this Lease, at Landlord's request, Tenant shall (A) procure, pay for and keep in full force and effect such other insurance as Landlord shall reasonably require, and (B) increase the limits of such insurance as Landlord shall reasonably require; provided, however such other insurance and increased limits shall be those then being maintained by prudent operators of comparable facilities and considering the financial condition of the Tenant, size and type of business conducted on the Demised Premises by Tenant and in no event shall Tenant be required to carry casualty insurance in excess of the full replacement cost of the Demised Premises, and, unless required by applicable law, Landlord shall not have the right to require Tenant to obtain Pollution Legal Liability Insurance.

(f)    Tenant shall provide Landlord with a certificate of insurance evidencing Landlord and its parent as an additional insured for all above mentioned coverages except Workers Compensation and Employers Liability for all activities connected with this Lease and/or the Demised Premises and stating that the above listed insurance is primary to any coverage that may be available to Landlord. Each such policy shall provide that the insurer shall provide at least thirty (30) days prior written notice to Landlord of cancellation, modification, or material change to any policy. Such certificate shall be in a form acceptable to, and underwritten by insurance company(ies) with a Best rating of at least A:VII, if possible and in no event lower than a "B" rating. The purchase of appropriate insurance coverage by Tenant or the furnishing of certificates of insurance shall not release Tenant from its obligations or liabilities under this Lease.

**Section 16.    WAIVER OF SUBROGATION**

Landlord shall cause each insurance policy carried by Landlord, if any, insuring the Demised Premises and Complex against loss by fire and causes covered by all risks hazard insurance coverage or insuring Landlord's personal property and Tenant shall cause each insurance policy carried by Tenant and insuring the Demised Premises and its merchandise, trade fixtures, furnishings, equipment and all other items of personal property against loss by fire and causes covered by such all risks coverage, to be written in a manner so as to provide that the insurance company waives all right of recovery by way of subrogation against the Landlord or Tenant as the case may be in connection with any loss or damage covered by any such policies. Subject to obtaining consent, if any, required from the insurer, each party (the "Releasing Party") hereby releases the other from any loss or damage caused by fire or any of the risks insurable under all risks casualty insurance. If the release of either Landlord or Tenant, as set forth in the second sentence of this Section 16, shall contravene any law with respect to exculpatory

- 21 -

agreements, the liability of the party in question shall be deemed not released but shall be deemed secondary to the latter's insurance.

## Section 17.   DAMAGE AND DESTRUCTION

(a)     In the event the improvements upon the Demised Premises and/or the Building are damaged or destroyed by a fire or other casualty, subject to the provisions of Section 17(c) hereof, Landlord shall repair, restore and rebuild such improvements in an expeditious manner to the prior condition and such repair, restoration and rebuilding shall be subject to the provisions of Section 8 hereof. Notwithstanding anything herein contained to the contrary, Landlord shall not be required to repair, restore and/or rebuild the entire Building or to repair, restore and/or rebuild any portion of the Building so that the same is the same as or similar to the Building prior to such damage or destruction, but Landlord shall remove all debris and Hazardous Materials, cause the Demised Premises to be in a safe and sightly condition and repair, restore and rebuild the Complex Utility Lines unless Landlord shall elect in writing to relocate the same. There shall be no abatement in the basic rental or any additional rental as a result of any such damage or destruction, provided, however, to the extent Tenant ceases utilizing Landlord's Services in total during such repair, restoration and rebuilding, the Service Rent during such period shall be abated.

(b)     Notwithstanding anything herein contained to the contrary, Tenant may, subject to Landlord's prior approval (not to be unreasonably withheld or delayed), make alterations, additions and/or modifications to the Demised Premises being so repaired, restored and rebuilt so long as the cost thereof does not exceed the cost of repair, restoring and rebuilding the Demised Premises as then covered by the Casualty Policy. If the proceeds of the Casualty Policy shall exceed the cost of such repair, restoration and rebuilding (after payment of such deductible), such excess shall be paid to Landlord upon the completion of such repair, restoration and rebuilding. Notwithstanding anything herein contained to the contrary, Landlord shall have absolutely no obligation or responsibility to repair, restore or replace or contribute to the cost of the repair, restoration or replacement of any of Tenant's merchandise, trade fixtures, furnishings, equipment or any other items of personal property and Tenant shall be fully responsible therefor.

(c)     (i)     Notwithstanding anything herein contained to the contrary, if the Demised Premises and/or the Building shall be damaged or destroyed by fire or other casualty covered by the Casualty Policy such that 35% or more in area of either the Demised Premises or the Building is rendered unfit for use, or if the Demised Premises and/or Building shall be damaged or destroyed by fire or other casualty not covered by the Casualty Policy such that 35% or more in area of either the Demised Premises or the Building is rendered unfit for use, Tenant or Landlord shall have the right to terminate this Lease by written notice to the other within ninety (90) days after the date of such fire or other casualty. The party giving such notice must also submit a statement certified by an architect, together with appropriate supporting data.

(ii)     If Tenant shall elect to terminate this Lease pursuant to Section 17(c)(i) hereof, Tenant shall, subject to the extent of the proceeds of insurance which are recoverable for such purpose, pay to Landlord the cost of demolishing all improvements upon the Demised Premises in accordance with plans and specification therefor approved by Landlord, provided that, at Landlord's request, Tenant shall make provision for the repair and restoration of the

- 22 -

Complex Utility Lines so damaged or destroyed and for the retention of the Complex Utility
Lines which were not so damaged or destroyed.

        (iii)    If Tenant shall so elect to terminate this Lease pursuant to Section 17(c)(i)
hereof and if such fire or other casualty is covered by the Casualty Policy, Tenant shall pay the
cost of such demolition up to the amount of the then current deductible under the Casualty Policy
and if the proceeds of the Casualty Policy are insufficient, all costs in excess of the proceeds of
the Casualty Policy. If the amount of the proceeds of the Casualty Policy, exceed the cost of
such demolition (after payment of such deductible by Tenant), the balance of such excess shall
be paid to Landlord upon the completion of such demolition. If Tenant shall so elect to terminate
this Lease pursuant to Section 17(c)(i) hereof and if such fire or other casualty is not covered by
the Casualty Policy, Tenant shall, subject to the extent of the proceeds of insurance which are
recoverable for such purpose, pay all costs and expenses of demolishing the improvements upon
the Demised Premises.

## Section 18.  **EXPROPRIATION**

        (a)    If the whole of the Demised Premises shall be taken for any public or quasi-public
purpose under any statute or by right of expropriation or by private purchase in lieu thereof, then
the Lease shall automatically terminate as of the date possession has been taken.

        (b)    (i)    If more than twenty-five percent (25%) of the Building or so much of the
Demised Premises shall be so taken so that Tenant cannot reasonably operate from the Demised
Premises, as reasonably determined by Tenant, Tenant or Landlord shall have the right to
terminate this Lease as of the date possession has been taken. This right shall be exercised by
Landlord or Tenant, as the case may be, if at all, within ninety (90) days after notice of such
taking is received by the other party.

        (ii)    If Tenant shall elect to so terminate this Lease pursuant to Section 18(b)(i)
hereof, Tenant shall, subject to the extent of the proceeds of any expropriation award which are
recoverable for such purpose, pay to Landlord the cost of demolishing all improvements upon
the Demised Premises in accordance with plans and specifications approved by Landlord;
provided that, at Landlord request, Tenant shall make provision for the relocation, repair and
restoration of the Complex Unity Lines affected thereby, and provided, further, that a portion of
the condemnation award shall be made available to Tenant for such demolition as hereinafter
provided.

        (c)    If the Lease is not terminated pursuant to Sections 18(a) or (b)(i) hereof, Landlord
shall, at Tenant's sole cost and expense, make all repairs to the Demised Premises affected by
such taking (or purchase) to the extent necessary to restore the same to a complete architectural
unit (to the extent permitted, however, taking into consideration the amount of the Demised
Premises remaining after any such taking or purchase); provided, however, that a portion of the
expropriation award shall be made available to Tenant for such demolition as hereinafter
provided.

        (d)    If Tenant shall be required to pay to Landlord the cost of demolishing the
improvements upon the Demised Premises pursuant to Section 18(b)(ii) hereof or if the

- 23 -

improvements are restored pursuant to Section 18(c) hereof, that portion of the expropriation award received by Landlord relating to the taking of the improvements upon the Demised Premises and any such demolition and restoration (but not any portion of the award relating to the taking of any land) shall be made available to Tenant up to the reasonable cost of such demolition or restoration in the manner provided in Section 17(b) hereof for the disbursement of proceeds of the Casualty Policy (without regard to any deductible).

(e)    Subject to the Provisions of Sections 18(b)(ii), (c) and(d)(i) hereof, all damages awarded for such taking under the power of expropriation (or purchase in lieu thereof), whether for the whole or a part of the Demised Premises, shall belong to and be the property of Landlord, whether such damages shall be awarded as compensation for diminution in value to the leasehold or the fee of the Demised Premises; provided, however, that Tenant and not Landlord shall be entitled to the award made for depreciation to and the cost of removal of, Tenant's stock and trade fixtures, equipment and other personal property, moving expenses, loss of business and good will and related expenses. The termination of this Lease pursuant to this Section 18 shall not affect Tenant's rights to such award.

## Section 19.    ESTOPPEL CERTIFICATE

Each of Landlord and Tenant agrees within thirty (30) days after request therefor by the other to execute and deliver to the other a statement, in writing, certifying to the other and/or any party designated by the other that this Lease is in full force and effect.

## Section 20.    ATTORNMENT AND SUBORDINATION

(a)    Tenant agrees that this Lease shall, at the request of Landlord, be subordinate to any mortgages or deeds of trust that may be placed upon the Demised Premises after the date hereof and to any and all advances to be made thereunder, and to the interest thereon, and all renewals, replacements and extensions thereof, provided the mortgagee or trustee named in said mortgages or trust deeds shall agree to recognize the Lease in the event of foreclosure if tenant is not in default beyond the applicable notice, grace or cure period and enter into a lease directly with Tenant, and as a condition precedent thereto enters into a Subordination, Non-Disturbance and Attornment Agreement in form and substance reasonably approved by Tenant. Tenant also agrees that any mortgagee or trustee may elect to have this Lease constitute a prior lien to its mortgage or deed of trust, and in the event of such election and upon notification by such mortgagee or trustee to Tenant to that effect, this Lease shall be deemed a prior lien to the said mortgage or deed of trust, whether this Lease is dated prior to or subsequent to the date of said mortgage or deed of trust. Tenant agrees, that upon the request of landlord, any mortgagee or any trustee, it shall, without cost to Tenant, execute whatever instruments may be required to carry out the intent of this Section 20, provided such instruments are approved by Tenant, which approval shall not be unreasonably withheld. Landlord represents and warrants to Tenant that the Demised Premises is not subject to any mortgages or deeds of trust as of the Commencement Date.

(b)    In the event any proceedings are brought for the foreclosure of, or in the event of the conveyance of deed in lieu of foreclosure of, or in the event of exercise of the power of sale under, any mortgage made by Landlord covering the Demised Premises, Tenant hereby attorns

- 24 -

to, and covenants and agrees to execute an instrument in writing reasonably satisfactory to the
new owner whereby Tenant attorns to such successor in interest and recognizes such successor as
the Landlord under this Lease, subject to non-disturbance as provided for in Section 20(a) hereof.

## Section 21.    DEFAULT OF TENANT

(a)    In the event (i) of any failure of Tenant to pay any rental or other charges due
hereunder for more than ten (10) business days after written notice of such default shall have
been received by Tenant; or (ii) of any failure to perform any other of the terms, conditions or
covenants of this Lease (other than the covenants for the payment of rent) to be observed or
performed by Tenant, including without limitation the failure of Tenant to maintain in effect any
licence or permit necessary for the use, occupancy or operation in the Demised Premises in
accordance with this Lease or a breach of Section 4 of this Lease concerning Tenant's use of the
Demised Premises, for more than twenty (20) days after written notice of such default shall have
been received by Tenant (unless a shorter period is specified herein with respect to a specific
failure); provided, however, that if the curing of such default shall reasonably require in excess
of 20 days, Tenant shall not be deemed in default hereunder if Tenant shall commence to cure
such default within such 20 days period and thereafter diligently prosecutes such cure to
completion or (iii) Tenant shall abandon the Demised Premises prior to the last three (3) months
of the term (provided that Tenant's mere vacating of the Demised Premises shall not be deemed
to be abandonment provided that Tenant continues to pay rent and perform all obligations under
this Lease) or permits this Lease to be taken under any writ of execution; or (iv) Tenant assigns,
mortgages, sublets, encumbers or in any manner transfers the Demised Premises or its interest in
the Lease without Landlord's consent; or (v) Tenant makes an assignment for the benefit of
creditors, allows any petition under the bankruptcy law, or the appointment of a trustee or
receiver of Tenant, or its assets, or the estate created hereby shall be taken in execution or by
other process of law or Tenant shall be adjudicated insolvent or bankrupt pursuant to the
provisions of any state or federal insolvency or bankruptcy act, or if a receiver or trustee of the
property of Tenant shall be appointed by reason of the insolvency or inability of Tenant to pay its
debts, or if any assignment shall be made of the property of Tenant for the benefit of creditors; or
(vi) Tenant shall be liquidated or dissolved or shall begin proceedings towards its liquidation or
dissolution, then, unless such failure is caused directly or indirectly by the failure of the Landlord
to provide the services under Section 28 hereof, the Oshawa Labour and Management Services
Agreement or the ASA, or by the performance or non-performance of employees of the Landlord
pursuant to Section 4(f) hereof, Landlord, besides other rights or remedies it may have, shall
have the right to declare this Lease terminated and the term ended and/or shall have the
immediate right of re-entry and may remove all persons and property from the Demised Premises
and such property may be removed and stored in a public warehouse or elsewhere at the cost of,
and for the account of Tenant, without evidence, of notice or resort to legal process and without
being deemed guilty of trespass, or becoming liable for any loss or damage which may be
occasioned thereby.

(b)    Should Landlord elect to re-enter, as herein provided, or should it take possession
pursuant to legal proceedings or pursuant to any notice provided by law, it may either terminate
this Lease or it may from time to time, without terminating this Lease, make such alternations
and repairs as may be necessary in order to relet the Demised Premises, and relet the Demised
Premises or any part thereof for such term or terms (which may be for a term extending beyond

- 25 -

the term of this Lease) and as such rental or rentals and upon such other terms and conditions as Landlord in its sole and absolute discretion may deem advisable. Upon each such reletting all rentals and other sums received by Landlord from such reletting shall be applied, first, to the payment of any indebtedness other than rent due hereunder from Tenant to Landlord; second, to the payment of any reasonable costs and expenses of such reletting, including reasonable brokerage fees and attorneys' fees and of reasonable costs of such alterations and repairs; third, to the payment of rent and other changes due and unpaid hereunder; and the residue, if any, shall be held by Landlord and applied in payment of future rent as the same may become due and payable hereunder. If such rentals and other sums received from such reletting during any month be less than that to be paid during that month by tenant hereunder, Tenant shall pay such deficiency to Landlord. Such deficiency shall be calculated and paid monthly. Tenant shall in no event be entitled to any rent collected or payable upon any reletting, whether or not such rent shall exceed the rent reserved in this Lease. No such re-entry or taking possession of the Demised Premises by Landlord shall be construed as an election on its part to terminate this Lease unless a written notice of such intention be given to Tenant or unless the termination thereof be decreed by a court of competent jurisdiction. Notwithstanding any such reletting without termination, Landlord may at any time hereafter elect to terminate this Lease for such previous breach. Should Landlord at any time terminate this Lease for any breach, in addition to any other remedies it may have, it may recover from Tenant all damages it may incur by reason of such breach, including the cost of recovering the Demised Premises, and reasonable attorneys' fees.

(c)      In case suit shall be brought for recovery of possession of the Demised Premises, for the recovery of rent or any other amount due under the provisions of this Lease, or because of the breach of any other covenant herein contained on the part of either party to be kept or performed, and a breach shall be established, the losing party shall pay to the prevailing party all expenses incurred therefor, including reasonably attorney's, consultant's and expert's fees.

(d)      Notwithstanding anything herein contained to the contrary, if Tenant shall be in default in the performance of any of the terms or provisions of this Lease and if Landlord shall give to Tenant notice in writing of such default specifying the nature thereof, and it Tenant shall fail to cure such default within the time provided in Section 21(a) hereof or immediately if such default requires emergency action, Landlord may, in addition to its other legal and equitable remedies, cure such default for the account of and at the costs and expense of Tenant, and the sums so expended by Landlord, including reasonable legal fees, shall be deemed to be additional rent and shall be paid by Tenant on the day when Basic Rent shall next become due and payable.

## Section 22.   TENANT'S SELF HELP REMEDY

In the event that Landlord does not undertake any repair, maintenance or replacement detailed in Section 7 of this Lease, Tenant may perform such repair, maintenance or replacement and set off the cost thereof against Basic Rent payable under the Lease provided that:

(a)      Tenant gives Landlord 30 days' prior written notice specifying the nature of the required repair, maintenance or replacement and the cost thereof; and

- 26 -

(b)    The failure to undertake such repair, maintenance or replacement would have a material adverse effect on Tenant's business operations.

In the event that Landlord gives notice within 20 days next following receipt of such notice from Tenant that Landlord disputes whether such repair, maintenance or replacement is necessary or whether Landlord is responsible therefor pursuant to Section 7 or whether the cost thereof is reasonable, the dispute shall be determined in accordance with Section 30 and Tenant shall have no right to perform the repair, maintenance or replacement or set off the cost thereof against Basic Rent.

## Section 23.    QUIET ENJOYMENT

Upon payment by Tenant of the rent herein provided, and upon the observance and performance of all the covenants, terms and conditions on Tenant's part to be observed and performed, Tenant shall peaceably and quietly hold and enjoy the Demised Premises for the term hereby demised without hindrance or interruption by Landlord or any other person or persons lawfully or equitably claiming by, through or under Landlord, subject, nevertheless, to the terms and conditions of this Lease and any mortgages to which this Lease is subordinate (subject to the provisions of Section 20(a) hereof) and all applicable laws and ordinances and charges therein.

## Section 24.    TENANT'S PROPERTY

(a)    Landlord shall not be responsible or liable to Tenant for any loss or damage or injury to persons resulting to Tenant or its property from bursting, stoppage or leaking of gas, sewer, wastewater or steam pipes or for any damage or loss of property or injury to persons within the Demised Premises from any cause whatsoever other than the gross negligence or wilful default of Landlord, its agents, employees and contractors.

(b)    Tenant shall give prompt notice to Landlord in case of fire or accident in the Demised Premises.

## Section 25.    HOLDING OVER

Any holding over after the expiration of the term hereof with the consent of Landlord shall be construed to be a tenancy from month to month (at the monthly rent including the Services Rent and the Common Areas Charge herein specified), and shall otherwise be on the same terms and conditions herein specified so far as applicable. In the event Tenant remains in possession of the Demised Premises after the expiration of the term of this Lease without Landlord's consent, Tenant shall also pay to Landlord all damages sustained by Landlord as a result of retention of possession of the Demised Premises after the expiration of the term of this Lease.

## Section 26.    COMMON AREAS

For purposes of this Lease, the "Common Areas" shall be those areas of the Complex used in common by Landlord and Tenant, including all areas and facilities used by Landlord and Tenant in common on the date prior to the date of this Lease and shall include, without limitation, roads, landscaped areas, parking areas (other than parking areas dedicated to

- 27 -

the use of one or more buildings), sidewalks, driveways, retention basins, loading areas, building entrances and exits, restrooms, corridors, vestibules, lobbies, break rooms, locker rooms, elevators, boardrooms, cafeterias and photocopying rooms. Subject to the provision of this Lease, Landlord shall operate, maintain, and repair the Common Areas in a manner comparable to the manner that Landlord operates, maintain and repairs the same on the date hereof.

**Section 27.   Intentionally Deleted.**

**Section 28.   ENVIRONMENTAL MANAGEMENT SERVICES**

(a)   Landlord shall continue to manage and retain liability and responsibility for all environmental issues associated with the Demised Premises following the Commencement Date. All reasonable costs incurred in the ordinary course of business, consistent with past practice associated with maintaining day-to-day environmental compliance (and not remediation) of the Demised Premises which are not provided for in the Oshawa Labour and Management Services Agreement, shall be borne by Tenant upon presentation of account in accordance with the provisions of the ASA. All costs relating to remediation of the Demised Premises shall remain the responsibility of Landlord. Landlord shall indemnify Tenant against any and all Losses arising out of environmental contamination (including remediation) and non-compliance (irrespective of whether the related contamination or non-compliance occurred prior to or after the Commencement Date), except the Tenant shall indemnify Landlord for any contamination and non-compliance first occurring after the Commencement Date which is caused by the gross negligence of Tenant.

(b)   The Parties contemplate that, in managing environmental issues at the Demised Premises, Landlord will include the Demised Premises in all applicable environmental programs in effect at the Complex including, without limiting the generality of the foregoing, all programs directed to auditing, due diligence, monitoring, testing, environmental reporting and compliance with applicable laws, permits or any and all such orders or directives issued by a competent authority. Where changes to existing programs are required in order to effect enhanced auditing, due diligence, monitoring, testing, environmental reporting, compliance with applicable laws, permits or any and all orders or directives, such changes shall be implemented by Landlord. It is also contemplated by the Parties that the Demised Premises will participate in all applicable spill prevention response activities following the Commencement Date in the ordinary course of business, consistent with past practice, and that Tenant will be responsible for all reasonable costs of this kind attributable to the Demised Premises, payable by Tenant in accordance with the provisions of the ASA.

(c)   Tenant shall take no steps which compromise the compliance status of the Demised Premises and shall give notice to Landlord of all proposed changes to product, product components or manufacturing processes which are likely to have environmental implications, or implications for compliance with relevant permits, orders or directives, prior to implementation (which changes shall be subject to Landlord's prior written approval, acting reasonably), and sufficiently in advance of implementation to permit the impact of the proposed changes to be fully assessed.

- 28 -

(d)    As used in this Section 28, "Losses" shall mean any claims, demands, actions, causes of action, liabilities, damages, losses, costs or expenses (including reasonable expenses of investigation and reasonable consultants' and solicitors' fees and disbursements), fines and penalties.

(e)    It is contemplated by the Parties that the Demised Premises will be certified by a third party as compliant with ISO 14000 EMS prior to January 1, 2002.  Landlord shall coordinate the implementation of the EMS, and Tenant shall pay all reasonable costs associated with the implementation of the program, up to a maximum of US$ 40,000.

## Section 29.    **MISCELLANEOUS**

(a)    One or more waivers of any covenant or condition shall not be construed as a waiver of a subsequent breach of the same covenant or condition, and the consent or approval to or of any act requiring consent or approval shall not be deemed to render unnecessary consent or approval to or of any subsequent similar act.  No breach of a covenant or condition of this Lease shall be deemed to have been waived, unless such waiver be in writing signed by the waiving party.

(b)    This Lease and the Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Demised Premises and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between them other than are herein set forth.  Except as expressly set forth herein, Tenant has not relied upon any representations of Landlord or its agents as an inducement to enter into this Lease.  No alternation, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by each party.

(c)    Nothing contained herein or any other agreement between Landlord and Tenant shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto it being understood and agreed that neither the method of computation of rent, nor any other provision contained herein, nor any acts of the parties herein, shall be deemed to create any relationship between the parties hereto other than the relationship of Landlord and Tenant.  Whenever herein the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders.

(d)    In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war or other reason of a like nature not the fault of the party delayed in performing work or doing acts required under the terms of this Lease, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.  The party entitled to such extension hereunder shall give written notice as soon as possible to the other party hereto of its claim of right to such extension and the reason(s) therefor.  The provisions of this Section 29(d) shall not operate to excuse either Landlord or Tenant from prompt payment of any

- 29 -

payments required by the terms of this Lease provided, however, that in no event shall Tenant be required to pay for any of Landlord's Services while same are not supplied as a result of any of the causes described in this Section 29(d) except where Landlord is obligated to pay its suppliers of such services notwithstanding any non-supply as a result of any of the causes described in this Section 29(d).

(e)    All notices, requests, consents, waivers, approvals or other communications permitted or required to be given to either party under this Lease shall be in writing and shall be deemed to have been given when personally delivered, or when sent via fax (upon receipt of confirmed "good' transmission) and first class mail or by recognized overnight delivery system and shall be deemed effective upon receipt (or refusal to accept delivery) to the following:

If to Landlord, addressed to:

General Motors of Canada Limited
1908 Colonel Sam Drive
Oshawa, Ontario
L1H 8P7

Attention:  Treasurer

With a copy to:

General Motors of Canada Limited
1908 Colonel Sam Drive
Oshawa, Ontario
L1H 8P7

Attention:  General Counsel

If to Tenant, addressed to:

Delphi Canada Inc.
c/o Delphi Energy & Chassis Systems
4800 S. Saginaw Street
M/C 485-301-140
Flint, Michigan  48501

Attention:  Pat Straney

- 30 -

With a copy to:

Delphi Automotive Systems Corporation
5725 Delphi Drive
Troy, Michigan
48098-2815

Attention: Assistant General Counsel, Commercial

Either party may designate a different addressee by notice to the other as herein provided.

(a)    All rights and liabilities herein given to or imposed upon the respective parties hereto shall extend to and bind the several respective heirs, executors, administrators, successors and assigns of the said parties. No rights, however, shall inure to the benefit of any assignee of Tenant.

(b)    The captions section numbers, article numbers, and index appearing in this Lease are inserted only as a matter of convenience and in no way define, limit, construe, or describe the scope or intent of such sections or articles of this Lease nor in any way affect this Lease.

(c)    Each of Landlord and Tenant represents and warrants unto the other that there are no claims for brokerage commissions or finder's fee in connection with this lease, and agrees to indemnify the other and hold it harmless from all liabilities arising from any such claim arising from an alleged agreement or act by it (including, without limitation, the cost of legal fees in connection therewith); such agreement to survive the termination of this Lease.

(d)    Tenant shall not record this Lease without the written consent of Landlord; however, upon the request of either party hereto, the other party shall join in the execution of a memorandum or so-called "short form" of this Lease for the purposes of registration. Said memorandum or short form of this Lease shall describe the parties, the Demised Premises, the term of this Lease, any special provisions, and shall incorporate this Lease by reference.

(e)    In the event of any transfer or transfers of Landlord's interest in the Demised Premises, the transferor shall be automatically relieved of any and all obligations on the part of Landlord accruing from and after the date of such transfer to the extent that the transferee has assumed such obligations.

(f)    No payment by one party or receipt by the other of a lesser amount than the rent or other amount due hereunder shall be deemed to be other than on account of the earliest stipulated amount due, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and the receiving party shall accept such check or payment without prejudice to its right to recover the balance of such amount due or pursue any other remedy in this Lease provided.

(g)    This Lease shall be governed by, and construed in accordance with, the laws of the Province of Qntario. If any provision of this Lease or the application thereof to any person or

- 31 -

circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease shall
not be affected thereby and each provision of the Lease shall be valid and enforceable to the
fullest extent permitted by law.

(h)      Except as expressly provided to the contrary herein, whenever Landlord or
Tenant's consent or approval is required under the terms of this Lease, such consent or approval
shall not be unreasonably withheld, conditioned or delayed.

(i)      Any liability of Landlord hereunder (which for purposes of this Section 29(m)
shall be deemed to include Landlord's employees, agents, suppliers and contractors of any tier)
to Tenant with respect to any and all claims arising out of the performance or nonperformance of
the Landlord hereunder whether based on contract, warranty, tort (including negligence), strict
liability or otherwise shall in no event, include loss of proceeds, profits or revenue or the loss of
use of either, loss by reason of shutdowns or inability to operate at any level, cost of replacement
of services not so supplied or obligations not so performed or incidental, special or consequential
damages of any nature whatsoever.

(j)      The expiration of earlier termination of the term of this Lease shall not release
either party from any liability or obligation accruing prior to such expiration or termination,
unless otherwise expressly provided herein.

## Section 30.      **DISPUTE RESOLUTION**

(a)      **Resolution Between the Parties.**      Save and except where a provision hereof
specifically provides for a different dispute resolution mechanism, if a disagreement arises
between the Landlord and Tenant in relation to this Lease, the parties will first endeavour to
resolve such disagreement through friendly negotiations in good faith between the following
groups of persons referenced below in order of priority:

(i)      each party's experts from the area(s) relevant to the dispute in question;

(ii)      each party's contract manager;

(iii)      the executives of each party responsible for the area in which the dispute
arises;

(iv)      the President of GMCL and the President of Delphi Canada; and

(v)      upon written notice identifying the matter in dispute, to mediation or other
method of alternative dispute resolution to be defined by the parties.

If such a disagreement arises, one party will give written notice to the other party
that advises that a disagreement exists and acknowledges the steps above that have been utilized
without success as at the date of the notice (the **"Dispute Notice Date"**).

- 32 -

(b)    **Arbitration.** If an amicable solution cannot be reached between the parties using friendly negotiations in good faith, within four months following the Dispute Notice Date, then the disagreement will be submitted to arbitration, unless otherwise agreed to by the parties.

The arbitration will be carried out in accordance with the rules of Conciliation and arbitration of the International Chambers of Commerce, by one or more arbitrators appointed in accordance with the said rules. The arbitration will take place in Toronto, Canada in the English language.

The decision of the arbitrator(s) will be final and binding on the parties. If any party does not perform the obligations imposed upon it by the decision in full and in a timely manner, the other party will be entitled to seek the enforcement of the decision from any competent court in any jurisdiction.

## Section 31.    **TERMINATION RIGHTS**

If Landlord requests termination of this Lease, Tenant and Landlord agree to discuss commercially reasonably terms of a possible Tenant departure (such as Landlord's reimbursement of Tenant's relocation costs).

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands the day and year first above written.

| APPROVED | |
|---|---|
| FINANCIAL | LEGAL |
| BPM | dc |
| DATE | DATE |
| 4/28/00 | 4/28/00 |

**GENERAL MOTORS OF CANADA LIMITED**
**(Landlord)**

By: _____
Name: L. D WORRALL
Title: Vice-President

By: _____
Name: M. J. Zur Schmiede
Title: Vice-President

**DELPHI CANADA INC.**
**(Tenant)**

By: _____
Name: RICHARD J. WILKINS
Title: CHIEF FINANCIAL OFFICER

By: _____
Name:

Title:

## SCHEDULE "A"

## DEMISED PREMISES



## SCHEDULE "B"

## LEGAL DESCRIPTION

**700 Park Road South, Oshawa ("Tri-Link Plant")**

### Short Legal Description

PIN#16391-0021(LT) Land Titles Conversion Qualified

Part of Lots 13 Concession Broken Front East Whitby as in EW23139 (Secondly) Except
OS75744 and OS91241;    Part Lot 13 Concession Broken Front East Whitby as in
EW23141 Except OS91241;    Part Lot 13 Concession Broken Front East Whitby as in
D329027, D318841, OS128089,OS177565 and OS176568;    Part Lot 14 Concession
Broken Front East Whitby as in EW23140 Except OS75744, 40R-15834 and Parts 3, 4,
10 and 11 on 40R-9435;    Part Lot 14 Concession Broken Front East Whitby as in
EW23340;    Part Lot 14 Concession Broken Front East Whitby as in EW23338 Except
Part 10 on 40R-8780, Parts 1 and 2 on 40R-8779, Part 1 on 40R-9917 and Part 2 on 40R-
6485,    City of Oshawa (formerly Township of East Whitby) Regional Municipality of
Durham (No. 40)

## SCHEDULE "C"

## PLAN OF COMPLEX



## SCHEDULE "D"

## PERMITTED ENCUMBRANCES

### A.    SPECIFIC ENCUMBRANCES

**700 Park Road South, Oshawa ("Tri-Link Plant")**

1.    Instrument No. OS162800 registered July 14, 1967 being a Lis Pendens filed in The Supreme Court of Ontario by Echo Construction Limited as the Plaintiff and Clover Glade Subdivision Limited, Stevensons Road Realty Company Limited, North Shore Realty Company Limited and John Edwin Harris as Defendants which Landlord is in process of removing from title.

2.    Instrument No. D26607 registered May 5, 1976 being a License Agreement to install, repair, maintain and replace underground cables and concrete conduits over Part 1 on 40R-2443 (being part of GM lands) between General Motors of Canada Limited and Bell Canada.

3.    Instrument No. D130900 registered October 15, 1981 being a Site Plan Agreement for the lands to be used as a roadway to provide access to parking facilities for employees between The Corporation of The City of Oshawa and General Motors of Canada Limited (affects only part of lands shown as Parts 1 & 2 on 40R6485)

     Note: Part 2 has now been transferred to The City for road widening purposes.

4.    Instrument No. D196790 registered May 24, 1985 being a Declaration (Section 22 of the Registry Act) of an Appointment by the Bank of Nova Scotia of The Clarkson Company Limited as Receiver, Manager and Agent of Whitby Welding Limited (being the plaintiff in Claim for Lien No. D-166103 which said Lien has now been released and deleted from title) which Landlord is in process of removing from title.

5.    Instrument No. D359597 registered March 21, 1991 being an Encroachment Agreement for the benefit of General Motors of Canada Limited over the lands of The Regional Municipality of Durham, for the construction and maintenance of a watermain over Part 1 on 40R-12764 (being part of Park Road South) Note: This agreement shall terminate on the date of the sale or transfer of the GM lands unless the Region approves the assignment of this agreement.

6.    Instrument No. D432102 registered May 5, 1994 being a Site Plan Agreement for the lands to be used as a central access roadway between The Corporation of The City of Oshawa and General Motors of Canada Limited (affects only part of the lands shown as Part 1 on 40R-10887).

### B.    GENERAL ENCUMBRANCES

1.    Restrictions, easements, rights-of-way, restrictive covenants, licenses, servitudes, watercourse, right of water, right of access or user or other similar rights in land (including, without restriction, rights of way and servitudes for railways, sewers, drains,

gas and oil pipelines, gas and water mains, electric light and power and telephone or telegraph or cable television conduits, poles, wires and cables) granted to or reserved by other persons and rights reserved to or vested in any municipality or governmental or other public authority by the terms of any lease, license, franchise, grant, agreement or permit, which do not materially adversely affect the marketability of the Lands.

2.    Security given to a public utility or any municipality or governmental or other public authority when required by such utility or other authority in connection with the development, management, ownership and operation of the Lands.

3.    The reservations, limitations, exceptions, provisos and conditions, if any, expressed in any original grants from the Crown.

4.    Subdivision agreements, site plan control agreements, servicing agreements, development agreements and other similar agreements with government authorities affecting the development or use of the Lands, provided same have been complied with to the Commencement Date and do not materially adversely affect the marketability or current use of the Lands.

5.    Encumbrances respecting minor encroachments by the Lands over neighbouring lands and/or permitted under agreements with the owners of such other lands.

Title defects or irregularities which are of a minor nature and in the aggregate will not materially impair the current use or marketability of the Lands.

## SCHEDULE "E"

## SERVICES RENT

Basic Rent, Common Area Charge and "Services Rent"
Delphi Canada Inc. & General Motors of Canada Ltd.

Schedule "E"

| Service | Battery Monthly | Annual Cost Battery | Trilink Monthly | Annual Cost Trilink | Annualized Cost Both Plants | Account Number | Comments/Issues |
|---|---|---|---|---|---|---|---|
| Basic Rent | $30,115 | $361,380 | $23,260 | $279,120 | $640,500 | | Assessed based on U S $1/sq. foot (C$1.439 = U S $1.00) |
| Common Area Charge | $2,250 | $27,000 | $1,917 | $23,004 | $50,004 | | 501 heads @ C$100.00 |
| Janitorial Services | $88,000 | $1,056,000 | $3,750 | $45,000 | $1,101,000 | | Source: 2000 CPE Assessment  (Subject to Manpower Requirements submitted by Delphi) |
| Electricity - metered | $153,917 | $1,847,004 | $20,500 | $246,000 | $2,093,004 | | Estimate (To be metered and billed on usage ) |
| Steam - metered | $101,531 | $1,218,372 | $1,802 | $21,624 | $1,239,996 | | Estimate (To be metered and billed on usage ) Rate to be $8.07/mlb for 2000 |
| Natural Gas - metered | $14,667 | $176,004 | $4,917 | $59,004 | $235,008 | | Estimate (To be metered and billed on usage ) |
| Compressed Air - metered | $37,553 | $450,636 | $115 | $1,380 | $452,016 | | Estimate (To be metered and billed on usage ) Rate to be agreed by parties |
| Water - metered | $11,250 | $135,000 | $4,167 | $50,004 | $185,004 | | Estimate (To be metered and billed on usage ) |
| Fire Protection | | | | | | | Included in the lease payment above. |
| Communication & Technical Infrastructure - Autoplex | $1,500 | $18,000 | $1,500 | $18,000 | $30,000 | 13575 | Source: Ian Morgan |
| Totals | $440,783 | $5,289,396 | $61,928 | $743,136 | $6,032,532 | | |
| | Monthly Battery | Annual Battery | Monthly Trilink | Annual Trilink | Total Annual Services Rent Cost | | |

**EXHIBIT 1.175**
**SEPARATION COSTS**

Relocate GMT200/201 Door Modules From Columbus To CMM
Relocate Power Products From Columbus to CMM
Columbus Latch Relocation

Columbus Service Build-Out
GMT201 Power Sliding Door From Columbus to CMM
Troy Tech Center Separation

CMM Chemical Storage
Vandalia Tech Center Separation
Production Transfers out of Vandalia

Door Module Relocation to Orion
Columbus Salaried Headcount Reductions

CMM Separation
Columbus Holding Cost (1 year)

Application Separation

Infrastructure

Software License

Transition Services Close Down

Payroll & Benefit Providers

Facility Separation

## Exhibit 5.01(a)(vii)(i)

**Lease Agreement dated as of May 1, 2000 between Delphi Canada Inc. and General Motors of Canada Limited, as amended August 1, 2002**

## OSHAWA LABOUR AND MANAGEMENT SERVICES AGREEMENT

Entered into as of May 1, 2000

BETWEEN:

### GENERAL MOTORS OF CANADA LIMITED

(hereinafter referred to as "GMCL")

OF THE FIRST PART

- and -

### DELPHI CANADA INC.

(hereinafter referred to as "Delphi")

OF THE SECOND PART

RECITALS:

A.          Delphi Canada Inc. ("Delphi") and General Motors of Canada Limited ("GMCL") have entered into an Asset Purchase Agreement dated as of the 31st day of December, 1998 amended and restated as of April 30, 2000 (the "Asset Purchase Agreement") for the sale of each of the Businesses ;

B.          Pursuant to the Asset Purchase Agreement, the employees of the Businesses will remain employees of GMCL;

C.          GMCL has agreed to provide to Delphi the services of certain GMCL hourly rate employees for the Businesses;

D.          GMCL has also agreed to provide certain management and supervisory services as well as certain indirect services of GMCL non-unionized employees currently engaged, on a substantially full-time basis, in the operation of the Businesses;

E.          GMCL and Delphi are entering into this Agreement to set forth the terms and conditions governing the Services to be provided hereunder;

- 2 -

THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, GMCL and Delphi agree as follows:

1. **DEFINITIONS**

In this Agreement (including the recitals to this Agreement) the definitions found in the Asset Purchase Agreement, to the extent not defined in this Agreement will apply.  In addition, the following words will have the following meaning:

1.1    **"Agreement"** means this Labour and Management Services Agreement.

1.2    **"Annual Operating Parameters"** has the meaning ascribed thereto in Section 2.2.

1.3    **"Appeal Committee"** has the meaning ascribed thereto in Section 5.5.

1.4    **"Assigned Employee"** or **"Assigned Employees"** means an employee or employees of GMCL providing services to a Business, those persons providing services to a Business by virtue of rights to employment at one of the Businesses under the Collective Agreement, those GMCL employees, if any, who replace Assigned Employees who depart from a Business for any reason and such other GMCL employees whose services are provided by GMCL to Delphi pursuant to this Agreement;

1.5    **"Assigned Hourly Employee"** means an Assigned Employee who is represented by the CAW and to whom the Collective Agreement, when in effect, applies and includes a person deemed to be assigned to the Business by virtue of rights to employment at one of the Businesses under the Collective Agreement.

1.6    **"Assigned Salaried Employee"** means an Assigned Employee who is not an Assigned Hourly Employee, and may include a non-unionized GMCL employee who is not remunerated on a Salaried basis.

1.7    **"Businesses"** means, together, the business and operations on the Closing Date as conducted by GMCL of:  (a) the manufacture of Battery Products at the Oshawa Battery Plant; and (b) the manufacture of Chassis Products at the Oshawa Tri-Link Plant ("TRI-LINK"); and either of which may be referred individually, a "Business".

1.8    **"CAW"** means the National Automobile, Aerospace, Transportation and General Workers Union of Canada (CAW/Canada) and includes Locals 222 and any successors thereof.

1.9    **"Collective Agreement"** means the Master Agreement between GMCL and the CAW dated October 19, 1999 and all associated or related documents, letters and further agreements between GMCL and the CAW, including, without limitation, the local agreements between GMCL and Local 222, CAW Oshawa as amended, and includes statutory or negotiated extensions thereof, and any successor agreements thereto, and any written communications with the CAW which impose obligations on GMCL or set out the understanding of GMCL and the CAW with respect to the meaning of any provision of such Master Agreement and local agreements.

1.10   **"Collective Agreement Issue"** means an issue, including but not limited to a difference or dispute, regarding the administration of the Collective Agreement, and includes but is not limited to all grievances under the Collective Agreement and any issue concerning the interpretation, application, operation or alleged violation of the Collective Agreement, or concerning discipline or dismissal, affecting a Assigned Hourly Employee or a union.

1.11   **"Composite Fringe Amount"** has the meaning ascribed thereto in Section 3.3.

1.12   **"Delphi US"** means Delphi Automotive Systems Corp., the ultimate parent corporation of Delphi, and its successors or assigns.

1.13   **"Employment Costs"** has the meaning ascribed thereto in Section 3.1(b);

1.14   **"Employment Laws"** means all Laws relating in whole or in part to the Assigned Employees, including without limitation, Laws with respect to occupational health and safety, human rights, employment standards, workplace safety and insurance, labour relations, pay equity as well as Laws regarding wages, and the withholding and remittance of taxes on the wages and salaries of Employees, including those amounts owed pursuant to the *Income Tax Act, Canada Pension Plan, Employer Health Tax Act,* and the *Employment Insurance Act.*

1.15   **"GMCL Policy"** means employment procedures, programs, standards and policies with respect to or are applicable to GMCL employees who are not unionized.

1.16   **"GMCL Service"** means employment with GMCL.

- 4 -

1.17 **"Hourly Employees"** means employees of GMCL who are represented by the CAW and to whom the Collective Agreement, when in effect, applies.

1.18 **"Laws"** means all applicable laws, by-laws, rules, regulations, orders, ordinances, protocols, codes, guidelines, policies, notices, directions and judgements or other requirements of any Governmental Authority.

1.19 **"Lay-off Cost Amount"** has the meaning ascribed thereto in Section 3.4.

1.20 **"Loss"** means any claim, demand, action, cause of action, damage, costs, liability or expense, including reasonable professional fees and all costs incurred in investigating or pursuing any of the foregoing or any proceeding relating to any of the foregoing.

1.21 **"OHSA"** means the Occupational Health and Safety Act (Ontario), as amended.

1.22 **"OPEB Expense"** means in relation to any calendar year, the amount determined in accordance with Séction 3.3;

1.23 **"Particular Employment Cost Matters"** has the meaning ascribed in Section 3.2.

1.24 **Pension Expense"** means in relation to any calendar year, the amount determined in accordance with Section 3.3;

1.25 **"Services"** means the services of the Assigned Employees provided by GMCL to Delphi pursuant to this Agreement.

- 5 -

## 2.    PROVISION OF SERVICES

### 2.1    GMCL Employment Services

In accordance with and subject to the terms and conditions hereof, GMCL agrees to employ and provide to Delphi the Services of Assigned Salaried Employees to operate the Businesses. On May 1, 2000 the number of such Assigned Salaried Employees shall be fifty-two (52) and as of that date, the persons who are Assigned Salaried Employees will be the persons employed by GMCL on that date in the operation of the Businesses. The number and identity of Assigned Salaried Employees after May 1, 2000 will vary in accordance with this Agreement. GMCL is not obliged to replace Assigned Salaried Employees who depart the Businesses.

In accordance with and subject to the terms and conditions· hereof, GMCL also agrees to employ and provide to Delphi the Services of Hourly Employees necessary to manufacture the products of the Business at their current locations as of the date of this Agreement. On May 1, 2000, such persons will be the persons who are the Hourly Employees who are engaged in the operation of the Businesses on that date but the Parties acknowledge the number and identity of such persons will vary in accordance with this Agreement and the provisions of the Collective Agreement. In the event Delphi wishes to use the Services of Hourly Employees in excess of the number of Assigned Hourly Employees then provided by GMCL, it shall give GMCL written notice of the number of such Hourly Employees required and the duration for which such Hourly Employees are required. For greater certainty any Hourly Employees so provided become Assigned Hourly Employees. GMCL will use commercially reasonable efforts to provide the services of such additional Hourly Employees as soon as practicable but not in any case less than within 60 days of receipt of such notice.

Schedule 2.1 sets forth the number of GMCL employees who are actively at work at the Businesses as of May 1, 2000 and those GMCL employees who have employment rights related to the Businesses, catagorized as hourly and salaried, direct and indirect.

### 2.2    Annual Operating Parameters

(a)    Delphi Canada will provide strategic and operational direction to Assigned Salaried Employees consistent with the Laws, the Collective Agreement, GMCL Policy and the Annual Operating Parameters.

(b)    Delphi and GMCL will evaluate the skills of the Assigned Salaried Employees and will use commercially reasonable efforts to (i) jointly determine what initiatives are required to improve operations which if agreed may include changes to identity of Assigned Salaried Employees and (ii) to agree on an action plan to achieve such improvements.

(c)     Recognizing that GMCL will retain exclusive control to direct the day-to-day work of Assigned Employees (including discipline) and that Delphi will provide operational direction to Assigned Salaried Employees, Delphi and GMCL will agree on Annual Operating Parameters. The Annual Operating Parameters will govern costs, productivity, quality and delivery performances of the Businesses. They will be formulated based on productivity, quality, and other traditional measurement metrics excerpted from Delphi's business plans for the Businesses consistent with the provisions of Laws, the Collective Agreement and GMCL Policy. The 2000 budget and business plan metrics will be the Annual Operating Parameters for the balance of 2000 and will serve as the basis for subsequent Annual Operating Parameters. Absent agreement regarding matters specifically referenced in the Annual Operating Parameters, which agreement will not be unreasonably withheld, GMCL will supply Services in a manner consistent with the conduct of the Businesses as carried on prior to the failure to agree to any applicable provisions within the Annual Operating Parameters.

(d)     Delphi will advise GMCL in writing of the manufacturing processes and procedures to be followed by the Assigned Employees, provided that such manufacturing processes and procedures must be consistent with Laws, the Collective Agreement, GMCL Policy and the Annual Operating Parameters. GMCL will direct its Assigned Employees to follow Delphi manufacturing processes and procedures provided to it in writing by Delphi in accordance with Section 2.2(a), except where in the opinion of GMCL, acting reasonably, such processes and procedures violate Laws, the Collective Agreement, GMCL Policy or this Agreement.

(e)     GMCL will compensate Delphi for documented additional costs incurred by Delphi if Delphi is prevented or precluded from implementing a, detailed cost reduction initiative presented in writing to GMCL because of GMCL unreasonably refusing to implement such initiative. A refusal to implement such an initiative is not an unreasonable refusal by GMCL if such initiative (i) is not consistent with the Collective Agreement (as interpreted by GMCL acting reasonably and in good faith), (ii) would violate Law, or (iii) would have a material adverse effect, as reasonably documented by GMCL, on the operations of GMCLL.

(f)     Any disputes, including failures to agree, between GMCL and Delphi concerning matters covered in this Section 2.2 must be submitted to the Appeal Committee for resolution in accordance with this Agreement.

**2.3     Administration of the Collective Agreement**

(a)     Delphi acknowledges that GMCL  and Assigned Salaried Employees in providing the Services, and otherwise performing its obligations under this Agreement, are

- 7 -

required to comply with all of GMCL's obligations under the Collective Agreement. Delphi will not prevent, impair or impede such compliance. Delphi also agrees that the terms of the Collective Agreement shall govern if there is a conflict between the terms of the Collective Agreement and this Agreement.

(b)     GMCL shall have exclusive control over hiring, discipline, termination and directing the day to day work of Assigned Hourly Employees, as well as over administration of the Collective Agreement and management of Collective Agreement Issues.

(c)     Loss incurred by GMCL in the administration of the Collective Agreement, including but not limited to costs or expenses incurred in assisting and advising Delphi, for grievance procedures, the arbitration process or legal services pertaining to a Collective Agreement Issue, in relation to Services provided to a Business by the Assigned Hourly Employees shall be the responsibility of Delphi and to the extent not otherwise reimbursed under this Agreement GMCL shall be reimbursed by Delphi for all such costs in accordance with Section 3.5, except where the Loss relates to a Collective Agreement Issue caused by a GMCL employee who is not an Assigned Employee. Delphi may refer any dispute regarding its obligations under this provision to the Appeal Committee in accordance with this Agreement.

(d)     Delphi shall co-operate with GMCL in all respects to assist GMCL in fulfilling its responsibilities related to the administration of the Collective Agreement as it affects the Assigned Hourly Employees and the Businesses under this Agreement.

## 2.4     Absent Assigned Employees

(a)     GMCL hourly and salaried employees identified on Schedule 2.1 who (i) are absent from the Businesses at Closing, due to illness or injury and, who subsequently go on a compensable or sick leave of absence for the same condition or, (ii) who at Closing are on statutory, compensable or sick leave of absence will, upon their return to active employment, subject to the requirements of the Collective Agreement, GMCL Policy and applicable Law be returned to the job at the Businesses which was held immediately prior to their absence.  Such employees will then become Assigned Employees.

(b)     GMCL hourly and salaried employees identified in Schedule "2.1", who are, as at Closing, on layoff or leave from the Businesses, including disability leave (whether or not any applicable waiting period relating to such disability leave is then satisfied), shall, upon their return to active employment, be returned subject to the

requirements of the Collective Agreement, GMCL Policy and applicable Laws to the job at the Business which was held immediately prior to their absence.

(c)    Notwithstanding any other provisions in this Agreement, to the extent that any Assigned Employees are terminated or laid off as a result of the implementation of this Section 2.4, GMCL will pay the costs attributable to any terminations or lay-offs caused by the return to work of the persons referred to in this Section 2.4 and Delphi will not be required to reimburse such costs as defined in Article 3.

## 2.5    No Employment Relationship and the Relationship of the Parties

(a)    It is acknowledged and agreed by the Parties that the Assigned Employees shall remain employees of GMCL and that nothing contained in this Agreement shall be construed to imply that they are the employees of Delphi.

(b)    GMCL shall provide the Services to Delphi as an independent contractor and the relationship between GMCL and Delphi shall be that of independent parties and neither Party shall be considered an agent of the other, except as expressly and specifically agreed to in respect of compensation, payroll and benefit administration services provided by GMCL on behalf of Delphi.

(c)    GMCL shall not have the power or authority to bind Delphi or to assume or create any obligations or responsibilities, express or implied, on Delphi's behalf or in its name, nor shall GMCL represent to anyone that GMCL has such power or authority except as expressly provided in this Agreement or as may be expressly agreed to in writing by the Parties. Delphi shall not have the power or authority to bind GMCL or to assume or create any obligations or responsibilities express or implied, on GMCL's behalf or in its name nor shall Delphi represent to anyone that Delphi has such power or authority except as expressly provided in this Agreement or as may be expressly agreed to in writing by the Parties.

(d)    Assigned Employees performing the Services under this Agreement shall at all times be under GMCL's direction and control and both GMCL and Delphi shall instruct their personnel accordingly. GMCL shall retain the sole and exclusive right to assign, direct, discipline, promote, hire and terminate the Assigned Employees, except as otherwise expressly provided in this Agreement.

## 2.6    GMCL Supervision

(a)    GMCL has the exclusive right to discipline Assigned Employees, subject to the applicable terms and conditions of employment. If GMCL determines that it is appropriate to suspend or terminate an Assigned Employee, then GMCL shall so

notify Delphi in writing and at GMCL's option, either terminate or suspend the employment of the Assigned Employee, or terminate the assignment in respect of that Assigned Employee and accept that Assigned Employee into another position outside of the Businesses. If GMCL chooses to terminate the assignment and transfer the Assigned Employee to a GMCL position, then:

(i)     GMCL and Delphi shall, acting reasonably having regard to all of the surrounding circumstances, mutually agree upon the effective date of such transfer; and

(ii)    Delphi shall be responsible for all Employment Costs relating to such employee until a suitable alternative placement can be arranged for the Assigned Employee.

(b)    If a dispute arises between GMCL and the CAW regarding the termination of the assignment of an Assigned Hourly Employee and a transfer of the Assigned Hourly Employee out of either Business, the dispute shall be deemed to be a Collective Agreement Issue which shall be managed in accordance with the requirements of Section 2.3 of this Agreement. The Collective Agreement Issue will be permitted to proceed to arbitration if GMCL and the CAW are unable to agree on any other resolution. GMCL and Delphi agree to be bound by the outcome of any such arbitration, including (but not limited to) an award that the Assigned Hourly Employee is to be reinstated to the grieved position in the Businesses.

## 2.7    Compensation, Payroll and Benefit Administration

Subject to GMCL entitlement to be reimbursed by Delphi in accordance with Article 3 of this Agreement:

(a)    GMCL shall continue to maintain, administer and pay the payroll and benefits of the Assigned Hourly Employees in accordance with the Collective Agreement and applicable Law.

(b)    GMCL shall continue to maintain, administer and pay the payroll and benefits of Assigned Salaried Employees in accordance with GMCL Policy. GMCL will advise Delphi in writing of any material changes to GMCL Policy as soon as practicable in advance of the implementation of such changes

(c)    GMCL will remain solely responsible for the maintenance, administration and payment of Workplace Safety and Insurance, Employment Insurance, Canada Pension Plan, Employer Health Tax and all other coverage and payments or assessments to governments or government agencies that accrue or arise after the

commencement of this Agreement in connection with the Assigned Employees. Without limiting the foregoing, GMCL shall remain responsible for and make payments necessary to satisfy the requirements of the *Income Tax Act* (Canada) and any provincial taxes in connection with the Assigned Employees.

### 2.8    Delphi Directly Hiring Employees

Delphi agrees that it will not hire any persons to perform work required to be performed by members of the CAW bargaining unit at the Businesses. All such persons shall be provided by GMCL in accordance with this Agreement. Delphi may directly hire personnel as Delphi employees or Delphi contract employees ("Delphi Employees"), provided that they will not perform work required to be performed by members in the bargaining unit governed by the Collective Agreement.

Delphi will directly pay all costs associated with Delphi Employees. Delphi Employees will have no entitlement under GMCL r Policies, including, without limitation to GMCL self nomination process and GMCL benefit programs and will have no access or recall rights to any GMCL position. Delphi shall be directly responsible for establishing and maintaining appropriate payroll, and benefit practices and benefit plans for Delphi Employees. Delphi will be solely responsible for the maintenance, administration and payment Workplace Safety and Insurance, Employment Insurance, Canada Pension Plan, Employer Health Tax and all other coverage and payments for assessments to governments or governmental agencies that arise or accrue in connection with Delphi Employees. Delphi shall be responsible for making payments necessary to satisfy the requirements of the Income Tax Act (Canada) and any provincial taxes in connection with the Delphi Employees. Delphi will be solely responsible for directing and supervising Delphi Employees unless otherwise agreed between the Parties.

### 2.9    Termination of Assignment

(a)    If an Assigned Employee departs a Business for any reason other than layoff or termination at the request of Delphi, including, without limitation, transfer, resignation, election to transfer to another location at GMCL, GMCL shall inform Delphi of the employee's departure as soon as practicable upon GMCL becoming aware of the departure. If Delphi is advised by an Assigned Employee that he or she is terminating or resigning, Delphi shall inform GMCL but shall have no authority to accept such termination or resignation.

(b)    Subject to Section 2.10 and 2.2(b), GMCL will not be responsible for replacing Assigned Salaried Employees. GMCL shall be responsible only for staffing any vacancy that results from an Assigned Hourly Employee departing from the Business other than layoff or termination at the request of Delphi, and then only if

Delphi requests replacement of such persons.  Any GMCL employee filling such vacancy shall be deemed to be an Assigned Employee.

(c)    Where an Assigned Hourly Employee elects to transfer out of the Business in accordance with the Collective Agreement, GMCL and Delphi shall, acting reasonably having regard to all of the surrounding circumstances, and subject to the requirements of the Collective Agreement, mutually agree upon the effective date of such transfer.

(d)    It is agreed GMCL will not replace or increase the number of Customer Service Engineers ("CSEs") employed in respect of the Businesses.  Notwithstanding the provisions on any purchase order governing the services provided by CSEs to the Businesses, all Employment Costs, and support costs related to CSEs (including all of GMCL's costs relating to vehicles provided to such CSE's, such as insurance, marketing losses, theft, repair, replacement, gas, etc.) will be the responsibility of the appropriate Delphi division and will be reimbursed to GMCL by that Delphi division.

## 2.10    Self Nomination by Assigned Salaried Employee

Assigned Salaried Employees may continue to self-nominate for other positions within GMCL in accordance with the GMCL self-nomination process and policies (subject to reasonable restrictions on movement where such move is determined by Delphi to be adverse to a Business).  GMCL will not reassign Assigned Salaried Employees away from the Business without first consulting Delphi and obtaining Delphi's consent which consent shall not be unreasonably withheld.  Positions to replace Assigned Salaried Employees will be posted by GMCL in accordance with GMCL policies upon Delphi's request when openings arise as a result of an Assigned Salaried Employee self-nominating for other positions within GMCL.  Appropriate replacement personnel satisfactory to Delphi include other qualified GMCL salaried employees as identified in accordance with GMCL Policies who volunteer to transfer to either Business or Delphi Employees.

GMCL alone will be required to review and approve internal postings for and promotions to "Level 8" positions involving Assigned Salaried Employees.

Neither Party or their affiliates may approach the other's employees about employment opportunities without prior written consent of the other Party.

## 2.11    Delphi Offers of Employment

Once Delphi has provided notice in writing to GMCL of its *bona fide* long-term plan for the Businesses, Delphi will be permitted to offer *bona fide* employment to the Assigned

Salaried Employees upon terms and conditions to be agreed between GMCL and Delphi, but in any case substantially similar in value in the aggregate to that then offered by GMCL. Once all the terms of employment have been agreed upon between GMCL and Delphi and the offers made, such Assigned Salaried Employees will have thirty (30) days to consider the offer of employment. During that period, GMCL and Delphi will work together to encourage Assigned Salaried Employees to accept employment with Delphi. The effective date of the transfer to employment with Delphi will be a mutually agreeable date, no later than 18 months thereafter and GMCL and Delphi will work together to transition any Assigned Salaried Employees who elect not to transfer to Delphi into suitable GMCL jobs. To the extent that such employees elect not to transition to Delphi and are not placed within GMCL, GMCL and Delphi will share equally the costs of the resulting layoff or severance, if any.

Except as provided in this Section 2.11, Delphi will not employ or offer to employ a GMCL employee or, for a period of fifteen months after retirement, a GMCL employee who has taken incentive separation from GMCL, without the prior consent of GMCL, such consent which will not be unreasonably withheld.

### 2.12    Complaints to Outside Agencies

GMCL is the party responsible for defending against all claims, complaints, suits and actions against it relating to or involved with the employment or cessation of employment of Assigned Employees, including, without limitation, claims under contract, tort, equity, or pursuant to any Employment Laws, and Delphi agrees to reimburse GMCL for the portion of any settlement or judgment that constitutes (a) Employment Costs or (b) that were caused by the actions (i) of Delphi or (ii) GMCL, where GMCL was complying with Delphi's processes or procedures or Annual Operating Parameters provided that GMCL has advised Delphi of the claim, complaint or action, and Delphi has consented to any settlement (such consent not to be unreasonably withheld). Further Delphi agrees to reimburse GMCL for all reasonable legal and administrative costs resulting from such claims, complaints suits or actions in proportion that it is obligated to reimburse GMCL on the substantive portion of the claim.

GMCL reserves the right to transfer, reassign, rehire, terminate or otherwise deal with a Assigned Employee to ensure compliance with Laws and to ensure compliance with an order or ruling from a government organization, agency or body. Delphi agrees to assist GMCL to comply with all Laws relating to the provision of Services under this Agreement.

### 2.13    Performance Evaluation

GMCL shall apply its policy of carrying out annual performance reviews to the Assigned Salaried Employees and shall conduct all such reviews in accordance with the applicable GMCL Policy. Delphi may provide input to GMCL concerning the performance of Assigned Salaried Employees. Delphi concerns about performance issues relating to Assigned Employees

may be referred to the Appeal Committee if, in Delphi's view, Delphi's concerns have not otherwise been adequately addressed..

### 2.14   Approval of Communications

(a)     Where Delphi contemplates formal communications outside of those communications required to operate the Businesses to GMCL's employees, the public or governmental representatives relating to Delphi's plans, intentions or obligations with respect to the Businesses or the Assigned Employees; such communications shall be reviewed and agreed to by both GMCL and Delphi acting reasonably. If GMCL objects to the proposed communication the dispute shall be referred to the Appeals Committee for resolution prior to its release.

(b)     GMCL shall have no authority through any authorized or unauthorized communications with its employees or their representatives, the public, or governmental officials, to commit Delphi to obligations, hiring arrangements, benefits or other terms or conditions of employment or to any other matter, nor shall any such communication by GMCL expand the specific and limited obligations of Delphi set forth herein.

(c)     Where communications are desired by Delphi to Assigned Employees, such communications shall be made by GMCL. Delphi shall have no authority through any authorized or unauthorized communications with its employees or their representatives, the public, or governmental officials, to commit GMCL to obligations, hiring arrangements, benefits or other terms or conditions or employment or to any other matter governed by this Agreement, nor shall any such communication by Delphi expand the specific and limited obligations of GMCL set forth herein.

## 3.   **PAYMENT FOR SERVICES**

### 3.1   **Delphi Reimbursement of Employment Costs**

(a)     Delphi shall be obligated to reimburse GMCL for all Employment Costs defined in subsection (b), relating to the Businesses incurred on or after May 1, 2000, which will include:   (i) weekly and semi-monthly payment for payroll, payroll related taxes, and related costs for Assigned Hourly and Assigned Salaried Employees, respectively;   (ii) reimbursement for Particular Employment Cost Matters as defined in Section 3.2; and (ii) a Composite Fringe Amount defined in Section 3.3 that is inclusive of the Layoff Cost Amount defined in Section 3.4. GMCL shall maintain responsibility for Employment Costs incurred prior to May 1, 2000, including but not limited to 2000, including but not limited to 2000 calendar year

vacation pay, special paid allowance, statutory holidays, Christmas bonus, and paid
absence allowance.

(b)     Employment Costs means all direct costs paid to or on behalf of the Assigned
Employees by GMCL relating to Services provided to the Businesses for:  (i)
salaries, wages, holiday pay, vacation pay, bonuses, costs of living allowances,
shift premiums, overtime costs;  (ii) third party provider costs GMCL incurs for
GMCL benefit plans;  (ii) legally required costs referred to in Section 2.7(c).
These Employment Costs are as set forth in Schedule 3.1(b) and must be incurred
as a result of the Collective Agreement, GMCL Policies, or Employment Laws.

## 3.2    Arrangements and Reimbursement for Particular Employment Cost Matters

### (a)    Ideas For Excellence

All GMCL employees shall remain eligible to submit suggestions under the GMCL
Ideas for Excellence Program for improvements to either GMCL or Delphi
operations.  GMCL and Delphi will appoint representatives to determine the
disposition of suggestions that affect the Businesses.  If Delphi agrees that the
suggestion made on or after May 1, 2000 is to be implemented in respect of a
Business, then Delphi and GMCL shall determine jointly the award to be made to
the GMCL employee in respect of the suggestion.  GMCL will make the payment
agreed in accordance with the GMCL Ideas for Excellence Program and Delphi
will reimburse GMCL in an amount representing Delphi's proportionate share of
the financial benefit.

### (b)    Tuition Allowance

GMCL has the right to approve the taking of courses by Assigned Employees.
Delphi shall reimburse GMCL for all costs associated with the tuition allowance
program for Assigned Salaried Employees regarding short-term training courses
where Delphi agrees to the Assigned Salaried Employee taking such course.
Delphi will have no reimbursement obligations for long-term training and
education (that is, degree programs) allowances provided to Assigned Salaried
Employees.

Delphi shall reimburse GMCL for all costs associated with the tuition assistance
program and tuition assistance for dependent children plan contemplated by the
Collective Agreement and GMCL Policy.

(c)    **Company Cars**

GMCL will continue to provide eligible Assigned Salaried Employees with
company supplied automobiles in accordance with GMCL's policies governing
company supplied automobiles. Delphi shall reimburse GMCL for all of GMCL's
costs associated with providing such automobiles to Assigned Salaried Employees
(including, without limitation marketing losses, insurance, theft, repair,
replacement, gas, etc.).

However, if Delphi U.S. establishes a uniform stipend approach in lieu of
supplying automobiles to its employees in its operations in the United States, the
total amount which Delphi reimburses to GMCL pursuant to this paragraph shall
not exceed the product of:

U.S. pre-tax stipend amount (converted to Canadian dollars) multiplied by the
number of company supplied cars used by Assigned Salaried Employees.

(d)    **Compensation Fund for Assigned Salaried Employees**

Delphi will have input regarding administration of the GMCL compensation fund
at GMCL levels as applied to the Businesses. To the extent that the GMCL
compensation fund percentage of compensation is greater than the percentage of
compensation provided under similar Delphi U.S. programs, Delphi will only be
required to reimburse GMCL for the costs that would have been incurred if
GMCL applied the Delphi U.S. percentage of compensation to the Assigned
Salaried Employees. Subject to the foregoing sentence, Delphi will reimburse
GMCL for the total amount of the enhanced variable compensation award paid by
GMCL to Assigned Employees(which in respect of any options will be based on
the Black-Scholes value at the time of the grant by GMCL) assigned by GMCL to
any stock options granted by GMCL. For greater certainty, GMCL will be
responsible and Delphi will not be obliged to reimburse GMCL for the cost of
exercise of any stock options granted by GMCL.

(e)    **General Training**

(i)    GMCL will be responsible for providing any training that is
required under the Collective Agreement and Delphi will
reimburse GMCL for all costs relating to such training.

(ii)    Other than in respect of the training referred to in subparagraph
(i) above, GMCL and Delphi will use commercially reasonable
efforts to develop a joint process to determine the appropriate

training to be provided to the Assigned Employees.  Subject to Section 3.2(e)(i), Delphi will have primary responsibility for operations and organizational-related training such as lean manufacturing training.  GMCL will have primary responsibility for personnel and country-related training, including but not limited to, health and safety, human rights, environmental and diversity training.

(iii)    Delphi will only be obligated to reimburse GMCL for its out-of-pocket costs for training, such as consultants, training materials and development costs, food and rentals of third party space. Delphi will not be responsible for costs related to GMCL employees providing the training or GMCL facilities used for the training.

(iv)    Delphi will be responsible for paying for all operations and organizational training except to the extent that bumping caused by an event caused by GMCL or GMCL employees other than Assigned Employees exceeds 10% of a specific employee classification affected by the bumping.  Such training is set forth in Section 3.2(f).  In such case, either

(1)    GMCL will either (a) provide Assigned Employees with the applicable training, or (b) will pay (and will not be reimbursed by Delphi) for the out-of-pocket costs for the standard operations and organizational training provided by Delphi, including Employment Costs,  for those new Assigned Employees, above such percentage who bump in the Businesses, or

(2)    GMCL will only transfer such persons after completing the necessary training itself.

(v)    Any dispute concerning whether training should be provided, the cost of training or the allocation of the costs therefor will be referred to the Appeal Committee.

(f)    **Skilled Trades Training**

The Parties agree that certain training is required for particular trades:

Tool & Die:

Hands-on machine familiarization – (overlap with the resident trades person) – 80 hrs.

Electrician:

IMT Gas Certification – 120 hrs.

Robot Training – 80 hrs.

Hands-on Equipment Familiarization – 80 hrs. (overlap)

Miller Weld Controls – 16 hrs. (TRI-LINK only)

AFS Fastening – 24 hrs. (TRI-LINK only)

Vision Systems – 8 hrs. (TRI-LINK only)

Mig Welding – 8 hrs. (TRI-LINK only)

Industrial Mechanic - Millwright

IMT Gas Certification – 120 hrs. (Delphi should only train the 16 people and beyond that all additional would be GMCL's responsibility)

Hands-on Equipment Familiarization – 80 hrs. (overlap)

Mig Welding (Robots) – 8 hrs. (TRI-LINK only).

GMCL and Delphi will agree upon the allocation of the costs in advance of such training.

(g) **Travel**

If it is necessary for Assigned Employees to travel in the course of their work assignment, the travel guidelines of the GM Travel Policy, as amended from time to time, will apply to Assigned Salaried Employees and the Collective Agreement will apply to Assigned Hourly Employees. The Assigned Employees will be reimbursed by GMCL and Delphi will reimburse GMCL for such costs of travel that Delphi approves in advance.

(h)    **Lay-offs and Terminations**

    (i)    <u>Lay-offs Under Thirteen Weeks</u>

        The costs of any layoffs anticipated to be of thirteen (13) weeks or less will be paid by GMCL and reimbursed by Delphi as incurred regardless of the initiating cause. Such layoffs of a temporary nature and hence the required funding will be supported by a special report to be generated by GMCL to Delphi. When a layoff is deemed to be short term GMCL will continue to be reimbursed in the same fashion until such time that the layoff ends.

    (ii)    <u>Lay-offs Greater than Thirteen Weeks</u>

        (A)    Delphi shall give GMCL at least six months' notice of any changes to the Businesses that may lead to the layoff of Assigned Employees anticipated to be greater than thirteen (13) weeks, (but at least one year in the event of a plant closure). Delphi acknowledges that GMCL has obligations that could be breached if Delphi fails to give GM notice of layoffs anticipated to be greater than 13 weeks. Upon receipt of such notice, GMCL shall provide sufficient working notice to the CAW and any affected Assigned Hourly Employees in compliance with the applicable statutory and Collective Agreement notice requirements. GMCL shall pay the costs relating to layoffs of this nature and will be reimbursed by Delphi in respect of the Layoff Cost Amount in accordance with Sections 3.3 and 3.4.

(i)    **Vehicle Purchase Program**

    GMCL will bear the costs of the GMCL Vehicle Purchase Program if used by Assigned Employees. Delphi will not be required to reimburse such costs.

**3.3    Composite Fringe Amount**

(a)    The Composite Fringe Amount in any year will be based initially upon the costs determined in accordance with this Agreement for costs of the type set out in Schedule 3.3. Such amount will include an amount for layoffs of a type referred to in Section 3.2(h)(ii) and early retirement costs determined in accordance with section 3.4 ("Lay-off Cost Amount"). The Composite Fringe Amount will be reviewed and adjusted annually to reflect the variance in the prior year's forecast. The Parties recognise that costs of the type set out in Schedule 3.3 are not

definitive of all types of costs that should be considered as part of the Composite Fringe Amount in future years. The Composite Fringe Amount may vary from year to year reflecting required legislative or market changes to fringe benefits paid by GMCL to its employees. As well, the types of costs incurred may vary depending on the particular sub-population of employees under study.

(b)     In relation to the OPEB Expense and the Pension Expense, which forms part of the Composite Fringe Amount, the annual adjustment will reflect (i) the difference between the forecast number of Assigned Employees and the actual number of such Assigned Employees and (ii) the difference between the forecast OPEB Expense and Pension Expense upon which the monthly invoices to Delphi are based, and the actual OPEB Expense and Pension Expense, based upon the relevant FASB report referred to in this Section.

(c)     For each calendar year Delphi and GMCL will agree on a Composite Fringe Amount for Assigned Employees that includes: (i) selected forecast fringe benefit costs for the calendar year; and (ii) any amount carried forward from the previous calendar year that represents the difference between the amount accrued by GMCL in accordance with this Agreement and the amount paid by Delphi Canada. The reconciliation of the Composite Fringe Amounts contemplated in Article 3 will be at calculated at a minimum, on an annual basis, but no later than January of the following year. Delphi and GMCL will reconcile the Actual "Composite Fringe Benefit" categories to the amount which Delphi reimbursed on a 1/12th budget basis and the aggregate variance will be settled no later than March 31 of the following year.

(d)     The Composite Fringe Amounts for Assigned Employees will include an amount for Pension Expense reflecting active service cost only (i.e., exclude any amount for interest expense, retiree expense or prior period actuarial gains or losses) where GMCL's liability for the Business employees is valued on an economic basis. For pension liability valuation purposes, all actuarial assumptions will be consistent with GMCL's prior year-end valuation as reported in GMCL's FASB-87 report, except for: (i) the discount rate, which will be the plan's actuarially assumed asset return rate in the previous year; and (ii) the pension benefit will be assumed to increase at the average rate over the past rolling 10 years. These exceptions will adjust the valuation to be an economic valuation. By valuing these expenses on an economic basis, any future pension benefit enhancements approved by GMCL will not be incorporated in any future allocations to Delphi (i.e., the benefit plan design will remain fixed).

(e)     The Composite Fringe Amounts for Assigned Hourly Employees will also include an amount for OPEB Expense reflecting active service cost only (i.e., exclude any amount for interest expense, retiree expense or prior period actuarial gains or

losses) where GMCL's liability for the Business employees is valued on an economic basis. For OPEB liability valuation purposes, all actuarial assumptions will be consistent with GMCL's prior year-end valuation as reported in GMCL's FASB-106 report, except for: (i) the discount rate, which will be the Pension Plan's actuarially assumed asset return rate in the previous year; and (ii) the health care trend rate will be assumed to be 100 basis points higher. These exceptions will adjust the valuation to be an economic valuation. By valuing these expenses on an economic basis, any future OPEB enhancements approved by GMCL will not be incorporated in any future allocations to Delphi (i.e., the benefit plan design will remain fixed).

(f)     The hourly and salaried Composite Fringe Amounts will include amounts for other fringe benefits that reflect GMCL's prior experience adjusted in a way consistent with GMCL's budgeting process used to determine the expense at GMCL's other operations.

### 3.4    Lay-off Cost Amount

(a)     Delphi and GMCL will agree on Lay-off Cost Amounts for Assigned Employees in accordance with the following process:

(i)     In May of each year, prior to the commencement of the applicable calendar year budget process, the Parties will agree on the next year's forecast Lay-off Cost Amount using a weighted amount of lay-off costs and the cost of early retirement. The weighting will be determined, and mutually agreed upon based on past experience for the number of retirement elections.

(ii)    The layoff costs will include SUB, IMP, VTEP payment, Health care, group insurance and any Pension Expense and OPEB Expense as calculated in the Composite Fringe Amount. The early retirement allowance will include the allowance and pension plan experience loss. (See Schedule 3.4 for examples)

(b)     The Lay-Off Cost Amount will be reviewed and adjusted annually to reflect the difference between forecast lay-off events (i.e., timing, number and mix of layoffs and early retirements) and actual layoff events (i.e., timing, number and mix). The variance between forecast and actual lay-off events and resulting actual and forecast Lay-off Cost Amounts will be subject to an annual reconciliation of the assumed timing, number and mix of long term layoff and early retirement as part of the reconciliation of the Composite Fringe Amount.

(c)     The base head count for assessing the Layoff Cost Amount for 2000 calendar year will be 449 Assigned Hourly Employees and 52 Assigned Salaried Employees. The base head count will be reduced by 1% annually for normal attrition (such as normal retirement without incentive payments, quit, or deaths). Such reduction will be recognised only as of January (starting in 2001) of each year, rounded down to the next whole number. The base head count will also be reduced for actual long-term layoffs that have occurred and for which Delphi has agreed to pay the costs pursuant to this Section 3.4. Base head count will be increased for additional permanently assigned heads added to Delphi.

(d)     Notwithstanding anything else in this Agreement, Delphi shall only be responsible for reimbursing layoff costs amount relating to long-term layoffs for Assigned Employees when such layoff reduces the Assigned Employee headcount within the Businesses below the then applicable base headcount for assessing actual layoff costs set out in the paragraph above.

**[Delphi will be given credit against future Layoff Cost Amounts for reducing GMCL layoff costs during periods that the Businesses Assigned Employees who are permanent active GMCL employees are is in excess of the base head count.]** However, in such case, notwithstanding the definition of Employment Costs and Lay-off Cost Amount, Delphi will be responsible for reimbursing GMCL for any actual layoff costs incurred by GMCL subsequent to the commencement of this Agreement in relation to Assigned Employees for whom it has received such credit, but only if such excess employees are actually laid off directly from Delphi.

### 3.5    Invoices

GMCL shall invoice Delphi, and be paid, for the Services and other amounts required to be paid by Delphi to GMCL under this Agreement in accordance with the Schedule 3.5 attached hereto. GMCL's invoice for the Services will be submitted t on or before the times specified in Schedule 3.5. Delphi shall pay by electronic fund transfer on or before the times specified on Schedule 3.5. Any amounts payable under this Agreement in respect of which goods and services tax or harmonized sales tax is payable shall have such tax added thereto, and Delphi shall in addition to the amount payable pay an amount equal to the tax exigible thereon to the bank account(s) specified by GMCL from time to time.

In the event that GMCL determines that an invoice previously issued contains an error or omission, a correction will be made to a subsequent invoice as soon as is practicably possible. The subsequent invoice will show the correction as a separate line item with a description of the nature of the error and the period to which it relates.

- 22 -

GMCL shall be solely responsible for any penalties or interest as a result of errors or omissions arising from the assessment, calculation, collection, payment, or remittance of any goods and services tax or any other applicable tax related to GMCL's invoices for Services.

## 4.    **TERM AND TERMINATION**

### 4.1    **Termination**

This Agreement shall commence May 1, 2000 and shall continue indefinitely unless terminated under, and only under, the following alternative conditions.

1.    Delphi gives written termination notice to GMCL on or before September 1, 2001 with termination effective December 31, 2002 or such other date to which both Parties agrees.

2.    Delphi gives written termination notice to GMCL on or before September 1, 2004 with termination effective December 31, 2005 or such other date to which Parties agrees.

3.    Delphi gives written termination notice to GMCL on or after December 31, 2005 with termination effective at least one year after notice has been given or such other date to which GMCL agrees.

4.    GMCL gives written termination notice to Delphi with termination effective at least to one year after notice has been given.

The Party requesting termination shall be liable for costs associated with termination of this Agreement including, but not limited to, associated severance and layoff costs.

### 4.2    **Insolvency Default**

A Party (not then subject to the events enumerated in this Section) may terminate this Agreement on sixty (60) days' notice if:

(a)    if the other Party does not generally pay its debts when such debts become due or admits in writing its inability to pay its debts generally or becomes insolvent or makes a general assignment for the benefit of creditors or conveys or transfers any of its material property with a view to delaying, defeating or hindering creditors or any proceedings are instituted by or against the other Party seeking to adjudicate it a bankrupt or insolvent or seeking liquidation or winding up, reorganization or relief of debtors or other similar law or seeking the entry of an order for relief or

- 23 -

the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property (excluding proceedings being contested by the other Party in good faith so long as any enforcement proceedings are stayed), or if a receiver, trustee, custodian or other similar official for it or for any substantial part of its property is appointed, or any of them shall take any corporate action to authorize any of the actions set forth above in this clause;

(b)     if an order shall be made or an effective resolution passed for the winding-up, liquidation or dissolution of the other Party; or

(c)     if an encumbrancer shall take possession of all or a substantial part of the property of the other Party (whether by appointment of a receiver, receiver and manager or otherwise) or if a distress or execution or any similar process be levied or enforced there against and remain unsatisfied for such period as would permit such property or such substantial part thereof to be sold thereunder.

The Party whose condition under either paragraphs (a), (b), or (c) triggered the termination shall bear the costs of any such termination of this Agreement, including layoff and severance costs.

### 4.3     Force Majeure

Delays in or the failure of any Party to perform its obligations under this Agreement shall not constitute a default hereunder or give rise to any claim for Loss if and to the extent caused by a general lock-out of the GMCL complex or occurrences beyond the control of the Party so affected, including, but not limited to, decrees of Government (whether federal, provincial or municipal), acts of God, inability to procure materials or labour, strikes (legal or illegal), slowdowns, refusal to work or other activity to restrict output by Assigned Employees, fires, floods, explosions, riots, war, rebellion, sabotage and atomic or nuclear incidents; but lack of finances shall in no event be deemed to be a cause beyond a Party's control. A Party, who wishes to rely on this Section, shall advise the other Parties of such state of force majeure as soon as possible.

## 5.     INDEMNITY

### 5.1     Indemnity by GMCL

GMCL shall defend, hold harmless and indemnify Delphi against any Loss as a result of, in connection with or related to:

(a)     product liability claims in respect of products manufactured by GMCL Assigned Employees for Delphi pursuant to this Agreement, but only to the extent of any Loss attributable to the gross negligence or wilful misconduct of GMCL or its