employees in failing to comply with Delphi's manufacturing processes and procedures as required under this Agreement. For greater certainty Delphi is responsible and liable for all aspects of the design and engineering of such products manufactured after the date of the Agreement;

(b)    all employment related claims by Assigned Employees, or by the CAW on behalf of Assigned Employees, except (i) that such indemnity shall not preclude GMCL from claiming reimbursement from Delphi for any portion of such Losses that are otherwise amounts reimbursable by Delphi to GMCL under this Agreement and (ii) this indemnity does not extend to Losses to the extent, such Losses, are attributable to (A) GMCL properly implementing Delphi Annual Operating Parameters or (B) to the gross negligence of Delphi or wilful misconduct of Delphi Employees, (including without limitation, breach of Laws, or actions constituting sexual harassment or constructive dismissal);

(c)    claims by the CAW in relation to this Agreement and GMCL's performance of the terms of this Agreement, except to the extent that the claim relates to the actions of GMCL taken at the direction of Delphi or in accordance with the proper implementation of the Annual Operating Parameters.

(d)    claims, including prosecutions and other regulatory proceedings, commenced against Delphi Canada as a result of the alleged failure of GMCL to comply with the duties and responsibilities under applicable Laws in relation to GMCL's provision of Services under this Agreement.

## 5.2    Indemnity by Delphi

Delphi shall defend, hold harmless and indemnify GMCL against any Loss as a result of, in connection with or related to:

(a)    product liability claims relating to products manufactured after the date of this Agreement, except claims that are specified as a GMCL liability in s. 5.1(i); or

(b)    any employment related claims by Delphi Employees, except to the extent that such claims relates to the gross negligence of GMCL or wilful misconduct of GMCL employees (other than Assigned Employees) including breach of Laws, actions constituting sexual harassment or constructive dismissal.

## 5.3    Certain Limitations

Unless otherwise specifically provided, the obligations of indemnification in Sections 5.1 and 5.2 shall be subject to the requirements that the Party seeking to be indemnified

provides the indemnifying Party, in respect of any claim made by a third party, prompt notice in writing of such claim and an opportunity at the indemnifying Party's sole expense to resist, defend and negotiate a settlement regarding the same, including the final disposition of any appeal therefrom. The other Party shall have the right at its sole expense and option to be represented by counsel of its own choice in defence of any such claim and to be consulted in respect of all negotiations for settlement in connection with any such claim.

### 5.4    Sole Remedy

The Parties agree that any dispute between GMCL and Delphi with respect to the obligations of the parties to this Agreement or the interpretation, application, or alleged violation of this Agreement or the failure by the Parties to agree on a matter which, under the terms herein, requires the agreement of the Parties (collectively "Disputes") shall be subject to the provisions set out in Section 5.5.

### 5.5    Dispute Resolution

The Parties shall use all commercially reasonable efforts to settle all Disputes without resorting to mediation, arbitration or otherwise. Senior employees with expertise concerning the dispute shall first attempt to settle the Dispute within thirty (30) days of the issue being raised in writing by a Party. In the event that the Dispute is unresolved at the end of such period, it may be referred by either party to an appeal committee consisting of the GMCL Vice President, Personnel, Vice President Finance and Vice President Operations and Delphi E&C Director of Canadian Operations and Personnel Director, Delphi's Oshawa site manager and Delphi Canada's CFO (the "Appeal Committee"). The Appeal Committee will meet within thirty (30) days of having a Dispute referred to it and use commercially reasonable efforts to resolve the Dispute within sixty (60) days of the date of the referral of the Dispute. Regarding labour issues, the Appeal Committee will resolve Disputes in an effort to achieve a result that reflects as reasonably practicable the result that would have occurred had Delphi executed its own collective agreement with the CAW in the context of being the major supplier to GMCL. If any Dispute remains unsettled by the Appeal Committee within thirty (30) days of a Dispute being referred to it, either Party may require that the Dispute be subject to the Dispute resolution mechanism agreed between General Motors Corporation and Delphi U.S. If the Dispute is not resolved within the time frame set out in such agreement a Party may commence proceedings hereunder by delivering a written notice from a Senior Vice President or comparable executive officer of such Party (the "Demand") to the other Party providing reasonable description of the Dispute to the other and expressly requesting mediation hereunder.

The Parties hereby agree to submit all Disputes to non-binding mediation before a mediator reasonably acceptable to both Parties. If, after such mediation, the Parties subject to such mediation disagree regarding the mediator's recommendation, such Dispute shall be submitted to arbitration under the terms hereof, which arbitration shall be final, conclusive and binding upon the Parties, their successors and assigns. The arbitration shall be conducted in

Oshawa, Ontario by three arbitrators acting by majority vote (the "Panel") selected by agreement of the parties not later than ten (10) days after the delivery of the recommendation provided by the mediator as described above or, failing such agreement, appointed pursuant to the commercial arbitration rules of the American Arbitration Association, as amended from time to time (the "AAA Rules"). If an arbitrator so selected becomes unable to serve, his or her successors shall be similarly selected or appointed. The arbitration shall be conducted pursuant to the l Arbitration Act (Ontario) and such procedures as the Parties subject to such arbitration may agree, or, in the absence of or failing such agreement, pursuant to the AAA Rules. Notwithstanding the foregoing: (i) each Party shall have the right to audit the books and records of the other Party that are reasonably related to the Dispute; (ii) each Party shall provide to the other, reasonably in advance of any hearing, copies of all documents which a Party intends to present in such hearing; and (iii) each Party shall be allowed to conduct reasonable discovery through written requests for information, document requests, requests for stipulation of fact and depositions, the nature and extent of which discovery shall be determined by the Parties; provided that if the Parties cannot agree on the terms of such discovery, the nature and extent thereof shall be determined by the Panel which shall take into account the needs of the Parties and the desirability of making discovery expeditious and cost effective. The award shall be in writing and shall specify the factual and legal basis for the award. The Panel shall apportion all costs and expenses of arbitration, including the Panel's fees and expenses and fees and expenses of experts, between the prevailing and non-prevailing Party as the Panel deems fair and reasonable. The Parties hereto agree that monetary damages may be inadequate and that either Party by whom this Agreement is enforceable shall be entitled to seek specific performance of the arbitrators' decision from a court of competent jurisdiction, in addition to any other appropriate relief or remedy. Notwithstanding the foregoing, in no event may the Panel award consequential, special, exemplary or punitive damages. Any arbitration award shall be binding and enforceable against the parties hereto and judgment may be entered thereon in any court of competent jurisdiction.

## 6.    INSPECTION OF RECORDS

### 6.1    Records

All Employment Cost and time records shall be maintained by GMCL and GMCL shall maintain detailed, complete and accurate accounting records of Employment Costs and of the hours of direct labour performed under this Agreement. The hours of such labour billed by GMCL shall be supported by work schedules showing hours worked and by evidence of actual payment either through payroll records or cancelled cheques. All records pertaining to this Agreement shall be preserved for at least seven (7) years following the expiration or termination of this Agreement or any purchase order under it.

GMCL agrees that its books and records, or such part thereof, relating to the performance of its obligations under this Agreement, shall at all reasonable times during business hours and on reasonable prior notice be subject to inspection by any authorized representative of Delphi and/or any government authorities having jurisdiction.

## 7.    COMPLIANCE WITH LAW

### 7.1    Compliance with Law

GMCL and Delphi, as the case may be,  shall use commercially reasonable efforts to cause their respective employees, agents and representatives to, comply with and observe all applicable Laws,.

### 7.2    Permits and Approvals

GMCL is responsible for obtaining (and maintaining) any necessary governmental permits for approvals that are required by law in order for GMCL to provide the Services to Delphi under this Agreement.

### 7.3    Governing Law

This Agreement shall be governed by, and construed and enforced in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein.  Subject to Section 5.5, the Parties hereby irrevocably attorn to the exclusive jurisdiction of the Courts of the Province of Ontario in respect of the subject matter hereof.

## 8.    CONFIDENTIALITY

### 8.1    GMCL's Name

Delphi shall not, directly or indirectly, in any manner use or register or attempt to register (i) any name containing General Motors of Canada Limited, GMCL, General Motors Corporation, General Motors or GM, or (ii) any other mark, name or design owned by GMCL or its subsidiaries or affiliates or any confusingly similar marks, names or designs.  Without limiting the generality of the foregoing, Delphi shall not use GMCL's name in any advertising, promotional materials, publicity releases or other written material distributed to prospective clients relating to the Services to be performed by GMCL hereunder or the results thereof, without the prior written consent of GMCL.

### 8.2    Delphi Confidentiality Obligations

All GMCL Confidential Information disclosed or otherwise made available to Delphi by GMCL shall be considered confidential by Delphi. "GMCL Confidential Information" means confidential information known or used by GMCL in connection with its business including without limitation employee information (both personal and costs), financial information, marketing information, business opportunities and research and development which information

may be modified, amended or improved from time to time, together with all data, compilations of information, forecasts, studies and other documentation, whether in oral, written, graphic, machine readable or physical form.

Delphi shall not be subject to the obligations of this Section 8.2 with respect to:

(a)     information which is in the public domain or public information at the time of Delphi's receipt thereof from GMCL;

(b)     information which, after Delphi's receipt thereof from GMCL, becomes part of the public domain or public information through no act or fault of Delphi;

(c)     information which Delphi can show was lawfully in Delphi's possession prior to the receipt thereof from GMCL;

(d)     information which at the time it was received in good faith by Delphi from an independent third party was lawfully in possession of such third party and under no obligation of secrecy; and

(e)     information which is released from the provisions of this Agreement by the written authorization of GMCL.

Delphi shall, and shall cause its officers, directors, employees and agents, to keep confidential all Confidential Information and not use such information except as contemplated by this Agreement. The standard of care imposed on Delphi for protecting such information shall be the reasonable and prudent care necessary to prevent improper disclosure or use of such information, to the same degree employed by Delphi to protect its own information of such nature, Delphi shall not be liable to GMCL, nor it will not be a default under this Confidentiality provision unless Delphi is grossly negligent in breaching this standard. During and after the term of this Agreement, Delphi agrees to not for any reason, without the prior written authorization of GMCL, directly or indirectly provide any other person, firm or corporation with access to the GMCL Confidential Information or make use of the GMCL Confidential Information for its personal benefit or for the benefit of any person, firm or corporation other than GMCL or assist others in doing so.

Delphi acknowledges that the GMCL Confidential Information is confidential and a valuable asset of GMCL and is and at all times shall remain the exclusive property of GMCL and the confidentiality of the same shall be protected by Delphi. All applicable intellectual property rights residing in the GMCL Confidential Information, including, without limitation, patents, copyrights, industrial designs, trade-marks and trade secrets are and will remain the exclusive property of GMCL.

Upon written request from GMCL upon the termination of this Agreement, Delphi shall promptly return to GMCL all GMCL Confidential Information in Delphi's possession or subject to its control.

Delphi agrees to request that Delphi salaried employees execute a confidentiality acknowledgment in favour of GMCL substantially in the form of Schedule 8.2.

In the event that Delphi or anyone to whom Delphi provides or otherwise makes available the GMCL Confidential Information pursuant to this Agreement becomes legally compelled to disclose any of the GMCL Confidential Information to any government entity or other third party, Delphi will provide GMCL with prompt notice, together with copies of all GMCL Confidential Information which Delphi intends to disclose so that GMCL may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. Such notice and GMCL Confidential Information shall be provided to GMCL in writing at least five (5) Business Days prior to disclosure of same to any governmental entity or other third party. In the event that such protective order or other remedy is not obtained, or that GMCL waives compliance with the provisions of this Agreement, Delphi will furnish only that portion of the GMCL Confidential Information which Delphi is advised, by written opinion of counsel, addressed to Delphi, is legally required and will exercise reasonable commercial efforts to obtain reliable assurance that confidential treatment will be accorded the GMCL Confidential Information.

### 8.3    GMCL Confidentiality Obligations

All Delphi Confidential Information disclosed or otherwise made available to GMCL by Delphi shall be considered confidential by GMCL. "Delphi Confidential Information" means confidential information known or used by Delphi in connection with its business including without limitation employee information (both personal and costs), financial information, marketing information, business opportunities and research and development which information may be modified, amended or improved from time to time, together with all data, compilations of information, forecasts, studies and other documentation, whether in oral, written, graphic, machine readable or physical form.

GMCL shall not be subject to the obligations of this Section 8.3 with respect to:

(a)    information which is in the public domain or public information at the time of GMCL's receipt thereof from Delphi;

(b)    information which, after GMCL's receipt thereof from Delphi, becomes part of the public domain or public information through no act or fault of GMCL;

(c)     information which GMCL can show was lawfully in GMCL's possession prior to the receipt thereof from Delphi;

(d)     information which at the time it was received in good faith by GMCL from an independent third party was lawfully in possession of such third party and under no obligation of secrecy; and

(e)     information which is released from the provisions of this Agreement by the written authorization of Delphi.

GMCL shall, and shall cause its officers, directors, employees and agents, to keep confidential all Delphi Confidential Information and not use such information except as contemplated by this Agreement. The standard of care imposed on GMCL for protecting such information shall be the reasonable and prudent care necessary to prevent improper disclosure or use of such information, to the same degree employed by GMCL to protect its own information of such nature, GMCL shall not be liable to Delphi, nor it will not be a default under this Confidentiality provision unless GMCL is grossly negligent in breaching this standard. During and after the term of this Agreement, GMCL agrees to not for any reason, without the prior written authorization of Delphi, directly or indirectly provide any other person, firm or corporation with access to the Delphi Confidential Information or make use of the Delphi Confidential Information for its personal benefit or for the benefit of any person, firm or corporation other than Delphi or assist others in doing so.

GMCL acknowledges that the Delphi Confidential Information is confidential and a valuable asset of Delphi and is and at all times shall remain the exclusive property of Delphi and the confidentiality of the same shall be protected by GMCL. All applicable intellectual property rights residing in the Delphi Confidential Information, including, without limitation, patents, copyrights, industrial designs, trade-marks and trade secrets are and will remain the exclusive property of Delphi.

Upon written request from Delphi upon termination of this Agreement, GMCL shall promptly return to Delphi all Delphi Confidential Information in GMCL's possession or subject to its control.

GMCL agrees to request that GMCL Assigned Salaried Employees execute a confidentiality acknowledgment in favour of Delphi substantially in the form of Schedule 8.3.

In the event that GMCL or anyone to whom GMCL provides or otherwise makes available the Delphi Confidential Information pursuant to this Agreement becomes legally compelled to disclose any of the Delphi Confidential Information to any government entity or other third party, GMCL will provide Delphi with prompt notice, together with copies of all Delphi Confidential Information which GMCL intends to disclose so that Delphi may seek a

protective order or other appropriate remedy and/or waive compliance with the provisions of this
Agreement. Such notice and Delphi Confidential Information shall be provided to Delphi in
writing at least five (5) Business Days prior to disclosure of same to any governmental entity or
other third party. In the event that such protective order or other remedy is not obtained, or that
Delphi waives compliance with the provisions of this Agreement, GMCL will furnish only that
portion of the Delphi Confidential Information which GMCL is advised, by written opinion of
counsel, addressed to GMCL, is legally required and will exercise reasonable commercial efforts
to obtain reliable assurance that confidential treatment will be accorded the Delphi Confidential
Information.

### 8.4    Public Disclosures

The terms of this Agreement shall be kept confidential by the Parties except that
the CAW may be informed by GMCL of its terms. GMCL and Delphi Canada will consult with
each other before issuing any press releases or otherwise making any public statements with
respect to this Agreement or the transactions contemplated hereby, and shall not issue any press
release or make any public statement without mutual consent, except as may be required by
applicable law and then only after such prior consultation.

## 9.    **NOTICE**

### 9.1    Notice

Any notice or other communication required or permitted to be given by this
Agreement shall be in writing and shall be effectively given if (i) delivered personally; or (ii) sent
by prepaid courier service; or (iii) sent by facsimile and confirmed by mailing the original
document so sent by prepaid mail on the same or following day,

If to GMCL:

General Motors of Canada Limited
1908 Colonel Sam Drive
Oshawa, Ontario  L1H 8P7
Attention:      Treasurer
Fax No:       (905) 644-6273

with a copy to:  General Motors of Canada Limited

1908 Colonel Sam Drive
Oshawa, Ontario  L1H 8P7
Attention:      General Counsel
Fax No:        (905) 644-7772

If to Delphi Canada:

Delphi Canada Inc.
c/o Delphi Energy & Chassis Systems
4800 S. Saginaw Street
M/C 485-301-14C

Flint, Michigan 48501

Attention:      President
Fax No:        (810) 257-6957

with a copy to:  Delphi Automotive Systems Corporation

5725 Delphi Drive
Troy, MI 48098-2815
Attention:      Assistant General Counsel, Commercial Practices
Fax No.        (248) 813-2491

or at such address as the Party to whom such notice or other communication is to be given
shall have advised the Party giving same in the manner provided in this Section.  Any
notice or other communication delivered personally or by prepaid courier service shall be
deemed to have been given and received on the day of actual receipt at such address,
provided that if such day is not a Business Day (as defined below), such notice or other
communication shall be deemed to have been given and received on the next Business
Day.  Any notice or other communication transmitted by facsimile shall be deemed given
and received on the day of its transmission provided that the sending Party contacts the
receiving Party to confirm receipt thereof and that such day is a Business Day and such
transmission is completed before 5:00 p.m. on such day, failing which such notice or other
communication shall be deemed given and received on the first Business Day after its
transmission.  Regardless of the foregoing, if there is a mail stoppage or labour dispute or
threatened labour dispute which has affected or could affect normal mail delivery by
Canada Post, then a Party who sends a notice or other communication by telecopier shall
be relieved from the obligation to mail the original document in accordance with this
Section.

10.  **GENERAL**

### 10.1    Cooperation

Delphi and GMCL agree to work together in good faith and cooperate in performing under this Agreement.  In this regard, other than with respect to claims by GMCL or any GMCL affiliate against Delphi, GMCL shall, at the reasonable request of Delphi, provide Delphi with technical assistance, documentation, and other information, through Assigned Employees and, to the extent possible, former Assigned Employees. Delphi shall reimburse GMCL for GMCL's reasonable out-of-pocket costs incurred in connection with such assistance as agreed upon by the Parties.

### 10.2    Survival

Sections 5, regarding indemnification, 6, regarding inspection of records, 8, regarding confidentiality, and 10.1, regarding cooperation, shall survive the termination of this Agreement for a period of seven (7) years.  If any portion of this Agreement is deemed invalid by a court of competent jurisdiction, the other provisions of this Agreement will apply with full force and effect.

### 10.3    No Assignment

This Agreement shall be binding upon the parties hereto and shall not be assignable or transferable by either party to any third party without the prior written consent of the other party, which consent may be withheld to the other party in its sole discretion.

### 10.4    Time

Time is of the essence in the performance of the Parties' respective obligations under this Agreement.

### 10.5    Singular, etc.

In this Agreement, the use of words in the singular or plural, or with a particular gender, shall not limit the scope or exclude the application of any provision of this Agreement to such person or persons or circumstances as the context otherwise requires.

- 34 -

### 10.6   Headings

The division of this Agreement and the insertion of headings is for convenience of reference only and shall not affect the construction or interpretation of this Agreement or any part thereof.

### 10.7   Currency

Unless otherwise indicated, all dollar amounts referred to in this Agreement are in lawful Canadian funds.  All amounts to be paid pursuant to this Agreement are to be paid in lawful Canadian funds.

### 10.8   Entire Agreement

This Agreement, including all schedules attached hereto and including any purchase orders and/or releases issued by GMCL from time to time shall constitute the entire agreement between the Parties with respect to the furnishing of the Services.

### 10.9   Waiver and Modification

No provision of this Agreement shall be deemed waived, amended or modified by any Party unless such waiver, amendment or modification is in writing, and signed by an authorized representative of each Party.

### 10.10  Business Day

For the purposes of this Agreement, "Business Day" shall mean any day that is not a Saturday, Sunday, a statutory or public holiday or a day on which GMCL is closed for business.

### 10.11  Counterparts

This Agreement may be executed by the Parties in separate counterparts or by facsimile, each of which when so executed and delivered shall be an original, but all such counterparts or facsimile copies shall together constitute one and the same instrument. All signatures of the Parties to and pursuant to this Agreement may be transmitted by facsimile, and such facsimile will for all purposes be deemed to be the original signature of the person whose signature it reproduces and will be binding upon that person and on the Party on whose behalf that person signed.

### 10.12  Third Parties

Nothing contained in this Agreement is intended to or shall be construed to confer upon or give to any person, firm, corporation, association, labour organization, or trust other than the Parties and their respective successors and permitted assigns, any claims, rights, or remedies under or by reason of this Agreement.

**IN WITNESS WHEREOF**, the Parties hereby have caused this Agreement to be

executed by their duly authorized representatives as of the date first above written.


**GENERAL MOTORS OF CANADA LIMITED**

By: _____

    Title:

By: _____

    Title:


**DELPHI CANADA INC.**

By: _____

    Title:

By: _____

    Title:


| APPROVED | |
|---|---|
| FINANCIAL | LEGAL |
| BPM 4/28/00 | CJC |
| DATE | DATE April 28, 2000 |

## SCHEDULE "2.1"

## TOTAL EMPLOYEES

| LOCATION | HOURLY EMPLOYEES | SALARIED EMPLOYEES |
|---|---|---|
| OSHAWA BATTERY | 244 | 25 |
| TRI-LINK | 205 | 27 |
| TOTAL | 449 | 52 |

Hourly Employees on leave, etc.

### Oshawa Battery

| Leave | 4 |
|---|---|
| Layoff | 8 |
| Total | 12 |

### Oshawa Tri-Link

| Leave | 3 |
|---|---|
| Layoff | 3 |
| Total | 6 |

Salaried Employees on leave, etc.

Nil

## Schedule 3.1(b) – Payroll Related Actuals

| Description | Group | |
|---|---|---|
| 1  Straight Time | Hourly | Salary |
| 2  Shift Premiums | Hourly | Salary |
| 3  Overtime | Hourly | Salary |
| 4  COLA | Hourly | |
| 5  Vacation Pay (PAA, SPA) | Hourly | |
| 6  Special Payment (Holiday Bonus) | Hourly | Salary |
| 7  Holiday Pay | Hourly | |
| 8  Short Work Week Benefits | Hourly | |
| 9  Bereavement, Election & Jury Duty | Hourly | |
| 10  Disability Leave of Absence | Hourly | Salary |
| 11  Military leave of Absence | Hourly | |
| 12  Enhanced Variable Pay | | Salary |
| 13  Health Care Tax | Hourly | Salary |
| 14  Employment Insurance | Hourly | Salary |
| 15  Employment Insurance Rebate | | Salary |
| 16  Canada Pension Plan | Hourly | Salary |
| 17  Stock Savings Plan | | Salary |
| 18  Tuition and Tool Allowance | Hourly | |
| 19  Tuition Refund | Hourly | Salary |
| 20  Worker's Compensation | Hourly | Salary |
| 21  Short-term Layoff Costs | Hourly | Salary |
| 22  Short-term Leave | Hourly | Salary |

## Schedule 3.3 – Composite Fringe Items

| Description | Group | |
|---|---|---|
| 23 Wages Training Program | Hourly | |
| 24 Group Life Insurance | Hourly | Salary |
| 25 Health Care Benefits | Hourly | Salary |
| 26 Substance Abuse | | Salary |
| 27 Legal Services Plan | Hourly | |
| 28 Retiree Health Group / OPEB | Hourly | Salary |
| 29 Pension Plan | Hourly | Salary |
| 30 Stock Savings Plan | Hourly | |
| 31 National Training Fund | Hourly | |
| 32 Paid Educational Leave | Hourly | |
| 33 Training Fund - National Overtime Penalty | Hourly | |
| 34 Long-term Layoff Costs | Hourly | Salary |
| 35 Special Canadian Contingency Plan | Hourly | |
| 36 Other Benefits As Agreed To By GMCL And Delphi From Time to Time | Hourly | Salary |

## Schedule 3.4 – Layoff Cost Example (Salary)

| Salary Layoffs | 2000 CY | 2001 CY | 2002 CY |
|---|---|---|---|
| **Year 1** | | | |
| Sub payments per head | | | |
| (6 mths * 6140/mth * 75%) + (6 mths * 6140/mth * 60%), less EI portion | 33,627 | 35,308 | 37,074 |
| Health care per head (1 mth * 307.07 + 11 mths * 222.79) | 2,758 | 2,903 | 3,055 |
| Group Ins per head ( 1 mth @ 222.96 + 11 mths @ 98.09) | 1,302 | 1,367 | 1,435 |
| Pension Cost | 5,800 | 6,090 | 6,395 |
| OPEB Cost | 1,400 | 1,474 | 1,551 |
| Total Costs - year 1 | 44,887 | 47,141 | 49,509 |
| **Year 2** | | | |
| Sub payments per head (12 mths @ $6140/mth * .60%) | 44,208 | 46,418 | 48,739 |
| Health care per head (12 mths @ 222.79) | 2,673 | 2,814 | 2,962 |
| Group Ins per head (12 mths @ 98.09) | 1,177 | 1,236 | 1,298 |
| Pension Cost | 5,800 | 6,090 | 6,395 |
| OPEB Cost | 1,400 | 1,474 | 1,551 |
| Total Costs - year 2 | 55,259 | 58,032 | 60,944 |
| **Year 3** | | | |
| ICP payments per head (12 mths @ $6140/mth * 60%) | 44,208 | 46,418 | 48,739 |
| Total Costs - year 3 | 44,208 | 46,418 | 48,739 |
| **Total Layoff Costs Per Employee** | 144,353 | 151,592 | 159,193 |

## Schedule 3.4 – Layoff Cost Example (Hourly)

| Early Retirements | 2000 CY 90% | 2001 CY 90% | 2002 CY 90% |
|---|---|---|---|
| Document 12 Early Retirement Incentive | 50,000 | 50,000 | 50,000 |
| Pension Plan Experience Loss | 98,650 | 98,650 | 98,650 |
| **Total Early Retirement Costs Per Employee** | 148,650 | 148,650 | 148,650 |

| Layoffs | 10% | 10% | 10% |
|---|---|---|---|
| **Year 1** | | | |
| Sub payments per head (52 weeks * $698/week), less EI portion | | | |
| = (52*698)-(39*413) | 20,189 | 21,198 | 22,258 |
| Health care per head (1 mth * 264.31 + 11 mths * 188.42) | 2,337 | 2,460 | 2,589 |
| Group Ins per head ( 1 mth @ 204.08 + 11 mths @ 46.43) | 715 | 751 | 788 |
| Pension Cost | 5,000 | 5,250 | 5,513 |
| OPEB Cost | 1,100 | 1,158 | 1,219 |
| Total Costs - year 1 | 29,341 | 30,816 | 32,366 |
| **Year 2** | | | |
| Sub payments per head (52 weeks @ $698/week) | 36,296 | 38,111 | 40,016 |
| Health care per head (12 mths @ 188.42) | 2,261 | 2,380 | 2,505 |
| Group Ins per head (12 mths @ 46.43) | 557 | 585 | 614 |
| Pension Cost | 5,000 | 5,250 | 5,513 |
| OPEB Cost | 1,100 | 1,158 | 1,219 |
| Total Costs - year 2 | 45,214 | 47,483 | 49,866 |
| **Year 3** | | | |
| IMP payments per head (52 weeks @ $644/week) | 33,488 | 35,162 | 36,921 |
| Health care per head (12 mths @ 188.42) | 2,261 | 2,380 | 2,505 |
| Group Ins per head (12 mths @ 46.43) | 557 | 585 | 614 |
| Total Costs - year 3 | 36,306 | 38,127 | 40,039 |
| **Year 4** | | | |
| Sub payments per head (52 weeks @ $698/week) | 36,296 | 38,111 | 40,016 |
| Health care per head (12 mths @ 188.42) | 2,261 | 2,380 | 2,505 |
| Group Ins per head (12 mths @ 46.43) | 557 | 585 | 614 |
| Total Costs - year 4 | 39,114 | 41,076 | 43,135 |
| **Year 5** | | | |
| Sub payments per head (26 weeks @ $698/week) | 18,148 | 19,055 | 20,008 |
| Health care per head (6 mths @ 188.42) | 1,131 | 1,190 | 1,252 |
| Group Ins per head (6 mths @ 46.43) | 279 | 293 | 307 |
| Total Costs - year 5 | 19,557 | 20,538 | 21,568 |
| **Total Layoff Costs Per Employee** | 169,532 | 178,040 | 186,975 |

## SCHEDULE "3.5"

(a)    Except as specified in paragraph (c) Delphi will reimburse GMCL on a weekly basis for Assigned Hourly Employee payroll and related payroll taxes and payments on or before the dates on Schedule 3.5.A.

(b)    Except as specified in paragraph (c) Delphi will reimburse GMCL semi-monthly for Assigned Salaried Employee payroll and related payroll taxes and payments on or before the dates on Schedule 3.5.A, except for reimbursement of the cost of the options granted as part of variable compensation which will be reimbursed at the end of the month in which the optins are paid.

(c)    Delphi will reimburse GMCL on a monthly (5th Working Day of following month) for Hourly and Salary actual incurred Health Care Tax and Worker's Compensation Tax.

(d)    Composite Fringe Amounts will be recovered on a prorated monthly basis based on the agreed Composite Fringe Amount for the year in question and paid on or before the dates set out in Schedule 3.5.A.

(e)    All other reimbursements due under this Agreement between the Parties shall be paid within fourteen days of the presentment of invoices for such payment, invoices for ordinary course reimbursement may be presented at the end of each month in which the expense was incurred and invoices for extraordinary items and all reimbursement in excess of $500,000 may be presented upon the expense being incurred.  In either case, payment will be due 14 days after presentment of the invoice.

(f)    Any other Employee related costs which may arise during the course of this agreement must be reviewed and agreed upon by Delphi prior to invoicing and will be reimbursed to GMCL on the appropriate basis depending on the type of cost, i.e., weekly, semi-monthly.

## Schedule 3.5 – Invoice Delphi Funding Schedule – Calendar Year 2000

| Month | Hourly Pay<br><br>Funding Code "A" | Short-term Layoff / Leave<br><br>Funding Code "A*" | Salaried Pay<br><br>Funding Code "B" |
|---|---|---|---|
| May | 10th<br>17th<br>25th<br>31st | 11th<br>18th<br>26th<br>1st | 12th<br>30th |
| June | 7th<br>14th<br>21st<br>28th | 8th<br>15th<br>22nd<br>29th | 14th<br>28th |
| July | 5th<br>12th<br>19th<br>26th | 6th<br>13th<br>20th<br>27th | 12th<br>28th |
| August | 2nd<br>10th<br>16th<br>23rd<br>30th | 3rd<br>11th<br>17th<br>24th<br>31st | 14th<br>30th |
| September | 7th<br>13th<br>20th<br>27th | 8th<br>14th<br>21st<br>28th | 13th<br>27th |
| October | 4th<br>12th<br>18th<br>25th | 5th<br>13th<br>19th<br>26th | 11th<br>30th |
| November | 1st<br>8th<br>15th<br>22nd<br>29th | 2nd<br>9th<br>16th<br>23rd<br>30th | 14th<br>29th |
| December | 6th<br>13th<br>20th<br>28th | 7th<br>14th<br>21st<br>29th | 13th<br>20th |

## Schedule 3.5 – Invoice Payroll & Composite Fringe Funding Legend

| Funding Code | "A" | Delphi To Reimburse "Weekly" |
|---|---|---|
| | "A*" | Delphi To Reimburse "Weekly" |
| | "B" | Delphi To Reimburse "Semi-Monthly" |
| | "C" | Delphi To Reimburse "Monthly" |

| | Description | Employee Group | Funding Code | Employee Group | Funding Code |
|---|---|---|---|---|---|
| 1 | Straight Time | Hourly | A | Salary | B |
| 2 | Shift Premiums | Hourly | A | Salary | B |
| 3 | Overtime | Hourly | A | Salary | B |
| 4 | COLA | Hourly | A | | |
| 5 | Vacation Pay (PAA, SPA) | Hourly | A | | |
| 6 | Special Payment (Holiday Bonus) | Hourly | A | Salary | B |
| 7 | Holiday Pay | Hourly | A | | |
| 8 | Short Work Week Benefits | Hourly | A | | |
| 9 | Bereavement, Election & Jury Duty | Hourly | A | | |
| 10 | Disability Leave of Absence | Hourly | A | Salary | B |
| 11 | Military leave of Absence | Hourly | A | | |
| 12 | Enhanced Variable Pay | | | Salary | B |
| 13 | Health Care Tax | Hourly | C | Salary | C |
| 14 | Employment Insurance | Hourly | A | Salary | B |
| 15 | Employment Insurance Rebate | | | Salary | B |
| 16 | Canada Pension Plan | Hourly | A | Salary | B |
| 17 | Stock Savings Plan | | | Salary | B |
| 18 | Tuition and Tool Allowance | Hourly | A | | |
| 19 | Tuition Refund | Hourly | A | Salary | B |
| 20 | Worker's Compensation | Hourly | C | Salary | C |
| 21 | Short-term Layoff Costs | Hourly | A* | Salary | B |
| 22 | Short-term Leave | Hourly | A* | Salary | B |

| | Description | Employee Group | Funding Code |
|---|---|---|---|
| 23 | Wages Training Program | Hourly | C |
| 24 | Group Life Insurance | Hrly/Salary | C |
| 25 | Health Care Benefits | Hrly/Salary | C |
| 26 | Substance Abuse | Salary | C |
| 27 | Legal Services Plan | Hourly | C |
| 28 | Retiree Health Group / OPEB | Hrly/Salary | C |
| 29 | Pension Plan | Hrly/Salary | C |
| 30 | Stock Savings Plan | Hourly | C |
| 31 | National Training Fund | Hourly | C |
| 32 | Paid Educational Leave | Hourly | C |
| 33 | Training Fund - National O/T Penalty | Hourly | C |
| 34 | Long-term Layoff Costs | Hrly/Salary | C |
| 35 | Special Canadian Contingency Plan | Hourly | C |
| 36 | Other Benefits As Agreed To By GMCL/ Delphi From Time to Time | Hrly/Salary | C |

## SCHEDULE 8.2

## DELPHI SALARIED EMPLOYEES
## CONFIDENTIALITY ACKNOWLEDGMENT

TO:    GENERAL MOTORS OF CANADA LIMITED ("GMCL")

Dear Sirs/Mesdames:

I acknowledge that as an employee of Delphi Canada Inc. ("Delphi Canada") who may from time to time receive non-public, confidential or proprietary information pertaining to GMCL and its affiliates, including, without limitation, information concerning GMCL costs, technology, financing, financial statements, pricing and business plans ("Information"). "Information" does not include information that is or becomes generally available to the public other than as a result of disclosure by me or other Delphi Canada employees or that is received by me from an independent third party that obtained it lawfully and was under no duty of confidentiality.

I will keep the Information confidential and will not, without your prior written consent, disclose such Information to any person other than (i) as required by law; (ii) to employees of GMCL and their affiliates; or (iii) to Delphi Canada or Delphi Canada employees as required to permit Delphi to provide services to GMCL. I will not use such Information for any purpose other than to provide the services to GMCL. Any copies of the Information in my possession will be returned to you promptly upon your request (and, in any event, within five (5) business days after such request).

I acknowledge that disclosure of the Information may cause serious irreparable damage and harm to GMCL and that remedies at law would be inadequate to protect against breach of this agreement, and therefore I agree in advance to the granting of injunctive relief in your favour for any breach of the provisions of this acknowledgment and to the specific enforcement of the terms of this acknowledgment, without proof of actual damages, in addition to any other remedy to which you would be entitled.

Yours very truly,


By:_____          _____
      [Name of Employee]                                        Witness Signature


Date:_____          _____
                                                                      Name of Witness (Printed)

## SCHEDULE 8.3
## GMCL ASSIGNED SALARIED EMPLOYEES
## CONFIDENTIALITY ACKNOWLEDGMENT


TO:    DELPHI CANADA INC. ("Delphi Canada")

Dear Sirs/Mesdames:

I acknowledge that as an employee of General Motors of Canada Limited ("GMCL") who may provide services to Delphi Canada from time to time I may receive non-public, confidential or proprietary information pertaining to Delphi Canada and its affiliates, including, without limitation, information concerning Delphi Canada costs, technology, financing, financial statements, pricing and business plans ("Information"). "Information" does not include information that is or becomes generally available to the public other than as a result of disclosure by me or other GMCL employees or that is received by me from an independent third party that obtained it lawfully and was under no duty of confidentiality.

I will keep the Information confidential and will not, without your prior written consent, disclose such Information to any person other than (i) as required by law;  (ii) as required in order to properly perform services for Delphi;  (iii) to employees of Delphi Canada and their affiliates;  or (iv) to GMCL or GMCL employees as required to permit GMCL to provide services to Delphi Canada.  I will not use such Information for any purpose other than to provide the services to Delphi.  Any copies of the Information in my possession will be returned to you promptly upon your request (and, in any event, within five (5) business days after such request).

I acknowledge that disclosure of the Information may cause serious irreparable damage and harm to Delphi Canada and that remedies at law would be inadequate to protect against breach of this agreement, and therefore I agree in advance to the granting of injunctive relief in your favour for any breach of the provisions of this acknowledgment and to the specific enforcement of the terms of this acknowledgment, without proof of actual damages, in addition to any other remedy to which you would be entitled.

Yours very truly,


By:_____          _____
    [Name of Employee]                Witness Signature


Date:_____          _____
                                      Name of Witness (Printed)

**Exhibit 5.01(a)(vii)(ii)**

**Oshawa Labour & Management Agreement between Delphi Canada, Inc. and General Motors Canada Limited dated as of May 1, 2000**

## ADMINISTRATIVE SERVICES AGREEMENT

**THIS ADMINISTRATIVE SERVICES AGREEMENT** ("Agreement") is made and entered into as of May 1, 2000 by GENERAL MOTORS OF CANADA LIMITED, a Canadian Corporation ("GMCL"), and DELPHI CANADA INC., an Ontario corporation, ("Delphi Canada"), based upon the following:

**WHEREAS,** GMCL and Delphi Canada are parties to an Asset Purchase Agreement dated as of December 31, 1998 as amended and restated May 1, 2000 (the "Asset Purchase Agreement"), under which Delphi Canada is purchasing certain assets from GMCL in connection with GMCL's Battery Products business at the Oshawa Battery Plant and the Chassis Products business at the Oshawa Tri-Link Plant, which constitute the Businesses that are the subject of the Asset Purchase Agreement; and

**WHEREAS,** in accordance with the Asset Purchase Agreement, GMCL and Delphi Canada will enter the Oshawa Labour and Management Services Agreement with respect to the provision of the services of GMCL employees directly engaged in the operation of the Businesses; and

**WHEREAS,** in accordance with the Asset Purchase Agreement, GMCL and Delphi Canada will enter Leases with respect to the Oshawa Battery Plant and Oshawa Tri-Link Plant; and

**WHEREAS,** in connection with the Asset Purchase Agreement and Leases, GMCL has agreed to provide to Delphi Canada, directly or through one or more of its affiliates or third party suppliers, commencing on the date of closing as set forth in the Asset Purchase Agreement, certain administrative services, under the terms and conditions set forth in this Agreement; and

**WHEREAS,** GMCL and Delphi Canada are entering into this Agreement to set forth terms and conditions governing GMCL's provision of services to Delphi Canada and the rights and obligations of the parties with respect thereto; and

**WHEREAS,** capitalized terms in this Agreement shall have the meaning ascribed thereto in the Asset Purchase Agreement unless defined otherwise in this Agreement.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, GMCL and Delphi Canada agree as follows:

1.    Provision of Services

      1.1    During the Term of this Agreement as defined in Section 4 below ("Term"), GMCL will provide or ensure the provision to Delphi Canada of any services provided by GMCL or its Affiliates to the Businesses (as defined in the Asset Purchase Agreement) in the year period ending April 30, 2000 (the "Prior Year") which Delphi Canada reasonably identifies and requests in writing that GMCL provide to it, in accordance with the times, specifications and other provisions contained in Delphi Canada purchase orders issued from time to time and in accordance with this Agreement (the "Services"). The Services shall be provided in the manner and at a relative level of service consistent in all material

respects with that provided by GMCL or its Affiliates to the Businesses in the Prior Year.

1.2   GMCL represents that Exhibit 1.1 (listing "Administrative Services") includes only those services which GMCL and Delphi Canada have agreed are to be provided. The parties agree to review and amend, if required, the Exhibit on an annual basis to more fully list the Services and to carry out the intent of Section 1.1. The terms of this Agreement will apply except to the extent conflicting with the terms of an Exhibit as to a particular Service, in which case the terms of such Exhibit will control.

1.3   GMCL shall continue to manage all Health and Safety and Industrial Hygiene issues associated with the properties subject to the Leases (the "Delphi Facilities") in the same manner in all respects as before the Closing Date. All costs associated with such management shall be borne by Delphi Canada upon presentation of account.  The Parties contemplate that in managing Health and Safety and Industrial Hygiene issues at the Delphi Facilities, GMCL will include the Delphi Facilities in all generally applicable Health and Safety and Industrial Hygiene programmes in effect at GMCL Oshawa Autoplex, including without limiting the generality of the foregoing, all programmes directed to auditing, due diligence, monitoring, testing, Health and Safety and Industrial Hygiene reporting, compliance with applicable laws, permits, any and all orders or directives issued by a competent authority.   Where changes to existing programmes are required in order to effect enhanced auditing, due diligence, monitoring, testing, Health and Safety and Industrial Hygiene reporting, compliance with applicable laws, permits, or any and all orders or directives, such changes shall be implemented by GMCL.  It is also contemplated by the Parties that the Delphi Facilities will participate in all applicable spill prevention, response, and remediation activities in the same manner and degree following the Closing Date as was the case prior to the Closing Date, and that the same method and approach to costs allocation will be used following the Closing Date.  Delphi Canada will take no steps which compromise the compliance status of the Delphi Canada Facilities, and will ensure that all proposed changes to product, product components, or manufacturing processes which may have Health and Safety and Industrial Hygiene implications, or implications for compliance with relevant permits, orders or directives will be revealed to GMCL Health and Safety and Industrial Hygiene personnel prior to implementation, and sufficiently in advance of implementation to permit the impact of the proposed changes to be fully assessed.  GMCL shall be responsible for all losses attributable to Health and Safety and Industrial Hygiene management services GMCL provides under this Agreement except to the extent such Losses are attributable to the gross negligence of Delphi.

1.4   If, after the execution of this Agreement, Delphi Canada requests GMCL to provide a Service available from GMCL and omitted from the Exhibit, such Service shall be provided to Delphi Canada subject to GMCL's consent, which consent shall not be unreasonably withheld or delayed, and GMCL and Delphi Canada shall negotiate in good faith to agree on the terms and conditions

- 3 -

upon which such Service would be added to this Agreement, it being agreed that, subject to Article 2, the charges for such Services should be determined on a basis consistent with the methodology for determining the charges provided for in this Agreement (i.e., sufficient to cover GMCL's actual costs, without any profit margin).

1.5    Services will be performed by GMCL in the same manner as GMCL performs or requires performance of the same services for its own organization and customers.  Subject to the foregoing, GMCL has the right to change the manner of rendering Services from time to time, but in no event will any such change cause a material adverse effect on the quality of the Services rendered, except only if (a) such change relates to a Service provided by a U.S. Affiliate of GMCL and is made necessary by a change mandated by such U.S. Affiliate and (b) such change is generally applicable to GMCL and its U.S. and Canadian vehicle producing Affiliates.    In any case, all changes will be implemented to the extent practicable so as to minimize any disruption to Delphi Canada's operations and ability of Delphi Canada to use such Services.  Delphi Canada shall have the option of paying for changes in its systems and operations to minimize any such disruption, and GMCL will cooperate in a commercially reasonable fashion in implementing its changes in coordination with any changes made by Delphi Canada so as to minimize such disruption.

1.6    Services and the form of reports and other data as historically rendered will be adapted at no charge for Delphi Canada's use in a reasonable manner, in order to reflect the separation of Delphi Canada from GMCL. Additional adaptation requested by Delphi Canada will be provided by GMCL at Delphi Canada's expense.  Reports and other data will be given to Delphi Canada in a form separate from reports and other data applicable to GMCL and its Affiliates, and access thereto will be restricted except to the extent necessary to perform the Services.

1.7    Subject to Section 1.8, this Agreement shall not be exclusive and Delphi Canada may order other services from other parties.  GMCL may provide these Services to other parties at any time.

1.8    The Services of GMCL referenced in Section 4.2, must however be exclusively used by Delphi Canada during the Term of the Oshawa Labour and Management Services Agreement of GMCL that are environmental services in respect of a premises that are subject to a Lease must be exclusively used by Delphi Canada during the term of the relevant Lease.

2.    Pricing

2.1    In the first year that Services are provided, the pricing charged to Delphi Canada for each Service will be an amount equal to the cost allocated, consistent with past practice, to the Businesses in the Prior Year for such Service as set out in Exhibit 1.1, adjusted to reflect any changes in the nature, cost or level of the Services provided; *provided that*, if no cost has historically been allocated to the Businesses for any Service, then Delphi Canada shall pay to GMCL that

- 4 -

portion of the total cost borne by GMCL which GMCL would have allocated to Delphi Canada under its internal allocation formula.

2.2    The pricing for Services shall be subject to revision by GMCL annually on January 1 based on GMCL's costs for the Service in the year then ended and shall be allocated, consistent with the manner in which such costs have been allocated to the Businesses in the prior year. GMCL shall notify Delphi Canada as soon as practical after establishing the revised costs of Services of such costs.

2.3    To the extent that GMCL undertakes projects in order to improve its cost structure, and such projects are beneficial to Delphi Canada and are approved in advance by Delphi Canada, costs or investments associated with the execution of such approved projects including, but not limited to, systems investments, property purchase or lease and furniture, fixtures and equipment will be shared between GMCL and Delphi Canada pro rata based on the annual volume of transactions performed. If a project is not approved by Delphi Canada, Delphi Canada will not be entitled to receive any cost benefit resulting from such project and, if such project requires modifications in Delphi Canada interfaces, Delphi Canada will bear the reasonable cost for such modifications.

3.    <u>Payment</u>

As indicated on the Exhibit, Delphi Canada will pay GMCL on a prox 15 term agreement. All payments will be made in immediately available funds by wire transfer.

4.    <u>Term</u>

4.1    The initial Term for each Service shall be coincident with the initial term of the Lease for the Business with respect to which the Service is provided, subject to renewal by the Parties by mutual agreement in writing. In the event of valid termination of one Lease but not the other, the Services shall continue only in respect of the location for which a Lease continues to be in effect.

4.2    Notwithstanding Section 4.1, Services consisting of health and safety, payroll and other human resources services in respect of GMCL's employees who are supplied to Delphi under the Oshawa Labour and Management Services Agreement shall continue until the termination of the Oshawa Labour and Management Services Agreement.

4.3    Delphi Canada may, upon sixty (60) days' prior notice, request an extension beyond the Term contemplated for a Service in Section 4.1. In such event, GMCL and Delphi Canada shall negotiate in good faith to agree to the terms and conditions upon which such Service may be extended taking into consideration whether GMCL has sufficient available personnel, time and resources to provide such Service.

- 5 -

4.4    If either party cancels any Service, other than a Service referred in Section 1.8, before the end of the Term of such Service without giving the required notice under this Agreement, the other party will invoice or re-bill the cancelling party for all cancellation costs, if any, without provision for profit to the other party. GMCL and Delphi Canada will work together to minimize any cancellation costs.

4.5    Upon termination of any Service and for a reasonable time thereafter, GMCL shall cooperate with Delphi Canada in assuring a smooth transition for provision of such Service.

5.    Independent Contractor Relationship

GMCL shall for all purposes be an independent contractor of Delphi Canada with respect to the Services being provided under this Agreement. GMCL shall be solely responsible for (i) the supply, maintenance, repair and replacement of all equipment, machinery, parts, materials and other products used in connection with the provision of the Services, (ii) the fulfillment of all obligations to GMCL's contractors, employees and subcontractors and (iii) the compliance with all laws, regulations, orders and other governmental requirements applicable to GMCL's performance of the Services. The foregoing sentence shall not limit any obligation of Delphi Canada to pay for certain items as specifically set forth in the Leases.

6.    Limitation of Liability

Neither GMCL nor Delphi Canada will be responsible to the other for any damages, including, without limitation, incidental, consequential, punitive, or special damages, arising out of either's performance or failure to perform under this Agreement, except where the party has committed gross negligence or willful misconduct. With respect to any liability resulting from an act or omission of any third party vendor providing a Service under this Agreement, GMCL shall have no liability to Delphi Canada for any amount in excess of the amount that is recovered from the vendor. GMCL will assign any rights or causes of action it may have against the vendor to Delphi Canada to the extent permitted and will cooperate with Delphi Canada in pursuing legal action against the vendor.

7.    Indemnification

Subject to Section 1.3 of this Agreement and the indemnification provisions of the Leases, Delphi Canada shall indemnify, defend and hold harmless GMCL, its directors, officers, employees and agents from and against any losses, claims, damages, costs, expenses, liabilities or actions (including reasonable attorneys' fees) arising out of the performance or failure to perform Services on behalf of Delphi Canada except if GMCL has committed gross negligence or willful misconduct.

8.    Audit Rights

The cost of Services provided under this Agreement shall be subject to audit by Delphi Canada or by certified public accountants retained by Delphi Canada at any time during GMCL's normal business hours and upon reasonable notice to GMCL. GMCL shall maintain all relevant records (including all relevant ledgers, books, vouchers, time sheets, billing rates, billing

- 6 -

calculation worksheets, invoices and backup information related thereto from suppliers) in a manner to facilitate such audit throughout the term of each Service, the cost of which is being audited and for one (1) year after the payment due date of the invoice for any such Service even if all or any part of such one (1) year period occurs after the term of such Service, only to the extent consistent with past practices. The provisions of this Paragraph shall continue in full force and effect notwithstanding expiration or termination of this Agreement for any reason. In the event it is discovered, whether through an audit or otherwise, that Delphi Canada has overpaid GMCL, such overpayment shall be refunded to Delphi Canada with interest. Such refund shall be without prejudice to any other remedies Delphi Canada shall have under this Agreement or at law.

9.    Proprietary Information

In the performance of this Agreement, certain proprietary commercial and financial information of a party (the disclosing party) may be made available to the other party (the receiving party). The receiving party agrees to: (i) exercise reasonable discretion so as to maintain the confidential nature of such proprietary information consistent with the receiving party's procedures for handling similar information of its own, (ii) use such information only in connection with its provision or receipt of Services hereunder, and (iii) not use, disclose, or otherwise divulge such information to others without the prior written authorization of the disclosing party. The receiving party has no obligation with respect to any information which is or becomes publicly known or available to the public through no wrongful act of the receiving party; which is already known to the receiving party at the time of receipt; or which is approved for release by written authorization of the disclosing party.

10.    Force Majeure

In the event that either party is rendered wholly or partially unable to carry out its obligations under this Agreement because of a lockout or because of causes beyond its reasonable control, including but not limited to, war (whether or not declared), sabotage, insurrection, rebellion, riot or other act of civil disobedience, labour disputes (including strikes), act of a public enemy, act of any government or any agency or subdivision thereof, fire, accident, explosion, epidemic, quarantine, restrictions, storm, flood, earthquake or other act of God, or new laws or regulations forbidding or limiting the execution of this Agreement, then the performance of either party or both parties, as they are affected by such cause, is excused during the continuance of any such inability.

11.    Notices

All notices, requests, consents, or other communications permitted or required under this Agreement shall be in writing and shall be deemed to have been given when

- 7 -

personally delivered, or when sent if sent via facsimile (with receipt confirmed), or on the first
business day after sent by reputable overnight carrier.

If to GMCL:

General Motors of Canada Limited
1908 Colonel Sam Drive
Oshawa, Ontario   L1H 8P7
Attn: Treasurer
Fax No.: (905) 644-6273

With a copy to:

General Motors of Canada Limited
1908 Colonel Sam Drive
Oshawa, Ontario   L1H 8P7
Attn: General Counsel
Fax No.: (905) 644-7772

If to Delphi Canada:

Delphi Canada Inc.
c/o Delphi Energy & Chassis Systems
4800 S. Saginaw Street
M/C 485-301-140
Flint, MI 48501
Attn: President - Pat Straney

Fax No.: (810) 257-6957

With a copy to:

Delphi Automotive Systems LLC
5725 Delphi Drive
Troy, MI  48098-2815
Attn: Assistant General Counsel, Commercial Practices
Fax No.: (248) 813-2491

12.    Entire Agreement

This Agreement constitutes the entire agreement between the parties with respect
to the subject matter hereof.  All Exhibits attached to this Agreement are incorporated herein and
made a part hereof by this reference.

13.    Waiver

Any waiver by GMCL or Delphi Canada of any breach or of a failure to comply
with any provision of this Agreement (i) shall be valid only if set forth in a written instrument
signed by the party to be bound, and (ii) shall not constitute, or be construed as, a continuing

- 8 -

waiver of such provision, or a waiver of any other breach of, or failure to comply with, any provision of this Agreement.

14.    Severability

     Should any provision, or any portion thereof, of this Agreement for any reason be held invalid or unenforceable, such decision shall not affect the validity or enforceability of any of the other provisions, or portions thereof, of this Agreement, which other provisions, and portions, shall remain in full force and effect, and the application of such invalid or unenforceable provision, or portion thereof, to persons or circumstances other than those as to which it is held invalid or unenforceable shall be valid and be enforced to the fullest extent permitted by law.

15.    Specific Performance

     Delphi Canada acknowledges that the provision of the Services referenced in Section 1.8 are an integral part of the transaction contemplated by the Asset Purchase Agreement and Oshawa Labour and Management Services Agreement under which Delphi Canada has received a significant benefit. Delphi Canada acknowledges and agrees that a breach of Section 1.8 or termination of those Services prior to the end of their respective term would cause GMCL irreparable harm not compensable in damages. Delphi Canada further acknowledges and agrees that it is essential to the effective enforcement of this Agreement that GMCL be entitled to the remedy of an injunction or specific performance without being required to show irreparable harm.

16.    Amendment

     This Agreement may only be amended in writing by duly authorized representatives or officers of the parties.

17.    Counterparts

     This Agreement may be executed in counterparts, each of which shall constitute an original although not fully executed, but all of which when taken together, shall constitute an original although not fully executed, but all of which when taken together, shall constitute but one agreement. Delivery by facsimile of this Agreement or an executed counterpart hereof shall be deemed a good and valid execution and delivery hereof.

- 9 -

18.    <u>Headings</u>

The headings contained in this Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof.

19.    <u>Governing Law</u>

This Agreement shall be construed and enforced in accordance with the laws of the Province of Ontario, without giving effect to rules governing the conflict of laws.

20.    <u>Defined Terms</u>

All capitalized terms shall have the meaning ascribed thereto in the Asset Purchase Agreement unless otherwise defined in this Agreement.

21.    <u>Disputes</u>

The parties agree that any disputes concerning this Agreement or the subject matter hereof, including the interpretation or application of this Agreement will be settled in accordance with the dispute resolution provisions in the Oshawa Labour and Management Services Agreement as the exclusive remedy of the parties.

22.    <u>Benefit of Agreement</u>

This Agreement shall bind and inure to the benefit of the parties and their successors and permitted assigns, but may not be assigned, subcontracted or delegated by GMCL

- 10 -

or Delphi Canada without the consent of the other Party in its sole discretion.  There shall be no third party beneficiaries of this Agreement or any of its provisions.

**IN WITNESS WHEREOF,** this Agreement has been duly executed by the parties hereto as of the day and year first above written.

### GENERAL MOTORS OF CANADA LIMITED

By: _L. Worrall_

Name:  L.D. WORRALL

Title:                          Vice-President

By: _Roger Schmiede_                          C.S.

Name:  J. ZUR SCHMIEDE

Title:                          Vice-President

### DELPHI CANADA INC.

By: _Richard J Wilkins_

Name:  RICHARD J. WILKINS

Title: CHIEF FINANCIAL OFFICER

I have authority to bind the Corporation

| APPROVED | |
|---|---|
| FINANCIAL | LEGAL |
| *(initials)* 4/28/00 | *(initials)* Ap 28/2000 |
| DATE | DATE |

## Administrative Services Agreement (ASA)
### Delphi Canada Inc. & General Motors of Canada Ltd.

Exhibit 1.1

| Service | Battery Monthly | Annual Cost Battery | Trilink Monthly | Annual Cost Trilink | Annualized Cost Both Plants | Dept Number | Comments/Issues |
|---|---|---|---|---|---|---|---|
| Environmental (incl. Wastewater Treatment) | $5,833 | $69,996 | $4,500 | $54,000 | $123,996 | 19305 | Source: Work effort study 2000 budget |
| Medical Services Regional Personnel | $7,043 | $84,516 | $7,043 | $84,516 | $169,032 | 19955 | ONA negotiationed contract increases |
| Security Services Regional Personnel | $31,161 | $373,932 | $31,161 | $373,932 | $747,864 | 19959 | Security here includes Fire Protection which is a mostly Pinkerton expense and maintence to fire equipment. |
| Security Services Divisional Personnel | $569 | $6,828 | $568 | $6,816 | $13,644 | 19305 | |
| Industrial Hygiene Divisional Personnel | $2,417 | $29,004 | $2,000 | $24,000 | $53,004 | 19105 | This is a natural spill out of the allocation to account 19105, was previously only Industrial Hygiene. |
| Health & Safety Divisional Personnel | $2,500 | $30,000 | $2,000 | $24,000 | $54,000 | 19105 | This is a natural spill out of the allocation to account 19105, was previously only Industrial Hygiene. 2000 includes CAW National Co-ordinators(new) as well as |
| Industrial Relations Divisional Personnel | $6,354 | $76,248 | $6,353 | $76,236 | $152,464 | 19205 | post negotiations benefit book, joint annual meeting, other union (powerhouse) negotiations |
| Div Admin / Employment Equity Divisional Personnel | $4,013 | $48,156 | $4,012 | $48,144 | $96,300 | 19405 | |
| Organization & Employee Dev. Divisional Personnel | $826 | $9,912 | $825 | $9,900 | $19,812 | 19705 | |
| Sal. Personnel/Comp.Ben.Policy Divisional Personnel | $2,000 | $24,000 | $2,000 | $24,000 | $48,000 | 19805 | Salaried Personnel /Compensation Benefit Policy |
| Personnel Admin Regional Personnel | $401 | $4,812 | $400 | $4,800 | $9,612 | 19958 | Wages/Fringe, training travel, Floral Tribute, Call center services. |
| Labour Relations Regional Personnel | $1,311 | $15,732 | $1,310 | $15,720 | $31,452 | 19960 | Labour relations and CAW reps. Interface |
| Cross docking Expense Stores Car Plant | $1,335 | $16,020 | $765 | $9,180 | $25,200 | 19866 | This expense is from the Car plant. |
| Handling Fee Expense Stores Car Plant | $1,890 | $22,680 | $1,890 | $22,680 | $45,360 | 19766/19866 | This expense is from the Car plant. |
| Indirect Material Buyer GMCL Indirect Material Purchasing | $1,583 | $18,996 | $1,583 | $18,996 | $37,992 | 19937 | Source: Assessment Worksheet - Allocation of 75 heads and related costs for indirect purchasing |
| MOA Tracking of Expense | $250 | $3,000 | $250 | $3,000 | $6,000 | | This is the cost that MOA incurs in tracking and billing for expense reports and other ASA billing. |

Charlie Rivet / Terry Krajewski

04/26/2000

## Delphi Canada Inc. & General Motors of Canada Ltd.

| Service | Battery Monthly | Annual Cost Battery | Trillik Monthly | Annual Cost Trillik | Annualized Cost Both Plants | Dept Number | Comments/Issues |
|---|---|---|---|---|---|---|---|
| Hourly Employment | $417 | $5,004 | $417 | $5,004 | $10,008 | 19961 | |
| Payroll | $28,167 | $338,004 | $21,167 | $254,004 | $592,008 | 36520 | Includes department work effort plus carrier admin costs |
| Timekeeper | $1,750 | $21,000 | $1,750 | $21,000 | $42,000 | | The portion of the timekeeper needed for Delphi personnel. |
| Maintaining Almenu | | $0 | | $0 | $0 | | Special Requests Only (Pay as you Go) |
| Logistics | $0 | $0 | $0 | $0 | $0 | | There is no fee for this service.  Direct freight charges will be handled through Corpay. |
| Supplier Quality Laboratory Salt Spray testing | | $0 | | $0 | $0 | | Assume Delphi has their own salt spray equipment. |
| Totals | $59,820 | $1,197,840 | $59,994 | $1,079,928 | $2,277,768 | | |
| | Monthly Battery | Annual Battery | Montly Trielk | Annual Trielk | Total Annual ASK Cost | | |

Charlie Ryan / Tony Krajewski

Page ___ / Confidential
2 of 2

04/28/2000

## Exhibit 5.01(a)(viii)
**Trademark and Trade Name Agreement dated as of January 1, 1999 between Delphi
Automotive Systems Corporation (n/k/a Delphi), DAS, and GM**

## TRADEMARK AND TRADE NAME AGREEMENT

This TRADEMARK and TRADE NAME AGREEMENT is made and entered into as of the Effective Date, by and among Delphi Automotive Systems Corporation, a company organized under the laws of the State of Delaware ("DAS"), Delco Electronics Corporation, a wholly-owned subsidiary company of DAS organized under the laws of the State of Delaware ("DE"), Delphi Technologies, Inc., a wholly-owned subsidiary company of DE organized under the laws of the State of Delaware ("DT"), and General Motors Corporation, a corporation organized under the laws of the State of Delaware ("GM").

# WITNESSETH

WHEREAS, GM has created DAS to acquire certain assets and assume certain liabilities of GM's automotive components business.

WHEREAS, DT desires to acquire and GM is willing to assign all of its rights, title and interest to certain trademarks and trade names.

WHEREAS, DT desires to acquire, and GM is willing to grant, a license to use certain trademarks and Trade names worldwide.

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, for themselves and their successors and assigns, agree as follows:

1.    DEFINITIONS.    The following terms have the meaning ascribed to them herein:

ACDelco Trademark.    The term "ACDelco Trademark" shall mean the trademarks AC, DELCO, ACDelco and all formatives and derivatives thereof.

Business Sector.    The term "Business Sector" shall mean the Delphi Automotive Systems Group, including its affiliated companies.

GMSPO.    The term "GMSPO" shall mean General Motors Service Parts Operations, a division of GM.

Business Relationship Agreement.    The term "Business Relationship Agreement" shall mean the Delphi/SPO Business Relationship Agreement between DAS and GM included among the Ancillary Agreements to the Master Separation Agreement.

Assigned Trademarks.    The term "Assigned Trademarks" shall mean the "DELPHI" trademark, the other trademarks set forth in Exhibit A, any other trademarks used exclusively in the Business Sector, and all common law rights as well as the applications for and registrations thereof worldwide.

Assigned Trade Names.    The term "Trade Names" shall mean the subsidiary and joint venture company names set forth on Exhibit C, and divisional, departmental and business unit names of the Business Sector immediately prior to the Effective Date.

(i)     DAS agrees that for the duration of the Business Relationship Agreement (through 31 December 2000), and except as provided in Subparagraphs (b) and (c) of this Section, the Legacy Trademarks will be used only in relation to OEM business and will always be used in association with the DELPHI trademark and Trade name.

(ii)    If DAS elects to cancel the Business Relationship Agreement or allow it to terminate, DAS agrees not to use or permit others to use the Legacy Trademarks in relation to aftermarket sales until after 31 December 2001.   However, if GM elects to cancel the Business Relationship Agreement, then DT may use and permit others to use the Legacy Trademarks in relation to aftermarket sales after 31 December 2000.

(iii)   DAS agrees that it will not use the Legacy Trademarks in Europe and South America in relation to aftermarket sales so long as it is using the ACDelco Trademark.

(b)     DT may permit DAS and its subsidiary and affiliated companies and third party licensees to continue to use Legacy Trademarks alone in existing tooling and on current Products; however, when tooling is replaced or refurbished the DELPHI trademark will be substituted for or added to the Legacy Trademark if it is commercially practical to do so.

(c)     DT grants to GM a perpetual, nonexclusive, royalty free license, with the right to sublicense, the Assigned Trademarks or Licensed Delco Electronics Trademarks for use in relation to restoration parts (including all related prints, drawings, specifications and tools) for GM vehicles to the extent such parts are no longer manufactured by DAS or DAS no longer desires to manufacture or have those parts manufactured.  GM agrees that all such restoration parts shall comply with provisions corresponding to the Goodwill provisions set forth in Paragraph 8 below, the Protection of Rights provisions provided in Paragraph 9 below and the Quality Control provisions set forth in Paragraph 11 below.   GM also agrees to indemnify DT and its affiliated companies and hold them harmless from any and all liability with regard to such restoration parts.  DAS and GM will each appoint a representative to be responsible for restoration parts matters.

(d)     DAS agrees that with regard to the FREEDOM trademark:

3

will not display the Licensed Trade Name in any other logo without prior written approval of GM.

(b)    Trademark Grant.    Subject to the terms and conditions of this Agreement, GM hereby grants DT the right to grant to DE and DE's subsidiaries and affiliates, joint ventures, and sublicensees in existence immediately prior to the Effective Date a royalty free license to use the Licensed Delco Electronics Trademarks on current Products and future automotive audio products.

(i)    The grant shall include all typical uses such as letterhead, business cards, signage as well as the advertising, promotion, distribution, service and sale of products in the Territory except as provided herein, and shall include use as a corporate name as well as a Trade name.

(c)    Sole Use.    DE agrees that its use of the Licensed Trade Name and the Licensed Delco Electronics Trademarks is with the permission of GM.

(d)    Scope of Use. DE undertakes to wind down the use of the Licensed Delco Electronics Trademarks on products other than automotive audio equipment over a two-year period or as tooling is replaced or refurbished.

(e)    Term.    The term of the license granted in this Section 4 shall be perpetual, fully paid, royalty-free and commence on the Effective Date, and shall continue unless terminated as provided herein or until such time as DE has ceased use of the Licensed Trade Name and Licensed Delco Electronics Trademarks for two years or has notified GM that it has ceased their use.

(f)    Non-Assignment.    It is agreed that nothing contained in this Agreement shall be construed as an assignment or grant to DE, DT or DAS of any other right, title or interest in or to the Licensed Trade Name, it being understood that all rights relating thereto are reserved by GM, except for the license of the right to use and utilize the Licensed Trade Name only as specifically and expressly provided in this Agreement.

(g)    Standard of Conduct.    GM acknowledges that the overall manner in which business is being conducted by DE meets its high standards. So as not to impair the substantial goodwill that GM has built up and

5

(b)   <u>Special Undertakings with Respect to Brazil/MERCOSUR</u>

GM grants to DT a royalty free license to use and authorize others to use DELCO in conjunction with FREEDOM for batteries in the MERCOSUR region (Brazil, Argentina, Paraguay, Uruguay) during a wind down period from 1/1/99 (Effective Date) until 12/31/99, with no extensions permitted thereafter. The license extends to "battery specialists" in Brazil who use DELCO FREEDOM on signs, trucks and buildings as well.

(i)   DT is unrestricted as to its use of FREEDOM as a brand.

(ii)   GM may begin selling ACDelco batteries in Brazil on or after 1 January 2000.

(iii)   GM is unrestricted from using the ACDelco Trademark on other parts in Brazil.

(iv)  GM may continue using ACDelco on batteries it sells in MERCOSUR countries other than Brazil.

(c)   <u>Provision for the Use of the ACDelco Trademarks by Third Parties During Wind Down Period</u>

It is agreed that DAS and GM will use their best efforts to identify all situations where DAS will be assigned the business relationship with a joint venture or other third party and such entity has a pre-existing trademark license with GM to use the ACDelco Trademark (Exhibit F) and address them in the following manner within 12 months of the Effective Date:

1.   Assign a priority to each of the joint ventures and third party relationships that have been identified.

2.   For each such joint venture or third party relationship, identify the appropriate operating units of DAS and GM and the appropriate personnel including attorneys for DAS and GM as necessary and develop a resolution that is satisfactory to all parties and implement it in agreements accordingly.

7

Paragraph 5(c)(3 and 4) of this Agreement and GM or its nominee shall have the right at all reasonable business hours to examine said books of account and records and all other documents and material in the possession or under the control of DAS and shall have free and full access thereto for said purposes and for the purpose of making extracts therefrom. DAS must segregate its records in such a manner as to facilitate a complete audit and agrees that such audit may be used as a basis of settlement of charges in accordance with this Agreement. Examinations under this paragraph shall be conducted during normal business hours with notice of such examination provided to DAS at least one week prior to such examination, and no more often than once each calendar year. DAS agrees to maintain such records for at least two years.

6.    LIMITATIONS TO DAS' RIGHTS.

DAS shall not use the Licensed Trademarks directly or indirectly on or in connection with, or in relation to, any product except as provided herein. DAS shall not make trademark use of the Licensed Trademarks or any confusingly similar forms of, variation on, or alternative spelling of the terms "AC", "DELCO", "ACDelco", "GM" or "GENERAL MOTORS", or other Licensed Trademark except as provided in this Agreement. No other right or license is granted hereby by implication or otherwise under any other mark, trademark, service mark or Trade name of GM.

7.    LIMITATIONS TO GM'S RIGHTS.

Except with respect to issuing license agreements to third parties for parts and components used in the restoration of GM vehicles as provided in Paragraph 2(c), GM shall not use, and will not directly or indirectly authorize or permit any third party to use the Assigned Trademarks or the Assigned Trade Names (or any confusingly similar form of variation on, or alternative spelling thereof), directly or indirectly on or in connection with or in relation to any products or services.

8.    GOODWILL

DAS recognizes the value of the goodwill associated with the Licensed Trade Name and the Licensed Trademarks and acknowledges that the Licensed Trade Name and Licensed Trademarks, and all rights therein and the goodwill pertaining thereto, belong exclusively to GM and that the Licensed Trade Name and Licensed Trademarks have acquired secondary meaning in the mind of the public in association with GM. Notwithstanding anything to the

9

such infringement or imitation. If GM decides not to take action, DAS or a DAS subsidiary may then take action in its own name and at its expense and discretion and may join GM as a party to the extent necessary, provided that DAS indemnifies and defends and holds GM harmless from any claims, suits, or counterclaims resulting therefrom.

(c)    <u>No Registration</u>.  Except as otherwise provided in this Agreement, DAS shall not attempt to register the Licensed Trademarks, or any formative thereof, alone or as part of its own trademark, nor shall DAS use or attempt to register any marks which are likely to be confusingly similar to or constitute a colorable imitation of the Licensed Trademarks. This undertaking shall survive the termination of this Agreement.

(d)    <u>Registration and Registered User</u>.  GM has in GM's name registrations of the Licensed Trademarks in the Territory. In the event that DAS or a DAS subsidiary or affiliate desires to market products bearing the DELCO or DELCO ELECTRONICS trademark in any country where they are not adequately registered, DE or DT shall first promptly notify GM so appropriate trademark applications can be filed by GM and where necessary registrations issued before any manufacturing or marketing of such products shall commence; provided that GM shall instruct the filing of any application within sixty (60) days after receipt of the notice to GM. DAS agrees to cooperate with GM in having DAS, DT and/or DE recorded as a registered user where GM in its sole discretion deems that such recordal is necessary.

(e)    <u>Maintenance</u>.  DAS agrees to reimburse GM for its out-of-pocket costs associated with filing new applications, renewing, filing affidavits and/or evidence of use, or other taxes, expenses or fees associated with maintaining the Licensed Delco Electronics Trademark registrations in the Territory, recording as a registered user DAS, DT and/or DE or others with which DT has a trademark/technology agreement and costs, attorneys, investigators and other fees associated with taking reasonable action against infringers or counterfeiters of the Licensed Delco Electronics Trademarks in the Territory. GM shall endeavor to give DAS three (3) months' prior notice of the deadlines for such maintenance and renewal and in countries where there is no actual or contemplated use the option of declining to maintain or renew such registrations or recordals. Each party shall furnish the other with all reasonable requested information and documentation (including the execution and delivery of any appropriate and accurate affidavits, declaration, oaths and other documentation) to assist the other in obtaining or maintaining trademark registrations or other forms of intellectual property protection and registrations and in any litigation or administrative proceeding related thereto.

11

Products bearing the Licensed Delco Electronics Trademarks together with information relating to the design, specification, manufacture and reliability of products including but not limited to those supplied to GM pursuant to the Business Relationship Agreement. This requirement shall survive the termination of such Business Relationship Agreement.

(c)   Advertising. DE shall provide GM, at GM's request, a representative sampling of all current or proposed tags, labels, identification plates, packaging, advertising copy, brochures, catalogs, marketing and promotional materials, bearing the Licensed Delco Electronics Trademarks or Licensed Trade Name not previously provided pursuant to this provision (individually or collectively, the "Material") for GM's review of (i) the manner in which the Licensed Delco Electronics Trademarks and Licensed Trade Name are used and depicted and (ii) conformity to the Quality Standards. GM shall use its best efforts to respond with any reasonable objections thereto in writing within fourteen (14) days, and the parties will use their best efforts to resolve in good faith such objections. If GM shall fail, however, to object in writing within thirty (30) days after receipt of the Material, it shall be deemed to have consented to DE's use of the Material. Such consent by GM shall not constitute a waiver of DAS' other duties under this Agreement.

## 12.   TERMINATION

(a)   Bankruptcy. If any party (i) files a voluntary petition for an order of relief in bankruptcy; (ii) is adjudicated a bankrupt; (iii) has an involuntary petition in bankruptcy filed against it which remains unstayed or undismissed for sixty (60) days following the filing thereof; (iv) makes an assignment for the benefit of its creditors or pursuant to any bankruptcy law; or (v) has a liquidating receiver appointed for it or for its business, the license hereby granted to that party shall automatically terminate without any notice being necessary.

(b)   Material Breach. If any party commits a material breach of any of its obligations under this Agreement, any other party shall have the right to terminate the license granted to that party upon ninety (90) days prior written notice ("Notice Of Termination"), and such Notice Of Termination shall become effective unless the breaching party shall have substantially remedied the breach within the ninety (90) days and the breaching party is working in good faith to fully remedy such breach.

If to GM:

     General Motors Service Parts Operations

     6200 Grand Pointe Drive

     P.O. Box 6020

     Grand Blanc, MI  48439

     Attention:  General Manager

With a copy to:

     General Motors Corporation

     Office of General Counsel

     3031 W. Grand Boulevard

     P.O. Box 33114

     Detroit, Michigan  48232-5122

     Attention:  Trademark Counsel

If to DAS, DE or DT:

     Delphi Technologies, Inc.

     Legal Staff

     Delphi Drive

     Troy, Michigan

## 17.    RELATIONSHIP BETWEEN THE PARTIES

Nothing in this Agreement shall be construed to place the parties in a relationship whereby either shall be considered to be the agent of the other for any purpose whatsoever.  Neither party is authorized to bind the other party or to enter into any contract or assume any obligation for the other. Any such unauthorized act will be null and void as to the party for which such obligations were assumed.    Nothing in this Agreement shall be construed to establish a relationship of partners or joint ventures between GM and DAS.    Each party is individually responsible only for its own obligations, duties and promises as set out in this Agreement.

(b)    <u>Service of Process</u>.  Service of process shall be effective if mailed pursuant to Paragraph 16 hereof.

(c)    <u>Singular Shall Include Plural</u>.  Whenever required by the context, the singular shall include the plural and the plural the singular, and the masculine shall include the feminine and neuter.

(d)    <u>Severability</u>. The provisions of this Agreement shall be severable, and if any provision of this Agreement shall be held or declared to be illegal, invalid or unenforceable in any jurisdiction, such illegality, invalidity or unenforceability shall not affect any other provision hereof or the interpretation and effect of this Agreement as to any other jurisdiction, and the remainder of this Agreement, disregarding such illegal, invalid or unenforceable provision shall continue in full force and effect as though such illegal, invalid or unenforceable provision had not been contained herein.

(e)    <u>Heading</u>.  Headings or titles to Paragraphs or subparagraphs in this Agreement are for the convenience of reference only and shall not affect the meaning or interpretation of this Agreement or any part hereof.

(f)    <u>No Modifications</u>.  This Agreement may not be released, discharged, abandoned, changed or modified in any manner except in an instrument signed by each of the parties hereto.

(g)    <u>No Strict Construction</u>.  The language used in this Agreement shall be deemed to be language chosen by all parties hereto to express their mutual intent, and no rule of strict construction against either party shall apply to any term or condition of this Agreement.

(h)    <u>Signature Representation</u>.  Each person who signs this Agreement on behalf of a party hereto represents and warrants that he has the proper authority to execute this Agreement on such party's behalf.

IN WITNESS WHEREOF, GM, DAS, DE and DT have caused this Agreement to be executed by their duly authorized representatives on the day and year first written above.

GENERAL MOTORS CORPORATION

DELPHI AUTOMOTIVE SYSTEMS CORPORATION

BY_____

BY _____Alan S. Dawes_____

TITLE_____

TITLE_____Vice President_____

DELCO ELECTRONICS CORPORATION

DELPHI TECHNOLOGIES, INC.

BY_____
        David B. Wohleen

BY_____
        Andrew Brown, Jr.

TITLE_____President_____

TITLE_____President_____

18

# EXHIBIT A

## ASSIGNED TRADEMARKS

ACTIVE AUDIO

AIRSTAR

AUDYSSEY

AUTRA

CASM

CHIPSTACK

COMMUNIPORT

DE & DESIGN



DELPHI

DECISE

DELIGHT

DRB



DYNAVOLT

E-LOC

E-TUNE

E-Z-PACK

ENERGEN

ETR

EYECUE

FORESIGHT

1

## EXHIBIT A

MONSOON

MULTEC

MUSIC IMMERSION

NDH

P.E.D.

PACK-CON

PACKARD

PACKARD LOGO



PASSKEY

PLEASURIZER

PLIACELL

RAT

ROCHESTER

RP



RP



SAGINAW

SAGINAW LOGO



SEALRATER

SENTRI-SEAL

# EXHIBIT A

### COMMON LAW TRADEMARKS

ACTRA
ADAPTIVE PROTECTIONS SYSTEM
ADAPTIVE RESTRAINT TECHNOLOGY
ADCAT
AGILON
COM-PACK
CONDELP
CRUISESTEER
DBC7
DEL-PACK
DHT-3
DOCK AND LOCK
E-STEER
E-H-STEER
EASYSPLICE
EXA-LIGHT
EZDEK
EZDOOR
EZGLASS
EZHATCH
FLEXA-LIGHT
FLEXISPLICE
FLEXWIRE
GASCAT
HID
HV3
IMAGI-KNIT
INFI-KNIT
INFINITILT
INNOVENT
INTELLIGENT PROTECTION SYSTEM
INTELLSTART
INVISAMOD
LINEAX
LIGHTPACK
LIGHTSAVER
LITE PACK
LOGISTIX
LUXURYTILT
MAESTRO
MAGICDOOR
MAGNA RIDE
METRI-PACK
MICRO
MICRO-PACK
OES
OPEN COCKPIT
OPTI-LIGHT
OPTI-NET
QUADRASTEER
POWERMASTER

5

# EXHIBIT B

## LICENSED TRADEMARKS

**AC in Bullseye**



**AC in Circle**



**AC**



**AC-DELCO**

**ACDELCO**

ACDelco

**ACDELCO**



1

# EXHIBIT C

## ASSIGNED TRADEMARK/TRADENAME AGREEMENTS

Aegis Technologies
Alambrados Y Circuitos Electronicos
Ambrake
American Axle
Arco
Arabian Battery Holding Company
Arneses Electricos Automotrices SA de CV
Auto Cable Industries Ltd.
Autoensambles Y Logistica SA de CV
Beijing Delphi Automotive Systems Co., Ltd.
Blaimer 2
Calsonic Harrison Co., Ltd.
Carquest
Cei, Co., Ltd.
Centro Tecnico Herramental SA de CV
Cofomat
Compagnie Des Faiscaux Tunisiens International SA
Componentes Delfa, CA
Cordoflex do Brasil
Delnosa
Delphi Alambrados Automotrices
Delphi Alambrados and Circuitos Electricos SA de CV
Delphi Automotive Systems Australia, Ltd.
Delphi Automotive Systems China Inc.
Delphi Automotive Systems do Brasil
Delphi Automotive Systems Deutschland GMBH
Delphi Automotive Systems Espana SA
Delphi Automotive Systems France SA
Delphi Automotive Systems (M) SDN BHD
Delphi Automotive Systems Private Ltd. (Pte)
Delphi Automotive Systems International Inc.
Delphi Automotive Systems International Inc. - Beijing
Delphi Automotive Systems International Inc. - Changchun
Delphi Automotive Systems International Inc. - Shanghai
Delphi Automotive Systems Luxembourg
Delphi Automotive Systems Overseas Corporation
Delphi Automotive Systems Poland
Delphi Automotive Systems Pvt Ltd. – Chassis
Delphi Automotive Systems Pvt Ltd. – E & E
Delphi Automotive Systems Pvt Ltd. – Packard
Delphi Automotive Systems Pvt Ltd. - Saginaw
Delphi Automotive Systems SA de CV
Delphi Automotive Systems Sweden
Delphi Automotive Systems Thailand, Inc.
Delphi Automotive Systems (Thailand) Ltd.
Delphi Automotive Systems Uk Ltd.
Delphi Automotive Systems Vienna GMBH
Delphi Cableados

1

## EXHIBIT C

ITT Automotive Mabu
Kabelindo Munri PT
KDS Company, Ltd.
Kyungshin Delphi Packard
MB Cable Confections SDN BHD (M)
Merit Verwaltungs GMBH
Noteco Comercio E Particpacoes Ltda
Packard Cta Pty Ltd.
Packard Electric Baicheng Co., Ltd.
Packard Electric Baicheng Ltd., Chanchun Service Center
Packard Electric Czech Republic
Packard Electric Hebi Co., Ltd.
Packard Electric Ireland, Ltd.
Packard Electric Shanghai Co., Ltd.
Packard Electric Systems Samara Cable Company
Packard Electric VAS KF
Pietong Engine Co.
Promotora – Arcomex I
Promotora – Arcomex II
Promotora – Arela I
Promotora – Arela II
Promotora – Arela III
Promotora – Arela V
Promotora – Arela VI
Promotora – Arela VII
Promotora – Arela VIII
Promotora – Cordaflex I
Promotora – Cordaflex II
Promotora – Macopel SA de CV
Promotora de Partes Electricas
Promotora de Partes Electricas Automotrices
PT Packard Kabelindo Murni Indonesia
Reinshagen GMBH
Reinshagen Italia SRL
Reinshagen Tournai SA
Reinshagen UK Branch
Rio Bravo Electricos
Saginaw Delhi Automotive Latch
Saginaw Deutschland GMBH
Saginaw Norinco Lingyun Driveshaft Ltd.
Saginaw Zhejiang Xiaoshan Steering Gear Co., Ltd.
Samaro Cable Co
Sanyco
Sengton Transportation Implement Company
Shanghai Delphi Automotive Air Conditioning Systems Co. Ltd.
Shanghai Saginaw Dongfeng Steering Gear Co., Ltd.
Shinsung Packard Company Ltd.
Sistemas Electricos y Conmutadores
Sistemas Para Automotores de Mexico
Society Francaise Des Amortisseurs De Carbon
Sodex
Sonigistix
Sung San Co., Ltd.
Tianjin Delphi Suspension Systems Co., Ltd.

# EXHIBIT D

## LICENSED DELCO ELECTRONICS TRADENAMES

Delco Electronics Asia Pacific Pte., Ltd.

Delco Electronics Corporaiton

Delco Electronics Europe GMBH

Delco Electronics International Inc. (DEII)

Delco Electronics Overseas Corporation U.K. Branch

Delco Electronics Singapore Pte., Ltd.

Delco Electronics International Inc.

Shanghai Delco Electronics & Instrumentation Co., Ltd.

1

## EXHIBIT F

### THIRD PARTY USE OF ACDELCO TRADEMARK

AC Battery Co.

Arlamex

ASEC (Allied Signal Catalyseurs Pour L'Environment SA)

Asermex

Bakony

Bujias De Colombia

Bujias Mexicanas

Delco Chassis Nsk

Empreses ca le de Tlaxcala

Katcon Sa de Cv

Middle East Battery Company

Sistemas de Frenos

Zhuzhou Spark Plug Plant

## Exhibit 5.01(a)(ix)
### Intellectual Property Contracts Transfer Agreement dated as of December 4, 1998, between DTI and GM, as amended October 31, 2001


**DELPHI**
Automotive Systems

Charles K. Veenstra
Assistant General Counsel

31 October 2001

Howard N. Conkey
General Motors Corporation

Amendment to
GM-Delphi Intellectual Property Contracts Transfer Agreement

Schedule A of the GM-Delphi Intellectual Property Contracts Transfer Agreement does
not specifically refer to the September 1992 Technology License and Service Agreement
between Delco Chassis Division of General Motors Corporation and Delphi
Componentes, S.A. (formerly ACG Componentes, S.A.), the May 1993 clarification of
that agreement, nor the December 1996 modification of that agreement.

Accordingly, please sign and return a copy of this amendment to indicate your agreement
that the following have been assigned to Delphi Technologies, Inc., and that schedule A
of the GM-Delphi Intellectual Property Contracts Transfer Agreement is amended to
include:

- the September 1992 Technology License and Service Agreement between Delco
  Chassis Division of General Motors Corporation and Delphi Componentes, S.A.
  (formerly ACG Componentes, S.A.)

- the May 1993 clarification of that Technology License and Service Agreement

- the December 1996 modification of that Technology License and Service
  Agreement

Regards -

General Motors Corporation

by

date 11/27/01

Legal Staff - Intellectual Property
5725 Delphi Drive  Troy, Michigan  48098  USA

(c)    If the parties discover that any agreement assigned pursuant to clause 1.2(a) does not primarily relate to a Delphi Copyright, Delphi will reassign such agreement to GM. If the parties discover that any IP Agreement primarily relating to Delphi Copyrights is not included on schedule B, they will amend schedule B to include that IP Agreement.

1.3    If any agreement referenced in clause 1.1(a) or 1.2(a) may not be assigned to Delphi for the benefit of Delphi and Delphi Affiliates without the consent of another party to the agreement, or without government approval, GM will use reasonable effort (or cause the GM Affiliate to use reasonable effort) to obtain such consent or approval. Until such consent or approval is obtained, GM will retain and administer (or cause the GM Affiliate to retain and administer) such agreement for the benefit of Delphi or a Designated Delphi Affiliate as provided in the Master Separation Agreement between GM and Delphi Automotive Systems Corporation. However, GM and GM Affiliates are not required to incur any additional payment obligation under this paragraph, but will permit Delphi or a Delphi Affiliate to make any payment necessary for GM or the GM Affiliate to retain and administer an agreement for the benefit of Delphi and Designated Delphi Affiliates.

1.4    Delphi will fulfill (and cause Delphi Affiliates to fulfill) all obligations imposed on Delphi or Delphi Affiliates by the agreements assigned hereunder, and will indemnify and hold harmless GM and GM Affiliates against any breach of such obligations by Delphi or a Delphi Affiliate.

1.5    GM will fulfill (and cause GM Affiliates to fulfill) all obligations imposed on GM or GM Affiliates by the agreements assigned hereunder, and will indemnify and hold harmless Delphi and Delphi Affiliates against any breach of such obligations by GM or a GM Affiliate.

1.6    Delphi hereby grants (and will cause Delphi Affiliates to grant) a sublicense to GM, together with the right to further sublicense GM Affiliates and others, under IP Agreements with others, for technology and intellectual property owned by others to the extent Delphi or Delphi Affiliates have the right to do so without further payment obligation. At GM's request, and to the extent it has the right to do so without further payment obligation, Delphi will provide (or cause Delphi Affiliates to provide) to GM and Designated GM Affiliates third party technology licensed under IP Agreements with others. In each case, Delphi or the Delphi Affiliate will permit GM or a GM Affiliate to make any payment necessary for Delphi or the Delphi Affiliate to grant such a sublicense or provide such technology to GM and Designated GM Affiliates.

1.7    The parties may execute a specific transfer instrument for one or more Delphi IP Agreements. In any such instance, the parties desire that this agreement be applied and construed in a manner and to the extent consistent with that instrument.

3 -    <u>Sublicenses to Delphi</u>

3.1    GM hereby grants (and will cause GM Affiliates to grant) a sublicense to Delphi,
together with the right to further sublicense Delphi Affiliates and others, under IP
Agreements with others, for technology and intellectual property owned by others
to the extent GM and GM Affiliates have the right to do so without further
payment obligation. At Delphi's request, and to the extent it has the right to do so
without further payment obligation, GM will provide (or cause a GM Affiliate to
provide) such technology to Delphi and Designated Delphi Affiliates. In each
case, GM or the GM Affiliate will permit Delphi or a Delphi Affiliate to make
any payment necessary for GM or the GM Affiliate to grant such a sublicense or
provide such technology to Delphi and Designated Delphi Affiliates.

3.2    Schedule D lists IP Agreements with others under which GM or a GM Affiliate
has the right to sublicense Delphi or a Delphi Affiliate. The parties recognize
schedule D may not be complete.

3.3    Delphi will fulfill (and cause Delphi Affiliates to fulfill) all obligations imposed
on Delphi or Delphi Affiliates by the sublicenses granted pursuant to clause 3.1,
and will indemnify and hold harmless GM and GM Affiliates against any breach
of such obligations by Delphi or a Delphi Affiliate.

3.4    GM will fulfill (and cause GM Affiliates to fulfill) all obligations imposed on GM
or GM Affiliates by the agreements referred to in clause 3.1, and will indemnify
and hold harmless Delphi and Delphi Affiliates against any breach of such
obligations by GM or a GM Affiliate.

4 -    <u>Other provisions</u>

4.1    Term

This agreement will remain in effect until all rights and obligations have expired.

4.2    Notices

All notices or other communications relating to this agreement must be written,
and will be deemed to have been properly given when delivered in person,
received by facsimile, or delivered by registered or certified mail as shown by a
return receipt. Such notices or other communications must be addressed as
follows:

4

"Delphi Business Sector" means domestic and foreign operations of the Delphi Automotive Systems business sector of GM, and its predecessor organizations. The Delphi Business Sector is the predecessor of Delphi Automotive Systems Corporation and its subsidiaries.

"Delphi Copyright" means a copyright or semiconductor chip mask work right assigned to Delphi pursuant to the Intellectual Property Transfer Agreement executed herewith between the parties.

"Delphi IP Agreement" means an IP Agreement entered by GM or a GM Affiliate and established primarily for the benefit of the Delphi Business Sector.

"Designated Delphi Affiliate" means a Delphi Affiliate designated by Delphi at any time.

"Designated GM Affiliate" means a GM Affiliate designated by GM at any time.

"Effective Date" means 1 January 1999.

"GM Affiliate" means an organization directly or indirectly Controlled by GM at any time, but excluding Delphi Automotive Systems Corporation and its subsidiaries.

"IP Agreement" means an agreement entered into prior to the Effective Date which provides for rights in technology or intellectual property.

The parties have signed two copies of this agreement as of the Effective Date.

GENERAL MOTORS CORPORATION         DELPHI TECHNOLOGIES, INC.

By _____          By _____

Name    Thomas J. Davis             Name    Andrew Brown, Jr.

Title   Vice President and          Title   President
        Group Executive

**Schedule A - Delphi IP Agreements**

(20 pages attached)

| | COMPANY | SUBJECT | EFFECT | |
|---|---|---|---|---|
| | | dampers | | |
| 26 | Delco Chassis NSK do Brasil | License re Gen III wheel bearings | | S/F |
| 27 | Delphi Chassis Systems USA | License from de Carbon re monotube dampers | | S/F |
| 28 | Dow Chemical | Non-analysis (exp) | 20 Nov 97 | |
| 29 | DSSCSC | Opel brake drum manufacture | | S/F |
| 30 | DuPont | Joint development re Neoprene engine mount | | |
| 31 | DuPont | Non-disclosure (exp) | | |
| 32 | Environmental Research Institute of Michigan (ERIM) | Provide brake, roll & vehicle damping systems for Variable Dynamic Testbed Vehicle | 18 Apr 97 | |
| 33 | FASA Krosno | Tech License | negotiating | |
| 34 | FAG | Sale of strut bearing business to FAG | | |
| 35 | FORUM | Tech License re boosters, master cylinders & wheel brakes | | F/S |
| 36 | Inorganic Recycling | Master agrt for asbestos treatment | | |
| 37 | ITT – Teves | License re brake components to GM France | | |
| 38 | ITT – Teves | Working agreement | | |
| 39 | Link Engineering | License re accelerator asm | 21 Jun 85 | |
| 40 | Link Engineering | License re brake pedal force – decel instrumentation | 4 Jun 84 | S |
| 41 | Lucas | License re brake components to GM France | | |
| 42 | Lucas Varity | Brake license | negotiating | |
| 43 | Mercedes | Mutual Non-disclosure re modules | | |
| 44 | MTS Systems | Demo Agrt for height sensor test & evaluation | 25 Nov 97 | |
| 45 | National Center for Manufacturing Sciences | Membership in consortium | 16 Dec 97 | |
| 46 | Noise Cancellation Technologies | Joint development re engine mounts | | |
| 47 | PBR Automotive | Patent License & Tech Assist | | F |
| 48 | PBR Automotive | Partial re-negotiation of Tech Assist re Banksia | | F |
| 49 | PBR Automotive USA | License & Tech Assist re brakes | | F |
| 50 | PBR Automotive | License & Tech re brakes | | F |

| Company | Agreement Date |
| --- | --- |
| American Telephone and Telegraph Company | 1/12/83 |
| Bix Manufacturing Company | 6/4/93 |
| Bose Corporation | 8/29/81 |
| Hitachi, Ltd. | 8/29/83 |
| Kent State University | 3/26/90 |
| Motorola | 2/9/87 |
| Motorola | 12/17/81 |
| Motorola | 12/22/81 |
| Motorola | 7/26/77 |
| Motorola | 8/30/77 |
| Motorola | 9/11/84 |
| Motorola | 9/11/84 |
| National Semiconductor Corporation | 5/29/81 |
| National Semiconductor Corporation | 6/30/86 |
| National Semiconductor Corporation | 12/4/89 |
| N.V. Philips' Gloeilampenfabrieken | 6/30/81 |
| Philips Export B.V. | 1/17/84 |

Delphi-E Study -Contracts

| Company | Effective |
|---------|-----------|
| Daewoo Automotive Components, Ltd | (1) 4/27/94 (motors), (2) 6/28/94 (ICE-4), (3) 6/28/94 (alternators), (4) 6/28/94 (distributors), (5) 6/28/94 (HEI coils) |
| Delco Remi - Componentes Electronicos, LDA, Portugal | |
| Delkor (JV in Seoul, Korea, 50% owned by | 4-Dec-85 |
| Delphi Automotive Systems Australia Ltd | 1-Jun-94 |
| Delphi Automotive Systems France, Gennevilliers, France | 1-Jan-96 |
| Delphi Automotive Systems India Private Limited, B-92, Himalaya House, 23-Kasturba Gandhi Marg, New Delhi 110001, India | 15-Apr-95 |
| Delphi Automotive Systems Luxembourg S. A. | |
| Delphi Automotive Systems of General Motors do Brasil Ltda, through Delphi Energy and Engine Management Division | 1-Jan-96 |
| Delphi Automotive Systems Vienna GmbH | |
| Delphi Energy and Engine Management Systems (M) Sdn Bhd | 4-Nov-94 |
| Delta Motor Corporation | 14-Jan-91 |
| Detroit Diesel Corporation | 19-Mar-96 |
| Dysekompagniet I/S | 25-Apr-95 |
| Edison Welding Institute | 18-Oct-85 |
| Empresas "Ca-Le" de Tlaxcala, S.A. de C. V., Mexico | 1-Jan-96 |
| Engelhard Corp., Menlo Park, CN 40, Edison, New Jersey 08818 | 7-Jul-92 |
| Equal flow Inc, 694 Prairie, Glen Ellyn, Il 60137 | 1-Jul-96 |
| Eveready Battery Company, Inc  25225 Detroit Rd, PO Box 45145, Westlake, Ohio  44145 | 31-Oct-94 |
| Exacto Spring Corp., Perfection Spring & Stamping Corp | 18-Sep-98 |
| Exxon Research and Engineering Company (and affiliated Sarnia Research laboratories) | 25-Sep-98 |
| Ferro Corporation of Cleveland Ohio | 15-Feb-96 |
| Ferro Corporation, Cleveland, Ohio | 26-May-95 |
| Ficht GmbH | 1-Feb-96 |
| Ficht GmbH & Co. KG, Spannleitenberg 1, D-85614 Kirchseeon, Germany | 2-Dec-96 |
| Flowform Ltd | 17-Aug-92 |
| Ford Motor Company (Automotive Components Division) | 13-Dec-94 |
| General Motors Austria Gesellschaft m.b.H. | 11-Oct-88 |
| General Motors France | 1-Jan-82 |
| General Motors France | 1-Jan-91 |
| General Motors France, Gennevilliers, France | 1-Jan-92 |
| General Motors France, Gennevilliers, France | 1-Jan-92 |
| General Motors France, Gennevilliers, France | 1-Jan-93 |
| Gerald Metals Inc. 6 High Ridge Park, Stanford, CT 06905 | 25-Feb-97 |
| Hitachi, Ltd., through Hitachi Automotive Products Division, 6 Surugadai 4-chome, Chiyoda-ku, Tokyo, Japan | 11-Sep-98 |
| Hitachi, Ltd., through Hitachi Automotive Products Division, 6 Surugadai 4-chome, Chiyoda-ku, Tokyo, Japan | 8-Apr-98 |
| Holden's Engine Company, 600 Lorimer Street, Port Melbourne 3207, Victoria, Australia | 21-Jun-95 |
| Honda R&D Company, Ltd. | 16-Mar-98 |
| Honda R&D Company, Ltd. | 1-Aug-94 |
| Hubei Auto Motor Factory and Beijing Everbright Industrial Co, Huabei Office and International Tendering Company of China National Technical Import and Export Co. | 22-Apr-92 |
| Hubei Delphi Automotive Generator Co., Ltd. (JV that is 51% owned by DASCI) | 5-Mar-96 |
| Industrial Technology Research Institute (ITRI), Taiwan | 1-Jan-95 |
| International Business Machines Corporation | 17-Aug-95 |

| Company | Effective |
|---|---|
| Systemas Electricos Y Conmutadores S.A. de C.V., Chihuahua, Mexico | 2-Jan-80 |
| *Taiwan* | *1-Apr-98* |
| Tawas Industies | 11-Nov-93 |
| Tecumseh Products Company | 23-Jun-94 |
| Teknekron Sensor Develpment Corporation | 19-Oct-92 |
| UBE Industries | 17-Nov-86 |
| University of California, Los Alamos National Laboratory, PO Box 1663 MS K571, Los Alamos, NM 87545 | 13-Apr-95 |
| Wesley Industries Inc 1825 S. Woodward Ave Suote 205, Bloomfield Hills, MI 48302 | 10-Feb-97 |
| Whitehead Engineered Products, Inc., 45 Gracey Avenue, Meriden, Connecticut 06450 | 30-Aug-91 |
| Worden, Mr. Gary, represented by Kurt Grossman, Wood, Herron & Evans, LLP, 2700 Carew Tower, 441 Vine Street, Cincinnati, OH | 19-Sep-97 |
| Zhuzhou Spark Plug Plant  China National Constructional & Agricultural Machinery Import and Export Corporation | 22-Jun-92 |

| Company | Effective |
|---|---|
| Advanced Casting Technologies | 24 NO 97 |
| AFPS Allied Signal | |
| Alma Products | 10 DE 90 |
| Armas | 30 SE 93 |
| Calsonic Harrison Corp. | 11 JL86 |
| Calsonic Harrison Corp. | JL 95 |
| Calsonic Harrison Corp. | Not signed yet |
| Calsonic Harrison Corp. | Not signed yet |
| Calsonic Calsonic | 25 OC 94 |
| Cambric Graphics DAC, CNTIC | 21 AP 93 |
| DAC | 26 FE 93 |
| DAC | 28 DE 95 |
| DAC | 13 MR 97 |
| DAC | 02 DE 97 |
| DAC | 18-Jan-98 |
| DAC | 13 NO 97 |
| DELFA | 20 JA 93 |
| DELFA | 28 OC 97 |
| DHTS do Brasil Ltd. | 26 AP 96 |
| Diavia | 18 DE 96 |
| Donchery | 22 DE 93 |
| EL Teriak | 02 FE 96 |
| FAACA | 19 OC 92 |
| FAACA | 01 OC 95 |
| Four Seasons | 24 NO 97 |
| HALLA | 17 AP 97 |
| Honda of America | |

# DELPHI INTERIOR TECHNOLOGY AGREEMENTS

| THIRD PARTY | EFFECTIVE DATE |
|---|---|
| AEGIS/Talley Defense Systems | 17-Jun-97 |
| Aladdin Industries Inc. | 13-Dec-96 |
| Audi AG – Nondisclosure | 12-Feb-96 and Approx. 16-May-97 |
| Autoflug GmbH | 2-Mar-82 |
| Autoliv | 18-Jan-96 |
| Automated Solutions Inc. | 21-Feb-97 |
| Battelle Memorial Institute | 11-Jan-85 |
| Boston University | 19-May-97 |
| Brose – Germany | 13-May-86 and 28-Jul-87 |
| Brose – Germany | 4-Aug-80 |
| Capro, Inc. | 6-Mar-98 |
| Cinpres | 26-Jun-98  and 15-Apr-91 |
| Colamco, Inc. | Approx. 2/85 |
| Daewoo Automotive Components Ltd. | 21-Dec-94 |
| Deneb Robotics/U.S. Army TACOM | Approx. 8/96 |
| Dow Chemical | 22-Sep-93 & 23-Feb-90 & 31 May-90 |
| European Components Corp | Unknown |
| European Components Corp/Takata | 4-Oct-88 |
| Fast 4M/Time Engineering Services | 15-Jun-98 |
| Ford Motor & Delco - Nondisclosure for Safety & Power Products | Negot. Ongoing |
| FSO Motor Car Company | 28-Jul-94 |
| Georgia Tech Research Corp. | 29-Jan-98 |
| Georgia Tech Research Corp. | 12-Mar-98 & 2-Nov-98 |
| Global Manufacturing Solutions, Inc. | 20-Dec-98 |
| Globe Motors | 10-Dec-97 |

# DELPHI INTERIOR TECHNOLOGY AGREEMENTS

| | |
|---|---|
| Toyota Motor Co.- Power Slide Door | 27-Nov-97 |
| Toyota Motor Co. | 18-Oct-95 |
| Toyota Motor Company | 2-Mar-98 |
| Toyota Motor Corporation | 18-Jul-95 and 27-Aug-98 |
| Toyota Motor/Johnson Controls/Trim Masters | 4-Mar-96 |
| TRW Vehicle Safety Systems | 22-Mar-96 |
| Tsinghua University | 28-Aug-97 |
| Univ. of Detroit Mercy | 18-May-96 and 17-Dec-97 |
| University of Oklahoma | Approx. 14-Aug-92 |

DELPHI PACKARD ELECTRIC TECHNOLOGY AGREEMENTS

Confidential Information

| Company | Date |
|---|---|
| Honda of Japan | 1-Jun-76 |
| Honda of Japan | 1-May-76 |
| Hyundai Japan | 6-Apr-78 |
| Hyundai Motor Company | 12-Aug-76 |
| Hyundai Motor Company | 1-Nov-76 |
| IAPMO (Finland) | 11-Apr-84 |
| ITT (Finland) | 15-Jun-87 |
| Instrument & Meter Electric Plant (Penglai City, People's Rep. of China) | 26-Jun-93 |
| Isuzu | 8-Feb-95 |
| Kawasaki Industrial Company | 15-Jun-87 |
| Jabil Corporation | 1-Dec-90 |
| Malaysia | Very on this |
| Nippon Tenshi Co., Ltd. | 20-Aug-86 |
| North American Parties | 21-Jun-90 |
| PLOKAG (Russia) | 1-Aug-94 |
| Packard Div of Fine Technology | 26-Oct-87 |
| Operations Design Center Agreement | 23-Feb-93 |
| Kendem Corporation | 3-Oct-93 |
| Relior (Germany) | 18-Nov-87 |
| Robeborn, K. Inc. | 18-Feb-87 |
| Siemens Packard Co., Ltd. Korea Fair Land | 12-Feb-96 |
| Sold State Electronics | Expected 11-Dec-96 |
| Sumitomo Wiring | 31-May-91 |
| Texas Instruments, Inc. (Siemens Industrial Automation) | 28-Jun-90 |

Shaded area : Will expire before the next publication in October, 1996
* Indicates signed/dated copy will be received in near future.
Chodd f

Sheet1

| Ref. # | Company | Effective Date |
|---|---|---|
| | 10/6/98 | |
| | D L ELLIS | |
| 1 | DHB - Components      Automotivos S.A. | 05AU98 |
| 2 | JKC Ltd. | 10SE97 |
| 3 | JKC Ltd. | 10SE97 |
| 4 | Delphi Saginaw NSK Co. Ltd. | 18MR97 |
| 5 | Daewoo Automotive Components Ltd. | 01OC96 |
| 6 | Daewoo Automotive Components Ltd. | 01OC96 |
| 7 | Saginaw Norinco Lingyun Drive Shaft Ltd. | 13NO95 |
| 8 | Saginaw - Zhijiang Xiao Shan Steering Gear, Ltd. | 22JN96 |
| 9 | China Aero Technology Import & Export Beijing Co. and Yubel machine Factory | 02MR94 |
| 10 | Shanghai Saginaw Dongfeng Steering Gear Ltd. | 06JN96 |
| 11 | Shanghai Saginaw Dongfeng Steering Gear Ltd. | 06JN96 |
| 12 | Saginaw Norinco Lingyun Drive Shaft Ltd. | 06DE95 |
| 13 | Saginaw - Zhijiang Xiao Shan Steering Gear, Ltd. | 22JN96 |
| 14 | Koyo Seiko | 01SE95 |
| 15 | Sanyco Industry Co. Ltd. | 17SE96 |
| 16 | Sanyco Industry Co. Ltd. | |
| 17 | DHMS (Daewoo Components) | 01AP87 |
| 18 | Daewoo Automotive Components Ltd. | 01JA93 |
| 19 | Compania Nacional De Direcciones Automotrices, S.A. DE C.V. (Condasa) | 29OC86 |

Shr

| | 10/6/98 d ellis | |
| --- | --- | --- |
| Ref. # | Company | Effective Date |
| 1 | Mecaplast | |
| 2 | Univ of Texas | |
| 3 | NCMS | Jun-92 |
| 4 | NCMS | Nov-92 |
| 5 | Industry Refractory | Jan-92 |
| 6 | CONTECH | Apr-98 |
| 7 | University of Glasgow | 15JN97 |
| 8 | Toyota | Sep-97 |
| 9 | Delphi Auto.. Sys Private Limited with General Motors | Dec-96 |
| 10 | Delphi Auto Sys Private Limited with General Motors | Oct-96 |
| 11 | GM France with Saginaw Division | Dec-92 |
| 12 | Saginaw Deutschland with Saginaw Division | Apr-93 |
| 13 | Saginaw Deutschland with saginaw Division | 1-Dec-92 |
| 14 | Saginaw Deutschland with Saginaw Division | 1-Mar-93 |
| 15 | Gm with Delphi India on various products | 1-Jun-97 |
| 16 | GM and Delphi Shanghai | 1-Sep-97 |
| 17 | DOE CRADA Batelle # 046 | 1-Jun-94 |
| 18 | DOE CRADA Oak Ridge # 92-0076 | 1-Mar-92 |
| 19 | Buckeye Custom Products | 1-Jan-89 |
| 20 | Magnetolastic Devices INC. | Dec-92 |
| | various | |

**Schedule B - Delphi Copyright agreements**

none identified

## Schedule C – Shared agreements

Robert Bosch GmbH and Robert Bosch Corporation - April 1992 Technology
Exchange/Development Agreement

National Center for Manufacturing Sciences et al - 1992 Project Agreement 170-
052-92031, as amended