MAR 04 1999 14:19 FR DELPHI LEGAL STAFF    248613245 TO 913133714012

# DELPHI
### Automotive Systems

## memo

Privileged and Confidential
Attorney Work Product

| | |
|---|---|
| Date: | March 4, 1999 |
| To: | Louis H. Lindeman, Jr. |
| From: | Joseph E. Papelian |
| Subject: | Asbestos Brake Pads |
| c: | Warren G. Anderson<br>John G. Blahnik<br>Graham M. Rickard<br>Logan G. Robinson |

This letter is a follow-up to our telephone conversation yesterday and memorializes the agreement reached last year during Project Oracle regarding existing and future asbestos brake claims.

The GM/Delphi Master Separation Agreement provides that Delphi will indemnify GM for all claims involving components and systems we provide to parties other than GM, and that Delphi will indemnify GM for all components and systems provided to GM that were manufactured after January 1, 1999. Although Delphi has not manufactured asbestos brake pads for several years, and has no plans to do so, there are pending brake asbestos claims against GM that the GM Legal Staff is defending. I understand Glenn Jackson of your section is the principal GM attorney supervising these cases.

While many of the asbestos brake pads were manufactured and installed on GM vehicles, others were sold to non-GM entities. Last year we agreed that GM would retain responsibility for all existing and future claims for asbestos brake pads manufactured by Delphi before January 1, 1999, including those sold to non-GM entities.

I believe this letter accurately summarizes our agreement. If you agree, please sign in the space below and return a signed copy to me.

Accepted and agreed to this 4th day of March 1999.

_Louis H. Lindeman Jr._

C:\DELPHI\DELPHI-A\ORACLE\Lindeman-01-ltr.Doc

MAR 04 1999 14:54

MAY-12-99 WED 09:35                                                              P.02/04



memo

Privileged and Confidential
Attorney Work Product

Date      May 10, 1999

To        Louis H. Lindeman, Jr.

From      Joseph E. Papelian

Subject   Asbestos Brakes

cc        Warren G. Andersen
          John G. Blahnik
          Graham M. Rickard
          Logan G. Robinson


This letter supplements our March 4th agreement regarding existing and future asbestos brake claims.

My March 4th memo memorialized our agreement that GM would retain responsibility for all existing and future claims for asbestos brake pads manufactured by Delphi before January 1, 1999, including those sold to non-GM entities. Subsequent to that agreement, I learned that Delphi still manufactures asbestos rear brake drum linings for sale to Chrysler and GM. Chrysler uses these linings on one line of pick-up trucks (RAM 1500) and GM uses asbestos linings on the "J" car.

Chrysler plans to discontinue use of asbestos linings at the end of the 1999 Model Year. However, GM plans to use asbestos brake linings on the "J" car for several more model years. In addition, Delphi manufactures asbestos brake linings for service parts but sells them only to Chrysler and GM. The asbestos brake linings service parts sold to GM are for several models, but those sold to Chrysler are limited to the RAM 1500 truck. The attached schedule provides information about the part numbers and vehicle lines on which the asbestos linings are used. There are markings on the linings that reflect the date of manufacture and material used. Delphi has no plans to enter the after-market sale of asbestos brake linings or pads beyond that noted above.

Since Delphi currently sells asbestos linings only to Chrysler and GM for the applications noted on the attached, we propose amending our March 4 agreement as follows.

- GM would retain responsibility for all existing and future claims for asbestos brake pads manufactured by Delphi before January 1, 1999, including those sold to non-GM entities;

MAY 12 1999 09:37                                                      05/12/99   5263-02

P. 04/04

## 1998 DELPHI CHASSIS DRUM BRAKE LININGS

| APPLICATION | BRAKE TYPE | BLANK PART NO. | DRILLED PART | CHART | POSITION | COMPOUND | EDGE CODE | WIDTH +0.4/-1.0 | NOMINAL THICKNESS +/-1.0" | ARC LENGTH +/-1.0" |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | SEMI-METALLIC | | | | | | |
| 225 x 45 mm | L/T | 18018456 | | 18012561 | L/T | DM 9103 | 245 FE | 44.2 | 7.27 - 5.23 | 110 |
| 225 X 45 mm | L/T | 18025722 | | 18023622 | L/T | DM 9104 | 245 FE | 45.2 - 44.5 | 5.44 - 5.44 | 115 |
| 225 x 45 mm | L/T | 18015452 | | 18316453 | L/T | DM 9103 | 245 FE | 28.7 - 30.3 | 4.45 - 4.95 | 110 |
| 241 x 51 mm | D/S | 18011561 | | 18009605 | PRI | IN 4064 | 241 FF | 50.2 | 5.54 - 6.40 | 92 |
| 241 x 51 mm | | 15011564 | | 18109965 | SEC | IN 4064 | 241 FE | 50.2 | 7.37 - 8.13 | 119.5 |
| 241 x 51 mm | D/S | 18023859 | | 18009905 | PRI | DM 9100 | 243 EE | 50.2 | 5.54 - 6.40 | 92 |
| 241 x 51 mm | | 18023860 | | 18009905 | SEC | DM 9100 | 243 EE | 50.3 | 7.37 - 8.13 | 119 |
| 254 x 57 mm | L/T | 18010923 | | 18012561 | L/T | IN 4064 | 241 FF | 55.2 | 8.00 - 9.76 | 110 |
| 279 X 51 mm | D/S | 18018194 | | 18009905 | PRI | DM 9100 | 243 EE | 50.2 | 6.22 - 6.98 | 55 |
| 279 X 51 mm | | 18016817 | | 18009905 | SEC | DM 9103 | 243 EE | 50.3 | 7.24 - 8.00 | 132.5 |
| 279 x 51 mm | D/S | 17986377 | 1552896 | 17287778 | SEC | IN 4064 | 241 FF | 50.2 | 7.24 - 8.00 | 122 |
| 279 x 70 mm | D/S | 52025131 | | 52003181 | PRI | DM 9100 | 243 EE | 68.50 - 61.23 | 5.18 - 5.59 | 97 |
| 279 x 70 mm | | 52051113 | | 52003183 | SEC | DM 9100 | 243 EE | 69.50 - 61.23 | 6.38 - 7.14 | 134.97 |
| 263 x 70 mm | D/S | 17988363 | 18015203 | 17387770 | PRI | IN 4064 | 241 FF | 69.1 - 70.1 | 5.58 - 9.65 | 102.51 |
| 263 x 70 mm | | 17986354 | 18018206 | 17384770 | SEC | IN 4064 | 241 FF | 69.1 - 70.1 | 8.18 - 8.94 | 124.49 |
| 330 x 63 mm | D/S | 18013727 | 18015728 | 17967778 | PRI | DM 9100 | 243 EE | 63.5 | 6.78 - 7.54 | 111.3 |
| 330 x 63 mm | | 18019776 | 18018726 | 17987770 | SEC | DM 9100 | 243 EE | 63.5 | 9.96 - 10.72 | 131.5 |
| 330 x 69 mm | D/S | 17882978 | 18018818 | 17881776 | PRI | DM 9100 | 243 EE | 90 | 6.74 - 7.84 | 111.3 |
| 330 x 69 mm | | 17888978 | 18318817 | 17967776 | SEC | DM 9100 | 243 EE | 90 | 9.96 - 10.72 | 131.5 |
| | | | | ASBESTOS | | | | | | |
| "L" car  200 x 45 mm | L/T | 18012556 | | 18012561 | L/T | IN 4202 | 242 FE | 44.2 | 7.27 - 8.03 | 112.5 |
| J/N/K car  200 x 45 mm | D/S | 18003293 | 18003202 | 18009925 | SEC | IN 4050 | 235 FE | 44.2 | 7.22 - 7.95 | 117 |
| 200 x 45 mm | | 18005272 | 18025372 | 18003905 | PRI | IN 4050 | 235 FE | 44.2 | 5.02 - 7.30 | 88.6-42 |
| "A" car  225 x 45 mm | D/S | 18008440 | | 18009925 | PRI | IN 4050 | 235 FE | 44.2 | 6.91 - 6.36 | 87.5 |
| 225 x 45 mm | | 18008446 | | 18005905 | SEC | IN 4050 | 235 FE | 44.2 | 7.22 - 7.96 | 115 |
| C/H car  225 x 45 mm | L/T | 18012573 | | 18012561 | L/T | IN 4202 | 242 FE | 44.2 | 7.27 - 8.23 | 110 |
| S/T Truck  241 x 51 mm | D/S | 8474974 | | 18009784 | PRI | IN 4050 | 224 FF | 50.2 | 5.54 - 8.45 | 92 |
| 241 x 51 mm | | 18001770 | | 18009784 | SEC | IN 4050 | 235 FE | 50.2 | 7.37 - 8.13 | 119.5 |
| B Body  279 x 51 mm | D/S | 14025847 | 18010312 | 14025847 | PRI | IN 4050 | 224 FF | 50.2 | 6.22 - 6.98 | 53 |
| 279 x 51 mm | | 14025849 | 18013513 | 14025848 | SEC | IN 4050 | 235 FE | 50.2 | 7.54 - 8.00 | 122 |
| Chrysler  279 x 51 mm | D/S | 18045763 | | 18009905 | PRI | IN 4050 | 224 FF | 50.2 | 5.23 - 6.93 | 94.75 |
| RAM1500  279 x 51 mm | | 18045764 | | 18009905 | SEC | IN 4050 | 235 FE | 50.2 | 7.24 - 8.00 | 122 |
| 279 x 51 mm | D/S | 5471550 | | 18003784 | PRI | IN 4050 | 224 FF | 63.2 | 6.22 - 8.58 | 92 |
| 279 x 51 mm | | 18001765 | | 18009784 | SEC | IN 4050 | 235 FE | 68.2 | 7.24 - 8.00 | 159-152 |
| C/K Truck  263 x 70 mm | D/S | 14009997 | 18018317 | 14009867 | PRI | IN 4053 | 252 FE | 69.1 - 70.1 | 5.63 - 6.63 | 102.51 |
| 263 x 70 mm | | 14209498 | 18018317 | 14009828 | SEC | IN 4053 | 236 FE | 69.1 - 70.1 | 8.16 - 8.94 | 124.45 |
| UPS VAN SERVICE  230 x 69 mm | D/S | 333219 | SAME | | PRI | IN 4035 | 224 FF | 64.38 - 59.33 | 9.74 - 7.52 | 111.6 |

## Exhibit 5.01(b)(iii)

**Investment Tax Credit Transfer Agreement dated December 8, 2000 between Delphi Automotive Systems Corporation (n/k/a Delphi) and GM**

## INVESTMENT TAX CREDIT TRANSFER AGREEMENT

This INVESTMENT TAX CREDIT TRANSFER AGREEMENT ("Agreement") is made and entered into as of December 8, 2000, by and between General Motors Corporation ("GM"), a Delaware corporation, and Delphi Automotive Systems Corporation ("Delphi"), a Delaware corporation.

### RECITALS

WHEREAS, pursuant to Subdivision 12 of Section 210 of Chapter 60 of the New York Laws (hereinafter "Tax Law"), where property with respect to which investment tax credit has been allowed is disposed of by transfer to a taxpayer in a qualified transaction that otherwise qualifies under the Tax Law, the taxpayer and the transferor may jointly elect to permit such credit to be treated as the credit of the taxpayer and carried forward by the taxpayer (hereinafter referred to as "unused credit");

WHEREAS, GM and Delphi agree that property was transferred to Delphi from GM by means of a qualified transaction that otherwise qualifies under the Tax Law;

WHEREAS, GM and Delphi desire to jointly elect pursuant to the Tax Law to permit such credit to be treated as the credit of Delphi;

WHEREAS, the joint election is to be made by filing a document indicating the joint election with the GM and Delphi New York franchise tax returns for tax year 1999, due on or about December 15, 2000;

WHEREAS, GM and Delphi agree that the amount of unused credit with respect to the property transferred tentatively is $43,817,192, calculated in the manner and for the years as indicated in Attachment 1, that schedule being incorporated by reference and made a part of this Agreement;

WHEREAS, it is the intention of the parties to cooperate fully to maximize the amount of the investment tax credit that is the subject of this joint election;

NOW, THEREFORE, in consideration of the agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, and intending to be legally bound thereby, GM and Delphi agree as follows:

Section 1. The above recitals are hereby incorporated into this Agreement by reference.

Section 2. GM and Delphi will execute this Agreement, all parties signing thereto being authorized to execute said Agreement;

Section 3. GM and Delphi will execute the document included as Attachment 2, such document constituting the aforementioned joint election;

Section 4. GM and Delphi will file said executed document described as Attachment 2 with their respective 1999 New York franchise tax returns on or before the extended due date of December 15, 2000;

Section 5. In consideration of the execution of this agreement and the election Delphi will make payments to GM as follows:

    a.  Where a credit is allowed to Delphi pursuant to Section 210 (12)(g)(11) of the Tax Law, Delphi shall pay to GM forty percent (40%) of the amount of such credit applied by Delphi in accordance with the provisions of Section 210 (12)(g)(11)(H) of the Tax Law;

    b.  Delphi shall pay to GM forty percent (40%) of the amount of unused credit used to offset, reduce or eliminate any New York tax, expense, fee, or any other amount due by Delphi, except as discussed in subsection a above.

    c.  Delphi shall make available to GM all records necessary to permit a review of the compliance with the provisions of this Section 5.

Section 6. In the event that the State of New York audits or otherwise attempts to adjust the amount or availability of the unused credit, such audit shall be the responsibility of Delphi, with the complete cooperation of GM with respect to records or any other relevant information that may be in the control of GM.

    a.  Delphi shall conduct such audits of the unused credits in good faith, and any audits, assessments, agreements, settlements and related documents that affect the amount of the payment to be paid to GM thereto are subject to review by GM prior to their acceptance by Delphi.

    b.  In the event that outside legal or other professional expenses are incurred by Delphi to defend the amount or availability of the unused credit, GM shall reimburse Delphi for forty percent (40%) of such expenses. Delphi shall be reimbursed by GM after Delphi presents to GM a demand for such reimbursement supported by copies of such invoices setting forth the detail of the expense.

    c.  In the event that any audits, assessments, agreements or settlements result in a reduction of the unused credit that has become final, and to the extent that any related amount has been previously paid to GM, GM shall reimburse Delphi for forty percent (40%) of such reduction paid to the State of New York after being presented with a demand for such reimbursement, such demand attaching copies and setting forth the detail of the reduction.

Section 7. Disputes arising in connection with this Agreement shall be resolved in accordance with the procedures set forth in the Master Separation Agreement, with the proviso that each arbitrator shall be a tax attorney or tax accountant who is generally

recognized in the tax community as a qualified and competent tax practitioner with
experience in the tax area involved in the issue or issues to be resolved.

Section 8.

a.  All payments required by this Agreement shall be made by (i) wire transfer to the
    appropriate bank account as may from time to time be designated by the parties for
    such purpose; provided, that on the date of such wire transfer notice of the transfer is
    given to the recipient thereof in accordance with Section 9 hereof, or (ii) any other
    method agreed to by the parties.  All payments due under this Agreement shall be
    deemed to be paid when available funds are actually received by the payee.

b.  Delphi shall make the payments provided for in Section 5 not later than 30 days
    following:

    I.    the application of the credit as provided in Section 5(a) of this Agreement
          and if such application is a refund then Delphi will pay GM when it
          receives the refund from the State of New York, or

    II.   the filing of a return or report which utilizes the unused credit to offset,
          reduce or eliminate any New York tax, expense or fee, as provided in
          Section 5(b) of this Agreement.

c.  Payments due shall not be reduced or subjected to setoff by Delphi for any reason
    whatsoever.

Section 9.

a.  Notices, requests, permissions, waivers, and other communications hereunder shall be
    in writing and shall be deemed to have been duly given upon (a) a transmitter's
    confirmation of a receipt of a facsimile transmission (but only if followed by
    confirmed delivery of a standard overnight courier the following Business Day or if
    delivered by hand the following Business Day), or (b) confirmed delivery of a
    standard overnight courier if delivered by hand, to the parties at the following
    addresses (or at such other addresses for a party as shall be specified by like notice):

        If to GM, to:

            General Motors Corporation
            300 Renaissance Center
            MC 482-C15-C66
            Detroit, Michigan 48265-3000
            Attention:  Harry Brinsden
            Telecopy No.: (313) 665-4123

12/08/00

If to Delphi, to:

> Delphi Automotive Systems
> P.O. Box 5086
> MC 480-414-410
> Troy, Michigan  48007-5086
> Attention:  Denise C. Olbrecht
> Telecopy No.: (248) 267-5771

Such names and addresses may be changed by notice given in accordance with this Section 9.

Section 10.  GM and Delphi may assign any of their rights or obligations under this Agreement to any subsidiary or affiliate that they shall designate.

Section 11.  This Agreement contains the entire understanding of the parties hereto with respect to the subject matter contained herein, and supersedes and cancels all prior agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter.

Section 12.  This Agreement may be amended, modified or supplemented only by a written agreement signed by all of the parties hereto.

Section 13.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Michigan, without reference to choice of law principles, including matter of construction, validity and performance.

Section 14.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

Section 15.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner.

Section 16.  Franchise tax shall mean that tax imposed pursuant to Article 9-A of Chapter 60 of the New York Laws.

12/08/00

IN WITNESS WHEREOF, each of the parties has caused this Investment Tax Credit Transfer Agreement to be executed on its behalf by its officers or designates thereunto duly authorized, all as of the day and year first written above.

GENERAL MOTORS CORPORATION

By: _Roger D. Wheeler_

Title: _CHIEF TAX OFFICER_

DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By: _[signature]_

Title: _CHIEF TAX OFFICER_

12/08/00

Attachment 1

**New York State**
**Investment Credit Carryforward**

**Total GM & Subs Carryforward**

| | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carryforward From Prior Years | 292,035 | 23,303,542 | 36,371,996 | 33,289,132 | 37,313,392 | 45,280,701 | 50,098,617 | 52,468,246 | 56,099,566 | 58,416,336 | 61,969,482 | 64,913,219 | 68,606,281 | 105,251,364 |
| Current Year ITC | 29,068,818 | 15,966,165 | 5,664,672 | 4,896,148 | 8,518,576 | 5,420,186 | 2,972,570 | 4,362,485 | 4,212,606 | 3,891,991 | 3,394,530 | 3,763,992 | 13,118,625 | (4,586,431) |
| Current Year Recapture Of ITC | (750,413) | (451,638) | (464,067) | (345,689) | (54,187) | (32,833) | (46,207) | (517,203) | (1,453,494) | (34,256) | (197,185) | (55,139) | (124,120) | |
| Total Carryforward Plus Current Year | 28,610,440 | 38,818,069 | 41,572,601 | 37,839,591 | 45,777,781 | 50,668,054 | 53,024,980 | 56,253,528 | 58,858,678 | 62,274,071 | 65,166,827 | 68,622,072 | 81,600,786 | |
| ITC Used In Current Year | (5,306,898) | (446,073) | (10,283,469) | (526,199) | (497,080) | (569,427) | (556,734) | (153,982) | (4,442,342) | (304,589) | (253,608) | (15,791) | (16,873) | (19,373,055) |
| Carryforward To Future Years | 23,303,542 | 38,371,996 | 33,289,132 | 37,313,392 | 45,280,701 | 50,098,617 | 52,468,246 | 56,099,566 | 58,416,336 | 61,969,482 | 64,913,219 | 68,606,281 | 81,583,913 | |

**Delphi Portion**

| | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carryforward From Prior Years | 0 | 6,401,684 | 19,360,722 | 19,506,575 | 21,633,295 | 24,306,274 | 27,972,136 | 30,504,024 | 33,604,276 | 35,902,755 | 37,991,606 | 39,814,750 | 41,829,516 | 54,230,367 |
| Current Year ITC | 8,624,491 | 13,796,106 | 3,826,240 | 2,593,504 | 2,944,132 | 3,959,122 | 2,860,845 | 3,625,104 | 3,707,645 | 2,197,640 | 2,014,648 | 2,049,426 | 2,011,664 | (3,141,285) |
| Current Year Recapture Of ITC | (222,642) | (399,253) | (313,457) | (183,112) | (18,728) | (44,778) | (44,779) | (479,640) | (1,279,266) | (19,942) | (117,029) | (30,022) | (19,033) | |
| Total Carryforward Plus Current Year | 8,401,849 | 19,807,537 | 22,873,505 | 21,916,967 | 24,558,699 | 28,241,413 | 30,608,003 | 33,648,485 | 36,032,655 | 38,081,053 | 39,889,225 | 41,834,155 | 43,822,147 | |
| ITC Used In Current Year | (1,558,444) | (130,995) | (3,019,882) | (154,526) | (145,974) | (167,223) | (163,493) | (45,213) | (129,900) | (89,447) | (74,475) | (4,637) | (4,955) | (5,689,164) |
| Adjusted Amount | 6,843,405 | 19,676,542 | 19,853,623 | 21,762,441 | 24,412,725 | 28,074,190 | 30,444,510 | 33,604,276 | 35,902,755 | 37,991,606 | 39,814,750 | 41,829,516 | 43,817,192 | |
| % Disallowed Per NY Audit | 5.1217% | 2.2892% | 9.0702% | 4.9786% | 3.6157% | 2.5777% | 4.8769% | | | | | | | |
| Amount Disallowed | (441,721) | (315,820) | (347,048) | (129,146) | (106,451) | (102,064) | (140,486) | | | | | | | (1,582,726) |
| Carryforward To Future Years | 6,401,684 | 19,360,722 | 19,506,575 | 21,633,295 | 24,306,274 | 27,972,136 | 30,504,024 | 33,604,276 | 35,902,755 | 37,991,606 | 39,814,750 | 41,829,516 | 43,817,192 | 43,817,192 |

December 8, 2000


State of New York Department of Taxation and Finance
W.A. Harriman Campus
Albany, NY  12227


Joint Election Under Tax Law Section 210.12(g)(11)(B)


For General Motors Corporation:

I certify that I am an authorized person with respect to the transferor, General Motors
Corporation.  On behalf of General Motors Corporation, I elect to utilize the investment
tax credit provisions set forth in Tax Law section 210.12(g)(11)(B).

---

On behalf of General Motors Corporation

ROGER D. WHEELER
CHIEF TAX OFFICER                    12/8/2000
Name & Title                          Date


For Delphi Automotive Systems Corporation:

I certify that I am an authorized person with respect to the taxpayer, Delphi Automotive
Systems Corporation.  On behalf of Delphi Automotive Systems Corporation, I elect to
utilize the investment tax credit provisions set forth in Tax Law section 210.12(g)(11)(B).

---

On behalf of Delphi Automotive Systems Corporation

James P. Whitson
Chief Tax Officer                     12/11/2000
Name & Title                          Date

## CONFIDENTIALITY AGREEMENT

This CONFIDENTIALITY AGREEMENT ("Agreement") is made and entered into as of February 27, 2001, by and between General Motors Corporation ("GM"), a Delaware corporation, and Delphi Automotive Systems Corporation ("Delphi"), a Delaware corporation. The Agreement reduces to writing the oral agreement and understanding reached between the parties on December 11, 2000.

## RECITALS

WHEREAS, GM and Delphi have entered into an INVESTMENT TAX CREDIT TRANSFER AGREEMENT (incorporated by reference and made a part of this Agreement) which relates to a claim for refund of unused Investment Tax Credit with the State of New York;

WHEREAS, GM and Delphi filed tax returns on or about December 15, 2000 making the required elections and claiming the refund;

NOW, THEREFORE, GM and Delphi agree as follows:

Section 1. The purpose of this Agreement is to protect and prevent unauthorized disclosure of confidential information to any third party.

Section 2. GM and Delphi agree that the terms of the INVESTMENT TAX CREDIT TRANSFER AGREEMENT are confidential and will not be discussed with, or disclosed to, any third party unless required by law.

IN WITNESS WHEREOF, each of the parties has caused this Confidentiality Agreement to be executed on its behalf by its officers or designates thereunto duly authorized, all as of the day and year first written above.

GENERAL MOTORS CORPORATION

By: _Michaelenack_

Title: General Director - State and Local Taxes and Global Customs Activities

DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By: _Richard J. Zelbach_

Title: Director of Tax Administration

Delphi Corporation (f/k/a Delphi Automotive Systems Corporation)
Tax Year: 01/01/02 - 12/31/02

**Form CT-46 - Claim for Investment Tax Credit**

**Investment Tax Credit Carryforward**

The taxpayer, Delphi Automotive Systems Corporation (DASC) was spun-off from General Motors Corporation (GMC) on May 28, 1999. Pursuant to Tax Law Section 210.12(q)(11)(B), on December 8, 2000, DASC and GMC entered into an election whereby the amount of any unused Investment Tax Credits relating to DASC New York State investments prior to the spin-off date are to be treated as a credit of DASC which will be carried forward by the taxpayer. The joint election that was entered into by DASC and GMC (copy attached), was filed with each party's respective New York State franchise tax return for the tax year ended December 31, 1999, as required by Tax Law Section 210.12(q)(11)(B). The following Tax Law Section specifies the manner in which the unused credits are to be treated in years subsequent to the spin-off of the taxpayer from GMC.

Tax Law section 210.12(q)(11)(h) specifies that:

Where a credit is allowed to a taxpayer pursuant to this subparagraph, the taxpayer may treat the amount of such credit as an overpayment of tax to be credited or refunded in accordance with the provisions of section ten hundred eighty-six of this chapter, provided, however, the provisions of subsection (c) of section ten hundred eighty-eight of this chapter notwithstanding, no interest shall be paid thereon. Such credit shall be allowed against the tax imposed by this article with respect to the second succeeding taxable year next following the transaction year, provided that not more than one-fourth of the amount of such credit may be applied by the taxpayer, whether to reduce tax otherwise due or to be treated as an overpayment to be credited or refunded, with respect to such second succeeding taxable year and each of the next three taxable years following such second succeeding taxable year.

The unused Investment Tax Credit transferred from General Motors Corporation to DASC on May 28, 1999. DASC's first taxable year after the transaction year was May 29, 1999 through December 31, 1999. Therefore, the second succeeding taxable year following the transaction year is the tax year January 1, 2000 through December 31, 2000. The total unused credits as of May 28, 1999 were $43,817,192. The following schedule outlines the availability of one-fourth of the amount of total credits to be applied in the second succeeding taxable year and each of the next three taxable years following the second succeeding taxable year. The taxpayer will claim a refund of the allowable amount of credits on Form CT-46 (Claim for Investment Tax Credit).

**Amount of Unused Investment Tax Credit Available for Tax Years 2000-2003:**

| Tax Year | Allowable Refund | Total Future Amounts Available for Credit or Refund |
|---|---|---|
| 2000 | 10,954,298 | |
| 2001 | 10,954,298 | |
| 2002 | 10,954,298 | |
| 2003 | 10,954,298 | 10,954,298 |
| | 43,817,192 | 10,954,298 |

**Detail of Available Unused Investment Tax Credit:**

| | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|---|---|---|---|---|
| Carryforward From Prior Years | 0 | 6,401,684 | 19,360,722 | 19,506,575 | 21,633,295 | 24,306,274 | 27,972,136 | 30,504,024 | 33,604,276 |
| Current Year ITC | 8,624,491 | 13,796,106 | 3,826,240 | 2,593,504 | 2,944,132 | 3,593,122 | 2,880,645 | 3,625,104 | 3,707,645 |
| Current Year Recapture Of ITC | (222,642) | (390,253) | (313,437) | (183,112) | (18,728) | (23,983) | (44,778) | (479,640) | (1,279,265) |
| Total Carryforward Plus Current Year | 8,401,849 | 19,807,537 | 22,873,505 | 21,916,967 | 24,558,699 | 27,875,413 | 30,808,003 | 33,649,489 | 36,032,656 |
| ITC Used In Current Year | (1,558,444) | (130,995) | (3,019,882) | (154,526) | (145,974) | 97,277 | (163,493) | (45,213) | (129,960) |
| Adjusted Amount | 6,843,405 | 19,676,542 | 19,853,623 | 21,762,441 | 24,412,725 | 27,972,136 | 30,644,510 | 33,604,276 | 35,902,795 |
| % Disallowed Per NY Audit | 6.1217% | 2.3392% | 9.0702% | 4.9795% | 3.6157% | | 4.8789% | | |
| Amount Disallowed | (441,721) | (315,820) | (347,048) | (129,146) | (105,451) | (102,054) | (140,486) | | |
| Carryforward To Future Years | 6,401,684 | 19,360,722 | 19,506,575 | 21,633,295 | 24,306,274 | 27,972,136 | 30,504,024 | 33,604,276 | 35,902,795 |

| | 1995 | 1996 | 1997 | 1998 | Totals |
|---|---|---|---|---|---|
| Carryforward From Prior Years | 35,902,755 | 37,991,606 | 39,814,750 | 41,829,516 | |
| Current Year ITC | 2,197,640 | 2,014,648 | 2,049,426 | 2,011,664 | 54,230,367 |
| Current Year Recapture Of ITC | (19,343) | (117,029) | (30,022) | (19,033) | (3,141,285) |
| Total Carryforward Plus Current Year | 38,081,053 | 39,889,225 | 41,834,153 | 43,822,147 | |
| ITC Used In Current Year | (89,441) | (74,475) | (4,687) | (5,689,164) | |
| Adjusted Amount | 37,991,606 | 39,814,750 | 41,829,516 | 43,817,192 | |
| % Disallowed Per NY Audit | | | | | |
| Amount Disallowed | | | | | (1,562,726) |
| Carryforward To Future Years | 37,991,606 | 39,814,750 | 41,829,516 | 43,817,192 | 43,817,192 |

Statement 10

## Exhibit 5.01(b)(iv)

**Management Services Agreement dated September 19, 2002, as amended, among Delphi Corporation and General Motors Management Corporation, Delphi Mechatronic Systems, Inc., Packard-Hughes Interconnect Company and ASEC Manufacturing**

## MANAGEMENT SERVICES AGREEMENT

This Management Services Agreement, including Exhibits A, B, C and D and Addenda 1 through 3 (the "Agreement"), dated September 17, 2002, is entered into by and between Delphi Corporation, a Delaware corporation (formerly known as Delphi Automotive Systems Corporation) ("Delphi") and General Motors Investment Management Corporation, a Delaware corporation ("GMIMCo").

## RECITALS

1.      Delphi and certain of its wholly-owned subsidiaries (each a "Delphi Subsidiary" and collectively the "Delphi Subsidiaries") sponsor "employee pension benefit plans," as defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA") § 3(2)(A). These employee pension benefit plans (each a "U.S. Plan" and collectively the "U.S. Plans") are subject to the provisions of ERISA.

2.      Delphi, acting through its Board of Directors, appointed the Executive Committee of the Board of Directors as "named fiduciary" (as defined in ERISA § 402(a)(2)) with respect to the U.S. Plans sponsored by Delphi.

3.      Additionally, Delphi, acting through its Board of Directors, designated GMIMCo as "named fiduciary" (as defined in ERISA § 402(a)(2)) for purposes of investment of the U.S. Plans sponsored by Delphi.

4.      Further, pursuant to two separate Investment Management Agreements between GMIMCo and Delphi (together, the "Investment Management Agreements"), each dated January 1, 1999 and each subsequently amended through the date of this Agreement, Delphi, acting through one of its designated officers, appointed GMIMCo "investment manager" (as defined in ERISA § 3(38)(A)) with respect to the U.S. Plans Delphi sponsors.

5.      Moreover, Delphi, acting through its Board of Directors, directed the establishment of the Investment Policy Committee of Delphi ("IPC") and authorized the IPC to: (a) make annual recommendations to the Executive Committee regarding investment policy guidelines for the assets of the U.S. Plans sponsored by Delphi; (b) interact with and oversee the performance of the named fiduciary for investment purposes of the U.S. Plans sponsored by Delphi; (c) acting as employer on behalf of Delphi and in accordance with a procedure described in ERISA § 402(a)(2), remove and replace the named fiduciary for investment purposes of the U.S. Plans sponsored by Delphi with itself or another appointee; and (d) perform such fiduciary and other responsibilities as may be delegated to it or as have been authorized by the Executive Committee.

6.      In anticipation of and for the purpose of executing this Agreement, and in accordance with a procedure described in ERISA § 402(a)(2), the IPC removed and immediately re-appointed GMIMCo as named fiduciary for investment purposes and re-appointed GMIMCo as investment manager of the U.S. Plans sponsored by Delphi to undertake the duties, responsibilities and authority set forth in this Agreement, reserving to itself the authority to: (a) remove a portion of the assets of any of the U.S. Plans from the investment control and authority

L:.DH\DELPHI  FPO:DELPHI DRAFTS\MSA FINAL.DOC

of GMIMCo (any assets so removed by the IPC or by any other person or entity duly appointed and empowered by Delphi or a Delphi Subsidiary are referred to as the "Removed Assets"); (b) direct how the Removed Assets are to be invested; and (c) appoint "investment manager(s)" (as defined in ERISA § 3(38)(A)) to manage the Removed Assets (investment managers other than GMIMCo that are appointed by the IPC or by any other entity duly appointed and empowered by Delphi or a Delphi Subsidiary are referred to in this Agreement as "Delphi Investment Managers") as it deems appropriate in its sole discretion.

7.      Each Delphi Subsidiary, acting through its respective Board of Directors, general partner, or other duly designated "named fiduciary," as applicable, has designated GMIMCo as "named fiduciary" (as defined in ERISA § 402(a)(2)) for purposes of investment of the U.S. Plans it sponsors.

8.      Delphi, GMIMCo, and each Delphi Subsidiary, simultaneous with the execution of this Agreement, are entering into a separate Addendum to this Agreement pursuant to which each Delphi Subsidiary, acting through a designated officer, will authorize Delphi, the IPC, and GMIMCo to act in accordance with the terms of this Agreement, including the right of the IPC to remove assets from the control and management of GMIMCo and to appoint one or more Delphi Investment Managers to manage the Removed Assets, and the Addendum for each Delphi Subsidiary will be ratified and approved by the governing body of such Delphi Subsidiary or the designated named fiduciary for the U.S Plans sponsored by such subsidiary.

9.      GMIMCo, in its capacity as a named fiduciary for purposes of investment of the U.S. Plans, has and may again in the future enter into one or more trust agreements (such agreement(s) together with any amendments or restatements collectively referred to as the "Trust Agreements") with one or more trustees or custodians (such trustees or custodians serving as such from time to time with respect to the trust funds next referred to being sometimes collectively referred to as the "Trustee") and other parties establishing trust funds to hold the assets of the U.S. Plans (collectively, the "Trust Funds").

10.      The Trust Agreements provide for the assets of the U.S. Plans to be invested by the Trustee as directed by a named fiduciary or investment manager and permit the assets of the Trust Funds to be held in one or more group trusts which are incorporated into the Trust Agreements.

11.      General Motors Trust Company, a New Hampshire trust company and an affiliate of GMIMCo (such company together with any successor being referred to as "GMTC"), has established and may again in the future establish various collective investment funds in which assets of the U.S. Plans may be invested (the "Collective Funds").

## TERMS

In consideration of the foregoing Recitals and the mutual covenants and agreements set forth in this Agreement and other good and valuable consideration, the parties agree as follows:

### Section 1.    Plans Covered.

The U.S. Plans to which this Agreement relates are listed in Exhibit A, as it may be amended from time to time by written agreement of the parties.  No other plans are covered by this Agreement.

### Section 2.    Retention.

Delphi retains GMIMCo to perform investment management services for the U.S. Plans subject to the terms and conditions of this Agreement.  In addition, Delphi retains GMIMCo to perform such other related services with respect to the U.S. Plans as are specified in this Agreement.

### Section 3.    GMIMCo Duties Regarding the U.S. Plans.

(a)    In accordance with its appointment as named fiduciary for purposes of investment of the U.S. Plans, GMIMCo will have and perform the investment management authority listed in items (i) through (viii) below with respect to the U.S. Plans, it being understood that GMIMCo will have full and independent authority to act in connection with those listed items; provided, however, that the extent of such authority is subject to Section 4 (regarding Delphi Investment Managers) below.  In addition, but subject to Section 4, GMIMCo will perform the duties with respect to the U.S. Plans as provided in items (ix) through (xxxii) below.  GMIMCo acknowledges that, with respect to its independent authority and duties as investment manager under this Section 3 referred to in ERISA § 3(38)(A) to the extent applicable to GMIMCo, it is a fiduciary with respect to the U.S. Plans as contemplated by ERISA § 3(38)(C).

(i)    Selection, hiring, monitoring, evaluation and termination of investment managers.  In this regard, GMIMCo has the power to appoint investment managers (as defined in ERISA §3(38)) and is authorized to establish investment guidelines for the investment managers appointed by it, and to negotiate and enter into investment management agreements with respect to the assets of the U.S. Plans with such investment managers.

(ii)    Allocation of assets among investment managers and strategies.

(iii)    Management of portfolio transitions, with full authority regarding in-kind contributions, asset liquidations, and the use of transition accounts.

(iv)    Selection, hiring, monitoring, evaluation and termination of the Trustee, and management of the Trustee relationship (it being understood that GMIMCo will ensure that the Trustee maintains custody of the assets of the U.S. Plans in accordance with ERISA § 403(a) and the regulations thereunder).

3

(v)    Projections of cash flows of the investment accounts within the U.S. Plans taking into account plan liquidity sources and needs as and to the extent identified to GMIMCo by Delphi.

(vi)    Performance of asset mix management, including tactical asset allocation and rebalancing assets within Strategic Investment Policy Guidelines (as defined in subparagraph (x) below).

(vii)    Management of short-term cash.

(viii)    Establishment and management of equitization, currency overlay and similar derivative-based strategies with respect to the U.S. Plan assets.

(ix)    Conduct comprehensive studies of the U.S. Plans' pension liabilities, investment objectives, and risk tolerance (with input from Delphi and its actuaries) as and when such asset/liability studies are requested by Delphi.

(x)    Periodic (and on at least an annual basis) review and recommendations concerning the appropriateness and efficacy of existing investment policy guidelines for the Hourly and Salaried Plans (as defined in Exhibit A) setting forth target allocations and ranges for broad investment categories (e.g., equity, fixed income, real estate), which guidelines, as of the date of this Agreement, are set forth in Exhibit B, and any additional policy guidelines for other U.S. Plans (as such guidelines may be amended by the IPC, the "Strategic Investment Policy Guidelines") based on, among other things, pension liabilities, investment objectives and risk tolerance, in light of Delphi's objectives with respect to the U.S. Plans as communicated by it to GMIMCo.

(xi)    Research with respect to new asset classes or strategies for consideration by Delphi for the U.S. Plans.

(xii)    Recommendations regarding the addition or deletion of investment options that are offered to participants under the participant-directed defined contribution U.S. Plans (defined contribution U.S. Plans being referred to in this Agreement as "DC U.S. Plans").

(xiii)    Advice regarding plan design issues as requested by Delphi.

(xiv)    Advice regarding plan liability analysis and funding decisions as requested by Delphi.

(xv)    Administration of U.S. Plan expense accruals and fee payments based on data provided by or on behalf of Delphi or the Trustee.

(xvi)    Monitoring of trade execution costs and brokerage commissions based on data provided by or on behalf of the Trustee or third-party investment managers.

4

(xvii)  Monitoring of securities lending activities.

(xviii)  Management of any brokerage commission recapture program of the U.S.
Plans.

(xix)  Monitoring of soft dollar utilization by the U.S. Plans based on data
provided by or on behalf of the Trustee or third-party investment
managers.

(xx)  Oversight of proxy voting policies and procedures.  In this regard,
GMIMCo will maintain procedures for voting proxies with respect to
securities held in GMIMCo managed investments and for overseeing
proxy voting by investment managers retained by GMIMCo.

(xxi)  Assistance to Delphi in connection with its (A) obtaining the financial data
required for annual actuarial valuations, (B) preparing Department of
Labor filings, Internal Revenue Service filings, summary annual reports
and summary plan descriptions, (C) preparing corporate financial
statement footnote disclosures, (D)  periodic corporate, plan and
regulatory audits and (E) preparing benefit plan cost analyses, in
connection with each of the foregoing clauses (A) through (E) as required
by Delphi in administering the U.S. Plans (it being understood and agreed
that such assistance will be limited to matters pertaining to the services
provided by GMIMCo under the Agreement).

(xxii)  Oversight of U.S. Plan investment data provided by the Trustee to any
recordkeeper ("Recordkeeper") with respect to a U.S. Plan.

(xxiii)  Assistance to Delphi treasury, legal, and human resource departments and
the applicable Delphi benefits center(s) in addressing questions regarding
pension, benefits, and Trust issues (it being understood and agreed that
such assistance will be limited to matters pertaining to the services
provided by GMIMCo under this Agreement).

(xxiv)  Monitoring of third-party investment funds made available by Delphi to
U.S. Plan participants under the DC U.S. Plans.

(xxv)  Monitoring of the Recordkeeper relationship with respect to investment-
related issues.

(xxvi)  Monitoring of Delphi's relationship with any online investment advice
provider designated by Delphi ("DC Adviser") with respect to a DC U.S.
Plan.

(xxvii) Coordinating the development and production of Delphi-approved DC
U.S. Plan participant communications and educational materials,
consisting of Pathways Magazine, Promark Fund fact sheets, the

5

Investment Performance Summary, and any successor publications for the DC U.S. Plans.

(xxviii) Assistance with coordination of content for the website of the DC U.S. Plans.

(xxix) Assistance with the preparation of the investment-related sections of annual prospectuses for participants in the DC U.S. Plans.

(xxx) Performing the following functions with respect to the assets of the U.S. Plans managed by it (and without taking into account any other assets of such U.S. Plans):

    (A)    monitor U.S. Plan-level investment risk exposures;

    (B)    monitor asset class-level risk exposures;

    (C)    monitor investment manager investment guideline compliance;

    (D)    assess risks of investment manager internal investment controls;

    (E)    monitor counter-party exposures; and

    (F)    provide procedures for disaster recovery and business continuity of GMIMCo.

(xxxi) Providing reports to such personnel as Delphi may designate, in accordance with Exhibit C.

(xxxii) Participating in (A) quarterly meetings with the IPC to report on fund returns and analysis of fund performance and to discuss significant activities affecting U.S. Plan investments, (B) annual benefits meetings with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW") and the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers and Communication Workers of America ("IUE-CAW"), and (C) such other meetings as Delphi reasonably requests.

    (b)    In furtherance of its authority as set forth above, but subject to Section 4 of this Agreement, GMIMCo has the following specific powers with respect to the discretionary investment management of the assets of the U.S. Plans:

    (i)    to establish, form, invest in, dissolve, liquidate or take any other actions with respect to any corporation, limited liability company, partnership, trust or other person, including, without limitation, any title holding corporation under Internal Revenue Code ("Code") §§ 501(c)(2) or 501(c)(25);

6

(ii)    to abandon, acquire, convert, dispose of, exchange, exercise, grant, hold, issue, lease, mortgage, permit to expire, permit to be held in escrow, pledge, redeem, sell, subscribe for, surrender, vote, write, or take any and all other actions with respect to Securities or Other Property[1], and to exercise or decline to exercise any rights or obligations appurtenant or otherwise relating thereto, including (A) engaging in any transactions involving any combination of and taking any actions necessary or appropriate to settle transactions in puts, calls or other forms of options (covered or uncovered), futures contracts, swaps or other Securities or Other Property and (B) entering into stand-by agreements for future investment (either with or without a stand-by fee), short-selling programs, foreign exchange or foreign exchange contracts, swaps, guaranteed investment contracts, synthetic guaranteed investment contracts, bank or insurance company investment contracts (including guarantees with respect to investments), contracts for the immediate or future delivery of or otherwise pertaining to Securities or Other Property, and similar instruments and other derivative investments;

(iii)    to initiate, settle, compromise or submit to arbitration any claims, debts or damages due or owing to or from the investment accounts of the U.S. Plans or to commence, join in or defend, or represent any such investment account in, any suits or proceedings in any court of law or before any other body or tribunal, including, without limitation, any claims with respect to taxes; provided, however, that Delphi will retain the right, in its sole discretion, to commence, join in, or oppose any such settlements, compromises, arbitrations, suits, or proceedings where it may be adversely affected by the outcome, or where it believes that such action is required by ERISA or other applicable law;

(iv)    to commence, join in, consent to or oppose the reorganization, recapitalization, consolidation, sale, merger, foreclosure, liquidation or readjustment of the finances of any person or the Securities or Other Property thereof, and to deposit any Securities or Other Property with any protective, reorganization or similar committee, and to pay or agree to pay

---

[1] The term "Securities or Other Property" means property of any kind or nature, whether real or personal, tangible or intangible, whole or part interest therein, wherever situated, without being limited to the classes of property in which trustees are authorized to invest trust funds by any law or any rule of court of any jurisdiction, including without limitation: currency, evidences of obligations or indebtedness of any person, trust or participation certificates, general or limited interests in partnerships, membership interests in any organization or other person, insurance or annuity contracts, guaranteed investment contracts, synthetic guaranteed investment contracts, bank investment contracts, leaseholds, fee titles, mortgages or other interests in realty, preferred or common stocks, American depositary receipts, certificates of deposit, evidences of ownership in joint ventures, swap contracts, futures and/or option contracts, short-selling programs, foreign exchange contracts, contracts for future or immediate receipt or delivery of securities or relating to the lending of securities or property and other derivative investments.

the expenses and compensation of any such committee and any assessments levied with respect to Securities or Other Property so deposited;

(v)     to borrow money, to guarantee indebtedness or other obligations of other persons, to pledge any Securities or Other Property for the payment of any such loan or guarantee, or for any other purpose (whether or not in connection with the borrowing of money), and to enter into contracts ancillary or relating to such loans, guarantees or pledges;

(vi)     to manage, administer, operate, lease for any number of years (regardless of any restrictions on leases made by fiduciaries), develop, improve, repair, alter, demolish, mortgage, pledge, grant options with respect to, or otherwise deal with any property or interest therein at any time held by it, and to renew, extend or participate in the renewal or extension of any mortgage upon such terms as may be deemed advisable;

(vii)     to agree to a reduction in the rate of interest on or other modification in the terms of any mortgage, loan or guarantee, to waive or enforce any default whether in the performance of any covenant or condition of any mortgage, loan or guarantee in such manner and to such extent as may be deemed advisable, to exercise and enforce any and all rights of foreclosure, to bid on property in foreclosure, to take a deed in lieu of foreclosure with or without paying consideration therefor and in connection therewith to release the obligation on the bond secured by such mortgage, and to exercise and enforce in any action, suit or proceedings at law or in equity any rights or remedies in respect of any such mortgage, loan or guarantee;

(viii)     to convert monies received with respect to assets in the investment accounts of the U.S. Plans into or out of U.S. dollars or other currencies;

(ix)     to collect dividends, interest, rents, royalties and other forms of income on or distributions in respect of Securities or Other Property;

(x)     to exercise any right appurtenant to any Securities or Other Property, including without limitation, by general or limited power of attorney, or by serving or otherwise acting as a general or limited partner of a partnership, a managing or other member of a limited liability company, a member of an association, committee or other organization or in any similar capacity with respect to any person;

(xi)     to invest at any bank (A) in any type of interest bearing investments (including, but not limited to, savings accounts, money market accounts, certificates of deposit and repurchase agreements) and (B) in non-interest bearing accounts (including, but not limited to, checking accounts);

(xii)     to invest in the Collective Funds as well as in other collective investment funds (which in each case may provide for payment by the U.S. Plans of

8

fund-level management and other fees and costs, for purchase and redemption related transaction costs or fees in lieu thereof to be borne by the investor purchasing or redeeming and for limitations on the size and/or frequency of and required advance notice with respect to such transactions); and

(xiii) to invest in open-end and closed-end investment companies, regardless of the purposes of which such funds were created, including those managed, serviced, advised and/or distributed by GMIMCo or its affiliates, and any partnership, limited or unlimited, joint venture and other forms of joint enterprise created for any lawful purpose.

(c) GMIMCo's responsibilities and obligations with respect to the U.S. Plans are limited to those responsibilities and obligations specifically set forth in this Agreement.

Section 4.    <u>Delphi Investment Managers</u>.

(a) During the term of this Agreement and subject to the terms of this Section 4, Delphi (acting through the IPC or other duly appointed person or entity) may withdraw from GMIMCo's management assets of the U.S. Plans and arrange for those Removed Assets to be managed by one or more Delphi Investment Managers; <u>provided, however</u>, that the Trustee and Recordkeeper with respect to all of the other assets of the U.S. Plans continue to be the Trustee and Recordkeeper, respectively, of any assets so withdrawn. GMIMCo will have no duties or responsibilities in connection with the selection, hiring, monitoring, evaluation and termination of Delphi Investment Managers.

(b) In the event that Delphi intends to withdraw assets from GMIMCo's management, Delphi will provide GMIMCo with prompt written notice of such intent. The notice will specify (i) the amount of assets that are being withdrawn, (ii) the U.S. Plan(s) with respect to which such assets relate, (iii) the name, address and contact information for the Delphi Investment Manager(s) who will manage the assets, (iv) the asset class and sub-asset class mandate from which the assets will be withdrawn and in which they will be invested by the applicable Delphi Investment Manager(s) and (v) the proposed date(s) upon which the withdrawal of assets and the appointment of the Delphi Investment Manager(s) are to become effective. After such notice is delivered, the parties agree to cooperate to effect the transfer of the Removed Assets to the specified Delphi Investment Manager(s) in a commercially reasonable time frame and manner.

(c) Delphi acknowledges that transaction costs and out-of-pocket third party expenses directly related to a transition may be incurred as a result of the appointment and termination of, and movement of assets to and from, a Delphi Investment Manager, and agrees that all such costs, regardless of by whom incurred, will be borne by Delphi or the applicable U.S. Plan(s).

(d) In the event that and for so long as a Delphi Investment Manager is appointed to manage Removed Assets:

(i) if requested by GMIMCo, Delphi will either provide to GMIMCo or arrange for GMIMCo to receive (A) within the time frame set by the Trustee to meet GMIMCo's reporting requirements, the month-end values

9

of the Removed Assets and (B) in a commercially reasonable time frame, such other information with respect to the Removed Assets in such manner and form as GMIMCo may reasonably request in connection with its performance of services under this Agreement;

(ii)    except as otherwise provided in Section 3(a)(iv) (regarding the Trustee), but regardless of whether the appointment of a Delphi Investment Manager is effective under ERISA § 405(c) to relieve Delphi of any responsibility for investment or management of the Removed Assets, GMIMCo will have none of the authority, power, control, advisement, responsibilities, delegations, duties, or designations referred to in ERISA § 3(21), nor will it have any of the designations, delegations, authority, duties, responsibilities or powers specified in Sections 2 or 3 of this Agreement with respect to the Removed Assets, and, accordingly, will, to that extent, not be deemed a fiduciary with respect to such Removed Assets except as otherwise expressly provided in Sections 4(d)(iii) and (iv) below, and will have no obligations to take any of the Removed Assets into account in carrying out any of its authority, powers and duties with respect to the assets of the U.S. Plans except as otherwise expressly provided in Sections 4(d)(iii) and (iv) below;

(iii)   GMIMCo will consult with and make recommendations to Delphi regarding the allocation of inflows and outflows of U.S. Plan assets as between GMIMCo, on the one hand, and each Delphi Investment Manager, on the other hand, it being understood that (A) in the absence of a decision by Delphi to the contrary pursuant to the parenthetical in Section 4(d)(iv)(B) (regarding asset management mix and re-balancing), GMIMCo's allocable portion thereof will be equal to the result obtained by multiplying the amount of a particular inflow or outflow by a fraction the numerator of which is the most recent preceding calendar month-end value of the assets under GMIMCo's management of the U.S. Plan experiencing the cash flow and the denominator of which is the value of all of the assets of such U.S. Plan, (B) Delphi will cause and have sole responsibility for the Delphi Investment Managers to contribute out of the Removed Assets their allocable portion of any such outflow, and (C) Delphi will timely provide to each of GMIMCo, the Delphi Investment Manager(s) and the Trustee all appropriate directions and instructions to effect such allocations;

(iv)    GMIMCo's sole duties with respect to the Removed Assets will be to:

(A)    take into account cash flow data with respect to the Removed Assets timely provided to GMIMCo by or on behalf of Delphi (along with U.S. Plan liquidity needs as and to the extent identified to GMIMCo by Delphi) in GMIMCo's projections of cash flows of the investment accounts within the U.S. Plans;

10

se
05-44481-rdd    Doc 9263-33    Filed 09/06/07    Entered 09/06/07 16:35:43    Exhibit
7.20(b)  Part 8 (Modified)    Pg 25 of 81


(B)   take into account relevant data with respect to the Removed Assets timely provided to GMIMCo by or on behalf of Delphi in the making by GMIMCo of recommendations to Delphi regarding asset mix management, including rebalancing assets within the Strategic Investment Policy Guidelines, of the U.S. Plans' assets (it being understood and agreed that Delphi will be solely responsible for evaluating such recommendations, deciding whether and to what extent they will be implemented and then directing GMIMCo and the Delphi Investment Manager(s) as to the manner of implementation of Delphi's decisions, all as and to the extent that Delphi deems appropriate);

(C)   take into account relevant data with respect to the Removed Assets and other matters timely provided to GMIMCo by or on behalf of Delphi and its actuaries in GMIMCo's performance of asset/liability studies with respect to the U.S. Plans as and when such studies are requested by Delphi;

(D)   take into account relevant data with respect to the Removed Assets timely provided to GMIMCo by or on behalf of Delphi in GMIMCo's monitoring of the Recordkeeper relationship with respect to investment-related issues;

(E)   take into account relevant data with respect to the Removed Assets timely provided to GMIMCo by or on behalf of Delphi in the provision by GMIMCo of assistance to Delphi in connection with Delphi's (A) obtaining the financial data required for annual actuarial valuations, (B) preparing Department of Labor filings, Internal Revenue Service filings, summary annual reports and summary plan descriptions, (C) preparing corporate financial statement footnote disclosures and (D) preparing benefit plan cost analyses, in connection with each of the foregoing clauses (A) through (D) as required by Delphi in administering the U.S. Plans (it being understood and agreed that such assistance will be limited to matters pertaining to the other services provided by GMIMCo under this Agreement);

(F)   exercise its authority under Section 3(a)(iv) (regarding the Trustee); and

(G)   take into account, to the extent necessary, relevant data with respect to the Removed Assets for the purpose of fulfilling GMIMCo's reporting obligations under Section 3(a)(xxxi).

Section 5.    <u>Compensation and Expenses</u>.

Delphi, acting for itself and on behalf of the U.S. Plans, agrees that GMIMCo will receive compensation and reimbursement of expenses, effective as of January 1, 2002 in accordance with Exhibit D.

Section 6.    <u>Records and Audit Rights</u>.

GMIMCo will preserve its records relating to services it performs under this Agreement (to the extent that it maintains records with respect to such service) for a period of seven (7) years from the date of such performance, unless a shorter period is approved by Delphi in writing; <u>provided, however,</u> that if a longer period of retention is required by law for a particular type of record, GMIMCo will preserve such records for the legally required period. Delphi may, at its expense, examine and audit these records during normal business hours, upon reasonable advance written notice to GMIMCo. Delphi may perform the audits itself, or use an outside, independent auditor. GMIMCo will fully cooperate with Delphi's reasonable requests during such audits. Delphi will not engage direct or indirect competitors of GMIMCo to perform audit services.

Section 7.    <u>Representations, Warranties and Covenants of GMIMCo</u>.

GMIMCo represents and warrants to and covenants with Delphi that:

(a)    it has been duly incorporated and is validly existing as a corporation under the laws of the State of Delaware and the statements with respect to it contained in the Recitals to this Agreement are true and correct; .

(b)    it is registered with the Securities and Exchange Commission as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act"), and will use its best efforts to remain so registered during the term of this Agreement;

(c)    this Agreement has been duly and validly authorized, executed and delivered on behalf of GMIMCo and is a valid and binding agreement of GMIMCo enforceable against GMIMCo in accordance with its terms;

(d)    the execution and delivery of this Agreement by GMIMCo will not violate, or constitute a breach of or default under, the certificate of incorporation or by-laws of GMIMCo, any agreement or instrument by which GMIMCo is bound or, to the best of GMIMCo's knowledge, any order, rule, law or regulation applicable to GMIMCo of any court, governmental body, administrative agency or self-regulatory authority having jurisdiction over GMIMCo; and

(e)    it will cooperate with Delphi as it may reasonably so request, and promptly inform Delphi of any significant developments, in order to facilitate Delphi's compliance with applicable requirements under this Agreement.

Section 8.    <u>Representations, Warranties and Covenants of Delphi</u>.

Delphi represents and warrants to and covenants with GMIMCo that:

12

(a)    it has been duly incorporated and is validly existing as a corporation under the laws of the State of Delaware and the statements with respect to it contained in the Recitals to this Agreement are true and correct;

(b)    each Delphi Subsidiary has been duly formed and is validly existing as a corporation or partnership under the laws of its state of organization and the statements with respect to the Delphi Subsidiary and the Delphi Subsidiary's board of directors or general partner, as applicable, contained in the Recitals to this Agreement and to the applicable Addendum are true and correct;

(c)    Delphi and the appropriately designated committee or officer of Delphi and each Delphi Subsidiary and the appropriately designated entity or officer of each Delphi Subsidiary have all necessary corporate power and other authority and have taken all necessary action to take the steps ascribed to them in the Recitals to this Agreement and any applicable Addendum;

(d)    this Agreement and each Addendum has been duly and validly authorized, executed and delivered on behalf of Delphi and/or a Delphi Subsidiary, as applicable, and is a valid and binding agreement of each such party enforceable against such party in accordance with its terms;

(e)    the execution and delivery of this Agreement by Delphi and each Addendum by Delphi and a Delphi Subsidiary will not violate, or constitute a breach of or default under, their constituent documents, any plan document of a U.S. Plan or any other agreement or instrument by which any such party or any U.S. Plan is bound or, to the best of Delphi's knowledge, any order, rule, law or regulation applicable to Delphi or a Delphi Subsidiary or any U.S. Plan of any court, governmental body, administrative agency or self-regulatory authority having jurisdiction over Delphi or a Delphi Subsidiary or any U.S. Plan;

(f)    it has delivered to GMIMCo true and correct copies of the U.S. Plans listed in Exhibit A including all amendments thereto through and including the date of this Agreement, and will provide GMIMCo all subsequent material amendments to or restatements of any such documents during the term of this Agreement;

(g)    each of the U.S. Plans is qualified under Code §401(a);

(h)    the review of and decision to enter into this Agreement and for Delphi and each Delphi Subsidiary to enter into the applicable Addendum, including the decision to authorize the investment of assets of the U.S. Plans in the Collective Funds, has been made solely and independently by a fiduciary or fiduciaries (other than GMIMCo or any of its affiliates) with investment discretion for the U.S. Plans;

(i)    Delphi has authorized each Recordkeeper to provide GMIMCo with such data and other information in the possession or under the control of or otherwise available to such Recordkeeper (including, without limitation, access to relevant web sites) as may from time to time be requested by GMIMCo; and

13

(j)     it will cooperate with GMIMCo as it may reasonably so request, and promptly inform GMIMCo of any developments, in order to facilitate the performance of GMIMCo's duties and compliance with applicable requirements under this Agreement.

### Section 9.    Confidentiality.

(a)     GMIMCo agrees to keep confidential and not to disclose any information or matter relating to the investments of the U.S. Plans (other than to GMIMCo's or Delphi's employees, agents, advisors, or representatives responsible for matters relating to the investments of the U.S. Plans, each such person being hereinafter referred to as an "Authorized Representative"); provided, however, that GMIMCo and its Authorized Representatives may make such disclosure to the extent that (i) the information being disclosed is publicly known at the time of the proposed disclosure by GMIMCo or such Authorized Representative, (ii) such disclosure, in the opinion of legal counsel (which may be inside counsel), is required by law or regulation, (iii) such disclosure is requested or demanded by any regulatory agency which has regulatory authority over GMIMCo and/or any of its Authorized Representatives, or (iv) Delphi otherwise consents.

(b)     Delphi agrees to keep confidential and not disclose (and to cause each Delphi Subsidiary to keep confidential and not disclose): (i) this Agreement or (ii) any information or other matter relating hereto including GMIMCo's actual or proposed costs or fees for the services provided under this Agreement or under the Investment Management Agreements (other than to Delphi's or a Delphi Subsidiary's officers, directors and employees responsible for matters relating to the U.S. Plans); provided, however, that Delphi or a Delphi Subsidiary may disclose such information to the extent that (X) the item being disclosed is publicly known at the time of the proposed disclosure by Delphi or a Delphi Subsidiary or one of its officers, directors, or employees, (Y) such disclosure by Delphi or a Delphi Subsidiary or one of its officers, directors, or employees, in the opinion of legal counsel (which may be inside counsel), is required by law or regulation or (Z) such disclosure is requested or demanded by any regulatory agency which has regulatory authority over Delphi or a Delphi Subsidiary or any of its officers, directors or employees; and provided further, that Delphi may disclose asset class information for the U.S. Plans and, upon the execution (immediately prior to the disclosure referred to below) of a confidentiality agreement between GMIMCo and a consultant retained by Delphi, disclose to such consultant information regarding GMIMCo's actual or proposed costs or fees for the services provided under this Agreement.

(c)     GMIMCo agrees to inform its officers, directors, and employees, and Delphi agrees (and agrees to cause each Delphi Subsidiary) to inform its officers, directors and employees, of the confidential nature of such information and will instruct such persons not to disclose such confidential information to any other person.

### Section 10.    GMIMCo Standard of Care; Liability.

GMIMCo will perform its duties and obligations under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims ("the GMIMCo Standard of Care"). GMIMCo will be deemed

14

to have discharged its duties and obligations under this Agreement so long as it complies with
the GMIMCo Standard of Care. Subject to ERISA, no affiliate of GMIMCo, other than GMTC,
and no officer, director or employee of GMIMCo or any of its affiliates, will have any liability to
Delphi, any Delphi Subsidiary, any U.S. Plan or any Trust Fund for action taken, or for failure to
act, under or in connection with this Agreement.

**Section 11.    Indemnification; Litigation; Dispute Resolution.**

(a)    To the fullest extent permitted by applicable law, neither GMIMCo nor any of its
affiliates will be liable for any loss sustained by the U.S. Plans or the Trust Funds by reason of
the acquisition, holding, management or disposition of any asset of the U.S. Plans or the Trust
Funds in good faith and in accordance with the provisions of this Agreement. Subject to such
limitations as may be imposed by ERISA or other applicable law, GMIMCo will indemnify and
hold harmless the U.S. Plans, Delphi and Delphi's affiliates (other than in any of such affiliate's
capacity as a participant in or beneficiary of a U.S. Plan) from and against any and all losses,
claims, damages, liabilities and any reasonable and necessary expenses incurred by the U.S.
Plans, Delphi or any such affiliate in connection therewith (including reasonable attorneys' fees)
to which any such person may become subject arising as a result of any failure by GMIMCo to
perform its duties under this Agreement in accordance with the GMIMCo Standard of Care.

(b)    Subject to such limitations as may be imposed by ERISA or other applicable law,
Delphi will indemnify and hold harmless GMIMCo and its affiliates  from and against any and
all losses, claims, damages, liabilities and any reasonable and necessary expenses incurred by
GMIMCo or any such affiliate in connection therewith (including reasonable attorneys' fees) to
which any such person may become subject (i) arising as a result of any action which they take
or refrain from taking in accordance with the direction of Delphi, any Delphi Investment
Manager(s), or other person authorized by Delphi to direct GMIMCo in connection with this
Agreement; and (ii) in instances where GMIMCo has performed its duties under this Agreement
in accordance with the GMIMCo Standard of Care. GMIMCo will have no duty to make any
investigation or inquiry as to the genuineness of the signature of any person or as to any
statement contained in such directions, and it may accept the same as conclusive evidence of the
truth and accuracy of the statement. Subject to ERISA, no affiliate of Delphi and no officer,
director or employee of Delphi or any of its affiliates, will have any liability to GMIMCo or any
affiliate of GMIMCo for action taken, or for failure to act, under or in connection with this
Agreement.

(c)    Upon the assertion of any claim or the commencement of any action, suit or
proceeding involving an indemnified party under this Section 11 that may give rise to liability of
an indemnifying party hereunder, the party knowledgeable about the claim will promptly notify
the other party of the existence of such claim, action, suit or proceeding. To the extent one party
is obligated to defend an indemnified party in accordance with this Section 11, the indemnifying
party will have the right to defend or settle such claim, action, suit, or proceeding at its own
expense and with counsel of its own selection; provided, however, that the indemnified party will
at all times have the right to fully participate in any settlement decision that it reasonably
believes would have an adverse effect on its business. The indemnified party will make
available to the indemnifying party all requested books and records relating to such claim, action,
suit or proceeding, and the parties agree to render to each other such requested assistance as is

15

reasonably necessary to ensure a proper and adequate defense, all at the respective indemnifying party's sole expense.  Neither party will settle a claim, action, suit or proceeding that might give rise to liability of the other party without the prior written consent of such other party.

Section 12.    Bonding.

To the extent bonding is required by any applicable law with regard to the services GMIMCo is providing, GMIMCo will obtain such bond.

Section 13.    Term; Curing of Defaults; Termination.

(a)    This Agreement is effective as of the date first above written and, unless earlier terminated as provided in paragraphs (b) through (d) below, will remain in effect until terminated by Delphi or by GMIMCo with 90 days prior written notice to the other; provided, however, that nothing in this Agreement may be construed to limit the power of Delphi to terminate GMIMCo's appointment as a named fiduciary for investment purposes of the U.S. Plans.

(b)    In the event of a material breach of this Agreement, the party alleging the breach must give written notice of the breach to the other party.  If the breach is not cured within 30 days of such notice, the non-breaching party may terminate this Agreement upon written notice to the other party (which termination will be effective immediately or on such later date as may be specified in such notice).

(c)    Each of GMIMCo and Delphi may immediately terminate this Agreement upon written notice to the other party (which termination will be effective immediately or on such later date as may be specified in such notice), without prejudice to any other right or remedy, in the event that (i) in the case of Delphi, GMIMCo or (ii) in the case of GMIMCo, Delphi or any of the U.S. Plans or Trust Funds:

(A)    makes an assignment for the benefit of creditors,

(B)    files a voluntary petition in bankruptcy,

(C)    is adjudged bankrupt or insolvent or there is entered against it an order for relief in any bankruptcy or insolvency proceeding,

(D)    files a petition or answer seeking for it any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation,

(E)    seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator for it or of all or any substantial part of its properties,

(F)    files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding described in clauses (A) through (E), or

16

(G)    90 days expires following commencement of any proceeding against it seeking a bankruptcy or insolvency determination, reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation if the proceeding has not been dismissed within such period, or 90 days expires following the appointment of a trustee, receiver or liquidator for it or all or any substantial part of its properties without its agreement or acquiescence, which appointment is not vacated or stayed within such period, or if the appointment is so stayed, 90 days expires following the expiration of the stay, unless during such period the appointment is vacated.

(d)    This Agreement may be terminated by either party upon written notice to the other party (which termination will be effective immediately or on such later date as may be specified in such notice) with respect to services to be performed for any U.S. Plan in the event that a notice of intent to terminate such U.S. Plan is filed, a notice is issued by the Pension Benefit Guaranty Corporation to terminate involuntarily such U.S. Plan, such U.S. Plan fails to meet the minimum funding standards under the Code or ERISA, or such U.S. Plan is unable to pay benefits thereunder when due, or the Internal Revenue Service advises that a Trust Fund may not be qualified or exempt from federal income tax under the Code as described in Section 8(h) of this Agreement.

(e)    Upon the termination of this Agreement pursuant to this Section 13, any fees or costs that are accrued (in accordance with Exhibit D) as of the date of termination but are at such date unpaid will be due and payable within 30 days of either (i) the date of termination or (ii) if required pursuant to Exhibit D for certain fees and costs, the date of any invoice sent to Delphi in connection therewith.

### Section 14.    Force Majeure.

Neither GMIMCo nor Delphi will be deemed to have breached this Agreement or be held liable for any failure or delay in the performance of all or any portion of its obligations under this Agreement if it is prevented from doing so by a cause or causes beyond its reasonable control. Without limiting the generality of the foregoing, such causes include acts of God, fires, floods, storms, earthquakes, riots, boycotts, strikes, lock-outs, wars and war operations, restraints of government, power or communication line failure or other circumstance beyond such party's reasonable control, or by reason of the judgment, ruling or order of any court or agency of competent jurisdiction or change of law or regulation subsequent to the execution of this Agreement.

### Section 15.    Services to Other Clients.

The parties agree that GMIMCo and its affiliates may engage in any other business or act as investment adviser or investment manager to any other person or entity, whether or not having investment objectives similar to those of Delphi, the U.S. Plans or the Trust Funds, and that GMIMCo and its affiliates may give advice and take action with respect to any of their other clients which may differ from advice given or from the timing and nature of actions taken with respect to the U.S. Plans or the Trust Funds.

17

Section 16.    **Status of the Parties.**

GMIMCo and Delphi are independent contractors. Nothing in this Agreement creates or may be construed to constitute GMIMCo, its affiliates, Delphi, the Delphi Subsidiaries, the U.S. Plans or the Trust Funds as members of any partnership, joint venture, association, unincorporated business or other joint entity.

Section 17.    **No Third Party Rights.**

Except to the extent ERISA, Sections 10 (regarding standard of care), 11 (regarding indemnification), or 15 (regarding services to other clients) of this Agreement or this Section 17 otherwise expressly so provides, this Agreement does not confer any rights or remedies upon any person other than Delphi and GMIMCo and their respective successors and permitted assigns.

Section 18.    **Assignment.**

Except as contemplated herein, a party may not assign this Agreement (including but not limited to within the meaning of "assignment" as defined in the Advisers Act) without the prior written consent of the other party, and any attempted assignment without such consent will be null and void.

Section 19.    **Amendment.**

This Agreement may not be modified or amended in any respect except in writing signed by the parties hereto.

Section 20.    **Notices.**

(a)    Any notice, approval, consent or similar communication required by this Agreement to be in writing will be deemed duly given if sent by registered or certified mail, return receipt requested, postage prepaid and addressed to the intended recipient as set forth below:

|  |  |
|---|---|
| If to Delphi: | Delphi Corporation |
| | Attention: Treasurer |
| | 5725 Delphi Drive |
| | Troy, Michigan 48098 |
| | |
| If to GMIMCo: | General Motors Investment Management Corporation |
| | Attention: Vice President & General Counsel |
| | 767 Fifth Avenue |
| | New York, New York 10153. |

(b)    Any party may send any notice to the intended recipient at the address set forth above using any other means (including personal delivery, expedited courier, messenger service, ordinary mail, facsimile or electronic mail), but no such notice will be deemed to have been duly given unless and until it is actually received by the intended recipient. Any party may change its address for notices by giving the other party written notice of such change.

18

**Section 21.    Governing Law.**

Subject to the provisions of ERISA, the Code, and the Advisers Act, this Agreement will be construed, administered and enforced according to the internal law (and not the law of conflicts) of the State of New York.

**Section 22.    Severability.**

If any provision of this Agreement is held to be invalid or unenforceable, the remaining provisions of this Agreement will continue in full force and effect so long as they preserve the basic terms of this Agreement.

**Section 23.    Waiver.**

No delay or omission by either party to exercise any right or power under this Agreement will impair such right or power or be construed to be a waiver thereof. A waiver by either of the parties of any of the covenants to be performed by the other or any breach of this Agreement will not be construed to be a waiver of any succeeding breach or of any other covenant contained in this Agreement. Except as otherwise expressly provided in this Agreement, all remedies provided for in this Agreement will be cumulative and in addition to and not in lieu of any other remedies available to either party at law, in equity or otherwise.

**Section 24.    Survival.**

Sections 6 (regarding records and audit rights), 9 (regarding confidentiality), and 11 (regarding indemnification) will survive the termination or expiration of this Agreement.

**Section 25.    Counterparts.**

This Agreement may be executed in one or more counterparts, which will together constitute one and the same document.

**Section 26.    GMIMCo ADV.**

Delphi, on behalf of itself and each U.S. Plan, acknowledges that it has been provided with of a copy of Part II of GMIMCo's Form ADV under the Advisers Act. Notwithstanding the provisions of Section 13, Delphi may terminate this Agreement without penalty within five business days after the date that this Agreement is executed, pursuant to Advisers Act Rule 204-3(b).

**Section 27.    Compliance with Laws.**

It will be a duty and obligation of GMIMCo under this Agreement to perform its services hereunder in accordance with all laws, rules and regulations applicable to it.

**Section 28.    Entire Agreement.**

This Agreement embodies the entire understanding of the parties and supersedes any prior agreements or understandings with respect to the subject matter of this Agreement.


IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement on the date first above written.


**DELPHI CORPORATION**

By: _____
Name:  John Blahnik
Title:    Treasurer


**GENERAL MOTORS INVESTMENT
MANAGEMENT CORPORATION**

By: _____
Name:    W. Allen Reed
Title:    President and Chief Executive
Officer

20

**Addendum 1 to Management Services Agreement Dated September 17, 2002**

**Delphi Mechatronic Systems, Inc.**

## RECITALS

1.      Delphi Corporation ("Delphi") and General Motors Investment Management Corporation ("GMIMCo") have entered into a Management Services Agreement dated September 17, 2002 ("MSA") pursuant to which GMIMCo will perform certain services in its role as "named fiduciary" (as defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA") § 402(a)(2)) for investment purposes and "investment manager" (as defined in ERISA § 3(38)(A)) of the U.S. Plans, and provide certain other services for the U.S. Plans.

2.      Delphi Mechatronic Systems, Inc., a Delaware corporation ("D-MS"), is a wholly-owned subsidiary of Delphi and is thus part of the same "controlled group of corporations" (as defined in Internal Revenue Code ("Code") § 1563(a)) as Delphi.

3.      D-MS sponsors certain U.S. Plans listed in Exhibit A to the MSA.

4.      The D-MS Board of Directors is the "named fiduciary" (as defined in ERISA § 402(a)(2)) of the D-MS-sponsored U.S. Plans and is authorized to appoint a named fiduciary for investment purposes and one or more investment managers for such U.S. Plans.

5.      D-MS, acting through its Board of Directors, designated GMIMCo as named fiduciary for purposes of investment of the assets of the U.S. Plans sponsored by D-MS and investment manager for the U.S. Plans D-MS sponsors.

6.      D-MS has authorized Delphi (whether acting through the IPC or other person or entity appointed by Delphi) to act in accordance with the MSA with respect to the U.S. Plans sponsored by D-MS to the same extent that Delphi acts with respect to the U.S. Plans sponsored by Delphi.

7.      Capitalized terms used in this Addendum without definition have the meanings given to them in the MSA.

## TERMS

**Section 1.      Appointment and Retention.**

D-MS appoints GMIMCo as investment manager and retains GMIMCo to perform for the D-MS-sponsored U.S. Plans the services to be provided by GMIMCo for the Delphi-sponsored U.S. Plans under the MSA and in accordance with all of the terms and conditions of the MSA.  GMIMCo accepts such appointment.

L:\DH\DELPHI  FPO\DELPHI DRAFTS\MSA ADDENDUM 1 (DMS) FINAL.DOC

**Section 2.**    <u>GMIMCo Responsibilities</u>.

GMIMCo will provide the services for the D-MS-sponsored U.S. Plans that it provides to the Delphi-sponsored U.S. Plans in accordance with all terms and conditions of the MSA.

**Section 3.**    <u>Delphi Authorization</u>.

D-MS authorizes Delphi, and any persons or entities authorized to act on behalf of Delphi under the MSA, to act in accordance with the terms of the MSA with regard to the U.S. Plans sponsored by D-MS, including, without limitation, the payment of GMIMCo's compensation and expenses pursuant to Section 5 and Exhibit D of the MSA as such compensation and expenses relate to the D-MS-sponsored U.S. Plans, and the removal of Removed Assets and allocation of such assets to Delphi Investment Manager(s) pursuant to Section 4 of the MSA, and Delphi agrees to so act.

**Section 4.**    <u>Notices</u>.

(a)    Any notice, approval, consent, or similar communication required by this Addendum to be in writing to be sent to D-MS will be deemed duly given if sent by registered or certified mail, return receipt requested, postage prepaid and addressed to the intended recipient as set forth below:

| | |
|---|---|
| If to D-MS: | Delphi Mechatronic Systems, Inc.<br>Attention: Employee Benefit Plan Administrator<br>3110 Wood Creek Drive<br>Downers Grove, Illinois 60515 |
| If to Delphi: | Delphi Corporation<br>Attention:  Treasurer<br>5725 Delphi Drive<br>Troy, Michigan 48098 |
| If to GMIMCo: | General Motors Investment Management Corporation<br>Attention:  Vice President & General Counsel<br>767 Fifth Avenue<br>New York, New York 10153. |

(b)    Any party may send any notice to the intended recipient at the address set forth above using any other means (including personal delivery, expedited courier, messenger service, ordinary mail, facsimile, or electronic mail), but no such notice will be deemed to have been duly given unless and until it is actually received by the intended recipient.  Any party may change its address by giving the other party notice.

**Section 5.**    <u>Relationship to MSA</u>.

Unless otherwise specified in this Addendum, the terms and conditions of the MSA govern this Addendum and, in the event of a conflict between the MSA and this Addendum, the MSA governs.

**DELPHI CORPORATION**

By: _____

Name:   John Blahnik
Title:    Treasurer

**GENERAL MOTORS INVESTMENT
MANAGEMENT CORPORATION**

By: _____

Name:    W. Allen Reed
Title:    President and Chief Executive
           Officer

**DELPHI MECHATRONIC SYSTEMS, INC.**

By: _____

Name:    Lothar Veeser
Title:    President

3

**Addendum 2 to Management Services Agreement Dated September 17, 2002**

**Packard-Hughes Interconnect Company**

## RECITALS

1.      Delphi Corporation ("Delphi") and General Motors Investment Management Corporation ("GMIMCo") have entered into a Management Services Agreement dated September 17, 2002 ("MSA") pursuant to which GMIMCo will perform certain services in its role as "named fiduciary" (as defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA") § 402(a)(2)) for investment purposes and "investment manager" (as defined in ERISA § 3(38)(A)) of the U.S. Plans, and provide certain other services for the U.S. Plans.

2.      Packard-Hughes Interconnect Company, a Delaware corporation ("PHI"), is a wholly-owned subsidiary of Delphi and is thus part of the same "controlled group of corporations" (as defined in Internal Revenue Code ("Code") § 1563(a)) as Delphi.

3.      PHI sponsors certain U.S. Plans listed in Exhibit A to the MSA.

4.      The PHI Board of Directors is the "named fiduciary" (as defined in ERISA § 402(a)(2)) of the PHI-sponsored U.S. Plans and is authorized to appoint a named fiduciary for investment purposes and one or more investment managers for such U.S. Plans.

5.      PHI, acting through its Board of Directors, designated GMIMCo as named fiduciary for purposes of investment of the assets of the U.S. Plans sponsored by PHI and investment manager for the U.S. Plans PHI sponsors.

6.      PHI has authorized Delphi (whether acting through the IPC or other person or entity appointed by Delphi) to act in accordance with the MSA with respect to the U.S. Plans sponsored by PHI to the same extent that Delphi acts with respect to the U.S. Plans sponsored by Delphi.

7.      Capitalized terms used in this Addendum without definition have the meanings given to them in the MSA.

## TERMS

**Section 1.      Appointment and Retention.**

PHI appoints GMIMCo as investment manager and retains GMIMCo to perform for the PHI-sponsored U.S. Plans the services to be provided by GMIMCo for the Delphi-sponsored U.S. Plans under the MSA and in accordance with all of the terms and conditions of the MSA. GMIMCo accepts such appointment.

L:\DH\DELPHI  FPO\DELPHI DRAFTS\MSA ADDENDUM 2 (PHI) FINAL.DOC

**Section 2.**    **GMIMCo Responsibilities.**

GMIMCo will provide the services for the PHI-sponsored U.S. Plans that it provides to the Delphi-sponsored U.S. Plans in accordance with all terms and conditions of the MSA.

**Section 3.**    **Delphi Authorization.**

PHI authorizes Delphi, and any persons or entities authorized to act on behalf of Delphi under the MSA, to act in accordance with the terms of the MSA with regard to the U.S. Plans sponsored by PHI, including, without limitation, the payment of GMIMCo's compensation and expenses pursuant to Section 5 and Exhibit D of the MSA as such compensation and expenses relate to the PHI-sponsored U.S. Plans, and the removal of Removed Assets and allocation of such assets to Delphi Investment Manager(s) pursuant to Section 4 of the MSA, and Delphi agrees to so act.

**Section 4.**    **Notices.**

(a)    Any notice, approval, consent, or similar communication required by this Addendum to be in writing to be sent to PHI will be deemed duly given if sent by registered or certified mail, return receipt requested, postage prepaid and addressed to the intended recipient as set forth below:

| | |
|---|---|
| If to PHI: | Packard-Hughes Interconnect Company<br>Attention: Employee Benefit Plan Administrator<br>17159 Von Karman Avenue<br>Irvine, California 92614-0901 |
| If to Delphi: | Delphi Corporation<br>Attention: Treasurer<br>5725 Delphi Drive<br>Troy, Michigan 48098 |
| If to GMIMCo: | General Motors Investment Management Corporation<br>Attention: Vice President & General Counsel<br>767 Fifth Avenue<br>New York, New York 10153. |

(b)    Any party may send any notice to the intended recipient at the address set forth above using any other means (including personal delivery, expedited courier, messenger service, ordinary mail, facsimile, or electronic mail), but no such notice will be deemed to have been duly given unless and until it is actually received by the intended recipient. Any party may change its address by giving the other party notice.

2

**Section 5.    Relationship to MSA.**

Unless otherwise specified in this Addendum, the terms and conditions of the MSA govern this Addendum and, in the event of a conflict between the MSA and this Addendum, the MSA governs.

**DELPHI CORPORATION**

By: _____

Name:    John Blahnik

Title:    Treasurer


**GENERAL MOTORS INVESTMENT MANAGEMENT CORPORATION**

By: _____

Name:    W. Allen Reed

Title:    President and Chief Executive Officer


**PACKARD-HUGHES INTERCONNECT COMPANY**

By: _____

Name:  CHARU MANOCHA

Title:  DIRECTOR OF HUMAN RESOURCES


3

**Addendum 3 to Management Services Agreement Dated September 17, 2002**

**ASEC Manufacturing**

**RECITALS**

1.    Delphi Corporation ("Delphi") and General Motors Investment Management Corporation ("GMIMCo") have entered into a Management Services Agreement dated September 17, 2002 ("MSA") pursuant to which GMIMCo will perform certain services in its role as "named fiduciary" (as defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA") § 402(a)(2)) for investment purposes and "investment manager" (as defined in ERISA § 3(38)(A)) of the U.S. Plans, and provide certain other services for the U.S. Plans.

2.    ASEC Manufacturing, a Delaware general partnership a/k/a Delphi Catalyst Systems ("ASEC"), is a wholly-owned subsidiary of Delphi and is thus part of the same "controlled group of corporations" (as defined in Internal Revenue Code ("Code") § 1563(a)) as Delphi.

3.    ASEC sponsors certain U.S. Plans listed in Exhibit A to the MSA.

4.    The ASEC Benefits Committee is the "named fiduciary" (as defined in ERISA § 402(a)(2)) of the ASEC -sponsored U.S. Plans and is authorized to appoint a named fiduciary for investment purposes and one or more investment managers for such U.S. Plans.

5.    ASEC, acting through its Benefits Committee, designated GMIMCo as named fiduciary for purposes of investment of the assets of the U.S. Plans sponsored by ASEC and investment manager for the U.S. Plans ASEC sponsors.

6.    ASEC has authorized Delphi (whether acting through the IPC or other person or entity appointed by Delphi) to act in accordance with the MSA with respect to the U.S. Plans sponsored by ASEC to the same extent that Delphi acts with respect to the U.S. Plans sponsored by Delphi.

7.    Capitalized terms used in this Addendum without definition have the meanings given to them in the MSA.

**TERMS**

**Section 1.**    **Appointment and Retention.**

ASEC appoints GMIMCo as investment manager and retains GMIMCo to perform for the ASEC-sponsored U.S. Plans the services to be provided by GMIMCo for the Delphi-sponsored U.S. Plans under the MSA and in accordance with all of the terms and conditions of the MSA.  GMIMCo accepts such appointment.

L:\DH\DELPHI  FPO\DELPHI DRAFTS\MSA ADDENDUM 3 (ASEC) FINAL.DOC

**Section 2.**    **GMIMCo Responsibilities.**

GMIMCo will provide the services for the ASEC-sponsored U.S. Plans that it provides to the Delphi-sponsored U.S. Plans in accordance with all terms and conditions of the MSA.

**Section 3.**    **Delphi Authorization.**

ASEC authorizes Delphi, and any persons or entities authorized to act on behalf of Delphi under the MSA, to act in accordance with the terms of the MSA with regard to the U.S. Plans sponsored by ASEC, including, without limitation, the payment of GMIMCo's compensation and expenses pursuant to Section 5 and Exhibit D of the MSA as such compensation and expenses relate to the ASEC-sponsored U.S. Plans, and the removal of Removed Assets and allocation of such assets to Delphi Investment Manager(s) pursuant to Section 4 of the MSA, and Delphi agrees to so act.

**Section 4.**    **Notices.**

(a)    Any notice, approval, consent, or similar communication required by this Addendum to be in writing to be sent to ASEC will be deemed duly given if sent by registered or certified mail, return receipt requested, postage prepaid and addressed to the intended recipient as set forth below:

| | |
|---|---|
| If to ASEC: | ASEC Manufacturing<br>Attention: Employee Benefit Plan Administrator<br>1301 Main Parkway<br>Catoosa, Oklahoma 74015 |
| If to Delphi: | Delphi Corporation<br>Attention:  Treasurer<br>5725 Delphi Drive<br>Troy, Michigan 48098 |
| If to GMIMCo: | General Motors Investment Management Corporation<br>Attention:  Vice President & General Counsel<br>767 Fifth Avenue<br>New York, New York 10153. |

(b)    Any party may send any notice to the intended recipient at the address set forth above using any other means (including personal delivery, expedited courier, messenger service, ordinary mail, facsimile, or electronic mail), but no such notice will be deemed to have been duly given unless and until it is actually received by the intended recipient.  Any party may change its address by giving the other party notice.

2

**Section 5.**    <u>Relationship to MSA</u>.

Unless otherwise specified in this Addendum, the terms and conditions of the MSA govern this Addendum and, in the event of a conflict between the MSA and this Addendum, the MSA governs.

**DELPHI CORPORATION**

By:   _____
Name:  John Blahnik
Title:   Treasurer


**GENERAL MOTORS INVESTMENT MANAGEMENT CORPORATION**

By:   _____
Name:  W. Allen Reed
Title:   President and Chief Executive Officer


**ASEC MANUFACTURING**

By:   _____
Name:   F. Thomas Sprunger
Title:   Manager, Human Resources

3

## EXHIBIT A

### TO MANAGEMENT SERVICES AGREEMENT

### LIST OF U.S. PLANS

1. Delphi Retirement Program for Salaried Employees (the "Salaried Plan");

2. Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan" and together with the Salaried Plan, the "Hourly and Salaried Plans");

3. ASEC Manufacturing Retirement Program;

4. ASEC Manufacturing Savings Plan;

5. Packard Hughes Interconnect Non-Bargaining Retirement Plan;

6. Packard Hughes Interconnect Bargaining Retirement Plan;

7. Packard Hughes Interconnect Foley, Alabama Facility Retirement Plan;

8. Delphi Mechatronic Systems Retirement Program;

9. Delphi Mechatronic Systems Savings-Stock Purchase Program;

10. Delphi Income Security Plan for Hourly-Rate Employees;

11. Delphi Savings-Stock Purchase Program for Salaried Employees in the United States; and

12. Delphi Personal Savings Plan for Hourly-Rate Employees in the United States.

## EXHIBIT B

### TO MANAGEMENT SERVICES AGREEMENT

### STRATEGIC INVESTMENT POLICY GUIDELINES

### FOR THE HOURLY AND SALARIED PLANS (AS DEFINED IN EXHIBIT A)

| Asset Class | Strategic Investment Policy Guideline Range[1] |
|---|---|
| **Equity** | |
| - US Publicly Traded | 24-36 |
| - Private Market | 5-9 |
| - Developed International Markets | 20-26 |
| - Emerging Markets | 0-4 |
| | |
| **Fixed Income** | |
| - Global Bonds | 17-27 |
| - High Yield | 7-11 |
| | |
| **Absolute Return Strategy** | 0-2 |
| **Real Estate** | 5-9 |

---

[1] Within the policy guideline ranges, specific target allocations have been and will be recommended by GMIMCo and approved by the IPC.

L:\DM\DELPHI  FPO\DELPHI DRAFTS\MSA EXHIBIT B FINAL.DOC

**EXHIBIT C**

**TO MANAGEMENT SERVICES AGREEMENT**

**REPORTING**

1.   Quarterly reports will be delivered after the end of each calendar quarter. Reports
     for quarters prior to the quarter ended June 30, 2003 will be delivered within
     forty-five days after quarter-end. Reports for the quarter ended June 30, 2003 and
     subsequent quarters will be delivered within thirty days after quarter-end.
     GMIMCo will use reasonable best efforts to deliver reports at least five business
     days prior to the relevant quarterly IPC meeting if that occurs earlier than the
     agreed upon due date of a quarterly report, and to improve the timing of report
     delivery for the quarters ending after June 2003.  These reports will include:

     (a)   Asset values of each U.S. Plan;

     (b)   Asset allocation versus strategic policy for the defined benefit U.S. Plans
           (hereinafter "DB U.S. Plans");

     (c)   Explanation of changes in market values for the Hourly and Salaried Plans
           (as defined in Exhibit A);

     (d)   Investment results compared to relevant benchmarks at the total plan and
           asset class levels, including discussion thereof for major asset classes
           managed by GMIMCo, for the DB U.S. Plans;

     (e)   Significant investment activities, including manager changes for major
           asset classes managed by GMIMCo;

     (f)   Fund allocations by asset class for the Delphi Savings-Stock Purchase
           Program for Salaried Employees in the United States and the Delphi
           Personal Savings Plan for Hourly-Rate Employees in the United States;

     (g)   Summary performance versus benchmark by asset class for the Delphi
           Savings-Stock Purchase Program for Salaried Employees in the United
           States and the Delphi Personal Savings Plan for Hourly-Rate Employees
           in the United States; and

     (h)   Allocation of major asset classes at the sub-asset-class level for the Hourly
           and Salaried Plans.

2.   Beginning with the quarterly report pertaining to the calendar period ending
     December 31, 2002, the quarterly reports will also include:

     (a)   Plan level performance attribution by asset class for the Hourly and
           Salaried Plans;

     (b)   Balanced Fund performance attribution by asset class;

L:\DH\DELPHI  FPO\DELPHI DRAFTS\MSA EXHIBIT C FINAL.DOC

EXHIBIT C

(c)    Rolling excess return, tracking error versus benchmarks and information ratio for major asset classes managed by GMIMCo for the Hourly and Salaried Plans; and

(d)    Fact sheets for each major asset class managed by GMIMCo for the Hourly and Salaried Plans, including (but not limited to) investment managers in the asset class and overall allocations by major characteristics appropriate to each asset class (e.g. economic sectors, major holdings, geography, and/or credit quality).

3.    An estimate of calendar year-to-date investment returns for the Hourly and Salaried Plans will be delivered bi-weekly within five business days following the end of each bi-weekly period.

4.    An estimate of the market values of the Hourly and Salaried Plans will be delivered annually within three business days following the end of the calendar year.

EXHIBIT D

TO MANAGEMENT SERVICES AGREEMENT

COMPENSATION AND EXPENSE REIMBURSEMENT

1.    <u>Management Fee</u>

Delphi, on behalf of itself and the U.S. Plans, will pay or cause to be paid to GMIMCo a fee ("Management Fee") consisting of a "Base Assets Fee" and an "Alternative Assets Fee".  The Management Fee will be calculated monthly and payable quarterly in arrears, as described in this Exhibit D. The Base Assets Fee is calculated at the per annum percentage rates of Average Base Assets (as defined below) determined in accordance with the following schedule:

| <u>Average Base Assets</u> | <u>Per Annum Rate</u> |
|---|---|
| first $3.5 billion | .035% |
| over $3.5 billion | .025%; |

and the Alternative Assets Fee is calculated at the per annum rate of .40% of Average Alternative Assets (as defined below).

For purposes of calculating and paying the Management Fee:

(a)    "Average Base Assets" means, with respect to each calendar month, the sum of the Value (as defined below) of the Base Assets (as defined below) on the last day of such month and the Value of the Base Assets on the last day of the immediately preceding calendar month, divided by two (it being understood that in the case of the month of January, 2002, for the purpose of determining the Value of the Base Assets on the last day of  the immediately preceding calendar month, the Value of the corresponding assets on December 31, 2001 will be used);

(b)    "Average Alternative Assets" means, with respect to each calendar month, the sum of the Alternative Assets (as defined below) on the last day of such month and the Alternative Assets on the last day of the immediately preceding calendar month, divided by two (it being understood that in the case of the month of January, 2002, for the purpose of determining the Alternative Assets on the last day of  the immediately preceding calendar month, the corresponding assets on December 31, 2001 will be used);

(c)    "Base Assets" means, on any date, all of the assets of the U.S. Plans that on such date are managed by GMIMCo under the Agreement, minus the Alternative Assets on such date;

L:\DH\DELPHI FPD\DELPHI DRAFTS\MSA EXHIBIT D FINAL.DOC

(d)    "Alternative Assets" means, on any date, the result obtained by multiplying (i) the Value on such date of the aggregate gross assets of the U.S. Plans by (ii) the percentage which represents the policy allocation to Alternative Investments[1] for the Hourly and Salaried Plans (as defined in Exhibit A) as approved from time to time by the IPC (disregarding, for purposes of calculating the Base Assets Fee and the Alternative Assets Fee, any ranges around such policy allocation as may be so approved), it being understood that such policy allocation to Alternative Investments as of the date of the Agreement is 13%;

(e)    "Value" means the value in U.S. dollars as communicated to GMIMCo by the Trustee of the assets in question;

(f)    At the end of each quarter, following the receipt of an invoice from GMIMCo providing detailed supporting information for the Management Fee for such quarter, the invoice will be paid within 30 days from one or more Funds (as defined in section 2(b) below) or the U.S. Plans' interests in such Funds as determined by GMIMCo or its affiliates and upon the direction to the Trustee, which payment will be reported in the next following summary provided by GMIMCo to Delphi pursuant to paragraph 4 below;

(g)    GMIMCo will allocate the Management Fee among the various U.S. Plans in proportion to the market value of each of the U.S. Plans. Accordingly, following the end of each quarter GMIMCo will provide written instructions to the Trustee regarding the allocation of the Management Fee with respect to such quarter among the various U.S. Plans. Delphi may from time to time amend the standing allocation instructions for the Management Fee by providing GMIMCo with new written instructions; and

(h)    It is understood by the parties to the Agreement that there is no minimum Management Fee.

---

[1] For the purposes of this Exhibit D to the Agreement, Alternative Investments include private market investments, real estate investments including investments in real estate investment trusts, investments in absolute return strategies and investments in other alternative strategies as may be identified and agreed by the parties to the Agreement after the date of Agreement.

2

2.    <u>Direct Fund Costs</u>

Delphi, on behalf of itself and the U.S. Plans, will pay or cause to be paid, and will cause the U.S. Plans to bear, the Delphi Portion of Direct Fund Costs (each as defined below).

For purposes of calculating and paying Direct Fund Costs:

(a)    "Fund" means any trust, account, fund, company or other vehicle holding or otherwise established or existing with respect to assets attributable to any U.S. Plan and which vehicle is managed by (and/or by third parties retained by or on behalf of) GMIMCo or its affiliates;

(b)    "Direct Fund Costs" means those expenses incurred by or with respect to any Fund. Such expenses include but are not limited to (i) expenses incurred by GMIMCo or its affiliates in connection with management of any Fund (whether such management is by GMIMCo, such affiliates or third parties), including Allocated Expenses (as defined below), (ii) investment management fees and related expenses payable to or incurred by persons other than GMIMCo and its affiliates, (iii) brokerage commissions and other trading expenses, (iv) interest, (v) taxes, if any, (vi) trustee and custodial fees and expenses and (vii) legal, accounting and other professional fees and expenses;

(c)    "Allocated Expenses" means that portion of the compensation and benefits, facility and occupancy, information technology and other expenses incurred by GMIMCo or its affiliates and allocated by GMIMCo or its affiliates to a Fund pursuant to the activity-based costing model or other cost allocation system employed from time to time by GMIMCo or its affiliates;

(d)    "Delphi Portion" means (i) the percentage determined by dividing the Value (as defined in Section 1(e) of this Exhibit D) of a Fund's net assets attributable to the U.S. Plans by the Value of such Fund's total net assets or (ii) in the case of one or more particular Direct Fund Costs such other percentage as may from time to time be agreed to between GMIMCo and Delphi;

(e)    in furtherance of but without limiting the obligations of Delphi with respect to the Delphi Portion of Direct Fund Costs, such Costs will be paid by a Fund to a third party or GMIMCo or its affiliates when and as directed by GMIMCo or its affiliates; and

(f)    GMIMCo will allocate the Delphi Portion of Direct Fund Costs among the various U.S. Plans in proportion to the market value of each of the U.S. Plans. Accordingly, GMIMCo will provide written instructions to the Trustee regarding such allocation of the Delphi Portion of Direct Fund Costs among the various U.S. Plans. Delphi may from time to time amend the allocation instructions for Direct Fund costs by providing GMIMCo with new written instructions.

3.    <u>Out-of-Pocket Expenses.</u>

3

(a)    Delphi, itself and on behalf of the U.S. Plans, will be responsible for the payment of, and will cause either one or more U.S. Plans or Delphi to bear, all Out-of-Pocket Expenses "Out-of-Pocket Expenses" means those amounts (other than Direct Fund Costs) related to a U.S. Plan that are paid or payable to a third party or have been paid by GMIMCo to a third party on behalf of Delphi or a U.S. Plan. Such Expenses include (but are not limited to) fees and expenses with respect to:

(i)    U.S. Plan or trust record keeping;

(ii)    communications with Plan participants (e.g., contract writers, printing, publication and mailing costs);

(iii)    trustees and custodians;

(iv)    third party DC U.S. Plan advisers, if any;

(v)    U.S. Plan or trust accounting;

(vi)    U.S. Plan, trust, or other audits;

(vii)    preparation, publication and distribution of U.S. Plan, trust, or other financial statements;

(viii)    regulatory filings (e.g., Form 5500), examinations, and other proceedings;

(ix)    actuarial, legal, or tax matters;

(x)    Pension Benefit Guaranty Corporation premiums; and

(xi)    beneficiary payment processing expenses.

"Out-of-Pocket Expenses" will also be deemed to include fees and expenses with respect to (i) the provision of special services by GMIMCo or its affiliates (e.g., services arising out of an acquisition or divestiture by Delphi) and (ii) the incurrence of regulatory or other expenses occasioned by and directly as a result of compliance with the requirements of the Agreement.

(b)    In furtherance of, but without limiting the payment obligations of Delphi with respect to, Out-of-Pocket Expenses, such Expenses will be paid by the U.S. Plans or Delphi (as applicable) to a third party (or, if incurred by GMIMCo or its affiliates, to GMIMCo or its affiliates) (i) in the case of Delphi, within thirty days of invoice by GMIMCo supporting such expense and (ii) in the case of the U.S. Plans, when and as directed by GMIMCo or its affiliates.

EXHIBIT D

(c)    With respect to a particular Out-of-Pocket Expense, unless Delphi directs otherwise, GMIMCo will direct the Trustee to allocate Out-of-Pocket Expenses among the applicable U.S. Plans or Funds in proportion to the market value of the applicable U.S. Plans or Funds.

Reporting

In addition to the reporting obligations outlined in Exhibit C, GMIMCo will provide to Delphi on a quarterly basis detailed information supporting the calculation of the Management Fee (including all relevant Values), the Delphi Portion of Direct Fund Costs, and Out-of-Pocket Expenses (listed according to the items specified in this Exhibit D) for the most recent calendar quarter.

Re-Negotiation of Management Fee

In the event that, at any time during the term of the Agreement, either:

(a)    the percentage policy allocation referred to in Section 1(d)(ii) of this Exhibit D is either reduced to below 11% or increased to greater than 15% of the aggregate value of the gross assets of such U.S. Plans; or

(b)    the total of Removed Assets, plus all other U.S. Plan assets which for any reason (other than payment of benefits, fees or expenses in the ordinary course of business, and investment losses) cease to be managed by GMIMCo under the Agreement, exceeds $2 billion;

then the parties will, if either party chooses to initiate discussions regarding the Management Fee (by providing written notice to the other), attempt in good faith to re-negotiate the Management Fee. In the event that the parties are unable, after good faith negotiations, to agree upon a new Management Fee, then either party may terminate the Agreement upon 30 days' written notice to the other, notwithstanding any provision in Section 13 of the Agreement to the contrary.

5

**<u>Exhibit 5.01(b)(v)</u>**
**Battery Facilitation Agreement – Transaction Summary**
**dated as of March 21, 2005 between Delphi and GM**

GM/Delphi Confidential

### GM/Delphi Battery Facilitation Agreement – Transaction Summary

This Transaction Summary, dated as of March 21, 2005 (**"Facilitation Agreement"**) will confirm the understanding between Delphi Corporation (**"Delphi"**) and General Motors Corporation (**"GM"**) regarding certain arrangements between the parties intended to facilitate the transfer of Delphi's global battery business to JCI (the **"JCI Transaction"**), and the transition from Delphi as the Tier I supplier to GM of certain automotive batteries to GM to JCI.

**A.    Delphi's U.S. Plant Consolidation.**

1.     Delphi shall transform its U.S. plant operations to be more efficient and competitive, including but not limited to:

    (i)    Transfer battery production at Anaheim and Olathe facilities to other Delphi battery facilities;
    (ii)   Transformation of Fitzgerald to other products ; and
    (iii)  Transformation of New Brunswick operations to competitive wage structure.

2.     GM and Delphi agree that the relocation cost associated with the flow back of Fitzgerald employees to a GM U.S. facility will be shared equally (50/50) by GM and Delphi up to a total $67,000 relocation cost ($33,500 each).   These costs shall include relocation allowances, relocation services and other related expenses provided for in the National Agreement or any other applicable collective bargaining agreement.     Regarding New Brunswick employees, GM intends to work with Delphi to make transfer and new hire opportunities available at GM or Delphi sites for New Brunswick employees.

3.     **Delphi's Olathe Battery Plant**. GM and Delphi will undertake the following actions commencing upon the Closing Date,  and for a four year period thereafter, (except where specified otherwise), contingent upon UAW cooperation and contractual considerations, as applicable.

    (i)    Delphi will offer as soon as possible after the date of this Facilitation Agreement and for a limited period, a one-time incentive attrition/redeployment opportunities to current Olathe employees, similar to opportunities and incentives offered in Flint West.
    (ii)   Relative to the consolidation of the Olathe Battery Plant and the employee redundancies associated with such consolidation, it is agreed between GM and Delphi that immediately after receiving concurrence from the UAW, Delphi will begin executing the Olathe Redeployment Plan. As a part of this redeployment plan GM will offer, as soon as possible, as openings occur, flow back opportunities to the GM Fairfax facility, for the Olathe employees pursuant to the provisions of the 2003 Delphi/GM/UAW National Agreements. In addition, if Delphi is successful in achieving the concurrence of the UAW, flow back opportunities will be extended to include employees hired after October 18, 1999, as well as any employees who are ineligible as a result of turning down a previous Fairfax job offer. GM also agrees to support any closed plant employee placement treatment for the Olathe employees, which Delphi negotiates with the UAW, provided a waiver of any GM new hire obligations created as a result of these placements is included in the Delphi /UAW settlement. Employees, as described above,

**DELPHI-JCI-000273**

*HIGHLY CONFIDENTIAL*

GM/Delphi Confidential

who volunteer for the Fairfax flow back option, will be placed on active status at the GM Fairfax Plant or into GM protected status on or before June 6, 2005.

Delphi will be responsible for all cost associated with managing the employees in protected status. Beginning January 1, 2006, GM will be responsible for all JOBS costs associated with the production employees. Delphi will remain responsible for all facility, management and administrative costs associated with those employees in protected status until June 5, 2006, or, until the total number of protected employees falls below twenty (20), whichever is earlier. No later than April 4, 2006, GM will assume the JOBS costs of the remaining skilled trades employees unless the parties mutually agree to extend such timing. The parties commit to make every effort to eliminate the JOBS costs as soon as possible. Such efforts may include items such as allowing Fairfax employees to accept extended area hire placement and backfilling with Olathe employees, retraining skilled trades employees for other classifications.

(iii)    GM will reimburse Delphi for 50% of all contractually related incremental costs (up to an annual reimbursement of $500,000.00) for hourly represented employees incurred at the North Kansas City Cockpit plant ("KCC Plant"), as a result of Delphi hiring employees at the KCC Plant cockpit operation under the Delphi Supplement and National Agreement, as applicable. Amount to be paid quarterly beginning the date of closure of the Battery Transaction for the prior three months' of expense.

(iv)    In addition to GM's obligation under clause (iii) above, GM will reimburse Delphi for current Olathe employees who accept redeployment opportunities at the KCC Plant, at a rate of $39,322.50 annually per employee. To be paid quarterly beginning the date of closure of the battery transaction for the prior three months' of expense.

4.    In addition to the payments described in Sections 2 and 3 above, GM would provide up to $30 million in funding to assist Delphi in restructuring operations for closure or transformation to a competitive wage workforce contingent upon the following milestones:

(i)    $7.5 million at closing of the JCI Transaction;

(ii)    $3.6 million payable upon price reduction implemented on July 1, 2005;

(iii)    $3.6 million payable upon price reduction implemented on July 1, 2006;

(iv)    $3.3 million payable upon price reduction implemented on July 1, 2007;

(v)    $6.0 million upon sale of New Brunswick to JCI or upon resourcing manufacturing of all New Brunswick battery volume after December 1, 2007, recognizing that GM is not obligated to provide any backfill work for New Brunswick; and

(vi)    $6.0 million upon re-sourcing manufacturing of all Fitzgerald battery volume to JCI.

No further consideration will be offered for any other U.S. battery sites. In the event the specific contingent milestones listed above do not occur, GM shall have no liability for the specific payment associated with such milestone.

5.    For the period from closure of the JCI Transaction until the subsequent sale of the New Brunswick Plant to JCI (the "New Brunswick Sale") and re-sourcing of Fitzgerald battery volume to JCI (but in no event beyond December 1, 2007), GM will purchase batteries

Page 2

DELPHI-JCI-000274

*HIGHLY CONFIDENTIAL*

GM/Delphi Confidential

manufactured at Delphi's Fitzgerald and New Brunswick operations through JCI, who will in turn have a contractual relationship with Delphi.

6.     In consideration of GM's cost sharing in Delphi's U.S. restructuring, JCI will receive price reductions for all North American batteries (OE, service, and aftermarket) manufactured at Fitzgerald or New Brunswick, per the following schedule and implemented by Delphi:

(i)     1.5% on July 1, 2005;
(ii)    2.0% on July 1, 2006; and
(iii)   3.0% on July 1, 2007.

These price reductions are in addition to any pre-existing contractual price reductions.

7.     GM through JCI will purchase GM's annual battery volume requirements from these sites for the product programs specified in **Exhibit A**, including all successor or derivative programs (excluding the GMT-900), through the earlier of December 1, 2007 or until battery operations at the New Brunswick and Fitzgerald facilities either cease production or are transferred to JCI;  provided, however, that such volume requirements shall not include: (i) programs exited at Delphi's request, (ii) batteries purchased by Delphi, and (iii)  batteries manufactured outside of the United States.   Should GM or JCI re-source a program from Exhibit A, for any programs that begin production prior to December 1, 2007 (or such other date as may apply under clauses A.8 or  A.9 below) other than for a reason permitted under Section A.10 below, Delphi would have a right to withhold price reductions.

8.     GM and Delphi will jointly develop a transition plan that will facilitate the re-sourcing of battery production from Fitzgerald to JCI based on the timing of the product backfill for 2007 by quarter.  Delphi intends to place backfill work for seventy-five (75) employees by June 30, 2007.  The parties intend to achieve 100% of the Fitzgerald battery re-sourcing by October 1, 2007 but will be predicated on GM's timed backfill plan for 175 hourly employees.

9.     In the event Delphi is delayed in achieving its commitments regarding the New Brunswick facility by the December 1, 2007 date referenced above, as the result of the inability to finalize the 2007 National IUE agreement for reasons beyond Delphi's reasonable control, the parties would agree upon a reasonable extension of that time period taking into consideration all appropriate facts and circumstances.   Delphi will make finalization of the New Brunswick Sale a priority in 2007 IUE-Delphi national negotiations.

10.    The above provisions notwithstanding, GM reserves the right to resource such products, but only in the event Delphi cannot satisfy GM's volume and quality requirements for Delphi produced batteries, based on technology in place at closing of JCI Transaction.

11.    <u>Fitzgerald Battery Replacement Work</u>.  As a result of the loss of the GMT201 battery business out of Fitzgerald, GM and Delphi agree that Delphi will move equivalent battery volume (GMX-365 program and certain SPO batteries) from Oshawa to Fitzgerald as soon as commercially practical:

(i)     Contracts will be at US pricing levels at the time of move; and
(ii)    FOB Delphi.

DELPHI-JCI-000275

*HIGHLY CONFIDENTIAL*

GM/Delphi Confidential

12.    <u>GMT900 and Fitzgerald Wind-Down</u>.    During the transition of batteries from Delphi to JCI, transition will be accomplished in a manner that assures all batteries for the GMT900 program will be sourced to JCI.    All pricing for these batteries will be handled between GM and JCI.    Loss of the GMT900 program will be backfilled in part by transferring remaining Oshawa battery volume to Fitzgerald in accordance with the jointly developed battery transition plan.  Contracts will be at US pricing levels at time of move and FOB Delphi

13.    <u>Non-Battery Fitzgerald Product Backfill</u>. GM will provide support for Delphi's plan to identify and place non-battery backfill product in the Fitzgerald, GA area upon the cessation of battery production as described in the August 10, 2004 side letter signed by GM and Delphi (the "**Fitzgerald Letter**"). The following changes will be made to the Fitzgerald Letter:

(i)    In lieu of all price increases, labor premiums or other labor related payments contemplated for the 150 jobs described in the Fitzgerald Letter, GM will pay Delphi $4.4 million per year for four years as a competitive adjustment.    Such competitive adjustment will be payable quarterly in increments of $1.1 million beginning with the last day of the calendar quarter in which the first such non-battery product begins SOP in Fitzgerald, GA (payments estimated to begin on June 30, 2007) and continue on the last day of each quarter thereafter until 16 such payments have been made. GM's obligation to make such annual payments is expressly contingent upon Delphi being market competitive in terms of price, quality and service during the 4 year period specified above.

(ii)    Incremental GM steering hose business that is sourced to Delphi Fitzgerald will be on a "Lifetime Contract" basis pursuant to GM's standard terms and conditions, except that Delphi may terminate any such contracts after expiration of the four year competitive adjustment upon one year's advance notice to GM. In the event of such termination, Delphi will reimburse GM for the cost of re-tooling the business to a new supplier if GM paid for the cost of the original tooling.  All reasonable efforts will be made to transfer production tooling to new supplier and avoid any such incremental retooling costs.

(iii)    GM intends to source the Lambda, Monte Carlo/Impala, and Buick La Crosse LY7 programs to Delphi for a total of 63 jobs; GM needs to provide product program details for the remaining 12 employee shortfall.

(iv)    GM will also provide viable incremental business opportunities to support 100 additional jobs for Fitzgerald tier 2 employees:

▪    Initial list of possible product program opportunities has been provided by GM, and GM is expected to provide Delphi with sufficient detail for each program for analysis and development of a business case

▪    Delphi must be competitive on the basis of quality, performance, technology and price for this new business.

▪    Programs that are sourced to Delphi Fitzgerald will be on a "Lifetime Contract" basis pursuant to GM's standard purchasing terms and conditions

**B.    <u>Delphi's Oshawa Battery Wind-down</u>.**

1.    Battery production is expected to wind down by May 31, 2005 as production relocates to other Delphi US Battery plants.  GMCL will provide necessary contractual and

**Page 4**

**DELPHI-JCI-000276**

GM/Delphi Confidential

Employment Standards Act notices of job loss to employees at Oshawa, including Delphi's Oshawa battery operation, and the parties will work together to develop an efficient wind-down plan. Each party will use its reasonable best efforts to assure that such plan will avoid disruption to vehicle programs / aftermarket. Such plan will include the handling and removal of Delphi's production assets. Except as expressly set forth below, all of the current GM, GMCL and Delphi agreements will remain in full force and effect in accordance with their respective terms.

2.    The current number of assigned employees at the Oshawa Battery operations is 265 assigned employees, consisting of: 254 assigned hourly employees and 11 assigned salaried employees. Lay-off cost amounts with respect to the wind-down of the Battery operations will be handled as follows:

(i)    In lieu of paying lay-off cost amounts for 65 assigned hourly employees of the Battery operations, Delphi will add 65 assigned hourly employees to Delphi's Chassis operations to supply the GMX210/230 (211/231) front and rear brake corners and GMT-800 (900) front brake corners at carryover pricing.  Inasmuch as there is a shortfall of transferred employees to the aforementioned 65 employees, Delphi will be required to pay GMCL CDN $150,000 per employee for such shortfall.

(ii)    With regard to the remaining 200 assigned employees remaining in the Battery operations (189 hourly and 11 salaried employees), (a) at completion of wind-down of the production at the Battery operations, Delphi will pay GMCL a lay-off cost amount of CDN $150,000 per employee for 67.5 assigned employees (in addition to the aforementioned shortfall if required), and (b) GMCL will absorb (i.e., assign no liability to Delphi) the lay-off cost amounts otherwise allocable to Delphi under the Oshawa Labour and Management Services Agreement between the parties (as amended, "LMSA") for the remaining 132.5 assigned employees.

(iii)    The assigned employee headcount will be reduced by 200 employees (increased to reflect any shortfall payments made by Delphi) for the purposes of computing future employees as to which Delphi is subject to lay-off provisions under the LMSA.

(iv)    No lay-off cost amounts will be owed by Delphi to GMCL under the LMSA for the actual number of transferred employees up to a total of 65, to the extent that such reductions will not cause GMCL to incur actual layoff or severance costs to its employees (e.g., GMCL is able to place such assigned hourly employee(s) elsewhere within GMCL without incurring layoff, severance or retirement incentive costs).  Such reductions are in addition to the 1% attritions, natural attritions and other attritions permitted under the LMSA.



(v)    GMCL will use its reasonable best efforts to notify Delphi of available openings for assigned hourly employees in order to reduce the assigned hourly employees headcount without incurring lay-off cost amounts.

3.    GMCL's assistance is subject to the following:

(i)    Delphi's agreeing to remain responsible for, and to pay GMCL the respective lay-off cost amounts for reductions in assigned employees supporting the Chassis operations, after taking into consideration permitted attritions and the above described headcount reductions and opportunity for Delphi to re-assign up to 65 assigned hourly employees; and

Page 5

DELPHI-JCI-000277

GM/Delphi Confidential

(ii)    Closure of the contemplated JCI Transaction. If the JCI Transaction does not close, the parties will re-negotiate GMCL's obligations under clause B.2(ii) above. In any case, the headcount reduction referred to in clause B.2(iii) above would be deemed to refer to 67.5 employees (or the actual number for which Delphi has paid layoff costs to GMCL) rather than 200 employees.

4.    Delphi Battery-related fees under the Administrative Services Agreement will cease to be assessed at the end of the month of the cessation of Battery production. All payments owed by Delphi under the Battery lease will terminate at the end of the month in which Delphi completes its obligations as stated in section 8 (b) of the lease agreement.

## C.    Transition Plan.

In support of the matters described in Sections A and B above, GM, Delphi, and JCI will develop a detailed battery transition plan that defines battery and non battery (Fitzgerald backfill) product movement between the various facilities for the 2005-2007 period.

## D.    Miscellaneous.

1.    It is understood that the Parties' agreements set forth herein, including Delphi's price reductions and GM's assistance in restructuring operations, providing replacement work and other financial support, are expressly contingent upon: (i) the transfer of the global Delphi battery business (OE, service, and aftermarket) to JCI on terms and conditions reasonably acceptable to GM (including, but not limited to, an economic subsidy from Delphi to JCI for New Brunswick employees not converted to competitive wage by the Closing of the New Brunswick Sale); (ii) the execution by GM and JCI of a long term battery supply agreement on terms and conditions acceptable to GM; (iii) execution by Delphi and JCI of a long term contract manufacturing agreement on terms and conditions acceptable to Delphi; (iv) Delphi's obtaining acceptable agreements with the UAW and support from the IUE for its restructuring of the New Brunswick facility; and (v) GMCL obtaining CAW support for accomplishment of the quality, service, technology and price improvements noted above.

2.    It is intended that the terms and conditions pertaining to JCI in this Facilitation Agreement be consistent with the GM/JCI Long Term Supply Agreement.

3.    The parties understand and agree that this Facilitation Agreement constitutes only a statement of mutual intentions with respect to the matters referred to herein, does not constitute a binding obligation on any party and does not contain all terms upon which agreement must be reached with respect to such matters. A binding commitment with respect to the matters referred to in this Facilitation Agreement will result only from the execution of definitive agreements, subject to the conditions expressed therein.

DELPHI-JCI-000278

*HIGHLY CONFIDENTIAL*

MAR 21 '85 16:27 FR DELPHI        248 813 2699 TO 915965753404        P.08/05

GM/Delphi Confidential

4.    This Facilitation Agreement shall be governed by and construed in accordance with the laws of the State of Michigan, without regard to the conflict of laws principles thereof.  This Facilitation Agreement may not be amended or otherwise modified except by a written instrument signed by both parties.

**DELPHI CORPORATION**                    **GENERAL MOTORS CORPORATION**

By: _John Blahnik_                         By: _Susan Tuohy_

    John Blahnik                             Susan Tuohy

Title:  **Director, Mergers,**            Title:  **Executive Director, Finance**
        **Acquisitions & Planning**              **General Motors WWP**

Date: _3/21/05_                            Date: _3 - 21 - 05_

**Page 7**

MAR 21 '85 17:16                           586 575 1519        PAGE.08

**DELPHI-JCI-000279**

*HIGHLY CONFIDENTIAL*

GM/Delphi Confidential

## Fitzgerald & New Brunswick Product Programs for 2005-2007

| Platform | Delphi Mfg. Plant | Platform | Delphi Mfg. Plant |
|---|---|---|---|
| GM SPO Canada – currently mfd. In US or Canada | | GMT-265 | New Brunswick |
| GM SPO US - currently mfd. In US | | GMT-305 | New Brunswick |
| H1 | | GMT-325 | New Brunswick |
| J-2902 | | GMT-330 | New Brunswick |
| GMX-211 | | GMT-360 | New Brunswick |
| GMX-231 | | GMT-368 | New Brunswick |
| GMX-283 | | GMT-370 | New Brunswick |
| GMT-800 | All | GMX-001 | New Brunswick |
| GMT-800E | All | GMX-002 | New Brunswick |
| GMT-820 | All | GMX-130 | New Brunswick |
| GMT-830 | All | GMX-295 | New Brunswick |
| GMT-880 | All | GMX-320 | New Brunswick |
| GMX-365 | Anaheim * | GMX-380 | New Brunswick |
| | Anaheim * | GMX-381 | New Brunswick |
| 97PA | Fitzgerald | GMX-384 | New Brunswick |
| GMT-315 | Fitzgerald | GMX-386 | New Brunswick |
| GMT-610 | Fitzgerald | J | New Brunswick |
| GMX-220 | Fitzgerald | M/L | New Brunswick |
| GMX-222 | Fitzgerald | P-90 | New Brunswick |
| GMX-270 | Fitzgerald | GMT-319 | Undefined |
| GMX-272 | Fitzgerald | GMT-361 | Undefined |
| GMX-310 | Fitzgerald | GMT-371 | Undefined |
| GMX-357 | Fitzgerald | GMT-440 | Undefined |
| H2 | Fitzgerald | GMX-282 | Undefined |
| S5S | Fitzgerald | GMX-322 | Undefined |

* Pending transition plan to be proposed by Delphi and approved by GM

DELPHI-JCI-000280

*HIGHLY CONFIDENTIAL*

# DELPHI

June 30, 2005

Bo Andersson
Vice President
General Motors Corporation
30009 Van Dyke Avenue M/C 480-206-114
Warren, Michigan 48090-9025

Dear Bo:

            In connection with the sale by Delphi Corporation ("**Delphi**") of its global
Starting, Lighting and Ignition lead-acid ("**SLI**") battery business to Johnson Controls,
Inc. ("**Buyer**") (the "**JCI Transaction**"), General Motors Corporation ("**GM**") and Delphi
have previously executed: (i) a non-binding letter agreement dated August 10, 2004
relating to non-battery backfill products for Delphi's Fitzgerald, Georgia SLI facility (the
"**Fitzgerald Letter**"); and (ii) a non-binding GM/Delphi Battery Facilitation Agreement –
Transaction Summary dated March 21, 2005 relating to cost sharing between the
parties to facilitate transformation of Delphi's US SLI plants (the "**Facilitation
Agreement**"). With regard to the aforementioned agreements, GM and Delphi agree as
follows:

1.       GM is executing a supply agreement with Buyer relating to SLI batteries made in
the US, and consents to the transfer of existing SLI agreements to Buyer.

2.       Notwithstanding language to the contrary therein, the terms and conditions of the
Fitzgerald Letter, as modified by the Facilitation Agreement shall be binding on both GM
and Delphi effective as of the closing of the JCI Transaction; provided, however, that the
parties acknowledge and agree that any then remaining GM commitments and/or
obligations therein shall immediately become null and void in the event Delphi sells,
conveys, assigns, leases or otherwise transfers  majority ownership, control and/or
operation of the Fitzgerald Steering Hose operations (as referenced in the Fitzgerald
Letter) to a third party.

3.       Notwithstanding language to the contrary therein, the terms and conditions of
the Facilitation Agreement shall be binding on both GM and Delphi effective as of the
closing of the JCI Transaction; provided, however, that the parties acknowledge and
agree that: (i) any then remaining GM commitments and/or obligations pursuant to
Section A.13 of the Facilitation Agreement shall immediately become null and void in the
event Delphi sells, conveys, assigns, leases or otherwise transfers majority ownership,
control and/or operation of the Fitzgerald Steering Hose operations to a third party; and
(ii) any then remaining GM commitments and/or obligations pursuant to Section A.3 of
the Facilitation Agreement shall  immediately become null and void in the event Delphi
sells, conveys, assigns, leases or otherwise transfers majority ownership, control and/or

Delphi Corporation, 5725 Delphi Drive, Troy, MI  48098

DELPHI-JCI-000281

*HIGHLY CONFIDENTIAL*

Bo Andersson
June 30, 2005
Page 2

operation of  the North Kansas City Cockpit Plant (as referenced in the Facilitation Agreement) to a third party.

4.      In the event that the JCI Transaction does not close on June 30, 2005, the "July 1, 2005" date referred to in clauses A.4(ii) (payment of $3.6 million GM to Delphi) and A.6(i) (1.5% price reduction) of the Facilitation Agreement shall be deemed to refer to "the first day of the month immediately following the closing of the JCI Transaction".

5.      Exhibit A to this letter (Fitzgerald & New Brunswick Product programs for 2005-2007) replaces and supercedes the Exhibit A attached to the Facilitation Agreement.

6.      This letter, the Fitzgerald Letter, and Facilitation Agreement shall be governed by, and construed and enforced in accordance with the laws of the State of Michigan, without regard to the conflict of laws principles thereof. The terms of this letter may not be amended or otherwise modified except by a written instrument signed by both parties.

If you are in agreement with the foregoing, please so indicate by signing and returning the enclosed copy of this letter to the undersigned.

Very truly yours,

Stephen H. Olsen
Director, Mergers and Acquisitions

ACCEPTED AND AGREED FOR GM:

By: _____

Bo Andersson,
Vice President
Date: _____06/30/05_____

DELPHI-JCI-000282

*HIGHLY CONFIDENTIAL*

## EXHIBIT "A"

### Fitzgerald & New Brunswick Product Programs for 2005-2007

| Platform | Delphi Mfg. Plant | Platform | Delphi Mfg. Plant |
|---|---|---|---|
| GM SPO Canada – currently mfd. In US | | GMX-357 | Fitzgerald |
| GM SPO US -  currently mfd. In US | | H2 | Fitzgerald |
| GM SPO I – currently mfd. in US | | S5S | Fitzgerald |
| H1 | Fitzgerald | GMT-265 | Fitzgerald |
| GMX-211 | Fitzgerald | GMT-325 | New Brunswick |
| GMX-231 | Fitzgerald | GMT-330 | New Brunswick |
| GMX-283 | | GMT-360 | Both |
| GMT-800 | Both | GMT-368 | Both |
| GMT-800E | Both | GMT-370 | Both |
| GMT-820 | Both | GMX-001 | New Brunswick |
| GMT-830 | Both | GMX-130 | New Brunswick |
| GMT-880 | Both | GMX-295 | Fitzgerald |
| GMX-365 (L26 & L27 engines) | Fitzgerald | GMX-320 | Fitzgerald |
| 97PA | Fitzgerald | GMX-380 | Both |
| GMT-315 | Both | GMX-381 | Both |
| GMT-610 | Both | GMX-384 | Both |
| GMX-220 | Fitzgerald | J | New Brunswick |
| GMX-222 | Fitzgerald | M/L | Both |
| GMX-270 | Fitzgerald | P-90 | New Brunswick |
| GMX-272 | Fitzgerald | W4 | Both |
| GMX-310 | Fitzgerald | | |

**Note:** Successor programs are not listed but are considered as extended production of the Programs identified above.

DELPHI-JCI-000283

*HIGHLY CONFIDENTIAL*

Execution Copy

### *Letter Agreement*

The purpose of this letter agreement ("Agreement") is to formalize the understanding that has been reached between General Motors Corporation ("GM") and Delphi Corporation ("Delphi") regarding the future use of the "Freedom" trade name and associated trademarks. In this regard the parties mutually agree as follows:

1.  The parties acknowledge and agree that as part of the sale of Delphi's global battery business to Johnson Controls, Inc.("JCI"), Delphi has granted JCI a perpetual, non-revocable, exclusive, global license to JCI for use of the "Freedom" trade name and associated trademarks with SLI lead acid batteries. Such license being non-transferable except in connection with sale of JCI's SLI lead acid battery business.

2.  The parties further acknowledge and agree that prior to entering into any transaction that would sell, assign, or otherwise transfer Delphi's ownership of the "Freedom" trade name and associated trademarks, Delphi will offer GM a right of last refusal on the same terms and conditions.

This Agreement shall be governed by the laws of the State of Michigan without regard to the principles of conflicts of law, shall be binding and inure to the benefit of Delphi and GM and their respective successors and assigns, and may only be modified or amended by a written document duly executed by both parties.

**Delphi Corporation**                     **General Motors Corporation**

By: _Steph H. ake_                          By: _____

Date: _June 30, 2005_                        Date: _06/30/05_

**DELPHI-JCI-000288**

# DELPHI

August 10, 2004

Mary Boland
GMNA Vice President and CFO
General Motors Corporation
300 Renaissance Drive M/C 482-C35-D24
Detroit, Michigan 48265-3000

Dear Mary:

This letter will confirm our recent discussions relating to potential changes in Delphi's battery operations associated with the possible sale of certain of Delphi's assets relating to its global Starting, Lighting and Ignition lead acid ("SLI") battery business to Johnson Controls, Inc. ("Buyer") (the "Transaction"), recognizing that GM's consent is required for transfer of existing agreements to Buyer.

The Transaction contemplates technological and other improvements ("Improvements") to Delphi's SLI battery business that would be beneficial to both GM and Delphi. It is anticipated that the parties will develop a timing and transition plan, taking into account such factors as wind down of the battery business to coincide with timing of SOP for new business and avoidance of supplier cancellation charges. As part of the Improvements, the parties' intent is to transform the entire Fitzgerald hourly workforce such that all employees will be "Tier 2 Employees" under the terms of the two tier wage and benefit structure recently agreed upon between Delphi and the UAW. The parties recognize that the transformation and the headcount parameters set forth below are subject to Delphi's ability to negotiate a satisfactory Delphi-UAW agreement which includes capping employment at 150. Cost sharing between the parties to facilitate such transformation will be addressed in a separate agreement. GM and Delphi are willing to cooperate with each other in order to facilitate the Improvements, including:

1.  **Incremental GM Steering Hose Business for Delphi:**

    *   For placement in connection with the Delphi Fitzgerald, GA operation, GM would source incremental steering hose (both pressure and return hose) business for 50% of the headcount level agreed with the UAW, but in no case more than 75 hourly (direct and indirect) employees based on a standard 40 hour work week at the Tier 2 employee wage and benefit structure recently agreed upon between Delphi and the UAW. The parties agree that the headcount set forth below are based on a standard 40 hour work week. Beginning in 2007, business that may be sourced includes:

Delphi Corporation, 5725 Delphi Drive, Troy, MI  48098

Mary Boland
August 10, 2004
Page 2

| Vehicle Program | Vehicle Model | Employees |
|---|---|---|
| GMT962/966/967/968 | Lambda | 73 |
| GMT345 | Hummer III | 5 |
| GMX211/231 | Monte Carlo / Impala | 24 |
| GMX365 LY7 | Buick La Crosse | 9 |
| GMX367 P | Grand Prix | 2 |
| GMX215 | Cadillac XLR | 1 |
| Holden VE | Various | 9 |

- Delphi recognizes GM's memo of June 4, 2004 (attached as Exhibit "A") outlining potential requirements for certain programs noted above and will be prepared to respond accordingly once Delphi has adequately reviewed specific target pricing and product requirements, including math models and vehicle program timing.

- Delphi must be competitive in terms of quality, service, technology and price (initial agreed price and price reductions will be deemed competitive through September 2011) with similar products otherwise available to GM. If GM notifies Delphi of a supplier more competitive in quality, service, or technology, Delphi will have a reasonable opportunity to meet such alternative quality, service, or technology, failing which GM may at its sole discretion move the business to such other supplier. In the event GM moves the business as a result of non-competitiveness, Delphi shall immediately become responsible for any and all hourly employees and related costs impacted by such transfer of business.

- For above referenced programs where an integrated supplier has system responsibility, GM will exercise commercially reasonable efforts to encourage the supplier to re-source the business to Delphi and this business will be considered incremental revenue for Delphi.

- Requirement is for the incremental business to provide supply from September 2007 through September 2011 enabling a minimum duration of four (4) years. From the closing date of the Transaction until September 2011, Delphi will be provided with: (i) if otherwise competitive on quality, service and technology, a right to match the competitive price (if necessary) for next generation business having SOP between September 2007 and September 2011; and (ii) an opportunity to quote on next generation business having SOP after September 2011

- Both Delphi and GM are flexible to consider creative, mutually beneficial solutions to support GM's efforts to achieve re-sourcing of certain programs noted above.

2. **Delphi Transferred Steering Hose Work:**

- For placement in connection with the Delphi Fitzgerald, GA operation, Delphi would transfer steering hose business for 50% of the headcount level agreed with the UAW, but in no case more than 75 hourly (direct and indirect) employees. Notwithstanding the foregoing, GM's maximum obligation, under this item2, will be strictly limited to labor subsidies for transferred programs supporting up to a cumulative total of 75 hourly employees, as specified below. Beginning in 2007, business that may be sourced includes:

Mary Boland
August 10, 2004
Page 3

| Vehicle Program | Vehicle Model | Employee |
|---|---|---|
| GMT360/370 | Various models | 30 |
| GMT800/900 | Various models | 48 |
| GMT201 | Various models | 0 |
| GMT610 | Savanna / Express | 8 |
| GMX365 | Buick Regal | 6 |
| GMX380SS/381 | Malibu SS/G6 | 2 |

- Requirement is for the incremental business to provide supply from September 2007 through September 2011 enabling a minimum duration of four (4) years.   From the closing date of the Transaction until September 2011, Delphi will be provided with: (i) if otherwise competitive on quality, service and technology, a right to match the competitive price (if necessary) for next generation business having SCP between September 2007 and September 2011; and (ii) an opportunity to quote on next generation business having SOP after September 2011.
- GM will provide Delphi with a corresponding price increase (if any) as a direct result of mutually agreed differences in labor rates between the current manufacturing source and Delphi. The labor cost differential will be added to the price on contract at the time of the product on transfer. Outstanding price issues would be handled by the parties in the ordinary course of business.
- Both Delphi and GM are flexible to consider creative, mutually beneficial solutions to support Delphi's efforts to achieve transfer of programs noted above.

The above-referenced product programs under consideration may be adjusted due to the overall expectation to place work for up to 75 employees in each of Items 1 and 2 as described above.

Delphi and GM understand that this letter represents a non-binding statement of their mutual intentions regarding the Transaction and may not address all the issues on which agreement must be reached before the Transaction can be consummated through the execution of final contracts. Neither party shall make any public announcements or other public disclosures with respect to the Transaction or this Letter Agreement without the consent of the other party, except as required by applicable laws and regulations. Each party agrees to bear all of its own fees and expenses incurred in connection with this letter and the Transaction contemplated.

Mary Boland
August 10, 2004
Page 4

If you are in agreement with the foregoing, please so indicate by signing and returning the enclosed copy of this letter to the undersigned. We very much look forward to working with you as set forth above in connection with the proposed Transaction.

Very truly yours,

John Blahnik,
Vice President Treasury, Mergers,
Acquisitions & New Markets

**ACCEPTED AND AGREED FOR GM:**

By: _____

Mary Boland,
GMNA Vice President and CFO

Date: _8/12/04_____

Mary Boland
August 10, 2004
Page 5

## EXHIBIT "A"

- Delphi must meet or exceed GM's and/or System Supplier's metrics for Quality, Service, Delivery, Technology and Price – including Warranty

  - Delphi must agree to thorough quality audits and supply chain reviews as defined by GM and/or integrated suppliers
  - Program timing will not be compromised and all key gates must be met
    - Delphi must provide a documented and achievable timeline with plan to achieve to GM and/or integrated supplier
  - In the case of an integrated system supplier, said supplier will have option of moving any business if Delphi's performance does not meet specific targets
  - Delphi must identify and provide dedicated support through launch of program and key program gates, as defined by GM or integrated supplier
    - Delphi must also provide necessary on-going support for all FDT's
  - Delphi must meet GM's or integrated suppliers design and specification
    - System supplier will not modify system design to work around Delphi's design
  - Delphi will be responsible to fund any required tooling and/or engineering development costs for any program already funded and paid for
    - Delphi will also be responsible for on-going tuning "costs" and support associated with each program
  - System suppliers' current cost and annual performance and cost reduction targets will be met

**Execution Copy**

### *Letter Agreement*

The purpose of this letter agreement ("Agreement") is to formalize the understanding that has been reached between General Motors Corporation ("GM") and Delphi Corporation ("Delphi") regarding certain subsidy payments that Delphi has agreed to make to Johnson Controls, Inc ("JCI") in connection with JCI's acquisition of Delphi's global battery business and certain agreements by and between Delphi and GM intended to facilitate that transaction.  In this regard the parties mutually agree as follows:

> To the extent that all IUE hourly employees at Delphi's New Brunswick, New Jersey battery plant, have not converted to competitive wage by the time of Closing of the New Brunswick sale from Delphi to JCI ("New Brunswick Sale"), Delphi has agreed to provide JCI with an appropriate subsidy for New Brunswick employees, a description of which subsidy has been provided to GM (the "Subsidy"), a copy of which is attached to this Agreement as Exhibit A.  In this regard, Delphi agrees not to amend the terms of the Subsidy without GM's prior consent, which may not be unreasonably withheld or delayed.  Delphi will use reasonable best efforts to close the New Brunswick Sale as soon as practicable following finalization of the 2007 National IUE negotiations.

This Agreement shall be governed by the laws of the State of Michigan without regard to the principles of conflicts of law, shall be binding and inure to the benefit of Delphi and GM and their respective successors and assigns, and may only be modified or amended by a written document duly executed by both parties.

**Delphi Corporation**                    **General Motors Corporation**

By: _Steph H. Oke_                    By: _____

Date: _June 30, 2005_                    Date: _06/30/05_

**EXHIBIT A**

**SUBSIDY**

**Excerpts for New Brunswick Put and call Agreement dated June 30, 2005 ("Agreement")** between **JOHNSON CONTROLS, INC.**, a Wisconsin corporation (**"Buyer"**) and **DELPHI AUTOMOTIVE SYSTEMS LLC ("Seller")**

### Section 9.1

. . . . to the extent that: (i) Seller has delivered a Put Exercise Notice; and (ii) one hundred percent (100%) of the U.S. Hourly Employees have not been converted to a Competitive Package (as defined in <u>Exhibit 4.1</u>) by the Completion Date, Seller will subsidize Buyer in the amount of the Labor Differential (as defined in <u>Exhibit 4.1</u>) for the Traditional Wage Employees (as defined in <u>Exhibit 4.1</u>) who transfer or whom Seller, in its sole discretion, leases to Buyer on and after the Completion Date. In the event Seller chooses to lease such Traditional Wage Employees to Buyer, Seller will use commercially reasonable efforts to give notice of its interest to do so ninety (90) days prior to Completion Date.

### Exhibit 4.1, Section 3.A(ii)

(ii) Effective on the Completion Date, Buyer will offer employment to all U.S. Hourly Employees identified on <u>Schedule 3.A(i)</u> to <u>Exhibit 4.1</u>. U.S. Hourly Employees who accept Buyer's offer of employment (by reporting to work or otherwise acknowledging acceptance) will be referred to as Transferred U.S. Hourly Employees:

   a. U.S. Hourly Employees who are not active as of the Completion Date due to disability, layoff, family medical leave or other approved leave of absence will remain Seller's responsibility until any such U.S. Hourly Employee is ready to return to active employment in accordance with Seller's leave policies.

   b. Upon such U.S. Hourly Employee's return to active status, Buyer will offer employment in accordance with Section 3.A(ii) above, and, provided such individual accepts Buyer's offer of employment, will be considered a Transferred U.S. Hourly Employee as of such date. In the event that a U.S. Hourly Employee is seeking to return to active employment from a medical-based leave, such individual's fitness for active employment must be approved by both Seller and Buyer provided such does not violate any applicable collective bargaining agreement.

   c. If Seller and Buyer do not agree as to such individual's fitness for active employment, the issue will be submitted to an independent medical evaluator, whose determination will be final and binding on the parties. The cost of such independent medical evaluation will be shared equally by the parties.

**Exhibit 4.1,  Section 3.C(ii)**

(ii)    To the extent there remain Traditional Wage Employees as of the Completion Date, Seller will subsidize Buyer for the difference between the wages and benefits Buyer provides the Traditional Wage Employees and the wages and benefits Buyer provides Transferred U.S. Hourly Employees under the Competitive Package (the "**Labor Differential**"):

a.    Upon the earlier of Seller's delivery of a Put Exercise Notice to Buyer or Buyer's delivery of a Call Exercise Notice to Seller, the parties will confirm whether there remain any Traditional Wage Employees.  If the parties determine that there are, the parties will, in good faith,  negotiate:

(1)    The benefit treatment of such Traditional Wage Employees, which will be intended to allocate responsibility to Seller for the years of credited service each Traditional Wage Employee earned at Seller and to allocate responsibility to Buyer for the years of credited service each Traditional Wage Employee earns at Buyer;

(2)    An appropriate methodology for calculating the Labor Differential, which, notwithstanding Buyer's responsibilities under Section 3.A(iii), will:

(a)    Limit Buyer's liability for the Employment Rights of the Traditional Wage Employees as if they were eligible only for the Competitive Package; and

(b)    Not require Seller to make payments to Buyer in advance of Buyer's payment of actual benefit obligations to the Traditional Wage Employees;

(3)    The timing and method of payment or, if Seller opts to lease Traditional Wage Employees to Buyer, credit of such Labor Differential; and

(4)    Any  other  pertinent  terms  and  conditions associated with the allocation of Employment Rights consistent with this Agreement for the Traditional Wage Employees.

The benefit treatment, methodology, timing and any other pertinent terms and conditions will be documented in writing and become a part of this Agreement.

**Definitions:**

"**Call Exercise Notice**" means a written notice substantially in the form of <u>Exhibit 1.5</u> to this Agreement delivered by Buyer to Seller.

**"Competitive Package"** means the wages and benefits payable to new hire U.S. Hourly Employees at the New Brunswick Facility under the Delphi-IUE-CWA Local Agreement.

**"Completion"** means completion of the purchase of the [New Brunswick assets] by Buyer resulting from, and within thirty (30) days after, the exercise of the Put Option or Call Option contained in this Agreement.

**"Completion Date"** means the date of Completion, as specified in the Put Exercise or Call Exercise Notice.

**"Delphi-IUE-CWA National Agreement"** means the nationally negotiated collective bargaining agreements, including any letter agreements, MOUs, supplemental agreements and all applicable employee benefit plans in effect between Seller and the IUE-CWA.

**"Employment Rights"** means all obligations arising out of, or relating to, the employment relationship between the relevant company and the relevant employees, including, without limitation, payment of wages and salaries, employee benefits, taxes, vacation pay, sick leave and severance pay and any claims under any Laws dealing with employment.

**"IUE-CWA"** means the IUE-CWA, the Industrial Division of the Communication Workers of America, AFL-CIO and CLC.

**"Put Exercise Notice"** means a written notice substantially in the form of Exhibit 1.23 to this Agreement delivered by Seller to Buyer.

**"Traditional Wage Employees"** means the Transferred U.S. Hourly Employees who are eligible to receive wages and benefits in accordance with the Delphi-IUE-CWA National Agreement (i.e., in excess of the Competitive Package).

**"Transferred U.S. Hourly Employees"** means those hourly employees of Seller hired by Buyer pursuant to Section 3.A(ii) [of this Exhibit 4.1].

**"U.S. Hourly Employees"** means the hourly employees represented by the IUE-CWA who are employed by Seller at the New Brunswick, New Jersey plant immediately prior to the Completion Date and identified on Schedule 3.A(i) to this Exhibit 4.1 to be provided to Buyer by Seller concurrently with the Put Exercise Notice or within ten (10) days after Seller's receipt of a Call Exercise Notice, as applicable.

**Execution Copy**

### *Letter Agreement*

The purpose of this letter agreement (**"Agreement"**) is to formalize the understanding that has been reached between General Motors Corporation ("GM") and Delphi Corporation ("Delphi") regarding the future use of the "Freedom" trade name and associated trademarks. In this regard the parties mutually agree as follows:

1.    The parties acknowledge and agree that as part of the sale of Delphi's global battery business to Johnson Controls, Inc.("JCI"), Delphi has granted JCI a perpetual, non-revocable, exclusive, global license to JCI for use of the "Freedom" trade name and associated trademarks with SLI lead acid batteries. Such license being non-transferable except in connection with sale of JCI's SLI lead acid battery business.

2.    The parties further acknowledge and agree that prior to entering into any transaction that would sell, assign, or otherwise transfer Delphi's ownership of the "Freedom" trade name and associated trademarks, Delphi will offer GM a right of last refusal on the same terms and conditions.

This Agreement shall be governed by the laws of the State of Michigan without regard to the principles of conflicts of law, shall be binding and inure to the benefit of Delphi and GM and their respective successors and assigns, and may only be modified or amended by a written document duly executed by both parties.

**Delphi Corporation**                    **General Motors Corporation**

By: _Steph H. Ol___                        By: _____

Date: _June 30, 2005___                    Date: _06/30/05_____

**Execution Copy**

*Letter Agreement*

The purpose of this letter agreement ("Agreement") is to formalize the understanding that has been reached between General Motors Corporation ("GM") and Delphi Corporation ("Delphi") regarding the future use of the "Freedom" trade name and associated trademarks. In this regard the parties mutually agree as follows:

1.      The parties acknowledge and agree that as part of the sale of Delphi's global battery business to Johnson Controls, Inc.("JCI"), Delphi has granted JCI a perpetual, non-revocable, exclusive, global license to JCI for use of the "Freedom" trade name and associated trademarks with SLI lead acid batteries. Such license being non-transferable except in connection with sale of JCI's SLI lead acid battery business.

2.      The parties further acknowledge and agree that prior to entering into any transaction that would sell, assign, or otherwise transfer Delphi's ownership of the "Freedom" trade name and associated trademarks, Delphi will offer GM a right of last refusal on the same terms and conditions.

This Agreement shall be governed by the laws of the State of Michigan without regard to the principles of conflicts of law, shall be binding and inure to the benefit of Delphi and GM and their respective successors and assigns, and may only be modified or amended by a written document duly executed by both parties.

**Delphi Corporation**                          **General Motors Corporation**

By: _____Steph H. ole_____          By: _____

Date: __June 30, 2005_____          Date: ___06/30/05_____

**Exhibit 5.01(b)(vi)**
**Agreement dated as of June 3, 2005 between Delphi and GM**
**concerning certain matters related to Collins & Aikman Corporation**

## Agreement

1.   GM guarantees that Delphi will receive payment of $8.3 million by wire transfer upon the satisfaction of the terms of this agreement("Agreement") by Delphi.

2.   Delphi will assign to GM 50% of the first proceeds received on its $16.6 million pre-petition claim against C&A (the "Delphi Claim"). The maximum amount that GM may recover from the proceeds of the Delphi Claim will equal the difference between $8.3 million and the amount that GM is otherwise able to setoff against C&A. Delphi agrees to pursue all of its rights against C&A under the Delphi Claim and consult with GM in that regard and will provide GM with the right of first refusal to purchase the Delphi Claim.

3.   Delphi will only reduce the Delphi Claim to the extent that GM offsets the amounts that it pays to Delphi under this Agreement.

4.   In consideration of the payments made by GM to Delphi under this Agreement, Delphi agrees to continue to supply to C&A through the term of C&A's bankruptcy to ensure the continuity of supply of parts to GM and will work in good faith to enter into an agreement with C&A for the continued supply of these parts through the term of the bankruptcy.

5.   GM shall not have any responsibility to Delphi for any premium freight charges relating to C&A including those incurred by Delphi during the period from and after May 12, 2005 through and including May 19, 2005.

6.   GM will guaranty the payment for goods shipped and delivered by Delphi to C&A after May 19, 2005 until the earlier of (a) the termination of the purchase orders between C&A and Delphi which is consented to by GM or (b) C&A's emergence from bankruptcy, limited to the amount of goods shipped in accordance with trade terms provided by similarly situated suppliers to C&A.

7.   The terms of this Agreement shall be held in strict confidence by the parties. To the extent that Delphi breaches this confidentiality agreement, all consideration received by Delphi under this Agreement will be returned to GM.

8.   This document contains the entire agreement of the parties in connection with the subject matter of this Agreement and cannot be changed or terminated orally. All prior agreements, understandings, representations, warranties and negotiations regarding the subject matter hereof, if any, are merged into this Agreement. The parties executing this Agreement as representatives warrant that they have the power and authority to execute this Agreement on behalf of the corporation or entity that they represent and that their signatures bind said corporations or entities to the terms of this Agreement. This Agreement may be executed in any number of duplicate originals or counterparts, each of such duplicate originals or counterparts shall be deemed to be an original and taken together shall constitute but one and the same instrument. The parties agree that their respective

JUN 06 2005 10:46  FR                           TO 912482674597        P.02/02

JUN 03 '05 15:16 FR DELPHI

signatures may be delivered by facsimile with original signatures to follow, and
that facsimile signatures shall be treated as originals for all purposes.  This
Agreement is made in the State of Michigan and shall be governed by, and
construed and enforced in accordance with the laws of the State of Michigan,
without regards to conflicts of law principles.

Agreed,

Date: June 3, 2005                    Delphi Corporation

                                      By: _D. WOHLEEN_____

                                      Its: _____

Date: June 3, 2005                    General Motors Corporation

                                      By: _____

                                      Its: _ASSISTANT  TREASURER_____

DETROIT.1816621.3

2

**Exhibit 5.11(c)**
**Certain Employment Related Claims**

09/04/2007

EXHIBIT 5.11(c)

| File Name | Court |
|---|---|
| James Burdette v. GM and UAW | USDC, Southern District of OH, Western Division |
| Julie Brittingham and David Brittingham v. Delphi and GM, et al. | US Ct of Appeals Sixth Circuit OH |
| Lynn Rowell v. General Motors Corp. Life & Disability Benefits Program and Metropolitan Life Insurance Company | USDC Southern District NY |
| Michael D. Straney v. General Motors Corporation | USDC Eastern District Southern Division MI |
| Thomas Alfred Sylvester v. General Motors Corporation | Saginaw County Circuit Court MI |