**Hearing Date And Time: October 3, 2007 At 10:00 a.m.**
**Objection Deadline: September 28, 2007 At 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)
Nathan Stuart (NS 7872)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
**http://www.delphidocket.com**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                             :
        In re                                                :  Chapter 11
                                                             :
DELPHI CORPORATION, <u>et al.</u>,                           :  Case No. 05-44481 (RDD)
                                                             :
                                                             :  (Jointly Administered)
                    Debtors.                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

MOTION FOR ORDER APPROVING (I) DISCLOSURE STATEMENT, (II) RECORD DATE,
VOTING DEADLINE, AND PROCEDURES FOR TEMPORARY ALLOWANCE
OF CERTAIN CLAIMS, (III) HEARING DATE TO CONSIDER CONFIRMATION
OF PLAN, (IV) PROCEDURES FOR FILING OBJECTIONS TO PLAN,
(V) SOLICITATION PROCEDURES FOR VOTING ON PLAN, (VI) CURE CLAIM
PROCEDURES, (VII) PROCEDURES FOR RESOLVING DISPUTES RELATING TO
<u>POSTPETITION INTEREST, AND (VIII) RECLAMATION CLAIM PROCEDURES</u>

("SOLICITATION PROCEDURES MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Motion[1] for an order  (the "Solicitation Procedures Order") approving (i) the Disclosure Statement (as defined below), (ii) a voting record date, voting deadline, and procedures for temporary allowance of certain claims for voting purposes, (iii) procedures for filing objections to the Plan (as defined below), (iv) procedures for soliciting and tabulating votes on the Plan, (v) a hearing date to consider confirmation of the Plan, (vi) cure claim procedures, (vii) procedures for resolving disputes relating to postpetition interest, and (viii) reclamation claim procedures.

On August 6, 2007, this Court entered the Order Scheduling Non-Omnibus Hearing On Debtors' Motion To Approve Solicitation Procedures And Disclosure Statement (Docket No. 8898) (the "Scheduling Order").  Among other things, the Scheduling Order set September 28, 2007 as the deadline for objections to the Disclosure Statement and this Motion, and October 3, 2007 as the date for the hearing on the Disclosure Statement (the "Disclosure Statement Hearing").  Including these two dates, the Debtors propose the following solicitation schedule:

| **DATE** | **EVENT** |
|---|---|
| **September 28, 2007** | Disclosure Statement objection deadline |
| | Voting record date |
| **October 3, 2007** | Disclosure Statement hearing |

---

[1]    Capitalized terms not otherwise defined in this Motion have the meanings ascribed to them in the Disclosure Statement.

| **DATE** | **EVENT** |
|---|---|
| **October 12, 2007** | Deadline to publish confirmation hearing notice |
| | Deadline to distribute solicitation packages |
| | Deadline to mail postpetition interest rate determination notices |
| **October 29, 2007** | Deadline to distribute cure amount notices |
| | Deadline to distribute reclamation election notices |
| **November 5, 2007** | Rule 3018(a) motion deadline |
| | Plan exhibit filing deadline |
| **November 9, 2007** | Voting deadline |
| | Plan objection deadline |
| | Deadline to return postpetition interest rate determination notice |
| | Deadline to return cure amount notice |
| | Deadline to return Reclamation election notice |
| **November 14, 2007** | Ballot report filing deadline |
| **November 19, 2007** | Confirmation hearing |

In further support of this Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their

businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections

1107(a) and 1108.  The Court has ordered joint administration of these cases.

2.         No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official

committee of equity holders (together with the official committee of unsecured creditors, the

"Statutory Committees").

3.         This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

4.         The statutory predicates for the relief requested herein are sections 105,

502, 1125, 1126, and 1128 of the Bankruptcy Code and rules 2002, 3003, 3017, 3018, and 3020

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.        <u>Current Business Operations Of The Debtors</u>

5.         Delphi and its subsidiaries and affiliates (collectively, the "Company") as

of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately

$15.4 billion.[2]   At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues and the thirteenth largest public company

business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

---

[2]     The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
        and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27,
        2007.

debtors and continue their business operations without supervision from the Bankruptcy Court.[3]

6.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

8.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

---

[3]    On March 20 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding.  The application was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.   The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[4]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred

a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee

special attrition programs.

> 9.    The Debtors believe that the Company's financial performance has
deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational
restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which
have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production
environment for domestic OEMs resulting in the reduced number of motor vehicles that GM
produces annually in the United States and related pricing pressures, and (iii) increasing
commodity prices.

> 10.    In light of these factors, the Company determined that it would be
imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product
portfolio, operational issues, and forward-looking revenue requirements.  Because discussions
with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005,
the Company commenced these chapter 11 cases for its U.S. businesses to complete its
transformation plan and preserve value for its stakeholders.

D.    Filing Of The Disclosure Statement And Plan

> 11.    Concurrently herewith, on September 6, 2007, the Debtors filed with the
Court (a) the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates,

---

[4]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating
loss in calendar year 2004 was $482 million.

Debtors And Debtors-In-Possession (as subsequently amended, supplemented, or otherwise

modified, the "Plan"), and (b) the Disclosure Statement with respect to the Plan of

Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession

(as subsequently amended, supplemented, or otherwise modified, the "Disclosure Statement").

Relief Requested

12.    By this Motion, the Debtors request, among other things, that the Court

enter the Solicitation Procedures Order, substantially in the form attached hereto as Exhibit 1,

approving (i) the Disclosure Statement, (ii) a voting record date, voting deadline, and procedures

for temporary allowance of certain claims for voting purposes, (iii) a hearing date to consider

confirmation of the Plan, (iv) procedures for filing objections to the Plan, (v) procedures for

soliciting and tabulating votes on the Plan, (vi) cure claim procedures, (vii) procedures for

resolving disputes relating to postpetition interest, and (viii) reclamation claim procedures.

I.    APPROVAL OF DISCLOSURE STATEMENT

13.    Section 1125(b) of the Bankruptcy Code prohibits postpetition solicitation

of a reorganization plan unless the plan and "a written disclosure statement approved, after notice

and a hearing, by the court as containing adequate information" are transmitted to those persons

whose votes are being solicited.  As previously stated, the Debtors filed their proposed Plan and

related Disclosure Statement, and they seek to commence solicitation of acceptances of the Plan.

14.    The Debtors request that the Court approve the Disclosure Statement as

providing adequate information within the meaning of Section 1125(a)(1) of the Bankruptcy

Code, which defines "adequate information" as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably
> practicable in light of the nature and history of the debtors and the
> condition of the debtor's books and records, that would enable a

> hypothetical reasonable investor typical of holders of claims or interests of
> the relevant class to make an informed judgment about the plan. . . .

11 U.S.C. § 1125(a)(1).  In examining the adequacy of the information contained in a disclosure

statement, a bankruptcy court has broad discretion.  See Texas Extrusion Corp. v. Lockheed

Corp. (In re Texas Extrusion Corp.), 844 F.2d 1142, 1157 (5th Cir.); In re Dakota Rail, 104 B.R.

138, 142 (Bankr. D. Minn. 1989) (court has "wide discretion to determine . . . whether a

disclosure statement contains adequate information without burdensome, unnecessary and

cumbersome detail").  Accordingly, the determination of whether a disclosure statement contains

adequate information is to be made on a case-by-case basis, focusing on the unique facts and

circumstances of each case.  In that regard, courts generally examine whether the disclosure

statement contains information including:

- the circumstances that gave rise to the filing of the bankruptcy petition;

- a complete description of the available assets and their value;

- the anticipated future of the debtor;

- the source of the information provided in the disclosure statement;

- a disclaimer, which typically indicates that no statements or information concerning the debtor or its assets or securities are authorized other than those set forth in the disclosure statement;

- the condition and performance of the debtor while in chapter 11;

- information regarding claims against the estate;

- a liquidation analysis setting forth the estimated return that creditors would receive under chapter 7;

- the accounting and valuation methods used to produce the financial information in the disclosure statement;

- information regarding the future management of the debtor, including the amount of compensation to be paid to any insiders, directors, and/or officers of the debtor;

- a summary of the plan of reorganization;

- an estimate of all administrative expenses, including attorneys' fees and accountants' fees;

- the collectibility of any accounts receivable;

- any financial information, valuations or <u>pro</u> <u>forma</u> projections that would be relevant to creditors' determinations of whether to accept or reject the plan;

- information relevant to the risks being taken by the creditors and interest holders;

- the actual or projected value that can be obtained from avoidable transfers;

- the existence, likelihood, and possible success of non-bankruptcy litigation;

- the tax consequences of the plan; and

- the relationship of the debtor with its affiliates.

<u>See, e.g.</u>, <u>In re Scioto Valley Mortgage Co.</u>, 88 B.R. 168, 170-71 (Bankr. S.D. Ohio 1988); <u>see also</u> <u>In re Ionosphere Clubs, Inc.</u>, 179 B.R. 24, 29 (S.D.N.Y. 1995) (determination of whether a disclosure statement contains adequate information made on case-by-case basis).

15.    The Debtors submit that the Disclosure Statement contains adequate information within the meaning of section 1125 of the Bankruptcy Code.  The Disclosure Statement is both extensive and comprehensive and satisfies each of the informational items outlined in <u>In re Scioto Valley Mortgage Co.</u>  Indeed, the Disclosure Statement contains descriptions and summaries of, among other things, (i) the Plan,  (ii) the Debtors' history and prepetition capital structure, (iii) certain events leading to the commencement of the chapter 11 cases, (iv) the significant events during the chapter 11 cases,  (v) the claims asserted against the Debtors' estates, (vi) the new securities to be issued under the Plan, (vii) various risk factors affecting the Plan and the Debtors' restructuring, (viii) a liquidation analysis setting forth the estimated return that creditors would receive in a hypothetical chapter 7 case, (ix) financial

information and valuations relevant to creditors' determinations of whether to accept or reject the

Plan, (x) certain securities law and tax law consequences of the Plan, and (xi) a disclaimer

indicating that no statements or information concerning the Debtors and their assets and

securities are authorized other than those set forth in the Disclosure Statement.  Accordingly, the

Debtors submit that the Disclosure Statement contains adequate information within the meaning

of section 1125 of the Bankruptcy Code and should be approved.

16.     As set forth above, the Scheduling Order provides that the deadline for

objections to the Disclosure Statement and this Motion is September 28, 2007.  The Scheduling

Order also provides that objectors shall make a good faith effort to include language in their

objections that would resolve the objections and that any objectors participate in a meet-and-

confer conference at the offices of counsel for the Debtors on October 2, 2007 at 8:30 a.m.

(prevailing Eastern time).

17.     The Debtors further request that the Court authorize them to (i) make non-

material changes to the Disclosure Statement and related documents (including the exhibits

thereto and to this Motion) and (ii) revise the Disclosure Statement and related documents

(including the exhibits thereto) to add further disclosure concerning events occurring at or after

the Disclosure Statement Hearing, before distributing it to each person and entity in accordance

with the terms of the proposed Solicitation Procedures Order.  If so permitted, the Debtors would

file copies with the Court of any changed pages blacklined to show the changes.

18.     In light of the nature and breadth of information provided by the

Disclosure Statement, the Debtors' also request that the Court find that, as far as the Court has

been made aware, (i) all material information regarding the Debtors and their subsidiaries, their

respective assets, affairs, and financial conditions, and the reorganization and restructuring

provided for under the Plan has been set forth in the Disclosure Statement and the Debtors'

public filings with the Securities and Exchange Commission before the date of the Disclosure

Statement Hearing (or the exhibits or appendices thereto), or that all such material information

has been disclosed fully and adequately thereby, and (ii) there is no material nonpublic

information regarding the Debtors or their subsidiaries, their respective assets, affairs, or

financial conditions, or the reorganization and restructuring provided for under the Plan that has

not been disclosed.

## II.    ESTABLISHMENT OF RECORD DATE, VOTING DEADLINE, AND CERTAIN OTHER PROCEDURES

A.    <u>Record Date</u>

19.    Bankruptcy Rule 3018(a) provides that the "date the order approving the

disclosure statement is entered or another date fixed by the court, for cause, after notice and a

hearing" is the record date for determining the "holders of stocks, bonds, debentures, notes, and

other securities" entitled to receive ballots and materials necessary for voting on the Plan, as

specified in Bankruptcy Rule 3017(d).  Unless otherwise ordered by the Court, Bankruptcy Rule

3018(a) purports to set a record date on the date when the Clerk of the Court enters an order

approving the Disclosure Statement.

20.    The Plan contemplates that holders of the Debtors' publicly traded

securities, including the Senior Notes, the Subordinated Notes, and the Existing Common Stock

(all as defined in the Plan, and collectively, the "Securities") will be entitled to vote on the Plan

and that their votes will be solicited.  The Debtors believe that there are over 350,000 holders of

Securities.  To compile a list of holders of the Debtors' Securities as of a certain date in these

chapter 11 cases, the registrars of the Debtors' Securities need advance notice of the date that will

serve as the record date.  Compiling such a list for purposes of mailing notices takes time and

requires coordination with Financial Balloting Group, LLC, the Debtors' special plan balloting, solicitation, and information agent for publicly held securities ("FBG").[5]  Because of the time it will take to compile the list of holders of Securities, the record date should occur at least five days before the Disclosure Statement Hearing to ensure that the Debtors have sufficient time to distribute the solicitation packages (the "Solicitation Packages") and other notices prior to the October 12, 2007 distribution deadline.

21.    Accordingly, the Debtors request that this Court exercise its authority under Rule 3018(a) of the Bankruptcy Rules to fix September 28, 2007, five days before the beginning of the hearing on the Disclosure Statement, as the record date (the "Record Date") for determining (i) creditors and interest holders entitled to receive Solicitation Packages and other notices and (ii) creditors entitled to vote to accept or reject the Plan, notwithstanding anything to the contrary in the Bankruptcy Rules.  For clarity, and to ensure there is no confusion as a result of "last-minute" claims trading activity, the Debtors request that the Court order that the proper holder of a docketed proof of claim or scheduled claim be determined by reference to KCC's (as defined below) claims register as may be modified by Notices of Transfer filed and reflected on the Court's official docket (ECF) at 11:59 p.m. (prevailing Eastern time) on September 28, 2007, and that only those registered holders of claims as reflected on the docket together with KCC's database on the Record Date be entitled to vote.  The holders of any claims filed after the Record Date would not be entitled to vote.

---

[5]    On September 4, 2007, the Debtors filed their Application For Order Under 11 U.S.C. §§ 327(a) And 328 And Fed. R. Bankr. P. 2014 And 3017 For Authorization To Employ And Retain Financial Balloting Group LLC As Special Plan Balloting, Solicitation, And Information Agent For Publicly-Held Securities (the "FBG Application") (Docket No. 9246), seeking this Court's approval to retain FBG as the Debtors' special plan balloting, solicitation, and information agent for publicly held securities.

B.    Voting Deadline

22.    Bankruptcy Rule 3017(c) requires the Court to fix a time within which

holders of claims and interests may vote to accept or reject the Plan.  The Debtors request under

this Rule that the Court set November 9, 2007 at 7:00 p.m. (prevailing Eastern time) (the "Voting

Deadline") as the last date and time by which ballots for accepting or rejecting the Plan must be

received by the respective Voting Agents (as defined below) to be counted.  As discussed in

more detail below, the Debtors propose to send, or cause to be sent in the manner described

below, the Solicitation Packages and other notices to those parties entitled to receive Solicitation

Packages on or before October 12, 2007 (the "Solicitation Date").  Accordingly, the proposed

Voting Deadline would be 28 days after the last Solicitation Packages and other notices are sent.[6]

The Debtors propose that to be counted, ballots must be returned to and received by the

respective Voting Agents (as set forth in more detail below) on or before the Voting Deadline by

(i) mail in the return envelope provided with each ballot, (ii) overnight delivery, or (iii) hand

delivery.  Furthermore, the Debtors propose that any ballot submitted by electronic or facsimile

transmission not be counted.

C.    Temporary Allowance Of Claims For Voting Purposes

23.    The Debtors request that, under section 105(a) of the Bankruptcy Code,

any holder of a claim (as defined in section 101(5) of the Bankruptcy Code) or interest to which

the Debtors filed an objection, whether the objection related to the entire claim or a portion

thereof, not be entitled to vote on the Plan and not have its vote counted in determining whether

the requirements of section 1126(c) of the Bankruptcy Code have been met with respect to the

---

[6]    The Debtors intend to make every effort to mail Solicitation Packages as soon after the Disclosure Statement
Hearing, but believe October 12, 2007 is the latest day that completion of distribution of Solicitation Packages
can be reasonably assured.

Plan (except to the extent and in the manner as may be set forth in the objection) (a) unless such

claim or interest has been temporarily allowed for voting purposes in accordance with

Bankruptcy Rule 3018(a) and the Solicitation Procedures Order or (b) except to the extent that,

on or before the Voting Deadline, the objection to such claim or interest has been withdrawn or

resolved in favor of the creditor or interest holder asserting the claim or interest.  On October 12,

2007, the Debtors propose to send recipients of an objection to expunge their claim or interest,

including those claimants or interest holders against whose claim or interest an objection is

already pending, a notice of non-voting status, substantially in the form of Exhibit 2, a copy of

which is attached hereto ("Notice of Non-Voting Status").

          24.      The Debtors have filed objections requesting the Court to modify claims

either in amount, Debtor, or claim classification.  The Debtors further propose that the

Solicitation Procedures Order provide that any holder of a claim which is subject to a pending

objection that seeks to modify the claim be allowed to vote in the amount and class set forth in

the objection.

          25.      As contemplated in the Preservation Of Estate Claims Procedures Order,[7]

the Debtors intend to file under seal certain avoidance and other actions against various parties,

including many creditors.  The avoidance complaints will not contain any objection seeking the

disallowance of a defendant's claim.  More specifically, the complaints will not seek under

section 502(d) of the Bankruptcy Code the disallowance of a claim on the basis that the

defendant has received and not returned an avoidable transfer.  Accordingly, the filing of a

complaint will not constitute an objection as that term is used in section 502(a) of the Bankruptcy

---

[7]    Order Under 11 U.S.C. §§ 102(1)(A), 105(a), 107, 108(a)(2), And 546(A) And Fed. R. Bankr. P. 7004, 9006(c),
And 9018 (i) Authorizing Debtors To Enter Into Stipulations Tolling Statute Of Limitations With Respect To
Certain Claims, (ii) Authorizing Procedures To Identify Causes Of Action That Should Be Preserved, And
(iii) Establishing Procedures For Certain Adversary Proceedings Including Those Commenced By Debtors
Under 11 U.S.C. § 541, 544, 545, 547, 548, Or 553 (Docket No. 9105).

Code, which provides that, in the absence of an objection, a proof of claim is deemed allowed.

For the avoidance of doubt, however, the Debtors request that the filing of an avoidance action

which includes no objection to a claim held by the defendant will not, by itself, cause the

defendant's claim to lose the benefit of deemed allowance under section 502(a) with respect to

voting on the Plan.[8]  To the extent that the Court were to conclude otherwise, the Debtors

alternatively request under Rule 3018(a) that such a claim be allowed temporarily for voting

purposes, and not for the purposes of distribution or otherwise, only if the claim would have been

deemed allowed under section 502(a) but for the filing of the avoidance action.

   26.  Bankruptcy Rule 3018(a) provides, in relevant part, that,

"[n]otwithstanding objection to a claim or interest, the court after notice and hearing may

temporarily allow the claim or interest in an amount which the court deems proper for the

purpose of accepting or rejecting a plan."  The Debtors request that the Court, pursuant to section

105(a) of the Bankruptcy Code, (a) fix November 5, 2007 (the "Rule 3018(a) Motion Deadline")

as the deadline for claimants and interest holders to file and serve motions under Bankruptcy

Rule 3018(a) ("Rule 3018(a) Motion(s)")[9] requesting temporary allowance of the movant's claim

or interest for purposes of voting and (b) require that such a motion be filed with the Clerk of the

Court and served on the Notice Parties (as defined below) in the manner set forth for

Confirmation Objections (as defined below) so as to be <u>received</u> no later than 4:00 p.m.

---

[8] Such an order would also further the purpose of the Preservation Of Estate Claims Procedures Order, which to avoid disruption to the Debtors' business relationships permits the Debtors to file avoidance actions under seal and extends the time for service of the complaints until March 31, 2008.  During the solicitation period, generally only the Debtors will know which creditors are named as defendants in a sealed avoidance complaint. Thus, if those defendants' claims were not deemed allowed under section 502(a), the Debtors would need to send the defendants a Notice of Non-Voting Status and at some point reveal the reason for the claims' disallowance, thus defeating the purpose of filing avoidance actions under seal.

[9] The Debtors propose, however, that if they object to a claim or interest on or after October 29, 2007, the Rule 3018(a) Motion Deadline be extended for that claim or interest such that the deadline would be seven calendar days after the filing of the Debtors' objection.

(prevailing Eastern time) on the Rule 3018(a) Motion Deadline.  The Debtors propose that the

Court consider only those Rule 3018(a) Motions that have been timely filed and served in

accordance with the provisions of this paragraph and Motion.

27.    The Debtors further propose that any party timely filing and serving a

Rule 3018(a) Motion be provided a ballot and be permitted to cast a provisional vote to accept or

reject the Plan.  The Debtors also propose that if, and to the extent that the Debtors and such a

party are unable to resolve the issues raised by the Rule 3018(a) Motion before the Voting

Deadline, then the Court on the Confirmation Hearing Date (as defined below) would determine

whether the provisional ballot should be counted as a vote on the Plan.  Such a procedure would

help ensure that an efficient and accurate tabulation of ballots can be completed by the

Confirmation Hearing Date (as defined below).  Moreover, setting the Confirmation Hearing

Date as the date for the hearing of Rule 3018(a) Motions would permit the Court to avoid

holding separate hearings on such motions and the tabulation results may be such that neither

party would be interested in litigating the merits of the Rule 3018(a) Motions.  Nothing in these

procedures is intended to affect the Debtors' right to object to any proof of claim.

D.    <u>Unliquidated Claims</u>

28.    For all persons or entities which filed a proof of claim reflecting a claim or

portion of a claim that is unliquidated, the Debtors propose that the claim be allowed temporarily

for voting purposes only, and not for purposes of allowance or distribution, for the portion of the

claim that is not unliquidated.  If the entire claim is reflected as unliquidated, then the Debtors

request that the claim be counted for purposes of determining whether a sufficient number of the

allowed claims in the corresponding class has voted to accept the Plan, but that the allowed

amount of the claim for voting purposes be deemed to be $1.00, subject to the right of such

holder to file a Rule 3018(a) Motion.

E.    <u>Contingent Claims</u>

29.    For all persons or entities which timely filed a proof of claim reflecting a

claim or portion of a claim that is contingent, the Debtors propose that the claim be disallowed in

its entirety for voting purposes, subject to the right of the holder to file a Rule 3018(a) Motion.

Contingent claims include any claim that has been explicitly designated as contingent on the

proof of claim form.  Contingent claims also include any claims that were the subject of

prepetition litigation between the Debtors and the claimant as of the Petition Date.  Finally,

contingent claims include any claims that were not the subject of prepetition litigation, but that

otherwise involved an allegation of liability against the Debtors that was contested or otherwise

was the subject of continuing, unresolved investigations as of the Petition Date.

III.    <u>CONFIRMATION HEARING DATE</u>

30.    Bankruptcy Rule 3017(c) provides that "[o]n or before approval of the

disclosure statement, the court . . . may fix a date for the hearing on confirmation" of a plan.  By

this Motion, the Debtors request that the Court set November 19, 2007, at 10:00 a.m. (prevailing

Eastern time), to be continued at the Court's direction, if necessary, as the hearing date to

consider confirmation of the Plan (the "Confirmation Hearing Date").  The Debtors also request

that the Court order that the Confirmation Hearing Date may be continued from time to time by

announcing the continuance in open court or otherwise, all without further notice to parties in

interest.

31.    To provide notice of the Confirmation Hearing Date to creditors and

parties in interest, the Debtors propose to use the form of notice attached hereto as <u>Exhibit 3</u> (the

"Confirmation Hearing Notice").  The Confirmation Hearing Notice provides notice of, among

other things, the following: (i) approval of the Disclosure Statement, (ii) the hearing set to

consider confirmation of the Plan, (iii) the deadline and procedures for filing objections to

confirmation of the Plan, (iv) the deadline and procedures for temporary allowance of certain

claims for voting purposes, (v) the treatment of certain unliquidated, contingent, or disputed

claims for notice, voting and distribution purposes, (vi) the record date, (vii) the voting deadline

for receipt of ballots, (viii) information relating to releases and injunctions contemplated by the

Plan.

IV.    PROCEDURES FOR FILING OBJECTIONS TO CONFIRMATION

32.    Bankruptcy Rule 3020(b)(1) provides that objections to confirmation of a

plan must be filed and served "within a time fixed by the court."  The Debtors request under this

Rule that the Court set 4:00 p.m. (prevailing Eastern time) on November 9, 2007 (the

"Confirmation Objection Deadline") as the last date and time for filing and serving objections to

the confirmation of the Plan ("Confirmation Objections").  As discussed in more detail below,

the Debtors propose to send, or cause to be sent in the manner described below, the Solicitation

Packages and other notices on or before October 12, 2007.  Accordingly, the Confirmation

Objection Deadline allows for at least 28 days following the date the Solicitation Packages and

other notices are sent.  The Debtors request that only timely filed and served written

Confirmation Objections be considered and that Confirmation Objections not timely filed and

served in the manner described in this paragraph and the immediately following paragraph be

stricken.

33.    The Debtors request that the Court direct that Confirmation Objections, if

any, must (i) be in writing, (ii) comply with the Bankruptcy Rules and the Local Bankruptcy

Rules for the Southern District of New York, (iii) set forth the name of the objector and the

nature and amount of any claim or interest asserted by the objector against or in the Debtors,

their estates, or their property, (iv) state with particularity the legal and factual bases for the

objection, and (v) be filed with the Court together with proof of service, and served by personal

service, overnight delivery, or first-class mail, with a hard copy delivered to the chambers of the

Honorable Robert D. Drain, so as to be <u>RECEIVED</u> no later than the Confirmation Objection

Deadline, by the following (collectively, the "Notice Parties"):

<u>Counsel For The Debtors</u>

Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
Att'n: John Wm. Butler, Jr.
Att'n: George N. Panagakis
Att'n: Ron E. Meisler

and

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Att'n: Kayalyn A. Marafioti
Att'n: Thomas J. Matz

<u>United States Trustee</u>

The Office of the United States Trustee
33 Whitehall Street, Suite 2100
New York, New York 10004
Att'n: Alicia M. Leonhard

<u>Counsel For The Creditors' Committee</u>

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Att'n: Robert J. Rosenberg
Att'n: Mark A. Broude

<u>Counsel For The Equity Committee</u>

Fried, Frank, Harris, Shriver & Jacobson LLP

One New York Plaza
New York, New York 10004
Att'n: Bonnie K. Steingart


Counsel For A-D Acquisition Holdings, LLC

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900, Miami, Florida 33131
Att'n: Thomas E. Lauria

       and

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Att'n:  Glenn M. Kurtz

Att'n:  Gregory Pryor


## V.    APPROVAL OF SOLICITATION PROCEDURES

### A.    Duties Of Voting Agents

34.    In this Courts' Final Order Under 28 U.S.C. § 156(c) Authorizing

Retention And Appointment Of Kurtzman Carson Consultants LLC ("KCC") As Claims,

Noticing, And Balloting Agent For Clerk Of Bankruptcy Court (the "KCC Retention Final

Order"), dated December 1, 2005 (Docket No. 1374), the Court authorized the retention of KCC

and authorized KCC to (i) assist the Debtors with the distribution of required notices to parties-

in-interest, (ii) receive, maintain, docket, and otherwise administer the proofs of claim filed in

the these chapter 11 cases, (iii) tabulate acceptances and rejections of the Debtors' plans of

reorganization, and (iv) provide such other administrative services that the Debtors might require.

35.    To prepare for their solicitation process, the Debtors have hired RR

Donnelley Global Capital Markets ("Donnelley") as their printer.  The Debtors believe that

Donnelley has the capacity and expertise to print the hundreds of thousands of documents and

burn a similar number of CD-ROMs necessary to facilitate the Debtors' Plan solicitation.

36.    In addition, on September 4, 2007, the Debtors filed their Application For

Order Under 11 U.S.C. §§ 327(a) And 328 And Fed. R. Bankr. P. 2014 And 3017 For

Authorization To Employ Financial Balloting Group LLC As Special Plan Balloting, Solicitation,

And Information Agent For Publicly-Held Securities (the "FBG Application") (Docket No.

9246), seeking this Court's approval to retain FBG as the Debtors' special plan balloting,

solicitation, and information agent for Securities.

37.    Accordingly, the Debtors have requested KCC (the "Creditor Voting

Agent") and FBG (the " Securities Voting Agent," and together with the Creditor Voting Agent,

the "Voting Agents") to act as the voting agents for the solicitation of votes with respect to the

Plan.  As contemplated and authorized in the KCC Order and the FBG Order, the Debtors

request that the Voting Agents assist the Debtors in (i) overseeing the mailing of the Solicitation

Packages, (ii) receiving, tabulating, and reporting on ballots cast for or against the Plan by

holders of claims against and interests in the Debtors, (iii) responding to inquiries from creditors

and interest holders relating to the Plan, the Disclosure Statement, and the ballots and matters

related thereto, including the procedures and requirements for voting to accept or reject the Plan

and for objecting to the Plan, (iv) soliciting votes on the Plan, and (v) if necessary, contacting

creditors and interest holders regarding the Plan.

38.    With respect to claims against one of the Debtors (or all or some of them)

whether or not asserted, other than claims based on Securities, the Debtors propose that their

restructuring advisor, FTI Consulting, Inc. ("FTI"), work with KCC to ensure that the claims

filed in these cases, and scheduled claims not superseded by a proof of claim, are accurately

assigned to appropriate classes under the Plan.  This data will initially be sorted by FTI.  Once

the data is complete, FTI would then forward this information to KCC, which would create

personalized PDF (Portable Document Format) images of the ballots to be distributed with

Solicitation Packages.  KCC would then forward these PDF images of the ballots to Donnelley

for printing and Donnelley would mail the completed Solicitation Packages to creditors.  The

ballots for these creditors would include instructions requesting voters to return the ballots to

KCC for tabulation and for ease the envelopes accompanying the ballots would be pre-addressed

with KCC's address.

    39.  With respect to claims based on Securities, including as described below

Class C General Unsecured Claims (Senior Note Claims), Class C General Unsecured Claims

(TOPrs Claims), and Class G-1 Existing Common Stock Claims, FBG would distribute, receive,

and tabulate the appropriate ballots.

    40.  Under the terms of the MDL Settlements (as defined in the Plan), the

Debtors have agreed with the lead plaintiffs in the MDL Actions (as defined in the Plan) that, for

voting purposes only, Claims in Class E (Section 510(b) Note Claims), Class G-2 (Section 510(b)

Equity Claims), and Class H (Section 510(b) ERISA Claim) (all as described in more detail

below) will be voted by their respective class action representatives and the persons and entities

who filed Claims other than those putative members of the classes represented by the class action

representatives.

B.  Ballots

    41.  The Debtors also request the Court to approve the ballots for voting on the

Plan in substantially the forms attached collectively hereto as Exhibit 4.  Bankruptcy

Rule 3017(d) requires the Debtors to mail a form of ballot, which substantially conforms to

Official Form No. 14, only to "creditors and equity security holders entitled to vote on the plan."

The Debtors propose to distribute the ballots to creditors and interest holders whose votes are to be solicited.  The forms for the ballots are based on Official Form No. 14 but have been modified to address the particular aspects of these chapter 11 cases and to include certain additional information that the Debtors believe to be relevant and appropriate for each class of claims.

42.      There are a total of 42 Debtors.  The Plan contemplates and is predicated upon entry of an order substantively consolidating certain of the Debtors' estates for purposes of all actions associated with confirmation and consummation of the Plan.  The Debtors in a particular consolidated Debtor group are proposed to be substantively consolidated with each other but not with any other Debtor.  For balloting purposes, each Debtor or consolidated group of Debtors has been assigned its own number, as set forth in the chart below.  The claims against and interests in each Debtor, in turn, have been assigned to separate lettered classes with respect to each Debtor, based on the type of claim involved.  Accordingly, the classification of any particular claim against or interest in any of the Debtors depends on the particular Debtor or Debtor group against which such claim is asserted (or in which such interest is held) and the type of claim or interest in question.  The numbers applicable to the various Debtors and Debtor groups are as follows:

| Number | Consolidated Debtor Group Or Debtor Name | Debtors In Group |
| --- | --- | --- |
| 1 | Delphi-DAS Debtors | Delphi Corporation, Delphi Automotive Systems LLC, ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Services Solutions, Inc., Delphi Liquidation Holding Company, Delphi LLC, Aspire, Inc., Delphi NY Holding Corporation, Delphi Receivables LLC, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Exhaust Systems Corporation, and Environmental Catalysts, LLC. |

| Number | Consolidated Debtor Group Or Debtor Name | Debtors In Group |
|---|---|---|
| 2 | DASHI Debtors | Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi International Holdings Corp., and Delphi International Services, Inc. |
| 3 | Connection System Debtors | Packard Hughes Interconnect Company and Delphi Connection Systems |
| 4 | Specialty Electronics Debtors | Specialty Electronics, Inc. and Specialty Electronics International Ltd. |
| 5 | Delco Electronics Overseas Corporation | Non-Consolidated Entity |
| 6 | Delphi Diesel Systems Corp. | Non-Consolidated Entity |
| 7 | Delphi Furukawa Wiring Systems LLC | Non-Consolidated Entity |
| 8 | Delphi Mechatronic Systems, Inc. | Non-Consolidated Entity |
| 9 | Delphi Medical Systems Corporation | Non-Consolidated Entity |
| 10 | Delphi Medical Systems Colorado Corporation | Non-Consolidated Entity |
| 11 | Delphi Medical Systems Texas Corporation | Non-Consolidated Entity |
| 12 | MobileAria, Inc. | Non-Consolidated Entity |

43.     Under the Plan, claims against and interests in each of the Debtors are divided into lettered classes.  Not all of the classes apply to every Debtor or Debtor Group, and consequently not all of the lettered classes appear in the case of each Debtor.  Further, not every lettered class below will receive ballots depending on their voting status.  Whenever such a class of claims or interests is relevant to a particular Debtor or Debtor group, that class of claims or interests will be grouped under the appropriate lettered class from the following list:

| Class | Description |
|---|---|
| Class A | Class A consists of all Secured Claims against the applicable Debtor or consolidated group of Debtors. |
| Class B | Class B consists of all Flow-Through Claims against the applicable Debtor or consolidated group of Debtors. |

| Class | Description |
|-------|-------------|
| Class C | Class C consists of all General Unsecured Claims against the applicable Debtor or consolidated group of Debtors, including Senior Note Claims and Subordinated Note Claims. |
| Class D | Class D consists of all GM Claims against the applicable Debtor or consolidated group of Debtors. |
| Class E | Class E consists of all Section 510(b) Note Claims against Delphi. |
| Class F | Class F consists of all Intercompany Claims against the applicable Debtor or consolidated group of Debtors. |
| Class G-1 | Class G-1 consists of all Existing Common Stock of Delphi. |
| Class G-2 | Class G-2 consists of all Section 510(b) Equity Claims against Delphi. |
| Class H | Class H consists of all Section 510(b) ERISA Claims against Delphi. |
| Class I | Class I consists of all Other Interests in Delphi. |
| Class J | Class J consists of all Interests in the Affiliate Debtors. |

44.     The appropriate ballot forms, as applicable, will be distributed to holders of claims in the following classes under the Plan, which are those classes entitled to vote to accept or reject the Plan.  The relevant ballots, as well as the particular Voting Agent responsible for solicitation of the claims related to the particular ballots (as reflected in the parentheticals), are set forth below:

- Ballot for holders of Class C General Unsecured Claims (KCC)
- Beneficial Owner Ballot for holders of Class C General Unsecured Claims (Senior Note Claims)[10]  (FBG)
- Master Ballot for Class C Record Holders of General Unsecured Claims

---

[10]    The Ballots for the Senior Notes Claims include specialized ballots for each series of the Senior Notes as well as the Subordinated Notes: the 6.55% Notes due 2006, dated May 31, 2001; 6.50% Notes due 2009, dated April 28, 1999; the 6.50% Notes due 2013, dated July 22, 2003; the 7.125% Notes due 2029, dated April 28, 1999; and the Adjustable Rate Junior Subordinated Note, due 2033.

(Senior Note Claims) (FBG)

- Beneficial Owner Ballot for holders of Class C TOPrs Claims (FBG)

- Master Ballot for Class C Record Holders of TOPrs Claims (FBG)

- Class D GM Ballot (KCC)

- Ballot for holders of Class E Section 510(b) Note Claims (KCC)

- Beneficial Owner Ballot for holders of Class G-1 Existing Common Stock Claims (FBG)

- Master Ballot for Class G-1 Record Holders of Existing Common Stock Claims (FBG)

- Ballot for holders of Class  G-2 Section 510(b) Equity Claims (KCC)

- Ballot for holders of Class H Section 510(b) ERISA Claims (KCC)

45.    The Debtors propose that each of the 11 forms of ballots listed above be labeled with the number of the appropriate Debtor entity or Debtor group and be printed on different colored paper to reflect the appropriate class as listed above.  All ballots except for Beneficial Owner ballots for holders of publicly held securities would be accompanied by pre-addressed, postage prepaid return envelopes addressed to the appropriate Voting Agents (as identified above) or such parties as the Voting Agents may direct.

C.    Unimpaired Creditors

46.    Under the Plan, certain classes of claims are unimpaired as defined in section 1124 of the Bankruptcy Code ("Unimpaired Creditors").  Under section 1126(f) of the Bankruptcy Code, the Unimpaired Creditors are conclusively presumed to have accepted the Plan, and solicitation of votes from these creditors is not required.  Although Bankruptcy Rule 3017(d) provides that a court may order that a plan and disclosure statement need not be distributed to holders of unimpaired claims that are conclusively presumed to have accepted a plan, the Debtors prefer to distribute a complete Solicitation Package, absent a ballot, to the Unimpaired Creditors to preempt their requests for copies of the Disclosure Statement and Plan.

47.     Class A (Secured Claims), Class B (Flow-Through Claims), and Class J

(Interests in Affiliate Debtors)[11] are deemed Unimpaired Creditors and are conclusively

presumed to accept the Plan.  Solicitation of votes with respect to these classes of claims is not

required, and accordingly the Debtors assert that holders of claims in these classes need not

receive ballots.  In addition, in lieu of a ballot and in accordance with Rule 3017(d), the Debtors

propose to mail to the Unimpaired Creditors a notice, substantially in the form of Exhibit 5

attached hereto, that gives (i) notice of the filing of the Plan, (ii) notice of the specific Plan

provisions with respect to the Unimpaired Creditors, (iii) instructions regarding the various ways

to obtain and view additional copies of the Disclosure Statement and Plan and other documents,

(iv) information regarding the Confirmation Hearing, and (v) detailed directions for filing

objections to confirmation of the Plan.

D.      Unliquidated Claims

48.     Consistent with paragraph 26 above, the Debtors propose that all persons

or entities which filed a proof of claim reflecting a claim or portion of a claim that is

unliquidated, except for those parties filing a Rule 3018(a) Motion, will receive the ballot

appropriate to their class marked in the amount of $1.00 for voting the unliquidated portion of

their claim.

E.      Other Non-Voting Classes

49.     In addition to holders of those claims set forth above, claimants holding

claims in Class I (Other Interests) under the Plan, as well as holders of contingent claims and

claims subject to a pending objection to expunge or otherwise disallow such claim, would

---

[11]    Solicitation Packages will be sent only to those holders of interests in affiliate Debtors that are not wholly
owned by Debtor entities.

receive the Solicitation Package without a ballot and with the Notice of Non-Voting Status

attached hereto as Exhibit 2.

F.    Intercompany Claims

50.    Holders of Class F Intercompany Claims which do not retain or receive

any property under the Plan and are deemed to reject the Plan under 11 U.S.C. § 1126(g).

Holders of Class F Intercompany Claims whose claims are reinstated are unimpaired and deemed

to accept the Plan.  Therefore, the Debtors assert that they need not send ballots or Solicitation

Packages to holders of Class F Intercompany Claims.

G.    Content And General Transmittal Of Solicitation Package

51.    Bankruptcy Rule 3017(d) specifies the materials to be distributed to all

impaired creditors and equity security holders following approval of a disclosure statement.

Pursuant to this Bankruptcy Rule, the Debtors propose to transmit or cause to be transmitted on

or before the Solicitation Mailing Date, to the persons listed below, subject to the limitations

contained therein and elsewhere in this Motion, by United States mail, first-class postage prepaid,

or by hand or by overnight courier, a Solicitation Package containing a copy or conformed

printed version of:

- the Confirmation Hearing Notice;

- the Solicitation Procedures Order (without exhibits attached);

- to the extent applicable, the appropriate ballot and notice as set forth above for the specific creditor or interest holder, with appropriate voting instructions, in substantially the forms attached hereto as Exhibit 4 (as may be modified for particular classes and with instructions attached thereto), and a pre-addressed postage prepaid return envelope;

- a CD-ROM containing the Disclosure Statement, the Plan, and the publicly filed materials appended thereto;

- solicitation letters, if any, from the Creditors' Committee and Equity Committee;

- to the extent appropriate, an Internal Revenue Service form W-9 (Request for Taxpayer Identification Number and Certification) to be returned with a party's ballot;[12] and

- a Postpetition Interest Rate Determination Notice (as defined below) for all holders of General Unsecured Claims, other than Senior Note Claims or TOPrs Claims.

52.    The Disclosure Statement and Plan, including exhibits, are more than 1,000 pages in length.  Accordingly, to reduce substantially the administrative costs associated with printing and mailing such a voluminous document, the Debtors propose, with the consent of both the Creditors' Committee and the Equity Committee, to serve the Disclosure Statement and Plan (including exhibits) via CD-ROM instead of in printed format to all parties. This procedure has been approved in several other large chapter 11 cases in this district. See, e.g., In re Delta Airlines, Inc., et al., Case No. 05-17923 (Banrk. S.D.N.Y.); In re Adelphia Communications Corp., et al., Case No. 02-41729 (Bankr. S.D.N.Y.); In re Enron Corp, et al., Ch. 11 Case No. 01-16034 (Bankr. S.D.N.Y.); see also In re UAL Corp., et al., Ch. 11 Case No. 02-48191 (Bankr. N.D. Ill.). The Plan and Disclosure Statement also are available at no charge via the Internet at www.delphidocket.com. In addition, the Debtors will provide parties in interest (at no charge) a hard copy of the Solicitation Package upon reasonable written or telephonic request as set forth in paragraph 72 below.

53.    The Debtors propose that the following creditors, equity holders, and other parties in interest receive the Solicitation Package (with exclusions as noted herein): (i) the United States Trustee, (ii) all nonvoting unimpaired creditors, (iii) equity holders, (iv) holders of

---

[12]    Form W-9s, with instructions, will be included in the appropriate Solicitation Packages for completion by creditors and interest holders to eliminate the need to pursue completed forms prior to distribution to holders of allowed claims and interests.  For the avoidance of doubt, receipt of a form W-9, however, does not guarantee in any way that a creditor or interest holder will be eligible for a distribution under the Plan.  Indeed a claim or interest must first be allowed in accordance with the Plan prior to being eligible for any distribution.

claims in non-voting Class I under the Plan, (v) persons or entities which filed a proof of claim reflecting a claim or portion of a claim that is unliquidated, and (vi) creditors holding claims in a class designated as impaired and entitled to vote on the Plan (A) who have filed proofs of claim that have not been disallowed by an order of the Court entered on or before the Record Date or (B) whose claims are scheduled in the Debtors' schedules of assets and liabilities dated April 18, 2006, or any amendment thereof (the "Schedules") and not otherwise superseded by a proof of claim, other than those scheduled as (x) unliquidated, contingent, or disputed or (y) zero or unknown in amount.  For the avoidance of doubt, to the extent a creditor's claim is scheduled in the Debtors' Schedules as unliquidated, contingent, or disputed or zero or unknown in amount and no proof of claim was filed to supersede such scheduled claim, the creditor will not receive a Solicitation Package on account of its scheduled claim.  To avoid duplication and reduce expenses, the Debtors propose that creditors who have filed duplicate claims in any given class be entitled to receive only one Solicitation Package and one ballot for voting their claims with respect to that class.

H.    Disputed Claims

54.    As explained above, if the Debtors file an objection to a creditor's proof of claim in its entirety or if an objection to expunge or otherwise disallow such claim is already pending, the Debtors propose that the claim be disallowed in its entirety for voting purposes (except to the extent and in the manner as may be set forth in the objection), subject to the right of its holder to file a Rule 3018(a) Motion.  The Debtors propose to distribute to holders of disputed claims a Solicitation Package, absent a ballot, and the Notice of Non-Voting Status, informing each holder that his, her, or its claim has been disallowed in its entirety for voting purposes, subject to the right of the holder to file a Rule 3018 Motion as described above.

I.      Transmittal To Public Security Holders

        55.      Bankruptcy Rule 3017(e) provides that "the court shall consider [at the

disclosure statement hearing] the procedures for transmitting the documents and information

required by [Bankruptcy Rule 3017(d)] to beneficial holders of stock, bonds, debentures, notes

and other securities and determine the adequacy of such procedures and enter such orders as the

court deems appropriate."  Because of the complexity and difficulty associated with reaching

beneficial owners of publicly traded securities, many of whom hold their securities in brokerage

accounts and through several layers of ownership, the Debtors propose that materials be sent in a

manner customary in the securities industry so as to maximize the likelihood that beneficial

owners of the Debtors' Securities will receive the materials in a timely fashion.  Thus, the

Debtors propose to transmit the Solicitation Packages to holders of the Debtors' Securities, or

claims based on those Securities where appropriate,[13]  by mailing or delivering the Solicitation

Packages no later than the Solicitation Mailing Date to (i) each registered holder of Securities as

of the Record Date (collectively the "Record Owners") and (ii) to each bank or brokerage firm,

or the agent therefor, identified by the Debtors or the Securities Voting Agent as an entity

through which beneficial owners (the "Beneficial Owners") hold the Securities (collectively, the

"Intermediary Record Owners").  In addition, master ballots would be distributed to the

Intermediary Record Owners after the initial distribution of Solicitation Packages, in accordance

with customary procedures in the publicly traded securities industry.

---

[13]    The classes of claims under the Plan to be solicited in this manner, or partially in this manner, as the case may
be, include Class C General Unsecured Claims (Senior Note Claims), Class C General Unsecured Claims
(TOPrs Claims), and Class G-1 Existing Common Stock Claims.

(a)    Labels For Record Holders

56.    To facilitate the mailing described in the immediately preceding paragraph, the Debtors request that the Court order each of the trustees and transfer agents, including, Wilmington Trust Company (as Indenture Trustee for the Senior Notes), Law Debenture Trust Company of New York (as Indenture Trustee for the Subordinated Notes), and Computershare Shareholder Services (as Transfer Agent of Existing Common Stock) or any successors thereto[14] to provide the Securities Voting Agent by October 5, 2007 an electronic file containing the names, addresses, and holdings of the respective Record Owners of the Debtors' Securities as of the Record Date or, if unable to provide an electronic file, two sets of adhesive labels and a list containing the same information.

(b)    Dissemination To Beneficial Holders

57.    Even after the mailings described above have been made, additional steps are necessary to ensure that the Beneficial Owners of the Securities receive Solicitation Packages and have an opportunity to vote.  Thus, the Debtors propose that the Court order the Intermediary Record Owners to distribute Solicitation Packages to the respective Beneficial Owners within five business days after receipt of the Solicitation Packages.

(c)    Voting By Beneficial Holders

58.    The Debtors request that the Court authorize two options for Intermediary Record Owners to obtain the votes of Beneficial Owners and order these entities to use the appropriate procedure as set forth below.  Under the first option, the Intermediary Record Owners could forward the Solicitation Package to the Beneficial Owners of the Securities for voting, which package would have to include a beneficial owner ballot as set forth above (the

---

[14]    For clarity, and to avoid duplicative voting, the Debtors will not distribute ballots to Wilmington Trust Company or Law Debenture Trust Company of New York by virtue of the claims they filed on behalf of their holders in their capacities as Indenture Trustees.

"Beneficial Owner Ballot") and a return envelope provided by and addressed to the Intermediary

Record Owner.  Under this option, the Intermediary Record Owners must summarize the

individual votes of their Beneficial Owners from the Beneficial Owner Ballots on a master ballot

in substantially the form attached as part of Exhibit 4 (a "Master Ballot"). The Intermediary

Record Owners would then return the Master Ballot to the Securities Voting Agent.

59.     Alternatively, the Intermediary Record Owner could prevalidate a

Beneficial Owner Ballot (a "Prevalidated Ballot") by signing that ballot and by indicating on the

ballot the Intermediary Record Owner for the Securities, the principal amount or number of

shares, as applicable, owned by such Beneficial Owner, and the appropriate account numbers

through which the Beneficial Owner's holdings are derived.  The Intermediary Record Owner

would then forward the Solicitation Package, including the Prevalidated Ballot and a return

envelope addressed to the Securities Voting Agent for voting by the Beneficial Owner.

60.     The Debtors request authority to reimburse Intermediary Record Owners

(whether directly or through the Voting Agents) for their reasonable and customary out-of-

pocket expenses incurred in performing the tasks described above upon written request by these

entities (subject to the Court's retaining jurisdiction to resolve any disputes over any request for

reimbursement).

61.     The Debtors propose to serve a copy of the Solicitation Procedures Order

on the Indenture Trustees for the Senior Notes and the Subordinated Notes, the Transfer Agent of

Existing Common Stock, and each Intermediary Record Owner identified by the Debtors and the

Securities Voting Agent as an entity through which Beneficial Owners hold Securities.  The

Debtors submit that the procedures they seek to follow adequately recognize the complex

structure of the securities industry, enable the Debtors to transmit materials to the Record

Owners and Beneficial Owners of the Debtors' Securities, and afford the Beneficial Owners with

a fair and reasonable opportunity to vote.

J.      Other Voting Procedures

           (a)    When No Notice Or Transmittal Necessary

        62.    The Debtors propose that Solicitation Packages not be sent to creditors

whose Claims are based solely on amounts scheduled by the Debtors and whose claims already

have been paid in the full scheduled amount, except that if, and to the extent that, any such

creditor would be entitled to receive a Solicitation Package for any reason other than by virtue of

the fact that its claim had been scheduled by the Debtors, the creditor would be sent a

Solicitation Package in accordance with the procedures set forth above.  In addition, the Debtors

request that they not be required to send a Solicitation Package to any creditor who filed a proof

of claim if the amount asserted in the proof of claim has already been paid.

        63.    Because sending Solicitation Packages and other notices to outdated or

otherwise improper addresses results in needless expense, the Debtors also request authority not

to give notice or service of any kind upon any person or entity to which the Debtors mailed a

Disclosure Statement Hearing Notice and received any of these notices returned by the U.S.

Postal Service marked "undeliverable as addressed," "moved – left no forwarding address,"

"forwarding order expired," or with a similar reason for return of the notice, unless the Debtors

have been informed in writing by that person or entity of the person's or entity's new address.

           (b)    Procedures For Vote Tabulation

        64.    To avoid uncertainty, to provide guidance to the Debtors and the Voting

Agents, and to avoid the potential for inconsistent results, the Debtors request under section

105(a) of the Bankruptcy Code that the Court establish the guidelines set forth below for

tabulating votes to accept or reject the Plan.

65. <u>Votes Counted</u>. The Debtors propose that any timely received ballot that contains sufficient information to permit the identification of the claimant or interest holder and is cast as an acceptance or rejection of the Plan be counted and be deemed to be cast as an acceptance or rejection of the Plan, as the case may be. The Debtors propose that the foregoing general procedures would be subject to the following:

- If a claim is deemed allowed in accordance with the Plan, that claim would be allowed for voting purposes in the deemed allowed amount set forth in the Plan,

- If a claim for which a proof of claim has been filed is marked as unliquidated or partially unliquidated, the claim, or the unliquidated portion of the claim, would be temporarily allowed for voting purposes only, and not for purposes of allowance or distribution, in the amount of $1.00, with the liquidated portion of partially unliquidated claim similarly temporarily allowed at its liquidated amount,

- If a claim is subject to a potential avoidance action, the action would not, by itself, cause the claim to lose the benefit of deemed allowance under section 502(a) of the Bankruptcy Code with respect to voting on the Plan,

- If a claim has been estimated or otherwise allowed for voting purposes by order of the Court, the claim would be temporarily allowed in the amount so estimated or allowed by the Court for voting purposes only, and not for purposes of allowance or distribution, and

- If the Debtors have served and filed an objection to a claim at least ten calendar days before the Confirmation Hearing, the claim would be temporarily disallowed for voting purposes only and not for the purposes of the allowance or distribution, except to the extent and in the manner as may be set forth in the objection.

66. <u>Votes Not Counted</u>. The Debtors further propose that the following ballots not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected:

- Any ballot received after the Voting Deadline unless the Debtors have granted an extension in writing of the Voting Deadline with respect to that ballot,

- Any ballot that is illegible or contains insufficient information to permit the identification of the claimant or interest holder,

- Any ballot cast by a person or entity that does not hold a claim or interest in a class that is entitled to vote to accept or reject the Plan,

- Any ballot cast on account of a proof of claim filed after the Record Date,

- Any ballot cast for a claim listed in the Schedules as unliquidated, contingent, or disputed and for which (i) no superseding proof of claim was timely filed and (ii) no Rule 3018(a) Motion has been filed by the Rule 3018(a) Motion Deadline,

- Any ballot cast in a manner that neither indicates an acceptance nor rejection of the Plan or that indicates both an acceptance and rejection of the Plan,

- Any ballot submitted by facsimile transmission or other electronic means of transmission, and

- Any unsigned ballot.

67.    The Debtors believe that the foregoing proposed procedures provide for a fair and equitable voting process.  As mentioned above, if any creditor seeks to challenge the allowance of its claim for voting purposes, the Debtors request that the Court direct the creditor to serve on the Debtors and file with the Court a Rule 3018(a) Motion temporarily allowing such claim in a different amount for purposes of voting to accept or reject the Plan by the Rule 3018(a) Motion Deadline.  The Debtors further propose in accordance with Bankruptcy Rule 3018 that, as to any creditor filing such a motion, the creditor's ballot not be counted unless temporarily allowed by the Court for voting purposes, after notice and a hearing.

(c)    <u>Changing Votes</u>

68.    Notwithstanding Bankruptcy Rule 3018(a), whenever two or more ballots are cast voting the same claim before the Voting Deadline, the Debtors request that the last ballot received before the Voting Deadline be deemed to reflect the voter's intent and thus to supersede any prior ballots.  However, the Debtors request that when an ambiguity exists as to which ballot was the latest mailed, the Voting Agent have the right to contact the creditor and calculate the vote according to the voter's stated intent.  This procedure would be without prejudice to the

Debtors' right to object to the validity of the second ballot on any basis permitted by law and, if

the objection is sustained, to count the first ballot for all purposes.  This procedure of counting

the latest ballot is consistent with practice under various state and federal corporate and securities

laws.  Moreover, it would spare the Court and the Debtors the time and expense of responding to

motions brought pursuant to Bankruptcy Rule 3018(a) and attempting to show cause for

changing votes.

    (d)  <u>No Vote Splitting; Effect</u>

  69.  The Debtors propose that the Court clarify that claim splitting is not

permitted and order that creditors who vote must vote all their claims within a particular class

either to accept or to reject the Plan.

    (e)  <u>Counting Ballots From Beneficial Holders</u>

  70.  The Debtors propose the following procedures for tabulating votes cast by

holders of the Securities.  These procedures are designed to enable the Securities Voting Agent

to tabulate votes from holders of the Securities, and to enable the Court to verify the results of

that vote by requiring the collection and retention of data and documents regarding the vote.

  71.  First, the Debtors propose that Intermediary Record Owners that use the

Master Ballot voting process be directed to retain for inspection by the Court, for one year

following the Voting Deadline, the Beneficial Owner Ballots cast by Beneficial Owners and that

Intermediary Record Owners that send Prevalidated Ballots to Beneficial Owners for direct

return to the Securities Voting Agent be required to retain for inspection by the Court, for one

year following the Voting Deadline, a list of those Beneficial Owners to whom the Prevalidated

Ballots were sent.

  72.  Second, to avoid "double counting," the Debtors propose that (i) votes cast

by Beneficial Owners holding Securities through Intermediary Record Owners and transmitted

by means of a Master Ballot or Prevalidated Ballot be applied against the positions held by the

Intermediary Record Owners with respect to the Securities and (ii) votes submitted by an

Intermediary Record Owner on a Master Ballot or Prevalidated Ballot not be counted to the

extent that they are in excess of the position maintained by the respective Intermediary Record

Owner in the Securities on the Record Date.

73.    Third, the Debtors propose that the following assumptions apply to

Prevalidated Ballots: (i) each Prevalidated Ballot is for a single account and (ii) each vote is a

separate vote and not duplicative of any other vote cast by other customers of such Intermediary

Record Owner (unless specific evidence exists that indicates that one vote is for the identical

account number and amount of another vote).

74.    Fourth, to the extent that conflicting votes or overvotes are submitted on a

timely received Master Ballot or Prevalidated Ballot, the Debtors propose that the Securities

Voting Agent attempt to resolve the conflict or overvote before the preparation of the vote

certification to ensure that as many Securities claims and interests as possible are accurately

tabulated.

75.    Fifth, to the extent that overvotes on a timely received Master Ballot or

Prevalidated Ballot are not reconcilable before the preparation of the vote certification, the

Debtors propose that the Securities Voting Agent count votes in respect of the  Master Ballot or

Prevalidated Ballot in the same proportion as the votes to accept and reject the Plan submitted on

the Master Ballot or Prevalidated Ballot that contained the overvote, but only to the extent of the

applicable Intermediary Record Owner's position on the Record Date in the Securities.

76.    Sixth, because Intermediate Record Owners generally are voting on behalf

of the Beneficial Owners for whom they hold Securities and the Master Ballots that they fill out

merely reflect the voting instructions given by those Beneficial Owners, Intermediary Record

Owners should be authorized to complete multiple Master Ballots, and the votes reflected by

such multiple Master Ballots should be counted except to the extent that they are duplicative of

other Master Ballots.  For the same reasons as set forth above for allowing subsequently filed

ballots to supersede previously filed ballots, the Court should order that, if two or more Master

Ballots submitted are inconsistent in whole or in part, the latest Master Ballot received before the

Voting Deadline would, to the extent of the inconsistency, supersede and revoke any prior

Master Ballot, subject to the Debtors' right to object to the validity of the second Master Ballot

on any basis permitted by law, including under Rule 3018(a), and, if such objection is sustained,

the first Master Ballot would then be counted.

        77.     Finally, to avoid inconsistent treatment and to guide the Debtors and the

Securities Voting Agent, the Court should order that each Intermediary Record Owner or

Beneficial Owner of the Securities be deemed to have voted the full principal amount (and with

respect to the TOPrS, the number of TOPrS), or number of shares held, notwithstanding anything

to the contrary on the Ballot.  Therefore, with respect to the Senior Notes and TOPrS the

Securities Voting Agent may adjust any principal amount or number of TOPrS voted to reflect

the corresponding claim amount, including prepetition interest.

K.     <u>Plan Exhibits And Disclosure Statement Appendices Filing Deadline</u>

        78.     The Debtors intend to file all exhibits and schedules to the Plan and

appendices to the Disclosure Statement with the Court on or before November 5, 2007 (the

"Exhibit Filing Date").

L.     <u>Supplemental Notice Of Confirmation Hearing</u>

        79.     To ensure proper notice of the Confirmation Hearing, the Debtors propose

to send the Confirmation Hearing Notice to parties to executory contracts and unexpired leases,

which parties are not currently "creditors" as defined in section 101(10) of the Bankruptcy Code.

In addition, Bankruptcy Rule 2002(l) permits the Court to "order notice by publication if it finds

that notice by mail is impracticable or that it is desirable to supplement notice."  Because of the

large number of parties-in-interest in these chapter 11 cases, the Debtors propose to publish a

publication version of the Confirmation Hearing Notice (the "Confirmation Hearing Publication

Notice") on or before October 12, 2007 in the global edition of the Wall Street Journal, the

national edition of the New York Times, the Detroit Free Press, the Detroit News, the Cleveland

Plain Dealer, the Toledo Blade, the Indianapolis Star, and the Kokomo Tribune.  The Debtors

believe that publication of this notice will give sufficient notice of the Confirmation Hearing to

persons and entities which do not otherwise receive notice by mail as provided for in the

Solicitation Procedures Order.

M.    Copies And Review Of Documents

80.    Copies of the Plan and Disclosure Statement (including after the Exhibit

Filing Date all exhibits, schedules, and appendices) are publicly available by accessing the

Delphi Legal Information Website, www.delphidocket.com, and may also be obtained, upon

reasonable written request, from the Creditor Voting Agent, Kurtzman Carson Consultants LLC,

2335 Alaska Avenue, El Segundo, California 90245, Att'n: Delphi Corporation, et al.

N.    Notices To Union-Represented Employees And Former Employees

81.    From June through August 2007, the Debtors entered into settlements with

their principal U.S. labor unions to provide certainty with respect to future labor costs and allow

Delphi to emerge from chapter 11 with more competitive labor costs (the "Union Settlement

Agreements").[15]   The Union Settlement Agreements provide that all employees of the Debtors

---

[15]    The unions include the United Automobile, Aerospace and Agricultural Implement Workers of America (the
"UAW"), the United Steel Workers (the "USW"), the International Union of Electronic, Electrical, Salaried,

represented or formerly represented by the Unions, as well as certain non-represented employees

and former employees, waive and release any and all claims against Delphi, GM, and the Unions,

arising under the Union Settlement Agreements or other collective bargaining agreements

between Delphi and the Unions (the "Waivers").

82.    The Debtors provided notice of the Waivers to the affected employees and

former employees before receiving this Court's approval of the Union Settlement Agreements

and believe that this prior notice is sufficient with respect to employees or former employees

who would not otherwise be entitled to receive notice of the Plan and Confirmation Hearing.  In

an effort to ensure that those parties affected by the Waivers receive notice of the Waivers'

effectiveness following the effective date of the Plan, however, the Debtors are willing to

provide the current and former Union-represented employees with the Confirmation Hearing

Notice and a specialized notice substantially similar to the notices provided to the current and

former Union-represented employees at the time the Debtors entered into the Union Settlement

Agreements.  A copy of the notices proposed to be sent to employees and former employees

represented  by the UAW, USW, IUE-CWA, IAM, IBEW, and  IUOE are attached hereto as

Exhibits 6, 7, 8, 9, 10, and 11, respectively.  A copy of the notice proposed to be sent to certain

non-represented employees and former employees is attached hereto as Exhibit 12.

## VI.    CURE CLAIM PROCEDURES

83.    To assume supply contracts (both for direct and indirect material supply)

pursuant to the Plan under 11 U.S.C. § 365, the Debtors will be required to cure certain defaults

under those contracts.  In most bankruptcy cases, the usual process for curing contract defaults is

Machine and Furniture Workers-Communication Workers of America (the "IUE-CWA"), the International
Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78 (the
"IAM"), the International Brotherhood of Electrical Workers and its Local 663 (the "IBEW"), and the
International Union of Operating Engineers Locals 832S, 18S, and 101S (the "IUOE," together with the UAW,
USW, IUE-CWA, IAM, and IBEW, the "Unions").

to pay the default claims in cash upon assumption.  In these cases, to allow holders of cure

claims to participate in the treatment afforded to general unsecured creditors under the Plan, the

Debtors intend to allow these holders to elect to receive either cash or plan currency, including

postpetition interest, on account of their cure claims.  Should a counterparty select cash, no

postpetition interest will be paid.

84.     To effect this election, to the extent the Debtors have not already agreed

upon a cure with a supply contract counterparty, the Debtors propose to send the counterparties

to their supply contracts a separate notice which will state the amount the Debtors believe

necessary to cure the supply contract (the "Cure Amount Claim"), and allow the counterparty to

elect either payment of the Cure Amount Claim in cash or in the plan currency afforded holders

of General Unsecured Claims (as defined in the Plan) (the "Cure Amount Notice").  Under the

Plan, assuming the Cure Amount Claim is not in dispute, the Cure Amount Claim would be paid

on the effective date of the Plan or as soon as reasonably practicable thereafter.  A copy of the

proposed form of Cure Amount Notice is attached hereto as <u>Exhibit 13</u>.

85.     The Cure Amount Notice provides that, if the counterparty agrees with the

Debtors' stated Cure Claim Amount, it may choose the treatment for its cure claim.  If the

counterparty disagrees with the Cure Claim Amount, the counterparty would be required to so

mark and return the Cure Amount Notice by November 9, 2007, and such party must

subsequently file a substantive objection to the Cure Claim Amount (in accordance with the

procedures outlined in the Cure Amount Notice) on or before the date that is 30 days following

the effective date of the Plan.  The Cure dispute would then be resolved following the effective

date of the Plan in accordance with the Debtors' general claim resolution procedures.  If the

counterparty makes no election and/or does not indicate that it will dispute the Cure Claim

Amount by November 9, 2007, such counterparty would be given plan currency with
postpetition interest on account of its Cure Claim Amount.

86.     The Debtors propose to send the Cure Amount Notice to the supply
contract counterparties on or before October 29, 2007, giving recipients until November 9, 2007,
or 10 days to complete and return these notices to KCC.

87.     The Plan provides and the Cure Amount Notice makes clear that the Cure
Claim Amount will be paid directly to the contract party and not to the current holder of a claim
underlying the Cure Claim Amount, if any.  This procedure is necessary to ensure that the supply
contract counterparty has received the cure necessary for the Debtors to assume the supply
contract under section 365 of the Bankruptcy Code, even if the supply contract counterparty is no
longer the current holder of the claim underlying the Cure Claim Amount.

VII.    POSTPETITION INTEREST RATE DISPUTE PROCEDURES

88.     The Plan provides for the payment of postpetition interest on General
Unsecured Claims, other than Senior Note Claims or TOPrs Claims, from the Petition Date
through December 31, 2007 at the Michigan Statutory Rate (as defined in the Plan).  In
consultation with the Creditors' Committee, the Debtors have agreed to send a notice to the
affected claimants as part of their Solicitation Package that sets forth this proposed treatment of
interest and establishes a procedure by which affected claimants can object to this treatment (the
"Postpetition Interest Rate Determination Notice").  A copy of the proposed form of Postpetition
Interest Rate Notice is attached hereto as Exhibit 14.

89.     If a party receiving the Postpetition Interest Rate Determination Notice
wishes to contest the rate of interest to be paid on account of its claim, the Debtors propose that
the party be required to return the Postpetition Interest Rate Determination Notice to KCC on or

before November 9, 2007, the same date as the Voting Deadline.  The Debtors would then

review the Postpetition Interest Rate Determination Notice and, if they disagree with the interest

rate requested, the Debtors would file an objection to the notice no later than 30 days after the

effective date of the Plan.  The dispute would then be resolved following the effective date of the

Plan in accordance with the Debtors' general claim resolution procedures and as more fully

described in the Plan.  To the extent that the Postpetition Interest Rate Determination Notice has

been returned and relates to a claim that would otherwise be allowed, such claim would no

longer be deemed an allowed claim for purposes of distribution until the interest rate issue is

resolved consensually or by Court order.

VIII.    <u>RECLAMATION CLAIM PROCEDURES</u>

90.    With respect to reclamation claims asserted by sellers of goods with a

statutory or common law right to reclamation ("Sellers"), the Debtors propose to allow each

Seller to elect the treatment afforded to allowed general unsecured claims for the amount of its

reclamation claim (which included postpetition interest) rather than have the Debtors seek a

judicial determination that the Sellers' reclamation claims are subject to the Debtors' reserved

defense that reclamation claims are not entitled to administrative priority status on the grounds

that the goods and/or the proceeds from the sale of the goods for which Sellers are seeking a

reclamation claim are or were subject to a valid and perfected security interest (the "Prior Lien

Defense").  If a Seller elects to decline the treatment afforded to general unsecured creditors,

then that Seller's reclamation claim would be automatically adjourned to a contested hearing to

be held after the Debtors' emergence from chapter 11 on a date following the effective date of the

Plan.  The parties would then litigate before this Court to determine whether the Prior Lien

Defense applies to those Sellers' reclamation claims.  In addition, the Debtors would retain all other reserved defenses with respect to the reclamation claims.

91.    To effect this election, the Debtors propose to send the Sellers a separate personalized notice by October 29, 2007 which would identify each such Seller's reclamation claim (the "Reclamation Claim") and permit the Seller to choose the treatment for its reclamation claim (the "Reclamation Election Notice").  A copy of the proposed form of Reclamation Election Notice is attached hereto as <u>Exhibit 15</u>.  Notwithstanding the above, the Debtors reserve all rights in law and in equity to contest the amount of a Seller's Reclamation Claim to the extent such amount has yet to be resolved pursuant to the Amended Final Reclamation Order Under 11 U.S.C. §§ 362, 503, And 546 And Fed. R. Bankr. P. 9019 Establishing Procedures For The Treatment of Reclamation Claims, entered November 4, 2005 (Docket No. 881).

92.    To contest the proposed general unsecured treatment, the Seller would be required to so mark and return the Reclamation Election Notice by November 9, 2007.  If the Seller makes no election on the Reclamation Election Notice, or affirmatively elects the treatment afforded general unsecured claims, it would receive a distribution on account of its Reclamation Claim in plan currency with postpetition interest to the extent such Reclamation Claim is Allowed and would be deemed to have waived any right to seek administrative priority status for its Reclamation Claim.  For clarity, notwithstanding the treatment afforded Reclamation Claims under these procedures, Reclamation Claims will not receive any voting rights on the Plan on account of their Reclamation Claims.

Notice Of Motion

93.    Notice of this Motion has been provided in accordance with the Scheduling Order and the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain

Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883).  In addition, the Debtors have published or will publish notice of this Motion in the global edition of the Wall Street Journal, the national edition of the New York Times, the Detroit Free Press, the Detroit News, the Cleveland Plain Dealer, the Toledo Blade, the Indianapolis Star, and the Kokomo Tribune.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

94.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court (a) enter an order

substantially in the form of Exhibit 1 attached hereto and (b) grant them such other and further

relief as is just.

Dated: New York, New York
       September 6, 2007


                        SKADDEN, ARPS, SLATE, MEAGHER
                        By:  /s/ John Wm. Butler, Jr.
                           John Wm. Butler, Jr. (JB 4711)
                           George N. Panagakis (GP 0770)
                           Ron E. Meisler (RM 3026)
                           Nathan Stuart (NS 7872)
                        333 West Wacker Drive, Suite 2100
                        Chicago, Illinois  60606
                        (312) 407-0700

                                - and -


                        By:  /s/ Kayalyn A. Marafioti
                           Kayalyn A. Marafioti (KM 9632)
                           Thomas J. Matz (TM 5986)
                        Four Times Square
                        New York, New York 10036
                        (212) 735-3000

                        Attorneys for Delphi Corporation, et al.,
                           Debtors and Debtors-in-Possession