**Hearing Date And Time:  September 27,  2007 at 10:00 a.m.**
**Objection Deadline:  September 20, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

          - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                                          :
          In re                                           :     Chapter 11
                                                          :
DELPHI CORPORATION, et al.,                               :     Case No. 05-44481 (RDD)
                                                          :
                                                          :     (Jointly Administered)
                Debtors.                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. § 363(b) AND FED. R.
BANKR. P. 6004 AND 9019 AUTHORIZING AND APPROVING ENTRY INTO AND
PERFORMANCE OF WARRANTY, SETTLEMENT, AND RELEASE AGREEMENT AND
COVENANT NOT TO SUE WITH GENERAL MOTORS CORPORATION

("GM WARRANTY SETTLEMENT MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order pursuant to 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 and 9019 authorizing and approving Delphi's[1] entry into and performance under that certain Warranty, Settlement, and Release Agreement and Covenant Not to Sue with General Motors Corporation ("GM"), and respectfully represent as follows:

<u>Background</u>

A.      <u>The Chapter 11 Filings</u>

1.      On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  The Court has ordered joint administration of these cases.

2.      No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee," and together with the Creditors' Committee, the "Statutory Committees").

3.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

---

[1]     For the purpose of convenience, references to "Delphi" herein means, as the context requires, (i) Delphi to the extent such reference implicates assets and liabilities of Delphi or (ii) any other specific Debtor entity undertaking the transaction(s) referenced to the extent such transaction affects the assets and liabilities of such entity.

4.      The statutory predicates for the relief requested herein are sections 363(b)

of the Bankruptcy Code and rules 6004 and 9019 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as

of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately

$15.4 billion.[2]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues and the thirteenth largest public company

business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors and continue their business operations without supervision from the Bankruptcy Court. [3]

6.      The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer ("OEM").

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

---

[2]     The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27,
2007.

[3]     On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core
automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency
proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso
receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of
which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31,
2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing
footprint and to lower its overall cost structure.

3

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

C.    Events Leading To The Chapter 11 Filing

        8.    In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[4]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred

a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee

special attrition programs.

        9.    The Debtors believe that the Company's financial performance

deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which

have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production

environment for domestic OEMs resulting in the reduced number of motor vehicles that GM

---

[4]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating
loss in calendar year 2004 was $482 million.

produces annually in the United States and related pricing pressures, and (iii) increasing
commodity prices.

10.    In light of these factors, the Company determined that it would be
imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product
portfolio, operational issues, and forward-looking revenue requirements.  Because discussions
with its major stakeholders had not progressed sufficiently by the end of the third quarter of
2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its
transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined the key tenets of a
transformation plan that it believed would enable it to return to stable, profitable business
operations.  The Debtors stated that they needed to focus on five key areas:[5] first, modifying the
Company's labor agreements to create a competitive arena in which to conduct business;[6]

---

[5]    In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their
execution of an equity purchase and commitment agreement with certain investors and a plan framework
support agreement with those investors and GM.  On July 9, 2007, Delphi confirmed that it had formally
terminated the equity purchase and commitment agreement and related plan framework support agreement but
that it expected to enter into new framework agreements with plan investors presently.  Subsequently, on July
18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment
agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan
investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill
Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co. and an affiliate
of Pardus Capital Management, L.P. (collectively, the "New Plan Investors").  Under the Delphi-Appaloosa
EPCA, the New Plan Investors agreed to invest up to $2.55 billion in preferred and common equity in the
reorganized Delphi to support the Company's transformation plan and plan of reorganization.  This Court
approved the Delphi-Appaloosa EPCA on August 2, 2007.

[6]    Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International Union,
United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM that (a)
modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the
UAW, and its various locals, (b) provides that GM will undertake certain financial obligations to Delphi's
UAW-represented employees and retirees to facilitate these modifications, and (c) modifies retiree welfare
benefits for certain UAW-represented retirees of the Debtors.  This agreement, which was approved by this
Court on July 19, 2007, should permit the Debtors to continue to implement their transformation plan and to
develop, prosecute, confirm, and consummate a plan of reorganization.  On August 6, 2007, similar agreements
were reached with the International Association of Machinists and Aerospace Workers and its District 10 and

second, concluding their negotiations with GM to finalize GM's financial support for the

Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[7]

third, streamlining their product portfolio to capitalize on their world-class technology and

market strengths and make the necessary manufacturing alignment with their new focus;[8] fourth,

transforming their salaried workforce to ensure that the Company's organizational and cost

structure is competitive and aligned with its product portfolio and manufacturing footprint;[9] and

devising a workable solution to their current pension situation.[10]

---

Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America and its local unions, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers. Such agreements were approved by this Court on August 16, 2007. On August 16, 2007, Delphi also reached a similar agreement with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and USW Local 87L, which was approved by this Court on August 29, 2007.

[7]  On July 9, 2007, Delphi confirmed that its discussions with GM on a comprehensive settlement agreement had entered the documentation phase and that it expected that a settlement with GM would be incorporated into the Debtors' plan of reorganization rather than filed with this Court for separate approval.

[8]  In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants. The Debtors have been working to divest non-core assets so as to maximize the value of their estates for stakeholders. During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, and obtained court approval for the sale of substantially all of the assets of their brake hose, catalyst, and Saltillo, Mexico brake plant businesses. In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

[9]  As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages. The Company's revised operating structure consists of its four core business segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture. The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan. To ensure that their organizational and cost structure is competitive, the Debtors obtained an Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order"). The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[10]  To that end, on May 31, 2007, the Bankruptcy Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 plan year funding waivers, which were approved by the IRS, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Plans"). On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively.

E.    The Debtors' Plan Of Reorganization

12.    On September 6, 2007, the Debtors reached another key milestone in their chapter 11 cases by filing their Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "Plan").  The Plan is based upon a series of global settlements and compromises that involve every major constituency in the Debtors' reorganization cases.  Indeed, the Debtors, the Debtors' principal U.S. labor unions, GM, the Statutory Committees, and the lead plaintiffs in certain securities actions (on behalf of holders of various claims based on alleged violations of federal securities laws and the Employee Retirement Income Security Act of 1974, as amended) all have contributed to global settlements and compromises that provide for a recovery through a plan distribution amounting to the principal amount of the claim plus accrued interest at a negotiated plan value for general unsecured creditors, and agreed upon distributions to other classes of creditors and interests.  The Plan is supported by the Creditors' Committee on behalf of unsecured creditors, the Equity Committee on behalf of holders of Delphi's common stock, and GM.  A hearing will be held on October 3, 2007 to approve the Debtors' solicitation procedures and disclosure statement with respect to the Plan.  The Debtors will seek to have a hearing on confirmation of the Plan on November 19, 2007.  The Debtors expect to emerge from these chapter 11 cases on December 31, 2007.

13.    Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

7

E.        Background To Proposed Settlement

14.        At the outset of these cases, the Debtors announced publicly their

commitment to take care of their customers.  Thus, as part of the "first day" relief, the Debtors

obtained this Court's permission to honor, among other things, prepetition customer warranty

obligations and to continue performing on their warranty obligations in the ordinary course of

business.  See Order Under 11 U.S.C. §§ 105(a), 363, 1107 And 1108 Authorizing Debtors To

Honor Prepetition Obligations To Customers And Otherwise Continue Customer Programs In

The Ordinary Course of Business ("Customer Programs Order") (Docket No. 221).  In

furtherance of that policy, the Debtors negotiated the inclusion of a provision within the Delphi-

Appaloosa EPCA (approved by this Court on August 2, 2007 (Docket No. 8856)) and the

Debtors' proposed plan of reorganization which provides that customer obligations will be

classified as "Flow-Through Claims"; that is, claims that will be unimpaired and satisfied in the

ordinary course of business, subject to the preservation and flow-through of all estate rights,

claims, and defenses with respect to such claims.

15.        Consistent with the Customer Programs Order entered by this Court on

October 14, 2005 (Docket No. 221) and the proposed treatment set forth in Delphi's proposed

plan of reorganization and the Delphi-Appaloosa EPCA, this Motion seeks authorization and

approval for the Debtors to settle for approximately $200 million certain warranty claims

asserted by GM and to expunge with prejudice the unliquidated component of all such claims

asserted in GM's proof of claim, as more fully set forth in the Warranty Settlement Agreement.[11]

The claims that are the subject of the Warranty Settlement Agreement have arisen pursuant to

various master and purchase agreements and supply contracts between GM and/or GM's

---

[11]    To the extent there exists any conflict between this Motion and the terms of the Warranty Settlement
         Agreement, the Warranty Settlement Agreement will govern and control the parties' rights and obligations.

affiliates and Delphi and its subsidiaries for the purchase of automotive parts and systems.  GM

has asserted that it incurred costs and suffered damages arising from certain customer warranty

claims and/or recall campaigns related to allegedly non-conforming parts and systems.

Specifically, GM filed a proof of claim on July 31, 2006 alleging that it expected to incur

approximately $530 million in damages plus unliquidated amounts on account of these Claims,

and that it would incur additional costs over time ("GM's Proof of Claim").

16.       During recent discussions with GM regarding the comprehensive

settlement agreements that are incorporated into the Debtors' proposed plan of reorganization,

the parties expressed interest in resolving known warranty claims expeditiously.  The Debtors

were interested in pursuing negotiations because without a resolution of the GM warranty claims,

the Debtors would emerge from chapter 11 with little or no certainty as to the quantification of

GM's asserted claims.[12]  Accordingly, Delphi vigorously negotiated with GM to resolve these

claims.

17.       During the negotiation to resolve the warranty claims, GM advised Delphi

that since July 31, 2006 the aggregate amount of the warranty claims had increased substantially

from the aggregate amount asserted in GM's Proof of Claim.  GM attributed this increase in part

to the passage of time since the filing of its proof of claim and in part to facts that were not

previously known.

<u>Relief Requested</u>

18.       By this Motion, the Debtors seek entry of an order under section 363(b) of

the Bankruptcy Code and Bankruptcy Rules 6004 and 9019 authorizing and approving Delphi's

---

[12]    Even if the Debtors were unable to emerge from chapter 11 in their anticipated time frame, the Debtors believe
that entry of the proposed form of order now is warranted because the value of this settlement to the Debtors is
substantial in light of the cost and uncertainty of litigation and plus the added benefit of saving the Debtors'
estates hundreds of millions of dollars of potential liability.

entry into and performance under that certain Warranty, Settlement, and Release Agreement with

GM (the "Warranty Settlement Agreement"), which (i) settles all outstanding warranty claims

and issues related to a component or assembly supplied by Delphi to GM that are (a) known by

GM as of August 10, 2007 (except for two potential claims),[13] (b) believed by GM to be Delphi's

responsibility in whole or in part, and (c) in GM's normal investigation process[14] as of August

10, 2007, or which should have been in that process, but were withheld for the purpose of

pursuing a claim against Delphi, (ii) limits the liability related to certain other warranty claims

that have become known by GM on or after June 5, 2007 (together with (i), the "Warranty

Claims")[15], and (iii) prohibits both GM and Delphi from initiating any action against the other

related to any of the warranty claims that are settled in the agreement, all as more fully set forth

below.[16]

---

[13]    The existence of these two potential claims are in no way inconsistent with the Warranty Settlement Agreement
because, as set forth in the agreement, GM has not yet determined whether Delphi has any responsibility with
respect to these claims.

[14]    The Warranty Settlement Agreement provides, in pertinent part:

> Where excessive warranty expenses or recall expenses are incurred and GM believes there
> may be supplier responsibility for such warranty or recall expenses, GM's normal process is to
> actively investigate the issue and work with the supplier to determine the root cause of the
> issue and responsibility for the excessive warranty expenses or recall expenses.

Warranty Settlement Agreement, § 1.10 (GM Representations).

[15]    The Warranty Claims are identified in the Warranty Settlement Agreement and the exhibits thereto.

[16]    Section 1.10 of the Warranty Settlement Agreement provides, in pertinent part:

> This Section shall, however, foreclose GM from bringing a claim against Delphi if it is shown
> that on or before August 10, 2007, (i) GM did not know about the claim, (ii) the amount of the
> claim then exceeded $1 million, or GM then believed the claim would exceed $1 million, (iii)
> the claim is then in GM's investigation process or GM determined that it should have been in
> GM's investigation process but excluded it from that process for the purpose of pursuing a
> claim against Delphi, and (iv) GM then believed or reasonably should have believed that
> Delphi had some responsibility for the claim.

Warranty Settlement Agreement, § 1.10 (GM Representations).

<u>Basis For Relief</u>

19.    In the exercise of their business judgment, to resolve a highly contentious

issue with Delphi's largest customer, and to avoid the costs, delay, and uncertainty of litigation,

the Debtors have agreed to settle all known outstanding GM Warranty Claims pursuant to the

Warranty Settlement Agreement.  As set forth below, under the terms of the Warranty Settlement

Agreement, a copy of which is attached hereto as <u>Exhibit A</u>,[17] each of the parties obtains

valuable rights and provides valuable releases to the other.

20.    The following is a summary of the salient terms and conditions of the

agreement:

<u>Consideration</u>.  The settled claims would be settled for (i) an estimated $130
million to be paid in cash over time and (ii) an estimated $70 million[18] by the
delivery of replacement product to GM.

<u>Right To Pursue Actions</u>.  With respect to certain of the settled claims, Delphi
would retain the right to pursue certain actions against the relevant manufacturers
and share 50% of any gross recovery with GM, subject to a carve-out in one
instance,[19] that it obtains from such manufacturers.

<u>Waiver Of Contribution And Covenant Not To Sue</u>.   GM would waive any right
that it has or may have in the future to sue or otherwise pursue Delphi and/or its
affiliates for contribution related to certain claims or the facts underlying those
claims.  If GM and Delphi are named in a lawsuit, and the lawsuit proceeds to
trial, Delphi would be free to assert all defenses, including those defenses adverse
to GM.  GM would take no affirmative acts or cooperate with any third party to

---

[17]    Certain sensitive terms of the Warranty Settlement Agreement were redacted.  A complete copy of the Warranty
Settlement Agreement has been provided to the Statutory Committees, the New Plan Investors, the U.S.
Trustee, and this Court.  In addition, as set forth in the Order Under 11 U.S.C. § 107(b) And Fed. R. Bankr. P.
9018 Authorizing Debtors To File Redacted Version Of Warranty Settlement Agreement (Docket No. 9268), a
complete and unredacted copy of the Warranty Settlement Agreement is available to parties-in-interest upon
request, provided that the requesting party is affected by the settlement and the requesting party and the Debtors
execute a confidentiality agreement that is acceptable to Delphi, in its sole discretion.

[18]    $70 million represents the anticipated costs associated with the delivery of replacement product contemplated
by the Warranty Settlement Agreement.  Nevertheless, the Warranty Settlement Agreement provides the upper
limit with respect to such anticipated costs.

[19]    The Warranty Settlement Agreement provides that, with respect to one category of claims, Delphi would share
50% of any gross recovery with GM, but only to the extent that such gross recovery exceeds $8 million.
Warranty Settlement Agreement, § 3.3.

11

sue, add, and/or join Delphi as part of any suit or action related to these claims.
Each of the parties would not initiate against the other any action related to any
settled claims or the facts underlying such settled claims.  Both GM and Delphi
would agree that the Warranty Settlement Agreement could be pled by either
party as a complete defense to any claim or entitlement related in any way to the
settled claims or the facts underlying the settled claims.

Release.  Each of the parties would fully and forever release the other and its
affiliates from any and all claims, actions, demands, obligations, and lawsuits of
any kind or description whatsoever, and any compensation or damages
whatsoever, including but not limited to incidental, consequential, compensatory,
and exemplary damages relating in any way to the settled claims or any and all
claims, damages, actions, demands, obligations, and lawsuits that could have been
brought related to the underlying subject matter of the settled claims.[20]  Affiliates
and entities acting or purporting to act on behalf of GM or Delphi would be
limited to affiliates and entities for which each respective company has
management control.

Proof Of Claim.  Pursuant to the Warranty Settlement Agreement, Delphi has
advised GM that upon entry of an order approving the agreement, the claims
agent would be directed (a) to reduce the liquidated component relating to
warranty claims asserted in GM's Proof of Claim by $530,081,671, which
includes, without limitation, the personal injury claims related to warranty claims
asserted in GM's Proof of Claim, and (b) to expunge with prejudice the
unliquidated component relating to warranty claims asserted in GM's Proof of
Claim.  Nothing contained in the agreement would be construed to reduce any
amounts to be paid to GM pursuant to the settlement agreement and/or
restructuring agreement incorporated in the Debtors' proposed plan of
reorganization; except that GM would not receive any further consideration,
except as explicitly provided in the agreement, on account of those warranty
claims settled pursuant to the Warranty Settlement Agreement.

Jurisdiction.  All actions brought, arising out of, or related to the Warranty
Settlement Agreement would be brought in the Bankruptcy Court, and the
Bankruptcy Court would retain exclusive jurisdiction to determine any and all
such actions.   The Parties irrevocably and unconditionally consent to submit to
the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating
to the agreement and the transactions contemplated thereby (and agree not to
commence any litigation relating thereto except in the Bankruptcy Court).  To the
extent the Bankruptcy Court declines jurisdiction, the sole remedy for any alleged
breach of the agreement would be to file suit in an appropriate Michigan State
Court located in Oakland County, Michigan.

---

[20]    GM has asserted setoff and/or recoupment claims with respect to certain Warranty Claims and/or recall
campaigns.  The Warranty Settlement Agreement resolves any and all such claims that are settled under the
terms of the Warranty Settlement Agreement.

12

Payment.  Delphi would pay the amounts due under Sections 3.1, 3.2, 3.3, and 3.4 of the Warranty Settlement Agreement on or before November 1, 2007, by wire transfer in accordance with instructions to be provided by GM; except that at Delphi's election Delphi could defer these payments until it receives payments from GM, at or about the time of its emergence from bankruptcy, pursuant to the proposed comprehensive settlement agreement and/or restructuring agreement and that is incorporated into the proposed plan of reorganization, and in the event of such a deferral GM would set off these payments against the amounts then payable to Delphi by GM.  In the event Delphi elects to defer these payments, GM would receive interest at the rate of 6% per annum on the payment from November 1, 2007 until paid by Delphi or set off against amounts payable by GM.

21.    The Warranty Settlement Agreement resolves the Warranty Claims for an amount estimated by Delphi to be approximately $200 million.  Warranty Claims include, without limitation, all warranty obligations asserted in GM's Proof of Claim.  Moreover, for the avoidance of doubt, the settlement of a Warranty Claim includes the settlement of unreported claims within a category of claims resolved by the Warranty Settlement Agreement.  For example, if a particular consumer or customer has a defective part that has not yet been reported to GM (i.e., the end user has not yet brought his or her vehicle in for repair) but the type of warranted defect in the make, model, and year of vehicle is known and is disclosed in the Warranty Settlement Agreement and GM has determined that Delphi is responsible, in whole or in part, for the defect, then the liability related to such part would be resolved pursuant to the Warranty Settlement Agreement.  Moreover, pursuant to the Warranty Settlement Agreement, GM would be prevented from bringing certain warranty or recall claims not disclosed in the agreement, as set forth in Section 1.10 of the Warranty Settlement Agreement.

22.    This Motion and the relief requested hereby is particularly important to the Debtors because honoring customer obligations such as the Warranty Claims is critical to the Debtors' reputation and these types of claims are typically satisfied by Delphi and its peers in the

ordinary course of business.  As set forth in the Debtors' first-day "Customer Programs" motion,

in the ordinary course of their businesses the Debtors engage in certain practices to develop and

sustain their positive reputation with their customers and in the marketplace for their products.

Such practices include, among others, warranty programs which are designed to retain current

customers, attract new ones, and ultimately enhance revenue and profitability.  Although the

Debtors believe that entry into the Warranty Settlement Agreement is an ordinary course

transaction that is permitted under the Customer Programs Order, in light of the substantial

aggregate amount of the Warranty Claims, the settlement amount, and the fact that GM is the

counterparty to the agreement, the Debtors filed this Motion out of an abundance of caution.  As

set forth herein, in the exercise of their business judgment, the Debtors have determined that

execution of and performance under the Warranty Settlement Agreement is in the best interests

of the Debtors and their estates.

          23.      Delphi and GM bargained in good faith to arrive at the terms and

conditions of the Warranty Settlement Agreement.  The Debtors estimate that the proposed

warranty settlement will save their estates hundreds of millions of dollars in potential liability

which otherwise would flow through unimpaired under the terms of the Debtors' proposed plan

of reorganization.  Simply stated, the Debtors believe that the settlement is a good compromise.

If litigated, the warranty dispute could be materially more expensive to the Debtors.  In addition,

the settlement avoids potentially costly arbitrations or litigations and the threat of further

warranty litigation and disputes related to the settled claims.  Furthermore, and significantly, the

Warranty Settlement Agreement resolves a very contentious issue with Delphi's largest customer.

If allowed to continue, this dispute could further impede the Debtors' reorganization efforts.

Thus, the Debtors believe it would be prudent to enter into the Warranty Settlement Agreement

and to resolve its disputes with GM regarding Warranty Claims at this time.  The Debtors believe

that the Warranty Settlement Agreement with GM should be approved.

Applicable Authority

24.     By this Motion, the Debtors respectfully request the entry of an order

under Rule 9019(a) of the Bankruptcy Rules approving the Warranty Settlement Agreement and

the settlement terms contained therein.  Bankruptcy Rule 9019 provides, in relevant part, that

"[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise

or settlement."  Bankruptcy Rule 9019(a).  Settlements and compromises are "a normal part of

the process of reorganization," Protective Comm. for Indep. Stockholders of TMT Trailer Ferry,

Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 308 U.S.

106, 130 (1939)); see also In re Adelphia Comm'ns Corp., 327 B.R. 143, 159 (decision to accept

or reject a settlement lies within sound discretion of bankruptcy court), adhered to on

reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

25.     Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate

when the compromise is fair and equitable and is in the best interests of a debtor's estate.  See,

e.g., TMT Trailer Ferry, 390 U.S. at 424; Adelphia Comm'ns, 327 B.R. at 159 ("The settlement

need not be the best that the debtor could have obtained.  Rather, the settlement must fall 'within

the reasonable range of litigation possibilities.'") (citations omitted) (quoting In re Penn Centr.

Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979); Nellis v. Shugrue, 165 B.R. 115, 121

(S.D.N.Y. 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is

in the best interest of an estate before approving it.").  In general, compromises in the bankruptcy

context should be approved unless they "'fall below the lowest point in the range of

15

reasonableness.'"  Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983)

(citation omitted); In re Adelphia Comm'ns Corp., 327 B.R. at 159.

26.     The Supreme Court in TMT Trailer Ferry set forth the following factors

that courts should consider in determining whether a proposed settlement or compromise is in the

best interests of a debtor's estate:  (a) the probability of the debtor's success in the litigation, (b)

the difficulties associated with collection, (c) the complexity of the litigation, and the attendant

expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors.

TMT Trailer Ferry, 390 U.S. at 424-25; see also Nellis, 165 B.R. at 122; Fry's Metals, Inc. v.

Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002).

27.     Courts in this district have further elaborated on these factors to consider,

including, inter alia, (a) the balance between the likelihood of plaintiff's or defendants' success

should the case go to trial vis-à-vis the concrete present and future benefits held forth by the

settlement without the expense and delay of a trial and subsequent appellate procedures, (b) the

prospect of complex and protracted litigation if the settlement is not approved, (c) the

competency and experience of counsel who support the settlement, and (d) the extent to which

the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.

Adelphia Comm'ns, 327 B.R. at 159-60; accord In re Texaco Inc., 84 B.R. 893, 902 (Bankr.

S.D.N.Y. 1988).

28.     The bankruptcy court need not determine that all of the foregoing criteria

favor approval of a compromise, and the proposed compromise need not be the best agreement

that the debtor could have achieved under the circumstances.  See Adelphia Comm'ns, 327 B.R.

at 159-60; see also Penn Centr., 596 F.2d at 1114.  Instead, the court's proper "role is to

determine whether the settlement as a whole is fair and equitable," In re Lee Way Holding Co.,

120 B.R. 881, 890 (Bankr. S.D. Ohio 1990), and falls "'within the reasonable range of litigation

possibilities.'"  In re Telesphere Comm'ns, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994)

(citation omitted).  To that end, courts should not substitute their own judgment for that of the

debtor, but rather should "'canvass the issues.'"  Adelphia Comm'ns, 327 B.R. at 159 (quoting

W.T. Grant Co., 699 F.2d at 608); accord Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust

Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd sub nom. Sobchack

v. Am. Nat'l Bank & Trust Co., 17 F.3d 600 (2d Cir. 1994).

29.     The Warranty Settlement Agreement should be approved under

Bankruptcy Rule 9019(a) because the terms of the settlement between Delphi and GM are fair

and equitable, and are in the best interests of the Debtors and their estates.  Most significantly,

the Warranty Settlement Agreement provides for the immediate resolution of the Warranty

Claims, and the Debtors estimate that the settlement would save the Debtors' estates significant

potential liability which absent this settlement could flow through the Debtors' reorganization

pursuant to the Debtors' proposed plan of reorganization.  Moreover, the proposed settlement

falls well within the reasonable range of litigation possibilities.  The Warranty Settlement

Agreement resolves a difficult dispute between GM and Delphi, and provides certainty and

finality with respect to the Warranty Claims.  Thus, the Debtors believe that resolving the

Warranty Claims pursuant to the terms of the Warranty Settlement Agreement is a fair and

reasonable compromise of this matter.

30.     In addition, because the proposed settlement is in the best interests of the

Debtors, their estates, their creditors, and other parties in interest, entering into the Warranty

Settlement Agreement represents reasonable business judgment on the part of the Debtors and

thus is appropriate under section 363(b)(1).[21]  Accord, e.g.,  In re Orion Pictures Corp., 4 F.3d
1095, 1098-99 (2d Cir. 1993); In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y.
1992).

Notice

31.    Notice of this Motion has been provided in accordance with the
Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,
9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,
And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Amended
Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m),
9006, 9007, and 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case
Management, And Administrative Procedures, entered October 26, 2006 (Docket No. 5418).  In
light of the nature of the relief requested, the Debtors submit that no other or further notice is
necessary.

Memorandum Of Law

32.    Because the legal points and authorities upon which this Motion relies are
incorporated herein, the Debtors respectfully request that the requirement of the service and
filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy
Rules for the United States Bankruptcy Court for the Southern District of New York be deemed
satisfied.

---

[21]    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that the debtor in possession, "after notice
and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . .."
11 U.S.C. § 363(b)(1).

WHEREFORE Delphi respectfully request that the Court enter an order (a)

authorizing and approving Delphi's entry into and performance under the Warranty Settlement

Agreement with GM and (b) granting Delphi such other and further relief as is just.

Dated:        New York, New York
              September 7, 2007

                                SKADDEN, ARPS, SLATE, MEAGHER
                                & FLOM LLP


                                By:     /s/ John Wm. Butler, Jr.
                                        John Wm. Butler, Jr. (JB 4711)
                                        John K. Lyons (JL 4951)
                                        Ron E. Meisler (RM 3026)
                                333 West Wacker Drive, Suite 2100
                                Chicago, Illinois 60606
                                (312) 407-0700

                                            - and -


                                By:     /s/ Kayalyn A. Marafioti
                                        Kayalyn A. Marafioti (KM 9632)
                                        Thomas J. Matz (TM 5986)
                                Four Times Square
                                New York, New York 10036
                                (212) 735-3000

                                Attorneys for Delphi Corporation, et al.,
                                 Debtors and Debtors-in-Possession

19

**Exhibit A**
**<u>Warranty Settlement Agreement</u>**