**Hearing Date And Time: September 27, 2007 At 10:00 a.m.**
**Objection Deadline: September 20, 2007 At 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
     In re                              :        Chapter 11
                                        :
DELPHI CORPORATION, et al.,             :        Case No. 05-44481 (RDD)
                                        :
                        Debtors.        :        (Jointly Administered)
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION UNDER 11 U.S.C. § 105(a) AND 546 AND FED. R. BANKR. P. 9019 FOR ORDER
AMENDING AND RESTATING AMENDED FINAL ORDER UNDER
11 U.S.C. §§ 362, 503, AND 546 AND FED. R. BANKR. P. 9019 ESTABLISHING
PROCEDURES FOR THE TREATMENT OF RECLAMATION CLAIMS

("MOTION TO AMEND RECLAMATION PROCEDURES")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this motion (the "Motion")[1] for an order under 11 U.S.C. §§ 105(a) and 546

amending and restating the Amended Final Reclamation Order Under 11 U.S.C. §§ 362, 503,

And 546 And Fed. R. Bankr. P. 9019 Establishing Procedures For The Treatment of Reclamation

Claims, entered November 4, 2005 (Docket No. 881) (the "Amended Final Reclamation Order"),

to authorize the Debtors to resolve reclamation claims in conjunction with the Debtors' Joint Plan

of Reorganization (as subsequently amended, supplemented, or otherwise modified, the "Plan")

filed on September 6, 2007 and offer holders of reclamation claims the opportunity to elect the

treatment afforded under the Plan to allowed general unsecured claims for the amount of such

reclamation claims (which includes postpetition interest).  In support of this Motion, the Debtors

respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their

businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections

1107(a) and 1108.  The Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

---

[1]    All capitalized terms not defined herein have the meanings assigned to them in the Motion For Order Under 11
U.S.C. §§ 362, 503, And 546 And Fed. Bankr. P. 9019 Establishing Procedures For Treatment Of Reclamation
Claims.

committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S.

Trustee appointed an official committee of equity holders (the "Equity Committee," and together

with the Creditors' Committee, the "Statutory Committees").

3.      No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S.

Trustee appointed an official committee of equity holders (the "Equity Committee," and together

with the Creditors' Committee, the "Statutory Committees").

4.      The statutory predicates for the relief requested herein are sections 105(a)

and 546 of the Bankruptcy Code and rule 9019 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as

of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately

$15.4 billion.[2]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues and the thirteenth largest public company

business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors and continue their business operations without supervision from the Bankruptcy Court. [3]

---

[2]   The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
      and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27,
      2007.

[3]   On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core
      automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency
      proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso
      receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of
      which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31,
      2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing
      footprint and to lower its overall cost structure.

6.      The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer ("OEM").

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

C.      Events Leading To The Chapter 11 Filing

8.      Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications. Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

    9.    The Debtors believe that the Company's financial performance

deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which

have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production

environment for domestic OEMs resulting in the reduced number of motor vehicles that GM

produces annually in the United States and related pricing pressures, and (iii) increasing

commodity prices.

    10.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements. Because discussions

with its major stakeholders had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its

transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

    11.    On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations. The Debtors stated that they needed to focus on five key areas:[4] first, modifying the

---

[4]    In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their
execution of an equity purchase and commitment agreement with certain investors and a plan framework
support agreement with those investors and GM. On July 9, 2007, Delphi confirmed that it had formally
terminated the equity purchase and commitment agreement and related plan framework support agreement but
that it expected to enter into new framework agreements with plan investors presently. Subsequently, on July
18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment

Company's labor agreements to create a competitive arena in which to conduct business;[5]

second, concluding their negotiations with GM to finalize GM's financial support for the

Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[6]

third, streamlining their product portfolio to capitalize on their world-class technology and

market strengths and make the necessary manufacturing alignment with their new focus;[7] fourth,

transforming their salaried workforce to ensure that the Company's organizational and cost

---

agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors"). Under the Delphi-Appaloosa EPCA, the New Plan Investors agreed to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization. This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.

[5]    Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM that (a) modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the UAW, and its various locals, (b) provides that GM will undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate these modifications, and (c) modifies retiree welfare benefits for certain UAW-represented retirees of the Debtors. This agreement, which was approved by this Court on July 19, 2007, should permit the Debtors to continue to implement their transformation plan and to develop, prosecute, confirm, and consummate a plan of reorganization. On August 6, 2007, similar agreements were reached with the International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America and its local unions, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers. Such agreements were approved by this Court on August 16, 2007. On August 16, 2007, Delphi also reached a similar agreement with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and USW Local 87L, which was approved by this Court on August 29, 2007.

[6]    On July 9, 2007, Delphi confirmed that its discussions with GM on a comprehensive settlement agreement had entered the documentation phase and that it expected that a settlement with GM would be incorporated into the Debtors' plan of reorganization rather than filed with this Court for separate approval.

[7]    In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants. The Debtors have been working to divest non-core assets so as to maximize the value of their estates for stakeholders. During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, and obtained court approval for the sale of substantially all of the assets of their brake hose, catalyst, and Saltillo, Mexico brake plant businesses. In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

6

structure is competitive and aligned with its product portfolio and manufacturing footprint;[8] and

devising a workable solution to their current pension situation.[9]

E.        The Debtors' Plan Of Reorganization

12.        On September 6, 2007, the Debtors reached another key milestone in their

chapter 11 cases by filing their Joint Plan Of Reorganization Of Delphi Corporation And Certain

Affiliates, Debtors And Debtors-In-Possession (the "Plan").  The Plan is based upon a series of

global settlements and compromises that involve every major constituency in the Debtors'

reorganization cases.  Indeed, the Debtors, the Debtors' principal U.S. labor unions, GM, the

Statutory Committees, and the lead plaintiffs in certain securities actions (on behalf of holders of

various claims based on alleged violations of federal securities laws and the Employee

Retirement Income Security Act of 1974, as amended) all have contributed to global settlements

and compromises that provide for a recovery through a plan distribution amounting to the

principal amount of the claim plus accrued interest at a negotiated plan value for general

unsecured creditors, and agreed upon distributions to other classes of creditors and interests.  The

Plan is supported by the Creditors' Committee on behalf of unsecured creditors, the Equity

---

[8]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture. The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.  To ensure that their organizational and cost structure is competitive, the Debtors obtained an Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order"). The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[9]    To that end, on May 31, 2007, the Bankruptcy Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 plan year funding waivers, which were approved by the IRS, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Plans").  On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively.

Committee on behalf of holders of Delphi's common stock, and GM. A hearing will be held on October 3, 2007 to approve the Debtors' solicitation procedures and disclosure statement with respect to the Plan. The Debtors will seek to have a hearing on confirmation of the Plan on November 19, 2007. The Debtors expect to emerge from these chapter 11 cases on December 31, 2007.

13.    Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

F.    Existing Reclamation Procedures

14.    On October 8, 2005, the Debtors filed the Motion For Order Under 11 U.S.C. §§ 362, 503, And 546 And Fed. Bankr. P. 9019(a) Providing Administrative Treatment Expense For Certain Holders Of Valid Reclamation Claims And (b) Establishing Procedures For Resolution And Payment Of Reclamation Claims (Docket No. 21) (the "First Reclamation Motion"), which sought entry of an order (i) instituting uniform procedures (the "Reclamation Procedures") under section 546 of the Bankruptcy Code and Bankruptcy Rule 9019 for the treatment of reclamation claims, (ii) authorizing the Debtors to conduct settlement negotiations to reconcile and pay each such reclamation claim, and (iii) enjoining sellers of goods with a statutory or common law right to reclamation ("Sellers") from pursuing payment of reclamation claims by alternative means. This Court granted the motion and on October 13, 2005 entered the Order Under 11 U.S.C. §§ 362, 503, and 546 and Fed.R.Bankr.P. 9019 Establishing

8

Procedures for the Treatment of Reclamation Claims (Docket No. 230) which order was

subsequently amended on November 4, 2005 by the Amended Final Reclamation Order.

15.    Among other things, the Amended Final Reclamation Order required the

Debtors to provide each Seller with a so-called Statement of Reclamation setting forth the extent

and basis, if any, upon which the Debtors believed the Seller's reclamation claim was not legally

valid.  In addition, paragraph 2(b)(ii) of the Amended Final Reclamation Order required that

each such Statement of Reclamation identify any defenses that the Debtors chose to reserve.  In

accordance with paragraph 2(b)(ii) of the Amended Final Reclamation Order, the Debtors

reserved the right in the Statement of Reclamation provided to each Seller to reduce or disallow a

reclamation claim if the goods and/or the proceeds from the sale of the goods are or were subject

to a valid security interest (the "Prior Lien Defense," and together with the Debtors' other

reserved defenses, the "Reserved Defenses").[10]

### Relief Requested

16.    By this Motion, the Debtors request entry of an order under sections

105(a) and 546 of the Bankruptcy Code and Bankruptcy Rule 9019 amending and restating the

Amended Final Reclamation Order.  Specifically, the Debtors request permission to resolve

reclamation claims in conjunction with the Plan.  On September 6, 2007, the Debtors filed the

Motion for Order Approving (I) Disclosure Statement, (II) Record Date, Voting Deadline, and

Procedures for Temporary Allowance of Certain Claims, (III) Hearing Date to Consider

Confirmation of Plan, (IV) Procedures for Filing Objections to Plan, (V) Solicitation Procedures

for Voting on Plan, (VI) Cure Claim Procedures, (VII) Procedures for Resolving Disputes

---

[10]    On December 23, 2005, the Debtors filed the Motion For Order Extending The Deadline For The Debtors To Submit Statements Of Reclamation Under Fed. R. Bankr. P. 9006(b) (Docket No. 1616) (the "Extension Motion"), proposing that the time by which the Debtors were required to submit Statements of Reclamation as set forth in paragraph 2(b)(i) of the Amended Final Reclamation Order be extended by an additional 45 days. On January 5, 2006, this Court granted the relief requested in the Extension Motion (Docket No. 1747).

Relating to Postpetition Interest, and (VIII) Reclamation Claim Procedures (Docket No. 9266)

(the "Solicitation Procedures Motion") and the disclosure statement with respect to the Plan.

17.    Among other things, under the procedures proposed in the Solicitation

Procedures Motion, the Debtors propose to allow each Seller to elect for its reclamation claim

the treatment afforded to allowed general unsecured claims under the Plan (which includes

postpetition interest on the allowed amount of the claim) rather than have the Debtors seek a

judicial determination that the Sellers' reclamation claims are subject to the Prior Lien Defense.

If a Seller elects to decline the treatment afforded to general unsecured creditors, then a hearing

on that Seller's reclamation claim would be automatically adjourned to a contested hearing to be

held after the effective date of the Plan.  The parties would then litigate before this Court to

determine whether the Prior Lien Defense applies to that Seller's reclamation claim.  In addition,

the Debtors would retain all other reserved defenses with respect to such reclamation claims.

Basis For Relief

18.    The Debtors have determined that the election proposed by this Motion is

in the best interests of the debtors and their estates, and that the Sellers themselves may prefer to

elect Plan treatment for their claims.  The Plan, if confirmed, provides that allowed general

unsecured claims will be satisfied with a combination of cash and equity in the reorganized

Debtors such that the distribution to each such creditor would amount to payment of the general

unsecured claim plus postpetition interest from the Petition Date through December 31, 2007,

based on a negotiated Plan value for the new equity in the reorganized Debtors.  In contrast,

holders of administrative claims would be paid in full in cash in the ordinary course or as

otherwise agreed but would not be entitled to postpetition interest.  The Debtors propose to allow

Sellers to elect to take general unsecured claim treatment on account of their reclamation claims

because the Debtors believe that, given the proposed treatment of general unsecured claims

10

under the Plan, many, if not all, Sellers might prefer general unsecured claim treatment instead of administrative claim treatment.

19.     The Debtors further submit that the relief requested by this Motion will not prejudice the rights of any Sellers with respect to their reclamation claims.  To the extent a Seller does not elect general unsecured claim treatment, that Seller will have the opportunity to seek administrative priority treatment for its reclamation claim, to the extent such claim is valid, at a contested hearing on the Debtors' exercise of the Prior Lien Defense.

20.     Finally, the Debtors contend that deferring such a contested hearing until after emergence is in the best interests of the Debtors, their estates, and parties-in-interest. Litigating the Prior Lien Defense when the Company is preparing to emerge from chapter 11 would put an undue burden on the Debtors and would impair their ability to successfully reorganize in a timely manner.

### Proposed Procedures For Reclamation Claim Election

21.     As described in the Solicitation Procedures Motion, to effect this election, the Debtors propose to send the Sellers, by October 29, 2007, a separate personalized notice which would identify each such Seller's reclamation claim and permit the Seller to choose the treatment for its reclamation claim (the "Reclamation Election Notice").  A copy of the proposed form of Reclamation Election Notice is attached as Exhibit 15 to the Solicitation Procedures Motion and also attached as Exhibit A hereto.  If a Seller elects Plan treatment for its claim, the Debtors would nonetheless reserve all rights in law and in equity to contest the amount of a Seller's reclamation claim to the extent such amount has yet to be resolved pursuant to the Amended Final Reclamation Order.

11

22.     To contest the proposed general unsecured treatment, the Seller would be required to so mark and return the Reclamation Election Notice by November 9, 2007.  If a Seller makes no election on the Reclamation Election Notice, or affirmatively elects the treatment afforded general unsecured claims under the Plan, the Seller would receive a distribution on account of its reclamation claim in Plan currency with postpetition interest to the extent such reclamation claim is allowed, and would be deemed to have waived any right to seek administrative priority status for its reclamation claim.  Notwithstanding the treatment afforded reclamation claims under these procedures, holders of reclamation claims will not receive any voting rights on the Plan on account of their reclamation claims.

Applicable Authority

A.     This Court Is Authorized To Amend The Existing Reclamation Procedures

23.     Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a), this Court is authorized to amend the Reclamation Procedures.  "'Section 105 is an omnibus provision phrased in general terms as to be the basis for a broad exercise of power in the administration of a bankruptcy case.'"  In re Elmendorf, 345 B.R. 786, 502 (Bankr. S.D.N.Y. 2006) (quoting In re Flores, 291 B.R. 44, 54 (Bankr. S.D.N.Y. 2003)).

B.     The Debtors Should Be Permitted To Assert The Prior Lien Defense In Conjunction With The Plan

24.     Reclamation rights are generally governed by section 2-702(2) of the Uniform Commercial Code (the "UCC").  Section 2-702(2) allows a seller of goods, upon discovering that the buyer has received the goods on credit while insolvent, to reclaim the goods upon a demand made within ten days after the buyer's receipt of the goods.  Under Bankruptcy

12

Code section 546(c), a seller of goods to a debtor, in the ordinary course of the seller's business,

retains its statutory or common law right to reclaim the goods so long as it complies with the

additional requirements of section 546(c).

25.    The Amended Final Reclamation Order recognizes these rights.  Under that

order, the Debtors were required to tender a Statement of Reclamation in response to each

Seller's Reclamation Demand that the Debtors received.  In each Statement of Reclamation, the

Debtors set forth the extent and basis upon which the Debtors believed that the underlying

reclamation claim was not legally valid and identified the defenses they chose to preserve.

26.    The reclamation claims of all Sellers who (i) returned the Statement of

Reclamation by the Reconciliation Deadline and indicated their assent to the Reconciled

Reclamation Claim as contained in the Statement of Reclamation, (ii) failed to return the

Statement of Reclamation by the Reconciliation Deadline, and (iii) returned the Statement of

Reclamation by the Reconciliation Deadline but failed to indicate either assent or dissent, were

all deemed to hold an Allowed Reclamation Claim in the amount of the Reconciled Reclamation

Claim.  See Amended Final Reclamation Order ¶ 2(c)(i).  The Allowed Reclamation Claims,

however, remain subject to the Debtors' Reserved Defenses.

27.    The Debtors preserved certain Reserved Defenses, including the Prior

Lien Defense, under section 546 of the Bankruptcy Code and section 2-702(2) of the UCC in

both the Amended Final Reclamation Order and the Reclamation Statements.  The basis of the

Debtors' Prior Lien Defense is that the rights of a reclamation claimant under Bankruptcy Code

section 546(c) are "subject to the prior rights of a holder of a security interest in such goods or

the proceeds thereof."  11 U.S.C. § 546(c).

28.     On January 5, 2007, this Court entered the Order Under 11 U.S.C. §§ 105,

361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And Fed. R. Bankr. P.

2002, 4001, And 6004(g)(I) Authorizing Debtors to Obtain Post-Petition Financing And (II)

Authorizing Debtors To Refinance Secured Post-Petition Financing And Prepetition Secured

Debt (Docket No. 6461) (the "DIP Refinancing Order"), which provides for the simultaneous

release of the prepetition secured lenders' liens upon full repayment of the obligations to the

prepetition lenders from the postpetition financing.  The DIP Refinancing Order also grants a

lien to the debtor-in-possession lenders on all prepetition and postpetition property of the

Debtors that was unencumbered after the prepetition secured lender's liens were released.  See

DIP Refinancing Order ¶¶ 11(a), 6(a).

29.     This Court previously stated that "a reclaiming creditor does not have a

right of reclamation until it is established that either the secured creditor, with a prior interest in

its particular asset, has released the asset or has been paid in full."  See Transcript of Hearing on

August 17, 2006, page 35, lines 17-21.[11]  Therefore, the value of a reclamation claim will be

determined by the decision that a secured creditor makes with respect to its lien on the reclaimed

goods.  See Galey & Lord Inc. v. Arley Corp. (In re Arlco, Inc.), 239 B.R. 261, 272 (Bankr.

S.D.N.Y. 1999).

30.     Courts in this jurisdiction have held that the simultaneous release of a

prepetition lenders' lien and the grant of a postpetition lien to the DIP lenders of the Debtors'

prepetition and postpetition property constitutes an integrated transaction rendering the

reclamation claims valueless.  In re Dana Corporation, 367 B.R. 409, 413 (Bankr. S.D.N.Y.

2007) (finding that integrated transaction rendered reclamation claims valueless, even when the

---

[11]    A copy of an excerpt from the August 17, 2006 transcript is attached as Exhibit B hereto.

prepetition secured lenders were paid in full); In re Dairy Mart Convenience Stores, 302 B.R. 128, 134 (Bankr. S.D.N.Y. 2003) (holding that rollover lien pursuant to DIP refinancing order is an integrated transaction).

31.    Indeed, the Debtors submit that amending the Reclamation Procedures to invoke the Prior Lien Defense is necessary and appropriate to carry out the provisions of section 546(c) of the Bankruptcy Code and the Amended Final Reclamation Order and is therefore in the best interests of the Debtors, their respective estates, and creditors. Invoking the Prior Lien Defense will benefit the Debtors by preserving cash as the Debtors prepare to emerge from chapter 11. Offering each Seller the option to elect the treatment afforded to allowed general unsecured claims for the amount of its reclamation claims will benefit the Debtors, estates, and creditors by lowering administrative costs associated with litigation of the Prior Lien Defense. Conducting a hearing on the Prior Lien Defense, if necessary, after the Debtors' anticipated emergence from chapter 11 will benefit the Debtors by postponing potentially distracting litigation until after the effective date of the Plan.

Notice

32.    Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered October 26, 2006 (Docket No. 5418). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

15

Memorandum Of Law

33.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that the Court enter an order (a) amending and restating the Amended Final Reclamation Order, thereby amending the procedures established for the treatment of reclamation claims and (b) granting the Debtors such other and further relief as is just.

Dated:          New York, New York
                September 7, 2007

                                        SKADDEN, ARPS, SLATE, MEAGHER
                                         & FLOM LLP


                                        By:    /s/ John Wm. Butler, Jr.
                                               John Wm. Butler, Jr. (JB 4711)
                                               John K. Lyons (JL 4951)
                                               Ron E. Meisler (RM 3026)
                                        333 West Wacker Drive, Suite 2100
                                        Chicago, Illinois 60606
                                        (312) 407-0700

                                                    - and -


                                        By:    /s/ Kayalyn A. Marafioti
                                               Kayalyn A. Marafioti (KM 9632)
                                               Thomas J. Matz (TM 5986)
                                        Four Times Square
                                        New York, New York 10036
                                        (212) 735-3000

                                        Attorneys for Delphi Corporation, et al.,
                                          Debtors and Debtors-in-Possession