Hearing Date & Time:  September 27, 2007 at 10:00 a.m.
Objection Deadline:  September 20, 2007 at 4:00 p.m.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan, III (AH 8807)
Ron E. Meisler (RM 3026)


          - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)


Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
      In re                                   :    Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :    Case No. 05-44481 (RDD)
                                              :
                        Debtors.              :    (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER APPROVING MULTIDISTRICT
LITIGATION AND INSURANCE SETTLEMENTS

("MDL AND INSURANCE SETTLEMENT APPROVAL MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this motion for an order (i) approving under 11 U.S.C. § 363(b)(1) and Fed. R.

Bankr. P. 9019 (a) an agreement that settles as to Delphi and others the securities lawsuits in the

multidistrict litigation (the "MDL") pending against Delphi and other defendants, (b) an

agreement that settles as to Delphi and others the lawsuits in the MDL alleging violations of the

Employee Retirement Income Security Act of 1974 ("ERISA"), (c) an agreement among Delphi,

certain insured officers and directors, and certain insurance carriers resolving MDL-related

insurance claims, and (d) Delphi's release of affirmative claims against its current and former

insured officers and directors relating to or arising out of alleged securities violations (which will

resolve, among other things, the derivative suits in the MDL and related derivate suits in the state

courts), (ii) certifying the Securities Class and the ERISA Class (as those terms are defined

below) for purposes of settlement and granting the class representatives certain allowed class

claims and/or interests and for no other purposes under Fed. R. Bankr. P. 9014(c) and 7023 and

Fed. R. Civ. P. 23, (iii) authorizing the class representatives to vote on behalf of their class

members with respect to the Plan and directing the class representatives to cast all votes under

their control in favor and acceptance of the Plan on behalf of their respective classes, (iv)

deeming the insurance policies covered by the insurance agreement fully exhausted and forever

discharged, (v) barring any person insured under those policies from asserting claims against the

policies, (vi) lifting the automatic stay with respect to certain documents provided by the Debtors

to the lead plaintiffs in the MDL securities action under 11 U.S.C. § 362(d)(1) and Fed. R. Bankr.

P. 4001(d), and (vii) provided that the United States Department of Labor ("DOL") determines

not to object to such relief, expunging a proof of claim filed by the DOL concerning an

investigation of potential ERISA violations and barring the DOL from instituting or maintaining

claims against any of the current or former officers or directors of Delphi arising out of or related

to the allegations in the ERISA lawsuits in the MDL.

Introduction

      1.      Delphi and certain of its current and former officers and directors have

been named as defendants in several putative class actions under the federal securities laws and

ERISA, as well as in a number of derivative actions filed by shareholders on behalf of Delphi.  In

December 2005, the Judicial Panel on Multidistrict Litigation (the "MDL Panel") issued an order

centralizing all of those federal actions in the United States District Court for the Eastern District

of Michigan (the "District Court") under the caption In re:  Delphi Corp. Securities, Derivative

and "ERISA" Litigation, Master Case No. 05-md-1725 (GER).  Over the past several months,

Delphi, other parties to the MDL, and certain insurers, with the assistance of a special master

appointed by the District Court, have conducted discussions and negotiations regarding a

settlement of the MDL.  On August 31, 2007, those discussions resulted in the following

agreements resolving the MDL as to Delphi and certain other defendants, and settling certain

insurance claims arising from the MDL and government investigations and proceedings related

to Delphi:

> - a "Stipulation and Agreement of Settlement With Certain Defendants"
>   among the lead plaintiffs in the securities portion of the MDL (the
>   "Securities Lead Plaintiffs"),[1] on behalf of themselves and a putative class;
>   Delphi, Delphi Trust I, Delphi Trust II; J.T. Battenberg III, John. G.
>   Blahnik, Robert H. Brust, Virgis W. Colbert, Alan. S. Dawes, David N.
>   Farr, Paul R. Free, Bernd Gottschalk, Susan A. McLaughlin, Oscar de
>   Paula Bernardes Neto, Cynthia A. Niekamp, John D. Opie, Roger S.

---

[1]    The lead plaintiffs are Teachers' Retirement System of Oklahoma, Public Employees' Retirement System of
Mississippi, Raiffeisen Kapitalanlage-Gesellschaft m.b.H., and Stichting Pensioenfonds ABP.  (Exhibit A
¶ 1(ee).)

Penske, Donald L. Runkle, John D. Sheehan, and Patricia C. Sueltz (the "Securities Officer and Director Defendants"); and Banc of America Securities LLC, Barclays Capital Inc., Bear Stearns & Co. Incorporated ("Bear Stearns"), Citigroup Global Markets, Credit Suisse Securities (USA) LLC ("Credit Suisse"), Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley & Co. Incorporated, UBS Securities LLC, and Wachovia Capital Markets, LLC (the "Underwriter Defendants"), a copy of which is attached to this motion as <u>Exhibit A</u> (the "Securities Stipulation"), and an accompanying "Supplemental Agreement" among the same parties that includes confidential information concerning the settlement contemplated by the Securities Stipulation;[2]

- a "Stipulation and Agreement of Settlement With Certain Defendants – ERISA Actions" among the named plaintiffs in the ERISA portion of the MDL (the "ERISA Named Plaintiffs"),[3] on behalf of themselves and a putative class; Delphi; ASEC Manufacturing General Partnership ("ASEC Manufacturing"); Delphi Mechatronic Systems, Inc. ("Delphi Mechatronic"); the Executive Committee of Delphi's Board of Directors and its members (the "Executive Committee"); Delphi's Investment Policy Committee and its members (the "Investment Policy Committee"); and Mr. Battenberg, Mr. Brust, Mr. Dawes, Ms. McLaughlin, and Mr. Opie (the "ERISA Officer and Director Defendants"), a copy of which is attached to this motion as <u>Exhibit B</u> (the "ERISA Stipulation"); and

- a "Stipulation and Agreement of Insurance Settlement" among Delphi; Mr. Battenberg, Milan Belans, Mr. Blahnik, Mr. Brust, Mr. Colbert, Mr. Dawes, Mr. Farr, Mr. Free, Mr. Gottschalk, Peter H. Janak, Judith Kudla, Ms. McLaughlin, Mr. Bernardes, Ms. Niekamp, Mr. Opie, Mr. Penske, Catherine Rozanski, Mr. Runkle, Mr. Sheehan, and Ms. Sueltz (the "Insurance Officers and Directors"); and National Union Fire Insurance Company of Pittsburgh, Pa., Zurich American Insurance Company, Federal Insurance Company, Twin City Fire Insurance Company, American Casualty Company of Reading PA, Arch Insurance Company, St. Paul Mercury Insurance Company, Great American Insurance Company, Allied World Assurance Company LTD, Endurance Specialty Insurance Ltd., and Starr Excess International (the "Insurers"), a copy of which is attached to this motion as <u>Exhibit C</u> (the "Insurance Stipulation").

---

[2]   To maintain confidentiality, the Supplemental Agreement will not be filed with this Court, but will be provided to this Court upon request for an in camera review.

[3]   The named plaintiffs are Gregory Bartell, Thomas Kessler, Neal Folck, Donald McEvoy, Irene Polito, and Kimberly Chase-Orr.  (<u>Exhibit B</u> ¶ 1(cc).)

2.      It is a condition to the settlements contemplated by the stipulations that that the securities lawsuits and the ERISA lawsuits be settled contemporaneously and that the stipulations be approved by this Court and the District Court.

3.      In addition to these stipulations, Delphi's Board of Directors (the "Board") decided on August 7, 2007 to release affirmative claims by Delphi against current and former officers and directors of Delphi (including officers and directors who are not parties to the Securities Stipulation, the ERISA Stipulation, or the Insurance Stipulation), the Underwriter Defendants, and General Motors Corporation ("GM") and its affiliates that relate to or arise out of alleged violations of the federal securities laws from March 7, 2000 through March 3, 2005, but reserved the right to assert such claims as a defense or setoff to claims asserted by such officers and directors.  This decision was based on the findings and recommendations of a special committee of the Board (the "Special Committee") and the Board's determination that the release would facilitate a final resolution of the MDL and related derivative actions in the state courts, particularly as it relates to the Insurers' contribution of insurance proceeds as part of the settlement.

4.      Under the stipulations, the Securities Lead Plaintiffs, as representatives of the Securities Class (as defined below), will be granted an allowed claim and/or interest in these cases in the aggregate face amount of $204.0 million, without further provision for accrued interest, and ERISA Named Plaintiffs, as representatives of the ERISA Class (as defined below), will be granted an allowed interest in these cases in the face amount of $24.5 million, also without further provision for accrued interest.  The Securities Lead Plaintiffs' allowed claim and/or interest and the ERISA Named Plaintiffs' allowed interest will be satisfied with consideration in the same form and ratio as the consideration distributed to general unsecured

5

creditors under the Plan, and will be treated in the same manner as general unsecured creditors
under the Plan.

     5.     The consideration used to satisfy the Securities Lead Plaintiffs' allowed
claim/interest will be reduced by the consideration, if any, needed to satisfy the allowed
claims/interest of members of the Securities Class against the Debtors who opt out of the
Securities Class.  This mechanism ensures that the aggregate consideration distributed by the
Debtors to resolve the Delphi Securities Action (as defined below) will not exceed the
consideration necessary to satisfy an allowed claim in the face amount of $204.0 million.[4]  Based
on the Debtors' identification of the individual claimants who have potentially preserved their
right to a recovery by filing timely proofs of claim related to the allegations in the Delphi
Securities Action against the Debtors, the Debtors do not believe that the face amount of opt-out
claims allowed in these cases will be substantial.

     6.     Although the Plan proposed by the Debtors on September 6, 2007
contemplates a full recovery for general unsecured creditors – and thereby a full recovery with
respect to the Securities Lead Plaintiffs' allowed claim and the ERISA Named Plaintiffs' allowed
interest – the stipulations are not dependent upon the Debtors' proposed Plan in this respect.  If
the Debtors' proposed Plan is not confirmed, for example, and instead the Debtors emerge from
chapter 11 under a Plan that provides general unsecured creditors with a 50% recovery, the
stipulations will remain in force and the Securities Lead Plaintiffs and the ERISA Named
Plaintiffs would likewise receive a 50% recovery on their allowed claim and allowed interest,

---

[4]    The ERISA Stipulation does not provide for a similar mechanism because members of the ERISA Class cannot
opt out.

6

respectively.  Furthermore, the stipulations do not contain any deadlines or termination rights with respect to the timing of the confirmation or consummation of the Plan.

7.      The stipulations provide for the payment of additional consideration to the Securities Lead Plaintiffs, including a payment of $88.6 million by the Insurers on behalf of certain current and former insured Delphi officers and directors, a payment of $1.5 million by the Underwriter Defendants, and a portion of the remainder of any insurance proceeds available under a certain insurance policy after payment of certain defense costs, as well as additional consideration to the ERISA Named Plaintiffs, including a payment of $22.5 million by the Insurers on behalf of certain current and former insured Delphi officers and directors and a portion of the remainder of any insurance proceeds available under a certain insurance policy after payment of certain defense costs.  The stipulations also establish separate accounts to be funded by the Insurers and used for defense costs incurred by certain current and former insured Delphi officers and employees in connection with government investigations and proceedings, provide that the insurance policies covered by the Insurance Stipulation will be deemed fully exhausted and forever discharged, and bar any person insured under those policies from asserting claims against the policies.

8.      In exchange for the consideration provided under the stipulations, the Securities Lead Plaintiffs, the ERISA Named Plaintiffs, the Underwriter Defendants, certain current and former officers and directors of Delphi, and the Insurers agreed to release their claims against Delphi related to the allegations in the MDL, and Delphi agreed to release its MDL-related claims against those parties, thereby providing a complete resolution of the MDL as to Delphi.

<u>Background</u>

A.      <u>The Chapter 11 Filings</u>

9.      On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their

businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections

1107(a) and 1108.  The Court has ordered joint administration of these cases.

10.      No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official

committee of equity holders.

11.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

12.      The predicates for the relief requested herein are sections 362 and 363 and

of the Bankruptcy Code, Rules 4001, 7023, 9014, and 9019 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Rule 23 of the Federal Rules of Civil Procedure.

B.      <u>Current Business Operations Of The Debtors</u>

13.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as

of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately

$15.4 billion.[5]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

---

[5]      The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
        and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27,
        2007.

company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.[6]

14.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

15.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

---

[6]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

C.      Events Leading To The Chapter 11 Filing

16.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[7] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

17.      The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

18.      In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005,

---

[7]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

the Company commenced these chapter 11 cases for its U.S. businesses to complete its

transformation plan and preserve value for its stakeholders.

      D.     The Debtors' Transformation Plan

      19.    On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations.  The Debtors stated that they needed to focus on five key areas:[8] first, modifying the

Company's labor agreements to create a competitive arena in which to conduct business;[9] second,

concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy

---

[8]    In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors and a plan framework support agreement with those investors and GM.  On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework support agreement but that it expected to enter into new framework agreements with plan investors presently.  Subsequently, on July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors").  Under the Delphi-Appaloosa EPCA, the New Plan Investors agreed to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization.  This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.

[9]    Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM that (a) modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the UAW, and its various locals, (b) provides that GM will undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate these modifications, and (c) modifies retiree welfare benefits for certain UAW-represented retirees of the Debtors.  This agreement, which was approved by this Court on July 19, 2007, should permit the Debtors to continue to implement their transformation plan and to develop, prosecute, confirm, and consummate a plan of reorganization.  On August 6, 2007, similar agreements were reached with the International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America and its local unions, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers.  Such agreements were approved by this Court on August 16, 2007.  On August 16, 2007, Delphi also reached a similar agreement with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and USW Local 87L, which was approved by this Court on August 29, 2007.

and labor costs and to ascertain GM's business commitment to the Company;[10] third,

streamlining their product portfolio to capitalize on their world-class technology and market

strengths and make the necessary manufacturing alignment with their new focus;[11] fourth,

transforming their salaried workforce to ensure that the Company's organizational and cost

structure is competitive and aligned with its product portfolio and manufacturing footprint;[12] and

devising a workable solution to their current pension situation.[13]

  E.  <u>The Debtors' Plan Of Reorganization</u>

    20.  On September 6, 2007, the Debtors reached another key milestone in their

chapter 11 cases by filing their Joint Plan Of Reorganization Of Delphi Corporation And Certain

Affiliates, Debtors And Debtors-In-Possession (the "Plan"). The Plan is based upon a series of

---

[10] On July 9, 2007, Delphi confirmed that its discussions with GM on a comprehensive settlement agreement had entered the documentation phase and that it expected that a settlement with GM would be incorporated into the Debtors' plan of reorganization rather than filed with this Court for separate approval.

[11] In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants. The Debtors have been working to divest non-core assets so as to maximize the value of their estates for stakeholders. During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, and obtained court approval for the sale of substantially all of the assets of their brake hose, catalyst, and Saltillo, Mexico brake plant businesses. In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

[12] As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages. The Company's revised operating structure consists of its four core business segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture. The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan. To ensure that their organizational and cost structure is competitive, the Debtors obtained an Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order"). The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[13] To that end, on May 31, 2007, the Bankruptcy Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 plan year funding waivers, which were approved by the IRS, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Plans"). On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively.

global settlements and compromises that involve every major constituency in the Debtors'

reorganization cases.  Indeed, the Debtors, the Debtors' principal U.S. labor unions, GM, the

Statutory Committees, and the lead plaintiffs in certain securities actions (on behalf of holders of

various claims based on alleged violations of federal securities laws and the Employee

Retirement Income Security Act of 1974, as amended) all have contributed to global settlements

and compromises that provide for a recovery through a plan distribution amounting to the

principal amount of the claim plus accrued interest at a negotiated plan value for general

unsecured creditors, and agreed upon distributions to other classes of creditors and interests.  The

Plan is supported by the Creditors' Committee on behalf of unsecured creditors, the Equity

Committee on behalf of holders of Delphi's common stock, and GM.  A hearing will be held on

October 3, 2007 to approve the Debtors' solicitation procedures and disclosure statement with

respect to the Plan.  The Debtors will seek to have a hearing on confirmation of the Plan on

November 19, 2007.  The Debtors expect to emerge from these chapter 11 cases on December 31,

2007.

          21.      Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

        F.      The Multidistrict Litigation

          22.      Delphi, along with Delphi Trust I, Delphi Trust II, certain current and

former officers, directors, and employees of Delphi or its subsidiaries, and certain other parties

were named as defendants in several lawsuits that were filed in the District Court, the United

States District Court for the Southern District of New York (the "Southern District of New

York"), the United States District Court for the Southern District of Florida (the "Southern

District of Florida"), and the United States District Court for the Southern District of Ohio

beginning in March 2005 following Delphi's announced intention to restate certain of its

financial statements.  The lawsuits fall into three categories.

23.    One group of lawsuits alleges, among other things, that Delphi, certain of

its current and former officers and directors, and others made materially false and misleading

statements in violation of the federal securities laws.  On September 23, 2005, the securities

actions filed in the Southern District of New York were consolidated in that court.  On

September 30, 2005, Lead Plaintiffs filed a consolidated class action complaint on behalf of

themselves and all other persons and entities who purchased or otherwise acquired publicly

traded securities of Delphi, including securities issued by Delphi Trust I and Delphi Trust II,

during the period beginning March 7, 2000 through March 3, 2005, inclusive, and who were

injured thereby, including all persons and entities who acquired shares of Delphi common stock

and preferred stock in the secondary market and all persons or entities who acquired debt

securities of Delphi in the secondary market or pursuant to a registration statement.  The

consolidated securities actions (and a related securities action filed in the Southern District of

Florida), were transferred to the District Court under the MDL Panel's order in December 2005.

24.    Another group of putative class action lawsuits, brought on behalf of

participants in certain of Delphi's and its subsidiaries' defined contribution employee benefit

plans that invested in Delphi and GM common stock, was brought under ERISA.  The ERISA

actions generally allege, among other things, that the plans suffered losses as a result of alleged

breaches of fiduciary duties under ERISA.  On October 21, 2005, the ERISA actions were

14

consolidated in the District Court, and on December 21, 2005, they became part of the MDL under the MDL Panel's order.  The ERISA Named Plaintiffs filed a consolidated class action complaint on behalf of all participants and beneficiaries of certain plans whose plan accounts were invested in Delphi and/or GM common stock during the period May 28, 1999 to November 1, 2005.  Delphi was not named as a defendant in the ERISA complaint due to Delphi's chapter 11 filings, but the ERISA Named Plaintiffs stated that they planned to proceed with claims against Delphi in these cases, and that they would name Delphi as a defendant if the automatic stay is modified or lifted to permit it.

25.    The third group of lawsuits is comprised of shareholder derivative actions against certain current and former officers and directors of Delphi.  These suits allege that the defendants breached a variety of duties owed by them to Delphi in connection with matters related to Delphi's restatement of its financial results.  The federal derivative actions, all of which were administratively closed after Delphi filed its voluntary petition for reorganization relief with this Court, were concentrated in the District Court under the MDL Panel's order in December 2005.

G.    Multidistrict Litigation Settlement Discussions

26.    On July 11, 2007, the District Court entered an order in the MDL appointing the Honorable Layn R. Phillips, a former United States District Judge, as a special master (the "Special Master") for the purpose of facilitating settlement negotiations.  The Special Master conducted a mediation regarding the MDL in New York City on July 23, 24, 29, and 30, 2007, and additional mediation sessions on August 13 and 15, 2007.  The mediation involved representatives of the Securities Lead Plaintiffs, the ERISA Named Plaintiffs, the Debtors, the Securities Officer and Director Defendants, the ERISA Officer and Director Defendants, the Underwriter Defendants, and the Insurers.  Following the formal mediation sessions, the parties

continued to discuss and negotiate a settlement, and the parties exchanged several drafts of

proposed settlement papers throughout the latter half of August 2007.  With the assistance of the

Special Master and the District Court, the parties finalized their agreements during the last week

of August 2007, and they executed the stipulations on August 31, 2007.

H.    The Securities Stipulation

27.    The Securities Stipulation is intended to fully and completely resolve the

Delphi Securities Action[14] and certain related claims as to Delphi, Delphi Trust I, Delphi Trust II,

the Securities Officer and Director Defendants, the Underwriter Defendants (collectively, the

"Securities Settling Defendants"), and certain related persons and entities.  The Securities

Stipulation's principal terms are summarized in the remaining paragraphs of this section.[15]

28.    Releases.  The Securities Stipulation provides for the following releases

upon the effective date of the Securities Stipulation:

(a)    The Securities Lead Plaintiffs and all members of the Securities Class (as
defined below) will release all claims related to the Delphi Securities
Action against the Securities Released Parties,[16] including Delphi, and any

---

[14]    The "Delphi Securities Action" means In re:  Delphi Corp. Securities, Derivative & "ERISA" Litigation, Master
File No. 05-md-1725 (GER), and relating to In Re:  Delphi Corp. Securities Litigation, No. 06-10026, and Case
Nos. 06-10027, 06-10028, 06-10029, 06-10030, 06-10031, and 06-10032, and Bernstein v. Delphi Trust I, No.
2:06-CV-10025 (GER) (formerly No. 9:05-CV-80307 (KLR) (S.D. Fla.)).  (Exhibit A ¶ 1(x).

[15]    The summaries of the Securities Stipulation, the ERISA Stipulation, and the Insurance Stipulation set forth in
this motion are qualified entirely by and are subject to the actual terms and conditions of the stipulations.

[16]    The "Securities Released Parties" include (i) the Securities Settling Defendants, Thomas H. Wyman, Shoichiro
Irimajiri, their past or present subsidiaries, parents, principals, affiliates, general or limited partners or
partnerships, successors and predecessors, heirs, assigns, officers, directors, agents, employees, attorneys,
advisors, investment advisors, investment bankers, underwriters, insurers, co-insurers, re-insurers, consultants,
administrators, estates, executors, trustees, personal representatives, immediate family members, and any person,
firm, trust, partnership, corporation, officer, director, or other individual or entity in which any Securities
Settling Defendant has a controlling interest or which is related to or affiliated with any of the Securities
Settling Defendants, and the legal representatives, heirs, executors, administrators, trustees, successors in
interest, assigns, or bankruptcy estates of Delphi and its affiliates in these cases, and (ii) General Motors
Corporation ("GM"), its past or present subsidiaries, parents, principals, affiliates, general or limited partners or
partnerships, successors and predecessors, heirs, assigns, officers, directors, agents, employees, attorneys,
advisors, investment advisors, investment bankers, underwriters, insurers, co-insurers, re-insurers, accountants,
auditors, consultants, administrators, executors, trustees, personal representatives, immediate family members,

(cont'd)

16

other person who may claim any form of contribution or indemnity from the Securities Released Parties.[17]  (Exhibit A ¶¶ 1(oo), 3(a).)

(b)     The Securities Settling Defendants, including Delphi, will release all claims related to the Delphi Securities Action against the Securities Lead Plaintiffs, the members of the Securities Class, and their respective counsel.  (Id. ¶¶ 1(pp), 3(b).)

(c)     The Underwriter Defendants will release all claims related to the Delphi Securities Action against the Securities Released Parties, including Delphi, and any other person who may claim any form of contribution or indemnity from the Securities Released Parties; provided, however, that Settled Underwriter Defendants' Claims do not include claims arising from a separate agreement among Delphi and the Underwriter Defendants.[18]. (Id. ¶¶ 1(rr), 3(c).).

---

*(cont'd from previous page)*

and any person, firm, trust, partnership, corporation, officer, director, or other individual or entity in which GM has a controlling interest or which is related to or affiliated with GM, and the legal representatives, heirs, executors, administrators, trustees, successors in interest, or assigns of GM; provided, however, that the inclusion of GM cannot be construed to release any claims asserted in Deka Investment GmbH v. General Motors Corporation, No. 2:06-cv-12258 (GER) (E.D. Mich.).  (Id. ¶ 1(ll).)

[17]     The claims released under this provision comprise any and all claims, debts, demands, rights, or causes of action, suits, matters, and issues or liabilities whatsoever (including, but not limited to, any claims for damages, interest, attorneys' fees, expert or consulting fees, and any other costs, expenses, or liability whatsoever), whether based on federal, state, local, statutory, or common law or any other law, rule, or regulation, whether fixed or contingent, accrued or unaccrued, liquidated or unliquidated, at law or in equity, matured or unmatured, whether class of individual in nature, including both known claims and Unknown Claims (as defined in the Securities Stipulation), (i) that have been asserted in the Delphi Securities Action against any of the Securities Released Parties or (ii) that could have been asserted in any forum by the members of the Securities Class (as defined below) or any of them or the successors and assigns of any of them against any of the Securities Released Parties which arise out of, are based upon, or relate to the allegations, transactions, facts, matters, or occurrences, representations, or omissions involved, set forth, or referred to in the Delphi Securities Action and related to the purchase, acquisition, or holding of Delphi Securities (as defined in the Securities Stipulation). (Id. ¶ 1(oo).)

[18]     In connection with the Securities Stipulation, Delphi and the Underwriter Defendants executed an Underwriters Indemnification Agreement on August 31, 2007, a copy of which is attached to this motion as Exhibit D.  Under the Underwriters Indemnification Agreement, Delphi agreed to indemnify the Underwriter Defendants for reasonable legal fees and costs incurred by the Underwriter Defendants after the District Court preliminarily approves the Securities Stipulation resulting from certain discovery in the Delphi Securities Action, including fees and costs related to depositions of individuals employed by or affiliated with the Underwriter Defendants and/or their affiliates and the Underwriter Defendants' retrieval, review, and production of documents and data in response to discovery requests.  (Exhibit D ¶ 1.)  Delphi has no obligation to make payments under the Underwriters Indemnification Agreement until the effective date of the Securities Stipulation.  (Id.)

29.    <u>Bar Order</u>.  The Securities Stipulation contemplates that the District Court will include a bar order in its final judgment approving the Securities Stipulation (the "Securities Bar Order").  (<u>Id.</u> ¶ 4.)  Under the Securities Bar Order:

(a)    In accordance with 15 U.S.C. § 78u-4(f)(7)(A), all claims for contribution arising out of the claims or allegations in the Delphi Securities Action or the Securities Settled Claims (i) by any person or entity against the Securities Released Parties or (ii) by the Securities Released Parties against any person or entity (other than a person or entity whose liability has been extinguished by the settlement of the Securities Released Party) are barred.  (<u>Id.</u> ¶ 5(a).)  In accordance with 15 U.S.C. § 78u-4(f)(7)(B), any final verdict or judgment that might be obtained by or on behalf of the Securities Class or a member of the Securities Class against any person or entity for loss for which such person or entity and any Securities Released Party are found to be jointly liable will be reduced by the greater of (i) an amount that corresponds to the percentage of responsibility of any such Securities Released Party(s) for common damages or (ii) the amount paid to the Securities Class by or on behalf of each such Securities Released Party for common damages.  (<u>Id.</u>)

(b)    Any person who received actual or constructive notice or has actual knowledge of the notice of the proposed settlement of the Delphi Securities Action (the "Securities Barred Persons") will be barred from asserting against the Securities Released Parties claims that arise from or relate to the Securities Barred Person's alleged liability to the Securities Class or any member of the Securities Class (the "Securities Barred Claims").  (<u>Id.</u> ¶ 5(b).)  If, however, (i) the Securities Class or any member of the Securities Class obtains any judgment against any Securities Barred Person based upon, arising out of, or relating to any Securities Settled Claim arising under the Securities Act of 1933 (the "Securities Act") for which such Securities Barred Person and any Securities Released Party is found to be jointly and severally liable, that person or entity will be entitled to a judgment credit equal to an amount that is the greater of (x) the amount paid to the Securities Class by or on behalf of each Securities Released Party for common damages pursuant to the Securities Act or (y) an amount that corresponds to the percentage of responsibility of any Securities Released Party that constitute "covered persons" pursuant to 15 U.S.C. § 78u-4(f)(10)(C) for common damages pursuant to the Securities Act, and/or (ii) the Securities Class or any member of the Securities Class obtains any judgment against any Securities Barred Person based upon, arising out of, or relating to any Securities Settled Claim arising under the Securities Exchange Act of 1934 (the "Exchange Act") for which such Securities Barred Person and any Securities Released Party is found to be jointly liable, that Securities Barred Person will be entitled to a judgment credit equal to an amount that is the greater of (x) the amount paid to the

18

Securities Class by or on behalf of each Securities Released Party for common damages pursuant to the Exchange Act or (y) an amount that corresponds to the percentage of responsibility of any Securities Released Party for common damages pursuant to the Exchange Act.  (Id.)

(c)    A Securities Settling Defendant will not be enjoined from bringing Securities Barred Claims against a Securities Barred Person if for any reason such Securities Barred Person asserts, or is legally not barred by the Securities Bar Order from bringing, Securities Barred Claims against such Securities Settling Defendant.  (Id. ¶ 6.)

30.    <u>Settlement Consideration</u>.  In consideration for, among other things, the

releases and the Securities Bar Order provided for in the Securities Stipulation, the Securities

Settling Defendants will distribute, pay, or cause to be paid the following:

(a)    Within ten business days after the District Court's entry of an order preliminarily approving the Securities Settlement, the Insurers, on behalf of the Securities Officers and Directors Defendants, will pay to an escrow agent $88.6 million plus 76.3% of the proceeds remaining under a $5.0 million portion of a certain insurance policy after payment of all defense costs incurred as of the District Court's entry of the order preliminarily approving the Securities Stipulation.[19]  (Id. ¶¶ 1(bb)-(cc), 7(a).)

(b)    Also within ten business days after the District Court's entry of an order preliminarily approving the Securities Settlement, the Underwriter Defendants (with the exception of Bear Stearns and Credit Suisse), will pay to the escrow agent an aggregate amount of $1.5 million in cash.  (Id. ¶¶ 1(xx), 7(b).)

(c)    As soon as practicable after the later of (i) certain conditions related to the Insurers' payment, the Underwriter Defendants' payment, and the approval of the Securities Stipulation and the ERISA Stipulation by the District Court and this Court or (ii) the effective date of the Debtors' emergence from chapter 11 protection, Delphi will distribute to the escrow agent the Securities Delphi Net Consideration.  The Securities Delphi Net Consideration will comprise the consideration – in the same form, ratio, and treatment provided to general unsecured creditors under the Plan – that will satisfy an allowed claim in the face amount of $204.0 million, with no provision for accrued interest, less the consideration – also in the

---

[19]    The cash remaining from the insurance policy will not exceed $5.0 million, and the Insurers' payment will therefore not exceed approximately $3,815,000 (76.3% of $5.0 million).  Because certain defense costs have been incurred and paid from this $5.0 million, the actual payment to the escrow agent will be less than this amount.

same form, ratio, and treatment provided to general unsecured creditors under the Plan – needed to satisfy allowed claims, if any, by potential members of the Securities Class who opt out of the Securities Class.  (<u>Id.</u> ¶ 1(a), (r)-(s), (v).)

31.    <u>No Admission Of Wrongdoing</u>.  The Securities Stipulation provides that it cannot be (i) offered or received against the Securities Settling Defendants as evidence of or construed or deemed to be evidence of any presumption, concession, or admission by any of the Securities Settling Defendants with respect to the truth of any fact alleged by any of the plaintiffs or the validity of any claim that has been or could have been asserted in the Delphi Securities Action or in any litigation, or the deficiency of any defense that has been or could have been asserted in the Delphi Securities Action or in any litigation, or of any liability, negligence, fault, or wrongdoing of the Securities Settling Defendants, (ii) offered or received against the Securities Settling Defendants as evidence of a presumption, concession, or admission of any fault, misrepresentation, or omission with respect to any statement or written document approved or made by any of the Securities Settling Defendants, (iii) offered or received against the Securities Settling Defendants as evidence of a presumption, concession, or admission with respect to any liability, negligence, fault, or wrongdoing, or, with certain exceptions related to the effectuation of the Securities Stipulation, in any way referred to for any other reason as against the Securities Settling Defendants, in any other civil, criminal, or administrative action or proceedings, or (iv) construed against the Securities Settling Defendants as an admission or concession that the consideration to be given under the Securities Stipulation represents the amount that could be or would have been recovered after trial.  (<u>Id.</u> ¶ 33(a)-(d).)

32.    <u>Mechanics And Administration</u>.  The Securities Stipulation includes the following provisions, among others, concerning mechanics and administration:

(a)    Upon this Court's entry of an order approving the Securities Stipulation and certifying the Securities Class for purposes of settlement only, the

20

Securities Lead Plaintiffs will withdraw, without prejudice, proof of claim number 14092 in these cases and all other proofs of claim filed by Securities Lead Plaintiffs on behalf of the Securities Class.  (Id. ¶ 11(b).) On the same date, the Securities Lead Plaintiffs, as representatives of the Securities Class, will be granted an allowed claim and/or interest in these cases in the aggregate face amount of $204.0 million, with no provision for accrued interest (the "Securities Allowed Claim"), which will be classified under the Plan in separate debt and equity classes based on a plan of allocation to be proposed by the Securities Lead Plaintiffs' counsel and approved by the District Court.  (Id. ¶¶ 1(nn), 11(a).)

(b)     Upon this Court's entry of an order approving the Securities Stipulation and certifying the Securities Class for purposes of settlement only, any proof of claim that relates to the Delphi Securities Action and was filed by or on behalf of the Securities Lead Plaintiffs or any other named plaintiff in the Delphi Securities Action in any capacity other than as representatives of the Securities Class will be deemed to be estimated at $1 for purposes of voting with respect to the Plan, and will be classified pursuant to the Plan in the separate debt or equity classes applicable to the Securities Allowed Claim according to the type of security or securities on which such proof of claim is based, as disclosed by Securities Lead Plaintiffs in filings in the Delphi Securities Action, it being understood that such proofs of claim will be entitled to vote in more than one class as appropriate.  (Id. ¶ 11(c).)

(c)     Upon this Court's entry of an order approving the Securities Stipulation, the Underwriter Defendants will withdraw, and will be deemed to have withdrawn, all proofs of claim filed by them in these cases concerning any claims to indemnification, contribution, or other reimbursement from Delphi on account of or relating to the Delphi Securities Action.  (Id. ¶ 11(f).)

(d)     Provided that the Plan is consistent with and incorporates the Securities Stipulation, the Securities Lead Plaintiffs will cast any and all votes concerning the Plan under their control by virtue of any claim filed by or granted to them in these cases, in either their individual or representative capacity (including the Securities Allowed Claim) in favor of and in acceptance of the Plan.  (Id. ¶ 11(e).)

(e)     Upon the effective date of the Securities Stipulation, the Securities Lead Plaintiffs and any other named plaintiff in the Delphi Securities Action will withdraw with prejudice and will be deemed to have withdrawn any proof of claim (not including the Securities Allowed Claim) that relates to the Delphi Securities Action and was filed by them or on their behalf in these cases in either their individual or representative capacity.  (Id. ¶ 12.)

(f)     Delphi's distribution of the Securities Delphi Net Consideration under the Securities Stipulation will be in full satisfaction of the Securities Allowed Claim.  (<u>Id.</u> ¶ 1(v).)

(g)     Of the $88.6 million paid by the Insurers, $10.0 million will be transferred to a separate account for the benefit of the Former Delphi Officers and Employees[20] and will be accessible by them for defense costs only in the event that that there is any indictment of any Former Delphi Officer or Employee in connection with their work at Delphi.  (<u>Id.</u> ¶ 1(cc) & Ex. C ¶ A.)  In the event that no indictment of any Former Delphi Officer or Employee occurs by January 31, 2009, the escrow account will be closed and the proceeds in the account and any interest will be disbursed at the direction of Securities Lead Plaintiffs' counsel, unless any Former Delphi Officer or Employees makes a showing to the Special Master that good cause exists to maintain the account.  (<u>Id.</u> Ex. C ¶ A.)  Securities Lead Plaintiffs can request that the Special Master release some or all of the proceeds in the account before January 31, 2009 upon a showing that there is no threat that any of the Former Delphi Officers and Employees face criminal exposure and/or potential indictment, and Securities Lead Plaintiffs have the right to request that the Special Master release some or all of the proceeds on January 31, 2009.  (<u>Id.</u> Ex. C ¶ D.)  In no event will the proceeds remain in the account if no Former Delphi Officer or Employee has been indicted and no proceeds have been withdrawn by December 31, 2010; provided, however, that if any Former Delphi Officer or Employee has been indicted, any funds remaining in the account on December 31, 2010 will not be released to Securities Lead Plaintiffs' counsel unless and until the criminal proceeding with respect to the indicted Former Delphi Officer or Employee has been resolved.  (<u>Id.</u> Ex. C ¶ F.)

33.     <u>Termination Rights</u>.  With respect to termination rights, the Securities

Stipulation provides that:

(a)     The Securities Lead Plaintiffs and the Securities Settling Defendants each have the right to terminate the Securities Stipulation within 30 days of (i) the District Court declining to enter an order preliminarily approving the Securities Stipulation in any material respect, (ii) the District Court refusing to approve the Securities Stipulation, (iii) the District Court declining to enter a judgment or order approving the Securities Stipulation in any material respect, (iv) the District Court declining to enter the Securities Bar Order in any material respect in its judgment or order

---

[20]    The "Former Delphi Officers and Employees" are Mr. Battenberg, Mr. Belans, Mr. Blahnik, Mr. Dawes, Mr. Free, Ms. Kudla, Ms. Rozanski, and Mr. Janak.  (<u>Id.</u> Ex. E ¶ A.)

approving the Securities Stipulation, (v) this Court refusing to approve the Securities Stipulation or the Insurance Stipulation, (vi) the date upon which a judgment or order by the District Court or this Court approving the Securities Stipulation is modified or reversed in any material respect by any level of appellate court, (vii) the date upon which the ERISA Stipulation is terminated, (viii) the failure of the Insurers or the Underwriter Defendants to make the payments described in paragraph 30 of this motion; provided, however, that all termination rights will expire upon Delphi's distribution of the Securities Delphi Net Consideration pursuant to the Securities Stipulation.  (Id. ¶ 30.)

(b)    Notwithstanding anything else in the Securities Stipulation, any Securities Settling Defendant, in his, her, or its sole and unfettered discretion, can terminate the Securities Stipulation pursuant to the terms of a separate Supplemental Agreement if potential members of the Securities Class who purchased in the aggregate in excess of a certain amount of certain Delphi securities between March 7, 2000, and March 3, 2005, inclusive, elect to opt out of the Securities Class.[21]  (Id. ¶¶ 28, 31.)

34.    The Securities Class.  The class of plaintiffs contemplated by the

Securities Stipulation includes:  All persons and entities who purchased or otherwise acquired

publicly traded securities of Delphi, including securities issued by Delphi Trust I and Delphi

Trust II, during the period of time between March 7, 2000 and March 3, 2005, inclusive, and

who suffered damages thereby, including all persons and entities who acquired shares of Delphi

common stock and preferred stock in the secondary market and all persons or entities who

acquired debt securities of Delphi in the secondary market or pursuant to a registration statement

(the "Securities Class").  (Id. ¶ 1(j), (m), (w).)  The Securities Class does not include (i) any

Securities Defendant,[22] (ii) any member of the family of any of the Securities Officer and

Director Defendants, (iii) any entity in which any Securities Defendant has a controlling interest,

---

[21]    The Supplemental Agreement also addresses certain discovery obligations of Delphi and the manner in which it will address proofs of claim filed by potential members of the class who may choose to opt out.

[22]    The "Securities Defendants" are Delphi, Delphi Trust I, Delphi Trust II, the Securities Officer and Director Defendants, the Underwriter Defendants, Deloitte & Touche LLP, BBK, Ltd., Setech, Inc., JPMorgan Chase & Co., Mr. Wyman, and Mr. Irimajiri.

(iv) any officer, director, or partner of any Securities Defendant or their subsidiary or affiliate, or (v) the legal representatives, heirs, successors, and assigns of any such excluded party.  (Id. ¶ 1(j).)

35.    Lifting Of Automatic Stay.  In the Securities Stipulation, Delphi and the Securities Lead Plaintiffs agreed to lift the automatic stay under section 362 of the Bankruptcy Code with respect to certain documents that were provided by the Debtors to the Securities Lead Plaintiffs under this Court's Agreed Order Regarding Interim Disposition With Respect To Lead Plaintiffs' Motion For Limited Modification Of Automatic Stay, dated April 16, 2007 (Docket No. 7718) (the "Agreed Order").  Lifting the automatic stay will expand the purposes for which the Securities Lead Plaintiffs can use the documents, including with respect to the ongoing Delphi Securities Action against the non-settling defendants.

I.    The ERISA Stipulation

36.    The ERISA Stipulation, which follows the same general structure of the Securities Stipulation, is intended to fully and completely resolve the Delphi ERISA Action[23] and certain related claims as to Delphi, ASEC Manufacturing, Delphi Mechatronic, the Executive Committee, the Investment Policy Committee, the ERISA Officer and Director Defendants (collectively, the "ERISA Settling Defendants"), and certain related persons and entities.  The ERISA Stipulation's principal terms are summarized in the remaining paragraphs of this section.

37.    Releases.  The ERISA Stipulation provides for the following releases upon the effective date of the ERISA Stipulation:

---

[23]    The "Delphi ERISA Action" means In re: Delphi Corp. Securities, Derivative & "ERISA" Litigation, Master File No. 05-md-1725 (GER), Case Nos. 05-CV-70882, 05-CV-70940, 05-CV-71030, 05-CV-71200, 05-CV-71249, 05-CV-71291, 05-CV-71339, 05-CV-71396, 05-CV-71397, 05-CV-71987, 05-CV-71437, 05-CV-71508, 05-CV-71620, 05-CV-71897, 05-CV-72198.  (Exhibit B ¶ 1(p).)

(a)    The ERISA Named Plaintiffs and all members of the ERISA Class will release all Settled Claims (as defined in the ERISA Stipulation, which generally include all claims related to the Delphi ERISA Action) against the ERISA Released Parties,[24] including Delphi.  (Id. ¶¶ 1(kk), 3(a).)

(b)    The ERISA Settling Defendants, including Delphi, will release all claims related to the Delphi ERISA Action against the ERISA Named Plaintiffs, the members of the ERISA Class, and their respective counsel.  (Id. ¶¶ 1(ll), 3(b).)

38.    Bar Order.  The ERISA Stipulation contemplates that the District Court

will include a bar order in its final judgment approving the ERISA Stipulation (the "ERISA Bar

Order").  (Id. ¶ 5.)  Under the ERISA Bar Order:

(a)    Any person who received actual or constructive notice or has actual knowledge of the notice of the proposed settlement of the Delphi ERISA Action in connection with the fairness hearing in the District Court (the "ERISA Barred Persons") will be barred from asserting claims that arise out of or are related to the Delphi ERISA Action or the ERISA Settled Claims (the "ERISA Barred Claims") against the ERISA Released Parties. (Id. ¶ 5.)

(b)    Any judgments entered against the ERISA Barred Persons in the Delphi ERISA Action will be reduced by a judgment reduction amount, and nothing in the ERISA Stipulation or the ERISA Bar Order will limit joint and several liability applicable to non-settling parties as to the portion of any judgment against non-settling parties in the Delphi ERISA Action that remains after application of the ERISA Judgment Reduction Amount.  (Id. ¶ 6.)

(c)    The ERISA Settling Defendants will be permanently enjoined from bringing the ERISA Barred Claims against the ERISA Barred Persons;

---

[24]  The "ERISA Released Parties" include the ERISA Settling Defendants, Thomas H. Wyman, General Motors Investment Management Corporation, and their past or present members, subsidiaries, parents, principals, affiliates, general or limited partners or partnerships, successors and predecessors, heirs, assigns, officers, directors, agents, employees, fiduciaries, attorneys, advisors, investment advisors, investment bankers, underwriters, insurers, co-insurers, re-insurers, consultants, administrators, estates, executors, trustees, personal representatives, employee benefit plans and their fiduciaries, unions and union representatives, immediate family members, and any person, firm, trust, partnership, corporation, officer, director, or other individual or entity in which any ERISA Settling Defendant has a controlling interest or which is related to or affiliated with any of the ERISA Settling Defendants, and the legal representatives, heirs, executors, administrators, trustees, successors in interest, assigns, or bankruptcy estates of Delphi and its affiliates in these cases; provided, however, that in no event will the ERISA Released Parties be deemed to include State Street Bank and Trust Company ("State Street").  (Id. ¶ 1(jj).)

provided, however, that the ERISA Settling Defendants will not be enjoined from bringing the ERISA Barred Claims against the ERISA Barred Persons if the ERISA Barred Persons assert or are not barred by the ERISA Bar Order from bringing the ERISA Barred Claims against the ERISA Settling Defendants.  (Id. ¶ 7.)

39.    Hold Harmless Agreement.  Under the ERISA Stipulation, the ERISA Named Plaintiffs, on their own behalf and on behalf of the ERISA Class, agreed to hold the ERISA Released Parties, including Delphi, harmless from any claims for indemnification or contribution arising from or relating to the Delphi ERISA Action that are asserted by the ERISA Barred Persons against the ERISA Released Parties.  (Id. ¶ 23.)  The hold harmless agreement will be implemented solely through (i) the reduction of any judgment obtained against an indemnified party by an amount equal to the payment that such party would otherwise receive from the ERISA Released Parties on account of such indemnified claim or (ii) recovery from the consideration outlined in paragraph 40 of this motion.  (Id.)  Because of the ERISA Named Plaintiffs' hold-harmless obligations, the ERISA Stipulation provides that, until the Delphi ERISA Action has been concluded and fully and finally resolved with respect to all ERISA Barred Persons, there shall be no distribution from the Net Settlement Fund (as defined in the ERISA Stipulation) that would cause the balance remaining in the Net Settlement Fund to be less than the aggregate of the ERISA Named Plaintiffs' claims for potential damages with respect to all claims against the ERISA Barred Persons that have not been concluded and fully and finally resolved.  (Id.)  In addition, if the ERISA Named Plaintiffs compromise and settle any claim against any party (other than the ERISA Settling Defendants) arising from or relating to the Delphi ERISA Action, the Named Plaintiffs will cause the settlement to bar that party from making any claims for indemnification or contribution against the ERISA Released Parties or otherwise seeking indemnification or contribution from the ERISA Released Parties.  (Id.)

26

40.    <u>Settlement Consideration</u>.  In consideration for, among other things, the
releases and the ERISA Bar Order provided for in the ERISA Stipulation, the ERISA Settling
Defendants will distribute, pay, or cause to be paid the following:

(a)    Within ten days after the District Court's entry of an order preliminarily
approving the ERISA Stipulation, the Insurers, on behalf of the ERISA
Officer and Director Defendants, will pay to an escrow agent $22.5
million plus 23.7% of the proceeds remaining under a $5.0 million portion
of a certain insurance policy after any remaining cash from a certain
insurance policy after payment of all outstanding defense costs incurred as
of the District Court's entry of the order preliminarily approving the
ERISA Stipulation.[25]  (<u>Id.</u> ¶¶ 1(w), (y), 8(a).)

(b)    As soon as practicable after the later of (i) certain conditions related to the
Insurers' payment and the approval of the Securities Stipulation and the
ERISA Stipulation by the District Court and this Court or (ii) the effective
date of the Debtors' emergence from chapter 11 protection, Delphi will
distribute to the escrow agent the ERISA Delphi Consideration.  (<u>Id.</u> ¶
8(b).)  The ERISA Delphi Consideration will comprise the consideration –
in the same form, ratio, and treatment provided to general unsecured
creditors under the Plan – that will satisfy an allowed interest in the face
amount of $24.5 million, with no provision for accrued interest.  (<u>Id.</u> ¶
1(n), (t), (q).)

41.    <u>No Admission Of Wrongdoing</u>.  The ERISA Stipulation provides that it
cannot be (i) offered or received against the ERISA Settling Defendants as evidence of or
construed or deemed to be evidence of any presumption, concession, or admission by any of the
ERISA Settling Defendants with respect to the truth of any fact alleged by any of the plaintiffs or
the validity of any claim that has been or could have been asserted in the Delphi ERISA Action
or in any litigation, or the deficiency of any defense that has been or could have been asserted in
the Delphi ERISA Action or in any litigation, or of any liability, negligence, fault, or
wrongdoing of the ERISA Settling Defendants, (ii) offered or received against the ERISA

---

[25]    These are the same $5.0 million in proceeds referenced in the Securities Stipulation.  The cash remaining from
the insurance policy will not exceed $5.0 million, and the Insurers' payment will therefore not exceed
approximately $1,185,000 (23.7% of $5.0 million).  Moreover, because certain defense costs have already been
incurred and paid, the actual payment will be less than this amount.

Settling Defendants as evidence of a presumption, concession, or admission of any fault,

misrepresentation, or omission with respect to any statement or written document approved or

made by any of the ERISA Settling Defendants, (iii) offered or received against the ERISA

Settling Defendants as evidence of a presumption, concession, or admission with respect to any

liability, negligence, fault, or wrongdoing, or, with certain exceptions related to the effectuation

of the ERISA Stipulation, in any way referred to for any other reason as against the ERISA

Settling Defendants, in any other civil, criminal, or administrative action or proceedings, or (iv)

construed against the ERISA Settling Defendants as an admission or concession that the

consideration to be given under the ERISA Stipulation represents the amount that could be or

would have been recovered after trial.  (Id. ¶ 21(a)-(d).)

   42. <u>Mechanics And Administration</u>.  The ERISA Stipulation includes the

following provisions concerning mechanics and administration:

   (a) Upon this Court's entry of an order approving the ERISA Stipulation and certifying the ERISA Class for purposes of settlement only, the ERISA Named Plaintiffs will withdraw, without prejudice, any proof of claim they allegedly filed on behalf of the ERISA Class.  (Id. ¶ 11(b).)  On the same date, the ERISA Named Plaintiffs, as representatives of the ERISA Class, will be granted an allowed interest in these cases in the face amount of $24.5 million, with no provision for accrued interest (the "ERISA Allowed Interest"), which will be classified under the Plan in a separate equity class.  (Id. ¶¶ 1(t), 11(a).)

   (b) Upon this Court's entry of an order approving the ERISA Stipulation and certifying the ERISA Class for purposes of settlement only, any proof of claim that relates to the Delphi ERISA Action and was filed with this Court by or on behalf of the ERISA Named Plaintiffs in any capacity other than as representatives of the ERISA Class will be deemed to be estimated at $1 for purposes of voting with respect to the Plan, and will be classified pursuant to the Plan in the separate equity class applicable to the ERISA Allowed Interest.  (Id. ¶ 11(c).)

   (c) With respect to voting concerning the Plan, the ERISA Named Plaintiffs will cast any and all votes under their control by virtue of any claim based on or related to the Delphi ERISA Action and filed by or granted to them in either their individual or representative capacities (including the ERISA

Allowed Interest) in favor of and in acceptance of the Plan, provided that the Plan incorporates the settlement contemplated by the Insurance Stipulation. <u>Id.</u> ¶ 11(e).)

(d)    Upon the Effective Date (as defined in the ERISA Stipulation), the ERISA Named Plaintiffs will withdraw and will be deemed to have withdrawn, with prejudice, any proof of claim (not including the ERISA Allowed Interest) that relates to the Delphi ERISA Action and was filed by them or on their behalf in either their individual or representative capacity. (<u>Id.</u> ¶ 12.)

(e)    Delphi's distribution of the ERISA Delphi Consideration under the ERISA Stipulation will be in satisfaction of the ERISA Allowed Interest. (<u>Id.</u> ¶ 1(n).)

43.    <u>Termination Rights</u>. With respect to termination rights, the ERISA

Stipulation provides that:

(a)    The ERISA Named Plaintiffs and the ERISA Settling Defendants each have the right to terminate the ERISA Stipulation within 30 days of (i) the District Court declining to enter an order preliminarily approving the ERISA Stipulation in any material respect, (ii) the District Court refusing to approve the ERISA Stipulation, (iii) the District Court declining to enter a judgment or order approving the ERISA Stipulation in any material respect, (iv) the District Court declining to enter the ERISA Bar Order in any material respect in its judgment or order approving the ERISA Stipulation, (v) this Court refusing to approve the ERISA Stipulation or the Insurance Stipulation, (vi) the date upon which a judgment or order by the District Court or this Court approving the ERISA Stipulation is modified or reversed in any material respect by any level of appellate court, (vii) the date upon which the Securities Stipulation is terminated, (viii) the failure of the Insurers to make the payment described in paragraph 40 of this motion; <u>provided</u>, <u>however</u>, that all termination rights will expire upon Delphi's distribution of the ERISA Delphi Consideration pursuant to the ERISA Stipulation. (<u>Id.</u> ¶ 18.)

(b)    Notwithstanding anything else in the ERISA Stipulation, the ERISA Settling Defendants can, in their sole and unfettered discretion, elect to terminate the ERISA Stipulation on or before the tenth business day before the fairness hearing concerning the ERISA Stipulation in the District Court if any claim or potential claim by the DOL against any of the ERISA Released Parties that relates to the Delphi ERISA Action has

not been resolved on terms acceptable to the ERISA Released Party.[26]  (Id. ¶ 19.)

44.    The ERISA Class.  The class of plaintiffs contemplated by the ERISA Stipulation includes:  All persons (a) who were (i) participants in or beneficiaries of the Delphi Savings-Stock Purchase Program for Salaried Employees, the Delphi Personal Savings Plan for Hourly-Rate Employees, or the ASEC Manufacturing Savings Plan between May 28, 1999 and November 1, 2005 or (ii) participants in or beneficiaries of the Delphi Mechatronic Systems Savings-Stock Purchase Program between June 1, 2001 and November 1, 2005 and (b) whose accounts included investments in the Delphi and/or GM Stock Funds (the "ERISA Class").  (Id. ¶ 1(i).)  Excluded from the Delphi ERISA Class are (i) the ERISA Defendants,[27] (ii) members of the immediate families of each of the ERISA Defendants, (iii) any entity in which any ERISA Defendant has a controlling interest, (iv) any parent, subsidiary, or affiliate of an ERISA Defendant, (v) any person who was an officer or director of an ERISA Defendant or any of the ERISA Defendants' subsidiaries or affiliates during the period between May 28, 1999 and November 1, 2005, inclusive, and (vi) the legal representatives, heirs, predecessors, successors, or assigns of any such excluded person or entity.  (Id.)

J.    Insurance Coverage And The Insurance Stipulation

45.    The Insurance Stipulation among Delphi, the Insurance Officers and Directors, and the Insurers fully resolves the claims for insurance coverage by Delphi and the Insurance Officers and Directors with respect to the Delphi Securities Action, the Delphi ERISA Action, certain derivative demands and actions against certain of the Insurance Officers and

---

[26]    The Debtors have objected to the DOL's proofs of claim, and are seeking to have the proofs of claim withdrawn, expunged, or estimated before the deadline for exercising this termination right.

[27]    The "ERISA Defendants" are Delphi, ASEC Manufacturing, Delphi Mechatronic, the Executive Committee, the Investment Policy Committee, the ERISA Officer and Director Defendants, and State Street.  (Id. ¶ 1(l).)

Directors alleging the same or related facts as those alleged in the Delphi Securities Action, certain government investigations and proceedings related to Delphi – including a formal investigation and enforcement action by the SEC, and investigations and potential legal proceedings initiated by the United States Department of Justice and the United States Attorney's Office for the Southern District of New York – and all matters based upon, arising out of, or alleging the same or certain related wrongful acts.

46.    To place the Insurance Stipulation in its proper context, it is necessary to provide some background regarding the structure of the insurance coverage Delphi maintained for the Insurance Officers and Directors. The Insurance Officers and Directors, and others, are insured for $200 million under a number of directors' and officers' liability and fiduciary liability insurance policies purchased by Delphi and issued by the Insurers. The policies are arrayed in two successive $100 million "towers" of insurance. Each tower comprises a number of policies, and each policy occupies a single level within the tower. In order for a particular insurance policy to apply, the policyholder's liability must exceed the limits of all insurance policies occupying lower levels within the tower structure. Thus, for example, the policy providing $5 million of coverage at a level above the first $100 million in coverage does not apply until the policyholder's liability exceeds $100 million. Further, many of the Insurers have taken the position that a particular insurance policy does not apply until each Insurer occupying a lower level has actually paid its full coverage limits.

47.    The first $100 million tower of insurance ("Tower I") provides broad coverage that is typical of liability insurance policies for officers and directors and fiduciaries. Delphi's officers and directors, and in certain circumstances employees, are covered with respect to securities litigation, ERISA litigation, and the defense of government investigations and

proceedings. Delphi itself is also covered to the extent it indemnifies its officers, directors, and

employees, as well as to the extent it jointly defends and settles its own liability with that of its

officers and directors. There are few defenses to coverage available under these policies, and the

coverage is broad.[28]

48.    The insurance coverage provided under the second $100 million tower

("Tower II") is narrower and subject to more defenses to coverage. Tower II covers only

Delphi's officers, directors, and employees. Delphi itself is not covered under Tower II and the

Debtors' estates have no interest in the insurance proceeds. Moreover, the coverage applies only

when Delphi is not legally permitted to indemnify one or more officers, directors, or employees.

Some of the Insurers have asserted that the coverage does not apply so long as there is no legal

impediment to indemnification under the indemnification standard provided by Delaware law,

even if Delphi is financially unable to indemnify the officers, directors, and employees.

49.    Some of the Insurers occupy multiple positions in the towers. For

example, the policy at the top of Tower II and the policy at the bottom of Tower I are separate

policies issued by corporate affiliates. Similarly, the policy at the bottom of Tower II (and thus

the first dollars of proceeds available the under this tower of insurance) and the policy at the top

of Tower I (the last dollars available under that insurance tower) are separate policies issued by

the same insurance company.

50.    Because of the relationship among the policies within each tower, as well

as the relationship between the towers, a global resolution of insurance issues required the

participation and consent of all of the Insurers.

---

[28]    From 2005-2007, the Debtors, in the ordinary course of their business, have made or will make payments to the
following Insurers under rescission waiver agreements to maintain the viability of the insurance towers:
National Union Fire Insurance Company of Pittsburgh, Pa., Zurich American Insurance Company, Federal
Insurance Company, Twin City Fire Insurance Company, and American Casualty Company of Reading PA.

51.     The payments by the Insurers under the Securities Stipulation, the ERISA
Stipulation, and the Insurance Stipulation will require the payment of the full $100 million in
Tower I, as well as $36.1 million of the $100 million available from Tower II.  Delphi's officers,
directors, and employees compromised their claims for coverage as to each Insurer in Tower II,
with each Insurer agreeing to pay some, but not all, of its insurance proceeds in exchange for a
release of all other obligations under its policies.  To achieve this result and gain access to the
$36.1 million in proceeds from Tower II, the parties to the Insurance Stipulation agreed that
those policies would be deemed fully exhausted, and that all insureds, including but not limited
to the officers, directors, and employees covered by the Insurance Stipulation, would have no
further rights under the insurance towers.

52.     As a result, the Insurance Officers and Directors (as well as other insured
officers and directors) will have no further coverage under those policies.  For this reason, and to
achieve the global resolution of the MDL achieved under the settlement, Delphi agreed to release
their potential affirmative claims against the Insurance Officers and Directors related to the
Delphi Securities Action, the Delphi ERISA Action, and related derivative demands and actions
and government investigations and proceedings.  (Id. ¶ 6.)  The Insurance Stipulation specifies
that Delphi will release all such affirmative claims, but will retain the right to assert the claims as
a defense or setoff, under section 502(d) of the Bankruptcy Code or otherwise, with respect to
claims asserted by the Insurance Officers and Directors against the Debtors' estates.  (Id.)

53.     To further protect Delphi officers, directors, and employees who would
otherwise be left without insurance coverage under the settlement, $10 million of the Insurers'
payment under the Securities Stipulation will be separately maintained in an escrow account to
cover defense costs in connection with any indictments of certain former officers and employees

(as described in subparagraph 32(g) of this motion), and the Insurers agreed in the Insurance

Stipulation to provide $20 million to be apportioned among certain former officers and

employees for defense costs incurred as part of certain government investigations and

proceedings and/or any other defense costs reasonably related to their tenure at Delphi.  (Id. ¶ 10.)

54.    Finally, because there are officers, directors, and employees who are

insured under the exhausted policies but are not parties to the Securities Stipulation, the ERISA

Stipulations, or the Insurance Stipulation, Delphi agreed to seek a bar order barring any insured

person from making an insurance claim against the exhausted policies.  Accordingly, the Debtors

have provided notice of this motion to all potential insureds under the policies (in addition to the

Insurance Officers and Directors) and are seeking in this motion the entry of such a bar order by

this Court.  As described in paragraph 64 of this motion, Delphi has released all claims it has or

may have against its current and former insured officers and directors that are based on or relate

to alleged violations of the federal securities laws during the class period covered by the Delphi

Securities Action.  Based on the Debtors' current understanding, there are no other claims or

demands related to the Delphi Securities Action, the Delphi ERISA Action, or the various

investigations against any other officers, directors, or employees whose interests in the policies

will be exhausted as part of this comprehensive settlement.

55.    The Insurance Stipulation's provisions are summarized in more detail

below.

56.    Proofs Of Claim.  Upon this Court's approval of the Insurance Stipulation,

any proof of claim or portion of any proof of claim filed in these cases by or on behalf of the

Insurance Officers and Directors Released Parties[29] or the Insurers Released Parties[30] that relates to any claim of loss, damage, reimbursement, contribution, or indemnification arising out of or relating to the Delphi Securities Action, the Delphi ERISA Action, certain derivative demands of actions, or certain government investigations and proceedings will be deemed to have an estimated amount of $0 for all purposes in these cases.  (Id. ¶ 3.)  On the effective date of the Insurance Stipulation, the Insured Officers and Directors Released Parties will be deemed to have withdrawn with prejudice all such proofs of claim or portions of such proofs of claim, and the Insurers Released Parties will be deemed to have withdrawn with prejudice all proofs of claim or portions of any proofs of claim filed in these cases by them or on their behalf relating to, based upon, or by reason of certain insurance policies.  (Id. ¶ 8.)

57.    Releases.  The Insurance Stipulation provides for the following releases upon the effective date of the Insurance Stipulation:

(a)    The Delphi Released Parties,[31] including Delphi, and the Insurance Officers and Directors Released Parties will release all insurance claims related to the MDL and certain government investigations and proceedings against the Insurers Released Parties and any other person who may claim any form of contribution or indemnity from the Insurers Released Parties. (Id. ¶¶ 1(dd), 4.)

(b)    The Delphi Released Parties, including Delphi, and the Insurers Released Parties will release all claims related to the MDL and certain government

---

[29]    The "Insurance Officers and Directors Released Parties" are the Insurance Officers and Directors and any and all past, present, and future heirs, estates, administrators, trustees, executors, agents, attorneys, representatives, and assigns of each of the Insured Officers and Directors, as well as any person acting on behalf of the Insured Officers and Directors, either singularly or collectively.  (Id. ¶ 1(m).)

[30]    The "Insurers Released Parties" are the Insurers, their past or present or future subsidiaries, parents, principals, affiliates, general or limited partners or partnerships, successors and predecessors, heirs, estates, assigns, officers, directors, shareholders, owners, representatives, agents, employees, attorneys, advisors, insurers, co-insurers, re-insurers, consultants, administrators, executors, or trustees.  (Id. ¶ 1(x).)

[31]    The "Delphi Released Parties" are Delphi and any and all predecessors, successors, parents, subsidiaries, affiliates, assigns, transferees, agents, attorneys, directors, officers, employees, shareholders of Delphi, and any person or entity acting on Delphi's behalf.  (Id. ¶ 1(n).)

investigations and proceedings against the Insurance Officers and Directors Released Parties and any other person who may claim any form of contribution or indemnity from the Insurance Directors and Officers Released Parties.  (Id. ¶¶ 1(cc), 5.)

(c)     The Insurers Released Parties and the Insurance Officers and Directors Released Parties will release all claims related to the MDL and certain government investigations and proceedings against the Delphi Released Parties, including Delphi, and any other person who may claim any form of contribution or indemnity from the Delphi Released Parties.  (Id. ¶¶ 1(bb), 8.)

58.     Defense And Setoff Rights.  Notwithstanding the releases outlined in subparagraphs 57(a)-(b) of this motion, in the event that the Insurance Officers and Directors Released Parties assert any claim against the Delphi Released Parties or their respective counsel, then Delphi and its counsel will be entitled to use and assert the Insurance Settled Officers and Directors Claims and any factual matters included within them against such Insurance Officers and Directors Released Party in defense or setoff of such claim.  (Id. ¶ 6.)  In the event that Delphi asserts any of the Insurance Settled Officers and Directors Claims in defense or setoff of a claim made by one of the Insurance Officer or Director against Delphi in these cases and the Insurance Officer or Director is successful with respect to such defense or setoff interposed by Delphi, then the Insurance Officer or Director will, pursuant to a proof of claim or interest that was timely filed in these cases, be entitled to assert a claim for indemnification for legal fees and expenses incurred in defense of such Insurance Settled Officers and Directors Claim to the extent such indemnification is required by Delphi's bylaws and/or Delaware law.  (Id.)

59.     Bar Order.  It is a condition to the effectiveness of the Insurance Stipulation that this Court enter an order barring and enjoining any person who is, may be, or claims to be an insured under any of the Insurance Policies (as defined in the Insurance

Stipulation[32]) or who otherwise claims to have an interest in the Insurance Policies, including

any interest alleged to arise by reason of a claim against an insured, or who derives their claim

from any insured under any of the Insurance Policies, including without limitation any judgment

creditors, claimants, assignees, or similar persons from instituting and/or prosecuting any actions

or claims against any of the Insurers arising out of related to any of the Insurance Policies or the

obligations of any of the Insurers under any of the Insurance Policies.  (Id. ¶ 12(c).)

60.    Settlement Consideration.  In consideration for, among other things, the

releases and the bar order providing for in the Insurance Stipulation, the Insurers agreed in the

Insurance Stipulation to pay (i) $88.6 million plus the portion of the remaining liability limit

under a certain insurance policy that has not already been incurred in the defense of the Former

Officers and Employees for services rendered as of the District Court's entry of an order

preliminarily approving the Securities Stipulation to the escrow agent under the Securities

Stipulation, (ii) $22.5 million to the escrow agent under the ERISA Stipulation, and (iii) $20.0

million to an escrow agent identified by the Former Delphi Officers and Employees.  (Id. ¶¶ 9,

11.)

61.    Termination Rights.  The Insurance Stipulation will terminate if the

Securities Stipulation is terminated or if the ERISA Stipulation is terminated.

K.    The Board's Actions With Respect To The Multidistrict Litigation Settlement

62.    In May 2005, the Board appointed the Special Committee to consider a

demand from a shareholder that Delphi bring an action against certain current and former

directors and officers premised on alleged violations of the federal securities laws (the

---

[32]    The Bar Order is also intended to include the fiduciary liability insurance coverage provided by Zurich
American Insurance Company Policy No. FLC 9024054, which was not identified in the Insurance Stipulation
but is related to and shares the limit of liability of the Zurich American Insurance Company insurance policy
referenced in the Insurance Stipulation.

"Derivative Demand"), and whether to assert any claims against the Debtors' former directors,
officers, and employees based on allegations similar to those raised in the MDL. The Special
Committee, whose members were Mr. Farr and Mr. Naylor, retained Covington & Burling LLP
to act as its independent legal counsel. The Special Committee, with the assistance of its counsel,
reviewed the results of an investigation conducted by the Board's Audit Committee and
conducted additional interviews and reviewed additional documents with respect to the potential
claims. At a Board meeting held on August 7, 2007, the Special Committee reported its findings
and recommendations to the Board.

63.    The Board also considered the relationship between the potential claims
and the Debtors' broader objective of achieving a final resolution of the Delphi Securities Action
and the Delphi ERISA Action. In that regard, the Board considered that taking certain actions
with respect to the potential claims would facilitate the payment of insurance proceeds from
Tower II and thereby make it easier to reach a settlement of the Delphi Securities Action and the
Delphi ERISA Action. Those actions included releasing and holding harmless certain of
Delphi's former employees who were named as defendants in the MDL, determining that such
former employees are not entitled to indemnification under Delphi's bylaws and Delaware law,
and releasing claims against any current or former officers, directors, and employees based on
the allegations in the Delphi Securities Action and the Delphi ERISA Action.

64.    Based on these considerations, the applicable standards for
indemnification under Delphi's bylaws and Delaware law, and the Board's determination that
resolving the MDL was in the best interests of the Debtors and their estates, a quorum of the
Board comprising members who are not named as defendants in the Delphi Securities Action
resolved that (i) Delphi will not assert the claims in the Derivative Demand, (ii) Delphi will

release all affirmative claims against all current and former officers and directors of Delphi

relating to or arising out of alleged violations of the federal securities laws during the period of

time between March 7, 2000 and March 3, 2005, inclusive, but will retain the right to assert such

claims as a defense or setoff to claims asserted by such officers and directors, and (iii) certain

former officers, directors, and employees have not met the standards for indemnification under

Delphi's bylaws and Delaware law, and Delphi therefore will not indemnify those former officers,

directors, and employees against any liabilities arising out of or in connection with the Delphi

Securities Action.  In addition, a quorum of the Board comprising members not named as

defendants in the Delphi Securities Action or the Delphi ERISA Action decided to grant Delphi

management the authority to finalize and enter into the settlement agreements that were

ultimately embodied in the Securities Stipulation, the ERISA Stipulation, and the Insurance

Stipulation.

   L.  The District Court's Preliminary Approval Orders

    65.  On September 5, 2007, the District Court entered an Order Of Preliminary

Approval And For Notice And Hearing concerning the Delphi Securities Action (the "Securities

Order") which, among other things, preliminarily approved the settlement contemplated by the

Securities Stipulation, preliminarily certified the Securities Class, and scheduled a fairness

hearing on the settlement contemplated by the Securities Stipulation for November 13, 2007.  A

copy of the District Court's order concerning the Delphi Securities Action is attached to this

motion as Exhibit D.

    66.  On the same day, the District Court entered an Order Preliminarily

Approving Settlement, Preliminarily Certifying A Settlement Class, Approving Forms And

Methods Of Notice, And Setting a Fairness Hearing concerning the Delphi ERISA Action (the

"ERISA Order") which, among other things, preliminarily approved the settlement contemplated

by the ERISA Stipulation, preliminarily certified the ERISA Class, and scheduled a fairness

hearing on the settlement contemplated by the Securities Stipulation for November 13, 2007.  A

copy of the District Court's order concerning the Delphi ERISA Action is attached to this motion

as <u>Exhibit E</u>.

        M.     <u>The United States Department Of Labor's Proofs Of Claim</u>

        67.     The DOL has filed proof of claim number 9826 in these cases, dated July

14, 2006 (the "DOL Proof Of Claim"), arising from the DOL's investigation of possible ERISA

violations concerning the ASEC Manufacturing Employee Benefit Plans.  The Debtors objected

to the DOL Proof Of Claim on July 13, 2007.[33]  The Delphi ERISA Action also involves

allegations of ERISA violations concerning the ASEC Manufacturing Savings Plan, and the

settlement contemplated by the ERISA Stipulation provides a recovery for that plan in exchange

for a release of all claims as to Delphi (and other defendants) related to the allegations in the

Delphi ERISA Action.

        68.     In order to achieve the final and complete resolution of matters related to

the Delphi ERISA Action and related insurance claims that is intended under the stipulations, the

Debtors are requesting the following relief with respect to the DOL:  The Debtors have provided

special notice of this motion to the DOL.  The Debtors hereby request that, if the DOL, in its sole

discretion, determines not to object to the relief requested as to it, this Court enter an order

expunging the DOL Proof Of Claim and barring and enjoining the DOL from instituting and/or

prosecuting any investigations, actions, or claims against any of the current or former officers or

---

[33]   <u>See</u> Debtors' Nineteenth Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr.
P. 3007 To Certain (A) Insufficiently Documented Claims, (B) Claims Not Reflected On Debtors' Books And
Records, (C) Untimely Claim, And (D) Claims Subject To Modification, Tax Claims Subject To Modification,
Modified Claims Asserting Reclamation, And Consensually Modified And Reduced Claims, dated July 13,
2007 (Docket No. 8617).

directors of Delphi arising out of or related to the allegations in the Delphi ERISA Action (the "DOL Bar Order").

Relief Requested

69.    By this motion, the Debtors' request that this Court enter an order (i) approving the Securities Stipulation, the ERISA Stipulation, the Insurance Stipulation, and the Board's decision to release affirmative claims against Delphi's current and former officers and directors relating to or arising out of alleged violations of the securities laws from March 7, 2000 through March 3, 2005 as part of a comprehensive settlement of the MDL and related insurance claims under section 363(b)(1) of the Bankruptcy Code and Bankruptcy Rule 9019(a), (ii) certifying the Securities Class and the ERISA Class for purposes of settlement and granting the Securities Allowed Claim and the ERISA Allowed Interest and for no other purposes under Bankruptcy Rules 9014(c) and 7023 and Fed. R. Civ. P. 23, (iii) authorizing the Securities Lead Plaintiffs to cast votes concerning the Plan on behalf of the Securities Class without any further solicitation of the Securities Class, and directing the Securities Lead Plaintiffs to cast all votes under their control in favor of the Plan, provided that the Plan is consistent with and incorporates the Securities Stipulation, (iv) authorizing the ERISA Named Plaintiffs to cast votes concerning the Plan on behalf of the ERISA Class without any further solicitation of the ERISA Class, and directing the ERISA Named Plaintiffs to cast all votes under their control in favor of the Plan, (v) deeming the Insurance Policies (as defined in the Insurance Stipulation) fully exhausted and forever discharged upon the effective date of the Insurance Stipulation, (vi) barring any person insured under the Insurance Policies from asserting claims against the Insurance Policies, (vii) lifting the automatic stay with respect to the documents provided to the Securities Lead Plaintiffs pursuant to the Agreed Order under section 362 of the Bankruptcy Code and Bankruptcy Rule

4001(d), and (viii) provided that the DOL determines not to object to such relief, expunging the

DOL Proof Of Claim and entering the DOL Bar Order.

Basis For Relief

A.    Approval Of The Multidistrict Litigation Settlement Is Warranted Under Section
      363 Of The Bankruptcy Code And Bankruptcy Rule 9019

70.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  Use of estate property outside the ordinary course of business may be

authorized if the debtor demonstrates a sound business justification for it.  See Comm. of Equity

Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business

judgment rule requires finding that good business reason exists to grant debtor's application

under section 363(b)); see also In re Del. & Hudson Ry. Co., 124 B.R. 169, 178-179 (D. Del.

1991).

71.    The Second Circuit has held that, although the bankruptcy court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming an "arbiter of disputes between

creditors and the estate."  Orion Pictures Corp. v. Showtime Network, Inc. (In re Orion Pictures

Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's consideration of a debtor's section

363(b) motion is a "summary proceeding," intended merely as a means "to efficiently review

the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate.

It is not the time or place for prolonged discovery or a lengthy trial with disputed issues."  Id. at

1098-99.

72.    Once the debtor articulates a valid business justification, a presumption

arises that "in making a business decision the directors of a corporation acted on an informed

42

basis, in good faith and in the honest belief that the action was in the best interests of the

company.'" Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re

Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992).  As a rule, the debtor's business

judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable

that it could not be based upon sound business judgment, but only on bad faith, or whim or

caprice.'"  In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc.,

128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

73.     Under Bankruptcy Rule 9019(a), "the court may approve a compromise or

settlement" upon notice to certain parties.  The key question under Bankruptcy Rule 9019(a) is

whether the settlement is "fair and equitable" and in the best interests of the debtor's estate, an

analysis that requires the court to make an "informed and independent judgment" based on the

"fact necessary for an intelligent and objective opinion of the probabilities of ultimate success

should the claim be litigated."  TMT Trailer Ferry Protective Comm. For Independent

Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25 (1968).  The court

"should form an educated estimate of the complexity, expense, and likely duration of such

litigation, the possible difficulties of collecting on any judgment which might be obtained, and

all other factors relevant to a full and fair assessment of the wisdom of the proposed

compromise," including by comparing the compromise "with the likely rewards of litigation."  Id.

74.     The Second Circuit has developed several factors relevant to this inquiry,

including (a) the balance between the litigation's possibility of success and the settlement's future

benefits, (b) the likelihood of complex and protracted litigation, with its attendant expense,

inconvenience, and delay, including the difficulty in collecting on the judgment, (c) the

paramount interests of the creditors, including each affected class's relative benefits and the

degree to which creditors either do not object to or affirmatively support the proposed settlement,

(d) whether other parties in interest support the settlement, (e) the competency and experience of

counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing,

the settlement, (f) the nature and breadth of releases to be obtained by officers and directors, and

(g) the extent to which the settlement is the product of arm's length bargaining.  Iridium Capital

Corp. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452,

461-62 (2d Cir. 2007).

75.    In applying these factors, it is not necessary for the court "to conduct a

'mini trial' to determine the merits of the underlying litigation."  In re Ashford Hotels, Ltd., 226

B.R. 797, 802 (Bankr. S.D.N.Y. 1998)  "Rather, the court's responsibilities are to familiarize

itself with all facts necessary for an intelligent and objective opinion, canvass the issues, and see

whether the settlement falls below the lowest point in the range of reasonableness."  Id.; accord

Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983).  Moreover, in

"making this assessment, there is a general presumption in favor of settlements, as compromises

are favored in bankruptcy."  In re Tower Automotive, Inc., 342 B.R. 158, 164 (Bankr. S.D.N.Y.

2006) (internal citations omitted).

76.    The settlements at issue here easily satisfy the business judgment test

under section 363(b)(1) and the fair and equitable standard under Rule 9019(a).  To begin, the

settlements provide the Debtors with a resolution of the MDL as well as related insurance claims

arising from the MDL and certain government investigations and proceedings, which will allow

the Debtors to avoid the costs of further litigation with respect to those matters.  Although it is

possible that the Debtors could avoid liability altogether with respect to those matters if the

litigation continued, or that the claims related to the MDL would be estimated at zero for

44

purposes of the Plan, that is not a likely outcome, and in any event would most likely require the

expenditure of significant time and money by the Debtors to achieve that result.  In reaching

their decision to enter into the settlements, the Debtors weighed the potential costs and the

likelihood of success in litigation or an estimation proceeding against the benefits provided to the

Debtors and their estates, creditors, and stakeholders, and concluded that the settlements offered

the best opportunity to obtain a resolution of the MDL and related matters while moving toward

a successful emergence from chapter 11 protection.

77.    Second, there is no doubt that the claims at issue in the MDL are complex,

and that resolving those claims other than through a settlement would involve protracted

litigation involving, among other things, dispositive motions, extensive discovery, and, if

necessary, trial.  An estimation process in this Court would involve many of the same features,

and would likely be resisted by the Securities Lead Plaintiffs and the ERISA Named Plaintiffs.

Indeed, as the court recognized in S.E.C. v. Drexel Burnham Lambert Inc. (In re Drexel

Burnham Lambert Group, Inc.), 130 B.R. 910 (S.D.N.Y. 1991), a case involving a settlement of

a securities action, as between settlement and estimation, settlement "is the more appropriate

method of resolving" claims because estimation "would unduly delay the resolution of [the]

Chapter 11 cases, possibly for years, deplete the assets of these estates, and consume substantial

resources of the judiciary."  Id. at 926.

78.    Third, with respect to creditors, given that the Debtors' proposed Plan

contemplates a full recovery for general unsecured creditors, the consideration provided to the

Securities Lead Plaintiffs and the ERISA Named Plaintiffs under the stipulations would not

affect their recoveries under the proposed Plan.  With respect to the members of the Securities

Class (and those who opt out of the Securities Class) and the ERISA Class, the stipulations
provide for consideration that otherwise would not be available to those classes of creditors.

79.    Fourth, the parties to the settlement agreements were advised throughout
the process by counsel that are competent and experienced with respect to the federal securities
laws, ERISA, derivative actions, insurance matters, and the resolution of complex litigation
involving multiple parties.  This Court also possesses competence and experience in these areas.

80.    As for releases, the settlement involves a variety of releases with respect
to Delphi's current and former officers and directors, including (i) the release of Securities
Settled Claims by the Securities Lead Plaintiffs and all members of the Securities Class and the
release of Settled Underwriter Defendants' Claims by the Underwriter Defendants under the
Securities Stipulation, (ii) the release of the ERISA Settled Claims by the ERISA Named
Plaintiffs and all members of the ERISA Class under the ERISA Stipulation, (iii) the release of
Insurance Settled Officers and Directors Claims by the Delphi Released Parties and the Insurers
Released Parties under the Insurance Stipulation, and (iv) under the Board's resolution on August
7, 2007, the release of all claims against Delphi's current and former officers and directors –
including officers and directors who are not parties to the Securities Stipulation, the ERISA
Stipulation, or the Insurance Stipulation – that relate to or arise from alleged violations of the
federal securities laws from March 7, 2000 through March 3, 2005.

81.    The nature and scope of these releases should be given little or no weight
in this Court's analysis because the stipulations were authorized by the members of the Board
who are not named as defendants in the Delphi Securities Action or the Delphi ERISA Action,
and the Board resolution releasing claims was vetted by the Special Committee and approved by
the members of the Board who are not named as defendants in the Delphi Securities Action.  See

46

In re Adelphia Communications Corp., 327 B.R. 143, 165 (Bankr. S.D.N.Y. 2005) (giving this factor "no weight" where "[b]oard members who considered the settlement were wholly disinterested"). Furthermore, the releases are appropriate in light of the comprehensive resolution achieved under the settlement.

82.     Finally, the settlements are the product of arms' length bargaining by sophisticated parties represented by competent and experienced counsel. The settlements resulted from a process that unfolded over nearly three months under the able supervision of the Special Master appointed by the District Court in July 2007. Based on these factors, this Court should conclude that the Debtors exercised reasonable business judgment in entering into the settlements under section 363(b)(1), and that the settlements are fair and equitable under Rule 9019(a).

B.     Certification Of The Securities Class And The ERISA Class For Purposes Of Settlement And Granting The Class Claims And Interests Is Appropriate Under Bankruptcy Rules 9014(c) And 7023 And Fed. R. Civ. P. 23

83.     The Securities Stipulation and the ERISA Stipulation contemplate the certification by this Court of the Securities Class and the ERISA Class under Bankruptcy Rule 7023 and Fed. R. Civ. P. 23 for purposes of (i) settlement, (ii) granting the Securities Lead Plaintiffs, as representatives of the Securities Class, the Securities Allowed Claim, and (iii) granting the ERISA Named Plaintiffs, as representatives of the ERISA Class, the ERISA Allowed Interest, and for no other purposes. Under Bankruptcy Rule 9014(c), this Court has the authority to direct that Bankruptcy Rule 7023 shall apply to this matter. See Fed. R. Bankr. P. 9014(c) (providing that the "court may at any stage in a particular matter direct that one or more of the other rules in Part VII shall apply").

84.     Bankruptcy Rule 7023 and Fed. R. Civ. P. 23 grant this Court discretion to recognize class claims. In re Musicland Holding Corp., 362 B.R. 644, 650 (Bankr. S.D.N.Y.

2007); In re Thomson McKinnon Sec., Inc., 150 B.R. 98, 101 (Bankr. S.D.N.Y. 1992). In

addition, "[c]lasses may be certified for settlement purposes only." In re WorldCom, Inc., 347

B.R. 123, 141 (Bankr. S.D.N.Y. 2006). "Like all other proposed classes, settlement classes must

satisfy the four criteria enunciated in Fed. R. Civ. P. 23(a) and one of the three alternatives set

forth in Fed. R. Civ. P. 23(b)." WorldCom, 347 B.R. at 141. The requirements of Fed. R. Civ. P.

23(a) are satisfied when:

> (1) the class is so numerous that joinder of all members is impracticable,
> (2) there are questions of law or fact common to the class, (3) the claims
> or defenses of the representative parties are typical of the claims or
> defenses of the class, and (4) the representative parties will fairly and
> adequately protect the interests of the class.

85.     Under Fed. R. Civ. P. 23(b)(1), a class can be certified if "the prosecution

of separate actions by or against individual members of the class would create a risk of" either

"inconsistent or varying adjudications with respect to individual members of the class which

would establish incompatible standards of conduct for the party opposing the class," or

"adjudications with respect to individual members of the class which would as a practical matter

be dispositive of the interests of the other members not parties to the adjudications or

substantially impair or impede their ability to protect their interests." Federal Rule of Civil

Procedure 23(b)(2) applies when "the party opposing the class has acted or refused to act on

grounds generally applicable to the class, thereby making appropriate final injunctive relief or

corresponding declaratory relief with respect to the class as a whole."

86.     Certification is proper under Fed. R. Civ. P. 23(b)(3) when "the questions

of law or fact common to the members of the class predominate over any questions affecting

only individual members," and "a class action is superior to other available methods for the fair

and efficient adjudication of the controversy." The following factors are pertinent to these

determinations:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Id. With respect to the fourth factor, "when considering a proposed settlement class, the court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." WorldCom, 347 B.R. at 141.

87.    In connection with the Securities Order and the ERISA Order, the District Court considered the requirements under Fed. R. Civ. P. 23, made findings with respect to each of those requirements, and preliminarily certified the Securities Class under Fed. R. Civ. P. 23(b)(3) and the ERISA Class under Fed. R. Civ. P. 23(b)(1) and (2), both for purposes of settlement only.  (See Exhibit D; Exhibit E.)  Because the analysis undertaken by the District Court as to Fed. R. Civ. P. 23 is the same analysis that would apply here, and to avoid the possibility of inconsistent rulings that could derail the settlement-approval process, the Debtors respectfully request that this Court adopt the District Court's findings and conclusions with respect to Fed. R. Civ. P. 23.

88.    In addition to applying the requirements of Fed. R. Civ. P. 23, bankruptcy courts also consider whether "the benefits that generally support class certification in civil litigation [are] realizable in the bankruptcy case."  In re Woodward & Lothrop Holdings, Inc., 205 B.R. 365, 369 (Bankr. S.D.N.Y. 1997); accord In re Musicland Holding Corp., 362 B.R. 644, 651 (Bankr. S.D.N.Y. 2007) (stating that bankruptcy courts should consider whether "the benefits derived from the use of the class claim device are consistent with the goals of bankruptcy").  That standard is satisfied here because certifying the Securities Class and the ERISA Class will allow the Debtors to settle the MDL and related insurance claims in an

49

efficient manner without impeding the administration of these cases or the confirmation process

with respect to the Plan, and it will afford significant consideration to members of the Securities

Class and the ERISA Class who otherwise might not receive a recovery in these cases.  See

Woodward & Lothrop Holdings, 205 B.R. at 369 (explaining that the benefits that class actions

confer include "increased efficiency" and "compensation to injured parties").

        89.    For the reasons stated above, the Debtors' request that this Court certify

the Securities Class and the ERISA Class for purposes of settlement, granting the Securities Lead

Plaintiffs, as representatives of the Securities Class, the Securities Allowed Claim, and granting

the ERISA Named Plaintiffs, as representatives of the ERISA Class, the ERISA Allowed Interest,

and for no other purposes.[34]

C.    The Securities Lead Plaintiffs And The ERISA Named Plaintiffs Should Be
Authorized To Vote As Representatives Of The Securities And ERISA Classes
And Directed To Vote In Favor And Acceptance Of The Plan

        90.    The Securities Stipulation provides that the Securities Lead Plaintiffs will

cast all votes concerning the Plan that are under their control, including the votes arising from

the Securities Allowed Claim, on behalf of the Securities Class.  Because the allegations in the

Delphi Securities Action (and therefore the basis for the Securities Allowed Claim) involve both

debt and equity securities, the Securities Class's votes will be divided between separate debt and

equity classes for voting purposes, with the precise division determined by a plan of allocation to

be proposed by the Securities Lead Plaintiffs.  The ERISA Stipulation contains similar terms,

providing that the ERISA Named Plaintiffs will cast all concerning the Plan that are under their

control, including the votes arising from the ERISA Allowed Interest, on behalf of the ERISA

---

[34]    In the event that the settlements contemplated by the Securities Stipulation and the ERISA Stipulation do not
become effective, the parties to the stipulations have reserved all rights with respect to challenging class
certification and the propriety of granting the Securities Lead Plaintiffs and the ERISA Named Plaintiffs a class
claim.

Class.  All of the ERISA Class's votes will be placed in a separate equity class, because the
allegations in the Delphi ERISA Action (and therefore the basis for the ERISA Allowed Interest)
are limited to alleged ERISA violations concerning equity securities.  Under both stipulations,
the class representatives agreed to cast their votes in favor of the Plan, provided that the Plan is
consistent with and incorporates the terms of the stipulations.

91.    When a class has been certified, a bankruptcy court can authorize the
representatives of the class to vote on behalf of all class members with respect to the debtor's
plan of reorganization.  See King Resources Stockholders' Protective Comm. v. Baer (In re King
Resources Co.), 651 F.2d 1326, 1340-41 (10th Cir. 1980) (holding that class representatives can
vote on plan on behalf of class when court order authorizes such voting); In re A.H. Robins Co.,
88 B.R. 742, 744 (E.D. Va. 1988) (noting that court had "authorized named plaintiffs . . . to vote
as class representatives either acceptance or rejection of the [p]lan on behalf of . . . [c]lass
[a]ction plaintiffs").  Allowing the Securities Lead Plaintiffs to vote on behalf of the Securities
Class and the ERISA Named Plaintiffs to vote on behalf of the ERISA Class with respect to the
Plan is proper because those classes were certified for settlement purposes by the District Court
in its orders of September 5, 2007 and the Securities Stipulation and the ERISA Stipulation
contemplate representative voting on the Plan.  When, as here, class representatives enter into
settlements that offers class members a recovery that otherwise would not be available to them, it
is appropriate to allow the class representatives to vote on behalf of those class members,
particularly in situations where the class members themselves did not file proofs of claim.  The
Securities Allowed Claim and the ERISA Allowed Interest and their accompanying votes were
made possible only because of the settlements negotiated by the class representatives, and it is
only fitting that those representatives have the authority to cast those votes.

D.    Approval Of Delphi's Agreement To Lift The Automatic Stay Is Warranted Under
Fed. R. Bankr. B. 4001(d) And Section 362 Of The Bankruptcy Code

92.    As part of the Securities Stipulation, Delphi and the Securities Lead

Plaintiffs agreed to lift the automatic stay imposed by section 362 of the Bankruptcy Code with

respect to documents provided by the Debtors to the Securities Lead Plaintiffs pursuant to this

Court's Agreed Order modifying the automatic stay.  The documents generally include

documents that had been produced by the Debtors to the United States Securities and Exchange

Commission (the "SEC"), except such documents that were privileged or protected by the

attorney work product doctrine.  Under the Agreed Order, the Securities Lead Plaintiffs were

allowed to use the documents for any purpose, except for certain purposes related to motions to

dismiss, amended complaints, and other pleadings in the Delphi Securities Action.  Under the

Securities Stipulation, the automatic stay will be lifted in its entirety with respect to those

documents.[35]

93.    An agreement to modify or terminate the automatic stay is permitted under

Bankruptcy Rule 4001(d)(1)(C).  Under section 362(d)(1) of the Bankruptcy Code, relief from

the automatic stay can be granted "for cause."  The Second Circuit considers several factors in

deciding whether to lift a stay under section 362(d)(1):

> (1) whether relief would result in a partial or complete resolution of the
> issues; (2) lack of any connection with or interference with the bankruptcy
> case; (3) whether the other proceeding involves the debtor as a fiduciary;
> (4) whether a specialized tribunal with the necessary expertise has been
> established to hear the cause of action; (5) whether the debtor's insurer has
> assumed full responsibility for [a defense]; (6) whether the action
> primarily involves third parties; (7) whether litigation in another forum
> would prejudice the interests of other creditors; (8) whether the judgment
> claim arising from the other action is subject to equitable subordination; (9)

---

[35]    The Debtors and the Securities Lead Plaintiffs will also enter into an appropriate confidentiality order that will
govern their use of the documents in the ongoing Delphi Securities Action.

whether the movant's success in the other proceeding would result in a
judicial lien avoidable by the debtor; (10) the interests of judicial economy
and the expeditious and economical resolution of litigation; (11) whether
the parties are ready for trial in the other proceeding; and (12)[the] impact
of the stay on the parties and the balance of harms.

Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus.), 907 F.2d 1280, 1286

(2d Cir. 1990).

94.    Many of these factors do not apply here because the relief sought would

remove the restrictions on the Securities Lead Plaintiffs' ability to use the documents produced

under the Agreed Order, and would not result in litigation by the Securities Lead Plaintiffs

against the Debtors.  The considerations weight in favor of lifting the stay include the fact that

the relief would completely resolve all outstanding issues between the Debtors and the Securities

Lead Plaintiffs concerning their use of the documents, including their use of the documents in the

Delphi Securities Action.  The relief will not interfere with these cases because the Debtors have

already produced the documents.  Furthermore, the Securities Lead Plaintiffs' use of the

documents will not prejudice the interests of the Debtors' creditors because the Securities

Stipulation resolves the Delphi Securities Action as to Delphi, including with respect to any

claims for contribution or indemnification related to the Delphi Securities Action.  In sum, the

relief sought applies to documents that have already been produced and which the Securities

Lead Plaintiffs may already use for a range of purposes, and relates primarily to an action that,

under the Securities Stipulation, will no longer involve the Debtors.  Under these circumstances,

this Court should lift the stay with respect to those documents under section 362(d)(1).

E.    The United States Department Of Labor's Proof Of Claim Should Be Expunged

95.    As discussed above, the Debtors have provided special notice of this

motion to the DOL.  Provided that the DOL determines not to object, the Debtors respectfully

request that this Court expunge the DOL Proof Of Claim and enter the DOL Bar Order.

53

96.    The DOL Proof Of Claim relates to potential ERISA violations involving the ASEC Manufacturing Employee Benefit Plans.  The Delphi ERISA Action involves related allegations, and the settlement contemplated by the ERISA Stipulation provides the ASEC Manufacturing Savings Plan (along with the Delphi Personal Savings Plan for Hourly-Rate Employees, the Delphi Savings-Stock Purchase Program for Salaried Employees, and the Delphi Mechatronic Systems Savings-Stock Purchase Program) with a gross recovery of more than $22 million in insurance proceeds plus the ERISA Allowed Interest in the face amount of $24.5 million.  Furthermore, the purpose of the ERISA Stipulation is to completely and finally resolve all claims related to the Delphi ERISA Action as to Delphi, ASEC Manufacturing, and the other parties to the ERISA Stipulation.  Because the ERISA Stipulation provides compensation the ASEC Manufacturing Savings Plan and allowing the DOL Proof Of Claim would be inconsistent with the ERISA Stipulation's objective of providing a complete and final resolution of all claims related to the Delphi ERISA Action, the DOL Proof Of Claim should be expunged.

97.    For much the same reasons, any additional investigations, claims, or actions by the DOL against Delphi's current or former officers or directors relating to the allegations in the Delphi ERISA Actions would also counteract the purposes of the settlement. Further activity by the DOL against such individuals could cause them to incur defense costs and other potential liabilities for which they no longer have insurance coverage because of the releases and the bar order provided in the Insurance Stipulation.  Accordingly, the Debtors are also seeking in this motion the DOL Bar Order, which will bar the DOL from instituting and/or prosecuting any investigations, actions, or claims against any of the current or former officers or directors of Delphi arising out of or related to the allegations in the Delphi ERISA Action.

98.    The Debtors believe that, under the circumstances that exist here, it is appropriate for the DOL to consent to this relief, and the Debtors intend to conduct discussions with the DOL concerning their views on this question in the weeks before the hearing on this motion.

<u>Notice Of Motion</u>

99.    Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered October 26, 2006 (Docket No. 5418).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

100.    Because the legal points and authorities upon which this motion relies are incorporated herein, the Debtors respectfully request that the requirement of serving and filing a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

Dated: New York, New York
       September 7, 2007

                                        SKADDEN, ARPS, SLATE, MEAGHER
                                         & FLOM LLP

                                        By: /s/ John Wm. Butler, Jr.
                                            John Wm. Butler, Jr. (JB 4711)
                                            John K. Lyons (JL 4951)
                                            Albert L. Hogan, III (AH 8807)
                                            Ron E. Meisler (RM 3026)
                                        333 West Wacker Drive, Suite 2100
                                        Chicago, Illinois 60606
                                        (312) 407-0700

                                                    - and -

                                        By:  /s/ Kayalyn A. Marafioti
                                            Kayalyn A. Marafioti (KM 9632)
                                            Thomas J. Matz (TM 5986)
                                        Four Times Square
                                        New York, New York 10036
                                        (212) 735-3000

                                        Attorneys for Delphi Corporation, <u>et al.</u>,
                                         Debtors and Debtors-in-Possession