**Hearing Date And Time: September 27, 2007 At 10:00 a.m.**
**Objection Deadline: September 20, 2007 At 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :
    In re                           :    Chapter 11
                                    :
DELPHI CORPORATION, et al.,         :    Case No. 05-44481 (RDD)
                                    :
                       Debtors.     :    (Jointly Administered)
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 502(c)
(A) ESTIMATING AND SETTING MAXIMUM CAP ON CERTAIN
CONTINGENT OR UNLIQUIDATED CLAIMS AND (B) APPROVING
<u>EXPEDITED CLAIMS ESTIMATION PROCEDURES</u>

("CLAIMS ESTIMATION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Motion For Order Pursuant To 11 U.S.C. §§ 105(a) And 502(c) (a) Estimating And Setting Maximum Cap On Certain Contingent Or Unliquidated Claims And (b) Approving Expedited Claims Estimation Procedures (the "Motion"), and respectfully represent as follows:

Background

A.  The Chapter 11 Filings

1.  On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  The Court has ordered joint administration of these cases.

2.  No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee," and together with the Creditors' Committee, the "Statutory Committees").

3.  This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.  The statutory predicates for the relief requested herein are sections 105(a) and 502(c) of the Bankruptcy Code.

B.    Current Business Operations Of The Debtors

        5.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.[2]

        6.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

        7.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[2]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Spanish court approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.   Events Leading To The Chapter 11 Filing

8.   In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

9.   The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

---

[3]   Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

4

10.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.     The Debtors' Transformation Plan

11.     On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas:[4] first, modifying the Company's labor agreements to create a competitive arena in which to conduct business;[5]

---

[4]  In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors and a plan framework support agreement with those investors and GM.  On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework support agreement but that it expected to enter into new framework agreements with plan investors presently.  Subsequently, on July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors").  Under the Delphi-Appaloosa EPCA, the New Plan Investors agreed to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization.  This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.

[5]  Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM that (a) modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the UAW, and its various locals, (b) provides that GM will undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate these modifications, and (c) modifies retiree welfare benefits for certain UAW-represented retirees of the Debtors.  This agreement, which was approved by this Court on July 19, 2007, should permit the Debtors to continue to implement their transformation plan and to develop, prosecute, confirm, and consummate a plan of reorganization.  On August 6, 2007, similar agreements were reached with the International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America and its local unions, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers.  Such agreements were approved by this Court on August 16, 2007.  On August 16, 2007, Delphi also reached a similar agreement with the United Steel, Paper and Forestry, Rubber, Manufacturing,

5

second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[6] third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus;[7] fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint;[8] and devising a workable solution to their current pension situation.[9]

E.    The Debtors' Plan Of Reorganization

12.    On September 6, 2007, the Debtors reached another key milestone in their chapter 11 cases by filing their Joint Plan Of Reorganization Of Delphi Corporation And Certain

---

Energy, Allied Industrial and Service Workers International Union and USW Local 87L, which was approved by this Court on August 29, 2007.

[6] On July 9, 2007, Delphi confirmed that its discussions with GM on a comprehensive settlement agreement had entered the documentation phase and that it expected that a settlement with GM would be incorporated into the Debtors' plan of reorganization rather than filed with this Court for separate approval.

[7] In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants. The Debtors have been working to divest non-core assets so as to maximize the value of their estates for stakeholders. During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, and obtained court approval for the sale of substantially all of the assets of their brake hose, catalyst, and Saltillo, Mexico brake plant businesses. In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

[8] As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages. The Company's revised operating structure consists of its four core business segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture. The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan. To ensure that their organizational and cost structure is competitive, the Debtors obtained an Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order"). The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[9] To that end, on May 31, 2007, the Bankruptcy Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 plan year funding waivers, which were approved by the IRS, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Plans"). On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively.

Affiliates, Debtors And Debtors-In-Possession (the "Plan").  The Plan is based upon a series of global settlements and compromises that involve every major constituency in the Debtors' reorganization cases.  Indeed, the Debtors, the Debtors' principal U.S. labor unions, GM, the Statutory Committees, and the lead plaintiffs in certain securities actions (on behalf of holders of various claims based on alleged violations of federal securities laws and the Employee Retirement Income Security Act of 1974, as amended) all have contributed to global settlements and compromises that provide for a recovery through a plan distribution amounting to the principal amount of the claim plus accrued interest at a negotiated plan value for general unsecured creditors, and agreed upon distributions to other classes of creditors and interests.  The Plan is supported by the Creditors' Committee on behalf of unsecured creditors, the Equity Committee on behalf of holders of Delphi's common stock, and GM.  A hearing will be held on October 3, 2007 to approve the Debtors' solicitation procedures and disclosure statement with respect to the Plan.  The Debtors will seek to have a hearing on confirmation of the Plan on November 19, 2007.  The Debtors expect to emerge from these chapter 11 cases on December 31, 2007.

        13.     Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

14.     By this Motion, the Debtors seek entry of an order (a) estimating and setting a maximum cap on certain contingent or unliquidated claims and (b) approving expedited claims estimation procedures. The Debtors submit that such relief is in the best interests of the Debtors, their estates, and all parties-in-interest.

Basis For Relief

A.    <u>The Debtors' Contingent Or Unliquidated Claims</u>

15.    On April 12, 2006, this Court entered an Order Under 11 U.S.C. §§ 107(b), 501, 502, And 1111(a) And Fed R. Bankr. P. 1009, 2002(a)(7), 3003(c)(3), And 5005(a) Establishing Bar Dates For Filing Proofs Of Claim And Approving Form And Manner Of Notice Thereof (Docket No. 3206) (the "Bar Date Order"). Among other things, the Bar Date Order established July 31, 2006 (the "Bar Date") as the last date for all persons and entities holding or wishing to assert "Claims," as such term is defined in 11 U.S.C. § 101(5) (each, a "Claim"), against a Debtor (collectively, the "Claimants") to file a proof of claim with respect to each such Claim. Subsequently, approximately 16,600 proofs of claim were filed, of which approximately 6,360 proofs of claim (38%) were filed as either wholly or partially contingent or unliquidated in amount (the "Unliquidated Proofs of Claim").

B.    <u>The Effectiveness Of The Plan Requires Liquidation Of Unliquidated Proofs of Claim</u>

16.    Under section 1.1 of Amended Exhibit B to the Delphi-Appaloosa EPCA, one condition precedent to the effectiveness of a plan of reorganization is that the aggregate amount of certain trade claims and other unsecured claims that have been asserted or scheduled, but not yet disallowed as of the effective date of such plan of reorganization, shall be allowed or estimated for distribution purposes by this Court to be no more than $1.7 billion. Consequently, the Debtors have worked to reconcile and resolve their claims pool on an expedited basis,

8

devoting a significant amount of time and resources to the claims resolution process. Between September 19, 2006 and the date of this Motion, the Debtors have filed 20 omnibus claims objections seeking disallowance of approximately 9,700 proofs of claim with approximately $9.6 billion in asserted liquidated amounts plus unliquidated amounts, and modification of approximately 3,400 proofs of claim with approximately $560 million in asserted liquidated amounts. As of September 5, 2007, the Bankruptcy Court has entered orders expunging approximately 9,100 proofs of claim, which reduced the amount of asserted claims by approximately $8.7 billion. In addition, the asserted claim amount of approximately 2,700 claims has been reduced by approximately $42.5 million either through orders in respect of omnibus claims objections ($24.5 million) or stipulated orders ($18.0 million). Additionally, 80 proofs of claim asserting approximately $188 million have been withdrawn.

17.    Furthermore, Article 9.8 of the Debtors' proposed Plan will establish a distribution reserve for the purpose of effectuating distributions to holders of disputed claims or disputed interests (the "Distributed Reserve Account").[10] The effective date of Plan is contingent

---

[10]   9.8  Procedures For Treating And Resolving Disputed And Contingent Claims.

(b) Distribution Reserve. The Debtors shall establish one or more Distribution Reserves, including reserves aggregating $1.7 billion on account of General Unsecured Claims (other than Senior Note Claims and TOPrS Claims), Section 510(b) Note Claims, Section 510(b) Equity Claims, Section 510(b) ERISA Claims, and Cure Claims for the purpose of effectuating distributions to holders of Disputed Claims or Disputed Interests pending the allowance or disallowance of such claims or interests in accordance with this Plan. To the extent that any Claims remain Disputed Claims as of the Effective Date, the Debtors or Reorganized Debtors shall seek an order from the Bankruptcy Court establishing the amounts to be withheld as part of the Distribution Reserves. Without limiting the foregoing, the Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim, including any such Claim arising from the Debtors' or Reorganized Debtors' rejection of an executory contract, pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors have previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Disputed Claim at any time during litigation concerning any objection to any Disputed Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount may, as determined by the Bankruptcy Court, constitute either (a) the Allowed amount of such Disputed Claim, (b) a maximum limitation on such Disputed Claim, or (c) in the event such Disputed Claim is estimated in connection with the estimation of other Claims within the same Class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Disputed Claims so estimated; provided, however, that if the estimate constitutes the maximum

on a condition precedent that originated in the Delphi-Appaloosa EPCA, which requires that certain trade claims and other unsecured claims be allowed or estimated for distribution purposes by the Bankruptcy Court to be no more than $1.7 billion.[11] (the "Capped Claims").

18.    Notwithstanding the Debtors' efforts to administer claims as expeditiously as possible, as of September 5, 2007, there are approximately 300 contingent or unliquidated proofs of claim that do not flow through the Debtors' chapter 11 cases under the Plan or have not otherwise been resolved pursuant to various court orders or settlement agreements (the "Unliquidated Claims").  These Unliquidated Claims either require further reconciliation by the Debtors or have been adjourned pursuant to the Order Pursuant to 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (I) Dates For Hearings Regarding Objections To Claims And (II) Certain Notices And Procedures Governing Objection entered December 6, 2006 (Docket No. 6089) (the "Claims Procedures Order").

---

limitation on a Disputed Claim, or on more than one such Claim within a Class of Claims, as applicable, the Debtors may elect to pursue supplemental proceedings to object to any ultimate allowance of any such Disputed Claim.  All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

(c)    No Recourse To Debtors Or Reorganized Debtors.  Any Disputed Claim or Disputed Interest that ultimately becomes an Allowed Claim or Allowed Interest, as the case may be, shall be entitled to receive its applicable distribution under the Plan solely from the Distribution Reserve established on account of such Disputed Claim or Disputed Interest.  In no event shall any holder of a Disputed Claim or Disputed Interest have any recourse with respect to distributions made, or to be made, under the Plan to holders of such Claims or Interests to any Debtor or Reorganized Debtor on account of such Disputed Claim or Disputed Interest, regardless of whether such Disputed Claim or Disputed Interest shall ultimately become an Allowed Claim or Allowed Interest, as the case may be, or regardless of whether sufficient Cash, New Common Stock, New Warrants, or other property remains available for distribution in the Distribution Reserve established on account of such Disputed Claim or Disputed Interest at the time such Claim or Interest becomes entitled to receive a distribution under the Plan.

[11]    12.2 Conditions To The Effective Date.  The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 12.3 of this Plan:

(f)    The Bankruptcy Court shall have entered one or more orders estimating Disputed Claims, if any, for the purposes of distributions and establishing Distribution Reserves, such that the maximum amount of allowable claims excluding Senior Note Claims and TOPrS Claims, and postpetition interest is less than the Unsecured Claims Threshold or the Debtors, the Plan Investors, and the Statutory Committees shall be reasonably satisfied that the amount of all Allowed General Unsecured Claims, excluding Senior Note Claims, TOPrS Claims, and postpetition interest shall not exceed the Unsecured Claims Threshold.

Section 1.200 of the Plan defines "Unsecured Claims Threshold" as $1.7 billion.

10

C.  The Debtors Propose To Estimate And Set A Maximum Cap On Unliquidated Claims

19.  To satisfy the Capped Claims requirement, in addition to continuing efforts to reconcile claims, the Debtors have estimated, on a claim-by claim basis, a proposed cap at a specific liquidated amount (each, a "Maximum Capped Amount") for each of the Unliquidated Claims listed on Exhibit A attached hereto.  The Maximum Capped Amount is based on an analysis of the documentation attached to these claims, as well as the Debtors' experience in negotiating settlements of, or litigating, similar claims.

20.  By this Motion, the Debtors request an order, pursuant to 11 U.S.C. §§ 105(a) and 502(c), estimating and setting a maximum cap on each Unliquidated Claim in the proposed Maximum Capped Amount indicated for that claim on Exhibit A hereto.  The Debtors are not seeking final resolution of these claims for the purposes of allowance.  Instead, the Debtors are seeking to estimate all Unliquidated Claims solely for the purposes of tabulating votes on the Plan and setting appropriate reserves for the Distributed Reserve Account of the Plan.[12]  The proposed Maximum Capped Amounts set forth on Exhibit A hereto do not represent and should not be construed as the Debtors' estimate of probable liability on any Unliquidated Claim.[13]  Rather, these amounts represent the Debtors' estimate of the maximum liability that has been or could reasonably be asserted by the Claimant on account of each Unliquidated Claim.  The Debtors reserve the right to object to, or seek to estimate, any and all Unliquidated Claims at lesser amounts for purposes of allowance and distribution.

---

[12]  As referenced above, however, under Article 9.8 of the Plan, in no event would any holder of a disputed claim whose claim ultimately might be liquidated in an amount higher than the Maximum Capped Amount for such claim have any recourse with respect to distributions to be made under the Plan to any Debtor or reorganized Debtor on account of such disputed claim.

[13]  By including a claim on Exhibit A hereto, the Debtors are not conceding or admitting to any liability with respect to such claim.

11

D.  **The Debtors Propose Estimation Procedures For Claimants Making Counterproposals**

    a.  **Counterproposals By Claimants Of Maximum Capped Amounts**

21. By service of a copy of this Motion, the Debtors have given notice of the proposed Maximum Capped Amount and the relief requested herein with respect to each Claimant whose Unliquidated Claim appears on Exhibit A hereto. If any Claimant disagrees with the Maximum Capped Amount, the Debtors propose that each such Claimant must submit a counterproposal for a different maximum capped amount for its Unliquidated Claim (each, a "Counterproposal") by the objection deadline of September 20, 2007.

22. If a Claimant timely submits a Counterproposal, the Debtors seek to reserve the right either to (a) accept the Counterproposal (or a lesser agreed upon amount) as the Maximum Capped Amount for the Unliquidated Claim for purposes of tabulating votes on and setting appropriate reserves for the Distributed Reserve Account of the Plan or (b) reject the Counterproposal and seek to estimate, for purposes of tabulating votes on the Plan and setting appropriate reserves for the Distributed Reserve Account of the Plan, the Unliquidated Claim at a subsequent hearing date (an "Estimation Hearing").

23. If a Claimant neither objects to this Motion, nor submits a Counterproposal by September 20, 2007, the Debtors will seek an order estimating such Claimant's Unliquidated Claim for purposes of tabulating votes on the Plan and setting appropriate reserves for the Distributed Reserve Account of the Plan in the proposed Maximum Capped Amount as indicated on Exhibit A hereto.

    b.  **Claims Not Resolved Following Counterproposal May Be Subject Of An Estimation Hearing Under Expedited Claims Estimation Procedures**

24. If a Claimant timely files an objection to this Motion or submits a Counterproposal that is rejected (without subsequent agreement on a lower amount) with respect

12

to an Unliquidated Claim, then the Debtors propose that they be allowed to request that the Unliquidated Claim be estimated solely for purposes of tabulating votes on the Plan and setting appropriate reserves for the Distributed Reserve Account of the Plan at an Estimation Hearing, in the proposed Maximum Capped Amount indicated on Exhibit A hereto pursuant to the expedited claims estimation procedures described herein.

25. The Debtors propose to schedule each unresolved Unliquidated Claim for an Estimation Hearing of the Debtors' election by serving upon the relevant Claimant by facsimile or overnight delivery and filing with this Court a notice substantially in the form attached as Exhibit B hereto at least 20 calendar days before the Estimation Hearing.

26. The Debtors request that all such Estimation Hearings be held on the dates and times designated in the proposed Claims Procedures Order.

27. To the extent that the hearing on an Unliquidated Claim is adjourned to an Estimation Hearing, the Debtors propose that the Debtors and the Claimant be required to file and serve a supplemental pleading (a "Summary Brief") summarizing their respective positions no later than ten calendar days before the scheduled Estimation Hearing. In addition, the Debtors request that each party be entitled to submit two affidavits or declarations setting forth evidence in support of its Summary Brief. Summary Briefs would not exceed fifteen single-sided, double-spaced pages (exclusive of exhibits or declarations). The Debtors further propose that either party may file and serve a responsive brief (the "Responsive Brief") three calendar days before the Estimation Hearing, not to exceed eight single-sided, double-spaced pages, and supplements to each party's affidavits or declarations.

28. The Debtors request that the evidentiary and legal record be confined to the material included in the Summary Briefs, the Responsive Briefs, affidavits and declarations,

and arguments presented at the Estimation Hearing.  The Debtors also request that with respect to testimony by declarants, direct testimony may be heard only through declarations, witnesses may be subject to cross examination, and the party offering the testimony may conduct a re-direct examination of its witness.

29.     Finally, the Debtors propose that upon a showing of good cause by either party, this Court may allow or require additions to the record or any of the aforementioned procedures or guidelines as it deems necessary or appropriate.

Applicable Authority

30.     There is ample authority for the Court to estimate and set a maximum cap on the Unliquidated Claims for purposes of enabling the Debtors to satisfy the Capped Claims requirement.  Indeed, section 502(c) of the Bankruptcy Code provides that the Court shall estimate for purpose of allowance "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case."  11 U.S.C. § 502(c).  Although section 502(c) provides that a court shall estimate claims for purposes of "allowance," courts have used section 502(c) to estimate claims for more limited purposes, such as determining the amount to be placed in a reserve fund.  See, e.g., In re Jacom Computer Servs., Inc., 280 B.R. 570, 573 (Bankr. S.D.N.Y. 2002) (ordering estimation of disputed claims for establishing an appropriate reserve); In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 740 (Bankr. S.D.N.Y. 1992) (estimating disputed claims for reserve purposes).  Here, the Debtors' reorganization Plan cannot become effective unless the total amount of certain trade and unsecured claims does not exceed $1.7 billion.  The Debtors cannot achieve this goal unless certain of those claims, the Unliquidated Claims, are estimated and capped solely for purposes of tabulating votes on the Plan and setting appropriate reserves for the Distributed Reserve Account

of the Plan. Accordingly, the Motion should be granted to prevent undue delay in the administration of the Debtors' chapter 11 cases and the effectiveness of the Plan.

31. A court may authorize the estimation of a claim using "whatever method is best suited to the circumstances" of a particular case and recognizing that absolute certainty is not possible. Addison v. Langston (In re Brints Cotton Mktg., Inc.), 737 F.2d 1338, 1341 (5th Cir. 1984) (citation omitted). Although the Court is bound by the legal rules that govern the ultimate value of the claim, it has wide discretion in establishing the method to be used to arrive at an estimate of a claim or a group of claims. Id. See also Bittner v. Borne Chem. Co., 691 F.2d 134, 135 (3d Cir. 1982) (estimation requires only "sufficient evidence on which to base a reasonable estimate of the claim"); In re Windsor Plumbing Supply Co., 170 B.R. 503, 521 (Bankr. E.D.N.Y. 1994) (advocating use of probabilities in estimation of claims); In re Baldwin-United Corp., 55 B.R. 885, 898 (Bankr. S.D. Ohio 1985) (estimation "does not require that a bankruptcy judge be clairvoyant").

32. Additionally, section 105(a) of the Bankruptcy Code provides that a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Courts' discretion in choosing the process for estimating claims ranges from conducting summary trials (Baldwin, 55 B.R. at 899), to reviewing written submissions of proposed facts in the absence of a hearing (Windsor, 170 B.R. at 517), to taking the matter under advisement after a hearing to review of the pleadings and briefs (Lane, 68 B.R. at 613). Whatever the procedure a bankruptcy court chooses to estimate a claim, it must be consistent with the policy underlying chapter 11, that a "reorganization must be accomplished quickly and efficiently." Bittner, 691 F.2d at 137. Depending on the number, type, and complexity of Unliquidated Claims that become the subject

of Estimation Hearings, the Debtors may request, at the Estimation Hearing, that the Court (a) adopt one or more of the accepted procedures for estimation described above and (b) schedule such hearings to estimate such claims, either individually or in appropriate groupings. Because the estimation of the Unliquidated Claims is required to administer the Debtors' chapter 11 cases and to implement the Debtors' reorganization plan, as described above, the relief sought herein also is appropriate pursuant to section 105(a) of the Bankruptcy Code.

33.     Finally, the Debtors submit that the relief sought herein is clearly in the best interests of their estates and creditors, while at the same time offers significant protections to the Claimants. The Debtors and their professionals have expended significant time and effort on analyzing each and every one of the Unliquidated Claims and have arrived at a good-faith estimate of the maximum respective amounts in which each Unliquidated Claim could, if meritorious, ultimately be allowed. Moreover, the Claimants will be given an opportunity to submit Counterproposals, negotiate, and, where appropriate, litigate the estimation of the proposed Maximum Capped Amounts.

## Notice Of Motion

34.     Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered October 26, 2006 (Docket No. 5418). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

35.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) estimating and capping certain contingent or unliquidated claims, (b) approving procedures for expedited estimation, and (c) granting the Debtors such other and further relief as is just.

Dated:     New York, New York
           September 7, 2007

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:    /s/ John Wm. Butler, Jr.
       John Wm. Butler, Jr. (JB 4711)
       John K. Lyons (JL 4951)
       Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:    /s/ Kayalyn A. Marafioti
       Kayalyn A. Marafioti (KM 9632)
       Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, <u>et</u> <u>al.</u>,
  Debtors and Debtors-in-Possession

17