UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                 :

    In re                             :       Chapter 11
                                   :

DELPHI CORPORATION, et al.,       :       Case No. 05-44481 (RDD)
                                   :

                     Debtors. :       (Jointly Administered)
                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a) AND 328
AND FED. R. BANKR. P. 2014 AUTHORIZING EMPLOYMENT AND
RETENTION OF KEYBANC CAPITAL MARKETS INC. AS FINANCIAL ADVISOR
AND INVESTMENT BANKER TO DEBTORS NUNC PRO TUNC TO MAY 29, 2007

("KBCM RETENTION APPLICATION")

        Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this application (the "Application") for entry of an order under 11 U.S.C. §§ 327(a)

and 328 and Fed. R. Bankr. P. 2014 authorizing the employment and retention of KeyBanc

Capital Markets Inc. ("KBCM") as financial advisor and investment banker to the Debtors,

effective nunc pro tunc to May 29, 2007.  In support of this Application, the Debtors submit the

Declaration And Statement Of Paul E. Schneir Under Fed. R. Bankr. P. 2014 And 2016 In

Support of Application (the "Schneir Declaration"), executed on August 14, 2007.  In further

support of this Application, the Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

        1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their

businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections

1107(a) and 1108.  The Court has ordered joint administration of these cases.

2.      No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official

committee of equity holders (together with the official committee of unsecured creditors, the

"Statutory Committees").

3.      This Court has jurisdiction over this application pursuant to 28 U.S.C. §§

157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are sections 327(a)

and 328 of the Bankruptcy Code and rule 2014 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules").

B.      <u>Current Business Operations Of The Debtors</u>

5.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as

of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately

$15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues and the thirteenth largest public company

---

[1]   The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
      and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27,
      2007.

business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court. [2]

6.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

7.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

---

[2]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Spanish court approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

C.      Events Leading To The Chapter 11 Filing

8.      In the first two years following Delphi's separation from GM, the
Company generated approximately $2 billion in net income.  Every year thereafter, however,
with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the
Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]
Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of
approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred
a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee
special attrition programs.

9.      The Debtors believe that the Company's financial performance
deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational
restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which
have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production
environment for domestic OEMs resulting in the reduced number of motor vehicles that GM
produces annually in the United States and related pricing pressures, and (iii) increasing
commodity prices.

10.     In light of these factors, the Company determined that it would be
imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product
portfolio, operational issues, and forward-looking revenue requirements.  Because discussions
with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005,

---

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating
loss in calendar year 2004 was $482 million.

the Company commenced these chapter 11 cases for its U.S. businesses to complete its

transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

      11.    On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations.  The Debtors stated that they needed to focus on five key areas:[4] first, modifying the

Company's labor agreements to create a competitive arena in which to conduct business;[5] second,

concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy

---

[4]   In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their
execution of an equity purchase and commitment agreement with certain investors and a plan framework
support agreement with those investors and GM.  On July 9, 2007, Delphi confirmed that it had formally
terminated the equity purchase and commitment agreement and related plan framework support agreement but
that it expected to enter into new framework agreements with plan investors presently.  Subsequently, on July
18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment
agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan
investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill
Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co. and an affiliate
of Pardus Capital Management, L.P. (collectively, the "New Plan Investors").  Under the Delphi-Appaloosa
EPCA, the New Plan Investors agreed to invest up to $2.55 billion in preferred and common equity in the
reorganized Delphi to support the Company's transformation plan and plan of reorganization.  This Court
approved the Delphi-Appaloosa EPCA on August 2, 2007.

[5]   Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International Union,
United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM that (a)
modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the
UAW, and its various locals, (b) provides that GM will undertake certain financial obligations to Delphi's
UAW-represented employees and retirees to facilitate these modifications, and (c) modifies retiree welfare
benefits for certain UAW-represented retirees of the Debtors.  This agreement, which was approved by this
Court on July 19, 2007, should permit the Debtors to continue to implement their transformation plan and to
develop, prosecute, confirm, and consummate a plan of reorganization.  On August 6, 2007, similar agreements
were reached with the International Association of Machinists and Aerospace Workers and its District 10 and
Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663,
International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication
Workers of America and its local unions, and Locals 832S, 18S, and 101S of the International Union of
Operating Engineers.  Such agreements were approved by this Court on August 16, 2007.  On August 16, 2007,
Delphi also reached a similar agreement with the United Steel, Paper and Forestry, Rubber, Manufacturing,
Energy, Allied Industrial and Service Workers International Union and USW Local 87L, which was approved
by this Court on August 29, 2007.

and labor costs and to ascertain GM's business commitment to the Company;[6] third, streamlining

their product portfolio to capitalize on their world-class technology and market strengths and

make the necessary manufacturing alignment with their new focus;[7] fourth, transforming their

salaried workforce to ensure that the Company's organizational and cost structure is competitive

and aligned with its product portfolio and manufacturing footprint;[8] and devising a workable

solution to their current pension situation.[9]

E.    The Debtors' Plan Of Reorganization

12.    On September 6, 2007, the Debtors reached another key milestone in their

chapter 11 cases by filing their Joint Plan Of Reorganization Of Delphi Corporation And Certain

Affiliates, Debtors And Debtors-In-Possession (the "Plan").  The Plan is based upon a series of

---

[6]    On July 9, 2007, Delphi confirmed that its discussions with GM on a comprehensive settlement agreement had
entered the documentation phase and that it expected that a settlement with GM would be incorporated into the
Debtors' plan of reorganization rather than filed with this Court for separate approval.

[7]    In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and
"non-core" product lines and plants.  The Debtors have been working to divest non-core assets so as to
maximize the value of their estates for stakeholders.  During the 2006 and 2007 calendar years, for example, the
Debtors sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, and obtained
court approval for the sale of substantially all of the assets of their brake hose, catalyst, and Saltillo, Mexico
brake plant businesses.  In addition, as announced publicly, the Debtors anticipate selling additional non-core
assets, including, without limitation, their steering, interior, and closures businesses.

[8]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product
portfolio on core technologies for which the Company believes it has significant competitive and technological
advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics
and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also
has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the
Company's transformation plan.  To ensure that their organizational and cost structure is competitive, the
Debtors obtained an Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter
Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order").
The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable,
accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration
processes and significantly reduce SG&A expenses as part of their transformation plan.

[9]    To that end, on May 31, 2007, the Bankruptcy Court granted the Debtors' motion for authority to perform under
the terms of those certain September 30, 2006 plan year funding waivers, which were approved by the IRS, for
both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees
(collectively, the "Plans").  On July 13, 2007, the IRS modified the conditional funding waivers granted to
Delphi related to the Plans, extending the dates by which Delphi is required to file a plan of reorganization and
emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively.

global settlements and compromises that involve every major constituency in the Debtors' reorganization cases.  Indeed, the Debtors, the Debtors' principal U.S. labor unions, GM, the Statutory Committees, and the lead plaintiffs in certain securities actions (on behalf of holders of various claims based on alleged violations of federal securities laws and the Employee Retirement Income Security Act of 1974, as amended) all have contributed to global settlements and compromises that provide for a recovery through a plan distribution amounting to the principal amount of the claim plus accrued interest at a negotiated plan value for general unsecured creditors, and agreed upon distributions to other classes of creditors and interests.  The Plan is supported by the Creditors' Committee on behalf of unsecured creditors, the Equity Committee on behalf of holders of Delphi's common stock, and GM.  A hearing will be held on October 3, 2007 to approve the Debtors' solicitation procedures and disclosure statement with respect to the Plan.  The Debtors will seek to have a hearing on confirmation of the Plan on November 19, 2007.  The Debtors expect to emerge from these chapter 11 cases on December 31, 2007.

13.     Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

14.     By this Application, the Debtors seek to employ and retain KBCM as financial advisor and investment banker with respect to the matters described herein, effective as of May 29, 2007.  Accordingly, the Debtors respectfully request the entry of an order under

7

sections 327(a) and 328 of the Bankruptcy Code and Bankruptcy Rule 2014 authorizing the

employment and retention of KBCM as financial advisor and investment banker pursuant to the

letter agreement dated May 29, 2007, a copy of which is attached hereto as Exhibit 1 (the

"Engagement Letter").

Services To Be Rendered

15.    As set forth in the Engagement Letter, the Debtors have engaged KBCM

to provide the following services in connection with the formulation, analysis, negotiation, and

implementation of the divestiture or other strategic alternatives relating to the Debtors' bearings

business located in Sandusky, Ohio (the "Bearings Business") whether pursuant to (a) a merger,

consolidation, reorganization, recapitalization, or other transaction or series of related

transactions pursuant to which the Bearings Business is acquired by or combined with another

person or entity or (b) the acquisition, directly or indirectly, by another person or entity, in a

single transaction or series of related transactions, of all or a substantial portion of the assets of

the Bearings Business (each of the transactions referred to in clauses (a) and (b) is hereinafter

referred to as a "Transaction"):[10]

> (a)    assisting the Debtors and its other professionals in reviewing and evaluating the terms of any proposed Transaction, in responding thereto and, if directed, in developing and evaluating alternative proposals for a Transaction;
>
> (b)    assisting in the definition of objectives related to value and terms of divestiture;

---

[10]    A Transaction does not include a transaction involving the acquisition of all or substantially all of the Debtors' existing business, whether pursuant to the acquisition of stock or assets under a plan of reorganization or a sale of substantially all of the Company's assets under section 363 of the Bankruptcy Code under which the Bearings Business remains with the reorganized Company and/or acquired business regardless of whether the equity of the reorganized Company is owned by the existing shareholders, its employees, and/or pre-petition creditors.

(c)     assisting in the identification and solicitation of appropriate transaction parties;

(d)     preparing and distributing confidentiality agreements and appropriate descriptive selling materials (including offering memorandums, management presentations, and other documentation as may be required or appropriate);

(e)     reviewing and analyzing any proposals the Debtors receives from third parties in connection with a Transaction;

(f)     assisting or participating in discussions and/or negotiations with the parties-in-interest in connection with a Transaction or other transaction;

(g)     advising and attending meetings of the Debtors' board of directors, creditor groups, official constituencies, and other interested parties, as the Debtors determine to be necessary or desirable;

(h)     if requested, participating in hearings before this Court or such district or other bankruptcy courts as the Debtors may request and providing relevant testimony with respect to the matters described in the Engagement Letter and issues arising with respect thereto in connection with any proposed plan of reorganization;

(i)     assisting the Debtors' internal and external counsel to enable such counsel to provide legal advice to the Debtors; and

(j)     rendering such other financial advisory and investment banking services as may be reasonably requested by the Debtors in connection with any of the foregoing.

## Qualifications Of KBCM

16.     KBCM is one of the largest bank-aligned middle market merger advisory firms in the United States.  Between 2000 and June 26, 2007, KBCM completed approximately 250 transactions valued in the aggregate at over $22 billion.  KBCM specializes in public and private clients whose enterprise value is between $250 million and $2.5 billion and transaction sizes ranging from $50 million to $1 billion.  KBCM assists clients with all aspects of the transaction process, from valuation and marketing through contract negotiations and closing.  In addition, KBCM has significant experience with joint ventures, recapitalizations, and restructurings.

17.    KBCM is aware that the Debtors have submitted applications relating to
the proposed retention and employment of other investment banking and financial advisory
professionals in connection with these chapter 11 cases.  The services to be provided by KBCM
under the Engagement Letter are limited to the matters set forth therein, and will not duplicate
the services of these or any other proposed professional to the Debtors.  KBCM will make every
effort to avoid duplicating the work performed by such other professionals retained by the
Debtors.

18.    The services of KBCM are necessary to enable the Debtors to maximize the
value of their estates.  The Debtors submit that KBCM is well-qualified and able to represent the
Debtors in a cost-effective, efficient, and timely manner.

Disinterestedness Of Professionals

19.    To the best of the Debtors' knowledge, information, and belief, KBCM has
no connection with, and holds no interests adverse to, the Debtors, their creditors, or any other
party-in-interest, or their respective attorneys or accountants, in the matters for which KBCM is
proposed to be retained, except as disclosed in the Schneir Declaration.

20.    To the best of the Debtors' knowledge, KBCM is a "disinterested person,"
as such term is defined in section 101(14) of the Bankruptcy Code, and as required under section
327(a) of the Bankruptcy Code.  The Schneir Declaration, executed on behalf of KBCM in
accordance with section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014, is filed
contemporaneously herewith and incorporated herein by reference.  The Debtors' knowledge,
information, and belief regarding the matters set forth in this Application are based on, and made
in reliance upon, the Schneir Declaration.

<u>Professional Compensation</u>

21.    If this Application is approved, as compensation for the services rendered

under the Engagement Letter, KBCM will be entitled to receive the following fees:

(a)    A transaction fee (the "Transaction Fee") equal to the greater of $750,000
or 1.25% of the Transaction Value.[11]

(b)    50% of the stated Transaction Fee in the event a transaction is
consummated with certain parties.

(c)    The Transaction Fee will become payable in full by the Debtors upon
consummation of a Transaction.

(d)    If the Transaction is not consummated, but the Debtors, directly or
indirectly, receive "compensation" from a potential buyer, then the
Debtors will pay to KBCM, promptly upon receipt of such compensation,
a cash fee equal to 25% of such compensation (the "Break-Up Fee").  For
purposes of this paragraph, the term compensation" means (i) a break-up
or a topping or other fee or payment, including any fee or payment
characterized as expense reimbursement or liquidated damages (whether
payable in cash or other consideration) in connection with the termination
or cancellation of an acquisition agreement or of the Company's efforts to

---

[11]    "Transaction Value" means (i) the total amount of cash paid, directly or indirectly, for the Bearings
Business (including, without limitation, the total amount of cash deposited in escrow under the terms of any
agreement relating to the Transaction); (ii) the fair market value of any assets, securities, or other property
or rights transferred, directly or indirectly, in payment for the Bearings Business (including, without
limitation, the present value, as of the closing date of the Transaction, of any payments to be made under
non-competition, consulting, or similar arrangements and any deferred or contingent payments, whether or
not such payments are dependent upon future results of operations or other measures of future
performance), except that debt instruments will be valued at the face amount thereof; (iii) the principal
amount of any funded indebtedness and any long-term liabilities appearing on the most recent balance sheet
of the Company prior to the consummation of the Transaction and any other liabilities (contingent or
otherwise), in each case, that are directly or indirectly assumed or refinanced in connection with the
Transaction; and (iv) the aggregate proceeds received from any sales, transfers, or other dispositions of
assets of the Bearings Business, through a securitization program or otherwise (other than sales of
inventory and idle equipment in the ordinary course of business).  If the Company retains ownership of a
portion of the Bearings Business, the Transaction Value will be increased by such amount as may be
appropriate to reflect the value of such retained portion of the Bearings Business. For purposes of
calculating the Transaction Fee, the fair market value of securities for which there is an established trading
market will be the closing sale price of the securities on the trading day preceding the date of the closing of
the Transaction.  The fair market value of any assets, securities, property, or rights (other than as provided
above) will be mutually agreed by KBCM and the Company.  If the parties cannot agree upon the fair
market value of such assets, securities, property, or rights, they will choose a qualified appraiser of national
standing to conclusively determine, at the Company's expense, such fair market value.  Upon request, the
Company will make available to KBCM any information available to it for purposes of calculating the
amount of any component of the Transaction Value.

effect a Transaction during the term of this engagement or the 12-month
period thereafter, or (ii) a lock-up fee in connection with a standstill
agreement made during such time.

22.     The Company has also agreed to reimburse KBCM periodically, upon

request, and upon consummation of the Transaction or Transactions contemplated hereby, for all

reasonable out-of-pocket expenses incurred in connection with the performance of its duties

under the Engagement Letter, including transportation, lodging, meals, document services,

courier charges, database services, and word processing production, and reasonable fees and

expenses of third parties retained by KBCM, if any, such as legal counsel; provided, however,

that the Debtors will not be obligated to reimburse KBCM for out-of-pocket expenses in excess

of $50,000, unless the Debtors provided their prior written consent to such reimbursement.

23.     The Debtors and KBCM acknowledge and agree that (a) the hours worked,

(b) the results achieved, and (c) the ultimate benefit to the Debtors of the work performed, in

each case, in connection with KBCM's engagement, may be variable, and the Debtors and

KBCM have taken such factors into account in setting the fees under the Engagement Letter;

provided, however, that with respect to the hours worked, KBCM will devote whatever resources

as are required to fulfill the purposes of its engagement on a timely basis.

24.     KBCM will apply to this Court for compensation and reimbursement of

expenses in accordance with section 330(a) of the Bankruptcy Code, the Bankruptcy Rules, the

Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New

York (the "Local Rules"), the U.S. Trustee's guidelines for compensation and reimbursement of

expenses, and any other applicable orders of this Court.  KBCM acknowledges that all

compensation and reimbursements of expenses will be subject to this Court's review and

approval after notice and a hearing.

25.     Consistent with its ordinary practice and the practice of financial advisors in other chapter 11 cases whose fee arrangements are typically not hours-based, KBCM does not ordinarily maintain contemporaneous time records in one-tenth hour increments or provide or conform to a schedule of hourly rates for its professionals.  The Debtors therefore request that KBCM be excused from compliance with such requirements and that it be required only to maintain such time records in one-hour increments.

26.     The Debtors will pay all fees and expenses of KBCM under the Engagement Letter as promptly as practicable in accordance with the terms thereof and the orders of this Court governing interim and final fee applications, and after obtaining all necessary further approvals from this Court, if any.

27.     The Debtors believe that KBCM 's fees are fair and reasonable in light of industry practice and market rates both inside and outside of chapter 11 cases.

Termination

28.     The Engagement Letter may be terminated with or without cause by KBCM or the Debtors at any time upon receipt of written notice by the other party to that effect. Upon termination of the Engagement Letter, neither party will have any liability or continuing obligation to the other, except that (a) the provisions of Appendix A, Appendix B,and Appendix C to the Engagement Letter will survive any such termination, (b) the Debtors will remain liable for KBCM's reasonable out-of-pocket expenses incurred and fees earned up to the time of termination, and (c) if a Transaction is consummated within 12- months of the termination of KBCM's engagement or if a definitive agreement with respect to such a transaction which is subsequently consummated is entered into during such 12-month period, or if the Debtors receive Compensation with respect to any such Transaction that is not consummated, the Debtors

13

will pay KBCM the Transaction Fee or the Break-up Fee, as the case may be, in accordance with
the terms of the Engagement Letter.

Indemnification

29.    The Debtors request that the following summary of the indemnification
provisions contained in Appendix B of the Engagement Letter (the "Indemnification Provisions")
be approved:

(a)    Subject to the terms of the order approving the Application, and in the
event that KBCM becomes involved in any capacity in any action,
proceeding, or investigation brought by or against any person, including
stockholders of the Company, in connection with any matter related to the
engagement described in the Engagement Letter, the Debtors will
reimburse KBCM for its reasonable and customary legal and other
expenses (including the cost of any investigation and preparation)
reasonably incurred in connection therewith as such expenses are incurred;
provided, however, that if it is finally judicially determined by a court of
competent jurisdiction in any such action, proceeding, or investigation that
any loss, claim, damage, or liability of KBCM has resulted primarily from
the bad faith, gross negligence, or willful misconduct of KBCM in
performing the services which are the subject of the Engagement Letter,
KBCM will repay such portion of the reimbursed amounts that is
attributable to expenses incurred in relation to the act or omission of
KBCM which is the subject of such finding.

(b)    Subject to the terms of the Retention Order, the Company will indemnify
and hold KBCM harmless against any losses, claims, damages, or
liabilities to KBCM in connection with any matter related to the
engagement described in the letter agreement, except to the extent that any
such loss, claim, damage, or liability is finally judicially determined by a
court of competent jurisdiction to have resulted primarily from the bad
faith, gross negligence, or willful misconduct of KBCM in performing the
services that are the subject of the letter agreement.

(c)    If for any reason the foregoing indemnification is unavailable to KBCM or
insufficient to hold it harmless, then the Debtors will, to the extent not
prohibited by law, contribute to the amount paid or payable by KBCM as a
result of the claims, damages, losses, expenses, and liabilities in such
proportion as is appropriate (i) to reflect the relative benefits to the
Debtors and its securityholders on the one hand, and KBCM on the other
hand, in connection with the transaction to which such exculpation,
indemnification, or reimbursement relates or (ii) if the allocation on that
basis is not permitted by applicable law, to reflect not only the relative

14

benefits referred to in clause (i) above but also the relative fault of KBCM and the Debtors as well as any other relevant equitable considerations. It is hereby agreed that the relative benefits to the Debtors, on the one hand, and KBCM, on the other hand, with respect to this engagement will be deemed to be in the same proportion as (x) the Transaction Value of the Transaction (whether or not consummated) for which KBCM is engaged to render financial advisory services bears to (y) the fee paid to KBCM in connection with such engagement. In no event will KBCM contribute in excess of the fees actually received by it pursuant to the terms of the Engagement Letter.

(d)      The Debtors will be liable for any settlement of any claim against KBCM made with the Debtors' written consent. The Debtors will have the right to assume the defense of any action or other proceeding (whether formal or informal) or threat thereof, whether or not in connection with pending or threatened litigation or arbitration and whether or not any indemnified party is a party, in each case to the extent relating to claims, damages, losses, expenses, and liabilities for which indemnification is available (each, an "Action"), including the employment of counsel reasonably satisfactory to KBCM and will not, without the prior consent of KBCM (which will not be unreasonably withheld or delayed), settle, compromise, consent, or otherwise resolve or seek to terminate any pending or threatened Action (whether or not any indemnified party is a party thereto) unless such settlement, compromise, consent, or termination (i) contains an express, unconditional release of each indemnified party which is a party to such Action from all liability relating to such Action and (ii) does not include an admission of fault, culpability, or a failure to act by or on behalf of any indemnified party.

(e)      Any indemnified party will be entitled to retain separate counsel of its choice and participate in the defense of any Action in connection with any of the matters to which the letter agreement relates, but the fees and expenses of such counsel will be at the expense of such indemnified party unless (i) the Debtors fail promptly to assume the defense and employ counsel or (ii) the named parties to any such Action (including any impleaded parties) include such indemnified party and the Debtors, and such indemnified party will have been advised by counsel that there may be one or more legal defenses available to it which are different from or in addition to those available to the Debtors; provided that the Debtors will not in such event be responsible under the Engagement Letter for the fees and expenses of more than one firm of separate counsel (in addition to local counsel) in connection with any such Action in the same jurisdiction.

(f)      No person seeking indemnification or contribution under Appendix B of the Engagement Letter will, without the Debtors' prior written consent, settle, compromise, or consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation, or

15

proceeding referred to herein. The reimbursement, indemnity, and
contribution obligations of the Debtors will be in addition to any liability
which the Debtors may otherwise have, will extend upon the same terms
and conditions to the directors, agents, employees, and controlling persons
(if any), of KBCM, and will be binding upon and inure to the benefit of
any successors, assigns, heirs and personal representatives of the
Company, KBCM, and any such person.

(g)     The indemnity obligations of the Debtors will not extend to any affiliate of
KBCM or to the directors, agents, employees, or controlling persons (if
any), as the case may be, of KBCM or any such affiliate to the extent that
any loss, claim, damage, or liability is finally judicially determined by a
court of competent jurisdiction to have resulted primarily from the bad
faith, gross negligence, or willful misconduct of KBCM or any such other
person in performing the services which are the subject of the Engagement
Letter.

(h)     The Debtors agree that neither KBCM nor any of such affiliates, directors,
agents, employees, or controlling persons will have any liability to the
Debtors or their stockholders for or in connection with any matter referred
to in the Engagement Letter except to the extent that any losses, claims,
damages, liabilities, or expenses incurred by the Debtors are finally
judicially determined by a court of competent jurisdiction to have resulted
primarily from the bad faith, gross negligence, or willful misconduct of
KBCM in performing the services that are the subject of the Engagement
Letter.

30.     The Debtors and KBCM believe that the Indemnification Provisions are

customary and reasonable for financial advisory and investment banking engagements, both out-

of-court and in chapter 11 proceedings.  See In re Acterna Corp., Case No. 03-12837 (BRL)

(Bankr. S.D.N.Y. June 24, 2003); In re Joan & David Halpern, Inc., 248 B.R. 43 (Bankr.

S.D.N.Y. 2000), aff'd, 2000 WL 1800690 (S.D.N.Y. 2000);  see also United Artists Theater Co.

v. Walton, 315 F.3d 217 (3d Cir. 2003); Bodenstein v. Comdisco, Inc., 2002 U.S. Dist. LEXIS

17994 (N.D. Ill. 2002).

### Memorandum Of Law

31.     Because the legal points and authorities upon which this Application relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) approving the employment of KBCM as the Debtors' financial advisor and investment banker nunc pro tunc to May 29, 2007 in respect of the matters described in the Engagement Letter and (b) granting the Debtors such other and further relief as this Court may deem just.

Dated:    New York, New York
          September 12, 2007

                        DELPHI CORPORATION, on behalf of itself and
                        certain of its subsidiaries and affiliates, as Debtors and
                        Debtors-in-possession

                        By:    /s/  John D. Sheehan
                               Name: John D. Sheehan
                               Title:   Vice President and Chief Restructuring
                                        Officer

**KeyBanc**
Capital Markets

127 Public Square
Cleveland, OH 44114

May 29, 2007

**PERSONAL AND CONFIDENTIAL**

Delphi Corporation
5725 Delphi Drive
Troy, MI 48098

      Attention: Mr. Stephen H. Olsen, Director – Mergers and Acquisitions

Ladies and Gentlemen:

This letter agreement, by and among Delphi Corporation (the "Company") and KeyBanc Capital Markets Inc. ("KBCM"), shall confirm the terms and conditions of the retention of KBCM as financial advisor and investment banker to the Company in connection with a possible Transaction (as defined below).

<u>Services to be Rendered.</u>  In connection with the formulation, analysis, negotiation and implementation of the divestiture or other strategic alternatives relating to the Company's bearings business located in Sandusky, Ohio, (the "Business"), whether pursuant to a Transaction or combination of transactions, KBCM will perform the following services, and, in connection therewith advise the Company, as requested by the Company (collectively, the "Services"):

      (a)    assist the Company and its other professionals in reviewing and evaluating the terms of any proposed Transaction, in responding thereto and, if directed, in developing and evaluating alternative proposals for a Transaction;

      (b)    assist in the definition of objectives related to value and terms of divestiture;

      (c)    assist in the identification and solicitation of appropriate transaction parties;

      (d)    prepare and distribute confidentiality agreements and appropriate descriptive selling materials (to include offering memorandums, management presentations, and other documentation as may be required or appropriate);

      (e)    review and analyze any proposals the Company receives from third parties in connection with a Transaction or other transaction;

Delphi Corporation
May 29, 2007
Page 2

(f)    assist or participate in discussions and/or negotiations with the parties in interest in connection with a Transaction or other transaction;

(g)    advise and attend meetings of the Company's board of directors, creditor groups, official constituencies and other interested parties, as the Company determines to be necessary or desirable;

(h)    if requested, participate in hearings before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") or such district or other bankruptcy courts as the Company may request and provide relevant testimony with respect to the matters described herein and issues arising with respect thereto in connection with any proposed reorganization plan;

(i)    assist the Company's internal and external counsel to enable such counsel to provide legal advice to the Company, as contemplated herein; and

(j)    render such other financial advisory and investment banking services as may be reasonably requested by the Company in connection with any of the foregoing.

<u>Application for Retention of KBCM.</u>  KBCM will cooperate with the Company in the preparation of an order for approval of this letter agreement and KBCM's retention by the Company under the terms of this letter agreement ("Retention Order").

KBCM acknowledges that in the event that the Bankruptcy Court approves its retention by the Company pursuant to the application process described herein, this letter agreement (including payment of KBCM's fees and expenses hereunder) shall be subject to the jurisdiction and approval of the Bankruptcy Court under Section 328(a) of the Bankruptcy Code.

All payments made pursuant to this letter agreement must be made in conformity with the orders from the Bankruptcy Court including the order under 11 U.S.C. Section 331 establishing procedures for interim compensation and reimbursement of expenses of professionals (the "Interim Compensation Order") (Docket No. 869).  KBCM will timely file the appropriate interim and final applications for allowance of compensation and reimbursement of expenses pursuant to the Retention Order and Interim Compensation Order.

<u>Sharing of Information with Counsel.</u>  The Company has retained the law firm of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") to provide legal advice to the Company in connection with the legal aspects of the chapter 11 reorganization cases, including Transactions that may occur.  The Company also employs inside counsel to advise the Company on those same matters. The Company anticipates that from time to time privileged communications may need to be shared with KBCM in order to permit KBCM to provide the most comprehensive advice to the Company and to counsel to the Company in order to support such counsel's provision of legal advice to the Company.  The Company intends that any such sharing of privileged information

Delphi Corporation
May 29, 2007
Page 3

occur without waiver of the attorney-client privilege or of any other privileges that may apply.

This letter agreement confirms KBCM's agreement that, to the extent privileged information is
shared with KBCM, such sharing is made solely for the purpose of facilitating KBCM's
provision of services pursuant to this letter agreement and in recognition that KBCM and the
Company share a common interest for that purpose. KBCM shall maintain the confidentiality of
all privileged communications that are shared with it and will not disclose such privileged
matters to any other person (including any of its affiliates) without the prior written consent of
the Company or except as required by law or by court order.

As consideration for KBCM's services, the Company agrees to pay KBCM a transaction fee (the
"Transaction Fee") the greater of $750,000 or 1.25% of Transaction Value. In the event a
transaction is consummated with ███████████ and ███████████████████████, the
Company will owe KBCM exactly fifty percent (50%) of the stated Transaction Fee.

For purposes of this letter agreement, the term "Transaction Value" means (i) the total amount of
cash paid, directly or indirectly, for the Business (including, without limitation, the total amount
of cash deposited in escrow under the terms of any agreement relating to the Transaction); (ii)
the fair market value of any assets, securities or other property or rights transferred, directly or
indirectly, in payment for the Business (including, without limitation, the present value, as of the
closing date of the Transaction, of any payments to be made under non-competition, consulting
or similar arrangements and any deferred or contingent payments, whether or not such payments
are dependent upon future results of operations or other measures of future performance), except
that debt instruments will be valued at the face amount thereof; (iii) the principal amount of any
funded indebtedness and any long-term liabilities appearing on the most recent balance sheet of
the Company prior to the consummation of the Transaction and any other liabilities (contingent
or otherwise), in each case, that are directly or indirectly assumed or refinanced in connection
with the Transaction; and (iv) the aggregate proceeds received from any sales, transfers or other
dispositions of assets of the Business, through a securitization program or otherwise (other than
sales of inventory and idle equipment in the ordinary course of business).

If the Company retains ownership of a portion of the Business, the Transaction Value shall be
increased by such amount as may be appropriate to reflect the value of such retained portion of
the Business.

For purposes of calculating the Transaction Fee, the fair market value of securities for which
there is an established trading market will be the closing sale price of the securities on the trading
day preceding the date of the closing of the Transaction. The fair market value of any assets,
securities, property or rights (other than as provided above) will be mutually agreed by KBCM
and the Company. If the parties cannot agree upon the fair market value of such assets,
securities, property or rights, they will choose a qualified appraiser of national standing to
conclusively determine, at the Company's expense, such fair market value. Upon request, the

Delphi Corporation
May 29, 2007
Page 4

Company will make available to KBCM any information available to it for purposes of calculating the amount of any component of the Transaction Value.

The Transaction Fee will become payable in full by the Company upon consummation of (a) any merger, consolidation, reorganization, recapitalization or other transaction or series of related transactions pursuant to which the Business is acquired by or combined with another person or entity or (b) the acquisition, directly or indirectly, by another person or entity, in a single transaction or series of related transactions, of all or a substantial portion of the assets of the Business (each of the transactions referenced in clauses (a) and (b) above is hereinafter referred to as a "Transaction"). Notwithstanding the foregoing, a Transaction does not include a transaction involving the acquisition of all or substantially all of the Company's existing business, whether pursuant to the acquisition of stock or assets under a plan of reorganization or a sale of substantially all of the Company's assets under Section 363 of the Bankruptcy Code under which the Business remains with the reorganized Company and/or acquired business regardless of whether the equity of the reorganized Company is owned by the existing shareholders, its employees and/or pre-petition creditors.

If the Transaction is not consummated, but the Company, directly or indirectly, receives "Compensation" from a potential buyer, then the Company shall pay to KBCM, promptly upon receipt of such Compensation, a cash fee equal to 25% of such Compensation (the "Break-Up Fee"). For purposes of this paragraph, the term "Compensation" means (i) a break-up or a topping or other fee or payment, including any fee or payment characterized as expense reimbursement or liquidated damages (whether payable in cash or other consideration) in connection with the termination or cancellation of an acquisition agreement or of the Company's efforts to effect a Transaction during the term of this engagement or the 12-month period thereafter, or (ii) a lock-up fee in connection with a standstill agreement made during such time.

Subject to the Retention Order and Interim Compensation Order, the Company agrees to reimburse KBCM periodically, upon request, and upon consummation of the Transaction or transactions contemplated hereby, for all reasonable out-of-pocket expenses incurred in connection with the performance of its duties under this letter agreement, including transportation, lodging, meals, document services, courier charges, database services and word processing production and reasonable fees and expenses of third parties retained by it, if any, such as legal counsel; *provided, however* that the Company shall not be obligated to reimburse KBCM for out-of-pocket expenses in excess of $50,000, unless the Company has provided its prior written consent to the reimbursement of such out-of-pocket expenses.

This letter agreement may be terminated with or without cause by KBCM or the Company at any time upon receipt of written notice by the other party to that effect. Upon termination of this letter agreement, neither party will have any liability or continuing obligation to the other, except that: (i) the provisions of Appendix A, Appendix B and Appendix C to this letter agreement will survive any such termination; (ii) the Company will remain liable for KBCM's reasonable out-

Delphi Corporation
May 29, 2007
Page 5

of-pocket expenses incurred and fees earned up to the time of termination; and (iii) if a
Transaction is consummated within 12-months of the termination of KBCM's engagement or if a
definitive agreement with respect to such a transaction which is subsequently consummated is
entered into during such 12-month period, or if the Company receives Compensation with
respect to any such Transaction that is not consummated, the Company will pay KBCM the
Transaction Fee or the Break-up Fee, as the case may be, in accordance with the terms of this
letter agreement.

KBCM and the Company agree that the provisions set forth in Appendix A, Appendix B and
Appendix C attached to this letter agreement form an integral part of this letter agreement and
are hereby incorporated by reference in their entirety. Capitalized terms used but not defined in
any of the Appendices hereto shall have the meanings assigned to them in this letter agreement.
All references in the Appendices hereto to the "letter agreement" shall mean this letter
agreement.

If this letter agreement accurately sets forth the understanding between us, please sign the
enclosed copy of this letter agreement below and return it to KBCM, at which time, subject to
any necessary bankruptcy court approvals, this letter agreement will become a mutually binding
obligation.

Very truly yours,

KEYBANC CAPITAL MARKETS INC.

By: _____
Its: _____

Agreed to as of the above date:

Delphi Corporation

By: _____
Its: _____

Taxpayer Identification Number:

38-343-0473

Delphi Corporation
May 29, 2007
Page 6

## APPENDIX A

### Standard Terms and Conditions

The Company will provide KBCM with the names of all parties with which it has had discussions or contacts concerning a Transaction, and the Company agrees that it and its directors and executive officers will promptly inform KBCM of any inquiry it may receive concerning the availability of all or a portion of the Business for purchase.

The Company will provide KBCM (and will request that each prospective purchaser with which the Company enters into negotiations provide KBCM) with such information as KBCM reasonably deems appropriate in connection with its engagement and will provide KBCM with timely access to the Company's officers, directors and advisors as the Company reasonably determines is appropriate for purposes of this engagement. The Company acknowledges that KBCM: (i) will be using and relying upon publicly available information or information supplied by or on behalf of the Company in connection with its engagement without independent verification; (ii) does not assume responsibility for the accuracy of any such information and (iii) will not act in the capacity of an appraiser of any assets or liabilities of the Company, including the Business, or any prospective purchaser, it being agreed that any valuation of the Business or its assets shall not be construed as an appraisal.

All opinions and advice (written or oral) given by KBCM to the Company in connection with KBCM's engagement under the letter agreement are intended solely for the benefit and use of the Company and shall be treated as confidential by the Company, and the parties agree that no such opinion or advice shall be used, reproduced, disseminated, quoted or referred to at any time, in any manner or for any purpose, by either party without the other's written consent, except as expressly contemplated by the letter agreement or as may otherwise be required by applicable law. The Company confirms that the factual information to be furnished by it, when delivered, to the best of its knowledge will be prepared in good faith, and, to the knowledge of the Company, will not contain any material misstatement of fact or omit to state a material fact. The Company will promptly notify KBCM if it learns of any material misstatement of fact in, or material omission of fact from, any information previously delivered to KBCM.

As you know, KBCM is a full service securities firm and as such may from time to time effect transactions for its own account or the account of customers, and hold positions in securities or options on securities of companies which may be the subject of the engagement contemplated by the letter agreement. KBCM has adopted policies and procedures designed to preserve the independence of its research analysts whose review may differ from those of KBCM's investment banking area. KBCM and its affiliates also may from time to time perform various investment banking, commercial banking and financial advisory services for other clients and customers who may have conflicting interests with respect to the Company or the Transaction. Neither KBCM nor its affiliates will use any non-public information obtained from the Company pursuant to this engagement in connection with the performance by KBCM or its

Delphi Corporation
May 29, 2007
Page 7

affiliates of services for other companies. Except as required by applicable law or with the prior consent of the Company, KBCM will not furnish any such information to any of its affiliates or other persons including legal entities. The Company also acknowledges that KBCM and its affiliates have no obligation to use in connection with this engagement or otherwise to furnish to the Company, confidential information obtained from other companies.

The Company acknowledges KBCM may have fiduciary or other relationships whereby KBCM or its affiliates may exercise voting power over securities of various persons, which securities may from time to time include securities of the Company or of potential purchasers or others with interests in respect of the Transaction. Subject to the provisions of the immediately preceding paragraph, the Company acknowledges that KBCM or such affiliates may exercise such powers and otherwise perform its functions in connection with such fiduciary or other relationships without regard to KBCM's relationship to the Company hereunder.

The Company acknowledges that KBCM is not an advisor as to legal, tax, accounting or regulatory matters in any jurisdiction. The Company should consult with its own advisors concerning such matters and is responsible for making its own independent investigation and appraisal of the Transaction contemplated by the letter agreement, and KBCM has no responsibility or liability to the Company with respect to such matters.

The Company has retained KBCM for the limited purposes set forth in the letter agreement, and the parties acknowledge and agree that their respective rights and obligations are contractual in nature. Each party disclaims any intention to impose fiduciary obligations on the other by virtue of the engagement contemplated by the letter agreement. The letter agreement is solely for the benefit of KBCM, the Company and each of their respective officers, directors, employees and agents, and any person controlling them within the meaning of the Securities Act of 1933, as amended, and the respective legal representatives, successors and assigns of KBCM and the Company, and no other person, including any equityholder or creditor of either party, shall acquire or have any right under or by virtue of the letter agreement. KBCM will not assign this letter agreement or sub-contract any portion of its responsibilities without the prior written consent of the Company. The Company acknowledges and agrees that (i) KBCM will act as an independent contractor and is being retained solely to assist the Company in its efforts to effect the Transaction and that KBCM is not being retained to advise the Company on, or to express any opinion as to, the wisdom, desirability or prudence of consummating the Transaction and (ii) any advice rendered by KBCM does not constitute a recommendation to any equityholder that such equityholder might or should take in connection with the Transaction.

No fee payable to any other financial advisor by the Company or any other company in connection with the subject matter of this engagement shall reduce or otherwise affect any fee payable to KBCM under the letter agreement.

**EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN**

Delphi Corporation
May 29, 2007
Page 8

**RESPECT OF ANY SUIT, ACTION, CLAIM OR PROCEEDING (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATING TO OR ARISING OUT OF THE LETTER AGREEMENT, THE ENGAGEMENT OF KBCM PURSUANT TO THE LETTER AGREEMENT OR THE PERFORMANCE BY KBCM OF THE SERVICES CONTEMPLATED BY THE LETTER AGREEMENT.**

With the consent of the Company (except in the case of league tables and similar industry compilations for which no such consent shall be required) KBCM, after public announcement and closing of the Transaction, may publish, at its own expense, advertisements announcing the completion of the Transaction and KBCM's role therein.

The letter agreement may not be amended or modified except in writing and shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of laws. The parties have consulted with their attorneys, have read and understand this letter agreement, and sign it as their own free will. This letter agreement contains the entire understanding between the parties.

If any term, provision, covenant or restriction contained in the letter agreement, including this Appendix A, is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in the letter agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Delphi Corporation
May 29, 2007
Page 9

## APPENDIX B

### Indemnification Provisions

In the event that KeyBanc Capital Markets ("KBCM") becomes involved in any capacity in any action, proceeding or investigation brought by or against any person, including stockholders of the Company, in connection with any matter related to the engagement described in the letter agreement, subject to the terms of the Retention Order, the Company will reimburse KBCM for its reasonable and customary legal and other expenses (including the cost of any investigation and preparation) reasonably incurred in connection therewith as such expenses are incurred; provided, however, that if it is finally judicially determined by a court of competent jurisdiction in any such action, proceeding or investigation that any loss, claim, damage or liability of KBCM has resulted primarily from the bad faith, gross negligence or willful misconduct of KBCM in performing the services which are the subject of the letter agreement, KBCM shall repay such portion of the reimbursed amounts that is attributable to expenses incurred in relation to the act or omission of KBCM which is the subject of such finding.  Subject to the terms of the Retention Order, the Company shall indemnify and hold KBCM harmless against any losses, claims, damages or liabilities to KBCM in connection with any matter related to the engagement described in the letter agreement, except to the extent that any such loss, claim, damage or liability is finally judicially determined by a court of competent jurisdiction to have resulted primarily from the bad faith, gross negligence or willful misconduct of KBCM in performing the services that are the subject of the letter agreement.  If for any reason the foregoing indemnification is unavailable to KBCM or insufficient to hold it harmless, then the Company shall, to the extent not prohibited by law, contribute to the amount paid or payable by KBCM as a result of the claims, damages, losses, expenses and liabilities in such proportion as is appropriate (i) to reflect the relative benefits to the Company and its securityholders on the one hand, and KBCM on the other hand, in connection with the transaction to which such exculpation, indemnification or reimbursement relates or (ii) if the allocation on that basis is not permitted by applicable law, to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of KBCM and the Company as well as any other relevant equitable considerations.  It is hereby agreed that the relative benefits to the Company, on the one hand, and KBCM, on the other hand, with respect to this engagement shall be deemed to be in the same proportion as (i) the Transaction Value of the Transaction (whether or not consummated) for which KBCM is engaged to render financial advisory services bears to (ii) the fee paid to KBCM in connection with such engagement.  In no event shall KBCM contribute in excess of the fees actually received by it pursuant to the terms of the letter agreement.  The Company shall be liable for any settlement of any claim against KBCM made with the Company's written consent.  The Company shall have the right to assume the defense of any action or other proceeding (whether formal or informal) or threat thereof, whether or not in connection with pending or threatened litigation or arbitration and whether or not any indemnified party is a party, in each case to the extent relating to claims, damages, losses, expenses and liabilities for which

Delphi Corporation
May 29, 2007
Page 10

indemnification is available hereunder (each, an "Action"), including the employment of counsel
reasonably satisfactory to KBCM and will not, without the prior written consent of KBCM,
(which shall not be unreasonably withheld or delayed), settle, compromise, consent or otherwise
resolve or seek to terminate any pending or threatened Action (whether or not any indemnified
party is a party thereto) unless such settlement, compromise, consent or termination (a) contains
an express, unconditional release of each indemnified party which is a party to such Action from
all liability relating to such Action and (b) does not include an admission of fault, culpability or a
failure to act by or on behalf of any indemnified party.  Any indemnified party shall be entitled
to retain separate counsel of its choice and participate in the defense of any Action in connection
with any of the matters to which the letter agreement relates, but the fees and expenses of such
counsel shall be at the expense of such indemnified party unless (x) the Company has failed
promptly to assume the defense and employ counsel or (y) the named parties to any such Action
(including any impleaded parties) include such indemnified party and the Company, and such
indemnified party shall have been advised by counsel that there may be one or more legal
defenses available to it which are different from or in addition to those available to the Company;
provided that the Company shall not in such event be responsible under the letter agreement for
the fees and expenses of more than one firm of separate counsel (in addition to local counsel) in
connection with any such Action in the same jurisdiction.  No person seeking indemnification or
contribution under this Appendix B will, without the Company's prior written consent, settle,
compromise or consent to the entry of any judgment or otherwise seek to terminate any action,
claim, suit, investigation or proceeding referred to herein.  The reimbursement, indemnity and
contribution obligations of the Company under this Appendix B shall be in addition to any
liability which the Company may otherwise have, shall extend upon the same terms and
conditions to the directors, agents, employees and controlling persons (if any), of KBCM, and
shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal
representatives of the Company, KBCM, and any such person.  The indemnity obligations of the
Company hereunder shall not extend to any affiliate of KBCM or to the directors, agents,
employees, or controlling persons (if any), as the case may be, of KBCM or any such affiliate to
the extent that any loss, claim, damage or liability is finally judicially determined by a court of
competent jurisdiction to have resulted primarily from the bad faith, gross negligence or willful
misconduct of KBCM or any such other person in performing the services which are the subject
of the letter agreement.  The Company also agrees that neither KBCM nor any of such affiliates,
directors, agents, employees or controlling persons shall have any liability to the Company or its
stockholders for or in connection with any matter referred to in the letter agreement except to the
extent that any losses, claims, damages, liabilities or expenses incurred by the Company are
finally judicially determined by a court of competent jurisdiction to have resulted primarily from
the bad faith, gross negligence or willful misconduct of KBCM in performing the services that
are the subject of the letter agreement.  The provisions of this Appendix B shall survive any
termination or completion of the engagement provided by the letter agreement and shall be in
addition to any rights that any indemnified party hereunder may have at common law or
otherwise.  Notwithstanding the foregoing, neither KBCM nor its directors, agents, employees
and controlling persons shall be entitled to indemnification or contribution pursuant to this letter

Delphi Corporation
May 29, 2007
Page 11

agreement Appendix B based on any services provided or other actions taken by such persons after any termination or completion of services under this letter agreement.

Delphi Corporation
May 29, 2007
Page 12

## APPENDIX C

## KEYBANC CAPITAL MARKETS INC.
## SPECIAL DISCLOSURE STATEMENT

KeyBanc Capital Markets Inc. ("KBCM"), is a wholly-owned subsidiary of KeyCorp. KBCM is a broker/dealer registered with the Securities and Exchange Commission, and a member of the National Association of Securities Dealers, Inc. ("NASD"), the New York Stock Exchange ("NYSE") and the Securities Investor Protection Corporation ("SIPC").

KeyCorp is also the parent of KeyBank National Association. KBCM is not a bank; it is a separate corporate entity from its affiliated bank subsidiaries of KeyCorp. The obligations of KBCM are not obligations of any of its affiliate banks, and none of the affiliated banks are responsible for, or guarantee, the securities sold, offered or recommended by KBCM. Except in certain specified circumstances, securities and other investment products sold, offered or recommended by KBCM are not bank deposits or obligations, and are not insured by the FDIC. KBCM will sell, as agent, banker's acceptances or CD's issued by its affiliate banks and by unaffiliated third party banks. The CD's that KBCM sells as agent are insured by the FDIC only to the extent that the FDIC insures the deposits of the issuing bank.

KBCM's banking affiliates may be lenders to issuers of securities that KBCM underwrites or privately places, in which case the proceeds of securities offerings underwritten or privately placed may be used to repay those loans. Please refer to the relevant offering disclosure documents for a discussion of any such lending arrangement.

**Important information required by U.S. Patriot Act.** To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each client. Therefore, all new and existing clients of KeyCorp and its affiliates are subject to certain identity verification requirements.

When a client hires any entity within the KeyCorp family of companies for the purpose of conducting business on behalf of the client, KeyCorp or its applicable affiliate will ask for their address and identification number (i.e., tax ID or social security number). In the case of an individual, his or her date of birth will be required. For certain business accounts, we also must obtain date of birth and other information for certain individuals associated with the business. KeyCorp and its affiliates reserve the right to request any such other identifying documents from clients or their principals as they deem necessary to ensure compliance with applicable law.