**Bidding Procedures Hearing Date And Time:  September 27, 2007 at 10:00 a.m.**
**Bidding Procedures Objection Deadline:  September 24, 2007 at 4:00 p.m.**
**Sale Hearing Date And Time:  October 25, 2007 at 10:00 a.m.**
**Sale Hearing Objection Deadline:  October 18, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)


          - and -


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)


Attorneys for Delphi Corporation, et al.,
     Debtors and Debtors-in-Possession


Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698


Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                          :
      In re                               :      Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :      Case No. 05-44481 (RDD)
                                          :
                       Debtors.           :      (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

EXPEDITED MOTION FOR ORDERS UNDER 11 U.S.C. §363 AND FED. R. BANKR. P. 2002,
6004, AND 9014 (A) (I) APPROVING BIDDING PROCEDURES, (II) GRANTING CERTAIN BID
PROTECTIONS, (III) APPROVING FORM AND MANNER OF SALE NOTICES, AND (IV) SETTING SALE
HEARING DATE AND (B) AUTHORIZING AND APPROVING SALE BY DELPHI AUTOMOTIVE
SYSTEMS LLC AND DELPHI TECHNOLOGIES, INC. OF CERTAIN EQUIPMENT AND OTHER ASSETS
PRIMARILY USED IN DEBTORS' SAGINAW CHASSIS BUSINESS FREE AND CLEAR OF LIENS

("SAGINAW CHASSIS ASSET SALE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this expedited motion (the "Motion") for orders under 11 U.S.C. § 363 and Fed.

R. Bankr. P. 2002, 6004, and 9014 (a)(i) approving the bidding procedures set forth herein and

attached hereto as Exhibit A (the "Bidding Procedures"), (ii) granting certain bid protections, (iii)

approving the form and manner of sale notices (the "Notice Procedures"), and (iv) setting a date

for the sale hearing (the "Sale Hearing") and (b) authorizing and approving the sale (the "Sale")

of certain assets of Delphi Automotive Systems LLC ("DAS LLC") and Delphi Technologies,

Inc. (together with DAS LLC, the "Selling Debtor Entities") comprising a significant portion of

the assets (the "Acquired Assets"), including, without limitation, manufacturing equipment and

test and development equipment primarily used and located at DAS LLC's chassis facility in

Saginaw, Michigan[1] (the "Saginaw Chassis Business") for approximately $26.4 million and other

consideration, including Inventory Value (as defined below) and the Saltillo Expense

Reimbursement (as defined below).  The Acquired Assets are being sold free and clear of liens

pursuant to the Asset Purchase Agreement (the "Agreement")[2] dated September 17, 2007 by and

among the Selling Debtor Entities and TRW Integrated Chassis Systems LLC (the "Purchaser")

or to the Successful Bidder (as hereinafter defined) submitting a higher or otherwise better bid.

Delphi Canada (together with the Selling Debtor Entities, the "Sellers") also will be selling

---

[1]    In addition to the assets located at the chassis facility located in Saginaw, Michigan, the Selling Debtor Entities are also selling assets located at facilities in Spring Hill, Tennessee, Dayton, Ohio, and Saltillo, Mexico.  Delphi Canada, Inc. ("Delphi Canada"), a non-Debtor affiliate, is also selling assets located at a facility in Oshawa, Ontario, Canada pursuant to an Asset Purchase Agreement dated September 17, 2007 by and between Delphi Canada and the Purchaser (the "Canadian Agreement"), which is an agreement ancillary to the Agreement and is attached hereto as Exhibit B.  The Canadian Assets (defined below) are being sold as part of the competitive bidding process described herein.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Agreement.

certain manufacturing equipment and personal property (the "Canadian Assets") for $1.2 million

to the Purchaser or to the Successful Bidder submitting a higher or otherwise better bid.  In

support of this Motion, the Selling Debtor Entities respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their

businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections

1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S.

Trustee appointed an official committee of equity holders (the "Equity Committee," and together

with the Creditors' Committee, the "Statutory Committees").

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are section 363 of

the Bankruptcy Code and rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").

B.    Current Business Operations Of The Debtors

5.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as

of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately

3

$15.4 billion.[3]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues and the thirteenth largest public company

business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors and continue their business operations without supervision from the Court. [4]

6.      The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer ("OEM").

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

---

[3]   The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
      and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27,
      2007.

[4]   On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core
      automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency
      proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso
      receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of
      which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31,
      2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing
      footprint and to lower its overall cost structure.

4

single largest customer, today more than half of Delphi's revenue is generated from non-GM
sources.

C.      Events Leading To The Chapter 11 Filing

8.      In the first two years following Delphi's separation from GM, the
Company generated approximately $2 billion in net income.  Every year thereafter, however,
with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the
Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[5]
Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of
approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred
a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee
special attrition programs.

9.      The Debtors believe that the Company's financial performance
deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational
restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which
have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production
environment for domestic OEMs resulting in the reduced number of motor vehicles that GM
produces annually in the United States and related pricing pressures, and (iii) increasing
commodity prices.

10.      In light of these factors, the Company determined that it would be
imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product
portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

---

[5]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating
loss in calendar year 2004 was $482 million.

with its major stakeholders had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its

transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations.  The Debtors stated that they needed to focus on five key areas:[6] first, modifying the

Company's labor agreements to create a competitive arena in which to conduct business;[7]

second, concluding their negotiations with GM to finalize GM's financial support for the

---

[6]    In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors and a plan framework support agreement with those investors and GM.  On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework support agreement but that it expected to enter into new framework agreements with plan investors presently.  Subsequently, on July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors").  Under the Delphi-Appaloosa EPCA, the New Plan Investors agreed to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization.  This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.

[7]    Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM that (a) modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the UAW, and its various locals, (b) provides that GM will undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate these modifications, and (c) modifies retiree welfare benefits for certain UAW-represented retirees of the Debtors.  This agreement, which was approved by this Court on July 19, 2007, should permit the Debtors to continue to implement their transformation plan and to develop, prosecute, confirm, and consummate a plan of reorganization.  On August 6, 2007, similar agreements were reached with the International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America and its local unions, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers.  Such agreements were approved by this Court on August 16, 2007.  On August 16, 2007, Delphi also reached a similar agreement with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and USW Local 87L, which was approved by this Court on August 29, 2007.

Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[8]

third, streamlining their product portfolio to capitalize on their world-class technology and

market strengths and make the necessary manufacturing alignment with their new focus;[9] fourth,

transforming their salaried workforce to ensure that the Company's organizational and cost

structure is competitive and aligned with its product portfolio and manufacturing footprint;[10] and

devising a workable solution to their current pension situation.[11]

E.    The Debtors' Plan Of Reorganization

12.    On September 6, 2007, the Debtors reached another key milestone in their

chapter 11 cases by filing their Joint Plan Of Reorganization Of Delphi Corporation And Certain

Affiliates, Debtors And Debtors-In-Possession (the "Plan").  The Plan is based upon a series of

---

[8]    On September 6, 2007, Delphi announced that it has entered into comprehensive settlement agreements with GM consisting of a Global Settlement Agreement and a Master Restructuring Agreement, both of which are subject to this Court's approval as part of the plan confirmation process.  Delphi's comprehensive settlement with GM resolves all outstanding disputes between Delphi and GM.

[9]    In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants.  The Debtors have been working to divest non-core assets so as to maximize the value of their estates for stakeholders.  During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, and obtained court approval for the sale of substantially all of the assets of their brake hose, catalyst, and Saltillo, Mexico brake plant businesses.  In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

[10]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.  To ensure that their organizational and cost structure is competitive, the Debtors obtained an Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order").  The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[11]    To that end, on May 31, 2007, this Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 plan year funding waivers, which were approved by the IRS, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Plans").  On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively.

global settlements and compromises that involve every major constituency in the Debtors'

reorganization cases.  Indeed, the Debtors, the Debtors' principal U.S. labor unions, GM, the

Statutory Committees, and the lead plaintiffs in certain securities actions (on behalf of holders of

various claims based on alleged violations of federal securities laws and the Employee

Retirement Income Security Act of 1974, as amended) all have contributed to global settlements

and compromises that provide for a recovery through a plan distribution amounting to the

principal amount of the claim plus accrued interest at a negotiated plan value for general

unsecured creditors, and agreed upon distributions to other classes of creditors and interests.  The

Plan is supported by the Creditors' Committee on behalf of unsecured creditors, the Equity

Committee on behalf of holders of Delphi's common stock, and GM.  A hearing will be held on

October 3, 2007 to approve the Debtors' solicitation procedures and disclosure statement with

respect to the Plan.  The Debtors will seek to have a hearing on confirmation of the Plan on

November 19, 2007.  The Debtors expect to emerge from these chapter 11 cases on December

31, 2007.

13.    Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

14.    By this Motion, the Selling Debtor Entities seek approval for the sale of

the Acquired Assets to the Purchaser, which is subject to additional competitive bidding pursuant

to the proposed Bidding Procedures.  To effect the sale, the Selling Debtor Entities seek entry of

two types of relief.  First, at the omnibus hearing to be held on September 27, 2007, the Selling

Debtor Entities will seek entry of an order substantially in the form attached hereto as Exhibit C

(the "Bidding Procedures Order") approving the Bidding Procedures, Notice Procedures, and

certain bid protections to be provided to the Purchaser pursuant to the Agreement and as

described more fully herein.  Second, subject to the terms of the Bidding Procedures Order, at

the omnibus hearing to be held on October 25, 2007, the Selling Debtor Entities will seek entry

of an order substantially in the form attached hereto as Exhibit D (the "Sale Approval Order")

authorizing and approving the Sale to the Purchaser or to the Successful Bidder, as the case may

be.

15.     As more fully set forth below, after a comprehensive strategic review, the

Selling Debtor Entities believe that the Sale is their best opportunity under the circumstances to

maximize the underlying core value of the Acquired Assets.  Therefore, the Sale is in the best

interests of their estates and their stakeholders.

Basis For Relief

F.     The Saginaw Chassis Equipment

16.     The Sellers operate certain manufacturing and subassembly facilities in

Saginaw, Michigan, Oshawa, Ontario, Canada, and Spring Hill, Tennessee.  These facilities

provide a variety of brake corner assemblies, components (rotors, knuckles, and brake drums),

and axle modules to GM and other customers for both truck and passenger car applications.  In

2006, the net revenues of the Saginaw Chassis Business were approximately $925 million.  The

facility in Saginaw (the "Saginaw Facility") currently employs approximately 700 active hourly

employees represented by the International Union of Automobile, Aerospace and Agricultural

Workers of America, Local Union No. 467 (the "Local UAW") and approximately 78 salaried

employees.

G.      Factors Leading To The Sale

17.      On March 31, 2006, the Debtors announced the five key tenets of their

transformation plan, one of which was to streamline their product portfolio by identifying non-

core product lines that do not fit into their future strategic framework.  Indeed, the brake business

was identified as a non-core product line.  Since the Saginaw Chassis Business, which is a subset

of the Debtors' brake business, does not fit within the Debtors' anticipated product portfolio, the

Sellers have determined to divest the Acquired Assets and have worked with GM to develop a

resourcing plan.

18.      In 2006, GM began to resource certain brake corner module and rear axle

businesses from the Sellers to the Purchaser and other suppliers via the normal purchasing

quoting process and GM requested that the Sellers work with these suppliers to transfer

manufacturing capability.  The Acquired Assets have been used by the Selling Debtor Entities to

produce these products for GM prior to and during this transition period.  The Selling Debtor

Entities, therefore, determined that the value of the Acquired Assets would be maximized

through a divestiture and maintenance of production at the current site.  Absent a divestiture at

this time, it is likely that the Acquired Assets would be liquidated at auction, yielding far less

value to the Selling Debtor Entities.

19.      Because GM resourced the procurement of brake corner modules and rear

axles from the Sellers to the Purchaser, for the past nine months, the Sellers and the Purchaser

have been negotiating agreements related to the Sale of the Acquired Assets and the Canadian

Assets.  The parties have been coordinating the transition of designated programs and

determining which machinery and equipment, related supplies, tools, and inventory is required to

effect a smooth transition.  Both parties determined that maintaining the manufacturing at the

Saginaw Facility was the best alternative that minimizes transition risk, and therefore, as part of

the Agreement, the Sellers decided to lease the Saginaw Facility and the Purchaser decided to

consolidate and transfer certain machinery and other assets located in Oshawa, Ontario, Canada,

Spring Hill, Tennessee and Saltillo, Mexico into the Saginaw Facility.  Because the Debtors

manufacture other parts for customers from the Saginaw Facility, the Debtors requested and the

Purchaser has agreed to manufacture some brake programs on behalf of the Sellers as a contract

manufacturer pursuant to the terms of the Contract Manufacturing Agreement (as defined

below), until such customer programs expire in July 2008.  The Contract Manufacturing

Agreement obviates the need for the Sellers to transfer production and incur unnecessary costs

and risks.  Both parties have also agreed on a Transition Services Agreement (defined below)

providing needed services to ensure a smooth transition.

   20. The Selling Debtor Entities, in their business judgment, concluded that the

proposal from the Purchaser, which formed the basis of the Agreement attached hereto as <u>Exhibit</u>

<u>E</u>, offered the most advantageous terms and the greatest economic benefit to the Selling Debtor

Entities.  The Purchaser's offer is currently the highest and best offer, providing the highest

amount of consideration for the Acquired Assets.

H. <u>The Agreement</u>

   21. Pursuant to the Agreement, the Sellers would sell the Acquired Assets to

the Purchaser for approximately $26.4 million and other consideration, including the cost of

useable and merchantable inventory existing as of the closing date (the "Inventory Value") and

out of pocket costs and expenses incurred in relocating manufacturing equipment and related

tooling from Saltillo, Mexico[12] and installing and requalifying such manufacturing equipment

and tooling at the Leased Premises (as defined below) (the "Saltillo Expense Reimbursement").[13]

The Acquired Assets of the Selling Debtor Entities would be sold free and clear of all liens

(including tax liens and any statutory or common law liens, possessory or otherwise), charges,

pledges, security interests, conditional sale agreements or other title retention agreements, leases,

mortgages, security interests, options, or other encumbrances (including the filing of, or

agreement to give, any financing statement under the Uniform Commercial Code of any

jurisdiction) and any monetary amounts which are secured by any lien (collectively, the "Liens").

22.    The significant terms of the Agreement are as follows:[14]

(a)    General Terms.  The Purchaser would acquire the Acquired Assets, which comprise substantially all of the assets[15] primarily used by the Saginaw Chassis Business, through an asset sale.[16]

(b)    Bankruptcy Court Approval.  The Sale of the Acquired Assets would be subject to approval by this Court and competitive bidding pursuant to the Bidding Procedures.

(c)    Documentation.  The Sale would be effected pursuant to the Agreement and related documentation.  At the Closing, the Selling Debtor Entities and the Purchaser would enter into, among others, the following agreements: (i) a lease agreement (the "Lease Agreement") granting the Purchaser certain rights in the Saginaw Facility located at 2328 East Genesee Avenue, Saginaw, Michigan (the "Leased Premises"), (ii) a transition services agreement providing the Purchaser certain transition services (the "Transition Services

---

[12]    The assets being relocated from Saltillo, Mexico are not related to the assets being sold under this Court's order approving the sale of DAS LLC's Mexico Brake Plant assets, dated July 19, 2007 (Docket No. 8705).

[13]    Unless otherwise agreed in writing by the Purchaser, the Saltillo Expense Reimbursement is capped at $400,000.

[14]    In the event of any discrepancy between the Agreement and this summary of the Agreement, the provisions of the Agreement are controlling.

[15]    Delphi Canada is also selling the Canadian Assets pursuant to the Canadian Agreement.

[16]    Copies of the (i) schedules to the Agreement and (ii) the above-referenced contract manufacturing, transition services, and lease agreements are available upon request to parties-in-interest who can show that they would be affected by the relief requested by this Motion and who execute a confidentiality agreement acceptable to the Debtors.

Agreement"), and (iii) a contract manufacturing agreement describing the products to be manufactured by the Purchaser on Selling Debtor Entities' behalf until July 2008 (the "Contract Manufacturing Agreement," and together with the Lease Agreement, the Transition Services Agreement and the Canadian Agreement, the "Ancillary Agreements").

(d)    Purchase Price.  The purchase price to be paid by the Purchaser would be approximately $26.4 million for the Acquired Assets plus the Inventory Value and the Saltillo Expense Reimbursement (the "Purchase Price").[17]

(e)    Deposit Escrow.  Upon execution of the Agreement, the Purchaser placed $2,000,000 of the Purchase Price into an escrow account.  Upon Closing, or if the Agreement is terminated prior to Closing because of certain actions of the Purchaser, the Selling Debtor Entities would be entitled to the funds in the escrow account.  Any such payment would constitute the Selling Debtor Entities' sole recourse in the event that the Purchaser terminates the Agreement prior to the date of the Auction (as defined below).  Upon any breach by the Purchaser on or after the Auction date, the Selling Debtor Entities would be entitled to all available remedies in law or equity.

(f)    Representations And Warranties.  Pursuant to the Agreement, the Selling Debtor Entities would provide certain standard representations and warranties relating to the Sale of the Acquired Assets and the Purchaser would provide representations and warranties generally standard in a transaction of this type.  The representations and warranties of the parties would survive closing of the Sale and expire on the later of the second anniversary of the closing date or 90 days after the applicable party discovers the indemnifiable claim.

(g)    Covenants.  The Ancillary Agreements would be executed and delivered by the Sellers to the Purchaser, and all other agreements and transactions contemplated under the Agreement or any Ancillary Agreement to be performed by the Sellers on or before the Closing would be performed in all material respects.  The Sellers would also be required to, among other things: (i) use and operate the Acquired Assets in the ordinary course of business and supply products to its customers and maintain and repair the Leased Premises and all tangible Acquired Assets as previously done in the ordinary course of business, (ii) use commercially reasonable efforts to comply with all requirements under the Bankruptcy Code and the Bankruptcy Rules in connection with obtaining approval of the sale of the Acquired Assets, and (iii) use commercially reasonable efforts to take all actions necessary, proper, or advisable to effectuate the Sale in accordance with the Agreement or Ancillary Agreements.  For a period of five years after the Closing, the Sellers would be required not to take certain actions which would place it in competition with the Purchaser with respect to the Saginaw Chassis Business.  Simultaneously

---

[17]    The purchase price to be paid by the Purchaser for the Canadian Assets under the Canadian Agreement would be $1.2 million, and combined with the Purchase Price of approximately $26.4 million and assumed Inventory Value of approximately $15 million, the cumulative purchase price paid by the Purchaser would be approximately $42.6 million.

with the execution of the Agreement, the Purchaser's indirect parent, Kelsey-Hayes Company, has executed a guaranty related to the Purchaser's obligations under the Agreement.

(h)    Additional Assets. Should the Selling Debtor Entities or the Purchaser determine, in their reasonable discretion, that any machinery or equipment (i) used by the Selling Debtor Entities exclusively in the production of the products or operation of the Leased Premises and (ii) necessary to enable the Purchaser to manufacture the products or operate the Leased Premises was not included in the Acquired Assets (the "Additional Assets"), the Selling Debtor Entities would transfer, sell, and assign such Additional Assets to the Purchaser, but only to the extent that (x) the Selling Debtor Entities still own such Additional Assets (and have not entered into a binding agreement to sell same), (y) the gross book value on the Selling Debtor Entities' balance sheet (the "GBV") of each such Additional Asset is less than $250,000 (the "Individual Threshold Value"), and (z) the total GBV of such Additional Assets and any other Additional Assets previously transferred under the Agreement is, in the aggregate, less than $750,000 (the "Aggregate Threshold Value").  For any Additional Asset with a GBV that exceeds the Individual Threshold Value, such Additional Asset would be available for sale to the Purchaser for a purchase price that is equal to 22% of the GBV of the applicable Additional Asset.  Once the Aggregate Threshold Value is reached, including by transfer of a particular Additional Asset that exceeds the Aggregate Threshold Value, any remaining Additional Assets would also be available for sale to the Purchaser for a purchase price that is equal to 22% of the GBV of the applicable Additional Asset.  For the avoidance of doubt, any assets other than the Additional Assets, including without limitation assets related to the GMT295 program or manufacture of calipers for the GMX211 program, that the Purchaser desires to purchase from the Selling Debtor Entities would be available only for sale to the Purchaser at the Selling Debtor Entities' sole discretion and on terms acceptable to the Selling Debtor Entities in their sole discretion.

(i)    Indemnification.  The Selling Debtor Entities have agreed to indemnify the Purchaser for damages incurred by Purchaser as a result of or arising out of: (i) the liabilities retained by the Selling Debtor Entities and excluded assets, (ii) a breach of any representation or covenant of the Selling Debtor Entities contained in the Agreement, or (iii) a breach of any covenant to be performed by the Selling Debtor Entities under the Agreement.

(j)    Closing Conditions.  In addition to certain other customary closing conditions relating to the Court's approvals and regulatory matters, the obligation of the parties to close the Sale would be subject to the satisfaction of the following conditions: (i) the performance in all respects by the Selling Debtor Entities and the Purchaser of their covenants under the Agreement and (ii) the accuracy of the Selling Debtor Entities' and Purchaser's representations and warranties in all material respects.  Furthermore, the obligation of the Purchaser and the Selling Debtor Entities to close the Sale would be subject to (a) the Purchaser's assumption of all of the collective bargaining agreements applicable to the hourly employees identified in the Agreement according to the terms set forth in the Agreement and (b) the Selling

14

Debtor Entities' license to GM of certain licensed intellectual property.[18]  The Selling Debtor
Entities' obligation to consummate the Sale would be conditioned on GM's entering into an
agreement reasonably acceptable to the Selling Debtor Entities releasing the Selling Debtor
Entities of their obligations to manufacture and deliver products to GM upon the Purchaser's
assuming responsibility to manufacture and deliver such products to GM.  In addition, the
Purchaser would enter into a supply agreement with GM on terms and conditions fully
satisfactory to the Purchaser by September 26, 2007.  Also, by no later than September 24, 2007,
the Purchaser would complete its due diligence review of certain collectively bargained
documents.  If the Purchaser is willing to assume the obligations imposed by such documents,
then the Purchaser would so advise the Selling Debtor Entities in writing no later than 5:00 p.m.
(prevailing Eastern time) on September 24, 2007, whereupon this condition to Closing would be
satisfied in full.  If the Purchaser is unwilling to assume the obligations imposed by such
documents, and therefore there would be no hearing on the Motion and the Agreement would be
terminated, the Purchaser would so advise the Selling Debtor Entities in writing no later than
5:00 p.m. (prevailing Eastern time) on September 24, 2007.  Lastly, if the Term Sheet—Delphi
Pension Freeze and Cessation of OPEB and GM Consensual Triggering of Benefit Guarantee
(the "Term Sheet") will not be in effect on the date identified by the parties as the date of the
Closing, the parties, in conjunction with the UAW and GM, as applicable, would use reasonable
efforts to reach a satisfactory resolution of the benefit issues relative to the Term Sheet.  Such
condition to Closing would be deemed satisfied once the parties reach a satisfactory resolution of
these issues.

       (k)    <u>Termination</u>.  The Agreement could be terminated in the following
circumstances (but not by a party which is in breach of the Agreement) by either the Sellers or
the Purchaser: (i) upon mutual written consent of the Sellers and the Purchaser, (ii) if the Sellers
consummate an Alternative Transaction (as defined below), (iii) provided that the terminating
party is not in breach of its obligations under the Agreement, if a Sale Approval Order is not
entered by December 15, 2007, and such Sale Approval Order, as of December 15, 2007, is not
subject to a stay or injunction, (iv) provided that the terminating party is not in breach of its
obligations under the Agreement, if the Closing has not occurred for any reason prior to January
10, 2008, (v) if a Material Adverse Effect occurs, but only by a party that is not in breach of the
Agreement, and (vi) if at any time prior to the Closing if the Purchaser fails to perform any of its
covenants or obligations under the Agreement or materially breaches any representation or
warranty under the Agreement.

       (l)    <u>Certain Supplier Contracts.</u> Prior to the closing date, the Purchaser would
provide the Sellers with written notice identifying any suppliers of goods or services necessary
for the manufacture of the products or operation of the Leased Premises who currently supply or
process raw materials or sub-components to the Sellers or who provide services to the Selling
Debtor Entities pursuant to a supplier contract and who refuse to do business with Purchaser on
terms reasonably acceptable to the Purchaser.  At the Purchaser's option, the Selling Debtor

---

[18]    At the September 27, 2007 omnibus hearing, by separate motion, the Debtors will also seek authority to enter
into and perform under a license agreement with GM, which agreement, subject to this Court's approval, would
satisfy the above intellectual property condition to closing.

Entities would make available to the Purchaser the goods or services provided by such suppliers under the relevant supplier contracts in accordance with the terms of the Transition Services Agreement.

I.    Workforce Provisions

23.    The Agreement does not provide for the transfer of any of the Selling

Debtor Entities' salaried employees.  The Purchaser, however, has interviewed many salaried

employees regularly assigned to work at the Leased Premises and certain other salaried

employees located at other locations (Troy, Michigan, Dayton, Ohio, and Brighton, Michigan)

who spend a majority of their time supporting the design, development, material purchasing, and

product launch for the production or assembly of products at the Leased Premises, Spring Hill,

Tennessee, or Oshawa, Ontario, Canada.  After completing the interviews for the purpose of

determining to which salaried employees the Purchaser would make an offer, the Purchaser

would provide the Sellers two lists. One list would identify the salaried employees to whom the

Purchaser wishes to extend an offer of employment.  The other list would identify salaried

employees to whom the Purchaser does not wish to extend an offer of employment (the

"Excluded Employees").  The lists would be provided to the Selling Debtor Entities as soon as

practicable, but no later than 30 days from the date of the Agreement.

24.    Under the terms of the Agreement, for each salaried employee offered a

position by the Purchaser, the Purchaser would provide the Selling Debtor Entities with the terms

of each individual offer of employment.  In the event that the Selling Debtor Entities determine

that each offer provides wages and benefits that are substantially comparable in the aggregate to

wages and benefits that the Selling Debtor Entities provide the salaried employee as of the offer

date, they would advise Purchaser and the employee of such determination.  In the event that the

Selling Debtor Entities determine that the terms are not substantially similar in the aggregate, the

Purchaser may, in its sole discretion, cure any deficiency so as to meet this standard.

25.    If after consultation with the Purchaser, the Selling Debtor Entities

determine that the terms of employment offered by the Purchaser are not substantially

comparable in the aggregate to the current terms of employment, the Sellers would promptly so

inform the affected employee and provide such employee the option of (a) receiving severance

benefits from the Selling Debtor Entities in accordance with the Delphi Corporation Separation

Allowance Plan for U.S. Employees or (b) accepting the Purchaser's offer of employment and

waiving eligibility for any severance benefits from the Selling Debtor Entities.  In no event,

however, would the Purchaser bear any responsibility or liability relating to any severance

benefits the Selling Debtor Entities provide to: (i) any of the salaried employees who receive

severance benefits from the Selling Debtor Entities in accordance with the Delphi Corporation

Separation Allowance Plan for U.S. Employees as the result of the Purchaser's failure to meet the

"substantially comparable in the aggregate" standard or (ii) the Excluded Employees.  In

addition, for a period of five years after the Closing, the Selling Debtor Entities and their

affiliates would not offer to employ or employ any salaried employees hired by the Purchaser

under the terms of the Agreement.

26.    With respect to the Selling Debtor Entities' active hourly employees, the

Purchaser would commence employment for all such hourly employees effective at Closing.

Unless the Purchaser is otherwise able to negotiate and execute mutual collective bargaining

agreements with the respective unions prior to Closing, the Purchaser would assume all of the

obligations under the collective bargaining agreements applicable to the transferred hourly

employees.  The Purchaser also agrees to assume and recognize the seniority status of each of the hourly employees who transfer to the Purchaser for all purposes.

27.    If the Purchaser is unable to negotiate and execute mutual collective bargaining agreement prior to Closing and thereby assumes the obligations under the collective bargaining agreements applicable to the hourly employees identified in the Agreement, then the following would apply:

(a)    <u>Pension Plan</u>:  As of the Closing and as provided for in the Agreement, the Purchaser would establish a cash balance pension plan for the benefit of the transferring hourly employees.  Such plan would contain provisions that mirror the provisions of the Selling Debtor Entities' cash balance plan for hourly employees on the close of business on the day immediately preceding the Closing under the terms of the applicable collective bargaining agreements.  With respect to the Purchaser's case balance pension plan, the Purchaser would recognize the pre-closing credited service under the Selling Debtor Entities' cash balance plan of each of the transferring hourly employees for eligibility and vesting purposes, but not benefit accrual purpose.  The Purchaser would recognize post-closing credited service of each of the hourly employees for vesting, eligibility, and benefit accrual purposes subject to the terms of the Purchaser's cash balance plan and the terms of the Agreement.

(b)    <u>Active Health And Welfare Benefits</u>:  As of the Closing and as provided for in the Agreement, the Purchaser would establish medical, dental, vision, disability, life insurance, and health care spending account plans for the benefit of the transferring hourly employees.  Such plans would contain provisions that mirror the provisions of the Selling Debtor Entities' medical, dental, vision, disability, life insurance, and health care spending account plans that were applicable to the hourly employees on the close of business on the day immediately preceding the Closing under the terms of the applicable collective bargaining agreements.

(c)    <u>Retiree Medical Benefits</u>: As of the Closing and as provided for in the Agreement, the Purchaser would establish a notional post-retirement health care account for the benefit of eligible hourly employees who retire from the Purchaser with an opening balance equal to the individual account balances of such hourly employees under the Selling Debtor Entities' notional post-retirement health care account as of the day immediately prior to Closing.  Such account would contain provisions that mirror the provisions of the Selling Debtor Entities' post-retirement health care account that were applicable to the hourly employees on the close of

business on the day immediately preceding the Closing under the terms of the applicable collective bargaining agreements. The Purchaser would recognize the pre-Closing credited service under the Selling Debtor Entities' post-retirement health care account for each of the transferred hourly employees for eligibility purposes.

(d)      401(k) Plan: As of the Closing and as provided for in the Agreement, the Purchaser would establish a 401(k) plan for the benefit of the transferred hourly employees (or otherwise amend an existing 401(k) plan of Purchaser to include provisions specific to the hourly employees) (the "Purchaser's 401(k) Plan"). The Purchaser's 401(k) Plan would contain provisions that mirror the provisions of the Delphi Personal Savings Plan that were applicable to the hourly employees on the close of business on the day immediately preceding the Closing under the terms of the applicable collective bargaining agreements.

(e)      Supplemental Unemployment Benefit Plan: As of the Closing and as provided for in the Agreement, the Purchaser would establish a supplemental unemployment benefit plan for the benefit of the transferring hourly employees. Such benefit plan would contain provisions that mirror the provisions of Delphi Supplemental Unemployment Benefit Plan that were applicable to the hourly employees on the close of business on the day immediately preceding the Closing under the term of the applicable collective bargaining agreements.

(f)      Notwithstanding anything to the contrary herein, any transferring hourly employee who is considered a "Covered Employee" under the Term Sheet is not eligible either to participate in the cash balance pension plan or retiree medical plan established by the Purchaser or to receive matching contributions under the Purchaser's 401(k) Plan for the period of time such employee is eligible for benefits through GM in accordance with the Term Sheet.

J.      Bidding Procedures

28.      The Sale of the Acquired Assets and the Canadian Assets would be subject to higher or otherwise better offers pursuant to the Bidding Procedures. The Selling Debtor Entities believe that the proposed structure of the Bidding Procedures is the one most likely to maximize the realizable value of the Acquired Assets for the benefit of the Selling Debtor Entities' estates, their stakeholders, and other interested parties. Accordingly, the Selling Debtor Entities seek approval of the Bidding Procedures for the Sale of the Acquired Assets.

29.    The Bidding Procedures describe, among other things, the assets available

for sale, the manner in which bidders and bids become "qualified," the coordination of diligence

efforts among bidders, the receipt and negotiation of bids received, the conduct of any

subsequent Auction (as defined below), the ultimate selection of the Successful Bidder(s), and

this Court's approval thereof (collectively, the "Bidding Process").

30.    The proposed Bidding Procedures attached hereto as <u>Exhibit A</u> are as

follows:[19]

(a)    <u>Assets To Be Sold</u>:  The assets proposed to be sold are the Acquired
Assets and the Canadian Assets.

(b)    <u>Free Of Any And All Liens</u>: The Selling Debtor Entities' Acquired
Assets are to be sold free and clear of any Liens.

(c)    <u>Participation Requirements</u>:  To ensure that only bidders with a
serious interest in the purchase of the Acquired Assets and the Canadian Assets participate in the
Bidding Process, the Bidding Procedures provide for minimal requirements for a potential bidder
to become a "Qualified Bidder":  (i) executing a confidentiality agreement in form and substance
satisfactory to the Sellers, (ii) providing the Sellers with certain financial assurances as to such
bidder's ability to close a transaction, (iii) submitting a preliminary proposal reflecting the
purchase price range, any Acquired Assets or Canadian Assets expected to be excluded, the
structure and financing of the transaction, any anticipated regulatory approvals, the anticipated
time frame and any anticipated impediments to obtaining such approvals, any additional
conditions to closing that the qualified bidder may wish to impose, and the nature and extent of
any due diligence it may wish to conduct and the date by which such due diligence would be
completed, and (iv) delivering a good faith deposit in the amount of $2,000,000 (the "Good Faith
Deposit").

(d)    <u>Due Diligence</u>:  All Qualified Bidders would be afforded an
opportunity to participate in the diligence process.  The Sellers would coordinate the diligence
process and provide due diligence access and additional information as reasonably requested by
any Qualified Bidders.

(e)    <u>Bid Deadline</u>:  A bid deadline of 11:00 a.m. (prevailing Eastern
time) on October 16, 2007 (the "Bid Deadline") would be established.  The Selling Debtor
Entities may extend the Bid Deadline once or successively, but are not obligated to do so.  If the

---

[19]    In the event of any conflict between the Bidding Procedures and this summary of the Bidding Procedures, the
provisions of the Bidding Procedures control.  Capitalized terms used but not otherwise defined in this summary
have the meanings ascribed to them in the Bidding Procedures.

Selling Debtor Entities extend the Bid Deadline, they would promptly notify all Qualified Bidders of such extension.

(f)    <u>Break-up Fee</u>:  Only in the event that the Selling Debtor Entities terminate the Agreement to consummate an Alternative Transaction (as defined below) and sell, transfer, or otherwise dispose of all or substantially all or a material portion of the Acquired Assets in a transaction or a series of related transactions with one or more parties other than the Purchaser in accordance with the Bidding Procedures (the "Alternative Transaction"), the Sellers would pay the Purchaser an amount equal to $1,500,000 (the "Break-Up Fee").  Notwithstanding the foregoing, the Purchaser would not be entitled to a Break-Up Fee if the Purchaser would be in material breach of the Agreement or the Bidding Procedures.

(g)    <u>Bid Requirements</u>:  All bids would be required to include the following documents: (i) a letter stating that the bidder's offer would be irrevocable until two business days after the Closing, (ii) an executed copy of the Agreement, together with all schedules, marked to show amendments and modifications to the agreement, purchase price, and proposed schedules, (iii) a Good Faith Deposit, and (iv) satisfactory written evidence of a commitment for financing or other ability to consummate the proposed transaction.

(h)    <u>Qualified Bids</u>: To be deemed a "Qualified Bid," a bid would be required to be received by the Bid Deadline and, among other things, would be required to (i) be on terms and conditions that are substantially similar to, and are not materially more burdensome or conditional to the Sellers than those contained in the Agreement, (ii) not be contingent on obtaining financing or the outcome of unperformed due diligence, (iii) have a value greater than the purchase price reflected in the Agreement, the purchase price reflected in the Canadian Agreement, and the amount of the Break-Up Fee, plus $500,000 initially, and in increments of $250,000 for any subsequent bid, (iv) not be conditioned on any bid protections, such as a break-up fee, termination fee, expense reimbursement, or similar type of payment, (v) contain acknowledgements and representations as set forth in the Bidding Procedures, and (vi) include a commitment to consummate the purchase of the Acquired Assets and the Canadian Assets within not more than fifteen days after entry of the Court's order approving such purchase.

(i)    <u>Conduct Of Auction</u>: If the Sellers receive at least one Qualified Bid in addition to that of the Purchaser, they would conduct an auction (the "Auction") of the Acquired Assets and the Canadian Assets at 10:00 a.m. (prevailing Eastern time) on or before October 23, 2007, or such later time as the Sellers notify all Qualified Bidders who have submitted Qualified Bids, in accordance with the procedures outlined in the Bidding Procedures, which include: (i) attendance at the Auction would be limited to specified parties as outlined in the Bidding Procedures, (ii) at least two Business Days prior to the Auction, each Qualified Bidder with a Qualified Bid would be required to inform the Sellers whether it intends to participate in the Auction and at least one Business Day prior to the Auction, the Sellers would be required to provide such bidders attending the auction with copies of the Qualified Bid or combination of Qualified Bids which the Sellers then believe is the highest or otherwise best offer for the Acquired Assets and the Canadian Assets, (iii) all Qualified Bidders would be entitled to be present for all subsequent bids, and (iv) bidding at the Auction would begin with the highest or otherwise best Qualified Bid, continue in minimum increments of at least

$250,000 and conclude after each participating bidder has had the opportunity to submit one or more additional subsequent bids.

(j)    Selection Of Successful Bid:  As soon as practicable after the conclusion of the Auction, the Sellers would review each Qualified Bid and identify the highest or otherwise best offer(s) for the Acquired Assets and the Canadian Assets (the "Successful Bid") and the bidder(s) making such bid(s) (the "Successful Bidder(s)").  The Sellers would sell the Acquired Assets and the Canadian Assets for the highest or otherwise best Qualified Bid or combination of Qualified Bids and the transaction would be consummated as soon as reasonably practicable following the approval of such Qualified Bid by the Court.

(k)    Sale Hearing: The Selling Debtor Entities request that the Sale Hearing be scheduled for October 25, 2007 at 10:00 a.m. (prevailing Eastern time) and that the Sale Hearing could be adjourned or rescheduled by the Sellers without notice other than by an announcement of the adjourned date at the Sale Hearing.  If no Qualified Bids other than that of the Purchaser are received, the Sellers would proceed with the sale of the Acquired Assets and the Canadian Assets to the Purchaser following entry of such order.  If the Sellers receive additional Qualified Bids, then at the Sale Hearing, then the Sellers would seek approval of the Successful Bid, as well as the second highest or best Qualified Bid (the "Alternate Bid," and such bidder, the "Alternate Bidder").  A bid would not be deemed accepted by the Sellers unless and until approved by the Court.  Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for specified reasons, then the Alternate Bid would be deemed to be the Successful Bid and the Sellers would be permitted to effectuate a sale to the Alternate Bidder without further order of the Court.

(l)    Return Of Good Faith Deposits:  The Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) would be held in an interest-bearing escrow account and all Qualified Bids would remain open until two business days following the closing of the Sale (the "Return Date").  Notwithstanding the foregoing, the Good Faith Deposit submitted by the Successful Bidder, together with interest thereon, would be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder.  If a Successful Bidder fails to consummate an approved sale, the Sellers would not have any obligation to return such Good Faith Deposit and such deposit would irrevocably become property of the Sellers.  On the Return Date, the Sellers would return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

(m)    Reservation Of Rights:  The Sellers, after consultation with the agents for its secured lenders and the Creditors' Committee: (i) could determine which Qualified Bid, if any, would be the highest or otherwise best offer and (ii) could reject, at any time, any bid (other than the Purchaser's bid) that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the Sellers, including the Selling Debtor Entities and their estates and their stakeholders, and as determined by the Selling Debtor Entities in their sole discretion.

K.    Break-Up Fee

31.    The Purchaser has expended, and likely will continue to expend,
considerable time, money, and energy pursuing the Sale and has engaged in extended arm's-
length and good faith negotiations regarding a possible sale.  The Agreement is the culmination
of these efforts.

32.    In recognition of this expenditure of time, energy, and resources, the
Selling Debtor Entities have agreed to provide certain bid protections to the Purchaser.
Specifically, the Agreement provides for, and the Selling Debtor Entities respectfully request that
the Bidding Procedures Order approve, a break-up fee payable by the Selling Debtor Entities to
the Purchaser in the amount of $1,500,000, which is 3.6% of the cumulative purchase price,[20] if
the Selling Debtor Entities terminate the Agreement to close an Alternative Transaction and the
Selling Debtor Entities consummate an Alternative Transaction.  The Selling Debtor Entities
recognize that a 3.6% Break-Up Fee is at the higher end of the range of traditional bid
protections approved in asset sales pursuant to section 363 of the Bankruptcy Code.
Nonetheless, the Break-Up Fee was a material inducement for, and a condition of, the
Purchaser's entry into the Agreement.

33.    The Selling Debtor Entities believe that the proposed Break-Up Fee is fair
and reasonable in view of (a) the intensive analysis, due diligence investigation, and negotiation
undertaken by the Purchaser in connection with the Sale and (b) the fact that the Purchaser's
efforts would maximize the value of the Acquired Assets for the benefit of all stakeholders
whether as a result of consummating the divestiture pursuant to the Agreement or making the
highest or otherwise best offer to be submitted at any Auction.

---

[20]    Assumes an Inventory Value of approximately $15 million based on current inventory levels and includes the
value of the Canadian Assets.

34.     The Purchaser is unwilling to keep open its offer to purchase the Acquired

Assets under the terms of the Agreement unless this Court authorizes payment of the Break-Up

Fee.  Thus, absent entry of the Bidding Procedures Order and approval of the Break-Up Fee, the

Selling Debtor Entities may lose the opportunity to obtain what they believe to be the highest and

best offer for the Acquired Assets.

35.     Moreover, payment of the Break-Up Fee will not diminish the Selling

Debtor Entities' estates.  The Selling Debtor Entities would not expect to pay the Break-Up Fee

unless and they do so to accept an alternative Successful Bid, which would result in even greater

value to the Selling Debtor Entities' estates and their stakeholders.  The Selling Debtor Entities

thus request that this Court authorize payment of the Break-Up Fee pursuant to the terms and

conditions of the Agreement.

L.      Notice Of Sale Hearing

36.     Within five days after entry of the Bidding Procedures Order (the "Mailing

Date"), the Selling Debtor Entities (or their agent) propose to serve the Motion, the Agreement,

the proposed Sale Approval Order, the Bidding Procedures, and a copy of the Bidding

Procedures Order by first-class mail, postage prepaid, upon (i) the U.S. Trustee, (ii) counsel for

the Purchaser, (iii) counsel for the Creditors' Committee, (iv) counsel for the Equity Committee,

(v) all entities known to have expressed an interest in a transaction with respect to the Acquired

Assets during the past six months, (vi) all entities known to have asserted any Lien, claim,

interest, or encumbrance in or upon the Acquired Assets, (vii) all federal, state, and local

regulatory or taxing authorities or recording offices, including but not limited to environmental

regulatory authorities, which have a reasonably known interest in the relief requested by the

Motion, (viii) the United States Attorney's office, (ix) the United States Department of Justice,

(x) the Securities and Exchange Commission, (xi) the Internal Revenue Service, (xii) all entities

on the Master Service List (as defined by the Supplemental Order Under 11 U.S.C. §§ 102(1)

And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing

Dates And Certain Notice, Case Management, And Administrative Procedures (Docket No.

2883) (the "Supplemental Case Management Order")), and (xiii) such other entities as are

required to be served with notices under the Supplemental Case Management Order.

        37.     The Selling Debtor Entities also propose pursuant to Fed. R. Bankr. P.

2002(l) and 2002(d) to publish a notice of the Sale in a form substantially similar to the form

annexed hereto as Exhibit F in the Wall Street Journal (International Edition), the New York

Times, the Saginaw News, and the Bay City Times within five days of entry of the Bidding

Procedures Order or as soon as practicable thereafter, and the Sellers request that such

publication notice be deemed proper notice to any other interested parties whose identities are

unknown to the Sellers.

Applicable Authority

M.      Approval Of Bidding Procedures

        38.     Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be

authorized if the debtor demonstrates a sound business justification for it.  See Comm. Of Equity

Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business

judgment rule requires finding that good business reason exists to grant debtor's application

under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 178-179 (D.

Del. 1991).

39.    The Second Circuit has held that, although the bankruptcy court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate."  Orion Pictures Corp. v. Showtime Network, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's consideration of a debtor's section 363(b) motion is a summary proceeding, intended merely as a means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate.  It is not the time or place for prolonged discovery or a lengthy trial with disputed issues."  Id. at 1098-99.

40.    Once the debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity."  Id.  To satisfy its burden, it is not enough for an objector simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections."  Lionel, 722 F.2d at 1071.

41.    As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'"  In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).  As set forth above, the Selling Debtor Entities have sound business justifications for

pursuing a sale process at this time.  Because GM has resourced the majority of the Saginaw

Chassis Business to the Purchaser, the sale of the Acquired Assets and the Canadian Assets from

the Sellers to the Purchaser will ensure a seamless transition of operations and minimize

interruption to the Saginaw Chassis Business.  In addition, the sale of the Acquired Assets as a

whole will generate value substantially higher than if the Selling Debtor Entities wound down

the Saginaw Chassis Business.

42.    The Selling Debtor Entities submit that the Bidding Procedures would

encourage competitive bidding because the Purchaser would not have entered into the

Agreement without such provisions.  The Bidding Procedures have thus induced a bid that

otherwise would not have been made.  Finally, the mere existence of the Bidding Procedures

permits the Selling Debtor Entities to insist that competing bids be materially higher or otherwise

better than the Agreement, which will produce a clear benefit to the Selling Debtor Entities, their

estates, their stakeholders, and all other parties-in-interest.

43.    A prospective purchaser of assets from a chapter 11 debtor may be

reluctant to make an offer because it knows that even if it reaches agreement with the debtor, its

offer will be subject to a higher bid by another party.  Pre-approved bidding procedures address

these concerns by assuring initial bidders that any auction procedure will be predictable and

reasonable.  Thus, the Selling Debtor Entities submit that the use of the Bidding Procedures also

reflects sound business judgment.

N.    Sale Of The Acquired Assets Free And Clear Of Liens

44.    Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may

sell property free and clear of any lien, claim, or interest in such property if, among other things:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such
> interest;

(2)  such entity consents;

(3)  such interest is a lien and the price at which such property is sold is great that the aggregate value of all liens on such property;

(4)  such interest is in bona fide dispute; or

(5)  such entity could be compelled in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

45.    Therefore, section 363(f) permits the Selling Debtor Entities to sell the Acquired Assets free and clear of Liens.  Each Lien that is not the result of an assumed liability satisfies at least one of the five conditions of 11 U.S.C. § 363(f), and the Selling Debtor Entities submit that any such Lien will be adequately protected by attachment to the net proceeds of the Sale, subject to any claims and defenses the Selling Debtor Entities may possess with respect thereto.  Accordingly, the Selling Debtor Entities request that the Acquired Assets be transferred to the Purchaser or the Successful Bidder(s), as the case may be, free and clear of all Liens.

O.    The Purchaser Is A Good Faith Purchaser Pursuant To
      Section 363(m) Of The Bankruptcy Code And The Transaction
      Contemplated By The Agreement Should Carry The
      Protections Of Section 363(n) Of The Bankruptcy Code

46.    Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Although the Bankruptcy Code does not define "good faith," the Second Circuit Court of Appeals in In re Gucci held that the

good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made.  A purchaser's good faith is lost by

> 'fraud, collusion between the purchaser and other bidders or the trustee, or
> an attempt to take grossly unfair advantage of other bidders.'

126 F.3d at 390 (quoting In re Rock Industries Machinery Corp., 572 F.2d 1195, 1198 (7th Cir.

1978) (interpreting Bankruptcy Rule 805, the precursor of section 363(m))); see also Evergreen

Int'l Airlines Inc. v. Pan Am Corp. (In re Pam Am Corp.), Case Nos. 91 Civ. 8319 (LMM) to 91

Civ. 8324 (LMM), 1992 WL 154200 at *4 (S.D.N.Y. June 18, 1992); In re Sasson Jeans, Inc., 90

B.R. 608, 610 (S.D.N.Y. 1988).

      47.    Section 363(n) of the Bankruptcy Code further provides, in relevant part,

that:

> The trustee may avoid a sale under this section if the sale price was
> controlled by an agreement among potential bidders at such sale, or may
> recover from a party to such agreement any amount by which the value of
> the property sold exceeds the price at which such sale was consummated,
> and may recover any costs, attorneys' fees, or expenses incurred in
> avoiding such sale or recovering such amount.

      48.    The Selling Debtor Entities submit, and will present evidence at the Sale

Hearing, that the Agreement reflects an intensely negotiated, arm's-length transaction.

Throughout the negotiations, the Purchaser has at all times acted in good faith.  Moreover, to the

extent that the assets are sold to a Successful Bidder, it will be because of a well-planned

competitive process and intense negotiations at arm's length to be conducted at an Auction.  As a

result of the foregoing, the Selling Debtor Entities request that the Court make a finding that the

Purchase Price to be paid by the Purchaser constitutes reasonably equivalent value and fair

consideration under any applicable law.

      49.    The Selling Debtor Entities, therefore, request that this Court make a

finding that the Purchaser has purchased the Acquired Assets in good faith within the meaning of

section 363(m) of the Bankruptcy Code.  Further, the Selling Debtor Entities request that this

Court make a finding that the asset purchase agreement reached as a result of the Bidding

Procedures necessarily will comprise an arm's-length, intensely-negotiated transaction entitled to

the protections of section 363(m) of the Bankruptcy Code.  Because the Selling Debtor Entities

have shown that the Purchaser's successful bid is not the product of fraud or collusion between

the Purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of

other bidders, the Selling Debtor Entities further request that this Court make a finding that the

transactions contemplated by the Agreement are not avoidable under section 363(n) of the

Bankruptcy Code.

P.      Approval Of The Break-Up Fee

          50.      Bidding incentives encourage potential bidders to invest the requisite time,

money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to

the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11

process.  See, e.g., In re 995 Fifth Ave. Associates, L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992)

(bidding incentives may "be legitimately necessary to convince a white knight to enter the

bidding by providing some form of compensation for the risks it is undertaking") (citation

omitted).  Bankruptcy courts often approve bidding incentives under the business judgment rule.

In re Global Crossing Ltd., 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) ("[N]o litigant has

seriously argued the inapplicability of the business judgment test, and if any such argument had

been made, the Court would be compelled . . . to reject it."); In re Bethlehem Steel Corp., Case

No. 02 Civ. 2854 (MBM), 2003 WL 21738964 at *8 n.13 (S.D.N.Y. July 28, 2003) (the court

should approve agreements providing bidding incentives "unless they are unreasonable or appear

more likely to chill the bidding process than to enhance it").  One court, explaining the force of

the business judgment rule in this context, stated "the business judgment rule does not become

inapplicable simply because a court decides a break-up fee is too large." In re Integrated Resources, 147 B.R. at 660.

51.    In this district, courts have established a three part-test for determining when to permit bidding incentives.  The three factors are: "whether (i) the relationship of parties who negotiated breakup fee is tainted by self-dealing or manipulation, (ii) the fee hampers, rather than encourages, bidding, and (iii) the amount of the fee is unreasonable relative to purchase price." Id.

52.    Here, the Selling Debtor Entities seek authority to utilize the Bidding Process and the Break-Up Fee in the event that the Purchaser is not ultimately the Successful Bidder or must increase the Purchaser's bid price to become the Successful Bidder.  As the stalking horse bidder, the Purchaser has contributed a significant investment in time and resources.  Although the proposed $1,500,000 Break-Up Fee is 3.6% of the cumulative purchase price, [21] the Selling Debtor Entities believe that in these circumstances the Break-Up Fee is nonetheless fair and reasonable in amount.  Moreover, the Purchaser is not entitled to an expense reimbursement under the Agreement.  See, e.g., In re Allegiance Telecom, Inc., Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. 2004) (allowing 2.8% break-up fee and expense reimbursement provision in asset sale agreement); In re Enron Corp., Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. 2004) (approving 3% break-up fee if debtor closes superior transaction); In re Loral Space & Communications Ltd., Case Nos. 03-41710 and 03-41709 (RDD) (Bankr. S.D.N.Y. 2003) (allowing 2% for break-up fee and .8% for expense reimbursement only if court enters order approving alternative transaction); In re Genuity Inc., Case No. 02-43558 (PCB)(Bankr. S.D.N.Y. 2002) (allowing 4.13% break-up fee if court approved alternative transaction); In re

---

[21]    Assumes an Inventory Value of approximately $15 million based on current inventory levels and includes the value of the Canadian Assets.

<u>PSINet, Inc.</u>, Case No. 01-13213 (REG) (Bankr. S.D.N.Y. 2001) (permitting 4.28% break-up fee

in event that seller consummated transaction with alternative bidder); <u>In re Teligent, Inc.</u>, Case

No. 01-12974 (SMB) (Bankr. S.D.N.Y. 2001) (allowing break up fee ranging from 1.3% to

4.25% depending on value of alternative transaction).

Q.    <u>Conclusion</u>

         53.    The Selling Debtor Entities submit that the relief requested in this Motion,

including the Bidding Procedures, bid protections, and Notice Procedures are in the best interests

of the Selling Debtor Entities' estates and will maximize value for all stakeholders.  The Selling

Debtor Entities will further show at the Sale Hearing that the entry approving the Sale of the

Acquired Assets of the Selling Debtor Entities free and clear of Liens to the Purchaser or to the

Successful Bidder by the Purchaser or the Successful Bidder, as the case may be, are likewise in

the best interests of the Selling Debtor Entities' estates and will maximize value for all

stakeholders.

<u>Notice</u>

54.      Notice of this Motion has been provided in accordance with the

Supplemental Case Management Order, and the Amended Eighth Supplemental Order Under 11

U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing

Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative

Procedures, entered October 26, 2006 (Docket No. 5418).  Further notice with respect to the Sale

will be provided in accordance with the Notice Procedures described herein.  In addition, the

Debtors have complied with the Supplemental Case Management Order with respect to the filing

of this Motion and the need for expedited relief.[22]  In light of the nature of the relief requested,

the Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

55.      Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Selling Debtor Entities respectfully request that the requirement of the

service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local

Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York

be deemed satisfied.

---

[22]    The Debtors have noticed this Motion for the omnibus hearing on September 27, 2007.  In compliance with the terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors' Committee regarding the relief sought in this Motion as well as the timing of its filing.  The Debtors have been informed that the Creditors' Committee has consented to this Motion being heard on September 27, 2007. Because this Motion is being filed on less than 20 days' notice, parties-in-interest will have until September 24, 2007 to file an objection to entry of the Bidding Procedures Order.

WHEREFORE the Selling Debtor Entities respectfully request that this

Court enter an order (a)(i) approving the Bidding Procedures, (ii) granting certain bid

protections, (iii) approving the Notice Procedures, and (iv) setting the Sale Hearing, (b)

approving the Sale of the Acquired Assets by the Sellers free and clear of Liens to the Purchaser

or to the Successful Bidder, and (c) granting them such other and further relief as is just.

Dated: New York, New York
       September 17, 2007

       SKADDEN, ARPS, SLATE, MEAGHER
         & FLOM LLP

       By: _/s/ John Wm. Butler, Jr._____
         John Wm. Butler, Jr. (JB 4711)
         John K. Lyons (JL 4951)
         Ron E. Meisler (RM 3026)
       333 West Wacker Drive, Suite 2100
       Chicago, Illinois  60606
       (312) 407-0700

           - and -

       By: _/s/ Kayalyn A. Marafioti_____
         Kayalyn A. Marafioti (KM 9632)
         Thomas J. Matz (TM 5986)
       Four Times Square
       New York, New York 10036
       (212) 735-3000

       Attorneys for Delphi Corporation, et al.,
         Debtors and Debtors-in-Possession