**ASSET PURCHASE AGREEMENT**

**BETWEEN**

**TRW INTEGRATED CHASSIS SYSTEMS LLC**

**AND**

**DELPHI CANADA, INC.**

**DATED: SEPTEMBER 17, 2007**

## ASSET PURCHASE AGREEMENT

TRW Integrated Chassis Systems LLC , a Delaware limited liability company ("TRW" or "Purchaser") and Delphi Canada, Inc., a corporation organized under the laws of the Province of Ontario, Canada ("Delphi Canada" or "Seller") enter into this Asset Purchase Agreement on September 17, 2007.

## RECITAL:

Seller desires to sell to Purchaser all right, title and interest of Seller in and to the Acquired Assets (as defined below), and Purchaser desires to make such purchases subject to the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the premises, mutual promises, representations, warranties and covenants contained in this Agreement and other good and valuable consideration, and intending to be legally bound hereby, the Parties agree:

## DEFINITIONS

The following terms, as used in this Agreement, have the following meanings whether used in the singular or plural (other terms are defined in Sections or Schedules to which they pertain):

"**Acquired Assets**" means all of Seller's right, title and interest in and to the following:

    A.    Manufacturing Equipment; and

    B.    Other Personal Property.

"**Affiliate**" means with respect to any Party any business or other entity directly or indirectly controlling, controlled by or under common control with such specified entity. For purposes of this definition, control means ownership of at least fifty percent (50%) of the shares or other equity interest having power to elect directors or persons performing a similar function.

"**Agreement**" means this Asset Purchase Agreement, including all Schedules and Exhibits.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which banks in Oshawa, Ontario Canada are authorized or obligated by law or executive order to close.

"**Claims**" means right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.

"**Closing**" has the meaning set forth in Section 6.1.

"**Closing Date**" means the date of Closing.

"**Excluded Assets**" means any assets not included in the Acquired Assets.

"**Governmental Entity**" means any federal, provincial, state or local, tribunal, legislative, executive, governmental, quasi-governmental or regulatory authority, self-regulatory authority,

2

agency, department, commission, instrumentality or body having governmental authority with respect to the transactions contemplated hereby, under applicable law.

"**Knowledge**" with respect to Seller means the actual, conscious knowledge of the individuals listed on Schedule 4.1.  "**Knowledge**" with respect to Purchaser means the actual, conscious knowledge of the individuals listed on Schedule 4.2.

"**Laws**" means laws, ordinances, codes, standards, administrative rulings or regulations of any applicable federal, state, provincial, local or foreign governmental authority.

"**Liabilities**" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including without limitation Claims for employment (including all Claims by or against employees and others providing services to Seller in respect of actions occurring or alleged to have occurred on or before the Closing Date), intellectual property, product performance and all other product liability matters

"**Lien**" means any lien (including tax liens and any statutory or common law liens, possessory or otherwise), charge, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing or registration statement under the Personal Property Security Act) and any monetary amounts which are secured by any Lien.

"**Manufacturing Equipment**" means the machinery and equipment described on Schedule M, attachments and accessories to such items, together with the Tooling and the Tooling Claims (but only to the extent assignable under otherwise applicable law).

"**Material Adverse Effect**" means any change or event that has a material adverse effect on the Acquired Assets taken as a whole, except any change or event resulting from, relating to or arising out of: (i) any act or omission of Seller taken with the prior written consent of the Purchaser; (ii) any action taken by Seller or Purchaser or any of their respective representatives required by the terms of this Agreement; (iii) general business or economic conditions; (iv) conditions affecting the industry and markets in which Purchaser and Seller generally operate; (v) increases in energy, electricity, natural gas, raw materials or other operating costs; (vi) national or international political or social conditions, including the engagement by the United States or Canada in hostilities whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon such country, or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of any such countries; (vii) financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index); (viii) changes in generally accepted accounting principles in the United States or Canada; (ix) changes in any Law; (x) any existing event, occurrence or circumstance listed in any Schedule provided under Article 4 of this Agreement as of the date hereof; or (xi) any adverse change in or effect on the Acquired Assets that is cured, in its entirety, by Seller, before the earlier of (1) the Closing Date, and (2) the date on which this Agreement is terminated pursuant to Section 8.

"**Ordinary Course of Business**" means the use and operation of the Acquired Assets, consistent with custom and practice of Seller prior to the Closing Date.

"**Organizational Documents**" means: (a) the articles of incorporation and the bylaws of a corporation; (b) the partnership agreement and any statement of partnership of a general

3

partnership; (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (d) the articles or certificate of organization and the operating agreement or other document intended to govern the structure and/or internal affairs of a limited liability company; (e) any charter, agreement, indenture, or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (f) any amendment to the foregoing.

"**Other Personal Property**" means all of the following owned by Seller which are used primarily in the manufacture or shipment of the Products at the Product Facility or the use or operation of the Acquired Assets: Spare Parts; disposable and non-disposable dunnage (including in-plant racking and containers and all shipping containers and dunnage in the possession of customers or outside processors, to the extent such items are used primarily in the manufacture, processing or shipment of the Products); any warranties given by the manufacturers or suppliers of any Acquired Assets; and the assets described on Schedule O, in each case, to the extent existing on the date(s) the Manufacturing Equipment is delivered to Purchaser.  For certainty, Other Personal Property does not include any Excluded Assets or any Manufacturing Equipment.

"**Party**" or "**Parties**" means Purchaser, and Seller.

"**Past Model Service Parts**" means the Products identified on Schedule P-2 (as such Schedule P-2 may be modified from time to time in writing based on the mutual agreement of Purchaser and Seller).

"**Person**" means an individual, a corporation, a partnership, a limited liability company, an association, a trust or other entity or organization.

"**Products**" means the products identified on Schedule P-1 and Schedule P-2 (as such Schedule P-2 may be modified from time-to-time in writing based on the mutual agreement of Purchaser and Seller).

"**Product Facility**" means Seller's leased facility located in Oshawa, Ontario Canada where the Acquired Assets are currently located.

"**Purchase Price**" has the meaning given in Section 2.1.

"**Purchaser**" means TRW Integrated Chassis Systems LLC, a Delaware limited liability company.

"**Sale**" means the sale, transfer and assignment of the Acquired Assets from Seller to Purchaser in accordance with this Agreement.

"**Seller**" means Delphi Canada, Inc., a corporation organized under the laws of the Province of Ontario, Canada.

"**Spare Parts**" means all spare parts for the Manufacturing Equipment and perishable Tooling used in the manufacture of the Products (including spare perishable Tooling), in each case existing on the date(s) the Manufacturing Equipment is delivered to Purchaser.

"**Tax(es)**" means any tax or similar governmental charge, impost or levy whatsoever (including, without limitation, income, franchise, transfer taxes, use, gross receipts, goods and services value added, employment, excise, ad valorem, property, withholding, payroll, social contribution, customs duty, minimum or windfall profit taxes or transfer fees), together with any

4

related penalties, fines, additions to tax or interest, imposed by Canada or any province, local or foreign government or subdivision or agency thereof.

"**Tooling**" means all tooling, gauges, dies, fixtures, test and assembly fixtures, patterns, casting patterns, cavities, molds, prototype tooling, engineering product testing tooling and fixtures and similar items (a) utilized exclusively in connection with the Manufacturing Equipment or the manufacture or processing of Products wherever located; (b) all such items for Past Models Service Parts, if any; and, (c) owned by Seller and used by suppliers exclusively for the manufacture of sub-components for the Products, where ever located.

"**Tooling Claims**" means all claims, rights, and causes of action, if any, Seller has or may have against any vendors who are in possession of Seller-owned or GM-owned Tooling related to such vendors' failure to properly and timely maintain, repair or refurbish such Tooling.

**1.      CONVEYANCE OF THE ACQUIRED ASSETS.**

   1.1    **Acquired Assets Transaction.**

Upon the terms and subject to the conditions set forth in this Agreement at Closing (unless otherwise expressly provided in this Agreement) Seller will sell, transfer, assign, convey and deliver to the Purchaser, and Purchaser will purchase, accept and acquire from the Seller, the Acquired Assets, free and clear of all Liens, except for liens that are referenced in Section 4.1(C).

   1.2    **Purchaser's Removal of the Acquired Assets**.

   A.    Promptly following Closing, Purchaser will remove at its cost and expense the Acquired Assets for export from Canada.  Seller shall have the right to monitor all removal activities.  Until the Acquired Assets are removed by Purchaser, title to and risk of loss in respect to such Acquired Assets will remain in Seller.  In connection with Purchaser's removal of the Acquired Assets, Purchaser shall not unreasonably interfere with any ongoing production by Seller.

   B.    To the extent any agreements between Seller and any unions representing workers at the Product Facility require that the dismantling and removal of the Acquired Assets be completed by union employees, Purchaser shall use such employees to remove the Acquired Assets or, subject to the consent of the applicable union, reimburse Seller for any amounts Seller must pay the employees in lieu of using them to dismantle and remove such Acquired Assets.

   C.    Purchaser will use due care in the removal of the Acquired Assets so as to not damage Seller's premises.  Purchaser will be responsible for and reimburse Seller for any damage to Seller's premises as a result of Purchaser's removal activities, but will not be required to reimburse Seller for any costs and expenses of the decommissioning activities or costs and expenses incurred to restore the premises (e.g. filling press pits, sealing off ducts, rewiring etc.) to the extent such restoration would be required upon removal of the Acquired Assets by any party.

   1.3    **Post-Closing Asset Deliveries**.

Should Seller or Purchaser, in its reasonable discretion, determine after the Closing that any Acquired Assets are still in the possession of Seller, Seller will promptly deliver them to Purchaser at no cost to Purchaser. Should Seller or Purchaser, in its reasonable discretion,

5

determine after the Closing that any Excluded Assets were delivered to Purchaser, Purchaser will promptly return them to Seller at no cost to Seller.

    1.4    **No Assumption of Liabilities by Purchaser**.

Except as specifically provided in this Agreement, Purchaser will not assume or have any responsibility for any of Seller's Liabilities (collectively, the "Retained Liabilities").

## 2. PURCHASE PRICE.

    2.1    **Purchase Price for Acquired Assets**. Subject to the terms and conditions of this Agreement, the aggregate purchase price for the Acquired Assets will be One Million Two Hundred Thirty Nine Thousand Two Hundred Forty Dollars ($1,239,240) (the "Purchase Price").

    2.2    **Payment of Purchase Price**. The Purchase Price will be paid by Purchaser to Seller on or before the later of the Closing Date or January 5, 2008 in cash by wire transfer to an account designated in writing by Seller. Notwithstanding anything to the contrary contained in this Agreement, if Purchaser fails to make such payment as set forth herein, Seller shall have the right to setoff such amount against or to recoup from any amounts due to Purchaser and its Affiliates from Seller and its Affiliates.

## 3. PARTS BANK.

At Purchaser's option, and provided Seller is reimbursed for all reasonable incremental costs and expenses (i.e., in addition to the applicable purchase price and the cost of working capital funds) of producing and maintaining such parts banks (and such parts banks are paid for according to payment terms now in effect between the applicable customer and Seller) and subject to capacity constraints, Seller will produce any reasonably required parts banks of the Products to meet Delphi's customers' production needs for the period November 29, 2007 through January 18, 2008.

## 4. REPRESENTATIONS AND WARRANTIES.

    4.1    **Warranties of Seller**.

Seller represents and warrants, as of the date hereof, to Purchaser with respect to the Acquired Assets as follows:

    A.    Corporate Authority. Seller has the requisite corporate authority to execute and perform in accordance with this Agreement, and this Agreement shall constitute a valid and binding obligation of Seller.

    B.    No Conflict. The execution and performance by Seller of this Agreement does not violate, conflict with or result in a breach by Seller of its certificate or articles of incorporation or bylaws or of any other agreement to which Seller is a party or by which it is bound.

    C.    Title to Acquired Assets. Seller warrants that, as of the date of delivery of the Acquired Assets, Seller will have good and marketable title to the Acquired Assets and the Acquired Assets will be sold, assigned, transferred or delivered, as the case may be, free and clear of any Lien, except for liens asserted by the Pension Benefit Guaranty Corporation ("PBGC") against the Acquired Assets, which to Seller's

6

Knowledge, are not perfected (provided that any such lien against the Acquired Assets will be subject to the terms of Section 7.4(A) below).

D.     Litigation.  Except as set forth on Schedule 4.1.D., there is no litigation - equitable or legal, administrative, arbitrative or other proceedings - pending against Seller with respect to the Acquired Assets, and Seller has no Knowledge of any written notice of violation of any applicable law, rule or regulation, or any written notice of threatened litigation or Claims, with respect to the Acquired Assets.

E.     Condition of Personal Property.  With respect to all Acquired Assets, Seller has performed maintenance consistent with applicable maintenance policies and procedures and will continue to perform such maintenance in the Ordinary Course of Business through the Closing Date.

F.     Maintenance of Spare Parts and Crib Items.  Through the Closing, Seller will manage its on-hand supply of Spare Parts in the Ordinary Course of Business and will not deplete such supply.

G.     Brokers.  Seller has employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Purchaser would be liable.

H.     Absence of Other Representations or Warranties.  Except for the warranties expressly set forth in this Agreement, Seller makes no representations or warranties, express or implied, with respect to the Acquired Assets.  For the avoidance of doubt, no warranty or representation is given on the contents of the documents provided in due diligence, on any other documents or other information not contained in this Agreement, all which were produced only for information purposes.

4.2    **Warranties of Purchaser**.

Purchaser warrants and represents to Seller as follows:

A.     Corporate Authority.  Purchaser has the requisite corporate authority to execute and perform in accordance with this Agreement, and this Agreement constitutes a valid and binding obligation of Purchaser.

B.     No Conflicts.  The execution and performance by Purchaser of this Agreement does not violate, conflict with or result in a breach of Purchaser's certificate or articles of incorporation, or by-laws, or of any other agreement to which Purchaser is a party of by which it is bound.

C.     Consents and Approvals.  No consent, approval, or authorization of any non-governmental third party and no consent, approval, authorization or declaration of or filing or registration with any foreign, federal, state, provincial or local governmental or regulatory authority is required to be made or obtained by Purchaser in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

D.     Litigation.  There is no litigation, equitable or legal, administrative, arbitrative, or other proceedings pending, or to the Knowledge of Purchaser, threatened against or affecting Purchaser which could reasonably be expected to result in the

7

issuance of an order restraining, enjoining or otherwise prohibiting Purchaser from consummating the transactions contemplated by this Agreement.

  E. <u>Brokers.</u> Purchaser has employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Seller would be liable.

  F. <u>Solvency.</u> Upon the consummation of the transactions contemplated by this Agreement:  (i) Purchaser will not be insolvent; (ii) Purchaser will not be left with unreasonably small capital; (iii) Purchaser will not have incurred debts beyond its ability to pay such debts as they mature; and (iv) the capital of Purchaser will not be impaired.

  G. <u>Availability of Funds.</u> Purchaser has or will have available, at or prior to Closing, sufficient cash in immediately available funds to pay the Purchase Price and all costs, fees and expenses necessary to consummate the transactions contemplated by this Agreement.

  H. <u>Compliance with Laws.</u> To Purchaser's Knowledge, Purchaser is in compliance with all Laws applicable to it, except with respect to those violations that could not reasonably be expected to result in the issuance of an order outstanding restraining, enjoining or otherwise prohibiting Purchaser from consummating the transactions contemplated by this Agreement.

 4.3 **Survival of Representations and Warranties.**

The representations and warranties made by the Seller in <u>Section 4.1</u> and by the Purchaser in <u>Section 4.2</u> will survive the Closing and will expire on the second anniversary of the Closing Date (the "<u>Expiration Date</u>").

 4.4 **Fair Disclosure.**  Any matter fairly disclosed in any Schedule to this Agreement will be deemed an exception for all other representations and warranties contained in this Agreement whether or not such other representations or warranties contain a reference to such Schedule.

**5.** **CONDITIONS TO CLOSING.**

 5.1 **Conditions to Obligations of Seller and Purchaser**.  The respective obligations of each Party to effect the transactions contemplated by this Agreement will be subject to the satisfaction or waiver at or prior to the Closing Date of the following condition precedent:

  A. <u>No Law, Judgments, Etc.</u> No provisions of any applicable Law and no judgment, injunction (preliminary or permanent), order or decree that prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement will be in effect.

 5.2 **Conditions to Obligations of Purchaser**.

The obligation of Purchaser to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Purchaser):

  A. <u>Accuracy of Warranties</u>. Except as otherwise permitted by this Agreement, the representations and warranties of Seller contained in this Agreement will

be true and correct as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a Material Adverse Effect on Seller's ability to consummate the transactions contemplated by this Agreement.

B.  **Performance of Covenants**.  All agreements and transactions contemplated hereby to be performed by Seller on or before the Closing will have been performed in all material respects.

5.3  **Conditions to Obligations of Seller**.

Except as otherwise permitted by this Agreement, the obligation of Seller to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Seller):

A.  **Accuracy of Warranties**. The representations and warranties of Purchaser contained in this Agreement (without taking into account any materiality or Material Adverse Effect qualification therein), will be true and correct as of the Closing Date if made on such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a Material Adverse Effect on Purchaser's ability to consummate the transactions contemplated by this Agreement.

B.  **Performance of Covenants**.  All agreements and transactions contemplated hereby to be performed by Purchaser on or before the Closing will have been performed in all material respects.

C.  **GM Agreement**.  GM enters into an agreement reasonably acceptable to Seller releasing Seller of its obligations to manufacture and deliver Products to GM upon Purchaser assuming responsibility to manufacture and deliver such Products to GM.

**6.   CLOSING.**

6.1  **Closing Date**.

Subject to the satisfaction of the conditions set forth in this Agreement, the closing (the "Closing") of the transactions contemplated hereby will take place at the offices of Purchaser's counsel on November 30, 2006 or on such other date or at such other time as the Parties may agree.

6.2  **Seller's Deliveries**.

At the Closing, Seller will deliver to Purchaser the following, in proper form for recording where appropriate:

A.  An officer's certificate, dated as of the Closing Date, executed on behalf of Seller, certifying that the conditions specified in Section 5 have been fulfilled.

B.  A certificate, dated as of the Closing Date, executed on behalf of Seller by a Secretary or an Assistant Secretary, certifying: (i) a true and correct copy of Seller's

9

Organizational Documents; and (ii) a true and correct copy of the resolutions of the appropriate Seller management group authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby.

  C. Appropriate receipts.

  D. Duly executed Bill of Sale for all Acquired Assets to be transferred at Closing.

 6.3 **Purchaser's Deliveries**.  At the Closing, Purchaser will deliver to Seller, in proper form for recording where appropriate:

  A. An officer's certificate, dated as of the Closing Date, executed on behalf of Purchaser, certifying that the conditions specified in Section 5 have been fulfilled.

  B. A certificate, dated as of the Closing Date, executed on behalf of the Purchaser by its Secretary or an Assistant Secretary, certifying: (i) a true and correct copy of Purchaser's Organizational Documents; and (ii) a true and correct copy of the resolutions of the Purchaser's board authorizing the execution, delivery and performance of this Agreement by Purchaser and the consummation of the transactions contemplated hereby.

**7.** **CERTAIN ADDITIONAL COVENANTS.**

 7.1 **Continued Operations**.

Except: (i) as otherwise provided in this Agreement; (ii) for any changes that may be required under applicable Laws; or (iii) as set forth in the following sentence, until the Closing, Seller will continue to use and operate the Acquired Assets in the Ordinary Course of Business and maintain and repair the tangible Acquired Assets as previously done in the Ordinary Course of Business.

 7.2 **Registrations, Filings and Consents; Further Actions.**

Upon the terms and subject to the conditions of this Agreement, each of the Parties will use commercially reasonable efforts to take, or cause to be taken, all appropriate actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement as promptly as practicable including, without limitation, using their reasonable best efforts to cause the satisfaction of all conditions to Closing.

 7.3 **Further Assurances.**

If at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instructions and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under this Agreement).

 7.4 **Indemnification.**

A.    <u>Seller's Agreement to Indemnify</u>.  If the Closing occurs and Purchaser makes a written claim for indemnification against Seller in accordance with the procedures set forth in this <u>Section 7.4</u>, then, from and after the Closing, Seller agrees to indemnify and hold harmless Purchaser from and against all out-of-pocket liabilities, claims, assessments, losses, judgments, settlements, damages, costs and expenses (including, without limitation, reasonable professional fees and expenses) (collectively, the "<u>Purchaser Damages</u>") incurred by Purchaser as a result of or arising out of: (i) the Retained Liabilities and Excluded Assets; (ii) a breach of any representation or covenant of Seller contained in this Agreement; (iii) a breach of any covenant to be performed by Seller under this Agreement or (iv) any Claims asserted against Purchaser or any of the Acquired Assets as a result or in respect of the liens asserted by the PBGC.

B.    <u>Purchaser's Agreement to Indemnify</u>.  If the Closing occurs and Seller makes a written claim for indemnification against Purchaser in accordance with the procedures set forth in this <u>Section 7.4</u>, then, from and after the Closing, Purchaser shall indemnify and hold harmless Seller from and against all out-of-pocket liabilities, claims, assessments, losses, judgments, settlements, damages, costs and expenses (including, without limitation, reasonable professional fees and expenses) (collectively, the "<u>Seller Damages</u>") incurred by Seller as a result of or arising out of: (i) a breach of any representation or warranty of Purchaser contained in this Agreement; (ii) a breach of any covenant to be performed by Purchaser under this Agreement; or (iii) the use, operation or ownership of any of the Acquired Assets after the Closing unless such matters are of a nature also subject to indemnification pursuant to <u>Section A</u> above.

C.    <u>Limitations on Agreements to Indemnify</u>. The obligations of the Parties to indemnify the other pursuant to this <u>Section 7.4</u> are subject to the following limitations:

(i)    Each Party agrees that, from and after the Closing, the indemnification provided in this <u>Section 7.4</u> is the exclusive remedy for a breach by the other Party of any representation, warranty, agreement or covenant contained in this Agreement, and that there shall be no other remedy for any breach by a party in respect of any claim for monetary damages arising out of or under this Agreement.

(ii)    In calculating amounts payable to an indemnified party, the amount of any indemnified Purchaser Damages or Seller Damages, as the case may be, shall be determined without duplication of any other damages for which a claim has been made or could be made under any other representation, warranty or covenant included herein.

(iii)    Any written notice delivered by an indemnified party to an indemnifying party seeking indemnification pursuant to this Agreement shall set forth, with as much specificity as is reasonably practicable, the basis of the claim, the sections of this Agreement which form the basis for the claim, and, to the extent reasonably practicable, a reasonable estimate of the amount of the Purchaser Damages or Seller Damages, as the case may be, that have been or may be sustained by such indemnified party.

(iv)    Notwithstanding any other provision of this Agreement, in no event shall an indemnified party be entitled to indemnification pursuant to this Agreement to the extent any Purchaser Damages or Seller Damages, as the

11

case may be, were attributable solely to the indemnified party's own gross negligence or willful misconduct.

(v)     No indemnifying party shall be liable to an indemnified party until the amount of all indemnifiable damages of such indemnified party in the aggregate exceeds $100,000, after which point the indemnifying party will be obligated to the indemnified party for all damages (and not just the amount in excess of such amount); provided, however, the foregoing $100,000 threshold amount shall not apply in respect of any indemnification sought by Purchaser under Section 7.4.A.iv of this Agreement.

(vi)    The obligation of any Party to indemnify the other pursuant to the terms of this Section 7.4 shall apply only to the extent the Party seeking indemnification notifies the other Party of such damages in writing on or before the later of (a) two years after the Closing Date, or (b) 90 days after the applicable Party first learns about the claim for which indemnification is sought under this Section 7.4.

(vii)   To the extent an indemnifying party makes any indemnification payment pursuant this Section 7.4 for which the indemnified party has a right to recover against a third party (including an insurance company but specifically excluding situations that are self insured, including through any captive insurance company), the indemnifying party shall be subrogated to the right of the indemnified party to seek and obtain recovery from such third party.

D.    Third Party Indemnification.  The obligations of any indemnifying party to indemnify any indemnified party under Section 7.4 with respect to Purchaser Damages or Seller Damages, as the case may be, resulting from the assertion of liability by third parties (including Governmental Entities) (an "Indemnification Claim"), shall be subject to the following terms and conditions:

(i)     Any party against whom any Indemnification Claim is asserted shall give the party required to provide indemnity hereunder written notice of any such Indemnification Claim promptly after learning of such Indemnification Claim (with such notice satisfying the requirements of Section 9.1), and to the extent such matter involves a third party claim, the indemnifying party may, at its option, undertake the defense thereof by representatives of its own choosing and shall provide written notice of any such undertaking to the indemnified party. Failure to give prompt written notice of an Indemnification Claim hereunder shall not affect the indemnifying party's obligations under this Section 7.4, except to the extent that the indemnifying party is actually prejudiced by such failure to give prompt written notice. The indemnified party, at the indemnifying party's expense, shall, and shall cause its employees and representatives to, reasonably cooperate with the indemnifying party in connection with the settlement or defense of such Indemnification Claim and shall provide the indemnifying party with all available information and documents concerning such Indemnification Claim. If the indemnifying party, within thirty (30) days after written notice of any such Indemnification Claim, fails to assume the defense of such Indemnification Claim, the indemnified party against whom such claim has been made shall (upon further written notice to the indemnifying party) have the right to undertake the defense, compromise or settlement of such claim on behalf of and for the account and risk, and at the expense, of the indemnifying party.

12

    (ii) Anything in this Section 7.4 to the contrary notwithstanding: (i) the indemnified party shall not settle a claim for which it is indemnified without the prior written consent of the indemnifying party, which consent shall not be unreasonably withheld, conditioned or delayed; and (ii) the indemnifying party shall not enter into any settlement or compromise of any action, suit or proceeding, or consent to the entry of any judgment for relief other than monetary damages to be borne exclusively by the indemnifying party, without the prior written consent of the indemnified party, which consent shall not be unreasonably withheld, conditioned or delayed.

    (iii) Notwithstanding anything to the contrary in this Agreement, upon receipt of any such third party claim, Seller, in its sole discretion, may elect to defend against such claim and settle or otherwise resolve such claim without Purchaser's consent.

   E. Exclusive Indemnifications. The indemnifications in this Section 7.4 are the exclusive indemnifications to be given by the Parties.

**8.** **TERMINATION.**

  8.1 If, after the date of this Agreement and prior to the passage of title and risk of loss, (x) any Manufacturing Equipment is lost, severely damaged or destroyed by any cause whatsoever (excluding ordinary wear and tear and damage caused by the acts or omissions of Purchaser or its agents or employees), and (y) such loss, damage or destruction does not constitute a Material Adverse Effect, this Agreement shall terminate with respect to the affected Acquired Asset, and an adjustment in the amount of 22% of the GBV of the affected Acquired Asset will be made to the Purchase Price by the Parties.  Likewise, if after the date of this Agreement and prior to the passage of title and risk of loss, (a) any Manufacturing Equipment is lost, severely damaged or destroyed by any cause whatsoever (excluding ordinary wear and tear and damage caused by the acts or omissions of Seller or its agents or employees), and (b) Seller, at its option, repairs or replaces such Acquired Asset with an asset that, when compared to the original Acquired Asset results in an improvement that can be capitalized under U.S. GAAP, then an adjustment in an amount equal to the net book value of the improvement will be made to the Purchase Price by the Parties; provided, however, (i) there will be no adjustment to the Purchase Price under subparts (a) and (b) of this paragraph to the extent the casualty to the asset is covered by insurance, and (ii) Purchaser shall have the right to terminate this Agreement under Section 8.2.E if the Purchase Price adjustment under subparts (a) and (b) of this paragraph is more than $50,000.

  8.2 This Agreement may be terminated at any time prior to the Closing by either Party:

   A. by mutual written consent; or

   B. provided that the terminating Party is not in breach of its obligations under this Agreement, if the Closing shall not have occurred for any reason on or before the Closing Date; or

   C. if a Material Adverse Effect occurs, but only by a Party that is not in breach of this Agreement.

13

8.3     This Agreement may be terminated at any time prior to the Closing by Seller if Purchaser materially fails to perform any of its covenants or obligations under this Agreement or materially breaches any representation or warranty under this Agreement.

8.4     This Agreement may be terminated at any time prior to November 1, 2007 by Purchaser.

## 9.     MISCELLANEOUS.

9.1     **Notices**.

All notices, requests, consents or other communications permitted or required under this Agreement will be in writing and will be deemed to have been given when personally delivered, or when sent if sent via facsimile (with receipt confirmed), or on the first business day after sent by reputable overnight carrier, or on the third business day after sent by registered or certified first class mail (with receipt confirmed), to the following:

|  |  |
|---|---|
| If to Seller: | **DELPHI CANADA, INC.**<br>c/o Delphi Automotive Systems LLC<br>5725 Delphi Drive<br>Troy, Michigan 48098<br>Attn:    AHG - Manager, Mergers & Acquisitions -<br>            Saginaw Brake Transaction<br>Fax No.:  248-813-2410 |
| With a copy to: | **DELPHI CANADA, INC.**<br>c/o Delphi Automotive Systems LLC<br>5725 Delphi Drive<br>Troy, Michigan 48098<br>Attn:    Deputy General Counsel - Transactional<br>            and Restructuring<br>Fax No.:  248-813-2491 |
| If to Purchaser: | **TRW INTEGRATED CHASSIS SYSTEMS LLC**<br>12025 Tech Center Drive<br>Livonia, Michigan 48150<br>Attn:    Assistant General Counsel<br>Fax No.:  734-855-3250 |
| With a copy to: | **KELSEY-HAYES COMPANY**<br>Vice President<br>North American Braking<br>12025 Tech Center Drive<br>Livonia, MI 48150<br>Fax No.:  734-855-3006 |
| With a copy to: | Honigman Miller Schwartz and Cohn LLP<br>660 Woodward Avenue<br>2290 First National Building<br>Detroit, Michigan  48226-3506<br>Attn:    Donald F. Baty, Jr.<br>Fax No.:  317-465-7315 |

provided, however, if a Party will have designated a different addressee by notice, then to the last addressee so designated.

      9.2    **Bulk Sales Laws**.

Seller and Purchaser hereby waive compliance by Seller with the provisions of the bulk sales law of any province, state or foreign jurisdiction.

      9.3    **Assignment.**

This Agreement will be binding and inure to the benefit of the successors and assigns of each of the Parties and their Affiliates, but no rights, obligations, duties or liabilities of any Party may be assigned without the prior written consent of the others, which will not be unreasonably withheld; provided, however, Purchaser may assign this Agreement to any wholly owned subsidiary, but such assignment will not relieve Purchaser of any of its obligations under this Agreement.

      9.4    **Entire Agreement.**

This Agreement represents the entire agreement and understanding between the Parties with respect to the transactions contemplated herein. This Agreement supersedes all prior agreements, understandings, arrangements, covenants, representations or warranties, written or oral, by any officer, employee or representative of either Party dealing with the subject matter hereof.

      9.5    **Waiver.**

Any waiver by Seller or Purchaser of any breach or of a failure to comply with any provision of this Agreement: (i) will be valid only if set forth in a written instrument signed by the Party to be bound; and (ii) will not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any provision of this Agreement. At any time prior to the Closing Date, the Parties may: (a) extend the time for the performance of any of the obligations or other acts of the other Parties hereto; (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions contained herein. Except as otherwise expressly provided herein, any agreement on the part of a Party to any such extension or waiver will be valid only if set forth in an instrument in writing signed on behalf of such Party.

      9.6    **Severability.**

Should any provision, or any portion thereof, of this Agreement for any reason be held invalid or unenforceable, such decision will not affect the validity or enforceability of any of the other provisions, or portions thereof, of this Agreement, which other provisions, and portions, will remain in full force and effect, and the application of such invalid or unenforceable provision, or portion thereof, to persons or circumstances other than those as to which it is held invalid or unenforceable will be valid and be enforced to the fullest extent permitted by Law.

      9.7    **Amendment.**

This Agreement may only be amended only in writing by duly authorized representatives or officers of the Parties

9.8     **Expenses.**

Each Party will be responsible for its own expenses incurred in connection with the preparation of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby.

9.9     **Third Parties.**

Nothing contained in this Agreement, express or implied, is intended to or will be construed to confer upon or give to any person, firm, corporation, association, labor union or trust (other than the Parties, their Affiliates and their respective permitted successors and assigns), any claims, rights or remedies under or by reason of this Agreement.

9.10    **Headings.**

The headings contained in this Agreement are inserted for convenience only and will not be deemed to constitute a part of this Agreement.

9.11    **Counterparts.**

More than one counterpart of this Agreement may be executed by the Parties, and each fully executed counterpart will be deemed an original.

9.12    **Governing Law.**

This Agreement will be construed and enforced in accordance with the laws of the Province of Ontario, without giving effect to rules governing the conflict of laws.

9.13    **Taxes**.

All Taxes or similar charges and all charges for filing and recording documents in connection with the transfer of the Acquired Assets (including recording fees) will be paid by Purchaser.

9.14    **Venue and Retention of Jurisdiction.**

The Purchaser and Seller irrevocably and unconditionally consent to submit to the jurisdiction of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby and agree not to commence any litigation relating thereto except in the Bankruptcy Court.

9.15    **Risk of Loss.**

Unless otherwise provided in this Agreement, all risk of loss, damage or destruction to all or any part of the Acquired Assets will be borne exclusively by the Seller through the Closing.

9.16    **Enforcement of Agreement.**

The Parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or were otherwise breached. It is accordingly agreed that the Parties will be entitled to an injunction or

injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to all other remedies available at law or in equity.

    9.17    **Dispute Resolution**.

Seller and Purchaser will, in the first instance, attempt to settle any and all claims or disputes arising in connection with this Agreement by good faith negotiations by senior management of each party. If the dispute is not resolved by senior management within thirty (30) days after delivery of a written request for such negotiation by either party to the other, either party may make a written demand (the "Demanding Party") for formal dispute resolution (the "Notice") and specify therein in reasonable detail the nature of the dispute. Within fifteen (15) business days after receipt of the Notice, the receiving party (the "Defending Party") will submit to the other a written response. The Notice and the response will include: (i) a statement of the respective party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that party and of any other person who will accompany the executive to meetings of the parties. Within fifteen (15) business days after such written notification, the executives (and others named in the Notice or response) will meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute. All reasonable requests for information made by one party to the other will be honored promptly. All negotiations pursuant to this Section 9.17 are confidential and will be treated as compromise and settlement negotiations for purposes of applicable rules of evidence. In any case, the Parties agree not to commence any litigation actions until the expiration of ninety (90) days after the date of the Notice, and all such actions are subject to Section 9.14 above.

    9.18    **Dollar Amounts.**

All amounts referenced in this Agreement are in US dollars.

    9.19    **Survival.**

Except as otherwise explicitly set forth herein, no terms in this Agreement survive termination or Closing, as the case may be.

    9.20    **Jury Trial Waiver.**

**THE PARTIES EACH HEREBY KNOWINGLY, VOLUNTARILY AND WITHOUT COERCION, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES ARISING OUT OF OR IN RELATION TO THIS AGREEMENT. NO PARTY SHALL BE DEEMED TO HAVE RELINQUISHED THE BENEFIT OF THIS WAIVER OF JURY TRIAL UNLESS SUCH RELINQUISHMENT IS IN A WRITTEN INSTRUMENT SIGNED BY THE PARTY TO WHICH SUCH RELINQUISHMENT WILL BE CHARGED.**

    9.21    **Parent Guaranty**. Simultaneous with execution of this Agreement, Purchaser's indirect parent, Kelsey-Hayes Company, is executing a guaranty in the form attached as Exhibit 9.21.

17

**IN WITNESS WHEREOF**, the Parties have caused this Asset Purchase Agreement to be executed by their duly authorized officers.

**TRW INTEGRATED CHASSIS SYSTEMS LLC**

By: _____

Print Name: _____

Its: _____


**DELPHI CANADA, INC.**

By: _____

Print Name: _____

Its: _____

## **LIST OF SCHEDULES AND EXHIBITS**

| **Designation** | **Description** |
|---|---|
| Schedule M | Manufacturing Equipment |
| Schedule O | Certain Other Personal Property |
| Schedule P-1 | Production Products |
| Schedule P-2 | Past Model Service Parts |
| Schedule 4.1 | Knowledge of Seller |
| Schedule 4.1.D. | Litigation |
| Schedule 4.2 | Knowledge of Purchaser |
| Exhibit 9.21 | Parent Guaranty |

DETROIT.2790969.2