**EXECUTION DRAFT**

**ASSET PURCHASE AGREEMENT**

**AMONG**

**TRW INTEGRATED CHASSIS SYSTEMS LLC,**

**DELPHI AUTOMOTIVE SYSTEMS LLC,**

**AND**

**DELPHI TECHNOLOGIES, INC.**

**DATED:  SEPTEMBER 17, 2007**

## ASSET PURCHASE AGREEMENT

TRW Integrated Chassis Systems LLC, a Delaware limited liability company ("<u>Purchaser</u>") and Delphi Automotive Systems LLC, a Delaware limited liability company ("<u>Delphi</u>") and Delphi Technologies, Inc., a Delaware corporation ("<u>DTI</u>") enter into this Asset Purchase Agreement on September 17, 2007.

## RECITALS:

A.     On October 8, 2005 (the "<u>Petition Date</u>"), Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions for relief (the "<u>Bankruptcy Cases</u>") under Chapter 11 of Title 11, U.S.C. §§101 et seq. (as amended) (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>").

B.     Delphi, along with certain affiliated companies, continues to operate as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

C.     The Sellers desire to sell to Purchaser all of their respective right, title and interest in and to the Acquired Assets (as defined below), and Purchaser desires to make such purchases subject to the terms and conditions set forth in this Agreement and as authorized under Sections 105 and 363 of the Bankruptcy Code.

**NOW, THEREFORE,** in consideration of the premises, mutual promises, representations, warranties and covenants contained in this Agreement and other good and valuable consideration, and intending to be legally bound hereby, the Parties agree:

## DEFINITIONS

The following terms, as used in this Agreement, have the following meanings whether used in the singular or plural (other terms are defined in Sections or Schedules to which they pertain):

"**Acquired Assets**" means all of Seller's right, title and interest in and to the following:

        A.   Manufacturing Equipment;

        B.   Test and Development Equipment;

        C.   Inventory;

        D.   Assigned Permits; and

        E.   Other Personal Property.

"**Affiliate**" means with respect to any Party any business or other entity directly or indirectly controlling, controlled by or under common control with such specified entity. For purposes of this definition, control means ownership of at least fifty percent (50%) of the shares or other equity interest having power to elect directors or persons performing a similar function. For certainty, Delphi Canada is an Affiliate of Delphi and DTI.

"**Agreement**" means this Asset Purchase Agreement, including all Schedules and Exhibits.

"**Ancillary Agreements**" means the Lease Agreement, the Transition Services Agreement and the Contract Manufacturing Agreement.

"**Assumed Liabilities**" has the meaning given in <u>Section 1.8</u>.

"**Assigned Permits**" means Seller's QSO/ISO certifications for the Leased Premises to the extent such permits and certifications are assignable by Seller.

"**Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**Bidding Procedures**" has the meaning given in <u>Section 12.2</u>.

"**Bidding Procedures Order**" means the order of the Bankruptcy Court approving the Bidding Procedures.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which banks in Detroit, Michigan are authorized or obligated by law or executive order to close.

"**Canadian Agreement**" means that certain Asset Purchase Agreement of approximate even date between Delphi Canada and Purchaser.

"**Canadian Assets**" means the manufacturing equipment and other related assets used by Delphi Canada to manufacture certain Products to be sold by Delphi Canada to Purchaser pursuant to the Canadian Agreement.

"**Claim**" or "**Claims**" means "claim" as defined in Section 101(5)(a) of the Bankruptcy Code.

"**Closing**" has the meaning set forth in <u>Section 10.1</u>.

"**Closing Date**" means the date of Closing.

"**Collective Bargaining Agreements**" has the meaning given in Section 4.2.C.

"**Computer Assets**" means all of the following that are in use at the Leased Premises but excluding any such assets that are leased by Delphi: computers, servers, printers, scanners, network equipment, uninterrupted power supplies, and related computing environment infrastructure.

"**Contract Manufacturing Agreement**" has the meaning set forth in <u>Section 5.4</u>.

"**Contract Manufacturing Equipment**" means all of the machinery and equipment described on <u>Schedule C-1</u> and <u>Schedule C-2</u>. The Contract Manufacturing Equipment described on <u>Schedule C-1</u> is part of the Acquired Assets being purchased by Purchaser and is sometimes referred to as the "<u>TRW Contract Manufacturing Equipment</u>." The Contract Manufacturing Equipment described on <u>Schedule C-2</u> is <u>not</u> part of the Acquired Assets and is sometimes referred to as the "<u>Delphi Contract Manufacturing Equipment</u>."

"**Customers**" mean GM, AZ Automotive Corp., Modatek Systems, Chassis Corporation, Metalsa S. de RL, Triad Services Group, Inc. and PBR Columbia LLC, and the term "**Customer**" means any one of the Customers.

"**Delphi Canada**" means  Delphi Canada, Inc., a corporation organized under the laws of the Province of Ontario, Canada.

"**Deposit Escrow Agent**" means J.P. Morgan Trust Company, National Association.

"**Deposit Escrow Agreement**" means the Deposit Escrow Agreement entered into among Seller, Purchaser and the Deposit Escrow Agent as of the date of this Agreement in the form attached hereto as Exhibit 1.

"**Excluded Assets**" means assets not included in the Acquired Assets, including as set forth in Section 1.5.

"**Governmental Entity**" means any United States federal, state or local, tribunal, legislative, executive, governmental, quasi-governmental or regulatory authority, self-regulatory authority, agency, department, commission, instrumentality or body having governmental authority with respect to the transactions contemplated hereby, under applicable law.

"**GM**" means General Motors Corporation and its subsidiaries and Affiliates.

"**Inventory**" means all of Delphi's (a) raw materials and purchased component parts related to the Products manufactured at the Leased Premises which are in Delphi's possession or control as of the Closing Date, (b) rotors which are in the possession or control of March Coatings, Inc. as of the Closing Date, and (c) any work in process inventory that the parties agree in writing to include in the definition of "Inventory" (for example, work in process manufactured by Delphi pursuant to Section 5.3 below). For certainty, Inventory does not include Supplies or Spare Parts and Crib Items.

"**Inventory Value**" means Delphi's cost for "useable" and "merchantable" Inventory existing as of the Closing Date. For purposes of determining the Inventory Value: (a) "useable" means not obsolete and reasonably usable by Purchaser in manufacturing Products in quantities not to exceed the applicable Customers' outstanding unsatisfied releases as of the Closing Date, and (b) "merchantable" means merchantable as that term is defined in U.C.C. § 2-314, in conformance with applicable customer purchase order or supply contract specifications, reasonably applied, and not rusted, damaged or deteriorated such that it cannot reasonably be used in the ordinary course of business without processing or preparation not normally done in the ordinary course of business. To determine the Inventory Value, a physical inventory will be jointly completed by Delphi and Purchaser as of the Closing Date and in respect of Inventory at March Coatings, Inc. as of the Closing Date, Inventory Value will be adjusted as appropriate to take into account any payments that have been made or need to be made to March Coatings, Inc. for any processing done to such Inventory.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

"**Internally Supplied Parts**" has the meaning set forth in Section 5.1.

"**Knowledge**" with respect to any Seller means the actual, conscious knowledge of the individuals listed on Schedule 8.1.  "**Knowledge**" with respect to Purchaser means the actual, conscious knowledge of the individuals listed on Schedule 8.2.

"**Licensed Applications**" means application Software listed on Schedule S which is currently used at the Leased Premises by Delphi and/or EDS in the daily operations of the business conducted therein. For certainty, as part of the sale contemplated hereby, Purchaser will have a non-exclusive, paid-up license and right to use the Licensed but in all events the

licenses of the Licensed Applications are subject to the specific terms and conditions set forth in the agreements pursuant to which such Licensed Applications have been licensed to Delphi and Purchaser will be responsible for all license and maintenance fees coming due after the Closing Date.

"**Laws**" means laws, ordinances, codes, standards, administrative rulings or regulations of any applicable federal, state, local or foreign governmental authority.

"**Lease Agreement**" has the meaning set forth in <u>Section 6.1</u>.

"**Leased Premises**" means that portion of Delphi's facility located at 2328 East Genesee Avenue, Saginaw, Michigan that is to be leased to Purchaser pursuant to the terms of the Lease Agreement.

"**Liabilities**" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including without limitation Claims for employment and other employment related relief and/or obligation of any type (including all Claims by, against or on behalf of and/or in connection with all former or existing employees and others providing services to Seller in respect of actions occurring or alleged to have occurred on or before the Closing Date), intellectual property, product performance and all other product liability matters.

"**Licensed Intellectual Property**" means intellectual property that as of the date of this Agreement (a) is owned by Seller or any Seller Affiliates, or that Seller or any Seller Affiliates otherwise have the right to sublicense, and (b) relates to Products and/or is necessary or desirable for the design, manufacture, assembly, testing and tuning of Products.

"**Lien**" means any lien (including tax liens and any statutory or common law liens, possessory or otherwise), charge, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction) and any monetary amounts which are secured by any Lien.

"**Manufacturing Equipment**" means the machinery and equipment described on <u>Schedule M</u>, attachments and accessories to such items, together with the Tooling and Tooling Claims (but only to the extent such Tooling Claims are assignable under otherwise applicable law).

"**Material Adverse Effect**" means any change or event that has a material adverse effect on (a) the Acquired Assets taken as a whole, or (b) the Leased Premises, <u>except</u> any change or event resulting from, relating to or arising out of: (i) any act or omission of Seller taken with the prior written consent of the Purchaser; (ii) any action taken by Seller or Purchaser or any of their respective representatives required by the terms of this Agreement; (iii) general business or economic conditions; (iv) conditions affecting the industry and markets in which Purchaser and Seller generally operate; (iv) increases in energy, electricity, natural gas, raw materials or other operating costs; (v) changes resulting from any action required by the Bankruptcy Court; (vi) national or international political or social conditions, including the engagement by the United States in hostilities whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon such country, or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of any such countries; (vii) financial, banking or securities markets (including any disruption thereof and any decline in the price of any security

or any market index); (viii) changes in generally accepted accounting principles in the United States; (ix) changes in any Law; (x) any existing event, occurrence or circumstance listed in any Schedule provided under Article 8 of this Agreement as of the date hereof; or (xi) any adverse change in or effect on the Acquired Assets or the Leased Premises that is cured, in its entirety, by Seller, before the earlier of (1) the Closing Date, and (2) the date on which this Agreement is terminated pursuant to Section 13.

"**Nondisclosure Agreement**" means the nondisclosure and confidentiality letter agreement dated August 10, 2006 executed by Purchaser and Delphi.

"**Ordinary Course of Business**" means, with respect to (a) the use and operation of the Acquired Assets, consistent with custom and practice of Seller prior to the Petition Date or to the extent consistent with orders issued in the Bankruptcy Cases, and (b) with respect to determining Inventory Value, in the ordinary course of business by non-bankrupt manufacturers and suppliers of goods similar to the Products. For purposes of this Agreement, reduction of inventory levels at the Other Product Facilities in conjunction with the removal of the Acquired Assets and the Contract Manufacturing Equipment from such Other Product Facilities shall be deemed to be in the Ordinary Course of Business.

"**Organizational Documents**" means: (a) the articles of incorporation and the bylaws of a corporation; (b) the partnership agreement and any statement of partnership of a general partnership; (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (d) the articles or certificate of organization and the operating agreement or other document intended to govern the structure and/or internal affairs of a limited liability company; (e) any charter, agreement, indenture, or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (f) any amendment to the foregoing.

"**Other Personal Property**" means all of the following owned by Seller which are used or associated with the manufacture or shipment of the Products or the use or operation of the Leased Premises or the other Acquired Assets: the Software; Spare Parts and Crib Items; disposable and non-disposable dunnage (including in-plant racking and containers and all shipping containers and dunnage at the Leased Premises, in the possession of customers or outside processors or located at the Other Product Facilities, to the extent such items are used primarily in the manufacture, processing or shipment of the Products); Supplies located at the Leased Premises; Computer Assets; any warranties given by the manufacturers or suppliers of any Acquired Assets (but only to the extent such warranties are assignable under otherwise applicable law without assumption under Section 365 of the Bankruptcy Code); the assets described on Schedule O; and office furniture and office equipment located at the Leased Premises, in each case, to the extent that they exist on the Closing Date. For certainty, Other Personal Property does not include any Excluded Assets or any assets that are within the description of any other assets included in categories "A" through "E" of the definition of Acquired Assets.

"**Other Product Facilities**" means Seller's facilities located in Spring Hill, Tennessee and Saltillo, Mexico where the Non-Saginaw Assets (as defined in Section 1.3.A below) are currently located.

"**Past Model Service Parts**" means the Products identified on Schedule P-2 (as such Schedule P-2 may be modified from time to time in writing based on the mutual agreement of Purchaser and Seller).

"**Party**" or "**Parties**" means Purchaser, and Seller.

"**Person**" means an individual, a corporation, a partnership, a limited liability company, an association, a trust or other entity or organization.

"**Pre-Closing Agreement Payments**" means all payments made by TRW Automotive Inc. to Delphi under that certain Pre-Closing Agreement dated February 15, 2007, as amended.

"**Products**" means the products identified on Schedule P-1 and Schedule P-2 (as such Schedule P-2 may be modified from time-to-time in writing based on the mutual agreement of Purchaser and Seller).

"**Purchase Price**" has the meaning given in Section 3.1.

"**Purchaser**" means TRW Integrated Chassis Systems LLC, a Delaware limited liability company.

"**Retained Liabilities**" means Seller's Liabilities other than the Assumed Liabilities.

"**Saginaw Supplied Parts**" has the meaning set forth in Section 5.5.

"**Sale**" means the sale, transfer and assignment of the Acquired Assets from Seller to Purchaser in accordance with this Agreement.

"**Sale Approval Order**" means an order or orders of the Bankruptcy Court approving the Sale issued pursuant to Sections 363 of the Bankruptcy Code in form and substance reasonably satisfactory to Purchaser, authorizing and approving, among other things, the sale, transfer and assignment of the Acquired Assets, and the lease of the Leased Premises all in accordance with the terms and conditions of this Agreement and the Ancillary Agreements.

"**Sale Motion**" means the motion filed by Delphi and DTI with the Bankruptcy Court for approval of the Sale Approval Order.

"**Saltillo Expense Reimbursement Amount**" means an amount equal to Delphi's documented out of pocket costs and expenses incurred in relocating Manufacturing Equipment and related Tooling from Saltillo, Mexico and installing and requalifying such Manufacturing Equipment and Tooling at the Leased Premises pursuant to a budget previously approved in writing by Purchaser. Unless otherwise agreed in writing by Purchaser, the maximum Saltillo Reimbursement Amount is $400,000.

"**Seller**" means Delphi and/or DTI, as the context requires, to the extent of their actual interests in the subject matter of the sentence or clause in which the term is used.

"**Software**" means the software (and licenses to use Licensed Applications) described on Schedule S.

"**Spare Parts and Crib Items**" means (a) all spare parts for Manufacturing Equipment and perishable Tooling used in the manufacture of the Products (including spare perishable Tooling), in each case existing on the Closing Date as to items to be delivered to Purchaser on the Closing Date, or in the case of Manufacturing Equipment delivered after the Closing Date, such items existing on the date(s) such other Manufacturing Equipment is delivered to Purchaser, and (b) spare parts for the Leased Premises infrastructure equipment, personal protection equipment (including gloves, safety glasses, safety vests and hearing protection), and all other spare or maintenance items used in the manufacture of the Products, in shipping

and receiving, or in the operation of the Leased Premises in each case to the extent on hand at the Leased Premises on the Closing Date.

"**Supplier Contracts**" mean all written Seller purchase orders and supply agreements for goods or services necessary for the manufacture of the Products or operation of the Leased Premises and product warranty or service agreements related to such purchase orders and supply agreements outstanding on the Closing Date.

"**Supplies**" means all maintenance, shop and manufacturing supplies, cleaning supplies, lubricants, packaging and shipping materials, labels, and other supplies used in the manufacture or shipping and receiving the Products or Inventory or in the operation of the Leased Premises in each case to the extent on hand at the Leased Premises on the Closing Date.

"**Tax(es)**" means any tax or similar governmental charge, impost or levy whatsoever (including, without limitation, income, franchise, transfer taxes, use, gross receipts, goods and services value added, employment, excise, ad valorem, property, withholding, payroll, social contribution, customs duty, minimum or windfall profit taxes or transfer fees), together with any related penalties, fines, additions to tax or interest, imposed by the United States or any state, county, local or foreign government or subdivision or agency thereof.

"**Test and Development Equipment**" means the test/laboratory equipment and the manufacturing development equipment described on Schedule T.

"**Third Party Assets**" has the meaning set forth in Section 1.5.

"**Tooling**" means all tooling, gauges, dies, fixtures, test and assembly fixtures, patterns, casting patterns, cavities, molds, prototype tooling, engineering product testing tooling and fixtures and similar items (a) utilized exclusively in connection with the Manufacturing Equipment or the manufacture or processing of Products, where ever located; (b) all such items for Past Model Service Parts; and (c) such items owned by Seller and used by suppliers or outside processors exclusively for the manufacture of sub-components for the Products, where ever located.

"**Tooling Claims**" means all claims, rights, and causes of action, if any, Seller has or may have against any vendors who are in possession of Seller-owned or GM-owned Tooling related to such vendors' failure to properly and timely maintain, repair or refurbish such Tooling.

"**Transition Services Agreement**" has the meaning set forth in Section 7.

"**UAW**" means the International Union, United Automotive, Aerospace and Agricultural Workers of America and its Local Union Number 467.

## 1.    CONVEYANCE OF THE ACQUIRED ASSETS.

### 1.1    Acquired Assets Transaction.

Upon the terms and subject to the conditions set forth in this Agreement at Closing (unless otherwise expressly provided in this Agreement or the Ancillary Agreements) Seller will sell, transfer, assign, convey and deliver to the Purchaser, and Purchaser will purchase, accept and acquire from the Seller, the Acquired Assets, free and clear of all Liens.

### 1.2    Acquired Assets in Possession of Third Parties.

Subject to <u>Section 1.3</u> and <u>Section 1.5</u> below, Purchaser will take ownership of all Acquired Assets wherever the same are located.

1.3     **Purchaser's Removal of Certain Acquired Assets Not Located at or About the Leased Premises**.

A.   Purchaser will remove at its cost and expense any Acquired Assets located at the Other Product Facilities (the "<u>Non-Saginaw Assets</u>") with such removal to be according to the schedule set forth on <u>Schedule 1.3.A</u> or on such dates and at such times as are otherwise mutually agreeable to the Parties but in any event to be completed by May 31, 2008.   Seller shall have the right to monitor all removal activities related to the Non-Saginaw Assets.   Until the Non-Saginaw Assets are removed by Purchaser, title to and risk of loss in respect to such Acquired Assets will remain in Seller.   In connection with Purchaser's removal of the Non-Saginaw Assets, Purchaser shall not unreasonably interfere with any ongoing production by Delphi.

B.   To the extent any agreements between Seller and any unions representing workers at the Other Product Facilities require that the dismantling and removal of the Non-Saginaw Assets be completed by union employees, Purchaser shall use such employees to remove the Non-Saginaw Assets or, subject to the consent of the applicable union, reimburse Seller for any amounts Seller must pay the employees in lieu of using them to dismantle and remove such Non-Saginaw Assets.

C.   Purchaser will use due care in the removal of the Non-Saginaw Assets so as to not damage Seller's premises.   Purchaser will be responsible for and reimburse Seller for any damage to Seller's premises as a result of Purchaser's removal activities, but will not be required to reimburse Seller for any costs and expenses of the Decommissioning Activities or costs and expenses incurred to restore the premises (e.g. filling press pits, sealing off ducts, rewiring etc.) to the extent such restoration would be required upon removal of the Non-Saginaw Assets by any party. For purposes of this Agreement, "Decommissioning Activities" shall have the meaning ascribed to it in Attachment 2, Schedule 1 of the Lease.

D.   Upon mutual agreement of the Parties, (i) certain Non-Saginaw Assets, including Tooling, may be removed from the Other Product Facilities by Seller prior to Closing, and (ii) certain capital expenditures may be made by Seller to increase capacity at the Leased Premises or otherwise facilitate transition of production of the Products from the Other Product Facilities to the Leased Premises prior to Closing.   In each such case, Purchaser will reimburse Seller for all reasonable costs associated with (i) the removal of the Non-Saginaw Assets from the Other Product Facilities and installation of such Non-Saginaw Assets at the Leased Premises, and (ii) the capital expenditures made by Seller to increase capacity at the Leased Premises or otherwise facilitate transition of production of the Products to the Leased Premises. For certainty, Purchaser will have no obligation to reimburse Seller under this <u>Subsection 1.3.D.</u> for any expenditures or expenses unless agreed to by Purchaser in writing in advance.

1.4     **TRW Contract Manufacturing Assets and Certain Other Acquired Assets**.

Purchaser will use due care in the removal of the TRW Contract Manufacturing Assets and other Acquired Assets located in Buildings 2 and 4 of the Leased Premises so as to not damage the premises.   Purchaser will be responsible for any damage to the Leased Premises as a result of Purchaser's removal activities, but will not be required to reimburse Seller for any

costs and expenses of Decommissioning Activities or costs and expenses incurred to restore the premises to the extent such restoration would be required upon removal of the TRW Contract Manufacturing by any party (e.g. filling press pits, sealing off ducts, rewiring etc.). Seller shall have the right to monitor all removal activities.

1.5   **Certain Excluded Assets**.

Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreements, the following properties and assets of Seller will not be included in the Acquired Assets:

A.   Any Tooling, dunnage or containers owned by a Customer or any third party, and the other items owned by any third party, including those items set forth on Schedule 1.5.A ("Third Party Assets"); provided, that to the extent any Tooling, dunnage or containers are owned by a customer, Purchaser shall, subject to the rights of the owner thereof, have any right to use such items in the manufacture and shipping of Products that Seller has as of the Closing Date.

B.   The assets listed on Schedule 1.5.B.

C.   All Supplier Contracts.

D.   The Delphi Contract Manufacturing Equipment.

E.   Information and materials protected by the attorney-client privilege or that Seller considers to be proprietary information.

F.   All work histories, personnel and medical records of employees of Delphi who are not being hired by Buyer.

1.6   **Post-Closing Asset Deliveries**.

Subject to Section 1.3 above, should Seller or Purchaser, in its reasonable discretion, determine after the Closing that any Acquired Assets (including books, records or other materials) are still in the possession of Seller, Seller will promptly deliver them to Purchaser at no cost to Purchaser. Should Seller or Purchaser, in its reasonable discretion, determine after the Closing that books, records or other materials not included in the Acquired Assets or otherwise constituting Excluded Assets were delivered to Purchaser, Purchaser will promptly return them to Seller at no cost to Seller.

1.7   **Certain Supplier Contracts**.

As soon as possible, but in all events at least 10 business days prior to the Closing Date, Purchaser will provide Seller with written notice identifying any suppliers of goods or services necessary for the manufacture of the Products or operation of the Leased Premises who currently supply or process raw materials or sub-components to Seller or who provide services to Seller, in each case, pursuant to a Supplier Contract and who refuse to do business with Purchaser on terms reasonably acceptable to Purchaser ("Dissident Vendors").  At Purchaser's option and subject to any express prohibitions in the Supplier Contracts, Seller will make available to Purchaser the goods or services provided by the Dissident Vendors under the relevant Supplier Contracts in accordance with the terms of the Transition Services Agreement (as defined in Section 7.1).

1.8    **No Assumption of Retained Liabilities by Purchaser**.

Purchaser will not assume or have any responsibility for the Retained Liabilities. Purchaser will assume and have responsibility for the Assumed Liabilities. For purposes of this Agreement, the term "Assumed Liabilities" means (a) liabilities specifically created or assumed by Purchaser under this Agreement, the Ancillary Agreements or the Sale Approval Order, (b) certain obligations and liabilities arising under the Collective Bargaining Agreements as provided in Section 4.2, and (c) obligations arising post-Closing under the Assigned Delphi Contracts (as defined in Section 5.2).

1.9    **Past Model Service Parts.**

Purchaser will have the option, exercisable in writing on or before January 10, 2008 (or such later date as may be agreed to in writing by Purchaser and Delphi), to purchase any Past Model Service Parts that Delphi has not previously sold or liquidated (or entered into a binding agreement to sell or liquidate). The Past Model Service Parts will be sold pursuant to the terms of a separate purchase order on terms acceptable to Delphi and Purchaser. The purchase price for the Past Model Service Parts will be Delphi's inventory cost or, if such information is not available, a price mutually acceptable to Purchaser and Delphi.   The purchase price for any Past Model Service Parts that Purchaser elects to purchase will be paid within 30 days of the date Purchaser takes possession or control of such inventory.

2.    **DELIVERY OF CERTAIN DOCUMENTATION AND NO COMPETE AGREEMENT.**

2.1    Delivery of Certain Documentation.

A.    As soon as reasonably practicable following execution of this Agreement, but in any event within five (5) business days following execution of this Agreement, Seller will deliver to Purchaser, unless specifically provided below in whatever form currently exists, the following items listed on Schedule O (the "Process Documents"): all quality plans, process flow charts and process control plans (PPAP file), operator instructions, gauge tracking, routing sequences and calibration records.   The foregoing Process Documents will include documents that are related to sub-components supplied to Delphi or Delphi Canada by third parties or supplied to Delphi or Delphi Canada by other Delphi plants or Affiliates, in each case only to the extent that (i) such sub-components are incorporated into the Products, and (ii) such sub-component documents are included in the PPAP files delivered to Purchaser pursuant to this Section 2.1.A.   To the extent that agreements preclude the disclosure of documents or other information to Purchaser, Seller shall use commercially reasonable efforts to obtain consent for Seller to release the documents or to persuade the necessary third party to release the documents directly to Purchaser. Notwithstanding the foregoing, Seller is only obligated to deliver the Process Documents to the extent that such Process Documents exist at the Leased Premises or at the Other Product Facilities or at Delphi Canada's facility in Oshawa, Ontario, Canada or are otherwise in the possession or control of Seller or Delphi Canada.  For purposes of this Section 2.1.A only, "deliver" shall mean that Seller has (i) collected the Process Documents that are located at the Leased Premises or at any other location other than the Other Product Facilities and made them available to Purchaser in the office of the quality manager for the Leased Premises or at the work station at which such Process Documents are utilized, as appropriate; and (ii) collected the Process Documents that are located at the Other Product Facilities and made them available to Purchaser in the office of the quality manager for the applicable Other

Product Facility or at the work station at which such Process Documents are utilized, as appropriate, provided, however, that Purchaser shall not remove any Process Documents from the Other Product Facilities until such time as the Non-Saginaw Assets to which such Process Documents apply are removed in accordance with this Agreement (but Purchaser shall have the right to make and remove copies of Process Documents located at the Other Product Facilities).

B.    As soon as reasonably practicable following execution of this Agreement and receipt of written direction from GM, but in any event within five (5) business days following execution of this Agreement and receipt of written direction from GM, Seller will deliver to Purchaser the following information for all components of the Products (in no event to include any next generation Products), in electronic format (i.e., on a CD): (1) the latest released drawing for all components of the Products  (the "Drawings") and (2) the engineered Bill of Material (BOM) for the Products (items 1-2 collectively referred to as "Pre-License Product Documents").  Prior to Seller's license to GM of the Licensed IP, Purchaser agrees that it will not use the Pre-License Product Documents for any purpose other than quoting potential suppliers of sub-components for the Products for sourcing contingent upon Purchaser acquiring the Acquired Assets. Furthermore, as soon as reasonably practicable following Seller's license to GM of the Licensed Intellectual Property and to the extent required, final approval of such license by the Bankruptcy Court and receipt of written direction from GM, but in any event within five (5) business days following such events, Seller will deliver to Purchaser, in electronic format (i.e., on a CD), the following items (the "Post-License Product Documents"): engineering specifications for the Products, open manufacturing or design change requests for the Products and all materials and sub-components used in the manufacture of the Products.  Notwithstanding the foregoing, Seller is only obligated to deliver those Post-License Product Documents that (i) GM directs Seller in writing to deliver to TRW, and (ii) those Post-License Product Documents that exist and are in Seller's or Delphi Canada's possession or control. For purposes of this Section 2.1.B only, "deliver" shall mean that Seller has (i) collected the Product Documents and made them available to Purchaser in the office of the quality manager for the Leased Premises.

C.    Any and all Process Documents and Product Documents provided by Seller or Seller's representatives to Purchaser pursuant to this Section 2.1 shall be subject to the terms of the Non-Disclosure Agreement as modified at Closing pursuant to Section 2.3 of this Agreement.  Furthermore, other than to the extent that such rights are transferred by Seller to Purchaser at Closing pursuant to the terms of this Agreement or licensed by GM to TRW, the delivery of the Process Documents and/or the Product Documents pursuant to this Section 2.1 shall not be construed as granting or conferring any license or other right to Purchaser under any patent or similar intellectual property right of Seller.

2.2   **No Compete Agreement.**

A.   For a period of five (5) years from the Closing Date, except with the written consent of Purchaser, Seller will not and will cause its Affiliates not to, either on its or their own account or in conjunction with or on behalf of any person, firm or company design, manufacture or assemble (including quoting or offering to design, manufacture or sell) any brake corner modules, rear suspension modules, knuckles, or rotors in the United States or Canada for the customer programs set forth on Schedules P-1 and P-2 and their respective next-generation programs ("Competitive Activity"). For certainty the foregoing:

(i)   will not: (v) prohibit Seller or its Affiliates from continuing to sell to Customers components for past model service parts; or (w) prohibit Seller or its Affiliates from selling Contract Manufacturing Parts to third parties, which are manufactured by Purchaser during the term of the Contract Manufacturing Agreement, or service parts related thereto during or after the term of the Contract Manufacturing Agreement; or (x) prohibit Seller or any of its Affiliates from licensing any IP related to the Products to GM; or (y) apply to Delphi's Affiliates Korea Delphi Automotive Company ("KDAC") or PBR Knoxville LLC; or (z) prohibit Seller or its Affiliates from selling finished goods or work in process inventory existing as of the Closing Date or other inventory in connection with winding down in an orderly fashion operations at the Other Product Facilities, Delphi's facility located at Needmore Road in Dayton, Ohio, or any related supplier locations as reasonably determined by Seller.

(ii)   will not prohibit in any way: (v) the acquisition of a controlling interest or merger with any person, or any division or business unit thereof, which is not primarily engaged in a Competitive Activity, acquired by or merged, directly or indirectly, into Seller or any of its Affiliates after the Closing Date, (w) the acquisition by Seller or any of its Affiliates, directly or indirectly, of a non-controlling ownership interest in any person, or any division or business unit thereof, or any other entity engaged in a Competitive Activity, if the Competitive Activity accounts for fifteen percent (15%) or less of the sales or fifteen percent (15%) or less of the value of the acquired business at the date of such acquisition (whichever is greater) and the Competitive Activity is not anticipated to become greater than twenty percent (20%) of such acquired business's sales or value; (x) the acquisition by Seller or any of its Affiliates, directly or indirectly, of less than five percent (5%) of the publicly traded stock of any person engaged in a Competitive Activity; (y) excluding such activities in connection with the Products or next-generation programs related thereto, the provision of consulting services to, the license of any technology that Seller or any of its Affiliates owns or has license to use, or the financing (on its own behalf or on behalf of any other Person) of any person for the purpose of designing or manufacturing on behalf of Seller or any of its Affiliates or selling to Seller or any of its Affiliate components and parts for automotive applications; and (z) consistent with Seller's troubled supplier practices, any direct or indirect activities of Seller or any of its Affiliates to advise, operate, manage or finance a troubled supplier of Seller or any of its Affiliates.

(iii)   excluding any license to GM, will prohibit Seller and its Affiliates from licensing the Licensed Intellectual Property for use in any Competitive Activity.

B.   While the restrictions contained in this Section 2.2 are considered by the Parties to be reasonable in all the circumstances, it is recognized that restrictions of the nature in question may fail for technical reasons and, accordingly, it is hereby agreed and declared that if any of such restrictions will be adjudged to be void as going beyond what is reasonable in all the circumstances for the protection of the interests of Purchaser but would be valid if part of the wording thereof were deleted or the periods thereof reduced or the range of activities or area dealt with thereby reduced in scope the said restriction will apply with such modifications as may be necessary to make it valid and effective.

### 2.3   **Nondisclosure Agreement.**

Effective as of the Closing, Purchaser will be deemed to be released of its obligations arising under the Nondisclosure Agreement; provided however, from and after the Closing: (i) paragraph 8 of the Nondisclosure Agreement shall remain in full force and effect with respect to any persons not transferred to or hired by Purchaser pursuant to the terms of this Agreement; and (ii) the foregoing release shall only apply to Product Documents and Licensed Intellectual Property to the extent that Purchaser's use of such Product Documents and Licensed Intellectual Property is within the scope of any sublicense from GM to Purchaser.

### 3.   **PURCHASE PRICE.**

3.1   **Purchase Price for Acquired Assets**.   Subject to the terms and conditions of this Agreement, the aggregate purchase price for the Acquired Assets will be the following amount (the "Purchase Price"): (i) Twenty-Six Million Three Hundred Sixty Thousand Seven Hundred Sixty Dollars ($26,360,760); plus (ii) the Inventory Value as of the Closing Date; plus (iii) the Saltillo Expense Reimbursement Amount.

3.2   **Payment of Purchase Price**.

A.   The Pre-Closing Agreement Payments will be credited against the Purchase Price on the Closing Date.

B.   The following portion of the Purchase Price will be paid by Purchaser to Seller on the Closing Date in cash by wire transfer to an account designated in writing by Seller: (v) Twenty–Six Million Three Hundred Sixty Thousand Seven Hundred Sixty Dollars ($26,360,760) plus (w) the Saltillo Expense Reimbursement Amount plus (x) 80% of the Parties' good faith estimate of the Inventory Value as of the Closing Date based on Schedule 3.2, which reflects Inventory Value as of the last day of June 2007 (the "Inventory Partial Payment") minus (y) the Deposit minus (z) the sum of all Pre-Closing Agreement Payments.

C.   Within 30 days of the Closing Date, the Inventory Value will be jointly determined by Purchaser and Delphi and if the Inventory Value exceeds the amount of the Inventory Partial Payment, Purchaser will promptly pay Delphi the difference in cash by wire transfer to an account designated in writing by Delphi.  Likewise, if the Inventory Value is less than the amount of the Inventory Partial Payment, Delphi will promptly pay Purchaser the difference in cash by wire transfer to an account designated in writing by Purchaser.  If any dispute arises between Purchaser and Delphi related to Inventory Value, which dispute the Parties are unable to resolve within ten (10) days, each of Purchaser and Delphi shall select an independent accountant (whose fees and costs shall be paid by the respective Party who retained each accountant) and those independent accountants shall jointly determine the

Inventory Value.  If the two independent accountants cannot agree on the Inventory Value, disputes will be subject to the dispute resolution procedures set forth in Section 14.18.

3.3    **Deposit Amount.**

A.    Upon execution of this Agreement, Purchaser shall pay Two Million Dollars ($2,000,000) in immediately available funds to the Deposit Escrow Agent pursuant to the terms of the Deposit Escrow Agreement (such amount, together with the interest accrued thereon prior to the Closing, the "Deposit") to be held by the Deposit Escrow Agent in an interest bearing account reasonably acceptable to Purchaser to serve as a Good Faith Deposit under this Agreement, and, subject to Article 12 hereof, to be released in accordance with the following procedures:

(i)    Deposit Instructions.  At Closing, Seller and Purchaser shall jointly instruct the Deposit Escrow Agent to deliver the Deposit, by wire transfer of immediately available funds, to an account designated by Seller in the Deposit Escrow Agreement (and such amount shall be applied towards the payment of the Purchase Price).  The costs and expenses of the Deposit Escrow Agent will be paid from and borne solely by the Deposit;

(ii)    Termination of Agreement.  Upon any failure by Purchaser to consummate the transactions contemplated hereby pursuant to this Agreement if and as required by Article 10 hereof, the Deposit Escrow Agent shall deliver the Deposit, in accordance with the terms of the Deposit Escrow Agreement, by wire transfer of immediately available funds, to an account designated by Seller in the Deposit Escrow Agreement, to be retained by Seller.  Any such payment shall constitute Seller's sole recourse in the event Purchaser notifies Seller, prior to the Auction date, of Purchaser's intent to terminate this Agreement.  Upon any breach by Purchaser on or after the Auction date, Seller will be entitled to all available remedies in law or equity.

(iii)    Other Reason.  Upon termination of this Agreement for any other reason or upon the failure by Seller to consummate the transactions contemplated hereby pursuant to this Agreement if and as required by Section 10 (provided that Purchaser is not in breach of this Agreement, in which case Section 3.3.A(ii) shall apply), Seller and Purchaser shall jointly instruct the Deposit Escrow Agent to deliver the Deposit, by wire transfer of immediately available funds, to an account designated by Purchaser in the Deposit Escrow Agreement, to be retained by Purchaser.

3.4    **Purchase Price Allocation**.

A.    The Purchase Price for the Acquired Assets (other than any amounts paid for Past Model Service Parts and including any adjustments) will be allocated by the Parties among the Acquired Assets according to Schedule 3.4 (the "Allocation").

B.    Purchaser and Seller will each report the federal, state and local income Tax consequences of the Sale in a manner consistent with the Allocation, including, if applicable, the preparation and filing of Forms 8594 under Section 1060 of the Internal Revenue Code (or any successor form or successor provision of any future Tax law) with their respective federal income Tax returns for the taxable year that includes the Closing Date, and none of the Parties will take any position inconsistent with the

Allocation unless required under applicable law.  Seller will provide Purchaser and Purchaser will provide Seller with a copy of any information required to be furnished to the Secretary of Treasury under Internal Revenue Code Section 1060.

**4.    <u>EMPLOYEE MATTERS.</u>**

4.1    <u>Salaried Employees</u>.

A.    Prior to executing this Agreement, Purchaser has interviewed: 1)  salaried employees regularly assigned to work at the Saginaw facility; and 2)  salaried employees located in Troy, Dayton and Brighton who spend a majority of their time supporting the design, development, material purchasing, and product launch for the production or assembly of Products at Saginaw, Spring Hill or Oshawa for the purpose of determining to which salaried employees Purchaser wishes to offer employment.

B.    With respect to the salaried employees interviewed, Delphi has provided Purchaser the following information:

(i)    Name

(ii)    Current job title, dates in position, and position description

(iii)    Prior two job titles and dates in positions

(iv)    Date of hire

(v)    Current salary and two-year salary history

(vi)    Bonus target and three-year bonus payout history

(vii)    Long term (cash and equity) incentive target(s) and three-year history

(viii)    Three most recent performance reviews

(ix)    Documented disciplinary and corrective actions

C.    After completing the interviews referenced in Section 4.1.A, Purchaser will provide Delphi with two lists.  One list will identify the salaried employees to whom Purchaser wishes to extend an offer of employment.  This list may be attached to this Agreement as <u>Schedule 4.1</u>.  The other list will identify salaried employees to whom Purchaser does not wish to extend an offer of employment (hereinafter referred to as the "<u>Excluded Employees</u>").  The lists will be provided to Delphi as soon as practical but no later than thirty (30) days from the date of this Agreement.

D.    From the date of this Agreement through the Closing Date, except for "for-cause" terminations, Delphi will not terminate or redeploy any of the salaried employees identified on <u>Schedule 4.1</u>.

E.    From the date of this Agreement through the Closing Date, Delphi will not make available alternative positions to, or otherwise seek to delay the commencement of employment with Purchaser by, any salaried employee identified on <u>Schedule 4.1</u>, except

employees to whom Delphi provided retention guarantees prior to their being assigned to the positions identified in Section 4.1.A above.

F.    For a period of five years after the Closing Date, Delphi and its affiliates will not offer to employ or employ any employees hired by Purchaser under the provisions of this Section 4.  For a period of five years after the Closing Date, Purchaser and its affiliates will not offer to employ or employ:  1) any of the salaried employees identified on Schedule 4.1 who receive severance benefits from Delphi in accordance with the Delphi Corporation Separation Allowance Plan for U.S. Employees as the result of Purchaser's failure to meet the "substantially comparable in the aggregate" standard described in Section 4.1.G; or 2) the Excluded Employees.

G.    With respect to the salaried employees identified on Schedule 4.1, prior to Closing, Purchaser will provide Delphi with the terms of each individual offer of employment Purchaser wishes to extend.  Within ten business days of Delphi receiving such terms of each offer, Delphi, in its sole discretion, will determine whether each offer provides wages and benefits that are substantially comparable in the aggregate to wages and benefits Delphi provides the salaried employee as of the offer date and advise Purchaser and the employee of its determination.  In the event Delphi determines that the terms are not substantially similar in the aggregate, Purchaser may, in its sole discretion, cure any deficiency so as to meet this standard.    However, if after consultation with Purchaser, Delphi, in its sole discretion, determines that Purchaser has still not met this standard, the affected employee will be so advised and given the option of:  1) receiving severance benefits from Delphi in accordance with the Delphi Corporation Separation Allowance Plan for U.S. Employees (and thus barred from employment by Purchaser for five years in accordance with Section 4.1.F); or 2) accepting Purchaser's offer of employment and waiving eligibility for any severance benefits from Delphi.  In no event, however, will Purchaser bear any responsibility or liability relating to any severance benefits Delphi provides to: 1) any of the salaried employees identified on Schedule 4.1 who receive severance benefits from Delphi in accordance with the Delphi Corporation Separation Allowance Plan for U.S. Employees as the result of Purchaser's failure to meet the "substantially comparable in the aggregate" standard; or 2) the Excluded Employees.

H.    Unless provided otherwise in this Agreement, Purchaser will be solely responsible for and will bear all Liabilities arising from acts or events relating to employment occurring on or after the Closing Date with respect to the salaried employees identified on Schedule 4.1 whom Purchaser hires.  Unless provided otherwise in this Agreement, Delphi will be solely responsible for and will bear all liabilities arising from acts or events relating to employment occurring prior to the Closing Date with respect to the salaried employees identified on Schedule 4.1 whom Purchaser hires.

4.2    Hourly Employees.

A.    No later than ten (10) days following the execution of this Agreement, Delphi will provide Purchaser with a list of the hourly employees regularly assigned to work at the Leased Premises.  The list will identify the hourly employees on active and inactive status as of the day the list is issued. For all inactive hourly employees, Delphi will identify each employee's specific inactive status and, if other than due to a layoff, the expected return to work date, if any.  For all hourly employees on layoff, Delphi will place the employees in seniority order and identify their seniority date as defined under the collective bargaining agreements identified in Section 4.2(C).  Such list will be attached

to this Agreement as <u>Schedule 4.2</u> and updated as of the business day immediately preceding the Closing.

B.    Effective at Closing, Purchaser will commence employment of all of the active hourly employees identified on <u>Schedule 4.2</u>.

(i)    Inactive hourly employees identified on <u>Schedule 4.2</u> due to disability, family medical leave, or other approved leave of absence will remain Delphi's responsibility until any such hourly employee is ready to return to active employment in accordance with Delphi's leave policies and applicable collective bargaining agreement provisions.  As soon as possible, but no later than three business days after Delphi's receipt of notice of such employee's expected return to work date, Delphi will notify  Purchaser of the expected return to work date.

(ii)    In the event that an hourly employee identified on <u>Schedule 4.2</u> is seeking to return to active employment from a medical-based leave, such individual's fitness for active employment must be approved by both Delphi and Purchaser provided such does not violate any applicable Purchaser or Delphi collective bargaining agreement.  If Delphi and Purchaser do not agree as to such individual's fitness for active employment, the issue will be submitted to an independent medical evaluator, whose determination will be final and binding on the parties.  The cost of such independent medical evaluation will be shared equally by the parties.

(iii)    Hourly employees identified on <u>Schedule 4.2</u> who are not actively at work as of the Closing due to layoff ("<u>Laid Off Employees</u>") will remain Delphi's responsibility until any such Laid Off Employee is transferred to Purchaser.  Laid Off Employees will be placed on a recall list according to their seniority as defined by the collective bargaining agreements identified in Section 4.2(C).  Laid Off Employees will be transferred to Purchaser from the recall list as Purchaser has need for additional bargaining unit personnel.

C.    Unless Purchaser negotiates and executes Purchaser-UAW collective bargaining agreement(s) prior to Closing, Purchaser will assume all of the collective bargaining agreements to the extent applicable to the hourly employees identified on <u>Schedule 4.2</u> at the Leased Premises ("<u>Collective Bargaining Agreements</u>"), including but not limited to:

(i)    the UAW-Delphi Supplemental Agreement dated April 29, 2004 as amended (the "Supplemental Agreement);

(ii)    the 2003-2007 UAW-Delphi National Agreement, including the supplemental agreements attached thereto, as amended and  extended through September 14, 2011 (the "National Agreement");

(iii)    the UAW-Delphi-GM Memorandum of Understanding – Delphi Restructuring dated June 22, 2007, including the Attachments thereto, and all agreements referenced therein (the "Restructuring Agreement");

(iv)    the agreements contained in the booklet captioned "Local Agreements BETWEEN Delphi Energy & Chassis Systems Saginaw Operations AND Local 467, UAW, 2003", as amended; and

(v) any Memorandum of Understanding between Delphi, Purchaser and the UAW regarding the effects of the sale upon bargaining unit members ("the Effects MOU").Delphi and Purchaser agree that, to the maximum extent possible, this Agreement will be interpreted in a manner consistent with the Effects MOU. However, if any provision of the Effects MOU is inconsistent with any provisions of this Agreement, the provisions of the Effects MOU will govern.

Delphi and Purchaser acknowledge that the Collective Bargaining Agreements assumed by Purchaser apply only to the bargaining unit members at the Leased Premises.

D.      Purchaser will recognize the seniority of each of the hourly employees who transfers to Purchaser for all purposes in accordance with the Collective Bargaining Agreements.

E.      If Purchaser is unable to negotiate and execute Purchaser-UAW collective bargaining agreement(s) prior to Closing and thereby assumes the Collective Bargaining Agreements referenced above, the following shall apply in respect of the employee benefit provisions of such agreements:

(i)      <u>Pension Plan</u>.  Effective as of the Closing and subject to the following, Purchaser will establish a defined benefit pension (cash balance) plan for the benefit of the hourly employees identified on <u>Schedule 4.2</u>. who commence employment with Purchaser (the "Hourly Employees").  Such cash balance pension plan will contain provisions that mirror the Individual Retirement Plan provisions of the Delphi Hourly-Rate Employees Pension Plan ("Delphi HRP") (and only such other provisions of the Delphi HRP necessary to implement the Purchaser cash balance plan) that were applicable to the Hourly Employees on the close of business on the day immediately preceding the Closing under the terms of the Collective Bargaining Agreements.  In no event shall Purchaser be required to establish or otherwise provide benefits in connection with the Delphi HRP, other than the Individual Retirement Plan provisions, as provided under the National Agreement or otherwise, which benefits shall be considered Retained Liabilities of Seller for purposes of the indemnification provisions of Section 11.5 hereof.  In establishing such cash balance pension plan, the following shall apply:

(a)      Purchaser will recognize the pre-Closing credited service under the Delphi HRP, as in effect immediately prior to the Closing, of each of the Hourly Employees for eligibility and vesting purposes only but not benefit accrual purposes. Purchaser will recognize post-Closing credited service of each of the Hourly Employees for vesting, eligibility, and benefit accrual purposes subject to the terms of the Purchaser cash balance plan.

(c)      Except as otherwise provided herein, Hourly Employees will continue to be eligible for pension benefits from Delphi in accordance with the terms of the Delphi HRP, including but not limited to any benefits accrued under the Individual Retirement Plan provisions of the Delphi HRP, based on their pre-Closing credited service with Delphi and, to the extent permitted under applicable law, their post-Closing credited service with Purchaser for eligibility and vesting purposes which benefits shall be

considered Retained Liabilities of Seller for purposes of the indemnification provisions of Section 11.5 hereof.

(e)    For purposes hereof, any employee identified on Schedule 4.2 who is on leave or layoff and commences active employment with Purchaser after the Closing, shall not be eligible to participate in or receive any service credits under the cash balance plan established by Purchaser until such time as the employee becomes an active employee of Purchaser and any obligation for benefits shall remain with Delphi until such time.

(f)    Notwithstanding anything to the contrary herein, any Hourly Employee who is considered a "Covered Employee" under the Term Sheet—Delphi Pension Freeze and Cessation of OPEB and GM Consensual Triggering of Benefit Guarantee (the "Term Sheet"), is not eligible to participate in the cash balance pension plan established by Purchaser for the period of time such employee is eligible to accrue credited service in the General Motors pension plan in accordance with the Term Sheet and only service and wages earned with Purchaser after such period of time shall be taken into account for benefit accrual purposes.  In this regard, effective at Closing, Purchaser will assume any and all obligations to pay GM for this benefit avoidance in accordance with Section 2.02(d)(ii) of the Global Settlement Agreement Between GM and Delphi dated September 6, 2007 that, but for Purchaser's purchase of the Acquired Assets, would have been Delphi's obligations.

(ii)    Active Health and Welfare Benefits.  Effective as of the Closing and subject to the following, Purchaser will establish medical, dental, vision, disability, life insurance and health care spending account plans for the benefit of the Hourly Employees.  Such plans will contain provisions that mirror the provisions of the Delphi medical, dental, vision, disability, life insurance and health care spending account plans that were applicable to the Hourly Employees on the close of business on the day immediately preceding the Closing under the terms of the Collective Bargaining Agreements.  In establishing such plans, the following shall apply:

(a)    All limitations as to pre-existing conditions, exclusions, service conditions and waiting periods shall be inapplicable to the Hourly Employees, except limitations or waiting periods that were in effect with respect to such employees as of the Closing under the Delphi medical, dental, vision, disability, life insurance and health care spending account plans.

(b)    Notwithstanding the foregoing, if the Closing occurs on a day other than the last day of the calendar year, those Hourly Employees who become active employees of Purchaser after the Closing shall continue to participate in Delphi's medical, dental, vision, and health care spending account plan for a period of 90 days from the Closing (or such longer or shorter period of time as is mutually agreed to by the parties, but in no event after the date on which Purchaser has established such plans in accordance with this subsection) and Purchaser shall pay Delphi the COBRA premium rates associated with participation by the Hourly

Employees under such Delphi plans during this period. For purposes hereof, any employee identified on Schedule 4.2 who is on leave or layoff and commences active employment with Purchaser after the Closing, shall not be eligible to participate in Purchaser's medical, dental, vision, disability, life insurance and health care spending account plans until such time as the employee becomes an active employee of Purchaser and any obligation for benefits shall remain with Delphi until such time.

(c)    To the extent permissible under the Collective Bargaining Agreement(s), Purchaser reserves the right to designate the carriers or administrators of the medical, dental, vision, disability, life insurance and health care spending account plans it establishes for the benefit of the Hourly Employees.

(d)    Purchaser shall have no responsibility for any claims relating to any of Delphi's medical, dental, vision, disability, life insurance and health care spending account plans to the extent incurred prior to the Closing, regardless of whether such claims are filed or reported before, on or after the Closing.  Such claims shall be dealt with under the terms of such Delphi medical, dental, vision, disability, life insurance and health care spending account plans.

(iii)    Retiree Medical Benefits.   Effective as of the Closing and subject to the following, Purchaser will establish a notional post-retirement health care account for the benefit of eligible Hourly Employees who retire from Purchaser. Such account will contain provisions that mirror the provisions of the Delphi post-retirement health care account that were applicable to the Hourly Employees on the close of business on the day immediately preceding the Closing under the terms of the Collective Bargaining Agreements. In no event shall Purchaser be required to establish or otherwise provide any other type or form of retiree medical benefits, as provided under the Collective Bargaining Agreements or otherwise.  In establishing such account, the following shall apply:

(a)    Effective as of the Closing, Purchaser will establish an opening balance under its post-retirement health care account for each eligible Hourly Employee equal to the individual account balances of such Hourly Employees under Delphi's notional post-retirement health care account as of the day immediately prior to Closing, increased for any accrued but un-credited or unpaid interest and contributions as of the Closing.  In consideration thereof, the purchase price will be adjusted as of the Closing by the sum of the individual account balances of Hourly Employees as of the Closing under Delphi's notional post-retirement health care account, which will be increased for any accrued but un-credited or unpaid interest and contributions as of the Closing and reduced to reflect the actuarial economic present value of such balances as determined by Watson Wyatt Worldwide assuming Delphi's actuarial assumptions as of the prior measurement date and using a 7.375% discount rate.

(b)    Purchaser will recognize the pre-Closing credited service with Delphi under the terms of the Delphi post-retirement health care account, as in effect immediately prior to the Closing, of each of the

Hourly Employees for purposes of eligibility for the post-retirement health care account established by Purchaser.

(c)    As of the Closing, Hourly Employees will no longer be eligible for any post-retirement health care account from Delphi.

(d)    For purposes hereof, any employee identified on <u>Schedule 4.2</u> who is on leave or layoff and commences active employment with Purchaser after the Closing, shall not be eligible to participate in or receive any service credits under the post-retirement health care account established by Purchaser until such time as the employee becomes an active employee of Purchaser and any obligation for benefits shall remain with Delphi until such time.

(e)    Notwithstanding anything to the contrary herein, Hourly Employees who are considered "Covered Employees" under the Term Sheet, and are able to attain eligibility for retiree medical benefits through GM under the Term Sheet are not eligible to receive credits to the post-retirement health care account established by Purchaser.    Hourly Employees who are considered "Covered Employees" under the Term Sheet but cannot attain eligibility to receive retiree medical benefits through GM under the Term Sheet are eligible to receive credits to the post-retirement health care account established by Purchaser only for service earned after the Closing.

(iv)    <u>401(k) Plan</u>.    Effective as of the Closing and subject to the following, Purchaser will establish a 401(k) plan for the benefit of the Hourly Employees (or otherwise amend an existing 401(k) plan of Purchaser to include provisions specific to the Hourly Employees) ("Purchaser's 401(k) Plan"). Purchaser's 401(k) Plan will contain provisions that mirror the provisions of the Delphi Personal Savings Plan ("Delphi PSP") that were applicable to the Hourly Employees on the close of business on the day immediately preceding the Closing under the terms of the Collective Bargaining Agreements.  In establishing such plan, the following shall apply:

(a)    Purchaser will recognize the pre-Closing credited service under the terms of the Delphi PSP, as in effect immediately prior to the Closing, of each of the Hourly Employees for eligibility and vesting purposes only.

(b)    Matching contributions to Purchaser's 401(k) Plan will be made in shares of TRW Stock.

(c)    Hourly Employees shall be required to enroll in Purchaser's 401(k) plan, in accordance with the enrollment procedures identified by Purchaser prior to Closing.

(d)    Hourly Employees shall have a range of investment options in which to invest their accounts under Purchaser's 401(k) Plan, as designated by the TRW Automotive North American Investment Committee.

(e)    To the extent allowed under applicable law, Hourly Employees who transfer to Purchaser and become eligible for a distribution of their account balances in the Delphi PSP will be permitted,

at their discretion, to rollover such account balances to Purchaser's 401(k) Plan in a form acceptable to Purchaser. Prior to accepting such rollovers, Purchaser may request reasonable proof, including a current IRS Determination Letter, that the Delphi PSP is qualified under Section 401(a) of the Internal Revenue Code.

(f)    Notwithstanding anything to the contrary herein, Hourly Employees who are considered "Covered Employees" under the Term Sheet, are not eligible to receive any company matching contributions under the Purchaser's 401(k) Plan for the period of time they are eligible to accrue credited service in the General Motors pension plan in accordance with the Term Sheet.

(v)    <u>Supplemental Unemployment Benefit Plan</u>.  Effective as of the Closing, Purchaser will establish a Supplemental Unemployment Benefit Plan for the benefit of the Hourly Employees, which will contain provisions that mirror the provisions of the Delphi Supplemental Unemployment Benefit Plan that were applicable to the Hourly Employees on the close of business on the day immediately preceding the Closing under the terms of the Collective Bargaining Agreements.

(vi)    Nothing contained herein is intended to adversely affect the Purchaser's ability to receive any benefits of the Term Sheet or any obligations associated with such Purchaser's receiving such benefits, and this Section 4.2 shall be construed and interpreted accordingly.

(vii)    Immediately following the Closing, Delphi and Purchaser shall issue a joint notice to the Hourly Employees and the International Union, UAW, advising of the benefit provisions described herein, including, if applicable, details as to the Hourly Employees' continued entitlement to benefits from Delphi based on their service and wages prior to Closing.

F.    To the extent Purchaser is able to negotiate and execute Purchaser-UAW collective bargaining agreement(s) prior to Closing, the terms of such Purchaser-UAW collective bargaining agreement(s) shall, subject to any applicable Effects MOU provisions referenced in Section 4.2.C.(v), control in respect of the employee benefit plans and provisions for the hourly employees identified on <u>Schedule 4.2</u>. who commence active employment with Purchaser and Section 4.2.E. shall, to the extent inconsistent with any such Purchaser-UAW collective bargaining agreement(s), be inapplicable.

G.    Purchaser and Delphi shall, and shall cause each of their respective subsidiaries and/or third party administrators and consultants (to the extent reasonably practicable), to provide to the other all such information as the other may reasonably request to enable the requesting party to adopt, establish and administer the employee benefit plans and programs under this Agreement and the Collective Bargaining Agreements.  Such information shall, to the extent reasonably practicable, be provided in the format and at the times and places requested, but in no event shall the party providing such information be obligated to incur any out-of-pocket expense not reimbursed the party making such request, nor to make such Information available outside its normal business hours and premises.  Any information shared or exchanged pursuant to this Agreement shall at all times be kept confidential.  At a minimum, and in no event later than ten business days following the execution of this Agreement, Delphi

shall provide to Purchaser copies of all legally required plan documents applicable to the Individual Retirement Plan provisions of the Delphi Hourly-Rate Employees Pension Plan, the active health and welfare benefits, the post-retirement health care account, the Delphi Personal Savings Plan, and the Delphi Supplemental Unemployment Benefit Plan, including formal plan documents and summary plan descriptions meeting the requirements of the Internal Revenue Code of 1986, as amended, and the Employee Retirement Income Security Act of 1974, as amended, described in Section 4.2.E above.

H.     Delphi will retain responsibility to administer and all liability for labor grievances and arbitration proceedings (collectively "the Grievances") arising from alleged violations of the Collective Bargaining Agreements occurring prior to the Closing; provided, however, that such grievances are filed within ninety (90) days of the Closing. For a period of ninety (90) days following the Closing, Purchaser will notify Delphi of any Grievances filed after the Closing which relate to alleged violations of the collective bargaining agreements occurring prior to the Closing.  Purchaser will be responsible to administer and bear all liability for Grievances arising from alleged violations of the Collective Bargaining Agreements occurring after the Closing..   To the extent the administration or resolution of any Grievances requires both the Purchaser's and Delphi's participation, the following apply:

(i)     Purchaser and Delphi will cooperate in the defense of the Grievances.

(ii)    Purchaser will not settle any Grievance without Delphi's consent if such settlement will result in liability or obligation for Delphi.  Such consent will not be unreasonably withheld.

(iii)   Delphi will not settle any Grievance without Purchaser's consent if such settlement will result in liability for Purchaser.  Such consent will not be unreasonably withheld.

(iv)    If the seniority of an hourly employee who transfers to Purchaser is reinstated as a result of the disposition of a Grievance or a court or administrative order, Purchaser will reinstate the employee as if he/she had been an employee of Purchaser as of the Closing subject to the terms of the Grievance disposition, court or administrative order.

(v)     For hourly employees who transfer to Purchaser and who have been continuously employed, back pay liability to the extent relating to an event, occurrence or cause of action arising prior to the Closing will be allocated to Delphi.  Liability relating to an event, occurrence or cause of action arising subsequent to the Closing will be allocated to Purchaser.

(vi)    For hourly employees who transfer to Purchaser because they are reinstated through the grievance procedure, back pay liability relating to periods prior to the Closing will be allocated to Delphi.  Liability relating to periods subsequent to the Closing will be allocated to Purchaser.

(vii)   The parties will discuss treatment of Grievances involving unusual circumstances or events that continue before and after the Closing.

(viii)  If either party unreasonably withholds consent to a settlement or processing of a Grievance recommended by the other party or elects to continue

to defend the Grievance, then such party will be liable for the portion of the back pay or other liability resulting from the ultimate disposition of such Grievance (or subsequent settlement) which is in excess of the liability that would have resulted from the settlement recommended and rejected.

I.    Liabilities, obligations, commitments, costs and expenses for workers' compensation benefits related to injuries or illnesses which are incurred or first diagnosed on or after the Closing by hourly employees who transfer to Purchaser will be the responsibility of Purchaser.

J.    Liabilities, obligations, commitments, costs and expenses for claims for severance, termination (actual or constructive), WARN Act, or other payments or benefits by hourly employees who transfer to Purchaser deriving from Purchaser's acquisition under this Agreement will be the responsibility of Purchaser.

K.    Subject to Purchaser's obligations under paragraph 4.2.C to assume the Collective Bargaining Agreements (and thereby duplicate the applicable employee benefit plans), Purchaser will not assume any of Delphi's employee benefit plans.

L.    Buyer will assume responsibility for all liabilities, obligations, commitments, costs and expenses for claims of the hourly employees who transfer to Purchaser (or any dependent thereof who becomes a "qualified beneficiary" within the meaning of Section 4980B(g)(1) of the Internal Revenue Code) related to compliance with the requirements of continuation coverage under Section 4980B of the Internal Revenue Code or Section 601 of ERISA or as the result of any "qualifying event" within the meaning of Section 4980B(f)(3) of the Internal Revenue Code which occurs on or after the Closing.

M.    Unless provided otherwise in this Agreement, Purchaser will be solely responsible for and will bear all Liabilities arising from acts or events relating to employment of the Hourly Employees occurring on or after the date on which each respective Hourly Employee commences employment with Purchaser.  Unless provided otherwise in this Agreement, Delphi will be solely responsible for and will bear all Liabilities arising from acts or events relating to employment of the Hourly Employees occurring prior to the date on which each respective Hourly Employee commences employment with Purchaser.

4.3    Due Diligence.

A.    No later than ten business days following the execution of this Agreement, Delphi shall provide Purchaser:

(i)    A description of all pending Grievances involving the hourly employees listed on Schedule 4.2.

(ii)    A description of all pending employment-related litigation by or against employees identified on Schedule 4.1 and Schedule 4.2.

(iii)    A description of all pending administrative agency complaints, charges, unfair labor practice charges, or investigations by or against employees listed on Schedule 4.1 or Schedule 4.2.

(iv)    A description of any consent orders or orders by any court or administrative agency applicable to employees listed on <u>Schedule 4.1</u> or <u>Schedule 4.2</u>.

(v)    All documents constituting the Collective Bargaining Agreements between Delphi and the UAW applicable to the hourly employees listed on <u>Schedule 4.2</u>, including but not limited to any side letters, memoranda of understanding or agreement, and Grievance or arbitration settlements.

(vi)    With respect to hourly employees listed on <u>Schedule 4.2</u>:

a.    Name;

b.    Job classification/title;

c.    Date of hire;

d.    Rate of pay;

e.    Identification of whether the employee has "flowback rights" and, if so, the date by which the employee must exercise such rights;

f.    Attendance history for the past three years; and

g.    Documented disciplinary and corrective actions.

(vii)    The plan documents referenced in Section 4.2.G.


**5.    <u>CONTINUED SUPPLY BY PURCHASER AND SELLER.</u>**

5.1    <u>**GM Directed Buy Parts**</u>.

For component parts listed on <u>Schedule 5.1</u> which are produced by Delphi or its Affiliates and used in the manufacture of the Products (the "<u>Internally Supplied Parts</u>"), Delphi agrees to sell and supply such parts to Purchaser at the pricing set forth in those certain GM "Directed Buy" letters for the life of the underlying programs (and without regard to the "Duration/Until" reference on <u>Schedule 5.1</u>) or such earlier date as GM directs that Purchaser use alternative sources for the Internally Supplied Parts. The sale of the Internally Supplied Parts will be pursuant to purchase orders issued by Purchaser to Delphi after the Closing with terms consistent with this Section 5.1 and the GM "Directed Buy" letters but will be governed by the GM purchase order general terms and conditions in effect as of the date the purchase orders for the Internally Supplied Parts are accepted by Delphi.

5.2    <u>**Non-GM Directed Buy Parts**</u>.

For any component parts listed on <u>Schedule 5.2</u> which are produced by Delphi or its Affiliates and used in the manufacture of the Products (the "<u>Non-GM Directed Buy Parts</u>"), Delphi agrees to sell and supply (or cause its Affiliates to sell and supply) such parts to Purchaser on the same terms and conditions on which Delphi supplied such parts to itself or such Affiliates supplied the parts to Delphi, with such sales being pursuant to (i) an assignment to Purchaser of any internal Delphi purchase orders (the "<u>Assigned Delphi Contracts</u>"), or (ii)

according to the pricing and for the term set forth on <u>Schedule 5.2</u> and in accordance with the GM purchase order general terms and conditions in effect as of the date of this Agreement. Purchaser shall have no obligation to cure any defaults that may exist under the Assigned Delphi Contracts as of the Closing Date. Nothing herein shall be construed to obligate Delphi or its Affiliates to sell or supply Non-GM Directed Buy Parts to Purchaser for longer than the periods set forth on <u>Schedule 5.2</u> other than on terms acceptable to Purchaser and the Delphi unit or Affiliate involved.

5.3   **Parts Banks.**

At Purchaser's option, and provided Delphi is reimbursed for all reasonable incremental costs and expenses (i.e., in addition to the applicable purchase price and the cost of working capital funds) of producing and maintaining such parts banks (and such parts banks are paid for according to payment terms now in effect between the applicable customer and Delphi) and subject to capacity constraints, Delphi will produce any reasonably required parts banks of the Products to meet the customers' production needs (a) for a period of 21 days after the Closing Date for Products manufactured at the Leased Premises, (b) for the period mutually agreed by Purchaser and Seller for Products now manufactured by Delphi at the Other Product Facilities.

5.4   **Contract Manufacturing.**

During the period from the Closing Date through July 31, 2008 (or thereafter as extended on a month-to-month basis by mutual agreement of the Parties), Purchaser will manufacture the component parts listed on <u>Schedule 5.4</u> (the "<u>Contract Manufacturing Parts</u>") as a contract manufacturer in accordance with the terms of a Contract Manufacturing Agreement substantially in the form of <u>Exhibit 5.4</u> (for convenience, such manufacturing is referred to as the "<u>Contract Manufacturing</u>"):

5.5   **Saginaw Supplied Parts.**

For component parts listed on <u>Schedule 5.5</u> which are produced by Delphi at the Leased Premises and used in the manufacture of the Products at the Other Product Facilities (the "<u>Saginaw Supplied Parts</u>"), Purchaser agrees to sell and supply such parts to Seller at the pricing set forth on <u>Schedule 5.5</u> until such time as the applicable Non Saginaw Assets are removed from the Other Product Facilities and Seller has no further requirements for the Saginaw Supplied Parts, with such sales being pursuant to a standard Delphi purchase order issued by Seller and accepted by Purchaser.

6.   **LEASED PREMISES.**

6.1   **Lease Agreement**.

At the Closing, Delphi and Purchaser will enter into a lease (the "<u>Lease Agreement</u>") in the form attached as <u>Exhibit 6.1</u>.

6.2   **[Intentionally omitted]**.

6.3   **Removal of Delphi Contract Manufacturing Equipment.**

Delphi agrees that it will remove at its cost and expense all Delphi Contract Manufacturing Equipment from the Leased Premises on a program-by-program basis after the applicable assets are no longer being used for Contract Manufacturing in accordance with the Contract Manufacturing Removal Plan attached hereto as <u>Exhibit 6.3</u>. Delphi will pay for all

Decommissioning Activities in respect of the Delphi Contract Manufacturing Equipment, together with the costs of repairing any material damage caused to the Leased Premises during the removal of the Delphi Contract Manufacturing Equipment or the Decommissioning Activities related thereto. To the extent any agreements between Purchaser and any unions representing workers at the Leased Premises require that the dismantling and removal of the Delphi Contract Manufacturing Equipment be completed by union employees, Delphi shall use such employees to remove the Delphi Contract Manufacturing Equipment or, subject to the consent of the applicable union, reimburse Purchaser for any amounts Purchaser must pay the employees in lieu of using them to dismantle and remove such assets. In connection with the removal of the Delphi Contract Manufacturing Equipment, Delphi shall not unreasonably interfere with any ongoing production by Purchaser.   Purchaser shall have the right to monitor all removal activities.

7.    **CERTAIN TRANSITION MATTERS.**

7.1    **Transition Services Agreement**.   Delphi and Purchaser will enter into a transition services agreement in the form attached hereto as <u>Exhibit 7.1</u> (the "<u>Transition Services Agreement</u>")pursuant to which Delphi will provide certain transition services to Purchaser and Purchaser will provide certain transition services to Seller, in each case at the providing party's cost, as set forth in the Transition Services Agreement.

7.2    **Equipment Leases**.

Although Purchaser recognizes that Delphi is not able to assume and assign the leases of any equipment used at the Leased Premises given that such assets are leased under agreements that include assets at other Delphi locations, Delphi agrees to work in good faith with Purchaser and the applicable lessor(s) on a consensual buy-out of any such assets not subject to redeployment within Delphi or otherwise necessary for the continued operation of Delphi's business that Purchaser may elect to acquire at Purchaser's cost and expense.  In no event will Delphi be obligated to incur any liability or cost in connection with Purchaser's acquisition of any equipment currently leased by Delphi.

7.3    **Purchasing Activities.**

A.   Within three (3) business days following the execution of this Agreement, Seller or Delphi Canada, as applicable, will deliver a letter to all vendors who supply goods or services to Seller or Delphi Canada in connection with the manufacture of the Products or the operation of the Leased Premises pursuant to a Supplier Contract (collectively, "<u>Existing Vendors</u>") advising them that subject to Bankruptcy Court approval, Seller intends to sell the Acquired Assets and Delphi Canada intends to sell certain of its assets to Purchaser and that the Existing Vendors are authorized to provide quotes to Purchaser for the applicable goods or services and otherwise engage in negotiations with Purchaser regarding supplying Purchaser after Bankruptcy Court approval and the Closing occurs.  Purchaser acknowledges that Seller's and Delphi Canada's letters to the Existing Vendors will advise such Existing Vendors of their continued obligations to supply Seller's and Delphi Canada's requirements for the applicable goods and services in accordance with the Supplier Contracts despite any negotiations or agreements with Purchaser.

B.   Within five (5) business days following the execution of this Agreement and subject to any confidentiality obligations to the Existing Vendors or other third parties, Seller will:

(i)    provide to Purchaser, to the extent the same exist, details of all pending pricing or other commercial disputes with Existing Vendors, copies of all direct supply letters and related agreements in respect of the goods or services provided by the Existing Vendors, and all other data and documentation reasonably requested by Purchaser for purposes of Purchaser quoting the Existing Vendors and entering into agreements and purchase orders that are contingent upon Purchaser acquiring the Acquired Assets.  Other than provided for in this Section 7.3.B. for purposes of quoting the Existing Vendors and entering into agreements and purchase orders that are contingent upon Purchaser acquiring the Acquired Assets, any and all information provided by Seller or Seller's representatives to Purchaser shall be subject to the terms of the Non-Disclosure Agreement as modified by Section 2.3 of this Agreement; and

(ii)    afford Purchaser reasonable access to a designated Seller's representative of Global Supply Management staff knowledgeable about the goods and services Seller purchases from the Existing Vendors to assist Purchaser in understanding background information necessary to purchase the subject goods and services.

C.    Upon execution of this Agreement, Purchaser shall have the same right that Seller has to inspect all Tooling and customer owned Tooling in the possession of the Existing Vendors and Seller will cooperate with Purchaser in giving any reasonably necessary consents, authorizations or directions to the Existing Vendors to allow Purchaser to inspect such items (at Purchaser's cost and expense).

## 8.    REPRESENTATIONS AND WARRANTIES.

8.1    **Warranties of Seller**.

Delphi (and DTI as to Subparagraph L below) represents and warrants, as of the date hereof, severally, to Purchaser with respect to the Acquired Assets being sold by such Seller as follows:

A.    Corporate Authority.  Subject to the entry and effectiveness of the Bidding Procedures Order and Sale Approval Order (collectively, the "Orders"), Seller has the requisite corporate authority to execute and perform in accordance with this Agreement, and, upon full satisfaction of the terms and conditions of the Orders, this Agreement shall constitute a valid and binding obligation of Seller.

B.    No Conflict.  The execution and performance by Seller of this Agreement does not violate, conflict with or result in a breach by Seller of its certificate or articles of incorporation or bylaws or of any other agreement to which Seller is a party or by which it is bound, except for those violations that are excused by or are unenforceable as a result of the Bankruptcy Code.

C.    Title to Acquired Assets.  Seller warrants that, as of the date of delivery of the Acquired Assets, Seller will have good and marketable title to the Acquired Assets and the Acquired Assets will be sold, assigned, transferred or delivered, as the case may be, free and clear of any Lien, as permitted under Section 363(f) of the Bankruptcy Code.

D.    Litigation.  Except for the pendency of the Bankruptcy Cases or as otherwise set forth on Schedule 8.1.D., there is no litigation - equitable or legal,

administrative, arbitrative or other proceedings - pending against Seller with respect to the Acquired Assets, and Seller has no Knowledge of any written notice of violation of any applicable law, rule or regulation, or any written notice of threatened litigation or Claims, with respect to the Acquired Assets.

E.   Sufficiency of Assets.   To Seller's Knowledge the Acquired Assets together with the Canadian Assets and the assets described in Section 1.5 comprise all of the tangible assets reasonably necessary to manufacture the Products and operate the Leased Premises in all material respects as the Products were manufactured and as the Leased Premises was operated by Sellers.   Purchaser acknowledges and agrees that its exclusive remedy in respect of any claim arising out of this Section 8.1(E) will be as provided in Section 11.2 of this Agreement.

F.   Condition of Personal Property.   With respect to all Acquired Assets, Seller has performed maintenance consistent with applicable maintenance policies and procedures and will continue to perform such maintenance in the Ordinary Course of Business through the Closing Date.

G.   Third Party Assets.   To Seller's Knowledge, the items set forth on Schedule 1.5.A and any customer-owned tooling or dunnage are the only Third Party Assets used by Seller in the manufacture or shipment of the Products or the operation of the Leased Premises.

H.   Maintenance of Spare Parts and Crib Items. Through the Closing, Seller will manage its on-hand supply of Spare Parts and Crib Items in the Ordinary Course of Business and will not deplete such supply.

I.   Compliance with Laws.   To Seller's Knowledge, the production, distribution and export/import operations with respect to the Products are in compliance with all applicable Laws, except where the failure to be in compliance would not have a Material Adverse Effect.

J.   Brokers.   Seller has employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Purchaser would be liable.

K.   Absence of Other Representations or Warranties.   Except for the warranties expressly set forth in this Agreement and the Ancillary Agreements, Seller makes no representations or warranties, express or implied, with respect to the Acquired Assets.   For the avoidance of doubt, no warranty or representation is given on the contents of the documents provided in due diligence, on any other documents or other information not contained in this Agreement or the Ancillary Agreements, all which were produced only for information purposes.

L.   Licensed Intellectual Property. In respect of the Licensed Intellectual Property:

(i)     The Licensed Intellectual Property includes all intellectual property of Sellers' and related rights necessary or desirable for the design, manufacture, assembly, testing and tuning of the Products;

(ii)     GM has or will have the right to grant Purchaser and its affiliates a North American, perpetual, irrevocable, paid-up, royalty-free right and license to

develop, make, have made, use, import, export, sell and offer to sell any Products using the Licensed Intellectual Property, all without further royalty payment by Purchaser or its affiliates to Seller for use of Licensed Intellectual Property (other than as required by the Transition Services Agreement);

(iii)    Seller has the right to license the Licensed Intellectual Property to GM and that there are no outstanding licenses that are inconsistent with those rights; and

(iv)    Other than as set forth on <u>Schedule 8.1.L</u>, Seller has not received any written notice of infringement, and otherwise has no Knowledge regarding any infringement, with respect to the Licensed Intellectual Property.

M.    <u>Collective Bargaining Agreements</u>.  All of the material collective bargaining agreements applicable to the Leased Premises are set forth in, referenced in, or attached to the documents specifically listed in section 4.2.C(i) through (v).

8.2    **<u>Warranties of Purchaser</u>**.

Purchaser warrants and represents to Seller as follows:

A.    <u>Corporate Authority</u>.  Purchaser has the requisite corporate authority to execute and perform in accordance with this Agreement, and this Agreement constitutes a valid and binding obligation of Purchaser.

B.    <u>No Conflicts</u>.  The execution and performance by Purchaser of this Agreement does not violate, conflict with or result in a breach of Purchaser's certificate or articles of incorporation, or by-laws, or of any other agreement to which Purchaser is a party of by which it is bound.

C.    <u>Consents and Approvals</u>.  No consent, approval, or authorization of any non-governmental third party and no consent, approval, authorization or declaration of or filing or registration with any foreign, federal, state or local governmental or regulatory authority is required to be made or obtained by Purchaser in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

D.    <u>Litigation.</u>  There is no litigation, equitable or legal, administrative, arbitrative, or other proceedings pending, or to the Knowledge of Purchaser, threatened against or affecting Purchaser which could reasonably be expected to result in the issuance of an order restraining, enjoining or otherwise prohibiting Purchaser from consummating the transactions contemplated by this Agreement.

E.    <u>Brokers.</u>  Purchaser has employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Seller would be liable.

F.    <u>Solvency.</u> Upon the consummation of the transactions contemplated by this Agreement:  (i) Purchaser will not be insolvent; (ii) Purchaser will not be left with unreasonably small capital; (iii) Purchaser will not have incurred debts beyond its ability to pay such debts as they mature; and (iv) the capital of Purchaser will not be impaired.

G.  <u>Availability of Funds.</u>  Purchaser has or will have available, at or prior to Closing, sufficient cash in immediately available funds to pay the Purchase Price and all costs, fees and expenses necessary to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

H.  <u>Compliance with Laws.</u>  To Purchaser's Knowledge, Purchaser is in compliance with all Laws applicable to it, except with respect to those violations that could not reasonably be expected to result in the issuance of an order outstanding restraining, enjoining or otherwise prohibiting Purchaser from consummating the transactions contemplated by this Agreement.

I.  <u>Anti-Money Laundering.</u>  To Purchaser's Knowledge, Purchaser is in compliance with: (i) all applicable provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-57) ("<u>USA Patriot Act</u>"), as amended, and all regulations issued pursuant to it; (ii) Executive Order No. 13224 on Terrorist Financing, Effective September 24, 2001, and relating to Blocking Property and Prohibited Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism; (iii) the International Emergency Economic Power Act (50 U.S.C. 1701 et seq.), and any applicable implementing regulations; (iv) the Trading with the Enemies Act (50 U.S.C. 50 et seq.), and any applicable implementing regulations; and (v) all applicable legal requirements relating to anti-money laundering, anti-terrorism and economic sanctions in the jurisdictions in which Purchaser operates or does business.  Neither the Purchaser nor any of its directors, officers or Affiliates is identified on the United States Treasury Department Office of Foreign Asset Control's ("<u>OFAC</u>") list of "<u>Specially Designated Nationals and Blocked Persons</u>" (the "<u>SDN List</u>") or otherwise the target of an economic sanctions program administered by OFAC, and Purchaser is not affiliated in any way with, or providing financial or material support to, any such persons or entities.  Purchaser agrees that should it, or any of its directors, officers or Affiliates be named at any time in the future on the SDN List, or any other similar list maintained by the U.S. Government, Purchaser shall inform the Seller in writing immediately.

8.3  **Survival of Representations and Warranties.**

The representations and warranties made by the Seller in <u>Section 8.1</u> and by the Purchaser in <u>Section 8.2</u> will survive the Closing and will expire on the second anniversary of the Closing Date (the "<u>Expiration Date</u>").

8.4  **Fair Disclosure.**  Any matter fairly disclosed in any Schedule to this Agreement will be deemed an exception for all other representations and warranties contained in this Agreement whether or not such other representations or warranties contain a reference to such Schedule.

**9.    CONDITIONS TO CLOSING.**

9.1  **Conditions to Obligations of Seller and Purchaser**.The respective obligations of each Party to effect the transactions contemplated by this Agreement will be subject to the satisfaction or waiver at or prior to the Closing Date  (or such earlier time as is indicated below) of the following conditions precedent:

A.  <u>Sale Approval Order</u>. The Sale Approval Order will be entered by the Bankruptcy Court and will not be subject to a stay or injunction.

      B.  <u>No Law, Judgments, Etc</u>.  No provisions of any applicable Law and no judgment, injunction (preliminary or permanent), order or decree that prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement will be in effect.

      C.  <u>Collective Bargaining Agreements</u>.  Purchaser will assume all UAW-Delphi Collective Bargaining Agreements, including all agreements amendatory and supplemental thereto in accordance with <u>Section 4.2.C</u> of this Agreement.

      D.  <u>Licensed Intellectual Property</u>.  Seller licenses to GM all of the Licensed Intellectual Property and to the extent required, such license is finally approved by the Bankruptcy Court.

      E.  <u>GM Agreement</u>.  By the close of business on September 26, 2007, Purchaser enters into a supply agreement with GM on terms and conditions fully satisfactory to Purchaser.

      F.  <u>Benefit Guarantee Issue</u>. The Term Sheet—Delphi Pension Freeze and Cessation of OPEB and GM Consensual Triggering of Benefit Guarantee (the "Term Sheet") shall take effect in accordance with paragraph (2) thereof.  However, if the Term Sheet will not be in effect on the date identified by the parties as the date of Closing, the parties, in conjunction with the UAW and GM, as applicable, shall use reasonable efforts to reach a satisfactory resolution of the benefit issues relative to the Term Sheet.  Such condition to Closing shall be deemed satisfied once the parties reach a satisfactory resolution of these issues.

      G.  <u>Labor Documents</u>. Purchaser shall have completed its review of the collectively bargained "Unpublished Letters & Documents – 2003 National Agreement," "Unpublished Letters & Documents - 1999 National Agreement," and "Unpublished Letters and Documents - 1996 National Agreement," listed on pages 8 through 12 of Attachment E of the Restructuring Agreement no later than September 24, 2007. If Purchaser is willing to assume the obligations imposed by such documents, it will so advise Seller in writing no later than 5:00 p.m. on September 24, 2007, whereupon this condition to closing will be satisfied in full. If Purchaser is unwilling to assume the obligations imposed by such documents and therefore there will not be a court hearing on the sale of the transaction and the Agreement will be terminated, Purchaser will so advise Seller in writing no later than 5:00 p.m. on September 24, 2007.

9.2    **<u>Conditions to Obligations of Purchaser</u>**.

The obligation of Purchaser to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Purchaser):

      A.  <u>Accuracy of Warranties</u>.  Except as otherwise permitted by this Agreement, and after giving effect to the Sale Approval Order, the representations and warranties of Seller contained in this Agreement will be true and correct as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a Material Adverse Effect on Seller's ability to consummate the transactions contemplated by this Agreement.

B. <u>Performance of Covenants</u>. Each of the Ancillary Agreements to which Seller is a party will have been executed and delivered by Seller to Purchaser, and all other agreements and transactions contemplated hereby or in this Agreement or any Ancillary Agreement to be performed by Seller on or before the Closing will have been performed in all material respects.

9.3   **Conditions to Obligations of Seller**.

Except as otherwise permitted by this Agreement, the obligation of Seller to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Seller):

A. <u>Accuracy of Warranties</u>. The representations and warranties of Purchaser contained in this Agreement (without taking into account any materiality or Material Adverse Effect qualification therein), will be true and correct as of the Closing Date if made on such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a Material Adverse Effect on Purchaser's ability to consummate the transactions contemplated by this Agreement.

B. <u>Performance of Covenants</u>. Each of the Ancillary Agreements to which Purchaser is a party will have been executed and delivered by such Party to Seller, and all other agreements and transactions contemplated hereby or in any Ancillary Agreement to be performed by Purchaser on or before the Closing will have been performed in all material respects.

C. <u>GM Agreement</u>. GM enters into an agreement reasonably acceptable to Seller releasing Seller of its obligations to manufacture and deliver Products to GM upon Purchaser assuming responsibility to manufacture and deliver such Products to GM.

D. <u>Payment of Purchase Price</u>. Purchaser shall have paid the Purchase Price called for by <u>Section 3.2.B.</u>

10.   **CLOSING.**

10.1   **Closing Date**.

Subject to the satisfaction of the conditions set forth in this Agreement, the closing (the "<u>Closing</u>") of the transactions contemplated hereby will take place at the offices of Purchaser's counsel on January 2, 2007 or the first day thereafter that the conditions set forth in Article 9 have been satisfied or waived (other than conditions which by their nature can be satisfied only at the Closing), or on such other date or at such other time as the Parties may agree.

10.2   **Ancillary Agreements.**

At the Closing, the Parties will execute and deliver or, where appropriate, cause their respective Affiliates to execute and deliver each of the Ancillary Agreements.

10.3   **Seller's Deliveries**.

At the Closing, Seller will deliver to Purchaser the following, in proper form for recording where appropriate:

  A. Executed assignments for the Assigned Delphi Contracts.

  B. An officer's certificate, dated as of the Closing Date, executed on behalf of Seller, certifying that the conditions specified in <u>Section 9</u> have been fulfilled.

  C. A certificate, dated as of the Closing Date, executed on behalf of Seller by a Secretary or an Assistant Secretary, certifying: (i) a true and correct copy of Seller's Organizational Documents; and (ii) a true and correct copy of the resolutions of the appropriate Seller management group authorizing the execution, delivery and performance of this Agreement and any Ancillary Agreement to which Seller is a party and the consummation of the transactions contemplated hereby and thereby.

  D. Copies of all orders of the Bankruptcy Court pertaining to the contemplated transactions contemplated by this Agreement and the Ancillary Agreements, including the Bidding Procedures Order and the Sale Approval Order.

  E. Appropriate receipts.

  F. Duly executed Bill of Sale for all Acquired Assets to be transferred at Closing.

10.4 **Purchaser's Deliveries**. At the Closing, Purchaser will deliver to Seller, in proper form for recording where appropriate:

  A. The Purchase Price to be paid at Closing as set forth in Section 3.2.B.

  B. An officer's certificate, dated as of the Closing Date, executed on behalf of Purchaser, certifying that the conditions specified in <u>Section 9</u> have been fulfilled.

  C. A certificate, dated as of the Closing Date, executed on behalf of the Purchaser by its Secretary or an Assistant Secretary, certifying: (i) a true and correct copy of Purchaser's Organizational Documents; and (ii) a true and correct copy of the resolutions of the Purchaser's board authorizing the execution, delivery and performance of this Agreement by Purchaser and the consummation of the transactions contemplated hereby.

## 11. <u>CERTAIN ADDITIONAL COVENANTS.</u>

11.1 **Continued Operations**.

Except: (i) as otherwise provided in this Agreement; (ii) required by or resulting from the Bankruptcy Cases or otherwise approved by the Bankruptcy Court; (iii) for any changes that may be required under applicable Laws; or (iv) as set forth in the following sentence, until the Closing, Seller will continue to use and operate the Acquired Assets in the Ordinary Course of Business and supply Products to its customers and maintain and repair the Leased Premises and all tangible Acquired Assets as previously done in the Ordinary Course of Business.

11.2 **Additional Assets.**

Should Seller or Purchaser determine, in its reasonable discretion, that any machinery or equipment (i) used by Seller exclusively in the production of the Products or operation of the Leased Premises, and (ii) necessary to enable the Purchaser to manufacture the Products or operate the Leased Premises was not included in the Acquired Assets (the "Additional Assets"), Seller will transfer, sell and assign such Additional Assets to Purchaser, but only to the extent that (i) Seller still owns such Additional Assets (and has not entered into a binding agreement to sell), (ii) the gross book value on Seller's balance sheet (the "GBV") of each such Additional Asset is less than $250,000 (the "Individual Threshold Value"), and (iii) the total GBV of such Additional Assets and any other Additional Assets previously transferred under this Section 11.3 is less than $750,000 (the "Aggregate Threshold Value").  For any Additional Asset with a GBV that exceeds the Individual Threshold Value, such Additional Asset will be available for sale to Purchaser for a purchase price that is equal to 22% of the GBV of the applicable Additional Asset.  Once the Aggregate Threshold Value is reached, including by transfer of a particular Additional Asset that will exceed the Aggregate Threshold Value, any remaining Additional Assets will also be available for sale to Purchaser for a purchase price that is equal to 22% of the GBV of the applicable Additional Asset.  For the avoidance of doubt, any assets other than the Additional Assets, including without limitation, assets related to the GMX295 program or manufacture of calipers for the GMX211 program, which Purchaser desires to purchase from Seller will only be available for sale to Purchaser at Seller's sole discretion and on terms acceptable to Seller in its sole discretion.

### 11.3   Registrations, Filings and Consents; Further Actions.

Upon the terms and subject to the conditions of this Agreement, each of the Parties will use commercially reasonable efforts to take, or cause to be taken, all appropriate actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as promptly as practicable including, without limitation, using their reasonable best efforts to cause the satisfaction of all conditions to Closing.

### 11.4   Further Assurances.

If at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instructions and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under this Agreement).

### 11.5   Indemnification.

A.   Seller's Agreement to Indemnify.  If the Closing occurs and Purchaser makes a written claim for indemnification against Seller in accordance with the procedures set forth in this Section 11.5, then, from and after the Closing, Seller agrees to indemnify and hold harmless Purchaser from and against all out-of-pocket liabilities, claims, assessments, losses, judgments, settlements, damages, costs and expenses (including, without limitation, reasonable professional fees and expenses) (collectively, the "Purchaser Damages") incurred by Purchaser as a result of or arising out of: (i) the Retained Liabilities and Excluded Assets; (ii) a breach of any representation or covenant of Seller contained in this Agreement; or (iii) a breach of any covenant to be performed by Seller under this Agreement.

B.    <u>Purchaser's Agreement to Indemnify</u>.    If the Closing occurs and Seller makes a written claim for indemnification against Purchaser in accordance with the procedures set forth in this <u>Section 11.5</u>, then, from and after the Closing, Purchaser shall indemnify and hold harmless Seller from and against all out-of-pocket liabilities, claims, assessments, losses, judgments, settlements, damages, costs and expenses (including, without limitation, reasonable professional fees and expenses) (collectively, the "<u>Seller Damages</u>") incurred by Seller as a result of or arising out of: (i) a breach of any representation or warranty of Purchaser contained in this Agreement; (ii) a breach of any covenant to be performed by Purchaser under this Agreement; (iii) the use, operation or ownership of any of the Acquired Assets after the Closing unless such matters are of a nature also subject to indemnification pursuant to <u>Section A</u> above; or (iv) any warranty, product liability (other than to the extent arising from Seller's or its Affiliates design of the Products) or other claims related to or arising from Purchaser's manufacture or sale of the Products after the Closing Date other than the Contract Manufacturing Parts, which will be governed by the terms of the Contract Manufacturing Agreement.

C.    <u>Limitations on Agreements to Indemnify</u>. The obligations of the Parties to indemnify the other pursuant to this <u>Section 11.5</u> are subject to the following limitations:

(i)    Each Party agrees that, from and after the Closing, the indemnification provided in this <u>Section 11.5</u> is the exclusive remedy for a breach by the other Party of any representation, warranty, agreement or covenant contained in this Agreement, and that there shall be no other remedy for any breach by a party in respect of any claim for monetary damages arising out of or under this Agreement.

(ii)    In calculating amounts payable to an indemnified party, the amount of any indemnified Purchaser Damages or Seller Damages, as the case may be, shall be determined without duplication of any other damages for which a claim has been made or could be made under any other representation, warranty or covenant included herein.

(iii)    Any written notice delivered by an indemnified party to an indemnifying party seeking indemnification pursuant to this Agreement shall set forth, with as much specificity as is reasonably practicable, the basis of the claim, the sections of this Agreement which form the basis for the claim, and, to the extent reasonably practicable, a reasonable estimate of the amount of the Purchaser Damages or Seller Damages, as the case may be, that have been or may be sustained by such indemnified party.

(iv)    Notwithstanding any other provision of this Agreement, in no event shall an indemnified party be entitled to indemnification pursuant to this Agreement to the extent any Purchaser Damages or Seller Damages, as the case may be, were attributable solely to the indemnified party's own gross negligence or willful misconduct.

(v)    No indemnifying party shall be liable to an indemnified party until the amount of all indemnifiable damages of such indemnified party in the aggregate exceeds $100,000, after which point the indemnifying party will be

obligated to the indemnified party for all damages (and not just the amount in excess of such amount).

(vi)    The obligation of any Party to indemnify the other pursuant to the terms of this Section 11.5 shall apply only to the extent the Party seeking indemnification notifies the other Party of such damages in writing on or before the later of (a) two years after the Closing Date, or (b) 90 days after the applicable Party first learns about the claim for which indemnification is sought under this Section 11.5.

(vii)    To the extent an indemnifying party makes any indemnification payment pursuant this Section 11.5 for which the indemnified party has a right to recover against a third party (including an insurance company but specifically excluding situations that are self insured, including through any captive insurance company), the indemnifying party shall be subrogated to the right of the indemnified party to seek and obtain recovery from such third party.

D.    Third Party Indemnification.  The obligations of any indemnifying party to indemnify any indemnified party under Section 11.5 with respect to Purchaser Damages or Seller Damages, as the case may be, resulting from the assertion of liability by third parties (including Governmental Entities) (an "Indemnification Claim"), shall be subject to the following terms and conditions:

(i)    Any party against whom any Indemnification Claim is asserted shall give the party required to provide indemnity hereunder written notice of any such Indemnification Claim promptly after learning of such Indemnification Claim (with such notice satisfying the requirements of Section 14.1), and to the extent such matter involves a third party claim, the indemnifying party may, at its option, undertake the defense thereof by representatives of its own choosing and shall provide written notice of any such undertaking to the indemnified party. Failure to give prompt written notice of an Indemnification Claim hereunder shall not affect the indemnifying party's obligations under this Section 11.5, except to the extent that the indemnifying party is actually prejudiced by such failure to give prompt written notice. The indemnified party, at the indemnifying party's expense, shall, and shall cause its employees and representatives to, reasonably cooperate with the indemnifying party in connection with the settlement or defense of such Indemnification Claim and shall provide the indemnifying party with all available information and documents concerning such Indemnification Claim. If the indemnifying party, within thirty (30) days after written notice of any such Indemnification Claim, fails to assume the defense of such Indemnification Claim, the indemnified party against whom such claim has been made shall (upon further written notice to the indemnifying party) have the right to undertake the defense, compromise or settlement of such claim on behalf of and for the account and risk, and at the expense, of the indemnifying party.

(ii)    Anything in this Section 11.5 to the contrary notwithstanding: (i) the indemnified party shall not settle a claim for which it is indemnified without the prior written consent of the indemnifying party, which consent shall not be unreasonably withheld, conditioned or delayed; and (ii) the indemnifying party shall not enter into any settlement or compromise of any action, suit or proceeding, or consent to the entry of any judgment for relief other than monetary damages to be borne exclusively by the indemnifying party, without the prior

written consent of the indemnified party, which consent shall not be unreasonably withheld, conditioned or delayed.

(iii)    Nothing in this Agreement, the Sale Approval Order or any Ancillary Agreements including, without limitation, any right to indemnification in favor of Purchaser, shall alter or otherwise vitiate the legal effect of the bar date order and discharge injunction under a confirmation on any third party claim against Seller that would otherwise be barred or discharged thereunder. Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreement, upon receipt of any such third party claim, Seller, in its sole discretion, may elect to defend against such claim and settle or otherwise resolve such claim without Purchaser's consent.

E.    <u>Not Exclusive Indemnifications</u>.  The indemnifications in this <u>Section 11.5</u> are the exclusive indemnifications to be given by the Parties, except for the indemnifications provided for in the Ancillary Agreements, which shall govern and control any indemnifications given under each applicable Ancillary Agreement.

11.6    **Intellectual Property Covenant.**    Sellers covenant not to sue Purchaser on account of Purchaser's use of any Licensed Intellectual Property that is licensed by Sellers to GM and in turn sublicensed to Purchaser, and Sellers agree that they will not seek additional compensation for Purchaser's use of any Licensed Intellectual Property, provided that such use is within the scope of the sublicense granted to Purchaser by GM.

11.7    **Canadian Agreement.**    Purchaser acknowledges that the Canadian Assets will be included in the Transaction (as defined in Section 12.2) subject to competitive bidding as set forth in Article 12 of this Agreement.  In the event that Purchaser is not the Successful Bidder and Sellers notify Purchaser of their intent to terminate this Agreement under <u>Section 13.2.B</u>, then Purchaser agrees that it will terminate the Canadian Agreement under Section 8.4 thereof within three (3) Business Days of such notice.  Furthermore, once the conditions set forth in Article 9 of this Agreement have been satisfied or waived, Purchaser agrees that it will not exercise its right to terminate the Canadian Agreement under Section 8.4 thereof.

11.8    **Parent Guaranty.**    Simultaneous    with    execution    of    this    Agreement, Purchaser's indirect parent, Kelsey-Hayes Company, is executing a guaranty in the form attached as <u>Exhibit 11.8</u>.

## 12.    <u>BANKRUPTCY ACTIONS</u>

12.1    <u>**Orders**</u>.

As soon as reasonably practicable after the execution of this Agreement, Delphi will file a motion with the Bankruptcy Court seeking approval of the Bidding Procedures Order (and related notices) and the Sale Approval Order.  Delphi shall use commercially reasonable efforts to comply with (or, to the extent not already obtained, obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and the Bankruptcy Rules in connection with obtaining approval of the sale of the Acquired Assets under this Agreement, and the other transactions contemplated by the other Ancillary Agreements, including serving on all required persons in the Bankruptcy Cases, notice of the Sale Motion, the Sale Hearing and the objection deadline in accordance with Bankruptcy Rules 2002, 6004, 6006 and 9014, the Bidding Procedures Order or other orders of the Bankruptcy Court, and any applicable local rules of the Bankruptcy Court.

12.2    **Bidding Procedures**.

A.    Delphi Initial Bankruptcy Actions.  This Section 12.2 sets forth the bidding procedures (the "Bidding Procedures") to be employed with respect to the Agreement and the Sale of the Acquired Assets, including the Canadian Assets, and the other transactions contemplated by this Agreement and the Ancillary Agreements, including the Canadian Agreement (collectively, the "Transaction").  The Transaction is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court in the Sale Approval Order.  The following overbid provisions and related bid protections are designed to compensate Purchaser for its efforts and agreements to date and to facilitate a full and fair process (the "Bidding Process") designed to maximize the value of the Acquired Assets and the Canadian Assets for the benefit of Delphi's creditors, shareholders and bankruptcy estate.

B.    Qualified Bidder.  Unless otherwise ordered by the Bankruptcy Court or as otherwise determined by Delphi, in order to participate in the bidding process, each person (a "Potential Bidder"), other than Purchaser, must deliver (unless previously delivered) to Delphi:

(i)    an executed confidentiality agreement in form and substance satisfactory to Delphi;

(ii)    current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Acquired Assets and the Canadian Assets, current audited financial statements of the equity holders of the Potential Bidder who shall guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement acceptable to Delphi and its financial advisors;

(iii)    a preliminary (non-binding) written proposal regarding:  (a) the purchase price range; (b) any assets expected to be excluded; (c) the financing of the Transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (d) any anticipated regulatory approvals required to close the Transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (d) any conditions to closing that it may wish to impose in addition to those set forth in this Agreement; and (f) the nature and extent of additional due diligence it may wish to conduct and the date by which such due diligence will be completed; and

(iv)    the Good Faith Deposit.

A Potential Bidder that delivers the documents described in the previous subparagraphs above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of the Potential Bidder to consummate the Transaction, if selected as a successful bidder, and that Delphi determines in its sole discretion is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transaction within the time frame provided by this Agreement shall be deemed a "Qualified Bidder."  As promptly as practicable, after a Potential Bidder delivers all of the materials required above, Delphi shall determine, and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.  At the same time that Delphi notifies the Potential Bidder that it is a Qualified Bidder, Delphi shall allow the Qualified Bidder to begin to conduct due diligence with respect to the Acquired Assets provided in Section 12.2.D below.  Notwithstanding the foregoing, Purchaser shall be deemed a Qualified Bidder for purposes of the Bidding Process.

C.    <u>Bid Deadline</u>.  A Qualified Bidder that desires to make a bid shall deliver written copies of its bid to:

| | |
|---|---|
| Delphi Automotive Systems LLC: | Delphi Automotive Systems LLC<br>5725 Delphi Drive<br>Troy, MI  48098<br>Attn:    Director, Mergers & Acquisitions |
| With copies to, Delphi's outside counsel: | Skadden, Arps, Slate Meagher & Flom LLP<br>333 West Wacker Drive<br>Chicago, IL  60606-1285<br>Attn:    Ron Meisler |
| Delphi's Legal Staff: | Delphi Legal Staff<br>MC 480-410-268<br>5825 Delphi Drive<br>Troy, MI  48098<br>Attn:    Karen J. Craft |
| Counsel to the Official Committee of unsecured creditors appointed in the Bankruptcy Cases (the "Creditors' Committee"): | Latham & Watkins LLP<br>885 Third Avenue<br>New York, NY  10022<br>Attn:    Mark A. Broude |
| The Creditors' Committee's financial advisor: | Mesirow Financial Consulting LLC<br>21st Floor<br>666 Third Avenue<br>New York, NY  10017<br>Attn:    Ben Pickering |
| Counsel to the debtors' secured lenders: | Davis, Polk & Wardwell<br>450 Lexington Avenue<br>New York, NY  10017<br>Attn:    Donald Bernstein and Brian Resnick |

so as to be received not later than 11:00 A.M. (EST), on October 16, 2007 (the "<u>Bid Deadline</u>").  Delphi may extend the Bid Deadline once or successively, but is not obligated to do so.  If Delphi extends the Bid Deadline, it will promptly notify all Qualified Bidders of such extension.  As soon as reasonably practicable following receipt of each Qualified Bid, Delphi shall deliver complete copies of all items and information enumerated in the section below entitled "<u>Bid Requirements</u>" to counsel for the official committee of equity security holders (the "<u>Equityholders' Committee</u>").

D.    <u>Due Diligence</u>.  Delphi shall afford each Qualified Bidder due diligence access to the Acquired Assets and the Canadian Assets.  Due diligence access may include access to data rooms, on site inspections and such other matters which a Qualified Bidder may request and as to which Delphi, in its sole discretion, may agree to.  Delphi shall designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders.  Any and all due diligence shall cease after the Bid Deadline.

Delphi may, in its discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at site inspections.  Delphi (or any of its representatives) shall not be obligated to furnish any information relating to Acquired Assets and the Canadian Assets to any person other than to Qualified Bidders who make an acceptable preliminary proposal.

  E. <u>Bid Requirements</u>.  All bids must include the following documents (the "<u>Required Bid Documents</u>"):

   (i) A letter stating that the bidder's offer is irrevocable until two (2) Business Days after the closing of the Transaction.

   (ii) An executed copy of the Agreement and the Ancillary Agreements (the "<u>Marked Agreements</u>") to show those amendments and modifications to such agreements that the Qualified Bidder proposes, including the Purchase Price (as defined in the Agreement).

   (iii) A good faith deposit (the "<u>Good Faith Deposit</u>") in the form of a certified bank check from a U.S. bank or by wire transfer (or other form acceptable to Delphi in its sole discretion) payable to the order of Delphi (or such other party as Delphi may determine) in an amount equal to $2 million dollars.

   (iv) Written evidence of a commitment for financing or other evidence of ability to consummate the Transaction satisfactory to Delphi and its advisors.

  F. <u>Qualified Bids</u>.  A bid will be considered only if the bid:

   (i) Is on terms and conditions (other than the amount of the consideration) that are substantially similar to, and are not, in Delphi's sole discretion, materially more burdensome or conditional to Delphi than, those contained in the Agreement.

   (ii) Is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder.

   (iii) Proposes a transaction on terms that Delphi determines, in its sole discretion, has a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum of the Purchase Price plus the purchase price for the Canadian Assets plus the amount of the Break-Up Fee, plus: (x) in the case of the initial Qualified Bid, $500,000 dollars; and (y) $250,000 in the case of any subsequent Qualified Bids, over the immediately preceding highest Qualified Bid.

   (iv) Is not conditioned upon any bid protections, such as a break-up fee, termination fee, expense reimbursement or similar type of payment.

   (v) Includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets and the Canadian Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets and the Canadian Assets in making its bid; and (iii) did not rely upon any written or oral statements, representations,

promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets and the Canadian Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreements.

(vi)    Includes a commitment to consummate the purchase of the Acquired Assets (including the receipt of any required governmental approvals) within not more than fifteen (15) days after entry of an order by the Bankruptcy Court approving such purchase and license, subject to the receipt of any governmental approvals which must be obtained within 10 days after entry of such order.

(vii)    Is received by the Bid Deadline.

A bid received from a Qualified Bidder will constitute a "<u>Qualified Bid</u>" only if it includes all of the Required Bid Documents and meets all of the above requirements; provided, however, that Delphi shall have the right, in its sole discretion, to entertain bids for the Acquired Assets and the Canadian Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids.  Notwithstanding the foregoing, Purchaser shall be deemed a Qualified Bidder, and the Agreement shall be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Transaction.  A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such Transaction.  Each Qualified Bid other than that of Purchaser is referred to as a "<u>Subsequent Bid</u>".  If Delphi does not receive any Qualified Bids other than the Agreement received from Purchaser, Delphi will report the same to the Bankruptcy Court and will proceed with the Transaction pursuant to the terms of the Agreement.

G.    <u>Bid Protection</u>.  Recognizing Purchaser's expenditure of time, energy and resources, Delphi has agreed to provide certain bidding protections to Purchaser. Specifically, Delphi has determined that the Agreement will further the goals of the Bidding Procedures by setting a floor that all other Potential Bids must exceed.  As a result, Delphi has agreed that if Purchaser is not the Successful Bidder, Delphi shall, in certain circumstances, pay to Purchaser the Break-Up Fee.  The payment of the Break-Up Fee shall be governed by the provisions of the Agreement and the Order of the Bankruptcy Court approving the Bidding Procedures.

H.    <u>Auction, Bidding Increments and Bids Remaining Open</u>.   If Delphi receives at least one (1) Qualified Bid in addition to the Agreement, Delphi will conduct an auction (the "<u>Auction</u>") of the Acquired Assets upon notice to all Qualified Bidders who have submitted Qualified Bids at 10:00 a.m. EST on or before October 23, 2007, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60606-1285 or Four Times Square, New York, New York 10036 (at Delphi's election) or such later time or other place as Delphi shall notify all Qualified Bidders who have submitted Qualified Bids (but in no event later than the second (2nd) Business Day prior to the Sale Hearing), in accordance with the following procedures:

(i)    Only Delphi, Purchaser, any representative of the Creditors' Committee and the Equityholders' Committee, the agent under Delphi's post-petition credit facility (and the legal and financial advisers to each of the foregoing), and any Qualified Bidder who has timely submitted a Qualified Bid

shall be entitled to attend the Auction, and only Purchaser and the other Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

(ii)      At least two (2) Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform Delphi whether it intends to participate in the Auction and at least one (1) Business Day prior to the Auction, Delphi shall provide copies of the Qualified Bid or combination of Qualified Bids which Delphi believes is the highest or otherwise best offer to all Qualified Bidders who have informed Delphi of their intent to participate in the Auction.

(iii)      All Qualified Bidders who have submitted a Qualified Bid shall be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction.

(iv)      Seller may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith.

(v)      Bidding at the Auction shall begin with the highest or otherwise best Qualified Bid or combination of Qualified Bids and continue in minimum increments of at least $250,000 higher than the previous bid or bids. The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit an additional Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid or bids.  For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by Purchaser), Delphi may give effect to any Break-Up Fee that may be payable to Purchaser under the Agreement as well as any assets to be retained by Delphi.

(vi)      At the conclusion of the Auction, or as soon thereafter as practicable, Delphi, in consultation with its financial advisors, shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Transaction; and (ii) identify the highest or otherwise best offer(s) for the Acquired Assets and the Canadian Assets received at the Auction (the "Successful Bid(s)" the bidder(s) making such bid, the "Successful Bidder(s)").

I.      Acceptance of Qualified Bids.  Delphi shall sell the Acquired Assets and the Canadian Assets for the highest or otherwise best Qualified Bid (or combination of Qualified Bids) upon the approval of such Qualified Bid(s) by the Bankruptcy Court after the hearing (the "Sale Hearing").  If, after an Auction in which Purchaser: (i) shall have bid an amount in excess of the consideration presently provided for in the Agreement with respect to the transactions contemplated under the Agreement; and (ii) is the Successful Bidder, it shall, at the Closing under the Agreement, pay, in full satisfaction of the Successful Bid, an amount equal to: (a) the amount of the

Successful Bid; less (b) the Break-Up Fee.  Delphi's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute Delphi's acceptance of the bid.  Delphi will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

J.    Sale Hearing.  The Sale Hearing will be held before the Honorable Judge Robert Drain on October 25, 2007 at 10:00 A.M. (prevailing Eastern Time) at the United States Bankruptcy Court for the Southern District of New York, located in New York, New York, but may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.  If Delphi does not receive any Qualified Bids (other than the Qualified Bid of Purchaser), Delphi will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Acquired Assets and the Canadian Assets to Purchaser following entry of the Sale Approval Order.  If Delphi does receive additional Qualified Bids, then, at the Sale Hearing, Delphi shall seek approval of the Successful Bid(s), as well as the second highest or best Qualified Bid(s) (the "Alternate Bid(s)" and such bidder(s), the "Alternate Bidder(s)").    Delphi's presentation to the Bankruptcy Court of the Successful Bid(s) and Alternate Bid(s) shall not constitute Delphi's acceptance of either or any such bid(s), which acceptance shall only occur upon approval of such bid(s) by the Bankruptcy Court at the Sale Hearing.  Following approval of the sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of: (i) failure of a condition precedent beyond the control of either Delphi or the Successful Bidder; or (ii) a breach or failure to perform on the part of such Successful Bidder(s), then the Alternate Bid(s) shall be deemed to be the Successful Bid(s) and Delphi shall effectuate a sale to the Alternate Bidder(s) without further order of the Bankruptcy Court.

K.    Return of Good Faith Deposit.  The Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) shall be held in an interest-bearing escrow account and all Qualified Bids shall remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders), until two (2) Business Days following the closing of the Transaction (the "Return Date").    Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Successful Bidder(s), together with interest thereon, shall be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder(s).  If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, Delphi will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become property of Delphi.  On the Return Date, Delphi shall return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

L.    Reservation of Rights.  Delphi, after consultation with the agents for its secured lenders and the Creditors' Committee: (i) may determine, which Qualified Bid, if any, is the highest or otherwise best offer; and (ii) may reject at any time, any bid (other than Purchaser's initial bid) that is: (a) inadequate or insufficient; (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of the Transaction; or (c) contrary to the best interests of Delphi, its estate and creditors as determined by Delphi in its sole discretion.

12.3  **Break-up Fee**.

In the event Seller terminates this Agreement under <u>Section 13.2.B.</u> and sells, transfers or otherwise disposes of all or substantially all or a material portion of the Acquired Assets in a transaction or a series of related transactions with one or more parties other than Purchaser in accordance with the Bidding Procedures (such event being an "<u>Alternative Transaction</u>"), Seller shall, within five (5) Business Days after the consummation of the Alternative Transaction(s), pay to Purchaser an amount equal to $1,500,000 (the "<u>Break-Up Fee</u>").  Notwithstanding the foregoing, Purchaser shall not be entitled to a Break-Up Fee if Purchaser is in material breach of this Agreement or the Bidding Procedures.

## 13.    <u>TERMINATION.</u>

13.1    If, after the date of this Agreement and prior to the passage of title and risk of loss, (x) any Manufacturing Equipment or Test and Development Equipment, is lost, severely damaged or destroyed by any cause whatsoever (excluding ordinary wear and tear and damage caused by the acts or omissions of Purchaser or its agents or employees), and (y) such loss, damage or destruction does not constitute a Material Adverse Effect, this Agreement shall terminate with respect to the affected Acquired Asset, and an adjustment in the amount of 22% of the GBV of the affected Acquired Asset will be made to the Purchase Price by the Parties. Likewise, if after the date of this Agreement and prior to the passage of title and risk of loss, (a) any Manufacturing Equipment or Test or Development Equipment, is lost, severely damaged or destroyed by any cause whatsoever (excluding ordinary wear and tear and damage caused by the acts or omissions of Seller or its agents or employees), and (b) Seller, at its option, repairs or replaces such Acquired Asset with an asset that, when compared to the original Acquired Asset results in an improvement that can be capitalized under U.S. GAAP, then an adjustment in an amount equal to the net book value of the improvement will be made to the Purchase Price by the Parties; <u>provided</u>, <u>however</u>, (i) there will be no adjustment to the Purchase Price under subparts (a) and (b) of this paragraph to the extent the casualty to the asset is fully covered by insurance (i.e., no out-of-pocket costs incurred by Seller), and (ii) Purchaser shall have the right to terminate this Agreement under Section 13.2.E if the Purchase Price adjustment under subparts (a) and (b) of this paragraph is more than $1,000,000.

13.2    This Agreement may be terminated at any time prior to the Closing by either Party:

A.    by mutual written consent; or

B.    if Delphi consummates an Alternative Transaction according to the terms of this Agreement;

C.    provided that the terminating Party is not in breach of its obligations under this Agreement, if the Bankruptcy Court has not entered a Sale Approval Order, on or before December 15, 2007 and such Sale Approval Order, as of December 15, 2007, is not subject to a stay or injunction;

D.    provided that the terminating Party is not in breach of its obligations under this Agreement, if the Closing shall not have occurred for any reason prior to January 10, 2008; and

E.    if a Material Adverse Effect occurs, but only by a Party that is not in breach of this Agreement.

13.3    This Agreement may be terminated at any time prior to the Closing by Seller if Purchaser materially fails to perform any of its covenants or obligations under this Agreement or materially breaches any representation or warranty under this Agreement.

13.4    In the event of termination of this Agreement as provided in <u>Section 13.2.B.</u> hereof, this Agreement shall forthwith become void and there shall be no liability or obligation on the part of the Parties, except (i) as set forth in <u>Section 12.3</u>, as well as <u>Article14</u> to the extent applicable to such surviving sections each of which, to the extent applicable, shall survive termination of this Agreement, and (ii) that nothing herein shall relieve any Party from liability for any willful or intentional breach of any provision hereof prior to termination.  No termination of this Agreement shall affect the obligations of the parties contained in the Nondisclosure Agreement, all of which obligations shall survive termination of this Agreement in accordance with their terms.

## 14.    <u>MISCELLANEOUS.</u>

14.1    <u>Notices</u>.

All notices, requests, consents or other communications permitted or required under this Agreement will be in writing and will be deemed to have been given when personally delivered, or when sent if sent via facsimile (with receipt confirmed), or on the first business day after sent by reputable overnight carrier, or on the third business day after sent by registered or certified first class mail (with receipt confirmed), to the following:

|  |  |
|---|---|
| If to Seller: | **DELPHI AUTOMOTIVE SYSTEMS LLC**<br>5725 Delphi Drive<br>Troy, Michigan 48098<br>Attn:    AHG - Manager, Mergers & Acquisitions -<br>        Saginaw Brake Transaction<br>Fax No.: 248-813-2410 |
| With a copy to: | **DELPHI AUTOMOTIVE SYSTEMS LLC**<br>5725 Delphi Drive<br>Troy, Michigan 48098<br>Attn:    Deputy General Counsel - Transactional<br>        and Restructuring<br>Fax No.: 248-813-2491 |
| If to Purchaser: | **TRW INTEGRATED CHASSIS SYSTEMS LLC**<br>12025 Tech Center Drive<br>Livonia, Michigan 48150<br>Attn:    Assistant General Counsel<br>Fax No.: 734-855-3250 |
| With a copy to: | **KELSEY-HAYES COMPANY**<br>Vice President<br>North American Braking<br>12025 Tech Center Drive<br>Livonia, MI 48150<br>Fax No.:  734-855-3006 |

With a copy to:          Honigman Miller Schwartz and Cohn LLP
660 Woodward Avenue
2290 First National Building
Detroit, Michigan  48226-3506
Attn:     Donald F. Baty, Jr.
Fax No.:  317-465-7315

provided, however, if a Party will have designated a different addressee by notice, then to the last addressee so designated.

### 14.2  **Bulk Sales Laws**.

Seller and Purchaser hereby waive compliance by Seller with the provisions of the bulk sales law of any state or foreign jurisdiction.

### 14.3  **Assignment.**

This Agreement will be binding and inure to the benefit of the successors and assigns of each of the Parties and their Affiliates, but no rights, obligations, duties or liabilities of any Party may be assigned without the prior written consent of the others, which will not be unreasonably withheld; provided, however, Purchaser may assign this Agreement to any wholly owned subsidiary, but such assignment will not relieve Purchaser of any of its obligations under this Agreement or the Ancillary Agreements.

### 14.4  **Entire Agreement.**

This Agreement, together with the Ancillary Agreements, Bidding Procedures Order and Sale Approval Order represents the entire agreement and understanding between the Parties with respect to the transactions contemplated herein. This Agreement supersedes all prior agreements, understandings, arrangements, covenants, representations or warranties, written or oral, by any officer, employee or representative of either Party dealing with the subject matter hereof.

### 14.5  **Waiver.**

Any waiver by Seller or Purchaser of any breach or of a failure to comply with any provision of this Agreement: (i) will be valid only if set forth in a written instrument signed by the Party to be bound; and (ii) will not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any provision of this Agreement. At any time prior to the Closing Date, the Parties may: (a) extend the time for the performance of any of the obligations or other acts of the other Parties hereto; (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions contained herein. Except as otherwise expressly provided herein, any agreement on the part of a Party to any such extension or waiver will be valid only if set forth in an instrument in writing signed on behalf of such Party.

### 14.6  **Severability.**

Should any provision, or any portion thereof, of this Agreement for any reason be held invalid or unenforceable, such decision will not affect the validity or enforceability of any of the other provisions, or portions thereof, of this Agreement, which other provisions, and portions, will remain in full force and effect, and the application of such invalid or unenforceable provision,

or portion thereof, to persons or circumstances other than those as to which it is held invalid or unenforceable will be valid and be enforced to the fullest extent permitted by Law.

14.7   **Amendment.**

This Agreement may only be amended only in writing by duly authorized representatives or officers of the Parties

14.8   **Expenses.**

Except for the Break-Up Fee or as provided in any Ancillary Agreement, each Party will be responsible for its own expenses incurred in connection with the preparation of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby.

14.9   **Third Parties.**

Nothing contained in this Agreement, express or implied, is intended to or will be construed to confer upon or give to any person, firm, corporation, association, labor union or trust (other than the Parties, their Affiliates and their respective permitted successors and assigns), any claims, rights or remedies under or by reason of this Agreement.

14.10   **Headings.**

The headings contained in this Agreement are inserted for convenience only and will not be deemed to constitute a part of this Agreement.

14.11   **Counterparts.**

More than one counterpart of this Agreement may be executed by the Parties, and each fully executed counterpart will be deemed an original.

14.12   **Governing Law.**

This Agreement will be construed and enforced in accordance with the laws of the State of Michigan and, to the extent applicable, the Bankruptcy Code, without giving effect to rules governing the conflict of laws.

14.13   **Public Announcements**.

Seller may inform its employees, customers, suppliers and/or any of the constituents in the Bankruptcy Cases (including, without limitation, the UAW, the unsecured creditors committee, the equity committee, ad hoc committees and the plan investors and other stakeholders and General Motors) of the substance of this Agreement. Seller and Purchaser will consult with each other before issuing any press releases with respect to this Agreement or the transactions contemplated hereby, and will not issue any press release without mutual consent, except as may be required by Law and then only with such prior consultation.  Notwithstanding the foregoing, Seller or Purchaser may make any public filing contemplated in this Agreement without the need for prior consultation; provided, however, to the extent practicable, Seller or Purchaser will provide a copy of such public filing to the other Party prior to its filing.

14.14   **Taxes**.

All Taxes (other than income taxes or taxes payable in respect of gains on the sale of assets) or similar charges and all charges for filing and recording documents in connection with the transfer of the Acquired Assets (including recording fees) will be paid by Purchaser.

14.15  **Venue and Retention of Jurisdiction.**

The Purchaser and Seller irrevocably and unconditionally consent to submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby, including the Ancillary Agreements (and agree not to commence any litigation relating thereto except in the Bankruptcy Court.

14.16  **Risk of Loss.**

Unless otherwise provided in this Agreement (including in Sections 1.3 and 1.4 above), all risk of loss, damage or destruction to all or any part of the Acquired Assets will be borne exclusively by the Seller through the Closing.

14.17  **Enforcement of Agreement.**

The Parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or were otherwise breached. It is accordingly agreed that the Parties will be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to all other remedies available at law or in equity.

14.18  **Dispute Resolution**.

Seller and Purchaser will, in the first instance, attempt to settle any and all claims or disputes arising in connection with this Agreement or any Ancillary Agreement by good faith negotiations by senior management of each party. If the dispute is not resolved by senior management within thirty (30) days after delivery of a written request for such negotiation by either party to the other, either party may make a written demand (the "Demanding Party") for formal dispute resolution (the "Notice") and specify therein in reasonable detail the nature of the dispute. Within fifteen (15) business days after receipt of the Notice, the receiving party (the "Defending Party") will submit to the other a written response. The Notice and the response will include: (i) a statement of the respective party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that party and of any other person who will accompany the executive to meetings of the parties. Within fifteen (15) business days after such written notification, the executives (and others named in the Notice or response) will meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute. All reasonable requests for information made by one party to the other will be honored promptly. All negotiations pursuant to this Section 14.17 are confidential and will be treated as compromise and settlement negotiations for purposes of applicable rules of evidence. In any case, the Parties agree not to commence any litigation actions until the expiration of ninety (90) days after the date of the Notice, and all such actions are subject to Section 14.15 above.

14.19  **Dollar Amounts.**

All amounts referenced in this Agreement are in US dollars.

14.20  **Survival.**

Except as otherwise explicitly set forth herein, no terms in this Agreement survive termination or Closing, as the case may be.

14.21 **Bankruptcy Court Approval.**

Notwithstanding anything to the contrary herein, Sellers' obligations under <u>Section 12.3</u> are expressly subject to the entry of the Bidding Procedures Order.  All other obligations of Sellers hereunder are subject to the entry of the Sale Approval Order.

14.22 **Jury Trial Waiver.**

**THE PARTIES HERETO ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT THAT THIS RIGHT MAY BE WAIVED.  THE PARTIES EACH HEREBY KNOWINGLY, VOLUNTARILY AND WITHOUT COERCION, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES ARISING OUT OF OR IN RELATION TO THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS. NO PARTY SHALL BE DEEMED TO HAVE RELINQUISHED THE BENEFIT OF THIS WAIVER OF JURY TRIAL UNLESS SUCH RELINQUISHMENT IS IN A WRITTEN INSTRUMENT SIGNED BY THE PARTY TO WHICH SUCH RELINQUISHMENT WILL BE CHARGED.**

**IN WITNESS WHEREOF**, the Parties have caused this Asset Purchase Agreement to be executed by their duly authorized officers.

**TRW INTEGRATED CHASSIS SYSTEMS LLC**

By:_____

Print Name:_____

Its:_____


**DELPHI AUTOMOTIVE SYSTEMS LLC**

By:_____

Print Name:_____

Its:_____


**DELPHI TECHNOLOGIES, INC.**

By:_____

Print Name:_____

Its:_____

## LIST OF SCHEDULES AND EXHIBITS

**Designation**              **Description**

Schedule C-1              TRW Contract Manufacturing Equipment

Schedule C-2              Delphi Contract Manufacturing Equipment

Schedule M                Manufacturing Equipment

Schedule O                Certain Other Personal Property

Schedule P-1              Production Products

Schedule P-2              Past Model Service Parts

Schedule S                Software and software licenses to be transferred

Schedule T                Test and Development Equipment

Schedule 1.3.A            Schedule for removal of Non-Saginaw Assets

Schedule 1.5.A            Third Party Assets (assets not owned by Delphi but used in the
                          manufacturing Products or operating the Leased Premises)

Schedule 1.5.B            Certain Excluded Assets

Schedule 3.2              Inventory Value

Schedule 3.4              Purchase Price allocation

Schedule 4.1              Certain salaried employees (to be completed by parties within 30 days)

Schedule 4.2              Hourly Employees

Schedule 5.1              GM Directed Buy Parts (parts to be supplied by Delphi to Purchaser)

Schedule 5.2              Non GM Directed Buy Parts

Schedule 5.4              Contract Manufacturing Parts

Schedule 5.5              Saginaw Supplied Parts (parts to be supplied by Purchaser to Delphi)

Schedule 8.1              Knowledge of Seller

Schedule 8.1.D            Litigation

Schedule 8.1.L            Infringement

Schedule 8.2              Knowledge of Purchaser

Exhibit 1                 Deposit Escrow Agreement

Exhibit 5.4               Contract Manufacturing Agreement

Exhibit 6.1               Lease Agreement

Exhibit 6.3               Contract Manufacturing Removal Plan

Exhibit 7.1               Transition Services Agreement

Exhibit 11.8              Parent Guaranty

DETROIT.2786665.7