**Hearing Date And Time: September 27, 2007 at 10:00 a.m.**
**Objection Deadline: September 24, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                   :
    In re                                       :      Chapter 11
                                                   :
DELPHI CORPORATION, et al.,        :      Case No. 05-44481 (RDD)
                                                    :
                                                    :      (Jointly Administered)
                 Debtors.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P.
6004 AUTHORIZING AND APPROVING ENTRY INTO AND PERFORMANCE OF
LICENSE AGREEMENT WITH GENERAL MOTORS GLOBAL TECHNOLOGY
<u>OPERATIONS, INC. AND GENERAL MOTORS CORPORATION</u>

("GM LICENSE AGREEMENT MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this expedited motion (the "Motion") for an order pursuant to 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 authorizing and approving Delphi and Delphi Technologies, Inc. ("DTI") to enter into and perform their obligations under that certain License Agreement (the "License Agreement") with General Motors Global Technology Operations, Inc. ("GMGTO") and General Motors Corporation ("GM," and together with GMGTO, the "GM Entities"), and respectfully represent as follows:

## Background

A.  The Chapter 11 Filings

1. On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. The Court has ordered joint administration of these cases.

2. No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee," and together with the Creditors' Committee, the "Statutory Committees").

3. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are section 363(b) of the Bankruptcy Code and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.    Current Business Operations Of The Debtors

5.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.[2]

6.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

7.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

---

[1]  The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[2]  On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

3

assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.  Events Leading To The Chapter 11 Filing

8.  In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

9.  The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM

---

[3] Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

4

produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

10. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D. The Debtors' Transformation Plan

11. On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations. The Debtors stated that they needed to focus on five key areas:[4] first, modifying the Company's labor agreements to create a competitive arena in which to conduct business;[5]

---

[4] In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors and a plan framework support agreement with those investors and GM. On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework support agreement but that it expected to enter into new framework agreements with plan investors presently. Subsequently, on July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors"). Under the Delphi-Appaloosa EPCA, the New Plan Investors agreed to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization. This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.

[5] Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM that (a) modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the UAW, and its various locals, (b) provides that GM will undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate these modifications, and (c) modifies retiree welfare benefits for certain UAW-represented retirees of the Debtors. This agreement, which was approved by this Court on July 19, 2007, should permit the Debtors to continue to implement their transformation plan and to develop, prosecute, confirm, and consummate a plan of reorganization. On August 6, 2007, similar agreements

second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[6] third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus;[7] fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint;[8] and devising a workable solution to their current pension situation.[9]

---

were reached with the International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America and its local unions, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers. Such agreements were approved by this Court on August 16, 2007. On August 16, 2007, Delphi also reached a similar agreement with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and USW Local 87L, which was approved by this Court on August 29, 2007.

[6] On September 6, 2007, Delphi announced that it has entered into comprehensive settlement agreements with GM consisting of a Global Settlement Agreement and a Master Restructuring Agreement, both of which are subject to this Court's approval as part of the plan confirmation process. Delphi's comprehensive settlement with GM resolves all outstanding disputes between Delphi and GM.

[7] In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants. The Debtors have been working to divest non-core assets so as to maximize the value of their estates for stakeholders. During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, and obtained court approval for the sale of substantially all of the assets of their brake hose, catalyst, and Saltillo, Mexico brake plant businesses. In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

[8] As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages. The Company's revised operating structure consists of its four core business segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture. The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan. To ensure that their organizational and cost structure is competitive, the Debtors obtained an Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order"). The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[9] To that end, on May 31, 2007, the Bankruptcy Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 plan year funding waivers, which were approved by the IRS, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Plans"). On July 13, 2007, the IRS modified the conditional funding waivers granted to

E.     The GM Settlement and the Debtors' Plan Of Reorganization

12.     During the third quarter of 2007, the Debtors reached two key milestones in their chapter 11 cases. Specifically, on September 6, 2007, Delphi announced that it entered into comprehensive settlement agreements with GM consisting of a Global Settlement Agreement (the "GSA") and a Master Restructuring Agreement (the "MRA"), both of which are subject to Bankruptcy Court approval as part of the plan confirmation process. Delphi's comprehensive settlement with GM resolves all outstanding issues between Delphi and GM including: litigation commenced in March 2006, by Delphi, to terminate certain supply agreements with GM; all potential claims and disputes with GM arising out of the separation of Delphi from GM in 1999; certain post-separation claims and disputes between Delphi and GM; the proofs of claim filed by GM against Delphi in Delphi's chapter 11 cases; GM's treatment under Delphi's proposed plan of reorganization; and various other legacy and ordinary course business matters between the companies. The GSA is intended to resolve outstanding issues among Delphi and GM that have arisen or may arise before Delphi's emergence from chapter 11 and will be implemented by Delphi and GM in the short term. The MRA is intended to govern certain aspects of Delphi and GM's commercial relationship following Delphi's emergence from chapter 11 and will require a significantly longer period of time to implement.

13.     The second key milestone achieved was the filing of the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "Plan") (Docket No. 9263). The Plan is based upon a series of global settlements and compromises that involve every major constituency in the Debtors' reorganization cases. Indeed, the Debtors, the Debtors' principal U.S. labor unions, GM, the Statutory Committees,

---

Delphi related to the Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively.

7

and the lead plaintiffs in certain securities actions (on behalf of holders of various claims based on alleged violations of federal securities laws and the Employee Retirement Income Security Act of 1974, as amended) all have contributed to global settlements and compromises that provide for a recovery through a plan distribution amounting to the principal amount of the claim plus accrued interest at a negotiated plan value for general unsecured creditors, and agreed upon distributions to other classes of creditors and interests. The Plan is supported by the Creditors' Committee on behalf of unsecured creditors, the Equity Committee on behalf of holders of Delphi's common stock, and GM. A hearing will be held on October 3, 2007 to approve the Debtors' solicitation procedures and disclosure statement with respect to the Plan. The Debtors will seek to have a hearing on confirmation of the Plan on November 19, 2007. The Debtors expect to emerge from these chapter 11 cases on December 31, 2007.

14. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

F.    The License Agreement And The Global Settlement Agreement With GM

15. As set forth above, the GSA and the MRA provide for a comprehensive settlement of all outstanding issues between Delphi and GM. Both the GSA and the MRA are exhibits to the Debtors' Plan and are subject to the approval of this Court as part of the Plan

confirmation process. The License Agreement is an exhibit to the GSA.[10] Because Delphi will be selling or otherwise exiting non-core businesses pursuant to its transformation plan, the parties negotiated the License Agreement to facilitate GM's continued acquisition of components that are based on certain technology owned by Delphi. Acquisition of these components is necessary for the uninterrupted continuation of GM's manufacturing operations.

## Relief Requested

16.     By this Motion, the Debtors seek entry of an order under section 363(b) of the Bankruptcy Code and Bankruptcy Rule 6004 authorizing, but not directing, Delphi and DTI to enter into and perform their obligations under the License Agreement with the GM Entities, a copy of which is attached hereto as Exhibit A.

## Basis For Relief

17.     In the course of their businesses, the Debtors develop, manufacture, and supply various products to GM (and its affiliated entities) that are integral to GM's manufacturing operations. As part of their transformation plan, the Debtors have identified certain of their businesses that they have decided to exit (the "Wind-down Businesses" and "Footprint Businesses") or sell (the "Sale Businesses"), many of which provide products necessary for GM's continuing operations. The Debtors have agreed to assist GM in transitioning the supply of such products from the Debtors to other suppliers in a manner that will allow GM to maintain its manufacturing operations without disruption.

---

[10]   The License Agreement and related exhibits attached hereto reflect several technical and clerical revisions to the version of the License Agreement attached to the Plan. The Plan exhibit will be updated pending court approval of this Motion. The revisions were anticipated and addressed pursuant to Section 3.5 of the License Agreement. A marked copy of the License Agreement reflecting changes made to the version appended to the GSA will be made available upon request to counsel for the Debtors.

05-44481-rdd   Doc 9370   Filed 09/17/07   Entered 09/17/07 22:06:40   Main Document
Pg 10 of 17

18. <u>Material Terms Of The License Agreement</u>.  To facilitate the transition of these businesses, Delphi and DTI have agreed to (i) furnish certain manufacturing and technical information, (ii) provide technical assistance related to such transferred information and documentation, and (iii) grant intellectual property licenses to the GM Entities and buyers of the Sale Businesses.  In consideration for these actions, GM has agreed to pay Delphi and DTI the aggregate sum of $38.5 million.  The summary of the License Agreement herein is for descriptive purposes only.  If there is any conflict between this summary and any terms of the License Agreement, the terms of the License Agreement shall govern.

19. Specifically, under the License Agreement, Delphi and DTI would furnish the GM Entities with technical information and data related to GM products supplied by the Wind-down Businesses and Footprint Businesses (the "Wind-down Products" and "Footprint Products," respectively).  The technical information and documentation would be furnished according to Schedule D to the License Agreement.  Schedule D identifies the technical information that Delphi and DTI will furnish to GM, including, but not limited to, bills of material, assembly drawings, and design specifications, and other information as mutually agreed by the parties.

20. In addition, Delphi and DTI have agreed to provide related technical support to the GM Entities, including (a) access to the Debtors' facilities and technical personnel, (b) instruction and assistance related to fabricating parts, inspecting materials and components, and (c) testing products produced by the Wind-down Businesses, Footprint Businesses, and the GM products supplied by a Sale Business (the "Sale Products").  Delphi and DTI would provide this technical support, at no additional cost, for one year following the effective date of the

License Agreement, and thereafter according to the terms of the License Agreement as set forth on Schedule E attached thereto.

   21. Delphi and DTI also have agreed to grant licenses for intellectual property related to the Wind-down Products, Footprint Products, and Sale Products generally as follows:

   (a) <u>Wind-down And Footprint Products</u>: With respect to the Wind-down and Footprint Products, and derivatives thereof, under the License Agreement, Delphi and DTI would grant GM a perpetual, fully-paid, worldwide, non-exclusive, irrevocable license, with the right to sublicense to its affiliates and/or designated suppliers.

   (b) <u>Sale Products</u>:  Delphi and DTI would transfer or license certain intellectual property to buyer(s) of a Sale Business to allow the buyer(s) to continue to supply the products of such Sale Business and derivatives thereof to GM without interruption.  With respect to certain Sale Products, under the License Agreement, Delphi and DTI would also grant to GM, operative under conditions set forth in Section 3.3 of the License Agreement, a perpetual, fully-paid, worldwide, non-exclusive, irrevocable license, with the right to sublicense to its affiliates and/or designated suppliers.

   22. The intellectual property subject to the License Agreement includes (i) inventions, improvements thereto, patents, and patent applications, (ii) copyrights and copyrightable works, (iii) trade secrets and confidential information, and (iv) computer software. With respect to Wind-down Products and Sale Products or any derivatives or re-use thereof, the License Agreement provides that neither Delphi nor its Affiliates will assert any intellectual property claims against GM, its affiliates, or their designated suppliers or customers.  The License Agreement also authorizes GM to sublicense certain intellectual property related to

products supplied to GM by businesses of the Debtors that may be subject to future divestiture as set forth in section 3.3(d) of the License Agreement.

23.    Pursuant to the License Agreement, Delphi and DTI have agreed to reimburse GM for any damages resulting from an improper transfer of intellectual property to GM under the License Agreement, and GM has agreed to indemnify Delphi and DTI for costs associated with warranties, recall campaigns, and/or product liability actions for the Wind-Down Products, Footprint Products, Sale Products, and their respective derivatives produced under the licenses (except where Delphi is the tier 1 supplier).

24.    <u>Immediate Approval Is Warranted</u>.  Although the License Agreement is an exhibit to the GSA (for which the Debtors intend to seek court approval as part of the Plan confirmation process), the Debtors seek separate and immediate approval of the License Agreement.  Both Delphi and GM have concluded that implementing the terms of the License Agreement as soon as reasonably practicable would provide significant benefits to both parties prior to confirmation.  Moreover, delaying the implementation of the License Agreement until confirmation likely would have adverse effects on the exit or sale of certain non-core businesses.[11]  Likewise, the Debtors believe that the clear limitation associated with the license of intellectual property to GM related to the Sale Businesses would enhance the Debtors' ability to market such businesses to potential buyers.  The Debtors are currently pursuing potential transactions related to the Sale Businesses, certain of which the Debtors intend to complete by year's end, and the relief requested herein is necessary for the Debtors to make preliminary

---

[11]   For example, the Debtors' sale to TRW Integrated Chassis Systems LLC ("TRW") or to the successful bidder, as applicable, of certain assets primarily used and located at the Debtors' chassis facility in Saginaw, Michigan, which matter is scheduled for the September 27, 2007 hearing, requires, as a closing condition, that the Debtors perform certain of their obligations under the License Agreement.  This sale is anticipated to yield approximately $42.6 million.  Absent entry of an order approving this Motion at this time, the Debtors may not be able to close on their sale to TRW.

preparations in connection with such divestitures.  Thus, the License Agreement would confer material benefits upon Delphi and DTI independent of those provided for in the GSA and the MRA.  Accordingly, court approval of the License Agreement on an expedited basis is warranted and serves the best interests of the Debtors and their estates.

Applicable Authority

25.     Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it.  See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).

26.     Although the Bankruptcy Court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate."  In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's consideration of a debtor's section 363(b) motion is a summary proceeding intended merely as a means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate.  It is not the time or place for prolonged discovery or a lengthy trial with disputed issues."  Id. at 1098-99.

27.     Once the debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the

13

05-44481-rdd    Doc 9370    Filed 09/17/07    Entered 09/17/07 22:06:40    Main Document
      Pg 14 of 17

company.'" In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992). Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." Id. To satisfy its burden, it is not enough for an objector simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections." Lionel Corp., 722 F.2d at 1071.

        28.     As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)). The business judgment test is premised on the debtor's business judgment that the proposed use of property of the estate would be beneficial to the estate. Orion Pictures, 4 F.3d at 1099. To a bankruptcy court, "'business judgment'…is just that – a judgment of the sort a businessman would make." Id.

        29.     Entering into the License Agreement in accordance with the terms described above reflects a sound use of the Debtors' business judgment. The License Agreement facilitates the Debtors' exit from non-core businesses as provided for in their transformation plan while ensuring that their largest customer retains access to the intellectual property required to maintain the continuous operation of its supply chain. The License Agreement also will result in an immediate payment to Delphi and DTI in the amount of $38.5 million for the benefit of their estates, an amount which the Debtors believe represents fair and equitable consideration based on their review and valuation of the intellectual property and services they have agreed to provide GM thereunder. Moreover, approval of the License Agreement on an expedited basis is necessary to facilitate the exit from the Debtors' non-core businesses without delay.

Notice

30. Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered October 26, 2006 (Docket No. 5418). In addition, the Debtors have complied with the Supplemental Case Management Order with respect to the filing of this Motion and the need for expedited relief.[12] In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

31. Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

---

[12] The Debtors have noticed this Motion for the omnibus hearing on September 27, 2007. Because this Motion is being filed on fewer than 20 days' notice, parties-in-interest will have until September 24, 2007 to file an objection to this Motion. In compliance with the terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors' Committee regarding the relief sought in this Motion as well as the timing of its filing. The Creditors' Committee has consented to this Motion being heard on September 27, 2007; provided, however, that such consent shall not be deemed to be a waiver of the Creditors' Committee's right to object to or seek an adjournment of this Motion on the basis that there was insufficient time to complete diligence related to the License Agreement or the Motion or to prepare for the September 27, 2007 hearing. The Debtors reserve their rights, without limitation, to respond to any such objection and to object to any requests for adjournment of this Motion.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) authorizing Delphi and DTI to enter into and perform under the License Agreement with the GM Entities and (b) granting the Debtors such other and further relief as is just.

Dated:     New York, New York
           September 17, 2007

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:    /s/ John Wm. Butler
       John Wm. Butler, Jr. (JB 4711)
       John K. Lyons (JL 4951)
       Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:    /s/ Kayalyn A. Marafioti
       Kayalyn A. Marafioti (KM 9632)
       Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

**Exhibit A**
**License Agreement**