# EXHIBIT B-1

EXECUTION COPY

LIGHTSOURCE FORMATION AGREEMENT

AMONG

GENERAL MOTORS CORPORATION,

LIGHTSOURCE PARENT CORPORATION

AND

PEP GUIDE, LLC

Dated as of September 29, 1998

TABLE OF CONTENTS

Page

1.   DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.   ASSET EXCHANGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
     2.1.   Asset Exchanges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            2.1.1.   Asset Exchanges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            2.1.2    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            2.1.3.   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            2.1.4.   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
     2.2.   Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
     2.3.   Excluded Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            2.3.1.   GM Bailed Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            2.3.2.   Personnel and Medical Records . . . . . . . . . . . . . . . . . . . . . . . 10
            2.3.3.   Third-Party Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            2.3.4.   Certain Current Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            2.3.5.   Certain Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            2.3.6.   Product Evaluation Vehicles; Pooled Vehicles . . . . . . . . . . 11
            2.3.7.   Tax Refunds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            2.3.8.   Intangibles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            2.3.9.   Other Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            2.3.10.  Real Estate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            2.3.11.  Certain Environmental, Privileged and Proprietary Documents . . . . . . . 11
     2.4.   Post-Closing Asset Deliveries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
     2.5.   Nonassignable Permits and Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . 12
            2.5.1.   Nonassignability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
            2.5.2.   Efforts to Obtain Consents and Waivers . . . . . . . . . . . . . . . 12
            2.5.3.   If Waivers or Consents Cannot be Obtained . . . . . . . . . . . . 13
            2.5.4.   Obligation of Newco to Perform . . . . . . . . . . . . . . . . . . . . . . 13

3.   ASSET AMOUNT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
     3.1.   Asset Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
     3.2.   Preparation of Closing Inventory Statement . . . . . . . . . . . . . . . . . . . . . 13
     3.3.   Asset Amount Adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
     3.4.   Prorations, Adjustments of Expenses Following the Closing . . . . . . . . . 15
            3.4.1.   Prorations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
            3.4.2.   Further Assurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
            3.4.3.   Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
            3.4.4.   Prosecution of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
     3.5.   Supplementary Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

4.   ASSUMPTION OF LIABILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

5.   REPRESENTATIONS AND WARRANTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
     5.1.   Representations and Warranties of GM . . . . . . . . . . . . . . . . . . . . . . . . . . 18
            5.1.1.   Organization; Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
            5.1.2.   Authority; Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
            5.1.3.   Qualification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
            5.1.4.   Sufficiency of Acquired Assets . . . . . . . . . . . . . . . . . . . . . . . 19
            5.1.5.   Personal Property; Third-Party Bailed Assets . . . . . . . . . . . 19
            5.1.6.   Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
            5.1.7.   Intellectual Property Rights . . . . . . . . . . . . . . . . . . . . . . . . . . 20
            5.1.8.   Compliance with Laws; Permits . . . . . . . . . . . . . . . . . . . . . . 21
            5.1.9.   Brokers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
            5.1.10.  No Consents Required; Absence of Conflicting Agreements . . . . . . . . 21

5.1.11. Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
5.1.12. Undisclosed Liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
5.1.13. Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
5.1.14. Regulatory Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
5.1.15. Real Estate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
5.1.16. Tax Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
5.1.17. Absence of Certain Changes or Events . . . . . . . . . . . . . . . . . . . . . . . . 26
5.1.18. ERISA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
5.1.19. Labor Relations and Employment . . . . . . . . . . . . . . . . . . . . . . . . . . 26
5.1.20. No Misleading Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
5.1.21. Current Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
5.1.22. Year 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
5.1.23. Absence of Other Representations or Warranties . . . . . . . . . . . . . . . 28
5.1.24. Preference Stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
5.2.     Representations and Warranties of PEP Guide and Newco . . . . . . . . . . 28
         5.2.1.   Corporate Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
         5.2.2.   Corporate Power, Due Authorization . . . . . . . . . . . . . . . . . . . . . . . 29
         5.2.3.   No Consent Required . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
         5.2.4.   Absence of Conflicting Agreements . . . . . . . . . . . . . . . . . . . . . . . 29
         5.2.5.   Salaried Transferred Employees . . . . . . . . . . . . . . . . . . . . . . . . . . 30
         5.2.6.   Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
         5.2.7.   Brokers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
         5.2.8.   Subsidiary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

6.     PERSONNEL MATTERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
       6.1.    Responsibility for Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
       6.2.    Special Provisions Relating to Hourly Employees . . . . . . . . . . . . . . . 31
       6.3.    Return of Certain Hourly Transferred Employees to GM . . . . . . . . . . 32
       6.4.    Payment of Wages and Benefits of Hourly Transferred Employees . . . . . . . . . 33
       6.5.    Special Provisions Relating to Salaried Employees . . . . . . . . . . . . . . 35
       6.6.    Retirement Program and Pension Plans . . . . . . . . . . . . . . . . . . . . . . . 35
               6.6.1.   Hourly Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
               6.6.2.   Salaried Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
               6.6.3.   Other Plan Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
               6.6.4.   Transfer of Liabilities and Assets . . . . . . . . . . . . . . . . . . . . . . . 43
               6.6.5.   Amendment or Termination of Newco Plans . . . . . . . . . . . . . . . . 45
       6.7.    Health Care and Life and Disability Benefits Programs, Special Benefit . . . . . . 45
               6.7.1.   Health Care and Life and Disability Benefit Programs . . . . . . . . . . . . 45
               6.7.2.   Special Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
               6.7.3.   Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
       6.8.    Amendment or Termination of Benefit Plans . . . . . . . . . . . . . . . . . . . 49
       6.9.    Employee Information, Cooperation in Establishing Newco Benefit Plans . . . 49
       6.10.   Grievances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
       6.11.   Savings Plan Transfers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
       6.12.   Allocation of Responsibility for Suggestions Existing as of Closing . . . . . . 50
       6.13.   SUB/GIS and JOBS Programs -- Maximum Liabilities . . . . . . . . . . . . . . 50
       6.14.   Vehicle Purchase Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
       6.15.   Training and Tuition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
       6.16.   Tuition Reimbursement Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
       6.17.   Workers' Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
       6.18.   Legal Services Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
       6.19.   Liability for Certain Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
       6.20.   Approval of Communications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
       6.21.   Rehiring of Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Page

7.  REAL ESTATE MATTERS ............................................. 53
    7.1.  Conveyance ................................................. 53
    7.2.  Title ...................................................... 53
    7.3.  Land Surveys ............................................... 54

8.  CONDITIONS TO CLOSING ............................................ 54
    8.1.  Conditions to Obligations of PEP Guide and Newco ........... 54
        8.1.1.  Accuracy of Representations and Warranties ......... 54
        8.1.2.  Performance of Covenants ........................... 54
        8.1.3.  No Litigation ...................................... 54
        8.1.4.  Consents to Assignment of Certain Contracts ........ 54
        8.1.5.  Ancillary Agreements ............................... 55
        8.1.6.  Material Adverse Effect ............................ 55
        8.1.7.  Agreement with Lender. ............................. 55
        8.1.8.  Lender Acknowledgment and Security Agreement ....... 55
        8.1.9.  Missing Items ...................................... 55
    8.2.  Conditions to Obligations of GM ............................ 55
        8.2.1.  Accuracy of Representations and Warranties ......... 55
        8.2.2.  Performance of Covenants ........................... 56
        8.2.3.  No Litigation ...................................... 56
        8.2.4.  Certain Agreements ................................. 56
        8.2.5.  Salaried Employees ................................. 56
        8.2.6.  Agreement with Lender .............................. 56
        8.2.7.  Lender Acknowledgment and Security Agreement ....... 56

9.  ENVIRONMENTAL MATTERS ............................................ 56
    9.1   Definitions ................................................ 56
        9.1.1.  Adverse Consequences ............................... 56
        9.1.2.  Anderson Plating Operations ........................ 57
        9.1.3.  Chlorinated Solvent ................................ 57
        9.1.4.  Clean Closure ...................................... 57
        9.1.5.  Environmental Condition ............................ 57
        9.1.6.  Environmental Laws ................................. 57
        9.1.7.  Governmental Authority ............................. 58
        9.1.8.  Hazardous Material ................................. 58
        9.1.9.  Knowledge .......................................... 58
        9.1.10. Monroe Press Pit Area .............................. 58
        9.1.11. Non-Compliance Matter .............................. 58
        9.1.12. Release ............................................ 59
    9.2.  Environmental Assessments and Compliance Audits ............ 59
        9.2.1.  Environmental Confidentiality ...................... 59
        9.2.2.  Pre-Closing Environmental Assessments .............. 59
        9.2.3.  Pre-Closing Environmental Compliance Audits ........ 59
    9.3.  GM Remediation and Corrective Action ....................... 60
        9.3.1.  GM Remediation ..................................... 60
        9.3.2.  Remedial Action Plans .............................. 60
        9.3.3.  Remedial Action Factors ............................ 60
        9.3.4.  PCBs ............................................... 61
        9.3.5.  ACM ................................................ 61
        9.3.6.  GM Compliance Action Plans ......................... 61
        9.3.7.  No Other Obligation ................................ 61
        9.3.8.  Non-Interference ................................... 61
        9.3.9.  Newco's Review Period .............................. 62

Page

9.3.10. Modification Based on Newco's Input ........................... 62
9.3.11. Implementation ............................................ 62
9.3.12. Clean Closure ............................................. 62
9.3.13. Newco's Obligations ....................................... 63
9.4. Access .......................................................... 63
9.4.1. GM Access ................................................. 63
9.4.2. Access Limitations ........................................ 64
9.5. Real Property - Use Restrictions ................................. 64
9.5.1. Generator-Only Status ..................................... 64
9.5.2. Transfers ................................................. 64
9.5.3. Removal of Improvements ................................... 65
9.5.4. Specific Restrictions ..................................... 65
9.5.5. Notice Filing ............................................. 65
9.6. Transition - Permits/Environmental Committee ..................... 65
9.6.1. Environmental Permits ..................................... 65
9.6.2. Transfer .................................................. 65
9.6.3. Environmental Committee ................................... 66
9.7. Waste Management ................................................ 66
9.7.1. Hazardous Waste Removal ................................... 66
9.7.2. Post-Closing Waste Management ............................. 67
9.7.3. No Arrangement for Disposal ............................... 67
9.8. Environmental Management System ................................. 67
9.9. GM's Representations and Warranties ............................. 67
9.9.1. No Actions ................................................ 67
9.9.2. No Notices ................................................ 67
9.9.3. No Listing ................................................ 68
9.9.4. No Liens .................................................. 68
9.9.5. No Chlorinated Solvent Use ................................ 68
9.10. Newco's Covenants, Obligations and Acknowledgments .............. 68
9.10.1. Compliance with Environmental Law ........................ 68
9.10.2. Non-Compliance Notice .................................... 68
9.10.3. Newco's Obligations in Connection with GM's Remedial Actions ..... 68
9.10.4. Equipment Decommissioning – Anderson Plant ............... 69
9.10.5. Equipment Decommissioning – Monroe Plant ................. 69
9.10.6. Disclosure and Recordation ............................... 70
9.10.7. Releases and Hazardous Materials ......................... 70
9.10.9. Newco's Additional Acknowledgments ....................... 70
9.11. Defense and Indemnification Obligations ......................... 71
9.11.1. GM's Defense and Indemnification Obligations ............. 71
9.11.2. Newco's Defense and Indemnification Obligations .......... 72
9.11.3. Apportionment ............................................ 72
9.11.4. Third-Party Claims ....................................... 73
9.12. Confidentiality ................................................ 73
9.12.1. Environmental Confidentiality Agreement .................. 73
9.12.2. Confidentiality Obligations .............................. 73
9.12.3. Disclosures .............................................. 73
9.12.4. Notification ............................................. 74
9.12.5. Public Information ....................................... 74
9.13. Dispute Resolution ............................................. 74
9.14. Miscellaneous .................................................. 75
9.14.1. Designation of Representatives ........................... 75
9.14.2. Exclusivity .............................................. 75
9.14.3. Covenant Not to Sue ...................................... 75
9.14.4. Reporting ................................................ 76

                                                                                        Page

            9.14.5. Notices  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

10.   CLOSING  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
      10.1.   The Closing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
      10.2.   Asset Exchanges  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
      10.3.   Additional Documents and Papers  . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

11.   CERTAIN ADDITIONAL COVENANTS  . . . . . . . . . . . . . . . . . . . . . . . . . 79
      11.1.   Operation of the Business  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
      11.2.   Further Assurances  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
      11.3.   Reasonable Access  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
      11.4.   Transition Services and Arrangements  . . . . . . . . . . . . . . . . . . . . . . . . 80
      11.5.   Books and Records  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
      11.6.   Technical Documentation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
      11.7.   Payment and Collections  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
      11.8.   Non-Competition  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
      11.9.   Subsequent Financial Statements  . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
      11.10.  Injunctions/Orders  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
      11.11.  Supplements to Schedules  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
      11.12.  Confidentiality  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
      11.13.  Intellectual Property Licenses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
              11.13.1.  Licenses to Newco  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
              11.13.2.  Licenses to GM  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
              11.13.3.  Sublicense to Newco  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
      11.14.  Pre-Emptive Right  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
      11.15.  Management Dilution  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
      11.16.  Capital Contribution  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
      11.17.  Warrants  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
              11.17.1.  Issuance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
              11.17.2.  Form  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
              11.17.3.  Exercise  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
              11.17.4.  Transfer Restrictions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
              11.17.5.  Registration Rights  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
              11.17.6.  Other Terms  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
      11.18.  Put Rights  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

12.   INDEMNIFICATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
      12.1.   Survival  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
      12.2.   Indemnification  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89
              12.2.1.  Indemnification Provisions for Benefit of Newco  . . . . . . . . . . . . . . 89
              12.2.2.  Indemnification Provisions for Benefit of GM  . . . . . . . . . . . . . . . . 89
      12.3.   Indemnification Procedure as to Third-Party Claims  . . . . . . . . . . . . . . . . . 90
      12.4.   Exclusive Remedy  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
      12.5.   Dispute Resolution  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

13.   TERMINATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
      13.1.   Termination  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
      13.2.   Effect of Termination  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

14.   MISCELLANEOUS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
      14.1.   Bulk Sales Laws  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
      14.2.   Notices  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
      14.3.   Assignment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
      14.4.   Pledge to Lenders  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

                                                                                      Page

14.5.   Entire Agreement ......................................... 94
14.6.   Waiver ................................................... 95
14.7.   Failure or Delay Not Waiver, Remedies Cumulative .................... 95
14.8.   Specific Performance ...................................... 95
14.9.   Amendment ............................................... 95
14.10.  Expenses ................................................. 95
14.11.  Third Parties ............................................. 96
14.12.  Severability .............................................. 96
14.13.  Headings ................................................. 96
14.14.  Counterparts ............................................. 96
14.15.  Governing Law; Jurisdiction; Consent to Service of Process ............... 96
14.16.  Public Announcements ..................................... 97
14.17.  Sales or Transfer Taxes .................................... 97
14.18.  Other Tax Matters ........................................ 97
14.19.  Solely Corporate Obligations ............................... 97
14.20.  Transfer of Series A Senior Preferred Stock ......................... 98
14.21.  The Closing .............................................. 98

## TABLE OF EXHIBITS AND SCHEDULES

| | |
|---|---|
| Component Supply Agreement | Exhibit A |
| GM Note | Exhibit B |
| Right of Access Agreement | Exhibit C |
| Shareholders and Registration Rights Agreement | Exhibit D |
| Warrants Certificate | Exhibit E |
| Environmental Confidentiality  Agreement | Exhibit 9.2.1 |
| Form of License or Sublicense | Exhibit 11.13.1 |
| | |
| Certain Acquired Assets | Schedule 2.1.1A |
| Pre-existing Agreements | Schedule 2.1.1B |
| GM Bailed Assets | Schedule 2.3.1 |
| Third Party Assets | Schedule 2.3.3 |
| Excluded Contracts | Schedule 2.3.5 |
| Other Assets | Schedule 2.3.9 |
| Nonassignable Contracts | Schedule 2.5.1A |
| Contracts Requiring Consents | Schedule 2.5.1B |
| Liens on Personal Property and Inventory | Schedule 5.1.5A |
| Personal Property | Schedule 5.1.5B |
| Bailed Personal Property | Schedule 5.1.5D |
| Litigation | Schedule 5.1.6A |
| Material Litigation | Schedule 5.1.6B |
| Product Liability Claims | Schedule 5.1.6C |
| Intellectual Property | Schedule 5.1.7A |
| Claims Against Intellectual Property | Schedule 5.1.7B |
| Licenses Requiring Consents | Schedule 5.1.7C |
| Permits | Schedule 5.1.8 |
| Compliance with Laws | Schedule 5.1.8A |
| Certain Permits in Default | Schedule 5.1.8B |
| Certain Other Permits in Default | Schedule 5.1.8C |
| Financial Statements | Schedule 5.1.11A |
| Reconciliation | Schedule 5.1.11B |
| Liabilities | Schedule 5.1.12 |
| Material Contracts | Schedule 5.1.13A |
| Contracts in Default | Schedule 5.1.13B |
| Contracts to be Assigned | Schedule 5.1.13D |
| Required Permits | Schedule 5.1.14 |
| Owned Real Estate and Anderson, Indiana Real Estate | Schedule 5.1.15A |
| Leased Real Estate | Schedule 5.1.15B |
| Government Notices | Schedule 5.1.15E |
| Impairment of Utilities | Schedule 5.1.15G |
| Changes in Business | Schedule 5.1.17 |
| ERISA | Schedule 5.1.18 |
| Labor Relations and Employment | Schedule 5.1.19A |
| Current Products | Schedule 5.1.21 |
| Year 2000 | Schedule 5.1.22 |
| Hourly Employees | Schedule 6.1A |
| Salaried Employees | Schedule 6.1B |
| SUB Fund | Schedule 6.13 |

| | |
|---|---|
| Contract Consents Required on Closing Date | Schedule 8.1.4 |
| Changes in Business after Date of Agreement | Schedule 8.1.6 |
| Monroe Press Pit Area | Schedule 9.1.10 |
| GM Environmental Assessments | Schedule 9.2.2A |
| Newco Pre-Closing Environmental Assessments | Schedule 9.2.2B |
| GM Compliance Audit Reports | Schedule 9.2.3A |
| Newco and PEP Guide Compliance Audit Reports | Schedule 9.2.3B |
| Remedial Actions | Schedule 9.3.1(a) |
| Non-Compliance Matters | Schedule 9.3.6 |
| Chlorinated Solvents | Schedule 9.5.4 |
| Environmental Permits | Schedule 9.6.1 |
| Environmental Permits (GM) | Schedule 9.6.1A |
| Environmental Permits (Newco) | Schedule 9.6.1B |
| Environmental Permits (Not Transferred) | Schedule 9.6.1C |
| Environmental Actions | Schedule 9.9.1 |
| Environmental Notices | Schedule 9.9.2 |
| Environmental Listings | Schedule 9.9.3 |
| Environmental Liens | Schedule 9.9.4 |
| Part Numbers | Schedule 9.10.3 |
| Support Services | Schedule 11.4.1 |
| Products Covered by Non-compete Provision | Schedule 11.8.1 |
| Management Dilution | Schedule 11.15 |

## LIGHTSOURCE FORMATION AGREEMENT

LIGHTSOURCE FORMATION AGREEMENT dated as of September 29, 1998, among General Motors Corporation, a Delaware corporation ("GM"), Lightsource Parent Corporation, a Delaware corporation ("Newco"), and PEP Guide, LLC, a Delaware limited liability company ("PEP Guide").

### WITNESSETH

1.    GM and PEP Guide have caused Newco to be incorporated and will each transfer certain assets to it in exchange for Newco securities and payments on the terms and subject to the conditions set forth in this Agreement.

2.    In furtherance of the foregoing, (a) GM will contribute the Business (as defined below) and the GM Note (as defined below) to Newco, or one or more designees of Newco, and (b) PEP Guide will contribute $15,000,000 cash, subject to adjustment as provided herein, to Newco.

3.    In exchange (a) GM will receive $15,000,000 cash, subject to adjustment as provided herein, 50 shares of Series A Senior Preferred Stock, 5 shares of Series A Preference Stock (as defined below), 5 shares of Series B Preference Stock (as defined below), 375,000 shares of Class B Common Stock (as defined below) and certain Warrants (as defined below) issued by Newco to GM from time to time, and (b) PEP Guide will receive 50 shares of Series A Senior Preferred Stock (as defined below) and 375,000 shares of Class A Common Stock (as defined below).

4.    The Parties also desire to make certain representations, warranties, covenants and agreements in connection with the transactions contemplated hereby.

NOW THEREFORE, in consideration of the premises, mutual promises, representations, warranties, and covenants contained in this Agreement, the Parties agree:

1.    **DEFINITIONS.**

The following terms, as used in this Agreement, shall have the following meanings whether used in the singular or plural (other terms are defined in the Sections to which they pertain):

"1997 Financial Statements" has the meaning set forth in Section 5.1.11.

"Acquired Assets" means the assets referred to in Section 2.1.

"Administrative Assets" means books, records and other administrative assets of every kind and nature, wherever located, including, price lists, correspondence, mailing lists, lists of customers and potential customers, vendor lists, production data, sales materials and records, market studies, penetration data, and other market information, sales and marketing plans, programs and strategies, sales, costs and other financial data, purchasing materials and records, personnel records of employees, billing records, accounting records (including documentation supporting all amounts and disclosures included in the 1997 Financial Statements), other financial records, sale order files, tool routings, labor routings, facility blueprints, service blueprints, and plant layouts, including trade secrets, know-how, show-how, designs and proprietary commercial information, methods, practices,

05-44481-rdd    Doc 9426-3    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-1
- Light Source Formation Agreement    Pg    of 59

2

procedures, processes and formulae with respect to any of the foregoing, in each case, other than such as constitute Intellectual Property.

"Affiliate" means with respect to any Person any other Person directly or indirectly controlling, controlled by or under common control with such Person. For purposes of this definition, control means ownership of more than 50% of the shares or other equity interest having power to elect directors or persons performing a similar function.

"Agreement" means this Newco Formation Agreement, including its Schedules and Exhibits.

"Ancillary Agreements" means the Anderson, Indiana Lease, the Component Supply Agreement, the GM Note, the Intellectual Property Licenses, the Memorandum of the Anderson, Indiana Lease, the Right of Access Agreement and the Shareholders and Registration Rights Agreement.

"Anderson, Indiana Lease" means the lease of the Anderson, Indiana Real Estate between GM, as lessor, and Newco (or Newco's designee(s)), as lessee, in form and substance reasonably satisfactory to the parties thereto, to be entered into at the Closing pursuant to Article 10.

"Anderson, Indiana Real Estate" means the Real Estate located in Anderson, Indiana owned by GM and described in Schedule 5.1.15A.

"Anderson Inspection Program" has the meaning set forth in Section 9.1.2.

"Anderson Plant" means the Anderson, Indiana Real Estate.

"Anderson Plating Operations" has the meaning set forth in Section 9.1.3.

"Asset Amount" means the amount of the Acquired Assets as set forth in Section 3.1A.

"Associates" has the meaning set forth in Rule 12b-2 promulgated under the Securities Exchange Act of 1934, as amended.

"Assumed Liabilities" has the meaning set forth in Article 4.

"Benefit Plans" has the meaning set forth in Section 6.1.13A(x).

"Business" means the (i) forward lighting products business (and operations relating thereto) at the Monroe, Louisiana plant and (ii) signal lighting products and Lighting Systems Engineering Center business (and operations relating thereto) at the Anderson, Indiana plant, in each case as currently conducted by GM through the Business Sector.

"Business Sector" means the Delphi Interior and Lighting Systems Division of Delphi Automotive, including operations in Rimir, Mexico.

"Business Target Number" has the meaning set forth in Section 6.3B.

"Cash Amount" has the meaning set forth in Section 3.1C.

"CHR" has the meaning set forth in Section 6.15.

"Class A Common Stock" means the voting Class A common stock, par value $1.00, of Newco.

"Class B Common Stock" means the non-voting Class B common stock, par value $1.00, of Newco.

"Closing" has the meaning set forth in Section 10.1.

"Closing Date" means the date of Closing.

"Closing Inventory Amount" has the meaning set forth in Section 3.2.

"Closing Inventory Statement" has the meaning set forth in Section 3.2.

"Code" means the Internal Revenue Code of 1986, as amended.

"Component Supply Agreement" means the Component Supply Agreement between GM and Newco in the form of Exhibit A hereto to be entered into at the Closing pursuant to Article 10.

"Confidentiality Agreement" has the meaning set forth in Section 11.3.

"Consent" has the meaning set forth in Section 5.1.10B.

"Consolidated EBITDA" means, for any Person, for any period, an amount equal to the sum of (i) Consolidated Net Income for such period, plus (ii) the provision for taxes for such period based on income or profits to the extent such income or profits were included in computing Consolidated Net Income and any provision for taxes utilized in computing net loss under clause (i) hereof, plus (iii) Consolidated Interest Expense for such period, plus (iv) depreciation for such period, plus (v) amortization for such period (including the amortization of deferred financing costs and expenses), minus, (vi) to the extent added in computing Consolidated Net Income, all non-cash gains for such period, minus, (vii) management fees to Palladium and (viii) $500,000 on a monthly basis, all for such Person and its subsidiaries determined on a consolidated basis in accordance with GAAP.

"Consolidated Interest Expense" for any period means the total interest expense of a Person and its subsidiaries determined on a consolidated basis in accordance with GAAP for such period.

"Consolidated Net Income" for any period means the net income from continuing operations (after taxes) of a Person and its subsidiaries determined on a consolidated basis in accordance with GAAP, excluding the effect of extraordinary or non-recurring cash gains or cash losses (as such gains or losses are determined in accordance with GAAP) for such period.

"Contracts" means, purchase orders, sales agreements, service contracts, distribution agreements, quotations and bids, leases, license agreements, product warranty, technical assistance or service agreements, and other commitments, agreements, and undertakings entered into by GM or any of its Affiliates with respect to the Business or any of the Acquired Assets, including the Listed Contracts, in each case other than such as constitute Intellectual Property.

4

"Delphi Automotive" means the Delphi Automotive Systems Group, currently a business unit of GM, regardless of whether GM continues to own the unit or a separate entity if such unit becomes a separate entity in the future.

"EDS" means Electronic Data Systems Corporation, a Delaware corporation.

"EDS Agreements" means, together, the agreements between GM and EDS pursuant to which, among other things, GM purchases and EDS provides information technology services.

"Employee Benefit Plan" means any Employee Pension Benefit Plan, Employee Welfare Benefit Plan, or any other material employee vacation, severance, bonus, or other benefit plan or program, whether or not subject to ERISA.

"Employee Pension Benefit Plan" has the meaning set forth in ERISA Section 3(2).

"Employee Welfare Benefit Plan" has the meaning set forth in ERISA Section 3(1).

"Environmental Confidentiality Agreement" means the Environmental Confidentiality Agreement dated as of February 26, 1998 between GM and Palladium.

"Environmental Law" has the meaning set forth in Section 9.1.6.

"Environmental Permits" has the meaning set forth in Section 9.6.1.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" has the meaning set forth in Section 2.3.

"GAAP" means United States generally accepted accounting principles, consistently applied.

"GM" means General Motors Corporation, a Delaware corporation.

"GM Applicable Supplement" has the meaning set forth in Section 6.6.1(b)(ii).

"GM Bailed Assets" means the assets referred to in Section 2.3.1.

"GM Hourly Pension Plan" has the meaning set forth in Section 6.6.1.

"GM Indemnitee" has the meaning set forth in Section 12.2.2A.

"GM JOBS Program" has the meaning set forth in the UAW Agreement.

"GM Leave Employee" has the meaning set forth in Section 6.1B.

"GM Note" means the promissory note in the form of Exhibit B hereto to be issued by GM to Newco at the Closing pursuant to Article 10.

"GM Salaried Retirement Program" has the meaning set forth in Section 6.6.2.

"GM Service Fraction" has the meaning set forth in Section 6.6.1(b)(ii).

05-44481-rdd    Doc 9426-3    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-1
- Light Source Formation Agreement    Pg 16 of 59

5

"GM's knowledge" or "to the knowledge of GM" means actual knowledge of GM employees who, in the Ordinary Course of Business, would be expected to know or have reason to know, after reasonable inquiry, information called for by the particular subject matter identified.

"Governmental Authority" means any court, agency, or commission, or other governmental entity, authority or instrumentality, whether federal, state, local, or foreign, for all purposes other than Article 9.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Hourly Participants" has the meaning set forth in Section 6.6.1.

"Hourly Returned Employee" has the meaning set forth in Section 6.3A.

"Hourly Transferred Employees" has the meaning set forth in Section 6.1A.

"Improvements" means buildings, fixtures, and other improvements.

"including" means including without limitation.

"Intellectual Property" means intellectual and similar intangible personal property and rights of every kind and nature, including United States and foreign (i) patents and patent applications, inventions, invention disclosures, which may or may not form the basis of patent applications, and shop rights, (ii) trademarks, service marks and trade names (including trademarks and trade names associated with the name "Guide") and all registrations and recordings thereof, and all applications in connection therewith, including registrations, recordings and applications in the United States Patent & Trademark Office, any state of the United States or any other Governmental Authority, all goodwill symbolized thereby or associated therewith and all extensions and renewals thereof, (iii) copyrights (including all copyrights, whether registered or unregistered, copyright registrations and applications to register copyrights), (iv) Software, (v) Technical Documentation and (vi) licenses and rights with respect to any of the foregoing or property of like nature, including, but not limited to, confidentiality agreements, invention assignments or agreements, non-competition agreements with current or former employees of the Business or third parties, and other intellectual property agreements relating to the Business.

"Intellectual Property Licenses" has the meaning set forth in Section 11.13.

"Intended Return Date" has the meaning set forth in Section 6.3C.

"Inventory" means inventory, including raw materials, work-in-process, finished products, supplies and spare parts of the Business, wherever located (but not at the Rimir, Mexico plant), and reflected as assets on the books and records of the Business.

"Laws" means, for all purposes other than Article 9 hereof, laws, statutes, ordinances, codes, standards, rules, administrative rulings, judgments, orders, decrees, or regulations of any Governmental Authority.

"Lien" means any lien, charge, claim, pledge, covenant, security interest, conditional sale agreement or other title retention agreement, lease, tenancy, right of occupancy, mortgage, restriction, reservation, reversion, license, easement, security agreement, option, covenant,

restriction, right to purchase or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"Listed Contracts" means the Contracts listed in Schedule 5.1.13A.

"Losses" has the meaning set forth in Section 12.2.1.

"Material Adverse Effect" means a material adverse effect on the business, assets, properties, condition (financial or otherwise), results of operations or prospects of the Business as currently conducted, taken as a whole, or on the ability of the Parties to consummate the transactions contemplated hereby.

"Memorandum of the Anderson, Indiana Lease" means the memorandum of the Anderson, Indiana Lease between GM, as lessor, and Newco (or Newco's designee(s)), as lessee, in form and substance reasonably satisfactory to the parties thereto, to be entered into at the Closing pursuant to Article 10.

"Monroe Plant" means the Owned Real Estate located in Monroe, Louisiana.

"Monroe Press Pit Area" has the meaning set forth in Section 9.1.13.

"MOU" has the meaning set forth in Section 6.2D.

"Mutual Retirement" has the meaning set forth in Section 6.6.1(i).

"Newco" means Lightsource Parent Corporation, a Delaware corporation.

"Newco Hourly Pension Plan" has the meaning set forth in Section 6.6.1.

"Newco Indemnitee" has the meaning set forth in Section 12.2.1A.

"Newco Interim Supplement" has the meaning set forth in Section 6.6.1(c)(i).

"Newco Return Notice" has the meaning set forth in Section 6.3C.

"Newco Salaried Retirement Program" has the meaning set forth in Section 6.6.2.

"Newco Service Fraction" has the meaning set forth in Section 6.6.1(b)(i).

"NLRB" means the United States National Labor Relations Board.

"North America" means the United States, the present territory of Canada and Mexico.

"Ordinary Course of Business" means, for all purposes other than Article 9 hereof, the ordinary course of business of the Business consistent with past practice.

"Owned Real Estate" means the Real Estate located in Monroe, Louisiana owned by GM and described in Schedule 5.1.15A.

"Palladium" means Palladium Equity Partners, LLC, a Delaware limited liability company.

"Party" or "Parties" means Newco, PEP Guide and/or GM.

"PEP Guide" means PEP Guide, LLC, a Delaware limited liability company.

"Permits" means permits, concessions, grants, franchises, licenses, consents, certificates, orders, and other authorizations and approvals of any Governmental Authority necessary for the conduct of the Business as currently conducted or the ownership of the Acquired Assets, other than Environmental Permits and other than those relating to the formation and/or qualification to do business of the corporate entity operating the Business.

"Permitted Exceptions" means, with respect to the Owned Real Estate and the Anderson, Indiana Real Estate: (a) liens for any current real estate or ad valorem taxes or assessments not yet due and payable or being contested in good faith by appropriate proceedings; (b) inchoate mechanic's, materialmen's, laborer's, and carrier's liens and other similar inchoate liens arising by operation of Law in the Ordinary Course of Business for obligations which are not due and payable and which will be paid or discharged in the Ordinary Course of Business; (c) matters disclosed in the Survey on the date hereof; (d) rights of the public and adjoining property owners in streets and highways abutting and adjacent to the Owned Real Estate; (e) zoning ordinances; and (f) those Liens listed in Schedule 5.1.15E.

"Person" means any individual, corporation, organization, partnership, joint venture, trust, firm, association (whether or not Incorporated), Governmental Authority or other entity.

"Personal Property" means tangible personal property (other than Inventory) of the Business, including production machinery, equipment, tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, business machines, office furniture and fixtures, in-factory vehicles, trucks, model shop equipment, laboratory test fixtures, and other tangible personal property, wherever located.

"Pre-October 1, 1999 Retirees" has the meaning set forth in Section 6.6.1(f)

"Pre-October 1, 1999 Returned Employees" has the meaning set forth in Section 6.6.1(g).

"Prime Rate" means the rate of interest from time to time announced publicly by Citibank, N.A. at its offices in New York, New York as the prime rate.

"Products" means those automotive components, including forward and signal lights and related components, as manufactured, assembled, designed, processed, marketed, offered for sale, sold, imported, installed or serviced by, or in the conduct of, the Business on or immediately prior to the Closing Date.

"REA" means the Retirement Equity Act.

"Real Estate" means real property and interests in real property including Improvements.

"Real Property" means the Anderson Plant and the Monroe Plant.

"Right of Access Agreement" means the Right of Access Agreement between GM and Newco in the form of Exhibit C hereto to be entered into at the Closing pursuant to Article 10.

"Salaried Participants" has the meaning set forth in Section 6.6.2.

05-44481-rdd    Doc 9426-3    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-1
- LiquiSource Formation Agreement    Pg ? of 59

8

"Salaried Transferred Employees" has the meaning set forth in Section 6.1A.

"Series A Preference Stock" means the Series A preference stock, $1,000,000 liquidation value per share, having such other terms as set forth in the "Term Sheet for Series A Preference Stock", to be issued by Newco to GM pursuant to Section 2.1.1.

"Series B Preference Stock" means the Series B convertible preference stock, $1,000,000 liquidation value per share, convertible into 250,000 shares of the Class B Common Stock, having such other terms as set forth in the "Term Sheet for Series B Preference Stock", to be issued by Newco to GM pursuant to Section 2.1.1.

"Series A Senior Preferred Stock" means the 15% senior preferred stock, $150,000 liquidation value per share, having such other terms as set forth in the "Term Sheet for Series A Senior Preferred Stock", to be issued by Newco to GM and PEP Guide pursuant to Section 2.1.1.

"Shareholders and Registration Rights Agreement" means the shareholders and registration rights agreement among Newco, GM and PEP Guide in the form of Exhibit D hereto to be entered into at the Closing pursuant to Article 10.

"Software" means programs, routines, subroutines, translators, object, source and microcode, operating and related systems, compilers, assemblers, hardware and accessories, in each case, that cause a computer to perform in an expected manner and all documentation related thereto, including flow charts, instructions, end-user manuals, models and test aids, and any and all updates and modifications thereto, wherever located.

"Special Unvested Participant" has the meaning set forth in Section 6.6.1(e) and 6.6.2(a)(i).

"Survey" has the meaning set forth in Section 7.3.

"Targeted Inventory Amount" means Inventory in the amount of $51,227,000 (based on the 1997 Financial Statements on a FIFO basis).

"Tax Return" means any return, declaration, report, claim for refund or information return, amended return or statement, or any other similar filings, related to Taxes, including any schedule or attachment thereto.

"Tax" or "Taxes" means any federal, state, local, or foreign income, profits, franchise, gross receipts, payroll, sales, employment, use, personal property, real property, excise, value added, estimated, stamp, alternative or add-on minimum, environmental, withholding and any other tax, duty or assessment (including any interest, penalties or additions).

"Technical Documentation" means, wherever located, (i) all proprietary technical information of every kind and nature, including manuals and documentation, advertising and promotional material, catalogues, and photographs; (ii) trade secrets, confidential and non-confidential know-how, confidential and non-confidential show-how, designs and proprietary technical information, methods, practices, procedures, processes and formulae with respect to the manufacture, assembly, design, processing, marketing, offer for sale, import, installation and servicing of the Products; and (iii) information concerning sources of supply, components and services.

05-44481-rdd    Doc 9426-3    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-1
- Light Source Formation Agreement    Pg 20 of 59

9

"Transfer Documents" means such bills of sale, assignments, and other good and sufficient instruments of transfer, including (i) a covenant or limited warranty deed warranting against grantor's acts to the Owned Real Estate and (ii) assignments with respect to the Intellectual Property included in the Acquired Assets, in each case, in form and substance reasonably satisfactory to PEP Guide and its counsel providing for the contribution to Newco of title to the Acquired Assets as provided in this Agreement and as PEP Guide may reasonably request.

"Transferred Employees" has the meaning set forth in Section 6.1A.

"UAW" means the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, and/or its Local Unions 1977 and 662.

"UAW Agreement" means the collective bargaining agreement executed between the UAW and GM, effective November 18, 1996 to September 14, 1999, including all supplemental and local agreements and memoranda of understanding.

"Valuation Date" has the meaning set forth in Section 6.6.4(d).

"WARN Act" means Worker Adjustment and Retraining Notification Act of 1988.

"Warrants" has the meaning assigned to such term in Section 11.17.1.

"Warrants Certificate" means the Warrants Certificate in the form of Exhibit E hereto.

"$" or "U.S. $" or "dollars" means the lawful currency of the United States.

2.    ASSET EXCHANGES.

    2.1.    Asset Exchanges.

        2.1.1.    Asset Exchanges.  At Closing GM shall (i) lease the Anderson, Indiana Real Estate to Newco (or Newco's designee(s)) pursuant to the Anderson, Indiana Lease free and clear of any and all Liens except Permitted Exceptions, and (ii) contribute to Newco (or Newco's designee(s)) free and clear of any and all Liens, except Permitted Exceptions, the following assets and properties, wherever located, together with all of the right, title and interest of GM and its Affiliates therein (collectively, the "Acquired Assets"): (A) Owned Real Estate, (B) Inventory, (C) to the extent used or held for use primarily in the Business, Personal Property including the equipment listed on Schedule 2.1.1A (including all property, plant or equipment located at the Monroe Plant or the Anderson Plant, whether or not paid for, and whether or not an obligation is due or recordable as a liability under GAAP), Intellectual Property and Administrative Assets,  (D) to the extent used or held for use significantly in the Business, Contracts, Permits, Environmental Permits, subject to and in accordance with Article 9, together with any and all goodwill, rights, claims, rights of setoff, deposits and rights of recovery relating thereto, and (E) the GM Note, subject, in each case, to Section 2.3. and in the case of Intellectual Property, further subject to the pre-existing agreements and rights of joint owners identified in Schedule 2.1.1B.

        2.1.2    At Closing PEP Guide shall contribute to Newco the Cash Amount.

10

2.1.3.  At Closing Newco shall distribute (a) to GM the Cash Amount and issue to GM 50 shares of Series A Senior Preferred Stock, 5 shares of Series A Preference Stock, 5 shares of Series B Preference Stock and 375,000 shares of Class B Common Stock, and (b) to PEP Guide 50 shares of Series A Senior Preferred Stock and 375,000 shares of Class A Common Stock.

2.1.4.  Newco shall issue Warrants to GM from time to time in accordance with Section 11.17.

2.2.  Payments.

All cash payments under Section 2.1 shall be made in U.S. dollars by wire transfer in immediately available funds to an account designated by the applicable Party.

2.3.  Excluded Assets.

Notwithstanding anything to the contrary in Section 2.1 of this Agreement, the following properties and assets (collectively, the "Excluded Assets") shall not be included in the Acquired Assets:

2.3.1.  GM Bailed Assets.

The machinery, equipment, special tools or tooling, dies, molds, patterns, jigs, gauges and production fixtures, and special material handling equipment listed in Schedule 2.3.1, and all dunnage and containers ("GM Bailed Assets").  The GM Bailed Assets shall remain in the possession of the Business at the Closing and shall be provided to Newco after the Closing on a bailment basis, subject to GM's standard purchase order terms and conditions applicable to bailed assets set forth in Schedule 2.3.1, for the purpose of furnishing to GM and its Affiliates and others all or part of their respective requirements for automotive components, including Products.

2.3.2.  Personnel and Medical Records.

All personnel and medical records of employees and former employees of GM who worked at any time for any reason at the Business for whom a record exists at the Business at the time of Closing; provided, however, Newco will be provided the originals of all personnel and medical records of employees and former employees of GM who have accepted employment with Newco, after notice to such employees.  All such personnel and medical records of such employees shall be books and records governed by Section 12.5 of this Agreement.  Upon written request of GM, Newco shall promptly return any and all of these records to GM at which time GM shall provide Newco with copies of the personnel and medical records of such employees.  If an employee objects to provision of personnel or medical records to Newco, the records will not be provided, except as permitted by applicable Law.

2.3.3.  Third-Party Assets.

All computer hardware or equipment, Software, or other assets owned by EDS or other Persons (other than the Parties) located at the Owned Real Estate or Anderson, Indiana Real Estate, as listed in Schedule 2.3.3.

2.3.4.  Certain Current Assets.

Cash, bank accounts, accounts receivable and prepaid expenses of the Business as of the Closing.

### 2.3.5. Certain Contracts.

Contracts or commitments for the borrowing or lending of money, lines of credit, or guarantees of indebtedness; credit cards issued to or through GM; letters of credit, performance or payment bonds, or guarantees of performance; contracts or commitments with any investment banker, financial advisor, finder, or broker (collectively, "Excluded Contracts"). Schedule 2.3.5 sets forth a list of all Excluded Contracts that Newco will be required to replace in order to conduct the Business as currently conducted.

### 2.3.6. Product Evaluation Vehicles, Pooled Vehicles.

Any vehicles assigned pursuant to GM's "Product Evaluation Program" and pooled vehicles.

### 2.3.7. Tax Refunds.

Any refund of Taxes, or claim for refund of Taxes, of any kind relating to any period prior to the Closing Date.

### 2.3.8. Intangibles.

All Intellectual Property other than items included in the Acquired Assets; provided, however, that Newco and its Affiliates may continue to sell or dispose of any existing inventories or service materials of the Business bearing any such trademark, service mark, or trade name, or related corporate name of GM or any of its Affiliates, to third parties for a period of 18 months after the Closing Date in a manner consistent with past practice of the Business and the name and reputation associated therewith; and provided further, that Newco may sell any existing or future inventories, whether of Products or otherwise, or service materials of the Business bearing any such trademark, service mark, or trade name, or related corporate name of GM or its Affiliates (other than trademarks, service marks, trade names or corporate names involving the word "Delphi" or its symbols), to GM or any such Affiliate without limitation.

### 2.3.9. Other Assets.

All of the Inventory that shall have been transferred or disposed of by GM prior to Closing in the Ordinary Course of Business, and the other assets listed on or prior to the date hereof in Schedule 2.3.9.

### 2.3.10. Real Estate.

Fee title to the Anderson, Indiana Real Estate.

### 2.3.11. Certain Environmental, Privileged and Proprietary Documents.

Certain privileged environmental documents of GM that are the subject of the representation in Section 9.9.6 hereof.

### 2.4. Post-Closing Asset Deliveries.

Should GM and Newco reasonably determine after the Closing that any Acquired Assets are still in the possession of GM or any of its Affiliates, GM shall or shall cause such Affiliates to promptly deliver any and all such Acquired Assets to Newco, at GM's sole cost and expense. Should GM and

12

Newco reasonably determine after the Closing that any properties or assets not constituting Acquired Assets were delivered to Newco, Newco shall promptly return any and all such properties and assets to GM, at GM's sole cost and expense.

    2.5.   Nonassignable Permits and Contracts.

       2.5.1.  Nonassignability.

To the extent that any Contract or Permit, or license or right with respect to Intellectual Property, is not capable of being assigned to Newco at the Closing or without the Consent of the issuer thereof or the other party thereto or any Person (including a Governmental Authority), or if such assignment or attempted assignment would constitute a breach thereof, or a violation of any Law, this Agreement shall not constitute an assignment thereof, or an attempted assignment, unless any such Consent is obtained. All Listed Contracts listed in Schedule 5.1.13D and Permits that are not capable of being assigned to Newco at or prior to the Closing are listed in Schedule 2.5.1A, and all Listed Contracts listed in Schedule 5.1.13D and Permits that may be so assigned only upon receipt of a Consent are listed in Schedule 2.5.1B.

       2.5.2.  Efforts to Obtain Consents and Waivers.

In the event that any of the Consents referred to in Section 2.5.1 is not obtained prior to the Closing, GM shall, at GM's sole cost and expense, use all reasonable best efforts, and Newco shall cooperate with GM, to obtain the Consents and to resolve the impracticalities of assignment referred to in Section 2.5.1 after the Closing; provided, however, that GM and Newco shall bear its own costs and expenses, and neither GM nor Newco shall be obligated to pay any material consideration therefor to the Person from whom the Consent is requested (other than filing and similar fees payable to any Governmental Authority).

       2.5.3.  If Waivers or Consents Cannot be Obtained.

If the Consents referred to in Section 2.5.1 with respect to Permits assignable under applicable Law and Contracts and licenses or rights are not obtained by GM, or until the impracticalities of assignment referred to therein are resolved, GM's sole responsibility with respect to such Consents, notwithstanding Section 2.1, shall be to, during the 18-month period commencing on the Closing Date, use all reasonable best efforts, at GM's sole cost and expense, to (i) provide to Newco the benefits of any such Permit or Contract or license or right referred to in Section 2.5.1 (ii) cooperate in any reasonable and lawful arrangement designed to provide such benefits to Newco, without incurring any financial obligation to Newco other than to provide such benefits, and (iii) enforce for the account and benefit of Newco any rights of GM arising from such Permits or Contracts or licenses or rights referred to in Section 2.5.1 against such issuer thereof or other party or parties thereto (including the right to elect to terminate in accordance with the terms thereof on the advice of Newco). No action taken pursuant to this Section 2.5 shall be deemed to satisfy the condition set forth in Section 8.1.4 hereof.

13

### 2.5.4.   Obligation of Newco to Perform.

To the extent that Newco is provided the benefits, pursuant to Section 2.5.3, of any such Permit or Contract or license or right, Newco shall perform, on behalf of GM, for the benefit of the issuer thereof or the other party or parties thereto the obligations of GM thereunder or in connection therewith, but only to the extent that (i) such action by Newco would not result in any material default thereunder or in connection therewith, and (ii) such obligation would have been a liability assumed by Newco pursuant to Article 4 but for the non-assignability or non-transferability thereof, and if Newco shall fail to perform in any material respect as required herein, GM, without waiving any rights or remedies that it may have under this Agreement or applicable Laws, may suspend its performance under Section 2.5.3 in respect of the instrument which is the subject of such failure to perform unless and until such situation is remedied.

## 3.   ASSET AMOUNT.

### 3.1.   Asset Amount.

A. The amount of the Acquired Assets (the "Asset Amount") is $39,750,582 minus the amount, if any, by which the Closing Inventory Amount, as finally determined pursuant to Section 3.2, is less than (or plus the amount, if any, by which the Closing Inventory Amount is more than) the Targeted Inventory Amount.

B. At least five business days, but in no event more than 12 business days, prior to the Closing Date, GM shall provide to PEP Guide and Newco its good faith estimate of the amount of the Inventory as of the Closing Date, which estimate shall be certified in writing by an appropriate officer of GM (the "Estimated Inventory Amount").

C. The term "Cash Amount" means one-half of (x) $29,750,582 cash minus (y) the amount, if any, by which the Estimated Inventory Amount is less than the Targeted Inventory Amount.

### 3.2.   Preparation of Closing Inventory Statement.

A. Within 90 days after the Closing, GM shall deliver to Newco, at GM's sole cost and expense, a statement (the "Closing Inventory Statement") setting forth the amount of Inventory existing at the Closing Date, consisting of the book value of the Inventory on a FIFO basis less the $500,000 of "tool crib" Inventory and, if present on the Closing Date, $2,000,000 of service parts that have not been sold since January 1, 1997 (the "Closing Inventory Amount"), accompanied by an audit report of Deloitte & Touche LLP or other independent public accountants of recognized national standing stating that (i) they have audited the Closing Inventory Statement in accordance with generally accepted auditing standards and (ii) in their opinion, the Closing Inventory Statement has been prepared in accordance with GAAP consistently applied with the 1997 Financial Statements, except that Inventory is costed on a FIFO basis rather than a LIFO basis. It is understood that, in applying GAAP, all accounting methods, policies, practices, procedures, classifications, judgments or estimation methodologies shall be consistent with those used to prepare the 1997 Financial Statements, except that Inventory is costed on a FIFO basis rather than a LIFO basis, but only if and to the extent that they are not inconsistent with GAAP and without any leeway for materiality. Contemporaneously, GM shall deliver to Newco a schedule setting forth a calculation of the Asset Amount and the amount of any payment or note to be made or issued, and by whom, pursuant to Section 3.3.

05-44481-rdd    Doc 9426-3    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-1
- Light Source Formation Agreement    Pg 2 of 59

14

B. Newco and GM, each at its own expense, shall cooperate fully and shall use their reasonable best efforts to cause their respective accountants to consult in advance in determining the procedures for taking inventories and other matters. If so requested by Newco, GM shall, and shall cause Deloitte & Touche LLP or other independent public accountants of recognized national standing to, deliver to Newco, or permit Newco and its accountants to review, the working papers of GM and such accountants relating to the Closing Inventory Statement (collectively, the "Working Papers").

C. In the event that Newco is in disagreement with the Closing Inventory Amount set forth on the Closing Inventory Statement or with GM's calculation of the Asset Amount, and in the event that such disagreements exceed an aggregate amount of $750,000, Newco shall, within 30 business days after receipt of the Closing Inventory Statement, the accompanying audit report, the schedule setting forth the calculation of the Asset Amount and, if requested, the Working Papers, notify GM of such disagreements. If Newco and GM shall not have resolved all such disagreements within 20 business days immediately following notice thereof by Newco, both GM and Newco shall immediately refer those items of disagreement to a three-member dispute resolution panel. The panel shall consist of the Chief Financial Officer of GM and Newco, or such individual's designee, plus one individual designated by them together. The panel may establish procedures for resolution of the disagreements, including a requirement that reasonable requests made by one Party to the other for information shall be honored in order that each of the Parties may be advised of relevant facts. A majority decision of the dispute resolution panel shall be the view of the panel but shall not be binding unless the Parties agree in writing in advance of submittal that it shall be binding. Resolution of the matters in dispute shall be made as soon as practicable in accordance with this Agreement. Any costs and fees of such dispute resolution panel shall be shared equally by GM and Newco. Each of the Parties agrees that neither it nor any of its Affiliates will initiate other legal action with respect to the Closing Inventory Statement, the Closing Inventory Amount or the calculation of the Asset Amount unless and until such efforts have been unsuccessful in resolving the disagreements for at least 60 days after a written notice of disagreement was delivered to GM with respect to such matter.

### 3.3.  Asset Amount Adjustment.

On the fifth business day following the determination of the Asset Amount pursuant to Section 3.2, either (i) GM shall pay Newco the total amount, if any, by which the Target Inventory Amount (or if lower, the Estimated Inventory Amount) exceeds the Closing Inventory Amount, together with simple interest at the Prime Rate from the Closing Date through and including the date of payment, or (ii) Newco shall pay GM the total amount, if any, by which the Closing Inventory Amount exceeds the Target Inventory Amount (or if lower, the Estimated Inventory Amount); provided that the maximum cash payments to be made by Newco pursuant to this Section 3.3 shall not exceed $30,000,000 minus the sum of all payments made by PEP Guide and Newco under Articles 2 and 3, and to the extent that GM is entitled to any excess, it shall be paid in the form of a Newco note to GM with a six-month maturity in a principal amount equal to such excess and payable in equal monthly installments of principal together with simple interest at the Prime Rate from the date of issuance through and including each payment date. All cash payments under this Section shall be made by wire transfer in U.S. dollars in immediately available funds to an account designated by the receiving Party. In the event Newco is in disagreement with a portion of the Closing Inventory Statement, the Closing Inventory Amount or the calculation of the Asset Amount, Newco or GM, as the case may be, shall pay any undisputed amounts pursuant hereto, and any disputed amounts shall be paid at such time as all disagreements are resolved in accordance with Section 3.2C hereof.

05-44481-rdd    Doc 9426-3    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-1
- LightSource Formation Agreement    Pg 26 of 59

15

3.4.    Prorations, Adjustments of Expenses Following the Closing.

    3.4.1.    Prorations.

        (i)  To the extent that GM makes any payment with respect to the Business prior to, on or following the Closing Date with respect to any item listed in any of clauses (ii)(a) through (e) below relating to any period following the Closing Date, Newco shall reimburse GM that portion of such payment relating to such period following the Closing Date, and

        (ii)  To the extent PEP Guide or Newco makes any payment relating to the Business following the Closing Date with respect to any item listed in any of the clauses (a) through (e) below relating to any period on or prior to the Closing Date, GM shall reimburse PEP Guide or Newco that portion of such payment relating to such period on or before the Closing Date, in each case for the following:

            (a) personal property, real property and other ad valorem Taxes.

            (b) water, wastewater treatment and sewer charges, and any other assessments payable with respect to the Owned Real Estate or the Anderson, Indiana Real Estate, together with Taxes thereon.

            (c) electric, fuel, gas, telephone and other utility charges.

            (d) reimbursable employee business expenses.

            (e) payments and charges, including rentals and other charges under leases, due pursuant to any Contracts (other than pursuant to collective bargaining agreements or Benefit Plans) or Permits or licenses or rights with respect to Intellectual Property, in each case, to which GM is a party or is obligated and which are being assumed by Newco pursuant to this Agreement.

In connection with the foregoing, at the Closing GM shall deliver to PEP Guide and Newco a list of all outstanding bills and invoices for, and setting forth the amount of, Taxes, water, sewer, and other assessments, and electric, fuel, gas, and other utility charges due within 30 days following the Closing, where the failure to pay such amounts within such thirty-day period will result in interest, penalties and/or late charges in excess of $5,000 individually.

    3.4.2.    Further Assurance.

A.  To the extent that after Closing, GM, on the one hand, or Newco, on the other hand, receives any bills or invoices for any of the items listed in this Section 3.4 or similar items, relating to both pre-Closing and post-Closing periods, such Party shall within 10 business days send a copy of any such bills or invoices to the other Party.

B.  If necessary to avoid incurring interest, penalties and/or late charges, the Party receiving any such bill or invoice shall pay all amounts shown to be due thereon, and shall invoice the other Party for reimbursement of all amounts owed by such other Party thereunder, and such other Party shall reimburse such amounts in accordance with Section 3.4.3.

05-44481-rdd    Doc 9426-3    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-1
- Light Source Formation Agreement    Pg ● of 59

16

### 3.4.3. Payments.

Except as set forth in Section 3.4.2, any reimbursement due under this Section 3.4 shall be made by wire transfer of immediately available funds or check (A) with respect to the disputed portion of any item, within 15 days after the end of the month during which a final determination thereof has been made with respect thereto and (B) with respect to the undisputed portion of any item, within 15 days after the end of the month during which a written notice which sets forth the nature and amount of such payment, together with the manner in which such amounts were calculated, has been received. When a Party makes a payment to a third party which is required to be reimbursed to it by another Party, the reimbursement payments shall be considered the repayment of an advance.

### 3.4.4. Prosecution of Claims.

Any Party liable for more than 50% of the amount apportioned or to be borne under this Agreement with respect to any item referred to in this Section 3.4, may, at its option, prosecute by litigation or administrative proceeding, at its sole expense and risk, including the obligation to pay such amount and full penalties thereon, if any, in its own name and in the name of the other Party, and receive any and all claims for refund, abatement or recovery without any subsequent obligation to remit or prorate any portion thereof to the other Party, subject to its reimbursement obligation under Section 3.4.1; provided, however, that if such Party is liable for less than 75% of the amount apportioned or to be borne under this Agreement with respect to any item referred to in this Section 3.4, then such Party shall not consent to the entry of any judgment or enter into any settlement with respect to any such item without the written consent of the other Party, which shall not be unreasonably withheld or delayed. The other Parties shall cooperate with any such prosecution of any claim with respect to any such item at the expense of the Party prosecuting such claim, but shall not be required to incur any risk or expense.

### 3.5. Supplementary Payments.

A. As soon as practicable after December 31, 1998, Newco shall deliver to GM, at Newco's sole cost and expense, copies of audited financial statements of the Business, with appropriate footnotes, similar to the 1997 Financial Statements, for the period beginning on the Closing Date and ending on December 31, 1998 (the "Stub Period Financial Statements"). The Stub Period Financial Statements shall be prepared in accordance with GAAP consistently applied with the 1997 Financial Statements (except for the effects of purchase accounting and, if applicable, change in method of valuing Inventory) and shall fairly present the balance sheet as of December 31, 1998 and the results of operations and cash flows of the Business for the period indicated and shall be accompanied by an unqualified report thereon of independent public accountants of recognized national standing. Contemporaneously, Newco shall deliver to GM a statement (the "Supplementary Payment Statement") setting forth the calculation of Consolidated EBITDA (plus or minus, as the case may be, the impact of the effects of the use of purchase accounting and, if applicable, the change in the method of Inventory) and the Supplementary Payment (as defined below). If so requested by GM, Newco shall, and shall cause independent public accountants of recognized national standing to, deliver to GM, or permit GM and its accountants to review, the working papers of Newco and such accountants relating to the Supplementary Payment Statement (collectively, the "Stub Period Working Papers").

B. If the Closing Date is after August 31, 1998 and on or before October 1, 1998, and if Consolidated EBITDA of the Business for the period from October 1, 1998 to December 31, 1998, represented in the Stub Period Financial Statements, is more than $115,000 less than $7,800,000,

05-44481-rdd   Doc 9426-3   Filed 09/19/07   Entered 09/19/07 19:21:39   Exhibit B-1
- Light Source Formation Agreement   Pg of 59

17

GM shall pay to Newco the total amount by which Consolidated EBITDA for such period is less than $7,800,000.

If the Closing Date is after October 1, 1998 and on or before October 31, 1998, and if Consolidated EBITDA of the Business for the period from November 1, 1998 to December 31, 1998, represented in the Stub Period Financial Statements, is more than $30,000 less than $2,100,000, GM shall pay to Newco the total amount by which Consolidated EBITDA (including the amount of any negative number) for such period is less than $2,100,000.

If the Closing Date is after November 1, 1998 and on or before November 30, 1998, and if Consolidated EBITDA of the Business for the period from December 1, 1998 to December 31, 1998, represented in the Stub Period Financial Statements, is more than $10,000 less than $700,000, GM shall pay to Newco the total amount by which Consolidated EBITDA (including the amount of any negative number) for such period is less than $700,000.

The "Supplementary Payment" shall be any such amount refunded to Newco together with simple interest at the Prime Rate from the Closing Date through and including the date of payment.

C. Subject to Section 3.5D, GM shall pay Newco the Supplementary Payment within five business days of Newco's delivery to GM of the Stub Period Financial statements and the Supplementary Payment Statement, pursuant to Section 3.5A, by wire transfer in U.S. dollars in immediately available funds to an account designated by Newco.

D. In the event that GM is in disagreement with the calculation of Consolidated EBITDA or the Supplementary Payment set forth on the Supplementary Payment Statement, and in the event that such disagreement exceeds, in either case, $50,000, GM shall, within 30 business days after receipt of the Supplementary Payment Statement, the accompanying Stub Period Financial Statements and, if requested, the Stub Period Working Papers, notify Newco of such disagreement(s). If Newco and GM shall not have resolved all such disagreements within 20 business days immediately following notice thereof by GM, both GM and Newco shall immediately refer those items of disagreement to a three-member dispute resolution panel. The panel shall consist of the Chief Financial Officer of GM and Newco, or such individual's designee, plus one individual designated by them together. The panel may establish procedures for resolution of the disagreements, including a requirement that reasonable requests made by one Party to the other for information shall be honored in order that each of the Parties may be advised of relevant facts. A majority decision of the dispute resolution panel shall be the view of the panel but shall not be binding unless the Parties agree in writing in advance of submittal that it shall be binding. Resolution of the matters in dispute shall be made as soon as practicable in accordance with this Agreement. Any costs and fees of such dispute resolution panel shall be shared equally by GM and Newco. Each of the Parties agrees that neither it nor any of its Affiliates will initiate other legal action with respect to the Supplementary Payment Statement or the calculation of Consolidated EBITDA or the Supplementary Payment unless and until such efforts have been unsuccessful in resolving the disagreements for at least 60 days after a written notice of disagreement was delivered to Newco with respect to such matter.

4.   ASSUMPTION OF LIABILITIES.

From and after the Closing Date, Newco shall assume and shall pay, perform and discharge, subject to the provisions of Article 6, the obligations of GM with respect to the Business to be paid, performed or discharged after the Closing Date under the Contracts and Permits and licenses and rights with respect to Intellectual Property, in each case, included in the Acquired Assets and assigned to Newco pursuant to this Agreement, and for goods ordered by GM or its Affiliates prior

to the Closing Date in the Ordinary Course of Business that are necessary for use in the Business and which are received by Newco after the Closing Date, except to the extent included in the Closing Inventory Amount to be reflected on the Closing Inventory Statement (collectively, the "Assumed Liabilities").

Newco shall not assume, nor shall it be liable or otherwise responsible for, any obligations or liabilities of GM or any of its Affiliates, whether relating to the Business or otherwise, except for the Assumed Liabilities. Without limiting the generality of the foregoing, except for the Assumed Liabilities, Newco shall not assume, or become liable or otherwise responsible for, any liabilities, obligations, or commitments of GM or any of its Affiliates, whether contingent or otherwise, fixed or absolute, known or unknown, present or future or otherwise, whether relating directly or indirectly to the conduct of the Business or the ownership of the Acquired Assets on or prior to the Closing Date, including accounts payable and accrued liabilities, accruable liabilities in accordance with GAAP, obligations or future obligations whether or not recordable as a liability under GAAP for property, plant or equipment located at the Monroe Plant or the Anderson Plant, wages, employee benefits, employment discrimination claims, product liability claims, litigation (including litigation with respect to intangibles described in Section 2.3.8 or Intellectual Property), product returns, environmental liabilities, Tax liabilities, license fees and utility charges.

Notwithstanding the foregoing, no provision of this Article 4 is intended to limit or otherwise restrict the obligations and liabilities of Newco under the Permitted Exceptions or pursuant to Section 3.4, Article 6 and Article 9 hereof, but this sentence shall not cause Newco to become liable for Taxes that are not Assumed Liabilities.

5.    REPRESENTATIONS AND WARRANTIES.

5.1.    Representations and Warranties of GM.

GM represents and warrants to PEP Guide and Newco as follows:

5.1.1.    Organization; Standing.

GM is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware, and has the requisite corporate power and corporate authority to own, lease and operate the Acquired Assets and to carry on the Business as currently conducted.

5.1.2.    Authority; Binding Effect.

GM has the requisite corporate power and corporate authority to execute and deliver this Agreement and the Ancillary Agreements to which GM is a party, and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated herein and therein. The execution, delivery and performance of, and consummation of the transactions contemplated by, this Agreement and the Ancillary Agreements to which GM is a party have been duly authorized by all necessary corporate action on the part of GM and its Affiliates, and no other corporate action or proceeding on the part of GM or any of its Affiliates is required to authorize the execution, delivery or performance of, or consummation of the transactions contemplated by, this Agreement or any Ancillary Agreement. This Agreement has been duly executed and delivered by GM, and is, and the Ancillary Agreements to which GM is a party will be when executed and delivered, valid and binding obligations of GM, enforceable against GM in accordance with their respective terms.

19

### 5.1.3. Qualification.

GM is duly qualified or licensed and in good standing as a corporation duly authorized to do business in the states of Indiana and Louisiana, which are the only jurisdictions where the nature of the Business as currently conducted, or the ownership, lease or operation of the Acquired Assets, makes such qualification or license necessary.

### 5.1.4. Sufficiency of Acquired Assets.

The Acquired Assets, together with (A) the Intellectual Property rights to be licensed or sublicensed on or prior to the Closing Date pursuant to the Intellectual Property Licenses, (B) the services and contracts to be provided or administered by GM or its Affiliates pursuant to Section 2.5 and (C) the Excluded Assets other than intangibles as described in Section 2.3.8 constitute all properties, assets, agreements, licenses and services necessary for the conduct of the Business as currently conducted.

### 5.1.5. Personal Property; Third-Party Bailed Assets.

A. GM has good and valid title to the Personal Property and Inventory included in the Acquired Assets and the Excluded Assets, free and clear of any and all Liens, except those set forth in Schedule 5.1.5A, none of which, individually or in the aggregate, interferes in any material respect with the current use by the Business of the assets to which they relate.

B. To GM's knowledge, Schedule 5.1.5B sets forth a list of all machinery, equipment and capitalized tools as of August 31, 1998, and a description of substantially all other tangible personal property, in each case, included in the Acquired Assets. The Personal Property which is required for the conduct of the Business as currently conducted included in the Acquired Assets and the GM Bailed Assets are in good working order and repair with the exception of such assets that need repair or replacement in the Ordinary Course of Business.

C. The Inventory is in good condition and is usable and of merchantable quality, except to the extent reserved in the books and records of GM with respect to the Business. All finished goods included in the Inventory are of appropriate quantity and quality and saleable in the Ordinary Course of Business. All machinery and equipment spare parts are useable in the ordinary course of business. All raw materials, work-in-process, and finished goods Inventory are of such quality as to meet or exceed GM's "in house" quality control standards and any applicable quality control standards of any Governmental Authority. All Inventory disposed of by GM since December 31, 1997 has been sold in the Ordinary Course of Business.

D. To GM's knowledge, Schedule 5.1.5D sets forth a list of the equipment, special tools or tooling, dies, molds, patterns, jigs, gauges and production fixtures and special material handling equipment in the possession of the Business and which is provided to the Business on a bailment basis by the customers identified in Schedule 5.1.5D (other than GM and its Affiliates).

### 5.1.6. Litigation.

Except as set forth in Schedule 5.1.6A, there is no claim, action, suit, proceeding, investigation or inquiry by or before any Governmental Authority or arbitration tribunal, whether at law or in equity, pending or, to GM's knowledge, threatened by or against GM or any of its Affiliates with respect to, or affecting, (i) the Business or (ii) any of the Acquired Assets, or (iii) which challenges or otherwise questions this Agreement or any of the Ancillary Agreements, or any action taken or to

05-44481-rdd    Doc 9426-3    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-1
- Light Source Formation Agreement    Pg 31 of 59

20

be taken pursuant hereto or thereto or in connection with the contribution of the Acquired Assets. And except as set forth in Schedule 5.1.6A, there is no judgment, order or decree of any Governmental Authority or arbitration tribunal with respect to the Business or any of the Acquired Assets. Except as set forth in Schedule 5.1.6B, none of the claims, actions, suits, proceedings, investigations or inquiries, or the judgments, orders or decrees, in each case, set forth in Schedule 5.1.6A (i) has had or is reasonably likely to have a Material Adverse Effect, (ii) is reasonably likely to impair GM's ability to perform its obligations hereunder or under any Ancillary Agreement or to consummate the transactions contemplated hereby or thereby or (iii) is reasonably likely to impair the ability the ability of Newco to conduct the Business after the Closing as currently conducted. Schedule 5.1.6C sets forth a list of all (a) written product liability claims, and oral claims for which GM has a written record, in each case, made against GM or, to GM's knowledge, any other Person with respect to the Products since December 31, 1997 and (b) amounts paid by GM (or any insurance company under any policy issued to GM) or, to GM's knowledge, any other Person with respect to such claims. There is no claim, action, suit, proceeding, investigation or inquiry by or before any Governmental Authority or arbitration tribunal pending or, to the knowledge of GM, threatened by or against GM or any of its Affiliates which relates to any Product alleged to have been, or to be, defective, or improperly designed or manufactured, including pursuant to any warranty, whether expressed or implied.

### 5.1.7.  Intellectual Property Rights.

A.  Schedule 5.1.7A sets forth a list of all U.S. and foreign patents, patent applications, inventions, trademarks, service marks, and trade names (including the name of each jurisdiction in which such Intellectual Property has been registered), and registered copyrights (including applications and registrations), as well as all licenses to or by and rights of GM or any of its Affiliates with respect to any of the foregoing, in each case, included in the Acquired Assets. Should GM or Newco reasonably determine after the Closing that items have inadvertently not been included in Schedule 5.1.7A, GM shall take all actions necessary to transfer ownership of such items to Newco.

B.  Except as set forth in Schedule 5.1.7B, (i) GM has good and valid title to, or an enforceable right to use, all the Intellectual Property to be assigned, licensed or sublicensed to Newco pursuant to this Agreement, free and clear of any and all Liens; (ii) none of such Intellectual Property has been knowingly misappropriated from any Person; (iii) GM has received no claim or notice that the use of any such Intellectual Property infringes or results in a product that infringes upon the rights of any other Person and, to GM's knowledge, no such infringement exists; (iv) to GM's knowledge, no infringement or improper use by any Person of any such Intellectual Property exists, and there is no claim, action, suit, proceeding, investigation or inquiry instituted by or on behalf of GM in which an act constituting an infringement of any of the rights to any such Intellectual Property has been alleged to have been committed by any Person; and (v) GM has not taken or omitted to take any action which would have the effect of waiving any rights to any such Intellectual Property.

C.  No claim, action, suit, proceeding, investigation, or inquiry, whether at law or in equity, is pending or, to GM's knowledge, threatened by or before any Governmental Authority or arbitration tribunal seeking the revocation of any license listed in Schedule 5.1.7A. Except as set forth in Schedule 5.1.7C, each such license is valid, binding and in full force and effect according to its terms; no notice of termination thereof or default thereunder has been sent or received by GM, and neither GM, nor, to GM's knowledge, any other party to any such license, is (or with notice or lapse of time or both would be) in material breach thereof; there are no unresolved material disputes under any such license; and the assignment or sublicense of any such license pursuant to this Agreement will not result in termination of, or result in a right of termination under, any such license, or bring into operation any other provision thereof; and GM has the right to assign or sublicense each such

license and, except as set forth in Schedule 5.1.7C, has obtained the Consent of the licensor where necessary.

D.  The Intellectual Property included in the Acquired Assets, together with (i) the Intellectual Property to be licensed or sublicensed at or prior to the Closing pursuant to the Intellectual Property Licenses and (ii) the Intellectual Property, including Software, to be used by GM, its Affiliates or EDS in providing the services pursuant to Section 11.4, constitute all Intellectual Property necessary for the conduct by Newco (or Newco's designee(s)) of the Business as currently conducted.  Except as set forth in Schedule 5.1.7B, GM has no knowledge of any claim or potential contingent claim that the conduct of the Business by Newco (or Newco's designee(s)) as currently conducted would infringe any patent or intellectual property right of any third party.  None of the intangibles described in Section 2.3.8 and included in the Excluded Assets is used or held for use primarily in the Business.

### 5.1.8.  Compliance with Laws; Permits.

Except as set forth in Schedule 5.1.8A, GM has been since December 31, 1997, and is, and the Business and the Acquired Assets have been since December 31, 1997, and are, in compliance in all material respects with all Permits and all Laws applicable to the Acquired Assets or the conduct of the Business.  GM possesses all such Permits, each of which is listed in Schedule 5.1.8.  Except as set forth in Schedule 5.1.8B, each such Permit is in full force and effect, and there is no claim, action, suit, proceeding, investigation, or inquiry pending or, to GM's knowledge, threatened, that has resulted or is reasonably likely to result in the revocation, cancelation or suspension, or any materially adverse modification, of any such Permit.  Since December 31, 1997, GM has not received from any Governmental Authority any notice alleging any conflict, default or violation, or revocation, cancelation or modification, of any such Permit, or any violation of any Law applicable to the Business or any of the Acquired Assets, except as set forth in Schedule 5.1.8C.

### 5.1.9.  Brokers.

GM has employed no finder, broker, agent, or other intermediary in connection with the negotiation or consummation of this Agreement, any Ancillary Agreement, or any of the transactions contemplated hereby or thereby, other than Morgan Stanley & Co. Incorporated, which is acting for GM and whose fees and expenses will be paid by GM.

### 5.1.10.  No Consents Required; Absence of Conflicting Agreements.

A.  The execution and delivery by GM of this Agreement and the Ancillary Agreements to which GM is a party do not, and the performance by GM of this Agreement and the Ancillary Agreements to which GM is a party and the consummation of the transactions contemplated hereby and thereby will not, (i) conflict with or violate the Certificate of Incorporation or By-Laws, in each case as currently in effect, of GM, (ii) conflict with or violate any Law applicable to GM, the Business or any of the Acquired Assets or by or to which GM, the Business or any of the Acquired Assets is bound or subject, (iii) result in a violation of or conflict with or constitute a default under, or result in the revocation, cancelation or modification of, any Permit or (iv) result in any breach of, or constitute a default (or an event that with notice or lapse of time or both would constitute a default) under, or give to any Person any right of termination, amendment, acceleration or cancelation of, or require payment under, or result in the creation of a Lien on any of the Acquired Assets under, any note, bond, mortgage, indenture, contract, agreement, arrangement, commitment, lease, license, permit, franchise or other instrument or obligation to which GM is a party or by or to which GM, the Business or any of the Acquired Assets is bound or subject.

05-44481-rdd    Doc 9426-3    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-1
- Li&#x2026;Source Formation Agreement    Pg &#x2026; of 59

22

B.  No consent, approval, waiver, license, order, authorization or permit of, or registration, declaration, or filing with, or notice to ("Consent"), any Governmental Authority or any other Person is required in connection with the execution, delivery, and performance by GM of this Agreement and the Ancillary Agreements to which GM is a party, or the consummation by GM of the transactions contemplated hereby and thereby, except (i) the Consents required under any Contracts or Permits listed in Schedule 2.5.1B, and (ii) any filing required under the HSR Act.

### 5.1.11.  Financial Statements.

GM has delivered to PEP Guide and Newco copies of the audited financial statements of (i) sales less costs and expenses and cash flows, for the years ended December 31, 1995, 1996 and 1997, and (ii) assets to be sold, as of the end of the years ended December 31, 1996 and 1997, of the Business, with appropriate footnotes (the "1997 Financial Statements"), attached hereto as Schedule 5.1.11A. Such statements have been prepared in accordance with GAAP consistently applied and fairly present the assets to be sold as of December 31, 1996 and 1997 and the related results of operations and cash flows of the Business for each of three years ended December 31, 1997 and are accompanied by an unqualified report thereon of Deloitte & Touche LLP. GM has also provided to PEP Guide and Newco a schedule entitled "Sales Less Costs & Expenses: OM to Statements", attached hereto as Schedule 5.1.11B, and such schedule fairly and accurately reconciles the financial statements contained in the Offering Memorandum dated November 1997 to the 1997 Financial Statements for the three years ended December 31, 1995, 1996 and 1997. GM or any current part of Delphi Automotive shall cooperate in the future with PEP Guide and Newco in (a) providing any additional predecessor information for the Business reasonably required by PEP Guide or Newco and (b) the reissuance of the 1997 Financial Statements or the financial statements to be delivered pursuant to Section 11.9 for unrestricted use by PEP Guide or Newco. Such cooperation shall include providing (without cost to Newco) the 1997 Financial Statements and financial statements to be delivered pursuant to Section 11.9, including unqualified reports thereon from Deloitte & Touche LLP, that are acceptable in form and content to the U.S. Securities and Exchange Commission (the "SEC") in filings under the Securities Act of 1933, as amended, and the Securities Exchange Act of 1934, as amended. Should changes to such statements be required in the future in order for them to be acceptable in form and content to the SEC, GM and any current part of Delphi Automotive (without cost to Newco) in cooperation with PEP Guide and Newco will use its best efforts in making such revisions as may be necessary to make such statements acceptable, including obtaining unqualified reports thereon from Deloitte & Touche LLP.

### 5.1.12.  Undisclosed Liabilities.

Except as set forth in Schedule 5.1.12, since December 31, 1997, neither GM nor any Affiliate of GM, with respect to the Business, has incurred any cost or expense other than (i) such as have been reflected as expenses in the 1997 Financial Statements and (ii) such as have been incurred since December 31, 1997 in the Ordinary Course of Business.

### 5.1.13.  Contracts.

A.  Except as listed in Schedule 5.1.13A, and other than licenses or rights with respect to Intellectual Property, neither GM nor any of its Affiliates is, in respect of the Business, a party to, or subject to, any oral or written:

      (i)    contract or commitment for the purchase, sale or lease (other than contracts required to be listed under clause (ii) or (iv) below) of tangible or intangible personal property

05-44481-rdd    Doc 9426-3    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-1
- Light Source Formation Agreement    Pg     of 59

23

involving any receipt to or expenditure by GM of more than $250,000 per annum and which is not terminable by GM upon notice of 30 days or less without any penalty or liability to GM;

(ii)    contract or commitment for the purchase, sale or lease (other than contracts listed under clause (iv)(b) below) of tangible or intangible personal property pursuant to purchase orders which (a) contain no additional or different terms than GM's standard purchase order terms and conditions set forth in Schedule 2.3.1 and (b) other than with respect to direct material purchases (i.e., the purchase of materials incorporated into the Products), involve any receipt or expenditure by GM of more than $250,000 per annum (together, "Standard Purchase Orders");

(iii)    contract to obtain services involving any expenditure by GM of more than $250,000;

(iv)    contract for the sale or lease of, or warranty relating to, the Products or the furnishing of services of the Business that (a) contains additional or different terms than GM's standard purchase order terms and conditions set forth in Schedule 2.3.1, or (b) involves any receipt to or expenditure by GM of more $250,000 per annum and which is not terminable by GM upon notice of 30 days or less;

(v)    sales agency, sales representative, broker, distributor, or similar contract, agreement or arrangement which cannot be canceled by GM without penalty or payment of any premium upon notice of 30 days or less;

(vi)    joint venture, joint research or development, joint financing, teaming or partnership contract or arrangement or other agreement involving sharing of profits or revenues;

(vii)    guarantee, performance bond, surety, indemnification, letter of credit or similar commitments relating to the performance of any obligation by any Person other than GM in respect of the Business;

(viii)    agreement, arrangement, contract or other commitment, including any covenant not to compete or other restrictive covenant, which purports to limit in any respect the manner, or the localities, in which GM or Newco is entitled to conduct all or any portion of the Business or own or operate any of the Acquired Assets;

(ix)    employment contract, stay, completion bonus or severance agreement with any employee of GM with respect to the Business;

(x)    plans, contracts or agreements pursuant to which GM, with respect to the Business, has any obligation to the Persons listed in Schedule 6.1A and Schedule 6.1B; Employee Pension Benefit Plans and Employee Welfare Benefit Plans relating to the Business which are sponsored by or contributed to by GM (the "Benefit Plans"); or agreements with any labor union or other representative of employees connected with the Business (including local agreements, amendments, supplements, letters, and memoranda of understanding of any kind); or

(xi)    contract or commitment relating to the Business and not otherwise referred to above, regardless of whether made in the Ordinary Course of Business, that involves any receipt to or expenditure by GM of more than $250,000 per annum and which is not terminable by GM upon notice of 30 days or less.

B. Except as set forth in Schedule 5.1.13B, (i) each of the Contracts is valid, binding and in full force and effect according to its terms; (ii) no notice of termination thereof or material default thereunder has been sent or received by GM, and neither GM, nor, to GM's knowledge, any other party to any of the Contracts, is (or with notice or lapse of time or both would be) in material breach thereof, (iii) there are no unresolved material disputes under any of the Contracts (other than those listed in Schedule 5.1.19A(viii) or referred to in Section 5.1.6A); (iv) all Listed Contracts listed in Schedule 5.1.13D have been entered into on an arm's-length basis; and (v) the assignment of any Listed Contract listed in Schedule 5.1.13D pursuant to this Agreement will not result in termination of, or result in a right of termination under, any Listed Contract, or bring into operation any other provision thereof.

C. GM has furnished to PEP Guide and Newco (i) copies of all written Listed Contracts (other than Standard Purchase Orders and the EDS Agreements), (ii) a written description of any oral Listed Contract, and (iii) copies of GM's standard forms, if any, for contracts for the sale or lease of, and warranties relating to, the Products or the furnishing of services of the Business.

D. Schedule 5.1.13D sets forth a list of all Listed Contracts which will be assigned to Newco at the Closing pursuant to this Agreement.

### 5.1.14. Regulatory Matters.

Except as set forth in Schedule 5.1.14, GM is not required to obtain any Permits with respect to the operation of the Business, ownership of the Acquired Assets or manufacture or sale of the Products.

### 5.1.15. Real Estate.

A. The Owned Real Estate and the Anderson, Indiana Real Estate, together set forth in Schedule 5.1.15A, constitute all of the Real Estate used or held for use in the Business or on which the Acquired Assets are located. Except for Permitted Exceptions and except as set forth on Schedule 5.1.15A, GM has good, marketable and insurable fee simple title to the Owned Real Estate and the Anderson, Indiana Real Estate, free and clear of any and all Liens. Except as set forth in Schedule 5.1.15A, GM is not a party to any contract or option to purchase, sell, assign, lease or otherwise acquire or dispose of, or to grant or create any interest in or restriction on or affecting, any Owned Real Estate or the Anderson, Indiana Real Estate, and since December 31, 1997, GM has not in respect of the Business purchased, sold, assigned or otherwise acquired or disposed of any Real Estate used in, or located in the area of, the Business.

B. Except as set forth in Schedule 5.1.15B, there is no Real Estate leased by GM or its Affiliates which is used or held for use primarily or exclusively in the Business.

C. GM has not received any written notice or communication advising it of any general or special assessment relating to the Owned Real Estate or the Anderson, Indiana Real Estate which is not fully paid. To the knowledge of GM, there are no plans by any Governmental Authority which may result in the imposition of any special assessment relating to the Owned Real Estate or the Anderson, Indiana Real Estate.

D. GM is in compliance in all material respects with, and has not received any written notice of any violation of, any and all building codes, special use permits, zoning ordinances, deed restrictions, covenants, subdivisions and urban redevelopment plans, and other applicable Laws relating to the Owned Real Estate or the Anderson, Indiana Real Estate.

05-44481-rdd    Doc 9426-3    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-1 - Li...Source Formation Agreement    Pg... of 59

25

E. Except for Permitted Exceptions and as set forth in Schedule 5.1.15E, there are no variances, special exceptions, easements or agreements pertaining to the Owned Real Estate or the Anderson, Indiana Real Estate imposed by, or granted by or entered into by GM, with or enforceable by any Governmental Authority. Except as set forth in Schedule 5.1.15E, no written notice from any Governmental Authority has been received by GM requiring or calling attention to the need for any work, repair, construction, alteration or installation on, or in connection with, the Owned Real Estate or the Anderson, Indiana Real Estate.

F. No certificate of occupancy or any equivalent thereof of any jurisdiction is required for the conduct of the Business as currently conducted by GM on any Owned Real Estate or the Anderson, Indiana Real Estate.

G. All of the Owned Real Estate and the Anderson, Indiana Real Estate have access and connections to sanitary sewer, water, electricity, gas, telephone and all other utilities needed to conduct the Business, and, to the knowledge of GM, other than as provided in Schedule 5.1.15G, there is no existing fact or condition which, individually or in the aggregate, is reasonably likely to result in termination of any such access or connection.

H. To the knowledge of GM, no fact or condition exists which would prohibit existing rights of access to and from the Owned Real Estate or the Anderson, Indiana Real Estate from and to public highways and roads, and GM has not received written notice of any pending or threatened restriction or denial, whether from a Governmental Authority or any other Person, upon such ingress or egress.

I. GM has not received any written notice of any pending or threatened condemnation or eminent domain proceeding with respect to the Owned Real Estate or the Anderson, Indiana Real Estate.

J. Neither the Owned Real Estate nor the Anderson, Indiana Real Estate is subject to any right of first refusal or right or option to purchase or right of first refusal or right or option to lease or acquire any interest therein.

### 5.1.16. Tax Matters.

A. GM has duly and timely filed with the appropriate federal, state, local, and foreign authorities or governmental agencies, all Tax Returns required to be filed with respect to the Business and has paid all Taxes due and owing except where the failure to file or to pay such Taxes would not have a Material Adverse Effect on the financial condition of the Business and would not cause a Tax Lien to apply to the Acquired Assets except for Permitted Exceptions.

B. GM has timely withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee working within the Business, except where the failure to file or to pay such Taxes would not have a Material Adverse Effect on the financial condition of the Business and would not cause a Tax Lien to apply to the Acquired Assets except for Permitted Exceptions.

C. GM is not a party to any Tax allocation or sharing agreement, except as provided in Section 3.4.1 of this Agreement, under which PEP Guide, Newco or the Acquired Assets could be subject to Tax or other liability after the Closing.

D. GM is not a party to, or subject to, any safe harbor leases or sale/leaseback transactions with respect to any of the Acquired Assets.

05-44481-rdd    Doc 9426-3    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-1
- Light Source Formation Agreement    Pg 1 of 59

26

E. There are no Liens with respect to Taxes upon the Business or any of the Acquired Assets other than with respect to Taxes not currently due and payable.

### 5.1.17. Absence of Certain Changes or Events.

Except as set forth on Schedule 5.1.17, since December 31, 1997, (a) GM has conducted the Business only in the Ordinary Course of Business, (b) GM has not engaged in or taken any action (or failed to take any action) with respect to the Business which would be prohibited by Section 11.1A (ii) or (iii) or Section 11.1B (ii) (other than in the Ordinary Course of Business) or (iii) if taken after the date of this Agreement and (c) there has not occurred, nor has there been any condition, event, circumstance, change or effect which has had or is reasonably likely to have, a Material Adverse Effect.

### 5.1.18. ERISA.

A. Except as set forth in Schedule 5.1.18, with respect to each employee benefit plan, arrangement or agreement that is maintained or contributed to by GM (the "Plans"):

   (i)    Each of the Plans is in compliance in all material respects with applicable Law (including, if applicable, ERISA and the Code); each of the Plans intended to be "qualified" within the meaning of Section 401 (a) of the Code is so qualified;

   (ii)    No Plan has an accumulated or waived funding deficiency within the meaning of Section 412 of the Code; GM has not incurred, directly or indirectly, any material liability (including any material contingent liability) to or on account of a Plan pursuant to Title IV of ERISA; no proceedings have been instituted to terminate any Plan that is subject to Title IV of ERISA; no "reportable event", as such term is defined in Section 4043(b) of ERISA, has occurred with respect to any Plan; and no condition exists that presents a material risk of incurring a liability to or on account of a Plan pursuant to Title IV of ERISA; and;

   (iii)    No Employee Pension Benefit Plan is multiemployer Plan (within the meaning of Section 4001(a)(3) of ERISA); there is no pending or, to the knowledge of GM, threatened or anticipated claim (other than routine claims for benefits) by, on behalf of or against any of the Employee Pension Benefit Plans or any trusts related thereto; each Employee Welfare Benefit Plan has been operated in compliance in all material respects with Section 4980B of the Code and all related rules and regulations at all times.

B. Neither the execution, delivery or performance of this Agreement or any Ancillary Agreement, nor the consummation of the transactions contemplated hereby or thereby, will accelerate the time of payment or vesting, or increase the amount, of compensation due to any Transferred Employee.

### 5.1.19. Labor Relations and Employment.

A. Except as set forth in Schedule 5.1.19A, with respect to the Business and the Acquired Assets: (i) there is no labor strike, lock-out or material dispute, slowdown or stoppage pending or, to the knowledge of GM, threatened against the Business and since December 31, 1997 there has not been any such labor strike or lockout, or material dispute, slowdown or stoppage; (ii) to the knowledge of GM, no union claims to represent the employees of the Business; (iii) GM is not a party to nor bound by any collective bargaining or similar agreement with any labor organization, written work rules or practices or unwritten work rules or practices material to the Business as presently conducted, agreed to with any labor organization or employee association; (iv) none of the

05-44481-rdd   Doc 9426-3   Filed 09/19/07   Entered 09/19/07 19:21:39   Exhibit B-1
- Light Source Formation Agreement   Pg 38 of 59

27

employees of GM is represented by any labor organization and GM has not received notice of any current union organizing petition to the NLRB from other employees of the Business, nor has GM received notice of any NLRB procedure concerning representation of such employees; (v) there are no written personnel policies, rules or procedures with respect to the terms of employment of employees of the Business; (vi) GM is in compliance in all material respects with all applicable Laws respecting employment and employment practices, terms and conditions of employment, wages, hours of work and occupational safety and health; (vii) there is no unfair labor practice charge or complaint against GM pending or, to the knowledge of GM, threatened before the NLRB or any similar Governmental Authority; (viii) there is no grievance arising out of any collective bargaining agreement or other grievance procedure which, if adversely determined, is, individually or in the aggregate, reasonably likely (A) to have a Material Adverse Effect, (B) to impair GM's ability to perform its obligations hereunder or under any Ancillary Agreement to which it is a party or to consummate the transactions contemplated hereby or thereby or (C) to impair materially the ability of Newco to conduct the Business after the Closing as presently conducted; (ix) there is no charge with respect to or relating to GM pending before the Equal Employment Opportunity Commission or any other agency responsible for the prevention of unlawful employment practices which, if adversely determined, is, individually or in the aggregate, reasonably likely (A) to have a Material Adverse Effect, (B) to impair GM's ability to perform its obligations hereunder or under any Ancillary Agreement to which it is a party or to consummate the transactions contemplated hereby or thereby or (C) to impair the ability of Newco to conduct the Business after the Closing as presently conducted; (x) GM has not received any written notice of the intent of any Governmental Authority responsible for the enforcement of labor or employment Laws to conduct an investigation or other inquiry with respect to or relating to GM, and no such investigation or other inquiry is in progress; and (xi) there is no claim, action, suit, proceeding, investigation or inquiry pending or, to the knowledge of GM, threatened in any forum by or on behalf of any present or former employee of the Business, any applicant for employment or classes of the foregoing alleging breach of any express or implied contract of employment, any Law governing employment or the termination thereof or other discriminatory, wrongful or tortuous conduct in connection with the employment relationship, which, if adversely determined, is, individually or in the aggregate, reasonably likely (A) to have a Material Adverse Effect, (B) to impair GM's ability to perform its obligations hereunder or under any Ancillary Agreement to which it is a party or to consummate the transactions contemplated hereby or thereby or (C) to impair the ability of Newco to conduct the Business after the Closing as presently conducted.

B.  Since December 31, 1997, with respect to the Business and the Acquired Assets, GM has not effectuated (i) a "plant closing" (as defined in the WARN Act) affecting any site of employment or one or more facilities or operating units within any site of employment or facility of the Business; or (ii) a "mass layoff" (as defined in the WARN Act) affecting any site of employment or facility of the Business; nor has the Business been affected by any transaction or engaged in layoffs or employment terminations sufficient in number to trigger application of any similar state or local law. None of the Business' employees has suffered an "employment loss" (as defined in the WARN Act) during the previous six months.

### 5.1.20. No Misleading Statements.

Neither this Agreement (including the Schedules and Exhibits hereto), or the certificates delivered pursuant to the terms hereof, nor any document or writing delivered by GM at the Closing in connection herewith, contains any untrue statement of a material fact or omits or fails to state any material fact necessary to make the statements contained herein or therein not misleading.

05-44481-rdd    Doc 9426-3    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-1
- Light Source Formation Agreement    Pg    of 59

28

5.1.21. <u>Current Products</u>.

Except as set forth on Schedule 5.1.21, the Products manufactured by Delphi Automotive in 1998 at the Monroe Plant and the Anderson Plant and shipped to GM generally complied with (i) all of GM's quality, design, service, technology and delivery requirements and procedures applicable to such Products and such Plants, including those applicable to such Plants in accordance with QS-9000 standards and (ii) the requirements applicable initially to Newco under the Component Supply Agreement.

5.1.22. <u>Year 2000</u>.

Except as set forth on Schedule 5.1.22, to the knowledge of GM, the computer software and hardware related to (i) the production, control and manufacturing processes of the Business and (ii) the order and acceptance systems between the Business and GM are and will be able to process all date information prior to and after December 31, 1999 without any material errors, aborts, delays or other material interruptions (collectively, "errors") in operations associated with the Year 2000 Problem. To the extent that any such material errors do occur, Newco shall provide GM reasonable notice of such material errors, and, with cooperation from Newco, notwithstanding Article 12, Newco's exclusive remedy is that GM shall use its best efforts to promptly repair the affected computer software and hardware. GM will continue to manage the investigation, planning, remediation, repair and testing of computer software and hardware with respect to the Year 2000 Problem as part of the current GM Year 2000 Program. GM and Newco will jointly continue to follow all plans and processes under the GM Year 2000 Program. GM and Newco will provide the necessary resources to continue participation in the GM Year 2000 Program, which includes completion of all respective activities and tasks required by the GM Year 2000 Program regarding investigation, planning, remediation, repair and testing of computer software and hardware. The "Year 2000 Problem" means the risk that computer hardware and software may be unable to recognize and properly execute date-sensitive functions involving certain dates prior to and any dates after December 31, 1998.

5.1.23. <u>Absence of Other Representations or Warranties</u>.

Except for the representations and warranties set forth in this Agreement, the Ancillary Agreements, and the certificates delivered pursuant to the terms hereof or thereof, GM makes no representations or warranties, express or implied, with respect to the Acquired Assets or the Business.

5.1.24. <u>Preference Stock</u>.

Except as provided herein, GM is not party to any agreement, and has no other obligation or intention, to sell, transfer, deliver or otherwise dispose of any Series A Preference Stock or Series B Preference Stock, and until one year after the Closing Date, GM will not do or make any of the foregoing except that after January 1, 1999 it may transfer such stock to Delphi Automotive.

5.2.    <u>Representations and Warranties of PEP Guide and Newco</u>.

PEP Guide and Newco represent and warrant to GM as follows:

05-44481-rdd    Doc 9426-3    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-1
- Liquidsource Formation Agreement    Pg of 59

29

### 5.2.1.  Corporate Data.

Each of Newco and PEP Guide is a corporation or company duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation or formation and has the requisite corporate or company power and corporate or company authority to own, lease and operate its properties and assets.

### 5.2.2.  Corporate Power, Due Authorization.

Each of Newco and PEP Guide has the requisite corporate or company power and corporate or company authority to execute and deliver this Agreement and the Ancillary Agreements to which it is a party, and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated herein and therein.  The execution, delivery and performance of, and consummation of the transactions contemplated by, this Agreement and the Ancillary Agreements to which each of Newco and PEP Guide is a party have been duly authorized by all necessary corporate or company action on the part of Newco or PEP Guide, as a party thereto, and no other corporate or company action or proceeding on the part of Newco or PEP Guide is required to authorize the execution, delivery and performance by it of, or consummation of the transactions contemplated by, this Agreement or any Ancillary Agreement to which it is party.  This Agreement has been duly executed and delivered by PEP Guide and is, and the Ancillary Agreements to which Newco or PEP Guide is a party will be when executed and delivered, valid and binding obligations of Newco and PEP Guide, as a party thereto, enforceable against it in accordance with their respective terms.

### 5.2.3.  No Consent Required.

No Consent of any Governmental Authority or any other Person is required in connection with the execution, delivery, and performance by Newco or PEP Guide of this Agreement or the Ancillary Agreements to which it is a party, or the consummation by Newco or PEP Guide of the transactions contemplated hereby and thereby, except any filing under the HSR Act, if such filing is required.

### 5.2.4.  Absence of Conflicting Agreements.

The execution and delivery by Newco and PEP Guide of this Agreement and the Ancillary Agreements to which it is a party does not, and the performance by Newco and PEP Guide of this Agreement and the Ancillary Agreements to which it is a party and the consummation of the transactions contemplated hereby and thereby will not, (i) conflict with or violate the Certificate of Incorporation or By-laws or Certificate of Formation or operating agreement, in each case as currently in effect, of Newco or PEP Guide, (ii) conflict with or violate any Law applicable to Newco or PEP Guide or by or to which Newco or PEP Guide is bound or subject, or (iii) result in any breach of, or constitute a default (or an event that with notice or lapse of time or both would constitute a default) under, or give to any Person any right of termination, amendment, acceleration or cancelation of, or require payment under, any note, bond, mortgage, indenture, contract, agreement, arrangement, commitment, lease, license, permit, franchise or other instrument or obligation to which Newco or PEP Guide is a party or by or to which Newco or PEP Guide is bound or subject.

05-44481-rdd   Doc 9426-3   Filed 09/19/07   Entered 09/19/07 19:21:39   Exhibit B-1
- Light Source Formation Agreement   Pg 41 of 59

30

### 5.2.5.  Salaried Transferred Employees.

Newco has no present intention of terminating the employment of any Salaried Transferred Employees.

### 5.2.6.  Financing.

PEP Guide has, or at the Closing will have, sufficient funds to consummate the transactions contemplated by this Agreement, including equity commitments in the amount of $30,000,000 or such other amount agreed to by GM and PEP Guide.

### 5.2.7.  Brokers.

Neither Newco nor PEP Guide has employed any finder, broker, agent, or other intermediary in connection with the negotiation or consummation of this Agreement, any Ancillary Agreement or any of the transactions contemplated hereby or thereby for which GM would be liable.

### 5.2.8.  Subsidiary.

Upon the Closing PEP Guide will be the registered and beneficial owner of all the outstanding shares of capital stock of Newco it is acquiring pursuant to this Agreement.

## 6.    PERSONNEL MATTERS.

Capitalized terms used in this Section 6 and not defined in this Section 6 or elsewhere in this Agreement, shall have their respective meanings set forth in the UAW Agreement, or in the applicable GM Salaried Policies manuals or Your GM Benefits Handbook for Salaried Employees in the United States or the plans identified in Schedule 5.1.13(x). Each reference to "seniority" in this Section 6 shall mean the individual's seniority based on such individual's total service with GM and Newco.

### 6.1.    Responsibility for Employees.

A.  Schedule 6.1A identifies all hourly employees of GM who were employed by, or otherwise accorded employment rights with respect to, the Business, or utilized primarily in the operation of the Business (including salaried employees who have become hourly employees) as of the date indicated therein, by name, location, and status (e.g., active, GM JOBS Program, leave of absence, and layoff) as of such date. GM agrees to provide to Newco a revised Schedule 6.1A on each of September 30, 1998 and the Closing Date dated as of such date. Schedule 6.1B identifies all salaried employees of GM whom GM will transfer to Newco, including name, location, and status (e.g., active or leave of absence). Effective as of Closing, GM will transfer to Newco, and Newco will employ, all active hourly employees identified on Schedule 6.1A who are employed by GM on the Closing Date, including those remaining in the GM JOBS Program associated with the Monroe Plant and the Anderson Plant, but excluding employees on layoff status (hourly employees who are actually transferred to Newco are referred to herein as "Hourly Transferred Employees"), and all active salaried employees identified on Schedule 6.1B (salaried employees identified on Schedule 6.1B who are actually transferred to Newco are referred to herein as "Salaried Transferred Employees"). Any Salaried Transferred Employee who becomes an hourly employee on or before the six month anniversary of the Closing Date shall be considered an Hourly Transferred Employee

05-44481-rdd   Doc 9426-3   Filed 09/19/07   Entered 09/19/07 19:21:39   Exhibit B-1
- Light Source Formation Agreement   Pg 42 of 59

31

for purposes of this Agreement. Hourly Transferred Employees and Salaried Transferred Employees will be collectively referred to herein as "Transferred Employees".

B. At Closing, hourly employees and salaried employees, in each case, who are identified on Schedule 6.1A or 6.1B, as applicable, and are on leave, including disability leave (whether or not any applicable waiting period relating to such disability leave is then satisfied) (each an "Hourly Leave Employee" or "Salaried Leave Employee" and, collectively, a "GM Leave Employee"), shall remain employed by GM. GM Leave Employees, however, will commence employment with Newco upon their return to work in accordance with termination of leave eligibility and, at such time, become Transferred Employees. Any disagreement between GM and Newco regarding termination of disability leave status will be submitted to a binding third party medical arbiter (selected by mutual agreement of GM and Newco). Cost of such arbitration shall be shared equally.

GM hourly and salaried employees who are absent at Closing due to illness or injury and, prior to reporting to work at Newco, subsequently go on a sick leave of absence for the same condition will be treated as GM Leave Employees. GM hourly and salaried employees who are absent at Closing and return to work shortly thereafter without going on an approved leave will become Transferred Employees at Closing and report to work at Newco when able or available.

C. Except as provided in Section 6.21, Newco agrees that it will not knowingly hire, without the prior written consent of GM (which consent shall not unreasonably be withheld), on a regular, contract or other basis, any employee who was employed on a salaried basis and who broke credited service with GM or any of its Affiliates within 18 months prior to Closing.

D. Newco will provide written notice to GM whenever a Transferred Employee retires or otherwise breaks seniority or length of service with Newco.

E. GM shall retain all liability (including, but not limited to, the requirements of the WARN Act and Section 4980B of the Code and any related rules and regulations) relating to any employee of GM or its Affiliates who is not and never was a Transferred Employee.

F. Prior to Closing, GM shall use its best efforts to reduce to zero the number of employees in the GM JOBS Program associated with the Monroe Plant and the Anderson Plant.

6.2.   Special Provisions Relating to Hourly Employees.

A. Effective as of the Closing, Newco will assume the UAW Agreement, Supplements and Exhibits, as required by Document 91 of the UAW Agreement.

B. Newco will maintain or cause to be maintained for the benefit of the Hourly Transferred Employees such employee benefit and pension plans as required by the UAW Agreement. Newco agrees to assume the GM seniority status of Hourly Transferred Employees for all purposes under the UAW Agreement. GM agrees to continue GM seniority accumulation for Hourly Transferred Employees pursuant to the provisions of the UAW Agreement applicable to laid off employees.

C. GM will comply with all its obligations under any and all collective bargaining agreements to which it is a party which affect the operation of or the Transferred Employees at the Monroe Plant and the Anderson Plant. Newco will comply with all its obligations under any and all collective bargaining agreements to which it is a party which affect the operation of, or the employees at the Monroe Plant and the Anderson Plant.

05-44481-rdd    Doc 9426-3    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-1
- Light Source Formation Agreement    Pg 43 of 59

32

D. GM and Newco expect to enter into an agreement (the "MOU") with the UAW with respect to the effects of the contribution of the Acquired Assets, the assumption by Newco of the applicable terms of the UAW Agreement and other related matters. The Parties agree that, to the maximum extent possible, this Agreement will be interpreted by GM and Newco in a manner consistent with the provisions of the MOU. To the extent, however, that any provision of the MOU is inconsistent with any provision of this Agreement with respect to the rights of any Hourly Transferred Employee, the provisions of the MOU shall supersede this Agreement.

      6.3.    Return of Certain Hourly Transferred Employees to GM.

A. During the term of the UAW Agreement, Newco will accept written applications from Hourly Transferred Employees to return to employment with GM and these employees will be eligible to accept bona fide active openings within GM on the same basis as laid-off GM UAW hourly employees. Hourly Transferred Employees who so apply may accept bona fide active openings within GM at any time in the future, and GM will make offers to these Hourly Transferred Employees, who have applied, on the basis of seniority GM-wide, within a trade or any non-skilled classification, as bona fide active openings arise. Any Hourly Transferred Employee returned to employment with GM under Section 6.3 shall cease to be a Transferred Employee and shall be referred to herein as an "Hourly Returned Employee" as of the date such employee returns to employment with GM. No Hourly Returned Employee who returns to employment with GM pursuant to this Section 6.3A. shall have any right to return to employment with Newco.

B. During the period beginning on the Closing Date and ending on the fifth anniversary of the Closing Date (the "Return Period"), Newco shall have the right, but not the obligation, to return Hourly Transferred Employees to employment with GM so that the number of Hourly Transferred Employees of the Business is reduced to 1,600 (The "Business Target Number") These returned employees shall cease to be Transferred Employees and will become Hourly Returned Employees in accordance with the following provisions:  (i) employees who voluntarily return to employment with GM will do so on the basis of applications and seniority within a trade or non-skilled classification (i.e., employees who submit applications to return to employment with GM will be ranked by seniority and the most senior employee within a trade or non-skilled classification will be offered the opportunity to return to employment with GM); provided, however, that to the extent Newco identifies an employee with critical skills who, on the basis of seniority, seeks to return to employment with GM, such employee will remain employed by Newco until Newco trains another employee to replace the employee with critical skills, which training Newco will complete as soon as practicable; (ii) in the absence of sufficient applications, Newco shall notify GM of the number of Hourly Transferred Employees to be returned to GM pursuant to this Section 6.3 at any particular time from either the Monroe Plant or Anderson Plant, which number will be filled by employees beginning with the lowest seniority employees within a trade or non-skilled classification. In the case of (i) or (ii) above, if bona fide openings do not exist within GM sufficient to actively employ such Hourly Transferred Employees whom Newco desires to return from the Monroe Plant or Anderson Plant to employment with GM, then GM will use its best efforts to provide incentives programs to, or to relocate, each such Hourly Transferred Employee at GM's expense within 60 to 90 days of the date such Hourly Transferred Employee becomes idle. If, after any such incentive payments or relocation, any such Hourly Transferred Employee remains idle, Newco will release all temporary hourly employees from such Plant, if any, prior to returning any Hourly Transferred Employees from such Plant to employment with GM. If Newco returns Hourly Transferred Employees to employment with GM so that the number of Hourly Transferred Employees of the Business is reduced to below 1,900 (but not below 1,600), Newco shall pay GM $2,000 per month for each full month (and a pro rata amount for any lesser period) remaining in the Return Period that each such returned Hourly Transferred Employee is employed by GM by wire transfer in U.S.

05-44481-rdd    Doc 9426-3    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-1
- Light Source Formation Agreement    Pg 44 of 59

33

dollars in immediately available funds by the 10th day of each month to an account designated by GM; provided that Newco shall pay a minimum of $12,000 for each such returned Hourly Transferred Employee regardless of the number of months remaining in the Return Period. In no event shall there be any payment by Newco for attrition at Newco or its Affiliates, including retirement, death, termination, voluntary severance or voluntary return.

C. At Closing, Newco will provide GM with a status report outlining the expected monthly flow of employees back to GM (specifying the number of employees within each employee classification), and Newco will promptly provide GM with, from time to time, any changes to this status report in excess of 50 employees. Newco will further provide GM with written notice prior to returning any Hourly Transferred Employees to employment with GM pursuant to Sections 6.3B or 6.3D (the "Newco Return Notice"). The Newco Return Notice shall specify the number of employees which Newco will return to GM, the plant (i.e., Monroe Plant or Anderson Plant) from which such employees will be returned, the number of employees in each classification, and the date on which Newco will return such employees to GM; provided, however, that the date of return of the employees to GM shall be no less than 30 days from the date on which such notice is delivered to GM, and names and social security numbers of such employees shall be provided to GM prior to the expiration of this thirty-day period. As used in this Agreement, the term "Intended Return Date" shall mean the date on which Newco will return employees to GM as specified in the Newco Return Notice. This written notice shall be provided to the director of the GM National Employee Placement Center, Room 9-128, 3044 West Grand Boulevard, Detroit, MI 48202. Notwithstanding the foregoing, in the event that GM notifies Newco that it has an accelerated need for employees which varies from the status report, Newco will use its reasonable efforts to accommodate GM's needs.

D. If any Hourly Leave Employee commences active employment with Newco at either the Monroe Plant or Anderson Plant at a time that the number of Hourly Transferred Employees exceeds the Business Target Number, Newco shall have the right but not the obligation to immediately return one Hourly Transferred Employee from the respective plant to employment with GM in accordance with procedures set forth in Section 6.3B. On the date of such employee's return to employment with GM, such employee will cease to be a Transferred Employee and will become an Hourly Returned Employee.

E. Any employment reductions which Newco seeks to make beyond the Business Target Number will be handled by Newco consistent with applicable labor agreements. Except as provided otherwise in Sections 6.6 and 6.7, Newco shall be solely responsible for the costs associated with such reductions.

F. If before the fifth anniversary of the Closing Date, Newco determines to increase employment levels at the Monroe Plant or the Anderson Plant to fulfill supply agreements between Newco and GM that are in existence at the Closing Date, Newco shall offer to rehire former employees from the Anderson Plant or Monroe Plant, as applicable, on the basis of seniority if any such employees remain in GM's JOBS Program (after application of the separation incentive payments/relocation efforts in accordance with Section 6.3B) or layoff. Any such employee hired by Newco shall, upon such hiring become an Hourly Transferred Employee. If no such employees remain in GM's JOBS Program, Newco may hire new employees.

6.4.    Payment of Wages and Benefits of Hourly Transferred Employees.

A. In accordance with Section 6.19, GM will be responsible for the payment of all wages and benefits of Hourly Transferred Employee relating to, or earned during, any period ending on or prior

to the Closing Date, except specifically provided otherwise in Sections 6.6 and 6.7. In accordance with Section 6.19, Newco will be responsible for the payment of all wages and benefits of Hourly Transferred Employees relating to, or earned during any period after the Closing Date, except as specifically provided otherwise in Sections 6.6 and 6.7.

B. In the event that at the Closing Date the number of Hourly Transferred Employees exceeds the Business Target Number, GM shall, on a monthly basis, reimburse Newco for wages and benefits of the excess Hourly Transferred Employees (excluding temporary employees) at each facility, for such periods of time, subsequent to the Closing Date, that such excess Hourly Transferred Employees are placed in Newco's JOBS Program. The amount of such reimbursement shall be computed as the cost of each excess employee's total wages and Benefits for the applicable period in the JOBS bank. For purposes of any reimbursement made between GM and Newco pursuant to Section 6.4 of this Agreement, "wages" shall mean actual wages paid to the employee and "Benefits" shall equal $71 per person per calendar day.

C. In the event that Newco seeks to return an Hourly Transferred Employee to employment with GM in accordance with Section 6.3B or 6.3D and GM is unable to accept the return of such employee, GM will reimburse Newco on a monthly basis for wages and Benefits of such excess Hourly Transferred Employee for such periods of time, following the Intended Return Date, that such Hourly Transferred Employee is placed in Newco's JOBS Program. The amount of such reimbursement shall be computed as the cost of each such employee's total wages and Benefits determined in accordance with Section 6.4B.

D. Newco shall use its reasonable efforts to enter into a Local Agreement at both the Monroe Plant and the Anderson Plant, and to enter into an MOU with the UAW in accordance with Section 6.2D as soon as practicable following Closing. However, in the event that prior to the later of (i) Newco entering into a Local Agreement at the Monroe Plant or the Anderson Plant whichever is applicable or (ii) Newco entering into an MOU with the UAW, Newco provides a Newco Return Notice with respect to a return of any employee whose job Newco has determined could have been eliminated through legitimate productivity gains, which return either the UAW or the UAW Local 1977 (in the case of Monroe Hourly Transferred Employees) or UAW Local 662 (in case of Anderson Hourly Transferred Employees) will not agree to, GM will reimburse Newco, on a monthly basis, for the wages and Benefits of each employee ("Affected Employee") who could not be returned and is placed in Newco's JOBS bank. The Newco Return Notice shall include written documentation of Newco's proposed productivity improvement as well as the UAW or local union's rejection of such improvement. Such reimbursement from GM shall be paid from the Intended Return Date specified in Newco Return Notice until the date (the "Execution Date") an agreement is signed by Newco and the national or local union which specifically prohibited the return of such employee. Upon the Execution Date, Newco shall either (i) immediately return to GM each Affected Employee or (ii) in the event that Newco is unable to return any Affected Employee, Newco shall promptly refund to GM all amounts received from GM associated with such Affected Employee (with interest at the Prime Rate). Notwithstanding the foregoing, Newco shall immediately notify the General Director, Personnel and Public Affairs, Delphi Interior and Lighting of any events which are likely to result in a request from Newco for reimbursement from GM under this Section 6.4D.

E. The cost of certain employee benefits will be divided between Newco and GM in accordance with Sections 6.6, 6.7 and 6.19. With respect to any reimbursement by GM made under Section 6.4B, C or D, Newco shall submit statements to GM monthly and GM shall pay such statements on a basis of Net 25th prox. Newco may seek reimbursement from GM for any Hourly Transferred Employee's wages and Benefits under either Section 6.4B or Section 6.4C or

Section 6.4D. Newco will not be entitled to simultaneously seek reimbursement under 6.4B, 6.4C or 6.4D for the same employees.

6.5.    Special Provisions Relating to Salaried Employees.

Newco will provide each Salaried Transferred Employee with salary, vacation entitlement, and employee benefit plans and programs (excluding, however, investment features of savings plans, plans and programs limiting coverage to executives, GM's equity plans, and as otherwise provided herein) which are in the aggregate substantially comparable to those provided by GM immediately prior to the Closing, until at least October 1, 1999. Except as otherwise provided in Sections 6.6 and 6.7, Newco will recognize a Salaried Transferred Employee's service with GM for all purposes. Notwithstanding the foregoing, (i) nothing in this Agreement shall be construed to require that Newco employ any Salaried Transferred Employee for any specific length of time and (ii) nothing in this Agreement shall require any Salaried Transferred Employee to be anything other than an "at will" employee of Newco.

6.6.    Retirement Program and Pension Plans.

6.6.1.    Hourly Employees.

Newco will establish or cause to be established, effective at Closing, a new defined benefit pension plan (the "Newco Hourly Pension Plan") covering the Hourly Transferred Employees which, in accordance with this Agreement and Newco's obligation to assume the UAW Agreement, will duplicate the terms and benefits provided to Hourly Transferred Employees under the GM Hourly-Rate Employees Pension Plan (the "GM Hourly Pension Plan"), a copy of which has been provided to Newco and PEP Guide. For purposes of the Anderson Plant, Newco will also duplicate the terms and benefits of the GM Hourly Pension Plan through October 1, 2002, including any changes negotiated between GM and the UAW in conjunction with the 1999 National Agreement. Effective at Closing, Hourly Transferred Employees who were participants in the GM Hourly Pension Plan at Closing (the "Hourly Participants"), shall become participants in the Newco Hourly Pension Plan. The Newco Hourly Pension Plan shall provide for the benefits set forth below, but only to the extent that the applicable collective bargaining agreement with the UAW and any applicable memorandum of understanding with the UAW so requires. GM will amend the GM Hourly Pension Plan to provide the benefits set forth below, but only to the extent that the applicable collective bargaining agreement with the UAW and any applicable memorandum of understanding with UAW so requires. For purposes of this Section 6.6.1, the term "credited service" shall have the meaning set forth in the UAW Agreement. For purposes of Section 6.6.1, credited service at both GM and Newco shall be taken into account by both GM and Newco for purposes of determining eligibility for benefits under the GM Hourly Pension Plan and Newco Hourly Pension Plan, respectively. Following Closing, Transferred Hourly Employees will accrue credited service in the Newco Hourly Pension Plan and will not accrue additional credited service in the GM Hourly Pension Plan except as specifically provided in Sections 6.6.1(f), (g) and (j). Hourly Returned Employees will accrue credited service in the GM Hourly Pension Plan beginning on the date they return to employment with GM and will not accrue additional credited service thereafter in the Newco Hourly Pension Plan.

(a)    With respect to any Hourly Participant who retires from Newco on or after age 62:

(i)    The Newco Hourly Pension Plan will pay such Hourly Participant a benefit which equals the applicable basic benefit rate (as set forth in the Newco Hourly Pension Plan) as

36

of the date of such retirement multiplied by credited service with Newco after the Closing Date (such benefit, "Basic Newco Benefit").

(ii)    The GM Hourly Pension Plan will pay such Hourly Participant a benefit which equals the applicable basic benefit rate (as set forth in the GM Hourly Pension Plan with respect to hourly employees of GM who are not Transferred Employees, determined as of the date of such retirement and taking into account the Hourly Participant's base hourly wage rate as of the date of retirement), multiplied by credited service with GM and with Newco on or before the Closing Date (such benefit, "Basic GM Benefit").

(b)    With respect to any Hourly Participant who retires from Newco on an early voluntary retirement before attaining age 62, with 30 or more total years of credited service with GM and Newco:

(i)    Prior to the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic Newco Benefit, reduced for Hourly Participant's age at retirement in accordance with the terms of the Newco Hourly Pension Plan and (B) an amount equal to the early retirement or other supplement, as determined under the Newco Hourly Pension Plan, taking into account such Hourly Participant's total credited service with GM and Newco ("Newco Applicable Supplement"), multiplied by a fraction the numerator of which is the number of years of credited service (including partial years) with Newco after the Closing Date and the denominator of which is the total credited service with GM and Newco as of the date of retirement ("Newco Service Fraction"). Following the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the Basic Newco Benefit, unreduced by age.

(ii)    Prior to the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic GM Benefit, reduced for Hourly Participant's age at retirement in accordance with the terms of the GM Hourly Pension Plan and (B) an amount equal to the early retirement or other supplement to which such Hourly Participant would be entitled using the benefit rates in effect under the GM Hourly Pension Plan at the time of such Hourly Participant's retirement, taking into account such Hourly Participant's total credited service with GM and Newco, multiplied by a fraction the numerator of which is the sum of credited service with GM and Newco on or before the Closing Date and the denominator of which is the total credited service with GM and Newco as of the date of retirement ("GM Service Fraction"). Following the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the Basic GM Benefit, unreduced by age.

(c)    With respect to any Hourly Participant who retires from Newco on an early voluntary retirement before attaining age 62, with less than 30 total years of credited service with GM and Newco:

(i)    Prior to the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic Newco Benefit, reduced for Hourly Participant's age at retirement in accordance with the terms of the Newco Hourly Pension Plan and (B) an amount equal to the interim supplement rate, as determined under the Newco Hourly Pension Plan ("Newco Interim Supplement"), multiplied by such Hourly Participant's credited service with Newco. Following the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the Basic

Newco Benefit, which, if applicable, shall be reduced for Hourly Participant's age at retirement in accordance with the terms of the Newco Hourly Pension Plan.

(ii)    Prior to the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic GM Benefit, reduced for Hourly Participant's age at retirement in accordance with the terms of the GM Hourly Pension Plan and (B) an amount equal to the interim supplement rate, using the benefit rates in effect under the GM Hourly Pension Plan at the time of such Hourly Participant's retirement, taking into account such Hourly Participant's age at retirement, multiplied by such Hourly Participant's credited service with GM. Following the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the Basic GM Benefit, which, if applicable, shall be reduced for Hourly Participant's age at retirement in accordance with the terms of the GM Hourly Pension Plan.

(d)    With respect to any Hourly Participant who retires from Newco upon total and permanent disability (by agreement between Newco and GM):

(i)    Prior to the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic Newco Benefit, unreduced for age and (B) an amount equal to the temporary supplement, as determined under the Newco Hourly Pension Plan, taking into account such Hourly Participant's total credited service with GM and Newco, multiplied by the Newco Service Fraction. Following the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the Basic Newco Benefit, unreduced for age.

(ii)    Prior to the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic GM Benefit, unreduced for age at retirement in accordance with the terms of the GM Hourly Pension Plan and (B) an amount equal to the temporary supplement, using the benefit rates in effect under the GM Hourly Pension Plan at the time of such Hourly Participant's retirement, taking into account such Hourly Participant's age at retirement and taking into account such Hourly Participant's total credited service with GM and Newco, multiplied by the GM Service Fraction. Following the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the Basic GM Benefit, unreduced for age.

(e)    The Newco Hourly Pension Plan will recognize for participation and vesting, but not for accrual purposes, credited service accrued by Hourly Participants under the GM Hourly Pension Plan as of Closing. In addition, the Newco Hourly Pension Plan will recognize for accrual purposes credited service previously accrued under the GM Hourly Pension Plan for any Hourly Participant who is not vested under the GM Hourly Pension Plan at Closing ("Special Unvested Participant"). Anything in this Agreement to the contrary notwithstanding, Special Unvested Participants shall receive no benefit under the GM Hourly Pension Plan and shall receive a benefit under the Newco Hourly Pension Plan determined solely under the terms of such plan and without regard to Sections 6.6.1 (a), (b), (c) and (d). In accordance with the provisions of Section 6.6.4, GM shall direct the trustees of the GM Hourly Pension Plan to transfer, in cash, from the trust under the GM Hourly Pension Plan to the trust under the Newco Hourly Pension Plan, an amount determined in accordance with Section 6.6.4(c).

(f)    The GM Hourly Pension Plan shall recognize, for accrual, vesting and eligibility purposes, credited service accumulated under the Newco Hourly Pension Plan for any Hourly Participants who (i) retire under the Newco Hourly Pension Plan on a normal, early voluntary, or

total and permanent disability basis (by agreement between Newco and GM) on or before October 1, 1999, and (ii) at the time of such retirement would have been eligible to retire under the GM Hourly Pension Plan on a normal, early voluntary, or total and permanent disability basis (by agreement between Newco and GM) had they continued to be employed by GM until such retirement (such Hourly Participants, "Pre-October 1, 1999 Retirees"). Anything in this Agreement to the contrary notwithstanding, Pre-October 1, 1999 Retirees shall receive no benefit under the Newco Hourly Pension Plan and shall receive a benefit under the GM Hourly Pension Plan determined solely under the terms of such plan and without regard to Sections 6.6.1(a), (b), (c) and (d). In accordance with the provisions of Section 6.6.4, Newco shall direct the Trustees of the Newco Hourly Pension Plan to transfer, in cash, from the trust under the Newco Hourly Pension Plan to the trust under the GM Hourly Pension Plan, an amount determined in accordance with Section 6.6.4(a).

(g)    The GM Hourly Pension Plan shall recognize, for accrual, vesting and eligibility purposes, credited service accumulated under the Newco Hourly Pension Plan for any Returned Hourly Employees who return to GM on or before October 1, 1999 ("Pre-October 1, 1999 Returned Employees"). Anything in this Agreement to the contrary notwithstanding, Pre-October 1, 1999 Returned Employees shall receive no benefit under the Newco Hourly Pension Plan and shall receive a benefit under the GM Hourly Pension Plan determined solely under the terms of such plan and without regard to Sections 6.6.1(a), (b), (c) and (d). In accordance with the provisions of Section 6.6.4, Newco shall direct the Trustees of the Newco Hourly Pension Plan to transfer, in cash, from the trust under the Newco Hourly Pension Plan to the trust under the GM Hourly Pension Plan, an amount determined in accordance with Section 6.6.4(b).

(h)    In the case of any Hourly Participant who has at least 30 years of credited service under the GM Hourly Pension Plan at Closing, there shall be no reduction in the Newco Applicable Supplement payable under the Newco Hourly Pension Plan as of Closing with respect to such Hourly Participant.

(i)    No early retirement under mutually satisfactory conditions ("Mutual Retirement") will be recognized under the GM Hourly Pension Plan after Closing for Hourly Participants. An Hourly Participant who retires from Newco under Mutual Retirement shall receive from the Newco Pension Plan the benefit described in Section 6.6.1(b) or (c), as applicable; provided, however, that in lieu of the portion of the Newco Applicable Supplement or Newco Interim Supplement, if any, that would otherwise be payable from the Newco Hourly Pension Plan under such section, the Hourly Participant shall receive, from the Newco Hourly Pension Plan such supplemental payment as is set forth in the Newco Hourly Plan with respect to Mutual Retirement (based on combined Newco and GM credited service). If an Hourly Participant who is vested at Closing subsequently retires from Newco under a Mutual Retirement, and such Hourly Participant is otherwise eligible to retire on a normal or early voluntary basis under the GM Hourly Pension Plan, then the GM Hourly Pension Plan shall pay benefits in accordance with 6.6.1(a), (b) or (c) as if such Hourly Participant had retired from Newco under a normal or early voluntary retirement, as applicable. If the Hourly Participant is not otherwise eligible to retire on a normal, or early voluntary basis under the GM Hourly Pension Plan as of the date of Mutual Retirement from Newco, then the Hourly Participant shall be eligible under the GM Hourly Pension Plan only for unreduced benefits commencing at age 62 and one month at the benefit levels in effect under the GM Hourly Pension Plan as of the date of retirement from Newco, determined in accordance with 6.6.1(a).

(j)    With respect to any Hourly Participant who is not a Pre-October 1, 1999 Returned Employee, who is vested in the GM Hourly Pension Plan as of Closing and is re-employed by GM thereafter, upon retirement from GM:

(i)     With respect to any Hourly Participant who retires from GM on or after age 62:

(A)     The Newco Hourly Pension Plan will pay such Hourly Participant the Basic Newco Benefit.

(B)     The GM Hourly Pension Plan will pay such Hourly Participant the Basic GM Benefit.

(ii)     With respect to any Hourly Participant who retires from GM on an early voluntary retirement before attaining age 62, with 30 or more total years of credited service with GM and Newco:

(A)     Prior to the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic Newco Benefit, reduced for Hourly Participant's age at retirement in accordance with the terms of the Newco Hourly Pension Plan and (B) an amount equal to the early retirement or other supplement to which such Hourly Participant would be entitled using the benefit rates in effect under the Newco Hourly Pension Plan at the time of such Hourly Participant's retirement, taking into account such Hourly Participant's total credited service with GM and Newco, multiplied by the Newco Service Fraction. Following the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the Basic Newco Benefit, unreduced by age.

(B)     Prior to the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic GM Benefit, reduced for Hourly Participant's age at retirement in accordance with the terms of the GM Hourly Pension Plan and (B) an amount equal to the early retirement or other supplement, as determined under the GM Hourly Pension Plan, taking into account such Hourly Participant's total credited service with GM and Newco, multiplied by the GM Service Fraction. Following the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the Basic GM Benefit, unreduced by age.

(iii)     With respect to any Hourly Participant who retires from GM on an early voluntary retirement before attaining age 62, with less than 30 total years of credited service with GM and Newco:

(A)     Prior to the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic Newco Benefit, reduced for Hourly Participant's age at retirement in accordance with the terms of the Newco Hourly Pension Plan and (B) an amount equal to the interim supplement rate, using the benefit rates in effect under the Newco Hourly Pension Plan at the time of such Hourly Participant's retirement, taking into account such Hourly Participant's age at retirement, multiplied by such Hourly Participant's credited service with Newco. Following the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the Basic Newco Benefit, which, if applicable, shall be reduced for Hourly Participant's age at retirement in accordance with the terms of the Newco Hourly Pension Plan.

(B)     Prior to the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic GM Benefit, reduced for Hourly Participant's age at retirement in accordance with the terms of the GM Hourly Pension Plan and (B) an amount equal to the interim supplement rate, as determined under the GM

Hourly Pension Plan, multiplied by such Hourly Participant's credited service with GM. Following the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the Basic GM Benefit, which, if applicable, shall be reduced for Hourly Participant's age at retirement in accordance with the terms of the GM Hourly Pension Plan.

(iv)    With respect to any Hourly Participant who retires from GM upon total and permanent disability (by agreement between Newco and GM):

(A)    Prior to the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic Newco Benefit, unreduced for age and (B) an amount equal to the temporary supplement, using the benefit rates in effect under the Newco Hourly Pension Plan at the time of such Hourly Participant's retirement, taking into account such Hourly Participant's age at retirement and taking into account such Hourly Participant's total credited service with GM and Newco, multiplied by the Newco Service Fraction. Following the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the Basic Newco Benefit, unreduced for age.

(B)    Prior to the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic GM Benefit, unreduced for age and (B) an amount equal to the temporary supplement rate, as determined under the GM Hourly Pension Plan, taking into account such Hourly Participant's total credited service with GM and Newco, multiplied by the GM Service Fraction. Following the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the Basic GM Benefit, unreduced for age.

(k)    Eligibility of surviving spouses of Hourly Participants and Hourly Returned Employees will be as follows:

(i)    The surviving spouse of an Hourly Participant, who is vested under the GM Hourly Pension Plan at Closing and who dies while employed by Newco, shall be eligible for payment from the GM Hourly Pension Plan of a pre-retirement monthly survivor benefit equal to the pre-retirement monthly survivor benefit rate, determined based on the benefit levels in effect under the GM Hourly Pension Plan at the time of death, multiplied by the Hourly Participant's credited service accrued under the GM Hourly Pension Plan as of Closing. All other GM Hourly Pension Plan terms shall apply, including but not limited to those regarding eligibility and duration of surviving spouse benefits.

(ii)    The surviving spouse of an Hourly Returned Employee who returns to GM after October 1, 1999, who is vested under Newco's Hourly Pension Plan and who dies while employed by GM, shall be eligible for payment from Newco's Hourly Pension Plan of a pre-retirement monthly survivor benefit equal to the pre-retirement monthly survivor benefit rate, determined based on the benefit levels in effect under Newco's Hourly Pension Plan at the time of death, multiplied by the Hourly Returned Employee's credited service accrued under Newco's Hourly Pension Plan. All other Newco's Hourly Pension Plan terms shall apply, including but not limited to those regarding eligibility and duration of surviving spouse benefits.

(l)    Any break in a Transferred Employee's service under the Newco Hourly Pension Plan also shall break such Transferred Employee's service under the GM Hourly Pension Plan with entitlement only to a deferred vested retirement at the benefit levels in effect under the GM Hourly Pension Plan as of the break in service from Newco. Any break in a Returned Employee's service

under the GM Hourly Pension Plan also shall break such Returned Employee's service under the Newco Hourly Pension Plan with entitlement only to a deferred vested retirement at the benefit levels in effect under the Newco Hourly Pension Plan as of the break of service from GM.

(m)    To the extent permitted by applicable law, all benefit payments to any Hourly Participant under the Newco Hourly Pension Plan shall be discontinued upon re-employment with GM or Newco on a regular, contract, or other basis. To the extent permitted by applicable law, all benefit payments to any Hourly Participant under the GM Hourly Pension Plan shall be discontinued upon re-employment with Newco or GM on a regular, contract, or other basis.

### 6.6.2.  Salaried Employees.

Newco will establish or cause to be established, effective as of the date of the Closing, a new retirement program (which may include a defined contribution plan) (the "Newco Salaried Retirement Program") which shall provide benefits necessary to ensure compliance by Newco with Section 6.5 of this Agreement. Effective at Closing, Salaried Transferred Employees (the "Salaried Participants") who were participants of the GM Retirement Program for Salaried Employees (the "GM Salaried Retirement Program") at Closing shall become participants in the Newco Salaried Retirement Program. For purposes of this Section 6.6.2, the term "credited service" shall have the meaning set forth in the GM Salaried Retirement Program.

(a)    The Newco Salaried Retirement Program shall contain the following provisions:

(i)    The Newco Salaried Retirement Program shall recognize, for participation and vesting, but not for accrual purposes, all credited service accrued by Salaried Participants under the GM Salaried Retirement Program as of Closing. In addition, Newco shall assume complete responsibility for all retirement benefits owed to Salaried Transferred Employees who are not vested on the Closing Date under the GM Salaried Retirement Program ("Special Unvested Participant") and Newco's Salaried Retirement Program will recognize for benefit accrual purposes credited service accrued under the GM Salaried Retirement Program as of the Closing.

(ii)    In the case of any Salaried Participant who has at least 30 years of credited service under the GM Salaried Retirement Program at Closing, upon such Salaried Participant's retirement from Newco, Newco or the Newco Salaried Retirement Program shall pay such Salaried Participant, in addition to any other applicable amount, an amount equal to the early retirement or other supplement, as determined under the GM Salaried Retirement Program, multiplied by the Newco Service Fraction.

(iii)    To the extent permitted under the applicable law, all benefit payments to any Salaried Participant under the Newco Salaried Retirement Program shall be discontinued upon re-employment with Newco or GM on a regular, contract, or other basis. Newco shall be responsible for making any payments required by this Section 6.6.2(a) if the Newco Salaried Retirement Program does not contain provisions calling for such payments.

(b)    GM shall amend the GM Salaried Retirement Program to provide Salaried Participants the following as of Closing:

(i)    All Salaried Participants who are vested under the GM Salaried Retirement Program at Closing and retire from Newco, who when taking into account GM and Newco credited service could retire under the GM Salaried Retirement Program, on a normal, early voluntary, or total and permanent disability basis (approved by GM) shall be entitled to payment from the GM

Salaried Retirement Program, upon retirement from Newco, of an amount equal to the total Part A benefits payable under the GM Salaried Retirement Program at the time of retirement from Newco and, for those Salaried Participants who were participants in Part B of the GM Salaried Retirement Program at Closing, (a) a Part B Primary Benefit based on the contributions of the individual Salaried Participant remaining in the GM Salaried Retirement Program as of date of retirement from Newco and the Part B Primary Benefit rates in effect at such time, and (b) a Part B Supplementary Benefit calculated based on the formula under the GM Salaried Retirement Program in effect on the date of retirement from Newco. Such Part B Benefit under the GM Salaried Retirement Program shall be determined as if the Salaried Participant were then retiring from GM on a normal or early voluntary basis or, if applicable, a total and permanent disability basis, and by taking into account solely for eligibility for retirement (but not for the determination of the amount of payment) the additional credited service which would have accrued under the GM Salaried Retirement Program had the service with Newco after the Closing been with GM. The GM Salaried Retirement Program payment will include a Part A Basic Benefit and a Part B Supplementary Benefit (both reduced for age where appropriate) for each year of applicable credited service accrued under the GM Salaried Retirement Program, and any Part B Primary Benefit and any applicable supplement in an amount equal to the difference between the sum of the Part A Basic Benefit and Part B Supplementary Benefit and the pro rata share of the total Part A Benefit. All other GM Salaried Retirement Program terms shall apply.

(ii) If a Salaried Participant, who is vested under the GM Salaried Retirement Program at Closing, subsequently retires from Newco and is not otherwise eligible to retire on a normal, early voluntary, or total and permanent disability basis under the GM Salaried Retirement Program as of the date of retirement from Newco, the Salaried Participant shall be eligible under the GM Salaried Retirement Program only for unreduced benefits at age 62 and one month at the benefit levels in effect under the GM Salaried Retirement Program as of the date of retirement from Newco, increased as appropriate until age 62 and one month as if the GM Salaried Retirement Program benefits had commenced as of the date the Salaried Participant retired from Newco.

(iii) The surviving spouse of any Salaried Participant, who was vested under the GM Salaried Retirement Program at Closing and died while employed by Newco, shall be eligible for payment from the GM Salaried Retirement Program of a survivor monthly benefit or REA pre-retirement monthly survivor benefit, whichever is applicable, based on the Salaried Participant's credited service accrued under the GM Salaried Retirement Program at Closing and the benefit levels in effect under the GM Salaried Retirement Program at the time of death. All other GM Salaried Retirement Program terms shall apply, including, but not limited to, those regarding eligibility and duration of surviving spouse benefits.

(iv) With regard to retirement under subsection (i), (ii) and (iii) above, for Salaried Participants who do not withdraw their Part B contributions prior to separation from service with Newco, the average monthly base salary for calculation of the Part B Supplementary Benefit under the GM Salaried Retirement Program shall be the Salaried Participant's average monthly base salary under the GM Salaried Retirement Program determined at Closing increased 3% per year (non-compounded) for each full year of salaried employment with Newco after Closing until the earlier of age 60, death, or retirement from Newco, but only if such Salaried Participant had continuous salaried employment with Newco from Closing through such event.

(v) Any other break in service under the Newco Salaried Retirement Program shall also break the Salaried Participant's credited service under the GM Salaried Retirement Program with entitlement only to a deferred vested benefit at the benefit levels in effect under the GM Salaried Retirement Program as of the break in service from Newco and the Salaried

05-44481-rdd   Doc 9426-3   Filed 09/19/07   Entered 09/19/07 19:21:39   Exhibit B-1
- Light Source Formation Agreement   Pg __ of 59

43

Participant's average monthly base salary as of Closing increased by 3% per year as described in subsection (iv) above through the date of such Salaried Participant's break in service.

(vi)   Any benefits payable from the GM Salaried Retirement Program under subsections (i), (ii) and (iii) shall be based on provisions applicable to other GM salaried retirees, including any increase in benefit rates based on the Salaried Participant's years of credited service under the GM Salaried Retirement Program.

(c)   To the extent permitted by applicable law, all benefits to any Salaried Participant under the Newco Salaried Retirement Program shall be discontinued upon re-employment with GM or Newco on a regular, contract, or other basis. To the extent permitted by applicable law, all benefit payments to any Salaried Participant under the GM Salaried Retirement Program shall be discontinued upon re-employment with Newco or GM on a regular, contract, or other basis; provided that GM shall not discontinue benefits provided to a former salaried employee that Newco is permitted to hire under Section 6.21.

(d)   With respect to a Salaried Special Unvested Participant covered under Section 6.6.2(a)(i), the amount to be transferred in accordance with Section 6.6.4 shall be the present value of each employee's accrued benefit as of the Closing Date using the benefit rate at the closing date and assumption for determining the minimum lump sum distribution under rules of the Internal Revenue Service for qualified plans.

### 6.6.3.   Other Plan Provisions.

Newco and GM acknowledge that neither they nor their respective pension plans or retirement programs shall be required to recognize any grants of additional age or additional credited service given to Salaried Participants or Hourly Participants by the other party and/or their respective pension plans or retirement programs for any reason. Except as otherwise provided in this Agreement, nothing herein shall be construed to limit GM's or Newco's right to amend the GM Hourly Pension Plan, GM Salaried Retirement Program, Newco Salaried Retirement Program or Newco Hourly Pension Plan (provided that any such amendment or termination is in compliance with Section 411(d)(6) of the Code) to eliminate all or a portion of any supplement or subsidy otherwise payable under their respective plans.

### 6.6.4.   Transfer of Liabilities and Assets.

(a)   With respect to each Pre-October 1, 1999 Retiree, the amount to be transferred in accordance with 6.6.1(f) will be calculated as follows. First, the monthly benefits which each such retiree would have received from the Newco Hourly Pension Plan had the employee remained in the Newco Hourly Pension Plan (including Newco's Basic Benefit, and if applicable, Newco's retirement supplement in accordance with Sections 6.6.1(a), (b), (c) and (d)) will be determined based on applicable benefit rates under the Newco Hourly Pension Plan as of the Valuation Date. Second, the present value of such benefit payments to each such retiree shall be calculated using the SFAS 87 assumptions (e.g., discount rates, mortality assumptions, etc.) set forth in GM's 10k filing for the prior fiscal year that were used to determine GM's net periodic pension expenses for the fiscal year prior to the year in which the Valuation Date occurs. To this amount will be added any pension payments actually made by GM to each such retiree, multiplied by the Newco Service Fraction for such retiree, plus interest at GM's SFAS 87 interest rate to the Valuation Date. The amount to be transferred with respect to each Pre-October 1, 1999 Retiree, regardless of whether the employee is alive on the date of the valuation, shall equal such sum.

05-44481-rdd    Doc 9426-3    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-1
- Light Source Formation Agreement    Pg    of 59

44

(b)     With respect to each Pre-October 1, 1999 Returned Employee, the amount to be transferred in accordance with 6.6.1(g) will be calculated as follows. First, a Projected Benefit Obligation (as defined under SFAS 87) for each such employee based on combined credited service with GM and Newco will be calculated as of the Valuation Date using benefit rates set forth in the GM-UAW contract in effect on the Valuation Date. All other assumptions for computing the Projected Benefit Obligations (as defined under SFAS 87) shall be taken from the SFAS 87 assumptions set forth in GM's 10k filing for the prior fiscal year that were used to determine GM's net periodic pension expense for the fiscal year prior to the year in which the Valuation Date occurs (e.g., retirement assumptions, discount rates, mortality assumptions, etc.). Second, the Projected Benefit Obligation for each such employee shall be multiplied by a fraction determined for each such employee. The numerator of such fraction will be the employee's credited service with Newco and the denominator of such fraction will be the numerator plus the employee's credited service with GM. For Special Unvested Participants, both the numerator and denominator shall reflect credited service transferred at Closing. The amount to be transferred with respect to each Pre-October 1, 1999 Returned Hourly Employee shall equal the product of the Projected Benefit Obligation and such fraction.

(c)     With respect to each Special Unvested Participant, the amount to be transferred in accordance with 6.6.1(e) will be calculated as follows. A Projected Benefit Obligation for each employee will be calculated as of the Closing Date using benefit rates set forth in the UAW Agreement in effect on the Closing Date. All other assumptions for computing the Projected Benefit Obligation shall be taken from the SFAS 87 assumptions set forth in GM's 10k filing for the prior fiscal year that were used to determine GM's net periodic pension expense for the fiscal year prior to the year in which the Closing Date occurs (e.g., retirement assumptions, discount rates, mortality assumptions, etc.). The amount to be transferred with respect to each Special Unvested Participant shall equal such Projected Benefit Obligation plus interest at GM's SFAS 87 discount rate from the Closing Date to the Valuation Date.

(d)     For purposes of this Section 6.6.4, the Valuation Date shall be defined as the date which is 18 months immediately following the Closing Date for all Pre-October 1, 1999 Retirees and all Pre-October 1, 1999 Returned Hourly Employees who retire or return to employment with GM, respectively, prior to the date 18 months immediately following the Closing Date. For all Special Unvested Participants, the Valuation Date shall be defined as the date which is 18 months immediately following the Closing Date.

(e)     The transfer of assets shall comply with Section 414(l) of the Code. However, to the extent that the amount required to be transferred under Section 414(l) is different from the amount determined in accordance with this Section 6.6.4, the amount required under Section 414(l) will be transferred. On the date of such transfer, GM will either pay to (or receive from) Newco, as the case may be, the excess (or the deficit) of the amount computed under this Section 6.6.4, and the amount transferred in accordance with Section 414(l), with interest at GM's SFAS 87 discount rate from the Valuation Date to the date of transfer.

(f)     The determination of amounts to be transferred in accordance with this Section 6.6.4 shall be made by the GM actuary; provided, however, that the GM actuary shall provide the actuary selected by Newco with all the documentation reasonably necessary for Newco to verify such determination within 180 days of the Valuation Date. Newco will verify such determination within 180 days of the receipt of such calculation. Thereafter, Newco and GM shall cooperate to file as soon as reasonably possible all documents, including Forms 5310A, which may be legally required to effect the liability and asset transfer. The transfer shall take place on the 31st day following such filing. Notwithstanding the above, if Newco's actuary informs GM within 60 days of receiving

B.      Except as provided in Section 6.17, GM shall have no liability for health care and life and disability benefits claimed by any Transferred Employee with respect to a claim incurred after Closing, regardless of whether the claim is for a same or similar medical condition, for which a claim was made prior to Closing. Newco shall have no liability for health care and life and disability benefits claimed by any Transferred Employee with respect to any claims incurred on or prior to Closing, regardless of when such claim is reported (which shall be the responsibility of GM).

C.      Upon retirement from Newco or GM, GM shall provide post-retirement health care and life insurance coverage to the following Transferred Employees and Hourly Returned Employees:

        (i)      For Hourly and Salaried Transferred Employees eligible to retire from GM at Closing on a normal or early voluntary basis with employer provided contributions for post-retirement health care and life insurance coverage.

        (ii)     For Hourly and Salaried Transferred Employees who retire on a normal, early voluntary, or total and permanent disability basis (approved by GM) under the GM Hourly Pension Plan or GM Salaried Retirement Plan, as applicable, on or before October 1, 1999, and are then otherwise eligible for employer provided contributions for post-retirement health care and life insurance coverage (including service with Newco for the purpose of determining such eligibility).

        (iii)    For all Hourly Returned Employees who are eligible for such benefits.

The provision of post-retirement health care and life insurance coverage by GM is subject to all applicable benefit plan terms, including but not limited to the right to amend, modify, suspend or terminate the plans. In the case of Hourly Transferred Employees, the post-retirement health programs shall satisfy in full the terms of the UAW Agreement, and, for purposes of the Anderson Plant, shall satisfy the full terms through October 1, 2002, including any changes negotiated between GM and the UAW in conjunction with the 1999 National Agreement.

D.      Provision of post-retirement health care and life insurance coverage for all other Transferred Employees shall be the primary responsibility of Newco, and Newco's health and life and disability benefits program shall take into account combined GM and Newco credited service for eligibility; subject, however, to all applicable plan terms, including but not limited to the right to amend, modify, suspend or terminate the plans.

In addition, the provision of optional and dependent life insurance coverage, if any, in retirement shall be the responsibility of whichever of GM or Newco has the responsibility for providing post-retirement life insurance benefits to the applicable Transferred Employee. In this regard, as of the Closing, Newco or GM, as applicable, shall make available post-retirement optional and dependent life insurance (and personal accident insurance) coverage to all Transferred Employees (at such Transferred Employees' sole expense) who are eligible for post-retirement life insurance from GM in an amount equal to that provided by GM to comparably situated GM employees as of the date of retirement from Newco; provided, however, that nothing herein shall limit Newco's or GM's ability to amend or terminate such coverage.

E.      With respect to post-retirement health care and life insurance coverage provided to Transferred Employees pursuant to Section 6.7.1C, Newco will reimburse GM annually for a portion of the cost of such programs allocated on the following basis: (i) with respect to Hourly Transferred Employees, Newco will reimburse GM on a pro rata basis based on years of service at Newco after the Closing Date to the date the Hourly Transferred Employee is first eligible to retire

05-44481-rdd    Doc 9426-3    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-1
- Ligh&ource Formation Agreement    Pg 8 of 59

47

and receive employer provided postretirement health care and life insurance benefits over total years of service at both Newco and GM to the date the Transferred Employee is first eligible to retire and receive employer provided post-retirement health care and life insurance benefits, and (ii) with respect to Salaried Transferred Employees, Newco will reimburse GM on a pro rata basis based on years of service at Newco after the Closing Date to the earliest date the Salaried Transferred Employee could have retired from GM on a 30 and Out or Age 55 with 85 Points basis with employer-provided post-retirement healthcare and life insurance benefits over the total years of service at both Newco and GM to the earliest date the Salaried Transferred Employee could have retired from GM on a 30 and Out or Age 55 with 85 Points basis with employer-provided post-retirement healthcare and life insurance benefits. If a Salaried Transferred Employee does not retire on a 30 and Out or Age 55 with 85 Points basis, Newco will reimburse GM annually for the cost of the post-retirement health care and life insurance coverage provided to such Salaries Transferred Employee multiplied by the Newco Service Fraction. With respect to post-retirement health care and life insurance coverage provided to Transferred Employees pursuant to Section 6.7.1D, GM will reimburse Newco annually for a portion of the cost of such programs allocated on the following basis: (i) with respect to Hourly Transferred Employees, GM will reimburse Newco on a pro rata basis based on years of service at GM and Newco to the Closing Date to the date the Transferred Employee is first eligible to retire and receive such post-retirement health care and life insurance benefits over total years of service at both GM and Newco to the date the Transferred Employee is first eligible to retire and receive employer provided post-retirement health care and life insurance benefits, and (ii) with respect to Salaried Transferred Employees, GM will reimburse Newco on a pro rata basis based on years of service at GM and Newco to the Closing Date to the earliest date the Salaried Transferred Employee could have retired from GM on a 30 and Out or Age 55 with 85 Points basis with employer-provided post-retirement healthcare and life insurance benefits over the total years of service at both Newco and GM to the earliest date the Salaried Transferred Employee could have retired from GM on a 30 and Out or Age 55 with 85 Points basis with employer-provided post-retirement healthcare and life insurance benefits. If a Salaried Transferred Employee does not retire on a 30 and Out or Age 55 with 85 Points basis, GM will reimburse Newco annually for the cost of the post-retirement health care and life insurance coverage provided to such Salaries Transferred Employee multiplied by the GM Service Fraction. Notwithstanding the foregoing, in the case of Hourly Transferred Employees who retire on a Mutual Retirement or Salaried Transferred Employees who retire on an Incentive Retirement GM's pro rata reimbursement shall not begin until such Transferred Employees otherwise would have been eligible to retire with employer provided post-retirement health care and life insurance coverage. For purposes of this paragraph, "30 and Out" means retirement after 30 or more years of service with GM and Newco, and "Age 55 with 85 Points" means retirement after age 55 with a combined age and service with GM and Newco equal to at least 85.

F.    Newco will be responsible for any incremental health care and life and disability benefits costs (i.e. in excess of the proration assuming the employee retires at the earliest retirement age) associated with any early retirement incentive programs offered by Newco.

6.7.2.  Special Benefit.

With respect to any Hourly Participant or Salaried Participant or such Hourly Participant's or Salaried Participant's spouse who would have become entitled to receive a Special Benefit (as defined in the GM Hourly Pension Plan or GM Salaried Retirement Program, as applicable) had such Hourly or Salaried Participant remained employed at GM during the period of time he or she was employed by Newco:

(i)    Such participant or spouse shall receive from the applicable GM pension plan an amount equal to the Special Benefit that would have been payable had the participant remained employed with GM during the period of time he or she was employed by Newco, multiplied by the GM Service Fraction.

(ii)    Such participant or spouse shall receive from the applicable Newco pension plan, a special benefit, determined under the applicable Newco pension plan, taking into account total credited service with GM and Newco, multiplied by the Newco Service Fraction.

### 6.7.3.  Miscellaneous.

A.    Information Requirements. As provided elsewhere herein, each Party shall reimburse the other Party annually for reasonable and customary health care costs within 45 days after receiving an invoice for same. Said invoice will provide all information necessary for the other Party to review and verify the amount of the pro-rata portion of the cost being invoiced. Further, at a minimum, said invoice will provide data by employee Social Security Number, which details the basis for the pro-rata calculation, the amount of cost incurred, whether the cost incurred was for the retired employee or surviving spouse, whether the cost was for medical, dental, or vision care, and what type of health care insurance plan the employee was enrolled in.

B.    Disputes. If one Party disputes the amount of any such invoice submitted by the other Party, the disputing Party shall provide the other Party with notice of such dispute within 45 days of receipt for said invoice. The other Party shall provide such additional supporting information as may be necessary to respond to the disputed amount within 15 days after receiving such notice. If the additional supporting information is acceptable to the disputing Party, the disputing party shall promptly pay the invoice. If the disputing Party continues to dispute the amount of the invoice following the receipt of the additional supporting information, the invoice shall be submitted to an independent certified public accountant or benefits consulting firm reasonably acceptable to both GM and Newco who shall resolve the dispute. Such resolution shall be binding, and the Party being invoiced shall promptly pay the amount established by the third party. The costs of such third party reviewer shall be shared equally by both Parties.

C.    Audit Right. Each Party shall, having first provided reasonable notice to the other Party, have the right to audit the books and records of the Party submitting an invoice for payment with regard to post-retirement benefit costs. Said audit shall be under the terms of a mutually acceptable Proprietary Data Agreement. The audit shall be conducted by an independent certified public accountant, a benefits consulting firm, or as appropriate, GM Audit Services. Such audits may be performed for each annual invoice received. Any overpayment or underpayment disclosed by such audit shall be credited or debited, as the case may be, against the amount owing on the current annual invoice. The cost of the audit shall be paid by the Party conducting the audit.

D.    Administration Cost. Each Party shall bear its own internal administrative cost associated with post-retirement health care cost.

E.    Personnel Data. Each year, 30 days after the anniversary of the Closing Date, Newco shall provide to GM a complete list of all transferred employees who continue to be employed by Newco. Said list shall provide the name, Social Security Number, years of credited service with Newco, and current employment status of transferred employees.

### 6.8.    Amendment or Termination of Benefit Plans.

Except as otherwise provided in this Article 6, nothing herein shall prejudice the right of Newco or GM to amend or terminate any of its plans, programs, policies or arrangements applicable to any Transferred Employee following the Closing.

### 6.9.    Employee Information, Cooperation in Establishing Newco Benefit Plans.

A.    GM and Newco will each provide the other any relevant information with respect to any Transferred Employee's employment with and compensation from GM or Newco, or rights or benefits under any employee benefit plan which either Party may reasonably request including, without limitation, all direct deposit authorizations provided by any Transferred Employee.

B.    Newco will establish Employee Welfare Benefit Plans, in accordance with the applicable laws, for the Transferred Employees on a timely basis so that such plans will be in effect on Closing. In accordance with the transition services arrangement between GM and Newco, for a period of time after Closing, GM shall administer the Employee Welfare Benefit Plans of Newco. With respect to each such Employee Welfare Benefit Plan, Newco will make all appropriate governmental filings and establish an ERISA benefits claim appeal process (and GM shall provide information relevant to administering such appeal process).

### 6.10.    Grievances.

GM has disclosed to PEP Guide and Newco (or will disclose prior to the Closing) all pending and, to the knowledge of GM, threatened labor grievances and arbitration proceedings which relate to the Business. Prior to the Closing, GM will disclose all labor grievances and arbitration proceedings which relate to the Business which remain unresolved on the Closing Date. GM and Newco will address (i) grievances open as of the date of the Closing and (ii) grievances filed after the date of the Closing relating to an event, occurrence or cause of action arising prior to Closing which affect or relate to the rights of GM or Newco under this Agreement and (iii) grievances filed after Closing relating solely to GM's actions or omissions which prevent an Hourly Transferred Employee from becoming an Hourly Returned Employee or commencing work with GM (collectively, the "Grievances") as set forth below. Newco and GM will cooperate in the defense of the Grievances. Newco will not settle any of the Grievances without GM's consent, if such settlement will result in liability for GM. Such consent will not be unreasonably withheld. GM will not settle any of the Grievances without Newco's consent if such settlement will result in liability for Newco or would require Newco to perform any act, including reinstatement or job assignment or would create any precedent. Such consent will not be unreasonably withheld. If the seniority of a grievant is reinstated as a result of the disposition of a Grievance or a court or administrative order, Newco will reinstate the grievant as if the grievant had been an Hourly Transferred Employee as of the date of the Closing and, in such case, if at the time of such reinstatement the number of employees at the Monroe Plant and Anderson Plant exceed the Business Target Number, as applicable, Newco may immediately return one Hourly Transferred Employee from one of the Plants to employment with GM. In general, for Hourly Transferred Employee who have been continuously employed, back pay liability for all Grievances will be allocated to GM. In general, for employees who become Hourly Transferred Employees because they are reinstated through the grievance procedure, back pay liability will be allocated to GM. The Parties will discuss treatment of Grievances involving unusual circumstances. If Newco withholds consent to a settlement of a Grievance recommended by GM or elects to continue to defend the Grievance jointly with GM, then Newco shall be liable for the portion of the back pay or other liability resulting from the ultimate disposition of such