**EXHIBIT B-2**

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- Liquidation Source Formation Agreement    Pg of 51

50

Grievance (or subsequent settlement) which is in excess of the liability that would have resulted from the settlement recommended by GM and rejected by Newco or that relates to the period following Newco's election to continue to defend the Grievance jointly, as applicable.

### 6.11.  Savings Plan Transfers.

Newco agrees to establish for all Transferred Employees a savings plan (under Section 401(k) of the Code) effective as of Closing. To the extent allowed by applicable law, Newco agrees that Hourly Transferred Employees with account balances in the GM Personal Savings Plan will be eligible to transfer such account balances in accordance with the provisions of the plan to Newco's savings plan applicable to Hourly Transferred Employees. To the extent allowed by applicable law, Salaried Transferred Employees with account balances in the GM Savings-Stock Purchase Program will be eligible to transfer such account balances in accordance with the provisions of the program to Newco's savings plan applicable to Salaried Transferred Employees. The manner of such transfer shall be a direct rollover.

### 6.12.  Allocation of Responsibility for Suggestions Existing as of Closing.

Newco will investigate and review any suggestions related to the Business pending as of Closing. GM will cooperate with Newco to facilitate the investigation and review of all such suggestions. With regard to any suggestions submitted on or prior to the Closing Date, GM will be responsible for payment of any suggestion award related to savings realized on or prior to Closing, with Newco responsible for payment related to savings realized after Closing. Newco will assume responsibility for suggestions related to the Businesses submitted by any Transferred Employee after Closing, regardless of whether submitted on Newco or GM suggestion forms.

### 6.13.  SUB/GIS and JOBS Programs -- Maximum Liabilities.

Newco acknowledges and agrees that, for purposes of the Newco SUB, GIS and JOBS Programs (or successor programs), Newco's maximum liabilities will be an amount determined as provided on Schedule 6.13.

### 6.14.  Vehicle Purchase Program.

Without cost to Newco, (i) Hourly Transferred Employees will continue to be eligible through September 14, 1999 to participate in the GM New Vehicle Purchase Program (the "Program"), and (ii) Salaried Transferred Employees will continue to be eligible through October 1, 1999 to participate in the Program, in each case, in accordance with the terms of the Program.

### 6.15.  Training and Tuition.

Newco will participate in joint activities through the UAW-GM Center for Human Resources ("CHR") in the same manner as provided prior to the Closing Date for the duration of the current UAW Agreement. This includes funding levels, the funding approval process, and full participation in jointly developed and negotiated programs. Newco's funding obligations will be met by monthly payments to the CHR in an amount equal to the accumulated funding obligation incurred by Newco, calculated each month pursuant to the current UAW Agreement's Memorandum of Understanding Joint Activities (III. Funding). Newco's funding rate for overtime hours will be based on the procedure in place for determining such funding rate pursuant to the current UAW Agreement.

6.16.   Tuition Reimbursement Expenses.

GM shall be responsible for payment of all tuition reimbursement expenses which are properly payable under the Tuition Assistance Plan for Salaried Transferred Employees for classes commenced or approved prior to Closing. Tuition reimbursement expenses with respect to Salaried Transferred Employees will be paid by Newco's tuition assistance plan for classes which commence on or after Closing and which have not been approved prior to Closing.

6.17.   Workers' Compensation.

A.      Notwithstanding any applicable state law, GM shall be responsible for (i) workers' compensation claims of Transferred Employees based on injuries or illnesses which arose out of and in the course of employment with GM or Newco on or prior to Closing, regardless of when such claim is made and (ii) workers' compensation claims of Returned Employees based on injuries or illnesses which arose out of and in the course of employment with GM on or after the date such employee returned to employment with GM.

B.      Notwithstanding any applicable state law, Newco will be responsible for (i) workers' compensation claims of Transferred Employees based on injuries and illnesses which arise out of and in the course of employment with Newco after Closing, regardless of whether such injury or illness is the same or similar to a prior injury or illness for which a workers' compensation claim was made on or prior to Closing and (ii) workers' compensation claims of Returned Employees based on injuries or illnesses which arose out of and in the course of employment with Newco prior to the date such employee returned to employment with GM, regardless of when such claim is made.

C.      Notwithstanding any applicable state law, (i) with respect to workers' compensation claims of Transferred Employees based on injuries and illnesses which do not relate to a single occurrence or event and which arise out of and in the course of both employment with GM or Newco on or prior to Closing and employment with Newco after the Closing, GM shall be responsible for any such claims filed on or prior to the first anniversary of the Closing Date and Newco shall be responsible for any such claims filed after the first anniversary of the Closing Date and (ii) with respect to workers' compensation claims of Returned Employees based on injuries or illnesses which do not relate to a single occurrence or event and which arise out of and in the course of both employment with Newco prior to the date such employee returned to employment with GM and employment with GM following such date, Newco shall be responsible for such claims filed on or prior to the date 90 calendar days immediately following the date such employee returned to employment with GM, and GM shall be responsible for any such claims filed thereafter.

D.      With regard to workers' compensation claims for which GM retains responsibility and which involve the payment of lost-time workers' compensation benefits for any GM Leave Employee, Newco will make reasonable efforts consistent with the provisions of the UAW Agreement, the applicable local agreement, and the applicable law, to place such employee in suitable employment. In the event GM and Newco disagree as to any workers' compensation claimant's ability to return to work, both GM and Newco will submit the disagreement to a binding third party medical arbitrator (selected by mutual agreement of Newco and GM). The cost of such arbitrator shall be shared equally by Newco and GM. GM and Newco shall cooperate in good faith to administer the allocation of the workers' compensation benefits provided for in this Section 6.17.

52

### 6.18.    Legal Services Plan.

A.    Newco will provide legal services and administrative support to Transferred Hourly Employees ("Newco Legal Services Plan") through the UAW-GM Legal Services Plan for the duration of the UAW Agreement, including funding required by that Agreement. Prior to Closing, PEP Guide and Newco will elect to pay for this plan either based on Newco's accruals for the plan or at the GM accrual rates. Newco will reimburse the UAW-GM Legal Services Plan on a monthly basis. At Newco's request, GM shall provide Newco such information relating to usage as may be reasonably requested by Newco in order to determine the cost of such usage.

B.    Files open as of the Closing Date with respect to Transferred Employees will be covered by the UAW-GM Legal Services Plan. Files opened after the Closing Date with respect to Transferred Employees and their surviving spouses will be covered by the Newco Legal Services Plan.

### 6.19.    Liability for Certain Benefits.

A.    Except to the extent provided otherwise in this Agreement, Newco shall be responsible for all salaries, wages and benefits of each Transferred Employee earned after the Closing Date, provided, however that except as otherwise provided in this Agreement with respect to Returned Employees, Newco shall not be responsible for any salaries, wages and benefits for periods of time on or after the date of the employee's return to employment with GM. Except to the extent provided otherwise in this Agreement, GM shall be responsible for salaries, wages and benefits of the Transferred Employees earned during or relating to periods on or prior to the Closing Date and, except as otherwise provided in this Agreement with respect to Returned Employees, for periods of time on and following the date of the employee's return to employment with GM.

B.    GM shall pay to Newco (net of relevant offset) an amount equal to the pro rata portion of any unutilized vacation entitlement, if any, that is attributable to Transferred Employees' service with GM before the Closing Date. GM shall pay to each Transferred Employee the amount of all salary and wages earned by such Transferred Employee for all periods ending on or prior to the Closing Date which have not been paid as of the Closing Date.

C.    Within 60 days following the end of each calendar year 1998 and 1999, GM and Newco shall determine the total dollar value of vacation pay, profit sharing and similar compensation-related items accrued for the applicable year with respect to a Transferred Employee or Hourly Returned Employee who was employed at both GM and Newco for such year (the "Accrued Pay"). The Accrued Pay thus determined shall be allocated between GM and Newco pro rata based on pay periods worked before and after the Closing Date (and portions thereof) at GM and Newco, respectively, during the applicable year. From the allocated Accrued Pay amounts both GM and Newco shall subtract any actual payments made by GM or Newco, respectively, during the applicable year to employees who were employed at both GM and Newco for such year (the "Net Accrued Pay"). In the event that Newco's Net Accrued Pay for Hourly Returned Employees exceeds GM's Net Accrued Pay for Transferred Employees, then Newco shall pay to GM the difference between Newco's Net Accrued Pay for Hourly Returned Employees and GM's Net Accrued Pay for Transferred Employees. In the event that GM's Net Accrued Pay for Transferred Employees exceeds Newco's Net Accrued Pay for Hourly Returned Employees, then GM shall pay to Newco the difference between GM's Net Accrued Pay for Transferred Employees and Newco's Net Accrued Pay for Hourly Returned Employees.

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- LifeSource Formation Agreement    Pg 5 of 51

53

6.20.    Approval of Communications.

Where formal communications by GM to GM's employees or Transferred Employees, the public or governmental representatives are contemplated relating to Newco's plans, intentions or obligations with respect to GM employees, such communications shall be reviewed with and approved by PEP Guide. Notwithstanding the foregoing, it is specifically agreed that GM shall have no authority through any authorized or unauthorized communications with its employees or their representatives, the public, or governmental officials, to commit Newco to obligations, hiring arrangements, benefits or other terms or conditions of employment or to any other matter governed by this Article 6, nor shall any such communication by GM expand the specific and limited obligations of Newco set forth herein.

Where formal communications by Newco to GM employees, Transferred Employees, the public or governmental representatives are contemplated relating to GM's plans, intentions or obligations with respect to GM employees, such communications shall be reviewed with and approved by GM. Notwithstanding the foregoing, it is specifically agreed that Newco shall have no authority through any authorized or unauthorized communications with its employees or their representatives, the public, or governmental officials, to commit GM to obligations, hiring arrangements, benefits or other terms or conditions of employment or to any other matter governed by this Article 6, nor shall any such communication by Newco expand the specific and limited obligations of GM set forth herein.

6.21.    Rehiring of Employees.

Newco may offer employment to, and employ, up to 40 former salaried employees of GM who terminated with GM from the 18th month before the Closing Date through the Closing Date.

7.    REAL ESTATE MATTERS.

7.1.    Conveyance.

With respect to the Owned Real Estate, GM will at the Closing execute and deliver to Newco (or Newco's designee(s)) covenant or limited warranty deeds warranting against grantor's acts with respect to the Owned Real Estate in recordable form sufficient to vest in Newco (or Newco's designee(s)) good, marketable and insurable fee simple title to such Owned Real Estate, subject only to the Permitted Exceptions. Notwithstanding any provision of applicable Law to the contrary, the representations, warranties and covenants contained in this Agreement with respect to the Owned Real Estate shall survive the delivery and acceptance of any deed required pursuant to the immediately preceding sentence, shall not be merged into any such deed and shall survive the Closing in accordance with Section 12.1 of this Agreement.

7.2.    Title.

GM will deliver to PEP Guide and Newco in form and substance satisfactory to them, a commitment for Form B 1992 ALTA Owner's Title Insurance Policies with respect to each of the Monroe Plant and the Anderson Plant issued by title insurer(s) approved by PEP Guide, and will deliver copies of each exception to title referred to therein. The title commitment charges, including charges for title abstract and examination, shall be paid by Newco.

7.3.    Land Surveys.

GM will deliver recent surveys ("Surveys") to PEP Guide and Newco, the cost of which shall be
borne by GM, which surveys shall be ALTA/ACSM Land Title Surveys acceptable to PEP Guide
(including 1 through 4, 6, 7 (other than Section (c)), 8 through 11, and 13 of Table A) for each of
the Owned Real Estate and the Anderson, Indiana Real Estate, showing, all known easements and
rights thereon which can be depicted on the Surveys, all Improvements (including fences and
driveways) and access to and from a dedicated and accepted public right-of-way.

8.    CONDITIONS TO CLOSING.

8.1.    Conditions to Obligations of PEP Guide and Newco.

The obligations of PEP Guide and Newco to consummate the transactions contemplated by this
Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions
(any one or more of which may be waived, to the extent permitted by applicable Law, in whole or
in part by PEP Guide):

8.1.1.    Accuracy of Representations and Warranties.

The representations and warranties of GM set forth in this Agreement or in any certificate or
document called for in this Agreement which are qualified as to materiality shall be true and correct
in all respects, and such representations and warranties as are not so qualified shall be true and
correct in all material respects, as of the date when made and at and as of the Closing Date as though
made on such date.

8.1.2.    Performance of Covenants.

GM shall have performed and complied in all material respects with all agreements, obligations,
covenants and conditions required by this Agreement to be performed or complied with by GM at
or prior to the Closing.

8.1.3.    No Litigation.

No claim, suit, action, proceeding, investigation or inquiry shall be threatened or pending by or
before any Governmental Authority in which it is sought to restrain or prohibit or to obtain material
damages or other material relief in connection with this Agreement, any Ancillary Agreement or the
consummation of the transactions contemplated hereby or thereby, or which is reasonably likely to
affect materially the value or utility of the Acquired Assets or the Business, or to impair the ability
of Newco to conduct the Business after the Closing as currently conducted.

8.1.4.    Consents to Assignment of Certain Contracts.

Notwithstanding any provision hereof to the contrary, GM shall have obtained and delivered to PEP
Guide and Newco the Consents set forth in Schedule 8.1.4 in a written instrument in form and
substance reasonably satisfactory to PEP Guide, or the third parties to any agreement requiring such
Consent shall have agreed in writing to terminate such agreement (without penalty to Newco or the
Business) and shall have entered into a substantially similar agreement with Newco, each of which
shall be in full force and effect and the valid and binding obligation of each party thereto.

### 8.1.5. Ancillary Agreements.

Each of the Ancillary Agreements to which GM or any of its Affiliates is a party (A) shall have been duly executed and delivered by such of GM and its Affiliates as are parties thereto, (B) shall be in full force and effect, and (C) shall be the valid and binding obligation of such of GM and its Affiliates as are parties thereto.

### 8.1.6. Material Adverse Effect.

Except as set forth in Schedule 8.1.6, during the period commencing on the date of this Agreement through and including the Closing Date, there shall not have occurred any condition, event, circumstance, change or effect that, individually or in the aggregate, has had or is reasonably likely to have any Material Adverse Effect, other than such as shall have resulted from general economic conditions or conditions affecting the automobile industry generally, including any decline in sales in the North American vehicle markets.

### 8.1.7. Agreement with Lender.

GM and the lender to Newco, or Newco's subsidiaries, shall have entered into arrangements which are satisfactory to PEP Guide, and such lender shall be prepared to fund working capital loans of at least $30,000,000 to Newco or Newco's subsidiaries.

### 8.1.8. Lender Acknowledgment and Security Agreement.

The agreement entered into by GM, Newco and the lender to Newco, or Newco's subsidiaries, referenced in Section 8.2.7 and providing for the exercise of GM's rights pursuant to the Right of Access Agreement, shall be satisfactory to PEP Guide and shall not reduce the loan availability, increase the costs or otherwise adversely affect the economic terms to Newco, or Newco's subsidiaries, of incurring financing from such lender.

### 8.1.9. Missing Items.

If at the date of execution of this Agreement, any Exhibit or Schedule was omitted or incomplete, then the missing item(s) shall be promptly furnished and shall be subject to the satisfaction of Newco and PEP Guide.

### 8.2. Conditions to Obligations of GM.

The obligations of GM to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived, to the extent permitted by applicable Law, in whole or in part by GM).

### 8.2.1. Accuracy of Representations and Warranties.

The representations and warranties of PEP Guide and Newco set forth in this Agreement or in any certificate or document called for in this Agreement which are qualified as to materiality shall be true and correct in all respects, and such representations and warranties as are not so qualified shall be true and correct in all material respects, as of the date when made and at and as of the Closing as though made on such date.

### 8.2.2. Performance of Covenants.

PEP Guide and Newco shall have performed and complied in all material respects with all agreements, obligations, covenants and conditions required by this Agreement to be performed or complied with by it at or prior to the Closing.

### 8.2.3. No Litigation.

No claim, suit, action, proceeding, investigation or inquiry shall be threatened or pending by or before any Governmental Authority in which it is sought to restrain or prohibit or to obtain material damages or other material relief in connection with this Agreement, any Ancillary Agreement or the consummation of the transactions contemplated hereby or thereby.

### 8.2.4. Certain Agreements.

Each of the Ancillary Agreements to which PEP Guide or Newco is a party (A) shall have been duly executed and delivered by such Parties, (B) shall be in full force and effect, and (C) shall be the valid and binding obligation of such Parties.

### 8.2.5. Salaried Employees.

Newco shall have made offers of employment to all salaried employees of the Business.

### 8.2.6. Agreement with Lender.

GM and the lender to Newco, or Newco's subsidiaries, shall have entered into arrangements which are satisfactory to GM, and such lender shall be prepared to fund working capital loans of at least $30,000,000 to Newco or Newco's subsidiaries.

### 8.2.7. Lender Acknowledgment and Security Agreement.

GM, Newco and the lender to Newco, or Newco's subsidiaries, shall have entered into an agreement which is satisfactory to GM that provides for the exercise of GM's rights pursuant to the Right of Access Agreement and the Lender's acknowledgement of such right and the granting by Newco to GM of a non-monetary security interest in the assets of Newco.

## 9.    ENVIRONMENTAL MATTERS.

### 9.1    Definitions.

#### 9.1.1.    Adverse Consequences.

"Adverse Consequences" means any liabilities, compensatory or punitive damages, treble damages mandated by statute to the extent recoverable under CERCLA or state CERCLA equivalent statutes, natural resource damages, penalties, costs and fines, including reasonable attorney's and reasonable consultant's fees, but excluding: (a) consequential, special or incidental damages (such as loss of profits, loss of business opportunity, loss of use, diminution in value of any property, or business interruption); (b) any attorney's or consultant's fees or other costs for any matter in which a Party has accepted its defense and indemnity obligations, and so notified the other Party pursuant to

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- Liq...ource Formation Agreement    Pg ... f 51

57

Section 9.12.4 (Notification); and (c) treble (or other multiple) damages mandated by statute except to the extent recoverable under CERCLA or state CERCLA equivalent statutes.

### 9.1.2.   Anderson Plating Operations.

"Anderson Plating Operations" means the metal plating operations as conducted at the Anderson Plant as of the Closing Date, including any equipment, piping and appurtenances used in connection with such operations and not used in connection with any other manufacturing operations at the Anderson Plant.

### 9.1.3.   Chlorinated Solvent.

"Chlorinated Solvent" means any chemical product containing chlorinated hydrocarbons or an organic solvent, including, without limitation, methylene chloride, carbon tetrachloride, chlorobenzene(s), trichloroethane, trichloroethene, tetrachloroethane, and tetrachloroethene, but not including any chemical compound consisting of less than 1% of such chlorine-containing organic solvent(s).

### 9.1.4.   Clean Closure.

An Environmental Condition will be "Clean Closed", when GM can establish the following:

(a)     no Hazardous Material is present at a level which exceeds the highest of: (i) natural background as determined in accordance with sound and accepted scientific and engineering literature, judgment and practice; (ii) the least stringent remediation standard acceptable under applicable Environmental Laws for industrial property in accordance with the requirements of the appropriate Governmental Authority; and (iii) the level determined by a site-specific risk assessment and approved by any Governmental Authority, if applicable Environmental Law requires such approval; and

(b)     the closure is approved in writing by the Governmental Authority if applicable Environmental Law requires such approval.

### 9.1.5.   Environmental Condition.

"Environmental Condition" means the presence of any Hazardous Material in the soils, surface water, or ground water on or under the Real Property in concentrations above the least stringent remediation standard acceptable under applicable Environmental Laws for industrial property in accordance with the requirements of the appropriate Governmental Authority. The presence of any Hazardous Material in or on any of the Acquired Assets or the buildings (including fixtures, appurtenances or equipment) is not considered an Environmental Condition. If no appropriate remediation standard is specified under applicable Environmental Laws, the remediation standard shall be established using recognized risk assessment methodologies as set forth in Section 9.3.3 (Remedial Action Factors).

### 9.1.6.   Environmental Laws.

"Environmental Laws" means all applicable federal, state and local laws, ordinances, regulations, final orders and final judgments, which have been duly enacted or promulgated and which are legally enforceable concerning the subject of the introduction, emission, discharge or release of any Hazardous Material into the air, soil or surface or ground water; the transportation, storage,

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- Light Source Formation Agreement    Pg    of 51

58

treatment or disposal of any Hazardous Material; or the remediation or investigation of contamination of air, soil, or surface or ground water by any Hazardous Material. Environmental Laws include, but are not limited to, the following federal statutes and similar or implementing state and local laws: the Clean Air Act, 42 U.S.C. §§ 7401, et seq.; the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601, et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986 (collectively "CERCLA"); the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, et seq.; the Emergency Planning and Community Right-to-Know Act of 1986,42 U.S.C. §§ 1001, et seq.; the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701 et seq.; the Pollution Prevention Act of 1990, 42 U.S.C. §§ 13101, et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901, et seq., as amended by the Hazardous and Solid Waste Amendments of 1984, (collectively "RCRA"); the Safe Drinking Water Act, 42 U.S.C. §§ 3001 et seq.; the Solid Waste Disposal Act, 42 U.S.C. §§ 6901, et seq.; and the Toxic Substances Control Act, 15 U.S.C. §§ 2601, et seq. ("TSCA"). The following are not considered Environmental Laws: (a) laws, ordinances, regulations, final orders or final judgments concerning primarily worker health or safety, including the Occupational Safety and Health Act "OSHA", and any similar state or local law or regulation; and (b) unpromulgated guidance documents, guidelines or directives from or by any Governmental Authority, which are not legally enforceable or duly promulgated.

### 9.1.7.  Governmental Authority.

"Governmental Authority" means any local, state or federal governmental agency with jurisdiction in the relevant matter pursuant to any Environmental Laws.

### 9.1.8.  Hazardous Material.

"Hazardous Material" means any substance defined as a "hazardous substance", "extremely hazardous substance", "hazardous material", "hazardous chemical", "oil", "petroleum", "hazardous or toxic pollutant", "pollutant", "chemical", "contaminant", "pesticide", "toxic chemical", "toxic substance", "hazardous waste" or similar terms (including constituents) under Environmental Laws.

### 9.1.9.  Knowledge.

"Knowledge" means the actual knowledge of any current GM officers, directors, relevant plant managers and environmental supervisors.

### 9.1.10.  Monroe Press Pit Area.

"Monroe Press Pit Area" means the area at the Monroe Plant identified in Schedule 9.1.10, and any pre-Closing Environmental Condition discovered in that area.

### 9.1.11.  Non-Compliance Matter.

"Non-Compliance Matter" means an on-going violation of an Environmental Law. The Release (except failure to report such a Release in violation of Environmental Law) or presence of any Hazardous Material in, on or under the soils, land surface or substrata, surface water, ground water, air or any other environmental medium in, or in the vicinity of, the Real Property, or in or on any building (including fixtures, appurtenances or equipment) located in or comprising any part of the Real Property are not considered Non-Compliance Matters. Notwithstanding the foregoing, any

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- Light Source Formation Agreement    Pg 11 of 51

59

independent violation of Environmental Law may constitute a Non-Compliance Matter. By way of example but not limitation, the following, if present, shall not be considered Non-Compliance Matters: (a) the presence of Hazardous Materials in either active or inactive piping or sewers, including any suggestion that such presence constitutes improper storage or disposal of wastes; and (b) the presence of Hazardous Materials on the roof of any building resulting from air borne emissions over time. By way of further example but not limitation, the following, if present, shall be considered Non-Compliance Matters: (i) the storage of hazardous waste in improperly labeled drums or in any containers for a time that exceeds the applicable RCRA time period.

### 9.1.12. Release.

"Release" means any spill, emission, escape, abandonment of any container or receptacle containing any Hazardous Material, leak, pumping, injection, deposit, disposal, discharge, dispersal, leaching, movement or migration into or through the environment (as defined under CERCLA) of any Hazardous Material, including any exacerbation or aggravation thereof, and the movement or migration, gradual or otherwise, of any Hazardous Material through or in the air, soil, surface water, ground water, or land surface or subsurface strata or formation.

## 9.2. Environmental Assessments and Compliance Audits.

### 9.2.1. Environmental Confidentiality.

GM and PEP Guide entered into the Environmental Confidentiality Agreement, as extended, attached to this Agreement as Exhibit 9.2.1. The Environmental Confidentiality Agreement will expire on the Closing Date, unless otherwise modified or extended by agreement between GM and PEP Guide.

### 9.2.2. Pre-Closing Environmental Assessments.

GM's consultants conducted environmental assessments of the Real Property and prepared final environmental assessment reports, including all related environmental sampling and analytical data (the "GM Environmental Assessments"). GM has delivered final copies of all GM Environmental Assessments to Newco and PEP Guide. Schedule 9.2.2A lists the GM Environmental Assessments delivered to Newco and PEP Guide. Under the Environmental Confidentiality Agreement, Newco and PEP Guide conducted their own environmental assessments of the Real Property, and prepared final environmental assessment reports, including all related environmental sampling and analytical data (the "Newco and PEP Guide Environmental Assessments"). Newco and PEP Guide have delivered final copies of all Newco and PEP Guide Environmental Assessments to GM. Schedule 9.2.2B lists the Newco and PEP Guide Environmental Assessments delivered to GM.

### 9.2.3. Pre-Closing Environmental Compliance Audits.

GM's consultants conducted an environmental compliance audit of the Business operations at each facility and prepared final compliance audit reports (the "GM Compliance Audit Reports"). GM has delivered final copies of all GM Compliance Audit Reports to Newco and PEP Guide. Schedule 9.2.3A lists the GM Compliance Audit Reports delivered to Newco and PEP Guide. Under the Environmental Confidentiality Agreement, Newco and PEP Guide conducted their own environmental compliance audit of the Business operations and prepared final compliance audit reports (the "Newco and PEP Guide Compliance Audits"). Newco and PEP Guide have delivered final copies of all Newco and PEP Guide Compliance Audits to GM. Schedule 9.2.3B lists the Newco and PEP Guide Compliance Audit Reports delivered to GM.

60

9.3.    GM Remediation and Corrective Action.

9.3.1.    GM Remediation.

GM will address or remediate, in accordance with Sections 9.3.4 (PCBs), 9.3.5 (ACM), and 9.11.3 (Apportionment), the following Environmental Conditions:

(a)    the Environmental Conditions listed on Schedule 9.3.1(a);

(b)    All Environmental Conditions at the Monroe Plant that existed on the Closing Date, but only if: (i) Newco notifies GM in writing of the existence of the Environmental Condition and provides to GM a copy of the environmental assessment report, including environmental sampling and analytical data and a description of the surrounding facts and circumstances, within twelve (12) months after the Closing Date; and (ii) GM is unable to demonstrate that the identified Environmental Condition(s) did not exist on the Closing Date. If either of these conditions is not satisfied, GM will have no remediation, defense, or indemnification obligations with respect to such Environmental Condition(s).

9.3.2.    Remedial Action Plans. GM will develop and implement remedial action plans for the Environmental Conditions under Section 9.3.1 (GM Remediation) only if remedial action is: (a) required by any Environmental Law; (b) required by a Governmental Authority under a judicial or administrative order issued under an Environmental Law; (c) reasonably required to prevent an actual and immediate threat to human health or the environment at the Real Property or surrounding property; or (d) the subject of a decision by GM, in its sole discretion, to perform remedial activity after conducting a risk-based evaluation. Except for situations described in Section 9.3.10 (Modification Based on Newco's Input); 9.11.3 (Apportionment) and 9.11.2 (Newco's Defense and Indemnification Obligations), GM is solely responsible for the costs of developing and implementing a remedial action plan under this Section 9.3.2 (Remedial Action Plans). Each remedial action plan will include a reasonable implementation schedule with milestone dates. GM will provide Newco the opportunity to review and comment on any remedial action plan as set forth in Section 9.3.9 (Newco's Review Period).

9.3.3.    Remedial Action Factors.

GM will use the following factors to develop remedial action plans:

(a)    the requirements under then existing Environmental Laws;

(b)    technical feasibility;

(c)    cost of the proposed alternatives;

(d)    the continued industrial use of the Real Property; and

(e)    risk based evaluations, human health and environmental risk based factors, including, but not limited to: (i) reasonable and relevant exposure pathways consistent with continued industrial use of the Real Property; (ii) typical simulated exposure distributions consistent with the relevant exposure pathways; (iii) fate and transport characteristics; (iv) local geology and hydrogeology; (v) toxicity of the materials in question; and (vi) other relevant factors employed in assessing risks to human health and the environment under generally accepted risk assessment principles and methodologies.

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- Light Source Formation Agreement    Pg 1 of 51

61

### 9.3.4.  PCBs.

The Acquired Assets and the Real Property may contain transformers, capacitors, or other equipment with polychlorinated biphenyl ("PCBs") dielectric fluid or other PCB materials. GM will remediate PCB contamination that exceeds the levels set forth in 40 CFR 761.125(c)(3)(iii) (1996), and that is identified pursuant to Section 9.3.1(a) (GM Remediation).  GM will remediate the affected area consistent with the PCB Spill Cleanup Policy set forth at 40 CFR Part 761, Subpart G (1996).  GM will also, at its option, repair and retrofill, or replace, any leaking transformer or capacitor, if Newco:  (a) provides written notice to GM of the leaking transformer or capacitor within 180 days after the Closing Date; (b) demonstrates that the PCB transformer or PCB capacitor was leaking on the Closing Date; and (c) provides to GM all related environmental sampling and analytical data associated with the PCB transformer or PCB capacitor.

### 9.3.5.  ACM.

The Acquired Assets and the buildings on the Real Property may contain asbestos-containing material (collectively "ACM").  GM has conducted asbestos surveys in accordance with generally accepted engineering standards.  The surveys, to the extent practicable, identified any exposed, damaged and friable ACM in the Acquired Assets and the Buildings on the Real Property.  GM has provided written reports of its ACM surveys (the "ACM Reports") to Newco and PEP Guide before the Closing Date.  GM, at its sole cost, will repair, encapsulate or replace the exposed, damaged and friable ACM identified in the ACM Reports.

### 9.3.6.  GM Compliance Action Plans.

GM will develop and implement compliance action plans to correct the following Non-Compliance Matters:

(a)    the Non-Compliance Matters listed on Schedule 9.3.6;

(b)    Non-Compliance Matters that existed on the Closing Date, but only if:  (i) Newco notifies GM in writing of the Non-Compliance Matter and the surrounding facts and circumstances within 12 months after the Closing Date; and (ii) either 1) Newco notifies GM of the Non-Compliance Matter within six months after the Closing Date and GM is unable to demonstrate that the Non-Compliance Matter(s) did not exist on the Closing Date; or 2) Newco notifies GM of the Non-Compliance Matter more than six months, but within 12 months after the Closing Date and Newco is able to demonstrate that the Non-Compliance Matter existed on the Closing Date.  If either of these conditions is not satisfied, GM will have no remediation, defense, or indemnification obligations with respect to such Non-Compliance Matter(s).

### 9.3.7.  No Other Obligation.

Except as expressly described in this Article 9, GM has no remediation, defense or indemnification obligations for any other Environmental Conditions or Non-Compliance Matters.

### 9.3.8.  Non-Interference.

In implementing any remedial action or compliance action required under this Article 9, and subject to Sections 9.3.9 (Newco's Review Period) and 9.3.10 (Modification Based on Newco's Input), or in exercising any right of access, GM will use its best efforts to avoid any unreasonable interference

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- Light Source Formation Agreement    Pg 14 of 51

62

with Newco's operation of the Business or use of the Acquired Assets or the Real Property, unless otherwise required by a Governmental Authority.

### 9.3.9. Newco's Review Period.

GM will provide Newco with a copy of any proposed remedial action plan or compliance action plan at least 30 days before the earlier of: (a) the scheduled start date for activities under the plan; or (b) the date GM is required, under Environmental Law, to submit the plan to a Governmental Authority. Newco is entitled to review or comment on any part of the proposed plan, including without limitation, any institutional control or physical restriction proposed in the plan. Newco will timely notify GM of any future uses of the Real Property proposed by Newco that may impact GM's proposed remedial action plan or compliance action plan. Newco will complete its review and provide its comments to GM promptly, but in no event more than 15 business days after Newco's receipt of any plan, unless required sooner by a Governmental Authority.

### 9.3.10. Modification Based on Newco's Input.

GM must modify or amend a remedial action plan or compliance action plan (unless otherwise required by a Governmental Authority) if Newco can demonstrate that the planned action, including without limitation, any proposed institutional control or physical restriction: (a) would unreasonably interfere with or unreasonably impair the ability of Newco to operate the Business or use the Acquired Assets or the Real Property as currently used or identified by Newco during the review period under Section 9.3.9 (Newco's Review Period) as a future use budgeted for implementation by Newco within Newco's current fiscal year or following fiscal year if, at the time the plan is submitted to Newco, Newco has already prepared and finalized a budget for the following fiscal year; (b) does not meet the remediation requirements of this Article 9; (c) will not remedy a Non-Compliance Matter under Environmental Laws; (d) would fail to correct an actual and immediate threat to human health or the environment; or (e) can be modified, in whole or in part, so that it can be completed in a shorter period of time at a similar cost to GM. If GM modifies a remedial action plan or compliance action plan at Newco's request in order to avoid interference with a proposed future use by Newco, and such proposed future use is not implemented by Newco within the applicable budgeted time period, then Newco shall reimburse GM for any and all costs and expenses incurred by GM in modifying the plan or as a result of the plan modification.

### 9.3.11. Implementation.

After review of proposed changes and comments, in accordance with this Section 9.3 (GM Remediation and Corrective Action), GM will implement the remedial action plans and compliance action plans: (a) in accordance with the time schedule; (b) in a good, safe, workmanlike manner; (c) without placing any physical restrictions on Newco's actual industrial use of the Acquired Assets and Real Property, other than reasonable use restrictions or institutional controls required as part of a remedial action or compliance action; and (d) in a manner that does not unreasonably interfere with Newco's ability to operate the Business, use the Acquired Assets, or use the Real Property, unless otherwise required by a Governmental Authority.

### 9.3.12. Clean Closure.

(a)    Monroe Plant. Once an Environmental Condition at the Monroe Plant is Clean Closed, GM will have no further remediation obligations to Newco. In addition, GM shall have no further defense or indemnification obligations to Newco with respect to actual claims brought by or on behalf of a Governmental Authority (including "citizen suits") arising from such

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- Light Source Formation Agreement    Pg 15 of 51

63

Environmental Condition. After GM completes Clean Closure of an Environmental Condition at the Monroe Plant, Newco will be solely responsible and liable for claims asserted by a Governmental Authority with respect to such Environmental Condition, and Newco will defend and indemnify GM in accordance with Section 9.11.2 (Newco's Defense and Indemnification Obligations). Clean Closure will not affect GM's indemnity obligations with respect to private third party claims for personal injury or property damage caused by the underlying Environmental Condition or GM's remediation activities.

(b)     Anderson Plant. Once an Environmental Condition at the Anderson Plant is Clean Closed, Newco shall not degrade or disrupt the Clean Closed area in a manner that affects the Clean Closed status. Clean Closure of an Environmental Condition at the Anderson Plant, however, will not affect GM's indemnity obligations with respect to such Environmental Condition.

### 9.3.13. Newco's Obligations.

Newco will cooperate and assist GM in implementing remedial action and compliance action plans in accordance with Section 9.10.3 (Newco's Obligations in Connection with GM's Remedial Actions).

### 9.3.14 Monroe Inspection

The Louisiana Department of Environmental Quality ("LDEQ") conducted an inspection of the Monroe Plant on September 8, 9, 1998 (the "September Inspection"). If the LDEQ issues an inspection report for the September Inspection within 12 months of the Closing Date, then any Non-Compliance Matters identified in the inspection report will be included in Schedule 9.3.6, but only if Newco meets the other requirements set forth in Section 9.3.6(b). If the LDEQ issues an inspection report for the September Inspection more than 12 months after the Closing Date, then GM will work with LDEQ to resolve any notices of violation identified in the inspection report (including payment of fines), but only if (a) the notice of violation is based solely and exclusively on the September Inspection and not on any subsequent or follow-up inspection after the Closing Date, and (b) the notice of violation relates only to activity or operations of the plant up to, and including the dates of the September Inspection. Any notice of violation not meeting these criteria will be dealt with as otherwise provided under this Article 9. Notwithstanding the foregoing, this Section 9.3.14 does not, directly or indirectly, extend, toll, or nullify the notice period in Section 9.3.6(b).

### 9.4.    Access.

#### 9.4.1.  GM Access.

After the Closing Date and upon reasonable notice to Newco, GM and its representatives may enter the Real Property and have access to the Acquired Assets to:

(a)     conduct remedial action or compliance action under Section 9.3 (GM Remediation and Corrective Action);

(b)     perform its obligations or exercise its rights under this Article 9;

(c)     investigate or remediate an environmental matter pertaining to an adjacent GM facility;

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- Light Source Formation Agreement    Pg 16 of 51

64

(d)    install, maintain and use any environmental monitoring or remediation equipment required by a remedial action or compliance action plan or a government agency;

(e)    investigate a claim for indemnification or remediate an underlying Environmental Condition, but only if GM has ongoing remedial, defense or indemnity obligations to Newco under this Article 9; and

(f)    inspect the Acquired Assets and Real Property for Newco's performance of its obligations under this Article 9.

(g)    conduct periodic environmental audits and inspections of conditions, practices, equipment and procedures in connection with Newco's operations of the Anderson Plant during the term of the Anderson, Indiana Lease. Such audits and inspections shall be at GM's cost, utilizing GM employees or consultants, and shall be conducted at times and in a manner so as to avoid unreasonable interference with Newco's ongoing operations at the Anderson Plant. All findings, conclusions and information created during such audits and inspections shall be treated as confidential pursuant to Section 9.12 (Confidentiality).

### 9.4.2. Access Limitations.

GM's access under this Section 9.4 (Access) is subject to: (a) Newco's reasonable requirements related to emergency conditions; and (b) Newco's reasonable health, safety or environmental requirements.

### 9.5. Real Property - Use Restrictions.

### 9.5.1. Generator-Only Status.

Newco covenants that, except for the existing GM RCRA permit at the Anderson Plant, Newco will not allow any of the Real Property to become a treatment, storage or disposal facility as that term is defined in RCRA and state RCRA equivalent statute, and Newco will maintain "generator-only" status under RCRA and state RCRA equivalent statute.

### 9.5.2. Transfers.

Except for any transfer by Newco to GM, any agreement for transfer of any interest in the Real Property through sale, lease, lease assignment, license, sublease, easement or otherwise, will (a) incorporate the rights and obligations of Newco and GM under this Article 9 and impose the obligations on any subsequent user, occupant or transferee of the Real Property; (b) restrict use of the Real Property to industrial (including warehouse) use consistent with any deed restrictions that may be placed on the Real Property; (c) provide that deed restrictions may be eliminated as an encumbrance upon the Real Property only with the written consent of GM, and (d) provide that the use restrictions are directly enforceable by GM against Newco and any subsequent user, occupant or transferee of the Real Property. Notwithstanding the foregoing: (i) any sublease or lease assignment relating to the Anderson Plant will be subject to, and in strict accordance with the terms of this Article 9; and (ii) any deed restriction or other encumbrance placed on the Monroe Plant as a result of the circumstances contemplated by this transaction shall provide that such restriction or encumbrance may be released when warranted by the facts and circumstances, and under reasonable conditions to be negotiated by GM and Newco at the time such release is sought. Newco shall be responsible for any costs associated with the removal of any restriction or encumbrance, and GM shall not bear any such costs.

65

### 9.5.3. Removal of Improvements.

With respect to any building, structure or other improvement which: (a) is located above an Environmental Condition for which GM has some responsibility under this Article 9; and (b) was identified as a barrier, institutional control, or engineering control of such Environmental Condition in a Remedial Action Plan prepared by GM, and subject to review and comment by Newco under Section 9.3.9 (Newco's Review Period), if Newco demolishes, removes or otherwise renders less effective as a barrier, institutional control, or engineering control such a building, structure or other improvement, then Newco will, at its sole cost, repair or replace the building, structure or other improvement with a barrier or other institutional control or engineering control with protective capabilities equivalent to those of the original building, structure or other improvement. If Newco fails to repair or replace the building, structure or other improvement, GM shall be relieved of any further remediation, defense or indemnity obligation with respect to such Environmental Condition. Newco will exercise due care during demolition, removal, and construction so as not to exacerbate, aggravate, contribute or add to any Environmental Condition existing as of the Closing Date.

### 9.5.4. Specific Restrictions.

Newco will not use Chlorinated Solvents in the operation of the Business, use of the Acquired Assets, or use of the Real Property, except for use of the materials (or their chemical equivalent) set forth in Schedule 9.5.4.

### 9.5.5. Notice Filing.

After reasonable notice to Newco, and subject to Section 9.3.10 (Modification Based on Newco's Input), GM may file any notice or other instrument: (a) required by any current or future Environmental Law for any remedial or compliance action by GM under this Article 9, (b) necessary to implement any deed restriction or other institutional control authorized to be imposed under this Article 9; or (c) necessary to prohibit the demolition or removal of any Building, structure or other improvement located on the Real Property. An instrument filed under this Section 9.5.5 (Notice Filing) must permit Newco to remove the building, structure or other improvement in accordance with Section 9.5.3 (Removal of Improvements).

### 9.6. Transition - Permits/Environmental Committee.

### 9.6.1. Environmental Permits.

As of the date of this Agreement, GM holds and is in material compliance with the permits, licenses, and authorizations listed in Schedule 9.6.1 (the "Environmental Permits"). GM represents and warrants that as of the date of this Agreement, no action is pending to revoke any of the Environmental Permits. GM has received no written notice from a Governmental Authority that such Governmental Authority intends to deny, or require GM to modify substantially, any of the Environmental Permits.

### 9.6.2. Transfer.

At Closing, GM will transfer to Newco the Environmental Permits listed on Schedule 9.6.1A - permits which can be transferred to Newco as a matter of law. Schedule 9.6.1B lists Environmental Permits which cannot be transferred to Newco as a matter of law or which cannot be transferred before Closing. Schedule 9.6.1C lists Environmental Permits that will not be transferred to Newco by GM, and will remain with GM as permittee, or will be closed by GM. GM will cooperate with

66

Newco to transfer to Newco or to obtain reissuance to Newco the Environmental Permits listed on
Schedule 9.6.1B. However, Newco will be solely responsible for obtaining or effecting the transfer
or reissuance to Newco of all Environmental Permits listed on Schedule 9.6.1B. GM and Newco
will cooperate with one another to obtain any consents, reviews or approvals necessary to transfer,
reissue or obtain the Environmental Permits. Each Party shall be responsible for its own costs and
expenses incurred in obtaining such consents, reviews and approvals.

### 9.6.3.  Environmental Committee.

Newco and GM will establish an Environmental Committee to facilitate environmental transition
issues. The Environmental Committee will:

(a)      consist of an equal number of representatives from each Party;

(b)      meet from time to time as necessary under prevailing circumstances, or at the request
of either Party, at a mutually agreed location;

(c)      coordinate the scheduling and implementation of remedial action plans and
compliance action plans under Section 9.3 (GM Remediation and Corrective Action);

(d)      coordinate and facilitate the transfer of Environmental Permits;

(e)      coordinate and facilitate the separation or transfer of utility services;

(f)      coordinate the scheduling of transition issues involving utilities, services, or wastes;

(g)      coordinate and consult on the idling and decommissioning of equipment at the
Anderson Plant;

(h)      address other scheduling or coordination issues arising under this Article 9.

Each Party will designate from time to time, by written notice to the other, a contact person who
will be primarily responsible for coordinating and managing that Party's participation on the
Environmental Committee. The Environmental Committee does not have the authority to (i) act as
a dispute resolution committee, or (ii) modify or amend the terms of this Agreement.

### 9.7.  Waste Management.

### 9.7.1.  Hazardous Waste Removal.

GM will properly dispose of any hazardous waste, as defined under RCRA or state RCRA
equivalent statutes generated by GM at the Real Property and accumulated in waste storage
containers, as of the Closing Date. GM will use best efforts to remove the hazardous waste
containers from the Real Property before the Closing Date. If GM cannot remove the hazardous
waste containers before the Closing Date, GM will label, segregate, and secure the hazardous waste
containers. Newco must not disturb the containers nor add any materials to the segregated
containers or interfere with GM's disposal activities. GM will remove and properly dispose of
(under its own generator identification number) the hazardous waste containers by the earliest of the
following time frames: (a) as soon as reasonably practicable after the Closing Date, (b) 45 days after
the Closing Date, or (c) the period required under Environmental Laws to maintain "generator-only"
status. Newco will remove and properly dispose of (under its own generator identification number)

05-44481-rdd   Doc 9426-4   Filed 09/19/07   Entered 09/19/07 19:21:39   Exhibit B-2
- Light Source Formation Agreement   Pg 19 of 51

67

any wastes, including but not limited to hazardous wastes, resulting from PEP Guide's and Newco's Pre-Closing investigation(s) of the Real Property and Acquired Assets.

### 9.7.2.  Post-Closing Waste Management.

Newco will obtain new RCRA and TSCA generator identification numbers for hazardous waste and PCBs. Newco is not allowed to use any generator identification numbers issued to GM for the Real Property. Newco will be responsible for all wastes, including but not limited to hazardous wastes, generated or accumulated by Newco after the Closing at the Real Property.

### 9.7.3.  No Arrangement for Disposal.

GM, Newco and PEP Guide acknowledge that the transactions contemplated by this Agreement are not intended, nor will be deemed to be, an arrangement for treatment, storage or disposal of any of the Acquired Assets or any substances or materials contained on the Real Property, and Newco and PEP Guide will not assert any claim or cause of action against GM based on the transactions hereunder.

### 9.8.   Environmental Management System.

Within 18 months of the Closing Date, Newco must develop and implement an environmental management system ("EMS") for the operation of the Business. Newco shall implement this EMS so long as GM has any outstanding indemnity obligation under this Article 9. At a minimum, the EMS must have the following elements: a written environmental policy; analysis of the environmental impact of the business; environmental objectives; detailed environmental operations and procedures; clear lines of responsibility and accountability for supervision of environmental matters; worker training; a program for regular auditing (at least every two years) of compliance with Environmental Laws, using generally accepted protocols; and management review of overall environmental performance.

### 9.9.   GM's Representations and Warranties.

In addition to GM's representations and warranties in Section 9.6.1 (Environmental Permits), to GM's Knowledge, GM represents and warrants that, as of the date of this Agreement:

### 9.9.1.  No Actions.

Except as set forth on Schedule 9.9.1, there is no civil, criminal or administrative action, suit, demand, claim, hearing, notice of violation, investigation, proceeding, notice or demand letter, existing or threatened, relating to the Business, the Acquired Assets or the Real Property under any Environmental Law which, as of the Closing Date, has not been cured, resolved or paid, as the case may be.

### 9.9.2.  No Notices.

Except as set forth on Schedule 9.9.2, GM has not received from any Governmental Authority any written request for information, notice of claim, demand or notification that GM is or may be potentially responsible for the investigation or cleanup of any Release or any threatened Release at any of the Real Property.

### 9.9.3.  No Listing.

Except as set forth on Schedule 9.9.3, none of the Real Property is listed or proposed for listing on the National Priority List promulgated pursuant to CERCLA or any similar list of sites of environmental contamination under state CERCLA equivalent statutes.

### 9.9.4.  No Liens.

Except as set forth on Schedule 9.9.4, no Lien has attached to the Acquired Assets or the Real Property under any Environmental Law which has not been removed or discharged of record.

### 9.9.5.  No Chlorinated Solvent Use.

Except as set forth in Schedule 9.5.4, GM currently neither uses nor stores Chlorinated Solvents at the Real Property.

### 9.9.6  Privileged Documents

Except as otherwise disclosed in the GM Environmental Reports, or in other information obtained by Newco before Closing, there are no material unresolved environmental matters described in the privileged documents that GM will remove from the Anderson and Monroe plants as Excluded Assets pursuant to Section 2.3.11 of this Agreement.

### 9.10.  Newco's Covenants, Obligations and Acknowledgments.

### 9.10.1.  Compliance with Environmental Law.

Except as specifically set forth in this Article 9, Newco, after the Closing Date, at its own cost and expense, covenants to comply with all Environmental Laws and comply with all permits, approvals, or authorizations relating to the operation of the Business, the use of the Acquired Assets, and the use of the Real Property.

### 9.10.2.  Non-Compliance Notice.

Notwithstanding any other provision of this Article 9, Newco will give GM notice in writing of the discovery of any Non-Compliance Matter which Newco believes existed on the Closing Date and the facts, circumstances and all available environmental sampling and analytical data associated with the Non-Compliance Matter within five business days after Newco's discovery.

### 9.10.3.  Newco's Obligations in Connection with GM's Remedial Actions.

Newco will:

(a)     cooperate with GM and its representatives to assist GM in implementing remedial actions or compliance actions in accordance with Section 9.3.11 (Implementation), including, without limitation, assisting GM in obtaining any required governmental approvals, consents, authorizations, waivers, or permits;

(b)     consent to the imposition of institutional controls and engineering controls such as caps, impermeable barriers or any existing Building or other existing structure on the Real Property

in order to assist GM in obtaining Clean Closure of Environmental Conditions identified in Section 9.3.1 (GM Remediation), provided that such controls are consistent with the current industrial use of the Real Property, and are not required to be modified or amended pursuant to Section 9.3.10 (Modification Based on Newco's Input);

(c)    take other actions that are reasonably necessary and appropriate to allow GM to implement any remedial action or compliance action plan, including, without limitation, restricting public access to the Real Property and maintaining equipment or material installed by GM in connection with a remedial action plan or compliance action plan;

(d)    exercise due care so as not to adversely affect the installation, operation, or maintenance of any action, measure or remedy existing or taken at the Real Property before the Closing Date or later under any remedial action or compliance action plan;

(e)    provide GM access to services, including potable water, electric and telephone utilities, security and wastewater treatment or conveyance facilities, in connection with GM's post-closing activities on the Real Property. GM will pay the costs for the services it uses, or reimburse Newco upon receipt of a detailed invoice, as appropriate under the circumstances;

(f)    perform the Environmental Management activities in accordance with Section 9.8 (Environmental Management System); and

(g)    use its best efforts to discontinue the Anderson Plating Operations as soon as practicable, but in no event later than December 31, 1999, and shall refrain from conducting any further plating operations during the remainder of the term of the Anderson, Indiana Lease. For purposes of this Section 9.10.3(g), "best efforts" shall mean fulfilling outstanding orders for part numbers set forth on Schedule 9.10.3 as quickly as practicable, and entering into no further contracts for other parts which would require the continuation of the Anderson Plating Operations.

9.10.4.  Equipment Decommissioning – Anderson Plant.

(a)    Newco will be responsible for decommissioning and removing any equipment at the Anderson Plant that Newco brings into the Anderson Plant after the Closing Date. Newco will also be responsible for decommissioning any equipment it moves or removes from the Anderson Plant, including equipment it intends to dispose of through scrap sale or otherwise. Decommissioning will be up to the point of connection to building utilities. As to any equipment that Newco moves within or removes from the Anderson Plant, Newco shall ensure that the equipment area is left in a condition that is safe for workers and in conformance with plant safety procedures and housekeeping practices. Newco will not remove any associated parts from any equipment that it abandons.

(b)    Newco will notify GM in writing of its intent to abandon any equipment in place at least 30 days prior to abandonment. GM shall provide to Newco any comments GM may have with respect to the proposed abandonment within 15 business days after receipt of Newco's notice. Any equipment to be abandoned in place will be idled by Newco in accordance with a mutually agreed upon tag-out/lock-out/sign-off procedure. Except as specifically provided in this Section 9.10.4 (Equipment Decommissioning – Anderson Plant), Newco will have no other decommissioning responsibility for the buildings, fixtures, appurtenances or equipment at the Anderson Plant.

9.10.5.  Equipment Decommissioning – Monroe Plant.

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- Light Source Formation Agreement    Pg 1 of 51

70

Newco shall be responsible for decommissioning equipment at the Monroe Plant. Except as specifically provided in Sections 9.3.4 (PCBs) and 9.3.5 (ACM), or otherwise related to GM's remediation obligations for Environmental Conditions, GM will have no responsibility for the buildings, fixtures, appurtenances or equipment at the Monroe Plant.

### 9.10.6. Disclosure and Recordation.

Newco acknowledges that the materials, records, reports and documents provided by GM as of the Closing Date comply in form and substance with the disclosure requirements of state Environmental Law disclosure requirements. Newco will record any information or a notice under applicable state Environmental Law disclosure requirements, provided, however, that Newco will not record any information or notice without GM's consent, which will not be unreasonably withheld.

### 9.10.7. Releases and Hazardous Materials.

Newco acknowledges that before the Closing Date: (a) there may have been Releases on the Real Property; (b) GM and others may have used, generated, treated, stored, recycled or disposed of any Hazardous Material on the Real Property.

### 9.10.8 Wastewater Treatment for Anderson Plating Operations

Newco will operate and maintain the wastewater treatment plant, located across the street from the Anderson Facility to process wastewater from the Anderson Plating Operations, in accordance with all applicable Environmental Laws, and will be responsible for all fines, penalties and costs arising from its failure to do so, except as otherwise provided in Sections 9.3.2 and 9.3.6 hereof. No later than 90 days after Newco discontinues the Anderson Plating Operations, Newco will surrender the wastewater treatment facility to GM for decommissioning pursuant to Section 9.10.4. During this 90 day period, GM will have access to the wastewater treatment plant purusant to Section 9.4. Before such surrender, Newco will (i) treat all contaminated wastewater from the Anderson Plating Operations, (ii) remove all free liquids and residual excess treatment chemicals from the wastewater treatment plant, (iii) dispose of any accumulated wastewater treatment plant sludge, to the extent that such sludge can be removed by normal means using existing equipment at the wastewater treatment plant, and (iv) secure all wastewater treatment equipment in accordance with a mutually agreed upon tag-out/lock-out/sign-off procedure consistent with Section 9.10.4.

### 9.10.9. Newco's Additional Acknowledgments.

Newco acknowledges that except as set forth in Sections 9.6.1 (Environmental Permits) and 9.9 (GM's Representations and Warranties), (a) GM has not made any representations or warranties to PEP Guide and Newco with respect to environmental matters; (b) PEP Guide and Newco have examined and investigated the physical nature and environmental condition of the Real Property; and (c) other than as set forth in Newco and PEP Guide's Compliance Audits or PEP Guide and Newco's Environmental Assessments, Newco and PEP Guide have not discovered any facts which are inconsistent with or contrary to GM's representations and warranties in Sections 9.6.1 (Environmental Permits) and 9.9 (GM's Representations and Warranties).

9.11.   Defense and Indemnification Obligations.

9.11.1.   GM's Defense and Indemnification Obligations.

Subject to Sections 9.3.12 (Clean Closure) and 9.11.3 (Apportionment) GM will indemnify and defend Newco Indemnitees from and against any and all Adverse Consequences to which they may be subjected as a result of a claim based upon any of the following:

(a)   Monroe Plant

(1)   Any claim by or on behalf of a Governmental Authority (including "citizen suits") seeking compliance with an Environmental Law or recovery of fines, penalties or other statutory sanctions or impositions, if the claim (i) pertains to an Environmental Condition (other than the Monroe Press Pit Area) or Non-Compliance Matter for which GM has responsibility under Section 9.3 (GM Remediation and Corrective Action) that has not been remedied or eliminated, and (ii) the claim is asserted within 36 months after the Closing Date;

(2)   Environmental Conditions identified from the Monroe Press Pit Area, if the claim is asserted on or before the tenth anniversary of the Closing Date;

(3)   Any off-site treatment, off-site transportation, off-site storage or off-site disposal of any Hazardous Material generated by GM at the Monroe Plant before the Closing Date;

(4)   Any personal injury or property damage to a third party (including any Newco employee) or to Newco's property, and any claim by a Governmental Authority for violations of Environmental Laws, but in any such case, only to the extent caused by GM's acts or omissions during its Post-Closing access to the Acquired Assets or the Real Property pursuant to Section 9.4.1 (GM Access), and only if the claim is asserted within 36 months after such act or omission; and

(5)   Any private third party claim for personal injury or property damage to the extent that it is alleged that such injury or property damage was caused by Hazardous Materials existing at Closing at the Monroe Plant if the claim is asserted within 84 months after the Closing Date. GM will indemnify and defend Newco under this subSection (5) until GM can demonstrate that Newco is responsible for at least a portion of the claim. At such time, Newco will assume its own defense and GM's indemnity obligation with respect to the specific claim will end.

(b)   Anderson Plant

(1)   Any Environmental Condition associated with the Anderson Plant, unless GM can demonstrate that the Environmental Condition was caused by Newco during the Anderson, Indiana Lease Term as such phrase is defined in Section 1.1 of the Anderson Lease;

(2)   Any claim arising from the presence of any Hazardous Material(s) in or on any building (including fixtures, appurtenances or equipment) located in or comprising any part of the Anderson Plant, unless GM can demonstrate that such presence of Hazardous Materials was caused by Newco during the Anderson, Indiana Lease term other than the presence of Hazardous Materials in or on equipment abandoned in compliance with Section 9.10.4 (Equipment Decommissioning -- Anderson Plant).

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- Light Source Formation Agreement    Pg 2 of 51

72

(3)    Any off-site treatment, off-site transportation, off-site storage or off-site disposal of any Hazardous Material generated by GM at the Anderson Plant before the Closing Date; and

(4)    Any personal injury or property damage to a third party (including any Newco employee) or to Newco's property to the extent caused by GM's acts or omissions during its Post-Closing access to the Acquired Assets or the Leased Property pursuant to Section 9.4.1 (GM Access);

9.11.2.  <u>Newco's Defense and Indemnification Obligations</u>.

Subject to Section 9.11.3 (Apportionment), Newco will indemnify, defend and hold harmless GM Indemnitees from and against any and all Adverse Consequences to which they may be subjected as a result of a claim based upon:

(a)    Any Release, Non-Compliance Matter, or Environmental Condition relating to the Real Property, the Business, or the Acquired Assets for which GM does not have responsibility under Section 9.3 (GM Remediation and Corrective Action), if the claim is brought within: (i) 36 months after the Closing Date for the Monroe Plant; and (ii) within 36 months after Newco vacates the Anderson Plant for the Anderson Plant;

(b)    Any Release, Non-Compliance Matter or Environmental Condition existing before the Closing Date to the extent caused by, contributed to, or aggravated by Newco, if the claim is brought within 36 months after the Closing Date;

(c)    Any offsite treatment, offsite transportation, offsite storage, or offsite disposal of any Hazardous Material generated by Newco;

(d)    Claims asserted by or on behalf of a Governmental Authority (including "citizen suits") with respect to any Environmental Condition at the Monroe Plant that has been Clean Closed in accordance with Section 9.3.12 (Clean Closure).

(e)    The presence of PCBs or ACM in or on the Real Property except to the extent that GM has explicitly provided Newco an indemnity under Section 9.11.1 (GM's Defense and Indemnification Obligations).

9.11.3.  <u>Apportionment</u>.

Newco will be responsible for any additional costs or liability to the extent attributable to the intermingling of a Release on the Real Property with an Environmental Condition for which GM is responsible, but only if the intermingling Release: (a) was caused by Newco; or (b) occurred after the Closing Date and was not caused by GM's activities on the Real Property. Each Party will be responsible for any additional Adverse Consequences caused by its own post closing actions or omissions which contribute to or aggravate any Environmental Condition or Non-Compliance Matter for which the other Party is responsible under Sections 9.11.1 (GM's Defense and Indemnification Obligations) or 9.11.2 (Newco's Defense and Indemnification Obligations). Liability will be determined by the Parties as soon as reasonably practicable based upon each Party's relative contribution to the Environmental Condition or Non-Compliance Matter.

05-44481-rdd   Doc 9426-4   Filed 09/19/07   Entered 09/19/07 19:21:39   Exhibit B-2
- Light Source Formation Agreement   Pg 26 of 51

73

#### 9.11.4. Third-Party Claims.

Neither Newco nor GM will initiate any action with any third party, including any Governmental Authority, which could reasonably be expected to lead to a claim against the other Party unless the action is a disclosure in accordance with Section 9.12.3 (Disclosures). Upon a disclosure under Section 9.12.3 (Disclosures), each Party is entitled to pursue any actions reasonably necessary in connection with the claim. If either Party, in performance of this Article 9, remediates or incurs costs or damages from a condition for which a third party may be responsible or liable, the Parties will cooperate in pursuing any claim for recovery of costs and damages against the responsible third party. Cooperation includes but is not limited to a Party acting as the real party in interest and assigning any rights or causes of action against any third party relating to a claim or the proceeds of a claim to the other Party.

### 9.12.   Confidentiality.

#### 9.12.1. Environmental Confidentiality Agreement.

This Agreement supersedes the terms and conditions of the Environmental Confidentiality Agreement except for any accrued claims, including but not limited to, accrued claims against third parties who have signed the Environmental Confidentiality Agreement acknowledgment.

#### 9.12.2. Confidentiality Obligations.

Except as provided in Section 9.12.3 (Disclosures), no Party will disclose to any third party the following:

(a)     environmental information, including reports, provided under the Environmental Confidentiality Agreement or this Agreement;

(b)     information concerning remediation or compliance actions under this Article 9,

(c)     information concerning investigations, inspections, or audits performed under this Article 9,

#### 9.12.3. Disclosures.

Subject to Section 9.12.4 (Notification) any Party may:

(a)     comply with any Environmental Law that requires disclosure of information about the environmental condition of the Business, the Real Property, or the Acquired Assets;

(b)     comply with any requirements under applicable laws, regulations, ordinances, rules, orders, codes or permits, to disclose information about the environmental condition of the Business, the Real Property or the Acquired Assets;

(c)     respond to a Governmental Authority's legally authorized request for information during an on-site inspection of the Acquired Assets or the Real Property but any request for supplementary information will be referred to the Party with primary responsibility under this Article 9;

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- Light Source Formation Agreement    Pg 26 of 51

74

(d)    mitigate a penalty if the penalty is not subject to any indemnification from under this Article 9; and

(e)    disclose information that is: (i) necessary to operate the Business; (ii) necessary to perform its obligations or exercise its rights under this Agreement; or (iii) necessary for a good faith attempt to obtain debt or equity financing related to the Acquired Assets or the Real Property; provided that before disclosure, the disclosing Party will require the third party to sign an acknowledgment and covenant, enforceable by both GM and Newco, prohibiting the third party from making any further disclosure of the information to any other person or entity without the other Party's written consent.

### 9.12.4.  Notification.

GM and Newco will notify the other Party of any disclosure the disclosing Party intends to make under Section 9.12.3 (Disclosures), but only to the extent the disclosure relates to matters for which the other Party has, or may have, primary responsibility under this Article 9. The Party receiving the notification, will have a reasonable time, under the circumstances, to review the intended disclosure. The disclosing Party will consider requests by the other Party to modify the disclosure and will use reasonable efforts to incorporate the other Party's comments in any disclosure and to avoid unnecessarily disclosing information the other Party considers confidential. If either Party receives a demand, request or order for disclosure from a Governmental Authority or a court for any environmental information related to the other Party's obligations under this Article 9, the receiving Party will (a) promptly provide the other Party with a copy of the demand, request or order and, (b) to the extent allowed by law, afford the other Party with the opportunity to contest the disclosure. Both Parties will reasonably cooperate with one another to contest the demand, request or order.

### 9.12.5.  Public Information.

This Section 9.12 (Confidentiality) will not apply to any information that already has been disclosed and is in the public domain unless the disclosure is in violation of this Article 9, or any acknowledgment and covenant required under Section 9.12.3 (Disclosures).

### 9.13.  Dispute Resolution.

In the event of any dispute between GM and Newco relating to this Article 9, the Parties shall first submit the dispute to the Director of GM Worldwide Facilities Group and to Newco's designee, who shall be at the level of plant manager or higher, or their respective designees. If, within 30 days of such submission, the Parties are unable to resolve the dispute, the Parties shall refer it to a nationally-recognized environmental consultant chosen by mutual agreement. The environmental consultant shall act as a mediator of the dispute, and the Parties shall use their best efforts to resolve the dispute within 60 days after referral to the environmental consultant. If the environmental consultant is unable to mediate a resolution of the dispute, then it shall be submitted to the three-member dispute resolution panel established in Section 12.5 of this Agreement, and the Parties shall attempt to resolve the dispute as provided therein. All other terms, conditions and provisions of Section 12.5 shall apply to the resolution of disputes arising under this Article 9.

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- Light Source Formation Agreement    Pg 27 of 51

75

9.14.    Miscellaneous.

9.14.1.    Designation of Representatives.

Newco and GM will designate, by written notice to the other, a contact person who will be primarily responsible for coordinating and managing that Party's activities and responsibilities under this Article 9.

9.14.2.    Exclusivity.

Except as provided in other Articles of this Agreement, (a) this Article 9 will exclusively govern all matters related to current and future Environmental Laws and the environmental condition and compliance status of the Acquired Assets, the Real Property and the Business; (b) the rights and obligations provided in this Article 9 contain the exclusive remedies of the Parties with respect to environmental matters and will be in lieu of, and not in addition to, all other remedies which may exist at law, in equity or under any other contract or agreement and the Parties may not assert any claim with respect to any environmental matter against the other which is not authorized in this Article 9; (c) the Parties hereby expressly waive any and all remedies or causes of action with respect to environmental matters that each might otherwise have against the other, but that are not authorized under this Article 9; and (d) all of the representations, warranties, covenants, agreements and indemnities set forth in this Agreement, or any other agreement between the Parties with respect to the transactions contemplated by this Agreement, other than those specifically set forth in this Article 9 will be deemed to exclude all matters relating to the environmental condition of the Acquired Assets and the Real Property or compliance of the Acquired Assets, the Real Property and the Business with current and future Environmental Laws. The Parties reserve the right to seek injunctive or other relief to the extent available under the law for any breach of this Article 9 and any damage or cost recovery in respect of the breach in any dispute resolution or other proceeding regarding any breach under Section 9.13 (Dispute Resolution) or otherwise will, except as otherwise set forth in Section 9.13 (Dispute Resolution), be limited to the Adverse Consequences caused by the breach.

9.14.3.    Covenant Not to Sue.

Except for breaches of this Article 9 by the other Party, and except for actions by GM against Newco based on common law or statutory contribution or joint-tortfeasor principles in furtherance of Section 9.11.1(a)(5), or actions by Newco against GM based on common law or statutory contribution or joint tortfeasor principles after the expiration of the GM indemnity set forth in Section 9.11.1(a)(5), each of GM and Newco (and PEP Guide) covenants not to sue the other Party for any Environmental Matter relating to the Business (a) for which the other Party has no defense or indemnity obligation under this Article 9; or (b) for which the other Party's defense and indemnification obligations under this Article 9 have expired under contract (including this Agreement), current or future Environmental Laws, other laws, or the common law or in equity. In addition, except for matters reserved under Section 9.3.12 (Clean Closure), Newco covenants not to sue GM for any Environmental Matter which has been Clean Closed under Section 9.3.12 (Clean Closure). If a claim has been asserted before the expiration of an applicable time period, the other Party's obligation to defend and indemnify will continue for that claim. Nothing in this Article 9, will affect the Parties' rights and causes of action arising under Section 14.3 (Assignment).

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- Lightsource Formation Agreement    Pg 28 of 51

76

9.14.4. <u>Reporting</u>.

Except as provided in Section 9.12 (Confidentiality), Newco will submit all required reports to governmental agencies for any environmental matter for which Newco has primary responsibility under this Article 9. Except as provided in Section 9.12 (Confidentiality), GM will submit all required reports to governmental agencies for environmental matters for which GM has primary responsibility under this Article 9. The Parties will cooperate reasonably to prepare and submit the reports. Notwithstanding Section 9.12 (Confidentiality), if Newco is required by Environmental Law to submit a report dealing solely with the operation of the Business before the Closing Date, GM will, at its sole cost, prepare and submit the report. Subject to Section 9.12 (Confidentiality), Newco will, at its sole cost, be responsible for all reports required to operate the Business after the Closing Date. If current or future Environmental Laws require reports which cover a time period that includes some time both before and after the Closing Date, the Parties will cooperate reasonably to prepare and submit a joint report, unless Environmental Laws allow separate reporting for pre- and post-Closing periods. Where a joint report is required or where both Parties are required to submit reports, each Party will provide the other Party the review and comment under Section 9.12.4 (Notification).

9.14.5. <u>Notices</u>.

Notices required under this Article 9 will be considered given when provided in accordance with Section 14.2 (Notices) to the persons designated below:

If to GM:

Marilyn J. Dedyne, P.E., CHMM
Worldwide Facilities Group
Remediation Team
General Motors Corporation
Mail Code 482-310-004
485 West Milwaukee
Detroit, MI 48202
(313) 556-0815
(313) 556-0803 (fax)

With a copy to:

Andrew Segovia
Attorney
Office of General Counsel
General Motors Corporation
Mail Code 482-112-149
3044 West Grand Blvd.
Detroit, MI 48202
(313) 556-2684
(313) 556-2199 (fax)

If to PEP Guide or to Newco:

Lightsource Parent Corporation
2915 Pendleton Avenue
Anderson, IN 46016
Attn: Chief Financial Officer
Fax: (765) 608-5173

with a copy to:

Palladium Equity Partners, LLC
Rockefeller Center
1270 Avenue of the Americas
Suite 2200
New York, NY 10020

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- LightSource Formation Agreement    Pg 29 of 51

77

Attn: Marcos Rodriquez
Fax: (212) 218-5155

and to

Cravath, Swaine & Moore
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Attn: Jeffrey A. Smith
Fax: (212) 765-0979

10.    CLOSING.

10.1.    The Closing.

The closing (the "Closing") of the transactions contemplated hereby shall take place jointly at the offices of Cravath, Swaine & Moore, in New York, New York and GM Legal Staff in Detroit, Michigan on October 30, 1998, or on such other date or at such other time as GM and PEP Guide may agree in writing.

10.2.    Asset Exchanges.

At Closing the following transactions shall occur in the order set forth below:

10.2.1.    The transactions described in Section 2.1.1 shall be consummated as provided therein, and the following documents (in proper form for recording where appropriate) shall be prepared, executed and delivered by the applicable Parties:

A.    Anderson, Indiana Lease

B.    Memorandum of the Anderson, Indiana Lease

C.    Intellectual Property Licenses

D.    GM Note

E.    Assignments for the Permits and Contracts.

F.    Covenant or limited warranty deeds warranting against grantor's acts with respect to the Owned Real Estate.

G.    Appropriate receipts.

H.    All other appropriate Transfer Documents necessary to provide for the contribution to Newco (or Newco's designee(s)) of title to Acquired Assets, free and clear of any and all Liens, except the Permitted Exceptions.

I.    All other documents and papers, including the Consents set forth in Section 8.1.4, reasonably requested by PEP Guide or Newco to effect the transactions contemplated hereby.

J.    An appropriate assumption agreement or other document or documents pursuant to which Newco assumes all Assumed Liabilities.

10.2.2.  The transactions described in Section 2.1.2 shall be consummated as provided therein and appropriate, executed documents shall be prepared by the applicable Parties.

10.2.3.  The transactions described in Section 2.1.3 shall be consummated as provided therein and appropriate, executed documents shall be prepared by the applicable Parties.

10.2.4.  The applicable Parties shall execute and deliver each to the other the following agreements:

A.    Component Supply Agreement

B.    Right of Access Agreement

C.    Shareholders and Registration Rights Agreement

10.2.5.  The applicable Parties shall execute and deliver each to the other the following:

A.    An appropriate certificate, dated as of the Closing Date, and signed by an authorized officer of GM which evidences the authorization of the execution, delivery and performance of this Agreement and the Ancillary Documents to which it is a party and fulfillment of the conditions specified in Section 8.1.

B.    An opinion of counsel of GM addressed to PEP Guide and Newco, dated as of the Closing Date, with respect to the due authorization and execution of the GM Note and stating that the GM Note is enforceable in accordance with its terms.

C.    Appropriate certificates, dated as of the Closing Date, and signed by an authorized officer of each of PEP Guide and Newco which evidence the authorization by each of PEP Guide and Newco of the execution, delivery and performance of this Agreement and the Ancillary Documents to which it is party and fulfillment of the conditions specified in Section 8.2.

10.2.6.  The transactions described in Section 2.1.4 shall be consummated as provided therein, and the following documents (in proper form for recording where appropriate) shall be prepared, executed and delivered by the applicable Parties a true, correct and complete affidavit delivered by GM which meets the requirements of Treasury Regulation Section 1.1445-2(b)(2) and which attests to GM's non-foreign status (the "FIRPTA Affidavit"); provided, however, that if GM shall fail to deliver the FIRPTA Affidavit at the Closing, PEP Guide shall withhold at the Closing and pay over to the appropriate taxing authority such portion of the applicable Cash Amount as required pursuant to Section 1445 of the Code.

10.3.  Additional Documents and Papers.

GM, PEP Guide or Newco shall deliver all other documents and papers reasonably requested by the other Party to effect the transactions contemplated hereby.

11.    CERTAIN ADDITIONAL COVENANTS.

11.1.  Operation of the Business.

Except as otherwise provided herein or as mutually agreed by GM and PEP Guide, and subject to any changes that may be required as the result of changes in applicable Laws which become effective after the date hereof, from and after the date hereof until the Closing, GM shall operate the Business only in the Ordinary Course of Business. Without limiting the generality of the foregoing, from the date hereof through the Closing, unless otherwise consented to by PEP Guide in writing, GM shall: (A) (i) cause the Acquired Assets to be maintained and kept in normal condition, repair and working order as on the date of this Agreement (normal wear and tear excepted); (ii) perform in all material respects all of its obligations under all Contracts and not amend or, in any material respect, modify any provision of any Listed Contract included in the Acquired Assets; (iii) keep in full force and effect insurance comparable in amount and scope to coverage maintained by it on the date of this Agreement; (iv) use its reasonable best efforts to maintain and preserve its business organization intact; (v) maintain the goodwill of the Business; and (vi) promptly advise PEP Guide and Newco of any change, event or circumstance which has had, or is reasonably likely to have, a Material Adverse Effect; and (B) (i) not take any action or permit any action within GM's reasonable control that would render any of GM's representations and warranties hereunder inaccurate at any time after the date hereof through and including the Closing Date; (ii) not take or permit any action reasonably expected to result in the imposition of a Lien on any of the Acquired Assets; (iii) not sell, transfer, assign, lease, pledge or otherwise encumber any of the Acquired Assets, other than the sale of Inventory in the Ordinary Course of Business and the sale or disposition of the assets listed in Schedule 2.3.9; (iv) not increase in any manner the compensation, severance or termination pay of, or pay, loan or provide any additional benefit to, employees of the Business (except as required by any agreements entered into, or retirement programs established prior to the date hereof, in each case as set forth in Schedule 5.1.13A or by the UAW Agreement; (v) not enter into any contract, commitment or transaction relating to the Acquired Assets or the Business, or any related series of such contracts, commitments or transactions, involving expenditures in excess of $250,000 per annum; or (vi) agree to do any of the foregoing.

11.2.  Further Assurances.

If at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instructions and documents) as another Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under this Agreement).

11.3.  Reasonable Access.

Until the Closing, GM shall provide each of PEP Guide and Newco and its respective advisors, accountants, attorneys and other representatives at such times, and in such manner, as is reasonable and as not to interfere with normal operations of the Business (i) reasonable access during normal business hours to all personnel, offices, facilities, properties and books and records of GM with respect to the Business and the Acquired Assets, and (ii) such of the financial and operating data and

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- Light Source Formation Agreement    Pg   of 51

80

other information of the Business as may be reasonably requested by PEP Guide or Newco. Any non-public books and records, data and information so provided shall be subject to the provisions of the letter dated October 31, 1997 between Morgan Stanley & Co. Incorporated, as advisor to, and on behalf of, GM and Palladium (the "Confidentiality Agreement").

11.4.    Transition Services and Arrangements.

11.4.1.(a)    To GM's knowledge, Schedule 11.4.1 sets forth (1) a list of all routine administrative support services, which will be provided by GM, its Affiliates or EDS to the Business after the Closing Date (together, "Transition Services") and (2) the monthly expense currently charged to the Business in respect of each such service ("Monthly Charges").

The Parties further acknowledge that, due to the large number of such services, systems, data and reports, it is not practical to identify and list on Schedule 11.4.1 each and every service, system and report to be provided to Newco pursuant to this Agreement. Accordingly, the Parties intend that, except as otherwise noted on Schedule 11.4.1, each Transition Service shall include (and the definition of "Transition Services" shall be deemed to include) all services, systems, data and reports relating to each Transition Service that GM and its subsidiaries are currently providing to the Business in the ordinary course of business and/or as are reasonably necessary for the orderly transition of the Business to Newco as contemplated by this Agreement after the Closing Date.

The Monthly Charges do not exceed $20,000,000 in the aggregate on an annual basis, and, to GM's knowledge, the Monthly Charges equal the monthly charges allocated to the Business for each such service at least since January 1, 1998. PEP Guide or Newco shall provide written notice to GM no later than 15 days prior to the Closing Date for each Transition Service that it desires to have provided to the Business following the Closing. Newco shall pay to GM, on the 25th day of the month following receipt of the invoice, as compensation for each requested Transition Service, the applicable Monthly Charges of such requested Transition Services, in accordance with the following: (i) from the Closing Date until the ten-month anniversary of the Closing Date, 100% of the applicable Monthly Charges; (ii) thereafter, until the fourteen-month anniversary of the Closing Date, 125% of the applicable Monthly Charges; (iii) thereafter until the twenty-four-month anniversary of the Closing Date, 150% of the applicable Monthly Charges. By mutual agreement of GM and Newco, upon at least thirty days prior written notice from Newco, GM shall provide Transition Services beyond such twenty-four-month anniversary, provided Newco thereafter shall pay to GM as compensation for such services 150% of the applicable Monthly Charges. The above provision notwithstanding, GM shall have no obligation or responsibility to agree to provide any such services beyond the twenty-four-month anniversary.

(b)    GM, solely in the capacity as agent of Newco, shall provide the Business with each Transition Service that PEP Guide or Newco requests GM to provide, in a manner consistent with the provision of such services as provided by GM to its own facilities, until the earlier to occur of (i) as to each Transition Service that PEP Guide or Newco requests GM to provide, the date on which Newco provides GM at least 30 days prior written notice that it no longer requires any or all of such services and (ii) the twenty-four-month anniversary of the Closing Date.

(c)    In addition to the Monthly Charges, Newco during the transition services period, shall be solely responsible for (i) all fees and costs related to additional, different or other non-routine (special reports, etc.) services actually used by Newco, (ii) ensuring that it is duly qualified to commence and carry on business generally, and in particular that it is duly qualified to commence and carry on business as the employer of the Transferred Employees (including the registration and compliance of any Employee Benefit Plan), (iii) all licensing, sublicensing,

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- Light Source Formation Agreement    Pg 9 of 51

81

conversion, and other costs relating to Newco's implementation of its own systems to handle transition services, and (iv) all costs incurred by GM and Newco to facilitate Newco's discontinuation or transfer to any new system different from that which was provided on the Closing Date (other than for changes to systems implemented by GM, in which event, Newco will be responsible only for its own costs). Newco shall pay to GM any amounts invoiced hereunder on the 25th day of the month following receipt of the invoice.

(d)    GM agrees to provide the Transition Services that PEP Guide or Newco requests GM to provide in a manner consistent with the provision of such services to its own facilities and GM does not warrant the efficiency, quality or effectiveness of such services to Newco. Notwithstanding Article 12 of this Agreement, GM shall be indemnified against, and defended and held harmless by Newco and for any Losses, damages, or expenses incurred by GM in connection with any and all claims, investigations, audits, actions, causes of action and suits arising from or relating to the provision of the Transition Services that PEP Guide or Newco requests GM to provide and provided by GM, and any actions taken by GM in connection therewith, except to the extent that such claim, investigation, audit, action, cause of action or suit arose from the gross negligence, recklessness or intentional malfeasance of GM.

(e)    If GM discontinues, materially modifies or materially changes any system providing services to its own facilities, GM may also discontinue, modify or change such system provided to Newco in relation to the Transition Services upon six months written notice to Newco. GM agrees to negotiate in good faith with Newco in an effort to minimize any disruption of such discontinuance, modification or change on Newco and/or GM.

11.4.2.    From and after the Closing, GM shall cooperate in good faith in assisting Newco in establishing separate and independent services to replace the Transition Services.

11.4.3.    If a Party is requested by another party to this Agreement, or, with proper authorization, on behalf of another Party undertakes, to make payments or advance funds on behalf of such other Party to facilitate the orderly consummation of the transition contemplated by this Section 11.4, the Party on whose behalf such payments are made shall reimburse the Party making such payments within 3 Business Days of receipt of appropriate documentation with respect to the payments. Interest at a rate of 10% per annum will be charged on any late payments.

11.4.4.    Other than with respect to claims by Newco or any Newco Indemnitee against GM or any of its Affiliates, Newco shall from time to time, at the reasonable request of GM, cooperate with GM in providing GM, to the extent possible through Newco employees formerly employed by GM, with technical assistance and information in respect to any claims brought against GM involving the conduct of the Business prior to Closing, including consultation and/or the appearance(s) of such persons on a reasonable basis as expert or fact witnesses in trials or administrative proceedings. GM shall reimburse Newco for all of its reasonable out-of-pocket costs incurred in connection with providing such services.

11.4.5.    Newco may terminate any or all of the Transition Services provided to Newco by GM at any time upon a minimum of 30 days' notice to GM, such that termination would be effective on the last day of the month next following the month in which notice is given.

11.4.6.    All data provided by GM hereunder shall be in the form used by the service provider of GM before the Closing Date. Unless furnished to the service provider by Newco, all media upon which the data is stored is and shall remain the property of such service provider. Special reports and other nonconforming data requests will be provided only if GM and

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- Light Source Formation Agreement    Pg 36 of 51

82

Newco enter into a separate agreement with respect thereto and will be subject to the cost plus sliding scale set forth in Section 11.4.1(a).

11.4.7.     Newco may use the GM BusinessCard, GM Acquisition Card and EDS Travelcall Card (collectively, "GM Cards") during the Transition Services period. GM and EDS may terminate Newco's use of any of the GM Cards upon 90 days prior written notice. GM shall be indemnified against, and defended and held harmless by Newco for any Losses, damages or expenses incurred by GM in connection with, any and all claims, investigations, audits, actions, causes of action and suits arising from or relating to negligence, recklessness or misuse of the GM Cards.

11.4.8.     Newco shall reimburse GM for additional software license fees charged by a software service provider associated with the transfer of a Transition Service to Newco charged by a software service provider.

11.5.  Books and Records.

A.    Newco shall preserve and keep all books and records, whether in electronic form or otherwise, included in the Acquired Assets and delivered to Newco pursuant hereto for a period of seven years after the Closing Date, or for any longer period as may be required by applicable Law, at Newco's sole cost and expense. During such period, Newco shall make such books and records available to GM as may be reasonably required and upon reasonable advance notice and for reasonable periods by GM in connection with any legal proceedings against GM or investigations of GM by any Governmental Authority or in connection with any Tax examination, audit or appeal of Taxes of GM, the Business or the Acquired Assets.  GM shall reimburse Newco for all of its reasonable out-of-pocket expenses incurred in connection with any request by GM to make available any books and records pursuant to the foregoing sentence. In the event Newco wishes to destroy or dispose of such books and records after such seven-year period, it shall first give 90 days' prior written notice to GM, and GM shall have the right at its option and expense, upon prior written notice given to Newco within such ninety-day period, to take possession of said records within 180 days after the date of Newco's notice to GM hereunder.

B.    To the extent that books and records of GM or any of its Affiliates which contain information relating to the Business are not included in the Acquired Assets, GM agrees to cooperate with Newco in providing Newco with any such information upon Newco's reasonable request to the extent that any such Information exists and is reasonably separable from GM information unrelated to the Business.  Newco shall reimburse GM for all of its reasonable out-of-pocket costs incurred in connection with any such request.

11.6.  Technical Documentation.

GM and its Affiliates shall deliver at the Closing to Newco at the Monroe Plant and/or the Anderson Plant all Intellectual Property included in the Acquired Assets or licensed to Newco in accordance with this Agreement. For a period of six years commencing at Closing, Newco, at its sole cost and expense, shall use its reasonable best efforts to maintain all Technical Documentation in its possession applicable to Product design, test, release and validation at a location at which such Technical Documentation shall be reasonably accessible to GM upon request (at GM's sole cost and expense). During such six year period, Newco shall not destroy or give up possession of its final copy of such Technical Documentation without offering GM the opportunity, at GM's sole cost and expense but without any payment to Newco, to obtain a copy of such documentation. In the event Newco wishes to destroy or dispose of such Technical Documentation after such six-year period,

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- Light Source Formation Agreement    Pg     of 51

83

it shall first give 90 days' prior written notice to GM, and GM shall have the right, at GM's option and expense, upon prior written notice given to Newco within such ninety-day period, to take possession of such Technical Documentation within 180 days after the date of the notice hereunder.

### 11.7.    Payment and Collections.

A.      GM shall take such action as may be reasonably necessary to segregate payments made or collections received on behalf of Newco after Closing, and Newco shall take such action as may be reasonably necessary to segregate payments made or collections received on behalf of GM after Closing, in order to ensure that the cost of the related liability or the benefits of the related assets accrue to the appropriate Party in accordance with the terms of this Agreement. To the extent that any such collections are received after Closing in the form of checks or other negotiable instruments payable to the other Party, GM or Newco, as appropriate, shall promptly take all necessary action to endorse such checks or instruments to permit the appropriate Party to collect the proceeds of such checks and instruments.

B.      GM shall exercise its best efforts to promptly forward to Newco any bills or other payables that GM receives on behalf of Newco.

### 11.8.    Non-Competition.

11.8.1 For a period of six years after the Closing Date, neither GM, any of its Affiliates nor any current part of Delphi Automotive will (i) hire away any executive officer of Newco or (ii), directly or indirectly, whether by ownership, control, management, operation or financing, compete within North America with Newco, the Business or their respective successors in the manufacture, or sale to original equipment manufacturers (or subcontractors thereto) for production use, of Products listed in Schedule 11.8.1 ("Competitive Business"); provided, however, that the restrictions contained in this Section 11.8.1 will not prohibit in any way (A) the acquisition of a controlling interest or merger with any Person, or a division or business unit thereof, which acquired Person, division or unit is not primarily engaged in a Competitive Business, provided that GM will not and does not obtain from such Competitive Business any of the products theretofore sourced from Newco or its subsidiaries, provided further that GM will take all reasonable steps, promptly after such acquisition or merger, but in no event later than six months thereafter, subject to Section 11.8.2, to offer for sale such portion of such Person, division or unit as constitutes a Competitive Business, (B) the acquisition by GM, directly or indirectly, of an ownership interest in any Person, or a division or business unit thereof, engaged in a Competitive Business, if the Competitive Business accounts for less than $5 million in annual revenues of such Person, division or unit, (C) the acquisition by GM, directly or indirectly, of a non-controlling ownership interest in any Person, or a division or business unit thereof, engaged in a Competitive Business, if the Competitive Business accounts for less than 15% of the operating revenues of such Person, division or unit, (D) the acquisition by GM, directly or indirectly, of less than 5% of the publicly traded stock of any Person engaged in a Competitive Business, (E) subject to compliance by GM and its Affiliates with their respective obligations under the Component Supply Agreement, the sale by GM of any product incorporating a Product made by a Competitive Business, (F) financing activities of General Motors Acceptance Corporation and its subsidiaries in its ordinary course of business, (G) the operations of the Sung San Company, Ltd., in the event that GM's interest in Sung San is not acquired by Newco, and (H) consistent with the Right of Access Agreement and the then generally applicable GM troubled supplier practices, direct or indirect activities of GM to advise, operate, manage or finance a troubled supplier of GM or its Affiliates in order to maintain approximately existing levels of production from such supplier for production requirements of GM and its Affiliates.

84

11.8.2  Upon the acquisition of any Competitive Business to be disposed of by GM pursuant to Section 11.8.1A, GM shall promptly notify Newco and Newco and afford Newco the right and opportunity to submit a bid to purchase such Competitive Business, which right and opportunity shall be no less timely or favorable than that afforded to any third party.

11.8.3  GM agrees that the provisions of Section 11.8.1 are necessary and reasonable to protect Newco in the conduct of the Business.  If any court of competent jurisdiction shall finally hold any restriction contained in this Section 11.8.1 to be invalid, illegal, or unenforceable by reason of the extent, duration, or geographical scope thereof, or otherwise, then the court making such determination shall have the right to reduce such extent, duration, geographical scope, or other provisions hereof, and in its reduced form such restriction shall then be enforceable in the manner contemplated hereby.

11.8.4  GM agrees that any breach by it of Section 11.8.1 will result in Newco suffering a loss which cannot adequately be compensated for in damages and that Newco shall be entitled to injunctive relief (without the necessity of posting a bond or other security), in addition to any and all other remedies available to it, whether at law or in equity.

11.9.  Subsequent Financial Statements.

As soon as practicable after the date hereof, GM, at its sole cost and expense, shall prepare audited financial statements of the Business, with appropriate footnotes, (i) sufficient for inclusion in a Form S-1 filed pursuant to the Securities Act of 1933, as amended, for the years ended December 31, 1997 and December 31, 1996 (the "Historical Financial Statements") and (ii) similar to the 1997 Financial Statements, for the period beginning on January 1, 1998 and ending on the Closing Date, or as of the Closing Date, as the case may be (the "Supplementary Financial Statements"), and provide copies of such statements to Newco.  The Historical Financial Statements shall be prepared in accordance with GAAP and shall be accompanied by an unqualified report thereon of Deloitte & Touche LLP or other independent public accountants of recognized national standing.   The Supplementary Financial Statements shall be prepared in accordance with GAAP consistently applied with the 1997 Financial Statements and shall fairly present the assets to be sold as of the Closing Date and the results of operations and cash flows of the Business for the period indicated and shall be accompanied by an unqualified report thereon of Deloitte & Touche LLP or other independent public accountants of recognized national standing.  GM shall provide assistance in the preparation of the statements and data and shall cooperate in the future with Newco in providing any additional predecessor information for the Business reasonably required by Newco.

11.10.  Injunctions/Orders.

In the event that any temporary, interim or other non-final injunction, order or decree is issued by a court of competent jurisdiction which restrains, prohibits or limits consummation by any Party of the transactions contemplated hereby or by the Ancillary Agreements, each Party shall use its reasonable best efforts to have such injunction, order or decree lifted, rescinded or revoked as soon as possible.

11.11.  Supplements to Schedules.

GM shall promptly supplement or amend each Schedule with respect to any matter hereafter arising or discovered which, if existing or known at the date of this Agreement, would have been required to be set forth, listed or otherwise disclosed in such Schedule.  No information in any such supplement or amendment of any Schedule shall be deemed to have been set forth, listed or

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- Light Source Formation Agreement    Pg   of 51

85

otherwise disclosed as of the date of this Agreement or shall have any other effect on the rights, obligations or interests of the Parties, unless PEP Guide specifically agrees thereto in writing.

### 11.12.  Confidentiality.

GM shall, and shall cause its Affiliates, and its and their respective officers, directors, employees and agents, to keep confidential all information relating to the Business and the Acquired Assets and not use such information except as contemplated by this Agreement, except (A) as may be required by applicable Law and then only after prior consultation with Newco, (B) that GM will not be subject to the obligations of this Section 11.12 with respect to such information that:    (a) is or becomes known publicly through no fault of GM; or (b) was already known to GM at the time of disclosure; or (c) is learned by GM from a third party under no obligation of confidentiality, or (d) is independently developed by an employee, agent, or consultant of GM without any use of or reliance on disclosures hereunder; or (e) is approved for release by written authorization of Newco, and (C) subject to Section 11.8, with respect to such of the Technical Documentation as is not included in the Acquired Assets. The standard of care imposed on GM and its Affiliates for protecting such information shall be the reasonable and prudent care necessary to prevent improper disclosure or use of such information, to the same degree employed by GM to protect its own information of such nature.

### 11.13.  Intellectual Property Licenses.

#### 11.13.1.  Licenses to Newco.

At the Closing, GM or its Affiliates shall grant to Newco a non-exclusive, irrevocable, perpetual, (other than with respect to trademarks and tradenames not included in the Acquired Assets) royalty-free license or sublicense substantially similar in form and substance to Exhibit 11.13.1 to use such Intellectual Property owned or sublicensable on a royalty-free basis by GM or its Affiliates and used in the Business but not included in the Acquired Assets, including for the purpose of manufacturing, assembling, designing, processing, marketing, offering for sale, selling, importing, installing and servicing the Products. Should GM or Newco reasonably determine after Closing th˙˙ items necessary for the conduct of the Business as currently conducted have not been included in such license or sublicense, GM shall grant to Newco a license or sublicense of such items.   For the purposes of this Section 11.13.1, items necessary for the conduct of the Business shall include those items that have been used, or are reasonably expected to be used, in the conduct of the Business as of the date of this Agreement.

#### 11.13.2.  Licenses to GM.

A.      Newco will grant back to GM a non-exclusive, irrevocable, perpetual, royalty-free license, including the right to sublicense its Affiliates, to use all Intellectual Property included in the Acquired Assets (except for trademarks, service marks and trade names included in the Acquired Assets) for (i) products other than products within the Business and (ii) vehicle lighting already awarded to another supplier prior to the date of this Agreement.

B.      Newco will also grant back to GM a limited, non-exclusive, irrevocable, fully-paid right and license to grant sublicenses only to GM suppliers or other parties to whom GM has already granted by written agreement as of the date of this Agreement a license to use, only for the term of such written agreements without renewals or extensions of same, the Intellectual Property included in the Acquired Assets for lighting for past model vehicles sold by GM or its Affiliates so long as such written agreement contains in force and effect provisions that GM will take appropriate steps to

05-44481-rdd   Doc 9426-4   Filed 09/19/07   Entered 09/19/07 19:21:39   Exhibit B-2
- Light Source Formation Agreement   Pg    of 51

86

assure that the level of quality of the products supplied by such suppliers under such written agreements meets or exceeds the quality standards of such products existing as of the date of this Agreement, provided that if after the term of any such license, Newco is unwilling to supply past model lighting products to GM at reasonable prices, Newco shall grant at GM's written request a license to GM to the Intellectual Property included in the Acquired Assets for such past models.

C.      This clause 11.13.2 will not affect GM's or its Affiliates' obligations under any other agreement with Newco relating to supply of vehicle lighting.

### 11.13.3. Sublicense to Newco.

GM shall grant Newco a nonexclusive, irrevocable, fully paid sublicense under the patents licensed to GM in the 22 May 1998 settlement agreement between the Lemelson Medical, Education and Research Foundation, Limited Partnership, et al. and GM, only to the extent and level of the annual production of products manufactured in the fields licensed in that agreement by GM's Delphi Automotive lighting business unit during the year immediately prior to the date of this Agreement.

### 11.14. Pre-Emptive Right.

If prior to an initial public offering of the common stock of Newco, Newco shall sell for cash additional shares of its common stock, GM shall be entitled to maintain its then current equity ownership share (which initially is 33.3%, based on the number of shares issuable upon conversion of the Series B Preference Stock and assuming issuance of the warrants issuable hereunder and exercise thereof) by purchasing from Newco a pro rata number of the additional shares at the same price per share as the other purchasers.

There shall be excepted from the foregoing any issuance of common stock by Newco for management or employee compensation or plans.

### 11.15. Management Dilution.

Except as set forth on Schedule 11.15, with respect to the period between January 1, 1998 and the Closing Date, and otherwise from the Closing Date until the third anniversary of the Closing Date, GM has not taken, and will not take, any actions to employ or retain the services of any salaried employees of the Business, including transferring such employees to a business unit other than the Business, soliciting or otherwise requesting such employees to agree to employment by GM or agreeing to employ or utilize the services of any such employee.

### 11.16. Capital Contribution.

GM, PEP Guide and Newco agree that all transactions described in Section 2.1.1 through 2.1.4 and in Section 3.5B will be part of a transaction pursuant to Section 351 of the Code for all Tax purposes and agree to report such transactions accordingly. Further, and without limitation, GM, PEP Guide and Newco hereby agree that it is the intent of all Parties that the GM Note be a contribution to the capital of Newco pursuant to such Section 351 transaction and agree to report such transaction accordingly. GM agrees not to claim any deduction for tax purposes with respect to the contribution of the GM Note or with respect to any payments made on the GM Note. No Party shall take any position inconsistent with the provisions of this paragraph for any purpose unless (and then only to the extent) such Party is required to do so by reason of a final determination by a taxing authority.

11.17. Warrants.

11.17.1. Issuance.

At the beginning of each 12-month period indicated below, Newco shall issue to GM warrants (the "Warrants") to purchase shares of Class B Common Stock. Such number of shares and exercise price shall be subject to adjustment on the terms set forth in Section 4 of the Warrants Certificate. Warrants issued at the beginning of a given period shall correspond to the Payments (as defined in the GM Note) scheduled to be made during such period, on a pro rata basis, in accordance with the terms of the GM Note. The number of Warrants to be issued in connection with each 12-month period of Payments and the aggregate exercise prices are set forth in the table below:

| Period Beginning | Number of Warrants | Aggregate Exercise Price |
|---|---|---|
| October 1, 1998 . . . . . . . . . . | 25,000 | $200,000 |
| October 1, 1999 . . . . . . . . . . | 25,000 | $200,000 |
| October 1, 2000 . . . . . . . . . . | 25,000 | $200,000 |
| October 1, 2001 . . . . . . . . . . | 25,000 | $200,000 |
| October 1, 2002 . . . . . . . . . . | 25,000 | $200,000 |
| Total | 125,000 | $1,000,000 |

11.17.2. Form.

The Warrants shall be issued pursuant to a certificate in the form of the Warrants Certificate, which certificate indicates the number of Warrants being issued thereby.

11.17.3. Exercise.

Any exercise of Warrants must be done in compliance with the terms of Article I of the Warrants Certificate and the holder thereof must complete the Exercise Form attached thereto.

11.17.4. Transfer Restrictions.

The Warrants shall be subject to the transfer restrictions indicated on the face of the Warrants Certificate and in Section 5 thereof and those set forth in Article III of the Shareholders and Registration Rights Agreement.

11.17.5. Registration Rights.

GM shall have the right to register the Class B Common Stock underlying any Warrants issued to it on the terms set forth in Article IV of the Shareholders and Registration Rights Agreement.

11.17.6. Other Terms.

The Warrants shall be governed in all other respects by the terms of the Warrants Certificate and the Shareholders and Registration Rights Agreement, as applicable.

88

11.18.  Put Rights.

11.18.1.

For the 12 month period beginning on the Closing Date, GM has the right to elect to sell, transfer and deliver to PEP Guide, and PEP Guide agrees to purchase from GM unconditionally and despite any legal or other impediment, no less than all of the 50 shares of Series A Senior Preferred Stock and 375,000 shares of Class B Common Stock GM received pursuant to Section 2.1.3 for an aggregate purchase price of $15,000,000, payable by wire transfer of immediately available funds.

11.18.2.

If GM does not exercise its put right under Section 11.18.1, then for the 12 month period beginning 12 months after the Closing Date, PEP Guide has the right to elect to sell, transfer and deliver to GM, and GM agrees to purchase from PEP Guide unconditionally and despite any legal or other impediment, no less than all of the 50 shares of Series A Senior Preferred Stock and 375,000 shares of Class A Common Stock PEP Guide received pursuant to Section 2.1.3 for an aggregate purchase price of $45,000,000, payable by wire transfer of immediately available funds.

11.18.3.

If GM did not exercise its put right under Section 11.8.1 and PEP Guide does not exercise its put right under Section 11.18.2, then for the 12 month period beginning 24 months after the Closing Date, GM has the right to elect to sell, transfer and deliver to PEP Guide and PEP Guide agrees to purchase from GM unconditionally and despite any legal or other impediment, no less than all of the 50 shares of Series A Senior Preferred Stock and 375,000 shares of Class B Common Stock GM received pursuant to Section 2.1.3 for an aggregate purchase price of $75,000,000, payable by wire transfer of immediately available funds.

11.18.4.

To exercise its right hereunder, the exercising Party shall give written notice to the other Party, said notice to be received within the relevant 12 month period.  If any Party makes timely exercise of its right hereunder then the Closing shall occur, with respect to a "put" under Section 11.18.1, 30 days and with respect to a "put" under Sections 11.18.2 or 11.18.3, 60 days after such notice is received by the other Party.  Time shall be of the essence under the terms and provisions of this Section 11.18. Any transferor of securities under this Section 11.18 shall be deemed to have made to the transferee the warranties provided in the New York Uniform Commercial Code Article 8, Section 8-108(a).

12.    INDEMNIFICATION.

12.1.    Survival.

The representations and warranties contained in this Agreement shall survive the Closing and continue in full force and effect for a period of two years after the Closing; provided, however, that the representations and warranties of GM (A) set forth in Section 5.1.16 shall continue in full force and effect through and until six months after the expiration of the applicable statute of limitations (including any extensions thereto) and (B) set forth in each of Sections 5.1.5A, 5.1.7B(i), 5.1.9, 5.1.15A (but only with respect to the second sentence thereof), 5.1.15D (but only with respect to zoning) and 5.1.6 shall continue in full force and effect indefinitely.  If, prior to the close of business

89

on the date the survival period terminates with respect to any representation or warranty, GM, on the one hand, or PEP Guide or Newco, on the other hand, shall have notified the other of a claim for indemnity hereunder and such claim shall not have been finally resolved or disposed of at such date, then such representation or warranty that is the basis for such claim shall continue to survive as to that claim and shall remain a basis for indemnity until such claim is finally resolved. All of the covenants of each of the Parties set forth in this Agreement shall survive the Closing and continue in full force and effect according to their respective terms.

12.2.   Indemnification.

12.2.1.   Indemnification Provisions for Benefit of Newco.

A.   Subject to and in accordance with the terms of this Article 12, from and after the Closing Date, GM shall indemnify, hold harmless and defend Newco and its Affiliates, their successors and assigns, and their partners, officers, directors, employees, shareholders and agents (individually, a "Newco Indemnitee" and, collectively, the "Newco Indemnitees"), from and against all demands, claims, actions or causes of action, assessments, losses, damages, diminution in value, liabilities, costs and expenses (including interest and penalties and reasonable expenses of investigation and attorneys' fees (collectively, "Losses")) to the extent arising out of or related to: (i) any breach of any representation or warranty of GM contained in this Agreement or in any certificate delivered pursuant to this Agreement; (ii) any breach of any covenant of GM set forth in this Agreement; (iii) any failure of GM to pay, perform or discharge any liabilities or obligations of GM (other than (a) the Assumed Liabilities and (b) to the extent that such payment, performance or discharge constitutes an obligation of Newco under Article 6 or 9); or (iv) directly or indirectly, the conduct of the Business or the ownership or operation of the Acquired Assets on or prior to the Closing Date; provided, however, that GM shall not be liable for Losses pursuant to clause (i) of this Section 12.2.1A unless a claim therefor has been made within the applicable survival period set forth in Section 12.1 and until the amount of all Losses (other than those arising out of or related to any breach of the representations and warranties as to which there shall not be any deductible set forth in Section 5.1.1, 5.1.2, 5.1.3, 5.1.5A, 5.1.7B(i), 5.1.9, 5.1:10 (with respect to Consents of Governmental Authorities only), 5.1.15A (but only with respect to the second sentence thereof) or 5.1.16) in the aggregate exceeds $250,000, after which point GM will be obligated to indemnify Newco Indemnitees from and against all Losses in excess of such amount. For purposes of calculating the amount of any Losses with respect to any of the Acquired Assets, "Losses" shall include the full replacement cost of such Acquired Assets.

B.   The Newco Indemnitees' rights under each of clauses (i), (ii), (iii) and (iv) of Section 12.2.1A shall be independent of each other; provided that, the Newco Indemnitees may not recover more than once for a particular indemnifiable Loss.

12.2.2.   Indemnification Provisions for Benefit of GM.

A.   Subject to and in accordance with the terms of this Article 12, from and after the Closing Date, Newco shall indemnify, hold harmless and defend GM and its Affiliates, their successors and assigns, and their partners, officers, directors, employees, shareholders and agents (individually, a "GM Indemnitee" and, collectively, the "GM Indemnitees") from and against all Losses to the extent arising out of or related to: (i) any breach of any representation or warranty of Newco contained in this Agreement or in any certificate delivered pursuant to this Agreement; (ii) any breach of any covenant of Newco set forth in this Agreement; (iii) any failure of Newco to pay, perform or discharge any of the Assumed Liabilities; or (iv) directly or indirectly, the conduct of the Business or the ownership or operation of the Acquired Assets by Newco after the Closing Date; provided,

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- Light Source Formation Agreement    Pg 2 of 51

90

however, that Newco shall not be liable for Losses pursuant to clause (i) of this Section 12.2.2A unless a claim therefor has been made within the applicable survival period set forth in Section 12.1.

B.    The GM Indemnitees' rights under each of clauses (i), (ii), (iii) and (iv) of Section 12.2.2A shall be independent of each other; provided that, the GM Indemnitees may not recover more than once for a particular indemnifiable Loss.

12.3.    Indemnification Procedure as to Third-Party Claims.

12.3.1    Upon receipt by either GM or Newco of written notice of the commencement of any third-party claim, action, suit, or proceeding (any such claim, action, suit, or proceeding being hereinafter referred to in this Section 12.3 as a "Claim"), in respect of which such Party (an "Indemnitee") is entitled to indemnification under this Agreement, such Indemnitee shall promptly notify the indemnitor under this Agreement (the "Indemnitor") of such Claim in writing; provided, however, that any failure to give such notice will not waive any rights of the Indemnitee except to the extent that the rights of the Indemnitor are prejudiced thereby. With respect to any Claim as to which such notice is given by the Indemnitee to the Indemnitor, the Indemnitor may, subject to the provisions of Section 12.3.2 below, assume the defense and settlement of such Claim; provided, however, that, except as otherwise provided in Section 12.3.2, (i) the Indemnitee shall cooperate with the Indemnitor in the defense and settlement of such Claim in any manner reasonably requested by the Indemnitor; (ii) the Indemnitee shall have the right to pay or settle such Claim at any time, in which event the Indemnitee shall be deemed to have waived any right to indemnification therefor by the Indemnitor; and (iii) the Indemnitor shall not consent to the entry of any judgment or enter into any settlement with respect to such Claim without the written consent of the Indemnitee; provided, however, that with respect to any Claim which is solely for money damages, if Indemnitee fails to consent to a written settlement offer (which includes an unconditional release of Indemnitee as a condition to the effectiveness of any such settlement) and judgment is subsequently entered in an amount exceeding the amount of such offer, and such judgment provides for the final and nonappealable resolution of such Claim, then Indemnitor shall have no responsibility for the amount of such excess.

12.3.2    If (i) the Indemnitor fails to assume the defense of such Claim or, having assumed the defense and settlement of such Claim, fails reasonably to contest such Claim in good faith, or (ii) the remedy sought by the claimant with respect to such Claim is not solely for money damages, the Indemnitee, without waiving its right to indemnification, may assume the defense and settlement of such Claim; provided, however, that (x) with respect solely to clause (ii) above, the Indemnitor shall be permitted to join in the defense and settlement of such Claim, to the extent related to money damages, and to employ counsel at its own expense, (y) the Indemnitor shall cooperate with the Indemnitee in the defense and settlement of such Claim in any manner reasonably requested by the Indemnitee, and (z) with respect solely to clause (ii) above, to the extent related to money damages, the Indemnitee shall not consent to the entry of any judgment or enter into any settlement with respect to such Claim without the written consent of the Indemnitor.

12.3.3    As used in this Section 12.3, the term Indemnitee shall be deemed to include the plural thereof where the rights or obligations of more than one Indemnitee may be involved.

12.4.    Exclusive Remedy.

Subject to the following sentence and the provisions of Article 9, GM and Newco agree that before commencing litigation they shall engage in the conciliation process set forth in Section 12.5 below with regard to any dispute as to this Agreement, or in the case of any dispute as to the Closing

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- Light Source Formation Agreement    Pg 44 of 51

91

Inventory Amount or the Closing Inventory Statement, Section 3.2, or in the case of any dispute as to Consolidated EBITDA, Section 3.5. Nothing contained herein, however, shall limit the rights of a Party to pursue any claim of fraud or to seek and obtain any and all equitable remedies, including injunctive relief to specifically enforce the other Party's obligations hereunder.

    12.5.   Dispute Resolution.

In the event of any dispute between GM and Newco relating to indemnification of any Loss pursuant to Section 12.2, other than with respect to third-party Claims (which shall be handled in the manner set forth in Section 12.3) or matters relating to Article 9 of this Agreement (which shall first be addressed as set forth in Section 9.13 of this Agreement), the Parties shall use all reasonable best efforts to resolve such dispute at an appropriate business level within their respective business organizations. In the event such efforts fail, such dispute shall be submitted to a three-member dispute resolution panel. On a case-by-case basis, the panel shall consist of the Chief Financial Officer of GM and Newco, or such individual's designee, plus one individual designated by them together. The panel may establish procedures for submission of the dispute, including that reasonable requests made by one Party to the other for information shall be honored in order that each of the Parties may be advised of relevant facts. A majority decision shall be the view of the panel but shall not be binding unless the Parties agree in writing in advance of submittal that it shall be binding. Each Party agrees that neither it nor any of its Affiliates will seek to enforce the indemnification provisions of this Article 12 as to any such matter unless and until such efforts have been unsuccessful in resolving the dispute within 60 days after a written claim for indemnification was made with respect to such matter; provided, however, that such restriction shall be inapplicable (i) to the extent that such delay is reasonably likely to prejudice in any material respect the rights of the Party seeking indemnification and (ii) to any action or petition seeking equitable relief. Settlement offers and any non-binding decision of such panel made in connection with any dispute resolution procedure pursuant to this Section 12.5 shall be deemed confidential and not admissible for any purpose in any litigation in which the Parties may be involved among or between themselves or with third parties, unless the Parties otherwise agree.

13.    TERMINATION.

    13.1.   Termination.

This Agreement may be terminated by giving written notice prior to the Closing as follows:

    (a)    by mutual written agreement of GM, Newco and PEP Guide;

    (b)    by GM, Newco or PEP Guide, if there shall be any order that is final and non-appealable preventing the consummation of the transactions contemplated hereby or by any Ancillary Agreement and the Party seeking to terminate the Agreement pursuant to this Section 13.1(b) has complied in all respects with its obligations under Section 11.10 hereof;

    (c)    by Newco or PEP Guide, at any time after November 30, 1998, if the transactions contemplated hereby and by the Ancillary Agreements shall not have been consummated through no fault of PEP Guide, Newco or any of their respective Affiliates;

    (d)    by GM, at any time after November 30, 1998, if the transactions contemplated hereby and by the Ancillary Agreements shall not have been consummated through no fault of GM or any of its Affiliates;

(e)    by Newco or PEP Guide, if GM or any of its Affiliates shall have breached or violated in any material respect any of its representations, warranties or covenants set forth in this Agreement, and such breach or violation shall not have been cured within 10 days after written notice thereof has been given by Newco or PEP Guide to GM; or

(f)    by GM, if PEP Guide, Newco or any of their respective Affiliates shall have breached or violated in any material respect any of its representations, warranties or covenants set forth in this Agreement, and such breach or violation shall not have been cured within 10 days after written notice thereof has been given by GM to Newco and PEP Guide.

The right of any Party to terminate this Agreement pursuant to this Section 13.1 shall remain operative and in full force and effect regardless of any investigation made by or on behalf of any Party hereto, any person controlling any such Party or any of their respective partners, officers or directors, whether prior to or after the execution of this Agreement.

13.2.    Effect of Termination.

Except as set forth in this Section 13.2, in the event of the termination of this Agreement pursuant to Section 13.1 hereof, this Agreement shall forthwith become null and void, there shall be no liability on the part of any Party or any of their respective partners, officers, directors, subsidiaries, Affiliates or Associates to any other party and all rights and obligations of any Party hereto shall cease; provided, however, that the foregoing shall not restrict or otherwise limit the liability of any Party arising out of or relating to such Party's willful breach of this Agreement.  Without limiting the generality of the foregoing, the representations, warranties, covenants and agreements in this Agreement shall terminate at or upon the termination of this Agreement pursuant to Section 13.1 hereof, except that the agreements set forth in Article 14 hereof and those set forth in this Section 13.2, in the Confidentiality Agreement, and in the Environmental Confidentiality Agreement and Right of Access Agreement shall survive termination of this Agreement, in accordance with their respective terms.

14.    MISCELLANEOUS.

14.1.    Bulk Sales Laws.

PEP Guide and Newco hereby waive compliance by GM with the provisions of the bulk sales law of any state or foreign jurisdiction, and, subject to and in accordance with Section 12.3, GM shall indemnify, hold harmless and defend PEP Guide and Newco and the other Newco Indemnitees from and against any and all Losses arising out of or related to the failure or alleged failure of GM to comply with any such law in respect of the contribution of the Acquired Assets to Newco.

14.2.    Notices.

Except as otherwise set forth herein, all notices, requests, consents, or other communications permitted or required under this Agreement shall be in writing and shall be deemed to have been given when personally delivered, or when sent if sent via facsimile (with receipt confirmed), or on the first business day after sent by reputable overnight courier or on the third business day after sent by registered or certified first-class mail (with receipt confirmed), to the following:

If to GM:

General Motors Corporation

767 Fifth Avenue
New York, NY 10153
Attn: Treasurer
Fax: (212) 418-3623

with a copy to:

General Motors Legal Staff
New Center One Building
3031 W. Grand Boulevard
Detroit, MI 48202
Attn: E. Christopher Johnson
Fax: (313) 974-0373

If to PEP Guide or to Newco:

Lightsource Parent Corporation
2915 Pendleton Avenue
Anderson, IN 46016
Attn: Chief Financial Officer
Fax: (765) 641-5087

with a copy to:

Palladium Equity Partners, LLC
Rockefeller Center
1270 Avenue of the Americas
Suite 2200
New York, NY 10020
Attn: Marcos Rodriguez
Fax: (212) 218-5155

and to

Cravath, Swaine & Moore
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Attn: Melvin Bedrick
Fax: (212) 474-3700

if any Party shall have designated a different addressee by notice, then to the last addressee so designated, and provided further, that, notwithstanding the foregoing, any notice given with respect to the designation of a different addressee shall be deemed to have been given when received.

14.3. Assignment.

This Agreement shall be binding upon and inure to the benefit of each of the Parties and their respective successors and permitted assigns, but no rights, interests or obligations of any Party herein may be assigned without the prior written consent of the other, which shall not be unreasonably withheld or delayed; provided, however, that no assignment of this Agreement or any

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- Light Source Formation Agreement    Pg 46 of 51

94

rights hereunder shall be made without the assignee. as a condition of such assignment, assuming in writing. its assignor's obligations under this Agreement, to the extent applicable to. such assignment. Notwithstanding the foregoing, PEP Guide and Newco may, without the prior written consent of GM, assign this Agreement and any or all of its respective rights, interests and obligations hereunder to (A) one or more of their respective Affiliates or (B) a transferee of all or any portion of the Acquired Assets or all or any portion of the Business, or any successor to all or any portion of the Acquired Assets or all or any portion of the Business; provided that such transferee or successor (i) has a net worth immediately after such assignment of not less than $30,000,000, (ii) assumes in writing all of Newco's obligations under this Agreement, to the extent applicable to such assignment, (iii) is not an original equipment manufacturer of fully assembled passenger cars and/or light duty trucks, (iv) has maintained a responsible environmental record and (v) is, or has an Affiliate that is, in good standing as a supplier to GM.  For purposes of the foregoing, a potential assignee or successor shall be deemed not to have a responsible environmental record only if such assignee or successor (Y) has a record of continuing or recurring noncompliance with any current or future Environmental Law and (Z) within the 5-year period immediately preceding such proposed assignment or transfer (i) has been convicted in federal or state court of a violation of a current or future Environmental Law, (ii) a federal or state court has issued an injunction, order, judgment, decree (including consent decrees) or other civil ruling as a result of noncompliance with a current or future Environmental Law; (iii) has materially violated an administrative order issued under a current or future Environmental Law; (iv) a Governmental Authority has issued a notice of noncompliance under a current or future Environmental Law; or (v) a Governmental Authority has filed an enforcement action under current or future Environmental Laws. As used in this Section 14.3, the term Environmental Law will also include similar laws of foreign jurisdictions.  Notwithstanding the foregoing, GM shall not unreasonably withhold or delay its consent of such assignment to a transferee or successor that is not, or does not have an Affiliate that is, a then current supplier of GM if (a) such transferee or successor satisfies the criteria set forth in clauses (B)(i) through (iv) of the immediately preceding sentence and (b) such transferee or successor or its Affiliate shall not have been terminated as a supplier by GM for reasons other than failure to be price competitive and shall have a reputation for large-scale, quality manufacturing and reliable performance of contracts. In addition, after the Closing, GM may assign, without the prior written consent of Newco, this Agreement and any or all of its rights, interests and obligations hereunder to a corporation or other business entity to which all or substantially all of the assets of Delphi Automotive is sold or otherwise transferred; provided such transferee agrees in writing to be bound by Section 11.8 herein.  The provisions of this Section shall be subject to 5.1.24. Notwithstanding any such assignment permitted by this Section 14.3, GM, PEP Guide and Newco shall in each case remain liable for all of its respective obligations hereunder.

14.4.  <u>Pledge to Lenders</u>.

Newco and its Affiliates may pledge its and their rights under this Agreement to their respective lenders as collateral security for indebtedness, provided that, upon any foreclosure by such lenders, such lenders or their designees shall take subject to all of the terms and conditions of this Agreement.

14.5.  <u>Entire Agreement</u>.

This Agreement, together with the Ancillary Agreements and the Confidentiality Agreement, represent the entire agreement and understanding among the Parties with respect to the transactions contemplated herein.  This Agreement supersedes all prior agreements, understandings, arrangements, covenants, representations, and warranties, written or oral, of any Party dealing with the subject matter hereof.

05-44481-rdd   Doc 9426-4   Filed 09/19/07   Entered 09/19/07 19:21:39   Exhibit B-2
- Light Source Formation Agreement   Pg of 51

95

14.6.   Waiver.

At any time, GM and PEP Guide may (a) extend the time for the performance of any of the obligations or other acts of another Party to this Agreement, (b) waive any inaccuracies in the representations and warranties of another Party to this Agreement contained herein or in any document delivered pursuant hereto and (c) waive compliance by another Party to this Agreement with any of the agreements or conditions contained herein. Any such extension or waiver shall be valid only if set forth in a written instrument signed by the Party sought to be bound thereby. Waiver by GM or PEP Guide of any such inaccuracies or of a failure to comply with any provision of this Agreement shall not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other inaccuracy of, or failure to comply with, any provision of this Agreement.

14.7.   Failure or Delay Not Waiver, Remedies Cumulative.

No failure or delay on the part of any Party in the exercise of any right hereunder shall impair such right or be construed to be a waiver of, or acquiescence in, any inaccuracy or breach of any representation, warranty or agreement herein, nor shall any single or partial exercise of any such right preclude other or further exercise thereof or of any other right. Except as set forth in Section 12.4, all rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

14.8.   Specific Performance.

Each of the Parties acknowledges that money damages would be both incalculable and an insufficient remedy for any breach of this Agreement by such party and that any such breach would cause GM, on the one hand, and PEP Guide and Newco, on the other hand, irreparable harm. Accordingly, each of the Parties also agrees that, in the event of any breach or threatened breach of the provisions of this Agreement by such party, GM, Newco or PEP Guide, as applicable, shall be entitled to equitable relief without the requirement of posting a bond or other security, including in the form of injunctions and orders for specific performance, in addition to all other remedies available to such party, whether at law or in equity. Notwithstanding the foregoing, in the event that any of the Acquired Assets is destroyed or suffers material damage as the result of an act of God or other event beyond the reasonable control of GM prior to the Closing Date, GM shall have no obligation hereunder to replace such Acquired Asset, but GM shall pay over to Newco the replacement value of such destroyed or damaged property; provided, however, that this provision is not intended to restrict or otherwise limit the respective rights of (A) GM under Section 3.1 (with respect to the Asset Amount) or (B) PEP Guide and Newco under Article 8 (with respect to conditions to closing) or Article 13 (with respect to termination of this Agreement).

14.9.   Amendment.

This Agreement may only be terminated or amended in a writing executed and delivered by duly authorized representatives or officers each of the Parties.

14.10.   Expenses.

Except as otherwise expressly provided in this Agreement, each Party shall be responsible for its own expenses incurred in connection with the preparation of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby.

05-44481-rdd   Doc 9426-4   Filed 09/19/07   Entered 09/19/07 19:21:39   Exhibit B-2
- Light Source Formation Agreement   Pg 48 of 51

96

14.11. Third Parties.

Nothing contained in this Agreement is intended to or shall be construed to confer upon or give to any person, firm, corporation, association, labor union, or trust other than the Parties and their respective successors and permitted assigns, any claims, rights, or remedies under or by reason of this Agreement.

14.12. Severability.

Should any provision, or any portion thereof, of this Agreement for any reason be held invalid or unenforceable, such decision shall not affect the validity or enforceability of any of the other provisions, or portions thereof, of this Agreement, which other provisions, and portions, shall remain in full force and effect, and the application of such invalid or unenforceable provision, or portion thereof, to persons or circumstances other than those as to which it is held invalid or unenforceable shall be valid and be enforced to the fullest extent permitted by law.

14.13. Headings.

The headings contained in this Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof.

14.14. Counterparts.

More than one counterpart of this Agreement may be executed by each of the Parties, and each fully executed counterpart shall be deemed an original, but all of which together shall constitute one and the same instrument. All signatures of each of the Parties to and pursuant to this Agreement may be transmitted by facsimile, and such facsimile will for all purposes be deemed to be the original signature of the Person whose signature it reproduces and will be binding upon that Person and on the party on whose behalf that Person signed.

14.15. Governing Law; Jurisdiction; Consent to Service of Process.

A.    This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of laws, except that Owned Real Estate matters shall be governed by the laws of the State of Louisiana, and that Anderson, Indiana Real Estate matters shall be governed by the laws of the State of Indiana. Article 9 matters shall be governed by the applicable laws of the state in which the Real Estate is located as well as by applicable Federal laws.

B.    Each of the Parties irrevocably submits to the exclusive jurisdiction of the courts of Delaware sitting in Wilmington, Delaware, and any appellate court thereof, for the purposes of any suit, action or other proceeding in connection with or relating to this Agreement or any of the Ancillary Documents and agrees that it will not attempt to deny or defeat such jurisdiction by motion or other request for leave from any such court. Each of the Parties hereto waives any right to trial by jury with respect to any action related to or arising out of this Agreement or the Ancillary Agreements. Each of the Parties agrees not to bring any suit, action or proceeding against any other of the other Parties in connection with this Agreement or the Ancillary Documents and the transactions contemplated hereby and thereby in any court outside of Delaware. Each of the Parties further agrees that it has appointed CT Corporation System, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801, as its agent for service of any process, summons, notice or document

97

for any such action, suit or proceeding. Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the Ancillary Documents or the transactions contemplated hereby or thereby in the courts referred to above, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

14.16.  Public Announcements.

GM and PEP Guide will consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and shall not issue any press release or make any public statement without mutual consent, except as may be required by applicable Law and then only after such prior consultation.

14.17.  Sales or Transfer Taxes.

Notwithstanding anything in this Agreement to the contrary, all sales, documentary, stamp, use, transfer, gross receipts, filing, conveyance, recording, and other similar Taxes and fees, including all applicable real estate transfer Taxes, intellectual property filing and recording fees and excluding any taxes based on or measured by income including the Indiana Gross Income Tax imposed by I.C. 6-2.1-1 et seq. (collectively, "Transfer Taxes"), arising out of or in connection with the transactions consummated pursuant to the Agreement shall be borne equally by GM and Newco. The Party which has primary responsibility under applicable Law for the payment of any particular Transfer Tax shall prepare and file the relevant Tax Return, and notify the other Party in writing of the Transfer Taxes shown on such Tax Return and the manner in which such Transfer Taxes were calculated, and such other party shall reimburse the filing Party for the amount of such Transfer Taxes to be borne by such other party by wire transfer of immediately available funds or check within five days after receipt of such notice.

14.18.  Other Tax Matters.

GM and Newco shall cooperate in connection with (i) the preparation or filing of any Tax Return, tax election, Tax consent or certification, or any claim for a Tax refund, (ii) any determination of liability for Taxes, and (iii) any audit, examination, or other proceeding in respect of Taxes related to the Business or the Acquired Assets. Such cooperation includes direct access to accounting, engineering and contracting personnel during normal business hours, and in a manner so as not to interfere with the normal business operations of GM or Newco. With respect to each Acquired Asset, GM shall provide to Newco, (a) before the Closing Date, its reasonable estimate of the tax basis of such Asset as of December 31, 1997 on the books of GM and, if the asset is depreciable for tax purposes, information concerning GM's tax depreciation of such Asset to the extent relevant to Newco's tax reporting with respect to such Asset, and (b) within 90 days after the Closing Date, definitive information of this type as shown on the books of GM. Information obtained pursuant to this Section 14.18 shall be kept confidential by GM in accordance with Section 11.12 and by Newco in accordance with the Confidentiality Agreement.

14.19.  Solely Corporate Obligations.

No recourse for any payment under this Agreement or any Ancillary Document, nor for any claim based hereon or thereon or otherwise in respect hereof or thereof, and no recourse under or upon any obligation, covenant or agreement of PEP Guide or Newco in this Agreement or any Ancillary Document, or because of the creation of any indebtedness represented hereby or thereby, shall be

05-44481-rdd    Doc 9426-4    Filed 09/19/07    Entered 09/19/07 19:21:39    Exhibit B-2
- LightSource Formation Agreement    Pg 50 of 51

98

had against any member, incorporator, stockholder, officer or director, as such, past, present or future, of PEP Guide or of Newco or of any successor company or corporation, either directly or through PEP Guide or Newco or any successor corporation, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise, it being expressly understood that all such liability is hereby expressly waived and released as a condition of, and as a consideration for, the execution of this Agreement and the Ancillary Documents.

    14.20.  Transfer of Series A Senior Preferred Stock.

Any transferee of the shares of Series A Senior Preferred Stock owned by PEP Guide may elect to assume this Agreement by written agreement delivered to GM and will be entitled to the rights and obligations provided for in Section 11.18.1 and 11.18.2.

    14.21.  The Closing.

The Parties agree to use their best efforts to consummate the Closing in a timely manner following the execution of this Agreement.

[SIGNATURE PAGE FOLLOWS]

05-44481-rdd   Doc 9426-4   Filed 09/19/07   Entered 09/19/07 19:21:39   Exhibit B-2
- Lightsource Formation Agreement   Pg 8 of 51

99

IN WITNESS WHEREOF, the Parties have caused this Lightsource Formation Agreement to be executed by their duly authorized officers as of the date and year first set forth above.

GENERAL MOTORS CORPORATION

By: _Fred J Bellar_

Name: FRED J. BELLAR III

Title: Director Ventures & Business Development

PEP GUIDE, LLC

By: PEP Guide Management, LLC, its
Managing Member

By: Marcos A. Rodriguez, its Managing
Member

_____

LIGHTSOURCE PARENT
CORPORATION

By: _Adam R Kae_

Name:   ADAM R. KAER

Title:   VICE President