**Hearing Date: September 27, 2007**
**Hearing Time: 10:00 a.m.**

Babette A. Ceccotti (BC 2690)
Peter D. DeChiara (PD 0719)
COHEN, WEISS AND SIMON LLP
330 West 42nd Street, 25th Floor
New York, New York 10036-6976
(212) 563-4100

Niraj R. Ganatra
International Union, UAW
8000 East Jefferson Avenue
Detroit, MI 48214
(313) 926-5216

Attorneys for International Union, UAW

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| DELPHI CORPORATION, *et al.*, ) | |
| ) | Case No. 05-44481 (RDD) |
| Debtors. ) | (Jointly Administered) |
| ) | |

**OBJECTION OF UAW TO DEBTORS' THIRD SUPPLEMENT TO KECP
MOTION [DOCKET NO. 9298] SEEKING AUTHORITY TO CONTINUE
<u>ANNUAL INCENTIVE PLAN FOR SECOND HALF OF 2007</u>**

International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW" or the "Union"), by its undersigned counsel, objects as follows to the Debtors' third supplement to their KECP motion [Docket No. 9298], in which they seek authority to continue the Annual Incentive Plan ("AIP") for executive bonuses through the second half of 2007.

1

**Preliminary Statement**

1.     In March 2007, the Court approved the extension of the AIP through the first half of 2007. But in its ruling, the Court made clear that the bonus program was out of the ordinary course of business and could not be extended further without Court approval. Two events have occurred since then which make it clear that no further executive bonuses should be allowed.

2.     First, in June, Delphi reached a settlement with the UAW under which the Union-represented employees agreed to make substantial sacrifices in jobs, pay and benefits. A key provision of the settlement, agreed to by Delphi in consideration for the employee concessions, requires "equivalence of sacrifice" when the Debtors set compensation for non-union employees, including management. There is simply no way that Delphi can fulfill its obligation to ensure "equivalence of sacrifice" by giving its executives up to $37.6 million in bonuses, on top of their salary and benefits, when the Union-represented employees have accepted substantial concessions.

3.     Second, earlier this month, the Debtors filed a disclosure statement and accompanying motion indicating that Delphi has now put in place the central elements of its transformation plan -- including settlements with its principal unions -- and is prepared to emerge from bankruptcy by year's end, just months from now. Debtors make no showing that Delphi needs to give millions in additional bonuses to keep its executives from quitting or underperforming during the short time between now and its emergence from bankruptcy.

4.     Indeed, giving management more bonuses now is not only unnecessary but counterproductive. Showering executives with more money while accepting substantial sacrifice from the rank-and-file can only create a climate of resentment and anger that would sour labor relations at Delphi just as it seeks to achieve post-Chapter 11 normalcy.

2

**Argument**

5.      This Court has held that the Debtors' AIP bonus program is outside the ordinary course of business and is therefore subject to judicial scrutiny. *See* February 17, 2006 Order [Docket No. 2441], at 3. As the Court explained last March in ruling on the second supplement to Debtors' KECP Motion, Debtors must seek court approval for each proposed six-month extension of the AIP bonus program, so that the proposed extension can be "tested first by the parties in interest and ultimately by the Court." March 22, 2007 transcript [Docket No. 7557], at 82. By requiring Delphi to seek approval for each proposed extension of the executive bonus program, the Court implicitly recognized that circumstances could change and that while the Court may have approved the program on previous occasions, new circumstances could justify the Court's refusal to continue it.

6.      The Court's decision to scrutinize the AIP program is correct, since the program is nothing more than a decision by Delphi management to give themselves bonuses. *See In re Regensteiner Printing Co.*, 122 B.R. 323, 326 (N.D. Ill. 1990) (holding, where debtor sought management bonuses, that "[c]ourts must scrutinize transactions between insiders and the debtor-in-possession to ensure that the transactions are fair to the estate and creditors"); *In re U.S. Airways, Inc.*, 329 B.R. 793, 797 (Bankr. E.D. Va. 2005) (noting "shady reputation" of key employee retention plans and Congress' concern with their excesses); *see generally* UAW's Nov. 22, 2005 Objection And Memorandum In Opposition To Debtors' Motion For An Order Authorizing Debtors To Implement A Key Employee Compensation Program [Docket No. 1135], at ¶8 (citing cases showing heightened judicial scrutiny of transactions between debtor and insiders).[1]

---

[1] That the bonus program may have passed muster with Delphi's hand-picked compensation committee is no basis for judicial deference. *See* July 14, 2006 UAW Objection To Debtors'

    7. In evaluating proposed management bonuses, a court should determine whether or not implementation of the bonuses would result in *all* employees having been treated fairly by the debtor. *See In re Dana*, 358 B.R. 567, 577 (Bankr. S.D.N.Y. 2006) (in reviewing proposed compensation program, court should ask "does it apply to all employees; does it discriminate unfairly?"). In particular, a court should ask whether the proposed management bonuses are consistent with the principal of shared sacrifice. *See id*. at 584 (noting that proposed management compensation program that includes AIP bonus may not be consistent with "the 'sharing the pain' objective"); *see also U.S. Airways*, 329 B.R. at 799 (finding "the most compelling" objection to proposed management compensation program "is that it represents a betrayal of the principle of 'shared sacrifice'").

    8. While the principle of sharing sacrifice plays a role in any case involving a proposed management compensation program, its consideration must be front and center here because of the settlement reached between Delphi, GM and the UAW. Delphi has always maintained that one of the principal goals of its Chapter 11 filing was to substantially reduce the size and cost of its unionized workforce. *See, e.g.,* Disclosure Statement [Docket No. 9264], at 29-30. Delphi achieved that goal when the UAW and its members agreed to the June 22, 2007 settlement.

    9. In the settlement, the Union-represented employees agreed, among other things, to a drastic shrinkage of the hourly workforce through the sale or transfer of seven Delphi plants and the winding down of ten others. *See* UAW-Delphi-GM Memorandum of Understanding ("MOU"), attached as Exhibit 1 to Docket No. 8693, at 2, 4 (§B(2), (4));

---

Motion To Supplement KECP [Docket No. 4556], at ¶5 (noting that executives doing the reviewing on one compensation committee are likely to have their own compensation reviewed by another committee in the mobile and connected world of board memberships.)

4

Disclosure Statement at 42. The union workers also agreed to a fundamental change in their benefit structure with the freezing of Delphi's pension plan and the elimination or transfer to GM of other post-employment benefits. *See* MOU at 16 (§F); Disclosure Statement at 42. The UAW-represented employees also sacrificed pay, agreeing to the elimination of cost-of-living adjustments (COLA's), *see* MOU at 14 (§D(1)(c)); Disclosure Statement at 42; the discontinuance of certain annual wage progressions, *see* MOU at 12 (§D(1)(a); and a reduction in the wage scales for new hires, *see id*. at 13 (§D(1)(b). Moreover, the UAW-represented employees consented to the elimination of certain job security provisions in their collective bargaining agreements. *See* Disclosure Statement at 42.[2]

        10.    As part of the consideration for all of these substantial concessions from the rank-and-file, Delphi agreed in the settlement to a clause entitled "Equivalence of Sacrifice." *See id*. at 20 (§I). In this provision, Delphi committed itself

> to the principle of "equivalence of sacrifice" when establishing compensation and benefit levels for salaried employees and management, to ensure that sacrifices by UAW-represented employees are reflected in the pay and benefit practices of all non-represented employees.

*Id*. According to the Court's July 19, 2007 order approving the settlement agreement [Docket No. 8693], the settlement -- including the "Equivalence of Sacrifice" clause -- "is binding on the Debtors," ¶4, and requires them "to take all actions necessary or appropriate to effectuate" it, ¶3.

        11.    Under the "Equivalence of Sacrifice" clause, Debtors must ensure that Delphi's executives sacrifice financially for the reorganization in a manner equivalent to the sacrifices made by the UAW-represented employees. As noted above, the UAW-represented

---

[2] In addition to agreeing to substantial cuts in its collective bargaining agreements, the UAW entered into attrition agreements with Delphi that facilitated Delphi's efforts to shed many of its senior, well-paid hourly employees. *See* Disclosure Statement at 40-42.

5

employees have made substantial concessions in jobs, benefits and pay. Delphi, however, far from requiring its executives to make equivalent sacrifices, now seeks to give them bonuses on top of their existing salaries and benefits. *See* Oct. 13, 2005 Motion For Order Authorizing The Debtors To Implement A Key Employee Compensation Program [Docket No. 213] at ¶27 (Delphi describing AIP pay as "bonuses"); *Dana*, 358 B.R. at 583 (referring to "AIP bonus"). There is simply no way that such bonuses are consistent with the equivalence-of-sacrifice clause of the settlement agreement.

12.     Moreover, Debtors have failed to demonstrate any need to give Delphi's executives additional bonuses during the short time that remains in this Chapter 11 case. *See generally* 11 U.S.C. §503(b)(1)(A) (administrative expenses must be for "actual, *necessary*" costs of preserving the estate) (emphasis added); *Dana*, 358 B.R. at 576.[3] In its October 2005 motion seeking to justify its proposed Key Employee Compensation Program (of which the AIP was one element), Delphi claimed that a large number of its executives had quit in 2005 and it argued that the "risk of attrition" had grown because "the commencement of a bankruptcy case heightens employee concerns regarding possible job loss, and often increases employee responsibilities." Motion at ¶18 [Docket No. 213]. Delphi argued that the KECP was needed to ensure that managers, "who are needed to implement the Company's transformation plan," *id*. ¶17, "remain loyal despite potential opportunities with competitors or other employers who may be perceived as providing more stable employment opportunities." *Id*. ¶18. A Watson Wyatt presentation made the "business case" for the KECP by noting that "Delphi must strive to retain its executives." *Id*. at Exhibit 1, at 5. It asserted that if executives quit, Delphi would have to

---

[3] After emerging from Chapter 11, Delphi would not have to obtain court approval for its management compensation policies.

offer signing bonuses and higher salaries to attract replacements and pay large headhunter fees. *See id.* at Exhibit 1, at 6.

13. In the instant motion, Debtors, who bear the burden of proof, cite no data showing a heightened attrition rate among Delphi executives, nor any evidence that its managers are threatening to leave or would be tempted to leave in the near future unless paid additional bonuses. The absence of any such evidence is not surprising because, far from being at the "commencement of a bankruptcy case" -- when there were apparently heightened "concerns regarding possible job loss" and increased responsibilities, *see* Oct. 13, 2005 Motion at ¶18 -- Delphi is now fast approaching the end of the bankruptcy case. Indeed, Delphi seeks a confirmation hearing on its plan of reorganization by mid-November 2007. *See* Sept. 6, 2007 Motion For Order Approving Disclosure Statement, etc. [Docket No. 9266], at 3.

14. Another reason more AIP bonuses are not now needed is that Delphi has announced its intention to implement a "Management Compensation Plan" upon its emergence from Chapter 11. While it has not yet unveiled the terms of this proposed plan, the plan will undoubtedly seek to provide yet further financial rewards to Delphi's executives. The prospect of shortly obtaining whatever cash, stock or other benefits await them in the Management Compensation Plan provides incentive enough to keep incumbent managers on the job and motivated. Indeed, it would be imprudent for the Court to allow the additional AIP bonuses now without knowing how richly Delphi seeks to reward its executives in the Management Compensation Plan.

15. Moreover, in the remote event that some executives were to leave between now and Delphi's emergence because they did not receive additional AIP bonuses, their departure would be a routine matter, no longer having the heightened impact it might have had at

7

the outset of the case, when Delphi was first undertaking the significant challenge of implementing its transformation plan.  As Delphi explains in its disclosure statement, it now has in place the core building blocks of the transformation plan, including settlements with all of its principal labor unions, a comprehensive settlement with GM, and a realignment of its business to focus on "core" operations.  *See* Disclosure Statement at DS-viii.

16. Nor is there evidence that the AIP bonuses are needed to help Delphi achieve its EBITDAR and OIBITDAR targets.  Indeed, Debtors' papers are devoid of any indication that in any of the prior six-month periods Delphi has ever had any trouble meeting these targets.  The apparent ease with which Delphi has met the AIP targets suggests that the AIP program, rather than a needed carrot to spur executives' performance, is simply a vehicle for giving them a virtually guaranteed pay boost.[4]

17. Finally, the proposed executive bonuses, unnecessary as they are, would also be destructive of employee morale.  In its initial objection to Debtors' Key Employee Compensation Program motion, the UAW explained how news of the proposed KECP had provoked widespread anger and resentment among Delphi's unionized workforce, especially since at the time Delphi was seeking significant contract concessions from its workers.  *See* Nov. 22, 2005 Declaration of Steve Grandstaff [Docket No. 1135, Attachment 1], at ¶5.  Now that the

---

[4] For two divisions -- the Powertrain division and the Electronics and Safety division -- the AIP targets are actually lower for the second half of 2007 than the first half.  *Compare* Second Supplement To KECP Motion [Docket No. 7200], at ¶7 *to* Third Supplement To KECP Motion [Docket No. 9298], at ¶9.  Debtors propose giving a bonus to executives in Electronics and Safety if, under their watch, the division's operating income *drops* from $281.3 million in the first half of 2007 to $157.8 million in the second half.  *See id.*  Executives in the Automotive Holdings Group would become eligible for bonuses if that division in the second half of 2007 has an OIBITDAR of *negative* $134.4 million.  Even assuming *arguendo* a link between management bonuses and company performance, one must question the need to reward such subpar performance.

8

UAW settlement has been reached and those concessions have become a reality, it would be particularly destructive of hourly employee morale to see those at the top of the hierarchy continue to enjoy big bonuses. It would be counterproductive to continue a bonus program that poisons labor relations just as Delphi is on the verge of emerging from Chapter 11. *See In re Geneva Steel Co.*, 236 B.R. 770, 773 (Bankr. D. Utah 1999) (noting that adoption of management bonuses "may jeopardize the continuing support of the [union] in [debtor's] reorganization process"). More importantly, having committed itself to equivalence of sacrifice, Delphi should be kept to its word and not permitted to enrich those at the top while accepting the sacrifices of those below.

## Conclusion

For the foregoing reasons, Debtors' third supplement to its KECP motion should be denied.

Dated: September 20, 2007

    /s/ Peter D. DeChiara
Babette A. Ceccotti (BC 2690)
Peter D. DeChiara (PD 0719)
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, NY 10036
(212) 563-4100

Niraj R. Ganatra
International Union, UAW
8000 East Jefferson Avenue
Detroit, MI 48214
(313) 926-5216

Attorneys for International Union, UAW

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
: 
In re: : Chapter 11
: 
: 
: Case No. 05-44481 (RDD)
DELPHI CORPORATION, *et al.*, : (Jointly Administered)
: 
Debtors. : 
----------------------------------------------------------------x

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2007 I caused a true and correct copy of the foregoing **Objection of UAW to Debtors' Third Supplement to KECP Motion [Docket No. 9298] Seeking Authority to Continue AIP for Second Half of 2007** to be duly served on the Master Service List parties by overnight mail and on the 2002 Service List parties by e-mail (to those parties with an email address) or First-Class mail (to those for whom no e-mail address is listed).

   /s/ Peter D. DeChiara
Peter D. DeChiara
COHEN, WEISS and SIMON LLP
330 West 42nd Street
New York, New York 10036
(212) 563-4100