Agreement No. #C0505851

Agreement for GPS System and Services

between

Verizon Services Corp.

and

MobileAria, Inc.

Philip Melone

Sourcing Process Leader

Mobile Aria, Inc.
C0505851

i

NOTICE                                    EXHIBIT A

CONFIDENTIAL - Not for use or disclosure outside Verizon except by written agreement

TABLE OF CONTENTS

1.    PARTIES.................................................................................................................. 1
2.    TERM...................................................................................................................... 1
3.    DEFINITIONS ........................................................................................................ 1
4.    SCOPE ................................................................................................................... 2
5.    CUSTOMER'S OPTIONS UNDER THE AGREEMENT........................................ 3
6.    SOFTWARE LICENSE .......................................................................................... 3
7.    PRICE AND TERMS OF PAYMENT ..................................................................... 5
8.    PURCHASE ORDERS; CANCELLATION OF PURCHASE ORDERS, REVOCATION OF
      ACKNOWLEDGEMENT.......................................................................................... 7
9.    PAYMENT TERMS, BILLING ................................................................................ 8
10.   RECORDS AND REPORTS................................................................................... 8
11.   DOCUMENTATION, SUPPLIER'S SPECIFICATIONS, INFORMATION, RECORDKEEPING AND
      DISCLOSURE......................................................................................................... 9
12.   ELECTRONIC PURCHASING.............................................................................. 10
13.   PRECEDENCE OF DOCUMENTS....................................................................... 11
14.   DELIVERY ............................................................................................................ 11
15.   BILL OF SALE ...................................................................................................... 12
16.   INSPECTION AND ACCEPTANCE OF PRODUCT AND SERVICES................... 12
17.   PRODUCT AND SOFTWARE WARRANTIES, SERVICES AND SUPPORT ........... 12
18.   SUPPLIER COMPREHENSIVE RESPONSIBILITIES FOR OVERALL PERFORMANCE........... 13
19    CHANGES TO HARDWARE OR SOFTWARE/PRODUCT CHANGE NOTICES ("PCNs") ........ 13
20    TECHNOLOGICAL OR SPECIFICATION CHANGE/PRODUCT DELETION/ SUBSTITUTION.. 15
21.   UNSATISFACTORY CONDITION SITUATIONS .................................................. 15
22.   PRODUCT CHANGES ......................................................................................... 16
23.   EXTRAORDINARY SUPPORT ............................................................................ 17
24    CONTINUING AVAILABILITY .............................................................................. 17
25.   TRAINING............................................................................................................. 18
26    INFORMATION AND INTELLECTUAL PROPERTY............................................. 18
27.   CUSTOMER'S PROPERTY AND TOOLING ....................................................... 19
28    COMPLIANCE WITH LAWS................................................................................. 20
29    FORCE MAJEURE ............................................................................................... 21
30    ASSIGNMENT ...................................................................................................... 21
31.   TRANSFER OF CONTROL AND SEPARATE ENTITY ....................................... 22
32.   DISASTER RECOVERY ....................................................................................... 22
33.   TAXES .................................................................................................................. 22
34.   PLANT AND WORK RULES AND RIGHT OF ACCESS ...................................... 23
35.   INDEMNIFICATION .............................................................................................. 23
36.   INSURANCE.......................................................................................................... 24
37.   INFRINGEMENT................................................................................................... 25
38.   LIMITATION OF LIABILITY .................................................................................. 26
39.   ESCROW AGREEMENT....................................................................................... 27
40    RELATIONSHIP OF PARTIES ............................................................................. 29
41.   TERMINATION...................................................................................................... 29
42.   PERFORMANCE REMEDIES .............................................................................. 29
43.   WORKAROUND .................................................................................................... 30
44.   POST TERMINATION/NON-RENEWAL ............................................................... 31
45.   DISPUTE RESOLUTION....................................................................................... 31
46.   NOTICES............................................................................................................... 31
47.   NO HAZARDOUS PRODUCTS AND COMPONENTS .......................................... 32

ii

Mobile Aria, Inc.
C0505851

NOTICE
CONFIDENTIAL - Not for use or disclosure outside Verizon except by written agreement

48.     GOVERNMENT CONTRACT PROVISIONS ................................................ 32
49      QUALITY...................................................................................................... 33
50.     NONWAIVER................................................................................................ 33
51.     SEVERABILITY ........................................................................................... 33
52.     SECTION HEADINGS .................................................................................. 33
53.     SURVIVAL OF OBLIGATIONS..................................................................... 33
54.     CHOICE OF LAW AND JURISDICTION ....................................................... 33
55.     ENTIRE AGREEMENT ................................................................................. 33
56.     SIGNATURES............................................................................................... 34

EXHIBITS

EXHIBIT A   AFFILIATES

EXHIBIT B  COMPONENTS OF PRODUCTS AND SERVICES

EXHIBIT C   VERIZON MARKET AREAS

EXHIBIT D   PURCHASE FOR INTERNAL USE  -  PRODUCT AND SERVICE WARRANTY AND
PRODUCT SUPPORT

EXHIBIT E  ELECTRONIC PURCHASING

EXHIBIT F  PRIMARY SUPPLIER COMMITMENT- COMPLIANCE WITH MINORITY, WOMAN-
OWNED, DISABLED AND VIETNAM ERA VETERAN BUSINESS ENTERPRISES (MWDVBE)
UTILIZATION

EXHIBIT G  SCOPE OF WORK

EXHIBIT G-1 SERVICE LEVEL AGREEMENT

EXHIBIT H QUALITY STANDARDS, PROCEDURES AND COMPLAINTS

EXHIBIT I CRITICAL MILESTONES AND PERFORMANCE COMPENSATION PAYMENTS

Mobile Aria, Inc.
C0505851

iii

NOTICE
CONFIDENTIAL - Not for use or disclosure outside Verizon except by written agreement

**AGREEMENT NO. C0505851**

## 1.    PARTIES

This Agreement for GPS System and Services (the "Agreement") is made and entered into as of May 15, 2005 (the "Effective Date") by and between MobileAria, Inc., a Delaware company with offices at 800 W. El Camino Real, Suite 240, Mountain View, CA 94040, (hereinafter "Supplier") and Verizon Services Corp., ("Customer"), a Delaware corporation, with offices at 240 East 38th Street New York, New York 10016, for the benefit of itself and its Affiliates as defined below in this Agreement.

## 2.    TERM

(a)    <u>Effective date and Term</u>. This Agreement shall be effective on June 15, 2005 (the "Effective Date") and shall continue in effect until June 14, 2010 (the "Expiration Date"), unless earlier terminated or extended.  This Agreement shall automatically terminate on the Expiration Date unless renewed by the mutual written agreement of the parties prior to the expiration of the term.

(b)    <u>Existing Purchase Orders Continue</u>.  The termination or expiration of this Agreement shall not affect the obligations of either party to the other under existing Orders accepted by Supplier and issued pursuant to this Agreement (except to the extent Orders are terminated or modified in accordance with the Section entitled "PURCHASE ORDERS; CANCELLATION OF PURCHASE ORDERS; REVOCATION OF ACKNOWLEDGEMENT"), but such Orders shall continue in effect as if this Agreement has not expired or terminated.

## 3.    DEFINITIONS

The terms defined in this Section shall have the meanings set forth below whenever they appear in this Agreement, unless the context in which they are used clearly requires a different meaning or a different definition is described for a particular Section or provision:

(a)    "Affiliate" means, at any time, and with respect to any corporation, person or other entity, any other corporation, person or entity that at such time, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such first corporation, person, or other entity.  As used in this definition, "Control" means (a) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a corporation, person or other entity, whether through the ownership of voting securities, or by contract or otherwise, or (b) direct or indirect ownership in the aggregate of twenty percent (20%) or more of any class of voting or equity interests in the other corporation, person or entity.

Orders for Products or Services under this Agreement may be placed by any Customer Affiliate. A Customer Affiliate that obtains or uses any Product or Service shall be entitled to all of the rights and benefits afforded to Customer under this Agreement and may enforce this Agreement in its own name and this Agreement may be enforced against such Customer Affiliate.

(b)    "Documentation" shall mean any and all written materials, drawings, and Specifications incident to Customer's use and operation of the Products, including but not limited to, full descriptions of planning, installation, engineering, use, test, maintenance, analysis, repair, training, operation, and Customer acceptance testing of the Products, together with any and all modifications, revisions, additions, improvements or enhancements to the above, that Supplier generally provides to its Customer in the ordinary course of business.

(c)    "Hardware" means the equipment described in EXHIBIT B-1 hereof entitled "DETAILED DESCRIPTION OF PRODUCTS AND SERVICES."

(d)    "Order" means a purchase order, or other written communication and/or electronic transmission that Customer may deliver to Supplier for the purchase of Product and/or Service.

(e)    "Product" means the Hardware and Software, collectively, and associated documentation described in EXHIBITB-1 hereof entitled "DETAILED DESCRIPTION OF PRODUCTS AND SERVICES."

(f)    "Service" means the Product-related work to be performed or provided by Supplier under this Agreement, including installation, maintenance, repair, the Application Service Provided (ASP) Service as defined and described in EXHIBIT B-1, hereof entitled "DETAILED DESCRIPTION OF PRODUCTS AND SERVICES", and other related services.,

(g)    "Software" means any programs, in object form, required for the operation of the Products purchased hereunder described in EXHIBITB-1 hereof entitled "DETAILED DESCRIPTION OF PRODUCTS AND SERVICES", including the following: operating programs in machine readable form and feature descriptions or firmware: (i) the Operating System Software, or (ii) the Data Center Software, both as defined and described in EXHIBITB-1 hereof entitled "DETAILED DESCRIPTION OF PRODUCTS AND SERVICES." Throughout this Agreement the term Software, as defined above, is included in the term Product. "Software" does not include source code unless explicitly set forth in this Agreement, an Order, or another document.

(h)    "Source Code" shall mean a computer program in the form of high-level language that generally is not directly executable by a processor.

(i)    "System" shall mean all components of the Products purchased hereunder, functioning together with the Application Service Provider ("ASP") Service, performing and interoperating as a fully integrated and efficient whole as described in EXHIBITB-1 hereof, entitled "DETAILED DESCRIPTION OF PRODUCTS AND SERVICES", in accordance with the Specifications contained in this Agreement or any Order(s) issued pursuant to this Agreement, including, without limitation, those set forth or otherwise identified in any other Appendices to this Agreement.

(j)    "Term" means a five (5) year period commencing on the Effective Date.

(k)    "Use" as it relates to Software shall mean: (i) the reading by authorized users into or out of Hardware memory of the Software and the execution of the Software whether in whole or in part by any individual having authorized access to any Product on which the Software is operated and "Users" shall include employees of Customer, its agents, or contractors; (ii) to transfer into, and store in, equipment selected by the Customer all or any portion of the Software; and (iii) to process and execute instructions, statements and data included in, or input to, the Software. The extent that Verizon is reselling any Software, use by or for Customer's direct or lower tier customers, as incident to, arising out of, or as reasonably necessary to comply with, the Telecommunications Act of 1996 or any FCC orders implementing same, or any similar unbundling, resale or interconnection requirements imposed by any state or local public service authority shall be deemed to be Use in the normal course of business and shall be included, without additional charge, within the scope of the licenses granted under this Agreement.

(l) "Specifications" shall mean specifications for the Product or Service as set forth in an Order, as well as Supplier's then current published specifications and Documentation, and applicable industry and government requirements.

## 4.    SCOPE

(a) Affiliates Included.  This Agreement is for the benefit of all U. S. and foreign Affiliates of Customer. Customer may purchase for its own use, Supplier's Product (except that for Software, Customer purchases a license as to the Software and Customer obtains no rights in the intellectual property embodied therein) and Service. Reference to "Customer" shall include Affiliates.

(b) <u>No Requirements.</u> This Agreement is nonexclusive and shall not be construed to require Customer to purchase any specific amount of Product or Service from Supplier, or to require Customer to sell any, all or a portion of Product or Services it orders, or restrict the purchase, and distribution of Product and/or Service to any geographic area. This is an "as ordered" document. In order for Supplier to ensure that sufficient inventory is available to fulfill Orders, Customer will provide Supplier with non-binding, written twelve (12) month rolling forecasts of Products and Services by the first day of each calendar month. Such forecasts shall be mutually updated by both parties as frequently as required.

(c) <u>Master Agreement</u>. This Agreement does not by itself order any Product or Service. Customer shall order Product or Service by submitting an Order and Supplier shall fulfill the Order as specified in Section 8 for (i) Product or Service listed in EXHIBIT B-2 hereof entitled "PRODUCT AND SERVICES PRICES" at the prices specified and (ii) other Product or Service for which Supplier accepts an Order at the price as quoted to Customer in writing.

(d) <u>International Purchases</u>. In order to facilitate international purchases of Products, the parties may find it convenient to enter into separate agreements between Supplier and Customer and/or their respective Affiliates authorized to conduct, or to negotiate for the right to conduct, business in foreign countries. The parties agree to use their best commercially reasonable efforts, to assure that the terms and conditions of any such agreements are consistent with the terms and conditions of this Agreement, subject to applicable requirements of local law and business practice.

(e) <u>Shrinkwrap Agreements</u>. This Agreement shall supersede all shrink wrap license agreements associated with the Products purchased and Software purchased hereunder and under no circumstances will any shrink wrap license provided by Supplier apply to such Products and Software.

(f)   <u>Non –Exclusivity</u>. This is not an exclusive dealings agreement.

(g) <u>Product Delivery Interval.</u> The Product Delivery Interval, milestones, and performance compensation payments are set forth in EXHIBIT B-3 hereof, entitled "PRODUCT DELIVERY INTERVALS" and in EXHIBIT I entitled "CRITICAL MILESTONES AND PERFORMANCE COMPENSATION PAYMENTS".

## 5. CUSTOMER'S OPTIONS UNDER THE AGREEMENT

<u>Internal Use.</u> If Customer orders Product and/or Service for internal use, then the provisions of EXHIBIT D hereof entitled "PURCHASE FOR INTERNAL USE - WARRANTY AND PRODUCT SUPPORT," shall apply. Internal use includes use by Customer, its Affiliates, employees, agents and subcontractors, and use whereby Customer provides services to third parties in the normal course of its business.

## 6. SOFTWARE LICENSE

(a).1 <u>Grant of License in Connection with Units of Hardware</u>. Unless otherwise specified in an Order, Supplier hereby grants to Customer, a perpetual, irrevocable, royalty-free, world-wide, non-exclusive, unrestricted, except as provided herein, right and license, under any intellectual property or license rights of Supplier or its Affiliates, to Use the Software, including, subject to the payment of the recurring monthly fee specified in EXHIBIT B-2 entitled "PRODUCT AND SERVICES PRICES", all feature releases/upgrades, patches, fixes, corrections, enhancements, improvements and updates relating to such Software only to the extent that they consist of the same or similar functionality set forth in the then-current Specifications, if, as and when available, in any form known or unknown, in whole or in part, in connection with the units of Hardware purchased pursuant to this Agreement, provided such Use is for Customer's internal business purposes only.

(a).2. <u>Grant of License in Connection with ASP Services</u>. With respect to Software used in the provision of ASP Services, unless otherwise specified in an Order, Supplier hereby grants to Customer, a royalty-free, world-wide, non-exclusive, unrestricted, except as provided herein, right and license, under any intellectual property or license rights of Supplier or its Affiliates, to Use the Software, including, subject to

MobileAria, Inc.
C0505851

the payment of the recurring monthly fee specified in EXHIBIT B-2 entitled "PRODUCT AND SERVICES PRICES", all feature releases/upgrades, patches, fixes, corrections, enhancements, improvements and updates relating to such Software only to the extent that they consist of the same or similar functionality set forth in the then-current Specifications, if, as and when available, in any form known or unknown, in whole or in part, in connection with the provision of ASP Services provided pursuant to this Agreement, provided such Use is for Customer's internal business purposes only.

(b)        If applicable, With regard to both (a).1 and (a).2 above, Supplier additionally grants to Customer the right to authorize any third party (who is not a competitor of Supplier, as determined by Supplier in its sole discretion) to exercise any of the foregoing rights and licenses, provided such exercise is solely in support of Customer's normal course of business and provided that this Agreement has not otherwise been terminated for any reason. Customer may not sublicense, transfer, or assign licenses granted and may not sell, rent, lease, transfer or assign the Product and Services, except as provided for under this Agreement.

Customer, its contractors, agents and permitted assigns, of Products purchased hereunder for which any Operating System Software is related, may copy the Operating System Software for use with the Hardware and ASP Service for archival purposes or for use in association with back-up equipment for disaster recovery purposes, as applicable, but shall not otherwise knowingly reproduce or make copies of any Software for distribution unless otherwise provided herein or provided pursuant to Supplier's written consent.

(c)        Ownership. Supplier represents that Supplier has the right, title and license to grant all licenses granted hereunder to Customer, and Customer acknowledges that Customer does not have any ownership interest in Software so licensed. All right, title and interest in and to the Software, the Services, Hardware, Supplier content, and any improved, updated, modified or additional parts (except to the extent of any Verizon proprietary information that has been incorporated) thereof, and all intellectual property rights embodied therein, shall at all times remain the property of Supplier or Supplier's licensors or third-party providers or partners, as applicable. Nothing herein shall give or be deemed to give Customer any right, title or interest in or to the same except as expressly provided in this Agreement. Supplier and its licensors reserve all rights not expressly granted herein. Customer agrees not to remove or destroy any copyright, logo, trademark, trade name, proprietary markings, or confidentiality legends placed upon or contained within the Software and/or Supplier supplied content.

(d)        All Maintenance and Support. All maintenance and support for the Software, including all feature releases/upgrades, patches, fixes, corrections, enhancements, improvements and updates and applicable service levels, are set forth in Exhibit D entitled "PURCHASE FOR INTERNAL USE-WARRANTY AND PRODUCT SUPPORT "

(e)        Illicit Code. Supplier warrants (a) unless authorized in writing by Customer or (b) necessary to perform valid duties under this Agreement and authorized in writing by Customer, any Software provided to Customer by Supplier for use by Supplier or Customer (including upgrades provided as Services) shall, as of the Effective Date: (a) contain no hidden files; (b) not replicate, transmit, or activate itself without control of a person operating computing equipment on which it resides; (c) not alter, damage, or erase any data or computer programs without control of a person operating the computing equipment on which it resides; (d) contain no encrypted embedded key unknown to Customer, node lock, time-out or other function, whether implemented by electronic, mechanical or other means, which restricts or may restrict use or access to any programs or data developed under this Agreement, based on residency on a specific hardware configuration, frequency of duration of use, or other limiting criteria ("Illicit Code"). Should any program have any of the foregoing attributes as of the Effective Date, and notwithstanding anything elsewhere in this Agreement to the contrary, Supplier shall be in default of this Agreement, and no cure period shall apply. In addition to any other remedies available to it under this Agreement, Customer reserves the right to pursue any civil and/or criminal penalties available to it against the Supplier.

7.      **PRICE AND TERMS OF PAYMENT**

7.1      **PRICES PRODUCTS AND SERVICES**

(a)      Prices. Products and Services will be furnished by Supplier in accordance with the prices stated in EXHIBITB-2 hereof, entitled "PRODUCT AND SERVICE PRICES." All costs and prices identified are in full compliance with all terms and conditions of this Agreement. Such prices shall be applicable to Orders issued to Supplier by Customer at the location and by the method agreed to by the parties. Supplier's price list for Software in EXHIBITB-2 hereof, entitled "PRODUCT AND SERVICE PRICES" must differentiate between the Operating System Software and the Data Center Software according to the FCC mandated Uniform System of Accounts, Part 32 of the FCC Rules and Regulations.

(b)      Increase During Term. Supplier shall not, during the term of this Agreement, increase the prices for Products or Services specified in EXHIBIT B-2 hereof entitled "PRODUCT AND SERVICES PRICES",

(c)      Reductions. Price reductions may be initiated by Supplier at any time. Any price decrease shall be effective immediately upon announcement by Supplier and shall apply to all Orders that have not been accepted by Supplier and processed by Customer for payment to Supplier.

Component Price Reduction. Supplier shall notify Customer immediately should the price of the Product crucial components, such as wireless modules, decrease by ten (10%) or more percent either due to manufacturer price reduction or Supplier substitute of the component. Such Component Price Reduction shall apply to Product Price for all Orders that have not been accepted by Supplier.

(d)      New Technology Replacement. Customer and Supplier recognize that Supplier may develop and market new Product ("New Technology") that is designed to enhance or replace the Product provided for in this Agreement. Supplier agrees to include the New Technology as part of its Product offerings within the terms provided for in this Agreement, and at a price for comparable, successor, or substitute features and functionality, no greater than the pricing, for Product stated within this Agreement, subject to the following:

   1.    Supplier shall strive during the Term to reduce prices for all Product and Services in accordance with the goal of continuous improvement.

   New technology shall only be furnished to Customer pursuant to a written amendment hereto and in accordance with section 19 entitled "Changes to Hardware or Software/Product Change Notices (PCN's)", and section 20 entitled "Technological or Specification Change/Product Deletion/ Substitution", including the notice requirements therein, except that price reductions may be made at any time.

   2.    New Technology shall be priced at the same or lower price for comparable, or successor, substitute features and functionality, as the replaced Product in accordance with the mutual goal of continuous improvement.

   3.    In the event New Technology will cause the Supplier to incur greater per-unit costs compared to current Product but will offer substantially increased capacity or features which will allow Customer to reduce its total costs or offer more services such that Supplier believes a price increase is justified, then:

   3(i).    Supplier shall provide to Customer a written detailed explanation of such proposed price increase including a breakdown of the additional costs incurred by the Supplier in providing such Product and how such additional features or capacity shall help reach the goal of continuous improvement.

3(ii).  Unless otherwise explicitly set forth herein, and subject to Section 7.1(b) above,  Supplier shall ensure continued availability of the current Product during the Term at the same or lower price as stated in EXHIBIT B-3 hereof, entitled "PRODUCT DELIVERY INTERVAL" unless otherwise agreed to pursuant to a written amendment to this Agreement.

4.  All such proposed changes to ATTACHMENT B-3 hereof, entitled "PRODUCT DELIVERY INTERVAL" shall be subject to Customer's written agreement evidenced by a written amendment to this Agreement.

(e)    New Technology Additions  Supplier may propose the addition of New Technology to EXHIBIT B-1 hereof, entitled "DETAILED DESCRIPTION OF PRODUCT AND SERVICE" which is not intended to replace or upgrade current Product ("New Technology Addition").  Supplier shall provide a detailed written explanation of how such New Technology Addition will meet the joint goal of continuous improvement.  All proposed New Technology Additions shall only be furnished to Customer pursuant to a written amendment to this Agreement or pursuant to a separate written agreement between the parties.

## 7.2    MOST FAVORED CUSTOMER

(a)    Supplier represents that all of the prices, warranties, benefits, terms and conditions granted to Customer by Supplier hereunder will be as favorable as the prices, warranties, benefits, terms and conditions granted to Supplier's other commercial customers under like or similar circumstances.

(b)    If at any time during the term of this Agreement, Supplier shall offer more favorable prices, warranties, benefits, terms, or conditions for substantially the same or similar Product or Services, in similar quantities, as those provided hereunder, then:

1.  Supplier shall, within thirty (30) days after the effective date of such offering, notify Customer of such fact in accordance with Section entitled "NOTICES", and offer Customer the more favorable offering and negotiate any additional differentiating factors; and

2. This Agreement and all applicable Orders shall be deemed to be automatically amended, effective retroactively to the effective date of the more favorable offering, and Supplier shall provide all the same terms of such offering to Customer including, the same prices, warranties, benefits, terms and conditions,  and

3. Customer shall have the right to decline to accept the offering, in which event such automatic amendment shall be deemed to be void.

(c)    Supplier's compliance with this clause shall be subject, at Customer's option, to independent verification in accordance with the Section entitled "RECORDS AND REPORT."

## 7.3    DISTINGUISH PAYMENT AND ACCEPTANCE

Payment by Customer of such invoices does not mean or imply that the Product has been accepted and does not impair or limit in any way Customer's full rights and remedies which shall be and remain as set forth in this Agreement.

## 7.4    CRITICAL MILESTONES

Supplier agrees to the schedule attached hereto as EXHIBIT I, entitled "CRITICAL MILESTONES AND PERFORMANCE COMPENSATION PAYMENTS", which sets forth certain "Critical Performance Milestones" which must occur as part of this Agreement and the dates by which Supplier must meet each of the milestones (the "Critical Performance Dates").  In the event Supplier fails to meet a Critical Performance Date, Supplier shall be considered in breach of this Agreement under section 41 (a) and shall be liable to compensate Customer in accordance with EXHIBIT I hereof, entitled "CRITICAL

MobileAria, Inc.
C0505851

MILESTONES AND PERFORMANCE COMPENSATION PAYMENTS", except to the extent any such delay is due in part to Customer's lateness.

## 7.5    FEATURE AVAILABILITY

(a)    Availability.  Supplier shall make features and innovations in architecture or functionality in the Product, available for delivery to Customer no later than the availability dates shown in EXHIBIT B-3 hereof, entitled "PRODUCT DELIVERY INTERVAL" for each listed feature package.  Such feature packages shall include, but not be limited to, those features, innovations in architecture or functionality as listed in EXHIBITB-1 hereof, entitled "DETAILED DESCRIPTION OF PRODUCT AND SERVICES."

(b)    Failure to Deliver.  Supplier acknowledges that any failure on its part to abide by the terms of the preceding paragraph could affect Customer's business.  Customer will treat movement of a specific feature, innovation in architecture or functionality, as listed in EXHIBITB-1 hereof, entitled "DETAILED DESCRIPTION OF PRODUCT AND SERVICES" from its original feature package to another feature package with a later delivery date, as if the original feature package had not been made available for delivery on the date specified in EXHIBITB-3 hereof, entitled "PRODUCT DELIVERY INTERVAL". Customer may consider Supplier in breach of the Agreement in accordance with section 41 (a) and hold supplier liable to compensate Customer in accordance with EXHIBIT I hereof, entitled "CRITICAL MILESTONES AND PERFORMANCE COMPENSATION PAYMENTS".

## 8.    PURCHASE ORDERS; CANCELLATION OF PURCHASE ORDERS; REVOCATION OF ACKNOWLEDGEMENT

(a)    Submission of Orders.  An Order may be mailed, sent by facsimile transmission or electronic data interchange (EDI).  Prior to initiating an EDI transaction, the parties will execute an EDI Trading Agreement which will set forth the terms and conditions of EDI transactions (attached as ATTACHMENT E-1 hereof, entitled "ELECTRONIC DATA INTERCHANGE (EDI)").

(b)    Acknowledgement of Orders.  Supplier shall be obligated within ten (10) days of receipt of Order to acknowledge or reject Orders, and, if acknowledging the Order, without conditioning such acknowledgement on the acceptance by Customer of any terms inconsistent with or in addition to those set forth in this Agreement, except as expressly set forth in Section 13 entitled "PRECEDENCE OF DOCUMENTS".  Upon acknowledgement, the Order and related acknowledgement shall constitute a binding contract for the purchase and sale of the applicable Product and/or Service governed by the provisions of this Agreement, as such provisions may be modified as provided herein.

(c)    Affiliate Orders.  Supplier may enforce each Order only against the Affiliate that submitted the Order.  Default by an Affiliate(s) shall not affect any other Affiliate party to this Agreement.

(d)    Breach by Affiliate. If an Affiliate shall be in material breach or default of this Agreement, including, but not limited to, timely payment for Product purchased and such breach shall continue for a period of thirty (30) days after receipt of Supplier's written notice, then, in addition to all other rights and remedies of law or equity or otherwise, Supplier shall have the right to suspend delivery of Product on outstanding Orders or revoke existing acknowledgements only with respect to such Affiliate.

(e)    Breach by Supplier.  If Supplier is in material breach or default of this Agreement in accordance with section 41, then, in addition to all other rights and remedies of law or equity or otherwise, Customer shall have the right to immediately cancel all applicable Orders without any obligation or liability to Supplier for said cancellation. However, if Supplier fails to tender delivery of Product or render Service on the respective date agreed upon or as set forth in Supplier's acknowledgement, then Customer shall have the right to immediately cancel all applicable Orders without further obligation or liability to Supplier for said cancellation or any obligation to provide Supplier a time period to cure said breach.

(f)      Cancellation of Order. Unless specified otherwise in an Exhibit to this Agreement, Customer may cancel or reschedule Orders for convenience, in whole or in part, without obligation or liability, by providing written notice to Supplier at least forty five (45) days before scheduled ship date of Product or date Service is to be rendered. Supplier shall make all efforts to minimize its damages, including but not limited to: reselling the Product to third parties, and use of parts for other equipment. Customer shall be responsible for any residual amounts not recouped by Supplier, and documented by Supplier to Customer in writing.

(g)      Effect of Termination on Orders Continue. The termination or expiration of this Agreement shall not affect the obligations of either party to the other under existing Orders accepted by Supplier and issued pursuant to this Agreement (except to the extent orders are terminated or modified in accordance with this Section entitled "PURCHASE ORDERS; CANCELLATION OF PURCHASE ORDERS; REVOCATION OF ACKNOWLEDGEMENT"), but such Orders shall continue in effect as if this Agreement had not been ended, except when termination of this Agreement is due to Customer's breach in which case Orders shall be deemed cancelled even if previously accepted.

(h)      Change Orders. Customer may, by issuing a written document labeled as a "Change Order", make changes to an Order, subject to Supplier agreeing in writing to such Change Order. If any change required by a Change Order alters the value of the Products ordered, Supplier shall promptly notify Customer and Supplier shall adjust the price accordingly. If the amount of the price adjustment is not specified in this Agreement, then the amount of any change in price caused by the adjustment may be no greater than Supplier's reasonable documentable increased costs and expenses. Supplier shall notify Customer within three (3) business days of Supplier's receipt of a Change Order if the Change Order will cause an increase in price. Customer may, at its discretion, agree to the changed price or withdraw the underlying Change Order.

## 9.      PAYMENT TERMS, BILLING

(a)      Payment Due Date. Customer shall pay for all Products net thirty (30) days from date of installation, or if installation is not required net thirty (30) receipt of an undisputed part of the invoice, unless payment terms more favorable to Customer are stated on Supplier's invoice and Customer elects to pay on such terms. Payment for related Service, unless specified otherwise in an Exhibit to this Agreement, shall be due thirty (30) days after receipt of an undisputed part of the invoice, provided all obligations of Supplier have been performed. However, payment shall not indicate acceptance of any Product or Service performed.

(b)      Disputed Invoices, Right of Set Off. If Customer disputes all or any portion of an invoice, it shall be required to pay only the amount not in dispute. Customer shall be entitled to set off any amount Supplier owes it against amounts payable under this or any other Agreement. Payment by Customer shall not result in waiver of any of its rights under this Agreement. Customer shall not be obligated to pay Supplier for Services that are not invoiced as required by this Agreement.

(c)      Invoices For Charges Specified in an Order. Supplier shall not issue an invoice for Products prior to installation of the Product or if there is no installation required, no invoice shall be issued prior to delivery of the Product. With respect to Services, no monthly invoice shall be issued prior to commencement of the Services. Invoices for charges specified in an Order shall be submitted by Supplier to the address specified in the Order. Invoices shall include, but not be limited to, (i) Order number; (ii) Order line number; (iii) Product identification number; (iv) ship to address; (v) quantity shipped and billed or quantity of service units performed and billed; (vi) net unit cost; and (vii) net invoice amount.

## 10.      RECORDS AND REPORTS

(a)      Complete Records. Supplier shall maintain complete and accurate records of all invoices, all amounts billable to and payments made by Customer, in accordance with generally accepted accounting

practices. Supplier shall retain and make available upon request such records for a period of five (5) years from the date of final shipment of Product or rendering of Services covered by this Agreement.

(b)      Monthly Purchase Report. When requested by Customer, Supplier shall, for all Orders placed directly with Supplier, provide Customer a monthly purchase report by ordering location, listing Product and Service purchased under this Agreement, including description, part number, quantities shipped, and associated list and net prices.

(c)      Disputed Amounts. Supplier agrees to provide reasonable supporting documentation concerning any disputed amount(s) within twenty (20) days after Customer or its Affiliates provides written notification of the dispute to the Supplier.

(d)      Audit. Customer and Supplier shall mutually agree upon an independent auditor who, at Customer's option and Customer's expense, shall audit Supplier's records of Supplier's transactions with its other commercial customers (provided the identity of such other commercial customers shall not be disclosed to Customer) for verification of Supplier's compliance with all provisions of this Agreement. Supplier shall be responsible for all audit/verification expenses only if the audit reveals that there is a deficiency or violation of Section 8 entitled "PURCHASE ORDERS; CANCELLATION OF PURCHASE ORDERS; REVOCATION OF ACKNOWLEDGEMENT" and section 7.2 entitled "MOST FAVORED CUSTOMER." At Customer's request, the independent auditor shall have access to the Supplier's records no more than two (2) times per year, (unless Customer has reason to believe that Supplier has not complied with all provisions of the Agreement), for purposes of audit during normal business hours during the term of this Agreement and during the respective periods in which Supplier is required to maintain such records. The accuracy of Supplier's billing shall be determined from the results of such audits.

(e)      Minority, Woman owned, Disabled and Vietnam Era Veteran Business Enterprises (MWDVBE) Utilization. With respect to the Supplier's Compliance (as the Primary Supplier) with Minority, Woman-owned, Disabled and Vietnam era Veteran Business Enterprises (MWDVBE) Utilization, Supplier must submit the Prime Supplier Quarterly Reports as described on the website and submit them via the website at http://www.verizon.com/diversity/Suppliers to Customer on a quarterly basis ten (10) business days following the end of each quarter. In addition, Supplier (as the Primary Supplier) agrees to provide opportunities for MWDVBE in accordance with ATTACHMENT F-1 hereof, entitled "PRIMARY SUPPLIER CONTRACT COMPLIANCE", of EXHIBIT F hereof, entitled "PRIMARY SUPPLIER COMPLIANCE WITH MINORITY, WOMAN-OWNED, DISABLED AND VIETNAM ERA VETERAN BUSINESS ENTERPRISES (MWDVBE) UTILIZATION".

(f)      Additional Reports. In addition to the various reports required of the Supplier elsewhere in this Agreement, Supplier will provide the following report:

> Supplier shall maintain a record of all No Trouble Founds ("NTFs") which permits tracking of NTFs to assure that any Product that has been categorized as an NTF for the third time is not returned to Customer for future deployment. Supplier shall also publish these results in a monthly summary report and forward such reports to Corporate Sourcing's SPL (Sourcing Process Leader), VERIZON, at the address designated in the NOTICES provision of this Agreement. Fees of fifty dollars ($50) for NTFs shall apply as described in Section 2 paragraph (b) of Exhibit D, entitled PURCHASE FOR INTERNAL USE- WARRANTY AND PRODUCT SUPPORT.

**11.      DOCUMENTATION, SUPPLIER'S SPECIFICATIONS, INFORMATION, RECORDKEEPING AND DISCLOSURE**

(a)      Documentation. Supplier agrees to furnish all Documentation that Supplier provides to its customers in the normal course of business that is required for or incident to Customer's use and operation of the Products and Services, including but not limited to the items set forth or otherwise identified in EXHIBIT B-1 hereof, entitled "DETAILED DESCRIPTION OF PRODUCT AND SERVICES", and the terms and conditions stated within this Agreement, for the System, Products and Services

MobileAria, Inc.
C0505851

purchased hereunder, and any succeeding changes thereto, at no additional charge    Supplier    shall
be responsible for updating the Documentation to incorporate subsequent updates and changes to
System or Product or Services. Customer shall provide Supplier with a list of persons and organizations
of Customer, to whom the updates shall be provided.  The updates and any subsequent changes shall
contain a Supplier identification reference number and date of issue to facilitate administration.  Such
subsequent changes and updates shall be provided within a reasonable time of their respective effective
dates, at no charge to Customer.

     Supplier grants Customer the right to make copies of Documentation furnished under this
Agreement for the exclusive internal use of Customer.  If any Documentation that is to be copied bears a
copyright or proprietary notice, Customer shall reproduce the copyright or proprietary notice on all copies.
Notwithstanding the preceding reference to proprietary markings, Supplier shall not provide Customer
with any proprietary information unless previously agreed to in advance in writing.

     On a continuing basis, Supplier shall provide, at no charge to Customer, Installation Alerts and
Broadcast Warnings, Product Change Notices, Engineering Change Notices, and documentation for
changes to Product, non-conformance to Specifications, service affecting items, acceptance failures, and
installation issues.  Such of the above referenced documents necessary to support Products shall be
provided by Supplier during Acceptance, Warranty Period, post-Warranty maintenance and for Customer
for as long as the technology survives.

(b)    <u>Supplier's Specifications and Drawings</u>.  Supplier's standard commercial and/or technical
Specifications (including drawings) or other applicable documentation, provided hereunder and listed in
EXHIBIT B-1: DETAILED DESCRIPTION OF PRODUCT AND SERVICES, shall be considered a part of
the REQUIREMENTS DOCUMENTS.

(c)    <u>Periodic Reports</u>. Supplier agrees to render on a monthly basis, at no charge to Customer and in
formats acceptable to Customer, unless otherwise mutually agreed upon or specified below, the following
reports (by way of example and not limitation):

     1.  Actual or Potential Event Reports
     2.  Repair & Replacement Reports
     3.  Reliability and Quality Measurements Product Performance Reports
     4.  Summary Product Troubles Reports
     5.  Monthly Custom Product Development Reports
     6.  Software Development Tracking Reports
     7.  Monthly Quality Performance Reports
     8.  Quarterly Diversified Supplier Subcontracting and Second Tier Reports
     9.  Diversified Supplier (MWDVBE) Utilization Reports
     10. NTF (No Trouble Found) Summary Reports
     11. Summary of Technical Support Calls
     12. Monthly Shipment and Order Reports
     13. Data Delivery Discrepancy Report

## 12.    ELECTRONIC PURCHASING

(a)    <u>Electronic Data Interchange</u>.  Within the first year of the Agreement, Supplier, shall, with best
commercially reasonable efforts participate with Customer in the development of an electronic data
interchange (EDI) for the communication of Orders, acknowledgements, subsequent invoicing or other
data that may be communicated between Customer and Supplier.  Supplier further agrees to the terms
and conditions as set forth in EXHIBIT-1 hereof entitled "ELECTRONIC DATA INTERCHANGE (EDI), of
EXHIBIT E hereof, entitled "ELECTRONIC PURCHASING", for the transmission of such electronically
communicated data.

**13.    PRECEDENCE OF DOCUMENTS**

(a)    <u>Orders</u>. All quotations, Orders, acknowledgements, and invoices issued pursuant to this Agreement shall be subject to the provisions contained in this Agreement. The terms and conditions of this Agreement will control over any conflicting or inconsistent terms contained in any quotation, Order, acknowledgement or invoice. Unless Supplier's rejection is forwarded to Customer within ten (10) days of receipt of the Order, the following provisions, as they relate to the Product ordered pursuant to a particular Order, can be changed by language contained in that Order: (i) the quantity, (ii) packaging instructions, (iii) shipping instructions, or (iv) delivery date.

(b)    <u>No Modifications</u>.    Except for the changes enumerated in Section 13 (a) (i-iv) above, no modification to this Agreement or additional terms contained in any quotation, Order acknowledgement, or invoice shall be valid without the prior written approval of the authorized representatives of the parties.

**14.    DELIVERY**

**1) Freight Terms**
Shipping charges for the Product are to be billed to United Parcel Service (UPS), Account Number W29-A35. Copies of account transactions are to be sent to the designated representative at each Customer Market Area as listed in Exhibit C entitled "VERIZON MARKET AREAS". If the Parties can not take advantage of the UPS process as set forth above, the parties shall meet and mutually agree on a different freight terms.

**14.1    OTHER SHIPPING REQUIREMENTS**

(a)    Supplier shall ship Purchase Orders (POs) complete unless directed otherwise by Customer. If the Supplier does not ship the order complete, Customer shall charge the Supplier back for the additional freight incurred by deducting the freight amount from Supplier's material invoices.

(b)    Unless instructed otherwise by Customer, Supplier shall, for PO's placed, (i) see that all subordinate documents bear Customer's PO number; (ii) enclose a packing list with each shipment and when more than one package is shipped, identify the one containing the packing list; (iii) mark Customer's PO number on all packages and shipping papers; (iv) render invoices showing Customer's PO number; (v) render separate invoices for each shipment or PO; (vi) forward shipping notices with invoices; (vii) invoice Customer by mailing or otherwise transmitting invoices, bills, and notices to the billing address on the PO; and (viii) make available a bill of lading upon request. PO numbers are required to facilitate prompt and correct shipment. All PO numbers for each shipment must be given to the carrier.

(c)    If applicable, delivery intervals for Product shall be specified in EXHIBIT B-3 hereof entitled DELIVERY INTERVAL". Standard delivery intervals begin from the date of Supplier's receipt of Customer's Order.

(d)    Supplier shall ship Product to Customer within (i) the delivery intervals specified in EXHIBIT B-3 entitled "DELVERY INTERVAL" (if applicable), or (ii) as otherwise provided by Supplier to Customer in a firm price quotation, purchase order acknowledgement or other written means. If Supplier fails to meet a delivery date, Customer may require an expedited delivery, with any additional costs to be borne by Supplier, or Customer may cancel all or part of the Order in accordance with Section 8 of this Agreement entitled "PURCHASE ORDERS; CANCELLATION OF PURCHASE ORDERS; REVOCATION OF ACKNOWLEDGMENT." If Product is delivered ahead of the delivery date, Customer may withhold payment for Product until after the specified delivery date or may place Product in storage, at Supplier's expense, until the specified delivery date.

(e)    In no event will Customer be liable for Premium shipping modes unless previously authorized by the Customer or its Transportation Management Operations (TMO) Premium shipments made without authorization will result in charge-backs to the Supplier. Shipping and routing instructions may be altered, as mutually agreed upon in writing, by Supplier and Customer. If requested by Customer, Supplier agrees to substantiate such charges by providing Customer with the original freight bill or a copy thereof.

(f)    Product shall be packaged for shipment, consistent with all applicable laws, at no additional charge, in commercially suitable containers, , that provide protection against damage during the shipment, handling and storage of the Product in reasonably dry, unheated quarters.

## 15.    BILL OF SALE

Supplier shall, upon request and after payment by Customer, execute and deliver to Customer a bill of sale or similar document evidencing conveyance of Product, free and clear of all liens, security interests and encumbrances.

## 16.    INSPECTION AND ACCEPTANCE OF PRODUCT AND SERVICES

(a)    Acceptance. If Supplier or its Agent is to perform installation of Product, the installation of the Product shall be performed in accordance with the mutually agreed on schedule as revised monthly by the parties. Product shall be accepted after Customer verifies Product performance in accordance with Supplier's advertised or published specifications or other mutually agreed upon specifications for such Product. Such acceptance testing shall take place no later than on the fifteenth (15th) day after installation of the Product is complete or fifteen (15) days after vehicle utilization whichever come first, but no later than thirty (30) days from installation. Unless Customer notifies Supplier in writing within the Acceptance Period that the Product fails to meet the agreed upon acceptance criteria and such notice contains a detailed description of the nonconformance, the Product shall be deemed accepted. If Product fails to meet the agreed upon acceptance criteria, Supplier shall have thirty (30) days to correct all deficiencies, unless otherwise mutually agreed. If, after the cure period, Product still fails to perform, Customer shall have the right to reject Product and request deinstallation by Supplier at Supplier's expenses in order to return Product to Supplier at Supplier's expense. Any amounts paid to Supplier by Customer shall be refunded to Customer within thirty (30) days after return of Product. The purchase price for such Product shall also be credited against any volumes under this Agreement within the applicable Market Area.

(b) Quality Control. Customer's right to inspect and test pursuant to EXHIBIT H entitled "QUALITY STANDARDS, PROCEDURES AND COMPLAINTS" does not relieve Supplier from its testing, inspection and quality control obligations. All nonconforming Products that are repaired shall be reinspected, including applicable tests. Time used by Supplier to correct nonconformities and for Supplier to retest nonconforming Products shall extend Customer's allowable time for acceptance or rejection by one (1) business day for each day used by Supplier to correct such nonconformities.

## 17.    PRODUCT AND SOFTWARE WARRANTIES, SERVICES AND SUPPORT

(a) Warranties. Supplier shall provide warranties as set forth in EXHIBIT D hereof, entitled "PURCHASE FOR INTERNAL USE - WARRANTY AND PRODUCT SUPPORT."

(b) Defects. Supplier warrants that it will disclose all potential or actual product defects in accordance with EXHIBIT D-2 hereof, entitled "DISCLOSURE OF POTENTIAL DEFECTS."

(c) Disclaimer. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT OR EXHIBIT D hereof, entitled "PURCHASE FOR INTERNAL USE – WARRANTY AND PRODUCT SUPPORT," THE SUPPLIER HEREBY DISCLAIMS ALL EXPRESS, IMPLIED AND STATUTORY WARRANTIES REGARDING THE PRODUCTS, THE SERVICES AND THE SYSTEM, INCLUDING BUT

NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON INFRINGEMENT OF ANY THIRD PARTY RIGHTS, AND THE FOREGOING DISCLAIMERS SHALL NOT AFFECT THE SUPPLIER'S INDEMNIFICATION OBLIGATIONS AS SET FORTH IN THIS AGREEMENT.

## 18. SUPPLIER COMPREHENSIVE RESPONSIBILITIES FOR OVERALL PERFORMANCE

Supplier represents, warrants and agrees that it has the full and final responsibility, duty and obligation to provide, perform, deliver and install, as set forth in the Scope of Work in EXHIBIT G, entitled" SCOPE OF WORK", the Product and Services as well as any ancillary services, facilities, and equipment, set forth in any Order(s) issued by Customer and accepted by Supplier pursuant to this Agreement and further Supplier agrees and acknowledges:

> 1. that it recognizes that the Product and Services which are to be provided under this Agreement are vital to Customer and must be delivered and installed without interruption, delay, cessation or limitation and in full compliance with the scheduled developmental dates, and requirements set forth in the Order(s), and perform in full compliance with the Specifications; and that in the event of any conflict or contention of whatever type or character between a Customer's Order(s) for Product and Services and any order by a third party, Supplier shall fulfill, the Customer's Order(s) on a commercially reasonable, fair and non-discriminatory basis in relation to third party Order(s); provided that Supplier acknowledges that any failure to provide Customer's Order in compliance with the terms of this Agreement is a breach in accordance with Section 41, entitled "TERMINATION" of the Agreement;

> 2. that Supplier has and will maintain an organization staffed by optimally useful number(s) of qualified personnel, including "the pilot team" who, where applicable, shall be identified in EXHIBIT B-3 hereof, entitled "DELIVERY INTERVAL", in a subsection entitled KEY PERSONNEL, with the knowledge, skill and resources optimally useful to perform and complete the Scope of Work in Exhibit G and that there are and will be, no impediments to, or commitments legal, contractual or otherwise which impede Supplier's timely performance and completion of the work or its capacity or capability to do so;

> 3. that should Supplier fail in its performance beyond the cures and remedies in this Agreement, the cost, and expense required to re-procure the Products and Services, and the time lost and the revenue income and profit jeopardized could be substantial and material;

> 4. that any such failure in Supplier's full performance under this Agreement may under the circumstances set forth in this Agreement constitute a Default by Supplier and give rise to an obligation to pay money damages and such other and additional relief or remedy as may be set forth in this Agreement or permitted at law or in equity, should any of the foregoing events occur.

## 19. CHANGES TO HARDWARE OR SOFTWARE/PRODUCT CHANGE NOTICES ("PCNS")

Supplier shall notify Customer in writing of any changes to Product and Services in accordance with the appropriate specification procedures in this Agreement. In addition the following provisions shall apply:

Supplier shall propose a schedule for the application of these changes at all Product locations, which schedule must be mutually agreed upon with Customer prior to implementation.

If Supplier develops a Method Of Procedure (MOP) for the change, the MOP shall be provided to Customer with the PCN. Any related engineering complaint number shall be included on the PCN form.

If Customer disagrees with the nature of, or with the classification which Supplier assigns to, a change in Product or Services, Customer shall have the right to escalate the matter for review, reclassification, and

resolution to higher levels of management within Customer and Supplier in accordance with section 45, entitled "DISPUTE RESOLUTION OF THIS AGREEMENT".

Class A designation shall mean (and apply to) changes that are required to correct a product deficiency. Class AC changes are those that would otherwise be classified as Class A changes, but have only a "Limited Application" or "Conditional Application". Supplier shall provide all changed Product for Class A and AC changes for as long as technically feasible at no charge to Customer. Where Supplier installed the Product subject to the Class A and AC change, Supplier will supply such change Product and installation labor without charge. Where Customer and/or its agent has installed Product, Supplier will supply such change to Product without charge and will reimburse or credit Customer for its labor to implement or execute corrective action for a change for as long as technically feasible  Supplier shall supply relevant Documentation to Customer for all Class A and AC changes.

Documentation changes, required to satisfy Supplier's obligations to provide Class A and AC changes to PRODUCT as specified herein, shall be provided by Supplier at no charge to Customer.

The Class B designation shall mean (and apply to) changes that are made to incorporate improvements in the design of existing products that result in better operation, improved testing and maintenance, longer life, service improvements, cost reductions, and/or addition of new features. The Class D designation shall mean (and apply to) changes that incorporate minoe new features and design improvements that do not affect the existing functionality or interchangeability of a Product, or that involve other minor improvements to service, testing, or other capabilities. For those changes classified as "B" or "D", Supplier shall notify Customer in writing one hundred and twenty (120) days prior to the effective date of such change to be made in the Product furnished under an Order.

For Class B changes, Supplier shall first notify Customer of the exact nature of the change.  Details of the proposed implementation procedure for Product which is being or will be manufactured shall be discussed with Customer within the notification time periods stated in the first section above.  Customer shall, at its option, determine if Product previously shipped shall be replaced or modified.  Should such replacement or modifications be deemed necessary, Supplier shall make arrangements for the necessary Product replacement or modification at prices and schedules to be mutually agreed upon with Customer prior to implementation.

In the event that Customer does not desire any such change, Customer shall notify Supplier in writing within sixty (60) days from the date of receipt of notification of change and Supplier shall not furnish any such changed Product to Customer pursuant to any Orders.  Customer may extend the sixty (60) day period if Customer is unable to respond within such period.

Supplier shall notify Customer in writing when implementation of each change has been completed at all affected locations.

Supplier shall reimburse Customer for all mutually agreed to costs incurred by Customer due to insufficient or incorrect instructions and/or Documentation provided in connection with changes to Products, only if the instructions and/or Documentation are mutually determined by Customers, acting in good faith, to be insufficient or incorrect.

All correspondence relating to changes to Product shall be sent to the following individuals or their successors as appointed by Customers:

Margaret Sheppard
Specialist- Operations
741 Zeckendorf Blvd.-Room R617
Garden City, NY 11530
(516) 832-3614
margaret.l.sheppard@verizon.com

Boris Elman
Technical Manager- System Analysis & Programming
40 Sylvan Road- Room 4-129
Waltham, MA 02451
(781) 718-4117
boris.elman@verizon.com

MobileAria, Inc.
C0505851

## 20.    TECHNOLOGICAL OR SPECIFICATION CHANGE/PRODUCT DELETION/ SUBSTITUTION

(a)    Supplier shall give Customer advance written notice as soon as Supplier has official release, of any technological or specification change, software/firmware revision, Product deletion or manufacturer discontinuance or other event that would negatively impact Product operation, interchangeability with existing Product, appearance, warranty, life cycle or Verizon engineering/quality approvals of any Product. Supplier shall, at the time of notification, provide Customer with (i) a Product change number; (ii) a description of such change; (iii) the reason for change; (iv) a description of the impact of such change upon reliability, Specifications, or form, fit or function; (v) proposed price impact (if any); and (vi) proposed effective date for such change and recommended implementation schedule. Supplier will also continue to provide Customer with maintenance service, repair service and parts for Hardware and Software, for a period of three (3) years after such event or the period described in Section 24 entitled "CONTINUING AVAILABILITY", whichever is greater.

(b)    If the parties fail to reach agreement on any such change in Product to be made by Supplier, then, in addition to all other rights and remedies at law or in equity or otherwise, Customer shall, at no cost or liability, have the right to terminate all pending Orders for Product affected by such change.

(c)    Supplier may discontinue the availability of Product at any time, in accordance with Section 24 entitled "CONTINUING AVAILABILITY", but shall accept Orders for discontinued Product for a period of one (1) year after the effective date of discontinuation.

(d)    Supplier agrees that if the required one hundred twenty (120) days' prior written notice is not provided, Supplier shall accept, at Customer's option, a Product exchange or return for all Product in Customer's inventory on the effective date of the change. Any Product returned must be unused, undamaged and in the original carton and may be returned, at Customer's option, for one hundred percent (100%) credit of the price paid or an equal dollar value exchange for any other Product offered under this Agreement.

## 21.    UNSATISFACTORY CONDITION SITUATIONS

(a)    Response Times. If at any time during normal operation Customer encounters an unsatisfactory condition as set forth below in the Product, Supplier agrees to meet the following time frames for resolving the condition. An Unsatisfactory Condition Report (UCR) formally documents a condition in writing. The UCR is also used to track, report and verify the condition.

(b)    A Priority One. A priority one (1) UCR reflects a condition in the sole discretion of Customer which endangers public or employee safety; degrades the ability to track, collect, or produce revenue; causes major degradation of service; or degrades the basic functionality of telecommunication service or its support systems by degrading Customer's ability to provide day-to-day services to its Customers. Within fifteen (15) days of receipt of written notification from Customer of a priority one (1) UCR, Supplier shall acknowledge receipt thereof in writing and confirm or deny in writing the existence of the conditions stated in the UCR. Supplier must provide a permanent resolution within thirty (30) days of such written notification from Customer.

(c)    A Priority Two. A priority two (2) UCR reflects a condition that potentially degrades the ability to track, collect, or produce revenue; could potentially result in a major degradation of service; could degrade the basic functionality of telecommunication service or its support systems by degrading Customer's capability to provide day-to-day services to its Customers. Within fifteen (15) days of receipt of written notification from Customer of a priority two (2) UCR, Supplier shall acknowledge receipt thereof in writing and confirm or deny in writing the existence of the conditions stated in the UCR. Supplier must provide a permanent resolution within ninety (90) days of notification.

(d)    A Priority Three. A priority three (3) UCR reflects a condition that could adversely affect normal maintenance and/or administration of Service; could adversely degrade the basic functionality of telecommunication service or its support systems by Customer's capability to provide day-to-day services

to its Customers. Within fifteen (15) days of receipt of written notification from Customer of a priority three (3) UCR, Supplier shall acknowledge receipt thereof in writing and confirm or deny in writing the existence of the conditions stated in the UCR. Supplier must provide a permanent resolution within one hundred eighty (180) days of notification.

(e)      The Permanent Resolution. The term "permanent resolution" shall mean a correction to an unsatisfactory condition in the form of a new or revised hardware or software module, hardware modification kit, software patch and/or revised operating or maintenance procedures that are acceptable to Customer. Corrections that are temporary in nature, such as work-around procedures, certain types of hardware modifications or software patches, shall require (i) a final version of the correction to be included in the next formal version/ modification/ release of Product provided to Customer or (ii) written Customer acceptance of an alternative. In either (i) or (ii), Supplier will provide a schedule for implementation of the final version of the correction, upgrade, or change, as applicable and Customer shall indicate selection of the workaround selected in writing. On an exception basis, Customer may agree to an extension of the time frames specified in paragraph a, b or c, and the Supplier is then bound by the newly agreed upon date.

(f)      Discussion. Supplier has the option to discuss the UCR condition statement with the Customer (e.g., whether condition exists within stated performance specification verses a design change) or query a priority level assignment. However, Supplier shall notify Customer in writing within five (5) days of the determination of a UCR if it chooses to discuss the UCR with Customer, but the time lines are in no way affected by this query or discussion, unless the priority is eventually modified by Customer or the UCR is withdrawn.

## 22.   PRODUCT CHANGES

(a) Changes. If, after Product has been shipped to Customer, Supplier issues changes affecting Product and such change is identified as necessary for the Product to continue to meet Supplier's published Specifications or design criteria (Mandatory Engineering Change), including an identified correction of a deficiency as a result of a UCR (refer to the Section entitled "UNSATISFACTORY CONDITION SITUATIONS"), Supplier shall provide prompt notification of required changes to Customer's Network Services Group (NSG) I & M Process Assurance- Service Delivery and/or testing organization(s) at the address provided to Supplier for such purpose. Supplier shall, at Supplier's expense, be responsible for costs for all Mandatory Engineering Changes and installation of such changes whether implemented by Supplier or Customer for a period of five (5) years beyond the applicable Product warranty period (as defined in EXHIBIT D entitled "PURCHASE FOR INTERNAL USE – PRODUCT AND SERVICE WARRANTY AND PRODUCT SUPPORT"), provided Product has been maintained during this period at current revision levels and subject to any payment of the recurring monthly fee specified in EXHIBIT B-2 entitled "PRODUCT AND SERVICES PRICES".

(b) Implementation. If Customer and Supplier ascertain that Product, or a part thereof, subject to such a change is readily returnable, Customer or Customer's agent or contractor shall remove, at Supplier's expense, and return such Product or part to Supplier's designated repair or manufacturing facility and Supplier, at Supplier's expense, shall implement such changes and return such changed Product or part to Customer's designated location. If removal of Product to be returned to Supplier for modification would create an out-of-service condition, Supplier shall first discuss with Customer and make suitable arrangements to provide replacement Product to prevent an out-of-service condition from occurring.

(c) Inventory. Any Product maintained in Customer's inventory subject to such a change shall be returned to Supplier's designated repair or manufacturing facility to implement changes and shall be returned to Customer's stocking location at Supplier's expense. If such changes in Customer's opinion create an adverse impact on the Product warranty, then Supplier shall accept at Customer's option, a Product exchange or return for all unchanged Product in Customer's inventory.

(d) Notice of Changes. All change notifications provided by Supplier to Customer shall contain the following information:

1.    Description of change;
2.    Reason for change;
3.    Impact on Customer service (i.e., outages, system downtime);
4.    Price impact, if known;
5.    Effective date of changes; and
6.    Implementation schedule of change.

(e)    Customer Requested Changes. Customer may request the Supplier to make changes to or enhance the Product. Upon Supplier's receipt of a written document describing in detail the changes requested by Customer, Supplier shall respond in writing to Customer within thirty (30) days. If Supplier agrees to undertake such modifications for Customer, the response shall identify a date for the proposed implementation schedule and cost for such changes to Product will be provided by the Supplier. And this Agreement will be amended accordingly.

## 23.    EXTRAORDINARY SUPPORT

In addition to the provisions for repair or replacement of Products set forth in EXHIBIT D, hereof, entitled "PURCHASE FOR INTERNAL USE- WARRANTY AND PRODUCT SUPPORT", Supplier agrees if any natural or other disaster or emergency causes an out of service condition, Supplier shall use commercially reasonable effort to locate or provide (i.e. procure or manufacture) and ship to Customer replacement Product, and make available necessary manpower within five (5) business days of verbal notification by Customer to an authorized representative of Supplier.

Such emergency support shall be available twenty-four (24) hours, seven (7) days a week for the duration of emergency, during the term of this Agreement, and for a period of five (5) years after the expiration of this Agreement or survival of the technology, whichever is less, subject to the payment of any recurring service fee specified in EXHIBIT B-2 entitled "PRODUCT AND SERVICES PRICES". The Supplier shall have a pager service, with a representative returning the call within thirty (30) minutes of the page.

Charges for replacement Products and Services shall be at the prices contained in EXHIBIT B-2, hereof, entitled "PRICES FOR PRODUCTS AND SERVICES", for the term of this Agreement. This clause shall not be construed to require Supplier to maintain any inventories whatsoever nor maintain any position of readiness to perform in the future nor require breach of Supplier's contractual obligations to third parties.

## 24.    CONTINUING AVAILABILITY

(a)    Notice and Continuing Availability. Subject to the terms and conditions of this Section, Supplier agrees to offer for sale functionally equivalent or superior maintenance, support, replacement and repair parts for Hardware ordered pursuant to this Agreement for as long as the technology survives commencing from Supplier's last shipment of such Product to Customer. In addition, subject to the terms and conditions of this Section, Supplier agrees to provide Software support for maintenance, replacement or updates as long as the technology survives. Notwithstanding the forgoing under this Paragraph, Supplier shall also give Customer one (1) year prior written notice of the discontinuance of the sale of maintenance, replacement and/or repair parts of Hardware, in order to allow Customer to make purchases during this period to fulfill its requirements; provided, however, that each such purchase shall not exceed the average purchases over the immediately preceding calendar quarter. Charges for support Services provided pursuant to this paragraph shall be mutually agreed upon at time of discontinuance notice.

(b)    Additional Support And Third Party Provision Of Support. After Supplier has fulfilled its obligations for post discontinuance Support, if for any other reason Supplier is unable to provide such Product. Supplier shall, if requested by Customer, endeavor to arrange for a third party to continue to furnish the discontinued maintenance, replacement and repair parts to Customer. In the event Supplier is not requested, or, if requested, is unable to find a third party to furnish such maintenance or replacement or repair of Product to Customer, which is acceptable to Customer, Supplier shall upon request by Customer, provide Customer with existing technical information and rights to the extent Supplier has such

MobileAria, Inc.
C0505851

rights including source code, and documentation, at a mutually agreed charge (if any), sufficient for Customer to manufacture or have manufactured the Product and maintain, modify and upgrade, the Software. The remedy set forth in this subsection (b) shall not relieve Supplier of any additional liability or obligation arising from Supplier's failure to comply with the terms of subsection (a) hereof.

(c)      Technical Information. Supplier shall protect against the loss or damage of the existing technical information required for the manufacture of the discontinued Product with the same degree of care that Supplier uses to protect its own valuable technical information.  In addition, Supplier shall advise Customer in writing at least six (6) months in advance of its decision to discontinue maintenance of any technical information, so that Customer may acquire its own or develop such technical information in accordance with the provisions of this section.

The technical information includes, by example and not by way of limitation:  (a) manufacturing drawings and specifications of raw materials and components comprising such Products; (b) manufacturing drawings and specifications covering special tooling and the operation thereof; (c) a detailed list of all commercially available Products and components purchased by the Supplier on the open market disclosing the part number, name, and location of the Supplier and price lists for the purchase thereof and (d) Source Code and Documentation.

## 25.    TRAINING

Supplier will provide unlimited on-demand access to a recorded flash training session to Customer.  Live web ex sessions may be scheduled as necessary and as determined by Customer.  Customer will make best efforts to ensure that its personnel view the recorded flash sessions before requesting any live sessions.  On-site training provided by Supplier is available at Customer's request as needed at a rate of twelve hundred ($1200.00) dollars per day, prorated for partial days. Supplier agrees to train Customer's trainer at Supplier's facility free of charge, upon Customer request. Such a request should not be made more than twice a year.

The training, training equipment and instructional DOCUMENTATION furnished by Supplier under this Agreement, shall be developed and furnished in accordance with the requirements, formats and procedures set forth in EXHIBIT D-6 hereto entitled "TRAINING TERMS"; provided that Customer acknowledges and agrees that any such DOCUMENTATION shall be furnished in electronic format only. Customer shall have the right to reproduce such instructional DOCUMENTATION at no charge solely for internal use.

## 26.    INFORMATION AND INTELLECTUAL PROPERTY

(a)      Information Defined.  The term "Information" includes: programs and related documentation; specifications, drawings, models, technical and business data and plans; works of authorship and other creative works; and ideas, knowledge and know-how.  Information may be transmitted in writing (or other tangible form) or orally.

(b)      Supplier Confidential Information.  Supplier will not provide to Customer any confidential information.  Confidential information will be clearly marked "Confidential" and shall only be sent to the Verizon Core Pilot Team (IT, Sourcing, Network Operations), labeled or otherwise designated as proprietary or confidential) and shall be considered by Customer to be confidential or proprietary information of Supplier. Customer will return such information to Supplier (or destroy it), upon termination of the Agreement or at Supplier's earlier request.  Unless such information was previously known to Customer free of any obligation to keep it confidential or is made public by Supplier or a third party without breach of any agreement, Customer will keep the information confidential and use it only in performing this Agreement.

(c)      Customer Information. Information that Customer furnishes to Supplier or that Supplier otherwise comes into contact with under this Agreement will remain Customer's property.  Supplier will return such

MobileAria, Inc.
C0505851

Information to Customer upon termination of the Agreement or at Customer's earlier request. Unless such Information was previously known to Supplier free of any obligation to keep it confidential or is made public by Customer or a third party without breach of any agreement, Supplier will keep the Information confidential and use it only in performing this Agreement.

(d)    Work Product.    The entire right, title and interest in all edits, original inventions and works of authorship created by Supplier, or on Supplier's behalf, for Customer hereunder shall be transferred to and vested in Customer, exclusive of any Supplier owned intellectual property rights in any Supplier owned software existing prior to the Effective Date of this Agreement and transferred to Customer hereunder which shall remain the property of Supplier. All such works shall be considered to be made for hire.   Supplier agrees to provide documentation and to sign all documents prepared or supplied by Customer which Customer believes are necessary to ensure the conveyance of all such right, title and interest, including patent, trademark and copyright, to Customer.   Notwithstanding the foregoing, the parties agree that the following shall not be considered works for hire under this Section and Supplier shall own all right, title and interest in and to the following:  (i) the Product, and any modifications or improvements thereto, (except to the extent of Product incorporating any Customer proprietary Information which shall be considered a work for hire) and (ii) any modifications, improvements, developments, original inventions and works of authorship created by Supplier or on Supplier's behalf unrelated to the Product   (except to the extent of Product incorporating any Customer proprietary Information which shall be considered a work for hire), including for example and without limitation, developments related to least congested channel algorithms and algorithms for wide area augmentation systems.

(e)    No Supplier Licenses.   Customer does not grant Supplier any license, express or implied, under any patent, copyright, trademark, trade secret or otherwise, except for the sole purposes of Supplier's performance of this Agreement.

(f)    Publicity And Disclosure

    1.    Supplier shall not provide copies of this Agreement, or otherwise disclose the terms of this Agreement, to any third party without the prior written consent of Customer; provided, however, that Supplier may, without obtaining Customer's consent, provide copies or make disclosures to prospective customers of the business of Supplier or of any Affiliate; or for the purpose of obtaining third party financing; and any regulatory or judicial body requesting such information.

    2.    Customer will not approve issuance of a press release to announce this or other agreements in which the Supplier is providing Products or Services to Customer, other than in exceptional situations where Customer determines that a release would significantly benefit Customer and has indicated such to Supplier in writing. The Supplier shall not, without Customer's prior written approval, release any advertising, sales promotion, press releases and other publicity matters relating to the Product furnished or the Service performed pursuant to this Agreement, when Customer's respective name or mark is mentioned or language from which the connection of said name or mark may be inferred or implied. Customer may withhold approval in its sole discretion.

## 27.    CUSTOMER'S PROPERTY AND TOOLING

(a)    Customer Ownership.   Title to and the right to immediate possession of any property, including patterns, tools, molds, jigs, dies, information provided in tangible form or made for Supplier's performance under this Agreement, and any other equipment or material, furnished to Supplier or paid for by Customer shall vest in Customer. Supplier may not furnish any articles made there from to any other party without the prior written consent of Customer. Supplier shall keep adequate records of such property and Supplier will safely store, protect, preserve, repair and maintain such property at Supplier's expense.

MobileAria, Inc.
C0505851

(b)     Customer Disclaimer of Warranties.  If Customer allows Supplier to use any of Customer's tools or equipment, such tools and equipment are supplied to Supplier "AS-IS" with no warranties whatsoever. CUSTOMER EXPRESSLY DISCLAIMS ALL WARRANTIES, INCLUDING ANY WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.  It is Supplier's responsibility to inspect the tools and equipment to assure that they are safe and fit for their intended purposes.  Subject to the provisions of Section 35 below, Supplier shall indemnify and hold Customer, as well as any Customer Affiliate, harmless against any claims, demands and liabilities that result from Supplier's use of such tools and equipment, including, but not limited to, any claims, demands and liabilities resulting from defects or other failures of the tools and equipment, the inadequacy of a tool or equipment for a particular task or the failure to properly use any tool or equipment.

## 28.    COMPLIANCE WITH LAWS

(a)     Supplier shall comply with the provisions of all applicable federal, state, county and local laws, ordinances, regulations and codes (including procurement of required permits or certificates) in manufacturing, assembling, selling and providing Product and Services and in performing its other obligations under this Agreement, including, but not limited to, the standards promulgated under the Occupational Safety and Health Act, Executive Order 11246, as amended, Section 503 of the Vocational Rehabilitation Act of 1973, as amended, the Vietnam Era Veterans Readjustment Assistance Act of 1974, the Immigration Reform and Control Act of 1986, the Civil Rights Acts of 1964 and 1991, the Americans with Disabilities Act, the Age Discrimination in Employment Act, and all rules and regulations relative to these Acts and other applicable equal employment opportunity laws, rules and regulations, which are expressly incorporated herein by reference.  Irrespective of whether a specification is furnished, if Product or containers furnished are required to be constructed, packaged, labeled, or registered in a prescribed manner, Supplier shall comply with applicable federal, state or local laws.  Subject to the provisions of Section 35(e) below, Supplier shall indemnify Customer against all claims, loss or damage sustained because of its noncompliance.

(b)     If any persons furnished under the Agreement by Supplier have a disability as defined in the Americans with Disabilities Act, 42 U.S.C.A. 12101 et seq. (the ADA), Supplier shall, where required by Title I of the ADA and at its sole expense, provide "reasonable accommodations" that may be required under Title I of the ADA including, but not limited to, "auxiliary aids and services" to make aural, visual materials or interpreters available to individuals furnished by Supplier with impairments so that such individuals are able to perform the essential functions of the job they are contracted to perform.  Subject to the provisions of Section 35 below, Supplier further agrees to indemnify and defend Customer for any losses, fines, reasonable attorney fees, or other penalties that may be incurred or assessed upon Customer due to Supplier's failure to comply with the provisions of the Title I of the ADA with respect to the persons furnished by Supplier.

(c)     Product furnished shall comply, to the extent applicable, with the requirements of the Federal Communications Commission's Rules and Regulations, as may be amended, including those sections concerning the labeling of such Product and the suppression of radiation to specified levels.  If the Product generates interference harmful to radio communications, and such Product was installed in accordance with such Rules and Regulations, then Supplier shall provide to Customer methods of suppressing the interference.  If the interference cannot be reasonably suppressed, Supplier shall accept return of the Product, refund to Customer the price paid for the Product and bear all mutually agreed to expenses for removal and shipment of such Product.  Nothing herein shall be deemed to diminish or otherwise limit Supplier's obligations under the "Warranty" provisions of this Agreement herein or any other rights or remedies available to Customer, whether at law or in equity.

(d)     When Product furnished under this Agreement is subject to registration under Part 68 of the Federal Communications Commission's Rules and Regulations as they may be amended from time to time ("Part 68"), Supplier warrants that such Product furnished under this Agreement is registered under and complies with Part 68 including, but not limited to, all labeling and customer instruction requirements unless such Product is furnished as part of a technical field trial or unless the Product is provided for

MobileAria, Inc.
C0505851

services not covered or exempt under Part 68. Supplier agrees to defend and hold Customer harmless from any liability, claim or demand (including the costs, expenses and reasonable attorney's fees on account thereof) that may arise out of Supplier's non-compliance with Part 68. Customer agrees to promptly notify Supplier of any liability, claim or demand against Customer for which Supplier is responsible under this clause and gives Supplier full opportunity and authority to assume the defense, including appeals, and to settle such liability, claims and demands, provided that if Customer reasonably believes that Supplier is not adequately handling such defense or settlement, Customer reserves the right to assume the defense or settlement.

(e)    Radio Frequency Energy Standards. Product furnished hereunder shall, at time of shipment, comply to the extent applicable with the requirements of Subpart J of Part 15 of the Federal Communications Commission's Rules and Regulations, as they may be amended from time to time, including those Sections concerning the labeling of such Product and the suppression of radio frequency and electro-magnetic radiation to the specified levels. Should the Product during use fail to meet relevant parts of the FCC Rules and Regulations for spurious emission and interference to radio communications, Supplier shall provide to Customer information relating to methods of suppressing such interference. In the event such interference cannot reasonably be suppressed, then all remedies as provided in Exhibit D, entitled "PURCHASE FOR INTERNAL USE – WARRANTY AND PRODUCT SUPPORT" shall apply. Supplier agrees to defend and hold Customer harmless from any liability, claim or demand (including the costs, expenses and reasonable attorney's fees on account thereof) that may arise out of Supplier's non-compliance with Part 68. Customer agrees to promptly notify Supplier of any liability, claim or demand against Customer for which Supplier is responsible under this clause and gives Supplier full opportunity and authority to assume the defense, including appeals, and to settle such liability, claims and demands, provided that if Customer reasonably believes that Supplier is not adequately handling such defense or settlement, Customer reserves the right to assume the defense or settlement.

## 29.    FORCE MAJEURE

(a)    Force Majeure. Except for a party's payment obligations, neither party shall be responsible for any delay or failure in performance of any part of this Agreement to the extent that such delay or failure is caused by fire, flood, explosion, war, embargo, government requirement, civil or military authority, acts of God, terrorism, strikes, slowdowns, picketing, boycotts, or any other circumstances beyond its reasonable control and not involving any fault or negligence of the party affected ("Condition"). If any such Condition occurs, the party delayed or unable to perform ("delayed party") shall give written notice to the other party within five (5) business days of the originally schedule performance date. If such Condition remains at the end of thirty (30) days, the party affected by the other's delay or inability to perform ("affected party") may elect to (i) terminate such Order or part thereof, or (ii) suspend such Order for the duration of the Condition, and if Customer is the suspending party, buy elsewhere comparable material to that to be sold under such Order, and apply to any commitment the purchase price of such purchase, and require the delayed party to resume performance of such Order once the Condition ceases, with an option in the affected party to extend the period of this Agreement up to the length of time the Condition endured.

(b)    Notices. Unless written notice is otherwise given to the delayed party by the affected party within sixty (60) days after the affected party is notified of the Condition, (a)(ii) above shall be deemed selected.

## 30.    ASSIGNMENT

(a)    No Supplier Assignment. Except in connection with a merger, consolidation, reorganization or sale of all or substantially all of Supplier's assets, Supplier may not assign any right or interest under this Agreement or Order issued pursuant to this Agreement (excepting moneys due or to become due) or delegate any work or other obligation owed by Supplier under this Agreement without first obtaining the written permission of Customer, which permission shall not be unreasonably withheld. Any attempted assignment or delegation in contravention of this section shall be void and ineffective. Any assignment of money shall be void and ineffective to the extent that: (1) Supplier fails to provide Customer at least thirty (30) days prior written notice of such assignment; or (2) such assignment attempts to impose upon

MobileAria, Inc.
C0505851

Customer obligations to the assignee in addition to the payment of such monies, or preclude Customer from dealing solely and directly with Supplier in all matters pertaining to the Agreement including, but not limited to, the negotiation of amendments or the settlement of charges due.

(b)    <u>Customer Assignment.</u>  Customer may freely assign all or part of this Agreement.

## 31.    TRANSFER OF CONTROL AND SEPARATE ENTITY

In the event that control of Supplier should transfer through acquisition or merger with a competitor of Customer (a "Competitor Acquisition"), Customer shall have a right to terminate this Agreement. Supplier shall notify Customer at the earliest possible time of possibility of acceptance by Supplier of the Competitor Acquisition and Customer may:

(a)    Request that Supplier insures that the System functionalities and Services contracted hereunder will be provided by Supplier's separate legal entity from the Customer's competitor, with all Supplier parties providing the System and Services separated from the operation of the competitor. Supplier shall safeguard all information from the Customer's Competitor the same way Supplier safeguards them from any other party.  In the event that Supplier refuses or is unable to partition the System and Services as required herein, Customer shall have the right to terminate the Agreement and request return of its information from Supplier.

(b)    Customer shall determine in its sole discretion if the party acquiring control of Supplier deems to be Customer's competitor.

## 32.    DISASTER RECOVERY PLAN

Supplier agrees to develop and maintain a Disaster Recovery Plan with respect to the Software, Data transmission and Hardware, which are critical to the provisioning of Products and Services under this Agreement.  The specific details of such Disaster Recovery Plan shall be made available to Customer, if requested, in writing upon execution of this Agreement.

## 33.    TAXES

(a)    The Supplier and Customer acknowledge and agree that it is their mutual objective and intent to legally minimize, to the extent feasible, the aggregate Federal, state or local tax with respect to the products or related services being purchased under this Agreement.

(b)    With respect to any Products or Services under this Agreement, if any Federal, state or local tax excluding any tax levied on property or income (a "Tax") is required by applicable law to be collected from Customer by Supplier, then (i) Supplier will bill, as a separately stated item, Customer for such Tax, (ii) Customer will timely remit such Tax to Supplier, and (iii) Supplier will timely remit such collected Tax to the applicable taxing authority.

(c)    If either Party is audited by a taxing authority or other governmental entity the other Party agrees to reasonably cooperate with the Party being audited in order to respond to any audit inquiries in a proper and timely manner so that the audit and/or any resulting controversy may be resolved expeditiously.

(d)    If applicable law places the responsibility on Supplier to collect a Tax from Customer and Supplier fails to do so, Customer will not be responsible for any interest or penalties associated with Supplier's failure to collect such Tax. Furthermore, Supplier shall not bill a Tax to Customer on products or services under this Agreement which is, by law, not taxable.

(e)    If an exemption procedure is available, such as a resale exemption certificate, and Customer complies with such procedure, then Supplier will not bill or collect such Tax during the effective period of the exemption.

(f)    Customer's Order may provide Supplier additional tax instruction as allowed by law including, but not limited to, Customer's self accrual and payment of taxes, temporary storage, research and development and/or other special jurisdictional exemptions.

(g)    Supplier will be responsible for personal property or ad valorem taxes on property owned by Supplier and Customer will be responsible for such taxes on property owned by Customer. Each Party is responsible for properly reporting owned property and neither Party will be responsible for either reporting or paying personal property or ad valorem taxes owed by the other Party.

## 34.    PLANT AND WORK RULES AND RIGHT OF ACCESS

(a)    The respective agents and employees of the parties, while on the premises of the other, shall comply with all plant rules, regulations and company standards for security, including (when required by U. S. government regulations) submission of satisfactory clearance from U. S. Department of Defense and other federal authorities concerned.

(b)    Each party shall permit reasonable access during normal working hours to its facilities in connection with the work. Reasonable prior notice shall be given when access is required.

(c)    If Supplier is given access, whether on-site or through remote facilities, to any Customer computer or electronic data storage system in order for Supplier to accomplish the work called for in this Agreement, Supplier shall limit such access and use solely to perform work within the scope of this Agreement and shall not access or attempt to access any computer system, electronic file, software or other electronic services other than those specifically required to accomplish the work required under this Agreement. Supplier shall limit such access to those of its employees who are qualified and required, subject to Customer requiring written authorization, to have such access in connection with this Agreement, and shall strictly follow all Customer's security rules and procedures for use of Customer's electronic resources. All user identification numbers and passwords disclosed to Supplier and any information obtained by Supplier as a result of Supplier's access to and use of Customer's computer and electronic data storage systems shall be deemed to be, and shall be treated as, Customer Information under applicable provisions of this Agreement. Supplier agrees to cooperate with Customer in the investigation of any apparent unauthorized access by Supplier to Customer's computer or electronic data storage systems or unauthorized release of Information by Supplier.

(d)    Supplier is responsible for ensuring that all of Supplier's employees, agents, subcontractors or other persons furnished by Supplier: (1) comply with all plant rules, regulations, and security procedures; and (2) work in harmony with all others working on the property of Customer and its Affiliates. If Supplier installs any products on the premises of Customer or its Affiliate, Supplier shall be responsible for promptly removing all packaging materials and debris. Supplier may not bring any toxic or hazardous materials onto any premises of Customer or its Affiliates without the permission of Customer, and Supplier shall be responsible for removing any such toxic or hazardous materials in accordance with all relevant laws, Section entitled "NO HAZARDOUS PRODUCTS AND COMPONENTS" and any additional requirements of Customer.

## 35.    INDEMNIFICATION

(a)    Indemnification by Supplier. Subject to Section 35(e) below, Supplier shall defend, indemnify and hold harmless Customer, its parents, subsidiaries and affiliates, and its and their respective directors, officers, partners, employees, agents, successors and assigns ("Customer Indemnified Parties"), from any claims, demands, lawsuits, damages, liabilities, judgments and settlements of every kind ("Claims"), that may be made: (i) by anyone for injuries (including death) to persons or damage to property, including theft, resulting in whole or in part from the acts or omissions of Supplier or those persons furnished by Supplier, including its subcontractors (if any); (ii) by persons furnished by Supplier and its subcontractors (if any) under worker's compensation or similar acts, (iii) by anyone in connection with or based upon Products or Services provided by Supplier and its subcontractors (if any) or contemplated by this

MobileAria, Inc.
C0505851

Agreement; and (iv) under any federal securities laws or under any other statute, at common law or otherwise arising out of or in connection with the performance by Supplier contemplated by this Agreement or any information obtained in connection with such performance (including breaches of Supplier's confidentiality obligations hereunder). The forgoing indemnification shall apply whether Supplier or a Customer Indemnified Party defends such Claim and whether the Claim arises out of the sole acts or omissions of the Supplier (and/or any subcontractor of Supplier), and/or jointly with any Customer Indemnified Party. Supplier shall also bind its subcontractors (if any) to similarly indemnify, hold harmless and defend the Customer Indemnified Parties.

(b)   Indemnification by Customer. Subject to Section 35(e) below, entitled, "Notices" Customer shall defend, indemnify and hold harmless Supplier, its parents, subsidiaries and affiliates, and its and their respective directors, officers, partners, employees, agents, successors, and assigns ("Supplier Indemnified Parties"), from any claims, demands, lawsuits, damages, liabilities, judgments, and settlements of every kind ("Claims"), that may be made: (i) as set forth in section 37 (b) below, entitled, "Verizon Infringement Indemnification" (ii) under any statute, at common law or otherwise arising out of or in connection with Customer's performance of its obligations as contemplated by this Agreement or any Information provided by Customer in connection with such performance (including breaches of Customer's confidentiality obligations hereunder); or (iii) as a result of Customer's use of the System in a manner not authorized by Supplier in the Specifications, or Documentation; or (iv) negligence, misconduct or fault of Customer in the performance of its obligations under this Agreement (for Claims due to the joint negligence, misconduct or fault of the Parties, section 35 (c) entitled "Claims of Joint Fault" apply).

(c) Claims of Joint Fault. If a Claim is the result of the joint negligence, joint misconduct, or joint fault of the Supplier and Customer, in such case, the amount of the Claim for which the Indemnified Party is entitled to indemnification shall be limited to that portion of such Claim that is attributable to the negligence, misconduct or other fault of the Indemnifying Party.

(d) No Limitations. The obligations of this provision are in addition to Supplier's obligation to provide insurance (pursuant to Section 36 entitled "INSURANCE"), and shall not be limited by any limitation on the amount or type of damages, compensation or benefits payable by Supplier under the Worker's Compensation Acts, Longshoremen and Harborworker's Act, Disability Benefits Act or any other employee benefit act.

(e) Notices. Customer Indemnified Party and Supplier Indemnified Party are individually referred to as "Indemnified Party". The foregoing indemnification obligations of the party having the indemnity obligations hereunder (the "Indemnifying Party"), are conditional upon the following: (i) the Indemnified Party will provide the Indemnifying Party with written notice of any written Claim covered by this indemnification and will cooperate with the Indemnifying Party in connection with the Indemnifying Party's evaluation of such claim; (iii) the Indemnifying Party shall defend any Indemnified Party, at the Indemnified Party's request, against any Claim promptly after receipt of such request; (iii) the Indemnifying Party shall assume the defense of such Claim with counsel reasonably satisfactory to the Indemnified Party, and (iv) an Indemnified Party shall not settle or compromise any such Claim or consent to the entry of judgment without the prior written consent of the Indemnifying Party and without an unconditional release of all Claims by each claimant or plaintiff in favor of the Indemnifying Party.

## 36.   INSURANCE

(a)      Limit Requirements. Supplier shall secure and maintain at its expense during the term of this Agreement (i) Commercial General Liability Insurance (including, but not limited to, premises-operations, broad form property damage, products/completed operations, contractual liability, independent contractors, personal injury) with limits of at least $2,000,000, combined single limit for each occurrence. (Limits may be satisfied with primary and/or excess coverage.) (ii) Commercial Automobile Liability with limits of at least $2,000,000, combined single limit for each occurrence. (Limit may be reduced to $1,000,000 if contract does not require Supplier to use vehicles to deliver products or perform services.)

(iii) Workers' Compensation insurance as required by Statute, and Employer's Liability insurance with limits of not less than $1,000,000 per occurrence.

(b)    Additional Requirements. The insurer must be licensed to do business in the state in which the work is performed and must have Bests Rating "AX" or better.  Supplier shall deliver a certificate of insurance on which VERIZON Communications Inc., its subsidiaries and affiliates and named company Verizon Services Corp., are included as additional insureds with reference to (i) above.  Certificates of insurance must be provided prior to any work being performed and must be kept in force during the term of this Agreement.  It is also agreed that Supplier's policy is primary.

(c)    No Subrogation.  Supplier shall waive its rights of subrogation against Customer for Workers' Compensation claims.  Supplier shall, prior to rendering such Services, furnish to the address specified in Notices provision of this Agreement, certificates or evidence of the foregoing insurance indicating the amount and nature of such coverage, the expiration date of each policy, and stating that no material change or cancellation of any such policy shall be effective unless thirty (30) days' prior written notice is given to Customer.  Supplier shall have the option, when permitted by law, to self-insure any or all of the foregoing risks.

(d)    No Limitation.  Supplier is responsible for determining whether the above minimum insurance coverages are adequate to protect its interests.  The above coverages do not constitute limitations upon Supplier's liability.

(e)    Endorsements.  The policies referred to above shall contain an endorsement naming Verizon as an Additional Insured and eliminating and removing any exclusion of liability for i) injury, including bodily injury and death, to an employee of the insured or of Customer or ii) any obligation of the insured to indemnify, hold harmless, defend or otherwise make contribution to Customer because of damage arising out of injury, including bodily injury and death, to an employee of Customer.

(f)    Self-Insure. Should Supplier elect to self-insure, in lieu of Certificates of Insurance as stipulated in this section Supplier shall provide to Customer:  (i) the self-insurance registration identification number assigned by each state in which Supplier desires to provide Services to Customer or manufactures Product; (ii) a letter of certification from Supplier's insurance carrier or self- insurance administrator that Supplier is self-insured for the coverages and amounts as stipulated in this Agreement, including that Customer is an additional insured and shall be indemnified and saved harmless from all claims, suits, and liabilities as set forth within this Agreement; and (iii) a notification of the states in which Supplier is provided coverage under its self-insurance.

## 37.    INFRINGEMENT

(a) Supplier Infringement Indemnification. Supplier shall indemnify, defend and hold harmless Customer Indemnified Parties from all Claims arising from or relating to any actual or alleged infringement or misappropriation of any issued United States patent, United States trademark, United States copyright or any actual or alleged violation of any other intellectual property rights arising from or in connection with the Products provided or the Services performed under this Agreement. Notwithstanding anything to the contrary contained in this Agreement (including, but not limited to, Section 35 entitled "INDEMNIFICATION" and Section 36 entitled "INSURANCE"), the provisions of this Section 37 entitled "INFRINGEMENT" shall govern the rights of Customer Indemnified Parties for Claims of infringement, misappropriation or violation of intellectual property rights. Supplier shall have no obligation under this Section 37(a) if the Claim is caused by, or results from: (1) Customer's combination or use of the Product with software, services, or products developed by Customer or third parties, which combination or use is not authorized by Supplier, (2) modification of the Product by anyone other than Supplier (and which modification is not authorized by Supplier), if such Claim would have been avoided by use of the unmodified Product, (3) Customer's continued allegedly infringing activity after having been notified thereof or after having been provided modifications that would have avoided the infringement, (4) Customer's use of the Product in a manner not in accordance with this Agreement, (5) Customer's failure

MobileAria, Inc.
C0505851

to abide by all applicable laws, rules, regulations and orders that affect the Product, (for which Customer has been notified by Supplier), or (6) Supplier's compliance with Customer's requirements, specifications or designs and those Customer requirements, specifications or designs are solely responsible for the Claim.

(b) Verizon Infringement Indemnification. Customer shall indemnify, defend and hold harmless Supplier Indemnified Parties from all Claims arising from or relating to any actual or alleged infringement or misappropriation of any issued United States patent, United States trademark, United States copyright or any actual or alleged violation of any other intellectual property rights arising from or in connection with (1) Customer's combination or use of the Product with software, services, or products developed by Customer or third parties, which combination or use is not authorized by Supplier, (2) modification of the Product by anyone other than Supplier (and which modification is not authorized by Supplier), if such Claim would have been avoided by the use of the unmodified Product, (3) Customer's continued allegedly infringing activity after being notified thereof, or after being provided modifications that would have avoided the alleged infringement, (4) Customer's use of the Product in a manner not in accordance with this Agreement, (5) Customer's failure to abide by all applicable laws, rules, regulations, and orders that affect the Product, (for which Customer has been notified by Supplier), or (6) Supplier's compliance with Customer's requirements, specifications or designs and those Customer requirements, specifications and designs are solely responsible for the Claim. Notwithstanding anything to the contrary contained in this Agreement (including, but not limited to, Section 35 entitled "INDEMNIFICATION"), the provisions of this Section 35 entitled "INFRINGEMENT" shall govern the rights of Supplier Indemnified Parties for Claims of infringement, misappropriation or violation of intellectual property rights.

(c) Procedures. The procedures set forth in Section 35(e) entitled "INDEMNIFICATION" shall apply in the case of any Claims of infringement, misappropriation or violation of intellectual property rights for which indemnification will be sought.

Without limitation of Section 35 entitled "INDEMNIFICATION", if the sale or use of the Products or Services is enjoined, Supplier shall, at Customer's option and Supplier's expense, either:

1.    Procure for Customer the right to use the Products or Services;
2.    Replace the Products or Services with equivalent, non-infringing Products or Services;
3.    Modify the Products or Services so they become non-infringing; or
4.    Remove the Products or Services and refund the purchase price, including transportation, installation, removal and other incidental charges.

## 38.    LIMITATION OF LIABILITY

IN NO EVENT SHALL SUPPLIER OR CUSTOMER BE LIABLE FOR ANY CONSEQUENTIAL, SPECIAL, INCIDENTAL. INDIRECT, PUNITIVE, EXEMPLARY, OR INDIRECT DAMAGES, RELATED TO THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION. LOST PROFITS, LOST SAVINGS, OR DAMAGES ARISING FROM LOSS OF USE, LOSS OF CONTENT, OR LOSS OF DATA, REGARDLESS OF THE LEGAL THEORY ON WHICH SUCH DAMAGES MAY BE BASED (INCLUDING NEGLIGENCE), AND EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF WHETHER ANY REMEDY SET FORTH IN THIS AGREEMENT FAILS OF ITS ESSENTIAL PURPOSE.

EXCEPT FOR CLAIMS DUE TO PERSONAL INJURY, DEATH, PROPERTY DAMAGES AND INDEMNITY CLAIMS UNDER SECTION 35 ENTITLED "INDEMNIFICATION" OR SECTION 37 ENTITLED "INFRINGEMENT", OR VIOLATION OF REGARDING CONFIDENTIAL INFORMATION UNDER SECTION 26, WHERE EACH PARTY HAS A DUTY TO INDEMNIFY, EACH PARTY'S AGGREGATE LIABILITY TO THE OTHER UNDER THIS AGREEMENT SHALL BE LIMITED TO THE TOTAL AMOUNTS PAID OR PAYABLE BY CUSTOMER TO SUPPLIER.

**39.    ESCROW AGREEMENT**

Supplier agrees to execute an ESCROW AGREEMENT for the for the purpose of safeguarding Source Codes and Technical Information (as defined below) pertaining to Products.

The ESCROW AGREEMENT shall be executed within sixty (60) days from the effective date of this AGREEMENT. The provisions of the ESCROW AGREEMENT, when executed, and as it may be from time to time amended, shall be incorporated herein by reference. Supplier hereby agrees to deliver to a mutually acceptable Escrow Agent or Agents (hereafter "AGENTS"), a package of technical information (hereafter referred to as "Technical Information") relating to the System, Product and Software utilized under this Agreement and any improvements or subsequent modifications thereto (to the extent that Customer is entitled to receive them under this Agreement) and any special tooling used in the manufacture thereof, and the operation, maintenance and repair thereof in sufficient detail so that Customer can make, have made, operate, maintain, use and repair such System and Products; provided, however, that to the extent any of the foregoing is not owned by Supplier or Supplier does not have the right to place the Technical Information into escrow and grant a license to Customer, Supplier shall obtain such right and license from the necessary third party in the name of the Customer. This Agreement is expressly conditioned upon and subject to the execution of the aforementioned ESCROW AGREEMENT within sixty (60) days from the date of execution of this AGREEMENT. Supplier shall bear costs and expenses charged by the AGENTS in connection with the ESCROW AGREEMENTS.

(B)  The Technical Information to be delivered to the AGENTS includes: schematics, PCB files and gerbers, bill of materials and supplier details, manufacturing and testing documentation, source code of Software, PC Software for factory test software and design documentation, and a list of all commercially available parts and components purchased by Supplier and readily available on the open market disclosing the part number, name and location of the provider, and current list price for the purchase thereof as of the date of initial deposit into escrow. The Technical Information shall be organized if applicable into subparts as follows:

    a.    SYSTEM organization ("family tree") drawings

    b.    functional block diagram drawings

    c.    detailed schematic diagrams

    d.    detailed logic diagrams

    e.    printed circuit card master drawings

    f.    printed circuit card assembly drawings

    g.    Mechanical piece-part drawings

    h.    mechanical and electrical parts list, including source suppliers

    i.    equipment wire lists

    j.    equipment assembly drawings

    k.    detailed descriptions of special test equipment

    l.    detailed test processes

    m.    detailed test specifications

n.    software and firmware program documentation, including source code tapes

o.    special tooling

p.    manufacturing assembly aid documentation

q.    circuit descriptions

r.    technical specifications

s.    physical design criteria

t.    software source codes

(C)    The Technical Information to be placed in escrow shall be reviewed for the correctness and completeness of content and information accuracy by Supplier's designated representatives.    Upon completion of such review the representatives shall verify in writing, that the package contains sufficient correct Technical Information for the purposes stated herein.

(D)    During the term of this AGREEMENT, Supplier agrees to update the Technical Information placed in escrow at least once every six (6) months so that the manufacturing, installation and testing information will conform to the System, Product and Services supplied to Customer at any corresponding time period. Changed Technical Information shall be added to that previously in escrow at the time of the change and shall be clearly marked to indicate the serial numbers of the first Product or tools, or the operating, installing and testing specifications and procedures, into which the change will have been introduced. During the term of the ESCROW AGREEMENTS no material shall be removed or withdrawn from the package unless it has been superseded by an update.

(E)    Supplier agrees to review and verify all updates and changes to the Technical Information in the manner set forth in paragraph (C) of this clause entitled "ESCROW AGREEMENTS".    Prior to submission to the AGENTS, Supplier's representatives shall verify in writing the accuracy and completeness of such updates and changes as outlined in the ESCROW AGREEMENT. Such verification shall be made at minimum every six (6) months whether or not any updates or changes to the Technical Information are made during such six (6) month interval.

Notwithstanding any prior approvals of Customer and/or any of their agents or any certificates filed by Supplier, in the event the Technical Information delivered by the AGENTS in accordance with the terms of the ESCROW AGREEMENT is, in any way, insufficiently complete or adequate to enable Customer to use the same for the purposes stated herein, Supplier agrees to furnish directly to AGENTS any or all Technical Information as required to made the Technical Information Package sufficient and complete.

(F)    At any time following delivery to Customer of the Technical Information by the AGENT, the Technical Information therein shall solely be used by Customer to make, have made, and/or use Product and Services of the type purchased under this Agreement to keep the installed System operational, including replacement of all or any part of such Product as may be required.

(G)    In the event that Customer use of the Technical Information within the scope hereof would involve the manufacture, use or practice of any invention covered by any United States or foreign Patent owned by or controlled at any time by Supplier, or by Supplier's parent company, successors, subsidiaries or assigns, then upon Customer being vested with the right to immediate possession and use of the Technical Information , Customer shall have a personal, nontransferable, non-exclusive royalty-free license under any such patents to make, have made and use any and all such inventions insofar as they are embodied in the System or Product or relate to or concern the performance of any aspect of this

MobileAria, Inc.
C0505851

clause of this Agreement. Customer acknowledges that the Technical Information contains Supplier's copyrights, proprietary data and trade secrets. Customer shall use reasonable care to keep such Technical Information as delivered to Customer by the AGENT confidential and shall in no case use less care than it uses to keep confidential its own confidential information of like nature; provided that Customer shall have the right to disclose such Technical Information so delivered to those of its employees, agents, suppliers and subcontractors who have a need to have access to such Technical Information on a "need to know" basis for the purposes of exercising Customer's rights under the Escrow Agreement. Customer's right to copy such Technical Information shall be limited to the amount of copying reasonably necessary to carry out the purposes set forth in this clause. Customer will insure that such other suppliers or manufacturers use the Technical Information only within the scope hereof and maintain the confidentiality thereof.

The ESCROW AGREEMENT shall incorporate the foregoing terms, provided that such terms may, to the extent agreed by the parties, be modified by the ESCROW AGREEMENT. In addition to the foregoing terms, the ESCROW AGREEMENT shall provide that, prior to any delivery of any of the Technical Information as a result of a default by Supplier, Supplier shall have a cure period for such default as mutually agreed on by both parties in the ESCROW AGREEMENT.

## 40.   RELATIONSHIP OF PARTIES

(a)   Supplier's Relationship.  In providing any Services under this Agreement, Supplier is acting solely as an independent contractor and not as an agent of any other party. Persons furnished by the respective parties shall be solely the employees or agents of such parties, respectively, and shall be under the sole and exclusive direction and control of such parties. They shall not be considered employees of the other party for any purpose. Each party shall be responsible for compliance with all laws, rules and regulations involving its respective employees or agents, including (but not limited to) employment of labor, hours of labor, health and safety, working conditions and payment of wages. Each party shall also be responsible, respectively, for payment of taxes, including federal, state, and municipal taxes, chargeable or assessed with respect to its employees or agents, such as social security, unemployment, worker's compensation, disability insurance and federal and state income tax withholding. Neither party undertakes by this Agreement or otherwise to perform or discharge any liability or obligation of the other party, whether regulatory or contractual, or to assume any responsibility whatsoever for the conduct of the business or operations of the other party. Nothing contained in this Agreement is intended to give rise to a partnership or joint venture between the parties or to impose upon the parties any of the duties or responsibilities of partners or joint venturers.

(b)   Customer's Contractors. Customer reserves the right to enlist contractors for engineering, installation or maintenance services with respect to Supplier's Products.

(c)   Subcontractors.  Supplier may subcontract any portion of the work to be performed hereunder (for example, including but unlimited to installation and maintenance Services); provided, however, Supplier shall remain liable to Customer under this Agreement for performance of its subcontractors.

## 41.   TERMINATION

(i)   (a) Without Cause. Customer may terminate this Agreement without cause, effective immediately, due to Regulatory or legal action not caused by Supplier or upon one hundred eighty (180) days prior written notice to Supplier. Termination shall not affect any Order placed, any subordinate agreement executed prior to the date of termination, or any fully paid up license granted to Customer. Upon termination of this Agreement without cause, Customer shall not be liable to Supplier, either for compensation or for damages of any kind or character whatsoever, whether on account of the loss by Supplier of present or prospective profits on sales or anticipated sales, or expenditures, investments or commitments made in connection with the establishment, development or maintenance of Supplier's business, or on account of any other cause or thing whatsoever. The termination shall not prejudice the rights or liabilities of the parties with respect to Product sold, or any indebtedness then owing by either

MobileAria, Inc.
C0505851

party to the other. <u>For Insolvency, Court Action, or Assignment</u>. Either party may terminate this Agreement, effective immediately, without liability for said termination, upon written notice to the other party, if any of the following events occur:

1. The other files a voluntary petition in bankruptcy;
2. The other is adjudged bankrupt;
3. A court assumes jurisdiction of the assets of the other under a federal reorganization act;
4. A trustee or receiver is appointed by a court for all or a substantial portion of the assets of the other;
5. The other becomes insolvent or suspends its business;
6. The other makes an assignment of its assets for the benefit of its creditors, except as required in the ordinary course of business;

(a)    <u>Material Breach</u>. Subject to subsection (d) below, either party may terminate this Agreement for a material breach or default of any of the terms, conditions or covenants of this Agreement by the other, provided that such termination may be made only following the expiration of a thirty (30) day period during which the other party has failed to cure such breach after having been given written notice of such breach.

(b)    <u>Termination by Supplier for Non-Payment</u>: Supplier may terminate this Agreement, or cancel an Order(s) for non-payment of the purchase price and then only if after thirty (30) days of receipt of written notice of non-payment in accordance with Section 46, entitled "NOTICES", Customer fails to pay such purchase price and thereupon Supplier issues its written notice of default and Customer fails to pay such purchase price within ten (10) business days of receipt of such notice of default. In no way shall such termination act to impair Customer's right, title and interest to the Product purchased hereunder, its rights under Section 6, entitled "SOFTWARE LICENSE" for Software licenses which have been purchased hereunder, and under Section 26, entitled "INFORMATION AND INTELLECTUAL PROPERTY" and under and Section 37, entitled "INFRINGEMENT."

## 42.    PERFORMANCE REMEDIES

In the event of Supplier's failure to perform any of its obligation under the Agreement, Customer in addition to and independent of all other rights and remedies at law or in equity, shall have available a full set of remedies as set forth in this Agreement. Such remedies shall include pre-default remedies under Sections 17, entitled "PRODUCT AND SOFTWARE WARRANTIES, SERVICES AND SUPPORT", Section 43, entitled "WORKAROUND", and EXHIBIT I, entitled "CRITICAL MILESTONES AND PERFORMANCE COMPENSATION PAYMENTS (which a Court of competent jurisdiction may deem to consider towards mitigation of damages). Further, Customer reserves the right, at its option, to place Supplier in default for any material failure to perform and proceed in accordance with Section 41, entitled "TERMINATION". In the event Customer chooses to terminate this Agreement for Supplier's default, it may, at its option, choose to terminate the Agreement, demand refund of the full purchase price paid to date, and/or impose liability upon Supplier for all costs and expenses arising out of Supplier's default including, but not limited to, excess cost of re-procurement, subject to the limitation of liability of section 38, entitled "LIMITATION OF LIABILITY."

## 43.    WORKAROUND

In the event Supplier fails to furnish a Product or provide a Service that conforms to Specifications and Customer determines that Supplier's failure to deliver a conforming Product or perform such Service will cause Customer to incur incremental costs, including operational costs, then Customer, in addition to and independent of all other rights and remedies at law or in equity or as provided in this Agreement, may notify Supplier in writing, in accordance with Section entitled "NOTICES", that a workaround condition exists. Supplier shall be liable under this section for such substantiated incremental costs, including, but not limited to, substantiated operational costs, engineering, installation, labor by Customer or its agents and other substitute service-related costs and substitute equipment, incurred by Customer, which costs

MobileAria, Inc.
C0505851

would not otherwise have been expended to provide or acquire functionality equivalent to that that would have been available had Supplier provided a Product or Service that conformed to the Specifications.

In addition, Supplier and Customer shall promptly participate in the joint preparation of a workaround plan to resolve the problem. Customer, however, shall have final approval of the workaround plan to be performed.

## 44.    POST TERMINATION/NON-RENEWAL

In the event of any termination or non-renewal of this Agreement, Supplier shall assist and cooperate in all reasonable ways with Customer and any replacement provider in the transition to a replacement provider. Such assistance shall include, but not be limited to, the delivery to Customer of any technical information or Documentation and Customer's information, and shall be provided in accordance with the provisions of subsection 8 (h) hereof entitled "CHANGE ORDER", including provisions for the payment of additional fees for any additional work.

## 45.    DISPUTE RESOLUTION

(a)    Nature of Dispute Resolution. The parties desire to resolve certain disputes, controversies and claims arising out of this Agreement without litigation. Accordingly, except in the case of (i) a dispute, controversy or claim relating to a breach or alleged breach on the part of either party of the provisions of Section 26 entitled "INFORMATION AND INTELLECTUAL PROPERTY", (ii) a suit, action or proceeding to compel Supplier to comply with its obligations to indemnify Customer pursuant to this Agreement or (iii) a suit, action or proceeding to compel either party to comply with the dispute resolution procedures set forth in this Section 45 entitled "DISPUTE RESOLUTION", the parties agree to use the following alternative procedure. The term "Dispute" means any dispute, controversy or claim to be resolved in accordance with the dispute resolution procedure specified in this Section entitled "DISPUTE RESOLUTION."

(b)    Procedure. At the written request of a party, each party shall appoint a knowledgeable, responsible representative to meet and negotiate in good faith to resolve any Dispute arising under this Agreement.    The parties intend that these negotiations be conducted by non-lawyer, business representatives. The discussions shall be left to the discretion of the representatives. Upon agreement, the representatives may utilize other alternative dispute resolution procedures such as mediation to assist in the negotiations. Discussions and correspondence among the representatives for purposes of these negotiations shall be treated as confidential information developed for purposes of settlement, shall be exempt from discovery and production, and shall not be admissible in any lawsuit without the concurrence of all parties. Documents identified in or provided with such communications, which are not prepared for purposes of the negotiations, are not so exempted and may, if otherwise admissible, be admitted in evidence in the lawsuit.

(c)    Remedies At Law or Equity. If the negotiations do not resolve the Dispute within sixty (60) days of the initial written request, the parties may pursue their available remedies in law or equity.

## 46.    NOTICES

(a)    Notices (with the exception of price change notifications pursuant to Section 7 entitled, PRICE AND TERMS OF PAYMENT, concerning this Agreement shall be in writing and shall be given or made by means of telegram, facsimile transmission, certified or registered mail, express mail or other overnight delivery service, or hand delivery, proper postage or other charges paid and addressed or directed to the respective parties as follows. A notice that is sent by facsimile shall also be sent by one of the other means set out in this subsection.

MobileAria, Inc.
C0505851

To Supplier:

    Mobile Aria, Inc.
    800 W. El Camino Real- Suite 240
    Mountain View, CA 94040
    Tom Wainwright
    650-237-4455
    twainwright@mobilearia.com

To Customer:

    Verizon Services Corp.
    240 East 38th Street
    New York, NY 10016
    Attn: Philip Melone
    212-338-7025
    Philip.j.melone@verizon.com

And to the Affiliate that placed the Order if different than Verizon Services Corp.

(b)    Notices for change by Supplier in ownership, change in name of firm, or change in mailing address must be given by Supplier by mailing to Customer within thirty (30) days of such change. Notices for change in ownership must include the names of all new owners or officers, registered agent for service of process and state of incorporation or organization.

## 47.    NO HAZARDOUS PRODUCTS AND COMPONENTS

(a)    <u>Supplier's Representations</u>. Supplier represents that each Product furnished by Supplier is safe for all intended uses, is nontoxic and presents no abnormal hazards to persons or the environment. Supplier agrees to notify Customer in writing and to supply an appropriate Material Safety Data Sheet (MSDS) to Verizon Services Corp., Integrated Technical Services Division, 221 E 37th Street, 4th Floor, New York, New York 10016 as well as to the ship-to point, if any Product or component thereof is toxic or hazardous under any Federal, state or local law or if the Product is capable of constituting a hazard. Supplier represents that Products display all reasonable notices and warnings of foreseeable hazards. Supplier further represents that if any Products or containers would be or could be classified as hazardous or otherwise regulated waste at the end of its useful life, Supplier has advised Customer in writing and provided Customer with proper disposal instructions.

(b)    <u>Notices</u>. Supplier shall immediately notify Customer by telephone (followed by written confirmation within twenty-four hours) if Product purchased or materials used fail to comply with applicable safety rules or standards of the United States Consumer Product Safety Commission or the Environmental Protection Agency or contain a defect that presents a foreseeable risk to the public health or injury to the public or the environment, whether by itself or when used by Customer for its intended purpose.

<u>(c) Shipping and Routing Instructions</u>. Supplier shall comply with EXHIBIT D entitled "HAZARDOUS MATERIALS REGULATIONS".

## 48.    GOVERNMENT CONTRACT PROVISIONS

If an Order contains a notation that Product or Service is intended for use under a government contract, it shall be subject to the then current government contract provisions printed on or attached to such Order.

**49.    QUALITY**

Supplier shall follow the requirements and procedures in EXHIBIT H1, hereof entitled "QUALITY STANDARDS, PROCEDURES AND COMPLAINTS." In respect to Products ordered by Customer.

**50.    NONWAIVER**

Either party's failure to enforce any of the provisions of this Agreement or any Order, or to exercise any option, shall not be construed as a waiver of such provisions, rights, or options, or affect the validity of this Agreement or any Order.

**51.    SEVERABILITY**

If any of the provisions of this Agreement shall be invalid or unenforceable, then such invalidity or unenforceability shall not invalidate or render unenforceable the entire Agreement. The entire Agreement shall be construed as if not containing the particular invalid or unenforceable provision or provisions, and the rights and obligations of Supplier and Customer shall be construed and enforced accordingly.

**52.    SECTION HEADINGS**

The headings of the sections are inserted for convenience only and are not intended to affect the meaning or interpretation of this Agreement.

**53.    SURVIVAL OF OBLIGATIONS**

Customer's and Supplier's obligations under this Agreement, which by their nature would continue beyond the termination, cancellation or expiration of this Agreement, shall survive termination, cancellation or expiration of this Agreement, including but not limited to, obligations to indemnify, insure and maintain confidentiality, and continued availability of Product support and warranty provisions set forth in EXHIBIT D entitled "PURCHASE FOR INTERNAL USE- PRODUCT AND SERVICE WARRANTY AND PRODUCT SUPPORT".

**54.    CHOICE OF LAW AND JURISDICTION**

The validity, interpretation and performance of this Agreement shall be governed by the procedural and substantive laws of the state of New York without regard to conflicts of laws. All actions under this Agreement shall be brought in a court of competent subject matter jurisdiction in the county of New York in the state of New York and both parties agree to accept the personal jurisdiction of such court. Supplier also agrees to submit, at Customer's option, to the jurisdiction of any court in the United States wherein an action is commenced against Customer based on a claim for which Supplier has indemnified Customer hereunder.

The application of the U. N. Convention on Contracts for the International Sale of Goods is specifically excluded from this Agreement.

**55.    ENTIRE AGREEMENT**

This Agreement together with its exhibits and attachments constitutes the entire agreement between the parties and cancels all contemporaneous or prior agreements, whether written or oral, with respect to the subject matter of this Agreement. Except as provided in Section 13, entitled "PRECEDENCE OF DOCUMENTS", and Section 8 entitled "PURCHASE ORDERS; CANCELLATION OF PURCHASE ORDERS; REVOCATION OF ACKNOWLEDGEMENT", no modifications shall be made to this Agreement unless in writing and signed by authorized representatives of the parties.

56.    **SIGNATURES**

Each party represents that it has executed this Agreement through its authorized representative.

CUSTOMER:                                    SUPPLIER:

Verizon Services Corp.                       MobileAria, Inc.

_George S Dowell_                            _Charle E Goad_
(Signature)                                  (Signature)

GEORGE S. DOWELL                             CHARLES L. GOAD
(Printed Name)                               (Printed Name)

VP- SUPPLY CHAIN SERVICES                    PRESIDENT
(Title)                                      (Title)

6/6/05                                       JUNE 2, 2005
(Date)                                       (Date)

EXHIBIT A

AFFILIATES VERIZON WEST (FORMER GTE AFFILIATES)

Left Intentionally Blank

MobileAria, Inc.
C0505851

EXHIBIT B

COMPONENTS OF PRODUCTS AND SERVICES

- ATTACHMENT  B-1 DETAILED DESCRIPTION OF PRODUCTS AND SERVICES

- ATTACHMENT  B-2 PRICES

- ATTACHMENT B-3 DELIVERY INTERVAL

i

EXHIBIT B

To Agreement No. C0505851

COMPONENTS OF PRODUCTS AND SERVICES

ATTACHMENT B-1 DETAILED DESCRIPTION OF PRODUCTS AND SERVICES

## 1)    Hardware

**Mobile Aria Vehicle Tracking and Control Unit (VTCU)**

Each Hardware unit shall consist of the following major components:

    a.   Telemetry collection unit including GPS receiver, digital cellular radio (EVDO), 10BaseT Ethernet port
    b.   Roof-mounted antenna array for GPS satellite signal reception, digital cellular communication
    c.   Vehicle power cable(s)
    d.   Antenna cables
    e.   Mounting hardware for all relevant components

Additional optional components of the VTCU

    1.   802.11b radio
    2.   Roof-mounted antenna array for 802.11b communication
    3.   ID badge proximity reader (Either the HID MiniProx or HID PCProx reader)
    4.   Badge reader cabling
    5.   Separate Ethernet jack for extending the built-in Ethernet port based on vehicle installation requirements.

## 2)    Software

**Java Messaging Server (JMS) Software for Customer Use (Client Software) /Interface**

Customer data centers require continuous feed from Supplier's Network Operations Center ("NOC") of events and messages generated by the Hardware units that are installed on Customer's vehicles. Supplier shall make available to Customer a JMS client software to be installed at Customer data centers to accept incoming messages from vehicles in the field. These events and messages must be:

- Transmitted to at least four (4) separate Verizon environments consisting of parallel operating clients, with data consistency among the four environments.

- Transmitted to Customer reliably and securely

- Delivered with guarantee and tracking of events/messages.

- Automatically stored and delivered, at a later point, if Customer data centers clients temporarily are unable to receive messages/events for any reason (automatic queue replay).
- The ability to handle bursts of events/messages at a given point in time.
- Re-tramsmission of already delivered messages/events, with manual intervention (manual queue replay)

**Operating System Software**

Each unit of Hardware includes embedded Windows CE operating system software and other proprietary Supplier drivers and applications.

### 3)    Services

**Application Service Provider (ASP) Service**

ASP Service includes Web Portal and Data Feed as described below:

a) Web Portal

Supplier shall provide a web portal to handle:

a. Customer Account(s) Management
b. Hardware to vehicle assignment during installation and maintenance
c. Field Service Requests (SR)
d. Landmark administration
e. Vehicle positions and VTCU pinging
f. Enable/Disable/Configure WiFi Access Point
g. Enable/Disable/Configure firewall
h. Over the Air Programming (OTAP) changes to units in the field

b) Data Feed

Date feed coming from the vehicles in the field to Customers Datacenter. Data Feed service includes:

a. Data Collection from VTCU
b. Monitoring of the health of network connectivity between Supplier and Carrier data centers
c. Data process control and management
d. Reverse geocoding of latitude and longitude into street addresses
e. Identification and delivery of Landmarks
f. End-to-end data flow proactive monitoring and alerting
g. Support of multiple data interfaces (queues) with ability to manage each data queue independently
h. Support of all required interface infrastructure upgrades , including Data Base, Operating Systems (OS), JMS, Security upgrades
i. Maintain high throughput data interface capability per Customer requirements
j. Documentation

4)    **Technical Support**

Technical Support will be provided to the Customer in accordance with the terms of
Section 8 of Exhibit D.  Technical Support will be the main point of contact for specific
vehicle issues in the field.    Customer Support is provided through either of the
following:

1. Phone call to Customer Support
2. Email to Customer Support
3. Self-help application via Internet

a)    **Engineering IT Support**

1. Support shall be provided Twenty-four (24) hours a day, seven (7) days a
week

2. Supplier shall provide proactive Monitor the ASP services.

Engineering IT Support Personnel and Responsibilities

| Title | Role | Support Responsibility |
|---|---|---|
| Technical Account Manager Cell phone # e-mail address | • Primary technical contact, liaison with engineering<br>• Track status, obtain resources, escalate issues<br>• Manage issues through entire lifecycle (ex. incident->bug)<br>• Incident patterns identification and analysis | • Priority 1 |
| IT Director Cell phone # e-mail address | • Manage and direct all application and database development, maintenance, and support activities.<br>• Track status, obtain resources, escalate issues<br>• Manage IT resources | • Priority 1 and 2 |
| Engineering Production Support Staff Cell phone # e-mail address | • Support and maintain IT and system resources | • Priority 1, 2 and 3 |

Responsibilities

| Supplier | Customer |
|---|---|
| • Provide maintenance, monitoring, repair and upgrades for all system | • Provide assistance, as needed, to |

| | |
|---|---|
| components as needed<br>• Maintain appropriate personnel to perform system activities<br>• Provide an ongoing updated list of primary and backup contacts | resolve incidents<br>• Provide an ongoing updated list of primary and backup contacts<br>• Report incidents by using mutually agreed on system |

b)    Request Priority

| Priority | Description | Response | Updates | Communication |
|---|---|---|---|---|
| 1 | Critical request<br>• Crucial loss of system functionality<br>• Inability to perform critical business activities | Immediate | Hourly | Phone<br>Email<br>Self-service web |
| 2 | Urgent request<br>• Serious loss of system functionality<br>• Degradation of business activities<br>• Urgent scheduled requests | Within 4 hours or as needed | Every 4 hours | Phone<br>Email<br>Self-service web |
| 3 | Normal request<br>• Desirable functionality improvement<br>• Scheduled requests | Within 1 business day | Every day or as needed | Email<br>Self-service web |

c)    Proactive Monitoring

| Supplier Data Center Services | Supplier Applications |
|---|---|
| Systems<br><br>• Network<br>• Servers<br>• Database<br>• Storage<br>• Backup<br><br>Parameters | Systems<br><br>• Applications<br>• Telcontar Engine<br>• JMS Queues<br>• Vehicle Tracking & Control Unit (VTCU)<br><br>Parameters<br><br>• Basic Server metrics |

| |
|---|---|
| • SNMP<br><br>• Process Monitoring<br><br>• Log scrapping<br><br>• Oracle Monitoring<br><br>• Custom scripts | • Process monitoring<br><br>• Oracle Monitoring<br><br>• Custom Scripts using simulators and dedicated devices |

d)    VTCU Monitoring by Supplier

| Parameter | Description |
|---|---|
| Heartbeat (alive signal) | No heartbeat for 24 hours triggers an alert |
| GPS data | Invalid data triggers alert<br>• Date<br>• Time<br>• Longitude and/or latitude<br>• Reverse-geocoded addresses |
| Sequence number | Gaps in messages trigger alert |
| Pings | More than 10 pings within 24 hours |
| Date and time of incident | Used for trend analysis |
| Device ID | Used for device identification |
| Truck ID | Used for truck identification |
| Device location | Used for device identification and trend analysis |

Supplier shall generate Exception report daily

Supplier shall generate Weekly Reports to be analyzed by Supplier Technical Account Manager every Friday

- Incidents sorted by region

- Number of incidents by type

- Incident sorted by type

e)    **On-site Support**

On-site support will be provided in accordance with the terms of Section 9 of Exhibit D.

5)    **Strategic Account Management by Supplier**

**Supplier shall make available the following support personnel to customer:**

Personnel:

Account Manager

Dedicated Team:

- Back-up Account Manager

- Technical Account Manager

- Customer Support Manager

- Field Support

Executive Sponsor:

Additional personnel made available during deployment:

- 2 Supplier Operations Project Managers

- 2 Project Managers from Supplier's Installation Agent- An installation agent is hired by the Supplier to perform the installation of the VTCUs.

Roles of Account Management Team:

- Account Manager

  - Dedicated Single Point of Contact

  - Monthly and Quarterly reporting

  - Evaluate evolving business needs with Customer

- Technical Account Manager

  - Liaison to Supplier's Engineering and Customer

  - Analysis and resolution of escalated technical issues

- Customer Support Manager

  - Monitor and resolve trouble tickets on Customer Support System

  - Monitor proactively device status and JMS interface

  - Manage Supplier call center team

Reports by Account Management Team:

In addition to the reports described in Engineering IT Support above, the Account Team will provide the following reports:

During deployment phase:

- Daily Updates during deployment via portal

- Weekly updates with Customer project team

Post deployment:

- Weekly updates with Customer project team

- Monthly meeting with Customer project team

- Quarterly Executive Review

**Installation Services**

a. Installation services will be provided for the installation of Hardware in vehicles onsite

b. Customer shall provide the configuration options for each vehicle prior to installation

c. Customer shall provide access to the vehicle(s) on specific date and time as specified in rollout schedule. Any supplemental installation visits resulting from non-availability of Customer vehicles will generate an additional charge to Customer.

d. Customer will provide site and vehicle access after hours for a minimum of ten (10) hours, up to six (6) days a week. The six (6) days are Monday through Saturday.

   Supplier will schedule Installation two (2) to four (4) weeks prior to install date. Supplier will confirm with local contact. Supplier will give confirmation one day prior to installation date. Vehicles will be arranged together in one area at the garage or yard keys will be available.

e. De-installation services includes: Removal of existing unit and antenna in vehicle only. Cabling will not be removed. Hardware will be given to Local Garage Manager.