# Exhibit A

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :
    In re                          :    Chapter 11
                                    :
DELPHI CORPORATION, et al.,         :    Case No. 05-44481 (RDD)
                                    :
                    Debtors.    :    (Jointly Administered)
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SUPPLEMENTAL APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a) AND 328
AND FED. R. BANKR. P. 2014(a) MODIFYING SCOPE OF EMPLOYMENT AND
RETENTION OF JONES LANG LASALLE AMERICAS, INC. AS REAL ESTATE
ADMINISTRATIVE AND TRANSACTION SERVICES PROVIDER TO DEBTORS

("JLL SUPPLEMENTAL RETENTION APPLICATION")

      Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this supplemental retention application (the "Supplemental Application") for a supplemental order under 11 U.S.C. §§ 327(a) and 328 and Fed. R. Bankr. P. 2014(a) modifying the employment and retention of Jones Lang LaSalle Americas, Inc. ("JLL") as real estate administrative and transactional services provider to the Debtors.  Specifically, the Debtors propose to retain JLL as listing agent for certain of Delphi Automotive Systems LLC's ("DAS LLC") properties in Warren, Ohio and Coopersville, Michigan, and to provide limited real estate administrative and transaction services beyond the scope of the listing agreements.  In support of this Supplemental Application, the Debtors submit the Second Supplemental Affidavit of James

Becker, executed September 14, 2007 (the "Becker Affidavit"), and respectfully represent as follows:

## Background

A.   The Chapter 11 Filings

    1.   On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

    2.   No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee," and together with the Creditors' Committee, the "Statutory Committees").

    3.   This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

    4.   The statutory predicates for the relief requested herein are sections 327(a) and 328 of the Bankruptcy Code and rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.   Current Business Operations Of The Debtors

    5.   Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately

$15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Court.[2]

        6.        The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

        7.        Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's

---

[1] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[2] On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

3

single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.   Events Leading To The Chapter 11 Filing

8.   In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

9.   The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

10.   In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions

---

[3]   Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

4

with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.     The Debtors' Transformation Plan

11.     On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations. The Debtors stated that they needed to focus on five key areas:[4] first, modifying the Company's labor agreements to create a competitive arena in which to conduct business;[5] second, concluding their negotiations with GM to finalize GM's financial support for the

---

[4]     In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors and a plan framework support agreement with those investors and GM. On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework support agreement but that it expected to enter into new framework agreements with plan investors presently. Subsequently, on July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors"). Under the Delphi-Appaloosa EPCA, the New Plan Investors agreed to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization. This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.

[5]     Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM that (a) modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the UAW, and its various locals, (b) provides that GM will undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate these modifications, and (c) modifies retiree welfare benefits for certain UAW-represented retirees of the Debtors. This agreement, which was approved by this Court on July 19, 2007, should permit the Debtors to continue to implement their transformation plan and to develop, prosecute, confirm, and consummate a plan of reorganization. On August 6, 2007, similar agreements were reached with the International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America and its local unions, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers. Such agreements were approved by this Court on August 16, 2007. On August 16, 2007, Delphi also reached a similar agreement with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and USW Local 87L, which was approved by this Court on August 29, 2007.

5

Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[6] third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus;[7] fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint;[8] and devising a workable solution to their current pension situation.[9]

E.  The Debtors' Plan Of Reorganization

12. On September 6, 2007, the Debtors reached another key milestone in their chapter 11 cases by filing their joint plan of reorganization (the "Plan"). The Plan is based upon

---

[6] On September 6, 2007, Delphi announced that it has entered into agreements with GM consisting of a Global Settlement Agreement and a Master Restructuring Agreement, both of which are subject to this Court's approval as part of the plan confirmation process. Delphi's comprehensive settlement with GM resolves all outstanding disputes between Delphi and GM.

[7] In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants. The Debtors have been working to divest non-core assets so as to maximize the value of their estates for stakeholders. During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, and their brake hose and catalyst businesses. The Debtors also obtained court approval for the sale of substantially all of the assets of their Saltillo, Mexico brake plant business. In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

[8] As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages. The Company's revised operating structure consists of its four core business segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture. The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan. To ensure that their organizational and cost structure is competitive, the Debtors obtained an Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order"). The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[9] To that end, on May 31, 2007, this Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 pension plan year funding waivers, which were approved by the IRS, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Pension Plans"). On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Pension Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively.

a series of global settlements and compromises that involve every major constituency in the Debtors' reorganization cases. Indeed, the Debtors, the Debtors' principal U.S. labor unions, GM, the Statutory Committees, and the lead plaintiffs in certain securities actions (on behalf of holders of various claims based on alleged violations of federal securities laws and the Employee Retirement Income Security Act of 1974, as amended) all have contributed to global settlements and compromises that provide for a recovery through a Plan distribution. General unsecured creditors are to receive the principal amount of their claims plus accrued interest at a negotiated Plan value and other classes of creditors and interests are to receive agreed upon distributions. The Plan is supported by the Creditors' Committee on behalf of unsecured creditors, the Equity Committee on behalf of holders of Delphi's common stock, and GM. A hearing on the Debtors' solicitation procedures and disclosure statement with respect to the Plan commenced on October 3, 2007 and is scheduled to continue on October 25, 2007. If this Court authorizes the Debtors to solicit acceptances or rejections of the Plan (as such Plan may be modified) by October 31, 2007, the Debtors expect to confirm their Plan and commence the rights offering contemplated by the Plan in December 2007 and emerge from chapter 11 as soon as practicable thereafter. Currently, the Debtors expect to emerge from these chapter 11 cases by January 2008.

    13. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

14.   By this Supplemental Application, the Debtors request entry of a supplemental order under sections 327(a) and 328 of the Bankruptcy Code authorizing the Debtors to modify the scope of JLL's retention to serve as the listing agent for certain properties in Warren, Ohio[10] (the "Ohio Property") and Coopersville, Michigan (the "Michigan Property"), and to provide other limited real estate administrative and transaction services for the Debtors, nunc pro tunc to June 1, 2007, on the terms and conditions of (a) that certain Listing Agreement dated as of June 1, 2007 (the "Ohio Listing Agreement"), a copy of which is attached as Exhibit 1 to the Becker Affidavit, (b) that certain Listing Agreement dated September 1, 2007 (the "Michigan Listing Agreement"), a copy of which is attached as Exhibit 2 to the Becker Affidavit, and (c) that certain consulting agreement between JLL and DAS LLC, dated as of July 1, 2007 (the "Consulting Agreement"), a copy of which is attached as Exhibit 3 to the Becker Affidavit.

Overview Of The Debtors' Retention Of JLL

15.   On November 9, 2005, the Debtors filed an application (Docket No. 996) (the "Initial JLL Application") to employ JLL as the Debtors' exclusive real estate administrative and transactional services provider to provide integrated real estate services, including transactional services, lease administration, and assistance in the valuation of real property owned by the Debtors.  On December 1, 2005, this Court entered the Order Under 11 U.S.C. §§ 327(a) And 328 And Fed. R. Bankr. P. 2014(a) Authorizing Employment And Retention Of Jones Lang LaSalle Americas, Inc. As Real Estate Administrative And Transaction Services Provider To Debtors (Docket No. 1385).  Since that time, JLL has filed a Supplemental Affidavit Of James C. Becker In Support Of Application For Order Under 11 U.S.C. §§ 327(a) And 328

---

[10]   The properties included are those located at North River Road and Larchmont Avenue, Griswold Street and Paige Avenue, and Dana Street.

05-44481-rdd    Doc 10448-1    Filed 10/04/07    Entered 10/04/07 18:14:52    Exhibit A
Pg 10 of 17

And Fed. R. Bankr. P. 2014(a) Authorizing Employment And Retention Of Jones Lang LaSalle Americas, Inc. As Real Estate Administrative And Transaction Services Provider To Debtors (Docket No. 2097) and five interim fee applications to cover JLL's fees and expenses through May 31, 2007.[11]

16. To enable the Debtors to list their real property with other brokers and thereby receive more competitive commission rates, in the exercise of their business judgment the Debtors decided to terminate the Real Estate Services Agreement between DAS LLC and JLL, dated September 2, 2005, as amended by the First Amendment to Real Estate Services Agreement, dated November 9, 2005. The Debtors now wish to retain the services of JLL in a more limited scope as outlined in the Ohio Listing Agreement, the Michigan Listing Agreement, and the Consulting Agreement and as described below.

### Services To Be Rendered Under The Ohio Listing Agreement

17. Under the Ohio Listing Agreement, JLL would have the exclusive right to list the Ohio Property for a period of nine months, ending on February 29, 2008. The duties under the Listing Agreement would include, but not be limited to:

> (a) Developing and implementing a marketing program, including advertising, for the sale and partial leaseback of the Ohio Property (the "Ohio Transaction");

---

[11] See Jones Lang LaSalle Americas, Inc.'s First Interim Application For Allowance And Payment Of Compensation And Reimbursement Of Expenses Pursuant To 11 U.S.C. §§ 328, 330 And 331 (Docket No. 3527); Jones Lang LaSalle Americas, Inc.'s Second Interim Application For Allowance And Payment Of Compensation And Reimbursement Of Expenses Pursuant To 11 U.S.C. §§ 328, 330 And 331 (Docket No. 4786); Jones Lang LaSalle Americas, Inc.'s Third Interim Application For Allowance And Payment Of Compensation And Reimbursement Of Expenses Pursuant To 11 U.S.C. §§ 328, 330 And 331 (Docket No. 6001); Jones Lang LaSalle Americas, Inc.'s Fourth Interim Application For Allowance And Payment Of Compensation And Reimbursement Of Expenses Pursuant To 11 U.S.C. §§ 328, 330 And 331 (Docket No. 7531), and Jones Lang LaSalle Americas, Inc.'s Fifth Interim Application For Allowance And Payment Of Compensation And Reimbursement Of Expenses Pursuant To 11 U.S.C. §§ 328, 330 And 331 (Docket No. 8809). This Court has entered orders granting four of these interim fee applications at docket numbers 6986, 6997, 7019, 8422, 8423, and 8446.

(b) Presenting the Ohio Property, and information pertaining to it, to potential buyers who might be willing to enter into the Ohio Transaction;

(c) Showing the Ohio Property to interested parties;

(d) Participating in any multi-listing or other information referral arrangement or agreement, and cooperating with any other brokers;

(e) Contacting all parties, if any, who have shown an interest in the Ohio Property as shown on a list to be provided by the Debtors;

(f) Presenting all offers and proposals received to the Debtors;

(g) Obtaining such market and other information as may be requested by the Debtors from time to time, and aiding the Debtors in evaluating all offers and proposals;

(h) Performing those other activities which are normal and customary in the practice of commercial or industrial real estate brokerage; and

(i) Performing all duties and activities in a timely and efficient manner.

Services To Be Rendered Under The Michigan Listing Agreement

18.    Under the Michigan Listing Agreement, JLL would have the exclusive right to list the Michigan Property for a period of nine months, ending on May 31, 2008.  The duties under the Listing Agreement would include, but not be limited to:

(a) Developing and implementing a marketing program, including advertising, for the sale of the Michigan Property (the "Michigan Transaction");

(b) Presenting the Michigan Property, and information pertaining to it, to potential buyers who might be willing to enter into the Michigan Transaction;

(c) Showing the Michigan Property to interested parties;

(d) Participating in any multi-listing or other information referral arrangement or agreement, and cooperating with any other brokers;

(e) Contacting all parties, if any, who have shown an interest in the Michigan Property as shown on a list to be provided by the Debtors;

(f) Presenting all offers and proposals received to the Debtors;

10

    (g)    Obtaining such market and other information as may be requested by the Debtors from time to time, and aiding the Debtors in evaluating all offers and proposals;

    (h)    Performing those other activities which are normal and customary in the practice of commercial or industrial real estate brokerage; and

    (i)    Performing all duties and activities in a timely and efficient manner.

<u>Services To Be Rendered Under The Consulting Agreement</u>

19.    In addition to entering into the Ohio Listing Agreement and Michigan Listing Agreement, the Debtors seek to employ and retain JLL pursuant to the Consulting Agreement to assist the Debtors with transaction services and lease administration services with respect to real property owned by them. The Debtors anticipate that JLL would perform similar functions to those which JLL has performed during the course of these chapter 11 cases, but on a reduced scale, except that JLL would not be entitled to any commission or other fees related to the services to be provided under the Consulting Agreement unless and until JLL and Delphi enter into a commission agreement for a specific transaction. Specifically, the Debtors propose that JLL provide transaction services, including supporting the Debtors' corporate real estate organization and any other related real estate activity as directed by the Debtors. In addition, JLL would assist with lease administration services as directed by the Debtors, including performing data entry and database updating with respect to the Debtors' real property information database.

<u>Disinterestedness Of Professionals</u>

20.    Except as set forth in the Becker Affidavit, to the best of the Debtors' knowledge based upon the Becker Affidavit, JLL and their respective principals and professionals (a) do not have any connection with the Debtors, their creditors, or any other party-in-interest, or their respective attorneys or accountants, (b) are "disinterested persons" under

11

section 101(14) of the Bankruptcy Code and as required under section 327(a) of the Bankruptcy Code, and (c) do not hold or represent an interest adverse to the estate.

Professional Compensation

21.   As more fully set forth in the Ohio Listing Agreement, at the closing of the sale of the Ohio Property, JLL would receive a commission based on the following percentages of the actual sale price for the Ohio Property:

>    (a)   3.5% if another broker participates in the sale, 1.5% of which JLL will pay to the selling broker;
>
>    (b)   2.5% if another broker does not participate in the sale; and
>
>    (c)   2.0% if the Ohio Property is sold as the result of a referral from DAS LLC.

22.   JLL would receive no commission on any lease made pursuant to the sale by DAS LLC of a building. Furthermore, a fee of 20% of the net commission received by JLL would be paid to DREAL, Inc.[12] at closing.

23.   Similarly, under the Michigan Listing Agreement, at the closing of the sale of the Michigan Property, JLL would receive a commission based on the following percentages of the actual sale price for the Michigan Property:

>    (a)   6.0% if another broker participates in the sale, 3.0% of which JLL would pay to the selling broker; and
>
>    (b)   5.0% if another broker does not participate in the sale.

24.   Finally, under both the Ohio Listing Agreement and the Michigan Listing Agreement, if JLL receives a commission or if the particular Listing Agreement expires, JLL would not be reimbursed for any expenses it may have incurred over the course of the particular Listing Agreement. Expenses would only be reimbursed pursuant to the particular Listing

---

[12]   DREAL, Inc., a Debtor, is a licensed real estate broker and wholly-owned subsidiary of Delphi Automotive Systems LLC.

Agreement under the limited conditions enumerated therein and such reimbursement expenses cannot exceed $5,000.

25. Under the Consulting Agreement, JLL would provide two account personnel to provide the transaction services and lease administration services outlined above. The parties have agreed that the monthly fee for transactions services provided by JLL's consultant Brian Collins would be $12,031.88 and the monthly fee for lease administration services provided by Janice Lanoo would be $6,339.38.  In addition, the Debtors have agreed to reimburse JLL for reasonable expenses directly related to the performance of services under the Consulting Agreement incurred by the account personnel as specified in Exhibit A to the Consulting Agreement; except that such expenses must have been approved by the Debtors in writing and in advance.

26. In the event that this Court approves the Debtors' supplemental retention of JLL, (a) JLL's fees and expenses would continue to be subject to (i) the jurisdiction and approval of this Court with regard to JLL's retention, (ii) the Interim Compensation Order (Docket No. 869), the Supplemental Interim Compensation Order (Docket No. 2747), the Second Supplemental Interim Compensation Order (Docket No. 2986), the Third Supplemental Interim Compensation Order (Docket No. 3630), the Fourth Supplemental Interim Compensation Order (Docket No. 4545), the Fifth Supplemental Interim Compensation Order (Docket No. 5310), and the Sixth Supplemental Interim Compensation Order (Docket No. 6145) (collectively, the "Interim Compensation Orders") and any amendments thereto, and (iii) any requirements governing interim and final fee applications as set forth in the Interim Compensation Orders, and (b) Delphi would pay all fees and expenses of JLL under the Ohio Listing Agreement, the Michigan Listing Agreement, or the Consulting Agreement as promptly as practicable in

13

accordance with the terms thereof, the Interim Compensation Orders, as may be amended, and any other orders of this Court governing interim and final fee applications.

27. JLL would continue to file fee applications for interim and final allowance of compensation and reimbursement of expenses pursuant to the procedures set forth in sections 330 and 331 of the Bankruptcy Code, any applicable Bankruptcy Rules, the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), the guidelines established by the Office of the United States Trustee, and further orders of this Court.

28. The Debtors believe that the compensation structure described herein is fair and reasonable in light of industry practice, market rates both inside and outside of chapter 11 cases, and the scope of work to be performed pursuant to this retention.

Limitation Of Liability

29. Under the terms of the Ohio Listing Agreement, as described in the Rider To The Listing Agreement incorporated therein, the Michigan Listing Agreement, as described in the Rider To The Listing Agreement incorporated therein, and the Consulting Agreement, JLL and Delphi have agreed to limit liability against each other. Specifically, the parties have agreed to waive special damages against each other, including but not limited to consequential and punitive damages. Moreover, in no event would JLL's liability to Delphi exceed $1 million under the Listing Agreements or $50,000 in connection with administrative services and $500,000 in connection with transaction services under the Consulting Agreement, except that the foregoing limitation on liability would not apply to losses arising from (a) the indemnifying party's gross negligence, willful, fraudulent, or criminal misconduct, or (b) third party claims.

14

### Broker's Subagent

30.     As disclosed in Attachment II to the Michigan Listing Agreement, to most effectively market the Michigan Property, JLL has engaged real estate agents Bradley H. Rosely and David J. Levitt of the Grand Rapids-based commercial real estate brokerage firm, S.J. Wisinski & Company as its subagent.  JLL proposes to share its brokerage fee with S.J. Wisinski on a fifty-fifty basis.  For compensation purposes, Mr. Rosely and Mr. Levitt are not considered "brokers" entitling JLL to a 6.0% commission.  Nonetheless, should any other agent from the firm S.J. Wisinski & Company participate in the sale, JLL would be entitled to a 6.0% commission.

### Conclusion

31.     The Debtors believe that entering into each of the Ohio Listing Agreement, the Michigan Listing Agreement, and the Consulting Agreement with JLL is in the best interests of the Debtors' estates and that JLL will provide value to the estates through its services. Accordingly, for the foregoing reasons, the Debtors request that this Court approve this Supplemental Application.

### Notice

32.     Notice of this Supplemental Application has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883) and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered October 26, 2006 (Docket

No. 5418). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

33. Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing the Debtors to retain JLL for the listing of DAS LLC's Warren, Ohio property under the Ohio Listing Agreement, (b) authorizing the Debtors to retain JLL for the listing of DAS LLC's Coopersville, Michigan property under the Michigan Listing Agreement, (c) authorizing the Debtors to employ and retain JLL for additional services as set forth in the Consulting Agreement, and (d) granting the Debtors such other and further relief as is just.

Dated: New York, New York
October 4, 2007

DELPHI CORPORATION, on behalf of itself and certain of its subsidiaries and affiliates, as Debtors and Debtors-in-possession

By: /s/ John D. Sheehan
Name: John D. Sheehan
Title: Vice President, Chief Restructuring Officer

16