# Exhibit B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
    In re                               :    Chapter 11
                                        :
DELPHI CORPORATION, et al.,             :    Case No. 05-44481 (RDD)
                                        :
                  Debtors.      :    (Jointly Administered)
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - x

### SECOND SUPPLEMENTAL AFFIDAVIT OF JAMES C. BECKER REGARDING RETENTION OF JONES LANG LASALLE AMERICAS, INC. AS REAL ESTATE ADMINISTRATIVE AND TRANSACTION SERVICES PROVIDER TO DEBTORS

COUNTY OF WAYNE      )
                           ) ss:
STATE OF MICHIGAN    )

      JAMES C. BECKER, being duly sworn, deposes and states as follows:

      1.    I am a Managing Director in the firm of Jones Lang LaSalle Americas, Inc. ("JLL"), real estate administrative and transaction services provider for Delphi Corporation ("Delphi" or the "Company") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors").

      2.    I submit this second supplemental affidavit (the "Second Supplemental Affidavit") in connection with the Debtor's Supplemental Application for an Order under 11 U.S.C. §§ 327(a) and 328 and Fed. R. Bankr. P. 2014(a) Modifying the Scope of Employment and Retention of JLL as the Real Estate Administrative and Transaction Services Provider to the Debtors (the "Supplemental Application").

      3.    On November 9, 2005, the Debtors filed their Application for Order under 11 U.S.C. §§ 327(a) and 328 and Fed. R. Bankr. P. 2014(a) Authorizing Employment and Retention of Jones Lang LaSalle Americas, Inc. as Real Estate Administrative and Transaction Services Provider to Debtors (the "Application").

4.   In connection therewith, I submitted the Declaration of James C. Becker in Support

of Application for Order under 11 U.S.C. §§ 327(a) And 328 and Fed. R. Bankr. P. 2014(a)

Authorizing Employment and Retention of Jones Lang LaSalle Americas, Inc. as Real Estate

Administrative and Transaction Services Provider to Debtors (the "Initial Affidavit").  In

connection with the preparation of the Initial Affidavit, JLL conducted a conflicts examination

that included the following individuals and entities: (a) Debtors' affiliates and subsidiaries; (b)

current and former directors and officers of the debtors (of the past five years); (c) lenders; (d)

insurers; (e) professionals; (f) parties to litigation and their counsel; (g) holders of 5% or more of

any outstanding equity security of the Company; (h) record noteholders holding 5% or more of

any outstanding issuance of notes of the Company; (i) top 50 creditors; (j) indenture trustees; (k)

underwriters of securities issued in the past three years; (l) counterparties to major leases; (m)

counterparties to major contracts; (n) lienholders; (o) major customers; (p) major suppliers; (q)

state and other governmental authorities; (r) letter of credit issuers and beneficiaries; (s) unions;

and (t) other miscellaneous interested parties.

5.   On December 1, 2005, the Bankruptcy Court entered its Order under 11 U.S.C.

§§ 327(a) and 328 and Fed. R. Bankr. P. 2014(a) Authorizing Employment and Retention of

Jones Lang LaSalle Americas, Inc. as Real Estate Administrative and Transaction Services

Provider to Debtors, authorizing the Debtors' retention of JLL, retroactive to November 3, 2005,

pursuant to the terms of the parties' Real Estate Services Agreement dated September 2, 2005, as

amended by the First Amended to Real Estate Services Agreement, dated November 9, 2005

(collectively, the "Engagement Agreement").

6.   On February 6, 2006, I submitted the Supplemental Affidavit of James C. Becker in

Support of Application for Order under 11 U.S.C. §§ 327(a) and 328 and Fed. R. Bankr. P.

2014(a) Authorizing Employment and Retention of Jones Lang LaSalle Americas, Inc. as Real

Estate Administrative and Transaction Services Provider to Debtors (the "Supplemental

Affidavit"). In connection therewith, JLL conducted an updated check for conflicts of interest

and other conflicts and connections with respect to the Debtors' bankruptcy cases and disclosed

those entities with whom JLL had a prior client relationship and the nature of that relationship.

7.    JLL has been asked to assist the Debtors, pursuant to the terms of a Listing

Agreement executed by the parties, a copy of which is attached hereto as Exhibit 1 (the "Ohio

Listing Agreement"), with the marketing and sale and partial lease-back of certain of the

Debtors' real property holdings located in Warren, Ohio (the "Ohio Property"). Under the Ohio

Listing Agreement, JLL would have the exclusive right to list the Ohio Property for a period of

nine months, ending on February 29, 2008. The duties under the Ohio Listing Agreement would

include, but not be limited to:

(i)    Developing and implementing a marketing program, including advertising, for the sale and partial leaseback of the Ohio Property (the "Ohio Transaction");

(ii)    Presenting the Ohio Property, and information pertaining to it, to potential buyers who might be willing to enter into the Ohio Transaction;

(iii)    Showing the Ohio Property to interested parties;

(iv)    Participating in any multi-listing or other information referral arrangement or agreement, and cooperating with any other brokers;

(v)    Contacting all parties, if any, who have shown an interest in the Ohio Property as shown on a list to be provided by the Debtors;

(vi)    Presenting all offers and proposals received to the Debtors;

(vii)    Obtaining such market and other information as may be requested by the Debtors from time to time, and aiding the Debtors in evaluating all offers and proposals;

(viii)    Performing those other activities which are normal and customary in the practice of commercial or industrial real estate brokerage; and

(ix)    Performing all duties and activities in a timely and efficient manner.

3

8.   As more fully set forth in the Ohio Listing Agreement, at the closing of the sale of the Ohio Property, JLL would receive a commission based on the following percentages of the actual sale price for the Ohio Property:

    a.   3.5% if another broker participates in the sale, 1.5% of which JLL will pay to the selling broker;

    b.   2.5% if another broker does not participate in the sale; and

    c.   2.0% if the Ohio Property is sold as the result of a referral from DAS LLC.

9.   JLL would receive no commission on any lease made pursuant to the sale by DAS LLC of a building.  Furthermore, a fee of 20% of the net commission received by JLL would be paid to DREAL, Inc.[1] at closing.

10.   In addition, JLL has been asked to assist the Debtors, pursuant to the terms of an additional Listing Agreement (the "Michigan Listing Agreement") executed by the parties, a copy of which is attached hereto as Exhibit 2, to assist the Debtors with the marketing and sale of certain of the Debtors' real property holdings located in Coopersville, Michigan (the "Michigan Property").  Under the Michigan Listing Agreement, JLL would have the exclusive right to list the Michigan Property for a period of nine months, ending on May 31, 2008.  The duties under the Michigan Listing Agreement would include, but not be limited to:

    (i)   Developing and implementing a marketing program, including advertising, for the sale of the Michigan Property (the "Michigan Transaction");

    (ii)   Presenting the Michigan Property, and information pertaining to it, to potential buyers who might be willing to enter into the Michigan Transaction;

    (iii)   Showing the Michigan Property to interested parties;

---

[1]   DREAL, Inc., a Debtor, is a licensed real estate broker and wholly-owned subsidiary of Delphi Automotive Systems LLC.

4

(iv)     Participating in any multi-listing or other information referral arrangement or agreement, and cooperating with any other brokers;

(v)     Contacting all parties, if any, who have shown an interest in the Michigan Property as shown on a list to be provided by the Debtors;

(vi)     Presenting all offers and proposals received to the Debtors;

(vii)     Obtaining such market and other information as may be requested by the Debtors from time to time, and aiding the Debtors in evaluating all offers and proposals;

(viii)     Performing those other activities which are normal and customary in the practice of commercial or industrial real estate brokerage; and

(ix)     Performing all duties and activities in a timely and efficient manner.

11.     Under the Michigan Listing Agreement, at the closing of any sale of the Michigan Property, JLL would receive a commission based on the following percentages of the actual sale price for the Michigan Property:

a.     6.0% if another broker participates in the sale, 3.0% of which JLL would pay to the selling broker; and

b.     5.0% if another broker does not participate in the sale.

12.     In order to most effectively market the Michigan Property, JLL has engaged real estate agents Bradley H. Rosely and David J. Levitt of the Grand Rapids-based commercial real estate brokerage firm, S.J. Wisinski & Company as its subagent. JLL proposes to share its brokerage fee with S.J. Wisinski on a fifty-fifty basis. For compensation purposes, Mr. Rosely and Mr. Levitt are not considered "brokers" entitling JLL to a 6.0% commission. Nonetheless, should any other agent from the firm S.J. Wisinski & Company participate in the sale, it is my understanding that JLL would be entitled to a 6.0% commission.

13.     Recently, the Debtors provided notice of their desire to terminate the Engagement Agreement, effective as of June 30, 2007. In addition, the Debtors have requested that JLL continue to provide certain professional services under the terms of a new consulting agreement

5

(the "Consulting Agreement"), a copy of which is attached hereto as Exhibit 3, notwithstanding the termination of the Engagement Agreement.

14.    In connection with the Debtors' requests, JLL has performed an updated check for any potential conflicts of interest on other connections between JLL and significant parties in interest in the Debtor's cases.  The results of our updated conflict check are set in the attached Exhibit 4.

15.    Unless a change in the nature of relationship previously disclosed has occurred, to the extent that a connection between JLL and the Debtors, a creditor of the Debtors or any other party in interest has been previously disclosed, it has not been included in this Second Supplemental Affidavit.

16.    Based on the conflicts search conducted to date and described herein, to the best of my knowledge, and except as otherwise stated herein, neither I, JLL, nor any principal or employee thereof, insofar as I have been able to ascertain, have any connection with the Debtors, their creditors, or any other party-in-interest, or their respective attorneys or accountants other than providing the Debtors with facility maintenance and administration services outside of the Engagement Agreement and the Agreements set forth above.  Accordingly, I, JLL and its principals and employees are each "disinterested persons" under section 101(14) of the Bankruptcy Code, and as required under section 327(a) of the Bankruptcy Code, and do not hold or represent an interest adverse to the estate.

17.    JLL will continue to periodically review its files during the pendency of these chapter 11 cases to ensure that no disabling conflicts or other disqualifying circumstances exist or arise.  If any new relevant facts or relationships are discovered or arise, JLL will use reasonable efforts to identify such further developments and will promptly file a supplemental affidavit as required pursuant to Bankruptcy Rule 2014(a).

6

18.    I am not related, and to the best of my knowledge, no principal or employee of JLL

is related, to any United States District Judge or United States Bankruptcy Judge in the Southern

District of New York or to the United States Trustee for such district or any employee in the

office thereof.

19.    According to the Consulting Agreement, JLL will not be entitled to any

commission or other fees related to the services rendered thereunder unless JLL and the Debtors

enter into a commission agreement for a specific transaction. Nevertheless, nothing contained in

the Consulting Agreement shall impact JLL's right to receive any and all commissions due under

the Engagement Agreement, subject to the revenue sharing procedures contained therein.

20.    JLL acknowledges that all amounts paid to JLL during these chapter 11 cases are

subject to final allowance by this Court.  In the event that any fees or expenses paid to JLL

during these cases are disallowed by this Court, the fees and expenses will be disgorged by JLL

and returned to the Debtors or as otherwise ordered by this Court.

FURTHER AFFIANT SAYETH NOT.


_____
James C. Becker


Sworn to before me
this /4 day of September, 2007


_____
Notary Public

Exhibit 1

| **BROKER:** | Jones Lang LaSalle Americas, Inc. | **DATE:** | June 1, 2007 |
| | 200 East Randolph | | |
| | Chicago, Il 60601 | **Project #:** | PRJ1504 |
| | | | PRJ1505 |
| | | | PRJ1506 |

## LISTING AGREEMENT

In consideration of the mutual covenants contained in this Agreement and other valuable consideration, the receipt and sufficiency of which is mutually acknowledged, the properties located at North River Road & Larchmont Avenue (PRP00027); Griswold Street & Paige Avenue (PRP00028); Dana Street (PRP14835000) (hereinafter collectively referred to as the "Property"), are being placed on the market by Delphi Automotive Systems LLC (hereinafter referred to as "DELPHI"), whose Real Estate Department is located in Troy, MI, and are hereby listed with you on the following terms and conditions:

1. TERM:

Upon your acceptance, this listing shall be exclusive with you, subject only to the exceptions and exclusions contained herein, for a period of nine (9) months from the date of this agreement above and expiring on the last day of February, 2008.

2. DUTIES:

You shall:

A. Develop and implement a marketing program, including advertising, for the sale and partial leaseback of the Property (the "Transaction").

B. Present the Property, and information pertaining to it, to those potential buyers who are willing to enter into the Transactions as further indicated in Paragraph 26.B., below.

C. Show the Property to interested parties.

D. Participate in any multi-listing or other information referral arrangement or agreement, and cooperate with any other brokers.

E. Contact all parties, if any, who have shown an interest in the Property as shown on a list which may be provided by DELPHI.

F. Present all offers and proposals received to DELPHI.

G. Obtain such market and other information as may be requested by DELPHI from time to time, and aid DELPHI in evaluating all offers and proposals.



1

H.  Perform those other activities required by this Agreement and those other activities which are normal and customary in the practice of commercial or industrial real estate brokerage.

I.  Perform all duties and activities in a timely and efficient manner.  Time is of the essence in the performance thereof.

## 3. COMPLIANCE WITH CIVIL RIGHTS AND OTHER LAWS:

The listed Property shall be offered in compliance with the provisions of all Civil Rights laws, including but not limited to those regarding race, color, creed, sex, ancestry or national origin, and you agree that all marketing and other activities shall be conducted in conformance with all federal, state and local laws and regulations.

## 4. WITHDRAWAL OF LISTING:

DELPHI reserves the right to withdraw this Listing Agreement at any time if DELPHI elects to retain the Property for its own use, that of a joint venture partner, or that of a corporation owned or controlled by DELPHI.  DELPHI further reserves the right to withdraw this listing Agreement in the event that DELPHI elects to donate the Property, either by gift or bargain sale, to an organization qualified pursuant to Internal Revenue Code to receive a deductible contribution.  In the event of the withdrawal, no commissions, brokerage fees, finders fees final fees, expenses or other monetary amounts shall be payable to you except as set forth in Paragraph 9, below.

## 5. EXCLUSIONS:

This section has been intentionally deleted.

## 6. TERMINATION:

DELPHI reserves the right to terminate this Agreement at any time at its sole discretion.

A.  With Cause  DELPHI reserves the right to cancel this Agreement without liability (unless you procured a purchaser of a sale that actually closes) to DELPHI in the event any of the following, or comparable, events occur and if you fail to correct such failure or breach within ten (10) days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice from DELPHI specifying such failure or breach:

I.  With respect to your firm, company, or employer:  Insolvency, bankruptcy proceedings (voluntary or involuntary), appointment of a receiver or trustee, or execution of an assignment for the benefit of creditors; provided however, that any such petition, appointment, or assignment is not vacated or nullified within fifteen (15) days of such event.

II.  Your repudiation or breach of the terms of this agreement.

2

III. Your failure to perform services as specified by DELPHI.

IV. Your failure to perform services as specified in this agreement so as to endanger the timely or proper completion of your duties and functions, or so as to endanger the consummation of the transaction provided in this Agreement.

V. A merger or reorganization of your firm, or termination or other unavailability of one or more personnel, which in DELPHI's sole judgment may adversely affect or otherwise alter the performance of you or your firm's personal services. It is specifically agreed that the unique expertise, skill, reputation, and experience of you or certain personnel within your firm, and their continued availability, are necessary for the performance of this Agreement and are a specific inducement for DELPHI to enter into and continue this Agreement.

B.  Without Cause  In the event that this Agreement is terminated by DELPHI without cause, no commissions, brokerage fees, finders fees, final fees, expenses or other monetary amounts shall be payable to you from DELPHI except as provided in Paragraphs 9 and 11 below.

## 7. DESTRUCTION OF PROPERTY:

In the event that the Property are wholly or partially damaged or destroyed, or taken under the power of eminent domain in whole or in part, such that DELPHI, in its sole discretion, determines that this Agreement shall be terminated, no commissions, brokerage fees, finder's fees, insurance proceeds, expenses or other monetary amounts shall be payable to you except as provided in Paragraph 9, below.

## 8. BUDGET, INITIAL EXPENSES:

You shall pay all normal marketing costs associated with the offering of the Property, including but not limited to, advertising materials, brochures, mailings, signage, media advertising, travel expenses and long distance telephone charges. You further agree that prior to this Agreement there have been no commissions, fees, or expenses or other monetary amounts which will be reimbursable to you by DELPHI.

DELPHI shall be solely responsible for the cost of any extraordinary marketing activities requested and approved by DELPHI and you in writing and conducted by you.  Placement of any signage on the Property must be approved by DELPHI.

## 9. REIMBURSEMENT OF EXPENSES:

In the event that the Property is withdrawn from the market pursuant to Paragraph 4, above, or terminated without cause pursuant to Paragraph 6.B., above, or if the Property is destroyed as discussed in Paragraph 7, above, you will be reimbursed for any actual out-of-pocket expenses incurred by you and attributable specifically to the Property.  Such expenses may include advertising materials, media expenses, telephone and mailing charges, and travel.

3



Reimbursable expenses shall not exceed Five Thousand and 00/100 Dollars ($5,000.00) and shall not include salary, labor, premiums for first class travel, normal office overhead expenses, or claims or expenses submitted by your contractors or suppliers. Further, reimbursable expenses shall not include routine advertising and marketing in which the Property is one of a group of properties. All reimbursable expenses must have been approved in advance in writing by DELPHI. You agree that you will not be reimbursed unless specific documentation of such expenses, satisfactory to DELPHI in its sole discretion, is provided by you within fifteen (15) days of your receipt from DELPHI of notice that a withdrawal, transfer, termination without cause, or Property damage has occurred.

It is agreed that in the event a commission is paid to you, or if this Listing Agreement expires at the end of this term or any extension term, no expenses of any type will be reimbursed by DELPHI.

## 10. AGREEMENTS WITH OTHER BROKERS:

You represent and warrant that you have reached or will reach satisfactory agreements relating to commissions, sharing of expenses, and other fee matters among any cooperating, selling, or other third party brokers. You agree to indemnify and hold DELPHI harmless from and against any claims, allegations, liabilities, suits (including reasonable attorney fees), or demands arising from a claim by any such third party broker for a fee or commission, whose claim is based on, or alleged to be based on your conduct. DELPHI agrees to refer to you any and all inquiries received regarding the Property, whether received from you, other brokers or anyone else.

## 11. PROTECTION PERIOD AND CONDITIONS:

Following the expiration of the listing period or termination without cause by DELPHI, you will be protected and your commission paid if a Sale or Leasing Agreement is executed by DELPHI within sixty (60) days of such expiration or cancellation. Such an Agreement must be with a bona fide prospect which you have listed by name and address, and filed with DELPHI. This list must be filed in writing by certified mail, return receipt requested, within five (5) days after expiration of this listing or within five (5) days of a termination without cause by DELPHI.

## 12. REPORTS:

You agree to submit a report every four (4) weeks regarding the following:

A. Contacts made, including the type, content, name, date and affiliation of the contact.

B. Showings or inspections of the Property, including the date, time and name of the prospect.

4



C.  Comments regarding general market conditions, including changes and events.

D.  Comments regarding comparable properties, including newly vacant or newly listed properties, and properties recently sold and properties recently leased.

E.  Copies of all advertising done to promote the Property.

13.  ADVERTISING CONTENT:

All advertising text and other promotional materials related to marketing the Property must be approved in writing by DELPHI prior to the incurring of any (other than incidental) expenses related to the item, and prior to dissemination or display.  Retouching or other alteration of photographs is generally unacceptable. The use of the name Delphi Automotive Systems LLC in advertising related to marketing the Property is subject to prior written approval, and DELPHI must similarly approve the use, design, content and placement of any signage.

Other than including the name of Delphi Automotive Systems LLC in a routine list of representative clients, you shall not, without first obtaining the written approval of DELPHI, advertise or publish the fact that you have contracted to furnish DELPHI with the services agreed upon.  No explicit or implicit statement shall be made in a routine list of representative clients, or in any other advertising or published or broadcast material, that would allow a reader, listener, or observer to infer or conclude that DELPHI endorses, favors, approves of or supports you or your services, or their quality, in any manner whatsoever.

14.  PRESS STATEMENTS, CONTRACTS WITH GOVERNMENTAL PERSONNEL:

You agree not to issue any press statements or speak directly with the media about the Property, your marketing efforts, or your relationship with Delphi Automotive Systems LLC without prior written approval of DELPHI.  Any press inquiries you receive or media articles regarding the Property should be reported immediately to the Real Estate Department of DELPHI, and you are not authorized to speak on behalf of Delphi Automotive Systems LLC.  You also agree to report immediately the content of any discussions regarding the Property you have had with, or any inquiries you receive from, any government official or employee.

15.  INDEMNIFICATION:

You agree to indemnify and hold Delphi Automotive Systems LLC harmless from and against  any liability, claims, demands or expenses (including reasonable attorney fees), or damages to the Property of or injuries (including death) to DELPHI's employees or any other person arising from or in connection with your performance or work or use of Delphi Automotive Systems LLC Property except for liability, claim, or demand arising out of the sole negligence of Delphi Automotive Systems LLC.

16.  AUDIT AND INSPECTION:

With respect to commission(s) or expense matters (or the reimbursement or sharing thereof with any party), upon DELPHI's written request you agree to submit sufficient supporting data to permit DELPHI's audit, and shall thereafter promptly furnish such supplemental and supporting information as DELPHI shall request. DELPHI, or it's agents, shall have the right to audit all books, records and other items relating to any commission or expense matter as related to this sale or lease.

## 17. ENVIRONMENTAL MATTERS:

You acknowledge and agree that any and all information, whether written or oral, regarding the environmental status of the Property provided to you or any prospect, or which comes to your knowledge, shall be considered the sole and exclusive Property of Delphi Automotive Systems LLC and is considered and will be kept confidential in perpetuity. You acknowledge and agree that such information will not be discussed with or provided to any third party, other than those employees or agents of you or the prospect who are essential to completing the sale and or financing of the project, without the prior written consent of DELPHI.

Notwithstanding anything contained herein to the contrary, in the event you are required to disclose any such information to any governmental entity pursuant to applicable law, prior to disclosing the same you shall notify in writing and provide DELPHI with copies of all information which you intend to so disclose. Such notice and information shall be provided to DELPHI in writing at least five (5) business days prior to disclosure of the same to any governmental agency.

If you or your employees or agents disclose information in violation of the provisions of this paragraph, then you agree that you shall be liable to Delphi Automotive Systems LLC for liquidated damages in the amount of Ten Thousand Dollars ($10,000) for each such disclosure. You acknowledge that DELPHI will suffer substantial damages if such information is wrongfully disclosed, but the determination of the exact amount of such damages would be difficult if not impossible. The setting of the Ten Thousand Dollars ($10,000) liquidated damage amount is reasonable in light of all relevant facts now available to the parties. DELPHI shall also be entitled to injunctive relief in order to prevent disclosure of any such information.

## 18. OTHER CONFIDENTIAL MATTERS:

All information, matters regarding price or other terms, negotiating positions, material, records and other data provided to you by DELPHI or at the request of DELPHI, or by prospects, relating to the Property and the listing are provided solely for providing the services under this agreement. You assert no right or title to, or other interest in, any such information or material. You agree that unless otherwise approved in writing by DELPHI, all such information or material will be treated in absolute confidentiality.

You agree that while you have the custody or possession of any material subject to the confidentiality restrictions of this paragraph, unless otherwise approved in

writing by DELPHI, you will not (i) copy or duplicate, or permit anyone else to copy or duplicate, any of such material or (ii) provide or make available such information or material to any other person or entity other than your employees who have a need to know such information. You shall also take appropriate actions by instruction or agreement to advise your employees of their obligations with respect to use, copying, protection and security of such information or material.

In the event you are required to disclose any such information or material to any governmental entity pursuant to applicable law, prior to disclosing the same you shall notify in writing and provide DELPHI with copies of all information which you intend to so disclose. Such notice and information shall be provided to DELPHI in writing at least five (5) business days prior to the disclosure of the same to any government authority.

19. INDEPENDENT CONTRACTING PARTIES:

DELPHI and you are and shall be independent contracting parties. Nothing in this Agreement shall make either party the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other.

20. NO IMPLIED WAIVER:

The failure of either party at any time to require performance by the other party of any provision of this Agreement shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this Agreement constitute a waiver of any succeeding breach of the same or any other provisions.

21. NON-ASSIGNMENT:

You may not assign or delegate your obligations under this agreement without DELPHI's prior written consent.

22. SEVERABILITY:

If any term of this Agreement is invalid or unenforceable under any statute, regulation, ordinance, executive order or any other rule of law, such term shall be deemed reformed or deleted, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Agreement shall remain in full force and effect.

23. ENTIRE AGREEMENT:

This Agreement contains our entire understanding and supersedes all prior Agreements, understanding, discussions, warranties and representations. This Agreement may not be amended or modified except by a document in writing signed by DELPHI and you.

7



24. CHOICE OF LAW:

   This Agreement is to be construed according to the laws of the state of Michigan.

25. DELPHI CONTACT:

   All matters concerning this Property shall be discussed with Jeff Beaudoen
   (Office Telephone Number 248-814-1438).    Absent emergencies, plans for
   showings of the Property should be first discussed with the aforesaid and not with
   personnel at the facility.

   Kindly indicate your acceptance of this agreement by signing and returning ONE
   (1) copy of this listing Agreement.

26. GENERAL TERMS REGARDING SALE, LEASE OR TERMINATION:

   A.  DELPHI reserves the right to reject any and all offers.

   B.  This Agreement applies only to the following transaction (s), and DELPHI
   will consider only those transaction(s) so indicated (circled and initialed) below.
   Unless you and DELPHI have indicated a transaction below, and executed the
   appropriate attachment, you agree that referral or mention of a prospect by you to
   DELPHI will not constitute any reservation or registration with, or obligation of
   any type by, DELPHI to pay you a commission or any other monetary amount in
   the event of a future change in the type of transaction desired or subject to
   consideration by DELPHI (for example, and not by way of limitation, if a sale
   evolves into a lease, or if a sublease evolves into the purchase of the leasehold or
   a fee):

   I.  Sale of Fee:                   __X_Yes          ___No
         Initial: DELPHI _____    Broker _____

         (If yes, attach and execute DELPHI attachment
         I-Specific Terms Regarding Offers to Purchase Fee.)

   II.  Lease:                        ___Yes          _X_No
         Initial  DELPHI _____    Broker _____

         (If yes, attach and execute DELPHI attachment
         II-Specific Terms Regarding Offers to Lease.)

   III.  Sale of Leasehold           ___Yes          _X_No
         Initial: DELPHI _____    Broker _____

         (If yes, attach and execute DELPHI attachment

8

Initial DELPHI _____ Broker _____

(If yes, attach and execute DELPHI Attachment
IV - Specific Terms Regarding Offers to Sublease.)

V. Early Termination:        ___ Yes        **X No**

Initial  DELPHI _____        Broker _____

(If Yes, attach and execute DELPHI Attachment V-Specific Terms
Regarding Negotiations to Terminate with the Landlord.)

C.    The Property are being offered "as is" without any representation or
warranties as to their condition or soundness. The prospect should satisfy himself
or herself as to the condition of the Property.

D. All offers are to be submitted in writing to DELPHI Real Estate Department,
and all must be accompanied by complete detail on the proposed use of the
building, as well as information on the financial capability of the offeror.

DELPHI shall be given minimum of thirty (30) days to accept or reject the
offer, and such acceptance shall be conditional on, and subject to, the preparation
and full execution of a binding contract which shall be prepared by the Real
Estate Department of DELPHI, or outside counsel.

E. No commission or commission installment will be considered as due, earned,
or payable until an Agreement as specified in Paragraph 26.D., above, is executed
with a party acceptable to DELPHI and closing has occurred. The content of any
Agreement, and the acceptability of any party, shall be decided by DELPHI in its
sole discretion.

The submission of this Agreement to you or of an Agreement specified in
Paragraph 26.D., above, to you or to any party shall be for examination purposes
only. Such submission does not and shall not constitute a reservation or election
to complete an Agreement with you, or otherwise create any interest in the
payment of any expenses, fees, or commissions by DELPHI. Further, such
submissions do not and shall not constitute a reservation or election to complete
an Agreement specified in Paragraph 26.D., above, or otherwise create an interest
in the Property or any portion thereof.

Execution of any Agreement by one party and its return to the other party shall
not be binding, notwithstanding any time interval, until a fully executed
Agreement is delivered to the party which first signed the Agreement.

F. Any deposits retained from any unconsummated transaction will belong solely
to DELPHI, and unless otherwise provided DELPHI will designate the escrow

9

agent and the terms and conditions of escrow, if any. In any event you will, upon request by DELPHI, promptly and forthwith forward all deposits, whether forfeited or unforfeited under the terms of any Agreement, to DELPHI, any claim or demand to the contrary notwithstanding.

G. Cooperative listings and other brokerage arrangements must be disclosed and agreed to by DELPHI, and the fee arrangements therefore must be agreed to by any cooperating brokers on Attachment I, II, III, IV, and/or V.

H. Commissions will not be based upon the value of any personal Property, productive machinery or equipment, or specialized machinery, systems, or equipment, sold to the purchaser of the fee or leasehold, or to a lessee or sublessee, regardless of whether or not a separate bill of sale is issued for such Property. In any event, the decision of DELPHI and the purchaser as to the allocation of purchase price between the real estate and such Property will be final, as will be the determination of whether any particular Property is real Property (including fixtures) or personal Property.

I. No representation is made by DELPHI as to the conditions or suitability of the building or Property for any proposed use, and it will be solely the purchaser's or tenant's obligation to determine and be satisfied that its occupancy will not be contrary to any statutes or ordinances, and particularly to the applicable zoning laws, and to pay for any obtain any necessary permits connected with occupancy. The purchaser or tenant will be responsible for obtaining any zoning variances necessary for the use of the Property.

Delphi Automotive Systems LLC

By: _____

Date: _6/20/07_____

Accepted By: _____

Firm Name: _Jones Lang LaSalle Americas, Inc_

Date: _May 11, 2007_

_June 11, 2007_

(BMC)

I.   A commission, based on the following percentage (s) of the actual sale price, will be payable by DELPHI at closing:

A.   **3.5%** if another ("selling") broker participates in the sale, with you receiving **3.5%** and the selling broker receiving **1.5%** from you.

B.   **2.5%** if another broker does not participate in the sale.

C.   **2.0%** if the Property is sold as the result of a referral from DELPHI.

II.  If a lease is made pursuant to the sale by DELPHI of a building, for example to make an investment by a purchaser viable, no commission will be paid by DELPHI on the lease.

III. A fee of 20% of the net commission received by you will be paid to DREAL, Inc., at closing.

Delphi Automotive Systems LLC

By: _____

Date: __6/20/07_____

Accepted By: _____

Firm Name: _JONES LANG LaSalle AMERICAS, INC._

Date: _MAY 11 2007_

June 11, 2007

(BMC)

## RIDER TO THE LISTING AGREEMENT

The provisions of this rider shall be incorporated into the Listing Agreement between Jones Lang LaSalle Americas, Inc. ("Jones Lang LaSalle") and Delphi Automotive Systems LLC ("DELPHI") ("Agreement") for the sale of properties located at North River Road & Larchmont Avenue (PRP00027); Griswold Street & Paige Avenue (PRP00028); Dana Street (PRP14835000) (hereinafter collectively referred to as the "Property") and shall be given full force and effect as if it were part of the Agreement.

LIMITED LIABILITY:

In no event shall any partner, shareholder, director, officer, agent, servant, employee, representative or affiliate of either party shall have any personal liability in connection with this agreement.

Neither party shall be liable to the other for, and each party hereby waives any and all rights to claim against the other, any special, indirect, incidental, consequential, punitive or exemplary damages in connection with this Agreement, including, but not limited to, lost profits, even if such party has knowledge of the possibility of such damages; and in no event shall Jones Lang LaSalle's liability to DELPHI exceed One Million Dollars ($1,000,000) per year; provided however, that such limitation on liability will not apply to losses arising (i) from the indemnifying party's gross negligence, willful, fraudulent or criminal misconduct, or (ii) third-party claims

Delphi Automotive Systems LLC

By: _____

Date: ___6/20/07___

Accepted By: _____

Firm Name: _Jones Lang LaSalle Americas, Inc._

Date: _May 11, 2007_

_June 4, 2007_

(PMC)

Exhibit 2

| **BROKER:** | Jones Lang LaSalle Americas, Inc. | **DATE:** | September 1, 2007 |
| | 3044 W. Grand Blvd., Suite L-100 | | |
| | Detroit, Michigan  48202 | **Project #:** | PRJ1462 |

## LISTING AGREEMENT

In consideration of the mutual covenants contained in this Agreement and other valuable consideration, the receipt and sufficiency of which is mutually acknowledged, the property located at 999 Randall Street in Coopersville, Michigan (PRP00010) (hereinafter referred to as the "Property"), are being placed on the market by Delphi Automotive Systems LLC (hereinafter referred to as "DELPHI"), whose Real Estate Department is located in Troy, MI, and are hereby listed with you on the following terms and conditions:

1. TERM:

   Upon your acceptance, this listing shall be exclusive with you, subject only to the exceptions and exclusions contained herein, for a period of nine (9) months from the date of this agreement above.

2. DUTIES:

   You shall:

   A.  Develop and implement a marketing program, including advertising, for the sale of the Property (the "Transaction").

   B.  Present the Property, and information pertaining to it, to those potential buyers who are willing to enter into the Transactions as further indicated in Paragraph 26.B., below.

   C.  Show the Property to interested parties.

   D.  Participate in any multi-listing or other information referral arrangement or agreement, and cooperate with any other brokers.

   E.  Contact all parties, if any, who have shown an interest in the Property as shown on a list which may be provided by DELPHI.

   F.  Present all offers and proposals received to DELPHI.

   G.  Obtain such market and other information as may be requested by DELPHI from time to time, and aid DELPHI in evaluating all offers and proposals.

   H.  Perform those other activities required by this Agreement and those other activities which are normal and customary in the practice of commercial or industrial real estate brokerage.

1

I.  Perform all duties and activities in a timely and efficient manner.  Time is of the essence in the performance thereof.

3. COMPLIANCE WITH CIVIL RIGHTS AND OTHER LAWS:

The listed Property shall be offered in compliance with the provisions of all Civil Rights laws, including but not limited to those regarding race, color, creed, sex, ancestry or national origin, and you agree that all marketing and other activities shall be conducted in conformance with all federal, state and local laws and regulations.

4. WITHDRAWAL OF LISTING:

DELPHI reserves the right to withdraw this Listing Agreement at any time if DELPHI elects to retain the Property for its own use, that of a joint venture partner, or that of a corporation owned or controlled by DELPHI.  DELPHI further reserves the right to withdraw this listing Agreement in the event that DELPHI elects to donate the Property, either by gift or bargain sale, to an organization qualified pursuant to Internal Revenue Code to receive a deductible contribution.  In the event of the withdrawal, no commissions, brokerage fees, finders fees final fees, expenses or other monetary amounts shall be payable to you except as set forth in Paragraph 9, below.

5. EXCLUSIONS:

This section has been intentionally deleted.

6. TERMINATION:

DELPHI reserves the right to terminate this Agreement at any time at its sole discretion.

A.  With Cause  DELPHI reserves the right to cancel this Agreement without liability (unless you procured a purchaser of a sale that actually closes) to DELPHI in the event any of the following, or comparable, events occur and if you fail to correct such failure or breach within ten (10) days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice from DELPHI specifying such failure or breach:

I.  With respect to your firm, company, or employer:  Insolvency, bankruptcy proceedings (voluntary or involuntary), appointment of a receiver or trustee, or execution of an assignment for the benefit of creditors; provided however, that any such petition, appointment, or assignment is not vacated or nullified within fifteen (15) days of such event.

II.  Your repudiation or breach of the terms of this agreement.

III.  Your failure to perform services as specified by DELPHI.

2

IV.  Your failure to perform services as specified in this agreement so as to endanger the timely or proper completion of your duties and functions, or so as to endanger the consummation of the transaction provided in this Agreement.

V.  A merger or reorganization of your firm, or termination or other unavailability of one or more personnel, which in DELPHI's sole judgment may adversely affect or otherwise alter the performance of you or your firm's personal services.  It is specifically agreed that the unique expertise, skill, reputation, and experience of you or certain personnel within your firm, and their continued availability, are necessary for the performance of this Agreement and are a specific inducement for DELPHI to enter into and continue this Agreement.

B.  Without Cause  In the event that this Agreement is terminated by DELPHI without cause, no commissions, brokerage fees, finders fees, final fees, expenses or other monetary amounts shall be payable to you from DELPHI except as provided in Paragraphs 9 and 11 below.

7.  DESTRUCTION OF PROPERTY:

In the event that the Property are wholly or partially damaged or destroyed, or taken under the power of eminent domain in whole or in part, such that DELPHI, in its sole discretion, determines that this Agreement shall be terminated, no commissions, brokerage fees, finder's fees, insurance proceeds, expenses or other monetary amounts shall be payable to you except as provided in Paragraph 9, below.

8.  BUDGET, INITIAL EXPENSES:

You shall pay all normal marketing costs associated with the offering of the Property, including but not limited to, advertising materials, brochures, mailings, signage, media advertising, travel expenses and long distance telephone charges.  You further agree that prior to this Agreement there have been no commissions, fees, or expenses or other monetary amounts which will be reimbursable to you by DELPHI.

DELPHI shall be solely responsible for the cost of any extraordinary marketing activities requested and approved by DELPHI and you in writing and conducted by you.  Placement of any signage on the Property must be approved by DELPHI.

9.  REIMBURSEMENT OF EXPENSES:

In the event that the Property is withdrawn from the market pursuant to Paragraph 4, above, or terminated without cause pursuant to Paragraph 6.B., above, or if the Property is destroyed as discussed in Paragraph 7, above, you will be reimbursed for any actual out-of-pocket expenses incurred by you and attributable specifically to the Property.   Such expenses may include advertising materials, media expenses, telephone and mailing charges, and travel.

Reimbursable expenses shall not exceed Five Thousand and 00/100 Dollars ($5,000.00) and shall not include salary, labor, premiums for first class travel,

3

normal office overhead expenses, or claims or expenses submitted by your contractors or suppliers. Further, reimbursable expenses shall not include routine advertising and marketing in which the Property is one of a group of properties. All reimbursable expenses must have been approved in advance in writing by DELPHI. You agree that you will not be reimbursed unless specific documentation of such expenses, satisfactory to DELPHI in its sole discretion, is provided by you within fifteen (15) days of your receipt from DELPHI of notice that a withdrawal, transfer, termination without cause, or Property damage has occurred.

It is agreed that in the event a commission is paid to you, or if this Listing Agreement expires at the end of this term or any extension term, no expenses of any type will be reimbursed by DELPHI.

10. AGREEMENTS WITH OTHER BROKERS:

You represent and warrant that you have reached or will reach satisfactory agreements relating to commissions, sharing of expenses, and other fee matters among any cooperating, selling, or other third party brokers. You agree to indemnify and hold DELPHI harmless from and against any claims, allegations, liabilities, suits (including reasonable attorney fees), or demands arising from a claim by any such third party broker for a fee or commission, whose claim is based on, or alleged to be based on your conduct. DELPHI agrees to refer to you any and all inquiries received regarding the Property, whether received from you, other brokers or anyone else.

11. PROTECTION PERIOD AND CONDITIONS:

Following the expiration of the listing period or termination without cause by DELPHI, you will be protected and your commission paid if a Sale or Leasing Agreement is executed by DELPHI within sixty (60) days of such expiration or cancellation. Such an Agreement must be with a bona fide prospect which you have listed by name and address, and filed with DELPHI. This list must be filed in writing by certified mail, return receipt requested, within five (5) days after expiration of this listing or within five (5) days of a termination without cause by DELPHI.

12. REPORTS:

You agree to submit a report every four (4) weeks regarding the following:

A. Contacts made, including the type, content, name, date and affiliation of the contact.

B. Showings or inspections of the Property, including the date, time and name of the prospect.

C. Comments regarding general market conditions, including changes and events.

4

D. Comments regarding comparable properties, including newly vacant or newly listed properties, and properties recently sold and properties recently leased.

E. Copies of all advertising done to promote the Property.

13. ADVERTISING CONTENT:

All advertising text and other promotional materials related to marketing the Property must be approved in writing by DELPHI prior to the incurring of any (other than incidental) expenses related to the item, and prior to dissemination or display. Retouching or other alteration of photographs is generally unacceptable. The use of the name Delphi Automotive Systems LLC in advertising related to marketing the Property is subject to prior written approval, and DELPHI must similarly approve the use, design, content and placement of any signage.

Other than including the name of Delphi Automotive Systems LLC in a routine list of representative clients, you shall not, without first obtaining the written approval of DELPHI, advertise or publish the fact that you have contracted to furnish DELPHI with the services agreed upon. No explicit or implicit statement shall be made in a routine list of representative clients, or in any other advertising or published or broadcast material, that would allow a reader, listener, or observer to infer or conclude that DELPHI endorses, favors, approves of or supports you or your services, or their quality, in any manner whatsoever.

14. PRESS STATEMENTS, CONTRACTS WITH GOVERNMENTAL PERSONNEL:

You agree not to issue any press statements or speak directly with the media about the Property, your marketing efforts, or your relationship with Delphi Automotive Systems LLC without prior written approval of DELPHI. Any press inquiries you receive or media articles regarding the Property should be reported immediately to the Real Estate Department of DELPHI, and you are not authorized to speak on behalf of Delphi Automotive Systems LLC. You also agree to report immediately the content of any discussions regarding the Property you have had with, or any inquiries you receive from, any government official or employee.

15. INDEMNIFICATION:

You agree to indemnify and hold Delphi Automotive Systems LLC harmless from and against any liability, claims, demands or expenses (including reasonable attorney fees), or damages to the Property of or injuries (including death) to DELPHI's employees or any other person arising from or in connection with your performance or work or use of Delphi Automotive Systems LLC Property except for liability, claim, or demand arising out of the sole negligence of Delphi Automotive Systems LLC.

16. AUDIT AND INSPECTION:

With respect to commission(s) or expense matters (or the reimbursement or sharing thereof with any party), upon DELPHI's written request you agree to submit sufficient supporting data to permit DELPHI's audit, and shall thereafter

5

promptly furnish such supplemental and supporting information as DELPHI shall request. DELPHI, or it's agents, shall have the right to audit all books, records and other items relating to any commission or expense matter as related to this sale or lease.

17. ENVIRONMENTAL MATTERS:

You acknowledge and agree that any and all information, whether written or oral, regarding the environmental status of the Property provided to you or any prospect, or which comes to your knowledge, shall be considered the sole and exclusive Property of Delphi Automotive Systems LLC and is considered and will be kept confidential in perpetuity. You acknowledge and agree that such information will not be discussed with or provided to any third party, other than those employees or agents of you or the prospect who are essential to completing the sale and or financing of the project, without the prior written consent of DELPHI.

Notwithstanding anything contained herein to the contrary, in the event you are required to disclose any such information to any governmental entity pursuant to applicable law, prior to disclosing the same you shall notify in writing and provide DELPHI with copies of all information which you intend to so disclose. Such notice and information shall be provided to DELPHI in writing at least five (5) business days prior to disclosure of the same to any governmental agency.

If you or your employees or agents disclose information in violation of the provisions of this paragraph, then you agree that you shall be liable to Delphi Automotive Systems LLC for liquidated damages in the amount of Ten Thousand Dollars ($10,000) for each such disclosure. You acknowledge that DELPHI will suffer substantial damages if such information is wrongfully disclosed, but the determination of the exact amount of such damages would be difficult if not impossible. The setting of the Ten Thousand Dollars ($10,000) liquidated damage amount is reasonable in light of all relevant facts now available to the parties. DELPHI shall also be entitled to injunctive relief in order to prevent disclosure of any such information.

18. OTHER CONFIDENTIAL MATTERS:

All information, matters regarding price or other terms, negotiating positions, material, records and other data provided to you by DELPHI or at the request of DELPHI, or by prospects, relating to the Property and the listing are provided solely for providing the services under this agreement. You assert no right or title to, or other interest in, any such information or material. You agree that unless otherwise approved in writing by DELPHI, all such information or material will be treated in absolute confidentiality.

You agree that while you have the custody or possession of any material subject to the confidentiality restrictions of this paragraph, unless otherwise approved in writing by DELPHI, you will not (i) copy or duplicate, or permit anyone else to copy or duplicate, any of such material or (ii) provide or make available such information or material to any other person or entity other than your employees

6

who have a need to know such information. You shall also take appropriate actions by instruction or agreement to advise your employees of their obligations with respect to use, copying, protection and security of such information or material.

In the event you are required to disclose any such information or material to any governmental entity pursuant to applicable law, prior to disclosing the same you shall notify in writing and provide DELPHI with copies of all information which you intend to so disclose. Such notice and information shall be provided to DELPHI in writing at least five (5) business days prior to the disclosure of the same to any government authority.

19. INDEPENDENT CONTRACTING PARTIES:

DELPHI and you are and shall be independent contracting parties. Nothing in this Agreement shall make either party the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other.

20. NO IMPLIED WAIVER:

The failure of either party at any time to require performance by the other party of any provision of this Agreement shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this Agreement constitute a waiver of any succeeding breach of the same or any other provisions.

21. NON-ASSIGNMENT:

You may not assign or delegate your obligations under this agreement without DELPHI's prior written consent.

22. SEVERABILITY:

If any term of this Agreement is invalid or unenforceable under any statute, regulation, ordinance, executive order or any other rule of law, such term shall be deemed reformed or deleted, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Agreement shall remain in full force and effect.

23. ENTIRE AGREEMENT:

This Agreement contains our entire understanding and supersedes all prior Agreements, understanding, discussions, warranties and representations. This Agreement may not be amended or modified except by a document in writing signed by DELPHI and you.

24. CHOICE OF LAW:

This Agreement is to be construed according to the laws of the state of Michigan.

7

25. DELPHI CONTACT:

All matters concerning this Property shall be discussed with Jeff Beaudoen (Office Telephone Number 248-814-1438). Absent emergencies, plans for showings of the Property should be first discussed with the aforesaid and not with personnel at the facility.

Kindly indicate your acceptance of this agreement by signing and returning ONE (1) copy of this listing Agreement.

26. GENERAL TERMS REGARDING SALE, LEASE OR TERMINATION:

A. DELPHI reserves the right to reject any and all offers.

B. This Agreement applies only to the following transaction (s), and DELPHI will consider only those transaction(s) so indicated (circled and initialed) below. Unless you and DELPHI have indicated a transaction below, and executed the appropriate attachment, you agree that referral or mention of a prospect by you to DELPHI will not constitute any reservation or registration with, or obligation of any type by, DELPHI to pay you a commission or any other monetary amount in the event of a future change in the type of transaction desired or subject to consideration by DELPHI (for example, and not by way of limitation, if a sale evolves into a lease, or if a sublease evolves into the purchase of the leasehold or a fee):

I. Sale of Fee:                     __X_ Yes          ___No
   Initial: DELPHI                  Broker

   (If yes, attach and execute DELPHI attachment
   I-Specific Terms Regarding Offers to Purchase Fee.)

II. Lease:                          ___Yes          _X_No
    Initial DELPHI                  Broker

    (If yes, attach and execute DELPHI attachment
    II-Specific Terms Regarding Offers to Lease.)

III. Sale of Leasehold              ___Yes          _X_No
     Initial: DELPHI                Broker

     (If yes, attach and execute DELPHI attachment
     III-Specific Terms Regarding Offers to Purchase Leasehold.)

8

IV.  Sublease:                    ___Yes        **X No**

      Initial  DELPHI _____  Broker _____

(If yes, attach and execute DELPHI Attachment
IV - Specific Terms Regarding Offers to Sublease.)

V.  Early Termination:            ___Yes        **X No**

      Initial  DELPHI _____  Broker _____

(If Yes, attach and execute DELPHI Attachment V-Specific Terms
Regarding Negotiations to Terminate with the Landlord.)

C.  The Property are being offered "as is" without any representation or warranties
as to their condition or soundness.  The prospect should satisfy himself or herself
as to the condition of the Property.

D.  All offers are to be submitted in writing to DELPHI Real Estate Department,
and all must be accompanied by complete detail on the proposed use of the
building, as well as information on the financial capability of the offeror.

    DELPHI shall be given minimum of thirty (30) days to accept or reject the
offer, and such acceptance shall be conditional on, and subject to, the preparation
and full execution of a binding contract which shall be prepared by the Real Estate
Department of DELPHI, or outside counsel.

E.  No commission or commission installment will be considered as due, earned,
or payable until an Agreement as specified in Paragraph 26.D., above, is executed
with a party acceptable to DELPHI and closing has occurred.  The content of any
Agreement, and the acceptability of any party, shall be decided by DELPHI in its
sole discretion.

    The submission of this Agreement to you or of an Agreement specified in
Paragraph 26.D., above, to you or to any party shall be for examination purposes
only.  Such submission does not and shall not constitute a reservation or election
to complete an Agreement with you, or otherwise create any interest in the
payment of any expenses, fees, or commissions by DELPHI.  Further, such
submissions do not and shall not constitute a reservation or election to complete
an Agreement specified in Paragraph 26.D., above, or otherwise create an interest
in the Property or any portion thereof.

    Execution of any Agreement by one party and its return to the other party shall
not be binding, notwithstanding any time interval, until a fully executed
Agreement is delivered to the party which first signed the Agreement.

F.  Any deposits retained from any unconsummated transaction will belong solely
to DELPHI, and unless otherwise provided DELPHI will designate the escrow
agent and the terms and conditions of escrow, if any.  In any event you will, upon

request by DELPHI, promptly and forthwith forward all deposits, whether forfeited or unforfeited under the terms of any Agreement, to DELPHI, any claim or demand to the contrary notwithstanding.

G.  Cooperative listings and other brokerage arrangements must be disclosed and agreed to by DELPHI, and the fee arrangements therefore must be agreed to by any cooperating brokers on Attachment I, II, III, IV, and/or V.

H.  Commissions will not be based upon the value of any personal Property, productive machinery or equipment, or specialized machinery, systems, or equipment, sold to the purchaser of the fee or leasehold, or to a lessee or sublessee, regardless of whether or not a separate bill of sale is issued for such Property.  In any event, the decision of DELPHI and the purchaser as to the allocation of purchase price between the real estate and such Property will be final, as will be the determination of whether any particular Property is real Property (including fixtures) or personal Property.

I.  No representation is made by DELPHI as to the conditions or suitability of the building or Property for any proposed use, and it will be solely the purchaser's or tenant's obligation to determine and be satisfied that its occupancy will not be contrary to any statutes or ordinances, and particularly to the applicable zoning laws, and to pay for any obtain any necessary permits connected with occupancy. The purchaser or tenant will be responsible for obtaining any zoning variances necessary for the use of the Property.

Delphi Automotive Systems LLC

By: _____

Date:  8-29-07

Accepted By: _____

Firm Name:  Jones Lang LaSalle

Date:  8/27/07

## ATTACHMENT I - SPECIFIC TERMS REGARDING OFFERS TO PURCHASE FEE

1. The list price is **$5,250,000**.

2. Commission:

    I.    A commission, based on the following percentage (s) of the actual sale price, will be payable by DELPHI at closing:

        A.    **6.0%** if another ("selling") broker participates in the sale, with you receiving **3.0%** and the selling broker receiving **3.0%** from you.

        B.    **5.0%** if another broker does not participate in the sale.

    II.    If a lease is made pursuant to the sale by DELPHI of a building, for example to make an investment by a purchaser viable, no commission will be paid by DELPHI on the lease or received by JLL from a 3rd-party.

    III.    A fee of **20%** of the net commission received by you will be paid to DREAL, Inc., at closing.

Delphi Automotive Systems LLC

By: _____

Date: 8-29-07

Accepted By: _____

Firm Name: Jones Lang La Salle

Date: 8/27/07

11

## ATTACHMENT II - SPECIFIC TERMS REGARDING BROKER'S SUBAGENT

In order to most effectively market the property, Jones Lang LaSalle has engaged real estate agents Bradley H. Rosely and David J. Levitt of the Grand Rapids based commercial real estate brokerage firm, S.J. Wisinski & Company, as its subagent. Jones Lang LaSalle will share its brokerage fee with S.J. Wisinski on a fifty-fifty basis.

Delphi expressly agrees that for the purposes of this Agreement, the term Selling Broker as it pertains to the brokerage fee (per the schedule in Attachment 1 of this Agreement), excludes only Bradley H. Rosely and David J. Levitt and that any other agent employed at S. J. Wisinski & Company or any other licensed agent or other legal party due a fee under Michgan Law will be considered a "Selling Broker" corresponding to the higher fee.

## RIDER TO THE LISTING AGREEMENT

The provisions of this rider shall be incorporated into the Listing Agreement between Jones Lang LaSalle Americas, Inc. ("Jones Lang LaSalle") and Delphi Automotive Systems LLC ("DELPHI") ("Agreement") for the sale of property located at 999 Randall Street in Coopersville, Michigan (PRP00010) (hereinafter referred to as the "Property") and shall be given full force and effect as if it were part of the Agreement.

LIMITED LIABILITY:

In no event shall any partner, shareholder, director, officer, agent, servant, employee, representative or affiliate of either party shall have any personal liability in connection with this agreement.

Neither party shall be liable to the other for, and each party hereby waives any and all rights to claim against the other, any special, indirect, incidental, consequential, punitive or exemplary damages in connection with this Agreement, including, but not limited to, lost profits, even if such party has knowledge of the possibility of such damages; and in no event shall Jones Lang LaSalle's liability to DELPHI exceed One Million Dollars ($1,000,000) per year; provided however, that such limitation on liability will not apply to losses arising (i) from the indemnifying party's gross negligence, willful, fraudulent or criminal misconduct, or (ii) third-party claims

Delphi Automotive Systems LLC

By: _____

_John A. Jaffurs, Executive Director, Operations Support Group_

Date: _____9/13/07____

Accepted By: _____

Firm Name: _Jones Lang La Salle_

Date: _9/17/07_

Exhibit 3

## CONSULTING AGREEMENT

**THIS CONSULTING AGREEMENT** (this "**Agreement**") is made as of **July 1, 2007,** between **JONES LANG LASALLE AMERICAS, INC.,** a Maryland corporation ("**Jones Lang LaSalle**") and **DELPHI AUTOMOTIVE SYSTEMS LLC,** a Delaware limited liability company ("**Delphi**").

### BACKGROUND

A.    Jones Lang LaSalle and Delphi are parties to a Real Estate Services Agreement, dated September 2, 2005, as amended (the "2005 Agreement"). The 2005 Agreement terminated effective June 30, 2007.

B.    The parties wish to enter into a Consulting Agreement for the provision of consulting services related to Delphi's real estate holdings on a non-exclusive basis.

In consideration of the promises, covenants and agreements set forth below, the parties agree as follows:

## ARTICLE I
## RELATIONSHIP AND SCOPE OF SERVICES

**1.1    Scope.** Delphi hereby retains Jones Lang LaSalle to provide the specific services described, and for the compensation, set forth below (the "**Services**") with respect to real estate in which Delphi has or desires to acquire an ownership, leasehold or subleasehold interest ("**Properties**"). Jones Lang LaSalle agrees to provide the Services upon the terms and conditions set forth in this Agreement.

| Service | Description | Account Personnel | Monthly Fee |
|---|---|---|---|
| Transaction Services | Support Delphi's Operations Support Group corporate real estate organization and any other Delphi real estate activity, as directed by Delphi | Brian Collins | $12,031.88 |
| Administration Services | Lease administration services regarding Delphi Properties, including data entry and database updating as directed by Delphi. | Janice Lanoo | $6,339.38 |

**1.2    Standard of Conduct.** Jones Lang LaSalle shall perform the Services in accordance with this Agreement and all applicable laws, codes, ordinances, regulations and other requirements of governmental authorities and with a level of skill and diligence which is consistent with the highest applicable professional standards for firms of national reputation providing similar services.

## ARTICLE II
## FEES AND EXPENSES

**2.1** **General.** Jones Lang LaSalle will be entitled, as its sole compensation for the Services to (a) receive the monthly fees as set forth in Article 1 above and (b) the expense reimbursements set forth in Exhibit A. Within thirty (30) days of receipt of request for payment in the form approved by Delphi (including all supporting documentation required by Delphi), Delphi shall pay the fee for the Account Personnel for the prior month; provided, however, any reimbursement of employee expenses for the Account Personnel shall be due on the date of payment of any such expenses by Jones Lang LaSalle and shall be made through an ACH Electronic Funds Transfer or other such electronic payment method. The parties shall, in good faith, negotiate reasonable fees and costs to be paid to Jones Lang LaSalle on account of any services performed by Jones Lang LaSalle which Delphi has authorized but which are not within the scope of the Services.

**2.2** **Commission.** Jones Lang LaSalle will be not be entitled to any commission or other fees related to the Services rendered to Delphi unless Jones Lang LaSalle and Delphi enter into a commission agreement for a specific transaction. Notwithstanding the foregoing, nothing contained in this Agreement shall impact Jones Lang LaSalle's rights to receive commissions, if any, in connection with the 2005 Agreement.

**2.3** **Taxes.** Delphi shall be responsible for all taxes due and payable on any compensation or any other payments to Jones Lang LaSalle in connection with the Services to the extent such taxes are not paid by a third party, including any sales tax, value-added tax or gross receipts tax; provided, however, in no event shall Delphi be responsible for any net income, franchise or property tax assessed against Jones Lang LaSalle, all of which shall be the responsibility of Jones Lang LaSalle.

## ARTICLE III
## OBLIGATIONS AND COOPERATION

**3.1** **In General.** Delphi will provide office space, computers, telephones, office equipment and supplies to the Account Personnel. Additionally, Delphi shall provide to designated personnel of Jones Lang LaSalle such information and access to personnel and facilities of Delphi as Delphi determines is necessary or desirable in furtherance of the provision of Services. Delphi shall cooperate with Jones Lang LaSalle and use reasonable efforts to facilitate Jones Lang LaSalle's efficient performance of the Services.

**3.2    Account Personnel:**

A.    During the term of this Agreement, it is understood that Mr. Brian Collins shall provide the Transaction Services and Ms. Janice Lannoo shall provide the Administration Services to Delphi in the manner required under this Agreement (**"Account Personnel"**) unless Delphi requires a changes to the Account Personnel pursuant to Section 3.2.C below.  Said Account Personnel shall be composed of employees of Jones Lang LaSalle that shall be reimbursed for their compensation by Delphi per Article II.  Account Personnel will not work on non-Delphi matters.

B.    All matters pertaining to the employment, supervision, compensation, promotion and discharge of Account Personnel are the full responsibility of Jones Lang LaSalle.  Jones Lang LaSalle will fully comply with all laws and regulations applicable to worker's compensation, social security, unemployment insurance, hours of labor, wages, working conditions and all other employer-employee matters.    Jones Lang LaSalle will require Account Personnel, when on Delphi's premises and performing services for Delphi under this Agreement, to comply with all of Delphi's rules, regulations and policies. Jones Lang LaSalle is likewise responsible for any affiliates, subcontractors and other agents Jones Lang LaSalle uses to perform services under this Agreement.

C.    Delphi may bar Account Personnel from Delphi's premises for failure to obey Delphi's rules, regulations and policies.  Delphi may require Jones Lang LaSalle to replace any Account Personnel barred for failure to obey Delphi's rules, regulations and policies or any Account Personnel who, in Delphi's opinion, fails to perform his responsibilities in accordance with Delphi's expectations

**3.3    Independent Contractors.**    The parties are and shall remain independent contractors, contracting with each other solely for the purpose of carrying out the provisions of this Agreement.  It is expressly understood and agreed that Account Personnel furnished by Jones Lang LaSalle will be and remain the employee of Jones Lang LaSalle.  Under no circumstances may such Account Personnel be considered Delphi's employee or agent with any rights to compensation or benefits other than those provided by Jones Lang LaSalle.  Nothing herein shall constitute either party as the partner, agent or legal representative of the other, for any purpose whatsoever, and in no event shall Jones Lang LaSalle make any commitments of any nature whatsoever which may be binding upon Delphi.

**ARTICLE IV**
**TERM**

The term of this Agreement shall commence on July 1, 2007 and shall terminate on December 31, 2007.  As of September 1, 2007, either party may earlier terminate all or a portion of this Agreement for any reason, provided that such party has given thirty (30) days prior written notice of termination to the non-terminating party in accordance with Section 8.4 hereof; for the sake of clarity if a party wishes to terminate all or a portion of this Agreement effective September 1, 2007, the terminating party would have to deliver notice on or before August 2, 2007.  Notwithstanding the foregoing, either party may terminate this Agreement at any time In the event of a breach of this

Agreement by the other party which is not cured within ten (10) days of written notice sent to the breaching party; provided that, in the event of: (i) any recurring breach by Jones Lang LaSalle of which Jones Lang LaSalle has previously been notified in writing; (ii) the negligent performance of Jones Lang LaSalle's duties under this Agreement of which Jones Lang LaSalle has previously been notified in writing; or (iii) any breach of the confidentiality restrictions of this Agreement, Delphi shall have the right to terminate this Agreement effective upon notice to Jones Lang LaSalle.

## ARTICLE V
## INDEMNIFICATION

**5.1    Indemnification by Jones Lang LaSalle.** Except for the negligence of Delphi and its affiliates and their respective agents and employees, Jones Lang LaSalle shall defend (with counsel reasonably acceptable to Delphi), indemnify and hold harmless Delphi and its affiliates, shareholders, directors, officers, employees and agents from and against all losses, damages, expenses (including reasonable attorney's fees), claims, suits and liabilities of any nature whatsoever arising out of or in connection with its negligent acts or omissions or those of its affiliates or their respective agents, employees, contractors, subcontractors and independent real estate representatives, the failure of Jones Lang LaSalle to comply with the terms and conditions of this Agreement, or premised upon an allegation that Delphi is the employer of Account Personnel. Delphi shall notify Jones Lang LaSalle of any claim, loss or damage for which Jones Lang LaSalle is responsible under this article, promptly after Delphi becomes aware of such claim, loss or damage.

**5.2    Indemnification by Delphi.** Except for the negligence of Jones Lang LaSalle and its affiliates and their respective agents, employees, contractors, subcontractors and independent real estate representatives, Delphi shall defend (with counsel reasonably acceptable to Jones Lang LaSalle), indemnify and hold harmless Jones Lang LaSalle and its affiliates, shareholders, directors, officers, employees and agents from and against all losses, damages, expenses (including reasonable attorney's fees), claims, suits and liabilities of any nature whatsoever arising out of or in connection with its negligent acts or omissions or those of its affiliates or their respective agents and employees or the failure of Delphi to comply with the terms and conditions of this Agreement. Jones Lang LaSalle shall notify Delphi of any claim, loss or damage for which Delphi is responsible under this article, promptly after Jones Lang LaSalle becomes aware of such claim, loss or damage.

**5.3    Limitation on Liability.**

A.    Each party's liability hereunder shall be limited to its assets; and no partner, director, officer, agent, servant, employee, representative or affiliate of either party shall have any personal liability in connection with this Agreement. In no event will either party be liable to the other for any loss of or damage to revenues, profits or goodwill or other special, incidental, indirect, consequential or punitive damage of any kind resulting from its performance or failure to perform the terms of this Agreement or from the provision of Services, including, without limitation, any interruption of business, even if it has been advised of the possibility of such damages; and in no event shall each party's liability under this Agreement (a) in connection with Administrative Services (described in Section 1.1 above) exceed Fifty Thousand Dollars ($50,000) and (b) in connection with any Transaction Services (described in Section 1.1 above) exceed Five Hundred

Thousand Dollars ($500,000); provided however, that such limitation on liability will not apply to losses arising (i) from the indemnifying party's gross negligence, willful, fraudulent or criminal misconduct, or (ii) third-party claims.

B.    Notwithstanding the foregoing, Jones Lang LaSalle has advised Delphi: (i) that it recommends that Delphi expand the scope of Jones Lang LaSalle's retention to provide two (2) full-time professionals rendering Administrative Services; and (ii) the retention of two (2) full-time professionals rendering Administrative Services will eliminate the risk of loss that could otherwise arise due to any interruption in the services to be rendered by the sole professional providing Administrative Services to Delphi pursuant to this Agreement.  The parties agree that Jones Lang LaSalle shall not be liable to Delphi for any loss, claim or damage resulting from any interruption in Administrative Services due to Delphi's election to retain only one (1) professional from Jones Lang LaSalle for the Administrative Services.

5.4    **Survival of Indemnification.**  The provisions of this article shall survive the termination of this Agreement.

### ARTICLE VI
### CONFIDENTIALITY

6.1    **Confidential Information Regarding Delphi:**

A.    Jones Lang LaSalle acknowledges that, in connection with the performance of the Services, Delphi shall provide Jones Lang LaSalle with information Delphi believes is necessary to permit Jones Lang LaSalle to understand Delphi's requirements with respect to particular Properties and Delphi may provide Jones Lang LaSalle with other information relating to Delphi and the Properties that is not generally known to the public or which Delphi considers to be confidential or proprietary.  Jones Lang LaSalle further acknowledges that information regarding: (i) Delphi's interest in Properties; (ii) the business plans, needs and requirements of Delphi; and (iii) terms which may be acceptable to Delphi under prospective leasing and purchase agreement is highly confidential and is maintained by Delphi as trade secrets.  (All information identified in the preceding two (2) sentences is hereafter referred to as **"Delphi Confidential Information"**.)

B.    Jones Lang LaSalle shall not: (i) disclose Delphi Confidential Information to any person or entity other than employees who have a need to know such information; (ii) use Delphi Confidential Information for the benefit of any person or entity other than Delphi; or (iii) assert any right, title or other interest in Delphi Confidential Information.  Jones Lang LaSalle shall also take appropriate actions by instruction or agreement to advise employees of their obligations with respect to use, copying, protection and security of Delphi Confidential Information.  Notwithstanding anything contained in this Agreement, Jones Lang LaSalle shall have the right to disclose such information which: (i) is or becomes available to the public other than as a result of a breach by Jones Lang LaSalle under this Section 6.1; (ii) becomes available to Jones Lang LaSalle from a third party not known by Jones Lang LaSalle to be under any obligation of confidentiality to Delphi; (iii) Jones Lang LaSalle is legally required to disclose or as is necessary or desirable in any litigation or dispute resolution

proceedings between Delphi and Jones Lang LaSalle; or (iv) is, in Delphi's sole and exclusive judgment, reasonably necessary for Jones Lang LaSalle to perform its services hereunder.

**6.2    Confidential Information Regarding Jones Lang LaSalle.**    Delphi acknowledges that source codes and operating features of software programs developed and to be developed by Jones Lang LaSalle may be confidential or proprietary and may be maintained by Jones Lang LaSalle as trade secrets if they were developed at no cost to Delphi and outside of the performance of the Services. (All programs and information identified in the preceding sentence, which are proprietary or confidential and have been developed at no cost to Delphi and outside of the performance of the Services shall be referred to as "**Jones Lang LaSalle Confidential Information**"). Delphi shall use reasonable efforts to respect and observe the confidential or proprietary nature of Jones Lang LaSalle Confidential Information if Jones Lang LaSalle has advised Delphi of its confidential or proprietary nature at the time the applicable information is disclosed to Delphi. Delphi shall not use Jones Lang LaSalle Confidential Information for the benefit of any person or entity other than Jones Lang LaSalle or Delphi. Notwithstanding anything contained in this Agreement, Delphi shall have the right to disclose such information which: (i) is or becomes available to the public other than as a result of a breach by Delphi under this Section 6.2; (ii) becomes available to Delphi from a third party not known by Delphi to be under any obligation of confidentiality to Jones Lang LaSalle; or (iii) Delphi is legally required to disclose or as is necessary or desirable in any litigation or dispute resolution proceedings between Delphi and Jones Lang LaSalle.

**6.3.    Advertisement and Publication:**

A.    Jones Lang LaSalle shall not, without the written approval of Delphi, advertise or publish the fact that Jones Lang LaSalle has contracted with Delphi to furnish services to Delphi. In addition, Jones Lang LaSalle shall not make any explicit or implicit statement that would allow a listener, observer or reader to infer or conclude that Delphi approves of, endorses, favors or supports Jones Lang LaSalle, or its quality, in any manner whatsoever.

B.    Without the prior written approval of Delphi, Jones Lang LaSalle shall not issue any press statements or speak directly with the media about any services provided under this Agreement or its relationship with Delphi. Any press inquiries Jones Lang LaSalle receives regarding this Agreement or the Services or any other matter pertaining to Delphi must be reported immediately by Jones Lang LaSalle to Delphi.

C.    In locating Properties, Jones Lang LaSalle shall not advise any owner or any other third party of Jones Lang LaSalle's relationship to Delphi, except as Delphi directs in writing. Unless Delphi otherwise requests, Jones Lang LaSalle shall advise owners and their representatives and agents that Jones Lang LaSalle is acting on behalf of an undisclosed principal; provided, however, in no event shall Jones Lang LaSalle be required to sign any agreements as an undisclosed principal.

D.    Neither party shall disclose the economic terms of this Agreement, except: (i) as is legally required; or (ii) is necessary or desirable in any litigation or dispute resolution proceedings that involve the parties.

### 6.4    Use of Software and Similar Property:

A.    Jones Lang LaSalle may use or develop software and similar and related materials in the course of its performance of the Services. However, Jones Lang LaSalle may change any database or software used to maintain Delphi's information database without Delphi's prior written approval if such changes do not adversely affect the storage of or reasonable access to Delphi's data. Delphi shall own any such software (and related source codes or documentation) and all similar materials, which are developed at Delphi's cost or expense. Delphi agrees that it has no right in any such software (or related source codes or documentation) or any similar materials, including, without limitation, any right to purchase, license, use or restrict the use of any such software or similar materials if they have been developed without cost to Delphi. Without limiting the above, upon termination of this Agreement, Jones Lang LaSalle shall cooperate in transferring the data/information in the database managed by Jones Lang LaSalle to Delphi in a machine readable form. Except as set forth herein, no right is granted Delphi in any software upon which the database has been constructed. Jones Lang LaSalle shall be reimbursed its reasonable costs, expenses and time (at hourly rates negotiated between the parties) incurred pursuant to said transfer.

B.    Jones Lang LaSalle will maintain the Delphi+ Lease Administration System to permit the Account Personnel to manage Delphi's worldwide owned and leased real property portfolio. The fee for the Delphi+ Lease Administration System is One Thousand Five Hundred Dollars ($1,500) per month.

### 6.5    Survival. The provisions of this article shall survive the termination of this Agreement.

### ARTICLE VII
### REPRESENTATIONS

### 7.1    Jones Lang LaSalle's Representations.    Jones Lang LaSalle represents that:

A.    Jones Lang LaSalle has the full power and authority to: (i) execute, deliver and perform this Agreement; and (ii) carry out its business as now conducted and contemplated hereby.

B.    This Agreement has been duly authorized, executed and delivered by Jones Lang LaSalle and constitutes the legal, valid and binding obligation of Jones Lang LaSalle, enforceable against Jones Lang LaSalle in accordance with the terms hereof, subject, however, to limitations imposed by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the enforcement of creditors' rights generally and to general principles of equity.

C.      Jones Lang LaSalle is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Maryland.  Jones Lang LaSalle is authorized to conduct business, to the extent required by applicable law, in each State in which it currently conducts its business

**7.2**   **Delphi's Representations.**  Delphi represents that:

A.      Delphi has the full power and authority to: (i) execute, deliver and perform this Agreement; and (ii) carry out its business as now conducted and contemplated hereby.

B.      This Agreement has been duly authorized, executed and delivered by Delphi and constitutes the legal, valid and binding obligation of Delphi, enforceable against Delphi in accordance with the terms hereof, subject, however, to limitations imposed by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the enforcement of creditors' rights generally and to general principles of equity.

C.      Delphi is a limited liability company duly formed and validly existing and in good standing under the laws of the State of Delaware.  Delphi is authorized to conduct business, to the extent required by applicable law, in each State in which it currently conducts its business.

### ARTICLE VIII
### GENERAL PROVISIONS

**8.1**   **Entire Agreement.**  This Agreement supersedes any and all prior agreements, whether oral or in writing, and sets forth the entire understanding and agreement between Jones Lang LaSalle and Delphi regarding the subject matter hereof.  This Agreement may be amended, modified or supplemented only in writing as agreed to and signed by authorized representatives of Jones Lang LaSalle and Delphi.

**8.2**   **No Waiver.**  No forbearance, delay or indulgence by either party in enforcing the provisions of this Agreement shall prejudice or restrict the rights of that party, nor shall any waiver of its rights operate as a waiver of any subsequent breach.

**8.3**   **Severability.**  If any provision of this Agreement is held invalid or unenforceable and a court refuses to modify or reform any such provision, such provision shall be eliminated from this Agreement but each of the remaining provisions shall remain in full force and effect.  The provisions contained in this Agreement are deemed separate and severable.

**8.4**   **Notices.**  All notices required hereunder shall be in writing and delivered to the address of the recipient set forth below its signature hereto or such other address as the recipient may designate by notice given in accordance with this section.  Any notice shall be delivered by hand, overnight courier service or by certified first class mail return receipt requested, postage prepaid and shall be deemed to have been served upon receipt or refusal to accept receipt.

**8.5    Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original. Such counterparts shall together constitute one and the same document. Signatures transmitted by facsimile shall be considered authentic and legally binding.

**8.6    Assignment.** Except for assignment to affiliates of Delphi, Delphi shall not assign any of its rights or obligations hereunder, whether in whole or in part, without the prior written consent of Jones Lang LaSalle, which consent may be unreasonably withheld, provided that Delphi may require that Jones Lang LaSalle continue to perform Services under this Agreement with respect to any business unit or property that is sold, disposed of or otherwise transferred by Delphi. Jones Lang LaSalle may not assign any of its rights or obligations hereunder, whether in whole or in part, without the prior written consent of Delphi, except that Jones Lang LaSalle may assign its rights and obligations under this Agreement to any successor to Jones Lang LaSalle's entire business operations as a result of any merger, consolidation or sale of substantially all of its assets, provided the assignee assumes all of Jones Lang LaSalle's obligations hereunder and Delphi receives at least thirty (30) days' prior written notice of the assignment. If Jones Lang LaSalle assigns this Agreement, Jones Lang LaSalle shall remain liable under this Agreement.

**8.7    Conflicts of Interest.** Jones Lang LaSalle acknowledges and agrees that, although Jones Lang LaSalle is not an agent of Delphi in performing the Services under this Agreement, Jones Lang LaSalle shall be obligated to: (i) exercise the good faith, loyalty and honesty that an agent owes to its principal; (ii) disclose to Delphi all potential conflicts of interest that may arise between Delphi and Jones Lang LaSalle; and (iii) act in the best interest of Delphi at all times.

**8.10    Governing Law; Jurisdiction.** This Agreement has been negotiated, executed by Delphi and delivered in the State of Michigan. This Agreement and the respective rights and obligations of the parties under this Agreement shall be governed by, and shall be determined under, the internal laws of the State of Michigan applicable to contracts between residents of the State of Michigan to be performed solely in the State of Michigan, i.e., without regard to choice of law principles. Without limitation of the parties' agreement to arbitrate disputes as set forth in Section 8.11 10 below, the parties hereto agree that, in the event any legal action involving or relating to this Agreement is instituted as a result of, in connection with our outside of arbitration, such action shall be brought and maintained solely in a court of the State of Michigan or a Federal court sitting in the State of Michigan. Jones Lang LaSalle hereby consents and agrees to cause each affiliate of Jones Lang LaSalle and each subcontractor, agent, representative and independent real estate representative that performs any of the Services under this Agreement to consent to the exclusive jurisdiction of the courts of the State of Michigan and Federal courts sitting in the State of Michigan.

**8.11    Arbitration.** Any dispute or issue of interpretation between Jones Lang LaSalle and Delphi arising out of this Agreement shall be resolved in the following manner: Notwithstanding the submission to jurisdiction set forth in Section 8.10 above, either party may (as the exclusive remedy available to it) seek binding arbitration in Southfield, Michigan (or such other location in the Detroit, Michigan metropolitan area as the offices of the American Arbitration Association may be relocated), in accordance with the commercial arbitration rules of the American Arbitration Association. A single arbitrator shall be jointly selected by the parties to this Agreement. If the parties to this

Agreement fail to agree on a single arbitrator within sixty (60) days of the filing of a demand for arbitration, the American Arbitration Association shall select the arbitrator. The arbitration shall be conducted at the offices of the American Arbitration Association in Southfield, Michigan. The arbitrator has the authority to order, and the parties agree to submit to discovery under, procedures consistent with the Michigan Court Rules of 1985, as amended Subchapter 2.300, Discovery, or any hereinafter promulgated amendment or replacement provision. Jones Lang LaSalle hereby consents and agrees to cause each affiliate of Jones Lang LaSalle and each subcontractor, agent, representative and independent real estate representative that performs any of the Services under this Agreement to consent to the authority of an arbitrator selected in accordance with this Section 8.11. The award of the arbitrator shall be binding upon all parties, an a judgment upon the award may be entered by any court of competent jurisdiction. The substantially prevailing party in the arbitration shall be entitled to recover from the non-prevailing party its reasonable expenses incurred in connection with any such arbitration proceeding.

    **8.12   Audit.** Delphi shall have the right, at any time and from time to time, upon reasonable prior written notice to Jones Lang LaSalle, to review, audit and make copies of all relevant books, records, payroll data, receipts, agreements, documents and other materials, including Jones Lang LaSalle's administrative and accounting policies, guidelines, practices and procedures, which relate to the Services being performed under this Agreement, in order to substantiate any charges and other matters arising under this Agreement. Jones Lang LaSalle will maintain and preserve all such documents for a period of two (2) years following final payment for the Services to which the documents relate. Jones Lang LaSalle will provide Delphi with reasonable access to its facilities and otherwise cooperate and facilitate any such review and audits by Delphi.

    **IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first set forth above.

**JONES LANG LASALLE AMERICAS, INC.**

By: _____

Its: _____

_____
_____
_____

Attn: _____

**DELPHI AUTOMOTIVE SYSTEMS LLC**

By: _____

Its: _____

5825 Delphi Drive
Troy, Michigan  48098-2815
Attn:  Director of Operations Support
            Group

## EXHIBIT A

### EXPENSE REIMBURSEMENT

All reasonable out-of-pocket expenses directly related to the Account Personnel performing the Services (including necessary travel, accommodations, apartment rentals, etc., but excluding costs of Jones Lang LaSalle's home office and other overhead expenses) shall be reimbursed to Jones Lang LaSalle, provided that Delphi shall have approved such out-of-pocket expenses in writing in advance.   Such reimbursements shall be made thirty (30) days following receipt of request for reimbursement in the form approved by Delphi (including all supporting documentation required by Delphi).   Jones Lang LaSalle will comply with Delphi's policies regarding expense reimbursements, as the same may be modified from time to time.  Jones Lang LaSalle shall also comply with the requirements regarding travel arrangements set forth below.

### TRAVEL REIMBURSEMENT

A.    If Account Personnel are required by Delphi to travel as an incidental requirement in performing services for Delphi, then such travel expenses, subject to prior written approval of Delphi, will be reimbursable as follows:

| | |
|---|---|
| 1. Air Travel | Economy/Coach class only.  Business class is permitted for travel only to the Asia Pacific region and upon prior written consent by Delphi. |
| 2. Hotel | Jones Lang LaSalle will exercise good, sound business judgment and discretion in choosing hotels, such as moderately priced chain hotels or hotels that offer discounted corporate rates.  Where extended travel is involved, reduced rates may be available and should be requested. |
| 3. Rental cars | Compact or intermediate class only.  The cost of collision damage waiver and personal accident insurance is the responsibility of Jones Lang LaSalle. |
| 4. Mileage Allowance | Reimbursement will be at $0.32 per mile, or no less than whatever Delphi reimburses on a regional basis to its employees, which are in excess of his or her normal commute from home to work and back.  When permanently assigned to another location, even if the new location is temporary, Jones Lang LaSalle will not be reimbursed for excess miles, additional driving time, etc. |
| 5. Expense Reports | Customarily available receipts for all reimbursable expenses must be attached to expense reports Jones Lang LaSalle submits. Detailed receipts are required for all meals and other expenditures of $25.00 or more. |
| 6. Meals | Meals will not be reimbursed for non-overnight trips, except in the case of late return occasioned by travel outside normal |

7. Extended Travel      Jones Lang LaSalle should review the home visit policy prior to a trip. Generally, the following provisions apply:

If the travel expense is less than the living expense in the temporary location, Jones Lang LaSalle will be reimbursed for travel to the permanent location every week.

If the travel expense is more than the living expense in the temporary location, Jones Lang LaSalle will be reimbursed for travel to the permanent location every two weeks.

Excess expenses due to frequent travel or stays will not be reimbursed by Delphi without its prior written approval.

8. Miscellaneous      When Jones Lang LaSalle (or its employee) chooses an alternative method of transportation, *e.g.,* to drive instead of fly, reimbursement, including meals and lodging, will not exceed the lesser of the two costs. Documentation to support the lesser cost must be attached to expense report. Travel time must also be limited if on working hours.

The employee, his or her immediate supervisor, and an authorized Delphi representative must sign the expense report form.

Jones Lang LaSalle is responsible for travel reservations, hotel/motel accommodations and rental cars. If directed by Delphi, Jones Lang LaSalle will make all travel arrangements through Global Experts in Travel (GET) using a special account set up for such purposes.

Any cash advance by Jones Lang LaSalle to its employee is the responsibility of Jones Lang LaSalle.

B.      All travel for which Jones Lang LaSalle seeks reimbursement will be submitted to Delphi on standard vouchers, with substantiating documentation, and will accompany the monthly invoices.

Exhibit 4

**Jones Lang LaSalle Conflict Summary**

| Company | Nature of Service |
|---|---|
| American Axle and Manufacturing Holdings Inc. | Facility Management |
| Ford Motor Co. | Facility Management |
| General Motors Corp. | Non – exclusive  transaction management, project management and facility management, Investment Management |
| GM Powertrain | Non – exclusive  transaction management, project management and facility management |
| GMNA | Non – exclusive  transaction management, project management and facility management |
| GMSPO | Non – exclusive  transaction management, project management and facility management |
| AON (Bermuda) Limited | Regional transaction services |
| AON Risk Services, Inc. | Regional transaction services |
| AON Risk Services of Illinois | Regional transaction services |
| Hewitt Associates | Regional transaction services |
| MetLife | Regional transaction services |
| St. Paul Fire & Marine Insurance Company | Regional transaction services |
| Towers Perrin | Regional transaction services |
| Microsoft Services | Regional transaction services, project management |
| Motorola Inc. | Facility Management |
| Siemens AG | Facilities Management |
| Visteon Automotive Systems | Facility Management, Project Management |
| Federal Mogul Corp. | Non exclusive Transaction Services |

| | |
|---|---|
| Shell Oil | Leasing & Management |
| Saturn Corp. | Non – exclusive  transaction management, project management and facility management |
| Toronto Dominion Bank | Project Management |
| Fidelity Institutional Retirement Services Company | Facility Management |
| Ernst & Young | Regional transaction services & Project Management |
| KPMG LLC | Regional transaction services |
| Linklaters | Transaction services |
| Foley & Lardner LLP | Regional transaction services & Project Management |
| J.P. Morgan Trust Company, N.A. | Transaction Services & Leasing & management services |
| ABN AMRO Incorporated | Non – exclusive  transaction management, project management and facility management |
| Banc of America Securities LLC | Non – exclusive  transaction management, project management and facility management |
| Citigroup Global Markets Inc. | Transaction services, Leasing & Management services |
| Deutsche Bank Securities Inc. | Transaction services , Facility Management Services |
| HSBC Securities Inc. | Transaction Services, Facility Management |
| Wachovia Capital Markets, LLC | Facility Management |
| International Brotherhood of Electrical Workers | Leasing & management services |
| LaSalle National Bank | Facility Management Services |
| Wells Operating Partnership, L.P. | Leasing & Management services |
| Honeywell International | Public Institution services |
| Verizon | Project management services |
| Goldman Sachs Credit Partners L.P. | Facility Management Services |

| | |
|---|---|
| National City Bank | Project management and Transaction services |
| Wells Capital Management | Leasing & management services |
| Wind River CLO I, Ltd. | Regional Transaction services |
| Lehman Brothers | Leasing & Management services |
| Mellon Trust | Exclusive transaction management, project management and facility management |
| State Street Bank and Trust Company | Project Management services |
| Capital Group International, Inc. | Leasing & Management services |