**Hearing Date and Time: October 25, 2007 at 10:00 a.m.**
**Objection Deadline: October 18, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| DELPHI CORPORATION, et al., | Case No. 05-44481 (RDD) |
| | (Jointly Administered) |
| Debtors. | |

MOTION FOR ORDER UNDER FED. R. BANKR. P. 9019 AUTHORIZING AND APPROVING DELPHI AUTOMOTIVE SYSTEMS LLC'S ENTRY INTO SETTLEMENT AGREEMENT WITH VALEO SWITCHES AND DETECTIONS SYSTEMS, INC. AND VALEO ELECTRICAL SYSTEMS, INC.

("VALEO SETTLEMENT MOTION")

Delphi Automotive Systems LLC ("DAS LLC"), a debtor in the above-captioned cases, hereby submits this Motion For Order Under Fed. R. Bankr. P. 9019 Authorizing And Approving DAS LLC'S Entry Into Settlement Agreement With Valeo Switches And Detections Systems, Inc. And Valeo Electrical Systems, Inc. (the "Motion"), and respectfully represents as follows:

## Background

### A. The Chapter 11 Filings

1. On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

2. No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee," and together with the Creditors' Committee, the "Statutory Committees").

3. On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263) (the "Plan") and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264) (the "Disclosure Statement"). No order approving the Disclosure Statement or confirming the Plan has yet been entered by this Court.

4. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

5. The statutory predicate for the relief requested herein is rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B. Current Business Operations Of The Debtors

6. Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Court.[2]

7. The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

---

[1] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[2] On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Spanish court approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

8. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C. Events Leading To The Chapter 11 Filing

9. In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

10. The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

[3] Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

11. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D. The Debtors' Transformation Plan

12. On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations. The Debtors stated that they needed to focus on five key areas:[4] first, modifying the Company's labor agreements to create a competitive arena in which to conduct business;[5]

---

[4] In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors and a plan framework support agreement with those investors and GM. On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework support agreement. On July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors"). Under the Delphi-Appaloosa EPCA, the New Plan Investors agreed to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization. This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.

[5] As of August 29, 2007, this Court has entered the following orders approving settlements between Delphi and each of its U.S. labor unions:

second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[6] third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus;[7] fourth, transforming their salaried workforce to ensure that the Company's organizational and cost

---

- International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (Docket No. 8693);
- International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America (Docket No. 9106);
- International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers (Docket No. 9107); and
- United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and USW Local 87L (Docket No. 9169).

On September 4, 2007, at Delphi's request, this Court entered an order withdrawing without prejudice Delphi's motion for order under sections 1113(c) and 1114(g) of the Bankruptcy Code authorizing rejection of collective bargaining agreements and modification of retiree welfare benefits (Docket No. 9221).

6 On September 6, 2007, Delphi announced that it entered into agreements with GM consisting of a Global Settlement Agreement and a Master Restructuring Agreement, both of which are subject to this Court's approval as part of the plan confirmation process. Delphi's comprehensive settlement with GM resolves all outstanding disputes between Delphi and GM. The Global Settlement Agreement and Master Restructuring Agreement were filed as Exhibits 7.20(a) and 7.20(b) to the Plan, respectively. See Docket No. 9263.

7 In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants. The Debtors have been working to divest non-core assets so as to maximize the value of their estates for stakeholders. During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, and their brake hose and catalyst businesses. The Debtors also obtained court approval for the sale of substantially all of the assets of their Saltillo, Mexico brake plant business. In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

structure is competitive and aligned with its product portfolio and manufacturing footprint;[8] and devising a workable solution to their current pension situation.[9]

E. The Debtors' Plan Of Reorganization

13. By filing the Plan and related Disclosure Statement on September 6, 2007, the Debtors reached another key milestone in their chapter 11 cases. The Plan is based upon a series of global settlements and compromises that involve every major constituency in the Debtors' reorganization cases. A hearing on the Debtors' solicitation procedures and Disclosure Statement commenced on October 3, 2007 and is scheduled to continue on October 25, 2007. If this Court authorizes the Debtors to solicit acceptances or rejections of the Plan (as such Plan may be modified) by October 31, 2007, the Debtors expect to confirm their Plan and commence the rights offering contemplated by the Plan in December 2007 and emerge from chapter 11 as soon as practicable thereafter. Currently, the Debtors expect to emerge from these chapter 11 cases by January 2008.

---

[8] As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages. The Company's revised operating structure consists of its four core business segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture. The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan. To ensure that their organizational and cost structure is competitive, the Debtors obtained an Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order"). The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[9] To that end, on May 31, 2007, this Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 pension plan year funding waivers, which were approved by the IRS on May 1, 2007, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Pension Plans"). On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Pension Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively. On September 28, 2007, the IRS approved a similar waiver with respect to the Delphi Hourly-Rate Employees Plan for the September 30, 2007 pension plan year. The Debtors' motion for authority to perform under the terms of that waiver is scheduled for an October 25, 2007 hearing. On October 4, 2007, the IRS, at Delphi's request, further modified the conditions to the initial waivers so that they are generally consistent with the conditions to the most recent waiver.

14. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

15. By this Motion, DAS LLC seeks entry of an order under Bankruptcy Rule 9019 authorizing and approving a settlement agreement (the "Settlement Agreement") entered into by and among DAS LLC, Valeo Switches and Detections Systems, Inc., and Valeo Electrical Systems, Inc. (together with Valeo Switches and Detections Systems, Inc., "Valeo").

Basis For Relief

F. Background To The Proposed Settlement Agreement

16. Prior to the commencement of these chapter 11 cases, Valeo sold certain multi-function electrical switches to DAS LLC, which DAS LLC used in steering column assemblies sold to DAS LLC's customers. On March 18, 2005, DAS LLC filed an action entitled Delphi Auto. Sys., L.L.C. v. Valeo Switches & Detection Sys., Inc., et al., Case No. 05-55765-CK, in the Circuit Court for the County of Saginaw, State of Michigan (the "State Court Action") alleging that some of the multi-function electrical switches sold by Valeo to DAS LLC were defective. In the State Court Action, DAS LLC sought to recover damages from Valeo arising from the allegedly defective switches based on (a) alleged breach of warranty agreements contained in certain purchase orders and (b) Valeo's alleged violations of certain provisions of the Michigan Uniform Commercial Code.

G. The Proposed Settlement Agreement

17. As a preliminary matter, notwithstanding Bankruptcy Rule 9019(a), DAS LLC believes that it is authorized to settle the dispute with Valeo in the ordinary course of business under section 363(c) of the Bankruptcy Code, without this Court's approval. But, at the request, and upon the insistence, of Valeo, DAS LLC is filing this Motion to seek this Court's approval of the Settlement Agreement.

18. To resolve and settle the State Court Action and any other claims that DAS LLC may have against Valeo relating to the sale of the multi-function electrical switches by Valeo to DAS LLC as of the date of the Settlement Agreement, Valeo and DAS LLC have, subject to this Court's approval, entered into the Settlement Agreement, a copy of which is attached hereto as Exhibit A. The salient terms of the Settlement Agreement are as follows:[10]

1) The effectiveness of the Settlement Agreement is contingent upon entry of a final and non-appealable order by this Court approving the Settlement Agreement;

2) Valeo would pay $4 million to DAS LLC (the "Settlement Payment");

3) DAS LLC and its officers, employees, administrators, agents, successors, and assigns (the "DAS LLC Releasors") would release and forever discharge Valeo and its officers, employees, agents, successors, and assigns (the "Valeo Releasees") from any and all actions, causes of action, claims, damages, demands, debts, liabilities, and obligations, arising out of or related to the S/T and M/L steering column multi-function electrical switches sold by Valeo to DAS LLC (or the costs of GM's recalls of the S/T and M/L multi-function electrical switches), including, but not limited to, any claims that were asserted in the State Court Action which may be asserted by DAS LLC against the Valeo Releasees, or that any of them had, now have, or could claim to have, in the State Court Action related to such S/T and M/L electrical switches, as of the date of the Settlement Agreement as well as any potential claim relating to the Grand Prix steering column multifunction electrical switch for the 2000 through 2002

[10] The discussion of the Settlement Agreement herein is only intended to provide a summary of the settlement terms. To the extent this summary differs in any way from the terms of the Settlement Agreement, the terms of the Settlement Agreement control.

model years; provided however, that nothing in the Settlement Agreement will constitute a release or discharge by the DAS LLC Releasors of any claim against the Valeo Releasees arising under chapter 5 of the Bankruptcy Code or otherwise unrelated to the State Court Action;

4) DAS LLC represents and warrants that DAS LLC is the sole owner of all of DAS LLC's claims against Valeo arising out of or in connection with all multi-function electrical switches sold to DAS LLC by Valeo, including, but not limited to, the claims asserted in the State Court Action; and

5) DAS LLC would agree to indemnify and hold harmless Valeo and any the Valeo Releasees from and against any losses, costs, expenses, damages, or expenditures that Valeo and any of the Valeo Releasees may suffer, incur, or sustain arising out of, attributable to, or resulting from any breach of DAS LLC's representations described in subparagraph 4) above.

Applicable Authority

19. By this Motion, DAS LLC respectfully requests the entry of an order under Bankruptcy Rule 9019(a) approving the Settlement Agreement. Bankruptcy Rule 9019 provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Bankruptcy Rule 9019(a). Settlements and compromises are "a normal part of the process of reorganization." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 308 U.S. 106, 130 (1939)); see also In re Adelphia Communications Corp., 327 B.R. 143, 159 (decision to accept or reject settlement lies within sound discretion of bankruptcy court), adhered to on reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

20. Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate when the compromise is fair and equitable and is in the best interests of the debtor's estate. See, e.g., TMT Trailer Ferry, 390 U.S. at 424; Adelphia, 327 B.R. at 159 ("The settlement need not be the best that the debtor could have obtained. Rather, the settlement must fall 'within the reasonable range of litigation possibilities.'") (citations omitted) (quoting In re Penn Centr. Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979); Nellis v. Shugrue, 165 B.R. 115, 121

(S.D.N.Y. 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it."). In general, compromises in the bankruptcy context should be approved unless they "'fall below the lowest point in the range of reasonableness.'" Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (citation omitted).

21. The Supreme Court in TMT Trailer Ferry set forth the following factors that courts should consider in determining whether a proposed settlement or compromise is in the best interests of a debtor's estate: (a) the probability of the debtor's success in the litigation, (b) the difficulties associated with collection, (c) the complexity of the litigation and the attendant expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors. TMT Trailer Ferry, 390 U.S. at 424-25; see also Nellis, 165 B.R. at 122; Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002).

22. Courts in this district have further elaborated on these factors to consider the following factors, among other factors, where applicable: (a) the balance between the likelihood of plaintiff's or defendants' success should the case go to trial vis-à-vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures, (b) the prospect of complex and protracted litigation if the settlement is not approved, (c) the nature and breadth of releases to be obtained by the directors and officers as a result of the settlement, and (d) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion. Adelphia, 327 B.R. at 159-60; accord In re Texaco Inc., 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

23. The bankruptcy court need not determine that all of the foregoing criteria favor approval of a compromise, and the proposed compromise need not be the best agreement

that the debtor could have achieved under the circumstances. See Adelphia, 327 B.R. at 159-60. Instead, the court's proper "role is to determine whether the settlement as a whole is fair and equitable," In re Lee Way Holding Co., 120 B.R. 881, 890 (Bankr. S.D. Ohio 1990), and falls "'within the reasonable range of litigation possibilities.'" In re Telesphere Communications, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994) (citation omitted). To that end, courts should not substitute their own judgment for that of the debtor, but rather should "'canvass the issues'" to affirm that the proposed settlement falls above "'the lowest point in the range of reasonableness.'" Adelphia, 327 B.R. at 159 (quoting W.T. Grant Co., 699 F.2d at 608); accord Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd sub nom. Sobchack v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.), 17 F.3d 600 (2d Cir. 1994).

24. The Settlement Agreement between DAS LLC and Valeo should be approved under Bankruptcy Rule 9019(a) because its terms are fair and equitable, fall well within the range of reasonableness, and are in the best interests of DAS LLC and its estate. As is the case with any litigation, the outcome of the State Court Action is uncertain, and a trial on the merits would involve significant time and expense and impose an administrative burden on DAS LLC's estate. Additionally, because Valeo continues to supply certain automotive parts to DAS LLC, continued active litigation between DAS LLC and Valeo could ultimately impair the business relationship between the parties. By entering into the Settlement Agreement, DAS LLC and Valeo could put their commercial dispute behind them and continue their normal business relationship without the distraction of the pending State Court Action. Absent the Settlement Agreement, the parties would return to expensive and time consuming litigation to the detriment of DAS LLC and its estate.

25. Moreover, upon entry of a final order approving of the Settlement Agreement, DAS LLC would receive a payment of $4 million to resolve all claims that DAS LLC has against Valeo related to any and all multi-function electrical switches sold by Valeo to DAS LLC. In the exercise of its business judgment, DAS LLC believes that the terms of the Settlement Agreement are reasonable and are in the best interests of DAS LLC's estate. Based on the benefits to be realized from entering into the Settlement Agreement, together with the potential harm to the estate if the relief requested herein is not granted, DAS LLC respectfully requests that the Motion be granted.

## Notice Of Motion

26. Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered October 26, 2006 (Docket No. 5418). In light of the nature of the relief requested, DAS LLC submits that no other or further notice is necessary.

## Memorandum Of Law

27. Because the legal points and authorities upon which this Motion relies are incorporated herein, DAS LLC respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE DAS LLC respectfully requests that this Court enter an order (a) authorizing and approving DAS LLC's entry into the Settlement Agreement and (b) granting it such other and further relief as is just.

Dated: New York, New York
October 5, 2007

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: /s/ John Wm. Butler, Jr.
John Wm. Butler, Jr. (JB 4711)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By: /s/ Kayalyn A. Marafioti
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession