**Hearing Date And Time:  October 25, 2007 At 10:00 a.m.**
**Objection Deadline:  October 18, 2007 At 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
      In re                      :    Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :    Case No. 05-44481 (RDD)
                                              :
                                              :    (Jointly Administered)
            Debtors.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION UNDER 11 U.S.C. § 363 AND FED. R. BANKR. P. 9019
FOR ORDER AUTHORIZING  DELPHI CORPORATION
TO PERFORM UNDER SECOND PENSION FUNDING WAIVER
ISSUED BY UNITED STATES INTERNAL REVENUE SERVICE

("SECOND IRS PENSION FUNDING WAIVER MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (the "Debtors"), submit this

motion (the "Motion") under 11 U.S.C. § 363 and Fed. R. Bankr. P. 9019 for entry of an order

authorizing Delphi to perform under a second pension funding waiver for Delphi's hourly

pension plan (the "Second Waiver") issued by the United States Internal Revenue Service (the

"IRS").  In support of this Motion, the Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their

businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections

1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S.

Trustee appointed an official committee of equity holders (the "Equity Committee," and together

with the Creditors' Committee, the "Statutory Committees").

3.    On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization

Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No.

9263) (the "Plan") and the Disclosure Statement With Respect To Joint Plan Of Reorganization

Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No.

9264) (the "Disclosure Statement").  No order approving the Disclosure Statement or confirming

the Plan has yet been entered by this Court.

       4.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

       5.    The statutory predicates for the relief requested herein are section 363 of

the Bankruptcy Code and rule 9019 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").

B.    <u>Current Business Operations Of The Debtors</u>

       6.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as

of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately

$15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues and the thirteenth largest public company

business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors and continue their business operations without supervision from the Court.[2]

       7.    The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27,
2007.

[2]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core
automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency
proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso
receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of
which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31,
2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing
footprint and to lower its overall cost structure.

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer ("OEM").

       8.     Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

C.     <u>Events Leading To The Chapter 11 Filing</u>

       9.     In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred

a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee

special attrition programs.

---

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

4

10.    The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

11.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

12.    On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas:[4] first, modifying the

---

[4]    In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors and a plan framework support agreement with those investors and GM.  On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework support agreement.  On July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors").  Under the Delphi-Appaloosa EPCA,  the New Plan Investors agreed to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization.  This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.

Company's labor agreements to create a competitive arena in which to conduct business;[5]

second, concluding their negotiations with GM to finalize GM's financial support for the

Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[6]

third, streamlining their product portfolio to capitalize on their world-class technology and

market strengths and make the necessary manufacturing alignment with their new focus;[7] fourth,

transforming their salaried workforce to ensure that the Company's organizational and cost

structure is competitive and aligned with its product portfolio and manufacturing footprint;[8] and

devising a workable solution to their current pension situation.[9]

---

[5]    As of August 29, 2007, this Court has entered the following orders approving settlements between Delphi and each of its U.S. labor unions:
   • International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (Docket No. 8693);
   • International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America (Docket No. 9106);
   • International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers (Docket No. 9107); and
   • United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and USW Local 87L (Docket No. 9169).
   On September 4, 2007, at Delphi's request, this Court entered an order withdrawing without prejudice Delphi's motion for order under sections 1113(c) and 1114(g) of the Bankruptcy Code authorizing rejection of collective bargaining agreements and modification of retiree welfare benefits (Docket No. 9221).

[6]    On September 6, 2007, Delphi announced that it has entered into agreements with GM consisting of a Global Settlement Agreement and a Master Restructuring Agreement, both of which are subject to this Court's approval as part of the plan confirmation process.  Delphi's comprehensive settlement with GM resolves all outstanding disputes between Delphi and GM.  The Global Settlement Agreement and Master Restructuring Agreement were filed as Exhibits 7.20(a) and 7.20(b) to the Plan, respectively.  See Docket No. 9263.

[7]    In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants.  The Debtors have been working to divest non-core assets so as to maximize the value of their estates for stakeholders.  During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, and their brake hose and catalyst businesses.  The Debtors also obtained court approval for the sale of substantially all of the assets of their Saltillo, Mexico brake plant business.  In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

[8]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages.  The Company's revised operating structure consists of its four core business segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.  To ensure that their organizational and cost structure is competitive, the

6

E.      The Debtors' Plan Of Reorganization

13.      By filing the Plan and related Disclosure Statement on September 6, 2007,

the Debtors reached another key milestone in their chapter 11 cases.  The Plan is based upon a

series of global settlements and compromises that involve every major constituency in the

Debtors' reorganization cases.  A hearing on the Debtors' solicitation procedures and Disclosure

Statement commenced on October 3, 2007 and is scheduled to continue on October 25, 2007.  If

this Court authorizes the Debtors to solicit acceptances or rejections of the Plan (as such Plan

may be modified) by October 31, 2007, the Debtors expect to confirm their Plan and commence

the rights offering contemplated by the Plan in December 2007 and emerge from chapter 11 as

soon as practicable thereafter.  Currently, the Debtors expect to emerge from these chapter 11

cases by January 2008.

14.      Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

---

Debtors obtained an Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order"). The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[9]     To that end, on May 31, 2007, this Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 pension plan year funding waivers, which were approved by the IRS on May 1, 2007, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Pension Plans").  On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Pension Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively. On September 28, 2007, the IRS approved a similar waiver with respect to the Delphi Hourly-Rate Employees Plan for the September 30, 2007 pension plan year.  By this Motion, the Debtors seek authority to perform under the terms of that waiver.

<u>Relief Requested</u>

15.    By this Motion, the Debtors seek entry of an order under section 363(b) of

the Bankruptcy Code and Bankruptcy Rule 9019 authorizing Delphi to perform under the Second

Waiver issued by the IRS, a copy of which is attached hereto as <u>Exhibit A</u>.

<u>Basis For Relief</u>

A.    <u>The First Pension Funding Waivers</u>

16.    Delphi maintains two separate Pension Plans for its employees: one for

salaried workers (the "Salaried Plan") and one for hourly workers (the "Hourly Plan").  The

Debtors' funding obligations under the Pension Plans are governed by the Internal Revenue Code

(the "IRC") and the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C.

§§ 1001-1461 ("ERISA").  Under the IRC and ERISA, the Debtors are required to meet certain

minimum funding standards for the Pension Plans.[10]

17.    Since the Debtors sought reorganization relief under chapter 11 of the

Bankruptcy Code, they have been making "normal cost" contributions to the Pension Plans, <u>i.e.</u>,

contributions that reflect the amounts related to service provided by plan participants post-filing.

These "normal cost" contributions are less than the minimum funding requirements established

under the IRC and ERISA.  As a result, if additional amounts are not contributed within eight

and one-half months after the end of the plan year for which the contributions are due, an

accumulated funding deficiency would arise, which under the IRC could result in certain excise

tax penalties.  For the plan year ended September 30, 2006, the Debtors anticipated that if the

Pension Plans were not funded in accordance with IRC and ERISA minimum funding

---

[10]    Delphi has smaller pension plans at three of its Debtor subsidiaries.  With the support of their Statutory
Committees and the New Plan Investors, the Debtors have contributed the amounts required by ERISA so that
the subsidiary plans do not have any accumulated funding deficiencies.

requirements by June 15, 2007, the IRS would likely have asserted that there was a funding

deficiency of at least $1.25 billion in the Pension Plans for that plan year, and the IRS might

have asserted a total potential excise tax after June 15, 2007 of more than $1.4 billion.

18.    Although the Debtors disputed, and continue to dispute, that the IRS could

properly levy certain excise tax penalties against the Debtors, the Debtors applied to the IRS and

the Pension Benefit Guaranty Corporation (the "PBGC") for pension funding waivers for the

Hourly Plan and Salaried Plan for the plan year ended September 30, 2006.  On May 1, 2007, the

IRS agreed to grant pension funding waivers (the "First Waivers") under which the Debtors

preempted any such dispute with the IRS over the penalties by (a) extending the June 15, 2007

funding deadline for the plan year ended September 30, 2006, thereby avoiding any accumulated

funding deficiency for that year, and (b) settling the IRS's excise tax claims for the plan year

ended September 30, 2005, in exchange for the Debtors' commitment to make an accelerated

contribution of $10 million to Delphi's Hourly Plan upon the Debtors' emergence from chapter

11.  The $10 million contribution would be deductible by Delphi and credited towards any

required contributions for the plan year ending September 30, 2007.  Delphi also agreed to make

a second $10 million contribution to Delphi's Hourly Plan as partial pre-payment of Delphi's

post-emergence minimum funding obligations.  This $10 million accelerated contribution also

would be deductible by Delphi and credited towards any required contributions for the plan year

ending September 30, 2007.

19.    Equally as important, the First Waivers facilitate the Debtors' intention to

transfer certain pension obligations applicable to the Hourly Plan to GM under section 414(l) of

the IRC, as set forth in the original plan framework support agreement which the Debtors

announced on December 18, 2006 (the "Original Plan Framework Support Agreement").  Under

9

section 414(l) of the IRC, obligations in a pension plan can be transferred to another pension

plan without negative tax implications if certain conditions are met.  The proposed Plan filed by

Delphi on September 6, 2007 contemplates that Delphi will make a section 414(l) transfer to a

GM pension plan of approximately $1.5 billion of Hourly Plan net liabilities.

20.    On May 31, 2007, this Court entered an order (the "IRS Pension Funding

Waiver Order") (Docket No. 8117) authorizing Delphi to (a) perform under the First Waivers

issued by the IRS and (b) provide letters of credit to the PBGC in connection with the First

Waivers in the amount of (i) $100 million with respect to Delphi's Hourly Plan and (ii) $50

million with respect to Delphi's Salaried Plan.[11]

21.    Under the First Waivers, the IRS agreed, subject to certain conditions

contained in the waiver ruling letters, to waive the minimum funding requirements for the plan

year ended September 30, 2006.  The terms of the First Waivers provided in part that (a) Delphi

had to file a chapter 11 plan of reorganization by July 31, 2007 and (b) Delphi had to satisfy any

minimum funding requirements by the effective date of a plan of reorganization no later than

November 15, 2007.

22.    On July 13, 2007, the IRS modified the First Waivers at Delphi's request

by extending the dates by which Delphi was required to file its plan of reorganization and

emerge from chapter 11 to December 31, 2007 and February 29, 2008, respectively.

B.    The Second Pension Funding Waiver

23.    On August 3, 2007, Delphi applied to the IRS and PBGC for a temporary

waiver of its minimum funding obligations concerning the Hourly Plan for the plan year ending

September 30, 2007.  The primary purpose of this Second Waiver is to facilitate the Debtors'

---

[11]    The Second Waiver has no effect on the PBGC's right to hold the $100 million letter of credit with respect to
the Delphi Hourly Plan that was provided by the Debtors in connection with the First Waivers.

effort to transfer certain hourly pension obligations to GM under section 414(l) of the IRC, as set forth in the Debtors' proposed Plan. As reflected in Section 7.22 of the Debtors' proposed Plan, this transfer is an essential aspect of the Debtors' efforts to reorganize successfully with the full and voluntary participation of its U.S. labor unions and other key constituencies.

24.     A funding waiver for the plan year ending September 30, 2007 is necessary to make the transfer economically efficient for the Debtors. Under the IRC and ERISA funding standards, a section 414(l) transfer implemented during a plan year is not fully reflected on the pension plan's books in the same way that a cash contribution would be recognized. As a result, even if pension liabilities under the Hourly Plan were transferred to GM, the Debtors would have to make cash contributions to the Hourly Plan for the plan year ending September 30, 2007, as though a significant portion of the transferred liabilities remained in the Hourly Plan. Absent the Second Waiver, these redundant cash contributions would result in projected overfunding of the Hourly Plan. The Second Waiver allows the Debtors to avoid this economically inefficient outcome by deferring the date on which funding contributions are due to the Hourly Plan and to implicitly reflect in the delayed contributions the funding relief that results from the section 414(l) transfer.

25.     On September 28, 2007, the IRS agreed to grant the Second Waiver subject to certain conditions contained in the waiver ruling letter. The terms of the Second Waiver provide in part that (a) Delphi must file a chapter 11 plan by December 31, 2007, (b) Delphi must satisfy any minimum funding requirements for the plan year ending September 30, 2007 within five days following the effective date of the plan of reorganization, which must occur no later than February 29, 2008, and (c) Delphi must contribute $20 million to the Hourly

11

Plan within five days following the effective date of the plan of reorganization, in addition to the

$20 million accelerated contributions required under the First Waivers.

26.    In addition, the terms of the Second Waiver, like those of the First Waiver

applicable to the Hourly Plan, require Delphi to make contributions to the Hourly Plan following

emergence to bring the plan's funding up to date as though neither the First or Second Waiver

had been granted.  Delphi is required to estimate and contribute approximately three-quarters of

the amount necessary to satisfy this condition within five days following the effective date of the

plan of reorganization, with the remaining quarter deposited into escrow.  Within five months

following the effective date of the plan of reorganization, Delphi must calculate the precise

amount necessary to bring the plan's funding up to date and make an appropriate true-up

contribution from the escrow account and general assets if necessary.  Any unused escrow will

be returned to Delphi immediately following this true up.

27.    On October 4, 2007, the IRS further modified the First Waivers at Delphi's

request by making conforming amendments to the First Waivers, as modified on July 13, 2007.

The amendments modify the conditions to the First Waivers so that they are generally consistent

with the conditions to the Second Waiver.  Copies of the July 13, 2007 and October 4, 2007

modifications are attached hereto as <u>Exhibit B</u>.

28.    The Debtors seek authority for Delphi to perform under the Second

Waiver.  The cost of performing under the Second Waiver, approximately $20 million, is

substantially less than the benefits to be gained from effecting the section 414(l) transaction in an

economically efficient manner, and performance under the waivers is accordingly in the best

interests of the Debtors and their estates.  The transfer of Hourly Plan pension liabilities to GM

would help the Debtors to effect the pension agreement negotiated with GM and embodied in the

12

proposed Plan, a key component of the Debtors' successful emergence from chapter 11.

Consistent with the First Waiver concerning the Hourly Plan for the year ended September 30,

2006, the Debtors stand by their commitment to bring their pension funding obligations current

after emergence from chapter 11.  For these reasons, the Debtors assert that the Second Waiver is

in the best interests of the Debtors' estates and will maximize value for all stakeholders as

described above.

Applicable Authority

A.    The Debtors Have Exercised Sound Business Judgment

29.    Section 363(b)(1) of the Bankruptcy Code permits a debtor-in-possession

to use property of the estate "other than in the ordinary course of business" after notice and a

hearing.  11 U.S.C. § 363(b)(1).  Use of estate property outside the ordinary course of business if

the debtor demonstrates a sound business justification for it.  See, e.g., In re Lionel Corp., 722

F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business

reason exists to grant debtor's application under section 363(b)); In re Del. Hudson Ry. Co., 124

B.R. 169, 179 (Bankr. D. Del. 1991).

30.    The Second Circuit has held that, although the bankruptcy court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must resist becoming "arbiter of disputes between creditors and the

estate."  In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's

consideration of a debtor's section 363(b) motion is a summary proceeding, intended as a means

to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of

the bankruptcy estate.  It is not the time or place for prolonged discovery or a lengthy trial."

Orion Pictures, 4 F.3d at 1098-99.

13

31.    Once the debtor articulates a valid business justification, a presumption

arises that "in making a business decision the directors of a corporation acted on an informed

basis, in good faith and in the honest belief that the action was in the best interests of the

company.'" In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992). Thereafter,

"[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of

rebutting the presumption of validity." Id.    To satisfy its burden, an objector must "produce

some evidence respecting its objections." Lionel, 722 F.2d at 1071.

32.    As a rule, a debtor's business judgment "should be approved by the court

unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound

business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74,

81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo.

1991)).

33.    As set forth above, Delphi has sound business justification for performing

under the Second Waiver at this time.  The Second Waiver is necessary to make the section

414(l) transfer of the Hourly Plan described above economically efficient for the Debtors.

Without the Second Waiver, the Debtors would be required to make cash contributions to the

Hourly Plan for the plan year ending September 30, 2007 which would result in projected

overfunding of the Hourly Plan.  Moreover, the Second Waiver will facilitate a consensual

resolution of the Debtors' pension obligations that will allow Delphi to emerge from chapter 11

successfully.  Finally, the Debtors negotiated the terms of the Second Waiver with the IRS and

the PBGC at arm's length and in good faith.

B.    The Court Should Approve The Settlement Set Forth In The Agreement

34.    Bankruptcy Rule 9019 provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Bankruptcy Rule 9019(a).  Settlements and compromises are "a normal part of the process of reorganization," Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 308 U.S. 106, 130 (1939)); see also In re Adelphia Commc'ns Corp., 327 B.R. 143, 159 (decision to accept or reject settlement lies within sound discretion of bankruptcy court), adhered to on reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

35.    Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate when the compromise is fair and equitable and is in the best interests of a debtor's estate.  See, e.g., TMT Trailer Ferry, 390 U.S. at 424; Adelphia Commc'ns, 327 B.R. at 159 ("The settlement need not be the best that the debtor could have obtained.  Rather, the settlement must fall 'within the reasonable range of litigation possibilities.'") (citations omitted) (quoting In re Penn Cent. Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979)); Nellis v. Shugrue, 165 B.R. 115, 121 (S.D.N.Y. 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it.").  In general, compromises in the bankruptcy context should be approved unless they "'fall below the lowest point in the range of reasonableness.'"  Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983).

36.    The Supreme Court in TMT Trailer Ferry set forth the following factors that courts should consider in determining whether a proposed settlement or compromise is in the best interests of a debtor's estate:  (a) the probability of the debtor's success in the litigation, (b)  the difficulties associated with collection, (c) the complexity of the litigation, and the attendant expense, inconvenience, and delay, and (d) the paramount interests of the estate's

15

creditors. <u>TMT Trailer Ferry</u>, 390 U.S. at 424-25; <u>see also</u> <u>Nellis</u>, 165 B.R. at 122; <u>Fry's Metals,</u>

<u>Inc. v. Gibbons</u> (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002).

      37.     Courts in this district have further elaborated on these factors to consider:

(a) the balance between the likelihood of plaintiff's or defendants' success should the case go to

trial vis-à-vis the concrete present and future benefits held forth by the settlement without the

expense and delay of a trial and subsequent appellate procedures, (b) the prospect of complex

and protracted litigation if the settlement is not approved, (c) the proportion of the class members

who do not object or who affirmatively support the proposed settlement, (d) the competency and

experience of counsel who support the settlement, (e) the relative benefits to be received by

individuals or groups within the class, (f) the nature and breadth of releases to be obtained by the

directors and officers as a result of the settlement, and (g) the extent to which the settlement is

truly the product of arm's-length bargaining, and not of fraud or collusion. <u>Adelphia Commc'ns</u>,

327 B.R. at 159-60; <u>accord</u> <u>In re Texaco Inc.</u>, 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

      38.     The bankruptcy court need not determine that all of the foregoing criteria

favor approval of a compromise, and the proposed compromise need not be the best agreement

that the debtor could have achieved under the circumstances. <u>See</u> <u>Adelphia Commc'ns</u>, 327 B.R.

at 159-60; <u>Penn Cent.</u>, 596 F.2d at 1114. Instead, the court's proper "role is to determine whether

the settlement as a whole is fair and equitable," <u>In re Lee Way Holding Co.</u>, 120 B.R. 881, 890

(Bankr. S.D. Ohio 1990), and falls "'within the reasonable range of litigation possibilities.'" <u>In re</u>

<u>Telesphere Commc'ns, Inc.</u>, 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994). To that end, courts

should not substitute their own judgment for that of the debtor, but rather should "'canvass the

issues'" to affirm that the proposed settlement falls above "'the lowest point in the range of

reasonableness.'" <u>Adelphia Commc'ns</u>, 327 B.R. at 159 (quoting <u>W.T. Grant Co.</u>, 699 F.2d at

608); <u>accord</u> <u>Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co.</u> (In re Ionosphere Clubs,

Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), <u>aff'd sub nom.</u> <u>Sobchack v. Am. Nat'l Bank & Trust</u>

<u>Co.</u>, 17 F.3d 600 (2d Cir. 1994).

    39. Delphi's performance under the Second Waiver should be approved under

Bankruptcy Rule 9019(a) because the settlement terms contained therein are fair and equitable,

fall well within the range of reasonableness, and are in the best interests of the Debtors and their

estates.  Most significantly, the Second Waiver will allow the Debtors to avoid redundant cash

contributions to the Hourly Plan that would result in projected overfunding of the Hourly Plan

while incurring only $20 million in costs.  This settlement will also assist the Debtors in their

goal outlined in the Debtors' proposed Plan to effect the economically efficient transfer of certain

pension obligations applicable to the Hourly Plan to GM under section 414(l) of the IRC.  This

resolution is a key component of the Debtors' transformation plan and their successful emergence

from chapter 11.  For these reasons, performance under the terms of the Second Waiver is in the

best interests of the Debtors' estates and will maximize value for all stakeholders as described

above.

Notice Of Motion

    40. Notice of this Motion has been provided in accordance with the

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Amended

Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m),

9006, 9007, and 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case

Management, And Administrative Procedures, entered October 26, 2006 (Docket No. 5418).  In

17

light of the nature of the relief requested, the Debtors submit that no other or further notice is

necessary.

Memorandum Of Law

41.    Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York be deemed

satisfied.

WHEREFORE the Debtors respectfully request that this Court enter an order (i)

authorizing, but not directing, Delphi to perform under the Second Waiver with the IRS and the

PBGC and (ii) granting the Debtors such other and further relief as is just.

Dated:  New York, New York
        October 5, 2007

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

By:  /s/ John Wm. Butler, Jr.
       John Wm. Butler, Jr. (JB 4711)
       John K. Lyons (JL 4951)
       Ron E. Meisler (RM 3026)
     333 West Wacker Drive, Suite 2100
     Chicago, Illinois  60606
     (312) 407-0700

                 - and -

By:  /s/ Kayalyn A. Marafioti
       Kayalyn A. Marafioti (KM 9632)
       Thomas J. Matz (TM 5986)
     Four Times Square
     New York, New York 10036
     (212) 735-3000

     Attorneys for Delphi Corporation, et al.,
       Debtors and Debtors-in-Possession