**Hearing Date And Time: October 25, 2007 at 10:00 a.m.**
**Objection Deadline: October 18, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

　　- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
　　Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
　　　　　　　　　　　　　　　　　　　　:
　　In re　　　　　　　　　　　　　　　　:　　Chapter 11
　　　　　　　　　　　　　　　　　　　　:
DELPHI CORPORATION, et al.,　　　　　　　:　　Case No. 05-44481 (RDD)
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:　　(Jointly Administered)
　　　　　　　Debtors.　　　　　　　　　　:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 363(c), 1107, AND 1108,
AND CASH MANAGEMENT ORDER, AND ALTERNATIVELY, UNDER 11 U.S.C. §§
363(b)(1) AND 364(c), CONFIRMING AUTHORITY OF DELPHI AUTOMOTIVE
SYSTEMS (HOLDING), INC. TO COMPLETE INTERCOMPANY TRANSFER OF FUNDS

("DASHI INTERCOMPANY TRANSFER MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases, including Delphi Automotive Systems (Holding), Inc. ("DASHI") and Delphi Automotive Systems LLC ("DAS LLC") (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order pursuant to 11 U.S.C. §§ 363(c), 1107, and 1108, and the Cash Management Order (as defined below), and alternatively, under 11 U.S.C. §§ 363(b)(1) and 364(c), confirming DASHI's authority to complete an intercompany transfer in an amount expected to be up to $650 million to DAS LLC, for the purposes set forth herein, and respectfully represent as follows:

## Background

A.  <u>The Chapter 11 Filings</u>

    1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

    2.    No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee," and together with the Creditors' Committee, the "Statutory Committees").

    3.    On September 6, 2007, the Debtors filed their Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263) (the "Plan") and their Disclosure Statement With Respect To Joint

2

Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264) (the "Disclosure Statement"). No order approving the Disclosure Statement or confirming the Plan has yet been entered by this Court.

4. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

5. The statutory predicates for the relief requested herein are sections 363, 364, 1107, and 1108 of the Bankruptcy Code.

B. Current Business Operations Of The Debtors

6. Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Court.[2]

7. The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and

---

[1] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[2] On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Spanish court approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

3

modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

8.  Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.  Events Leading To The Chapter 11 Filing

9.  In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

---

[3] Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

4

10. The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

11. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.  The Debtors' Transformation Plan

12. On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations. The Debtors stated that they needed to focus on five key areas:[4] first, modifying the

---

[4] In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors and a plan framework support agreement with those investors and GM. On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework support agreement. On July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors"). Under the Delphi-Appaloosa EPCA, the New Plan Investors agreed to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization. This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.

5

Company's labor agreements to create a competitive arena in which to conduct business;[5] second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[6] third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus;[7] fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint;[8] and devising a workable solution to their current pension situation.[9]

---

[5]  As of August 29, 2007, this Court has entered the following orders approving settlements between Delphi and each of its U.S. labor unions:
- International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (Docket No. 8693);
- International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America (Docket No. 9106);
- International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers (Docket No. 9107); and
- United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and USW Local 87L (Docket No. 9169).

On September 4, 2007, at Delphi's request, this Court entered an order withdrawing without prejudice Delphi's motion for order under sections 1113(c) and 1114(g) of the Bankruptcy Code authorizing rejection of collective bargaining agreements and modification of retiree welfare benefits (Docket No. 9221).

[6]  On September 6, 2007, Delphi announced that it entered into agreements with GM consisting of a Global Settlement Agreement and a Master Restructuring Agreement, both of which are subject to this Court's approval as part of the plan confirmation process. Delphi's comprehensive settlement with GM resolves all outstanding disputes between Delphi and GM. The Global Settlement Agreement and Master Restructuring Agreement were filed as Exhibits 7.20(a) and 7.20(b) to the Plan, respectively. See Docket No. 9263.

[7]  In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants. The Debtors have been working to divest non-core assets so as to maximize the value of their estates for stakeholders. During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, and their brake hose and catalyst businesses. The Debtors also obtained court approval for the sale of substantially all of the assets of their Saltillo, Mexico brake plant business. In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

[8]  As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages. The Company's revised operating structure consists of its four core business segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture. The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan. To ensure that their organizational and cost structure is competitive, the

6

E.     The Debtors' Plan Of Reorganization

    13. By filing the Plan and related Disclosure Statement on September 6, 2007, the Debtors reached another key milestone in their chapter 11 cases.  The Plan is based upon a series of global settlements and compromises that involve every major constituency in the Debtors' reorganization cases.  A hearing on the Debtors' solicitation procedures and Disclosure Statement commenced on October 3, 2007 and is scheduled to continue on October 25, 2007.  If this Court authorizes the Debtors to solicit acceptances or rejections of the Plan (as such Plan may be modified) by October 31, 2007, the Debtors expect to confirm their Plan and commence the rights offering contemplated by the Plan in December 2007 and emerge from chapter 11 as soon as practicable thereafter.  Currently, the Debtors expect to emerge from these chapter 11 cases by January 2008.

    14. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally,

---

Debtors obtained an Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order").  The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[9] To that end, on May 31, 2007, this Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 pension plan year funding waivers, which were approved by the IRS on May 1, 2007, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Pension Plans").  On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Pension Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively.  On September 28, 2007, the IRS approved a similar waiver with respect to the Delphi Hourly-Rate Employees Plan for the September 30, 2007 pension plan year.  The Debtors' motion for authority to perform under the terms of that waiver is scheduled for an October 25, 2007 hearing.  On October 4, 2007, the IRS, at Delphi's request, further modified the conditions to the initial waivers so that they are generally consistent with the conditions to the most recent waiver.

the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

F.     Proposed Intercompany Transaction

15.    Delphi manages the global cash and liquidity position of Delphi and its debtor and non-debtor subsidiaries and affiliates on a daily basis in the ordinary course of business.  As of September 30, 2007, Delphi's global liquidity (including availability under its DIP financing facility) was approximately $2.4 billion.  While this amount is more than sufficient to operate Delphi's global businesses, including all of the Debtors' operations, in accordance with Delphi's business plan, the Debtors believe they could increase the Company's global efficiencies and meet other legitimate corporate objectives by utilizing a portion of Delphi's global cash balances in the Debtors' operations.

16.    Consistent with Delphi's representations to the Court since the outset of these chapter 11 cases, the Debtors have been, and for the duration of these cases are expected to continue to be, "consumers" of cash in the aggregate while the Global Affiliates (as defined below) are expected to be "accumulators" of cash in the aggregate.  Indeed, Delphi's five year consolidated business plan filed as Appendix C to the Disclosure Statement contemplates that Delphi's non-U.S. affiliates will continue to dividend or otherwise transfer funds to DASHI. Maintaining the Debtors' access to cash balances internally generated by Delphi's global businesses will reduce the Debtors' borrowings under its DIP financing facility, thus decreasing interest expense, and minimizing the amount of debt needed to fund Delphi's emergence from chapter 11.  In addition, as set forth more fully below, these transactions will create global tax efficiencies.  Accordingly, DASHI is in the process of accumulating cash balances in an amount expected to be up to $650 million from certain non-Debtor global affiliates (the "Global

8

Affiliates").  These transactions are governed by the laws of the respective jurisdictions of each of the Global Affiliates.

        17.    After DASHI accumulates the funds, DASHI intends to effectuate a transfer of the funds in accordance with the Order Under 11 U.S.C. §§ 363 And 553 Authorizing (I) Continued Maintenance Of Existing Bank Accounts, (II) Continued Use Of Existing Cash Management System, (III) Continued Use of Business Forms, (IV) Preservation And Exercise Of Intercompany Setoff Rights, And (V) Grant Of Administrative Status For Postpetition Intercompany Transactions  (Docket No. 882) (the "Cash Management Order").  As required by the Cash Management Order and permitted by the order approving the Debtors' refinancing of its DIP financing facility (Docket No. 6461) (the "DIP Financing Order"), in exchange for DASHI's ordinary course intercompany transfer of funds to DAS LLC, DAS LLC will grant DASHI (a) a lien (in the priority permitted under the DIP Financing Order) on all assets and (b) an administrative claim (see Cash Management Order ¶¶ 10-15.)

        18.    In connection with, and in advance of implementing, this transaction, the Debtors consulted with the New Plan Investors and the Statutory Committees, consistent with the transparent manner in which the Debtors have conducted their chapter 11 cases.  On October 4, 2007, counsel for the Creditors' Committee informed the Debtors that the Committee would not consent at this time without the Debtors proceeding with a motion and order of the Bankruptcy Court.  Accordingly, the Debtors have filed this Motion out of an abundance of caution.

## Relief Requested

        19.    By this Motion, the Debtors seek entry of an order under sections 11 U.S.C. §§ 363(c), 1107, and 1108, and the Cash Management Order, and alternatively, under 11 U.S.C. §§ 363(b)(1) and 364(c), confirming DASHI's authority to complete an intercompany

9

transfer to DAS LLC in an amount expected to be up to $650 million (the "Intercompany Transaction").

### Basis For Relief

20.    The proposed Intercompany Transaction will provide a definitive source of liquidity, as contemplated in the proposed Plan, during a time of uncertainty in the capital markets, without the inherent transactions costs—including, among other things, borrowing fees and closing costs—of obtaining funds from external sources in the marketplace. In addition, rather than simply accumulating cash outside the United States, Delphi will be able to invest the funds to meet the objectives set forth in Delphi's five year consolidated business plan.

21.    Moreover, the additional liquidity will allow the Debtors to reduce their borrowings and thus reduce their funded interest expense, saving the Debtors tens of millions of dollars of interest under their DIP financing facility. Absent an extension or amendment, the DIP Financing Facility will expire on the earlier of December 31, 2007 and the date of the substantial consummation of a reorganization plan that is confirmed pursuant to an order of this Court. Given the current uncertainty in the credit market, and in any event, as a matter of prudence and business judgment, the Debtors will likely extend their current DIP Facility. The additional liquidity afforded by the Intercompany Transaction should ease the administrative burden and reduce the cost of obtaining such extension or amendment.

22.    The Intercompany Transaction also will create certain tax efficiencies. Any taxable income recognized by the Debtors for United States federal income tax purposes as a result of the transaction is expected to be fully offset by Delphi's tax losses. If such transaction were to occur after the Debtors' emergence from chapter 11, the Debtors' tax losses may not be available to fully offset the amount of taxable income resulting from the transaction because

Delphi may undergo an "ownership change," as defined in the Internal Revenue Code of 1986, under the proposed Plan, and, as such, the availability of its tax losses following emergence could be limited. (See Disclosure Statement, Article XII.)

Applicable Authority

23.     Sections 1107(a) and 1108 of the Bankruptcy Code vest debtors-in-possession with authority to continue operating their businesses. The Debtors, operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of a chapter 11 debtor-in-possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." Id.

24.     Section 1107(a) of the Bankruptcy Code provides that the debtor-in-possession shall have the duties of a trustee in a chapter 11 case with all the rights and powers of a trustee. 11 U.S.C. § 1107. Section 363(c) of the Bankruptcy Code provides in pertinent part: "[T]he [debtor-in-possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).

25.     Despite the filing of this Motion, the Debtors assert that the relief requested herein is in the ordinary course of business.[10] Indeed, as set forth in the Cash

---

[10]   The Debtors assert that the Intercompany Transaction is in the ordinary course of their business as it satisfies the "creditor's expectation test" and "industry-wide" test adopted by the Second Circuit. See In re Lavigne, 114 F.3d 379, 384 (2d Cir. 1997) Indeed, these types of intercompany transactions have taken place before and will continue to take place in the future as a routine matter. Moreover, it is common for funds to be transferred on an intercompany basis as a matter of cash management in large companies in the automotive industry and in

11

Management Motion, the Debtors routinely enter into intercompany financial transactions, such as the Intercompany Transaction contemplated by this Motion, in the ordinary course of their business. The Cash Management Order specifically provides that the Debtors are authorized to continue to engage in such intercompany transactions in the ordinary course of the Debtors' business (see Cash Management Order ¶ 10). As this Court is aware, the Cash Management Order requires that such intercompany transfers take the form of a loan or extension of intercompany credit, with the "Beneficiary Debtor" providing the lending Debtor a lien securing the amount of the transfer and an administrative claim (see Cash Management Order ¶¶ 12-14). This is precisely the manner in which DASHI intends to effectuate the Intercompany Transaction.[11]

26.     Nevertheless, because the Creditors' Committee has expressed concern with respect to the ordinary course nature of the proposed transaction because of the size and the timing of the transfer, the Debtors are prosecuting this Motion out of an abundance of caution and to obtain this Court's confirmation of DASHI's authority to complete the Intercompany Transaction. Nonetheless, even if this Court were to find that the Intercompany Transaction constitutes a transaction outside of the ordinary course of business, the Court should grant the relief requested because the basis for relief articulated by the Debtors is clearly compliant with section 363(b)(1) of the Bankruptcy Code which requires that "there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of

---

other comparably sized companies. While the Creditors' Committee seems focused on the size of the Intercompany Transaction, courts in this jurisdiction have explained that an ordinary course analysis must be conducted with the comparable size of the company in mind. See Committee of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 617 (Bankr. S.D.N.Y. 1986). ("A debtor which is a large, multinational corporation engages in activities of a magnitude that would likely be considered extraordinary for a smaller business").

[11]   In light of these sound business reasons, there can be no doubt that DASHI has satisfied its fiduciary obligations with respect to the Intercompany Transaction (see Cash Management Order ¶ 15 ("Nothing in this order relieves any of the Debtors . . . of its fiduciary duties with respect to entry into any intercompany transactions.")).

business." Institutional Creditors of Continental Airlines, Inc. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.), citing In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); accord Stephens Indus., Inc. v. McClung (In re McClung), 789 F.2d 386, 390 (6th Cir. 1986); Fulton State Bank v. Schipper (In re Schipper), 109 B.R. 832, 836 (Bankr. N.D. Ill. 1989); In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1988).

27. The Second Circuit has held that, although the bankruptcy court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate." In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993). The Court's consideration of a debtor's section 363(b) motion is a summary proceeding, intended merely as a means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial with disputed issues." Orion Pictures, 4 F.3d at 1098-99.

28. As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)). For the reasons set forth above in paragraphs 19-21, the Debtors have sound business reasons to justify the Intercompany Transaction.

29. In addition, to the extent the Court determines that section 364(c) applies to the Intercompany Transaction, section 364(c) financing is appropriate under these circumstances. Indeed, DAS LLC could not obtain funds of the size, or on terms more favorable, than that provided by the proposed Intercompany Transaction. Accord 11 U.S.C. § 364(c). For

all of the reasons mentioned above, the Debtors believe that the relief requested herein is in the best interests of the estates and should be granted.

### Notice

30. Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered October 26, 2006 (Docket No. 5418). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

31. Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (i) confirming DASHI's authority to complete the Intercompany Transaction and (ii) granting the Debtors such other further relief as is just.

Dated:   New York, New York
         October 5, 2007

        SKADDEN, ARPS, SLATE, MEAGHER
         & FLOM LLP

        By:   /s/ John Wm. Butler, Jr.
            John Wm. Butler, Jr. (JB 4711)
            John K. Lyons (JL 4951)
            Ron E. Meisler (RM 3026)
        333 West Wacker Drive, Suite 2100
        Chicago, Illinois 60606
        (312) 407-0700

                - and –

        By:   /s/ Kayalyn A. Marafioti
            Kayalyn A. Marafioti (KM 9632)
            Thomas J. Matz (TM 5986)
        Four Times Square
        New York, New York 10036
        (212) 735-3000

        Attorneys for Delphi Corporation, et al.,
         Debtors and Debtors-in-Possession