UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| DELPHI CORPORATION, *et al.*, | Case No. 05-44481 (RDD) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF MICHEL POULET IN SUPPORT OF
SIEMENS VDO AUTOMOTIVE SAS'S CLAIM NUMBER 2247**

I, Michel Poulet, hereby declare:

1. I am currently employed by Siemens VDO Automotive SAS ("VDO") in Toulouse, France as Senior Business Manager and have held this position since November of 1988. In this position, I have been involved in VDO's dealings with Delphi Automotive Systems Energy & Chassis Systems ("Delphi") since Delphi first contacted VDO to invite it to submit a quotation for certain ABS and Suspension parts programs.

2. In April of 2000, VDO received a letter from Delphi inviting VDO to submit a quotation to become the supplier of chassis control modules for certain of Delphi's ABS and Suspension programs. Three of these programs, designated by Delphi as the GMX 245, GMX 295, and GMT 800 programs, related to the Suspension programs and had already been awarded to Delphi. The remaining programs related to the ABS programs that Delphi expected to be, but had not yet been, awarded. A copy of the letter VDO received from Delphi and the attachments to it are attached hereto as Exhibit A and collectively referred to as "RFQ" in this Declaration. As with a number of other documents exchanged by VDO and Delphi during the quotation process, the RFQ was sent electronically, and, as a result, the copy that VDO received from Delphi was not signed.

3.     Among the materials included with Delphi's RFQ were the Delphi Standard Purchase Order Terms and Conditions ("Terms and Conditions" or "T&C") and the Delphi Energy & Chassis Systems Long Term Contract ("Long Term Contract" or "LTC"). (*See* Ex. A.)

4.     Delphi's RFQ also included projections for the anticipated number of parts for each of the three programs Delphi expected to require and order from whoever it selected as its supplier. (Ex. A, RFQ at Scenarios 1-3.)

5.     In response to Delphi's invitation, VDO sent the requested quote, including the related materials, to the address Delphi provided in Dayton, Ohio. The relevant portion of the materials VDO sent to Delphi are attached hereto as Exhibit B.

6.     After VDO submitted its quote, Delphi informed VDO that it required VDO to include a signed version of Delphi's Long Term Contract as part of its submission before Delphi would consider the quotation. In response to this request, VDO, as instructed, forwarded a version of Delphi's Long Term Contract signed only by it. The Long Term Contract then became part of VDO's response to Delphi's RFQ.

7.     VDO's response to Delphi's RFQ communicated VDO's intention to enter into a contract with Delphi on the terms set forth in that response. This response is referred to as VDO's "Offer" throughout this declaration.

8.     VDO's Offer provided detailed information regarding the terms VDO proposed for its potential agreement with Delphi. (*See* Ex. B.) To prepare that information, VDO relied on the estimates Delphi provided in its RFQ for the quantities of parts Delphi would order. In Appendices A and B to its Offer, VDO used Delphi's estimates to determine the per-part-prices for the Suspension programs, relying on Delphi's estimate that it would require 111,625 parts

annually for the GMT 800 program and 43,000 parts annually for the GMX 245 and GMX 295 programs.

9. At the same time, VDO's Offer addressed the specific terms that would govern the parties' relationship should Delphi accept VDO's offer and select it as the supplier. (*See* Ex. B.) In addressing these terms, VDO accepted some of the proposals that Delphi made in its RFQ while rejecting others. (*Id.*) In those instances where VDO rejected Delphi's proposal, VDO's Offer set forth the terms it proposed. (*Id.*)

10. The terms of VDO's Offer included a provision VDO titled "Program Cancellation." (*See* Ex. B, at p. 8.) In that provision, VDO stated the terms under which it would be able to recover costs incurred in support of the Delphi parts programs in the event that Delphi cancelled any of the programs prior to ordering any parts. (*Id.*) VDO included this provision because VDO was to recover these costs through per-part-pricing, meaning VDO needed an alternate mechanism to recover these costs should Delphi fail to order any parts under one or more of the programs.

11. In response to VDO's Offer, on August 2, 2000, Delphi sent VDO a letter informing VDO that its quote had been selected, and Delphi was accepting VDO's offer. The letter from Delphi is attached hereto as Exhibit C and is referred to as the "Nomination Letter."

12. Delphi first sent the Nomination Letter by facsimile on August 3, 2000. Delphi sent it again on September 13, 2000, this time by mail from the Kettering, Ohio office of Delphi's Darrell Lewis. (*See* Ex. C.)

13. Having previously received a copy of the Long Term Contract signed by VDO, Delphi also executed that same version of the Long Term Contract. Both Brian R. Thompson and Brigette Colter signed the Long Term Contract on behalf of Delphi, and each indicated that

they did so on October 31, 2000. A copy of the executed Long Term Contract is attached hereto as Exhibit D.

14. VDO and Delphi held a kick-off meeting in Dayton, Ohio on August 10, 2000 to discuss the development work and other topics related to VDO's work following Delphi's selection of it as the supplier for the ABS and Suspension programs.

15. Following the kick-off meeting, VDO began working both to develop the products themselves and the capacity to produce those products. Based on Delphi's estimated volumes for both the ABS and Suspension programs, which combined was over 1,000,000 parts per year, VDO intended to produce the products for both programs on a single production line. The volume estimated by Delphi meant that these programs would fully utilize that production line. As a result, VDO needed to find a production line that could be fully devoted to the Delphi programs. VDO found such a production line at one of its locations in Mexico.

16. In June of 2001, after VDO began its development work, Delphi informed VDO that Delphi had not received the award of the ABS programs in the time frame Delphi originally expected and, as a result, Delphi would not need the ABS parts from VDO in the originally expected timeframes.

17. As a result of this change, production for the ABS program was postponed. Because the plan that VDO and Delphi had developed for production of the ABS and Suspension parts had called for the parts to be produced on the same production line, this delay meant the production line now would be producing parts only for the Suspension programs. Delphi estimated that these programs, the GMX 245, GMX 295, and GMT 800 programs, would require 154,625 parts annually. Because the Suspension program alone meant that the Delphi programs would not fully utilize a production line, VDO now needed to find a different production line.

VDO searched for a production line already producing parts for other programs but with available capacity sufficient to produce the approximately 150,000 parts per year Delphi now estimated that it would require.

18. VDO identified a production line at its location in Foix, France with this capacity and therefore shifted its work to develop the capacity to produce these parts at that line.

19. VDO and Delphi then met on December 13, 2001 to review the production concept and discuss the production schedule. This meeting was attended by VDO's Francis Bonhoure, Mark Glasson, Frank Scarachilli, Werner Koestler, and me. Representing Delphi at the meeting were Thomas Gold, Darrell Lewis, Mike Shields, David Hoptry, and Greg Cazzell.

20. During this meeting, the parties discussed a number of issues relating to these three programs, including how delays in Delphi's own production schedule, and the corresponding impact on VDO's production schedule, would impact VDO's costs and how VDO might be compensated for the additional costs of development through adjustments to the per-part-prices Delphi would pay once production began. In these discussions, both parties acknowledged the need for some adjustments to compensate VDO for the costs it incurred as a result of Delphi's adjustments to the production schedule.

21. VDO continued its development work, which ultimately resulted in VDO having the ability to produce the parts for Delphi's GMX 245, GMX 295, and GMT 800 programs. This work extended throughout 2002 and included various meetings and discussions between VDO and Delphi.

22. On December 13, 2002, VDO submitted an updated quote based on information provided by Delphi following the submission of VDO's Offer. A true and correct copy of the updated quote is attached hereto as Exhibit E and is referred to as "Updated Quote" throughout

this Declaration. Included among the adjustments set forth in the Updated Quote, VDO indicated it would amortize its development costs during the first two years of production. (*Id.*) As a result, the Updated Quote also reflected a significant price decrease in the third year of production following VDO's full recoupment of its development costs during the first two years of production. (*Id.*, at p. 2.)

23. In its Updated Quote, VDO again stated that its price quotation was based on the annual volume assumptions provided by Delphi and stated that VDO reserved the right to adjust its prices should Delphi's actual annual volume be more than 10% above or below those assumptions. (Ex. E, at p. 1.) VDO again included its Program Cancellation provision in the Updated Quote, again stating that if Delphi cancelled any of the programs, VDO would able to recover costs incurred by it through an equitable cancellation charge. (*Id.*, at p. 3.)

24. Following VDO's submission of its Updated Quote, Delphi wrote back to VDO stating: "Concerning your most recent quote, 'most things' look okay." A true and correct copy of the January 21, 2003 e-mail from Delphi's Michael Shields with this response is attached hereto as Exhibit F. In this response to VDO's Updated Quote, Delphi noted certain issues that required further discussions, such as transportation costs, but otherwise indicated that the parties were "real close to getting all the details behind us, updating the Long Term Contract and issuing the additional tooling purchase orders . . . ." (*Id.*)

25. After completing the required development work for the GMX 245 and GMX 295 programs, VDO submitted to Delphi extensive materials for the PPAP process. The PPAP process is used to allow suppliers like VDO and their customers like Delphi to be sure that the parts the supplier has developed for its customers match the required specifications. The process occurs after all work on development of the parts is completed, after the development and

installation of a production line is completed, and the part is ready for production. In the process, the supplier produces 300 units of the part on the completed production line and then submits six of those parts, along with extensive documentation regarding the specifications for the part and its production, to its customer for final approval.

26. VDO submitted the PPAP for the GMX 245 and GMX 295 programs to Delphi on April 30, 2004. Delphi provided VDO with approval for the GMX 245 and GMX 295 programs on May 14, 2004. Copies of the approvals for these two programs are attached hereto as Exhibits G and H, respectively.

27. Following this approval, Delphi began ordering parts for the GMX 245 and GMX 295 programs from VDO in July of 2004. In total, as of the date of VDO's claim in this matter, Delphi had ordered 8,208 parts from the GMX 245 program and 16,325 parts from the GMX 295 program.

28. On May 28, 2004, VDO submitted the PPAP for the GMT 800 program to Delphi for its review and approval. Delphi provided VDO with the approval for the GMT 800 program on August 10, 2004. A copy of that approval is attached hereto as Exhibit I.

29. Starting in the second half of 2004, orders for the GMX 245 and GMX 295 program parts fell below the quantities Delphi projected it would order. Continuing to this day, Delphi has ordered between approximately 10% and 20% of the parts it estimated it would order for these two programs.

30. With regard to the GMT 800 program, Delphi issued a blanket purchase order for the GMT 800 program on July 30, 2004. A true and correct copy of that purchase order is attached hereto as Exhibit J. Delphi, however, has never released any parts for production under that purchase order, meaning Delphi never requested that VDO actually provide it with any of

the parts in this program. As a result of Delphi's failure to actually request the parts in this program, Delphi effectively cancelled the program altogether.

31. As a result of Delphi's failure to order the expected volumes in all three programs, VDO was prevented from recovering the costs it incurred developing the capacity to produce those items for Delphi, resulting in the losses set forth in VDO's claim.

32. Beginning in January 2005 and continuing periodically throughout that year, VDO attempted to negotiate an equitable cancellation charge and to recoup the unrecovered development costs that resulted from Delphi's failure to order the projected volume of parts. These efforts were ultimately unsuccessful. As a result, VDO still has not recovered the costs it incurred in developing the capacity to produce parts for Delphi's Suspension program.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 9th, 2007.

_____
Michel Roulet

CHILIB-2112253.4-323624-00006 10/9/07 5:28 PM