| | |
|---|---|
| **REED SMITH LLP**<br>By: Elena Lazarou (EL 5681)<br>599 Lexington Avenue, 29th Floor<br>New York, NY 10022<br>(212) 521-5400 | Attorneys for Claimant<br>Siemens VDO Automotive SAS |

and

Randall D. Lehner (IL # 6237535)
Max A. Stein (IL #6275993)
10 South Wacker Drive, 40th Floor
Chicago, Illinois 60606
(312) 207-1000
(admitted *pro hac vice*)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>DELPHI CORPORATION, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 05-44481 (RDD)<br><br>(Jointly Administered) |

### CLAIMANT SIEMENS VDO AUTOMOTIVE SAS'S
### INITIAL MEMORANDUM IN SUPPORT OF CLAIM NUMBER 2247

Claimant Siemens VDO Automotive SAS ("VDO") filed Claim 2247 ("Claim") to recover development costs VDO incurred after Delphi Automotive Systems Energy & Chassis Systems ("Delphi") awarded VDO a contract to develop, manufacture and supply parts for Delphi's ABS and Suspension programs. Delphi breached the parties' contract regarding the Suspension programs by failing to order the estimated quantities of parts and failing to order other parts altogether. Exacerbating that breach, Delphi then failed to compensate VDO for costs incurred developing the parts and the capacity to produce them. In this claim, VDO seeks damages from Delphi to compensate VDO for the amounts it expended developing the parts and the capacity to produce those parts for Delphi pursuant to the parties' contract.

Delphi and VDO have negotiated and will soon submit a Joint Stipulation to the Court intended to further streamline the Court's consideration of VDO's Claim. Pursuant to that Stipulation, VDO submits this Memorandum addressing what documents comprise the parties' agreement and whether those documents give VDO the right to pursue its Claim and recover its damages either under the contract itself or, if the contract is unenforceable, under equitable doctrines.[1]

As explained in greater detail below, the documents that both sides agree are, at least, part of the parties' agreement—Delphi's Long Term Contract and Delphi's General Terms and Conditions, both of which Delphi itself drafted—make clear that the contract also includes VDO's response to Delphi's Request for Quotation and other documents exchanged by the parties. Because those documents expressly grant VDO the right to recover its development costs if Delphi either failed to order the parts as estimated or cancelled one of the programs altogether, VDO's claim should now be allowed. Indeed, if the contract did *not* include the materials VDO argues are part of the contract, the contract would lack an essential term—quantity—and consequently be invalid and unenforceable. Under well-established rules of contract construction, the Court should avoid interpreting the parties' agreement in a way that renders it a nullity. If, however, as Delphi proposes, the Court construes the parties' agreement in this way, then the law is equally clear that VDO may still recover from Delphi under the doctrine of promissory estoppel. In either case, VDO's Claim against Delphi should be allowed.

---

[1] As further explained in a Joint Stipulation to be submitted to the Court, VDO's Initial Memorandum is submitted pursuant to the parties' agreement to address these issues through a modified procedure. Under this procedure, the parties agreed to seek the Court's guidance on these issues while reserving their right to submit additional evidence, information, and argument regarding VDO's claim, as contemplated by the procedures in the Court's Claim Objection Procedures Order.

## BACKGROUND

### A.    Delphi Solicits Bids From Potential Suppliers.

In April 2000, Delphi sent VDO a Request for Quotation ("RFQ") from its Kettering, Ohio office, offering VDO the opportunity to supply Delphi with parts for its ABS and Suspension programs, including the GMX 245, GMX 295, and GMT 800 programs. (Declaration of Michel Poulet ("Poulet Decl.") ¶ 2 & Ex. A.)  Delphi invited VDO to submit a quote and proposed certain parameters for Delphi's relationship with its potential suppliers. (Poulet Decl. Ex. A, Letter from Jane S. Thompson and Brigette Colter, dated April 6, 2000.) Delphi attached the Delphi Standard Purchase Order Terms and Conditions ("Terms and Conditions" or "T&C") and the Delphi Energy & Chassis Systems Long Term Contract ("Long Term Contract" or "LTC") as appendices to its RFQ.  (Poulet Decl. ¶ 3 & Ex. A.)

In addition to the RFQ's general proposals, Delphi provided specific details regarding the ABS and Suspension programs, including the expected annual production volumes.  (Poulet Decl. ¶ 4.)  Delphi presented this information under three separate scenarios, each of which contemplated Delphi ordering a set quantity of parts.  (Poulet Decl. Ex. A at Scenarios 1-3.)  In addition to these production scenarios, Delphi also stated that it required "detailed information" from its potential suppliers "to make an informed and strategic selection" of its supplier.  (*Id*., at RFQ Cover Letter.)  Nowhere in the RFQ did Delphi state that it could decide not to purchase any parts from VDO.

Delphi's RFQ also instructed potential suppliers to "[s]end two copies of your response to Delphi Energy and Chassis Systems – Dayton, Ohio, USA," and provided an address. (Poulet Decl. Ex. A, RFQ at p. 7.)  Additionally, Delphi provided phone numbers, all in Dayton Ohio's 937 area code, for Delphi personnel who could answer questions regarding the RFQ.  (*Id*.)

### B. VDO Submits Its Offer, Including The Required Detailed Information And Its Own Proposed Terms.

As directed by Delphi's invitation, VDO sent its quote, including related materials, to Delphi in Dayton, Ohio. (Poulet Decl. ¶ 5 & Ex. B, Letter from Mike Tramutolo and Michel Poulet, dated July 20, 2007.) VDO also submitted a copy of the Long Term Contract, signed only by it, which Delphi requested before even considering VDO's quote. (Poulet Decl. ¶ 6.) These materials comprised VDO's offer (the "Offer"). (*Id.* ¶ 7.)

In its Offer, VDO provided the detailed information Delphi requested, as well as terms VDO required should Delphi select it as the supplier. (Poulet Decl. ¶ 8 & Ex. B.) Importantly, VDO's detailed Offer modified or rejected many of the parameters Delphi had proposed in its RFQ. (Poulet Decl. ¶¶ 9-10 & Ex. B.) Among other things, VDO's Offer made clear, in multiple places, that the pricing it proposed was contingent on Delphi ordering the volumes presented in Scenario-1 of Delphi's RFQ. For instance, VDO's Offer stated that the pricing offered for Scenario-3 was based on the "assumption that Siemens will be awarded, at a minimum, the given programs and volumes listed in Scenario-1." (*See* Poulet Decl. Ex. B, Offer at p. 2.)

In a section of the Offer titled "Quote Verbiage, Definition and Terms," VDO stated additional contract terms. (Poulet Decl. Ex. B, at p. 6.) There, VDO emphasized that its Offer was contingent on the volume assumptions Delphi provided. VDO also addressed how it would recover its costs. (*Id.*) In a subsection titled "Unit Prices and Annual Volumes," VDO stated:

> Our pricing is based upon the annual volume assumptions given in Delphi quote package. Siemens reserves the right to submit to Delphi revised pricing in instances where the actual annual volume purchased is below the quoted volume by 20% or more.
>
> It is agreed that Delphi will award Siemens 100% of the volume for the program covered in this quote and Siemens will support Delphi in any negotiations for price increases in the event of variance to the volumes stated.

- 4 -

(*Id.*)  Through this language VDO rejected two aspects of Delphi's RFQ.  First, by stating that Delphi was to award VDO "100% of the volume for the program," VDO rejected Delphi's attempt to award anything less than Delphi's full requirements for these parts and also rejected Delphi's attempt to reserve the right to purchase these parts from other suppliers.  Second, by reserving VDO's right to submit revised pricing if Delphi's actual orders fell more than 20% below its projected orders, VDO rejected Delphi's attempts to foreclose adjustments to the per-part-prices.

Tellingly, VDO also provided terms addressing what would happen in the event that any of the programs were cancelled.  In a subsection titled "Program Cancellation," VDO proposed:

> In the event that the program covered in this letter is cancelled prior to production, without fault by Siemens, an equitable cancellation charge will be negotiated to cover the appropriate costs incurred by Siemens in supporting this program.

(Poulet Decl. Ex. B, Offer at p. 8.)  Through this provision, VDO rejected those portions of Delphi's Terms and Conditions that attempted to make a supplier's ability to recover development costs subject to Delphi's discretion.  (*See* Poulet Decl. Ex. A, T&C ¶ 11 (stating that seller's recovery of, among other things, development costs, was limited to Delphi's option to purchase "any or all raw materials, work-in-process and finished goods inventory").)[2]

### C. Delphi Selects VDO As Its Supplier.

In a letter Delphi sent to VDO two weeks later, Delphi informed VDO of its selection as Delphi's supplier.  (Poulet Decl. ¶ 11 & Ex. C, Letter from Brigette Shepherd-Colter and Brian R. Thompson, dated August 2, 2000, ("Nomination Letter").)  Delphi also sent that same letter to

---

[2] VDO's Offer also emphasized the import of Delphi's volume estimates by incorporating those estimates into its commitment to make the pricing proposed in its Offer available over the 5 year contract period. (Poulet Decl. Ex. B, Offer at p. 9-10.)

- 5 -

VDO in hard copy from its Kettering, Ohio office on September 13, 2000.  (Poulet Decl. ¶ 12 & Ex. C, at p. 1.)  In the letter, Delphi explained that it selected VDO "based, in part, on your final quote and pricing matrix and your technical presentations."  (Poulet Decl. Ex. C, at p. 2.)

### D.    VDO Begins Work Developing The Capacity To Produce Parts For Delphi.

After Delphi accepted VDO's Offer, VDO began work to produce parts for Delphi.  (Poulet Decl. ¶ 14.)  This work began with a meeting on August 10, 2000.  (*Id.*)  Following this meeting, VDO began developing both the parts themselves and the capacity to produce those parts.  (*Id.* ¶ 15.)  Once VDO began this work, Delphi informed VDO that it had not yet been awarded the ABS programs, and so Delphi would not need those parts in the expected timeframes.  (*Id.* ¶ 16.)  As a result, Delphi delayed the start of production for the ABS parts.  (*Id.* ¶ 17.)  Additionally, this delay meant that VDO had to find a different production line for the Suspension parts.  (*Id.*)  VDO had planned to produce the parts for both the ABS and Suspension programs on the same production line, but the delay of ABS production meant that the line would not be fully utilized.  (*Id.*)  VDO identified an alternate production line in Foix, France and shifted its work to develop the capacity to produce the parts there.  (*Id.* ¶ 18.)

After learning about the delay, VDO met with Delphi in December 2001 to adjust the production schedule.  (Poulet Decl. ¶ 19.)  Both parties also discussed compensating VDO for additional costs of development by adjusting the per-part-prices.  (*Id.* ¶¶ 19-21.)  These discussions demonstrate that both parties recognized VDO was entitled to some adjustment.

The parties' ongoing discussions ultimately resulted in VDO submitting an updated quote to Delphi.  (Poulet Decl. ¶ 22 & Ex. E, Letter from Francis Bonhoure and Michel Poulet, dated December 13, 2002, ("Updated Quote").)  Among other things, the Quote modified how VDO amortized its development costs, with those costs now amortized over the first two years of production for the GMX 245, GMX 295, and GMT 800 programs.  (Poulet Decl. Ex. E, Updated

- 6 -

Quote at pp. 1-2.)  At the same time, VDO reaffirmed that the terms of its Offer, giving VDO with remedies should Delphi either order more or less parts than it projected or cancel a program altogether, by, once again, including those terms in the Updated Quote.  (Poulet Decl. Ex. E, Updated Quote at pp. 1, 3.)

After receiving the Updated Quote, Delphi wrote to VDO stating:  "Concerning your most recent quote, 'most things' look okay."  (Poulet Decl. ¶ 24 & Ex. F, Email from Michael Shields dated January 21, 2003.)  While Delphi identified certain issues that required further discussions, such as transportation costs, it offered no objection to the provisions regarding VDO recouping its costs.  (*Id.*)

VDO developed the capabilities to produce the parts within the modified timeframe agreed on by the parties.  (Poulet Decl. ¶ 21.)  Proving VDO's success developing these capabilities, Delphi approved, through its PPAP process, the parts VDO produced for all three programs.  (*Id.* ¶¶ 25-26, 28.)  In May 2004, Delphi gave its PPAP approval to the parts for the GMX 245 and GMX 295 programs and started to order parts shortly after that date.  (*Id.* ¶ 26 & Exs. G, H.)  In total, Delphi ordered 8,208 parts from VDO under the GMX 245 program and 16,325 parts from the GMX 295 program as of the date of VDO's claim in this matter.  (Poulet Decl. ¶ 27.)  Similarly, Delphi approved the parts for the GMT 800 program through the PPAP process in August 2004, shortly after it submitted a blanket purchase order for those parts in July 2004.  (*Id.* ¶¶ 28, 30 & Exs. I, J.)

E.   **Delphi Fails To Order The Projected Quantities Or Compensate VDO For Costs Incurred In Developing The Products.**

In the second half of 2004, Delphi failed to order the contemplated quantities of parts from VDO for the GMX 245 and GMX 295 programs or to compensate VDO for these volume shortfalls.  (Poulet Decl. ¶ 29.)  Delphi also essentially cancelled the GMT 800 program

altogether without ordering a single part. (*Id.* ¶ 30.) As a result of Delphi's failure to order the expected volumes, VDO was unable to recover the substantial costs it incurred developing the capacity to produce those parts for Delphi. (*Id.* ¶ 31.) Delphi also failed to compensate VDO for the cancellation and volume shortfalls, despite the parties' agreement to those terms in VDO's Offer providing for such compensation.

Following Delphi's failure to order the projected volume of parts, VDO attempted to negotiate an equitable cancellation charge and to recoup the unrecovered development costs. These unsuccessful efforts began in January 2005 and continued periodically until the bankruptcy filing. (Poulet Decl. ¶ 32.)

## ARGUMENT

### I.  THE PARTIES' AGREEMENT INCLUDES PROVISIONS ENTITLING VDO TO RECOVER THE AMOUNTS SET FORTH IN ITS CLAIM.

To determine what terms govern the parties' relationship, this Court should give effect to the parties' intent by looking to the plain language of the documents exchanged by the parties. *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997). The plain, unambiguous language that Delphi drafted and included in its Terms and Conditions includes the terms set forth in VDO's Offer, including provisions enabling VDO to recover on its claim, in the parties' written agreement. Delphi asks this Court to ignore the unambiguous language Delphi drafted and hold that only the terms of the Long Term Contract and Delphi's Terms and Conditions govern the parties' relationship. (Delphi's Statement ¶ 16.) Delphi, however, cannot ignore language in those documents and seek to enforce those same documents as the parties' agreement. As VDO demonstrates below, the parties' written agreement includes the terms set forth in VDO's Offer, and the other documents

exchanged by the parties. Accordingly, VDO is entitled to an allowed claim for its costs under the parties' agreement.

### A. Ohio Law Governs The Parties' Agreement.

Both parties concur that their agreement, at a minimum, includes those provisions of Delphi's Long Term Contract and Terms and Conditions not modified or rejected by VDO's Offer. These documents, which are the only documents that state which law governs the parties' agreement, provide that Ohio laws governs that agreement. The Terms and Conditions state: "This Contract is to be construed according to the laws of the . . . state . . . from which this Contract is issued as shown by the address of Buyer." (Poulet Decl. Ex. A, T&C ¶ 26.) Although neither the Long Term Contract nor the Terms and Conditions include an address, Delphi's address was provided in both Delphi's RFQ and its Nomination Letter. In those documents, Delphi stated that its address was in Kettering, Ohio. (Poulet Decl. Ex. A, Delphi RFQ; Poulet Decl. Ex. C, Delphi Nomination Letter.) Likewise, Delphi instructed VDO to send its Offer to Delphi's global purchasing offices in Dayton, Ohio. (Poulet Decl. Ex. A, RFQ at p. 7.) Finally, Delphi identified multiple individuals to contact regarding the RFQ process, each of whom had phone numbers in the Dayton, Ohio area. (*Id.*) Because Delphi's communications with VDO all clearly identified Delphi's address as being in Ohio, the language in Delphi's Terms and Conditions requires that Ohio law govern this dispute.

### B. Plain Language That Delphi Itself Drafted And That Is Undisputedly Part Of The Parties' Agreement Incorporates VDO's Offer, And Other Written Documents, Into The Parties' "Contract."

"The cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties. . . . 'The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement.'" *Foster Wheeler*, 678 N.E.2d at 526 (quoting *Kelly v. Medical Life Ins. Co.*, 509 N.E.2d 411, 413 (Ohio 1987)). In

- 9 -

determining that intent, "a writing, or writings executed as part of the same transaction, will be read as a whole, and the intent of each part will be gathered from a consideration of the whole." *Foster Wheeler*, 509 N.E.2d at 526. In giving effect to the parties' intent, "'if the language of a contract is susceptible of two constructions, one of which will render it valid and give effect to the obligation of the parties, and the other will render it invalid and ineffectual, the former construction must be adopted.'" *CoBank ACB Corp. v. Alexander*, No. 3:96-CV-7687, 1999 WL 33734462, at *8 (N.D. Ohio July 27, 1999) (quoting *Stewart v. Herron*, 82 N.E. 956, 959 (Ohio 1907)).

As explained below, the plain language of Delphi's Long Term Contract and Terms and Conditions demonstrates that the parties' agreement includes the terms set forth in VDO's Offer. In the Long Term Contract, Delphi incorporated by reference its Terms and Conditions: "Buyer's General Terms and Conditions, a copy of which is attached, are hereby incorporated into this Contract by reference. . . ." (Poulet Decl. Ex. D, LTC ¶ 5.) In those Terms and Conditions, Delphi defined the parties' "Contract" to specifically include additional documents relating to the goods to be provided by VDO. In its definition of "Contract," Delphi incorporates the parties' written dealings concerning the parts at issue by stating:

> Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification ***and other document, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract")***.

(Poulet Decl. Ex. A, T&C ¶ 1 (emphasis added).) Importantly, in identifying the documents that comprise "this Contract," Delphi states that *each* of the identified documents are "*collectively* referred to as this 'Contract.'" (*Id.* (emphasis added).) Because the "Contract" documents include each "other document . . . relating to the goods and/or services" (*id.*) to be provided by

VDO, Delphi's language incorporates into the parties agreement all of their written dealings regarding the parts to be provided by VDO.

The integration clause that Delphi included in its Terms and Conditions further confirms that all of the parties' written documents regarding the parts are included in their agreement. That clause states that the "Contract," as Delphi previously defined it, contains the entirety of the parties' agreement:

> **29.    ENTIRE AGREEMENT**
>
> This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written contract amendment issued by Buyer.

(Poulet Decl. Ex. A, T&C ¶ 29.)  By using the term "This Contract," Delphi's integration clause specifically references the definition of "Contract" from the first paragraph of Delphi's Terms and Conditions.  Thus, these bookend provisions of Delphi's Terms and Conditions make clear that, contrary to its current argument, Delphi defined the parties' agreement to consist of all of their written communications.[3]  And because those written communications include VDO's Offer and the Nomination Letter, Delphi cannot avoid the terms set forth in the Offer that it accepted in the Nomination Letter.

### C.    Even If Delphi's Own Language Did Not Incorporate VDO's Offer Into the Parties' Agreement, VDO's Offer Must Still Be Part Of That Agreement Because It Sets Forth The Terms Of The Offer That Delphi Accepted.

Assuming, *arguendo*, that the Court accepted Delphi's contention that the language Delphi drafted does not mean what it says, the terms set forth in VDO's Offer would still remain

---

[3] Even if Delphi were to argue these provisions of its Terms and Conditions are ambiguous, any construction of the terms must be construed against Delphi as the undisputed drafter of the language. *See, e.g., Central Realty Co. v. Clutter*, 406 N.E.2d 515, 517 (Ohio 1980).

part of the parties' agreement. Indeed, even under Delphi's construction, VDO's Offer sets forth the terms of that agreement because it is the offer that Delphi accepted.

"In order to prove the existence of a contract, a plaintiff is required to demonstrate the essential requirements of an offer, acceptance, and consideration." *Dyno Constr. Co. v. McWane, Inc.*, 198 F.3d 567, 572 (6th Cir. 1999) (citing *Helle v. Landmark, Inc.*, 472 N.E.2d 765, 773 (Ohio Ct. App. 1984)). Whether a communication constitutes an offer "depends primarily upon the intention of the person communicating the quotation as demonstrated by all of the surrounding facts and circumstances." *Dyno Constr. Co.*, 198 F.3d at 572 (citing *Interstate Indus., Inc. v. Barclay Indus., Inc.*, 540 F.2d 868, 871 (7th Cir. 1976)).

Here, VDO's Offer and Delphi's Nomination Letter provide the required elements of a contract. In VDO's Offer, VDO communicated the specific terms under which it proposed to enter into an agreement with Delphi and expressly rejected those provisions of Delphi's Long Term Contract and Terms and Conditions it was unwilling to accept. Delphi then accepted VDO's Offer, including those terms that VDO proposed to replace language from Delphi's RFQ that VDO rejected. The result was a contract between VDO and Delphi, with the terms set forth in VDO's Offer and Delphi acceptance of that offer.

### D.    The Parties' Agreement Includes Terms That Enable VDO To Recover On Its Claim.

As the previous two sections demonstrate, the parties' agreement includes the terms set forth in VDO's Offer. VDO's ability to recover on its claim hinges, in turn, on whether the terms of that agreement include provisions allowing for that recovery. Here again, the plain language of the parties' agreement demonstrates VDO's right to recovery.

> **1.     The Program Cancellation provision that VDO proposed and Delphi accepted allows VDO to recover costs incurred in support of the cancelled GMT 800 program.**

The language of the documents comprising the parties' agreement, and the timing of their exchange, shows that the Program Cancellation provision from VDO's Offer is part of that agreement. In its RFQ, Delphi presented its initial proposal: "The Supplier bears the cost of development. Cost recovery can occur only from within the production piece price, production tooling and/or the Development/Alpha/Beta/Prototype piece price and tooling." (Poulet Decl. Ex. A, RFQ at p. 2.) Delphi elaborated on this initial proposal in its Terms and Conditions stating that the only way a supplier would be compensated for any unrecovered costs if Delphi chose to terminate a program for its convenience was if Delphi, "at its option," chose to purchase "any or all raw materials, work-in-process and finished goods inventory related to the goods under this Contract." (Poulet Decl. Ex. A, T&C ¶ 11.)

In its Offer, VDO clearly rejected Delphi's proposal. Instead, VDO set forth its own position in the "Program Cancellation" subsection of the Quote Verbiage, Definition and Terms portion of its Offer. That subsection states:

> In the event that the program in this letter is cancelled prior to production, without fault by Siemens, an equitable cancellation charge will be negotiated to cover the appropriate costs incurred by Siemens in supporting this program.

(Poulet Decl. Ex. B, Offer at p. 8.) Delphi agreed to VDO's Program Cancellation provision when Delphi, in its Nomination Letter, accepted VDO's Offer without modifying or rejecting this provision. As a result of VDO's rejection of Delphi's initial proposal, VDO's articulation of its own term in its Offer, and Delphi's acceptance of that term, the parties' agreement includes the Program Cancellation provision.

The terms set forth in VDO's Updated Quote confirm that the parties included the Program Cancellation provision in their agreement. (Poulet Decl. ¶ 23 & Ex. E, Updated Quote

- 13 -

at p. 3.) The Updated Quote again included the Program Cancellation provision, thereby making it clear that VDO required the provision be a part of the parties' agreement to prevent VDO from entering into a contract that obligates it to incur millions of dollars in costs that it might never recover. (Poulet Decl. Ex. E, Updated Quote at p. 3.) Given VDO's repeated articulation of this provision and others relating to its ability to recover development costs and Delphi's acceptance of these provisions without objection, it follows that the parties' intended for their agreement to include the Program Cancellation provision.

> **2.    Delphi's acceptance of The Unit Prices and Annual Volumes provision allows VDO to recover costs not recovered due to insufficient orders for parts in the GMX 245 and GMX 295 programs.**

Just as the parties' agreement included a mechanism allowing VDO to recover for costs incurred in support of programs cancelled prior to production, it also provided that VDO could recover, through a per-piece-price increase, for any cost recovery shortfalls that might result from Delphi's failure to order the projected quantities of parts. The parties intent to include this provision in their agreement is shown by VDO's modification of Delphi's initial proposal regarding cost recovery to allow for volume shortfall cost recovery.

Delphi's initial proposal, as set forth in its RFQ and Terms and Conditions, is the same one discussed earlier. It proposed that the only mechanism for such recovery, other than per-part-pricing, is entirely within Delphi's discretion. (Poulet Decl. Ex. A, RFQ at p. 2; Poulet Decl. Ex. A, T&C ¶ 11.) VDO's Offer did not reject Delphi's position in its entirety. Instead, VDO's Offer included language that modified this proposal: in the event that Delphi's purchases fell more than 20% below its projected volumes, VDO reserved the right to submit revised pricing. (Poulet Decl. Ex. B, Offer at p. 6.) As with the Program Cancellation provision, Delphi agreed to VDO's position by accepting VDO's Offer without expressing any disagreement with this proposed term. Thus, consistent with the parties' intent, the parties' agreement allows VDO

to recover the costs it now seeks relating to the shortfalls in Delphi's orders in the GMX 245 and GMX 295 programs.

Further demonstrating that the parties intended to include this provision in their agreement, VDO, as it had with the Program Cancellation provision, included it again in its Updated Quote. (Poulet Decl. ¶ 23 & Ex. E, Updated Quote at p. 1.) For this provision, however, VDO did not simply restate the provision, it actually modified it to allow VDO to adjust its pricing should Delphi's actual orders be 10%, rather than 20%, above or below its projections. And, as with each prior instance, Delphi never objected to this provision. (Poulet Decl. Ex. E, Updated Quote at p. 1.)

## II. ALTERNATIVELY, VDO'S CLAIM SURVIVES EVEN IF THE PARTIES' AGREEMENT IS LIMITED TO THE LONG TERM CONTRACT AND THE TERMS AND CONDITIONS.

If the Court were to agree with Delphi and hold that the parties' agreement consists only of the Long Term Contract and Delphi's Terms and Conditions, this conclusion would render the parties' agreement unenforceable. As a result, Delphi's success in limiting the scope of documents comprising the parties' agreement would not bar VDO's claim; it would only change the legal basis for it. Without a valid agreement, VDO would be able to recover under the equitable doctrine of promissory estoppel.

### A. The Long Term Contract And Terms And Conditions Fail To Include The Necessary Terms For A Requirements Contract.

The Long Term Contract and Terms and Conditions purport to be a requirements contract. "A requirements contract is a contract which calls for one party to furnish materials or goods to another party to the extent of the latter's requirements in business." *Cyril Bath Co., v. Winters Indus.*, 892 F.2d 465, 467 (6th Cir. 1989). Under Ohio law, to be valid and binding, a requirements contract must include "[a] term which measures the quantity by the output of the

seller or the requirements of the buyer." *Orchard Group, Inc. v. Konica Med. Corp.*, 135 F.3d 421, 428 (6th Cir. 1998) (quoting *Cyril Bath Co.*, 892 F.2d at 467). This quantity term can be provided in one of two ways: either through a specific numeric amount, even if that amount is only an estimate, or by a promise of exclusivity. *See Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 7 F. Supp. 2d 954, 959-60 (N.D. Ohio 1998). In those instances where a specific numeric term is lacking, the contract instead must contain a term requiring that the parties' relationship be exclusive. *See Orchard Group*, 892 F.2d at 428.

The existence of a quantity term determines whether a contract is a valid, enforceable requirements contract or an invalid, nonbinding, indefinite, quantities contract. *See Triad Metals, Inc. v. Wheeling-Pittsburgh Steel Corp. (In re Wheeling-Pittsburgh Steel Corp.)*, 360 B.R. 632, 640-41 (Bankr. N.D. Ohio 2006). Without a quantity term, "even if the buyer needs the commodity in question, he is not obligated to purchase it from the seller." *Id*. at 641. This lack of obligation, in turn, means "the buyer's promise is deemed illusory and unenforceable." *Id*.

Here, Delphi's argument that the parties' agreement consists only of the Long Term Contract and Terms and Conditions means that the agreement lacks a quantity term and is therefore an unenforceable, indefinite, quantities contract. Following Delphi's argument, the parties' agreement consists only of the terms Delphi included in the Long Term Contract and Terms and Conditions. These terms, however, lack any numeric terms regarding quantity. Instead, as discussed above, the only numeric terms are found in the documents that Delphi argues are not included in the parties' agreement: Delphi's RFQ and VDO's Offer. (Poulet Decl. Ex. A, RFQ; Poulet Decl. Ex. B, Offer.) As a result, by its own argument, Delphi must rely on those numeric terms in these other documents to provide the required quantity term for an

enforceable agreement, but cannot do so. *See, e.g.*, *Miami Packaging, Inc. v. Processing Sys., Inc.*, 792 F. Supp. 560, 563-64 (S.D. Ohio 1991) (integration clause meant that estimates provided prior to execution of written contract cannot be used to vary the terms of that contract).

Lacking a specific quantity term, the Long Term Contract and Terms and Conditions instead would have to include a provision under which Delphi promised to purchase the parts exclusively from VDO. The terms of the Long Term Contract, however, specifically reject designating VDO as an exclusive supplier. It instead includes language allowing Delphi to purchase the parts that it was contracting for VDO to supply from other suppliers. (Poulet Decl. Ex. D, LTC ¶ 4.) In fact, Delphi has taken that exact position in its Initial Statement to the Court in this matter: "The Long Term Contract . . . allowed the Debtors to purchase the parts at issue elsewhere." (Delphi Initial Statement ¶ 17.) Thus, according to Delphi, the parties' agreement not only is not exclusive, but it also allows Delphi to buy the parts that are the subject of the parties' agreement from another supplier.[4]

By limiting the parties' agreement to the Long Term Contract and the Terms and Conditions, Delphi has eliminated from that agreement the very term needed to make it enforceable. Consequently, under Delphi's argument, the parties' agreement is unenforceable, and Delphi cannot rely on those unenforceable terms to avoid its liability to VDO.

---

[4] The fact that limiting the parties' agreement to the two documents Delphi claims comprise that agreement results in, at the very least, serious questions regarding its enforceability further demonstrates the fatal flaws with Delphi's efforts to avoid the plain language of its own definition of "Contract." Indeed, to give meaning to the parties' intentions, it makes far more sense that Delphi intended the plain meaning of its definition of "Contract"—a meaning that incorporates into the parties' agreement the documents containing terms necessary to make that contract valid—than it does that Delphi intentionally limited the parties' agreement to two documents that fail to include the terms necessary to make that agreement enforceable. *See CoBank ACB Corp. v. Alexander*, No. 3:96-CV-7687, 1999 WL 33734462, at *8 (court should interpret contract to be valid, not invalid).

### B. Without An Enforceable Requirements Contract, VDO Can Recover For Its Claims Under Equitable Doctrines.

Because Delphi's effort to limit the parties' agreement to the Long Term Contract and Terms and Conditions causes that agreement to be an invalid and unenforceable contract, VDO's ability to recover its claim is not limited to the parties' agreement. Rather, VDO can pursue its claim under equitable doctrines, such as promissory estoppel.

Under Ohio law, a claim for promissory estoppel provides that "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Mers v. Dispatch Printing Co.*, 483 N.E.2d 150, 154 (Ohio 1985) (quoting *Talley v. Teamsters Local No. 377*, 357 N.E.2d 44, 47 (Ohio 1976)). To prove promissory estoppel, Ohio courts require four elements to be established: (1) the existence of a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) reasonable and foreseeable reliance; and (4) injury to the party claiming estoppel due to that reliance. *See Cohen & Co., CPAs v. Messina, CPA*, 492 N.E.2d 867, 872 (Ohio Ct. App. 1985).

Here, VDO can establish each of these four elements. First, as to the existence of a clear and unambiguous promise, Delphi promised to VDO that it would purchase the parts for its GMT 800, GMX 245 and GMX 295 programs from VDO. These promises are included in each of the documents that the parties' exchanged in the Request for Quotation process. (Poulet Decl. Ex. A, RFQ; Poulet Decl. Ex. B, Offer; Poulet Decl. Ex. C, Nomination Letter; Poulet Decl. Ex. D, Long Term Contract.) In this promise, Delphi agreed that VDO would recover the costs associated with these programs, either through per-part-pricing or through an equitable Program Cancellation and adjustment to the per-part-pricing charge. (Poulet Decl. Ex. B, Offer; Poulet

Decl. Ex. C, Nomination Letter.)  Second, VDO relied on Delphi's promises by expending millions of dollars doing the development work necessary for VDO to be able to produce the parts for Delphi.  (Poulet Decl. ¶¶ 14-32.)  Third, VDO's reliance on Delphi's promises was reasonable and foreseeable.  In fact, Delphi encouraged this reliance by approving the parts VDO developed for each of the three programs, submitting a blanket purchase order for the GMT 800 program, and actually releasing parts for the GMX 245 and GMX 295 programs.  (*Id.* ¶¶ 26-28, 30.)  Finally, VDO was injured by its reliance on Delphi's promises by expending millions of dollars working to develop the parts and the capacity to produce those parts for Delphi.  (*Id.* ¶¶ 14-32.)  Indeed, Delphi's defense to VDO's claim does not assert that VDO did not incur the costs it now seeks to recover, but rather disputes whether Delphi is liable for those costs.

Moreover, the existence of Delphi's promises to VDO, VDO's reliance on those promises, and the reasonableness of that reliance is further shown by the parties' discussions in both late 2001 and 2002.  In late 2001, Delphi and VDO discussed the need to modify the previously agreed upon prices to allow VDO to recoup its full development costs following the production delays.  (Poulet Decl. ¶¶ 19-20.)  This topic then arose again in late 2002, when VDO provided Delphi with its Updated Quote.  (*Id.* ¶ 22 & Ex. E, Updated Quote.)  In the Updated Quote, VDO again included the Program Cancellation provision as well as the provision calling for adjustments to the per-part-pricing if Delphi's actual order volume was more than 10% above or below its projections.  (*Id.* ¶ 23 & Ex. E, Updated Quote.)  As was the case when VDO first included these provisions in its Offer, Delphi voiced no objection to either provision.  (*Id.* ¶ 24 & Ex. F.)  Thus, Delphi's own actions reaffirmed that it had indeed promised to allow VDO to recoup its development costs, that VDO relied on those promises, and that VDO's reliance was reasonable.

Coupled with VDO's expenditure of millions of dollars developing products and the capacity to produce those products for Delphi, Delphi's actions, both during the RFQ process and after it, establish the required elements of a promissory estoppel claim. Accordingly, VDO is entitled to an allowed claim to recover the costs it now seeks.

## CONCLUSION

VDO's claim in this matter is valid, either under the terms of the parties' agreement or under equitable theories of recovery. Accordingly, VDO's claim should be allowed, and Delphi's arguments to the contrary should be rejected.

Dated: New York, New York
October 9, 2007

        Respectfully submitted,

        **REED SMITH LLP**

        By:   /s/ Elena P. Lazarou
           Elena P. Lazarou (EL 5681)
           599 Lexington Avenue, 29th Floor
           New York, New York 10022
           (212) 521-5400

           and

           Randall D. Lehner (IL # 6237535)
           Max A. Stein (IL #6275993)
           10 South Wacker Drive, 40th Floor
           Chicago, Illinois 60606
           (312) 207-1000
           (admitted *pro hac vice*)

        Attorneys for Claimant Siemens VDO Automotive SAS