1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION,


        Debtor.


- - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                September 28, 2007

                10:12 AM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

A P P E A R A N C E S :

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

     Attorneys for Debtor

     333 West Wacker Drive

     Chicago, IL 60606


BY:   JOHN K. LYONS, ESQ.



BUCHANAN INGERSOLL  ROONEY P.C.

     Attorneys for Arkema, Inc.

     1835 Market Street

     Philadelphia, PA 19103


BY:   WILLIAM H. SCHORLING, ESQ.

3

1          P R O C E E D I N G S

2          THE COURT:  Be seated.  Okay.  Delphi Corporation.

3          MR. LYONS:  Good morning, Your Honor.  John Lyons on

4   behalf of Delphi and its affiliates.  This is the twelfth

5   claims hearing, Your Honor.  And today I have, once again, with

6   me, Mr. Dean Unrue (ph.) the claims administrator,

7   Lisa Diez (ph.) and Sara Platt (ph.) who are also colleagues

8   who are working with the claims effort.

9          Your Honor, as I traditionally do, I'd like to hand

10  up, kind of, a chart showing the most recent statistics.

11         THE COURT:  All right.

12         MR. LYONS:  Now again, this chart shows everything

13  that is in the claims procedures right now and the various

14  results to date.  I would envision, perhaps, for the November

15  claims hearing we may submit a different chart which will show

16  where we are versus the 1.7 billion dollar EPGA target because

17  I think that may become a more relevant number so Your Honor

18  can see exactly where we are in relation to that.

19         THE COURT:  Okay.

20         MR. LYONS:  We still are north of that, if you look

21  at the asserted amounts of the claim.  And especially if you'd

22  look at the estimated amounts or the caps that other parties

23  have proposed to us.  I mean, technology properties alone is

24  4.1 billion so obviously may be outliers that skew the number.

25  But we are making progress and at the next few claims hearings

4

1    we're hopefully we can achieve that 1.7 billion.

2              THE COURT:  Okay.

3              MR. LYONS:  With your permission, Your Honor, I'd

4    like to go through the agenda.  Today we really only have one

5    contested matter.

6              THE COURT:  But before we -- before we get there, and

7    I know you've been very successful in negotiating settlements

8    and consensual resolutions of these claim objections, but I

9    wanted to ask you, is there some build up of problem claims?

10   I'm just trying to see whether these will, sort of, dealt with

11   as we have today one or two at a claims hearing or whether

12   you're getting to a point where maybe you have, like, twenty

13   that are really in the state where they're going to have to be

14   litigated.

15             MR. LYONS:  It's hard to say, Your Honor.  We

16   maintain a rolling list of top fifty variances to our amount,

17   which we -- which is, kind of, a list which we work off of.

18   Certainly, I think there are at least five to ten which appear

19   to be headed towards litigation.  I mean, honestly, we took on

20   a lot of the litigated claims earlier in the process but

21   certainly, I think, you know, technology properties, cadence,

22   you know, those are ones that do not seem to be easily resolved

23   although we have settlement meetings next week.

24             THE COURT:  Okay.

25             MR. LYONS:  It's always hard to say.  The most

5

1  contested litigious claims, HE Services for example, I though

2  that was going to go to a trial and we settled it.

3        THE COURT:  All right.  But there's -- you're not

4  expecting -- right now you're not expecting, you know, twenty

5  to be heard in November or December?

6        MR. LYONS:  No.

7        THE COURT:  Okay.

8        THE COURT:  We've staged them where --

9        THE COURT:  All right.

10        MR. LYONS:  -- we make sure that we would not

11  overburden Your Honor.  Having said that, we may ask for a

12  spillover date in December, for example.

13        THE COURT:  All right.

14        MR. LYONS:  If December 7th may be open.

15        THE COURT:  No, that's fine.

16        MR. LYONS:  And if -- and if something --

17        THE COURT:  And that's where I was going.  Is, you

18  know, if you are getting to a point where -- either to move the

19  settlement process along or just to move your administrative

20  process along you need to schedule trials, you don't have to

21  stick to an omnibus date necessarily at that point, if you're

22  down to, you know, twenty or so claims, for example.

23        MR. LYONS:  We appreciate that.

24        THE COURT:  Okay.

25        MR. LYONS:  And we may -- and again, under the claims

6

1   procedures it's a sixty-five day lead time.  So we would give

2   the Court plenty of notice if we wanted, you know, additional

3   dates.

4           THE COURT:  Okay.  That's fine.

5           MR. LYONS:  Okay.  Turning to the agenda, Your Honor,

6   I will quickly run through the stipulations we are proposing to

7   hand up after the hearing and then we can move on to the

8   contested matters.

9           First, Your Honor, on the agenda item number 1 is the

10  claim objection of P.D. George.  That claim asserted an

11  unsecured non-party claim of 405,000 dollars.  We've agreed to

12  settle that for non-priority claim of 400,000 dollars and

13  change.  And also the claimant is going to reserve the right to

14  seek 4,700 dollars as an administrative priority claim based

15  upon reclamation.

16          THE COURT:  Okay.

17          MR. LYONS:  Agenda item number 2, the claim of A-1

18  Specialized Services and Supplies.  That claimant asserted a

19  reclamation demand in the amount of 430,000 dollars and change.

20  The debtors believe the reclamation claim was only 1265, or the

21  claimant asserted a secured claim for a non-liquidated amount.

22  The parties have agreed to resolve that for an allowed general

23  unsecured non-priority claim in the amount of 430,000 dollars

24  and change.  And the claimant has agreed to withdraw its

25  reclamation demand.

7

1          THE COURT:  Okay.

2          MR. LYONS:  Item number 3 is the claim of Intermet

3    Corporation and (indiscernible) Group LLC.  Claimant asserted

4    three claims, each in the amount of 3.7 million dollars and

5    change.  One against DASS LLC, one against Delphi Electronics

6    Holding LLC and the last one against Delphi Corp.  The parties

7    have agreed to settle claim number one for 489, which is the

8    claim against DASS LLC for an allowed general unsecured claim

9    amount of 3.738, which is 12,000 dollars less than the initial

10   asserted amount.  And they've agreed to withdraw the other two

11   and have them expunged in their entirety.

12          THE COURT:  Okay.

13          MR. LYONS:  Item number 4 on the agenda, the claim

14   Makes Piano Company.  Claimant asserted a secured claim for

15   45,000 dollars against DAS LLC.  Parties have agreed to settle

16   that as an allowed general unsecured claim in the amount of

17   40,000 dollars.

18          Item number 5 is the claim of Millwood Inc./Liberty

19   Industries.  Claimant asserted a non-priority unsecured claim

20   in the amount of 164,000 dollars and change and a priority

21   claim in the amount of 50 -- approximately 56,000 dollars

22   against DAS LLC.  They also entered into four letter agreements

23   that acknowledge a reclamation claim in the aggregate amount of

24   5,900 dollars, of course subject to our global defenses.

25          The parties have agreed to settle the claim for an

8

1    allowed general unsecured claim in the amount of 220,000

2    dollars and Millwood will reserve the right to seek priority

3    status for that reclamation claim subject, of course, to our

4    valid defenses in the amount of approximately 6,000 dollars.

5            THE COURT:  Okay.

6            MR. LYONS:  Item number 6 is the St. Louis Collector

7    of Revenue claim.  The claimant asserted a number of claims all

8    totaling less than 20,000 dollars.  And the parties have agreed

9    to settle those claims for -- for less than that.  And I won't

10   go into the exact numbers but it is less than that and does

11   reflect a reduction for those proofs of claim.

12           MR. LYONS:  Item number 7 is the claim of

13   Multek Flexible Circuits and its (indiscernible) SPCP.  The

14   claimant asserted non-secured non priority claim in the amount

15   of 220,000 against DASS LLC.  The parties have agreed to settle

16   that for 180,000 dollars.  So there's approximately a -- a

17   43,000 dollar reduction.

18           THE COURT:  Okay.

19           MR. LYONS:  And all those, Your Honor, we have

20   stipulations which as in the past, we'll hand up after the

21   hearing.

22           Now turning to the contested matters.  The first item

23   is in agenda item number 8.  Following discussions with

24   Marsilli (ph.), they have decided to withdraw their motion.

25           THE COURT:  Okay.

9

1          MR. LYONS:  Item 9 is the hearing of --

2          THE COURT:  Well, let me -- let me make sure then as

3    to the status of this claim.  You had previously objected to it

4    as being untimely?

5          MR. LYONS:  No, I believe Marsilli -- they were

6    seeking leave to actually file a --

7          THE COURT:  Oh, they hadn't filed one at all.

8          MR. LYONS:  No.

9          THE COURT:  All right.

10         MR. LYONS:  No, the Italian Ice did not.

11         THE COURT:  All right.  So no order needs to be

12   entered then because there's no claim.

13         MR. LYONS:  That is correct.

14         THE COURT:  All right.  Okay.

15         MR. LYONS:  A withdrawal would be sufficient.

16         THE COURT:  All right.

17         MR. LYONS:  And, Your Honor, we had already

18   previously expunged the North American entity that filed a

19   proof of claim.  So that's why there may be a little bit of

20   confusion.

21         THE COURT:  All right.

22         MR. LYONS:  Item number 9, Your Honor, if we could

23   pass over.  That's the hearing regarding the motion of Arkema.

24         THE COURT:  Right.

25         MR. LYONS:  And we'll get to that.  But first item

10

1   number 10.  And these are claims objections of four claims

2   which we had filed.  At our last hearing, Your Honor, I had

3   mentioned that late claims don't really fall within our

4   procedures.  They, kind of, fall within the cracks because we

5   don't contest the merits.  And nor are they motions to dismiss.

6   So pursuant to that discussion we did file a Notice of Hearing

7   and filed a response and served it on the four claimants.  And

8   as of today we heard back from one claimant who decided to just

9   agree to have the claim expunged.

10          THE COURT:  Okay.

11          MR. LYONS:  And that --

12          THE COURT:  Who was that?

13          MR. LYONS:  That is -- that's Clark Thomas Winters,

14   P.C.

15          THE COURT:  Okay.

16          MR. LYONS:  The other three, Your Honor, we've

17   checked the docket and checked our inboxes.  And I checked with

18   Ms. Marafioti and we have never received a response from either

19   of these three claimants.  We do have a confirmation of the

20   FedEx that they did receive the notice of the hearing and the

21   response.  And so, Your Honor, we believe that those are

22   uncontested.

23          THE COURT:  All right.  There's a problem with it

24   though, at least I think there is.  The notice is dated

25   September 21st and I just don't think it was sufficient for

11

1    today.  Obviously, one of the four claimants got it because

2    they contacted you.  But I think you need to give them more

3    time.

4            MR. LYONS:  Well, what would you suggest?

5            THE COURT:  Well, and this is, kind of, unusual

6    because their claim is late.  So, in essence, you're doing them

7    a favor by teeing up the issue.  Under the rules they have to

8    make a motion to have their claim timely filed.

9            MR. LYONS:  Correct.

10           THE COURT:  So, I -- you know, I think it's

11   undisputed.  I did read their papers.  They don't dispute that

12   the claims are late.  So it seems to me that you should give

13   them a notice saying that unless they file a motion by the

14   next -- we have a date in October, right, for an omnibus?

15           MR. LYONS:  October 10th, yes.

16           THE COURT:  By October 10th to be heard -- I'm sorry,

17   to be heard on October 10th that the Court will enter an order

18   disallowing the claim as being untimely.

19           MR. LYONS:  If no response is filed.

20           THE COURT:  Right.

21           MR. LYONS:  Okay.  Right.

22           THE COURT:  And you could say that you had -- you had

23   previously filed this omnibus objection and that will

24   constitute your response to any motion that's filed.

25           MR. LYONS:  Very good.  We were actually going to

12

1    relinquish that October 10th date because we don't have any

2    contested matters for that date.

3              THE COURT:  Well, you may not anyway.

4              MR. LYONS:  If they don't respond it would just be --

5              THE COURT:  Right.  Then you wouldn't have to come

6    down, you'd just submit the order.

7              MR. LYONS:  Okay.  Very good.  So now in the future,

8    would two weeks be sufficient if we were two weeks similar?

9              THE COURT:  Yeah, I think so.  Again, you're doing

10   them the favor --

11             MR. LYONS:  Right.

12             THE COURT:  -- because otherwise they'd have to file

13   the motion.  So you're flagging -- you're highlighting the

14   issue for them.  So I think two weeks is sufficient.

15             MR. LYONS:  Okay, Your Honor.  We will do so.  Okay,

16   Your Honor --

17             THE COURT:  But here it was -- it was, like, five or

18   six days and I don't think that's enough.

19             MR. LYONS:  It was -- yes, it was seven days.

20             THE COURT:  Yeah.

21             MR. LYONS:  Okay, Your Honor.  With our last matter,

22   the motion of Arkema, I'll turn the podium over to counsel for

23   Arkema.

24             THE COURT:  Okay.

25             MR. SCHORLING:  May it please the Court, my name is

13

1   William Schorling.  I'm a member of the firm of Buchanan

2   Ingersoll and Rooney and I represent Arkema, Inc., the movant

3   on Arkema Inc.'s motion to file late claim.

4        Your Honor, the parties have agreed to submit the

5   matter on the declarations and supplemental declarations and

6   have no objections to the exhibits.

7        THE COURT:  Okay.

8        MR. SCHORLING:  So I would like to move Exhibits A-1

9   through A-9, B, C and D which are attached to Arkema's motion

10  although they're referenced in the declaration of John Ludz

11  (ph.) into evidence.  Exhibit D is the form of the proof of

12  claim that Arkema would file if its motion is granted.  We're

13  offering that to show what Arkema would file not for the

14  purpose of filing.

15       THE COURT:  All right.  And as you say, this is --

16  there's no objection?

17       MR. SCHORLING:  No objection, Your Honor.

18  (Arkema's Motion were hereby received as Creditor's Exhibit A-1

19  through A-9 B, C & D for identification, as of this date.)

20       THE COURT:  All right.  And then you're also going to

21  rely on the two declarations by Mr. Ludz?

22       MR. SCHORLING:  That's correct, Your Honor. I'd also

23  move the supplemental declaration of Mr. Ludz and the

24  declaration of Mr. Ludz, both of which have been previously

25  filed.

14

1        THE COURT:  Okay.  So that'll be admitted, I guess,

2  as A-10 and A-11?  Should we do that or do you want to make it

3  E and F?

4        MR. SCHORLING:  I hadn't lettered them, but E

5  and F --

6        THE COURT:  Why don't we make them E and F.

7        MR. SCHORLING:  E and F would probably be better.

8  (Supplemental Declaration & Declaration of Mr. Ludz was hereby

9  received as Creditor's Exhibit E and F for identification, as

10  of this date.)

11        THE COURT:  Okay.  So those are moved.

12        MR. SCHORLING:  Your Honor, I have for the Court's

13  convenience, a binder of our declaration -- the supplemental

14  declaration if the Court would like it.

15        THE COURT:  I think I -- I have them here.

16        MR. SCHORLING:  Okay.

17        THE COURT:  If -- I mean, I don't think there's

18  anything missing from them so I can just rely on what I have.

19        MR. SCHORLING:  Okay.  I also have a copy of the

20  supplemental declaration filed by Delphi.  I'm going to refer

21  to those in my argument --

22        THE COURT:  Okay.

23        MR. SCHORLING:  If that's all right to the Court --

24  with the Court.

25        THE COURT:  All right.  I have that too.

15

1    MR. SCHORLING:  The issue is whether Arkema's failure

2  to file a timely proof of claim was due to excusable neglect.

3  It's governed by Rule 9006(b).  And the Supreme Court's

4  decision in Pioneer and its progeny, which includes the ENRON

5  case, generally the standard is inadvertence, mistake or

6  carelessness.  Arkema did receive notices of the bar date.  It

7  received nine of them.  Six were blank, three had the claim

8  listed as disputed and contingent one, which is A-5, did in

9  fact refer to the claim of ATOFINA Chemicals Inc., which is

10  Arkema's predecessor.  The claim form itself was, I think,

11  about eleven pages back or eleven printed pages, five back-to-

12  back back in the form.  Those notices were received on April 25

13  and 26 by Mr. Ludz.  John Ludz --

14    THE COURT:  I think 24 and 25.

15    MR. SCHORLING:  I'm sorry?

16    THE COURT:  I think April 24 and 25 but -- at least

17  that's when they're stamped.

18    MR. SCHORLING:  Oh, okay.  I stand corrected.  Mr.

19  John Ludz, the legal assistant, looked at them.  They appeared

20  to be identical and he selected one, which unfortunately was

21  blank.

22    THE COURT:  Do you --

23    MR. SCHORLING:  He worked from that blank claim --

24    THE COURT:  Do you know, if you turn to those

25  exhibits A-1 through --

16

1          MR. SCHORLING:  Yes.

2          THE COURT:  -- A-9, you'll see at the top of each of

3   them handwriting, A-1 for example says Delphi Corp - ATOFINA

4   Chemicals?

5          MR. SCHORLING:  Yes.

6          THE COURT:  If you go to A-8 it says Arkema Inc.,

7   Delphi Automotive.  And there's writing like that on the top of

8   all of them.

9          MR. SCHORLING:  Yes.

10          THE COURT:  Sometimes with ATOFINA, excuse me.  And

11   sometimes Arkema, sometimes ELF.  Do you know whose writing

12   that is?

13          MR. SCHORLING:  I don't.

14          THE COURT:  You don't think it's a lawyer's though?

15   Well, you don't know where it came from?

16          MR. SCHORLING:  I don't know where it came from.  If

17   I asked, I don't remember what the answer was.

18          THE COURT:  If you what?

19          MR. SCHORLING:  If I'd -- If I asked, I don't

20   remember what I was told.

21          THE COURT:  Okay.

22          MR. SCHORLING:  I can tell you what I think it is but

23   I --

24          THE COURT:  No, that's all right.

25          MR. SCHORLING:  I don't think that's more than

1    speculation.

2        THE COURT:  Okay.

3        MR. SCHORLING:  As I said, John Ludz looked at the

4    proofs of claim.  He selected one to work from, unfortunately

5    it was blank, as he's -- as he was instructed to do in Section

6    9 or 8 of the proof of claim.  He went to Delphidocket.com.

7    That homepage is Exhibit 1 to the supplemental declaration of

8    Delphi.  He clicked on -- at the top there's a highlighted

9    place to show that you can click through to another web page

10   entitled Claim Creditor Search.  He clicked on that.

11        Delphi, in its objection, argues that he should have

12   gone to the schedules.  He didn't.  But if he had he would have

13   found there are one hundred plus schedules on that page and

14   there is no way to search them all at once.  You'd need to know

15   the debtor and the schedule in order to find the proof of

16   claim.  Instead he clicked on Claim Creditor Search to see if

17   he could find the claim.  He filled in ATOFINA, this is Exhibit

18   4 to the supplemental declaration of Delphi.  And up popped the

19   results page, which is Exhibit 5.  He doesn't have any

20   recollection of having seen Exhibit 5.  Delphi says he should

21   have known the D and the U box were checked but there's no

22   explanation as to what C, D or U mean next to the claim.

23   Instead, ATOFINA Chemical Inc. is highlighted on that page.

24   You can vaguely see the underlining to indicate that you can

25   click through.  He did click through.  It's a logical place to

18

1   go if you're unclear --

2           THE COURT:  I'm sorry.  You have to go much -- what

3   did he -- what did he do next?

4           MR. SCHORLING:  He clicked on ATOFINA Chemical Inc.,

5   which on the webpage it comes up as actually highlighted to

6   indicate that you can click through.

7           THE COURT:  You mean under the name?

8           MR. SCHORLING:  Yeah, the name.

9           THE COURT:  So there is a hyperlink there?

10          MR. SCHORLING:  Pardon?

11          THE COURT:  There was a hyperlink there to --

12          MR. SCHORLING:  Yes, there is a hyperlink on the

13  name.

14          THE COURT:  Okay.

15          MR. SCHORLING:  And he clicked on the name and he got

16  to our Exhibit B.

17          THE COURT:  Okay.

18          MR. SCHORLING:  And on that Exhibit B he saw that it

19  was scheduled -- listed schedule F, status scheduled amount

20  33,043 dollars and fifty cents.  Status objection filed N,

21  there is no direction to another page.  There is no hyperlink

22  to another page.  There is no statement on that page that it's

23  disputed, unliquidated or contingent.  Mr. Ludz took that

24  amount 33,043 dollars and fifty cents, reconciled it to what

25  ATOFINA Chemical, Inc. thought it was owed.  It was -- the

19

1    differences were not material.  And he concluded, mistakenly,

2    that he did not need to file a proof of claim because he

3    thought the claim was scheduled and not listed as disputed or

4    contingent.

5            He printed out the webpage, which is Exhibit B.  And

6    you can see at the bottom, on the right-hand side, that it's

7    dated April 27, 2006.  Two or three days after Arkema had

8    received the proofs of claim.  Nothing happened, Arkema

9    followed the case but nothing happened in the Delphi case until

10   it read a press release dated July 24th of this year that

11   Delphi was going to pay one hundred percent to unsecured

12   creditors.  At that point it called Kurtzman Carson to confirm.

13   At that point Kurtzman Carson informed Arkema, John Ludz and

14   his supervisor, that in fact the claim was scheduled as

15   unliquidated and disputed and he called us.

16           We sent a draft on August 3rd, of our motion to

17   counsel at Skadden.  We received in return in a letter dated

18   August the 7th, and I will say we had several telephone

19   conversations.  Skadden has been nothing but professional.  In

20   the letter Skadden agreed it wouldn't assert the failure to

21   file after August the 3rd as an objection to Delphi's motion

22   until Delphi -- Arkema's motion until Delphi notified Arkema

23   that we wouldn't be able to resolve the matter.  That notice

24   was given on September the 6th or 7th and we filed the motion

25   on September the 7th.

20

1       The Pioneer case is similar to this case.  In Pioneer

2  the claims bar notice was confusing because the Supreme Court

3  said it was unusual and confusing to combine notice of a

4  Section 341 hearing meeting with a bar date and permitted the

5  late filed proof of claim.  Here the creditor data webpage was

6  confusing.  It showed a schedule amount.  It showed a schedule.

7  Didn't show that the claim was disputed or unliquidated.  John

8  Ludz was confused and mistakenly thought that the claim was

9  scheduled at 33,043 dollars and fifty cents and not disputed or

10 unliquidated.  His belief was reasonable.  The steps he took

11 were reasonable.  They were mistaken but they were reasonable.

12 In deciding whether or not the Court should exercise its

13 discretion to allow a late filed claim or the failure was due

14 to excusable neglect, at least in the Second Circuit the Courts

15 look at several factors.  The delay, here Arkema acted promptly

16 after it learned that in fact its claim was scheduled as

17 unliquidated and disputed.

18       We contacted Skadden about one week after Arkema

19 learned that the claim was scheduled as disputed and

20 unliquidated.  Prejudiced to Delphi, certainly the amount,

21 33,000 dollars when there are more than five billion dollars in

22 claims filed in the case is not prejudicial.  The claim amount

23 that's filed -- that would be filed is the same amount that's

24 listed on Schedule F for Delphi Automotive LLC.  It would not

25 open the floodgates to similar creditors.

21

1          Here, the creditor would need to show that it

2    received blank proofs of claim, looked at it, went to the

3    creditor webpage, clicked through on the creditor claims

4    search, found it's claim, that it's claim was, in fact, in a

5    scheduled amount and that that amount reconciled to the amount

6    that the creditor thought it was due.  We know John Ludz did

7    that because John printed out the webpage and the webpage is

8    dated April 27, 2006.

9          For those reasons we believe it's appropriate for the

10   Court to grant Arkema's motion and permit Arkema to file a late

11   proof of claim.

12          THE COURT:  Okay.  In the -- the search result that's

13   on Exhibit 5, is there any other explanation for the item C, U

14   and D then contingent, unliquidated and disputed.

15          MR. SCHORLING:  I don't know.  They don't say what

16   they are.

17          THE COURT:  But this is -- I mean, Mr. Ludz says he's

18   been doing this since 2001.

19          MR. SCHORLING:  But he also says, in his supplemental

20   declaration, that he's not generally familiar with that --

21          THE COURT:  With what?

22          MR. SCHORLING:  With that kind of a page.  He

23   didn't -- he clicked on ATOFINA Chemicals, Inc.  Looking at it,

24   if its unclear, in today's world, you click on the next link

25   and hope maybe you'll find an explanation or you'll look for

22

1    help.  And he clicked through.

2              THE COURT:  There is -- I mean, if you have a

3    question as to a -- a potential contradiction between Exhibit 5

4    to Arkema's -- for Arkema and Exhibit -- I'm sorry, Exhibit 5

5    for the debtor as an Exhibit B, wouldn't you then go to the --

6    reconcile it by actually looking at the schedules and just

7    scroll -- scroll down.  I know it would take a while but you'd

8    scroll down to Arkema and see how it's scheduled?

9              MR. SCHORLING:  You could.  Mr. Ludz didn't.  He

10   looked at the Exhibit B and it says scheduled amount.  And it

11   shows a schedule, and it's actually scheduled AMT on Exhibit B.

12             THE COURT:  I'm sorry, it's actually what?

13             MR. SCHORLING:  It's scheduled AMT and it shows an

14   amount.  So, nature of claim general unsecured, scheduled

15   amount 33,043 dollars and fifty cents.

16             THE COURT:  Right.

17             MR. SCHORLING:  It's the last line.  And from that he

18   concluded that there was a scheduled amount of a claim and it

19   wasn't shown as unliquidated, contingent or disputed.  He was

20   mistaken but that's what he concluded.

21             THE COURT:  Okay.  All right.

22             MR. SCHORLING:  Thank you.

23             MR. LYONS:  As a preliminary matter, Your Honor, we'd

24   like to introduce both declarations of Mr. Kurtzman into

25   evidence.  And I can either hand them up -- I'm not sure, what

23

1    exhibit are we on, G and H?

2              THE COURT:  Well, why don't we make them debtor's 1

3    and 2?

4              MR. LYONS:  Okay.  Debtor's 1 and 2, may I approach?

5              THE COURT:  Or, I'm sorry, why don't we make them

6    Debtor's 6 and 7.

7              MR. SCHORLING:  No objection, Your Honor.

8    (Declarations of Mr. Kurtzman were hereby received as Debtor's

9    Exhibit D-5 & 6 for identification, as of this date.)

10             THE COURT:  Okay.  So they'll be admitted.

11             MR. LYONS:  And all the exhibits attached thereto,

12   we'd move in as well.

13             THE COURT:  Okay.

14             MR. LYONS:  Your Honor, we briefed this.  And we are

15   going to rely, obviously, in our briefs I think we have

16   thoroughly briefed the matter.  I just have a couple of points,

17   first of all on the prejudice matter.  It's probably said, and

18   overdone, the slippery slope argument that it'll open the

19   floodgates and, you know, be disastrous to let any claim in.

20   But in the facts and circumstances of this case, where we have

21   got an EPGA requirement of 1.7 billion dollars, that number was

22   negotiated based upon claims that were timely filed.  So it

23   really has a very material impact on the successful

24   reorganization of this case.  Again, you know, it's publicized.

25   Its a hundred cent plus accrued interest case.  A lot of other

24

1    people, if they see late claims come in, may say oh, I forgot

2    about that, maybe I should try to get my claim in.  I mean,

3    it's a very real -- real risk here.  So there's real prejudice.

4    And I believe we meet the Pioneer test on the prejudice point.

5           As to the excusable neglect --

6           THE COURT:  Could I -- before you go on.  I

7    understand the argument as to people that haven't filed claims

8    at all so far, how many claims, do you know or maybe your

9    colleagues know, have actually been filed late so far?

10          MR. LYONS:  There have been 842.

11          THE COURT:  Okay.  Do you know that amount?

12          MR. LYONS:  We don't.  I'll tell you, Your Honor,

13   though the summary of claims does have some line items for late

14   filed claims.

15          THE COURT:  The thing you gave up to me earlier this

16   morning?

17          MR. LYONS:  Yes, those are the ones that are in the

18   procedures right now.

19          THE COURT:  Okay.  Untimely claims --

20          MR. LYONS:  Yes.

21          THE COURT:  -- 14.58 million, I think, but those are

22   just nine.  Oh, I'm sorry; I'm just looking at one omnibus

23   objection.  I'm not totaling them up.  Yeah --

24          MR. LYONS:  Right.  So if you'd see for omnibus 124

25   through 19 --

25

1          THE COURT:  There's twenty-three.

2          MR. LYONS:  Correct.

3          THE COURT:  At 5.287 million.

4          MR. LYONS:

5          THE COURT:  And then omnibus twenty-one you have

6    fourteen million.

7          THE COURT:  Right.  And those are nine, so that's

8    thirty-two.  But you say there are another, roughly, 390

9    besides those?

10          MR. LYONS:  There are and claims keep coming in.  For

11   example, I know Department of Labor filed a claim in August for

12   three million dollars.  I mean, you know, claims keep on coming

13   in even though we're way -- we're well past the bar date.  And

14   of course, it's a different analysis.  There may be a late

15   claim that is an amendment of a timely filed claim that may

16   meet the standards -- the amendment standards.  So it's hard to

17   categorize they're all just late.  They may relate back to a

18   timely filed proof of claim as well.

19          THE COURT:  Okay.

20          MR. LYONS:  Back to the excusable neglect point, Your

21   Honor.  There's no evidence at all, obviously, that we were

22   trying to confuse anyone.  The company has several accounts

23   with this creditor.  The notice -- the notice itself, I don't

24   think there's any question that the notice was not clear.  I

25   mean, the notice is a clear bar date notice.  And if you would

26

1    have read the one that was disputed or unliquidated it clearly

2    said you have to file a claim.  So I don't think there's any

3    dispute that notice itself was confusing.  The confusion was

4    the number of notices that -- that were sent out to ATOFINA.

5             And, Your Honor, that's the way ATOFINA did business

6    with the debtors.  There were several accounts and Delphi could

7    not make a value judgment not to send out a proof of claim form

8    on a particular account.  They may be the same entities, they

9    may be not.  If you look at Mr. Kurtzman's original declaration

10   you can see there are differences in the names on the proofs of

11   claim.  That they are not the same name.  You have ATOFINA

12   Chemicals Inc, EFT.  You have ATOFINA Chemicals Inc. Auto Glass

13   Division.  You have Arkema Inc.  You have Elf Atochem North

14   America Fluorochemicals Division.  I mean, these are different,

15   you know, may well be different product lines, different

16   divisions and different accounts.

17            Delphi certainly could not decide not to send out a

18   notice.  There may be an unliquidated claim in the auto glass

19   division that is not -- although not scheduled it may be out

20   there and under the bar date order we're required to send that

21   notice.  So we did what we were required to do under Your

22   Honor's orders and also under the Bankruptcy Code to send these

23   notices out.

24            As to excusable neglect, I mean again, the claim form

25   should have been read.  They were clear.  If you would have

27

 1    read the notices it would have said -- and that point is

 2    conceded, they said your claim is scheduled as a disputed,

 3    unliquidated claim and you have to file a proof of claim.  I

 4    mean, that's uncontested.

 5            You know, moreover, it's a little particular or a

 6    little strange -- I mean, after they hear about a hundred cent

 7    plan they then pick up the phone and call Kurtzman.  They told

 8    him right away you're undisputed -- you have an undisputed

 9    claim.  I mean, why didn't they do that in the beginning?

10            THE COURT:  No, they didn't.  They said you have a

11    disputed claim.

12            MR. LYONS:  I'm sorry, you have a disputed -- right,

13    I'm sorry, Your Honor.  You have a disputed, unliquidated

14    claim.  I mean, they could have done that when they got the

15    nine notices.  They answered it readily.  That's why we had a

16    hotline.  And the hotline was set forth in the proof of claim

17    form if there was any confusion.  Plus the website, Your Honor.

18    If you would click on -- the bar date notice said go to the

19    schedules.  It didn't say go to the, you know, the creditors

20    search function.  It said you can go to the schedules to see

21    exactly how your -- how you're scheduled.  But moreover, even

22    if you did the creditors search, the individual creditor

23    search, it said -- it said UD.

24            I mean, what does that mean?  When you're trying to

25    determine if your claim is unliquidated or disputed you see the

28

1    webpage come up saying UD, it's just not reasonable to not

2    think there's any import to that when that's what you're trying

3    to confirm.  So, Your Honor, I just don't believe that the

4    facts here show excusable neglect.  It went to the legal

5    department; the legal assistant had bankruptcy training, had

6    been doing this since 2001.  You know, this is not the case

7    where you have somebody who -- who just does not have any kind

8    of legal sophistication that would justify that type of

9    response.

10            Thank you.

11            THE COURT:  So you're saying there is -- there is

12    some significance here in the fact that the names are

13    different?

14            MR. LYONS:  I think that would --

15            THE COURT:  ATOFINA versus Arkema versus Elf or EFT?

16            MR. LYONS:  It would certainly belie an understanding

17    that these were identical copies because they had different

18    names.

19            THE COURT:  On the other hand, I guess the debtors

20    acknowledge that there's, sort of, an overall relationship

21    through ATOFINA, sort of, generally or not?

22            MR. LYONS:  I think they're different product lines

23    and different -- and again, Your Honor, I don't really have a

24    great understanding of the exact business relationship but

25    certainly they do business under different names and have

29

1   different product lines.

2          THE COURT:  Okay.

3          MR. SCHORLING:  William Schorling, just briefly Your

4   Honor.  A-1 and A-2 both are ATOFINA Chemicals Inc.  One says F

5   and one says Auto Glass Division but to say that John Ludz

6   should have known just by looking at the name on the proof of

7   claim, I don't think matters.

8          As to whether or not, if he'd done everything right

9   he would have gotten the right answer, excusable neglect

10  doesn't apply unless there has been a mistake, inadvertence or

11  carelessness.  So we're not talking about whether or not a

12  mistake has made, merely whether or not what he did was

13  reasonable and that it's excusable under the law.  Thank you.

14         THE COURT:  Okay.  All right.  I have before me a

15  motion by Arkema Inc. to file, or for leave to file a late

16  proof of claim.  The motion is governed by Bankruptcy Rule

17  9006(b) and that rule's interpretation by the Supreme Court in

18  Pioneer Investment Services Company versus Brunswick Associates

19  Limited Partnership, 507 US 380, 1993, as well as the

20  subsequent case law interpreting that case, including as both

21  parties have acknowledge, Midland Cogeneration Venture Limited

22  Partnership versus Enron, 419 F.3d. 115, Second Circuit 2005.

23         Bankruptcy Rule 9006(b)(1) permits a claimant to file

24  a late proof of claim if the failure to submit a timely proof

25  of claim was due to "excusable neglect".  Under the rule and

30

1   the case law the burden on proving excusable neglect is on the

2   claimant seeking to extend the bar date deadline.  See, for

3   example, In Re R.H. Macy and Company, Inc., 161 BR 355, 360

4   Bankruptcy SDNY, 1993.

5        Under the Pioneer case the Supreme Court developed a

6   two-step test to determine whether the cause for late filing

7   was due to excusable neglect.  First, the movant must show that

8   its failure to file timely claim constituted neglect as opposed

9   to willfulness, which is generally attributed to a movant's

10  inadvertence, mistake or carelessness, 507 US at

11  387 -- 88 -- 388.

12       After establishing the neglect the movant must show,

13  by a preponderance of the evidence, that the neglect was

14  excusable, which is determined by balancing the following

15  factors; (a) danger or prejudice to the debtor, (b) the length

16  of the delay and whether or not it would impact the case, (c)

17  the reason for the delay, in particular whether the delay was

18  within the control of the movant and (d) whether the movant

19  acted in good faith, ID at 395.

20       In the Midland Cogeneration versus Enron case, the

21  Second Circuit considered that test.  And in interpreting

22  Pioneer the Court stated "we have taken a hard line" in

23  applying the Pioneer test, citing Silivanch (ph.) versus

24  Celebrity Cruises, Inc., 333 F.3d, 355-368, Second Circuit

25  2003.

31

1        In a typical case three of the Pioneer factors, the

2    length of the delay, the danger of prejudice and the movant's

3    good faith usually weigh in favor of the party seeking the

4    extension.  We noted though, in the Silivanch case that we

5    stand -- I'm sorry, that we and others have focused on the

6    third factor, the reason for the delay, including whether it

7    was within the reasonable control of the movant.  And we

8    cautioned that the equities will rarely, if ever, favor a party

9    who fails to follow the clear dictates of a court rule.  And

10   that where the rule is entirely clear we continue to expect

11   that a party claiming excusable neglect will, in the ordinary

12   course, loose under the Pioneer test, 419 F.3d at 122-123,

13   internal citations are omitted.  See it also In Re Musicland

14   Holding Corporation 356 BR 603, Bankruptcy SDNY, 2006, in which

15   Chief Bankruptcy Judge Bernstein, citing Enron, stated that the

16   Second Circuit focuses on the "reason for the delay" in

17   determining excusable neglect under Pioneer and that "the other

18   factors are relevant only in closed cases."

19        In affirming, Judge Gonzalez in the Midland versus

20   Enron case, the Second Circuit discussed the four Pioneer

21   factors.  First, with regard to inadvertence, the Court stated

22   that the fact that the staff that was focusing on related

23   litigation was not sufficient to meet the inadvertence test in

24   that instance.  Additionally, if a clear deadline is missed due

25   to law office failure, including inattention or lack of

32

1    oversight an extension is not justified, In Re Musicland 356 BR

2    608.

3              Second in terms of the delay in filing the claim, the

4    Enron court held that whether the claim was filed before or

5    after the date in which the plan of reorganization was filed

6    should not be conclusive, 419 F.3d. at 129.  Instead, in

7    determining whether a delay is too long a Court should consider

8    the context of the proceeding as a whole, ID at 128.  Along

9    with the creditor's explanation for the delay, ID at 129.  That

10   is in Enron, the Court noted that there may be a reasonable

11   explanation for a delay that under appropriate circumstances

12   may be excusable if the claimant, as appears to be the case

13   here, acted promptly when it determined there was a problem to

14   correct it.

15             On the other hand, the Second Circuit in Enron also

16   said that objectively, even if the delay was not undue in terms

17   of the claimant's conduct the mere fact of a delay in the

18   context of the particular bankruptcy case may well be relevant

19   because of intervening steps that might have occurred in the

20   bankruptcy case.  In Enron the Second Circuit was reluctant to

21   substitute its judgment for the Bankruptcy Court's finding that

22   six months did not constitute a short delay and did so

23   notwithstanding the fact that the claimant and the debtor in

24   the Enron case were in discussions during, at least, some of

25   that period.

33

1    Third, as to the debtors prejudice or the prejudice

2    to the debtor, the Second Circuit upheld the Bankruptcy Court's

3    determination that the risk of opening the door to other

4    similarly situated claimants was such that the debtor would be

5    prejudiced if the claim were allowed, despite the fact that the

6    claims value was negligible in the context of the entire case.

7    In Enron, finally, the Second Circuit recognized that the

8    Bankruptcy Court had found that the claimant had acted in good

9    faith but that factor standing alone did not persuade it to

10   grant the motion.

11   The finding by the Second Circuit that -- in the

12   context of the proceeding as a whole delay may argue against

13   allowing a late claim to be filed, notwithstanding that the

14   plan itself had not been filed or confirmed is consistent with

15   prior case law in this circuit and has been followed subsequent

16   to Enron as well.  This is because strict enforcement of a bar

17   date enables a trustee or debtor in possession and the other

18   constituents who are active in the case to evaluate the claims

19   against the estate and formulate a negotiated plan based upon

20   the timely filed claims.  Allowing late file claims, especially

21   after a debtor's plan is confirmed, but also after it has been

22   proposed following considerable work subjects the debtor to

23   prejudice because it would have to renegotiate settlements

24   reached in contemplation of the known timely filed claims

25   against the estate.  See, for example, Enron 419 F.3d, at 129

34

1    in which the Second Circuit noted that even before -- I'm

2    sorry, the allowance of a late filed claim or the permission to

3    file a claim late, even if granted before a plan has been filed

4    or confirmed may disrupt and prejudice the debtor.  The

5    contrary argument that nothing is set in stone until the plan

6    is confirmed "ignores the arduous process of valuing assets,

7    validating claims and negotiating a compromise among a host of

8    creditors" because the claim is "nonetheless submitted long

9    after the negotiations required to develop a plan have begun."

10   See also In Re Drexel Burnham Lambert Group, Inc., 148 BR 1002,

11   1008 through 1010, Bankruptcy (SDNY 1993).

12           Here the claimant relies upon case law suggesting

13   that in appropriate circumstances the reason for the delay is

14   not within the reasonable control of the movant.  For example,

15   in Pioneer the bar date notice itself was confusingly buried in

16   the section 341 meeting notice.  In a different Enron case, In

17   Re Enron Corporation 2003 Bankruptcy Lexus 2113, Bankruptcy

18   (SDNY September 23, 2003), Judge Gonzalez found in granting a

19   motion under 9006(b) that the claimant would not reasonably

20   know to file a proof of claim where (a) the claimant reasonably

21   believed that the time -- that the bar date had run, that it

22   had no claim against Enron.  And even more importantly (b) that

23   the information as to whether the claimant had a proof of

24   claim -- had a claim or not against Enron was solely within

25   Enron's control.  It meant that the claimant did not have

35

1  reasonably within its power the ability to file a or the

2  knowledge that it needed to file a claim in a timely manner.

3         Analogizing from such case law, Arkema contends that

4  the reason for the delay here by it was not within its

5  reasonable control and that to the contrary it was confused by

6  the information provided to it by the debtors in connection

7  with the bar date notice.  I conclude to the contrary, that

8  based on the review of the exhibits the reason for the delay

9  here was within the reasonable control of Arkema.  As set forth

10 in the declaration and supplement declaration of Mr. Ludz, who

11 was the paralegal in Arkema's in-house law department, I find

12 that Mr. Ludz was given reasonable notice and direction of the

13 need to file a proof of claim for Arkema, particularly in light

14 of his experience and level of sophistication.

15        As he notes in paragraph 4 of his declaration, he is

16 responsible for bankruptcy filings by Arkema and has been

17 filing proofs of claim in bankruptcy cases on Arkema's behalf

18 since 2001.  As set forth in paragraph 9 of his declaration, he

19 knew the importance of reviewing a debtor's schedules.  The

20 official schedules of liabilities in determining whether to

21 file a proof of claim.  In addition to knowing that from his

22 prior experience, he was also clearly informed by the bar date

23 notice of the need to file a proof of claim if in fact the

24 claim was set forth in the schedules as disputed, contingent or

25 unliquidated, as shown by the various identical copies of the

36

1   bar date notice attached as exhibits or as part of exhibits A-1

2   through A-9 to Arkema's motion.

3          And the accuracy of that notice is not in dispute,

4   nor could it be in dispute.  The bar date notice also directs

5   the claimant to two sources for obtaining or reviewing copies

6   of the debtor's schedules.  One, at the debtor -- at the

7   debtor's website which is identified.  And the other at the

8   Court's Pacer website.

9          Mr. Ludz acknowledges that he went to the debtor's

10  website.  He did not hit to the hyperlink specifically

11  identified as schedules -- of the debtor's schedules because he

12  saw a shortcut which the debtor's website permitted, to do a

13  search specifically by creditor name.  It is not clear from the

14  papers, but it was clarified in oral argument that he next, in

15  his search through the specific creditor name site on the

16  website of the creditor name hyperlink on the website turns

17  to -- I'm sorry, entered the related creditor name, ATOFINA, in

18  the specific creditor name search text attached as Exhibit 4 to

19  the debtor's objection to Arkema's motion which brought up the

20  screen attached as Exhibit 5 to the debtor's opposition to the

21  motion.  That screen lists ATOFINA Chemicals Inc, again a

22  related entity to Arkema.  And in the -- to the right of that

23  listing has a U and a D entered into a blank space above a

24  heading that has spaces for C, U and D.  This is consistent

25  with the heading in the official form, number 6, for Schedule

1   F, Creditors Holding Unsecured Non-Priority Claims which

2   contains a narrow box above which is the heading in each case

3   as follows, contingent, with a narrow box for each claim listed

4   on the schedules, which it is common practice to put the letter

5   C if the debtor believes its contingent.  Unliquidated, again

6   its common practice if the debtor believes the claim isn't

7   liquidated to put the letter U.  And disputed, again, where

8   it's common practice for the debtor to put the letter D in the

9   narrow box if it believes a particular claim is disputed.

10          Therefore, I believe, that particularly given

11   Mr. Ludz' experience in filing proofs of claim and experience

12   with debtor's schedules and understanding of the importance of

13   debtor's schedules he would have reasonably understood that the

14   debtor's Schedule F listed ATOFINA Chemicals Inc., as

15   undisputed -- I'm sorry, as unliquidated and disputed.

16          He went, according to his declaration, one step

17   further hitting the hyperlink in Exhibit 5 for ATOFINA

18   Chemicals, Inc.,  That exhibit, to my mind, clearly setting

19   forth that the claim was unliquidated and disputed, which

20   brought him to Exhibit B to Arkema's motion, which is a screen

21   that says Creditor Data.  That screen does not have any boxes

22   for listing whether the claim is contingent, unliquidated or

23   disputed.  It does list a scheduled amount.  It states that no

24   objection has been filed and that no creditor information has

25   been filed.  It states the scheduled amount, 33,043 dollars and

38

1    fifty cents.  It is conceivable that Mr. Ludz would have been

2    confused by the absence of any information on this screen

3    regarding whether the debtor believed that the claim was

4    contingent, unliquidated or disputed.  But given that he could

5    only get to this screen through the screen attached as

6    Exhibit 5 to the debtor's objection, and given the importance

7    of the schedules, which he acknowledges, I believe it was not

8    reasonable for him to look back at the schedules themselves or

9    to do further due diligence.  And that his failure to do so was

10   reasonably within his control.

11           I say that for one other reason, which is that form

12   of proofs of claim received by Mr. Ludz, including the form

13   proof of claim for Arkema Inc, the actual creditor as shown on

14   Exhibit A-8 to Arkema's motion was pre-printed as stating that

15   the debtor has listed your claim as contingent, unliquidated

16   and disputed.

17           Arkema contends that because other proofs of claim

18   forms received by Mr. Ludz for related entities did not contain

19   such a designation, which was also contained in Exhibit A-9 for

20   Arkema Inc., meant that he was also confused and reasonably

21   believed that the claim was not contingent, unliquidated or

22   disputed.  However, the packages received by Mr. Ludz were for

23   different corporate entities or had different names.

24           A-1 is for ATOFINA Chemicals and from the debtor,

25   Delphi Corporation.  A-2 was again for the debtor, Delphi

39

1    Corporation, among the many debtor entities and was addressed

2    to ATOFINA Chemicals, Inc.  A-3 was Delphi Corporation and

3    related to ATOFINA Chemicals Inc/EFT, formally ELF Atochem NA,

4    Inc.  A-4 was blank again but it was for ATOFINA Chemicals,

5    Inc., EFT, formerly ELF Atochem North America.  A-5, which

6    actually had the listing, or the statement, that the debtor has

7    listed your claim as unliquidated and disputed was for ATOFINA

8    Chemicals, Inc, not Arkema.  A-6, which did not state any

9    judgment by the debtor that the claim was unliquidated or

10   disputed was, however, for ELF Atochem North America as was A-

11   7, although it referred to the Flourochemicals division.  And

12   it's only then, at A-8, does one get to Arkema, Inc.  And A-9

13   to Arkema, Inc., which as I noted before, both of those proofs

14   of claim do state the debtor's contention that -- on this form

15   to be filled out the debtor's have listed the claim as

16   contingent, unliquidated and disputed.

17          Somebody wrote at the top of each of the notices the

18   name of the claimant, as noted by Delphi in the proof of claim

19   form.  There's no evidence as to who did that but I conclude

20   that it was reasonably within Mr. Ludz' control to know that

21   Delphi believed that they were separate entities with accounts

22   added.  And that he should have checked each of the claim forms

23   and would have, had he done so, seen that as for Arkema itself,

24   the claimant here, the debtors in the notice itself as opposed

25   to on the website where they also provided that information,

40

1   informed him that the debtor's viewed the Arkema claim as

2   unliquidated and disputed.

3        Given that record, I conclude  that the reason for

4   the delay was in the control, or reasonably within the control

5   of Arkema.  The other factors which, as I noted before, are of

6   lesser importance in a bankruptcy case also provide some

7   support for the debtor's position and do not tip the balance in

8   favor of Arkema's position.  Although I conclude that Arkema

9   has acted in good faith and moved quickly after discovering or

10  confirming that the debtors treated its claim as disputed and

11  unliquidated to file this motion or to rectify the situation.

12  But other factors argue in favor of the debtor's position.

13       This case is, actually at this stage, quite mature.

14  A largely, if not wholly consensual plan, has been negotiated.

15  It is premised upon, among other things, an investment by an

16  investor group.  Negotiated not only with the debtor but also

17  the creditors committee and the equity committee.  The

18  investment, as well as the plan distribution formula is

19  premised upon, among other things, a specific dollar cap of

20  certain categories of unsecured claims.  Arkema's claim would

21  fall into that category.  The cap is a billion-seven dollars.

22  Obviously Arkema's claim of 33,000 dollars would not, in all

23  likelihood, trip that target one way or the other.

24       On the other hand, the debtors have been through a

25  lengthy claim analysis and claim objection process.  It's

41

1    represented to me by the parties representing the debtor,

2    counsel and claim administrator that as part of that process

3    there are, as of today, roughly 420 late filed claims with

4    others coming in.  And it appears to me that all of those

5    claims in the aggregate are for many millions of dollars.

6         Were I to take a broader reading of the facts here,

7    which I believe would be contrary to the Second Circuit case

8    law that I cited earlier, the debtors and the other parties

9    analysis of allowable claims, in my mind, would change

10   materially.  And moreover, creditors who had not filed a claim,

11   in my mind, would be inspired to do so, particularly given the

12   sophistication of Mr. Ludz and the alleged basis for his

13   confusion, which is the hyperlink from Exhibit 5 to the

14   debtor's objection.

15        Consequently, the year that has expired, having been

16   used very productively by the debtor's and their constituents

17   in, among other things, analyzing allowable claims is a

18   inordinant delay in and of itself, notwithstanding the fact

19   that Arkema moved promptly once it recognized that it would

20   need to file a proof of claim.  And as noted, that delay is

21   meaningful because of the prejudice that would occur to the

22   debtor in its reorganization effort if the claim were to be

23   allowed today.

24        So, for those reasons, I'll deny the motion and

25   counsel for the debtors should submit an order consistent with

42

1    my ruling.

2              MR. LYONS:  We will, Your Honor.  Thank you.  One

3    matter I have, Your Honor.  I calculated the dates and two

4    weeks gets us, actually, to October 11.  What I would -- for

5    the other three claimants --

6              THE COURT:  Well, what was the -- what was the

7    omnibus date?

8              MR. LYONS:  October 10th.

9              THE COURT:  All right.  But the two -- I mean, you've

10   already given them -- they've already gotten what you've sent

11   them?

12             MR. LYONS:  Yes.

13             THE COURT:  They've had the time to read it.  So, it

14   was served some time on the 21st, they probably got it three

15   days later.  I think -- I think the 10th is okay.

16             MR. LYONS:  Okay.  And we could always put their

17   response brief two days before the hearing rather than a week

18   which is typical.

19             THE COURT:  That's fine.

20             MR. LYONS:  So we'll do that.  We'll get that out

21   today.

22             THE COURT:  That's fine.

23             MR. LYONS:  Thank you, Your Honor.

24             THE COURT:  All right.  As I sometimes do, when I

25   give a long ruling, I'll look at the transcript and reserve the

43

1   right to correct my ruling.  But again, the ruling is that the

2   motion will be denied.

3            MR. LYONS:   Thank you, Your Honor.

4        (Proceedings concluded at 11:26 AM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

44

1

2                         **I N D E X**

3

4                       **E X H I B I T S**

5    CREDITOR'S          DESCRIPTION          PAGE

6    A-1 - A-9 B, C & D  Arkema's Motion      13

7

8    E and F             Supplemental         14

9                        Declaration &

10                       Declaration of

11                       Mr. Ludz

12   OTHER'S

13   D-5 & 6             Declarations of      23

14                       Mr. Kurtzman

15

16                          RULINGS

17                       Page      Line

18   Motion is Denied       41       24

19

20

21

22

23

24

25

45

1

2                          C E R T I F I C A T I O N

3

4       I, Pnina Eilberg, court approved transcriber, certify that the

5       foregoing is a correct transcript from the official electronic

6       sound recording of the proceedings in the above-entitled

7       matter.

8

9       _____ October 1, 2007

10      Signature of Transcriber              Date

11

12      Pnina Eilberg

13      typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25