**Bidding Procedures Hearing Date And Time:  October 25, 2007 at 10:00 a.m.**
**Bidding Procedures Objection Deadline:  October 22, 2007 at 4:00 p.m.**
**Sale Hearing Date And Time:  To Be Determined**
**Sale Hearing Objection Deadline:  To Be Determined**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -     x
                                                              :
    In re                                                     :     Chapter 11
                                                              :
DELPHI CORPORATION, et al.,                                   :     Case No. 05-44481 (RDD)
                                                              :
                                                              :     (Jointly Administered)
                        Debtors.                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -     x

EXPEDITED MOTION FOR ORDERS UNDER 11 U.S.C. §§ 363, 365, AND 1146 AND FED. R. BANKR. P.
2002, 6004, 6006, AND 9014 (A) (I) APPROVING BIDDING PROCEDURES, (II) GRANTING CERTAIN
BID PROTECTIONS, (III) APPROVING FORM AND MANNER OF SALE NOTICES, AND (IV) SETTING
SALE HEARING DATE AND (B) AUTHORIZING AND APPROVING (I) SALE OF CERTAIN
OF DEBTORS' ASSETS COMPRISING SUBSTANTIALLY ALL THE ASSETS PRIMARILY USED IN
DEBTORS' COCKPITS AND INTERIOR SYSTEMS AND INTEGRATED CLOSURE SYSTEMS
BUSINESSES FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES,
(II) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, AND (III) ASSUMPTION OF CERTAIN LIABILITIES

("INTERIORS AND CLOSURES BUSINESSES SALE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this expedited motion (the "Motion") for orders under 11 U.S.C. §§ 363, 365, and 1146 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 (a) (i) approving the bidding procedures set forth herein and attached hereto as <u>Exhibit A</u> (the "Bidding Procedures"), (ii) granting certain bid protections, (iii) approving the form and manner of sale notices (the "Notice Procedures"), and (iv) setting a date for the sale hearing (the "Sale Hearing") and (b) authorizing and approving (i) the sale (the "Sale") of certain of the Selling Debtor Entities' (defined below) assets (the "Purchased Assets") comprising substantially all the assets primarily used in the Selling Debtor Entities' cockpits and interior systems business (the "Interiors Business") and integrated closure systems business (the "Closures Business," and together with the Interiors Business, the "Interiors and Closures Businesses") to the Buyers or the Successful Bidder (both as hereinafter defined) submitting a higher or otherwise better bid, as the case may be, (ii) the assumption and assignment of certain prepetition executory contracts and unexpired leases (the "Assumed U.S. Contracts") and the assignment of certain postpetition executory contracts and unexpired leases (the "Post-Petition Contracts," and collectively with the Assumed U.S. Contracts, the "Assigned Contracts") to the Buyers or the Successful Bidder, as the case may be, and (iii) the assumption of certain liabilities (the "Assumed Liabilities") by the Buyers or the Successful Bidder, as the case may be.  In support of this Motion, the Selling Debtor Entities (as defined below) respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee," and together with the Creditors' Committee, the "Statutory Committees").

3.    On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263) (the "Plan") and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264) (the "Disclosure Statement").  No order approving the Disclosure Statement or confirming the Plan has yet been entered by this Court.

4.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

5.    The statutory predicates for the relief requested herein are sections 363, 365, and 1146 of the Bankruptcy Code and rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3

B.       Current Business Operations Of The Debtors

6.       Delphi and its subsidiaries and affiliates (collectively, the "Company")

as of December 31, 2006 had global net sales of $26.4 billion and global assets of

approximately $15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth

largest public company business reorganization in terms of revenues and the thirteenth largest

public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are

not chapter 11 debtors and continue their business operations without supervision from this

Court.[2]

7.       The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems

and modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer ("OEM").

8.       Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted

the Company's business through various divisions and subsidiaries.  Effective January 1, 1999,

the assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
       and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27,
       2007.

[2]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core
       automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency
       proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its
       Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the
       funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan
       on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its
       manufacturing footprint and to lower its overall cost structure.

connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

9.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

10.    The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

---

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

11.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

12.    On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas:[4] first, modifying the Company's labor agreements to create a competitive arena in which to conduct business;[5]

---

[4]    In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors and a plan framework support agreement with those investors and GM.  On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework support agreement.  On July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors").  Under the Delphi-Appaloosa EPCA, the New Plan Investors agreed to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization.  This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.

[5]    As of August 29, 2007, this Court has entered the following orders approving settlements between Delphi and each of its U.S. labor unions:
- International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") (Docket No. 8693);
- International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America (the "IUE-CWA") (Docket No. 9106);
- International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers (Docket No. 9107); and
- United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and USW Local 87L (Docket No. 9169).

On September 4, 2007, at Delphi's request, this Court entered an order withdrawing without prejudice Delphi's motion for order under sections 1113(c) and 1114(g) of the Bankruptcy Code authorizing rejection of collective bargaining agreements and modification of retiree welfare benefits (Docket No. 9221).

second, concluding their negotiations with GM to finalize GM's financial support for the

Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[6]

third, streamlining their product portfolio to capitalize on their world-class technology and

market strengths and make the necessary manufacturing alignment with their new focus;[7]

fourth, transforming their salaried workforce to ensure that the Company's organizational and

cost structure is competitive and aligned with its product portfolio and manufacturing

footprint;[8] and devising a workable solution to their current pension situation.[9]

---

[6]    On September 6, 2007, Delphi announced that it entered into agreements with GM consisting of a Global
Settlement Agreement and a Master Restructuring Agreement, both of which are subject to this Court's
approval as part of the plan confirmation process. Delphi's comprehensive settlement with GM resolves all
outstanding disputes between Delphi and GM. The Global Settlement Agreement and Master Restructuring
Agreement were filed as Exhibits 7.20(a) and 7.20(b) to the Plan, respectively. See Docket No. 9263.

[7]    In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and
"non-core" product lines and plants. The Debtors have been working to divest non-core assets so as to
maximize the value of their estates for stakeholders. During the 2006 and 2007 calendar years, for example,
the Debtors sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, and their
brake hose and catalyst businesses. The Debtors also obtained court approval for the sale of substantially all
of the assets of their Saltillo, Mexico brake plant business. In addition, as announced publicly, the Debtors
anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures
businesses.

[8]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its
product portfolio on core technologies for which the Company believes it has significant competitive and
technological advantages. The Company's revised operating structure consists of its four core business
segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic
Architecture. The Company also has two additional segments, Steering and Automotive Holdings Group,
which will be transitioned as part of the Company's transformation plan. To ensure that their organizational
and cost structure is competitive, the Debtors obtained an Order Under 11 U.S.C. § 363(b) And Fed. R.
Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007
(Docket No. 7773) (the "Finance Outsourcing Order"). The Finance Outsourcing Order authorized the
Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and
expense reporting, general ledger, and contract administration processes and significantly reduce SG&A
expenses as part of their transformation plan.

[9]    To that end, on May 31, 2007, this Court granted the Debtors' motion for authority to perform under the terms
of those certain September 30, 2006 pension plan year funding waivers, which were approved by the IRS on
May 1, 2007, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for
Salaried Employees (collectively, the "Pension Plans"). On July 13, 2007, the IRS modified the conditional
funding waivers granted to Delphi related to the Pension Plans, extending the dates by which Delphi is
required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 29,
2008, respectively. On September 28, 2007, the IRS approved a similar waiver with respect to the Delphi
Hourly-Rate Employees Plan for the September 30, 2007 pension plan year. The Debtors' motion for
authority to perform under the terms of that waiver is scheduled for an October 25, 2007 hearing. On October

E.     The Debtors' Plan Of Reorganization

13.     By filing the Plan and related Disclosure Statement on September 6, 2007, the Debtors reached another key milestone in their chapter 11 cases.  The Plan is based upon a series of global settlements and compromises that involve every major constituency in the Debtors' reorganization cases.  A hearing on the Debtors' solicitation procedures and Disclosure Statement commenced on October 3, 2007 and is scheduled to continue on October 25, 2007.  If this Court authorizes the Debtors to solicit acceptances or rejections of the Plan (as such Plan may be modified) by October 31, 2007, the Debtors expect to confirm their Plan and commence the rights offering contemplated by the Plan in December 2007 and emerge from chapter 11 as soon as practicable thereafter.  Currently, the Debtors expect to emerge from these chapter 11 cases by January 2008.

14.     Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

15.     By this Motion, Delphi and the selling Debtor entities described in the agreement (the "Selling Debtor Entities")[10] seek approval for the sale of the Interiors and

4, 2007, the IRS, at Delphi's request, further modified the conditions to the initial waivers so that they are generally consistent with the conditions to the most recent waiver.

[10]     Under the Agreement, the Selling Debtor Entities include Delphi, Delphi Automotive Systems LLC ("DAS LLC"), Delphi Automotive Systems (Holdings) Inc., and Delphi Technologies, Inc.  Certain assets would be sold under the Agreement by non-Debtor affiliates of the Selling Debtor Entities listed on Schedule 1 to the Agreement.  The Selling Debtor Entities and the selling non-Debtor affiliates are collectively referred to as the "Sellers."  For the purpose of convenience, references to the "Sellers" herein (including in all exhibits)

Closures Businesses to Inteva Products, LLC ("Inteva") and certain of its affiliates (the

"Buyers"),[11] subject to additional competitive bidding pursuant to the proposed Bidding

Procedures.  To effect the sale, the Selling Debtor Entities seek two types of relief.  First, at the

omnibus hearing to be held on October 25, 2007, the Selling Debtor Entities will seek entry of

an order substantially in the form attached hereto as <u>Exhibit B</u> (the "Bidding Procedures

Order") approving the Bidding Procedures, Notice Procedures, and certain bid protections to be

provided to the Buyers pursuant to the Agreement and as described more fully herein.  Second,

subject to the terms of the Bidding Procedures Order, at the omnibus hearing to be held on

_____, the Selling Debtor Entities will seek entry of an order substantially in the form

attached hereto as <u>Exhibit C</u> (the "Sale Approval Order") authorizing and approving the Sale to

the Buyers or the Successful Bidder, as the case may be, including, without limitation, the

assumption and assignment of the Assumed U.S. Contracts to the Buyers, and the assumption

by the Buyers of the Assumed Liabilities.

<u>Basis For Relief</u>

16.    The Company has stated that to achieve the necessary cost savings and

operational effectiveness envisioned in its transformation plan, it must streamline its product

portfolio to capitalize on its world-class technology and market strengths and make the

necessary manufacturing realignment consistent with its new focus.  As part of the Company's

transformation plan, the Company identified the Interiors and Closure Systems Businesses as

non-core businesses subject to disposition.

---

means, as the context requires, (i) the Selling Debtor Entities to the extent such reference implicates assets of
the Selling Debtor Entities or (ii) non-Debtor affiliates to the extent such reference implicates assets of the
non-Debtor affiliates.  Moreover, for convenience, use of the term "Selling Debtor Entities" means as the
context requires, the specific Debtor entity undertaking the transaction(s) referenced to the extent such
transaction affects the assets of such entity.

[11]    This Motion will refer to Inteva Products LLC., together with any affiliates it identifies in Schedule 1 of the
Agreement, as the "Buyers," or to any of them individually as a "Buyer."

17.     Accordingly, following extensive marketing efforts, on October 15,

2007, the Sellers and the Buyers entered into a Master Sale and Purchase Agreement, a copy of

which is attached hereto as Exhibit D (the "Agreement").  The Agreement contemplates a

global divestiture of the Company's Interiors and Closures Businesses to the Buyers for the

Purchase Price of $106 million, which is comprised of the preliminary purchase price of

approximately $80 million, subject to certain adjustments (the "Preliminary Purchase Price"),

and the Post-Closing Payments of approximately $26 million.[12]  The divestiture, as

memorialized in the Agreement, contemplates that certain of the assets will be sold by Delphi

non-Debtor affiliates.  The transactions to be undertaken by the Delphi non-Debtor affiliates,

although memorialized in the Agreement and the attachments thereto, are generally not the

subject of this Motion because those entities are not under the supervision of this Court.  The

discussion in this Motion is generally (but not exclusively) limited to transactions to be

undertaken by the Selling Debtor Entities, which require Court approval.

F.      The Interiors And Closures Businesses

18.     Collectively, the Interiors and Closures Businesses serve a number of

vehicle manufacturers ("VMs") through a global footprint that includes manufacturing

operations in the U.S., Mexico, Austria, Germany, China, and South Korea.  The Interiors and

Closures Businesses generate annual revenue of approximately $1.3 billion.

19.     The Interiors Business is a leading provider of instrument panels,

consoles, and cockpits to VMs in North America.  The Interiors Business has grown from a

---

[12]    In addition to the Preliminary Purchase Price, on each of the first, second, third, fourth, and fifth anniversaries
of the closing date, Inteva would pay $1 million to DAS LLC.  On the first business day following the earliest
of: (i) the business day immediately following the fifth anniversary of the closing date and (ii) the date Buyers
sell substantially all of the ownership interests in the Interiors and Closures Businesses and the joint ventures
being sold under the Agreement (a sale to an unrelated third party of 80% or more of the equity of Inteva
would be deemed to be a sale of such assets), Inteva would pay $21 million to DAS LLC (the "Post-Closing
Payment").

captive GM supplier to the estimated third-largest cockpit and interior systems manufacturer in

North America with a diverse customer base.  The Interiors Business succeeds based on its

expertise in design and development of interiors and cockpit technologies, its excellence in

manufacturing and logistics, and its experienced, focused management team.

        20.      The Interiors Business comprises two product lines – instrument panels

("IPs") and consoles (the "IP Product Line") and cockpits (the "Cockpits Product Line").

Capable of design, development, test, validation, and design integration engineering services,

the IP Product Line currently has the capacity to produce more than 3.3 million IPs and more

than 700,000 consoles per year.  The IP Product Line operates in four manufacturing plants

(Vandalia, Ohio; Adrian, Michigan; Gadsden, Alabama; and Matamoros, Mexico).

        21.      The Cockpits Product Line provides engineering design integration

services and assembles finished cockpits that are delivered sequenced to VM final assembly

plants.  Production of cockpits involves the integration and assembly of components including

instrument panels, floor consoles, instrumentation, steering wheels, IP structure, heating,

ventilation, and air-conditioning ("HVAC") systems, occupant protection systems, audio

components, and electrical wiring.  The Cockpits Product Line currently has the capacity to

produce more than 500,000 cockpits and consoles per year.  The Cockpits Product Line

operates in three manufacturing plants (Cottondale, Alabama; North Kansas City, Missouri;

and Orion, Michigan).

        22.      The Closures Business is a leading provider of vehicle latches (the

"Latch Product Line") and door modules (the "Door Module Product Line") to VMs

worldwide.  Similar to the Interiors Business, the Closures Business has grown from a captive

GM supplier to a global, diverse business that is the second-largest latch manufacturer both in

11

North America and globally and a leading producer of integrated door module systems. The

Closures Business has successfully produced more than 29 million individual door systems.

Central to the Closures Business' success is its expertise in design and development of latching

and door module technologies, its excellence in competitive manufacturing and logistics, and

its experienced, focused management team. The Closures Business is one of the few

businesses capable of supporting VMs in all aspects of production, from initial conception and

design development through validation and program launch.

        23.      The Latch Product Line manufactures and produces passenger and

commercial vehicle latching systems, including systems for vehicle doors, rear compartments,

and tailgates. The Latch Product Line has produced more than one billion latches and

currently manufactures more than 22 million latches per year. Currently, the Latch Product

Line operates in four manufacturing plants (Columbus, Ohio; Matamoros, Mexico; Shanghai,

China; and Kyungsan, South Korea) and three technical centers (Troy, Michigan; Juarez,

Mexico; and Wuppertal, Germany).

        24.      The Door Module Product Line produces highly integrated door

modules that combine latching, window lift systems, audio, occupant protection, and other

components. Such products can be assembled directly into vehicles in final assembly plants.

The Door Module Product Line provides a range of products to global VMs, from simple

window controls to complete door modules. The product line currently produces more than two

million door modules per year. The Door Module Product Line operates in five

manufacturing plants (Columbus, Ohio; Vandalia, Ohio; Grosspetersdorf, Austria; Woerth,

Germany; and Shanghai, China) and is supported by two technical centers (Troy, Michigan and

Wuppertal, Germany).

12

G.        Factors Leading To The Sale

25.        Although the Company believes that the Interiors and Closures Businesses are fundamentally strong, neither business fits within the Company's anticipated product portfolio under its transformation plan.  In particular, the Company has determined, after an intensive product portfolio review, that the Interiors and Closures Businesses are outside the primary focus of the Company's growth and long-term strategic goals.

26.        The Company believes, however, that as standalone businesses, the Interiors and Closures Businesses could become more profitable and competitive.  The Company has therefore determined that the value of the Interiors and Closures Businesses would be maximized through their divestiture.  To achieve that goal, while balancing the needs of its customers, the Company is seeking to sell the Interiors and Closures Businesses to a buyer.  The Company, including its Selling Debtor Entities, will carefully manage the transition of the Interiors and Closures Businesses and the Sale will be completed in coordination with the Company's customers, employees, unions, and other stakeholders.

27.        The Company has actively marketed the Interiors and Closures Businesses for over one year.  As part of this process, the Company identified several potential purchasers for the Interiors Business, the Closures Business, or both, and provided those parties with access to information about the Interiors and/or Closures Businesses.

28.        The Sellers evaluated the terms and benefits of the proposals, as well as the benefits of other alternatives to divesting the Interiors and Closures Businesses.  In their business judgment the Sellers concluded that the proposal from the Buyers, which formed the basis of the Agreement, offered the most advantageous terms and the greatest economic benefit.  This decision was based in part on the Sellers' ability to maximize the value of the

05-44481-rdd    Doc 10606    Filed 10/15/07    Entered 10/15/07 23:21:33    Main Document
Pg 14 of 43


business line as a going concern and their belief that the Buyers would continue to provide quality products to the Company's customers, many of whom buy other products from Delphi. Inteva is a wholly owned subsidiary of The Renco Group, Inc. ("Renco"). Renco is a private diversified investment holdings company with a broad portfolio of operating companies and financial investments. Renco holds interests in a number of companies in the mining, automotive, magnesium, steel, metals fabrication, and material handlings industries. Operating companies in which Renco holds an interest include AM General, US Magnesium, Doe Run Resources, Unarco Material Handling, and Baron Drawn Steel. Renco affiliates generate in excess of $3.5 billion in revenue.

H.    The Agreement

29.    Pursuant to the Agreement, (a) the Selling Debtor Entities would (i) sell the Purchased Assets owned by the Selling Debtor Entities free and clear of any Interests and/or Claims,[13] except for Permitted Encumbrances as defined in the Agreement, in consideration for their allocated share of the Purchase Price of $106 million, subject to adjustments and other consideration, and (ii) assume (if applicable) and assign the Assigned Contracts to the Buyers and (b) the Buyers will assume the Assumed Liabilities.

---

[13]    "Interests and/or Claims" means any and all liens, claims, interests, and encumbrances of any type whatsoever (whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the Petition Date, and whether imposed by agreement, understanding, law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability), including but not limited to those (i) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Selling Debtor Entities' or the Buyer's interest in the Purchased Assets, or any similar rights, and (ii) relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Interiors and Closures Businesses prior to the Closing Date, including the transfer of the Purchased Assets to the Buyers.

14

30.    The significant terms of the Agreement are as follows:[14]

(a)    <u>General Terms</u>.  The Buyers would acquire the Purchased Assets, which comprise substantially all of the assets primarily used by the Interiors and Closures Businesses through an asset sale (other than the certain assets expected to be excluded), including real property, personal property, inventory, contracts, administrative assets, permits, certain intellectual property, licensed intellectual property, and certain documented technical information, and software pertaining to the design or manufacture of the Interiors and Closures Businesses' products**.**

(b)    <u>Bankruptcy Court Approval</u>.  The Sale of the Purchased Assets would be subject to approval by this Court and competitive bidding pursuant to the Bidding Procedures.

(c)    <u>Documentation</u>.  The Sale would be effected pursuant to the Agreement and related documentation.[15]  At the closing,[16] certain of the Sellers and certain of the Buyers would enter into, among others, the following ancillary agreements (collectively, the "Ancillary Agreements"):[17] (i) the Patent Assignment; (ii) the Trademark Assignment, (iii) the Mexico Asset Sale Agreement, (iv) the China Share Transfer Agreement, (v) the Korea Share Transfer Agreement, (vi) the Austria Asset Sale Agreement, (vii) the Germany Asset Sale Agreement, (viii) the Transition Services Agreement, (ix) the Bills of Sale (or mutually agreed invoices), (x) the Assignment and Assumption Agreements, (xi) the Vandalia Manufacturing Services Agreement, (xii) the Grosspetersdorf Manufacturing Services Agreement, (xiii) the Columbus Manufacturing Services Agreement, (xiv) the Adrian HVAC Excluded Product Manufacturing Services Agreement, (xv) the Vandalia Lease, (xvi) the Troy Technical Center Sublease, (xvii) the Mexico Shared Substation Services Agreements, and (xviii) the Mexico Shared Wastewater Treatment Plant Services Agreement.  The Ancillary Agreements would be delivered to Sellers on terms reasonably satisfactory to Sellers on or before the closing and would be performed in all material respects.

(d)    <u>Purchase Price</u>.  The Purchase Price to be paid by the Buyers to the Sellers would be $106 million, which would be comprised of the Preliminary Purchase Price of $80 million, subject to adjustments, and the Post-Closing Payment of $26 million.

(e)    <u>Deposit Escrow</u>.  Immediately upon the Buyers' receipt of notice from the Sellers of Board Approval (defined below), the Buyers would deliver to the escrow agent $2 million that would be held as an earnest money deposit (such amount, together with the

---

[14]    In the event of any discrepancy between the Agreement and this summary, the provisions of the Agreement control.  Although the terms and conditions are generally the same for all the Sellers, the summaries in this Motion refer generally to the Selling Debtor Entities and not the non-Debtor Sellers.

[15]    Copies of the schedules to the Agreement and the Ancillary Agreements (as defined above) are available upon request to parties-in-interest who execute a confidentiality agreement acceptable to the Debtors and who show that they would be affected by the relief requested in this Motion.

[16]    The Selling Debtor Entities anticipate that the sale would close in the first half of 2008.

[17]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Agreement.

15

interest accrued thereon prior to closing, the "Deposit Amount").  Upon closing, the Sellers would be entitled to apply the Deposit Amount to the Preliminary Purchase Price.  Upon any material breach by the Buyers that the Buyers fail to remedy in accordance with the terms of the Agreement or the Bidding Procedures (defined below) and that results in termination of the Agreement, the Sellers would be entitled to retain the Deposit Amount.  In the event that the Agreement is terminated for a reason other than a material breach by the Buyers, then, on: (i) the date which would be ten days after such termination or (ii) in the event that an Alternative Transaction (defined below) is completed, the Return Date (defined below) (whichever would be earlier), the Sellers' and the Buyers' representatives would jointly instruct the agent holding the Deposit Amount in escrow to deliver the Deposit Amount, by wire transfer of immediately available funds, to an account designated by Buyers' representative in the Deposit Escrow Agreement, to be retained by Buyers.

(f)    Representations And Warranties.  Pursuant to the Agreement, the Selling Debtor Entities would provide representations and warranties relating to the Sale and the Purchased Assets and the Buyers would provide representations and warranties generally standard in a transaction of this type.  The representations and warranties of the Selling Debtor Entities would not survive the closing.  The representations and warranties of the Buyers would survive for a period of eighteen months following the closing.

(g)    Covenants.  Except as otherwise disclosed in the Agreement, between the date of signing the Agreement and the closing, the Selling Debtor Entities would be required to refrain from doing any of the following, among other things, without prior written consent of the Buyers (which consent would not be unreasonably withheld): (i) purchase or sell any capital stock or other equity interests of either Shanghai Delphi Automotive Door Systems, Co., Limited or KDS Company, Ltd. (the "JV Companies") or grant or make any option, subscription, warrant, call, commitment or agreement of any character in respect of any such capital stock or other equity interests, or permit any JV Company to incur any debt obligations or make any loan outside the ordinary course of business, except that this would not limit the ability of any JV Company to pay cash dividends or distributions of Net Cash to the Sellers between the date of the Agreement and the closing as long as a JV Company complies with all applicable laws (including liquidity requirements), (ii) sell or otherwise dispose of Acquired Assets, excluding sales of tooling to customers, sales of inventory and sales of receivables to financial institutions or credit collection agencies, in each case in the ordinary course of business, (iii) incur, assume, or guarantee any debt obligation that would become an Assumed Liability, (iv) incur any encumbrance on any material Acquired Assets, in each case other than the Permitted Encumbrances as defined in the Agreement, (iv) except as required by any written contract in effect on the date of the Agreement or as required by law, with respect to any U.S. employee or non-U.S. employee of the Interiors and Closures Businesses:  (A) adopt or, except to comply with applicable law, amend any Seller employee benefit plan, (B) increase in any manner (including the acceleration of vesting or payment of a payment or benefit) the compensation, employee benefits, or fringe benefits of any U.S. employees or non-U.S. employees, or (C) enter into any new, or amend any existing, collective bargaining agreement or similar agreement with respect to any U.S. employees or non-U.S. employees, (v) make any material change in the accounting methods or practices followed by the Interiors and Closures Businesses (other than such changes that are required by law or GAAP), (vi) make any election relating to taxes, enter into any closing agreement

relating to taxes, settle any claim or assessment relating to taxes or consent to any claim or assessment relating to taxes or any waiver of the statute of limitations for any such claim or assessment that could affect the Buyers or the Interiors and Closures Businesses, or could give rise to or increase the Assumed Liabilities or the excluded liabilities as set forth in the Agreement, (vii) terminate or make any material amendment to a material contract, or waive any material right thereunder, (viii) amend any organizational document of any JV Company if the Seller selling the securities has a right to veto any such amendment, (ix) fail to maintain insurance in a manner consistent with Sellers' past practice, (x) disclose any secret or confidential intellectual property (except by way of issuance of a patent or in the ordinary course of business (A) under customer purchase order terms that do not accept supplier information as confidential or (B) under confidentiality agreements entered into on customary terms with other third parties or allow any patent  or trademark registration to lapse or become abandoned (except in the ordinary course of business), (xi) allow any permit relating to the Interiors and Closures Businesses to lapse or fail to renew any such permit, (xii) agree or commit to do any of the foregoing, or (xiii) take any action that causes any JV Company to take any action or to fail to take any action as is proscribed under section 6.1 of the Agreement with respect to the business, assets, or liabilities of such JV Company, as applicable.  For a period of five years after the closing, the Selling Debtor Entities would be required not to take certain actions which would compete with the Interiors and Closures Businesses.

   (h)  <u>Indemnity</u>.  Under the Agreement, certain of the Sellers would be obligated to indemnify the Buyers on account of any claims asserted against the Buyers as a result of, or arising out of, (i) certain retained liabilities, (ii) the breach of any representation or warranty of the Sellers contained in the Agreement, subject to certain exceptions, or (iii) the breach of any covenant or agreement of the Sellers contained in the Agreement.  The Sellers agree that they would not seek to estimate these indemnity claims.

   (i)  <u>Closing Conditions</u>. In addition to certain other customary closing conditions relating to bankruptcy court approvals and regulatory matters (including certain competition filings), the obligation of the Buyers to close the Sale would be subject to the satisfaction of the following conditions: (i) the Sellers' receipt of any required consent and waiver of any right of first refusal from the partner in each JV Company to the Sellers' sale of certain sale securities pertaining to the JV Companies, (ii) the substantial completion of certain separation activities, (iii) the Buyers' entering into a supply agreement with GM (the "GM Agreement"), (iv) the Buyers' entering into an agreement with the UAW (the "UAW Agreement"), (v) the Buyer's entering into an agreement with the IUE-CWA (the "IUE-CWA Agreement"), and (vi) Delphi's approval of the Sale by its Board of Directors on or before October 17, 2007 (the "Board Approval").

   (j)  <u>Termination</u>.  The Agreement could be terminated in the following circumstances by a party which is not in breach of the Agreement: (i) upon mutual written consent of Delphi on behalf of the Sellers and Inteva on behalf of the Buyers, (ii) by either the Sellers or the Buyers if consummation of the Sale would violate any final non-appealable order of any regulatory governmental entity (other than this Court), (iii) by either party, if the Sellers consummate an Alternative Transaction (defined below), (iv) by either party, if this Court has not entered a Sale Approval Order on or before 120 days after the date of the

Agreement, or if such Sale Approval Order, as of the date that is 120 days after the date of the Agreement, is subject to a stay or injunction, (v) by either party if closing does not occur within 120 days after entry of the Sale Approval Order for any reason other than failure to obtain regulatory approvals, (vi) by the Buyers upon a material breach of the Agreement by Sellers that cannot be cured within 30 days of receiving notice of such breach or the occurrence of an event that results in a material adverse effect to the Interiors and Closures Businesses,[18] (vii) by the Sellers upon a material breach of the Agreement by Buyers that cannot be cured within 30 days of receiving notice of such breach, or (viii) by either party if the Board Approval is not received.

(k)    Break-up Fee.  Subject to Court approval and certain exceptions, in the event that the Sellers sell, transfer, lease, or otherwise dispose of all or a material portion of the Interiors and Closures Businesses or the Acquired Assets in a transaction or a series of related transactions with a party other than the Buyers (an "Alternative Transaction") within 12 months after termination of the Agreement, then in any such event, the Sellers (on a pro rata basis, based on the allocation of the purchase price paid in the Alternative Transaction) would, upon consummation of the Alternative Transaction, pay the Buyers an amount equal to the lesser of (i) $2.4 million or (ii) three percent of the post-termination Alternative Transaction purchase price (the "Post-Termination Alternative Transaction Purchase Price"). The Post-Termination Alternative Transaction Purchase Price means the purchase price received upon consummation of a Sale with another purchaser within 12 months following termination of the Agreement in any circumstance where Expense Reimbursement (as defined below) is payable to the Buyers and the purchase price received upon consummation of such Alternative Transaction is equal to or greater than 80% of the Preliminary Purchase Price set forth in the Agreement (collectively with paragraph 28(k)(i) above, the "Break-Up Fee").  If the Break-Up Fee is paid under paragraph 28(k)(ii) above, the Sellers would also be entitled to receive the Expense Reimbursement.  The Break-Up Fee, however, would not be paid if (y) the Buyers are in material breach of the Agreement or the Bidding Procedures or (z) the Agreement was terminable because the Sale would violate any final non-appealable order of any regulatory governmental entity. Buyers would not be entitled to the Break-Up Fee if the closing does not occur because of the Buyer's failure to enter into the GM Agreement, the UAW Agreement, or the IUE-CWA Agreement.

(l)    Expense Reimbursement.  Subject to Court approval and certain exceptions, the Sellers would be required to reimburse the Buyers' reasonable, actual out-of-pocket fees and expenses incurred in connection with the transactions contemplated by the Agreement in an amount not to exceed $250,000, which is approximately 0.2% of the Purchase Price  (the "Expense Reimbursement"), generally upon termination of the Agreement unrelated to an Alternative Transaction, other than in a circumstance (i) in which the Buyers are in breach of the Agreement for which the Sellers had previously notified the Buyers or (ii) in the case of regulatory approvals, in which the event giving rise to termination would not relate solely to the status, actions, or conduct of the Sellers.

---

[18]    For purposes of this provision, the Selling Debtor Entities' will obtain waivers by the UAW and the IUE-CWA of any "no sale" provisions contained in any of the Selling Debtor Entities' collective bargaining agreements.

(m)    Transfer Taxes.  The Selling Debtor Entities and the Buyers would use commercially reasonable efforts and cooperate in good faith to exempt the Sale from any sales taxes, documentary and stamp taxes, transfer, documentary, sales, use, registration, recording, stamp, use, gross receipts, excise, value-added, and other such taxes and related fees ("Transfer Taxes") as may be payable in connection with the Sale.  In the event that an exemption(s) is unavailable, the Buyers would be liable for and pay all Transfer Taxes arising out of or incurred in connection with the Agreement.

I.    Allocation Of Purchase Price

31.    As noted above, some of the Purchased Assets are being sold by certain non-Debtor affiliates.  The allocation of the Purchase Price among the Selling Debtor Entities and the non-Debtor Sellers is set forth in the chart attached to the Agreement.

J.    Workforce Provisions

32.    Pursuant to the Agreement, the Buyers generally would offer employment to all but five of the Selling Debtor Entities' salaried employees (excluding inactive salaried employees) who primarily support the Interiors and Closures Businesses, including (i) all salaried employees at the facilities in Adrian, Michigan, Gadsden, Alabama, and Cottondale, Alabama and (ii) salaried employees who primarily support the Interiors and Closures Businesses at the facilities in Vandalia, Ohio and Troy Michigan.  The Buyers' offer of employment would include salary and benefits packages that are substantially comparable in the aggregate to those in place immediately prior to closing.  For such salaried employees of the Selling Debtor Entities, the Buyers would maintain the requisite level of compensation and benefits for a minimum of 12 months following the closing (unless such employee's term is otherwise governed by an employee contract).

33.    For all of the Selling Debtor Entities' hourly employees, the Buyers' offer of employment would be on the same terms and at the same level of compensation and

19

benefits as were in effect immediately prior to closing.[19]  Along those lines, the Buyers would

assume the terms and conditions of the domestic collective bargaining agreements, as they may

be modified by mutual agreement of the Buyers and the respective union, applicable at the

Cottondale, Alabama; Adrian, Michigan; and Gadsden, Alabama facilities.  However, the

Buyers would not assume any obligation or liabilities under the Seller employee benefit plans

referred to in such collective bargaining agreements but rather will establish Buyer-sponsored

employee benefit plans which comply with the terms and conditions of the domestic collective

bargaining agreements.  The Buyers would recognize the seniority status of the transferred

hourly employees who are employed in accordance with a domestic collective bargaining

agreement for all purposes of continued employment with the Buyers.

    34.  The Selling Debtor Entities would retain responsibility for all workers'

compensation liability related to injuries or illness incurred prior to closing by domestic

employees transferred to the Buyers, provided that such claims are filed within 12 months of

closing.  Regardless of the vesting date, the Sellers would be responsible for vacation pay,

profit sharing, and incentive compensation for any employees transferred to the Buyers due for

the calendar year in which the closing occurs on a pro-rata basis.

    35.  The Buyers would offer participation and eligibility for benefits under

the Buyers' benefit plans to transferred employees as of the closing.  The Buyers would

recognize the pre-closing credited service for the transferred salaried employees of the Selling

Debtor Entities for eligibility and vesting purposes but not benefit accrual purposes, provided

---

[19] Potential bidders should note that certain benefit treatment in the Agreement is intended to effect assumption
of the CBAs and, to the extent subject to assumption, these issues remain subject to the parties' rights and
obligations related to bargaining with the UAW.

that such recognition does not cause a duplication of compensation or benefits as between the

Selling Debtor Entities and the Buyers.

36.     The Buyers would not provide the Selling Debtor Entities' salaried

employees with a defined benefit plan, but would provide a defined contribution plan.  The

Selling Debtor Entities would retain all assets and liabilities under their defined benefit pension

plan for the benefits accrued prior to closing for any of their transferred salaried employees.

37.     The Buyers would be responsible for all obligations and liabilities

relating to any claims for services, termination, redundancy, change in control agreements, or

other payments or benefits by the transferred employees of the Selling Debtor Entities arising

from the transactions contemplated by the Agreement and based on the Buyers' actions

following the closing.

K.     Bidding Procedures

38.     The Sale of the Interiors and Closures Businesses would be subject to

higher or otherwise better offers pursuant to the Bidding Procedures.  The Selling Debtor

Entities believe that the proposed structure of the Bidding Procedures is the one most likely to

maximize the realizable value of the Interiors and Closures Businesses for the benefit of the

Sellers, including the Selling Debtor Entities and their estates, their stakeholders, and other

interested parties.  Accordingly, the Selling Debtor Entities seek approval of the Bidding

Procedures for the Sale of the Interiors and Closures Businesses.

39.     The Bidding Procedures describe, among other things, the assets

available for sale, the manner in which bidders and bids become "qualified," the coordination

of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of

any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder(s),

and this Court's approval thereof (collectively, the "Bidding Process").

21

40.    The proposed Bidding Procedures attached hereto as <u>Exhibit A</u> provide,

in relevant part, as follows:[20]

(a)    <u>Participation Requirements</u>:  To ensure that only bidders with
financial ability and a serious interest in the purchase of the Purchased Assets participate in
the Bidding Process, the Bidding Procedures provide for certain requirements for a potential
bidder to become a "Qualified Bidder":  (i) executing a confidentiality agreement in form and
substance satisfactory to the Sellers, (ii) providing the Sellers with certain financial
assurances, including current audited financial statements or such other form of financial
disclosure and credit-quality support or enhancement acceptable to the Sellers and their
financial advisors as to such bidder's ability to close, and (iii) submitting a preliminary
proposal reflecting (A) the purchase price range, (B) any Purchased Assets expected to be
excluded, (C) the structure and financing of the transaction, (D) any anticipated regulatory
approvals, (E) the anticipated time frame and any anticipated impediments to obtaining such
approvals, (F) any additional conditions to closing the qualified bidder may wish to impose,
and (G) the nature and extent of any due diligence the qualified bidder may wish to conduct
and the date by which such due diligence would be completed.

(b)    <u>Due Diligence</u>:  All Qualified Bidders would be afforded an
opportunity to participate in the diligence process.  The Sellers would coordinate the
diligence process and provide due diligence access and additional information as reasonably
requested by any Qualified Bidders.  Except as otherwise stated in the Agreement, due
diligence would not continue after the Bid Deadline (defined below).

(c)    <u>Bid Deadline</u>:  All bids would have to be received not later than
11:00 a.m. (prevailing Eastern time) by November 26, 2007 (the "Bid Deadline").  The
Sellers could extend the Bid Deadline once or successively, but would not be obligated to do
so.

(d)    <u>Bid Requirements</u>:  All bids would be required to include the
following documents: (i) a letter stating that the bidder's offer would be irrevocable for the
period set forth in the Bidding Procedures, (ii) an executed copy of the Agreement, together
with all schedules, marked to show amendments and modifications to the agreement,
purchase price, and proposed schedules, (iii) a good faith deposit in an amount equal to 2.6%
of the Preliminary Purchase Price, but which would in no event be less than the Deposit
Amount, and (iv) satisfactory written evidence of a commitment for financing or other ability
to consummate the proposed transaction.

(e)    <u>Qualified Bids</u>:  To be deemed a "Qualified Bid," a bid would be
required to be received by the Bid Deadline and, among other things, would be required to (i)
be on terms and conditions (other than the amount of the consideration and the particular
liabilities being assumed) that are substantially similar to, and are not materially more

---

[20]    In the event of any conflict between the Bidding Procedures and this summary of the Bidding Procedures, the
provisions of the Bidding Procedures control.  Capitalized terms used but not otherwise defined in this
summary have the meanings ascribed to them in the Bidding Procedures.

burdensome or conditional to the Sellers than, those contained in the Agreement, (ii) have a value greater than the purchase price reflected in the Agreement, plus the amount of the Break-Up Fee, plus $1,000,000, (iii) not be contingent on obtaining financing or the outcome of unperformed due diligence, (iv) not be conditioned on (A) bid protections, other than the bidding increments contemplated in the Bidding Procedures or (B) such bid being deemed the Successful Bid (as defined below) by the Sellers, (v) contain acknowledgements and representations that the bidder (A) has had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to making its offer, (B) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Purchased Assets in making its bid, and (C) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the marked agreement, and (vi) include a commitment to consummate the purchase or the Purchased Assets immediately upon completion of all closing conditions within Sellers' reasonable control, which may as early as 15 days after entry of the Sale Approval Order, or in the case of any governmental approvals, 60 days after entry of such order.  The Sellers would retain the sole right to deem a bid a Qualified Bid even if such bid does not conform to one or more of the bid requirements described herein.  Notwithstanding the foregoing, the Buyers would be deemed a Qualified Bidder, and the Agreement would be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale.  A Qualified Bid would be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction.  Each Qualified Bid other than the Agreement would be referred to as a "Subsequent Bid."

(f)    Conduct Of Auction: If the Sellers receive at least one Qualified Bid in addition to that of the Buyers, they would conduct an auction (the "Auction") of the Purchased Assets at 10:00 a.m. (prevailing Eastern time) on December 6, 2007 or such later time as the Sellers notify all Qualified Bidders who have submitted Qualified Bids in accordance with the procedures outlined in the Bidding Procedures, which include: (i) attendance at the Auction would be limited to specified parties as outlined in the Bidding Procedures, (ii) at least two Business Days prior to the Auction, each Qualified Bidder with a Qualified Bid would inform the Sellers whether it intends to participate in the Auction and at least one Business Day prior to the Auction, the Sellers would provide such bidders and the UAW with copies of the Qualified Bid which the Sellers then believe would be the highest or otherwise best offer for the Purchased Assets, (iii) all Qualified Bidders would be entitled to be present for all Subsequent Bids, and (iv) bidding at the Auction would begin with the highest or otherwise best Qualified Bid, continue in minimum increments of at least $1,000,000, and conclude after each participating bidder has had the opportunity to submit one or more additional Subsequent Bids.

(g)    Selection Of Successful Bid:  As soon as practicable after the conclusion of the Auction, the Sellers, in consultation with their advisors, would review each Qualified Bid and identify the highest or otherwise best offer for the Purchased Assets (the "Successful Bid") and the bidder making such bid (the "Successful Bidder").  The Sellers would sell the Purchased Assets for the highest or otherwise best Qualified Bid to the

Successful Bidder upon the approval of such Qualified Bid by this Court after the Sale Hearing.

(h)    Sale Hearing: The Selling Debtor Entities request that the Sale Hearing be scheduled for _____ at 10:00 a.m. (prevailing Eastern time) and that the Sale Hearing could be adjourned or rescheduled by the Sellers without notice other than by an announcement of the adjourned date at the Sale Hearing.[21]  If no Qualified Bid other than that of the Buyers is received, the Sellers would proceed with the sale of the Purchased Assets to the Buyers, pursuant to the terms of the Agreement, as it may be modified by the Sale Approval Order, following entry of such order.  If the Sellers receive additional Qualified Bids, then at the Sale Hearing, the Selling Debtor Entities could seek approval of the Successful Bid, as well as the second highest or best Qualified Bid (the "Alternate Bid," and such bidder, the "Alternate Bidder").  A bid would not be deemed accepted by the Sellers unless and until approved by this Court.  Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for specified reasons, then the Alternate Bid would be deemed to be the Successful Bid and the Sellers would be permitted to effectuate a sale to the Alternate Bidder without further order of this Court.

(i)    Return Of Good Faith Deposits:  Good faith deposits of all Qualified Bidders (except for the Successful Bidder) would be held in an interest-bearing escrow account and all Qualified Bids would remain open until two business days following the closing of the Sale (the "Return Date").  Notwithstanding the foregoing, the good faith deposit submitted by the Successful Bidder, together with interest thereon, would be applied against the payment of the purchase price upon closing of the Sale to the Successful Bidder. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, such Successful Bidder would forfeit its good faith deposit, and such good faith deposit would irrevocably become the property of the Sellers.  On the Return Date, the Sellers would return the good faith deposits of all other Qualified Bidders, together with the accrued interest thereon.

(j)    Reservation Of Rights:  The Sellers, after consultation with the agents for its secured lenders' and the Creditors' Committee:  (i) may determine which Qualified Bid, if any, is the highest or otherwise best offer and (ii) may reject, at any time, any bid (other than the Buyers' initial bid) that is:  (A) inadequate or insufficient, (B) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (C contrary to the best interests of the Sellers, including the Selling Debtor Entities, their estates, and their stakeholders as determined by the Selling Debtor Entities in their sole discretion.

L.    Bid Protections

41.    At various times over the course of the last year, the Buyers have

expended, and likely would continue to expend, considerable time, money, and energy

---

[21]    The Sale Hearing would be set for a date at least six business days after the Auction.  The Selling Debtor Entities will notify parties-in-interest of the Sale Hearing Date under the Notice Procedures described herein.

pursuing the purchase of the Interiors and Closures Businesses.  Moreover, the Buyers have

engaged in extended arm's length and good faith negotiations regarding a possible sale.  The

Buyers are not "insiders" of any of the Debtors as that term is defined in section 101(31) of the

Bankruptcy Code.  The Agreement is the culmination of these efforts.

42.    In recognition of this expenditure of time, energy, and resources, the

Selling Debtor Entities have agreed to provide certain bid protections to the Buyers (the "Bid

Protections").  Specifically, the Agreement provides for, and the Selling Debtor Entities

respectfully request that this Court approve, a Break-Up Fee payable by the Sellers to the

Buyers in the amount not to exceed $2.4 million, which is approximately 3% of the

Preliminary Purchase Price and 2.3% of the Purchase Price (includes Post-Closing Payments),

if the Sellers, with certain exceptions, consummate an Alternative Transaction.

43.    In addition, the Selling Debtor Entities respectfully request this Court's

approval of the term in the Agreement providing for reimbursement of the Buyers' reasonable,

actual out-of-pocket fees and expenses incurred in connection with the transactions

contemplated by the Agreement, in an amount not to exceed $250,000, which is 0.2% of the

Purchase Price under certain circumstances.

44.    If the Buyers become entitled to receive any Break-Up Fee or Expense

Reimbursement, then such Break-Up Fee or Expense Reimbursement would be the sole and

exclusive remedy of the Buyers, whether at law or in equity, for any breach by Delphi or any

of its affiliates of the terms and conditions of the Agreement or the Deposit Escrow

Agreement.

45.    The Bid Protections were a material inducement for, and a condition of,

the Buyers' entry into the Agreement.  The Sellers believe that the Bid Protections are fair and

reasonable in view of (a) the intensive analysis, due diligence investigation, and negotiation

undertaken by the Buyers in connection with the Sale and (b) the fact that the Buyers' efforts

have increased the chances that the Sellers would receive the highest or otherwise best offer for

the Purchased Assets.

46.    The Buyers are unwilling to commit to hold open their offer to purchase

the Purchased Assets under the terms of the Agreement without the approval of the Bid

Protections and the Bidding Procedures Order.  Thus, absent entry of the Bidding Procedures

Order and approval of the Bid Protections, the Sellers would lose the opportunity to obtain

what they believe to be the highest and best offer for the Purchased Assets.

47.    Moreover, payment of the Break-Up Fee would not diminish the Selling

Debtor Entities' estates.  The Sellers would not expect to pay the Break-Up Fee unless they do

so to accept an alternative Successful Bid, which must exceed the price offered by the Buyers

by an amount sufficient to pay the Break-Up Fee.  The Expense Reimbursement is a necessary

cost of obtaining a binding commitment from the Buyers for the sale of the Interiors and

Closures Businesses.  The Selling Debtor Entities thus request that this Court authorize

payment of the Bid Protections pursuant to the terms and conditions of the Agreement.

M.    Assumption And Assignment Of Contracts

48.    The Selling Debtor Entities seek authority under section 365 of the

Bankruptcy Code to assume and assign the Assumed U.S. Contracts to the Buyers or the

Successful Bidder, as the case may be.  The approximate cost to cure the Assumed U.S.

Contracts related to (i) the Interiors Business is $3,023,017 and (ii) the Closures Business is

$8,111,724.  With respect to the Assumed U.S. Contracts, at least 20 days prior to the Sale

Hearing, the Selling Debtor Entities propose to file with this Court and serve on each non-

Debtor party to an Assumed U.S. Contract a cure notice substantially in the form attached

26

hereto as <u>Exhibit E</u> (the "Cure Notice").  The Cure Notice would state, with respect to the

Assumed U.S. Contracts, the cure amount that the Selling Debtor Entities believe is necessary

to assume such contract or lease pursuant to section 365 of the Bankruptcy Code (the "Cure

Amount") and would notify each party that such party's lease or contract would be assumed

and assigned to the Buyers to be identified at the conclusion of the Auction.  In addition, such

Cure Amounts would be listed on a schedule to the Sale Approval Order.  In connection with

the proposed Sale, the Selling Debtor Entities also seek authority under section 363 of the

Bankruptcy Code to assign the Post-Petition Contracts to the Buyers or the Successful Bidder,

as the case may be.  There are no past due obligations under the Post-Petition Contracts.

          49.     The Debtors propose that any objection to the Cure Amount would be

required to be filed within ten days of the date of the Cure Notice and served as set forth in the

Cure Notice.  Any objection to the Cure Amount would be required to state with specificity

what cure amount the party to the Assumed U.S. Contract believes is required, including

appropriate documentation thereof.  If no objection is timely received, the Cure Amount set

forth in the Cure Notice would be controlling notwithstanding anything to the contrary in any

Assumed U.S. Contract or other document, and the non-Debtor party to the Assumed U.S.

Contract would be forever barred from asserting any other claims against the Selling Debtor

Entities, the Buyers, or the Successful Bidder (as appropriate) or the property of any of them,

as to such Assumed U.S. Contract.

          50.     In addition, at least 20 days prior to the Sale Hearing, the Selling Debtor

Entities propose to file with this Court and serve on each non-Debtor party to an Assigned

Contract a notice substantially in the form attached hereto as <u>Exhibit F</u> (the "Purchaser

Assumption/Assignment Notice").  The Purchaser Assumption/Assignment Notice would

identify the Buyers as the party that would be assigned all of the Selling Debtor Entities' right, title, and interest in the Assigned Contracts, subject to completion of the bidding process provided under the Bidding Procedures.[22] Non-Debtor parties to any Assumed U.S. Contract would be required to file an objection to the assumption and/or assignment of the Assumed U.S. Contract within ten days of service of the Purchaser Assumption/Assignment Notice, and such parties would be required to state, with specificity, the legal and factual basis of their objection, unless otherwise ordered by this Court.

51.    At least 20 days prior to the Sale Hearing or on the business day following the Bid Deadline, whichever is later, the Selling Debtor Entities propose to send a notice (the "Qualified Bidder Assumption/Assignment Notice"), substantially in the form attached hereto as Exhibit G, to each non-Debtor party to an Assigned Contract identifying any Qualified Bidders as potential parties to which the Assigned Contracts would be assigned. The Qualified Bidder Assumption/Assignment Notice would give the Selling Debtor Entities the ability to address promptly any adequate assurance issues that contract parties may have with any of the Qualified Bidders. Non-Debtor counterparties to any Assumed U.S. Contract would be required to file an objection to the assumption and/or assignment of the Assumed U.S. Contract within ten days from the service of the Qualified Bidder Assumption/Assignment Notice, and such parties would be required to state, with specificity, the legal and factual basis of its objection, unless otherwise ordered by this Court.

---

[22]    The Selling Debtor Entities propose to serve the Purchaser Assumption/Assignment Notice and the Qualified Bidder Assumption/Assignment Notice (as defined below) upon each non-Debtor counterparty to the Post-Petition Contracts as a means of fulfilling any requirement under the applicable contract to provide notice of assignment.

N.    Notice Of Sale Hearing

52.    Within five days after entry of the Bidding Procedures Order (the

"Mailing Date"), the Selling Debtor Entities (or their agent) propose to serve the Motion, the

Agreement, the proposed Sale Approval Order, the Bidding Procedures, and a copy of the

Bidding Procedures Order by first-class mail, postage prepaid, upon (i) the U.S. Trustee, (ii)

counsel for the Buyers, (iii) counsel for the Creditors' Committee, (iv) counsel for the Equity

Committee, (v) all entities known to have expressed an interest in a transaction with respect to

the Purchased Assets during the past six months, [23] (vi) all entities known to have asserted any

lien, claim, interest, or encumbrance in or upon the Purchased Assets, (vii) all federal, state,

and local regulatory or taxing authorities or recording offices, including but not limited to

environmental regulatory authorities, which have a reasonably known interest in the relief

requested by the Motion, (viii) all parties to Assigned Contracts, (ix) the United States

Attorney's office, (x) the United States Department of Justice, (xi) the Securities and Exchange

Commission, (xii) the Internal Revenue Service, (xiii) all entities on the Master Service List (as

defined by the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P.

2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice,

Case Management, And Administrative Procedures (Docket No. 2883) (the "Supplemental

Case Management Order")), and (xiv) such other entities as are required to be served with

notices under the Supplemental Case Management Order.

O.    Publication Notice

53.    The Selling Debtor Entities also propose, pursuant to Fed. R. Bankr. P.

2002(l) and 2002(d), that publication of a notice of the Sale in a form substantially similar to

---

[23]    All such entities would be served by electronic mail, in addition to overnight mail, to the extent the Debtors
have electronic mail addresses for such parties.

the form annexed hereto as <u>Exhibit H</u> in the <u>Wall Street Journal</u>, the <u>New York Times</u>, the <u>Dayton Daily News</u>, and the <u>Detroit Free Press</u> by the Mailing Date or as soon as practicable thereafter, be deemed proper notice to any other interested parties whose identities are unknown to the Sellers.

P.    <u>The Troy Technical Center</u>

54.    In connection with the Sale, the Sellers would be subleasing a portion of a technical center in Troy, Michigan to the Buyers.  This is reflected in the Troy Technical Center Sublease, an agreement ancillary to the Agreement.  On September 28, 2007, DAS LLC entered into a sixth amendment of lease with 1401 Troy Associates Limited Partnership (the "Landlord") covering certain premises located at 1401 Crooks Road, Troy Michigan (the "Sixth Amendment").  A copy of the Sixth Amendment is attached hereto as <u>Exhibit I</u>.  The technical center in Troy is part of the premises covered under the Sixth Amendment.  Under the Sixth Amendment, the Landlord grants DAS LLC certain termination rights.  Without these termination rights, DAS LLC would have had to consider rejecting the lease, because such lease relates, in part, to businesses it is seeking to sell or wind down.  As a result of the Sixth Amendment, the Selling Debtor Entities could now provide the Buyers necessary access to the technical center in Troy immediately upon closing of the Sale.

55.    DAS LLC believes that it is authorized to enter into and perform under the Sixth Amendment in the ordinary course of business under section 363(c) of the Bankruptcy Code, without this Court's approval.  But, at the request, and upon the insistence, of the Landlord, the Selling Debtor Entities are seeking this Court's approval of the Sixth Amendment.

Applicable Authority

Q.    Approval Of Bidding Procedures

56.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to
use property of the estate "other than in the ordinary course of business" after notice and a
hearing.  11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of
business may be authorized if the debtor demonstrates a sound business justification for it.  See
Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d
Cir. 1983) (business judgment rule requires finding that good business reason exists to grant
debtor's application under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124
B.R. 169, 178-179 (D. Del. 1991).

57.    The Second Circuit has held that, although the bankruptcy court sits as
an "overseer of the wisdom with which the bankruptcy estate's property is being managed by
the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between
creditors and the estate." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion
Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).  This Court's consideration of a debtor's
section 363(b) motion is a "summary proceeding," intended merely as a means "to efficiently
review the . . . debtor's decision[s] . . . in the course of the swift administration of the
bankruptcy estate.  It is not the time or place for prolonged discovery or a lengthy trial with
disputed issues." Id. at 1098-99.

58.    Once the debtor articulates a valid business justification, a presumption
arises that "in making a business decision the directors of a corporation acted on an informed
basis, in good faith and in the honest belief that the action taken was in the best interests of the
company.'" Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re
Integrated Res.), 147 B.R. 650, 656 (S.D.N.Y. 1992)(citations omitted).  Thereafter, "[p]arties

31

opposing the proposed exercise of a debtor's business judgment have the burden of rebutting

the presumption of validity." Id.  To satisfy its burden, it is not enough for an objector simply

to raise and argue an objection. Rather, an objector "is required to produce some evidence

respecting its objections."  Lionel Corp., 722 F.2d at 1071.

59.    As a rule, the debtor's business judgment "should be approved by the

court unless it is shown to be "so manifestly unreasonable that it could not be based upon

sound business judgment, but only on bad faith, or whim or caprice."  In re Aerovox, Inc., 269

B.R. 74, 80 (Bankr. D. Mass. 2001) (citations omitted).

60.    As set forth above, the Sellers have sound business justifications for

pursuing a sale process at this time.  Although the Sellers believe that the Interiors and

Closures Businesses are fundamentally strong, the Interiors and Closures Businesses do not fit

the Debtors' anticipated product portfolio under their transformation plan.  Thus, the Selling

Debtor Entities have determined that the Interiors and Closure Businesses' value would be

maximized through their divestiture.  Moreover, delaying the sale of the Purchased Assets may

result in the erosion of the Interiors and Closures Businesses' value. Accordingly, there is a

sound business purpose for pursuing the sale process promptly and in accordance with the

Bidding Procedures.

61.    Moreover, a prospective purchaser of assets from a chapter 11 debtor

may be reluctant to make an offer because it knows that even if it reaches agreement with the

debtor, its offer will be subject to a higher bid by another party.  Pre-approved bidding

procedures address these concerns by assuring initial bidders that any auction procedure would

be reasonable.  Thus, the Selling Debtor Entities submit that the use of the Bidding Procedures

also reflects sound business judgment.

R.       Approval Of The Bid Protections

62.      Bidding incentives encourage potential bidders to invest the requisite

time, money, and effort to negotiate with a debtor and perform the necessary due diligence

attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of

the chapter 11 process.  See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr.

S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight

to enter the bidding by providing some form of compensation for the risks it is undertaking")

(citation omitted).  Bankruptcy courts often approve bidding incentives under the business

judgment rule.  See In re Global Crossing Ltd., 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003)

("[N]o litigant has seriously argued the inapplicability of the business judgment test, and if any

such argument had been made, the Court would be compelled . . . to reject it."); United States

Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.), No. 02 Civ. 2854, 2003 WL

21738964, at *8 n.13 (S.D.N.Y. July 28, 2003) (the court should approve agreements providing

bidding incentives "unless they are unreasonable or appear more likely to chill the bidding

process than to enhance it").  One court, explaining the force of the business judgment rule in

this context, stated "the business judgment rule does not become inapplicable simply because a

court decides a break-up fee is too large." Integrated Resources, 147 B.R. at 660.

63.      This district has established a three part test for determining when to

permit bidding incentives.  Id. at 657-58.  The three questions for a court to consider when

assessing a break-up fee are: "(1) is the relationship of the parties who negotiated the break-up

fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage,

bidding; and (3) is the amount of the fee unreasonable relative to the proposed purchase price."

Id. at 657.

33

64.    Here, the Selling Debtor Entities seek authority to utilize the Bidding Process and Bid Protections in the event that the Buyers are not ultimately the Successful Bidder or must increase the Buyers' bid price to become the Successful Bidder.  The Bid Protections are fair and reasonable in amount, particularly in view of the efforts previously made and to be made by the Buyers and the risk to the Buyers of being used as a stalking horse.  Moreover, the maximum payment under the proposed Bid Protections – the $2.4 million Break-Up Fee (approximately 3% of the Preliminary Purchase Price and 2.3% of the Purchase Price) – not only constitutes a fair and reasonable percentage of a proposed purchase price, but is within the range that is customary for similar transactions of this type in the bankruptcy context.  See, e.g., In re Allegiance Telecom, Inc., Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. 2004) (allowing 2.8% break-up fee and expense reimbursement provision in asset sale agreement); In re Enron Corp., Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. 2004) (approving 3% break-up fee if debtor closed superior transaction); In re Genuity Inc., Case No. 02-43558 (PCB)(Bankr. S.D.N.Y. 2002) (allowing 4.13% break-up fee if court approved alternative transaction); In re PSINet, Inc., Case No. 01-13213 (REG) (Bankr. S.D.N.Y. 2001) (permitting 4.28% break-up fee in the event that seller consummated transaction with alternative bidder); In re Teligent, Inc., Case No. 01-12974 (SMB) (Bankr. S.D.N.Y. 2001) (allowing break up fee ranging from 1.3% to 4.25% depending on value of alternative transaction).  In addition, the payment of the Break-Up Fee or the Expense Reimbursement, as the case may be, is reasonable in light of the significant investment in time and resources that the Buyers would have contributed as the stalking horse bidder.

65.    The Selling Debtor Entities submit that the Bidding Procedures and the Bid Protections have encouraged competitive bidding because the Buyers would not have

entered into the Agreement without such provisions.  The Bidding Procedures and the Bid

Protections have thus induced a bid that otherwise would not have been made.  Finally, the

mere existence of the Bidding Procedures and Bid Protections permits the Sellers to insist that

competing bids be materially higher or otherwise better than the Agreement, which would

produce a clear benefit to the Selling Debtor Entities, their estates, and their stakeholders.

S.      Sale Of The Purchased Assets Free And
        Clear Of Liens, Claims, Encumbrances, And Interests

          66.      Under section 363(f) of the Bankruptcy Code, a debtor-in-possession

may sell property free and clear of any lien, claim, or interest in such property if, among other

things:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such
>     interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is sold is greater than the
>     aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a
>     money satisfaction of such interest.

11 U.S.C. § 363(f).

          67.      Here, section 363(f) of the Bankruptcy Code permits the Selling Debtor

Entities to sell the Purchased Assets free and clear of all liens, claims, and encumbrances, other

than the Permitted Encumbrances.[24]  Excluding Permitted Encumbrances, each lien, claim, or

encumbrance that is not the result of an assumed liability satisfies at least one of the five

conditions of section 363(f), and the Selling Debtor Entities submit that any such lien, claim, or

---

[24]   As a result of intense negotiations, certain liabilities will be assumed by the Buyers or the Successful Bidder,
       as the case may be.

encumbrance would be adequately protected by attachment to the net proceeds of the Sale,

subject to any claims and defenses that the Selling Debtor Entities may possess with respect

thereto.  Accordingly, except for the liens resulting from the Assumed Liabilities or the

Permitted Encumbrances, the Selling Debtor Entities request that the Purchased Assets be

transferred to the Successful Bidder(s) free and clear of all liens, claims, and encumbrances,

with such liens, claims, and encumbrances to attach to the proceeds of the Sale of the

Purchased Assets.

T.     The Buyers Are Good Faith Purchasers Pursuant To
       Section 363(m) Of The Bankruptcy Code And The Transaction
       Contemplated By The Agreement Should Carry The
       Protections Of Section 363(n) Of The Bankruptcy Code

68.     Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under subsection (b)
or (c) of this section of a sale or lease of property does not affect the validity of
a sale or lease under such authorization to an entity that purchased or leased
such property in good faith, whether or not such entity knew of the pendency of
the appeal, unless such authorization and such sale or lease were stayed pending
appeal.

11 U.S.C. § 363(m).  Although the Bankruptcy Code does not define "good faith," the Second

Circuit Court of Appeals in In re Gucci has held that the:

good faith of a purchaser is shown by the integrity of his conduct during the
course of the sale proceedings; where there is a lack of such integrity, a good
faith finding may not be made.  A purchaser's good faith is lost by "fraud,
collusion between the purchaser and other bidders or the trustee, or an attempt
to take grossly unfair advantage of other bidders."

Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 390 (2d. Cir. 1997) (quoting In

re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting former

Bankruptcy Rule 805, the precursor of section 363(m))); see also Evergreen Int'l Airlines Inc.

v. Pan Am Corp. (In re Pan Am Corp.), No. 91 Civ. 8319, 1992 WL 154200, at *4 (S.D.N.Y.

June 18, 1992); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988).

36

69.     Section 363(n) of the Bankruptcy Code further provides, in relevant part, that:

> The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount.

11 U.S.C. § 363(n).

70.     The Selling Debtor Entities submit, and will present evidence at the Sale Hearing, that the Agreement reflects an intensely negotiated, arm's length transaction.  Indeed, these negotiations have continued, on and off, for approximately one year.  Throughout the negotiations, the Purchaser has at all times acted in good faith.  Moreover, to the extent that the assets are sold to a Successful Bidder, it will be because of a well planned competitive process and intense negotiations at arm's length to be conducted at an Auction.  As a result of the foregoing, the Selling Debtor Entities request that the court make a finding that the Purchaser Price to be paid by the Purchaser constitutes reasonably equivalent value and fair consideration under any applicable law.

71.     Throughout the negotiations, the Buyers have at all times acted in good faith.  Moreover, to the extent that the assets are sold to a Successful Bidder, it would be because of a well planned competitive process and intense negotiations at arm's length to be conducted at the Auction.  The Selling Debtor Entities, therefore, request that this Court make a finding that the Buyers or the Successful Bidder, as the case may be, have purchased the Purchased Assets and assumed the Assigned Contracts and Assumed Liabilities in good faith within the meaning of section 363(m) of the Bankruptcy Code.  Because a key element of a good faith finding is that the Buyers' successful bid is not the product of fraud or collusion

between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair

advantage of other bidders, the Selling Debtor Entities further request that this Court make a

finding that the transactions contemplated by the Agreement are not avoidable under section

363(n) of the Bankruptcy Code.

U.    Relief From Transfer Taxes Under Section 1146(c) Of the Bankruptcy Code

72.    Bankruptcy Code section 1146(c) provides that "[t]he issuance, transfer,

or exchange of a security, or the making or delivery of an instrument of transfer under a plan

confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp

tax or similar tax."  11 U.S.C. § 1146(c).  This language has been construed to include transfers

pursuant to a sale outside of, but in furtherance of effectuating, a reorganization plan.  See City

of New York v. Jacoby-Bender, Inc. (In re Jacoby-Bender, Inc.), 758 F.2d 840, 842 (2d Cir.

1985) (holding that when transfer is necessary to consummation of plan, transfer is "under a

plan" within meaning of section 1146(c)); In re United Press Int'l, Inc., No. 91 B 13955, 1992

Bankr. LEXIS 842, at *4 (Bankr. S.D.N.Y. May 18, 1992) (holding that section 1146(c)

exemption applied to section 363 sale in instance in which it found "the value of the Debtor's

assets . . . likely to deteriorate [during] time necessary to . . . confirm a plan"); In re Beulah

Church of God In Christ Jesus, Inc., 316 B.R. 41, 50-51 (Bankr. S.D.N.Y 2004) (stating that

determination of applicability of section 1146(c) exemption depends on whether transfers are

in view of, and integral to, a Chapter 11 plan that is subsequently confirmed); City of New

York v. Smoss Enters. Corp. (In re Smoss Enters. Corp.), 54 B.R. 950, 951 (E.D.N.Y. 1985)

(stating that section 1146(c) was designed to reach transfer of assets, on which "plan hinged

and which the court had to approve prior to the confirmation").

73.    As set forth above, as part of their transformation plan, the Selling

Debtor Entities have identified non-core product lines, including the Interiors and Closures

38

Businesses, that do not fit into the company's future strategic framework, and have planned to

sell or wind-down these product lines.  As mentioned above, on September 6, 2007, the

Debtors filed the Plan.  Section 7.30 of the Plan contemplates the Debtors selling assets outside

the Plan, but obtaining relief as if such divestitures were part of the Plan.  Thus, this sale

process may continue after a plan has already been filed, which would squarely satisfy <u>Beaulah

Church</u>.  <u>See</u> <u>Beulah Church</u>, 316 B.R. at 50-51.  In light of the foregoing, the Selling Debtor

Entities submit that the Sale should be exempt under section 1146(c) of the Bankruptcy Code

from any stamp, transfer, sales, recording, or similar taxes.

V.    <u>The Assumption And Assignment Of The Assumed U.S. Contracts</u>

      74.    Section 365(f)(2) of the Bankruptcy Code provides that:

> The trustee may assign an executory contract or unexpired lease of the debtor
> only if –
>
> (A)    the trustee assumes such contract or lease in accordance with the
> provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such
> contract or lease is provided, whether or not there has been a default in such
> contract or lease.

11 U.S.C. § 365(f)(2).

      75.    Under section 365(a) of the Bankruptcy Code a debtor, "subject to the

court's approval, may assume or reject any executory contract or unexpired lease of the

debtor."  11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the

requirements for assuming an unexpired lease or executory contract of a debtor.  It provides:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of
> the debtor, the trustee may not assume such contract or lease unless, at the time
> of the assumption of such contract or lease, the trustee –
>
> (A)    cures, or provides adequate assurance that the trustee will
> promptly cure, such default;

39

     (B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

     (C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

     76.     Courts give the phrase "adequate assurance of future performance" a "practical, pragmatic construction." EBG Midtown S. Corp. v. Mcharen/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992), aff'd, 993 F.2d 300 (2d Cir. 1993) (presence of adequate assurance should be "determined under the facts of each particular case"); see also In re Fifth Ave. Originals, 32 B.R. 648, 652 (Bankr. S.D.N.Y. 1983) (holding that adequate assurance was furnished on two separate grounds). Courts have consistently held that the phrase does not require total assurances. See In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) ("[I]t does not mean absolute insurance that the debtor will thrive and make a profit."); In re Prime Motor Inns, Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) (although no single solution will satisfy every case, the required assurance will fall "considerably short of an absolute guaranty of performance"). In fact, adequate assurance has been provided by demonstrating the Buyers' financial health and experience in managing the type of enterprise or property assigned. See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance existed when prospective assignee of lease from debtor had financial resources and had expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

     77.     To the extent that any defaults exist under any prepetition executory contract or unexpired lease that is to be assumed and assigned in connection with the sale of the Purchased Assets or any portion thereof, the Selling Debtor Entities would cure any such

default.  As set forth above, Renco affiliates generate revenue in excess of $3.5 billion annually.  The Buyers have the financial resources to perform under the Assumed U.S. Contracts.  Moreover, if necessary, the Selling Debtor Entities will adduce facts at the Sale Hearing demonstrating the financial wherewithal of the Buyers or the Successful Bidder, as the case may be, their experience in the industry, and their willingness and ability to perform under the contracts to be assumed and assigned to them.

78.    The Sale Hearing therefore will provide this Court and other parties-in-interest ample opportunity to evaluate and, if necessary, challenge the ability of the Buyers or the Successful Bidder(s) to provide adequate assurance of future performance under the contracts to be assumed.  This Court therefore should have a sufficient basis to authorize the Selling Debtor Entities to assume and assign the Assumed U.S. Contracts as set forth in the Agreement.

W.    Conclusion

79.    The Selling Debtor Entities submit that the granting of the Bidding Procedures, Bid Protections, and Notice Procedures, the setting of a Sale Hearing, and the entry of an order approving the Sale of the Purchased Assets free and clear of liens, claims, and encumbrances, the assumption and assignment of the Assigned Contracts, and the assumption of the Assumed Liabilities by the Buyers or the Successful Bidder (as the case may be) are in the best interests of the Selling Debtor Entities' estates and will maximize value for all stakeholders.

## Notice

80.     Notice of this Motion has been provided in accordance with the

Supplemental Case Management Order and the Amended Eighth Supplemental Order Under

11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014

Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And

Administrative Procedures, entered October 26, 2006 (Docket No. 5418).  Specifically, the

Selling Debtor Entities have provided notice of this Motion on the Master Service List (as

defined in the Supplemental Case Management Order), each party who filed a notice of

appearance or request for documents in accordance with Bankruptcy Rule 2002, and all entities

known to have expressed an interest in a transaction with respect to the Purchased Assets

during the past 14 months.  Further, after entry of the Bidding Procedures Order, notice with

respect to the Motion and Sale would be provided in accordance with the Notice Procedures

described herein.  In addition, the Debtors have complied with the Supplemental Case

Management Order with respect to the filing of this Motion and the need for expedited relief.[25]

In light of the nature of the relief requested, the Debtors submit that no other or further notice

is necessary.

## Memorandum Of Law

81.     Because the legal points and authorities upon which this Motion relies

are incorporated herein, the Selling Debtor Entities respectfully request that the requirement of

the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the

---

[25]    The Debtors have noticed this Motion for the omnibus hearing on October 25, 2007.  In compliance with the
terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the
Creditors' Committee regarding the relief sought in this Motion as well as the timing of its filing.  The
Debtors have been informed that the Creditors' Committee has consented to this Motion being heard on
October 25, 2007.  Because this Motion is being filed on less than 20 days' notice, parties-in-interest will have
until October 22, 2007 to file an objection to entry of the Bidding Procedures Order.

Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of

New York be deemed satisfied.

WHEREFORE the Selling Debtor Entities respectfully request that this Court

enter an order (a) (i) approving the Bidding Procedures, (ii) granting the Bid Protections, (iii)

approving the Notice Procedures, and (iv) setting the Sale Hearing, (b) approving (i) the Sale

of the Purchased Assets free and clear of liens, claims, and encumbrances to the Buyers or to

the Successful Bidder, (ii) the assumption and assignment of the Assigned Contracts to the

Buyers or the Successful Bidder, and (iii) the assumption of the Assumed Liabilities by the

Buyers or the Successful Bidder, and (c) granting them such other and further relief as is just.

Dated:          New York, New York
                October 15, 2007
                                        SKADDEN, ARPS, SLATE, MEAGHER
                                         & FLOM LLP


                                        By:    /s/ John Wm. Butler, Jr.
                                              John Wm. Butler, Jr. (JB 4711)
                                              John K. Lyons (JL 4951)
                                              Ron E. Meisler (RM 3026)
                                        333 West Wacker Drive, Suite 2100
                                        Chicago, Illinois 60606
                                        (312) 407-0700

                                                - and -


                                        By:    Kayalyn A. Marafioti
                                              Kayalyn A. Marafioti (KM 9632)
                                              Thomas J. Matz (TM 5986)
                                        Four Times Square
                                        New York, New York 10036
                                        (212) 735-3000

                                        Attorneys for Delphi Corporation, et al.,
                                         Debtors and Debtors-in-Possession