## **Exhibit D**

**Sale And Purchase Agreement**

**MASTER SALE AND PURCHASE AGREEMENT**

**AMONG**

**DELPHI CORPORATION**

**AND**

**INTEVA PRODUCTS, LLC**

**DATED AS OF**

**October 15, 2007**

## TABLE OF CONTENTS

PAGE NO.

1.    DEFINITIONS ...................................................................................................1
      1.1    Certain Defined Terms ..............................................................................1
      1.2    Other Interpretive Provisions ...................................................................19
2.    PURCHASE AND SALE...............................................................................19
      2.1    Transfers by Sellers and their Affiliates ..................................................19
      2.2    Assumption of Liabilities Regarding Acquired Assets .............................21
      2.3    Retained Liabilities .................................................................................22
      2.4    Deferred Items .......................................................................................23
3.    PURCHASE PRICE; ADJUSTMENT; ALLOCATION.............................25
      3.1    Deposit Amount ......................................................................................25
      3.2    Preliminary Purchase Price .....................................................................25
      3.3    Preparation of Closing Inventory Statement............................................26
      3.4    Preliminary Purchase Price Adjustments ................................................27
      3.5    Allocation of Purchase Price ...................................................................30
4.    REPRESENTATIONS AND WARRANTIES OF SELLERS....................30
      4.1    Organization ...........................................................................................30
      4.2    Authorization; Enforceability...................................................................30
      4.3    JV Companies .........................................................................................31
      4.4    Financial Statements ..............................................................................33
      4.5    No Conflicts or Approvals .......................................................................34
      4.6    Sufficiency of Acquired Assets ...............................................................34
      4.7    Compliance with Law; Permits ................................................................35
      4.8    Proceedings ...........................................................................................35
      4.9    Absence of Certain Changes...................................................................35
      4.10   Tax Matters ............................................................................................35
      4.11   Employee Benefits ..................................................................................35
      4.12   Intellectual Property................................................................................36
      4.13   Contracts ................................................................................................37
      4.14   Environmental Matters ............................................................................38
      4.15   Insurance................................................................................................40
      4.16   Personal Property Assets, Inventory .......................................................40
      4.17   Real Property ..........................................................................................41
      4.18   No Brokers' Fees ....................................................................................42
      4.19   No Other Representations or Warranties ..................................................42
      4.20   Fair Disclosure .......................................................................................42
5.    REPRESENTATIONS AND WARRANTIES OF BUYERS....................42
      5.1    Organization ...........................................................................................42
      5.2    Authorization; Enforceability...................................................................42
      5.3    No Conflicts or Approvals .......................................................................43
      5.4    Proceedings ...........................................................................................43
      5.5    Solvency.................................................................................................43
      5.6    Anti-Money Laundering ...........................................................................43
      5.7    Investment Representations.....................................................................44
      5.8    No Inducement or Reliance; Independent Assessment .............................44
      5.9    Financial Ability ......................................................................................45
      5.10   Adequate Assurance of Future Performance ...........................................45
      5.11   No Brokers' Fees ....................................................................................45
      5.12   Compliance with Laws ............................................................................45
6.    COVENANTS AND AGREEMENTS ...........................................................45
      6.1    Conduct of Business between Signing and Closing...................................45
      6.2    Bankruptcy Actions.................................................................................47
      6.3    Assumed U.S. Contracts; Cure Amounts .................................................47

|        | 6.4  | Non-Competition ................................................................................48 |
|        | 6.5  | Tax Matters; Cooperation; Preparation of Returns; Tax Elections ..............49 |
|        | 6.6  | Employees Matters................................................................................51 |
|        | 6.7  | Contact with Customers and Suppliers .....................................................58 |
|        | 6.8  | Technical Documentation ......................................................................58 |
|        | 6.9  | Books and Records and Litigation Assistance From and After Closing .......59 |
|        | 6.10 | Corporate Names ................................................................................60 |
|        | 6.11 | Intellectual Property Licenses................................................................61 |
|        | 6.12 | Intentionally Omitted .............................................................................62 |
|        | 6.13 | Competition Clearance..........................................................................63 |
|        | 6.14 | Further Actions ....................................................................................64 |
|        | 6.15 | Further Assurances ..............................................................................64 |
|        | 6.16 | Shared Items Transferred to Buyers; Transfer Pricing................................64 |
|        | 6.17 | Buyer's Financing Activities....................................................................64 |
|        | 6.18 | Agency Designation .............................................................................65 |
|        | 6.19 | Customs Duties ....................................................................................65 |
|        | 6.20 | Intracompany Transfers ........................................................................65 |
|        | 6.21 | Environmental Due Diligence .................................................................65 |
|        | 6.22 | Transfer of Environmental Permits .........................................................66 |
|        | 6.23 | Removal of Personal Property from Certain Locations ...............................66 |
|        | 6.24 | Mexican Newco ....................................................................................66 |
|        | 6.25 | Certain Confidentiality Agreements .........................................................67 |
|        | 6.26 | JV Companies Post-Closing Payments....................................................67 |
|        | 6.27 | Names Selected by Business for Post-Closing Usage................................67 |
|        | 6.28 | Troy Technical Center Landlord Estoppel and Nondisturbance..................68 |
|        | 6.29 | Certain Acquired Assets Located in Mexico .............................................68 |
| **7.** | **CONDITIONS TO CLOSING** ...........................................................**68** |
|        | 7.1  | Conditions to Obligations of Seller and Buyer ..........................................68 |
|        | 7.2  | Conditions to Obligations of Buyer .........................................................69 |
|        | 7.3  | Conditions to Obligations of Sellers........................................................70 |
| **8.** | **CLOSING**..........................................................................................**70** |
|        | 8.1  | Closing Time and Date ..........................................................................70 |
|        | 8.2  | Ancillary Agreements ............................................................................70 |
|        | 8.3  | Seller's Deliveries at Closing .................................................................72 |
|        | 8.4  | Buyer's Deliveries at Closing .................................................................72 |
| **9.** | **TERMINATION** ..................................................................................**73** |
|        | 9.1  | Termination ..........................................................................................73 |
|        | 9.2  | Break-Up Fee; Expense Reimbursement..................................................74 |
|        | 9.3  | Procedure and Effect of Termination........................................................76 |
| **10.**| **BIDDING PROCEDURES**..................................................................**76** |
|        | 10.1 | Delphi Initial Bankruptcy Actions ...........................................................76 |
|        | 10.2 | Qualified Bidder....................................................................................76 |
|        | 10.3 | Bid Deadline ........................................................................................77 |
|        | 10.4 | Due Diligence .......................................................................................78 |
|        | 10.5 | Bid Requirements .................................................................................78 |
|        | 10.6 | Qualified Bids .......................................................................................78 |
|        | 10.7 | Bid Protection .......................................................................................79 |
|        | 10.8 | Auction, Bidding Increments and Bids Remaining Open.............................80 |
|        | 10.9 | Acceptance of Qualified Bids .................................................................81 |
|        | 10.10| Sale Hearing .........................................................................................81 |
|        | 10.11| Return of Good Faith Deposit.................................................................81 |
|        | 10.12| Reservation of Rights ............................................................................82 |
| **11.**| **LIABILITY, INDEMNIFICATION** ........................................................**82** |
|        | 11.1 | Limitations of Liability ...........................................................................82 |
|        | 11.2 | Survival.................................................................................................82 |

| | 11.3 | Indemnification | 82 |
|---|---|---|---|
| | 11.4 | Environmental Matters | 84 |
| | 11.5 | Indemnification Procedures | 88 |
| | 11.6 | Mitigation | 89 |
| | 11.8 | Dispute Resolution | 90 |
| **12.** | **MISCELLANEOUS** | | **90** |
| | 12.1 | Fees and Expenses | 90 |
| | 12.2 | Bulk Sales Laws | 90 |
| | 12.3 | Payments in Dollars | 90 |
| | 12.4 | Amendment | 90 |
| | 12.5 | Assignment | 90 |
| | 12.6 | Waiver | 91 |
| | 12.7 | Notices | 91 |
| | 12.8 | Entire Agreement | 92 |
| | 12.9 | Counterparts | 92 |
| | 12.10 | Publicity | 92 |
| | 12.11 | Headings | 92 |
| | 12.12 | Severability | 92 |
| | 12.13 | Third Parties | 92 |
| | 12.14 | Governing Law | 93 |
| | 12.15 | Venue and Retention of Jurisdiction | 93 |
| | 12.16 | Risk of Loss | 93 |
| | 12.17 | Enforcement of Agreement | 93 |

## MASTER SALE AND PURCHASE AGREEMENT

**THIS MASTER SALE AND PURCHASE AGREEMENT**, dated as of October 15**, 2007** between **DELPHI CORPORATION,** a Delaware corporation ("**Delphi**") on behalf of itself and the other entities set forth on Schedule 1, and **INTEVA PRODUCTS, LLC**, a Delaware limited liability company, on behalf of itself and the other buyers set forth on Schedule 1 (each a "**Buyer**" and, collectively, the "**Buyers**"):

**WHEREAS,** Delphi, through its Affiliates referred to in this Agreement, is engaged in the Business (as hereinafter defined);

**WHEREAS,** the Securities Sellers (as hereinafter defined) own, directly or indirectly, the Sale Securities (as hereinafter defined);

**WHEREAS,** the Asset Sellers (as hereinafter defined) own the Acquired Assets (as hereinafter defined);

**WHEREAS,** on October 8, 2005 (the "**Petition Date**"), the Filing Affiliates (as hereinafter defined) filed voluntary petitions for relief (the "**Bankruptcy Cases**") under Chapter 11 of Title 11, U.S.C. §§ 101 et seq. (as then amended) (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"); and

**WHEREAS,** as contemplated by Sections 363, 365 and 1146 of the Bankruptcy Code, the Securities Sellers and the Asset Sellers desire to sell to the Buyers all of their right, title and interest in and to the Purchased Assets (as hereinafter defined), and Buyers desire to make such purchase, subject to and in accordance with the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the premises and the representations, warranties, covenants and agreements contained in this Agreement and other good and valuable consideration, and intending to be legally bound, the Parties agree:

1.    **DEFINITIONS:**

    **1.1    Certain Defined Terms.**  As used in this Agreement, the following terms have the meanings set forth below or in the sections referred to below:

"**Accounts Payable**" means all trade accounts payable and other obligations to pay suppliers and third parties to the extent arising from the conduct of the Business or relating to the Acquired Assets, including intercompany payables and all trade accounts payable  to the extent not settled prior to the Closing Date.

"**Accounts Receivable**" means all trade accounts receivable and other rights to payment from customers to the extent arising from the conduct of the Business or relating to the Acquired Assets, including Intercompany Receivables and all other accounts or notes receivable, including customer payments owed to a Seller in connection with tools acquired on behalf of a customer, and the full benefit of all security for such accounts or notes, to the extent not paid prior to the Closing Date.

"**Acquired Assets**" – Section 2.1.2.

"**Administrative Assets**" mean books, records and other administrative assets primarily used or held for use in the Business, including advertising and promotional materials, catalogues, price lists, correspondence, mailing lists, photographs, production data, sales materials and records, purchasing materials and records, personnel records of employees, billing records, accounting records, other financial records and sale order files; provided, however, that Administrative Assets does not include Intellectual Property or Technical Documentation.

"**Affiliate**" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.  For purposes of this definition, "control" means the possession, directly or indirectly or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs or management policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"**Agreement**" means this Master Sale and Purchase Agreement (including the Schedules and Exhibits referred to herein, each of which is incorporated herein by reference), as amended, modified or supplemented from time to time.

"**Allocation**" – Section 3.5.1.

"**Alternate Bid(s)**" – Section 10.10.

"**Alternate Bidder(s)**" – Section 10.10.

"**Alternative Transaction**" – Section 9.2.1.

"**Ancillary Agreement(s)**" means the Transfer Agreements and other agreements referred to in Section 8.2.

"**Asset Buyer(s)**" means the Buyers set forth on Schedule 1, with respect to the assets related to the manufacturing facilities, technical centers, technology and warehouses set forth opposite their names.

"**Asset Seller(s)**" means the Sellers set forth on Schedule 1, with respect to the assets related to the Manufacturing Facilities, technical centers, technology and warehouses set forth opposite their names.

"**Assumed Liabilities**" – Section 2.2.

"**Assumed U.S. Contracts**" – Section 6.3.

"**Auction**" – Section 10.8.

"**Bankruptcy Cases**" – Recitals.

"**Bankruptcy Code**" – Recitals.

"**Bankruptcy Court**" – Recitals.

2

"**Bankruptcy Rules**" mean the U.S. Federal Rules of Bankruptcy Procedure.

"**Benchmark Inventory Amount**" means the amount set forth in the statement of Inventory of the Business as of December 31, 2006, attached as <u>Schedule 3.3.1</u>.

"**Benefit Guarantee Term Sheet**" – Section 6.6.1.H

"**Bid Deadline**" – Section 10.3.

"**Bidder Confidentiality Agreements**" – Section 6.25.

"**Bidding Procedures**" – Section 10.1.

"**Bidding Procedures Order**" means the order of the Bankruptcy Court approving the Bidding Procedures and certain provisions of this Agreement, including, but not limited to, Buyers' right, under the terms and conditions set forth hereafter, to a Break-Up Fee or Expense Reimbursement.

"**Bidding Process**" – Section 10.1.

"**Break-Up Fee**" – Section 9.2.1.B.

"**Business**" means the design, testing, manufacture, development, marketing and sale of the Products by the Asset Sellers at the Manufacturing Facilities and Technical Centers and Sales Offices, except for the Excluded Assets and the JV Companies.

"**Business Day**" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the City of New York.

"**Buyer(s)**" – Recitals.

"**Buyer Indemnified Parties**" – Section 11.3.2.

"**Buyers' Representative**" – Section 6.18.

"**Cap Amount**" **-** Section 11.3.2.B.

"**Cash**" means the sum of cash, cash equivalents and liquid investments plus all deposited but uncleared bank deposits and less all outstanding checks and electronic payments of the Business.

"**Cash Contribution**" means the tax effected at a rate of thirty-eight percent (38%), per unit cash flow, where cash flow equals per unit revenue less per unit: material cost, labor cost and plant burden cost (excluding depreciation and amortization).  In the case where the low cost country site is an existing facility of the Business, plant burden cost refers only to the Incremental Plant Burden required to support the Columbus products at that site.

"**Claims**" mean all Losses, Liabilities, claims (as defined in Section 101 of the Bankruptcy Code), damages or expenses (including reasonable legal fees and expenses) whatsoever, whether known or unknown, fixed, liquidated, contingent or otherwise.

"**Closing**" – Section 8.1.

"**Closing Date**" – Section 8.1.

"**Closing Inventory**" -  Section 3.4.1.A.

"**Closing Inventory Statement**" means the statement of Inventory of the Business (as adjusted in accordance with this Agreement) as of 11:59 P.M. (Eastern Standard Time) on the Closing Date, which statement will be prepared and delivered in accordance with Section 3.3.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Bargaining Agreements**" mean all collective bargaining agreements with any labor union, works council or other representative of Transferred Employees (including local agreements, amendments, supplements, letters and memoranda of understanding of any kind).

"**Columbus Latch Operations**" – Section 3.4.3.A.

"**Columbus Manufacturing Services Agreement**" means a manufacturing services agreement pursuant to which Delphi or its Affiliate will manufacture Buyers' requirements for those Products currently manufactured or contemplated to be manufactured at Delphi's Columbus, Ohio Manufacturing Facility, using machinery, equipment and tooling to be owned by Buyers.

"**Combined Business**" means the Business and Sellers' ownership interests in the JV Companies.

"**Commitment Letter**" – Section 5.9.

"**Committee**" – Section 10.3.

"**Competent Authority**" means a person, agency, department or subdivision thereof having governmental authority under an applicable Environmental Law, and/or a court or tribunal of competent jurisdiction.

"**Competition/Investment Law**" means any Law that is designed or intended to prohibit, restrict or regulate: (i) foreign investment; or (ii) antitrust, monopolization, restraint of trade or competition.

"**Competitive Business**" – Section 6.4.1.

"**Compliance Matter**" means an event, condition, activity, practice, action or omission at any Manufacturing Facility (other than the Grosspetersdorf, Austria, Vandalia, Ohio and Columbus, Ohio facilities) which gives rise to a breach or violation of an Environmental Law, but which excludes Environmental Contamination.

"**Confidential Information Memorandum**" means the Confidential Information Memoranda dated August 2006, relating to the Business.

"**Confidentiality Agreement**" means the confidentiality agreements between The Renco Group, Inc. and Delphi relating to the Sale, dated September 5, 2006 and September 6, 2006.

4

"**Consent**" means any consent, approval, authorization, waiver, permit, agreement, license, certificate, exemption, order, registration, declaration, filing or notice of, with or to any Person, or the expiration or termination of the waiting period under any Competition/Investment Law, in each case required to permit the consummation of any of the transactions contemplated by this Agreement.

"**Contracts**" mean purchase orders, sales agreements, service contracts, distribution agreements, sales representative agreements, employment or consulting agreements, Software licenses, leases, product warranty or service agreements and other binding commitments, agreements, arrangements and undertakings of any nature.

"**Controlled Group Liability**" means any and all liabilities (i) under Title IV of ERISA, (ii) under Section 302 of ERISA, (iii) under Sections 412 and 4971 of the Code, (iv) as a result of a failure to comply with the continuation coverage requirements of Section 601 et seq. of ERISA and Section 4980B of the Code, and (v) under corresponding or similar provisions of foreign laws or regulations.

"**Copyrights**" mean: (i) copyrights existing anywhere (registered, statutory or otherwise) and registrations, renewals, revivals, reissuances, extensions and applications for registration thereof, and all rights therein provided by international treaties or conventions; (ii) moral rights (including, without limitation, rights of paternity and integrity), and waivers of such rights by others; (iii) database and data protection rights whether or not based on copyright; (iv) semiconductor chip mask work registrations and applications therefore; and (v) rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Corporate Trademark Rights**" means Trademark Rights used both in the Business and in other businesses conducted directly or indirectly by Delphi.

"**CPA Firm**" – Section 3.3.3.

"**CRFMs**" means condenser radiator fan modules included in Seller's HVAC operations.

"**Cure Amounts**" mean all cure amounts payable in order to cure any monetary defaults required to be cured under Section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by Filing Affiliates and assignment to Buyers of the Assumed U.S. Contracts under the Sale Approval Order.

"**Data Room**" means the data room(s) in which the documents and information related to the Business, the Acquired Assets and JV Companies were disclosed to Buyers' representatives and counsel.

"**Debt Obligations**" mean obligations for borrowed money as evidenced by bonds, debentures, notes, financing or capital (as opposed to operating) leases and other similar instruments, letters of credit, performance bonds, bid bonds and other sureties of any kind or nature, and all guaranties of any of the foregoing.

"**Deductible Amount**" - Section 11.3.2.B.

"**Defending Party**"  - Section 11.7.

"**Deferred Items**" – Section 2.4.1.

"**Delphi**" – Recitals.

"**Demanding Party**" – Section 11.7.

"**Deposit Amount**" – Section 3.1.

"**Deposit Escrow Agreement**" means the Deposit Escrow Agreement referred to in Section 8.2.5, dated as of the date hereof, executed by and among Buyers' Representative, Delphi and Escrow Agent concurrently with this Agreement.

"**EBITDA**" – Section 3.4.3.

"**EC Merger Regulation**" means Council Regulation (EEC) 4064/89 of the European Community, as amended.

"**Effects MOU**" – Section 6.6.2.

"**Employee Benefit Plan**" means any pension, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive or deferred compensation, hospitalization, severance, vacation, sick leave, fringe or welfare benefits, any employment or consulting Contracts, collective bargaining agreements, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals, and written or binding oral statements of policies, practices or understandings relating to employment; provided, however, that for purposes of Section 4.11.2 and the first sentence of Section 4.11.3, "**Employee Benefit Plan**" shall not include oral statements of policies, practices or understandings.

"**Encumbrance**" means: (i) with respect to the Sale Securities or the equity interests in Mexican Newco, any voting trust, shareholder agreement, proxy or other similar restriction; and (ii) with respect to any property or asset (including the Sale Securities or any other shares of capital stock owned by Sellers, Buyers or their respective Affiliates) any lien, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction or a similar law relating to security interests in and over personal property).

"**Environment**" means the following media (whether individually or commingled): air, water, surface water, groundwater (whether an aquifer or water below the surface of the ground), and ground (whether at the surface or below the surface) and all organisms, ecosystems, flora, and natural resources.

"**Environmental Claim**" means a Proceeding by any Person alleging Liability arising from: (i) the existence of, exposure to or a Release of Hazardous Materials; (ii) noncompliance with any Environmental Law; or (iii) Environmental Contamination.  The term "**Environmental Claim**" shall include any claim by any Governmental Authority for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and any claim by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from the presence of

Hazardous Materials   or arising from alleged injury or threat of injury to health or the Environment, but shall not include claims by employees or other persons pursuant to any occupational safety and health act or regulation.

"**Environmental Contamination**" means the presence of a Hazardous Material at, in, under, on or about the Environment above applicable regulatory criteria or in violation of applicable Environmental Laws.

"**Environmental Damages**" means Losses arising under or pursuant to any Environmental Law or Environmental Claim, but in all cases excluding Losses deemed consequential or loss of profit.

"**Environmental Law**" means all Laws applicable to the conduct and the operation of the Business, or to any current or prior activity conducted on the Real Property, in force on or prior to the Closing Date, and relating to: (i) pollution; (ii) the management, handling, generation, treatment, storage, disposal or release of, or exposure to, Hazardous Materials; or (iii) the protection of the Environment, public health or natural resources.  Without limiting the generality of the foregoing, Environmental Laws include the federal Comprehensive Environmental Response, Compensation and Liability Act, the federal Resource Conservation and Recovery Act and the Michigan Natural Resources and Environmental Protection Act, all as amended, but shall not include claims by employees or other persons pursuant to any occupational safety and health act or regulation.

"**Environmental Permits**" mean any licenses, permits, authorizations and approvals issued by any Governmental Authority and required to be obtained or maintained by the Business in respect of the Acquired Assets under Environmental Laws material to the conduct and the operation of the Business.

"**Equityholders' Committee**" – Section 10.3.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**Escrow Agent**" means the escrow agent under the Deposit Escrow Agreement.

"**Excluded Assets**" – Section 2.1.3.

"**Excluded Products**" – Section 2.1.3.M.

"**Excluded Software**" means the Software identified on Schedule 2.1.3.O(iii).

"**Expense Reimbursement**" – Section 9.2.2.

"**Filing Affiliates**" mean Delphi and the following Affiliates of Delphi, each of which are included in the Bankruptcy Cases and operate certain portions of the Business or are Asset Sellers and/or Securities Sellers: Delphi Automotive Systems LLC, Delphi Automotive Systems (Holding), Inc. and Delphi Technologies, Inc.

"**Final Inventory Statement**" – Section 3.3.3.

"**Financial Statements**" – Section 4.4.

"**Foreign Operations**" mean the operations of the Business other than by any of the Filing Affiliates.

"**Future Unaudited Financial Statements**" – Section 4.4

"**GAAP**" means United States generally accepted accounting principles and practices as in effect from time to time.

"**Good Faith Deposit**" – Section 10.5.3.

"**Governmental Approval**" means any Consent of, with or to any Governmental Authority.

"**Governmental Authority**" means any United States or foreign federal, state, provincial or local government or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"**Governmental Order**" means, with respect to any Person, any judgment, order, writ, injunction, decree, stipulation, agreement, determination or award entered or issued by or with any Governmental Authority and binding on such Person.

"**Grievances**" - Section 6.6.7.

"**Grosspetersdorf Manufacturing Services Agreement**" means a manufacturing services agreement pursuant to which Delphi or its Affiliate will manufacture Buyers' requirements for those Products currently manufactured at Delphi's Grosspetersdorf, Austria Manufacturing Facility, using machinery, equipment and tooling to be owned by Buyers.

"**Hazardous Materials**" means any substance, element, mixture, chemical, constituent, waste, pollutant, contaminant, or material which is regulated or can give rise to Liabilities or Losses under an Environmental Law or an Environmental Permit, including asbestos, petroleum or petroleum-based or petroleum-derived compounds, polychlorinated biphenyls, and noxious, radioactive, flammable, ignitable, toxic, corrosive, reactive or caustic compounds or materials (whether solid, liquid or gaseous).

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"**HVAC**" means heating, ventilation and air conditioning.

"**Hybrid CrossCar Beam**" means an element of an automobile structure that provides the structural support for the vehicle cockpit incorporating additional features/functions through over-molded plastic content resulting in decreased mass and/or size of the ultimate cockpit.

"**Inactive Employees**" – Section 6.6.3.A

"**Income Statements**" – Section 4.4.

8

"**Incremental Plant Burden**" means additional expenses: (i) directly incurred by Buyer or its subsidiaries in connection with the low cost country site to which Columbus Products are relocated in order to manufacture Columbus Products at such site; and (ii) not included in the Financial Statements.

"**Indemnifiable Losses**" – Section 11.3.1

"**Indemnification Claim**" **-** Section 11.5.4.A

"**Individual Claim Amount**" **-** Section 11.3.2.B.

"**Intellectual Property**" means Patent Rights, Trademark Rights, Copyrights, Software, Trade Secrets and Know-How.

"**Intercompany Receivables**" mean the right of any Seller or its Affiliates to payment and performance of any Liabilities of the Business.

"**Inventory**" means finished goods, raw materials, work-in-process, packaging, stores, stock, supplies and other inventory, primarily used or held for use in the Business wherever located.

"**IUE-CWA**" means the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers AFL-CIO, the Industrial Division of the Communications Workers of America and its Local Union Number 711 (Gadsden).

"**JV Audited Financial Statements**" – Section 4.3.5.

"**JV Company(ies)**" means the following joint ventures which are engaged in the manufacture, development and sale of Products: Shanghai Delphi Automotive Door Systems, Co., Limited and KDS Company, Ltd.

"**JV Financial Statements**" – Section 4.3.5.

"**JV Licensed Intellectual Property**" – Section 4.3.11.

"**JV Material Contracts**" – Section 4.3.12.

"**JV Owned Intellectual Property**" – Section 4.3.11.

"**JV Partner Consent**" means any required consent and waiver of any right of first refusal from the partner in each JV Company to Delphi's sale of the Sale Securities.

"**Know-How**" means proprietary technical and business knowledge and information, regardless of whether recorded and, if recorded, regardless of the media in which it is recorded, such knowledge and information including specifications, designs, methodologies, processes and production techniques resulting from research and development, technology, manufacturing and production processes, research and development information, drawings, specifications, designs, plans, proposals, technical data, vendor and marketing and business data and customer and vendor lists and information, whether or not confidential.

"**Knowledge of Buyers**" or "**Buyers' Knowledge**" (or a similar phrase) means the actual knowledge, after reasonable inquiry of the individuals listed on Schedule 1.1.A, without imputation of the knowledge of any other Person.

"**Knowledge of Sellers**" or "**Sellers' Knowledge**" (or a similar phrase) means the actual knowledge, after reasonable inquiry of the individuals listed on Schedule 1.1.B, without imputation of the knowledge of any other Person; provided, however, that: (i) for purposes of Section 4.14 (Environmental Matters), "**Knowledge of Sellers**" or "**Sellers' Knowledge**" means the actual knowledge of: (a) the Divisional Environmental Manager, after reasonable inquiry of those individuals who, in the ordinary course of their employment with Delphi, would be expected to have knowledge of the matters addressed in Section 4.14 hereof, as listed on Schedule 1.1B; and (b) such listed individuals, in any case, without imputation of the knowledge of any other Person; and (ii) for purposes of Section 4.3 (JV Companies), "**Knowledge of Sellers**" or "**Sellers' Knowledge**" means the actual knowledge of the business line executive of the Combined Business and the chief financial officers of the JV Companies, without imputation of the knowledge of any other Person.

"**Law**" means any and all applicable laws, rules, regulations, directives, decrees, treaties, statutes, provisions of any constitution and principles (including principles of the common law) of any Governmental Authority, as well as any applicable Governmental Order.

"**Leased U.S. Hourly Employees**" – Section 6.6.1.H

"**Leased Real Property**" – Section 4.17.1.

"**Liabilities**" mean any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on- or off- balance sheet, including those arising under any Law, Claim, Governmental Order, Contract or otherwise.

"**Licensed Intellectual Property**" means Sellers' rights with respect to Intellectual Property (exclusive of Software) licensed or sublicensed to Sellers from a third party, and that is used in, or conceived for use in, the Business, including Licensed Intellectual Property listed in Schedule 4.13.1, but excluding Sublicensed Intellectual Property.

"**Losses**" mean any and all claims, Liabilities, losses, damages, fines, penalties and costs (in each case including reasonable out-of-pocket expenses (including reasonable attorneys', accountants', technical consultants', engineers' and experts' fees and expenses)).

"**Management Presentations**" mean the presentations, expert meetings, site visits and question and answer sessions, provided by Delphi and Sellers (and their advisers and counsel) to the Buyers (and their advisers and counsel), with respect to the Business, the Acquired Assets and the JV Companies in view of the transactions contemplated herein.

"**Manufacturing Facilities**" means the Business' manufacturing facilities located at Matamoros, Mexico; Columbus, Ohio; Vandalia, Ohio; Woerth, Germany; Grosspetersdorf, Austria; Adrian, Michigan; Gadsden, Alabama; Cottondale, Alabama; North Kansas City, Missouri; and Orion, Michigan, each of which is singly referred to as a "**Manufacturing Facility**".

10

"**Marked Agreement**" – Section 10.5.2.

"**Material Adverse Effect**" means any change, occurrence or development that has, or is reasonably likely to have, a material adverse effect on the business, assets, Liabilities (except to the extent assumed or retained by Sellers' hereunder), results of operations, financial condition or prospects of the Combined Business, taken as a whole, but excludes any effect: (i) resulting from general economic or business conditions not disproportionately affecting the Combined Business; (ii) resulting from any changes in any Law, or in GAAP or any foreign generally accepted accounting principles; (iii) that is cured by the Sellers before the date of any termination of this Agreement by Buyers' Representative pursuant to Section 9.1 hereof; (iv) resulting from the negotiation, announcement or performance of this Agreement or the transactions contemplated hereby, including by reason of the identity of any Buyer or communication by any Buyer or its Affiliates of its plans or intentions regarding operation of the Business; (v) resulting from any act or omission of any Seller taken with the prior consent of any Buyer; (vi) resulting from the regulatory status of any Buyer; (vii) resulting from any act of God or other *force majeure* type event not disproportionately affecting the Combined Business relative to the competitors of the Combined Business; or (viii) resulting from acts of war or terrorism, whether or not directed at the Combined Business or Buyer.

"**Material Contracts**" – Section 4.13.1.

"**Mexican Newco**" – Section 6.24.

"**MDEQ**" – Section 6.21.

"**Net Benefit**" – Section 3.4.3.C(ii).

"**Net Cash**" means, for each JV Company, Cash less Debt Obligations (pro-rated based on Sellers' percentage ownership interest). In the event that the Debt Obligations of a JV Company exceed its Cash, the net amount of such Debt Obligations will be referred to as "**Net Debt**".

"**Net Relocation Investment**" – Section 3.4.3.C(iv).

"**NKC Manufacturing Services Agreement**" means a Manufacturing Services Agreement pursuant to which the Buyer of the North Kansas City, Missouri Manufacturing Facility will manufacture CRFMs currently manufactured at such facility for Delphi and/or its Affiliates.

"**Notice**" - Section 11.7.

"**NRB Payment Formula**" – Section 3.4.3.C(i).

"**NRB Statement**" – Section 3.4.3.B(i).

"**NRBA**" – Section 3.2.2.

"**Non-U.S. Employees**" means the employees (salaried and hourly) who are employed by Sellers primarily in the Business in a country other than the United States immediately prior to the Closing and identified on Schedule 4.11.1.[1]

"**Objection**" – Section 3.3.2.

"**OEM**" means automotive original equipment manufacturer.

"**OFAC**" – Section 5.6.

"**Ordinary Course of Business**" means, in all material respects, the usual, regular and ordinary course of a business consistent with the past practice thereof.

"**Organizational Document**" means, as to any Person, its certificate or articles of incorporation, its regulations or by-laws or any equivalent documents under the law of such Person's jurisdiction of incorporation or organization.

"**Owned Intellectual Property**" means Intellectual Property in and to which Sellers or any of their respective Affiliates hold, or have a right to hold, in whole or in part, any right, title and interest.

"**Owned Real Property**" – Section 4.17.2.

"**Partial Assignment Purpose**" – Section 6.25.

"**Party(ies)**" means Delphi and/or Buyers' Representative.

"**Patent Rights**" mean: (i) patentable inventions, whether or not reduced to practice, and whether or not yet made the subject of a pending patent application or applications; (ii) designs, ideas and conceptions of patentable subject matter, including, without limitation, any invention disclosures and inventor certificates, whether or not reduced to practice and whether or not yet made the subject of a pending patent application or applications; (iii) national (including the United States) and multinational statutory invention and design registrations, patents and patent applications (including provisionals, substitutions, reissues, divisions, continuations, continuations-in-part, extensions and reexaminations) and all rights therein provided by international treaties or conventions; and (iv) rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Permits**" – Section 4.7.

"**Permitted Encumbrance**" means: (i) security interests relating to vendor tooling arising in the Ordinary Course of Business; (ii) Encumbrances in favor of any Sellers' pre-Petition Date secured lenders and post-Petition Date secured lenders which, upon Closing, will attach to the proceeds of the Sale attributable to the sale of the assets of the Filing Affiliates in the same order and priority that the Encumbrances attached to the assets of the Filing Affiliates, subject to

---

[1]    All hourly and salaried employees of the manufacturing facilities (other than Vandalia, Grosspetersdorf and Columbus), including those on leave status, will be included in the Sale, except that with respect to employees at the technical centers in Wuppertal and Juarez, only those employees of the Business will be transferred.

all existing defenses and other objections; (iii) any Encumbrance that may be created by or on behalf of Buyers, including in the case of Mexican Newco, mutually agreed Encumbrances; (iv) in relation to Real Property: (a) Encumbrances relating to any current real estate or ad valorem taxes or assessments not yet delinquent or being contested in good faith by appropriate Proceedings; (b) mechanic's, materialmen's, laborer's and carrier's liens and other similar liens arising by operation of law or statute in the Ordinary Course of Business for obligations which are not delinquent and which will be paid or discharged prior to Closing in the Ordinary Course of Business; (c) matters which an ALTA survey, or a similar survey in any other country, would disclose; (d) rights of the public and adjoining property owners in streets and highways abutting and adjacent to the Real Property; (e) easements, covenants, restrictions and other encumbrances of public record (except that encumbrances set forth on <u>Schedule 4.17.2</u> would be removed at Closing); and (f) such other Encumbrances, the existence of which, in the aggregate, would not materially interfere with or materially affect the use of the respective underlying asset to which such Encumbrances relate as used on the Closing Date; and (vi) in the case of Sale Securities of the JV Companies, restrictions contained in the joint venture agreement, shareholders agreement or related agreements affecting such Sale Securities.

"**Person**" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, joint venture, limited liability company, Governmental Authority or other entity.

"**Personal Property**" means tangible personal property primarily used or held for use in the Business, including production machinery, equipment, tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, related spare parts, business machines, computer hardware and other information technology assets, office furniture and fixtures, in-factory vehicles, trucks, model shop equipment, laboratory test fixtures and other tangible personal property, whether located on the Real Property, at the place of business of a vendor or elsewhere; provided, however, that the Personal Property does not include Intellectual Property or Technical Documentation.

"**Petition Date**" – Recitals.

"**Post-Closing Compliance Matter**" means a Compliance Matter occurring after the Closing Date.

"**Post-Closing Environmental Contamination**" means Environmental Contamination that results from an act, omission or event that occurs after the Closing Date.

"**Post-Closing Tax Period**" means any taxable period (or portion thereof) beginning after the close of business on the Closing Date.

"**Post-Petition Contracts**" mean the Contracts of the Filing Affiliates relating to the Business entered into by such Filing Affiliates on or after the Petition Date.

"**Post-Termination Alternative Transaction Purchase Price**" – Section 9.2.1.B.

"**Potential Bidder**" – Section 10.2.

"**Pre-Closing Compliance Matter**" means a Compliance Matter occurring on or prior to the Closing Date.

"**Pre-Closing Environmental Contamination**" means Environmental Contamination that: (i) results from an act, omission or event that occurs on or prior to the Closing Date; or (ii) is a result of the presence of Hazardous Materials that were generated or used in the operation of the Business prior to the Closing Date.

"**Post-Closing Payments**" – Section 3.4.4.

"**Pre-Closing Tax Period**" means any taxable period (or portion thereof) ending on or before the close of business on the Closing Date.

"**Pre-Closing Wastes**" – Section 11.4.1.B.

"**Pre-Petition Contracts**" mean the Contracts of the Filing Affiliates relating to the Business entered into by such Filing Affiliates before the Petition Date.

"**Preliminary Purchase Price**" – Section 3.2.1.

"**Price Adjustment**" – Section 3.2.2.

"**Proceeding**" means any action, claim, demand, suit, proceeding, citation, summons, subpoena, inquiry or investigation of any nature, civil, criminal, regulatory or otherwise, in law or in equity, by or before any Governmental Authority.

"**Product(s)**" means latches and door modules, Transferred Cinching Products, and instrument panels and cockpit modules of the Business, other than Excluded Products.

"**Product Warranty Claims**" – Section 2.2.2.

"**Productive Inventory**" means Inventory consisting of finished Products, as well as work-in-process or raw materials incorporated into Products.

"**Property Taxes**" – Section 6.5.3.

"**Purchase Price**" – Section 3.4.4.

"**Purchased Assets**" means the Acquired Assets and the Sale Securities.

"**Purchased Intellectual Property**" means Sellers' right, title and interest in Owned Intellectual Property, other than Shared Intellectual Property, that is used in, or conceived for use in, the Business, including the Intellectual Property listed in Schedule 4.12.1.A and Schedule 4.12.1.B.

"**Qualified Bid**" – Section 10.6.6.

"**Qualified Bidder**" – Section 10.2.

"**Real Property**" means the Owned Real Property and the Leased Real Property.

"**Release**" means any spill, emission, leaking, leaching, dumping, seeping, escape, disposal, placement, burial or discharge of any Hazardous Materials at, in, onto, under or through the Environment.

"**Relevant Items**" – Section 3.3.2.

"**Relocation Net Cash Flow Benefit**" – Section 3.4.3.c(iii).

"**Remedial Works**" means the works, designs, investigations and activities carried out by a Party in relation to Environmental Contamination or Compliance Matters, but excluding expenses of investigating information for the purposes of making a claim for indemnification under this Agreement.

"**Remediation Standards**" means standards which are: (i) the minimum criteria or standards under Environmental Laws, including use of risk assessment methodologies where permitted, in existence as of the time of completion of any Remedial Works to which such standards apply; and (ii) applicable to the industrial use and operations at the Real Property as carried out at the Closing Date.

"**Remedy**" - Section 11.4.3.A.

"**Required Bid Documents**" – Section 10.5.

"**Restricted Parties**" – Section 6.6.10.

"**Restricted Period**" – Section 6.4.1.

"**Retained Cinching Products**" - Section 6.11.3.B.

"**Retained Cinching Products Intellectual Property**" - Section 6.11.3.B.

"**Retained Liabilities**" – Section 2.3.

"**Return Date**" – Section 10.11.

"**Sale**" means the sale, assignment and transfer of the Purchased Assets from Sellers to Buyers in accordance with this Agreement and the relevant Transfer Agreements.

"**Sale Approval Order**" means an order or orders of the Bankruptcy Court entered pursuant to Sections 363 and 365 of the Bankruptcy Code, the form and substance of which is reasonably satisfactory to Buyer, authorizing and approving, among other things, the Sale free and clear of all Encumbrances on Purchased Assets sold by a Filing Affiliate, other than Permitted Encumbrances.

"**Sale Hearing**" – Section 10.9.

"**Sale Motion**" means the motion filed by Delphi with the Bankruptcy Court for entry of the Sale Approval Order.

"**Sale Securities**" mean the shares of the JV Companies, as set forth on Schedule 4.3.2 to this Agreement.

"**SDN List**" – Section 5.6.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Securities Buyer(s)**" means the Buyers set forth on <u>Schedule 1</u>, with respect to the Sale Securities of the JV Company set forth opposite their names.

"**Securities Seller(s)**" means the Sellers set forth on <u>Schedule 1</u>, with respect to the Sale Securities of the JV Company set forth opposite their names.

"**Seller(s)**" means Delphi and/or the relevant Asset Sellers or Securities Sellers (including Filing Affiliates and non-Filing Affiliates that are Sellers) with respect to the relevant Acquired Assets or Sale Securities, as appropriate with respect to the portion of the Business and the context in which such term is used.

"**Seller Tax Liabilities**" means all Taxes relating to Acquired Assets, the operations, employees, assets or income of the Asset Sellers for the Pre-Closing Tax Period and the portion of the Straddle Period allocated to Seller under Section 6.5.3.

"**Shared Intellectual Property**" means Owned Intellectual Property (other than Corporate Trademark Rights and Excluded Software) that is used in, or conceived for use in, the Business and in one or more other businesses conducted directly or indirectly by Delphi or an Affiliate but is not used or conceived for use primarily in the Business.

"**Significant Customer(s)**" – Section 4.13.3.

"**Software**" means computer software and programs, including source code, shareware, firmware, middleware, courseware, open source code, operating systems and specifications, system data, record and table layouts, databases, files documentation, storage media, manuals and other materials related thereto.

"**SOP**" – Section 3.4.3.A

"**Straddle Period**" – Section 6.5.3.

"**Sublicensed Intellectual Property**" means Sellers' rights with respect to the Intellectual Property listed in <u>Schedule 6.11.1</u> and any other Intellectual Property (exclusive of Software) licensed or sublicensed to Sellers from a third party, and that is used in, or conceived for use in, the Business but is not primarily used or held for use in the Business.

"**Subsequent Bid**" – Section 10.6.6.

"**Successful Bid(s)**" – Section 10.8.6.

"**Successful Bidder(s)**" – Section 10.8.6.

"**Tax**" or "**Taxes**" means any federal, state, local or foreign taxes of any kind, including but not limited to those measured on, measured by or referred to as, income, alternative or add-on minimum, gross receipts, escheat, capital, capital gains, capital stock, sales, use, *ad valorem*, franchise, profits, license, privilege, transfer, withholding, payroll, employment, withholding on amounts paid to or by the taxpayer, unemployment, disability, social security, social, excise, severance, stamp, occupation, premium, goods and services, value added,

property, environmental or windfall profits taxes, customs, duties or similar fees, assessments or charges of any kind whatsoever,  together with any interest and any penalties, additions to tax or additional amounts imposed by any Governmental Authority.

"**Tax Claim**" means any Claim related to Tax or Taxes.

"**Tax Return**" means any return (including estimated returns), report, declaration, form, election letter, statement, claim for refund or other information required to be filed with any Governmental Authority with respect to Taxes, including any schedule or attachment thereto or amendment thereof.

"**Taxing Authority**" means, with respect to any Tax, the Governmental Authority thereof that imposes such Tax and the agency, court or other body (if any) charged with the interpretation, administration or collection of such Tax for such Governmental Authority.

"**Technical Centers and Sales Offices**" means the technical and customer support centers located at Troy, Michigan; Vandalia, Ohio; Juarez, Mexico; Stuttgart, Germany; Wuppertal, Germany; and Wolfsburg, Germany.

"**Technical Documentation**" means all documented technical information owned by Sellers that is currently in the files of the Business or primarily used in the Business, in each case pertaining to the design or manufacture of the Products.

"**Third Party**" or "**third party**" means any person not a Party, Buyer, Seller or a Competent Authority.

"**Trade Secrets**" mean: (i) all forms and types of financial, business, scientific, technical, economic, manufacturing or engineering information, including patterns, plans, compilations, specifications, tooling, program devices, formulas, designs, prototypes, testing plans, methods, techniques, processes, procedures, programs, customer and vendor lists, pricing and cost data, whether tangible or intangible, and regardless of whether or how stored, compiled or memorialized physically, electronically, graphically, photographically or in writing, if the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public, and (ii) confidential technical and business information (including ideas, formulas, compositions, inventions and conceptions of inventions whether patentable or un-patentable and whether or not reduced to practice); and (iii) all rights to sue or recover and retain damages, costs and attorneys' fees for present and past misappropriation of any of the foregoing.

"**Trademark Rights**" mean: (i) trademarks, trade names and service marks; (ii) the goodwill associated with trademarks, trade names and service marks; (iii) registrations and applications for registration of trademarks, trade names and service marks; and (iv) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Transfer Agreement(s)**" – Section 8.2.2.

"**Transfer Regulation**" means any Law pursuant to which the employment of any employee of an Asset Seller (or any employee of any other Affiliate of Delphi, except for the JV Companies, who is dedicated to the Business) will transfer to a Buyer in connection with the transactions contemplated by this Agreement, including pursuant to Directive 77/187/EC of the

European Parliament and council and any Law adopted pursuant thereto, and any Law, works council or union agreement otherwise relating to the delivery of information to or consultation with employees or their representatives in connection with the transactions contemplated by this Agreement.

"**Transfer Taxes**" – Section 6.5.5.

"**Transferred Cinching Products**" - Section 6.11.3.A.

"**Transferred Employees**" means all U.S. Employees and Non-U.S. Employees who accept a Buyer's offer of employment or otherwise transfer to Buyers pursuant to Transfer Regulations or Sections 6.6.1.A or 6.6.1.B, but excluding in all cases employees of either of the JV Companies other than seconded employees of any Delphi Affiliate referred to in Section 6.6.1.A.

"**Transferred Non-U.S. Employees**" means all Transferred Employees who are Non-U.S. Employees.

"**Transferred U.S. Employees**" means all Transferred Employees who are either U.S. Hourly Employees or U.S. Salaried Employees.

"**Transition Services Agreement**" – <u>Exhibit 8.2.3</u>.

"**Troy Technical Center Sublease**" – <u>Exhibit 8.2.11</u>.

"**UAW**" means the International Union, United Automobile, Aerospace and Agricultural Works of America and its Local Unions Number 2083 (Cottondale) and 2031 (Adrian).

"**Union Consents**" means waiver by the Unions of any "no sale" provisions contained in any of the Seller U.S. Collective Bargaining Agreements.

"**Union(s)**" means the UAW and IUE-CWA.

"**U.S. Employees**" means U.S. Hourly Employees and U.S. Salaried Employees.

"**U.S. Hourly Employees**" means the hourly employees represented by the UAW, and IUE-CWA of the Adrian, Michigan; Gadsden, Alabama; or Cottondale, Alabama Manufacturing Facilities who are employed by Sellers primarily in the Business (in the case of Adrian, Michigan, including HVAC employees) in the United States immediately prior to the Closing and identified on <u>Schedule 4.11.1</u>.

"**U.S. Salaried Employees**" means the salaried employees and hourly non-union employees who are employed by Sellers primarily in the Business in the United States immediately prior to the Closing and identified on <u>Schedule 4.11.1</u>.

"**USA Patriot Act**" – Section 5.6.

"**Vandalia Lease**" means a lease substantially in the form of <u>Exhibit 8.2.10</u> hereto.

"**Vandalia Manufacturing Services Agreement**" means a Manufacturing Services Agreement pursuant to which Delphi or its Affiliate will manufacture Buyers' requirements for

those Products currently manufactured at Delphi's Vandalia, Ohio Manufacturing Facility, using machinery, equipment and tooling to be owned by Buyers.

**1.2    Other Interpretive Provisions.**  The words "**hereof**", "**herein**" and "**hereunder**" and words of similar import when used in this Agreement refer to this Agreement as a whole (including any Schedules hereto) and not to any particular provision of this Agreement, and all Article, Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.  The words "**include**", "**includes**" and "**including**" are deemed to be followed by the phrase "without limitation."  The meanings given to terms defined herein are equally applicable to both the singular and plural forms of such terms.  Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms.  Except as otherwise expressly provided herein, all references to "**dollars**" or "**$**" are deemed references to the lawful money of the United States of America, and all references to "**euros**" or "**€**" are deemed references to the lawful money of the European Economic and Monetary Union.  References to undertakings by the "**Buyer(s)**" or the "**Seller(s)**" are understood to be undertakings by the relevant Buyer to perform, and by the relevant Seller to perform, as the case may be.

**2.    PURCHASE AND SALE:**

**2.1    Transfers by Sellers and their Affiliates:**

**2.1.1    Purchase and Sale of the Sale Securities.**  Upon the terms and subject to the conditions set forth in this Agreement as modified or supplemented by any applicable Transfer Agreement, on the Closing Date, the Securities Sellers will sell, transfer, assign, convey and deliver to the Securities Buyers, and the Securities Buyers will purchase, accept and acquire, the Sale Securities free and clear of all Encumbrances except Permitted Encumbrances.

**2.1.2    Purchase and Sale of the Acquired Assets.**  Upon the terms and subject to the conditions set forth in this Agreement as modified or supplemented by any applicable Transfer Agreement, on the Closing Date, the Asset Sellers will sell, transfer, assign, convey and deliver to the Asset Buyers, and the Asset Buyers will purchase, accept and acquire from the Asset Sellers, free and clear of all Encumbrances except Permitted Encumbrances, all of the assets and properties described in the next sentence (collectively, the "**Acquired Assets**"), subject in each case to Section 2.1.3.  The Acquired Assets consist of all of Asset Sellers' right, title and interest in and to the non-cash assets primarily used or held for use in the Business (other than the Excluded Assets), including: Real Property, Personal Property, Inventory, Contracts, Administrative Assets, Permits, Purchased Intellectual Property, Licensed Intellectual Property, Technical Documentation and Software that is specifically listed as "included" on Schedule 2.1.3.O(iii), in each case primarily used or held for use in the Business; provided that, with respect to the Technical Centers and Sales Offices, the Acquired Assets will consist only of the assets specifically set forth in Schedule 2.1.2.  Except for the Acquired Assets, the Asset Sellers will retain all other assets, properties, rights and interests owned, used or held by the Asset Sellers.

**2.1.3    Excluded Assets.**  Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreements, the following properties and assets will not be included in the Acquired Assets (the "**Excluded Assets**"):

**A.    Third Party Assets.**  Any machinery, equipment, tools, Inventory, tooling, dies, molds, patterns, jigs, gauges, production fixtures, special material handling equipment, customer dunnage and containers owned by an OEM or any other third party, including third party bailed assets, in each case as set forth in Schedule 2.1.3.A or, in the case of tooling, as will be set forth on Schedule 2.1.3.A at least fifteen (15) days before Closing (such tooling Schedule to be reasonably satisfactory to Buyers' Representative); provided however, that any Contracts or other rights the Asset Sellers have pertaining to such bailed assets will be transferred as part of the Acquired Assets.

**B.    Intellectual Property.**  Corporate Trademark Rights, Shared Intellectual Property and Sublicensed Intellectual Property (except for the limited rights granted to the Buyers pursuant to Sections 6.10 and 6.11).

**C.    Financial Assets.**  All Cash and Accounts Receivable of the Business as of Closing.

**D.    Insurance.**  Insurance coverage and insurance policies relating to the operations of the Business, including any and all claims and rights thereunder and the proceeds thereof and all prepaid insurance premiums.

**E.    Claims.**  All claims, defenses, causes of action or claims of any kind relating to either Excluded Assets or Retained Liabilities.

**F.    Tax Refunds, Returns.**  All tax refunds, credits, prepayments or deferred tax assets, and Tax Returns and work papers relating thereto for time periods prior to Closing.

**G.    Bankruptcy Rights.**  All of the rights and claims of the Filing Affiliates available to Filing Affiliates under the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the Bankruptcy Code, and any related claims and actions arising under such sections by operation of law or otherwise, including any and all proceeds of the foregoing.

**H.    Personnel Records.**  All work histories, personnel and medical records of employees and former employees of any Seller who worked at any time for any reason at the Business for whom a record exists at the Business at the time of Closing; provided, however, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, the appropriate Buyer(s) will be provided the originals of all personnel and medical records of all Transferred Employees after posted written notice or other appropriate notice to such Transferred Employees if legally required or if Sellers so elects.  All such personnel and medical records of Transferred Employees are books and records governed by Section 6.9 of this Agreement.  Upon written request of Sellers (or an Affiliate of Sellers), Buyer will promptly return or cause to be returned any and all of these records to Sellers (or an Affiliate of Sellers as directed) at which time Sellers, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, will provide the appropriate Buyer(s) with copies of the personnel and medical records of such employees.  If an employee objects to provision of personnel or medical records to any Buyer, the records will not be

provided, except to the extent Sellers determine that provision of the records to such Buyer over the objections by the employee is permitted by the applicable local law without adverse consequences to Sellers or to any Affiliate of Sellers.

**I.**    **Privileged Information and Materials**.  Information and materials protected by the attorney-client privilege (or its equivalent in jurisdictions outside the United States), or that, in the case of environmental-related documents, Sellers consider to be proprietary information.

**J.**    **Technical Centers and Sales Offices**.    All real property (including any improvements located thereon) and Personal Property located at the Technical Centers and Sales Offices, other than those assets which are specifically set forth on Schedule 2.1.2.

**K.**    **Certain Real Property and Personal Property**.  (i) Real Property at Columbus, Ohio; and (ii) Real Property and Personal Property at Vandalia, Ohio and Grosspetersdorf, Austria other than Personal Property used primarily in the Business.

**L.**    **Additional Excluded Personal Property**.    All assets, business lines, rights, Contracts and claims, wherever located, whether tangible or intangible, relating primarily to HVAC products, including machinery, equipment, Inventory and tooling of the HVAC assembly line located at Adrian, Michigan; and the CRFM operations located at North Kansas City, Missouri.

**M.**    **Excluded Products**.  All assets, business lines, rights, Contracts and claims, wherever located, whether tangible or intangible, real or personal relating primarily to power products, Retained Cinching Products or HVAC products and related assets (collectively, "**Excluded Products**").

**N.**    **Common Delphi Services**.    Subject to the provisions of the Transition Services Agreement, common Delphi services, if any, including legal, insurance, accounting, finance, tax and information technology and support.

**O.**    **Inventory and Other Assets**.  (i) All Inventory, products, rights, properties, assets and businesses of the Business which will have been transferred or disposed of by Sellers prior to Closing in the Ordinary Course of Business; (ii) any document, information, Permit, Contract, Intellectual Property or other asset the transfer of which is prohibited by any Law and in each case which is listed on Schedule 2.1.3.O(ii); (iii) all computer hardware, equipment, Software and other assets, in each case as are listed on Schedule 2.1.3.O(iii);and (iv) Vehicles assigned to Transferred Employees under Seller's company vehicle program and pooled vehicles.

**2.1.4**  **Post-Closing Asset Deliveries**.    Should Sellers, in their reasonable discretion, determine after the Closing that books, records or other materials constituting Acquired Assets are still in the possession of Sellers or any of its Affiliates, Sellers will or will cause such Affiliates to promptly deliver them to Buyers at no cost to Buyers. Should Sellers or Buyers, in their reasonable discretion, determine after the Closing that books, records or other materials constituting Excluded Assets were delivered to Buyers, Buyers will promptly return them to Sellers at no cost to Sellers.

**2.2** **Assumption of Liabilities Regarding Acquired Assets.**   The Buyers will assume, and will thereafter pay, perform and discharge as and when due, and will be liable with respect to only the following Liabilities of the Asset Sellers specifically referred to in this Section 2.2 (collectively, the "**Assumed Liabilities**"):

**2.2.1**   All Liabilities of the Asset Sellers arising under any Contracts, licenses, permits, leases and other agreements included in the Acquired Assets and assigned or otherwise transferred to Buyers or any relevant Buyer Affiliate pursuant to the terms of this Agreement or the Transfer Agreements and other obligations relating to any Buyer's ownership or use of the Acquired Assets, in each case arising on or after the Closing Date;

**2.2.2**   Recognizing that Seller will assign its rights against third party manufacturers, all Liabilities arising out of, resulting from or relating to product warranty or product return with respect to Products sold on, before or after Closing, including all Liabilities arising from, caused by or related to any obligation to implement any replacement, field fix, retrofit, modification or recall campaign with respect to any Product (collectively, "**Product Warranty Claims**") made, designed, manufactured, assembled, installed, sold, leased or licensed (whether or not any such Products are manufactured or shipped before or after Closing) by Sellers or any of its predecessors except that with respect to Products shipped before Closing, Buyer would be responsible only for: (i) Product Warranty Claims made after thirty-six (36) months following the Closing; and (ii) providing replacement Products at  cost (without mark-up) for Product Warranty Claims that are Seller's responsibility under this Agreement, provided that Buyer has the ability to manufacture and capacity is available (including current orders and new business awards) for no more than six (6) months in the aggregate per defect type – otherwise Buyer may charge such costs plus ten percent (10%) profit;

**2.2.3**   All Liabilities in the nature of general, automobile and product liability, arising on or after Closing, including any Liability for Claims made for injury to persons and/or property arising from, in each case caused by or arising out of the design, manufacture or assembly of any Product shipped on or after Closing, and any Liability arising from, caused by or arising out of any defective or insufficient warnings, labeling or instructions contained on or provided in connection with any such Products;

**2.2.4**   Any and all Environmental Claims or Environmental Damages relating to: (i) Post-Closing Environmental Contamination; (ii) Post-Closing Compliance Matters; or (iii) the operation of the Business after the Closing Date in violation of any Environmental Laws or any Environmental Permit, whether in effect prior to or after the Closing Date;

**2.2.5**   Any and all Tax Claims, to the extent that they arise out of or relate to the period after Closing;

**2.2.6**   Liabilities with respect to Transferred Employees as set forth in Section 6.6; and

**2.2.7**   All Liabilities that any Buyer assumes or agrees to pay for or be responsible for pursuant to the terms of any Ancillary Agreement or as required by Law due to the transfer of the Business to the Buyers.

**2.3**      **Retained Liabilities.**  Except as referred to in Section 2.2, Buyer will not assume or be deemed to have assumed, and will have no Liability with respect to, any other Liabilities of any Asset Seller, and any such Asset Seller will continue to be responsible for such Liabilities, including, without limitation, the following Liabilities (collectively, "**Retained Liabilities**"):

**2.3.1**   Accounts Payable of the Business as of Closing;

**2.3.2**   All Liabilities of the Asset Sellers arising under any Contracts, licenses, permits, leases and other agreements included in the Acquired Assets and assigned or otherwise transferred to Buyers or any relevant Buyer Affiliate pursuant to the terms of this Agreement or the Transfer Agreements and other obligations relating to any Buyer's ownership or use of the Acquired Assets, in each case arising prior to the Closing Date;

**2.3.3**   Product Warranty Claims made against the Business within thirty-six (36) months following the Closing with respect to Products shipped before the Closing;

**2.3.4**   All Liabilities in the nature of general, automobile and product liability arising before Closing, including any Liability for Claims made for injury to persons and/or property, arising from, caused by or arising out of the manufacture or assembly of any Product shipped before Closing, and any Liability arising from, caused by or arising out of any defective or insufficient warnings, labeling or instructions contained on or provided in connection with any such Products;

**2.3.5**   Any and all Environmental Claims or Environmental Damages relating to: (i) Pre-Closing Environmental Contamination; (ii) Pre-Closing Compliance Matters; or (iii) compliance with or failure to comply with any Environmental Laws or any Environmental Permit related to the operation of the Business prior to the Closing Date, including the liabilities referred to in Schedule 4.14.

**2.3.6**   Liabilities in respect of employment performed prior to the Closing (except as otherwise provided in Section 6.6), Controlled Group Liabilities and Liabilities under Seller Employee Benefit Plans;

**2.3.7**   Seller Tax Liabilities;

**2.3.8**   Any Liability of Sellers arising prior to the Closing Date for administrative fees and expenses that are "allowed administrative expenses" under Section 503(b) of the Bankruptcy Code;

**2.3.9**   Liabilities related to the Excluded Assets; and

**2.3.10**  Except as expressly provided in Section 2.2, any Liability of the Asset Sellers arising out of, relating to, or incurred in connection with the businesses retained by the Asset Sellers and which are not arising out of, relating to or incurred in connection with the Business.

**2.4**      **Deferred Items:**

**2.4.1**      **Non-Assignability.**  To the extent that any Contract or Permit included in the Acquired Assets is not capable of being assigned (whether pursuant to Section 365 of the Bankruptcy Code or, if inapplicable, then pursuant to the terms of such Contract or

other applicable law) to Buyer at the Closing without the Consent of the issuer thereof or the other party thereto or any third party (or a Governmental Authority), or if such assignment or attempted assignment would constitute a breach thereof, or a violation of any Law ("**Deferred Item(s)**"), this Agreement will not constitute an assignment thereof, or an attempted assignment, unless any such Consent is obtained.

2.4.2   **Efforts to Obtain Necessary Consents.**   At Buyer's request, the applicable Seller will, at its expense, use commercially reasonable efforts, and the applicable Buyer will, at its expense, cooperate with Sellers, to obtain the necessary Consents and to resolve the impracticalities of assignment referred to in Section 2.4.1 before or after the Closing.

2.4.3   **If Consents Cannot be Obtained.**   To the extent that the Consents referred to in Section 2.4.1 are not obtained by the applicable Seller, or until the impracticalities of assignment referred to therein are resolved, Sellers' sole responsibility with respect to such matters, notwithstanding Section 2.1.2, will be to use, during the twelve (12) month period commencing with the Closing, commercially reasonable efforts, at no transfer, assignment or similar cost to Sellers, to: (i) provide to Buyer the benefits of any Deferred Item; (ii) cooperate in any reasonable and lawful arrangement designed to provide such benefits to Buyer, without incurring any financial obligation to Buyer; and (iii) enforce for the account of Buyer and at the cost of Buyer any rights of Sellers arising from any Deferred Item referred to in Section 2.4.1 against such issuer thereof or other party or parties thereto.

2.4.4   **Obligation of Buyer to Perform.**   To the extent that Buyer is provided the benefits pursuant to Section 2.4.3 of any Deferred Item, Buyer will perform, on behalf of Sellers, for the benefit of the issuer thereof or the other party or parties thereto (including payment obligations) the obligations of Sellers thereunder or in connection therewith and if Buyer will fail to perform to the extent required herein, Sellers, without waiving any rights or remedies that they may have under this Agreement or applicable Laws, may suspend their performance under Section 2.4.3 in respect of the instrument which is the subject of such failure to perform unless and until such situation is remedied; or Sellers may perform at Buyer's sole cost and expense, in which case Buyer will reimburse Sellers' costs of such performance immediately upon receipt of an invoice therefore. Buyers will reimburse Sellers and will hold Sellers harmless from and against all Liabilities, incurred or asserted as a result of Sellers' post-Closing direct or indirect ownership, management or operation of the Deferred Items on behalf of Buyers.

2.4.5   **Standard of Care.**   Sellers will have no Liability to any Buyer arising out of the provision of the benefits of the Deferred Items other than for gross negligence or willful misconduct and will have no Liability for actions taken in accordance with the request or direction of Buyer Parent or its Affiliates. Buyers will reimburse Sellers and will hold Sellers harmless from and against all Liabilities, incurred or asserted as a result of Sellers' post-Closing direct or indirect ownership, management or operation of the Deferred Items.

2.5   **JV Company Liabilities.**   Notwithstanding anything to the contrary herein, no Liabilities of the JV Companies will be affected by this Agreement.  The Liabilities of the JV Companies will remain the Liabilities of the JV Companies and neither Sellers nor Buyers will have any obligation for such Liabilities or otherwise with respect to the JV Companies.

3.    **PURCHASE PRICE; ADJUSTMENT; ALLOCATION:**

    **3.1    Deposit Amount.**  Immediately upon receipt of notice that the condition referred to in Section 7.1.6 has been received, Buyers' Representative will deliver to the Escrow Agent pursuant to the terms of the Deposit Escrow Agreement Two Million Dollars ($2,000,000.00) in immediately available funds (such amount, together with the interest accrued thereon prior to the Closing, the "**Deposit Amount**"), to be held by the Escrow Agent in an interest bearing account reasonably acceptable to Buyers' Representative to serve as an earnest money deposit under this Agreement, and to be released in accordance with the following procedures (which procedures will be set forth in the Deposit Escrow Agreement):

    **3.1.1**    Delphi and Buyers' Representative will jointly instruct the Escrow Agent to deliver the Deposit Amount on the Closing Date, by wire transfer of immediately available funds, to an account designated by Delphi in the Deposit Escrow Agreement;

    **3.1.2**    Upon any material breach by a Buyer of this Agreement or the Bidding Procedures which results in termination of this Agreement, Delphi and Buyers' Representative will jointly instruct the Escrow Agent to deliver the Deposit Amount, in accordance with the terms of the Deposit Escrow Agreement, by wire transfer of immediately available funds, to an account designated by Delphi in the Deposit Escrow Agreement, to be retained by Delphi; or

    **3.1.3**    Upon termination of this Agreement in accordance with the termination provisions set forth in Article 9 for any reason other than a Buyer breach, then, on: (i) the date which is ten (10) days after such termination; or (ii) in the event that an Alternative Transaction is completed, the Return Date (which ever is earlier) Delphi and Buyers' Representative will jointly instruct the Escrow Agent to deliver the Deposit Amount, by wire transfer of immediately available funds, to an account designated by Buyer's Representative in the Deposit Escrow Agreement, to be retained by Buyers.

    **3.2    Preliminary Purchase Price:**

    **3.2.1**    On the Closing Date and subject to the terms and conditions of this Agreement, in consideration of the Sale, Buyers' Representative, on behalf of Buyers, will pay to Delphi or the Sellers designated by Delphi an amount equal to Seventy Eight Million Dollars ($78,000,000.00) (such amount plus the Deposit Amount, the "**Preliminary Purchase Price**").  The Parties understand and agree that the amount of the Purchase Price allocated to the Sales Securities identified in the China Share Transfer Agreement must be paid in local currency to the account designated by the applicable Seller.

    **3.2.2**    The Preliminary Purchase Price will be subject to a "**Price Adjustment**" for certain defined items, as more specifically described in Section 3.4.    Price Adjustment consists of only: (i) as of Closing, changes in Inventory balance between the date of the Benchmark Inventory Amount and Closing (taking into account the amounts relating to the Productive Inventory to be bought back from Buyers pursuant to Section 3.4.1.B); and (ii) the Net Relocation Benefit Amounts ("**NRBA**"), if any, that may be paid under the mechanism described in Section 3.4.3 below.

**3.3**    **Preparation of Closing Inventory Statement**:

**3.3.1**    Within sixty (60) days after the Closing Date, Delphi will prepare and deliver to Buyers' Representative a Closing Inventory Statement.  The Closing Inventory Statement will be based on a physical inventory of the Inventory of the Business, and utilizing a methodology, and accounting therefor, in accordance with GAAP consistent with the methodology used in determining the Benchmark Inventory Amount (attached as Schedule 3.3.1), to be taken jointly by the Parties within thirty (30) Business Days after the Closing Date, consistent with past practice, except that, with respect to Productive Inventory, any such Inventory reasonably expected not to be used within one (1) year after Closing will be deemed to have no value.  Each Party's out-of-pocket costs associated with such physical inventory count will be borne separately by such Party. Buyers will, after Closing and pending agreement or final determination of the Closing Inventory Statement, allow Delphi and its Affiliates and their accountants, agents and advisers such access to the Business, all relevant employees and all relevant records, information and other documentation (and will, upon request, provide copies thereof) as is reasonably necessary to enable Sellers to prepare the Closing Inventory Statement and to settle the Final Inventory Statement, including access to and the services of key personnel.

**3.3.2**    Buyers' Representative will, within thirty (30) days after the delivery by Delphi of the Closing Inventory Statement, complete its review of such statement.   If Buyers' Representative disagree with the Closing Inventory Statement, Buyers' Representative will, on or before the last day of such thirty (30) day period, inform Delphi in writing (the "**Objection**") of disagreements which in the aggregate exceed $100,000 (collectively, "**Relevant Items**").  Any Objection will specify in reasonable detail the nature of any disagreement so asserted, and include all supporting schedules, analyses, working papers and other documentation.  If: (i) no such Objection has been timely provided to Seller; or (ii) the sum of all Relevant Items fails to exceed $100,000, then: (a) the Closing Inventory Statement will be deemed to be the Final Inventory Statement; and (b) Sellers' calculations will be final and binding on the Parties of all items therein.

**3.3.3**    Delphi will then have thirty (30) days following the date it receives the Objection to review and respond to the Objection.  If Delphi and Buyers' Representative are unable to resolve all of their disagreements with respect to the determination of the foregoing items by the fifteenth (15th) day following Delphi's response thereto, after having used their good faith efforts to reach a resolution, they will refer their remaining differences to Grant Thornton   (the "**CPA Firm**"), who will, acting as experts in accounting and not as arbitrators, determine on a basis consistent with the requirements of Section 3.3, and only with respect to the specific Relevant Items remaining disputed, whether and to what extent, if any, the Closing Inventory Statement requires adjustment. Delphi and Buyers' Representative will request the CPA Firm to use its commercially reasonable efforts to render its determination within thirty (30) days.  In resolving any disputed item, the CPA Firm: (i) will be bound by the principles set forth in this Section 3.3 and Schedule 3.3.3; (ii) will limit its review to matters specifically set forth in the Objection that remain disputed; and (iii) will not assign a value to any item greater than the greatest value for such item claimed by either Party or less than the smallest value for such item claimed by either Party.  The CPA Firm's determination will be conclusive and binding upon Delphi and Buyers.  Delphi and Buyers will make reasonably available to the CPA Firm all relevant books and records, any work papers (including those of the Parties' respective accountants subject to any conditions such

accountants may impose) and supporting documentation relating to the Closing Inventory Statement, and all other items reasonably requested by the CPA Firm.  The "**Final Inventory Statement**" will be: (i) the Closing Inventory Statement if the Parties so agree or if so determined in accordance with Section 3.3.2; or (ii) if an Objection is made under Section 3.3.2, the Closing Inventory Statement, as adjusted pursuant to the agreement of the Parties, or as adjusted by the CPA Firm.  The fees, costs and expenses of the CPA Firm under this Section 3.3.3: (i) will be borne by Buyers' Representative in the proportion that the aggregate dollar amount of such disputed items so submitted that are unsuccessfully disputed by Buyers' Representative (as finally determined by the CPA Firm) bears to the aggregate dollar amount of such items so submitted; and (ii) will be borne by Delphi in the proportion that the aggregate dollar amount of such disputed items so submitted that are successfully disputed by Buyers' Representative (as finally determined by the CPA Firm) bears to the aggregate dollar amount of such items so submitted. Whether any dispute is resolved by agreement among the Parties or by the CPA Firm, changes to the Closing Inventory Statement may be made only for items as to which Buyers' Representative have taken exception in the Objection.  Each Party will bear its own expenses incurred in this dispute resolution process, including fees of its accountants, attorneys and other agents.

### 3.4    Preliminary Purchase Price Adjustments:

#### 3.4.1    Inventory Adjustment:

**A.**    If the amount of Inventory reflected in the final Closing Inventory Statement is less than the Benchmark Inventory Amount, Delphi will pay to Buyers' Representative an amount equal to such deficiency.  If the amount of Inventory reflected in the Final Inventory Statement ("**Closing Inventory**") is greater than the Benchmark Inventory Amount, Buyers' Representative will pay to Delphi an amount equal to such excess.  Such deficiency or excess payment will be paid in immediately available funds within three (3) Business Days after the ultimate determination of the Final Inventory Statement as provided in this Section 3.4.

**B.**    The relevant Sellers of Closing Inventory at the Columbus, Ohio; Vandalia, Ohio; and Grosspetersdorf, Austria Manufacturing Facilities will immediately buy back from the relevant Buyers all Productive Inventory included in the Closing Inventory for such sites, for use in the appropriate Manufacturing Services Agreement.  The amounts required to be paid by Buyers under Section 3.4.1.A above will be reduced by the Closing Inventory amount attributable to Productive Inventory bought back by Sellers under this Section 3.4.1.B, as payment in full by Sellers for such Productive Inventory.

#### 3.4.2    Intentionally Omitted.

#### 3.4.3    NRBA:

**A.**    **Generally.**    Upon the relocation of latch products currently produced in Columbus, Ohio ("**Columbus Latch Operations**") to a lower labor cost region / country within twenty-four (24) months of Closing; and (ii) the Business has achieved a minimum Earnings before Interest, Taxes, Depreciation and Amortization ("**EBITDA**") of $37.5 Million for the year in which a NRBA is

being determined, then Buyer will pay to Seller the amount calculated in accordance with the NRB Payment Formula and this Section 3.4.3.

To the extent that there is a NRBA under the NRB Payment Formula, payment will be made annually for four (4) years within ninety (90) days of the first (1st) anniversary date of the start of production ("**SOP**") at such new low labor cost location and within ninety (90) days of each subsequent anniversary date through the fourth (4th) anniversary date of SOP.

## B.    Preparation of NRBA Statements:

(i)    Within one hundred (100) days after the end of each calendar year for five (5) years following the date of SOP of the Columbus Latch Operations, Buyers' Representative will prepare and deliver to Delphi a statement of the NRB Payment Formula ("**NRB Statement**") with respect to the year just completed (pro-rated in the first (1st) year for the period beginning with SOP, and in the fifth (5th) year for the period ending on the fourth (4th) anniversary date of SOP, together with a review report of the NRB Statement prepared by Buyers' Representative' independent auditors. Buyers will, pending agreement or final determination of the NRB Statement, allow Delphi's independent auditors such access to Buyers' independent auditors and to the work papers of Buyer's independent auditors as is reasonably necessary to enable Delphi to confirm each NRB Statement.

(ii)    Delphi will, within thirty (30) days after the delivery by Buyers' Representative of a NRB Statement, complete its review of such statement. If Delphi disagrees with a NRB Statement, Delphi will, on or before the last day of such thirty (30) day period, inform Buyers' Representative of any Objections specifying in reasonable detail the nature of any disagreement so asserted.    If: (i) no such Objection has been timely provided to Buyers' Representative, then: (a) the relevant NRB Statement will be deemed to be the final; and (b) Buyers' calculations will be final and binding on the Parties of all items therein.

(iii)    If Delphi files an Objection to a NRB Statement, then the Parties will resolve any issues raised in such Objection in the manner set forth in Section 3.3.3 with respect to the Closing Inventory Statement.

## C.    Definitions:

(i)    "**NRB Payment Formula**" is an amount equal to fifty percent (50%) of the Net Benefit for the period.   An illustrative calculation of NRB Payment Formula is attached to this Agreement as Schedule 3.4.3.C.

(ii)    "**Net Benefit**" is the amount equal to the excess of: (i) the Relocation Net Cash Flow Benefit in any year in which it is positive number; less (ii) one hundred percent (100%) of the then outstanding Net Relocation Investment, and less (iii) the effects of achieving a 12.5% compounded annual rate of return on the then outstanding Net Relocation Investment; with any negative number resulting from this calculation being used as the "then outstanding Net Relocation Investment" for purposes of the following

28

year in which a determination is made (i.e., once applied to this determination, the amount of Net Relocation Investment so applied shall reduce the amount of Net Relocation Investment applicable in a subsequent year) until one hundred percent (100%) of the aggregate Net Relocation Investment has been applied, and the Net Relocation Investment has achieved a 12.5% compounded annual rate of return, following which the Relocation Net Cash Flow Benefit shall be deemed to be equal to the Net Benefit. In no event will Seller owe Buyer any amounts with respect to NRBA.

(iii) "**Relocation Net Cash Flow Benefit**" means: (i) the differential between: (a) the Columbus per unit Cash Contribution multiplied by the volume of units assumed in the Business' plan projections provided to Buyers on or about August 9, 2007; and (b) the low labor cost location per unit Cash Contribution multiplied by the actual volume of units produced at the low labor cost location for part numbers previously produced in Columbus and now being produced in a low labor cost location. The Columbus per unit Cash Contribution(s) by product type prepared prior to executing this Agreement (which are defined in <u>Schedule 3.4.3.C(iii)</u> hereto), will be used for the purposes of calculating Relocation Net Cash Flow Benefit. In calculating new low cost facility latch Cash Contribution, only Cash Contribution relating to the existing Columbus book of business (limited to part numbers in production as of the Closing Date and subsequent part numbers of such Products pursuant to routine engineering work orders; i.e., excluding engineering changes involving a subsequent customer's request-for-quotation process) being relocated will be taken into account.

(iv) "**Net Relocation Investment**" means the total cash cost incurred by Buyers relating to relocation of the Columbus Latch Operations including but not limited to: (i) Columbus equipment relocation cost; (ii) new, low cost facility and equipment cost; and (iii) additional low cost facility latch inventory above Columbus inventory. Net Relocation Investment does not include any costs related to plant closure (except as per (i) above). Net Relocation Investment also excludes any costs related to the relocation of Door Module production from the Vandalia facility.

3.4.4    <u>**Post-Closing Payments**</u>.  On each of the first, second, third, fourth and fifth anniversaries of the Closing Date, Inteva Products, LLC shall pay to Delphi Automotive Systems LLC the amount of One Million Dollars ($1,000,000.00).  On the first Business Day following the earlier of: (i) the Business Day immediately following the fifth (5th) anniversary of the Closing Date; and (ii) the date Buyers sell substantially all of the assets of the Combined Business (a sale to an unrelated third party of eighty percent (80%) or more of the equity of Inteva Products, LLC will be deemed to be a sale of such assets), Inteva Products, LLC shall pay to Delphi Automotive Systems LLC the amount of Twenty-One Million Dollars ($21,000,000.00).  The amounts payable to Delphi Automotive Systems LLC by Buyer pursuant to this Section 3.4.3 are referred to as the "**Post-Closing Payments**".

**3.4.5   Purchase Price.**  The Preliminary Purchase Price plus the Post-Closing Payments and plus or minus the adjustments referred to in Sections 3.4.1 through 3.4.3 is referred to as the "**Purchase Price**".

**3.5    Allocation of Purchase Price:**

**3.5.1**   The Parties agree to allocate the Purchase Price (i.e., both the Preliminary Purchase Price and any adjustments thereto, plus the Post-Closing Payments) among the Business and the agreements provided herein for transfer of the Business to Buyers and their Affiliates, for all purposes (including indemnification by the Asset Sellers hereunder and for accounting and tax purposes) (the "**Allocation**") in a manner consistent with the Allocation Schedule attached as Schedule 3.5.1.

**3.5.2**   Buyers and Asset Sellers and Securities Sellers will each report the federal, state and local income and other Tax consequences of the purchase and sale contemplated hereby in a manner consistent with the Allocation, including, if applicable, the preparation and filing of Forms 8594 under Section 1060 of the Internal Revenue Code (or any successor form or successor provision of any future tax law) with their respective federal income Tax Returns for the taxable year which includes the Closing Date, and neither will take any position inconsistent with the Allocation unless otherwise required under applicable law.  Delphi will provide Buyers' Representative and Buyers' Representative will provide Delphi with a copy of any information required to be furnished to the Secretary of the Treasury under Internal Revenue Code Section 1060.

**4.     REPRESENTATIONS AND WARRANTIES OF SELLERS:**

Each Seller represents and warrants, as of the date hereof, severally, to Buyers with respect to the Acquired Assets or Sale Securities being sold by such Seller and the Shared Intellectual Property and Sublicensed Intellectual Property being licensed or sublicensed by such Seller (except that the Filing Affiliates represent and warrant, jointly and severally, with respect to the Acquired Assets and the Sale Securities of the Filing Affiliates and the Shared Intellectual Property and Sublicensed Intellectual Property being licensed or sublicensed by such Filing Affiliate), as follows:

**4.1    Organization.**  Each Seller is a legal entity duly incorporated or organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization.  Each Seller has the requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted, and is duly qualified or licensed to do business and in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except where the failure to be so qualified or licensed would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on the ability of Sellers to consummate the transactions contemplated by this Agreement.

**4.2    Authorization; Enforceability.**  Subject to entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, as applicable, each Seller has the requisite corporate or other organizational power and authority to: (i) execute and deliver this Agreement and the Ancillary Agreements to which such Seller is a party; (ii) perform its obligations hereunder and thereunder; and (iii) consummate the transactions contemplated by this Agreement and the applicable Ancillary Agreements.  Subject to entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, if applicable, the execution and delivery

of this Agreement and the Ancillary Agreements by Delphi and each Seller that is a party to any of such agreements, and the performance by each of them of their respective obligations under any of such agreements, in the case of Delphi have been, and in the case of the other Sellers, prior to the Closing Date will be, duly authorized by all necessary corporate action on the part of such Seller. This Agreement has been duly executed and delivered by Delphi, and the Ancillary Agreements will be duly executed and delivered by Delphi and each Seller, as applicable, and, assuming due authorization, execution and delivery by Buyers, constitutes, or will constitute, a valid and binding agreement of Delphi and each Seller, as applicable, enforceable against each of them in accordance with their respective terms, except that: (a) enforceability of Section 9.2 of this Agreement is subject to entry and approval of the Bidding Procedures Order; and (b) enforceability of all other provisions of this Agreement is subject to entry and effectiveness of the Sale Approval Order.

**4.3**     **JV Companies:**

    **4.3.1**     Each JV Company: (i) is a legal entity duly incorporated or organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization; (ii) has the requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted; and (iii) is duly qualified or licensed to do business and in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except where the failure to be so qualified or licensed would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on the ability of Sellers to consummate the transactions contemplated by this Agreement.

    **4.3.2**     Except as set forth on Schedule 4.3.2: (i) Seller's equity in each of the JV Companies is owned of record and beneficially by the relevant Securities Seller as set forth on Schedule 1 to the Agreement; (ii) the Sale Securities are duly authorized, validly issued, fully paid up and non-assessable and are not subject to any preemptive rights; and (iii) there are no voting trust agreements or other contracts, agreements or arrangements, to which any Securities Seller is a party, restricting voting or dividend rights or transferability with respect to the Sale Securities.

    **4.3.3**     Except as set forth on Schedule 4.3.3, there is no outstanding security, right, subscription, warrant, option, privilege or other agreement, commitment or contract, preemptive, contractual or otherwise that gives the right to: (i) purchase or otherwise receive or be issued any share capital of a JV Company or any security of any kind convertible into or exchangeable or exercisable for any share capital of a JV Company; or (ii) receive or exercise any benefits or rights similar to any rights enjoyed by or accruing to a holder of share capital of a JV Company, including any rights to participate in the equity or income of a JV Company, or to participate in or direct the election of any directors of a JV Company or the manner in which any share capital of a JV Company are voted.

    **4.3.4**     No Seller has entered into any guarantee, performance bond, letter of credit or similar obligation on behalf of a JV Company.

    **4.3.5**     Schedule 4.3.5 sets forth: (i) the audited balance sheet of each of the JV Companies as of December 31, 2005 and December 31, 2006, and the related audited statements of income for the years ended as of December 31, 2005 and December 31,

2006 (the foregoing balance sheets and income statements of the JV Companies, and accompanying notes, are referred to as the "**JV Audited Financial Statements**"); and (ii) the unaudited balance sheet of each of the JV Companies as of June 30, 2007 and the related statement of income of each of the JV Companies for the six (6) month period ended as of June 30, 2007 (the foregoing statements of income together with the JV Audited Financial Statements are referred to as the "**JV Financial Statements**").  To the Knowledge of Sellers, except as set forth on <u>Schedule 4.3.5</u>, the JV Financial Statements: (i) are true in all material respects with respect to the purpose for which they were prepared; and (ii) present fairly in all material respects in accordance with the prevailing accounting standards in their respective jurisdictions the assets, liabilities, financial position and results of operations of the JV Companies.

    **4.3.6**    Except as set forth on <u>Schedule 4.3.6</u>, the execution, delivery and performance of this Agreement and of the Ancillary Agreements by Delphi and each Seller that is a party to do not: (i) violate or result in a breach of any Governmental Order or Law applicable to any of the JV Companies or any of their respective properties or assets; or (ii) require any Governmental Approval.

    **4.3.7**    To the Knowledge of Sellers, each JV Company has all of the assets necessary to carry on its respective business in all material respects as it is now being conducted.

    **4.3.8**    To the Knowledge of Sellers, except as set forth on <u>Schedule 4.3.8</u>, each JV Company currently conducts its respective business in compliance in all material respects with all Laws and the JV Companies possess all material Permits necessary to own, lease and operate their respective businesses.

    **4.3.9**    To the Knowledge of Sellers, except for items set forth in <u>Schedule 4.3.9</u>, there are no material Proceedings pending or threatened against the JV Companies.

    **4.3.10**    To the Knowledge of Sellers, except as set forth in <u>Schedule 4.3.10</u>, or as otherwise expressly permitted by this Agreement, since December 31, 2006: (i) the businesses of the JV Companies have been conducted only in the Ordinary Course of Business; (ii) no JV Company has incurred any Debt Obligations for the purpose of paying a cash dividend or made any loans; and (iii) there has not been any event, circumstance, occurrence, change or development in or affecting the JV Company businesses that has had a Material Adverse Effect.

    **4.3.11**    To the Knowledge of Sellers, <u>Schedule 4.3.11</u> list all patents and patent applications and all trademark registrations and applications therefore owned by the JV Companies (the "**JV Owned Intellectual Property**") or licensed to the JV Companies (the "**JV Licensed Intellectual Property**").    To the Knowledge of Sellers, each JV Company owns the entire right, title and interest in the JV Owned Intellectual Property, free and clear of all Encumbrances, and has a valid and enforceable right to the use of all JV Licensed Intellectual Property.

    **4.3.12**    To the Knowledge of Sellers, <u>Schedule 4.3.12.1</u> sets forth a list as of the dates set forth therein of each of the following Contracts to which each of the JV Companies is party or by which either of them is bound as of the date of this Agreement, other than JV Employee Benefit Plans (collectively, the  "**JV Material Contracts**"):

**A.** Partnership, joint venture agreements or other agreements involving a sharing of profits or expenses by the relevant JV Company;

**B.** Indentures, mortgages, loan agreements, capital leases, security agreements or other agreements for the incurrence of Debt Obligations, including letters of credit and overdrafts, and any guarantees of any of the foregoing;

**C.** Contracts under which any JV Company has licensed material JV Owned Intellectual Property to, or material JV Licensed Intellectual Property from, any other Person;

**D.** Each Contract to which either JV Company is a party that limits the freedom of the JV Company to compete in any line of business or with any Person or in any area and which would so limit the freedom of such JV Company after the Closing; and

**E.** All employment Contracts with respect to any employees of either JV Company involving aggregate compensation (inclusive of bonuses and other incentive payments) in excess of $100,000.

To the Knowledge of Sellers, except as set forth in Schedule 4.3.12.2: (i) no event has occurred that constitutes (or with notice or lapse of time would constitute) a material default by: (a) any JV Company under any JV Material Contract; or (b) any other party to any JV Material Contract; (ii) there are no material unresolved disputes under any of the JV Material Contracts; and (iii) the sale of the Sale Securities pursuant to this Agreement will not result in termination of, or result in a right of termination under, any such JV Material Contract, or bring into operation any other provision thereof.

**4.3.13** To the Knowledge of Sellers, except as disclosed in Schedule 4.3.13:

**A.** Each JV Company is in material compliance with Environmental Laws and with Environmental Permits applicable to the JV Company;

**B.** Neither JV Company has received, within all applicable limitation periods, any written notice from a Governmental Authority alleging that the operations or assets of the JV Company: (i) violates, or does not comply with; (ii) has violated or has not complied with; or (iii) is potentially liable under; in each case, any Environmental Laws or Environmental Permits; and

**C.** Neither JV Company has received notice of the existence of any material Environmental Claim or Compliance Matter and no Seller has Knowledge of any basis for a material Environmental Claim or Compliance Matter.

**4.4    Financial Statements.** Schedule 4.4.1 sets forth the unaudited combined balance sheet of the Business as of December 31, 2005 and December 31, 2006, the related unaudited statements of income for the years ended as of December 31, 2005 and December 31, 2006, the unaudited combined balance sheet of the Business as of August 31, 2007 (the December 31, 2006 Balance Sheet is referred to as the "**Reference Balance Sheet**") and the related unaudited statement of income for the eight (8) month period ended as of August 31, 2007 (the foregoing balance sheets and income statements of the Business are

referred to as the "**Financial Statements**"). Except as set forth on Schedule 4.4.2, the Financial Statements: (i) are true in all material respects with respect to the purpose for which they were prepared; (ii) were prepared from statements prepared and used by Seller in the ordinary course of managing the Business; and (iii) present fairly in all material respects in accordance with GAAP the assets, liabilities, financial position and results of operations of the Business on a pro-forma basis, recognizing that the Acquired Assets comprising the Business have not been operated as separate "stand alone" entities within Delphi, as of the dates and for the respective periods covered, and, as a result, the Business has been allocated certain charges and credits as discussed in the notes accompanying the Financial Statements and as otherwise described in Schedule 4.4.2.

Until the Closing Date, Seller agrees to furnish the unaudited combined balance sheet and the related unaudited statement of income of the U.S. operations of the Business for the most recent available month end period within forty-five (45) days after the end of each such period, as prepared by management (collectively the "**Future Unaudited Financial Statements**").  Each Seller that is a Filing Affiliate will be deemed to represent and warrant as of Closing in accordance with this Article 4 and the other terms of this Agreement, including the limitations of Article 11, that the Future Unaudited Financial Statements: (i) are true in all material respects with respect to the purpose for which they were prepared; (ii) were prepared from statements prepared and used by Seller in the ordinary course of managing the Business; and (iii) fairly present, in all material respects in accordance with the notes and other disclosures set forth in Schedule 4.4.1 and Schedule 4.4.2, the assets, liabilities, financial position and results of operations of the Business on a pro-forma basis, recognizing that the Acquired Assets comprising the Business have not been operated as separate "stand alone" entities within Delphi, as of the dates and for the respective periods covered, and, as a result, the Business has been allocated certain charges and credits as discussed in the notes accompanying the Financial Statements and as otherwise described in an amendment to Schedule 4.4.2.  The foregoing representation and warranty as to the Future Unaudited Financial Statements will be based on data received from Transferred Employees managing the Business and will be subject to  the accuracy of such data.

**4.5**    **No Conflicts or Approvals.**  Subject to entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, except as set forth on Schedule 4.5, the execution, delivery and performance of this Agreement and of the Ancillary Agreements by Delphi and each Seller that is a party to do not: (i) violate, conflict with or result in a breach by any of Delphi or Sellers of the Organizational Documents of any of Delphi or Sellers; (ii) violate or result in a breach of any Governmental Order or Law applicable to any of Delphi or Sellers or any of their respective properties or assets; (iii) require any Governmental Approval; or (iv) result in any breach of, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or result in any, or give to any rights of termination, cancellation or acceleration of any Encumbrance on any of the Acquired Assets pursuant to, any agreement, note, bond, contract, permit, lease, mortgage, indenture, license, franchise or other instrument included in the Acquired Assets or to which any of the Sellers is a party, in each case except as set forth in this Agreement and except as are excused by or unenforceable as a result of the filing of the Bankruptcy Cases or the applicability of any provision of or any applicable law of the Bankruptcy Code.

**4.6**    **Sufficiency of Acquired Assets.**  The Acquired Assets and the Sale Securities, together with the Shared Intellectual Property and the Sublicensed Intellectual Property, comprise all of the assets necessary for Buyer to carry on the Business in all material respects as it is now being conducted, except for:  (i) Excluded Assets, and (ii) assets used to produce

the services described in this Agreement or in any Ancillary Agreement, including services of the type outlined in the Transition Services Agreement that are currently provided by Sellers to the Business.

**4.7    Compliance with Law; Permits.**  Except as set forth on Schedule 4.7, to the Knowledge of Sellers, the Business is currently in compliance in all material respects with all Laws.  The Asset Sellers possess, and Schedule 4.7 lists, all material licenses, consents, approvals, permits and other Governmental Approvals ("**Permits**") necessary to own, lease and operate the Acquired Assets.  The representations and warranties relating to Environmental Laws and with Environmental Permits are exclusively set forth in Section 4.14.

**4.8    Proceedings.**  Except for claims raised in connection with the pendency of the Bankruptcy Cases, and for the Claims and other items set forth in Schedule 4.8 (and except with respect to compliance with Environmental Laws, which is covered by Section 4.14), there are no material Proceedings pending or, to the Knowledge of Sellers, threatened against the Securities Sellers or the Asset Sellers and relating to the Business or any of the Acquired Assets.

**4.9    Absence of Certain Changes.**  Except as set forth in Schedule 4.9, or as otherwise expressly permitted by this Agreement, since December 31, 2006: (i) the Business has been conducted only in the Ordinary Course of Business; and (ii) there has not been any event, circumstance, occurrence, change or development in or affecting the Business that has had, or would have, a Material Adverse Effect.

**4.10    Tax Matters.**  The Asset Sellers have withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any Transferred Employee other than Taxes that are immaterial with respect to the Transferred Employees.

**4.11    Employee Benefits.**  Regarding the Business:

**4.11.1** Schedule 4.11.1 contains a true, correct and complete list of all U.S. Employees and Non-U.S. Employees, including: (i) each such person's title or job/position/job code; (ii) each such person's job designation (i.e., salaried or hourly); (iii) each such person's location of employment; (iv) each such person's employment status (i.e., actively employed or not actively at work (due to, e.g., illness, short-term disability, sick leave, authorized leave or absence, etc.)); (v) each such person's current annual or hourly base rate of compensation; (vi) each person's date of hire; and, if applicable; and (vii) any material, individual specific provisions relating to such person's employment (e.g., non-compete agreement, separation pay agreement, etc.) to the extent permitted to be disclosed under applicable Law (including local privacy laws).[2]

**4.11.2** Schedule 4.11.2 sets forth a true, correct and complete list of each Seller Employee Benefit Plan.

**4.11.3** Copies of the following materials have been delivered or made available to Buyers' Representative with respect to each Seller Employee Benefit Plan: (i) current

---

2    **May be delivered to Buyer separately, rather than appended to the Agreement given the type of data included on it.**

plan documents; and (ii) current agreements and other documents relating to the funding or payment of benefits.  Each Seller Employee Benefit Plan has been maintained in compliance with applicable Laws in all material respects.

**4.11.4** Except as: (i) set forth in <u>Schedule 4.11.4</u>; and (ii) routine claims for benefits by participants and beneficiaries, there are no material pending or, to the Knowledge of Sellers, threatened Proceedings with respect to any Seller Employee Benefit Plans.    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in conjunction with any other event) result in, cause the accelerated vesting, funding or delivery of, or increase the amount or value of, any payment or benefit to any Transferred Employees.  There does not now exist, nor do any circumstances exist that could result in, any Controlled Group Liability that would be a Liability of Buyer or its Affiliates following the Closing.  All Seller Employee Benefit Plans subject to the Laws of any jurisdiction outside the United States (x) have been maintained in accordance with all applicable requirements, (y) if they are intended to qualify for special tax treatment, meet all requirements for such treatment and (z) if they are intended to be funded and/or book-reserved, are fully funded and/or book reserved, as appropriate, based upon reasonable actuarial assumptions.

**4.11.5 <u>Collective Bargaining Agreements</u>.**  <u>Schedule 4.11.5</u> contains a true, correct and complete list of all Collective Bargaining Agreements.  Seller has given access or delivered to Buyer true, correct and complete copies of each of the Collective Bargaining Agreements.  Except as disclosed on <u>Schedule 4.11.5</u>, Seller is in material compliance with each Collective Bargaining Agreement and all applicable Laws respecting employment and employment practices, terms and conditions of employment, wages and hours and occupational safety and health.

**4.11.6 <u>Grievance, Labor Negotiations</u>.**  Except as disclosed on <u>Schedule 4.11.6</u>, with respect to the Business: (i) there is no labor strike, dispute, slowdown or stoppage actually pending or, to Sellers' Knowledge, threatened against or involving Sellers; (ii) no Seller has in the past three (3) years experienced any work stoppage or other labor difficulty or organizational activity relating to any of its employees; and (iii) no labor grievance relating to any employee of Sellers is pending.  Except as set forth on <u>Schedule 4.11.6</u>, there are no material pending claims against Sellers whether under applicable Laws, employment agreements or otherwise asserted by any present employee or former employee of any other Person as relates to the Business, including claims on account of or for: (a) overtime pay, other than overtime pay for work done during the current payroll period; (b) wages or salary for any period other than the current payroll period; (c) any amount of vacation pay or pay in lieu of vacation or time off; or (d) any violation of any statute, ordinance or regulation relating to minimum wages or maximum hours at work, and, to Sellers' Knowledge, there are no such claims which have yet to be asserted.

**4.12    <u>Intellectual Property</u>:**

**4.12.1** <u>Schedule 4.12.1.A</u> and <u>Schedule 4.12.1.B</u>, respectively, list all patents and patent applications and all trademark registrations and applications therefore included in the Purchased Intellectual Property. Except: (i) as set forth in <u>Schedule 4.12.1.A</u>; (ii) instances in which such patents or patent applications are jointly owned with a third party identified in <u>Schedule 4.12.1.A</u>; or (iii) rights retained by employee-

inventors pursuant to the Law: (x) Sellers own the entire right, title and interest in the Purchased Intellectual Property, free and clear of all Encumbrances, and have the right to transfer Sellers' right, title and interest therein as set forth in this Agreement; (y) have a valid and enforceable right to the use of the Licensed Intellectual Property and have the right to transfer and/or assign Sellers' right and interest therein as set forth in this Agreement, in each case, such right and interest being subject to the terms of the Material Contracts.

**4.12.2** Sellers have a valid and enforceable right to the use of the Shared Intellectual Property and Sublicensed Intellectual Property and have the right to license the Shared Intellectual Property and sublicense the Sublicensed Intellectual Property as set forth in this Agreement, such license and sublicense being subject to the terms of the Contracts listed in Schedule 4.13.1 and Schedule 6.11.1.

**4.12.3** Except as set forth in Schedule 4.12.3, Sellers have not received notice of any allegation by any third party of Intellectual Property infringement or misappropriation resulting from the operation of the Business or relating to the Purchased Intellectual Property, the Licensed Intellectual Property, the Shared Intellectual Property or the Sublicensed Intellectual Property and Sellers have no Knowledge of any such infringement or misappropriation.

**4.12.4** Except as set forth in Schedule 4.12.4, Sellers have no Knowledge of any infringement or misappropriation by a third party of the Purchased Intellectual Property, the Licensed Intellectual Property, the Shared Intellectual Property or the Sublicensed Intellectual Property.

**4.12.5** Except as set forth in Schedules 4.12.4 (infringement by a third party), 4.11.4 (disputes with respect to employee-inventor compensation), 4.12.1.A (joint owners and licensees), 4.12.3 (allegations of infringement by Delphi), 4.13.1 (licenses) and 6.11.1 (sublicensed Contracts), Sellers have no Knowledge of any Claims by a third party (including present or former employees) that is adverse to the right, title or interest of Sellers in the Purchased Intellectual Property, Licensed Intellectual Property, Shared Intellectual Property or Sublicensed Intellectual Property.

**4.13**   **Contracts:**

**4.13.1**  Schedule 4.13.1 sets forth a list as of the dates set forth therein of each of the following Contracts to which any of the Asset Sellers with respect to the Business, is party or by which any of them is bound as of the date of this Agreement and that are included in the Acquired Assets, other than Seller Employee Benefit Plans (collectively, the "**Material Contracts**"):

**A.**   Partnership, joint venture agreements or other agreements involving a sharing of profits or expenses by the relevant Asset Seller party thereto with respect to the Business;

**B.**   Indentures, mortgages, loan agreements, capital leases, security agreements or other agreements for the incurrence of Debt Obligations, including letters of credit and overdrafts;

37

**C.**     Guarantees of the obligations of other Persons involving the potential expenditure by the Asset Sellers in respect of the Business after the date of this Agreement;

**D.**     Contracts, other than Contracts under standard purchase order terms with prospective suppliers or customers relating to the development of Products, under which any Seller has licensed Purchased Intellectual Property to, or Licensed Intellectual Property from, any other Person;

**E.**     Contracts involving the expenditure by the Asset Sellers in respect of the Business of more than $500,000 in any instance for the purchase of materials, supplies, equipment or services;

**F.**     Contracts providing that an Asset Seller in respect of the Business will receive future payments aggregating more than $500,000 per annum or $2,000,000 in the aggregate prior to the expiration of such Contract;

**G.**     Each material agency, dealer, sales representative, marketing, advertising, consulting or other similar Contract to which any of the Sellers is a party;

**H.**     Each Contract to which any of the Sellers is a party that limits the freedom of the Business to compete in any line of business or with any Person or in any area and which would so limit the freedom of the Sellers after the Closing;

**I.**     Each Contract with any Governmental Authority to which any of the Sellers is a party;

**J.**     All employment Contracts with respect to any employees of any of the Sellers relating to the Business involving aggregate compensation (inclusive of bonuses and other incentive payments) in excess of $75,000;

**K.**     All capital or operating leases relating to any of the Acquired Assets;

**L.**     Collective Bargaining Agreements and Contracts with U.S. Employees or Non-U.S. Employees that are not cancelable without penalty or further payment and without more than thirty (30) days' notice;

**M.**     All prepaid customer contracts (showing the amount received thereunder as of the date hereof); and

**N.**     All other Contracts, whether or not made in the Ordinary Course of Business, which are material to the Business, or the absence of which would have a Material Adverse Effect.

**4.13.2** Except as set forth in <u>Schedule 4.13.2</u>: (i) no event has occurred that constitutes (or with notice or lapse of time would constitute) a material default (except with respect to defaults that need not be cured under Section 365 of the Bankruptcy Code for Sellers to assume and assign such Material Contracts to Buyer, if applicable) by: (a) any Asset Seller under any Material Contract; or (b) to the Knowledge of Sellers,

any other party to any Material Contract; (ii) there are no material unresolved disputes under any of the Material Contracts; and (iii) the assignment of any material contract pursuant to this Agreement will not result in termination of, or result in a right of termination under, any such Material Contract, or bring into operation any other provision thereof.

**4.13.3** Set forth on <u>Schedule 4.13.3</u> is a list of the top five (5) customers ("**Significant Customers**") of the Business as of December 31, 2006 setting forth for each the amount of gross revenue received in 2006.   Except as set forth on <u>Schedule 4.13.3</u>, Seller has received no written notice, and has no Knowledge, that any Significant Customer will cease to do business with the Business or substantially reduce either the purchase of products from the Business or the pricing thereof.   Buyers acknowledge that the foregoing shall not be deemed a guarantee of customer volumes.

**4.14**    **Environmental Matters.**    To the Knowledge of Seller, except as disclosed in <u>Schedule 4.14</u>:

**4.14.1** The Business is in material compliance with Environmental Laws and with Environmental Permits applicable to the Business and the Real Property, and all Compliance Matters have been fully resolved with no further Liabilities accruing to the Business or any of the Acquired Assets;

**4.14.2** None of the Asset Sellers has received, within all applicable limitation periods, any written notice from a Governmental Authority alleging that the Business or the Real Property: (i) violates, or does not comply with; (ii) has violated or has not complied with; or (iii) is potentially liable under; in each case, any Environmental Laws or Environmental Permits;

**4.14.3** None of the Asset Sellers has received notice of, and there does not exist, any material Environmental Claim or Compliance Matter with respect to the Real Property or otherwise in connection with the Business;

**4.14.4** There has been: (i) no Release of any Hazardous Material on, at or under any Real Property or elsewhere that was generated or used in connection with the operation of the Business, in each case in concentrations or quantities exceeding Remediation Standards or migrating from any Real Property in concentrations likely to give rise to Environmental Damages; and (ii) no notice from any Governmental Authority of any Release of any Hazardous Material that was generated or used by the Business into the Environment.

**4.14.5** Environmental Contamination is not present at, in or under, or emanating from, the Real Property.

**4.14.6** No underground storage tanks are present at the Real Property.

**4.14.7** Seller has made available to Buyer copies of any and all non attorney-client privileged documents in Seller's possession, ownership or control constituting, regarding or referring to environmental assessments, investigations and compliance audits and all related materials, documents, data, due care plans and correspondence, including all submittals to, and correspondence to or from, any Governmental Authority, regarding or referring to the environmental condition of the Real Property (or

Environmental Contamination thereon or therefrom) or Seller's compliance with Environmental Laws, including Section 7a of Part 201 of the Michigan Natural Resources and Environmental Protection Act, MCL 324.20107a, and the regulations thereunder.

**4.14.8** Schedule 4.14 contains a complete and correct list of all Environmental Permits held by or for Seller in relation to any activity or operation conducted at the Property and/or pursuant to or in furtherance of the Business, including for each such Environmental Permit the title, permit number, issuing agency and effective and expiration dates. Except as disclosed in Schedule 4.14, Seller possesses, and has listed in Schedule 4.14, all Environmental Permits required for the lawful conduct of the Business.

**4.14.9** To the extent that the Real Property continues to be utilized for industrial purposes similar to those conducted on the date of execution of this Agreement, no further remediation of the existing radiological contamination at the Real Property will be required.

**4.15**    **Insurance.**   Schedule 4.15 contains a complete and correct list, in all material respects, of all material policies of insurance relating to the Business or covering any of the assets primarily used in or relating to the Business, other than Excluded Assets, indicating for each policy the carrier, risks insured, the amounts of coverage, deductible, expiration date and any material pending claims thereunder. All such policies are outstanding and in full force and effect.

**4.16**    **Personal Property Assets, Inventory:**

**4.16.1** Except as set forth on Schedule 4.16.1, the Asset Sellers have good title to, or hold by valid and existing lease or license with respect to, all Personal Property included in the Acquired Assets, including all Personal Property reflected as assets on the Reference Balance Sheet or acquired thereafter, except with respect to assets disposed of in the Ordinary Course of Business since such date.

**4.16.2** The Asset Sellers, with respect to the Acquired Assets, will own, or have valid leasehold interests in, all Personal Property being transferred to Buyers under this Agreement, and all transferred Personal Property used by the Business are in such condition (considering age and purpose for which they are used) as to enable the Business to be conducted as currently conducted without material disruption.

**4.16.3** Except to the extent identified in Schedule 4.16.3, the Inventory included in the Acquired Assets will, as of the Closing, be located at the Real Property. All Productive Inventory included in the Acquired Assets is saleable and usable in the ordinary course, except for such Inventory as to which an adjustment is made in the Closing Inventory Statement.

**4.16.4** Schedule 4.16.4 sets forth a list of substantially all machinery, equipment and capitalized tools with a book value greater than $100,000 included in the Acquired Assets.

**4.16.5** The valuation of the Inventory reflected in the Benchmark Inventory Amount reflects the historical Inventory valuation policy of the Asset Sellers.

**4.17**    **Real Property**:

**4.17.1** **Leased Properties**.    Schedule 4.17.1 lists all real property leased or subleased and constituting Acquired Assets (the "**Leased Real Property**").    Delphi has made available to Buyers' Representative true and complete copies of the leases and subleases covering the Leased Real Property (as amended to the date of this Agreement).    With respect to each lease and sublease and except as otherwise specified on Schedule 4.17.1:

> **A.**    Such lease or sublease is, to the Knowledge of Sellers, in all material respects, enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a Proceeding in equity or at law);

> **B.**    (i) None of the Asset Sellers is in material breach under any such lease or sublease, and, to the Knowledge of Sellers, no event has occurred which, with the passage of time or expiration of any grace period would constitute a material breach of any Asset Seller's obligations under such lease or sublease (except with respect to breaches that need not be cured under Section 365 of the Bankruptcy Code for the Filing Affiliates to assume and assign such leases or subleases to Buyer, if applicable); and (ii) none of the Asset Sellers has received a notice of material breach with respect to such lease or sublease; and

**4.17.2** **Owned Properties**.    Schedule 4.17.2 lists all real property owned which constitutes Acquired Assets (the "**Owned Real Property**").    With respect to each such parcel of the Owned Real Property and except as otherwise specified on Schedule 4.17.2 and the identified owner has good and marketable fee simple title, or equivalent title rights in non-U.S. jurisdictions, in all material respects to the parcel of the Owned Real Property, free and clear of any Encumbrances, except for Permitted Encumbrances.    For clarity, Permitted Encumbrances at Closing will not include the Encumbrances set forth on Schedule 4.17.2.

**4.17.3** **All Real Properties**.

> **A.**    Each parcel of Real Property, whether a Leased Real Property or an Owned Real Property, has such access as is necessary for the conduct of the business on such parcel as presently conducted: (i) to public streets or roads directly or by valid and subsisting easements; and (ii) to water, storm and sanitary sewer, telephone, gas, electric and other utilities directly from public streets or roads or by valid and subsisting easements.

> **B.**    Delphi has made available true and complete copies of available title insurance commitments for the U.S. Owned Real Property and available surveys with respect to each parcel of the Owned Real Property.

> **C.**    None of the material plants, buildings or other structures located on any Owned Real Property encroaches in a material respect upon any real property owned by another person or upon any easement burdening and affecting such Owned Real Property which would have a Material Adverse Effect

or materially interfere with the use of such Owned Real Property as presently conducted thereon.   No structure on any real property owned by another Person encroaches in a material respect upon any Owned Real Property which would have a Material Adverse Effect or materially interfere with the use of such Owned Real Property as presently conducted thereon.

**4.18**   **No Brokers' Fees.**   Sellers have employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Buyers will be liable.

**4.19**   **No Other Representations or Warranties.**   Except for the representations and warranties contained in this Article 4, the Sellers make no other express or implied representation or warranty to Buyers, and in particular but without limitation, no Seller is making any representations with respect to any plan(s) of Buyers for the future conduct of the Business, or any implied warranties of merchantability or fitness for a particular purpose.   For the avoidance of doubt, except for such matters as are covered by the representations and warranties contained in this Article 4, no warranty or representation is given on the contents of the documents provided in due diligence or with respect to the information contained in the Confidential Information Memorandum, Data Room, Management Presentations, reports or any financial forecasts or projections or other information furnished by Delphi or any Seller or their officers, directors, employees, agents or representatives or in any other documents or other information not contained in this Agreement or the Ancillary Agreements.

**4.20**   **Fair Disclosure.**   Any matter disclosed in any Schedule to this Agreement will be deemed an exception for all other representations and warranties contained in this Agreement whether or not such other representations, warranties or Schedules contain a reference to such Schedule, so long as it is reasonably apparent that such matter also applies to such other representations and warranties.

**5.**      **REPRESENTATIONS AND WARRANTIES OF BUYERS:**

The Buyers hereby represent and warrant to Sellers, as of the date hereof and of the Closing Date, as follows:

**5.1**   **Organization.**   Each Buyer is a legal entity duly incorporated or organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization.   Each Buyer has the requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted and is duly qualified or licensed to do business and is in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except where the failure to be so qualified or licensed would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on the ability of Buyers to consummate the transactions contemplated by this Agreement.

**5.2**   **Authorization; Enforceability.**   Each Buyer has the requisite corporate or other organizational power and authority to: (i) execute and deliver this Agreement and the Ancillary Agreements to which such Buyer is a party; (ii) perform its obligations hereunder and thereunder; and (iii) consummate the transactions contemplated by this Agreement and the applicable Ancillary Agreements.   The execution and delivery of this Agreement and the Ancillary Agreements by each Buyer that is a party to any of such agreements, and the performance by each of them of their respective obligations under any such agreements have

been duly authorized by all necessary corporate action on the part of such Buyer.  This Agreement has been duly executed and delivered by Buyers, and the Ancillary Agreements will be duly executed and delivered by the applicable Buyers and, assuming due authorization, execution and delivery by Sellers, constitutes, or will constitute, a valid and binding agreement of the applicable Buyers, enforceable against each of them in accordance with their respective terms, except as may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

**5.3**   **No Conflicts or Approvals.**   The execution, delivery and performance by Buyers of this Agreement and the Ancillary Agreements by each Buyer that is a party thereto and the consummation by Buyers of the transactions contemplated hereby and thereby do not and will not: (i) violate, conflict with or result in a breach by any Buyer of the Organizational Documents of any Buyer; (ii) violate, conflict with or result in a breach of, or constitute a default by any Buyer (or create an event which, with notice or lapse of time or both, would constitute a default) or give rise to any right of termination, cancellation or acceleration under, any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, lease, contract, agreement or other instrument to which any Buyer or any of their properties or assets may be bound; (iii) violate or result in a breach of any Governmental Order or Law applicable to any Buyer or any of their respective properties or assets; or (iv) except for applicable requirements of the HSR Act, the EC Merger Regulation and other applicable Competition/Investment Law, require any Governmental Approval, except, with respect to the foregoing clauses (ii), (iii) and (iv) above, as would not, individually or in the aggregate, have a material adverse effect on the ability of Buyers to consummate the transactions contemplated by this Agreement.

**5.4**   **Proceedings.**   There are no Proceedings pending or, to the Knowledge of Buyers, threatened against any of the Buyers that could reasonably be expected to restrain, delay or inhibit the ability of Buyers to consummate the transactions contemplated by this Agreement.  None of the Buyers is subject to any Governmental Order that could reasonably be expected to restrain, delay or otherwise inhibit the ability of Buyers to consummate the transactions contemplated by this Agreement.

**5.5**   **Solvency.**   Upon the consummation of the transactions contemplated by this Agreement: (i) none of the Buyers will be insolvent; (ii) none of the Buyers or the other legal entities constituting the Business will be left with unreasonably small capital; (iii) none of the Buyers or the Business will have incurred debts beyond its ability to pay such debts as they mature; (iv) the capital of Buyers and the other legal entities constituting the Business will not be impaired; and (v) immediately following Closing, Buyers individually and in the aggregate will have sufficient capital to continue the Business as a going concern.

**5.6**   **Anti-Money Laundering.**   Buyers are in compliance with: (i) all applicable provisions of  the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-57) ("**USA PATRIOT Act**") as amended and all regulations issued pursuant to it; (ii) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibited Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism; (iii) the International Emergency Economic Power Act (50 U.S.C. 1701 et seq.), and any applicable implementing regulations; (iv) the Trading with the Enemies Act (50 U.S.C. 50 et seq.), and any applicable implementing regulations; and (v) all applicable legal requirements relating to anti-money laundering, anti-terrorism and economic sanctions in the jurisdictions in which any Buyer

operates or does business.  Neither any Buyer nor any of its directors, officers or affiliates is identified on the United States Treasury Department Office of Foreign Asset Control's ("**OFAC**") list of "Specially Designated Nationals and Blocked Persons" (the "**SDN List**") or otherwise the target of an economic sanctions program administered by OFAC, and no Buyer is affiliated in any way with, or providing financial or material support to, any such persons or entities.  Buyers agree that should any of them, or any of their directors, officers or affiliates be named at any time in the future on the SDN List, or any other similar list maintained by the U.S. Government, Buyers will inform Delphi in writing immediately.

### 5.7    <u>Investment Representations</u>:

**5.7.1**    Each Buyer who is acquiring Sale Securities is acquiring such Sale Securities for its own account solely for investment and not with a view to, or for sale in connection with, any distribution thereof in violation of the Securities Act or the applicable securities Laws of any other jurisdiction.  Each Buyer agrees that it will not transfer any of the Sale Securities, except in compliance with the Securities Act and with the applicable securities Laws of any other jurisdiction.

**5.7.2**    Buyer Parents are "accredited investors" as defined in Rule 501(a) promulgated under the Securities Act.

**5.7.3**    Buyers understand that the acquisition of the Sale Securities to be acquired by it pursuant to the terms of this Agreement involves substantial risk.  Buyers and their officers have experience as investors in securities and equity interests of companies such as the ones being transferred pursuant to this Agreement and acknowledges that they can bear the economic risk of their investment and have such knowledge and experience in financial or business matters that Buyers are capable of evaluating the merits and risks of their investment in the Sale Securities to be acquired by them pursuant to the transactions contemplated hereby.

**5.7.4**    Each Buyer further understands and acknowledges that the Sale Securities have not been registered under the Securities Act or under the applicable securities Laws of any other jurisdiction and agrees that the Sale Securities may not be transferred unless such transfer is pursuant to an effective registration statement under the Securities Act or under the applicable securities Laws of any other jurisdiction, or, in each case, an applicable exemption therefrom.

**5.7.5**    Buyers acknowledge that the offer and sale of the Sale Securities has not been accomplished by the publication of any advertisement.

### 5.8    <u>No Inducement or Reliance; Independent Assessment</u>:

**5.8.1**    With respect to the Sale Securities, the Acquired Assets, the Business or any other rights or obligations to be transferred hereunder or under the Transfer Agreements or pursuant hereto or thereto, Buyers have not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by Delphi, any of its Affiliates, or any agent, employee, attorney or other representative of Delphi representing or purporting to represent Delphi or any Seller that are not expressly set forth herein or in the Transfer Agreements (including the Schedules and Exhibits hereto and thereto), whether or not any such representations, warranties or statements were made in writing or orally, and none of Delphi, any Affiliate

of Delphi, or any agent, employee, attorney, other representative of Delphi or other Person will have or be subject to any Liability to any Buyer or any other Person resulting from the distribution to Buyers, or Buyers' use of, any such information, including the Confidential Information Memorandum and any information, documents or material made available in the Data Room or any Management Presentations or in any other form in expectation of the transactions contemplated by this Agreement.

**5.8.2**   Buyers acknowledge that they have made their own assessment of the present condition and the future prospects of the Business and are sufficiently experienced to make an informed judgment with respect thereto.   Buyers acknowledge that neither Delphi nor any of its Affiliates has made any warranty, express or implied, as to the prospects of the Business or its profitability for Buyers, or with respect to any forecasts, projections or business plans prepared by or on behalf of Delphi and delivered to Buyers in connection with Buyers' review of the Business and the negotiation and the execution of this Agreement.

**5.9**   **Financial Ability.**   Buyers have the financial ability and will have available at Closing sufficient Cash in immediately available funds to pay the Preliminary Purchase Price and thereafter to pay the Purchase Price if greater than the Preliminary Purchase Price, and all costs, fees and expenses necessary to consummate the transactions contemplated by this Agreement.   In particular, Buyers have provided to Sellers evidence of their financial ability to consummate this Agreement and the transactions contemplated hereby as evidenced by the commitment letter attached hereto as <u>Schedule 5.9</u> ("**Commitment Letter**").

**5.10**   **Adequate Assurance of Future Performance.**   Buyer has provided or will be able to provide, at or prior to Closing, adequate assurance of its future performance under each Assumed U.S. Contract to the parties thereto (other than Sellers) in satisfaction of Section 365(f)(2)(B) of the Bankruptcy Code, and no other or further assurance will be necessary thereunder with respect to any Assumed U.S. Contract.

**5.11**   **No Brokers' Fees.**   Buyers have employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Sellers would be liable.

**5.12**   **Compliance with Laws.**   Buyers are in compliance with all Laws applicable to Buyers, except with respect to those violations that could not reasonably be expected to result in the issuance of an order restraining, enjoining or otherwise prohibiting Buyer from consummating the transactions contemplated by this Agreement.

**6.**   **COVENANTS AND AGREEMENTS:**

**6.1**   **Conduct of Business between Signing and Closing:**

**6.1.1**   Except as: (i) contemplated by this Agreement; (ii) disclosed on <u>Schedule 6.1.1</u>; (iii) permitted under orders already issued in the Bankruptcy Cases and not otherwise prohibited under this Section 6.1.1; (iv) required by or resulting from any changes of applicable Laws; or (v) set forth in this Agreement or the transactions contemplated hereby, from and after the date of this Agreement and until the Closing, Delphi will cause the Asset Sellers to conduct the operations of the Business in the Ordinary Course of Business and use commercially reasonable efforts to maintain and preserve relations with customers, suppliers, employees and others having business

relationships with the Business. Except: as contemplated by this Agreement or as disclosed on Schedule 6.1.1, from and after the date of this Agreement and until the Closing, Delphi will cause the Asset Sellers with respect to the Business and the Securities Sellers with respect to Sections 6.1.1.A and 6.1.1.I below to refrain from doing any of the following without the prior written consent of Buyers' Representative (which consent will not be unreasonably withheld or delayed):

    **A.**    Purchase or sell any capital stock or other equity interests of any JV Company or grant or make any option, subscription, warrant, call, commitment or agreement of any character in respect of any such capital stock or other equity interests, or permit any JV Company to incur any Debt Obligations or make any loan outside the Ordinary Course of Business; provided, however, that this will not limit the ability of any JV Company to pay cash dividends or distributions of Net Cash to Delphi or any of its Affiliates between the date hereof and the Closing Date as long as a JV Company complies with all applicable Laws (including liquidity requirements) ;

    **B.**    Sell or otherwise dispose of Acquired Assets, excluding sales of tooling to customers, sales of Inventory and sales of receivables to financial institutions or credit collection agencies, in each case in the Ordinary Course of Business;

    **C.**    Incur, assume or guarantee any Debt Obligation that would become an Assumed Liability;

    **D.**    Incur any Encumbrance on any material Acquired Assets, in each case, other than Permitted Encumbrances;

    **E.**    Except as required by any written Contract as in effect on the date hereof or as required by Law, with respect to any U.S. Employee or non-U.S. Employee:  (i) adopt or, except to comply with applicable Law, amend any Seller Employee Benefit Plan, (ii) increase in any manner (including the acceleration of vesting or payment of a payment or benefit) the compensation, employee benefits or fringe benefits of any U.S. Employees or Non-U.S. Employees or (iii) enter into any new, or amend any existing, Collective Bargaining Agreement or similar agreement with respect to any U.S. Employees or Non-U.S. Employees;

    **F.**    Make any material change in the accounting methods or practices followed by the Business (other than such changes that are required by Law or GAAP;

    **G.**    Make any election relating to Taxes, enter into any closing agreement relating to Taxes, settle any claim or assessment relating to Taxes or consent to any claim or assessment relating to Taxes or any waiver of the statute of limitations for any such claim or assessment that could affect the Buyer or the Business, or could give rise to or increase an Assumed or Excluded Liability;

    **H.**    Terminate or make any material amendment to a Material Contract, or waive any material right thereunder;

**I.**    Amend any Organizational Document of any JV Company if Securities Seller has a right to veto any such amendment;

**J.**    Fail to maintain insurance in a manner consistent with Sellers' past practice;

**K.**    Disclose any secret or confidential Intellectual Property relating to the Business (except by way of applying for a patent or in the Ordinary Course of Business: (i) under customer purchase order terms that do not accept supplier information as confidential; or (ii) under confidentiality agreements entered into on customary terms with other third parties) or allow any patent or trademark registration or application to lapse or become abandoned (except in the Ordinary Course of Business);

**L.**    Allow any Permit relating to the Business to lapse or fail to renew any such Permit; or

**M.**    Agree or commit to do any of the foregoing.

**N.**    Knowingly take any action that causes any JV Company to take any action or to fail to take any action as is proscribed under this Section 6.1 with respect to the business, assets or liabilities of such JV Company, as applicable.

## 6.2    <u>Bankruptcy Actions</u>:

**6.2.1**    As soon as practicable after the execution of this Agreement, Delphi will, and will cause the other Sellers that are Filing Affiliates to, file a motion or motions (and related notices and proposed orders) with the Bankruptcy Court seeking approval of the Bidding Procedures Order and entry of a Sale Approval Order.

**6.2.2**    Delphi will use commercially reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the sale of the Purchased Assets under the Agreement, including serving on all required Persons in the Bankruptcy Cases, notice of the Sale Motion, the Sale Hearing (as hereinafter defined) and the objection deadline in accordance with Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (as modified by orders of the Bankruptcy Court), the Bidding Procedures Order or other orders of the Bankruptcy Court, and any applicable local rules of the Bankruptcy Court.

**6.3**    <u>Assumed U.S. Contracts; Cure Amounts</u>.    No later than as soon as practicable after the Auction, Delphi will, pursuant to a motion (which motion may be incorporated into the Sale Motion), move to assume and assign to Buyers the Pre-Petition Contracts listed on <u>Schedule 6.3</u> (collectively, the "**Assumed U.S. Contracts**") and will provide notice thereof in accordance with all applicable Bankruptcy Rules as modified by orders of the Bankruptcy Court. Seller will pay Cure Amounts as agreed to by Delphi and each party to an Assumed U.S. Contract or, absent such agreement, by order of Bankruptcy Court in the time and manner specified by the Sale Approval Order.

### 6.4    **Non-Competition**:

**6.4.1**    Delphi and each Seller undertake and agree with Buyers that for a period of five (5) years after the Closing Date (the "**Restricted Period**"), except with the consent of Buyers' Representative, neither Delphi nor any Seller will not, and will procure that each Affiliate thereof will not, either on its own account or in conjunction with or on behalf of any person, firm or company, whether by sales, marketing or other activities, carry on or be engaged, whether as a shareholder, director, employee, partner or agent in carrying on any business which is engaged in the design, development, manufacture, remanufacture or sale of Products as carried on by the Business currently or at the Closing Date (a "**Competitive Business**"); provided, however, that the restrictions contained in this Section 6.4.1 will not prohibit, in any way, (i) the acquisition by Delphi or any of its Affiliated companies, directly or indirectly, of a non-controlling ownership interest in any Person or a division or business unit thereof, or any other entity engaged in a Competitive Business, if the Competitive Business accounts for fifteen (15%) percent or less of the sales or fifteen (15%) percent or less of the value of the acquired business at the date of such acquisition (whichever is the greater), but in no event having greater than $25 million in gross sales of products of the Competing Business; (ii)  the acquisition by Delphi or any of its Affiliated companies, directly or indirectly, of less than five (5%) percent of the publicly traded stock of any Person engaged in a Competitive Business; (iii) consistent with Delphi's troubled supplier practices relating to assuring supply of its Products to Delphi's OE customers so as to prevent a production interruption at such customers, any direct or indirect activities of Delphi or any Delphi Affiliate to advise, operate, manage or finance a troubled supplier of Delphi or its Affiliates, provided that Seller would use all commercially reasonable efforts to re-source the affected products as soon as practicable (within ninety (90) days unless Buyer consents to a longer period) and provide Purchaser with an opportunity to bid on such re-sourced products that are competitive with the Product; or (iv) the design, development, manufacture, remanufacture or sale of cinching latches and strikers, CRFMs and other HVAC products and the Excluded Products.

**6.4.2**    As a separate and independent covenant, Delphi and each Seller undertake and agree with Buyers that for the Restricted Period, except with the consent of Buyers' Representative, neither Delphi nor any Seller will, and Delphi will procure that each Affiliate thereof will not, either for its own account or in conjunction with or on behalf of any person, firm or company, for the purpose of carrying on any Competitive Business, call upon, solicit, advise or otherwise do, or attempt to do, business with any customers of the Business.

**6.4.3**    In the event that the covenants contained in Section 6.4.1 or Section 6.4.2 are more restrictive than permitted by Law, the Parties agree that the covenants contained in Section 6.4.1 or Section 6.4.2 will be enforceable and enforced to the extent permitted by Law.

**6.4.4**    The Restricted Period shall be extended by the length of any period during which Delphi or any Seller is determined by a Court of competent jurisdiction, to be in breach of the terms of this Section 6.4.

**6.4.5**    Delphi acknowledges that the covenants set forth in this Section 6.4 are an essential element of this Agreement and that, but for the agreement of Delphi to comply with these covenants and agreement of Delphi to ensure that all of its Affiliates

comply with these covenants, the Buyers would not have entered into this Agreement. Delphi acknowledges that: (i) this Section 6.4 constitutes an independent covenant that shall not be affected by performance or nonperformance of any other provision of this Agreement by the Buyers other than payment of the entire Purchase Price; (ii) $10 million of the Purchase Price shall be consideration allocable to such independent covenant (without limiting Buyers' rights for indemnification purposes hereunder to be allocated among the Sellers on a pro rata basis consistent with the Allocation); (iii) if any covenant of Delphi set forth in this Section 6.4 were not performed in accordance with its specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at law would exist and damages would be difficult to determine, and that the Buyers shall be entitled to specific performance of the terms of this Section 6.4, in addition to any other remedy at law or equity; and (iv) Delphi has independently consulted with their counsel and after such consultation agree that the covenants set forth in this Section 6.4 are reasonable and proper.

**6.5     Tax Matters; Cooperation; Preparation of Returns; Tax Elections:**

      **6.5.1**    Seller will be responsible for the preparation and filing of all Tax Returns for the JV Company(ies) that are due on or prior to the Closing Date, including amended returns, applications for loss carryback refunds and applications for estimated tax refunds.   JV Company(ies) will make any payments required to be made with these returns.  Buyer will be responsible for the preparation and filing of all Tax Returns for the JV Company(ies) that are due after the Closing Date, including amended returns, applications for loss carryback refunds and applications for estimated tax refunds. JV Company(ies) will make any payments required to be made with these returns.

      **6.5.2**    Seller will be responsible for the preparation and filing of all Tax Returns relating to the Acquired Assets for all periods ending on or prior to the Closing Date, including amended returns, applications for loss carryback refunds and applications for estimated tax refunds.  Seller will make any payments required to be made with these returns.

      **6.5.3**    Buyer shall prepare and file all Tax Returns relating to all real property Taxes, personal property Taxes or similar ad valorem obligations (collectively, "**Property Taxes**") levied with respect to the Acquired Assets for any taxable period that begins before the Closing Date and ends after the Closing Date (each such taxable period, a "**Straddle Period**"), whether imposed or assessed before or after the Closing Date, other than Straddle Period Tax Returns that Seller is required to file by applicable law. Seller shall be liable for and shall indemnify Buyer, its Affiliates and each of their respective officers, directors, employees, stockholders, agents and representatives against all liability for the entire amount of Property Taxes levied for the Straddle Period multiplied by a fraction the numerator of which is the number of days in the Tax period ending on the Closing Date and the denominator of which is the number of days in the entire Tax period.  Buyer shall be liable for and shall indemnify Seller, its Affiliates and each of their respective officers, directors, employees, stockholders, agents and representatives against all liability for the entire amount of Property Taxes levied for the Straddle Period multiplied by a fraction the numerator of which is the number of days in the Tax period beginning on the day following the Closing Date and the denominator of which is the number of days in the entire Tax period.  Any credits relating to a Straddle Period shall be taken into account as though the relevant Straddle Period ended on the Closing Date.  All determinations necessary to give effect to the foregoing allocations

shall be made in a manner that does not accelerate deductions or defer income.  With respect to any such Straddle Period returns or filings, the non-filing party shall pay to the filing party, not later than five (5) Business Days before the due date for payment of such Property Taxes levied for the Straddle Period, provided that the non-filing Party has received notice of the allocation at least ten (10) Business Days prior to the due date for payment under this Section 6.5.3, an amount equal to the portion of such Property Taxes levied for the Straddle Period for which the non-filing party is liable under this Section 6.5.3, and the filing party shall, promptly following the filing thereof, provide the non-filing party with a copy of such return or other filing and a copy of a receipt showing payment of any such Property Taxes levied for the Straddle Period.  If notice of the allocation is not provided to the non-filing party at least fifteen (15) Business Days prior to the due date for payment under this Section 6.5.3, the non-filing party shall pay fifteen (15) days after receipt of notice, but shall have no liability if the payment is not made at least five (5) Business Days before the due date for payment of such Property Taxes levied for the Straddle Period.  For any Property Tax Returns for the Straddle Period which the Seller was required by law to file prior to the Closing Date, the Seller shall provide an allocation between Seller and Buyer of the Property Taxes reflected on such returns, applying this Section 6.5.3 and taking into account all payments made as of the Closing Date, as soon as practicable following Closing.  The Party with a net liability to the other Party shall make a payment in settlement of the net liability within fifteen (15) days following the date on which the allocation is provided.  Any payments under this Section 6.5.3 shall be treated as purchase price adjustments under Article 3.

6.5.4    Buyers will be responsible for the preparation and filing of all Tax Returns relating to the Acquired Assets for all periods beginning after the Closing.  Buyers or Buyers will make all payments required with respect to any such Tax Return.

6.5.5    Sellers and Buyers will use commercially reasonable efforts and cooperate in good faith to exempt the sale, conveyance, assignments, transfers, and deliveries to be made to the Buyers hereunder from any federal, state, county, local, foreign and other transfer, documentary, sales, use, registration, recording, stamp, value-added and other such taxes (including all applicable real estate transfer taxes, but excluding any taxes based on or attributable to income or gains) and related fees (including notarial fees as well as any penalties, interest and additions to tax) ("**Transfer Taxes**") payable in connection with such sale, conveyance, assignments, transfers and, deliveries, to the extent provided in the Sale Approval Order, in accordance with Section 1146(c) of the Bankruptcy Code.  If Bankruptcy Court approval is granted for such exemption, then any instrument transferring the acquired assets to the Buyers will contain the following endorsement:

> Because the transactions contemplated by this Agreement have been authorized pursuant to Order of the United States Bankruptcy Court for the Southern District of New York relating to a chapter 11 plan of [Seller], they are exempt from transfer taxes, stamp taxes, or any other similar taxes pursuant to 11 U.S.C. § 1146(c).

To the extent not exempt under Section 1146 of the Bankruptcy Code and approved in the Sale Approval Order, such Transfer Taxes arising out of or incurred in connection with this Agreement will be borne solely by Buyers.  The party that is legally required to file a Tax Return relating to Transfer Taxes will be responsible for preparing and timely filing such Tax Return.  Delphi will prepare the Transfer Tax returns for which Delphi is

responsible as soon as is practicable and provide the Buyers with a copy to review. Buyers agree to provide Delphi with comments and the amount of transfer tax to be paid in sufficient time to enable Delphi to timely file the return and pay the Transfer Tax.

**6.5.6**   Buyers and Sellers will cooperate, or cause their Affiliates to cooperate, in connection with: (i) the preparation and filing of any Tax Return, Tax election, Tax consent or certification or any claim for a Tax refund; (ii) any determination of liability for Taxes; and (iii) any audit, examination or the prosecution or defense of any claim, suit or other proceeding in respect of Taxes related to the Business or the Acquired Assets. Buyer and Seller agree to furnish or cause their Affiliates to furnish to each other upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets, the JV Companies, or the Business (including access to books and records) as is reasonably necessary to so cooperate.  Buyer and Seller or their Affiliates shall each execute and deliver such other documents as are necessary to carry out the intent of this Section 6.5.  Buyer and Seller shall provide, or cause their Affiliates to provide, timely notice to each other in writing of any pending or threatened Tax audits, assessments or litigation with respect to the Acquired Assets or the Business for any taxable period for which the other party may have liability under this Agreement.  Buyer and Seller shall furnish, or cause their respective Affiliates to furnish, to each other copies of all correspondence received from any Taxing Authority in connection with any Tax Audit or information request with respect to any taxable period for which the other party or its Affiliates may have liability under this Agreement.

**6.5.7**   Buyers will not make any election under Internal Revenue Code Section 338 for any JV Company.

**6.6**   **Employee Matters:**

**6.6.1**   **Transferred Employees.**  Sellers will update <u>Schedule 4.11.1</u> as of the day prior to Closing:

**A.**   Subject to Section 6.6.1.B, Section 6.6.1.H, and Section 6.6.3, effective as of the Closing, the relevant Buyer will offer employment to all U.S. Employees, other than Inactive Employees, and Non-U.S. Employees with such new employment to commence (if accepted, whether by reporting to work or otherwise) with effect from the Closing; provided, however, that, the relevant Buyer will assume the employment Contracts listed on <u>Schedule 6.6.1</u> of any Non-U.S. Employees in accordance with applicable Transfer Regulations.  In addition, the relevant Buyer will: (i) employ the employees of Sellers or Sellers' Affiliates (for the purpose of this Section 6.6.1.A, Seller's Affiliates will include Korea Delphi Automotive Systems Corporation) currently seconded to either of the JV Companies, in accordance with applicable terms of employment; or (ii) elect to retain such employees through an employment contract company (e.g., FESCO); in any case, in accordance with applicable Laws and Transfer Regulations.  Buyers will comply with all requirements of the Transfer Regulations, including assuming and recognizing the seniority status of such employees for all purposes of the continued employment with the relevant Buyer.

**B.**   Subject to the next sentence, Buyer will offer employment to all but up to five (5) active U.S. Salaried Employees, other than Inactive Employees who will transfer in accordance with Section 6.6.3, who primarily support the

Business, including: (i) all salaried employees at the Adrian, Michigan; Gadsden, Alabama; and Cottondale, Alabama Manufacturing Facilities; and (ii) salaried employees who primarily support the Business in the case of the Vandalia, Ohio technical center, and the Troy, Michigan technical center and corporate offices. The foregoing obligation would not apply to employees ineligible for employment by Buyer based on "cause" as previously identified in Buyer's due diligence and mutually agreed by the parties which will not be unreasonably withheld.  For all U.S. Salaried Employees, except as otherwise provided herein, Buyers' offer of employment will include salary and benefits packages that are substantially comparable in the aggregate to those in place immediately prior to Closing.  Prior to tendering such offers, Buyers will provide Sellers with information sufficient to satisfy Sellers (not to be unreasonably withheld) that such offers meet the "substantially comparable in the aggregate" requirement.  Sellers' satisfaction that Buyers' offers meet this requirement will not be unreasonably withheld.  For all such U.S. Salaried Employees, Buyers will maintain the requisite level of compensation and benefits for a minimum of twelve (12) months following the Closing Date; provided, however, that, where the level of compensation and benefits of any such employees is governed by a Contract containing a different duration provision and referred to in <u>Schedule 6.6.1</u>, Buyers will abide by the terms of such Contract.

C.      For all U.S. Hourly Employees or Non-U.S. Employees, Buyer's offer of employment (or assumption of employment Contract as applicable for any Non-U.S. Employees) will be on the same terms, at the same level of compensation and with the same benefits in effect immediately prior to Closing. The specific terms governing the offer of employment to any Non-U.S. Employee will be as set forth in the applicable Transfer Agreement and in compliance with applicable Transfer Regulations.

D.      Sellers will retain responsibility for all Liabilities for workers' compensation benefits related to injuries or illnesses incurred by Transferred U.S. Employees prior to the Closing, provided that claims for such Liabilities are filed within twelve (12) months of the Closing.  All other such Liabilities will be the responsibility of Buyer.

E.      Regardless of the vesting date, Sellers will be responsible for the amount of all accrued and unutilized vacation pay and any profit sharing or incentive compensation of Transferred U.S. Employees due for the calendar year in which the Closing occurs on a pro-rata basis using the number of days worked by the Transferred U.S. Employees for Seller or other Seller-Affiliated employer.

F.      Buyers will assume all accrued pension and vacation pay liabilities for all Transferred Non-U.S. Employees, as set forth in the Transfer Agreements.

G.      Seller will remain responsible for all employment rights of Transferred U.S. Employees incurred or vesting prior to the Closing, except as otherwise provided in this Section 6.6, and will retain all assets relating thereto, including training funds in connection with Seller U.S. Collective Bargaining Agreements.

**H.**    Schedule 6.6.1.H lists the U.S. Hourly Employees who, as of the Closing Date, are or may become eligible for traditional pension benefits under the Delphi Hourly-Rate Employees Pension Plan ("**Delphi HRP**") (i.e., pension benefits other than cash balance benefits provided in accordance with the Individual Retirement Plan provisions of the Delphi HRP) and their union affiliation (i.e., UAW or IUE-CWA).   Seller will continue to employ the U.S. Hourly Employees listed on Schedule 6.6.1.H and will lease such U.S. Hourly Employees (hereinafter "**Leased U.S. Hourly Employees**") to Buyer until such time as benefit accruals under the Delphi HRP are frozen in accordance with the "**Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and GM Consensual Triggering of Benefit Guarantee**" (i.e., Attachment B of the 2007 UAW-Delphi-GM Memorandum of Understanding – Delphi Restructuring dated June 22, 2007 or Attachment B of the IUE-CWA-Delphi-GM Memorandum of Understanding – Delphi Restructuring dated August 5, 2007, as applicable) (hereinafter the "**Benefit Guarantee Term Sheet**"), but in no event for a period longer than nine (9) months following Closing unless Buyer agrees otherwise (which agreement Buyer may withhold in its sole discretion).   Subject to the preceding sentence, once the Delphi HRP is frozen in accordance with the Benefit Guarantee Term Sheet, Buyer will offer employment to the Leased U.S. Hourly Employees and, if accepted, such Leased U.S. Hourly Employees will become Transferred  Employees.  For and in relation to the lease period, Buyer will reimburse Seller for all of Seller's employment-related costs, including wages and benefits, associated with the Leased U.S. Hourly Employees at the rate of $34.67 per hour worked for production employees and $59.40 for skilled trades employees.

**6.6.2  Collective Bargaining Agreements.**  Buyers will assume the terms and conditions of all Collective Bargaining Agreements referred to in Schedule 6.6.1 that relate to Non-U.S. Employees, in accordance with applicable Transfer Regulations. Buyers will assume the terms and conditions of the Collective Bargaining Agreements applicable at the Cottondale, Alabama; Adrian, Michigan; and Gadsden, Alabama Manufacturing Facilities as such terms and conditions may be modified by mutual agreement of the Buyer and the respective unions prior to Closing and subject to a Memorandum of Understanding between Seller and the respective Union regarding the effects of the sale upon the bargaining unit members (the "**Effects MOU**"); provided, however, that Buyer will not assume any obligation or liabilities under the Effects MOUs or under Seller Employee Benefit Plans referred to in such Collective Bargaining Agreements but rather will establish Buyer-sponsored employee benefit plans which are consistent with the terms and conditions of such Collective Bargaining Agreements; and, provided, further, that the assumed Collective Bargaining Agreements will  apply only to  U.S. Hourly Employees who become  Transferred Employees, and other individuals hired by Buyer after Closing.  Buyers will recognize the seniority status of all Transferred Employees who are employed in accordance with a Collective Bargaining Agreement for all purposes of continued employment with Buyers.

**6.6.3  Inactive Employees:**

**A.**    U.S. Employees who are not active employees as of the Closing ("**Inactive Employees**") due to disability, family medical leave or other approved leave of absence will remain Sellers' responsibility until such employee is ready

to return to active employment in accordance with Sellers' leave policies and Section 6.6.3.B below.

**B.**    When an Inactive Employee is ready to return to active status in accordance with Sellers' leave policies, Buyers will offer employment to such individual in accordance with Section 6.6.1 and, provided such individual accepts Buyers' offer of employment, such individual will be considered a Transferred Employee as of the date such individual reports to work with Buyers for active duty.  In the event that an employee is seeking to return to active employment from a medical-based leave, such individual's fitness for active employment must be approved by both Sellers and Buyers; provided that such process does not violate any applicable Collective Bargaining Agreement or Law.

**C.**    If Sellers and Buyers do not agree as to an individual's fitness for active employment, the issue will be submitted to an independent medical evaluator, whose determination will be final and binding on the Parties.  The cost of such independent medical evaluation will be shared equally by the Parties.

### 6.6.4   Employee Benefit Plans:

**A.**    Buyers will assume all accrued pension liabilities for all Transferred Non-U.S. Employees, in accordance with the applicable Transfer Regulations and as set forth in this Agreement or the Transfer Agreements.

**B.**    Subject to Section 6.6.4.E below, Transferred U.S. Employees' and their dependents' and beneficiaries' participation in and eligibility for benefits under the Seller Employee Benefit Plans (other than vested pension benefits) will cease as of the Closing.  Notwithstanding the preceding sentence, the Seller Employee Benefit Plans which are welfare plans as defined under ERISA will retain liability for all claims incurred by the Transferred U.S. Employees and their dependents and beneficiaries prior to the Closing, including claims which are not submitted until after the Closing.  A claim will be deemed incurred, as applicable:

(i)    On the date of the occurrence of death or dismemberment in the case of claims under life insurance and accidental death and dismemberment Seller Employee Benefit Plans;

(ii)    On the date on which the service or treatment is provided in the case of claims under medical, hospital, dental and similar Seller Employee Benefit Plans; or

(iii)    On the date immediately following a Transferred U.S. Employee's last day worked on which a physician legally licensed to practice medicine certifies to total disability under the applicable disability Seller Employee Benefit Plans.

**C.**    Transferred U.S. Employees' and their dependents' and beneficiaries' participation in and eligibility for benefits under the Buyers' Employee Benefit Plans will commence as of the Closing.  Buyers will not assume any Seller Employee Benefit Plans applicable to Transferred U.S. Employees or any Assets or Liabilities relating to:

(i)    Any Employee Benefit Plan which Sellers or any of their subsidiaries maintain, contribute to or have any obligation to contribute to;

(ii)    Any Employee Benefit Plan to which Sellers or any of their subsidiaries have incurred or expect to incur liability, direct or indirect, contingent or otherwise, under Title IV of ERISA with respect to the termination of, or withdrawal from, any Employee Benefit Plan;

(iii)    Any accumulated funding deficiency (as defined in Section 302 of ERISA) that has occurred, exists or is reasonably expected to occur with respect to any Employee Benefit Plan subject to Title IV of ERISA with respect to which Sellers or any of their Affiliates have or may have any Liability, direct or indirect, contingent or otherwise; or

(iv)    Claims of the U.S. employees of Sellers or their Affiliates (or a dependent thereof who becomes a "qualified beneficiary" within the meaning of Section 4980B(g)(1) of the Internal Revenue Code) related to compliance with the requirements of continuation coverage under Section 4980B of the Internal Revenue Code or Section 601 of ERISA or as a result of any "qualifying event" within the meaning of Section 4980B(f)(3) of the Internal Revenue Code which occurs prior to the Closing.

**D.**    Buyers will recognize a Transferred U.S. Salaried Employee's pre-Closing credited service with Seller for eligibility and vesting purposes but not benefit accrual purposes with respect to any Employee Benefit Plans of any Buyer.    However, in no case will credited service be recognized under this provision if such recognition will cause a duplication of compensation or benefits as between Sellers and Buyers.

**E.**    Buyer will not provide transferred U.S. Salaried Employees with a defined benefit plan, but will provide a defined contribution plan.    Seller will retain all assets and liabilities under Seller's defined benefit pension plan for the benefits accrued prior to Closing for any transferred U.S. Salaried Employees. Subject to Seller obtaining the requisite government approvals to do so, Seller's defined benefit plan will continue to recognize service at Buyer for purposes of vesting and eligibility (but not benefit accrual) provided that Buyer will reimburse Seller quarterly solely for the service cost of Seller's pension supplement as set forth in Part A, Article I, Section 2 of the Delphi Retirement Program for Salaried Employees.    The annual service cost Buyer pays Seller will be based upon the Seller's SFAS 87 assumptions in Seller's then most-recent annual report subject to it being reasonably acceptable to Buyer's actuary.    Other than reimbursement for the service cost relating to the pension supplement, Buyer will have no obligation relating to Seller's defined benefit plan.

**F.**    Buyer will not provide retiree welfare benefits (including retiree medical benefits and life insurance) to Transferred U.S. Salaried Employees. Sellers will retain all liability and responsibility for retiree welfare benefits for Transferred U.S. Salaried Employees who are eligible to retire from Sellers as of the Closing.    With regard to transferred U.S. Salaried Employees who are not eligible to retire as of the Closing but who are eligible for retiree welfare benefits:

(i)      Buyer will pay to Delphi the annual service cost of the Delphi retiree medical benefits being earned by such Transferred U.S. Salaried Employees for the years employed by Buyer up to the date such employees' eligibility requirements have been fulfilled; and

(ii)      Buyer will pay to Delphi the annual service cost of the Delphi retiree life insurance being earned by such Transferred U.S. Salaried Employees for the years employed by Buyer up to the date such employees actually retire from Buyer.

On an annual basis, Buyer will pay to Delphi the above annual service costs under Delphi's benefit plans associated with retiree welfare benefits for the Transferred U.S. Salaried Employees.  If a Transferred U.S. Salaried Employee leaves the employ of Buyers prior to his being eligible to retire with retiree welfare benefits in accordance with Seller's applicable retiree welfare benefit plans, the service cost previously paid by Buyers for such employee will be deducted from any future contribution by Buyer.  Seller will provide such retiree welfare benefits in accordance with the Seller retiree welfare benefit plans in effect on or after the date such Transferred U.S. Salaried Employee actually retires.  The annual service cost Buyer pays Delphi will be based upon the Seller's SFAS 106 assumptions in Seller's then most-recent annual report, subject to it being reasonably acceptable to Buyer's actuary.

**G.**      Pension and retiree welfare benefits received from Seller (contingent on Buyers' reimbursements for pension and retiree medical service costs under Section 6.6.4.E and 6.6.4.F) shall be included in determining Buyers' satisfaction of the "substantially comparable in the aggregate" requirement in Section 6.6.1.B.

**H.**      **Severance.**  Buyers will be responsible for all obligations and liabilities relating to any claims for severance, termination (actual or constructive), redundancy, change in control agreements or other payments or benefits by Transferred U.S. Employees arising from the transactions contemplated under this Agreement and based on Buyer's actions following the Closing; provided, however, that Seller will be responsible for reimbursing all severance amounts incurred by Buyer for the number of U.S. Hourly Employees who at the Closing Date are manufacturing HVAC products under the Adrian Manufacturing Services Agreement, within ten (10) Business Days after receipt of an invoice reasonably detailing all such severance amounts actually incurred by Buyer for hourly Transferred Employees upon  termination of the Adrian Manufacturing Services Agreement.

**I.**      **Employee Benefits of U.S. Hourly Employees.**  On or before Closing the Parties will agree as to the mechanics of the "our watch, your watch" details of this Section 6.6.4, as relates to U.S. Hourly Employees who become Transferred Employees.

**6.6.5  COBRA.**  Seller will retain responsibility for all liabilities, obligations, commitments, costs and expenses for claims of the Transferred U.S. Employees (or a dependent thereof who becomes a "qualified beneficiary" within the meaning of

Section 4980B(g)(1) of the Internal Revenue Code) related to compliance with the requirements of continuation coverage under Section 4980B of the Internal Revenue Code or Section 601 of ERISA or as the result of any "qualifying event" within the meaning of Section 4980B(f)(3) of the Internal Revenue Code which occurs at or prior to the Closing.

6.6.6    **WARN Act.**  Buyers will assume all post-Closing obligations and liabilities relating to WARN Act or other similar notice Laws, if any, by Transferred Employees arising from the transactions contemplated under this Agreement.

6.6.7    **Grievances.**  Seller will retain responsibility to administer and all liability for labor union grievances and arbitration proceedings (collectively the "**Grievances**") involving claims of Transferred U.S. Hourly Employees incurred prior to the Closing, but only if Buyer notifies Seller within one (1) year after Closing of any Grievances filed after the Closing which relate to claims incurred prior to the Closing.  Buyer will be responsible to administer and bear all liability for Grievances involving claims incurred after the Closing and Grievances involving claims incurred prior to the Closing to the extent that Seller was not provided notice of any such Grievances within one (1) year of Closing.  To the extent the administration or resolution of any Grievances requires both the Buyers' and Sellers' participation, the following apply:

A.    Buyers and Sellers will cooperate in the defense of the Grievances.

B.    Buyers will not settle any Grievance without Sellers' consent if such settlement will result in Liability for Seller.  Such consent will not be unreasonably withheld.

C.    Sellers will not settle any Grievance without Buyers' consent if such settlement will result in Liability for Buyers.  Such consent will not be unreasonably withheld.

D.    If the seniority of an employee is reinstated as a result of the disposition of a Grievance or Governmental Order, Buyer will reinstate the employee as if such employee had been a Transferred U.S. Hourly Employee as of the Closing.

E.    For Transferred U.S. Hourly Employees who have been continuously employed, back pay Liability to the extent relating to an event, occurrence or cause of action arising prior to the Closing will be allocated to Seller.  Liability relating to an event, occurrence or cause of action arising subsequent to the Closing will be allocated to Buyer.

F.    For employees who become Transferred U.S. Hourly Employees because they are reinstated through the grievance procedure, back pay Liability relating to periods prior to the Closing will be allocated to Seller.  Liability relating to periods subsequent to the Closing will be allocated to Buyer.

G.    The Parties will discuss treatment of Grievances involving unusual circumstances or events that continue before and after the Closing.

**H.**     If either party withholds consent to a settlement or processing of a Grievance recommended by the other party or elects to continue to defend the Grievance, then such party will be liable for the portion of the Liabilities resulting from the ultimate disposition of such Grievance (or subsequent settlement) which is in excess of the liability that would have resulted from the settlement recommended and rejected.

**6.6.8    Cooperation.**    Sellers and Buyers will provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this Section 6.6.

**6.6.9    Union and Works Council Notifications.**    Sellers and Buyers will reasonably cooperate in connection with any notification required by Law to, or any required consultation with, or the provision of documents and information to, the employees, employee representatives, work councils, unions, labor boards and relevant government agencies and governmental officials concerning the transactions contemplated by this Agreement.

**6.6.10  Non-Solicitation.**    Delphi and each Seller, in each case on behalf of itself and its Affiliates (collectively, "**Restricted Parties**"), agree, for a period of five (5) years following Closing: (i) not to offer to employ any of the salaried Transferred Employees of the Business; and (ii) not to employ or offer to employ any of the individuals listed on Schedule 6.6.10 hereto; in each case without Buyer's prior consent (not to be unreasonably withheld).    Notwithstanding the foregoing, the Restricted Parties may employ any individuals referred to in clause (i) above who either: (a) respond to a general advertisement that is not targeted specifically at the salaried Transferred Employees; or (b) have been terminated by Buyer prior to commencement of employment discussions with a Restricted Party.

**6.6.11  Amendment of Buyer Plans**.    Subject to Buyers' compliance with its obligations under Section 6.6.1.B (twelve (12) month requirement) and Section 11.3.1, nothing in this Section 6.6 shall prevent the amendment or termination of any Employee Benefit Plan of any Buyer or limit the right of Buyer or any of its Affiliates to terminate the employment of any Transferred Employee at any time.    Without limiting the generality of Section 12.13, nothing in this Section 6.6, express or implied, is intended to or shall confer upon any Transferred Employee any right, benefit or remedy of any nature whatsoever against Buyers or their Affiliates.

**6.7     Contact with Customers and Suppliers.**    Prior to the Closing, except in the ordinary course as a supplier to certain customers and without discussing the Sale, Buyers and their Affiliates and their respective representatives will contact and communicate with the Transferred Employees, customers, suppliers and licensors of the Business in connection with the transactions contemplated by this Agreement only with the prior consent of Delphi, which consent shall not be unreasonably withheld and, except with respect to General Motors, may be conditioned upon a designee of Delphi being present at any such meeting or conference.

**6.8     Technical Documentation.**    Sellers have delivered, or will deliver on or before the Closing, to the Buyer, a copy of all Technical Documentation included in the Acquired Assets.    For a period of not less than ten (10) years commencing at the Closing, Buyers will use reasonable efforts to maintain all Technical Documentation applicable to Product design, test, release and validation at a location at which it will be reasonably accessible to Delphi upon

Seller's request where such access is reasonably necessary in connection with the defense of litigation or Claims brought against Seller by a third party, an investigation or inquiry by a Governmental Authority, or third party subpoenas.  During such ten (10) year period, Buyers will not destroy or give up possession of the final copy of such Technical Documentation without offering Delphi the opportunity to obtain a copy of such documentation at Delphi's expense but without any payment to Buyers.

### 6.9    <u>Books and Records and Litigation Assistance From and After Closing</u>:

6.9.1    Buyers will preserve and keep all books, records, computer files, software programs and any data processing files delivered to Buyer by Seller and its Affiliates pursuant to the provisions of this Agreement for a period of not less than five (5) years from the Closing Date, or for any longer period as may be required by any Law, Governmental Entity Order or in connection with any ongoing litigation, audit or appeal of Taxes, or Tax examination, at Buyer's sole cost and expense.   During such period, Buyer will: (i) provide Seller with such documents and information as necessary, consistent with past practice, to complete the accounting books and records of each facility included within the Business; and (ii) make such books and records available to Seller and its Affiliates as may be reasonably required by Seller and its Affiliates in connection with any legal proceedings against or governmental investigations of Seller and its Affiliates or in connection with any Tax examination, audit or appeal of Taxes of Seller and its Affiliates, the Business or the Acquired Assets.  Seller or its Affiliates will reimburse Buyer for the reasonable out-of-pocket expenses incurred in connection with any request by Seller to make available records pursuant to the foregoing sentence.  In the event Buyer wishes to destroy or dispose of such books and records after five (5) years from the Closing Date, it will first give not less than ninety (90) days' prior written notice to Seller, and Seller will have the right, at its option, upon prior written notice given to Buyer within sixty (60) days of receipt of Buyer's notice, to take possession of said records within ninety (90) days after the date of Buyer's notice to Seller hereunder.

6.9.2    Buyers will, from time to time, at the reasonable request of Sellers, cooperate fully with Sellers in providing Sellers and their Affiliates (as appropriate) (to the extent possible through Transferred Employees) with technical assistance and information in respect to any claims brought against Sellers and their Affiliates involving the conduct of the Business prior to Closing, including consultation and/or the appearance(s) of such persons on a reasonable basis as expert or fact witnesses in trials or administrative proceedings.  Sellers will reimburse Buyers and their Affiliates for their reasonable, actual direct out-of-pocket costs (travel, employee time (other than for clerical services), hotels, etc.) of providing such services.  In particular, Buyers, for themselves and on behalf of their Affiliates, agree to: (i) retain all documents required to be maintained by Law and all documents that may be reasonably required to establish due care or to otherwise assist Sellers and their Affiliates in pursuing, contesting or defending such claims; (ii) make available their documents and records in connection with any pursuit, contest or defense, including documents that may be considered to be "confidential" or subject to trade secret protection (except that: (a) no documents or records protected by the attorney client privilege in favor of Buyers and their Affiliates must be made available if making these documents or records available would cause the loss of this privilege (in any case, however, Buyers must notify Sellers of the existence of such privileged documents); and (b) Sellers and their Affiliates will agree to keep confidential documents and records that are confidential or are subject to trade secret protection); (iii) promptly respond to discovery requests in connection with such claim,

understanding and acknowledging that the requirements of discovery in connection with litigation require timely responses to interrogatories, requests to produce and depositions and also understanding and acknowledging that any delays in connection with responses to discovery may result in sanctions; (iv) make available, as may be reasonably necessary and upon reasonable advance notice and for reasonable periods so as not to interfere materially with Buyers' business, mutually acceptable engineers, technicians or other knowledgeable individuals to assist Sellers and their Affiliates in connection with such claim, including investigation into claims and occurrences described in this section and preparing for and giving factual and expert testimony at depositions, court proceedings, inquiries, hearings and trial; and (v) make available facilities and exemplar parts for the sole and limited use of assisting Sellers and their Affiliates in the contest or defense.

**6.10    Corporate Names:**

**6.10.1** Buyers will have the right (including the right to authorize their relevant Affiliates) to continue to sell or dispose of any existing inventories or service materials of the Business in existence at the Closing and bearing any trademark, service mark, trade name or related corporate name of Delphi or any Affiliate of Delphi for a period of no more than ninety (90) days after the Closing Date (one hundred eighty (180) days for engineering drawings) in a manner consistent with past practice of the Business and the name and reputation associated therewith, provided that Buyers and their Affiliates will clearly indicate to recipients of such written materials that the Business is owned by Buyers and their Affiliates and is no longer affiliated with, and Buyer and its Affiliates do not represent, the Sellers or any Affiliate of Seller.

**6.10.2** After the expiration of the applicable period set forth in Section 6.10.1, Buyers will not use, and will use commercially reasonable efforts to cause the JV Companies not to use, the name "Delphi" and any trademarks, trade names, brandmarks, brand names, trade dress or logos relating or confusingly similar (including on any signs, billboards, advertising materials, telephone listings, web sites, labels, stationery, office forms, packaging or other materials) in connection with the Business or otherwise.  No later than forty-five (45) days before the Closing Date, Buyer shall submit a company name change request to Seller for review.  Upon the agreement by the Parties on such name change, Seller will be responsible for registering such new name with the relevant government authority, provided that Buyer shall provide all necessary assistance and documents required to achieve that effect.

**6.10.3** If not completed prior to Closing, consistent with the terms of applicable JV Company Contracts included in the Acquired Assets, Buyers will use all commercially reasonable efforts to cause each of the JV Companies to amend its certificate of incorporation, partnership agreement, limited liability company agreement and other applicable documents, in order to change the names of such companies to a name not containing the word "Delphi", with such changes to take effect pursuant to the terms of the respective transfer deed governing the sale of each JV Company.

**6.10.4** Each of the Parties acknowledges and agrees that the remedy at Law for any breach of the requirements of this Section 6.10 would be inadequate, and agrees and consents that without intending to limit any additional remedies that may be available, temporary and permanent injunctive and other equitable relief may be granted

without proof of actual damage or inadequacy of legal remedy in any Proceeding which may be brought to enforce any of the provisions of this Section 6.10.

**6.10.5** Notwithstanding the foregoing, nothing in this Section 6.10 shall prevent Buyers from selling all existing inventory for Chevrolet Malibu door module service parts and Fiat Stilo latch service parts until all such inventory has been sold, provided that such service parts are packaged in a manner to indicate that the Business is owned by Buyers and their Affiliates and is no longer affiliated with, and Buyer and its Affiliates do not represent, the Sellers or any Affiliate of Seller.

## 6.11    <u>Intellectual Property Licenses</u>:

**6.11.1** <u>License to Buyers</u>.  Delphi, on behalf of itself and its Affiliates, hereby grants to Buyers, as of the Closing Date, a worldwide, perpetual, paid-up, royalty free license to use the Shared Intellectual Property to develop, manufacture, use, import, export, offer to sell and sell Products and to reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith, subject to any restrictions arising from rights granted to third parties prior to the Closing Date; such license will be exclusive for a period of five (5) years after the Closing Date and nonexclusive after such period.  Further, Delphi, on behalf of itself and its Affiliates, hereby grants to Buyers, as of the Closing Date, a sublicense for all Sublicensed Intellectual Property, said sublicense being subject to the terms of the applicable Contracts listed in <u>Schedule 6.11.1</u>, to develop, manufacture, import, export, offer to sell and sell Products, and to reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith; effective upon and for a period of five (5) years after the Closing Date, neither Delphi nor its Affiliates will further sublicense the Sublicensed Intellectual Property to develop, manufacture, import, export, offer to sell or sell Products.  The license granted to Buyer under this Section 6.11.1 does not extend to the Excluded Products and is not assignable in whole or in part except to a purchaser of all or substantially all of the portion of the Business to which the license pertains.

**6.11.2** <u>License to Sellers</u>.  Buyers, on behalf of themselves and their Affiliates, hereby grant to Seller as of the Closing Date, a worldwide, perpetual, paid-up, royalty free, non-exclusive license to develop, manufacture, use, import, export, offer to sell and sell products and services of the type provided by Sellers and their Affiliates as of the Closing Date (other than the Products, but including Hybrid CrossCar Beams), and to reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith, using any Purchased Intellectual Property, subject to any restrictions arising from rights granted to third parties prior to the Closing Date.  The license granted to Seller under this Section 6.11.2 also extends to the Hybrid CrossCar Beam.

**6.11.3** <u>Further Understandings</u>.  The licenses granted above in this Section 6.11: (i) include the right for the licensed party to sublicense to any of its Affiliates, to its and their successors, and to suppliers, customers and others in connection with the conduct of the businesses contemplated by this Agreement; and (ii) do not include any right to use any Trademark Rights.  In addition, Sections 6.11.3.A-6.11.3.F detail certain rights concerning cinching latches and cinching strikers:

**A.**    The remote cinching latch, power pulldown units and the Lincoln power cinching striker (the "**Transferred Cinching Products**") are Products and will be transferred with the Business.  Owned Intellectual Property that is used primarily for Transferred Cinching Products is Purchased Intellectual Property and will be transferred with the Business.

**B.**    The integral cinching latch, the advanced development power cinching striker and the advanced development power cinching latch (the "**Retained Cinching Products**") are Excluded Products and will not be transferred with the Business.  Owned Intellectual Property that is used primarily for Retained Cinching Products ("**Retained Cinching Products Intellectual Property**") is not Purchased Intellectual Property but will be licensed as set forth in Section 6.11.3.C.

**C.**    Buyers' license under Section 6.11.1 also includes the right to use Retained Cinching Products Intellectual Property to develop, manufacture, use, import, export, offer to sell and sell cinching and non-cinching latches and strikers and to reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith.

**D.**    Delphi's license under Section 6.11.2 also includes the limited right to use Purchased Intellectual Property that is included in the Retained Cinching Products as of the Closing Date, to develop, manufacture, use, import, export, offer to sell and sell cinching latches and strikers for use with power closure drive systems sold by Delphi and its Affiliates and the successors to Delphi's power closure drive systems business, and for sale to Shanghai Delphi Automotive Door Systems Co., Ltd. and its successors, and to reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith.

**E.**    The non-competition provisions of Section 6.4.1 do not prohibit development, manufacture, use, import, export, offer to sell and sale of cinching latches and strikers for use with power closure drive systems sold by Sellers and their Affiliates.

**F.**    The non-competition provisions of Section 6.4.1 do not prohibit development, manufacture, use, import, export, offer to sell and sale of cinching and non-cinching latches and strikers by the successors to Delphi's power closure drive systems business.  However, this Agreement does not provide a right for such successors to use Purchased Intellectual Property except as set forth in Section 6.11.3.D.

**6.11.4  <u>Post-Closing Intellectual Property</u>.**  This Agreement does not grant Sellers any rights under any Intellectual Property created by Buyers after the Closing Date, and does not grant Buyers any rights under any Intellectual Property created by Sellers after the Closing Date.

**6.12    Intentionally Omitted.**

### 6.13    Competition Clearance:

**6.13.1** Subject to the terms hereof, Buyers and Delphi agree to cooperate and to use commercially reasonable efforts to obtain, as promptly as practicable following the date hereof, any Governmental Approvals required for the Closing under the HSR Act, EC Merger Regulation and any other applicable Competition/Investment Law, to respond to any government requests for information thereunder, to contest and resist in good faith any action thereunder, and to have lifted or overturned any Governmental Order that restricts, prevents or prohibits the consummation of the transactions contemplated by this Agreement.  The Parties will use commercially reasonable efforts to complete, no later than five (5) days after the Bid Deadline, Schedule 6.13.1, which includes a list of all countries in which competition filings may be required or appropriate.  In this respect, Buyers will make (or continue to prosecute, if made previously) all the competition filings set forth in Schedule 6.13.1 no more than five (5) Business Days after the date such Schedule has been completed, and Buyers' Representative will: (i) promptly inform Delphi of all oral and written communications with any Governmental Authority in respect of any required Governmental Approval; (ii) give Delphi the opportunity to comment on all filings and any response prepared by Buyers prior to Buyers' submitting such response to the relevant Governmental Authority; and (iii) afford Delphi or any Seller designated by Delphi the opportunity to attend any meetings, telephone conferences or video conferences organized with the Governmental Authorities in relation to any required Governmental Approval.  Notwithstanding the foregoing, the Parties agree that neither of them will make any voluntary filing under applicable foreign antitrust laws or regulations unless advised by legal counsel in such jurisdiction that the failure to make a filing could result in a Material Adverse Effect or otherwise be in violation of applicable Law.    Each party hereto will promptly inform the other of any oral or other communication from any Governmental Authority regarding any of the transactions contemplated by this Agreement and the Ancillary Agreements.  If the competition authority in any such country: (i) imposes conditions upon its approval of the transactions contemplated by this Agreement; or (ii) files a Proceeding before a Governmental Agency seeking to restrain or prohibit, or to obtain damages or other relief in connection with, the consummation of the transactions contemplated by this Agreement, the Parties will take commercially reasonable steps to negotiate with the competition authority regarding, and comply with, any conditions or modifications requested by such competition authority, consistent with the general intention of this Agreement (that ownership of the Business will be vested in the Buyers). Subject to Section 9.2.2, each Party will bear its own costs and expenses incurred in negotiating and agreeing to the required conditions or modifications with the competition authorities.

**6.13.2** Buyers will not acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets if the entering into of a definitive agreement relating to or the consummation of such acquisition, merger or consolidation would reasonably be expected to: (i) impose any delay in the obtaining of, or significantly increase the risk of not obtaining, any authorizations, consents, orders, declarations or approvals of any Governmental Authority necessary to consummate the transactions contemplated by this Agreement or the Transfer Agreements or the expiration or termination of any applicable waiting period; (ii) increase the risk of any Governmental Authority entering an order prohibiting the consummation of the transactions contemplated by this Agreement or the Transfer

Agreements; (iii) significantly increase the risk of not being able to remove any such order on appeal or otherwise; or (iv) delay or prevent the consummation of the transactions contemplated by this Agreement or the Transfer Agreements.

### 6.14    Further Actions:

**6.14.1** Within three (3) Business Days after the entry of an unstayed Sale Approval Order by the Bankruptcy Court, the Parties will use commercially reasonable efforts to take all actions and to do all things necessary, proper or advisable under Law to consummate the transactions contemplated hereby and by the Transfer Agreements. In furtherance of the foregoing, the Parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto in connection with the transactions contemplated by this Agreement.

**6.14.2** At all times prior to the Closing: (i) Delphi will notify Buyers' Representative in writing of any fact, condition, event or occurrence that will result in the failure of any of the conditions contained in Article 7 to be satisfied, promptly upon any of them becoming aware of the same; and (ii) Buyers' Representative will notify Delphi in writing of any fact, condition, event or occurrence that will result in the failure of any of the conditions contained in Article 7 to be satisfied, promptly upon any of them becoming aware of the same.

**6.15    Further Assurances.**  If at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, the parties hereto shall take or cause to be taken all such necessary action, including, without limitation, the execution and delivery of such further instruments and documents as may be reasonably requested by the other party for such purposes or otherwise to consummate and make effective the transactions contemplated hereby; provided that, to the extent not indemnified or required hereunder the cost of such action or of such instruments and documents related thereto shall be borne by the party requesting them.    The foregoing covenant will survive the Closing of the transactions contemplated herein.

**6.16    Shared Items Transferred to Buyers; Transfer Pricing.** With respect to any contracts for goods or services included in the Acquired Assets and that are used by both the Business and other operations of Delphi or its Affiliates that are set forth on Schedule 6.16, and that will be transferred to Buyers at Closing, Buyers will provide Sellers with the benefits of such contracts in substantially the same manner described in Section 2.4 above regarding Deferred Items, and Delphi will cause Sellers to reimburse Buyers for such benefits in substantially the manner described in Section 2.4, until the earlier of such time as separate contracts for such goods or services have been agreed between the applicable Seller and the other Party or Parties to such contract or contracts, or until the termination of such contract or contracts.-

### 6.17    Buyer's Financing Activities:

**6.17.1** Buyers acknowledge and agree that: (i) Sellers and their Affiliates have no responsibility for any financing that Buyers may raise in connection with the transactions contemplated hereby including with respect to any offering materials and other documents prepared by or on behalf of or utilized by Buyers or their Affiliates, or Buyers' financing sources, in connection with Buyers' financing activities in connection

with the transactions contemplated hereby which include any information provided by Sellers or any of their Affiliates; and (ii) Buyers' obligations to consummate and to cause to be consummated the transactions contemplated by this Agreement and the Transfer Agreements are not subject to any condition or contingency with respect to the financing.

6.17.2  Buyers will take, or cause to be taken, all actions and will do, or cause to be done, all things necessary, proper or advisable to: (i) maintain in effect the Commitment Letter; (ii) enter into definitive financing agreements with respect to the financing, so that such agreements are in effect as promptly as practicable but in any event no later than the Closing Date; and (iii) consummate the financing at or prior to Closing.  In the period between the date hereof and the Closing Date, upon request of Buyers' Representative, Sellers will, and will use commercially reasonable efforts to cause its Affiliates and representatives to, reasonably cooperate with Buyers in connection with the financing.  If, notwithstanding the use of commercially reasonable efforts by Buyers to satisfy their obligations under this Section 6.17.2, any of the financing or the Commitment Letter (or any definitive financing agreement entered with respect thereto) expire or are terminated prior to the Closing, in whole or in part, for any reason, Buyers' Representative will promptly notify Delphi of such expiration or termination and the reasons therefor.

6.18  **Agency Designation.**  Each of the Buyers designates and appoints as its agent and attorney-in-fact Inteva Products, LLC ("**Buyers' Representative**") with full power and authority to act in such Buyer's name, place and stead in any way which such Buyer could do with respect to matters requiring notice to, or consent by, such Buyer with respect to any and all matters set forth in this Agreement, including execution of any and all agreements, deeds, documents, instruments and other papers proper or desirable to effectuate the purposes of this Agreement.  Except as may be otherwise set forth in a local Transfer Agreement or agreed by the Parties, the power designated in the preceding sentence may not be terminated by any Buyer until the date that is eighteen (18) months after the Closing Date.

6.19  **Customs Duties.**  The Buyers expressly agree to reimburse Sellers for all customs-related duties, fees and associated costs incurred by Sellers on behalf of Buyers following the Closing, including all such duties, fees and costs incurred in connection with co-loaded containers that clear customs intentionally or unintentionally under Sellers' importer/exporter identification numbers and bonds/guarantees post-Closing.

6.20  **Intracompany Transfers.**  At Closing, Buyers will enter into purchase orders with Delphi, its applicable Affiliates and Sellers pursuant to which all current intracompany transfers to the Business from Delphi, its Affiliates and Sellers will continue at customer directed pricing if the relevant component being sold to the Business is a customer directed buy component, or at current transfer pricing included in Contracts set forth in Schedule 4.13.1.

6.21  **Environmental Due Diligence.**   With respect to this Agreement dated October 15, 2007 only, this Section 6.21 governs over any conflicting language in Section 10.4 of this Agreement, but only to the date of the Bid Deadlines.  Prior to the Closing, Buyer shall have the right to conduct, at its expense: (i) an environmental assessment of the Real Property in one or more phases, including the procurement and analysis of samples of soil, groundwater, indoor air or any other environmental medium, and any building component or other material located at, on, in or under the Real Property; and (ii) an assessment or evaluation of the compliance status of the Business and/or the Real Property in relation to applicable Environmental Law.  Seller shall provide access and information to, and otherwise cooperate

with, Buyer in any environmental assessment or environmental compliance assessment or audit conducted pursuant to this Section 6.21. Without limiting the generality of the foregoing, Buyer shall have the right to review Seller's non attorney-client privileged records regarding, and to interview employees or representatives of Seller who may have knowledge of conditions and events relevant to, the operating history, compliance history and environmental condition of the Real Property. In carrying out its environmental assessment activities pursuant to this Section 6.21, Buyer shall exercise reasonable efforts to avoid interference with Seller's operations at the Real Property. If the Real Property is shown, through Buyer's environmental assessment activities or otherwise, to be a "facility" within the meaning of Part 201 of the Michigan Natural Resources and Environmental Protection Act, MCL 324.20101 et seq., Buyer may, at its expense, prepare and submit to the Michigan Department of Environmental Quality ("**MDEQ**") a "baseline environmental assessment", or "BEA", pursuant to MCL 324.20126. Buyer may also, at its expense, prepare a plan to meet due care obligations at the Real Property imposed under MCL 324.20107a. Buyer may, at its option and expense, request from MDEQ a determination of the adequacy of the BEA and due care plan pursuant to MCL 324.20129a. Buyer shall provide Seller with copies of any and all site assessment reports, including any and all BEAs, and all data contained or referred to therein, generated pursuant to or in connection with Buyer's activities conducted pursuant to this Section. Notwithstanding anything in this Section 6.21 to the contrary, Buyer shall not be permitted to exercise any of its rights in this section after the Bid Deadline.

**6.22** **Transfer of Environmental Permits**. Seller shall provide such assistance and cooperation, and shall execute such documents, as reasonably requested by Buyer to facilitate the proper and timely transfer of all Environmental Permits to Buyer. Without limiting the generality of the foregoing, Seller consents to Buyer's disclosure of the impending transfer of Environmental Permits to all appropriate Governmental Authorities.

**6.23** **Removal of Personal Property from Certain Locations**. Schedule 7.1.5 contemplates Buyers' removal on the Closing Date of all Personal Property included in the Acquired Assets that is located at the Juarez, Mexico or Wuppertal, Germany Technical Centers and Sales Offices. Subject to Section 3.4.2, Buyers will be solely responsible for all costs relating to disconnecting, dismantling, packaging, preparing for shipment, loading such Personal Property onto the truck(s) of a carrier selected by Buyer to transport such items on the Closing Date, freight charges and returning such Technical Centers and Sales Offices to a clean and safe condition (plating over or barricading all pits, trenches or other openings in the floor and removing all conduits, pipes and ducts, and removing machine wastes), all in a good and workman-like manner that does not interfere with or adversely effect Seller's operation on the site and in accordance with applicable Law. In addition, Buyers' employees or agents must comply with Seller's rules, regulations and policies applicable to third party contractors on Seller's site.

**6.24** **Mexican Newco**. No later than thirty (30) days prior to the Closing Date, Delphi shall transfer and assign or cause to be transferred and assigned to Buyer all of the issued and outstanding stock of **Closures Interiors, S. de R.L. de C.V.** ("**Mexican Newco**"), free and clear of all Encumbrances, other than Permitted Encumbrances, in exchange for a purchase price equal to the aggregate out-of-pocket costs incurred by Sellers in establishing Mexican Newco and obtaining necessary Permits, such purchase price not to exceed $25,000 USD unless agreed by Buyer (not to be unreasonably withheld). The payment will be made in immediately available funds as of the date of transfer. As of the date of such transfer, Mexican Newco shall: (i) be duly incorporated, validly existing and in good standing under the Laws of Mexico;, (ii) not own, lease or otherwise have the right to use any assets other than Permits necessary or

desirable for the conduct of the Business in Mexico and/or to acquire the Permits; and (iii) not have any other Liabilities or employees.

**6.25**    **Certain Confidentiality Agreements.**    Although not included in the Acquired Assets, Seller will: (i) provide to Buyer, at Buyer's sole cost and expense (including reimbursement of out-of-pocket costs incurred by Sellers in providing such benefits as well as internal costs but solely where such internal costs relate to enforcement of a Bidder Confidentiality Agreement), the benefits of certain clauses of the type indicated on Schedule 6.25.A and contained in confidentiality agreements entered into between Delphi and any Qualified Bidder or other Person that is a competitor of the Business in connection with a potential sale of the Business or any product line included in the Business as will be listed on Schedule 6.25.B at Closing (collectively, the "**Bidder Confidentiality Agreements**"), as such clauses may be modified in a particular Bidder Confidentiality Agreement, but only to the extent relating to the Business or Transferred Employees (the "**Partial Assignment Purpose**"); and (ii) cooperate in any reasonable and lawful arrangement designed to provide benefits to Buyer for the Partial Assignment Purpose, without any Seller incurring any financial obligation to Buyer or any third party of whatsoever kind or nature including enforcing for the account of Buyer and at the sole cost of Buyer any rights of Sellers arising from any Bidder Confidentiality Agreement with respect to the Partial Assignment Purpose, against the other party or parties thereto.    The relevant portions of the Bidder Confidentiality Agreements relating to the Partial Assignment Purpose shall be deemed to be partially assigned to Buyers to the extent necessary to effect the Partial Assignment Purpose as described in the preceding sentence.    Sellers will: (a) have no Liability to any Buyer arising out of this Section 6.25; and (b) will be reimbursed and held harmless by Buyers from and against all Liabilities, incurred or asserted as a result of Buyers' post-Closing enforcement of the Bidder Confidentiality Agreements in connection with the Partial Assignment Purpose, in the case of each of the foregoing clauses (a) and (b) other than as a result of Seller's: (1) failure to perform its obligations under this Section 6.25 or to follow Buyer's reasonable instructions in connection therewith; or (2) gross negligence or willful misconduct.

**6.26**    **JV Companies Post-Closing Payments.**    The relevant Buyers agree to use their reasonable best efforts as a partial equity owner to cause each of the JV Companies, as soon as practicable after Closing and in accordance with applicable Laws (including liquidity requirements), financing documents, third party consents (if any) and the relevant Articles of Association, to: (i) distribute the maximum amount of cash resulting from earnings in 2007 as are legally permitted to be distributed, including one hundred percent (100%) of all dividends that may have been declared but not paid on or before close of business on the Closing Date; and (ii) promptly remit one hundred percent (100%) of the relevant pro rata portion of such distributions to the US Filing Affiliates.    In the event that the relevant Buyer incurs any income, withholding or other Taxes, bank charges, currency conversion charges or other costs in connection with such distribution, Buyer will remit the amount of such distribution net of all such costs.

**6.27**    **Names Selected by Business for Post-Closing Usage.**    If Buyer is not the Successful Bidder, then Buyer will assign all rights to the name and mark "Inteva", which is the name and mark selected by the Business for post-Closing usage: (i) in the case of a termination as to which the Break-Up Fee is payable, for no additional consideration; and (ii) in the case of a termination in which Buyer is entitled to Expense Reimbursement, Buyer's reasonable, out-of-pocket costs directly and solely related to obtaining legal opinions as to the availability of such name and mark, establishing of the Buyer entity utilizing such name, recording the use of such

name with Governmental Authority, and applying for registration of trademark rights in such mark may be included in the determination of Expense Reimbursement.

**6.28    Troy Technical Center Landlord Estoppel and Nondisturbance.**  Seller shall use commercially reasonable efforts to obtain and deliver to Buyer prior to Closing, in form and substance reasonably satisfactory to Buyer, the written agreement of the landlord of the Troy Technical Center confirming the truth and accuracy of Delphi Automotive Systems LLC's representation and warranty set forth in the first sentence of Section 4.01.D of the Troy Technical Center Sublease, and an agreement of such landlord to honor such sublease and not disturb Buyer's use and enjoyment of the leased premises so long as Buyer timely complies with the terms and conditions of such sublease.

**6.29    Certain Acquired Assets Located in Mexico.**  The Acquired Assets that are located in Mexico and subject to a temporary importation customs regime shall be transferred by Sellers to Buyers in full compliance with any legal and/or administrative provision that may apply in order to, when applicable, preserve the relevant Acquired Assets' temporary importation customs status. Specifically, Sellers shall transfer temporary imported Acquired Assets through the so-called "virtual export pedimentos" and Buyers shall prepare and effectuate the so-called "virtual import pedimentos" as permitted under Mexican law and regulation. Buyers and Sellers shall exercise reasonable commercial efforts and shall cooperate to effectuate these "virtual export/import" transactions.

# 7.    CONDITIONS TO CLOSING:

**7.1    Conditions to Obligations of Seller and Buyer.**  The respective obligations of each Party to effect the transactions contemplated by this Agreement will be subject to the satisfaction or waiver by both Parties at or prior to the Closing Date of the following conditions precedent:

**7.1.1    Sale Approval Order and Bidding Procedures Order.** The Sale Approval Order and Bidding Procedures Order will be entered by the Bankruptcy Court and will not be subject to a stay or injunction.

**7.1.2    No Law, Judgments, etc.**  No provisions of any applicable Law or Governmental Order that restrains, prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement will be in effect (each Party taking any and all steps required by Sections 6.13 and 6.14 of this Agreement).

**7.1.3    Governmental Approvals.**  All required Governmental Approvals (including approvals under any Competition/Investment Law, as identified on Schedule 6.13.1) regarding the Sale will have been granted in writing by the appropriate Governmental Authorities or the waiting period with respect to any such filings will have expired or been terminated.

**7.1.4    Receipt of JV Partner Consent.**  Delphi's receipt of any necessary JV Partner Consent.

**7.1.5    Day 1 Readiness.**  The separation activities set forth in Schedule 7.1.5 will have been substantially completed.

**7.1.6    Board Approval.**  The Board of Directors of Delphi Corporation must have approved the Sale on or before October 17, 2007.

**7.2    Conditions to Obligations of Buyer.**  The obligation of Buyers to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Buyer):

**7.2.1    Accuracy of Warranties.**  Except as otherwise permitted by this Agreement or a Transfer Agreement, and after giving effect to the Sale Approval Order, the representations and warranties of Sellers contained in Article 4 of this Agreement that are qualified by materiality, Material Adverse Effect or words of similar import will be true and correct as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), and the representations and warranties of Sellers contained in Article 4 of this Agreement that are not qualified by materiality, Material Adverse Effect or words of similar import will be true and correct in all material respects (except for representations and warranties that speak as of a specific date or time, which will be true and correct in all material respects only as of such date or time).

**7.2.2    Performance of Covenants.**  Sellers will have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by it at or prior to the Closing.

**7.2.3    Delivery of Ancillary Agreements.**  Sellers will have delivered duly executed copies of each of the Ancillary Agreements.

**7.2.4    Customer Contracts.**  All material Contracts with customers of the Business, including, without limitation, the Contracts set forth on Schedule 7.2.4 shall have been assigned to the Buyers or otherwise be consistent with the status set forth on Schedule 7.2.4.

**7.2.5    Permit Transfers.**  All Permits, Environmental Permits and other authorizations necessary for the lawful conduct of the Business shall have been transferred or reissued, as applicable, to Buyer if legally required to enable Buyer to continue the permitted activity, unless the same may be transferred or reissued, as applicable, under applicable Law after the Closing.

**7.2.6    No Material Adverse Effect.**  Since the date of this Agreement, no Material Adverse Effect shall have occurred and be continuing at Closing.

**7.2.7    Insurance Certificates**.  Delphi shall have added the relevant Buyer(s) as additional insured(s) on the applicable current and historic general liability and excess liability policies and shall have delivered certificates to Buyer confirming the same.

**7.2.8    General Motors Contract**.  Buyer shall have entered into a Supply Agreement with General Motors Corporation in form and substance as shall be reasonably satisfactory to Buyer, including prices no less favorable to Buyer in the aggregate than those previously negotiated by Seller's representatives with GM in connection with the transactions contemplated by this Agreement, as previously provided to Renco on or about October 12, 2007.

**7.2.9    UAW Agreement.**  Agreement between Buyers' Representative and the UAW substantially in the form of Schedule 7.2.9 shall have been signed with such changes as may be agreed between the UAW and Buyer.

**7.2.10  IUE Agreement.**  Agreement between Buyer and the IUE substantially in the form of Schedule 7.2.10, as may be modified by the Buyer and the IUE, shall have been executed.

**7.3    Conditions to Obligations of Sellers.**  Except as otherwise permitted by this Agreement or a Transfer Agreement, the obligation of Sellers to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Sellers):

**7.3.1    Accuracy of Warranties.**  The representations and warranties of Buyer contained in Article 5 of this Agreement that are not qualified by materiality or words of similar import will be true and correct as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), and the representations and warranties of Buyer contained in Article 5 of this Agreement that are qualified by materiality or words of similar import shall be true and correct in all material respects as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct in all material respects only as of such date or time).

**7.3.2    Performance of Covenants.**  Buyer and its Affiliates will have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by it at or prior to the Closing.

**7.3.3    Delivery of Ancillary Agreements.**  Buyers will have delivered duly executed copies of each of the Ancillary Agreements.

**7.3.4    Seller U.S. Collective Bargaining Agreements.**  Consistent with Section 6.6.2, Buyer's assumption of all Collective Bargaining Agreements applicable to the Adrian, Michigan, Cottondale, Alabama and Gadsden, Alabama Manufacturing Facilities as may be modified prior to Closing by Buyer and the respective union(s).

## 8.    CLOSING:

**8.1    Closing Time and Date.**  Subject to the terms and conditions of this Agreement, the closing (the "**Closing**") of the transactions contemplated by this Agreement will take place at the offices of Delphi at 10:00 a.m. on the second Business Day after the conditions set forth in Article 7 will have been satisfied or waived (other than conditions which by their nature can be satisfied only at the Closing), or on such other date or at such other time as the Parties may agree (the "**Closing Date**").  For tax and accounting purposes, the effective time of the transaction will be 11:59 p.m. Eastern time on the Closing Date.  The Closing of the Transfer Agreements will take place simultaneously with the Closing or on a later date if mutually agreed by the relevant Seller and relevant Buyer.

**8.2    Ancillary Agreements.**  At or prior to the Closing, the Sellers will duly execute and deliver to the Buyers, and the Buyers will duly execute and deliver to Sellers, each of the

following agreements (each, an "**Ancillary Agreement**" and collectively, "**Ancillary Agreements**") to which they are to be a party:

**8.2.1**    A Patent Assignment substantially in the form of <u>Exhibit 8.2.1.A</u> and a Trademark Assignment substantially in the form of <u>Exhibit 8.2.1.B</u>, as well as any other instruments necessary to transfer the Purchased Intellectual Property.

**8.2.2**    The following Transfer Agreements (collectively, the "**Transfer Agreements**"):

**A.**    Mexico Asset Sale Agreements, substantially in the forms set forth in <u>Exhibit 8.2.2.A.1</u> and <u>Exhibit 8.2.2.A.2</u>.

**B.**    China Share Transfer Agreement, substantially in the form set forth in <u>Exhibit 8.2.2.B</u>.

**C.**    Korea Share Transfer Agreement, substantially in the form set forth in <u>Exhibit 8.2.2.C</u>.

**D.**    Austria Asset Sale Agreement, substantially in the form set forth in <u>Exhibit 8.2.2.D</u>.

**E.**    Germany Asset Sale Agreement, substantially in the form set forth in <u>Exhibit 8.2.2.E</u>.

**8.2.3**    The Transition Services Agreement, substantially in the form set forth in <u>Exhibit 8.2.3</u>.

**8.2.4**    The Bills of Sale, substantially in the form set forth in <u>Exhibit 8.2.4</u> or mutually agreed invoices.

**8.2.5**    The Assignment and Assumption Agreements, substantially in the form set forth in <u>Exhibit 8.2.5</u>.

**8.2.6**    The Vandalia Manufacturing Services Agreement, substantially in the form set forth in <u>Exhibit 8.2.6</u>.

**8.2.7**    The Grosspetersdorf Manufacturing Services Agreement, substantially in the form set forth in <u>Exhibit 8.2.7</u>.

**8.2.8**    The Columbus Manufacturing Services Agreement, substantially in the form set forth in <u>Exhibit 8.2.8</u>.

**8.2.9**    The Adrian HVAC Excluded Product Manufacturing Services Agreement, substantially in the form set forth in <u>Exhibit 8.2.9</u>.

**8.2.10**    The Vandalia Lease, substantially in the form set forth in <u>Exhibit 8.2.10</u>.

**8.2.11**    The Troy Technical Center Sublease, substantially in the form set forth in <u>Exhibit 8.2.11</u>.

**8.2.12** The Mexico Shared Substation Services Agreements, substantially in the form of Exhibit 8.2.12..

**8.2.13** The Mexico Shared Wastewater Treatment Plant Services Agreement, substantially in the form of Exhibit 8.2.13.

**8.3** **Seller's Deliveries at Closing.** At or prior to the Closing, the appropriate Sellers will deliver or cause to be delivered to the relevant Buyer:

**8.3.1** To the extent that equity interests of the JV Companies are represented by stock certificates, original certificates evidencing the Sale Securities (to the extent applicable in the respective jurisdiction), which certificates will be duly endorsed for transfer or accompanied by duly executed stock transfer powers or other appropriate instruments of assignment and transfer in favor of the relevant Buyer or its permitted assigns;

**8.3.2** Quit claim deeds (or non U.S. equivalent) for the Owned Real Property, substantially in the form of Exhibit 8.3.2 or such other form of conveyance in substance equivalent to such form of deed;

**8.3.3** Where required by applicable Law in the jurisdiction concerned, copies of the resolutions (or local equivalent) of the boards of directors of each Seller and, where required, the stockholders/owners of each Seller, authorizing and approving this Agreement, Ancillary Agreements and the transactions contemplated hereby and thereby;

**8.3.4** Certified copies of all orders of the Bankruptcy Court pertaining to the transactions contemplated by this Agreement and the Ancillary Agreements, including the Bidding Procedures Order and the Sale Approval Order; and

**8.3.5** An officer's certificate, dated as of the Closing Date, executed on behalf of Sellers, certifying that the conditions specified in Section 7.2 have been fulfilled.

**8.3.6** Resignations of all Seller representatives who are directors (or equivalent) or officers of the JV Companies, except as otherwise requested by Buyers' Representative no less than ten (10) Business Days prior to the Closing Date.

**8.3.7** Unconditional releases by each Seller in favor of each of the JV Companies with respect to any Liabilities of such JV Company to such Seller other than payments owed to any Seller for goods or services purchased in the Ordinary Course of Business.

**8.3.8** All other documents and papers reasonably requested by Buyer to transfer title to the Acquired Assets or Sale Securities in accordance with this Agreement or to otherwise effect the transactions contemplated by this Agreement or the Ancillary Agreements.

**8.4** **Buyer's Deliveries at Closing.** At or prior to the Closing, Buyer will deliver or cause to be delivered to Delphi and each Seller designated by Delphi the following:

**8.4.1**   The balance of the Preliminary Purchase Price by wire transfer of immediately available funds to an account or accounts designated by Delphi not less than two (2) Business Days prior to the Closing;

**8.4.2**   Where required by applicable Law in the jurisdiction concerned, copies of the resolutions (or local equivalent) of the boards of directors of each Buyer and, where required, the stockholders/owners of each Buyer, authorizing and approving this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby;

**8.4.3**   An officer's certificate, dated as of the Closing Date, executed on behalf of Buyers, certifying that the conditions specified in Section 7.3 have been fulfilled.

## 9.   <u>TERMINATION</u>:

**9.1**   <u>Termination.</u>   This Agreement may be terminated at any time prior to the Closing:

**9.1.1**   By the mutual written consent of Delphi and Buyers' Representative.

**9.1.2**   By either Delphi or Buyers' Representative:

**A.**   Provided the terminating Party is not in material breach of its obligations under this Agreement, if the Closing will not have occurred within one hundred twenty (120) days after entry of the Sale Approval Order for any reason other than a failure of the conditions set forth in Sections 7.1.2 or 7.1.3.

**B.**   If Seller consummates an Alternative Transaction.

**C.**   Provided the terminating Party is not in material breach of its obligations under this Agreement, if any Governmental Authority of competent jurisdiction (other than the Bankruptcy Court) has issued a Governmental Order or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated hereby and such Governmental Order or other action has become final and nonappealable.

**D.**   Provided the terminating Party is not in material breach of its obligations under this Agreement, if the Bankruptcy Court has not entered the Sale Approval Order, on or before the date that is one hundred twenty (120) days after the date of this Agreement, or if such Sale Approval Order, as of the date that is one hundred twenty (120) days after the date of this Agreement, is subject to a stay or injunction on such date.

**E.**   If the Delphi Corporation Board Approval is not received by 11:59 p.m. EST on October 17, 2007.

**9.1.3**   By Buyers' Representative, upon written notice to Delphi and provided that Buyers are not then in material breach of any representation, warranty, covenant or other agreement contained in this Agreement, if Delphi has materially breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, provided that such breach or failure to

perform: (y) is not cured within thirty (30) days after written notice thereof or, in the case where the date or period of time specified for performance has lapsed, promptly following written notice thereof from Buyers' Representative; or (z) is incapable of being cured by Delphi;

**9.1.4**   Provided none of the Buyers is in material breach of its obligations under this Agreement, at any time prior to Closing, if a Material Adverse Effect has occurred, Buyers' Representative may terminate within ten (10) Business Days after becoming aware of such event so long as such event is continuing at the time of any such termination and not reasonably capable of being cured within ninety (90) days after entry of the Sale Approval Order or the date of this Agreement, whichever is later.   For purposes of this Section 9.1.4, failure to obtain the necessary Union Consents or the necessary JV Partner Consents prior to Closing will be deemed to be a Material Adverse Effect.

**9.1.5**   By Delphi, upon written notice to Buyers' Representative and provided that Delphi is not then in material breach of any representation, warranty, covenant or other agreement contained in this Agreement, if any Buyer has breached or failed to perform in any material respect any of its obligations or covenants contained in this Agreement, and such breach or failure to perform: (i) is not cured within thirty (30) days after written notice thereof or, in the case where the date or period of time specified for performance has lapsed, promptly following written notice thereof from the non-breaching party; or (ii) is incapable of being cured by any Buyer.

**9.2**   <u>**Break-Up Fee; Expense Reimbursement**</u>:

**9.2.1**   Subject to the last two (2) sentences of Section 9.2.3, in the event that Delphi sells, transfers, leases or otherwise disposes, directly or indirectly, including through an asset sale, stock sale, merger or other similar transaction, of all or a material portion ("material portion" refers to the latches product line) of the Business  or the Acquired Assets in a transaction or a series of related transactions with one or more Parties other than any Buyer (such event being an "**Alternative Transaction**") within twelve (12) months after termination of this Agreement, either: (i) in accordance with the Bidding Procedures and this Agreement is terminated pursuant to Section 9.1.2.B; or (ii) as referred to in Section 9.2.1.B below; then in any such event, Sellers (on a pro rata basis, based on the allocation of the purchase price paid in the Alternative Transaction) will, upon the consummation of the Alternative Transaction(s), pay to Buyers' Representative an amount equal to the lesser of:

**A.**   Two Million Four Hundred Thousand Dollars ($2,400,000); or

**B.**   Three percent (3%) of the post-termination Alternative Transaction purchase price (the "**Post-Termination Alternative Transaction Purchase Price**").  The Post-Termination Alternative Transaction Purchase Price means the purchase price received upon consummation of a Sale with another purchaser within twelve (12) months following termination of this Agreement in any circumstance where Expense Reimbursement is payable to Buyer and the purchase price received upon consummation of such Alternative Transaction is equal to or greater than eighty percent (80%) of the Preliminary Purchase Price set forth in this Agreement (collectively with Section 9.2.1.A above, the "**Break-Up Fee**").  In any circumstance in which the Break-Up Fee is payable pursuant to

this Section 9.2.1.B, Buyer shall also be entitled to receive the Expense Reimbursement provided for in Section 9.2.2.

Notwithstanding the foregoing, Buyer shall not be entitled to the Break-Up Fee if: (i) Buyer is in material breach of this Agreement or the Bidding Procedures and has received written notice of such breach from Delphi; or (ii) this Agreement is terminable under Section 9.1.2.C.

**9.2.2**   Subject to Section 9.2.3, in the event this Agreement is terminated pursuant to Sections 9.1.2.A, 9.1.2.B, 9.1.2.D, 9.1.3 or 9.1.4, and provided that Buyers are not then in breach of this Agreement or the Bidding Procedures, and, in the case of Section 9.1.2.A, the failure or occurrence of the event giving rise to any such termination results solely from the status of Delphi or any action or conduct of Delphi and not from the status of Buyers or their Affiliates or any action or conduct or market position of Buyers or any of their Affiliates, then Sellers (on a pro rata basis, based on the allocation of the purchase price paid in the Alternative Transaction) will be obligated to pay Buyers' Representative an amount equal to Buyers' Representative's reasonable, actual out-of-pocket fees and expenses (including, without limitation, reasonable attorneys' fees, expenses of their financial advisors, and expenses of other consultants) incurred in connection with the transactions contemplated by this Agreement (the "**Expense Reimbursement**") up to a maximum of $250,000.   Any Expense Reimbursement payable upon termination of this Agreement will be immediately earned upon such termination and payable by Delphi to Buyers' Representative promptly upon the delivery of an invoice related to such Expense Reimbursement to Delphi by Buyers' Representative to be delivered to Delphi within ten (10) Business Days of termination of this Agreement; provided, however, that if Delphi believes, in good faith, that the amount of the Expense Reimbursement sought by Buyers' Representative is not reasonable, then Delphi will have the right to seek Bankruptcy Court review thereof prior to paying such amount.

**9.2.3**   Buyers acknowledge and agree that, except as otherwise expressly set forth in Section 9.2.1 of this Agreement, in the event that Buyers' Representative terminates this Agreement or Delphi terminates this Agreement and Buyers become entitled to receive or receive any Expense Reimbursement, Buyers will not be entitled to receive nor will they receive the Break-Up Fee or any portion thereof, and, conversely, in the event that Buyers become entitled to receive or receives any Break-Up Fee, none of them will be entitled to receive nor will they receive the Expense Reimbursement or any portion thereof.   If Buyers become entitled to receive any Break-Up Fee and/or Expense Reimbursement, then such Break-Up Fee and/or Expense Reimbursement will be the sole and exclusive remedy of Buyers, whether at law or in equity, for any breach by Delphi or any of its Affiliates of the terms and conditions of this Agreement or the Deposit Escrow Agreement.   Notwithstanding anything to the contrary in this Agreement, if the Closing does not occur for a reason referred to in Section 7.2.8 (GM Contract), Section 7.2.9 (UAW Agreement) or 7.2.10 (IUE Agreement), in no event will Buyers be entitled to any Break-Up Fee, recognizing that Expense Reimbursement may be payable to Buyers if Buyers are otherwise entitled to such reimbursement under the terms of this Agreement.

**9.2.4**   As between Sellers and Buyers, the Sellers shall be jointly and severally liable for the obligation to pay to Buyers' Representative any amounts payable thereto

pursuant to this Section 9.2.  As among Sellers, such amounts will be allocated in accordance with Section 11.5.4.B.

**9.3**    **Procedure and Effect of Termination.**  In the event of the termination of this Agreement and the abandonment of the transactions contemplated hereby pursuant to Section 9.1, written notice thereof will forthwith be given to all other Parties.  If this Agreement is terminated and the transactions contemplated by this Agreement are abandoned as provided herein:

**9.3.1**    Buyers will redeliver to Sellers all documents, work papers and other material of any of Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof;

**9.3.2**    The provisions of the Confidentiality Agreement will continue in full force and effect; and

**9.3.3**    The following sections of this Agreement will survive any termination of this Agreement and remain in full force and effect: (i) Article 9 (Termination); and (ii) Sections 3.1 (Deposit Amount), 12.1 (Fees and Expenses), 12.5 (Assignment), 12.6 (Waiver), 12.7 (Notices), 12.8 (Entire Agreement), 12.10 (Publicity), 12.14 (Governing Law) and 12.15 (Venue and Retention of Jurisdiction).

**9.3.4**    No party to this Agreement will have any Liability under this Agreement to any other except: (i) that nothing herein will relieve any party from any Liability for any breach of any of the representations, warranties, covenants and agreements set forth in this Agreement occurring before such termination, and, except as provided by Section 9.2.3 above, no Party waives any Claim with respect thereto; and (ii) as contemplated by Section 9.3.3 above.

## 10.    BIDDING PROCEDURES:

**10.1**    **Delphi Initial Bankruptcy Actions.**    This Article 10 sets forth the bidding procedures (the "**Bidding Procedures**") to be employed with respect to the Agreement and the Sale of the Purchased Assets.  The Sale is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court in the Sale Approval Order.  The following overbid provisions and related bid protections are designed to compensate Buyers for their efforts and agreements to date and to facilitate a full and fair process (the "**Bidding Process**") designed to maximize the value of the Purchased Assets for the benefit of Sellers' and their Affiliates' creditors, shareholders and bankruptcy estate.

**10.2**    **Qualified Bidder.** Unless otherwise ordered by the Bankruptcy Court, for cause shown, or as otherwise determined by Sellers, in order to participate in the bidding process, each person (a "**Potential Bidder**"), other than Buyers, must deliver (unless previously delivered) to Delphi, its counsel, its in-house counsel, and its financial advisors at the addresses provided in Section 10.3:

**10.2.1** An executed Confidentiality Agreement in form and substance satisfactory to Delphi.

**10.2.2** Current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets

and the Business, current audited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement acceptable to Delphi and its financial advisors; and

10.2.3 A preliminary (non-binding) written proposal regarding: (i) the purchase price range; (ii) any assets and/or equity interests expected to be excluded; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) any conditions to closing that it may wish to impose in addition to those set forth in this Agreement; and (vi) the nature and extent of additional due diligence it may wish to conduct and the date by which such due diligence will be completed.

A Potential Bidder that delivers the documents described in the previous subparagraphs above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of the Potential Bidder to consummate the Sale and perform post-Closing, if selected as a successful bidder, and that Delphi determines in its sole discretion is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale within the time frame provided by this Agreement will be deemed a "**Qualified Bidder**".  As promptly as practicable, after a Potential Bidder delivers all of the materials required above, Delphi will determine, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.  At the same time that Delphi notifies the Potential Bidder that it is a Qualified Bidder, Delphi will allow the Qualified Bidder to begin to conduct due diligence with respect to the Purchased Assets and the Business as provided in Section 10.4 below.  Collectively, Buyers will be deemed a Qualified Bidder for purposes of the Bidding Process.

10.3    **Bid Deadline.**  A Qualified Bidder that desires to make a bid will deliver written copies of its bid to: Delphi Automotive Systems LLC, 5725 Delphi Drive, Troy, Michigan 48098 Attention: Director of Mergers & Acquisitions for Delphi Automotive Holdings Group, with copies to: (i) Delphi's counsel,  Skadden, Arps, Slate, Meagher & Flom LLP, at 333 West Wacker Drive, Chicago, Illinois 60601-1285, Attention: Ron E. Meisler and Brian M. Fern; (ii) Delphi's in-house counsel, Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098, Attn: Deputy General Counsel – Transactional & Restructuring; (iii) Delphi's financial advisor, Rothschild, Inc., 1251 Avenue of the Americas, New York, NY 10020, Attention: William Cannon; (iv) counsel to the official committee of unsecured creditors appointed in the Bankruptcy Cases (the "**Committee**"), Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022, Attention: Robert J. Rosenberg and Mark A. Broude; and (v) counsel for the agent under Delphi's postpetition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017, Attention: Donald S. Bernstein and Brian Resnick, in each case so as to be received not later than 11:00 A.M. (EST), on a date to be determined by Delphi that is at least five (5) Business Days before date of Sale Hearing (the "**Bid Deadline**").  Delphi may extend the Bid Deadline once or successively, but is not obligated to do so.  If Delphi extends the Bid Deadline, it will promptly notify all Qualified Bidders of such extension.  As soon as reasonably practicable following receipt of each Qualified Bid, Sellers will deliver complete copies of all items and information enumerated in the section below entitled "Bid Requirements" to counsel for the Official Committee of Equity Security Holders (the "**Equityholders' Committee**").  The Sellers also will provide the UAW with notice of all Qualified Bidders and their contact information.  Qualified Bidders should note that certain benefit treatments of the Agreement are intended to effect

assumption of the UAW Collective Bargaining Agreement and, to the extent subject to assumption, these issues remain subject to the parties' rights and obligations related to bargaining with the UAW.

**10.4    Due Diligence.**  Delphi will afford each Qualified Bidder due diligence access to the Purchased Assets and the Business.  Due diligence access may include Management Presentations as may be scheduled by Delphi, access to data rooms, on site inspections and such other matters which a Qualified Bidder may request and as to which Delphi, in its sole discretion, may agree.  Delphi will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders.  Subject to Section 6.21, any additional due diligence will not continue after the Bid Deadline.  Delphi may, in its discretion, coordinate due diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at Management Presentations or site inspections.  Neither Delphi nor any of its Affiliates (nor any of their respective representatives) will be obligated to furnish any information relating to Purchased Assets and the Business to any Person other than to Qualified Bidders who make an acceptable preliminary proposal.

**10.5    Bid Requirements.**    All bids must include the following documents (the "**Required Bid Documents**"):

**10.5.1**  A letter stating that the bidder's offer is irrevocable until two (2) Business Days after the Closing of the Sale of the Purchased Assets.

**10.5.2**  An executed copy of this Agreement, together with all Schedules and Exhibits (a "**Marked Agreement**"), marked to show those amendments and modifications to such agreement that the Qualified Bidder proposes, including the Purchase Price (as defined in this Agreement).

**10.5.3**  A good faith deposit (the "**Good Faith Deposit**") in the form of a certified bank check from a U.S. bank or by wire transfer (or other form acceptable to Delphi in its sole discretion) payable to the order of Delphi (or such other party as Delphi may determine) in an amount equal to two and six tenths percent (2.6%) of the Preliminary Purchase Price, but which shall in no event be less than the Deposit Amount.

**10.5.4**  Written evidence of a commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to Delphi and its advisors.

**10.6    Qualified Bids.**  A bid will be considered only if the bid:

**10.6.1**  Is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder.

**10.6.2**  Proposes a transaction on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that Delphi determines, in its sole discretion, are similar to, and are not materially more burdensome or conditional than the terms of the Agreement and that has a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum of the Purchase Price plus the amount of the Break-Up Fee, plus$1,000,000.

**10.6.3**  Is not conditioned upon: (i) any bid protections, such as a break-up fee, termination fee, expense reimbursement or similar type of payment; or (ii) such bid being deemed the Successful Bid by the Sellers.

**10.6.4**  Includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreement.

**10.6.5**  Includes a commitment to consummate the purchase of the Purchased Assets (including the receipt of any required Governmental Approvals) immediately upon completion of all closing conditions within Sellers' reasonable control, which may as early as  fifteen (15) days after entry of an order by the Bankruptcy Court approving such purchase, or in the case of any Governmental Approvals, sixty (60) days after entry of such order.

**10.6.6**  Is received by the Bid Deadline.

A bid received from a Qualified Bidder will constitute a "**Qualified Bid**" only if it includes all of the Required Bid Documents and meets all of the above requirements; provided, however, that Delphi will have the right, in its sole discretion, to entertain bids for the Purchased Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids.  Notwithstanding the foregoing, Buyers collectively will be deemed Qualified Bidders, and the Agreement will be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale.  A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction.  Each Qualified Bid other than that of Buyers is referred to as a "**Subsequent Bid**".  If Delphi does not receive any Qualified Bids other than the Agreement received from Buyers, Delphi will report the same to the Bankruptcy Court and will proceed with the Sale pursuant to the terms of this Agreement.

**10.7**  **Bid Protection.**  Recognizing Buyers' expenditure of time, energy and resources, Delphi has agreed to provide certain bidding protections to Buyers.  Specifically, Delphi has determined that the Agreement will further the goals of the Bidding Procedures by setting a floor that all other Potential Bids must exceed.  As a result, Delphi has agreed that if Delphi does not close with Buyers because Delphi consummates an Alternative Transaction and Buyers are not in material breach of the Agreement or the Bidding Procedures, Delphi will pay to Buyers' Representative the Break-Up Fee to the extent required under Section 9.2.1 hereof. In the event the Agreement is terminated pursuant to Sections 9.1.2.A, 9.1.2.B., 9.1.2.D, 9.1.3 or 9.1.4 hereof, then in certain circumstances Delphi will be obligated to pay Buyers' Representative's Expense Reimbursement to the extent required under Section 9.2.2 hereof. The payment of the Break-Up Fee and/or the Expense Reimbursement (as applicable) will be governed by the provisions of the Agreement, including Section 9.2.3, and the order of the Bankruptcy Court approving the Bidding Procedures.

    **10.8**   **Auction, Bidding Increments and Bids Remaining Open.**  If Delphi receives at least one (1) Qualified Bid in addition to the Agreement, Delphi will conduct an auction (the "**Auction**") of the Purchased Assets and the Business upon notice to all Qualified Bidders who have submitted Qualified Bids at 10:00 a.m. EST on or about December 6, 2007 at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60601-1285 or Four Times Square, New York, New York 10036 (at Delphi's election) or such later time or other place as Delphi will notify all Qualified Bidders who have submitted Qualified Bids (but in no event later than the second (2nd) Business Day prior to the Sale Hearing), in accordance with the following procedures:

    **10.8.1**  Only Delphi, Buyers' Representative, any representative of the Committee and the Equityholders' Committee, any representative of Delphi's secured lenders (and the legal and financial advisers to each of the foregoing), any representative of the UAW, and any Qualified Bidder who has timely submitted a Qualified Bid will be entitled to attend the Auction, and only Buyers' Representative and the other Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

    **10.8.2**  At least two (2)  Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform Delphi whether it intends to participate in the Auction and at least one (1)[3] Business Day prior to the Auction, Delphi will provide copies of the Qualified Bid or combination of Qualified Bids which Delphi believes is the highest or otherwise best offer to all Qualified Bidders who have informed Delphi of their intent to participate in the Auction and the UAW.

    **10.8.3**  All bidders will be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder will be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction.

    **10.8.4**  Sellers may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith.

    **10.8.5**  Bidding at the Auction will begin with the highest or otherwise best Qualified Bid or combination of Qualified Bids and continue in minimum increments of at least $1,000,000 higher than the previous bid or bids. The Auction will continue in one or more rounds of bidding and will conclude after each participating bidder has had the opportunity to submit an additional Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid or bids.  For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by Buyers' Representative), Delphi may give effect to any Break-Up Fee that may be

---

[3]    Five (5) days is chilling.  Bid Deadline could be less than five (5) Business Days prior to auction. If that is the case, it makes no sense to have a bidder tell us if it is attending the auction before submitting a bid.

payable to Buyers' Representative under the Agreement as well as any assets and/or equity interests to be retained by any Seller.

**10.8.6** At the conclusion of the Auction, or as soon thereafter as practicable, Sellers, in consultation with its financial advisors, will: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale; and (ii) identify the highest or otherwise best offer(s) for the Purchased Assets and the Business received at the Auction (the "**Successful Bid(s)**" the bidder(s) making such bid, the "**Successful Bidder(s)**").

**10.9    Acceptance of Qualified Bids.**  Sellers will sell the Purchased Assets for the highest or otherwise best Qualified Bid, as determined by Delphi, upon the approval of such Qualified Bid by the Bankruptcy Court after the hearing (the "**Sale Hearing**").  If, after an Auction in which Buyers' Representative: (i) will have bid an amount in excess of the consideration presently provided for in the Agreement with respect to the transactions contemplated under the Agreement; and (ii) is the Successful Bidder, it will, at the Closing under the Agreement, pay, in full satisfaction of the Successful Bid, an amount equal to: (a) the amount of the Successful Bid; less (b) the Break-Up Fee.  Delphi's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute Delphi's acceptance of the bid.  Delphi will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

**10.10    Sale Hearing.**  The Sale Hearing will be held before the Honorable Judge Robert Drain on _____, 2007 at _____ (prevailing Eastern Time) at the United States Bankruptcy Court for the Southern District of New York, located in New York, New York, but may be adjourned or rescheduled in Delphi's sole discretion, subject to Bankruptcy Court Approval, as necessary, without further notice by an announcement of the adjourned date at the Sale Hearing.  If Delphi does not receive any Qualified Bids (other than the Qualified Bid of Buyers), Delphi will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Purchased Assets to Buyers following entry of the Sale Order.  If Delphi does receive additional Qualified Bids, then, at the Sale Hearing, Delphi will seek approval of the Successful Bid(s), as well as the second highest or best Qualified Bid(s) (the "**Alternate Bid(s)**" and such bidder(s), the "**Alternate Bidder(s)**").  Following approval of the sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of: (i) failure of a condition precedent beyond the control of either Delphi or the Successful Bidder; or (ii) a breach or failure to perform on the part of such Successful Bidder(s), then the Alternate Bid(s) will be deemed to be the Successful Bid(s) and Delphi may, subject to satisfaction of all applicable conditions to closing, effectuate a sale to the Alternate Bidder(s) without further order of the Bankruptcy Court.

**10.11    Return of Good Faith Deposit.**  The Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) will be held in an interest-bearing escrow account and all Qualified Bids will remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders), until two (2) Business Days following the Closing of the Sale (the "**Return Date**").  Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Successful Bidder(s), together with interest thereon, will be applied against the payment of the Purchase Price upon Closing of the Sale to the Successful Bidder(s).  If a Successful Bidder breaches its obligations under the Bidding Procedures Order or any agreement entered into with respect to its Successful Bid or fails to consummate a sale because of a breach or failure to perform on the part of such

Successful Bidder, Delphi will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit will irrevocably become property of Delphi.  On the Return Date, Delphi will return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

**10.12**  **Reservation of Rights.**  Delphi, after consultation with the agents for its secured lenders and the Committee: (i) may determine, which Qualified Bid, if any, is the highest or otherwise best offer; and (ii) may reject at any time, any bid (other than Buyers' initial bid) that is: (a) inadequate or insufficient; (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of  the Sale; or (c) contrary to the best interests of Sellers, its estate and creditors as determined by Delphi in its sole discretion.

**11.**    **LIABILITY, INDEMNIFICATION:**

**11.1**    **LIMITATIONS OF LIABILITY.** EXCEPT AS OTHERWISE PROVIDED HEREIN, NEITHER DELPHI NOR ANY OF THE OTHER SELLERS UNDERTAKES ANY LIABILITY FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, INDIRECT OR PUNITIVE DAMAGES EXCEPT AS MAY BE ASSESSED AGAINST A BUYER INDEMNIFIED PARTY BY A COURT OF COMPETENT JURISDICTION; SUBJECT TO ANY PROVISION OF THIS AGREEMENT TO THE CONTRARY, DELPHI WILL NOT BE LIABLE FOR ANY, AND BUYERS ASSUME LIABILITY FOR ALL, PERSONAL INJURY AND PROPERTY DAMAGE RESULTING FROM BUYERS' INVESTIGATION AND EXAMINATION OF THE ACQUIRED ASSETS AND THE JV COMPANIES, THE HANDLING, TRANSPORTATION, POSSESSION, PROCESSING, FURTHER MANUFACTURE OR OTHER USE OR RESALE OF ANY OF THE ACQUIRED ASSETS AFTER THE CLOSING DATE, WHETHER SUCH ACQUIRED ASSETS ARE USED OR RESOLD ALONE OR IN COMBINATION WITH OTHER ASSETS OR MATERIALS; AND, SUBJECT TO THE RETAINED LIABILITIES, THE REPRESENTATIONS AND WARRANTIES OF THE SELLERS EXPRESSLY CONTAINED IN ARTICLE 4 AND THE INDEMNIFICATION PROVIDED IN THIS ARTICLE 11, BUYERS ACKNOWLEDGE THAT THE ACQUIRED ASSETS AND SALE SECURITIES ARE BEING SOLD IN THEIR PRESENT STATE AND CONDITION, "AS IS, WHERE IS," WITH ALL FAULTS, AND BUYERS' ARE PURCHASING AND ACQUIRING SUCH ACQUIRED ASSETS AND SALE SECURITIES ON THAT BASIS PURSUANT TO BUYERS' OWN INVESTIGATION AND EXAMINATION AFTER HAVING BEEN PROVIDED WITH AN ADEQUATE OPPORTUNITY AND ACCESS TO SUCH ACQUIRED ASSETS TO COMPLETE SUCH INVESTIGATION OR EXAMINATION.

**11.2**    **Survival.**  The representations and warranties of the Filing Affiliates set forth in Article 4 will not survive Closing.  The representations and warranties of all other Sellers set forth in Article 4 will survive for a period of eighteen (18) months after the Closing Date, except that the representations and warranties of such other Sellers set forth in Sections 4.3.5 through 4.3.13 will not survive Closing and provided that the representations and warranties of such other Sellers set forth in Section 4.14 (*Environmental Matters*) will survive for a period of five (5) years after the Closing Date.  The representations and warranties of the Buyers set forth in Article 5 will survive for a period of eighteen (18) months following the Closing Date.  The covenants and agreements of the parties in this Agreement will survive the Closing in accordance with their terms.

**11.3**    **Indemnification.**  Except as may be expressly set forth in this Agreement or in an Ancillary Agreement, no Seller or Buyer will be required to indemnify any other party to any of such agreements.

**11.3.1  Buyers' Indemnification of Delphi.**  Subject to the limitations set forth in this Article 11, from and after the Closing, Buyers will, severally and not jointly indemnify, defend and hold harmless Sellers and their Affiliates and their respective directors, officers, employees, advisors, representatives and agents from and against all Losses actually incurred by Sellers and their Affiliates and their respective directors, officers, employees, advisors, representatives and agents, including in connection with any actions, suits, demands, assessments, judgments and settlements, in any such case reduced by the amount of insurance proceeds actually recovered from any Person or entity with respect thereto ("**Indemnifiable Losses**") relating to, resulting from or arising out of (i) any Assumed Liability, (ii) the breach of any representation and warranty of Buyers contained in this Agreement, provided that Sellers shall have provided to Buyers written notice of a claim for indemnification with respect to a breach of a representation and warranty prior to the expiration of the survival period of such representation and warranty as provided in Section 11.2, or (iii) the breach of any covenant or agreement of any Buyer contained in this Agreement.

**11.3.2  Sellers' Indemnification of Buyers.**  Subject to the limitations set forth in this Article 11, from and after the Closing: (i) the Filing Affiliates will, jointly and severally with respect to Retained Liabilities, and any related covenants or agreements, of the U.S. operations of the Business; and (ii) each Seller of Acquired Assets will, solely with respect to the Acquired Assets sold by such Seller, the related Retained Liabilities and any related covenants or agreements contained in this Agreement, severally and not jointly, indemnify, defend and hold harmless Buyers and their Affiliates and their respective directors, officers, employees, partners, advisors, representatives and agents (collectively, the "**Buyer Indemnified Parties**") from and against all Indemnifiable Losses relating to, resulting from or arising out of: (i) any Retained Liability (including any Liabilities associated with Excluded Assets) other than Assumed Liabilities and Retained Liabilities referred to in Section 11.4 (*Environmental Matters*), for which Section 11.4 shall provide the exclusive basis for indemnification; (ii) the breach of any representation and warranty of Sellers contained in this Agreement, provided that the Filing Affiliates' obligation under this Section 11.3.2.(ii) shall expire at the Closing, and further provided that there shall be no indemnification with respect to the breach of any representation or warranty contained in Sections 4.3.5 through 4.3.13; or (iii) the breach of any covenant or agreement of the Sellers contained in this Agreement:

**A.**  Delphi's and each Seller's obligation to indemnify for Indemnifiable Losses shall apply only to those Claims which are notified to Delphi or such Seller on or before the date that is eighteen (18) months after the Closing Date with the exception of: (i) any claims for indemnification made pursuant to Section 4.14 or Section 11.4 (*Environmental Matters*), which shall be notified to Delphi or such Seller on or before the fifth (5th) anniversary of the Closing Date; and (ii) any claims for indemnification made with respect to the Retained Liabilities specified in Section 2.3.2, which shall be notified to Delphi or such Seller on or before ten (10) Business Days following the date that is thirty-six (36) months after the Closing Date.

**B.**  Neither Delphi or any Seller shall be liable for Indemnifiable Losses pursuant to this Section 11.3.2 until: (i) an individual claim or occurrence (together with any related claims or occurrences) is greater than Twenty Five Thousand Dollars ($25,000.00) ("**Individual Claim Amount**"); and (ii) the amount of all Indemnifiable Losses (which exceeds the Individual Claim Amount)

in the aggregate exceeds Four Hundred Thousand Dollars ($400,000.00) ("**Deductible Amount**"), after which point Delphi and/or the applicable Seller will be obligated to indemnify the Buyer Indemnified Parties from and against Indemnifiable Losses exceeding the Individual Claim Amounts that are in excess of the Deductible Amount until the aggregate amount of Indemnifiable Losses indemnified by Delphi and the combined Sellers reaches an amount equal to twenty percent (20%) of the Purchase Price, after which point Delphi and Sellers will have no further obligation with respect to Indemnifiable Losses under this Agreement; provided, however, that no individual Seller shall be obligated to indemnify the Buyer Indemnified Parties from and against Indemnifiable Losses in excess of one hundred percent (100%) of the Purchase Price for the Acquired Assets sold by such Seller.  The term "**Cap Amount**" refers to the maximum amount payable by Delphi, a Seller or all Sellers as the case may be.  Buyers agree that, subject to Section 6.4.5, from and after the Closing, the indemnification provided in this Section 11.3.2 is the exclusive remedy for a breach by Delphi or any Seller of any agreement or covenant contained in this Agreement that, by its terms, is intended to be performed by Seller after the Closing Date or against Delphi or such Seller for any applicable Retained Liabilities or Excluded Assets.

    **C.**    In calculating amounts payable hereunder, the amount of any Indemnifiable Losses shall be determined without duplication of any other Losses for which a Claim has been made by Buyers or could be made under any other representation, warranty, covenant or agreement included herein, i.e., an indemnified party may not recover more than once for a particular Indemnifiable Loss.

**11.4    Environmental Matters:**

**11.4.1    Indemnification of Seller and Buyer:**

    **A.**    Delphi and Sellers agree to indemnify, defend and hold harmless the Buyer Indemnified Parties from and against any Environmental Damages arising from or relating to: (i) the existence of Pre-Closing Environmental Contamination or a Release at any location of any Hazardous Materials that were generated or used prior to the Closing at the Real Property (including, without limitation, the migration or leaching of Hazardous Materials released at or from the Real Property prior to the Closing), or in connection with or as a result of the operation of any portion of the Business or the Manufacturing Facilities before the Closing; (ii) any failure to comply with any Environmental Law or any Environmental Permit related to the operation of the Business prior to the Closing; or (iii) any Pre-Closing Compliance Matter, including, without limitation, the liabilities referred to in Schedule 4.14.  Delphi's and Sellers' obligation to indemnify, defend and hold harmless includes, without limitation, any Environmental Damages: (a) relating to response actions required to comply with Environmental Laws; (b) asserted by any third party for personal injury, property damage or natural resources damages caused by any Hazardous Material; or (c) arising from: (1) the shipment prior to the Closing of any Hazardous Material from any of the Manufacturing Facilities; (2) the arrangement prior to the Closing Date for the treatment or off-site disposal of any Hazardous Material owned by or generated at the Manufacturing Facilities or by the Business; or (3) the shipment

or arrangement for treatment or disposal of any wastes generated or used in connection with the operation of the Business prior to the Closing.

**B.**    Prior to the Closing, Delphi, Sellers and Buyers' Representative shall jointly inventory and list the Pre-Closing Wastes present at the Manufacturing Facilities. The "**Pre-Closing Wastes**" shall include those hazardous and non-hazardous wastes generated in connection with the facility operations which have been containerized for and prior to disposal. To the extent that such Pre-Closing Waste has not been removed from the Manufacturing Facilities prior to Closing, Delphi and Sellers shall arrange for proper shipment, treatment and disposal of such Pre-Closing Wastes within ninety (90) days following the Closing Date (unless Sellers are precluded from such action by applicable Law, in which case Sellers shall arrange for proper shipment, treatment and disposal of such wastes as soon as practicable).  If Delphi and Sellers fail or are unable to take such action, Delphi and Sellers shall reimburse Buyers for any costs incurred by Buyers in arranging for the shipment, treatment and disposal of such Pre-Closing Wastes at a facility acceptable to Delphi and Sellers, and Delphi and Sellers shall indemnify Buyers pursuant to Section 11.4.1.A for any Claims relating to such Pre-Closing Wastes.

**C.**    Subject to the provisions of this Agreement, and solely with respect to the Manufacturing Facilities, Buyers shall indemnify Delphi and Sellers for Environmental Damages arising from and against any Environmental Damages arising from or relating to: (i) the existence of Post-Closing Environmental Contamination or a Release at any location of any Hazardous Materials that were generated or used subsequent to the Closing at the Real Property (including, without limitation, the migration or leaching of Hazardous Materials released at or from the Real Property subsequent to the Closing), or in connection with or as a result of the operation of any portion of the Business or the Manufacturing Facilities after the Closing; (ii) any failure to comply with any Environmental Law or any Environmental Permit related to the operation of the Business subsequent to the Closing; or (iii) any Post-Closing Compliance Matter. Buyers' obligation to indemnify, defend and hold harmless includes, without limitation, any Environmental Damages: (a) relating to response actions required to comply with Environmental Laws; (b) asserted by any third party for personal injury, property damage or natural resources damages caused by any Hazardous Material; or (c) arising from: (1) the shipment subsequent to the Closing of any Hazardous Material from any of the Manufacturing Facilities; (2) the arrangement subsequent to the Closing Date for the treatment or off-site disposal of any Hazardous Material owned by or generated at the Manufacturing Facilities or by the Business; or (3) the shipment or arrangement for treatment or disposal of any wastes generated or used in connection with the operation of the Business subsequent to the Closing.

**D.**    Subject to the provisions of this Agreement, including, without limitation, the next sentence, for those Environmental Damages arising from circumstances that may be considered both: (i) Pre-Closing Environmental Contamination and Post-Closing Environmental Contamination; or (ii) Pre-Closing Compliance Matters and Post-Closing Compliance Matters, such Environmental Damages shall be allocated between the Parties in proportion to the extent that such Environmental Damages are the result of Pre-Closing

Environmental Contamination or Post-Closing Environmental Contamination, or Pre-Closing Compliance Matters or Post-Closing Compliance Matters, and each Party shall indemnify the other for its share as determined by such allocation.

**11.4.2** __Limitations on Liability.__  Claims relating to environmental matters are subject to the limitations of this Section 11.4.2 and to the Deductible Amounts and Cap Amounts of Sections 11.3.2.  Neither Party shall be liable under this Agreement for Environmental Damages:

**A.**    In the case of Environmental Claims arising from Pre-Closing Compliance Matters or Post-Closing Compliance Matters (as the case may be), unless written notice of such claim has been served on the non-claiming Party on or before five (5) years following the Closing Date.

**B.**    In the case of Environmental Claims arising from a Pre-Closing Environmental Contamination or Post-Closing Environmental Contamination (as the case may be), unless written notice of such claim has been served on the non-claiming Party on or before five (5) years following the Closing Date.

**C.**    Where such Environmental Damages are the result of the indemnified party using the Manufacturing Facility for a use other than or more sensitive than the industrial use in effect at the Closing, or as a result of changing the zoning or land use classification of the Manufacturing Facility to a classification more sensitive than the industrial classification in effect at Closing;

**D.**    To the extent the claiming Party did not take reasonable steps to avoid or mitigate any Environmental Damages, acting in a reasonable and cost-effective manner; in the case of an emergency, where a Party takes any action to avoid or mitigate any Environmental Damages: (i) it shall for the avoidance of doubt not be in breach of this Agreement and shall not be precluded from recovering its Environmental Damages provided that the claiming Party notifies the other Party of such circumstances as soon as reasonably practicable and provided that such actions or steps are reasonably necessary to avert the emergency; and (ii) the reasonable costs and expenses of all steps taken pursuant to the duty to mitigate contained in this Section 11.4.2.D shall be deemed to be Environmental Damages.

**E.**    Following the Closing  and for a period of five (5) years thereafter, the Buyers shall not conduct any investigation of the environmental condition of the soil, groundwater, surface water or other environmental medium at any Manufacturing Facility without a specific legal obligation for doing so.  Buyers shall not disclose the results of any prior investigations of the environmental condition of any Manufacturing Facility or any subsequent investigation of any Manufacturing Facility to any third party (other than to lenders providing financing to Buyers in connection with the transactions contemplated by this Agreement) unless:

(i)    The disclosure is required by any law (including any Environmental Law);

86

(ii)     The Buyers are advised in writing by counsel that the disclosure is otherwise necessary or appropriate pursuant to any law (statutory or decisional), rule and/or regulation and such writing is provided to Seller at least ten (10) days prior to such disclosure, if practicable;

(iii)     The information is clearly in the public domain through no fault of the claiming Party; or

(iv)     Seller has given prior written approval to the disclosure.

provided, however, that if following Closing the Buyers, acting reasonably in the ordinary course of operations or other business activities (including expansion or transfer of a facility) discover or are made aware of substances not previously identified by Sellers' disclosures or through Buyer's due diligence activities prior to Closing, individually or in combination with other substances known to be present at the Manufacturing Facilities at the time of the Closing, that may be Hazardous Materials, the Buyers shall have the right to have samples taken and analyzed and, if the analyses show the presence of Hazardous Materials, the right to determine the extent of the contamination.

**11.4.3  Remediation of Environmental Damage:**

**A.**     Where an Environmental Damage arises out of Environmental Contamination, the non-claiming Party shall be responsible for Remedial Works or the redressing of a Compliance Matter ("**Remedy**") to no less but no more than the Remediation Standards allowed by applicable Environmental Laws; such Remedial Works may be determined, in compliance with applicable Environmental Laws, using risk assessment and related risk evaluation methods. Remedial Works shall be conducted using the most cost effective methods of investigation, corrective measures, remediation and/or containment (including the use of institutional controls or deed restrictions for use of the property for industrial purposes only), and in accordance with the requirements of subparagraph C below.

**B.**     The non-claiming Party shall, where a Remedy is required pursuant to this Agreement, have the right to conduct such Remedy.

**C.**     The conduct of a Remedy shall be as follows:

(i)     The non-claiming Party shall prepare appropriate work plans or scopes of work to satisfactorily undertake and complete the Remedy under this Agreement; such Party will provide the other Party with an opportunity to review and comment on such work plans or scopes of work. The non-claiming Party shall, in good faith, reasonably consider such comments, but is not required to adopt them;

(ii)     When requested, the claiming Party shall cooperate with the non-claiming Party in any communications with the appropriate Competent Authority;

(iii)     Where Delphi or any Seller is the non-claiming Party, Delphi and Sellers will take all reasonable steps to avoid interfering with Buyers'

operation or use of the Manufacturing Facility, and Buyers will reasonably cooperate with Seller including providing access to the Manufacturing Facility and the use of utilities (at Delphi and Sellers' expense) in the conduct of the Remedy;

(iv)    Where applicable the non-claiming Party shall provide copies of all relevant correspondence sent to and received from a Competent Authority, and keep the claiming Party reasonably apprised of the progress of the conduct of the Remedy; and

(v)    The conduct of the Remedy shall be deemed complete when:

(1)    The non-claiming Party has fully implemented the Remedy pursuant to and in accordance with a written plan of remedial or corrective action, approved in writing by an applicable Competent Authority, which plan contains or incorporates objective, Remediation Standards, and has demonstrated compliance with such Remediation Standards in accordance with such written plan and Environmental Law; or

(2)    Where approval or other oversight by a Competent Authority is not required by Environmental Law, and subject to Section 11.4.3.A of this Agreement, the non-claiming Party's implementation of the Remedy results in attainment of the objective, Remediation Standards which are allowed by applicable Environmental Laws.

**11.5    Indemnification Procedure.**    The obligations of any indemnifying party to indemnify any indemnified party under Sections 11.3.1 or 11.3.2 with respect to Indemnifiable Losses  resulting from the assertion of liability by third parties (including Governmental Entities) (an "**Indemnification Claim**"), shall be subject to the following terms and conditions:

**11.5.1**  Any party against whom any Indemnification Claim is asserted shall give the party required to provide indemnity hereunder written notice of any such Indemnification Claim promptly after learning of such Indemnification Claim (with such notice satisfying the requirements of this Section 11.5.1), and the indemnifying party may, at its option, undertake the defense thereof by representatives of its own choosing and shall provide written notice of any such undertaking to the indemnified party.  Failure to give prompt written notice of a Indemnification Claim hereunder shall not affect the indemnifying party's obligations under this Article 11, except to the extent that the indemnifying party is actually prejudiced by such failure to give prompt written notice. Any written notice delivered by the indemnified party to the indemnifying party seeking indemnification pursuant to this Agreement with respect to Indemnifiable Losses shall set forth, with as much specificity as is reasonably practicable, the basis of the claim for Indemnifiable Losses, the sections of this Agreement which form the basis for the claim, copies of all material written materials relating to such claim and, to the extent reasonably practicable, a reasonable estimate of the amount of the Losses that have been or may be sustained by the indemnified party.  The indemnified party shall, and shall cause its employees and representatives to, cooperate with the indemnifying party in connection with the settlement or defense of such Indemnification Claim and shall provide the indemnifying party with all available information and documents concerning

such Indemnification Claim. If the indemnifying party, within fifteen (15) days after written notice of any such Indemnification Claim, fails to assume the defense of such Indemnification Claim, the indemnified party against whom such claim has been made shall (upon further written notice to the indemnifying party) have the right to undertake the defense, compromise or settlement of such claim on behalf of and for the account and risk, and at the expense, of the indemnifying party, subject to the right of the indemnifying party to assume the defense of such Indemnification Claim at any time prior to settlement, compromise or final determination thereof upon written notice to the indemnified party.

11.5.2 Anything in this Section 11.5 to the contrary notwithstanding: (i) the indemnified party shall not settle a claim for which it is indemnified without the prior written consent of the indemnifying party, which consent shall not be unreasonably withheld, conditioned or delayed; and (ii) the indemnifying party shall not enter into any settlement or compromise of any action, suit or proceeding, or consent to the entry of any judgment for relief other than monetary damages to be borne by the indemnifying party, without the prior written consent of the indemnified party, which consent shall not be unreasonably withheld, conditioned or delayed.

11.5.3 **Indemnification Payments.**  All payments under this Article 11 shall be treated as adjustments to the Purchase Price.

11.5.4 **No Estimation:**

A.    Each of the Sellers acknowledges and agrees that any claim that may exist or hereafter arise in favor of Buyers under this Article 11 is a contingent, unliquidated administrative claim against Sellers (an "**Indemnification Claim**").  Each of the Sellers further agrees that: (i) it shall not seek, and hereby waives its right, to have any Indemnification Claim estimated under §502(c) of the Bankruptcy Code or otherwise for any purpose including, without limitation, for allowance, distribution, feasibility of any plan of reorganization or establishment of any reserves for, or on account of, any Indemnification Claim; (ii) any Indemnification Claim shall not be discharged or otherwise affected by the confirmation of any plan which may be confirmed in the Sellers' bankruptcy case; and (iii) Buyer shall be relieved from any obligation it has or may have to file a proof of claim to preserve Buyer's right to assert any Indemnification Claim.

B.    Without limiting Buyers' rights hereunder, allocation of any Indemnification Claim among the Sellers will be made in accordance with the Allocation; provided, however, that if a Seller or Sellers are responsible for the act or event giving rise to the Indemnification Claim then such Seller or Sellers will be responsible for all of the Indemnification Claim in proportion to their responsibility. Nothing in this Section 11.5.4.B shall in any way limit, reduce or otherwise adversely affect Buyers' rights to indemnification under this Article 11.

11.6    **Mitigation.**  Notwithstanding any other provision of this Agreement, in no event shall a Party be entitled to indemnification pursuant to this Agreement to the extent any Losses were attributable to such Party's own gross negligence or willful misconduct.

**11.7    Dispute Resolution.**    Sellers, on the one hand, and Buyers, on the other hand, will, in the first instance, attempt to settle any and all claims or disputes arising in connection with this Agreement by good faith negotiations by senior management of each party.  If the dispute is not resolved by senior management within thirty (30) days after delivery of a written request for such negotiation by either party to the other, either party may make a written demand (the "**Demanding Party**") for formal dispute resolution (the "**Notice**") and specify therein in reasonable detail the nature of the dispute.  Within fifteen (15) Business Days after receipt of the Notice, the receiving party (the "**Defending Party**") shall submit to the other a written response.  The Notice and the response shall include: (i) a statement of the respective party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that party and of any other person who will accompany the executive to meetings of the parties.  Within fifteen (15) Business Days after such written notification, the executives (and others named in the Notice or response) will meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute.  All reasonable requests for information made by one party to the other will be honored promptly.  All negotiations pursuant to this Section 11.7 are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.

## 12.    MISCELLANEOUS:

**12.1    Fees and Expenses.**  Except as set forth in Section 9.2.2 and except as otherwise provided in the Ancillary Agreements, Delphi, on behalf of Sellers, on the one hand, and Buyers, on the other hand, will each bear their own expenses and the expenses of their Affiliates in connection with the preparation and negotiation of this Agreement and the consummation of the transactions contemplated hereby, including their respective brokers' or funders' fees and all fees and expenses of their respective counsel, auditors, consultants and other representatives.  Buyers will be solely responsible for: (i) all expenses in connection with their due diligence review of the Business, including, without limitation, surveys, title work, title inspections, title searches, environmental testing or inspections, building inspections, UCC lien and other searches; and (ii) any cost in connection with notarization, registration or recording of this Agreement or an Ancillary Agreement required by applicable Law.

**12.2    Bulk Sales Laws.**  Buyers waive compliance by Delphi and Sellers with any applicable bulk sales Law.

**12.3    Payments in Dollars.**  Except as otherwise provided in this Agreement or an Ancillary Agreement, all payments pursuant hereto will be made by wire transfer in U.S. Dollars in same day or immediately available funds.

**12.4    Amendment.** This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by the duly authorized representative or officer of the Parties.

**12.5    Assignment.**  This Agreement will be binding on and inure to the benefit of the successors and assigns of each Party, provided, that no assignment of any rights or obligations hereunder will be made by any Seller or Buyer without the written consent of the other Party, except the assignment of this Agreement by a Filing Affiliate to a succeeding entity following such Filing Affiliate's emergence from Chapter 11 (which assignment will not require the other Party's consent).  Notwithstanding the foregoing, Buyers may assign their rights and obligations under this Agreement to any lender providing financing in connection with the transactions

contemplated by this Agreement upon a material default by Buyers under such lender financing agreement; provided that such lender agrees to be bound by the terms of this Agreement; provided, however, that nothing in this Section 12.5 shall prevent Buyers from granting a security interest in this Agreement to any such lender.

**12.6    Waiver.**  Any waiver by Sellers or Buyers of any breach or of a failure to comply with any provision of this Agreement: (i) will be valid only if set forth in a written instrument signed by the Party to be bound; and (ii) will not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any provision of this Agreement.  At any time prior to the Closing Date, the Parties may: (a) extend the time for the performance of any of the obligations or other acts of the other Parties; (b) waive any inaccuracies in the representations and warranties contained in this Agreement or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions contained herein.  Except as otherwise expressly provided in this Agreement, any agreement on the part of a Party to any such extension or waiver will be valid only if set forth in an instrument in writing signed on behalf of such Party.

**12.7    Notices.**  Unless additional means are expressly provided herein, any notice, request, consent or other communication required or permitted to be given under this Agreement will be in writing and will be deemed to have been sufficiently given or served for all purposes: (i) when personally delivered; (ii) on the first (1st) Business Day after sent by a nationally or internationally recognized overnight courier service with signature to the recipient at the address below indicated; (iii) on the third (3rd) Business Day after sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) when sent if sent by facsimile with confirmation of receipt:

<table>
<tr><td><strong>If to any Buyer:</strong></td><td><strong>INTEVA PRODUCTS, LLC</strong><br>1401 Crooks Road<br>Troy, Michigan 48098<br>Attn:  President<br>Fax:  248-655-8906</td></tr>
<tr><td><strong>With a copy to:</strong></td><td><strong>CADWALADER, WICKERSHAM & TAFT LLP</strong><br>One World Financial Center<br>New York, New York 10281<br>Attn:    Michael C. Ryan, Esq.<br>Fax:    212-504-6666</td></tr>
<tr><td><strong>And With a Copy to:</strong></td><td><strong>THE RENCO GROUP, INC.</strong><br>30 Rockefeller Plaza<br>New York, NY  10112<br>Attn:    Roger Fay<br>Fax:    212-541-6197</td></tr>
<tr><td><strong>If to Delphi:</strong></td><td><strong>DELPHI CORPORATION</strong><br>5725 Delphi Drive<br>Troy, Michigan 48098<br>Attn:  Vice President and Treasurer<br>Fax No.:  248-813-2648</td></tr>
</table>

**With a copy to:**      **DELPHI CORPORATION**
5725 Delphi Drive
Troy, Michigan 48098
Attn:    Deputy General Counsel -
Transactional & Restructuring
Fax No.:  248-813-2491

provided, however, if either Party will have designated a different addressee by notice, then to the last addressee so designated.

**12.8**    **Entire Agreement.**  This Agreement, together with the Ancillary Agreements and the Confidentiality Agreement contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof and thereof.

**12.9**    **Counterparts.**  This Agreement may be executed in two or more counterparts, each of which will be deemed an original, and all of which will constitute one and the same Agreement.  Facsimile signatures will be treated as originals.

**12.10**  **Publicity.**  Except as required by Law (and then only after prior consultation with the other Party) or in connection with the Bankruptcy Cases, neither Party (nor any of the other Buyers and Sellers) will issue any press release or make any public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party (not to be unreasonably withheld, delayed or conditioned).  Any press release will take into account the obligation to provide prior information to Seller's European works council and its works councils in Germany and Austria, as well as union representatives in the United States and Mexico, in accordance with applicable law and past practice of Seller.

**12.11**  **Headings.**  The headings contained in this Agreement are for convenience only, do not constitute a part of this Agreement and will not be deemed to limit or affect any of the provisions hereof.

**12.12**  **Severability.**  The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable: (i) a suitable and equitable provision will be substituted therefore in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision; and (ii) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability, nor will such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

**12.13**  **Third Parties.**  Nothing expressed or implied in this Agreement is intended or will be construed to confer upon or give to any Person, other than the Parties, their Affiliates and their respective permitted successors or assigns, any Claims, rights or remedies under or by reason of this Agreement.

**12.14    Governing Law.** This Agreement will in all respects be governed by and construed in accordance with the laws of the State of New York, and to the extent applicable the Bankruptcy Code, without giving effect to rules governing the conflict of laws.

**12.15    Venue and Retention of Jurisdiction.**    The Parties irrevocably and unconditionally submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agree not to commence any litigation relating thereto except in the Bankruptcy Court).

**12.16    Risk of Loss.** Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Acquired Assets or the Business will be borne exclusively by Sellers.

**12.17    Enforcement of Agreement.** The Parties agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or were otherwise breached. It is accordingly agreed that the Parties will be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to all other remedies available at law or in equity.

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first above written.

**DELPHI CORPORATION**


By:_____/s/_____
Name:  **Fred J. Bellar III**
Title:    Executive Director of M&A, AHG


**INTEVA PRODUCTS, LLC**


By:_____/s/_____
Name:  **Roger Fay**
Title:    Vice President

The following U.S. Persons sign this Agreement with respect to the Acquired Assets or Sale Securities being bought or sold by such Person and their joint and several obligations only with respect to indemnification obligations relating to the portion of the Business transferred by any one of them under this Agreement.

**DELPHI AUTOMOTIVE SYSTEMS LLC**

By:_____/s/_____
Name: **Fred J. Bellar III**
Title:   Vice President

**DELPHI AUTOMOTIVE SYSTEMS
(HOLDINGS) INC.**

By:_____/s/_____
Name: **Fred J. Bellar III**
Title:   Executive Director of M&A, AHG

**DELPHI TECHNOLOGIES, INC.**

By:_____/s/_____
Name: **Fred J. Bellar III**
Title:   Executive Director of M&A, AHG

## SCHEDULES

| | |
|---|---|
| Schedule 1 | Detail of Sellers and Buyers |
| Schedule 1.1.A | Buyers Knowledge |
| Schedule 1.1.B | Sellers Knowledge |
| Schedule 2.1.2. | Acquired Assets of Technical Centers and Sales Offices |
| Schedule 2.1.3.A | Third Party Bailed Assets |
| Schedule 2.1.3.O(ii) | Asset Transfers Prohibited by Law |
| Schedule 2.1.3.O(iii) | Excluded Computer Hardware, Equipment, Software and Other Assets |
| Schedule 3.3.1 | Benchmark Inventory Amount |
| Schedule 3.3.3 | Principles Regarding Inventory Values |
| Schedule 3.4.3.C(i) | NRB Payment Formula Illustration |
| Schedule 3.4.3.C(iii) | Columbus Cash Contribution(s) |
| Schedule 3.5.1 | Allocation |
| Schedule 4.3.2 | JV Companies |
| Schedule 4.3.3 | JV Capital Stock |
| Schedule 4.3.5 | JV Financial Statements |
| Schedule 4.3.6 | JV Transfers Prohibited by Law/Government Approvals |
| Schedule 4.3.8 | JV Non-Compliance with Law/Permits |
| Schedule 4.3.9 | Proceedings Against JV Companies |
| Schedule 4.3.10 | JV Ordinary Course of Business |
| Schedule 4.3.11 | JV Owned or Licensed Intellectual Property |
| Schedule 4.3.12.1 | JV Material Contracts |
| Schedule 4.3.12.2 | JV Material Defaults |
| Schedule 4.3.13 | JV Environmental |
| Schedule 4.4.1 | Financial Statements |
| Schedule 4.4.2 | Exceptions to GAAP |
| Schedule 4.5 | No Conflicts or Approvals |
| Schedule 4.7 | Non-Compliance with Law |
| Schedule 4.8 | Proceedings against Sellers |
| Schedule 4.9 | Absence of Certain Changes |
| Schedule 4.11.1 | Transferred Employees |
| Schedule 4.11.2 | Employee Benefit Plans |
| Schedule 4.11.4 | Proceedings Relating to Seller Employee Benefit Plans |
| Schedule 4.11.5 | Collective Bargaining Agreements |
| Schedule 4.11.6 | Labor Relations |
| Schedule 4.12.1.A | Patents |
| Schedule 4.12.1.B | Trademarks |
| Schedule 4.12.3 | Allegations of Third Party of Intellectual Property |
| Schedule 4.12.4 | Infringement of the Purchased Intellectual Property |
| Schedule 4.13.1 | Material Contracts |
| Schedule 4.13.2 | Contract Issues Post-Petition Contracts |
| Schedule 4.13.3 | Significant Customers |
| Schedule 4.14 | Environmental Matters |
| Schedule 4.15 | Insurance |
| Schedule 4.16.1 | Defects in Title for Personal Property Assets |
| Schedule 4.16.3 | Other Inventory Locations |
| Schedule 4.16.4 | Machinery, Equipment and Capitalized Tools |
| Schedule 4.17.1 | Leased Real Property |
| Schedule 4.17.2 | Owned Real Property |
| Schedule 5.9 | Commitment Letter |

1

Schedule 6.1.1          Exceptions to Covenants Regarding Conduct of Business prior to the Closing
Schedule 6.25.A         Template of Confidential Agreement Clauses
Schedule 6.25.B         Strategic Bidders
Schedule 6.3            Assumed U.S. Contracts
Schedule 6.6.1          Employment Agreements to be Assumed by Buyer
Schedule 6.6.1.H        Leased Hourly Employees
Schedule 6.6.10         Restricted Parties
Schedule 6.11.1         Sub-Licensed Intellectual Property Contracts
Schedule 6.12           Post-Closing Obligations
Schedule 6.13.1         Competition Filings
Schedule 6.16           Shared Items Transferred to Buyer
Schedule 7.1.5          Day 1 Readiness
Schedule 7.2.4          Material Contracts Assigned to Buyer
Schedule 7.2.9          UAW Agreement
Schedule 7.2.10         IUE Agreement

## EXHIBITS

Exhibit 8.2.1.A          Patent Assignment
Exhibit 8.2.1.B          Trademark Assignment
Exhibit 8.2.2.A.1        Mexico Asset Sale Agreement
Exhibit 8.2.2.A.2        Mexico Asset Sale Agreement – Mexican entity
Exhibit 8.2.2.B          China Share Transfer Agreement
Exhibit 8.2.2.C          Korea Share Transfer Agreement
Exhibit 8.2.2.D          Austria Asset Sale Agreement
Exhibit 8.2.2.E          Germany Asset Sale Agreement
Exhibit 8.2.3            Transition Services Agreement
Exhibit 8.2.4            Bills of Sale
Exhibit 8.2.5            Assignment and Assumption Agreements
Exhibit 8.2.6            Vandalia Manufacturing Services Agreement
Exhibit 8.2.7            Grosspetersdorf Manufacturing Services Agreement
Exhibit 8.2.8            Columbus Manufacturing Services Agreement
Exhibit 8.2.9            Adrian HVAC Excluded Product Manufacturing Services
                         Agreement
Exhibit 8.2.10           Vandalia Lease
Exhibit 8.2.11           Troy Technical Center Sublease
Exhibit 8.2.12           Mexico Shared Substation Services Agreement
Exhibit 8.2.13           Mexico Shared Wastewater Treatment Plant Services
                         Agreement
Exhibit 8.3.2            Deed for Owned Real Property

## SCHEDULE 1

## DETAILS OF SELLERS AND BUYERS

| | ASSET/ STOCK | SELLER | BUYER |
|---|---|---|---|
| **MANUFACTURING FACILITY:**[4] | | | |
| Vandalia, Ohio **[DM, IP]** | Asset | Delphi Automotive Systems LLC | Inteva Products, LLC |
| Columbus, Ohio **[DM, L]** | Asset | Delphi Automotive Systems LLC | Inteva Products, LLC |
| Cottondale, Alabama **[C]** | Asset | Delphi Automotive Systems LLC | Inteva Products, LLC |
| N. Kansas City, Missouri **[C]** | Asset | Delphi Automotive Systems LLC | Inteva Products, LLC |
| Orion, Michigan **[C]** | Asset | Delphi Automotive Systems LLC | Inteva Products, LLC |
| Adrian, Michigan **[IP]** | Asset | Delphi Automotive Systems LLC | Inteva Products, LLC |
| Gadsden, Alabama **[IP]** | Asset | Delphi Automotive Systems LLC | Inteva Products, LLC |
| Grosspetersdorf, Austria **[DM]** | Asset | Delphi Packard Austria GmbH | Austrian or German Newco |
| Woerth, Germany **[DM]** | Asset | Delphi Deutschland, GmbH | KG Newco |
| CMMI Matamoros, Mexico **[L, IP]** | Asset | Delphi Automotive Systems LLC and Delphi Interior Systems de Mexico, S.A. de C.V. | Inteva Products, LLC and Closures Interiors, S. de R.L. de C.V. |
| Shanghai, China **[DM, L]** | Stock of Shanghai Delphi Automotive Door Systems, Co., Limited | 60% - Delphi Automotive Systems (China) Holding Company Limited | Inteva Products, LLC |
| Kyungsan, Korea **[L]** | Stock of KDS Company Ltd. | 50% - Delphi Automotive Systems (Holdings) Inc. | Inteva Products, LLC |
| | | | |
| **TECHNICAL CENTERS:** | | | |
| Troy, Michigan **[DM, L, C, IP]** | Asset | Delphi Automotive Systems LLC | Inteva Products, LLC |
| Wuppertal, Germany **[DM, C, IP]** | Asset | Delphi Deutschland, GmbH | GmbH Newco |
| Juarez, Mexico **[L]** | Asset | Delphi Automotive Systems S.A. de C.V. | Closures Interiors, S. de R.L. de C.V. |
| Vandalia, Ohio **[DM, IP]** | Asset | Delphi Automotive Systems LLC | Inteva Products, LLC |
| | | | |
| **TECHNOLOGY:** | | | |

---

[4]    DM = Door Modules; L = Latches; C = Cockpits; and IP = Instrument Panels.

| | | | |
|---|---|---|---|
| Troy, Michigan **[DM, L, C, IP]** | Asset | Delphi Technologies, Inc. | Inteva Products, LLC |
| | | | |
| | | | |
| **WAREHOUSES:** | | | |
| Ventana, Italy[5] **[KDS L]** | Asset | N/A | |

---

[5]    Of several warehouses used by the Business, the Ventana, Italy warehouse is listed because it is legally required that KDS products be repackaged in this leased warehouse in order for Korean products to be sold in Italy.

## SCHEDULE 3.5.1

## ALLOCATION OF PRELIMINARY PURCHASE PRICE

The Preliminary Purchase Price and Post-Closing Payments shall be allocated as follows

|  |  | Purchase Price Allocation<br>$ USD MM |
|---|---|---|
| 1. | All Acquired Assets of Filing Affiliates.<br><br>Note: Includes 100% of the $26 Million Post-Closing Payments under section 3.4.4 | 70.9 |
| 2. | Shares KDS Company Ltd. (Korea) Sale of Shares | 10.4 |
| 3. | Shares Shanghai - Delphi Automotive Door Systems Co. Ltd. (China) Sale of Shares | 13.3 |
| 4. | Delphi Interiors Systems de Mexico,  S.A. de C.V Sale of  Assets | 8.0 |
| 5. | Delphi Automotive Systems SA de CV. Sale of Assets | 0.5 |
| 6. | Delphi Automotive Systems Deutschland, GmbH Sale of Assets. | 2.2 |
| 7. | Delphi Packard Austria GmbH. Sale of  Assets | 0.7 |
|  | **Total** | 106.0 |

Imputed interest on Post-Closing Payments will be calculated pursuant to applicable Internal Revenue Code provisions.  The Parties agree to allocate the Purchase Price with respect to each asset as specified by the Buyer in its reasonable discretion consistent with and within the categories in the chart above.