U.S. Department of Labor
Office of the Solicitor
230 South Dearborn Street, Rm 844
Chicago, Illinois 60604
(312) 353-4454
Peter D. Broitman (PB 2275)

U.S. Department of Labor
Office of the Solicitor
1240 E. 9th Street, Rm 881
Cleveland, Ohio 44199
(216) 522-3875
Janice L. Thompson (JT 0337)

Attorneys for Elaine L. Chao, Secretary of Labor
United States Department of Labor, Claimant

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
:
In re                                    :    Chapter 11
:
DELPHI CORPORATION, et al.,              :    Case No. 05-44481 (RDD)
:
Debtors.                     :    (Jointly Administered)
:
---------------------------------------------------------------x

**THE SECRETARY'S SUPPLEMENTAL RESPONSE TO THE
DEBTORS' OBJECTION TO PROOF OF CLAIM NUMBER 15135
AND STATEMENT OF DISPUTED FACTS**

**I**

**THE SECRETARY'S CLAIM**

The Secretary filed a timely proof of claim on July 31, 2006, thereafter amended on August 9, 2007, on behalf of the Delphi Personal Savings Plan for Hourly Rate Employees in the United States (the "Delphi Plan") asserting an unsecured pre-petition obligation. The Secretary's claim was filed against Delphi Corporation ("Delphi") as the Delphi Plan's fiduciary and named administrator. The Secretary's claim is based on

losses incurred by the Delphi Plan and its participants as a result of Delphi's breaches of its fiduciary obligations under Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. Section 1001, *et seq.*, and its failure to fully remedy those breaches. As a result of Delphi's fiduciary breaches, the Delphi Plan lost $3,079,439.31 up to the date of Delphi's bankruptcy filing on October 8, 2005, lowering the account balances of nearly 11,000 plan participants.

II

**THE FACTS SUPPORTING THE SECRETARY'S CLAIM**

**A.    The Delphi Plan**

The Delphi Plan is a defined contribution plan to which Delphi's hourly employees can elect to defer a portion of their salaries and wages for retirement and invest them in various funds.[1] Delphi established the plan in May 1999 when it was incorporated following its spin-off from General Motors Corporation.[2]

Delphi was the named plan administrator to the Delphi Plan. The Delphi Plan document gave Delphi (along with its plan administrator committees) the responsibility for the day-to-day operation, management and administration of the plan, and all of its decisions were deemed "final and binding."[3] Delphi, as plan administrator, appointed Fidelity Investment Institutional Operations Company, Inc. ("Fidelity") to perform

---

[1] Declaration of Frank Schneider ("Schneider Declaration"), par. 5(f), Ex. 6, p. DOL-PSP-000509; par. 7, Ex. 18, pp. DT-DEDOL-0000069-77.

[2] Schneider Declaration, par. 5(d), Ex. 4, p. DOL-PSP-000124.

[3] Schneider Declaration, par. 7, Ex. 18, pp. DT-DEDOL-0000059 and 83.

2

recordkeeping and administrative services for the plan, which included making plan fund transfers as the plan's "Stock Fund Agent."[4]

### B.   The Failure to Follow the Plan Document

Beginning January 2000, the Delphi Plan required the General Motors ("GM") stock dividends held in the plan's GM Stock Fund ("GMSF") to be invested in the plan's Promark Income Fund ("Promark Fund").[5] During the period from March 2000 through December 2003, however, Fidelity incorrectly instructed State Street Bank (State Street), the plan's trustee, to invest the dividends in the GMSF.[6] Throughout this period, Delphi received statements that showed that "Dividend Investment Income" deposits continued to be made in the GMSF.[7]

As a result of a participant inquiry in March 2004, Fidelity discovered the error and notified Delphi.[8] In May 2004, General Motors Management Corporation (GMIMCo), the plan's investment manager, determined that the error caused over $1 million in losses to participant accounts, and advised Delphi of its determination.[9]

---

[4] Schneider Declaration, par. 5(b), Ex. 2, p. DOL-PSP-001781; par. 5(c), Ex. 3, par. 5(d), Ex. 4, pp. DOL-PSP-000124-125.

[5] Schneider Declaration, par. 5(d), Ex. 4, pp. DOL-PSP-000124-125; par. 7, Ex. 18, p. DT-DEDOL-0000077.

[6] Schneider Declaration, par. 5(d), Ex. 4, pp. DOL-PSP-000124-125.  As the dividends were declared each quarter, March 2000 was the first month they would have been declared.

[7] Schneider Declaration, par. 6(a), Ex. 12, pp. 3 (fn 2) and 4; par. 5(h), Ex. 8.

[8] Schneider Declaration, par. 6(d), Ex. 15, p. 2.

[9] Schneider Declaration, par. 5(g), Ex. 7; par. 8, Ex. 19, Ex. 19(a).

3

**C.     Delphi's Correction**

   **1.     The Corrections Considered by Delphi**

In response to Delphi's request to be provided with a list of possible actions that could be taken as a result of the error, Fidelity proposed the following alternatives:

- Take no corrective action;
- Notify the participants of the error, but take no corrective action;
- Offer the participants the options of doing nothing or of selling the GMSF shares that had been incorrectly purchased and purchasing shares of the Promark Fund with the proceeds and make an adjustment for the losses caused by the error;
- Make an "interest spread/rate of return" allocation to participant accounts estimated to result in a $40,000 and $145,000 payout for all accounts; or
- Sell the GMSF shares that had been incorrectly purchased, purchase shares of the Promark Fund with the proceeds and make an adjustment for the losses caused by the error.

Fidelity did not propose that Delphi file a legal action against itself, GMIMCo or State Street for the improper investment of the GM stock dividends.[10]

   **2.     The Correction Chosen by Delphi**

Despite its knowledge of participant losses in excess of $1 million, Delphi chose not to make plan participants whole. It rather chose to offer participants the options of doing nothing or of selling the GMSF shares and purchasing shares of the Promark Fund.[11] Accordingly, by notice dated September 6, 2005, Fidelity, on behalf of Delphi,

---

[10] Schneider Declaration, par. 6(b), Ex. 13.

[11] Schneider Declaration, par. 9, Ex. 20, p. 5 (second full par.); par. 10, Ex. 21, p. 2 (fourth and fifth par.).

4

advised participants of the error and afforded them those two options.[12] Delphi's notice to participants described the options as follows:

- Option 1 - You may keep your increased GM Common Stock Fund in your Delphi PSP account. Your account…will continue to function as in the past with the GM Common Stock Fund being a sell-only option with no new money being invested in the GM Common Stock Fund….

- Option 2 - You may have your account adjusted so that the past GM Common Stock dividends that were incorrectly invested are moved to the Promark Income Fund. This option will require that **all** GM common stock shares incorrectly purchased due to the dividend being reinvested be sold and invested in the Promark Income Fund. You should be aware that, if you choose this option, the GM shares will be **sold using current market prices** and the Promark Fund will be purchased. An adjustment will then be made to your account for any change to the market value of your PSP account due to the dividends being incorrectly invested. Selecting Option #2 could result in an increase/decrease of market value of your account depending on the prices of the GM Common Stock Fund and Promark Income Fund on the date of the correction. (Emphasis in the original.)

Participants who chose not to replace their GMSF shares under Option 1 were not required to take any affirmative step. Participants who chose to make the replacement under Option 2, and thereby make themselves whole, however, were required to telephone Fidelity within 30 days. In August 2004, a year before Delphi sent participants the notice, Delphi had estimated participant losses at $1.8 million.[13] By the time the notice was sent in September 2005, Fidelity had estimated participant losses at $2.9

---

[12] Schneider Declaration, par. 6(c), Ex. 14. The September 6, 2005 notice went out on Delphi's letterhead, but was signed by Fidelity.

[13] Schneider Declaration, par. 5(d), Ex. 4, p. DOL-PSP-000126.

5

million.[14] Ultimately, Fidelity made cash adjustments totaling only $856,596.56 to 1,476 participants who elected to sell their GMSF shares.[15] As noted *supra*, this "correction" failed to restore the losses to the accounts of nearly 11,000 plan participants, which as of Delphi's bankruptcy filing, totaled over $3 million.

### 3. Delphi's Application to the IRS to Maintain the Delphi Plan's Tax-Qualified Status

Before sending its September 6, 2005 participant notice, Delphi had sought IRS approval of its correction method. It did so to maintain the Delphi Plan's tax qualified status, a status which represented a significant tax benefit to Delphi as plan sponsor. *See* IRS Code 404; Reg. 1.404(a); 412.[16]

The participant notice Delphi submitted to the IRS for approval was not the same one it sent to participants on September 6th. In particular, in the description of Option 1 in the participant notice submitted to the IRS, Delphi advised participants that they "may keep the GM Stock Fund units that were incorrectly purchased with dividends." In the notice that Delphi sent to participants, however, Delphi changed the original reference to the participants' "GM Stock Fund units" to the participants' "increased" GM Stock Fund. In addition, the participant notice submitted to the IRS stated that the option of selling the GMSF shares in exchange for shares of the Promark Fund (Option 2) "could result in an *increase* in value of your account … on the date of correction." The notice that Delphi sent to participants, however, changed the description of that option to state that selection

---

[14] Schneider Declaration, par. 6(f), Ex. 17.

[15] Schneider Declaration, par. 6(a), Ex. 12, p. 6.

[16] Schneider Declaration, par. 5(d), Ex. 4.

6

of the option could result in an "*increase/decrease* of market value of your account…on the date of correction." (Emphasis added.) [17]

Ultimately, the IRS approved Delphi's proposed correction, thereby allowing Delphi to continue to enjoy the tax benefits of being the sponsor of a tax qualified plan. In giving its approval, however, the IRS specifically advised Delphi that its approval "should not be construed as affecting the rights of any party under any other law, including Title I of the Employee Retirement Income Security Act of 1974."[18]

---

[17] Schneider Declaration, par. 5(d), Ex. 4, Attachment 1, p. DOL-PSP-000130-131. The participant notice Delphi submitted to the IRS described participants' options as follows:

- Option 1 - You may keep the GM Stock Fund units that were incorrectly purchased with dividends between January 1, 2000 and March 9, 2004. Your GM Stock Fund account under the PSP will remain as a "sell-only" investment option with no units able to be purchased—but you can keep the units that were purchased with dividends before March 10, 2004. **This option requires no action by you.**

- Option 2 - You may choose to have your PSP account adjusted so that your account in the PSP will be restored to a position as if all of the GM Stock Fund dividends paid between January 1, 2000 and December 31, 2003 had been properly directed into the Promark Income Fund. To select this option, you will need to call the Delphi Investment Service Center by 4:00 PM Eastern Standard Time ("EST") on __ XX, 2005 (30 day election window). This option will require that all GM Stock Fund units purchased between January 1, 2000 and December 31, 2003 be sold (i.e., you may not elect some units be sold and some not). A contribution will then be made to the Promark Income Fund equal to the greater of the proceeds from the sale of your GM Stock Fund units and the balance in the Promark Income Fund had the GM dividends been properly invested. This correction method could result in an increase in value of your account depending on the prices of the GM Stock Fund and the Promark Income Fund on the date of the correction. (Emphasis in the original.)

[18] Schneider Declaration, par. 5(e), Ex. 5; par. 5(j), Ex. 10, par. 6(a), Ex. 12, pg. 5.

7

# III

# ARGUMENT

### A. The Delphi Plan was an ERISA-Covered Employee Benefit Plan

ERISA Section 3(3) defines a covered employee benefit plan as including employee pension plans. An employee pension plan is defined as "any plan, fund, or program" which is "established or maintained by an employer or by an employee organization, or both, to the extent that … such plan, fund or program - provides retirement income …." The Delphi Plan, established by Delphi for its hourly employees to provide them with retirement income, was therefore an ERISA-covered plan under Section 3(3).

### B. Delphi was a Fiduciary to the Delphi Plan

ERISA Section 3(21)(A) provides, in relevant part, that a person is a fiduciary with respect to a plan to the extent he exercises any discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets or has any discretionary authority or discretionary responsibility in the administration of such plan.

Delphi was the named plan administrator to the Delphi Plan. The position of plan administrator, like the position of trustee, "by [its] very nature," carries fiduciary status. 29 C.F.R. Section 2509.758 at D 3.[19] Moreover, under the terms of the Delphi Plan document, Delphi (along with its plan administrator committees) was given the

---

[19] *See also NLRB v. Amax Coal Co., Div. of Amax, Inc., 453 U.S. 322 (1981)*; *Donovan v. Mercer*, 747 F.2d 304, 309 (5th Cir. 1984) (citing DOL regulation); *Narda v. Rhode Island Hosp. Trust Nat'l Bank*, 744 F. Supp. 685 (D. Md. 1990); *Freund v. Marshall & Ilsley Bank*, 485 F. Supp. 629, 635 (W.D. Wis. 1979).

8

responsibility for the day-to-day operation, management and administration of the plan, and all of its decisions were deemed "final and binding." Delphi therefore was not only a fiduciary – but the central fiduciary – to the Delphi Plan under Section 3(21)(A).

### C. ERISA's Fiduciary Duties - "The Highest Known to the Law"

ERISA is a comprehensive remedial statute designed to promote and protect the interests of participants and their beneficiaries in employee benefit plans. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983); *Nachman Corp. v. Pension Ben. Guaranty Corp.*, 446 U.S. 359, 361-62 (1980). Through the enactment of ERISA, Congress intended to ensure the equitable character and financial soundness of employee benefit plans "by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." ERISA Section 2(b). Congress' chief concern was the misuse and mismanagement of plan assets by plan fiduciaries. *Massachusetts Mutual Life Insurance Company v. Russell*, 473 U.S. 134, 139, n.8 (1985). Thus, in order to protect the participants of employee benefit plans, ERISA strictly regulates the management of plan assets, and imposes duties on plan fiduciaries that are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272, n.8 (2d Cir. 1982).

### D. Delphi Breached its Fiduciary Duties under ERISA

**1. Delphi Violated ERISA Sections 404(a)(1)(D) and 404(a)(1)(B) by Failing to Follow the Terms of its Own Plan Document Regarding the Investment of the Dividends Declared on the GM Stock Shares**

ERISA Section 404(a)(1)(D) requires a fiduciary to act in accordance with the documents and instruments governing a plan. The facts establishing Delphi's violation of Section 404(a)(1)(D) are straightforward. Despite the fact that beginning January 2000,

9

the Delphi Plan required the GM stock dividends to be invested in the Promark Fund, during the period from March 2000 through December 2003, the dividends were incorrectly invested in the GMSF.

The fact that Delphi, the primary fiduciary with the responsibility for the administration and management of the Delphi Plan, delegated the duty of making the dividend investments to Fidelity is no defense. ERISA Section 404(a)(1)(B) requires fiduciaries to act "with the care, skill, prudence, and diligence" that a prudent person acting in a like capacity and familiar with such matters would use. Case law has established that fiduciaries who fail to make <u>any</u> effort to monitor the conduct of its appointees will be liable for the acts and omissions of its appointees under Section 404(a)(1)(B). *See e.g., Sandoval v. Simmons,* 622 F. Supp. 1174, 1215- 1216 (Corporate fiduciary "took no ... steps to satisfy its obligation to monitor.").[20] In the instant case, the facts show that throughout the relevant period, Delphi received statements that showed that "Dividend Investment Income" deposits continued to be made in the GMSF. Thus, if it had monitored Fidelity at all, Delphi would have discovered Fidelity's error.

**2.     Delphi Violated ERISA Sections 404(a)(1)(A) and 406(b)(2) by
         Failing to Enforce the Plan's Legal Rights Under Contract or
         to Otherwise Correct Known Violations and to Restore Known
         Losses to Participant Accounts**

After discovering the multi-million dollar injury caused by its four year fiduciary failure to follow the plan's terms, Delphi added insult to that injury by choosing not to simply reverse the error and make all of the affected participants whole, but instead took steps calculated to serve its own interests.

---

[20] *See also In re Enron Corp. Sec., Derivative & ERISA Lit*., 284 F. Supp.2d 511, 552-53, 601 (S.D. Tex. 2003) ("[A]s a matter of law, … Enron … has a fiduciary duty to monitor its appointees."); and ERISA Section 405(c)(2)(A)(iii).

10

ERISA Section 404(a)(1)(A) requires fiduciaries to discharge their duties with respect to ERISA-covered plans solely in the interests of participants. The duty of loyalty imposed on fiduciaries by Section 404(a)(1)(A) requires fiduciaries to act with "complete loyalty" to plan participants and beneficiaries with an "eye single" to their interests. *Leigh v. Engle*, 727 F.2d 113, 125 (7th Cir. 1984), quoting *Donovan*, 680 F.2d at 271. Under Section 406(b)(2), fiduciaries are prohibited from acting in any transaction on behalf of a party whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries. Section 406(b)(2) is one of several ERISA provisions that were promulgated by Congress in order to facilitate Congress' remedial interest in protecting employee benefit plans by creating easily applied "blanket prohibitions." *Gilliam v. Edwards*, 492 F. Supp. 1255, 1263 (D.N.J. 1980). *See also Whitfield v. Tomasso*, 682 F. Supp. 1287, 1304 (E.D.N.Y. 1988). Delphi's actions in this case constituted classic violations of ERISA's loyalty and self-dealing provisions.

Under Delphi's contract with Fidelity, Fidelity specifically agreed to "redirect" the investment of the GM stock dividends to the Promark Fund.[21] In addition, as plan fiduciaries, State Street had an obligation to only follow directions that were consistent with the plan's terms, and GMIMCo, which had appointed State Street,[22] had an obligation to monitor State Street's actions. As a plan fiduciary charged with the duty of loyalty, therefore, Delphi had an obligation to seek remedies on behalf of the plan from all three companies under contract and/or under ERISA. *See Cent. States, Se. & Sw.*

---

[21] Schneider Declaration, par. 5(c), Ex. 3, p. DOL-PSP-001862-63 (par. 8).

[22] Schneider Declaration, par. 5(a), Ex. 1, p. DOL-PSP-000064 (last "Whereas" clause).

11

*Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 571 (1985).[23]  Despite its fiduciary obligation to enforce the plan's legal rights, Delphi filed no legal actions.[24] Instead of filing suit, or simply paying participants from its own funds what it knew was owed to them, Delphi rather chose to make whole only those participants who elected to sell the GM shares.[25]

Moreover, Delphi's notice to participants was misleading in two important respects.  First, the notice made the option of doing nothing (Option 1) – the option that did not make them whole – sound more attractive than it actually was by describing the participants' GM Stock Fund as having "increased."  Delphi did so despite the fact that it

---

[23] *See also* A. Scott & W. Fratcher, *The Law of Trusts* § 282.1 (4th ed. 1989) ("if the trustee holds in trust a contract right against a third person and the trustee improperly refuses to bring an action to enforce the contract, the beneficiaries can maintain a suit in equity against the trustee joining the obligor as a co-defendant.").  This common law rule, applied by the Supreme Court in *Cent. States*, was also applied in the following cases: *Luna v. Luna*, 406 F.3d 1192, 1200 (10th Cir. 2005); *Collins v. Pension & Ins. Comm. of S. Cal. Rock Prods. & Ready Mixed Concrete Ass'ns*, 144 F.3d 1279, 1283-84 (9th Cir. 1998); *Best v. Cyrus*, 310 F.3d 932, 936 (6th Cir. 2002); *United States v. LaBarbara*, 129 F.3d 81, 88 (2d Cir. 1997);*Diduck v. Kaszycki & Sons Contractors, Inc.*, 874 F.2d 912, 918 (2d Cir. 1989); *Rosen v. Hotel & Rest. Employees & Bartenders Union*, 637 F.2d 592, 600 (3d Cir. 1981).

[24] In addition to Sections 404(a)(1)(A) and 406(b)(2), Delphi's failure to sue also violated Section 404(a)(1)(B) which, as noted *supra*, requires fiduciaries to act prudently.

[25] The Secretary's investigation disclosed that Delphi's correction method was recommended by its in-house counsel.  During her investigation, the Secretary's request for documents related to this recommendation was refused on the grounds that the documents were protected from disclosure by the attorney-client privilege.  However, because this recommendation was made in the context of Delphi seeking advice about the administration of the plan, the "fiduciary exception" to the attorney-client privilege requires their production.  See *Martin v. Valley National Bank,* 140 F.R.D. 291 (S.D.N.Y. 1991); *Hammond v. Trans World Air Lines, Inc.*, 1991 U.S. District LEXIS 6868, WL 93498 (N.D. Ill. 1991) *Petz v. Ethan Allen Inc.*, 113 F.R.D. 494, 497 (D. Conn. 1985); *Washington-Baltimore Newspaper Guild Local 35 v. Washington Star Co.*, 543 F. Supp. 906, 909, (D.D.C. 1982).  It is therefore the Secretary's intention to formally request these documents in discovery.

knew that between March 2000, when the dividends were first incorrectly invested, and September 2005, the "Price Unit Value" of the GMSF had in fact decreased from $187.15 to $74.74.[26] In addition, Delphi advised participants that choosing to sell their GM shares (Option 2) could result in a decrease in the market value of their account "on the date of the correction." Under Option 2, however, the participants received whatever Promark shares could be purchased by the GM share "trade-in" value, plus an adjustment to make up for any change in the market value of participant accounts caused by the incorrect investment of the GM stock dividends. As a consequence, although under Option 2, the participant's account value could be increased by Delphi's promised adjustment for its failure to follow the plan document's terms, it could never be decreased.

The inescapable conclusion is that in drafting the participant notice, Delphi sought to discourage participants from correcting their accounts, knowing the result would be a smaller payout for participants and a larger savings for itself. It was exactly such self-interested behavior Sections 404(a)(1)(A) and 406(b)(2) were designed to address. *See Mullins v. Pfizer, Inc.*, 23 F.3d 663, 668-69 (2d Cir. 1994) ("[W]hen a plan administrator speaks, it must speak truthfully."); *Varity Corp. v. Howe*, 516 U.S. 489, 504 (1996) (Material misrepresentations are "inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1)(A) of ERISA.").

---

[26] Schneider Declaration, par. 5(h), Ex. 8, pp. DOL-PSP-002312; par. 5(k), Ex. 11.

13

### 3. Delphi's Misrepresentations in its Participant Notice Constituted Additional and Distinct Violations of ERISA Section 404(a)(1)(A)

As noted *supra*, Section 404(a)(1) prohibits a fiduciary from making material misrepresentations to plan participants. *Id*.[27] By referring to the GMSF as "increasing" in the description of Option 1 when it knew that no increase had occurred, and advising participants of the possibility of a "decrease" in the description of Option 2 when it knew that no decrease was possible, Delphi committed additional and distinct breaches of its duty of loyalty.

### E. Delphi's Statute of Limitations Defense is without Merit

Delphi argues that some or all of the recovery sought by the Secretary on behalf of participants is time-barred by ERISA Section 413 that provides in relevant part as follows:

> [n]o action may be commenced under this title with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of –
>    (1)  six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
>    (2)  three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation ….

None of the recovery sought by the Secretary is time-barred.

---

[27] *See also Krohn v. Huron Memorial Hosp.*, 173 F.3 543 (6th Cir. 1999) (ERISA imposes an affirmative duty to provide complete information); *Kurz v. Philadelphia Elec. Co.*, 994 F.2d 136, 140 (3d Cir. 1993) ("the ultimate inquiry is whether there is a 'substantial likelihood' that the affirmative misrepresentation 'would mislead a reasonable employee in making an adequately informed decision ….'").

14

The Secretary only first became aware of Delphi's incorrect investment of the GM stock dividends on October 3, 2005, when she read about it in the Detroit Free Press.[28] The Secretary therefore could not have had actual knowledge of Delphi's fiduciary breaches until some time after that date when her investigation disclosed the facts that established the elements for those fiduciary breaches. *See Martin v. Pac. Lumber Co.*, No. C-91-1812, 1993 WL 832744, at *2 (N.D. Cal. 1993). The three year limitation period therefore has not yet run.

The six year limitation period also has not yet run. The six year limitation period for a failure to monitor breach, an act of omission, does not run until six years from the last date the breach could have been cured. See Section 413(1)(B) and *Wilson Land Corporation v. Smith Barney, Inc.*, 1999 WL 1939270 *11 (E.D.N.C.) (in which the court held that Smith Barney's "obligation to monitor" was not time-barred until six years after the last date its monitoring violation could have been cured). The six year limitation period for Delphi's failure to monitor Fidelity therefore will not run until December 10, 2009, six years after the last incorrect investment was made.[29] In addition, the six year limitation period for Delphi's decision to make whole only those participants who elected to sell their GM shares and for its decision to do so in a misleading way will not run until September 6, 2011, six years from Delphi's notice to participants. Finally, the six year limitation period for Delphi's failure to sue Fidelity, State Street and GMIMCo will not run until six years after the last day Delphi could have brought suit. *See Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1090 n. 12 (7th Cir. 1992). The six year

---

[28]Schneider Declaration, par. 4.

[29]Schneider Declaration, par. 5(k), Ex. 11.

15

limitation period for Delphi's failure to bring a contract action for the first incorrectly invested dividends therefore will not run until March 10, 2010, six years from the last day Delphi could have brought an action under the four year statute of limitations for contract actions in Michigan, the state in which the plan was administered. Similarly, the six year limitation period for Delphi's failure to bring an ERISA action for the first incorrectly invested dividends will not run until March 10, 2012, six years from the last day Delphi could have brought such an action under the ERISA six year limitation period.[30]

### F. Delphi's Defense of Participant Ratification is without Merit

Delphi argues that its failure to correctly invest the GM stock dividends was not a fiduciary breach because by giving participants the opportunity of ratifying the incorrect investment, it complied with Section 210 of the Second Restatement of Trusts which permits fiduciaries to remedy an unauthorized purchase by seeking such after-the-fact ratification. Delphi's argument is without merit for several reasons.

First, Section 210 must be read in conjunction with Section 216's admonition that "failure to object" does not constitute "consent." Under the Second Restatement, therefore, the fact that 11,000 affected plan participants chose not to sell their GM shares can not be construed as their ratification of Delphi's fiduciary breach.

In addition, even assuming Section 210 could be read as Delphi proposes, it could not be applied to ERISA cases. Although ERISA's fiduciary standards are derived from the common law of trusts, they are "more exacting" than their common law counterparts

---

[30] The six rather than the three year limitation period applies to Delphi's ERISA action for the first incorrectly invested dividends because three years from Delphi's actual knowledge of the error was later than six years from the first incorrectly invested dividends.

16

and must be applied in light of the "special nature and purpose of employee benefit plans." *Donovan v. Mazolla*, 716 F.2d 1226, 1231 (9th Cir. 1983).  In line with this fundamental ERISA principle, ERISA Section 410 specifically provides that "any provision in an agreement or instrument which purports to relieve a fiduciary from obligation, or duty … shall be void as against public policy."[31]  Accordingly, Section 210's ratification rule (as read by Delphi) can not be squared with ERISA's remedial purpose or its fiduciary standards.

Finally, even if Section 210's ratification rule applied to ERISA cases in the manner proposed by Delphi, it could not be applied in this case.  As noted *supra*, Delphi misrepresented the investment risks of the available options.  Moreover, despite its claim that it wanted to allow participants the choice of holding or selling, Delphi failed to advise participants of the losses caused by the incorrect dividend investments.  Knowing the losses, and therefore the gain to be realized from selling the GM shares, was obviously critical to any rational investment analysis of the choices presented.  Under such circumstances, participants' 'rejection or affirmation' of Delphi's fiduciary breach was meaningless.[32]

---

[31] See also *Chicago Bd. Options Exch., Inc. v. Connecticut Gen. Life Ins. Co.*, 713 F.2d 254,259 (7th Cir. 1983) (As the legislative history of [Section 410] makes clear, … exculpatory provisions which relieve a fiduciary from liability for breach of the fiduciary responsibility are to be void and of no effect.")

[32] Delphi also claims that it consulted with the UAW regarding its correction method.  Such consultation, to the extent that it occurred, is irrelevant for the same reasons after-the-fact ratification by individual plan participants is irrelevant.

17

### G. Delphi's Defense that IRS "Blessed" it's Correction Method is without Merit

Delphi argues that because the IRS "blessed" its method of correcting its breach, the court should allow it to retain the money it owes to participants. As it did in its notice to participants, Delphi has misrepresented the facts.

Delphi applied to the IRS for approval of its correction method to maintain the plan's tax qualified status – a status which represented a significant tax benefit to Delphi as plan sponsor. At all times, therefore, Delphi understood that the "blessing" given by the IRS was not a blessing of Delphi's fiduciary breaches under ERISA. As the IRS made clear to Delphi, its approval "should not be construed as affecting the rights of any party under any other law, including Title I of the Employee Retirement Income Security Act of 1974."

Moreover, the correction method proposed by Delphi to the IRS was not the correction method implemented by Delphi, and the correction method implemented appears to have been calculated to discourage participants from selecting the only option that would have made them whole.

In the description of the do nothing option in the participant notice submitted to the IRS (Option 1), Delphi advised participants that they "may keep the GM Stock Fund units that were incorrectly purchased with dividends." As noted *supra*, however, the notice that Delphi sent to participants, made the option of doing nothing – the option that did not make them whole – sound more attractive than it actually was by changing the original neutral reference to the participants' "GM Stock Fund units" to the participants' "increased" GM Stock Fund.

18

In addition, the participant notice submitted to the IRS stated that the option of selling the GMSF shares in exchange for shares of the Promark Fund (Option 2) "could result in an *increase* in value of your account … on the date of correction." As noted *supra*, however, even though there was no possibility of a decrease, the notice that Delphi sent to participants changed the description of that option to state that selection of the option could result in an "*increase/decrease* of market value of your account…on the date of correction." (Emphasis added.)

Thus, not only did Delphi alter the participant notice to discourage participants from choosing the only option that made them whole, but, like a dishonest butcher who puts his thumb on the scale when his customer's back is turned, it did so only when the IRS wasn't looking.[33]

---

[33] Delphi retroactively amended its plan to permit the participant election regarding the investment of the GM stock. Although not specifically raised by Delphi, any argument that such a retroactive amendment should relieve it of fiduciary liability would be without merit. As noted *supra*, under Section 410, any plan provision that purports to relieve a fiduciary from liability under ERISA (which this retroactive amendment, as a practical matter, purports to do) is void as against public policy. *See e.g., Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1460 (9th Cir. 1995) ("[W]e hold that any interpretation of the Plan which prevents individuals acting in a fiduciary capacity from being found liable as fiduciaries is void.") In addition, as also noted *supra*, the IRS approval of Delphi's correction method was not a blessing of Delphi's fiduciary breaches under ERISA and was, in any case, tainted by Delphi's post-approval edits to the participant notice.

## IV

## CONCLUSION

The Secretary's claim on behalf of the Delphi Plan and its participants should be allowed and Delphi should be ordered to make the plan's participants whole.

Respectfully submitted,

**JONATHAN L. SNARE**
Acting Solicitor of Labor

**JOAN E. GESTRIN**
Regional Solicitor

By: ___/s/ Peter D. Broitman___
    **PETER D. BROITMAN** (PD 2275)
    Chicago ERISA Counsel
U. S. Department of Labor
Office of the Solicitor
230 South Dearborn Street, Rm 844
Chicago, Illinois 60604

By: ___/s/ Janice L. Thompson___
    **JANICE L. THOMPSON** (JT 0337)
U.S. Department of Labor
Office of the Solicitor
1240 E. 9th Street, Rm 881
Cleveland, Ohio 44199

    and

**ELIZABETH S. GOLDBERG**
Trial Attorney

Attorneys for **ELAINE L. CHAO**,
Secretary of Labor, United
States Department of Labor,
Claimant