# Exhibit 15



Margaret H. Raymond
Vice President and
Associate General Counsel

June 2, 2006



**CONFIDENTIAL TREATMENT REQUESTED
PURSUANT TO 29 C.F.R. SECTION 70.26(b)**

BY OVERNIGHT DELIVERY

Frank Schneider
Employee Benefits Security Administration
211 West Fort Street
Suite 1310
Detroit, MI 48226-3211

Re: Delphi Personal Savings Plan for Hourly-Rate Employees in the United States
Fidelity Plan Number 29000

Dear Mr. Schneider:

This letter serves as the response to the questions you raised during our telephone conversation on April 24, 2006. Those questions arose after your review of our February 27, 2006 response to the January 10, 2006 subpoena requesting documents in the above-referenced matter.

We respond on behalf of those FMR Corp. subsidiaries and affiliates ("Fidelity") responsible for providing recordkeeping and related services to the Delphi Personal Savings Plan for Hourly-Rate Employees (the "Plan"). This response is provided subject to and without waiving any of the objections set forth in our February 26, 2006 response. All terms in this letter have the same meanings as in our prior letter, unless otherwise noted.

This response and all exhibits [Bates numbered FID-DOL-DEL 00441–00474] are hereby designated as confidential information within the meaning of 29 C.F.R. § 70.26(b).

<u>**Follow-Up Request 1**</u>

**Was Delphi's instruction to Fidelity to invest GM common stock dividends in the GM common stock fund oral or written?**

We have been unable to locate any written direction from Delphi to invest GM common stock dividends in the GM common stock fund. Typically, however, as a new plan is brought onto

FMR Corp.
Legal Department

82 Devonshire Street F6C
Boston, MA 02109-3614

Phone: 617 563-5590
Fax: 617 385-1869
margaret.raymond@fmr.com







Fidelity's recordkeeping system, funds are set up for dividend reinvestment absent specific directions to the contrary.

**Follow-Up Request 2**

**Was the change (Delphi's instruction to Fidelity to invest GM common stock dividends in the Promark Income Fund) oral or written?**

We have been unable to locate any formal written direction from an authorized signer instructing Fidelity to invest GM common stock dividends in the Promark Income Fund. Our files do, however, contain a participant communication dated May 1999 describing the re-direction of GM common stock dividends to the Promark Income Fund in the Plan. That letter is attached as FID-DOL-DEL 00441–00444.

**Follow-Up Request 3**

**Can you provide more information about the initial participant inquiry that gave rise to the discovery that dividend reinvestments were being directed to the GM common stock fund?**

Fidelity received a call from a participant on March 2, 2004. The participant wanted to know why his account held a balance in the GM Common Stock fund, even though he had previously exchanged all of his holdings out of that fund.

**Follow-Up Request 4**

**Who at Fidelity notified whom at Delphi of the error in March 2004? Was this oral or written?**

Fidelity's Brian Donoghue telephoned Karen Cobb at Delphi on March 3, 2004 to inform Delphi that dividends paid on GM common stock had been reinvested in the GM common stock fund.

**Follow-Up Request 5**

**a) Please provide names of Delphi and GM Asset Management individuals with PSW Access from July 2001 to February 2004.**

Cobb, Karen
DeMarco, John
Fligstein, Michael
James, Shannon
Lessnau, Kathryn
McFerrin, Chastity
Ruzbarsky, Frank
Studer, Brian
Trimble, Michelle





Tschampion, Charles

**b) Please provide names of the Delphi contacts to whom Fidelity mailed trial balance reports from 1/2000 – 7/2001.**

We believe that trial balance reports sent to Delphi were directed to Kathy Lessnau in the 2000 – 2001 timeframe.

Follow-Up Request 6

**In Brian Donoghue's 3/18/04 e-mail to Michelle Trimble at Delphi, there are different affected participant totals cited than in the VCP letter.**

- **The e-mail states that there were 13,517 total participants that held the stock fund within the Delphi PSP and received a dividend that was invested in GM.**
- **The VCP notice states that approximately 12,250 participants were potentially harmed.**

**Can you clarify the discrepancy between the figures of 13,517 and 12,250?**

The 3/18/04 e-mail included a reasonable estimate of the numbers in the impacted population, and was provided to Delphi before the exact time frame of the error had been determined. We cannot now recreate the exact assumptions used to derive the number in the e-mail, but it may have counted participants in the GM Common Stock Fund since the inception of the Plan on Fidelity's recordkeeping system. The VCP filing used precise time frames to estimate the affected population. (The final number of affected participants differed from the VCP filing estimate due to participant deaths and tracking of beneficiaries attributable to deceased participants.)

Follow-Up Request 7

**Can you provide a breakdown of the 12,332 affected participants that would show:**

- **How many participants had active accounts?**
- **How many participants had taken distributions?**
- **How many participants (of the total participants who elected the reinvestment correction) were owed $50 or less?**

We have a resource that allows us to track such information with respect to the 12,251 participant accounts that were impacted. (As noted, this number excludes beneficiaries for deceased participants.) Of that number, 10,326 had a market value greater than zero ("active accounts") as of 10/31/05, and 1,925 had a market value of $0 as of that date. During the allocation process, approximately 315 of the participants who elected a correction received $50 or less.





Follow-Up Request 8

**How did Brian Donoghue come up with the options in his 3/18/04 e-mail? Were these designed to be compliant with the IRS employee plan resolution guidelines? Were these designed to be compliant with ERISA?**

Mr. Donoghue developed the options in the 3/18/04 e-mail based on his understanding of Fidelity's recordkeeping capabilities, after discussions with colleagues. The 3/18/04 e-mail was intended to provide for Delphi's consideration those correction options that were administratively feasible. Fidelity is not responsible for ERISA or tax compliance of the Plan, and Mr. Donoghue's e-mail was not intended to thrust Fidelity into such a role.

Follow-Up Request 9

**Is Krista D'Aloia an employee of Fidelity? What is her title?**

Krista D'Aloia is a Fidelity employee. Her title is Vice President.

Follow-Up Request 10

**Did Fidelity prepare cost projections if all affected participants elected the correction method? (Cited as $1.8M in VCP). What would it have cost if everyone had elected a correction?**

For some period of time, Fidelity made estimates of the cost of total correction. See FID-DOL-DEL 00445. In the spring or summer of 2005, Fidelity developed an estimator tool for use by telephone representatives during the election period. The tool was designed to calculate an estimate of the amount any given individual might receive if he/she elected a correction (based on then-current prices and a correction methodology that approximated the final methodology used). The tool could also provide a total for all affected participants, and was sometimes queried by Fidelity employees for that purpose. Fidelity made no formal calculation of the total cost as of 11/1/2005 if everyone had elected a correction.

Follow-Up Request 11

**What was the total number of GM stock shares or units that were incorrectly purchased?**

- **Brian Donoghue's 3/18/04 e-mail cites 51,144 units.**
- **A document provided by Delphi cites 47,598 units (in historical dividend summary).**

We have not been provided the document you reference, and cannot comment on numbers in the document provided by Delphi that you reference.

Follow-Up Request 12

**Delphi provided to the DOL a copy of a 3/24/04 e-mail from Brian Donoghue to Michelle Trimble (with a copy to Krista D'Aloia) regarding the dividend reinvestment issue. Can you**





**elaborate on the paragraph of the e-mail suggesting that "we are not aware of any litigation on similar issues." Who made that determination?**

The sentence "we are not aware of any litigation on similar issues" represents Ms. D'Aloia's conclusions. Ms. D'Aloia is trained as a lawyer, and follows legal and regulatory matters relevant to retirement plans.

**Follow-Up Request 13**

**Who was at the meeting held on 5/21/04 to discuss the GM dividend reinvestment issue, and what was discussed?**

**Delphi provided documents that reflect attendance by:**

- **GM Asset Management;**
- **Delphi;**
- **Fidelity – Tom Hohl, Jeff Cutts, Chris DeWit, Roy Fralin, Brian Donoghue.**

We have not been provided a copy of the document, and cannot comment on anything reflected in that document. We have no records of any meeting involving these individuals. Although there was a telephone call involving those Fidelity individuals with representatives from Delphi and GM Asset Management, we cannot establish that the telephone call happened on that date. The subject discussed during the telephone call was the GM dividend reinvestment issue. We do not have a record of the precise discussions during that call, or the precise attendees from Delphi or GM Asset Management.

**Follow-Up Request 14**

**Confirm the chronology and dates of service for the Fidelity client service managers for the Delphi plan:**

During the relevant period (from the discovery of the problem through the correction processing), the following Fidelity employees served as client service managers for the Delphi plans:

Brian Donoghue: discovery of problem through May 2005
Kevin O'Brien: May 2005 – September 2005
Scott Bouman: October 2005 through correction processing

**Follow-Up Request 15**

**In the 8/9/05 e-mail from Kevin O'Brien to John DeMarco (provided by Delphi), explain:**

1) **What does "Operations CR&R" mean?**
2) **What was discussed at the meeting?**





We have not been provided a copy of this document, and therefore cannot comment on its contents. We note that CR&R is an abbreviation for a Fidelity group known as "Customer Research & Resolution."

Follow-Up Request 16
**Did Fidelity or Delphi draft participant notices that were provided to the IRS? If Fidelity provided these drafts, did Delphi make any edits to the draft?**

Fidelity drafted the participant notices that were provided to the IRS. Fidelity submitted the drafts to Delphi for review and comment and Delphi edited the drafts that Fidelity prepared.

Follow-Up Request 17
**Why did the VCP letter state that Delphi was going to make the adjustment payment, if Fidelity actually made the payment?**

There was no commitment by Fidelity as of the date of the VCP filing with respect to funding some or all of the correction.

Follow-Up Request 18
**Why did Fidelity pay for the dividend reinvestment correction?**

Fidelity funded approximately $860,000 for correction of the dividend reinvestment problem to avoid controversy with Delphi. Fidelity values the Delphi relationship, and concluded that there was some basis from which one might conclude that Fidelity was aware in 1999 that the Delphi dividend in the Plan was to be re-directed to the Promark Income Fund.

Follow-Up Request 19
**When did Fidelity inform Delphi they were going to pay for the error? Did Fidelity inform Delphi of its decision in writing?**

We have no record concerning when Fidelity informed Delphi that Fidelity would fund the correction, nor do we believe that Fidelity made a commitment to Delphi to fund all of the correction, regardless of amount. We believe all discussions between Fidelity and Delphi about funding the correction were oral.

Follow-Up Request 20
**Were participant notice letters were sent by regular first class mail?**

Yes.





**Follow-Up Request 21**
**Why was the decision made to have participants call in to elect the correction instead of notifying Fidelity in writing?**

Fidelity's model for servicing participant-directed plans is premised on participant communication via telephone or internet. Fidelity believes that these methods of participant interaction maximize participant responsiveness and efficiency, and minimize the risk of error. In this case, the use of telephone elections leveraged proven technology and allowed prompt and efficient implementation of the election.

**Follow-Up Request 22**
**Did Fidelity provide any training manuals regarding this issue to phone representatives? If so, DOL requests that we produce any guidelines/manuals provided to telephone representatives.**

Training materials provided to telephone representatives, FID-DOL-DEL 00446–00453, are enclosed.

**Follow-Up Request 23**
**Can Fidelity provide a sample of participants who called in who elected, and did not elect the correction?**

Attached are "end to end" examples of Delphi PSP participants who called the dedicated toll-free number during the calling window, labeled as FID-DOL-DEL 00454–00474. The documents labeled as FID-DOL-DEL 00454–00465 relate to participants who elected a correction. (Note that these are the same participants reflected in samples provided to Delphi in Fidelity's December 8, 2005 letter. We provided you this letter and its enclosures as Exhibit 12 to our February 27, 2006 letter.) For participants who elected a correction, we include screen shots from Fidelity's call logging system reflecting the call to elect a correction, screen shots from Fidelity's workflow system reflecting the creation of the work item to adjust the participant account, screen shots from Fidelity's recordkeeping system showing the corrective processing as of 11/1/05, and confirmations of the corrective processing mailed to participants. The documents labeled FID-DOL-DEL 00466–00474 relate to participants who did not elect any correction. For these participants, we include screen shots from Fidelity's call logging system showing any inquiries the participant made to Fidelity during the election window, screen shots from the workflow system showing that no "ADJ" (adjustment) work items were generated for the participant during the election window, and screen shots from Fidelity's recordkeeping system showing the absence of any corrective processing as of 11/1/05.





Follow-Up Request 24
**Did Fidelity provide a special phone number for participant elections concerning this matter?**

Fidelity provided a toll-free number different from the regular plan servicing number for this election.

Follow-Up Request 25
**Why were corrections implemented as of 11/1/05?**

Fidelity processed the correction as soon as administratively feasible after close of the election window.

Follow-Up Request 26
**Did corrections include lost earnings? Explain.**

The dividend methodology that Fidelity was directed to use included a step for determining the number of units of the Promark Income Fund that should have been purchased on each dividend date, and then valuing those units using the *current* value of the Promark Income Fund, in order to obtain the "present value" of the dividends had they been correctly reinvested. (This step is included as "Step 3" in the proposed correction methodology included in the direction letter, previously provided as FID-DOL-DEL 00304.) The process of using the current value of the Promark Income Fund gave the participant the benefit of any change in value he/she would have experienced had the dividend correction been correctly processed from the outset. (Please note that the Promark Income Fund does not pay interest or dividends, and thus has no "earnings" as such.)

Follow-Up Request 27
**Confirm that the two 9/6/05 letters were the only two notices sent to participants. If participants had already taken a distribution, did they receive anything different?**

The September 6, 2005 letters were the only letters sent to participants. No different letter was used for participants who had taken a distribution.

Follow-Up Request 28
**Confirm that $856,596.50 was the amount that Fidelity contributed to adjust the 1476 participants who elected a correction.**

Fidelity funded a correction of $856,597 (rounded to the nearest dollar) to correct the accounts of electing participants and beneficiaries of deceased participants for whose account an election was made.





We received your additional supplemental requests by e-mail on May 26, 2006. We will respond to those items under separate cover.

Sincerely yours,

Margaret H. Raymond
Vice President, Associate General Counsel

Enclosures