# Exhibit 20

**Report of Interview**     U.S. Department of Labor
Employee Benefits Security Administration



Date of Interview: <u>April 27, 2006</u>

Frank Kuplicki was interviewed at 5725 Delphi Drive, Troy, Michigan on the above date at approximately 1:45 p.m. by Investigator Frank Schneider. He was advised that the writer is conducting an official investigation of Delphi Personal Savings Plan for Hourly Employees in the United States for the Employee Benefits Security Administration, U.S. Department of Labor pursuant to the ERISA. He was further advised that the writer was requesting his voluntary cooperation, and that any information obtained during this official investigation which may involve violations of other laws will be referred to the appropriate agency for consideration.

In response to questioning, Frank Kuplicki provided the following information:

Frank Kuplicki ("Kuplicki") is the only benefits Attorney at Delphi. He has worked for Delphi since the spin-off, but started working for General Motors Company ("GM") fifteen years ago. Kuplicki fields questions from Delphi staff on matters related to the benefit plans. Kuplicki researches the issues and attempt to answer them himself. If Kuplicki is unable to answer the questions himself then he consults an Attorney named Lonnie Hassel from the Groom Law Group out of Washington DC.

Kuplicki did not know who from Fidelity alerted Delphi, who at Delphi was alerted or how they were alerted. Typically, Fidelity would contact Delphi's Director of Pension and Welfare Benefits or the individual directly under the Director. Fidelity would not contact Kuplicki directly.

Delphi considered the error; the dividends incorrectly invested in the General Motors Stock Fund ("GMSF") to be Fidelity's fault and Fidelity's problem to fix. Delphi asked Fidelity what the options were for correcting the error and, Kuplicki confirmed, on March 18, 2004 Delphi received an e-mail from Fidelity with a list options (Attachment 1). The e-mail was from Brian Donoghue, a Fidelity employee. The e-mail was to Michelle Trimble, a former Delphi employee that worked with the defined contribution plans. The e-mail was cc to Michael Smith, Jeffrey Cutts and Roy Fralin. Michael Smith and Jeffrey Cutts were Fidelity employees. Kuplicki did not know who Roy Fralin was. Kuplicki did not know how Fidelity came up with the options they provided in the e-mail. Kuplicki could not recall any projections regarding the financial impact being discussed early. Kuplicki does not believe that there were projections initially because nobody knew how big the error was or what the financial impact might be due to the unique nature of the issue.

There were lots of conversations internally at Delphi and between Delphi and Fidelity about the

By: _____     Date Prepared: <u>April 28, 2006</u>
Frank Schneider, Investigator
At: Detroit District Office     File No.: <u>52-011672</u>

This document is the property of the Employee Benefits Security Administration
Its contents are not to be disclosed to unauthorized persons.

PWBA 202
(Rev. 6/87)

Report of Interview
Frank Kuplicki
April 27, 2006
Page 2

options provided by Fidelity on March 18, 2004 (Attachment 1). Mike Fligstein ("Fligstein"), Delphi's former Director of the Pension and Welfare Benefits Group, Karen Cobb ("Cobb"), an Attorney that handles taxation issues involving the benefit plans and Kuplicki were all involved in the discussions. Kuplicki did not recall Michelle Trimble being present during any of the discussions. Kuplicki also could not recall who at Fidelity participated in the discussions but indicated that Fidelity's legal counsel were involved. Kuplicki considered many of the conversations involving Delphi and Fidelity's legal counsel to be privileged. Kuplicki consulted with outside Counsel, Lonnie Hassel from the Groom Law Group. Kuplicki considers those conversations to be privileged as well.

Kuplicki did not know if Fidelity informed Delphi that they were going to assume the financial reasonability for the fix when the list of options was provided to Delphi on March 18, 2004. Kuplicki was not involved in the discussions regarding Fidelity's agreement to pay. Kuplicki's involvement with respect to the incorrectly invested dividends has mainly been focused on the legalities of fixing the problem. Kuplicki indicated that Fligstein was the individual that might have knowledge about Fidelity's agreement to accept financial responsibility for the error. As Kuplicki understands the arrangement with Fidelity, Fidelity agreed to pay any amounts owed, no matter what fix was selected by Delphi or if every Participant had elected to correct their account.

Kuplicki could not recall if any of the options provided by Fidelity (Attachment 1), were pushed more than the others because so many people were advocating different options. Kuplicki also could not recall if Delphi suggested any options besides those listed in the e-mail.

The first two options listed in the e-mail (Attachment 1), taking no action and communicating the issue and taking no action, were not considered by Delphi. Kuplicki also agreed that the first two options were the least expensive options, in that no monies would have been owed by Delphi or Fidelity. The potential impact, listed for taking no action, states that the risk is Participants will discover the error and potentially bring action against Delphi/Fidelity. Kuplicki understood this statement to mean that Participants might bring a class action lawsuit against Delphi and or Fidelity. Kuplicki could not recall if the cause of action or what the potential harm would be to the Participants had been discussed. He also did not think that any projections had been calculated or provided to Delphi by March 18, 2004 as well. Further, the Participants did get more shares of GM Stock as a result of the error.

Kuplicki did not know why offering the Participants a choice or "an election window" initially only included Participants with account balances. Kuplicki indicated that the list of options provided by Fidelity (Attachment 1) were merely corrective concepts or ideas for discussion. Kuplicki did not know why the default position, if a Participant did not make an election, was to retain the incorrectly invested dividends in the GMSF. Everyone thought at the time that having more GMSF shares was an advantage to the Participants or a better investment. Kuplicki confirmed that the PMIF was the default investment option listed in the Fidelity Administrative Manual. Kuplicki stated it is only listed as the default option because it is one of the most conservative investments, there is not a high risk of losing money and it is easy for Participants to

**Report of Interview**
Frank Kuplicki
April 27, 2006
Page 3

reinvest the money in this account to another fund. Kuplicki agreed that if no Participants elected to change their account, Delphi and Fidelity would not have owed any money. Further, Kuplicki agreed that Delphi and Fidelity's liability was limited only to those Participants that elected to have their accounts corrected. Had the price of GMSF increased when the Participants had to elect either to maintain their account as it was or have their account corrected, then a Participant would have been crazy to elect to have their account corrected.

Kuplicki had no answer; however, when asked why the choice was still offered since it was estimated in the VCP application that the financial impact to Participant's accounts was $1.8 million. Kuplicki could not recall when the financial estimates were formulated. Early on, Kuplicki remembers everyone trying to figure out whether or not the error hurt Participants or benefited Participants, that is why Delphi looked to Fidelity to help determine how big the problem was.

Kuplicki could not recall why offering Participants a choice or "an election window" was selected by Delphi over providing Participants with a proactive good faith adjustment payment or selling all the incorrectly purchased shares of the GMSF and purchasing PMIF shares. Delphi thought that offering a choice was the fairest option and was the more accurate way to correct the error. Participants also believed that they got an advantage because of the error since they got more GMSF shares. Participants did not want the additional shares of the GMSF taken away from them.

Kuplicki thought that one of the reasons that selling all of the incorrectly purchased GMSF shares and purchasing PMIF shares was not selected was because of the potential impact identified by Fidelity (Attachment 1), that it could have provided an "unfair" correction to Participants that traded out. Kuplicki could not remember how, under the method selected by Delphi, Participant accounts were corrected if they that took a distribution from the Plan between 2000 and the time of correction, November 1, 2005. Kuplicki suggested talking to Fligstein or John DeMarco ("DeMarco"), Delphi's current Director of Pension and Welfare Benefits.

Kuplicki confirmed that Fidelity described the "potential impact" (Attachment 1) of making a good faith adjustment payment to Participants and selling all of the incorrectly purchased GMSF shares and purchasing PMIF shares as complicated to communicate to Participants and challenging and expensive to accomplish administratively. Kuplicki, however, had no answer as to why Fidelity did not have the same concerns with offering a choice to Participants and why the only concern of Fidelity's was the financial impact the choice might create. Kuplicki did agree, however, that one of the options provided by Fidelity was to sell all of the incorrectly purchased GMSF shares and purchase PMIF shares. Kuplicki did not have an opinion as to which option provided by Fidelity would have been the most complicated but stated that offering the Participants a choice might have been the most complicated since it required a choice rather than just imposing a fix. Delphi just preferred offering the Participants a choice and allowing them to have control of their own destiny. Kuplicki did not know how Participant accounts were corrected if a Participant had taken a distribution between 2000 and the time of correction. He

**Report of Interview**
Frank Kuplicki
April 27, 2006
Page 4

also could not remember what choice was offered to Participants that had taken a distribution between 2000 and the time of correction.

Kuplicki stated that he researched ERISA and contacted outside counsel to determine if providing the participants with a choice was acceptable. Kuplicki stated that his legal opinion was based on cases he found that communicated what the law was. Kuplicki considered his research privileged.

Kuplicki also stated that he reviewed the Department of Labor's ("DOL") and IRS's voluntary compliance programs and elected the IRS's because it appeared to fit the best with the error that occurred. Kuplicki indicated that selecting the appropriate program was a difficult decision because there really were no examples similar to what occurred with the Delphi Hourly Plan. Using the IRS's procedures, however, allowed the Plan to maintain its tax qualification status. Delphi also thought that getting the IRS's approval would validate the decisions that they made.

Delphi did not seek an advisory opinion or request an information letter from the DOL.

Kuplicki was the only Attorney representing the Plan. Cobb only reviewed the fix with respect to the tax qualifications. There were no Attorneys representing the Participants or Beneficiaries, however, Delphi did have to inform the Unions of the error. Kuplicki did not recall State Street being involved in any capacity. Kuplicki also could not recall if anyone from the General Motors Investment Management Company ("GMIMCo") was involved. However, he thought that GMIMCo had to know what was going on since they are responsible for monitoring the investments of the Plans.

In an e-mail dated March 24, 2004 from Brian Donoghue to Michelle Trimble, Fligstein, Cobb (formerly Zimmerman) and Kuplicki (Attachment 2), Donoghue states that after "having a chance to talk with Krista, we are not aware of any litigation of this matter", referring to the GM dividend issue. Kuplicki indicated that he believes that Krista was a Fidelity Attorney based on the nature of that statement. The e-mail also stated that from "an ERISA fiduciary perspective (thus far we have focused in IRS corrective action), offering the participants the ability to control their own destiny is arguably the best approach." Delphi asked Fidelity, based on their experience, if they had ever seen anything like Delphi's issue before and asked Fidelity to research whether or not providing the Participants with a choice would be an acceptable manner to correct the error. Kuplicki believes that the March 24, 2004 e-mail was the results of Fidelity's research. Kuplicki did his own research as well, since Delphi had potentially different perspectives on the issue then Fidelity. Kuplicki considers his research confidential and privileged.

Kuplicki could not recall what his opinion was regarding the statement, from "an ERISA fiduciary perspective (thus far we have focused in IRS corrective action), offering the participants the ability to control their own destiny is arguably the best approach." Kuplicki did not and still does not disagree with that statement and believes that offering the Participants a choice was the

**Report of Interview**
Frank Kuplicki
April 27, 2006
Page 5


correct and fair thing to do. Kuplicki believes that he might have come to the conclusion that offering the Participants a choice was the right thing to do, based on a result of the case law that he reviewed, which he documented in a memorandum that he considers privileged.

On May 21, 2004 there was a conference call involving the GM dividend issue (Attachment 3). Kuplicki confirmed that he participated in the conference call, along with Cobb and Fligstein. Kuplicki stated that he could not confirm that everyone listed on Attachment 3 participated in the conference call for Fidelity and General Motors Asset Management (also referred to as GMIMCo). Tom Hohl is an attorney for Fidelity. The others listed under Fidelity: Jeff Cutts; Chris Dewitt; Roy Fralin and Brian Donoghue are all administrative employees. Kuplicki did not remember GMIMCo being involved in the conference call, but indicated that if they were it was because the PMIF was a GMIMCo fund and GMIMCo would have had all of the historical information about the fund. GMIMCo might also have been included in the conference call because they are the named fiduciary for investment purposes and Delphi and Fidelity wanted their input on the corrective method selected. Kuplicki had heard of Chuck Tschampion but did not know Jonathan Lavy from GMIMCo. Kuplicki could not recall what was discussed at this meeting. Kuplicki did not locate any written notes or memorandums regarding this meeting. However, Kuplicki thought that the memorandum prepared by Cobb on May 24, 2004 (Attachment 4)[1] might have memorialized what was discussed during a meeting held on May 21, 2004. Kuplicki also could not recall any conversations about Fidelity's agreement to accept financial responsibility for the error and did not believe that it would have been discussed with GMIMCo participating in the conference call.

Delphi made the decision that in order to correct the Plan, the Plan needed to file for correction through the Internal Revenue Service's ("IRS") Voluntary Correction Program ("VCP"). Kuplicki did not know who exactly made that decision and could not provide an exact date as to when that decision was made. The VCP was mentioned in an e-mail from Fidelity, dated March 18, 2004 (Attachment 1) and in a memorandum written by Cobb on May 24, 2004 (Attachment 4). Kuplicki confirmed, that according to Cobb's memorandum dated May 24, 2004, the Employee Plans Compliance Resolution System ("EPCRS") prefers full correction and that the correction method should restore the Plan "to the position it would have been had the failure not occurred." Kuplicki believes that full correction under the EPCRS, is in "the eye of the beholder" and that providing a choice or making a good faith adjustment payment could be full correction as easily as selling all the incorrectly purchased dividends and purchasing PMIF shares. Kuplicki agreed, however, that Fidelity's option of selling the incorrectly purchased dividends and purchasing the PMIF shares would have restored the Plan to where it should have been had the failure not occurred. Kuplicki confirmed that the only Participant accounts that were corrected were for those that contacted Fidelity and elected to do so. Participants' accounts

---

[1] The memorandum from Karen Cobb, dated May 24, 2004, was provided by Fidelity in response to the Department's subpoena. When the writer began questioning Kuplicki about the document, (Attachment 4) Kuplicki stated that he would consider Attachment 4 to be privileged and that Fidelity could not waive Delphi's right to assert the privilege.

**Report of Interview**
Frank Kuplicki
April 27, 2006
Page 6

were not corrected if the Participant did not contact Fidelity or the Participant elected not to correct their account. Kuplicki indicated that Cobb is the best person to speak with regarding the VCP program.

When Delphi filed with the VCP there was a $25,000 filing fee, which was reimbursed by Fidelity. Kuplicki could not recall if Delphi asked Fidelity to pay for the VCP filing fee. Kuplicki suggested talking to DeMarco or Fligstein.

Kuplicki could not remember if Fidelity drafted the notice sent to Participants. Kuplicki does not know how the notices were sent to Participants.

Fidelity's position is that they are the directed record keeper for the Plans and they typically request letters of direction from Delphi. With respect to the dividend reinvestment error, Fidelity wanted Delphi's direction on the fix and Delphi looked to Fidelity for the options to fix the error and for the fix. Delphi thought that the fix agreed upon was the most appropriate and took care of the Participants.

Fidelity was extremely cooperative in working with Delphi to figure out how to fix the error. Fidelity has acknowledged that the error was their fault, has provided a fix that was agreeable to Delphi and assumed the financial responsibility for the fix. Kuplicki did not know the mechanics of how the corrective payments were made to Participants, if lost earnings were included or why the payout date of November 1, 2005 was selected. He indicated that DeMarco would know the most about how the payouts worked.

Kevin O'Brien ("O'Brien") is an employee of Fidelity and was the Plan's contact person after Brian Donoghue. Kuplicki did not deal directly with O'Brien. O'Brien would have worked with Fligstein or DeMarco.

Kuplicki did not know how to explain or why there was a transfer out of 398,214.697 shares from the GMSF during the first quarter of the 2000 Plan Year and only a transfer in of 343,017.624 shares during the second through third quarter of the 2000 Plan Year (See Attachment 5). Additionally, he did not know why there would be transfers into this fund, beside the incorrectly reinvested dividends.

Kuplicki did not know who at Delphi received the monthly trial balance reports sent by Fidelity.

| | |
|---|---|
| From: | Donoghue, Brian |
| Sent: | Thursday, March 18, 2004 1:44 PM |
| To: | 'michelle.trimble' |
| Cc: | Smith, Michael E; Fralin, Roy; Cutts, Jeffrey |
| Subject: | GM stock fund dividend issue |

Hi Michelle,

I hope all is well.

Here is the letter that outlines the GM stock fund dividend issue.



GM dividend.doc
(49 KB)

Please take some time to read through it and let me know your thoughts. We can set up a time to talk through the details and discuss some options.

Thanks,
Brian

1

CONFIDENTIAL TREATMENT REQUESTED BY FMR CORP. AND ITS SUBSIDIARIES PURSUANT TO 29 C.F.R. 70.26(b)    FID-DOL-DEL 00274

ATTACHMENT #1

Below is a synopsis of the issue as well as some alternative ways to address. In addition, we have estimated the approximate cost as well as identifying pros and cons for each approach.

### Synopsis of the issue:

On March 3, 2004, Fidelity discovered that dividends received for the GM Stock Fund (the "Stock Fund") within the Delphi Personal Savings Plan (PSP) were being reinvested in the GM Stock Fund and participants were being allocated additional units in the Stock Fund. We discussed the issue with Delphi that week and made the change so that all future GM dividends will be routed to the Promark Income fund. The March dividend has been handled in this manner.

Up until on or about October 1999 the GM Stock Fund was an active option within the Delphi PSP and participants could direct contributions and exchange into the Stock Fund. GM dividends were reinvested into the stock fund. Although the date is unclear, at some point in time after October 1999, any dividend that the GM stock fund paid should not have purchased additional shares of the GM stock fund. The dividend should have been directed to the Promark Income fund.

Note, this error can be characterized as an operational failure, rather than a plan qualification issue. Under Self Correction Program (SCP) within the Employee Plans Compliance Resolution System (EPCRS), the method of addressing operational errors is to attempt to put participants in the place they would have been absent the operational error. However, the EPCRS recognizes that full correction is not always possible or desired. For example, if the costs of the analysis are excessive relative to the correction or if market conditions dictate other approaches are certainly feasible. Further, participant choice certainly is factor to consider in this instance. Some participants may actually want to retain their GM dividend units given current market conditions.

### What has happened to date:

There are a total of 13,517 participants that held the Stock Fund within the Delphi PSP and received a dividend which was invested in the GM stock fund since the spin off. Today, there are approximately 8,530 participants that still have a balance in the Stock Fund. In total, 51,144 units of the GM Common Stock have been purchased that should not have been.

### Fund performance:

Below is some information that outlines some indicators of performance for the two funds over the relevant period of time. The two funds are completely different types of investments as far as objectives and diversification is concerned. As it is invested primarily in GM stock, the Stock Fund sees large swings in price and performance while the income fund, which has fixed income objective, does not. Based on current market conditions, the income fund may be attractive. However, if the stock fund undergoes a great gain in the near future, it quickly becomes the more attractive of the two.

GM Stock Fund

- The average Stock Fund Net Asset Value (NAV) on the days in which a dividend posted is $131.60
- The high was $187.15 and the low was $74.8
- The March 16th stock fund price is $110.75

Promark Income Fund

- The average income fund price on the days in which a dividend posted is $15.39
- The high was $17.52 and the low was $13.53
- The March 16th stock fund price is $17.52

(Note, the Promark Income Fund does not allocate additional units when earnings are posted; rather the NAV is increased,

The rate of return for the two funds is just as varied. Given certain points in time the GM stock will and has out performed the Promark Income fund. The opposite is also true. This point can

CONFIDENTIAL TREATMENT REQUESTED BY FMR CORP. AND ITS SUBSIDIARIES PURSUANT TO 29 C.F.R. 70.26(b)   FID-DOL-DEL 00275

ATTACHMENT #1

clearly be illustrated by looking at the average annual 1 year return for the two funds. GM stock has drastically out performed the Promark Income in the 1 year category & over the 3 year period the funds are basically consistent with each other.

Rate of Returns

|  | 1 year average annual | 3 year average annual | 5 year average annual | 10 year average annual |
|---|---|---|---|---|
| **GM Stock Fund** | 52.10% | 6.03% | 1.84% | 5.44% |
| **Promark Income Fund** | 5.30% | 6.35% | 6.28% | 6.22% |

### Alternatives

Based on our experience with similar situations, below we have outlined a number of approaches and noted what the impact / risk is likely to be. We are by no means limited to these options. These are just the ideas we have based on past practices for similar situations.

#### 1. No Action

Change the dividend investment, which has been done, make no adjustments to participant accounts and do not communicate to participants.

- **Potential Impact** - Risk that participants discover the error, are dissatisfied with the result and bring action against Delphi/Fidelity for adjustment based on current market conditions.

#### 2. Communicate the issue

Same approach as above except communicate the situation to participants. Explain the issue and what will take place going forward and that no retroactive corrective action will made. The rational of this approach could be substantiated in the communication by showing that based on the average price of the Stock Fund and the average price of the Promark Income Fund, the participant is better off today with how dividends were allocated.

- **Potential Impact**- There is still the risk that participants will seek to have their accounts adjusted given current market conditions.

#### 3. Offer an election window

Communicate the issue to participants with a balance. Indicate what happened with regard to their GM Stock Fund and what will happen going forward. Offer participants the option of what they would like to see occur with their account. If a participant would like to have their units of the GM Stock Fund that were allocated to their account for dividends liquidated and those dollars used to purchase the Income fund 'as of' they can call the 800 number and we will make the adjustment to their account. Note, the dividend units received on dividend units previously allocated in error will also be liquidated. If participants do not respond within the time frame, the matter will be closed and no adjustment will be made to participant accounts who did not call.

- **Potential Impact** – It is difficult to estimate the financial impact as it is unknown if participants will call. Depending on the fluctuation of the stock price and the number of people that respond this could be very low or it could be large as well. Administratively this could be somewhat challenging to manage depending on the size of the response. This alternative addresses the issue with "finality" and the arguably eliminates the risk of participants coming forward in the future to have their account adjusted.

CONFIDENTIAL TREATMENT REQUESTED BY FMR CORP. AND ITS SUBSIDIARIES PURSUANT TO 29 C.F.R. 70.26(b)    FID-DOL-DEL 00276

ATTACHMENT #1

**4. Proactive / good faith adjustment**
Calculate an interest spread based on the difference between the present cash value of the GM Stock Fund units purchased incorrectly & the units of the Promark Income fund that would have been purchased. Using the 5 year average annual Promark Income fund rate of return, calculate an amount that will be allocated to participant accounts and invested in Promark Income fund for missed earnings.

**Potential Impact** - Depending on the price of the stock fund and the methodology that we use (average prices vs. real time) this could range from $40,000 to about $145,000 spread across 8,530 participants in the fund today. This is also a very complicated solution to communicate to people. However, the benefit is that participants will be receiving an additional allocation which is a positive item to communicate.

**5. Sell & Buy**
This would involve selling the GM units the dividend bought and purchasing the Promark Income fund 'as of' the correct date to ensure that receive the full amount of Promark income fund units.

- **Potential Impact** - This is likely to be very unpopular among the participant base and is very difficult to cover everyone fairly. We are unable to chase participants that have traded out of the fund or cashed out of the plan. This could lead to an "unfair" correction as participants who did trade out while the stock was high arguably received an unfair advantage in gains. Essentially, we would be selling their GM units at a relatively unattractive price and buying Promark Income units. Depending on the market this could be expensive to complete. This would also be, by far, the most challenging and expensive to accomplish administratively.

CONFIDENTIAL TREATMENT REQUESTED BY FMR CORP. AND ITS SUBSIDIARIES PURSUANT TO 29 C.F.R. 70.26(b)    FID-DOL-DEL 00277

ATTACHMENT #1

GM dividend issue                                                                                              Page 1 of 2

**Zimmer, Karen M**

| | |
|---|---|
| **From:** | Donoghue, Brian [Brian.Donoghue@fmr.com] |
| **Sent:** | Wednesday, March 24, 2004 12:02 PM |
| **To:** | Trimble, Michelle; Fligstein, Mike S; Zimmer, Karen M; Kuplicki, Francis |
| **Cc:** | Smith, Michael E; Fralin, Roy; Cutts, Jeffrey; D'Aloia, Krista |
| **Subject:** | GM dividend issue |

Hello,

Thank you for taking the time to meet with us earlier this week to discuss the GM dividend issue that we are currently working through. Below is the list of take aways that we wanted to get back to you on.

Please take some time to read thru and digest this information and let us know your thoughts. Please let us know when you would like to schedule another call to determine next steps.

If you should have any questions please do not hesitate to call.

1. **What happened to the future mix within the Delphi PSP?**

   Any future mix and/or loan repayment that was being directed to the GM common stock fund was directed to the promark income fund after the negotiation (unless the participant had made another election).

2. **Litigation results of similar issues.**

   After having a chance to talk with Krista, we are not aware of any litigation of this matter. From an ERISA fiduciary perspective (thus far we have focused in IRS corrective action), offering the participants the ability to control their own destiny is arguably the best approach. We have definitely offered the "election" approach previously although not with a dividend which was incorrectly processed (i.e. incorrect fund mapping, posting to incorrect mix elections).

3. **What has happened to the people who no longer have a GM stock balance, did they trade out or take a full payout?**

   Currently there are 1,898 people that have traded out of or withdrawn out of the GM Stock fund but still have a balance greater than $100 in the Delphi PSP. This indicates that there are about 3,000 people that have taken all of their assets out of the Delphi PSP in some manner (full payout or transfer to GM PSP).

4. **Performance example -**

   Mike Smith has done an excellent job with doing an analysis on a sample of people. Attached is a spread sheet that outlines the net result. We calculated what the account would look like if the dividend had been invested into the Promark fund starting 1/1/2000 for a sample of people. We compare what the GM stock fund (within their account) is worth today and what it would look like with the Stock fund PLUS the income fund.

   <<DPHPSPDelphiStockDividendAnalysis.xls>>

   To illustrate the example - lets consider the example of person with 5 units of GM stock on 1/1/2000.

   - Having the GM dividend buy additional shares of GM stock the person would have a total of 5.793 GM units today and it would be worth $634.72 (using 3/19 prices).
   - If the dividends had been transferred to the Promark income fund; the sum of the GM stock and the Promark income fund would be valued at $656.78 (using 3/19 prices).

4/14/2004

ATTACHMENT #2

DOL-PSP-002084

In this example, the current value of the GM Stock and the promark income fund (had the dividends been routed to the income fund) is greater by $22.07 using 3/19 prices. On the flip side, the person has gained 0.793 units of GM stock having the dividends reinvested into the GM stock fund.

Thank you,
Brian

4/14/2004

DOL-PSP-002085

Attachment #2





| Attendees: | **AGENDA** |
|---|---|
| Delphi: Karen Cobb, Mike Fligstein & Frank Kuplicki<br>GMAM: Chuck Tschampion & Jonathan Lavy - *Performance*<br>Fidelity Investments: Tom Hohl, Jeff Cutts, Chris Dewitt, Roy Fralin & Brian Donoghue | GM Dividend issue<br>05/21/2004<br>4:00 PM EST |
| Call in number - 1-866-902-8346 (650-599-0382)<br>Meeting ID - 3575653 | |
| **Intro** | |
| **GMAM –**<br>    Chuck Tschampion<br>    Jonathan Lavy | Discuss the financial analysis comparison of the General Motors Company stock fund and Promark Income fund over specific periods of time. |
| **Fidelity Investments**<br>    Tom Holh<br>    Jeff Cutts<br>    Chris Dewitt<br>    Roy Fralin<br>    Brian Donoghue | Discuss possible solution to propose to the IRS. |
| **Open forum - All** | Open Question & Answer |
| **Next steps - All** | Determine next set of steps toward a resolution |

ATTACHMENT #3

DOL-PSP-002129

# DELPHI

**Memo**
**Privileged and Confidential**

Date: May 24, 2004

To: File

From: Karen Cobb

Subject: Reinvestment of GM Dividends in the PSP

FACTS: At the spin-off (May 29, 1999), the Delphi PSP (Personal Savings Plan) became effective. All future employee and employer contributions were directed to the Delphi PSP. However, the Delphi UAW employees were given a choice of maintaining their existing GM PSP account or transferring their existing GM PSP balance to the Delphi PSP. The IUE-CWA employees were not given the choice; their GM PSP assets were transferred to the Delphi PSP in an aggregate trust-to-trust transfer. Shortly after the spin-off, union negotiations began. Pursuant to a letter dated 5/14/99 – dividends in the PSP were to be redirected into the GM Stock Fund until October 1999 pending negotiations. The PSP plan language Article 7.05(a), resulting form the negotiations, requires that GM Stock Fund dividends be invested in the Promark Income Fund. All PSP provisions that changed due to 1999 negotiations were implemented by Fidelity Investments, the recordkeeper of the PSP, with an effective date of 1/1/2000 except for the reinvestment of the GM stock dividends. As such, the GM dividends continued to be reinvested into the GM Stock Fund from March 2000 through December 2003. Over 12,000 participants have been affected by this operational failure to administer the plan according to its terms. The PSP received a favorable Internal Revenue Service (IRS) determination letter dated June 27, 2003 that considers "GUST" amendments (a series of six tax laws affecting qualified plans).

EPCRS: This memorandum discusses the correction method available for the operational failure described above under EPCRS (Employee Plans Compliance Resolution System) set forth in Revenue Procedure 2003-44, 2003-1 C.B. 1051, the voluntary correction program offered by the IRS. For a qualified plan, such as the PSP, if a plan sponsor corrects a plan failure in accordance with the applicable requirements of EPCRS, the plan will remain tax-qualified. A qualified plan is any plan that intends to satisfy the requirements of Section 401(a) of the Internal Revenue Code of 1986, as amended (IRC). An "operational" failure is a qualification failure (one that threatens the qualification of the plan) that arises solely from a failure to follow the plan terms. Certain eligibility provisions of the EPCRS correction methods require a current favorable determination letter.

*Correction Principles.* An overriding correction principle of EPCRS is that a "failure is not corrected unless full correction is made with respect to all participants and beneficiaries, and for all taxable years (whether or not the taxable year is closed)" (Sec. 6.02). The restoration method used should restore the plan to the position it would have been had the failure not occurred, keep plan assets in the plan and be adjusted for earnings. Correction must be made for the "period of failure" which is the period from the date that the failure began through the date of correction.

For discrimination testing purposes, a corrective allocation to a participant's will be considered an annual addition for the limitation year to which the corrective allocation relates not the year in which the allocation is made. However, if a corrective distribution is $50 or less, correction is not required if the reasonable direct cost of processing and delivering the distribution to the participant would exceed the amount of the distribution. Also, reasonable actions must be taken to locate all current and former participants and beneficiaries to whom additional benefits are

1 of 2

owed. Such actions include use of the IRS Letter Forwarding Program or the Social Security Administration Employer Reporting Service. If either of these programs are used, a plan will still only be considered to be fully corrected if an individual is provided a corrective allocation if located at a later time.

*Self-Correction of Significant/Insignificant Operational Failures (SCP).* Self-correction (those corrections made without obtaining IRS approval and paying a fee) is only available to remedy operational defects. To self-correct, correction must be made within the last day of the second plan year following the plan year in which the failure first occurred. If the SCP is unavailable, a plan sponsor may voluntarily seek approval from the IRS to correct an operational failure provided the plan.

*Voluntary Correction with Service Approval (VCP).* Using the VCP, a Plan Sponsor will pay a fee (for plans with over 10,000 participants the fee is $25,000) and obtain the Service's approval for the correction method at any time before audit. The application for approval to the IRS consists of a letter from the plan sponsor to the IRS that contains a description of the failures, proposed methods for correction, other procedural items and supporting documentation. Once agreement is reached on the correction method, the IRS will issue a compliance statement specifying the corrective action required. The Plan Sponsor must sign and return the compliance statement to the Service within 30 days or the plan may then be referred to Employee Plans Examinations. The specific corrections must be implemented within 150 days (unless extension is granted at the time the compliance agreement is signed). The EPCRS Revenue Procedure provides an exhaustive list of examples for both correcting failures and adjusting for earnings. Any correction method chosen should closely resemble one already provided for in the IRC, regulations or the EPCRS examples to receive sanction from the IRS.

*Analysis.* The incorrect dividend allocation treatment is an operational failure that arises solely from a failure to follow the plan terms. Because the first failure occurred in March 2000, we are unable to self-correct because the correction period has lapsed. Correction for the failures that occurred in 2000 would have had to have been corrected no later than December 31, 2002. As such, we may apply to the IRS for approval of a correction method. The correction process includes the following:
- A submission to the IRS for approval with payment of a $25,000 fee;
- Full reasonable correction for all affected plan participants and beneficiaries (including "lost" participants) above a floor correction amount (possibly $50); and
- An adjustment for lost earnings on the corrective allocation.

This PSP dividend reinvestment failure is unusual and no commonly used correction method appears applicable without modification. We recommend pursuing VCP for this matter.

*Proposed Correction Method.* We will seek the approval of the IRS to allow participants to make a choice to "do nothing" or to undo the incorrectly reinvested dividends and put the participant in the same place as they would have been had the dividends been directed into the Promark Income Fund. The participant's choice would be as follows:
1. to retain their GM Stock Fund with the reinvested dividends; or
2. to divest the portion of their GM Stock Fund due to the incorrectly reinvested dividends (and any growth) and contribute those proceeds to the Promark Income Fund. Also, if a difference in value is calculated between the two positions, Delphi would make an employer contribution for that differential to each electing individual's account.

We will send a letter to all affected participants (and former participants) informing them of the issue and choice that must be made within a set period of time. The letter will contain an example of the correction method with an explanation of the economic impact. Ideally, we would prefer that the letter direct participants to call a Fidelity call center for an accurate accounting of their individual choice. However, this communication (as with all aspects of the process) will be subject to negotiation with the IRS.

CONFIDENTIAL TREATMENT REQUESTED BY FMR CORP. AND ITS SUBSIDIARIES PURSUANT TO 29 C.F.R. 70.26(b)        FID-DOL-DEL 00279

ATTACHMENT #4

```
04/17/2001        PLAN: 29000                                                                    PAGE 19
                                      DELPHI AUTOMOTIVE SYSTEMS
                                       PERSONAL SAVINGS PLAN

                                       SUMMARY OF PLAN OPERATIONS


                            ----- FUND: EDS STOCK FUND  ------    ----- FUND: GM COMMON STK FD  ------
                                CASH              SHARES              CASH              SHARES

Market Value as of 12/31/1999   0.00              0.000               0.00              0.000

A. TOTAL RECEIPTS

   Contributions/Employer
      COMPANY CONTRIBUTIONS     0.00              0.000               0.00              0.000

   Contributions/Employee
      PRE-TAX SAVINGS           0.00              0.000               0.00              0.000
      ROLLOVER                  0.00              0.000               0.00              0.000
      PROFIT SHARING            0.00              0.000               0.00              0.000
      AFTER-TAX SAVINGS         0.00              0.000               0.00              0.000

   Interest and Dividends       0.00              0.000           1,162,243.86          7,545.294
   Realized Gain/(Loss)     (  2,003.47)          0.000         ( 573,942.44)           0.000
   Unrealized Gain/(Loss)   ( 15,444.33)          0.000         ( 23,453,096.10)        0.000
   Loan Repayment (Principal)   0.00              0.000               0.00              0.000
   Loan Repayment (Interest)    0.00              0.000               0.00              0.000
   Exchange In               206,230.06        1,230.933         68,221,019.90        343,017.624
   Forfeiture Credit            0.00              0.000               0.00              0.000
   Transfer In                23,457.11          176.190          4,705,730.44         27,596.721
   Adjustment (+)               0.00              0.000               0.00              0.000

TOTAL RECEIPTS               212,239.37        1,409.123         50,061,955.66        378,159.639


B. TOTAL DISBURSEMENTS

   Benefit Payments        (   5,297.58)    (     35.621)    (  1,946,280.97)    (    12,179.164)
   Forfeiture Debit             0.00              0.000      (     19,584.43)    (       116.174)
   Administrative Fee           0.00              0.000               0.00              0.000
   Exchange Out            (   8,214.45)    (     57.449)    (  6,350,615.27)    (    31,615.079)
   Loan Withdrawal         (   1,883.93)    (     13.675)    (  1,607,112.92)    (     9,670.310)
   Transfer Out                 0.00              0.000               0.00              0.000
   Adjustment (-)               0.00              0.000               0.00              0.000

TOTAL DISBURSEMENTS       (  15,395.96)    (    106.745)    (  9,923,593.59)    (    53,580.727)


Market Value as of 12/31/2000  196,843.41       1,302.378         40,138,362.07        324,578.912
```

ATTACHMENT #5

DT-DEDOL 0001019
Confidential Treatment
Requested by Deloitte &
Touche, LLP

/77

| 04/17/2001  PLAN: 29000 | DELPHI AUTOMOTIVE SYSTEMS<br>PERSONAL SAVINGS PLAN | | | PAGE: 14 |
|---|---|---|---|---|

SUMMARY OF PLAN OPERATIONS

| | FUND: GM COMMON STK FD | | FUND: GM CLASS H STOCK | |
|---|---|---|---|---|
| | CASH | SHARES | CASH | SHARES |
| Market Value as of 12/31/1999 | 69,352,636.56 | 396,006.604 | 0.00 | 0.000 |
| **A. TOTAL RECEIPTS** | | | | |
| Contributions/Employer | | | | |
| COMPANY CONTRIBUTIONS | 0.00 | 0.000 | 0.00 | 0.000 |
| Contributions/Employee | | | | |
| PRE-TAX SAVINGS | 0.00 | 0.000 | 0.00 | 0.000 |
| ROLLOVER | 2,983.09 | 16.990 | 0.00 | 0.000 |
| PROFIT SHARING | 0.00 | 0.000 | 0.00 | 0.000 |
| AFTER-TAX SAVINGS | 0.00 | 0.000 | 0.00 | 0.000 |
| Interest and Dividends | 425,503.93 | 2,273.693 | 0.00 | 0.000 |
| Realized Gain/(Loss) | 9,088,320.87 | 0.000 | 0.00 | 0.000 |
| Unrealized Gain/(Loss) | 0.00 | 0.000 | 0.00 | 0.000 |
| Loan Repayment (Principal) | 1,251.46 | 7.188 | 0.00 | 0.000 |
| Loan Repayment (Interest) | 69.94 | 0.403 | 0.00 | 0.000 |
| Exchange In | 0.00 | 0.000 | 0.00 | 0.000 |
| Forfeiture Credit | 0.00 | 0.000 | 0.00 | 0.000 |
| Transfer In | 1,717,476.62 | 9,096.442 | 0.00 | 0.000 |
| Adjustment (+) | 3,184.73 | 16.932 | 0.00 | 0.000 |
| TOTAL RECEIPTS | 11,238,790.64 | 11,411.648 | 0.00 | 0.000 |
| **B. TOTAL DISBURSEMENTS** | | | | |
| Benefit Payments | (843,178.46) | (4,551.775) | 0.00 | 0.000 |
| Forfeiture Debit | (11,838.12) | (60.084) | 0.00 | 0.000 |
| Administrative Fee | 0.00 | 0.000 | 0.00 | 0.000 |
| Exchange Out | (78,877,871.42) | (398,214.697) | 0.00 | 0.000 |
| Loan Withdrawal | (858,539.20) | (4,591.696) | 0.00 | 0.000 |
| Transfer Out | 0.00 | 0.000 | 0.00 | 0.000 |
| Adjustment (-) | 0.00 | 0.000 | 0.00 | 0.000 |
| TOTAL DISBURSEMENTS | (80,591,427.20) | (407,418.252) | 0.00 | 0.000 |
| Market Value as of 12/31/2000 | 0.00 | 0.000 | 0.00 | 0.000 |

Handwritten annotations:
- 157.11
- 69352636.56 + 11238790.64 = 80,591,427.20
- Net Appreciation
- GM Stock Σ(d)(p2x 27) = (14,938,718) 2231
- ATTACHMENT #5

DT-DEDOL 0001014
Confidential Treatment
Requested by Deloitte &
Touche, LLP

177