## **Exhibit A**

Disclosure Statement changed pages, blacklined against version filed on September 6, 2007

# DELPHI

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - == -x
                           :
In re                      :    Chapter 11
                           :
DELPHI CORPORATION, et al.,    :    Case No. 05-44481 (RDD)
                           :
                           :    (Jointly Administered)
                 Debtors.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO**
**FIRST AMENDED JOINT PLAN OF**
**REORGANIZATION OF DELPHI CORPORATION AND**
**CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION**

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(800) 718-5305
(248) 813-2698 (International)
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)
Nathan L. Stuart (NS 7872)

SKADDEN, ARPS, SLATE, MEAGHER        Of Counsel
   & FLOM LLP                    DELPHI CORPORATION
Four Times Square                  5725 Delphi Drive
New York, New York 10036        Troy, Michigan 48098
Kayalyn A. Marafioti (KM 9632)      David M. Sherbin
Thomas J. Matz (TM 5986)         Sean P. Corcoran
                                 Karen J. Craft

Attorneys for Debtors and Debtors-in-Possession

Dated:  New York, New York
       September 6November ●, 2007

---

**DISCLAIMER**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.
ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY
COURT HAS APPROVED THIS DISCLOSURE STATEMENT.  THIS DISCLOSURE
STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED
BY THE COURT.**

## EXECUTIVE SUMMARY

On October 8 and 14, 2005, Delphi Corporation and("Delphi" or the "Company") and 41 of its direct and indirect United States subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession (collectively, the "Debtors"), filed petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  Chapter 11 of the Bankruptcy Code allows a debtor to sponsor a plan of reorganization that proposes how to treat claims against, and interests in, such debtor.  A plan of reorganization must be voted on by holders of claims and interests and then must meet various standards to be confirmed by the Bankruptcy Court.  Consummation of a confirmed plan of reorganization is how a debtor emerges from chapter 11.

On September 6, 2007, the Debtors filed their Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "September 6 Plan") and on November ●, 2007, the Debtors filed their First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "Plan").  The purpose of this Disclosure Statement is to provide to the holders of Claims against, and Interests in, the Debtors adequate information to make an informed judgment about the Plan.

The following introduction and summary is a general overview only and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan.  All capitalized terms not defined in this Disclosure Statement have the meanings ascribed to them in the Plan, unless otherwise noted.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan being proposed by Delphi Corporation and 41 of its direct and indirect United States subsidiaries and affiliates, debtors and debtors-in-possession, which filed petitions for chapter 11 relief on October 8 and October 14, 2005 (the "Petition Date") with the United States Bankruptcy Court for the Southern District of New York.

Certain of Delphi's U.S. affiliates are not debtors in these Chapter 11 Cases and, with the exception of one of Delphi's wholly-owned indirect Spanish subsidiaries, none of the Delphi affiliates located outside of the U.S. has commenced chapter 11 cases or similar proceedings in any other jurisdictions.  These non-Debtor affiliates are not necessarily affected by the Plan to the same extent as are Delphi and the Affiliate Debtors.  Certain provisions of the Plan, and thus the descriptions and summaries contained herein, may be the subject of continuing negotiations among the Debtors and various parties, have not been finally agreed upon, and may be modified.  Such modifications, however, will not have a material effect on the distributions contemplated by the Plan.

A copy of the Plan is annexed hereto as Appendix A.  Historical financial results of the Company are attached hereto as Appendix B.  Financial projections for the reorganized

**D.    Business Plan**

The Debtors' substantial progress on their Transformation Plan provides the foundation for the Company's 2007-2011 business plan (the "Business Plan").  When developing the Business Plan, Delphi considered the impact that elements of the Transformation Plan would have on its operations, including the transformation of its hourly workforce, Delphi's relationship with its largest customer, GM, the impact of changes in Delphi's production portfolio and manufacturing footprint, cost reductions achieved as a result of the SG&A restructuring, and pension funding strategies with the Internal Revenue Service (the "IRS") and the Pension Benefit Guaranty Corporation (the "PBGC").

Delphi's financial projections for 2007-2011 are attached hereto as Appendix C.  The Business Plan projects that in 2008, revenue will decline as Delphi continues to exit certain of its product lines as part of the portfolio transformation.  The dispositionAs a result of product lines is expected to be substantially completedrevised volume production forecasts for GM North America ("GMNA") by the end of 2008, Delphi and thereafter the Business Plan projects that revenue increases in Global Insight ("GI/DRI") (formerly known as Data Resources, Inc.), an industry expert that publishes reports on vehicle production forecasts, as well as the revised capital structure of the reorganized company necessitated by the recent dislocation in the remaining years of thecapital markets, Delphi has revised its Business Plan.  Although the revised Business Plan calls for a further decline in revenue in 2008, the revised Business Plan projects that revenue increases in 2008-2011 by a compound annual growth rate of 5.76.3%.  In the final years of the Business Plan, it is expected that margins will expand to industry-competitive levels as Delphi expands its current business lines and grows into new markets.

The Business Plan demonstrates that a significant amount of cash will be spent in connection with restructuring activities.  Each division has contemplated a significant number of restructuring activities, the scope, timing, and cost of which were included in the Business Plan and affect the forecast.  As a result of the restructuring, the Business Plan financials also reflect expected cost savings in manufacturing, that are the product of the labor transformation and global restructuring initiatives.  As manufacturing and engineering operations are migrated from high cost to low cost locations, savings are generated, resulting in Delphi's belief that it will be well positioned to meet customer expectations and achieve competitive margins.  Beyond the impact of these manufacturing cost initiatives, further savings in material costs are expected to be realized through engineering activities, supplier price reductions, and the continued shift in the supplier footprint to lower cost locations following Delphi's own manufacturing footprint migration.  The resulting transformation and growth results in a plan under which Delphi continues to expand its revenue expectations in Asia, Europe, and South America while expecting revenue declines in North America.

**E.    Plan Investor And Exit Financing**

The description below is based on the Debtors' current status of discussions with third parties and will be updated as such discussions evolve.

Notice of Proposed Amendments
October 29, 2007

To support the Company's Transformation Plan and Business Plan, the Debtors entered into an Equity Purchase and Commitment Agreement with Plan Investors led by A-D Acquisition Holdings, LLC, an affiliate of Appaloosa Management L.P.  On the terms and subject to the conditions of the Investment Agreement, the Plan Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in Reorganized Delphi.

The Plan Investors also agreed to purchase any unsubscribed shares of New Common Stock of Reorganized Delphi in connection with a $1.575 billion Discount Rights Offering (as defined below) that will be made available to Delphi's common stockholders who are holders of shares of Delphi common stock as of the date the Confirmation Hearing commences.

In addition to the proceeds from the Investment Agreement and the Discount Rights Offering, the Company will need to obtain funded debt of $7 billion to $7.5 billion to emerge from chapter 11 successfully.  The Company has identified and commenced discussions with six of the top ten lenders based on 2006 syndicated loans in the U.S. and seven of the top ten lenders based on 2006 corporate high-yield debt in the U.S. and global markets.  The Company expects to file a commitment letter for this exit financing early in the Fourth Quarter of 2007.

**F.    Summary Of The Plan Of Reorganization**

The Plan is based upon a series of global settlements and compromises that involve every major group of constituents in the Debtors' reorganization cases.  The Debtors, all of the Debtors' principal U.S. labor unions, GM, the Creditors' Committee, the lead plaintiffs in certain security actions (on behalf of holders of various claims based on alleged violations of federal securities law and ERISA), and the Equity Committee have contributed to global settlements and compromises that provide for a recovery through a plan distribution amounting to the principal amount of the claim plus accrued interest, at a negotiated plan value for general unsecured creditors, and agreed upon distributions to other classes of creditors and interests.  The Plan is supported by the Creditors' Committee on behalf of unsecured creditors, the Equity Committee on behalf of holders of Delphi's common stock, and GM.

Under the Plan, cash and shares of New Common Stock of Reorganized Delphi will be distributed to holders of General Unsecured Claims amounting, in the aggregate, to the principal amount of such claims plus accrued interest, a "par plus accrued recovery at Plan value".  GM will receive a cash distribution on account of certain of its claims against the Debtors.  Certain plaintiffs in a multi-district securities litigation will receive, through a settlement with the Debtors, cash and shares of New Common Stock of Reorganized Delphi in approximately the same proportion as the general unsecured creditors.  Holders of existing Delphi common stock will receive a distribution of shares of New Common Stock of Reorganized Delphi, five-year warrants exercisable to purchase shares of New Common Stock of Reorganized Delphi, and transferable and non-transferable subscription Rights to purchase shares of New Common Stock of Reorganized Delphi.

The settlements embodied by the Plan feature Rights Offerings that will be conducted after confirmation of the Plan and will allow Delphi's common stockholders, who are holders of shares of Delphi common stock as of the date when the Confirmation Hearing commences, to purchase (i) through the exercise of transferable Rights, 40,845,016 shares of the New Common Stock of Reorganized Delphi at a price per share of $38.56 (reflecting a discount to the negotiated plan enterprise value of Reorganized Delphi) generating gross proceeds of up to $1.575 billion, and (ii) through the exercise of non-transferable Rights, up to $572 million worth of shares in the aggregate of New Common Stock of Reorganized Delphi, at a price per share of $45.00 (reflecting the negotiated plan enterprise value of Reorganized Delphi).  Holders of existing common stock will also receive their pro rata share of $66 million of New Common Stock (1,476,000 of a total of 147,627,046) and New Warrants to purchase an aggregate of 5% of New Common Stock of Reorganized Delphi at an exercise price of $45 per share.  The Rights will be issued only to those individuals who are holders of Delphi's common stock as of the close of business on the date the Confirmation Hearing commences.  The Rights will be issued to those common stock holders after the Bankruptcy Court has confirmed the Debtors' Plan and Delphi's Registration Statement for the Rights Offerings has been declared effective by the SEC.  Appaloosa and the other Plan Investors, if any, which have agreed not to participate in the Par Value Rights Offering, will not participate in the Par Value Rights Offering and Rights that would otherwise be distributed to such parties pursuant to the Par Value Rights Offering by virtue of their current common stock holdings will be distributed to the other holders of Existing Common Stock.

Current stockholders of Delphi who receive, but decide not to exercise, their transferable and non-transferable Rights can sell their existing shares of Delphi common stock and/or their transferable Rights subject to applicable law and realize value by selling their shares and/or their transferable Rights.  Sale of shares prior to the date the Confirmation Hearing commences will effectively also result in the sale of the transferable and non-transferable rights.  Neither Delphi nor its Board of Directors makes any recommendation with respect to any exercise or sale of Rights or sale of shares of common stock.  See Section VII.C. — Rights Offerings for additional information regarding the Rights Offerings.

To support the Company's Transformation Plan and Business Plan, the Debtors entered into an Equity Purchase and Commitment Agreement (the "Investment Agreement") with Plan Investors led by A-D Acquisition Holdings, LLC, an affiliate of Appaloosa Management L.P. ("Appaloosa").  On the terms and subject to the conditions of the Investment Agreement, the Plan Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in Reorganized Delphi.  The Debtors will amend the Investment Agreement, pending Bankruptcy Court approval, in November 2007.  The Investment Agreement amendment will reflect certain adjustments to the proposed investments by the Plan Investors.

In addition, the amended Investment Agreement will provide for a $1.575 billion Discount Rights Offering (as described below) that will be made available to Delphi's unsecured creditors.

DS-xi

In addition to the proceeds from the Investment Agreement and the Discount Rights Offering, the Company will need to obtain funded debt to emerge from chapter 11 successfully.  Initially, the Company sought financing of up to $7.5 billion in funded debt and a $1.6 billion asset-based revolving loan.  Because of the dynamics of the capital markets in the third quarter of 2007, however, the Debtors reduced proposed debt levels under the Plan by $1.9 billion to facilitate an emergence financing package that could be executed under existing market conditions.  Based on recent improvements in the capital markets, including the leveraged loan market, the Debtors, after consultation with the Creditors' Committee, the Plan Investors, and GM, plan to move forward with an asset-based revolving loan in the amount of $1.6 billion, $3.7 billion of first-lien funded financing (possibly in conjunction with the extension of their debtor-in-possession financing facility), and second lien funded financing in the amount of $1.5 billion.  The Debtors intend to enter into a "best efforts" financing arrangement with one or more nationally recognized investment banks on or before November 7, 2007, and to seek approval of such exit financing at the Debtors' November 29, 2007 omnibus hearing.

**F.      Summary Of The First Amended Plan Of Reorganization**

The Plan is based upon a series of global settlements and compromises that involve nearly every major group of constituents in the Debtors' reorganization cases.  The Debtors, all of the Debtors' principal U.S. labor unions, GM, the Creditors' Committee, and the lead plaintiffs in certain securities actions (on behalf of holders of various claims based on alleged violations of federal securities law and ERISA) have contributed to global settlements and compromises that provide for a recovery to general unsecured creditors (other than holders of TOPrS, as defined below) through a plan distribution amounting to the principal amount of the claim plus accrued interest, at a negotiated plan value, and agreed upon distributions to other classes of creditors and interests.  **The Plan is supported by the Creditors' Committee on behalf of unsecured creditors and GM.**

Under the Plan, holders of General Unsecured Claims will receive a combination of shares of New Common Stock of Reorganized Delphi and subscription rights to participate in a discount rights offering (as described below) to acquire shares of New Common Stock. The recovery for holders of General Unsecured Claims (other than holders of TOPrS, as defined below) will amount, in the aggregate, to the principal amount of such holders' claims plus accrued postpetition interest at negotiated Plan value, a "par plus accrued recovery at Plan value."  For holders of claims arising from subordinated notes issued in connection with trust preferred securities issued in 2003 by Delphi Trust I and Delphi Trust II (the "TOPrS"), the recovery will amount, in the aggregate, to 100% of total prepetition claims (which claims include principal plus accrued prepetition interest) at negotiated Plan value.  The TOPrS claims, which are subordinate to other General Unsecured Claims, will be allowed in the amount of $421 million will not receive accrued postpetition interest. GM will receive cash, a second lien note, and junior preferred convertible stock on account of certain of its claims against the Debtors.  Subject to approval by the Bankruptcy Court and the District Court presiding over the matter, certain lead plaintiffs in a multi-district securities class action litigation through a settlement with the Debtors will receive, on behalf of themselves and the class they represent, shares of New Common Stock of Reorganized Delphi and subscription rights to participate in the discount rights offering in

the same proportion as the general unsecured creditors.  Holders of existing Delphi common stock will receive a distribution of subscription rights to purchase shares of New Common Stock of Reorganized Delphi through a par value rights offering and warrants exercisable for six months following the Debtors' emergence from chapter 11 to purchase shares of New Common Stock of Reorganized Delphi.

The settlements embodied in and by the Plan feature Rights Offerings that will be conducted after confirmation of the Plan.  Delphi's general unsecured creditors will have the ability to purchase through the exercise of non-transferable rights, 45,026,801 shares of the New Common Stock of Reorganized Delphi at a price per share of $34.98 (reflecting a discount to the negotiated plan enterprise value of Reorganized Delphi) generating gross proceeds of up to $1.575 billion (the "Discount Rights Offering").  The Discount Rights Offering will include oversubscription rights.

Delphi's existing common stockholders, who are holders of shares of Delphi common stock as of the date when the Confirmation Hearing commences, may purchase through the exercise of non-transferable Rights, up to 12,711,111 shares in the aggregate of New Common Stock of Reorganized Delphi, at a price per share of $41.58 (reflecting the negotiated plan enterprise value of Reorganized Delphi) (the "Par Value Rights Offering").  Holders of existing common stock will also receive New Warrants to purchase an aggregate of $1.0 billion of New Common Stock of Reorganized Delphi at an exercise price of $45 per share.  The Par Value Rights will be issued only to those individuals who are holders of Delphi's common stock as of the close of business on the date the Confirmation Hearing commences.  The Par Value Rights will be issued to those common stock holders after the Bankruptcy Court has confirmed the Debtors' Plan and Delphi's Registration Statement for the Par Value Rights Offering has been declared effective by the SEC.  The shares available to Delphi common stockholders through the Par Value Rights Offering would otherwise have been issued to Unsecured Creditors and Appaloosa.  Appaloosa and the other Plan Investors, if any, which have agreed not to participate in the Par Value Rights Offering, will not participate in the Par Value Rights Offering and Par Value Rights that would otherwise be distributed to such parties pursuant to the Par Value Rights Offering by virtue of their current common stock holdings will be distributed to the other holders of Existing Common Stock.

Current stockholders of Delphi who may receive, but do not desire to exercise, their non-transferable Par Value Rights can sell their existing shares of Delphi common stock subject to applicable law and realize value by selling their shares.  Sale of shares prior to the date the Confirmation Hearing commences will effectively also result in the sale of the Par Value Rights and the right to receive New Warrants.  Neither Delphi nor its Board of Directors makes any recommendation with respect to any exercise or sale of shares of common stock.  See Section VII.C. – Rights Offerings for additional information regarding the Rights Offerings.

Each of Delphi and its 41 Affiliate Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan provides for the substantive consolidation of certain of the Debtors' Estates for voting and distribution purposes only. The Plan contains separate classes and proposes recoveries for holders of Claims against

and Interests in the Debtors.  After careful review of the Debtors' current business operations, estimated recoveries in a liquidation scenario, and the prospects of ongoing business, the Debtors have concluded that the recovery to the Debtors' creditors and equityholders will be maximized by the reorganization of the Debtors as contemplated by the Plan.

Although the Debtors need only to establish that the stakeholders will receive at least as much under the proposed Plan as in a liquidation under chapter 7 of the Bankruptcy Code, the Debtors believe that the recoveries provided by the Plan will be significantly better than those realized through a liquidation.  Specifically, the Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part.  According to the valuation analysis prepared by the Debtors' investment banker and financial advisor, Rothschild, Inc., and the liquidation analysis prepared by the Company, with the assistance of the Debtors' restructuring and financial advisor, FTI Consulting, Inc., the Debtors believe that the value of the Estates of the Debtors is significantly greater in the proposed reorganization than in a liquidation.

The effectiveness of the Plan, and thus the consummation of the Plan, is subject to a number of conditions precedent.  There can be no assurances that these conditions will be satisfied.  In addition, the Debtors have reserved the right to amend or modify the Plan as it applies to any of the Debtors.

**G.**    **Summary Of Changes To The Plan**

| **Party** | **September 6, 2007 Plan** | **Amended Plan** |
|---|---|---|
| **Plan Investors** | **Direct Investment**<br>- Purchase $400 million of preferred stock convertible at an assumed enterprise value of $11.75 billion<br>- Purchase $400 million of preferred stock convertible at an assumed enterprise value of $12.80 billion<br>- Purchase $175 million of New Common Stock at an assumed enterprise value of $13.9 billion | **Direct Investment**<br>- Purchase $400 million of preferred stock convertible at an assumed enterprise value of $10.80 billion<br>- Purchase $400 million of preferred stock convertible at an assumed enterprise value of $11.80 billion<br>- Purchase $175 million of New Common Stock at an assumed enterprise value of $13.0 billion |
| **GM** | **$2.7 billion**<br>- $2.7 billion in Cash | **$2.7 billion**<br>- $750 million in Cash<br>- $750 million in a second lien note<br>- $1.2 billion in junior convertible preferred stock |

| Party | September 6, 2007 Plan | Amended Plan |
|---|---|---|
| **Unsecured Creditors** | **Par plus accrued recovery at Plan value**<br>- 80% in New Common Stock valued at $45 per share<br>- 20% in Cash | **Par plus accrued recovery at Plan value**<br>- 92.4% in New Common Stock valued at $41.58 per share<br>- 7.6% through pro rata participation in the Discount Rights Offering |
| **TOPrS** | **Par plus accrued recovery at Plan value**<br>- 100% in New Common Stock valued at $45 per share | **Par recovery at Plan value**<br><br>- 92.4% in New Common Stock valued at $41.58 per share<br>- 7.6% through pro rata participation in the Discount Rights Offering |
| **Existing Common Stockholders** | **Par Value Rights**<br>- Right to acquire approximately 12,711,111 shares of New Common Stock at a purchase price of $45.00 per share | **Par Value Rights**<br>- Right to acquire approximately 12,711,111 shares of New Common Stock at a purchase price of $41.58 per share |
| | **Warrants**<br>- Warrants to acquire an additional 5% of New Common Stock at $45.00 per share exercisable for five years after emergence | **Warrants**<br>- Warrants to acquire $1.0 billion of New Common Stock at $45.00 per share exercisable for six months after emergence |
| | **Direct Distribution**<br>- 1,476,000 shares of New Common Stock | |
| | **Discount Rights**<br>- Right to purchase 40,845,016 shares of New Common Stock at a purchase price of $38.56 per share | |

**H.        Summary Of Treatment Of Claims And Interests Under The Plan**

The Plan contains separate classes for holders of Claims against and Interests in the Debtors.  As required by the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified.  The table below summarizes the treatment of certain administrative and priority claims and sets forth the Debtors' estimates of the amount of Claims that will ultimately be Allowed in each category.

DS-xv

**DIP Claims, Administrative Claims, And Priority Tax Claims**

| Description | Treatment Under Plan |
|---|---|
| **DIP Claims** | DIP Claims consist of the DIP Facility Revolver Claim in the approximate amount of $682 million, the DIP Facility First Priority Term Claim in the approximate amount of $250 million, and the DIP Facility Second Priority Term Claim in the approximate amount of $2.495 billion.  Under the Plan the DIP Claim will be paid on the Effective Date in full in Cash.<br><br>**Estimated Amount of Claims:        $3.427 billion**<br>**Percentage Recovery:                100%** |
| **Administrative Claims** | An administrative claim is a claim for payment of an expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estates and operating the business of the Debtors, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Cases, Professional Claims, and certain other Claims.  For illustrative purposes, the estimated amounts of Administrative Claims include Cure Claims.  Under the Plan and the procedures provided therein, Administrative Claims will be paid in full in Cash in the ordinary course or as otherwise agreed.<br><br>**Estimated Amount of Claims:        $~~735~~332 million to $700 million plus other Administrative Claims in the ordinary course of business**<br>**Percentage Recovery:                100%** |

Notice of Proposed Amendments
October 29, 2007

| Description | Treatment Under Plan |
|---|---|
| **Priority Tax Claims** | A priority tax claim is a claim for payment of taxes by governmental units as specified in section 507(a)(8) of the Bankruptcy Code.  Under the Plan, Priority Tax Claims will be paid (1) equal cash payments, including postpetition interest, over a period not to exceed six years after the assessment of the tax totaling the aggregate amount of the claim, (2) other treatment that is agreed between the Debtors and the holder of the priority tax claim, or (3) payment in full in Cash plus postpetition interest.<br><br>**Estimated Amount of Claims:**    **$20 million to $73 million**<br>**Percentage Recovery:**                      **100%** |

The table below summarizes the classification and treatment of the principal prepetition Claims and Interests in the Plan.  The classification and treatment for all Classes are described in more detail in Section IX—Summary Of The Reorganization Plan. The table below also sets forth the Debtors' estimates of the amount of Claims that will ultimately be Allowed in each Class based upon the Debtors' review of all proofs of claim and schedules not superseded by proofs of claim, and consideration of the provisions of the Plan that affect the allowance of certain Claims.

The Debtors' investment banker and financial advisor, Rothschild, performed a valuation of the Reorganized Debtors and the New Common Stock as a going concern based on information and financial projections provided by the Debtors.  Rothschild estimated the total enterprise value range of Reorganized Delphi to be between $11.4 2 billion and $14.4 1 billion with a midpoint of approximately $12.9 7 billion as of December 31, 2007, as discussed more fully in the Valuation Analysis attached hereto as Appendix D. As part of the Plan, and for the purpose of making distributions to allow a par plus accrued at Plan value recovery for holders of general unsecured claims, the Debtors, Creditors' Committee, ~~Equity Committee,~~ GM, and Plan Investors, negotiated an agreed deemed value of the reorganized debtors' equity at $45.00 41.58 per share, which amounts to an implied enterprise value of approximately $13.0 billion.  The total enterprise value is assumed to be $12. 11.8 billion for purposes of setting the price of New Common Stock for the Discount Rights Offering and for setting the initial conversion price of the new Series B Senior Convertible Preferred Stock, par value $0.01 per share, of Reorganized Delphi.  For setting the initial conversion price of the new Series A ~~-1 Senior Convertible Preferred Stock of Reorganized Delphi, par value $0.01 per share, and the new Series A-2~~ Senior Convertible Preferred Stock of Reorganized Delphi, par value $0.01 per share, the total enterprise value is assumed to be $11.75 10.8 billion.

The valuation of the Reorganized Debtors and the New Common Stock conducted by Rothschild was based on certain assumptions including, among other things, an assumption that the results projected for the Reorganized Debtors will be achieved in all material respects.  No assurance can be given, however, that the projected results will be achieved.  To the extent that the valuation assumptions are dependent upon the

Notice of Proposed Amendments
October 29, 2007

achievement of the results projected by the Debtors, the valuation assumptions must be considered speculative.  The valuation assumptions also consider, among other matters, (i) market valuation information concerning certain publicly-traded securities of certain other companies that are considered relevant, (ii) certain general economic and industry information considered relevant to the business of the Reorganized Debtors, and (iii) such other investigations and analyses as Rothschild deemed necessary or appropriate.  The Debtors and Rothschild believe that these valuation assumptions are reasonable.

     The foregoing valuation assumptions are not a prediction or reflection of post-confirmation trading prices of the New Common Stock or any other securities.  Such securities may trade at substantially higher or lower prices because of a number of factors, including those discussed in Section X—General Considerations And Risk Factors To Be Considered.  The trading prices of securities issued under a plan of reorganization are subject to many unforeseeable circumstances and therefore cannot be predicted.

     In addition, for certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows.  For example, a counterparty to an executory contract that is assumed by the Debtors has the option of electing one of two cure treatments, which may change the amount of administrative claims or general unsecured claims, and for the illustrative estimated amounts, Cure Claims are included in both the Administrative Claim and General Unsecured Claim categories.  Accordingly, for these reasons, no representation can be or is being made with respect to whether the estimated percentage recoveries shown in the table below will actually be realized by the holders of Allowed Claims in any particular Class.  ~~Furthermore, the illustrative estimated amounts shown in the table below do not include prepetition interest amounts.~~

**Classified Claims**

| Class Description | Treatment Under Plan |
| --- | --- |
| **Secured Claims** | Secured Claims are claims, other than DIP Lender Claims (which are treated as Administrative Claims), that are secured by liens on property in which the Debtors have an interest.  Under the Plan, the legal, equitable, and contractual rights of each holder of a Secured Claim will be, at the option of the Debtor, paid in full or be unimpaired and reinstated (which means that the claim holder's rights will be unaltered by the Plan and that Delphi will cure outstanding payment defaults, if any). |
| | **Estimated Amount of Claims:**  $~~29~~20 million  to  $~~34~~30 million<br>**Estimated Percentage Recovery:**  100% |

| Class Description | Treatment Under Plan |
|---|---|
| **General Unsecured Claims** | General Unsecured Claims include claims arising as a result of trade claims (other than GM's claims, which are treated below), claims arising from the Delphi's Senior Notes, TOPrS Claims, and other general unsecured claims that might result from, for example, the rejection of executory contracts or unexpired leases. Delphi cannot predict with certainty the total amount of General Unsecured Claims that ultimately may be allowed.  Under the Plan, general unsecured creditors ~~(other than TOPrS)~~ will receive ~~cash in an amount equal to 20% of the claim and~~ the number of shares of New Common Stock in Reorganized Delphi equal to ~~80~~92.4% of the claim and the value of discount rights equal to 7.6% of the claim, subject to certain rounding provisions in the Plan. ~~In resolution of intercreditor disputes regarding subordination, TOPrS will receive a distribution of 100% New Common Stock~~The TOPrS subordination provision will be deemed satisfied pursuant to the Plan, which will provide a recovery of 100% of the principal and accrued prepetition interest to holders of TOPrS claims.<br><br>~~Funded Debt Claims of $2.5 billion plus other General Unsecured Claims of $1.7 billion or less, which amount is inclusive of Cure Claims and the treatment provided to Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b) ERISA Claims~~Estimated Amount of Allowed Claims:          $3.319 billion to $3.687 billion plus applicable accrued postpetition interest in the amount of $393 million<br><br>Estimated Percentage Recovery:          100 ~~%~~% of principal and applicable accrued postpetition interest, at Plan value of $41.58 per share |

DS-xx

| Class Description | Treatment Under Plan |
|---|---|
| **GM Claims** | Delphi and GM are party to two agreements that resolve issues arising from Delphi's Separation from GM and address matters in Delphi and GM's ongoing relationship.  The Plan serves as a motion to approve those agreements.  Under the Plan, for good and valuable consideration provided by GM under the Delphi-GM Definitive Documents, and in full settlement and satisfaction of the GM Claims, GM will receive all consideration set forth in the Delphi-GM Definitive Documents, including, without limitation, (1) ~~Cash~~ $1.2 billion in ~~the amount~~junior preferred securities, (2) $1.5 billion, of ~~$2.7 billion to~~which at least $750 million will be ~~paid on the Effective Date, (2)~~ in cash and the remainder will be in a second lien note with market terms, (3) retention of the GM Surviving Claims as provided for in section 4.03 of the Settlement Agreement, (~~3~~4) the effectuation of the IRC Section 414(l) assumption as provided for in section 2.03 of the Settlement Agreement, and (~~4~~5) the releases as provided for in sections 3.01, 4.02, and 4.03 of the Settlement Agreement.<br><br>**Amount of Allowed Claim:**      **Agreed Compromise**<br>**Estimated Percentage Recovery:**   **Agreed Compromise** |

| Class Description | Treatment Under Plan |
|---|---|
| **Section 510(b) Note Claims** | Section 510(b) Note Claims arise from the securities actions consolidated in the multi-district litigation ~~pending~~ in the United States District Court for the Eastern District of Michigan and include claims asserted by current or former holders of the Senior Notes ~~or~~ and TOPrS for damages or rescission in connection with the purchase or sale of those securities.  Pursuant to the terms of the Securities Settlement (which resolves the claims and causes of action asserted by holders of Section 510(b) Note Claims and Section 510(b) Equity Claims), holders of Section 510(b) Note Claims and Section 510(b) Equity Claims will receive ~~a claim~~ an Allowed Claim valued at $204 million.  The Debtors will make ~~a~~ distribution of ~~Cash and~~ New Common Stock and Discount Rights, in the same proportion as the distribution of ~~Cash and~~ New Common Stock and Discount Rights made to holders of General Unsecured Claims, to fund ~~a~~ that portion of the Securities Settlement reflecting the $204 million Allowed Claim, which will be divided between the Section 510(b) Note Claims and the Section 510(b) Equity Claims according to the ~~plan of allocation~~ Securities Settlement approved by the MDL Court.  If any holder of a Section 510(b) Note Claim opts out of the Securities Settlement, and that ~~holder's claim~~ holder has filed a claim that is ultimately allowed in the Chapter 11 Cases, then the holder of the Allowed Section 510(b) Opt Out Note Claim will receive a distribution, from the Securities Settlement, of ~~Cash~~ New Common Stock and ~~Stock~~ Discount Rights equal to the amount of the Allowed Section 510(b) Opt Out Note Claim in the same proportion as the distribution of ~~Cash and~~ New Common Stock and Discount Rights made to holders of General Unsecured Claims.<br><br>**Estimated Recovery:** Allocated share of $204 million Allowed Claim<br>**Estimated Percentage Recovery:** Agreed ~~Compromise~~ compromise which amounts to 100% recovery of principal amount of Allowed Claim at Plan value. |

| Class Description | Treatment Under Plan |
|---|---|
| **Intercompany Claims** | An Intercompany Claim is a claim by Delphi or one or more of its affiliates against other Delphi affiliates on account of various matters incurred in the ordinary course of business.  Under the Plan, at the option of Delphi with certain exceptions, Intercompany Claims will either be reinstated and treated in the ordinary course of business or eliminated, except that Intercompany Claims among Debtors that will be substantively consolidated as a Debtor group will be eliminated.  The ultimate disposition of Intercompany Claims will be based upon business planning reasons of Reorganized Delphi and will not affect distributions to other creditors under the Plan.<br><br>**Estimated Amount of Claims:**    N/A<br>**Estimated Percentage Recovery:**   N/A |
| **Existing Common Stock** | Delphi's Existing Common Stock will be canceled on the Effective Date.  Each Holder of Delphi's Existing Common Stock will receive a pro rata distribution of ~~(six-month warrants to purchase, for $45.00 per share, an additional $~~1) 1,476,000 shares .0 billion of New Common Stock ~~in~~of Reorganized Delphi ~~(at a $45.00 per share negotiated plan,~~ and non-transferable par ~~value), (2)~~ value. ~~transferable Rights to purchase 45,600,000 of~~ rights to purchase up to 12,711,111 shares of the ~~total 147,627,046 shares of~~ New Common Stock ~~(to be reduced by the guaranteed minimum~~ of ~~10%~~ Reorganized Delphi for a price of ~~the Rights for the Plan Investors) in Reorganized Delphi for $1.75 billion in the aggregate (exercise price $38.56~~$41.58 per share~~), (3) five-year warrants to purchase, for $45.00 per share, an additional 5% of the New Common Stock of Reorganized Delphi, and (4) non-transferable Rights to purchase approximately $572 million (in the aggregate) of the New Common Stock of Reorganized Delphi for a price of $45.00 per share~~.<br><br>**Estimated Recovery:** ~~Agreed Compromise~~          **$69 Million** |

Notice of Proposed Amendments
October 29, 2007

| Class Description | Treatment Under Plan |
|---|---|
| **Section 510(b) Equity Claims** | Section 510(b) ~~equity claims~~Equity Claims arise from the securities actions consolidated in MDL and include claims by current or former holders of Delphi's existing common stock for damages or rescission in connection with the purchase or sale of the common stock.  Pursuant to the terms of the Securities Settlement (which resolves the claims and causes of action asserted by holders of Section 510(b) Note Claims and Section 510(b) Equity Claims), holders of Section 510(b) Note Claims and Section 510(b) Equity Claims will receive ~~a claim~~an Allowed Claim valued at $204 million.  The Debtors will make ~~a~~ distribution of ~~Cash and~~ New Common Stock and Discount Rights, in the same proportion as the distribution of Cash and New Common Stock made to holders of General Unsecured Claims, to fund ~~a~~that portion of the Securities Settlement reflecting the $204 million Allowed Claim, which will be divided between the Section 510(b) Note Claims and the Section 510(b) Equity Claims according to the ~~plan of allocation~~Securities Settlement approved by the MDL Court.  If any holder of a Section 510(b) Equity Claim opts out of the Securities Settlement, and that ~~holder's claim~~holder has filed a claim that is ultimately allowed in the Chapter 11 Cases, then the holder of the Allowed Section 510(b) Opt Out Equity Claim will receive a distribution, from the Securities Settlement, of ~~Cash~~ New Common Stock and ~~Stock~~Discount Rights equal to the amount of the Allowed Section 510(b) Opt Out Equity Claim in the same proportion as the distribution of ~~Cash and~~ New Common Stock and Discount Rights made to holders of General Unsecured Claims.<br><br>**Estimated Recovery:** _____Allocated share of $204 million Allowed Claim<br>**Estimated Percentage Recovery:** Agreed ~~Compromise~~compromise which amounts to 100% recovery of principal amount of Allowed Claim at Plan value. |

Notice of Proposed Amendments
October 29, 2007

| Class Description | Treatment Under Plan |
|---|---|
| **Section 510(b) ERISA Claims** | Section 510(b) ERISA claims arise from the alleged failure of certain defendants to exercise their fiduciary duties in administering certain retirement plans' investments in Delphi common stock.  The ERISA based claims have been consolidated in the MDL.  Pursuant to the terms of the ERISA Settlement, holders of Section 510(b) ERISA Claims will receive a claim valued at $24.5 million.  The Debtors will make a distribution of ~~Cash and~~ New Common Stock and Discount Rights, in the same proportion as the distribution of ~~Cash and~~ New Common Stock and Discount Rights made to holders of General Unsecured Claims, to fund a portion of the ERISA Settlement, which will be distributed according to the plan of allocation approved by the MDL Court.<br><br>**Estimated Recovery:** _____ **Allocated share of $24.5 million Allowed Claim**<br>**Estimated Percentage Recovery:    Agreed ~~Compromise~~ compromise which amounts to 100% recovery of principal amount of Allowed Claim at Plan value.** |
| **Other Interests** | Other Interests consist of all options, warrants, call rights, puts, awards, or other agreements to acquire existing Delphi common stock.  Under the Plan, all Other Interests will be cancelled and holders of Other Interests will not receive a distribution under the Plan on account of such Other Interests.<br><br>**Percentage Recovery:        0%** |
| **Interests In Affiliate Debtors** | Interests in affiliate debtors consist~~s~~ of any other stock, equity security, or ownership interest in any affiliate Debtor.  Under the Plan, interests in affiliate debtors will not be impaired or cancelled by the Plan.<br><br>**Estimated Amount of Interests:    N/A**<br>**Estimated Percentage Recovery:    N/A** |

**THE DEBTORS AND THE CREDITORS' COMMITTEE BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, AS APPLICABLE.  EACH OF THE DEBTORS <u>STRONGLY</u> <u>RECOMMENDS</u> THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.  THE CREDITORS' COMMITTEE ~~AND THE EQUITY COMMITTEE RECOMMEND~~<u>RECOMMENDS</u> THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.**

Notice of Proposed Amendments
October 29, 2007

### B.    Delphi Customer And Supplier Relationships

### *1.    Delphi's Relationship With Its Customers*

Delphi has a strong commitment to its customers and seeks to provide its customers with leading-edge technology and product development, superior engineering, outstanding quality, and world-class customer support.  Although GM remains Delphi's largest single customer, 56% of Delphi's sales in 2006 were to customers other than GM.  That percentage has consistently risen since Delphi's separation from GM in 1999 (the "Separation"), and Delphi's revenue from non-GM business grew from $6.9 billion in 1999 to $14.8 billion in 2006.  In the later years of Delphi's 2007-2011 business plan, it is projected that GM sales will be 24% of Delphi's sales and non-GM sales will comprise 76% of sales.



Notice of Proposed Amendments
October 29, 2007

constructive partner.  GM was also favorably inclined towards Cerberus because of Union support and because of positive experience with Cerberus's involvement with General Motors Acceptance Corporation.  This feedback from GM encouraged the Company that it could complete the transaction, and therefore realize the Transformation Plan and emerge from chapter 11 protection in ~~2007~~the near term.

### D.    Negotiation Of The Framework Agreements

By late November 2006, the Debtors and the Original Investors began working on documenting their agreements.  Prior to that time period, various groups had circulated and commented on draft "term sheets" outlining potential agreements for the framework for a plan of reorganization (the "Framework Agreements") and discussion points related to the Framework Agreements.  Both the Equity Committee and the Creditors' Committee actively reviewed and commented on the "term sheets" and many of their discussion points were incorporated in the Framework Agreements.  After late November and early December 2006, the Creditors' Committee declined to comment further on the Framework Agreements, despite several invitations from the Debtors to do so.  The Equity Committee did continue to comment on the Framework Agreements, and the Debtors continued to carefully evaluate each of its comments.

On December 11, 2006, Delphi's management presented to the Board for approval an investment agreement and plan support agreement.  These agreements were fully negotiated and were the most favorable agreements that management at that time believed it could reasonably achieve under the circumstances through arms-length bargaining.  After a full discussion with the management team and its advisors, the Board approved and authorized the Company to enter into these agreements.  Taking into account the transaction as a whole, including the fact that it could facilitate an emergence from chapter 11 in an orderly fashion and in an acceptable timeframe (of critical importance in preserving the value of the estate), as well as the importance of having GM publicly committed to certain plan framework support agreements, the Debtors concluded that the benefits to the Debtors' Estates of entering into the agreements outweighed the burdens imposed under the agreements.

On December 18, 2006, Delphi announced that it had entered into a Plan Framework Support Agreement (the "PSA") with the Original Investors and GM, which outlined a framework plan of reorganization, including an outline of the proposed financial recovery of the Company's stakeholders and the treatment of certain claims asserted by GM, the resolution of certain pension funding issues, and the corporate governance of Reorganized Delphi. The PSA, as well as the economics and structure of the plan framework itself, was expressly conditioned on reaching consensual agreements with the Unions and GM.

On the same date, the Debtors filed a motion (the "Framework Motion") with the Bankruptcy Court seeking approval of the PSA and an Equity Purchase and Commitment Agreement (the "Original EPCA") among the Company and the Original Investors under the terms and subject to the conditions of which the Original Investors would invest up to $3.4 billion in reorganized Delphi.

approval of the Separation and spin-off, presentations to investors, underwriters, and rating agencies from 1998-1999, documents regarding Delphi's post-separation commercial relationship with GM, SEC filings and analysts' reports, and certain documents produced by GM to the Creditors' Committee pursuant to the Creditors' Committee's prior Rule 2004 motion in the Bankruptcy Court.  The Debtors did not otherwise have access to documents solely within GM's custody and control.

Based on the factual information discovered through their ongoing investigations, the Debtors' professionals analyzed the legal strengths and weaknesses of the GM Claims and Defenses.  Although the Debtors concluded that some of the GM Claims and Defenses are colorable, inasmuch as the known facts may support certain legal causes of action, the Debtors also concluded that other purported claims and causes of action may not be supported by the facts.  Moreover, the Debtors further concluded that for the potential causes of action that may be supported by the facts, GM may have available to it certain substantial complete or partial legal defenses to those claims or causes of action, including, among others, defenses based on applicable statutes of limitations.  Furthermore, as part of the Debtors' overall assessment of the GM Claims and Defenses, the Debtors, through their professionals, also estimated the economic damages that might be recoverable through the GM Claims and Defenses.  Here again, the Debtors determined that, although certain causes of action may give rise to economic damages, GM may also have substantial factual defenses to the recovery of such economic damages.  The Statutory Committees disagree with the Debtors' assertions in this paragraph, although ~~they support~~the Creditors' Committee supports the settlement that the Debtors and GM have reached.

In sum, although the potential economic recovery to the Debtors from the GM Claims and Defenses may be significant in absolute terms, the Debtors have concluded that any such recovery carries with it a risk of significant uncertainty in light of the potential factual and legal defenses available to GM, as well as the inherent risk of uncertainty that would accompany such a substantial litigation matter.  Moreover, the pursuit of the GM Claims and Defenses in a manner adversarial to GM is, without question, mutually exclusive of GM's substantial consensual support of the Debtors' reorganization and transformation efforts as currently contemplated in the Plan, including GM's support for the resolution of Delphi's legacy union labor obligations, as well as GM's support of the Debtors' business through ongoing commercial relationships.  Similarly, the pursuit of the GM Claims and Defenses in a manner adversarial to GM would likely result in litigation that would take years to resolve, during which time the Debtor's ability to exit successfully from its chapter 11 reorganization and operate as a competitive enterprise would be much more uncertain.  Based on all of the Debtors' own investigation and analysis, as well as the input provided by the Debtors' Statutory Committees, it is the Debtors' judgment that the consensual resolution of the GM Claims and Defenses as contemplated in the Plan is in the best interests of the Debtors' Estates and is clearly superior to any alternative under which the Debtors would seek to pursue the GM Claims and Defenses through proceedings adversarial to GM.

Notice of Proposed Amendments
October 29, 2007

### 2.    Global Settlement Agreement And Master Restructuring Agreement With GM

As discussed above, the Debtors and GM have an extensive commercial relationship and an intertwined corporate and organizational history which has given rise to certain alleged claims and causes of action by each of Delphi and GM against the other. Pursuant to the Debtors' Plan, and subject to the requirements of Bankruptcy Rule 9019, the Debtors and GM have determined to settle various disputes and compromise certain claims as provided by two principal agreements: (i) a Global Settlement Agreement, as amended (the "Settlement Agreement") and (ii) a Master Restructuring Agreement, as amended (the "Restructuring Agreement"). Given the scope of their continuing commercial relationship, performance of the obligations set forth in the Settlement Agreement and the Restructuring Agreement is critical to the successful implementation of the Debtors' Transformation Plan and is also vitally important to GM.

The discussions between the Debtors and GM that ultimately led to the terms set forth in the Settlement Agreement and the Restructuring Agreement began shortly after the Debtors filed the GM Contract Rejection Motion. As part of a joint effort to avoid litigation related to the GM Contract Rejection Motion, during the spring and summer of 2006, the Debtors and GM developed the framework for GM's contributions to the Debtors in support of the Transformation Plan and the guiding tenets for strengthening the parties' business relationship to achieve mutually beneficial commercial and strategic objectives, which are reflected in the Settlement Agreement and the Restructuring Agreement.

The Debtors' discussions with GM continued intermittently through April 2007. By May 2007, the parties had agreed on the broad outlines of the Settlement Agreement and the Restructuring Agreement. Throughout the summer of 2007, working groups of specialists in various subject matter areas together with senior management from the Debtors and GM developed comprehensive approaches for addressing a wide range of matters, including the resolution of issues related to the Debtors' pension and retiree benefit plans, the disposition of various legacy agreements between the Debtors and GM, the restructuring of the Debtors' U.S. manufacturing base, and the adoption of guidelines for certain ongoing commercial agreements. The parties exchanged initial drafts of various sections of the Settlement Agreement and the Restructuring Agreement in July 2007 and negotiated specific terms and conditions over the succeeding six weeks. Both the Settlement Agreement and the Restructuring Agreement were substantially complete by the end of August 2007.

The Settlement Agreement addresses primarily those matters for which the Debtors and GM have agreed upon resolutions that can be implemented in the short term. Accordingly, most obligations set forth in the Settlement Agreement are to be performed upon, or as soon as reasonably practicable after, the occurrence of the Effective Date of the Debtors' Plan. By contrast, resolution of most of the matters addressed in the Restructuring Agreement shall require a significantly longer period that shall extend for a number of years after confirmation of the Plan. The principal material terms of the Settlement Agreement and the Restructuring Agreement are described below. In this section, terms

**IAM Releasing Parties, the IBEW Releasing Parties, the IUOE Releasing Parties, and the Non-Represented Employees Releasing Parties.**

(2)    Surviving Claims

The releases provided for in the Settlement Agreement shall not apply to certain Surviving Claims as expressly set forth in the Settlement Agreement and identified as the Delphi Surviving Claims and the GM Surviving Claims.

(3)    ~~Cash~~Consideration To Be ~~Paid To~~Received By GM

The Settlement Agreement provides that, on the Effective Date, and pursuant to the Plan, Delphi shall ~~pay in cash to GM~~ provide the ~~sum of $2,700,000,000. The payments made~~following consideration to GM (collectively, and together with the releases to be provided to the GM Related Parties pursuant to ~~this provision~~the Settlement Agreement, the "Consideration"): (i) $1.5 billion in a combination of at least $750 million in cash and the remainder in a second lien note (the "GM Note") with the amount of such cash and the terms of the GM Note established as set forth in Exhibit F of the Settlement Agreement; provided, however, that terms other than those set forth in Exhibit F of the Settlement Agreement and the form of the GM Note must be satisfactory to GM to the extent that such terms (it being understood that none of the terms on Exhibit F of the Settlement Agreement may be changed without GM's written consent) or form would have a material impact on GM, on the benefits GM reasonably is expected to receive under the Plan (including, without limitation, GM's distributions thereunder), the Restructuring Agreement, or on the ability of the Debtors to fulfill any obligations to any GM-Related Parties under the Plan, the Restructuring Agreement, or any agreements assumed, reinstated, or ratified under the Restructuring Agreement, and (ii) $1.2 billion in junior preferred convertible stock with the terms set forth in Exhibit G of the Settlement Agreement; provided, however, that terms other than those set forth in Exhibit G of the Settlement Agreement and the form of the certificate of designation of the junior preferred convertible stock must be satisfactory to GM to the extent that such terms (it being understood that none of the terms on Exhibit G of the Settlement Agreement may be changed without GM's written consent) or form would have a material impact on GM, on the benefits GM reasonably is expected to receive under the Plan (including, without limitation, GM's distributions thereunder), the Restructuring Agreement, or on the ability of the Debtors to fulfill any obligations to any GM-Related Parties under the Plan, the Restructuring Agreement, or any agreements assumed, reinstated, or ratified under the Restructuring Agreement.

The Consideration to be received by GM under the Settlement Agreement and the survival of the GM Surviving Claims shall be in (i) satisfaction of all claims asserted or assertable under sections 501, 502, 503, 506, and 507 of the Bankruptcy Code or otherwise by the GM-Related Parties against the Debtors in the Chapter 11 Cases, including those asserted in the GM Proof of Claim, and (ii) settlement of the GM Proof of Claim.

(iv)    Implementation

The Settlement Agreement provides that:

DS-73

- the Debtors shall file the Settlement Agreement with the Bankruptcy Court as an exhibit to the Plan;

- within ten days after the Disclosure Statement Approval Date, the Debtors shall withdraw the Section 365 Motion without prejudice; and

- upon approval by the Bankruptcy Court of a Labor MOU with respect to a particular Union, the Debtors shall withdraw, without prejudice, the 1113/1114 Motion solely with respect to such Union.  (By order entered September 4, 2007, the 1113/1114 Motion has been withdrawn without prejudice with respect to all of the Unions.)

(v)    Conditions To Effectiveness

The provisions of the Settlement Agreement, except for the implementation provisions described above (which became effective upon execution of the Settlement Agreement), shall become effective upon the occurrence of certain events unless waived by consent of the Debtors and GM, including the following:

- all Unions shall have ratified their respective Labor MOUs, and the Bankruptcy Court enters orders in form and substance satisfactory to Delphi, GM, and the applicable Union approving such MOUs, which orders become Final Orders;

- the Bankruptcy Court shall have approved the Settlement Agreement in the Confirmation Order, which approval shall be in form and substance satisfactory to the Parties, in connection with confirmation of the Plan and such order shall have become a Final Order;

- to the extent that the terms of any of the following would have a material impact on GM, on the benefits GM reasonably is expected to receive under the Plan (including, without limitation, ~~GM's~~GM's distributions thereunder), the Restructuring Agreement, or the Settlement Agreement, or on the ability of any Debtors to fulfill any obligations to any GM-Related Parties under the Plan, the Restructuring Agreement, the Settlement Agreement, or any agreements assumed, reinstated, or ratified under the Restructuring Agreement, GM shall have consented in writing to any and all of the following:  (1) amendments, supplements, or other modifications to the Plan; (2) (i) any exhibits or other attachments to the Plan, (ii) any documents or instruments incorporated by reference or otherwise into the Plan or into any exhibits or other attachments thereto, and (iii) any and all amendments, supplements, or other modifications to any of the exhibits, attachments, documents, or instruments described in clauses (i) or (ii) of this sentence; and (3) the proposed Confirmation Order and any and all amendments, supplements, or other modifications thereto; provided, however, that GM shall provide written notice to Delphi of which item described in clauses (1) through (3) of this sentence required ~~GM's~~GM's consent pursuant to this sentence but was withheld, and Delphi may seek resolution by the Bankruptcy Court of whether ~~GM's~~GM's consent was so

required; provided further, however, that the Parties agree that, among other things, any increase in the amount of distributions (or change in the form of distributions) to holders of claims or equity interests under the Plan, any change in any of the provisions of section 4.01, 4.02, or 4.03 of the Settlement Agreement, or any change in the identity of the Plan Investors other than as permitted by the EPCA shall be deemed for purposes of Articles VI and VII of the Settlement Agreement to have a material impact on GM, on the benefits that GM is expected to receive under the Plan, the Restructuring Agreement, and the Settlement Agreement, and on the ability of the Debtors to fulfill obligations to GM-Related Parties under the Plan, the Restructuring Agreement, the Settlement Agreement, and agreements assumed, reinstated, or ratified under the Restructuring Agreement; and

- the Effective Date shall have occurred and GM shall have received ~~a cash payment in~~ the ~~amount of $2,700,000,000 under the Plan~~Consideration;

provided, however, that no statute, rule, or regulation or order, judgment, or decree of any court or administrative agency or other governmental entity is in effect which prohibits the consummation of one or more of the transactions to be consummated under the Settlement Agreement, unless such transaction is severed pursuant to the Settlement Agreement; provided further, however, that the substantial majority of all assets, whether real or personal, used to produce any products pursuant to GM Purchase Orders shall be owned or leased by DAS (other than tooling owned by GM) and all obligations pursuant to the GM Purchase Orders shall be the responsibility of DAS.  GM irrevocably consents to the performance of the GM Purchase Orders by DAS and any Delphi-Related Party that is directly or indirectly wholly-owned by Delphi, as directed by DAS; provided, however, that any change of the location of production shall require GM's prior written consent. Regardless of whether the transaction is severed, the Debtors and GM shall use reasonable efforts to prevent the entry of, and to appeal promptly, any injunction or other order prohibiting one or more of the transactions to be consummated under the Settlement Agreement.

(vi)    Selected Miscellaneous Provisions

(1)    Termination

The Settlement Agreement may be terminated and the transactions contemplated thereby may be abandoned as follows:

- by mutual written consent of both Delphi and GM;

- by GM if Delphi files with, or presents to, the Bankruptcy Court without GM's prior written consent any of the following, but only to the extent that any of the following would have a material impact on GM, on the benefits GM reasonably is expected to receive under the Plan (including, without limitation, GM's distributions thereunder), the Restructuring Agreement, or the Settlement Agreement, or on the ability of any Debtors to fulfill any obligations to any GM-Related Parties under the Plan, the Restructuring Agreement, the

DS-75

Settlement Agreement, or any agreements assumed, reinstated, or ratified under the Restructuring Agreement: (i) amendments, supplements, or other modifications to the Plan; (ii) exhibits or other attachments to the Plan, or any amendments, supplements, or other modifications thereto; or (iii) the proposed Confirmation Order or any amendments, supplements, or other modifications thereto; provided, however, that GM shall provide Delphi with written notice of its intent to terminate the Settlement Agreement pursuant to section 7.03(b) of the Settlement Agreement, which notice shall indicate which item described in clauses (i) through (iii) of this sentence is the basis for GM's intent to terminate the Settlement Agreement pursuant to section 7.03(b) of the Settlement Agreement; provided further, however, that Delphi shall have 30 days from the provision of such notice to (x) withdraw or amend such item in a manner that no longer gives rise to GM's termination right in respect of such item before GM may actually terminate the Settlement Agreement and/or (y) obtain a determination by the Bankruptcy Court that GM does not have a right to terminate the Settlement Agreement pursuant to section 7.03(b) of the Settlement Agreement;

- by GM if (i) any of the Chapter 11 Cases is converted into a case under chapter 7 of the Bankruptcy Code or (ii) a trustee is appointed pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

- by either Delphi or GM if the Effective Date has not occurred by March 31, 2008 or, if the EPCA has not been terminated by such date, the first to occur of the termination of the EPCA or April 30, 2008; or

- by GM if it ~~has~~shall not ~~have~~ received ~~a cash payment in~~ the ~~amount of $2,700,000,000 under the Plan~~Consideration by March 31, 2008 or, if the EPCA has not been terminated by such date, the first to occur of the termination of the EPCA or April 30, 2008.

(2)    Governing Law; Jurisdiction; Venue

The Settlement Agreement shall be governed and construed in accordance with the internal laws of the State of New York, the forum state in which the Bankruptcy Court sits, without regard to any conflict of law provision that could require the application of the law of any other jurisdiction. Pursuant to the Plan and the Confirmation Order, the Settlement Agreement is incorporated by reference in its entirety into the Plan and forms an integral part thereof. Accordingly, by its execution and delivery of the Settlement Agreement, each Party has irrevocably and unconditionally agreed that the Bankruptcy Court shall retain exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of the Settlement Agreement and the Restructuring Agreement; provided, however, that the Bankruptcy Court shall not have jurisdiction over (i) disputes arising out of the provisions set forth in Article III of the Restructuring Agreement or the agreements referenced in sections 5.01(c) and (d) of the Restructuring Agreement, or (ii) disputes arising out of agreements between any Delphi-Affiliate Party on the one hand and GM or any of its Affiliates on the other in which disputes no Delphi-Related Party has an interest;

DS-76

and <u>provided</u> <u>further</u> that after the second anniversary of the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters related to the construction, interpretation, or enforcement of the Settlement Agreement and the Restructuring Agreement; and <u>provided</u> <u>further</u> that the jurisdiction of the Bankruptcy Court over all matters related to the Settlement Agreement and the Restructuring Agreement shall terminate upon the fourth anniversary of the Effective Date. Furthermore, each Party agrees to waive any objection based on forum non conveniens.

(3)    Dispute Resolution

In the event a Settlement Dispute arises among the Parties, upon the written request of either Party, such Settlement Dispute shall be referred to the Director of Business Development at GM and the Finance Director of Automotive Holdings Group or the Director, Strategic Planning at Delphi (at Delphi's discretion) for resolution in good faith. In the event that GM's Director of Business Development and Delphi's Finance Director of Automotive Holdings Group or the Director, Strategic Planning are unable to resolve such dispute, such Settlement Dispute shall be referred, at either Party's written request, to the Assistant Treasurer of GM and the Assistant Treasurer or Treasurer of Delphi (at Delphi's discretion). If within ten days after such referral, GM's Assistant Treasurer and Delphi's Assistant Treasurer or Treasurer are unable to resolve the Settlement Dispute, the Settlement Dispute may be elevated by either Party to GM's Treasurer or Chief Financial Officer (at GM's discretion) and Delphi's Chief Executive Officer or Chief Financial Officer (at Delphi's discretion) for resolution. To the extent that the job title of any of the foregoing positions is changed, this provision shall be deemed to apply to such successor title or, if the position is eliminated or vacated, to the job title of the party taking over the responsibility of the eliminated or vacated position.

(4)    <u>Effects Of Plan And EPCA Amendments</u>

Notwithstanding anything contained in the Settlement Agreement, the Parties agree that amendments to be made to the Plan or the Investment Agreement in the form (other than immaterial and non-substantive changes) of the drafts of the amendment to the Plan filed with the Bankruptcy Court on October 29, 2007 and the Investment Agreement amendment filed with the Bankruptcy Court on October 29, 2007, shall not result in the non-satisfaction of the condition set forth in Section 6.01(c) of the Settlement Agreement or in the triggering of the termination right set forth in Section 7.03(b) of the Settlement Agreement.

(b)    <u>Master Restructuring Agreement</u>

The Restructuring Agreement is intended to govern certain aspects of Delphi and GM's commercial relationship following the Effective Date. The Restructuring Agreement addresses, among other things, the scope of GM's existing and future business awards to Delphi and related pricing agreements and sourcing arrangements, GM commitments with respect to reimbursement of specified ongoing labor costs, the disposition of certain Delphi facilities, and the treatment of existing agreements between Delphi and GM.

- The settlement of a social plan in the "Concurso," or Spanish insolvency proceeding, of Delphi Automotive Systems Espana S.L., the funding of which was approved by the Bankruptcy Court on July 19, 2007 and approved by the Spanish Concurso court on July 31, 2007;

- The sale of the brake components business, including a manufacturing plant in Saltillo, Mexico, to Robert Bosch LLC and its affiliate Frenados Mexicanos, S.A. de C.V., which was approved by the Bankruptcy Court on July 19, 2007;

- The sale of the brake hose manufacturing business in Dayton, Ohio to Harco Manufacturing Group, LLC, which was effective September 28, 2007; and

- The sale of the Company's original equipment and aftermarket catalyst business (the "Catalyst Business") to Umicore ("Umicore"), which was ~~approved by the Bankruptcy Court on August 16, 2007; and~~ effective September 30, 2007.

In addition, on April 30, 2007, the Debtors closed a transaction whereby an investor purchased and leased to the Debtors a facility comprised of 347,800 square feet of office space and 90,000 square feet of lab space situated on approximately 35 acres located in Auburn Hills, Michigan.  Through this transaction, the Debtors expect to obtain significant economic advantages from the consolidation of six leased and owned facilities in Michigan and Illinois, and possibly other facilities over the next few years.  The Debtors expect that this transaction will create a single, state-of-the-art technical center located in close proximity to the Debtors' major customers, accelerate the development of new products and innovations, foster better communications among employees, and properly project Delphi's image of technical and technological excellence.  The Debtors further believe that the consolidated facility will facilitate creative dialogue among diverse groups and teams at Delphi, and that this dialogue will spark new innovation that will enable the Debtors to gain an edge on competitors in the industry.

In furtherance of the product portfolio and manufacturing footprint transformation, as an important aspect of the settlements reached with Delphi's Unions, certain provisions in the labor agreements that precluded Delphi from selling or closing facilities that did not figure into Delphi's planned core business operations were removed or modified.  In anticipation of reaching these settlements with its Unions, Delphi has been preparing for the sale of Delphi's Steering, Interiors and Closures, and Wheel Bearing businesses, and the Company's business plan reflects the short-term reduction in revenue from divested businesses as well as the increased efficiency that will ultimately result from Delphi's focus on its core businesses.  In completing the realignment of its product portfolio, Delphi will continue to work diligently to assure that the transformation is seamless and transparent and that quality, delivery, and customer satisfaction are not negatively impacted.

**H.    Cost Structure Transformation**

As part of its organizational restructuring, the fourth element of Delphi's Transformation Plan, the Company expects to reduce its global salaried workforce by as

*2.*    ***Salaried Employee Compensation Program***

2.(a)    Competitively Benchmarked Salaried Employee Compensation Program – Introduction – Compensation Committee Philosophy and Strategy Statement

The One of the fundamental tenets of the Company's transformation plan has been to become competitive in every aspect of its business including both hourly and salaried compensation programs.  To meet that objective with respect to the Company's salaried employee compensation program, the Company has also developed a competitively benchmarked executive and non-executive compensation program consistent with the requirements of the Plan Investors.

The Investment Agreementprograms.  For purposes of this section, "senior management" means those global employees in Bands A through F, as defined below,well as the Delphi Strategy Board ("DSB").  This group comprises about 560 such employees and the Delphi Strategy Board is comprised of the Delphi's 21 top policy-making decision makers (each, a "DSB Member").

A competitively benchmarked salaried executive compensation program is also required under Section 9(a)(xxi) of the Investment Agreement which provides that the Company must"shall enter into employment agreements and other compensation arrangements with senior management relating to compensation, benefits, supplemental retirement benefits, stock options and restricted stock awards, severance and change in control provisions, and other benefits on market terms (as determined by Delphi's Compensation Committee) based on the advice of Watson Wyatt Worldwide, Inc. (an independent outside advisor to the Compensation Committee) and reasonably acceptable to ADAH.  Delphi is also obligated under Exhibit D to the ."  In September 2007, ADAH informed Delphi that the Company's salaried executive compensation program complied with the requirements of the Investment Agreement to consultand was acceptable to ADAH.  While Delphi has also consulted with the Creditors' Committee regarding these competitively benchmarked compensation programs. as required by the Investment Agreement, the Creditors' Committee is not required to approve or endorse these programs and has not done so.  The Plan constitutes a request to authorize and approve the competitively benchmarked compensation programs.

These programs have been developed under the supervision of Delphi's Compensation CommitteeCommittee which consists of three independent directors who joined the board since 2005.Board of Directors within the last three years:

| Name | Position | Term On Board |
|---|---|---|
| Craig G. Naylor | Chairman of the Compensation Committee | Since 2005 |
| John D. Englar | Member of the Compensation Committee | Since 2006 |
| Raymond J. Milchovich | Member of the Compensation Committee | Since 2005 |

Notice of Proposed Amendments
October 29, 2007

For an employee who enters into a new employment, retirement, indemnification, and other agreement with the Debtors or Reorganized Debtors to obtain the benefits of such agreements, the employee must contractually waive and release any claims arising from pre-existing employment, retirement, indemnification, or other agreement.

Since September, 2006, the Compensation Committee of the Board of Directors has met more than 20 times to thoroughly discuss, review, and ultimately recommend for approval the term of the executive compensation and executive benefit programs, including the Employment and Change in Control agreements to be signed by each Delphi Strategy Board member officer.

In designing the executive compensation components for the newly restructured company, the Compensation Committee developed a compensation philosophy and strategy that is summarized as follows:

- Provide median total direct compensation (salary plus at risk short and long-term incentives)

Since September, 2006, the Compensation Committee has met more than 20 times to thoroughly discuss, review and refine the executive compensation and executive benefit programs.  These programs require written employment and change in control agreements to be signed by each DSB Member and short-form agreements to be signed by the remainder of the Company's executives.  These agreements are required to be signed and delivered to the Company in order for an executive to participate in the post-emergence salaried executive compensation program.

Among other matters, both the longer-form DSB agreements and the short-form agreements for other executives include voluntary waivers of claims against the Company as of the Effective Date by each executive with respect to all compensation and benefit related claims against the Company existing under prior programs.  In the case of DSB members, these waivers will include waivers of the prepetition "Change in Control Agreements."  As discussed below, the aggregate change in control liabilities arising under the prepetition Change in Control Agreements are potentially substantial.  If all participants were to successfully assert claims under the Change in Control Agreements, the resulting liability could total as much as $257.5 million.  All Change in Control Agreements are listed on Plan Exhibit 8.1(a), and will be rejected pursuant to the Plan.  Accordingly, the Company's implementation of the new competitively benchmarked salaried executive compensation programs will not only fulfill the Company's transformation objective of achieving competitive salaried compensation programs but will also benefit the Company and its stakeholders by eliminating up to $257.5 million of potential prepetition claims from the Company's unsecured claims pool.

In designing the executive compensation components for the reorganized Delphi, the Compensation Committee is committed to delivering a total compensation program for salaried executive employees that supports Delphi's business and people strategies and aligns with the interests of Delphi's key stakeholders.  In particular, the Compensation Committee believes that Delphi must provide a target total reward opportunity sufficient to attract and retain high-caliber executives who can effectively manage Delphi's complex

Notice of Proposed Amendments
October 29, 2007

global businesses, taking into account the competitive marketplace, as well as each executive's experience and performance.  In general, this involves developing and adjusting, in conjunction with the Compensation Committee's independent compensation consultant, a target pay structure that provides median total direct compensation opportunity at planned levels of performance and total direct compensation opportunity which can be above the median when Delphi achieves performance that exceeds the plan. In this regard, the Compensation Committee assesses both total direct compensation, which is the sum of salary plus annual incentive opportunity plus long-term incentive opportunity, and total compensation, which includes other aspects of pay, including retirement benefits.  Market total direct compensation comparisons for the members of the DSB were developed from proxy data from a comparable group of large, diversified companies, as well as from manufacturing and auto industry survey data.  Market total direct compensation comparisons for non-DSB executives were developed from survey data only

Other material elements of the Compensation Committee's philosophy and strategy can be summarized as follows:

- Link the majority of the total compensation opportunities to performance-based incentives and the creation of shareholder value consistent with Delphi's long-term strategic goals
- Make stock-based incentives a core element of executives' compensation including stock holding requirements for senior executives
- Provide flexibility to recognize, differentiate, and reward individual performance

Delphi will supplement the Plan through the filing of Exhibit 7.8 by the Plan Exhibit Filing Date following approval by ADAH and consultation with the Creditors' Committee.

Exhibit 7.8 of the Plan includes the full compensation philosophy statement adopted by the Compensation Committee, summaries of the major elements of the post-emergence compensation program (described in summary below) and the form employment and change in control agreements to be executed by DSB members (although the Company anticipates that the employment agreements for the new post-Effective Date Executive Chairman, the President and Chief Executive Officer and the Executive Vice President and Chief Financial Officer will also include terms and conditions customary for such agreements.)  The documents included in Exhibit 7.8 of the Plan have been approved by ADAH under the Investment Agreement.

(b)    Competitively Benchmarked Salaried Employee Compensation Program – Summary of Emergence Date Payments and the Post-Emergence Salaried Executive Compensation Program

The following describes each component of the new compensation and benefit arrangements for senior management.  The compensation and benefit arrangements have

been structured based on market median; market for the DSB Members is determined by reference to 18 peer companies.  The peer companies which represent a cross-section of companies similar to Delphi and/or with whom Delphi competes for executive talent are TRW Automotive Holdings Corp., Visteon Corp., Parker-Hannifin Corp., Federal Mogul, and BorgWarner Inc., Pepsico Inc., Kraft Foods Inc., Johnson Controls Inc., Honeywell International Inc., Best Buy Co Inc., Du Pont (E I) De Nemours, Coca-Cola Co., 3M Co., International Paper Co., Ratheon Co., Goodyear Tire & Rubber Co., Lear Corp. and Kimberly-Clark Corp.  Market for employees in Bands A through F market is determined through the use of relevant survey data.

(i)     Claims Release Process

For an executive who enters into a new employment, retirement, indemnification, and other agreement with the Debtors or Reorganized Debtors to obtain the benefits of such agreements, the executive must contractually waive and release any claims arising from pre-existing employment, retirement, indemnification, or other agreements.  As a condition to entering into new employment, change-in-control, indemnification or other employment-related agreements and/or becoming eligible to participate in certain new compensation and benefit arrangements, including the new supplemental executive retirement program, certain employees must contractually waive and release any claims arising from prepetition commitments, including pre-existing employment, change-in-control, indemnification or any other employment-related agreements and/or benefits under certain compensation and benefit arrangements.  For non-DSB members, Delphi will enter into short-form agreements that will describe the Emergence Date and post-Emergence Date payments and compensation program benefits available to an executive and will also implement the claims waiver discussed herein.

(ii)     Executive Employment Agreements

For DSB Members, Delphi will enter into new employment agreements with each DSB Member that generally provide that the executive will serve in an executive position reasonably consistent with his or her current position and at the executive's current work location (although the executive can be relocated in connection with the relocation of his or her principal business unit).  The employment agreements will become effective on the consummation of the Plan and will continue through December 31, 2010.  The agreements will automatically renew each January 1st commencing on January 1, 2011 for additional one-year terms unless either party gives 60 days' advance written notice of non-renewal.  The executive will receive a base salary at an annual rate equal to his or her current salary, which will be subject to annual review and increase and which may not be reduced except pursuant to across-the-board salary reductions.  In addition, the executive will be eligible to participate in short-term incentive plans and long-term incentive plans at levels comparable to similarly situated executives and to participate in all employee benefit plans and arrangements made available by Delphi to similarly situated executives, including supplemental executive retirement programs.

An executive will be entitled to severance if Delphi terminates the executive's employment without "Cause" or the executive resigns for "Good Reason."  Under the employment agreement "Cause" includes any of the following actions (if not cured by the

DS-100

executive within ten business days of the receipt of written notice thereof ): (i) continued failure by the executive to satisfactorily perform his/her duties, (ii) willful misconduct or gross negligence, (iii) the commission of a felony or of a misdemeanor involving moral turpitude, (iv) the commission of an act involving dishonesty that results in harm to the Company, or (v) a material breach of the employment agreement.  "Good Reason" under the terms of the employment agreement means an event constituting a material breach of the employment agreement and includes: (i) the assignment to the executive either of duties materially inconsistent with his status or substantially adversely different in nature or status (but ceasing to be a publicly-held corporation will not constitute Good Reason), (ii) a reduction in the executive's base salary or a material reduction in the executive's incentive compensation (except for an across-the-board reduction affecting all executives), (iii) the relocation of the executive's principal place of employment more than 25 miles from its current location (unless the relocation is of the executive's business unit or is due to the executive's transfer to a position that the Company believes in good faith will enhance the executive's career opportunities), or (iv) the Company's failure to pay the executive any current or deferred compensation within seven days of its due date.  For DSB members, the severance package that the executive will receive is:

- 18 months' base salary and 18 months' short term incentive target paid over an 18 month period;
- a lump sum cash payment of any unvested amounts credited to the executive's accounts under the Company's tax-qualified and/or nonqualified supplemental or excess defined contribution plans; and
- vesting acceleration on service-based equity awards.

Receipt of the foregoing severance is conditioned on the executive's execution of a release of claims in favor of Delphi and on the executive's compliance with a perpetual non-disclosure provision, an invention assignment provision, an 18-month non-competition provision and an 18-month non-solicitation provision (covering customers and employees).  The aggregate amount of severance, if, in the unlikely event, all 441 U.S.-based DSB Members and Bands A through F were terminated by the Company without Cause, is estimated to be approximately $125 million (the aggregate severance for the Company's non-U.S.-based employees has not been estimated).

(iii)    Short-Term Incentive Plan

The purpose of the Short-Term Incentive Plan is to motivate and reward performance and provide incentives based upon business metrics to those employees who contribute to the success of Delphi.  Target award and required performance levels are established by the Compensation Committee before the commencement or within the first 25% of the performance period, including minimum and maximum award and performance levels.  Assuming that the Effective Date occurs prior to March 1, 2008, the Compensation Committee of Reorganized Delphi will be establishing award and performance levels for the 2008 fiscal year and beyond.  Awards are based on specified measures, including but not limited to return on assets, return on equity, working capital, total stockholder return, cash flow, net income, and earnings per share.

Notice of Proposed Amendments
October 29, 2007

Final awards will be based on the performance achieved versus the goals established at the beginning of the period. The Compensation Committee may adjust the awards upward or downward. Although adjustments to the final performance award may be made based on individual performance, adjustments to awards issued to a "covered officer" (an individual whose compensation falls under section 162(m) of the Internal Revenue Code) may only be made to reduce, not increase, an award. No award to a "covered officer" will be paid unless the performance is certified by the Compensation Committee.

Receipt of an award is conditioned on continued employment with the Company. If before the end of any performance period an executive quits or is dismissed for cause, the executive will not be eligible to receive a final award. If employment terminates because of death, retirement, permanent disability, or other terminations approved by the Compensation Committee, the Compensation Committee may waive the requirement of continued employment and pay a reduced award based on a partial year's employment. On the effective date of any change in control, all awards will be paid on a pro-rata basis based on the greater of the target award or actual performance.

The Compensation Committee has the right to amend, modify, suspend, or terminate the Short-Term Incentive Plan although such actions may give rise to certain payment and other rights under executive employment agreements. Any such actions that would result in the Short-Term Incentive Plan becoming reduced in value or unavailable to its participants could result in the departure of plan participants from the Company and could impair Delphi's ability to attract and retain high-caliber executives who can effectively manage Delphi's complex global businesses, taking into account the competitive marketplace, as well as each executive's experience and performance. Stockholder approval, however, is required for certain amendments to preserve the exemption of awards granted under the Short-Term Incentive Plan from the limitations on deductibility of section 162(m) of the IRC. The aggregate annual short-term incentive opportunity for all DSB Members and Bands A through F (approximately 560 executives worldwide) at target is estimated to be approximately $46 million.

(iv)    Long-Term Incentive Plan

The purpose of the Long-Term Incentive Plan is to provide incentive award programs to attract and retain exceptional employees, to align such employees with the long-term strategies of the Company and to best align the employee interests with those of the Delphi's stockholders.

The Long-Term Incentive Plan allows for the grant of various awards, including stock options, stock appreciation rights ("SARs"), restricted stock, and restricted stock units. Options granted may be either non-qualified stock options or incentive stock options ("ISOs"). ISOs are intended to qualify as "incentive stock options" within the meaning of section 422 of the IRC. The exercise price of a SAR or an option must be equal to or greater than the fair market value of the Company's common stock on the date of grant and the term of any SAR or option may not exceed ten years.

DS-102

The Compensation Committee has the authority to determine the terms and conditions of exercise, including vesting and any additional Company or individual performance-based conditions, of all equity awards granted under the Long-Term Incentive Plan.  Awards of stock options and SARs are limited to an annual individual maximum of 1,000,000 shares and awards of restricted stock and restricted stock units are limited to an annual individual maximum of 500,000 shares.  The Long-Term Incentive Plan also provides for the grant of performance-based cash awards.

Performance levels are established by the Compensation Committee during the first 25% of the performance period.  It is anticipated that the Compensation Committee of Reorganized Delphi will be establishing performance levels for the long-term incentive program.  The Compensation Committee may adjust the awards upward or downward.  (Adjustments to awards issued to a "covered officer" (as defined under section 162(m) of the IRC) may only be made to reduce, not increase, an award.  No award to a "covered officer" will be paid unless the performance is certified by the Compensation Committee.)  Generally, awards are cancelled when an employee quits or is dismissed for any reason before the first anniversary of the grant date.  In the case of retirement more than one year after the grant date, an employee may retain his or her stock options and SARs until the earlier of their expiration date or five years from the employee's retirement date.  Upon an employee's death or permanent disability more than one year after the grant date, the employee's options and SARs will remain outstanding until the earlier of their expiration date or three years from the date of the employee's death or permanent disability.

Awards of restricted stock and restricted stock units will vest immediately upon an employee's retirement, permanent disability, or death more than one year after the grant date, although cash performance awards may be pro-rated based on the number of eligible months the employee was employed over the total award period.  Any employee or former employee who engages in misconduct before the second anniversary of his or her termination of employment will be required to forfeit outstanding awards, forfeit the right to receive any future awards, and repay any amounts received in connection with previous awards, including any profits realized on the sale of company stock received pursuant to an award.

The Compensation Committee has the right to amend, modify, suspend or terminate the Long-Term Incentive Plan although such actions may give rise to certain payment and other rights under executive employment agreements.  Any such actions that would result in the Long-Term Incentive Plan becoming reduced in value or unavailable to its participants could result in the departure of plan participants from the Company and could impair Delphi's ability to attract and retain high-caliber executives who can effectively manage Delphi's complex global businesses, taking into account the competitive marketplace, as well as each executive's experience and performance.  Stockholder approval, however, is required to (i) increase the maximum number of shares of common stock for which awards may be granted, (ii) grant options or SARs at a discount, (iii) permit exercise of an option or SAR without full payment at the time of exercise, (iv) extend the exercise period of an option or a SAR, (v) make an award to non-employees, (vi) re-price any outstanding option or SAR or cancel and re-grant an option or SAR with a lower exercise price, (vii) increase the annual individual limit on cash awards, or (viii)

Notice of Proposed Amendments
October 29, 2007

grant any award after the Long-Term Incentive Plan's expiration date.  In the event of any merger, reorganization, consolidation, recapitalization, stock dividend, or other change in corporate structure affecting the Delphi's common stock, the Compensation Committee may adjust the share reserve, the individual award limits, or the number and exercise price of shares of common stock subject to outstanding awards granted under the Long-Term Incentive Plan.

Upon a change in control, all outstanding time-based equity awards will vest.  In addition, it is contemplated that any performance-based equity awards will vest upon a sale of more than 50% of the Company's then-outstanding shares or upon a sale of all or substantially all of the assets of the Company if certain targets relating to internal rate of return are achieved in connection with such sale.  Any performance-based cash awards will be paid on a pro-rata basis based on the greater of the target award and actual performance.  If upon a change in control the consideration paid to holders of shares of the Delphi's common stock is solely cash, the Compensation Committee may provide that each award will be cancelled in exchange for a cash payment.

The initial target grant of equity under the Long-Term Incentive Plan will be awarded for Bands A through C in stock options, shares of restricted stock, cash or a combination thereof and for Bands D and above, including DSB Members, one-half in shares of restricted stock and the other half in stock options.  Further, one-half of the restricted stock and options awarded will be time-vested and one-half will be performance-vested.  The initial target grant will cover an 18-month period where no further awards will be made during this time (other than for an executive's promotion).  For certain executives, the initial target grant of equity will be supplemented with an additional one-time grant of equity awards to maintain their overall compensation levels at the median of competitive market practice considering the modifications being made to the supplemental retirement plans (as discussed under the New SERP and Salaried Retirement Equalization Savings Program sections below).  The estimated lifetime total value of the supplemental retirement grants is expected to be approximately $11.5 million.  The aggregate long-term incentive opportunity, on an annualized basis, for all DSB Members and Bands A through F is estimated to be approximately $80 million.  This amount represents the total estimated value of the service-vested equity awards and performance-based equity awards, assuming target performance levels are achieved.  As agreed as between Delphi and ADAH, the long-term incentive plan assumes that 10% of the available shares of Delphi's fully diluted common stock will be reserved for future annual grants to executives, including but not limited to the initial target grant of equity.  The initial target grant of equity that will be made as of the Effective Date is expected to constitute approximately 3% of the available shares of Delphi's fully diluted common stock.

(v)    Chapter 11 Effective Date Executive Payments

As part of the overall total compensation program approved in 2005 by the Compensation Committee for DSB Members and in Bands A through F, the Company determined that long-term incentive performance opportunities should be paid on the Effective Date of the Plan in an amount equivalent to approximately 80% of an individual employees' 2004 long-term incentive performance target (as subsequently adjusted in

some cases by the Compensation Committee) for a period equivalent to 18 months even if the chapter 11 reorganization took longer than 18 months to complete. (The Debtors currently estimate the period from the Filing Date to the Effective Date to be approximately 28 months.)

During the chapter 11 cases, certain outstanding long-term incentive awards that were granted pre-petition with post-petition vesting cycles were thereafter cancelled and executives were not awarded any new grants during the post-petition period. In addition, the Debtors determined during the chapter 11 cases not to seek separate approval by the Bankruptcy Court for this element of the salaried executive compensation program but to instead incorporate the program into the Plan as part of the Plan confirmation process. The Company also expects to make an Effective Date payment to the Company's Executive Chairman (who does not participate in this or any other incentive compensation program) as determined by the Compensation Committee prior to the Effective Date.

Pursuant to Emergence Date performance payment program, cash payments made on the Effective Date would generally be equivalent to one-third of the annualized value of an executive's prepetition awards that were cancelled and the awards not granted during the post-petition period (subject to adjustment by the Compensation Committee based on individual performance). The aggregate payments under this program are estimated to be approximately $34 million on an annualized basis for the duration of the chapter 11 cases (or approximately $78 million in the aggregate). Even with these cash payments, total executive compensation at Delphi for the duration of the chapter 11 cases will have fallen materially below competitive practice as demonstrated in the following charts:



Notice of Proposed Amendments
October 29, 2007

(vi)    Retirement Program for Executives

A new Retirement Program for executives will be implemented, consisting of two parts, (1) a "New SERP", which consists of the traditional Supplemental Executive Retirement Program that will be frozen in early 2008 in connection with Delphi's emergence from chapter 11 and which applies to past service and (2) the Salaried Retirement Equalization Savings Program, which is a new nonqualified defined contribution plan that will apply to future service.

(1)    Supplemental Executive Retirement Program

The Supplemental Executive Retirement Program (the "New SERP") will be an unfunded, nonqualified benefit plan.  The New SERP is closed to new participants.  To be eligible to receive a benefit under the New SERP, an executive employee must be a regular executive employee at retirement, and have at least ten years of service and be 55 years old at retirement.  In addition, an executive employee otherwise eligible to participate in the New SERP will be entitled to a benefit under the New SERP if he or she is involuntarily separated from service without cause (or if he or she has entered into an employment agreement with the Company, leaves for Good Reason) and has at least five years of service with the Company.  In such cases, payment of the benefit will then be deferred until he or she is at least 55 years old.  For a period of two years following separation from employment, any retired executive employee entitled to receive a benefit under the New SERP may not compete with the Company without the Company's consent.

Benefits under the New SERP are paid under either the Regular Formula or the Alternative Formula.  The Regular Formula provides a benefit equal to 2% of the executive employee's average monthly base salary multiplied by the executive employee's total years of Delphi Retirement Program for Salaried Employees ("SRP") Part B and Part C service less the sum of (i) the unreduced monthly SRP pension benefits to which the executive employee is entitled and (ii) 2% multiplied by the maximum allowable social security benefit multiplied by the total of the executive's SRP Part A and Part C service as of the Effective Date.  The Alternative Formula provides a benefit equal to 1.5% of the executive employee's average monthly base salary plus average monthly annual incentive compensation multiplied by the executive employee's total years of SRP Part B and Part C service (capped at 35 years) less the sum of (i) the unreduced monthly SRP benefits to which the executive employee is entitled and (ii) the maximum allowable social security benefit.  However calculated, benefit amounts will be reduced for early retirement before age 62.  Following the date of the freeze, no additional years of credited service, base salary increases or incentive compensation awards will be used in the calculation of the benefit under the New SERP.

Benefits under the New SERP are paid as a five-year annuity beginning on the later of (i) the first day of the month at least 15 days after the employee's separation from service and (ii) the first day of the first month following the employee's 55th birthday, except that any payment to a "specified employee" (as defined under section 409A of the Internal Revenue Code) will be delayed to the extent required thereunder.  Death benefits are paid in a lump sum to the spouse and/or beneficiary of an executive employee who was eligible

DS-106

for benefits under the plan at the time of his or her death.  Benefits under the New SERP may be reduced by any amounts owed by the employee to the Company.

        (2)     Salaried Retirement Equalization Savings Program

The Salaried Retirement Equalization Savings Program is a funded plan, prospectively replacing the pre-existing supplemental retirement programs and maintained primarily for the purpose of providing deferred compensation to certain executives, managers, and other highly compensated employees of the Company.  The purpose of the Salaried Retirement Equalization Savings Program is to supplement the Company's qualified defined contribution savings plan (currently known as the S-SPP) and allow Company nonelective contributions and matching contributions to be made into a nonqualified defined contribution savings plan in situations where legal limitations under the S-SPP have been reached.  A participant will vest in his or her employer and matching contributions as set forth in the adoption agreement.  A participant is always 100% vested in the amounts credited to his or her account that are attributable to participant deferrals.

Distributions from a participant's account will be made according to elections, made or deemed made by, the participant, except that distributions to "specified employees" (as defined under section 409A of the IRC) will not be made before a date that is six months after the specified employee's separation from service.  A participant may elect at least 12 months before a scheduled distribution event to delay the payment date for a minimum of five years from the original payment date, as well as to change the form of payment of any amounts subject to a deferral election.  A participant who experiences a separation from service before retirement will receive the vested amount credited to his or her account in a single lump sum.  Delphi also has the ability to delay payments due to a participant under the plan if it reasonably anticipates that its deduction with respect to such payment would be limited or restricted under section 162(m) of the IRC or the employer reasonably anticipates that the payment will violate the terms of a loan agreement or other similar contract.

In the event of a change in control, the Company may terminate the plan and distribute all amounts credited to participant accounts within 30 days before or 12 months after the change of control (provided that all substantially similar arrangements are also terminated).  In the event of a change of control, the participant will receive the vested amount credited to his or her account in a lump sum.  The Company also may terminate the plan if all substantially similar arrangements are terminated, no payments (except required payments) are made within 12 months after termination, all payments are made within 24 months after termination, and the employer does not adopt a new substantially similar arrangement within five years following termination.

        (vii)     Change In Control Agreements

Effective on the Effective Date of the Plan, the Company will enter into new change in control agreements with each DSB Member.  Generally, "Change in Control" means (i) any person (or entity) is or becomes the beneficial owner, directly or indirectly, of securities of the Company representing more than 50% of the combined voting power of

Notice of Proposed Amendments
October 29, 2007

the Company's then outstanding securities, (ii) the following individuals cease for any reason to constitute a majority of the number of directors then serving: individuals who constitute the Board on the Effective Date with any new director whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least two-thirds of the directors then still in office who either were directors on the Effective Date or whose appointment, election or nomination for election was previously so approved or recommended, (iii) a merger of the Company or any direct or indirect subsidiary of the Company with any other entity, other than a merger which results in the voting securities of the Company outstanding immediately prior to such merger continuing to represent more than 50% of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation, or (iv) the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets, other than a sale or disposition by the Company of all or substantially all of the Company's assets to an entity, more than 50% of the combined voting power of the voting securities of which are owned by stockholders of the Company in substantially the same proportions as their ownership of the Company immediately before the sale.  "Change in Control" does not include consummation of the Plan of Reorganization or transactions contemplated thereunder.

The change in control agreements generally provide:

- a lump sum cash payment equal to two to three times (based on the executive's position) the executive's base salary and target bonus;

- 24 to 36 months (based on the executive's position) of benefit continuation coverage for the executive and his or her dependents;

- a lump sum cash payment equal to the sum of (1) any unpaid cash incentive compensation allocated to executive for completed fiscal years and (2) a pro-rata portion of any unpaid cash incentive compensation for uncompleted periods (assuming performance at target levels);

- a lump sum cash payment equal to the contributions that would have been made to any of the Company's tax-qualified and/or nonqualified supplemental or excess defined contribution plans on behalf of the executive in the two to three years (based on the executive's position) following the date of termination (assuming maximum contribution levels);

- outplacement services until the earlier of one year or the executive's acceptance of employment; and

- vesting acceleration of service-based equity awards and vesting acceleration of performance-based equity awards upon a sale of more than 50% of the Company's then-outstanding shares or upon a sale of all or substantially all of

Notice of Proposed Amendments
October 29, 2007

the assets of the Company if certain targets relating to internal rate of return are achieved in connection with such sale.

If any of these payments or benefits become subject to excise tax on "golden parachute" payments, the executive will be entitled to a gross-up payment (but only if the executive's total payments and benefits exceed 110% of the greatest pre-tax amount the executive could be paid without causing the executive to be liable for any excise taxes in connection with the gross-up payment).

Receipt of severance is conditioned on the executive's execution of a release of claims in favor of Delphi and on the executive's compliance with a perpetual non-disclosure provision, an invention assignment provision, a 12- to 18-month non-competition provision, and a 12- to 18-month non-solicitation provision (covering customers and employees). In addition, the Company is obligated to pay all of an executive's legal fees with respect to any good-faith dispute of any issue under the change in control agreement. Under the change in control agreement under discussion with the Company's chief executive officer, the chief executive officer will have the right to voluntarily terminate employment during the 30-day period beginning 12 months after the change in control and still receive all change-in-control related benefits under the agreement.

The change in control agreements will be effective on the consummation of the Plan and will continue through December 31, 2009. The agreements will automatically renew each January 1st commencing on January 1, 2009 for additional one-year terms unless notice of non-renewal is given by either party before September 30th of the preceding year. In addition, the change in control agreements will automatically renew for a two-year term upon the occurrence of a change in control.

(c)    Chapter 11 Salaried Employee Compensation Program – Summary of Key Employee Compensation Program

The Debtors have implemented certain aspects of a key employee compensation program pursuant to which executive-level U.S. employees have the capability of receiving incentive-based compensation based on the Company's and individual performance. Upon commencement of the Debtors' Chapter 11 Cases, certain of the Debtors' salaried employees' compensation programs were terminated, including the annual incentive program and long-term incentive program. The Debtors also cancelled a retention awards program enacted before the Petition Date. As a result, upon the Debtors' entry into chapter 11, the Debtors' U.S. executives saw their total compensation opportunities decrease by approximately 50%, going from a total prepetition compensation plan composed of base salary, an annual incentive program, a long-term incentive program, and retention grants to a postpetition compensation package consisting solely of base salary.

The Debtors' chapter 11 key executive compensation program consisted of three primary parts: (i) a short-term at-risk performance payment compensation program, (ii) an emergence award plan that provided limited cash compensation in lieu of chapter 11 long-term incentives and an equity based award covering post-emergence long-term

incentives for the 18 month period following the Effective Date and (iii) a prepetition severance plan that was modified in the third quarter of 2005.  The overall program was designed, in part, to replace some of the prepetition compensation programs for the Debtors' U.S. executives.  The overall program was premised on the principle that the Company should provide market-competitive compensation opportunities designed to motivate its executive workforce to perform for the Debtors.  Notably, Delphi's chapter 11 compensation program was different from traditional employee compensation and retention programs in at least two important ways.  First, the current Executive Chairman (and former CEO) of Delphi, opted not to participate in the program but is instead eligible for a discretionary performance payment, which will be determined separately by the Compensation Committee prior to the Effective Date.  Second, Delphi's program had no "retention" payments ("pay to stay" vs. "pay for performance") within its design.

Indeed, the short-term at-risk incentive compensation programs ultimately proposed by the Debtors during the Chapter 11 Cases have incorporated six-month performance cycles, as opposed to the more traditional year-long periods, to closely monitor the Debtors' ongoing financial progress and to ensure that executive performance remains linked to the evolving demands of the Chapter 11 Cases.  Additionally, even if the Debtors achieve their corporate and division-level performance targets, eligible employees also must maintain an acceptable level of personal achievement to qualify for the at-risk incentive compensation payments.  Finally, the Debtors implemented an EBITDAR-based metric to evaluate the corporate-wide performance of the Debtors and agreed to extensive discretion of the Creditors' Committee in adjusting this metric in two of the chapter 11 performance periods.  The Debtors also eliminated from their analysis various variances in performance (i.e., gains from the steady state business plan early in the chapter 11 cases and variances from the transformation business plan later in the chapter 11 cases) obtained during the applicable performance period as a result of agreements reached with GM and the Unions.  By designing a short-term at-risk incentive compensation program in this manner, the Debtors sought to maximize the performance of their executives, which in turn, would increase the value of the Debtors' Estates.

During the chapter 11 cases, the Bankruptcy Court authorized the Debtors to implement the short-term elements of the compensation program.  The longer term elements of the original chapter 11 compensation program (i.e., cash performance payments on the Effective Date and long-term equity incentive grants for post-emergence periods) were deferred to the plan confirmation process and are incorporated into the overall salaried executive compensation program developed by the Compensation Committee and approved by ADAH under the Investment Agreement.

(d)    Summary of Certain Material Prepetition Executive Compensation Programs

(i)    Supplemental Executive Retirement Program

Since the separation from GM, Delphi has had a Supplemental Executive Retirement Program (the "SERP") for certain employees.  The SERP is a non-qualified plan under the IRC that is separate from, but is integrated with, the Delphi Retirement Program for Salaried Employees, a qualified pension plan under the IRC.  Pursuant to the

authority granted by that certain Order Under 11 U.S.C. §§ 105(a), 363, 507, 1107, And 1108 (i) Authorizing Debtors To Pay Prepetition Wages And Salaries To Employees And Independent Contractors; (ii) Authorizing Debtors To Pay Prepetition Benefits And Continue Maintenance Of Human Capital Benefit Programs In the Ordinary Course; And (iii) Directing Banks To Honor Prepetition Checks For Payment Of Prepetition Human Capital Obligations (Docket No. 198), the Debtors have, throughout the course of the Chapter 11 Cases, continued to make monthly SERP payments to eligible retirees, limited to $5,000 per month per retiree.  Pursuant to the Plan, however, the Debtors will (i) no longer honor their obligations under the SERP as the Debtors will reject, as of the Effective Date, or otherwise terminate the current SERP and (ii) implement a new Supplemental Executive Retirement Program (the "New SERP") with respect to current eligible employees (subject to the execution of a waiver of claims) which, in effect, (a) freezes the benefits under the SERP and modifies eligibility to the age of 55 years with ten years of service and (b) supplements the frozen SERP benefit with a new benefit under a separate plan.  Accordingly, as of the effective date of the Plan, the Debtors will no longer make monthly SERP payments to retirees and retirees will have 30 days after the effective date of the Plan to file a proof of claim for any claims arising under the SERP.  Current eligible employees that were entitled to the SERP should not be penalized by the rejection, termination, and/or halting of benefits with respect to the SERP because these active employees should generally become eligible to participate in the New SERP.

Under the Plan, all persons holding or wishing to assert Claims arising out of the SERP, and whose SERP Claims vested prior to the Effective Date, must file with the Bankruptcy Court and serve upon the Debtors a separate, completed, and executed proof of claim (substantially conforming to Form. No. 10 of the Official Bankruptcy Forms) no later than 30 days after the Effective Date.  All such Claims not filed within such time will be forever barred from assertion against the Debtors and their Estates or the Reorganized Debtors and their property.  Any Claims arising out of SERP after the Effective Date will be disallowed in their entirety.  Allowed SERP Claims will receive the treatment afforded to Allowed General Unsecured Claims under the Plan.  Each such Allowed SERP Claim will receive a distribution on the earliest Distribution Date after such SERP Claim is allowed, if ever.  For further details, including details regarding postpetition interest on General Unsecured Claims, see Sections IX.E – Treatment Of Claims And Interests Under The Plan and IX.H – Provisions Governing Distributions of this Disclosure Statement.

(ii)     Change In Control Agreements

In early 2000, Delphi modified certain terms of its change in control agreements (collectively, the "Change in Control Agreements") with its officers that had been in existence since the Separation.   The Change in Control Agreements provide certain benefits to each participant (each, a "Participant") upon the occurrence of a change in control of Delphi and additional benefits if the employment of a Participant is terminated for certain reasons after a change in control.  A change in control is defined under the Change in Control Agreements to include (i) the acquisition by any person, other than Delphi or any subsidiary of Delphi, of beneficial ownership of 25% or more of the outstanding common stock of Delphi; (ii) certain changes in the composition of Delphi's board of directors; (iii) certain mergers, consolidations, and other reorganizations of

Delphi in which Delphi is not the surviving corporation; (iv) any sale, lease, exchange, or other transfer of 50% or more of the assets of Delphi; or (v) a liquidation or dissolution of Delphi.

Pursuant to the Change in Control Agreements, Participants are entitled to certain payments and benefits upon the occurrence of a change in control, including the immediate vesting of all unvested options and restricted stock units, and the full funding of all of the Participant's "target awards" and any compensation previously deferred at the election of the Participant, together with accrued interest or earnings thereon. Additional payments and benefits are payable to Participants who cease to be employed by Delphi during the three years following a change in control if (i) Delphi terminates the Participant's employment other than for "cause" (as defined therein); (ii) the Participant terminates his or her employment if, without his or her consent, (a) his or her salary and other compensation or benefits are reduced for reasons unrelated to Delphi's or the Participant's performance, (b) his or her responsibilities are negatively and materially changed, (c) he or she must relocate his or her work location or residence more than 25 miles from its location as of the date of the change in control, or (d) Delphi fails to offer him or her a comparable position after the change in control; or (iii) during the one-month period following the first anniversary of the change in control, the Participant ceases to be employed by Delphi for any reason other than for cause.

The aggregate change in control liabilities arising from these and other rights granted to Participants under the Change in Control Agreements are potentially substantial. Executives continuing their employment with Delphi after the Effective Date of the Plan will be asked to waive benefits under the Change in Control Agreements and certain other programs in order to be eligible for Delphi's emergence compensation program and other related benefits. To the extent a Participant does not waive such benefits, the Company intends to challenge any asserted claims under the Change in Control Agreements. If all Participants were to successfully assert claims under the Change in Control Agreements, the resulting liability could total as much as $257.5 million. All Change in Control agreements are listed on Plan Exhibit 8.1(a) to the Plan, and will be rejected pursuant to the Plan.

(iii)    Benefit Equalization Plan For Salaried Employees

The Benefit Equalization Plan for Salaried Employees ("BEP") is available to executives whose contribution and benefit levels in the Delphi Savings-Stock Purchase Program ("S-SPP") exceed certain limits under IRC Section 415. The BEP is not funded and since October 2004, contributions have been de minimis. Amounts contributed to the BEP are separately accounted for. Distributions under the BEP are expected to aggregate approximately $160,000 and will be distributed to approximately 141 participants with an average distribution of $1,120 and a maximum individual distribution of approximately $10,000. The BEP amounts will be distributed upon emergence, and then plan will be terminated.

Notice of Proposed Amendments
October 29, 2007

below.  Under IRC Section 414(l), obligations in a pension plan can be transferred to another pension plan without negative tax implications if certain conditions are met.  The IRC Section 414(l) transfer facilitates Delphi's resolution of its pension issues, significantly improves the security and funding of the Delphi pension plans, and is in the best interests of plan participants.  The IRS issued a favorable ruling with respect to the IRC Section 414(l) transaction on May 29, 2007.

In exchange for the waivers, the Debtors agreed to bring their pension funding obligations up to date upon emergence from chapter 11, including an accelerated contribution to the Hourly Plan in the amount of $10 million for the plan year ending September 30, 2007 and a $10 million accelerated contribution to the Hourly Plan in settlement of any excise taxes that had already accrued.  As security for their obligations under the waivers, the Debtors provided the PBGC with letters of credit in the amount of $100 million on account of the Hourly Plan and $50 million on account of the Salaried Plan.  The Debtors intend to comply with the remaining terms of the waivers shortly following the effective date of the Plan of reorganization, at which time the letters of credit will be terminated.

On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to its pension plans, extending the dates by which Delphi is required to file a Plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 29, 2008, respectively.

On August 3, 2007, Delphi applied to the IRS and PBGC for a temporary waiver of its minimum funding obligations with respect to the Hourly Plan for the plan year ending September 30, 2007.  The Debtors reached an agreement with the IRS and PBGC on the terms of such a conditional waiver on September 28, 2007.  This second waiver is necessary to enable the IRC Section 414(l) transfer to be implemented in an economically efficient manner after September 30, 2007.  Consistent with the ~~waiver~~waivers already granted with respect to the Hourly Plan and the Salaried Plan for the ~~plan~~ year ended September 30, 2006, the Debtors would stand by their commitment to bring their pension funding obligations up to date upon emergence from chapter 11.  The Debtors ~~have proposed that the letter of credit provided~~filed a motion on October 5, 2007 for authority to ~~the PBGC for the first waiver would also serve as security for their obligations~~perform under the second waiver.  The Bankruptcy Court entered an order approving the motion dated as of October 25, 2007.

On October 4, 2007, the IRS further modified the first set of conditional funding waivers, conforming the conditions to the first waivers so that they are generally consistent with the conditions to the second waiver.

As a result of the successful negotiation of the waivers and the IRC Section 414(l) transfer, Delphi's business plan provides that Delphi will be able to timely meet its pension obligations following emergence from chapter 11.



**Development Of Final Business Plan**

\* Includes a confirmation/update of macroeconomic factors such as exchange rates, commodities, GMNA volumes as well as divisional input related to revenue plans and other cost items

\*\* Relates to the outcomes of negotiations with GM and Unions which varied from the assumptions in the preliminary business plan

Over this time period, the Business Plan and certain of the financial data, projections, and assumptions imbedded in the Business Plan were analyzed and evaluated by numerous parties, including an external accounting firm that was engaged by Delphi and other external parties who closely reviewed the data and provided recommendations to Delphi.  These findings were considered and taken into account when finalizing the Business Plan.  In addition, Delphi provided drafts of the preliminary Business Plan to certain key stakeholders, including the Statutory Committees and their advisors, at various times during the plan development.  Finally, as discussed below, the Business Plan was amended in October 2007 to account for certain changes in the capital structure of Reorganized Delphi as well as an updated forecast for GMNA volumes in 2008.

### 1.    Creation Of The Business Plan

Delphi's annual business plan development process is comprehensive, requiring the analysis of a significant amount of data regarding various aspects of the business, as well as a vetting and review process at various levels of the organization for key aspects of the Business Plan.  As previously discussed, the Company has seven divisions.  Each division is comprised of several global product business units ("PBUs").  The business plan development process requires each of the Company's PBUs and, subsequently, divisions, to create a five-year business plan which becomes a component of the overall corporate business plan.  At the start of the planning period, Delphi develops macroeconomic assumptions that are used by each of its PBUs when developing their detailed business plans.  The use of common assumptions ensures that the Business Plan is based on consistent metrics.  Such assumptions include the following:

- expected customer production volumes;
- forecasted cost of significant commodities used in the business (e.g., the costs of copper and steel);

DS-117

- estimated foreign exchange rates over the business plan period; and
- expected U.S. labor rates.

Delphi uses ~~Global Insight ("GI"), formerly known as Data Resources, Inc.~~DRI, a third-party forecasting service, as the basis of certain assumptions regarding anticipated customer production and vehicle line volumes. When incorporating the forecasts produced by GI/DRI, Delphi uses its historical knowledge of the industry to further refine the forecasts related to ~~GM North America ("~~GMNA~~")~~ production, in light of the fact that GMNA has historically been a significant component of Delphi's revenue plan. ~~Therefore~~Consistent with prior practice, Delphi has ~~reduced~~evaluated the GI ~~forecasted GMNA~~/DRI forecasts in creating the customer product volume ~~expectations by approximately 4%, with the largest reductions in~~ assumptions underlying the ~~later years of the plan.~~ Business Plan.

## 2.    *Development Of The Revenue Plan*

### (a)    Identifying Business Opportunities

Utilizing the macroeconomic assumptions developed by corporate management, each PBU develops its own five-year business plan. A key component of each PBU's plan is its revenue plan. In developing its revenue plan, each PBU undertakes a detailed assessment of future revenue opportunities with its customers. Although the process of tracking sales opportunities is an ongoing activity that is continuously evaluated by Delphi sales account managers, once a year a complete evaluation of the revenue opportunities is completed during which a majority of the PBUs attribute confidence levels to each opportunity.

Certain of the identified revenue opportunities are known because they are derived from booked business – that is, business for which the Company already has a formal customer award or purchase order. Other revenue opportunities are prospective, based on business for which the Company believes it may receive a contract (unbooked business). To evaluate whether the revenue projections from prospective opportunities should be included in its revenue plan, PBUs engaged in the original equipment automotive business will review each individual opportunity in the Company's sales opportunity tracking system and make a determination as to how likely it is that Delphi will win the business. The PBU will make its determination based on historical trends and industry knowledge, and will add the projected revenue from that business to its estimated revenue line if it is reasonably confident that it can achieve the resulting projected revenue stream. For PBUs with a focus other than original equipment automotive sales, the revenue determinations are based primarily ~~based~~ on historical trends and industry knowledge.

In addition to identifying which customer business it believes it will win, in the process of creating its revenue plan a PBU will also assess the percentage of the customer's business it believes it will acquire, such as whether it will supply all of the customer's needs for a particular part or whether the customer is likely to use multiple sources for the part.

For Delphi's original equipment automotive business, because of the nature of the original equipment automotive industry, in which there are long periods between the time when customers award business to their suppliers and the time when production begins, in

DS-118

| | | |
|---|---|---|
| Operating Income | 5.3% | -9.0% |
| * excludes restructuring | | |

The Business Plan demonstrates that a significant amount of cash will be spent on restructuring activities. Each division has contemplated a significant number of restructuring activities, the scope, timing, and cost of which were included in the Business Plan and affect the forecasts. As a result of the restructuring, the Business Plan financials also reflect expected cost savings in manufacturing, which result from the labor transformation and global restructuring initiatives. As manufacturing and engineering operations are migrated from high-cost to low-cost locations, savings are generated, resulting in Delphi's belief that it will be well positioned to meet customer expectations and achieve competitive margins. Beyond the impact of these manufacturing cost initiatives, further savings in material costs are expected to be realized through engineering initiatives, supplier price reductions, and the continued shift in the supplier footprint to lower cost locations following Delphi's own manufacturing footprint migration. The resulting transformation and growth results in a plan where Delphi continues to expand its revenue expectations from Europe, Asia, and South America while expecting revenue declines in North America.

**D.    Amendments To Final Business Plan**

Following the completion of the Business Plan appended to the Disclosure Statement filed on September 6, 2007, two events occurred which had an impact on the Business Plan. First, GI/DRI revised its projections for GMNA production volume for the period covered by the Business Plan. Second, because of the dislocation in the capital markets in the second half of 2007 and the resulting change in the distributions under the Plan, the anticipated capital structure of Reorganized Delphi changed, which affected certain assumptions underlying the Business Plan.

### Amendments To Final Business Plan



**1.    *GMNA Production Volume***

In September 2007, GI/DRI revised its outlook for GMNA production volumes. Delphi reviewed the forecasts released by GI/DRI and discussed the basis of the

Notice of Proposed Amendments
October 29, 2007

predictions with GI/DRI and GM.  GI/DRI adjusted its forecasts on the basis of a number of macroeconomic factors, some of which Delphi believes are overstated or will be mitigated in ways not contemplated by GI/DRI.  Although GI/DRI predicted a significant decrease in GMNA production throughout the Business Plan period, after discussions with GM and based on its own historical experience with GI/DRI and GM, Delphi believes that GMNA will have a short-term inventory adjustment period rather than the long-term downward sales reduction of the magnitude forecasted by GI/DRI.  Thus, Delphi has adjusted its projections for 2008 based on the new GMNA forecast but has left the projections unchanged for 2009-2011.

Because GMNA has historically been (and continues to be) a significant component of Delphi's revenue plan, a change in GMNA production can have a material impact on Delphi's forecasted revenue, particularly when the predicted volume reductions relate to vehicle programs in which Delphi provides a high percentage of content.  In this case, it is predicted that as a result of the GMNA volume reductions, Delphi's projected revenue will be reduced in 2008 by $346 million. To mitigate these losses, Delphi will reduce certain of its fixed costs, including engineering costs, SG&A costs, and structural manufacturing costs, which will result in a required $15 million increase in restructuring expenses in 2008.  The net reduction to Delphi's earnings before interest, taxes, depreciation, amortization, and restructuring costs ("EBITDAR") is expected to be approximately $87 million.  In addition, due to the reduction in forecasted sales in 2008, Delphi's working capital levels are expected to be reduced by $43 million in 2008, and thereafter are expected to return to previously planned levels for the remainder of the Business Plan.  As such, there is no net impact to working capital over the combined 2008/2009 timeframe.

Notice of Proposed Amendments
October 29, 2007



## 2008-2011 GMNA Production Forecasts

2. *Revised Capital Structure*

Delphi has also adjusted its Business Plan to reflect the revised capital structure of Reorganized Delphi and revisions to the currency used for the payment of claims under the Plan, which affect certain of the assumptions underlying the Business Plan.

First, in developing the Business Plan, it was anticipated that Reorganized Delphi would have new long-term debt including a $1.6 billion asset-based revolving facility, a $5.6 billion exit term loan, and $1.5 billion in unsecured notes.  When the capital structure of Reorganized Delphi was revised based on market conditions in the third and fourth quarters of 2007 and Effective Date cash distributions under the Plan were reduced, the amount, structure, and interest rates on that debt also changed.  Thus, the Company amended its assumptions to reflect a $3.7 billion exit term loan, a $1.9 billion reduction.  In addition, the assumptions were modified to replace $1.5 billion in unsecured notes with $1.5 billion in second lien notes.  Assumptions regarding the $1.6 billion asset-based revolving facility remained unchanged.  Accordingly, the Business Plan reflects a decrease in net debt.

Second, the change in the currency of distributions provided to various stakeholders under the Plan resulted in reduced cash distributions at the Effective Date, which affected the Company's assumptions regarding cash flow.  Because the Plan now calls for a reduction in cash distributions, the Business Plan reflects an increase in cumulative cash flow during 2008-2011.

Notice of Proposed Amendments
October 29, 2007

- a sale, transfer, or other disposition of all or substantially all of the assets of Reorganized Delphi and its subsidiaries, on a consolidated basis;

- any merger or consolidation involving a change of control of Reorganized Delphi; or

- any acquisition of or investment in any other Person having a value in excess of $250 million in any twelve-month period.

Rather than advancing a separate plan framework support agreement following the structure of the terminated PSA, the Investment Agreement itself outlines Delphi's proposed framework for a plan of reorganization, which includes distributions to be made to creditors and shareholders, the treatment of GM's claims, and the corporate governance of the reorganized Company.

While the filing of this Disclosure Statement and the appendices and/or the exhibits to the appendices hereto was made by the Debtors after consultation with ADAH and the mutual agreement that none of the parties to the Investment Agreement shall be prejudiced by such filing, neither ADAH nor the other Plan Investors have approved this Disclosure Statement or the appendices and/or the exhibits to the appendices hereto. Neither the filing of this Disclosure Statement, the Plan and any of the exhibits and/or appendices to this Disclosure Statement or the Plan made as part of the filing of this Disclosure Statement and the Plan, nor the terms thereof, shall result in the waiver or modification of any of the rights and/or obligations of any party to the Investment Agreement including, without limitation, the provisions set forth in Section 9(a)(xxviii) of the Investment Agreement.

### 3.    *Amendment To The Investment Agreement*

During the month of October, the Debtors negotiated an amendment to the Investment Agreement as a result of anticipated changes to the September 6 Plan and the passage of time. Provisions of the Investment Agreement were amended to reflect changes to the Discount Rights Offering and the issuance of Series C Preferred Stock to be issued to GM. In addition, a number of provisions in the Investment Agreement were amended to reflect events that occurred since the previous amendment was approved on August 2, 2007. Certain covenants and related conditions and termination rights were amended to provide greater certainty to the consummation of the transaction. For example, the amendment to the Investment Agreement eliminates certain covenants regarding the delivery and approval of documents that have already been delivered and finalized, such as the Plan and Disclosure Statement, a disclosure letter, the GM Definitive Documents, and the Union Settlement Agreements, while maintaining approval rights over amendments to those agreements and documents. In addition, the amendment to the Investment Agreement extends the timeframe by which the HSR filings are to be made and the dates for which agreements for certain key documentation must be reached.

**C.     Rights Offerings**

Pursuant to the Investment Agreement, the Company has agreed to conduct the Discount Rights Offering and pursuant to the Plan, the Company will conduct a ~~par value rights offering (the "~~Par Value Rights Offering~~")~~.  Pursuant to the Discount Rights Offering, ~~Delphi's common stockholders, who are~~ holders of ~~shares of Delphi common stock~~General Unsecured Claims as of the date the Confirmation Hearing commences, (the "Rights Offering Record Date") will receive non-transferable Rights to purchase up to approximately $1.575 billion of shares of the New Common Stock of Reorganized Delphi at an exercise price of $~~38.56~~34.98 per share, a discount to the negotiated ~~plan~~Plan value. The holders of General Unsecured Claims will also receive the right to purchase any unsubscribed Rights not otherwise exercised in the Discount Rights Offering.  Pursuant to the Par Value Rights Offering, Delphi's common stockholders at the Rights Offering Record Date will receive non-transferable Rights to purchase up to $~~572~~12,711,111 shares (valued at approximately $529 million ~~of shares~~) of New Common Stock of Reorganized Delphi at an exercise price of $~~45.00~~41.58, the negotiated ~~plan~~Plan value ~~price, which shares consist~~ of ~~approximately $522 million of the~~ New Common Stock ~~consisting of shares contributed by the Unions~~.  The shares of New Common Stock underlying the Par Value Rights Offering are shares that would otherwise be issued to General Unsecured Creditors and ~~other unsecured creditors, plus an additional $50 million of the New Common Stock that would otherwise be distributable to~~Appaloosa ~~and its affiliates.~~.

The Rights Offerings will commence following confirmation of the Plan and conclude ~~at least~~ on a date that is approximately 30 days thereafter.

The Plan Investors have committed, on the terms and subject to the conditions of the Investment Agreement, to purchase any shares of New Common Stock that were offered through the Discount Rights Offering to eligible holders, but whose rights were not properly exercised in the initial offering or through the exercise of oversubscription rights. In the event that no ~~shareholders were to subscribe to the Rights Offering~~Discount Rights are exercised, the Plan Investors, through this backstop commitment, would purchase all of the unsubscribed shares for approximately $1.575 billion.

~~When the Debtors were considering entering into the Investment Agreement, there was considerable focus on negotiating plan treatment for existing equity holders that was acceptable to the Equity Committee. After extensive negotiations, the Equity Committee's formal support of the Investment Agreement largely hinged on the terms of the Rights Offerings, and the proposed Rights Offerings are a reflection of the negotiations that took place among the Debtors, the Creditors' Committee, the Equity Committee, GM, and the Plan Investors.~~

(a)     Eligibility For Participation In Rights Offerings

Each holder of a General Unsecured Claim as of the Rights Offering Record Date will be entitled to participate in the Discount Rights Offering.  Each holder of Existing Common Stock as of the Rights Offering Record Date will be entitled to participate in the Par Value Rights Offering~~s~~. The Rights Offering Record Date will be the date on which the Confirmation Hearing commences.

Notice of Proposed Amendments
October 29, 2007

(b)    Issuance Of Rights

The Rights will be issued ~~no later than four business days~~ after (i) the Bankruptcy Court has confirmed the Debtors' Plan and (ii) the SEC declares the Registration Statement for the Rights Offerings effective. Holders that hold shares of Existing Common Stock through a brokerage account, bank, or other nominee will not receive an actual rights certificate. If a holder wishes to obtain a separate rights certificate, the holder should promptly contact its broker, bank, or other nominee and request a separate rights certificate. It will not be necessary to have a physical rights certificate to elect to exercise Rights.

In the Discount Rights Offering, holders of ~~Existing Common Stock~~allowed General Unsecured Claims on the Rights Offering Record Date will receive Rights to purchase ~~40,845,016~~45,026,801 shares of New Common Stock. These rights will not be transferable. The Rights will entitle holders to purchase New Common Stock for $~~38.56~~34.98 per share. ~~It will not be necessary to have a physical rights certificate to effectuate a sale or transfer of the Rights.~~ In the Par Value Rights Offering, holders of Existing Common Stock on the Rights Offering Record Date will receive Rights to purchase ~~$572 million~~ up to 12,711,111 shares in the aggregate ~~worth of shares~~ of New Common Stock (valued at approximately $529 million), which would otherwise be issued to Unsecured Creditors and Appaloosa. These rights will not be transferable. These Rights will entitle holders to purchase New Common Stock for $~~45.00~~41.58 per share.

(c)    Rights Offering Period

The Rights Offerings will commence when the Rights are distributed following confirmation of the Plan and conclude ~~at least~~approximately 30 days later. After the Rights expire, any and all unexercised Rights will automatically terminate without further notice or order of the Bankruptcy Court, and any purported exercise of any such unexercised Rights by any Person will be null and void.

(d)    Exercise Of Rights

The Rights Offering documents will set forth in detail how to exercise the Rights and such procedures should be carefully followed.

(e)    Alternatives To Exercising The Rights; ~~Transfer Restriction Of~~

~~(e)~~    To realize value from the Par Value Rights Offering

~~To realize value from the Rights Offerings~~, as alternatives to exercising the Rights, holders of ~~the Rights~~ Existing Common Stock may ~~(i)~~ sell their shares of Existing Common Stock prior to the commencement of the Confirmation Hearing ~~or (ii) in the case of the Discount Rights Offering, sell their Rights to participate in the Discount Rights Offering.~~

DS-129

(i)        Sale Of Shares

In advance of the commencement of the Confirmation Hearing, a holder of Existing Common Stock may sell its shares.  If a holder sold~~sells~~ its shares prior to the Rights Offering Record Date, the buyer would be entitled to receive the Rights to participate in the ~~Discount Rights Offering and the~~ Par Value Rights Offering.  In addition, by selling its shares prior to the Rights Offering Record Date, a shareholder would also be selling its entitlement to participate in the distribution to shareholders of New ~~Common Stock and New~~ Warrants contemplated by Article 5.7 of the Plan.

(ii)        Sale Of Rights

The Rights issued for the Discount Rights Offering are transferable. Therefore, as an alternative to exercising those Rights, holders may sell the Rights to third parties. Any such transfer of Rights must be made sufficiently in advance of the expiration date of the Rights Offering to comply with settlement procedures applicable to sales of securities. If trading in the rights is initiated, such trading can be expected to be on a customary basis in accordance with normal settlement procedures. Trades effected in Rights will be required to be settled within three trading days after the trade date. A purchase and sale of Rights that is effected on the date that is two days prior to the expiration date of the Rights Offering would be required to be settled not later than the time the Rights will have expired (or, if the holder uses guaranteed delivery procedures, not later than 5:00 p.m., New York City time, on the third business day after the expiration date). Therefore, if Rights are purchased on or after the date that is two days prior to the expiration date and the holder does not properly comply with guaranteed delivery procedures, such Rights may be received after they have already expired and will be of no value.

The Rights issued for the Par Value Rights Offering are not independently transferable, but the Common Stock is transferable as discussed in subsection (i) above.

(f)        Distribution Of Rights Offering Shares

On or as soon as reasonably practicable after the Effective Date, but no later than the Distribution Date, Reorganized Delphi will issue the New Common Stock to those holders of Rights that properly exercised their Rights pursuant to the Rights certificates.

**D.    Exit Financing**

The description below is based on the Debtors' current status of discussions with third parties and will be updated as such discussions evolve.

In addition to the equity funds raised from the Plan Investors and the Rights Offerings, the Plan contemplates that the Reorganized Debtors will have exit financing in place in an amount sufficient to repay the Debtor In Possession ("DIP") Facility Revolver Claims, the DIP Facility First Priority Term Claims, and the DIP Facility Second Priority Term Claims, make other payments required to be made on the Effective Date, and conduct their post-reorganization operations (the "Exit Financing Facility").  The terms of the Exit Financing Facility are outlined in the term sheet attached to the Plan as an

exhibitArrangements").  The Debtors intend to enter into a "best efforts" financing arrangement with one or more nationally recognized investment banks on or before November 7, 2007, and to seek approval of such exit financing at the Debtors' November 29, 2007 omnibus hearing.

Beginning shortly after the approval of the Original EPCA, the Debtors contacted prospective lenders to solicit proposals regarding a potential exit facility and to conduct negotiations with respect to the terms of the proposals.  The Debtors distributed information packages to the institutions that were possible sources of exit financing.  By the beginning of June 2007, these institutions had conducted significant due diligence with the assistance of the Debtors.  To ensure comparable proposals, Delphi also sent a common request for proposal ("RFP") to select lenders after receiving their preliminary proposals.  The Debtors received RFP responses during the week of June 25, 2007, prior to recent changes in debt the capital market conditions.  As a result, the selected lenders subsequently reaffirmed their interest in providing exit financing but indicated that terms and pricing were likely to change dependent on market conditions.  The Debtors intend to continue discussions with such selected lenders

Initially, the Company sought financing of up to $7.5 billion in funded debt and, while there can be no assurances, anticipate obtaining a commitment from one or more lending sources on or before the date a $1.6 billion asset-based revolving loan through the RFP process.  Because of the dynamics of the Disclosure Statement Hearing.

Additional description of financing will be provided following receiptcapital markets in the third quarter of commitment letter2007, however, the Debtors reduced proposed debt levels under the Plan by $1.9 billion to facilitate an emergence financing package that could be executed under existing market conditions.  Based on recent improvements in the capital markets, including the leveraged loan market, the Debtors, after consultation with the Creditors' Committee, the Plan Investors, and GM, plan to move forward with an asset-based revolving loan in the amount of $1.6 billion, $3.7 billion of first-lien funded financing (possibly in conjunction with the extension of its debtor-in-possession financing facility), and second lien funded financing in the amount of $1.5 billion.

The second lien financing will have a maturity of 8 years, and at least $750 million of this facility will be raised from a third-party lender.  The remaining portion, up to $750 million, will be obtained by providing a note to GM which will have the same terms as the third-party financing.  The third-party lender will also have the right, through the Effective Date, to purchase up to $500 million of the financing evidenced by the note to GM at par value.  The amount of the second lien facility will be reduced by any financing obtained under the first lien facility in excess of $3.7 billion (the "Excess Amount"), with the portions of the loans provided by GM reduced, provided that the sum of (i) undrawn availability plus any open letters of credit up to $100 million pursuant to an asset-based revolving credit facility and (ii) Delphi's pro forma consolidated cash as of the Effective Date (excluding the Excess Amount and after giving pro forma effect to the $1.5 billion cash payment to GM in connection with the 414(l) transaction) (the "Liquidity Amount") is at least $3.189 billion.  In the event that the Liquidity Amount is less than $3.189 billion,

then any Excess Amount shall be retained by Delphi up to the point that the amount of such Excess Amount retained plus the Liquidity Amount equals $3.189 billion and the remaining amount shall be paid to GM and the second lien financing will be reduced by such amount paid to GM as provided above.  GM will not have registration rights with respect to the GM Note.

## VIII.    THE CHAPTER 11 CASES

### A.    Continuation Of Business; Stay Of Litigation

On October 8, 2005, Delphi and 38 of its U.S. subsidiaries and affiliates filed voluntary petitions in the Bankruptcy Court for reorganization relief under Chapter 11 of the Bankruptcy Code.  On October 14, 2005, three additional U.S. Delphi affiliates filed voluntary petitions.  Since the Petition Date, the Debtors have continued to operate as debtors-in-possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code.  The Debtors are authorized to operate their businesses in the ordinary course, with transactions out of the ordinary course of business requiring Bankruptcy Court approval.

An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors.  This relief provided the Debtors with the "breathing room" necessary to assess and reorganize their business.  The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of a plan of reorganization.

### B.    Chapter 11 Stakeholders

The following parties are current stakeholders in the Debtors' Chapter 11 Cases and/or have appeared or participated as parties-in-interest in one or more of these consolidated cases.

Notice of Proposed Amendments
October 29, 2007



### C.    Summary Of Certain Relief Obtained At The Outset Of The Chapter 11 Cases

#### 1.    First Day Orders

On October 8, 2005, the Debtors filed several motions seeking the relief provided by certain so-called "first day orders."  First day orders are intended to facilitate the transition between a debtor's prepetition and postpetition business operations by approving certain regular business conduct that may not be authorized specifically under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court.

The first day orders in the Chapter 11 Cases, which were entered over the course of several days after the October 8, 2005 petition date, authorized, among other things:

(a)    Administrative

- the joint administration of each of the Debtors' chapter 11 cases;

- the establishment of case management procedures and omnibus hearing dates;

Notice of Proposed Amendments
October 29, 2007

Freescale Semiconductor, Inc., (v) General Electric Company;, (vi) IUE-CWA, and (vii) Wilmington Trust Company, as Indenture Trustee.  Flextronics and Electronic Data Systems Corp. subsequently resigned from the Creditors' Committee, and on or about March 6, 2006, the United States Trustee appointed Tyco Electronics Corporation to the Creditors' Committee.  On October 1, 2007, the United States Trustee filed an amended appointment of the Creditors' Committee incorporating the changes described in the previous sentence as well as appointing SABIC Innovative Plastics (formerly GE Plastics, a part of General Electric Company).  In addition to these members, the UAW participates as an ex-officio member of the Creditors' Committee as noted in its Notice Of Withdrawal Of Motion And Memorandum Of International Union, UAW For An Order Directing Its Appointment To The Official Committee Of Unsecured Creditors, dated January 20, 2006 (Docket No. 1864).  Prior to the February 3, 2006 meeting of creditors, the PBGC was also granted ex-officio status.

The Creditors' Committee is represented by Latham & Watkins LLP.  The Creditors' Committee's financial advisor is Mesirow Financial Consulting, LLC, and the Creditors' Committee financial advisor and investment banker is Jefferies & Company.

On April 28, 2006, the United States Trustee appointed an official Committee of Equity Holders pursuant to section 1102 of the Bankruptcy Code to represent the interests of all equity holders in these cases.  The following seven equity holders were selected to serve as members of the Equity Committee: (i) James E. Bishop, Sr., (ii) Brandes Investment Partners, L.P. ("Brandes"), (iii) D.C. Capital Partners, L.P., (iv) Dr. Betty Anne Jacoby, (v) James H. Kelly, (vi) James N. Koury, trustee of the Koury Family Trust, and (vii) Luqman Yacub.  On May 11, 2006, the United States Trustee amended the Equity Committee to include Pardus European Special Opportunities Master Fund, L.P. ("Pardus") in place of Dr. Betty Anne Jacoby.  On October 3, 2006, D.C. Capital Partners, L.P. resigned from the Equity Committee.  Subsequently, on June 4, 2007, Pardus resigned from the Equity Committee.  Brandes has taken a leave of absence and is not currently active in Equity Committee matters.

The Equity Committee is represented by Fried, Frank, Harris, Shriver & Jacobson LLP.  The Equity Committee's financial advisor is Houlihan Lokey Howard & Zukin Capital, Inc.

### 3.    *Postpetition Financing*

On October 12, 2005, the Debtors were granted interim approval pursuant to an interim Bankruptcy Court order, to use up to $950 million of the $2 billion DIP credit facility.  The original DIP credit facility was subsequently amended by the First Amendment to the DIP Credit Facility, dated October 27, 2005 (the "First Amended DIP Credit Facility").  The First Amended DIP Credit Facility enabled the Debtors to borrow up to $2.0 billion from a syndicate of lenders arranged by J.P. Morgan Securities Inc. and Citigroup Global Markets, Inc., for which JPMorgan Chase Bank, N.A. was the administrative agent (the "Administrative Agent") and Citicorp USA, Inc., was syndication agent (together with the Administrative Agent, the "Agents").  Specifically, the First Amended DIP Credit Facility consisted of a $1.75 billion revolving facility and a $250 million term loan facility (collectively, the "Amended DIP Loans").  The Debtors sought

Notice of Proposed Amendments
October 29, 2007

approval of the First Amended DIP Credit Facility to ensure necessary liquidity during the Chapter 11 Cases.  On October 28, 2005, the Bankruptcy Court granted final approval of the DIP financing order, which approved the First Amended DIP Credit Facility, providing the Debtors access to $2 billion in DIP financing subject to certain terms and conditions set forth in the DIP financing documents, as amended, and an adequate protection package for the lenders to the prepetition credit facilities as well as to those parties asserting rights of setoff against the Debtors.

In light of the favorable environment in the debt markets at the time, in December 2006, the Debtors determined to refinance their secured facilities.  Thus, on January 5, 2007, the Bankruptcy Court granted Delphi's motion to obtain replacement postpetition financing of approximately $4.5 billion to refinance both the $2.0 billion First Amended DIP Credit Facility and the approximate $2.5 billion outstanding on its $2.825 billion prepetition credit facility.  On January 9, 2007, Delphi entered into a Revolving Credit, Term Loan, and Guaranty Agreement (the "Refinanced DIP Credit Facility") to borrow up to approximately $4.5 billion from a syndicate of lenders.  The Refinanced DIP Credit Facility consists of a $1.75 billion first priority revolving credit facility ("Tranche A" or the "Revolving Facility"), a $250 million first priority term loan ("Tranche B" or the "Tranche B Term Loan" and, together with the Revolving Facility, the "First Priority Facilities"), and an approximate $2.5 billion second priority term loan ("Tranche C" or the "Tranche C Term Loan");").  Borrowings under the Refinanced DIP Credit Facility are prepayable at Delphi's option without premium or penalty.  As a result of the refinancing, the Debtors have saved approximately $8.9 million per month in financing costs.

The Refinanced DIP Credit Facility will expire on the earlier of December 31, 2007 or the date of the substantial consummation of a reorganization plan that is confirmed pursuant to an order of the U.S. Bankruptcy Court.  Borrowings under the Refinanced DIP Credit Facility are prepayable at Delphi's option without premium or penalty.The Debtors intend to file a motion for approval of an amendment to the Refinanced DIP Facility to provide for a six-month extension of the maturity of the facility to July 1, 2008.  The Debtors plan to seek approval of this motion at the Omnibus Hearing scheduled for November 16, 2007.

In preparation for the foregoing amendment, on October 5, 2007, the Debtors filed a motion, and the Bankruptcy Court entered an order dated as of October 25, 2007, confirming DASHI's authority under the Final Cash Management Order (Docket No. 882) to consummate an intercompany transfer to DAS LLC.  Specifically, DASHI is accumulating cash balances from certain of its global affiliates in an amount expected to be up to $650 million and, subject to the requisite consent of the DIP Lenders, will transfer these funds to DAS LLC in accordance with Final Cash Management Order.  As required by the Final Cash Management Order, in exchange for DASHI's transfer of funds to DAS LLC, DAS LLC will grant DASHI (a) a lien (in the priority permitted under the Refinanced DIP Credit Facility) on all assets and (b) an administrative claim (the "Intercompany Transaction").  The Intercompany Transaction, among other things, will provide a definitive source of liquidity on favorable terms to the Debtors.  This additional liquidity will allow the Debtors to reduce their borrowings and thus reduce their funded interest expense, saving the Debtors millions of dollars of interest under their Refinanced DIP

Credit Facility.  In addition, the Intercompany Transaction may create certain tax efficiencies which will inure to the benefit of all of the Debtors' stakeholders.  In connection with this transaction, the PBGC expressed certain concerns because they contend that the funds to be transferred by DASHI would be subject to pre-existing PBGC liens totaling $255 million.  Although the Debtors dispute PBGC's position, the Debtors understand that the issue presented is an important policy matter for the PBGC that would likely compel the agency to appeal an adverse judicial determination of this issue.  To resolve this issue, the Debtors incorporated an adequate protection mechanism granting replacement liens to the PBGC, but only to the extent that the PBGC does in fact have valid, perfected, enforceable and non-avoidable liens in the funds to be transferred.  In addition, the entered order makes clear that all parties in interest in these cases retain and reserve the right to challenge the PBGC's purported liens on any grounds and that all of PBGC's claims, defenses, and arguments with respect to any such challenges are expressly reserved and preserved.

The Refinanced DIP Credit Facility provides the lenders with a perfected first lien (with the relative priority of each tranche as set forth above) on substantially all material tangible and intangible assets of Delphi and its wholly-owned U.S. subsidiaries (however, Delphi is pledging only 65% of the stock of its first-tier foreign subsidiaries to the extent that, in its reasonable business judgment, adverse tax consequences would result if more of such stock were pledged).  The Refinanced DIP Credit Facility further provides that amounts borrowed under the Refinanced DIP Credit Facility will be guaranteed by substantially all of Delphi's Affiliate Debtors, each as debtor and debtor-in-possession. The amount outstanding at any one time under the First Priority Facilities is limited by a borrowing base computation as described in the Refinanced DIP Credit Facility. Borrowing base standards may be fixed and revised from time to time by the Administrative Agent in its reasonable discretion, with any changes in such standards to be effective ten days after delivery of a written notice thereof to Delphi (or immediately, without prior written notice, during the continuance of an event of default).  The Refinanced DIP Credit Facility includes affirmative, negative, and financial covenants that impose restrictions on Delphi's financial and business operations, including Delphi's ability to, among other things, incur or secure other debt, make investments, sell assets, and pay dividends or repurchase stock.  So long as the Facility Availability Amount (as defined in the Refinanced DIP Credit Facility) is equal to or greater than $500 million, compliance with the restrictions on investments, mergers, and disposition of assets does not apply (except in respect of investments in, and dispositions to, direct or indirect U.S. subsidiaries of Delphi that are not guarantors).

The covenants require Delphi to, among other things, maintain a rolling 12-month cumulative Global EBITDAR (earnings before the deduction of interest expenses, taxes, depreciation, amortization, and restructuring charges) for Delphi and its direct and indirect subsidiaries on a consolidated basis, beginning on December 31, 2006 and ending on November 30, 2007 at the levels set forth in the Refinanced DIP Credit Facility. The Refinanced DIP Credit Facility contains certain defaults and events of default customary for debtor-in-possession financings of this type.  Upon the occurrence and during the continuance of any default in payment of principal, interest, or other amounts due under the

alleged that certain current and former directors and officers of the Company breached a variety of duties owed by them to Delphi in connection with matters related to the Company's restatement of its financial results.  Following the commencement of the Chapter 11 Cases on October 8, 2005, all of the Shareholder Derivative Actions were administratively closed.

(c)      MDL And Related Settlements

(i)      MDL Settlements

On July 11, 2007, the MDL Court appointed the Honorable Layn R. Phillips, former United States District Judge, as a special master for settlement discussions. Through mediated settlement discussions, representatives of Delphi, Delphi's insurance carriers, the Creditors' Committee, the Equity Committee, and certain other named defendants involved in the MDL proceedings, with the assistance of Judge Phillips, were able to reach a settlement agreement with the Lead Plaintiffs and the ERISA Action plaintiffs resulting in a complete resolution as to Delphi, its subsidiaries, current and former directors and officers, and certain other defendants and related parties and settlement of the Multidistrict Litigation (the "MDL Settlements").  The MDL Settlements do not resolve claims against certain other defendants and potential defendants, including but not limited to Deloitte & Touche, LLP, BBK, Ltd., SETECH, Inc., and JPMorgan Chase & Co.  The MDL Settlements are comprised of a settlement with the Lead Plaintiffs (the "Securities Settlement"), the ERISA Plaintiffs (the "ERISA Settlement"), and related agreement between Delphi, various insurance companies, and certain former directors and officers (the "Insurance Settlement").  The MDL Settlements were submitted on August 31, 2007 to the MDL Court for preliminary approval and for scheduling a final fairness hearing. On September 5, 2007, the MDL Court granted preliminary approval of the MDL Settlements, and scheduled a final fairness hearing for November 13, 2007.  The On September 7, 2007, the Debtors expect to file filed a motion with the Bankruptcy Court on September 7, 2007 (which will be heard on September 27, 2007), seeking Bankruptcy Court approval of the MDL Settlement.

Under the terms of the MDL Settlements, which require the approval of both the MDL Court and the Bankruptcy Court, the Lead Plaintiffs and the ERISA Action plaintiffs will receive claims/interests that will be satisfied through the Debtors' Plan.  The Lead Plaintiffs will be granted a single allowed claim/interest in the face amount of $204 million. The Lead Plaintiffs' claim/interest will be classified in both the Section 510(b) Note Claim and Section 510(b) Equity Claim classes based on the plan of allocation approved by the MDL Court.  The Lead Plaintiffs' claim/interest will be satisfied through consideration in the same form, ratio, and treatment as what will be used to satisfy holders of General Unsecured Claims under the Debtors' Plan.  If any class member opts out of the Securities Settlement, and ultimately receives an allowed claim in the Debtors' Chapter 11 Cases, the amount received by the opt-out class members.  The motion was originally scheduled to be heard on September 27, 2007, but after consultation with a number of stakeholders, including counsel for the MDL plaintiffs and Creditors' Committee, the Debtors determined to use a two-step bifurcated approval process for the MDL Settlements in the Bankruptcy Court.  As the first step in the process, the Debtors sought and received

preliminary approval of the MDL Settlements, including without limitation, class certification, and solicitation mechanics, at the October 25, 2007 omnibus hearing. The MDL Settlements are subject to final consideration by the Bankruptcy Court at the Confirmation Hearing on the Debtors' Plan, following the Bankruptcy Court's consideration of certain objections that may be filed by any of the "Potential Objectors" (that is, (i) the Official Committee of Unsecured Creditors, (ii) the United States Department of Labor, (iii) Wilmington Trust Company, as indenture trustee, (iv) the Ad Hoc Committee of Trade Creditors, (v) Davidson Kempner Capital Management LLC, SPCP Group, LLC, Castlerigg Master Investments Ltd., Elliott Associates, L.P., and CR Intrinsic Investors, LLC, and (vi) the Equity Committee) by the deadline for filing objections to the confirmation of the Plan.

Under the terms of the MDL Settlements, which require the approval of both the MDL Court and the Bankruptcy Court, the Lead Plaintiffs and the ERISA Action plaintiffs will receive claims/interests that will be satisfied through the Debtors' Plan. The Lead Plaintiffs will be granted a single Allowed Claim/Interest in the face amount of $204 million. The Lead Plaintiffs' $204 million Allowed Claim will be classified in both the Section 510(b) Note Claim and Section 510(b) Equity Claim classes based on the plan of allocation approved by the MDL Court. The Lead Plaintiffs' claim/interest will be satisfied through consideration in the same form, ratio, and treatment as what will be used to satisfy ~~such~~ holders of General Unsecured Claims under the Debtors' Plan. If any class member opts out of the Securities Settlement, and ultimately receives an allowed claim in the Debtors' Chapter 11 Cases, the amount received by the holder of an allowed opt-out claim will be deducted from the amount used to satisfy the Lead Plaintiffs in the Securities Settlement. ~~The Debtors will object to any claims filed by~~ A distribution made to a holder of an allowed opt- ~~out plaintiffs~~ out claim will be in the same Plan currency as that distributed on account of the Securities Settlement. The Debtors will object to any claims filed by members of the class in Securities Action who opt out of the Securities Settlement in the Bankruptcy Court, and will seek to have such claims expunged. The ERISA Settlement is structured similarly to the Securities Settlement. The ERISA Plaintiffs' claim/interest will be allowed in the amount of $24.5 million and will be satisfied with consideration in the same form, ratio, and treatment as that which will be used to satisfy holders of General Unsecured Claims under the Debtors' Plan. Unlike the Securities Settlement, the ERISA Plaintiffs are not entitled, and thus will not be able, to opt out of their settlement.

In addition to the proceeds from the claims in the Chapter 11 Cases, the Lead Plaintiffs will also receive a distribution of insurance proceeds up to $88.6 million, including the remainder of any insurance proceeds (which proceeds could be used by directors and officers in connection with non-indemnifiable claims) that are not used by the eight former directors and officers as permitted in the MDL Settlements (as discussed further below), and a distribution of $1.5 million from certain underwriters named as defendants in the MDL proceedings. The ERISA Action Plaintiffs will also receive a distribution of insurance proceeds in the amount of $22.5 million. The additional proceeds from the MDL Settlements will be divided and distributed according to the terms of the MDL Settlements ~~and the plan of allocations approved in connection with such settlements~~. The insurance proceeds are being held in escrow accounts pursuant to the MDL Settlements and subject to the direction of the MDL Court.

DS-144

(b)    <u>Reclamation Claims Program</u>

On November 4, 2005, the Bankruptcy Court approved global procedures for receiving, reviewing, responding to, and resolving reclamation demands.  The Debtors received thousands of reclamation demands, including duplicate demands. Due to the high volume of reclamation demands received by the Debtors, the Bankruptcy Court granted the Debtors a 45-day extension of the deadline to reconcile all reclamation claims.  After reviewing these demands, the Debtors identified 855 non-duplicate reclamation demands with a total face amount of more than $285 million.

To facilitate the review process of these 855 reclamation demands and the requirement to respond to all reclamation demands within 135 days, the Debtors developed a comprehensive process for responding to all such reclamation demands, evaluating any disagreements, and reaching agreed reclamation claim amounts subject to certain reserved defenses.  Reclamation response statements were sent to all 855 claimants on February 21, 2006.  These statements, representing the results of many hours of review of invoices and billing records, identified total reclamation claims of approximately $18.4 million.  <u>Since that time as a result of additional negotiations and reconciliations, the current amount of reclamation claims is approximately $22 million.</u>  As a result of almost continual negotiations with reclamation claimants since the Petition Date, more than 785 of the original 855 non-duplicate claims have now been resolved, subject to reservation of further defenses.

With respect to reclamation claims, the Debtors propose to allow each claimant to elect to take a general unsecured claim for the amount of its reclamation claim rather than have the Debtors seek a judicial determination that the reclamation claims are subject to the Debtors' reserved defense that reclamation claims are not entitled to administrative priority status on the grounds that the goods and/or the proceeds from the sale of the goods for which claimants are seeking a reclamation claim are or were subject to a valid security interest (the "Prior Lien Defense").   If a claimant elects to decline a general unsecured claim, then that claimant's reclamation claim will be automatically adjourned to a contested hearing to be held after the Debtors' emergence from chapter 11, which would determine whether the Prior Lien Defense applies to those claimants' reclamation claims.  The Debtors would retain all other reserved defenses with respect to the reclamation claims.

To effect this election, ~~and as more fully outlined in the Solicitation Procedures Order,~~ the Debtors are sending the claimants a separate notice which will ~~state the amount the Debtors believe is the valid amount of each such claimants' reclamation claim (the "Reconciled Reclamation Claim Amount") and~~ allow each claimant to choose the treatment for its reclamation claim (the "Reclamation Election Notice").

The Reclamation Election Notice provides that ~~if~~ the claimant ~~agrees with the Debtors' stated Reconciled Reclamation Claim Amount, it~~ may ~~elect~~ either <u>elect</u> payment of the reclamation claim in the plan currency afforded to holders of general unsecured claims under the Plan or ~~to~~ assert administrative priority treatment for ~~their~~ <u>its</u> reclamation claim and litigate such treatment at a contested hearing on the Prior Lien Defense to be held after the Company's emergence from chapter 11.  ~~If the claimant disagrees with the Reconciled Reclamation Claim Amount, the claimant is required to~~ <u>To contest treatment of</u>

DS-147

its reclamation claim as a general unsecured claim, the Seller must so mark and return the Reclamation Election Notice by November 12, 2007. Any dispute over the Reconciled Reclamation Claim Amount will then be resolved following the effective datethe deadline to be established by the Bankruptcy Court for the submission of votes on the Plan in accordance with the Reclamation Procedures set forth in the order entered by the Bankruptcy Court establishing procedures for the treatment of reclamation claims. If the claimant makes no election and does not dispute the Reconciled Reclamation Claim Amount, it will be given plan currency with postpetition intereston the Reclamation Election Notice, or affirmatively elects the treatment afforded general unsecured claims, it will receive a distribution on account of its Reconciled Reclamation Claim Amountin the currency afforded to holders of general unsecured claims under the Plan, to the extent that such Reclamation Claim is allowed, and will be deemed to have waived any right to seek administrative priority status for its Reclamation Claim. Notwithstanding the treatment afforded Reclamation Claims under these procedures, Reclamation Claims will not receive any voting rights on the Plan on account of their Reclamation Claims.

To the extent that the Debtors resolicit acceptances or rejections of the Plan (or any alternative plan of reorganization), such resolicitation will include a provision allowing any holder of a Reclamation Claim who made any election pursuant to the Reclamation Election Notice to amend such election by filing a duly executed copy of a rescission notice (which must be in a form reasonably acceptable to the Creditors' Committee) on or before the deadline for voting on such amended plan.

## 5.    *Disposition Of Assets*

### (a)    Sale Of De Minimis Assets

On October 28, 2005, the Bankruptcy Court entered an order permitting the Debtors to sell certain assets of de minimis value. The order approved procedures for selling assets, outside the ordinary course of business, without further court approval provided that the purchase price is less than $10 million for each transaction or in the aggregate for a related series of transactions. In connection with this order, the Debtors formulated internal approval procedures to both comply with closing conditions and satisfy the notice procedures set forth in the order. During these Chapter 11 Cases, the Debtors have disposed of assets under the de minimis assets order.

### (b)    JCI Transaction

Prior to the commencement of these Chapter 11 Cases, the Debtors sold their global battery business to Johnson Controls, Inc. ("JCI"), with the limited exception of two U.S. facilities located in New Brunswick, New Jersey and the other in Fitzgerald, Georgia. Accordingly, although the transaction occurred prepetition, the Debtors needed to address several post-closing matters relating to the Debtors' disposition of the Company's money-losing battery manufacturing facility in New Brunswick, New Jersey and the planned transition to JCI of battery production in the Fitzgerald, Georgia facility. Because JCI could not fill existing customer needs with its own manufacturing facilities, Delphi Automotive SystemsDAS LLC agreed to keep the Fitzgerald and New Brunswick facilities operating exclusively to sell batteries to JCI, even though the New Brunswick facility was

losing approximately $3 million per month and the Fitzgerald facility was losing approximately $2 million per month.

To limit these losses, the Debtors negotiated a transfer agreement with JCI, which was approved by the Bankruptcy Court on June 26, 2006.  The approved transfer agreement provided for (a) the sale of the New Brunswick facility to JCI, (b) the continued supply of batteries as well as the orderly transition of production to JCI from the Fitzgerald facility, (c) the implementation of an attrition plan with the IUE-CWA with provisions included to encourage the consensual separation of approximately 200 of the New Brunswick facility's 300 hourly employees, (d) the payment of $12.5 million from JCI to mitigate a majority of the costs of that attrition plan, and (e) the IUE-CWA's waiver of the no-sale clause and certain neutrality obligations with respect to the New Brunswick facility. The Debtors completed this sale on August 1, 2006.

(c)    MobileAria, Inc.

On July 21, 2006, the Bankruptcy Court entered an order approving the sale of all of the assets of MobileAria, an Affiliate Debtor, through an auction process.  The auction for the assets of MobileAria was held on July 6, 2006 and the sale hearing was held on July 19, 2006.  On July 31, 2006, MobileAria and Wireless Matrix USA, Inc. closed the sale of substantially all of MobileAria's assets in accordance with the Bankruptcy Court's order dated July 21, 2006.  MobileAria received cash proceeds of approximately $11 million in connection with the sale.

(d)    Interiors And Closures

On February 20, 2007, Delphi announced that it had signed a non-binding term sheet with the Renco Group, Inc. for the sale of its Interiors and Closures business.  On October 15, 2007, Delphi and certain of its affiliates entered into a Master Sale And Purchase Agreement with Inteva Products, LLC and certain of its affiliates (the "Interiors and Closures Agreement") for the sale of substantially all of the assets primarily used in the Company's cockpits and interior systems business and integrated closures systems business.  Concurrently, the Debtors filed a motion requesting a hearing on October 25, 2007 to approve bidding procedures in connection with the sale.  On October 26, 2007, the Bankruptcy Court entered an order approving those bidding procedures (the "Interiors and Closures Bidding Procedures Order").  It is anticipated that a hearing to approve the sale will be held on January 8, 2008.  The effectiveness of the Interiors and Closures Agreement is subject to the competitive bidding process approved in the Interiors and Closures Bidding Procedures Order, including a potential auction, and Bankruptcy Court approval.

(e)    Brake Hose

On March 27, 2007, the Bankruptcy Court entered an order approving the sale of certain of the Debtors' assets comprising substantially all of the assets exclusively used in the brake hose product and certain intellectual property related to the brake hose business to Harco Manufacturing Group, LLC for $9.8 million ("Harco").  On September 28, 2007, the Debtors and other consideration Harco closed the sale in accordance with the

Bankruptcy Court's March 27, 2007 order.  The Debtors received cash proceeds of approximately $9.8 million in connection with the sale.

(f)    Catalyst

On June 6, 2007, the Debtors announced that they had entered into a sale and purchase agreement with Belgium-based Umicore for the sale of assets of their global original equipment and aftermarket Catalyst Business.  Concurrently, the Debtors filed a motion requesting a hearing on June 26, 2007 to approve bidding procedures in connection with the sale and a hearing on August 16, 2007 to approve the sale.  On August 8, 2007, the Debtors, pursuant to bidding procedures approved by the Bankruptcy Court, held an auction for the Catalyst Business.  At the conclusion of the auction, the Debtors determined that Umicore had submitted the highest ‑and best bid, and on August 16, 2007, the Bankruptcy Court approved the sale of the Catalyst Business to Umicore for $75 million, subject to adjustments, and other consideration.  The~~On September 30, 2007, the~~ Debtors ~~anticipate~~and Umicore closed the sale ~~closing before the end~~in accordance with the Bankruptcy Court's order dated August 16, 2007.  The Debtors received cash proceeds of ~~2007~~approximately $66.0 million in connection with the sale.

(g)    Mexico Brake Plant Asset Sale

~~On June 14, 2007, Robert Bosch, DAS LLC, and two non-Debtor Mexican affiliates (including Delphi Sistemas de Energia, S.A. de C.V. ("DSE")) signed an asset sale and purchase agreement for the transfer by DAS LLC and DSE of most, but not all, of the material, equipment, and productive materials used for the production of brake products in a Saltillo, Mexico manufacturing plant for approximately $15 million.  On June 15, 2007, the Debtors filed a motion requesting a hearing on June 26, 2007 to approve bidding procedures in connection with the sale and a hearing on July 19, 2007 to approve the sale.  On July 19, 2007, the Bankruptcy Court entered an order approving the sale of assets.  The parties intend to close the sale by the end of the third quarter of 2007.~~

~~6.    Salaried Employee-Related Programs~~

~~(a)    Key Employee Compensation Program~~

~~The Debtors have implemented certain aspects of a key employee compensation program ("KECP"), pursuant to which executive-level U.S. employees have the capability of receiving incentive-based compensation based on the Company's and individual performance.  Upon commencement of the Debtors' Chapter 11 Cases, certain of the Debtors' salaried employees' compensation programs were terminated, including the annual incentive program and long-term incentive program.  The Debtors also cancelled a retention awards program enacted before the Petition Date.  As a result, upon the Debtors' entry into chapter 11, the Debtors' U.S. executives saw their total compensation opportunities decrease by approximately 50%, going from a total prepetition compensation plan composed of base salary, an annual incentive program, a long-term incentive program, and retention grants to a postpetition compensation package consisting solely of base salary.~~

Notice of Proposed Amendments
October 29, 2007

The Debtors' KECP motion consisted of three primary parts: (i) a short-term at-risk incentive compensation program, (ii) an emergence award plan, and (iii) a prepetition severance plan that was modified in the third quarter of 2005. The KECP program was designed, in part, to replace some of the prepetition compensation programs for the Debtors' U.S. executives. The KECP takes as a principle that the Company should provide market-competitive compensation opportunities designed to motivate its executive workforce to perform for the Debtors. Notably, the KECP in this case is different from traditional employee compensation and retention programs in at least two important ways. First, Mr. Miller, the former CEO and current Executive Chairman of Delphi, opted not to participate in the KECP. Rather, Mr. Miller is eligible for a discretionary performance payment, which would be determined by the compensation committee of Delphi's Board of Directors. Second, the KECP has no "retention" aspect at all.

Eligible employees under the KECP do not receive automatic payments simply for remaining in the employ of the Debtors. Rather, all incentive-based compensation is linked to specific performance and emergence targets in order to give these employees incentive to work towards a successful and early emergence from chapter 11. Indeed, the short-term at-risk incentive compensation programs ultimately proposed by the Debtors during the Chapter 11 Cases have incorporated six-month performance cycles, as opposed to the more traditional year-long periods, to closely monitor the Debtors' ongoing financial progress and to ensure that executive performance remains linked to the evolving demands of the Chapter 11 Cases. Additionally, even if the Debtors achieve their corporate and division-level performance targets, eligible employees also must maintain an acceptable level of personal achievement to qualify for the at-risk incentive compensation payments. Finally, the Debtors implemented an EBITDAR-based metric to evaluate the performance of the Debtors. In doing so, however, the Debtors eliminated from their analysis gains, if any, obtained during the applicable performance period as a result of their negotiations with GM and the Unions. By designing a short-term at-risk incentive compensation program in this manner, the Debtors sought to maximize the performance of their executives, which in turn, would increase the value of the Debtors' Estates.

Although the implementation of the KECP was heavily contested by numerous constituents, the Bankruptcy Court ultimately approved elements of the KECP. Specifically, the short-term at-risk incentive compensation program has since been approved by the Bankruptcy Court for periods covering 2006 and the first half of 2007.

(b)    Supplemental Executive Retirement Program

Since the separation from GM, Delphi has had a Supplemental Executive Retirement Program (the "SERP") for certain employees. The SERP is a non-qualified plan under the IRC that is separate from, but is integrated with, the Delphi Retirement Program for Salaried Employees, a qualified pension plan under the IRC. Pursuant to the authority granted by that certain Order Under 11 U.S.C. §§ 105(a), 363, 507, 1107, And 1108 (i) Authorizing Debtors To Pay Prepetition Wages And Salaries To Employees And Independent Contractors; (ii) Authorizing Debtors To Pay Prepetition Benefits And Continue Maintenance Of Human Capital Benefit Programs In the Ordinary Course; And (iii) Directing Banks To Honor Prepetition Checks For Payment Of Prepetition Human

DS-151

Capital Obligations (Docket No. 198), the Debtors have, throughout the course of the Chapter 11 Cases, continued to make monthly SERP payments to eligible retirees, limited to $5,000 per month per retiree.  Pursuant to the Plan, however, the Debtors will (i) no longer honor their obligations under the SERP as the Debtors will reject, as of the Effective Date, or otherwise terminate the current SERP and (ii) implement a new Supplemental Executive Retirement Program (the "New SERP") with respect to current eligible employees (subject to the execution of a waiver of claims) which, in effect, (a) freezes the benefits under the SERP and modifies eligibility to the age of 55 years with ten years of service and (b) supplements the frozen SERP benefit with a new benefit under a separate plan (the "DC SERP").  Accordingly, as of the effective date of the Plan, the Debtors will no longer make monthly SERP payments to retirees, the retirees will have 30 days after the effective date of the Plan to file a proof of claim for any claims arising under the SERP, and current eligible employees that were entitled to the SERP will not be penalized by the rejection, termination, and/or halting of benefits with respect to the SERP because they will be eligible to participate in the New SERP.

Under the Plan, all persons holding or wishing to assert Claims arising out of the SERP, and whose SERP Claims vested prior to the Petition Date, must file with the Bankruptcy Court and serve upon the Debtors a separate, completed, and executed proof of claim (substantially conforming to Form. No. 10 of the Official Bankruptcy Forms) no later than 30 days after the Effective Date.  All such Claims not filed within such time will be forever barred from assertion against the Debtors and their Estates or the Reorganized Debtors and their property.  Any Claims arising out of SERP after the Petition Date will be disallowed in their entirety.  Allowed SERP Claims will receive the treatment afforded to Allowed General Unsecured Claims under the Plan.  Each such Allowed SERP Claim will receive a distribution on the earliest Distribution Date after such SERP Claim is allowed, if ever.  For further details, including details regarding postpetition interest on General Unsecured Claims, see Sections IX.E—Treatment Of Claims And Interests Under The Plan and IX.H—Provisions Governing Distributions of this Disclosure Statement.

(c)      Change In Control Agreements

In early 2000, Delphi modified certain terms of its change in control agreements (collectively, the "Change in Control Agreements") with its officers that had been in existence since the Separation.   The Change in Control Agreements provide certain benefits to each participant (each, a "Participant") upon the occurrence of a change in control of Delphi and additional benefits if the employment of a Participant is terminated for certain reasons after a change in control.  A change in control is defined under the Change in Control Agreements to include (i) the acquisition by any person, other than Delphi or any subsidiary of Delphi, of beneficial ownership of 25% or more of the outstanding common stock of Delphi; (ii) certain changes in the composition of Delphi's board of directors; (iii) certain mergers, consolidations, and other reorganizations of Delphi in which Delphi is not the surviving corporation; (iv) any sale, lease, exchange, or other transfer of 50% or more of the assets of Delphi; or (v) a liquidation or dissolution of Delphi.

Notice of Proposed Amendments
October 29, 2007

Pursuant to the Change in Control Agreements, Participants are entitled to certain payments and benefits upon the occurrence of a change in control, including the immediate vesting of all unvested options and restricted stock units, and the full funding of all of the Participant's "target awards" and any compensation previously deferred at the election of the Participant, together with accrued interest or earnings thereon. Additional payments and benefits are payable to Participants who cease to be employed by Delphi during the three years following a change in control if (i) Delphi terminates the Participant's employment other than for "cause" (as defined therein); (ii) the Participant terminates his or her employment if, without his or her consent, (a) his or her salary and other compensation or benefits are reduced for reasons unrelated to Delphi's or the Participant's performance, (b) his or her responsibilities are negatively and materially changed, (c) he or she must relocate his or her work location or residence more than 25 miles from its location as of the date of the change in control, or (d) Delphi fails to offer him or her a comparable position after the change in control; or (iii) during the one-month period following the first anniversary of the change in control, the Participant ceases to be employed by Delphi for any reason other than for cause.

The aggregate change in control liabilities arising from these and other rights granted to Participants under the Change in Control Agreements are potentially substantial. Executives continuing their employment with Delphi after the Effective Date of the Plan will be asked to waive benefits under the Change in Control Agreements and certain other programs in order to be eligible for Delphi's emergence compensation program and other related benefits. To the extent a Participant does not waive such benefits, the Company intends to challenge any asserted claims under the Change in Control Agreements. If all Participants were to successfully assert claims under the Change in Control Agreements, the resulting liability could total as much as $257.5 million.

(d)    Benefit Equalization Plan For Salaried Employees

The Benefit Equalization Plan for Salaried Employees ("BEP") is available to executives whose contribution and benefit levels in the Delphi Savings-Stock Purchase Program ("S-SPP") exceed certain limits under IRC Section 415. The BEP is not funded and since October 2004, contributions have been de minimis. Amounts contributed to the BEP are separately accounted for. The BEP will be terminated and all accounts paid out within 30 days of the Effective Date or as soon as practicable thereafter.

On June 14, 2007, Robert Bosch, DAS LLC, and two non-Debtor Mexican affiliates (including Delphi Sistemas de Energia, S.A. de C.V. ("DSE")) signed an asset sale and purchase agreement for the transfer by DAS LLC and DSE of most, but not all, of the material, equipment, and productive materials used for the production of brake products in a Saltillo, Mexico manufacturing plant for approximately $15 million. On June 15, 2007, the Debtors filed a motion requesting a hearing on June 26, 2007 to approve bidding procedures in connection with the sale and a hearing on July 19, 2007 to approve the sale. On July 19, 2007, the Bankruptcy Court entered an order approving the sale of assets. The parties intend to close the sale during the fourth quarter of 2007.

Notice of Proposed Amendments
October 29, 2007

(h)     Saginaw Chassis Asset Sale

On September 17, 2007, DAS LLC and Delphi Technologies, Inc. entered into an Asset Purchase Agreement with TRW Integrated Chassis Systems LLC (the "Saginaw Chassis Agreement") for the sale of certain of the assets, including, without limitation, manufacturing equipment and test and development equipment primarily used and located at the Company's chassis facility in Saginaw, Michigan, for approximately $26.4 million and other consideration, including approximately $15 million for useable and merchantable inventory existing as of the closing date and up to $0.4 million for out-of-pocket costs and expenses incurred in relocating manufacturing equipment and related tooling from Saltillo, Mexico.  Delphi Canadia, Inc. also is selling assets located at a facility in Oshawa, Ontario, Canada pursuant to an Asset Purchase Agreement dated September 17, 2007, by and between Delphi Canada, Inc. and TRW Integrated Chassis Systems LLC, which is an agreement ancillary to the Saginaw Chassis Agreement.  Also on September 17, 2007, Delphi filed a motion with the Bankruptcy Court requesting approval of bidding procedures for the sale and requesting that a sale hearing be set.  The hearing to approve bidding procedures in connection with the sale is currently set for November 16, 2007.  The effectiveness of the Saginaw Chassis Agreement is subject to a competitive bidding process, including a potential auction, and Bankruptcy Court approval.

### 7.6.     Real Property And Related Matters

Pursuant to a Bankruptcy Court order dated November 30, 2005, the Bankruptcy Code section 365(d)(4) deadline for assuming or rejecting the Debtors' unexpired leases of nonresidential real property was extended to June 7, 2007.  On April 13 and August 16, 2007, the Bankruptcy Court entered orders further extending the 365(d)(4) deadline.  The current deadline is the earlier of the date when a plan of reorganization in the Chapter 11 Cases is confirmed and February 29, 2008.

Separately, on March 27, 2007, the Bankruptcy Court entered an order authorizing the Debtors to effectuate a transaction that enabled the Debtors to consolidate into one facility located in Auburn Hills, Michigan, six of their leased office and technical centers located in Michigan and Illinois, and a portion of one owned site in Flint, Michigan.  The same order authorized the Debtors to reject certain leases for facilities that would be consolidated.  The consolidation of these facilities will enable to the Debtors to create a consolidated footprint in Southeast Michigan that is closer to key customers and will generate net savings of over $100 million dollars over a ten-year period.

### 8.7.     Global Events

In February 2007 Delphi's indirect wholly owned Spanish subsidiary, Delphi Automotive Systems España, S.L. ("DASE"), announced the planned closure of its sole operation at the Puerto Real site in Cadiz, Spain.  The closure of this facility is consistent with Delphi's transformation planTransformation Plan to optimize its manufacturing footprint and to lower its overall cost structure.  The facility, which has approximately 1,600 employees, is the primary holding of DASE.

DS-154

including the right under section 502(d) of the Bankruptcy Code to use defensively the abandoned avoidance cause of action as a ground to object to all or any part of a claim against any estate asserted by a creditor that remains in possession of, or otherwise obtains the benefit of, the avoidable transfer.

~~Once~~Although actions subject to these procedures have been commenced, the Debtors will proceed no further and not use them for any purpose while they focus on confirming the Plan. The procedures are designed to permit the Debtors to preserve these claims while otherwise maintaining the status quo with all parties-in-interest. The actions will remain dormant and become relevant again only in the unlikely event that the Debtors do not timely emerge from chapter 11.

(c)    FICA Claimants' Estate Causes of Action

In 1999 and 2003, Delphi, a predecessor of DAS LLC, and Delphi Automotive Systems Services LLC (the "FICA Claimants") agreed to pay "ratification bonuses" shortly after the effective date of duly ratified collective bargaining agreements to certain union members who were classified in a specified status (i.e., active status, protected status, temporary layoff status, or various forms of short-term leave of absence). The FICA Claimants contend that the payments were not "wages" subject to taxation under the Federal Insurance Contributions Act ("FICA") because the payments were not in exchange for any services by the union members, but instead constituted payments in exchange for a promise by the union membership to be bound by the collective bargaining agreements. The FICA Claimants nevertheless withheld and paid FICA taxes to the IRS to avoid the possibility of becoming secondarily liable for the FICA taxes owed to the IRS by those union members. The FICA Claimants subsequently filed claims for refunds with the IRS. The IRS denied the refund claim for 1999 FICA taxes while these Chapter 11 Cases were pending, but the IRS has yet to act on the refund claim for 2003 FICA taxes. The FICA Claimants may file actions for the benefit of the estates to recover an amount that is currently estimated to be $26,058,128 in 1999 and 2003 FICA overpayments, as well as related interest, and to expressly preserve these estate causes of action in Exhibit 7.24 of the Plan.

**E.    Summary Of Claims Process**

The Debtors' claims administration process in these chapter 11 cases is an advanced process compared to other large, complex Chapter 11 Cases. The Debtors have made significant progress in reconciling and allowing claims, primarily because one of the conditions in both the Original EPCA and the Investment Agreement is that the allowed or estimated amount for certain "trade and other unsecured claims" will not exceed $1.7 billion, the dollar threshold negotiated among the Debtors and the Plan Investors.

*1.    Schedules Of Assets And Liabilities And Statements Of Financial Affairs*

On January 20, 2006, the Debtors filed with the Bankruptcy Court Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, the "Schedules and Statements"). In compliance with the requirements under the Bankruptcy Code, separate

DS-160

Schedules and Statements were filed for the 42 debtors in the jointly-administered chapter 11 cases.  The Debtors filed amendments to the Schedules and Statements on February 1, 2006 ~~and~~, April 18, 2006, and for ten Debtors on October 12, 2007.  The global notes and limitations with respect to the Schedules and Statements are incorporated by reference in, and comprise an integral component of, the Schedules and Statements, and should be referred to and reviewed in connection with the Schedules and Statements.

For financial reporting purposes, the Debtors, along with their subsidiaries which are not the subject of cases under the Bankruptcy Code, prepare consolidated financial statements that are filed with the SEC and that are audited annually.  Unlike the consolidated financial statements, the Schedules and Statements reflect the assets and liabilities of each individual Debtor, except as otherwise noted.  The Schedules and Statements do not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles in the United States, nor are they intended to fully reconcile to the consolidated financial statements filed by Delphi.

### 2.    *Claims Bar Date*

On April 12, 2006, the Bankruptcy Court entered an order (the "Bar Date Order") establishing July 31, 2006 as the general deadline for filing proofs of claim against the Debtors (the "Bar Date").  Proofs of claim were not required to be filed by any person or entity who

- agreed with the nature, classification, and amount of its Claim as described in the Schedules and Statements and whose Claim against a Debtor was not listed as "disputed," "contingent," or "unliquidated" in the Schedules,

- already filed a proof of claim against the correct Debtor,

- asserted only an administrative expense claim and not a claim otherwise subject to the Bar Date Order,

- asserted a claim solely on the basis of future pension or other post-employment benefits,

- had a claim that had been allowed by or paid pursuant to a Bankruptcy Court order,

- was the holder of certain notes, or

- held Delphi common stock.

The Bar Date Order also provides for a new Bar Date for claimants who may be affected by two specific events which might have occurred before or may occur after the Bar Date.  First, if the Debtors amend the Schedules and Statements to reduce the undisputed, non-contingent, and liquidated amounts or to change the nature or classification of a particular Claim against a Debtor reflected therein, then the affected claimant has until 30 calendar days after such claimant is served with notice that the Debtors have amended their

DS-161

Schedules to file a proof of claim or to amend any previously filed proof of claim in respect of such amended scheduled claim.  Second, holders of claims based on the rejection of executory contracts and unexpired leases have until the later of (i) the Bar Date or (ii) 30 calendar days after the effective date of such rejection to file a claim.

Under the Bar Date Order, any person or entity which was required to file a proof of claim, but failed to do so in a timely manner on or before the applicable Bar Date, is forever barred, estopped, and enjoined from (a) asserting any claim that such person or entity has against the Debtors that (i) is in an amount that exceeds the amount set forth in the Schedules and Statements as undisputed, non-contingent, and unliquidated or (ii) is of a different nature or in a different classification than as set forth in the Schedules and Statements and (b) voting upon, or receiving distributions under, any plan or plans of reorganization in these Chapter 11 Cases in respect of such a claim, and the Debtors and their property will be forever discharged from any and all indebtedness or liability with respect to such a claim.

The Debtors' claims and noticing agent, Kurtzman Carson Consultants LLC, provided notice of the Bar Date by mailing to each person listed in the Schedules and Statements: (i) a notice of the Bar Date, (ii) a proof of claim form, and (iii) statements which indicated whether the claim of each recipient was listed in the Schedules and Statements as either unliquidated, contingent, and/or disputed.

The Debtors also published notice of the Bar Date on or before April 24, 2006 in New York Times (national edition), the Wall Street Journal (national, European, and Asian editions, USA Today (worldwide), the Automotive News (national edition), and in local editions of the following: the Adrian Daily Telegram, the Arizona Daily Star, the Buffalo News, the Chicago Sun Times, the Clinton News, the Columbus Dispatch, the Daily Leader, the Dayton Daily News, the Detroit Free Press, the El Paso Times, the Fitzgerald Herald Leader, The Flint Journal, the Gadsden Times, the Grand Rapids Press, the Greensville News, the Indianapolis Star, the Kansas City Star, the Kokomo Tribune, the Lansing State Journal, the Laurel Leader, the Los Angeles Daily News, the Milwaukee Journal Sentinel, the Mobile Beacon, The Mobile Register, the Oakland Press, the Olathe Daily News, the Rochester Democrat and Chronicle, the Saginaw News, the Sandusky Register, the Tribune Chronicle, the Tulsa World, The Tuscaloosa News, and The Vindicator.

In total, the Debtors provided notice of the Bar Date to more than 500,000 persons and entities.

### 3.    *Proofs Of Claim And Other Claims*

As of ~~September 5~~October 26, 2007, the Debtors had received approximately 16,~~600~~700 proofs of claim, of which approximately 900 were filed after the Bar Date.  A portion of these approximately 16,~~600~~700 proofs of claim assert, in part or in whole, unliquidated amounts.  In addition, the Debtors have compared proofs of claim received to scheduled liabilities and determined that there are certain scheduled liabilities for which no proof of claim was filed.  In the aggregate, total proofs of claim and scheduled liabilities assert approximately $37 billion in liquidated amounts, including approximately $900

million in intercompany claims, and additional unliquidated amounts.  Although the
Debtors have not completed the process of reconciling these proofs of claim and thus, the
ultimate amount of such liabilities is not determinable at this time, the Debtors believe that
the aggregate amount of claims filed is likely to exceed the amount that will ultimately be
allowed by the Bankruptcy Court.

### 4.    Claims Reconciliation Progress

The Debtors have sought to resolve their claims pool on an expedited basis. With
$37 billion in liquidated amounts plus certain unliquidated amounts asserted against the
Debtors as of January 31, 2007 in more than 16,500 proofs of claim, and certain scheduled
liabilities for which no proof of claim was filed, the Debtors faced a challenging task.
Between September 19, 2006 and ~~September 5~~October 26, 2007, the Debtors ~~have~~ filed
~~20~~22 Omnibus Claims Objections seeking disallowance of approximately 9,~~700~~800 proofs
of claim with approximately $9.6 billion in asserted liquidated amounts plus unliquidated
amounts, and modification of approximately 3,~~400~~700 proofs of claim with approximately
$~~560~~727 million in asserted liquidated amounts.  As of ~~September 5~~October 26, 2007, the
Bankruptcy Court has entered orders expunging approximately 9,~~100~~300 proofs of claim,
which reduced the amount of asserted claims by approximately $~~8.7~~9.3 billion.  In addition,
the asserted claim amount of approximately ~~2,700~~3,100 claims has been reduced by
approximately $~~42.5~~67.2 million either through orders on omnibus claims objections
($~~24.5~~35.1 million) or stipulated orders ($~~18.0~~32.1 million).  Additionally, ~~80~~87 proofs of
claim asserting approximately $~~188~~249 million have been withdrawn.

The Debtors and their advisors devoted a significant amount of time to the claims
resolution process. For example, the Debtors gained court approval of certain claims
objection procedures, which are discussed in more detail below, applicable to claims that
become contested when claimants respond to an omnibus objection. Pursuant to these
procedures, the Debtors scheduled multiple claims for adjudication in a hearing before the
Bankruptcy Court, held multiple "meet-and-confer" discussions and mediations, and
ultimately resolved several contested claims during the period from October 2006 through
~~August~~October 2007 before they were scheduled for hearing. Finally, with respect to
contested claims that did proceed to hearing, the Debtors obtained orders disallowing and
expunging 94% of such claims, thus reducing the prepetition unsecured claims pool by
approximately $230 million.

As of ~~September 5~~October 26, 2007, there are approximately ~~500~~250 proofs of
claim of the approximately 16,~~500~~700 proofs of claim which still require further
reconciliation by the Debtors.  The Debtors anticipate that some of these remaining proofs
of claim will be withdrawn as they are reconciled and the Debtors intend to place all
remaining proofs of claim that are not withdrawn on future omnibus claims objections.

### 5.    Claims Objection Procedures And Estimation Procedures Motion

On May 22, 2006, the Debtors established a team of analysts whose primary duty
was to reconcile all proofs of claim filed against the Debtors. The claim reconciliation
process entails comparing the assertions in each proof of claim to the Debtors' books and
records.  The reconciliation includes a validation of three basic claim components: Debtor,

classification, and amount.  Once a discrepancy between an asserted claim and the Debtors' books and records is identified, the Debtors place the claim on an objection to be filed with the Bankruptcy Court and seek either to disallow and expunge or modify the claim in accordance with their books and records (an "Omnibus Claims Objection"). The Debtors filed their first Omnibus Claims Objection on September 19, 2006 and to date have filed ~~20~~22 Omnibus Claims Objections.

On December 7, 2006, the Bankruptcy Court entered an order (the "Claims Procedures Order") establishing (1) special hearings to consider contested claims matters, (2) certain procedures governing the filing and contents of claimants' responses to Omnibus Claims Objections, (3) certain procedures governing the adjudication of contested claims matters, and (4) certain procedures for the service of Omnibus Claims Objections.  The Claims Procedures Order provides that if a claimant files a response to an Omnibus Claims Objection and that response complies with the procedures set forth in that order, then the hearing on the Debtors' objection to the claim will be adjourned to a special claims hearing.  During the claims administration process, claimants have filed responses with respect to approximately 1,~~500~~750 claims.  As of ~~September 5~~October 26, 2007, the Bankruptcy Court had conducted ~~ten~~14 claims hearings to adjudicate approximately ~~585~~750 of those claims, resulting in those claims being disallowed and expunged.  A total of ~~62~~110 signed settlement agreements have resulted in settlements satisfactory to the Debtors.  The remaining claims have either been scheduled to be resolved at future claims hearings, are subject to further reconciliation, or are being negotiated in the hopes of reaching consensual agreements which would be presented at future claims hearings by the parties.

~~The Debtors intend~~On September 28, 2007, the Bankruptcy Court entered an order ("Estimation Procedures Order") with respect to ~~file their Motion For Order Pursuant To 11 U.S.C. §§ 105(A) And 502(C) (A) Estimating And Setting Maximum Cap On Certain Contingent Or Unliquidated Claims And (B) Approving Expedited Claims Estimation Procedures (the "Estimation Procedures Motion") which will be scheduled~~ certain contingent or unliquidated claims establishing (1) a maximum cap amount for certain claims, solely for the ~~September 27, 2007 omnibus hearing.  The Estimation Procedures Motion will seek to implement procedures for estimating all remaining Disputed Claims with an unliquidated component~~purposes of tabulating votes on and ~~establishing Disputed Claims Reserves as~~setting appropriate reserves under any plan of reorganization of the ~~Effective Date~~Debtors, (2) that the Debtors may further object to, or seek to estimate, any and all of the unliquidated claims at lesser amounts for purposes of allowance and distribution, (3) that hearing dates scheduled pursuant to the Claims Procedures Order will also be used to consider the estimation of certain claims, and (4) certain expedited claims estimation procedures governing the filings and evidence that would be presented in conjunction with an estimation hearing.

### 6.    *Key Classes Of Claims*

(a)    <u>GM Claims</u>

(i)    GM's Proof Of Claim

On July 31, 2006, GM filed an unliquidated amended proof of claim.  The claims asserted by GM included warranty/recall claims, overpricing and overpayment claims, short shipments claims, damaged goods claims, missed price reduction claims, lease and service contract claims, flowback employee post employment benefits and relocation cost claims, claims arising under the special attrition programs, UAW benefit guarantee claims, personal injury indemnification claims, environmental claims, federal, state, and other tax claims, and intellectual property claims. For certain portions of its claim, GM provided documentation aggregating approximately $6 billion.  Under the Plan, GM will receive $2.7 billion and other consideration in satisfaction of its claims.  In addition, certain GM claims will flow through the Chapter 11 Cases and be satisfied by the Reorganized Debtors in the ordinary course of business while certain of GM's warranty claims were settled by agreement of the parties as set forth more fully below.

(ii)    Settlement Of GM Warranty Claims

GM asserted that it incurred costs and suffered damages arising from certain customer warranty claims and/or recall campaigns related to allegedly non-conforming parts and systems supplied by Delphi to GM.  These claims were not subject to the general settlement with GM as documented in the Global Settlement Agreement and Master Restructuring Agreement.  During separate negotiations to resolve the warranty claims, GM advised Delphi that the amount of certain warranty claims had substantially increased from those asserted in GM's proof of claim.

On September 2~~7~~, 2007, the ~~Debtors anticipate filing a~~ <u>Bankruptcy Court granted Delphi's</u> motion ~~seeking authorization from the Bankruptcy Court~~ to enter into and perform under a settlement agreement resolving the warranty claims (the "Warranty Settlement Agreement") with GM for a total estimated amount of approximately $200 million.  With certain limited exceptions, the agreement (i) settles all outstanding warranty claims and issues related to a component or assembly supplied by Delphi to GM that are (a) known by GM as of August 10, 2007, (b) determined by GM to be Delphi's responsibility in whole or in part, and (c) managed in GM's investigation process, and (ii) limits the liability related to certain other warranty claims that have become known by GM on or after June 5, 2007.  Under the Warranty Settlement Agreement, GM ~~would be~~ <u>is</u> foreclosed from bringing any type of claim set forth on the exhibits attached thereto, if it is shown that on or before August 10, 2007 (i) GM knew about the claim, (ii) the amount of the claim exceeded $1 million as of the date of the Warranty Settlement Agreement or GM believed the claim would exceed $1 million, (iii) the claim, as of the date of the Warranty Settlement Agreement, was in GM's investigation process or GM determined that it should have been in GM's investigation process but excluded it from that process for the purpose of pursuing a claim against Delphi, and (iv) GM believed as of the date of the Warranty Settlement Agreement, or reasonably should have believed at that time, that Delphi had some responsibility for the claim.  The Debtors estimate that the settlement saves their Estates

hundreds of millions of dollars in potential liability which, ~~to the extent ultimately allowed and~~ absent this settlement, would likely receive Flow-Through Claim status.

(b)      Labor Union Claims

In total, the Unions filed 663 proofs of claim against the Debtors, asserting approximately $11.8 billion plus additional unliquidated amounts.  Of the total union claims, the UAW asserted a claim for $11 billion plus additional unliquidated amounts, the UAW GM Center for Human Resources asserted a claim for $145 million, the USW asserted a claim for $570 million, the IUE-CWA and affiliated unions asserted 441 claims asserting unliquidated amounts, the IUOE and affiliated unions asserted 127 claims asserting approximately $98,000 plus unliquidated amounts, the IBEW and affiliated unions asserted 45 claims asserting approximately $3.3 million plus unliquidated amounts, and the IAM and affiliated unions asserted 45 claims asserting approximately $225,000 plus unliquidated amounts.

A joint stipulation and agreed order entered by the Bankruptcy Court on February 26, 2007 between the Debtors and the IUE-CWA, IAM, IBEW, and IUOE resolved 481 claims, with those unions agreeing to withdraw those claims.  The remaining 182 claims, asserting approximately $11.72 billion plus additional unliquidated amounts, have been resolved pursuant to additional Bankruptcy Court orders or are expected to be resolved through stipulations reached with the Unions.

(c)      Environmental And Other Regulatory Claims And Investigations

Delphi is subject to the requirements of U.S. federal, state, local, and non-U.S. environmental and occupational safety and health laws and regulations. These include laws regulating air emissions, water discharge, and waste management.  Delphi has an environmental management structure designed to facilitate and support its compliance with these requirements globally.  Although Delphi intends to comply with all such requirements and regulations, the Debtors cannot provide assurance that they are at all times in compliance.  The Debtors have made and will continue to make capital and other expenditures to comply with environmental requirements.  Although such expenditures were not material during the past three years, Delphi is preparing to spend $10.9 million to install pollution control equipment on coal-fired boilers at its Saginaw, Michigan Steering Division facility to meet U.S. and Michigan air emission regulations.  Environmental requirements are complex, change frequently, and have tended to become more stringent over time.  Accordingly, the Debtors cannot assure that environmental requirements will not change or become more stringent over time or that the Debtors' eventual environmental cleanup costs and liabilities will not be material.

Delphi is also subject to complex laws governing the protection of the environment and requiring investigation and cleanup of environmental contamination.  Delphi is in various stages of investigation and cleanup at its manufacturing sites where contamination has been discovered.  Additionally, Delphi has received notices that it is a potentially responsible party ("PRP") in proceedings at various sites, including the Tremont  Barrel Fill  Site located in Tremont City, Ohio.  In September 2002, Delphi and other PRPs

DS-166

entered into a Consent Order with the Environmental Protection Agency ("EPA") to perform a Remedial Investigation and Feasibility Study concerning a portion of the site. The Remedial Investigation has been completed, and an Alternatives Array Document should be finalized in 2007.  A Feasibility Study and Record of Decision are expected to be completed in 2008.  Although Delphi believes that capping and future monitoring is a reasonably possible outcome, it appears that the State of Ohio will oppose that remedy. Because  the manner of  remediation  is yet to be determined, it is possible that the final resolution of this matter may require  the Debtors to make material future expenditures for remediation, possibly over an extended period of time and possibly substantially in excess of the existing reserves.  Delphi believes that its liability for the site will be between 25% and 60% of the final overall site investigation and remediation costs.  Delphi will continue to re-assess any potential remediation costs and, as appropriate, Delphi's overall environmental reserves as the investigation proceeds.

When it has been possible to provide reasonable estimates of Delphi's liability with respect to environmental sites, provisions have been made in accordance with U.S. GAAP. As of June 30, 2007, Delphi's reserve for such environmental investigation and clean up was approximately $120 million, which reflects in part the retention by GM of the environmental liability for certain inactive sites as part of the Separation.  Delphi cannot ensure that environmental requirements will not change or become more stringent over time or that Delphi's eventual environmental cleanup costs and liabilities will not exceed the amount of its current reserves.  Moreover, facility sales and/or closures relating to the restructuring process could trigger additional and perhaps material environmental remediation costs, as previously unknown conditions may be identified.

As was agreed to in connection with the Investment Agreement, and as is further outlined in the Plan, Environmental Obligations have been classified as Flow-Through Claims and thus will be unimpaired by the Plan and will be satisfied in the ordinary course of Delphi's business (subject to the preservation and flow-through of all Estate rights, claims, and defenses with respect to those obligations).

(d)    State Of New York Workers' Compensation Board Claims

Under the laws of the various jurisdictions in which they operate, the Debtors are required to maintain workers' compensation policies and to provide Employees with workers' compensation coverage for claims arising from or related to workplace illnesses or injuries arising during their employment with the Debtors.  Therefore, and in accordance with applicable requirements of local law, the Debtors maintain workers' compensation policies in all states in which they operate.

In the State of New York, the Debtors currently provide their Employees with self-insured workers' compensation.  Pursuant to workers' compensation policies, Employees seeking reimbursement for work-related injuries file their claims directly against the Debtors.  In connection with their self-insured workers' compensation, the Debtors are required by some of the states in which they operate as a self-insured, including New York, to post security such as cash, securities, irrevocable letters of credit, security deposits, or surety bonds for the benefit of the respective state.  Failure of the Debtors to pay their workers' compensation obligations can result in a draw down in the

Notice of Proposed Amendments
October 29, 2007

affected state of such letters of credit, security deposits, and/or surety bonds. Further, failure to maintain the requisite security could give a state the right to revoke the Debtors' self-insured employer status. By virtue of the provisions of a first day order entered in the Chapter 11 Cases, the Debtors were authorized to pay all amounts related to workers' compensation claims and incurred but not reported claims.

To date, the Debtors have paid all workers' compensation obligations to their Employees arising in the State of New York. Under the Plan, all workers' compensation obligations, regardless of whether they arise from prepetition or postpetition events, and regardless of whether a proof of claim has been filed, will flow through the Plan and continue to be paid by the Debtors in the ordinary course.

The Debtors have been advised by the State of New York Workers' Compensation Board ("NYSWCB") that because of recalculations by the NYSWCB based upon reports submitted by the Debtors, the amount of security currently posted by the Debtors with New York is substantially inadequate and would require a significant increase to be in compliance with the updated requirements. The Debtors do not agree with the revised calculation and take issue with the conclusions of the NYSWCB. As a result, representatives of the Debtors and the NYSWCB have been in continuing discussions to try to resolve this issue. If this issue is not resolved to the satisfaction of the NYSWCB, it is likely that the State of New York will seek to terminate Delphi's ability to maintain self-insured status pursuant to provisions of the New York State's Workers' Compensation Law. Delphi reserves its right to challenge any such effort. In the event the Debtors' ability to maintain self-insured status is revoked, alternative arrangements for workers' compensation coverage would most certainly be more costly.

### F.    Professional Fees

At the commencement of these Chapter 11 Cases, the Bankruptcy Court entered an order establishing procedures for interim compensation and reimbursement of expenses of professionals (the "Compensation Order"). The Compensation Order requires professionals retained in these cases to submit monthly fee statements to the Debtors and requires the Debtors to pay 80% of the requested fees and 100% of the requested expenses pending interim approval by the Bankruptcy Court. The remaining 20% of fees requested in such fee statements are paid only upon further order of the Bankruptcy Court (the "Holdback"). The Compensation Order requires the professionals retained in these Chapter 11 Cases to file applications for approval of their fees and expenses for the preceding four-month period approximately every four months.

To monitor costs to the Debtors' estates and avoid duplicative efforts in the review of fee applications filed in these Chapter 11 Cases, the Debtors, the Creditors' Committee, and the U.S. Trustee negotiated the formation of a joint fee review committee (the "Fee Review Committee") to review, comment on, and, if necessary, object to the various fee applications filed in these Reorganization Cases. On May 5, 2006, the Bankruptcy Court authorized the establishment of the Fee Review Committee and approved a protocol regarding the committee, its composition, mandate, and procedures. The Fee Review Committee is comprised of representatives of each of: (a) the U.S. Trustee for this District, (b) the Debtors, and (c) the Creditors' Committee. On August 17, 2006, the Bankruptcy

Notice of Proposed Amendments
October 29, 2007

Court entered an order authorizing the Fee Review Committee to retain Legal Cost Control, Inc. as a fee analyst to assist the Fee Review Committee.

The fees approved by the Bankruptcy Court for the Debtors', Creditors' Committee's, and Equity Committee's professionals are as follows (including ~~requested fees and expenses for the fifth interim fee application period, which will be heard at the October 25, 2007 omnibus hearing, and~~ fees and expenses incurred through ~~July~~ August 31, 2007, invoiced or estimated as of ~~September~~ October 15, 2007):

| Period | First Interim Fee Application Period | Second Interim Fee Application Period | Third Interim Fee Application Period | Fourth Interim Fee Application Period | Fifth Interim Fee Application Period | Sixth Interim Fee Application Period |
|---|---|---|---|---|---|---|
| **Dates** | 10/8/2005 – 1/31/2006 | 2/1/2006 – 5/31/2006 | 6/1/2006 – 9/30/2006 | 10/1/2006 – 1/31/2007 | 2/1/2007 – 5/31/2007 | 6/1/2007 – ~~7~~8/31/2007 |
| **Fees** | $40,116,406 | $56,680,150 | $49,362,582 | $49,295,947 | ~~$61,329,410~~$60,934,511 | ~~$17,497,130~~$34,682,977 |
| **Expenses** | $2,295,873 | $4,081,250 | $4,307,390 | $3,358,907 | ~~$4,175,610~~$4,120,478 | ~~$948,479~~$2,772,019 |

All fee applications filed in these cases are subject to final approval by the Bankruptcy Court.

## IX.    SUMMARY OF THE REORGANIZATION PLAN

### A.    Introduction

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and its shareholders. In addition to permitting rehabilitation of the debtor, chapter 11 promotes equality of treatment of creditors and equity security holders who hold substantially similar claims against or interests in the debtors and its assets. In furtherance of these goals, upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan, and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the

Cash, securities, and other property in respect of certain Classes of Claims and Interests as provided in the Plan.  The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan, and the securities and other property to be distributed under the Plan are described below.

### 1.    *Settlements Embodied In The Plan*

The foundation of Delphi's restructuring and the Plan is a series of interdependent settlements (each, a "Settlement" and, collectively, the "Settlements") and compromises of various claims and disputes.  The Settlements, which are the product of protracted negotiations between and among various constituencies, including the Debtors, GM, the UAW, the IUE-CWA, the USW, the IAM, the IBEW, the IUOE, the Creditors' Committee, ~~the Equity Committee,~~ and the MDL Plaintiffs (collectively, the "Settlement Negotiation Parties"), and their respective financial and legal professionals, are reflected in the recoveries of the various holders of claims and interests under the Plan and are designed to achieve a global, consensual resolution of these Chapter 11 Cases.  Although litigation could produce somewhat different absolute and relative recoveries than those embodied in the Plan for some of the Settlement Negotiation Parties, those parties believe that any such litigation would be extraordinarily expensive and would not be finally resolved for a long period of time, which would consequently delay and materially reduce distributions to all holders of Claims and Interests.  The Debtors also believe that the recoveries provided to holders of Claims and Interests under the Plan are substantially higher than the lowest point in the range of reasonable litigation outcomes in the absence of the Settlements.  The Settlements among the Settlement Negotiation Parties have paved the way for the Plan, which will enable maximum distributions to all of the holders of Claims and Interests, without the cost and delay of litigation.  The Equity Committee actively participated in the various negotiations leading to the Settlements.  As previously discussed, certain events and market factors affecting Plan distributions and the Debtors' businesses led to continued discussions among certain of the Settlement Negotiation Parties after the filing of the September 6 Plan. As a result of those discussions, which led to diminished distributions to the holders of Existing Common Stock, the Equity Committee now disagrees with and may oppose the terms of certain of the Settlements.

The claims and disputes being resolved by the Settlements include, among others:

- Delphi's potential claims and causes of action against GM, the Statutory Committees' request to prosecute such claims, and the resolution of GM's proof of claim.

- The claims asserted by the UAW, IUE-CWA, USW, IAM, IBEW, and IUOE against the Debtors and the ratification of labor agreements with each of the Debtors' principal labor unions.

- The claims and causes of action asserted by various plaintiffs against certain defendants including the Debtors in the Multidistrict Litigation in the United States District Court for the Eastern District of Michigan.

Notice of Proposed Amendments
October 29, 2007

The substance of each of the Settlements is discussed at length previously in this Disclosure Statement. Although the Settlement Negotiation Parties disagree over the relative strengths and weaknesses of the claims and potential defenses involved asserted by certain parties to the Settlements and, accordingly, disagree as to how those claims and defenses would fare if litigated to final judgment, they do agree that resolution of the claims and disputes is crucial to confirmation of any plan. Clearly, any litigation concerning the settled matters would be exceptionally complicated and protracted, and given the magnitude of the values involved and the amount of claims at stake, would be hotly contested and expensive. Such litigation would in turn substantially prolong these Chapter 11 Cases, which all constituencies believe is not in the best interests of the Estates or Delphi's long term business objectives. For these reasons, the Debtors believe that the Settlements reached among the Settlement Negotiation Parties are in the best interests of the Estates and all stakeholders.

### 2.  *The Plan Investors' Investment*

As briefly summarized above, the Plan Investors have agreed to make a substantial investment in the Reorganized Debtors in furtherance of the Debtors' Transformation Plan and Plan of Reorganization. The Plan Investors' investment will be made pursuant to the Investment Agreement, a copy of which is attached as Exhibit 7.11 to the Plan. Under the Investment Agreement, the Plan Investors have agreed to purchase New Preferred Stock in Reorganized Delphi for $800 million, New Common Stock in Reorganized Delphi for $175 million, and any shares of New Common Stock in Reorganized Delphi that are not subscribed for in the Rights Offering.

### C.  **Summary Of Changes To The Plan**

Delphi's Transformation Plan accomplishments are described in detail in Section V of the Disclosure Statement. It is Debtors' view (along with that of the Debtors' advisors) that the majority of the Transformation Plan's goals have been completed, and that the transformation goals available through chapter 11 have been accomplished. Consequently, the Debtors (and their advisors) believe that the value of the Debtors' businesses will erode if the Debtors continue to operate under chapter 11 of the Bankruptcy Code and a prompt consummation of the Plan is not achieved.

For the months during which the September 6 Plan was being negotiated, assumptions were made regarding the availability of certain exit financing terms, the enterprise value of the Reorganized Debtors, and the valuation of distribution to holders of Claims and Interests that distributed value to senior creditors and junior interest holders. Since those negotiations took place and the Debtors filed the September 6 Plan, the availability of the financing terms assumed in the September 6 Plan has been reduced by $1.9 billion and the Business Plan has been revised to reflect reduced volume production forecasts for GMNA. As a result, Delphi undertook discussions with several of its constituents following the filing of the Plan and Disclosure Statement on September 6, 2007. These discussions led to amendments to the September 6 Plan and changes to Plan recoveries for all stakeholders.

Notice of Proposed Amendments
October 29, 2007

The changes in recoveries for the various stakeholders is a result of the Debtors' need to preserve the value of the Company by consummating its Plan, the settlements embodied in the Plan, and the ability of the Plan Investors to make contributions to the Debtors' reorganization. Each of the Debtors' stakeholders places a different value on the settlements embodied in the Plan, but the Debtors believe that a prompt consummation of the Plan is in the best interests of the Debtors, the estates, and the stakeholders.

### 1. *General Unsecured Creditors*

The September 6 Plan provided for holders of General Unsecured Claims to recover the principal amount of such holders' Claims plus accrued interest, or a "par plus accrued recovery at Plan value." The ultimate recovery to holders of General Unsecured Claims (exclusive of TOPrS Claims) has not changed, but the currency used to effect this recovery has been modified under the Amended Plan. Under the September 6 Plan, holders of General Unsecured Claims were to be receive a "par plus accrued" distribution equal to 80% stock valued at $45 per share and 20% in Cash. Under the Plan, holders of General Unsecured Claims now will receive 92.4% of their allowed claims (including applicable accrued postpetition interest) in stock valued at $41.58 per share and Discount Rights equal to the value of 7.6% of their allowed claims (including applicable accrued postpetition interest). In addition, holders of General Unsecured Claims will receive oversubscription rights in the Discount Rights Offering that will enable them to purchase New Common Stock underlying the Discount Rights that are not exercised. The price of New Common Stock available through the exercise of oversubscription rights will be $0.25 per share higher than the Discount Rights Offering, with incremental cash paid to all non-subscribing General Unsecured Creditors on a pro rata basis.

Under the September 6 Plan, the holders of TOPrS Claims were to receive payment of their Claims (including accrued postpetition interest) in full in stock valued at $45 per share. The Plan now provides that holders of TOPrS Claims will receive payment of their Claims (excluding postpetition interest) in full at Plan value of which 92.4% will be paid in stock valued at $41.58 per share and Discount Rights equal to the value of 7.6% of their allowed claims (excluding applicable accrued postpetition interest).

### 2. *GM*

The September 6 Plan proposed to pay GM $2.7 billion in Cash in settlement of the GM Claim on the Effective Date of the Plan. The Plan now provides GM an overall claim in the same amount, but such claim will be paid in different currency. Under the Plan, GM will receive the consideration described in Section V.F.2.(a)(iii)(3) – Consideration To Be Received By GM.

### 3. *Existing Common Stock*

Under the September 6 Plan, holders of Existing Common Stock would have received their pro rata share of 1,476,000 shares of New Common Stock, certain participation rights in the Discount Rights Offering at a purchase price of $38.56 per share, certain participation rights in the Par Value Rights to purchase New Common Stock at $45.00 per share, and their pro rata share of New Warrants (exercisable for five years) at an

Notice of Proposed Amendments
October 29, 2007

exercise price of $45.00 per share.  The Plan now provides holders of Existing Common Stock with a pro rata share of rights to acquire up to 12,711,111 shares of New Common Stock in the Par Value Rights Offering at $41.58 per share.  These shares would otherwise be allocated to holders of General Unsecured Claims and Appaloosa on account of their claims.  In addition, holders of Existing Common Stock will receive their pro rata share of New Warrants to acquire $1.0 billion of New Common Stock at $45, and the New Warrants will be exercisable for six months after the Effective Date.  Any proceeds from the exercise of New Warrants will be used by Delphi to redeem shares of the preferred stock held by GM.

### C.D.    Substantive Consolidation Of Certain Debtors

The Plan contemplates and is predicated upon entry of an order substantively consolidating certain of the Debtors' Estates for purposes of all actions associated with confirmation and consummation of the Plan.  The Court may order substantive consolidation in the exercise of its general equitable discretionary powers under section 105(a) of the Bankruptcy Code to ensure the equitable treatment of creditors.  The effect of substantive consolidation will be the pooling of the assets and liabilities of the consolidated Debtors and the satisfaction of creditor claims from the resulting common fund.  The Debtors in a particular consolidated Debtor group will be substantively consolidated with each other but not with any other Debtor.

Specifically, under the Plan, the groups of Debtors and individual non-consolidated Debtors are

| Number | Consolidated Debtor Group Or Debtor Name | Debtors In Group |
|---|---|---|
| 1 | Delphi-DAS Debtors | Delphi Corporation, Delphi Automotive Systems LLC, ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Services Solutions, Inc., Delphi Liquidation Holding Company, Delphi LLC, Aspire, Inc., Delphi NY Holding Corporation, Delphi Receivables LLC, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Exhaust Systems Corporation, and Environmental Catalysts, LLC |
| 2 | DASHI Debtors | Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi International Holdings Corp., and Delphi International Services, Inc. |
| 3 | Connection System Debtors | Packard Hughes Interconnect Company and Delphi Connection Systems |
| 4 | Specialty Electronics Debtors | Specialty Electronics, Inc. and Specialty Electronics International Ltd. |
| 5 | Delco Electronics Overseas Corporation | Non-Consolidated Entity |

DS-174

Subject to the provisions of the Plan, on the first Periodic Distribution Date occurring after the later of (a) the date when an Administrative Claim becomes an Allowed Administrative Claim or (b) the date when an Administrative Claim becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the holder of such Administrative Claim, a holder of an Allowed Administrative Claim will receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, (i) Cash equal to the unpaid portion of such Allowed Administrative Claim or (ii) such other less favorable treatment as to which the Debtors (or the Reorganized Debtors) and the holder of such Allowed Administrative Claim have agreed upon in writing; provided, however, that that (x) holders of the DIP Facility Revolver Claim, DIP Facility First Priority Term Claim, DIP Facility Second Priority Term Claim, and Investment Agreement Claims will be deemed to have Allowed Administrative Claims as of the Effective Date in such amount as the Debtors and such holders of such DIP Facility Revolver Claim, DIP Facility First Priority Term Claim, DIP Facility Second Priority Term Claim, and Investment Agreement Claims have agreed upon in writing or as determined by the Bankruptcy Court, which Claims will be paid in accordance with Article X of the Plan, and (y) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases and Allowed Administrative Claims arising under contracts assumed during the Chapter 11 Cases prior to the Effective Date will be paid by the Debtors or the Reorganized Debtors in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, provided however that (i) any cure payments associated with the assumed contracts will be paid in accordance with Sections 2.1(a) or 2.1(b) of the Plan, except as otherwise provided in Article VIII of the Plan and (ii) the contracts have not been rejected pursuant to Section 8.1(a) of the Plan. Holders of Administrative Claims will not be entitled to Postpetition Interest unless the documents governing such Administrative Claims explicitly so provide.

(b)    Priority Tax Claims

Commencing on the first Periodic Distribution Date occurring after the later of (a) the date a Priority Tax Claim becomes an Allowed Priority Tax Claim or (b) the date a Priority Tax Claim first becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the holder of such Priority Tax Claim, at the sole option of the Debtors (or the Reorganized Debtors), such holder of an Allowed Priority Tax Claim will be entitled to receive, on account of such Priority Tax Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Priority Tax Claim, (i) equal Cash payments during a period not to exceed six years after the assessment of the tax on which such Claim is based, totaling the aggregate amount of such Claim, plus Postpetition Interest, plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to by a particular taxing authority, (ii) such other treatment as is agreed to by the holder of an Allowed Priority Tax Claim and the Debtors (or the Reorganized Debtors), provided that such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors) than the treatment set forth in clause (i) of this paragraph, or (iii) payment in full in Cash plus Postpetition Interest.

DS-181

Customer Obligation from a customer of Delphi as of the date of the commencement of the hearing on the Disclosure Statement, (b) Environmental Obligation (excluding those environmental obligations that were settled or capped during the Chapter 11 Cases (to the extent in excess of the capped amount)), (c) an Employee-Related Obligation (including worker compensation and unemployment compensation claims) asserted by an hourly employee that is not otherwise waived pursuant to the Union Settlement Agreements, (d) any Employee-Related Obligation asserted by a salaried, non-executive employee who was employed by Delphi as of the date of the commencement of the hearing on the Disclosure Statement, (e) any Employee-Related Obligation asserted by a salaried executive employee who was employed by Delphi as of the date of the commencement of the hearing on the Disclosure Statement and has accepted the Management Compensation Program as described in Section 7.8 of the Plan, and (f) litigation exposures and other liabilities arising from litigation that are covered by insurance but only in the event that the party asserting the litigation ultimately agrees to limit its recovery to available insurance proceeds; provided, however, that all Estate Causes of Action and defenses to any Flow-Through Claim will be fully preserved.

The legal, equitable, and contractual rights of each holder of a Flow-Through Claim, if any, will be unaltered by the Plan and will be satisfied in the ordinary course of business at such time and in such manner as the applicable Reorganized Debtor is obligated to satisfy each Flow-Through Claim (subject to the preservation and flow-though of all Estate Causes of Action and defenses with respect thereto, which will be fully preserved). The Debtors' failure to object to a Flow-Through Claim in their Chapter 11 Cases will be without prejudice to the Reorganized Debtors' right to contest or otherwise object to the classification of such Claim in the Bankruptcy Court.

(iii)    Class J (Interests In Affiliate Debtors).

Class J consists of all Interests in Affiliate Debtors.  "Interests in Affiliate Debtors" means the legal, equitable, contractual, and other rights of any Person with respect to any equity securities of, or ownership interests in the Affiliate Debtors.

On the Effective Date, except as otherwise contemplated by the Restructuring Transactions, the holders of Interests in the Affiliate Debtors will retain such Interests in the Affiliate Debtors under the Plan.

**(b)    Classes Of Claims That Are Impaired**

(i)    Class C (General Unsecured Claims).

Class C consists of all General Unsecured Claims that may exist against a particular Debtor.  The term "General Unsecured Claims" means any Claim, including a Senior Note Claim, a TOPrS Claim, or a SERP Claim that is not otherwise an Administrative Claim, Priority Tax Claim, Secured Claim, Flow-Through Claim, GM Claim, Section 510(b) Note Claim, Intercompany Claim, Section 510(b) Equity Claim, Section 510(b) ERISA Claim, Section 510(b) Opt Out Claim, or Intercompany Claim.

Except as otherwise provided in and subject to Articles 9.8, 11.~~10~~9, and 11.~~15~~14 of the Plan, on the first Periodic Distribution Date occurring after the later of (a) the date when a General Unsecured Claim becomes an Allowed General Unsecured Claim or (b) the date when a General Unsecured Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such General Unsecured Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed General Unsecured Claim (including any applicable Postpetition Interest) and after giving effect to ~~the redistribution provision of~~ Article 11.~~10, (a)~~9 of the Plan, each holder of an Allowed General Unsecured Claim ~~other than a TOPrS Claim~~ will receive ~~Cash equal to 20% of such Claim and~~ the number of shares of New Common Stock (~~valued~~ at ~~$45~~ a value for Plan purposes of $41.58 per share~~) equal to 80% of such Claim, and (b) each holder of an Allowed TOPrS Claim will receive the number of shares~~ of New Common Stock ~~(valued at $45 per share)~~ equal to ~~100~~92.4% of such Claim~~. In~~ (including any applicable Postpetition Interest) except, that in each case~~, however,~~ fractional shares of New Common Stock will not be distributed to holders of Allowed General Unsecured Claims, and all such fractional shares ~~shall~~will be rounded, and distributions ~~will~~shall be made, in accordance with Article 9.10 of the Plan. ~~Furthermore, prior to giving effect to the redistribution provision of Article 11.10, the Cash payable with respect to Allowed General Unsecured Claims will be increased, and the number of shares of New Common Stock correspondingly decreased, by each such Claim's Pro Rata share of all Reduced Cure Cash.~~

On the commencement date of the Discount Rights Offering and pursuant to the Registration Statement and Article 7.15 of the Plan, each holder of a General Unsecured Claim will receive such holder's Pro Rata share of the Discount Rights. In addition, (i) pursuant to the Discount Rights Offering, each Exercising Creditor will receive the opportunity to exercise its Pro Rata portion (with respect to all Exercising Creditors) of Discount Oversubscription Rights and (ii) each Non-exercising Creditor will receive, on the first Periodic Distribution Date occurring after the later of (a) the date when the Non-exercising Creditor's General Unsecured Claim becomes an Allowed General Unsecured Claim or (b) the date when a the Non-exercising Creditor's General Unsecured Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such General Unsecured Claim, such holder's Pro Rata portion (with respect to all Non-exercising Creditors) of the Oversubscription Cash.

The Plan provides for the payment of postpetition interest on General Unsecured Claims at the applicable contractual non-default rate from the Petition Date through December 31, 2007 (and if there is no contract rate, at the Michigan Statutory Rate—that rate of interest provided for in Michigan Compiled Laws § 600.613 (4.845%), calculated as if the Petition Date were the date when the complaint had been filed under Michigan Law). In consultation with the Creditors' Committee, and as authorized by the Bankruptcy Court in the Solicitation Procedures Order, the Debtors have agreed to send a notice to the affected claimants as part of their Solicitation Package that sets forth this proposed treatment of interest and establishes a procedure by which affected claimants can submit their applicable contractual interest rate to the Debtors (the "Postpetition Interest Rate Determination Notice").

If a party receiving the Postpetition Interest Rate Determination Notice wishes to submit a contractual rate of interest to be paid on account of its claim, the party receiving the notice is required to return the Postpetition Interest Rate Determination Notice to the Voting Agent for General Unsecured Creditors (Kurtzman Carson Consultants) on or before ~~November ●,~~[●], 2007, the same date as the Voting Deadline.  The Debtors will then review the Postpetition Interest Rate Determination Notice and, if they disagree with the interest rate requested, file an objection to the notice no later than 30 days after the Effective Date of the Plan.  The dispute will then be resolved following the Effective Date of the Plan in accordance with the Debtors' general claim resolution procedures and as more fully described in the Plan.

(ii)     Class D (GM Claim).

Class D consists of the GM Claim that may exist against a particular Debtor.  The phrase "GM Claim" means any Claim of GM, excluding any Claim arising as a result of the IRC Section 414(l) Transfer, all Flow-Through Claims of GM, and all other Claims and amounts to be treated in the normal course or arising, paid, or treated pursuant to the Delphi-GM Definitive Documents (including the "GM Surviving Claims" as defined in the Delphi-GM Global Settlement Agreement), but will otherwise include all claims asserted in GM's proof of claim.

As provided in Article 7.20, the Plan constitutes a request to authorize and approve the Restructuring Agreement and the Settlement Agreement.  For good and valuable consideration provided by GM under the Delphi-GM Definitive Documents, and in full settlement and satisfaction of the GM Claims, GM will receive all consideration set forth in the Delphi-GM Definitive Documents (subject to the terms and conditions set forth in such documents), including, without limitation, (a) ~~Cash~~ $1.2 billion in junior preferred convertible stock with the ~~amount~~terms set forth in the Settlement Agreement; (b) $1.5 billion in a combination of ~~$2.7 billion to be paid on the Effective Date; (b)~~ at least $750 million in Cash and the GM Note; (c) retention of the GM Surviving Claims (as defined in the Settlement Agreement) as provided for in section 4.03 of the Settlement Agreement; (~~e~~d) the effectuation of the IRC Section 414(l) Transfer as provided for in section 2.03 of the Settlement Agreement; and (~~d~~e) the releases as provided for in sections 4.01, 4.02 and 4.03 of the Settlement Agreement.

(iii)    Class E (Section 510(b) Note Claims).

Class E~~ 1~~ consists of all ~~Securities Action Claim~~Section 510(b) Note Claims that may exist against a particular Debtor.  A "Section 510(b) Note Claim" means any Cause of Action consolidated in the MDL Actions related to any claim against the Debtors (a) arising from the rescission of a purchase or sale of any Senior Notes, Subordinated Notes, or TOPrS, (b) for damages arising from the purchase of Senior Notes, Subordinated Notes, or TOPrS, and (c) for alleged violations of the securities laws, misrepresentations, or any similar Claims related to the Senior Notes, Subordinated Notes, or TOPrS.

In accordance with the terms of the Securities Settlement, the Securities Settlement disbursing agent will receive, on behalf of all holders of Section 510(b) Note Claims, and in full satisfaction, settlement, and discharge of, and in exchange for, all Section 510(b)

Notice of Proposed Amendments
October 29, 2007

Note Claims, ~~Cash and~~ New Common Stock, Discount Rights, and/or Oversubscription Cash as described in the Securities Settlement in the same proportion as the distribution of New Common Stock and Discount Rights made to the holders of General Unsecured Claims (without application of the intercreditor settlement between the Senior Notes and the TOPrS).  If any Section 510(b) Opt Out Note Claim ultimately becomes an Allowed Section 510(b) Opt Out Note Claim, however, then the holder of such Allowed Section 510(b) Opt Out Note Claim will receive a distribution of ~~Cash and~~ New Common Stock and Discount Rights solely from the Securities Settlement in the same proportion of ~~Cash and~~ New Common Stock and Discount Rights distributed to holders of General Unsecured Claims; ~~except~~ it being understood that with respect to any distribution made to a holder of an Allowed Section 510(b) Opt Out Note Claim, the Securities Settlement will be reduced by the same amount of ~~Cash and~~ New Common Stock and Discount Rights that the holder of such Allowed Claim will be entitled to receive.

(iv)    Class F (Intercompany Claims).

Class F consists of all Intercompany Claims that may exist against a particular Debtor.  An "Intercompany Claim" means a Claim by a Debtor, an Affiliate of a Debtor, or a non-Debtor Affiliate against another Debtor, Affiliate of a Debtor, or non-Debtor Affiliate.

Except as otherwise provided in Article 7.2 of the Plan, on the Effective Date, at the option of the Debtors or the Reorganized Debtors, the Intercompany Claims against any Debtor, including, but not limited to, any Intercompany Claims arising as a result of rejection of an Intercompany Executory Contract or Intercompany Unexpired Lease, will not receive a distribution on the Effective Date and instead will either be (a) Reinstated, in full or in part, and treated in the ordinary course of business, or (b) cancelled and discharged, in full or in part, in which case such discharged and satisfied portion will be eliminated and the holders thereof will not be entitled to, and will not receive or retain, any property or interest in property on account of such portion under the Plan; provided, however, that any Intercompany Claims against any Debtor held by a non-Debtor affiliate will be Reinstated.

(v)    Class G-1 (Existing Common Stock).

Class G-1 consists of all Existing Common Stock.  "Existing Common Stock" means shares of common stock of Delphi that are authorized, issued, and outstanding prior to the Effective Date.

On the Effective Date, the Existing Common Stock will be cancelled.  On the commencement date of the Par Value Rights Offering~~s~~, each holder of an Allowed Interest pertaining to the Existing Common Stock as of the Rights Offerings Record Date will receive non-transferable Par Value Rights to purchase 12,711,111 shares of New Common Stock pursuant to the ~~Discount Rights Offering and the~~ Par Value Rights Offering; ~~provided, however,~~ except that Appaloosa and the other Plan Investors, if any, which have agreed to not participate in the Par Value Rights Offering, ~~will~~ may not participate in the Par Value Rights Offering and Par Value Rights that would otherwise be distributed to Appaloosa and such other Plan Investors will be instead distributed to the other holders of

DS-186

Existing Common Stock. ~~The Rights distributed pursuant to the Discount Rights Offering will be transferable.~~  In addition, ~~except as otherwise provided in and subject to Article 9.9 of the Plan,~~ on the Distribution Date, or as soon thereafter as is reasonable and practical, each holder of an Allowed Interest pertaining to the Existing Common Stock will receive in exchange for such Interest its Pro Rata distribution of ~~(a) 1,476,000 shares of the New Common Stock and (b)~~ New Warrants.

(vi)    Class G-2 (Section 510(b) Equity Claims).

Class G-2 consists of all Section 510(b) Equity Claims. "Section 510(b) Equity Claim" means any Cause of Action consolidated in the MDL Actions related to any claim <u>against the Debtors</u> (a) arising from the rescission of a purchase or sale of any Existing Common Stock, (b) for damages arising from the purchase or sale of Existing Common Stock, and (c) for alleged violations of the securities laws, misrepresentations, or any similar Claims related to the Existing Common Stock.

In accordance with the terms of the Securities Settlement, the Securities Settlement disbursing agent will receive, on behalf of all holders of Section 510(b) Equity Claims, and in full satisfaction, settlement, and discharge of, and in exchange for, all Section 510(b) Equity Claims, ~~Cash and~~ New Common Stock<u>, Discount Rights, and/or Oversubscription Cash</u> as described in the Securities Settlement~~; provided, however, that if~~ <u>in the same proportion as the distribution of New Common Stock and Discount Rights made to the holders of General Unsecured Claims (without application of the intercreditor settlement between the Senior Notes and the TOPrS).  If</u> any Section 510(b) Opt Out Equity Claim ultimately becomes an Allowed Section 510(b) Opt Out Equity Claim, then the holder of such Allowed Section 510(b) Opt Out Equity Claim will receive a distribution of ~~Cash and~~ New Common Stock <u>and Discount Rights</u> solely from the Securities Settlement in the same proportion of ~~Cash and~~ New Common Stock <u>and Discount Rights</u> as is distributed to holders of General Unsecured Claims; ~~provided further, however,~~ <u>it being understood</u> that with respect to any distribution made to a holder of an Allowed Section 510(b) Opt Out Equity Claim, the Securities Settlement will be reduced by the same amount of ~~Cash and~~ New Common Stock <u>and Discount Rights</u> that the holder of such Allowed Claim will be entitled to receive.

(vii)    Class H (Section 510(b) ERISA Claims).

Class H~~-1~~ consists of all Section 510(b) ERISA Claims. "Section 510(b) ERISA Claim" means any Cause of Action consolidated in the MDL Actions arising from the alleged violation of ERISA.

In accordance with the terms of the ERISA Settlement, the ERISA Settlement disbursing agent will receive, on behalf of all holders of Section 510(b) ERISA Claims, and in full satisfaction, settlement, and discharge of, and in exchange for, all Section 510(b) ERISA Claims, ~~Cash and~~ New Common Stock<u>, Discount Rights, and/or Oversubscription Cash</u> as described in the ERISA Settlement.

DS-187

(viii)    Class I (Other Interests).

Class I consists of all Other Interests.  "Other Interests" means all options, warrants, call rights, puts, awards, or other agreements to acquire Existing Common Stock.

On the Effective Date, all Other Interests will be deemed cancelled and the holders of Other Interests will not receive or retain any property on account of such Other Interests under the Plan.

### ~~F.~~G.    Means For Implementation Of The Plan

#### 1.    Continued Corporate Existence

Subject to the Restructuring Transactions contemplated by the Plan, each of the Debtors will continue to exist after the Effective Date as a separate entity, with all the powers of a corporation, limited liability company, or partnership, as the case may be, under applicable law in the jurisdiction in which each applicable Debtor is incorporated or otherwise formed and pursuant to its certificate of incorporation and bylaws or other organizational documents in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws or other organizational documents are amended and restated by the Plan and the Certificate of Incorporation and Bylaws, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.  There are certain Affiliates of the Debtors that are not Debtors in these Chapter 11 Cases.  The continued existence, operation, and ownership of such non-Debtor Affiliates is a material component of the Debtors' businesses, and, as set forth in Article 11.1 of the Plan, all of the Debtors' equity interests and other property interests in such non-Debtor Affiliates will revest in the applicable Reorganized Debtor or its successor on the Effective Date.

#### 2.    Restructuring Transactions

On or following the Confirmation Date, the Debtors or Reorganized Debtors, as the case may be, will take such actions as may be necessary or appropriate to effect the relevant Restructuring Transactions.  The term "Restructuring Transactions" means a dissolution or winding up of the corporate existence of a Debtor or the consolidation, merger, contribution of assets, or other transaction in which a Reorganized Debtor or non-Debtor Affiliate directly owned by a Debtor merges with or transfers some or substantially all of its assets and liabilities to a Reorganized Debtor or their Affiliates, on or following the Confirmation Date, as set forth in the Restructuring Transaction Notice.  The Restructuring Transactions contemplated by the Plan include, but are not limited to, all of the transactions described in the Plan.  Such actions may also include, without limitation:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, guaranty, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities under applicable law; and (d) all other actions that

such Debtors and Reorganized Debtors determine are necessary or appropriate, including the making of filings or recordings in connection with the relevant Restructuring Transaction.  The form of each Restructuring Transaction will be determined by the boards of directors of a Debtor or Reorganized Debtor party to any Restructuring Transaction.  In the event a Restructuring Transaction is a merger transaction, upon the consummation of such Restructuring Transaction, each party to such merger will cease to exist as a separate corporate entity and thereafter the surviving Reorganized Debtor will assume and perform the obligations of each merged Debtor under the Plan.  In the event a Reorganized Debtor is liquidated, the Reorganized Debtors (or the Reorganized Debtor which owned the stock of such liquidating Debtor prior to such liquidation) will assume and perform the obligations of such liquidating Debtor.  Implementation of the Restructuring Transactions will not affect the distributions under the Plan.

The Debtors will file a Restructuring Transactions Notice listing the contemplated Restructuring Transactions on or before ~~November 2, 2007~~ the Plan Exhibit Filing Date. As of the date of this Disclosure Statement, the Debtors believe that the following entities will be either dissolved, liquidated, or merged into their parent entities.

- Delphi NY Holding Corporation

- Delphi Automotive Systems Services, LLC

- Delphi Services Holding Corporation

- Delphi Foreign Sales Corporation

- Exhaust Systems Corporation

- Environmental Catalysts, LLC

- ASEC Manufacturing General Partnership

- ASEC Sales General Partnership

- Delphi Automotive Systems Tennessee, Inc.

- Delphi Receivables, LLC

- Mobile Aria, Inc.

- Delphi Medical Systems Texas Corporation

- Specialty Electronics International Ltd.

- Delphi Integrated Service Solutions, Inc.

- Aspire Inc.

Notice of Proposed Amendments
October 29, 2007

The Debtors may add or subtract from this prior to filing the Restructuring Transactions Notice, and the list is presently provided solely for the purpose of relating the Debtors' current intention with respect to Restructuring Transactions.  The Restructuring Transactions Notice will provide greater detail with respect to the structure of the Restructuring Transactions.

In connection with the Debtors' exit financing and other foreign subsidiary matters, the ~~Company also intends~~Restructuring Transactions may include, but not be limited to ~~consolidate and/or restructure,~~ the consolidation and/or restructuring of the ownership and capital structure of certain foreign subsidiaries (primarily European~~) in the fourth quarter of 2007.~~).  To the extent a Restructuring Transaction affects a foreign entity held directly by a chapter 11 Debtor, then, unless authorized by a separate order of the Bankruptcy Court, such transaction will be consummated only following entry of the Confirmation Order pursuant to the authority anticipated to be granted by the Confirmation Order.  Specifically, the Company anticipates that DASHI and certain of its non-debtor subsidiaries will be involved in various consolidation and/or restructuring transactions designed, among other things, to facilitate increased access to liquidity and to maximize structural efficiency.  In connection with these transactions, certain non-U.S. entities will be pushed two tiers further down from DASHI – where most non-U.S. entities are held.  These transactions will be structured as capital contributions and/or in exchange for various forms of consideration, including without limitation, debt and/or equity.

For illustrative purposes, the following diagram represents a current, yet limited, organizational diagram of DASHI and certain of its subsidiaries.  The diagram includes, among other entities, ~~those non-U.S.~~certain of the entities that are anticipated to be impacted by the Restructuring Transactions, as indicated in yellow.



*Remaining shares held by Delphi International Holdings Corp (USA).

Notice of Proposed Amendments
October 29, 2007

The foreign subsidiaries that are anticipated to be part of the contemplated Restructuring Transactions include, without limitation, the "Foreign Subs Group B" entities listed on the diagram above as well as Delphi Tychy Sp.Z.o.o. and Delphi Poland S.A. As a result of the restructuring, it is contemplated that the "Foreign Subs Group B" entities as well as Delphi Tychy Sp.Z.o.o. will be transferred such that they are held at the same tier as the "Foreign Subs Group A" entities reflected on the diagram. The following is a chart listing the entities included in "Foreign Subs Group A" and those entities



anticipated to be included "Foreign Subs Group B":

| Foreign Subs Group A | Foreign Subs Group B |
|---|---|
| • ~~Delphi Automotive Systems Portugal S.A. (Portugal)~~ | • Delphi Packard Electric Ceska Republic (Czech Republic) |
| • ~~Delphi Automotive Systems Deutschland Verwaltungs GmbH (Germany)~~ | • Delphi Packard Romania Srl (Romania) |
| • ~~Delphi Delco Electronics Europe Gmbh~~ | • Delphi Holding Hungary Asset Management LLC (Hungary) |

Notice of Proposed Amendments
October 29, 2007

| Foreign Subs Group A | Foreign Subs Group B |
|---|---|
| ~~(Germany)~~<br>● ~~Delphi Deutschland GmbH (Germany)~~<br>● ~~Delphi Holding GmbH (Austria)~~<br>● ~~Delphi South Africa Pty Ltd (South Africa)~~<br>● ~~Delphi France Holding SA S (France)~~<br>● <u>Delphi Automotive Systems Portugal S.A. (Portugal)</u><br>● <u>Delphi Automotive Systems Deutschland Verwaltungs GmbH (Germany)</u><br>● <u>Delphi Delco Electronics Europe Gmbh (Germany)</u><br>● <u>Delphi Deutschland GmbH (Germany)</u><br>● <u>Delphi Holding GmbH (Austria)</u><br>● <u>Delphi South Africa Pty Ltd (South Africa)</u><br>● Delphi Diesel Systems SRl (Romania) | ● Delphi Otomotiv Sistemleri Sanayi Ticaret AS (Turkey)<br>● Delphi Automotive Systems Limited Sirketi (Turkey)<br>● Delphi Slovensko sro (Slovakia)<br>● DAS UK Limited (UK)<br>● Delphi Diesel Systems Limited (UK)<br>● DAS Luxembourg SA (Luxembourg) (37.5%)*<br>● DAS Sweden AB (Sweden)<br>● Mecel AB (Sweden)*<br>● Delphi Belgium NV (Belgium)<br>● DAS Morocco (Morocco)<br><br>*Entities currently owned by other Debtor entities would be transferred to DASHI prior to or as part of a Restructuring Transaction. |

The Debtors will include with its Restructuring Transactions Notice ~~to be filed on or before November 2, 2007,~~ a supplemental illustrative diagram updating the above illustration to reflect the consummation of anticipated Restructuring Transactions related to those entities held directly by DASHI.

### 3.    Certificate Of Incorporation And Bylaws

The Certificate of Incorporation and Bylaws of the Reorganized Debtors will be adopted and amended as may be required so that they are consistent with the provisions of the Plan and the Bankruptcy Code.  The <u>number of shares of New Common Stock and New Preferred Stock authorized under the</u> Certificate of Incorporation of Reorganized Delphi will~~, among~~ <u>be sufficient to satisfy requirements of the Investment Agreement, GM Settlement Agreements, and any</u> other ~~things:  authorize [●] million shares of New Common Stock at $0.01 par value per share and [●] shares of New Preferred Stock and requirements of the Plan and will~~ otherwise comply with section 1123(a)(6) of the Bankruptcy Code.  Each Affiliate Debtor will amend its certificate of incorporation, charter, bylaws, or applicable organizational document to otherwise comply with section 1123(a)(6).

### 4.    Directors And Executive Chair Of Reorganized Delphi

(a)    <u>The Search Committee And The New Board of Directors</u>

The method for choosing the Board of Directors of the reorganized Delphi (the "Reorganized Board of Directors") is a result of a negotiated agreement among various key constituencies.  As a result of this negotiated agreement, the interests of numerous parties should be adequately represented by the Reorganized Board of Directors.

A five-member search committee (the "Search Committee") will select the members of the Reorganized Board of Directors.  The members of this committee will

Notice of Proposed Amendments
October 29, 2007

Delphi reserves the right to identify new officers and members of the boards of directors or similar governing bodies of each such Affiliate Debtor at any time thereafter.

### 7.    *Employment, Retirement, Indemnification, And Other Agreements And Incentive Compensation Programs*

The Debtors must enter into employment, retirement, indemnification, and other agreements with the Debtors' respective active directors, officers, and employees who will continue in such capacities (or similar capacities) after the Effective Date, all as more fully stated on Exhibit 7.8 attached to the Plan, which contains a summary of the Management Compensation Plan and of components of compensation to be paid to management after the Effective Date; provided, however, that to enter into or obtain the benefits of any employment, retirement, indemnification or other agreement with the Debtors or Reorganized Debtors, an employee must contractually waive and release any claims arising from pre-existing employment, retirement, indemnification, or other agreements with any of the Debtors.  The Management Compensation Plan, as more fully described on Exhibit 7.8 to the Plan, may include equity, bonus, and other incentive plans as components of compensation to be paid to executives after the Effective Date (including a long-term incentive plan that assumes 10% of the available shares of Reorganized Delphi's fully diluted New Common Stock will be reserved for future annual grants to executives, including but not limited to the initial target grant of equity awards).

### 8.    *Procedures For Asserting SERP Claims*

All persons holding or wishing to assert Claims solely on the basis of further pension or other post-employment benefits arising out of the SERP, and whose SERP Claims vest or vested prior to the Effective Date, must file with the Bankruptcy Court and serve upon the Debtors a separate, completed, and executed proof of claim (substantially conforming to Form. No. 10 of the Official Bankruptcy Forms) no later than 30 days after the Effective Date.  All such Claims not filed within such time will be forever barred from assertion against the Debtors and their Estates or the Reorganized Debtors and their property.  Any Claims arising out of the SERP after the Effective Date will be disallowed in their entirety.  On the Effective Date, the Debtors will reject or otherwise terminate the SERP and will implement a new Supplemental Executive Retirement Program with respect to current eligible employees (subject to the execution of a waiver of claims), all as more fully described on Exhibit 7.8.

### 9.    *Cancellation Of Existing Securities And Agreements*

On the Effective Date, except as otherwise specifically provided for herein in the Plan or as otherwise required in connection with any Cure, (a) the Existing Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of the Debtors as are Reinstated under the Plan, will be cancelled; provided, however, that Interests in the Affiliate Debtors will not be cancelled, and (b) the obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents

governing the Existing Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors, except such notes or other instruments evidencing indebtedness or obligations of the Debtors as are Reinstated under ~~the~~this Plan, as the case may be, will be released and discharged; provided, however, that any agreement that governs the rights of a holder (including the Indentures) of a Claim and that is administered by an indenture trustee, agent, or servicer (each hereinafter referred to as a "Servicer") will continue in effect solely for purposes of (~~i~~x) allowing such Servicer to make the distributions on account of such Claims under the Plan as provided in Article IX of the Plan and (~~ii~~y) permitting such Servicer to maintain any rights or liens it may have for fees, costs, and expenses under such indenture or other agreement; provided~~,~~ further, however, that the preceding proviso will not affect the discharge of Claims against or Interests in the Debtors under the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Reorganized Debtors.  The Reorganized Debtors will not have any obligations to any Servicer (or to any Disbursing Agent replacing such Servicer) for any fees, costs, or expenses incurred on and after the Effective Date of the Plan except as expressly provided in Article 9.5 of the Plan; provided further, however, that nothing ~~herein~~in Section 7.10 of the Plan will preclude any Servicer (or any Disbursing Agent replacing such Servicer) from being paid or reimbursed for prepetition or postpetition fees, costs, and expenses from the distributions being made by such Servicer (or any Disbursing Agent replacing such Servicer) pursuant to such agreement in accordance with the provisions set forth therein, all without application to or approval by the Bankruptcy Court.

### 10.    Plan Investors' Contribution

Pursuant to the terms and conditions of the Investment Agreement, the Plan Investors will pay to the Debtors Cash in the amount specified in the Investment Agreement, attached to the Plan as Exhibit 7.11, to be utilized by the Reorganized Debtors to make Cash distributions ~~pursuant to Article V of~~as required under the Plan~~,~~ and for general working capital purposes.

### 11.    Sources Of Cash For Plan Distributions

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Plan will be obtained from the Exit Financing ~~Facility~~Arrangements, the Investment Agreement, the Rights Offerings, existing Cash balances, and the operations of the Debtors and the Reorganized Debtors.

### 12.    Establishment Of Cash Reserve

On the Effective Date, the Debtors will fund the Cash Reserve in such amounts as the Debtors determine are necessary to make the required future payments to Administrative Claims, Priority Tax Claims, and as otherwise provided by the Plan.

### 13.    *Post-Effective Date Financing*

An important aspect of the Debtors' emergence plan is a are new, exit financing facilityarrangements designed to fund certain payments under the Debtors' restructuring plan and to provide working capital to the reorganized enterprise.  The Plan provides that on the Effective Date, the Reorganized Debtors will enter into the Exit Financing FacilityArrangements, in an aggregate funded principal amount of no less than $3.7 billion, the terms of which are described in the Exit Financing Facility Term Sheetexit financing term sheets attached to the Plan as Exhibit 7.14, to obtain the funds necessary to repay the DIP Facility Revolver Claims, the DIP Facility First Priority Term Claims, and the DIP Facility Second Priority Term Claims, make other payments required to be made on the Effective Date, and conduct their post-reorganization operations.  The Reorganized Debtors may execute all documents and enter into all agreements as may be necessary and appropriate in connection with the Exit Financing Facility.Arrangements.  In the Confirmation Order, the Bankruptcy Court will approve the terms of the Exit Financing FacilityArrangements in substantially the form filed with the Bankruptcy Court (and with such changes as the applicable Debtors and respective agents and lenders parties thereto may agree upon) and authorize the applicable Reorganized Debtors to execute the same together with such other documents as the applicable Reorganized Debtors and the applicable lenders may reasonably require to effectuate the treatment afforded to such parties under the Exit Financing Facility.Arrangements.  A more detailed discussion of the Exit Financing Facility is contained in <u>Section VII.D – Exit Financing</u> above.

### 14.    *Rights Offerings*

The Rights Offerings are an aspect of the Company's exit financing package and were important in obtaining the support of the Equity Committee.  After extensive negotiations, the Equity Committee's formal support of the Investment Agreement largely hinged on the terms of the Rights Offerings, and the Rights Offerings are a reflection of the negotiations that took place among the Debtors, the Equity Committee, the Plan Investors, the Creditors' Committee, and GM.

(a)    <u>Discount Rights Offering</u>

(i)    <u>Eligibility For Participation In Discount Rights Offering</u>

Pursuant to the PlanRegistration Statement, and under the terms of Article 5.3 of the Plan and the Investment Agreement, Delphi will commence the Discount Rights Offering.  The a Discount Rights Offering will allow Delphi's common stockholders as of the Rights Offering Record Date to purchase for each shareto generate gross proceeds of Existing Common Stock, through the exercise of transferableup to $1.575 billion.  Discount Rights Offering Holders will be offered Discount Rights, 40,845,016 to purchase up to 45,026,801 shares of New Common Stock, in exchange for a Cash payment equal to $38.5634.98 per share of New Common Stock for each Discount Right exercised.  Rights distributed pursuant to the Discount Rights Offering will be freely  Rights will be distributed to the Discount Rights Offering Holders based on each Discount Rights Offering Holders' Pro Rata allocation of the Discount Rights.  If a Claim of the Discount Rights Offering Holder is not Allowed or otherwise reconciled by the Debtors by the date

DS-199

of commencement of the Confirmation Hearing, such Claim will be temporarily allowed, solely for purposes of participation in the Discount Rights Offering, in the amount so estimated by the Bankruptcy Court or agreed to by the holder of the claim and the Debtors. Discount Rights distributed pursuant to the Discount Rights Offering will not be transferable.

(b)    Par Value Rights Offering

(ii)    Pursuant to the Plan and under the terms of Exhibit B to the Investment Agreement, Delphi will commence a Par Value Rights Offering pursuant to which each holder of Existing Common Stock on the Rights Offering Record Date will be offered the opportunity to purchase a proportionate amount of the number of shares of New Common Stock with an aggregate value equal to $572 million in exchange for the Cash payment of $45.00 per share of such Discount Oversubscription Rights

Under the terms of Article 5.3 of the Plan and consistent with the Investment Agreement, to the extent the Discount Rights Offering is not fully subscribed, Exercising Creditors will be eligible to exercise, at their discretion, Discount Oversubscription Rights to purchase shares of New Common Stock not otherwise purchased through the Discount Rights Offering in exchange for a Cash payment equal to $35.23 per share of New Common Stock for each Discount Oversubscription Right exercised.  To the extent the number of the Discount Oversubscription Rights subscribed for by Exercising Creditors is greater than the number of Discount Oversubscription Rights available, the Discount Oversubscription Rights will be available to Exercising Creditors (based upon such creditors' underlying claim) on a Pro Rata basis (with respect to all Exercising Creditors) up to the amount of Discount Oversubscription Rights each Exercising Creditor has elected to exercise, until all Oversubscription Rights have been allocated.

(iii)    Distribution Of New Common Stock; provided, however, that Appaloosa and the other Plan Investors, if any, which have agreed to not participate in the Par Value Rights Offering, will not participate in the Par Value Rights Offering and Rights that would otherwise be distributed to Appaloosa and such other Plan Investors will be instead distributed to the other holders of Existing Common Stock.  The $572 million of the New Common Stock offered under the Par Value Rights Offering would otherwise be distributable to holders of General Unsecured Claims, Appaloosa, and the Unions.

(c)    Distribution Of Shares

The Rights Offerings will be conducted in accordance with the terms of the Investment Agreement and pursuant to the Plan.  All New Common Stock issued in connection with the exercise of Discount Rights and Discount Oversubscription Rights

DS-200

pursuant to the Discount Rights Offerings will be issued on the Effective Date and will be distributed to holders of Rights who have exercised the Rights on, or as soon as reasonably practicable after, the Distribution Date.

        (b)      Par Value Rights Offering

           (i)     Eligibility For Participation In Par Value Rights Offering

        Pursuant to the Registration Statement, and under the terms of the Plan, Delphi will commence a Par Value Rights Offering pursuant to which each holder of Existing Common Stock on the Rights Offering Record Date will be offered the opportunity to purchase a proportionate amount of 12,711,111 shares of New Common Stock, provided however, that Appaloosa and the other Plan Investors, if any, which have agreed to not participate in the Par Value Rights Offering may not participate in the Par Value Rights Offering and the Par Value Rights that would otherwise be distributed to Appaloosa and such other Plan Investors will be instead distributed to the other holders of Existing Common Stock. The shares of New Common Stock offered under the Par Value Rights Offering are shares of New Common Stock that would otherwise be distributable to holders of General Unsecured Claims, Appaloosa, the UAW, the IUE-CWA, and the USW as set forth in Article 11.14 of the Plan.

           (ii)    Distribution Of New Common Stock

        All New Common Stock issued in connection with the exercise of Par Value Rights pursuant to the Par Value Rights Offerings shall be issued on the Effective Date and shall be distributed to holders of Rights who have exercised the Rights on, or as soon as reasonably practicable after, the Distribution Date.

### 15. Issuance Of Stock In Reorganized Delphi

        (a)      New Common Stock

        On the Effective Date, Reorganized Delphi will authorize shares of New Common Stock in an amount to be determined on or before the date of the Confirmation Hearing. A summary of selected terms of the New Common Stock is attached to the Plan as Exhibit 7.16(a). On the Distribution Date, or as soon as reasonably practicable thereafter, Reorganized Delphi will be deemed to have issued a total number of shares of New Common Stock necessary to satisfy obligations on account of Claims and Interests under the Plan and obligations under the Rights Offering and Investment Agreement. The issuance of the New Common Stock will be in compliance with the applicable registration requirements or exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code. The issuance and delivery of New Common Stock representing Direct Subscription Shares and Unsubscribed Shares will be in accordance with the terms of the Investment Agreement.

        (b)      Registration Rights Agreement

Without limiting the effect of section 1145 of the Bankruptcy Code, as of the Effective Date, the Reorganized Debtors will enter into a Registration Rights Agreement, substantially in the form of Exhibit 7.16(b) to the Plan, with the Plan Investors and any Related Purchaser, Ultimate Purchaser (each as defined in the Investment Agreement), affiliate of a Plan Investor who owns registrable securities, assignee, or transferee who executes a joinder agreement as contemplated by such Registration Rights Agreement.

(c)    <u>Listing On Securities Exchange Or Quotation System</u>

On the Effective Date, Delphi or Reorganized Delphi will use its commercially reasonable efforts to list and maintain the listing of the New Common Stock on a major New York based exchange. Persons receiving distributions of more than 5% of New Common Stock, by accepting such distributions, must have agreed to cooperate with Reorganized Delphi's reasonable requests to assist Reorganized Delphi in its efforts to list the New Common Stock on a national securities exchange quotation system.

**16.    *Issuance Of New Preferred Stock***

Pursuant to the Investment Agreement, on the Effective Date, Reorganized Delphi will authorize, issue, and deliver the "Series A 1" and "Series B" New Preferred Stock in exchange for the contribution of the Plan Investors described in Article 7.11 of the Plan. A summary of selected terms of the New Warrants "Series A" and "Series B" New Preferred Stock is attached to the Plan as Exhibit 7.18 17(a). The issuance and delivery of "Series A" and "Series B" New Preferred Stock will be in accordance with the terms of the Investment Agreement and Section 4(2) of the Securities Act.

Pursuant to the terms of the Delphi-GM Global Settlement Agreement, on the Effective Date, Reorganized Delphi will authorize, issue, and deliver the "Series C" New Preferred Stock to GM. A summary of the terms of the "Series C" New Preferred Stock is attached as Exhibit G to the Delphi-GM Global Settlement Agreement. The issuance and delivery of the "Series C" New Preferred Stock will be in accordance with the terms of the Delphi-GM Global Settlement Agreement and Section 1145(a) of the Bankruptcy Code.

**17.    *New Warrants***

On the Effective Date, Reorganized Delphi will authorize, issue, and deliver the New Warrants. A summary of selected terms of the New Warrants is attached to the Plan as Exhibit 7.18. The issuance of the New Warrants and the New Common Stock underlying the New Warrants will be in compliance with the applicable registration requirements or exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code. The proceeds generated from the exercise of the New Warrants will be used by the Reorganized Debtors to redeem shares of the "Series C" New Preferred Stock issued to GM under the terms of the Delphi-GM Global Settlement Agreement.

### 18.    MDL Settlements

The MDL Settlements are subject to final consideration by the Bankruptcy Court at the Confirmation Hearing on the Debtors' Plan, following the Bankruptcy Court's consideration of certain objections that may be filed by any of the "Potential Objectors" (that is, (i) the Official Committee of Unsecured Creditors, (ii) the United States Department of Labor, (iii) Wilmington Trust Company, as indenture trustee, (iv) the Ad Hoc Committee of Trade Creditors, (v) Davidson Kempner Capital Management LLC, SPCP Group, LLC, Castlerigg Master Investments Ltd., Elliott Associates, L.P., and CR Intrinsic Investors, LLC, and (vi) the Equity Committee) by the deadline for filing objections to the confirmation of the Plan.

### (a)    Securities Settlement

Upon the later of the Effective Date or the date the last order, as between the Bankruptcy Court and the MDL Court, approving the Securities Settlement, a copy of which is attached to the Plan as Exhibit 7.19(a), becomes ~~final~~a Final Order, Reorganized Delphi will, in accordance with the Securities Settlement ~~and the plan of allocation described therein~~, distribute the ~~Cash and~~ New Common Stock and Discount Rights described in Articles 5.5 and 5.8 of the Plan to the disbursing agent appointed by the MDL Court.

### (b)    ERISA Settlement

Upon the later of the Effective Date or the date the last order, as between the Bankruptcy Court and the MDL Court, approving the ERISA Settlement, a copy of which is attached to the Plan as Exhibit 7.19(b), becomes ~~final~~a Final Order, Reorganized Delphi will, in accordance with the ERISA Settlement ~~and the plan of allocation described therein~~, distribute the ~~Cash and~~ New Common Stock and Discount Rights described in Articles 5.9 of the Plan to the disbursing agent appointed by the MDL Court.

### (c)    Insurance Settlement

In connection with the Securities Settlement and the ERISA Settlement, Delphi, certain defendants in the MDL Actions, and Delphi's insurers entered into the Insurance Settlement, a copy of which is attached to the Plan as Exhibit 7.19(c).

### 19.    GM Settlement

The Plan constitutes a request to authorize and approve the (a) Settlement Agreement, attached to the Plan as Exhibit 7.20(a), that will resolve the GM Claims, and (b) the Restructuring Agreement, attached to the Plan as Exhibit 7.20(b), that will set forth the continuing obligations of GM and Delphi, which will become effective on the Effective Date, subject to the terms contained therein.  Each of the Settlement Agreement and Restructuring Agreement are incorporated by reference into this Plan in their entirety.  In that regard, the Settlement Agreement and Restructuring Agreement address issues specifically relating to the present and future relationship of Delphi, GM, and their Affiliates that are otherwise addressed in this Plan and as they are intended to relate to

Persons arising under section 544, 545, 547 of the Bankruptcy Code, 548, or 553 of the Bankruptcy Code or similar state laws will not be retained by the Reorganized Debtors unless specifically listed on Exhibit V7.24 to the Plan.  A non-exclusive list

Because of Retained Actions will be filed as Exhibit V to the Plan on or beforePlan's treatment of unsecured creditors, the Exhibit Filing Date.

UnderDebtors have determined that the Plan, affirmative pursuit of many if not all of these causes of action are unnecessary.would not benefit their estates and creditors.  As described in Section IX – Summary Of The Reorganization Plan above, the Plan will pay or satisfy all Allowed Claims in full through distributions of cash, common stock, or both. As a result, avoiding preferential transfers through causes of action under section 547 of the Bankruptcy Code or similar state laws would provide little or no benefit to the Debtors' Estates because any party returning such a transfer would be entitled to an unsecured claim for the same amount, to be paid or satisfied in full under the Plan.  For the same reasons, avoiding statutory liens under section 545 of the Bankruptcy Code or prepetition setoffs under section 553 of the Bankruptcy Code would provide little or no benefit to the Estates. As a result, under the Plan the Reorganized Debtors will not retain the Preference Claims except those specifically listed on Exhibit V7.24 to the Plan.

### 24.    Reservation Of Rights

With respect to any avoidance causes of action under section 544, 545, 547, 548, or 553 of the Bankruptcy Code that the Debtors abandon in accordance with the procedures described immediately aboveArticle 7.24 of the Plan (Preservation Of Causes Of Action), the Debtors reserve all rights, including the right under section 502(d) of the Bankruptcy Code to use defensively the abandoned avoidance cause of action as a ground to object to all or any part of a claim against any Estate asserted by a creditor that remains in possession of, or otherwise obtains the benefit of, the avoidable transfer.

### 25.    Exclusivity Period

The Debtors will retain the exclusive right to amend or modify the Plan, and to solicit acceptances of any amendments to or modifications of the Plan, through and until the Effective Date.

### 26.    Corporate Action

Each of the matters provided for under the Plan involving the corporate structure of any Debtor or Reorganized Debtor or corporate action to be taken by or required of any Debtor or Reorganized Debtor will, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and will be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, creditors, or directors of any of the Debtors or the Reorganized Debtors.

### 27.    Effectuating Documents; Further Transactions

Notice of Proposed Amendments
October 29, 2007

Each of the Chief Executive Officer, Chief Financial Officer, Chief Restructuring Officer, and General Counsel of the Debtors, or their respective designees, will be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan or to otherwise comply with applicable law.  The secretary or assistant secretary of the Debtors will be authorized to certify or attest to any of the foregoing actions.

### 28.    *Consummation Of Divestiture Transaction*

In the event that the Bankruptcy Court enters an order on or prior to the Effective Date authorizing Debtor(s) to sell assets free and clear of liens, claims, and encumbrances, such Debtor(s) will be permitted to close on the sale of such assets subsequent to the Effective Date free and clear of liens, claims, and encumbrances pursuant to sections 363 and 1123 of the Bankruptcy Code.

### 29.    *Exemption From Certain Transfer Taxes And Recording Fees*

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property will not be subject to any stamp taxes and any other similar tax or governmental assessment to the fullest extent contemplated by section 1146(c) of the Bankruptcy Code, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation of any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 30.    *Trade And Other Unsecured Claims Threshold*

In the event the Debtors fail to satisfy the condition set forth in Section 9(a)(xxii) of the Investment Agreement and ADAH waives such condition, to the extent the Debtors issue any shares of New Common Stock pursuant to the Plan (after giving affect to any Cash or other consideration provided to holders of Trade and Other Unsecured Claims under the Plan) as a result of Trade and Other Unsecured Claims aggregating in excess of $1.45 billion, then (i) the Debtors must issue to the Plan Investors additional Direct Subscription Shares, and (ii) adjust the conversion price of the New Series A Preferred Shares and the New Series B Preferred Shares each in accordance with the terms of Section 9(a)(xxii) of the Investment Agreement.

### ~~G.~~**H.**    Unexpired Leases And Executory Contracts

#### 1.    *Assumed And Rejected Leases And Contracts*

##### (a)    Executory Contracts And Unexpired Leases

All executory contracts and unexpired leases as to which any of the Debtors is a party will be deemed automatically assumed in accordance with the provisions and

requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such executory contracts or unexpired leases (i) will have been previously rejected by the Debtors by Final Order of the Bankruptcy Court, (ii) will be the subject of a motion to reject pending on or before the Effective Date, (iii) will have expired or terminated on or prior to December 31, 2007 (and not otherwise extended) pursuant to its own terms, (iv) are listed on the schedule of rejected executory contracts or unexpired leases attached to the Plan as Exhibit 8.1, or (v) are otherwise rejected pursuant to the terms of the Plan. Entry of the Confirmation Order by the Bankruptcy Court will constitute approval of the rejections and assumptions contemplated hereby pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Each executory contract or unexpired lease assumed pursuant to Article 8.l(a) of the Plan will vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law. The Debtors reserve the right to file a motion on or before the Confirmation Date to assume or reject any executory contract or unexpired lease. Notwithstanding the foregoing or anything else in Article VIII to the Plan, (i) all executory contracts or unexpired leases between GM and any of the Debtors will receive the treatment described in the Delphi-GM Definitive Documents and, (ii) all agreements and exhibits or attachments thereto, between the Unions and Delphi will receive the treatment as described in Article 7.21 of the Plan and the Union Settlement Agreements, and (iii) all executory contracts memorializing Ordinary Course Customer Obligations will receive the treatment described in Article 5.2 of the Plan.

(b)      Real Property Agreements

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property will include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (ii) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as a part of the Plan. In the event the Effective Date does not occur, the Bankruptcy Court will retain jurisdiction with respect to any request to extend the deadline for assuming any unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

(c)      Exhibits Not Admissions

Neither the exclusion nor the inclusion by the Debtors of a contract or lease on Exhibit 8.1 nor anything contained in the Plan will constitute an admission by the Debtors that such lease or contract is an unexpired lease or executory contract or that any Debtor, or its respective Affiliates, has any liability thereunder. The Debtors reserve the right, subject to notice, to amend, modify, supplement, or otherwise change Exhibit 8.1 on or before the Confirmation Date.

**2.**    ***Payments Related To Assumption Of Executory Contracts And Unexpired Leases***

 (a) <u>Material Supply Agreements</u>

  Any monetary amounts by which each Material Supply Agreement to be assumed pursuant to the Plan is in default will be satisfied, under section 365(b)(1) of the Bankruptcy Code by Cure, and will be paid to the non-Debtor counterparty to the Material Supply Agreement.  To the extent Cure has not already been agreed to between the Debtor party to the agreement and the non-Debtor party, the Debtors or Reorganized Debtors will provide each party whose Material Supply Agreement is being assumed or assumed and assigned pursuant to the Plan, in accordance with the Cure procedures established under the Solicitation Procedures Order, with a notice that will provide:  (i) the contract or lease being assumed or assumed and assigned; (ii) the name of the proposed assignee, if any; (iii) the proposed cure amount if any, that the applicable Debtor or Reorganized Debtor believes it (or its assignee) would be obligated to pay in connection with such assumptions; (iv) an election for the payment terms of the Cure Amount Claim, and (v) the procedures for such party to object to the assumption or assumption and assignment of the applicable contract or lease or the amount of the proposed Cure Claim Amount (the "Cure Amount Notice").  The Cure Amount Notice will be in substantially the form approved by the Bankruptcy Court under the Solicitation Procedures Order and will be served on each non-~~debtor~~ Debtor party or parties to a Material Supply Agreement.  If the non-~~debtor~~Debtor party does not timely respond to the Cure Amount Notice, the Cure Amount Claim will be paid in ~~Cash and~~ New Common Stock and Discount Rights in the same proportion as that received by holders of Allowed General Unsecured Claims on or as soon as reasonably practicable after the Effective Date.  If the non-~~debtor~~Debtor party responds to the Cure Amount Notice in accordance with the procedures set forth in the Solicitation Procedures Order and the non-~~debtor~~Debtor party asserts a dispute regarding (x) the nature or amount of any Cure, (y) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (z) any other matter pertaining to assumptions, Cure will occur following the entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment, as the case may be.  If there is a dispute as to the amount of Cure that cannot be resolved consensually among the parties, the Debtors will have the right to reject the contract or lease for a period of five days after entry of a final order establishing a Cure amount in excess of that provided by the Debtors.

 (b) <u>Other Executory Contracts And Other Unexpired Leases</u>

  The provisions (if any) of each Other Executory Contract or Other Unexpired Lease to be assumed under the Plan which are or may be in default shall be satisfied solely by Cure.  Any party to an Other Executory Contract or Other Unexpired Lease that wishes to assert that Cure shall be required as a condition to assumption must file and serve a proposed Cure Claim so as to be received by the Debtors or Reorganized Debtors as applicable, and their counsel at the address set forth in Article 14.8 of the Plan within 45 days after entry of the Confirmation Order (the "Cure Claim Submission Deadline"), after

which the Debtors or Reorganized Debtors, as the case may be, will have 45 days to file any objections thereto.  Should a party to an Other Executory Contract or Other Unexpired Lease not file a proposed Cure Claim by the Cure Claim Submission Deadline in accordance with the procedures set forth in the Plan, then any default then existing will be deemed cured as of the day following the Cure Claim Submission Deadline and such party will forever be barred from asserting against the Debtors or the Reorganized Debtors, as applicable, a claim that arose on or prior to the Confirmation Date.  If there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of any Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, the matter shall be set for hearing in the Bankruptcy Court on the next available hearing date, or such other date as may be agreed upon, and Cure, if any, will occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be.  If there is a dispute as to the amount of Cure that cannot be resolved consensually among the parties, the Debtors will have the right to reject the contract or lease for a period of five days after entry of a Final Order establishing a Cure amount in excess of that provided by the Debtors.  If the cure amount was filed and served in accordance with the procedures set forth in the Plan and is not disputed, the Debtors or Reorganized Debtors, as the case may be, will pay the Cure Claim, if any, to the claimant within 20 days after service of the Cure Claim.  Disputed cure amounts that are resolved by agreement or Final Order will be paid by the Debtors within 20 days of such agreement or Final Order.

To the extent the Debtor who is party to the executory contract or unexpired lease is to be merged or liquidated as part of a Restructuring Transaction, the non-Debtor parties to such executory contract or unexpired lease will, upon assumption as contemplated in the Plan, be deemed to have consented to the assignment of such executory contract or unexpired lease to the Reorganized Debtor that is the surviving entity after such Restructuring Transaction.  The provisions (if any) of each Intercompany Executory Contract and Intercompany Unexpired Lease to be assumed under the Plan which are or may be in default will be satisfied in a manner to be agreed to by the relevant Debtors and/or non-Debtor Affiliates.

(c)     Intercompany Executory Contracts And Intercompany Unexpired Leases

Any Cure Claim arising from the assumption of an Intercompany Executory Contract or an Intercompany Unexpired Lease will be Reinstated and will be satisfied in a manner to be agreed to by the relevant Debtors and/or non-Debtor Affiliates.

(d)     Assignment Pursuant To Restructuring Transactions

To the extent the Debtor who is party to an executory contract or unexpired lease is to be merged or liquidated as part of a Restructuring Transaction, the non-Debtor parties to such executory contract or unexpired lease will, upon assumption as contemplated in the Plan, be deemed to have consented to the assignment of such executory contract or

Notice of Proposed Amendments
October 29, 2007

unexpired lease to the Reorganized Debtor that is the surviving entity after such Restructuring Transaction.

### (c)3.    *Rejection Damages Bar Date*

If the rejection by the Debtors (pursuant to the Plan or otherwise) of an executory contract or unexpired lease results in a Claim, then such Claim will be forever barred and will not be enforceable against the Debtors, the Reorganized Debtors, or such entities' properties unless a proof of claim is filed with the Claims Agent and served upon counsel to the Debtors and the Creditors' Committee within 30 days after the later of (a) entry notice of the Confirmation Order or (b) notice that the executory contract or unexpired lease has been rejected, unless otherwise ordered by the Bankruptcy Court.

### H.I.    Provisions Governing Distributions

### 1.    *Time Of Distributions*

Except as otherwise provided for herein or ordered by the Bankruptcy Court, distributions under the Plan will be made on a Periodic Distribution Date.

### 2.    *No Interest On Disputed Claims*

Unless otherwise specifically provided for in the Plan or as otherwise required by Section 506(b) of the Bankruptcy Code, interest will not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

### 3.    *Disbursing Agent*

The Disbursing Agent will make all distributions required under the Plan except with respect to any holder of a Claim or Interest whose distributionClaim or Interest is governed by an agreement and is administered by a Servicer, which distributions will be deposited with the appropriate Servicer, as applicable, who will deliver such distributions to the holders of Claims or Interests in accordance with the provisions of the Plan and the terms of any governing agreement.  If any such Servicer is unable to make such distributions, the Disbursing Agent, with the cooperation of such Servicer, will make such distributions.

### 4.    *Surrender Of Securities Or Instruments*

On or before the Distribution Date, or as soon as practicable thereafter, each holder of an instrument evidencing a Claim (a "Certificate") will be required to surrender such Certificate to the Disbursing Agent, or, with respect to indebtedness that is governed by an agreement and administered by a Servicer, the respective Servicer, and such Certificate will be cancelled solely with respect to the Debtors and such cancellation will not alter the obligations or rights of any non-Debtor third parties vis-a-vis one another to such instruments.  This requirement does not apply to any Claims Reinstated pursuant to the terms of the Plan.  No distribution of property under the Plan will be made to or on behalf

Notice of Proposed Amendments
October 29, 2007

of any such holder unless and until such Certificate is received by the Disbursing Agent or the respective Servicer or the unavailability of such Certificate is reasonably established to the satisfaction of the Disbursing Agent or the respective Servicer. Any holder who fails to surrender or cause to be surrendered such Certificate, or fails to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Disbursing Agent or the respective Servicer prior to the second anniversary of the Effective Date, will be deemed to have forfeited all rights and Claims in respect of such Certificate and will not participate in any distribution hereunder, and all property in respect of such forfeited distribution, including any dividends or interest attributable thereto, will revert to the Reorganized Debtors notwithstanding any federal or state escheat laws to the contrary.

### 5.    *Services Of Indenture Trustees, Agents, And Servicers*

The Reorganized Debtors will reimburse any Servicer (including ~~indenture trustees~~the Indenture Trustees) for reasonable and necessary services performed by it (including reasonable attorneys' fees and documented out-of-pocket expenses) in connection with the making of distributions under the Plan to holders of Allowed Claims or Interests, without the need for the filing of an application with, or approval by, the Bankruptcy Court. ~~For purposes of reviewing the reasonableness of the fees and expenses of the Servicers (and their attorneys), the Debtors, the Statutory Committees, and the Office of the United States Trustee for the Southern District of New York must be provided with copies of invoices of each Servicer (and its attorneys) in the form typically rendered in the regular course of the Servicers' business or attorneys' representation of the Servicers. The invoices must contain narrative descriptions of the services rendered and itemization of expenses incurred.~~ To the extent that there are any disputes that the reviewing parties are unable to resolve with the Servicers, the reviewing parties must report to the Bankruptcy Court as to whether there are any unresolved disputes regarding the reasonableness of the Servicers' (and their attorneys') fees and expenses. Any such unresolved disputes may be submitted to the Bankruptcy Court for resolution.

### 6.    *Claims Administration Responsibility*

#### (a)    Reorganized Debtors

The Reorganized Debtors will retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and making distributions (if any) with respect to all Claims and Interests, except as otherwise described in Article IX of the Plan.

#### (b)    Joint Claims Oversight Committee

On the Effective Date, a Joint Claims Oversight Committee will be formed. The Joint Claims Oversight Committee will monitor the general unsecured claims reconciliation and settlement process conducted by the Reorganized Debtors, provide guidance to the Reorganized Debtors, and address the Bankruptcy Court if the Joint Claims Oversight Committee disagrees with the Reorganized Debtors' determinations requiring claims resolution. The composition of the Joint Claims Oversight Committee must be reasonably satisfactory to Appaloosa, but in any case, will include at least one

representative appointed by Appaloosa and one representative appointed by the Creditors'
Committee.  For so long as the claims reconciliation process continues, the Reorganized
Debtors will make regular reports to the Joint Claims Oversight Committee.  The Joint
Claims Oversight Committee may employ, without further order of the Bankruptcy Court,
professionals to assist it in carrying out its duties as limited above, including any
professionals retained in these Chapter 11 Cases, and the Reorganized Debtors will be
required to pay the reasonable costs and expenses of the Joint Claims Oversight Committee
and its members, including reasonable professional fees, in the ordinary course without
further order of the Bankruptcy Court.

(c)    Filing Of Objections

Unless otherwise extended by the Bankruptcy Court, any objections to Claims
and/or Interests must be served and filed on or before the Claims/Interests Objection
Deadline.  Notwithstanding any authority to the contrary, an objection to a Claim or
Interest will be deemed properly served on the holder of the Claim or Interest if the Debtors
or Reorganized Debtors effect service by the following means:  (i) in accordance with
Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule
7004, (ii) to the extent counsel for a holder of a Claim or Interest is unknown, by first class
mail, postage prepaid, on the signatory on the proof of claim or other representative
identified on the proof of claim or any attachment thereto (or at the last known addresses of
such holders of Claims if no proof of claim is filed or if the Debtors have been notified in
writing of a change of address), or (iii) by first class mail, postage prepaid, on any counsel
that has appeared on behalf of the holder of the Claim or Interest in the Chapter 11 Cases
and has not withdrawn such appearance.

(d)    Determination Of Claims Or Interests

Any Claim or Interest determined and liquidated pursuant to (i) the ADR
Procedures, (ii) an order of the Bankruptcy Court, or (iii) applicable non-bankruptcy law
(which determination has not been stayed, reversed, or amended and as to which
determination (or any revision, modification, or amendment thereof) the time to appeal or
seek review or rehearing has expired and as to which no appeal or petition for review or
rehearing was filed or, if filed, remains pending) will be deemed an Allowed Claim or an
Allowed Interest in such liquidated amount and satisfied in accordance with the Plan.  The
Plan will not constitute or be deemed a waiver of any claim, right, or Cause of Action that
the Debtors or the Reorganized Debtors may have against any Person in connection with or
arising out of any Claim or Claims, including, without limitation, any rights under section
157(b) of title 28 of the United States Code.

### 7.    *Delivery Of Distributions*

(a)    Allowed Claims

Distributions to holders of Allowed Claims will be made by the Disbursing Agent
or the appropriate Servicer (a) at the addresses set forth on the proofs of claim filed by such
holders of Claims (or at the last known addresses of such holders of Claims if no proof of
claim is filed or if the Debtors have been notified in writing of a change of address), (b) at

the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related proof of claim, (c) at the addresses reflected in the Schedules if no proof of claim has been filed and the Disbursing Agent has not received a written notice of a change of address, or (d) in the case of a holder of a Claim whose Claim is governed by an agreement and administered by a Servicer, at the addresses contained in the official records of such Servicer.

(b)    <u>Allowed Interests</u>

For the purpose of making distributions (other than the Rights) to holders of Allowed Interests pertaining to Existing Common Stock, the transfer ledger in respect of the Existing Common Stock in Delphi will be closed as of the close of business on the Effective Date, and the Disbursing Agent and its respective agents will be entitled to recognize and deal for all purposes with only those holders of record stated on the transfer ledger maintained by the stock transfer agent for the Existing Common Stock in Delphi as of the close of business on the Effective Date.

(c)    <u>Undeliverable Distributions</u>

If any distribution to a holder of a Claim or Interest is returned as undeliverable, no further distributions to such holder of such Claim or Interest will be made unless and until the Disbursing Agent or the appropriate Servicer is notified of the then-current address of such holder of the Claim or Interest, at which time all missed distributions will be made to such holder of the Claim or Interest without interest. Amounts in respect of undeliverable distributions will be returned to the Reorganized Debtors until such distributions are claimed.  <u>The Debtors will make reasonable efforts to locate holders of undeliverable distributions.</u>  All claims for undeliverable distributions must be made on or before the later to occur of (i) the second anniversary of the Effective Date or (ii) six months after such holder's Claim or Interest becomes an Allowed Claim or an Allowed Interest, after which date all unclaimed property will revert to the Reorganized Debtors free of any restrictions thereon and the claim of any holder or successor to such holder with respect to such property will be discharged and forever barred, notwithstanding federal or state escheat laws to the contrary.

**8.    *Procedures For Treating And Resolving Disputed And Contingent Claims***

(a)    <u>No Distributions Pending Allowance</u>

No payments or distributions will be made with respect to all or any portion of a Disputed Claim or Disputed Interest unless and until all objections to such Disputed Claim or Disputed Interest have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim or Disputed Interest has become an Allowed Claim or Allowed Interest.  All objections to Claims or Interests must be filed on or before the Claims Objection Deadline.

(b)    Distribution Reserve

The Debtors will establish one or more Distribution Reserves, including reserves aggregating $1.7 billion on account of General Unsecured Claims (other than Senior Note Claims New Common Stock, New Warrants, Oversubscription Cash, and TOPrS Claims), Section 510(b) Note Claims, Section 510(b) Equity Claims, Section 510(b) ERISA Claims, and Cure Claims Cash raised by the Par Value Rights Offering for the purpose of effectuating distributions to holders of Disputed Claims or Disputed Interests pending the allowance or disallowance of such claims or interests in accordance with the this Plan.

(i)    Distribution Reserve Related To New Common Stock And New Warrants Distributed Pursuant To The Plan

The Debtors or the Disbursing Agent will establish a reserve to hold the New Common Stock and New Warrants that would otherwise be distributed to holders of Disputed Claims or Disputed Interests based on the amounts estimated by the Bankruptcy Court of such Claims or Interests or agreed to by the holder of such Claim or Interest and the Debtors.

(ii)    Distribution Reserve For Oversubscription Cash

The Debtors or Disbursing Agent shall establish a Distribution Reserve for the Oversubscription Cash.  The Distribution Reserve shall be equal to the Pro Rata portion of the Oversubscription Cash to which Non-exercising Creditors would be entitled under this Plan as of the Effective Date, as if the Disputed Claims of such Non-exercising Creditors were Allowed Claims in their (a) Face Amount or (b) estimated amounts of such Disputed Claim as approved by the Bankruptcy Court or agreed to by the holder of such Claim and Debtors.  Payments and distributions from the Distribution Reserve for Oversubscription Cash will be made as appropriate to (i) any Non-exercising Creditor holding a Disputed Claim that has become an Allowed Claim, as soon as reasonably practicable after the date such Disputed Claim becomes an Allowed Claim and (ii) any Non-exercising Creditors holding Allowed Claims if any Disputed Claim is disallowed in whole or in part.

(iii)    Estimation Of Claims For Distribution Reserves

To the extent that any Claims remain Disputed Claims as of the Effective Date, the Debtors or Reorganized Debtors will seek an order from the Bankruptcy Court establishing the amounts to be withheld as part of the Distribution Reserves.  Without limiting the foregoing, the Debtors or the Reorganized Debtors may at any time  request that the Bankruptcy Court estimate any Disputed Claim, including any such Claim arising from the Debtors' or Reorganized Debtors' rejection of an executory contract, pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors have previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Disputed Claim at any time during litigation concerning any objection to any Disputed Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount may, as determined by the Bankruptcy Court, constitute either (a) the Allowed amount of such Disputed Claim, (b) a maximum limitation on such Disputed Claim, or (c) in the event such

DS-217

Disputed Claim is estimated in connection with the estimation of other Claims within the same Class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Disputed Claims so estimated.  If the estimate constitutes the maximum limitation on a Disputed Claim, or on more than one such Claim within a Class of Claims, as applicable, the Debtors may elect to pursue supplemental proceedings to object to any ultimate allowance of any such Disputed Claim.  All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

(c)    <u>No Recourse To Debtors Or Reorganized Debtors</u>

Any Disputed Claim or Disputed Interest that ultimately becomes an Allowed Claim or Allowed Interest, as the case may be, will be entitled to receive its applicable distribution under the Plan solely from the Distribution Reserve established on account of such Disputed Claim or Disputed Interest.  In no event will any holder of a Disputed Claim or Disputed Interest have any recourse with respect to distributions made, or to be made, under the Plan to any Debtor or Reorganized Debtor on account of such Disputed Claim or Disputed Interest, regardless of whether such Disputed Claim or Disputed Interest will ultimately become an Allowed Claim or Allowed Interest, as the case may be, or regardless of whether sufficient Cash, New Common Stock, New Warrants, or other property remains available for distribution in the Distribution Reserve established on account of such Disputed Claim or Disputed Interest at the time such Claim or Interest becomes entitled to receive a distribution under the Plan.

(d)    <u>Distributions After Allowance</u>

Payments and distributions from the Distribution Reserve to each respective holder of a Claim or Interest on account of a Disputed Claim or Disputed Interest, to the extent that it ultimately becomes an Allowed Claim or an Allowed Interest, will be made in accordance with provisions of the Plan that govern distributions to such holder of a Claim or Interest.  On the first Periodic Distribution Date following the date when a Disputed Claim or Disputed Interest becomes undisputed, noncontingent, and liquidated, the Disbursing Agent will distribute to the holder of an Allowed Claim or Allowed Interest any Cash, New Common Stock, New Warrants, or other property from the Distribution Reserve that would have been distributed on the dates when distributions were previously made had such Allowed Claim or Allowed Interest been an Allowed Claim or Allowed Interest on such dates.  After a Final Order of the Bankruptcy Court has been entered, or other final resolution has been reached with respect to all Disputed Claims and Disputed Interests, ~~any remaining Cash in the Distribution Reserve will revert to the Reorganized Debtors and~~ (i) any remaining New Common Stock in the Distribution Reserve will revert to the Reorganized Debtors and be held as treasury stock ~~. Any~~, (ii) any Oversubscription Cash remaining in the Distribution Reserve will be distributed on a Pro Rata basis based on the Allowed Claims of Non-exercising Creditors, and (iii) any property held in ~~the~~ a distribution reserve established solely on account of Class 1G-1 will not revert to the Debtors and will be distributed to holders of Allowed Class 1G-1 Interests in accordance

DS-218

with Article 5.6 of the Plan. Subject to the limitations in Article 9.2 of the Plan, all distributions made under Article IX of the Plan on account of an Allowed Claim will be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to holders of Allowed Claims included in the applicable class. The Disbursing Agent will be deemed to have voted any New Common Stock held in the Distribution Reserve in the same proportion as shares previously disbursed by the Disbursing Agent. The Servicers will be deemed to have voted any New Common Stock held by such Servicers in the same proportion as shares previously disbursed by such Servicers.

(e)     De Minimis Distributions

Neither the Disbursing Agent nor any Servicer will have any obligation to make a distribution on account of an Allowed Claim or Allowed Interest from any Distribution Reserve or otherwise if (i) the aggregate amount of all distributions authorized to be made from such Distribution Reserve or otherwise on the Periodic Distribution Date in question is or has a value less than $250,000; provided that the Debtors will make a distribution on a Periodic Distribution Date of less than $250,000 if the Debtors expect that such Periodic Distribution Date will be the final Periodic Distribution Date, or (ii) the amount to be distributed to the specific holder of the Allowed Claim or Allowed Interest on the particular Periodic Distribution Date does not both (x) constitute a final distribution to such holder and (y) have a value less than $50.00.

### 9.     Section 510(b) Opt Out Claims

No Section 510(b) Opt Out Claim will be an Allowed Claim unless and until such Claim has been allowed by Final Order of the Bankruptcy Court. Any Section 510(b) Opt Out Claim that ultimately becomes an Allowed Claim will be entitled to receive its applicable distribution under the Plan solely from the applicable portion of the Securities Settlement. In no event will any holder of a Section 510(b) Opt Out Claim have any recourse with respect to distributions made, or to be made, under the Securities Settlement to holders of such Claims or Interests to any Debtor or Reorganized Debtor on account of such Section 510(b) Opt Out Claim, regardless of whether such Claim will ultimately become an Allowed Claim or regardless of whether sufficient Cash or New Common Stock remains available for distribution at the time such Claim is Allowed.

### 10.     Fractional Securities

(a)     ~~Distributions To Holders Of General Unsecured Claims.~~

Payments of fractions of shares of New Common Stock or New Warrants will not be made ~~to holders of General Unsecured Claims~~. Fractional shares of New Common Stock or New Warrants that would otherwise be distributed ~~to holders of Allowed General Unsecured Claims~~ under the Plan will be rounded to the nearest whole number of shares in accordance with the following method: (a) fractions of one-half (1/2) or greater will be rounded to the next higher whole number of shares and ~~the Cash distribution made to the holder of such Allowed General Unsecured Claim pursuant to Article 5.3 will be reduced~~

DS-219

by the equivalent amount of such rounded-up portion of such share (based on a $45 per share value) and (b) fractions of less than one-half (1/2) will be rounded to the next lower whole number of shares and the Cash distribution made to the holder of such Allowed General Unsecured Claim pursuant to Article 5.3 will be increased by the equivalent amount of such rounded-down portion of such share (based on a $45 per share value).

(b)        Distributions To Holders Of Existing Common Stock

Payments of fractions of shares of New Common Stock and New Warrants will not be made to holders of Existing Common Stock.  Fractional shares of New Common Stock and New Warrants will be rounded to the next greater or next lower number of shares in accordance with the following method:  (a) fractions of one-half (1/2) or greater will be rounded to the next higher whole number and (b) fractions of less than one-half (1/2) will be rounded to the next lower whole number.

### I.J.      Allowance And Payment Of Certain Administrative Claims

#### 1.      *DIP Facility Claims*

(a)      DIP Facility Revolver Claims

On the Effective Date, the DIP Facility Revolver Claim will be allowed in an amount to be agreed upon by the Debtors and, as applicable, the DIP Lenders, or as ordered by the Bankruptcy Court, at least five Business Days prior to the Effective Date, and all obligations of the Debtors thereunder will be paid in full in Cash in accordance with the DIP Credit Agreement on the Effective Date.

(b)      DIP Facility First Priority Term Claim

On the Effective Date, the principal amount of the DIP Facility First Priority Term Claim will be allowed in an amount agreed upon by the Debtors and, as applicable, the DIP Lenders, or as ordered by the Bankruptcy Court, at least five Business Days prior to the Effective Date, and all obligations of the Debtors thereunder will be paid in full in Cash in accordance with the DIP Credit Agreement on the Effective Date, except that with respect to letters of credit issued under the DIP Facility, such claims may be satisfied in full by the cash collateralization of such letters of credit, or by procuring back-up letters of credit, in each case, on terms reasonably satisfactory to in accordance with the DIP Agent Credit Agreement, or as otherwise agreed to by the DIP Agent.

(c)      DIP Facility Second Priority Term Claim

On the Effective Date, the principal amount of the DIP Facility Second Priority Term Claim will be allowed in an amount agreed upon by the Debtors and, as applicable, the DIP Lenders, or as ordered by the Bankruptcy Court, at least five Business Days prior to the Effective Date, and all obligations of the Debtors thereunder will be paid in full in Cash in accordance with the DIP Credit Agreement on the Effective Date.

(c)    Holdback Amount

On the Effective Date, the Debtors or the Reorganized Debtors will fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Amount for all Professionals.  The Disbursing Agent will maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order.  Such funds will not be considered property of the Debtors, the Reorganized Debtors or the Estates.  The remaining amount of Professional Claims owing to the Professionals will be paid to such Professionals by the Disbursing Agent from the Holdback Escrow Account when such claims are finally allowed by the Bankruptcy Court. When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, will be paid to the Reorganized Debtors.

(d)    Post-Confirmation Date Retention

Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors will employ and pay Professionals in the ordinary course of business.

### 4.    Substantial Contribution Compensation And Expenses Bar Date

Any Person (including ~~indenture trustee for~~ the ~~Senior Notes and Subordinated Notes (collectively, the "Prepetition~~ Indenture Trustees"~~));~~) who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must file an application with the clerk of the Bankruptcy Court on or before the 45th day after the Effective Date (the "503 Deadline"), and serve such application on counsel for the Debtors, the Statutory Committees, ~~the~~ Plan Investors, the United States Trustee, and such other parties as may be ~~ordered~~decided by the Bankruptcy Court ~~or required by~~ and the Bankruptcy Code on or before the 503 Deadline, or be forever barred from seeking such compensation or expense reimbursement.  Notwithstanding the foregoing, on or within fifteen (15) days after the Confirmation Date, the ~~Prepetition~~ Indenture Trustees must deliver to the Debtors, ~~the Statutory Committees, the Plan Investors, and the United States Trustee~~ either (a) a statement indicating ~~that~~ such ~~Prepetition~~ Indenture Trustee's prepetition fees and expenses are less than the amounts set forth on Exhibit 10.4 ~~of the Plan~~ or (b) their invoices for their respective fees and expenses. ~~The reviewing parties~~; and the Debtor will ~~then~~ have the right to file an objection with the Bankruptcy Court, which objection must be filed with fifteen (15) days of receipt.  If ~~a Prepetition~~ an Indenture Trustee has delivered notice that its prepetition fees and expenses are less than the amounts set forth on Exhibit 10.4 of the Plan~~,~~ or absent any such objection, the ~~Prepetition~~ Indenture Trustees' invoice for its fees and expenses will be paid ~~in Cash~~ by the Debtors or Reorganized Debtors, as applicable, on the Effective Date, or as soon thereafter as practicable, without ~~the~~ need to file an application for the payment of its fees and without ~~the~~ need for further order of the Bankruptcy Court.

### 5.    Other Administrative Claims

DS-222

such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the
Bankruptcy Code, (b) a Claim or Interest based upon such Claim, debt, right, or Interest is
allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim, right,
or Interest accepted the Plan.  The Confirmation Order will be a judicial determination of
the discharge of all Claims against and Interests in the Debtors, subject to the occurrence of
the Effective Date.

### 3.     *Compromises And Settlements*

In accordance with Article 9.6 of the Plan, pursuant to Bankruptcy Rule 9019(a),
the Debtors may compromise and settle various (a) Claims against, or Interests in, them
and (b) Causes of Action that they have against other Persons up to and including the
Effective Date.  After the Effective Date, such right will pass to the Reorganized Debtors as
contemplated in Article 11.1 of the Plan, without the need for further approval of the
Bankruptcy Court.  Notwithstanding the foregoing, Bankruptcy Court approval will be
required after the Effective Date if the Joint Claims Oversight Committee objects to a
proposed settlement based on criteria established by the board of directors of Reorganized
Delphi.

### 4.     *Release By Debtors Of Certain Parties*

The releases provided in the Plan and described below discharge and release certain
parties from claims arising from prepetition actions and claims (including claims held by
third parties, such as creditors and shareholders) and limit the liability against certain
parties for acts or omissions arising out of or in connection with these Chapter 11 Cases
unless such actions are the result of willful misconduct or gross negligence.  The releases
of each of the major constituencies in these cases, including the Debtors' officers, directors,
and employees, the Creditors' Committee, the Equity Committee, the Plan Investors, the
DIP Agent, the DIP Lenders, the Unions, and GM, allow the parties to participate in the
Debtors' restructuring cases and protect individuals who have contributed to the
restructuring process.  The parties for whom releases are provided have participated in
complex negotiations with an unprecedented scope.  Moreover, the amounts contributed by
each of these parties as part of settlements or other agreements are substantial.  The
contributions made by some parties amount to billions of dollars invested in Delphi's
reorganization.  Further, these parties conditioned their settlements and agreements on
receiving the releases contemplated by the Plan.  Thus, because of the value provided to the
Debtors' estates as a result of these critical and necessary settlements and agreements, the
Debtors believe it is appropriate to provide the releases described below.

**Pursuant to section 1123(b)(3) of the Bankruptcy Code, but subject to Article
11.13 of the Plan, effective as of the Effective Date, each Debtor, in its individual
capacity and as a debtor-in-possession for and on behalf of its respective Estate, will
release and discharge and be deemed to have conclusively, absolutely,
unconditionally, irrevocably, and forever released and discharged all Released
Parties for and from any and all claims or Causes of Action existing as of the
Effective Date in any manner arising from, based on, or relating to, in whole or in
part, the Debtors, the subject matter of, or the transactions or events giving rise to,
any Claim or Interest that is treated in the Plan, the business or contractual**

DS-224

arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to any such Claims, Interests, restructuring, or the Chapter 11 Cases.   The Reorganized Debtors and any newly-formed entities that will be continuing the Debtors' businesses after the Effective Date will be bound, to the same extent the Debtors are bound, by the releases and discharges set forth above.  Notwithstanding the foregoing, nothing in the Plan will be deemed to release (i) any of the Debtors or GM from their obligations under the Delphi-GM Definitive Documents or the transactions contemplated thereby, (ii) any of the Debtors, the Unions, or GM from their obligations under the Union Settlement Agreements or the transactions contemplated thereby, or (iii) any of the Debtors or the Plan Investors or their affiliates from their obligations under the Investment Agreement or the transactions contemplated thereby.

The term "Released Parties" means, collectively, (a) all officers of each of the Debtors, all members of the boards of directors of each of the Debtors, and all employees of each of the Debtors, in each case in their respective capacities as of the date of the commencement of the hearing on the Disclosure Statement, (b) the Creditors' Committee and all current and former members of the Creditors' Committee in their respective capacities as such, (c) the Equity Committee and all current and former members of the Equity Committee in their respective capacities as such, (d) the DIP Agent in its capacity as such, (e) the DIP Lenders solely in their capacities as such, (f) all Professionals , (g) the Unions and current or former members, officers, and committee members of the Unions, and (h) the Indenture Trustees, in their capacities as such, and (i) with respect to each of the above-named Persons, such Person's affiliates, advisors, principals, employees, agents, officers, directors, representatives, financial advisors, attorneys, accountants, investment bankers, consultants, agents, and other representatives and professionals.

### 5.    *Release By Holders Of Claims And Interests*

On the Effective Date, (a) each Person who votes to accept the Plan and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each entity (other than a Debtor), which has held, holds, or may hold a Claim against or Interest in the Debtors, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the Cash, New Common Stock, New Warrants, and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Plan (each, a "Release Obligor"), will have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any claim or Cause of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, the Debtors, the subject matter of, or the transaction or event giving rise to, the claim of such Release Obligor, the business or contractual arrangements between any Debtor and Release Obligor or any Released Party, the restructuring of the claim prior to the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction, obligation, restructuring, or the Chapter 11 Cases,

Notice of Proposed Amendments
October 29, 2007

including, but not limited to, any claim relating to, or arising out of the Debtors' Chapter 11 Cases, the negotiation and filing of the Plan, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation, or consummation of the Plan, the Disclosure Statement, the Plan Exhibits, **the Union Settlement Agreements,** any employee benefit **plan,** instrument, release, or other agreement or document created, modified, amended, or entered into in connection with either the Plan or any other agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 cases; provided, however, that (A) Article 11.5 is subject to and limited by Article 11.13 of the Plan and (B) Article 11.5 will not release any Released Party from any Cause of Action held by a governmental entity existing as of the Effective Date based on (i) the Internal Revenue Code or other U.S. state, city, or municipal tax code, (ii) the environmental laws of the United States or any U.S. state, city, or municipality, (iii) any criminal laws of the United States or any U.S. state, city, or municipality, (iv) the Exchange Act, the Securities Act, or other securities laws of the United States or any U.S. state, city, or municipality, (v) the Employee Retirement Income Security Act of 1974, as amended, or (vi) the laws and regulations of the Bureau of Customs and Border Protection of the United States Department of Homeland Security.  Notwithstanding the foregoing, all releases given by GM to (i) the Debtors and the Debtors' Affiliates shall be as set forth in the Delphi-GM Global Settlement Agreement and (ii) the Unions shall be as set forth in the Union Settlement Agreements.

### 6.    *Release By Unions*

The releases provided for in (i) Section K.3 of the UAW-Delphi-GM Memorandum of Understanding, (ii) Section H.3 of the IUE-CWA-Delphi-GM Memorandum of Understanding, (iii) Section G.3 of the USW Memoranda of Understanding, (iv) Section F.3 of the IUOE Local 18S Memorandum of Understanding and IUOE Local 832S Memorandum of Understanding and Section E.3 of the IUOE Local 101S Memorandum of Understanding; (v) Section F.3 of the IBEW E&S Memorandum of Understanding and the IBEW Powertrain Memorandum of Understanding; and (vi) Section F.3 of the IAM Memorandum of Understanding are incorporated by reference herein in their entirety.

### 7.    *Release Of GM By Debtors And Third Parties*

On the Effective Date, GM will receive all releases provided for in Article IV of the Settlement Agreement.  Those provisions are incorporated by reference in the Plan in their entirety.

### 8.    *Release And Exculption Of Plan Investors By Debtors And Third Parties*

In consideration of the contributions to the Debtors' reorganization made by the Plan Investors, and pursuant to ~~section~~ 9(a)(~~xxviii)(A~~iv) of the Investment Agreement, ~~as of~~ on the Effective Date~~, each of~~ (a) ~~pursuant to section 1123(b)(3) of~~

~~the Bankruptcy Code, each Debtor,~~ each Plan Investor (in its ~~individual~~ capacity ~~and as a debtor~~ as such or otherwise), its Affiliates, shareholders, partners, directors, officers, employees and advisors shall be released by the Debtors and each entity (other than a Debtor), which has held, holds or may hold, a Claim against or Interest in the Debtors from liability for participation ~~in possession for and on behalf of its Estate, and (b) each Release Obligor shall have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Plan Investor, its Affiliates, shareholders, partners, directors, officers, employees, and advisors from any liability for participation of~~ the transactions contemplated by the that certain Equity Purchase and Commitment Agreement, dated as of January 18, 2007 (the "Original Agreement"), the Investment Agreement, the preferred term sheet exhibit to the Investment Agreement, the Plan Framework Support Agreement, dated as of January 18, 2007 (the "Original PSA~~"), Exhibit B to the Investment Agreement, "~~) and the Plan and any other investment in the Debtors discussed with the Debtors whether prior to or after the execution of the foregoing to the fullest extent permitted under applicable law ~~provided, however, that such release~~, (b) each Plan Investor (in its capacity as such or otherwise), its Affiliates, shareholders, partners, directors, officers, employees and advisors shall not have or incur any liability to any party with respect to all of the foregoing actions set forth in subclause (a) and shall be additionally exculpated to the same extent as the Debtors directors, officers, employees, attorneys, advisors and agents are otherwise exculpated under the Plan pursuant to Article 11.11, and (c) each Plan Investor (in its capacity as an investor), its Affiliates, shareholders, partners, directors, officers, employees and ~~exculpation~~ advisors shall be released to the same extent the Debtors' directors, officers, employees, attorneys, advisors and agents are otherwise released under the Plan pursuant to Article 11.4 of the Plan and Article 11.5 of the Plan; provided, that such releases and exculpations shall not prohibit or impede the Debtors' ~~or Reorganized Debtors'~~ ability to assert defenses or counterclaims in connection with or relating to the Original Agreement or the Original PSA.

### 9. *Setoffs*

Subject to Article 11.13 of the Plan, the Debtors may, but will not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against such holder of such Claim, but neither the failure to do so nor the allowance of any Claim will constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such holder of such Claim.

### 10. *Subordination Rights*

All Claims against the Debtors and all rights and claims between or among holders of Claims relating in any manner whatsoever to distributions on account of Claims against or Interests in the Debtors, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, will be deemed satisfied by the distributions under the Plan to holders of Claims having such subordination rights. Such subordination rights will

Notice of Proposed Amendments
October 29, 2007

be deemed waived, released, discharged, and terminated as of the Effective Date~~; provided, however, that in resolution of the subordination rights of the holders of the claims in Class 1C, all Cash otherwise distributable to holders of TOPrS Claims pursuant to Article 5.3 of the Plan (the "TOPrS Cash") will be distributed to holders of Claims in Class 1C (subject to the proviso at the end of this sentence), and in the place and stead thereof the holders of TOPrS Claims will receive the number of shares of New Common Stock equal to the TOPrS Cash divided by $45 (the "TOPrS Stock") such that the Allowed TOPrS Claims will be satisfied in full, including postpetition interest, solely through the issuance of New Common Stock (valued at $45.00 per share) to the holders of such Claims provided further, however, that in resolution of intercreditor issues between the Delphi-DAS Debtors and subsidiaries, the TOPrS Cash will be reallocated among all holders of General Unsecured Claims (but not among the holders of TOPrS Claims) on a Pro Rata basis, and the distribution of New Common Stock to holders of General Unsecured Claims will be reduced by such holders' Pro Rata share of the TOPrS Stock.  For the avoidance of doubt, TOPrS Cash does not include the Cash received by Appaloosa pursuant to Article 11.14 of the Plan~~.  Except as otherwise specifically provided for in the Plan, distributions to the various Classes of Claims ~~hereunder~~ will not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim by reason of any subordination rights or otherwise, so that each holder of a Claim will have and receive the benefit of the distributions in the manner set forth in the Plan.

Except as otherwise provided in the Plan (including any Plan Exhibits) or the Confirmation Order, the right of any of the Debtors or Reorganized Debtors to seek subordination of any Claim or Interest pursuant to section 510 of the Bankruptcy Code~~, other than TOPrS Claims,~~ is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time will be modified to reflect such subordination.  Unless the Plan (including Plan Exhibits) or the Confirmation Order otherwise provide, no distributions will be made on account of a Claim, subordinated pursuant to Article 11.~~10~~9(b) unless the Claims senior to such subordinated Claims are satisfied in full.

### 11.    *Exculpation And Limitation Of Liability*

**Subject to Article 11.13 of the Plan, the Debtors, the Reorganized Debtors, the Statutory Committees, the members of the Statutory Committees, in their capacities as such, the UAW, the IUE-CWA, the USW, the IAM, the IBEW, the IUOE, the DIP Agent, the DIP Lenders in their capacities as such and as holders of Claims and Interests, GM, the ~~Plan Investors~~Indenture Trustees in their capacities as such, and any of such parties' respective ~~present~~current or former members, officers, directors, committee members, affiliates, employees, advisors, attorneys, representatives, accountants, financial advisors, consultants, investment bankers, or agents and any of such parties' successors and assigns, will not have or incur, and are hereby released from, any claim, obligation, Cause of Action, or liability to any party, or any of its agents, employees, representatives, current or former members, financial advisors, attorneys or ~~Affiliates~~affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Debtors' Chapter 11 Cases, the negotiation and filing of the Plan, the filing of the Chapter 11 Cases, the**

formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation or consummation of the Plan, the Disclosure Statement, the **Plan Exhibits, the** Union Settlement Agreements, any employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with either the Plan or any agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 Cases, except for their willful misconduct and gross negligence and except with respect to obligations arising under confidentiality agreements, joint interest agreements, and protective orders entered during the Chapter 11 Cases, and in all respects will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  Other than as provided for in this Article and in Article 11.13, no party or its agents, employees, representatives, ~~member~~**current** or former members, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, will have any right of action against the parties listed in this Article for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation or consummation of the Plan, the Disclosure Statement, the Union Settlement Agreements, any employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with either the Plan or any agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 Cases.  For the avoidance of doubt, the exculpatory provisions of this Article, which apply to postpetition conduct, are not intended, nor will they be construed, to bar any governmental unit from pursuing any police or regulatory action.  Moreover, nothing in the Plan will be deemed to release (i) any of the Debtors or GM from their obligations under the Delphi-GM Definitive Documents or the transactions contemplated thereby, (ii) any of the Debtors, the Unions, or GM from their obligations under the Union Settlement Agreements or the transactions contemplated thereby, or (iii) any of the Debtors or the Plan Investors or their affiliates from their obligations under the Investment Agreement or the transactions contemplated thereby**, or for any of the Debtors from their obligations under the Plan or the transactions contemplated thereby**.

## 12.    *Indemnification Obligations*

The Plan contains provisions concerning the Indemnification Rights of Indemnitees.  The term "Indemnitee" means all current and former directors, officers, employees, agents, or representatives of the Debtors who are entitled to assert Indemnification Rights.  The term "Indemnification Rights" means obligations of the Debtors, if any, to indemnify, reimburse, advance, or contribute to the losses, liabilities, or expenses of an Indemnitee pursuant to the Debtor's certificate of incorporation, bylaws, policy of providing employee indemnification, applicable law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against an Indemnitee based upon any act or omission related to an Indemnitee's service with, for, or on behalf of the Debtors.  The term "Continuing Indemnification Rights" means those

co-obligor or joint tortfeasor of a Released Party or who is otherwise liable under theories of vicarious or other derivative liability.

### *14.    Injunction*

**Subject to Article 11.13 of the Plan, the satisfaction, release, and discharge pursuant to Article XI of the Plan will act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim, Interest, or Cause of Action satisfied, released, or discharged under the Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.**

### *15.    Proceeds Of Par Value Rights Offerings*

The New Common Stock to be offered in the Par Value Rights Offering ~~shall~~will consist of New Common Stock otherwise distributable to the following ~~three~~ groups of holders of Claims in the following amounts (in each case at $~~45~~41.58 per share): _(a) $50 million~~1,111,111 shares of New Common Stock otherwise distributable to Appaloosa, (b) all of the New Common Stock otherwise distributable to the UAW, IUE-CWA and USW, and (c) an amount of New Common Stock otherwise distributable to holders of Claims in Classes 1C through 12C as a whole ~~(excluding the~~ otherwise distributable New Common Stock ~~referred~~ to in clauses (a) and (b)) ~~which~~ is equal to the difference between $~~572 million~~ 12,711,111 shares of New Common Stock and the sum of the ~~value~~number of ~~the otherwise distributable~~shares of New Common Stock ~~referred to in ~~clauses~~clause (a) and (b).  As to each foregoing group as a whole, the Cash generated from the Par Value Rights Offering ~~shall increase the amount of Cash and~~will decrease the amount of New Common Stock otherwise distributable to such group as a whole on a Pro Rata basis based upon the amount of ~~otherwise distributable New Common Stock~~ referred to above by each group as a whole.  Within each group, the Cash generated from the Par Value Rights Offering allocable to a group as a whole pursuant to the foregoing sentence ~~shall increase the amount of Cash and~~will decrease the amount of New Common Stock otherwise distributable to the holders of Claims within each group on a Pro Rata basis based upon the Allowed Amount of each holder's Claims within a group.  Appaloosa (in its capacity as a stockholder of Delphi) has agreed not to participate in the Par Value Rights Offering and has agreed to use commercially reasonable efforts to obtain such agreement from ~~the~~ other Plan Investors.

## X.    GENERAL CONSIDERATIONS AND RISK FACTORS TO BE CONSIDERED

Every holder of a Claim against or Interest in a Debtor should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein) before deciding whether to vote to accept or to reject the Plan.

Notice of Proposed Amendments
October 29, 2007

to the date that this Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of the Debtors' operations.

Critical assumptions ~~underlying~~underlie the Debtors' ~~business plan~~Business Plan. Events that ~~will~~may have a significant impact on the Reorganized Debtors' ability to achieve projections, and that correspondingly have a material impact on value, include:

- Capital Markets risk – availability and cost of funds (debt/equity);

- Pension Asset Returns below assumed rates of return resulting in additional future cash contributions to the Company's pension plans;

- Industry ~~OE~~OEM volumes significantly below GI/DRI projections and GMNA volumes below projections in the Business Plan;

- Significant reductions in revenue if not able to "book" the "unbooked" revenue assumed in the plan;

- Customer/Supplier disruptions (e.g., labor strife, financial difficulties);

- Unknown significant product (warranty), environmental or legal liability risk;

- Material commodity costs above projections;

- Inability to achieve material cost reduction initiatives, including supplier price reductions and engineering initiatives;

- Significant failure to execute restructuring initiatives on a timely basis or at estimated costs – e.g., Europe restructuring programs;

- Significant customer pricing reductions through marketplace pressures beyond those anticipated in the plan;

- Change in tax environment from that anticipated in the plan (legislative or execution of tax strategies to minimize cash taxes);

- Health care inflation significantly beyond that estimated employee benefit costs and salaried retirement health care;

- Cash flow constraints from working capital if unsuccessful in supplier initiative to return to pre-bankruptcy payment terms; and

- Working capital liquidity pressures if customers are not timely in payments for accounts receivable.

In addition, Delphi has projected GMNA production volumes higher than GI/DRI in years 2009-2011 of the Business Plan based on Delphi's expectations of overall market growth and GM's ability to maintain market share so as to benefit from such overall market

DS-241

growth.  If industry forecasts regarding the overall market or Delphi's expectations regarding GM's ability to retain market share and benefit from overall market growth is incorrect and Delphi is not able to reduce costs despite a more flexible cost structure resulting from Delphi's transformation, then there could be a material adverse impact to the Business Plan.  Moreover, if volume assumptions are correct but the actual mix of anticipated products differs from Business Plan assumptions, there could be a material impact on the projections.

The foregoing variations and assumptions may be material and may adversely affect the ability of the Reorganized Debtors to make payments with respect to post-Effective Date indebtedness and to achieve the Projections.  Because the actual results achieved throughout the periods covered by the Projections can be expected to vary from the projected results, the Projections should not be relied upon as a guaranty, representation, or other assurance that the actual results will occur.

Except with respect to the Projections and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement.  Neither the Debtors nor the Reorganized Debtors intend to update the Projections for the purposes hereof; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections.

### E.    Sources And Uses Of Cash For Plan Distributions

The Debtors' ability to fund Cash distributions under the Plan, and therefore consummate the Plan in its present form, is dependent, in part, upon the Debtors' ability to obtain the Exit Financing Facility Arrangements.  Recent conditions in the credit markets beyond the Debtors' control have substantially decreased the amount of credit available to potential borrowers and have increased the cost of such credit.  If such conditions continue, the Debtors' ability to obtain a commitment for the Exit Financing Facility Arrangements on acceptable terms may be limited.  Accordingly, there can be no assurances that the Debtors will obtain an Exit Financing Facility Arrangements as contemplated by the Plan.  If the Debtors are unable to obtain such Exit Financing Facility Arrangements, the Debtors may be unable to consummate the Plan without substantial modifications.

### F.    Access To Financing And Trade Terms

The Debtors' operations are dependent on the availability and cost of working capital financing and trade terms provided by suppliers and may be adversely affected by any shortage or increased cost of such financing and supplier support.  The Debtors' postpetition operations have been financed from operating cash flow and borrowings pursuant to the DIP Facility.  The Debtors believe that substantially all of their needs for funds necessary to consummate the Plan and for post-Effective Date working capital financing will be met by projected operating cash flow, financings contemplated by the Exit Financing Facility Arrangements, the EPCA, the Rights Offerings, and trade terms supplied by suppliers.  If the Debtors or Reorganized Debtors have greater working capital

needs, they may be required to either (a) obtain other sources of financing or (b) curtail their operations.

In addition, GM is one of the largest creditors and a significant stakeholder in these Chapter 11 Cases, and Delphi's ability to consummate the transactions contemplated by the Union Settlement Agreements, the Investment Agreement, and the Plan depends not only on GM's ability to meet its obligations under the Delphi-GM Definitive Documents, but also on GM's ability to fulfill certain financial obligations to Delphi's Union-represented employees and retirees comprehended in the Union Settlement Agreements. GM has reported a variety of challenges it is facing, including with respect to its debt ratings, its relationships with its unions and large shareholders and its cost and pricing structures. If GM is unable or unwilling to fulfill these commitments, Delphi believes that the Company's cost structure and ability to operate will be adversely affected.

### G. Claims Estimations

The Plan requires as a condition to consummation that the aggregate sum of certain Claims be allowed or estimated for distribution purposes in an amount that is less than or equal to the Unsecured Claims Threshold. The Plan requires as a condition to consummation that all conditions to the effectiveness of the Investment Agreement must have been satisfied or waived in accordance with the Investment Agreement. The Investment Agreement contains as a similar condition. The ultimate allowance to consummation that the aggregate amount of all Trade and estimation of Claims is subject to certain risks, assumptions, and uncertainties. Accordingly, there can be no assurances Other Unsecured Claims that the Debtors will be able have been asserted or scheduled but not yet disallowed shall be allowed or estimated for distribution purposes by the Bankruptcy Court to satisfy such conditions be no more than $1.45 billion, excluding all allowed accrued postpetition

In addition, the Debtors intend to estimate for distribution purposes Disputed Claims with an unliquidated component. The actual amount at which such Claims are ultimately allowed may differ in some respect from the estimates. Holders of Disputed Claims are entitled to receive distributions under the Plan upon allowance of such Claims solely from the Disputed Claims Distribution Reserve established on account of such Claim. If a Disputed Claim is ultimately allowed in an amount that exceeds, and at the time of such allowance, the value of the Cash, insufficient New Common Stock or other property New Warrants are available for distribution from the Disputed Claims Distribution Reserve, the distributions on account of such Allowed Claim will be limited to such available amounts and the holder of such Allowed Claim will have no recourse against any Debtor or Reorganized Debtor for any deficiency that may arise.

### H. Value Of, And Market For, New Common Stock

If Rights holders do not exercise all of their rights in the Discount Rights Offering and a small number of Rights holders exercise their oversubscription rights and/or the Plan Investors purchase all or a portion of their backstop commitments, the public float of the New Common Stock will be significantly reduced. Similarly, if less than all of the Par Value Rights are exercised in the Par Value Rights Offering, the shares of New Common

Stock offered in the Par Value Rights Offering that are not purchased pursuant to the exercise of rights will be issued to holders of General Unsecured Claims in partial satisfaction of their claims, and the public float of the New Common Stock may be further reduced to the extent that these creditors' shares are excluded from the calculation of the public floatIn addition, the assumed Plan value of the New Common Stock distributed under the Plan may change based on the ultimate amount of Allowed Claims.  Finally, the market value of the New Common Stock may increase or decrease from the Plan value of the New Common Stock after the Effective Date based on numerous factors, including fluctuations in the market and conditions extraneous to Delphi as well as other risk factors disclosed herein.

Following Delphi's delisting from the NYSE, price quotations for its common stock have been available on the Pink Sheets.  Delisting from the NYSE resulted in a reduction in the liquidity of Delphi's existing common stock.  The Company intends to apply to list the New Common Stock with a major New York-based exchange after the Effective Date of the Plan if and when the Company meets the listing requirements.  It is unlikely, however, that the shares of the New Common Stock will qualify for listing at the time they are issued on the Effective Date of the Plan, and Delphi cannot guarantee that the New Common Stock will ever be listed or quoted on any securities exchange or quotation system.  If Delphi is not able to list or quote the New Common Stock on any securities exchange or quotation system, the Company intends to cooperate with any registered broker-dealer who may seek to initiate price quotations for the New Common Stock on the OTC Bulletin Board.

Trading on the OTC Bulletin Board is dependent on a broker-dealer being willing to make a market in the New Common Stock, which Delphi cannot predict will be initiated or, if initiated, will continue.  No assurance can be given that the New Common Stock will be quoted on the OTC Bulletin Board or that an active trading market will exist.  The nature of OTC Bulletin Board trading may limit a holder's ability to resell its shares of the New Common Stock if an active trading market for the New Common Stock does not emerge.  Even if an active market does develop for the New Common Stock, Delphi can give no assurance as to how long it will continue, the liquidity of the market, or at what price the New Common Stock will trade. Lack of liquidity of the New Common Stock also may make it more difficult for Delphi to raise additional capital, if necessary, through equity financings.

## I.    Potential Dilution Caused By Options Or Warrants

As stated above, the The Management Compensation Plan may reserve for certain members of management, directors, and other employees of Reorganized Delphi a total of [x] shares or [y]% of the shares of New Common Stock of Reorganized Delphi, including options or warrants to acquire such Stock upon terms outlined in the Management Compensation Plan.  In addition, the New Warrants will be issued to holders of Existing Common Stock to purchase additional shares of New Common Stock of Reorganized Delphi.  If the New Warrants are exercised or other equity interests are distributed to management as discussed above will dilute, the ownership percentage represented by the

DS-244

New Common Stock of Reorganized Delphi distributed on the Effective Date under the Plan will be diluted.

**J.      Potential Dilution Caused By Distribution Of New Common Stock With Respect To Trade And Other Unsecured Claims In Excess Of $1.45 Billion**

The Investment Agreement contains as a condition to consummation that the aggregate amount of all Trade and Other Unsecured Claims that have been asserted or scheduled but not yet disallowed shall be allowed or estimated for distribution purposes by the Bankruptcy Court to be no more than $1.45 billion, excluding all allowed accrued postpetition interest thereon.  In the event that ADAH waives such a condition, and Reorganized Delphi issues any shares of New Common Stock pursuant to the Plan with respect to any Trade and Other Unsecured Claim in excess of $1.45 billion (the "Excess Shares"), the Investment Agreement provides that Reorganized Delphi shall issue to the Plan Investors additional New Common Stock without payment of any additional consideration therefore, in such amount in the aggregate that is sufficient to ensure that the percentage of shares of outstanding New Common Stock that such Plan Investors would have owned on the closing date of the transactions contemplated by the Investment Agreement had such Excess Shares not been issued (assuming for this purpose that all Excess Shares are issued on that closing date) is maintained.  In that event, the ownership percentage represented by the New Common Stock of Reorganized Delphi distributed pursuant to the Plan will be diluted.  In addition, the Investment Agreement provides that the issuance of such additional New common Stock shall result in an adjustment to the conversion price of the Series A Preferred Stock and the Series B Preferred Stock.

**J.K.    Potential Ownership Change**

Because the Plan Investors will hold a significant equity position in the Reorganized Debtors following the consummation of the plan, if the Plan Investors dispose of all or a significant amount of this position after the Effective Date, it could cause the Reorganized Debtors to undergo an ownership change (within the meaning of Internal Revenue Code section 382).  This would generally limit (or possibly eliminate) the Reorganized Debtors' ability to use net operating losses and other tax attributes.

**K.L.    Tax Planning**

Due to time and resource constraints resulting from the commencement of the Chapter 11 Cases, the Debtors have used and may continue to use certain estimating techniques in connection with their tax planning efforts (for example, in determining the existence and magnitude of built-in gains or losses).  The use of such estimating techniques, while cost-effective, necessarily results in lower confidence levels with respect to certain of the tax analyses.

**L.M.    Dividends**

The Debtors do not anticipate that cash dividends or other distributions will be paid with respect to the New Common Stock in the foreseeable future.

DS-245

## XI.    SECURITIES LAW MATTERS

### A.    Issuance Of New Securities

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act of 1933, as amended (the "Securities Act"), and state securities laws if three principal requirements are satisfied:  (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claims or interests and partly for cash or property.  Except as noted below, the Debtors believe that the offer and sale of ~~(i)~~ New Common Stock to the holders of General Unsecured Claims, ~~(ii) New Common Stock to the holders of Existing Common Stock~~ Section 510(b) Note Claims, Section 510(b) Equity Claims, and ~~(iii) New Warrants to the holders of Existing Common Stock~~ Section 510(b) ERISA Claims satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.  ~~The Debtors believe that the offer and sale of New Common Stock in Reorganized Delphi underlying the New Warrants satisfies the requirements of section of 1145(a)(2) of the Bankruptcy Code and is exempt from registration under the Securities Act and state securities laws.~~

Delphi plans to file an amendment to its previously filed registration statement on Form S-1 to update that registration statement for the Rights Offerings and the New Warrants.  The registration statement, as so amended, is expected to cover the subscription rights for the ~~Discount~~ Rights ~~Offering and the Par Value Rights Offering, and~~ Offerings, the underlying New Common Stock in Reorganized Delphi offered in the Rights Offerings, the New Warrants, and the New Common Stock in Reorganized Delphi underlying the New Warrants.  This Disclosure Statement does not constitute an offer to sell or the solicitation of an offer to buy any securities in the Rights Offerings.  Any such offer or sale will be made solely by means of a prospectus relating to the Rights ~~Offerings~~ Offering which will be provided at such time as the Rights Offerings commence.

### B.    Subsequent Transfers Of New Common Stock ~~And New Warrants~~

The New Common Stock ~~and New Warrants~~ to be issued pursuant to the Plan may be freely transferred by most recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the New Common Stock ~~and New Warrants (including the underlying New Common Stock)~~ are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" with respect to such securities.  Section 1145(b) of the Bankruptcy Code defines four types of "underwriters":

(i)    persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

DS-246

(ii)      persons who offer to sell securities offered under a plan for the holders of such securities;

(iii)      persons who offer to buy such securities from the holders of such securities, if the offer to buy is:

(A)      with a view to distributing such securities; and

(B)      under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

(iv)      a person who is an "issuer" with respect to the securities as the term "issuer" is defined in section 2(11) of the Securities Act.

Under section 2(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer.

To the extent that persons who receive New Common Stock ~~or New Warrants~~ pursuant to the Plan are deemed to be "underwriters," resales by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Persons deemed to be underwriters may, however, be permitted to sell such New Common Stock ~~or New Warrants~~ without registration pursuant to the provisions of Rule 144 under the Securities Act.  These rules permit the public sale of securities received by "underwriters" if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Common Stock or ~~New Warrants or~~ other security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular person receiving New Common Stock or ~~New Warrants or~~ other securities under the Plan would be an "underwriter" with respect to such New Common Stock or ~~New Warrants or~~ other securities.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN.  The Debtors recommend that potential recipients of the New Common Stock ~~or New Warrants~~ consult their own counsel concerning whether they may freely trade New Common Stock ~~or New Warrants~~.

**written to be used, and cannot be used, by holders of Claims or Interests for the purpose of avoiding penalties that may be imposed on them under the IRC, (ii) such discussion is written in connection with the promotion or marketing of the transactions or matters discussed herein, and (iii) holders of Claims or Interests should seek advice based on their particular circumstances from an independent tax advisor.**

### A.    United States Federal Income Tax Consequences To The Debtors

#### 1.    Cancellation Of Indebtedness Income

The exchange of certain debt securities for New Common Stock and/or cash Rights may result in the cancellation of a portion of the Debtors' outstanding indebtedness.  In general, the discharge of a debt obligation in exchange for an amount of cash and other property having a fair market value (or, in the case of a new debt instrument, an "issue price") less than the "adjusted issue price" of the debt that is discharged gives rise to cancellation of indebtedness ("COD") income to the debtor. However, COD income is not taxable to the debtor if the debt discharge occurs in a Title 11 bankruptcy case. Rather, under the IRC, such COD income instead will reduce certain of the Debtors' tax attributes, generally in the following order: (a) net operating losses and NOL carryforwards ("NOLs"); (b) general business credit carryforwards; (c) minimum tax credit carryforwards; (d) capital loss carryforwards; (e) the tax basis of the Debtors' depreciable and nondepreciable assets (but not below the amount of its liabilities immediately after the discharge); (f) passive activity loss and credit carryforwards; and (g) foreign tax credit carryforwards. A debtor may elect to alter the preceding order of attribute reduction and, instead, first reduce the tax basis of its depreciable assets (and, possibly, the depreciable assets of its subsidiaries). The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (i.e., such attributes may be available to offset taxable income that accrues between the date of discharge and the end of the Debtors' taxable year). Any excess COD income over the amount of available tax attributes is not subject to United States federal income tax and has no other United States federal income tax impact.

Because some of the Debtors' outstanding indebtedness will be satisfied in exchange for New Common Stock and Rights, the amount of COD income, and accordingly the amount of tax attributes required to be reduced, will depend in part on the fair market value of the New Common Stock and Rights. This value cannot be known with certainty until after the Effective Date.

#### 2.    Net Operating Losses-Section 382

The Debtors anticipate that they will experience an "ownership change" (within the meaning of IRC section 382) on the Effective Date as a result of the issuance of New Common Stock, Rights, and New Warrants, and other interests to holders of Claims and Interests and the Plan Investors pursuant to the Plan. As a result, the Debtors' ability to use any pre-Effective Date NOLs and other tax attributes to offset their income in any post-Effective Date taxable year (and in the portion of the taxable year of the ownership change following the Effective Date) to which such a carryforward is made generally (subject to various exceptions and adjustments, some of which are described below) will be

DS-249

limited to the sum of (a) a regular annual limitation (prorated for the portion of the taxable year of the ownership change following the Effective Date), and (b) any carryforward of unused amounts described in (a) from prior years. IRC section 382 may also limit the Debtors' ability to use "net unrealized built-in losses" (i.e., losses and deductions that have economically accrued but are unrecognized as of the date of the ownership change) to offset future taxable income. Moreover, the Debtors' loss carryforwards will be subject to further limitations if the Debtors experience additional future ownership changes or if they do not continue their business enterprise for at least two years following the Effective Date.

The operation and effect of IRC section 382 will be materially different from that just described if the Debtors are subject to the special rules for corporations in bankruptcy provided in IRC section 382(l)(5). In that case, the Debtors' ability to utilize their pre-Effective Date NOLs would not be limited as described in the preceding paragraph. However, several other limitations would apply to the Debtors under IRC section 382(l)(5), including (a) the Debtors' NOLs would be calculated without taking into account deductions for interest paid or accrued in the portion of the current tax year ending on the Effective Date and all other tax years ending during the three-year period prior to the current tax year with respect to the Claims that are exchanged ~~for New Common Stock~~ pursuant to the Plan, and (b) if the Debtors undergo another ownership change within two years after the Effective Date, the Debtors' IRC section 382 limitation with respect to that ownership change will be zero. Even if IRC section 382(l)(5) is available, it is uncertain whether the provisions of IRC section 382(l)(5) would be available in the case of the ownership change that is expected to occur as a result of the confirmation of the Plan. The Debtors have not yet determined whether they would seek to have the IRC section 382(l)(5) rules apply to the ownership change arising from the consummation of the Plan (assuming IRC section 382(l)(5) would otherwise apply).

If the Debtors do not qualify for, or elect not to apply, the special rule under IRC section 382(l)(5) for corporations in bankruptcy described above, a different rule under IRC section 382 applicable to corporations under the jurisdiction of a bankruptcy court will apply in calculating the annual IRC section 382 limitation. Under this rule, the limitation will be calculated by reference to the lesser of the value of their respective new stocks (with certain adjustments) immediately after the ownership change or the value of such company's assets (determined without regard to liabilities) immediately before the ownership change. Although such calculation may substantially increase the annual IRC section 382 limitation, the Debtors' use of any NOLs or other tax attributes remaining after implementation of the Plan may still be substantially limited after an ownership change.

Because the Plan Investors will hold a significant equity position in the Reorganized Debtors following the consummation of the Plan, if the Plan Investors dispose of all or a significant amount of this position after the Effective Date, it could cause the Reorganized Debtors to undergo an ownership change. This would generally limit (or possibly eliminate) the Reorganized Debtors' ability to use NOLs and other tax attributes.

DS-250

**B.**     **United States Federal Income Tax Consequences To Holders Of Claims Against And Interests In The Debtors**

The following discusses certain United States federal income tax consequences of the transactions contemplated by the Plan to holders of Claims or Interests that are "United States holders" as defined below. The United States federal income tax consequences of the transactions contemplated by the Plan to holders of Claims or Interests (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other things, (1) whether the Claim or Interest and the consideration received in respect thereof are "securities" for United States federal income tax purposes; (2) the manner in which a holder acquired a Claim or Interest; (3) the length of time the Claim or Interest has been held; (4) whether the Claim or Interest was acquired at a discount; (5) whether the holder has taken a bad debt deduction or worthless stock deduction with respect to the Claim or Interest (or any portion thereof) in the current or prior years; (6) whether the holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim or Interest; (7) the holder's method of tax accounting; and (8) whether the Claim or Interest is an installment obligation for United States federal income tax purposes. Therefore, holders of Claims or Interests should consult their own tax advisors for information that may be relevant based on their particular situations and circumstances regarding the particular tax consequences to them of the transactions contemplated by the Plan. This discussion assumes that the holder has not taken a bad debt deduction with respect to a Claim or Interest (or any portion thereof) in the current or any prior year and such Claim or Interest did not become completely or partially worthless in a prior taxable year. Moreover, the Debtors intend to claim deductions to the extent they are permitted to deduct any amounts they pay in cash, stock or other property pursuant to the Plan.

For purposes of the following discussion, a "United States holder" is a holder of Claims or Interests that is (1) a citizen or individual resident of the United States, (2) a corporation created or organized in the United States or under the laws of the United States or any political subdivision thereof, (3) an estate the income of which is subject to United States federal income taxation regardless of its source, or (4) a trust if (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust or (ii) the trust was in existence on August 20, 1996 and properly elected to be treated as a United States person.

### *1.     Holders Of General Unsecured Claims Other Than Subordinated Note Claims*

~~Except with respect to holders of Subordinated Note Claims described in Section XII.B.2 - Holders Of Subordinated Note Claims below, pursuant~~Pursuant to the Plan, the Debtors will issue New Common Stock and ~~cash~~Discount Rights to holders of General Unsecured Claims to discharge such Claims.  The United States federal income tax consequences arising from the Plan to such holders of General Unsecured Claims will vary depending upon, among other things, whether such Claims constitute "securities" for United States federal income tax purposes.  The determination of whether a debt instrument constitutes a "security" depends upon an evaluation of the nature of the debt

instrument, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for United States federal income tax purposes. Generally, corporate debt instruments with maturities when issued of less than five years are not considered securities, and corporate debt instruments with maturities when issued of ten years or more are considered securities. Each holder is urged to consult its <u>own</u> tax advisor regarding the status of its Claim.

If such Claims constitute "securities" for United States federal income tax purposes, the exchange of such Claims for New Common Stock and ~~cash~~<u>Discount Rights</u> should constitute a "recapitalization" for United States federal income tax purposes. As a result, except as discussed below with respect to Claims for accrued interest and accrued market discount, a holder of such Claims should <u>not</u> recognize gain~~, but not~~ <u>or</u> loss~~, with respect to each Claim surrendered in an amount equal to the lesser of (1) the amount of gain realized (i.e., the excess of the cash~~ <u>on the exchange of its General Unsecured Claims for New Common Stock</u> ~~and fair market value of any other property received by such holder in respect of its Claim over the adjusted tax basis of such Claim), excluding any such cash or property received in respect of a Claim for accrued interest that had not been included in income, and (2) the amount of cash received by such holder in respect of its Claim (other than with respect to any Claim for accrued interest). Any such gain recognized will generally be treated as capital gain if the Claim is a capital asset in the hands of the holder. In addition, a holder's aggregate adjusted tax basis in the New Common Stock (other than the New Common Stock received for accrued interest) should be equal to the aggregate adjusted tax basis in the Claims exchanged therefore (exclusive of any basis in such Claim attributable to accrued interest), decreased by the amount of cash received, and increased by any gain recognized, and such holder's holding period for the New Common Stock (other than New Common Stock received for accrued interest) will include the holding period of the Claims exchanged therefor, provided that such Claims are held as capital assets on the Effective Date.~~ <u>Discount Rights (other than with respect to any Claim for accrued interest). A holder's adjusted tax basis in a General Unsecured Claim should be allocated among the New Common Stock and Discount Rights received with respect to such Claim based upon the relative fair market values thereof (other than New Common Stock and Discount Rights received for accrued interest). The holding period for the New Common Stock and Discount Rights will include the holder's holding period for the General Unsecured Claims.</u>

Under the Plan, a portion of the New Common Stock and ~~cash~~<u>Discount Rights</u> distributed to holders of General Unsecured Claims may be treated as distributed with respect to their Claims for accrued interest. Holders of Claims for accrued interest which previously have not included such accrued interest in taxable income will be required to recognize ordinary income equal to the amount of ~~cash and~~ New Common Stock <u>and Discount Rights</u> received with respect to such Claims for accrued interest. The extent to which consideration distributable under the Plan is allocable to accrued interest is not clear. Holders of such Claims are advised to consult their own tax advisors to determine the amount, if any, of consideration received under the Plan that is allocable to accrued interest.

DS-252

Notice of Proposed Amendments<br>October 29, 2007

The market discount provisions of the IRC may apply to holders of General Unsecured Claims.  In general, a debt obligation other than a debt obligation with a fixed maturity of one year or less that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, the revised issue price) exceeds the adjusted tax basis of the bond in the holder's hands immediately after its acquisition.  However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount.  ~~Any accrued but unrecognized market discount with respect to such Claims generally will be treated as ordinary interest income to the extent of the gain recognized in connection with the recapitalization described above, unless the holder elected to include accrued market discount in taxable income currently.  Any remaining accrued but unrecognized market discount generally will be treated as ordinary income to the extent of the gain recognized upon the subsequent disposition of New Common Stock received in exchange for the Claim.  The~~ A U.S. Holder should not be required to recognize any accrued but unrecognized market discount upon the disposition of its General Unsecured Claims for New Common Stock and Discount Rights pursuant to the Plan, although it may be required to recognize any accrued but unrecognized market discount upon a subsequent taxable disposition of its New Common Stock and Discount Rights (including any New Common Stock received upon exercise of a Discount Right).  Although not free from doubt, the Company believes that a U.S. Holder should not be required to recognize any accrued but unrecognized market discount upon the exercise of a Discount Right received in exchange for its General Unsecured Claims.  However, the treatment of accrued market discount in a nonrecognition transaction is ~~, however,~~ subject to the issuance of Treasury ~~Regulations~~ regulations that have not yet been promulgated.  In the absence of such regulations, the application of the market discount rules ~~in the present transaction~~ to the exercise of a Discount Right received in exchange for a General Unsecured Claim is uncertain.  ~~A~~ If a holder of a ~~market discount bond~~ Claim that ~~is~~ was required under the market discount rules of the IRC to defer its deduction of all or a portion of the interest on indebtedness, if any, incurred or maintained to acquire or carry the ~~bond may be allowed to deduct such interest, in whole or in part, on disposition of such bond for cash.  However~~ Claim, continued deferral of the deduction for interest on such indebtedness may be required ~~to the extent attributable to the New Common Stock.~~  Any such deferred interest expense would be attributed to the New Common Stock and Discount Rights received in exchange for the Claim, and would be treated as interest paid or accrued in the year in which the New Common Stock ~~is~~ and Discount Rights are disposed.

If such General Unsecured Claims do not constitute "securities" for United States federal income tax purposes, the exchange of such Claims for New Common Stock and ~~cash~~ Discount Rights should constitute a taxable exchange for United States federal income tax purposes.  As a result, a holder of Claims would generally recognize income, gain or loss for United States federal income tax purposes in an amount equal to the difference between (1) the ~~cash and the~~ fair market value on the Effective Date of the New Common Stock and Discount Rights received in exchange for its Claim, and (2) the holder's adjusted tax basis in its Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes

a capital asset in the hands of the holder, whether the Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim.  Any such gain recognized would generally be treated as ordinary income to the extent that the ~~cash and~~ New Common ~~Stock~~Stock and Discount Rights are received in respect of accrued but unpaid interest or accrued market discount that, in either case, have not been previously taken into account under the holder's method of accounting as discussed above in this ~~Section XII.B.1~~XII.B.1 - Holders Of General Unsecured Claims Other Than Subordinated Note Claims.  A holder of Claims recognizing a loss as a result of the Plan may be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year.  A holder's aggregate tax basis in the New Common Stock and Discount Rights received in exchange for its Claims would generally be equal to the aggregate fair market value of such ~~stock~~New Common Stock and Discount Rights on the Effective Date.  The holding period for the New Common Stock and Discount Rights received pursuant to the Plan would begin on the day after the Effective Date.

### 2. *Holders Of Subordinated Note Claims*

Delphi believes that the Subordinated Note Claims constitute securities for United States federal income tax purposes.  Accordingly, the exchange of Subordinated Note Claims for New Common Stock and Discount Rights should constitute a "recapitalization" for United States federal income tax purposes.  As a result, except as discussed below with respect to Claims for accrued interest and accrued market discount, a holder of such Claims should not recognize gain or loss on the exchange of its Subordinated Note Claims for New Common Stock and Discount Rights (other than with respect to any Claim for accrued interest).  In addition, a holder's ~~aggregate~~adjusted tax basis in a Subordinated Note Claim should be allocated among the New Common Stock and Discount Rights received with respect to such Claim based upon the relative fair market values thereof (other than the New Common Stock and Discount Rights received for accrued interest~~should be equal to the aggregate adjusted tax basis in the Claims exchanged therefore (exclusive of any basis in such Claim attributable to accrued interest~~), and such holder's holding period for the New Common Stock and Discount Rights (other than New Common Stock and Discount Rights received for accrued interest) will include the holding period of the Claims exchanged therefor, provided that such Claims are held as capital assets on the Effective Date.

In addition, as is discussed in Section ~~XII.B.1~~XII.B.1 - Holders Of General Unsecured Claims Other Than Subordinated Note Claims  above, holders of Subordinated Note Claims will recognize ordinary income to the extent that the consideration they receive in discharge of their Claims is treated as received in satisfaction of accrued and unpaid interest with respect to such Claims.  Moreover, under the market discount rules discussed in Section ~~XII.B.1~~XII.B.1 - Holders Of General Unsecured Claims Other Than Subordinated Note Claims above, ~~any accrued but unrecognized market discount generally will~~a U.S. Holder should not be ~~treated as ordinary income to the extent of the gain recognized upon the subsequent~~required to recognize any accrued but unrecognized market discount upon the disposition of its Subordinated Note Claims for New Common Stock and Discount Rights pursuant to the Plan, although it may be required to recognize any accrued but unrecognized market discount upon a subsequent taxable disposition of its

New Common Stock and Discount Rights (including any New Common Stock received upon exercise of a Discount Right).  Although not free from doubt, the Company believes that a U.S. Holder should not be required to recognize any accrued but unrecognized market discount upon the exercise of a Discount Right received in exchange for its Subordinated Note Claims.  However, the ~~Claim.  The~~ treatment of accrued market discount in a nonrecognition transaction is~~, however,~~ subject to the issuance of Treasury regulations that have not yet been promulgated.  In the absence of such regulations, the application of the market discount rules ~~in the present transaction~~ to the exercise of a Discount Right received in exchange for a Subordinated Note Claim is uncertain.  If a holder of a Claim that was required under the market discount rules of the IRC to defer its deduction of all or a portion of the interest on indebtedness, if any, incurred or maintained to acquire or carry the Claim, continued deferral of the deduction for interest on such indebtedness may be required.  Any such deferred interest expense would be attributed to the New Common Stock and Discount Rights received in exchange for the Claim, and would be treated as interest paid or accrued in the year in which the New Common Stock ~~is~~and Discount Rights are disposed.

### 3.    *Existing Common Stockholders*

(a)    Certain Consequences To Holders Of Existing Common Stock

A holder of Delphi's Existing Common Stock ~~that receives New Common Stock pursuant to the Plan~~ generally will ~~not~~ recognize ~~income,~~capital gain~~, deduction,~~ or loss (subject to the wash sale rules discussed below) on the receipt of ~~New Common Stock,~~Par Value Rights~~, and New Warrants, and, except where noted,  in~~ the ~~remainder of this discussion assumes that the receipt of New Common Stock,~~Par Value Rights.  Offerings and any New Warrants issued in the Plan in an amount equal to the difference between the fair market value of the Par Value Rights and New Warrants ~~by a holder is not taxable.  A holder~~, if any, received and the holder's adjusted tax basis in ~~its~~the Existing Common Stock ~~should be allocated among the New Common Stock,~~exchanged for such Par Value Rights~~ and New Warrants based upon the relative fair market values thereof.  The~~.  Such capital gain or loss will be long-term capital gain or loss if the holding period for the ~~New~~Existing Common Stock~~,~~ exchanged for the Par Value Rights~~,~~ and New Warrants ~~will include the holder's holding period for the Existing Common Stock.~~

~~A holder that does not receive New Common Stock pursuant to the Plan (for example, due to the fact that payments of fractions of shares of New Common Stock will not be made to holders of Existing Common Stock) generally will recognize capital gain or loss on the receipt of Rights in the Rights Offerings and any New Warrants issued in the Plan in an amount equal to the difference between the fair market value of the Rights and New Warrants, if any, received and the holder's adjusted tax basis in the Existing Common Stock exchanged for such Rights and New Warrants.  Such capital gain or loss will be long-term capital gain or loss if the holding period for the Existing Common Stock exchanged for the Rights and New Warrants, if any,~~ exceeds one year at the time the Par Value Rights and New Warrants are distributed.  Capital gains of non-corporate holders may be eligible for reduced rates of taxation.  The deductibility of capital losses is subject to limitations.  Holders are urged to consult their own tax advisors regarding such

limitations.  The holder's tax basis in ~~the~~the Par Value Rights and New Warrants, if any, will be equal to the fair market value of the Par Value Rights and New Warrants at the time the Par Value Rights and New Warrants are received.  The holding period for the Par Value Rights and New Warrants, if any, will commence on the day after the date of receipt.

To the extent a loss would otherwise be recognizable on the exchange, such loss may be deferred under the "wash sale" rules of the Code. The wash sale rules provide for the disallowance of a loss on the sale or other disposition of shares of stock or securities where it appears that, within a period beginning 30 days before the date of such sale or disposition and ending 30 days after such date, the holder acquired, or has entered into a contract or option to acquire, "substantially identical" stock or securities. If the Existing Common Stock and the New Common Stock receivable upon exercise of the Par Value Rights and New Warrants are considered substantially identical and the exchange of Existing Common Stock for Par Value Rights and New Warrants results in a loss to the holder, such loss may be disallowed and added to the tax basis of the Par Value Rights and New Warrants received. The extent to which such loss would be disallowed is unclear. Holders of Existing Common Stock are urged to consult their own tax advisors regarding how the "wash sale" rules apply to them in light of their particular circumstances.

(b)    Exercise Of Par Value Rights And New Warrants

A holder will not recognize gain or loss on the exercise of a Par Value Right or a New Warrant.  The holder's tax basis in New Common Stock received as a result of the exercise of the Par Value Right or New Warrant (the "Additional New Common Stock") will equal the sum of the exercise price paid for the Additional New Common Stock and the holder's tax basis in the Par Value Right or New Warrant determined as described in Section ~~XII.B.3(a)~~XII.B.3(a) – Certain Consequences To Holders Of Existing Common Stock above.  The holding period for the Additional New Common Stock received as a result of the exercise of the Par Value Right or New Warrant will begin on the exercise date.

A holder that exercises Par Value Rights or New Warrants should be aware that, to the extent the wash sale rules did not apply to an exchange of Existing Common Stock for Par Value Rights and New Warrants as described in Section XII.B.3(a) – Certain Consequences to Holders of Existing Common Stock above, the exercise of such Par Value Rights or New Warrants could result in any loss that might otherwise be recognized by such holder upon receipt of Par Value Rights or New Warrants or with respect to a holder's Existing Common Stock ~~to be~~being disallowed under the "wash sale" rules if such exercise occurs within 30 days of the receipt of the Par Value Rights or New Warrants. If the "wash sale" rules apply to a holder's loss upon receipt of Par Value Rights or New Warrants or with respect to its Existing Common Stock, the holder's tax basis in any Additional New Common Stock received as a result of the exercise of the Par Value Rights or New Warrants would be increased to reflect the amount of the disallowed loss.  Holders of Existing Common Stock are urged to consult their own tax advisors regarding how the "wash sale" rules apply to them in light of their particular circumstances.

DS-256

(c)    Sale, Exchange, Or Other Taxable Disposition Of Par Value Rights And New Warrants

If a holder sells, exchanges or otherwise disposes of Par Value Rights or New Warrants in a taxable disposition, the holder generally will recognize capital gain or loss equal to the difference, if any, between the amount realized for the Par Value Rights or New Warrants and the holder's tax basis in the Par Value Rights or New Warrants. Capital gains of non-corporate holders derived with respect to a sale, exchange or other disposition of Par Value Rights or New Warrants in which the holder has a holding period exceeding one year (determined as described in Section ~~XII.B.3(a)~~XII.B.3(a) – Certain Consequences To Holders Of Existing Common Stock above) may be eligible for reduced rates of taxation.  The deductibility of capital loss is subject to limitations.  ~~Holder's~~Holders are urged to consult their own tax advisors regarding such limitations.

(d)    Expiration Of Par Value Rights And New Warrants

A holder that allows a Par Value Right or New Warrant to expire generally should recognize capital loss equal to the holder's tax basis in the Par Value Right or New Warrant, which will be treated as long-term or short-term capital loss depending upon whether such holder's holding period in the Par Value Rights or New Warrants exceeds one year as of the date of the expiration (determined as described in Section XII.B.3(a) – Certain Consequences To Holders Of Existing Common Stock above).  The deductibility of capital losses is subject to limitations.  Holders are urged to consult their own tax advisors regarding such limitations.

(e)    Distributions On ~~New Common Stock And~~ Additional New Common Stock

The gross amount of any distribution of cash or property made to a holder with respect to ~~New Common Stock or~~ Additional New Common Stock generally will be includible in gross income by a holder as dividend income to the extent such distributions are paid out of the current or accumulated earnings and profits of Delphi as determined under United States federal income tax principles.  A distribution which is treated as a dividend for United States federal income tax purposes may qualify for the 70% dividends-received deduction if such amount is distributed to a holder that is a corporation and certain holding period and taxable income requirements are satisfied.  Any dividend received by a holder that is a corporation may be subject to the "extraordinary dividend" provisions of the IRC.

A distribution in excess of Delphi's current and accumulated earnings and profits will first be treated as a return of capital to the extent of the holder's adjusted tax basis in its ~~New Common Stock or~~ Additional New Common Stock and will be applied against and reduce such basis dollar-for-dollar (thereby increasing the amount of gain and decreasing the amount of loss recognized on a subsequent taxable disposition of the ~~New Common Stock or~~ Additional New Common Stock).  To the extent that such distribution exceeds the holder's adjusted tax basis in its ~~New Common Stock or~~ Additional New Common Stock, the distribution will be treated as capital gain, which will be treated as long-term capital gain if such holder's holding period in its ~~New Common Stock or~~

Additional New Common Stock exceeds one year as of the date of the distribution. Dividends received by non-corporate holders in taxable years beginning before January 1, 2011 may qualify for a reduced rate of taxation if certain holding period and other requirements are met.

(f)    Sale, Exchange, Or Other Taxable Disposition Of ~~New Common Stock Or~~ Additional New Common Stock

For United States federal income tax purposes, a holder generally will recognize capital gain or loss on the sale, exchange or other taxable disposition of any of its ~~New Common Stock or~~ Additional New Common Stock in an amount equal to the difference, if any, between the amount realized for the ~~New Common Stock or~~ Additional New Common Stock and the holder's adjusted tax basis in the ~~New Common Stock or~~ Additional New Common Stock.  Capital gains of non-corporate holders derived with respect to a sale, exchange or other disposition of ~~New Common Stock or~~ Additional New Common Stock held for more than one year may be eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.  Holders are urged to consult their own tax advisors regarding such limitations.

### 4.    Holders Of Other Interests

A holder of an Other Interest that is deemed cancelled under the Plan will recognize a loss for United States federal income tax purposes in an amount equal to such holder's adjusted tax basis in the Other Interest.  The character of such loss as capital loss or as ordinary loss will be determined by a number of factors, including the tax status of the holder and whether the holder holds its Other Interest as a capital asset.

### 5.    Holders Of Section 510(b) Note Claims And Section 510(b) Equity Claims

Pursuant to the Plan, the Debtors will issue New Common Stock and ~~cash~~Discount Rights to the holders of Section 510(b) Note Claims and Section 510(b) Equity Claims. The exchange of such Claims for New Common Stock and ~~cash~~Discount Rights should constitute a taxable transaction for United States federal income tax purposes.  As a result, a holder of such Claims would generally recognize income, gain or loss for United States federal income tax purposes in an amount equal to the difference between (1) the ~~cash and the~~ fair market value on the Effective Date of the New Common Stock and Discount Rights received in exchange for its Claim, and (2) the holder's adjusted tax basis in its Claim.  The character of such gain or loss as capital gain or loss or as ordinary income will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, ~~whether the Claim was purchased at a discount,~~ and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claims.  Holders are urged to consult their own tax advisor regarding the character of such income, gain or loss.  A holder's aggregate tax basis in the New Common Stock and Discount Rights received in exchange for its Claims would generally be equal to the aggregate fair market value of such ~~stock~~New Common Stock and Discount Rights on the Effective Date.

DS-258

executory contracts and unexpired leases and thereby create a significantly higher number of unsecured claims.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

### D.    Estimated Valuation Of The Reorganized Debtors

A copy of the analysis of the total enterprise value of the Reorganized Debtors is attached to this Disclosure Statement as <u>Appendix D</u>.

In connection with the framework discussion held among the Debtors, Plan Investors, the Statutory Committees, and GM during the fall of 2006, the parties negotiated an agreed enterprise value of $45 per share as well as an assumption that the aggregate amount of all trade claims and other unsecured claims (including any accrued interest) (excluding (i) unsecured funded debt claims, (ii) Flow-Through Claim, (iii) GM Claims, (iv) securities claims) (collectively, the "Other Unsecured Claims") that have been asserted or scheduled but yet disallowed as of the effective date of the Plan shall be allowed or estimated for distribution purposes by the Bankruptcy Court to be no more than $1.7 billion, excluding all allowed accrued postpetition interest thereon. The negotiated plan value of $45 per share falls within the range of the Rothschild estimated total enterprise value of $11.4 billion to $14.4 billion.

Subsequent to having reached the $45 per share agreed plan valuation and the $1.7 billion cap on Allowed Other Unsecured Claims, the claims review process has progressed and the Debtors now anticipate that the ultimately Allowed Other Unsecured Claims will be less than $1.7 billion. The reduction in estimated claims is a result of both subsequent objections to filed claims and the resolution thereof as well as the assumption under the Reorganized Debtors' five-year business plan of approximately $240 million of claims relating to GM and labor subsidies that otherwise would have constituted alleged General Unsecured Claims. Notwithstanding the subsequent events, the framework assumptions agreed to by the Debtors and the principal stakeholders are maintained in the Plan. Accordingly, the assumed amount of ultimately Allowed Other Unsecured Claims continues to be $1.7 billion which, under the Plan, includes a $275 million claims reserve. To the extent that Allowed Other Unsecured Claims are less than the $1.7 billion estimate that is being reserved under the Plan, the cancellation of the stock reserved for the excess claim will result in an accretion in the assumed value of all parties receiving stock under the Plan.

DS-262

| ($Millions) | Net Proceeds Available For Distribution | | Secured Recovery[2] | | Admin & Priority Recovery | | General Unsecured, Trust Preferreds[1], and PBGC Recovery | | Equity Recovery | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Lower | Higher | Lower | Higher | Lower | Higher | Lower | Higher | Lower | Higher |
| Debtor(s) | $ | $ | % | % | % | % | % | % | $ | $ |
| **Substantive Consolidation Under The Plan** | | | | | | | | | | |
| Delphi-DAS Debtors | 3,781 | 5,338 | 76% | 100% | 0% | 30% | 0% | 0% | - | - |
| DASHI Debtors | 3,564 | 5,036 | 100% | NA | 100% | 100% | 55% | 83% | - | - |
| Delphi Medical Systems Colorado Corporation | 15 | 20 | 100% | NA | 0% | 100% | 0% | 0% | - | - |
| Delphi Medical Systems Texas Corporation | 4 | 6 | 100% | NA | 0% | 78% | 0% | 0% | - | - |
| Delphi Medical Systems Corporation | 0 | 5 | 100% | NA | 0% | 19% | 0% | 0% | - | - |
| Connection Systems Debtors | 14 | 18 | 100% | NA | 0% | 100% | 0% | 0% | - | - |
| Delphi Diesel Systems Corporation | 105 | 137 | 100% | NA | 0% | 100% | 0% | 1% | - | - |
| Delphi Mechatronic Systems, Inc. | 22 | 29 | 100% | NA | 0% | 42% | 0% | 0% | - | - |
| Specialty Electronics Debtors | 6 | 7 | 100% | NA | 100% | 100% | 0% | 0% | - | - |
| Delco Electronics Overseas Corporation | 42 | 47 | 100% | NA | 12% | 100% | 0% | 0% | - | - |
| MobileAria Inc. | 3 | 3 | 100% | NA | 0% | 100% | 0% | 0% | - | - |
| Delphi Furukawa Wiring Systems LLC | 5 | 6 | 100% | NA | 50% | 85% | 0% | 0% | - | - |
| **Substantive Consolidation - All Debtors** | 7,459 | 10,434 | 100% | 100% | 65% | 100% | 0% | 18% | - | - |

NA - Not applicable due to $0 estimated allowed claims in the creditor class.

1 - The Trust Preferred subordinated debt is classified under the Delphi-DAS Debtors.

2 - DIP claims have a 100% recovery in all instances.

## 2.   *Comparison Of Liquidation Analysis And Valuation Analysis*

The liquidation analysis attached hereto as Appendix E contains two separate analyses—a "Substantive Consolidation – All Debtors" analysis, and "Substantive Consolidation Under The Plan" analysis based on the Debtors' proposed partially-consolidated substantive consolidation groupings.  The "Substantive Consolidation – All Debtors" analysis assumes that the Debtors are substantively consolidated and that creditors share in the proceeds of all of the Debtors' assets without regard to (a) the separate legal identity of each Debtor and (b) which Debtors are obligated on particular claims.  The "Substantive Consolidation Under The Plan" analysis assumes that only certain of the Debtors are consolidated, and that the Debtors are liquidated through those groupings or independently.  As discussed above, the PBGC is a primary creditor of Delphi and each of its subsidiaries. The PBGC's claims arise out of joint and several liability of each of the Debtors to the PBGC under applicable non-bankruptcy law.

In a "Substantive Consolidation Under The Plan" liquidation (accounting for partial consolidation of Debtor entities), the PBGC would have a claim against each consolidated Debtor group or Debtor and would be entitled to receive a distribution from the proceeds of asset liquidations of each consolidated Debtor group or Debtor on account of such claim.  Alternately, in a "Substantive Consolidation – All Debtors" liquidation, the PBGC's claims against Delphi's subsidiaries would be deemed a single claim against the consolidated Debtors' assets and would share in distributions with all other unsecured creditors of each of the other Debtors.  As a consequence, the estimated recovery of the PBGC, based on the assumptions contained in the attached liquidation analysis, is higher in the "Substantive Consolidation Under The Plan" scenario – 55% to 83% for the PBGC – and lower in the "Substantive Consolidation – All Debtors" scenario – 0% to 18% for the PBGC.  Correspondingly, the recoveries of other unsecured creditors based on such assumptions is generally lower in the "Substantive Consolidation Under The Plan" scenario – 0% for general unsecured creditors (except for the DASHI Debtors and Delphi Diesel Systems Corporation) - and generally higher in the "Substantive Consolidation – All Debtors"

Notice of Proposed Amendments
October 29, 2007

scenario – 0% to 18% for general unsecured creditors.  Holders of existing common stock would receive no distribution under either liquidation scenario.

No estimate is included in the aforementioned liquidation recoveries for recoveries relating to potential affirmative damage claims against GM.  The Debtors believe that an estimate of the ultimate recoveries from such claims is highly subjective and dependant on numerous variables, including (i) the probabilities of successful judgment; (ii) accounting for the costs to litigate; (iii) the cost and time required to litigate the affirmative claims; and (iv) the collectibility of amounts significant enough to alter the outcome of the Liquidation Analysis.  Furthermore, as more fully described in Appendix E, it is management's belief that the amount of the affirmative action claims recoveries necessary to impact the "best interests" test is higher than the anticipated recoveries.

The valuation analysis attached hereto as Appendix D leads to the conclusion that recoveries under the Plan would be at least as much, and in many cases significantly greater, than the recoveries available in a Chapter 7 liquidation, whether such liquidation was conducted on a Substantive Consolidation – All Debtors or Substantive Consolidation Under The Plan basis.  In particular, the Debtors estimate that under the Plan, holders of General Unsecured Claims will receive a recovery equal to the principal amount of the claim plus accrued interest, ~~payable~~paid 92.4% in ~~Cash equal to 20% of the Claim and the number shares of~~ New Common Stock (~~valued~~ at ~~the negotiated reorganization value of $45~~$41.58 per share~~) equal to 80% of such Claim.~~ and 7.6% through pro rata participation in the Discount Rights Offering.  Furthermore, holders of existing common stock will also receive a distribution under the plan of reorganization.

## XIV.   CONFIRMATION

### A.      Confirmation Without Acceptance Of All Impaired Classes:  The "Cramdown" Alternative

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of Claims, without the consideration of votes of insiders, has accepted it.  The Court may confirm the Plan at the request of the Debtors notwithstanding the Plan's rejection (or deemed rejection) by impaired Classes as long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it.  A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free

Notice of Proposed Amendments
October 29, 2007

## 2.    *Conditions To Consummation*

The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 12.3 of the Plan:

- The Reorganized Debtors must have entered into the Exit Financing ~~Facility~~Arrangements and all conditions precedent to the consummation thereof must have been waived or satisfied in accordance with the terms thereof.

- The Bankruptcy Court will approve the settlement between the Debtors and GM as documented in the Delphi-GM Definitive Documents, the Delphi-GM Definitive Documents will have become effective in accordance with their terms, and GM will have received ~~payment from Delphi in~~ the ~~amount of $2.7 billion~~ consideration from Delphi pursuant to the terms ~~thereof~~of the Settlement Agreement.

- The Bankruptcy Court must have entered one or more orders, which may include the Confirmation Order, authorizing the assumption and rejection of unexpired leases and executory contracts by the Debtors as contemplated by Article 8.1 of the Plan.

- The Confirmation Order must have been entered by the Bankruptcy Court and will be a Final Order, the Confirmation Date must have occurred, and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code will have been made, or, if made, will remain pending.

- Each Exhibit, document, or agreement to be executed in connection with the Plan will be in form and substance reasonably acceptable to the Debtors.

- ~~The Bankruptcy Court will have entered one or more orders estimating Disputed Claims, if any, for the purposes of distributions and establishing Distribution Reserves, such that the maximum amount of allowable claims excluding Senior Note Claims and TOPrS Claims, and postpetition interest  is less than the Unsecured Claims Threshold or the Debtors, the Plan Investors, and the Statutory Committees will be reasonably satisfied that the amount of all Allowed General Unsecured Claims, excluding Senior Note Claims, TOPrS Claims, and postpetition interest will not exceed the Unsecured Claims Threshold.~~

- The Bankruptcy Court must have entered one or more orders, which may be the Confirmation Order, approving the MDL Settlements.

- The MDL Court must have entered one or more orders approving the MDL Settlements.

- All conditions to ~~confirmation set forth in~~ the effectiveness of the Investment Agreement, including the satisfaction of the Trade and Other Unsecured Claims

Threshold described Section 9(a)(xxii) of the Investment Agreement, must
have been satisfied or waived in accordance with the terms of the Investment
Agreement.

- All conditions to effectiveness in the Delphi-GM Definitive Documents must
have been satisfied or waived in accordance with the terms of the Delphi-GM
Definitive Documents.

### C.    Waiver Of Conditions To Confirmation And Consummation Of The Plan

With the exception of those The conditions set forth in Article Articles 12.1(a),
12.2(b), (f), (ic), and (j12.2(e) of the Plan, the conditions set forth in Article 12.1 and
Article 12.2 of the Plan may be waived, in whole or in part, by the Debtors without any
notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.  The
failure to satisfy; except that in connection with the satisfaction or waive any waiver of the
condition to the Confirmation Date orset forth in section 12.2(e) of the Plan, no material
modification of the Investment Agreement, the Effective Date may be asserted by
Delphi-GM Definitive Agreements and the Debtors in their sole discretion regardless of
the circumstances giving rise to the failureexhibits to each such agreements that have an
effect on the recoveries of such condition to be satisfied (including any action or inaction
by the Debtors in their sole discretion).unsecured creditors may be made without the
consent of the Creditors' Committee and the respective non-Debtor counterparty to the
agreement.  No other condition set forth in Articles 12.1 and 12.2 of the Plan may be
waived.  The failure of the Debtors to exercise any of the foregoing rights will not be
deemed a waiver of any other rights, and each such right will be deemed an ongoing right,
which may be asserted at any time.

### D.    Retention Of Jurisdiction

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy
Court will have exclusive jurisdiction of all matters arising out of, and related to, the
Chapter 11 Cases and the Plan, including, among others, the following matters:

(a)    to hear and determine motions for (i) the assumption or
rejection or (ii) the assumption and assignment of executory contracts or unexpired leases
to which any of the Debtors are a party or with respect to which any of the Debtors may be
liable, and to hear and determine the allowance of Claims resulting therefrom including the
amount of Cure, if any, required to be paid;

(b)    to adjudicate any and all adversary proceedings, applications,
and contested matters that may be commenced or maintained pursuant to the Chapter 11
Cases, the Plan, or that were the subject of proceedings before the Bankruptcy Court prior
to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and
Disputed Interests, and all controversies and issues arising from or relating to any of the
foregoing;

Notice of Proposed Amendments
October 29, 2007

(p)    to hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

(q)    to enter a final decree closing the Chapter 11 Cases;

(r)    to enforce all orders previously entered by the Bankruptcy Court;

(s)    to hear and determine all matters relating to any Section 510(b) Note Claim, Section 510(b) Equity Claim, or Section 510(b) ERISA Claim and the implementation of the MDL Settlement for plan distribution purposes;

(t)    to hear and determine all matters arising in connection with the interpretation, implementation or enforcement of the Investment Agreement; and

(u)    to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Delphi-GM Definitive Documents, except as provided in such documents.

Notwithstanding anything contained herein to the contrary, the Bankruptcy Court retains exclusive jurisdiction to adjudicate and to hear and determine disputes concerning Retained Actions and any motions to compromise or settle such disputes or Retained Actions.  Despite the foregoing, if the Bankruptcy Court is determined not to have jurisdiction with respect to the foregoing, or if the Reorganized Debtors choose to pursue any Retained Actions in another court of competent jurisdiction, the Reorganized Debtors will have authority to bring such action in any other court of competent jurisdiction.

## XV.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords holders of Claims and Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders.  If the Plan is not confirmed, however, the theoretical alternatives include:  (a) continuation of the pending Chapter 11 Cases; (b) an alternative plan or plans of reorganization; or (c) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

### A.    Continuation Of The Bankruptcy Case

If the Debtors remain in chapter 11, they could continue to operate their businesses and manage their properties as debtors-in-possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code.  It is not clear whether the Debtors could survive as a going concern in protracted Chapter 11 Cases.  In particular, the Debtors could have difficulty sustaining the high costs and the erosion of market confidence which may be caused if the Debtors remain chapter 11 debtors-in-possession.

Notice of Proposed Amendments
October 29, 2007