## **Exhibit G**

Management Compensation Plan (to be included in Plan Exhibit 7.8)

**Compensation Committee Philosophy and Strategy**

**Delphi Corporation**
**Compensation Philosophy and Strategy**

The Compensation Committee of the Board (the "Committee") is committed to providing a total compensation program that supports Delphi's business and people strategies and aligns with the interests of Delphi's key stakeholders during the Chapter 11 and shareholders thereafter.

**Objectives.** The Committee's overall objectives regarding executive compensation can be summarized as follows:

- Provide a target total reward opportunity sufficient to attract and retain high-caliber executives (see the Definitions section below for an explanation of the various executive groups referred to herein) who can effectively manage Delphi's complex global businesses, taking into account the competitive marketplace, as well as each executive's experience and performance. In general, this involves developing and adjusting, in conjunction with the Committee's independent compensation consultant, a target pay structure that provides median total direct compensation at planned levels of performance and total direct compensation above the median when Delphi achieves performance that exceeds plan. In this regard, the Committee assesses both total direct compensation, which is the sum of salary + annual incentive opportunity + long-term incentive opportunity, and total compensation, which includes other aspects of pay, including retirement benefits. Market total direct compensation comparisons for the members of the Delphi Strategy Board (DSB) are developed from proxy data from a comparable group of large, diversified companies, as well as from manufacturing and auto industry survey data. Market total direct compensation comparisons for non-DSB executives are developed from survey data only.

- Link the majority of the total compensation opportunity to performance-based incentives, annual financial and strategic goals, and the creation of sustainable shareholder value consistent with Delphi's long-term strategic goals.

- Align Delphi executives' interests with those of shareholders by making stock-based incentives a core element of our executives' compensation and requiring that they retain a meaningful amount of common stock during their tenure.

- Recognize the cyclical nature of Delphi's businesses and the need to manage for value throughout the business cycle.

- Provide flexibility to recognize, differentiate, and reward individual performance.

**Reward Philosophy.** The Committee believes the following items should be rewarded, and the Delphi compensation programs are customized to recognize company and individual performance and contribution regarding these items.

- Financial – financial goals established by the Board of Directors are primary indicators of whether the company and its business units are achieving their annual and long-term business strategies and objectives.

**Delphi Corporation**
**Compensation Philosophy and Strategy**

- Customer/Operational – customer important operating metrics are quality, delivery, product launch performance, as well as internal measures of efficiency such as manufacturing performance, engineering performance, safety performance, etc.

- People - Delphi's executives' leadership attributes, including development of people, ethical conduct, and development of a diverse workforce are periodically assessed and evaluated.

**Elements of Compensation.**  The Committee intends to structure an executive compensation program that consists primarily of the following integrated components, which together make up an executive's total compensation.

- Salary – The Committee intends to provide executives with salaries commensurate with their job responsibilities, experience, and performance, subject to the competitive marketplace.

- Annual Incentive – Awards under the annual plan provide a direct link between executive compensation and the annual performance of the company and each executive.  A target incentive pool will be created each year based on achievement of financial or operational metrics selected from time to time by the Board of Directors. Each executive will receive an award opportunity, with the award being earned based first on the company and division (if applicable) achieving specific financial goals and second on an assessment of the executive's performance for the year.  That assessment can result in the award being reduced to zero or increased to a specified maximum of an executive's target opportunity.

- Long-term Incentive – Awards under the long-term plan align the economic interest of executives and shareholders and are designed to encourage achievement of Delphi's long-term strategic objectives.  Each executive will receive a long-term incentive award opportunity each year consistent with competitive data, adjusted from time to time for his or her performance, leadership potential, and contribution, as well as changes in the competitive data.

  The Committee will determine the vesting criteria for each award, including the duration of the vesting period, whether the vesting is graded or cliff, whether vesting is conditioned upon achievement of performance goals or continued service only, etc.

  The Committee intends to use a variety of award vehicles, which could include stock options, stock appreciation rights, restricted stock or units, performance shares or units, cash awards, etc, as it deems appropriate from time to time.

  The Committee also intends to make long-term incentive awards at approximately the same time each year to  focus executives on the importance of creating long-term shareholder value.

- Employment and Change in Control Agreements – To retain and attract highly-qualified executives and to protect the Company's interests, the Committee believes that executive employment agreements are appropriate and that these objectives are achieved by offering each DSB member a competitive severance benefit in return for covenants not to compete and not to solicit.

**Delphi Corporation**
**Compensation Philosophy and Strategy**

The Committee also believes that separate change in control (CIC) agreements are appropriate. By entering into these CIC agreements before the occurrence of a CIC, the Committee expects each DSB member's full attention and dedication to shareholders' interests in the event any CIC is contemplated or occurs, and willingness to remain in his or her position until the completion of the CIC, even if it may mean the loss of his or her position.

- Retirement Benefits – Retirement benefits also fulfill an important role with the Committee's overall total compensation objectives because they provide a financial security component and promote retention. The Committee intends for Delphi's retirement programs, including the amount of benefits, to be competitive and for employees and executives to bear a portion of the responsibility for funding their retirement benefits.

- Perquisites – Perquisites and related benefits are consistent with the Committee's overall total compensation objectives because they ensure competitiveness at the top executive level. The Committee, however, believes that any perquisites should be modest, reasonable in terms of cost, and aligned with business needs.

**Performance Management.** Each executive's performance for the year is assessed under Delphi's performance system. The assessment affects any merit increases in salary, the payment of annual incentive awards, and the amount of any long-term incentive awards. Indicated below is the person, or persons, including the Compensation Committee, responsible for each executive's performance review:

- Executive Chairman – by the Compensation Committee, subject to the review and approval of the Board of Directors

- CEO – by the Compensation Committee, subject to the review and approval of the Board of Directors

- Each DSB Member – by the CEO, subject to the review and approval of the Compensation Committee

- Non-DSB Executives – by their direct supervisors, subject to the review and approval of the DSB officer to whom such executive ultimately reports. A non-DSB executive subject to Section 16 of the Securities Exchange Act of 1934 also has his or her compensation reviewed and approved (in the case of equity awards) by the Compensation Committee.

**Definitions.** Each of the key terms referred to above is defined as follows:

- Delphi Strategy Board (DSB) – Delphi's officer group (Vice Presidents and above), approximately 21 individuals, which includes the functional and staff heads of various Corporate functions

- Non-DSB executives - Approximately 535 global executives who are eligible for compensation under Delphi's Executive Compensation and Benefit programs. This group comprises Bands A-F under Delphi's compensation structure.

**Delphi Corporation**
**<u>Compensation Philosophy and Strategy</u>**

- Executives – The combined Delphi Strategy Board and non-DSB executives, approximately 560 executives

**Summary Of Management Compensation Plans**

## Delphi Corporation Short-Term Incentive Plan

| | |
|---|---|
| *Authority, Delegation and Eligibility* | • administered by the Compensation Committee |
| | • the Compensation Committee may delegate its administrative authority to the CEO, the Delphi Strategy Board or any other committee or individual to determine individual award grants to employees who are not members of the Delphi Strategy Board and not Section 16 officers |
| | • only employees are eligible to receive awards under the plan |
| *Term* | • 10 years (effective on the consummation of the Company's Plan of Reorganization) |
| *Determination of the Annual Incentive Award* | • Annual target award and performance levels are established by the Compensation Committee before the commencement of or within the first 25% of the performance period (including minimum and maximum award performance levels) |
| | • Awards are based on specified financial measures, including return on assets, return on equity, total stockholder return, net income and earning per share. |
| | • The Committee may adjust performance levels upward or downward |
| *Determination and Payment of the Final Annual Incentive Award* | • final awards will be based on the performance achieved versus the goals established at the beginning of the period |
| | • adjustments to the final performance award may be made based on individual performance ("covered officer" adjustments may only be made to reduce, not increase, an award) |
| | • awards are limited to an annual individual maximum of $7.5 million per year |
| *Termination* | • if an employee quits or is dismissed for cause, the employee will not be eligible to receive a final award |
| | • if employment terminates due to death, retirement, permanent disability or other reason approved by the Committee, the Committee may pay a reduced award based on a partial year's employment |
| *Change in Control* | • on the effective date of a change in control, all awards will be paid on a pro-rata basis based on the greater of the target award or actual performance |
| *Amendments or Changes to Plan* | • the Committee has the right to amend, modify, suspend or terminate the plan |
| | • stockholder approval required for certain amendments to preserve the exemption under Section 162(m) of the Code |
| *Restatements* | • if the Company's financial results are materially restated, the Committee may require repayment of past awards; if restatement is due to fraud and the employee participated in the fraud, the employee must repay any amounts that would not have been paid based upon the restated results |

## Delphi Corporation Long-Term Incentive Plan

| | |
|---|---|
| *Authority, Delegation and Eligibility* | • administered by the Compensation Committee |
| | • the Compensation Committee may delegate its administrative authority to the CEO, the Delphi Strategy Board or any other committee or individual to determine individual award grants to employees who are not members of the Delphi Strategy Board and not Section 16 officers |
| | • only employees are eligible to receive awards under the plan |
| *Term* | • 10 years (effective on the consummation of the Company's Plan of Reorganization) |
| *Types of Awards* | • Options and SARS |
| |    o the exercise price of a SAR or an option must be equal to or greater than the fair market value of the Company's common stock on the date of grant |
| |    o the term of any SAR or option may not exceed 10 years |
| |    o options may be exercised by payment of cash, through delivery of previously acquired shares of the Company's common stock or a combination of cash and such previously acquired shares |
| |    o participants may satisfy any withholding taxes in connection with the exercise of an option or SAR in cash or stock |
| | • restricted stock and restricted stock units |
| | • cash-based awards |
| |    o Performance goals established prior to the granting of the award target and prior to the expiration of 25% of the specified performance period |
| |    o awards to "covered officers" may only be adjusted to reduce, not increase, the award |
| |    o no award will be paid to a "covered officer" unless the performance is certified by the Compensation Committee |
| *Annual Individual Limits* | • options or SARS: 1,000,000 shares |
| | • restricted stock or RSUs: 500,000 shares |
| | • cash awards: $10,000,000 |
| *Termination* | • Options and SARS |
| |    o Generally, awards are cancelled when an employee terminates employment for any reason prior to first anniversary of grant date |
| |    o upon retirement more than 1 year after grant, the award remains outstanding until the earlier of the expiration date or five years from the date of retirement |
| |    o upon death or permanent disability more than one year after grant, the award remains outstanding until the earlier of the expiration date or three years from the date of death or permanent disability |

- restricted stock and restricted stock units

  o generally, awards are cancelled when an employee terminates employment for any reason prior to first anniversary of grant date

  o upon retirement, permanent disability or death ,more than 1 year after grant, the award will vest immediately

- cash-based awards

  o award must be outstanding for one year from the date of grant to remain outstanding upon eligible termination from the company

  o pro-rated based on the number of eligible months employed over the total award period

*Clawback Provision*

- any employee or former employee who engages in misconduct prior to the second anniversary of his or her termination of employment will be required to forfeit outstanding awards, forfeit the right to receive any future awards and repay any amounts received in connection with previous awards, including any profits realized on the sale of company stock received pursuant to an award.

*Transferability*

- awards granted under the plan may not be transferred other than by will or by the laws of descent and distribution

*Amendments or Changes to Plan*

The Committee may amend the plan in its discretion.  However, stockholder approval is required to

- to increase the maximum number of shares of common stock for which awards may be granted

- grant options or SARS at a discount

- permit exercise of an option without full payment at the time of exercise

- extend the exercise period of an option or SAR

- make an award to non-employees

- reprice any outstanding option or grant an option with a lower exercise price

- increase the annual individual limit on cash awards

- grant any award after the plan's expiration date

*Adjustments or Changes in Capitalization*

- the Compensation Committee may adjust the individual award limits or the number and exercise price of shares of common stock subject to outstanding awards

*Change in Control*

- upon the occurrence of a change in control, all outstanding time-based equity awards will vest

- it is contemplated that award agreements will provide that performance-based equity awards will vest upon a sale of more than 50% of the Company's then-outstanding shares or upon a sale of all or substantially all of the assets of the Company, if certain targets relating to internal rate of return are achieved in connection with such sale.  Any performance-based cash awards will be paid on a pro-rata basis based on the greater of the target award and actual performance.

- if consideration to shareholders in the change in control transaction is paid solely in cash, each award shall be cancelled in exchange for a payment equal to the excess of the per share consideration over the per share exercise price (if any), multiplied by the number of shares granted under the award

# Change In Control[1] Agreements

| | |
|---|---|
| *Term* | • effective on the consummation of the Company's Plan of Reorganization through December 31, 2009 |
| | • automatically renews each 1/1 commencing 1/1/2009 for additional one year term unless notice of non-renewal is given by either party before 9/30 of preceding year |
| | • automatically renews for 2 years upon the occurrence of a change in control |
| *Severance Benefits upon Termination without Cause[2] or Resignation for Good Reason[3]* | • lump sum cash payment equal to 2 to 3 times (based on the executive's position) the executive's base salary and target bonus |
| | • 24 to 36 months (based on the executive's position) of benefit continuation coverage for the executive and his/her dependents |
| | • lump sum cash payment equal to the sum of (i) any unpaid cash incentive |

---

[1]   Generally, "Change in Control" means (i) any person (or entity) is or becomes the beneficial owner, directly or indirectly, of securities of the Company representing more than 50% of the combined voting power of the Company's then outstanding securities, (ii) the following individuals cease for any reason to constitute a majority of the number of directors then serving: individuals who constitute the Board on the Effective Date with any new director whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least two-thirds of the directors then still in office who either were directors on the Effective Date or whose appointment, election or nomination for election was previously so approved or recommended, (iii) a merger of the Company or any direct or indirect subsidiary of the Company with any other entity, other than a merger which results in the voting securities of the Company outstanding immediately prior to such merger continuing to represent more than 50% of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation, or (iv) the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets, other than a sale or disposition by the Company of all or substantially all of the Company's assets to an entity, more than 50% of the combined voting power of the voting securities of which are owned by stockholders of the Company in substantially the same proportions as their ownership of the Company immediately before the sale.  "Change in Control" does not include consummation of the Plan of Reorganization or transactions contemplated thereunder.

[2]   Under the CIC agreement, the term "Cause" includes any of the following actions (if not cured by the executive within ten business days of the receipt of written notice thereof ): (i) continued failure by the executive to satisfactorily perform his/her duties, (ii) willful misconduct or gross negligence, (iii) the commission of a felony or of a misdemeanor involving moral turpitude, (iv) the commission of an act involving dishonesty that results in harm to the Company, or (v) a material breach of the agreement.

[3]   Under the CIC agreement, the term "Good Reason" includes: (i) the assignment to the executive either of duties materially inconsistent with his status or substantially adversely different in nature or status (but ceasing to be a publicly-held corporation will not constitute Good Reason), (ii) a reduction in the executive's base salary or a material reduction in the executive's incentive compensation (except for an across-the-board reduction affecting all executives), (iii) the relocation of the executive's principal place of employment more than 25 miles from its current location (unless the relocation is of the executive's business unit or is due to the executive's transfer to a position that the Company believes in good faith will enhance the executive's career opportunities), (iv) the Company's failure to pay the executive any current or deferred compensation within seven days of its due date or (v) a failure of a successor to assume the agreement.  "Good Reason" also includes in the case of the CEO, any termination by him of his employment during the 30-day period commencing on the first anniversary of the Change in Control.

compensation allocated to executive for completed fiscal years and (ii) a pro-rata portion of any unpaid cash incentive compensation for uncompleted periods (assuming performance at target levels)

- lump sum cash payment equal to the contributions that would have been made to any of the Company's tax-qualified supplemental or excess defined contribution plans on behalf of the executive in the 2 to 3 years (based on the executive's position) following the date of termination (assuming maximum contribution levels)

- outplacement services until the earlier of 1 year or the executive's acceptance of employment

- upon a change in control, vesting acceleration of service-based equity awards and vesting acceleration of performance-based equity awards upon a sale of more than 50% of the Company's then-outstanding shares or upon a sale of all or substantially all of the assets of the Company if certain targets relating to internal rate of return are achieved in connection with such sale

*Gross Up*
- if any of the payments and/or benefits will be subject to excise tax on "golden parachute" payments, the executive shall be entitled to a gross up payment (but only if the executive's total payments and benefits exceeds 110% of the greatest pre-tax amount the executive could be paid without causing the executive to be liable for any excise taxes in connection with such payment)

*Legal Fees*
- the Company is obligated to pay all of executive's legal fees with respect to any good faith dispute of any issue under the CIC agreement

*Restrictive Covenants*
- the agreement includes perpetual non-disclosure and invention assignment covenants

## Executive Employment Agreements

| | |
|---|---|
| *Term* | • effective on the consummation of the Company's Plan of Reorganization through December 31, 2010 |
| | • automatically renews each 1/1 commencing 1/1/2011 for additional one year term unless 60 days advanced written notice of non-renewal is given by either party |
| *Position and Duties* | • executive shall serve in an executive position reasonably consistent with his/her current position |
| *Place of Performance* | • current work location; but can be relocated in connection with relocation of Executive's principal business unit |
| *Compensation and Benefits* | • executive shall receive a base salary at an annual rate equal to his/her current salary |
| | ○ base salary is subject to annual review and increase |
| | ○ base salary may not be reduced except pursuant to across-the-board salary reductions |
| | • executive shall be eligible to participate in annual bonus plans at a level comparable to similarly situated executives |
| | • executive shall be eligible to participate in long-term incentive compensation plans at a level comparable to similarly situated executives |
| | • executive shall be eligible to participate in all employee benefit plans and arrangements made available by the Company to similarly-situated executives, including the defined benefit SERP |
| *Compensation upon Termination without Cause[4] or Resignation for Good Reason[5]* | • 18 months base salary and bonus (at target levels) paid over 18 months |
| | • lump sum cash payment of any unvested amounts credited to the executive's accounts under the Company's tax-qualified supplemental or excess defined contribution plans |
| | • vesting acceleration on all service-based equity awards |

---

[4]    Under the employment agreement, the term "Cause" includes any of the following actions (if not cured by the executive within ten business days of the receipt of written notice thereof ): (i) continued failure by the executive to satisfactorily perform his/her duties, (ii) willful misconduct or gross negligence, (iii) the commission of a felony or of a misdemeanor involving moral turpitude, (iv) the commission of an act involving dishonesty that results in harm to the Company, or (v) a material breach of the employment agreement.

[5]    Under the employment agreement, the term "Good Reason" means an event constituting a material breach of the employment agreement and includes: (i) the assignment to the executive either of duties materially inconsistent with his status or substantially adversely different in nature or status (but ceasing to be a publicly-held corporation will not constitute Good Reason), (ii) a reduction in the executive's base salary or a material reduction in the executive's incentive compensation (except for an across-the-board reduction affecting all executives), (iii) the relocation of the executive's principal place of employment more than 25 miles from its current location (unless the relocation is of the executive's business unit or is due to the executive's transfer to a position that the Company believes in good faith will enhance the executive's career opportunities), or (iv) the Company's failure to pay the executive any current or deferred compensation within seven days of its due date.

*Release*                              • receipt of severance is conditioned on executive executing a release of
                                         claims in favor of the Company

*Restrictive Covenants*                • receipt of severance is conditioned on executive's compliance with a
                                         perpetual non-disclosure provision, invention assignment provision, 18
                                         month non-competition provision and a 12 month non-solicitation
                                         (customers and employees) provision

## Supplemental Executive Retirement Program

| | |
|---|---|
| *Administration* | • the plan is administered by the Company |
| | • claims for benefits under the plan can be appealed to the Compensation Committee |
| *Effective Date* | • effective on the consummation of the Company's Plan of Reorganization |
| *Amendment, Modification, Suspension or Termination* | • the company may amend, modify, suspend or terminate the plan at any time |
| *Eligibility* | • to be eligible for a benefit, an executive employee must be (i) a regular executive employee at retirement, and (ii) have at least 10 years of service and be 55 years old at retirement. |
| | • an executive employee will be entitled to a benefit under the plan if he/she is involuntarily separated from service without cause (or with good reason if the executive employee has an employment agreement) and has at least 5 years of service and is at least 55 years old on the date he/she was involuntarily separated from service |
| | • the plan is closed to new participants |
| | • for a period of 2 years following separation from employment, any retired executive employee shall not compete with the Company without the Company's consent |
| *Regular Formula* | • 2% of average monthly base salary multiplied by the employee's total years of SRP Part B and Part C service less the sum of (i) the unreduced monthly SRP pension benefits to which the executive is entitled and (ii) 2% multiplied by the maximum allowable social security benefit multiplied by the total of the executive's SRP Part A and Part C service as of the effective date |
| *Alternative Formula* | • 1.5% of the average monthly base salary plus average monthly annual incentive compensation multiplied by the employee's total years of SRP Part B and Part C service (not to exceed 35) less the sum of (i) the unreduced monthly SRP benefits to which the executive is entitled and (ii) the maximum allowable social security benefit |
| *Amount of and Form of Distribution* | • the benefit under the plan will be paid as a 5-year monthly annuity |
| | • the amount of the payment will be reduced for early retirement prior to age 62 |
| *Payment of Benefits* | • benefit payment will commence on the later of (i) the 1st day of the month at least 15 days after the employee's separation from service or (ii) the 1st day of the 1st month following the employee's 55th birthday |
| | • any payment to a "specified employee" will be delayed 6 months |
| | • benefits under the plan may be reduced by any amounts owed by the employee to the Company (no greater than $5,000 in any calendar year) |
| *Death Benefits* | • death benefits will be paid in a lump sum to the spouse and/or beneficiary of an executive employee who was eligible for benefits under the plan at the time of his/her death |

## Salaried Retirement Equalization Savings Program

| | |
|---|---|
| *Grandfathering of Amounts Not Subject to 409A* | • amounts deferred before 1/1/05 that were earned and vested on 12/31/04 are separately accounted for |
| *Participation* | • only directors and "management" or "highly compensated" employees may participate in the plan |
| *Deferral Agreement* | • a deferral agreement must be timely executed for each plan year for which the participant wishes to defer compensation |
| | • a deferral agreement may only be changed or revoked during the period specified by the administrator |
| | • a participant must elect a distribution event and a form of payment for the compensation subject to the deferral agreement and for any employer contributions that may be credited to the participants account in the plan year |
| | • if a participant fails to execute a deferral election for a particular plan year, the participant will be deemed to have elected to receive a lump sum distribution upon separation of service |
| *Employer Contributions* | • the employer may credit a participant's account with such contributions as it shall specify |
| | • the employer may credit a participant's account with a matching contribution |
| *Investment of Contributions* | • the amounts in a participant's account shall be treated as invested in the investment options designated by the administrator |
| | • the amount in a participant's account will be adjusted for hypothetical investment earnings, expenses, gains or losses attributed to the investment options selected |
| *Right to Benefits* | • a participant will vest in his employer and matching contributions as set forth in the adoption agreement |
| | • a participant is always 100% vested in the amounts credited to his/her account that are attributable to participant deferrals |
| *Distribution of Benefits* | • distributions will be made according to elections, made or deemed made by, the participant |
| | • a participant may elect at least 12 months before a scheduled distribution event to delay the payment date for a minimum of 5 years from the original payment date, as well as to change the form of payment |
| | • a participant who experiences a separation from service before retirement will receive the vested amount credited to his/her account in a single lump sum |
| | • distributions to key employees will not be made before a date that is six months after the key employee's separation from service |
| | • in the event of a change of control, the participant will receive the vested amount credited to his/her account in a lump sum |

| | |
|---|---|
| *Permissible Delays in Payment* | • an employer may delay a distribution if it reasonably anticipates that its deduction with respect to such payment would be limited or restricted under Section 162(m) of the Code or the employer reasonably anticipates that the payment will violate the terms of a loan agreement or other similar contract |
| *Amendment and Termination* | • the employer may terminate the plan and distribute all amounts credited to participant accounts within 30 days prior to or 12 months after a change of control (provided that all substantially similar arrangements are also terminated) |
| | • the employer may terminate the plan if all substantially similar arrangements are terminated, no payments (except required payments )are made within 12 months of termination, all payments are made within 24 months of termination, and the employer does not adopt a new substantially similar arrangement within 5 years following termination |
| *Trust* | • the employer may establish a grantor trust to hold amounts contributed by the employer to correspond to amounts credited to participant accounts |
| *Administration* | • the administrator has the full power and responsibility to administer the plan |
| | • any person who believes he/she is being denied any rights or benefits may file a claim with the administrator |

**Form Of Change In Control Agreement**

CHANGE IN CONTROL AGREEMENT

THIS AGREEMENT, dated _____, 2007, is made by and between Delphi Corporation, a Delaware corporation (the "Company"), and _____ (the "Executive").

WHEREAS, the Company considers it essential to the best interests of its stockholders to foster the continued employment of members of the Delphi Strategy Board; and

WHEREAS, the Executive is a member of the Delphi Strategy Board; and

WHEREAS, the Board recognizes that the possibility of a Change in Control exists and that such possibility, and the uncertainty and questions which it may raise among members of the Delphi Strategy Board, may result in the departure or distraction of management personnel to the detriment of the Company and its stockholders; and

WHEREAS, the Board has determined that appropriate steps should be taken to reinforce and encourage the continued attention and dedication of members of the Delphi Strategy Board, including the Executive, to their assigned duties without distraction in the face of potentially disturbing circumstances arising from the possibility of a Change in Control;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the Company and the Executive hereby agree as follows:

1.    Defined Terms.  The definitions of capitalized terms used in this Agreement are provided in the last Section hereof to the extent not otherwise defined herein.

2.    Term of Agreement.   The Term of this Agreement shall commence on the consummation of the Company's Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code and shall continue in effect through December 31, 2009; provided, however, that commencing on January 1, 2009 and each January 1 thereafter, the Term shall automatically be extended for one additional year unless, not later than September 30 of the preceding year, the Company or the Executive shall have given notice not to extend the Term; and further provided, however, that if a Change in Control shall have occurred during the Term, the Term shall expire no earlier than [twenty-four (24) months][1] [twelve (12) months][2] beyond the month in which such Change in Control occurred.

3.    Compensation Other Than Severance Payments

3.1    Following a Change in Control and during the Term, during any period that the Executive fails to perform the Executive's full-time duties with the Company as a result of incapacity due to physical or mental illness, the Company shall pay the Executive's full salary to the Executive at the rate in effect at the commencement of any such period, together with all compensation and benefits payable to the Executive under the terms of any compensation or benefit plan, program or arrangement maintained by the Company during such period (other than any disability plan), until the Executive's employment is terminated by the Company for Disability.

3.2    If the Executive's employment shall be terminated for any reason following a Change in Control and during the Term, the Company shall pay the Executive's full salary to the Executive through the Date of Termination at the rate in effect immediately prior to the Date of

---

[1] 3x employees
[2] 2x employees

Termination or, if higher, the rate in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason, together with all compensation and benefits payable to the Executive through the Date of Termination under the terms of the Company's compensation and benefit plans, programs or arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the Executive, as in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason.

3.3     If the Executive's employment shall be terminated for any reason following a Change in Control and during the Term, the Company shall pay to the Executive the Executive's normal post-termination compensation and benefits as such payments become due.     Such post-termination compensation and benefits shall be determined under, and paid in accordance with, the Company's retirement, insurance and other compensation or benefit plans, programs and arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the Executive, as in effect immediately prior to the occurrence of the first event or circumstance constituting Good Reason.   Without limiting the generality of the foregoing and notwithstanding anything in Section 4, below, to the contrary, during the Term and upon the Executive's termination of employment for any reason following a Change in Control and during the Term, the Executive shall be entitled to participate in the DB SERP in accordance with its terms as in effect on the date hereof, without regard to any amendment or termination of the DB SERP after the date hereof.

4.     Severance Payments Upon Termination of Employment Following a Change in Control.

4.1     Subject to Section 4.2 hereof, if the Executive's employment is terminated during the Term following a Change in Control, other than (a) by the Company for Cause, (b) by reason of death or Disability, or (c) by the Executive without Good Reason, then, the Company shall pay the Executive the amounts, and provide the Executive the benefits, described in this Section 4.1 ("Severance Payments") and Section 4.2, in addition to any payments and benefits to which the Executive is entitled under Section 3 hereof.   For all purposes of this Agreement, the Executive's employment shall be deemed to have been terminated following a Change in Control by the Company without Cause or by the Executive with Good Reason, if (i) the Executive's employment is terminated by the Company without Cause prior to a Change in Control and such termination was at the request or direction of a Person who has entered into an agreement with the Company the consummation of which would constitute a Change in Control, (ii) the Executive terminates his employment for Good Reason prior to a Change in Control and the circumstance or event which constitutes Good Reason occurs at the request or direction of such Person, or (iii) the Executive's employment is terminated by the Company without Cause or by the Executive for Good Reason and such termination or the circumstance or event which constitutes Good Reason is otherwise in connection with or in anticipation of a Change in Control (provided, however, that such Change in Control referred to in clause (i), (ii) or (iii), as applicable, actually occurs).   Notwithstanding the foregoing, payment of all amounts payable under this Section 4.1 shall be delayed, if necessary, until the Executive has incurred a separation from service under Code Section 409A.

(A)     In lieu of any further salary payments to the Executive for periods subsequent to the Date of Termination and in lieu of any severance benefit otherwise payable to the Executive, the Company shall pay to the Executive a lump sum severance payment, in cash, equal to [     ][3] times the sum of (i) the Executive's base salary as in effect immediately prior to the Date of Termination or, if higher, in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason, and (ii) the Executive's target annual incentive compensation

---

[3] The relevant multiplier will range from two to three.

2

under any incentive plan maintained by the Company in respect of the fiscal year in which occurs the Date of Termination or, if higher, the fiscal year in which occurs the first event or circumstance constituting Good Reason.  Notwithstanding anything to the contrary, if the Change in Control event does not constitute a change in ownership or effective control of the Company or a change in ownership of a substantial portion of the assets of the Company under Code Section 409A, then an amount equal to the amount that would have been paid under the Executive's Employment Agreement upon a termination other than for cause (as defined in the Employment Agreement) or by the Executive for good reason (as defined in the Employment Agreement) had a Change in Control not occurred, shall be paid in installments for an eighteen (18) month period commencing on the first day of the month next following the Date of Termination and the remaining amounts payable under this clause (A) shall be paid in lump sum.

(B)    For the [    ]⁴ month period immediately following the Date of Termination, the Company shall arrange to provide the Executive and his dependents life, accident and health insurance benefits substantially similar to those provided to the Executive and his dependents immediately prior to the Date of Termination or, if more favorable to the Executive, those provided to the Executive and his dependents immediately prior to the first occurrence of an event or circumstance constituting Good Reason, at no greater after-tax cost to the Executive than the after-tax cost to the Executive immediately prior to such date or occurrence.  Benefits otherwise receivable by the Executive pursuant to this Section 4.1(B) shall be reduced to the extent benefits of the same type are received by or made available to the Executive during the [    ] month period following the Executive's termination of employment (and any such benefits received by or made available to the Executive shall be reported to the Company by the Executive); provided, however, that the Company shall reimburse the Executive for the excess, if any, of the after-tax cost of such benefits to the Executive over such cost immediately prior to the Date of Termination or, if more favorable to the Executive, the first occurrence of an event or circumstance constituting Good Reason.  If the Severance Payments shall be decreased pursuant to Section 4.2 hereof, and the Section 4.1(B) benefits which remain payable after the application of Section 4.2 hereof are thereafter reduced pursuant to the immediately preceding sentence, the Company shall, no later than five (5) business days following such reduction, pay to the Executive the least of (i) the amount of the decrease made in the Severance Payments pursuant to Section 4.2 hereof, (ii) the amount of the subsequent reduction in these Section 4.1(B) benefits, or (iii) the maximum amount which can be paid to the Executive without being, or causing any other payment to be, nondeductible by reason of section 280G of the Code.

(C)    Notwithstanding any provision of any annual or long term cash incentive plan to the contrary, the Company shall pay to the Executive a lump sum amount, in cash, equal to the sum of (i) any unpaid incentive compensation which has been allocated or awarded to the Executive for a completed fiscal year or other measuring period preceding the Date of Termination under any such plan and which, as of the Date of Termination, is contingent only upon the continued employment of the Executive to a subsequent date and (ii) a pro rata portion to the Date of Termination of the aggregate value of all contingent, cash incentive compensation awards to the Executive for all then uncompleted periods under any such plan, calculated as to each such award by multiplying the award that the Executive would have earned on the last day of the performance award period, assuming the achievement, at the target level, of the individual and corporate performance goals established with respect to such award, by the fraction obtained by dividing the number of full months and any fractional portion of a month during such performance award period through the Date of Termination by the total number of months contained in such performance award period.

---

⁴ The relevant period will range from twenty-four to thirty-six months and will correspond to the severance multiplier.

(D)    In addition to the benefits to which the Executive is entitled under each DC Pension Plan, the Company shall pay the Executive a lump sum amount, in cash, equal to the amount that would have been contributed thereto or allocated thereunder by the Company on the Executive's behalf in respect of the    [    ] [5] years immediately following the Date of Termination, determined (i) as if the Executive made the maximum permissible contributions thereto during such period, (ii) as if the Executive earned compensation during such period at a rate equal to the Executive's compensation (as defined in the DC Pension Plan) during the twelve (12) months immediately preceding the Date of Termination or, if higher, during the twelve (12) months immediately prior to the first occurrence of an event or circumstance constituting Good Reason, and (iii) without regard to any amendment to the DC Pension Plan made subsequent to a Change in Control, which amendment adversely affects in any manner the computation of benefits thereunder.

(E)    The Company shall provide the Executive with reasonable outplacement services suitable to the Executive's position for a period of one year or, if earlier, until the first acceptance by the Executive of an offer of employment.

4.2    (A)    Whether or not the Executive becomes entitled to the Severance Payments, if any payment or benefit received or to be received by the Executive (including any payment or benefit received or to be received in connection with a Change in Control or the termination of the Executive's employment, whether pursuant to the terms of this Agreement or any other plan, arrangement or agreement) (all such payments and benefits, excluding the Gross-Up Payment, being hereinafter referred to as the "Total Payments") will be subject (in whole or part) to the Excise Tax, then, subject to the provisions of subsection (B) of this Section 4.2, the Company shall pay to the Executive an additional amount (the "Gross-Up Payment") such that the net amount retained by the Executive, after deduction of any Excise Tax on the Total Payments and any federal, state and local income and employment taxes and Excise Tax upon the Gross-Up Payment, and after taking into account the phase out of itemized deductions and personal exemptions attributable to the Gross-Up Payment, shall be equal to the Total Payments.  For purposes of determining the amount of the Gross-Up Payment, the Executive shall be deemed to pay federal income taxes at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up Payment is to be made and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Executive's residence on the Date of Termination (or if there is no Date of Termination, then the date on which the Gross-up Payment is calculated for purposes of this Section 4.2), net of the maximum reduction in federal income tax which could be obtained from deduction of such state and local taxes.

(B)    In the event that, after giving effect to any redeterminations described in subsection (D) of this Section 4.2, the aggregate Total Payments do not equal or exceed 110% of the Safe Harbor Amount (as defined below), then subsection (A) of this Section 4.2 shall not apply and the cash Severance Payments shall first be reduced (if necessary, to zero), and the noncash Severance Benefits shall thereafter be reduced (if necessary, to zero) to the extent necessary so that no portion of the Total Payments is subject to the Excise Tax; provided, however, that the Executive may elect to have the noncash Severance Payments reduced (or eliminated) prior to any reduction of the cash Severance Payments.  "Safe Harbor Amount" means the greatest pre-tax amount of Total Payments that could be paid to the Executive without causing the Executive to become liable for any Excise Tax in connection therewith.

---

[5] The relevant multiplier will range from two to three years and will correspond to the severance multiplier.

4

(C)    For purposes of determining whether any of the Total Payments will be subject to the Excise Tax and the amount of such Excise Tax, (i) all of the Total Payments shall be treated as "parachute payments" within the meaning of section 280G(b)(2) of the Code, unless in the opinion of tax counsel ("Tax Counsel") reasonably acceptable to the Executive and selected by the accounting firm which was, immediately prior to the Change in Control, the Company's independent auditor (the "Auditor"), such other payments or benefits (in whole or in part) do not constitute parachute payments, including by reason of section 280G(b)(4)(A) of the Code, (ii) all "excess parachute payments" within the meaning of section 280G(b)(l) of the Code shall be treated as subject to the Excise Tax unless, in the opinion of Tax Counsel, such excess parachute payments (in whole or in part) represent reasonable compensation for services actually rendered, within the meaning of section 280G(b)(4)(B) of the Code, in excess of the Base Amount allocable to such reasonable compensation, or are otherwise not subject to the Excise Tax, and (iii) the value of any noncash benefits or any deferred payment or benefit shall be determined by the Auditor in accordance with the principles of sections 280G(d)(3) and (4) of the Code.  Prior to the payment date set forth in Section 4.3 hereof, the Company shall provide the Executive with its calculation of the amounts referred to in this Section 4.2(C) and such supporting materials as are reasonably necessary for the Executive to evaluate the Company's calculations.  If the Executive disputes the Company's calculations (in whole or in part), the reasonable opinion of Tax Counsel with respect to the matter in dispute shall prevail.

(D)    In the event that (i) amounts are paid to the Executive pursuant to subsection (A) of this Section 4.2, (ii) the Excise Tax is finally determined to be less than the amount taken into account hereunder in calculating the Gross-Up Payment, and (iii) after giving effect to such redetermination, the Severance Payments are to be reduced pursuant to subsection (B) of this Section 4.2, the Executive shall repay to the Company, within five (5) business days following the time that the amount of such reduction in Excise Tax is finally determined, the portion of the Gross-Up Payment attributable to such reduction (plus that portion of the Gross-Up Payment attributable to the Excise Tax and federal, state and local income and employment taxes imposed on the Gross-Up Payment being repaid by the Executive), to the extent that such repayment results in (i) no portion of the Total Payments being subject to the Excise Tax and (ii) a dollar-for-dollar reduction in the Executive's taxable income and wages for purposes of federal, state and local income and employment taxes) plus interest on the amount of such repayment at 120% of the rate provided in section 1274(b)(2)(B) of the Code.  In the event that (x) the Excise Tax is determined to exceed the amount taken into account hereunder at the time of the termination of the Executive's employment (including by reason of any payment the existence or amount of which cannot be determined at the time of the Gross-Up Payment) and (y) after giving effect to such redetermination, the Severance Payments should not have been reduced pursuant to subsection (B) of this Section 4.2, the Company shall make an additional Gross-Up Payment in respect of such excess and in respect of any portion of the Excise Tax with respect to which the Company had not previously made a Gross-Up Payment (plus any interest, penalties or additions payable by the Executive with respect to such excess and such portion) within five (5) business days following the time that the amount of such excess is finally determined.

4.3    The payments provided in subsections (A), (C) and (D) of Section 4.1 hereof and in Section 4.2 hereof shall be made not later than the fifth business day following the Date of Termination (or if there is no Date of Termination, then the date on which the Gross-Up Payment is calculated for purposes of Section 4.2 hereof); provided, however, that in no event shall payments be made later than the end of the Executive's taxable year following the taxable year in which the Executive remits the related Excise Tax; provided, further, that if the amounts of such payments, and the limitation on such payments set forth in Section 4.2 hereof, cannot be finally determined on or before such day, the Company shall pay to the Executive on such day an estimate, as determined in good faith by the Executive (or, in the case of payments under Section 4.2 hereof, in accordance with Section 4.2 hereof), of the minimum amount of such payments to which the Executive is clearly entitled and shall pay the remainder of such payments (together with interest on the unpaid remainder

(or on all such payments to the extent the Company fails to make such payments when due) at 120% of the rate provided in section 1274(b)(2)(B) of the Code) as soon as the amount thereof can be determined but in no event later than the thirtieth (30th) day after the Date of Termination. At the time that payments are made under this Agreement, the Company shall provide the Executive with a written statement setting forth the manner in which such payments were calculated and the basis for such calculations including, without limitation, any opinions or other advice the Company has received from Tax Counsel, the Auditor or other advisors or consultants (and any such opinions or advice which are in writing shall be attached to the statement).

4.4    The Company also shall pay to the Executive all legal fees and expenses incurred by the Executive in disputing in good faith any issue hereunder relating to the termination of the Executive's employment, in seeking in good faith to obtain or enforce any benefit or right provided by this Agreement, or in connection with any tax audit or proceeding to the extent attributable to the application of section 4999 of the Code to any payment or benefit provided hereunder. Such payments shall be made within five (5) business days after delivery of the Executive's written requests for payment accompanied with such evidence of fees and expenses incurred as the Company reasonably may require; provided, however, that in no event shall payments be made later than the last day of the Executive's taxable year following the taxable year in which the fee or expense was incurred. Notwithstanding the foregoing, in the event that the Executive does not prevail on at least one material issue in the relevant dispute or other proceeding, the Executive shall repay any amount previously paid by the Company pursuant to this Section 4.4 in respect of such dispute or other proceeding within ten (10) days of the final resolution thereof.

4.5    Notwithstanding anything in this Agreement to the contrary, to the extent required by Section 409A, payment of the amounts payable under this Agreement shall commence no earlier than the earlier of (i) the first day of the first month commencing at least six (6) months following the Executive's separation from service with the Company (within the meaning of Code Section 409A) or (ii) the Executive's date of death. During the six month waiting period, such amounts payable will accumulate with interest (at 120% of the rate provided in Code Section 1274(b)(2)(B)) and be paid as soon as possible.

4.6    Notwithstanding the foregoing, the Company's obligations to pay or provide any benefits, other than as required by Section 3.2 and Section 3.3, shall (1) cease as of the date the Executive breaches any of the provisions of Section 5 and (2) be conditioned on the Executive signing a general release of claims in favor of the Company and its affiliates, which is satisfactory to the Company, and the expiration of any revocation period provided for in such release. In addition, in the event the Executive breaches any of the provisions of Section 5 herein, Executive shall repay the Company an amount equal to the payments made under Section 4.1(A) herein (reduced by an amount equal to the total such payments divided by [ ],[6] which the Executive acknowledges is adequate consideration for the general release provided pursuant to clause (2) of the immediately preceding sentence) multiplied by a fraction, the numerator being the number of days remaining in the Restriction Period from the date of breach and the denominator being the number of days in the Restriction Period. Such repayment shall be made within ten (10) days of notice from the Company.

4A.    <u>Vesting of Equity and Equity-Based Awards</u>. If the Executive is employed by the Company through the date of a Change in Control:

(A)    The Company shall accelerate the vesting and cause the restrictions to lapse on all unvested or restricted time-vested equity or equity-based awards held by the

_____

[6] Either twenty-four or thirty-six (corresponding to the severance multiplier).

Executive as of such Change in Control and permit each time-vested stock option to acquire common stock of the Company and each time-vested stock appreciation right held by the Executive as of such Change in Control to remain exercisable for a period of nine months following such Change in Control (but in no event beyond the remainder of its term).

        (B)     If such Change in Control constitutes a Sale of the Company in which the Company's investors as of the Effective Date realize a net internal rate of return ("IRR") on their equity investment in the Company (using a cost basis equal to $45 per share) of at least 10%, assuming full vesting of all outstanding Company stock and stock options, the Company shall accelerate the vesting and cause the restrictions to lapse on all then-outstanding unvested or restricted performance-vested equity or equity-based awards held by the Executive as of such Sale of the Company and permit each performance-vested stock option to acquire common stock of the Company and each performance-vested stock appreciation right held by the Executive as of such Sale of the Company to remain exercisable for a period of six months following such Sale of the Company (but in no event beyond the remainder of its term). The Board or its compensation committee shall, in its discretion, adjust such IRR threshold at least every three years following the Effective Date, (i) with respect to awards granted after the date of such adjustment, or (ii) to appropriately reflect the effects of any mergers, acquisitions, recapitalizations or other corporate transactions involving the Company.

     5.    <u>Restrictive Covenants</u>. In recognition of the compensation to be paid to the Executive pursuant to Sections 3, 4 and 4A of this Agreement, and Section 5 of the Employment Agreement, the Executive agrees to be bound by the provisions of this Section 5 (the "Restrictive Covenants"). The Restrictive Covenants will apply without regard to whether any termination or cessation of the Executive's employment is initiated by the Company or the Executive, and without regard to the reason for that termination or cessation.

     5.1    <u>Return of Company Property</u>. The Executive agrees that following the termination of the Executive's employment for any reason, or at any time prior to the Executive's termination upon the request of the Company, he or she shall return all property of the Company, its parent, subsidiaries, affiliates and any divisions thereof, which is then in or thereafter comes into his or her possession, including, but not limited to, any Confidential Information (as defined below) or Intellectual Property (as defined below), or any other documents, contracts, agreements, plans, photographs, projections, books, notes, records, electronically stored data and all copies, excerpts or summaries of the foregoing, as well as any automobile or other materials or equipment supplied by the Company, its parent, subsidiaries, affiliates and any divisions thereof to the Executive, if any.

     5.2    <u>Confidentiality</u>.

        (A)     The Executive acknowledges and agrees that: (A) the Executive holds a position of trust and confidence with the Company and that his or her employment by the Company will require that the Executive have access to and knowledge of valuable and sensitive information, material, and devices relating to the Company and/or its business, activities, products, services, customers and vendors, including , but not limited to, the following, regardless of the form in which the same is accessed, maintained or stored: the identity of the Company's actual and prospective customers and their representatives; prior, current or future research or development activities of the Company and/or its customers; the products and services provided or offered by the Company to customers or potential customers and the manner in which such services are performed or to be performed; the product and/or service needs of actual or prospective customers; pricing and cost information; information concerning the development, engineering, design, specifications, acquisition or disposition of products and/or services of the Company; unique and/or proprietary computer equipment, programs, software and source codes, licensing information, personnel information, vendor information, marketing plans and techniques, forecasts, and other trade secrets ("Confidential Information"); (B) the direct and indirect disclosure of any such Confidential Information would place the Company at a competitive disadvantage and would do damage, monetary or otherwise, to the

Company's business; and (C) the engaging by the Executive in any of the activities prohibited by this Section 5.2(A) may constitute misappropriation and/or improper use of trade secrets in violation of the Michigan Uniform Trade Secrets Act, as well as a violation of this Agreement.

(B)    During the Term and at all times thereafter, the Executive shall not, directly or indirectly, whether individually, as a director, stockholder, owner, partner, employee, consultant, principal or agent of any business, or in any other capacity, publish or make known, disclose, furnish, reproduce, make available, or utilize any of the Confidential Information without the prior express written approval of an officer of the Company, other than in the proper performance of the duties contemplated herein, unless and until such Confidential Information is or shall become general public knowledge through no fault of the Executive.

(C)    In the event that the Executive is required by law to disclose any Confidential Information, the Executive agrees to give the Company prompt advance written notice thereof and to provide the Company with reasonable assistance in obtaining an order to protect the Confidential Information from public disclosure.

(D)    The failure to mark any Confidential Information as confidential shall not affect its status as Confidential Information under this Agreement.

5.3    Intellectual Property.

(A)    The Executive hereby assigns to the Company or its designees, without further consideration and free and clear of any lien or encumbrance, the Executive's entire right, title and interest (within the United States and all foreign jurisdictions), to any and all inventions, discoveries, improvements, developments, works of authorship, concepts, ideas, plans, specifications, software, formulas, databases, designees, processes and contributions to Confidential Information created, conceived, developed or reduced to practice by the Executive (alone or with others) during the Term which (A) are related to the Company's current or anticipated business, activities, products, or services, (B) result from any work performed by Executive for the Company, or (iii) are created, conceived, developed or reduced to practice with the use of Company property, including any and all Intellectual Property Rights (as defined below) therein ("Work Product"). Any Work Product which falls within the definition of "work made for hire", as such term is defined in the Copyright Act (17 U.S.C. Section 101), shall be considered a "work made for hire", the copyright in which vests initially and exclusively in the Company.  The Executive waives any rights to be attributed as the author of any Work Product and any "droit morale" (moral rights) in Work Product. The Executive agrees to immediately disclose to the Company all Work Product.  For purposes of this Agreement, "Intellectual Property" shall mean any patent, copyright, trademark or service mark, trade secret, or any other proprietary rights protection legally available.

(B)    The Executive agrees to execute and deliver any instruments or documents, and to do all other things reasonably requested by the Company in order to more fully vest the Company with all ownership rights in the Work Product.  If any Work Product is deemed by the Company to be patentable or otherwise registrable, the Executive shall assist the Company (at the Company's expense) in obtaining letters of patent or other applicable registration therein and shall execute all documents and do all things, including testifying (at the Company's expense) necessary or appropriate to apply for, prosecute, obtain, or enforce any Intellectual Property Right relating to any Work Product.  Should the Company be unable to secure the Executive's signature on any document deemed necessary to accomplish the foregoing, whether due to the Executive's disability or other reason, the Executive hereby irrevocably designates and appoints the Company and each of its duly authorized officers and agents as the Executive's agent and attorney-in-fact to act for and on the Executive's behalf and stead to take any of the actions required of Executive under the previous sentence, with the same effect as if executed and delivered by the Executive, such appointment being

8

coupled with an interest.

5.4     Non-Competition.

(A)     The Executive acknowledges and agrees that: (1) the Business (as defined below) is intensely competitive and conducted by the Company throughout the world; and (2) reasonable limits on the Executive's ability to engage in activities which are competitive with the Company are warranted in order to, among other things, reasonably protect trade secrets and proprietary information of the Company and to maintain and develop the Company's reputation, customer relationships, goodwill and overall status in the marketplace.

(B)     During the period of the Executive's employment with the Company and for a period of     [     ][7] months (the "Restriction Period") following the termination of the Executive's employment for any reason, and provided that the Company is making the payments, if any, required under Section 4.1(A), subject to Section 4.6, the Executive shall not engage in Competition (as defined below) with the Company.

(C)     For purposes of this Agreement, "Competition" by the Executive shall mean the Executive's engaging in, or otherwise directly or indirectly being employed by or acting as a consultant or lender to, or being a director, officer, employee, principal, agent, stockholder, member, owner or partner of, or permitting the Executive's name to be used in connection with the activities of any other business or organization anywhere in the world which competes, directly or indirectly, with the Company in the Business; provided, however, it shall not be a violation of this Section 5.4(C) for the Executive to become the registered or beneficial owner of up to three percent (3%) of any class of the capital stock of a corporation in Competition with the Company that is registered under the Securities Exchange Act of 1934, as amended, provided that the Executive does not otherwise participate in the business of such corporation.

For purposes of this Agreement, "Business" means the creation, development, manufacture, sale, promotion and distribution of vehicle electronics, transportation components, integrated systems and modules and other electronic technology and any other business which the Company engages in, or is preparing to become engaged in, at the time of the Executive's termination.

5.5     Non-Solicitation; Non-Interference.   During the period of the Executive's employment with the Company and for a period of [     ][8] months following the termination of the Executive's employment for any reason the Executive agrees that he will not, directly or indirectly, for the Executive's benefit or for the benefit of any other person, firm or entity, do any of the following:

(A)     solicit from any customer doing business with the Company as of the Executive's termination or within six (6) months prior to the Date of Termination, business of the same or of a similar nature to the Business;

(B)     solicit from any known potential customer of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six (6) months prior to the Date of Termination;

---

[7] The relevant period will be 12 or 18 months depending upon the Executive's severance period.

[8] The relevant period will be 12 or 18 months depending upon the Executive's severance period.

9

(C)    solicit the employment or services of, or hire or engage, any person who was employed or engaged by the Company as of the Date of Termination, or within 6 months thereof; or

(D)    otherwise interfere with the business or accounts of the Company, including, but not limited to, with respect to any relationship or agreement between the Company and any vendor or supplier.

5.6    <u>Injunctive Relief; Indemnity of Company</u>.  The Executive agrees that any breach or threatened breach of Sections 5.2, 5.3, 5.4 or 5.5 would result in irreparable injury and damage to the Company for which an award of money to the Company would not be an adequate remedy.  The Executive therefore also agrees that in the event of said breach or any reasonable threat of breach, the Company shall be entitled to seek an immediate injunction and restraining order to prevent such breach and/or threatened breach and/or continued breach by the Executive and/or any and all persons and/or entities acting for and/or with the Executive.  The terms of this paragraph shall not prevent the Company from pursuing any other available remedies for any breach or threatened breach hereof, including, but not limited to, remedies available under this Agreement and the recovery of damages.  The Executive and the Company further agree that the provisions of this Section 5 are reasonable.  The Executive agrees to indemnity and hold harmless the Company from and against all reasonable expenses (including reasonable fees and disbursements of counsel) which may be incurred by the Company in connection with, or arising out of, any violation of this Agreement by the Executive.

5.7    <u>Definition of Company</u>:  For purposes of this Section 5, the "Company," as used above, shall be construed to include the Company and its parent, subsidiaries and affiliates, including, without limitation, any divisions managed or supervised by the Executive.

5.8    <u>Survival</u>:  The provisions of this Section 5 survive the termination of Executive's employment with the Company, regardless of the reason for such termination, for the duration expressly stated in any such provision or, if no duration is stated, then indefinitely.

6.    <u>Termination Procedures and Compensation During Dispute</u>.

6.1    <u>Notice of Termination</u>.  After a Change in Control and during the Term, any purported termination of the Executive's employment (other than by reason of death) shall be communicated by written Notice of Termination from one party hereto to the other party hereto in accordance with Section 9 hereof.  For purposes of this Agreement, a "Notice of Termination" shall mean a notice which shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so indicated.  A purported termination of the Executive's employment by the Company for Cause shall not be treated as a termination for Cause hereunder unless, within thirty (30) days following the Company's delivery of a Notice of Termination for Cause, the Company provides the Executive with a copy of a resolution duly adopted by the affirmative vote of not less than a majority of the entire membership of the Board at a meeting of the Board which was called and held for the purpose of considering such termination (after reasonable notice to the Executive and a reasonable opportunity for the Executive, together with the Executive's counsel, to be heard before the Board) finding that, in the opinion of the Board, the Executive was guilty of conduct constituting Cause and specifying the particulars thereof in detail.

6.2    <u>Date of Termination</u>.  "Date of Termination," with respect to any purported termination of the Executive's employment after a Change in Control and during the Term, shall mean (i) if the Executive's employment is terminated for Disability, thirty (30) days after Notice of Termination is given (provided that the Executive shall not have returned to the full-time performance

of the Executive's duties during such thirty (30) day period), and (ii) if the Executive's employment is terminated for any other reason, the date specified in the Notice of Termination (which shall not be less than thirty (30) days nor more than sixty (60) days, respectively, from the date such Notice of Termination is given).

    6.3  <u>Compensation During Dispute</u>.  With respect to any termination of the Executive's employment during the Term and following a Change in Control, if within fifteen (15) days after any Notice of Termination is given, or, if later, prior to the Date of Termination, the party receiving such Notice of Termination notifies the other party that a dispute exists concerning the termination, the Company shall continue to pay the Executive the full compensation in effect when the notice giving rise to the dispute was given (including, but not limited to, salary) and continue the Executive as a participant in all compensation, benefit and insurance plans in which the Executive was participating when the notice giving rise to the dispute was given, until the earlier of (i) the date on which the Term ends or (ii) the date on which the dispute is finally resolved, either by mutual written agreement of the parties or by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected); <u>provided</u>, <u>however</u>, that this Section 6.3 shall be applicable in the event of a notice of dispute given by the Executive only if such notice is given in good faith and the Executive pursues the resolution of such dispute with reasonable diligence. Amounts paid under this Section 6.3 are not in addition to other amounts due under this Agreement and shall be offset against and reduce any amounts otherwise due under Section 4.1 hereof.

    7.  <u>No Mitigation</u>.  The Company agrees that, if the Executive's employment with the Company terminates during the Term, the Executive is not required to seek other employment or to attempt in any way to reduce any amounts payable to the Executive by the Company pursuant to Section 3 or 4 hereof. Further, except as specifically provided in Section 4.1(B) hereof, no payment or benefit provided for in this Agreement shall be reduced by any compensation earned by the Executive as the result of employment by another employer, by retirement benefits, by offset against any amount claimed to be owed by the Executive to the Company or otherwise, except for amounts actually owed by the Executive to the Company as of the Date of Termination.

    8.  <u>Successors; Binding Agreement</u>.

    8.1  In addition to any obligations imposed by law upon any successor to the Company, the Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

    8.2  This Agreement shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.  If the Executive shall die while any amount would still be payable to the Executive hereunder (other than amounts which, by their terms, terminate upon the death of the Executive) if the Executive had continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the executors, personal representatives or administrators of the Executive's estate.

    9.  <u>Notices</u>.  For the purpose of this Agreement, notices and all other communications provided for in the Agreement shall be in writing and shall be deemed to have been duly given when delivered or mailed by United States registered mail, return receipt requested, postage prepaid, addressed, if to the Executive, to the address inserted below the Executive's signature on the final page hereof and, if to the Company, to the address set forth below, or to such other address as either

party may have furnished to the other in writing in accordance herewith, except that notice of change of address shall be effective only upon actual receipt:

> To the Company:
>
> Delphi Corporation
> 5725 Delphi Drive
> Troy, Michigan  48098
>
> Attention: General Counsel

      10.    <u>Miscellaneous</u>.  No provision of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing and signed by the Executive and such officer as may be specifically designated by the Board.  No waiver by either party hereto at any time of any breach by the other party hereto of, or of any lack of compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.  This Agreement supersedes any other agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof which have been made by either party [including but not limited to the Change in Control Agreement entered into between the Company and the Executive dated as of [   ]]; <u>provided</u>, <u>however</u>, that this Agreement shall supersede any agreement setting forth the terms and conditions of the Executive's employment with the Company only in the event that the Executive's employment with the Company is terminated on or following a Change in Control, by the Company other than for Cause or by the Executive for Good Reason; and <u>provided</u>, <u>further</u>, that prior to a Change in Control, this Agreement shall not affect or supersede any agreement setting forth the terms and conditions of the Executive's employment with the Company or the termination thereof prior to a Change in Control.  All references to sections of the Exchange Act or the Code shall be deemed also to refer to any successor provisions to such sections.  Any payments provided for hereunder shall be paid net of any applicable withholding required under federal, state or local law and any additional withholding to which the Executive has agreed.  The obligations of the Company and the Executive under this Agreement which by their nature may require either partial or total performance after the expiration of the Term (including, without limitation, those under Sections 4, 5 and 6 hereof) shall survive such expiration.

      11.    <u>Validity</u>.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

      12.    <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

      13.    <u>Settlement of Disputes; Claims</u>.

      13.1    All claims by the Executive for benefits under this Agreement shall be directed to and determined by the Board and shall be in writing.  Any denial by the Board of a claim for benefits under this Agreement shall be delivered to the Executive in writing and shall set forth the specific reasons for the denial and the specific provisions of this Agreement relied upon.  The Board shall afford a reasonable opportunity to the Executive for a review of the decision denying a claim and shall further allow the Executive to appeal to the Board a decision of the Board within sixty (60) days after notification by the Board that the Executive's claim has been denied.

      13.2    The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Michigan, without regard to its conflicts of law principles.  The parties hereby irrevocably consent and submit to the jurisdiction of the federal

and state courts located within the state of Michigan in any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement.

14.    Definitions.  For purposes of this Agreement, the following terms shall have the meanings indicated below:

(A)    "Affiliate" shall have the meaning set forth in Rule 12b-2 promulgated under Section 12 of the Exchange Act.

(B)    "Auditor" shall have the meaning set forth in Section 4.2 hereof.

(C)    "Base Amount" shall have the meaning set forth in section 280G(b)(3) of the Code.

(D)    "Beneficial Owner" shall have the meaning set forth in Rule 13d-3 under the Exchange Act.

(E)    "Board" shall mean the Board of Directors of the Company.

(F)    "Cause" for termination by the Company of the Executive's employment shall mean (I) continued failure by the Executive to satisfactorily perform his duties; (II) willful misconduct or gross negligence by the Executive in the performance of his duties hereunder, including insubordination; (III) the Executive's commission of any felony or the Executive's commission of any misdemeanor involving moral turpitude (including entry of a guilty or nolo contendere plea); (IV) the Executive's commission of any act involving dishonesty that results in financial, reputational or other harm, monetary or otherwise, to the Company or its affiliates and subsidiaries, including but not limited to an act constituting misappropriation or embezzlement of the property of the Company or its parent, affiliates or subsidiaries, as determined in good faith by the Board; or (V) any material breach by the Executive of this Agreement.  The occurrence of any of the foregoing shall be a reason for Cause, provided that, if the Company determines that the circumstances constituting Cause are curable, then such circumstances shall not constitute Cause unless and until the Executive has been informed by the Company of the existence of Cause and given an opportunity of ten business days to cure, and such Cause remains uncured at the end of such ten-day period.

(G)    A "Change in Control" shall be deemed to have occurred if the event set forth in any one of the following paragraphs shall have occurred:

(I)    any Person is or becomes the Beneficial Owner, directly or indirectly, of securities of the Company (not including in the securities beneficially owned by such Person any securities acquired directly from the Company or its Affiliates) representing more than 50% of the combined voting power of the Company's then outstanding securities, excluding any Person who becomes such a Beneficial Owner in connection with a transaction described in clause (i) of paragraph (III) below;

(II)    the following individuals cease for any reason to constitute a majority of the number of directors then serving: individuals who, on the date hereof, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least two-thirds (2/3) of the directors then still in office who either were directors on the date hereof or whose

appointment, election or nomination for election was previously so approved or recommended;

    (III)  there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation or other entity, other than (i) a merger or consolidation which results in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) more than 50% of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation or (ii) a merger or consolidation effected to implement a recapitalization of the Company (or similar transaction) in which no Person is or becomes the Beneficial Owner, directly or indirectly, of securities of the Company (not including in the securities Beneficially Owned by such Person any securities acquired directly from the Company or its Affiliates) representing 25% or more of the combined voting power of the Company's then outstanding securities; or

    (IV)  the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets, other than a sale or disposition by the Company of all or substantially all of the Company's assets to an entity, more than 50% of the combined voting power of the voting securities of which are owned by stockholders of the Company in substantially the same proportions as their ownership of the Company immediately prior to such sale.

Notwithstanding the foregoing, a "Change in Control" shall not be deemed to have occurred by virtue of (i) the consummation of the Company's Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code, including, but not limited to, the issuance of the Company's Series A-1 Preferred Stock, Series A-2 Preferred Stock, and Series B Preferred Stock (the "Preferred Stock"), (ii) the consummation of any of the transactions contemplated by [insert appropriate reference to the purchase agreement, Company charter or other documentation setting forth the terms of the preferred stock and other corporate governance provisions] including, but not limited to, the conversion of the Preferred Stock into common stock of the Company and the conversion of Series B Preferred Stock into Series A-1 Preferred Stock or Series A-2 Preferred Stock, or (iii) the consummation of any transaction or series of integrated transactions immediately following which the record holders of the common stock of the Company immediately prior to such transaction or series of transactions continue to have substantially the same proportionate ownership in an entity which owns all or substantially all of the assets of the Company immediately following such transaction or series of transactions.

    (H)  "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

    (I)  "Company" shall mean Delphi Corporation and, except in determining under Section 14(G) hereof whether or not any Change in Control of the Company has occurred, shall include any successor to its business and/or assets which assumes and agrees to perform this Agreement by operation of law, or otherwise.

    (J)  "DB SERP" shall mean the Company's frozen defined benefit Supplemental Executive Retirement Program.

    (K)  "DC Pension Plan" shall mean any tax-qualified, supplemental or excess defined contribution plan maintained by the Company and any other defined contribution plan

or agreement entered into between the Executive and the Company which is designed to provide the Executive with supplemental retirement benefits.

(L)     "Date of Termination" shall have the meaning set forth in Section 6.2 hereof.

(M)     "Disability" shall be deemed the reason for the termination by the Company of the Executive's employment, if, as a result of the Executive's incapacity due to physical or mental illness, the Executive shall have been absent from the full-time performance of the Executive's duties with the Company for a period of six (6) consecutive months, the Company shall have given the Executive a Notice of Termination for Disability, and, within thirty (30) days after such Notice of Termination is given, the Executive shall not have returned to the full-time performance of the Executive's duties.

(N)     "Employment Agreement" shall mean the employment agreement entered into by and between the Company and the Executive.

(O)     "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended from time to time.

(P)     "Excise Tax" shall mean any excise tax imposed under section 4999 of the Code.

(Q)     "Executive" shall mean the individual named in the first paragraph of this Agreement.

(R)     "Good Reason" for termination by the Executive of the Executive's employment shall mean the occurrence after any Change in Control, or prior to a Change in Control under the circumstances described in clauses (ii) and (iii) of the second sentence of Section 4.1 hereof (provided, however, that a Change in Control actually occurs), without the written consent of the Executive, of any of the following events that has not been fully cured within ten (10) business days after written notice thereof has been given by the Executive to the Company setting forth in sufficient detail the conduct or activities the Executive believes constitute grounds for Good Reason:

(I)     the assignment to the Executive of any duties materially inconsistent with the Executive's status as a senior officer of the Company or a substantial adverse alteration in the nature or status of the Executive's responsibilities; provided, however, that any such assignment or substantial adverse alteration that occurs merely as a result of the Company's ceasing to be a publicly-held corporation shall not constitute Good Reason within the meaning of this Section 14(R)(I);

(II)     a reduction by the Company in the Executive's base salary as in effect on the date hereof or as the same may be increased from time to time except for across-the-board salary reductions similarly affecting all executives of the Company;

(III)     a material reduction in the Executive's incentive compensation opportunity or benefits, except for, in each case, across-the-board reductions similarly affecting all executives of the Company;

(IV)     the relocation of the Executive's principal place of employment to a location more than 25 miles from the Executive's principal place of employment as of immediately prior to such relocation or the Company's requiring the Executive to be based anywhere other than such principal place of employment (or permitted

relocation thereof) except for (i) required travel on the Company's business to an extent substantially consistent with the Executive's present business travel obligations, (ii) the relocation of the Executive's principal place of employment, in connection with the relocation of all or substantially all of the operations of the Executive's principal business unit, to the new location of such principal business unit or (iii) the relocation of the Executive's principal place of employment in connection with a transfer of the Executive to a new position that in the Company's reasonable, good faith belief, enhances the career opportunities of the Executive through additional responsibilities and management experiences (provided that such transfer does not otherwise constitute Good Reason (including under clause (I) above));

(V)        the failure by the Company to pay to the Executive any portion of the Executive's current compensation or to pay to the Executive any portion of an installment of deferred compensation under any deferred compensation program of the Company, within seven (7) days of the date such compensation is due; or

(VI)        a failure of a successor to assume this Agreement in accordance with Section 8.1 of this Agreement.

[Any termination by the Executive of his employment during the 30-day period commencing on the first anniversary of the occurrence of a Change in Control shall be deemed to be for Good Reason for all purposes of this Agreement.][9]

(S)        "Gross-Up Payment" shall have the meaning set forth in Section 4.2 hereof.

(T)        "Notice of Termination" shall have the meaning set forth in Section 6.1 hereof.

(U)        "Person" shall have the meaning given in Section 3(a)(9) of the Exchange Act, as modified and used in Sections 13(d) and 14(d) thereof, except that such term shall not include (i) the Company or any of its subsidiaries, (ii) a trustee or other fiduciary holding securities under an employee benefit plan of the Company or any of its Affiliates, (iii) an underwriter temporarily holding securities pursuant to an offering of such securities, or (iv) a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(V)        "Sale of the Company" shall mean any transaction or series of transactions (whether structured as a stock sale, merger, consolidation, reorganization, asset sale or otherwise), which results in the sale or transfer of (i) beneficial ownership of  more than 50% of the Company's then-outstanding shares of capital stock(determined based on fair market value), or (ii) all or substantially all of the assets of the Company and its subsidiaries taken as a whole (determined based on fair market value), in each case, other than to a Person, more than 50% of the combined voting power of the voting securities of which are owned by stockholders of the Company in substantially the same proportions as their ownership of the Company immediately prior to such sale or transfer.

(W)        "Severance Payments" shall have the meaning set forth in Section 4.1 hereof.

---

[9] CEO agreement only.

(X)      "Term" shall mean the period of time described in Section 2 hereof (including any extension, continuation or termination described therein).

(Y)      "Total Payments" shall mean those payments so described in Section 4.2 hereof.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

DELPHI CORPORATION

By:_____
         Name:
         Title:


_____
         EXECUTIVE

Address:

_____

_____

_____
(Please print carefully)

**Form Of Employment Agreement**

<u>EMPLOYMENT AGREEMENT</u>

AGREEMENT, dated [          ], 2007 by and between Delphi Corporation, a Delaware corporation (the "Company"), and [      ] (the "Executive").

WHEREAS, the Company considers it essential to the best interests of its stockholders to foster the continued employment of members of the Delphi Strategy Board;

WHEREAS, the Executive is a member of the Delphi Strategy Board;

WHEREAS, the Company wishes to secure the employment of the Executive pursuant to the terms and conditions set forth in this Agreement and the Executive desires to be employed by the Company pursuant to the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the Company and the Executive agree as follows:

1.    <u>Employment</u>.  The Company hereby agrees to employ the Executive, and the Executive hereby accepts such employment, on the terms and conditions hereinafter set forth.

2.    <u>Term</u>.  The Executive's employment with the Company pursuant to this Agreement will commence upon the consummation of the Company's Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code (the "Effective Date") and will end on December 31, 2010, unless earlier terminated as provided herein.  Notwithstanding the foregoing, commencing on January 1, 2011 and each January 1 thereafter (each, an "Extension Effective Date"), the term of this Agreement shall be extended, without further action by the Company or the Executive, for successive periods of twelve months each, unless either party shall have given 60 days advance written notice to the other party, in the manner set forth in Section 14 below, prior to the Extension Effective Date in question, that the term of this Agreement that is in effect at the time such written notice is given is not to be extended or further extended, as the case may be (the period during which this Agreement is effective being referred to as the "Term").

3.    <u>Position and Duties</u>.  During the Term, the Executive shall serve in an executive position reasonably consistent with his or her current position with the Company or in such other position or positions with a level of duties and responsibilities consistent with the foregoing with the Company and/or its subsidiaries and affiliates as the Board may specify from time to time.  During the Term, the Executive shall have the duties, responsibilities and obligations customarily assigned to individuals serving in the position or positions in which the Executive serves hereunder.  The Executive agrees to devote all of his or her working time and efforts to the performance of his or her duties for the Company.

4.    <u>Place of Performance</u>.  In connection with the Executive's employment by the Company, the Executive shall be based at the Company location or facility at which he or she is currently based, except for travel necessary in connection with the requirements of the Executive's position; provided, however, that in connection with the relocation of all or substantially all the operations of the Executive's principal business unit the Executive's place of performance may be changed to the new location or facility of such business unit; <u>provided</u> <u>further</u>, <u>however</u>, that the Company may relocate the Executive's principal place of employment in connection with a transfer of the Executive to a new position that in the Company's reasonable, good faith belief, enhances the career opportunities of the Executive through additional responsibilities and management experiences.

5.    <u>Compensation and Related Matters</u>.

(a)    <u>Base Salary</u>.  As compensation for the performance by the Executive of his or her obligations hereunder, during the Term, the Company shall pay the Executive a base salary at an annual rate equal to the annual rate in effect on the date hereof.  Base salary shall be payable in accordance with the Company's customary payroll practices for executives, as in effect from time to time.  The Board may conduct an annual review of the base salary and may increase such base salary in its discretion.  Once increased, base salary shall not thereafter be decreased, except pursuant to across-the-board salary reductions similarly affecting other Company executives.  The term "Base Salary" shall refer to the annual base salary as in effect from time to time.

(b)    Annual Incentive Compensation.  During the Term, the Executive shall be eligible to participate, at a level comparable to similarly situated executives of the Company, in such discretionary annual (or such shorter period) incentive compensation plans as may be authorized from time to time by the Board.

(c)    Long-Term Incentive Compensation.  During the Term, the Executive shall be eligible to participate, at a level comparable to similarly situated executives of the Company, in such long-term compensation arrangements as may be authorized from time to time by the Board.

(d)    Expenses.  The Company shall promptly reimburse the Executive for all reasonable business expenses incurred during the Term by the Executive in performing his or her duties hereunder provided that such expenses are incurred and accounted for in accordance with the policies and procedures established by the Company.

(e)    Other Benefits.  During the Term, the Executive shall be entitled to participate in all of the employee benefit plans and arrangements made available by the Company to its similarly situated executives, subject to and on a basis consistent with the terms, conditions and overall administration of such plans and arrangements.  Without limiting the generality of the foregoing and notwithstanding anything in Section 9, below, to the contrary, during the Term and thereafter the Executive shall be entitled to participate in (1) the Company's frozen defined benefit Supplemental Executive Retirement Program (the "DB SERP") in accordance with its terms as in effect on the date hereof, without regard to any amendment or termination of the DB SERP after the date hereof and (2) the Company's defined contribution Supplemental Executive Retirement Program in accordance with its terms as in effect from time to time.

6.    Offices.  The Executive agrees to serve without additional compensation, if elected or appointed thereto, as a director of the Company or any parent or subsidiaries of the Company, as a member of any committees of the board of directors of any such entity, and in one or more executive positions of any of the Company's subsidiaries, provided that the Executive is indemnified for serving in any and all such capacities on a basis no less favorable than is currently provided to any other director of the Company or any of its subsidiaries, or any such executive position, as the case may be.

7.    Termination.  The Executive's employment hereunder may be terminated as follows:

(a)    Death.  The Executive's employment hereunder shall terminate upon his death.

(b)    Cause.  The Company may terminate the Executive's employment hereunder for Cause.  The occurrence of any of the following, as reasonably determined by the Company, shall be a reason for Cause, provided that, if the Company determines that the circumstances constituting Cause are curable, then such circumstances shall not constitute Cause unless and until the Executive has been informed by the Company of the existence of Cause and given an opportunity of ten business days to cure, and such Cause remains uncured at the end of such ten-day period:

(i)    continued failure by the Executive to satisfactorily perform his duties;

(ii)    willful misconduct or gross negligence by the Executive in the performance of his duties hereunder, including insubordination;

(iii)    the Executive's commission of any felony or the Executive's commission of any misdemeanor involving moral turpitude (including entry of a guilty or nolo contendere plea);

(iv)    the Executive's commission of any act involving dishonesty that results in financial, reputational or other harm, monetary or otherwise, to the Company or its affiliates and subsidiaries, including but not limited to an act constituting misappropriation or embezzlement of the property of the Company or its parent, affiliates or subsidiaries, as determined in good faith by the Board; or

(v)    any material breach by the Executive of this Agreement.

2

(c)    Good Reason.    The Executive may terminate his employment hereunder for "Good Reason" upon the occurrence, without the written consent of the Executive, of an event constituting a material breach of this Agreement (including a failure of a successor to assume this Agreement in accordance with Section 13 hereof) by the Company that has not been fully cured within ten (10) business days after written notice thereof has been given by the Executive to the Company setting forth in sufficient detail the conduct or activities the Executive believes constitute grounds for Good Reason, including but not limited to:

(1)    the assignment to the Executive of any duties materially inconsistent with the Executive's status as a senior officer of the Company or a substantial adverse alteration in the nature or status of the Executive's responsibilities; provided, however, that the Company's ceasing to be a publicly-held corporation shall not constitute Good Reason within the meaning of this Section 7(c)(1);

(2)    a reduction by the Company in the Executive's Base Salary as in effect on the date hereof or as the same may be increased from time to time except for across-the-board salary reductions similarly affecting all executives of the Company;

(3)    a material reduction in the Executive's incentive compensation opportunity or benefits, except for, in each case, across-the-board reductions similarly affecting all executives of the Company

(4)    the relocation of the Executive's principal place of employment to a location more than 25 miles from the Executive's principal place of employment as of immediately prior to such relocation or the Company's requiring the Executive to be based anywhere other than such principal place of employment (or permitted relocation thereof) except for (i) required travel on the Company's business to an extent substantially consistent with the Executive's present business travel obligations, (ii) the relocation of the Executive's principal place of employment, in connection with the relocation of all or substantially all of the operations of the Executive's principal business unit, to the new location of such principal business unit or (iii) the relocation of the Executive's principal place of employment in connection with a transfer of the Executive to a new position that in the Company's reasonable, good faith belief, enhances the career opportunities of the Executive through additional responsibilities and management experiences (provided that such transfer does not otherwise constitute Good Reason (including under clause (1) above)); or

(5)    the failure by the Company to pay to the Executive any portion of the Executive's current compensation or to pay to the Executive any portion of an installment of deferred compensation under any deferred compensation program of the Company, within seven (7) days of the date such compensation is due.

(d)    Without Cause by the Company; Without Good Reason by the Executive.  The Company may terminate the Executive's employment hereunder at any time without Cause in accordance with Section 8.  The Executive may terminate the Executive's employment voluntarily for any reason or no reason at any time in accordance with Section 8.

8.    Termination Procedure.

(a)    Notice of Termination.    Any termination of the Executive's employment by the Company or by the Executive (other than termination pursuant to Section 7(a)) shall be communicated by a written notice ("Notice of Termination") to the other party hereto in accordance with Section 14.

3

(b)    Date of Termination. The "Date of Termination" shall mean (i) if the Executive's employment is terminated by the Executive's death, the date of his death, (ii) if the Executive's employment is terminated by the Company for Cause, the date specified in the Notice of Termination and (iii) if the Executive's employment is terminated under any circumstances other than those described in clause (i) or (ii) immediately preceding, the date specified in the Notice of Termination (which shall not be less than [sixty (60) days][1][thirty (30) days][2], nor more than ninety (90) days, respectively, from the date such Notice of Termination is given.

9.    Compensation upon Termination

(a)    Death. If the Executive's employment is terminated by reason of the Executive's death, the Company shall have no further obligations to the Executive under this Agreement and the Executive's benefits shall be determined under the Company's retirement, insurance and other benefit and compensation plans or programs then in effect in accordance with the terms of such plans and programs.

(b)    By Company without Cause or by the Executive for Good Reason. If during the Employment Period the Executive's employment is terminated by the Company other than for Cause or by the Executive for Good Reason, the Company shall:

(i)    continue to pay and otherwise provide to the Executive, during any notice period (in accordance with Section 8), all compensation, base salary and previously earned but unpaid incentive compensation (e.g., pro-rata) if any, and shall continue to allow the Executive to participate in any benefit plans in accordance with the terms of such plans;

(ii)    pay to the Executive any accrued unused vacation pay;

(iii)    pay to the Executive, in lieu of benefits under any severance plan or policy of the Company, an amount equal to the sum of the Executive's Base Salary as in effect as of the Date of Termination and the Executive's annual target incentive compensation as in effect for the year in which the Date of Termination occurs (annualized in the event the incentive compensation plan in which the Executive then participates is based on a period less than one year), divided by twelve (12). Such amount shall be paid monthly for an eighteen (18) month period commencing on the first day of the month next following the Date of Termination;

(iv)    pay to the Executive a lump sum amount, in cash, equal to the excess, if any, of the Executive's total account balance in the DC Pension Plan (as defined below) over the portion of the Executive's account balance in the DC Pension Plan that is vested as of the Date of Termination.  For purposes of this section, "DC Pension Plan" shall mean any tax-qualified, supplemental or excess defined contribution plan maintained by the Company and any other defined contribution plan or agreement entered into between the Executive and the Company which is designed to provide the Executive with supplemental retirement benefits; and

(v)    accelerate the vesting and cause the restrictions to lapse on all unvested or restricted time-vested equity or equity-based awards held by the Executive as of the Date of Termination and permit each time-vested stock option to acquire common stock of the Company and each time-vested stock appreciation right held by the Executive as of the Date of Termination to remain exercisable for a period of nine (9) months following the Date of Termination (but in no event beyond the remainder of its term).

All amounts payable under this Section 9(b) shall be paid (in the case of subsections (ii) and (iv)) or commence to be paid (in the case of subsections (i) and (iii)), as applicable, as soon as practicable following the Executive's termination of employment; provided that if the period during which the Executive is legally entitled to consider the terms of the release required under Section 11 hereof expires in the calendar year following the calendar year in which such termination of employment occurs

---

[1] 3x employees
[2] 2x employees

4

(whether or not the Executive waives some or all of such period), then the amounts payable under this Section 9(b) shall be paid or commence to be paid on the later of January 2 of such later year or the date on which such amounts would otherwise have been paid under this agreement without regard to this sentence. Notwithstanding the foregoing, payment of all amounts payable under this Section 9(b) shall be delayed, if necessary, until the Executive has incurred a separation from service under Section 409A of the Internal Revenue Code of 1986, as amended (the "Code").

(c)    By Company for Cause or by the Executive other than for Good Reason.  If the Executive's employment shall be terminated by the Company for Cause or by the Executive other than for Good Reason, the Company shall pay the Executive his Base Salary (at the rate in effect at the time Notice of Termination is given) through the Date of Termination, and the Company shall have no additional obligations to the Executive under this Agreement except as set forth in Section 9(d).

(d)    Compensation Upon any Termination.  Following any termination of the Executive's employment, the Company shall pay the Executive all amounts, if any, to which the Executive is entitled as of the Date of Termination under any compensation plan or benefit plan or program of the Company, at the time such payments are due in accordance with the terms of such plans or programs.

(e)    Return of Company Property.  The Executive agrees that following the termination of the Executive's employment for any reason, or at any time prior to the Executive's termination upon the request of the Company, he or she shall return all property of the Company, its parent, subsidiaries, affiliates and any divisions thereof, which is then in or thereafter comes into his possession, including, but not limited to, any Confidential Information (as defined below) or Intellectual Property (as defined below), or any other documents, contracts, agreements, plans, photographs, projections, books, notes, records, electronically stored data and all copies, excerpts or summaries of the foregoing, as well as any automobile or other materials or equipment supplied by the Company, its parent, subsidiaries, affiliates and any divisions thereof to the Executive, if any.

(f)    Requirement for a Release.  Notwithstanding the foregoing, the Company's obligations to pay or provide any benefits, other than as required by Section 9(d), shall (1) cease as of the date the Executive breaches any of the provisions of Section 12, other than the first monthly payment due under Section 9(b)(iii), which the Executive acknowledges is adequate consideration for the general release provided pursuant to clause (2) of this sentence; and (2) be conditioned on the Executive signing a general release of claims in favor of the Company and its affiliates, which is satisfactory to the Company, and the expiration of any revocation period provided for in such release.

10.    Disability.  If the Executive becomes "disabled" (within the meaning of the applicable disability plan, program or arrangement of the Company, as in effect from time to time), the Executive shall be entitled to such benefits as may be provided under such plan, policy or arrangement, but shall not be entitled to any payments under Section 9(b) hereof (unless the Executive returns to active employment and becomes entitled to such payments as a result of a subsequent termination of the Executive's active employment).

11.    Mitigation.  The Executive shall not be required to mitigate the amount of any payment provided for the Executive hereunder by seeking other employment or otherwise, nor shall the amount of any payment or benefit provided for the Executive hereunder be reduced by any compensation earned by the Executive as the result of employment by another employer, by retirement benefits, by offset against any amount claimed to be owed by the Executive to the Company or otherwise, except for amounts actually owed by the Executive to the Company as of the Date of Termination.

12.    Confidentiality; Intellectual Property; Non-Competition Requirement; etc.  In recognition of the compensation to be paid to the Executive pursuant to Sections 5 and 9 of this Agreement, the Executive agrees to be bound by the provisions of this Section 12 (the "Restrictive Covenants").  The Restrictive Covenants will apply without regard to whether any termination or cessation of the Executive's employment is initiated by the Company or the Executive, and without regard to the reason for that termination or cessation.

(a)    Confidentiality.

(i)      The Executive acknowledges and agrees that: (A) the Executive holds a position of trust and confidence with the Company and that his employment by the Company will require that the Executive have access to and knowledge of valuable and sensitive information, material, and devices relating to the Company and/or its business, activities, products, services, customers and vendors, including, but not limited to, the following, regardless of the form in which the same is accessed, maintained or stored: the identity of the Company's actual and prospective customers and their representatives; prior, current or future research or development activities of the Company and/or its customers; the products and services provided or offered by the Company to customers or potential customers and the manner in which such services are performed or to be performed; the product and/or service needs of actual or prospective customers; pricing and cost information; information concerning the development, engineering, design, specifications, acquisition or disposition of products and/or services of the Company; unique and/or proprietary computer equipment, programs, software and source codes, licensing information, personnel information, vendor information, marketing plans and techniques, forecasts, and other trade secrets ("Confidential Information"); (B) the direct and indirect disclosure of any such Confidential Information would place the Company at a competitive disadvantage and would do damage, monetary or otherwise, to the Company's business; and (C) the engaging by the Executive in any of the activities prohibited by this Section 12(a) may constitute misappropriation and/or improper use of trade secrets in violation of the Michigan Uniform Trade Secrets Act, as well as a violation of this Agreement.

(ii)     During the Employment Period and at all times thereafter, the Executive shall not, directly or indirectly, whether individually, as a director, stockholder, owner, partner, employee, consultant, principal or agent of any business, or in any other capacity, publish or make known, disclose, furnish, reproduce, make available, or utilize any of the Confidential Information without the prior express written approval of an officer of the Company, other than in the proper performance of the duties contemplated herein, unless and until such Confidential Information is or shall become general public knowledge through no fault of the Executive.

(iii)    In the event that the Executive is required by law to disclose any Confidential Information, the Executive agrees to give the Company prompt advance written notice thereof and to provide the Company with reasonable assistance in obtaining an order to protect the Confidential Information from public disclosure.

(iv)     The failure to mark any Confidential Information as confidential shall not affect its status as Confidential Information under this Agreement.

(b)      Intellectual Property.

(i)      The Executive hereby assigns to the Company or its designees, without further consideration and free and clear of any lien or encumbrance, the Executive's entire right, title and interest (within the United States and all foreign jurisdictions), to any and all inventions, discoveries, improvements, developments, works of authorship, concepts, ideas, plans, specifications, software, formulas, databases, designees, processes and contributions to Confidential Information created, conceived, developed or reduced to practice by the Executive (alone or with others) during the Employment Period which (A) are related to the Company's current or anticipated business, activities, products, or services, (B) result from any work performed by Executive for the Company, or (iii) are created, conceived, developed or reduced to practice with the use of Company property, including any and all Intellectual Property Rights (as defined below) therein ("Work Product"). Any Work Product which falls within the definition of "work made for hire", as such term is defined in the Copyright Act (17 U.S.C. Section 101), shall be considered a "work made for hire", the copyright in which vests initially and exclusively in the Company. The Executive waives any rights to be attributed as the author of any Work Product and any "droit morale" (moral rights) in Work Product. The Executive agrees to immediately disclose to the Company all Work Product. For purposes of this Agreement, "Intellectual Property" shall mean any patent, copyright, trademark or service mark, trade secret, or any other proprietary rights protection legally available.

6

(ii)      The Executive agrees to execute and deliver any instruments or documents, and to do all other things reasonably requested by the Company in order to more fully vest the Company with all ownership rights in the Work Product.  If any Work Product is deemed by the Company to be patentable or otherwise registrable, the Executive shall assist the Company (at the Company's expense) in obtaining letters of patent or other applicable registration therein and shall execute all documents and do all things, including testifying (at the Company's expense) necessary or appropriate to apply for, prosecute, obtain, or enforce any Intellectual Property Right relating to any Work Product.   Should the Company be unable to secure the Executive's signature on any document deemed necessary to accomplish the foregoing, whether due to the Executive's disability or other reason, the Executive hereby irrevocably designates and appoints the Company and each of its duly authorized officers and agents as the Executive's agent and attorney-in-fact to act for and on the Executive's behalf and stead to take any of the actions required of Executive under the previous sentence, with the same effect as if executed and delivered by the Executive, such appointment being coupled with an interest.

(c)      <u>Non-Competition</u>.

(i)      The Executive acknowledges and agrees that:    (A) the Business (as defined below) is intensely competitive and conducted by the Company throughout the world; and (B) reasonable limits on the Executive's ability to engage in activities which are competitive with the Company are warranted in order to, among other things, reasonably protect trade secrets and proprietary information of the Company and to maintain and develop the Company's reputation, customer relationships, goodwill and overall status in the marketplace.

(ii)      During the Employment Period and for a period of eighteen (18) months following the termination of the Executive's employment for any reason, and provided that the Company is making the payments, if any, required under Section 9(b), subject to Section 9(f), the Executive shall not engage in Competition (as defined below) with the Company.

(iii)      For purposes of this Agreement, "Competition" by the Executive shall mean the Executive's engaging in, or otherwise directly or indirectly being employed by or acting as a consultant or lender to, or being a director, officer, employee, principal, agent, stockholder, member, owner or partner of, or permitting the Executive's name to be used in connection with the activities of any other business or organization anywhere in the world which competes, directly or indirectly, with the Company in the Business; <u>provided</u>, <u>however</u>, it shall not be a violation of this Section 12(c) for the Executive to become the registered or beneficial owner of up to three percent (3%) of any class of the capital stock of a corporation in Competition with the Company that is registered under the Securities Exchange Act of 1934, as amended, provided that the Executive does not otherwise participate in the business of such corporation.

For purposes of this Agreement, "Business" means the creation, development, manufacture, sale, promotion and distribution of vehicle electronics, transportation components, integrated systems and modules and other electronic technology and any other business which the Company engages in, or is preparing to become engaged in, at the time of the Executive's termination.

(d)      <u>Non-Solicitation; Non-Interference</u>.   During the Employment Period and for a period of eighteen (18) months following the termination of the Executive's employment for any reason the Executive agrees that he or she will not, directly or indirectly, for the Executive's benefit or for the benefit of any other person, firm or entity, do any of the following:

(i)      solicit from any customer doing business with the Company as of the Executive's termination or within six (6) months prior to the Date of Termination, business of the same or of a similar nature to the Business;

(ii)      solicit from any known potential customer of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six (6) months prior to the Date of Termination;

7

(iii)    solicit the employment or services of, or hire or engage, any person who was employed or engaged by the Company as of the Date of Termination, or within 6 months thereof; or

(iv)    otherwise interfere with the business or accounts of the Company, including, but not limited to, with respect to any relationship or agreement between the Company and any vendor or supplier.

(e)    <u>Injunctive Relief; Indemnity of Company</u>.  The Executive agrees that any breach or threatened breach of subsections (a), (b), (c) or (d) of this Section 12 would result in irreparable injury and damage to the Company for which an award of money to the Company would not be an adequate remedy.  The Executive therefore also agrees that in the event of said breach or any reasonable threat of breach, the Company shall be entitled to seek an immediate injunction and restraining order to prevent such breach and/or threatened breach and/or continued breach by the Executive and/or any and all persons and/or entities acting for and/or with the Executive.  The terms of this paragraph shall not prevent the Company from pursuing any other available remedies for any breach or threatened breach hereof, including, but not limited to, remedies available under this Agreement and the recovery of damages.  The Executive and the Company further agree that the provisions of this Section 12 are reasonable.  The Executive agrees to indemnify and hold harmless the Company from and against all reasonable expenses (including reasonable fees and disbursements of counsel) which may be incurred by the Company in connection with, or arising out of, any violation of this Agreement by the Executive.

(f)    <u>Definition of Company</u>:  For purposes of this Section 12, the "Company," as used above, shall be construed to include the Company and its parent, subsidiaries and affiliates, including, without limitation, any divisions managed or supervised by the Executive.

(g)    <u>Survival</u>:  The provisions of this Section 12 survive the termination of Executive's employment with the Company, regardless of the reason for such termination, for the duration expressly stated in any such provision or, if no duration is stated, then indefinitely.

13.    <u>Assignment; Successors</u>.  This Agreement and all rights hereunder are personal to the Executive and may not, unless otherwise specifically permitted herein, be assigned by the Executive.  If the Executive should die while any amounts would still be payable to the Executive hereunder if the Executive had continued to live, all such amounts unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the Executive's devisee, legatee, or other designee or, if there be no such designee, to the Executive's estate.  The Company will require any and all successors (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.    As used in this Agreement, "Company" shall mean the Company as herein before defined and any successor to its business and/or assets as aforesaid which executes and delivers the agreement provided for in this Section 13 or which otherwise becomes bound by all the terms and provisions of this Agreement by operation of law.

14.    <u>Notice</u>.  For the purposes of this Agreement, notices, demands and all other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered or (unless otherwise specified) mailed by United States certified or registered mail, return receipt requested, postage prepaid, addressed as follows:

If to the Executive, at the Executive's most recent address shown in the records of the Company; and

If to the Company:

Delphi Corporation
5725 Delphi Drive
Troy Michigan 48098
Attention: General Counsel

8

or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

        15.    <u>Miscellaneous</u>.  No provisions of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing signed by the Executive and such officer of the Company as may be specifically designated by its Board.  No waiver by either party hereto at any time of any breach by the other party hereto of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.  No agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof have been made by either party which are not set forth expressly in this Agreement.  This Agreement is not intended and shall not be construed to confer any rights or remedies upon any other person or entity, other than the parties hereto.

        16.    <u>No Duplication of Benefits</u>.  Nothing in this Agreement shall be construed in a manner that would result in a duplication of benefits to the Executive.

        17.    <u>Taxes</u>.

        (a)    Any amounts payable pursuant to this Agreement shall be subject to applicable withholdings.

        (b)    Notwithstanding anything in this Agreement to the contrary, to the extent required by Section 409A, payment of the amounts payable under this Agreement shall commence no earlier than the earlier of (i) the first day of the first month commencing at least six (6) months following the Executive's separation from service with the Corporation (within the meaning of Code Section 409A) or (ii) the Executive's date of death.  During the six month waiting period, such amounts payable will accumulate without interest and be paid as soon as possible.

        18.    <u>Validity; Severability</u>.  In the event that any one or more of the provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason, the validity, legality and enforceability of the remainder of the Agreement shall not in any way be affected or impaired thereby.  Moreover, without limiting the generality of the foregoing, if any one or more of the provisions contained in this agreement shall be held to be unreasonable or unenforceable in any respect, including excessively broad as to duration, scope, activity or subject, such provisions shall be construed by limiting and reducing them so as to be enforceable to the maximum extent allowed by applicable law.

        19.    <u>Governing Law; Consent to Jurisdiction</u>.  The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Michigan, without regard to its conflicts of law principles.  The parties hereby irrevocably consent and submit to the jurisdiction of the federal and state courts located within the state of Michigan in any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement.

        20.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

        21.    <u>Entire Agreement</u>.  This Agreement sets forth the entire agreement of the parties hereto in respect of the subject matter contained herein and supersedes all prior agreements, promises, understandings, covenants, arrangements, communications, representations or warranties, whether oral or written, by any officer, employee or representative of any party hereto; and any prior agreement of the parties hereto in respect of the subject matter contained herein is hereby terminated and cancelled [including but not limited to the Employment Agreement entered into between the Company and the Executive dated as of [    ]]; <u>provided</u>, <u>however</u>, that this Agreement shall not supersede the Change in Control Agreement entered into with the Company on [    ], 2007; and <u>provided</u> <u>further</u> that if the Executive becomes entitled to payments and benefits under the Change in Control Agreement as a result of his termination of employment, he shall not be entitled to receive any payments or benefits under Section 9(b) of this Agreement.  Except as noted above, the compensation and benefits payable to the Executive under Section 9 of this Agreement shall be in lieu of any other severance benefits to which the Executive may

9

otherwise be entitled upon the Executive's termination of employment under any severance plan, program, policy or arrangement of the Company or any of its subsidiaries or affiliates.

      IN WITNESS WHEREOF, the parties have executed this Agreement on the date below.

      Delphi Corporation

By: _____

   Name:

   Title:

Date:_____

_____