## Exhibit H

Amendment to the Investment Agreement (to be included in Plan Exhibit 7.11)

<u>FIRST AMENDMENT TO THE EQUITY PURCHASE AND COMMITMENT AGREEMENT</u>

THIS FIRST AMENDMENT TO THE EQUITY PURCHASE AND COMMITMENT AGREEMENT (this "**Amendment**"), dated as of [_____], 2007, is made by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware ("**ADAH**"), Harbinger Del-Auto Investment Company, Ltd., an exempted company incorporated in the Cayman Islands ("**Harbinger**"), Merrill Lynch, Pierce, Fenner & Smith Incorporated, a Delaware corporation ("**Merrill**"), UBS Securities LLC, a Delaware limited liability company ("**UBS**"), Goldman, Sachs & Co., a New York limited partnership ("**GS**"), Pardus DPH Holding LLC, a Delaware limited liability company ("**Pardus**"), and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "**Company**").  ADAH, Harbinger, Merrill, UBS, GS and Pardus are each individually referred to herein as an "**Investor**" and collectively as the "**Investors**".  Capitalized terms used and not otherwise defined in this Amendment shall have the meanings assigned thereto in the EPCA (as defined below).

WHEREAS, the Company and certain of its subsidiaries and affiliates commenced the Chapter 11 Cases under the Bankruptcy Code in the Bankruptcy Court;

WHEREAS, the Company and the Investors have entered into that certain Equity Purchase and Commitment Agreement dated as of August 3, 2007 (the "**EPCA**"); and

WHEREAS, the Company has proposed certain changes to the Company's plan of reorganization and in connection therewith the Investors and the Company have agreed to amend the EPCA pursuant to this Amendment.

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, each of the parties hereto hereby agrees as follows:

1.     <u>Amended Provisions of EPCA</u>.

(a)     The sixth WHEREAS clause of the EPCA is hereby amended and restated in its entirety as follows:

"WHEREAS, the Company filed its motion (the "**Approval Motion**") seeking an order from the Bankruptcy Court that, among other things, all of the findings, conclusions and rulings contained in the Original Approval Order (i) apply to this Agreement (including the Commitment Fees, the Arrangement Fee, the Alternate Transaction Fees and the Transaction Expenses provided for herein), the parties hereto and the transactions

contemplated hereby, and (ii) continue in full force and effect with respect thereto (as so granted and issued on August 2, 2007; the "**Approval Order**");".

(b)    The seventh WHEREAS clause of the EPCA is hereby amended and restated in its entirety as follows:

"WHEREAS, the Company filed its motion (the "**Subsequent Approval Motion**") seeking an order from the Bankruptcy Court that (i) all the findings, conclusions and rulings contained in the Original Approval Order and the Approval Order (A) apply to this Agreement as amended (including the Commitment Fees, the Arrangement Fees, the Alternate Transaction Fees and the Transaction Expenses provided for herein), the Plan of Reorganization attached hereto as <u>Exhibit B</u> (the "**Plan**"), the parties hereto and the transactions contemplated hereby and (B) continue in full force and effect with respect thereto, and (ii) the disclosure statement attached hereto as <u>Exhibit C</u> ("**Disclosure Statement**") is approved as containing adequate information pursuant to Section 1125 of the Bankruptcy Code, which Subsequent Approval Motion was granted and order issued on November [8], 2007 (as so issued, the "**Subsequent Approval Order**" and the date of such order being the "**Subsequent Approval Date**");"

(c)    The eighth WHEREAS clause of the EPCA is hereby amended and restated in its entirety as follows:

"WHEREAS, the Company has proposed and submitted the Plan to the Bankruptcy Court for its approval;"

(d)    The ninth WHEREAS clause of the EPCA is hereby amended by deleting the words "plan of reorganization" at each occurrence of such words therein and replacing such words with the word "Plan".

(e)    The tenth WHEREAS clause of the EPCA is hereby amended by: (i) deleting the words "will provide, on the date hereof," and replacing them with the words "have provided"; and (ii) deleting the words "will confirm," and replacing them with the word "confirms".

(f)    Section 1 of the EPCA is hereby amended and restated in its entirety as follows:

"1.    <u>Rights Offering</u>.

(a)    The Company proposes to offer and sell shares of its new common stock, par value $0.01 per share (the "**New Common Stock**"), pursuant to a rights offering

(the "**Rights Offering**").  Pursuant to the Rights Offering, the Company will distribute at no charge to each Eligible Holder (as defined below), including, to the extent applicable, the Investors, that number of rights (each, a "**Right**") that will enable each Eligible Holder to purchase up to its pro rata portion of 45,026,801 shares in the aggregate of New Common Stock (each, a "**Share**") at a purchase price of $34.98 per Share (the "**Purchase Price**").  The term "**Eligible Holder**" means the holder of a General Unsecured Claim (as such term is defined in the Plan), which claim has been allowed or otherwise estimated for the purpose of participating in the Rights Offering on or before the date established by the Bankruptcy Court for determining all Eligible Holders of record.

(b)      The Company will conduct the Rights Offering pursuant to the Plan, which shall reflect the Company's proposed restructuring transactions described in this Agreement and the Summary of Terms of Preferred Stock attached hereto as Exhibit A (the "**Preferred Term Sheet"**).

(c)      The Rights Offering will be conducted as follows:

(i)      On the terms and subject to the conditions of this Agreement and subject to applicable law, the Company shall offer Shares for subscription by the holders of Rights as set forth in this Agreement.

(ii)      Promptly, and no later than four (4) Business Days, following the occurrence of both (1) the date that the Confirmation Order shall have been entered by the Bankruptcy Court and (2) the effectiveness under the Securities Act of 1933, as amended (the "**Securities Act**"), of the Rights Offering Registration Statement filed with the Securities and Exchange Commission (the "**Commission**") relating to the Rights Offering, the Company shall issue (the date of such distribution, the "**Rights Distribution Date**") to each Eligible Holder, Rights to purchase up to its pro rata portion of 45,026,801 Shares in the aggregate (the "**Basic Subscription Privilege**").  The Company will be responsible for effecting the distribution of certificates representing the Rights, the Rights Offering Prospectus and any related materials to each Eligible Holder.

(iii)      Each Eligible Holder who exercises in full its Basic Subscription Privilege will be entitled to subscribe for additional Shares offered in the Rights Offering for an amount as provided in the Plan to the extent the other Eligible Holders do not exercise all of their Rights in the Basic Subscription Privilege (the "**Over-Subscription Privilege**") with amounts in excess of the Purchase Price per Share paid pursuant to an Over-Subscription Privilege to be aggregated and distributed as provided for in the Plan.

(iv)     The Rights may be exercised during a period (the "**Rights Exercise Period**") commencing on the Rights Distribution Date and ending at the Expiration Time.  The Rights shall not separately be transferable. "**Expiration Time**" means the date that is 30 days after the Rights Distribution Date, or such later date and time as the Company, subject to the prior written approval of ADAH, may specify in a notice provided to the Investors before 9:00 a.m., New York City time, on the Business Day before the then-effective Expiration Time.  The Company shall use its reasonable best efforts to cause the effective date of the Plan (the "**Effective Date**") to occur as promptly as reasonably practicable after the Expiration Time.  For the purpose of this Agreement, "**Business Day**" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in New York City are generally authorized or obligated by law or executive order to close.  Each Eligible Holder who wishes to exercise all or a portion of its Rights shall (i) during the Rights Exercise Period return a duly executed document to a subscription agent reasonably acceptable to the Company and ADAH (the "**Subscription Agent**") electing to exercise all or a portion of such Eligible Holder's Basic Subscription Privilege and specifying the number of Shares, if any, such Eligible Holder wishes to purchase pursuant to its Over-Subscription Privilege and (ii) pay an amount, equal to the full Purchase Price of the number of Shares that the Eligible Holder elects to purchase pursuant to its Basic Subscription Privilege and Over-Subscription Privilege, by wire transfer of immediately available funds by the Expiration Time to an escrow account established for the Rights Offering.

(v)      As soon as reasonably practicable following the Effective Date, the Company will issue to each Eligible Holder who validly exercised its Basic Subscription Privilege and, if applicable, its Over-Subscription Privilege, the number of Shares to which such holder of Rights is entitled based on the terms of the Rights Offering.

(vi)     The Company hereby agrees and undertakes to give each Investor by electronic facsimile transmission the certification by an executive officer of the Company of either (i) the number of Shares elected to be purchased by Eligible Holders under their Basic Subscription Privilege and, if applicable, their Over-Subscription Privilege, the aggregate Purchase Price therefor, the number of Unsubscribed Shares and the aggregate Purchase Price therefor (a "**Purchase Notice**") or (ii) in the absence of any Unsubscribed Shares, the fact that there are no Unsubscribed Shares and that the commitment set forth in Section 2(a)(iv) is terminated (a "**Satisfaction Notice**") as soon as practicable after the Expiration Time and, in any event, reasonably in advance of the Closing Date (the date of

transmission of confirmation of a Purchase Notice or a Satisfaction Notice, the "**Determination Date**").

(vii)    The Rights Offering will provide each Eligible Holder who validly exercised its Rights with the right to withdraw a previous exercise of Rights after the withdrawal deadline established in the Rights Offering Registration Statement if there are changes to the Plan after the withdrawal deadline that the Bankruptcy Court determines are materially adverse to the holders of the Rights and the Bankruptcy Court requires resolicitation of votes under Section 1126 of the Bankruptcy Code or an opportunity to change previously cast acceptances or rejections of the Plan.".

(g)    Section 2(a)(i) of the EPCA is hereby amended by replacing the number "4,558,479" with the number "5,002,978" and by replacing the number "$38.39" with the number "$34.98".

(h)    Section 2(a)(iii) of the EPCA is hereby amended by replacing the number "$31.28" with the number "$29.67" and by replacing the number "12,787,724" with the number "13,481,313".

(i)    Section 2(a)(iv) of the EPCA is hereby amended by adding the words "pursuant to the Basic Subscription Privileges and Over-Subscription Privileges" after the words "Rights Exercise Period".

(j)    Section 2(i) of the EPCA is hereby amended (i) by replacing the words "Disclosure Statement Filing Date." with the words "original filing on September 6, 2007 of the Company's disclosure statement.  The Arrangement Fee and the first fifty percent (50%) of the Commitment Fees have been paid to ADAH." and (ii) by replacing the words "Disclosure Statement Approval Date.  The Arrangement Fee shall be paid to ADAH upon entry of the Approval Order." with the words "Subsequent Approval Date.".

(k)     The introductory paragraph to Section 3 of the EPCA is hereby amended (i) to delete the words "to be delivered pursuant to <u>Section 5(s)</u>" appearing in the first sentence and replacing them with the following words "delivered by the Company to the Investors on October 29, 2007" and (ii) to delete the ":" appearing at the end thereof and replace it with the following words ".  References in this Agreement to the Company SEC Documents filed prior to the date hereof shall mean Company SEC Documents filed prior to the Disclosure Letter Delivery Date and the Company's Quarterly Report on Form 10-Q filed on November [6], 2007.[1]".

(l)     Section 3(a) of the EPCA is hereby amended in clause (vi) by replacing the words "or any failure to timely file periodic reports or timely prepare financial statements and the costs and effects of completing the preparation of the Company's financial statements and periodic reports" and replacing them with the words ", the Company's failure to timely file its Form 10-Ks for the years ended December 31, 2005 and 2004, and its Form 10-Qs for the quarters ended September 30, 2006, March 31, 2006, March 31, 2005 and September 30, 2004, respectively, or timely prepare the corresponding required financial statements (and the costs and effects of completing the preparation of those aforementioned financial statements and periodic reports)".

(m)    Section 3(b)(ii) of the EPCA is hereby amended (i) by deleting the words "Prior to the execution by the Company and filing with the Bankruptcy Court of the Plan, the" and replacing them with the word "The" and (ii) by adding the words "had and" after the words "into the Plan".

(n)     Section 3(c)(ii) of the EPCA is hereby amended by replacing the words "will be" with the words "has been".

(o)     Section 3(d) in the fifth sentence thereof,  Section 3(f), Section 3(g), Section 4(h), Section 4(i), Section 5(d), Section 8(c)(v), Section 9(a)(xv), Section 9(c)(iii) and Section 12(c) of the EPCA are hereby amended by deleting the word "Terms" after the word "Plan" at each occurrence of such words therein.

(p)     Section 3(d) in the seventh sentence thereof,  Section 3(nn), Section 3(oo), Section 5(b), Section 5(j), Section 6(d) the introductory paragraph to Section 8, Section 9(a)(vi), Section 9(a)(xiv), Section 9(a)(xix), Section 9(c)(x) and Section 12(f) of the EPCA are hereby amended by deleting the words ", the Plan Terms" at each occurrence of such words therein.

---

[1] Brackets to be deleted prior to execution if Investors accept 10-Q filing prior to hearing date.

(q)     Section 3(d) of the EPCA is hereby amended by (i) replacing the word "June" in the second sentence thereof with the word "September", (ii) replacing the number "561,781,500" in the second sentence thereof with the number "561,781,590", (iii) replacing the number "85,978,864" in the second sentence thereof with the number "77,847,906",  (iv) replacing the number "23,207,104" in the eighth sentence thereof with the number "51,583,358", (v) replacing the number "124,400,000" with the number "136,794,982" in the ninth sentence thereof, (vi) replacing the number "12,787,724" with the number "13,481,313"  in the ninth sentence thereof and (vii) deleting the words "and (iii) 10,419,380 shares of Series B Preferred Stock will be issued and outstanding" and replacing them with the words ", (iii) 11,435,378 shares of Series B Preferred Stock and (iv) 26,666,667 shares of Series C Convertible Preferred Stock, par value $0.01 per share, will be issued and outstanding" in the ninth sentence thereof.

(r)     Section 3(i) of the EPCA is hereby amended by (i) inserting the words "included or incorporated by reference or" immediately preceding the words "to be included" at each occurrence of such words therein and (ii) replacing the words "will be set forth in the Disclosure Statement," with the words "the Disclosure Statement and will be set forth in the".

(s)     Section 3(j) of the EPCA is hereby amended by (i) inserting the words "conformed and" immediately prior to the words "will conform" appearing in the fifth sentence thereof and (ii) by inserting the words "did not and" immediately preceding the words "will not"  appearing in the sixth sentence thereof.

(t)     Section 3(m)(vii)(A) of the EPCA is hereby amended by inserting the words "and dated August 21, 2007" immediately after the words "April 5, 2007".

(u)     Section 3(m)(vii)(A) and Section 3(m)(viii)(A) of the EPCA are hereby amended by replacing the words "satisfaction of the condition with respect to the Business Plan in accordance with Section 9(a)(xxviii) of this Agreement" with the words "Disclosure Letter Delivery Date".

(v)     Section 3(m)(vii)(B) and Section 3(m)(viii)(B) of the EPCA are hereby amended by replacing the words "after the satisfaction of the condition with respect to the Business Plan in accordance Section 9(a)(xxviii) of this Agreement, the Business Plan approved by ADAH in accordance with this Agreement," with the words "from and after the Disclosure Letter Delivery Date, the Business Plan (and if amended in a manner that satisfies the condition with respect to the Business Plan set forth in Section 9(a)(xxviii), as so amended),".

(w)     Section 3(n) of the EPCA is hereby amended by replacing the words "or the Approval Order" with the words ", the Approval Order, the Subsequent Approval Order".

(x)     Section 3(ii) of the EPCA is hereby amended by adding the words "the Preferred Term Sheet or the Plan," immediately following the words "Section 8(c)(iv)," appearing therein.

(y)     Section 3(pp) of the EPCA is hereby amended and restated in its entirety to read as follows:

"(pp)   Labor MOUs.  On June 22, 2007, the Company entered into a Memorandum of Understanding (the "**UAW MOU**") with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("**UAW**") and GM.  On August 5, 2007, the Company entered into a Memorandum of Understanding (the "**IUE-CWA MOU**") with the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America ("**IUE-CWA**") and GM.  On August 16, 2007, the Company entered into two Memoranda of Understanding (the "**USW MOUs**", and collectively with the UAW MOU and the IUE-CWA MOU, as each such agreement has been amended through the Disclosure Letter Delivery Date, the "**Labor MOUs**") with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and its Local Union 87L (together, the "**USW**") and GM.  The UAW MOU, IUE-CWA MOU and the USW MOUs have been ratified by the membership of the UAW, IUE-CWA and USW, respectively, and true and complete copies of the Labor MOUs have been made available to ADAH.".

(z)     The following paragraph should be inserted in its entirety immediately following Section 3(pp):

"(qq)   Debt Financing.  The Company has delivered to ADAH a correct and complete copy of an executed "best efforts" financing letter (the "**Financing Letter**") from [identify banks] attached hereto as Exhibit D (on the terms indicated, the "**Bank Financing**" and, together with the GM Debt (as defined below), the "**Debt Financing**"). The Financing Letter is a legal, valid and binding obligation of the Company, and to the knowledge of the Company, the other parties thereto, and is in full force and effect. The Financing Letter has not been withdrawn, terminated or otherwise amended or modified in any respect and no event has occurred which, with or without notice, lapse of time or both, would constitute a default or breach on the part of the Company under the Financing Letter.  The Company has fully paid any and all fees required by the Financing Letter to be paid as of the date hereof."

(aa)     The introductory paragraph to Section 4 of the EPCA is hereby amended to replace the word "Each" in the first sentence thereof with the words "Except as set forth in a disclosure letter delivered by the Investors to the Company on the Disclosure Letter Delivery Date (the "**Investor Disclosure Letter**"), each".

(bb)     Section 5(a) of the EPCA is hereby amended by adding the word "Subsequent" immediately after the words "cause the" and the words "filing of the".

(cc)     Section 5(b) of the EPCA is hereby amended by (i) replacing the words "shall authorize, execute, file with the Bankruptcy Court and seek confirmation of, a Plan (and a related disclosure statement (the "**Disclosure Statement**"))" with the words "has authorized, executed and filed with the Bankruptcy Court and shall seek confirmation of, the Plan", (ii) replacing the words ", the Preferred Term Sheet and the Plan Terms," and the words ", the Preferred Term Sheet and the Plan Terms" with the words "and the Preferred Term Sheet" and  (iii) replacing the words "entry of an order by the Bankruptcy Court approving the Disclosure Statement (the "**Disclosure Statement Approval Date**") and the effectiveness under the Securities Act of the Rights Offering Registration Statement" with the words "Subsequent Approval Date".

(dd)     Section 5(d) of the EPCA is hereby amended by replacing the words "date the GM Settlement is agreed" with the words "Subsequent Approval Date" in the second sentence thereof.

(ee)     Section 5(i) of the EPCA are hereby amended by replacing the words "Disclosure Statement" with the word "Subsequent".

(ff)     The introductory paragraph of Section 5(n) of the EPCA is hereby amended and restated in its entirety as follows:

"(n)     Conduct of Business.  During the period from the date of this Agreement to the Closing Date (except as otherwise expressly provided by the terms of this Agreement including the Disclosure Letter, the Plan or any other order of the Bankruptcy Court entered on or prior to the date hereof in the Chapter 11 Cases), the Company and its Subsidiaries shall carry on their businesses in the ordinary course (subject to any actions which are consistent with the, at any time prior to the Disclosure Letter Delivery Date, Draft Business Plan or, at any time from and after the Disclosure Letter Delivery Date, the Business Plan and at all times from and after the Disclosure Letter Delivery Date, the Business Plan (and, if amended in a manner that satisfies the condition with respect to the Business Plan set forth in Section 9(a)(xxviii), as so amended) and, to the extent consistent therewith, use their commercially reasonable efforts to preserve intact their current business organizations, keep available the services of their current officers and

employees and preserve their relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with the Company or its Subsidiaries. Without limiting the generality of the foregoing, except as set forth in the Disclosure Letter, the Company and its Subsidiaries shall carry on their businesses in all material respects in accordance with, at any time prior to the Disclosure Letter Delivery Date, the Draft Business Plan and at all times from and after the Disclosure Letter Delivery Date, the Business Plan (and, if amended in a manner that satisfies the condition with respect to the Business Plan set forth in <u>Section 9(a)(xxviii)</u>, as so amended) and shall not enter into any transaction that, at any time prior to the Disclosure Letter Delivery Date, would be inconsistent with the Draft Business Plan (and, if amended in a manner that satisfies the condition with respect to the Business Plan set forth in <u>Section 9(a)(xxviii)</u>, as so amended) and shall use its commercially reasonable efforts to effect such Draft Business Plan and the Business Plan.  Without limiting the generality of the foregoing, and except as otherwise expressly provided or permitted by this Agreement (including the Disclosure Letter), the Plan or any other order of the Bankruptcy Court entered as of the date of the Original Agreement in these Chapter 11 Cases, prior to the Closing Date, the Company shall not, and shall cause its Subsidiaries not to, take any of the following actions without the prior written consent of ADAH, which consent shall not be unreasonably withheld, conditioned or delayed:".

(gg)    Section 5(n)(vi) of the EPCA is hereby amended (i) by replacing the word "satisfying" with the words "(and, if amended in a manner that satisfies", (ii) by replacing the word "of" with the words ", as so amended)" and (iii) by deleting the words "this Agreement, the Plan Terms,".

(hh)    Section 5(p) of the EPCA is hereby amended and restated in its entirety as follows:

"(p)    <u>GM Settlement</u>.  The Company has delivered to ADAH and its counsel a copy of the Global Settlement Agreement between the Company and GM dated September 6, 2007, the Master Restructuring Agreement between the Company and GM, dated September 6, 2007 each as amended by amendments (the "**GM Amendments**") dated as of October 29, 2007 (collectively, the "**GM Settlement**").  Other than the GM Amendments, the Company shall not enter into any other agreement with GM that (i) is materially inconsistent with this Agreement and the Plan, (ii) is outside the ordinary course of business or (iii) the terms of which would have a material impact on the Investors' proposed investment in the Company.  The Company has not entered into any material written agreements between or among the Company or any of its Subsidiaries and GM or any of its Subsidiaries directly relating to the Plan or the GM Settlement or the performance of the Transaction Agreements, and any such written agreements hereafter entered into will be disclosed promptly to ADAH.".

(ii)    Section 5(s) of the EPCA is hereby amended and restated in its entirety as follows:

"(s)    Business Plan.  The Company has delivered to ADAH a final five–year business plan dated the Disclosure Letter Delivery Date (the "**Business Plan**").  The Company represents and warrants to the Investors that the Business Plan was approved by the Company's board of directors and prepared in good faith and based on reasonable assumptions.".

(jj)    Section 5(t) of the EPCA is hereby amended and restated in its entirety as follows:

"(t)    Financing Assistance.  (i)  The Company shall use its reasonable best efforts to arrange the Bank Financing and the second lien debt to be issued to GM set forth in Exhibit E (the "**GM Debt**") on the terms and conditions described in the Financing Letter and in Exhibit E, including using its reasonable best efforts to (i) negotiate definitive agreements with respect thereto on terms and conditions contained therein, (ii) satisfy on a timely basis all conditions applicable to the Company in such definitive agreements that are within its control and (iii) consummate the Debt Financing at the Closing.  In the event any portion of the Debt Financing becomes unavailable on the terms and conditions contemplated in the Financing Letter or in Exhibit E, the Company shall promptly (and in any event within one Business Day) notify ADAH of such unavailability and the reasons therefore.  The Company shall give ADAH prompt notice of any breach by any party of the Financing Letter or any termination of the Financing Letter.  The Company shall keep ADAH informed on a reasonably current basis in reasonable detail of the status of its efforts to arrange the Debt Financing and shall not permit any amendment or modification to be made to, or any waiver of any provision or remedy under, in each case, to the extent adverse to the Company or the Investors, the Financing Letter or the terms set forth in Exhibit E.  The Company shall provide notice to ADAH promptly upon receiving the Debt Financing and shall furnish correct and complete copies of the definitive agreements with respect thereto to ADAH promptly upon their execution.  Subject to applicable regulatory or NASD requirements, Merrill and UBS (or their Affiliates) shall be entitled to participate in the Debt Financing on market terms.  The Company and its Subsidiaries shall execute and deliver any commitment letters, underwriting or placement agreements, registration statements, pledge and security documents, other definitive financing documents, or other requested certificates or documents necessary or desirable to obtain the Debt Financing.  The Company will (i) provide to ADAH and its counsel a copy of all marketing information, term sheets, commitment letters and agreements related to the Debt Financing and a reasonable opportunity to review and comment on such documents prior to such document being distributed, executed or delivered or filed with the Bankruptcy Court, (ii) duly consider in good faith any comments of ADAH and its counsel consistent with the Agreement, the Preferred Term Sheet and the Plan and any other reasonable comments of ADAH and its counsel and shall not reject such comments without first discussing the reasons therefor with ADAH or its counsel and giving due consideration to the views of ADAH and its counsel, and (iii) keep ADAH reasonably informed on a timely basis of developments in connection with the Debt Financing and provide the Investors with an opportunity to attend and participate in meetings and/or roadshows with potential providers of the Debt Financing.".

(kk)    Section 5(u), Section 12(d)(ii) and Section 12(d)(iv) of the EPCA are hereby amended by deleting such section and replacing it with the word "[Reserved].".

(ll)    Section 5(w) of the EPCA is hereby amended and restated in its entirety as follows:

"(w)    <u>Agreement on Key Documentation</u>.  The Company shall use its commercially reasonable efforts to agree on or prior to the date of issuance of the Confirmation Order on the terms of the Amended and Restated Constituent Documents, the Series A Certificate of Designations, the Series B Certificate of Designations and the Series C Certificate of Designations, the Shareholders Agreement and the Registration Rights Agreement with ADAH and any other Transaction Agreements.".

(mm)    Section 5(y) of the EPCA is hereby amended and restated in its entirety as follows:

"(y)    <u>Termination of Commitment Letters</u>.  The Company acknowledges and agrees that (i) the various commitment letters of Appaloosa in favor of ADAH and the Company, and of Harbinger Fund in favor of Harbinger and the Company, each dated January 18, 2007 and August 3, 2007, respectively, and (ii) the commitment letter of Pardus Special Opportunities Master Fund L.P. in favor Pardus and the Company dated as of August 3, 2007, have been terminated and are of no further force or effect and that each of Appaloosa, Harbinger Fund and Pardus Special Opportunities Master Fund L.P. shall have no further liability or obligation under those commitment letters.".

(nn)    Section 6(a) of the EPCA is hereby amended by inserting the words "any amendments to" prior to the words "the Disclosure Statement".

(oo)    Section 6(b), in the second sentence thereof, and Section 7, in the first sentence thereof, of the EPCA are hereby amended by replacing the words "Disclosure Statement Filing Date" with the words "Subsequent Approval Date".

(pp)    Section 8(b) and Section 8(c) of the EPCA is hereby amended by deleting the words "the PSA,".

(qq)    Section 8(c) of the EPCA is hereby amended by (i) in (c)(iii), replacing the words ", and certain of the Investors" with the words " and ADAH", (ii) in (c)(iv) deleting the words "among the Company and the Investors", (iii) in (c)(iv)(a), replacing the words "by the Investors, any Related Purchasers and the Ultimate Purchasers of the Unsubscribed Shares, the Direct Subscription Shares and the Series B Preferred Shares" with the words "of Registrable Securities (as defined

in the Preferred Term Sheet)", (iv) in (c)(iv)(c) and (c)(iv)(d), inserting the words "and GM and, to the extent customary and appropriate, the selling shareholders under the Resale Registration Statement" after the words "Investors" and "Investor", respectively, and (v) in (c)(vi), by replacing the words "and the Series B" with the words ", the Series B Certificate of Designations and the Series C".

(rr)    Section 9(a)(i) of the EPCA is hereby amended by (i) in the first sentence, inserting the word "Subsequent" between the words "The" and "Approval" and (ii) in the second sentence, replacing the words "Approval Order" with the word "order".

(ss)    Section 9(a)(iv) of the EPCA is hereby amended and restated in its entirety as follows:

"(iv)    <u>Release</u>.  The Confirmed Plan shall provide for (A) the release of each Investor (in its capacity as such or otherwise), its Affiliates, shareholders, partners, directors, officers, employees and advisors from liability for participation in the transactions contemplated by the Original Agreement, this Agreement, the Preferred Term Sheet, the Original PSA and the Plan and any other investment in the Company discussed with the Company whether prior to or after the execution of the foregoing to the fullest extent permitted under applicable law, (B) the exculpation of each Investor (in its capacity as such or otherwise), its Affiliates, shareholders, partners, directors, officers, employees and advisors with respect to all of the foregoing actions set forth in subclause (A) and additionally to the same extent the Company's directors, officers, employees, attorneys, advisors and agents are otherwise exculpated under the Plan, and (C) the release of each Investor (in its capacity as an investor), its Affiliates, shareholders, partners, directors, officers, employees and advisors to the same extent the Company's directors, officers, employees, attorneys, advisors and agents are otherwise released under the Plan; <u>provided</u>, that such releases and exculpations shall not prohibit or impede the Company's ability to assert defenses or counterclaims in connection with or relating to the Original Agreement or the Original PSA.".

(tt)    Section 9(a)(v) of the EPCA is hereby amended by deleting the words "the Plan Terms and".

(uu)    Section 9(a)(ix) of the EPCA is hereby amended by deleting the words "Confirmed Plan" appearing therein and replacing them with the words "Plan approved by the Bankruptcy Court in the Confirmation Order (the "**<u>Confirmed Plan</u>**")".

(vv)    Section 9(a)(xix) of the EPCA is hereby amended and restated in its entirety as follows:

"(xix)  <u>Financing</u>.  (A) The Company shall have received the proceeds of the Debt Financings and the Rights Offering that, together with the proceeds of the sale of the Investor Shares, are sufficient to fund fully the transactions contemplated by this Agreement, the Preferred Term Sheet, the GM Settlement (to the extent the Company is to fund such transactions) and the Plan; and (B) undrawn availability under, plus any open letters of credit pursuant to, the asset backed revolving loan facility described in <u>Exhibit D</u> shall be no less than $1.4 billion; <u>provided</u>, that such open letters of credit shall not exceed, in the aggregate, $100 million.".

(ww)    Section 9(a)(xx) of the EPCA is hereby amended and restated in its entirety as follows:

"(xx)    <u>Interest Expense</u>.  The Company shall have demonstrated, to the reasonable satisfaction of ADAH, that the pro forma interest expense for the Company during 2008 on the Company's Indebtedness will not exceed $575 million and ADAH shall have received from Delphi a certificate of a senior executive officer with knowledge of the foregoing to this effect with reasonably detailed supporting documentation to support such amount.".

(xx)    Section 9(a)(xxii) of the EPCA is hereby amended and restated in its entirety as follows:

"(xxii) <u>Trade and Other Unsecured Claims</u>.  The aggregate amount of all Trade and Other Unsecured Claims (as defined in the Plan) that have been asserted or scheduled but not yet disallowed shall be allowed or estimated for distribution purposes by the Bankruptcy Court to be no more than $1.45 billion, excluding all allowed accrued post-petition interest thereon; <u>provided</u>, that if ADAH waives this condition and the Company issues any shares of Common Stock pursuant to the Plan (after giving effect to any cash or other consideration provided to holders of Trade and Other Unsecured Claims under the Plan) as a result of Trade and Other Unsecured Claims aggregating in excess of $1.45 billion ("**Excess Shares**"), then (i) the Company shall issue to the Investors additional Direct Subscription Shares (in the proportions set forth in <u>Schedule 2</u>), without the payment of any additional consideration therefor, in such amount in the aggregate that is sufficient to ensure that the percentage of shares of outstanding Common Stock that such Investors would have owned on the Closing Date had such Excess Shares not been issued (assuming for this purpose that all Excess Shares are issued on the Closing Date) is maintained and (ii) the issuance of shares of Common Stock described in this <u>Section 9(a)(xxii)</u> shall be treated as an issuance of Common Stock without consideration for purposes of the anti-dilution provisions of the Preferred Shares and shall result in an adjustment to the conversion price of the Preferred Shares pursuant to the Series A Certificate of Designation and Series B Certificate of Designations.".

(yy)     Section 9(a)(xxvi) of the EPCA is hereby amended by inserting the words "after the Disclosure Letter Delivery Date" immediately after to the words "shall not have occurred" at each occurrence of such words therein.

(zz)     Section 9(a)(xxvii) of the EPCA is hereby amended (i) by, in the first sentence, replacing the words "the final Business Plan satisfying the condition with respect to the Business Plan set forth in Section 9(a)(xxviii) of this Agreement" with the words "the Business Plan" at each occurrence of such words therein and (ii) by, in the third sentence, replacing the words "$7,159 million" with the words "$5.2 billion".

(aaa)    Section 9(a)(xxviii) of the EPCA is hereby amended and restated in its entirety as follows:

"(xxviii) Plan, Delivered Investment Documents and Material Investment Documents.

(A)      (i)  The Company shall have delivered to ADAH prior to each Relevant Date and ADAH shall have made the determination referred to in Section 9(a)(xxviii)(B) with respect to all Material Investment Documents.  The term "**Material Investment Documents**" shall mean the Confirmation Order, the Rights Offering Registration Statement, any amendments or supplements to the Delivered Investment Documents, the Amended and Restated Constituent Documents, the Series A Certificate of Designations, the Series B Certificate of Designations, Series C Certificate of Designations, the Shareholders Agreement, the Registration Rights Agreement, the Transaction Agreements and any amendments and/or supplements to the foregoing.  The term "**Delivered Investment Documents**" shall mean, the GM Settlement, the Plan, the Disclosure Statement, the Business Plan and the Labor MOUs.  The term "**Relevant Date**" shall mean the date of issuance of the Confirmation Order and the Closing Date.

(ii)  With respect to any agreement that is a Material Investment Document or a Delivered Investment Document and was or is entered into in satisfaction of the condition set forth in Section 9(a)(xxviii), at each Relevant Date (i) such agreement shall remain in full force and effect and shall not have been rescinded, terminated, challenged or repudiated by any party thereto and (ii) the parties to such agreement, shall have performed and complied with all of their respective covenants and agreements contained in such agreement in all material respects through the Closing Date.  The Business Plan (and, if amended in a manner

that satisfies the condition with respect to the Business Plan set forth in this Section 9(a)(xxviii), as so amended) shall not have been rescinded or repudiated in any material respect by the Company or its Board of Directors.

(B)     With respect to any Material Investment Document (other than amendments or supplements to the GM Settlement), ADAH shall have determined within the time frames set forth in Section 9(a)(xxviii)(C), that it is reasonably satisfied with the terms thereof to the extent such terms would have a material impact on the Investors' proposed investment in the Company.  With respect to any amendments or supplements to the GM Settlement ADAH shall have determined that it is satisfied with the GM Settlement as so amended or supplemented in its reasonable discretion taking into account whether it has a material impact on the Investors' proposed investment in the Company and other relevant factors.

(C)     The conditions referred to in clause (A) above shall be deemed to have been conclusively satisfied without further action by any Party unless:

(1)     [Reserved];

(2)     [Reserved];

(3)     with respect to any Material Investment Document (or any amendment or supplement thereto) delivered to ADAH by the Company prior to the date of issuance of the Confirmation Order, ADAH has delivered (and has not withdrawn), within ten (10) days of delivery by the Company of the final form of such document, accompanied by a written request for approval of such document, a written deficiency notice to the Company reasonably asserting with reasonable specificity that such condition is not satisfied, and the Company shall not have cured such deficiency within ten (10) days of the Company's receipt of such notice (the "**Cure Period**"); and

(4)     with respect to any Material Investment Document (or any amendment or supplement thereto) delivered to ADAH by the Company after the date of issuance of the Confirmation Order and prior to the Closing Date, ADAH has delivered

(and has not withdrawn), within five (5) Business Days of delivery by the Company of the final form of such document accompanied by a written request for approval of such documents, a written deficiency notice to the Company reasonably asserting with reasonable specificity that such condition is not satisfied and the Company shall not have cured such deficiency during the Cure Period.".

(bbb)    Inserting the following immediately after Section 9(a)(xxiii) of the EPCA:

"(xxix) <u>PBGC Liens</u>.  The Company shall have obtained full releases, or made provisions therefor of all liens set forth on <u>Schedule 3(t)</u> and <u>Schedule 3(z)</u> of the Disclosure Letter (or required to be set forth thereon) and shall have delivered to ADAH evidence in form and substance reasonably satisfactory to ADAH, with respect thereto.".

(ccc)    Section 9(c)(i) of the EPCA is hereby amended by inserting the word "Subsequent" between the word "The" and the word "Approval".

(ddd)    Section 11(b) of the EPCA is hereby amended by replacing (i) the words "Disclosure Statement" with the words "Subsequent" at each occurrence of such words therein and (ii) the words "Filing Date" with the words "Approval Date" at each occurrence of such words therein.

(eee)    Section 12(d)(i) of the EPCA is hereby amended (i) by deleting the words "August 16, 2007" and replacing them with the words "November 20, 2007", (ii) by deleting the words "August 31, 2007" and replacing them with the words "December 14, 2007", and (iii) by inserting the word "Subsequent" between the word "the" and the word "Approval" at each occurrence therein.

(fff)    Section 13(b) is hereby amended by inserting the words "Facsimile:  (212) 521-6972" directly beneath the words "Attn:  Philip A. Falcone".

(ggg)    (i) Section 13(e) and the signature bloc of the EPCA are hereby amended by inserting a "," after the word "Goldman" at each occurrence of such word therein and (ii) Section 13(e) is hereby amended by inserting "LLP" after the word "Cromwell".

(hhh)    Section 15 of the EPCA is hereby amended by inserting the following after the first paragraph:

"Notwithstanding anything to the contrary in the Plan (including any amendments, supplements or modifications thereto) or the Confirmation Order (and any amendments, supplements or modifications thereto), if any of the terms of the Plan (including any amendments, supplements or modifications thereto) or Confirmation Order (including any amendments, supplements or modifications thereto) conflict with any of the terms of this Agreement, the terms of this Agreement shall govern.".

(iii)    Schedule 1 to the EPCA is replaced in its entirety with Schedule 1 hereto.

(jjj)    Schedule 2 to the EPCA is replaced in its entirety with Schedule 2 hereto.

(kkk)    Exhibit A to the EPCA is replaced in its entirety with Exhibit A hereto.

(lll)    Exhibit B to the EPCA is replaced in its entirety with Exhibit B hereto.

(mmm)    Exhibit C hereto should be inserted immediately following Exhibit B to the EPCA.

(nnn)    Exhibit D hereto should be inserted immediately following Exhibit C to the EPCA.

(ooo)    Exhibit E hereto should be inserted immediately following Exhibit D to the EPCA.

2.    <u>Effectiveness</u>.  This Amendment shall become effective (the "**Effective Date**") immediately upon (i) its execution by all the parties hereto and (ii) upon entry by the Bankruptcy court of the Subsequent Approval Order.  On and after the Effective Date, each reference in the EPCA to "this Agreement," "hereunder," "hereof," "herein" or words of like import referring to the EPCA, shall mean and be a reference to the EPCA as amended by this Amendment.  This Amendment shall operate as an amendment of the provisions of the EPCA referred to specifically herein.  Except as specifically amended by this Amendment and as set forth in the preceding sentence, the EPCA shall remain in full force and effect.  Except as expressly provided herein, this Amendment shall not be deemed to be a waiver of, or consent to, or a modification or amendment of, any other term or condition of the EPCA.

3.    <u>Assignment</u>.  Neither this Amendment nor any of the rights, interests or obligations under this Amendment will be assigned by any of the parties (whether by operation of law or otherwise) without the prior written consent of the other parties, except in accordance with Section 14 of the EPCA.

4.    <u>Third Party Beneficiaries</u>.  Except as otherwise provided in the EPCA, this Amendment (including the documents and instruments referred to in this Amendment) is not intended to and does not confer upon any person other than the parties hereto any rights or remedies under this Amendment.

5.    <u>Prior Negotiations; Entire Agreement</u>.  This Amendment (including the documents and instruments referred to in this Amendment) constitutes the entire agreement of the parties with respect to the subject matter of this Amendment and supersedes all prior agreements, arrangements or understandings, whether written or oral, among the parties with respect to the to the subject matter of this Amendment.

6.    <u>Miscellaneous</u>.  The provisions of Sections 13, 16, 17, 18, 20 and 21 of the EPCA shall apply to this Amendment.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be signed by their respective officers thereunto duly authorized, all as of the date first written above.

DELPHI CORPORATION

By: _____
    Name:
    Title:

A-D ACQUISITION HOLDINGS, LLC

By: _____
    Name:
    Title:

HARBINGER DEL-AUTO INVESTMENT COMPANY, LTD.

By: _____
    Name:
    Title:

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

By: _____
    Name:
    Title:

UBS SECURITIES LLC

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

GOLDMAN, SACHS & CO.

By: _____
    Name:
    Title:

PARDUS DPH HOLDING LLC

By: _____
    Name:
    Title:

SCHEDULE 1

Defined Term                                                      Section

ADAH ................................................................. Preamble
Additional Investor Agreement ........................................ Section 2 (k)
Affiliate ............................................................. Section 2 (a)
Agreement ............................................................ Preamble
Alternate Transaction ................................................ Section 9 (a)(v)
Alternate Transaction Agreement ...................................... Section 9 (a)(v)
Alternate Transaction Fee ............................................ Section 12 (g)
Alternative Financing ................................................ Section 2 (b)
Amended and Restated Constituent Documents ........................... Section 8 (c)
Appaloosa ............................................................ Recitals
Approval Motion ...................................................... Recitals
Approval Order ....................................................... Recitals
Arrangement Fee ...................................................... Section 2 (h)(iii)
Assuming Investor .................................................... Section 11 (b)
Available Investor Shares ............................................ Section 2 (b)
Bank Financing ....................................................... Section 3 (qq)
Bankruptcy Code ...................................................... Recitals
Bankruptcy Court ..................................................... Recitals
Bankruptcy Rules ..................................................... Section 3 (b)(i)
Basic Subscription Period ............................................ Section 1 (c)(ii)
Breaching Investor ................................................... Section 11 (b)
Business Day ......................................................... Section 1 (c)(iv)
Business Plan ........................................................ Section 5 (s)
Capital Structure Date ............................................... Section 3 (d)
Cerberus ............................................................. Recitals
Change of Recommendation ............................................. Section 9 (a)(vi)
Chapter 11 Cases ..................................................... Recitals
Closing Date ......................................................... Section 2 (d)
Closing Date Outside Date ............................................ Section 12 (d)(iii)
Code ................................................................. Section 3 (z)(ii)
Commission ........................................................... Section 1 (c)(ii)
Commitment Fees ...................................................... Section 2 (h)(ii)
Commitment Parties ................................................... Recitals
Company .............................................................. Preamble
Company ERISA Affiliate .............................................. Section 3 (z)(ii)
Company Plans ........................................................ Section 3 (z)(i)
Company SEC Documents ................................................ Section 3 (j)
Confirmation Order ................................................... Section 9 (a)(vii)
Confirmed Plan ....................................................... Section 9 (a)(ix)
Consideration Period ................................................. Section 12 (f)(ii)
Cure Period .......................................................... Section 9 (a)(xxviii)(C)(3)
Debt Financing ....................................................... Section 3 (qq)
Debtors .............................................................. Recitals
Delivered Investment Documents ....................................... Section 9(a)(xxviii)(A)(i)

<u>Defined Term</u>                                                    <u>Section</u>

Determination Date .............................................................. Section 1 (c)(vi)
DGCL .................................................................................... Section 3 (oo)
Direct Subscription Shares ................................................... Section 2 (a)(i)
Disclosure Letter .................................................................. Section 3
Disclosure Letter Delivery Date ......................................... Section 3
Disclosure Statement ........................................................... Recitals
Disinterested Director ......................................................... Section 8 (c)
Dolce ..................................................................................... Recitals
Draft Business Plan .............................................................. Section 3 (m)(vii)
Effective Date ...................................................................... Section 1 (c)(iv)
Eligible Holder ..................................................................... Section 1 (a)
Environmental Laws ............................................................ Section 3 (x)(i)
Equity Commitment Letter ................................................. Section 4 (o)
ERISA .................................................................................. Section 3 (z)(i)
Exchange Act ....................................................................... Section 3 (i)
Existing Shareholder Rights Plan ...................................... Section 3 (d)
Expiration Time ................................................................... Section 1 (c)(iv)
E&Y ...................................................................................... Section 3 (q)
Final Approval Order ........................................................... Section 9 (a)(i)
Financing Letter ................................................................... Section 3 (qq)
Financing Order .................................................................. Section 2 (j)
GAAP ................................................................................... Section 3 (i)
GM ........................................................................................ Recitals
GM Debt ............................................................................... Section 5 (t)
GM Settlement ..................................................................... Section 5 (p)
GS .......................................................................................... Preamble
Harbinger ............................................................................. Preamble
Harbinger Fund ................................................................... Recitals
HSR Act ............................................................................... Section 3 (g)
Indebtedness ........................................................................ Section 9 (a)(xxvii)
Indemnified Person .............................................................. Section 10 (a)
Indemnifying Party ............................................................. Section 10 (a)
Intellectual Property ............................................................ Section 3 (s)
Investment Decision Package ............................................. Section 3 (k)(iii)
Investor ................................................................................. Preamble
Investor Default ................................................................... Section 2 (b)
Investor Disclosure Letter ................................................... Section 4
Investors .............................................................................. Preamble
Investor Shares .................................................................... Section 2 (a)
Issuer Free Writing Prospectus .......................................... Section 3 (k)(iv)
IUE-CWA ............................................................................ Section 3 (pp)
IUE-CWA MOU .................................................................. Section 3 (pp)
knowledge of the Company ................................................ Section 22
Labor MOUs ........................................................................ Section 3 (pp)

<u>Defined Term</u>                                                  <u>Section</u>

Limited Termination ...................................................... Section 12 (d)
Losses........................................................................... Section 10 (a)
Material Adverse Effect................................................ Section 3 (a)
Material Investment Documents ................................... Section 9 (a)(xxviii)
Maximum Number........................................................ Section 2 (a)
Merrill .......................................................................... Preamble
Money Laundering Laws .............................................. Section 3 (ee)
Monthly Financial Statements ...................................... Section 5 (r)
Multiemployer Plans..................................................... Section 3 (z)(ii)
Net Amount................................................................... Section 9 (a)(xxvii)
New Common Stock ..................................................... Section 1 (a)
OFAC............................................................................ Section 3 (ff)
Option .......................................................................... Section 3 (d)
Options ......................................................................... Section 3 (d)
Original Agreement ...................................................... Recitals
Original Approval Motion ............................................ Recitals
Original Approval Order............................................... Recitals
Original Investors......................................................... Recitals
Original PSA ................................................................ Recitals
Over-Subscription Privilege......................................... Section 1 (c)(iii)
Pardus........................................................................... Preamble
Plan .............................................................................. Recitals
Preferred Commitment Fee........................................... Section 2 (h)(i)
Preferred Shares ........................................................... Section 2 (a)
Preferred Term Sheet ................................................... Section 1 (b)
Preliminary Rights Offering Prospectus ...................... Section 3 (k)(v)
Proceedings................................................................... Section 10 (a)
Purchase Notice ........................................................... Section 1 (c)(vi)
Purchase Price.............................................................. Section 1 (a)
Registration Rights Agreement .................................... Section 8 (c)
Related Purchaser......................................................... Section 2 (a)
Relevant Date............................................................... Section 9 (a)(xxviii)(A)(i)
Resale Registration Documents ................................... Section 8 (c)
Resale Registration Statement ..................................... Section 8 (c)
Restricted Period.......................................................... Section 5 (j)
Right............................................................................. Section 1 (a)
Rights Distribution Date .............................................. Section 1 (c)(ii)
Rights Exercise Period................................................. Section 1 (c)(iv)
Rights Offering ............................................................ Section 1 (a)
Rights Offering Prospectus.......................................... Section 3 (k)(ii)
Rights Offering Registration Statement....................... Section 3 (k)(i)
Satisfaction Notice ....................................................... Section 1 (c)(vi)
Securities Act............................................................... Section 1 (c)(ii)
Securities Act Effective Date....................................... Section 3 (k)(vi)

<u>Defined Term</u>                                                  <u>Section</u>

| Defined Term | Section |
|---|---|
| Series A Certificate of Designations | Section 2 (a)(iii) |
| Series A Preferred Stock | Section 2 (a)(iii) |
| Series A Purchase Price | Section 2 (a)(iii) |
| Series B Certificate of Designations | Section 2 (a)(i) |
| Series B Preferred Stock | Section 2 (a)(i) |
| Share | Section 1 (a) |
| Shareholders Agreement | Section 8 (c) |
| Significant Subsidiary | Section 3 (a) |
| Single-Employer Plan | Section 3 (z)(ii) |
| Standby Commitment Fee | Section 2 (h)(ii) |
| Stock Plans | Section 3 (d) |
| Subscription Agent | Section 1 (c)(iv) |
| Subsequent Approval Date | Recitals |
| Subsequent Approval Motion | Recitals |
| Subsequent Approval Order | Recitals |
| Subsidiary | Section 3 (a) |
| Superior Transaction | Section 12 (f) |
| Takeover Statute | Section 3 (oo) |
| Taxes | Section 3 (y) |
| Tax Returns | Section 3 (y)(i) |
| Transaction Agreements | Section 3 (b)(i) |
| Transaction Expenses | Section 2 (j) |
| Transformation Plan | Section 3 (m)(vi) |
| UAW | Section 3 (pp) |
| UAW MOUs | Section 3 (pp) |
| UBS | Preamble |
| Ultimate Purchasers | Section 2 (k) |
| Unsubscribed Shares | Section 2 (a)(iv) |
| USW | Section 3 (pp) |
| USW MOUs | Section 3 (pp) |

SCHEDULE 2

| Investor | Direct Subscription Shares | Direct Subscription Shares Purchase Price | Maximum Backstop Shares | Maximum Backstop Shares Purchase Price | Maximum Total Common Shares | Maximum Total Common Shares Purchase Price | Series A Preferred Stock[2] | Purchase Price | Series B Preferred Stock[3] | Purchase Price | Total Purchase Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ADAH | 1,933,680 | $67,638,500 | 17,403,120 | $608,746,500 | 19,336,800 | $676,385,000 | 13,481,313 | $400,000,000 | - | $- | $1,076,385,000 |
| Del-Auto | 771,104 | $26,972,600 | 6,939,939 | $242,753,400 | 7,711,043 | $269,726,000 | - | - | 3,645,027 | $127,500,000 | $397,226,000 |
| Merrill | 291,221 | $10,186,650 | 2,620,988 | $91,679,850 | 2,912,209 | $101,866,500 | - | - | 1,858,249 | $65,000,000 | $166,866,500 |
| UBS | 291,221 | $10,186,650 | 2,620,988 | $91,679,850 | 2,912,209 | $101,866,500 | - | - | 1,858,249 | $65,000,000 | $166,866,500 |
| GS | 1,043,478 | $36,500,000 | 9,391,300 | $328,500,000 | 10,434,778 | $365,000,000 | - | - | 1,000,596 | $35,000,000 | $400,000,000 |
| Pardus | 672,274 | $23,515,600 | 6,050,466 | $211,640,400 | 6,722,740 | $235,156,000 | - | - | 3,073,257 | $107,500,000 | $342,656,000 |
| Total | 5,002,978 | $175,000,000 | 45,026,801 | $1,575,000,000 | 50,029,779 | $1,750,000,000 | 13,481,313 | $400,000,000 | 11,435,378 | $400,000,000 | $2,550,000,000 |

**Proportionate Share of Preferred Commitment Fee:**

| | |
|---|---|
| ADAH | 50.4861% |
| Del-Auto | 15.9375% |
| Merrill | 8.1250% |
| UBS | 8.1250% |
| GS | 3.8889% |
| Pardus | 13.4375% |
| Total | 100% |

**Proportionate Share of Standby Commitment Fee:**

| | |
|---|---|
| ADAH | 40.3977% |
| Del-Auto | 15.4712% |
| Merrill | 6.0769% |
| UBS | 6.0769% |
| GS | 18.5397% |
| Pardus | 13.4375% |
| Total | 100% |

**Proportionate Share of Alternate Transaction Fee:[4]**

| | If full Commitment Fee received | If no Commitment Fee received |
|---|---|---|
| ADAH | 54.3750% | 46.8555% |
| Del-Auto | 15.9375% | 15.7150% |
| Merrill | 8.1250% | 7.1475% |
| UBS | 8.1250% | 7.1475% |
| GS | 0% | 9.6970% |
| Pardus | 13.4375% | 13.4375% |
| Total | 100% | 100% |

---

[2] Common stock equivalent units.

[3] Common stock equivalent units.

[4] Percentages will fluctuate depending on the amount of any Commitment Fee received.

<u>EXHIBIT A</u>

<u>Summary of Terms of Preferred Stock</u>

<u>EXHIBIT B</u>

<u>The Plan</u>

EXHIBIT C

Disclosure Statement

<u>EXHIBIT D</u>

[Financing Letter]

EXHIBIT E

The terms of the GM Note shall be determined as follows:

o   2nd lien exit financing of $1.5 billion (net of OID[1]) having a maturity of 8 years
    from the date of initial issuance, and issued under a single credit facility, allocated
    as follows:

    ▪   At least $750 million (net of OID) in a note with market clearing terms
        and covenants acceptable to Delphi to be raised from a third-party
        financing source prior to emergence.  All cash proceeds from the 2nd lien
        financing to be paid to GM.[2]

    ▪   $750 million (net of OID), as reduced by any cash proceeds above $750
        million as referred to above or as reduced below, in a note provided to GM
        having the same terms as provided in connection with the third-party
        financing.  The 2nd lien credit agreement will provide that at any time that
        GM holds more than $500 million (net of OID) of the Notes that any
        matter requiring approval of less than 100% of the Noteholders shall
        require the following approvals to be effective: (1) if GM votes in favor of
        the matter, the approval of at least one-third of the non-GM Noteholders
        (determined by principal amount); or (2) if GM does not vote in favor of
        the matter, the approval of at least two-thirds of the non-GM Noteholders
        (determined by principal amount).  No other special voting rights shall be
        included in the 2nd lien credit agreement.

    ▪   Third party financing source (i.e., the initial purchaser or underwriter) will
        have the right, through the emergence date, to replace GM on up to $500
        million (net of OID) of the note being provided to GM in which case cash
        in the amount of any such replacement shall be paid to GM and its note
        (net of OID) shall be reduced by such amount.

    ▪   If the 1st lien exit financing is greater than $3.7 billion (net of OID), an
        amount of cash equal to such excess (the "Excess Amount") will be paid
        to GM as part of its recovery and the 2nd lien financing will be reduced by
        such amount (with at least 50% of the remaining 2nd lien financing
        allocated to the third party financing source), provided that the sum of (i)
        undrawn availability plus any open letters of credit up to $100 million
        pursuant to an ABL revolving credit facility and (ii) Delphi's pro forma
        consolidated cash as of the Effective Date (excluding the Excess Amount
        and after giving pro forma effect to the $1.5 billion cash payment to GM

---

[1]        For all purposes of this Exhibit, OID excludes any fees paid to underwriters or agents
[2]        To the extent that the ABL revolving credit facility (to the exclusion of any other portion of the 1st lien exit
facility) has a first priority lien on any assets and the term loan portion of the 1st lien financing has a 2nd lien, the
notes subject to the 2nd lien financing shall have a third lien on such assets.

in connection with the 414(l) transaction) (the "Liquidity Amount") is at
least $3.189 billion.  In the event that the Liquidity Amount is less than
$3.189 billion, then any Excess Amount shall be retained by Delphi up to
the point that the amount of such Excess Amount retained plus the
Liquidity Amount equals $3.189 billion and the remaining amount shall be
paid to GM and the 2nd lien financing will be reduced by such amount
paid to GM as provided above.

o   GM shall not have registration rights with respect to the GM Note.

o   Subject to the following sentence, the collateral and guarantee package for the 2nd
lien financing will be substantially the same as that for the 1st lien financing.  The
2nd lien facility shall not have a lien on the assets (other than the stock of the first
tier foreign subsidiaries) solely securing the European portions of the 1st lien
facility.

o   The GM Note shall be subject to a 6 month lock-up from the effectiveness of the
Plan of Reorganization, provided however that, during such lock-up period, GM
shall not be restricted from selling second lien notes if such notes are sold to
investors at a price at least equal to par less any original issue discount (the
"Threshold Price"), or below the Threshold Price, if GM makes a pro rata
payment to the other holders of 2nd lien notes equal to the product of (i) the
absolute difference (measured in basis points) between the actual price at which
GM notes are sold by GM and the Threshold Price and (ii) the face amount of the
2nd lien notes held by others prior to giving effect to the sale of the GM notes.