**Hearing Date:  November 8, 2007 at 10:00 a.m.**
**Objection Deadline:  November 2, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
**http://www.delphidocket.com**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                                            :
          In re                                             :     Chapter 11
                                                            :
DELPHI CORPORATION, et al.,                                 :     Case No. 05-44481 (RDD)
                                                            :
                                                            :     (Jointly Administered)
          Debtors.                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a), 363(b), 503(b), AND 507(a)
AUTHORIZING AND APPROVING AMENDMENT TO
DELPHI-APPALOOSA EQUITY PURCHASE AND COMMITMENT AGREEMENT

("DELPHI-APPALOOSA INVESTMENT AGREEMENT AMENDMENT MOTION")

Delphi Corporation ("Delphi" or the "Company") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (the "Debtors"), submit this expedited motion (the "Motion") for an order under 11 U.S.C. §§ 105(a), 363(b), 503(b), and 507(a) authorizing and approving the Delphi-Appaloosa Equity Purchase and Commitment Agreement Amendment (as defined below) attached to the proposed order submitted herewith as Attachment 1 and respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee," and together with the Creditors' Committee, the "Statutory Committees").

3.    On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263) (the "Plan") and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264) (the "Disclosure Statement").  While no order approving the Disclosure Statement or confirming the Plan has yet been entered by this Court, the Court commenced the hearing on the

2

Disclosure Statement and related solicitation procedures motion on October 3, 2007 and has

entered two Orders with respect thereto on October 9, 2007 (Docket No. 10497) and October 19,

2007 (Docket No. 10662).  This Motion is filed pursuant to the October 19th Order which

provides for a November 8, 2007 hearing on this Motion if filed and served on October 29, 2007.

4.     This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

5.     The statutory predicates for the relief requested herein are sections 105(a),

363(b), 503(b), and 507(a) of the Bankruptcy Code and rule 6004 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").

B.     Current Business Operations Of The Debtors

6.     Delphi and its subsidiaries and affiliates (collectively, the "Company") as

of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately

$15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues and the thirteenth largest public company

business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors and continue their business operations without supervision from the Court.[2]

7.     The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

---

[1]     The aggregated financial data used herein generally consists of consolidated information from Delphi and its
        worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[2]     On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core
        automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency
        proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso
        receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of
        which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31,
        2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing
        footprint and to lower its overall cost structure.

3

largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

8.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company under a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

9.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] In 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. In 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

---

[3]      Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

10.     The Debtors believe that the Company's financial performance deteriorated because of (i) unsustainable U.S. legacy liabilities and operational restrictions that have prevented the Debtors from exiting unprofitable, non-core operations, all of which have contributed to relatively high and largely fixed labor costs, (ii) a competitive vehicle production environment for domestic OEMs resulting in a reduction of GM's annual U.S. production and related pricing pressures, and (iii) increasing commodity prices.

11.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.     The Debtors' Transformation Plan

12.     On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas: [4]  first, modifying the

---

[4]    As discussed in further detail in this Motion, in furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors (the "Original EPCA") and a plan framework support agreement with those investors and GM.  On July 9, 2007, Delphi confirmed that it had formally terminated the Original EPCA agreement and related plan framework support agreement.  On July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors").  Under the Delphi-Appaloosa EPCA, the New Plan Investors agreed to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization.  This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.

5

Company's labor agreements to create a competitive arena in which to conduct business; [5]

second, concluding their negotiations with GM to finalize GM's financial support for the

Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; [6]

third, streamlining their product portfolio to capitalize on their world-class technology and

market strengths and make the necessary manufacturing alignment with their new focus; [7] fourth,

transforming their salaried workforce to ensure that the Company's organizational and cost

---

[5]     As of August 29, 2007, this Court has entered the following orders approving settlements between Delphi and
        each of its U.S. labor unions:
        • International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America
          (Docket No. 8693);
        • International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication
          Workers of America (Docket No. 9106);
        • International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die
          Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, and Locals
          832S, 18S, and 101S of the International Union of Operating Engineers (Docket No. 9107); and
        • United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers
          International Union and USW Local 87L (Docket No. 9169).

[6]     On September 4, 2007, at Delphi's request, this Court entered an order withdrawing without prejudice Delphi's
        motion for order under sections 1113(c) and 1114(g) of the Bankruptcy Code authorizing rejection of collective
        bargaining agreements and modification of retiree welfare benefits (Docket No. 9221).

[7]     In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and
        "non-core" product lines and plants.  The Debtors have been working to divest non-core assets so as to
        maximize the value of their estates for stakeholders.  During the 2006 and 2007 calendar years, for example, the
        Debtors sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, and their brake
        hose and catalyst businesses.  The Debtors also obtained court approval for the sale of substantially all of the
        assets of their Saltillo, Mexico brake plant business.  In addition, as announced publicly, the Debtors anticipate
        selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

structure is competitive and aligned with its product portfolio and manufacturing footprint;[8] and

devising a workable solution to their current pension situation.[9]

E.    The Debtors' Plan Of Reorganization And GM Settlement

13.    By filing the Plan and related Disclosure Statement on September 6, 2007,

the Debtors reached another key milestone in their chapter 11 cases.  The Plan is based upon a

series of global settlements and compromises that involve every major constituency in the

Debtors' reorganization cases, including GM.  Attached as exhibits to the Plan are two

agreements, a Global Settlement Agreement and a Master Restructuring Agreement (the "GM

Settlement Documents"), which provide for a comprehensive settlement with GM.  Both

agreements are subject to this Court's approval as part of the confirmation process.

14.    A hearing on the Debtors' solicitation procedures and Disclosure

Statement commenced on October 3, 2007 and is scheduled to continue on November 8, 2007.

If this Court authorizes the Debtors to begin soliciting acceptances or rejections of the Plan (as

---

[8]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.  To ensure that their organizational and cost structure is competitive, the Debtors obtained an Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order").  The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[9]    To that end, on May 31, 2007, this Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 pension plan year funding waivers, which were approved by the IRS on May 1, 2007, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Pension Plans").  On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Pension Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 29, 2008, respectively.  On September 28, 2007, the IRS approved a similar waiver with respect to the Delphi Hourly-Rate Employees Plan for the September 30, 2007 pension plan year.  On October 4, 2007, the IRS, at Delphi's request, further modified the conditions to the initial waivers so that they are generally consistent with the conditions to the most recent waiver.  On October 25, 2007, this Court granted the Debtors' motion for authority to perform under the terms of that waiver.

such Plan may be modified) by November 21, 2007, the Debtors expect that the confirmation

hearing on the Plan will be conducted on January 10 and 11, 2007 and the Debtors will

commence the rights offering contemplated by the Plan  later in January 2008 and emerge from

chapter 11 as soon as practicable thereafter during the first quarter of 2008.

15.    Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

F.    Background Of The Delphi-Appaloosa Equity Purchase And Commitment Agreement

16.    The Original EPCA.  In the summer of 2006, Appaloosa Management L.P.

("Appaloosa") and Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), as significant

stakeholders of the Debtors, negotiated and entered into non-disclosure agreements with the

Debtors pursuant to which they obtained certain information from and about the Debtors and

their businesses and engaged in discussions regarding various potential reorganization structures

and related matters, including the potential requirement for a substantial equity investment in

Delphi to facilitate the Debtors' restructuring.  Following several months of negotiations among

Delphi, GM, the Statutory Committees, Appaloosa, Harbinger, and other potential investors, on

December 18, 2006, the Debtors announced their execution of an equity purchase and

commitment agreement (the "Original EPCA") with affiliates of Appaloosa, Cerberus Capital

Management, L.P. ("Cerberus"), and Harbinger, as well as Merrill Lynch & Co. ("Merrill") and

UBS Securities LLC ("UBS") (collectively, the "Original Investors"), and a plan framework

support agreement (the "Original PSA," and together with the Original EPCA, the "Original

Framework Agreements") with the Original Investors and GM.[10]  After a contested hearing, on

January 12, 2007, this Court authorized the Debtors to enter into the Original Framework

Agreements.[11]  On January 18, 2007, the Original Framework Agreements were fully executed.

17.    <u>Original EPCA Amendments, Termination, And Related Events</u>.  On

February 28, 2007, Delphi announced that it had entered into an amendment to the Original

EPCA with the Original Investors.  The amendment revised, among other things, the provision of

the Original EPCA granting Delphi and the affiliates of two Original Investors, Cerberus and

Appaloosa, the right to terminate the Original EPCA if Delphi did not reach tentative labor

agreements with its principal labor unions and a consensual settlement of legacy issues with GM

by January 31, 2007.  The amendment extended the termination deadline to a future date to be

determined through a notice mechanism.  The amendment also extended the deadline for making

certain regulatory filings under the federal antitrust laws.[12]

18.    On April 19, 2007, Delphi confirmed that it anticipated negotiating

additional changes to the Original EPCA and amendments to the Original PSA, and that none of

the parties to the Original EPCA or the Original PSA had issued a termination notice.  The

---

[10]    As previously discussed in the Debtors' motion for approval of the Original EPCA and the Original PSA, the Original EPCA and Original PSA were the product of framework discussions that commenced in August 2006 and culminated in the Debtors' December 18 announcement.  The Original PSA, as well as the economics and structure of the plan framework itself, were expressly conditioned on reaching consensual agreements with Delphi's U.S. labor unions and GM.  Both Delphi and the Original Investors were permitted to terminate the Original EPCA (which would terminate the Original PSA) if consensual agreements were not reached with labor and GM that were acceptable to each party in their sole discretion.  <u>See</u> Expedited Motion for Order Authorizing and Approving The Equity Purchase and Commitment Agreement Pursuant to Sections 105(a), 363(b), 503(b), and 507(a) of the Bankruptcy Code and the Plan Framework Support Agreement Pursuant To Sections 105(a), 363(b), and 1125(e) of the Bankruptcy Code, dated December 18, 2006 (Docket No. 6179).

[11]    <u>See</u> Order Authorizing and Approving The Equity Purchase and Commitment Agreement Pursuant to Sections 105(a), 363(b), 503(b) and 507(a) of the Bankruptcy Code and the Plan Framework Support Agreement Pursuant to Sections 105(a), 363(b) and 1125(e) of the Bankruptcy Code, dated January 12, 2007 (Docket No. 6589).

[12]    In furtherance of the transactions contemplated by the Original EPCA, on March 7, 2007, Delphi filed with the United States Securities and Exchange Commission a registration statement on Form S-1 regarding the rights offering for Delphi common stock.

primary reason for the negotiations was the differing views of Delphi, the Original Investors,

GM, and the Statutory Committees as to the enterprise value of a reorganized Delphi.  By early

July 2007, Delphi had determined that it would be unable reach agreements with its various

constituencies and investors that would permit the Original Framework Agreements to serve as a

basis for the Debtors' plan of reorganization.  Accordingly, on July 9, 2007, Delphi publicly

disclosed that it had terminated the Original EPCA and the Original PSA, and that it expected to

enter into new framework agreements at some point in July 2007.[13]

        19.    The Delphi-Appaloosa EPCA.  On July 18, 2007, Delphi announced that it

had accepted a new proposal for an equity purchase and commitment agreement with the

affiliates of lead investor Appaloosa Management L.P.; Harbinger Capital Partners Master Fund

I, Ltd.; Merrill Lynch, Pierce, Fenner & Smith Inc., UBS; Goldman Sachs & Co.; and Pardus

Capital Management L.P. (the "Delphi-Appaloosa EPCA"[14]).  The Delphi-Appaloosa EPCA

outlined the terms of the investment and the expected treatment of the Debtors' stakeholders in

its anticipated plan of reorganization and provided a framework for several other aspects of the

---

[13]   On July 7, 2007, pursuant to section 12(g) of the Original EPCA, Delphi sent a termination notice of the
Original EPCA to the other parties to the Original EPCA.  Upon the termination of the EPCA, a Termination
Event (as defined in the Original PSA) occurred, and all obligations of the parties to the Original PSA under the
Original PSA were immediately terminated.  As a consequence, the terms of the Original Framework
Agreements were of no further force and effect.

[14]   As referenced in the Delphi-Appaloosa EPCA and used herein, "Investors" means A-D Acquisition Holdings,
LLC (an affiliate of Appaloosa) ("ADAH"), Harbinger Del-Auto Investment Co. Ltd. (an affiliate of
Harbinger), Pardus DPH Holding LLC (an affiliate of Pardus), GS, Merrill, and UBS.  In connection with the
Delphi-Appaloosa EPCA, Appaloosa, Harbinger, and Pardus Special Opportunities Master Fund L.P.
(collectively, the "Commitment Parties"), are also executing certain equity commitment letters (the
"Commitment Letters," along with the Investment Proposal Letter (the "Proposal Letter") and the Delphi-
Appaloosa EPCA, collectively, the "Investment Agreements")) in support of the obligations of their respective
affiliate Investors under the Delphi-Appaloosa EPCA.  The Commitment Letters, in turn, set forth the terms and
conditions upon which the Commitment Parties will provide the funding to the Investors that will be necessary
to enable the Investors to make the investment called for under the Delphi-Appaloosa EPCA.  The Investors and
the Commitment Parties are collectively referred to herein as the "Plan Investors"; when the term "Plan
Investors" is used in connection with a specific agreement, the term includes only those Plan Investors as
defined in such agreement.

Debtors' reorganization.  On August 2, 2007, this Court authorized and approved the Delphi-
Appaloosa EPCA.[15]

20.    Under the terms of the Delphi-Appaloosa EPCA, the Plan Investors
committed to purchase $800 million of Series A Preferred Stock and Series B Preferred Stock
and approximately $175 million of New Common Stock in reorganized Delphi.  Additionally, on
the terms and subject to the conditions of the Delphi-Appaloosa EPCA, the Plan Investors
committed to purchase any unsubscribed shares of new common stock in connection with the
approximately $1.575 billion rights offering that was to be made available to holders of Delphi's
existing common stock. The rights offering was to have commenced following confirmation of
Delphi's Plan and conclude at least 30 days thereafter, but prior to Delphi's emergence from
chapter 11. Altogether, the Plan Investors would invest up to $2.55 billion in the reorganized
Company pursuant to the Investment Agreement. [16]

G.    Events Leading To The Delphi-Appaloosa EPCA Amendment

21.    Following the approval by this Court of the Delphi-Appaloosa EPCA on
August 2, 2007 and the filing of the Debtors' Plan on September 6, 2007, the occurrence of
various events in Delphi's chapter 11 cases and in the broader economy required the Debtors to
make changes to their five year business plan, the proposed capital structure of reorganized
Delphi, and some of the distributions contemplated under the Plan.  As discussed below, these
events, together with others resulting from the considerable progress that the Debtors have made

---

[15]    See Order Authorizing And Approving Delphi-Appaloosa Equity Purchase And  Commitment Agreement
Purusant To 11 U.S.C. §§ 105(a), 363(b), 503(b), And 507(a) dated August 2, 2007 (Docket No. 8856).

[16]    See Expedited Motion For Order Authorizing And Approving Delphi-Appaloosa Equity Purchase And
Commitment Agreement Pursuant To 11 U.S.C. §§ 105(a), 363(b), 503(b), And 507(a), dated July 18, 2007 (the
"Delphi-Appaloosa Investment And Plan Framework Motion") (Docket No. 8673).  The Delphi-Appaloosa
Investment And Plan Framework Motion contains a summary of the material terms of the Delphi-Appaloosa
EPCA.

in their restructuring, are reflected in the amendment to the Delphi-Appaloosa EPCA attached to the proposed order submitted herewith (the "Delphi-Appaloosa EPCA Amendment" or the "Amendment").  Importantly, unlike when the Plan Investors *reserved* on the contents of the Disclosure Statement and Plan when filed on September 6, 2007 – pursuant to the Amendment (and based on the terms thereof), the Plan Investors will have *approved* the Disclosure Statement and Plan (as amended by the potential amendments also filed today), the GM Definitive Documents (as amended by the amendment also filed today), the Labor MOUs with each of the Debtors' six US labor unions, certain disclosures made by the Debtors to the Plan Investors under the Investment Agreeement and related matters.

22.    <u>Reduced GMNA Volume Projections</u>.  One challenge for the Debtors' near-term restructuring plan is that the projections made by leading industry analysts for GM North America ("GMNA") production volume were revised in late September, 2007 to reflect a material decrease for 2008 (as well as 2009-2011) to  levels below the assumptions in the Debtors' five year business plan.  Delphi uses Global Insight, formerly known as Data Resources, Inc. ("GI/DRI"), a third-party forecasting service, as the basis for certain business plan assumptions regarding anticipated customer production and vehicle volumes.  When incorporating the GI/DRI forecasts into its business model, Delphi uses its historical knowledge of the automotive industry to further refine forecasts related to GMNA production.  Because GMNA has been and continues to be a significant component of Delphi's revenue plan, a change in GMNA production can have a material impact on Delphi's forecasted revenue, particularly when the predicted volume reductions relate to vehicle programs in which Delphi provides a high percentage of content.

23.     In September 2007, GI/DRI revised its outlook for GMNA production volumes.  Delphi reviewed the GI/DRI forecasts and discussed the basis for the predictions with GI/DRI and GM.  GI/DRI adjusted its forecasts on the basis of a number of macroeconomic factors, some of which Delphi believes are overstated or will be mitigated in ways not contemplated by GI/DRI.  Although GI/DRI has predicted a material decrease in GMNA production throughout the period covered by Delphi's business plan (2008 through 2011), after discussions with GM, and based on its own historical experience with GM and GI/DRI, Delphi has concluded that GMNA will have a short term inventory adjustment period rather than the long-term sales reduction of the magnitude forecast by GI/DRI.  Accordingly, Delphi has left its GMNA projections for 2009 through 2011 unchanged but has reduced its projections for 2008.

24.     Capital Markets Dislocation.  Because of the severe dislocation in the capital markets in the second half of 2007, the Debtors have been unable to obtain the level of new financing required upon emergence from Chapter 11 that they contemplated when this Court approved the Delphi-Appaloosa EPCA.  As contemplated during the summer of 2007, Delphi anticipated that reorganized Delphi would be able to obtain new, long-term financing composed of a $1.6 billion asset-based revolving facility, a $5.6 billion exit term loan, and $1.5 billion in unsecured notes.  By early September, however, the debt market had suffered a severe correction.  Based on extensive discussions with potential lenders, the Debtors concluded that there was insufficient market support to provide financing of the scope or structure originally contemplated.  Given the continuing uncertainty in the market, by late September, the Debtors had begun discussing alternative proposals.  Subsequently, the Debtors entered into discussions with various potential lenders concerning a new proposed financing package that would include

a $1.6 billion asset-based first-lien revolver, a first-lien term facility of at least $3.7 billion, and a senior secured second-lien term facility of up to $1.5 billion.

25.    Based on certain recent activity in the debt markets, conditions for borrowers in Delphi's position appear to have improved moderately since the interest rate cut announced by the Federal Reserve Board earlier this fall.  The Debtors have worked diligently to take advantage of this relative improvement in what remains a challenging financial environment by moving expeditiously to obtain the financing they believe they will need upon the conclusion of these chapter 11 cases.  The Debtors are in advanced discussions with various potential lenders concerning their revised financing arrangements, and intend to file with this Court, prior to the November 8th hearing on this Motion and continued hearing on the Disclosure Statement, a motion for approval to obtain exit financing substantially on the terms outlined above.  While the Debtors believe that they will be successful in obtaining and closing the modified exit financing on appropriate terms and conditions, the revised exit financing package does not provide sufficient excess cash to make in excess of $3 billion in cash distributions to general unsecured creditors and GM necessitating plan currency revisions in the Plan.

26.    <u>Progress In Delphi's Restructuring</u>.  Finally, as a result of the considerable progress that the Debtors have made in achieving their restructuring goals since this Court approved the Delphi-Appaloosa EPCA, a number of the terms in the Delphi-Appaloosa EPCA have been superseded.  For example, as discussed above, since August 2007, Delphi has reached consensual settlements and entered into memoranda of understanding with all of its major unions (collectively, the "Labor MOUs"), and in September 2007, the Debtors filed the Plan, along with definitive settlement documents with GM.  Likewise, a number of other events contemplated by the Delphi-Appaloosa EPCA have already occurred, including the payment to the Plan Investors

14

of certain commitment fees and the delivery to the Plan Investors by the Company of a new

business plan and a disclosure letter concerning exceptions to the Company's representations and

warranties (the "Disclosure Letter") in the Delphi-Appaloosa EPCA.

27.     Accordingly, as a consequence of the revised of GMNA demand

projections, the adverse conditions in the financial markets, and the continuing progress of the

Debtors' restructuring, the Debtors and the Plan Investors determined that the Delphi-Appaloosa

EPCA should be amended.

H.     The Delphi-Appaloosa EPCA Amendment

28.     The combination of the decrease in GMNA forecasts and related

uncertainties in the automotive sector, the Debtors' inability to obtain exit financing at the level

previously contemplated and the related uncertainties in capital market transactions in the

automotive sector, the changes to the Company's business plan (and the resulting minor

adjustment to Delphi's enterprise valuation, and changes required by the Plan Investors to obtain

their approval of the Disclosure Statement, Plan, GM and labor settlements and other disclosures

and related agreements have affected various provisions of the Delphi-Appaloosa EPCA,

including the terms of the Plan Investors' proposed investment in the Company.  The principal

material provisions of the Amendment are discussed below.

29.     Plan Investor Investments; Rights Offering.  Although the Delphi-

Appaloosa EPCA Amendment does not alter the amount of the Plan Investors' proposed

investment in the Company, it does modify the terms of this investment in a manner that is

generally consistent with the variance in the reduced level of enterprise valuation at which the

Creditors' Committee is prepared to recommend that unsecured creditors accept revised plan

currency (now equity and the right to participate in a discount rights offering) for deemed "par

plus accrued" treatment under the Plan.  Under the existing Delphi-Appaloosa EPCA, the Plan

15

Investors agreed to commit to purchase (a) approximately $175 million of common stock in the

reorganized Delphi (the "Direct Subscription Shares") and $800 million of preferred shares in the

reorganized Delphi (the "Preferred Shares") and (b) any unsubscribed shares of common stock in

connection with a discount rights offering (the "Rights Offering") to existing common stock

holders (the "Back Stop Commitment").  The Amendment has no effect on the amount of the

Plan Investors' proposed investment.  Pursuant to the Amendment, however, the Plan Investors

would receive an aggregate amount of 5,002,970 Direct Subscription Shares and 24,916,691

Preferred Shares rather than 4,558,479 Direct Subscription Shares and 12,207,104 Preferred

Shares under the Delphi-Appaloosa EPCA.[17]  The price of the Series A Preferred Shares has

been reduced from $31.28 to $29.67 per share, and the price of the Series B Preferred Shares has

been reduced from $38.39 to $34.98 per share.

   30.  The Rights Offering contemplated by the Delphi-Appaloosa EPCA

provided that Delphi would have distributed certain rights (the "Rights") to holders of common

stock to purchase their pro rata share of 41,026,311 shares of new common stock at a purchase

price of $38.39 per share.  Pursuant to the Amendment, General Unsecured Creditors (as defined

in the Plan), rather than common stock holders, will be the only stakeholders eligible to

participate in the Rights Offering.  Under the Amendment, each General Unsecured Creditor will

be entitled to purchase its portion of 45,026,801 shares of new common stock at a purchase price

of $34.98 per share.  The Amendment also would permit the implementation of an

oversubscription mechanism required by the Creditors' Committee to obtain the Committee's

approval of the Plan, pursuant to which eligible holders that purchase their full pro rata share of

---

[17] References to the number of shares in various sections of this Motion and the Delphi-Appaloosa EPCA are
preliminary estimates based on current assumptions regarding, among other items, amounts of unsecured claims
and accrued interest, assumed net debt at emergence from Chapter 11, and the date of emergence. Changes in
these assumptions may affect the actual number of shares issued pursuant to the Delphi-Appaloosa EPCA.  See,
e.g., Delphi-Appaloosa EPCA §§ 1(c), 2(a), 3(d).

Rights will be able to subscribe for additional Rights for a purchase price per share set forth in the Plan.

      31.     The Plan Investors' Backstop Commitment would remain unchanged under the Amendment. The Plan Investors would commit to purchase the number of shares that were offered through the Rights Offering to Eligible Holders, but whose rights were not properly exercised (the "Unsubscribed Shares"). In the event that no shareholders were to subscribe to the Rights Offering, the Plan Investors, through the Back Stop Commitment, would purchase all of the Unsubscribed Shares for approximately $1.575 billion. Altogether, through the Back Stop Commitment and the purchase of the Direct Subscription Shares and the Preferred Shares, the Plan Investors could invest up to $2.55 billion in the reorganized Debtors.

      32.     <u>Preferred Stock And Second Lien Financing For GM</u>. The Amendment provides for the issuance of new preferred stock to GM as part of the Debtors' Plan and contains a new covenant pursuant to which the Company would agree to arrange certain debt financing for the benefit of GM in accordance with the terms set forth in a new Exhibit E to the Delphi-Appaloosa EPCA. Pursuant to Exhibit E, the Company would agree to secure $1.5 billion in second lien debt as part of its exit financing package. Of this amount, at least $750 million would be raised through an independent third-party financing source prior to the emergence, with all proceeds payable to GM. The remaining $750 would take the form of a note provided to GM having the same terms as provided in connection with the third-party financing.

      33.     <u>Additional Provisions Concerning Financing</u>. The Amendment provides for inclusion of an additional representation by the Company that it has delivered a "best efforts" financing letter to be attached as new Exhibit D to the Delphi-Appaloosa EPCA (the "Financing Letter") and has paid any associated fees. A new covenant to be included under the Amendment

would require the Company to use commercially reasonable efforts to obtain the financing

described in the Financing Letter.  In addition, the Amendment contains additional conditions to

effectiveness related to financing that requires the Company to (a) have availability of at least

$1.4 billion (including at least $100 million available for letters of credit) under an asset-based

loan facility and (b) demonstrate that interest expense on the Company's indebtedness for 2008

will not exceed $575 million.

34.    <u>Limitation On Trade And Unsecured Claims</u>.  The Amendment would

provide for a new condition to the effectiveness of the Delphi-Appaloosa EPCA that the

aggregate amount of all Trade and Other Unsecured Claims (as defined in the Plan) that have

been asserted or scheduled but not yet disallowed shall be allowed or estimated for distribution

by the Bankruptcy Court to be no more than $1.45 billion, excluding all allowed accrued post-

petition interest thereon.

35.    <u>Elimination Of Certain Covenants, Conditions, And Termination Rights</u>.

The Amendment reflects the achievement of various milestones in the Debtors' chapter 11 cases

since this Court approved the Delphi-Appaloosa EPCA discussed above.  These include the

execution and Court approval of the Labor MOUs, the conclusion of definitive settlement

documents with GM, and the filing of the Debtors' Plan and Disclosure Statement.  The

Amendment also reflects that Delphi has delivered to the Plan Investors a revised business plan,

the Disclosure Letter, and a commitment letter related to exit financing.  A number of conditions

to the effectiveness of the Delphi-Appaloosa EPCA or covenants therein required the completion

of these and similar actions.  As these have now been completed, the Amendment removes the

conditions and covenants associated with them.  Several other conditions have been removed or

reduced in scope, including those related to the occurrence of strikes and the Plan Investors'

approval rights with respect to material investment documents. In addition, the amount of net debt required upon emergence has been reduced from $7.159 billion to $5.2 billion. Finally, given that the Company has now provided the Disclosure Letter to the Plan Investors, the Amendment eliminates the Plan Investors' right to terminate the Delphi-Appaloosa EPCA if not satisfied with the Disclosure Letter.

36.    Other Provisions. Perhaps the most significant developments since this Court's approval of the Delphi-Appaloosa EPCA on August 2, 2007 have been the filing of the Debtors' Plan and related Disclosure Statement and the conclusion of the GM Settlement Documents. Because neither of these events had occurred when the Delphi-Appaloosa EPCA was executed, Exhibit B of the Delphi-Appaloosa EPCA contained an outline of the Debtors' proposed framework, which included distributions to be made to creditors and shareholders and the treatment of GM's claims. The Amendment would delete Exhibit B and replace all references thereto in the Delphi-Appaloosa EPCA with references to the Plan or the GM Settlement Documents, as applicable.

37.    The Amendment would acknowledge that the commitment letters provided by affiliates of certain of the Plan Investors (as defined in the Delphi-Appaloosa EPCA, the "Commitment Parties") have been terminated and that the Commitment Parties have executed new commitment letters that take into account the provisions set forth in the Amendment. In addition, the Amendment updates the Company's representations and warranties concerning SEC Documents (as defined in the Delphi-Appaloosa EPCA) and extends the deadline for finalizing certain key documents related to the transactions contemplated in the Delphi-Appaloosa EPCA. These documents include the certificates of designation for the

Preferred Shares and the registration rights agreement.  Finally, the Amendment contains a new

condition that requires the Company to obtain a release and exculpation for each Plan Investor.

Relief Requested

38.     By this Motion, the Debtors seek entry of an order authorizing and

approving the Debtors' entry into the Delphi-Appaloosa EPCA Amendment pursuant to sections

105(a), 363(b), 503(b), and 507(a) of the Bankruptcy Code, and waiving the 10-day stay under

Bankruptcy Rule 6004(g).

Applicable Authority

A.     Approval Of The Delphi-Appaloosa EPCA Amendment

39.     Bankruptcy Code section 363(b)(1) permits a chapter 11 debtor to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  This Court may authorize use of estate property outside the ordinary

course of business if a debtor demonstrates a sound business justification for it.  In re Lionel

Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good

business reason exists to grant debtor's application under section 363(b)); In re Delaware Hudson

Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).  This "business judgment" test is premised on

the debtor's business judgment that the proposed use of property of the estate would be beneficial

to the estate.  Cf. Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),

4 F.3d 1095, 1099 (2d Cir. 1993) (analyzing business judgment standard under section 365).  To

a bankruptcy court, "'business judgment' . . . is just that – a judgment of the sort a businessman

would make."  Id.

40.     Once the debtor articulates a valid business justification, the business

judgment rule creates "a presumption that in making a business decision the directors of a

20

corporation acted on an informed basis, in good faith and in the honest belief that the action was

in the best interests of the company." In re Integrated Resources, Inc., 147 B.R. 650, 656

(S.D.N.Y. 1992) (citation omitted).  The debtor's business judgment "should be approved by the

court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound

business judgment, but only on bad faith, or whim or caprice.'"  In re Aerovox, Inc., 269 B.R. 74,

81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo.

1991)).  "Courts are both to interfere with corporate decisions absent a showing of bad faith, self

interest or gross negligence."  Integrated Resources,  147 B.R. at 656.

   41. The Debtors, in their sound business judgment, believe that the

transactions contemplated by the Delphi-Appaloosa EPCA, giving effect to the Amendment, will

facilitate the Debtors' transformation plan and their prosecution of a plan of reorganization, and

is in the best interests of their creditors, shareholders, and other parties-in-interest.  The factors

that the Debtors considered before filing the Delphi-Appaloosa Investment And Plan Framework

Motion remain highly relevant to the Debtors' proposed transaction with the Plan Investors.

Specifically, the value and dollar amounts of the commitments that the Plan Investors are

prepared to make, the timing of the contemplated transaction, and the execution risk associated

with the contemplated transactions under the Delphi-Appaloosa EPCA, giving effect to the

Amendment, all militate in favor of the relief requested in this Motion.  As discussed above, the

Amendment reflects the Debtors' efforts to adapt, improvise, and overcome various industry-

specific and macroeconomic challenges that have arisen during the past several months.  The

business outcomes reflected in the Amendment are consistent with both the Debtors' revised

business plan and the transformation plan announced in March 2006.  Moreover, the Amendment

would provide greater certainty that the transactions contemplated in the Delphi-Appaloosa

EPCA ultimately will be concluded.  Greater certainty in this regard would help facilitate the

Debtors' emergence from Chapter 11 as soon as practicable in 2008, which would rebound to the

benefit of all stakeholders.  Accordingly, this Court should authorize and approve the Debtors'

entry into the Amendment, as requested herein.


B.    Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

42.    Under Bankruptcy Rule 6004(g), "An order authorizing the use, sale, or

lease of property other than cash collateral is stayed until the expiration of 10 days after entry of

the order, unless the court orders otherwise."  Courts in this district have waived this stay upon a

showing of business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr.

S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the

order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr.P. 6004(g).");

In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of

"business exigency" for waiver of ten-day stay under Bankruptcy Rule 6004(g)).  In general,

courts will grant waivers when doing so is important to the debtor's financial health.  See In re

Second Grand Traverse School, 100 Fed. Appx. 430, 434-35 (6th Cir. 2004) (affirming decision

waiving 10-day stay because "time was of the essence"); In re Decora Indus., Inc., Case No. 00-

4459 (JJF), 2002 WL 32332749, at *9 (D. Del. May 20, 2002) ("[T]he Court understands that an

immediate closing is required to remedy Debtors' precarious financial and business position.

Accordingly, the Court will waive the Rules 6004(g) and 6006(d), allowing the parties to

close.").

43.    As described in this Motion, the Delphi-Appaloosa EPCA Amendment is

a the product of discussions that originally began in the summer of 2006.  The Debtors submit

that the waiver of the ten-day stay is appropriate here to allow for the payment of the

Commitment Fees, the Arrangement Fee, and the Transaction Expenses, as described in the

Delphi-Appaloosa EPCA, will add necessary certainty to the ongoing plan negotiations among

the stakeholders, and allow the Debtors and their stakeholders to pursue the consummation of

these cases.

        44.     Based on the foregoing, the Debtors believe that they have exercised

sound business judgment in deciding to execute the Delphi-Appaloosa EPCA Amendment and

that, accordingly, this Court should authorize and approve the Debtors' entry into such

agreements.

<u>Notice Of Motion</u>

        45.     Notice of this Motion has been provided in accordance with the

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), the Ninth

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered October 19, 2007 (Docket No. 10661), and the

Supplemental Order (A) Establishing Revised Hearing Date And Related Procedures On

Disclosure Statement And Solicitations Procedure Motion And (B) Setting Hearing Date And

Related Procedures For Potential Motions Amending Investment Agreement And Approving

Certain Exit Financing Agreements, entered October 19, 2007 (Docket No. 10662).  In light of

the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

WHEREFORE the Debtors respectfully request that the Court enter an order (i) authorizing and approving the Debtors' entry into the Delphi-Appaloosa EPCA Amendment and the payment of all associated fees, expenses, and damage claims, and of all related indemnities as and when provided for therein, pursuant to sections 105(a), 363(b), 503(b), and 507(a) of the Bankruptcy Code and Bankruptcy Rule 6004, and (ii) granting the Debtors such other and further relief as is just.

Dated:    New York, New York
          October 29, 2007

                              SKADDEN, ARPS, SLATE, MEAGHER
                              & FLOM LLP

                              By:    /s/ John Wm. Butler, Jr.
                                     John Wm. Butler, Jr. (JB 4711)
                                     George N. Panagakis (GP 0770)
                                     Ron E. Meisler (RM 3026)
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois 60606
                              (312) 407-0700

                                          - and -

                              By:    /s/ Kayalyn A. Marafioti
                                     Kayalyn A. Marafioti (KM 9632)
                                     Thomas J. Matz (TM 5986)
                              Four Times Square
                              New York, New York 10036
                              (212) 735-3000

                              Attorneys for Delphi Corporation, et al.,
                                Debtors and Debtors-in-Possession

24