UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :
   In re                                        :    Chapter 11
                                                              :
DELPHI CORPORATION, et al.,                                   :    Case No.  05 - 44481 (RDD)
                                                              :
            Debtors.   :    (Jointly Administered)
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. §§ 105(a), 363(b), 503(b), AND 507(a)
AUTHORIZING AND APPROVING DELPHI-APPALOOSA
EQUITY PURCHASE AND COMMITMENT AGREEMENT AMENDMENT

("DELPHI-APPALOOSA INVESTMENT AND PLAN SUPPORT ORDER")

Upon the motion (the "Motion")[1], dated October 29, 2007, of Delphi Corporation

("Delphi") and certain of its domestic subsidiaries and affiliates, debtors and debtor-in-

possession (collectively, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"),

for an order authorizing and approving the entry into the Equity Purchase and Commitment

Agreement Amendment (the "Amendment") and associated Investment Proposal Letter (the

"Proposal Letter") and Commitment Letters (the "Commitment Letters," and together with the

Proposal Letter and Delphi-Appaloosa EPCA Amendment, the "Investment Agreements")[2]

pursuant to sections 105(a), 363(b), 503(b), and 507(a) of title 11 of the United States Code, 11

U.S.C. §§ 101-1330, as amended and in effect on October 8, 2005 (the "Bankruptcy Code"); and

this Court having reviewed the Motion and having heard the statements of counsel and the

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
Motion.

[2]    The Investment Agreements are attached to this order as Exhibit 1.

evidence presented regarding the relief requested in the Motion at a hearing before this Court

(the "Hearing"); and this Court having determined that its approval of the Investment

Agreements would not constitute approval of a sub rosa or de facto reorganization plan; and due

and appropriate notice of the Motion having been given in accordance with this Court's

Supplemental Disclosure Statement, Investment Agreement, And Exit Financing Procedures

Order, entered October 19, 2007 (Docket No. 10662); and sufficient cause appearing therefor;

now, therefore,

IT IS HEREBY FOUND AND DETERMINED THAT:[3]

1.    <u>Jurisdiction</u>.  This Court has core jurisdiction over the Chapter 11 Cases, the

Motion, this order, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b)

and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The

statutory predicates for the relief requested herein are sections 105(a), 363(b), 503(b), 507(a),

and 1125(e) of the Bankruptcy Code.

2.    <u>Notice</u>.  The notice given by the Debtors of the Motion and the Hearing

constitutes proper, timely, adequate, and sufficient notice thereof and complies with the

Bankruptcy Code, the Bankruptcy Rules, and applicable local rules, and no other or further

notice is necessary.

3.    <u>Findings</u>.

(a)    On October 8 and October 14, 2005, the Debtors commenced the Chapter

11 Cases for the purpose of restructuring their businesses and related financial obligations

---

[3]    This order constitutes the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, as made
applicable herein by Bankruptcy Rules 7052 and 9014.  Any and all findings of fact shall constitute
findings of fact even if stated as conclusions of law, and any and all conclusions of law shall constitute
conclusions of law even if stated as findings of fact.

pursuant to an overall transformation strategy (the "Transformation Plan") that would

incorporate the following structural components:

      (i)      Modification of the Debtors' labor agreements;

      (ii)      Resolution of all issues and disputes between the Debtors and

General Motors Corporation ("GM") and its subsidiaries and affiliates regarding

(A) certain legacy obligations, including allocating responsibility for various

pension and other post-employment benefit obligations; (B) all alleged claims and

causes of action arising from the spinoff of Delphi from GM; (C) costs associated

with the transformation of the Debtors' businesses (including the establishment of

support to be provided by GM in connection with certain of those businesses that

the Debtors intend to shut down or otherwise dispose of); (D) the restructuring of

ongoing contractual relationships with respect to continuing operations; and (E)

the amount and treatment of GM's claims in the Chapter 11 Cases (together, the

"Designated Issues");

      (iii)      Development of a strategically focused product portfolio and

realignment of production capacity to support it;

      (iv)      Transformation of the Debtors' work force in keeping with a

sustainable cost structure and streamlined product portfolio;

      (v)      Resolution of the Debtors' pension issues; and

      (vi)      Restructuring of the Debtors' balance sheet to accommodate the

transformed business.

(b)      The Debtors continue to operate their respective businesses and manage

their respective properties as debtors-in-possession pursuant to sections 1107 and 1108 of

the Bankruptcy Code.  No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.  Pursuant to an order of this Court, the Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered.

(c)    Pursuant to its authority under section 1102 of the Bankruptcy Code, the United States Trustee for the Southern District of New York appointed the Creditors' Committee and the Equity Committee in the Chapter 11 Cases.

(d)    In the summer of 2006, Appaloosa Management L.P. ("Appaloosa") and Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), as significant stakeholders of the Debtors, and other potential investors negotiated and entered into non-disclosure agreements with the Debtors pursuant to which they obtained certain information from and about the Debtors and their businesses and engaged in discussions regarding various potential reorganization structures and related matters, including the potential requirement for a substantial equity investment in Delphi to facilitate the Debtors' restructuring.

(e)    As a result of those discussions, on December 18, 2006, Delphi filed a motion (the "Original Approval Motion") seeking approval of the plan framework support agreement among Delphi, Appaloosa, Cerberus Capital Management, L.P. ("Cerberus"), Harbinger, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill"), GM, and UBS Securities LLC ("UBS"), dated as of December 18, 2006 (as amended by the Amendment and Supplement to the Plan Framework Support Agreement, dated as of January 18, 2007, the "Original PSA"), and equity purchase and commitment agreement among Delphi, affiliates of Appaloosa, Harbinger, and Cerberus, Merrill, and UBS, dated as of January 18, 2007 (as amended by (i) a Supplement to the Equity Purchase and

4

Commitment Agreement dated as of January 18, 2007 and (ii) an Amendment to the

Equity Purchase and Commitment Agreement, dated February 29, 2007, the "Original

EPCA").

(f)     After holding a contested evidentiary hearing on the Original Approval

Motion on January 11 and 12, 2007, and considering the evidentiary record, the

objections to the relief requested, and the arguments of counsel, this Court overruled all

objections not withdrawn or settled and entered its order granting the relief requested by

the Debtors in the Original Approval Motion as it was modified at the hearing (the

"Original Approval Order").

(g)     On July 7, 2007, the Original EPCA was terminated pursuant to section

12(g) and the Original PSA was correspondingly terminated.  Due the Delphi's

termination of the Original EPCA under section 12 (g), no Alternate Transaction Fee (as

defined in the Original EPCA) is due and owing to the Original Plan Investors.  After the

termination of the Original EPCA, Delphi continued discussions with potential investors.

(h)     The parties subsequently agreed on a proposed equity investment by

certain affiliates of Appaloosa, Harbinger, Pardus Capital Management L.P. ("Pardus"),

Merrill, UBS, and Goldman Sachs & Co.("GS") (GS, together with Merrill, UBS, and

certain affiliates of Appaloosa, Harbinger, and Pardus, the "Investors") in Delphi (the

"Investment").  On August 2, 2007, this Court authorized and approved the Investment.

(i)     The Investment, which was to be an integral component of a plan, was to

be made pursuant to the Delphi-Appaloosa EPCA, which set forth the terms and

conditions under which the Investors would (i) purchase any unsubscribed shares issued

5

under a rights offering of new common stock of Delphi to be issued pursuant to such plan
and (ii) purchase newly issued shares of common stock and preferred stock of Delphi.

(j)    By late September 2007, as a consequence of circumstances and events
described in the Motion, the Debtors and the Plan Investors determined that the Delphi-
Appaloosa EPCA should be amended.

(k)    As set forth in the Motion, in connection with the Delphi-Appaloosa
EPCA, Appaloosa, Harbinger, and Pardus (collectively, the "Commitment Parties," and
together with the Investors, the "Plan Investors") will provide the Commitment Letters to
the Investors and Delphi, pursuant to which each Commitment Party will provide funding
to the Investors under the terms and subject to the limitations set forth in the
Commitment Letters.

(l)    The Investment Agreements, giving effect to the Amendment, are fair and
equitable to all parties.

(m)    The Debtors' decision to enter into the Amendment is a sound exercise of
their business judgment, is consistent with their fiduciary duties, and is based on good,
sufficient, and sound business purposes and justifications.

(n)    The Amendment was negotiated at arms' length and in good faith.

(o)    The Amendment is fair, reasonable, and in the best interests of the
Debtors, their estates, shareholders, creditors, and all parties-in-interest.

(p)    The relief requested in the Motion is in the best interests of the Debtors,
their estates, shareholders, creditors, and all parties-in-interest.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND
DECREED THAT:

1.      The Motion is GRANTED in its entirety, and shall not be subject to stay under

Bankruptcy Rule 6004(g).  Notwithstanding Rule 6004(g) of the Federal Rules of Bankruptcy

Procedure or any other Bankruptcy Rule, this order shall take effect immediately upon its entry.

2.      Any objection to the Motion not withdrawn or otherwise resolved as set forth in

this order is hereby overruled.

3.      Pursuant to Bankruptcy Code sections 105(a), 363(b), 503(b), and 507(a), the

Debtors and the applicable Plan Investors are hereby authorized, but not directed, to execute,

deliver, and implement the Investment Agreements and all exhibits and attachments thereto, and

to take any and all actions necessary and proper to implement the terms of the Investment

Agreements, and such agreements and documents shall be binding and enforceable against the

Debtors, their estates, and the other parties thereto in accordance with their terms and subject to

the conditions contained therein.  The Debtors and the Plan Investors are authorized to amend the

Investment Agreements without further order of the Bankruptcy Court to the extent that either

such amendments are not material to the Investment Agreements or such amendments have not

been objected to by either the Creditors' Committee or the Equity Committee following five

business days prior notice (or such shorter period as the Statutory Committees and the Debtors

may agree).

4.      This order is a final and non-interlocutory order and is immediately subject to

appeal pursuant to 28 U.S.C. § 158(a).

5.      This Court shall retain jurisdiction to hear and determine all matters arising from

the implementation of this order.

6.      The requirement under Local Rule 9013-1(b) for the service and filing of a

separate memorandum of law is deemed satisfied by the Motion.


Dated:    _____, 2007
            New York, New York

                              _____
                                UNITED STATES BANKRUPTCY JUDGE

October 29, 2007

Delphi Corporation
5725 Delphi Drive
Troy, MI 48098

Attn:  Robert S. "Steve" Miller
       Chairman

Re: Proposed Investment in Delphi Corporation

Dear Mr. Miller:

As you know, the signatories hereto have been engaged in discussions with Delphi Corporation ("Delphi" or the "Company") and various other parties in interest in the jointly administered chapter 11 cases (the "Chapter 11 Cases") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") with respect to Delphi and certain of its subsidiaries (collectively, the "Debtors") regarding certain amendments to the global resolution of the Chapter 11 Cases to be implemented pursuant to a plan of reorganization for the Debtors (the "Plan") and be funded in part by an equity investment in Delphi (the "Investment").

Pursuant to the Company's request, the undersigned severally, not jointly, submit this proposal (the "Proposal") to amend the Equity Purchase and Commitment Agreement dated as of August 3, 2007 by and among Delphi and the undersigned (the "Investment Agreement"). Upon the entry by the Bankruptcy Court of the Subsequent Approval Order (as defined and described below) and the satisfaction of the other conditions described in this letter, the undersigned will severally, not jointly, enter into the amendment to the Investment Agreement attached hereto as Annex A (the "Amendment") and each of A-D Acquisition Holdings, LLC, Pardus DPH Holding LLC and Harbinger Del-Auto Investment Company, Ltd. will deliver an Equity Commitment Letter in the forms attached hereto as Annexes B-1, B-2 and B-3. Our several obligations to enter into the Amendment, however, are subject to your using your commercially reasonable efforts to have the Bankruptcy Court enter the Subsequent Approval Order by, among other things: (a) preparing and filing with the Bankruptcy Court, no later than October 29, 2007, the Subsequent Approval Motion referred to in the Amendment and (b) using commercially reasonable efforts to obtain a hearing on the Subsequent Approval Motion on or before November 8, 2007. Capitalized terms used herein and not otherwise defined have the meanings ascribed thereto in the Investment Agreement as amended by the Amendment.

This Proposal is subject to, and expressly conditioned on, (1) the execution and delivery by all signatories thereto of the Amendment, (2) the entry by the Bankruptcy Court of an order, in form and substance reasonably satisfactory to each of us (the "Subsequent Approval Order") (i) approving and authorizing the Debtors to enter into and perform their obligations under the Investment Agreement as amended by the Amendment, (ii) authorizing the payment of the

Commitment Fees, the Arrangement Fees, the Alternate Transaction Fees and the Transaction
Expenses on the terms and subject to the conditions set forth in the Investment Agreement as
amended and (iii) approving the disclosure statement attached hereto as Annex C as containing
adequate information pursuant to Section 1125 of the Bankruptcy Code, (3) the Company's
Quarterly Report on Form 10-Q for the quarter ended September 30, 2007 having been delivered
in draft form to the undersigned by November 2, 2007, delivered in final form approved by the
Company for filing by 12:00 noon on November 6, 2007 and filed with the Securities and
Exchange Commission no later than November 6, 2007 and each of the undersigned shall be
reasonably satisfied with the contents of such filing; provided, that one Investor's determination
regarding its "reasonable" satisfaction with respect to such Form 10-Q shall not be determinative
of the "reasonableness" of any other Investor's determination with respect to such Form 10-Q,
(4) the Company having delivered to each of the undersigned an executed Financing Letter no
later than 12:00 noon on November 6, 2007 and each of the undersigned shall be satisfied in its
sole discretion with the terms of the Financing Letter and (5) Goldman, Sachs & Co. in its sole
discretion having executed a writing by 5:00 p.m., Prevailing Eastern Time on November 6,
2007 committing to the obligations in this Proposal to the same extent as the other undersigned
parties.

        This Proposal will remain open until 5:00 p.m., Prevailing Eastern Time on October 29,
2007, at which point it will expire unless Delphi has filed a motion, in form and substance
reasonably acceptable to us, seeking entry by the Bankruptcy Court of the Subsequent Approval
Order and requesting a hearing on such motion on or before November 8, 2007. In addition,
even if accepted by Delphi this Proposal shall terminate and be of no further force of effect if, on
or before November 16, 2007: (1) the Subsequent Approval Order has not been entered by the
Bankruptcy Court, (2) the Amendment has not been executed and delivered to us by Delphi, (3)
any of the undersigned determines in its sole discretion that either (a) the conditions to the
obligations of the undersigned contained in the Investment Agreement as amended by the
Amendment are incapable of being satisfied or (b) any of the undersigned is entitled to exercise a
termination right contained in the Investment Agreement as amended by the Amendment or (4)
any of the conditions set forth in clauses (3), (4) or (5) of the immediately preceding paragraph
has not been satisfied in accordance with its respective terms.

                                        *    *    *    *

We continue to be very enthusiastic about Delphi and look forward to pursuing the transactions contemplated by the Investment Agreement as amended to an expeditious and mutually successful conclusion.

A-D ACQUISITION HOLDINGS, LLC

By:_____

    Name:

    Title:

HARBINGER DEL-AUTO INVESTMENT
COMPANY, LTD.

By:_____

    Name:

    Title:

MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED

By:_____

    Name:

    Title:

UBS SECURITIES LLC

By:_____

    Name:

    Title:

By:_____

    Name:

    Title:

GOLDMAN, SACHS & CO.

By:_____

    Name:

    Title:

PARDUS DPH HOLDING LLC

By:_____

    Name:
    Title:

FIRST AMENDMENT TO THE EQUITY PURCHASE AND COMMITMENT AGREEMENT

                    THIS FIRST AMENDMENT TO THE EQUITY PURCHASE AND
COMMITMENT AGREEMENT (this "**Amendment**"), dated as of [＿＿＿], 2007, is made by and
among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of
the State of Delaware ("**ADAH**"), Harbinger Del-Auto Investment Company, Ltd., an exempted
company incorporated in the Cayman Islands ("**Harbinger**"), Merrill Lynch, Pierce, Fenner &
Smith Incorporated, a Delaware corporation ("**Merrill**"), UBS Securities LLC, a Delaware
limited liability company ("**UBS**"), Goldman, Sachs & Co., a New York limited partnership
("**GS**"), Pardus DPH Holding LLC, a Delaware limited liability company ("**Pardus**"), and
Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor,
as applicable, the "**Company**"). ADAH, Harbinger, Merrill, UBS, GS and Pardus are each
individually referred to herein as an "**Investor**" and collectively as the "**Investors**". Capitalized
terms used and not otherwise defined in this Amendment shall have the meanings assigned
thereto in the EPCA (as defined below).

                    WHEREAS, the Company and certain of its subsidiaries and affiliates
commenced the Chapter 11 Cases under the Bankruptcy Code in the Bankruptcy Court;

                    WHEREAS, the Company and the Investors have entered into that certain Equity
Purchase and Commitment Agreement dated as of August 3, 2007 (the "**EPCA**"); and

                    WHEREAS, the Company has proposed certain changes to the Company's plan
of reorganization and in connection therewith the Investors and the Company have agreed to
amend the EPCA pursuant to this Amendment.

                    NOW, THEREFORE, in consideration of the mutual promises, agreements,
representations, warranties and covenants contained herein, each of the parties hereto hereby
agrees as follows:

1.    Amended Provisions of EPCA.

      (a)    The sixth WHEREAS clause of the EPCA is hereby amended and restated in its
             entirety as follows:

      "WHEREAS, the Company filed its motion (the "**Approval Motion**") seeking an order
      from the Bankruptcy Court that, among other things, all of the findings, conclusions and
      rulings contained in the Original Approval Order (i) apply to this Agreement (including
      the Commitment Fees, the Arrangement Fee, the Alternate Transaction Fees and the

Transaction Expenses provided for herein), the parties hereto and the transactions
contemplated hereby, and (ii) continue in full force and effect with respect thereto (as so
granted and issued on August 2, 2007; the "**Approval Order**");".

(b)     The seventh WHEREAS clause of the EPCA is hereby amended and restated in
its entirety as follows:

"WHEREAS, the Company filed its motion (the "**Subsequent Approval Motion**")
seeking an order from the Bankruptcy Court that (i) all the findings, conclusions and
rulings contained in the Original Approval Order and the Approval Order (A) apply to
this Agreement as amended (including the Commitment Fees, the Arrangement Fees, the
Alternate Transaction Fees and the Transaction Expenses provided for herein), the Plan
of Reorganization attached hereto as Exhibit B (the "**Plan**"), the parties hereto and the
transactions contemplated hereby and (B) continue in full force and effect with respect
thereto, and (ii) the disclosure statement attached hereto as Exhibit C ("**Disclosure
Statement**") is approved as containing adequate information pursuant to Section 1125 of
the Bankruptcy Code, which Subsequent Approval Motion was granted and order issued
on November **[8]**, 2007 (as so issued, the "**Subsequent Approval Order**" and the date of
such order being the "**Subsequent Approval Date**");"

(c)     The eighth WHEREAS clause of the EPCA is hereby amended and restated in its
entirety as follows:

"WHEREAS, the Company has proposed and submitted the Plan to the Bankruptcy Court
for its approval;"

(d)     The ninth WHEREAS clause of the EPCA is hereby amended by deleting the
words "plan of reorganization" at each occurrence of such words therein and
replacing such words with the word "Plan".

(e)     The tenth WHEREAS clause of the EPCA is hereby amended by: (i) deleting the
words "will provide, on the date hereof," and replacing them with the words
"have provided"; and (ii) deleting the words "will confirm," and replacing them
with the word "confirms".

(f)     Section 1 of the EPCA is hereby amended and restated in its entirety as follows:

"1.     Rights Offering.

(a)    The Company proposes to offer and sell shares of its new common stock, par value $0.01 per share (the "**New Common Stock**"), pursuant to a rights offering (the "**Rights Offering**").  Pursuant to the Rights Offering, the Company will distribute at no charge to each Eligible Holder (as defined below), including, to the extent applicable, the Investors, that number of rights (each, a "**Right**") that will enable each Eligible Holder to purchase up to its pro rata portion of 45,026,801 shares in the aggregate of New Common Stock (each, a "**Share**") at a purchase price of $34.98 per Share (the "**Purchase Price**").  The term "**Eligible Holder**" means the holder of a General Unsecured Claim (as such term is defined in the Plan), which claim has been allowed or otherwise estimated for the purpose of participating in the Rights Offering on or before the date established by the Bankruptcy Court for determining all Eligible Holders of record.

(b)    The Company will conduct the Rights Offering pursuant to the Plan, which shall reflect the Company's proposed restructuring transactions described in this Agreement and the Summary of Terms of Preferred Stock attached hereto as Exhibit A (the "**Preferred Term Sheet**").

(c)    The Rights Offering will be conducted as follows:

(i)    On the terms and subject to the conditions of this Agreement and subject to applicable law, the Company shall offer Shares for subscription by the holders of Rights as set forth in this Agreement.

(ii)    Promptly, and no later than four (4) Business Days, following the occurrence of both (1) the date that the Confirmation Order shall have been entered by the Bankruptcy Court and (2) the effectiveness under the Securities Act of 1933, as amended (the "**Securities Act**"), of the Rights Offering Registration Statement filed with the Securities and Exchange Commission (the "**Commission**") relating to the Rights Offering, the Company shall issue (the date of such distribution, the "**Rights Distribution Date**") to each Eligible Holder, Rights to purchase up to its pro rata portion of 45,026,801 Shares in the aggregate (the "**Basic Subscription Privilege**").  The Company will be responsible for effecting the distribution of certificates representing the Rights, the Rights Offering Prospectus and any related materials to each Eligible Holder.

(iii)    Each Eligible Holder who exercises in full its Basic Subscription Privilege will be entitled to subscribe for additional Shares offered in the Rights Offering for an amount as provided in the Plan to the extent the other Eligible Holders do not exercise all of their Rights in the Basic Subscription Privilege (the "**Over-Subscription Privilege**") with amounts in excess of the Purchase Price per Share paid pursuant to an Over-

Subscription Privilege to be aggregated and distributed as provided for in
the Plan.

(iv)     The Rights may be exercised during a period (the "**Rights Exercise
         Period**") commencing on the Rights Distribution Date and ending at the
         Expiration Time. The Rights shall not separately be transferable.
         "**Expiration Time**" means the date that is 30 days after the Rights
         Distribution Date, or such later date and time as the Company, subject to
         the prior written approval of ADAH, may specify in a notice provided to
         the Investors before 9:00 a.m., New York City time, on the Business Day
         before the then-effective Expiration Time. The Company shall use its
         reasonable best efforts to cause the effective date of the Plan (the
         "**Effective Date**") to occur as promptly as reasonably practicable after the
         Expiration Time. For the purpose of this Agreement, "**Business Day**"
         means each Monday, Tuesday, Wednesday, Thursday and Friday that is
         not a day on which banking institutions in New York City are generally
         authorized or obligated by law or executive order to close. Each Eligible
         Holder who wishes to exercise all or a portion of its Rights shall (i) during
         the Rights Exercise Period return a duly executed document to a
         subscription agent reasonably acceptable to the Company and ADAH (the
         "**Subscription Agent**") electing to exercise all or a portion of such
         Eligible Holder's Basic Subscription Privilege and specifying the number
         of Shares, if any, such Eligible Holder wishes to purchase pursuant to its
         Over-Subscription Privilege and (ii) pay an amount, equal to the full
         Purchase Price of the number of Shares that the Eligible Holder elects to
         purchase pursuant to its Basic Subscription Privilege and Over-
         Subscription Privilege, by wire transfer of immediately available funds by
         the Expiration Time to an escrow account established for the Rights
         Offering.

(v)      As soon as reasonably practicable following the Effective Date, the
         Company will issue to each Eligible Holder who validly exercised its
         Basic Subscription Privilege and, if applicable, its Over-Subscription
         Privilege, the number of Shares to which such holder of Rights is entitled
         based on the terms of the Rights Offering.

(vi)     The Company hereby agrees and undertakes to give each Investor by
         electronic facsimile transmission the certification by an executive officer
         of the Company of either (i) the number of Shares elected to be purchased
         by Eligible Holders under their Basic Subscription Privilege and, if
         applicable, their Over-Subscription Privilege, the aggregate Purchase Price
         therefor, the number of Unsubscribed Shares and the aggregate Purchase
         Price therefor (a "**Purchase Notice**") or (ii) in the absence of any
         Unsubscribed Shares, the fact that there are no Unsubscribed Shares and

that the commitment set forth in Section 2(a)(iv) is terminated (a
"**Satisfaction Notice**") as soon as practicable after the Expiration Time
and, in any event, reasonably in advance of the Closing Date (the date of
transmission of confirmation of a Purchase Notice or a Satisfaction
Notice, the "**Determination Date**").

(vii)   The Rights Offering will provide each Eligible Holder who validly
exercised its Rights with the right to withdraw a previous exercise of
Rights after the withdrawal deadline established in the Rights Offering
Registration Statement if there are changes to the Plan after the
withdrawal deadline that the Bankruptcy Court determines are materially
adverse to the holders of the Rights and the Bankruptcy Court requires
resolicitation of votes under Section 1126 of the Bankruptcy Code or an
opportunity to change previously cast acceptances or rejections of the
Plan.".

(g)   Section 2(a)(i) of the EPCA is hereby amended by replacing the number
"4,558,479" with the number "5,002,978" and by replacing the number "$38.39"
with the number "$34.98".

(h)   Section 2(a)(iii) of the EPCA is hereby amended by replacing the number
"$31.28" with the number "$29.67" and by replacing the number "12,787,724"
with the number "13,481,313".

(i)   Section 2(a)(iv) of the EPCA is hereby amended by adding the words "pursuant
to the Basic Subscription Privileges and Over-Subscription Privileges" after the
words "Rights Exercise Period".

(j)   Section 2(i) of the EPCA is hereby amended (i) by replacing the words
"Disclosure Statement Filing Date." with the words "original filing on September
6, 2007 of the Company's disclosure statement.  The Arrangement Fee and the
first fifty percent (50%) of the Commitment Fees have been paid to ADAH." and
(ii) by replacing the words "Disclosure Statement Approval Date.  The
Arrangement Fee shall be paid to ADAH upon entry of the Approval Order." with
the words "Subsequent Approval Date.".

(k)   The introductory paragraph to Section 3 of the EPCA is hereby amended (i) to
delete the words "to be delivered pursuant to Section 5(s)" appearing in the first
sentence and replacing them with the following words "delivered by the Company
to the Investors on October 29, 2007" and (ii) to delete the ":" appearing at the
end thereof and replace it with the following words ".  References in this
Agreement to the Company SEC Documents filed prior to the date hereof shall

mean Company SEC Documents filed prior to the Disclosure Letter Delivery
Date and the Company's Quarterly Report on Form 10-Q filed on November [6],
2007.[1]".

(l)     Section 3(a) of the EPCA is hereby amended in clause (vi) by replacing the words
        "or any failure to timely file periodic reports or timely prepare financial
        statements and the costs and effects of completing the preparation of the
        Company's financial statements and periodic reports" and replacing them with the
        words ", the Company's failure to timely file its Form 10-Ks for the years ended
        December 31, 2005 and 2004, and its Form 10-Qs for the quarters ended
        September 30, 2006, March 31, 2006, March 31, 2005 and September 30, 2004,
        respectively, or timely prepare the corresponding required financial statements
        (and the costs and effects of completing the preparation of those aforementioned
        financial statements and periodic reports)".

(m)     Section 3(b)(ii) of the EPCA is hereby amended (i) by deleting the words "Prior
        to the execution by the Company and filing with the Bankruptcy Court of the
        Plan, the" and replacing them with the word "The" and (ii) by adding the words
        "had and" after the words "into the Plan".

(n)     Section 3(c)(ii) of the EPCA is hereby amended by replacing the words "will be"
        with the words "has been".

(o)     Section 3(d) in the fifth sentence thereof,  Section 3(f), Section 3(g), Section 4(h),
        Section 4(i), Section 5(d), Section 8(c)(v), Section 9(a)(xv), Section 9(c)(iii) and
        Section 12(c) of the EPCA are hereby amended by deleting the word "Terms"
        after the word "Plan" at each occurrence of such words therein.

(p)     Section 3(d) in the seventh sentence thereof,  Section 3(nn), Section 3(oo),
        Section 5(b), Section 5(j), Section 6(d) the introductory paragraph to Section 8,
        Section 9(a)(vi), Section 9(a)(xiv), Section 9(a)(xix), Section 9(c)(x) and Section
        12(f) of the EPCA are hereby amended by deleting the words ", the Plan Terms"
        at each occurrence of such words therein.

(q)     Section 3(d) of the EPCA is hereby amended by (i) replacing the word "June" in
        the second sentence thereof with the word "September", (ii) replacing the number
        "561,781,500" in the second sentence thereof with the number "561,781,590",
        (iii) replacing the number "85,978,864" in the second sentence thereof with the
        number "77,847,906",  (iv) replacing the number "23,207,104" in the eighth

---

[1] Brackets to be deleted prior to execution if Investors accept 10-Q filing prior to hearing date.

sentence thereof with the number "51,583,358", (v) replacing the number
"124,400,000" with the number "136,794,982" in the ninth sentence thereof, (vi)
replacing the number "12,787,724" with the number "13,481,313" in the ninth
sentence thereof and (vii) deleting the words "and (iii) 10,419,380 shares of Series
B Preferred Stock will be issued and outstanding" and replacing them with the
words ", (iii) 11,435,378 shares of Series B Preferred Stock and (iv) 26,666,667
shares of Series C Convertible Preferred Stock, par value $0.01 per share, will be
issued and outstanding" in the ninth sentence thereof.

(r)     Section 3(i) of the EPCA is hereby amended by (i) inserting the words "included
or incorporated by reference or" immediately preceding the words "to be
included" at each occurrence of such words therein and (ii) replacing the words
"will be set forth in the Disclosure Statement," with the words "the Disclosure
Statement and will be set forth in the".

(s)     Section 3(j) of the EPCA is hereby amended by (i) inserting the words
"conformed and" immediately prior to the words "will conform" appearing in the
fifth sentence thereof and (ii) by inserting the words "did not and" immediately
preceding the words "will not" appearing in the sixth sentence thereof.

(t)     Section 3(m)(vii)(A) of the EPCA is hereby amended by inserting the words "and
dated August 21, 2007" immediately after the words "April 5, 2007".

(u)     Section 3(m)(vii)(A) and Section 3(m)(viii)(A) of the EPCA are hereby amended
by replacing the words "satisfaction of the condition with respect to the Business
Plan in accordance with Section 9(a)(xxviii) of this Agreement" with the words
"Disclosure Letter Delivery Date".

(v)     Section 3(m)(vii)(B) and Section 3(m)(viii)(B) of the EPCA are hereby amended
by replacing the words "after the satisfaction of the condition with respect to the
Business Plan in accordance Section 9(a)(xxviii) of this Agreement, the Business
Plan approved by ADAH in accordance with this Agreement," with the words
"from and after the Disclosure Letter Delivery Date, the Business Plan (and if
amended in a manner that satisfies the condition with respect to the Business Plan
set forth in Section 9(a)(xxviii), as so amended),".

(w)     Section 3(n) of the EPCA is hereby amended by replacing the words "or the
Approval Order" with the words ", the Approval Order, the Subsequent Approval
Order".

(x)     Section 3(ii) of the EPCA is hereby amended by adding the words "the Preferred
        Term Sheet or the Plan," immediately following the words "Section 8(c)(iv),"
        appearing therein.

(y)     Section 3(pp) of the EPCA is hereby amended and restated in its entirety to read
        as follows:

"(pp)   Labor MOUs.  On June 22, 2007, the Company entered into a Memorandum of
Understanding (the "**UAW MOU**") with the International Union, United Automobile,
Aerospace and Agricultural Implement Workers of America ("**UAW**") and GM.  On
August 5, 2007, the Company entered into a Memorandum of Understanding (the "**IUE-
CWA MOU**") with the International Union of Electronic, Electrical, Salaried, Machine
and Furniture Workers-Communication Workers of America ("**IUE-CWA**") and GM.
On August 16, 2007, the Company entered into two Memoranda of Understanding (the
"**USW MOUs**", and collectively with the UAW MOU and the IUE-CWA MOU, as each
such agreement has been amended through the Disclosure Letter Delivery Date, the
"**Labor MOUs**") with the United Steel, Paper and Forestry, Rubber, Manufacturing,
Energy, Allied Industrial and Service Workers International Union and its Local Union
87L (together, the "**USW**") and GM.  The UAW MOU, IUE-CWA MOU and the USW
MOUs have been ratified by the membership of the UAW, IUE-CWA and USW,
respectively, and true and complete copies of the Labor MOUs have been made available
to ADAH.".

(z)     The following paragraph should be inserted in its entirety immediately following
        Section 3(pp):

"(qq)   Debt Financing.  The Company has delivered to ADAH a correct and complete
copy of an executed "best efforts" financing letter (the "**Financing Letter**")
from [identify banks] attached hereto as Exhibit D (on the terms indicated, the "**Bank
Financing**" and, together with the GM Debt (as defined below), the "**Debt Financing**").
The Financing Letter is a legal, valid and binding obligation of the Company, and to
the knowledge of the Company, the other parties thereto, and is in full force and effect.
The Financing Letter has not been withdrawn, terminated or otherwise amended or
modified in any respect and no event has occurred which, with or without notice, lapse of
time or both, would constitute a default or breach on the part of the Company under
the Financing Letter.  The Company has fully paid any and all fees required by
the Financing Letter to be paid as of the date hereof."

(aa)    The introductory paragraph to Section 4 of the EPCA is hereby amended to
        replace the word "Each" in the first sentence thereof with the words "Except as
        set forth in a disclosure letter delivered by the Investors to the Company on the
        Disclosure Letter Delivery Date (the "**Investor Disclosure Letter**"), each".

(bb)    Section 5(a) of the EPCA is hereby amended by adding the word "Subsequent"
        immediately after the words "cause the" and the words "filing of the".

(cc)    Section 5(b) of the EPCA is hereby amended by (i) replacing the words "shall
        authorize, execute, file with the Bankruptcy Court and seek confirmation of, a
        Plan (and a related disclosure statement (the "**Disclosure Statement**"))" with the
        words "has authorized, executed and filed with the Bankruptcy Court and shall
        seek confirmation of, the Plan", (ii) replacing the words ", the Preferred Term
        Sheet and the Plan Terms," and the words ", the Preferred Term Sheet and the
        Plan Terms" with the words "and the Preferred Term Sheet" and  (iii) replacing
        the words "entry of an order by the Bankruptcy Court approving the Disclosure
        Statement (the "**Disclosure Statement Approval Date**") and the effectiveness
        under the Securities Act of the Rights Offering Registration Statement" with the
        words "Subsequent Approval Date".

(dd)    Section 5(d) of the EPCA is hereby amended by replacing the words "date the
        GM Settlement is agreed" with the words "Subsequent Approval Date" in the
        second sentence thereof.

(ee)    Section 5(i) of the EPCA are hereby amended by replacing the words "Disclosure
        Statement" with the word "Subsequent".

(ff)    The introductory paragraph of Section 5(n) of the EPCA is hereby amended and
        restated in its entirety as follows:

"(n)    Conduct of Business.  During the period from the date of this Agreement to the
Closing Date (except as otherwise expressly provided by the terms of this Agreement
including the Disclosure Letter, the Plan or any other order of the Bankruptcy Court
entered on or prior to the date hereof in the Chapter 11 Cases), the Company and its
Subsidiaries shall carry on their businesses in the ordinary course (subject to any actions
which are consistent with the, at any time prior to the Disclosure Letter Delivery Date,
Draft Business Plan or, at any time from and after the Disclosure Letter Delivery Date,
the Business Plan and at all times from and after the Disclosure Letter Delivery Date, the
Business Plan (and, if amended in a manner that satisfies the condition with respect to the
Business Plan set forth in Section 9(a)(xxviii), as so amended) and, to the extent
consistent therewith, use their commercially reasonable efforts to preserve intact their
current business organizations, keep available the services of their current officers and
employees and preserve their relationships with customers, suppliers, licensors, licensees,
distributors and others having business dealings with the Company or its Subsidiaries.
Without limiting the generality of the foregoing, except as set forth in the Disclosure
Letter, the Company and its Subsidiaries shall carry on their businesses in all material
respects in accordance with, at any time prior to the Disclosure Letter Delivery Date, the
Draft Business Plan and at all times from and after the Disclosure Letter Delivery Date,

the Business Plan (and, if amended in a manner that satisfies the condition with respect to the Business Plan set forth in <u>Section 9(a)(xxviii)</u>, as so amended) and shall not enter into any transaction that, at any time prior to the Disclosure Letter Delivery Date, would be inconsistent with the Draft Business Plan (and, if amended in a manner that satisfies the condition with respect to the Business Plan set forth in <u>Section 9(a)(xxviii)</u>, as so amended) and shall use its commercially reasonable efforts to effect such Draft Business Plan and the Business Plan. Without limiting the generality of the foregoing, and except as otherwise expressly provided or permitted by this Agreement (including the Disclosure Letter), the Plan or any other order of the Bankruptcy Court entered as of the date of the Original Agreement in these Chapter 11 Cases, prior to the Closing Date, the Company shall not, and shall cause its Subsidiaries not to, take any of the following actions without the prior written consent of ADAH, which consent shall not be unreasonably withheld, conditioned or delayed:".

(gg)    Section 5(n)(vi) of the EPCA is hereby amended (i) by replacing the word "satisfying" with the words "(and, if amended in a manner that satisfies", (ii) by replacing the word "of" with the words ", as so amended)" and (iii) by deleting the words "this Agreement, the Plan Terms,".

(hh)    Section 5(p) of the EPCA is hereby amended and restated in its entirety as follows:

"(p)    <u>GM Settlement</u>. The Company has delivered to ADAH and its counsel a copy of the Global Settlement Agreement between the Company and GM dated September 6, 2007, the Master Restructuring Agreement between the Company and GM, dated September 6, 2007 each as amended by amendments (the "**GM Amendments**") dated as of October 29, 2007 (collectively, the "**GM Settlement**"). Other than the GM Amendments, the Company shall not enter into any other agreement with GM that (i) is materially inconsistent with this Agreement and the Plan, (ii) is outside the ordinary course of business or (iii) the terms of which would have a material impact on the Investors' proposed investment in the Company. The Company has not entered into any material written agreements between or among the Company or any of its Subsidiaries and GM or any of its Subsidiaries directly relating to the Plan or the GM Settlement or the performance of the Transaction Agreements, and any such written agreements hereafter entered into will be disclosed promptly to ADAH.".

(ii)    Section 5(s) of the EPCA is hereby amended and restated in its entirety as follows:

"(s)    <u>Business Plan</u>. The Company has delivered to ADAH a final five–year business plan dated the Disclosure Letter Delivery Date (the "**Business Plan**"). The Company represents and warrants to the Investors that the Business Plan was approved by the

Company's board of directors and prepared in good faith and based on reasonable
assumptions.".

(jj)     Section 5(t) of the EPCA is hereby amended and restated in its entirety as follows:

"(t)     Financing Assistance. (i) The Company shall use its reasonable best efforts to
arrange the Bank Financing and the second lien debt to be issued to GM set forth in
Exhibit E (the "**GM Debt**") on the terms and conditions described in the Financing Letter
and in Exhibit E, including using its reasonable best efforts to (i) negotiate definitive
agreements with respect thereto on terms and conditions contained therein, (ii) satisfy on
a timely basis all conditions applicable to the Company in such definitive agreements that
are within its control and (iii) consummate the Debt Financing at the Closing. In the
event any portion of the Debt Financing becomes unavailable on the terms and conditions
contemplated in the Financing Letter or in Exhibit E, the Company shall promptly (and in
any event within one Business Day) notify ADAH of such unavailability and the reasons
therefore. The Company shall give ADAH prompt notice of any breach by any party of
the Financing Letter or any termination of the Financing Letter. The Company shall
keep ADAH informed on a reasonably current basis in reasonable detail of the status of
its efforts to arrange the Debt Financing and shall not permit any amendment or
modification to be made to, or any waiver of any provision or remedy under, in each
case, to the extent adverse to the Company or the Investors, the Financing Letter or the
terms set forth in Exhibit E. The Company shall provide notice to ADAH promptly upon
receiving the Debt Financing and shall furnish correct and complete copies of the
definitive agreements with respect thereto to ADAH promptly upon their execution.
Subject to applicable regulatory or NASD requirements, Merrill and UBS (or their
Affiliates) shall be entitled to participate in the Debt Financing on market terms. The
Company and its Subsidiaries shall execute and deliver any commitment letters,
underwriting or placement agreements, registration statements, pledge and security
documents, other definitive financing documents, or other requested certificates or
documents necessary or desirable to obtain the Debt Financing. The Company will (i)
provide to ADAH and its counsel a copy of all marketing information, term sheets,
commitment letters and agreements related to the Debt Financing and a reasonable
opportunity to review and comment on such documents prior to such document being
distributed, executed or delivered or filed with the Bankruptcy Court, (ii) duly consider in
good faith any comments of ADAH and its counsel consistent with the Agreement, the
Preferred Term Sheet and the Plan and any other reasonable comments of ADAH and its
counsel and shall not reject such comments without first discussing the reasons therefor
with ADAH or its counsel and giving due consideration to the views of ADAH and its
counsel, and (iii) keep ADAH reasonably informed on a timely basis of developments in
connection with the Debt Financing and provide the Investors with an opportunity to
attend and participate in meetings and/or roadshows with potential providers of the Debt
Financing.".

(kk)    Section 5(u), Section 12(d)(ii) and Section 12(d)(iv) of the EPCA are hereby
        amended by deleting such section and replacing it with the word "[Reserved].".

(ll)    Section 5(w) of the EPCA is hereby amended and restated in its entirety as
        follows:

"(w)    Agreement on Key Documentation.  The Company shall use its commercially
reasonable efforts to agree on or prior to the date of issuance of the Confirmation Order
on the terms of the Amended and Restated Constituent Documents, the Series A
Certificate of Designations, the Series B Certificate of Designations and the Series C
Certificate of Designations, the Shareholders Agreement and the Registration Rights
Agreement with ADAH and any other Transaction Agreements.".

(mm)    Section 5(y) of the EPCA is hereby amended and restated in its entirety as
        follows:

"(y)    Termination of Commitment Letters.  The Company acknowledges and agrees
that (i) the various commitment letters of Appaloosa in favor of ADAH and the
Company, and of Harbinger Fund in favor of Harbinger and the Company, each dated
January 18, 2007 and August 3, 2007, respectively, and (ii) the commitment letter of
Pardus Special Opportunities Master Fund L.P. in favor Pardus and the Company dated
as of August 3, 2007, have been terminated and are of no further force or effect and that
each of Appaloosa, Harbinger Fund and Pardus Special Opportunities Master Fund L.P.
shall have no further liability or obligation under those commitment letters.".

(nn)    Section 6(a) of the EPCA is hereby amended by inserting the words "any
        amendments to" prior to the words "the Disclosure Statement".

(oo)    Section 6(b), in the second sentence thereof, and Section 7, in the first sentence
        thereof, of the EPCA are hereby amended by replacing the words "Disclosure
        Statement Filing Date" with the words "Subsequent Approval Date".

(pp)    Section 8(b) and Section 8(c) of the EPCA is hereby amended by deleting the
        words "the PSA,".

(qq)    Section 8(c) of the EPCA is hereby amended by (i) in (c)(iii), replacing the words
        ", and certain of the Investors" with the words " and ADAH", (ii) in (c)(iv)
        deleting the words "among the Company and the Investors", (iii) in (c)(iv)(a),
        replacing the words "by the Investors, any Related Purchasers and the Ultimate
        Purchasers of the Unsubscribed Shares, the Direct Subscription Shares and the
        Series B Preferred Shares" with the words "of Registrable Securities (as defined

in the Preferred Term Sheet)", (iv) in (c)(iv)(c) and (c)(iv)(d), inserting the words "and GM and, to the extent customary and appropriate, the selling shareholders under the Resale Registration Statement" after the words "Investors" and "Investor", respectively, and (v) in (c)(vi), by replacing the words "and the Series B" with the words ", the Series B Certificate of Designations and the Series C".

(rr)   Section 9(a)(i) of the EPCA is hereby amended by (i) in the first sentence, inserting the word "Subsequent" between the words "The" and "Approval" and (ii) in the second sentence, replacing the words "Approval Order" with the word "order".

(ss)   Section 9(a)(iv) of the EPCA is hereby amended and restated in its entirety as follows:

"(iv)   <u>Release</u>. The Confirmed Plan shall provide for (A) the release of each Investor (in its capacity as such or otherwise), its Affiliates, shareholders, partners, directors, officers, employees and advisors from liability for participation in the transactions contemplated by the Original Agreement, this Agreement, the Preferred Term Sheet, the Original PSA and the Plan and any other investment in the Company discussed with the Company whether prior to or after the execution of the foregoing to the fullest extent permitted under applicable law, (B) the exculpation of each Investor (in its capacity as such or otherwise), its Affiliates, shareholders, partners, directors, officers, employees and advisors with respect to all of the foregoing actions set forth in subclause (A) and additionally to the same extent the Company's directors, officers, employees, attorneys, advisors and agents are otherwise exculpated under the Plan, and (C) the release of each Investor (in its capacity as an investor), its Affiliates, shareholders, partners, directors, officers, employees and advisors to the same extent the Company's directors, officers, employees, attorneys, advisors and agents are otherwise released under the Plan; <u>provided</u>, that such releases and exculpations shall not prohibit or impede the Company's ability to assert defenses or counterclaims in connection with or relating to the Original Agreement or the Original PSA.".

(tt)   Section 9(a)(v) of the EPCA is hereby amended by deleting the words "the Plan Terms and".

(uu)   Section 9(a)(ix) of the EPCA is hereby amended by deleting the words "Confirmed Plan" appearing therein and replacing them with the words "Plan approved by the Bankruptcy Court in the Confirmation Order (the "**Confirmed Plan**")".

(vv)   Section 9(a)(xix) of the EPCA is hereby amended and restated in its entirety as follows:

"(xix) Financing. (A) The Company shall have received the proceeds of the Debt Financings and the Rights Offering that, together with the proceeds of the sale of the Investor Shares, are sufficient to fund fully the transactions contemplated by this Agreement, the Preferred Term Sheet, the GM Settlement (to the extent the Company is to fund such transactions) and the Plan; and (B) undrawn availability under, plus any open letters of credit pursuant to, the asset backed revolving loan facility described in Exhibit D shall be no less than $1.4 billion; provided, that such open letters of credit shall not exceed, in the aggregate, $100 million.".

(ww)   Section 9(a)(xx) of the EPCA is hereby amended and restated in its entirety as follows:

"(xx)   Interest Expense. The Company shall have demonstrated, to the reasonable satisfaction of ADAH, that the pro forma interest expense (cash or noncash) for the Company during 2008 on the Company's Indebtedness will not exceed $575 million and ADAH shall have received from Delphi a certificate of a senior executive officer with knowledge of the foregoing to this effect with reasonably detailed supporting documentation to support such amount.".

(xx)   Section 9(a)(xxii) of the EPCA is hereby amended and restated in its entirety as follows:

"(xxii) Trade and Other Unsecured Claims. The aggregate amount of all Trade and Other Unsecured Claims (as defined in the Plan) that have been asserted or scheduled but not yet disallowed shall be allowed or estimated for distribution purposes by the Bankruptcy Court to be no more than $1.45 billion, excluding all allowed accrued post-petition interest thereon; provided, that if ADAH waives this condition and the Company issues any shares of Common Stock pursuant to the Plan (after giving effect to any cash or other consideration provided to holders of Trade and Other Unsecured Claims under the Plan) as a result of Trade and Other Unsecured Claims aggregating in excess of $1.45 billion ("**Excess Shares**"), then (i) the Company shall issue to the Investors additional Direct Subscription Shares (in the proportions set forth in Schedule 2), without the payment of any additional consideration therefor, in such amount in the aggregate that is sufficient to ensure that the percentage of shares of outstanding Common Stock that such Investors would have owned on the Closing Date had such Excess Shares not been issued (assuming for this purpose that all Excess Shares are issued on the Closing Date) is maintained and (ii) the issuance of shares of Common Stock described in this Section 9(a)(xxii) shall be treated as an issuance of Common Stock without consideration for purposes of the anti-dilution provisions of the Preferred Shares and shall result in an adjustment to the conversion price of the Preferred Shares pursuant to the Series A Certificate of Designation and Series B Certificate of Designations.".

(yy)    Section 9(a)(xxvi) of the EPCA is hereby amended by inserting the words "after
the Disclosure Letter Delivery Date" immediately after to the words "shall not
have occurred" at each occurrence of such words therein.

(zz)    Section 9(a)(xxvii) of the EPCA is hereby amended (i) by, in the first sentence,
replacing the words "the final Business Plan satisfying the condition with respect
to the Business Plan set forth in Section 9(a)(xxviii) of this Agreement" with the
words "the Business Plan" at each occurrence of such words therein and (ii) by, in
the third sentence, replacing the words "$7,159 million" with the words "$5.2
billion".

(aaa)    Section 9(a)(xxviii) of the EPCA is hereby amended and restated in its entirety as
follows:

"(xxviii) Plan, Delivered Investment Documents and Material Investment
Documents.

(A)    (i) The Company shall have delivered to ADAH prior to each
Relevant Date and ADAH shall have made the determination
referred to in Section 9(a)(xxviii)(B) with respect to all Material
Investment Documents. The term "**Material Investment
Documents**" shall mean the Confirmation Order, the Rights
Offering Registration Statement, any amendments or supplements
to the Delivered Investment Documents, the Amended and
Restated Constituent Documents, the Series A Certificate of
Designations, the Series B Certificate of Designations, Series C
Certificate of Designations, the Shareholders Agreement, the
Registration Rights Agreement, the Transaction Agreements and
any amendments and/or supplements to the foregoing. The term
"**Delivered Investment Documents**" shall mean, the GM Settle-
ment, the Plan, the Disclosure Statement, the Business Plan and the
Labor MOUs. The term "**Relevant Date**" shall mean the date of
issuance of the Confirmation Order and the Closing Date.

(ii) With respect to any agreement that is a Material Investment
Document or a Delivered Investment Document and was or is
entered into in satisfaction of the condition set forth in Section
9(a)(xxviii), at each Relevant Date (i) such agreement shall remain
in full force and effect and shall not have been rescinded,
terminated, challenged or repudiated by any party thereto and
(ii) the parties to such agreement, shall have performed and
complied with all of their respective covenants and agreements
contained in such agreement in all material respects through the
Closing Date. The Business Plan (and, if amended in a manner

that satisfies the condition with respect to the Business Plan set
forth in this Section 9(a)(xxviii), as so amended) shall not have
been rescinded or repudiated in any material respect by the Com-
pany or its Board of Directors.

(B)    With respect to any Material Investment Document (other than
amendments or supplements to the GM Settlement), ADAH shall
have determined within the time frames set forth in Section
9(a)(xxviii)(C), that it is reasonably satisfied with the terms thereof
to the extent such terms would have a material impact on the
Investors' proposed investment in the Company.  With respect to
any amendments or supplements to the GM Settlement ADAH
shall have determined that it is satisfied with the GM Settlement as
so amended or supplemented in its reasonable discretion taking
into account whether it has a material impact on the Investors'
proposed investment in the Company and other relevant factors.

(C)    The conditions referred to in clause (A) above shall be deemed to
have been conclusively satisfied without further action by any
Party unless:

(1)    [Reserved];

(2)    [Reserved];

(3)    with respect to any Material Investment Document (or any
amendment or supplement thereto) delivered to ADAH by
the Company prior to the date of issuance of the Confirma-
tion Order, ADAH has delivered (and has not withdrawn),
within ten (10) days of delivery by the Company of the
final form of such document, accompanied by a written
request for approval of such document, a written deficiency
notice to the Company reasonably asserting with
reasonable specificity that such condition is not satisfied,
and the Company shall not have cured such deficiency
within ten (10) days of the Company's receipt of such
notice (the "**Cure Period**"); and

(4)    with respect to any Material Investment Document (or any
amendment or supplement thereto) delivered to ADAH by
the Company after the date of issuance of the Confirmation
Order and prior to the Closing Date, ADAH has delivered

(and has not withdrawn), within five (5) Business Days of delivery by the Company of the final form of such document accompanied by a written request for approval of such documents, a written deficiency notice to the Company reasonably asserting with reasonable specificity that such condition is not satisfied and the Company shall not have cured such deficiency during the Cure Period.".

(bbb)   Inserting the following immediately after Section 9(a)(xxiii) of the EPCA:

"(xxix) PBGC Liens.  ADAH shall be reasonably satisfied that the Company has obtained an agreement of the PBGC that such liens will be withdrawn in accordance with applicable law and shall have received evidence satisfactory to ADAH to that effect.".

(ccc)   Section 9(c)(i) of the EPCA is hereby amended by inserting the word "Subsequent" between the word "The" and the word "Approval".

(ddd)   Section 11(b) of the EPCA is hereby amended by replacing (i) the words "Disclosure Statement" with the words "Subsequent" at each occurrence of such words therein and (ii) the words "Filing Date" with the words "Approval Date" at each occurrence of such words therein.

(eee)   Section 12(d)(i) of the EPCA is hereby amended (i) by deleting the words "August 16, 2007" and replacing them with the words "November 20, 2007", (ii) by deleting the words "August 31, 2007" and replacing them with the words "December 14, 2007", and (iii) by inserting the word "Subsequent" between the word "the" and the word "Approval" at each occurrence therein.

(fff)   Section 13(b) is hereby amended by inserting the words "Facsimile:  (212) 521-6972" directly beneath the words "Attn:  Philip A. Falcone".

(ggg)   (i) Section 13(e) and the signature bloc of the EPCA are hereby amended by inserting a "," after the word "Goldman" at each occurrence of such word therein and (ii) Section 13(e) is hereby amended by inserting "LLP" after the word "Cromwell".

(hhh)   Section 15 of the EPCA is hereby amended by inserting the following after the
first paragraph:

"Notwithstanding anything to the contrary in the Plan (including any amendments,
supplements or modifications thereto) or the Confirmation Order (and any amendments,
supplements or modifications thereto), if any of the terms of the Plan (including any
amendments, supplements or modifications thereto) or Confirmation Order (including
any amendments, supplements or modifications thereto) conflict with any of the terms of
this Agreement, the terms of this Agreement shall govern.".

(iii)   Schedule 1 to the EPCA is replaced in its entirety with Schedule 1 hereto.

(jjj)   Schedule 2 to the EPCA is replaced in its entirety with Schedule 2 hereto.

(kkk)   Exhibit A to the EPCA is replaced in its entirety with Exhibit A hereto.

(lll)   Exhibit B to the EPCA is replaced in its entirety with Exhibit B hereto.

(mmm)Exhibit C hereto should be inserted immediately following Exhibit B to the
EPCA.

(nnn)   Exhibit D hereto should be inserted immediately following Exhibit C to the
EPCA.

(ooo)   Exhibit E hereto should be inserted immediately following Exhibit D to the
EPCA.

2.   Effectiveness. This Amendment shall become effective (the "**Effective Date**")
immediately upon (i) its execution by all the parties hereto and (ii) upon entry by the
Bankruptcy court of the Subsequent Approval Order. On and after the Effective Date,
each reference in the EPCA to "this Agreement," "hereunder," "hereof," "herein" or
words of like import referring to the EPCA, shall mean and be a reference to the EPCA as
amended by this Amendment. This Amendment shall operate as an amendment of the
provisions of the EPCA referred to specifically herein. Except as specifically amended
by this Amendment and as set forth in the preceding sentence, the EPCA shall remain in
full force and effect. Except as expressly provided herein, this Amendment shall not be
deemed to be a waiver of, or consent to, or a modification or amendment of, any other
term or condition of the EPCA.

3.   <u>Assignment</u>.  Neither this Amendment nor any of the rights, interests or obligations under this Amendment will be assigned by any of the parties (whether by operation of law or otherwise) without the prior written consent of the other parties, except in accordance with Section 14 of the EPCA.

4.   <u>Third Party Beneficiaries</u>.  Except as otherwise provided in the EPCA, this Amendment (including the documents and instruments referred to in this Amendment) is not intended to and does not confer upon any person other than the parties hereto any rights or remedies under this Amendment.

5.   <u>Prior Negotiations; Entire Agreement</u>.  This Amendment (including the documents and instruments referred to in this Amendment) constitutes the entire agreement of the parties with respect to the subject matter of this Amendment and supersedes all prior agreements, arrangements or understandings, whether written or oral, among the parties with respect to the to the to the subject matter of this Amendment.

6.   <u>Miscellaneous</u>.  The provisions of Sections 13, 16, 17, 18, 20 and 21 of the EPCA shall apply to this Amendment.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be signed
by their respective officers thereunto duly authorized, all as of the date first written above.

DELPHI CORPORATION

By: _____
      Name:
      Title:

A-D ACQUISITION HOLDINGS, LLC

By: _____
      Name:
      Title:

HARBINGER DEL-AUTO INVESTMENT
COMPANY, LTD.

By: _____
      Name:
      Title:

MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED

By: _____
      Name:
      Title:

UBS SECURITIES LLC

By: _____
      Name:
      Title:

By: _____

    Name:

    Title:


GOLDMAN, SACHS & CO.


By: _____

    Name:

    Title:


PARDUS DPH HOLDING LLC


By: _____

    Name:

    Title:

Defined Term                                                    Section

ADAH ............................................................................ Preamble
Additional Investor Agreement ......................................... Section 2 (k)
Affiliate ......................................................................... Section 2 (a)
Agreement ...................................................................... Preamble
Alternate Transaction ...................................................... Section 9 (a)(v)
Alternate Transaction Agreement ..................................... Section 9 (a)(v)
Alternate Transaction Fee ................................................ Section 12 (g)
Alternative Financing ...................................................... Section 2 (b)
Amended and Restated Constituent Documents ............... Section 8 (c)
Appaloosa ....................................................................... Recitals
Approval Motion ............................................................. Recitals
Approval Order ............................................................... Recitals
Arrangement Fee ............................................................. Section 2 (h)(iii)
Assuming Investor .......................................................... Section 11 (b)
Available Investor Shares ................................................ Section 2 (b)
Bank Financing ............................................................... Section 3 (qq)
Bankruptcy Code ............................................................ Recitals
Bankruptcy Court ............................................................ Recitals
Bankruptcy Rules ............................................................ Section 3 (b)(i)
Basic Subscription Period ................................................ Section 1 (c)(ii)
Breaching Investor .......................................................... Section 11 (b)
Business Day ................................................................... Section 1 (c)(iv)
Business Plan .................................................................. Section 5 (s)
Capital Structure Date ..................................................... Section 3 (d)
Cerberus ......................................................................... Recitals
Change of Recommendation ............................................ Section 9 (a)(vi)
Chapter 11 Cases ............................................................ Recitals
Closing Date ................................................................... Section 2 (d)
Closing Date Outside Date ............................................... Section 12 (d)(iii)
Code ............................................................................... Section 3 (z)(ii)
Commission .................................................................... Section 1 (c)(ii)
Commitment Fees ........................................................... Section 2 (h)(ii)
Commitment Parties ........................................................ Recitals
Company ......................................................................... Preamble
Company ERISA Affiliate ............................................... Section 3 (z)(ii)
Company Plans ............................................................... Section 3 (z)(i)
Company SEC Documents ............................................... Section 3 (j)
Confirmation Order ......................................................... Section 9 (a)(vii)
Confirmed Plan ............................................................... Section 9 (a)(ix)
Consideration Period ....................................................... Section 12 (f)(ii)
Cure Period .................................................................... Section 9 (a)(xxviii)(C)(3)
Debt Financing ............................................................... Section 3 (qq)
Debtors ........................................................................... Recitals
Delivered Investment Documents ..................................... Section 9(a)(xxviii)(A)(i)

## Defined Term                                                    Section

| Defined Term | Section |
|---|---|
| Determination Date | Section 1 (c)(vi) |
| DGCL | Section 3 (oo) |
| Direct Subscription Shares | Section 2 (a)(i) |
| Disclosure Letter | Section 3 |
| Disclosure Letter Delivery Date | Section 3 |
| Disclosure Statement | Recitals |
| Disinterested Director | Section 8 (c) |
| Dolce | Recitals |
| Draft Business Plan | Section 3 (m)(vii) |
| Effective Date | Section 1 (c)(iv) |
| Eligible Holder | Section 1 (a) |
| Environmental Laws | Section 3 (x)(i) |
| Equity Commitment Letter | Section 4 (o) |
| ERISA | Section 3 (z)(i) |
| Exchange Act | Section 3 (i) |
| Existing Shareholder Rights Plan | Section 3 (d) |
| Expiration Time | Section 1 (c)(iv) |
| E&Y | Section 3 (q) |
| Final Approval Order | Section 9 (a)(i) |
| Financing Letter | Section 3 (qq) |
| Financing Order | Section 2 (j) |
| GAAP | Section 3 (i) |
| GM | Recitals |
| GM Debt | Section 5 (t) |
| GM Settlement | Section 5 (p) |
| GS | Preamble |
| Harbinger | Preamble |
| Harbinger Fund | Recitals |
| HSR Act | Section 3 (g) |
| Indebtedness | Section 9 (a)(xxvii) |
| Indemnified Person | Section 10 (a) |
| Indemnifying Party | Section 10 (a) |
| Intellectual Property | Section 3 (s) |
| Investment Decision Package | Section 3 (k)(iii) |
| Investor | Preamble |
| Investor Default | Section 2 (b) |
| Investor Disclosure Letter | Section 4 |
| Investors | Preamble |
| Investor Shares | Section 2 (a) |
| Issuer Free Writing Prospectus | Section 3 (k)(iv) |
| IUE-CWA | Section 3 (pp) |
| IUE-CWA MOU | Section 3 (pp) |
| knowledge of the Company | Section 22 |
| Labor MOUs | Section 3 (pp) |

Defined Term                                                    Section

Limited Termination ............................................. Section 12 (d)
Losses.................................................................. Section 10 (a)
Material Adverse Effect....................................... Section 3 (a)
Material Investment Documents.......................... Section 9 (a)(xxviii)
Maximum Number............................................... Section 2 (a)
Merrill ................................................................ Preamble
Money Laundering Laws...................................... Section 3 (ee)
Monthly Financial Statements ............................ Section 5 (r)
Multiemployer Plans............................................ Section 3 (z)(ii)
Net Amount......................................................... Section 9 (a)(xxvii)
New Common Stock............................................. Section 1 (a)
OFAC.................................................................. Section 3 (ff)
Option ................................................................ Section 3 (d)
Options................................................................ Section 3 (d)
Original Agreement ............................................ Recitals
Original Approval Motion ................................... Recitals
Original Approval Order...................................... Recitals
Original Investors................................................ Recitals
Original PSA....................................................... Recitals
Over-Subscription Privilege................................ Section 1 (c)(iii)
Pardus................................................................. Preamble
Plan .................................................................... Recitals
Preferred Commitment Fee................................. Section 2 (h)(i)
Preferred Shares ................................................. Section 2 (a)
Preferred Term Sheet .......................................... Section 1 (b)
Preliminary Rights Offering Prospectus ............. Section 3 (k)(v)
Proceedings......................................................... Section 10 (a)
Purchase Notice .................................................. Section 1 (c)(vi)
Purchase Price..................................................... Section 1 (a)
Registration Rights Agreement........................... Section 8 (c)
Related Purchaser................................................ Section 2 (a)
Relevant Date...................................................... Section 9 (a)(xxviii)(A)(i)
Resale Registration Documents .......................... Section 8 (c)
Resale Registration Statement ............................ Section 8 (c)
Restricted Period................................................. Section 5 (j)
Right.................................................................... Section 1 (a)
Rights Distribution Date ..................................... Section 1 (c)(ii)
Rights Exercise Period........................................ Section 1 (c)(iv)
Rights Offering ................................................... Section 1 (a)
Rights Offering Prospectus ................................. Section 3 (k)(ii)
Rights Offering Registration Statement.............. Section 3 (k)(i)
Satisfaction Notice.............................................. Section 1 (c)(vi)
Securities Act...................................................... Section 1 (c)(ii)
Securities Act Effective Date.............................. Section 3 (k)(vi)

| Defined Term | Section |
|---|---|
| Series A Certificate of Designations | Section 2 (a)(iii) |
| Series A Preferred Stock | Section 2 (a)(iii) |
| Series A Purchase Price | Section 2 (a)(iii) |
| Series B Certificate of Designations | Section 2 (a)(i) |
| Series B Preferred Stock | Section 2 (a)(i) |
| Share | Section 1 (a) |
| Shareholders Agreement | Section 8 (c) |
| Significant Subsidiary | Section 3 (a) |
| Single-Employer Plan | Section 3 (z)(ii) |
| Standby Commitment Fee | Section 2 (h)(ii) |
| Stock Plans | Section 3 (d) |
| Subscription Agent | Section 1 (c)(iv) |
| Subsequent Approval Date | Recitals |
| Subsequent Approval Motion | Recitals |
| Subsequent Approval Order | Recitals |
| Subsidiary | Section 3 (a) |
| Superior Transaction | Section 12 (f) |
| Takeover Statute | Section 3 (oo) |
| Taxes | Section 3 (y) |
| Tax Returns | Section 3 (y)(i) |
| Transaction Agreements | Section 3 (b)(i) |
| Transaction Expenses | Section 2 (j) |
| Transformation Plan | Section 3 (m)(vi) |
| UAW | Section 3 (pp) |
| UAW MOUs | Section 3 (pp) |
| UBS | Preamble |
| Ultimate Purchasers | Section 2 (k) |
| Unsubscribed Shares | Section 2 (a)(iv) |
| USW | Section 3 (pp) |
| USW MOUs | Section 3 (pp) |

SCHEDULE 2

| Investor | Direct Subscription Shares | Direct Subscription Shares Purchase Price | Maximum Backstop Shares | Maximum Backstop Shares Purchase Price | Maximum Total Common Shares | Maximum Total Common Shares Purchase Price | Series A Preferred Stock[2] | Purchase Price | Series B Preferred Stock[3] | Purchase Price | Total Purchase Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ADAH | 1,933,680 | $67,638,500 | 17,403,120 | $608,746,500 | 19,336,800 | $676,385,000 | 13,481,313 | $400,000,000 | - | $- | $1,076,385,000 |
| Del-Auto | 771,104 | $26,972,600 | 6,939,939 | $242,753,400 | 7,711,043 | $269,726,000 | - | - | 3,645,027 | $127,500,000 | $397,226,000 |
| Merrill | 291,221 | $10,186,650 | 2,620,988 | $91,679,850 | 2,912,209 | $101,866,500 | - | - | 1,858,249 | $65,000,000 | $166,866,500 |
| UBS | 291,221 | $10,186,650 | 2,620,988 | $91,679,850 | 2,912,209 | $101,866,500 | - | - | 1,858,249 | $65,000,000 | $166,866,500 |
| GS | 1,043,478 | $36,500,000 | 9,391,300 | $328,500,000 | 10,434,778 | $365,000,000 | - | - | 1,000,596 | $35,000,000 | $400,000,000 |
| Pardus | 672,274 | $23,515,600 | 6,050,466 | $211,640,400 | 6,722,740 | $235,156,000 | - | - | 3,073,257 | $107,500,000 | $342,656,000 |
| Total | 5,002,978 | $175,000,000 | 45,026,801 | $1,575,000,000 | 50,029,779 | $1,750,000,000 | 13,481,313 | $400,000,000 | 11,435,378 | $400,000,000 | $2,550,000,000 |

**Proportionate Share of Preferred Commitment Fee:**

| | |
|---|---|
| ADAH | 50.4861% |
| Del-Auto | 15.9375% |
| Merrill | 8.1250% |
| UBS | 8.1250% |
| GS | 3.8889% |
| Pardus | 13.4375% |
| Total | 100% |

**Proportionate Share of Standby Commitment Fee:**

| | |
|---|---|
| ADAH | 40.3977% |
| Del-Auto | 15.4712% |
| Merrill | 6.0769% |
| UBS | 6.0769% |
| GS | 18.5397% |
| Pardus | 13.4375% |
| Total | 100% |

**Proportionate Share of Alternate Transaction Fee:**

| | If full Commitment Fee received | If no Commitment Fee received |
|---|---|---|
| ADAH | 54.3750% | 46.8555% |
| Del-Auto | 15.9375% | 15.7150% |
| Merrill | 8.1250% | 7.1475% |
| UBS | 8.1250% | 7.1475% |
| GS | 0% | 9.6970% |
| Pardus | 13.4375% | 13.4375% |
| Total | 100% | 100% |

[2] Common stock equivalent units.

[3] Common stock equivalent units.

[4] Percentages will fluctuate depending on the amount of any Commitment Fee received.

Summary of Terms of Preferred Stock

EXHIBIT A

**SUMMARY OF TERMS OF
SERIES A-1 PREFERRED STOCK,
SERIES A-2 PREFERRED STOCK,
AND SERIES B PREFERRED STOCK**

*Set forth below is a summary of indicative terms for a potential investment in Delphi Corporation by entities or funds controlled by Appaloosa Management, Harbinger Capital Partners, Merrill Lynch, Pierce, Fenner & Smith Incorporated., UBS Securities, Goldman, Sachs & Co. and Pardus Special Opportunities Master Fund L.P. The investment is being made in connection with a Plan of Reorganization of Delphi Corporation under chapter 11 of the Bankruptcy Code. The terms set forth below are intended solely to provide a framework for the parties as they proceed with discussions of the proposed transaction and do not constitute any agreement with respect to the definitive terms for any transaction or any agreement to agree or any solicitation of acceptances or rejections of any plan of reorganization. While the parties expect to negotiate in good faith with respect to the terms for a transaction, any party shall be free to discontinue discussions and negotiations at any time for any reason or no reason. No party shall be bound by the terms hereof and only execution and delivery of definitive documentation relating to the transaction shall result in any binding or enforceable obligations of any party relating to the transaction.*

| | |
|---|---|
| **Issuer:** | Delphi Corporation (the "***Company***"), a corporation organized under the laws of Delaware and a successor to Delphi Corporation, as debtor in possession in the chapter 11 reorganization case (the "***Bankruptcy Case***") pending in the United States Bankruptcy Court for the Southern District of New York. |
| **Investors:** | Entities or funds controlled by Appaloosa Management ("***Appaloosa***"), Harbinger Capital Partners ("***Harbinger***"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("***Merrill***"), UBS Securities ("***UBS***"), Goldman, Sachs & Co. ("***GS***") and Pardus Special Opportunities Master Fund L.P. ("***Pardus***" and together with Harbinger, Merrill, UBS and GS, the "***Co-Lead Investors***"), with the Series B Preferred Stock to be purchased by the Co-Lead Investors allocated as follows: (a) Harbinger—31.875%; (b) Merrill—16.25%; (c) UBS—16.25%; (d) GS—8.75%; and (e) Pardus—26.875%. Appaloosa or any Permitted Holder (as defined below) shall be the exclusive purchaser and sole beneficial owner for all purposes hereunder of the Series A-1 Preferred Stock (as defined below). Appaloosa, Harbinger, Merrill, UBS, GS and Pardus are collectively referred to as the "***Investors***." |
| **Securities to be Issued:** | Series A-1 Senior Convertible Preferred Stock, par value $0.01 per share (the "***Series A-1 Preferred Stock***"). The Series A-1 Preferred Stock shall convert to Series A-2 Preferred Stock (the "***Series A-2 Preferred Stock***" and, together with the Series A-1 Preferred Stock, the "***Series A Preferred Stock***") in certain circumstances described in this term sheet. |
| | Series B Senior Convertible Preferred Stock, par value $0.01 per share |

(the *"Series B Preferred Stock"* and, together with the Series A Preferred Stock, the *"Preferred Stock"*).

The Series B Preferred Stock shall be identical in all respect to the Series A-1 Preferred Stock except as specifically set forth below.

The Series A-2 Preferred Stock shall be identical in all respect to the Series A-1 Preferred Stock except it shall not have Voting Rights and Governance Rights (as defined below).

The (i) Series A-1 Preferred Stock and the shares of Common Stock underlying such Series A-1 Preferred Stock may not be, directly or indirectly, sold, transferred, assigned, pledged, donated, or otherwise encumbered or disposed of by any Series A Preferred Stock Holder (as defined below), during the two years following the effective date (the *"Effective Date"*) of the Company's plan of reorganization in the Bankruptcy case (the *"Plan"*) other than in whole pursuant to a sale of the Company (as defined below) (provided, however, that in any sale of Series A-1 Preferred Stock in connection with a sale of the Company, the seller of the Series A-1 Preferred Stock may receive consideration with a value no greater than the greater of (i) the fair market value of the Series A-1 Preferred Stock (or a preferred security of equivalent economic value), such fair market value not to reflect the value of the Voting Rights and Governance Rights attributable to the Series A-1 Preferred Stock, and (ii) the Liquidation Value) and (ii) Series B Preferred Stock and the shares of Common Stock underlying such Series B Preferred Stock, or any interest or participation therein may not be, directly or indirectly, sold, transferred, assigned, pledged or otherwise encumbered or disposed of (including by exercise of any registration rights) during the ninety days following the Effective Date other than in whole pursuant to a sale of the Company (each of (i) and (ii), the *"Transfer Restriction"*). A *"sale of the Company"* means the sale of the Company to a party or parties other than, and not including, Appaloosa or any affiliate of Appaloosa (for this purpose, an "affiliate" of Appaloosa shall not include any company in which a fund managed by Appaloosa or its affiliates invests and does not control) pursuant to which such party or parties acquire (i) the capital stock of the Company possessing the voting power under normal circumstances to elect a majority of the Company's Board of Directors (whether by merger, consolidation or sale or transfer of the Company's capital stock) or (ii) all or substantially all of the Company's assets determined on a consolidated basis.

**Purchase of Preferred Stock:**    At the Effective Date, (i) Appaloosa will purchase all of the 13,481,313 shares of Series A-1 Preferred Stock for an aggregate purchase price of $400 million and (ii) the Co-Lead Investors shall purchase all of the 11,435,378 shares of Series B Preferred Stock, for an aggregate purchase price of $400 million. The aggregate stated value of the Series A-1 Preferred Stock shall be $400 million and the aggregate stated value of

the Series B Preferred Stock shall be $400 million (in each case, the *"Stated Value"*).

**Mandatory Conversion into Common Stock:** The Company shall convert into Common Stock all, but not less than all, of the (i) Series A Preferred Stock on the first date the Mandatory Conversion Requirements are satisfied (but in no event earlier than August 31, 2012[1]) at the Conversion Price (as defined below) of the Series A Preferred Stock in effect on such conversion date, and (ii) Series B Preferred Stock on the first day the Mandatory Conversion Requirements are satisfied (but in no event earlier than the third anniversary of the Effective Date) at the Conversion Price (as defined below) of the Series B Preferred Stock in effect on such conversion date.

The *"Mandatory Conversion Requirements"* set forth in this section are as follows: (i) the closing price for the Common Stock for at least 35 trading days in the period of 45 consecutive trading days immediately preceding the date of the notice of conversion shall be equal to or greater than $55 per share and (ii) the Company has at the conversion date an effective shelf registration covering resales of the shares of Common Stock received upon such conversion of the Preferred Stock.

The Company will provide each Preferred Stock Holder (as defined below) with notice of conversion at least five (5) business days prior to the date of conversion.

The holders of the Series A Preferred Stock (the *"Series A Preferred Stock Holders"* and each, a *"Series A Preferred Stock Holder"*) will agree not to take any action to delay or prevent such registration statement from becoming effective.

**Liquidation Rights:** In the event of any liquidation, dissolution or winding up of the Company, whether voluntary or involuntary, the holders of Preferred Stock (the *"Preferred Stock Holders"* and each, a *"Preferred Stock Holder"*) shall receive, in exchange for each share, out of legally available assets of the Company, (A) a preferential amount in cash equal to (i) the Stated Value plus (ii) the aggregate amount of all accrued and unpaid dividends or distributions with respect to such share (such amount being referred to as the *"Liquidation Value"*) and (B) a non-preferential amount (if any) in cash (the *"Common Equivalent Amount"*) equal to (i) the amount that Preferred Stock Holder would have received pursuant to the liquidation if it had converted its Preferred Stock into Common Stock immediately prior to the liquidation minus (ii) any amounts received pursuant to (A)(i) and (ii) hereof (the Stated Value and dividends and distributions). For the avoidance of doubt, this paragraph should operate so that in the event of a liquidation, dissolution or winding up of the business of the Company, a Preferred Stock Holder

---

[1] Assumes emergence by February 29, 2008. Conversion date to be adjusted day-by-day to reflect any later date.

shall receive a total amount, in cash, equal to the greater of: (i) the
Liquidation Value and (ii) the amount that a Preferred Stock Holder
would have received pursuant to the liquidation, dissolution or winding
up of the business if it converted its Preferred Stock into Common Stock
immediately prior to the liquidation.

**Ranking:**

The Series A Preferred Stock and the Series B Preferred Stock shall rank
*pari passu* with respect to any distributions upon liquidation, dissolution
or winding up of the Company. The Preferred Stock will rank senior to
any other class or series of capital stock of the Company ("***Junior
Stock***") with respect to any distributions upon liquidation, dissolution or
winding up of the Company.

While any bankruptcy event is pending: (i) there shall be no dividends
or other distributions on shares of Junior Stock or any purchase,
redemption, retirement or other acquisition for value or other payment in
respect of Junior Stock unless the Preferred Stock has been paid its
Liquidation Value in full, (ii) there shall be no such dividends,
distributions, purchases, redemptions, retirement, acquisitions or
payments on Junior Stock in each case in cash unless the Preferred Stock
has first been paid in full in cash its Liquidation Value and (iii) there
shall be no dividends or other distributions on Series A Preferred Stock
or Series B Preferred Stock or any purchase, redemption, retirement or
other acquisition for value or other payment in respect of Series A
Preferred Stock or Series B Preferred Stock unless each of the Series A
Preferred Stock and Series B Preferred Stock shall receive the same
securities and the same percentage mix of consideration in respect of any
such payment, dividend or distribution.

**Conversion of
Preferred Stock
into Common
Stock:**

Each share of Preferred Stock shall be convertible at any time, without
any payment by the Preferred Stock Holder, into a number of shares of
Common Stock equal to (i) the Liquidation Value <u>divided by</u> (ii) the
Conversion Price. The Conversion Price shall initially be $29.67, with
respect to the Series A Preferred Stock, and $34.98 with respect to the
Series B Preferred Stock, in each case subject to adjustment from time to
time pursuant to the anti-dilution provisions of the Preferred Stock (as so
adjusted, the "***Conversion Price***"). The anti-dilution provisions will
contain customary provisions with respect to stock splits, recombinations
and stock dividends and customary weighted average anti-dilution
provisions in the event of, among other things, the issuance of rights,
options or convertible securities with an exercise or conversion or
exchange price below the Conversion Price, the issuance of additional
shares at a price less than the Conversion Price and other similar
occurrences.

**Conversion of Series A-1 Preferred Stock Into Series A-2 Preferred Stock:**

If (a) Appaloosa or any Permitted Holder (as defined below) sells, transfers, assigns, pledges, donates or otherwise encumbers to any person other than a Permitted Holder, or converts into Common Stock, shares of Series A-1 Preferred Stock with an aggregate Liquidation Value in excess of $100 million, or (b) David Tepper no longer controls Appaloosa and James Bolin is no longer an executive officer of Appaloosa, then all the shares of Series A-1 Preferred Stock shall automatically convert into Series A-2 Preferred Stock without any action on the part of the holder thereof; provided, that with respect to clause (a), no such conversion shall be effective until the Company has in effect a registration statement covering resales of the Common Stock issuable upon conversion of the Preferred Stock. The Series A Preferred Stock Holders will agree not to take any action to delay or prevent such registration statement from becoming effective.

If Appaloosa transfers shares of Series A-1 Preferred Stock to any person other than an affiliate of Appaloosa (such affiliate being a "*Permitted Holder*"), then all the shares of Series A-1 Preferred Stock so transferred shall automatically convert into Series A-2 Preferred Stock without any action on the part of the holder thereof.

The direct or indirect transfer of ownership interests in any Permitted Holder that owns shares of Series A-1 Preferred Stock such that such Permitted Holder ceases to be an affiliate of Appaloosa shall constitute a transfer of such Series A-1 Preferred Stock to a person other than a Permitted Holder for the purpose of this provision.

Each event described above in the previous two paragraphs of this section "Conversion of Series A Preferred Stock into Series A-2 Preferred Stock" is referred to as a "*Series A-2 Conversion Event*."

Subject to compliance with applicable securities laws and the Transfer Restriction, shares of Preferred Stock will be freely transferable.

**Dividends:**

Each Preferred Stock Holder shall be entitled to receive dividends and distributions on the Preferred Stock at an annual rate of 6.5% of the Liquidation Value thereof, with respect to the Series A Preferred Stock, and 3.25% of the Liquidation Value thereof, with respect to the Series B Preferred Stock, in each case payable quarterly in cash as declared by the Company's Board. Unpaid dividends shall accrue. In addition, if any dividends are declared and paid on the Common Stock, the Series A Preferred Stock shall be entitled to receive, in addition to the dividend on the Series A Preferred Stock at the stated rate, the dividends that would have been payable on the number of shares of Common Stock that would have been issued on the Series A Preferred Stock had it been converted immediately prior to the record date for such dividend.

**Preference with Respect to Dividends:** Each Preferred Stock Holder shall, prior to the payment of any dividend or distribution in respect of any Junior Stock, be entitled to be paid in full the dividends and distributions payable in respect of the Preferred Stock.

**Restriction on Redemptions of Junior Stock:** So long as shares of Series A Preferred Stock having a Liquidation Value of $200 million or more remain outstanding, the Company shall not and shall not permit any of its subsidiaries to, purchase, redeem or otherwise acquire for value any Junior Stock, except, so long as no bankruptcy event is pending, for (i) customary provisions with respect to repurchase of employee equity upon termination of employment, (ii) purchases, redemptions or other acquisitions for value of Common Stock not to exceed $50 million in any calendar year, and (iii) the mandatory redemption of outstanding shares of the Company's Series C Convertible Preferred Stock in accordance with the terms and conditions, and in the amounts, set forth on the Summary of Terms of Series C Preferred Stock attached as Annex I to this Exhibit A.

**Governance – Board of Directors:** A committee (the "*Search Committee*") shall be appointed consisting of one (1) representative of Appaloosa, one (1) representative of the Company, being the Company's lead director (currently John Opie), one (1) representative of the Unsecured Creditors Committee, being David Daigle, one (1) representative of the Co-Lead Investors other than UBS, GS and Merrill (who shall be determined by Appaloosa), and one (1) representative of the Equity Committee reasonably acceptable to the other members of the Search Committee. Each member of the Search Committee shall be entitled to require the Search Committee to interview any person to serve as a director unless such proposed candidate is rejected by each of the Appaloosa representative, the Company representative and the representative of the Unsecured Creditors' Committee. The entire Search Committee shall be entitled to participate in such interview and in a discussion of such potential director following such interview.

The board of directors of the Company shall consist of nine (9) directors (which number shall not be expanded at all times that the Series A-1 Preferred Stock has Series A-1 Board Rights (as defined below)), three (3) of whom (who shall be Class III Directors) shall initially be nominated by Appaloosa and elected at the time of emergence from Chapter 11 by the Series A Preferred Stock Holders (and thereafter shall be elected directly by the Series A Preferred Stock Holders) (the "Series A Directors"), one (1) of whom (who shall be a Class I Director) shall be the Executive Chairman selected as described below under "Executive Chairman", one (1) of whom (who shall be a Class I Director) shall be the Chief Executive Officer, one (1) of whom (who shall be a Class II Director) shall initially be selected by the Co-Lead Investor representative on the Search Committee with the approval of either the Company or the Unsecured Creditors' Committee (the "Joint Investor

Director"), one (1) of whom (who shall be a Class I Director) shall initially be selected by the Unsecured Creditors' Committee and two (2) of whom (who shall be Class II Directors) shall initially be selected by the Unsecured Creditors' Committee (such directors selected by the Unsecured Creditors' Committee and the Joint Investor Director, being the "Common Directors"). For the avoidance of doubt, all directors selected in accordance with this paragraph, shall have been interviewed and/or discussed by the Search Committee. Each director so selected shall be appointed to the initial Board of Directors of the Company unless at least three members of the following four members of the Search Committee objects to the appointment of such individual: the Appaloosa representative, the Company representative; the representative of the Unsecured Creditors' Committee; and the representative of the Equity Committee. Initially, the Board shall be comprised of (a) six (6) directors who satisfy all applicable independence requirements of the relevant stock exchange on which it is expected the Common Stock would be traded and (b) six (6) directors who are independent from the Investors; provided, that the requirements of this sentence may be waived by the unanimous consent of the Company, Appaloosa and the Unsecured Creditors Committee. Additionally, the Joint Investor Director must be independent from the Investors.

Directors initially will be placed as set forth above in three (3) classes: directors in the first class will have an initial term expiring at the annual meeting of stockholders to be held in 2009 (each a "Class I Director"), directors in the second class will have an initial term expiring at the annual meeting of stockholders to be held in 2010 (each a "Class II Director"), and directors in the final class will have an initial term expiring at the annual meeting of stockholders to be held in 2011 (each a "Class III Director"). After the expiration of each initial term of each class of directors, the directors will thereafter each have a one year term elected annually.

Following the initial election of the Executive Chairman and the Chief Executive Officer, the Executive Chairman and Chief Executive Officer shall be nominated for election to the Board by the Nominating and Corporate Governance Committee of the Board and elected to the board by the holders of the Common Stock and the Preferred Stock, voting as a class. The Executive Chairman of the Board shall be selected as described below under "Executive Chairman." The initial Chief Executive Officer shall be Rodney O'Neal, who shall become the Chief Executive Officer and President not later than the effective date of the Plan.

After the initial selection of the Series A Directors, until the earlier of the expiration of the term of the Class III Directors and the conversion of all Series A-1 Preferred Stock to Series A-2 Preferred Stock or Common Stock, (a) the Series A Preferred Stock shall continue to directly elect

(including removal and replacement) the Series A Directors subject to
the ability of the Nominating and Corporate Governance Committee to,
by majority vote, veto the selection of up to two proposed Series A
Directors for each Series A director position on the Board and (b) the
number of directors on the board of directors may not be increased. The
rights of Series A-1 Preferred Stock described in this paragraph are
referred to as "Series A-1 Board Rights". Upon the earlier of such date,
the Series A-1 Directors shall serve out their remaining term and
thereafter be treated as Common Directors.

After the initial selection of the Common Directors, the nominees for
election of the Common Directors shall be determined by the
Nominating and Corporate Governance Committee of the Company's
Board of Directors, with the Series A Directors on such committee not
entitled to vote on such determination at any time the Series A-1
Preferred Stock retains Series A-1 Board Rights, and recommended to
the Company's Board of Directors for nomination by the Board. Only
holders of Common Stock, Series B Preferred Stock and Series A
Preferred Stock that is not entitled to Series A Board Rights shall be
entitled to vote on the election of the Common Directors.

The Search Committee shall determine by majority vote the Committee
assignments of the initial Board of Directors; provided, that for the initial
Board and at all times thereafter that the Series A-1 Preferred Stock
retains Series A-1 Board Rights at least one Series A Director shall be on
all committees of the Board and a Series A Director shall constitute the
Chairman of the Compensation Committee of the Board; provided,
further, that so long as the Series A-1 Preferred Stock retains Series A-1
Board Rights, the Series A Directors shall not constitute a majority of the
Nominating and Corporate Governance Committee.    Committee
assignments shall be subject to all applicable independence and
qualification requirements for directors including those of the relevant
stock exchange on which the Common Stock is expected to be traded.
Pursuant to a stockholders' agreement or other arrangements, the
Company shall maintain that composition.

**Governance –**
**Executive**
**Chairman:**
The Executive Chairman shall initially be selected by majority vote of
the Search Committee, which must include the approval of the
representatives of Appaloosa and the Unsecured Creditors' Committee.
Any successor Executive Chairman shall be selected by the Nominating
and Corporate Governance Committee of the Board, subject (but only for
so long as any of the Series A-1 Preferred Stock remains outstanding) to
the approval of the Series A-1 Preferred Stock Holders. Upon approval,
such candidate shall be recommended by the Nominating and Corporate
Governance Committee to the Company's Board of Directors for
appointment as the Executive Chairman and nomination to the Board.
The Preferred Stock Holders will vote on the candidate's election to the
Board on an as-converted basis together with holders of Common Stock.

Notwithstanding the foregoing, if there shall occur any vacancy in the office of the Executive Chairman during the initial one (1) year term, the successor Executive Chairman shall be nominated by the Series A-1 Preferred Stock Holders (but only for so long any of as the Series A-1 Preferred Stock remains outstanding) subject to the approval of the Nominating and Corporate Governance Committee of the Board.

The Executive Chairman shall be a full-time employee of the Company with his or her principal office in the Company's world headquarters in Troy, Michigan and shall devote substantially all of his or her business activity to the business affairs of the Company.

The Executive Chairman shall cause the Company to and the Company shall be obligated to meaningfully consult with the representatives of the Series A-1 Preferred Stock Holders with respect to the annual budget and material modifications thereto prior to the time it is submitted to the Board for approval.

The employment agreements entered into by the Company with the Executive Chairman and the Chief Executive Officer shall provide that (i) upon any termination of employment, the Executive Chairman and/or the Chief Executive Officer shall resign as a director (and the employment agreements shall require delivery at the time such agreements are entered into of an executed irrevocable resignation that becomes effective upon such termination) and (ii) the right to receive any payments or other benefits upon termination of employment shall be conditioned upon such resignation. If for any reason the Executive Chairman or the Chief Executive Officer does not resign or the irrevocable resignation is determined to be ineffective, then the Series A-1 Preferred Stock Holders may remove the Executive Chairman and/or Chief Executive Officer as a director, subject to applicable law. The employment agreement of the Chief Executive Officer will provide that if the Chief Executive Officer is not elected as a member of the Company's Board, the Chief Executive Officer may resign for "cause" or "good reason".

The special rights of the Series A-1 Preferred Stock referred to in "Governance – Board of Directors" and in this "Executive Chairman" section are referred to as the "***Governance Rights***".

**Governance – Voting Rights:**

Except with respect to the election of directors, who shall be elected as specified above, the Preferred Stock Holders shall vote, on an "as converted" basis, together with the holders of the Common Stock, on all matters submitted to shareholders.

The Series A-1 Preferred Stock Holders shall be entitled to propose individuals for appointment as Chief Executive Officer and Chief Financial Officer, subject to a vote of the Board. The Series A-1

Preferred Stock Holders shall also have the non-exclusive right to propose the termination of the Executive Chairman (but only during the initial one (1) year term of the Executive Chairman and only for so long as the Series A-1 Preferred Stock remains outstanding), the Chief Executive Officer and Chief Financial Officer, in each case, subject to a vote of the Board. If the Series A Preferred Stock Holders propose the appointment or termination of the Chief Executive Officer or Chief Financial Officer, the Board shall convene and vote on such proposal within ten (10) days of the Board's receipt of notice from the Series A-1 Preferred Stock Holders; provided, that the then current Chief Executive Officer shall not be entitled to vote on either the appointment or termination of the Chief Executive Officer and shall not be entitled to vote on the termination of the Chief Financial Officer.

The Company shall not, and shall not permit its subsidiaries to, take any of the following actions (subject to customary exceptions as applicable) unless (i) the Company shall provide the Series A-1 Preferred Stock Holders with at least 20 business days advance notice and (ii) it shall not have received, prior to the 10th business day after the receipt of such notice by the Series A-1 Preferred Stock Holders, written notice from all of the Series A-1 Preferred Stock Holders that they object to such action:

- any action to liquidate the Company;

- any amendment of the charter or bylaws that adversely affects the Series A Preferred Stock (any expansion of the Board of Directors would be deemed adverse); or

- at all times that the Series A Preferred Stock is subject to the Transfer Restriction:

  - a sale, transfer or other disposition of all or substantially all of the assets of the Company and its subsidiaries, on a consolidated basis;

  - any merger or consolidation involving a change of control of the Company; or

  - any acquisition of or investment in any other person or entity having a value in excess of $250 million in any twelve-month period after the Issue Date.

The approval rights set forth above shall be in addition to the other rights set forth above and any voting rights to which the Series A Preferred Stock Holders are entitled above and under Delaware law.

The special rights of the Series A-1 Preferred Stock described above in this section "Governance – Voting Rights" are referred to as the "***Voting Rights***". The Series A-1 Preferred Stock Holders shall have no Voting

Rights after no shares of Series A-1 Preferred Stock are outstanding.

Appaloosa and the Permitted Holders shall not receive, in exchange for the exercise or non-exercise of voting or other rights in connection with any transaction subject to Voting Rights, any compensation or remuneration; <u>provided</u>, that this restriction shall not prohibit the reimbursement of expenses incurred by Appaloosa or any Permitted Holders and shall not prohibit the payment of fees by the Company to Appaloosa or any Permitted Holder if the Company has engaged Appaloosa or its affiliates as an advisor or consultant in connection with any such transaction.

**Change of Control:** In a merger or consolidation, or sale of the Company, involving a change of control of the Company (a "***Change of Control Transaction***"), each holder of Series A Preferred Stock may elect to require (the "***Series A Change of Control Put***") that such holder's shares of Series A Preferred Stock be redeemed by the Company for consideration payable in cash and/or freely tradable marketable securities equal to the greater of (i) the consideration with a value equal to the fair market value of the Series A Preferred Stock (such fair market value shall not reflect the value of the Voting Rights and Governance Rights attributable to the Series A-1 Preferred Stock) and (ii) the Liquidation Value. In a Change of Control Transaction, each holder of Series B Preferred Stock may elect to require (the "***Series B Change of Control Put***" and, together with the Series A Change of Control Put, the "***Change of Control Put***") that such holder's shares of Series B Preferred Stock be redeemed by the Company for consideration payable in cash and/or freely tradable marketable securities equal to the greater of (i) the consideration with a value equal to the fair market value of the Series B Preferred Stock and (ii) the Liquidation Value; <u>provided</u>, that each holder of Series B Preferred Stock who elects to exercise its Series B Change of Control Put shall receive the same securities and the same percentage mix of consideration as received by each holder of Series A Preferred Stock upon exercise of the Series A Change of Control Put in connection with such Change of Control Transaction. For the purpose of this provision, equity securities that are listed on a national securities exchange and debt that is registered, or 144A debt instruments which contain customary A/B exchange registration rights, shall be marketable securities.

The holders of the Company's Series C Preferred Stock also have a redemption right with respect to a Change of Control Transaction (the "***Junior Put Option***"). The holders of Series C Preferred Stock shall be entitled to receive, as consideration in connection with the exercise of a Junior Put Option, the same percentage of cash consideration as was paid or, but for the failure of Preferred Stockholders to exercise their Change of Control Put, would have been paid to the holders of Preferred Stock in connection with the exercise of a Change of Control Put; <u>provided</u>, that no holder of the Company's Series C Preferred Stock shall be entitled to any cash consideration upon exercise of a Junior Put Option if such cash

consideration would result in the Company's Series C Preferred Stock receiving more cash, in the aggregate, than would have been payable to all holders of Preferred Stock upon exercise of their Change of Control Put (unless holders of Preferred Stock are entitled to receive payment on the exercise of the Change of Control Put 100% in cash, in which case there shall be no limit on the cash payable to the Company's Series C Preferred Stock with respect to a Junior Put Option). In the event of a Change of Control Put where all or a part of the consideration to be received is marketable securities, the fair market value of such securities shall be determined as follows:

- If the consideration to be received is an existing publicly traded security, the fair market value shall reasonably be determined based on the market value of such security.
- If the consideration to be received is not an existing publicly traded security, the fair market value (taking into account the liquidity of such security) shall reasonably be determined by the board of directors of the Company in good faith. If the holders of the Preferred Stock object to the valuation of the board of directors, they may request that an appraisal be conducted to determine the fair market value of the consideration (taking into account the liquidity of such security). If such a request is made, the determination of the fair market value of the consideration shall be made by a nationally recognized investment banking, appraisal or valuation firm selected by the holders of the Series A and B Preferred Stock. If such holders cannot agree on a mutually acceptable appraisal firm, then the holders of the Series A Preferred Stock, on the one hand, and the Series B Preferred Stock, on the other hand, shall each choose one appraisal firm and the respective chosen firms shall agree on another appraisal firm which shall make the determination. The cost of such appraisal shall be borne by the Company.
- The determination of the fair market value of the consideration received in a Change of Control Transaction shall be determined within appropriate time periods to be agreed upon.

The Company shall not enter into a Change of Control Transaction unless adequate provision is made to ensure that holders of the Preferred Stock will receive the consideration referred to above in connection with such Change of Control Transaction.

**Reservation of Unissued Stock**:   The Company shall maintain sufficient authorized but unissued securities of all classes issuable upon the conversion or exchange of shares of Preferred Stock and Common Stock.

**Transferability**:   The Series A Preferred Stock Holders may sell or otherwise transfer such stock as follows:

12

- to any Permitted Holder; or

- subject to the Transfer Restriction, to any other person; <u>provided, however,</u> that upon any such transfer, the shares of Series A-1 Preferred Stock so transferred shall automatically convert into Series A-2 Preferred Stock.

**Registration Rights:**   Each and any Investor, Related Purchaser (as such term is defined in the Equity Purchase and Commitment Agreement among the Company and the Investors (as amended, the "***EPCA***")), Ultimate Purchaser (as such term is defined in the EPCA), and their affiliates or assignee or transferee of Registrable Securities (as defined below) (collectively, the "***Holders***") shall be entitled to registration rights as set forth below.  The registration rights agreement shall contain customary terms and provisions consistent with such terms, including customary hold-back, cutback and indemnification provisions.

<u>Demand Registrations.</u>  Subject to the Transfer Restriction, the Investors and their respective affiliates (including Related Purchasers) shall be entitled to an aggregate of five (5) demand registrations with respect to Registrable Securities, in addition to any shelf registration statement required by the EPCA with respect to Registrable Securities (which shelf registration shall be renewed or remain available for at least three years or, if longer, so long as the Company is not eligible to use Form S-3); <u>provided,</u> that all but one such demand right requires the prior written consent of Appaloosa and the one demand not requiring the consent of Appaloosa shall be at the request of the Investors and their respective affiliates (including Related Purchasers) holding a majority of the shares of Series B Preferred Stock; <u>provided, further,</u> that following the time that the Company is eligible to use Form S-3, the Investors and their respective affiliates (including Related Purchasers) shall be entitled to an unlimited number of demand registrations with respect to Registrable Securities (without the need for Appaloosa's consent).  Any demand registration may, at the option of the Investors and their respective affiliates (including Related Purchasers) be a "shelf" registration pursuant to Rule 415 under the Securities Act of 1933.  All registrations will be subject to customary "windows."

<u>Piggyback Registrations.</u>  In addition, subject to the Transfer Restriction, the Holders shall be entitled to unlimited piggyback registration rights with respect to Registrable Securities, subject to customary cut-back provisions.

<u>Registrable Securities</u>:  "***Registrable Securities***" shall mean and include (i) any shares of Series A-2 Preferred Stock, Series B Preferred Stock, any shares of Common Stock issuable upon conversion of the Preferred Stock, any other shares of Common Stock (including shares acquired in the rights offering or upon the exercise of preemptive rights) and any

additional securities issued or distributed by way of a dividend or other distribution in respect of any such securities, in each case, held by any Holder, and (ii) any shares of Common Stock issuable upon the conversion of the Company's Series C Preferred Stock and any additional securities issued or distributed by way of dividend or distribution in respect of any such shares of Common Stock. Securities shall cease to be Registrable Securities upon sale to the public pursuant to a registration statement or Rule 144, or when all shares held by a Holder may be transferred without restriction pursuant to Rule 144(k).

Expenses. All registrations shall be at the Company's expense (except underwriting fees, discounts and commissions agreed to be paid by the selling holders), including, without limitation, all fees and expenses of one counsel for any holders selling Registrable Securities in connection with any such registration.

**Preemptive Rights**: So long as shares of Series A-1 Preferred Stock having a Liquidation Value of $250 million or more remain outstanding, the Preferred Stock Holders shall be entitled to participate *pro rata* in any offering of equity securities of the Company, other than with respect to (i) shares issued or underlying options issued to management and employees and (ii) shares issued in connection with business combination transactions.

**Commitment Fee:** (a) A commitment fee of 2.25% of total commitment shall be earned by and payable to the Investors and (b) an additional arrangement fee of 0.25% of total commitment shall be earned by and payable to Appaloosa, all as provided for in the EPCA.

**Standstill** For a period of five (5) years from the Closing Date, Appaloosa will not (a) acquire, offer or propose to acquire, solicit an offer to sell or donate or agree to acquire, or enter into any arrangement or undertaking to acquire, directly or indirectly, by purchase, gift or otherwise, record or direct or indirect beneficial ownership (as such term is defined in Rule 13d-3 of the Exchange Act) of more than 25% of the Company's common stock or any direct or indirect rights, warrants or options to acquire record or direct or indirect beneficial ownership of more than 25% of the Company's common stock or (b) sell, transfer, pledge, dispose, distribute or assign ("***Transfer***") to any person in a single transaction, Company Common Stock or any securities convertible into or exchangeable for or representing the right to acquire the Company's Common Stock ("***Common Stock Equivalents***") representing more than 15% of the Company's then issued and outstanding (on a fully diluted basis) Common Stock; provided, that Appaloosa shall be permitted to Transfer the Company's Common Stock or Common Stock Equivalents (i) to Permitted Holders, (ii) as part of a broadly distributed public offering effected in accordance with an effective registration statement, (iii) in a sale of the Company, (iv) pursuant to any tender or exchange offer or (v) as otherwise approved by (A) during the initial three year

term of the Series A Directors, a majority of Directors who are not Series A Directors or (B) after the initial three year term of the Series A Directors, a majority of the Directors (customary exceptions shall apply for Transfers to partners, stockholders, family members and trusts and Transfers pursuant to the laws of succession, distribution and descent).

**Stockholders Agreement**:      Certain of the provisions hereof will be contained in a Stockholders Agreement to be executed and delivered by ADAH and the Company on the Effective Date.

**Governing Law**:      State of Delaware

The Plan

EXHIBIT C

## Disclosure Statement

[Financing Letter]

## EXHIBIT E

The terms of the GM Note shall be determined as follows:

- o  2nd lien exit financing of $1.5 billion (net of OID[1]) having a maturity of 8 years from the date of initial issuance, and issued under a single credit facility, allocated as follows:

  - ■  At least $750 million (net of OID) in a note with market clearing terms and covenants acceptable to Delphi to be raised from a third-party financing source prior to emergence. All cash proceeds from the 2nd lien financing to be paid to GM.[2]

  - ■  $750 million (net of OID), as reduced by any cash proceeds above $750 million as referred to above or as reduced below, in a note provided to GM having the same terms as provided in connection with the third-party financing. The 2nd lien credit agreement will provide that at any time that GM holds more than $500 million (net of OID) of the Notes that any matter requiring approval of less than 100% of the Noteholders shall require the following approvals to be effective: (1) if GM votes in favor of the matter, the approval of at least one-third of the non-GM Noteholders (determined by principal amount); or (2) if GM does not vote in favor of the matter, the approval of at least two-thirds of the non-GM Noteholders (determined by principal amount). No other special voting rights shall be included in the 2nd lien credit agreement.

  - ■  Third party financing source (i.e., the initial purchaser or underwriter) will have the right, through the emergence date, to replace GM on up to $500 million (net of OID) of the note being provided to GM in which case cash in the amount of any such replacement shall be paid to GM and its note (net of OID) shall be reduced by such amount.

  - ■  If the 1st lien exit financing is greater than $3.7 billion (net of OID), an amount of cash equal to such excess (the "Excess Amount") will be paid to GM as part of its recovery and the 2nd lien financing will be reduced by such amount (with at least 50% of the remaining 2nd lien financing allocated to the third party financing source), provided that the sum of (i) undrawn availability plus any open letters of credit up to $100 million pursuant to an ABL revolving credit facility and (ii) Delphi's pro forma consolidated cash as of the Effective Date (excluding the Excess Amount and after giving pro forma effect to the $1.5 billion cash payment to GM

---

[1]   For all purposes of this Exhibit, OID excludes any fees paid to underwriters or agents

[2]   To the extent that the ABL revolving credit facility (to the exclusion of any other portion of the 1st lien exit facility) has a first priority lien on any assets and the term loan portion of the 1st lien financing has a 2nd lien, the notes subject to the 2nd lien financing shall have a third lien on such assets.

in connection with the 414(l) transaction) (the "Liquidity Amount") is at least $3.189 billion. In the event that the Liquidity Amount is less than $3.189 billion, then any Excess Amount shall be retained by Delphi up to the point that the amount of such Excess Amount retained plus the Liquidity Amount equals $3.189 billion and the remaining amount shall be paid to GM and the 2nd lien financing will be reduced by such amount paid to GM as provided above.

o   GM shall not have registration rights with respect to the GM Note.

o   Subject to the following sentence, the collateral and guarantee package for the 2nd lien financing will be substantially the same as that for the 1st lien financing. The 2nd lien facility shall not have a lien on the assets (other than the stock of the first tier foreign subsidiaries) solely securing the European portions of the 1st lien facility.

o   The GM Note shall be subject to a 6 month lock-up from the effectiveness of the Plan of Reorganization, provided however that, during such lock-up period, GM shall not be restricted from selling second lien notes if such notes are sold to investors at a price at least equal to par less any original issue discount (the "Threshold Price"), or below the Threshold Price, if GM makes a pro rata payment to the other holders of 2nd lien notes equal to the product of (i) the absolute difference (measured in basis points) between the actual price at which GM notes are sold by GM and the Threshold Price and (ii) the face amount of the 2nd lien notes held by others prior to giving effect to the sale of the GM notes.

October 29, 2007

Delphi Corporation
5725 Delphi Drive
Troy, MI  48098

Attn:   Robert S. "Steve" Miller
        Chairman

Re: Proposed Investment in Delphi Corporation

Dear Mr. Miller:

As you know, the signatories hereto have been engaged in discussions with Delphi
Corporation ("Delphi" or the "Company") and various other parties in interest in the jointly
administered chapter 11 cases (the "Chapter 11 Cases") pending in the United States Bankruptcy
Court for the Southern District of New York (the "Bankruptcy Court") with respect to Delphi
and certain of its subsidiaries (collectively, the "Debtors") regarding certain amendments to the
global resolution of the Chapter 11 Cases to be implemented pursuant to a plan of reorganization
for the Debtors (the "Plan") and be funded in part by an equity investment in Delphi (the
"Investment").

Pursuant to the Company's request, the undersigned severally, not jointly, submit this
proposal (the "Proposal") to amend the Equity Purchase and Commitment Agreement dated as of
August 3, 2007 by and among Delphi and the undersigned (the "Investment Agreement"). Upon
the entry by the Bankruptcy Court of the Subsequent Approval Order (as defined and described
below) and the satisfaction of the other conditions described in this letter, the undersigned will
severally, not jointly, enter into the amendment to the Investment Agreement attached hereto as
Annex A (the "Amendment") and each of A-D Acquisition Holdings, LLC, Pardus DPH Holding
LLC and Harbinger Del-Auto Investment Company, Ltd. will deliver an Equity Commitment
Letter in the forms attached hereto as Annexes B-1, B-2 and B-3. Our several obligations to
enter into the Amendment, however, are subject to your using your commercially reasonable
efforts to have the Bankruptcy Court enter the Subsequent Approval Order by, among other
things: (a) preparing and filing with the Bankruptcy Court, no later than October 29, 2007, the
Subsequent Approval Motion referred to in the Amendment and (b) using commercially
reasonable efforts to obtain a hearing on the Subsequent Approval Motion on or before
November 8, 2007. Capitalized terms used herein and not otherwise defined have the meanings
ascribed thereto in the Investment Agreement as amended by the Amendment.

This Proposal is subject to, and expressly conditioned on, (1) the execution and delivery
by all signatories thereto of the Amendment, (2) the entry by the Bankruptcy Court of an order,
in form and substance reasonably satisfactory to each of us (the "Subsequent Approval Order")
(i) approving and authorizing the Debtors to enter into and perform their obligations under the
Investment Agreement as amended by the Amendment, (ii) authorizing the payment of the

Commitment Fees, the Arrangement Fees, the Alternate Transaction Fees and the Transaction Expenses on the terms and subject to the conditions set forth in the Investment Agreement as amended and (iii) approving the disclosure statement attached hereto as Annex C as containing adequate information pursuant to Section 1125 of the Bankruptcy Code, (3) the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2007 having been delivered in draft form to the undersigned by November 2, 2007, delivered in final form approved by the Company for filing by 12:00 noon on November 6, 2007 and filed with the Securities and Exchange Commission no later than November 6, 2007 and each of the undersigned shall be reasonably satisfied with the contents of such filing; provided, that one Investor's determination regarding its "reasonable" satisfaction with respect to such Form 10-Q shall not be determinative of the "reasonableness" of any other Investor's determination with respect to such Form 10-Q, (4) the Company having delivered to each of the undersigned an executed Financing Letter no later than 12:00 noon on November 6, 2007 and each of the undersigned shall be satisfied in its sole discretion with the terms of the Financing Letter and (5) Goldman, Sachs & Co. in its sole discretion having executed a writing by 5:00 p.m., Prevailing Eastern Time on November 6, 2007 committing to the obligations in this Proposal to the same extent as the other undersigned parties.

This Proposal will remain open until 5:00 p.m., Prevailing Eastern Time on October 29, 2007, at which point it will expire unless Delphi has filed a motion, in form and substance reasonably acceptable to us, seeking entry by the Bankruptcy Court of the Subsequent Approval Order and requesting a hearing on such motion on or before November 8, 2007. In addition, even if accepted by Delphi this Proposal shall terminate and be of no further force of effect if, on or before November 16, 2007: (1) the Subsequent Approval Order has not been entered by the Bankruptcy Court, (2) the Amendment has not been executed and delivered to us by Delphi, (3) any of the undersigned determines in its sole discretion that either (a) the conditions to the obligations of the undersigned contained in the Investment Agreement as amended by the Amendment are incapable of being satisfied or (b) any of the undersigned is entitled to exercise a termination right contained in the Investment Agreement as amended by the Amendment or (4) any of the conditions set forth in clauses (3), (4) or (5) of the immediately preceding paragraph has not been satisfied in accordance with its respective terms.

\*   \*   \*   \*

We continue to be very enthusiastic about Delphi and look forward to pursuing the transactions contemplated by the Investment Agreement as amended to an expeditious and mutually successful conclusion.

A-D ACQUISITION HOLDINGS, LLC

By:_____

    Name:
    Title:

HARBINGER DEL-AUTO INVESTMENT
    COMPANY, LTD.

By:_____

    Name:
    Title:

MERRILL LYNCH, PIERCE, FENNER &
    SMITH INCORPORATED

By:_____

    Name:
    Title:

UBS SECURITIES LLC

By:_____

    Name:
    Title:

By:_____

    Name:
    Title:

GOLDMAN, SACHS & CO.

By:_____

    Name:
    Title:

PARDUS DPH HOLDING LLC

By:_____

     Name:
     Title:

4

**APPALOOSA MANAGEMENT L.P.**
26 Main Street
Chatham, New Jersey 07928

October [29], 2007

A-D Acquisition Holdings, LLC
c/o Appaloosa Management L.P.
26 Main Street
Chatham, New Jersey, 07928
Attention: Jim Bolin

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098

Ladies and Gentlemen:

Reference is made to that certain Equity Purchase and Commitment Agreement, as amended by that certain First Amendment to such Equity Purchase and Commitment Agreement, dated as of October [29], 2007 (as from time to time amended, restated, amended and restated, modified or supplemented in accordance with the terms thereof, the "Agreement"), by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware (the "Investor"), Harbinger Del-Auto Investment Company, Ltd., an exempted company formed under the laws of the Cayman Islands, Merrill Lynch, Pierce Fenner & Smith Incorporated, a Delaware corporation, UBS Securities LLC, a limited liability company formed under the laws of the State of Delaware, Goldman Sachs & Co., a New York limited partnership, and Pardus DPH Holding LLC, a limited liability company formed under the laws of the State of Delaware, on the one hand, and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company"), on the other hand. Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

This letter will confirm the commitment of Appaloosa Management L.P. ("AMLP"), on behalf of one or more of its affiliated funds or managed accounts to be designated, to provide or cause to be provided funds (the "Funds") to the Investor in an amount up to $1,076,385,000, subject to the terms and conditions set forth herein. If (i) a Limited Termination has occurred, (ii) the Agreement has not been terminated by the Investor in accordance with its terms within ten (10) Business Days of the occurrence of such Limited Termination, and (iii) the Investor becomes obligated in accordance with Section 2(b) of the Agreement to purchase the Available Investor Shares as a result of such Limited Termination (an "Escalation Trigger"), the maximum amount of Funds referred to in the immediately preceding sentence shall be increased as follows: (i) by $166,866,500 if an Escalation Trigger arises as a result of a Limited Termination by Merrill Lynch, Pierce, Fenner & Smith Incorporated; (ii) by $166,866,500 if an Escalation Trigger arises as a result of a Limited Termination by UBS Securities LLC; (iii) by $397,226,000 if an Escalation Trigger arises as a result of a Limited Termination by Harbinger Del-Auto

A-D Acquisition Holdings, LLC
Delphi Corporation
October [29], 2007
Page 2


Investments Company, Ltd.; (iv) by $400,000,000 if an Escalation Trigger arises as a result of a
Limited Termination by Goldman Sachs & Co.; and (v) by $342,656,000 if an Escalation Trigger
arises as a result of a Limited Termination by Pardus DPH Holding LLC.  The Funds to be
provided by or on behalf of AMLP to the Investor will be used to provide the financing for the
Investor (i) to purchase the Investor Shares pursuant to the Agreement (the "Purchase
Obligation") and (ii) to satisfy the Investor's other obligations under the Agreement, if any;
provided, however, that the aggregate liability of AMLP under the immediately preceding
clauses (i) and (ii) shall under no circumstances exceed the Cap (as defined below).  AMLP shall
not be liable to fund to the Investor any amounts hereunder (other than to fund the Purchase
Obligation), unless and until, any party to the Agreement, other than the Company, commits a
willful breach of the Agreement.  For purposes of this letter agreement, the "Cap" shall mean (i)
at all times on or prior to the Subsequent Approval Date, $100,000,000 and (ii) after the
Subsequent Approval Date, $250,000,000.  Our commitment to fund the Investor's Purchase
Obligation is subject to the satisfaction, or waiver in writing by AMLP and the Investor, of all of
the conditions, if any, to the Investor's obligations at such time contained in the Agreement.

            Notwithstanding any other term or condition of this letter agreement, (i) under no
circumstances shall the liability of AMLP hereunder or for breach of this letter agreement
exceed, in the aggregate, the Cap for any reason, (ii) under no circumstances shall AMLP be
liable for punitive damages and (iii) the liability of AMLP shall be limited to monetary damages
only.  There is no express or implied intention to benefit any person or entity not party hereto
and nothing contained in this letter agreement is intended, nor shall anything herein be construed,
to confer any rights, legal or equitable, in any person or entity other than the Investor and the
Company.  Subject to the terms and conditions of this letter agreement, the Company shall have
the right to assert its rights hereunder directly against AMLP.

            The terms and conditions of this letter agreement may be amended, modified or
terminated only in a writing signed by all of the parties hereto.  AMLP's obligations hereunder
may not be assigned, except its obligations to provide the Funds may be assigned to one or more
of its affiliated funds or managed accounts affiliated with AMLP, provided that such assignment
will not relieve AMLP of its obligations under this letter agreement.

            This commitment will be effective upon the Investor's acceptance of the terms
and conditions of this letter agreement (by signing below) and the execution of the Agreement by
the Company and will expire on the earliest to occur of (i) the closing of the transactions
contemplated by the Agreement, and (ii) termination of the Agreement in accordance with its
terms; provided, however, that in the event that the Agreement is terminated, AMLP's
obligations hereunder to provide funds to the Investor to fund the Investor's obligations under
the Agreement on account of any willful breach of the Agreement for which the Investor would
be liable shall survive; provided, further, that the Company shall provide AMLP with written
notice within 90 days after the termination of the Agreement of any claim that a willful breach of
the Agreement has occurred for which the Investor would be liable and if the Company fails to
timely provide such notice then all of AMLP's obligations hereunder shall terminate, this letter

A-D Acquisition Holdings, LLC
Delphi Corporation
October [29], 2007
Page 3

agreement shall expire and any claims hereunder shall forever be barred. Upon the termination or expiration of this letter agreement, all rights and obligations of the parties hereunder shall terminate and there shall be no liability on the part of any party hereto.

AMLP hereby represents and warrants as follows:

(a) AMLP is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(b) AMLP has the requisite limited partnership power and authority to enter into, execute and deliver this letter agreement and to perform its obligations hereunder and all necessary action required for the due authorization, execution, delivery and performance by it of this letter agreement has been taken.

(c) This letter agreement has been duly and validly executed and delivered by AMLP and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d) AMLP has, and will have on the Closing Date, available funding necessary to provide the Funds in accordance with this letter agreement.

No director, officer, employee, partner, member or direct or indirect holder of any equity interests or securities of AMLP, or any of its affiliated funds or managed accounts, and no director, officer, employee, partner or member of any such persons other than any general partner (collectively, the "Party Affiliates") shall have any liability or obligation of any nature whatsoever in connection with or under this letter or the transactions contemplated hereby, and each party hereto hereby waives and releases all claims against such Party Affiliates related to such liability or obligation.

This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the conflict of laws principles thereof). AMLP, THE INVESTOR AND THE COMPANY HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.

The parties hereto acknowledge and agree that the commitment letter of AMLP in favor of the Investor and the Company, dated August 3, 2007, has been terminated and is of no further force and effect and that AMLP shall have no further liability or obligation under such commitment letter.

This letter agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and same instrument.

NEWYORK 6310830 (2K)

A-D Acquisition Holdings, LLC
Delphi Corporation
October [29], 2007
Page 4

* * * *

Sincerely,

**APPALOOSA MANAGEMENT L.P.**

By: _____
    Name:
    Title:

Agreed to and accepted as of the date first
above written:

**A-D ACQUISITION HOLDINGS, LLC**

By:_____
    Name:
    Title:

**DELPHI CORPORATION**

By:_____
    Name:
    Title:

**Harbinger Capital Partners Master Fund I, Ltd.**
c/o 555 Madison Avenue
New York, New York 10122

October [29], 2007

Harbinger Del-Auto Investment Company Ltd.
c/o Harbinger Capital Partners Master Fund I, Ltd.
555 Madison Avenue
New York, New York 10022

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098

Ladies and Gentlemen:

Reference is made to that certain Equity Purchase and Commitment Agreement, as amended by that certain First Amendment to such Equity Purchase and Commitment Agreement, dated as of October [29], 2007 (as from time to time amended, restated, amended and restated, modified or supplemented in accordance with the terms thereof, the "Agreement"), by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware, Harbinger Del-Auto Investment Company, Ltd., an exempted company formed under the laws of the Cayman Islands (the "Investor"), Merrill Lynch, Pierce Fenner & Smith, Incorporated, a Delaware corporation, UBS Securities LLC, a limited liability company formed under the laws of the State of Delaware, Goldman Sachs & Co., a New York limited partnership, and Pardus DPH Holding LLC, a limited liability company formed under the laws of the State of Delaware, on the one hand, and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company"), on the other hand.  Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

This letter will confirm the commitment of Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), on behalf of one or more of its affiliated funds or managed accounts to be designated, to provide or cause to be provided funds (the "Funds") to the Investor in an amount up to $397,226,000, subject to the terms and conditions set forth herein.  The Funds to be provided by or on behalf of Harbinger to the Investor will be used to provide the financing for the Investor (i) to purchase the Investor Shares pursuant to the Agreement (the "Purchase Obligation") and (ii) to satisfy the Investor's other obligations under the Agreement, if any; provided, however, that the aggregate liability of Harbinger under clauses (i) and (ii) shall under no circumstances exceed the Cap (as defined below).  Harbinger shall not be liable to fund to the Investor any amounts hereunder (other than to fund the Purchase Obligation), unless, and until, any party to the Agreement other than the Company commits a willful breach of the Agreement.  For purposes of this letter agreement, the "Cap" shall mean at all times $38,944,000.  Our commitment to fund the Investor's Purchase Obligation is subject to the satisfaction, or waiver in writing by Harbinger and the Investor, of all of the conditions, if any, to the Investor's obligations at such time contained in the Agreement.

Notwithstanding any other term or condition of this letter agreement, (i) under no circumstances shall the liability of Harbinger hereunder or for breach of this letter agreement

Delphi Corporation
October [29], 2007
Page 2

exceed, in the aggregate, the Cap for any reason, (ii) under no circumstances shall Harbinger be liable for punitive damages, and (iii) the liability of Harbinger shall be limited to monetary damages only. There is no express or implied intention to benefit any person or entity not party hereto and nothing contained in this letter agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than the Investor and the Company. Subject to the terms and conditions of this letter agreement, the Company shall have the right to assert its rights hereunder directly against Harbinger.

The terms and conditions of this letter agreement may be amended, modified or terminated only in a writing signed by all of the parties hereto. Harbinger's obligations hereunder may not be assigned, except its obligations to provide the Funds may be assigned to one or more of its affiliated funds or managed accounts affiliated with Harbinger, provided that such assignment will not relieve Harbinger of its obligations under this letter agreement.

This commitment will be effective upon the Investor's acceptance of the terms and conditions of this letter agreement (by signing below) and the execution of the Agreement by the Company and will expire on the earliest to occur of (i) the closing of the transactions contemplated by the Agreement, and (ii) termination of the Agreement in accordance with its terms; provided, however, that in the event that the Agreement is terminated, Harbinger' obligations hereunder to provide funds to the Investor to fund the Investor's obligations under the Agreement on account of any willful breach of the Agreement for which the Investor would be liable shall survive; provided, further, that the Company shall provide Harbinger with written notice within 90 days after the termination of the Agreement of any claim that a willful breach of the Agreement has occurred for which the Investor would be liable and if the Company fails to timely provide such notice then all of Harbinger' obligations hereunder shall terminate, this letter agreement shall expire and any claims hereunder shall be forever barred. Upon the termination or expiration of this letter agreement all rights and obligations of the parties hereunder shall terminate and there shall be no liability on the part of any party hereto.

Harbinger hereby represents and warrants as follows:

(a) Harbinger is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(b) Harbinger has the requisite corporate power and authority to enter into, execute and deliver this letter agreement and to perform its obligations hereunder and all necessary action required for the due authorization, execution, delivery and performance by it of this letter agreement has been taken.

(c) This letter agreement has been duly and validly executed and delivered by Harbinger and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d) Harbinger has, and will have on the Closing Date, available funding necessary to provide the Funds in accordance with this letter agreement.

No director, officer, employee, partner, member or direct or indirect holder of any equity interests or securities of Harbinger, or any of its affiliated funds or managed accounts, and no director, officer, employee, partner or member of any such persons other than any

Delphi Corporation
October [29], 2007
Page 3

general partner (collectively, the "Party Affiliates") shall have any liability or obligation of any nature whatsoever in connection with or under this letter or the transactions contemplated hereby, and each party hereto hereby waives and releases all claims against such Party Affiliates related to such liability or obligation.

This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the conflict of laws principles thereof). HARBINGER, THE INVESTOR AND THE COMPANY HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.

The parties hereto acknowledge and agree that the commitment letter of Harbinger in favor of the Investor and the Company, dated August 3, 2007, has been terminated and is of no further force and effect and that Harbinger shall have no further liability or obligation under such commitment letter.

This letter agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and same instrument.

Delphi Corporation
October [29], 2007
Page 4

Sincerely,

HARBINGER CAPITAL PARTNERS MASTER
FUND I, LTD.

By:   Harbinger Capital Partners Offshore
Manager, L.L.C., as investment manager

By:_____

Name:   Philip A. Falcone
Title:   Senior Managing Director

Agreed to and accepted as of the date first
above written:

**Harbinger Del-Auto Investment Company, Ltd.**

By:_____

Name:
Title:

**DELPHI CORPORATION**

By:_____

Name:
Title:

October [29], 2007

Pardus DPH Holding LLC
590 Madison Ave.
Suite 25E
New York, NY 10022

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098

Ladies and Gentlemen:

        Reference is made to that certain Equity Purchase and Commitment Agreement, as amended by that certain First Amendment to such Equity Purchase and Commitment Agreement, dated as of October [29], 2007 (as from time to time amended, restated, amended and restated, modified or supplemented in accordance with the terms thereof, the "Agreement"), by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware, Harbinger Del-Auto Investment Company, Ltd., an exempted company formed under the laws of the Cayman Islands, Merrill Lynch, Pierce Fenner & Smith Incorporated, a Delaware corporation, UBS Securities LLC, a limited liability company formed under the laws of the State of Delaware, Goldman Sachs & Co., a limited partnership formed under the laws of the State of New York and Pardus DPH Holding LLC, a limited liability company formed under the laws of the State of Delaware (the "Investor"), on the one hand, and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company"), on the other hand. Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

        This letter will confirm the commitment of Pardus Special Opportunities Master Fund L.P. ("Pardus"), to provide or cause to be provided funds (the "Funds") to the Investor in an amount up to $342,656,000, subject to the terms and conditions set forth herein. The Funds to be provided by or on behalf of Pardus to the Investor will be used to provide the financing for the Investor (i) to purchase the Investor Shares pursuant to the Agreement (the "Purchase Obligation") and (ii) to satisfy the Investor's other obligations under the Agreement, if any; provided, however, that the aggregate liability of Pardus under the immediately preceding clauses (i) and (ii) shall under no circumstances exceed the Cap (as defined below). Pardus shall not be liable to fund to the Investor any amounts hereunder (other than to fund the Purchase Obligation), unless and until, any party to the Agreement, other than the Company, commits a willful breach of the Agreement. For purposes of this letter agreement, the "Cap" shall mean $33,593,000. Our commitment to fund the Investor's Purchase Obligation is subject to the satisfaction, or waiver in writing by Pardus and the Investor, of all of the conditions, if any, to the Investor's obligations at such time contained in the Agreement.

Delphi Corporation
October [29], 2007
Page 2

Notwithstanding any other term or condition of this letter agreement, (i) under no circumstances shall the liability of Pardus hereunder or for breach of this letter agreement exceed, in the aggregate, the Cap for any reason, (ii) under no circumstances shall Pardus be liable for punitive damages and (iii) the liability of Pardus shall be limited to monetary damages only. There is no express or implied intention to benefit any person or entity not party hereto and nothing contained in this letter agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than the Investor and the Company. Subject to the terms and conditions of this letter agreement, the Company shall have the right to assert its rights hereunder directly against Pardus.

The terms and conditions of this letter agreement may be amended, modified or terminated only in a writing signed by all of the parties hereto. The obligations of Pardus hereunder may not be assigned, except its obligations to provide the Funds may be assigned to one or more of its affiliated funds or managed accounts affiliated with Pardus, provided that such assignment will not relieve Pardus of its obligations under this letter agreement.

This commitment will be effective upon the Investor's acceptance of the terms and conditions of this letter agreement (by signing below) and the execution of the Agreement by the Company and will expire on the earliest to occur of (i) the closing of the transactions contemplated by the Agreement, and (ii) termination of the Agreement in accordance with its terms; provided, however, that in the event that the Agreement is terminated, the obligations of Pardus hereunder to provide funds to the Investor to fund the Investor's obligations under the Agreement on account of any willful breach of the Agreement for which the Investor would be liable shall survive; provided further, that the Company shall provide Pardus with written notice within 90 days after the termination of the Agreement of any claim that a willful breach of the Agreement has occurred for which the Investor would be liable and if the Company fails to timely provide such notice then all of the obligations of Pardus hereunder shall terminate, this letter agreement shall expire and any claims hereunder shall forever be barred. Upon the termination or expiration of this letter agreement, all rights and obligations of the parties hereunder shall terminate and there shall be no liability on the part of any party hereto.

Pardus hereby represents and warrants as follows:

(a) Pardus is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(b) Pardus has the requisite limited partnership power and authority to enter into, execute and deliver this letter agreement and to perform its obligations hereunder and all necessary action required for the due authorization, execution, delivery and performance by it of this letter agreement has been taken.

(c) This letter agreement has been duly and validly executed and delivered by Pardus and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

- 2 -

Delphi Corporation
October [29], 2007
Page 3

        (d)  Pardus has, and will have on the Closing Date, available funding necessary to provide the Funds in accordance with this letter agreement.

        No director, officer, employee, partner, member or direct or indirect holder of any equity interests or securities of Pardus, or any of its affiliated funds or managed accounts, and no director, officer, employee, partner or member of any such persons other than any general partner (collectively, the "Party Affiliates") shall have any liability or obligation of any nature whatsoever in connection with or under this letter or the transactions contemplated hereby, and each party hereto hereby waives and releases all claims against such Party Affiliates related to such liability or obligation.

        This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the conflict of laws principles thereof). PARDUS, THE INVESTOR AND THE COMPANY HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.

        The parties hereto acknowledge and agree that the commitment letter of Pardus in favor of the Investor and the Company, dated August 3, 2007, has been terminated and is of no further force and effect and that Pardus shall have no further liability or obligation under such commitment letter.

        This letter agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and same instrument.

* * * *

NEWYORK 6310847 (2K)

Delphi Corporation
October [29], 2007
Page 4

Sincerely,

**PARDUS SPECIAL OPPORTUNITIES MASTER
FUND L.P.**

By: Pardus Capital Management L.P., its
    Investment Manager

By: _____
    Name:
    Title:

Agreed to and accepted as of the date first
above written:

**PARDUS DPH HOLDING LLC**

By:_____
    Name:
    Title:

**DELPHI CORPORATION**

By:_____
    Name:
    Title:

NEWYORK 6310847 (2K)