| | |
|---|---|
| TOGUT, SEGAL & SEGAL LLP<br>Bankruptcy Conflicts Counsel for Delphi Corporation, et al.,<br>Debtors and Debtors in Possession<br>One Penn Plaza, Suite 3335<br>New York, New York 10119<br>(212) 594-5000<br>Neil Berger (NB-3599)<br>Richard K. Milin (RM-7755) | HEARING DATE: 12/6/2007<br>AT:  10:00 a.m.<br><br>RESPONSE DEADLINE: 11/16/2007 |

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
: 
In re:                                                                    :
:                                Chapter 11
DELPHI CORPORATION, et al.,                          :                Case No. 05-44481 [RDD]
:
                                         Debtors.            :                Jointly Administered
:
-----------------------------------------------------------------x

**STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO
LOCAL BANKRUPTCY RULE 7056-1 IN SUPPORT OF DEBTORS'
MOTION FOR A SUMMARY JUDGMENT EXPUNGING
<u>CLAIM NUMBER 2247 ASSERTED BY SIEMENS VDO AUTOMOTIVE S.A.S.</u>**

Debtor Delphi Corporation and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), by their attorneys Togut, Segal & Segal LLP, respectfully submit, pursuant to Local Bankruptcy Rule 7056-1, the following statement of undisputed material facts as to which there is no genuine issue to be tried:

1.    On or about April 6, 2000, the Debtors' Jane Thompson and Brigette Colter sent a "Request for Quotation" ("RFQ") to Mike Tramutolo of Siemens VDO Automotive S.A.S. ("VDO").  The RFQ stated that the Debtors would be "evaluating a select group of suppliers" to manufacture electronic control units ("ECUs") to be used

in the 2004 and later model years.  (RFQ at 1, annexed to the Declaration of VDO's Senior Business Manager Michel Poulet dated October 9, 2007 ("VDO Decl."), Exh. A.)

2. The number of ECUs the Debtors would need, the RFQ stated, was "subject to some variation" because the RFQ's numbers were "projections."  The RFQ also stated that its dates were "generic" for "planning purposes only."  (RFQ at 1-2.)

3. The RFQ stated that, "[t]he Supplier bears the cost of development.  Cost recovery can occur only from within the production piece price, production tooling and/or the Development/Alpha/Beta/Prototype piece price and tooling."  (RFQ at 2.)

4. The RFQ stated that the Debtors would pay "tooling costs."  (RFQ at 5.)

5. The RFQ referred to and included the Debtors' Long Term Contract ("LTC") and Delphi Automotive Systems General Terms and Conditions ("T&C"), which the LTC expressly incorporated.  (*See* VDO Decl., ¶ 3; *id.*, Exh. D at ¶ 5.)

6. On June 8, 2000, VDO's Mike Tramutolo emailed to request changes in the LTC.  Mr. Tramutolo stated that the LTC allowed the Debtors to "resource" with a new supplier "as early as 31-Jul-05.  We would only be 2 years into production and would not have recovered our amortized costs." (Email, annexed to the Declaration of Jane S. Thompson dated October 30, 2007 ("Thompson Decl.") as Exhibit 1.) Tramutolo's email continued, "Can you accommodate us for this issue?  Either, Delphi could change the verbiage or we could add a noted exception." (*Id.*)

7. The Debtors refused Tramutolo's request in an email from Darrell Lewis dated June 12, 2000.  The email stated: "These are our standard terms.  You need to accept our standard terms in total, without change….I hope you can get Siemens to

2

agree to the standard terms, as any deviation will weight heavily in our selection." (Thompson Decl., Exh. 1.)

8. VDO responded to the RFQ in a letter from Mike Tramutolo and Michel Poulet dated July 20, 2000. (*See* VDO Decl., ¶ 5; *id.*, Exh. B.) VDO refers to this letter as the "Offer."

9. The "Offer" proposed prices for ECUs and discussed a number of technical issues. The "Offer" also stated that, "Siemens reserves the right to submit to Delphi revised pricing in instances where the actual annual volume purchased is below the quoted volume by 20% or more" and that, "[i]n the event that the program covered in this letter is cancelled prior to production, without fault by Siemens, an equitable cancellation charge will be negotiated to cover the appropriate costs incurred by Siemens in supporting this program." (VDO Decl., Exh. B.)

10. In his Declaration dated October 9, 2007, VDO's Michel Poulet states, "[a]fter VDO submitted its quote, Delphi informed VDO that it required VDO to include a signed version of Delphi's Long Term Contract as part of its submission before Delphi would consider the quotation. In response to this request, VDO, as instructed, forwarded a version of Delphi's Long Term Contract signed only by it." (VDO Decl., ¶ 6.)

11. In a letter headed "Nomination Letter" and dated August 2, 2000, the Debtors stated that they had selected VDO to supply the ECUs for model years 2004 through 2008. (*See* VDO Decl., Exh. C.)

12. The Debtors' "Nomination Letter" stated that the Debtors "continue to disagree" with VDO concerning an aspect of VDO's pricing for ECUs. (*See* VDO Decl., Exh. C.)

3

13. The Debtors' Nomination Letter stated: "Provided that … your company is able to meet or exceed the agreed upon terms for service, quality, technology, price, investment/tooling and timing, we intend to execute (sign) the long term contract already agreed to with Siemens on these programs." (VDO Decl., Exh. C.)

14. Despite the Nomination Letter's insistence on the terms of the LTC, Michel Poulet's Declaration dated October 8, 2007 describes the Letter as "accepting VDO's offer." (*See* VDO Decl., ¶ 11.)

15. On or about October 31, 2000, the Debtors signed the copy of the LTC that had been signed by VDO. (*See* VDO Decl., ¶ 13; *id.*, Exh. D.)

16. By signing the LTC, the Debtors agreed to purchase "approximately 100 percent (100%) of [their] production and service requirements" for the ECUs specified in the LTC from VDO. (*See* VDO Decl., ¶ 13; *id.*, Exh. D.)

17. The LTC provided that "[a]ll Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders … issued by Buyer from time to time." (VDO Decl., Exh. D at ¶ 5.)

18. As stated in the RFQ with which the LTC had originally been sent, the LTC made VDO responsible for its own development costs. (*See* LTC; RFQ.)

19. The LTC did not state that the Debtors were required to pay a "cancellation charge" or to compensate VDO if GM needed fewer controllers. (*See* LTC.)

20. The LTC stated that the Debtors would not be liable for any increases in the Seller's costs or "failure to achieve any expected cost savings." (*See* LTC, ¶ 3.)

21. The T&C stated that they were incorporated into "each purchase order, release, requisition, work order, shipping instruction, specification and other document … relating to the goods and/or services to be provided" pursuant to the parties' contract. (T&C, ¶ 1.)

4

22. The T&C provided that, once a supplier had accepted the Debtors' contract or had begun work, it accepted the T&C "in their entirety without modification." (T&C, ¶ 1.)

23. The T&C provided that, "[a]ny additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing." (T&C, ¶ 1.)

24. The LTC restricted the Debtors' rights to buy from other suppliers. (LTC, ¶¶ 4-5.)

25. The T&C stated that, if the Debtors determine "that the requirements of Buyers' customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other modification of this Contract." (T&C, ¶ 2.3.)

26. The T&C stated that the Debtors had the right "at any time [to] require Seller to implement changes to the specifications or design" of the ECUs, and to determine the amount of "any equitable adjustment in price," subject only to "work[ing] to resolve [any] disagreement in good faith." (T&C, ¶ 3.)

27. The T&C provided that the Debtors had the right to substitute goods or terminate the LTC if "Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract." (T&C, ¶ 6.)

28. The T&C required VDO to warrant that its ECUs would be "fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer." (T&C, ¶ 7.1.)

5

29. Although the T&C gave the Debtors a right to "terminate all or any part of this Contract, at any time and for any reason" (T&C, ¶ 11), the LTC limited this provision: "the Buyer's right to 'terminate for convenience' under the General Terms and Conditions will be inapplicable to this Contract until the end 2004 model year." (LTC, ¶ 5.)

30. After the parties signed the LTC, they continued to discuss issues relating to production of the ECUs. (*See* VDO Mem. at 6.)

31. More than two years after the LTC was signed, on or about December 13, 2002, VDO sent the Debtors a letter (the "updated quote") modeled on their "Offer" of July 20, 2000. (*See* VDO Decl., Exh. E.)

32. The "updated quote" contained terms even more favorable to VDO than those in its July 20, 2000 "Offer." For example, VDO now reserved the right to submit revised pricing if "annual volume is above or below the quoted volume by 10% or more," whereas two years earlier, the figure had been 20%. (*See* "updated quote" at 1, VDO Decl., Exh. E; "Offer," VDO Decl., Exh. B.)

33. VDO's "updated quote" requested an "equitable cancellation charge" in the event of "Program Cancellation." ("Updated quote" at 3.)

34. The "updated quote" stated: "In the event that the program covered in this letter is cancelled prior to the launch of the production tooling at Siemens VDO Automotive S.A.S., without fault by Siemens VDO Automotive S.A., then equitable cancellation charge, including [VDO] R&D cost, will be negotiated to cover the appropriate costs incurred by [VDO] in supporting this program." ("Updated quote" at 3.)

35. The "updated quote" does not state whether "the program" meant all types of ECU identified in the letter, what "cancellation" meant, how an "equitable" charge would be determined, what "appropriate costs" were, or what the Debtors'

6

obligations would be if negotiation concerning "appropriate costs" did not yield agreement. (*Id.*)

36. VDO's "updated quote" stated that "[t]otal development cost" for the ECUs was $3,625,000 and proposed that it be amortized over model years 2005 and 2006. (VDO Decl., Exh. E at 2.)

37. The Debtors' emailed response to VDO's "updated quote" stated: "I think we are real close to getting all the details behind us, updating the Long Term Contract and issuing the additional tooling purchase orders …" (*See* Email, VDO Decl., Exh. F.)

38. The parties did not sign an updated or revised LTC at any time after the Debtors signed the original LTC in October 2000. (Thompson Decl., ¶ 12.)

39. In December 2003, the Debtors paid VDO $618,000 for production tooling. (Thompson Decl., ¶¶ 13; *id.*, Exh. 2.)

40. To effectuate the purchase, the Debtors sent VDO a purchase order for the tooling which expressly incorporated, and reprinted in full, the T&C. (*Id.*)

41. Assuming VDO's numbers, the Debtors purchased 8,208 ECUs from VDO for the GMX 245 program and 16,325 ECUs for the GMX 295 program by the date of VDO's Claim. (VDO Decl., ¶ 27.)

42. The Debtors purchased the ECUs that they purchased for the GMX 245 and 295 programs pursuant to purchase orders. All of the purchase orders expressly incorporated the Debtors' T&C. (Thompson Decl., ¶ 14; *id.*, Exh. 3.)

43. Except when the purchase orders called for specific quantities of ECUs, they stated that the parties' contract was for "100%" of the Debtors' requirements and that the LTC controlled the parties' transaction. These purchase orders further stated (except that some omitted "2000" in the final sentence): "This agreement reflects

7

the latest part numbers, pricing and timing for Suspension ECUs described in the existing Long Term Contract (LTC) executed by buyer and seller as of June 16, 2000. All other Terms and Conditions of June 16, 2000 LTC remain in effect." (*See* Thompson Decl., ¶ 15; *id.*, Exh. 3.)

44. The Debtors also issued what VDO calls "a blanket purchase order for the GMT 800 program" on July 30, 2004. (*See* VDO Decl., ¶ 30; *id.*, Exh. J.)

45. The Debtors' "blanket purchase order," like the purchase orders the Debtors issued for the GMX 245 and 295 ECUs, provided that "[t]his Requirement Contract is for 100% unless otherwise specified" and that "the Terms and Conditions of June 16, 2000 LTC remain in effect." (*See id.*; Thompson Decl., Exh. 3.)

46. The "blanket purchase order" stated that, "[a]ny additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions) which Seller proposes will be deemed rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing." (*See* VDO Decl., Exh. J.)

47. Because of GM's requirements, the Debtors could not use VDO's ECU for the GMT 800 program. (*See* Thompson Decl., ¶ 16.)

48. The Debtors were able to use substantially the same ECUs that VDO had offered to manufacture for the GMT 800 program, with different connectors, for the GMT 900 program. (*See* Thompson Decl., ¶ 17.)

49. From July 8, 2005 through October 27, 2007, the Debtors purchased approximately 400,000 ECUs from VDO for the GMT 900 program – under the LTC – at prices between $52.30 and $56.26 each. (*See* Thompson Decl., ¶ 18; *id.*, Exh. 3.)

8

50. On or about January 24, 2006, VDO filed Proof of Claim No. 2247 (the "Claim") against Delphi Automotive Systems LLC. The Claim states that it seeks more than $9.3 million. (*See* Thompson Decl., Exh. 4.)

51. The Claim states that it seeks $7,763,230 for "Non amortized R&D costs due to [VDO] … following cancellation of GMT 800 application and volume shortfall of GMX 245 and GMX 295 applications." (*See* Thompson Decl., Exh. 4.)

52. The Claim states that it seeks approximately $1.5 million in trade payables. (*See* Thompson Decl., Exh. 4.)

53. VDO sold the trade payables portion of its Claim to Goldman Sachs Credit Partners L.P. in or about May 2006. Although the Debtors repeatedly requested that VDO reduce the amount of its Claim to account for the sale, VDO initially refused to do so. VDO eventually agreed to reduce the Claim to account for its sale of the Trade Payables portion of its Claim in a stipulation executed on October 24, 2007.

54. In VDO's February 2007 "Supplemental Response" to the Debtors' objection to its Claim, VDO provided a one-page itemization of the Claim's components. (*See* Thompson Decl, Exh. 5.) The itemization shows that more than $1.2 million of VDO's Claim does not represent reimbursement of development costs, but rather "missing" profit. (*See id.*)

55. Despite the Debtors' requests, VDO has provided no further detail concerning the calculation of its Claim since it filed its "Supplemental Response."

Dated:   New York, New York
         October 31, 2007                DELPHI CORPORATION, *et al.*,
                                         By their Bankruptcy Conflicts Counsel,
                                         TOGUT, SEGAL & SEGAL LLP
                                         By:

                                         /s/ Neil Berger
                                         NEIL BERGER (NB-3599)
                                         RICHARD K. MILIN (RM-7755)
                                         One Penn Plaza, Suite 3335
                                         New York, New York 10119
                                         (212) 594-5000